EXHIBIT B

# PROMISSORY NOTE
## (Non-Recourse)

Ref: Delphi01

$2,757,281.57

October 24, 2001
Chicago, Illinois

For value received, the undersigned promises to pay to the order of Lincolnwood Bank ("Bank") at its office in Lincolnwood, Illinois, the principal sum of Two million seven hundred fifty seven thousand two hundred eighty one and 57/100 Dollars ($2,757,281.57), together with interest on the unpaid principal amount hereof outstanding from time to time at a rate of 6.75% per annum. Repayment shall be made in consecutive installments commencing November 30, 2001. There shall be twelve (60) consecutive monthly installments in the amount of Fifty four thousand three hundred forty four and 17/100 Dollars ($54,344.17), each installment consisting of principal and interest. Delinquent payments not paid within fifteen (10) days following the due date thereof of principal and/or interest shall bear interest at the lesser of 1% per month or the highest rate permitted by law, until paid in full. Interest shall be computed over an assumed year of 360 days, and 30 day months.

This Note is secured by an Assignment and Security Agreement dated October 24, 2001 ("Assignment and Security Agreement"), to which reference is made as to the nature and extent of the security ("Collateral") for this Note, the rights of the Bank, the Borrower and any holder of this Note with respect to the Collateral and the acceleration of the maturity of the Note.

Any capitalized terms not defined herein shall have the meaning as defined in the Assignment and Security Agreement.

Debtor may prepay all or part of the indebtedness evidenced by this Note prior to the end of the term by paying all amounts then due hereunder plus a prepayment penalty based on the product of (a) current principal then owing, times (b) the fraction (i) number of remaining months until the final payment date, over (ii) twelve hundred (1200).

Upon the happening of any Event of Default set forth in the Assignment and Security Agreement entered into between Bank and undersigned, Bank may at any time thereafter without notice, which is expressly waived, declare the entire unpaid principal and interest of this Note to be immediately due and payable.

If there is any default in the payment of principal or interest hereunder, whether by reason of acceleration or otherwise, and this Note is placed in the hands of any attorney for collection, or is collected through any court, including any bankruptcy court, the undersigned promises to pay to the holder hereof its attorneys' fees and court costs

incurred in attempting to collect or secure this Note or enforce its rights in any collateral securing this Note, provided and to the extent that such reimbursement is allowed by law.

All parties hereto, whether makers, endorsers, sureties, guarantors, or otherwise, hereby severally waive presentment, demand, notice of dishonor, diligence in collection, protest, notice of protest and nonpayment and further waive all exemptions to which they or any of them may now or hereafter be entitled under the laws of Illinois or any other state and further agree that the holder hereof shall have the right, without notice, to deal in any way at any time with any party hereto or to grant to any such party any extension of time for payment of this Note or any other indulgence or forbearance whatsoever, without in any way affecting the liability of any party hereunder.

It is expressly understood and agreed that the undertaking of the undersigned to pay all amounts evidenced by this Note is included herein for the sole purpose of establishing the continuing existence of the indebtedness evidenced by this Note and the maturity of such indebtedness, and the Bank for itself, its successors and assigns, by the acceptance of this Note, agrees that, except as otherwise provided in the Assignment and Security Agreement, the Borrower has and shall have no personal liability or obligation with respect to payment of this Note and that this Note is payable solely from the proceeds received by the Bank (or the Bank's successors or assigns) from the Bank's right, title and interest in and to the Collateral; provided, however, that nothing in this paragraph shall be, or be deemed to be, a release or impairment of such indebtedness, or any security interest in any property or assignment of rentals or other sums with respect to said property or preclude the Bank from resorting to any such collateral in case of any default thereunder or from enforcing any of its rights under any assignment or security agreement securing the Note or in respect of any other collateral for this Note, or prejudice the rights of the Bank, its successors, or assigns, under the Assignment and Security Agreement, this Note, the collateral therefore or any such assignment or security agreement as against any subsequent owner of such property.

This Note and the rights of the holders thereof shall be governed by Illinois law without regard for conflicts of law rules.

Pacific Rim Capital, Inc.

By: _____

Title:  President _____

## Delphi Automotive Systems # 1 / Pacific Rim

Compound Period .......: Monthly

*MK*

| | | |
|---|---|---|
| Nominal Annual Rate ... : | 6.750 | % |
| Effective Annual Rate .. : | 6.963 | % |
| Periodic Rate ............. : | 0.5625 | % |
| Daily Rate ................. : | 0.01875 | % |

## CASH FLOW DATA

| Event | Start Date | Amount | Number | Period | End Date |
|---|---|---|---|---|---|
| 1 Loan | 10/24/2001 | 2,757,281.57 | 1 | | |
| 2 Payment | 11/30/2001 | 54,344.17 | 60 | Monthly | 10/31/2006 |

## AMORTIZATION SCHEDULE - Normal Amortization, 360 Day Year

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 10/24/2001 | | | | |
| 1 | 11/30/2001 | 54,344.17 | 19,149.00 | 35,195.17 | 2,757,281.57 |
| 2 | 12/31/2001 | 54,344.17 | 15,311.74 | 39,032.43 | 2,722,086.40 |
| 2001 | Totals | 108,688.34 | 34,460.74 | 74,227.60 | 2,683,053.97 |
| | | | | | |
| 3 | 01/31/2002 | 54,344.17 | 15,092.18 | 39,251.99 | 2,643,801.98 |
| 4 | 02/28/2002 | 54,344.17 | 14,871.39 | 39,472.78 | 2,604,329.20 |
| 5 | 03/31/2002 | 54,344.17 | 14,649.35 | 39,694.82 | 2,564,634.38 |
| 6 | 04/30/2002 | 54,344.17 | 14,426.07 | 39,918.10 | 2,524,716.28 |
| 7 | 05/31/2002 | 54,344.17 | 14,201.53 | 40,142.64 | 2,484,573.64 |
| 8 | 06/30/2002 | 54,344.17 | 13,975.73 | 40,368.44 | 2,444,205.20 |
| 9 | 07/31/2002 | 54,344.17 | 13,748.65 | 40,595.52 | 2,403,609.68 |
| 10 | 08/31/2002 | 54,344.17 | 13,520.30 | 40,823.87 | 2,362,785.81 |
| 11 | 09/30/2002 | 54,344.17 | 13,290.67 | 41,053.50 | 2,321,732.31 |
| 12 | 10/31/2002 | 54,344.17 | 13,059.74 | 41,284.43 | 2,280,447.88 |
| 13 | 11/30/2002 | 54,344.17 | 12,827.52 | 41,516.65 | 2,238,931.23 |
| 14 | 12/31/2002 | 54,344.17 | 12,593.99 | 41,750.18 | 2,197,181.05 |
| 2002 | Totals | 652,130.04 | 166,257.12 | 485,872.92 | |
| | | | | | |
| 15 | 01/31/2003 | 54,344.17 | 12,359.14 | 41,985.03 | 2,155,196.02 |
| 16 | 02/28/2003 | 54,344.17 | 12,122.98 | 42,221.19 | 2,112,974.83 |
| 17 | 03/31/2003 | 54,344.17 | 11,885.48 | 42,458.69 | 2,070,516.14 |
| 18 | 04/30/2003 | 54,344.17 | 11,646.65 | 42,697.52 | 2,027,818.62 |
| 19 | 05/31/2003 | 54,344.17 | 11,406.48 | 42,937.69 | 1,984,880.93 |
| 20 | 06/30/2003 | 54,344.17 | 11,164.96 | 43,179.21 | 1,941,701.72 |
| 21 | 07/31/2003 | 54,344.17 | 10,922.07 | 43,422.10 | 1,898,279.62 |
| 22 | 08/31/2003 | 54,344.17 | 10,677.82 | 43,666.35 | 1,854,613.27 |
| 23 | 09/30/2003 | 54,344.17 | 10,432.20 | 43,911.97 | 1,810,701.30 |
| 24 | 10/31/2003 | 54,344.17 | 10,185.19 | 44,158.98 | 1,766,542.32 |
| 25 | 11/30/2003 | 54,344.17 | 9,936.80 | 44,407.37 | 1,722,134.95 |
| 26 | 12/31/2003 | 54,344.17 | 9,687.01 | 44,657.16 | 1,677,477.79 |
| 2003 | Totals | 652,130.04 | 132,426.78 | 519,703.26 | |
| | | | | | |
| 27 | 01/31/2004 | 54,344.17 | 9,435.81 | 44,908.36 | 1,632,569.43 |
| 28 | 02/29/2004 | 54,344.17 | 9,183.20 | 45,160.97 | 1,587,408.46 |

Delphi Automotive Systems # 1 / Pacific Rim

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 29 | 03/31/2004 | 54,344.17 | 8,929.17 | 45,415.00 | 1,541,993.46 |
| 30 | 04/30/2004 | 54,344.17 | 8,673.71 | 45,670.46 | 1,496,323.00 |
| 31 | 05/31/2004 | 54,344.17 | 8,416.82 | 45,927.35 | 1,450,395.65 |
| 32 | 06/30/2004 | 54,344.17 | 8,158.48 | 46,185.69 | 1,404,209.96 |
| 33 | 07/31/2004 | 54,344.17 | 7,898.68 | 46,445.49 | 1,357,764.47 |
| 34 | 08/31/2004 | 54,344.17 | 7,637.43 | 46,706.74 | 1,311,057.73 |
| 35 | 09/30/2004 | 54,344.17 | 7,374.70 | 46,969.47 | 1,264,088.26 |
| 36 | 10/31/2004 | 54,344.17 | 7,110.50 | 47,233.67 | 1,216,854.59 |
| 37 | 11/30/2004 | 54,344.17 | 6,844.81 | 47,499.36 | 1,169,355.23 |
| 38 | 12/31/2004 | 54,344.17 | 6,577.62 | 47,766.55 | 1,121,588.68 |
| 2004 | Totals | 652,130.04 | 96,240.93 | 555,889.11 | |
| | | | | | |
| 39 | 01/31/2005 | 54,344.17 | 6,308.94 | 48,035.23 | 1,073,553.45 |
| 40 | 02/28/2005 | 54,344.17 | 6,038.74 | 48,305.43 | 1,025,248.02 |
| 41 | 03/31/2005 | 54,344.17 | 5,767.02 | 48,577.15 | 976,670.87 |
| 42 | 04/30/2005 | 54,344.17 | 5,493.77 | 48,850.40 | 927,820.47 |
| 43 | 05/31/2005 | 54,344.17 | 5,218.99 | 49,125.18 | 878,695.29 |
| 44 | 06/30/2005 | 54,344.17 | 4,942.66 | 49,401.51 | 829,293.78 |
| 45 | 07/31/2005 | 54,344.17 | 4,664.78 | 49,679.39 | 779,614.39 |
| 46 | 08/31/2005 | 54,344.17 | 4,385.33 | 49,958.84 | 729,655.55 |
| 47 | 09/30/2005 | 54,344.17 | 4,104.31 | 50,239.86 | 679,415.69 |
| 48 | 10/31/2005 | 54,344.17 | 3,821.71 | 50,522.46 | 628,893.23 |
| 49 | 11/30/2005 | 54,344.17 | 3,537.52 | 50,806.65 | 578,086.58 |
| 50 | 12/31/2005 | 54,344.17 | 3,251.74 | 51,092.43 | 526,994.15 |
| 2005 | Totals | 652,130.04 | 57,535.51 | 594,594.53 | |
| | | | | | |
| 51 | 01/31/2006 | 54,344.17 | 2,964.34 | 51,379.83 | 475,614.32 |
| 52 | 02/28/2006 | 54,344.17 | 2,675.33 | 51,668.84 | 423,945.48 |
| 53 | 03/31/2006 | 54,344.17 | 2,384.69 | 51,959.48 | 371,986.00 |
| 54 | 04/30/2006 | 54,344.17 | 2,092.42 | 52,251.75 | 319,734.25 |
| 55 | 05/31/2006 | 54,344.17 | 1,798.51 | 52,545.66 | 267,188.59 |
| 56 | 06/30/2006 | 54,344.17 | 1,502.94 | 52,841.23 | 214,347.36 |
| 57 | 07/31/2006 | 54,344.17 | 1,205.70 | 53,138.47 | 161,208.89 |
| 58 | 08/31/2006 | 54,344.17 | 906.80 | 53,437.37 | 107,771.52 |
| 59 | 09/30/2006 | 54,344.17 | 606.21 | 53,737.96 | 54,033.56 |
| 60 | 10/31/2006 | 54,344.17 | 310.61 | 54,033.56 | 0.00 |
| 2006 | Totals | 543,441.70 | 16,447.55 | 526,994.15 | |
| | | | | | |
| Grand Totals | | 3,260,650.20 | 503,368.63 | 2,757,281.57 | |

## ASSIGNMENT AND SECURITY AGREEMENT
### (Non-Recourse)

This agreement dated as of October 24, 2001, between Pacific Rim Capital, Inc. ("Borrower"), with its principal offices at 1 Jenner, Suite 170, Irvine, CA 92658 and Bank of Lincolnwood, with its principal offices at 4433 West Touhy, Lincolnwood, IL 60628 (the "Bank").

1.  <u>Definitions</u>.  As used herein:

    (a)  "Collateral" shall have the meaning specified in Section 2 hereof.

    (b)  "Contract" means Equipment Schedule No. 1 between Borrower, as lessor, and Lessee, as lessee incorporating the terms and conditions of Master Lease Agreement (Agreement No. 1836-00), dated June 29, 2001.

    (c)  "Contract Security" means each and every guaranty, security interest, mortgage, or other security securing the payment and performance of the Contract.

    (d)  "Events of Default" means any of the events specified in Section 7 hereof.

    (e)  "Goods" means the personal property, described on Schedule A attached hereto and incorporated as a part hereof, leased under the Contract assigned to Bank hereunder together with all replacements, substitutions, and repairs and accessories, additions, attachments, and parts which cannot be detached without causing material damage to the Goods now or hereafter incorporated in or affixed to such personal property.

    (f)  "Lessee" means Delphi Automotive Systems Corporation.

    (g)  "Notes" means the Promissory Notes executed this date and hereafter and payable by the Borrower to the Bank in connection with and referencing this Agreement.

    (h)  "Obligations" means each and every kind of debt or liability or obligation which Borrower may now or

hereafter owe to the Bank under the Notes or hereunder, whether existing or hereafter created or incurred, direct or indirect, absolute or contingent, due or to become due, primary or secondary, liquidated or unliquidated, or joint and several.

(i)    "Rent" means with respect to the Contract all rental payments and all other monies due or to become due under such Contract.

2.    <u>Security Interest</u>.    As security for the prompt and complete payment of all Obligations to the Bank, Borrower hereby assigns to the Bank, and grants to the Bank a first priority security interest in all of Borrower's right, title and interest which presently exists or which may hereinafter arise, in, to and under (i) all Goods, (ii) the Contract, (iii) all Rent, (iv) all Contract Security and (v) proceeds of any and all of the foregoing and the insurance referred to in Section 3(k) hereof.    All of the items described in (i) through (v) of this Section 2 are collectively referred to as the "Collateral".    Upon payment of all Obligations to the Bank with respect to the Contract, the Bank shall promptly reassign the Contract, without recourse, to Borrower.

3.    <u>Representations and Covenants of Borrower</u>.    Borrower represents, warrants and covenants to Bank that:

(a)    The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and is and will continue to be duly qualified and licensed as a foreign corporation in all jurisdictions wherein the failure to be so qualified would have a material adverse affect on its financial condition, its rights and remedies as lessor under the Contract or its ability to perform its obligations to the Bank hereunder.

(b)    The Borrower is fully authorized to execute, deliver and perform this Agreement and the Notes and to incur the indebtedness represented thereby, and no consent of any other party is required including but not limited to any governmental agency or regulatory authority.

(c)    This Agreement and the Notes are valid and enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization or other similar laws

generally affecting the enforceability of the rights of creditors.

(d) The execution delivery and performance by the Borrower of its obligations under this Agreement, the Notes and the Contract will not violate any provision of Borrower's Articles of Incorporation or By-Laws or any indenture, contract, agreement or instrument to which it is a party or by which it is bound, or any law, rule or regulation applicable to Borrower.

(e) Borrower has or will have good title to the Collateral, free and clear of all liens, attachments, encumbrances, security interests, disputes, set-offs, or counterclaims, except the Contract and the security interest granted hereunder; and Borrower will defend the Collateral against all claims and demands of all persons (other than the Bank or Lessee) claiming the Collateral or any interest therein, and will not encumber, sell or otherwise dispose of the Collateral, without prior written consent of the Bank. Upon Bank's payment in full, on behalf of Borrower, for and to the supplier of the Goods, the words "or will have" above (in this paragraph) shall be deemed to be deleted.

(f) The Contract is genuine and as to Borrower and to Borrower's knowledge, as to Lessee, legally valid and enforceable; the unpaid Rent thereon and any Contract Security therefor is and will be as represented to the Bank at the time of assignment; and the Contract and any Contract Security therefor is and will be at the time of assignment, free of any special arrangement or understanding or separate agreement regarding the Rent, or any other matter contemplated by or related to the Contract and the Contract Security therefor except as disclosed to the Bank in writing prior to assignment; no event of default has occurred and is continuing thereunder and , to Borrower's knowledge, no event has occurred and is continuing which with the lapse of time or giving of notice would constitute an event of default thereunder; and the Contract states that Lessee's obligation to pay the Rent due under the Contract is absolute and unconditional and not subject to any abatement, recoupment, defense, claim, counterclaim, reduction, set-off, or any other adjustment of any kind for any reason whatsoever.

(g)    Borrower shall perform all of its duties and obligations under the Contract.

(h)    Borrower has delivered to the Bank the only original counterpart of the Contract and Contract Security marked "Original".

(i)    Borrower will pay, or cause to be paid, all taxes levied or assessed against the Goods prior to the date on which penalties attach thereto; a) all Goods have been delivered and accepted by the Lessees of the Contract and each Lessee has acknowledged receipt and acceptance of the goods.

(j)    Risk of loss or damage to or destruction of the Goods shall be borne by the Lessee under the Lease, except to the extent that Lessee is exonerated of such risk by the Lease. However, Borrower shall also be responsible for seeing that Secured Party receives prior to funding a certificate of insurance from Lessee's insurer or, if allowed by Secured Party in lieu thereof, a self-insurance letter from Lessee.

(k)    Each item of Collateral constituting a motor vehicle shall be registered, and certificate of title shall be applied for within ten (10) days of the advance and issued thereafter, under the laws of each state in which said registration and the issuance of such a certificate of title are required, at the time the assignment of the Contract covering such Collateral is made to the Bank. Each item of Collateral constituting an aircraft shall be registered with the F.A.A. as required at the time assignment of the Contract covering such Collateral is made to the Bank. All other tangible Collateral will be located at the address of the Lessee thereof or such other address as Borrower may represent to the Bank in writing.

(l)    Borrower will cause the Bank's security interest granted hereunder to be endorsed on each certificate of title evidencing ownership of Collateral constituting motor vehicles.

(m)    Borrower will (i) permit the Bank to examine Borrower's books and records with respect to the Collateral and make extracts therefrom and copies thereof at any time and from time to time, (ii)

examine the Collateral at its location at
reasonable times; and (iii) permit the Bank to
discuss its affairs, finances and accounts as they
relate to the Contract with its officers,
employees and accountants at such reasonable times
and as often as the Bank may reasonably request.

(n)   Bank may execute and file, from time to time, such
financing statements as it deems appropriate to
protect its interest in the Collateral with such
governmental bodies as it deems appropriate, all
without signature of Borrower, or in the
alternative Borrower grants Bank a Power of
Attorney to affix Borrower's signature on
financing statements filed hereunder.  Borrower
will execute, from time to time, such financing
statements, assignments, and other documents
covering the Collateral, including proceeds, as
the Bank may reasonably deem appropriate in order
to perfect its security interest in the Collateral
(including Contract Security acquired by Borrower
after the related Contract has been assigned to
the Bank hereunder); will pay the cost of and
taxes, if any, due on filing the same in all
public offices in which the Bank may deem filing
to be appropriate; will disclose, to Borrower's
knowledge, upon request by the Bank the name of
the record owner and the legal description of any
real property to which any Goods may be deemed
fixtures; and will notify the Bank promptly upon
acquiring any Contract Security for a Contract
previously assigned to the Bank hereunder.

(o)   Upon request by the Bank, Borrower will file a
financing statement or statements, in proper form,
naming as debtor such Lessee or Lessees as may be
designated by the Bank, and will assign Borrower's
rights under any such financing statement to the
Bank, all in such form and according to such
procedure as to fully protect the Bank's interest
in the Collateral.

(p)   The Contract represents the sole agreement between
the Borrower and the Lessee with respect to the
leasing of the property described in said
Contract.

(q)   Borrower agrees so long as this Agreement is in
effect not to assign, sell, pledge, mortgage,
grant a security interest in or otherwise create
any encumbrance upon the Contract, the Collateral,

or Contract Security to anyone other than Bank, and will not transfer, amend, modify, cancel or terminate the Contract without the prior written consent of Bank.

(r)    The assignment and pledge contained herein is the only assignment and pledge of the Contract, Collateral, and Contract Security.

(s)    The audited consolidated financial statement as of the end of the most recent fiscal year of the Borrower, a copy of which has been furnished to the Bank, has been prepared in conformity with generally accepted accounting principles applied on a basis consistent with that of the preceding fiscal year and presents fairly the financial condition of the Borrower and its consolidated subsidiaries at such date, and the results of their operations for the year then ended, and since such date there has been no material adverse change in their financial condition.

(t)    No litigation or governmental proceedings are pending or threatened against the Borrower, except those referred to (including estimates of the dollar amounts involved) in a schedule contemporaneously furnished by the Borrower to the Bank and except litigation, the aggregate liability form which is not, in the opinion of the legal counsel of the Bank, in excess of $250,000.00.  Other than any liability, incident to such litigation or proceedings, the Borrower has no contingent liabilities not provided for or disclosed in the financial statement referred to in subsection 3(t) above.

(u)    No material Reportable Event, as such is defined in the Employee Retirement Income Security Act of 1974 ("ERISA") has occurred and is continuing with respect to any plan of the Borrower, covered by ERISA.

(v)    Upon request, Borrower will furnish to the Bank: (i) within one hundred twenty (120) days after the end of each fiscal year and within sixty (60) days after the end of each fiscal quarter a balance sheet and income and surplus statement showing its financial condition as of the close of such year or quarter, as appropriate, and the results of its operations for such period, prepared in accordance with generally accepted accounting principles,

with such annual reports certified by an independent certified public accountant; (ii) promptly, such other information regarding the operations, business and financial condition of Borrower which is made available to the public and/or listed with the Securities and Exchange Commission pursuant to the Securities Act of 1933 and/or the Securities Exchange Act of 1934 as amended, and (iii) with reasonable promptness, such other information regarding Borrower's operations, business and financial affairs as Bank may reasonably request.

4.    Collection of Rent.

(a)    Borrower shall notify the Lessee that all Rents payable under the Contract shall be paid to the Bank at its address stated on the first page of the Notice of Assignment executed and delivered by Lessee in connection herewith. The amounts from time to time received by the Bank as Rent under the Contract shall be applied to the amount of principal and interest then due and payable on the applicable Note secured by this Agreement. All sums received by the Bank from the Lessee due to the loss or destruction of the Collateral shall be applied to the remaining principal and interest then outstanding on the applicable Note secured by this Agreement, with any excess paid by the Bank to Borrower. Any insurance proceeds as regards the Collateral shall be applied according to the terms of the applicable Contract, but in the event the insurance proceeds are not used to replace or repair the Collateral for any reason whatsoever, said proceeds shall be paid to the Bank and applied to the principal and interest then outstanding on the applicable Note secured by this Agreement, with any excess paid by the Bank to Borrower.

(b)    The Bank may, upon occurrence of an Event of Default, renotify the Lessee that its Contract has been assigned to the Bank and that all Rent payable thereunder shall be paid directly to the Bank. The Bank may also direct Borrower to so renotify the Lessee, and Borrower agrees to follow any such directions. All Rent received by Borrower from Lessees so notified shall be delivered to the Bank immediately upon receipt thereof by Borrower in the same form as received except for Borrower's endorsement when necessary.

In the event Borrower fails to endorse any instrument given in payment of Rent, the Bank is hereby irrevocably authorized to endorse the same on Borrower's behalf.

5.  <u>Servicing of Contract</u>.  The Contract shall be serviced by Borrower upon the terms and conditions herein contained. Until all payments to be made under the Contract are paid in full, Borrower shall:

(a)  Use its reasonable efforts and due diligence with respect to all obligations under this Section 5 and shall supervise, administer, monitor and call collect all payment due under the Contract, and will perform all obligations under this Section 5 and incident to servicing, supervising, administering, monitoring and assist Bank in collecting and, at Bank's expense, repossessing, as well as those acts and duties which a reasonable prudent lender would perform, including using its reasonable efforts to collect all payments due under the Contract as and when the same become due.  In particular, but without limitation of the foregoing, Borrower shall perform such collection services as are customary or as the Bank may reasonably request or direct, including an investigation of delinquencies, personal contact with delinquent accounts, mail or telephone collection efforts, and, at Bank's expense, investigation and handling of repossessions of Collateral and the storage of repossessed Collateral, and any and all other ordinary collections and delinquency activities. Borrower agrees to conduct all aspects of said repossession and sale in accordance with applicable provisions of state and federal law.

(b)  Maintain adequate facilities for the collection of all sums payable pursuant to the Contract.

(c)  Without the written consent of the Bank, not waive any claim against any borrower, guarantor or other obligor arising out of any claim.

(d)  Take all such further reasonable action and execute, file, deliver, and record all such instruments and documents necessary to protect the interest of the Bank in the Contract as requested by Bank.

In the event the Contract assigned to the Bank is in default under the terms thereof for a period of thirty (30) days or more, the Bank may, in its sole discretion, rescind the servicing privileges and responsibilities set forth herein. Borrower shall have the opportunity, but not the obligation, to cure the default prior to any decision by the Bank by paying the Obligations in full with respect to such defaulted Contract and upon receipt of such payment the Bank shall reassign any such Contract that are a part of such transaction, all without recourse. Notwithstanding the Bank's right to rescind the servicing privileges and responsibilities of Borrower hereunder, the Bank may at any time require Borrower to arrange for the repossession of the Collateral, which shall be done upon Bank's request and expense and shall be stored at Bank's expense.

6.   <u>Power of Attorney</u>.   Borrower hereby irrevocably constitutes and appoints the Bank its true and lawful attorney with full power of substitution, for it and in its name, place and stead, to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all Rent, income and other sums which are assigned hereunder with full power to settle, adjust or compromise any claim thereunder as fully as Borrower could itself do, and to endorse the name of Borrower on all commercial paper given in payment or in part payment thereof, and in its discretion to file any claim or take any other action or proceeding, either in its own name, or otherwise, which the Bank may deem necessary or appropriate to collect any and all sums which may be or become due or payable under the Contract, or which may be necessary or appropriate to protect and preserve the right, title, and interest of the Bank in and to such Rent and other sums and the security intended to be created thereby. Borrower hereby appoints Lender as Borrower's attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Borrower, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as financing statement. Borrower will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral

7.   <u>Events of Default</u>.   The occurrence of any of the following events shall constitute an Event of Default hereunder:   (i) Borrower's failure to pay, when due any payment of principal or of interest on any Note and the continuance thereof for a period of ten (10) consecutive

calendar days after written notice from Bank to Borrower;
(ii) Borrower's default in the payment or performance of any
other obligation of the Borrower hereunder or under the
Notes and the continuance thereof for a period of fifteen
(15) consecutive calendar days after written notice from
Bank to Borrower; (iii) any warranty, representation or
statement made or furnished to the Bank or by or on behalf
of Borrower proves to have been false in any material
respect when made or furnished; (iv) dissolution,
liquidation, insolvency, or business failure of appointment
of a receiver of any part of the property of, assignment for
the benefit of creditors by, or the commencement of any
proceeding under any bankruptcy or insolvency law by or the
commencement of any proceeding under any bankruptcy law
against the Borrower and the continuance of any such
proceedings for sixty (60) days and undismissed, unbonded,
or undischarged; (v) failure to assign or grant a first
priority lien and security interest to Bank in the
Collateral; and (vi) an event of default occurs under the
Contract.

8.    <u>Rights and Remedies on Default</u>.

    (a)    Upon the occurrence of an Event of Default, and at
any time thereafter until such default is cured to
the written satisfaction of the Bank, the Bank
may, subject to Lessee's rights under the
Contract, exercise any one or more of the
following rights and remedies:

        (i) The Bank may declare any and all Obligations
to be immediately due and payable, and the same
shall thereupon become immediately due and payable
without further notice or demand; and

        (ii) The Bank may exercise any and all other
rights and remedies available to it by law or by
agreement, including rights and remedies under the
Uniform Commercial Code, or any other applicable
law, or under any Contract or Contract Security
therefor, and in connection therewith, the Bank
may require Borrower, at Bank's expense, to
assemble the Goods (subject to the rights, if any,
of the Lessee) and make them available to the Bank
at a place to be designated by the Bank which is
reasonably convenient to both parties, and any
notice of intended disposition of any of the
Collateral required by law shall be deemed
reasonable if such notice is mailed or delivered
to Borrower at its address as shown on the Bank's

records at least ten (10) days before the date of such disposition.

(b)   Notwithstanding anything to the contrary contained herein, if an Event of Default occurs solely as a result of a default or act or failure to act by Lessee under the Contract, the Bank shall be permitted to exercise its rights hereunder only with respect to the Note and Collateral related to such defaulted Contract and in such event Borrower has and shall have no personal liability or obligation with respect to payment of any amount or performance of any obligation hereunder or under the Note, which is payable solely from proceeds received by the Bank from the Bank's right, title and interest in and to the Collateral, except that the Borrower shall have personal responsibility for any loss or liability of the Bank arising out of or connected in any manner with a breach of the Borrower's representations, warranties or agreements herein (except only its agreement to pay principal and interest on the Note) and the payment thereof shall not be limited to the proceeds from the Collateral.

9.   <u>Miscellaneous</u>.

(a)   It is understood that, except for the obligation to not disturb Lessee's quiet enjoyment of the Goods subject to the terms of the Contract, the Bank does not in any way assume any of Borrower's obligations under the Contract, and Borrower hereby agrees to indemnify the Bank against all liability arising in connection with or on account of the breach by Borrower of any of its obligations under or with respect to the Contract or any of the Goods.

(b)   If Borrower fails to observe or perform any of its covenants or agreements contained in this Agreement and, except as to Section 3 above which shall have no remedy period, such failure is not remedied by Borrower within 15 days after written notice thereof, the Bank may, in addition to any other remedy, take whatever action may be necessary to remedy such failure; and should any such action require the expenditure of monies to protect and preserve the Bank's security interest in the Collateral (including payment of insurance premiums and taxes and removal of liens), the

amount of such expenditure shall become forthwith due and payable by Borrower, with interest at the lesser of eighteen (18%) percent per annum or the highest rate permitted by law, and such amounts shall constitute part of the Obligations secured by the security interest granted hereunder.

(c)    The Bank shall not be deemed to have waived any of its rights hereunder or under any other agreement, instrument or paper signed by Borrower unless waiver be in writing and signed by the Bank. No delay or omission on the part of the Bank in exercising any right shall operate as a waiver of such right or any other right. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion.

(d)    All rights and remedies of the Bank shall be cumulative and may be exercised singularly or concurrently, at the Bank's option, and the exercise or enforcement of any one such right or remedy shall not bar or be a condition to the exercise or enforcement of any other.

(e)    This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the laws of the State of Illinois without regard for conflicts of law rules. If any portion of this Agreement is deemed invalid, it shall not affect the balance of this Agreement.

(f)    Unless incurred by reason of a default or act or failure to act by Lessee under the Contract, Borrower agrees to pay the reasonable attorneys' fees, court costs, and legal expenses incurred by the Bank in the exercise of any right or remedy available to it under this Agreement.

(g)    This Agreement shall be binding upon and inure to the benefit of the successors and assigns of Borrower and the Bank.

(h)    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which when taken together shall constitute one and the same agreement.

(i)   No amendment of this Agreement shall be effective unless the same shall be in writing and signed by Bank and Borrower.   This Agreement contains a final and complete integration of all prior expressions by the parties hereto with respect to the subject matter hereof and shall constitute the entire agreement among the parties hereto with respect to the subject matter hereof, superseding all prior oral or written understandings.

(j)   All notices and other communications provided for hereunder shall be in writing (including telex communication and communication by facsimile copy) and mailed, telexed, transmitted or delivered, as to each party hereto, at its address set forth on the first page hereof or at such other address as shall be designated by such party in a written notice to the other parties hereto.   All such notices and communications shall be effective, upon receipt, or in the case of delivery by mail, five days after being deposited in the mails, or, in the case of notice by telex, when telexed against receipt of answer back, or in the case of notice by facsimile copy, when verbal communication of receipt is obtained, in each case addressed as aforesaid.

(k)   Bank agrees that its security interest and rights hereunder are subject to the rights of the Lessees under the Contract with respect to the property leased thereunder.

10.   Consent to Jurisdiction and Service of Process. BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN THE COUNTY OF COOK, STATE OF ILLINOIS AND IRREVOCABLY AGREES THAT, SUBJECT TO BANK'S ELECTION, ALL ACTIONS OR PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS.   BORROWER ACCEPTS FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NONEXCLUSIVE JURISDICTION OF THE COURTS DESCRIBED HEREIN AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS, AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DOCUMENT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY MANNER PERMITTED BY LAW OR SHALL BE DEEMED TO LIMIT THE RIGHT OF BANK TO BRING PROCEEDINGS AGAINST BORROWER IN THE COURTS OF ANY OTHER JURISDICTION.

11. <u>Waiver of Jury Trial</u>.  EACH OF BANK AND BORROWER HEREBY WAIVES THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE OTHER DOCUMENTS DELIVERED IN CONNECTION HEREWITH.  EACH OF BANK AND BORROWER ALSO WAIVES ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF BANK OR BORROWER.  THIS WAIVER IS INTENDED TO BE EFFECTIVE WITH RESPECT TO ALL DISPUTES WHICH ARISE OUT OF ANY OF THE DOCUMENTS OR PERTAIN TO THE TRANSACTIONS CONTEMPLATED THEREBY.  EACH OF BANK AND BORROWER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH ALREADY HAS RELIED ON SUCH WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON SUCH WAIVER IN ANY RELATED FUTURE DEALINGS.  EACH OF BANK AND BORROWER FURTHER WARRANTS AND REPRESENTS THAT EACH KNOWINGLY AND VOLUNTARILY HAS WAIVED ITS RIGHTS TO JURY TRIAL FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND THE OTHER DOCUMENTS.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

Pacific Rim Capital, Inc.

By: _____

Title: _____President_____

Bank Of Lincolnwood

By: _____

Title: _____SVP_____

## SCHEDULE A

| QTY. | PART/MODEL NUMBER | DESCRIPTION | SERIAL NO. |
|---|---|---|---|
| 1 | 049-408-02 | **TERADYNE** MANUFACTURING PROCESS TEST BASE SYSTEM, Z1888-2 W/O PRISM | 1888-2-208 |
| 1 | | OPT, Z18 PC W/STD MONITOR | |
| 1 | | OPT, DIAGNOSTIC PRINTER | |
| 1 | | UPGRADE, THC TO VP | |
| 3 | | DRVR/RCVR II-D BDS, BOX OF 8 | |
| 2 | | DRVR/RCVR II-D BDS, BOX OF 4 | |
| 1 | | OPT, DUAL PRGM PWR SPLY Z1803/1805/1808/1888 | |
| 1 | | OPT, HIGH VOLT 100V STIM FOR ATB2/EAO SYSTEMS | |
| 1 | | OPT, DUAL VACUUM Z1803PLUS-2, Z1888-2 | |
| 1 | | TRAINING, 18XX PRGM-VP | |
| 1 | | PCA, DRVR/RCVR II-D | |
| 1 | | OPT, Z18XX PHILIPS INTFC SFTWR | |
| 2 | | 1 DAY APPLICATIONS ASSITANCE AGREEMENT FOR Z1800-SERIES | |
| 1 | 10000589 | SIMPLIMATIC AUTOMATION CONVEYOR PACKAGE TO INCLUDE THE FOLLOWING:  2050, 24", ZW, HC | M108850 |
| 4 | 10000834 | 2010, 48", 2D, INSPECT | |
| 1 | 10000838 | 2010, 24", 32-34.5" ELEVATION | M109290 |
| 1 | 10000839 | 2010, 24", 52-54.5" INCLINE | M109300 |
| 1 | 10000840 | 2010, 24", 54.5" HEIGHT | M109310 |
| 1 | 10000842 | 2170, 16FT, EC, FS, INDEX, ALARM | M109320 |
| 2 | 10000844 | 2180, FIFO, CIMTRACK | |
| 1 | 10000853 | 2010, 837MM, Z, SLIDE, I | M109340 |
| 1 | 10000854 | 2010, 1.5 METER, Z, SLIDE, I | M109350 |
| 1 | 10000837 | 2090, 37"-32" WAVE INFEED | M109490 |
| 1 | 10000841 | 2090, 54"-37" LOWERATOR | M109500 |
| 1 | 10000851 | 2160, 13FT, P&F, Z, HC | M109580 |
| 1 | 10000678 | 2010 DUAL LANE 24", Z, 2D, .125 | |
| 1 | 10000440 | 8010, 93.5", AB, HC, I | |
| 3 | 10000695 | 2010, 24", Z, PWC, I | |
| 8 | 10000574 | 2010, 24", 1D, ZW, SLIDE, I | |
| 1 | 10000697 | 2230, 24", PWC, DESTACKER | M108830 |
| 1 | 10000687 | 2010, 80", Z, 2D, PWC, WORK | M109180 |
| 1 | 10000835 | 2010, 48" WORKSTATION | M109270 |
| 1 | 10000700 | 2260, 78", SERVO, PWC | |
| 1 | 10000468 | 2050 CIMTRACK INVERTER | |
| 1 | 11000003 | INSTALLATION | |
| 1 | 3600 | IMS MODEL 3600 INKJET MARKING SYSTEM | |
| 1 | 10000467 | 2120 CIMTRACK FLIGHTED BUFFER | |
| 1 | 156562 | SMEMA UPLINE INTERFACE | 276153 |
| 1 | 156563 | SMEMA DOWNLINE INTERFACE | |

| | | | |
|---|---|---|---|
| 1 | 160067 | TYPHOON E.STOP BLAMKING PLUG BOM | |
| 1 | 133944 | DO NOT FIT PASTE DISPENSER | |
| 1 | 152031 | BASIC BOARD INSPECTION | |
| 1 | 110V-INF | INF 110V M/C VOLTAGE SETTING | |
| 1 | 137977 | PROFLOW SCAR OPTION FOR INF | |
| 2 | 137471 | TRANSFER HEAD 300MM CASSETTE TYPE | |
| 1 | PAINT.D | DEK/UIC WHITE DSF 2.4.1 | |
| 1 | 158067 | INFINITY OPERATOR MANUAL (ENGLISH) | |
| 1 | 152035 | NETWORKED FILES, TCP/IP | |
| 1 | 157045 | QC-CALC V.2.0 32BIT, WIN 95/98 WIN NT 4.0 W/CABLE | |
| 1 | 157275 | BLUE UNDERSCREEN CLEANER 520MM | |
| 1 | 115975 | VACUUM/FILTRATION UNIT SP08 EL/CB 100-120V 60HZ | |
| 1 | 156915 | INTERNATIONAL PACKING | |
| 1 | SQA353 | SQY ASSY (45DEG X 300M) METAL | |
| 1 | INST.USA | INSTALLATION BY DEK USA | |
| 1 | WARRANTY.1 | WARRANTY 1 YEAR | |
| 1 | TRAINING | TRAINING | |
| 1 | | HIGH SPEED CHIP PLACER | CP742E-529 |
| 1 | DOAHO-0002 | CP742E SPARE PARTS KIT | |
| 1 | | QUICK CHIP PLACER | QP341E-992 |
| 1 | K2049M | KB-595EAP KEY BOARD | |
| 1 | 59320 | MULTI TRAY UNIT, MTU-9E QP341 (STACKABLE) | |
| 1 | UEEK-0100 | UCW01 PROG. KIT/MAIN MOD | |
| 1 | UEEK-4330 | CP7 FUJICAM PROGRAMMING INTERFACE | |
| 1 | UEEK-4300 | QP341 FUJICAM PROGRAMMING INTERFACE | |
| 1 | UEEK-0200 | UEEK-01 OPERATORS KIT WITH C/C SOFTWARE | |
| 1 | 39217 | SPARE FEEDER STORAGE RACK (CP6) | |
| 40 | AKJAA-2100 | KJD-0804-1.0-330 8MMX4MM CP 7 FEEDER PAPER | |
| 30 | AKJAA-2400 | KJE-0804-1.0-330 8MMX4MM CP 7 FEEDER EMBOSSED | |
| 20 | AKJAA-2200 | KJD-0804-1.3-330 8MMX4MM CP 7 FEEDER PAPER | |
| 10 | AKJAA-2500 | KJE-0804-1.3-330 8MMX4MM CP7 FEEDER EMBOSED | |
| 3 | A2835-AKJBA-0100 | KJE-1204 2.5-330 CP-VII FEEDER 12X4MM EMBOSSED | |
| 5 | A2835-AKJBA-0200 | KJE-1208 2.5-330 CP-VII FEEDER 12X8MM EMBOSSED | |
| 6 | A2835-AKJCA-0300 | KJE-1612-3.7-330 CP7 FEEDER | |
| 3 | AKDCA-6100 | FMB-16E-380 IP/QP MOTOR FEEDER | |
| 2 | AKDCA-6100 | FMB-16E-380 IP/QP MOTOR FEEDER | |
| 5 | AKDDA-6100 | FMB-24E-380 IP/QP MOTOR FEEDER | |
| 1 | UEEK-6010 | IMG01 GERBCAM INTERFACE GERBER TO CAD | |

| | | | |
|---|---|---|---|
| 1 | PHFA-4 | VIP 98 AIR TWENTY-TWO INCH BELT TYPE RECIRCULATION IMPINGEMENT CONVECTION REFLOW SOLDER FURNACE | |
| 1 | A0801010 | VC-21S MAIN UNIT RADIAL LEAD INSERTION MACHINE | |
| 1 | A4050110 | AC-7 AXIAL VCD MAIN UNIT | |
| 1 | VC-1112056-01 | VECTRA WAVESOLDERING SYSTEM | VC-1112056-01 |
| 1 | OP-BASE-VC | VECTRA BASE MACHINE | |
| 1 | OP-RGDV-VC | RIGID V FINGERS | |
| 1 | OP-FCLR-VC | FINGER CLEANER | |
| 1 | OP-CBS-VC | CENTER BOARD SUPPORT | |
| 1 | OP-MWTH-VC | MOTORIZED WIDTH ADJUST | |
| 1 | OP-VEC-VC | VECTA HEATER | |
| 1 | OP-TOPIR-VC | TOP INFRARED HEATER | |
| 1 | OP-ACCSPRAY-VC | ACCUSPRAY FLUXER | |
| 1 | OP-EXTFLX-WS | EXTERNAL FLUXER CABINET | |
| 1 | OP-N2PLS-VC | CONTOUR PLUS SYSTEM | |
| 1 | OP-N2ROT-VC | NITROGEN ROTARY CHIP NOZZLE | |
| 1 | OP-MROLL-VC | MOTORIZED ROLLOUT/JACK | |
| 1 | OP-HGTSNR-EC | WAVE HEIGHT SENSOR | |
| 1 | OP-SMEMA-WS | SMEMA INTERFACE | |
| 1 | OP-MNLS-WS | ENGLISH MANUALS | |
| 1 | ALP.000086.2 | PACKARD HUGHES DOMESTIC 4-UP PANEL | |
| 1 | ALP.DEMO14.0 | SPEEDROUTER DEMO SYSTEM, SAW, CONSUMABLE PACKAGE, EDGE BELT | |
| 1 | ALP.000086.1 | PACKARD HUGHES DOMESTIC 2-UP PANEL | |
| 2 | 960708 | CBL, 3COND, LINE CORD, US | |
| 1 | 56829 | PROD, D6, AS40, .50ML VIAL KIT | |
| 1 | 50803 | SERVICE, INSTALL, DX-120 | |
| 1 | SP5635 | SP SYS, DUAL COLUMN DX-120 AUTO | |
| 1 | | BARTECTOR MONITOR MODULE | |
| 1 | | SCANNER, HAND HELD FOR PS2, HS100 | |
| 1 | | CONTROLLER, C/W ALL STANDARD FEATURES INCLUDING 2 AVAILABLE, DB9, SERIAL PORTS | |
| 1 | | FIXTURE, PACKARD, DISPENSE | |
| 2 | ALP.000132.1 | TRAVERSER UNIT, 1500MM STROKE | |
| 1 | ALP.000133.1 | INSPECTION CONVEYOR, 2400MM, 4-ZONE | |
| 1 | ALP/000134.1 | LINKING CONVEYOR, 500MM, 1-ZONE | |
| 1 | ALP.000088.1 | FIXTURE, PACKARD, DOMESTIC | |
| 1 | ALP.000089.1 | FIXTURE, PACKARD, INTERNATIONAL | |
| 1 | ALP.000084.1 | ADD-ON HANDLER NTH 5260/4 | |
| 1 | ALP.000085.1 | GRS GRAPHICAL REPAIR STATION | |
| 2 | HISAC 1500 | HISAC 1500 ODD-FORM ASSEMBLY CELL | 20001112, 20001170 |
| 2 | | FINGER SETS | |
| 3 | | PROGRAMMABLE CLINCHING UNIT AND BOARD SUPPORT | |

| | | | |
|---|---|---|---|
| 4 | | VISION PLUS PACKAGE, LEADSCAN - LASER LEAD INSPECTION SYSTEM | |
| 5 | | FRONT FEEDER INTERFACE - ADDITIONAL 300MM OF FEEDER SPACE, 5 SLOTS | |
| 7 | | SINGLE LANE TUBE FEEDER WITH AUTOMATIC TUBE CHANGE | 1515, 1516, 1518, 1521, 1522, 1523, 1524 |
| 2 | | RADIAL FEEDER | 3607, 3608 |
| 10 | | GPAX FEEDER | 36073608 |
| 1 | M11125-4-0 | PUNCHING TOOL | |
| 1 | M11144-4-0 | CUSHION | |
| 1 | M11187-4-0 | GUIDE PLATE | |
| 2 | V0688 | CUSTOM REEL FEEDER | 0139, 0140 |

EXHIBIT C

## NOTICE OF ACKNOWLEDGMENT AND ASSIGNMENT

October 16, 2001

Delphi Automotive Systems Corporation
5725 Delphi Drive
Troy, MI 48098

Attention:  John G. Blahnik

Re:  Equipment Schedule No. 1 (the "Lease") to Master Lease Agreement dated as of June 29, 2001 (the "Agreement") between Pacific Rim Capital, Inc. as lessor ("Lessor") and  Delphi Automotive Systems Corporation as lessee (the "Lessee"),

Ladies and Gentlemen:

**NOTICE**

Lessor hereby notifies and directs Lessee that:

By collateral assignment, Lessor has assigned or will promptly assign to Bank of Lincolnwood ("Lender") all of Lessor's rights under the Lease, including all rights to receive rent payments and other sums due under the Lease (collectively, the "Payments").  Notwithstanding this assignment, Lessor will continue to perform Lessor's obligations under the Lease.

Until Lessee receives written notice to the contrary from Lender, Lessee will make all Payments directly to Lender at the following address:

Bank of Lincolnwood
4433 W. Touhy Avenue
Lincolnwood, IL 60712

**ACKNOWLEDGEMENT**

Lessee acknowledges to Lender that:

1.      True and complete copies of the Lease and the Agreement are attached hereto as Exhibit A, and they represent the sole agreements between Lessor and Lessee with respect to the Equipment and the Payments due and to become due under the Lease.

2.      Lessee has executed a Delivery Certificate for all the equipment described in the Lease (the "Equipment"),  and Lessee's obligation to make the Payments is absolute and unconditional, and Lessee will not assert against Lender, any claim, defense, counterclaim, recoupment, setoff or right to cancel the Lease.  There are 60 Basic Term Rent payments of $54,344.17 each due on the last day of each consecutive month, commencing on and including November 30, 2001, which Lessee will remit to Lender when due.

Notice and Acknowledgment of Assignment
Equipment Schedule No. 1
Delphi Automotive Systems Corporation
Page 2 of 2

3.    The Equipment has been fully and finally accepted by Lessee and is in Lessee's possession at the location specified in the Lease.

4.    The Lease and the Agreement are in full force and effect, and Lessee will not modify or consent to any modification of the Lease or the Agreement, without the prior written consent of Lender, and such modification will be ineffective without Lender's prior written consent, which consent will not be unreasonably withheld.

5.    Neither Lessee nor, to Lessee's knowledge, Lessor, is in default under the Lease or the Agreement.

6.    No sublease, assignment or transfer by Lessee will in any manner impair, diminish or relieve the Lessee of its primary obligations under the Lease or the Agreement, including its obligation to make all Payments.

7.    With respect to the Lease and the Agreement, Lessee and Lessor waive all of their rights and remedies under Article 2A of the Uniform Commercial Code, except to the extent that they are expressly set forth in the Lease or the Agreement.

8.    Lessee has not received any notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease, the Payments or the Equipment.

The undersigned Lessee and Lessor acknowledge and confirm that the above statements are true and correct.

**LESSOR:**

Pacific Rim Capital, Inc.

By: _____

Its: President

**LESSEE:**

Delphi Automotive Systems Corporation

By: _____

Its: Vice President and Treasurer

EXHIBIT D

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x

|  | : |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. § 365(a) AUTHORIZING
REJECTION OF PACIFIC RIM LEASE

("PACIFIC RIM LEASE REJECTION ORDER")

Upon the motion, dated October 17, 2005 (the "Motion"), of Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors"), for an order (the "Order") under 11 U.S.C. §

365(a) authorizing the Debtors to reject both the (a) Master Lease Agreement between Delphi

Automotive Systems Corporation ("Delphi Automotive"), predecessor in interest to Delphi, and

Pacific Rim, Inc. ("Pacific Rim"), dated June 29, 2001 (the "Pacific Rim Master Agreement"), and

(b) the Schedule, pursuant to the Pacific Rim Master Agreement, between Delphi Automotive (as

predecessor in interest to Delphi) and Pacific Rim, dated June 29, 2001 (the "Schedule 1 Lease");

and upon the record of the hearing held on the Motion; and this Court having determined that the

relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and

other parties-in-interest; and it appearing that proper and adequate notice of the Motion has been

given and that no other or further notice is necessary; and after due deliberation thereon; and good

and sufficient cause appearing therefor; it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.      The Motion is GRANTED.

2.      Each of the Pacific Rim Master Agreement and the Schedule 1 Lease is hereby rejected under section 365(a) of the Bankruptcy Code.

3.      The rejection of each of the Pacific Rim Master Agreement and the Schedule 1 Lease shall be effective as of October 17, 2005.

4.      Notwithstanding any provision of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended, or of the Federal Rules of Bankruptcy Procedure to the contrary, this Order shall take effect immediately upon signature.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

6.      The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:      New York, New York
            October 27, 2005


                                    /s/ Robert D. Drain
                                    UNITED STATES BANKRUPTCY JUDGE

EXHIBIT E

**FORM B10** (Official Form 10) (04/05)

| UNITED STATES BANKRUPTCY COURT SOUTHERN | DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor<br>DELPHI CORPORATION | Case Number<br>05-44481 |
|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br><br>Bank of Lincolnwood<br><br>Name and address where notices should be sent:<br><br>c/o Todd & Levi, LLP<br>444 Madison Avenue, Suite 1202<br>New York, New York 10022<br>Telephone number: 212 308-7400 | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br>☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☐ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

| Account or other number by which creditor identifies debtor: | Check here ☐ replaces<br>if this claim ☐ amends   a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**

| ☐ Goods sold<br>☐ Services performed<br>☐ Money loaned<br>☐ Personal injury/wrongful death<br>☐ Taxes<br>☒ Other   Equipment Lease | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)<br>☐ Wages, salaries, and compensation (fill out below)<br>Last four digits of SS #: _____<br>Unpaid compensation for services performed<br>from _____ to_____<br>(date)             (date) |
|---|---|

| **2. Date debt was incurred:**<br>June 29, 2001 and October 24, 2001 | **3. If court judgment, date obtained:** |
|---|---|

**4. Total Amount of Claim at Time Case Filed:** $ 1,208,562.95

|  | (unsecured) | (secured) | (priority) | (Total) |
|---|---|---|---|---|

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other_____

Value of Collateral:   $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $1,208,562.95

☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

| Date<br><br>May 24, 2006 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br><br>Jill Levi, Attorney in Fact |
|---|---|

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                    :
In re:                              :      Chapter 11
                                    :
      DELPHI CORPORATION, et al.,   :      Case No. 05-44481
                                    :
                         Debtors.   :      Jointly Administered
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


## RIDER TO PROOF OF CLAIM OF BANK OF LINCOLNWOOD


1.      The undersigned, Jill Levi, is the Attorney in Fact for Bank of

Lincolnwood, a state banking association organized and existing under the laws of the

State of Illinois ("Lincolnwood" or "Claimant").


2.      Delphi Automobile Systems Corporation, a debtor in the above-captioned

case ("DAS"), is liable to the Lincolnwood in the total amount of approximately

$1,208,562.95.  Lincolnwood's claim arose in connection with the lease to DAS of

certain machinery, equipment and other items pursuant to an equipment lease agreement,

as more fully set forth in paragraphs 8 through 16 below (collectively, the "Claim").


1

## **Background**

3.      Pursuant to that certain Master Lease Agreement, dated as of June 29, 2001 between DAS, as Lessee, and Pacific Rim Capital, Inc., as Lessor (the "Lease"), DAS leased to DAS from the Lessor certain machinery, equipment and other items described on and pursuant to Schedule No.1 to the Lease (the "Equipment").   Unless otherwise defined herein, all defined terms used herein shall be used as defined in the Lease.

4.      Thereafter, pursuant to that certain Assignment and Security Agreement dated as of October 2$^{d}$, 2001 (the "Lease Assignment"), among other things, the Lessor assigned to Lincolnwood all of its right, title and interest in and to the Lease, as security for the Lessor's obligations to Lincolnwood under that certain Promissory Note, dated October 24, 2001, made by Lessor and payable to Lincolnwood in the amount of $2,757,281.57 (the "Note").

5.      In connection with the Lease Assignment, DAS executed that certain Notice of Acknowledgement and Assignment (the "Acknowledgment"), pursuant to which DAS acknowledged the assignment of the Lessor's rights under the Lease to Lincolnwood.

2

## DAS Files For Bankruptcy Protection

6.      On or about October 8, 2005, DAS filed a Petition in Bankruptcy in the
United States Bankruptcy Court for the Southern District of New York.

7.      On or about October 17, 2005, DAS moved the Court for an Order under 11
U.S.C. 365(a) authorizing the rejection of the Lease.  Thereafter, on or about October 27,
2005, the Court entered an Order Authorizing the rejection of the Lease pursuant to 11
U.S.C. 365(a) (the "Rejection Order").

## The Claims Arising Under the Lease

8.      Following the issuance of the Rejection Order, DAS returned the
Equipment for disposition by Lincolnwood.  As a result, among other things, of the
rejection of the Lease, and the failure of DAS to pay Basic Term Rent to Lincolnwood in
accordance with the terms of the Lease, Events of Default have occurred under the Lease
entitling Lincolnwood to the exercise of certain remedies under the Lease and applicable
law.

9.      Pursuant to Section II of the Lease, DAS was required to pay rent to
Lincolnwood in accordance with the provisions of the applicable equipment schedule that

3

was executed by DAS and the Lessor and which schedule was incorporated into the provisions of the Lease.

10.    Pursuant to the applicable schedule to the Lease (and Delivery Certificates Nos. 1 through 4 of Schedule No. 1), DAS was required, among other things, to pay Basic Term Rent to the Lessor in the total amount of $54,344.17 per month, commencing on November 30, 2001 through and including October 31, 2006.

11.    In addition pursuant to Section II of the Lease, DAS was also required to pay a late charge in an amount equal to one cent ($.01) per dollar of Basic Term Rent if such rent was not paid on the due date thereof.

12.    Pursuant to Section XXIII of the Lease, DAS was required to pay interest on any past due rent at a rate equal to the lesser of (i) the Prime Rate as published in the *Wall Street Journal* on the date of the default and (ii) the maximum rate allowed by law.

13.    Pursuant to Section XII (4) of the Lease, upon the occurrence of an Event Of Default, Lincolnwood had the right to sell or otherwise dispose of the Equipment. Lincolnwood has sold of the Equipment and the net proceeds of such sale total $300,000.00.

4

14.    As a result of the occurrence of Events of Default under the Lease, pursuant

to Section XII of the Lease, Lincolnwood is entitled to damages in the amount of the

Stipulated Loss Value of the Equipment calculated as of September 30, 2005 (the date

immediately preceding the issuance of the Rejection Order), in the amount of

$1,502.655.51 less the net sales price received by Lincolnwood in respect of the sale of

the equipment ($300,000.00), plus reasonable attorneys' fees.   Such attorneys' fees

through April 30, 2006 total at least $5,907.44.


15.    Accordingly, DAS owes to Lincolnwood at least the sum of $ 1,208,562.95,

as set forth in paragraph 14 above.


16.    Copies of the Lease together with Schedule No.1 and the Delivery

Certificates annexed thereto, the Lease Assignment and the Acknowledgment are

annexed to this Proof of Claim.


17.    No judgment has been rendered upon the Claim or any part thereof.


18.    The Claim is not subject to any set-off or counterclaim.


19.    Following disposition of the Equipment, no security interest is held for the

Claim.  The Claim is an unsecured nonpriority claim.

5

20.    Claimant reserves the right to file additional proofs of claim, and/or to amend and/or supplement this Proof of Claim in any manner, including but not limited to, the specification of the precise sums claimed to be due, or other application to the Court, of a claim or claims for damages for any amount due or to become due under the Lease, including but not limited to indemnification for taxes and continuing costs and expense arising in relation to the Lease.

21.    The filing of this Proof of Claim is not (a) a waiver or release of Claimant's rights against any person, entity or property, (b) an election of remedy or (c) a waiver of any past, present or future default or event of default.

22.    All notices and communications concerning this Proof of Claim should be addressed as follows:

    Bank of Lincolnwood
    4433 West Touhy
    Lincolnwood, Illinois 60628
    Attention: Richard R. Robbins, President
    (847) 676-6072

with a copy to

    Todd & Levi, LLP
    444 Madison Avenue, Suite 1202
    New York, New York 10022
    Attention: Jill Levi, Esq.

Dated: May 24, 2006

Respectfully submitted,

BANK OF LINCOLNWOOD

By:
Name: Jill Levi
Title: Attorney in Fact

Penalty for presenting fraudulent claim.  Fine of up to $500,000 or imprisonment for up to 5 years or both. 18 U.S.C. §§ 152 and 3571.

7

EXHIBIT F

## PURCHASE AGREEMENT

|                          |          |
|--------------------------|----------|
| **TRANSACTION NO**       | 6348     |
| **DATE**                 | 5/03/2006 |

**SELLER**

Bank of Lincolnwood
4433 West Touhy Avenue
Lincolnwood, IL 60646

**ATTN: Richard Robbins**
Telephone: (847) 676-6020
Email:

**PURCHASER**

**CIT TECHNOLOGIES CORPORATION,**
d/b/a CIT SYSTEMS LEASING
2285 Franklin Road
Bloomfield Hills, MI  48302

**ATTN: BONNIE BRICKLEY**
Fax: 972-997-1619
Telephone: 972-997-1602

**Location of the Equipment:**
IBE SMT
318 Corporate Woods Drive
Magnolia, TX 77354

Seller hereby agrees to sell and Purchaser agrees to purchase the equipment ("Equipment") described below under the following terms and conditions: Equipment sold as-is where is.

| QTY | MFG | MODEL/ FEATURE | DESCRIPTION | SERIAL NUMBER | PURCHASE PRICE |
|-----|-----|----------------|-------------|---------------|----------------|
|     |     |                |             | TOTAL         | $300,000.00    |
|     |     |                |             | See Exhibit A |                |

1.    **Terms of Payment**:  Purchaser shall pay the Purchase Price to Seller by check within 5 business days of the signing of this Agreement.

2.    **Taxes**:  Seller will pay all sales, use, excise, or other transfer tax or charge imposed on the sale or transfer of the Equipment.  However, Purchaser represents that it is purchasing for resale and will provide Seller with a resale exemption certificate.

3    **Availability of the Equipment**:  Purchaser acknowledges that the Equipment is currently in its possession, custody and control and that it is currently storing and maintaining the Equipment.

4.    **Inspection and Installation**:  Purchaser acknowledges that it has already inspected the Equipment and that it has accepted the condition thereof.

5    **Risk of Loss**  Risk of Loss shall pass from Seller to Purchaser upon Seller's receipt of the Purchase Price.

6.     Assignment of Manufacturer's Warranties: Upon its receipt of the Purchase Price, Seller assigns to Purchaser its warranties on the Equipment, if any, and agrees to provide reasonable assistance, at Purchaser's expense, in enforcing those warranties

7.     Title: Seller warrants that as of its receipt of the Purchase Price, Seller will have good title to the Equipment, free and clear of all liens, encumbrances and security interests, other than Seller's security interest. Seller agrees to indemnify and hold Purchaser harmless from all claims and costs incurred in the defense of title to the Equipment and removal of any liens, encumbrances and security interests thereon. Upon its receipt of the Purchase Price, Seller shall provide a Bill of Sale transferring title to Purchaser in the form annexed hereto as Exhibit B

8.     LIMITATION OF LIABILITY, DISCLAIMER OF WARRANTIES: SELLER MAKES NO OTHER EXPRESS OR IMPLIED WARRANTIES OF ANY KIND RELATING TO THE EQUIPMENT INCLUDING THOSE OF MERCHANTABILITY, CONDITION, QUALITY, DURABILITY, OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE OR SUITABILITY OR ANY EXPRESS OR IMPLIED WARRANTIES THAT THE EQUIPMENT WILL SATISFY THE REQUIREMENTS OF ANY LAW, RULE, REGULATION, SPECIFICATION, OR CONTRACT AND EXPRESSLY DISCLAIMS THE SAME. Seller shall have no liability to Purchaser for any claim, loss, or damage caused or alleged to be caused directly, indirectly, incidentally, or consequentially by the Equipment, by any inadequacy thereof or deficiency or defect therein, by any incident whatsoever in connection therewith, arising in strict liability, negligence or otherwise. Seller shall not be relieved of liability as a result of its own negligence or willful misconduct.

9.     Purchaser's Remedies. Upon failure of Seller to perform or observe any term, covenant, warranty or condition of this Agreement, Purchaser may exercise any remedies available to a purchaser under the Uniform Commercial Code or other applicable law.

10.     Seller's Remedies: Upon failure of Purchaser to perform or observe any term, covenant, or condition of this Agreement, Seller may exercise any remedies available under the Uniform Commercial Code or other applicable law.

11     Applicable Law: This Agreement shall be governed by the laws of the State of Michigan

12.     Entire Agreement: This Agreement constitutes the entire agreement between Purchaser and Seller with respect to the purchase and sale of the Equipment and any representations or statements not contained in this Agreement shall not be binding upon Purchaser or Seller as a warranty or otherwise.

13.     Survival of Obligations: All covenants, warranties and representations in this Agreement or in any document delivered in connection herewith shall survive the performance or termination of this Agreement.

14     Facsimile Copies: Seller and Purchaser hereby agree and acknowledge that (a) in any hearing, trial or proceeding of any nature with respect to this Agreement, they may produce a facsimile copy of this document rather than the original copy thereof and that such facsimile copy shall be deemed to be the original, and (b) they have each received and reviewed all of the pages of this Agreement and that none of its provisions are missing or illegible

THIS PURCHASE AGREEMENT SHALL BE NULL AND VOID UNLESS SIGNED BY SELLER AND RECEIVED BY
PURCHASER WITHIN TEN (10) BUSINESS DAYS OF THE DATE OF THIS AGREEMENT

SELLER
Bank of Lincolnwood – 6348

By: _____

Print Name: __Richard R Robbins__

Title: __President /CCO__

Date: __5-3-06__

PURCHASER
CIT TECHNOLOGIES CORPORATION,
d/b/a CIT SYSTEMS LEASING

By: _____

Print Name: __Mary E. Rasmussen__
           Assistant Vice President
Title: _____Lease Operations_____

Date: __5/4/06__

## Exhibit A

### Equipment

1.  Conveyors for line

2.  Ink Jet Machine

3.  26S Infinity Screen Printer

4.  FUJI Chip Shooter, Feeder Storage Rack, Feeder Paper, Feeder Embors, Flex Placer, Keyboard, Motor Feeder, Main Module, Interface Board, Cable, Training and Installation.

5.  VIP-98 Air Reflow Oven

6.  Radial Lead Insertion Machine, Axial Insertion Machine, Conversion Software, Spares Parts Kit, Calibration Tool

7.  Vectra Base Wave Solder Machine

8.  Odd Form Cells, Custom Reel Feeder for AMPS tabs

9.  Speedrouter, Board Grippers

10. ICT Test Handling machine, Test Fixture for GE Maine Domestic Panel, Test Fixture for GE Maine, International PCB

11. ICT Tester

12. ION Chromatograph

13. Bartentor CP742E, Monitor Module for Fuji unit