# EXHIBIT A – Part 1

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 5

| | |
|---|---|
| IN THE MATTER OF:<br>SOUTH DAYTON DUMP AND<br>LANDFILL | ADMINISTRATIVE SETTLEMENT<br>AGREEMENT AND ORDER ON<br>CONSENT FOR REMEDIAL<br>INVESTIGATION/FEASIBILITY STUDY |
| City of Moraine | |
| | U.S. EPA Region 5 |
| Montgomery County, Ohio | CERCLA Docket No. _____ |
| Respondents | Proceeding Under Sections 104, 107 and |
| Listed in Appendix C | 122 of the Comprehensive Environmental<br>Response, Compensation, and Liability Act,<br>as amended, 42 U.S.C. §§ 9604, 9607 and<br>9622. |

VEW- '06 -C-852

## RI/FS ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT

### TABLE OF CONTENTS

I.       JURISDICTION AND GENERAL PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . 1
II.      PARTIES BOUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
III.     STATEMENT OF PURPOSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
IV.      DEFINITIONS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
V.       FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
VI.      CONCLUSIONS OF LAW AND DETERMINATIONS . . . . . . . . . . . . . . . . . . 8
VII.     SETTLEMENT AGREEMENT AND ORDER . . . . . . . . . . . . . . . . . . . . . . . . 9
VIII.    DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS . . . 9
IX.      WORK TO BE PERFORMED   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
X.       U.S. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS . . . . . . . . . 15
XI.      QUALITY ASSURANCE, SAMPLING, AND DATA AVAILABILITY   . . . . 17
XII.     SITE ACCESS AND INSTITUTIONAL CONTROLS   . . . . . . . . . . . . . . . . 19
XIII.    COMPLIANCE WITH OTHER LAWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
XIV.     RETENTION OF RECORDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
XV.      DISPUTE RESOLUTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
XVI.     STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
XVII.    FORCE MAJEURE   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
XVIII.   PAYMENT OF RESPONSE COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
XIX.     COVENANT NOT TO SUE BY U.S. EPA . . . . . . . . . . . . . . . . . . . . . . . . . .28
XX.      RESERVATIONS OF RIGHTS BY U.S. EPA . . . . . . . . . . . . . . . . . . . . . . . . .28
XXI.     COVENANT NOT TO SUE BY RESPONDENTS . . . . . . . . . . . . . . . . . . . . . 29
XXII.    OTHER CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
XXIII.   CONTRIBUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
XXIV.    INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
XXV.     INSURANCE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
XXVI.    FINANCIAL ASSURANCE   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
XXVII.   SEVERABILITY/INTEGRATION/APPENDICES . . . . . . . . . . . . . . . . . . . . 34
XXVIII.  ADMINISTRATIVE RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
XXIX.    EFFECTIVE DATE AND SUBSEQUENT MODIFICATION. . . . . . . . . . . . . 35
XXX.     NOTICE OF COMPLETION OF WORK  . . . . . . . . . . . . . . . . . . . . . . . . . 36


Appendix A    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Appendix B    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
Appendix C    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

ADMINISTRATIVE SETTLEMENT AGREEMENT AND ORDER ON CONSENT
FOR REMEDIAL INVESTIGATION/FEASIBILITY STUDY

## I. JURISDICTION AND GENERAL PROVISIONS

1.  This Administrative Settlement Agreement and Order on Consent ( "Settlement Agreement") is entered into voluntarily by the United States Environmental Protection Agency ("U.S. EPA") and the Respondents listed in Appendix C ("Respondents"). The Settlement Agreement concerns the preparation and performance of a remedial investigation and feasibility study ("RI/FS") at the South Dayton Dump and Landfill Site located on Dryden Road (sometimes called Springboro Pike) in Moraine, Ohio.("Site") and the reimbursement for future response costs incurred by U.S. EPA in connection with the RI/FS for this Site.

2.  This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §§ 9604, 9607 and 9622 ("CERCLA"). This authority was delegated to the Administrator of U.S. EPA on January 23, 1987, by Executive Order 12580, 52 Fed. Reg. 2926 (Jan. 29, 1987), and further delegated to Regional Administrators on May 11, 1994, by U.S. EPA Delegation Nos. 14-14-C and 14-14-D. This authority was further redelegated by the Regional Administrator, U.S. EPA, Region 5 to the Director, Superfund Division, U.S. EPA, Region 5 by U.S. EPA Delegation Nos. 14-14-C and 14-14-D on May 2, 1996.

3.  In accordance with Section 104(b)(2) and Section 122(j)(1) of CERCLA, 42 U.S.C. §§ 9604(b)(2) and 9622(j)(1), U.S. EPA notified the Federal and State natural resource trustees on August 1, 2005 of negotiations with potentially responsible parties regarding the release of hazardous substances that may have resulted in injury to the natural resources under Federal trusteeship. In accordance with Section 121(f)(1)(F), U.S. EPA has notified the State of Ohio (the "State") on August 4, 2005, of negotiations with potentially responsible parties regarding the implementation of the remedial investigation and feasibility study for the Site.

4.  U.S. EPA and Respondents recognize that this Settlement Agreement has been negotiated in good faith and that the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of fact, conclusions of law and determinations in Sections V and VI of this Settlement Agreement. Respondents agree to comply with and be bound by the terms of this Settlement Agreement and further agree that they will not contest the basis or validity of this Settlement Agreement or its terms.

## II. PARTIES BOUND

5. This Settlement Agreement applies to and is binding upon U.S. EPA and upon Respondents and their agents, heirs, successors and assigns. Any change in ownership or corporate status of a Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondent's responsibilities under this Settlement Agreement.

6. Respondents are jointly and severally liable for carrying out all activities required by this Settlement Agreement. However, the **financial** contribution of Respondents Boesch and Grillot to carrying out the activities required by this Settlement Agreement is limited to the balance in the South Dayton Environmental Remediation Trust being made available to the other Respondents to carry out the Work. In the event of the insolvency or other failure of any one or more Respondents to implement the requirements of this Settlement Agreement, the remaining Respondents shall complete all such requirements.

7. Respondents shall ensure that their contractors, subcontractors, and representatives receive a copy of this Settlement Agreement and comply with this Settlement Agreement. Respondents shall be responsible for any noncompliance with this Settlement Agreement.

8. Each undersigned representative of Respondents certifies that he or she is fully authorized to enter into the terms and conditions of this Settlement Agreement and to execute and legally bind the Respondents to this Settlement Agreement.

## III. STATEMENT OF PURPOSE

9. In entering into this Settlement Agreement, the objectives of U.S. EPA and Respondents are: (a) to determine the nature and extent of contamination and any current or potential threat to the public health, welfare, or the environment posed by the release or threatened release of hazardous substances, pollutants or contaminants at or from the Site and to collect sufficient data for developing and evaluating effective remedial alternatives by conducting a Remedial Investigation ("RI") as more specifically set forth in the Statement of Work ("SOW") attached as Appendix A to this Settlement Agreement; (b) to identify and evaluate remedial alternatives that protect human health and the environment by preventing, eliminating, reducing or controlling any release or threatened release of hazardous substances, pollutants, or contaminants at or from the Site, by conducting a Feasibility Study ("FS") as more specifically set forth in the Statement of Work ("SOW") in Appendix A to this Settlement Agreement; and (c) to recover response and oversight costs incurred by U.S. EPA with respect to this Settlement Agreement

10. The Work conducted under this Settlement Agreement is subject to approval by U.S. EPA and shall provide all appropriate and necessary information to assess site conditions and evaluate alternatives to the extent necessary to select a remedy that will be consistent with CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R.

2

Part 300 ("NCP"). Respondents shall conduct all Work under this Settlement Agreement in compliance with CERCLA, the NCP and all applicable U.S. EPA guidances, policies, and procedures.

# IV. DEFINITIONS

11. Unless otherwise expressly provided herein, terms used in this Settlement Agreement which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement Agreement or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a. "ARARs" mean all applicable local, state, and federal laws and regulations, and all "applicable requirements" or "relevant and appropriate requirements" as defined at 40 C.F.R. § 300.5 and 42 U.S.C. § 9261(d).

b. "CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. §§ 9601, *et seq.*

c. "Day" shall mean a calendar day. In computing any period of time under this Settlement Agreement, where the last day would fall on a Saturday, Sunday, or Federal holiday, the period shall run until the close of business of the next working day.

d. "Effective Date" shall be the effective date of this Settlement Agreement as provided in Section XXIX.

e. "EPA" or "U.S. EPA" shall mean the United States Environmental Protection Agency and any successor departments or agencies of the United States.

g. "OEPA" shall mean the Ohio Environmental Protection Agency and any successor departments or agencies of the State.

h. "Engineering Controls" shall mean constructed containment barriers or systems that control one of the following: downward migration, infiltration or seepage of surface runoff or rain; or natural leaching migration of contaminants through the subsurface over time. Examples include caps, engineered bottom barriers, immobilization processes, and vertical barriers.

i. "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in, reviewing or developing plans, reports, technical memoranda and other items pursuant to this Settlement Agreement, conducting community relations, providing technical assistance grants to community groups (if any), verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement Agreement, including but not limited to, payroll costs, contractor costs (including fees), travel

3

costs, laboratory costs, ATSDR costs, the costs incurred pursuant to Paragraph 55 and 57 (costs and attorneys fees and any monies paid to secure access, including the amount of just compensation) and Paragraph 41 (emergency response)

     j.   "Institutional controls" shall mean non-engineered instruments, such as administrative and/or legal controls, that help to minimize the potential for human exposure to contamination and/or protect the integrity of a remedy by limiting land and/or resource use. Examples of institutional controls include easements and restrictive covenants, zoning restrictions, special building permit requirements, and well drilling prohibitions.

     k.   "Interest" shall mean interest at the rate specified for interest on investments of the U.S. EPA Hazardous Substance Superfund established by 26 U.S.C. § 9507, compounded annually, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

     l.   "NCP" or "National Contingency Plan" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

     m.   "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent, the SOW, all appendices attached hereto (listed in Section XXVII) and all documents incorporated by reference into this document including without limitation U.S. EPA-approved submissions. U.S. EPA-approved submissions (other than progress reports) are incorporated into and become a part of the Settlement Agreement upon approval by U.S. EPA. In the event of conflict between this Settlement Agreement and any appendix, this Settlement Agreement shall control.

     n.   "Paragraph" shall mean a portion of this Settlement Agreement identified by an Arabic numeral.

     o.   "Parties" shall mean U.S. EPA and Respondents.

     p.   "RCRA" shall mean the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act, as amended, 42 U.S.C. §§ 6901, *et seq.*

     q.   "Respondents" shall mean those Parties identified in Appendix C, which is a list of those Parties which have signed this Settlement Agreement and agreed to be bound by the terms of this Administrative Order on Consent (Settlement Agreement).

     r.   "RI/FS Planning Documents" shall mean the RI/FS Work Plan; the Sampling and Analysis Plan, consisting of both the Field Sampling Plan and the Quality Assurance Project Plan; Laboratory and Contractor Quality Management Plans; and a Health and Safety Plan.

4

s.    "Section" shall mean a portion of this Settlement Agreement identified by a Roman numeral.

t.    "Site" shall mean the South Dayton Dump and Landfill Superfund Site, ("Site") located on Dryden Road (sometimes called Springboro Pike) in Moraine, Ohio. The Site is depicted generally on the figures (map and aerial photograph of the Site) attached as Appendix B and includes nearby areas where hazardous substances, pollutants or contaminants have or may have come to be located from the Site, or from former operations at the Site.

u.    "State" shall mean the State of Ohio.

v.    "Statement of Work" or "SOW" shall mean the Statement of Work for development of a RI/FS for the South Dayton Dump and Landfill Site, as set forth in Appendix A to this Settlement Agreement. The Statement of Work is incorporated into this Settlement Agreement and is an enforceable part of this Settlement Agreement as are any modifications made thereto in accordance with this Settlement Agreement. The SOW is divided into eight numbered Tasks. Each Task is divided into numbered subdivisions (*e.g.*, 1.2.1.3. Leachate Investigation). References to numbered Task subdivisions in the SOW will be so identified, for example, SOW Task 1.2.1.3. Leachate Investigation).

w.    "Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (4) any "hazardous waste" under Ohio Revised Code, Section 3734.01 (J).

x..    "Work" shall mean all activities Respondents are required to perform under this Settlement Agreement, except those required by Section XIV (Retention of Records).

## V. FINDINGS OF FACT

12.    Based on available information, including the Administrative Record in this matter, U.S. EPA hereby finds and, for purposes of enforceability of this Order only, the Respondents stipulate that the factual statutory prerequisites under CERCLA necessary for issuance of this Settlement Agreement and Administrative Order have been met. U.S. EPA's finding is based on the following specific findings which U.S. EPA asserts as facts:

13.    The South Dayton Dump and Landfill Site comprises approximately 80 acres and is located at 1975 Dryden Road (sometimes called Springboro Pike) in Moraine, Ohio. The Site is adjacent to the floodplain of the Great Miami River. Approximately 25,060 people live within a 4-mile radius of the Site. Six single family residences are located on the northwest side of East River Road and are adjacent to the southeast boundary of the Site. A seventh single family home is located on the southeast side of East River Road and is within 300 feet of the Site. A trailer

5

park with several residences is also situated approximately 300 feet southeast of the Site at the
southeast intersection of Dryden Road and East River Road.

14. Valley Asphalt, Jim City Salvage, the Miami Conservancy District, Ronald Barnett,
Margaret C. Grillot and Kathryn A. Boesch are the current owners of the Site. A 49.87 acre
portion of the Site (Parcel A) was purchased by Horace Boesch in 1937. In 1945 Horace Boesch
purchased an additional 30 acre portion of the Site (Parcel B). In 1947, Horace and Roxie
Boesch conveyed an undivided ½ interest in Parcel B to Cyril Grillot. In 1951, Horace and
Roxie Boesch conveyed an undivided ½ interest in Parcel A to Cyril Grillot. From 1947 until the
present, most of the Site has been owned by various members of the Boesch and Grillot families.
In 1958, Horace and Roxie Boesch and Cyril J. and Ruby Grillot recorded a conveyance of a
property interest (Right of Way Grant) to Dayton Power and Light. In 1975, Horace and Kathryn
A. Boesch and Cyril J. and Ruby Grillot recorded a conveyance of a property interest (easement)
to the University of Dayton. After Horace Boesch died in 1979, his estate conveyed shares of his
interest in the Site property to members of his family. Some of these heirs conveyed their
interest or a portion thereof to Katharine Boesch. Current owners of the real property where
hazardous waste dumping and landfilling areas took place in the past, as part of the operations of
the South Dayton Dump and Landfill, include Kathryn A. Boesch, Margaret C. Grillot, Valley
Asphalt, Jim City Salvage, Miami Conservancy District and Ronald Barnett.

15. Disposal of waste materials began at the Site in 1941. Materials dumped at the Site
included drummed wastes. Known hazardous substances were disposed at the Site between June
1973 and July 1976, including drums containing hazardous waste from nearby facilities. Some
of the drums contained cleaning solvents (1,1,1-trichloroethane ("TCA"); methyl ethyl ketone
("MEK"); and xylene); cutting oils; paint; Stoddard solvents; and machine-tool, water-based
coolants. Handwritten notes on an undated tax map from the Montgomery County Health
Department indicate that the site had previously accepted materials including "oils, paint residue,
brake fluids, chemicals for cleaning metals, solvents, etc." In addition, a CERCLA Notification
of Hazardous Waste Site Form submitted by Industrial Waste Disposal Company, Inc. ("IWD")
in 1981 indicated that the Site had been used as a disposal facility for the industrial and
municipal wastes of IWD's customers. The notification did not include information about the
specific types of wastes. More recently, the Site operated under a solid waste disposal permit
issued by Moraine County Health Department ("MCHD"). The permit allowed disposal of solid,
inert, insoluble materials such as unregulated foundry sand, slag, glass, and demolition debris.
There is no liner at the Site.

16. In 1985, OEPA conducted a Preliminary Assessment ("PA") at the Site. Based on
this PA's findings, a U.S. EPA Field Investigation Team ("FIT") conducted a Supplemental Site
Investigation ("SSI") at the Site. In 1991, the FIT collected 11 soil samples at or near the Site.
Contaminants have been detected in on-Site soil samples at levels above background.
Additionally, hazardous substances were reportedly disposed of at the Site in the past.

17. Soil sample results during the 1991 EPA FIT sample detected hazardous substances
in on-Site soil samples at levels significantly above background. The following substances were

6

detected: 1,2-Dichloroethene at 200 micrograms per kilogram in soil sample S8, tetrachloroethene at 11 micrograms per kilogram in soil sample S8, toluene at 7 micrograms per kilogram in soil sample S5, polychlorinated biphenyls, including Aroclor 1248 and Aroclor 1260 at 4,200 and 2,800 micrograms per kilogram, respectively, in soil sample S2, antimony at 31.6 milligrams per kilogram in soil sample S3, arsenic at 69.3 milligrams per kilogram in soil sample S9, barium as high as 991 milligrams per kilogram in soil sample S1, cadmium as high as 14 milligrams per kilogram in soil sample S3, chromium at 91.7 milligrams per kilogram in soil sample S3, mercury as high as .31 milligrams per kilogram in soil sample S3, nickel as high as 402 milligrams per kilogram in soil sample S8, lead as high as 3,300 milligrams per kilogram in soil sample S3, and zinc as high as 2,350 milligrams per kilogram in soil sample S3. Also, several polynuclear aromatic hydrocarbons were detected in several soil samples. Phenanthrene, benzo[a]anthracene, and benzo[a]pyrene were detected at concentrations as high as 16,000, 8,500, and 5,700 micrograms per kilogram, respectively, in soil sample S3; and fluoranthene was detected at 21,000 micrograms per kilogram in soil sample S6. Selected soil samples collected during OEPA's July 9, 1996 Phase II Site Team Evaluation Prioritization ("STEP") Investigation revealed higher concentrations than those found during the 1991 EPA FIT sampling. These samples included the following concentrations:

Tetrachloroethene:  59 micrograms/kilogram (S01)
Trichloroethene:  11 micrograms/kilogram (S10)
Antimony:  278 milligrams/kilogram (S08)
Arsenic:  141 milligrams/kilogram (S08)
Barium:  13,000 milligrams/kilogram (S08)
Cadmium:  16.3 milligrams/kilogram (S10)
Copper:  191,000 milligrams/kilogram (S10)
Lead:  12,100 milligrams/kilogram (S10)
Zinc:  11,500 milligrams/kilogram (S10)

*See* OEPA Site Team Evaluation Prioritization Report South Dayton Dump and Landfill, December 24, 1996, Table 1 on pages 18-21.

18.  In 2000, Valley Asphalt conducted a drum and soil removal from real property it owned within the boundaries of the Site.  A composite sample collected from the drums was TCLP toxic for cadmium (detected at 2.11 milligrams/liter; regulatory limit 1 milligram/liter) and lead (detected at 8.26 milligram/liter; regulatory limit 5 milligrams/liter) and contained contaminants including:

PCB-1254:  75,000 micrograms/kilogram
Benzene:  7,000 micrograms/kilogram
Chlorobenzene:  1,700 micrograms/kilogram
Ethylbenzene:  84,000 micrograms/kilogram
Toluene:  530,000 micrograms/kilogram
Trichloroethene:  64,000 micrograms/kilogram

7

Vinyl Chloride:840 micrograms/kilogram
Xylene: 340,000 micrograms/kilogram"

*See* Sample "Valley Dryden A 05/17/00" in "Appendix C, Laboratory Results" of TCA
Environmental, Inc. "Environmental Remediation Report at Valley Asphalt, Dryden Road
Moraine, Ohio, Montgomery County" prepared for Valley Asphalt dated September 5, 2000.

19. Between 1998 and 2004, the owners of part of the Site conducted several
investigations at the landfill, including groundwater and surface water sampling. Groundwater
analytical results from 2002 revealed maximum concentrations of vinyl chloride at 180
micrograms/liter (MW-101A) and trichloroethylene at 76 micrograms/liter in MW-210. In 2004
the maximum concentration of vinyl chloride detected in the groundwater by the owners was 20
microgram/liter (MW-101A) and the maximum concentration of trichloroethylene was 250
micrograms/liter (MW-210, sampling date 10/15/04). The U.S. EPA Maximum Contaminant
Level ("MCL") for vinyl chloride is 2 micrograms/liter and the MCL for trichloroetheylene is 5
micrograms/liter.

20. The South Dayton Dump and Landfill Site was proposed for inclusion on the
National Priorities List ("NPL"), pursuant to CERCLA Section 105, 42 U.S.C. § 9605, on
September 23, 2004. The Site received a Hazard Ranking Score ("HRS") of 48.63. *See* 69 FR
56970-01 (2004).

## VI. CONCLUSIONS OF LAW AND DETERMINATIONS

Based on the Findings of Fact set forth above, and the Administrative Record in this matter, U.S.
EPA has determined that:

21. The South Dayton Dump and Landfill Site is a "facility" as defined in Section 101(9)
of CERCLA, 42 U.S.C. § 9601(9).

22. The contamination found at the Site, as identified in the Findings of Fact above,
includes"hazardous substances" as defined in Section 101(14) of CERCLA, 42 U.S.C. §
9601(14).

23. The conditions described in paragraphs 16-18 of the Findings of Fact above
constitute an actual and/or threatened "release" of a hazardous substance from the facility as
defined in Section 101(22) of CERCLA, 42 U.S.C. § 9601(22).

24. Each Respondent is a "person" as defined in Section 101(21) of CERCLA, 42 U.S.C.
§ 9601(21).

25. Respondents are  responsible parties under Sections 104, 107 and 122 of CERCLA,
42 U.S.C. §§ 9604, 9607 and 9622. Each Respondent is either: a person who generated the
hazardous substances found at the Site, a person who at the time of disposal of any hazardous

substances owned or operated the Site, a person who is the "owner(s)" and/or "operator(s)" of the facility, as defined by Section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of Section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1), or is a person who arranged for disposal or transport for disposal of hazardous substances at the Site. Each Respondent therefore may be liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

26. The actions required by this Settlement Agreement are necessary to protect the public health, welfare or the environment, are in the public interest, 42 U.S.C. § 9622(a), are consistent with CERCLA and the NCP, 42 U.S.C. §§ 9604(a)(1), 9622(a), and will expedite effective remedial action and minimize litigation, 42 U.S.C.§ 9622(a).

27. U.S. EPA has determined that Respondents are qualified to conduct the RI/FS within the meaning of Section 104(a) of CERCLA, 42 U.S.C.§ 9604(a), and will carry out the Work properly and promptly, in accordance with Sections 104(a) and 122(a) of CERCLA, 42 U.S.C. §§ 9604(a) and 9622(a), if Respondents comply with the terms of this Settlement Agreement.

## VII. SETTLEMENT AGREEMENT AND ORDER

28. Based upon the foregoing Findings of Fact, Conclusions of Law, Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Respondents shall comply with all provisions of this Settlement Agreement, including, but not limited to, all appendices to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VIII. DESIGNATION OF CONTRACTORS AND PROJECT COORDINATORS

29. Selection of Contractors, Personnel.

a. All Work performed under this Settlement Agreement shall be under the direction and supervision of qualified personnel. Within 7 days of the Effective Date of this Settlement Agreement, and before the Work outlined below begins, Respondents shall notify U.S. EPA in writing of the names, titles, and qualifications of the personnel, including contractors, subcontractors, consultants and laboratories to be used in carrying out such Work. With respect to any proposed contractor, Respondents shall demonstrate that the proposed contractor has a quality system which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan ("QMP"). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by U.S. EPA. The qualifications of the persons undertaking the Work for Respondents shall be subject to U.S. EPA's review, for verification that such persons meet minimum technical background and experience requirements. If Respondents fail to demonstrate to U.S. EPA's satisfaction that

9

Respondents are qualified to perform properly and promptly the actions set forth in this
Settlement Agreement, U.S. EPA may take over the work required by this Settlement Agreement.

b. If U.S. EPA disapproves in writing of any person(s)' technical qualifications,
Respondents shall notify U.S. EPA of the identity and qualifications of the replacement(s) within
14 days of the written notice. If U.S. EPA subsequently disapproves of the replacement(s), U.S.
EPA reserves the right to terminate this Settlement Agreement and to conduct a complete RI/FS,
and to seek reimbursement for costs and penalties from Respondents. During the course of the
RI/FS, Respondents shall notify U.S. EPA in writing of any changes or additions in the personnel
used to carry out such Work, providing their names, titles, and qualifications. U.S. EPA shall
have the same right to disapprove changes and additions to personnel as it has hereunder
regarding the initial notification.

30. Within 7 days after the Effective Date, Respondents shall designate a Project
Coordinator who shall be responsible for administration of all actions by Respondents required
by this Settlement Agreement and shall submit to U.S. EPA the designated Project Coordinator's
name, address, telephone number, and qualifications. To the greatest extent possible, the Project
Coordinator shall be present on Site or readily available during Site Work. U.S. EPA retains the
right to disapprove of the designated Project Coordinator. If U.S. EPA disapproves of the
designated Project Coordinator, Respondents shall retain a different Project Coordinator and
shall notify U.S. EPA of that person's name, address, telephone number and qualifications within
14 days following U.S. EPA's disapproval. Respondents shall have the right to change their
Project Coordinator subject to U.S. EPA's right to disapprove. Respondents shall notify U.S.
EPA three (3) days before such change is made. The initial notification may be made orally, but
shall be promptly followed by a written notification.

31. U.S. EPA has designated Karen Cibulskis of the Superfund Division, Region 5 as its
Project Coordinator. U.S. EPA will notify Respondents of a change in its designation of the
Project Coordinator. Except as otherwise provided in this Settlement Agreement, Respondents
shall direct all submissions required by this Settlement Agreement to:

> Ms. Karen Cibulskis
> Remedial Project Manager
> U.S. EPA, Superfund Division
> Mail Code SR-6J
> 77 West Jackson
> Chicago, Illinois 60604-3590

Respondents are encouraged to make their submissions to U.S. EPA on recycled paper (which
includes significant post-consumer waste paper content where possible) and using two-sided
copies. Respondents shall make submissions electronically according to U.S. EPA Region 5
specifications. Receipt by Respondents' Project Coordinator of any notice or communication
from U.S. EPA relating to this Settlement Agreement shall constitute receipt by Respondents.
Documents to be submitted to the Respondents shall be sent to:

Steve Quigley, P.E.
Principal-in-Charge/Project Manager
Conestoga-Rovers & Associates Ltd.
651 Colby Drive
Waterloo, Ontario  N2V 1C2

32. U.S. EPA's Project Coordinator shall have the authority lawfully vested in a Remedial Project Manager ("RPM") and On-Scene Coordinator ("OSC") by the NCP. In addition, U.S. EPA's Project Coordinator shall have the authority consistent with the NCP to halt any Work required by this Settlement Agreement, and to take any necessary response action when s/he determines that conditions at the Site may present an immediate endangerment to public health or welfare or the environment. The absence of the U.S. EPA Project Coordinator from the area under study pursuant to this Settlement Agreement shall not be cause for the stoppage or delay of Work.

33. U.S. EPA and Respondents shall have the right, subject to Paragraph 30, to change their respective Project Coordinator. Respondents shall notify U.S. EPA three (3) days before such a change is made. The initial notification by either party may be made orally, but shall be promptly followed by a written notice.

34. U.S. EPA shall arrange for a qualified person to assist in its oversight and review of the conduct of the RI/FS, as required by Section 104(a) of CERCLA, 42 U.S.C. § 9604(a). Such person shall have the authority to observe Work and make inquiries in the absence of U.S. EPA, but not to modify the RI/FS Planning Documents or other work plans.

## IX. WORK TO BE PERFORMED

35. a.  Respondents shall conduct the RI/FS in accordance with the provisions of this Settlement Agreement, the SOW, CERCLA, the NCP, U.S. EPA guidance related to remedial investigations and feasibility studies including, but not limited to: the "Interim Final Guidance for Conducting Remedial Investigations and Feasibility Studies under CERCLA" (OSWER Directive # 9355.3-01); "Guidance for Data Useability in Risk Assessment" (OSWER Directive #9285.7-05); Risk Assessment Guidance for Superfund (RAGS), Volume I - Human Health Evaluation Manual (Part A), Interim Final (EPA-540-1-89-002), OSWER Directive 9285.7-01A, December 1, 1989; and Risk Assessment Guidance for Superfund (RAGS), Volume I - Human Health Evaluation Manual (Part D, Standardized Planning, Reporting, and Review of Superfund Risk Assessments), Interim, (EPA 540-R-97-033), OSWER Directive 9285.7-01D, January 1998; Implementing Presumptive Remedies, U.S. EPA, Office of Emergency and Remedial Response, EPA-540-R-97-029, October 1997; Presumptive Remedy for CERCLA Municipal Landfill Sites, U.S. EPA, OSWER Directive No. 9355.0-49FS, EPA-540-F-93-035, September 1993; Presumptive Remedies: CERCLA Landfill Caps RI/FS Data Collection Guide, U.S. EPA, OSWER Directive 9355.3-18FS, EPA/540/F-95/009, August 1995; Presumptive Response Strategy and Ex-Situ Treatment Technologies for Contaminated Ground Water at CERCLA Sites, OSWER Directive 9283.1-12, EPA-540-R-96-023, October 1996; and any other guidances referenced in the SOW, and any RI/FS related guidance subsequently issued by U.S. EPA.

11

b. In the RI and FS Reports, Respondents shall address the factors required to be taken into account in Section 121 of CERCLA, 42 U.S.C. § 9621, and Section 300.430 of the NCP, 40 C.F.R. § 300.430. The RI shall characterize the geology and hydrogeology of the Site, determine the nature and extent of hazardous substances, pollutants or contaminants at or from the Site, and characterize all ecological zones including terrestrial, riparian, wetlands, aquatic/marine, and transitional. Respondents shall prepare, for inclusion with the RI Report, a determination of the nature and extent of the current and potential threat to the public health or welfare or the environment posed by the release or threatened release of any hazardous substances, pollutants, or contaminants at or from the Site, including a "Baseline Human Health Risk Assessment" and "Baseline Ecological Risk Assessment." In the FS Report, Respondents shall determine and evaluate (based on treatability testing, where appropriate) alternatives for remedial action that protect human health and the environment by recycling waste or by eliminating, reducing and/or controlling risks posed through each pathway at the Site. In the FS Report, the Respondents shall evaluate a range of alternatives including but not limited to those alternatives described in 40 C.F.R. § 300.430(e) and remedial alternatives that utilize permanent solutions and alternative treatment technologies or resource recovery technologies. The FS Reports shall include a detailed analysis of individual alternatives against each of the nine evaluation criteria in 40 C.F.R. § 300.430(e)(9)(iii) and a comparative analysis that focuses upon the relative performance of each alternative against the nine criteria in 40 C.F.R. § 300.430(e)(9)(iii). Respondents shall submit to U.S. EPA and the State six (6) copies of all plans, reports, submittals and other deliverables required under this Settlement Agreement, the SOW and the RI/FS Planning Documents in accordance with the approved schedule for review and approval pursuant to Section X (U.S. EPA Approval of Plans and Other Submissions). All deliverables required by the SOW shall be submitted as directed by the SOW (see Page 2 of the SOW for detailed instructions on this point). Upon request by U.S. EPA, Respondents shall submit in electronic form all portions of RI and FS Reports, any report or other deliverable Respondents are required to submit pursuant to provisions of this Settlement Agreement, including the SOW. Detailed requirements for all reports and deliverables required by the SOW are set forth on page 2 of the SOW. Upon approval by U.S. EPA, all deliverables under this Settlement Agreement, including the SOW, shall be incorporated into and become enforceable under this Settlement Agreement.

36. Community Involvement Plan

U.S. EPA will prepare a Community Involvement Plan, in accordance with U.S. EPA guidance and the NCP. As requested by U.S. EPA, Respondents shall provide information supporting U.S. EPA's community relations programs.

37. Modification of any plans.

a. If at any time during the RI/FS process, Respondents identify a need for additional data, Respondents shall submit a memorandum documenting the need for additional data to the U.S. EPA Project Coordinator within seven (7) days of identification. U.S. EPA in its

12

discretion will determine whether the additional data will be collected by Respondents and whether it will be incorporated into reports and deliverables.

b. In the event of unanticipated or changed circumstances at the Site, Respondents shall notify the U.S. EPA Project Coordinator by telephone within 24 hours of discovery of the unanticipated or changed circumstances. In addition to the authorities in the NCP, in the event that U.S. EPA determines that the immediate threat or the unanticipated or changed circumstances warrant changes in the RI/FS Planning Documents, U.S. EPA shall modify or amend the RI/FS Planning Documents in writing accordingly. Respondents shall perform the RI/FS Planning Documents as modified or amended.

c. U.S. EPA may determine that in addition to tasks defined in the initially approved RI/FS Planning Documents, other additional Work may be necessary to accomplish the objectives of the RI/FS as set forth in the SOW for this RI/FS. U.S. EPA may require that Respondents perform these response actions in addition to those required by the initially approved RI/FS Planning Documents, including any approved modifications, if it determines that such actions are necessary for a complete RI/FS.

d. Respondents shall confirm their willingness to perform the additional Work in writing to U.S. EPA within 7 days of receipt of the U.S. EPA request. If Respondents object to any modification determined by U.S. EPA to be necessary pursuant to this Paragraph, Respondents may seek dispute resolution pursuant to Section XV (Dispute Resolution). The SOW and/or RI/FS Planning Documents shall be modified in accordance with the final resolution of the dispute.

e. Respondents shall complete the additional Work according to the standards, specifications, and schedule set forth or approved by U.S. EPA in a written modification to the RI/FS Planning Documents or written work plan supplement. U.S. EPA reserves the right to conduct the Work itself at any point, to seek reimbursement from Respondents, and/or to seek any other appropriate relief.

f. Nothing in this Paragraph shall be construed to limit U.S. EPA's authority to require performance of further response actions as otherwise provided in this Settlement Agreement.

38. Off-Site Shipment of Waste Material.

a. Respondents shall, prior to any off-site shipment of Waste Material from the Site to an out-of-state waste management facility, provide written notification of such shipment of Waste Material to the appropriate state environmental official in the receiving facility's state and to U.S. EPA's Designated Project Coordinator. However, this notification requirement shall not apply to any off-site shipments when the total volume of all such shipments will not exceed 10 cubic yards.

13

b. Respondents shall include in the written notification the following information: (1) the name and location of the facility to which the Waste Material is to be shipped: (2) the type and quantity of the Waste Material to be shipped; (3) the expected schedule for the shipment of the Waste Material; and (4) the method of transportation. Respondents shall notify the state in which the planned receiving facility is located of major changes in the shipment plan, such as a decision to ship the Waste Material to another facility within the same state, or to a facility in another state.

c. The identity of the receiving facility and state will be determined by Respondents following the award of the contract for the remedial investigation and feasibility study. Respondents shall provide the information required by Subparagraph 38.b and 38.d as soon as practicable after the award of the contract and before the Waste Material is actually shipped.

d. Before shipping any hazardous substances, pollutants, or contaminants from the Site to an off-site location, Respondents shall obtain U.S. EPA's certification that the proposed receiving facility is operating in compliance with the requirements of CERCLA Section 121(d)(3), 42 U.S.C. § 9621(d)(3), and 40 C.F.R. § 300.440. Respondents shall only send hazardous substances, pollutants, or contaminants from the Site to an off-site facility that complies with the requirements of the statutory provision and regulation cited in the preceding sentence.

39. Meetings. Respondents shall make presentations at, and participate in, meetings at the request of U.S. EPA during the initiation, conduct, and completion of the RI/FS. In addition to discussion of the technical aspects of the RI/FS, topics will include anticipated problems or new issues. Meetings will be scheduled at U.S. EPA's discretion.

40. Progress Reports. In addition to the deliverables set forth in this Settlement Agreement, Respondents shall provide to U.S. EPA monthly progress reports by the 10th day of the following month. At a minimum, with respect to the preceding month, these progress reports shall (1) describe the actions which have been taken to comply with this Settlement Agreement during that month, (2) include hard copies and electronic copies (according to U.S. EPA Region 5 specifications) of all results of sampling and tests and all other data received by the Respondents (3) describe Work planned for the next two months with schedules relating such Work to the overall project schedule for RI/FS completion, and (4) describe all problems encountered and any anticipated problems, any actual or anticipated delays, and solutions developed and implemented to address any actual or anticipated problems or delays.

41. Emergency Response and Notification of Releases.

a. In the event of any action or occurrence during performance of the Work which causes or threatens a release of Waste Material from the Site that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action. Respondents shall take these actions in accordance

14

with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondents shall also immediately notify the U.S. EPA Project Coordinator or, in the event of his/her unavailability, the On Scene Coordinator ("OSC") or the Regional Duty Officer, U.S. EPA Region 5 Emergency Planning and Response Branch at (Tel: (312) 353-2318) of the incident or Site conditions. In the event that Respondents fail to take appropriate response action as required by this Paragraph, and U.S. EPA takes such action instead, Respondents shall reimburse U.S. EPA all costs of the response action not inconsistent with the NCP pursuant to Section XVIII (Payment of Response Costs).

b. In addition, in the event of any release of a hazardous substance from the Site, Respondents shall immediately notify the U.S. EPA Project Coordinator, the OSC or Regional Duty Officer at (312) 353-2318 and the National Response Center at (800) 424-8802. Respondents shall submit a written report to U.S. EPA within 7 days after each release, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103(c) of CERCLA, 42 U.S.C. § 9603(c), and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq*.

## X. U.S. EPA APPROVAL OF PLANS AND OTHER SUBMISSIONS

42. After review of any plan, report or other item that is required to be submitted for approval pursuant to this Settlement Agreement, including the SOW, U.S. EPA shall: (a) approve, in whole or in part, the submission; (b) approve the submission upon specified conditions; (c) modify the submission to cure the deficiencies; (d) disapprove, in whole or in part, the submission, directing that Respondents modify the submission; or (e) any combination of the above. However, U.S. EPA shall not modify a submission without first providing Respondents at least one notice of deficiency and an opportunity to cure within 21 days, except where to do so would cause serious disruption to the Work or where previous submission(s) have been disapproved due to material defects.

43. In the event of approval, approval upon conditions, or modification by U.S. EPA, pursuant to Subparagraph 42(a), (b), (c) or (e), Respondents shall proceed to take any action required by the plan, report or other item, as approved or modified by U.S. EPA subject only to their right to invoke the Dispute Resolution procedures set forth in Section XV (Dispute Resolution) with respect to the modifications or conditions made by U.S. EPA. Following U.S. EPA approval or modification of a submittal or portion thereof, Respondents shall not thereafter alter or amend such submittal or portion thereof unless directed by U.S. EPA. In the event that U.S. EPA modifies the submission to cure the deficiencies pursuant to Subparagraph 42(c) and the submission had a material defect, U.S. EPA retains the right to seek stipulated penalties, as provided in Section XVI (Stipulated Penalties). U.S. EPA also retains the right to perform its own studies, complete the RI/FS (or any portion of the RI/FS), and seek reimbursement from Respondents for its costs; and/or seek any other appropriate relief.

15

44. <u>Resubmission of Plans.</u>

a. Upon receipt of a notice of disapproval, Respondents shall, within 15 days or such longer time as specified by U.S. EPA in such notice, correct the deficiencies and resubmit the plan, report, or other item for approval. Any stipulated penalties applicable to the submission, as provided in Section XVI, shall accrue during the 15-day period or otherwise specified period but shall not be payable unless the resubmission is disapproved or modified due to a material defect as provided in Paragraphs 45 and 46.

b. Notwithstanding the receipt of a notice of disapproval, Respondents shall proceed to take any action required by any non-deficient portion of the submission unless otherwise directed by U.S. EPA. Implementation of any non-deficient portion of a submission shall not relieve Respondents of any liability for stipulated penalties under Section XVI (Stipulated Penalties).

c. Respondents shall not proceed further with any subsequent activities or tasks until receiving U.S. EPA approval for the following deliverables: RI/FS Work Plan/Field Sampling Plan, Quality Assurance Project Plan, Draft Remedial Investigation Report, Treatability Testing Work Plan and Sampling and Analysis Plan, and Draft Feasibility Study Report. While awaiting U.S. EPA approval on these deliverables, Respondents shall proceed with all other tasks and activities which may be conducted independently of these deliverables, in accordance with the schedule set forth in this Settlement Agreement.

d. For all remaining deliverables not enumerated above in subparagraph 44.c., Respondents shall proceed will all subsequent tasks, activities and deliverables without awaiting U.S. EPA approval on the submitted deliverable. U.S. EPA reserves the right to stop Respondents from proceeding further, either temporarily or permanently, on any task, activity or deliverable at any point during the RI/FS.

45. If U.S. EPA disapproves a resubmitted plan, report or other item, or portion thereof, U.S. EPA may direct Respondents to correct the deficiencies. U.S. EPA also retains the right to modify or develop the plan, report or other item. Respondents shall implement any such plan, report, or item as corrected, modified or developed by U.S. EPA, subject only to their right to invoke the procedures set forth in Section XV (Dispute Resolution).

46. If upon resubmission, a plan, report, or item is disapproved or modified by U.S. EPA due to a material defect, Respondents shall be deemed to have failed to submit such plan, report, or item timely and adequately unless Respondents invoke the dispute resolution procedures in accordance with Section XV (Dispute Resolution) and U.S. EPA's action is revoked or substantially modified pursuant to a Dispute Resolution decision issued by U.S. EPA or superceded by an agreement reached pursuant to that Section. The provisions of Section XV (Dispute Resolution) and Section XVI (Stipulated Penalties) shall govern the implementation of the Work and accrual and payment of any stipulated penalties during Dispute Resolution. If U.S. EPA's disapproval or modification is not otherwise revoked, substantially modified or

16

superceded as a result of a decision or agreement reached pursuant to the Dispute Resolution
process set forth in Section XV, stipulated penalties shall accrue for such violation from the date
on which the initial submission was originally required, as provided in Section XVI.

47. In the event that U.S. EPA takes over some of the tasks, but not the preparation of the
RI Report or the FS Report, Respondents shall incorporate and integrate information supplied by
U.S. EPA into the final reports.

48. All plans, reports, and other items submitted to U.S. EPA under this Settlement
Agreement shall, upon approval or modification by U.S. EPA, be incorporated into and
enforceable under this Settlement Agreement. In the event U.S. EPA approves or modifies a
portion of a plan, report, or other item submitted to U.S. EPA under this Settlement Agreement,
the approved or modified portion shall be incorporated into and enforceable under this
Settlement Agreement.

49. Neither failure of U.S. EPA to expressly approve or disapprove of Respondents'
submissions within a specified time period, nor the absence of comments, shall be construed as
approval by U.S. EPA. Whether or not U.S. EPA gives express approval for Respondents'
deliverables, Respondents are responsible for preparing deliverables acceptable to U.S. EPA.

## XI. QUALITY ASSURANCE, SAMPLING AND DATA AVAILABILITY

50. Quality Assurance. Respondents shall assure that Work performed, samples taken
and analyses conducted conform to the requirements of the SOW, the QAPP and guidances
identified therein. Respondents will assure that field personnel used by Respondents are properly
trained in the use of field equipment and in chain of custody procedures. Respondents shall only
use laboratories which have a documented quality system that complies with "EPA Requirements
for Quality Management Plans (QA/R-2)" (EPA/240/B-01/002, March 2001) or equivalent
documentation as determined by U.S. EPA.

51. Sampling.

a. All results of sampling, tests, modeling or other data (including raw data)
generated by Respondents, or on Respondents' behalf, during the period that this Settlement
Agreement is effective, shall be submitted to U.S. EPA (in paper and electronic form according
to U.S. EPA Region 5 specifications) in the next monthly progress report as described in
Paragraph 40 of this Settlement Agreement. U.S. EPA will make available to Respondents
validated data generated by U.S. EPA unless it is exempt from disclosure by any federal or state
law or regulation.

b. Respondents shall verbally notify U.S. EPA, and the State at least 15 days prior
to conducting any field events as described in the SOW and RI/FS Work Plan/Field Sampling
Plan. At U.S. EPA's verbal or written request, or the request of U.S. EPA's oversight assistant,
Respondents shall allow split or duplicate samples to be taken by U.S. EPA (and its authorized

17

representatives) and the State, of any samples collected by Respondents in implementing this
Settlement Agreement. All split samples of Respondents shall be analyzed by the methods
identified in the QAPP.

52. Data Availability.

a. At all reasonable times, U.S. EPA and its authorized representatives shall have
the authority to enter and freely move about all property at the Site and off-site areas where
Work, if any, is being performed, for the purposes of inspecting conditions, activities, the results
of activities, records, operating logs, and contracts related to the Site or Respondents and its
contractor pursuant to this Settlement Agreement; reviewing the progress of Respondents in
carrying out the terms of this Settlement Agreement; conducting tests as U.S. EPA or its
authorized representatives deem necessary; using a camera, sound recording device or other
documentary type equipment; and verifying the data submitted to U.S. EPA by Respondents.
Respondents shall allow these persons to inspect and copy all records, files, photographs,
documents, sampling and monitoring data, and other writings related to Work undertaken in
carrying out this Settlement Agreement. Nothing herein shall be interpreted as limiting or
affecting U.S. EPA's right of entry or inspection authority under federal law. All persons
accessing the Site under this paragraph shall comply with all approved Health and Safety Plans.

b. Respondents may assert business confidentiality claims covering part or all of
the documents or information submitted to U.S. EPA and the State under this Settlement
Agreement to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA. 42
U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be
confidential by U.S. EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B.
If no claim of confidentiality accompanies documents or information when it is submitted to U.S.
EPA and the State, or if U.S. EPA has notified Respondents that the documents or information
are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2,
Subpart B, the public may be given access to such documents or information without further
notice to Respondents. Respondents agree not to assert confidentiality claims with respect to any
data related to Site conditions, sampling, or monitoring. Respondents shall segregate and clearly
identify all documents or information submitted under this Settlement Agreement for which
Respondents assert business confidentiality claims.

53. In entering into this Settlement Agreement, Respondents waive any objections to any
data gathered, generated, or evaluated by U.S. EPA, the State or Respondents in the performance
or oversight of the Work that has been verified according to the quality assurance/quality control
(QA/QC) procedures required by the Settlement Agreement or any U.S. EPA-approved Work
Plans or Sampling and Analysis Plans. If Respondents object to any other data relating to the
RI/FS, Respondents shall submit to U.S. EPA a report that specifically identifies and explains
their objections, describes the acceptable uses of the data, if any, and identifies any limitations to
the use of the data. The report must be submitted to U.S. EPA within 15 days of the monthly
progress report containing the data.

18

## XII. SITE ACCESS AND INSTITUTIONAL CONTROLS

54. If the Site, or any other property where access is needed to implement this Settlement Agreement, is owned or controlled by any of Respondents, such Respondents shall, commencing on the Effective Date, provide U.S. EPA ,the State, and their representatives, including contractors, with access at all reasonable times to the Site, or such other property, for the purpose of conducting any activity related to this Settlement Agreement.

55. Where any action under this Settlement Agreement is to be performed in areas owned by or in possession of someone other than Respondents, Respondents shall use their best efforts to obtain all necessary access agreements within 15 days after the Effective Date, or as otherwise specified in writing by the U.S. EPA Project Coordinator. Respondents shall immediately notify U.S. EPA if after using their best efforts they are unable to obtain such agreements. For purposes of this Paragraph, "best efforts" includes the payment of reasonable sums of money in consideration of access. Respondents shall describe in writing their efforts to obtain access. U.S. EPA may then assist Respondents in gaining access, to the extent necessary to effectuate the response actions described herein, using such means as U.S. EPA deems appropriate. Respondents shall reimburse U.S. EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XVIII (Payment of Response Costs).

56. Notwithstanding any provision of this Settlement Agreement, U.S. EPA retains all of its access authorities and rights, as well as all of its rights to require land/water use restrictions, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

57. If Respondents cannot obtain access agreements, U.S. EPA may obtain access for Respondents, perform those tasks or activities with U.S. EPA contractors, or terminate the Settlement Agreement. In the event that U.S. EPA performs those tasks or activities with U.S. EPA contractors and does not terminate the Settlement Agreement, Respondents shall perform all other activities not requiring access to that property, and shall reimburse U.S. EPA for all costs incurred in performing such activities. Respondents shall integrate the results of any such tasks undertaken by U.S. EPA into its reports and deliverables.

## XIII. COMPLIANCE WITH OTHER LAWS

58. Respondents shall comply with all applicable local, state and federal laws and regulations when performing the RI/FS. No local, state, or federal permit shall be required for any portion of any action conducted entirely on-site, including studies, if the action is selected and carried out in compliance with Section 121 of CERCLA, 42 U.S.C. § 9621. Where any portion of the Work is to be conducted off-site and requires a federal or state permit or approval, Respondents shall submit timely and complete applications and take all other actions necessary to obtain and to comply with all such permits or approvals. This Settlement Agreement is not,

19

and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## XIV. RETENTION OF RECORDS

59. During the pendency of this Settlement Agreement and for a minimum of 10 years after commencement of construction of any remedial action, each Respondent shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Site, regardless of any corporate retention policy to the contrary. Until 10 years after commencement of construction of any remedial action, Respondents shall also instruct their contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work.

60. At the conclusion of this document retention period, Respondents shall notify U.S. EPA at least 90 days prior to the destruction of any such records or documents, and, upon request by U.S. EPA, Respondents shall deliver any such records or documents to U.S. EPA. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Respondents assert such a privilege, they shall provide U.S. EPA with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by Respondents. However, no documents, reports or other information created or generated pursuant to the requirements of this Settlement Agreement shall be withheld on the grounds that they are privileged.

61. Each Respondent hereby certifies individually that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by U.S. EPA or the filing of suit against it regarding the Site and that it has fully complied with any and all U.S. EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XV. DISPUTE RESOLUTION

62. Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally.

63. If Respondents object to any U.S. EPA action taken pursuant to this Settlement Agreement, including billings for Future Response Costs, they shall notify U.S. EPA in writing of their objection(s) within 10 days of such action, unless the objection(s) has/have been resolved informally. U.S. EPA and Respondents shall have 20 days from U.S. EPA's receipt of Respondents' written objection(s) to resolve the dispute (the "Negotiation Period"). The Negotiation Period may be extended at the sole discretion of U.S. EPA. Such extension may be granted verbally but must be confirmed in writing to be effective.

64. Any agreement reached by the Parties pursuant to this Section shall be in writing and shall, upon signature by the Parties, be incorporated into and become an enforceable part of this Settlement Agreement. If the Parties are unable to reach an agreement within the Negotiation Period, an U.S. EPA management official at the Superfund Branch Chief level or higher will issue a written decision. U.S. EPA's decision shall be incorporated into and become an enforceable part of this Settlement Agreement. Respondents' obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Respondents shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with U.S. EPA's decision, whichever occurs. Respondents shall proceed in accordance with U.S. EPA's final decision regarding the matter in dispute, regardless of whether Respondents agree with the decision. If Respondents do not agree to perform or do not actually perform the Work in accordance with U.S. EPA's final decision, U.S. EPA reserves the right in its sole discretion to conduct the Work itself, to seek reimbursement from Respondents, to seek enforcement of the decision, to seek stipulated penalties, and/or to seek any other appropriate relief.

## XVI. STIPULATED PENALTIES

65. Respondents shall be liable to U.S. EPA for stipulated penalties in the amounts set forth in Paragraphs 66 and 67 for failure to comply with any of the requirements of this Settlement Agreement specified below unless excused under Section XVII (Force Majeure). "Compliance" by Respondents shall include completion of the Work under this Settlement Agreement or any activities contemplated under any of the RI/FS Planning Documents, work plans or other plan approved under this Settlement Agreement identified below in accordance with all applicable requirements of law, this Settlement Agreement, the SOW, and any plans or other documents approved by U.S. EPA pursuant to this Settlement Agreement and within the specified time schedules established by and approved under this Settlement Agreement.

66. Stipulated Penalty Amounts - Work.

a. The following stipulated penalties shall accrue per day for any noncompliance identified in Subparagraph 66(b):

21

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000.00 | 1st through 21st day |
| $2000.00 | 22d through 30th day |
| $3000.00 | 31st day and beyond |

    b.  Compliance Milestones:

- Timely notification to U.S. EPA in writing of names, titles and qualification of the personnel, including contractors, subcontractors, consultants, and laboratories to be used in carrying out the Work [Paragraph 29(a) and (b)].

- Submission to U.S. EPA of Respondent's designated Project Coordinator's name, address, telephone number and qualifications [Paragraph 30].

- Conduct site characterization activities as described in the SOW and RI/FS Work Plan/Field Sampling Plan [Paragraph 35].

- Prepare Technical Assistance Plan [Paragraph 36].

- Submission of Memorandum documenting need for additional data collection activities identified by Respondents [Paragraph 37(a)].

- Provide written commitment of willingness to perform additional Work identified by U.S. EPA [Paragraph 37(d)].

- Provide copy of written notification to U.S. EPA of off-site shipment of Waste Material from the Site to an out-of-state waste management facility [Paragraph 38].

- Monthly Progress Reports [Paragraph 40].

- Written report due in the event of any release of a hazardous substance from the Site [Paragraph 40(b)].

- Report objecting to RI/FS data [Paragraph 53].

- Provide written description of failed efforts to obtain access [Paragraph 55].

- Payment of Future Response Costs [Paragraph 79].

- Establish escrow account in the event of any dispute over billing.

22

67. Stipulated Penalty Amounts - RI/FS Planning Documents, Reports and Technical Memoranda

a. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate plans, reports, technical memoranda or other written documents required by Tasks 1 through 7 of the SOW in accordance with the Schedule in the SOW:

| Penalty Per Violation Per Day | Period of Noncompliance |
|---|---|
| $1,000 | 1st through 21st day |
| $2,000 | 22d through 30th day |
| $3,000 | 31st day and beyond |

68. Respondents shall be liable for stipulated penalties in the amount of $500.00 per day for the first week or part thereof and $1,000.00 per day for each week or part thereof thereafter for failure to meet any other obligation under this Settlement Agreement including the SOW.

69. All penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (1) with respect to a deficient submission under Section X (U.S. EPA Approval of Plans and Other Submissions), during the period, if any, beginning on the 31st day after U.S. EPA's receipt of such submission until the date that U.S. EPA notifies Respondents of any deficiency; and (2) with respect to a decision by the U.S. EPA Management Official at the Superfund Branch Chief level or higher, under Paragraph 64 of Section XV (Dispute Resolution), during the period, if any, beginning on the 21st day after the Negotiation Period begins until the date that the U.S. EPA management official issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

70. Following U.S. EPA's determination that Respondents have failed to comply with a requirement of this Settlement Agreement, U.S. EPA may give Respondents written notification of the same and describe the noncomp
liance. U.S. EPA may send Respondents a written demand for the payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether U.S. EPA has notified Respondents of a violation.

71. All penalties accruing under this Section shall be due and payable to U.S. EPA within 30 days of Respondents' receipt from U.S. EPA of a demand for payment of the penalties, unless Respondents invoke the dispute resolution procedures in accordance with Section XV (Dispute Resolution). All payments to U.S. EPA under this Section shall be paid by certified or