# EXHIBIT A – Part 2

cashier's check(s) made payable to "EPA Hazardous Substances Superfund," shall be mailed to U.S. EPA, Region 5, P. O. Box 371531, Pittsburgh, PA 15251-7531, shall indicate that the payment is for stipulated penalties, and shall reference the U.S. EPA Region and Site/Spill ID Number B52B, the U.S. EPA Docket Number V-W-'06-C-852, and the name and address of the party(ies) making payment. Copies of check(s) paid pursuant to this Section, and any accompanying transmittal letter(s) shall be sent to:

|  |  |
|---|---|
| Thomas C. Nash | Karen Cibulskis |
| Site Attorney | Remedial Project Manager |
| Office of Regional Counsel | Superfund Division |
| Mail Code C-14J | Mail Code SR-6J |
| 77 West Jackson | 77 West Jackson |
| Chicago, IL 60604-3590 | Chicago, IL 60604-3590 |

72. The payment of penalties shall not alter in any way Respondents' obligation to complete performance of the Work required under this Settlement Agreement.

73. Penalties shall continue to accrue as provided in Paragraph 69 during any dispute resolution period, but need not be paid until 15 days after the dispute is resolved by agreement or by receipt of U.S. EPA's decision.

74. If Respondents fail to pay stipulated penalties when due, U.S. EPA may institute proceedings to collect the penalties, as well as Interest. Respondents shall pay Interest on the unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph 71.

75. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any way limiting the ability of U.S. EPA to seek any other remedies or sanctions available by virtue of Respondents' violation of this Settlement Agreement or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(l) of CERCLA, 42 U.S.C. § 9622(l), and punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided, however, that U.S. EPA shall not seek civil penalties pursuant to Section 122(l) of CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for which a stipulated penalty is provided herein, except in the case of willful violation of this Settlement Agreement or in the event that U.S. EPA assumes performance of a portion or all of the Work pursuant to Section XX (Reservation of Rights by U.S. EPA), Paragraph 86. Notwithstanding any other provision of this Section, U.S. EPA may, in its sole and unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this Settlement Agreement.

## XVII. FORCE MAJEURE

76. Respondents agree to perform all requirements of this Settlement Agreement within the time limits established under this Settlement Agreement, unless the performance is delayed by a *force majeure*. For purposes of this Settlement Agreement, *force majeure* is defined as any event arising from causes beyond the control of Respondents or of any entity controlled by Respondents, including but not limited to their contractors and subcontractors, which delays or prevents performance of any obligation under this Settlement Agreement despite Respondents' best efforts to fulfill the obligation. *Force majeure* does not include financial inability to complete the Work or increased cost of performance.

77. If any event occurs or has occurred that may delay the performance of any obligation under this Settlement Agreement, whether or not caused by a *force majeure* event, Respondents shall notify U.S. EPA orally within twenty four hours of when Respondents first knew that the event might cause a delay. Within five (5) days thereafter, Respondents shall provide to U.S. EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondents' rationale for attributing such delay to a *force majeure* event if they intend to assert such a claim; and a statement as to whether, in the opinion of Respondents, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall preclude Respondents from asserting any claim of *force majeure* for that event for the period of time of such failure to comply and for any additional delay caused by such failure.

78. If U.S. EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by U.S. EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other obligation. If U.S. EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, U.S. EPA will notify Respondents in writing of its decision. If U.S. EPA agrees that the delay is attributable to a *force majeure* event, U.S. EPA will notify Respondents in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event.

## XVIII. PAYMENT OF RESPONSE COSTS

79. Payments for Future Response Costs.

a. Respondents shall pay U.S. EPA all Future Response Costs not inconsistent with the NCP. On a periodic basis, U.S. EPA will send Respondents a bill requiring payment that includes Region 5's Itemized Cost Summary, which includes direct and indirect costs

incurred by U.S. EPA and its contractors. If the U.S. Department of Justice has incurred costs for this Site, the bill will also include a DOJ-prepared cost summary, which would reflect costs incurred by DOJ and its contractors, if any. Respondents shall make all payments within 30 days of receipt of each bill requiring payment, except as otherwise provided in this Settlement Agreement. Respondents shall make all payments required by this Paragraph by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party(ies) making payment and U.S. EPA Site/Spill ID number B52B. Respondents shall send the check(s) to:

> U.S. Environmental Protection Agency, Region 5
> P. O. Box 371531,
> Pittsburgh, PA 15251-7531

Payment made pursuant to this paragraph may also be made to U.S. EPA by Electronics Funds Transfer ("EFT") in accordance with current EFT procedures to be provided to Respondents by U.S. EPA Region 5, and shall be accompanied by a statement identifying the name and address of the party(ies) making payment, the Site name, the U.S. EPA Region and Site/Spill ID Number B52B, and the U.S. EPA docket number for this action. Region 5 EFT procedures are: make payment to:

> Federal Reserve Bank of New York
> ABA No. 021030004
> Account No. 68010727
> 33 Liberty Street
> New York, NY 10045

Field Tag 4200 of the Fedwire message is: "D 68010727 Environmental Protection Agency."

Respondents shall: 1) complete Respondents' required bank form; 2) include Federal Reserve Bank of New York ABA # 021030004 on the bank form; 3) include the U.S. EPA Account # 68010727 on the form; and 4) include a statement identifying the name and address of the party(ies) making payment, the Site name, and the U.S. EPA Region and Site/Spill ID Number B52B.

b. At the time of payment, Respondents shall send notice that payment has been made to:

Thomas C. Nash                    Karen Cibulskis
Site Attorney                     Remedial Project Manager
Office of Regional Counsel        Superfund Division
Mail Code C-14J                   Mail Code SR-6J
77 West Jackson                   77 West Jackson
Chicago, IL 60604-3590            Chicago, IL 60604-3590

c. The total amount to be paid by Respondents pursuant to Subparagraph 79.a. shall be deposited in the South Dayton Dump and Landfill Site Special Account within the U.S. EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by U.S. EPA to the U.S. EPA Hazardous Substance Superfund.

80. If Respondents do not pay Future Response Costs within 30 days of Respondents' receipt of a bill, Respondents shall pay Interest on the unpaid balance of Future Response Costs. The Interest on unpaid Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. If U.S. EPA receives a partial payment, Interest shall accrue on any unpaid balance. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondents' failure to make timely payments under this Section, including but not limited to, payments of stipulated penalties pursuant to Section XVI. Respondents shall make all payments required by this Paragraph in the manner described in Paragraph 79.

81. Respondents may contest payment of any Future Response Costs under Paragraph 79 if they determine that U.S. EPA has made an accounting error or if they believe U.S. EPA incurred excess costs as a direct result of an U.S. EPA action that was inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the U.S. EPA Project Coordinator. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Respondents shall within the 30 day period pay all uncontested Future Response Costs to U.S. EPA in the manner described in Paragraph 79. Simultaneously, Respondents shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of Ohio and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondents shall send to the U.S. EPA Project Coordinator a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. Simultaneously with establishment of the escrow account, Respondents shall initiate the Dispute Resolution procedures in Section XV (Dispute Resolution). If U.S. EPA prevails in the dispute, within 5 days of the resolution of the dispute, Respondents shall pay the sums due (with accrued interest) to U.S. EPA in the manner described in Paragraph 79. If Respondents prevail concerning any aspect of the contested costs, Respondents shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to U.S. EPA in the manner described in Paragraph 79. Respondents shall be disbursed any balance of the escrow account. The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding Respondents' obligation to reimburse U.S. EPA for its Future Response Costs.

## XIX. COVENANT NOT TO SUE BY U.S. EPA

82. In consideration of the actions that will be performed and the payments that will be made by Respondents under the terms of this Settlement Agreement, and except as otherwise specifically provided in this Settlement Agreement, U.S. EPA covenants not to sue or to take administrative action against Respondents pursuant to Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606 and 9607(a), for the Work and Future Response Costs. This covenant not to sue shall take effect upon the Effective Date and is conditioned upon the complete and satisfactory performance by Respondents of all obligations under this Settlement Agreement, including, but not limited to, payment of Future Response Costs pursuant to Section XVIII. This covenant not to sue extends only to Respondents and does not extend to any other person.

## XX. RESERVATIONS OF RIGHTS BY U.S. EPA

83. Except as specifically provided in this Settlement Agreement, nothing herein shall limit the power and authority of U.S. EPA or the United States to take, direct, or order all actions necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or solid waste on, at, or from the Site. Further, nothing herein shall prevent U.S. EPA from seeking legal or equitable relief to enforce the terms of this Settlement Agreement, from taking other legal or equitable action as it deems appropriate and necessary, or from requiring Respondents in the future to perform additional activities pursuant to CERCLA or any other applicable law.

84. The covenant not to sue set forth in Section XIX above does not pertain to any matters other than those expressly identified therein. U.S. EPA reserves, and this Settlement Agreement is without prejudice to, all rights against Respondents with respect to all other matters, including, but not limited to:

> a. claims based on a failure by Respondents to meet a requirement of this Settlement Agreement;

> b. liability for costs not included within the definitions of Future Response Costs;

> c. liability for performance of response action other than the Work;

> d. criminal liability;

> e. liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

> f. liability arising from the past, present, or future disposal, release or threat of release of Waste Materials outside of the Site; and

28

g. liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Site.

h. liability for costs incurred if U.S. EPA assumes the performance of the Work pursuant to paragraph 85.

85. <u>Work Takeover</u>. In the event U.S. EPA determines that Respondents have ceased implementation of any portion of the Work, are deficient or late in their performance of the Work, or are implementing the Work in a manner which may cause an endangerment to human health or the environment, U.S. EPA may assume the performance of all or any portion of the Work as U.S. EPA determines necessary. Respondents may invoke the procedures set forth in Section XV (Dispute Resolution) to dispute U.S. EPA's determination that takeover of the Work is warranted under this Paragraph. Notwithstanding any other provision of this Settlement Agreement, U.S. EPA retains all authority and reserves all rights to take any and all response actions authorized by law.

## XXI. COVENANT NOT TO SUE BY RESPONDENTS

86. Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work, Future Response Costs, or this Settlement Agreement, including, but not limited to:

a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

b. any claim arising out of the Work or arising out of the response actions for which the Future Response Costs have or will be incurred, including any claim under the United States Constitution, the Ohio Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

c. any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Work or payment of Future Response Costs.

87. Except as provided in Paragraph 91, these covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Paragraphs 84 (b), (c), and (e) - (g), but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

29

88. Nothing in this Agreement shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

89. **AGREEMENT NOT TO CHALLENGE LISTING.** Respondents agree not to seek judicial review of a decision to list the Site on the NPL at any time after the Effective Date of this Settlement Agreement based on a claim that changed site conditions that resulted from the performance of the Work in any way affected the basis for listing the Site.

90. **WAIVER OF CLAIMS AGAINST DE MICROMIS PARTIES.** Respondents agree not to assert any claims and to waive all claims or causes of action that they may have for all matters relating to the Site, including for contribution, against any person where the person's liability to Respondents with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials.

91. The waiver in Paragraph 90 shall not apply with respect to any defense, claim, or cause of action that a Respondent may have against any person meeting the above criteria if such person asserts a claim or cause of action relating to the Site against such Respondent. This waiver also shall not apply to any claim or cause of action against any person meeting the above criteria if U.S. EPA determines:

a. that such person has failed to comply with any U.S. EPA requests for information or administrative subpoenas issued pursuant to Section 104(e) or 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) or 9622(e), or Section 3007 of the Solid Waste Disposal Act (also known as the Resource Conservation and Recovery Act or "RCRA"), 42 U.S.C. § 6972, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site, or has been convicted of a criminal violation for the conduct to which this waiver would apply and that conviction has not been vitiated on appeal or otherwise; or

b. that the materials containing hazardous substances contributed to the Site by such person have contributed significantly, or could contribute significantly, either individually or in the aggregate, to the cost of response action or natural resource restoration at the Site.]

92. **NATURAL RESOURCE DAMAGES.** For the purposes of Section 113(g)(1) of CERCLA, the parties agree that, upon issuance of this Settlement Agreement, remedial action under CERCLA shall be deemed to be scheduled and an action for damages (as defined in 42 U.S.C. § 9601(6)) must be commenced within 3 years after the completion of the remedial action.

30

## XXII. OTHER CLAIMS

93. By issuance of this Settlement Agreement, the United States and U.S. EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondents.

94. Except as expressly provided in Section XXI, Paragraph 90, (Non-Exempt De Micromis Waivers) and Section XIX (Covenant Not to Sue by U.S. EPA), nothing in this Settlement Agreement constitutes a satisfaction of or release from any claim or cause of action against Respondents or any person not a party to this Settlement Agreement, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States for costs, damages and interest under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

95. No action or decision by U.S. EPA pursuant to this Settlement Agreement shall give rise to any right to judicial review.

## XXIII. CONTRIBUTION

96. a. The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and that Respondents are entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Sections 113(f)(2) and 122(h)(4) of CERCLA, 42 U.S.C. §§ 9613(f)(2) and 9622(h)(4), for "matters addressed" in this Settlement Agreement. The "matters addressed" in this Settlement Agreement are the Work, and Future Response Costs.

b. The Parties agree that this Settlement Agreement constitutes an administrative settlement for purposes of Section 113(f)(3)(B) of CERCLA, 42. U.S.C. § 9113(f)(3)(B), pursuant to which the Respondents have, as of the Effective Date, resolved their liability to the United States for the Work, and Future Response Costs.

c. Except as provided in Section XXI , Paragraph 90 of this Settlement Agreement (Non-Exempt De Micromis Waivers),"nothing in this Settlement Agreement precludes the United States or Respondents from asserting any claims, causes of action, or demands for indemnification, contribution, or cost recovery against any person not a party to this Settlement Agreement. Nothing herein diminishes the right of the United States, pursuant to Section 113(f)(2)and (3), 42 U.S.C. § 9613(f)(2) and (3), to pursue any such persons to obtain additional response costs or response action, and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2).

## XXIV. INDEMNIFICATION

97. Respondents shall indemnify, save and hold harmless the United States, its officials, agents, contractors, subcontractors, employees and representatives from any and all claims or causes of action arising from, or on account of negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, or subcontractors, in carrying out actions pursuant to this Settlement Agreement. In addition, Respondents agree to pay the United States all costs incurred by the United States, including but not limited to attorneys fees and other expenses of litigation and settlement, arising from or on account of claims made against the United States based on negligent or other wrongful acts or omissions of Respondents, their officers, directors, employees, agents, contractors, subcontractors and any persons acting on their behalf or under their control, in carrying out activities pursuant to this Settlement Agreement. The United States shall not be held out as a party to any contract entered into by or on behalf of Respondents in carrying out activities pursuant to this Settlement Agreement. Neither Respondents nor any such contractor shall be considered an agent of the United States.

98. The United States shall give Respondents notice of any claim for which the United States plans to seek indemnification pursuant to this Section and shall consult with Respondents prior to settling such claim.

99. Respondents waive all claims against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States, arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to the Site. In addition, Respondents shall indemnify and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of Respondents and any person for performance of Work on or relating to the Site.

## XXV. INSURANCE

100. At least 21 days prior to commencing any On-Site Work under this Settlement Agreement, Respondents shall secure, and shall maintain for the duration of this Settlement Agreement, comprehensive general liability insurance and automobile insurance with limits of five million dollars, combined single limit, naming the United States as an additional insured. Within the same period, Respondents shall provide U.S. EPA with certificates of such insurance and a copy of each insurance policy. Respondents shall submit such certificates and copies of policies each year on the anniversary of the Effective Date. In addition, for the duration of the Settlement Agreement, Respondents shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of Respondents in furtherance of this Settlement Agreement. If Respondents demonstrate by evidence satisfactory

32

to U.S. EPA that any contractor or subcontractor maintains insurance equivalent to that described
above, or insurance covering some or all of the same risks but in an equal or lesser amount, then
Respondents need provide only that portion of the insurance described above which is not
maintained by such contractor or subcontractor.

## XXVI. FINANCIAL ASSURANCE

101. Within 30 days of the Effective Date, Respondents shall establish and maintain
financial security for the benefit of U.S. EPA in the amount of $1,500,000 in one or more of the
following forms, in order to secure the full and final completion of Work by Respondents:

> a. a surety bond unconditionally guaranteeing payment and/or performance of the
> Work;
>
> b. one or more irrevocable letters of credit, payable to or at the direction of U.S.
> EPA, issued by financial institution(s) acceptable in all respects to U.S. EPA
> equaling the total estimated cost of the Work;
>
> c. a trust fund administered by a trustee acceptable in all respects to U.S. EPA;
>
> d. a policy of insurance issued by an insurance carrier acceptable in all respects to
> U.S. EPA, which ensures the payment and/or performance of the Work;
>
> e. a corporate guarantee to perform the Work provided by one or more parent
> corporations or subsidiaries of Respondents, or by one or more unrelated
> corporations that have a substantial business relationship with at least one of
> Respondents; including a demonstration that any such company satisfied the
> financial test requirements of 40 C.F.R. § 264.143(f);
>
> f. a corporate guarantee to perform the Work by one or more of Respondents,
> including a demonstration that any such Respondent satisfies the requirements of
> 40 C.F.R. §143(f); and/or
>
> g. any other financial mechanism acceptable to and approved by U.S. EPA

102. Any and all financial assurance instruments provided pursuant to this Section shall
be in form and substance satisfactory to U.S. EPA, determined in U.S. EPA's sole discretion. In
the event that U.S. EPA determines at any time that the financial assurances provided pursuant to
this Section (including, without limitation, the instrument(s) evidencing such assurances) are
inadequate, Respondents shall, within 30 days of receipt of notice of U.S. EPA's determination,
obtain and present to U.S. EPA for approval one of the other forms of financial assurance listed
in Paragraph 102, above. In addition, if at any time U.S. EPA notifies Respondents that the
anticipated cost of completing the Work has increased, then, within 30 days of such notification,

Respondents shall obtain and present to U.S. EPA for approval a revised form of financial assurance (otherwise acceptable under this Section) that reflects such cost increase. Respondents' inability to demonstrate financial ability to complete the Work shall in no way excuse performance of any activities required under this Settlement Agreement.

103. If Respondents seek to ensure completion of the Work through a guarantee pursuant to Subparagraph 101.e. or 101.f. of this Settlement Agreement, Respondents shall (i) demonstrate to U.S. EPA's satisfaction that the guarantor satisfies the requirements of 40 C.F.R. § 264.143(f); and (ii) resubmit sworn statements conveying the information required by 40 C.F.R. § 264.143(f) annually, on the anniversary of the Effective Date, to U.S. EPA. For the purposes of this Settlement Agreement, wherever 40 C.F.R. § 264.143(f) references "sum of current closure and post-closure costs estimates and the current plugging and abandonment costs estimates," the current cost estimate of $1,500,000 for the Work at the Site shall be used in relevant financial test calculations.

104. If, after the Effective Date, Respondents can show that the estimated cost to complete the remaining Work had diminished below the amount set forth in Paragraph 102 of this Section, Respondents may, on any anniversary date of the Effective Date, or at any other time agreed to by the Parties, reduce the amount of the financial security provided under this Section to the estimated cost of the remaining Work to be performed. Respondents shall submit a proposal for such reduction to U.S. EPA, in accordance with the requirements of this Section, and may reduce the amount of the security after receiving written approval from U.S. EPA. In the event of a dispute, Respondents may seek dispute resolution pursuant to Section XV (Dispute Resolution) and may reduce the amount of security in accordance with U.S. EPA's written decision resolving the dispute.

106. Respondents may change the form of financial assurance provided under this Section at any time, upon notice to and prior written approval by U.S. EPA, provided that U.S. EPA determines that the new form of assurance meets the requirements of this Section. In the event of a dispute, Respondents may change the form of the financial assurance only in accordance with the written decision resolving the dispute.

## XXVII. SEVERABILITY/INTEGRATION/APPENDICES

106. If a court issues an order that invalidates any provision of this Settlement Agreement or finds that Respondents have sufficient cause not to comply with one or more provisions of this Settlement Agreement, Respondents shall remain bound to comply with all provisions of this Settlement Agreement not invalidated or determined to be subject to a sufficient cause defense by the court's order.

107. This Settlement Agreement including its appendices, and any deliverables, technical memoranda, specifications, schedules, documents, plans, reports (other than progress reports), etc. that will be developed pursuant to this Settlement Agreement and become incorporated into

34

and enforceable under this Settlement Agreement constitute the final, complete and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Settlement Agreement. The parties acknowledge that there are no representations, agreements or understandings relating to the settlement other than those expressly contained in this Settlement Agreement. The following appendices are attached to and incorporated into this Settlement Agreement:

"Appendix A" is the SOW.

"Appendix B" consists of two documents depicting the Site, an aerial photograph and a map produced by the Montgomery County Appraiser's Office.

"Appendix C" is the list of Settling Parties ("Respondents") who have signed this Settlement Agreement and agreed to be bound by the terms of this Administrative Order on Consent (Settlement Agreement).

## XXVIII. ADMINISTRATIVE RECORD

108. U.S. EPA will determine the contents of the administrative record file for selection of the remedial action. Respondents shall submit to U.S. EPA documents developed during the course of the RI/FS upon which selection of the response action may be based. Upon request of U.S. EPA, Respondents shall provide copies of plans, task memoranda for further action, quality assurance memoranda and audits, raw data, field notes, laboratory analytical reports and other reports. Upon request of U.S. EPA, Respondents shall additionally submit any previous studies conducted under state, local or other federal authorities relating to selection of the response action, and all communications between Respondents and state, local or other federal authorities concerning selection of the response action. U.S. EPA shall establish a community information repository at or near the Site, to house one copy of the administrative record.

## XXIX. EFFECTIVE DATE AND SUBSEQUENT MODIFICATION

109. This Settlement Agreement shall be effective three days after the Settlement Agreement is signed by the Director of the Superfund Division or his/her delegate.

110. This Settlement Agreement may be amended by mutual agreement of U.S. EPA and Respondents. Amendments shall be in writing and shall be effective when signed by U.S. EPA. U.S. EPA Project Coordinators do not have the authority to sign amendments to the Settlement Agreement.

111. No informal advice, guidance, suggestion, or comment by the U.S. EPA Project Coordinator or other U.S. EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondents shall relieve Respondents of their obligation to

35

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this 2ND day of AUGUST , 2006

For Respondent KATHRYN A. BOESCH

Signature: _Kathryn A. Boesch_

Name: C/O TIMOTHY D. HOFFMAN

Title: COOLIDGE WALL

Address: 33 W 1ST ST

DAYTON OHIO 45402

(937) 449-5540

36

obtain any formal approval required by this Settlement Agreement, or to comply with all
requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance
with this Settlement Agreement, with the exception of any continuing obligations required by
this Settlement Agreement, including but not limited to, payment of Future Response Costs,
provision of Access, and record retention, U.S. EPA will provide written notice to Respondents.
If U.S. EPA determines that any such Work has not been completed in accordance with this
Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and
require that Respondents modify the RI/FS Planning Documents or other work plan if
appropriate in order to correct such deficiencies. Respondents shall implement the modified and
approved RI/FS Planning Documents or other approved work plan and shall submit the required
deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the
approved modified RI/FS Planning Documents or other work plan shall be a violation of this
Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on
Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this 1st day of August , 2006 .

For Respondent GENERAL MOTORS CORPORATION

Signature: James P. Walle

Name: JAMES P. WALLe
Attorney At Law    P31198

Title: _____

Address: 300 RENAISSANCE CENTER
M/C 482-C24-024
DETROIT, MI 48243

obtain any formal approval required by this Settlement Agreement. or to comply with all
requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance
with this Settlement Agreement. with the exception of any continuing obligations required by
this Settlement Agreement, including but not limited to, payment of Future Response Costs,
provision of Access, and record retention, U.S. EPA will provide written notice to Respondents.
If U.S. EPA determines that any such Work has not been completed in accordance with this
Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and
require that Respondents modify the RI/FS Planning Documents or other work plan if
appropriate in order to correct such deficiencies. Respondents shall implement the modified and
approved RI/FS Planning Documents or other approved work plan and shall submit the required
deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the
approved modified RI/FS Planning Documents or other work plan shall be a violation of this
Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on
Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this 2ND day of AUGUST , 2006

For Respondent MARGARET C. GRILLOT

Signature: *Margaret C. Grillot*

Name: C/O TIMOTHY D. HOFFMAN

Title: COOLIDGE WALL

Address: 33 W 1ST ST
DAYTON, OHIO 45402
(937) 449-5540

36

obtain any formal approval required by this Settlement Agreement. or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement. with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs. provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this __1__ day of __August__, 2 __006__

For Respondent _____ Hobart Corporation _____

Signature _____

Name: _____ Philip S. Dallosto _____

Title: _____ Associate General Counsel _____

Address: _____ Illinois Tool Works Inc. _____

3600 West Lake Avenue
Glenview, IL 60026

NOTE: Hobart Corporation is a wholly owned
subsidiary of Illinois Tool Works Inc.

36

obtain any formal approval required by this Settlement Agreement, or to comply with all requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance with this Settlement Agreement, with the exception of any continuing obligations required by this Settlement Agreement, including but not limited to, payment of Future Response Costs, provision of Access, and record retention, U.S. EPA will provide written notice to Respondents. If U.S. EPA determines that any such Work has not been completed in accordance with this Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and require that Respondents modify the RI/FS Planning Documents or other work plan if appropriate in order to correct such deficiencies. Respondents shall implement the modified and approved RI/FS Planning Documents or other approved work plan and shall submit the required deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the approved modified RI/FS Planning Documents or other work plan shall be a violation of this Settlement Agreement.

The Undersigned Party enters into this Administrative Settlement Agreement and Order on Consent in the matter of the South Dayton Dump and Landfill Site.

Agreed this 3 day of August , 2006.

For Respondent Kelsey Hayes Company

Signature:

Name:    David Bialosky

Title:    Vice President & General Counsel

Address:    12001 Tech Center Drive, Livonia, MI 48154

obtain any formal approval required by this Settlement Agreement, or to comply with all
requirements of this Settlement Agreement, unless it is formally modified.

## XXX. NOTICE OF COMPLETION OF WORK

112. When U.S. EPA determines, that all Work has been fully performed in accordance
with this Settlement Agreement, with the exception of any continuing obligations required by
this Settlement Agreement, including but not limited to, payment of Future Response Costs,
provision of Access, and record retention, U.S. EPA will provide written notice to Respondents.
If U.S. EPA determines that any such Work has not been completed in accordance with this
Settlement Agreement, U.S. EPA will notify Respondents, provide a list of the deficiencies, and
require that Respondents modify the RI/FS Planning Documents or other work plan if
appropriate in order to correct such deficiencies. Respondents shall implement the modified and
approved RI/FS Planning Documents or other approved work plan and shall submit the required
deliverable(s) in accordance with the U.S. EPA notice. Failure by Respondents to implement the
approved modified RI/FS Planning Documents or other work plan shall be a violation of this
Settlement Agreement.


The Undersigned Party enters into this Administrative Settlement Agreement and Order on
Consent in the matter of the South Dayton Dump and Landfill Site.


Agreed this __ day of ___August___, 2006.

For Respondent __NCR Corporation___

Signature: _____

Name: __Sara R Olene__

Title: __Chief Litigation Counsel__

Address: __1700 S Patterson Blvd, Dayton, ON 45479__

36

It is so ORDERED AND AGREED this _____ 10th _____ day of _August_, 2006.

BY: _____    DATE: 8/10/2006

for   Richard C. Karl, Director
      Superfund Division
      U.S. Environmental Protection Agency
      Region 5

EFFECTIVE DATE: ___ 8/15/2006 ___

37

**Appendix A - Statement of Work**

## STATEMENT OF WORK
## FOR A REMEDIAL INVESTIGATION AND FEASIBILITY STUDY
## AT THE SOUTH DAYTON DUMP AND LANDFILL SITE
## MORAINE, OHIO

### PURPOSE:

This Statement of Work (SOW) sets forth the requirements for conducting a Remedial Investigation and Feasibility Study (RI/FS) at the 80-acre South Dayton Dump and Landfill Site located at 1975 Dryden Road in Moraine, Ohio (Figure 1). Based on a historical air photo analysis, handwritten notes on an undated tax map from the Montgomery County Combined Health Department, drum removal activities and a title search, the South Dayton Dump and Landfill Site property currently includes: 1) Lot 5054 (Valley Asphalt); 2) Lots 5171, 5172, 5173, 5174, 5175, 5176, 5177 and 5178 (Boesch and Grillot Plat); 3) Lot 3274 (Miami Conservancy District); 3) Lots 3753 and 4423 (Jim City Salvage); and 4) Lots 4610 and 3252 (Ronald Barnett) (Figure 2). The South Dayton Dump and Landfill Site also includes all off-property areas where hazardous substances or contaminants from the property or from past operations at the property have or may have come to be located ("the Site").

The RI shall evaluate the nature and extent of hazardous substances or contaminants at the Site. The RI shall also assess the risk which these hazardous substances or contaminants present for human health and the environment. The FS Report shall evaluate alternatives for addressing the impact to human health and the environment from hazardous substances or contaminants at the Site.

The Respondents have requested, and U.S. EPA agrees that the Respondents shall use a Presumptive Remedy approach consistent with U.S. EPA guidance including *Conducting Remedial Investigations/Feasibility Studies for CERCLA Municipal Landfill Sites* (EPA/540/P-91/001, February 1991) (Municipal Landfill Guidance) and *Presumptive Remedy for CERCLA Municipal Landfill Sites*, (EPA/540/F-93/035, September 1993) (Presumptive Remedy Guidance) to address the potential risk from direct contact with the landfill contents in the central portion of the Site (Figure 3 - Presumptive Remedy Area). Lead and copper are present in surface soil/material in this area (surface soil sample SS-10 collected 0-4" below ground surface) at concentrations as high as 12,100 mg/Kg for lead and 191,000 mg/Kg for copper (OEPA Site Team Evaluation Prioritization Report, December 24, 1996). A streamlined risk evaluation based on U.S. EPA Region 9 Preliminary Remediation Goals for industrial exposure (ingestion, inhalation and direct contact) indicates that these chemicals pose an unacceptable non-cancer hazard index of 15 for lead and 4.65 for copper. These hazard indices exceed U.S. EPA's acceptable non-cancer hazard index of 1 and, consistent with the Presumptive Remedy Guidance, indicate that remedial action is clearly warranted in this area. Consistent with the guidance, the Respondents and U.S. EPA agree that the presumptive remedy to address the direct contact risks in this area shall be containment (i.e., a landfill cap).

The Respondents shall conduct a conventional (i.e., not streamlined) RI/FS, risk assessment and ecological assessment consistent with the requirements of this SOW for all Site areas and/or media not addressed by the Presumptive Remedy approach above, and in all Site areas and/or media where the Respondents have not clearly indicated that there is a basis for remedial action and that a Presumptive Remedy approach is appropriate. The Respondents may, at any time, propose to expand the area identified on Figure 3-1 based on the data collected during the RI. Unless otherwise agreed to by U.S. EPA, a conventional RI/FS, baseline human health risk assessment and ecological assessment shall be conducted for:

- Landfill material, surface and subsurface soil and hot spots outside the Presumptive Remedy Area. The Respondents shall also investigate potential hot spots within the Presumptive Remedy Area as required by U.S. EPA based on the data collected during the RI or as needed to meet the objectives of this SOW. U.S. EPA may also require the Respondents to characterize the landfill materials and/or surface and subsurface soil within the Presumptive Remedy Area as a component of other Site investigations (i.e., groundwater, leachate, landfill and soil gas, surface water and sediment, property re-use, and closure requirements).
- Groundwater within and outside the Presumptive Remedy Area
- Leachate within and outside the Presumptive Remedy Area
- Landfill gas and soil vapor within and outside the Presumptive Remedy Area
- Surface water and sediment within and outside the Presumptive Remedy Area
- Air outside the Presumptive Remedy Area

The RI/FS shall comply with all requirements and guidance for RI/FS studies and reports, and shall also comply with the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), as amended by the Superfund Amendments and Reauthorization Act (SARA), and the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), Final Rule (40 CFR Part 300). At a minimum, the Respondents shall prepare and complete the RI and FS Reports consistent with the *Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA* (EPA/540/G-89/004, October 1988) (RI/FS Guidance), the Municipal Landfill Guidance, the Presumptive Remedy Guidance, and any other relevant guidance that the United States Environmental Protection Agency (U.S. EPA) uses in conducting or submitting deliverables for a RI/FS, as well as any additional requirements in the Administrative Settlement and Agreement on Consent (ASAOC). The RI/FS Guidance describes the report format and the required report content. Numerical references to the appropriate sections of the RI/FS Guidance follow the section headings throughout this SOW. U.S. EPA will provide any guidance, evolving or published during the conduct of the RI/FS, to the Respondents in a reasonable time frame prior to the due date for the submittal of applicable interim or final deliverables identified in this SOW. A partial list of guidance is included at the end of this SOW.

The Respondents shall submit all documents or deliverables required as part of this SOW to U.S. EPA, with a copy to the Ohio Environmental Protection Agency (Ohio EPA), for review and approval by U.S. EPA after consultation with the Ohio EPA.

Unless otherwise agreed to by U.S. EPA, the Respondents shall submit 4 paper copies of each deliverable to U.S. EPA and one paper copy of each deliverable to U.S. EPA's oversight contractor. Unless otherwise agreed to by U.S. EPA, the Respondents shall also submit electronic copies of each deliverable to U.S. EPA on compact disk in file formats compatible with MS Word and MS Excel, and one electronic copy of each deliverable in .pdf format. Files submitted in .pdf format shall not exceed 10MB in size.

The Respondents shall furnish all personnel, materials, and services necessary for, or incidental to, performing the RI/FS at the Site, except as otherwise specified herein.

At the completion of the RI/FS, U.S. EPA will be responsible for selecting a Site remedy, and will document the selected remedy in a Record of Decision (ROD). The remedial action selected by U.S. EPA will meet the cleanup standards specified in CERCLA Section 121. That is, the selected remedial action will protect human health and the environment; will comply with, or include a waiver of, applicable or relevant and appropriate requirements of other laws; will be cost-effective; will use permanent solutions and alternative treatment technologies or resource recovery technologies to the maximum extent practicable; and will address the statutory preference for treatment as a principal element. The final RI/FS Reports, as adopted by U.S. EPA, shall, with the administrative record, form the basis for the selection of the Site remedy and shall provide the information necessary to support the development of the ROD.

As specified in CERCLA Section 104(a)(1), as amended by SARA, U.S. EPA and Ohio EPA will provide oversight of the Respondents' activities throughout the RI/FS, including all field sampling activities. The Respondents shall support U.S. EPA's and Ohio EPA's initiation and conduct of activities related to the implementation of oversight activities.

## SCOPE:

The tasks Respondents shall complete as part of this RI/FS are:

Task 1: Project Scoping and RI/FS Planning Documents
Task 2: Community Relations
Task 3: Site Characterization
Task 4: Remedial Investigation Report
Task 5: Treatability Studies
Task 6: Development and Screening of Alternatives (Technical Memorandum)
Task 7: Detailed Analysis of Alternatives (FS Report)
Task 8: Progress Reports

## TASK 1: PROJECT SCOPING AND RI/FS PLANNING DOCUMENTS

Scoping is the initial planning process of the RI/FS and is initiated by U.S. EPA prior to issuing special notice. During this time, the Site-specific objectives of the RI/FS, including the preliminary remedial action objectives, are determined by U.S. EPA. Scoping is initiated prior to negotiations between the Respondents and U.S. EPA, and is continued, repeated as necessary, and refined throughout the RI/FS process. In addition to developing the Site-specific objectives of the RI/FS, U.S. EPA will determine a general management approach for the Site.

Consistent with the general management approach, the Respondents and U.S. EPA will plan the specific project scope. The Respondents shall document the specific project scope in the RI/FS Planning Documents. Because the work required to perform a RI/FS is not fully known at the onset, and is phased according to a Site's complexity and the amount of available information, it may be necessary to modify the Planning Documents during the RI/FS to satisfy the objectives of the study.

The preliminary objectives for the remedial action at the Site, based on currently available information [see Chapter 4 of *Conducting Remedial Investigations/Feasibility Studies for CERCLA Municipal Landfill Sites* (EPA/540/P-91/001, February 1991) and Section 1.2 of *Presumptive Response Strategy and Ex-Situ Treatment Technologies for Contaminated Groundwater at CERCLA Sites* (EPA 540-R-96-023, October 1996)] are:

- Contain and prevent direct contact with landfill contents and surface and subsurface soil in the Presumptive Remedy Area;

- Contain and prevent direct contact with landfill contents and surface and subsurface soil outside the Presumptive Remedy Area that pose an unacceptable current or potential future risk to human health or the environment;

- Minimize infiltration and resulting contaminant leaching to groundwater and surface water in areas where contaminants are currently leaching or have the potential to leach at concentrations that pose or would pose an unacceptable current or potential future risk to human health or the environment;

- Control surface water runoff and erosion;

- Treat or eliminate high levels of hazardous substances, pollutants, or contaminants (hot spots) to the extent practicable and necessary to protect human health and the environment;

- Collect and treat and/or contain contaminated groundwater and/or leachate to prevent further migration from the source area if the contaminated groundwater and/or leachate poses an unacceptable current or potential future risk to human health or the environment;

- Control and treat landfill gas and soil vapors that pose an unacceptable current or potential future risk to human health or the environment;

- Prevent exposure to contaminated groundwater above acceptable risk levels;

- Prevent or minimize further migration of the groundwater contaminant plume and actual or potential impacts to drinking water supplies and/or ecosystems (e.g., groundwater impacts to surface water, sediments, organisms and/or the food chain);

- Return the groundwater to its expected beneficial uses wherever practicable within a reasonable time frame for the Site;

- Remediate Site-related contaminated surface water and sediments;

- Remediate contaminated wetland areas that pose an unacceptable current or potential future risk to human health or the environment;

- Mitigate or abate other situations or factors that may pose a threat to public health, welfare, or the environment.

The strategy for achieving the remedial objectives and for the general management of the site will include the following. The Respondents shall:

- Conduct a remedial investigation and feasibility study consistent with the Municipal Landfill Guidance and the Presumptive Remedy Guidance to determine the extent of the landfilled materials to be contained in the Presumptive Remedy Area and to evaluate containment alternatives to address the direct contact risk from the landfilled materials in the Presumptive Remedy Area.

- Conduct a remedial investigation to fully determine the nature and extent of the release or threatened release of hazardous substances, pollutants, or contaminants in all Site areas and/or media not address by the Presumptive Remedy approach, and in all Site areas and/or media where the Respondents have not clearly indicated that there is a basis for remedial action and that a Presumptive Remedy approach is appropriate (see "Purpose" section of this SOW). In performing this investigation, the Respondents shall gather sufficient data, samples, and other information to fully characterize Site geology, hydrogeolgy, the nature and extent of the contamination at the Site, contaminant fate and transport mechanisms, and to support the human health and ecological risk assessments conducted for this Site. The RI shall include a hot spot investigation within and outside the Presumptive Remedy Area, and U.S. EPA may also require the Respondents to characterize the landfill materials and/or surface and subsurface soil within the Presumptive Remedy Area as a

*SDDL SOW*
*03-13-06*                                5