# EXHIBIT E – Part 1

## UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
### REGION 5

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Docket No. |
| | ) | |
| THE LANDFILL | ) | |
| AT THE | ) | ADMINISTRATIVE SETTLEMENT |
| | ) | AGREEMENT AND ORDER ON |
| TREMONT CITY LANDFILL SITE, | ) | CONSENT PURSUANT TO |
| 3108 SNYDER-DOMER ROAD, | ) | SECTIONS 104, 106, 107 and 122 OF |
| | ) | THE |
| CLARK COUNTY, OHIO | ) | COMPREHENSIVE |
| | ) | ENVIRONMENTAL RESPONSE, |
| Respondents are identified in | ) | |
| Attachment C. | ) | COMPENSATION, AND |
| | ) | LIABILITY ACT OF 1980, |
| | ) | as amended, 42 U.S.C. |
| | ) | §§ 9604, 9606, 9607, 9622. |
| | ) | |
| | ) | |

## I. JURISDICTION AND GENERAL PROVISIONS

1.  This Administrative Settlement Agreement and Order on Consent (Settlement Agreement) is entered into voluntarily by the United States Environmental Protection Agency (U.S. EPA) and Respondents identified in Attachment C to this Settlement Agreement. This Settlement Agreement provides for the performance of certain response actions by Respondents at or in connection with the Landfill or Landfill Operable Unit at the Tremont City Landfill Site, 3108 Snyder-Domer Road, Tremont City, German Township, Clark County, Ohio.

2.  This Settlement Agreement is issued under the authority vested in the President of the United States by Sections 104, 106(a), 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9604, 9607 and 9622, as amended (CERCLA). This authority has been delegated to the Administrator of the U.S. EPA by Executive Order No. 12580, January 23, 1987, 52 Federal Register 2923, and further delegated to the Regional Administrators by U.S. EPA Delegation Nos. 14-14-A, 14-14-C and 14-14-D, and to the Director, Superfund Division, Region 5, by Regional Delegation Nos. 14-14-A, 14-14-C and 14-14-D.

3.  U.S. EPA has notified the State of Ohio (State) of this action pursuant to Section 106(a) of CERCLA, 42 U.S.C. § 9606(a).

4.  U.S. EPA and Respondents recognize that this Settlement Agreement has been

negotiated in good faith and that the actions undertaken by Respondents in accordance with this Settlement Agreement do not constitute an admission of any liability. Respondents do not admit, and retain the right to controvert in any subsequent proceedings other than proceedings to implement or enforce this Settlement Agreement, the validity of the findings of facts, conclusions of law, and determinations in Sections IV and V of this Settlement Agreement. Respondents agree to comply with and be bound by the terms of this Settlement Agreement and further agree that they will not contest the basis or validity of this Settlement Agreement or its terms.

## II. **PARTIES BOUND**

5.  This Settlement Agreement applies to and is binding upon U.S. EPA and upon Respondents and their heirs, successors and assigns. Any change in ownership or corporate status of Respondents including, but not limited to, any transfer of assets or real or personal property shall not alter Respondents' responsibilities under this Settlement Agreement.

6.  Respondents are jointly and severally liable for carrying out all activities required by this Settlement Agreement. In addition, Respondent Springfield Gas Company, Inc. is jointly and severally liable with the other Respondents for carrying out all activities required by this Settlement Agreement that address releases primarily caused by Springfield Gas Company, Inc. In the event of the insolvency or other failure of any one or more Respondents to implement the requirements of this Settlement Agreement, the remaining Respondents shall complete all such requirements.

7.  Respondents shall ensure that their contractors, subcontractors, and representatives comply with this Settlement Agreement. Respondents shall be responsible for any noncompliance with this Settlement Agreement.

## III. **DEFINITIONS**

8.  Unless otherwise expressly provided herein, terms used in this Settlement Agreement which are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Settlement Agreement or in the appendices attached hereto and incorporated hereunder, the following definitions shall apply:

a.  "Effective Date" shall mean the effective date of this Settlement Agreement as provided in Section XXVIII.

b.  "Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing plans, reports, technical memoranda and other items pursuant to this Settlement Agreement, conducting community relations, providing technical assistance grants to community groups (if any), verifying the Work, or otherwise implementing, overseeing, or enforcing this Settlement

2

Agreement, including but not limited to, payroll costs, contractor costs (including fees), travel costs, laboratory costs, ATSDR costs, and the costs incurred pursuant to Paragraphs 23 and 32.

c. " Interest" shall mean interest at the rate specified for interest on investments of the U.S. EPA Hazardous Substances Superfund established by 26 U.S.C. § 9507, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year.

d. "Landfill" or "Landfill Operable Unit" shall mean the closed landfill facility, comprised of approximately 58 acres, which is located in a southern area of the Tremont City Landfill Site. For CERCLA response purposes, the Landfill Operable Unit includes any nearby media contaminated from Landfill-related activities. The Landfill or Landfill Operable Unit is depicted generally in Attachment A.

e. "National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

f. "Parties" shall mean U.S. EPA and Respondents.

g. "Respondents" shall mean those Parties identified in Attachment C.

h. "Settlement Agreement" shall mean this Administrative Settlement Agreement and Order on Consent and all appendices attached hereto. In the event of conflict between this Settlement Agreement and any appendix, this Settlement Agreement shall control.

i. "Site" shall mean the Tremont City Landfill Site, 3108 Snyder-Domer Road, German Township, Clark County, Ohio, comprised of approximately 80 acres and consisting of a closed landfill facility, a closed barrel fill facility, and a closed waste transfer station facility. The Site is depicted generally in Attachment B.

j. "Work" shall mean all activities Respondents are required to perform under Paragraph 15 of this Settlement Agreement.

## IV. U.S. EPA'S FINDINGS OF FACT

9. Based on available information, including the Administrative Record in this matter, U.S. EPA hereby finds that:

a. The Landfill is comprised of approximately 58 acres located in a southern area of the Tremont City Landfill Site. The Landfill began operation in October 1969 when a permit was issued by the Ohio Department of Health allowing the disposal of municipal waste and

3

industrial wastes, including, but not limited to, grinder sludge, paint burn-off ash, wastewater treatment sludge from electroplating operations, oil sludge and paint sludge. Based on available information, asbestos also was disposed of in the Landfill. Approximately one-third of the Landfill is unlined. The Landfill closed in September 1995 and is depicted generally in Attachment A.

b. Hydro-geological data indicate that surface drainage of the Landfill and shallow groundwater movement beneath the Landfill flow to a ravine containing an intermittent stream that is a tributary to Chapman Creek. Chapman Creek has been identified as a cold water habitat by Ohio EPA.

c. Historical and hydro-geological information indicates that the base of the Landfill may be in contact with an underlying aquifer.

d. The Landfill has waste containment systems consisting of a leachate collection system, a landfill gas control system, a storm water management system and a landfill cover system.

e. The Tremont Landfill Company, Inc. is the owner of the Site, including the Landfill. The Tremont Landfill Company, Inc. is a subsidiary of Danis Industries, Inc. Danis Industries, Inc. or its subsidiaries have owned and operated the Landfill since its creation.

f. The Tremont Landfill Company has been cited for numerous violations of the Ohio Administrative Code, Chapter 3745-27 (Ohio Solid Waste Rules) and a September 18, 2003, Order issued by the Clark County Board of Health concerning the improper operation and maintenance of and the inadequate funding of an assurance instrument for the Landfill. Tremont Landfill Company has discontinued performing some of its post-closure obligations at the Landfill.

g. Respondents Waste Management of Ohio and Allied Waste Industries, Inc. arranged for the disposal of hazardous substances at the Site and transported hazardous substances to the Site.

h. Respondent International Truck & Engine Corporation arranged for the disposal of hazardous substances or arranged with a transporter for transport for disposal of hazardous substances at the Site.

i. Respondents Goodyear Tire & Rubber, SK Construction, Delco, Peerless Transportation, Hobart Brothers (aka Trimark, Inc.), and Reliable Construction Services arranged for the disposal of hazardous substances or arranged with a transporter for transport for disposal of hazardous substances at the Site or transported hazardous substances to the Site.

4

j.  Respondent Springfield Gas Company, Inc. operates a methane gas recovery system on the Site.  Activities by Springfield Gas Company, Inc. at the Site have resulted in the creation of leachate seeps at the Landfill.

k.  Sampling of leachate indicates the presence of organic compounds, including vinyl chloride, xylenes, and toluene.  Presence of these compounds indicates that leachate could be a source of groundwater contamination.

l.  Sampling of landfill gas indicates the presence of organic contaminants, including methane, toluene, vinyl chloride, cis-1,2-dichloroethene, and tetrachlorethene.

m.  Releases of leachate from the leachate collection system and from the landfill cap into the ground were observed by Ohio EPA on several occasions in 2004 and 2005.

n.  A discontinuance in the operation and maintenance of the leachate collection and landfill gas control collection systems may result in the release of leachate and methane gas into the environment.

o.  The release of leachate could result in contaminated surface drainage and contaminated groundwater which could discharge into Chapman Creek and the underlying aquifer.

p.  The release of methane gas could cause explosive conditions at and near the Landfill.  Also, subsurface migration of the gas may increase the leachate mass and increase the potential for contaminant migration to the groundwater.

q.  U.S. EPA issued a General Notice letter to Respondents and other potentially responsible parties (PRPs) at the Landfill on or about December 22, 2003, and to Respondents Springfield Gas Company, Inc. and Allied Waste Industries, Inc. on or about September 30, 2005.

## V.  U.S. EPA'S CONCLUSIONS OF LAW AND DETERMINATIONS

10.  Based on the Findings of Fact set forth above, and the Administrative Record for this Site, U.S. EPA has determined that:

a.  The Landfill is a "facility," as defined by Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b.  The contamination found at the Landfill, as identified in the Findings of Fact above, includes "hazardous substances," as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

c.  Respondents are "persons," as defined by Section 101(21) of CERCLA, 42

U.S.C. § 9601(21).

d. Respondents Waste Management, Inc., Allied Waste Industries, Inc. and International Truck & Engine Corporation, Goodyear Tire & Rubber, SK Construction, Delco, Peerless Transportation, Hobart Brothers (aka Trimark, Inc.), and Reliable Construction Services are persons who generated hazardous substances found at the Landfill and/or arranged for disposal or transport for disposal of hazardous substances at the Landfill.

e. Respondent Tremont Landfill Company, Inc. is the current owner and operator of the Landfill and the grantor of a landfill gas lease which allows the assignee of the grantee, Springfield Gas Company, Inc., certain rights in land on the Site and the right to build and operate a landfill gas recovery system at the Landfill.

f. Respondent Springfield Gas Company, Inc. owns and operates a landfill gas recovery system at the Landfill pursuant to the landfill gas lease described in Subparagraph e., above. Activities performed by Springfield Gas Company, Inc. in its operation of the landfill gas recovery system at the Landfill have been the primary cause of certain of the releases of leachate from the Landfill. Springfield Gas Company, Inc., therefore, is an "operator," as defined by Section 101 (20) of CERCLA, 42 U.S.C. § 9601(20), with respect to the Landfill and is subject to actions under Sections 106 and 107(a) of CERCLA, 42 U.S.C. §§ 9606, 9607(a).

g. The conditions described in the Allegations of Fact above constitute an actual or threatened "release" of a hazardous substance from the Landfill into the environment as defined by Sections 101(8) and 101(22) of CERCLA, 42 U.S.C. §§ 9601(8) and 9601(22).

h. The conditions present at the Landfill constitute a threat to public health, welfare, or the environment based upon the factors set forth in Section 300.415(b)(2) of the National Oil and Hazardous Substances Pollution Contingency Plan, as amended (NCP), 40 CFR §300.415(b)(2). These factors include, but are not limited to, the following:

   i. Actual or potential exposure to nearby human populations, animals, or the food chain from hazardous substances, pollutants or contaminants; this factor is present at the Landfill due to the existence of leachate containing hazardous substances seeping from the Landfill.

   ii. Actual or potential contamination of drinking water supplies or sensitive ecosystems; this factor is present at the Site due to the existence of hazardous substances migrating into groundwater.

   iii. Threat of fire or explosion; this factor is present at the Landfill due to the existence of methane gas at lower explosive limits.

   iv. Other situations or factors that may pose threats to public health or

welfare or the environment; this factor is present at the Landfill due to the existence of failure to complete post-closure activities.

i.   The response actions required by this Settlement Agreement, if properly performed under the terms of this Settlement Agreement, are consistent with the NCP. The response actions required by this Settlement Agreement are necessary to protect the public health, welfare, or the environment.

## VI.  SETTLEMENT AGREEMENT AND ORDER

11.   Based upon the foregoing Findings of Fact, Conclusions of Law, Determinations, and the Administrative Record for this Site, it is hereby Ordered and Agreed that Respondents shall comply with all of their obligations under this Settlement Agreement, including, but not limited to, their obligations under all attachments to this Settlement Agreement and all documents incorporated by reference into this Settlement Agreement.

## VII.  DESIGNATION OF PROJECT COORDINATOR
## AND REMEDIAL PROJECT MANAGER

12.   Within 15 business days after the Effective Date, Respondents shall designate a Project Coordinator and shall submit to U.S. EPA the designated Project Coordinator's name, address, telephone number, and qualifications. The Project Coordinator shall coordinate administration of all actions by Respondents required by this Settlement Agreement. U.S. EPA retains the right to disapprove of the designated Project Coordinator, but approval shall not unreasonably be withheld. If U.S. EPA disapproves of the designated Project Coordinator, Respondents shall retain a different Project Coordinator and shall notify U.S. EPA of that person's name, address, telephone number, and qualifications within 10 business days following U.S. EPA's disapproval. Receipt by Respondents' Project Coordinator of any notice or communication from U.S. EPA relating to this Settlement Agreement shall constitute receipt by Respondents.

13.   U.S. EPA has designated Ron Murawski of the Remedial Response Branch #2, Region 5, as its Remedial Project Manager (RPM). Except as otherwise provided in this Settlement Agreement, Respondents shall direct all submissions required by this Settlement Agreement to the RPM at 77 West Jackson Boulevard, SR-6J, Chicago, Illinois, 60604-3590, by certified or express mail. Respondents shall also send a copy of all submissions to Diana Embil, Associate Regional Counsel, 77 West Jackson Boulevard, C-14J, Chicago, Illinois, 60604-3590. Respondents are encouraged to make submissions to U.S. EPA on recycled paper (which includes significant post-consumer waste paper content where possible) and using two-sided copies. Receipt by the RPM of any notice or communication from Respondents relating to this Settlement Agreement shall constitute receipt by U.S. EPA.

14.   U.S. EPA and Respondents shall have the right, subject to Paragraph 12, to change

their respective designated RPM or Project Coordinator. U.S. EPA shall notify the Respondents, and Respondents shall notify U.S. EPA at least 24 hours before such a change. The initial notification may be made orally but it shall be promptly followed by a written notice.

## VIII. WORK TO BE PERFORMED

15. Respondents shall perform the activities relating to the Landfill described in Subparagraphs a. through e., below. These activities shall comply with the requirements of the Ohio Administrative Code pertaining to Post-Closure Care for solid waste landfills.

      a. maintain the integrity and effectiveness of the existing leachate management system, including leachate collection and disposal, repairs and upkeep of the system, and performance of necessary leachate sampling and analysis;

      b. maintain the integrity and effectiveness of the existing landfill gas control system, including monitoring, flaring and gas collection as necessary;

      c. maintain the integrity and effectiveness of the surface water and sedimentation management systems;

      d. maintain the integrity and effectiveness of the cap system, including making repairs to the cap system as necessary to correct the effects of settling, dead vegetation, subsidence, ponding, erosion, leachate outbreaks, or other events, and prevent run-on and run-off from eroding or otherwise damaging the cap system;

      e. maintain as necessary any access roads needed to safely access and perform the Work.

16. Work Plan and Implementation

      a. Within 30 business days after the Effective Date, Respondents shall submit to U.S. EPA for approval a draft Work Plan, including a Quality Assurance Project Plan and Field Sampling Plan where sampling is required, for performing the Work generally described in Paragraph 15, above. The draft Work Plan shall provide a description of, and an expeditious schedule for, the actions required by this Settlement Agreement.

      b. U.S. EPA may approve, disapprove, require revisions to, or modify the draft Work Plan in whole or in part. If U.S. EPA requires revisions, Respondents shall submit a revised draft Work Plan within 7 business days of receipt of U.S. EPA's notification of the required revisions. Respondents shall implement the Work Plan as approved in writing by U.S. EPA in accordance with the schedule approved by U.S. EPA. Once approved, or approved with modifications, the Work Plan, the schedule, and any subsequent modifications shall be incorporated into and become fully enforceable under this Settlement Agreement.

c.   Respondents shall not commence any Work except in conformance with the terms of this Settlement Agreement. Respondents shall not commence implementation of the Work Plan developed until receiving written U.S. EPA approval pursuant to Paragraph 16.b.

17.   Health and Safety Plan   Within 30 business days after the Effective Date, Respondents shall submit for U.S. EPA review and comment a plan that ensures the protection of the public health and safety during performance of on-Site work under this Settlement Agreement. This plan shall be prepared consistent with U.S. EPA's Standard Operating Safety Guide (PUB 9285.1-03, PB 92-963414, June 1992). In addition, the plan shall comply with all currently applicable Occupational Safety and Health Administration (OSHA) regulations found at 29 C.F.R. Part 1910. If U.S. EPA determines that it is appropriate, the plan shall also include contingency planning. Respondents shall incorporate all changes to the plan requested by U.S. EPA and shall implement the plan during the pendency of the removal action.

18.   Quality Assurance and Sampling

a.   All sampling and analyses performed pursuant to this Settlement Agreement shall conform to U.S. EPA direction, approval, and guidance regarding sampling, quality assurance/quality control (QA/QC), data validation, and chain of custody procedures. Respondents shall ensure that the laboratory used to perform the analyses participates in a QA/QC program that complies with the appropriate U.S. EPA guidance. Respondents shall follow, as appropriate, "Quality Assurance/Quality Control Guidance for Removal Activities: Sampling QA/QC Plan and Data Validation Procedures" (OSWER Directive No. 9360.4-01, April 1, 1990), as guidance for QA/QC and sampling. Respondents shall only use laboratories that have a documented Quality System that complies with ANSI/ASQC E-4 1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs" (American National Standard, January 5, 1995), and "EPA Requirements for Quality Management Plans (QA/R-2) (EPA/240/B-01/002, March 2001)," or equivalent documentation as determined by U.S. EPA. U.S. EPA may consider laboratories accredited under the National Environmental Laboratory Accreditation Program (NELAP) as meeting the Quality System requirements. With respect to any proposed contractor, the Respondents shall demonstrate that the proposed contractor has a quality system which complies with ANSI/ASQC E4-1994, "Specifications and Guidelines for Quality Systems for Environmental Data Collection and Environmental Technology Programs," (American National Standard, January 5, 1995), by submitting a copy of the proposed contractor's Quality Management Plan (QMP). The QMP should be prepared in accordance with "EPA Requirements for Quality Management Plans (QA/R-2)," (EPA/240/B-01/002, March 2001) or equivalent documentation as determined by U.S. EPA.

b.   Upon request by U.S. EPA, Respondents shall have such a laboratory analyze samples submitted by U.S. EPA for QA monitoring. Respondents shall provide to U.S. EPA the QA/QC procedures followed by all sampling teams and laboratories performing data collection and/or analysis.

c.   Upon request by U.S. EPA, Respondents shall allow U.S. EPA or its authorized representatives to take split and/or duplicate samples. Respondents shall notify U.S. EPA not less than 3 business days in advance of any sample collection activity, unless shorter notice is agreed to by U.S. EPA. U.S. EPA shall have the right to take any additional samples that U.S. EPA deems necessary. Upon request, U.S. EPA shall allow Respondents to take split or duplicate samples of any samples it takes as part of its oversight of Respondents' implementation of the Work.

19.   Review and Approval of Respondents' Submissions   U.S. EPA in consultation with Ohio EPA may, consistent with the requirements of this Settlement Agreement, approve, disapprove, require revisions to, or modify in whole or in part the draft submissions made by Respondents under this Settlement Agreement. If U.S. EPA requires revisions, Respondents shall submit a revised submission within 15 business days of receipt of U.S. EPA's notification of the required revisions. Once approved, or approved with modifications, the submission shall be incorporated into and become a part of this Settlement Agreement.

20.   Reporting

a.   Respondents shall submit a written progress report to U.S. EPA concerning actions undertaken pursuant to this Settlement Agreement every 30th day after the date of receipt of U.S. EPA's approval of the Work Plan until termination of this Settlement Agreement, unless otherwise directed in writing by the RPM. These reports shall describe all significant developments during the preceding period, including the actions performed and any problems encountered, analytical data received during the reporting period, and the developments anticipated during the next reporting period, including a schedule of actions to be performed, anticipated problems, and planned resolutions of past or anticipated problems.

b.   Respondents shall submit 2 copies of all submissions required by this

Settlement Agreement. Upon request by U.S. EPA, Respondents shall submit such documents in electronic form.

c.   Respondents who own or control property at the Landfill shall, at least 30 days prior to the conveyance of any interest in real property at the Landfill , give written notice to the transferee that the property is subject to this Settlement Agreement and written notice to U.S. EPA [and the State] of the proposed conveyance, including the name and address of the transferee. Respondents who own or control property at the Landfill also agree to require that their successors comply with the immediately preceding sentence and Section IX (Landfill Access) and X (Access to Information).

21.   Final Report   Respondents shall submit for U.S. EPA review, within 60 business days after the end of the post-closure period or earlier termination of the Work set forth in Paragraph 15, above, a Final Report summarizing the actions taken pursuant to this Settlement

Agreement. The Final Report shall include a good faith estimate of total costs or a statement of actual costs incurred in performing the Work. The Final Report shall also include the following certification signed by a person who supervised or directed the preparation of the Report:

> "Under penalty of law, I certify that to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of the report, the information submitted is true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

## IX. LANDFILL ACCESS

22.    If the Landfill, or any other property in or adjacent to the area designated in Attachment B, where access is needed to implement the Work referenced in Paragraph 15 of this Settlement Agreement, is owned or controlled by Respondents, Respondents shall, commencing on the Effective Date, provide U.S. EPA and the State and their representatives, including contractors, with access at all reasonable times to the Landfill, or such other property, for the purpose of conducting any such activity or related oversight.

23.    It is the understanding of the parties that the U.S. EPA has obtained authorization to access the Landfill and any other properties where the Work referenced in Paragraph 15 of this Settlement Agreement will occur. If necessary, U.S. EPA may assist in gaining additional access, to the extent necessary to effectuate the response actions described herein, using such means as U.S. EPA deems appropriate. Respondents shall reimburse U.S. EPA for all costs and attorney's fees incurred by the United States in obtaining such access, in accordance with the procedures in Section XVIII. (Payment of Future Response Costs).

24.    Notwithstanding any provision of this Settlement Agreement, U.S. EPA retains all of its access authorities and rights, including enforcement authorities related thereto, under CERCLA, and any other applicable statutes or regulations.

## X. ACCESS TO INFORMATION

25.    Respondents shall provide to U.S. EPA and the State, upon request, copies of all non-privileged documents and information within their possession or control or that of their agents relating to the Work. Respondents shall also make available to U.S. EPA and the State, for purposes of investigation, information gathering or testimony, their employees, agents or representatives with knowledge of relevant facts concerning the performance of the Work. Prior to requesting any such access to individuals, U.S. EPA shall make reasonable efforts to secure such information from Respondents's Project Coordinator.

26. Respondents may assert business confidentiality claims covering part or all of the documents or information submitted to U.S. EPA and the State under this Settlement Agreement

11

to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Documents or information determined to be confidential by U.S. EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies documents or information when they are submitted to U.S. EPA and the State, or if U.S. EPA has notified Respondents that the documents or information are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such documents or information without further notice to Respondents.

27. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If any Respondent asserts such a privilege in lieu of providing documents, it shall provide U.S. EPA with the following information, to the extent that such information is not covered by the applicable privilege: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or information; 4) the name and title of each addressee and recipient; 5) a description of the contents of the document, record, or information; and 6) the privilege asserted by Respondents. However, no documents, reports or other information required to be submitted pursuant to this Settlement Agreement shall be withheld on the grounds that they are privileged.

## XI. RECORD RETENTION

28. Until 5 years after Respondents' receipt of U.S. EPA's notification pursuant to Section XXX (Notice of Completion of Work), Respondents shall preserve and retain all non-identical copies of records and documents (including records or documents in electronic form) now in its possession or control or which come into its possession or control that relate in any manner to the performance of the Work or the liability of any person under CERCLA with respect to the Landfill, regardless of any corporate retention policy to the contrary. Until 5 years after Respondents's receipt of U.S. EPA's notification pursuant to Section XXX (Notice of Completion of Work), Respondents shall also instruct its contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to performance of the Work. Any information that Respondents is required to provide or maintain pursuant to this Settlement Agreement is not subject to the Paperwork Reduction Act of 1995, 44 U.S.C. § 3501 et seq.

29. At the conclusion of this document retention period, Respondents shall notify U.S. EPA and the State at least 90 days prior to the destruction of any such records or documents, and, upon request by U.S. EPA or the State, Respondents shall deliver any such records or documents to U.S. EPA or the State. Respondents may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If any Respondent asserts such a privilege, it shall provide U.S. EPA or the State with the following: 1) the title of the document, record, or information; 2) the date of the document, record, or information; 3) the name and title of the author of the document, record, or

12

information; 4) the name and title of each addressee and recipient; 5) a description of the subject of the document, record, or information; and 6) the privilege asserted by Respondent. However, no documents, reports or other information required to be submitted pursuant to this Settlement Agreement shall be withheld on the grounds that they are privileged.

30. Each Respondent hereby certifies that to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed or otherwise disposed of any records, documents or other information (other than identical copies) relating to its potential liability regarding the Landfill since notification of potential liability by U.S. EPA regarding the Landfill and that it has fully complied with any and all U.S. EPA requests for information pursuant to Sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and Section 3007 of RCRA, 42 U.S.C. § 6927.

## XII. COMPLIANCE WITH OTHER LAWS

31. Respondents shall perform all actions required pursuant to this Settlement Agreement in accordance with all applicable local, state, and federal laws and regulations except as provided in Section 121(e) of CERCLA, 42 U.S.C. § 6921(e), and 40 C.F.R. §§ 300.400(e) and 300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-site actions required pursuant to this Settlement Agreement shall, to the extent practicable, as determined by U.S. EPA, considering the exigencies of the situation, attain applicable or relevant and appropriate requirements (ARARs) under federal environmental or state environmental or facility siting laws. Respondents shall identify ARARs in the Work Plan subject to U.S. EPA approval.

## XIII. EMERGENCY RESPONSE AND NOTIFICATION OF RELEASES

32. In the event of any action or occurrence during performance of the Work which causes or threatens a release of waste material from the Landfill that constitutes an emergency situation or may present an immediate threat to public health or welfare or the environment, Respondents shall immediately take all appropriate action. Respondents shall take these actions in accordance with all applicable provisions of this Settlement Agreement, including, but not limited to, the Health and Safety Plan, in order to prevent, abate or minimize such release or endangerment caused or threatened by the release. Respondents shall also immediately notify the RPM or, in the event of his/her unavailability, the Regional Duty Officer, Emergency Response Branch, Region 5 at (312) 353-2318, of the incident or Landfill conditions. In the event that Respondents fail to take appropriate response action as required by this Paragraph, and U.S. EPA takes such action instead, Respondents shall reimburse U.S. EPA all costs of the response action not inconsistent with the NCP.

33. In addition, in the event of any release of a hazardous substance from the Site, Respondents shall immediately notify the RPM at (312) 353-2318 and the National Response Center at (800) 424-8802. Respondents shall submit a written report to U.S. EPA within 7 business days after each release, setting forth the events that occurred and the measures taken or

13

to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the reoccurrence of such a release. This reporting requirement is in addition to, and not in lieu of, reporting under Section 103© of CERCLA, 42 U.S.C. § 9603©, and Section 304 of the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. § 11004, *et seq*.

## XIV. **AUTHORITY OF REMEDIAL PROJECT MANAGER**

34.  The Remedial Project Manager (RPM) shall be responsible for overseeing the implementation of this Settlement Agreement. The RPM shall have the authority vested in an On-Scene Coordinator (OSC) and an RPM by the National Contingency Plan (NCP), including the authority to halt, conduct, or direct any Work required by this Settlement Agreement. Absence of the RPM from the Landfill shall not be cause for stoppage of Work unless specifically directed by the RPM.

## XV. **DISPUTE RESOLUTION**

35.  Unless otherwise expressly provided for in this Settlement Agreement, the dispute resolution procedures of this Section shall be the exclusive mechanism for resolving disputes arising under this Settlement Agreement. The Parties shall attempt to resolve any disagreements concerning this Settlement Agreement expeditiously and informally. Any agreement reached by the parties pursuant to this Section shall be in writing and shall, upon signature by both parties, be incorporated into and become an enforceable part of this Settlement Agreement.

36.  If Respondents object to any U.S. EPA action taken pursuant to this Settlement Agreement, Respondents shall notify U.S. EPA in writing of its objection(s) within 10 business days of such action, unless the objection(s) have been resolved informally. This written notice shall include a statement of the issues in dispute, the relevant facts, all data, analysis or opinion supporting Respondents' position, and all supporting documentation on which Respondents rely. U.S. EPA shall submit its Statement of Position, including supporting documentation, within 10 business days of receipt of the written notice of dispute.

37.  U.S. EPA shall maintain an administrative record of any formal dispute under this Section. The record shall include the written notification of such dispute, and the Statement of Position served pursuant to Paragraph 36. Upon review of the administrative record, the Director of the Superfund Division, U.S. EPA Region 5, shall resolve the dispute consistent with the NCP and the terms of this Settlement Agreement.

38.  Respondents' obligations under this Settlement Agreement shall not be tolled by submission of any objection for dispute resolution under this Section. Following resolution of the dispute, as provided by this Section, Respondents shall fulfill the requirement that was the subject of the dispute in accordance with the agreement reached or with U.S. EPA's decision, whichever occurs.

14

# XVI. STIPULATED PENALTIES

39. Respondents shall be liable to U.S. EPA for stipulated penalties in the amounts set forth in Paragraph 40 for failure to comply with the Work requirements of this Settlement Agreement specified below, unless excused under Section XVII (*Force Majeure*), or modified by written agreement of the parties under Section XV (Dispute Resolution).

40. Stipulated Penalty Amounts:

|  | 1-14 days late | more than 14 days late |
|---|---|---|
| Failure to timely submit draft plans required by Paragraphs 16 and 17 | $ 250/day | $ 500/day |
| Failure to timely submit a revised draft submittal as required by Paragraph 19 | $ 250/day | $ 500/day |

41. Unless the failure to perform is excused or the timing for performance is otherwise modified by the parties, all penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs, and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: 1) with respect to a deficient submission under Section VIII (Work to be Performed), during the period, if any, beginning on the 31st day after U.S. EPA's receipt of such submission until the date that U.S. EPA notifies Respondents of any deficiency; and 2) with respect to a decision by the Director of the Superfund Division, U.S. EPA Region 5, under Section XV (Dispute Resolution), during the period, if any, beginning on the 21st day after the U.S. EPA submits its Statement of Position until the date that the Director of the Superfund Division, U.S. EPA Region 5, issues a final decision regarding such dispute. Nothing herein shall prevent the simultaneous accrual of separate penalties for separate violations of this Settlement Agreement.

42. Following U.S. EPA's determination that Respondents have failed to comply with a requirement of this Settlement Agreement, U.S. EPA may give Respondents written notification of the failure and describe the noncompliance. U.S. EPA may send Respondents a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraphs regardless of whether U.S. EPA has notified Respondents of a violation.

43. All penalties accruing under this Section shall be due and payable to U.S. EPA within 30 days of Respondents' receipt from U.S. EPA of a demand for payment of the penalties, unless Respondents invoke the dispute resolution procedures under Section XV (Dispute Resolution). All payments to U.S. EPA under this Section shall be paid by certified or cashier's check(s) made payable to "EPA Hazardous Substances Superfund," to the following address:

15

U.S. Environmental Protection Agency
Program Accounting & Analysis Section
P.O. Box 70753
Chicago, Illinois 60673

Respondents shall simultaneously transmit a copy of the check to the Director, Superfund
Division, U.S. EPA Region 5, 77 West Jackson Blvd., Chicago, Illinois, 60604-3590. Payments
shall be designated as "Stipulated Penalties - Landfill Operable Unit of the Tremont City Landfill
Site" and shall reference the payer's name and address, the U.S. EPA site identification number
(OHD980612188), and the docket number of this Settlement Agreement.

44. The payment of penalties shall not alter in any way Respondents' obligation to
complete performance of the Work required under this Settlement Agreement.

45. Penalties shall continue to accrue during any dispute resolution period, but need not
be paid until 15 business days after the dispute is resolved by agreement or by receipt of U.S.
EPA's decision determining that payment is due.

46. If Respondents fail to pay stipulated penalties when due, U.S. EPA may institute
proceedings to collect the penalties, as well as Interest. Respondents shall pay Interest on the
unpaid balance, which shall begin to accrue on the date of demand made pursuant to Paragraph
42. Nothing in this Settlement Agreement shall be construed as prohibiting, altering, or in any
way limiting the ability of U.S. EPA to seek any other remedies or sanctions available by virtue
of Respondents' violation of this Settlement Agreement, including, but not limited to, penalties
pursuant to Sections 106(b) and 122(*l*) of CERCLA, 42 U.S.C. §§ 9606(b) and 9622(*l*), and
punitive damages pursuant to Section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3). Provided,
however, that, U.S. EPA shall not seek civil penalties pursuant to Section 106(b) or 122(*l*) of
CERCLA or punitive damages pursuant to Section 107(c)(3) of CERCLA for any violation for
which a stipulated penalty is provided herein, except in the case of a willful violation of this
Settlement Agreement. Notwithstanding any other provision of this Section, U.S. EPA may, in
its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant
to this Settlement Agreement.

## XVII. FORCE MAJEURE

47. Respondents agree to perform all Work requirements of this Settlement Agreement
within the time limits established under this Settlement Agreement, unless the performance is
delayed or prevented by a *force majeure*. For purposes of this Settlement Agreement, a *force
majeure* is defined as any event arising from causes beyond the control of Respondents, or of any
entity controlled by Respondents, including but not limited to its contractors and subcontractors,
which delays or prevents performance of any obligation under this Settlement Agreement despite
Respondents's best efforts to fulfill the obligation. *Force majeure* does not include financial
inability to complete the Work or increased cost of performance of the Work.

48. If any event occurs or has occurred that may delay the performance of any Work obligation under this Settlement Agreement, whether or not caused by a *force majeure* event, Respondents shall notify U.S. EPA orally within 24 hours of when Respondents first knew that the event might cause a delay. Within 7 business days thereafter, Respondents shall provide to U.S. EPA in writing an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Respondents's rationale for attributing such delay to a *force majeure* event if it intends to assert such a claim; and a statement as to whether, in the opinion of Respondents, such event may cause or contribute to an endangerment to public health, welfare or the environment. Failure to comply with the above requirements shall be grounds for U.S. EPA to deny Respondents an extension of time for performance under this Section. Respondents shall have the burden of demonstrating by a preponderance of the evidence that the event is a *force majeure*, that the delay is warranted under the circumstances, and that best efforts were exercised to avoid and mitigate the effects of the delay.

49. If U.S. EPA agrees that the delay or anticipated delay is attributable to a *force majeure* event, the time for performance of the Work obligations under this Settlement Agreement that are affected by the *force majeure* event will be extended by U.S. EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the Work obligations affected by the *force majeure* event shall not, of itself, extend the time for performance of any other Work obligation that is not so affected. If U.S. EPA does not agree that the delay or anticipated delay has been or will be caused by a *force majeure* event, U.S. EPA will notify Respondents in writing of its decision. If U.S. EPA agrees that the delay is attributable to a *force majeure* event, U.S. EPA will notify Respondents in writing of the length of the extension, if any, for performance of the obligations affected by the *force majeure* event. In the event a *force majeure* event precludes the Respondents from entering any agreement(s) required under Paragraph 15, above, of this Settlement Agreement, U.S. EPA may excuse Respondents from performance of the Work under this Settlement Agreement.

## XVIII. PAYMENT OF FUTURE RESPONSE COSTS

50. Respondents shall pay U.S. EPA all Future Response Costs not inconsistent with the NCP. On a periodic basis, U.S. EPA will send Respondents a bill requiring payment that includes Region 5's Itemized Cost Summary, which includes direct and indirect costs incurred by U.S. EPA and its contractors. Respondents shall make all payments within 30 days of receipt of each bill requiring payment, except as otherwise provided in Paragraph 52 of this Settlement Agreement. Respondents shall make all payments required by this Paragraph by a certified or cashier's check or checks made payable to "EPA Hazardous Substance Superfund," referencing the name and address of the party(ies) making payment, the U.S. EPA Site/Spill ID number OHD980612188, and the Landfill Operable Unit Special Account Number B5B1 (02).

17

a.    Respondents shall send the check(s) to:

U.S. Environmental Protection Agency, Region 5
Superfund Program Accounting & Analysis Section
P.O. Box 70753
Chicago, Illinois 60673

b.    At the time of payment, Respondents shall send notice that payment has been made to:

| | |
|---|---|
| Ron Murawski | Diana Embil |
| Remedial Project Manager | Site Attorney |
| Superfund Division | Office of Regional Counsel |
| Mail Code SR-6J | Mail Code C-14J |
| 77 West Jackson | 77 West Jackson |
| Chicago, IL 60604-3590 | Chicago, IL 60604-3590 |

c.    The total amount to be paid by Respondents pursuant to Subparagraph a., above, shall be deposited in the Tremont City Landfill, Landfill Operable Unit Special Account within the U.S. EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by U.S. EPA to the U.S. EPA Hazardous Substance Superfund.

51.    If Respondents do not pay Future Response Costs within 30 days of Respondents' receipt of a bill, Respondents shall pay Interest on the unpaid balance of Future Response Costs. The Interest on unpaid Future Response Costs shall begin to accrue on the date of the bill and shall continue to accrue until the date of payment. If U.S. EPA receives a partial payment, Interest shall accrue on any unpaid balance. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the United States by virtue of Respondents' failure to make timely payments under this Section, including but not limited to, payments of stipulated penalties pursuant to Section XVI. Respondents shall make all payments required by this Paragraph in the manner described in Paragraph 50.

52.    Respondents may contest payment of any Future Response Costs under Paragraph 50, if they determine that U.S. EPA has made an accounting error or if they believe U.S. EPA incurred excess costs as a direct result of an U.S. EPA action that was inconsistent with the NCP. Such objection shall be made in writing within 30 days of receipt of the bill and must be sent to the U.S. EPA Project Coordinator. Any such objection shall specifically identify the contested Future Response Costs and the basis for objection. In the event of an objection, Respondents shall within the 30-day period pay all uncontested Future Response Costs to U.S. EPA in the manner described in Paragraph 50. Simultaneously, Respondents shall establish an interest-bearing escrow account in a federally-insured bank duly chartered in the State of Illinois and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. Respondents shall send to

18

the U.S. EPA Project Coordinator a copy of the transmittal letter and check paying the uncontested
Future Response Costs, and a copy of the correspondence that establishes and funds the escrow
account, including, but not limited to, information containing the identity of the bank and the bank
account under which the escrow account is established as well as a bank statement showing the
initial balance of the escrow account. Simultaneously with establishment of the escrow account,
Respondents shall initiate the Dispute Resolution procedures in Section XV (Dispute Resolution).
If U.S. EPA prevails in the dispute, within 5 days of the resolution of the dispute, Respondents shall
pay the sums due (with accrued interest) to U.S. EPA in the manner described in Paragraph 50. If
Respondents prevail concerning any aspect of the contested costs, Respondents shall pay that
portion of the costs (plus associated accrued interest) for which they did not prevail to U.S. EPA in
the manner described in Paragraph 50. Respondents shall be disbursed any balance of the escrow
account. The dispute resolution procedures set forth in this Paragraph in conjunction with the
procedures set forth in Section XV (Dispute Resolution) shall be the exclusive mechanisms for
resolving disputes regarding Respondents' obligation to reimburse U.S. EPA for its Future
Response Costs.

## XIX.  COVENANT NOT TO SUE BY U.S. EPA

53.  In consideration of the actions that will be performed and the payments that will be
made by Respondents under the terms of this Settlement Agreement, and except as otherwise
specifically provided in this Settlement Agreement, U.S. EPA covenants not to sue or to take
administrative action against Respondents pursuant to Sections 106 and 107(a) of CERCLA, 42
U.S.C. §§ 9606 and 9607(a), for the Work and Future Response Costs. This covenant not to sue
shall take effect upon the Effective Date and is conditioned upon the complete and satisfactory
performance by Respondents of all obligations under this Settlement Agreement, including, but not
limited to, payment of Future Response Costs pursuant to Section XVIII (Payment of Future
Response Costs). This covenant not to sue extends only to Respondents and does not extend to any
other person.

## XX.  RESERVATIONS OF RIGHTS BY U.S. EPA

54.  Except as specifically provided in this Settlement Agreement, nothing herein shall limit
the power and authority of U.S. EPA or the United States to take, direct, or order all actions
necessary to protect public health, welfare, or the environment or to prevent, abate, or minimize an
actual or threatened release of hazardous substances, pollutants or contaminants, or hazardous or
solid waste on, at, or from the Landfill. Further, nothing herein shall prevent U.S. EPA from
seeking legal or equitable relief to enforce the terms of this Settlement Agreement. U.S. EPA also
reserves the right to take other legal or equitable action as it deems appropriate and necessary, or to
require Respondents in the future to perform additional activities pursuant to CERCLA or any other
applicable law.

55.  The covenant not to sue set forth in Section XIX (Covenant Not to Sue by U.S. EPA)
above does not pertain to any matters other than those expressly identified therein. U.S. EPA

19

reserves, and this Settlement Agreement is without prejudice to, all rights against Respondents with respect to all other matters, including, but not limited to:

      a.   claims based on a failure by Respondents to meet a requirement of this Settlement Agreement;

      b.   liability for response costs incurred by U.S. EPA at or in connection with the Landfill;

      c.   liability for performance of response action other than the Work;

      d.   criminal liability;

      e.   liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

      f.   liability arising from the past, present, or future disposal, release or threat of release of hazardous substances outside of the Landfill; and

      g.   liability for costs incurred or to be incurred by the Agency for Toxic Substances and Disease Registry related to the Landfill.

### XXI.  COVENANT NOT TO SUE BY RESPONDENTS

56.   Respondents covenant not to sue and agree not to assert any claims or causes of action against the United States, or its contractors or employees, with respect to the Work or this Settlement Agreement, including, but not limited to:

      a.   any direct or indirect claim for reimbursement from the Hazardous Substance Superfund established by 26 U.S.C. § 9507, based on Sections 106(b)(2), 107, 111, 112, or 113 of CERCLA, 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, or 9613, or any other provision of law;

      b.   any claim arising out of response actions at or in connection with the Landfill, including any claim under the United States Constitution, the State Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, as amended, or at common law; or

      c.   any claim against the United States pursuant to Sections 107 and 113 of CERCLA, 42 U.S.C. §§ 9607 and 9613, relating to the Landfill.

These covenants not to sue shall not apply in the event the United States brings a cause of action or issues an order pursuant to the reservations set forth in Subparagraphs 55. b., c., and e. through g., above, but only to the extent that Respondents' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.