# EXHIBIT F – Part 1

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 5**

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Docket No. |
| | ) | |
| TREMONT CITY BARREL FILL | ) | ADMINISTRATIVE ORDER BY |
| OPERABLE UNIT | ) | CONSENT PURSUANT TO |
| | ) | SECTIONS 104, 106 OF THE |
| | ) | COMPREHENSIVE |
| | ) | ENVIRONMENTAL RESPONSE, |
| Respondents: | ) | COMPENSATION, AND |
| | ) | LIABILITY ACT OF 1980, |
| Listed in Attachment A | ) | as amended, 42 U.S.C. |
| | ) | §9606(a) |
| | ) | |

## I.  JURISDICTION AND GENERAL PROVISIONS

This Order is entered voluntarily by the United States Environmental Protection Agency ("U.S. EPA") and the Respondents.  The Order is issued pursuant to the authority vested in the President of the United States by Sections 104, 106(a), 107 and 122 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§9604, 9606(a), 9607 and 9622.  This authority has been delegated to the Administrator of the U.S. EPA by Executive Order No. 12580, January 23, 1987, 52 Federal Register 2923, and further delegated to the Regional Administrators by U.S. EPA Delegation Nos. 14-14-A, 14-14-C and 14-14-D, and to the Director, Superfund Division, Region 5, by Regional Delegation Nos. 14-14-A, 14-14-C and 14-14-D.

This Order provides for performance of a remedial investigation/feasibility study ("RI/FS") for the Barrel Fill Operable Unit ("the Barrel Fill") of the Tremont City Landfill Superfund Site ("the Site") as described in Section VI of this Order (the "Work") and for reimbursement of certain response costs in connection with the Site.  The Order requires Respondents to conduct the Work to help address the potential of an imminent and substantial endangerment to the public health, welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Barrel Fill.

A copy of this Order will also be provided to the State of Ohio, which has been notified of the issuance of this Order pursuant to Section 106(a) of CERCLA, 42 U.S.C. §9606(a).

Respondents' participation in this Order shall not constitute an admission of liability or of U.S. EPA's findings or determinations contained in this Order except in a proceeding to enforce the terms of this Order.  Respondents agree to comply with and be bound by the terms of this Order.  Respondents

1

further agree that they will not contest the basis or validity of this Order or its terms.

## II. **PARTIES BOUND**

This Order applies to and is binding upon U.S. EPA, and upon each Respondent and each Respondent's heirs, receivers, trustees, successors or assigns. Any change in ownership or corporate status of any Respondent including, but not limited to, any transfer of assets or real or personal property shall not alter such Respondents' responsibilities under this Order. Performing Respondents, as defined below, are jointly and severally liable for carrying out all activities required by this Order and Buyout Respondents, as defined below, are individually responsible for payment of their individual Buyout Settlement amounts as defined herein. Compliance or noncompliance by one or more Respondents with any provision of this Order shall not excuse or justify noncompliance by any other Respondent.

Performing Respondents shall each ensure that their contractors, subcontractors, and representatives comply with this Order. Performing Respondents shall each be responsible for any noncompliance with the Work provisions of this Order.

## III. **DEFINITIONS**

Terms used in this Order that are defined in Section 101 of CERCLA, 42 U.S.C. §9601, shall have the meanings provided therein. For purposes of this Order:

"Barrel Fill" shall mean the approximately 8.5 acre portion of the Site operated beginning in 1976 and closed in 1979 as a licensed landfill for the disposal of barreled or drummed wastes and designated as a separate Operable Unit of the Site by U.S. EPA.

"Barrel Fill Trust Fund" shall mean that trust fund established for the purposes of holding and distributing settlement funds for work done pursuant to this Order. The Barrel Fill Trust Account shall be established and administered by the Performing Respondents, consistent with the Trust Agreement attached hereto as Attachment C, and shall specify that the settlement funds shall be used to pay costs incurred by the Performing Respondents in performance of Work pursuant to this Order.

"Buyout Respondents" shall mean those persons or entities listed in Attachment B that are obligated to pay into the Barrel Fill Trust Fund the Buyout Settlement Amount listed in Attachment B as their share of costs for the Work done pursuant to this Order.

"Buyout Settlement Amounts" shall mean those settlement

2

amounts listed in Attachment B that shall be the amount paid by the individual Buyout Respondents into the Barrel Fill Trust Fund to resolve their individual liability for the Matters Addressed in this Order, as defined in Section XV (Contribution Protection).

"Future Oversight Costs" shall mean all costs that the United States incurs in reviewing or developing plans, reports and other items pursuant to this Order after the effective date of this Order.

"Parties" shall mean the signatories to this Order.

"Past Oversight Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurred at or in connection with the Site through May 31, 2002 including any payments to the State through a cooperative agreement, and Interest on all such costs.

"Performing Respondents" shall mean those persons or entities listed in Attachment A that are obligated to perform the Work pursuant to this Order.

"Site" shall mean the Tremont City Landfill Site consisting of approximately 80 acres located one and one-quarter miles west of Tremont City and south of the Clark/Champaign County line in the southwest quarter of Section 17 of German Township, Clark County, Ohio and including the closed landfill, closed Barrel Fill and a former RCRA permitted Waste Transfer Station.

"Work" shall mean all activities Performing Respondents are required to perform under this Order.

### IV. FINDINGS OF FACT

Based upon available information, including the Administrative Record in this matter, U.S. EPA finds, and for purposes of establishing jurisdiction and enforceability of this Order only, Respondents stipulate that the factual statutory prerequisites necessary for issuance of this Order under CERCLA have been met. For purposes of this Consent Order only, U.S. EPA finds as follows:

A.   The Site consists of approximately 80 acres located one and one-quarter miles west of Tremont City and south of the Clark/Champaign County line in the southwest quarter of Section 17 of German Township, Clark County, Ohio. The Site is comprised of an approximately 54 acre plot that is a closed sanitary landfill ("the Landfill"), an approximately 8 acre plot consisting of the closed Barrel Fill, and a former oil recycling and hazardous waste storage facility ("the Waste Transfer Station"). This Consent Order concerns a RI/FS of the closed Barrel Fill.

B.  The Site is located in an upland area near the crest of a divide between two east-southeast trending streams, Chapman Creek which is located approximately 3000 feet to the south and Storms Creek which is about one mile north of the Site. Chapman Creek and Storms Creek are tributaries to the Mad River, which is located approximately two miles east of the Site. Surface drainage and shallow groundwater movements are eastward to a ravine along the eastern boundary of the Site. The ravine contains an intermittent stream, which is a tributary to Chapman Creek which in turn is a tributary to the Mad River. Chapman Creek has been identified as a cold water habitat by Ohio EPA and a recent study done by OEPA determined that Chapman Creek is in excellent health as a designated cold water habitat.

C.  In approximately 1969, N-D Realty Co., Inc. or its predecessor purchased the 80-acre property comprising the Site. Shortly thereafter, N-D Realty Co., Inc. began operation of a sanitary landfill now known as the Tremont City Landfill at the Site. N-D Realty Co., Inc. subsequently changed its name or merged into the Danis Environmental Services, Inc. and/or the Tremont Landfill Company (collectively, "Tremont Landfill Company"). During its operation, the Landfill received for disposal, among other things, wood and brush ash, asbestos, special industrial wastes, epoxy dust, lead-based paint sludge, oil sludge, paint burn off ash and sodium silicate settlings. The Landfill closed in September 1995 and presently has an operative leachate collection system, groundwater monitoring and gas management system. As part of the assessment monitoring, a pump and treat system presently is removing groundwater in order to prevent discharge of leachate into Chapman Creek. Other corrective measure activities include post closure care and maintenance, routine groundwater monitoring, measurement of water levels in wells and gas probes, and monitoring of percent methane in gas probes.

D.  In approximately 1975, IWD Chemical Disposal Co., Inc. ("IWD Chemical"), a subsidiary of Danis Industries Corporation, divided the northern portion (roughly 24 acres) of the 80 acre Site into two smaller parcels consisting of approximately 8.5 acres and 14 acres. After extensive study of the area geology, IWD Chemical received a permit from the State of Ohio to operate the Barrel Fill as a disposal site for containerized industrial wastes. Between 1976 and 1979, IWD Chemical operated the smaller 8.5-acre parcel as a drum and barrel disposal area, (the Barrel Fill). During its operation, the Barrel Fill received, among other things, approximately 47,000 drums of various industrial wastes, including paint sludges, glues, resins,

4

asbestos and ink sludges, which were buried underground at the Barrel Fill. In addition, approximately 52,000 gallons of uncontainerized wastes were co-disposed in the Barrel Fill cells. Based on existing records, approximately 80% of the wastes disposed in the Barrel Fill were composed of glues, resins and paint wastes.

E. Beginning around 1976, IWD Liquid Waste, Inc. ("IWD Liquid"), a subsidiary of Danis Industries Corporation transported industrial wastes to the Site, including the containerized and uncontainerized wastes that were placed into the Barrel Fill.

F. In March 1980, IWD Chemical and IWD Liquid merged into Waste Management, Inc. ("WMI") and subsequently into Chemical Waste Management, Inc. ("CWM"), a subsidiary of WMI. As part of this merger, CWM became the owner of the 14 acre Waste Transfer Station. Danis Industries Corporation, or one of its subsidiaries, continued to own the Landfill and the Barrel Fill. CWM discontinued processing asbestos waste, but continued processing chlorinated solvents and waste oils and continued operation of the Waste Transfer Station. In 1980, the Waste Transfer Station received interim status from U.S. EPA as a RCRA hazardous waste storage facility. In 1984, Danis Industries Corporation, or one of its subsidiaries, reacquired ownership of the Waste Transfer Station, but Chemical Waste Management, Inc. continued to operate the Waste Transfer Station. In 1985, CWM ceased operations at the Site.

G. Clark County is covered by glacial drift deposits and underlain by sedimentary rocks consisting primarily of limestone and dolomite in the upland areas, and shale in the major valleys. The highest quality aquifers in Clark County are the sand and gravel glacial outwash valley deposits with the thickest and most permeable deposits being in the Mad River Valley above and below the City of Springfield, Ohio. The Mad River aquifer exhibits characteristics of high transmissivity and excellent recharge. The outwash materials are coarse and well sorted, and may be more than 200 feet thick in places.

H. Test borings at the Barrel Fill in 1983 revealed an uppermost sand lens generally less than one foot thick at depths ranging from 8-15 feet below the ground surface (at elevation 1090-1100 feet). A second "inter-till sand" deposit was present at depths of 30-35 feet (at elevation 1075-1080 feet) as documented in 10 of the test boring and monitoring well logs. It is more extensive than the upper permeable deposit extending across most of the northern two-thirds of the Barrel Fill and

5

appears to correlate with several borings at the adjacent Landfill. This deposit lies about 3-5 feet beneath the Barrel Fill waste cells (which were designed to maximum depths of 22 feet). This deposit is likely the outcrop in the ravine on the eastern edge of the Site where seepage has been observed. Several other deeper sand and gravel deposits have been observed which may extend beneath the Barrel Fill.

I.   At the Barrel Fill, the base elevation of waste disposal cells excavated in the glacial till directly overlies, and in some instances may intersect, the upper inter-till sand permeable zones. If these permeable zones are in direct contact with drummed waste and other bulk wastes disposed in the cells, a potential migration pathway exists for the movement of contaminants into the groundwater. Vertical migration through the glacial till may also be occurring.

J.   Analytical results from monitoring wells at the Barrel Fill show groundwater degradation possibly attributable to disposal operations. Monitoring wells at the Barrel Fill have shown higher concentrations of arsenic, chromium, lead, thallium, and manganese in comparison to up gradient monitoring wells.

K.   The primary, but not exclusive, contaminant pathway of concern at the Barrel Fill is groundwater and the associated potential impact of contaminant migration on domestic drinking water wells near the Site, natural springs, and the City of Springfield municipal well field located less than four miles southwest of the Site in the Mad River aquifer. The glacial geology in the area is complex and the existing monitoring well network may not be adequate to evaluate the potential for off-Site migration of contamination. In addition, disagreement exists over the lateral extent and continuity of the permeable units within the glacial till and the potential for vertical migration of contaminants through the glacial till into underlying drinking water aquifers.

L.   The contaminants found at the Barrel Fill in the groundwater and in the water from the seeps include: chromium; arsenic; manganese; sodium; sulfate; and tritium.

M.   The Tremont Landfill Company is an owner and operator of the Site.

N.   The Respondents listed in Attachments A and B to this Order are persons who arranged for disposal or treatment, or arranged with a transporter for transport for disposal or

6

treatment, of wastes that may have contained hazardous substances found at the Site.

O.  U.S. EPA has completed a preliminary assessment and inspection of the Site. In addition, U.S. EPA and the Ohio District Office of the United States Geological Survey (USGS), in conjunction with the Ohio EPA, have conducted three phases of field investigations, including groundwater, sediment and soil sampling and analyses, to determine the nature and extent of contamination. The investigations include, among other things, identification of potential sources of groundwater contamination and mapping of the Site's features.

P.  U.S. EPA has also issued General Notices of Potential Liability and information requests under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), to Respondents and to other Site potentially responsible parties ("PRPs").

Q.  As described above, hazardous substances have been or are threatened to be released at or from the Barrel Fill.

R.  As described above, as a result of the release or threatened release of hazardous substances, U.S. EPA has undertaken response actions at or in connection with the Site and surrounding areas under Section 104 of CERCLA, 42 U.S.C. § 9604.

## V.  CONCLUSIONS OF LAW AND DETERMINATIONS

Based on the Findings of Fact set forth above, and the Administrative Record supporting these removal actions, U.S. EPA has determined that:

A.  <u>Facility</u>.  The Barrel Fill is a "facility" as defined by Section 101(9) of CERCLA, 42 U.S.C. §9601(9).

B.  <u>Hazardous Substances</u>.  The substances noted above are "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. §9601(14).

C.  <u>Persons</u>.  Each Respondent is a "person" as defined by Section 101(21) of CERCLA, 42 U.S.C. §9601(21).

D.  <u>Release</u>.  The conditions described in the Findings of Fact set forth above do for purposes of this Order constitute an actual or threatened "release" of a hazardous substance from the facility into the "environment" as defined by Sections 101(8) and (22) of CERCLA, 42 U.S.C. §§9601 (8) and (22).

E.  <u>Threat</u>.  The conditions described in the Findings of Fact set forth above do for purposes of this Order define a

7

threat to public health, welfare, or the environment based upon the factors set forth in Section 300.415(b)(2).

F. <u>Endangerment</u>. The actual or threatened release of hazardous substances from the Facility may present an imminent and substantial endangerment to the public health, welfare, or the environment within the meaning of Section 106(a) of CERCLA, 42 U.S.C. §9606(a).

G. <u>Work</u>. Based upon the foregoing Findings of Fact, the U.S. EPA, as lead agency, and considering, among other factors, the factors set forth in 40 C.F.R. Section 300.430, has determined that the work conducted or to be conducted pursuant to this Order ("the Work") is necessary and appropriate to prevent, minimize and mitigate the release or threatened release of hazardous substances from the Facility. The U.S. EPA has determined pursuant to 40 C.F.R. Section 300.430 that Respondents can perform the Work promptly and properly.

H. <u>Consistent with NCP</u>. The Work required by this Order, if properly performed, is consistent with the CERCLA National Oil and Hazardous Substances Pollution Contingency Plan, or "NCP." The removal actions required by this Order are necessary to protect the public health, welfare, or the environment.

## VI. **ORDER**

Based upon the foregoing Findings of Fact, Conclusions of Law and Determinations, it is hereby ordered and agreed that Respondents shall comply with the following provisions, including but not limited to all documents attached to or incorporated into this Order, and perform the following actions:

A. <u>Designation of Contractor, Project Coordinator, and On-Scene Coordinator</u>.

Within 30 days of the effective date of this Order, Performing Respondents shall designate a Supervising Contractor to implement the Work. Performing Respondents shall also notify the U.S. EPA of the name and qualifications of any other contractors or subcontractors retained to perform significant Work under this Order at least 5 business days prior to commencement of Work by any such contractor or subcontractor. U.S. EPA retains the right to disapprove of the contractors and/or subcontractors retained by the Performing Respondents. If U.S. EPA disapproves a selected contractor, Performing Respondents shall retain a different contractor and shall notify U.S. EPA of that contractor's name and qualifications within five (5) business days prior to the performance of any Work by said contractor.

Within 30 days of the effective date of this Order, Performing Respondents shall designate a Project Coordinator who shall be responsible for the administration of Performing Respondents'

8

actions required by this Order. To the greatest extent possible, the Project Coordinator shall be present on-Site or readily available during Site work. U.S. EPA retains the right to disapprove of any Project Coordinator named by the Performing Respondents. If U.S. EPA disapproves of a selected Project Coordinator, Performing Respondents shall retain a different Project Coordinator and shall notify U.S. EPA of that person's name and qualifications within five (5) business days of U.S. EPA's disapproval. Receipt by Performing Respondents' Project Coordinator of any notice or communication from U.S. EPA relating to this Order shall constitute receipt by all Performing Respondents.

The U.S. EPA has designated Ronald Murawski of the Superfund Division, Region 5, as its Remedial Project Manager ("RPM"). Performing Respondents shall direct two copies of all notices and submissions required by this Order to the RPM at 77 West Jackson Boulevard, SR-6J, Chicago, Illinois, 60604-3590, by certified or express mail. Performing Respondents shall also send a copy of all submissions to Diana Embil, Assistant Regional Counsel, 77 West Jackson Boulevard, C-14J, Chicago, Illinois, 60604-3590. All Respondents are encouraged to make their submissions to U.S. EPA on recycled paper (which includes significant post-consumer waste paper content where possible) and using two-sided copies.

U.S. EPA and Performing Respondents shall have the right, subject to the immediately preceding paragraphs, to change their designated RPM or Project Coordinator. U.S. EPA shall notify the Performing Respondents, and Performing Respondents shall notify U.S. EPA, as early as possible before such a change is made, but in no case less than 24 hours before such a change. The initial notification may be made orally but it shall be promptly followed by a written notice.

    B.   Work to Be Performed.

Performing Respondents shall perform, at a minimum, the following RI/FS activities consistent with the attached Scope of Work (Attachment D) and any subsequent RI/FS Support Sampling Plans or Supplemental RI/FS Support Sampling Plans to be developed and approved pursuant to this Order:

    Develop and submit to U.S. EPA a RI/FS Support Sampling Plan, including a schedule of deliverables;

    Implement the Site Health and Safety Plan submitted to U.S. EPA, and all additional necessary revisions;

    Develop and submit to U.S. EPA an Alternative Array Document and RI/FS Report consistent with the RI/FS Support Sampling Plan and this Order;

    Perform an additional Site risk assessment as required to

9

complete an approved RI/FS Report;

Perform any additional work required under Paragraph 7.

1. <u>Standard for Performance of Work.</u> Performing Respondents shall perform the Work in conformance with the standards set forth in Section 121 of CERCLA, the NCP, U.S. EPA guidance on performance RI/FS, and any additional applicable guidance documents provided by U.S. EPA prior to the start of the implementation of any phase of the Work,

2. <u>RI/FS Support Sampling Plan and Implementation.</u> Within 120 days after the effective date of this Order, the Performing Respondents shall submit to U.S. EPA for approval a draft RI/FS Support Sampling Plan for performing the Barrel Fill RI/FS set forth above and consistent with Attachment D. The draft RI/FS Support Sampling Plan shall provide a description of, and an expeditious schedule for, the actions required by this Order.

If the RI/FS Support Sampling Plan is not in compliance with the standard set forth in Paragraph 1, U.S. EPA may disapprove, require revisions to, or modify the draft RI/FS Support Sampling Plan. If U.S. EPA requires revisions, Performing Respondents shall submit a revised draft RI/FS Support Sampling Plan within 30 days of receipt of U.S. EPA's notification of required revisions. Performing Respondents shall implement the RI/FS Support Sampling Plan as finally approved in writing by U.S. EPA in accordance with the schedule approved by U.S. EPA. Once approved, or approved with modifications, the RI/FS Support Sampling Plan, the schedule, and any subsequent modifications shall be fully enforceable under this Order. Performing Respondents shall notify U.S. EPA at least 48 hours prior to performing any on-site work pursuant to the U.S. EPA approved RI/FS Support Sampling Plan. Performing Respondents shall not commence or undertake any removal actions at the Site without prior U.S. EPA approval.

3. <u>Submittals.</u> If the draft RI/FS Support Sampling Plan, Supplemental RI/FS Support Sampling Plan and other Plans and the RI/FS Report are not in compliance with the standard set forth in Paragraph 1, U.S. EPA may disapprove, require revisions to, or modify the draft RI/FS Support Sampling Plan, Supplemental RI/FS Support Sampling Plan and any other Plans and the RI/FS Report submitted pursuant to this Order. If U.S. EPA requires revisions, Performing Respondents shall submit a revised draft Plan within 30 days of receipt of U.S. EPA's notification of required revisions. Subject to the conditions set forth in the notice of approval, the Performing Respondents shall implement the approved Plan, according to the schedule contained therein. If a new or modified guidance document adversely affects the schedule, Performing Respondents may propose such extension as U.S. EPA determines may be necessary to conform the Work to such guidance.

10

4. <u>Health and Safety Plan</u>. The RI/FS Support Sampling Plan shall incorporate a plan prepared by the Performing Respondents that ensures the protection of the public health and safety during performance of the Work under this Order. This plan shall comply with applicable Occupational Safety and Health Administration ("OSHA") regulations found at 29 C.F.R. Part 1910. If the Health and Safety Plan is not in compliance with the standard set forth in Paragraph 1, Performing Respondents shall incorporate all changes to the plan to bring the plan into compliance with the standard as recommended by U.S. EPA, and shall implement the plan during the pendency of the Work.

5. <u>Quality Assurance and Sampling</u>. All sampling and analysis performed pursuant to this Order shall conform to U.S. EPA direction, approval and guidance regarding sampling, quality assurance/quality control ("QA/QC"), data validation, and chain of custody procedures. These procedures shall be consistent with "EPA Requirements for Quality Assurance Project Plans for Environmental Data Operation," (EPA QA/R5; "Preparing Perfect Project Plans," (EPA /600/9-88/087), and subsequent amendments to such guidelines upon notification by U.S. EPA to Performing Respondents of such amendment. Amended guidelines shall apply only to procedures conducted after such notification. Performing Respondents shall ensure that the laboratory used to perform the analysis participates in a QA/QC program that complies with U.S. EPA guidance.

Upon request by U.S. EPA, Performing Respondents shall have such a laboratory analyze samples submitted by U.S. EPA for quality assurance monitoring. Performing Respondents shall provide to U.S. EPA the procedures followed by all sampling teams and laboratories performing data collection and/or analysis. Performing Respondents shall also ensure provision of analytical tracking information consistent with OSWER Directive No. 9240.0-2B, "Extending the Tracking of Analytical Services to PRP-Lead Superfund Sites."

Upon request by U.S. EPA, Performing Respondents shall allow U.S. EPA or its authorized representatives to take split and/or duplicate samples of any samples collected by Performing Respondents or their contractors or agents while performing Work under this Order. Performing Respondents shall notify U.S. EPA not less than three business days in advance of any sample collection activity. U.S. EPA shall have the right to take any additional samples that it deems necessary. Performing Respondents shall ensure that U.S. EPA personnel and their authorized representatives are allowed access at reasonable times to all laboratories utilized by Performing Respondents in implementing this Order. Performing Respondents shall ensure that the laboratories they utilize for the analysis of samples taken pursuant to this Order perform all analyses consistent with accepted U.S. EPA methods. Accepted U.S. EPA methods consist of those methods which are documented in the "Contract

11

Lab Program Statement of Work for Inorganic Analysis" and the "Contract Lab Program Statement of Work for Organic Analysis," dated September, 1999 and February, 2000, respectively, and any amendments made thereto during the course of the implementation of this Order.

6. <u>Alternatives Array Document and RI/FS Report</u>. In accordance with the schedule in the approved RI/FS Support Sampling Plan, the Performing Respondents shall submit to U.S. EPA for approval a draft Alternatives Array Document and draft RI/FS Report that is consistent with this Order and the SOW.

If the draft Alternatives Array Document is not in compliance with the standard set forth in Paragraph 1, U.S. EPA may disapprove, require revisions to, or modify the draft Alternatives Array Document. If U.S. EPA requires revisions, Performing Respondents shall submit a revised Alternatives Array Document incorporating all of U.S. EPA's required revisions to bring the report into compliance within 30 days of receipt of U.S. EPA's notification of the required revisions.

If the draft RI/FS Report is not in compliance with the standard set forth in Paragraph 1, U.S. EPA may disapprove, require revisions to, or modify the draft RI/FS Report. If U.S. EPA requires revisions, Performing Respondents shall submit a revised RI/FS Report incorporating all of U.S. EPA's required revisions to bring the report into compliance within 60 days of receipt of U.S. EPA's notification of the required revisions.

In the event of U.S. EPA disapproval of the revised RI/FS Report, Performing Respondents may be deemed in violation of this Order; however, approval shall not be unreasonably withheld by U.S. EPA. In such event, U.S. EPA retains the right to terminate this Order, conduct a complete RI/FS, and obtain reimbursement for costs incurred in conducting the RI/FS from the Performing Respondents.

The revised RI/FS report shall also include the following certification signed by a person who supervised or directed the preparation of that report:

> Under penalty of law, I certify that, to the best of my knowledge, after appropriate inquiries of all relevant persons involved in the preparation of this RI/FS Report, the information submitted is true, accurate, and complete.

Performing Respondents shall not commence or undertake any response actions at the Site without prior U.S. EPA approval.

7. <u>Additional Work</u>. In the event that the U.S. EPA or the Performing Respondents determine that additional work, including RI/FS support sampling and/or an engineering evaluation, is necessary to accomplish the objectives of the RI/FS Report, notification of such additional work shall be provided to the

12

other parties in writing. Any additional work which Performing Respondents determine to be necessary shall be subject to U.S. EPA's written approval prior to commencement of the additional work. Performing Respondents shall complete, in accordance with standards, specifications, and schedules U.S. EPA has approved, any additional work Performing Respondents have proposed, and which U.S. EPA has approved in writing or that U.S. EPA has determined to be necessary, and has provided written notice of pursuant to this paragraph.

    8.    <u>Reporting</u>. Performing Respondents shall submit a monthly written progress report to U.S. EPA concerning actions undertaken pursuant to this Order, on the 10th day of each month beginning in the first month after the effective date of this Order and until termination of this Order, unless otherwise directed in writing by the RPM. These reports shall describe all significant developments during the preceding period, including the Work performed and any problems encountered, analytical data received during the reporting period, and developments anticipated during the next reporting period, including a schedule of Work to be performed, anticipated problems and planned resolutions of past or anticipated problems.

Any Respondent that owns any portion of the Site shall, at least 30 days prior to the conveyance of any interest in real property at the Site, give written notice of this Order to the transferee and written notice of the proposed conveyance to U.S. EPA and the State. The notice to U.S. EPA and the state shall include the name and address of the transferee. The party conveying such an interest shall require that the transferee provide access as described in Section VI.C (Access to Property and Information).

    C.    <u>Access to Property and Information</u>.

Performing Respondents shall exercise their best efforts to provide or obtain access to the Site and off-Site areas to which access is necessary to implement this Order. To the extent obtained, such access shall be provided to U.S. EPA employees, contractors, agents, consultants, designees, representatives, and OEPA representatives, who shall be permitted to move freely at the Site and appropriate off-Site areas in order to conduct actions which U.S. EPA determines to be necessary. Performing Respondents shall submit to U.S. EPA, upon request, the results of all sampling or tests and all other data generated by Performing Respondents or their contractors, or on the Performing Respondents' behalf during implementation of this Order and shall provide to U.S. EPA, upon request, access to all non-privileged records and documentation related to the conditions at the Site and the actions conducted pursuant to this Order. This access to information may be limited by and subject to the joint defense privilege, attorney-client privilege and attorney work product doctrine. Regardless of any

13

such claim of privilege, Performing Respondents shall provide to U.S. EPA all sampling data developed pursuant to the requirements of this Order.

Where Work under this Order is to be performed in areas owned by or in possession of someone other than Respondents, Performing Respondents shall use their best efforts to obtain all necessary access agreements within 14 calendar days after the effective date of this Order, or as otherwise specified in writing by the RPM. Performing Respondents shall immediately notify U.S. EPA if, after using their best efforts, they are unable to obtain such agreements. Performing Respondents shall describe in writing their efforts to obtain access. U.S. EPA may then assist Performing Respondents in gaining access, to the extent necessary to effectuate the Work described herein, using such means as U.S. EPA deems appropriate. Performing Respondents shall reimburse U.S. EPA for all costs and attorneys fees incurred by the United States in obtaining such access. All persons granted access to the Site pursuant to this Order shall, as appropriate, be subject to the requirements of the Health and Safety Plan.

    D.    <u>Record Retention, Documentation, Availability of Information</u>

Performing Respondents shall preserve all documents and information, in their possession or the possession of their contractors, subcontractors or representatives, relating to Work performed under this Order, or relating to the hazardous substances found on or released from the Site, for six years following receipt of the Notice of Completion pursuant to Section XVIII below. At the end of this six-year period and at least 60 days before any document or information is destroyed, Performing Respondents shall notify U.S. EPA that such documents and information are available to U.S. EPA for inspection, and upon request, shall provide the originals or copies of such documents and information to U.S. EPA. In addition, Performing Respondents shall provide documents and information retained under this Section at any time before expiration of the six-year period at the written request of U.S. EPA. This access to information may be limited by and subject to the joint defense privilege, attorney-client privilege and attorney work product doctrine. Regardless of any such claim of privilege, Performing Respondents shall provide to U.S. EPA all sampling data developed pursuant to the requirements of this Order.

    E.    <u>Off-Site Shipments</u>.

All hazardous substances removed off-Site pursuant to this Order for treatment, storage or disposal shall be treated, stored, or disposed of at a facility or facilities in compliance, as determined by U.S. EPA, with the U.S. EPA Off-Site Rule, 40 C.F.R. § 300.440, 58 <u>Federal Register</u> 49215 (Sept. 22, 1993).

14

F.   Compliance with Other Laws.

Performing Respondents shall perform all Work required pursuant to this Order in accordance with all applicable local, state, and federal laws and regulations except as provided in CERCLA Section 121(e), 42 U.S.C. §9621(e), and 40 C.F.R. §300.415(j). In accordance with 40 C.F.R. § 300.415(j), all on-Site Work required pursuant to this Order shall, to the extent practicable, as determined by U.S. EPA, considering the exigencies of the situation, be performed in accordance with applicable or relevant and appropriate requirements under federal environmental or facility siting laws and regulations.

G.   Emergency Response and Notification of Releases.

If Performing Respondents have knowledge that the activities conducted pursuant to this Order cause an additional release of hazardous substances from the Barrel Fill and the additional release causes an endangerment to the public health, welfare, or the environment in excess of that currently posed at the Barrel Fill, Performing Respondents shall take all appropriate action to prevent, abate or minimize such release or endangerment caused by the release. Performing Respondents shall also immediately notify the RPM or, in the event of his or her unavailability, shall notify the Regional Duty Officer, Emergency Response Branch, Region 5 at (312) 353-2318, of the incident or Barrel Fill conditions. If Performing Respondents fail to respond, U.S. EPA may respond to the release or endangerment and reserve the right to recover costs associated with any such response.

Performing Respondents shall submit a written report to U.S. EPA within seven business days after each release under the preceding paragraph, setting forth the events that occurred and the measures taken or to be taken to mitigate any release or endangerment caused or threatened by the release and to prevent the recurrence of such a release. Performing Respondents shall also comply with any other notification requirements, including those in CERCLA Section 103, 42 U.S.C. § 9603, and Section 304 of the Emergency Planning and Community Right-To-Know Act, 42 U.S.C. § 11004.

Nothing in the preceding Paragraphs or in this Order shall be deemed to limit any authority of the U.S. EPA: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of hazardous substances on, at, or from the Site, or (b) to direct or order or pursue such action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of hazardous substances on, at, or from the Site, subject to Section XIV (Covenants Not to Sue by the United States).