Hearing Date and Time: November 30, 2006 at 10:00 a.m., prevailing Eastern Time
Objection Deadline: November 24, 2006 at 4:00 p.m., prevailing Eastern Time

Patricia B. Fugée (NY 2390946
OH 0070698)
ROETZEL & ANDRESS
One SeaGate, Suite 900
Toledo, Ohio 43604
Telephone: (419) 242-7985
Facsimile: (419) 242-0316
*Attorney for Ericka S. Parker, Chapter 7*
*Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **DELPHI CORPORATION, et al,** | : Case No.: 05-44481 |
| | : (Jointly Administered) |
| Debtors. | : |
| | : Judge Robert D. Drain |
| | : |

## RESPONSE OF ERICKA S. PARKER, CHAPTER 7 TRUSTEE TO DEBTORS' THIRD OMNIBUS OBJECTION (SUBSTANTIVE) TO CLAIMS AND REQUEST TO BE EXCUSED FROM ATTENDING FIRST HEARING AS TO SAME

Ericka S. Parker, Chapter 7 Trustee ("Trustee Parker") hereby responds to the Debtors' Third Omnibus Objection to Claims, and further asks that she and her counsel be excused from attending the hearing on November 30, 2006 in person. In support of this Response, Trustee Parker, by and through her undersigned counsel, represents as follows:

### *Response to Claims Objection*

1.      Trustee Parker was duly appointed as Chapter 7 Trustee in the Northern District of Ohio, Western Division, with respect to the bankruptcy filing of Toledo Professional Temps, Inc., f/k/a Flex-Tech Professional Services, Inc. ("Flex-Tech"), on July 16, 2003.

2.      Trustee Parker timely filed her proof of claim (claim number 8324) on June 21, 2006.   As is more fully set forth in the claim itself, this claim seeks recovery from Delphi pursuant to a confidential settlement between Delphi, Flex-Tech and Initial Transfer.

3.      The Debtors herein object to Trustee Parker's claim on the basis that it is "unsubstantiated." This is a baseless objection.

4.      Trustee Parker's claim stems from litigation that was *initiated by Delphi* in the Bankruptcy Court for the Northern District of Ohio (Western Division).   Delphi has been actively involved in that litigation, even agreeing to lift the stay in this Court so that those proceedings could continue. A true copy of the stipulation for relief from stay is attached hereto as Exhibit A.  Following the entry of stay relief, the Ohio Bankruptcy Court issued its Decision, dated September 27, 2006, in which Delphi's motion for summary judgment was denied, and suggesting that the Trustee's claims, as assignee of Initial Transfer, have merit.  A true copy of this decision is attached hereto as Exhibit B.   Because of the size of the documents and because Delphi already has copies of them, Trustee Parker is not attaching the remaining pleadings and evidence on file with the Ohio Bankruptcy Court to this response.

5.      Following the Court's determination, Trustee Parker prepared her motion for summary judgment on those issues. Before the motion could be filed, however, Trustee Parker's counsel was contacted by Delphi's Ohio counsel to try and resolve the remaining claims.  In fact, a verbal settlement of the Trustee's claim was reached, and counsel are currently working through the details of seeking this Court's approval and approval of the Ohio Bankruptcy Court of the settlement.

6.      Obviously, Delphi not only is familiar with Trustee Parker's claim, but has demonstrated that the claim, contrary to the representation in the Third Omnibus Objection, is in

fact substantiated. Accordingly, Trustee Parker requests that this Court overrule the Debtors' objection to her claim.

7.     The person possessing ultimate authority to reconcile, settle, or otherwise resolve the claim on behalf of Trustee Parker is:

Ericka S. Parker, Trustee
Law Office of Ericka S. Parker
1709 Spielbusch, Suite 100
Toledo, OH 43624-1372

### *Request to Be Excused from Personal Appearance at November 30 Hearing*

8.     As noted above, Trustee Parker is the Trustee with respect to a chapter 7 proceeding where the only remaining asset is the claim against Delphi. Moreover, as also noted above, Delphi's objection to the claim is baseless. Under the circumstances, Trustee Parker and her counsel request that they be excused from personally appearing at the hearing in New York on November 30, 2006, as it is unfair and inappropriate for the chapter 7 bankruptcy estate to have to incur the expense of this appearance. Rather, counsel requests that she be permitted to participate in this first hearing by telephone.

### *Memorandum of Law*

9.     Because the legal points and authorities upon which this Response relies are incorporated herein, Trustee Parker respectfully requests that the requirement of the service and filing of a separate memorandum of law pursuant to Rule 9013-1 (b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Trustee Parker respectfully requests that this Court enter an order overruling the Debtor's objection to her claim, excusing her from personally appearing at the hearing on November 30, 2006, and granting her such other and further relief as may be warranted and just.

Dated: Toledo, Ohio
November 21, 2006

Respectfully submitted,

/s/ *Patricia B. Fugée*
Patricia B. Fugée (NY 2390946 and
OH 0070698)
Roetzel & Andress, LPA
One SeaGate, Suite 999
Toledo, OH 43624
Telephone: (419) 242-7985
Facsimile: (419) 242-0316
Email: pfugee@ralaw.com
*Counsel for Ericka Parker, Chapter 7 Trustee*

94550.112335.0002

4

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - -x
                               :

        In re                      :       Chapter 11
                                 :

DELPHI CORPORATION, et al.,     :       Case No. 05-44481 (RDD)
                               :

                  Debtors.    :       (Jointly Administered)
                               :

- - - - - - - - - - - - - - - - - - - - - - - - -x

STIPULATION AND AGREED ORDER RESOLVING MOTION OF ERICKA S. PARKER,
CHAPTER 7 TRUSTEE, SEEKING RELIEF FROM AUTOMATIC STAY TO ALLOW HER
TO CONTINUE ASSERTING COUNTERCLAIMS IN PENDING LITIGATION BEING
PROSECUTED BY DEBTORS

WHEREAS, on February 21, 2003, Delphi Automotive Systems LLC, a debtor in

the above-captioned chapter 11 cases ("DAS LLC"), Flex-Tech, and Initial Transfer FT, Ltd.

entered into a settlement agreement (the "Settlement Agreement") related to the payment of

third-party suppliers of DAS LLC; and

WHEREAS, on or about July 15, 2003, Toledo Professional Temps, Inc., f/k/a

Flex-Tech Professional Services, Inc. ("Flex-Tech") sought chapter 7 relief in the United States

Bankruptcy Court for the Northern District of Ohio (the "Ohio Bankruptcy Court"); and

WHEREAS, on July 16, 2003, the chapter 7 trustee of Flex-Tech ("Trustee

Parker") was duly appointed as chapter 7 Trustee with respect to Flex-Tech's bankruptcy filing;

and

WHEREAS, on April 8, 2004, DAS LLC filed an adversary proceeding entitled

Delphi Automotive Systems, LLC v. Ericka S. Parker, Adv. Pro. No. 04-03114 in the Ohio

Bankruptcy Court (the "Flex-Tech Litigation"), in which it is seeking a declaratory judgment to

receive a judicial determination of various issues under the Settlement Agreement, including, but


0544481060814000000000018

not limited to, a determination that payments due from DAS LLC to third parties under the

Settlement Agreement are not property of the Flex-Tech bankruptcy estate; and

WHEREAS, on June 14, 2004, Trustee Parker filed her an Answer, Counterclaim,

and Third-Party Complaint; and

WHEREAS, on April 21, 2005, DAS LLC filed an Amended Complaint, which

included an interpleader count, thereby joining three third-party suppliers of DAS LLC,

Northwest Controls, Inc., REM Electrics Supply Company, Inc., and Comptrol, Inc. ("Comptrol")

as parties in the Flex-Tech Litigation; and

WHEREAS, on May 2, 2005, Trustee Parker filed her Amended Answer,

Counterclaim, and Third-Party Complaint in the Flex-Tech Litigation (the "Amended Answer

and Counterclaim"); and

WHEREAS, on November 4, 2005, DAS LLC filed a motion for summary

judgment in the Flex-Tech Litigation, which has been fully briefed by all relevant parties; and

WHEREAS, on October 8, 2005, Delphi Corporation ("Delphi") and certain of its

subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the

above-captioned cases (collectively, the "Debtors") filed voluntary petitions in this Court for

reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1330, as amended; and

WHEREAS, on May 9, 2006 Trustee Parker filed a motion seeking relief from

automatic stay (Docket No. 3705); and

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED

THAT:

2

1.    The automatic stay of 11 U.S.C. § 362 shall be and hereby is modified for the sole and limited purpose of allowing Trustee Parker to liquidate her alleged claim against the Debtors by continuing the Amended Answer and Counterclaim in the Flex-Tech Litigation, including, but not limited to, filing a motion for summary judgment thereon. Trustee Parker, however, shall not further amend the Amended Answer and Counterclaim without further leave of this Bankruptcy Court.

2.    Except as provided in paragraph 1 of this order, the automatic stay shall remain in full force and effect for any other purpose.

3.    In the event that the Ohio Bankruptcy Court finds DAS LLC liable to Flex-Tech and/or Comptrol under the Settlement Agreement, Trustee Parker shall return to this Bankruptcy Court for any further relief from the automatic stay, including but not limited to Trustee Parker's attempt to enforce any judgment in the Flex-Tech Litigation against the Debtors and/or to seek a determination that sums due under the Settlement Agreement are not property of the bankruptcy estate of DAS LLC.

4.    The automatic stay shall not be modified at this time to allow the Ohio Bankruptcy Court, or any other court, to determine (i) whether the funds allegedly owed by DAS LLC under the Settlement Agreement are assets of the Debtors' estates or (ii) the priority of any claim related to the Flex-Tech Litigation.

5.    Trustee Parker's rights to seek further relief from the automatic stay are preserved in full, and the Debtors reserve all rights to object to any further relief requested by Trustee Parker.

6.    This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

3

7.      Notwithstanding the requirements under Bankruptcy Rule 4001(a)(3),

good cause exists to have this order become effective immediately upon entry.

So Ordered in New York, New York, this 14<u>th</u> day of <u>August</u>, 2006

/s/Robert D. Drain
Honorable Robert D. Drain
United States Bankruptcy Judge

AGREED TO AND
APPROVED FOR ENTRY:

 /s/ Kayalyn A. Marafioti
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
   John Wm. Butler, Jr.
   John K. Lyons
   Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606-1285
(312) 407-0700

        - and –

   Kayalyn A. Marafioti
   Thomas J. Matz
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
and Debtors and Debtors-in-Possession


 /s/ Patricia B. Fugée
Patricia B. Fugée
ROETZEL & ANDRESS
One SeaGate, Suite 900
Toledo, OH 43604
(419) 242-7985

Attorneys for Ericka S. Parker, Chapter 7 Trustee

4

# EXHIBIT B

The court incorporates by reference in this paragraph and adopts as the findings and orders
of this court the document set forth below. This document has been entered electronically
in the record of the United States Bankruptcy Court for the Northern District of Ohio.



_____
Mary Ann Whipple
United States Bankruptcy Judge

**Dated: September 27 2006**


UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 03-35510 |
| | ) | |
| Toledo Professional Temps, Inc., | ) | Chapter 7 |
| | ) | |
| Debtor. | ) | Adv. Pro. No. 04-3114 |
| | ) | |
| Delphi Automotive Systems, Inc., | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Ericka Parker, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER REGARDING MOTION FOR SUMMARY JUDGMENT

This proceeding is before the court on a Motion for Summary Judgment [Doc. # 69] filed by Plaintiff
Delphi Automotive Systems, LLC, ("Delphi"), responses filed by Defendant Ericka Parker, the Chapter 7
Trustee (the "Trustee"), [Doc. # 75], and by Comptrol, Inc., third-party defendant and interpleader defendant
("Comptrol") [Doc. # 95], and Delphi's reply [Doc. # 86]. Delphi filed an Amended Complaint for
Interpleader and Declaratory Judgment with respect to a Settlement Agreement resolving litigation in the
United States District Court for the Northern District of Ohio, Eastern Division, that was entered into

between Delphi, Debtor Toledo Professional Temps, Inc., fka Professional Services, Inc., ("Debtor") and Initial Transfer FT, Ltd. ("Initial Transfer"). Having considered the motion and supporting brief, the responses and the reply, for the reasons that follow, Delphi's motion will be granted in part and denied in part.

## FACTUAL BACKGROUND

Delphi is an automotive products supplier. Historically, Delphi had handled all of its own purchasing functions from outside suppliers and manufacturers. In 1995, in an effort to reduce purchasing costs, it decided to out-source purchasing functions for non-production electronic parts, or indirect commodities, to an independent third party. After soliciting bids, Delphi awarded Debtor the contract to manage its purchasing functions for indirect commodities and entered into a Commodity Management Agreement for a term of 3 ½ years, ending on December 31, 1999. Under this agreement, Debtor designed and implemented a process to order all of Delphi's indirect commodities for eleven facilities and was responsible for and organized approximately five hundred suppliers that previously had direct relationships with Delphi. Debtor was responsible for paying the suppliers and designing and implementing an electronic interface to handle the high volume of customer orders.

At some time thereafter, Debtor failed to pay suppliers under the Commodity Management Agreement, and a number of lawsuits were filed in state court by various suppliers against Debtor and, in some cases, also against Delphi. [*See* Pl. Ex. 3, unnumbered pp. 6, 17]. In several of those lawsuits, Debtor filed third-party complaints against Delphi. On August 30, 2000, Delphi filed a Complaint for Declaratory Judgment against Debtor in the United States District Court for the Northern District of Ohio, case number 00-2191 ("the District Court litigation"), seeking, among other things, a declaratory judgment that Delphi no longer owed any compensation to Debtor under the Commodity Management Agreement and that Debtor is obligated to indemnify Delphi relating to any claims by third parties with whom Debtor dealt in connection with its performance under that contract.[1] Debtor filed counterclaims for breach of contract, unjust enrichment and fraud, as well as a third-party complaint against General Motors Corporation. Initial Transfer was not a named party in that case. However, in July 2001, Debtor transferred all of its rights and interests in the District Court claims to Initial Transfer.

---

[1] Although the parties have not submitted the pleadings in case number 00-2191 as evidence in this case, both Debtor and Delphi refer to the contents of those pleading in their briefs. Under Rule 201 of the Federal Rules of Evidence, the court has reviewed the docket in case number 00-2191 and has taken judicial notice of the contents of the pleadings in that case.

2

On or about February 19, 2003, Delphi, Initial Transfer and Debtor entered into a settlement agreement resolving the District Court litigation (the "Agreement"), which agreement was individually signed on behalf of each party. Under the Agreement,[2] Delphi agreed to pay Initial Transfer the sum of $500,000 on execution of the Agreement and, as explained in more detail below, $175,000 on May 1, 2003. [Pl. Ex. 1, ¶ 1]. The Agreement divided supplier claims into two categories, those of suppliers that had filed lawsuits (Filed Tier II Supplier Claims) and those that had potential claims but had not yet filed suit (Unfiled Tier II Supplier Claims). [*Id.* ¶ 2-3]. The Agreement with respect to Filed Tier II Supplier Claims provides that "Delphi shall resolve, at its expense," the lawsuits brought against Debtor by Winkle Electric Company, Inc., Comptrol, Northwest Controls, Inc. ("Northwest") and REM Electronics Supply Company ("REM"). [*Id.* ¶ 2(a)]. It also provides that all other lawsuits that had been brought by Tier II Suppliers, as listed in exhibit A to the Agreement, "are the responsibility of, and shall be resolved by, [Debtor] at its expense," that Debtor shall dismiss all of its claims against Delphi in those cases, and that Debtor indemnify Delphi against any claims of the suppliers in those cases. [*Id.* ¶2(a) and (b)]. The Agreement specifically provides that "[t]his indemnification does not extend to Initial Transfer." [*Id.* ¶ 2(b)]. As security for Debtor's indemnification of Delphi, the Agreement provides for Delphi to reduce its $175,000 payment to Initial Transfer due on May 1, 2003, by $30,000, and deposit the $30,000 into an interest bearing escrow account (Escrow A) in the name of Initial Transfer by May 1, 2003. [*Id.* ¶ 2(c)]. It further provides:

> When at least Thirty Thousand Dollars and 00/100 ($30,000.00) has been paid or caused to be paid to resolve the lawsuits listed on Exhibit A, then Initial Transfer shall be entitled to the funds in Escrow A, which shall be paid to Initial Transfer on or about May 1, 2004. In the event that at least Thirty Thousand Dollars and 00/100 ($30,000.00) has not been paid or caused to be paid to resolve the lawsuits listed on Exhibit A, Initial Transfer shall still be entitled to the remaining funds in Escrow A on or about May 1, 2004.

[*Id.*].

With respect to Unfiled Tier II Supplier Claims, the parties acknowledge in the Agreement that there are numerous potential claims of Tier II suppliers who have not filed lawsuits and lists 151 of those

---

[2] Generally, to be considered by the court at the summary judgment stage, "'documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e).'" *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) (quoting *Oris v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993); *Hal Roach Studios, Inc. v. Richard Feiner and Co.*, 896 F.2d 1542, 1550 (9th Cir. 1990). In this case, the settlement agreement, offered as Plaintiff's exhibit 1, is not authenticated by or attached to an affidavit. Nevertheless, both Debtor and Delphi cite that exhibit in setting forth the terms of the Agreement. As Debtor does not challenge the authenticity of exhibit 1, but instead refers the court to the exhibit, the court will consider the exhibit for purposes of Delphi's motion for summary judgment.

3

suppliers

in exhibit B attached to the Agreement. Paragraph 3(a) of the Agreement provides that "[i]f any of the Tier II suppliers listed on Exhibit B file lawsuits against [Debtor], [Debtor] shall not file any claims against Delphi therein, in any other pending action, nor shall [Debtor] file a new action against Delphi." "As security for the obligations stated in Paragraph 3(a)," the Agreement provides for Delphi to reduce its $175,000 payment to Initial Transfer due on May 1, 2003, by an additional $70,000, and deposit the $70,000 into an escrow account (Escrow B) in the name of Initial Transfer by May 1, 2003. [*Id.* ¶ 3(b)]. The Agreement further provides:

> As the claims listed on Exhibit B are resolved, [Debtor] shall supply Delphi with a copy of the Settlement Agreement pertaining to each claim. When at least Seventy Thousand Dollars and 00/100 ($70,000.00) has been paid or caused to be paid to resolve the claims listed on Exhibit B, then Initial Transfer shall be entitled to the funds in Escrow B, which shall be paid to Initial Transfer on or about May 1, 2005. In the event that Seventy Thousand Dollars and 00/100 ($70,000.00) has not been paid or caused to be paid by May 1, 2005 in settlement of the claims listed on Exhibit B, then the amount actually paid or caused to be paid shall be credited against the funds in Escrow B and released to Initial Transfer. The remaining funds in the escrow shall be split equally between Delphi and Initial Transfer.

[*Id.*]. Finally, the Agreement provides that Delphi has the right to assert any available claims against Debtor if any of the Tier II suppliers listed in exhibit B file lawsuits directly against Delphi. [*Id.* ¶ 3(c)]. Except for the obligations set forth in the Agreement, the parties each released the other two parties from any claims they could assert against that party. [*Id.* ¶ 4].

Thus, under the Agreement, Delphi was required, among other things, to pay to Initial Transfer $500,000 on execution of the Agreement and $75,000 by May 1, 2003. Delphi timely made those payments. [*See* Trustee's Ex. D, Interrog. # 6 and attached Ex. D-0002 & D-0004]. On May 1, 2003, Delphi was also required to deposit a total of $100,000 into escrow accounts in the name of Initial Transfer to be disbursed at later dates in accordance with the Agreement. Delphi did not deposit the escrow funds as provided by the Agreement. While the Agreement sets forth duties to be performed by both Delphi and Debtor, it is silent as to any duties to be carried out by Initial Transfer.

4

With respect to the Filed Tier II Supplier Claims,[3] Delphi settled Comptrol's lawsuit against Debtor and was ready and willing to pay Comptrol.[4] However, because Debtor filed its bankruptcy petition before that payment was made, and because both the Trustee and Comptrol now claim an interest in those settlement funds, Delphi has not yet paid Comptrol. Delphi has not resolved the lawsuits filed by Northwest and REM. According to Delphi's attorney, he left a message for both counsel for Northwest and REM in March or April of 2003 and neither returned his phone call. [Pl. Ex. 2, Schaefer Aff. ¶4]. Finally, there is no dispute that Debtor had not resolved any Tier II supplier claims before filing its bankruptcy petition.

On July 15, 2003, Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code. On April 8, 2004, Delphi commenced the instant adversary proceeding against the Trustee, seeking a declaratory judgment as to the rights and duties of the parties under the Agreement. Delphi filed its Amended Complaint on April 21, 2005, adding Northwest, REM, Comptrol, and Initial Transfer as defendants and adding a claim for interpleader. The Trustee filed an Amended Answer, Counterclaim, and Third Party Complaint in which she alleges that the funds paid or to be paid pursuant to the Agreement are part of Debtor's bankruptcy estate. Comptrol answered the complaint and third-party complaint, asserting its right to the funds to be paid by Delphi in settlement of its lawsuit against Debtor. Neither Northwest nor REM have answered the Amended Complaint. Initial Transfer also answered the Third Party Complaint, which alleges various claims against Initial Transfer, including that funds received by Initial Transfer from Delphi under the Agreement are property of the bankruptcy estate. The Trustee has since settled her claims against Initial Transfer and Initial Transfer has agreed, among other things, to transfer to the Trustee all of its rights, title and interest in and to the Agreement. [Case No. 03-35510, Doc. ## 85, 87, 88].

## LAW AND ANALYSIS

In its motion for summary judgment, Delphi argues that it is entitled to judgment as a matter of law that (1) it is not obligated to make any further payments under the Agreement to any escrow account or to Initial Transfer, (2) it is not obligated to make payments under the Settlement Agreement to REM or

---

[3] Although Delphi does not address the matter, according to the Trustee, upon information and belief, the lawsuit filed by Winkle Electric Company, Inc., was resolved before Debtor's bankruptcy petition was filed and is not at issue in this case. [Doc. # 75, Trustee's Oppos., p. 6].

[4] In its Answer, the Trustee admits "upon information and belief" Delphi's allegation that "Delphi settled Comptrol's lawsuit against [Debtor] for $107,714.65 and was ready and willing to pay Comptrol." [Doc. # 52, Amended Complaint ¶ 21, Doc. # 51, Answer ¶ 21]. Comptrol, however, in its Answer admits only that it is entitled to be paid $107,719.95 "plus interest at the rate of 10% per annum, or $153,965.34 as of May 31, 2005, from Delphi. . . ." [Doc. # 61, Answer ¶5].

5

Northwest, and (3) its only remaining obligation under the Agreement is to pay Comptrol and not the Trustee, with the amount to be determined at a later date. For the reasons that follow, Delphi's motion will be granted in part and denied in part.

## I.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In reviewing a motion for summary judgment, however, all inferences "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-88 (1986). The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, "and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party has met its initial burden, the adverse party "may not rest upon the mere allegations or denials of his pleading but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue for trial exists if the evidence is such that a reasonable factfinder could find in favor of the nonmoving party. *Id.*

## II.    Is Delphi obligated to fund the escrow accounts or pay Initial Transfer as contemplated in the Agreement?

Under the Agreement, Delphi was required to deposit a total of $100,000 in escrow accounts in the name of Initial Transfer by May 1, 2003, which funds would then be distributed in accordance with the Agreement on May 1, 2004, with respect to funds deposited in Escrow A, and May 1, 2005, with respect to funds deposited in Escrow B. Delphi presents two arguments in support of its position that it need not fund the escrow accounts. First, it argues, that it is excused from performing under the Agreement due to Debtor failing to resolve the Filed Tier II Supplier Claims, which it contends is a material breach of the Agreement.[5] Second, it argues that, under 11 U.S.C. § 365(d), the Agreement was rejected due to the

---

[5] Delphi also argues that Debtor materially breached the Agreement by failing to settle the Unfiled Tier II Supplier Claims described in paragraph 3 of the Agreement and listed in exhibit B to the Agreement. However, unlike paragraph 2(b) of the Agreement addressing the Filed Tier II Supplier Claims, paragraph 3 does not require Debtor to "resolve" the potential claims of Tier II suppliers that had not filed a lawsuit. Under paragraph 3, Debtor agreed only that, in the event such lawsuits were filed against it, Debtor may not file any claims against Delphi with respect thereto; it does not agree to resolve all of those claims. [Pl.

Trustee failing to timely assume it and that such rejection excuses Delphi's future performance under the Agreement. The Trustee argues that Delphi is obligated to fund the escrow accounts because Debtor has satisfied its obligations under the Agreement by commencing its bankruptcy case.

The parties' arguments, however, confuse to whom the parties' respective duties are owed under the Agreement. The Agreement unambiguously sets forth these duties and treats each party to the agreement as a separate entity,[6] notwithstanding the fact that Debtor and Initial Transfer have a common principal.[7] With respect to funding the escrow accounts, the Agreement requires Delphi to deposit a total of $100,000 ($30,000 into Escrow A and $70,000 into Escrow B) in the name of and on behalf of Initial Transfer, consideration for which Initial Transfer released all claims that it could assert against Delphi. The Agreement includes no provision for any payment to Debtor. And it expressly requires Delphi to pay Initial Transfer, in whole or in part, regardless of whether Debtor has resolved the Tier II Supplier Claims. With respect to Escrow A, the Agreement provides that even if $30,00 has not been paid to resolve the Filed Tier II Supplier Claims, "Initial Transfer shall still be entitled to the remaining funds in Escrow A on or about May 1, 2004." With respect to Escrow B, the Agreement provides a formula for determining the amount Delphi must pay to Initial Transfer on May 1, 2005. On that date, the amount that has been paid or caused to be paid to resolve the Unfiled Tier II Supplier Claims was to be credited against the $70,000 in Escrow B and released to Initial Transfer and the remaining funds were to be split equally between Delphi and Initial Transfer. As none of the supplier claims have been resolved, the Agreement requires Delphi to pay Initial Transfer one-half of the $70,000 that was to be deposited in Escrow B. The Agreement clearly requires payment regardless of Debtor's performance under the contract. Consequently, Debtor's breach of the Agreement does not excuse Delphi's duty to Initial Transfer under the Agreement. Of course, that duty now runs to the Trustee in light of Initial Transfer's assignment of its rights under the Agreement. 11

---

Ex. 1, ¶ 3(a)]. Although paragraph 3(b) requires Debtor to supply Delphi with a copy of the Settlement Agreement pertaining to each claim listed in exhibit B that is resolved, this provision relates only to the disbursement of funds that were to be deposited in Escrow B. [*See id.*, ¶ 3(b) (setting forth the manner of disbursement in the event that $70,000 has not been paid by May 1, 2005, to resolve the unfiled claims)]. Thus, Debtor's failure to resolve the Unfiled Tier II Supplier Claims is not a material breach of the Agreement.

[6] For example, the Agreement provides that Debtor's duty to indemnify Delphi "does not extend to Initial Transfer." [Pl. Ex. 1, ¶2(b)]. Also, the Agreement was executed with separate signature lines for both Debtor and Initial Transfer.

[7] Cecil Weatherspoon is the sole member of Initial Transfer and is president and sole shareholder of Debtor. [Doc. # 53, Counterclaim and Third Party Complaint, ¶ 4; Doc. # 59, Answer of Initial Transfer, ¶ 1].

7

U.S.C. § 541(a)(7).

Delphi also argues that the Agreement was rejected due to the Trustee failing to timely assume it and that such rejection excuses Delphi's future performance under the Agreement. This argument requires the court to consider the Sixth Circuit's definition of "executory contract," a term that is not defined in the Bankruptcy Code. Under § 365, subject to certain exceptions not applicable in this case, "the trustee, subject to the court's approval, may assume or reject any executory contract . . . of the debtor." 11 U.S.C. § 365(a). In a chapter 7 case, "if the trustee does not assume or reject an executory contract . . . within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract . . . is deemed rejected." 11 U.S.C. § 365(d)(1).

There is some confusion within the Sixth Circuit in identifying its approach to the definition of executory contract, specifically whether it has adopted the so-called Countryman definition,[8] *see  Terrell v. Albaugh (In re Terrell)*, 892 F.2d 469 (6th Cir. 1989), or whether it has rejected the Countryman definition and adopted a functional analysis, *Chattanooga Memorial Park v. Still (In re Jolly)*, 574 F.2d 349 (6th Cir. 1978); *see Rieser v. The Dayton Country Club (In re Magness)*, 972 F.2d 689, 694 (6th Cir. 1992). *See, e.g., Phar-Mor, Inc. v. Strouss Bldg. Assoc.*, 204 B.R. 948, 952 (N.D. Ohio 1997)(rejects argument that *Terrell,* which recites the Countryman definition, overruled *Jolly,* which adopted the functional analysis); *O'Brien v. Ravenswood Apartments, Ltd. (In re Ravenswood Apartments, Ltd.)*, 338 B.R. 307, 311 (B.A.P. 6th Cir. 2006)(states that *Terrell* adopted  the Countryman definition, but does not cite *Magness*); *In re DMR Fin. Servs.*, 274 B.R. 465, 469-72 (Bankr. E.D. Mich. 2002)(discussing *Jolly, Terrell* and *Magness,* concludes that *Jolly* functional approach is still controlling and that it encompasses the Countryman definition).

Although the court believes that the Agreement would be considered executory under either the Countryman definition[9] or the functional approach, the court agrees that the Sixth Circuit would still follow the *Jolly*  functional approach,  but that *Jolly* also encompasses the Countryman definition. *Strouss Bldg. Assoc.*, 204 B.R. at 952. In *Jolly* the Sixth Circuit concluded that the Countryman definition is helpful but

---

[8]Many courts have adopted the Countryman test to determine whether a contract is executory. According to Professor Vern Countryman's analysis, an executory contract is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L. Rev. 439, 460 (1973).

[9]As is pertinent to the Countryman definition, Delphi had also not completed its performance under the Agreement as of the July 15, 2003, petition date since it had not resolved the Comptrol, REM and Northwest lawsuits by then.

not controlling in determining whether a contract is executory. *Jolly,* 574 F.2d at 351. Instead, it articulated what is considered the "functional approach" to determining whether a contract is executory. The court recognized that "rejections [of executory contracts] serve a dual purpose; they relieve the debtor of burdensome future obligations during the period that he is trying to recover financially, and they constitute a breach of the contract, making the other party to the contract a creditor with a claim . . . ." *Jolly,* 574 F.2d at 350. It then explained that "[t]he key . . . to deciphering the meaning of the executory contract rejection provisions, is to work backward, proceeding from an examination of the purposes rejection is expected to accomplish. If those objectives have already been accomplished, or if they can't be accomplished through rejection, then the contract is not executory within the meaning of the Bankruptcy Act." *Jolly,* 574 F.2d at 351; *see Magness,* 972 F.2d at 694. The court stated that "[g]enerally, [executory contracts] are agreements which include an obligation for the debtor to do something in the future." *Jolly,* 574 F.2d at 351. However, the court explained that if the contract has already been breached before commencement of a bankruptcy case, then a claim for contract damages already exists and "there is no need for the rejection procedures, which create a breach and make the other party a creditor." *Id.* at 351.

In this case, the court finds that the Agreement is an executory contract. Debtor's obligations under the Agreement were to resolve the Filed Tier II Supplier Claims. The Agreement does not state a time within which those claims were to be resolved or even make time of the essence. However, it clearly contemplates performance after July 15, 2003, the date Debtor's Chapter 7 petition was filed. For example, the Agreement provides that "[w]hen at least Thirty Thousand Dollars and 00/100 ($30,000.00) has been paid or caused to be paid to resolve the lawsuits listed on Exhibit A, then Initial Transfer shall be entitled to the funds in Escrow A, which shall be paid to Initial Transfer on or about May 1, 2004." [Pl. Ex. 1, ¶ 2(c)]. Since the Agreement did not require Debtor's performance by July 15, 2003, Debtor was not in breach of a duty under the Agreement at the time its petition was filed. Instead, at that time, Debtor's obligation to resolve the Filed Tier II Supplier Claims continued into the future. The Agreement also requires Debtor to dismiss all of its claims against Dephi in the cases listed on Exhibit A. [*Id.* at ¶ 2(a)]. At the time Debtor's petition was filed, it had not done so. [*See* Doc. # 75, Trustee's Oppos., p. 14 (stating that "the Trustee, who now holds the right to pursue that litigation, can and will affirmatively dismiss all the third-party complaints against Delphi if it is necessary to do so")]. Applying the "functional approach" set forth in *Jolly,* the Agreement is executory since Debtor has obligations that continue into the future and rejection by the Trustee would have accomplished the dual purpose of relieving the estate of Debtor's burdensome future obligations and providing Delphi with a breach of contract claim against Debtor, thereby

9

making Delphi a creditor of Debtor.

In finding the Agreement executory, the court rejects the Trustee's argument that Debtor has satisfied its obligations to resolve the lawsuits identified in the Agreement merely by commencing its bankruptcy petition. The Trustee argues that Debtor's bankruptcy proceeding provides Delphi with the benefit that it negotiated to be absolved from all current and potential future litigation relating to its outsourcing arrangement with Debtor. The Trustee further argues that the Agreement does not require that the claims be paid or settled; rather it requires only that they be "resolved," which implies that Debtor take action to prevent the claims from continuing. According to the Trustee, Debtor's bankruptcy does just that. Thus, she argues that Debtor's bankruptcy accomplishes the purpose and goal of the Agreement.

The court finds this argument is without merit. First, the time for determining whether a contract is executory is when the bankruptcy petition is filed. *See, e.g., RCI Technology Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 264 (4th Cir. 2004); *Enterprise Energy Corp. v. United States (In re Columbia Gas System Inc.)*, 50 F.3d 233, 240 (3d Cir. 1995) (citing *Collingwood Grain, Inc. v. Coast Trading Co. (In re Coast Trading Co.)*, 744 F.2d 686, 692 (9th Cir. 1984) (indicating contracts executory at time of petition can be assumed); *Carlson v. Farmers Home Admin. (In re Newcomb)*, 744 F.2d 621, 624 (8th Cir. 1984) (stating critical time to be when the petition was filed)); *In re Level Propane Gases, Inc.*, 297 B.R. 503, 507 (Bankr. N.D. Ohio 2006) (stating the time for testing whether contract is executory is when the bankruptcy petition is filed). At the time Debtor filed its petition in this case, the Tier II Supplier Claims had not been resolved and Debtor had not dismissed its third-party complaints against Delphi. As a result, and as discussed above, the Agreement was executory when the petition was filed.

Second, although creditors may file proofs of claim in Debtor's bankruptcy case, they will not necessarily receive full payment of their claims. Because a corporation does not receive a discharge from debt in a Chapter 7 proceeding, *see* 11 U.S.C. § 727(a)(1); *N.L.R.B. v. Martin Arsham Sewing Co.*, 882 F.2d 216 (6th Cir. 1989); *Contreras v. Corinthian Vigor Ins. Brokerage, Inc.*, 103 F.Supp. 2d 1180, 1183 (N.D. Cal. 2000), the claims survive the bankruptcy to the extent they remain unpaid. And finally, to the extent supplier claims remain unpaid, Debtor's bankruptcy imposes no bar to suppliers seeking recovery against Delphi if otherwise entitled to do so.

The Trustee also argues that the Tier II Suppliers lack standing to pursue Delphi since there is no contractual privity between Delphi and the suppliers. She does not, however, explain the significance of this argument as it relates to Debtor's duties under the Agreement. To the extent that it is the Trustee's position that because there is no contractual privity between Delphi and the suppliers, Delphi could only

have negotiated to be free from any third-party claims of Debtor, the court disagrees. That could have been accomplished by simply requiring Debtor to dismiss all third-party claims and agree that it would not file any future claims against Delphi. The Agreement goes much further, requiring Debtor to resolve the Tier II Supplier Claims and to indemnify Delphi against any of the claims of those suppliers, with the exception of four specifically described claims. Clearly, the parties anticipated the possibility of claims being asserted against Delphi by the suppliers in the event any unpaid account was not satisfied by Debtor.[10]

Having found that the Agreement was executory when Debtor filed its petition, because the Trustee did not assume or reject the Agreement within sixty days, the Agreement is deemed rejected. *See* 11 U.S.C. § 365(d)(1). Rejection constitutes a material breach and, as such, excuses performance owed to the debtor by the non-debtor party. *See In re Crippin*, 877 F.2d 594, 597 (7th Cir.1989) (citing *Pacific Express, Inc. v. Teknekron Infoswitch Corp. (In re Pacific Express, Inc.)*, 780 F.2d 1482, 1486 n. 3 (9th Cir.1986)). In other words, "rejecting a contract allows a debtor to escape a contract's burdens; but, at the same time, the debtor must also give up any future benefit [it] might receive from the contract." *Id.* (citing *In re Schnabel*, 612 F.2d 315, 317 (7th Cir.1980)). As Debtor undertook substantial obligations under the Agreement but was not entitled to the monetary consideration, it made no sense for the Trustee to assume Debtor's contract with Delphi.

In light of the foregoing discussion, the court agrees that Delphi's performance to the extent owed to Debtor under the Agreement is excused as a result of rejection under § 365(d). However, that does not excuse its performance owed to Initial Transfer, who is not a debtor in the underlying bankruptcy case. Delphi's duties under the Agreement continue as to Initial Transfer. This fact does not change simply because Initial Transfer assigned its rights under the Agreement to the Chapter 7 Trustee. Accordingly, Delphi is not entitled to judgment as a matter of law that it is not obligated to make any further payments to, or on behalf of, Initial Transfer.

### III. Is Delphi obligated to make payments under the Agreement to REM or Northwest?

Delphi seeks an order that it is not obligated to make payments under the Agreement to REM or Northwest. It argues that REM and Northwest waived any rights they have under the Agreement to require Delphi to resolve their claims. In support of its argument, Delphi offers the affidavit of its attorney stating that he left a telephone message for counsel for REM and Northwest in March or April of 2003 and that

---

[10] Moreover, it is not clear that there is no contractual privity between Delphi and the suppliers or that the suppliers are limited to claims for breach of contract. In the District Court litigation, Debtor itself alleged that it acted as Delphi's disclosed agent in procuring products from the suppliers and alleged that Delphi was unjustly enriched. [*Flextech Prof'l Sys. v. Delphi Auto. Sys., LLC*, Case No. 00-129, Doc. # 35, ¶ 28-30 (N.D. Ohio 2001)].

11

neither attorney responded to his message. [Pl. Ex. 2, ¶ 4]. He does not state what was included in his message or how that amounted to "resolving" those lawsuits. In addition, Delphi argues that these creditors waived the right to payments because they did not answer the complaint in this proceeding alleging that they have waived their right to such payments.

The court finds Delphi's arguments without merit. A waiver is a voluntary relinquishment of a known right. *Chubb v. Ohio Bur. of Workers' Comp.*, 81 Ohio St.3d 275, 278 (1998). The facts alleged by Delphi do not support a finding that REM and Northwest voluntarily relinquished a known right.

Nevertheless, REM and Northwest are not signatories to the Agreement but are, at most, third-party beneficiaries. There is no evidence that Initial Transfer had any obligation to pay REM or Northwest. They are creditors of Debtor and, as third-party beneficiaries, they can assert only the rights available to Debtor under the contract. *See Gerig v. Kahn,* 95 Ohio St.3d 478, 481 (2002); *Spradlin v. Jarvis (In re In re Tri-City Turf Club, Inc.),* 323 F.3d 439, 444 (6th Cir. 2003). Because the Agreement has been rejected under § 365(d), Delphi's obligation to Debtor, and thus to REM and Northwest, to resolve those claims is excused. In so finding, the court makes no finding as to any liability Delphi has to REM and Northwest independent of the Agreement.

**IV.  Does the Agreement's provision that Delphi resolve Comptrol's claim require it to pay the Trustee the amount necessary to do so?**

Delphi also seeks an order that its only remaining obligation under the Settlement Agreement is to pay Comptrol, and not the Trustee, the amount necessary to resolve Comptrol's claim. As the Trustee recognizes in her opposition, Comptrol is a third-party beneficiary to the Agreement and, as such, has no greater rights than Debtor under the Agreement. Because the Agreement has been rejected under § 365(d), Debtor cannot enforce the Agreement to require payment with respect to Comptrol's claim. Moreover, the Agreement provides only that Delphi pay Comptrol the debt owed it by Debtor. It gives Debtor, itself, no right to receive that payment. Accordingly, the Trustee is not entitled to such payment. Even if the Agreement had been assumed, the court does not see how the estate would have been entitled to any funds due Comptrol from Delphi.

Comptrol filed a response to Delphi's motion for summary judgment stating only that it is owed a specified amount pursuant to its agreement with Delphi and the obligation owed to it by Debtor. This opinion, however, does not address any obligation Delphi might have under its agreement with Comptrol to settle Comptrol's claim. That issue is not a matter for this court to decide but is instead a matter to be determined in Delphi's bankruptcy case. The court's holding only addresses Delphi's obligation under the

12

Agreement it entered into with Debtor and Initial Transfer.

## CONCLUSION

Delphi is not entitled to judgment as a matter of law with respect to payments owed to Initial Transfer. However, finding that no genuine issue of material fact exists with respect to Delphi's obligations to pay to pay REM, Northwest, and Comptrol, and further finding that the Agreement was rejected pursuant to § 365(d), Delphi is entitled to summary judgment with respect to its obligations under the Agreement to REM, Northwest and Comptrol.

**THEREFORE,** for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Delphi's Motion for Summary Judgment [Doc. # 69] be, and hereby is, **GRANTED in part and DENIED in part.**

Patricia B. Fugée (NY 2390946
OH 0070698)
ROETZEL & ANDRESS
One SeaGate, Suite 999
Toledo, Ohio 43604
Telephone: (419) 242-7985
Facsimile: (419) 242-0316
*Attorney for Ericka S. Parker, Chapter 7*
*Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| **DELPHI CORPORATION, et al,** | : Case No.: 05-44481 |
| | : (Jointly Administered) |
| Debtors. | : |
| | : Judge Robert D. Drain |
| | : |
| | : |

### CERTIFICATE OF SERVICE

STATE OF OHIO          )
                       )          ss:
COUNTY OF LUCAS        )

Patricia B. Fugée, being duly sworn, deposes and says:

1.      I am not a party to the action. I am over the age of eighteen years and employed

by Roetzel & Andress, LPA, One Seagate, Suite 999, Toledo, OH 43604.

2.      I served a copy of the document(s) listed below by causing true and correct copies

of the same to be sent on November 21, 2006 via first class mail, postage pre-paid, to the persons

listed on Exhibit A hereto:

RESPONSE OF ERICKA S. PARKER, CHAPTER 7 TRUSTEE TO DEBTORS' THIRD OMNIBUS OBJECTION (SUBSTANTIVE) TO CLAIMS AND REQUEST TO BE EXCUSED FROM ATTENDING FIRST HEARING AS TO SAME.


*/s/ Patricia B. Fugée* _____
Patricia B. Fugée


Sworn to before me this 21st
day of November, 2006.


*/s/ Molly M. Troendle (Molly M. Like)*
NOTARY PUBLIC
Notary Public, State of Ohio
My Commission Expires: 4-15-09

6

## EXHIBIT A

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, IL 60606
Attn: John Wm. Butler, Jr., Esq.

Delphi Corporation
5725 Delphi Drive
Troy, MI 48098
Attn: General Counsel

Office of the U.S. Trustee
33 Whitehall Street
New York, NY 10004
Attn: Alicia M. Leonhard, Esq.

Simpson Thacher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017
Attn: Kenneth S. Ziman, Esq.

Davis, Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
Attn: Donald Bernstein, Esq. and Brian
Resnick, Esq.

Latham & Watkins, LLP
885 Third Avenue
New York, NY 10022
Attn: Robert J. Rosenberg, Esq. and Mark A.
Broude, Esq.

Fried, Frank, Harris, Shriver & Jacobson, LLP
One New York Plaza
New York, NY 10004
Attn: Bonnie Steingart, Esq.

Chambers for the Honorable Robert D. Drain
U.S. Bankruptcy Court, N.D. of New York
One Bowling Green, Courtroom 610
New York, NY 10004

94550.112335.0002