# EXHIBIT B

## IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

Edith C. James,                  :

                              :

        Plaintiff,          :

                              :         **Case No. 03CVH02-02213**

        v.                  :

                              :         **Judge Bender**

Delphi Automotive Systems, et al.,  :

                              :

        Defendants.       :

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OF DEFENDANTS DELPHI AUTOMOTIVE SYSTEMS, JAMES R. BARR AND LORETTA WOOLRIDGE AND MEMORANDUM IN SUPPORT

Defendants blatantly discriminated against plaintiff, Edith C. James, based upon her race and gender. The evidence establishes that plaintiff, a black female, applied and interviewed for the posted position of "Supervisor Salaried Personnel Adm.," a "seventh level" position designated by position code 7P21. To plaintiff's knowledge, this position has always been held by a white male at defendant Delphi Automotive Systems' plant in Columbus, Ohio.

Defendants were forced to give the job to plaintiff when she became the only remaining applicant. However, once she was placed in the job, defendants quickly revoked her supervisory job title, revoked her promotion, and added the duties and responsibilities of two former full-time employees. When these actions did not cause plaintiff to resign, defendants demoted her and replaced her with a white male. This individual was then given the supervisory title and promotion plaintiff had been promised, and the job duties and responsibilities were reduced.

Not surprisingly, defendants dispute the facts, and how the evidence should be construed, in an effort to articulate a business reason for their actions. This dispute, however, precludes summary judgment.

## I.    Factual Background

### A.    Edith James' Employment with Delphi

In mid-1999, Edith James responded to an open call for employment with defendant Delphi Automotive Systems ("Delphi"). [Depos. of Edith James at pp. 13-14.] During the open call, Ms. James interviewed with several Delphi employees, and was subsequently offered a position. In May 1999, Ms. James began her employment with Delphi at its Columbus, Ohio facility. [See attached Affidavit of Edith James.] Ms. James held a manufacturing advisor position and supervised approximately 25-30 hourly assembly line employees. [Depos. of Edith James at p. 17.]

As a new employee, Ms. James was placed on probation and received performance reviews in four month intervals. She received stellar four-month and eight-month performance reviews. [See Exhibits A and B, attached hereto.] Following her probation, Ms. James received a promotion to a sixth level position and continued to receive positive reviews. [See Exhibit C, attached hereto; Depos. of Edith James at p. 46.] Ms. James' performance was so exemplary that she was selected by Delphi to travel Denver, Colorado, to resolve problems with a component part supplier. [Affidavit of Edith James; Depos. of Edith James at pp. 100-101.]

### B.    The "Supervisor Salaried Personnel Adm." Position

In November 2000, Frank Cerny, who held the position of "Supervisor Salaried Personnel Adm.," announced his retirement. [Depos. of Loretta Woolridge at pp. 30-33; Depos. of Marcia Brown at p. 25.] At this time, the salaried personnel department consisted of the Supervisor Salaried Personnel Adm. Position, held by Cerny, and the "Salaried Personnel Rep." position held by Cerny's direct report, Marsha Brown. [Depos. of Frank Cerny at pp. 16-17; Depos. of Marsha Brown at p. 12.] Following Cerny's announcement, defendant Loretta Woolridge (hereinafter "Woolridge") instructed Cerny to post his position so that a successor could be selected. [Depos. of Loretta Woolridge at pp. 30-33; Depos. of Frank Cerny at p. 44.]

On November 15, 2000, the job opening was posted in Delphi's Columbus
Facility. The notice stated that applicants would be considered only for the "Supervisor Salaried
Personnel Adm." designated by position code 7P21. [See Exhibit D attached hereto.] The
posting accurately identified the job duties and responsibilities for the open position and its code.
[See Exhibit E, attached hereto; Depos. of Frank Cerny at pp. 46-47.] The Supervisor Salaried
Personnel Adm.[1] is a position within Delphi's Columbus, Ohio facility that has, to plaintiff's
knowledge, always been held by a white male.

### C.    Edith James Applies for the Supervisor Salaried Personnel Adm. Position

Ms. James applied for the posted position and was interviewed. [Depos. of Edith
James at pp. 99-100, 132-133; Depos. of Loretta Woolridge at pp. 30-32, 47-63.] Ms. Brown,
Cerny's direct report, also applied for the position and was interviewed by Woolridge. Like
plaintiff, Brown understood from Delphi's representations that the position for which she was
applying and interviewing was the seventh level Supervisor Salaried Personnel Adm. position.
[Depos. of Marsha Brown at pp. 31-32.] During the interviews, Woolridge discussed Cerny's
retirement, his job duties and responsibilities, and each candidate's qualifications. [Depos. of
Edith James at pp. 133-137; Depos. of Marsha Brown at pp. 31-35.] Woolridge never indicated
that the job duties and responsibilities, the job title, the position code, or pay level would be
changing. To the contrary, Woolridge's description of the position and pay was consistent with
the job Cerny held. [Depos. of Edith James at pp. 133-137; Depos. of Marsha Brown at pp. 31-
35; Depos. of Loretta Woolridge at pp. 46-48.] Thus, the interviewees understood that they had
applied and interviewed for the Supervisor Salaried Personnel Adm. position designated by code
7P21. Id.

---

[1] The Supervisor Salaried Personnel Adm. position at Delphi's Columbus facility is also known as Supervisor HRM
and has various "local" titles which apparently vary from day to day.

After interviewing the applicants, Woolridge selected four candidates to fill the position and presented her selections to Delphi's plant manager and core staff. [Depos. of Loretta Woolridge at pp. 57-63.] Plaintiff was the only minority candidate. *Id.* After reviewing the candidates, defendants were forced to eliminate the other three candidates for budgetary and business reasons. [Depos. of Loretta Woolridge at pp. 57-73.] As a result, Ms. James was given the job. *Id.*

### D.    **Delphi Changes The Position**

When Woolridge told Ms. James that she had been given the position, she did not tell plaintiff that she would not receive a promotion, that the job title had changed, or that additional duties and responsibilities were going to be added to the position. [Depos. of Edith James at pp. 138-139.]

In January 2001, Ms. James started her new job. [Affidavit of Edith James.] Although the job was purportedly a promotion, plaintiff received no training whatsoever. She was given the "opportunity" to shadow Cerny during his last days at Delphi, but was simultaneously required to train her own successor. [Affidavit of Edith James; Depos. of Loretta Woolridge at pp. 118-119; Depos. of Frank Cerny at p. 97.]

Because Ms. James knew that she had applied for, and been <u>promoted</u> to, the Supervisor Salaried Personnel Adm., she asked if she needed to fill out any additional paperwork concerning the promotion. [Affidavit of Edith James; Depos. of Loretta Woolridge at pp. 104-109.] When plaintiff pressed, Woolridge informed her that she had <u>not</u> received a promotion, that her job title would <u>not</u> be the same as Cerny's, and that she would <u>not</u> be paid at the seventh-level designated by position code 7P21. Instead, Woolridge told her, plaintiff's job title would be "Salaried Personnel Rep." – the title of the job that reported <u>to</u> Cerny's position – and she would be paid commensurate with a sixth-level position, position code 6P21. Moreover, Woolridge

told plaintiff that in addition to performing Cerny's job she also would be responsible for performing the job duties of two other full time employees. [Affidavit of Edith James.]

Ms. James was stunned by Delphi's actions. So was Ms. Brown, who already held the "Salaried Personnel Rep." designated by code 6P21 and who had applied to be promoted from that job into Cerny's position. [Affidavit of Edith James; Depos. of Marsha Brown at pp. 45-46.]

Despite Delphi's actions, plaintiff diligently tried to learn Cerny's job, and to perform the duties and responsibilities of the two other positions – Salaried Personnel Rep. and Director of Education and Training – that had placed on her. [Affidavit of Edith James.] Although Woolridge and Delphi expected plaintiff to have a long "learning curve," see Depos. of Loretta Woolridge at pp. 59-62, and although plaintiff repeatedly sought training and assistance, they refused to provide Ms. James with either. [Depos. of Loretta Woolridge at pp. 118-120, 140-144; Affidavit of Edith James.]

By overburdening plaintiff and simultaneously refusing to provide training or assistance, Delphi ensured that it was *impossible* for Ms. James to perform the job duties and responsibilities formerly held by three full-time employees. Although both the former Supervisor Salaried Personnel Adm. and Salaried Personnel Rep. expressed concern that one person simply could not perform all the new job duties and responsibilities, see Depos. of Frank Cerny at pp. 98-99 and Depos. of Marsha Brown at pp. 44-45, Delphi did not relent. Finally, the immense pressure began to take its toll. Ms. James began suffering from extreme high blood pressure, and for the first time in her life was placed on medication for this condition. [Affidavit of Edith James.]

**E.    <u>Ms. James is Demoted</u>**

Having failed to give plaintiff the job and pay that she was due pursuant to the job posting, and having saddled her with the work of three full-time employees, Delphi clearly

- 5 -

expected Ms. James to fail. Curiously, although defendants have argued after the fact that plaintiff's performance was inadequate, when plaintiff suggested in August 2001 that the job was overwhelming, defendants refused to allow her to even consider resigning. See Exhibit F, attached hereto.

Unknown to plaintiff, by the Fall of 2001 – just months after creating the conditions that ensured she would fail – Delphi was secretly taking steps to replace her. [Depos. of James Barr at pp. 62-67. See also Exhibit G attached hereto.] Significantly, the internal document detailing this plan clearly indicates that the planned "replacement" for Ms. James would be given a different position title and would be paid in accordance with a seventh-level job code (the pay level that was previously afforded Cerny and that plaintiff should have received). See Exhibit G. Ms. James, of course, was never told that Delphi was going to replace her. [Depos. of James Barr at pp. 65-67.]

After Delphi found a white male replacement for Ms. James, defendant James Barr gave Ms. James a negative performance review and demoted her to the manufacturing floor.[2] [Affidavit of Edith James.] This performance review was created in January 2002, after Delphi had taken steps to replace her. It was the first negative performance review plaintiff had received at Delphi, and clearly was prepared to justify Delphi's actions.

Even as plaintiff was being told of her demotion, Delphi posted a memo throughout the plant advising every employee that plaintiff was being demoted and that her replacement, Michael Waters, would receive a promotion and a new job title. See Exhibit H, attached hereto.

Having removed plaintiff from the position, Delphi reconfigured the job so that it once again resembled the job Cerny had held. For example, many of the additional tasks that

---

[2]    It is well known within Delphi being moved from the front office to the production floor is considered a demotion, regardless of the pay consequences.

had been added in an effort to overburden plaintiff (such as the education and training duties and responsibilities) were immediately removed from the position. Moreover, plaintiff's white male replacement, Mr. Waters, was immediately identified as a "supervisor" – even though he did not directly supervise any employees – and his salary was set as a seventh-level salary. [Depos. of James Barr at pp. 90-91.]

Ms. James' demotion, and the plant-wide announcement, humiliated and embarrassed her. [Affidavit of Edith James.] She was ridiculed and mocked by Delphi employees as a failure and a minority who would "never make it" in Delphi's front offices. [Affidavit of Edith James.] As a result, she sought medical treatment and was placed on medical leave, and was forced to resign. [Affidavit of Edith James.]

### E.    Defendants Did Not Follow Their Normal Business Practices

Notwithstanding their argument to the contrary, defendants' failure to provide Ms. James with the position title, position code, and promotion identified in Cerny's posting was inconsistent with Delphi's long-established business practices. [Depos. of Marsha Brown at pp. 46-47.] Defendants cite two instances that they believe are consistent with the way they treated plaintiff. However, in each instance the job posting made clear that the open position was a "sixth-level" position. See Exhibits I and J, attached hereto. In contrast, the job for which plaintiff applied was unequivocally identified as a "seventh-level" position. It was not until Delphi realized that it would actually be required to place Edith James in the job that it suddenly decided not to grant her the seventh-level job that had been posted.

Simply stated, when Cerny retired, Delphi posted an opening for a "Supervisor Salaried Personnel Adm." position and identified it as a "seventh-level" job. These were the title and job code held by Cerny. During the interviews for the job, Delphi described the job in a way that was fully consistent with the job held by Cerny. After Ms. James was given the job by default, Delphi (a) stripped the job title, (b) refused to pay plaintiff in accordance with a "seventh

level" position, (c) gave her the responsibilities of two additional jobs, and (d) refused to provide

her with training or assistance. Delphi then found a white male to replace plaintiff, gave him the

job, elevated him to the rank of supervisor, placed him at a seventh-level pay grade, took away

many of the additional tasks that had been added to overwhelm plaintiff, and demoted plaintiff.

Clearly, a jury can conclude from these facts that Edith James was the victim of race

discrimination.

## II.    Law and Argument

Summary judgment in only appropriate when (1) there is no genuine issue of

material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) after

considering all the evidence in favor of the nonmoving party, reasonable minds can come to but

one conclusion and that conclusion is adverse to the nonmoving party. *Zivich v. Mentor Soccer

Club, Inc.* (1998), 82 Ohio St.3d 367, 369-370. All inferences drawn from the underlying facts

contained in evidentiary materials must be construed in a light most favorable to the nonmoving

party. *Hanna v. Dayton Power & Light Co.* (1998), 82 Ohio St.3d 482, 485.

### A.    Defendants Clearly Discriminated Against Ms. James Based Upon Her Race and Gender

Pursuant to R.C. 4112.02:

"It shall be an unlawful discriminatory practice:

"(A) For any employer, because of the race, color *** [or] national
origin, *** of any person, to discharge without just cause *** or
otherwise to discriminate against that person with respect to hire,
tenure, terms, conditions, or privileges of employment, or any
matter directly or indirectly related to employment."

In interpreting violations of R.C. 4112, the Ohio Supreme Court has found that federal case law

interpreting Title VII of the Civil Rights Act of 1964 is generally applicable. *Plumbers &

Steamfitters Commt. v. Ohio Civil Rights Comm.* (1981), 66 Ohio St.2d 192, 196. Thus, the

- 8 -

*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, three step analysis applies to racial
discrimination cases brought in Ohio.

To establish a prima facie case of racial discrimination, plaintiff must establish (1)
that she is a member of a protected class; (2) that she was subject to an adverse employment
action; and (3) that there were similarly situated non-protected employees who were treated more
favorably than plaintiff or that she was replaced by a person outside the protected class. *Shah v.
General Electric Co.* (6th Cir. 1987), 816 F.2d 264, 270; *Henderson v. Cincinnati Bell Long
Distance, Inc.* (1996), 113 Ohio App.3d 793, 796; *Mitchell v. Toledo Hosp.* (6th Cir. 1992), 964
F.2d 577, 582. Once the plaintiff establishes a prima facie case of discrimination, a presumption
of discrimination is raised and the burden of production shifts to the defendants to articulate
some legitimate non-discriminatory reason for the adverse employment action. *McDonnell
Douglass* at 802, *Plumbers & Steamfitters Commt.* at 197.

If defendants carry their burden, then plaintiff is allowed to demonstrate the
employer's articulated reason for the adverse employment action is merely pretext. *Id.* at 804,
*Plumbers & Steamfitters Commt.* at 198. The plaintiff may establish pretext by showing that (1)
the stated reason has no basis in fact; (2) the state reason is not the actual reason; and (3) the
stated reason is insufficient to explain defendants' actions. *Logan v. Denny's Inc.* (6th Cir. 2001),
259 F.3d 558, 567. Thus pretext can be established by showing that the reason for the adverse
employment action is false and that discrimination was the true reason. *Id.* citing *St. Mary's
Honor Ctr. v. Hicks* (1993), 509 U.S. 502, 515.

### 1.    Ms. James has established a Prima Facie Case of Discrimination

It is undisputed that Ms. James, a black female, is a member of a protected class.
Thus, only an analysis of the final two prongs of the prima facie case is necessary.

a.    **Ms. James Was Subject To Adverse Employment Action**

Ms. James, a black female, applied and interviewed for the posted position

Supervisor Salaried Personnel Adm. with a position code of 7P21, a position traditionally held

by a white male. Plaintiff was given the position when she was the only remaining applicant.

However, once she received the position, defendants quickly revoked her supervisory job title,

revoked her promotion to a seventh level and added voluminous job duties and responsibilities

including those duties and responsibilities of two former full-time employees. While plaintiff

performed the job duties and responsibilities of three full-time employees, defendants demoted

her and replaced her with a white male who was given a supervisory title, a promotion, and

substantially fewer job duties..

Although demoting Ms. James establishes the adverse employment action, Ms.

James also was clearly discharged. To demonstrate a constructive discharge, plaintiff must

present evidence that (1) defendants deliberately created intolerable working conditions as

perceived by a reasonable person and (2) defendants took these actions with the intention of

forcing plaintiff to quit. *Logan v. Denny's Inc.* (6th Cir. 2001), 259 F.3d 558, 568, citing *Moore

v. KUKA Welding Sys.* (6th Cir. 1999), 171 F.3d 1073, 1080. Thus both the employer's intent and

the employee's objective feelings must be examined. *Id.* at 569.

In establishing defendants' deliberate intention to create intolerable working

conditions, the courts must consider the facts on a case by case basis, however, the following

relevant factors must be considered: (1) demotion; (2) reduction in salary; (3) reduction in job

responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a

younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to

encourage the employee's resignation; or (7) offers of early retirement or continued employment

on terms less favorable than the employee's former status. *Id.* (citations omitted). Each of these

- 10 -

factors either singly or in combination may establish whether a reasonable person would heave felt compelled to resign. *Id.*

Within Delphi's Columbus, Ohio facility, there is a distinct split between employees: those on the production floor and those in the front office. Obviously, employment in the front office is considered superior to those positions on the floor even though employees on the floor may receive higher compensation. A move from the production floor to the front office regardless of pay increases is considered a promotion. Deposition of Reginald Williams at 22-23, Affidavit of Edith James. Similarly, being removed from the human resource department in the front office and returned to the production floor is considered a demotion. *Id.* Although, defendants assert that being returned to the production floor is a lateral transfer not a demotion, Delphi and its employees knew this was a demotion.

In *Logan v. Denny's Inc.* (6th Cir 2001), 259 F.3d 558, 570, the same arguments were raised by the employer and rejected by the Court. The *Logan* Court considered the employer's continued position that the employee's position change was not a demotion but a lateral transfer, however, the true factors included the fact that the employee felt the job change was degrading and the fact that the job change was a disciplinary action due to poor performance. *Id.* Thus, the Court found that the basis for moving the employee along with the employee and others perception established logically that the change in position was not a lateral transfer but a demotion. *See also, Russell v. Drabik* (6th Cir. 2001), 24 Fed. Appx. 408, 2001 WL 1556996 (a lateral transfer can be considered an adverse employment action if it involves a loss of prestige or an objectively demeaning change or working conditions).

In addition to being demoted, Ms. James' job duties and responsibilities were reduced, on the production floor she performed more menial work and her hours were moved to second shift. Affidavit of Edith James. Clearly defendants intended for Ms. James to resign her employment. *See Logan* at 573 (the employers action of treating white employees more

- 11 -

favorably and conditioning further employment upon a demotion is sufficient to establish the employer's intention for the employee to resign.)   Thus a genuine issue of material fact remains as to whether Ms. James was subject to adverse employment action.

  **b.**  **Similarly Situated Non-Protected Employees Were Treated More Favorably than Ms. James and/or Ms. James Was Replaced by A Person Outside the Protected Class**

  It is undisputed that defendants selected a white male, Michael Waters, to replace Ms. James. *See attached* Exhibits H and K; Affidavit of Edith James, Barr Deposition at 97-98. Clearly, the mere fact that Ms. James was replaced by a person outside her protected class establishes the final prong of the prima facie case.

  However Ms. James was also treated differently that other similarly situated employees. To determine whether an employee is similarly situated, the inquiry does not require a comparison between plaintiff and other employees in every single aspect of their employment. *Ercegovich v. Goodyear Tire & Rubber Co.* (6th Cir. 1998), 154 F.3d 344, 352. The inquiry should be limited to only relevant aspects of the employees. *Id.*

  In the present case, Ms. James applied for the position held b a white male, Mr. Cerny. Notice #112 specifically identified the position title, position code, key elements of the position Mr. Cerny held as supervisor salaried personnel adm. *See attached* Exhibit D. Ms. James applied, interviewed, and was selected by Mr. Cerny's supervisor, Woolridge, to fill the position. However, Ms. James was not given a supervisory title, she did not hold a seventh level position, and she not only performed all the job duties and responsibilities of the salaried personnel office but all the job duties and responsibilities of the salaried education and training office.

  Although defendants attempt to make light of Ms. James alleged lack of qualifications, defendants gave Ms. James the position. Whether other white candidates were denied the position is completely irrelevant to this case and establishes defendants' intention to

blur the clear factual issues that Ms. James was treated differently that similarly situated non-protected employees.

Simply, Ms. James, a black female, was placed in a position traditionally held by a white male, she was given an exorbitant amount of job duties and responsibilities, and she was denied a supervisory job title and promotion. Neither Ms. James' white male predecessor or successor had any salaried education and training responsibilities, both held supervisor job titles, and both held seventh level position codes. Clearly a genuine issue of fact remains for trial as to whether Ms. James was treated less favorably than non-minority employees in the salaried personnel position.

### 2.    Defendant's Proffered Reasons Are Pretextual

Defendants assert that the decision to modify the position Ms. James was selected to fill was made before Ms. James was selected due to internal budgetary concerns, and Ms. James was given a developmental opportunity. Defendants further explain Ms. James' demotion as a result of complaints and concerns from Delphi's main offices. These stated reasons are insufficient to explain defendants actions. Although Delphi may have had internal budgetary concerns, defendants made no efforts to distribute additional job duties and responsibilities among other employees nor did it provide Ms. James with assistance or training to permit her to perform all the job duties and responsibilities. Clearly, Woolridge testified that Ms. James had difficulty learning the salaried personnel part of the position, which was a difficult position formerly staffed by two full time employees. Woolridge Deposition at 59-62, Brown Deposition at44-45. Further, Ms. James was also expected to full-fill the job duties and responsibilities of a third full-time position, director of education and training.

Defendants have clearly failed to produce a single document to support their position that these position changes and demotion were based upon anything other than discrimination. As the Court found in *Logan, supra.*, a genuine issue of fact remains when the

- 13 -

employer cannot support their statements with any alleged documents. *Logan, supra.* at 558. Further, defendants admit they never modified notice #112, and any other person selected to fill the position would have had a seventh level position code and a superior title to that given to Ms. James. [Woolridge Depo. at 63]. Accordingly, as defendants' arguments and statements are inconsistent, genuine issues of material fact remain for trial.

**B.    Defendants' Actions Violate Ohio Public Policy**

As stated above, defendants discriminated against plaintiff based upon her gender and her race. Ohio public policy clearly prohibits employers from taking discriminatory actions against their employees based solely upon their gender and race. *See Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St. 134. Therefore, as genuine issues of material fact remain for trial upon Ms. James racial and gender discrimination claims, genuine issues of fact remain as to whether defendants' discriminatory actions violated Ohio public policy.

**C.    Ms. James Suffered Serious Emotional Distress As a Result of Defendants' Actions**

Defendants placed Ms. James in a position requiring her to perform the job duties and responsibilities of three full-time employees, constantly pressured her to perform, denied her training, refused to redistribute any job duty or responsibility, and then embarrassed her by demoting her back to the production floor in solely to place a white male in the same office with fewer job duties and responsibilities. Clearly any person would find these actions outrageous and beyond all bounds of decency. Further, Ms. James did suffer actual emotional distress including extreme high blood pressure.

A cause of action for intentional infliction of emotional distress lies when the defendants' actions are so extreme and outrageous that they go beyond all possible bounds of decency and are utterly intolerable in a civilized community. *Yeager v. Local Union 20* (1983) 6 Ohio St.3d 369. Defendants' actions as stated above, including their blatant discrimination

- 14 -

against Ms. James, are outrageous and beyond all bounds of decency. Thus, genuine issues of fact remain for trial as to Ms. James intentional infliction of emotional distress claim.

## III.    Conclusion

As stated above, defendants posted a seventh level supervisory position in salaried personnel. Ms. James applied, interviewed, and was selected to fill the position traditionally held by a white male. Only after taking credit for replacing a white male with a black female, defendants revoke Ms. James promotion, supervisory job title, gave her an exorbitant amount of job duties and responsibilities, and finally humiliatingly demoted her publishing their decision to the entire plant. Incredibly, defendants immediately replaced Ms. James with a while male who was given a supervisory title, a promotion, and substantially fewer job duties and responsibilities. Clearly genuine issues of fact remain for trial.

Respectfully submitted,

Rex H. Elliott          (0054054)
Charles H. Cooper, Jr.   (0037295)
Sheila P. Vitale         (0068271)
Cooper & Elliott, LLC
2175 Riverside Drive
Columbus, Ohio 43221
(614) 481-6000
(614) 481-6001 (Facsimile)

Attorneys for Plaintiff
Edith C. James

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served upon the

following counsel of record, by ordinary U.S. mail, postage prepaid, this ⎵17$^{th}$day of December,

2003:

> Jeffrey D. Winchester, Esq.
> Jones Day
> 41 South High Street
> Suite 1900
> Columbus, Ohio  43215
>
> Robert S. Walker, Esq.
> Jones, Day
> 901 Lakeside Avenue
> Suite 1900
> Cleveland, Ohio  44114-1190
>
> Attorneys for Defendants

# AFFIDAVIT OF EDITH JAMES

## IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

Edith C. James,                              :
                                             :
     Plaintiff,     :
                                             :        Case No. 03CVH02-02213
     v.             :
                                             :        Judge Bender
Delphi Automotive Systems, et al.,           :
                                             :
     Defendants.    :

### AFFIDAVIT OF EDITH C. JAMES

State of Ohio,
County of Franklin, SS:

     I, Edith C. James, do hereby state under oath and penalty of perjury as follows:

     1.    I am the plaintiff in this action and I am submitting this Affidavit to present the Court with the facts regarding defendants discriminatory treatment of me. This Affidavit is based on my own personal knowledge of the matters set forth herein.

     2.    In May 1999 I was hired by Delphi Automotive Systems in Columbus, Ohio as a manufacturing advisor.

     3.    During my probationary period as a manufacturing advisor, I received positive performance reviews from my supervisor. After my probationary period ended, I received positive performance reviews as a manufacturing advisor.

     4.    As a probationary employee, I held a fifth level position code. Following my probationary period, I was promoted to a sixth level position code.

     5.    In November 2000, I applied for the position posted as Notice #112 for the job title Supervisor Salaried Personnel Adm. with a position code of 7P21. As the position was posted as a seventh level position, I understood that I had applied for a seventh level position.

6.     After submitting my self-nomination for the position posted as Notice #112, I was interviewed by Loretta Woolridge. During the interview, Ms. Woolridge advised me that Frank Cerny who formerly held the position was retiring, explained his job duties and responsibilities as they were listed on Notice #112, and asked me how I was qualified for the position. At no time during the interview did Ms. Woolridge advise me that the position had changed, that it was no longer a supervisory position, or that additional job duties and responsibilities were being added. I understood during my interview that I was solely being interviewed for the position Supervisor Salaried Personnel Adm. with a position code of 7P21.

4.     I was selected to fill the position posted in Notice #112 and was advised of this by Loretta Woolridge. When Ms. Woolridge advised me that I had been selected to fill the position, she blatantly advised me that I was not her choice to fill the position.

5.     After I began my new position in the personnel department, I inquired as to any documentation that I would need to fill out due to the promotion I believed I would receive since I was selected to fill a position posted as a seventh level and I held a sixth level pay code. It was not until I made this inquiry that I was advised by Mr. Cerny and Ms. Woolridge of all the changes to the position including the fact that I would not receive Mr. Cerny's job title, I would not receive a promotion to a seventh level, I would now perform the job duties and responsibilities of the salaried personnel rep. and director of education and training in addition to the job duties and responsibilities held by Mr. Cerny.

6.     When I began my salaried personnel position, the Salaried Personnel Office was disorganized. File cabinets were mislabeled, documents needed filed into personnel files, and boxes of documents were stacked above the filing cabinets, coat rack, and under chairs.

- 2 -

7.    I was given the job title and position code of the Salaried Personnel Rep.,
6P21 which was held by the employee Mr. Cerny supervised, Marcia Brown, who was also a
black female.

8.    Traditionally the Supervisor Salaried Personnel Adm. was held by a white
male. Further, the person Delphi selected to replace me was a white male who received both a
promotion to the seventh level and supervisory title.

9.    Loretta Woolridge was my supervisor from the time I accepted the
position in personnel until August 2001. While Ms. Woolridge was my supervisor she refused to
permit me to attend any training despite my repeated requests by indicating that the timing was
not appropriate or finding any number of excuses. As a result I did not receive any training
beyond shadowing my successor for a short period of time, one half day time when I went to
Delphi's Vandalia plant to review their EEO/AAP documents, and attending a short net meeting
even though I was advised by Delphi headquarters that I would learn far more in person.

10.    Despite the continued stress that was placed upon me, I continued to
attempt to perform the job duties and responsibilities formerly performed by three full-time
employees. However, when the job duties and responsibilities and defendants continued denial
of assistance and training became too much, I attempted to resign my position on August 28,
2001.

11.    My resignation letter was refused and defendants insisted that I remain in
the position and that they would make changes to my position.

12.    Following Ms. Woolridge's departure from Delphi Columbus, James Barr
was my supervisor.

13.    Ms. Woolridge completed the phase two evaluation for me after she left
Delphi's Columbus, Ohio facility. In that evaluation, Ms. Woolridge failed to identify my proper

- 3 -

social security number and improperly identified a Sherry Unsworth as an employee who assisted me. Sherry Unsworth was not an employee of Delphi's Columbus, Ohio facility and did not provide any assistance to me. Further, Ms. Woolridge knew of the exorbitant amount of job duties and responsibilities placed upon me and my continued attempt to meet all expectations. The review that she provided me with fails to identify the continued efforts I took to meet the job duties and responsibilities formerly performed by three full-time employees.

14.     In August 2001 James Barr became my interim supervisor and later assumed Ms. Woolridge's position and became my supervisor. He completed my phase three final review. This negative review criticizes me for filing to maintain training records on the CIIS and SAP system even though that was being performed by Sherry Rice under my supervision. Further, this review was the first time I was advised of any problems with my performance by Mr. Barr. In addition, while I was receiving this review, a notice was posted throughout the plant advising every employee that I was being demoted to the production floor and I was being replaced by a person who would receive a supervisory job title and a promotion.

15.     Being returned to the production floor from the front office is a demotion.

16.     In addition, when Michael Waters replaced me, the education and training duties and responsibilities that I was assigned were completely removed from the position. Mr. Waters had fewer job duties and responsibilities than I held while in the same position.

17.     When Mr. Waters came to Delphi's Columbus, I was permitted to briefly show Mr. Waters the office, the organization of my desk, and my contact information. I discussed my performance, issues, or concerns with the salaried personnel position with Mr. Waters and I never used the words "shutdown mode" in any conversation.

18.     When Delphi posts a position notice, the job title and position code are specifically posted indicating to all applicants the position code and title they would receive if

- 4 -

selected for the position. Delphi is in the practice of listing two position codes if the person selected could receive a higher or lower position code such as designating a position as a 6/7 level position.

19.    While employed in my salaried personnel position, defendants treated me differently that the white males who traditionally held the position and the white male who replaced me in the position. I had a lower position code, more job duties and responsibilities, and was given a lesser job title.

20.    Due to the stress defendants placed upon me to perform the job duties of three full-time employees, I began to suffer anxiety, sleeplessness, extreme high blood pressure, and distress. As a result my physician placed me on blood pressure medication to attempt to regulate my blood pressure.

21.    Following my demotion to the production floor, I was humiliated, ridiculed, mocked, and labeled as a failure throughout Delphi. I was placed on medical leave by my physician so that I could regulate my extremely high blood pressure directly related to my employment at Delphi. As a result of defendants actions, I was forced to resign my position with

22.    Finally, defendants claims that I have not experienced any medical problems as a result of Delphi's actions. Defendants have, and refuse to produce my medical records which clearly establish my extreme blood pressure as well as a medical leave by my treating physician. I was prescribed for the first time in my life medication to deal with my extreme high blood pressure. Prior to my employment in Delphi's personnel department I never had any issue with my blood pressure. Further, following my termination from Delphi, I have not had medical insurance and cannot afford medical attention. However, I have continued to monitor my blood pressure and it is now within what is known to be normal limits without medication.

- 5 -

FURTHER AFFIANT SAYETH NAUGHT.

Edith C. James

Sworn to before me and subscribed in my presence this 16th day of December,

2003.

Notary Public

SHEILA P. VITALE, ESQ.
Attorney at Law
Notary Public, State of Ohio
My Commission Has No Expiration
Section 147 03 R.C.

# AFFIDAVIT OF
# SHEILA P. VITALE

## IN THE COURT OF COMMON PLEAS OF FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| Edith C. James, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Case No. 03CVH02-02213 |
| v. | : | |
| | : | Judge Bender |
| Delphi Automotive Systems, et al., | : | |
| | : | |
| Defendants. | : | |

### AFFIDAVIT OF SHEILA P. VITALE, ESQ.

State of Ohio,
County of Franklin, SS:

      I, Sheila P. Vitale, Esq., do hereby state under oath and penalty of perjury as follows:

      1.   I am counsel for the plaintiff in this action and I am submitting this Affidavit to authenticate the Exhibits accompanying plaintiff's memorandum in opposition to summary judgment.

      2.   In particular, Exhibits A through K are each Delphi's business records and are true and accurate copies of the documents defendants have produced in this case or identified in their depositions.

      FURTHER AFFIANT SAYETH NAUGHT.

                               _Sheila P. Vitale_
                                 Sheila P. Vitale, Esq.

      Sworn to before me and subscribed in my presence this 17 day of December, 2003.

                    Notary Public     AARON D. EPSTEIN, ATTORNEY AT LAW
                                         NOTARY PUBLIC, STATE OF OHIO
                                         My commission has no expiration date
                                         Section 147.03 R.C.

# EXHIBIT A

## *PROBATIONARY EMPLOYEE*
## *PERFORMANCE APPRAISAL REVIEW*

TO _B. McClincy_ DATE _9-9-99_

EMPLOYEE _Edith Jame_ DEPARTMENT _____

CLASSIFICATION _Mfg. Advance_ CODE _5M13_

DATE EMPLOYEE WILL COMPLETE PROBATIONARY PERIOD _1-2000_

It is the responsibility of the Supervisor to review and evaluate the performance of probationary employees prior to the end of the fourth and eight months of the probationary period. The above named salaried employee will complete Four Months _✓_ Eight Months _____ of service on _9-1-99_ .

The application of the basic principles of the H.R.M. Appraisal System and the Performance Appraisal Review form should be utilized for this purpose. The Supervisor should make certain that all aspects of the evaluation are covered in an interview with the employee and then both must sign the appraisal.

The attached Employee Appraisal review form pertaining to the above employee and this form should be promptly return to the Salaried Personnel Department upon completion.

RECOMMENDATION OF SUPERVISOR:

Employee should be retained _____✓_____

Employee should be released _____
(Explain Below)

REMARKS: _Edith is making good progress_
_in her current job Assignment_

SIGNED _Robert JM Cly_ DATE _9/15/99_
　　　　　　Supervisor

REVIEWED _____ DATE _1STA00_
　　　　　Department Head

NAME: _Edith C. Samu_
SS# _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_
POSITION TITLE: _Mfg. Advisor_
BUSINESS UNIT: _3_

DELPHI
INTERIOR & LIGHTING SYSTEMS
PERFORMANCE EVALUATION
FIRST YEAR EMPLOYEE

## JOB RESPONSIBILITIES

| SKILLS & ATTRIBUTES REVIEW | DESCRIPTION OF PERFORMANCE |
|---|---|
| **FUNCTIONAL KNOWLEDGE & ABILITY:** Possesses depth of knowledge and skills required. Effectively applies knowledge and skills. Maintains awareness of developments. | _Improving with experience_ |
| **WORK TECHNIQUES:** Demonstrates innovative approach to assignments and projects. Organizes, plans, makes effective use of time. Demonstrates high work output while maintaining required quality levels. | _Demonstrates great work ethic._ |
| **QUALITY IMPROVEMENTS/CUSTOMER SATISFACTION:** Makes continuous incremental improvements. Focuses on meeting the needs and expectations of the customer. Demonstrates commitment to quality. | _Understands customer Relationship. High Commitment to Quality_ |
| **COMMUNICATIONS:** Speaks and writes in a clear and concise manner. Listens carefully. Keeps supervisor and others adequately and appropriately informed. | _Speaks & writes cleanly_ |
| **PLANNING & DECISION MAKING:** Plans and prioritizes work. Assesses work requirements. Makes timely and correct decisions. Accepts advice and direction. Involves others in important decisions. | _Is learning the pressure points of mfg. Sets Priorities well_ |
| **PROBLEM SOLVING:** Accurately identifies problems. Uses the Quality Network Problem Solving process. Implements solutions on a timely basis. Provides proper follow-up on problem resolution. | _Product & Process knowledge will help here_ |
| **GROUP INTERACTION AND TEAMWORK:** Cooperates in work group. Works effectively with other groups and departments. Supports Beliefs & Values of Quality Network. | _Conducts herself Professionally At All times._ |
| **OTHER:** (Please specify.) | |

# EXHIBIT B

## PROBATIONARY EMPLOYEE
## PERFORMANCE APPRAISAL REVIEW

TO _Bob McClixiy_ DATE _1-26-00_

EMPLOYEE _Edith C. Arme_ DEPARTMENT _3_

CLASSIFICATION _Mfg. Palo._ CODE _5R13_

DATE EMPLOYEE WILL COMPLETE PROBATIONARY PERIOD _5-24-2000_

It is the responsibility of the Supervisor to review and evaluate the performance of probationary employees prior to the end of the fourth and eight months of the probationary period. The above named salaried employee will complete Four Months _____ Eight Months _✓_ of service on _1-2000_ .

The application of the basic principles of the H.R.M. Appraisal System and the Performance Appraisal Review form should be utilized for this purpose. The Supervisor should make certain that all aspects of the evaluation are covered in an interview with the employee and then both must sign the appraisal.

The attached Employee Appraisal review form pertaining to the above employee and this form should be promptly return to the Salaried Personnel Department upon completion.

RECOMMENDATION OF SUPERVISOR:

Employee should be retained _____X_____

Employee should be released _____
(Explain Below)

REMARKS: _____

_____

SIGNED _Robert J. McCy_ DATE _2/25/00_
Supervisor

REVIEWED _____ DATE _____
Department Head

NAME: *Edith C. James*
SS# *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*
POSITION TITLE: *Mfg. Advisor*
BUSINESS UNIT: *3*

DELPHI
INTERIOR & LIGHTING SYSTEMS
PERFORMANCE EVALUATION
FIRST YEAR EMPLOYEE

## JOB RESPONSIBILITIES

## SKILLS & ATTRIBUTES REVIEW

## DESCRIPTION OF PERFORMANCE

| SKILLS & ATTRIBUTES REVIEW | DESCRIPTION OF PERFORMANCE |
|---|---|
| **FUNCTIONAL KNOWLEDGE & ABILITY:** Possesses depth of knowledge and skills required. Effectively applies knowledge and skills. Maintains awareness of developments. | *Knowledge is growing will try to provide Edith with like knowledge the more Big having her work as TM.* |
| **WORK TECHNIQUES:** Demonstrates innovative approach to assignments and projects. Organizes, plans, makes effective use of time. Demonstrates high work output while maintaining required quality levels. | *Willingness to Accept Responsibility High work out Put.* |
| **QUALITY IMPROVEMENTS/CUSTOMER SATISFACTION:** Makes continuous incremental improvements. Focuses on meeting the needs and expectations of the customer. Demonstrates commitment to quality. | *Starting to Concentrate on 1st time quality improvements on 3C/5C* |
| **COMMUNICATIONS:** Speaks and writes in a clear and concise manner. Listens carefully. Keeps supervisor and others adequately and appropriately informed. | *Communicates clearly in written & oral form* |
| **PLANNING & DECISION MAKING:** Plans and prioritizes work. Assesses work requirements. Makes timely and correct decisions. Accepts advice and direction. Involves others in important decisions. | *Plans Ahead —* |
| **PROBLEM SOLVING:** Accurately identifies problems. Uses the Quality Network Problem Solving process. Implements solutions on a timely basis. Provides proper follow-up on problem resolution. | *Strong Efforts in this Area.* |
| **GROUP INTERACTION AND TEAMWORK:** Cooperates in work group. Works effectively with other groups and departments. Supports Beliefs & Values of Quality Network. | *Improvement in Team Dynamic.* |
| **OTHER:** (Please specify.) | |

# EXHIBIT C

# DELPHI
### Automotive Systems

# PERSONAL BUSINESS PLAN

| Name: Edith C. James | Position Title: Mfg Advisor | Department: North Business Unit | Supervisor: ROBERT MCCLINCY | Division: Interiors |
|---|---|---|---|---|
| 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 | 5M13 | Location: Delphi I - Columbus | Review Year: 2000 | |

## Phase I - Annual Business Objectives

- Reduce lost time and recordable injuries by 17%
- Achieve a 98% participation rate in suggestions
- Implement suggestions within 60 days
- Institutionalize housekeeping mission and guidelines
- Improve equipment uptime to 90%
- Achieve ISO 14001 Certification
- 100% on time shipments to customers
- use RRPPM to 62
- No quality spills, downtime or stockouts at customer
- Reduce WFCC's from plant to 220
- Retain QS9000 Certification
- Achieve a 50% improvement in first time quality
- Zero mis-labels
- Improve Productivity
- Fully implement DMS

## Phase I - Major Responsibilities

- Advisor for left hand miniwedge final assembly lines on second shift
- Develop and maintain strong union / management relations.
- Continue to develop Quality Network Manufacturing Systems knowledge and execute implementation and team understanding.
- Lead the team improvement initiatives in the areas of safety, quality, productivity, and continuous improvement.

| Phase I - Performance Objectives (to be completed by March 15) SMART Objectives = Specific, Measurable, Aligned, Realistic, Time-specific. | Status | Phase II - Interim Feedback/Progress (to be completed by August 31) NS = Not Started, BT = Behind Target, AT = Ahead of Target, C = Completed | Status | Phase III - Final Review/Comments (to be completed by January 31 of following year) NM = Not Met, M = Met, E = Exceeded, O = Other |
|---|---|---|---|---|
| **SAFETY** | | | | |
| Reduce lost time injuries by 17%. | OT | 0 L.T. INJURIES | M | 6 L.T. INJURIES |
| be recordable injuries by 17%. | OT | 0 RECORD. INJURIES SINCE STARTING IN THE TEAM | M | 8 RECORDABLES |
| Hold monthly safety meeting for hourly employees. | OT | meeting occurring monthly | M | |
| Make monthly observation contact with all hourly employees under your supervision. | OT | | M | |
| Perform monthly safety audit. | OT | | M | |
| Ensure that hoist inspections, power vehicle inspections are completed, that personal protective equipment is being used properly, that guarding is in place and that the lockout procedure is being follwed where applicable. | OT | Checking completion of Lockout training | M | NEED TO WORK ON SHOP FLOOR CULTURE FOR SAFETY GLASSES / HEARING PROTECTION WHEN OFF THE JOB. |
| Update green cross daily. | | | | |
| Implement the housekeeping mission and workplace organization.(wovo workshop. Implemented (10/31/00) | BT | Establish Housekeeping mission by 7/31/00 | O | HOUSEKEEPING IMPROVED WOVO NEEDS IMPROVED |



CONFIDENTIAL
Subject to Protective Order

Revised 1/1/2000

CONFIDENTIAL

| Phase I - Performance Objectives (to be completed by March 15) SMART Objectives = Specific, Measurable, Aligned, Realistic, Time-specific | Status | Phase II - Interim Feedback/Progress (to be completed by August 31) NS = Not Started, BT = Behind Target, AT = Ahead of Target, OT = On Target, C = Completed | Status | Phase III - Final Review/Comments (to be completed by January 31 of following year) NM = Not Met, M = Met, E = Exceeded, O = Other | Status |
|---|---|---|---|---|---|
| **QUALITY** | | | | | |
| Maintain QS9000 Certification. | OT | NO FINDINGS | M | NO FINDINGS | M |
| Ensure that all quality systems are being followed all the time. | OT | TRADE CHECKS BEING PERFORMED | M | | M |
| Maintain all required QIC documentation. | OT | | M | | M |
| Execute and document all required employee training. | OT | TRAINING UP-TO-DATE | M | RECORDS MAINTAINED | M |
| Immediate correction and containment of known non-compliances. | OT | ROOT CAUSING NON-COMPLIANCES | M | | M |
| Ensure that red tag procedure is followed and enforced. | OT | TRAINING IN PLACE | M | | M |
| Ensure containment data is file appropriately. | OT | | M | | M |
| Measure first time quality, identify the causes of defects and champion the efforts to improve the first time quality performance.(wfcc reduced 75% by 7/1/00) | OT | ON WFLOW TARGET ON WFCC. NEEDS TO CONTINUE TO CHAMPION FTQ. CONTAINMENT IMPROVEMENT PROCESS WITH ENGR. + MNGMT | O | MET FTQC TARGET FEEL SHORT ON FTQ TARGET | O |
| **COST** | | | | | |
| Develop a plan to meet Customer Schedule which includes, 2 days finished goods in the warehouse, component parts inventory, manpower adjustments, cycle run plan and planned maintenance. | BT | CONTINUE TO RUN TO FILL AND EVALUATE BEHIND SCHEDULE PIN CARDS. | M | LEVEL SCHEDULE IMPLEMENTED AND MAINTAINED. | M |
| Free performance charts updated daily. | OT | | M | | M |
| Scrap data and tickets maintained. | OT | | M | | M |
| Adherence by all employees to the Shop Rules (2 breaks, lunches, etc.). | OT | | M | | M |
| Maintain TKS daily. | OT | | M | | M |
| % shift turnover. | OT | | M | | M |
| Ensure e to Local Equalization of Hours Agreement. | OT | | M | NEEDED TO BE MORE OF A PARTICIPATION IN MAKING SURE PROPERLY WAS DONE | M |
| Problem solve and act on issues resulting in not meeting Customer requirements. | OT | RUNNING AT OR ABOVE 70% IN THROUGHPUT. | M | NEED TO STRENGTHEN CONT | M |
| (Exceed 70% throughput on final lines(9/1/00) | OT | MORE DAYS USING CONT IMP. PLAN TO IMPROVE. | M | IMPLEMENT ACTIVITY | M |

PBP-2

DEL/IAM000034

CONFIDENTIAL
Subject to Protective Order

Revised 1/1/2000

## Phase I - Skill Development and Training Plan

| | Date Scheduled | Date Completed | Comments |
|---|---|---|---|
| Planned Customer Visitation | 2/06 3/06 4/00 | 3/06 | NOT SCHEDULED COMPLETED COMPLETED |
| Delphi orientation visit | | | |

Team Delphi ✓

Phase I Completion Date:

Phase II Completion Date: 6/21/00

Date of Compensation Discussion: 5/25/00

Date of Career Interest Discussion: 5/21/00

Comments:

| Global Competencies | Phase I — Check Those Which Apply | Strength | Proficient | Developmental Need | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Phase III - Review | | | | | |

Domestic Mobility: Yes ☒  No ☐
International Mobility: Yes ☒  No ☐
Comments:

Mobility

## Global Competencies

- Builds Relationships and Partnerships
- Change Leadership
- Coaching
- Communication Skills
- Customer Focus
- Decision Making
- Diversity
- Empowerment
- Functional Expertise
- Integrating/Functioning Globally
- Managing the Job
- Maturity
- ...ational Pattern
- Results Orientation
- Strategic Thinking and Execution
- Team Development
- Visionary Leadership

Phase III - Comments

### Language Proficiency
(1 = very good, 2 = good, 3 = sufficient, 4 = basic)

| Languages | Speak | Read | Write |
|---|---|---|---|
| French | | 3 | |

CONFIDENTIAL
Subject to Protective Order

☐ Satisfactory - Consistent Performance

Phase III - Overall Performance Summary    (Check One)
☒ Satisfactory - Performance Growing          ☐ Satisfactory - Performance Diminishing          ☐ Unsatisfactory

Phase III - Overall Performance Comments

... IN CONTINUES TO GROW : DEVELOP AS A
MANUFACTURING ADVISOR. EDITH ACCEPTED A JOB
IN PERSONNEL FOR 2001.

Phase III - Employee Comments

Supervisor Signature:
Date: 4/21/00

Employee Signature:
Date: 1/21/00

Second Level Supervisor:
Date: 4/25/01

Your signature does not necessarily signify agreement with the performance review. It means that each phase and the Overall Performance Summary have been discussed with you.

# EXHIBIT D

# NOTICE OF OPEN POSITION

## ** Self-Nomination Procedure **

### DELPHI INTERIOR SYSTEMS – COLUMBUS

Listed below is a salaried position that is open as of the date of this notice. If you are a Delphi Columbus regular active classified salaried employee and are interested in receiving consideration for this opening, a Self-Nomination Form must be personally filed with the Salaried Personnel Office no later than 4:00 PM on 11/28/00 to ensure consideration. The Self-Nomination Forms are available in the Salaried Personnel Office.

**JOB TITLE: Supv-Salaried Personnel Adm**          POSITION CODE: 7P21

SUPERVISOR: Loretta Woolridge          DEPARTMENT: 43 HRM

The following key elements describe the basic duties and responsibilities of the position and are not all-inclusive.

| Key Elements | Qualifications |
| --- | --- |
| • Interprets and communicates Corporate and unit personnel policies and procedures to salaried personnel<br>• Administers salaried compensation programs<br>• Counsels salaried employees on various matters<br>• Participates in the selection of new employees<br>• Trains, develops and evaluates employees<br>• Administers elements of the HRM Prism system<br>• Participates in the proper disposition of problem employee performance cases<br>• Administers and coordinates EEO and AAP responsibilities<br>• Regular contact with others outside the work group | • Thorough knowledge of Corporate and unit salaried personnel policies and procedures<br>• Knowledge of affirmative action, Title VII and other equal employment opportunity policies and procedures<br>• Highly developed oral and written communications skills<br>• High level of interpersonal skills to work effectively with others, motivate employees and elicit work output<br>• Relatively high level of analytical ability where problems are complex<br>• Ability to relate to all levels of management and the public at large<br>• Bachelors degree |

NOTE: Applications received by the Salaried Personnel Office in response to this notice will be considered only for this position.

NOTICE #: 112          POSTING DATE: 11/15/00          DEADLINE DATE: 11/28/00

## ** DELPHI AUTOMOTIVE SYSTEMS IS AN EQUAL OPPORTUNITY EMPLOYER **

DEL/JAM000037

# EXHIBIT E

7P21     SUPERVISOR-SALARIED –
         PERSONNEL ADMINISTRATION

F. L. S. A. Status: Exempt
Executive

## General Purpose of Position:

Supervise a medium to large group of employes engaged in the administration of Corporate and unit policies and programs affecting salaried personnel. Work involves the ability to make decisions within the limits of general policies and procedures. Independent judgment is often used, however, some direct guidance is received from supervisor.

## Major Duties and Responsibilities:

— Participates in the selection of new employes.
— Trains, develops and evaluates employes.
— Administers salaried compensation programs.
— Interprets and communicates Corporate and unit personnel policies and procedures to salaried personnel.
— Administers elements of Human Resources Management System.
— Counsels salaried employes on various matters.
— Regular contact with others outside the work group.
— Participates in the proper disposition of problem employe performance cases.

## Skills and Abilities:

— Thorough knowledge of Corporate and unit salaried personnel policies and procedures.
— Highly developed oral and written communications skills.
— Relatively high level of analytical ability where problems are complex.
— High level of interpersonal skills to work effectively with others, motivate employes, and elicit work output.
— Ability to relate to all levels of management and the public at large.

## Education and/or Training:

— College graduate or equivalent training
— Completion of recommended Corporate training programs.

*Previously held by Frank Cerny, mf*

---

The specific statements shown in each section of this description are not intended to be all inclusive. They represent typical elements and criteria considered necessary to successfully perform the job.