# EXHIBIT F

August 28, 2001

Delphi Automotive Systems
200 Georgesville Road
Columbus, Ohio 43228

Good Morning,

I began employment with Delphi Automotive Systems in May, 1999 and now, two years later, after serious deliberation, I find it necessary to resign from my current position effective September 28, 2001. In the time frame that exists I will diligently assist in the search for a replacement to fill the positions of Salary Personnel Representative and Education & Training Coordinator.

Thank you for giving me the opportunity to work with the Delphi organization

Sincerely,

Edith C. James

# EXHIBIT G

DELPHI CONFIDENTIAL

# HUMAN RESOURCE STAFFING DOCUMENT

## POSITION INFORMATION:

| | | | | |
|---|---|---|---|---|
| Requisition No.: MfgCol21INTP-07 | Product Line: | | Location: Columbus | Dept No.: 430 |
| Position Code: 7P21 | | | Position Title: Sr. Salaried HRM Rep. | Req. Date: 12/01/01 |
| Staff Area: HR | Division /Subsidiary: | | Safety & Interior | Per Unit: 5030 |

## OPPORTUNITY AWARENESS PROGRAM CONTACT INFORMATION:

Email Information:                          Fax:

| MAJOR JOB RESPONSIBILITIES | MAJOR JOB QUALIFICATIONS/SPECIFIC SKILLS (REQUIRED/PREFERRED) |
|---|---|
| Participates in selection of new employees | Highly developed oral & written |
| Trains, develops and evaluates employees | High level of analytical ability where problems are complex |
| Administers salaried compensation program | High level of interpersonal skills to work effectively with others, |
| Interprets and communicates salaried Corporate/divisional /plant personnel policies and procedures | Ability to work with all levels of leadership |
| Administers elements of HRM | Ability to apply knowledge of Corporate/divisional polices to resolve salaried issues |
| Counsels leadership and provides strategic direction to leadership | Ability to make decisions within the limits of general policies & procedures |
| Maintains regular contact with divisional contacts | |
| Participates in the proper disposition of HR issues | |
| Coordinates & participates in all aspects of salaried HRM | |

## EDUCATIONAL REQUIREMENTS (REQUIRED / PREFERRED):

Degree: BA. Required                          Major:

## SUPERVISOR INFORMATION:

| Name: | Phone: | Mail Code: |
|---|---|---|
| AMES BARR | | |

## DETAILED EXPLANATION OF NEED, SPECIFY REPLACEMENT OR ADDITION:

TARGET DATE: 12/01/2001

EPLACEMENT FOR E. JAMES

## AAP INFORMATION (U.S. ONLY):

| ☐ Not Underutilized | ☐ Underutilized – Minority | ☐ Underutilized - Female | Area of Work: |
|---|---|---|---|

## APPROVAL FOR HUMAN RESOURCES STAFFING DOCUMENT INITIATION: DIVISIONAL/DISCRETION

| HR Staffing Plan Owner / HR Rep | Date | Staff Director Approval | Date | Divisional Approval    12-5-01 | Date |
|---|---|---|---|---|---|

## CANDIDATES CONSIDERED:

| Name of Other Candidates Considered | Min | Fem | Internal | External | Reason Not Sel. |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Candidate Selected:                          Employee ID:

| ☐ Minority    ☐ Bonafied | ☐ Female    ☐ Proficiency | ☐ External Hire | ☐ Internal Transfer from Dept.: ☐ Internal Transfer from Div.: |
|---|---|---|---|

| Increase of: | % | Position Code: | Effective Date: |
|---|---|---|---|

## APPROVAL FOR CANDIDATE SELECTION: DIVISIONAL DISCRETION

| Staff Area Approval (As Delegated) | Date | Human Resources/EEO | Date | Releasing Staffing Plan Owner (For Internal Candidates) | Date |
|---|---|---|---|---|---|

AS-SP200

# EXHIBIT H


Automotive Systems

Date:        February 1, 2002

To:          Columbus Team

Subject:     Organizational Announcement

Effective February 1, 2002, we are pleased to announce that Mr. Michael Waters is promoted to Supv. of Human Resources for the Delphi Safety & Interior Columbus facility. In this assignment, Mike will report to Jim Barr, Plant Personnel Director. Mike will have responsibility for implementation of salaried personnel policies and procedures.

Prior to joining Delphi Automotive Systems in 1999 as an Analyst with the Executive Compensation Staff, he held various HR positions with a trucking and logistics firm. Mike earned his Bachelors degree in Business Administration from Central Michigan University.

Please join us in supporting Mike and welcoming him to Delphi Safety & Interior.

After the transition period, Edith James will be reassigned. Her new assignment will be announced at a future date.

Tom Green
Plant Manager
Delphi Safety & Interior
Columbus Facility

# EXHIBIT I

# NOTICE OF OPEN POSITION

## ** Self-Nomination Procedure **

## DELPHI AUTOMOTIVE – COLUMBUS

Listed below is a salaried position that is open as of the date of this notice.  If you are a Delphi Columbus regular active classified salaried employee and are interested in receiving consideration for this opening, a Self-Nomination Form must be personally filed with the Salaried Personnel Office no later than 4:00 p.m. on 3/3/00 to ensure consideration.  The Self-Nomination Forms are available in the Salaried Personnel Office.

JOB TITLE:  Labor Relations Representative          POSITION CODE:  6P11

SUPERVISOR:                                         DEPARTMENT:  43

The following key elements describe the basic duties and responsibilities of the position and are not all-inclusive.

| Key Elements | Qualifications |
|---|---|
| - Advises management of proper interpretation of local and national agreements, statements, letters and memos.<br>- Investigates grievances.<br>- Prepares written summations of grievances, recommends disposition and assists in administering the grievance procedure.<br>- Counsels management concerning potential disciplinary action.<br>- Participates in local negotiations.<br>- Keeps management advised of developments which could impact on operations.<br>- Regular contact with others outside the work group. | - Highly developed oral and written communications skills.<br>- High level of interpersonal skills to work effectively with others.<br>- Knowledge of agreements, policies, and understandings with the union.<br>- Relatively high level of analytical ability where problems are complex.<br>- College graduate. |

NOTICE:  Applications received by the Salaried Personnel Office in response to this notice will be considered only for this position.

NOTICE #: ~~104~~          POSTING DATE: 02/24/00          DEADLINE DATE:  03/03/00
106

## ** DELPHI AUTOMOTIVE IS AN EQUAL OPPORTUNITY EMPLOYER **

CONFIDENTIAL
Subject to Protective Order

DEL/JAM000376

# EXHIBIT J

## NOTICE OF OPEN POSITION

### ** Self-Nomination Procedure **

### DELPHI INTERIOR SYSTEMS – COLUMBUS

Listed below is a salaried position that is open as of the date of this notice. If you are a Delphi Columbus regular active classified salaried employee and are interested in receiving consideration for this opening, a Self-Nomination Form must be personally filed with the Salaried Personnel Office no later than 4:00 PM on 9/19/00 to ensure consideration. The Self-Nomination Forms are available in the Salaried Personnel Office.

JOB TITLE: **Safety Administrator**          POSITION CODE: 6P06 or 7P50

SUPERVISOR: Loretta Woolridge          DEPARTMENT: 43 HRM

The following key elements describe the basic duties and responsibilities of the position and are not all-inclusive.

| Key Elements | Qualifications |
|---|---|
| • Advises management on safety related matters<br>• Meets with union health and safety representative<br>• Maintains awareness of state and federal safety regulations and unit and corporate policies and procedures regarding safety and industrial health<br>• Conducts programs in safety training for other employees<br>• Reviews new equipment and methods for avoiding potential safety hazards<br>• May accompany compliance officers and prepare required data<br>• Investigates accidents and/or injuries<br>• Develops and implements programs to reduce job related injuries<br>• Conducts plant safety and housekeeping inspections<br>• Develops and administers plant safety rules and instructions<br>• Analyzes safety statistics and develops recommendations<br>• Complies with the terms of local and national labor agreements<br>• Regular contact with others outside the work group | • Thorough knowledge of manufacturing processes and industrial safety<br>• High level of oral and written communication skills<br>• High level of interpersonal skills to work effectively with others, motivate employees and elicit work output<br>• Understanding of environmental sampling techniques<br>• Relatively high level of analytical ability where problems are complex<br>• College graduate with a major in industrial safety or engineering or equivalent training<br>• Completion of recommended corporate training programs |

NOTE:  Applications received by the Salaried Personnel Office in response to this notice will be considered only for this position.

**NOTICE #: 110      POSTING DATE: 9/12/00          DEADLINE DATE: 9/19/00**

### ** *DELPHI AUTOMOTIVE SYSTEMS IS AN EQUAL OPPORTUNITY EMPLOYER* **

CONFIDENTIAL
Subject to Protective Order

DEL/JAM000377

# EXHIBIT K

Time: 13:17:16

User: KZDXPS
Employee: 01005529

CONFIDENTIAL

| | |
|---|---|
| Employee No | 01005529  Michael  S  Waters |
| Continuous Service Date | 03/29/1999 |
| Residence Status | |
| Exempt Status | Exempt |
| SSN | |
| Gender | Male |
| Birth Date | 10/05/1971 |
| Ethnic Origin | White/Not Hispanic origin |
| Veteran Status | Non-veteran |
| Disability Status | No |
| Telephone | |
| Address | |

REDACTED

**Education**

| Certificate | Year | School | Brn of Study 1 | Brn of Study 2 |
|---|---|---|---|---|
| Bachelor | 1994 | Central Michigan U | Business Admin - General/Commerce/Prod | |

| Language | | | |
|---|---|---|---|
| Language | Skill | Proficiency | |

**Appraisal**

| Date | App | Crit | Appraiser |
|---|---|---|---|
| 01/31/2003 | S | | JAMES BARR |
| 01/01/2001 | N | | |

**Employment**

| Date | Position | | PY GD | PY LV | Div/Stf | Pers. Area | Sub Area | Org Unit | EE SG | Reason for Action |
|---|---|---|---|---|---|---|---|---|---|---|
| 02/01/2002 | SUPV. HRM | | 7 | 7C | DPH-INTERIOR | COLUMBUS | OH | PERSON | D5030/430 | RA | PROMOTION-BONAFIDE |
| 06/01/2000 | EXEC COMP ANALYST | | 6 | 6B | DPH-HD QTRS | TROY | MI | PERSON | D0010/00500 | RA | PROMOTION-PROFICIENCY |
| 03/29/1999 | EXEC COMP ANALYST | | 6 | 6C | DPH-HD QTRS | TROY | MI | PERSON | D0010/00500 | RA | ADD RECORD |
| 03/29/1999 | EXEC COMP ANALYST | | 6 | 6C | DPH-HD QTRS | TROY | MI | PERSON | D0010/00500 | RA | HIRE-REGULAR |

CONFIDENTIAL
Subject to Protective Order

DEL/JAM000084

# DEPOSITION TRANSCRIPT
# EXCERPT PAGES

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO

- - -

1  Edith C. James,          :
2      Plaintiff,  :
3  vs.           : Case No. 03CVH02-02213
4  Delphi Automotive     :
5  Systems, et al.,      :
6
7      Defendants.  :

- - -

DEPOSITION

of Reginald D. Williams, a witness herein, taken
before me, Kendra E. Johnston, a Notary Public
in and for the State of Ohio, at the offices of
Jones Day, 41 South High Street, Columbus, Ohio,
on Friday, December 12, 2003, at 9:30 a.m.

- - -

Armstrong & Okey, Inc.
185 South Fifth Street, Suite 101
Columbus, Ohio  43215
(614) 224-9481 · (800) 223-9481
Fax - (614) 224-5724

- - -

**Page 2**

APPEARANCES:

Cooper & Elliott
By Sheila P. Vitale
2175 Riverside Drive
Columbus, Ohio  43221

On behalf of the Plaintiff.

Jones Day
By Jeffrey D. Winchester
41 South High Street
Suite 1900
Columbus, Ohio  43215-6113

On behalf of the Defendants.

- - -

**Page 3**

Friday Morning Session,
December 12, 2003.

- - -

STIPULATIONS

It is stipulated by and between counsel
for the respective parties that the deposition
of Reginald D. Williams, a witness herein,
called by the Plaintiff under the applicable
Rules of Civil Procedure, may be taken at this
time and reduced to writing in stenotypy by the
Notary, whose notes thereafter may be
transcribed out of the presence of the witness;
and that proof of the official character and
qualification of the Notary is waived; that the
examination, reading and signature of the said
Reginald D. Williams to the transcript of his
deposition are waived by counsel and the
witness; said deposition to have the same force
and effect as though signed by the said
Reginald D. Williams.

- - -

**Page 4**

INDEX TO EXHIBITS

- - -

| Plaintiff Exhibits | Identified |
|---|---|
| T  Job description | 19 |

- - -

21

1     Q. But that wasn't the biggest part of
2 your job duties; is that your understanding?
3     A. I would say no.
4     Q. So it wasn't a major part of your
5 job duties?
6     A. No, it was not.
7     Q. And at some point in time you were
8 removed from the director of education and
9 training and you became a production supervisor;
10 is that correct?
11     A. Correct.
12     Q. Did you apply for the production
13 supervisor position?
14     A. No.
15     Q. How were you moved?
16     A. I was told I was going back to
17 production.
18     Q. Who told you?
19     A. Loretta Woolridge.
20     Q. When were you told you were being
21 moved back to production supervisor?
22     A. When?
23     Q. Yes.
24     A. About the week before Thanksgiving

22

1 2000.
2     Q. Were you happy about being moved to
3 production supervisor?
4     A. No.
5     Q. Was the production supervisor
6 position back on the production floor?
7     A. Yes.
8     Q. Did you consider that a demotion?
9     MR. WINCHESTER: Objection. Can I
10 get a clarification? You're asking if he
11 personally, in his opinion, considered it a
12 demotion?
13     MS. VITALE: Right.
14     A. Yes.
15     Q. Why did you consider that a
16 demotion?
17     A. When moved up front to the office
18 area, it was considered a promotion.
19 Supervisors personally felt that's a promotion.
20 The production floor, to be sent back, I felt it
21 as a demotion.
22     Q. So just so I understand, within
23 Delphi, there's the front office area, which
24 would include human resource or personnel

23

1 department, and then there's the production
2 floor area?
3     A. Yes.
4     Q. And there's basically an
5 understanding within Delphi or to your
6 understanding that being moved up to the front
7 office was considered a promotion off of the
8 production floor?
9     MR. WINCHESTER: Objection to the
10 extent it calls for speculation as to what other
11 people thought. Go ahead.
12     MS. VITALE: And I'm just asking as
13 to your opinion.
14     A. In the locker room, moving to the
15 office was a promotion; going back to production
16 was a demotion.
17     Q. What do you remember about the
18 conversation with Ms. Woolridge when you were
19 told you were being moved back to the production
20 supervisor position?
21     A. During that time period, things got
22 kind of garbled in my mind. My wife became ill,
23 and shortly after that she passed, and all of
24 that just kind of rolled up into one big ball,

24

1 and I really don't have a lot of recollection of
2 the conversations that I had with people.
3     Q. You just remember being told that
4 you were being moved back?
5     A. Yes.
6     Q. Did you know what happened to -- who
7 took over the job duties and responsibilities of
8 the education and training?
9     A. Do I know? No, I don't. No, I
10 didn't.
11     Q. At some point in time did you learn
12 what happened to the education and training
13 duties and responsibilities after you were
14 demoted?
15     A. Yes. I was told, yes.
16     Q. Do you recall who told you what
17 happened to the education and training
18 responsibilities?
19     A. I believe Miss Woolridge did.
20     Q. Was this after you returned to
21 Delphi?
22     A. Yes.
23     Q. Do you remember when it was that you
24 returned to Delphi? I understand you took some

Armstrong & Okey, Inc. Columbus, Ohio (614) 224-9481

1

1                IN THE COMMON PLEAS

2            COURT OF FRANKLIN COUNTY, OHIO

3

4

5    EDITH JAMES,

6              Plaintiff,

7

8        -vs-                    Case No. 03-CVHO2-02213

9

10   DELPHI AUTOMOTIVE SYSTEMS, LORETTA

11   WOOLRIDGE, and JAMES R. BARR,

12              Defendants.

13

14   - - - - - - - - - - - - - - - - - - - - - - - - - - -/

15

16       DEPONENT:     LORETTA WOOLRIDGE

17       DATE:         Friday, November 14, 2003

18       TIME:         11:30 a.m.

19       LOCATION:     2301 West Big Beaver Road

20                     Suite 925

21                     Troy, Michigan

22       REPORTER:     Cindy A. Boedy, CSR-4696

23

24

25

30

1   A.  I know that the P means personnel.
2   Q.  And do you know what the 21 would mean?
3   A.  No, I don't.
4   Q.  So that would just basically mean 7th level in the
5       personnel department; is that correct?
6   A.  Uh-huh.
7           MR. WINCHESTER:  You have to answer orally.
8           THE WITNESS:  Yes, I'm sorry.  That is
9       correct.
10  BY MS. VITALE:
11  Q.  Did you assist in -- I understand that Frank Cerny
12      at a point in time decided to retire; is that
13      correct?
14  A.  That is correct.
15  Q.  And when he was retiring, he posted a position
16      opening for his position; is that correct?
17  A.  That's correct.
18  Q.  Did you participate at all in the posting of Frank
19      Cerny's position?
20  A.  No, I did not.  I just told him to post.
21  Q.  You told him to post for his position; is that
22      correct?
23  A.  Yes.  Get the posting up there.
24  Q.  And when you said, Get the posting up there, did you
25      mean for your, Frank Cerny's, position as supervisor

31

1       salaried personnel administration?
2   A.  At the time I just -- get the posting up there.  No
3       other direction was given to him.
4   Q.  You didn't tell him what job duties or
5       responsibilities to include?
6   A.  No, I did not.
7   Q.  Do you know that Frank Cerny placed the posting for
8       his position?
9   A.  I subsequently knew that, yes.
10  Q.  So you found out after Frank Cerny had posted for
11      his position?
12  A.  Well, just in a matter of, Is the posting up there,
13      have you posted, you know, your job?  And he said,
14      Yes, I've taken care of that.
15  Q.  The posting didn't go to you for approval before he
16      -- Frank Cerny put the posting up; is that correct?
17  A.  No, it didn't.
18  Q.  So at the time, it was the intention that Frank
19      Cerny's position would be replaced; is that correct?
20  A.  That's pretty much correct.
21  Q.  When you say "that's pretty much correct," what do
22      you mean?
23  A.  Well, at the time, Frank was going to vacate that
24      position when he retired, and at the time that's the
25      position that would have been replaced.

32

1   Q.  When you say "at the time" --
2           (Exhibit I marked.)
3   BY MS. VITALE:
4   Q.  Let me just for clarification make this a little
5       easier.  I want to show you what's marked is Exhibit
6       I.  Could you just tell me what Exhibit I is?
7   A.  This is a standard form in the self-nomination
8       procedure.
9   Q.  And it's for supervisor salaried personnel
10      administration; is that correct?
11  A.  Oh, yes.
12  Q.  And that was Frank Cerny's position, correct?
13  A.  Yes.
14  Q.  And it's posted -- or the posting date at the bottom
15      says November 15th, 2000.
16  A.  Yes.
17  Q.  When you said at the time it was intended to
18      replace, and correct me if I'm misstating your
19      testimony, but you indicated that at the time when
20      Frank Cerny announced his retirement, you had told
21      him to get the posting up there, and at the time the
22      intention was to replace his position; is that
23      correct?
24  A.  Yes, that's correct.
25  Q.  And at the time, you meant around November 15th,

33

1       2000; is that correct?
2   A.  That's correct.
3   Q.  What do you mean at the time that was the intention?
4       Did the intentions change at some point in time?
5   A.  Yes.
6   Q.  When did the intention change to replacing Frank's
7       position?
8   A.  During the latter part of 2000, the plant, more
9       specifically the division and even the corporation,
10      was in a posture to reduce and to find cost savings
11      within any area that those savings could be found,
12      and all functional areas were compelled to look
13      within their respective organizations to see where
14      they could make cuts.  Head count is generally the
15      first place you go in terms of structural cost
16      reductions, so the core staff began to dialogue and
17      certainly the plant manager began to be directive as
18      to, you know, how critical this issue was.  As a
19      matter of fact, she even put up a posting so that
20      the whole plant could know what kind of posture we
21      were in to try and get to the reductions that were
22      being asked by our company.
23          I had to look specifically within my own
24      group.  I'd already made cuts, but obviously, I
25      wasn't precluded from making more.

9 (Pages 30 to 33)

46

1   A.  No, I didn't.
2   Q.  And going back, when the discussions were being made
3       about, you know, taking away the supervisory
4       component of the supervisor salaried personnel
5       position and adding some training components to that
6       position, was there any discussions regarding the
7       position code being modified?
8   A.  I'm sorry, would you repeat your question?
9   Q.  Yes.  Back when you were having discussions
10      regarding the modifications of the job duties and
11      responsibilities such as taking away the supervisory
12      component of the supervisor salaried personnel
13      position and adding in some training
14      responsibilities, were there any discussions
15      regarding modifying or changing the position code?
16  A.  Discussions with whom?
17  Q.  With anyone.
18  A.  No, there was no discussion about modifying the
19      position code with anyone.
20  Q.  Was then there any discussions about changing it to
21      a 6th level position that you recall?  And I'm
22      talking about the time when the decisions were being
23      made about modifying the jobs such as taking away
24      the supervisory position and adding some training
25      components.

47

1   A.  In the conversations with Jan Santare and also
2       invariably in the core staff, when I was conveying,
3       you know, who I had selected for this position,
4       there were discussions that were similar to what
5       you're saying, but you know, they came -- they
6       actually came later.
7   Q.  So those discussions came after Ms. James was
8       selected to fill the position?
9   A.  No.  As far as the position is concerned, the
10      position ultimately was reconfigured, so in our
11      minds this wasn't the same position that was posted,
12      I guess, and otherwise, I'm trying to follow your
13      questions, but it's --
14  Q.  That will help clarify.  So the position that Ms.
15      James filled was not the position that was posted;
16      is that correct?
17  A.  It had been changed.
18  Q.  And in discussing the position as being a 6th level
19      position, when was that decision made, if you can
20      recall?
21  A.  Maybe I should -- I guess there wasn't a cut-and-dry
22      decision or discussion about it being a 6 or a 7, so
23      I will say when we started to interview the
24      candidates, there was a mix of both 6th and 7th
25      level candidates for this position.  There were 6th

48

1       and 7th level candidates who had submitted
2       applications, and so they were all in the interview
3       mix.  So it wasn't so much a focus on level that was
4       an issue for the interviewees, it was more making
5       sure that each interviewee knew that the job as it
6       had been posted was no longer the same; it had been
7       reconfigured.
8           So before discussing anything else or the
9       candidates as far as their continued interest, I
10      wanted to be sure that the interview started with
11      them understanding that the job had been
12      reconfigured.
13  Q.  And then you said before any discussions were made
14      regarding the position being a 6th or 7th -- did you
15      discuss with -- I guess strike that.
16          Did you discuss with the candidates whether
17      or not the position would be a 6th of 7th level?
18  A.  We didn't discuss that, but --
19  Q.  Go ahead.
20  A.  We didn't discuss that.
21  Q.  And just so we're on the same page, and I think I
22      understand, I'm not sure, in Delphi, there are 6th
23      level and 7th level positions?
24  A.  Certainly.
25  Q.  Now, you indicated that there were 6th level and 7th

49

1       level persons applying for the job which is marked
2       as Exhibit I, correct?
3   A.  That is correct.
4   Q.  And no decision was made at the time the
5       modifications to this job description -- job posted
6       as Exhibit I was made.  Does that make sense?
7   A.  That's right.
8   Q.  All right.  When, if you recall, were any
9       discussions made regarding the fact, you know, the
10      position code being 6th of 7th level?
11  A.  Would you repeat your question, I guess?
12  Q.  When if you recall at all -- first, do you recall
13      any discussions about the job being a 6th level or a
14      7th level job?
15      MR. WINCHESTER:  Let me interject and
16      object there.  I think that mischaracterizes
17      previous testimony.  If I'm understanding counsel's
18      question as some jobs are 6th only or some jobs are
19      7th only, I'm not sure that correctly captures the
20      testimony.
21      MS. VITALE:  No, that's not what I'm
22      asking.  Your clarification is fine.  And I see this
23      is getting kind of confusing for me too.
24  BY MS. VITALE:
25  Q.  I'm trying to determine -- I know that Exhibit I was

54

```
 1     whether it was a 7th -- you would retain the 7th
 2     level position or 7th level pay code or, you know,
 3     was 6th level was based on the individual?
 4   A.  That would have been a discussion that invariably
 5     would have come up once you're ready to make a
 6     selection now.
 7   Q.  You also indicate that some people that applied for
 8     this position had been performing Frank Cerny's type
 9     job in other areas; is that correct?
10   A.  At other Delphi locations.
11   Q.  Okay.  That's what I wanted to be clear on.
12   A.  Yes.
13   Q.  So you had some people from another Delphi facility
14     that were, you know, in HR doing the same position
15     generally as Frank Cerny?
16   A.  Yes.
17   Q.  They also applied to move to the Columbus facility?
18   A.  That's right.
19   Q.  Did you have any people from within the Columbus
20     facility other than Ms. James apply for the
21     position?  And I know there's been some discussions
22     about confidentiality of people's names, so first,
23     why don't you just give me the number, if any.
24   A.  Yes, there were other personnel who applied for the
25     position.  One was in finance.  Do you want race and
```

55

```
 1     sex of those?
 2   Q.  Sure.
 3   A.  A Caucasian female, a Caucasian male out of
 4     manufacturing.  In fact, I think there were two
 5     Caucasian males out of manufacturing, there was a
 6     minority male out of manufacturing.  To the best of
 7     my memory, those were the applicants.  There might
 8     have been --
 9   Q.  Someone else you just don't recall right now?
10   A.  Right.
11   Q.  So basically about -- not including Ms. James,
12     approximately four other people from within the
13     Columbus plant had applied for the position?
14   A.  That's right.
15   Q.  How many people applied from outside of the Columbus
16     plant?
17   A.  I don't know how many applied, I can tell you how
18     many I identified to interview.  There were two.
19     They were both Caucasians, and one was a male and
20     one was a female.
21   Q.  And are those two outside people, were they
22     performing Frank Cerny's job in other Delphi
23     facilities?
24   A.  The male was.
25   Q.  Female wasn't?
```

56

```
 1   A.  She had actually supported the male when he was
 2     gone.  They both were from the same work group.  So
 3     she had performed some of those duties, but they
 4     were not her assigned job.
 5   Q.  Who made the ultimate decision as to -- and let me
 6     strike that.
 7         You first indicated that you made the
 8     decision as to who was selected to be interviewed;
 9     is that correct?
10   A.  Ultimately, yes.  I'm sorry, to be -- to select for
11     the interview?
12   Q.  Yes.
13   A.  Oh, yes.  I made the decision.
14   Q.  And who made the decision then to -- who to hire
15     into that position?
16   A.  I had some help as far as that decision, and it was
17     from Jan Santare.
18   Q.  Did Jan sit in to any interviews?
19   A.  No, she did not.
20   Q.  The information then that you received regarding
21     people you interviewed, was that basically based on
22     your notes from the interview?
23   A.  Yes, and my -- just direct recollection.
24   Q.  So you discussed with her the people that you had
25     interviewed?
```

57

```
 1   A.  Yes.
 2   Q.  And then the two, both you and Jan, selected who
 3     would fill the position?
 4   A.  I actually discussed this with Jan in a core staff
 5     meeting.  Jan was -- Jan facilitated those meetings,
 6     and I was conveying to my core staff what my
 7     selection decisions were regarding this position.
 8   Q.  And how many -- You say what your selections were.
 9     Did you reduce it down then to one or two people?
10   A.  At the time I brought the issue to the core staff, I
11     had actually prioritized the candidates in terms of
12     my selection.  It was narrowed down to about
13     probably four people at that time.
14   Q.  And then you rated my first choice would be, my
15     second choice would be, correct?
16   A.  That is correct.
17   Q.  And of those four people, Edith James one of those
18     people?
19   A.  Yes.
20   Q.  What was the sex and race of the other three?
21   A.  The first was Caucasian male, the second was a
22     Caucasian female, and the third was a Caucasian male
23     that I sort of had on par with Edith at that time.
24   Q.  So there was kind of like three --
25   A.  Kind of like three tiers of -- yes.
```

15 (Pages 54 to 57)

62

1    said she could come in that job and hit the floor
2    running, that could perform this work the way that
3    the gentleman could have if I were able to get the
4    outside candidate. I would take a tremendous
5    flattening of a learning curve. So given that, I
6    said this is the choice then that I will go with.
7    And it was agreed, let's get her in the job and see
8    how she does. It's a growth opportunity at that
9    point.
10    It is probably at that time, you know, that
11    I began to accept we're going to get a person in
12    this job that we can grow into this position.
13   Q.    And just so I'm clear, the white male that was on
14    the same -- basically that you would write the same
15    as Ms. James, he had been in the training position
16    before, but he was frustrated with it and is that
17    why he was kind of -- was that why the core members,
18    core staff personnel, kind of said I'm not sure
19    about him?
20   A.    Well, it was -- I can't say it was just the core
21    staff. I had to obviously feel comfortable. I had
22    nothing but inputs from people who knew everybody
23    there, knew both of these individuals longer than I
24    had. The individual I'm talking about had been at
25    that plant for many, many years.

63

1    So it was just a matter of making the
2    decision that if you're going to grow someone in the
3    job, you can either take someone who has just enough
4    knowledge about how the activity to go -- would go
5    that they may not be open, you know, to some of the
6    training and the development and the molding that
7    you're going to want to do, or you can take someone
8    who just has an open slate to be able to, you know,
9    be openminded to that.
10   Q.    So the final decision to come down to Ms. James was
11    made with you, by you, along with Jan Santare and
12    the core staff; is that correct?
13   A.    Pretty much, yes.
14   Q.    And is it your understanding that if you were able
15    to select any of the other three people that they
16    would have come in as a 7th level, continued to
17    carry their 7th level position?
18   A.    Yes.
19    (Break was taken.)
20   BY MS. VITALE:
21   Q.    And I just want to go back for a second to make sure
22    we're all on same page that we were on before the
23    break.
24    You indicated that it was your
25    understanding then that any of the other three

64

1    candidates other than Ms. James, they all would have
2    continued on as their 7th level position had they
3    been offered the position which I believe just
4    became salaried personnel representative; is that
5    correct?
6    A.    The position at 6th level is salaried personnel
7    representative. If the 7th level person had been
8    selected, the title commensurate with the 7th level
9    at that particular job duty would have been used.
10   Q.    Do you know what the position title was then for the
11    job Ms. James assumed?
12   A.    Salaried personnel representative; that's all.
13   Q.    And do you know, was it discussed or do you have any
14    knowledge what the position title would have been
15    had a 7th level person been selected?
16   A.    I don't know the exact title. It may have been
17    senior representative. I'm not sure.
18   Q.    Who made the decision that Ms. James would remain a
19    6th level in the position?
20   A.    Basically from the discussions that I just
21    previously spoke about, and we looked at the
22    qualifications that she brought to the job, the
23    attributes that I said that would allow her to grow
24    into the position. It was all understood at that
25    point that a lateral move from where she resided

65

1    would be appropriate and that she would have some
2    opportunity to grow to eventually achieve possibly
3    7th level status in that job.
4    Q.    You indicated it was assumed that it would be -- Ms.
5    James would continue in the 6th level as a lateral
6    move. Did anyone specifically tell you, you know,
7    Ms. Woolridge, we're going to leave Ms. James in the
8    6th level, do a lateral move?
9    MR. WINCHESTER: Before you answer, I'm not
10    sure she used the word assume. I just wanted to put
11    that on the record.
12    THE WITNESS: I don't think I did use
13    assume.
14    MS. VITALE: Can you read back what her
15    answer was then? I'm sorry.
16    (Court reporter read back previous answer.)
17   BY MS. VITALE:
18   Q.    When you said that it was understood that Ms. James
19    would remain in the 6th level position. Did anyone
20    tell you specifically that Ms. James should remain
21    in a 6th level position?
22   A.    It's a conclusion that both Jan and I, you know,
23    came to that this would be an opportunity for us to
24    select Edith who was the fourth-choice candidate
25    internally to come in and have the opportunity to

70

1  A.  If they had been still interested in the job after
2      recognizing that it was not a supervisory component,
3      because in the organization, a supervisory component
4      can really be an in-level -- within-level promotion.
5      So it still could have had a -- it could have been a
6      promotion opportunity for them even though their
7      level would have been the same.
8  Q.  But had those two been selected, they would have
9      retained their 7th level position?
10 A.  Yes.
11 Q.  And then you just indicated that if they were still
12     -- if they were still interested in the position,
13     did either the white female or the white male, the
14     second and third choices, indicate to you during
15     their interview process that they were no longer
16     interested in the position?
17 A.  They did not indicate that to me.
18 Q.  And if either one of those 7th level individuals had
19     accepted the position or had been offered the
20     position that Ms. James was offered, their title
21     would have been different, correct?
22 A.  Their title would have been commensurate with the
23     title that was appropriate for the level, but they
24     still would have been, in essence, a salaried
25     personnel representative without the supervisory

71

1      component.
2  Q.  They would have had the same job duties but a
3      different title?
4  A.  They would have had the same job duties.
5  Q.  Different title, correct?
6  A.  Yes.
7  Q.  Would be earning a 7th level pay, correct?
8  A.  Their pay would have been established at the level
9      that they had coming into the job.
10 Q.  And just so I understand, a 6th level person being
11     paid at the 6th level, are they paid less than
12     somebody at a 7th level?
13 A.  They could be.
14 Q.  So the levels overlapped to some extent?
15 A.  There could be some overlap, yes.
16 Q.  Did you have any input or understanding of what the
17     pay would have been for the position had a 7th level
18     been selected?
19 A.  I didn't focus on pay at all.  That was basically an
20     area that once a selection is made and you're
21     getting ready to look at the demographic sheet, it
22     just depends on who you select for the job in terms
23     of whether or not there is even going to be a pay
24     change.  If it's a lateral move, there would not be
25     a pay change for the individual.  They would just

72

1      simply laterally move from one area of work, you
2      know, to the HR area of work.
3  Q.  Were there any discussions about the other
4      candidates who were 7th level candidates as to
5      whether it would have been a lateral move or a
6      promotion?
7  A.  There was not discussion.  It's just an understood
8      fact that if they were 7th level and they were
9      selected, it's understood that because that job in
10     the organization can be performed at both 6th and
11     7th level, that they would have retained their
12     level.  They would be doing the work.
13         What was understood by them though --
14     because, again, 7th level can receive a promotion
15     within 7 if they go to a supervisory status.  That's
16     why it was very important that they knew people who
17     were already 7, that if you accept this job, it's
18     not going to have a supervisory component.
19     Experienced seasoned people in the organization
20     understand that automatically to mean there won't be
21     any money changing if I took this job, because I
22     won't be a supervisor which pays more money than
23     just 7th level does or potentially can pay more
24     money than 7th level does.
25 Q.  So there was an understanding that if one of the 7th

73

1      level people were selected for the position that
2      they wouldn't have received a pay increase?
3  A.  We never discussed it.  No one in the interview
4      discussed pay.  And I don't want to presume what was
5      in their minds, but people who have been around in
6      the organization, you know, if I had to guess and I
7      don't want to do that, but I would think that's what
8      they understood.
9  Q.  How about your understanding?  Did you understand
10     that if a 7th level had been selected, it was going
11     to be no promotion, no pay increase, if they were
12     selected for the position?
13 A.  As long as the supervisory component would have
14     absolutely been dissolved in that job, yes, I
15     understood that.
16 Q.  At the time you're interviewing people, you
17     understood that the supervisory position was being
18     taken away?
19 A.  Not only did I understand it, but I informed every
20     interviewee of that fact.
21 Q.  So based on your prior answer, because you already
22     knew the supervisory position was being taken away,
23     any 7th level person that applied would have
24     retained their 7th level without receiving a pay
25     raise?

19 (Pages 70 to 73)

102

1  between January, she's involved with Frank.
2  Subsequent to that, the compensation time comes.
3  And within a couple of months, we have a plant
4  manager that's transitioned, a whole new vision is
5  coming to the plant.
6      So I don't know. It seems as there wasn't
7  anything that she was prevented from doing, but
8  through the course of those things that I've
9  explained to you, she was involved -- getting more
10  involved in the joint training aspects of her job by
11  the time I left.
12      MR. WINCHESTER: I was going to offer an
13  image that might help. The back burner image, if
14  something were on the back burner, it's still on the
15  stove, but it's still on the back burner. I don't
16  know if that helps counsel to get the picture.
17  BY MS. VITALE:
18  Q.  Is that basically what you're saying?
19  A.  That's kind of what I'm saying, yes.
20  Q.  So by the time you left, you were -- Edith was to --
21  she was gradually moving into more and more training
22  responsibilities; is that correct?
23  A.  Yes, as I saw it. I was still getting quite a few
24  complaints, you know, from other areas of the
25  organization. Those were ones that I was aware of.

103

1  I wasn't sitting in the office with Edith, so I
2  can't speak for people who might have gone directly
3  to complain to her. She wasn't very communicative
4  or forthcoming to me. Jane or John Doe came in to
5  complain. There were some things I found out after
6  the fact that a particular manager had been in her
7  office directly, and invariably those were times
8  when even after they had been in, something still
9  didn't get done or didn't get done timely enough.
10  Eventually I would get involved. Or there might be
11  some managers that called me up directly and would
12  complain.
13      I'm looking at an employee then in a
14  position, and by that time, the learning curve in
15  some areas should have flattened, and yes, we could
16  have consolidated these jobs and began to move into
17  some areas where I knew training had to go, but she
18  was still trying to master the components that are
19  the most critical daily aspects of the job.
20  Q.  Did you ever discuss with Ms. James determining if
21  she needed any assistance other than Sheri Rice?
22  A.  If she needed assistance.
23  Q.  In her job duties.
24  A.  Well, Sheri Rice was performing --
25  Q.  Right, other than Sheri Rice.

104

1  A.  -- responsibilities prior to Edith coming into that
2  job.
3  Q.  Right. Other than Sheri Rice, did you ever discuss
4  with Edith -- other than the assistance of Sheri
5  Rice, did you ever discuss with Edith whether or not
6  she needed assistance in other areas of her job?
7  A.  You saying assistance or you mean help and support
8  and knowing how to execute?
9  Q.  An assistant like Sheri Rice, somebody to assist her
10  or whether some of those job duties should be
11  modified to a different position or someone else.
12  A.  Basically, no, we didn't discuss that.
13  Q.  Do you know if Ms. James' gender or race played any
14  role in her selection for the position?
15  A.  Not at all.
16  Q.  Who advised Ms. James she was selected for the
17  position?
18  A.  I did.
19  Q.  Did you discuss with her her salary at that point?
20  A.  No, I did not.
21  Q.  Do you know when that was you informed Ms. James she
22  was selected?
23  A.  You mean specific date?
24  Q.  Or around what time. Was it in December of 2000?
25  A.  It was in December.

105

1  Q.  Did you ever have any discussion with Ms. James
2  about her salary?
3  A.  It was after Edith was on the job a couple of days.
4  I mean maybe a week. I'm not sure.
5  Q.  Can you tell me about that discussion?
6  A.  Edith and Frank came into my office. Let me back up
7  a little bit here. There had been -- we have a
8  plant newspaper, and the editor of that newspaper
9  was going to put an article in about Edith's move,
10  and so she went to Edith to get information from her
11  to put into the article. And Edith had enlisted a
12  title of what she was that was surprising to the
13  plant editor. So the plant editor came into my
14  office and said, You know, I want to print this
15  article, but Edith has a title that I didn't realize
16  it is -- that it is what is stated here, and you
17  know, would you just take a look at this article for
18  content and for correctness. And so I did. And it
19  was -- I can't exactly remember, but it had to do
20  with administrator of salaried personnel activities.
21  And so it was a little curious to me at that point
22  why that would be the case, and I thought, Well,
23  maybe she just doesn't know what the actual title of
24  the job is.
25      So I said, I'll talk to her. And I had

27 (Pages 102 to 105)

110

1  say that word, I like that word, because you know,
2  it means that someone is confident. I really wanted
3  her to know, you know, what she could expect, that
4  you're going to come and you're going to find a
5  completely set of experiences that you haven't
6  experienced before.
7  Q.  Did you think -- I'm sorry.
8  A.  So I did tell her that she wasn't -- that -- I
9  didn't -- I don't think I said, "You're not my first
10  pick." I don't think I said that. I think what I
11  said to her was that there was someone in the
12  interview mix who could actually come in and perform
13  the duties that Frank was performing right now, but
14  because of our cost reductions and our restraints in
15  adding new people, that is not an option available
16  to us.
17     I said, So what that did was it made us
18  look a lot more closely at our internal candidates.
19  And I tried to be as upbeat as I could about that.
20  Q.  Did you think when you told Ms. James or advised her
21  there was someone more qualified for the position
22  that she may not have accepted the position?
23     MR. WINCHESTER: Objection, calls for
24  speculation.
25     THE WITNESS: Go ahead and answer.

111

1     THE WITNESS: You said if I had told her
2  what now?
3  BY MS. VITALE:
4  Q.  When you told Ms. James that there was someone in
5  the interview process that was more qualified for
6  the position, did you think that she may not have
7  accepted the position?
8  A.  Do I think that when I told her? Oh, no, I didn't
9  -- I didn't think that that -- I thought it fair
10  just to tell her.
11  Q.  Do you know if the committee, the Delphi management
12  committee, which I believe you --
13     MR. WINCHESTER: The core group?
14     MS. VITALE: The core group, yes, thank
15  you.
16     THE WITNESS: One other thing, let me back
17  up. I want to be sure I understood your question in
18  the way I answered it, because I want to be sure I
19  was answering the question that you asked. Could
20  she --
21     MR. WINCHESTER: Read back the question.
22     THE WITNESS: -- read back that question
23  again?
24     (Court reporter read back previous
25  question.)

112

1     THE WITNESS: And I said no, I didn't.
2  Edith had interviewed for a position that I had
3  previously posted just four months prior, and I knew
4  she was certainly interested in working in the human
5  resource department.
6     MS. VITALE: We can take a break then.
7     (Break was taken.)
8  BY MS. VITALE:
9  Q.  Do you know if Delphi was looking for a female or a
10  minority to fill the modified salary personnel
11  position?
12     MR. WINCHESTER: Objection, asked and
13  answered.
14     THE WITNESS: No, I don't.
15  BY MS. VITALE:
16  Q.  You indicated -- Strike that.
17     Did you tell Edith James that the modified
18  salary personnel position she was placed in was a
19  developmental opportunity for her?
20  A.  Are you asking did I use the word "developmental"?
21  Q.  Did you tell her it was a developmental opportunity?
22  A.  I told her it was an opportunity that she could grow
23  into and to be developed.
24     (Exhibit J marked.)
25  BY MS. VITALE:

113

1  Q.  I'm going to show you what has been marked as
2  Exhibit J. Do you recognize or can you tell me what
3  this is?
4  A.  Yes. This is a salary personnel transaction
5  document.
6  Q.  And it's for Edith James; is that correct?
7  A.  Yes.
8  Q.  And is that your signature at the bottom underneath
9  Mr. Cerny's?
10  A.  Yes, it is.
11  Q.  And on this, directing your attention to the
12  right-hand column, the middle right-hand column, it
13  says, Reclass-develop/oppor. I'm assuming that's
14  developmental opportunity; is that correct?
15  A.  I'm sorry, would you say again?
16  Q.  On the right column, says Reclass-development/oppor.
17  Is that developmental opportunity?
18  A.  Yes. Reclassification.
19  Q.  And this refers to the modified salaried personnel
20  position that Ms. James assumed; is that correct?
21  A.  In this position, yes.
22  Q.  Did you ever discuss with Edith that she do a value
23  stream or a determination as to whether or not Edith
24  had assumed too many job duties?
25  A.  No. As far as value stream, and I can't remember

29 (Pages 110 to 113)

118

1    could grow to perform the duties of that job
2  Q.  Other than Sheri Rice, was there ever any
3    discussions of anyone else -- and this is before Ms.
4    James stepped into the job -- was there any
5    discussion of anyone else assisting in some of the
6    job duties that were going to be assumed by the new
7    modified salaried personnel position?
8  A.  No.
9  Q.  Do you know if Ms. James is still in the salaried
10    personnel position?
11  A.  I understand she's not in that position.
12  Q.  Do you know, did anyone talk to you other than your
13    counsel back in January of 2002 about Edith being in
14    the salaried personnel position?
15  A.  I've spoken to no one about Edith being in the
16    position.
17  Q.  Prior to Ms. James' third personal -- the third
18    phase of the personal business plan, did you talk to
19    Jim Barr?
20  A.  I'm sorry.
21  Q.  Did you talk to Jim Barr about the Phase 3
22    evaluation of Ms. James?
23  A.  No, I did not.
24  Q.  Did you provide Ms. James with any training for the
25    HR position or the salaried personnel position?

119

1  A.  Certainly the first round of training was to sit
2    with Frank Cerny for 30 days, so I was able to
3    secure her off the floor. Whether there was a
4    backfill for Edith at the time in manufacturing was
5    not the point of focus. We had to get her with
6    Frank, so that was the first round of training that
7    was provided. The job is basically an on-the-job
8    training kind of position. Beyond that, her
9    training would be continuous as she performed the
10    work and consulted with the subject matter experts
11    either right at the plant.
12    I could have potentially been a source of
13    information for her on some of the job duties, and I
14    made sure that she understood that she could come to
15    me particularly in areas that I performed before
16    like EEO and AAP kinds of matters.
17    Frank retired really assuring both myself
18    and Edith that he would be available for any
19    contacts that she would subsequently make.
20    In addition, she had an opportunity
21    certainly to rely on her corporate interface as
22    issues begin to materialize, and there were trouble
23    spots for Edith, I contacted Sandy Swanson and asked
24    if she could provide some training, certainly
25    discuss areas that were directly related to the job

120

1    that she was doing in Vandalia. Sandy was agreeable
2    to that, so then it was a matter of scheduling.
3    In addition, there was some EEO training,
4    AAP training, more specifically AAP training that
5    our corporate interface, Natalie Truehart, in
6    conjunction with -- I think it was Optimum Services
7    provided. This was some on-line training. It
8    consisted of maybe a day or two through net meeting,
9    if you're familiar with net meeting. And for some
10    portions of that training, I was able to sit in with
11    Edith when that training materialized.
12    Those were some training opportunities that
13    we had discussed.
14  Q.  I don't think that answered my question. Did you
15    personally provide any training to Ms. James?
16  A.  I specifically sat and discussed the affirmative
17    action program with her and provided some exposure.
18    I don't want to call it training, but it's certainly
19    dialoguing and instructing and then trying to
20    solicit feedback from her where -- you know, where,
21    if any, there were gaps in what I had conveyed to
22    her.
23  Q.  And you indicate there was -- Ms. James received
24    some training from Mr. Cerny and you had secured Ms.
25    James off the floor. Do you know if Ms. James

121

1    provided any training to her successor during that
2    time period?
3  A.  I was not aware if she did, but that wasn't an
4    expectation that I had. Frank was really more day
5    to day in control of their training, and I pretty
6    much, you know, left it to him to do.
7    Edith may have felt that she needed to go
8    back on the floor. And that's not uncommon that the
9    incumbent person if asked to come back, you know, if
10    there was an issue, but to my knowledge, it may have
11    just been to go back if at all but nothing that was
12    set up formally like that.
13  Q.  And you also indicated that Ms. James had --
14    position was learned while she was doing it, kind of
15    on-the-job learning experience, correct?
16  A.  The bulk of that job is.
17  Q.  And you also indicated there was a net meeting I
18    believe on EEO and AAP?
19  A.  Yes.
20  Q.  Now, Ms. James attended a net meeting; is that
21    correct?
22  A.  It was in her office.
23  Q.  Would this training information be on Ms. James'
24    training records?
25  A.  You know, I don't remember if there was a CTIS

31 (Pages 118 to 121)

138

1    unfinished PBP business. Does that mean personal
2    business plan business?
3    A.  Yes.
4    Q.  Please review the final. If no further discussion
5        is necessary, it needs to be housed in the record.
6        Do you recall what personal business plan business
7        this was regarding?
8    A.  Yes. When I -- before I left the Columbus plant, I
9        had a handwritten document when you go to sit in
10       and discuss the Phase 2. You basically hopefully
11       mutually agree as to what you are recognizing as a
12       supervisor in terms of the employee's progress and
13       that they're also on board with that.
14           I was also in the process of transitioning,
15       you know, from the Columbus plant, but it was a task
16       that I obviously needed to finish. So I made sure
17       that I sat down and manually went through and
18       discussed with every person directly their personal
19       business plan, but by the time that I was able to
20       formalize it, type it, get it into the system, I had
21       actually already transferred to my new job, and I no
22       question wanted to be sure that what we had mutually
23       agreed to in writing which would have been my
24       document at that point that it was absolutely
25       captured the way that it should be based on our

139

1        prior discussion.
2    Q.  So when you discussed the Phase 2, the personal
3        business plan, with Ms. James and you say that was
4        prior to your leaving Delphi Columbus, you had
5        handwritten in your comments and your evaluation; is
6        that correct?
7    A.  Yes.
8    Q.  So this e-mail, Exhibit M, refers to your typing in
9        into the personal business plan form the -- what you
10       had discussed with Ms. James?
11   A.  That's correct.
12   Q.  So did you ever discipline Ms. James?
13   A.  Discipline?
14   Q.  I guess formally, you know, discipline her for
15       anything. Or first let me back up.
16           Is there a disciplinary process or
17       procedure within Delphi that you're aware of?
18   A.  There's a disciplinary process for hourly employees
19       as it specifically relates to the contract. It's a
20       progressive disciplinary process.
21   Q.  So anything for salaried employees?
22   A.  There is no disciplinary process for salaried
23       employees.
24   Q.  Did you ever discuss with Ms. James problems with
25       her job performance prior to this Phase 2

140

1        evaluation?
2    A.  Made sure that Edith knew every time I received a
3        complaint from the organization. I also made sure
4        that if I observed something directly, I gave
5        immediate feedback, but I also gave feedback when I
6        had observations that my employees did something
7        favorable as well. So performance feedback was a
8        frequent thing that I tried to do.
9    Q.  Did you discuss with Ms. James that at any time up
10       to and including when you gave her her Phase 2
11       evaluation that if she did not improve in the
12       position she would have to be moved from the
13       position?
14   A.  I don't recall any discussion like that.
15   Q.  Did you ever deny Ms. James an ability to obtain job
16       training?
17           MR. WINCHESTER:  Objection, vague. Go
18       ahead and answer.
19           THE WITNESS:  You know, could you be more
20       specific about ...
21   BY MS. VITALE:
22   Q.  Any job training.
23   A.  There is no training that I recall denying Edith,
24       especially that which would have helped her in any
25       way to perform that job to the best of her ability.

141

1    Q.  Other than the training you sought out with Sandy
2        Swanson for Ms. James, did you seek out any
3        additional training for Ms. James?
4    A.  There wasn't training, per se. I did want her to
5        certainly visit other sites, I did want her to visit
6        our corporate offices so that they could put a face
7        with a name, and people that she would be
8        interfacing with she could also obviously get to
9        know a little better than on the phone.
10   Q.  Do you know if Ms. James ever visited other sites or
11       a corporate office?
12   A.  I think she visited Vandalia. She did finally
13       coordinate a date with Sandy Swanson.
14   Q.  So Ms. James coordinated the date to visit the
15       Vandalia site and speak with Ms. Swanson?
16   A.  Well, I was in Edith's office when we called Sandra
17       Swanson. As I recall, this may have been around the
18       merit time and maybe sometime after where we asked
19       Sandra would she be willing to sit with Edith and
20       just discuss some of the basic areas where Edith was
21       experiencing some -- you know, the trouble spots.
22   Q.  Is this the same conversation you described earlier
23       with Ms. Swanson in providing Ms. James with the
24       half-day training?
25   A.  I don't recall us talking about that earlier, but a

36 (Pages 138 to 141)

142

1    half day, I don't recall us talking about a half-day
2    training earlier.
3    Q.   I think earlier you -- Well, strike that.
4         Is this the only time Ms. James went to the
5    Vandalia plant to your knowledge?
6    A.   To my knowledge, that's the only time.
7    Q.   And this is the only time Ms. James went to receive
8    training from Ms. Swanson?  Is that correct to your
9    knowledge?
10        MR. WINCHESTER:  Make it clear.  You mean
11   physically went to receive training?  Is that what
12   you're saying?
13        MS. VITALE:  Yes.
14        THE WITNESS:  To my knowledge.
15   BY MS. VITALE:
16   Q.   Do you know what -- how long Ms. James was in the
17   Vandalia plant to receive training?
18   A.   I don't know for sure.
19   Q.   Do you know what areas Ms. James received training
20   from Ms. Swanson at the Vandalia plant?  And I'm
21   talking specifically when Ms. James went to the
22   Vandalia plant.
23   A.   I don't know.  I mean, there wasn't anything that I
24   saw in writing or anything.
25   Q.   Do you have any idea of what Ms. James and Ms.

143

1    Swanson discussed regarding the HR position?
2    A.   The position itself, the duties associated with it.
3    Q.   So what's your understanding of the training Ms.
4    James was to receive from Ms. Swanson?
5    A.   Primarily the duties associated with the salaried
6    personnel rep responsibilities of the job.
7    Q.   Do you know if this related to any EEO or AAP
8    training?
9    A.   I don't know for sure.
10   Q.   Do you know if Ms. James ever visited corporate
11   offices?
12   A.   That visit to my knowledge never materialized.
13   Q.   Do you know why?
14   A.   I think a couple of reasons that I know.  Beyond
15   that, I had basically communicated to our corporate
16   offices that I would like Edith to visit the
17   salaried manager in charge at the time herself was
18   on a special assignment.  I think the visit was --
19   it was not intended to be set up within the first 30
20   days, because we needed her to be with Frank.
21   Following that, it was just tough to schedule it as
22   I recall.
23   Q.   If Ms. James wanted any training whether, you know,
24   at corporate office or to visit another Delphi plant
25   or to receive even an outside training -- and by

144

1    "outside training," I mean something outside the
2    Delphi facilities -- did she need to request
3    permission from you?
4    A.   Yes.
5    Q.   Have you ever denied any of your employees the
6    ability to receive training?
7    A.   Have I denied them the ability to receive training?
8    Q.   Right.
9         MR. WINCHESTER:  Can we clarify that?  You
10   mean denied requests?
11        MS. VITALE:  Right.
12        THE WITNESS:  I can't specifically recall
13   denying a request to receive training, no.
14        (Exhibit N marked.)
15   BY MS. VITALE:
16   Q.   Why don't I show you what's been marked as Exhibit
17   N.  Can you tell me what this is?
18        MR. WINCHESTER:  Let me insert an objection
19   there.  I think that we've sort of established this
20   document was completed after Ms. Wooldridge left
21   Columbus.  I just wanted to insert that objection
22   for the record.
23        THE WITNESS:  This document is the personal
24   business plan it appears for Edith James subsequent
25   to the third phase of the personal -- of the

145

1    performance plan.
2    BY MS. VITALE:
3    Q.   So this is the completed personal business plan for
4    Ms. James all three phases, correct?
5    A.   It appears so.
6    Q.   Did you other than Phase 1 and Phase 2 which we
7    already spoke about -- did you have any input into
8    Phase 3 or any of the Phase 3 portions of this?
9    A.   I had no input.
10   Q.   Mr. Barr didn't talk to you about this evaluation or
11   Ms. James following your leaving Delphi Columbus?
12   A.   No, he did not.
13   Q.   Did you have any input into Ms. James being removed
14   from the position?
15   A.   No, I did not.
16   Q.   Did you ever discuss possibly removing Ms. James
17   from the position with anyone prior to your leaving
18   Delphi Columbus?
19   A.   Did I?
20   Q.   Discuss removing Ms. James from the position with
21   anyone prior to your leaving?
22   A.   No, I did not.
23   Q.   How about after you left Delphi Columbus?
24   A.   No, I did not.
25   Q.   Have you ever reviewed this Exhibit N?

**3**

```
 1        IN THE COURT OF COMMON PLEAS
 2           FRANKLIN COUNTY, OHIO
 3                   - - -
 4   Edith C. James,      :
 5        Plaintiff,  :
 6      vs.          : Case No. 03CVH02-02213
 7   Delphi Automotive    :
     Systems, et al.,     :
 8
 9        Defendants.  :
10
11              DEPOSITION
12   of Marcia Brown, a witness herein, taken before
13   me, Kendra E. Johnston, a Notary Public in and
14   for the State of Ohio, at the offices of Jones
15   Day, 41 South High Street, Columbus, Ohio, on
16   Wednesday, December 10, 2003, at 9:30 a.m.
17                  - - -
18
19
20
21       Armstrong & Okey, Inc.
         185 South Fifth Street, Suite 101
22          Columbus, Ohio  43215
         (614) 224-9481 - (800) 223-9481
23          Fax - (614) 224-5724
24                  - - -
```

**2**

```
 1   APPEARANCES:
 2        Cooper & Elliott
         By Sheila P. Vitale
 3        2175 Riverside Drive
         Columbus, Ohio  43221
 4
          On behalf of the Plaintiff.
 5
 6        Jones Day
         By Jeffrey D. Winchester
 7        41 South High Street
         Suite 1900
 8        Columbus, Ohio  43215-6113
 9        On behalf of the Defendants.
10                  - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**4**

```
 1                  Wednesday Morning Session,
 2                  December 10, 2003.
 3                       - - -
 4                   STIPULATIONS
 5        It is stipulated by and between counsel
 6   for the respective parties that the deposition
 7   of Marcia Brown, a witness herein, called by the
 8   Plaintiff under the applicable Rules of Civil
 9   Procedure, may be taken at this time and reduced
10   to writing in stenotypy by the Notary, whose
11   notes thereafter may be transcribed out of the
12   presence of the witness; and that proof of the
13   official character and qualification of the
14   Notary is waived; that the examination, reading
15   and signature of the said Marcia Brown to the
16   transcript of her deposition are waived by
17   counsel and the witness; said deposition to have
18   the same force and effect as though signed by
19   the said Marcia Brown.
20                       - - -
21
22
23
24
```

```
 1                  MARCIA BROWN
 2   being by me first duly sworn, as hereinafter
 3   certified, deposes and says as follows:
 4                   EXAMINATION
 5   By Ms. Vitale:
 6        Q.  Good morning, Ms. Brown.  Could you
 7   please state your full name and your -- are you
 8   working?
 9        A.  No.
10        Q.  And your home address then for the
11   record.
12        A.  Marcia L. Brown, 5540 Echo Road,
13   Columbus 43230.
14        Q.  And you already indicated you are
15   not working.  You're retired?
16        A.  Well, I am working.  I have a
17   nine-month-old granddaughter I'm taking care of.
18        Q.  That is work.
19        A.  Yes.
20        Q.  I have a six-month-old, so I
21   understand.
22        A.  Okay.  So you understand that.
23        Q.  Ms. Brown, I represent Edith James
24   in this litigation, and I'm going to go through
```

25

1    A.  Well, I think it was assumed within
2   the committee.
3    Q.  Okay.  And at one point in time you
4   were reassigned out of the personnel department,
5   and I think you described it as the business
6   unit 3 office manager position?
7    A.  Yes.
8    Q.  And you indicated that you were
9   transferred to that position; correct?
10   A.  Yes.
11   Q.  Was that a voluntary transfer or
12  were you just told you were being transferred?
13   A.  It was not voluntary.
14   Q.  There came a point in time where
15  Frank Cerny was retiring; correct?
16   A.  Right.
17   Q.  And I believe the testimony has been
18  that he made that announcement known around
19  November of 2000.  Does that sound correct?
20   A.  Yes.
21   Q.  At some point in time did you find
22  out or were you advised that the salaried
23  personnel rep position that you held was going
24  to be consumed by Mr. Cerny's successor?

26

1    A.  I was not actually told that at
2   first.  They were talking about -- they were
3   talking about they may have to eliminate the
4   job, that they may go down to one person.
5    Q.  Do you recall when those
6   conversations occurred?
7    A.  I really don't recall when because
8   we were going through so much stuff and we were
9   just kind of talking back and forth.  It was --
10  it was after he officially told us that he was
11  going to retire, but I just don't remember
12  exactly when.
13   Q.  Was it before you were reassigned?
14   A.  Oh, yes.
15   Q.  And how were you told that you were
16  being reassigned?
17   A.  I believe -- let's see.  Who told
18  me.  You have to understand that, being in that
19  department, we talked, and you hear things all
20  the time, and so to actually have somebody
21  actually just sit down and tell you, it's -- I
22  really think that Loretta told me that they were
23  going to split up the job, but this was -- this
24  was after -- boy, the times are -- I believe it

27

1   was after they had decided who was going to do
2   the job.
3    Q.  It was after Edith James was
4   selected to fill Frank Cerny's position?
5    A.  I think so.  But they didn't
6   announce who it was, who was going to take it.
7   I didn't know who it was.
8    Q.  So it was after the selection was
9   made?
10   A.  Yes, to the best of my memory.
11   MR. WINCHESTER:  Take a quick
12  break?
13   MS. VITALE:  Sure.
14   (Recess taken.)
15   Q.  You'd indicated that you were told
16  that the position you were in, salaried
17  personnel rep, was being eliminated and that was
18  sometime after the selection was made; is that
19  correct?
20   MR. WINCHESTER:  Objection.  I think
21  that mischaracterizes the testimony.  I think
22  she said that they talked about it before.  I'm
23  not sure.  I just think it mischaracterizes the
24  testimony.  Go ahead.

28

1    Q.  Is that the best of your
2   recollection, that you found out that your
3   position was being eliminated after the
4   selection was made?
5    A.  I think officially, but it wasn't
6   surprise surprise.  We had discussed that it
7   could be.
8    Q.  It could be?
9    A.  Uh-huh.
10   Q.  Okay.  But it wasn't a definite,
11  your position is being --
12   A.  Well, I didn't feel it was definite
13  until they told me I was moving.
14   Q.  Okay.  And you had applied for Frank
15  Cerny's position; is that correct?
16   A.  Uh-huh, yes.
17   Q.  And were you still within the HR
18  department when Ms. James assumed her HR
19  position?
20   A.  I was still there when she trained,
21  when she was in training.
22   Q.  So the month of January of 2001, you
23  were still in the HR department?
24   A.  Right.

7 (Pages 25 to 28)

29

1    Q.  Do you recall what month that you
2  moved to business unit 3?
3    A.  I thought it was March.  It might
4  have been part of February into March.
5    Q.  And when did Frank Cerny completely
6  retire and actually leave Delphi?  Do you
7  recall?
8    A.  I'm trying to think of the effective
9  date of his retirement, because he had vacation
10  prior to the effective date.
11    Q.  Okay.
12    A.  So it might have been in February
13  when he left.  I'm not -- I think his retirement
14  might have been effective April 1st.  I'm not
15  sure.
16    Q.  But he took some vacation time
17  before that?
18    A.  Right.  It was either April 1st or
19  March 1st, and he had vacation time.
20    Q.  Do you know when his last day
21  actually physically at Delphi or he was
22  physically there before he took his vacation and
23  retired?
24    A.  Well, I was downstairs when he was

30

1  still working.  I think his was March 1st, so it
2  was sometime in February.
3    Q.  And was Sherry Rice in the HR
4  department while you were in the HR department?
5    A.  No.  She came in right after I left,
6  I mean officially she came in.
7    Q.  Unofficially was she doing
8  something?
9    A.  Well, she might have been in there
10  for me to tell her where things were.  I'm not
11  sure of that.  I know she didn't officially
12  start until after I left.
13    Q.  And you indicated that three months
14  after you moved down to business unit 3, you
15  retired; correct?
16    A.  Right.
17    Q.  Was that a voluntary early
18  retirement?
19    A.  Yes.
20    Q.  I'm going to show you what was
21  previously marked in a deposition as Exhibit D.
22  Do you recognize what this is?
23    A.  Yes.
24    Q.  What is this?

31

1    A.  Self-nomination form.
2    Q.  And this is for Mr. Cerny's former
3  position?
4    A.  Yes.
5    Q.  And this is a position you applied
6  for?
7    A.  Yes, it is.
8    Q.  Did you review this posting before
9  you applied for the position?
10    A.  Yes.
11    Q.  And when you applied for the
12  position, what was your understanding of what
13  the job title you were applying for would be?
14    A.  Supervisor, Salaried Personnel
15  Administration.
16    Q.  And what was the position code that
17  you understood you were applying for?
18    A.  7P21.
19    Q.  And when you applied, you understood
20  that it was a 7th level position you were
21  applying for?
22    A.  Yes.
23    Q.  Were you interviewed for this
24  position?

32

1    A.  Yes, I was.
2    Q.  Who interviewed you?
3    A.  Loretta.
4    Q.  What do you recall of the interview
5  with Loretta?
6    A.  Well, she talked about the job as it
7  is.  You know, there again, I knew a lot of this
8  stuff, so I don't know -- I can't remember
9  exactly what she did say because I worked in
10  there, in that area.
11    Q.  You indicated that she talked about
12  the job as it was, and would those be the key
13  elements and qualifications that are listed in
14  this posting?
15    A.  Yes.
16    Q.  Did she discuss with you any
17  education and training responsibilities?
18    A.  I don't know because I can't
19  remember when that came up, when I found out
20  that education and training was going to be
21  involved.  I really don't remember the timing.
22    Q.  So it could have been before the
23  interview?
24    A.  It could have been.  I know at the

Armstrong & Okey, Inc.  Columbus, Ohio (614) 224-9481

33

1    time that we were going through a lot of
2    changes. I knew there were going to be a lot of
3    changes in the department. I didn't know what,
4    but, you know, they talked about -- Frank talked
5    about that there would be some changes, and
6    what's fuzzy is that I don't know whether it was
7    before this interview or after or during, you
8    know. This has been two years ago.
9        Q.  And during that interview, was it
10   told that it would not be a supervisory
11   position? Do you recall that?
12       A.  No, it wasn't told to me that it
13   wouldn't be.
14       Q.  Okay.
15       A.  See, my understanding is that it was
16   going to be 7P21, and I believe the 7P21 is a
17   supervisor, salaried personnel, so one goes with
18   the other. So I just -- when I saw the position
19   code, and I knew that was what Frank was, that
20   then I thought that's what it would be.
21       Q.  Okay. And during your interview
22   with Ms. Woolridge, it didn't come up that you
23   were not interviewing for a 7P21 supervisor
24   position?

34

1        A.  No, it did not come up.
2        Q.  And it also didn't come up in that
3    interview that the position you held, the
4    salaried personnel rep, was being eliminated?
5        A.  I think we did talk a little bit
6    about the fact that it was -- that that job
7    would go out. But, there again, it's cloudy as
8    to when because Loretta and I talked back and
9    forth, you know, because that was part of the
10   job, the communication, and when things would
11   come up, we talked about it, no specific date or
12   time. As to whether it was the official
13   interview, I'm not sure.
14       Q.  Okay. So you don't recall if you
15   were told that your position of salaried
16   personnel rep was eliminated at the interview or
17   after the interview?
18       A.  I'm pretty sure it was not at the
19   interview. I anticipated it, but it wasn't at
20   the interview.
21       Q.  Okay. So at the interview, it was
22   still a possibility of your job being
23   eliminated, but you weren't told --
24       A.  That didn't even come up. We didn't

35

1    talk about the job being eliminated. I'm pretty
2    sure. I think I was just in there talking about
3    accepting this job and giving my qualifications
4    on why I felt I should get it.
5        Q.  And when you said "this job," so the
6    record is clear, you mean the supervisor of
7    salaried personnel job with position code 7P21?
8        A.  Yes.
9        Q.  And at the time you applied for this
10   job, you were a 6th level employee?
11       A.  Yes.
12       Q.  Your position in HR as salaried
13   personnel rep, that was a full-time position;
14   correct?
15       A.  Yes.
16       Q.  And you indicated that there was
17   some discussions going on about changing the
18   structure in the HR department and eliminating
19   some positions and moving some job duties
20   around?
21       A.  Yes.
22       Q.  Do you know why this discussion was
23   going around about modifying the HR department?
24       MR. WINCHESTER: Objection to the

36

1    extent it calls for speculation. Go ahead.
2        A.  Well, I know that they were under a
3    budget cut, and so all the departments had to
4    cut and change.
5        Q.  Did anyone come to you and ask for
6    your input as to any HR positions that could be
7    eliminated or modified or removed?
8        A.  No. That gives me a lot of clout.
9    No. No. Especially since there was only two.
10   Well, when you say -- and you're saying HR, so
11   you're talking about just our department.
12       Q.  Right.
13       A.  Just our office.
14       Q.  Right.
15       A.  No.
16       Q.  Did Ms. Woolridge or Mr. Cerny ask
17   you whether you felt that your position as
18   salaried personnel rep could be handled by the
19   salaried personnel administrator, Mr. Cerny?
20       A.  I don't know whether it was ever
21   formally talked about like that. I knew that
22   they were eliminating the cars, which took up a
23   lot of time, but they reduced the car program,
24   so that is, I guess, one way of cutting back as

9 (Pages 33 to 36)

41

1 been told about her position code and -- and her
2 title, and so I said to her that "You should
3 talk to Frank," and then he would take it -- you
4 know, then go talk to Loretta. And then it was
5 soon after that, after her talk is when I found
6 out that it was going -- her title was going to
7 be supervisor, salaried -- I mean not
8 supervisor, but salaried personnel rep, the same
9 as I was.
10    Q. And by "her," you're meaning Edith
11 James; correct?
12    A. Yes.
13    Q. But prior to Ms. James having that
14 conversation with you, did you know that the job
15 title was modified to be what your former job
16 title was?
17    A. No.
18    Q. Do you know a person named Michael
19 Waters?
20    A. Yes.
21    Q. How do you know Michael Waters?
22    A. He took over after Edith left.
23    Q. Were you still with Delphi when
24 he --

42

1    A. When he took over?
2    Q. Right.
3    A. No, because Edith -- I left and
4 Edith was still in the job.
5    Q. Did you just find out through
6 friends at Delphi that Mike Waters --
7    A. Well, I knew -- I had heard that a
8 new person was coming in or to take that job,
9 and they told me his name, and then I was in the
10 plant for a retirement party and kind of
11 introduced myself.
12    Q. Do you know what his job title is?
13    A. If I said what I -- I would be
14 assuming.
15    Q. Okay.
16    MR. WINCHESTER: So the question is
17 do you know; right?
18    Q. Yeah. Do you know what it is?
19    A. Not -- no, not really.
20    Q. You said you would assume. What
21 would you assume his job title would be?
22    MR. WINCHESTER: Objection. Calls
23 for speculation. Go ahead.
24    A. That it was 7th level.

43

1    Q. And why would you assume that it was
2 a 7th level?
3    MR. WINCHESTER: Same objection.
4    A. Well, I had heard rumors that this
5 guy had come in and that he came in at a 7th
6 level.
7    Q. So you're assuming because you heard
8 rumors from other people within Delphi?
9    A. Uh-huh.
10    MR. WINCHESTER: You have to answer
11 orally.
12    A. Oh, yes. Yes.
13    Q. Any other basis for your assuming he
14 would be a 7th level?
15    A. Like what?
16    Q. Any other reason other than just
17 that you've heard from other people?
18    A. No. No, because once I heard that,
19 wasn't any other speculation at that point.
20    Q. Do you know whether or not the
21 education and training responsibilities were
22 assumed -- are still a part of the position that
23 Ms. James held and is now held by Mr. Waters?
24    A. I know that it is not held by Mr.

44

1 Waters.
2    Q. And how did you find that out?
3    A. You know, it's cloudy as to who told
4 me because it wasn't anybody in that department,
5 but I know the girl that took -- was going to
6 take over education and training, and I think
7 someone else told me that. You know how you
8 call back in the plant and say "Hey, what's
9 going on?" That's how I knew that Pat Scott
10 actually was doing education and training.
11    Q. Did you talk to anybody about your
12 having to come down here for your deposition
13 today?
14    A. No. Anybody but --
15    MR. WINCHESTER: Her attorney.
16    THE WITNESS: Yes.
17    Q. And he's your attorney for this
18 deposition?
19    A. Yes.
20    Q. When you heard about the changes
21 with the salaried personnel job formerly held by
22 Mr. Cerny, did you voice any concerns as to the
23 duties and responsibilities that were now being
24 put into the position?

11 (Pages 41 to 44)

3

1    IN THE COURT OF COMMON PLEAS
2    FRANKLIN COUNTY, OHIO
3    - - -
4    Edith C. James,    :
      :
5    Plaintiff,    :
      :
6    vs.    : Case No. 03CVH02-02213
      :
7    Delphi Automotive    :
     Systems, et al ,    :
8      :
     Defendants.  :
9
     - - -
10    DEPOSITION
11    of Edith C. James, Plaintiff herein, called by
12    the Defendants under the applicable Rules of
13    Civil Procedure, taken before me, JoDell J
14    Siefert, a Notary Public in and for the State of
15    Ohio, at the offices of Cooper & Elliott, LLC,
16    2175 Riverside Drive, Columbus, Ohio, on Friday,
17    October 31, 2003, at 9:00 a.m.
18
19    - - -
20
21    Armstrong & Okey, Inc
22    185 South Fifth Street - Suite 101
      Columbus, Ohio 43215
      (614) 224-9481 - (800) 223-9481
23    Fax - (614) 224-5724
24    - - -

3

1    Friday Morning Session,
2    October 31, 2003.
3    - - -
4    STIPULATIONS
5    It is stipulated by and between counsel
6    for the respective parties that the deposition
7    of Edith C. James, Plaintiff herein, called by
8    the Defendants under the applicable Rules of
9    Civil Procedure, may be taken at this time and
10    reduced to writing in stenotypy by the Notary,
11    whose notes thereafter may be transcribed out of
12    the presence of the witness; and that proof of
13    the official character and qualification of the
14    Notary is waived.
15    - - -
16
17
18
19
20
21
22
23
24

2

1    APPEARANCES:
2    Cooper & Elliott, LLC
      By Ms. Sheila P. Vitale
3    2175 Riverside Drive
      Columbus, Ohio 43225
4
      On behalf of the Plaintiff
5
      Jones Day
6    By Mr. Jeffrey D. Winchester
      41 South High Street - Suite 1900
7    Columbus, Ohio 43215
8      On behalf of the Defendants
9    ALSO PRESENT:
10    Mr. James Barr
11    - - -
12
13
14
15
16
17
18
19
20
21
22
23
24

4

1    INDEX TO EXHIBITS
2    Deposition Exhibits    Identified
3    1 - Salaried Employee Candidate
      information sheet    18
4
      2 - Performance Appraisal Review 9-9-99  49
5
      3 - Performance Appraisal Review 1-26-00  55
6
      4 - Letter of 4-26-99 from Mr. Cerncy
7    to Ms. James    83
8    5 - Salaried Personnel Transaction    84
9    6 - Employment History    93
10    7 - Notice of Open Position    99
11    8 - Self-Nomination Form    132
12    9 - Employment histories    150
13    10 - Training History    191
14    11 - 2001 Personal Business Plan    207
15    12 - 1-28-02 Personal Business Plan    258
16    13 - Earning records    291
17    14 - Termination Checklist    308
18    15 - Handwritten note    315
19    16 - Fax from Ms. James to Mr. Waters
      dated 5-28-02    316
20
      17 - Memo dated 2-1-02 regarding
21    organizational announcement    324
22    18 - Human Resource Staffing document   325
23    19 - Memo from Natalie Trueheart
      dated 2-5-01
24

1 (Pages 1 to 4)

17

1  know, the pallets would come around and you
2  would put -- load individual parts on it. So I
3  was one of the supervisors who is responsible
4  for type 3. There was another person who was
5  retiring at the time, so I was going to step in
6  with him to take over type 3.
7      Q. How many employees were you
8  responsible for?
9      A. On an average we were subassembly
10  line and the final line, so guessing, trying to
11  remember, perhaps 25 to 30.
12      Q. Had you ever worked for Delphi
13  before that time?
14      A. No. That was the first time.
15      Q. I'm sorry?
16      A. That was the first time.
17      Q. Had you ever worked for a
18  manufacturing entity before that time?
19      A. I had worked a part-time job, a
20  second job years prior in a facility. You know,
21  it wasn't the same type of facility. This was
22  like packing. Packing or assembly for packing
23  to be shipped out.
24      Q. Were you a supervisor at that time?

18

1      A. Oh, no. No. It was just an extra
2  job for like a seasonal thing. No, I was just a
3  person -- it was through a temporary agency.
4  You know, you're looking for a second job, you
5  contact a temporary agency because you know
6  there's usually short-term employment available.
7  So I was one of several people who heard the
8  call during the seasonal period and went to work
9  for a few weeks.
10      Q. And can you give me a ballpark about
11  when that was?
12      A. Oh, my gosh. I would say late '70s,
13  possibly early '80s.
14      MR. WINCHESTER: Let's go ahead and
15  mark this one.
16      (EXHIBIT HEREBY MARKED FOR
17      IDENTIFICATION PURPOSES.)
18      Q. Ms. James, I've just handed you a
19  document that the court reporter has marked as
20  Exhibit 1. Could you take a moment and review
21  that document?
22      (Recess taken.)
23      Q. Okay. Ms. James, have you had a
24  chance to review Exhibit 1?

19

1      A. Yes.
2      Q. Have you seen this before?
3      A. Yes, I think so. I think so.
4      Q. Can you tell me what it is?
5      A. It's a document that I'm assuming
6  that once they had gotten the information from
7  those of us who had applied during the
8  employment call that they had summarized the
9  information we submitted on the application or
10  in the resume to determine whether or not we
11  actually provided a good fit for the jobs or
12  positions that were currently available.
13      Q. After reviewing this document is
14  there anything on this document that's
15  inaccurate?
16      A. No. Not that I can see at this
17  time, no.
18      Q. So let's back up a little bit then
19  in your history. According to this you
20  graduated with a BA in psychology and a Master's
21  degree in art education from Ohio State,
22  correct?
23      A. The BA in psychology was from Berea
24  College.

20

1      Q. From Berea?
2      A. Berea College in Berea, Kentucky.
3      Q. When did you get that degree?
4      A. 1975.
5      Q. And did you go directly into your
6  Master's program?
7      A. No, I didn't.
8      Q. When did you join your Master's
9  program?
10      A. It was in the -- I think '91 I was
11  employed at Ohio State University and I
12  completed a Master's there in '93.
13      Q. So from the point you graduated in
14  1975 what was your employment?
15      A. I worked at Orient State Institute
16  at the time, it's now currently a correctional
17  facility, but at the time in '76 I came on it
18  was a mental institution. My undergrad was in
19  psychology so it seemed to fit.
20      Just before Orient I had gone back
21  home to Mt. Sterling, Kentucky, and worked with
22  Belk-Simpson Stores in their personnel area, and
23  then once I'd gotten the position at Orient then
24  I moved to Columbus.

5 (Pages 17 to 20)

**45**

1  HR department and if it was working with
2  Superior, once again, it would go to the HR
3  department. There are usually a battery of
4  tests that you would take also to determine if
5  the person was the right fit for that. It's
6  like a personality test, whatever. I did not
7  administer personality tests.
8      Q.  I just wanted to make it clear that
9  when you were at Lazarus were you also doing
10  this recruiting and interviewing?
11      A.  Sure you would. Because you wanted
12  to make sure there was -- you always have a core
13  of people who are there and they've been there
14  for several years. Lazarus at one time had been
15  responsible or owned Gold Circle stores and at
16  the time that Gold Circle folded up and was no
17  longer a retail establishment in the city, a lot
18  of people who had been with Gold Circle for
19  several years automatically transferred over to
20  Lazarus. So you had a veteran crew that was
21  continually there or consistently there. But
22  once again, it's in retail and that's a high
23  turnover area along with fast food. So there
24  was always a flux of people who were, you know,

**46**

1  sending in applications or turning applications
2  over.
3          If you need a part-time job or a
4  quick job, retail is one of the primary areas
5  that recruits for people.
6      Q.  And then you joined Delphi, correct,
7  after Lazarus?
8      A.  After Lazarus, correct.
9      Q.  And again, how long were you with
10  Lazarus before you joined Delphi?
11      A.  I'd say close to three years, two,
12  three years. That's just an approximate.
13      Q.  And tell me again what your exact
14  title was with Delphi when you first joined.
15      A.  Manufacturing advisor, production
16  advisor.
17      Q.  And what was your salary code?
18      A.  I think it was -- when you come in
19  as a trainee I believe it was like a 5M23 or 31,
20  whatever the fifth level. That's a trainee
21  code, training code, and once you made it
22  through probation and if they had determined
23  that you were proper fit for an advisor, then I
24  believe it went to 6M08.

**47**

1      Q.  What shift were you assigned to?
2      A.  Initially the first shift.
3      Q.  And did that ever change?
4      A.  Yes, it did.
5      Q.  When did that change?
6      A.  It changed in the fall of the year.
7  I think it was perhaps in November of the same
8  year, '99, it changed to second shift.
9      Q.  And how long did you work on second
10  shift?
11      A.  Maybe -- well, if it changed in
12  November and by the first of the year I was
13  moving, so perhaps six months perhaps.
14      Q.  Did you ever go back to first shift
15  while you were still -- let's call it a first
16  line supervisor. Can we agree that that's the
17  position you had?
18      A.  I can do that.
19      Q.  Did you ever go back to first shift
20  before you went into the HR job?
21      A.  Yes, I did. I went back to first
22  shift -- I'd been on second shift for, like I
23  said, approximately six months maybe, five or
24  six months, and I was told that I was going to

**48**

1  be assigned back to first shift into 1C, which
2  was one of the line areas.
3      Q.  Did you have any problem with that
4  decision to go back to first shift?
5      A.  Not at all. I preferred first
6  shift.
7      Q.  Had you requested to go back to
8  first shift?
9      A.  Well, sure. Anytime -- you know,
10  there was several employees who enjoyed being on
11  second shift, but when I was told I was going to
12  be moving to second I had indicated that if a
13  position had come forth once again that was on a
14  first shift line, a first shift time within the
15  same department that I was in at the time, then
16  I wanted to be considered for that.
17      Q.  So you preferred first shift?
18      A.  Yes.
19      Q.  Did you ever work third shift?
20      A.  No.
21          MR. WINCHESTER:  Let's go ahead and
22  mark this.
23          (EXHIBIT HEREBY MARKED FOR
24          IDENTIFICATION PURPOSES.)

12 (Pages 45 to 48)

97

1  would be in a B level such as this.
2  Q.  When you -- let me ask it this way
3  then, when you moved from the HRM position back
4  to the manufacturing advisor position, did your
5  pay change at all?
6  A.  No.  Pay did not change.
7  Q.  And then we go up to May 28, 2002.
8  That indicates if you go all the way across that
9  category, it says "Quit - Personal."
10  A.  Uh-huh.
11  Q.  Is that date correct there, May 28,
12  2002?
13  A.  That's probably correct.
14  Q.  And that's the date you left Delphi?
15  A.  That's the date I felt like I was
16  terminated.  I felt like I was terminated from
17  the position that I was in.
18  Q.  And why do you feel you were
19  terminated?
20  A.  I feel like I was terminated from
21  the position that I had held in the HR offices.
22  You know, as far as the date of May 28, that
23  could be when I provided closure and signed
24  documents, but I feel like I was terminated from

98

1  the position that I was in and the positions
2  that I was trying to do.
3  Q.  What about the manufacturing advisor
4  position, were you terminated from that
5  particular position?
6  A.  I don't feel like I was terminated
7  from the manufacturing advisor position.  I feel
8  like I was terminated from the salaried
9  personnel offices.
10  Q.  From the salaried personnel --
11  A.  HRM, human resources.  I feel as if
12  I was terminated from the job that I was
13  performing in that capacity in those offices.
14  Q.  And that's the one that says --
15  that's indicated here as salary HRM ADM; is
16  that --
17  A.  Let me find that.
18  Q.  -- correct?
19  A.  Yes.  That's the position that I was
20  working in the personnel office, and from what
21  my understanding was Frank was a salary HRM
22  administrator but that was not the position that
23  I was going to be holding.  That was not the
24  position title that I had.

99

1  Q.  So maybe now is a good time to talk
2  about that.
3  MR. WINCHESTER:  Actually, do we
4  need to take a break?
5  MS. VITALE:  Why don't we take a
6  little break.
7  (Recess taken.)
8  MR. WINCHESTER:  Would please mark
9  this?
10  (EXHIBIT HEREBY MARKED FOR
11  IDENTIFICATION PURPOSES.)
12  Q.  I have just handed you a document
13  that the court reporter has marked as
14  Exhibit 7.  Could you take a moment and review
15  that document and tell me what it is?
16  A.  It's a personnel posting indicating
17  a position that's available.
18  Q.  And that position listed here, the
19  job title looks like supervisor salaried
20  personnel admin.  Do you see that there?
21  A.  I do see that.  Supervisor salaried
22  personnel ADM.
23  Q.  And did you apply for this job?
24  A.  Yes, I did.

100

1  Q.  And this is the job that Frank Cerny
2  held, isn't it?
3  A.  That's correct.
4  Q.  And I want you to look at the key
5  elements portion.  Actually before you get
6  there, do you remember looking at this before
7  you applied for the position?
8  A.  No.
9  Q.  No?
10  A.  No.
11  Q.  When did you first see this notice
12  of open position?
13  A.  At the time this position came open
14  I was in Denver as a production advisor with
15  other individuals for Delphi.
16  Q.  What were you doing in Denver?
17  A.  I was a production advisor and there
18  was some concerns they had with one of the
19  suppliers that was supplying not only Delphi but
20  General Motors, and there were some issues that
21  they felt that needed to be corrected, so I was
22  one of four people that were asked to go out to
23  Denver and try and straighten things out.
24  Q.  And how long were you out in Denver

129

1  Where did that --
2      A.  There was a time during the year
3  when you would receive information from
4  divisional offices that would have what you had
5  selected the prior year or what you had selected
6  when you first came in, depending on your
7  longevity; this is what you had before, this is
8  who you had it with, this is what the duration
9  was.  It's time to change that, so you need to
10  make your adjustments here.  At one time I think
11  you had to talk to the person and they sent it
12  through.  They had switched to a point to where
13  you could actually call in supposedly and do it
14  by phone.  But there was several that wouldn't
15  do it by phone, they would come in and have it
16  done in the office there.
17      Q.  So employees had -- and we're
18  talking just about salaried employees?
19      A.  Correct.
20      Q.  They had two options, one was to do
21  it I guess like at a corporate headquarters kind
22  of thing?
23      A.  They didn't do it at corporate
24  headquarters.  It was sent -- the information

130

1  was sent from corporate headquarters, divisional
2  offices I should say, and that information was
3  your portfolio so to say; this is what you
4  selected before, this is what's now available,
5  you have to renew that.  So that was the
6  enrollment period.
7      Q.  So the employee would send that
8  where?
9      A.  It wasn't necessarily sent.  They
10  could come to the personnel office, which is
11  what some of them chose to do, and others opted
12  to use a telephone system where you could call
13  in and punch, punch, punch.
14      Q.  Punch numbers in and let the system
15  know either I'm going to stick with what I
16  have --
17      A.  It's a coded system, yeah.
18      Q.  Can you give me a ballpark
19  percentage of how many folks came in physically
20  to do that?
21      A.  When that information was sent out
22  and people received it, it was a continual flux
23  because people wanted to know what the changes
24  were.  You know, health care is an important

131

1  thing, so they wanted to know even though if
2  they stayed with the other one, was anything
3  changing?  If an option was to go to a new one,
4  what's the differences between the two?  You
5  know, and you could provide information as much
6  as what you had.  You know, but they may come to
7  you, but they may still call the information
8  line.
9      Q.  So you're not sure about how many
10  people came to you asking --
11      A.  No.  Like I said, at the time when
12  it's an enrollment period and that information
13  was sent out, then it would be a steady source
14  of people coming in to talk about the enrollment
15  and different plans that are offered.  Because
16  that was -- you know, it was -- like I said,
17  it's their livelihood.
18      Q.  Were they able to hand you their
19  paperwork or not?  Could they turn in their
20  paperwork to you?
21      A.  No.  It wasn't -- you know, I wasn't
22  to input their information for them.  It wasn't
23  that kind of a system.
24      Q.  So you were there to answer

132

1  questions?
2      A.  Right.  Some would try to give me
3  their paperwork and go ahead and input it and --
4      Q.  What would you tell them?
5      A.  You know, it's like this is your
6  choices that you're making and affecting your
7  health care system, you know.  It's your
8  responsibility to make sure that it's accurate
9  and you're doing what you need to do, and you'll
10  probably feel more comfortable when you hear the
11  responses back saying this is what you've got
12  and what you don't have.
13      MR. WINCHESTER:  Let's go ahead and
14  mark this one.
15      (EXHIBIT HEREBY MARKED FOR
16      IDENTIFICATION PURPOSES.)
17      Q.  The court reporter has just handed
18  you a document marked Exhibit 8.  If you could
19  take a moment and review that, please.
20      A.  Okay.
21      Q.  Can you tell me what this is?
22      A.  It's a self-nomination form.
23      Q.  And it's for the HRM job; is that
24  correct?

33 (Pages 129 to 132)

137

1    January 1, and once I go into the area --
2    because I did not assume the position January 1
3    in that job -- and I'm talking to Frank at the
4    same time I'm asking about the compensation, he
5    realized I didn't have a lot of the information
6    about the nonsupervisory position or Marsha
7    Brown is leaving or the definite increase in
8    responsibilities. So during this conversation
9    he said, "You don't know any of this, do you?"
10    "No, I don't. No, I didn't."
11       Q.  How long did Marsha stay in that
12    area before she was moved somewhere else?
13       A.  I don't remember exact dates. I
14    think she retired in June. I would say Marsha
15    may have been there another two to three weeks.
16       Q.  After you came into that area?
17       A.  Yes. Two weeks maybe.
18       Q.  Now, as of today do you have any
19    information as to, you know, the decision-making
20    process whereby the decision was made to alter
21    the job responsibilities of the job?
22       A.  How do you mean? I don't
23    understand.
24       Q.  Do you have any information as to

138

1    how the decision was made or what occurred prior
2    to the alteration of the job that we're talking
3    about today?
4       A.  Do I have any other information
5    about how it was made or the decision was made?
6       Q.  Yeah. Were you in any meetings,
7    have you seen any notes of meetings, do you have any
8    information as to how that decision was made?
9       A.  To change the job once I was in it
10    or whatever? No. No. I mean, my understanding
11    was I was applying for this position and that's
12    the position that I interviewed for and this is
13    the position I was talking about. It's only
14    when I get in the position after January 1 that
15    I find out this isn't what it's going to be,
16    this isn't it. And there is no position code
17    change, there is no nothing. You're going to be
18    doing this. So, no, I did not know of any other
19    meetings or hear of any other -- get any other
20    notes or anything. What I knew was I applied
21    for this job.
22       Q.  And I just wanted to get your
23    testimony clear, you don't recall Loretta
24    talking to you at all about possible alterations

139

1    of the job duties?
2       A.  No. Not prior to me accepting the
3    position.
4       Q.  If Loretta did testify to that, and
5    I know she's going to be deposed in this matter,
6    would you take the position that she's lying?
7       A.  That's a strong statement to accuse
8    someone of lying. I'm going to say maybe she
9    doesn't remember or something. That makes it
10    rather personal. It's not a personal thing.
11    That's like attacking someone and saying you're
12    lying, and that's not what I'm trying to do.
13    You know, I've said perhaps maybe she didn't
14    remember it or whatever, but I'm not going to
15    say Loretta was lying.
16       Q.  And the flip side of that, is it
17    possible that you don't remember, that maybe she
18    mentioned it during --
19       A.  I definitely remember. Because I
20    was excited about being able to move into a
21    different position, and this was a seventh level
22    position. Position codes reflect your
23    responsibilities and your compensation. It's an
24    achievement. It's an accomplishment. You know,

140

1    I see this position and it's a seventh level,
2    I'm excited about it, so, yes, I'm definitely
3    going to remember.
4       Q.  And how did you -- what did you tell
5    Frank when he gave you this information that the
6    position had changed?
7       A.  I didn't have to tell Frank the
8    position was changed. Frank assumed that I knew
9    it was changed and I had known from the
10    interview. When I came to him and questioned
11    the compensation statement or the position code
12    change, Frank sat back in his chair and he says,
13    "You don't know that. You don't know any of
14    that." And I'm like, "No, I do not."
15       Q.  When he explained to you what the
16    changes were what did you say to him?
17       A.  Frank decided that we needed to go
18    talk to Loretta to confirm what the changes were
19    and why I didn't know.
20       Q.  Okay. And so before you went to see
21    Loretta -- did you go see Loretta together?
22       A.  Yes.
23       Q.  Before you did that, anything else
24    you can remember that Frank told you?

35 (Pages 137 to 140)

281

1  reactive.
2      Q.  It looks like in Jim's assessment
3  you were in kind of a reactive mode in your job,
4  and that's what I'm reading here.  Is that your
5  sense of how things were going in your job that
6  year?
7      A.  I based that -- I can see where you
8  say that in the comments and I think there were
9  probably times when it was more of a reactive
10  rather than a proactive.  If I prioritize to get
11  this done or had to shift and do that, it was,
12  yeah, reach back and catch the other one.  So,
13  yes, there were probably times when it was
14  reactive instead of proactive.
15      Q.  At some point before this date, and
16  it's signed here on January 28 of '02 -- and I
17  noticed you didn't sign it, correct?
18      A.  Correct.
19      Q.  Sometime prior to this date you had
20  offered to resign from Delphi, hadn't you?
21      A.  Yes.
22      Q.  When did that happen?
23      A.  It was before Loretta had left.
24      Q.  Can you give me an idea?

282

1  Summertime?
2      A.  Late summer.
3      Q.  Late summer?
4      A.  Late summer.
5      Q.  Tell me what happened with that.
6      A.  As I've stated, I felt like I was
7  running in and performing the tasks of three
8  positions  I had repeatedly asked for time to
9  train and learn how to do something or get with
10  someone else in order to learn a better way of
11  doing something.  I was feeling pulled in
12  various directions.  And I had asked Loretta
13  could we sit down and at least talk about what I
14  felt like I needed assistance in from other
15  personnel or could she reflect on a prior task
16  or position she'd had.  Like affirmative action,
17  could we talk about the affirmative action and
18  certain components in that that needed to be
19  completed, and the response was not the most
20  favorable in terms of being able to provide time
21  or assistance or to get that accomplished.  And
22  I felt that I was doing the best I could do with
23  what I was doing.  And I didn't feel like that
24  was being recognized or appreciated at that

283

1  time.
2      Q.  And so you submitted a resignation
3  letter; is that correct?
4      A.  I did.
5      Q.  What did that letter say, do you
6  remember?
7      A.  Not verbatim.  Basically that I felt
8  that it was something I needed to resign at that
9  point.  I can't say for sure.  I'd have to pull
10  up a copy of the letter.  I don't want to say
11  something was in there that wasn't.
12      Q.  Do you have a copy of the letter in
13  your possession?
14      A.  I wrote the letter so, yeah, I
15  would.
16      MR. WINCHESTER:  And correct me if
17  I'm wrong, counsel, I'm not sure I've seen a
18  copy of that letter but I put in a request for
19  it, please, for a copy of her resignation
20  letter.
21      Q.  So who did you give that letter to?
22      A.  I gave it to Loretta Woolridge.
23      Q.  And what happened?
24      A.  She indicated she was not going to

284

1  accept it and that she preferred that I not
2  submit it to her.  She indicated my decision to
3  resign could affect her professional career.
4  And she wasn't sure if I actually wanted that in
5  my personnel file.
6      Q.  Did she say anything else to you?
7      A.  Not that I recall.  It was at the
8  time something was happening.  I don't know if a
9  fire drill or something was getting ready to go
10  on.  It wasn't like we sat down and discussed it
11  in long detail.
12      Q.  Do you remember what you told her in
13  response to the things that she said to you?
14      A.  No.  I remember making a statement,
15  you know, I'm submitting this resignation letter
16  to you, you know, as my supervisor.
17      Q.  You were very unhappy in your job at
18  that point, weren't you?
19      A.  I was overwhelmed in my job.  I
20  liked working in HR, that's what I wanted to do
21  when I came into the plant, so I was really
22  excited about being able to -- given that
23  opportunity to work in HR.  So I liked what HR
24  was about but I felt overwhelmed with the amount

71 (Pages 281 to 284)

289

1    I did set up an appointment with his assistant
2    at the time to come in and talk to him.  And I
3    told him I had considered what we had discussed
4    and that I indicated I did like working in the
5    human resources area, I enjoyed that interaction
6    with people, but I felt like we needed to
7    reconsider the responsibilities of that job,
8    that it was incorporating everybody and we
9    needed to maybe reconsider that.  And with the
10    basis and understanding that maybe that was
11    something that was going to be done, I liked the
12    position and, yes, I would like to go ahead and
13    remain in the position.  He agreed, said, "Thank
14    you very much.  I'm glad you made that
15    decision."  He said, "I think you're a valuable
16    person."
17             Tom Green indicates in the
18    conversation he had numerous reports from
19    several people that they really thought I was
20    doing the best I could and doing a good job, and
21    that's in September.
22        Q.  Did he say who those people were?
23        A.  No.  No.  That he'd gotten reports
24    from various people that I had been doing a good

290

1    job and trying to do what was asked of me.
2        Q.  Did you go back to Loretta and tell
3    her that you were staying?
4        A.  I don't recall doing that, no.
5        Q.  So do you have any idea how she got
6    word that you were going to stay?
7        A.  No.  I don't know for sure.  I would
8    only be surmising what I thought, but I don't
9    know for sure.
10        Q.  Did you ever talk to Loretta again
11    after the conversation about your resignation
12    letter?
13        A.  How so?  I mean, Loretta was my
14    supervisor.  We talked, yeah, quite a bit.
15        Q.  I want to get a sense if you were
16    talking or not talking to each other?
17        A.  Oh, we definitely had to talk to one
18    another.  She was the supervisor, you know, so
19    she was responsible for what was happening
20    there.  You know, not only with HR office but
21    with labor relations or, you know, the medical
22    department, security, what have you.  So, yeah,
23    we definitely had to talk.
24             MR. WINCHESTER:  Let's mark this.

291

1             (EXHIBIT HEREBY MARKED FOR
2             IDENTIFICATION PURPOSES.)
3        Q.  The court reporter has just handed
4    you a couple of documents stapled together that
5    we've marked as Exhibit 13.  And I'll represent
6    to you that these are your earning records --
7        A.  Okay.
8        Q.  -- while you were at Delphi.
9        A.  Okay.
10        Q.  And if you'd take a moment to look
11    through these, tell me if you've ever seen these
12    records before.
13        A.  No, I don't recall having seen these
14    before.
15        Q.  And we'll go through some of these
16    numbers and see if they're familiar to you.
17    Before we do that, can you tell me how your time
18    was monitored while you were working for
19    Delphi?  Did you have like a swipe card or
20    something like that?
21        A.  All employees had a swipe card.
22        Q.  And so when you would arrive at the
23    plant you'd swipe in and then when you left
24    you'd swipe out, is that --

292

1        A.  Correct.
2        Q.  -- how it worked?  So if we wanted
3    to take a look at your hours, let's say, when
4    you were a first line supervisor, that record
5    would be somewhere in the computer or somewhere
6    in the plant; do you know either way?
7        A.  I would think -- I think those
8    records are maintained for a certain period of
9    time and then they are removed.  I'm not sure if
10    they are removed to an archive database, but I'd
11    been told once before that you could only, you
12    know, recall information for a certain period of
13    time.
14        Q.  I want to direct your attention to
15    the second page.
16        A.  Okay.
17        Q.  And just to make things easier it
18    looks like the base earning is listed first each
19    month, is listed it looks like middle of month
20    and end of the month.  Does that make sense to
21    you there?
22        A.  Are you referring to like July, I
23    think it looks like 847.70?
24        Q.  Let's look at August because I think

73 (Pages 289 to 292)

3

IN THE COURT OF COMMON PLEAS
FRANKLIN COUNTY, OHIO
- - -
Edith C. James,         :
        Plaintiff,    :
    vs.              :  Case No. 03CVH02-02213
Delphi Automotive       :
Systems, et al.,       :

        Defendants.   :

        - - -
DEPOSITION
of James Barr, a witness herein, taken before
me, Kendra E. Johnston, a Notary Public in and
for the State of Ohio, at the offices of Jones
Day, 41 South High Street, Columbus, Ohio, on
Wednesday, November 19, 2003, at 9:30 a.m.
        - - -


        Armstrong & Okey, Inc.
        185 South Fifth Street, Suite 101
        Columbus, Ohio  43215
        (614) 224-9481 - (800) 223-9481
        Fax - (614) 224-5724
        - - -

---

Wednesday Morning Session,
November 19, 2003.
- - -
STIPULATIONS
    It is stipulated by and between counsel
for the respective parties that the deposition
of James Barr, a witness herein, called by the
Plaintiff under the applicable Rules of Civil
Procedure, may be taken at this time and reduced
to writing in stenotypy by the Notary, whose
notes thereafter may be transcribed out of the
presence of the witness; and that proof of the
official character and qualification of the
Notary is waived.
        - - -

---

2

APPEARANCES:
    Cooper & Elliott
    By Sheila P. Vitale
    2175 Riverside Drive
    Columbus, Ohio  43221

        On behalf of the Plaintiff

    Jones Day
    By Jeffrey D. Winchester
    41 South High Street
    Suite 1900
    Columbus, Ohio  43215-6113

        On behalf of the Defendants.

        - - -

---

4

INDEX TO EXHIBITS
        - - -
Plaintiff Exhibits          Identified
O  Note and Personal Business Plan    56
P  Requisition          62
**Q  Organizational Announcement
     from Tom Green          82**

**R  Salaried Personnel Transaction    98**

**S  Info re Michael Waters       102**

        - - -

---

1 (Pages 1 to 4)

61

1   aware of training to make someone understand
2   that. So I was giving her that kind of
3   feedback. You know, I don't know how to train
4   somebody to follow up other than make sure you
5   follow up. Don't just leave voice mails and
6   wait for the return.
7       Q. Did you speak with Ms. James at all
8   about whether she was capable of performing all
9   of her job duties and responsibilities, such as
10  whether she was able to perform all the duties
11  and responsibilities of the education and
12  training duties that she had assumed along with
13  the salaried personnel duties and
14  responsibilities?
15      A. Well, the training piece of it
16  honestly was a minor part of the job. She was
17  having problems with some of the basics of her
18  main function, and so that was essentially the
19  focus. Does that answer your question?
20      Q. Did you have any discussions with
21  Ms. James about her being removed from the
22  position? And I'm talking about since you
23  became her supervisor and prior to her final
24  personal business plan review.

62

1       A. No.
2       Q. I'm going to show you what I've
3   marked as Exhibit P, and I'll let you know this
4   is another document produced by your counsel in
5   response to discovery requests. Do you
6   recognize this document?
7       A. This particular one? I mean, I
8   recognize the form.
9       Q. Okay. We'll start there. What is
10  this document in general, the form?
11      A. It looks like what we would call a
12  requisition.
13      Q. And is that a basic job type posting?
14      A. No. This would be a requisition
15  that we would use as an internal document to
16  order a person for an opening; get it approved,
17  I guess is the way to say it.
18      Q. Okay. So this form here would be
19  filled out, and then where would this form go
20  so that you would have approval?
21      A. It would be circulated to the people
22  that need to approve it for signature.
23      Q. Okay. So this would go then to, it
24  looks like, the divisional offices; is that

63

1   correct?
2       A. Yes. They would have to approve
3   it.
4       Q. Is this done for every position
5   that's posted or that needs filled within Delphi
6   Columbus?
7           MR. WINCHESTER: Now you're talking
8   salaried or both salaried and hourly?
9           MS. VITALE: Either salaried or
10  hourly.
11      A. If it's just a reassignment within
12  the plant, I don't believe that there is a
13  document like this that goes up for divisional
14  approval. I believe that if we're bringing
15  someone in either on a transfer or hiring, then
16  that's when this kind of a document would apply.
17      Q. Okay. So when this type document is
18  used, is there also a posting that goes out
19  within the plant itself?
20      A. Sometimes.
21      Q. Describe what you mean "sometimes."
22      A. Well, again, I guess it depends on
23  the circumstances, I guess, with the particular
24  position. Sometimes we post. Sometimes we

64

1   don't. Sometimes we don't post if we are going
2   to take someone for a developmental reason,
3   we're going to put them in this role for
4   development purposes. We're not going to post
5   that and have everybody put in for it like they
6   have a shot when we really need right now to
7   give this person a developmental opportunity.
8   So I -- sometimes we do, sometimes we don't. It
9   depends on the situation.
10      Q. Okay. And this form, Exhibit P, is
11  also used when you are moving or requesting
12  someone to come from another plant; is that
13  correct?
14      A. Yeah, I -- I believe the right
15  answer is if I'm going to bring somebody into
16  the plant from the outside, whether that be from
17  a hire or from a transfer, then you're going to
18  have something like this.
19      Q. Okay. Did you fill this form out?
20      A. No.
21      Q. Have you ever seen this form before?
22          MR. WINCHESTER: You mean the
23  contents of the form?
24          MS. VITALE: Yes.

16 (Pages 61 to 64)

65

1   A. Not that I recall.
2   Q. Did you know on December 1st, 2001,
3 that Ms. James was going to be replaced?
4   A. There was discussion about the
5 problems that Edith was having and that it was
6 going to have to be addressed, so, yes, it was
7 being talked about.
8   Q. And who were these discussions with?
9   A. Well, you know, I guess from the
10 interested parties, it would have been from the
11 production -- it would have been from the top
12 managers of the plant, you know, the plant
13 manager, the production manager, the director of
14 human resources, at the divisional level. It
15 was being discussed by those people.
16   Q. Were you included in those
17 discussions?
18   A. Yeah, I was aware of it.
19   Q. So it was the plant manager, the
20 production manager, divisional person was
21 involved?
22   A. Director, yes.
23   Q. And yourself?
24   A. Yes.

66

1   Q. Anyone else?
2   A. There could have been other people
3 at the division discussing it.
4   Q. Do you know if Ms. James was aware
5 of any of these discussions back in December?
6     MR. WINCHESTER: Objection. Calls
7 for speculation.
8   A. No, I don't know.
9   Q. Did you talk to Ms. James about this
10 in December?
11   A. No. I think I said that prior to
12 the personal business plan discussion, I had not
13 talked to her about removing her.
14   Q. Did you talk to her at all about the
15 possibility that she may be removed?
16   A. No.
17   Q. Do you know who filled Exhibit P out?
18   A. I do not.
19   Q. Do you recall if you directed
20 anybody to fill this form out?
21   A. I did not.
22   Q. Do you know whether or not Ms.
23 James' position was posted within Delphi
24 Columbus?

67

1   A. I don't recall.
2   Q. Were there any discussions about
3 bringing somebody in from either another plant
4 or outside of the Delphi Columbus plant to fill
5 Ms. James' position prior to you discussing Ms.
6 James' position -- prior to your discussion with
7 Ms. James during her final personal business
8 plan review?
9   A. Well, when there are discussions
10 about transferring her to another position, you
11 naturally need to decide, you know, how you're
12 going to replace her, so I would say yeah, there
13 were discussions about what would we do.
14   Q. Do you know when it was decided that
15 Michael Waters would replace Ms. James?
16   A. That's -- a point in time, no, I do
17 not know. I just know that it's another -- it
18 was an issue that was discussed because there
19 was this divisional involvement in this
20 particular case, that, you know, it was being
21 discussed by a number of people that I
22 indicated. I don't recall exactly when the
23 decision was made to transfer her to her
24 previous position of manufacturing adviser.

68

1   Q. Do you recall when the decision was
2 made to bring Mike Waters into the Columbus
3 facility?
4   A. Oh. Well, no, I don't.
5   Q. Do you recall if that was before Ms.
6 James' final evaluation on her personal business
7 plan?
8     MR. WINCHESTER: Objection. The
9 witness has just said he doesn't know when the
10 decision was made. Go ahead.
11   A. No.
12   Q. So you don't know if it was made
13 before or after you discussed Ms. James' final
14 personal business plan evaluation?
15   A. No, I do not.
16   Q. Do you have any knowledge as to why
17 on Exhibit P the position code is listed as 7P21?
18   A. I didn't fill the form out, so I
19 guess I don't know why they put 7P21 there.
20   Q. Do you know why the position title
21 is Sr., which I'm assuming is Senior, Salaried
22 HRM Rep?
23   A. I guess my answer has to be the
24 same. I did not fill the form out and had no

17 (Pages 65 to 68)

89

1    understanding. Did somebody tell you that or
2    are you just assuming?
3        A.   I would have -- I guess I would have
4    been aware if he was being trained. What he was
5    doing was transitioning out of his old role and
6    getting moved. If there was training, it would
7    have -- I would have seen it on his personal
8    business plan under the training record, and
9    there isn't any there, so he didn't get any
10   training.
11       Q.   So based on what you said, is all
12   training that a person would undergo, you know,
13   at Delphi, any Delphi employee, is that all in
14   their training records?
15       A.   It should be. You know, and I'm
16   talking about formal training.
17       Q.   So there could be informal training
18   that wouldn't show up on those records?
19       A.   That's true.
20       Q.   Do you know if Mr. Waters had any
21   informal training?
22           MR. WINCHESTER: Specifically during
23   that transition period that you're talking
24   about?

90

1            MS. VITALE: Right.
2        A.   Informal meaning on the job, figure
3    it out, ask questions, get with who you need to
4    get to, yes.
5        Q.   Do you know if he had any informal
6    training by shadowing a person in any Delphi
7    plant, any HR person at any other Delphi plant,
8    prior to his arriving to Columbus and during
9    that transition period?
10       A.   I don't believe so.
11       Q.   Is it possible he could have, you
12   just may not know?
13       A.   Well, I don't want to say it's not
14   possible, but I don't believe it is.
15       Q.   The education and training
16   responsibilities held by or assumed by Ms. James
17   when she was in the position, have those duties
18   and responsibilities been moved to any other
19   position?
20       A.   Yes.
21       Q.   When were the training and education
22   responsibilities moved to another position?
23       A.   Well, it was actually in conjunction
24   with Mike Waters coming on board. We assigned

91

1    the training coordination role to another
2    employee in addition to her normal full-time
3    assignment.
4        Q.   Who did those job duties go to?
5        A.   Her name is Pat Scott.
6        Q.   And what's her position?
7        A.   She's our -- she's in the quality
8    department, and she is our QS 9000 coordinator
9    and internal auditor.
10       Q.   Do you know if she has an assistant
11   or clerk or someone who helps her input training
12   records into the computer program?
13       A.   She does not have an assistant that
14   I'm aware of. She -- it should be understood,
15   though, that the role of education and training,
16   since we are a union facility, we have a -- it's
17   called a joint position, and there is a
18   full-time hourly counterpart that's assigned to
19   the education and training coordination role
20   that's there available, so he's still there.
21       Q.   Do you know if Pat Scott, who
22   assumed the education and training
23   responsibilities, has she put together any
24   training for salaried personnel?

92

1        A.   Designed it, developed it?
2        Q.   Right.
3        A.   I don't believe so. That's not
4    typically what the role education and training
5    coordinator does. It is really to facilitate
6    the training in the plant, to identify some
7    training, and they do very little training
8    themselves, if any. They might participate in
9    some training from time to time, but it's not
10   essentially what the role is about.
11       Q.   You indicated earlier that the
12   decision to move the training and education
13   responsibilities was made about the time when
14   Mike Waters came on board the Columbus
15   facility. Who made that decision to remove the
16   education and training responsibilities?
17       A.   There was a number of people
18   involved, and it was essentially the same people
19   that were involved in reviewing the role
20   overall. It would have been Mark Lewis, the
21   director of human resources from the division.
22   It would have been input from the plant top
23   leadership as well.
24       Q.   Were you also involved in that

23 (Pages 89 to 92)

97

1  those duties were a part of that role because,
2  you know -- I became aware that they were while
3  I was still supervisor of labor relations, but
4  whether it was true that they were always part
5  of the role or not, I don't know.
6      Q.  So you don't know if Mr. Cerny had
7  any education and training responsibilities?
8      A.  It was my impression that he didn't,
9  but --
10     Q.  Okay.  And do you know whether or
11 not Ms. James' position in HR was posted at the
12 Columbus facility?
13     A.  Which --
14     Q.  That her position that she held
15 within HR, do you know if that position was ever
16 posted for a replacement or someone to fill Ms.
17 James' position?
18     MR. WINCHESTER:  In the Columbus
19 facility?
20     MS. VITALE:  Right.
21     A.  When she was being reassigned?
22     Q.  Right.
23     A.  I don't recall it being posted.
24     Q.  And you're Mr. Waters' supervisor;

98

1  is that correct?
2      A.  Yes.
3      Q.  Do you know whether Mr. Waters
4  received a promotion when he assumed his HR
5  position in the Columbus facility?
6      A.  Yes.  That's indicated in the
7  announcement.
8      Q.  Do you know who made that decision
9  that Mr. Waters would receive a promotion?
10     A.  No, I don't.
11     Q.  It wasn't you then?
12     A.  No.
13     Q.  I'm going to show you what's been
14 marked as Plaintiff's Exhibit R.  Do you
15 recognize this exhibit?
16     A.  I've seen a form like this before.
17     Q.  Did you see this salaried personnel
18 transaction for Mr. Waters before?
19     A.  I don't believe so.
20     Q.  And at the bottom of the page, there
21 are numerous signatures.  Are any of those
22 yours?
23     A.  No.
24     Q.  Based on this document, with

99

1  approvals and authorizations signed on January
2  9th, 2002, does it refresh your recollection at
3  all as to whether you knew that Mr. Waters was
4  selected to fill Ms. James' position as of
5  January 9th, 2002?
6      A.  No.
7      Q.  And on this salaried personnel
8  transaction form for Mr. Waters, it indicates
9  that his job title is Supv., Human Resources, on
10 the right-hand column, middle.  It says
11 "Promotion - bona fide."
12     A.  Yeah.
13     Q.  And then beneath that, is that his
14 job title?
15     A.  I can't -- I don't know.  That's not
16 how he's referred to and that's not -- and he's
17 not the supervisor of human resources.  I
18 can't -- I don't know.
19     Q.  Okay.  And I'll just relate to you
20 that this was actually produced to us by your
21 counsel in response to a discovery request.
22     In your position, do you normally go
23 through salaried personnel transactions for
24 employees, or is that something more that the

100

1  salaried human resource representative would
2  take care of?
3      A.  Between the salaried human resource
4  representative and the division, that would be
5  handled, the mechanics of it.  Typically I get
6  involved with an approval.
7      Q.  So the only time you would see it
8  would be for an approval?
9      A.  Right.
10     Q.  Do you know why your approval is not
11 on this document for Mr. Waters?
12     MR. WINCHESTER:  Objection.  Calls
13 for speculation.
14     A.  No, I don't know why.
15     Q.  Within the Columbus Delphi facility,
16 do you normally sign an approval for any
17 promotions, or if somebody comes into the
18 Columbus facility as a new employee, do you
19 normally sign and approve these personnel
20 transactions?
21     A.  No, I normally don't.  The approval,
22 in fact, is -- the whole system now is
23 electronic, so the approval process isn't like
24 this, but prior to that, I did not typically

25 (Pages 97 to 100)

3

```
 1        IN THE COURT OF COMMON PLEAS
 2           FRANKLIN COUNTY, OHIO
 3                    - - -
 4   Edith C. James,        :
 5        Plaintiff,   :
 6        vs.          :  Case No. 03CVH02-02213
 7   Delphi Automotive    :
     Systems, et al,
 8
         Defendants.  :
 9
10                    - - -
11          DEPOSITION
12   of Frank Cerny, a witness herein, taken before
13   me, Kendra E. Johnston, a Notary Public in and
14   for the State of Ohio, at the offices of Jones
15   Day, 41 South High Street, Columbus, Ohio, on
16   Friday, November 7, 2003, at 9:30 a.m.
17                    - - -
18
19
20
21        Armstrong & Okey, Inc.
          185 South Fifth Street, Suite 101
22        Columbus, Ohio  43215
          (614) 224-9481 - (800) 223-9481
23        Fax - (614) 224-5724
24                    - - -
```

2

```
 1   APPEARANCES:
 2        Cooper & Elliott
          By Sheila P. Vitale
 3        2175 Riverside Drive
          Columbus, Ohio  43221
 4
               On behalf of the Plaintiff
 5
          Jones Day
 6        By Jeffrey D. Winchester
          41 South High Street
 7        Suite 1900
          Columbus, Ohio  43215-6113
 8
               On behalf of the Defendants
 9
10                    - - -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

3

```
 1              Friday Morning Session,
 2              November 7, 2003.
 3                    - - -
 4              STIPULATIONS
 5        It is stipulated by and between counsel
 6   for the respective parties that the deposition
 7   of Frank Cerny, a witness herein, called by the
 8   Plaintiff under the applicable Rules of Civil
 9   Procedure, may be taken at this time and reduced
10   to writing in stenotypy by the Notary, whose
11   notes thereafter may be transcribed out of the
12   presence of the witness; and that proof of the
13   official character and qualification of the
14   Notary is waived.
15                    - - -
16
17
18
19
20
21
22
23
24
```

4

```
 1              INDEX TO EXHIBITS
 2                    - - -
 3   Plaintiff Exhibits           Identified
 4   A  Employment history           8
 5   B  Job description             18
 6   C  Offer letter                20
 7   D  Posting                     44
 8   E  Salaried Personnel Rep
        job description             58
 9
     F  Career Path Model           88
10
     G  HR Staffing Document        114
11
12                    - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

1 (Pages 1 to 4)

13

1  she come in the plant. Maybe '99. I'm just
2  guessing. I'm not sure.
3      Q.  And just so I understand, the
4  supervisor over you was the HR supervisor?
5      A.  Personnel director.
6      Q.  Okay. And as a supervisor in your
7  position as salaried personnel administration,
8  did you oversee other employees?
9      A.  Yes.
10     Q.  How many employees were you in
11  charge of?
12     A.  That varied over the years, but when
13  I retired, one.
14     Q.  And when you say it varied over the
15  years, how many was the most that you supervised
16  at one time?
17     A.  Directly supervised four, and then
18  was responsible for -- because there were people
19  that then worked for people who worked for me --
20  probably another dozen or 15, something like
21  that.
22     Q.  And when did it change from you
23  supervising four people directly to only one
24  person?

14

1      A.  That was a gradual thing too. I'm
2  going to say -- I'm not exactly sure, but it's
3  probably '97, '98, somewhere in there, '99. I'm
4  not sure. But it wasn't directly from four to
5  one. It was -- you know, there were lesser
6  numbers in between there too.
7      Q.  Okay. Do you know why the number of
8  people you supervised gradually went down from
9  four to one?
10     MR. WINCHESTER: Objection. Calls
11  for speculation. Go ahead and answer.
12     A.  Consolidation of jobs or the plant
13  executives determined that certain functions
14  should be handled in certain areas or by
15  different supervisors or what have you;
16  reduction of employees, that kind of thing.
17     Q.  Was there a continual reduction of
18  employees during the time that you were at
19  Delphi?
20     A.  I'm not sure "continual" is the
21  right word, but there was -- yeah, there was a
22  reduction of employees, head count reductions
23  over the years, yes.
24     Q.  And at the time you were leaving

15

1  Delphi, was there still a reduction of employees
2  going on?
3      A.  Yes.
4      Q.  Do you know why they were trying to
5  reduce the number of employees?
6      MR. WINCHESTER: Objection. Calls
7  for speculation. Go ahead.
8      A.  To the best of my knowledge, cost
9  cutting kind of things, like most companies.
10     Q.  Going back, in your position as
11  supervisor of salaried personnel, did you
12  receive performance reviews?
13     A.  Yes.
14     Q.  And, just generally, how was your
15  performance reviewed? What was it like in that
16  position?
17     A.  You mean what kind of -- I guess I'm
18  not sure I understand.
19     Q.  What kind of reviews did you get?
20  Were they, you know, you met expectations or you
21  met the job --
22     A.  Generally above expectations or
23  highly effective.
24     Q.  Did you receive any performance

16

1  reviews then from Loretta Woolridge?
2      A.  Yes.
3      Q.  Did she go over your performance
4  reviews with you?
5      A.  Yes.
6      Q.  And how were those reviews? The
7  same? Highly effective?
8      A.  Yes.
9      Q.  What were your job duties as the
10  supervisor of salaried personnel administration?
11     A.  Many and varied. I was responsible
12  for administering the salary policy provisions
13  that applied to all the salaried employees in
14  the plant. I was responsible for the hiring, I
15  guess you would say, and firing of salaried
16  employees; administering the merit plan;
17  administering the EEO plan, the affirmative
18  action plan; assisting employees with questions
19  concerning some benefit-related kinds of
20  activities. I supervised an employee. I guess
21  that's probably generally the highlights,
22  anyway, of my job. About a million other
23  things, but go ahead.
24     Q.  You supervised one employee; right?

Armstrong & Okey, Inc. Columbus, Ohio (614) 224-9481

17

1   A.  When I retired, yes.
2   Q.  Who was that employee?
3   A.  Marsha Brown.
4   Q.  And what was her position?
5   A.  She was a salaried personnel
6   representative.
7   Q.  And I know you've listed several job
8   duties that you had.  Did you perform any
9   training in your job duty?
10   A.  Yes, as it related to salaried
11   personnel, the salaried personnel areas or
12   functions related thereto.
13   Q.  So when you performed training, was
14   it like a training seminar that you would put
15   together or --
16   A.  They were training sessions that,
17   for example, if the merit plan information
18   needed to be disseminated among the salaried
19   employees, then I would usually conduct those
20   training sessions.
21   Q.  So the training that you performed
22   was more as to explaining the, you know, plans
23   or salary issues to the employees; is that
24   correct?

18

1   A.  Yes.
2   Q.  You didn't do training as to, you
3   know, how to use the machines or Team Delphi
4   trainings?
5   A.  No.
6   Q.  I'm going to show you what's been
7   marked as Exhibit B.  Could you look over that
8   for me and tell me what that is?
9   A.  Well, this is the job description
10   for my position, Supervisor, Salaried Personnel
11   Administration.
12   Q.  And it shows a code of 7P21; is that
13   correct?
14   A.  Yes.
15   Q.  Could you explain for me first what
16   a 7P21 is?
17   A.  Again, the 7 portion of that is the
18   level; the P is a designation for the area of
19   work, and P in this case refers to personnel;
20   and then the 21 is just a particular number
21   associated with this job.  Whoever created these
22   documents numbered the various jobs by a
23   numbering system, so that was the number given
24   to this job.

19

1   Q.  So you understood then the
2   supervisor, salaried personnel administration,
3   was a 7P21 job; is that correct?
4   A.  Yes.
5   Q.  And I'm going to go through some of
6   the job duties here with you.  You indicated
7   that you participated in the selection of new
8   employees, and that would be part of the hiring
9   and firing that you had indicated earlier; is
10   that correct?
11   A.  Yes.
12   Q.  And how did you participate in the
13   selection of new employees?  Did you do the
14   interviewing?
15   A.  Some, yes.  We did recruiting where
16   we would go do college recruiting or on one
17   occasion we recruited military personnel.  We
18   may -- in fact, we did a job fair where we had
19   applicants come to the plant, and I participated
20   in interviewing some of the people, and then
21   other times I would just kind of coordinate the
22   activity after we got the candidates lined up.
23   Q.  Did you also then send out letters
24   to inform new employees that they were hired by

20

1   Delphi?
2   A.  Yes.
3   Q.  Were you the only person in the
4   plant that had that responsibility of informing
5   new hires that, you know, "Welcome aboard;
6   you've been hired by Delphi," sending those kind
7   of correspondence out?
8   A.  Yes, and with the assistance of
9   Marsha Brown.
10   Q.  Did Marsha Brown send out letters or
11   did they always go out under your signature?
12   A.  Under my signature.
13   Q.  I'm going to show you what's been
14   marked as Exhibit C, and could you just tell me
15   if this is an example of one of the types of
16   letters that you would have sent out?
17   A.  Yes.
18   Q.  So this is pretty much a standard
19   type of letter that you would send out to new
20   hires; is that correct?
21   A.  Yes.
22   Q.  Did you have any other documents or
23   any other explanations for this first --
24   explanation of first job, "Participates in the

45

1    Q.   Other than putting this posting
2    together, what else did you do in selecting the
3    person that would replace you?
4    A.   We just coordinated the collection
5    of the applicants for the posting and submitted
6    those then to my supervisor.
7    Q.   Did you do any interviews?
8    A.   No.
9    Q.   Did you determine which people that
10   applied were qualified for the position?
11   A.   No.
12   Q.   And when you put this posting
13   together, you understood that the job would be
14   for Supervisor of Salaried Personnel Adm?
15   And "Adm" I'm assuming means Administration;
16   correct?
17   A.   Yes.
18   Q.   So you understood that you were
19   posting for your position; is that right?
20   A.   Yes.
21   Q.   And it was going to be a position
22   code 7P21; correct?
23   A.   Correct.
24   Q.   And the key elements that are

46

1    listed, those appear to be pretty much all the
2    job duties that we went through; is that
3    correct?
4    MR. WINCHESTER:  Do you want to give
5    him a moment to compare?
6    MS. VITALE:  Sure.
7    MR. WINCHESTER:  And you're
8    referring to Exhibit B; is that correct?
9    MS. VITALE:  Yes.
10   A.   Exhibit B doesn't have the EEO and
11   AAP responsibilities on it.  It looks like
12   pretty much the same except for the EEO and AAP.
13   Q.   And we had discussed earlier that
14   those were two additional job duties that you
15   had that weren't listed on the Exhibit B; is
16   that correct?
17   A.   Correct.
18   Q.   And you understood that the key
19   elements as they are listed on this Exhibit D
20   were the job duties that you had in the position?
21   A.   Yes.
22   Q.   Just for example, where it says
23   "trains, develops and evaluates employees,"
24   those were the same job duties that you

47

1    explained to me earlier; is that correct?
2    A.   Yes.
3    Q.   You didn't mean that to be education
4    training or anything like that; is that correct?
5    A.   That's correct.
6    Q.   And also on this Exhibit D, there's
7    a note listed.  It says "Applications received
8    by the Salaried Personnel Office in response to
9    this notice will be considered only for this
10   position."  What was your understanding of what
11   that note meant?
12   A.   That this notice is seeking
13   applicants only for this job.
14   Q.   Okay.  So if you put an application
15   in under this posting, you wouldn't be
16   considered for whatever other jobs were
17   available?
18   A.   That's correct.
19   Q.   Do you understand that or did you
20   know that the person that replaced you was not
21   going to be known as the Supervisor of Salaried
22   Personnel?
23   MR. WINCHESTER:  Can we get that
24   clear as to time frame, Counsel?

48

1    Q.   Let's just start when you posted
2    this Exhibit D, did you have any knowledge that
3    the person that would be replacing you would not
4    be known as Supervisor, Salaried Personnel
5    Administration?
6    A.   No.
7    Q.   Did you sometime after that learn
8    that the person that was going to be replacing
9    you would not be the supervisor of salaried
10   personnel administration?
11   A.   I learned after that it was going --
12   my replacement was going to remain a 6 at that
13   point.
14   Q.   When did you learn that?
15   A.   Good question.  It was shortly
16   before, but I don't -- I don't remember -- I
17   couldn't tell you exactly when it was.
18   Q.   When you indicated it was shortly
19   before, was that shortly before Ms. James
20   accepted the position?
21   A.   Yes.  Before she accepted the
22   position?
23   Q.   Yes.
24   A.   No.

12 (Pages 45 to 48)

97

1    A.  The best I can recall, I believe it
2  was when I found out that Mike Waters was coming
3  to the plant to replace her.
4    Q.  When you were training Ms. James,
5  did you train her on the education and training
6  portion that she would be assuming or just as to
7  your job duties and responsibilities?
8    A.  Just my job duties.
9    Q.  Do you recall what training you
10 provided Ms. James?
11   A.  Well, I tried to hit on essentially
12 all the topics we've discussed.  We spent
13 considerable amount of time on the merit
14 program, and we went over the policy manual.  We
15 looked at the EEO function, the affirmative
16 action plan function, the PRISM system, the
17 computer system.  She had to obviously know how
18 to get into that and look at and update records
19 and so forth in the system.  Went over ad hoc
20 reports that I used on a regular basis to
21 provide information to the staff and so forth.
22 So soup to nuts; it was everything.
23   Q.  So you tried to touch on every
24 aspect of your job?

98

1    A.  As best I could.
2    Q.  When you left and Ms. James took
3  over the position on her own in February of
4  2001, did you feel comfortable that you had
5  shown her enough of the job that she could
6  perform your job duties and responsibilities?
7    A.  As comfortable as I could given the
8  amount of time we had and her level of
9  understanding.
10   Q.  How much time do you recall spending
11 with Ms. James?
12   A.  I'm thinking she came -- again, this
13 is -- I'm not exactly sure when she came, but I
14 think it was like at the beginning of the year,
15 in January, so I think we had that month.
16   Q.  So three to four weeks of training?
17   A.  Right.  But she wasn't with me at
18 all times.
19   Q.  Where else was Ms. James?  Do you
20 recall?
21   A.  Well, she had to do some training on
22 her job, and she also had to spend some time
23 learning the training function.
24   Q.  Okay.  So her time was split between

99

1  training someone for her position as well as
2  learning your job duties as well as learning the
3  education and training job duties?
4    A.  Correct.
5    Q.  Do you think it would be difficult
6  for a new person to assume both the -- to assume
7  your job duties and responsibilities, a person
8  who's new to the HR department, as well as the
9  education and training responsibilities?
10   A.  I guess it depends on the person
11   Q.  Somebody who's just new to HR, who's
12 not been in the HR department.
13   A.  It would be more difficult if you're
14 new, yeah, if you have not been an HR person,
15 yes.
16   Q.  Do you think Ms. James could perform
17 the job duties and responsibilities of your
18 prior job?
19   A.  I think she could grow into it, but
20 it's hard to answer that question.
21   Q.  So is --
22   A.  She was a relatively new employee,
23 so --
24   Q.  But it was a position -- essentially

100

1  the supervisor, salaried personnel position was
2  a position that you kind of grew into; is that a
3  correct understanding?
4    A.  Well, depending again on the person
5  who was selected for the job.  If you had an
6  experienced person, they wouldn't need to do as
7  much growing as somebody who was new to it.
8    Q.  When you assumed the position, did
9  you kind of grow into the position?
10   A.  To a lot lesser extent than somebody
11 who would be new because I had been in the
12 organization; I knew the people; I knew how
13 things operated as an organization; I was very
14 familiar with that.  I had been in HR, in
15 personnel, for a number of years prior to that,
16 so I didn't need as much growing as some other
17 people might have.
18   Q.  But you understood that there was a
19 learning curve to the position?
20   A.  Every job -- I don't care if you've
21 been there for 30 years or whether you've been
22 there for two years, every job has a learning
23 curve to it.
24   Q.  You testified earlier that from time

25 (Pages 97 to 100)