# EXHIBIT C

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

F I L E D

CLERK OF COURTS

| | | |
|---|---|---|
| Edith C. James, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 04AP-215 |
| v. | : | (C.P.C. No. 03CVH02-02213) |
| Delphi Automotive Systems, | : | (REGULAR CALENDAR) |
| Loretta Woolridge and James R. Barr, | | |
| | : | |
| Defendants-Appellees. | | |
| | : | |

---

## O P I N I O N

Rendered on October 14, 2004

---

*Cooper & Elliott, LLC, Rex H. Elliott, Charles H. Cooper, Jr., Aaron D. Epstein* and *Sheila P. Vitale*, for appellant.

*Jones Day, Robert S. Walker* and *Jeffrey D. Winchester*, for appellees.

---

APPEAL from the Franklin County Court of Common Pleas.

BOWMAN, J.

{¶1}    Plaintiff-appellant, Edith C. James ("James"), appeals from a summary judgment granted by the Franklin County Court of Common Pleas in favor of defendants-appellees, Delphi Automotive Systems, Loretta Woolridge and James R. Barr (collectively "Delphi"), in this action alleging employment discrimination.

{¶2}    James was first employed by Delphi as a supervisor on the production floor, but sought and received what she viewed as a promotion to the human resources department.    Given a poor performance review, James was moved back to her production job, but alleges she began to have health problems which she attributed to job-related stress. James ultimately resigned and, in February 2003, initiated this action for race and gender discrimination, wrongful discharge in violation of public policy, and intentional infliction of emotional distress. The trial court granted summary judgment in favor of appellees. The court reasoned that, because James did not provide evidence of comparable non-protected persons who were treated more favorably and did not present evidence that she was subjected to an adverse employment action, she could not establish a prima facie case of discrimination by Delphi. The court additionally found that James had not established she was constructively discharged, that a public policy violation was supported by the facts, or that Delphi's actions constituted intentional infliction of emotional distress.

{¶3}    James now assigns the following as error:

> [I.] The Trial Court Erred In Granting Summary Judgment As To Appellant's Race and Gender Discrimination Claims.

> [II.] The Trial Court Erred When It Granted Summary Judgment On Ms. James' Public Policy Claim.

> [III.] The Trial Court Erred When It Granted Summary Judgment On Ms. James' Claim for Intentional Infliction of Emotional Distress.

{¶4}    James' first assignment of error charges that the trial court erred in granting summary judgment because genuine issues of material fact exist concerning her race and gender discrimination claim.

{¶5}    Appellate review of summary judgment motions is de novo. *Helton v. Scioto Cty. Bd. of Commrs.* (1997), 123 Ohio App.3d 158, 162. "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court." *Mergenthal v. Star Banc Corp.* (1997), 122 Ohio App.3d 100, 103. Civ.R. 56(C) provides that summary judgment may be granted when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made. *State ex rel. Grady v. State Emp. Relations Bd.* (1997), 78 Ohio St.3d 181, 183.

{¶6}    When a motion for summary judgment has been supported by proper evidence, a non-moving party may not rest on the mere allegations of his pleading, but his response, by affidavit or as otherwise provided in Civ.R. 56, must set forth specific facts showing that there is a genuine triable issue. Civ.R. 56(E); *Jackson v. Alert Fire & Safety Equip., Inc.* (1991), 58 Ohio St.3d 48, 52. To establish the existence of a genuine issue of material fact, the non-moving party must do more than simply resist the allegations in the motion. Rather, that party must affirmatively set forth facts which entitle him to relief. *Wing v. Anchor Media, Ltd. of Texas* (1991), 59 Ohio St.3d 108, 111. If the non-moving party "does not so respond, summary judgment, if appropriate, shall be entered against the party." Civ.R. 56(E).

{¶7}    In a case alleging employment discrimination, the plaintiff bears the initial burden of either presenting direct evidence of discrimination, or of establishing a prima facie case of discrimination indirectly by following the standard set forth in *McDonnell*

*Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817; and *Byrnes v. LCI Communication Holdings Co.* (1996), 77 Ohio St.3d 125. *Peters v. Ohio Dept. of Nat. Resources,* Franklin App. No. 03AP-350, 2003-Ohio-5895. In order to establish a prima facie case, the plaintiff must demonstrate that: (1) she is a member of a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) either that she was replaced by someone outside the protected class or that a comparable, non-protected person was treated more favorably. See, e.g., *Samadder v. DMF of Ohio, Inc.*, 154 Ohio App.3d 770, 2003-Ohio-5340, at ¶35; *Ferguson v. Lear Corp.*, 155 Ohio App.3d 677, 2003-Ohio-7261, at ¶17, citing *Brewer v. Cleveland Bd. of Edn.* (1997), 122 Ohio App.3d 378, 385; *Plumbers & Steamfitters Joint Apprenticeship Commt. v. Ohio Civ. Rights Comm.* (1981), 66 Ohio St.2d 192, 197.

{¶8}    Once the plaintiff establishes a prima facie case, the burden shifts to the employer to set forth a non-discriminatory reason for the discharge. If the employer does so, the burden then shifts back to the plaintiff to demonstrate, by a preponderance of the evidence, that the legitimate, non-discriminatory reason was merely a pretext for discrimination. Id.

{¶9}    The parties do not dispute that, as an African-American female, James is a member of a protected class. Nor does either side argue that James was not qualified for the position, although Delphi suggests that other more qualified employees who were not in a protected class were passed over for this position and that its expectation was that, although James was not the company's first choice and admittedly lacked experience, she would grow into the job. The trial court found that James submitted no evidence that comparable, non-protected persons were treated more favorably, and

also determined that James had not shown she suffered from any adverse employment actions. Thus, the court concluded James' evidence failed to make out a prima facie case of discrimination.

{¶10} In her deposition, James testified that she has a bachelor's degree in psychology and a master's degree in art education. She indicated that she had had a variety of different jobs before coming to Delphi, having worked in psychological counseling, as a social worker, as a university registrar, in sales and customer service, and in human resources. James was hired by Delphi in May 1999, as a 5th level Manufacturing Advisor, but then was promoted to a 6th level Production Advisor, working first shift and supervising about 25 to 30 employees. James said she first learned of the job opening in human resources in November 2000, when she read a job posting expressly indicating that the position of Supervisor of Salaried Personnel Administration was available and was designated as a level 7 position. This position had been held by Frank Cerny, who was retiring. Cerny testified that when he informed his supervisor, Woolridge, the Human Resources Director, that he would be retiring, he was told to prepare the posting, and that he did so based upon his job duties and position level at the time.

{¶11} James testified that Woolridge interviewed her for the job and that, during the interview, Woolridge confirmed that it was Cerny's position that was being filled. James did not ask and Woolridge did not volunteer the pay level for the position during the interview. James testified that Woolridge also did not mention that additional duties were being added to the job description. According to James, it was only after James accepted the job offer and began training with Cerny that she learned (from Cerny) that

job duties of two other employees were being added to the job, that the job would no longer involve a supervisory function, and that her pay level would not advance to 7 but would remain at 6.

{¶12} James asked Woolridge about changes in the position and Woolridge told her the company viewed this as a development opportunity, that it was felt that James was not quite ready for the position but that she might grow into it and that, as a result, a level 6 pay grade was appropriate. When Woolridge confirmed that the job had, in fact, been modified since its initial posting, and that James would be remaining at a level 6 and taking on the additional job duties previously performed by two other employees, Woolridge offered to permit James to return to the production floor in her previous capacity; however, James decided to go ahead and take the new position, believing that she could prove herself a success and advance to the level 7 pay grade.

{¶13} James testified that the job required her to work long hours, that she felt there were more tasks than she could accomplish given the time available for each task, and that, while she needed training to be more effective in the position, there was not enough time for her to obtain the help she needed. James reported to Woolridge and testified that, when she approached Woolridge about the need for more training, Woolridge would tell her this was not a good time, and that she could not be spared long enough to attend training. A performance review prepared by Woolridge indicated that, although James was not yet performing to company expectations, Woolridge was optimistic that James would continue to improve and grow into the job.

{¶14} In August 2001, Woolridge left the human resources department for another position at another Delphi facility. Her replacement, James Barr, prepared a

performance evaluation for James which was not so optimistic.  Where the previous report had indicated James was improving, and that some of the goals were on target, the new report by Barr noted many areas where James' goals had not been met, and noted that some of her deficiencies had resulted in critical tasks not being completed and some records being inaccurate.  James testified that, during this period, she felt overwhelmed by the number of tasks assigned her, but disagreed with Barr's assessment that she lacked a commitment to excellence, was not accountable for her work product, did not display an appropriate sense of urgency, and was not able to multi-task effectively.  James stated "I was certainly trying to prioritize between all three positions and make it happen," and that she was having some struggles with "being able to satisfy everybody at the same time." (James Depo. at 279.)

{¶15}  Frank Cerny testified in his deposition that he was surprised the education and training position was folded into his old job because he felt the additional work would be "a bit much." (Cerny Depo. at 51.)  In addition, Cerny was concerned that tasks formerly assigned to his assistant Marcia Brown were also being routed to James in the new post.  He expressed his concern in a discussion with Woolridge, who explained to him that the company was seeking a head count reduction and that the restructuring of his former position was for this reason.

{¶16}  Woolridge testified that, at the time of James' hiring, she was Plant Personnel Director.  When asked why she permitted Cerny to post the job as a level 7 supervisory position when she knew the company's intent was to add duties to the job and potentially have the person who filled the position remain at a level 6, she explained that she told applicants during the interview that the job had been reconfigured.  She

stated that there were 6 and 7 level employees who were interviewed, and that the interviews focused on discussing the job duties rather than the compensation. When asked why she considered James for the job, she stated she recognized that James would need to grow into the position, and that because of this she should remain at a level 6. Woolridge also said she explained to James that the job title was for a Salaried Personnel Representative rather than Salaried Personnel Administrator. Woolridge described a discussion she had with James when James confronted her after accepting the position and asked why she hadn't been told the job was not considered a level 7:

> She was very upset and I was too. I felt extremely badly that I had either not explained something so well or that had misread her body language and realized that I needed to be more specific at that point. And she persisted that, you know, This is what you posted. And I said, Edith, that job that you have today is not what we posted. I said, Ultimately, what we have is a nonsupervisory position and we placed a training role in there. I said, As far as the responsibilities, there's a tremendous amount of training you still have yet to go, you know, before you can start performing the duties that we haven't modified. And I said, If we have in any way misrepresented what you thought you were going to have, what you thought this job was going to be, I will give you the opportunity to exit out of it. * * *

(Woolridge Depo. at 107-108.) Woolridge denied not permitting James to seek training.

{¶17} Barr, Woolridge's replacement, testified that he himself had been a level 6 employee who had remained at level 6 when he was chosen to replace a level 7 employee. He stated his belief that Delphi employees commonly know that certain positions have a level 6 or level 7 pay range, but that when a lower level employee gets promoted to a position previously ranked at a higher level, he or she may not receive a higher level designation. He denied that James' performance problems stemmed from inadequate training, rather citing her inability to apply proper follow-up techniques, her

lack of responsibility for her work product, and her failure to timely file a critical report. He stated that, in his view, her return to the production floor had not been a demotion. Asked about the company's decision to hire Mike Waters, a white male, as James' replacement; to give Waters back the title Cerny had had of "Supervisor of Human Resources"; remove the extra duties of education and training; and return the job classification to level 7, Barr explained that he did not know why the job was again being called a supervisory position and that there was no significance to this designation. (Barr Depo. at 85.) He also stated that the division's Director of Human Resources and the plant's top leadership decided to move the education and training duties to another position in conjunction with Mike Waters being hired for the position, but Barr gave no explanation for this decision.

{¶18} Marcia Brown testified she had worked under Cerny as a level 6 Salaried Personnel Representative and had applied for Cerny's position at the same time that James did. Brown testified that Woolridge did not tell her during her interview that she was, in fact, not interviewing for the position as posted, nor did she learn that her own job was being fused with the posted position and that the new job title and pay level would be identical to her own. She also stated that she was not told that, if she were not selected for the job, she would be moved to another department. She stated she was surprised to learn later she had not interviewed for the job as posted and that, when she heard what tasks were being combined to form the job description, she felt that this would be too much work for any one person. She also testified that, in her observation, jobs at Delphi which were posted at level 7 remained level 7 positions no

matter who filled them. After James was chosen, Brown was moved to another department for several months until she retired.

{¶19} Reviewing this testimony, the trial court concluded that James did not show that comparable, non-protected persons were treated more favorably because the evidence regarding Cerny was that he had only achieved a level 7 pay grade after years of experience, and the evidence regarding Waters showed he had a business degree with a major in human resources management. Thus, the court held the circumstances of the two white males, who held the position both before and after James, were different from her own and so not comparable. However, we find any possible failure by James to demonstrate that Cerny and Waters were similarly situated does not defeat her claim, since she did adequately demonstrate that the person who replaced her (Waters) was not a member of the protected class. Thus, we disagree with the trial court that James' evidence failed to meet this prong of the *McDonnell Douglas* evidentiary framework.

{¶20} We also find that James presented sufficient evidence to raise a genuine issue of fact as to whether she was subjected to an adverse employment decision. On this issue, this court has stated:

> "The adverse action need not result in pecuniary loss, but must materially affect the plaintiff's terms and conditions of employment. * * * Factors to consider when determining whether an employment action was materially adverse include 'termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.' * * * Changes in employment conditions that result merely in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action." * * *

*Hart v. Columbus Dispatch/Dispatch Printing Co.*, Franklin App. No. 02AP-506, 2002-Ohio-6963, at ¶35, quoting *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 727.

{¶21} Delphi tries to downplay the effects of its decision to remove James from human resources and send her back to the production floor by presenting evidence suggesting that it did not consider moving her to human resources to have been a promotion, but, rather, a "development opportunity," that she did not receive an increase in pay, and that she did not have a supervisory role such as she had had while a Production Advisor. Delphi's witnesses also asserted that the actual job title—not Supervisor of Human Resources or Supervisor of Salaried Personnel Administration, but, rather, Salaried Personnel Representative—was not considered to be significant by Delphi management. Barr testified that, in his view, returning James to the production floor was not a demotion. (Barr Depo. at 81.)

{¶22} In contrast, several witnesses testified that the job as posted, Cerny's job, as a level 7 supervisory position located in the front office, and not on the production floor, was considered to be a promotion. Witnesses also noted that the change in the job description resulted in too many tasks being added to the job. At least one witness, Reginald Williams, testified that being moved to the front office was considered by Delphi employees to be a promotion, and that he considered his own move from Director of Education and Training to Production Supervisor, which occurred when the education and training function was tacked on to the job given James, to be a demotion.

{¶23} The cumulative effect of the business decisions surrounding James' move into and out of the human resources position leads us to the conclusion that James'

evidence at least raised a genuine issue of fact as to whether she suffered an adverse
employment action. Delphi combined three jobs in one, selected a person for the job
who had not previously worked in human resources for the company, gave that person
too many tasks to allow time for proper training, expected more work for less pay than
was given the previous job holder, eliminated from the position the incentives of a salary
increase and supervisory role, removed that person from the position without giving her
proper support, training or adequate time to grow into the job, returned her to her old job
and shortly thereafter gave her a less desirable shift, removed the extra tasks from the
human resources position before offering it to another employee who was not in a
protected class, and returned the position to the higher pay grade level when it was
given to the new employee. Taken alone, any one of these decisions might not be
viewed as adverse, but in concert they raise a question as to whether Delphi's motives
may have stemmed not from a legitimate business purpose but from a discriminatory
one.

{¶24} Addressing this evidence, the trial court was persuaded by evidence that,
when James returned to her position as production advisor, she remained at the same
pay level, and so concluded that James had not shown she suffered an adverse
employment action. However, our review of the evidence before the court indicates that
James was able to present sufficient evidence to raise a genuine issue of material fact
as to whether the circumstances surrounding her move back to the production floor
constituted an adverse employment action, and that more evidence was relevant to this
determination than simply whether the move involved a decrease in pay.

13

{¶25}  The trial court's decision also rejects James' argument that, because her

demotion resulted in various health problems which prompted her to resign from Delphi,

her evidence raised a genuine issue of fact as to whether she had been constructively

discharged.    According to the court, James failed to show that Delphi deliberately

created intolerable working conditions with the intention of forcing James to quit.  The

court was again persuaded by testimony of several witnesses indicating that Delphi did

not consider the move of James back to the production floor as a demotion

accompanied by a decrease in salary, and, therefore, the court found that James had

not raised a genuine issue of fact as to whether Delphi had caused intolerable working

conditions.

{¶26}  Regarding evidence necessary to prove constructive discharge, the Ohio

Supreme Court has stated:

> * * * [T]here is no sound reason to compel an employee to
> struggle with the inevitable simply to attain the "discharge"
> label.  No single factor is determinative.  Instead, a myriad of
> factors are considered, including reductions in sales territory,
> poor performance evaluations, criticism in front of co-
> employees,  inquiries  about  retirement  intentions,  and
> expressions of a preference for employees outside the
> protected group.   Nor does the inquiry change solely
> because an option to transfer is thrown into the mix, lateral
> though it may be.  A transfer accompanied by measurable
> compensation at a comparable level does not necessarily
> preclude a finding of constructive discharge.  Our review is
> not so narrowly circumscribed by the quality and attributes of
> the transfer option itself.  * * *

*Mauzy v. Kelly Services, Inc.* (1996), 75 Ohio St.3d 578, 589.

{¶27}  Despite statements by Delphi employees suggesting that there was no

intention to force James to quit, six weeks after moving her back to the production floor

the company decided to transfer her to another production advisor position requiring her

to work second shift.    James concluded that the transfer essentially signaled the
company's termination of her employment.    She decided she could no longer tolerate
her working conditions and that she needed to quit for the sake of her health.    In
addition, she testified, and at least one other witness confirmed, that employees on the
production floor viewed her return as a demotion.    She testified that:

> I was also very humiliated to know that at the time that Mr.
> Barr and I are discussing the change that a change of
> posting or a notice of announcement is being plastered
> throughout the plant. So by the time I walk back out to the
> plant I have innumerable people approaching me.    You
> know, I felt like that was certainly unjust.    I felt like I had
> been discriminated against, and I really didn't feel well with
> being there at that time.

(James Depo. at 310-311.)

{¶28}    James' evidence established that she is a member of a protected group,
that she was qualified for the job, and that she was replaced by a person outside a
protected class.    Her evidence also was sufficient to raise a genuine issue of fact as to
whether her move from the human resources department back to the production floor
constituted an adverse employment decision.    Thus, the trial court erred in determining
that she had failed to raise a genuine issue of fact regarding her prima facie case.

{¶29}    The second step the trial court should have taken was to determine
whether, in response to James' evidence, Delphi presented a legitimate non-
discriminatory reason for its actions.    *Samadder*, citing *Texas Dept. of Community
Affairs v. Burdine* (1981), 450 U.S. 248, 253.    Delphi explained, through deposition
testimony by Woolridge and Barr, that a company goal was to streamline where
possible in order to save money, thus, the decision was made to add the job duties of
two other positions to the position taken by James and to keep that job at a level 6.    In

her testimony, Woolridge denied refusing training opportunities to James, while Barr indicated that training was not James' problem, rather, it was poor performance related to her lacking follow through or being temperamentally unsuited to the position. Barr also denied that sending James back to the production floor was considered a demotion.    It was also Barr's view that Waters was more qualified for the position, having an educational background in human resources and coming from the human resources department of another division of the company.

{¶30}   These are all legitimate business reasons for Delphi's actions, but James' evidence provided an effective counter.   Deposition testimony established that Delphi may have had legitimate budgetary concerns prompting a decision to combine three jobs into one; however, after selecting James and telling her she would be given training and time to grow into the job, there was at least a question of fact whether Delphi management gave James enough training and time to meet their expectations.    In addition, although Barr stated James was not demoted when she was moved back to the production floor, there was contradictory evidence in the form of statements that employees generally felt that a move to the front office from the production area was a promotion, and that co-workers' response to news of James' move back indicated they felt she had been demoted.    Most persuasive was evidence that, once James was removed from the position, the extra tasks were also removed, and that although Waters, like James, was at level 6 prior to being offered the position, Waters, unlike James, was permitted to move up to level 7.   Finally, despite the company's explanation that Waters was preferred for the position because he was more qualified, the company reconfigured the position to give Waters fewer job tasks.    Based upon these

considerations, James' evidence raised a genuine issue of fact as to whether Delphi's stated legitimate business purposes for its actions were pretextual.

{¶31} Under this assignment of error, we conclude that summary judgment was inappropriate because James' evidence at least raised a genuine issue of fact as to the elements of her prima facie case, and because Delphi's stated purpose for its decisions, while legitimate, was adequately countered by James' evidence suggesting that the company's reasons were pretextual. Thus, we sustain James' first assignment of error.

{¶32} James' second assignment of error charges that the trial court erred in determining that James had not raised a genuine issue of fact supporting her public policy claim. According to James, Delphi violated public policy by withdrawing her promotion, revoking her pay raise, adding excessive job duties to the position after she took it, and replacing her with a white male who was given fewer job duties.

{¶33} In order to establish a claim for tortious violation of public policy, James must prove the following four elements: (1) a clear public policy manifested in a statute, regulation, or the common law; (2) that discharging an employee under circumstances like those involved would jeopardize the policy; (3) that the discharge at issue was motivated by conduct related to the policy; and (4) that there was no overriding business justification for the discharge. *Kulch v. Structural Fibers, Inc.* (1997), 78 Ohio St.3d 134, 151. The trial court determined that, in the absence of James' ability to establish grounds for relief by showing Delphi engaged in race and gender discrimination, James was unable to raise a genuine issue of fact regarding her public policy claim.

{¶34} Despite our conclusion that summary judgment for Delphi was in error on James' discrimination claims, the trial court properly rejected James' cause of action for

wrongful discharge in violation of public policy. This court has held that the remedies available in R.C. 4112.99, which generally provides that whoever violates R.C. Chapter 4112 is "subject to a civil action for damages, injunctive relief, or any other appropriate relief," are sufficient to provide complete relief to a damaged plaintiff. *Berge v. Columbus Community Cable Access* (1999), 136 Ohio App.3d 281, 306-307. Thus, James cannot successfully plead an alternative cause of action for wrongful discharge in violation of public policy where the basis for her claim is an alleged violation of R.C. 4112.02.[1] Because James has not met the requirements for an action for tortious violation of public policy, we find the trial court did not err in granting summary judgment on this claim, and so overrule James' second assignment of error.

{¶35} James' third assignment of error charges that the trial court erred in granting summary judgment to Delphi on James' claim for intentional infliction of emotional distress.

{¶36} In *Peitsmeyer v. Jackson Twp. Bd. of Trustees*, Franklin App. No. 02AP-1174, 2003-Ohio-4302, at ¶23, this court stated:

> To prevail on a claim for intentional infliction of emotional distress, appellant must demonstrate the following four elements: (1) the actor intended to cause emotional distress or knew or should have known that the actions would result in serious emotional distress; (2) the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it would be considered utterly intolerable in a civilized society; (3) the actor's actions were the proximate cause of appellant's injury; and (4)

---

[1] R.C. 4112.02 provides, in part:

**§4112.02. Unlawful discriminatory practices.**

It shall be an unlawful discriminatory practice:

(A) For any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

No. 04AP-215                                                                                        18

>           appellant suffered severe mental anguish. *Hanley v.*
>           *Riverside Methodist Hosp.* (1991), 78 Ohio App.3d 73, 82,
>           * * *; *Tackach v. Am. Med. Technology, Inc.* (1998), 128
>           Ohio App.3d 457 * * *.

{¶37}  The trial court based this conclusion on its belief that James had failed to

raise a genuine issue of fact supporting her race and gender discrimination claims.

Although we sustained James' first assignment of error, we nevertheless conclude that

summary judgment on the issue of intentional infliction of emotional distress was

appropriate. In *Peitsmeyer,* the plaintiff presented evidence that he was embarrassed

by the lack of respect shown him by former co-workers in emptying his office, and that

he was offended that he had to sort through personal items in front of co-workers and

had to retrieve some items from the trash. We held that the co-worker's conduct did not

rise to the level of outrageous conduct necessary to support a claim for intentional

infliction of emotional distress because "[t]o a reasonable extent, embarrassment and

humiliation are part of everyday life to which the law provides no remedy." Id. at ¶25.

Similarly, in the case at bar, the fact that James' co-workers were told of her move back

to the production floor at the same time she learned of it, and that she was subjected to

some taunting and negative comments upon her return to her old position, is not

conduct which rises to the level of outrageous, utterly intolerable, or beyond all possible

bounds of decency. Because James failed to present sufficient evidence supporting her

claim of intentional infliction of emotional distress so as to raise a genuine issue of fact,

the trial court did not err in granting summary judgment on this claim. Thus, we overrule

James' third assignment of error.

{¶38}  James' first assignment of error is sustained, her second and third

assignments of error are overruled, and the judgment of the Franklin County Court of

No. 04AP-215

Common Pleas is affirmed in part, reversed in part, and remanded for further proceedings in accordance with the opinion rendered herein.

*Judgment affirmed in part, reversed in part and cause remanded.*

PETREE and KLATT, JJ., concur.

_____