**Hearing Date and Time: November 30, 2006**
**at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)
Rachel S. Janger
Jessica Kastin (JK 2288)

GROOM LAW GROUP, CHTD
1701 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 857-0620
Lonie A. Hassel (LH 8805)

Attorneys for Delphi Corporation, et al.,
   Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :
     In re             :     Chapter 11
                    :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                    :
             Debtors.   :     (Jointly Administered)
                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF JAMES M. PETRIE IN SUPPORT OF DEBTORS' RESPONSE
TO USW'S MOTION TO COMPEL DEBTORS TO SUBMIT INDIVIDUAL
EMPLOYEE MATTER TO IMPARTIAL MEDICAL AUTHORITY

I, James M. Petrie, declare and state as follows:

1.      I am currently employed as Delphi's Pension Plan Manager, and am a member of

Delphi's Corporate Pension Staff.  I began working at General Motors Corporation ("GM")

effective July 8, 1963, as a cooperative engineering student and have worked at Delphi as

Pension Plan Manager since June 1, 1999, after it was spun off from GM.

2.      In my current position with Delphi my responsibilities include: drafting language

for proposed plan amendments, participating in national negotiations related to pension plan

changes, interpreting plan language, processing payments for pension administration expenses,

and calculating pension estimates for executives.  I also provide direction and advice to union

benefit representatives, develop and present pension training materials for union conferences,

provide direction to and audit the performance of Delphi's third party pension administrator, and

communicate pension performance to key Delphi stakeholders.

3.      I submit this declaration in support of the Debtors' Response to the motion filed

by the USW seeking to compel Delphi to have an impartial medical examiner determine whether

Terry Detrick ("Detrick"), an individual retiree, has recovered from the condition that qualified

him for total and permanent disability retirement more than 20 years ago and is able to return to

work (the "Motion").  Any capitalized terms not expressly defined herein are intended to have

the meanings ascribed to them in the Response, and references to Delphi herein include the

Debtors, as appropriate.  Except as otherwise indicated, all facts set forth in this declaration are

based upon my personal knowledge, my review of relevant documents, my opinion, and my

experience and knowledge of Delphi's employee benefit programs.  If I were called on to testify,

I could and would testify to the facts set forth herein.

I.      The Delphi-USW Hourly-Rate Pension Plan

        4.      Delphi and the USW have entered into a series of agreements governing the terms

and conditions of employment for USW-represented employees at Delphi facilities in Vandalia

and Dayton, Ohio.  Among these are a series of supplemental agreements containing the terms of

various benefit programs, including an Hourly-Rate Employees Pension Plan ("HRP"), which are

incorporated as part of the main collective bargaining agreement between Delphi and the USW

(the "CBA").  The provisions of the HRP represent the negotiated terms of agreement between

Delphi and the unions representing its hourly employees.  Currently, the CBA remains currently

in effect through September 14, 2007.

        5.      The terms of the HRP applicable to USW-represented employees at Delphi are the

same HRP terms applicable to all Delphi union-represented employees, including those

represented by the UAW and the IUE-CWA.

        A.      Total & Permanent Disability Retirement Provisions

        6.      The HRP provides retirement benefits for employees who are totally and

permanently disabled ("T&PD benefits").  A true and correct copy of the portion of the HRP

containing the T&PD benefit provisions is attached hereto as Exhibit A.  GM's pension plan

contains a similar provision.

        7.      The HRP outlines a strict review procedure for determining eligibility for T&PD

benefits.  An employee will only be deemed eligible to retire under this provision if he or she is

totally and permanently disabled preventing the employee from performing any job at the Delphi

facility where the employee has seniority.

        8.      In order to qualify for T&PD retirement an employee must have at least ten years

of credited service at Delphi as defined in Article III of the HRP, and must present "medical

evidence satisfactory to [Delphi]" of total and permanent disability, as described in Exhibit A at

page 83.  The plan provides for several layers of review if Delphi determines that the employee

is not in fact totally and permanently disabled based on the medical evidence presented,

including an appeal for a medical exam, as described in Exhibit A at pages 83-85.   If an

employee is determined to be totally and permanently disabled, he or she is entitled to retire and

receive T&PD benefits.

9.      A retiree who has been retired and receiving T&PD benefits may apply to return

to work, if the employee is able to demonstrate that the condition that caused the total and

permanent disability no longer exists or no longer totally disables the retiree.  The HRP outlines

a straightforward and strict review procedure, similar to the procedure used to determine whether

the employee was first eligible to retire under the T&PD provisions.  This procedure includes an

appeals process for evaluating whether an individual seeking to return to work from T&PD

retirement is fit to do so as described in Exhibit A at pages 87-89.

10.      The first step in evaluating an individual's fitness to return to work from a T&PD

retirement requires the retiree "to provide medical evidence to the Plant Medical Director,

satisfactory to the Corporation, that supports that such retiree is no longer T&PD."  (emphasis

added).  The information provided must include, "among other relevant information, a narrative

report that details what has improved and why the condition under which such retiree was

determined to be T&PD no longer exists or no longer disables the retiree."  In addition,

"[d]ocumentation will include appropriate lab reports and/or test results." (emphasis added).  The

Plant Medical Director may also examine the retiree.  These procedures are set forth in the HRP

attached hereto as Exhibit A at page 87.  Significantly, the documentation must exhibit a

dramatic change in the T&PD condition of the employee to warrant a finding that he or she is fit

to return to work.  This procedure was negotiated and agreed upon by Delphi and the USW.

11.     Pursuant to the clear procedures set forth in the HRP, if the Plant Medical

Director determines, after reviewing medical documentation (and in some cases an examination

by the Plant Medical Director), that the employee's condition has not changed in a manner that

renders the employee fit to return to work, the Medical Director is required to advise the retiree,

union benefit representative, and third party pension administrator of this determination.  If the

retiree disagrees, the retiree may contact his or her union benefit representative who may forward

the case to Delphi's Employee Benefits Staff for review with the Corporate Medical Director.

Delphi's Benefits Staff and Corporate Medical Director will then provide an explanation as to

why the retiree is not fit to return to work.  See  Exhibit A at 88.

12.     If the union benefit representative disagrees with the Company's determination,

then he or she may seek an impartial medical opinion.  "[I]n all cases where the retiree has been

retired for five or more years, the retiree will be sent to an impartial specialist approved by the

Delphi [employee benefits] staff and the Union Benefit Representative."  The decision of the

impartial physician or clinic is "final and binding on the retiree, the Union and the [Company]."

See Exhibit A at 88.  Again, this procedure was put in place as a result of collective bargaining

negotiations between Delphi and the unions representing its employees, including the USW.

13.     The terms of the HRP apply to all union-represented Delphi employees.  Delphi

and the unions representing its employees have successfully followed the procedures outlined in

the HRP since they were negotiated in 1999.  Delphi has received at least thirteen requests from

T&PD retirees to return to work since that time.  After following the procedures set forth in the

HRP, five retirees returned to work.  In addition, three individuals remain retired under the

T&PD program because they were considered, after an impartial medical examination, to

continue to be totally and permanently disabled and unable to work.  And, one individual's

impartial medical exam was cancelled because he died from the T&PD condition he alleged to have recovered from prior to the exam date. Finally, four individuals remain retired because, like Detrick, they failed to provide sufficient information for Delphi to make an initial determination as to the individual's recovery and fitness to return to work.

II.    Terry Detrick

14.    Terry Detrick was an employee at GM's Dayton, Ohio facility for approximately 15 years. In the early 1980s, Detrick

, as described in the "Statement of Employee's Physician" portion of Detrick's application for T&PD retirement, attached hereto as Exhibit B.

15.    On the "Statement of Employee's Physician" form, Detrick's physician indicated that

, making him totally and permanently disabled and therefore eligible for T&PD retirement.

16.    Detrick retired effective June 1, 1983, under the T&PD provisions of the GM pension plan. Subsequently, GM's Dayton, Ohio facility where Mr. Detrick worked was spun off as a Delphi facility. In order for Detrick to return to work at the Delphi plant, he and the USW must follow the procedure set forth in the HRP. Detrick has been retired and receiving pension and health benefits under the terms of the GM pension benefit program continuously since June 1, 1983.

17.    Detrick contacted first GM and then Delphi regarding returning to work in the late 1990s, but did not pursue his requests beyond submitting short doctor's notes from a Doctor Ieva Veveris. Delphi was unable to assess his fitness to return to work because of the brief, non-

substantive nature of the notes he provided, and informed him that he would have to provide more specific information to substantiate a change in his T&PD condition.

18.     Detrick also submitted several brief notes from Dr. Veveris to the Plant Medical Director in 2001, none of which were substantive or more than a page in length.  The only other documentation Detrick submitted to the Company was a list of the dates of his treatment sessions with Dr. Veveris.

19.     At the Union's request, in early 2002, Delphi attempted to evaluate Detrick's case on the basis of the information provided by him in 2001.  Doctor Tonya Rutledge, Plant Medical Director, passed the information provided by Detrick to the Divisional Medical Director, Dr. Thomas Pace for further guidance.  A true and correct copy of the letter from Dr. Rutledge to Dr. Pace is attached hereto as Exhibit C.  Dr. Pace also concluded that he could not make a determination as to Detrick's fitness to return to work based on the limited documentation provided to date.

20.      By letter dated August 19, 2002, attached hereto as Exhibit D, Dr. Pace informed the USW that he could not determine Detrick's fitness to return to work based on the information the USW had provided to the Company.  Contrary to the implication in the USW's Motion, Dr. Pace did not deny Detrick's claim but instead informed the USW and Detrick that he had not received enough information to make an initial determination as to Detrick's fitness to return to work.

21.     Delphi received two short letters (attached as Exhibits C and D to the USW's Motion), one in 2002 and one in 2003 from USW representatives requesting that Detrick be examined by an impartial medical examiner.  The USW attached no medical documentation to either of these letters and made no indication of a further change in Detrick's medical condition.

As Detrick had never presented any medical evidence regarding his treatment or detailing a change in his total and permanent disability, the Divisional Medical Director still could not make a determination about his fitness to return to work.

22.     It was not until January 28, 2005, that the USW submitted additional medical documentation, specifically the notes from Dr. Veveris' sessions with Detrick -- none of this medical documentation was dated, however, more recently than 2001.  Thus, these documents were not complete or current enough for the Divisional Medical Director to make a determination as to Detrick's ability to return to work.  As a result, the case could not progress to the first level of the appeal process set forth in the HRP (a review by Delphi Employee Benefits Staff and the corporate-level Medical Director), which is a clear prerequisite to the next level of appeal, which includes an examination by an impartial medical examiner -- the relief the USW seeks in its Motion.

23.     Steven Gebbia, Delphi's Executive Director, Benefits & Policy wrote a letter to the USW's Senior Counsel dated February 22, 2006, again stating Delphi's position that Detrick had not submitted the documentation required under the HRP, and "until he does so, no decision can be made" with respect to his fitness to return to work.

24.     The letter, attached hereto as Exhibit E, also explains Delphi's specific concern regarding Detrick's failure to provide adequate medical documentation given the changes at the Dayton, Ohio plant.  Mr. Gebbia listed the specific documentation that, pursuant to the clear terms of the HRP, Delphi would need to assess Detrick's fitness to return to work, and suggested that the USW contact Mr. Gebbia directly.  Delphi never received a response to this letter.  Thus, the Company remains unable to evaluate Detrick's fitness to return to work because he has not

complied with the first stage of review outlined in the HRP.  He is therefore not entitled to an

impartial medical exam as the USW asks the Court to grant him through its Motion.

III.    Benefits Associated With Detrick's Return To Work

25.    At the time that Detrick retired under the T&PD plan in 1983, he had 15.3 years

of credited service at GM and he was a Basic Benefit Class Code of A.  The Benefit Class Code

is based on the rate of pay for the classification held by the applicant and determines the monthly

benefit rate.  At the time of his retirement, Detrick's basic benefit rate was $18.20 per month per

year of credited service (or $18.20 multiplied by 15.3 years of credited service to obtain a

monthly benefit amount).  With post retirement increases, his rate today is $26.50 per month per

year of credited service totaling a monthly benefit of $405.45, less $20.27 for the surviving

spouse option, for an adjusted gross benefit of $385.18 per month.  Notably, Detrick has been

approved by the Social Security Administration to receive social security disability insurance

benefits ("SSDIB").  If he were not receiving SSDIB, Detrick would qualify for an additional

temporary benefit under the HRP, payable until he reaches age 62 and a month.

26.    If Detrick recovered from the condition that caused him to be totally and

permanently disabled and was able to return to work, only to subsequently retire shortly

thereafter, his basic benefit rate would equal $50.90 per month multiplied by his 15.3 years of

credited service.  Thus, a subsequent retirement with unreduced benefits would result in a gross

benefit to Detrick of $778.77 ($50.90 multiplied by 15.3 years of service), less surviving spouse

coverage of $38.94, for an adjusted gross benefit of $739.83 per month, or a 92.1% increase over

the amount of benefits he currently receives under the GM pension plan.  Given that the Dayton,

Ohio facility is scheduled to close in December 2007, if Detrick were to return to work he would

likely retire prior to the close of the facility.

27.     In addition, the USW has been actively negotiating an hourly attrition program with Delphi.  While the terms of any such program have not yet been finalized, in the event a USW hourly attrition program is implemented after Detrick returns to work, Detrick would be able to accelerate his retirement and commence receiving the higher benefit payments described above.  Based on his years of credited service, however, it is unlikely that Detrick would be eligible for any additional lump sum payment under the terms of any agreed upon USW hourly attrition program.

IV.    The Company's Interest In Making Pension Eligibility Determinations

28.     The discretion afforded to the Company in procedures set forth in the HRP is extremely important, in large part because of the serious economic and other consequences of determining that an employee has become _totally_ and _permanently_ disabled and no longer able to perform work of any kind for the Company.  Depending on the tenure of the individual employee, this determination entitles the employee to pension and health benefits potentially for life.

29.     The USW seeks here to bypass the procedures that it agreed to in the HRP requiring a T&PD retiree to first submit his or her claim for review at the plant level with adequate medical documentation before seeking corporate-level review or an examination by an impartial medical examiner.  The plant personnel are best qualified to make a T&PD determination because they are closest to and have the most knowledge about the employee or retiree and his or her work at a particular Delphi facility, as well as the jobs available at the facility and the skills required to perform those jobs.

30.     Moreover, allowing the USW to bypass the T&PD procedures and circumvent the Company's discretion would set a dangerous precedent for Delphi's thousands of union-represented employees and retirees to rely upon.  The HRP requires documentation satisfactory

to Delphi both for determinations that an employee is totally and permanently disabled and that a

T&PD retiree is fit to return to work.  If the USW is allowed to bypass these collectively

bargained procedures in this case, it could open the floodgates to claims by scores of both active

and retired GM and Delphi employees who are dissatisfied with any of the HRP's procedures -- a

result that was certainly not intended by either the Company or the unions representing its

employees when the terms of the HRP were negotiated and agreed upon as part of Delphi's

collective bargaining agreements.

I declare under penalty of perjury, and pursuant to 28 U.S.C. § 1746, that the foregoing is

true and correct to the best of my knowledge, information, and belief.

Executed this 22nd day of November, 2006

/s/ James M. Petrie
JAMES M. PETRIE

**EXHIBIT A**



*Supplemental Agreement*

Covering

**PENSION PLAN**

Exhibit A
to
**AGREEMENT**
between
**DELPHI ENERGY AND CHASSIS SYSTEMS**
**DELPHI AUTOMOTIVE SYSTEMS**
**CORPORATION**
and
**USWA**
**LOCAL NO. 87**
dated
December 8, 1999

Appendix D

### 3. Total and Permanent Disability Retirement

(a) Employees with seniority may apply for a total and permanent disability retirement on form HRP-15, "Application for Total and Permanent Disability Benefits". Such forms will be available through the Center or the Union member of the Pension Committee.

(b) The employee will supply a physician's statement and other necessary information on form HRP-15 and submit the form to the Center. The Center will furnish one copy of the front side of form HRP-15 to the Union member of the Pension Committee.

(c) An employee with seniority who has a terminal condition may apply immediately for T&PD retirement as provided in paragraphs (a) and (b) above. In the event such employee has been on leave at least one month and the cause of death is directly or indirectly a result of the terminal condition which gave rise to the disability leave of absence (for example, excluding death as a result of homicide, suicide or accidental death), and who has applied for retirement prior to death, shall not disqualify an otherwise eligible surviving spouse from receiving a benefit. Notwithstanding the foregoing, effective October 1, 1999, (a) in the case of an occupational injury or disease incurred in the course of employment with the Corporation resulting in death, neither the one-month period nor the leave of absence requirement shall apply, and (b) in the case of a terminal condition as such term is used and qualified in this paragraph, the one-month period shall not apply.

(d) The Center will notify each employee who has been absent for 5 continuous months, because of disability, of such employee's possible eligibility for total and permanent disability pension. The Union member of the Pension Committee will be furnished a copy of the employee's notification letter. If such

82

Appendix D

absence continues for a period of 9 full months because of disability and the employee has not applied for total and permanent disability pension, the Center will again notify the employee of such employee's possible eligibility for such pension and will furnish a copy of the employee's notification to the Union member of the Pension Committee.

(e) When it becomes necessary to determine whether an employee is totally and permanently disabled within the meaning of the Pension Plan, the following procedure shall govern:

(1) The Corporation will make such determination upon the basis of medical evidence satisfactory to it. If it is determined that the employee is totally and permanently disabled, the Center will process the application in accordance with the procedures set out in Section D, "Authorization for Pension Benefits".

If it is determined that the employee is not totally and permanently disabled, the Center will prepare form HRP-22, "Notice of Corporation Determination - Application for Total and Permanent Disability Benefits". Copies of such form will be furnished to the employee and the Union member of the Pension Committee. The Center also will furnish the Union member of the Pension Committee with a copy of the reverse side of form HRP-15, "Statement of Employee's Physician".

(2) If the Union member of the Pension Committee disagrees with the Corporation's determination, an appeal of such determination may be made in writing to the Center within 30 days after the Union member's receipt of form HRP-22. The Pension Committee shall then designate a clinic in the area which is on the approved list (Appendix D-1) to examine the employee and determine whether the

83

employee is totally and permanently disabled pursuant to the provisions in Article II, Section 3(b) of the Plan.

(3) In lieu of the provision in Paragraph B3 (e)(1) above, the Pension Committee may designate a clinic in the area on the approved list (Appendix D-1) to examine the employee and make a determination as set forth in Paragraph B3 (e)(2) above.

(4) Prior to the examinations referred to in Paragraphs B3 (e)(2) and B3 (e)(3) above, the Center will prepare form HRP-21, "Determination of Total and Permanent Disability", and will furnish one copy to the clinic, one copy to the employee and one copy to the Union member of the Pension Committee. An employee, whose Delphi employing unit is more than 40 miles one way from the clinic in the area on the approved list designated by the Pension Committee to examine the employee to make a determination as to whether the employee is totally and permanently disabled, will be reimbursed, upon written request, at the rate of 31 cents per mile for miles actually driven from the employee's residence to such clinic and back, using the most direct route available.

(5) The clinic, after examining the employee, shall make a determination if the employee is totally and permanently disabled. Such determination shall decide the question and shall be final and binding on the employee, the Corporation and the Union.

(6) Upon receipt of any clinic determination, the Center will complete form HRP-21A, "Notice of Clinic Determination - Total and Permanent Disability", furnish copies to the employee and the Union member of the Pension Committee, and retain a copy in the employee's pension file. If the clinic determination is that the employee is not totally and permanently disabled, form HRP-21A shall instruct

such employee to report to the Plant Medical Director for examination.

(7) If the clinic, after examining the employee, determines that the employee is not totally and permanently disabled, the Plant Medical Director will examine the employee to determine whether the employee is able to perform a job in the plant.

(8) If the Plant Medical Director, after examining the employee, determines that the employee is able to perform a job in the plant, the employee will be deemed by the Corporation not to be totally and permanently disabled within the meaning of the Pension Plan. Such job will be identified in writing to the employee with a copy to the Union member of the Pension Committee.

(9) If the Plant Medical Director, after examining the employee, determines that the employee is not able to perform any job in the plant, the employee will be deemed by the Corporation to be totally and permanently disabled within the meaning of the Pension Plan.

(l) When it becomes necessary to determine whether a disability pensioner continues to be totally and permanently disabled within the meaning of the Pension Plan, the following will implement the provisions of Article II, Section 3(c) of the Plan:

(1) The Corporation will make such determination upon the basis of medical evidence satisfactory to it. If it is determined that the pensioner is no longer totally and permanently disabled, the Corporation will prepare form HRP-23, "Notice of Corporation Determination - Cessation of Total and Permanent Disability Benefits", and will furnish copies to the disability pensioner, the Union member of the Pension Committee, the local Personnel Director, and two copies to the Board.

Appendix D

(2) If the Union member of the Pension Committee disagrees with the Corporation's determination, the procedure described in Paragraph B3 (e) will apply.

(g) When it is found that a disability pensioner is employed, the Corporation will make such investigation as it considers appropriate to determine if the pensioner is engaged in gainful employment for purposes other than rehabilitation. If the Corporation determines, on the basis of evidence satisfactory to it, that the employment in which the disability pensioner is engaged is gainful employment and is not for purposes of rehabilitation, the Corporation will prepare form HRP-23 and will furnish copies to the disability pensioner, the Union member of the Pension Committee, the local Personnel Director, and two copies to the Board.

(1) If such pensioner disputes the Corporation's determination on the basis that the employment is not gainful employment, such determination may be appealed by filing a written claim with the Pension Committee as set forth in Section K herein.

(2) If such pensioner disputes the Corporation's determination on the basis that the employment is for purposes of rehabilitation, such pensioner may, within 30 days of receipt of such determination, file a written claim with the Center on form BA 1, "Employee Claim to Pension Committee". The Pension Committee shall then designate a clinic in the area which is on the approved list (Appendix D-1) to examine the pensioner. The opinion of the clinic shall decide the question with respect to whether the employment in which the disability pensioner is engaged is rehabilitative or not and such opinion shall be final and binding on the pensioner, the Corporation and the Union. Such clinic exam shall not be performed

86

Appendix D

if there is any unresolved claim pending with respect to whether such pensioner's employment is gainful employment.

(h) If a disability pensioner returns to work for the Corporation, Management will notify the Union member of the Pension Committee and the Center of such return to work.

(i) When a former employee who has retired under total and permanent disability provisions (T&PD) asserts such retiree has recovered and notifies the Corporation of their intent to return to work, the following procedure will be utilized:

(1) The retiree will provide medical evidence to the Plant Medical Director, satisfactory to the Corporation, that supports that such retiree is no longer T&PD. The information will include, among other relevant information, a narrative report that details what has improved and why the condition under which such retiree was determined to be T&PD no longer exists or no longer disables the retiree. Documentation will include appropriate lab reports and/or test results.

(2) If necessary, the Plant Medical Director may examine the retiree to determine if the retiree has recovered.

(3) If the Plant Medical Director determines the retiree has recovered and is able to engage in regular employment on a job within the plant, the Plant Medical Director will review the matter with the Corporation. If the Corporation agrees, the retiree is to be removed from T&PD status and seniority will be treated as set forth in Exhibit A, Section 4(b) of the Supplemental Agreement (Pension Plan), and the retirement is to be cancelled. The Plant Medical Director will advise the retiree, the Union Benefit Representative (UBR), and the Center.

87

Appendix D

(4) If the Plant Medical Director determines that the retiree has not recovered and should remain on T&PD retirement, the retiree will continue in T&PD status under the Pension Plan. The Plant Medical Director will advise the retiree, the UBR and the Center.

(5) If the retiree disagrees, the retiree may contact the UBR. If the UBR disagrees with the Plant Medical Director's determination, the UBR will forward the case, with all pertinent medical information, to the Union Benefit Representative. The Union Benefit Representative may forward the case to the Delphi Employee Benefits (EB) Staff. After reviewing the case with the Corporate Medical Director, the Delphi EB Staff will provide the Union Benefit Representative with the Corporate Medical Director's decision of why the retiree has not recovered and is not able to engage in regular employment on a job within the plant. If the Union Benefit Representative disagrees with the determination of the Corporation, the Union Benefit Representative and the Delphi EB Staff may agree to schedule an exam with an impartial specialist physician selected by the Plant Medical Director or, in the absence of such agreement, the Delphi EB Staff will advise the Plant Medical Director to schedule an exam with an impartial clinic in the area which is on the approved list (Appendix D-1). However, in all cases where the retiree has been retired for five or more years, the retiree will be sent to an impartial specialist approved by the Delphi EB Staff and the Union Benefit Representative. The impartial clinic or physician will determine whether the retiree has recovered and is able to engage in regular employment on a job within the plant. The decision of the impartial clinic or physician is final and binding on the retiree, the Union and the Corporation.

88

Appendix D

If the impartial clinic determines the retiree remains totally and permanently disabled, the former employee remains retired and cannot reapply to return to work unless there is a substantial change in the retiree's medical condition subsequent to the initial request to return to work. If the impartial physician determines the retiree has recovered and is able to engage in regular employment on a job within the plant, the retiree is to be removed from T&PD status and seniority will be treated as set forth in Exhibit A, Section 4(b) of the Supplemental Agreement (Pension Plan). The Plant Medical Director will advise the retiree, the Union Benefit Representative and the Center of the determination.

C.  PENSION BENEFITS TO SURVIVING SPOUSE

1. An employee who retires prior to age 55 with benefits commencing on or after October 1, 1970, excluding 1) an employee with 30 or more years of credited service who retires with benefits commencing on or after October 1, 1974, or 2) an employee retiring with benefits commencing on or after October 1, 1984, as early as age 50 under mutually satisfactory conditions in accordance with the Standards set forth in the Pension Plan, will be informed by the Center prior to age 55 with respect to surviving spouse coverage. The retired employee for whom such surviving spouse coverage is to be effective must advise the Center of the intent to reject the coverage, on a form approved by the Corporation, "Rejection/Election of Survivor Coverage", which includes the written consent of the pensioner's spouse that informs the spouse of the effect of rejection, and that is witnessed by a notary public, and filing it with the Center, during the month prior to the month in which the pensioner attains age 55.

89

# EXHIBIT B

## STATEMENT OF EMPLOYE'S PHYSICIAN

**FILED UNDER SEAL**

Date signed _JUNE 25_ 19 _52_ Signature of physician. _____

Graduate of _MEDICAL SCHOOL_ Address: _BUENOS AIRS ARGENTINA_
                                                        Number                    Street

Year graduated _1946_                 _2801 FAR HILLS DAYTON . OHIO_    _45719_
                                          City            State or Province    Zip or Postal Code

# EXHIBIT C



**DELPHI**

Chassis Systems

February 18, 2002

Thomas Pace, M.D.
Divisional Medical Director Delphi E&C

RE: Detrick, Terry
SS # 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
DOB-09/27/48
Seniority date: 09/24/67
Date of T&P retirement-1983

Dr. Pace:

Mr. Detrick is applying for return to work after an approximate 22 years absence from his duties at GM/Delphi. Although his T&P application was approved 06/0/83, he was disabled and had not worked in the plant since 10/27/80.

His current psychiatrist is Dr. Ieva Veveris who had written 3 letters of support for his return to work when he initially presented to our plant on May 02, 2001 for request to return. At the time, it was investigated as to whether or not his application to return to work should be General Motors or Delphi. It has been determined that he is to apply to Delphi. Although his physician has submitted a letter of narrative support, he has not submitted further information that is required for consideration. The information in question is noted per the supplemental agreement covering pension plans dated 12/08/99, appendix D-2h page 87. He has applied two previous times to return to duties, April 1999 and May 1999. In October 1997, there was also a request for return to duties. All of these request appeals have been denied.

Eldon House, staff representative for Local 87, has contacted our department on his behalf and was advised of the need for this information, which the letter dated September 2001, from Dr. Veveris, attempts to address. Due to the requirements stated in the agreement of 12/08/99, these letters do not suffice as enough information to return him to duty. In addition, the previous appeals to return to work may have further information about his condition previously which is not at our plant.

I am submitting to you the information that we have for your review. In light of his prolonged absence from the work force here and the changes in the work environment, especially the magnitude of change, will he be able to tolerate these changes? In addition, he has attempted to change careers prior to his petition to return and unfortunately, was unsuccessful in that transition.

Dr. Pace, I apologize for the delay in which you have recovered this information. We were attempting to gather information involving this case and also which division had jurisdiction.

Respectfully,

Tonya R. Rutledge, M.D.

2701 Home Avenue (45417)   Post Office Box 1224   Dayton, Ohio 45401-1224   USA

# EXHIBIT D

262 - 3542

# DELPHI
Automotive Systems

memo

Date:      August 19, 2002

To:        Eldon House, Local 87

From:      Thomas Pace, M.D.

Subject:   Terry Detrick

Mr. House,

   After thorough examination of reports and records submitted, I find no current documentation to substantiate a reversal of the Total and Permanent Disability that was approved in June, 1983.

Thomas Pace, M.D.

**EXHIBIT E**

# DELPHI

February 22, 2006

Mr. Melvin Stein, Senior Counsel
United Steelworkers
Five Gateway Center
Pittsburgh, PA 15222

Dear Mr. Stein:

This letter is in response to your inquiry about the possibility of Terry Detrick,
returning to work from his total and permanent disability retirement ("T&PD").
Appendix D of Exhibit A of the Delphi Hourly-Rate Employees Pension Plan ("HRP")
states in pertinent part:

> "When a former employee who has retired under total & permanent disability provisions
> asserts such retiree has recovered .........the following procedure will be utilized:

> "The retiree will provide medical evidence to the Plant Medical Director, satisfactory to
> the Corporation, that supports that such retiree is no longer T&PD.  The information will
> include, among other relevant information, a narrative report that details what has
> improved and why the condition under which such retiree was determined to be T&PD
> no longer exists or no longer disables the retiree.  Documentation will include lab reports
> and/or test results.

> "If necessary, the Plant Medical Director may examine the retiree to determine if the
> retiree has recovered."

To date, Mr. Detrick has failed to supply the medical information noted above and until
he does so, no decision can be made.

When Mr. Detrick applied for T&PD his physician indicated that he had major
depression and had not responded to treatment and could never be expected to resume
gainful employment.

The USWA facility where Mr. Detrick last worked has changed dramatically from when
he last worked there.  The plant has gone through an extensive change from traditional
manufacturing to a process known as "lean manufacturing".  That process is very
intensive and physically and mentally demanding.

In order to determine if Mr. Detrick is no longer total and permanently disabled and that
his major depression has been cured, the following information must be supplied:

- A complete list (including address and phone number) of all physicians that have treated him since his retirement, along with a description of what specifically they were treating him for, the specific treatment plan and whether he went through group and/or individual therapy along with treatment dates and progress summary.

- A complete list of all prescriptions taken since his retirement, including drug name, strength, daily dosage and period of time taken (for example, from January 1988 to June 1999).

- A detailed list of all hospitalizations, including date hospitalized, date released, admitting physician and admitting diagnosis.

- A copy of all psychological teats, including MMPI.

- A detailed copy of psychiatric treatment plan(s) including summaries of individual and group therapy sessions.

- A complete copy of his medical file from Dr. Ieva Veveris.

This information can be sent to my attention at World Headquarters and I will see that the appropriate Delphi medical personnel review it and render a decision.

Sincerely,

*S.L. Gebbia*

Steve L. Gebbia
Executive Director
Employee Benefits & Policy