# EXHIBIT A

FORM B10   (Official Form 10) (4/01)

| UNITED STATES BANKRUPTCY COURT   SOUTHERN   DISTRICT OF   NEW YORK | |
|---|---|
| Name of Debtor | Case Number |
| **Delphi Automotive Systems Corporation** | **05-44481 (jointly administered)** |

| | |
|---|---|
| Name of Creditor (The person or other entity to whom the debtor owes money or property): **ICX Corporation, Cleveland, Ohio** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Name and address where notices should be sent: **James M. Ray** **53 State Street, 9th Floor - Mailcode: MBS970** **Boston, MA 02109** | ☐ Check box if you have never received any notices from the bankruptcy court in this case. |
| | ☐ Check box if the address differs from the address on the envelope sent to you by the court. |
| Telephone number: **617-994-7527** | THIS SPACE IS FOR COURT |
| Account or other number by which creditor identifies debtor: **L1137-002** | Check here if this claim ☐ replaces   ☐ amends   a previously filed claim, dated: _____ |

**1. Basis for Claim**

- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other   **Lease of Equipment: 1137-002**

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Your SS#:  _____ - _____ - _____
  Unpaid compensation for services performed
  from _____ to _____
       (date)              (date)

| 2. Date debt was incurred:   **10/02/2001 to present** | 3. If court judgment, date obtained:   **N/A** |
|---|---|

**4. Total Amount of Claim at Time Case Filed:**   $ **3,863,039.86**
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☒ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
- ☐ Real Estate   ☐ Motor Vehicle
- ☒ Other   leased equipment

Value of Collateral:  $ **3,863,039.86**

Amount of arrearage and other charges at time case filed included in secured claim, if any: $ **0.00**

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C.§ 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties of governmental units - 11 U.S.C. §507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a) ( ____ ).
*Amounts are subject to adjustment on 4/1/01 and every 3 years thereafter with respect to cases commenced on or after date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

| Date **7/27/06** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Leo J. Gibson*   att, for ICX |
|---|---|

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

**FORM B10** (Official Form 10) (9/97)

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## — DEFINITIONS —

### Debtor
The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

### Creditor
A creditor is any person, corporation, or other entity to whom the debtor owed a debt n the date that the bankruptcy case was filed.

### Proof of Claim
A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

### Secured Claim
A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from the property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. *(See also Unsecured Claim.)*

### Unsecured Claim
If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

### Unsecured Priority Claim
Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## Items to be completed in Proof of Claim form (if not already filed in)

**Court, Name of Debtor, and Case Number:**
Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**
Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

### 1. Basis for Claim:
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

### 2. Date Debt Incurred:
Fill in the date when the debt first was owed by the debtor.

### 3. Court Judgments:
If you have a court judgment for this debt, state the date the court entered the judgment.

### 4. Total Amount of Claim at Time Case Filed:
Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

### 5. Secured Claim:
Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date of the bankruptcy case was filed. A Claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

### 6. Unsecured Priority Claim:
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

### 7. Credits:
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

### 8. Supporting Documents:
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy. a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

# ICX/Delphi Equipment Lease Schedule 1137-002

As of 7/31/2006, Debtor will owe $2,860,475.30 on the above referenced lease schedule.

Pursuant to its rights under the lease, ICX has allocated $8,447.85 in costs and fees associated with the enforcement and protection of its rights under the lease identified in this proof of claim, for a total claim amount as of July 31, 2006 of $2,868,923.15. Additional costs and fees continue to accrue.

ICX reserves the right to amend or revise this proof of claim.

A copy of the master lease, along with the lease schedule, is attached in support of this proof of claim. If required, additional supporting documents are available upon request to ICX's counsel at:

Leo J. Gibson
Barris, Sott, Denn and Driker
211 West Fort Street, 15th Floor
Detroit, MI 48226

f:\docsopen\lgibson\l-oth\0320868.01

## MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT, dated as of March 30 ,2001("Agreement"), is between Delphi Automotive Systems Corporation("Delphi"), a Delaware corporation, with an office at 5725 Delphi Drive, Troy, Michigan 48098, as co-lessee, and, on the one hand, any subsidiary or affiliate of Delphi (including without limitation Delco Electronics Corporation) which is or becomes a party to this Agreement by execution of a Schedule (as defined below) incorporating this Agreement by reference, which subsidiary or affiliate has been confirmed in writing by Delphi to be authorized to be a co-lessee hereunder, as co-lessee (collectively, "Lessee"), and, on the other hand, Kensington Capital Corporation, a Pennsylvania corporation, with an office at Squirrel Hill Professional Building, 5725 Forward Avenue, Suite 30( Pittsburgh, Pennsylvania 15217 ("Lessor"). Whenever such a co-lessee executes a Schedule, Delphi shall be bound also thereby as co-lessee.

In consideration of the mutual covenants contained in this Agreement, Lessor and Lessee agree as follows:

I.    **LEASING:**

(a)    Subject to the terms and conditions set forth below, Lessor will lease to Lessee, and Lessee will lease from Lessor, the machinery, equipment and any other items ("Equipment") described in any Annex.A attached to this Agreement or made a part of this Agreement by subsequent execution by Lessor and Lessee ("Schedule"). Terms defined in a Schedule and not defined herein have the meanings contained in such Schedule.

(b)    Before Lessor purchases Equipment from the manufacturer or supplier thereof ("Supplier") and leases the Equipment to Lessee under a Schedule, Lessor must receive each of the following documents with respect to the Equipment, in form and substance satisfactory to Lessor: (i) a Schedule relating to the Equipment; (ii) a Purchase Order Assignment and Consent in the form of Annex B to the Schedule (unless Lessor issued the purchase order for the Equipment), and (iii) any other documents Lessor reasonably requests. Upon delivery of the Equipment and acceptance of the Equipment by Lessee, Lessee will execute and deliver to Lessor a Delivery Certificate (in the form of Annex C to the Schedule) covering the Equipment, and deliver or cause to be delivered to Lessor a bill of sale (unless Lessor issued the purchase order for the Equipment) for the Equipment (in form and substance satisfactory to Lessor). Lessor appoints Lessee as its agent to inspect and accept the Equipment from the Supplier. When Lessee executes a Delivery Certificate, Lessee will be deemed to have received and accepted from Lessor the Equipment described in the Delivery Certificate, but the execution of a Delivery Certificate will not limit any rights Lessee or Lessor may have against the Supplier.

II.    **TERM, RENT, AND PAYMENT:**

(a)    The rent payable for the Equipment and Lessee's right to use the Equipment will commence on the date Lessee executes the Delivery Certificate for the Equipment ("Lease Commencement Date"). The term of the lease of the Equipment will be the period specified in the applicable Schedule and shall be automatically extended on a month-to-month basis until terminated by either party upon six months prior written notice to the other party; provided, however, that Lessor may not give notice of its intent to terminate the lease as provided in the section until Lessee has enjoyed a minimum of six (6) months of any extended term. If any term is extended, the word "term" shall be deemed to refer to the extended term.

(b)      Lessee will pay rent in accordance with the provisions of the applicable Schedule to Lessor at its address stated above, or as Lessor otherwise directs. If Advance Rentals are payable under the applicable Schedule, (i) Lessee will pay them when Lessor accepts the Schedule and (ii) Lessor will apply them to the first rent payments under the Schedule. In no event shall any Advance Rental or any other rent payments be refunded to Lessee. If rent is not paid within ten (10) days of its due date, Lessee will pay a late charge of one cent ($.01) per dollar on, and in addition to, the amount of such rent.

III.    TAXES:

At Lessor's written request, Lessee will report (to the extent that it is legally permissible) and pay promptly all taxes, fees, and assessments due, imposed, assessed, or levied against the Equipment, or the purchase, ownership, delivery, leasing, possession, use or operation of the Equipment, or upon the rentals or receipts with respect to this Agreement or any Schedule, including all license and registration fees and all sales, use, personal property, excise, gross receipts, stamp, or other similar taxes, imposts, duties, and charges, and any penalties, fines, or interest on any such taxes, imposts, duties or charges, which any taxing authority imposes against this Agreement or any Schedules or supplemental documents, or against Lessor, Lessee, or the Equipment to the extent they relate to the term of this Agreement (collectively, "Taxes"). However, Lessee will not be liable for any taxes which are levied on or measured by the total gross income, net income, total gross receipts, capital, capital stock, or net worth of Lessor. Lessee is also not liable for any penalties, fines, or interest to the extent resulting from any acts or omissions of Lessor, unless they arise from Lessor's acts or omissions which are based on a request from Lessee or are in reliance on Lessee's representations or duties under this Agreement. When Lessor requests, Lessee will submit to Lessor written evidence of Lessee's payment of Taxes and send Lessor copies of any tax reports or returns submitted by Lessee with respect to Taxes assessed against the Equipment. Lessee will also (i) reimburse Lessor when Lessee receives written request for reimbursement for any Taxes charged to or assessed against Lessor, unless such Taxes have previously been paid by, or simultaneously billed to Lessee (in this regard Lessor and Lessee agree to mutually cooperate in the resolution of such matters with the appropriate taxing authorities) and (ii) show ownership of the Equipment by Lessor on all tax reports.

IV.    REPORTS:

(a)      Within ten (10) days after any tax or other lien attaches to any Equipment, Lessee will notify Lessor in writing of all material information Lessee possesses with respect to the lien and the location of the Equipment to which the lien has attached (unless the lien has been fully discharged.)

(b)      Lessee will permit Lessor to inspect any Equipment during normal business hours, if the exercise of such inspection right does not interfere with the normal operation of the Equipment or the business of Lessee. Lessee will not be required to demonstrate the operation of the Equipment to Lessor.

(c)      Lessee will keep the Equipment at the location specified in the applicable Schedule and will promptly notify Lessor, in writing, if Lessee relocates any Equipment. If Lessor requests, Lessee will notify Lessor promptly in writing of the location of any Equipment.

(d)    If any Equipment is lost or damaged and the estimated repair cost would exceed ten percent (10%) of the Equipment's then fair market value, or if any Equipment is otherwise involved in an accident causing significant personal injury or significant property damage, then Lessee will promptly notify Lessor, in writing, of such event.

## V.    DELIVERY, USE, AND OPERATION:

(a)    All Equipment will be shipped directly from the Supplier to Lessee at the address designated by Lessee.

(b)    Lessee will use the Equipment solely in the conduct of its business and in a manner that complies with all applicable laws and regulations.

(c)    LESSEE WILL NOT REMOVE ANY EQUIPMENT FROM THE CONTINENTAL UNITED STATES.

(d)    Lessee will keep the Equipment free and clear of all liens and encumbrances other than the following: (1) liens arising from claims attributable to Lessor, (2) liens for taxes of Lessee either not yet due or being contested in good faith by appropriate proceedings, and (3) materialmen's, mechanics', workmen's, repairmen's, or other like liens arising in the ordinary course of Lessee's business (including those arising under maintenance agreements entered into in the ordinary course of business) securing obligations that are not overdue or are being contested in good faith by appropriate proceedings, so long as such proceedings do not involve any material danger of the sale, forfeiture, or loss of the Equipment.

## VI.    SERVICE:

(a)    Lessee will cause the Equipment to be maintained in good operating order, repair, condition, and appearance in a manner consistent with the manufacturer's recommended maintenance program or, in the absence of such a program, in a manner consistent with normal industry maintenance practice for owned Equipment, normal wear and tear excepted. The Equipment shall at all times be mechanically and structurally sound and capable of performing the functions for which it was designed in accordance with the manufacturer's recommendations. At any time Lessor requests, Lessee will affix in a prominent position on each unit of Equipment plates, tags, or other identifying labels showing that Lessor owns the Equipment. Unless an Event of Default is continuing, Lessee may deliver possession of any Equipment to the Supplier or to any other provider for testing, service, repair, maintenance, or overhaul work.

(b)    Unless Lessor consents, Lessee will not affix or install any accessory, equipment, or device on any Equipment that impairs the originally intended function, fair market value or use of such Equipment. All additions, repairs, parts, supplies, accessories, equipment, and devices furnished, attached, or affixed to any Equipment, which are not readily removable, will be made only in compliance with applicable law, and will belong to Lessor and be subject to the terms of this Agreement. Unless Lessor consents, Lessee will not affix or install any Equipment to or in any real property if such installation is likely to cause the Equipment to be a fixture.

(c)    Lessee shall keep and maintain for each item of Equipment maintenance records, logs, repair orders and other similar documents, in the same manner that Lessee keeps and maintains such records for owned equipment.

## VII.    STIPULATED LOSS VALUE:

An "Event of Loss" means:  (i) the loss of any Equipment or its use due to the destruction of or damage to the Equipment which renders repair uneconomical or which renders such Equipment permanently unfit for normal use by Lessee; (ii) the theft, disappearance, confiscation, condemnation, or seizure of title to any Equipment which results in the loss of possession or use of the Equipment by Lessee for a period in excess of sixty (60) consecutive days; or (iii) the imposition of environmental or other legal restrictions that make continued use of the Equipment illegal or, in Lessee's commercially reasonable opinion, uneconomical.  Lessee will promptly and fully notify Lessor in writing upon the occurrence of any Event of Loss.  On the next rental payment date after an Event of Loss (the "Payment Date"), Lessee will pay Lessor, without duplication, the sum of (x) the Stipulated Loss Value (as defined in Annex D) of the Equipment which has suffered an Event of Loss calculated as of the rental period immediately preceding such Event of Loss ("Calculation Date") plus (y) all rental and other amounts which are due with respect to the applicable Equipment through the Payment Date.  Upon payment of all sums due hereunder, the term of this Agreement and, except as otherwise expressly provided herein with respect to the indemnities contained in Sections XV and Section XVI, the liability of Lessee with respect to the applicable Equipment will terminate, and Lessee will be entitled to retain possession of the Equipment "AS IS WHERE IS".

## VIII.    RISK OF LOSS:

Lessee hereby assumes and bears the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is received by a carrier for shipment to Lessee until the Equipment is received by Lessor in accordance with the shipping provisions in Section X.

## IX.    INSURANCE:

Lessee will keep all Equipment insured with "ALL-RISKS" property insurance to a limit of the Stipulated Loss Value, including, but not limited to, insurance for damage to or loss of such Equipment and maintain liability coverage for personal injuries, death, or property damage that may result from the use or operation of the Equipment, with Lessor named as additional insured and with a loss payable clause in favor of Lessor, as its interest may appear.  All policies will be issued by companies that are qualified to issue insurance in the State in which the Equipment is or will be located.  Lessee will deliver to Lessor, upon written request by Lessor, certificate(s) of insurance that state that the insurance is primary to any other insurance that may be available to Lessor and provide at least thirty (30) days' written notice to Lessor of cancellation, modification, or material change to any policy.  Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement.

## X.    RETURN OF EQUIPMENT:

(a)    At least thirty (30) days prior to the return of the Equipment, but in no event earlier than sixty (60) days prior to such return, Lessor shall have the option, at its sole expense, to have an original manufacturer Equipment dealer service representative (or other similarly qualified Equipment maintenance representative) conduct a comprehensive physical inspection of some or all of the Equipment and write a condition report based on such inspection (the "Inspection Report").

(b)    Upon any expiration or termination of this Agreement or any Schedule, Lessee will promptly, at its expense and subject to Lessee's rights in connection with an Event of Loss under Section VII, perform any repairs required by the Inspection Report or otherwise to place the affected Equipment in good condition and repair and in working order for its originally intended purpose, normal wear and tear excepted.  The Equipment will be deemed in good condition and repair and in working order if the Equipment meets normal industry standards for similar used Equipment.  Further, upon return the Equipment shall be in compliance with all applicable federal, state, and local safety standards and regulations with respect to the Equipment Location.  If deinstallation, disassembly, or crating is required, Lessee, at its cost, will deinstall, disassemble, and crate the Equipment in accordance with normal industry standards.  Lessee will then tender the affected Equipment to Lessor at the Equipment Location specified in the applicable Schedule or, at the option of Lessor, at any location designated by Lessor within two hundred fifty (250) miles of the Equipment Location.  After Lessee delivers the Equipment to Lessor at the Equipment Location or such other location as Lessor directs, Lessee will have no new responsibilities for the Equipment but will not be relieved of any obligations arising before delivery.

(c)    Without limiting the foregoing Section X(b), upon its return the Equipment will satisfy the following specific return conditions:

(i)    Decals, markings, numbers and other identification marks of Lessee shall be removed in a workmanlike manner as to not cause damage to the appearance of the Equipment.  Any area affected by such removal shall be restored to the same color and condition as the surrounding area.

(ii)    The Equipment will conform with all applicable manufacturer's operating specifications.

(iii)    The Equipment must be cleaned, have a good physical appearance, condition and be free form damage, normal wear and tear excepted.

(iv)    All process fluids and waste materials are to be removed from the Equipment and disposed of in accordance with applicable waste disposal laws and regulations.  Sumps and tanks must be clean and dry.  At no time are materials that would be considered "hazardous waste" by any applicable regulatory authority to be shipped with the machinery.

(v)    All accessories, cables, maintenance records, passwords, software and manuals shall be delivered with the Equipment to Lessor.

(d)    Until Lessee complies with the requirements of Section X(b) and X(c) above, Lessee's rent payment and other obligations under this Agreement will continue from month to month notwithstanding any expiration or termination of the lease term.  Lessor may terminate such continued leasehold interest upon ten (10) days' written notice to Lessee.  Lessee shall promptly undertake such actions as are necessary to satisfy the foregoing return conditions.

(e)    Lessee shall reasonably cooperate with Lessor's efforts to sell the Equipment at the expiration or earlier termination of the Lease including, without limitation, permitting potential users or buyers access to inspect equipment during normal business hours upon Lessor's reasonable request.

(f)    Upon Lessor's written request and provided that Lessee has the necessary storage space available, such availability to be determined by Lessee in its sole discretion, Lessee will store the requested Equipment (in a reasonable manner) for a period not to exceed sixty (60) days following the expiration of the Lease.

## XI.    EVENTS OF DEFAULT:

Lessor may declare this Agreement in default upon the occurrence of any one of the following events ("Events of Default"):

(a)    Lessee breaches its obligation to pay rent under any Equipment Schedule or any other sum when due under this Agreement and fails to cure the breach within ten (10) days after Lessee receives written notice of the breach;

(b)    Lessee breaches any of its insurance obligations under Section IX;

(c)    Lessee breaches any of its other obligations, representations, or warranties under this Agreement and fails to cure the breach within thirty (30) business days after Lessee receives written notice of the breach; or

(d)    Lessee becomes insolvent or ceases to do business as a going concern, makes an assignment for the benefit of creditors, files a petition for bankruptcy, reorganization or dissolution or is adjudicated a bankrupt or an insolvent, or an involuntary petition in bankruptcy is filed against Lessee and within 90 days after the commencement of any proceeding any such proceedings have not been dismissed.

Such declaration of default shall apply to all Schedules unless specifically excepted by Lessor.

## XII.    REMEDIES:

(a)    At any time an Event of Default is continuing, Lessor may, at its option, do one or more of the following with respect to all or any part of the Equipment, to the extent permitted by, and subject to compliance with applicable law then in effect:

(1)    require Lessee to return promptly all or any part of the Equipment in accordance with Section X hereof, as if the Equipment were being returned at the end of the term;

(2)    enter the premises, with or without legal process, where all or any part of the Equipment is located and take immediate possession of the Equipment;

(3)    sell the Equipment, upon fifteen (15) days' written notice to Lessee, at public or private sale, as Lessor determines, or otherwise dispose of, hold, use, operate, lease to others, or keep idle the Equipment as Lessor determines in its sole discretion, all free and clear of any rights of Lessee, except as hereinafter set forth in this Section XII. Lessor may sell the Equipment without having the Equipment present at place of sale, and Lessor may make reasonable use of Lessee's premises for the purpose of displaying and selling the Equipment at no expense to Lessor; and

(4)    whether or not Lessor has exercised any of its rights under subparagraphs (1), (2), and (3) of this Section XII, demand that Lessee pay to Lessor on a payment date

specified in a written notice from Lessor, as damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rental period immediately preceding the declaration of default), all rent due for the Equipment prior to the payment date Lessor specifies, any late charges provided for in Section II hereof, any interest provided for in Section XXIII(i) below, any accrued and then-due taxes, and all reasonable costs and expenses, including reasonable legal fees incurred by Lessor in connection with the enforcement of, but not the administration of, the Agreement.

If Lessor, pursuant to subparagraph (3) of this Section XII, sells, re-leases, or otherwise disposes of the Equipment, the proceeds of sale, lease, or other disposition if any will ~~be applied in the~~ following order of priorities:  (i) ~~to pay~~ ███████████████████████ ~~and expenses~~ incurred in taking, removing, holding, repairing, selling, leasing, or otherwise disposing of the Equipment; then (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee hereunder; then ████████████████████████ ~~nd then (iv) an~~ ████████████████ Lessee will immediately pay any deficiency arising under clauses ~~(i) or (ii) of this Section XII(a).~~

(b)    The foregoing remedies are cumulative and not exclusive of other remedies, and any or all of these remedies may be exercised in lieu of or in addition to each other or any other remedies available at law or in equity.  The waiver of any default will not be a waiver of any other or subsequent default.

XIII.    ASSIGNMENT:

(a)    LESSEE WILL NOT, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR WHICH LESSOR WILL NOT UNREASONABLY WITHHOLD, ASSIGN, CONVEY, SUBLEASE, MORTGAGE OR HYPOTHECATE ANY EQUIPMENT OR ITS RIGHTS OR INTEREST IN THIS AGREEMENT EXCEPT THAT LESSEE MAY ASSIGN, TRANSFER OR SUBLET ITS RIGHTS WITH RESPECT TO EQUIPMENT UNDER THIS AGREEMENT TO ANY ENTITY WHICH LESSEE, DIRECTLY OR INDIRECTLY, CONTROLS, IS CONTROLLED BY OR IS UNDER COMMON CONTROL WITH.  IF LESSEE ASSIGNS OR OTHERWISE TRANSFERS ANY RIGHTS WITH RESPECT TO ANY EQUIPMENT, LESSEE WILL REMAIN FULLY AND PRIMARILY LIABLE UNDER THIS AGREEMENT.

(b)    The parties agree that the sale of all or substantially all of the assets of Lessee or of more than 50% of the voting stock of Lessee through consolidation, merger or acquisition of another person or entity ("Other Person") shall be deemed an assignment for which Lessor's prior written consent shall be required.  Lessor will not withhold consent provided: (i) the Other Person executes and delivers to Lessor a duly authorized, legal, valid, binding and enforceable agreement, containing an effective assumption by the Other Person of punctual performance of the Lessee's covenants, obligations, and agreements as stated under the Lease; (ii) immediately after giving effect to such consolidation, merger or sale, no Event of Default shall have occurred and be continuing under the Lease; and (iii) the consolidated tangible net worth of the Other Person is not less than 75% of Lessee's tangible net worth immediately preceding such consolidation, merger or sale.

(c)     Lessor may, without the consent of Lessee, assign this Agreement or any Schedule. If Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Equipment Schedule to the assignee or as instructed by Lessor in the written notice. Lessee will also confirm, in writing, receipt of the notice of assignment by executing the Notice and Acknowledgment of Assignment set forth in Annex E.

(d)     The terms and provisions of this Agreement shall be binding upon and inure to the benefit of Lessor and Lessee and their successors and permitted assigns.

## XIV.   NET LEASE; ETC.:

This Agreement is a net lease. Lessee's obligation to pay rent and other amounts due under this Agreement is absolute and unconditional. Lessee will not be entitled to any abatement or reductions of, or set-offs against, the rent or other amounts Lessee owes Lessor under this Agreement, including, without limitation, any abatements, reductions, or set-offs arising or allegedly arising out of claims (present or future, alleged or actual, and including claims arising out of the negligence of Lessor or Supplier or their strict liability in tort) of Lessee against Lessor or Supplier under this Agreement or otherwise. This Agreement will not terminate nor will the obligations of Lessee to Lessor be affected by reason of any defect in or damage to, or loss of possession, use or destruction of, any Equipment from any cause whatsoever. Rents and other amounts due under this Agreement will continue to be paid in all events in the manner and at the times set forth in this Agreement unless the obligation is terminated pursuant to the express terms of this Agreement. Lessee hereby agrees that in the event Lessee fails to perform any obligation under this Lease in the time period provided and following a request to do so by Lessor, Lessor may, at its option, pay or perform said obligation and any payment made or reasonable expense incurred by Lessor in connection therewith shall become additional rent which shall be due and payable by Lessee upon demand.

## XV.   INDEMNIFICATION:

Lessee and Lessor will indemnify, save and hold harmless the other party, and the other party's agents, employees, successors, and assigns from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including reasonable legal expenses, of any kind or nature, in contract or tort, arising out of the breach by Lessor or Lessee, respectively, of any part of this Agreement. However, neither party will be entitled to indemnification to the extent that any losses, damages, penalties, injuries, claims, actions and suits, including reasonable legal expenses, of any kind and nature, in contract or tort, are caused by the negligence or malfeasance of the party that would otherwise be entitled to indemnification. Lessee will also indemnify, save and hold harmless Lessor, as owner and/or lessor, its agents, employees, successors, and assigns from and against any and all losses, damages, penalties, injuries, claims, actions, and suits, including reasonable legal expenses, of any kind or nature, in contract or tort (including Lessor's strict liability in tort), arising during the term of this Agreement, out of the selection, design, manufacture, acceptance, or rejection of the Equipment by Lessee, and the delivery to Lessee, possession, maintenance, use, condition, return, or operation of the Equipment by Lessee (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark, or copyright infringement or environmental damage). Lessor or Lessee, respectively, will, upon request by the other party, defend any actions based on, or arising out of, any claims that give rise to any such indemnification rights.

## XVI.   TAX BENEFITS:

(a)      Lessee will take any reasonable actions Lessor requests to assure that (i) as long as modified cost recovery or depreciation deductions ("Tax Benefits"), as defined by the Internal Revenue Code of 1986, as amended, (the "Code"), are available with respect to the purchase and ownership of the Equipment, Lessor will be the party entitled to claim the Tax Benefits relating to the Equipment, and (ii) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all Tax Benefits specified in Section C of the applicable Schedule.  At no time during the term of this Agreement will Lessee take any action or omit to take any action Lessor reasonably requests, or permit any sublessee or assignee to take any action Lessor reasonably requests, which results in the disqualification of any Equipment for, reduction of (which is not the result of Lessor having alternative minimum tax status), or recapture of, all or any portion of any Tax Benefits.  All references to Lessor in this Section XVI include Lessor and the consolidated taxpayer group of which Lessor is a member.

(b)      If as a result of a breach of any representation, warranty, or covenant of Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor reasonably determines that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any such Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any such Tax Benefit is recomputed or recaptured (any such determination, disallowance, adjustment, recomputation, or recapture being hereinafter called a "Loss"), then to the extent of any such breach Lessee will pay to Lessor, as additional rental payments, an amount that causes Lessor's net after-tax return on investment to equal the net after-tax return on investment (assuming an effective tax rate equal to the applicable corporate tax rate under the Code) that would have been realized by Lessor if the Loss had not occurred, computed in all cases using the same assumptions utilized in originally establishing the terms upon which the Equipment giving rise to the Loss was leased to Lessee.  This amount will be payable within thirty (30) days after Lessor notifies Lessee in writing that a Loss has occurred, including a written statement describing in reasonable detail the Loss and of the manner in which Lessor calculates its amount.

## XVII.   SURVIVAL:

All of Lessor's and Lessee's rights, privileges, and indemnities contained in Sections XV and XVI survive the expiration or other termination of this Agreement.  The rights, privileges, and indemnities contained in this Agreement are expressly made for the benefit of, and will be enforceable by Lessor and Lessee and their successors and assigns.

## XVIII.   DISCLAIMER:

LESSEE HAS SELECTED AND WILL SELECT ALL EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES.  LESSOR DOES NOT MAKE, HAS NOT MADE, WILL NOT MAKE, AND WILL NOT BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO ANY EQUIPMENT OR ANY COMPONENT OF ANY EQUIPMENT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE.  Without limiting the foregoing, Lessor has no responsibility or liability to Lessee or any other person with respect to any of the following, regard-less of any negligence of Lessor: (i) any liability, loss, or damage caused or alleged to be caused

directly or indirectly by any Equipment, any inadequacy of any Equipment, any deficiency or defect (latent or otherwise) in any Equipment, or any other circumstance in connection with any Equipment; (ii) the use, operation, or performance of any Equipment or any risks relating to any Equipment; (iii) any interruption of service, loss of business or anticipated profits, or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement, or replacement of any Equipment. If no Event of Default exists under this Lease, Lessee may assert and enforce, at Lessee's sole cost and expense, from time to time, in the name of and for the account of Lessor and Lessee (or both), as their interests may appear, whatever claims and rights Lessor and Lessee (or both) have against any Supplier of the Equipment.

## XIX.    REPRESENTATIONS AND WARRANTIES OF LESSEE:

Lessee represents and warrants to Lessor that:

(a)    Lessee has the power and capacity to enter into and perform this Agreement and all related documents Lessee executes in connection with this Agreement (together, the "Documents"). Lessee is qualified to do business wherever necessary to carry on its present business operations, including the jurisdiction(s) where the Equipment is or will be located.

(b)    The Documents have been duly authorized, executed, and delivered by Lessee and constitute valid, legal, and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of Lessor's remedies may be limited under applicable bankruptcy and insolvency laws and other laws related to or affecting the enforcement of creditors' rights from time to time in effect.

(c)    No approval, consent, or withholding of objections is required from any governmental authority or instrumentality with respect to the entry into or performance by Lessee of the Documents except as have already been obtained.

(d)    The entry into and performance by Lessee of the Documents will not:  (i) violate any judgment, order, law, or regulation applicable to Lessee or any provision of Lessee's organizational documents or (ii) result in any breach of, constitute a default under, or result in the creation of any lien, charge, security interest, or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan, or credit agreement or other instrument (other than this Agreement) to which Lessee is a party.

(e)    There are no suits or proceedings pending or threatened in court or before any commission, board, or other administrative agency against or affecting Lessee, which will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement.

(f)    The Equipment is and will remain tangible personal property.

(g)    Lessee is and will remain validly existing and in good standing under the laws of the State of its organization.

(h)    The Equipment will only be used for commercial or business purposes.

(i)    The statements and financial reports submitted to Lessor are material inducements to the execution by Lessor of this Lease, and such statements and reports are, and all such information hereafter furnished by Lessee to Lessor will be, complete, true and correct in all material respects as of the date submitted.

XX.    COVENANTS OF LESSOR:

(a)    Lessor will not directly or indirectly create, incur, assume, or permit the existence of any lien attributable to Lessor on any Equipment that adversely affects or has priority over Lessee's rights under this Agreement.

(b)    Provided no Event of Default exists, neither Lessor, nor any party claiming by or through Lessor, will  interfere with Lessee's quiet enjoyment of the Equipment during the applicable lease term.

XXI.    EARLY TERMINATION:

(a)    At any time on or after the First Termination Date (specified in the applicable Schedule), Lessee may terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date") that is at least ninety (90) days after Lessee delivers written notice of termination to Lessor.

(b)    After Lessee elects to terminate this Lease as to the Equipment listed on a Schedule, Lessee will, and Lessor may, solicit cash bids for the Equipment on an AS IS, WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS").

(c)    Prior to the Termination Date, Lessee will (i) certify to Lessor any bids Lessee receives and (ii) pay Lessor (A) the Termination Value set forth on Annex D to the applicable Schedule (calculated as of the Termination Date) for the Equipment, and (B) all rent and other sums due under this Agreement with respect to the applicable Equipment as of the Termination Date.

(d)    On of before the Termination Date, Lessor may elect either:

(i)    to sell the Equipment on an AS IS BASIS for cash to the highest bidder and refund to Lessee the proceeds of such sale (net of any expenses of the sale) up to the amount of the Termination Value.  If no sale occurs, the lease of the applicable Equipment will not terminate and Lessor promptly will refund the Termination Value (less any expenses incurred by Lessor) to Lessee; or

(ii)    not to sell the Equipment, in which case, on the Termination Date Lessee will (a) return the Equipment (in accordance with Section X) and (b) pay to Lessor the amount required under Section XXI(c) less the amount of the highest bid Lessee certifies to Lessor or that Lessor otherwise receives.

XXII.    PURCHASE OPTION:

(a)    If Lessee notifies Lessor at least ninety (90) days before the termination of the lease of any Equipment, then Lessee may purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for the option price set forth in said Schedule (the "Option Price") (plus all applicable sales taxes).  The Option Price will be a reasonable prediction of the Equipment's "Fair Market Value" at lease expiration.

(b)    "Fair Market Value" means the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell.  For the purpose of determining Fair Market Value, (i) the Equipment will be assumed to be in the condition in which it is required to be maintained and returned under this Agreement; (ii) any installed Equipment will be valued on an uninstalled basis; and (iii) costs of removal will not be deducted.

## XXIII.  MISCELLANEOUS:

(a)    LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION, DIRECTLY OR INDIRECTLY, BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT OR ANY RELATED DOCMENTS, AND THE RELATIONSHIP BETWEEN LESSEE AND LESSOR UNDER THIS AGREEMENT AND THE RELATED DOCUMENTS.  THIS WAIVER ENCOMPASSES ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS).  NOTWITHSTANDING ANY STATE OR FEDERAL LAW TO THE CONTRARY, THIS WAIVER IS NOT UNILATERALLY REVOCABLE.  THIS WAIVER ALSO APPLIES TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT, OR ANY RELATED DOCUMENTS.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b)    Unless and until Lessee exercises its rights under Section XXI above, nothing contained in this Agreement gives or conveys to Lessee any right, title, or interest in and to any Equipment except as a lessee.  No cancellation or termination by Lessor, pursuant to the provisions of this Agreement or any Schedule hereto, will release Lessee from any then outstanding obligations to Lessor.

(c)    Time is of the essence of this Agreement.

(d)    Lessor's or Lessee's failure at any time to require strict performance by the other party of any of the provisions of this Agreement will not waive or diminish Lessor's or Lessee's right to subsequently demand strict compliance with the terms of this Agreement.

(e)    Upon Lessor's request, Lessee will execute any instrument reasonably necessary for filing, recording, or perfecting the interest of Lessor.

(f)    All notices under this Agreement will be deemed adequately given if sent by registered or certified mail or by nationally recognized overnight delivery service to the addressee at its address stated in this Agreement, or at such other place as the addressee designates in writing.  All notices will be effective upon receipt or failure or refusal to accept receipt.

(g)    This Agreement and any Schedule and Annexes to this Agreement constitute the entire agreement of the parties with respect to the subject matter hereof.  NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY RELATED DOCUMENT OR ANY WAIVER OF ANY OF THE PROVISIONS OR CONDITIONS OF THIS AGREEMENT OR ANY RELATED DOCUMENTS WILL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES TO THIS AGREEMENT.

(h)     If Lessee fails to comply with any provision of this Agreement, Lessor will have the right, but will not be obligated to, effect compliance, in whole or in part following reasonable advance written notice to Lessee. All monies spent and expenses and obligations incurred or assumed by Lessor in effecting such compliance will be additional rent due to Lessor within five (5) working days after the date Lessor requests payment. Lessor's effecting such compliance will not waive Lessee's default.

(i)     In addition to the one cent ($.01) per dollar late charge in Section 2b, after an Event of Default, any rent or other amount not paid to Lessor will bear interest, both before and after any judgment or termination of this Agreement, at the lesser of the Prime Rate (as shown in the "Money Rates" column of *The Wall Street Journal* as of the date of Event of Default) or the maximum rate allowed by law.

(j)     Any provisions in this Agreement and any Schedule or any Related Document which are in conflict with any statute, law, or applicable rule will be deemed omitted, modified, or altered to the extent necessary to remedy the conflict.

(k)     This Agreement is governed by and is to be construed and enforced according to the internal laws of the State of Michigan, excluding any laws which direct the application of laws of any other jurisdiction.

(l)     Each year during the term of this Lease, Lessor will obtain annual audited financial statements of Lessee, provided that such financial statements are generally made available to the public. In the case where such financial statements or reports become unavailable to the public, Lessee hereby agrees to deliver to Lessor a copy of the Lessee's annual audited financial statements within a reasonable time after said statements are available. In addition, Lessee agrees to deliver to Lessor copies of other such regularly prepared periodic financial reports upon Lessor's request thereof.

(m)     In the event of any conflict between the terms and conditions of this Lease Agreement and the terms and conditions of any Equipment Schedule, the terms and conditions of such Equipment Schedule shall prevail.

Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

LESSOR:                                LESSEE:

Kensington Capital Corporation          Delphi Automotive Systems Corporation

By _____             By _____

Title _President_                       Title _Treasurer_

EQUIPMENT SCHEDULE
SCHEDULE NO. _____
DATED THIS _____
TO MASTER LEASE AGREEMENT
DATED AS OF _____

Lessor and its Mailing Address:

_____

_____

_____

_____

Lessee and its Mailing Address:

_____

_____

_____

_____

Capitalized terms not defined in this Schedule have the meanings assigned to them in the Master Lease Agreement identified above (the "Agreement"). (The Agreement and this Schedule are collectively referred to as the "Lease.")

A.    EQUIPMENT

Pursuant to the terms of the Lease, Lessor will acquire and lease to Lessee, and Lessee will lease from Lessor, the Equipment listed on Annex A attached to this Schedule and made a part of this Schedule.

B.    FINANCIAL TERMS

1.    Advance Rent (if any): $ _____

2.    Capitalized Lessor's Cost: $ _____

3.    Basic Term Lease Rate Factor: _____

4.    Daily Lease Rate Factor: _____

5.    Basic Term (Number of Months): _____

6.    Basic Term Commencement Date: _____

7.    Equipment Location: _____

8.    Lessee's Federal Tax ID Number: _____

9.    Supplier: _____

10.    Last Delivery Date: _____

11.    First Termination Date: _____ (____) months after the Basic Term Commencement Date.

12.    Option Price: _____

C.    TAX BENEFITS

Depreciation Deductions:

1.    Depreciation Method: [Two hundred percent (200%)] declining balance method, switching to straight line method for the first (1st) taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year yields a larger allowance.

2.    Recovery Period: _____

3.    Basis: _____ percent (_____%) of Capitalized Lessor's Cost.

D.    TERM AND RENT

1.    Interim Rent. For the period from and including the Lease Commencement Date to the Basic Term Commencement Date ("Interim Period"), Lessee will pay rent ("Interim Rent") for each unit of Equipment equal to the product of (x) the Daily Lease Rate Factor, (y) the Capitalized Lessor's Cost of such unit and (z) the number of days in the Interim Period.  Interim Rent is due on _____ [Insert applicable month, day and year after the date of the schedule]

2.    Basic Term Rent. Commencing on _____ [Insert applicable month, day and year after the date of the schedule], and on the same day of each following month (each, a "Rent Payment Date") during the Basic Term, Lessee will pay ("Basic Term Rent") equal to the product of (x) the Basic Term Lease Rate Factor and (y) the Capitalized Lessor's Cost of all Equipment covered by this Schedule.

3.    Adjustment to Capitalized Lessor's Cost.  If Lessee authorizes Lessor to adjust the Capitalized Lessor's Cost to account for equipment change orders, equipment returns, invoicing errors, and similar matters, Interim Rent and Basic Term Rent will be adjusted (pursuant to Paragraphs 1 and 2 above) and Lessor will promptly send Lessee a written notice stating the final Capitalized Lessor's Cost.

Except as expressly modified by this Schedule, all terms and provisions of the Agreement remain in full force and effect.  This Schedule is not binding or effective with respect to the Agreement or Equipment until executed by authorized representatives of Lessor and Lessee.

Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR:                                LESSEE:

By_____                       By_____
Name_____                       Name_____
Title_____                      Title_____

Rev. 3/28/00

**ANNEX A**
**TO**
SCHEDULE NO. _____
TO MASTER LEASE AGREEMENT
DATED AS OF _____

<u>DESCRIPTION OF EQUIPMENT</u>

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| | | | | |

Initials _____        _____
        Lessor                Lessee

Rev. 3/28/00

ANNEX B
TO
SCHEDULE NO. _____
TO MASTER LEASE AGREEMENT
DATED AS OF _____

PURCHASE ORDER ASSIGNMENT AND CONSENT

THIS ASSIGNMENT AGREEMENT, dated as of _____ ("Assignment") is entered into between _____ ("Lessor"), and _____ ("Lessee"), based upon the following:

A.    Lessee desires to lease certain equipment ("Equipment") from Lessor pursuant to the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease").

B.    Lessee desires to assign, and Lessor is willing to acquire, certain of Lessee's rights and interests under the purchase order(s), agreement(s), and/or document(s) (the "Purchase Orders") Lessee has issued to the Supplier(s) of such Equipment.

NOW, THEREFORE, in consideration of their mutual covenants under this Assignment and the Lease, Lessor and Lessee agree as follows:

SECTION 1.    DEFINED TERMS.

All terms used in this Assignment have the meaning ascribed to them in the Lease unless otherwise defined in this Assignment.

SECTION 2.    ASSIGNMENT.

(a)    Lessee hereby assigns and sets over to Lessor all of Lessee's rights and interests in and to the Equipment and, to the extent they relate to the Equipment, the Purchase Orders, including, without limitation, (i) the rights to purchase, to take title, and to be named the purchaser in the bill of sale for the Equipment, (ii) all claims for damages in respect of the Equipment (including, without limitation, all warranty and indemnity claims), and (iii) any and all rights of Lessee to compel performance by the Supplier.

(b)    Even though Lessee has assigned its rights and interests in and to the Equipment and Purchase Orders to Lessor, unless an Event of Default exists under the Lease, Lessee is authorized during the term of the Lease to assert and enforce, at Lessee's sole cost and expense, from time to time in the name of and for the account of Lessor or Lessee (or both), as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

SECTION 3.    CONTINUING LIABILITY OF LESSEE.

Even though Lessee has assigned its rights and interests in and to the Equipment and Purchase Orders to Lessor:    (a) Lessee will remain liable to the Supplier to perform any duties and obligations of the purchaser under the Purchase Orders, except respecting payment provided for in the Lease so long as Lessee has complied with its obligations under Section I(b) of the Lease, to the same extent as if this Agreement had not been executed; (b) the execution of this Agreement will not modify any contractual rights of the Supplier under the Purchase Orders,

except respecting payment provided for in the Lease, and the liabilities of the Supplier under the Purchase Orders will continue as if this Agreement had not been executed; (c) the exercise by Lessor of any of its rights under this Assignment or the Lease will not release Lessee from any of its duties or obligations to the Supplier, except payment provided for in the Lease, under the Purchase Orders; and (d) Lessor will not have any obligation or liability under the Purchase Orders by reason of, or arising out of, this Assignment or be obligated to perform any of the obligations or duties of Lessee under the Purchase Orders or to make any payment (except to pay for the Equipment, subject to the terms in the Lease) or to make any inquiry of the sufficiency of or authorization for any payment received by any Supplier or to present or file any claim or to take any other action to collect or enforce any claim assigned under this Assignment.

The parties hereto have caused this Assignment to be duly executed as of the date first above written.

LESSOR:                                          LESSEE:

By_____              By_____
Name_____            Name_____
Title_____             Title_____

## CONSENT AND AGREEMENT

Supplier consents to this Assignment and agrees not to assert any claims or defenses against Lessor or Lessee that are inconsistent with this Assignment.  Supplier further agrees that the Purchase Orders are amended as necessary to provide as follows:

(a)    Title to and risk of loss of the Equipment will pass to Lessor upon Lessee's execution of the Delivery Certificate for such Equipment; and

(b)    Supplier waives and discharges any security interest, lien, or other encumbrance in or upon the Equipment and agrees to execute such documents as Lessor requests evidencing the release of any such encumbrance and the conveyance to Lessor of title to the Equipment.

(c)    On and after the date this Consent is executed, Supplier will not make any addition to or delete any items from the Equipment referred to in the Assignment without the prior written consent of both Lessor and Lessee.

The undersigned has caused this Consent to be executed this _____ day of _____, 20_____.

SUPPLIER:

By _____
Name _____
Title _____

Rev. 3/28/00

**ANNEX C**
**TO**
SCHEDULE NO. _____
TO MASTER LEASE AGREEMENT
DATED AS OF _____

DELIVERY AND ACCEPTANCE CERTIFICATE

To:    _____ ("Lessor")

        Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all Equipment listed below has been delivered to the location of Lessee described in the Equipment Schedule and installed (if applicable), (b) Lessee has received the Equipment for all purposes of the Lease, and (c) Lessee has found the Equipment to be in good working order.

        Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

DESCRIPTION OF EQUIPMENT

Manufacturer            Serial Numbers            Type and Model of Equipment


_____
        Authorized Representative

Dated: _____

Rev. 3/28/00

ANNEX D
TO
SCHEDULE NO. _____
TO MASTER LEASE AGREEMENT
DATED AS OF  _____

## STIPULATED LOSS AND TERMINATION VALUE TABLE

| RENTAL | STIPULATED LOSS VALUE | TERMINATION VALUE |
|--------|-----------------------|-------------------|
| Interim Rent | % | % |
| Basic Term Rent | % | % |

Initials: _____          _____
         Lessor                        Lessee

* The Stipulated Loss Value or Termination Value for any unit of Equipment equal the Capitalized Lessor's Cost of the unit multiplied by the appropriate percentage derived from the above tables.  If the lease term is extended for any reason, then the last percentage figure shown above controls throughout the extended term.

Rev. 3/28/00

ANNEX E

## NOTICE OF ACKNOWLEDGMENT AND ASSIGNMENT

[Date]

[Delphi Division Address]

Attention:  [John W. Jarrett]

Re:  Equipment Schedule No. _____ (the "Lease") to Master Lease Agreement dated _____ (the "Agreement") between _____ as lessor ("Lessor") and Delphi Automotive Systems Corporation, acting through its _____ Division as lessee (the "Lessee"),

Ladies and Gentlemen:

NOTICE

Lessor hereby notifies and directs Lessee that:

By collateral assignment, Lessor has assigned or will promptly assign to _____ ("Lender") all of Lessor's rights under the Lease, including all rights to receive rent payments and other sums due under the Lease (collectively, the "Payments").  Notwithstanding this assignment, Lessor will continue to perform Lessor's obligations under the Lease.

Until Lessee receives written notice to the contrary from Lender, Lessee will make all Payments directly to Lender at the following address:

_____

ACKNOWLEDGEMENT

Lessee acknowledges to Lender that:

1.    True and complete copies of the Lease and the Agreement are attached hereto as Exhibit A, and they represent the sole agreements between Lessor and Lessee with respect to the Equipment and the Payments due and to become due under the Lease.

2.    If Lessee has executed a Delivery Certificate for the equipment described in the Lease (the "Equipment"),  then Lessee's obligation to make the Payments is absolute and unconditional, and Lessee will not assert against Lender, any claim, defense, counterclaim, recoupment, setoff or right to cancel the Lease.  If Lessee has not executed a Delivery Certificate, then upon Lessee's execution thereof, Lessee's obligation to make the Payments will be absolute and unconditional, and Lessee will not assert against Lender, any claim, defense, counterclaim, recoupment, setoff or right to cancel the Lease.

Rev. 3/28/00

3.      If Lessee has executed a Delivery Certificate for the Equipment, then the Equipment has been fully and finally accepted by Lessee and is in Lessee's possession at the location specified in the Lease.  If Lessee has not executed a Delivery Certificate, then upon Lessee's execution thereof, the Equipment will have been fully and finally accepted by Lessee and will be in Lessee's possession at the location specified in the Lease.

4.      The Lease and the Agreement are in full force and effect, and Lessee will not modify or consent to any material modification of the Lease or the Agreement, without the prior written consent of Lender, and such modification will be ineffective without Lender's prior written consent, which consent will not be unreasonably withheld.

5.      Neither Lessee nor, to Lessee's knowledge, Lessor, is in default under the Lease or the Agreement.

6.      No sublease, assignment or transfer by Lessee will in any manner impair, diminish or relieve the Lessee of its primary obligations under the Lease or the Agreement, including its obligation to make all Payments.

7.      With respect to the Lease and the Agreement, Lessee waives all of his rights and remedies under Article 2A of the Uniform Commercial Code, except to the extent that they are expressly set forth in the Lease or the Agreement.

8.      Lessee has not received any notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease, the Payments or the Equipment.

The undersigned Lessee and Lessor acknowledge and confirm that the above statements are true and correct.

**LESSOR:**

_____

**LESSEE:**

Delphi Automotive Systems Corporation


By: _____          By: _____

Its: _____          Its: _____

Counterpart No. _____/_____ of Three (3) man-
ually executed counterparts. Only the manually
executed counterpart numbered "1" is sufficient
to transfer Lessor's interest, or to grant a security
interest herein.

# EQUIPMENT SCHEDULE
## SCHEDULE NO. 002
### DATED THIS 2nd DAY OF OCTOBER, 2001
### TO MASTER LEASE AGREEMENT NO. 1137
### DATED AS OF MARCH 30, 2001

Lessor and its Mailing Address:

KENSINGTON CAPITAL CORPORATION
Squirrel Hill Professional Building
5725 Forward Ave., Suite 30
Pittsburgh, PA 15217

Lessee and its Mailing Address:

DELPHI AUTOMOTIVE
SYSTEMS CORPORATION
One Corporate Center
Mail Station A224
Kokomo, IN 46904-9005

Capitalized terms not defined in this Schedule have the meanings assigned to them in the Master Lease Agreement identified above (the "Agreement"). (The Agreement and this Schedule are collectively referred to as the "Lease".)

A.    EQUIPMENT

Pursuant to the terms of the Lease, Lessor will acquire and lease to Lessee, and Lessee will lease from Lessor, the Equipment listed on Annex A attached to this Schedule and made a part of this Schedule.

B.    FINANCIAL TERMS

1.    Advance Rent (if any): $ N/A

2.    Capitalized Lessor's Cost: $7,788,389.00

3.    Basic Term Lease Rate Factor: .017053

4.    Daily Lease Rate Factor: .00056843

5.    Basic Term (Number of Months): 60 Months

6.    Basic Term Commencement Date: November 1, 2001

7.    Equipment Location: See Attached Annex A

8.    Lessee's Federal Tax ID Number: 38-3430473

9.    Supplier: See Attached Annex A

10. <u>Last Delivery Date:</u> N/A

11. <u>First Termination Date:</u> Twelve (12) months after the Basic Term Commencement Date.

12. <u>Option Price:</u> Fair Market Value

C. TAX BENEFITS

<u>Depreciation Deductions:</u>

1. <u>Depreciation Method:</u> <u>Two Hundred</u> percent (<u>200</u>%) declining balance method, switching to straight line method for the first (1st) taxable year for which using the straight line method with respect to the adjusted basis as of the beginning of such year yields a larger allowance.

2. <u>Recovery Period:</u> 5 Year MACRS

3. <u>Basis:</u> <u>One Hundred</u> percent (<u>100</u>%) of Capitalized Lessor's Cost.

D. TERM AND RENT

1. <u>Interim Rent.</u> For the period from and including the Lease Commencement Date to the Basic Term Commencement Date ("Interim Period"), Lessee will pay rent ("Interim Rent") for each unit of Equipment equal to the product of (x) the Daily Lease Rate Factor, (y) the Capitalized Lessor's Cost of such unit and (z) the number of days in the Interim period. Interim Rent is due on <u>November 1, 2001</u>.

2. <u>Basic Term Rent.</u> Commencing on <u>November 1, 2001,</u> and on the same day of each following month (each, a "Rent Payment Date") during the Basic Term, Lessee will pay ("Basic Term Rent") equal to the product of (x) the Basic Term Lease Rate Factor and (y) the Capitalized Lessor's Cost of all Equipment covered by this Schedule.

3. <u>Adjustment to Capitalized Lessor's Cost.</u> If Lessee authorizes Lessor to adjust the Capitalized Lessor's Cost to account for equipment change orders, equipment returns, invoicing errors, and similar matters, Interim Rent and Basic Term Rent will be adjusted (pursuant to Paragraphs 1 and 2 above) and Lessor will promptly send Lessee a written notice stating the final Capitalized Lessor's Cost.

4.    Rental Adjustment: On or prior to the Commencement Date, the aforesaid lease rate factor shall be adjusted (but shall remain fixed during the term of the Lease) so that for each basis point (.01%) change in the average of the U.S. Treasury Securities Rates (determined as set forth below) from 4.75%, the Monthly Lease Rate Factor shown hereinabove shall be changed by .000459%; provided, however, that said average shall not be less than 4.75%. The "average of the U.S. Treasury Securities Rates" as used herein shall be equal to the rate for U.S. government securities, Treasury constant maturities having a term of 5 years as stated in the column entitled "Week Ending" in Federal Reserve Statistical Release H.15 as of the second Friday preceding the Commencement Date. Lessor shall promptly notify Lessee in writing of the new lease rate factor and the resultant monthly rental once determined in accordance with this section. Lessee's failure to object to the revised lease rate factor and monthly rental within ten (10) business days of its receipt of such notice or Lessee's payment of Lessor's invoice of the revised rental amount shall constitute Lessee's irrevocable acceptance of Lessor's calculations. Lessee and Lessor agree that such notice shall not constitute a modification for which a writing signed by both parties could be required.

Except as expressly modified by this Schedule, all terms and provisions of the Agreement remain in full force and effect. This Schedule is not binding or effective with respect to the Agreement or Equipment until executed by authorized representatives of Lessor and Lessee.

Lessee and Lessor have caused this Schedule to be executed by their duly authorized representatives as of the date first above written.

LESSOR: KENSINGTON CAPITAL CORPORATION

By _____

Name _Victor L. Tarun_____

Title _President_____

LESSEE: DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By _____

Name _CHRISTOPHER P. ARKWRIGHT_

Title _ASSISTANT FINANCE DIRECTOR_

FIRST ADDENDUM TO
EQUIPMENT SCHEDULE NO. 002
DATED THIS 2nd DAY OF OCTOBER, 2001
TO MASTER LEASE AGREEMENT NO. 1137
DATED AS OF MARCH 30, 2001

LEASE END OPTIONS

The undersigned parties agree that Lessee shall, at the end of the Initial Term or any extension or renewal of the Lease, have the option to do any one of the following:

1. Option to Extend or Purchase. Provided that Lessee is not then in default under the Lease, nor, but for the passage of time or giving of notice or both, would be in default thereunder, Lessee may, by giving Lessor at least 180 days irrevocable written notice of its intention to do so:

a. Purchase all of the Equipment for its Fair Market Purchase Value, plus any sales or use tax associated with such purchase. Upon receipt of payment in full, Lessor shall immediately deliver appropriate documents to Lessee vesting in Lessee title to the Equipment, free and clear of all liens and encumbrances created by, through or under Lessor. Lessee will take the Equipment "as is", "where is."

b. In lieu of purchasing the Equipment, renew the lease of all the Equipment pursuant to the terms of the Lease for such period as the parties hereto may agree at a monthly rental equal to the product resulting by the multiplication of the original Equipment Cost by the factor of 1.535% for 12 Months or .853% for 24 Months. Upon conclusion of such renewal term, the lease will automatically renew on a month-to-month basis at the said rental until terminated by either party upon at least 180 days written notice.

For purposes hereof, the terms "Fair Market Rental Value" and "Fair Market Purchase Value", shall mean an amount equal to the value which would be obtained in an arm's-length retail transaction between an informed and willing lessee or purchaser, and an informed and willing lessor or seller, as the case may be, (other than a lessee currently in possession or a used equipment dealer) neither being under any compulsion to purchase, sell, or lease, assuming that, as of the date of the subject fair market value determination, the Equipment is in a condition at least as good as required under this Lease with respect to return or maintenance thereof.

If the parties cannot agree on the Fair Market Purchase Value or Fair Market Rental Value of the Equipment, the parties shall select an independent appraiser knowledgeable about the Equipment and the said value shall be determined by said appraiser. If the parties cannot agree on such an appraiser, the parties shall each select an independent appraiser knowledgeable about the Equipment and the appraisers shall select a third such appraiser.

The Fair Market Purchase Value or Fair Market Rental Value of the Equipment (as the case may be) shall be the average of the independent written appraisals submitted by each of the three appraisers. All appraisal costs shall be borne equally by the parties.

2. <u>Return of the Equipment.</u>  Lessee may return all of the Equipment to Lessor in conformity with the applicable provisions of the Lease.

3. <u>Automatic Renewal.</u>  Lessee may permit the Lease to automatically renew for the term or terms set forth in the Lease in conformity with the applicable provisions of the Lease.

LESSOR:  ICX CORPORATION

By: _____

Title: _Victor L. Tatum_

Date: _President_

LESSEE:  DELPHI AUTOMOTIVE
SYSTEMS CORPORATION

By: _____

Title: _Christopher P. Arkwright._

Date: _Assistant Finance Director_

ANNEX A
TO
SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

DESCRIPTION OF EQUIPMENT

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| **EQUIPMENT LOCATION: 7929 South Howell Avenue, Oak Creek, WI 53154** | | | | |
| Sonoscan Inc. | | D6000 Imaging System | 1 | $142,595.00 |
| Siemens E & A | | Placement Machine HS50 | 2 | 1,107,932.00 |
| | | Nozzle C & P F5 HM | 1 | 286,871.00 |
| Genrad, Inc. | | SRT Summit HR 1100 | 3 | 180,000.00 |
| **EQUIPMENT LOCATION: 2033 East Boulevard, Kokomo, IN 46904-9005** | | | | |
| Speedline Tech., Inc. | | Screen Printer MPM UL | 1 | $151,608.00 |
| Speedline Tech., Inc. | | Screen Printer, Flux Print | 1 | 155,230.00 |
| Speedline Tech., Inc. | | Screen Printer, Paste Print | 1 | 151,170.00 |
| Speedline Tech., Inc. | | Pump Head Bal Control | 1 | 22,500.00 |
| Speedline Tech., Inc. | | Pump Head Bal Control | 1 | 22,500.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head | 2 | 892.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head 8" | 1 | 0.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head | 2 | 892.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head | 1 | 0.00 |
| Speedline Tech., Inc. | | Rear Fixed Rail | 1 | 4,850.00 |
| Siemens E & A | | Siplace HS 50 | 2 | 1,159,632.00 |
| Siemens E & A | | Printer, HP Desk Jet | 1 | 17,116.00 |
| Siemens E & A | | C&P Replacement Machine | 1 | 326,514.00 |
| Siemens E & A | | Printer, HP Desk Jet | 1 | 488.00 |
| Agilent Tech., Inc. | | Cost Combo Test System | 2 | 434,120.00 |
| Agilent Tech., Inc. | | Option 211 | 2 | 0.00 |
| Agilent Tech., Inc. | | System Power Distr. Unit | 2 | 0.00 |
| Agilent Tech., Inc. | | Option AWW 120/208VWYE | 2 | 0.00 |
| Agilent Tech., Inc. | | H6621A+U0H, UNIX Sftware | 2 | 0.00 |
| Agilent Tech., Inc. | | Option 005, 1 Yr. Unix SW | 2 | 0.00 |
| Agilent Tech., Inc. | | First Yr. SW Updates (Credit) | 2 | 0.00 |
| Intl. Thermal Systems | | Epoxy Underfill Cure Oven | 1 | 77,262.00 |
| Sonoscan, inc. | | Sonoscan D6000 Imag. System | 1 | 142,595.00 |
| WK Test LTD | | Wayne Kerr 3994 | 2 | 229,220.67 |
| WK Test LTD | | Wayne Kerr 3994 | 1 | 114,610.33 |
| Siemens E & A | | 119000 Siplace HS 50 | 2 | 1,086,586.00 |
| Siemens E & A | | Nozzle Changer for HS50 | 2 | 24,906.00 |
| Siemens E & A | | 119161-01 RV Head Nozzle | 8 | 24,864.00 |
| Siemens E &A | | 119078-01 Scanner | 2 | 14,438.00 |

**ANNEX A (continued)**
**TO**
**SCHEDULE NO. 002**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF MARCH 30, 2001**

DESCRIPTION OF EQUIPMENT

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| **EQUIPMENT LOCATION: 2033 East Boulevard, Kokomo, IN 46904-9005** | | | | |
| Siemens E & A | | 119090-01 SMEMA Interface | 2 | $ 0.00 |
| Siemens E & A | | 119000 Siplace HS50 | 1 | 543,293.00 |
| Siemens E & A | | 119160-01 Nozzle Changer | 1 | 12,453.00 |
| Siemens E & A | | 119161-0 Additional RV Head | 4 | 12,432.00 |
| Siemens E & A | | 119078-0 Hand Held Scanner | 1 | 3,219.00 |
| Siemens E & A | | 119092-01 SMEMA Interface | 1 | 0.00 |
| **EQUIPMENT LOCATION: 2100 East Lincoln Road, Kokomo, IN 46904-9005** | | | | |
| RVSI Systemation, Inc. | | Systemation ST-585 Machine | 1 | $160,000.00 |
| Dymatix | | Model 1046 Auto Die Sorter | 4 | 1,128,000.00 |
| **EQUIPMENT LOCATION: 1300 North Dort Highway, Flint, MI 48556** | | | | |
| Wand Enterprises, Inc. | | 2018AT, 20 Ton Press | 1 | $45,600.00 |

Initials:    _____    _____
             Lessor              Lessee

ANNEX B
TO
EQUIPMENT SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

PURCHASE ORDER ASSIGNMENT AND CONSENT

, THIS ASSIGNMENT AGREEMENT, dated as of September 28, 2001 ("Assignment") is entered into between Kensington Capital Corporation ("Lessor"), and Delphi Automotive Systems Corporation ("Lessee"), based upon the following:

A.    Lessee desires to lease certain equipment ("Equipment") from Lessor pursuant to the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease").

B.    Lessee desires to assign, and Lessor is willing to acquire, certain of Lessee's rights and interest under the purchase order(s), agreement(s), and/or document(s) (the "Purchase Orders") Lessee has issued to the Supplier(s) of such Equipment.

NOW, THEREFORE, in consideration of their mutual covenants under this Assignment and the Lease, Lessor and Lessee agree as follows:

SECTION 1.   DEFINED TERMS.

All terms used in this Assignment have the meaning ascribed to them in the Lease unless otherwise defined in this Assignment.

SECTION 2.   ASSIGNMENT.

(a)    Lessee hereby assigns and sets over to Lessor all of Lessee's rights and interests in and to the Equipment and, to the extent they relate to the Equipment, the Purchase Orders, including, without limitation, (i) the rights to purchase, to take title, and to be named the purchaser in the bill of sale for the Equipment, (ii) all claims for damages in respect of the Equipment (including, without limitation, all warranty and indemnity claims), and (iii) any and all rights of Lessee to compel performance by the Supplier.

(b)    Even though Lessee has assigned its rights and interests in and to the Equipment and Purchase Orders to Lessor, unless an Event of Default exists under the Lease, Lessee is authorized during the term of the Lease to assert and enforce, at Lessee's sole cost and expense, from time to time in the name of and for the account of Lessor or Lessee (or both), as their interests may appear, whatever claims and rights Lessor may have against any Supplier of the Equipment.

SECTION 3.   CONTINUING LIABILITY OF LESSEE.

Even though Lessee has assigned its rights and interests in and to the Equipment and Purchase Orders to Lessor: (a) Lessee will remain liable to the Supplier to perform any duties and obligations of the purchaser under the Purchase Orders, except respecting payment provided for in the Lease so long as Lessee has complied with its obligations under Section I(b) of the Lease, to the same extent as if this Agreement had not been executed; (b) the execution of this Agreement will not modify any contractual rights to the Supplier under the Purchase Orders, except respecting payment provided for in the Lease, and the liabilities of the Supplier under the Purchase Orders will continue as if this Agreement had not been executed; (c) the exercise by Lessor of any of its rights under this Assignment or the Lease will not release Lessee from any of its duties or obligations to the Supplier, except payment provided for in the Lease, under the Purchase Orders; and (d) Lessor will not have any obligation or liability under the Purchase Orders by reason of, or arising out of, this Assignment or be obligated to perform any of the obligations or duties of Lessee under the Purchase Orders or to make any payment (except to pay for the Equipment, subject to the terms in the Lease) or to make any in Inquiry of the sufficiency or authorization for any payment received by any Supplier or to present or file any claim or to take any other action to collect or enforce any claim assigned under this Assignment.

The parties hereto have caused this Assignment to be duly executed as of the date first above written.

LESSOR:  KENSINGTON CAPITAL
CORPORATION

By _Victop Tatum_

Name _VICTOR L. TATUM_

Title _President_

LESSEE:  DELPHI AUTOMOTIVE
SYSTEMS CORPORATION

By _C.P. Arkwright_

Name _CHRISTOPHER P. ARKWRIGHT_

Title _ASSISTANT FINANCE DIRECTOR_

Counterpart No. ____/____ of Three (3) manually executed counterparts. Only the manually executed counterpart numbered "1" is sufficient to transfer Lessor's interest, or to grant a security interest herein.

ANNEX C
TO
SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

<u>DELIVERY AND ACCEPTANCE CERTIFICATE</u>

To:    KENSINGTON CAPITAL CORPORATION ("Lessor")

Pursuant to the provisions of the Schedule and Master Lease Agreement that are referenced above (collectively, the "Lease"), Lessee certifies and warrants that (a) all Equipment listed below has been delivered to the location of Lessee described in the Equipment Schedule and installed (if applicable), (b) Lessee has received the Equipment for all purposes of the Lease and (c) Lessee has found the Equipment to be in good working order.

Lessee further certifies that (i) Lessee is not in default under the Lease; (ii) the representations and warranties made by Lessee under the Lease are true and correct on the date hereof; and (iii) Lessee has reviewed and approves the purchase documents for the Equipment, if any.

<u>DESCRIPTION OF EQUIPMENT</u>

| <u>Manufacturer</u> | <u>Serial Numbers</u> | <u>Type and Model of Equipment</u> |
|---|---|---|
| | | |

SEE ANNEX A

_____
Authorized Representative

Dated: October 12th, 2001

1137-002

## ANNEX D
## TO
## SCHEDULE NO. 002
## TO MASTER LEASE AGREEMENT
## DATED AS OF MARCH 30, 2001

Stipulated Loss Value Schedule
Lease Agreement No. 1137
Equipment Schedule No. 002

Interim Rent: 100%
Basic Rent: 100%

| Date | Stipulated Loss Value (% of Cost) |
|------|-----------------------------------|
| Nov-01-01 | 112.64469997 |
| Dec-01-01 | 111.56312077 |
| Jan-01-02 | 110.45308549 |
| Feb-01-02 | 109.31565335 |
| Mar-01-02 | 108.16946545 |
| Apr-01-02 | 107.01448386 |
| May-01-02 | 105.84768222 |
| Jun-01-02 | 104.66822150 |
| Jul-01-02 | 103.47680826 |
| Aug-01-02 | 102.27265586 |
| Sep-01-02 | 101.05945883 |
| Oct-01-02 | 99.83412670 |
| Nov-01-02 | 98.59594507 |
| Dec-01-02 | 97.34857148 |
| Jan-01-03 | 96.08887783 |
| Feb-01-03 | 94.81622291 |
| Mar-01-03 | 93.53422677 |
| Apr-01-03 | 92.24284897 |
| May-01-03 | 90.94289169 |
| Jun-01-03 | 89.63332783 |
| Jul-01-03 | 88.31508608 |
| Aug-01-03 | 86.98717827 |
| Sep-01-03 | 85.64969001 |
| Oct-01-03 | 84.30337275 |
| Nov-01-03 | 82.94729809 |
| Dec-01-03 | 81.58152103 |
| Jan-01-04 | 80.20676188 |
| Feb-01-04 | 78.82215280 |
| Mar-01-04 | 77.42771779 |
| Apr-01-04 | 76.02341431 |
| May-01-04 | 74.61230747 |
| Jun-01-04 | 73.19332386 |
| Jul-01-04 | 71.76745745 |
| Aug-01-04 | 70.33366625 |
| Sep-01-04 | 68.88983619 |
| Oct-01-04 | 67.43898886 |

ANNEX D (continued)
TO
SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

Stipulated Loss Value Schedule
Lease Agreement No. 1137
Equipment Schedule No. 002

Interim Rent: 100%
Basic Rent: 100%

| Date | Stipulated Loss Value (% of Cost) |
|---|---|
| Nov-01-04 | 65.98013548 |
| Dec-01-04 | 64.51113473 |
| Jan-01-05 | 63.03498049 |
| Feb-01-05 | 61.55073788 |
| Mar-01-05 | 60.05623797 |
| Apr-01-05 | 58.55143636 |
| May-01-05 | 57.03928751 |
| Jun-01-05 | 55.51893320 |
| Jul-01-05 | 53.99114748 |
| Aug-01-05 | 52.45510543 |
| Sep-01-05 | 50.90858181 |
| Oct-01-05 | 49.35448517 |
| Nov-01-05 | 47.79204661 |
| Dec-01-05 | 46.21901219 |
| Jan-01-06 | 44.63826128 |
| Feb-01-06 | 43.04908173 |
| Mar-01-06 | 41.44919056 |
| Apr-01-06 | 39.83854138 |
| May-01-06 | 38.22070606 |
| Jun-01-06 | 36.59496443 |
| Jul-01-06 | 34.96195497 |
| Aug-01-06 | 33.32098982 |
| Sep-01-06 | 31.66908885 |
| Oct-01-06 | 30.00977848 |
| Nov-01-06 and thereafter | 30.00000000 |

Stipulated Loss Values are due in addition to any rent due on the same date.

Initials:  _____          _____
                    Lessor                                    Lessee

* The Stipulated Loss Value or Termination Value for any unit of Equipment equal the Capitalized Lessor's Cost of the unit multiplied by the appropriate percentage derived from the above tables. If the lease term is extended for any reason, then the last percentage figure shown above controls throughout the extended term.

ANNEX D
TO
SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

Termination Value Schedule
Lease Agreement No. 1137
Equipment Schedule No. 002

| Date | Termination Value % of Cost |
|------|------------------------------|
| Nov-01-02 | 88.59594507 |
| Dec-01-02 | 87.34857148 |
| Jan-01-03 | 86.08887783 |
| Feb-01-03 | 84.81622291 |
| Mar-01-03 | 83.53422677 |
| Apr-01-03 | 82.24284897 |
| May-01-03 | 80.94289169 |
| Jun-01-03 | 79.63332783 |
| Jul-01-03 | 78.31508608 |
| Aug-01-03 | 76.98717827 |
| Sep-01-03 | 75.64969001 |
| Oct-01-03 | 74.30337275 |
| Nov-01-03 | 72.94729809 |
| Dec-01-03 | 71.58152103 |
| Jan-01-04 | 70.20676188 |
| Feb-01-04 | 68.82215280 |
| Mar-01-04 | 67.42771779 |
| Apr-01-04 | 66.02341431 |
| May-01-04 | 64.61230747 |
| Jun-01-04 | 63.19332386 |
| Jul-01-04 | 61.76745745 |
| Aug-01-04 | 60.33366625 |
| Sep-01-04 | 58.88983619 |
| Oct-01-04 | 57.43898886 |
| Nov-01-04 | 55.98013548 |
| Dec-01-04 | 54.51113473 |
| Jan-01-05 | 53.03498049 |
| Feb-01-05 | 51.55073788 |
| Mar-01-05 | 50.05623797 |
| Apr-01-05 | 48.55143636 |
| May-01-05 | 47.03928751 |
| Jun-01-05 | 45.51893320 |
| Jul-01-05 | 43.99114748 |
| Aug-01-05 | 42.45510543 |
| Sep-01-05 | 40.90858181 |
| Oct-01-05 | 39.35448517 |
| Nov-01-05 | 37.79204661 |

**ANNEX D (continued)**
**TO**
**SCHEDULE NO. 002**
**TO MASTER LEASE AGREEMENT**
**DATED AS OF MARCH 30, 2001**

**Termination Value Schedule**
**Lease Agreement No. 1137**
**Equipment Schedule No. 002**

| Date | Termination Value % of Cost |
|------|------------------------------|
| Dec-01-05 | 36.21901219 |
| Jan-01-06 | 34.63826128 |
| Feb-01-06 | 33.04908173 |
| Mar-01-06 | 31.44919056 |
| Apr-01-06 | 29.83854138 |
| May-01-06 | 28.22070606 |
| Jun-01-06 | 26.59496443 |
| Jul-01-06 | 24.96195497 |
| Aug-01-06 | 23.32098982 |
| Sep-01-06 | 21.66908885 |
| Oct-01-06 | 20.00977848 |
| Nov-01-06 | 20.00000000 |

Termination Values are due in addition to any rent due on the same date.

Initials:  _____        _____
           Lessor                  Lessee

* The Stipulated Loss Value or Termination Value for any unit of Equipment equal the Capitalized Lessor's Cost of the unit multiplied by the appropriate percentage derived from the above tables. If the lease term is extended for any reason, then the last percentage figure shown above controls throughout the extended term.

Counterpart No. _____ 1 _____ of Three (3) man-
ually executed counterparts. Only the manually
executed counterpart numbered "1" is sufficient
to transfer Lessor's interest, or to grant a security
interest herein.

ANNEX E

## NOTICE OF ACKNOWLEDGMENT AND ASSIGNMENT

Delphi Automotive Systems Corporation
One Corporate Center
Mail Station A224
Kokomo, IN 46904-9005

RE:  Equipment Schedule No. 002 (the "Lease") to Master Lease Agreement No. 1137
dated March 30, 2001 (the "Agreement") between Kensington Capital Corporation
as lessor ("Lessor") and Delphi Automotive Systems Corporation, acting through its
Delco Electronics Division as lessee (the "Lessee")

Ladies and Gentlemen:

## NOTICE

Lessor hereby notifies and directs Lessee that:

By collateral assignment, Lessor has assigned or will promptly assign to ICX
Corporation ("Lender") all of Lessor's rights under the Lease, including all rights to
receive rent payments and other sums due under the Lease (collectively, the "Payments").
Notwithstanding this assignment, Lessor will continue to perform Lessor's obligations
under the Lease.

Until Lessee receives written notice to the contrary from Lender, Lessee will
make all Payments directly to Lender at the following address:

ICX Corporation
P.O. Box 94781
Cleveland, OH 44101

## ACKNOWLEDGEMENT

Lessee acknowledges to Lender that:

1. True and complete copies of the Lease and the Agreement are attached hereto as
Exhibit A, and they represent the sole agreements between Lessor and Lessee
with respect to the Equipment and the Payments due and to become due under the
Lease.

2. If Lessee has executed a Delivery and Acceptance Certificate for the equipment described in the Lease (the "Equipment"), then Lessee's obligation to make the Payments is absolute and unconditional, and Lessee will not assert against Lender, any claim, defense, counterclaim, recoupment, setoff or right to cancel the Lease. If Lessee has not executed a Delivery and Acceptance Certificate, then upon Lessee's execution thereof, Lessee's obligations to make the Payments will be absolute and unconditional, and Lessee will not assert against Lender, any claim, defense, counterclaim, recoupment, setoff or right to cancel the Lease.

3. If Lessee has executed a Delivery and Acceptance Certificate for the Equipment, then the Equipment has been fully and finally accepted by Lessee and is in Lessee's possession at the location specified in the Lease. If Lessee has not executed a Delivery and Acceptance Certificate, then upon Lessee's execution thereof, the Equipment will have been fully and finally accepted by Lessee and will be in Lessee's possession at the location specified in the Lease.

4. The Lease and the Agreement are in full force and effect, and Lessee will not modify or consent to any material modification of the Lease or the Agreement, without the prior written consent of Lender, and such modification will be ineffective without Lender's prior written consent, which consent will not be unreasonably withheld.

5. Neither Lessee nor, to Lessee's knowledge, Lessor, is in default under the Lease or the Agreement.

6. No sublease, assignment or transfer by Lessee will in any manner impair, diminish or relieve the Lessee of its primary obligations under the Lease or the Agreement, including its obligation to make all Payments.

7. With respect to the Lease and the Agreement, Lessee waives all of his rights and remedies under Article 2A of the Uniform Commercial Code, except to the extent that they are expressly set forth in the Lease or the Agreement.

8. Lessee has not received any notice of a prior sale, transfer, assignment, hypothecation or pledge of the Lease, the Payments or the Equipment.

The undersigned Lessee and Lessor acknowledge and confirm that the above statements are true and correct.

LESSOR: KENSINGTON CAPITAL CORPORATION

By: _Victor Latin_____

Its: _President_____

LESSEE: DELPHI AUTOMOTIVE SYSTEMS CORPORATION

By: _C. P. Atwright_____

Its: _October 12th, 2001_____

ANNEX A
TO
SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

DESCRIPTION OF EQUIPMENT

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| **EQUIPMENT LOCATION: 7929 South Howell Avenue, Oak Creek, WI 53154** | | | | |
| Sonoscan Inc. | | D6000 Imaging System | 1 | $142,595.00 |
| Siemens E & A | | Placement Machine HS50 | 2 | 1,107,932.00 |
| | | Nozzle C & P F5 HM | 1 | 286,871.00 |
| Genrad, Inc. | | SRT Summit HR 1100 | 3 | 180,000.00 |
| **EQUIPMENT LOCATION: 2033 East Boulevard, Kokomo, IN 46904-9005** | | | | |
| Speedline Tech., Inc. | | Screen Printer MPM UL | 1 | $151,608.00 |
| Speedline Tech., Inc. | | Screen Printer, Flux Print | 1 | 155,230.00 |
| Speedline Tech., Inc. | | Screen Printer, Paste Print | 1 | 151,170.00 |
| Speedline Tech., Inc. | | Pump Head Bal Control | 1 | 22,500.00 |
| Speedline Tech., Inc. | | Pump Head Bal Control | 1 | 22,500.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head | 2 | 892.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head 8" | 1 | 0.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head | 2 | 892.00 |
| Speedline Tech., Inc. | | Rheometric Pump Head | 1 | 0.00 |
| Speedline Tech., Inc. | | Rear Fixed Rail | 1 | 4,850.00 |
| Siemens E & A | | Siplace HS 50 | 2 | 1,159,632.00 |
| Siemens E & A | | Printer, HP Desk Jet | 1 | 17,116.00 |
| Siemens E & A | | C&P Replacement Machine | 1 | 326,514.00 |
| Siemens E & A | | Printer, HP Desk Jet | 1 | 488.00 |
| Agilent Tech., Inc. | | Cost Combo Test System | 2 | 434,120.00 |
| Agilent Tech., Inc. | | Option 211 | 2 | 0.00 |
| Agilent Tech., Inc. | | System Power Distr. Unit | 2 | 0.00 |
| Agilent Tech., Inc. | | Option AWW 120/208VWYE | 2 | 0.00 |
| Agilent Tech., Inc. | | H6621A+U0H, UNIX Sftware | 2 | 0.00 |
| Agilent Tech., Inc. | | Option 005, 1 Yr. Unix SW | 2 | 0.00 |
| Agilent Tech., Inc. | | First Yr. SW Updates (Credit) | 2 | 0.00 |
| Intl. Thermal Systems | | Epoxy Underfill Cure Oven | 1 | 77,262.00 |
| Sonoscan, inc. | | Sonoscan D6000 Imag. System | 1 | 142,595.00 |
| WK Test LTD | | Wayne Kerr 3994 | 2 | 229,220.67 |
| WK Test LTD | | Wayne Kerr 3994 | 1 | 114,610.33 |
| Siemens E & A | | 119000 Siplace HS 50 | 2 | 1,086,586.00 |
| Siemens E & A | | Nozzle Changer for HS50 | 2 | 24,906.00 |
| Siemens E & A | | 119161-01 RV Head Nozzle | 8 | 24,864.00 |
| Siemens E &A | | 119078-01 Scanner | 2 | 14,438.00 |

ANNEX A (continued)
TO
SCHEDULE NO. 002
TO MASTER LEASE AGREEMENT
DATED AS OF MARCH 30, 2001

DESCRIPTION OF EQUIPMENT

| Manufacturer | Serial Numbers | Type and Model of Equipment | Number of Units | Cost Per Unit |
|---|---|---|---|---|
| **EQUIPMENT LOCATION: 2033 East Boulevard, Kokomo, IN 46904-9005** | | | | |
| Siemens E & A | 119090-01 | SMEMA Interface | 2 | $ 0.00 |
| Siemens E & A | 119000 | Siplace HS50 | 1 | 543,293.00 |
| Siemens E & A | 119160-01 | Nozzle Changer | 1 | 12,453.00 |
| Siemens E & A | 119161-0 | Additional RV Head | 4 | 12,432.00 |
| Siemens E & A | 119078-0 | Hand Held Scanner | 1 | 7,219.00 |
| Siemens E & A | 119092-01 | SMEMA Interface | 1 | 0.00 |
| **EQUIPMENT LOCATION: 2100 East Lincoln Road, Kokomo, IN 46904-9005** | | | | |
| RVSI Systemation, Inc. | | Systemation ST-585 Machine | 1 | $160,000.00 |
| Dymatix | | Model 1046 Auto Die Sorter | 4 | 1,128,000.00 |
| **EQUIPMENT LOCATION: 1300 North Dort Highway, Flint, MI 48556** | | | | |
| Wand Enterprises, Inc. | | 2018AT, 20 Ton Press | 1 | $45,600.00 |

Initials:    _(signature)_          _(signature)_
             _____           _____
             Lessor                Lessee