# GROUP EXHIBIT B

## ENVIRONMENTAL AGREEMENT

ENVIRONMENTAL AGREEMENT (the "Agreement") made as of the 11th day of April, 2005 by Delphi Corporation ("Delphi"), having an office at 5725 Delphi Drive, Troy, Michigan 48098-2815, Delphi Delco Electronics De Mexico, S.A. DE C.V. ("Delphi Mexico") and Prudential Investment Management, Inc. ("Prudential"), having an office c/o The Prudential Insurance Company of America, 8 Campus Drive, Parsippany, NJ 07054, on its own behalf and on behalf of other Indemnified Parties (as hereinafter defined).

### RECITALS

A.    Delphi Mexico is the fee owner of that certain real property more particularly described in Exhibit A attached hereto (said real property, together with all structures, buildings, improvements soil and groundwater located on, at or under the real property, being collectively referred to as the "Property").

B.    Delphi Mexico and PLA Holding VI, LLC, an affiliate of Prudential have entered into a purchase option dated December 16, 2004 pursuant to which Banco J.P. Morgan, S.A., Institucion de Banca Multiple, J.P. Morgan Grupo Financiero, Division Fiduciaria, not individually, but in its capacity as trustee (together with its successors and assigns under a Business Administration Trust Agreement, dated January 19, 2005 and known as Trust F/00121, benefiting the beneficiaries thereunder) (the "Buyer") intends to purchase the Property from Delphi Mexico and Delphi Mexico will convey the Property to Buyer by the delivery of a deed (the "Deed").

C.    Buyer is unwilling to acquire the Property unless Delphi and Delphi Mexico agree to provide the indemnification, representations, warranties, and covenants and other matters described in this Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Delphi hereby represents, warrants, covenants and agrees for the benefit of Prudential as follows:

### ARTICLE 1 - DEFINITIONS

Section 1.1    DEFINITIONS.  As used in this Agreement, the following terms shall have the following meanings:

"Environmental Law" means any federal, state and local laws, statutes, ordinances, rules and regulations, as well as common law, relating to protection of human health or the environment, Hazardous Substances, including use, collection, storage, transport, reuse, recycling, treatment and final disposition of Hazardous Substances, liability for or costs of Remediation or prevention of Releases of Hazardous Substances.  The term "Environmental Law" includes, but is not limited to, any federal, state and local laws, statutes, ordinances, rules, remediation programs and regulations, including Normas Oficiales Mexicanas ("NOMs") as well as common law:  conditioning transfer of property upon a negative declaration or other approval

of a governmental authority of the environmental condition of the Property; requiring notification or disclosure of Releases of Hazardous Substances or other environmental condition of the Property to the Secretaria de Medio Ambiente y Recursos Naturales ("SEMARNAT") and/or Procuraduria Federal de Proteccion al Ambiente ("PROFEPA") or any other governmental authority or other person or entity, whether or not in connection with transfer of title to or interest in property; imposing conditions or requirements in connection with permits or other authorization for lawful activity; relating to nuisance, trespass or other causes of action related to the Property; and relating to wrongful death, personal injury, or property or other damage in connection with the presence of Hazardous Materials at, on, under or from the Property. With respect to Delphi and Delphi Mexico's obligations under Sections 3.5, 3.6, 3.7 and 3.8 hereof, the term "Environmental Laws" shall include any applicable federal, state and local laws, statutes, ordinances, rules, remediation programs and regulations that come into effect or are amended or changed during the performance of said obligations.

"Hazardous Substances" includes but is not limited to tetrachlroethylene, trichloroethylene and any and all substances defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, biohazard materials or words of similar meaning or regulatory effect under any Environmental Laws, including but not limited to NOM-052-SEMARNAT-1993, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, radioactive materials, flammables and explosives.

"Indemnified Parties" includes Prudential Real Estate Investors, Prudential Investment Management, Inc., Prudential Financial Inc., PLA Industrial Fund I, LLC, PLA Holding VI, LLC, PLA Mexico Industrial Manager I LLC, Banco J.P. Morgan, S.A., Institucion de Banca Multiple, J.P. Morgan Grupo Financiero, Division Fiduciaria, not individually, but in its capacity as trustee (together with its successors and assigns under a Business Administration Trust Agreement, dated January 19, 2005 and known as Trust F/00121, benefiting the beneficiaries thereunder) and its or their successors and assigns, as well as the respective directors, officers, shareholders, members, partners, employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any and all of the foregoing and including but not limited to any successors by merger, consolidation or acquisition of all or a substantial part of any of their assets and business.

"Legal Action" means any claim, suit or proceeding, whether administrative or judicial in nature.

"Losses" includes any claims, suits, liabilities (including but not limited to strict liabilities), administrative or judicial actions or proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, costs of Remediation, costs of assessing damages or losses, judgments, awards, amounts paid in settlement, litigation costs, attorneys' fees, engineers' fees, environmental consultants' fees, and investigation costs (including but not limited to costs for sampling, testing and analysis of soil, water, air, building materials, and other materials and substances) and, with regard to third-party claims, the foregoing which are incurred in connection with any judicial or administrative proceedings.

chi-fs1\43)920(v05                                              2

"**Release**" with respect to any Hazardous Substance includes but is not limited to any release, deposit, discharge, emission, leaking, leaching, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"**Remediation**" includes but is not limited to any response, remedial, removal, or corrective action; any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance; any actions to prevent, cure or mitigate any Release of any Hazardous Substance; any action to comply with any Environmental Laws or with any permits issued pursuant thereto; any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances carried out by auditors and consultants registered in PROFEPA, and laboratories duly accredited by the Mexican accreditation entity (EMA), or authorized verification units, laboratories or the competent authority.

"**PCE**" means trichloroethylene, tetrachloroethylene, dichloroethylene, vinyl chloride and similar solvents and their degradation products.

## ARTICLE 2 - ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES

Delphi and Delphi Mexico represent and warrant, based upon written report(s) resulting from the environmental assessment(s) of the Property delivered to Prudential (collectively referred to herein as the "**Environmental Report**"), that to the best of their knowledge:

Section 2.1    HAZARDOUS SUBSTANCES.  There are no Hazardous Substances in, on, above, or under the Property, except those that are either (i) Hazardous Substances of such types and in such quantities as are customarily used or stored or generated for offsite disposal or otherwise present in or at properties of the relevant property type, and in compliance with all Environmental Laws and with permits issued pursuant thereto, or (ii) fully disclosed to Prudential in writing or in the Environmental Report.

Section 2.2    NO RELEASES.  There are no past, present or threatened Releases of Hazardous Substances in, on, above, under or from the Property, except as described in the Environmental Report.

Section 2.3    NO MIGRATION.    There is no Release of Hazardous Substances migrating to or from the Property.

Section 2.4    NO VIOLATIONS.  There is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto, in connection with the Property, except as described in the Environmental Report.

Section 2.5    COMPLETE DISCLOSURE.  Delphi Mexico has truthfully and fully provided to Prudential, in writing, any and all information relating to conditions in, on, above, under or from the Property that is known to Delphi Mexico and that is contained in files and records of Delphi Mexico or Delphi, including but not limited to any reports relating to Hazardous Substances in, on, above, under or from the Property and/or to the environmental condition of the Property.

Section 2.6    PROPERTY COMPLIANCE.  The Property and the operations conducted thereon do not violate any applicable Environmental Law or any restrictive covenant or deed restriction (recorded or otherwise), and there are no Hazardous Materials present under, on or at the Property which prohibit or restrict Delphi Mexico's ability to convey the Property, including under article 71 of the General Law for the Prevention and Integral Management of Wastes *(Ley General para la Prevencion y Gestion Integral de Residuos)*.

## ARTICLE 3 - ENVIRONMENTAL COVENANTS

Delphi and Delphi Mexico covenant and agree that:

Section 3.1    COMPLIANCE.  All uses and operations on or of the Property by Delphi or Delphi Mexico shall be in compliance with all Environmental Laws and permits issued pursuant thereto.

Section 3.2    NO RELEASES.  It or they shall not cause or permit any Hazardous Substances to be released in, on, above, under or from the Property in violation of Environmental Laws.

Section 3.3    NO HAZARDOUS SUBSTANCES.  It or they shall not cause or permit any Hazardous Substances to be located in, on, above or under the Property, except those that are either (i) Hazardous Substances of such types and in such quantities as are customarily used or stored or generated for offsite disposal or otherwise present in or at properties of the relevant property type, and in compliance with all Environmental Laws and with permits issued pursuant thereto, or (ii) fully disclosed to Prudential in writing and approved by Prudential.

Section 3.4    NO ENCUMBRANCES.  Delphi shall keep the Property free and clear of all liens and other encumbrances for work it performed or imposed pursuant to any Environmental Law, due to any act or omission of Delphi or Delphi Mexico (the "Environmental Liens").

Section 3.5    INVESTIGATION.  Within forty-five (45) days of the date hereof, Delphi Mexico shall commence, and diligently and as soon as practicable, complete, at its sole cost and expense, and through auditors and consultants registered in PROFEPA, and laboratories duly accredited by the Mexican accreditation entity (EMA), or a verification unit authorized by SEMARNAT, the implementation of the scope of work delineated on Exhibit B (including but not limited to sampling, testing and analysis of soil and water), and promptly deliver to Prudential all drafts and final reports and other work product, boring logs and laboratory data from its investigations.  Prudential and other Indemnified Parties shall be entitled to rely on such reports and other results thereof.  Buyer may, at its sole cost and expense, perform any supplemental and additional soil and groundwater investigations at the Property that it desires to further investigate or delineate contamination at or from the Property.

Section 3.6    SEMARNAT AND/OR PROFEPA.  Delphi Mexico or Delphi shall notify SEMARNAT and/or PROFEPA, as appropriate pursuant to the Environmental Laws, of the knowledge of the presence of PCE or any other Hazardous Substances at the Property and the extent of known PCE contamination at the Property.  Delphi Mexico or Delphi shall provide a draft of all documents, reports and submittals to PROFEPA, SEMARNAT or any other

chi-fs1\431926v05

4

governmental authority (each a "Regulator") at least five (5) days prior to the date of submittal and shall incorporate Prudential's reasonable comments therein, and shall provide a copy of the final documents as sent by copying Prudential on all correspondence to said parties. Within five (5) days of receipt of any correspondence from a Regulator with respect to the Property or activities taken hereunder, Delphi or Delphi Mexico shall provide a copy of such correspondence to Prudential.

When Delphi Mexico has completed the scope of work delineated on Exhibit B and Buyer has completed its supplemental and additional investigations, if any, Delphi Mexico shall cause its environmental consultant to prepare a report fully describing all investigations and sampling conducted by Delphi and Buyer and incorporating the results of the investigations and sampling conducted at or near the Property by Delphi and Buyer. Delphi Mexico shall provide a draft of the report (with the results of both Delphi's and Buyer's investigations) to Prudential and shall incorporate Prudential's reasonable comments. When the combined report is finalized and if the full extent of contamination present at the Property does not threaten human health or the environment and the concentrations of PCE do not exceed 500 ppb, Delphi Mexico shall provide a copy of the report in which it concludes that the presence of contamination does not threaten human health or the environment to SEMARNAT and/or PROFEPA and Prudential and shall request that SEMARNAT and/or PROFEPA issue a letter or other written document to Delphi and the Indemnified Parties that no further action, investigation or remediation is warranted or required (a "SEMARNAT Letter"). However, if the presence of contamination is a threat to human health and the environment or the concentration of PCE exceeds 500 ppb, Delphi shall or shall cause Delphi Mexico or its consultants to remediate the contamination to a concentration below 500ppb or such lower concentration required or requested by SEMARNAT and/or PROFEPA and then request that SEMARNAT and/or PROFEPA issue a SEMARNAT Letter.

Section 3.7    SEMARNAT AND/OR PROFEPA.  Delphi shall, at its sole cost and expense, comply with all requests or requirements of SEMARNAT or PROFEPA, as appropriate, including, without limitation, requests or requirements to (i) reasonably effectuate Remediation of any condition (including but not limited to a Release of a Hazardous Substance) in, on, above, under or from the Property; and (ii) comply with any Environmental Law.

Section 3.8    REMEDIATION.  If (i) SEMARNAT and/or PROFEPA, as appropriate, requests or requires an investigation and/or Remediation or (ii) PCE is present at, on or under the Property in excess of 500 ppb, or (iii) PCE has or is migrating from the Property to off-site property at a level in excess of 500 ppb or such lower level which is not allowed by the Environmental Laws as determined by PROFEPA and/or SEMARNAT or which presents risk to human health or the environment as determined by PROFEPA and/or SEMARNAT, then Delphi shall commence and continue to completion Remediation until (i) the contamination concentration is to a level allowed by the Environmental Law as determined by PROFEPA and/or SEMARNAT  and such time as (ii) PROFEPA and/or SEMARNAT issues a SEMARNAT Letter, and (iii) PCE is not present at the Property in excess of 500 ppb, and (iv) if PCE has migrated from the Property to off-site property, such PCE is below 500 ppb and SEMARNAT and/or PROFEPA has issued a SEMARNAT Letter with respect to such PCE. Seller agrees that for purposes of the Remediation it is the sole and exclusive responsible party and shall sign its name as the generator of all waste materials, and agrees to sign copies of all

appropriate waste characterization and manifest documentation required for disposal of such waste materials.

Delphi and Delphi Mexico covenant that that they shall employ appropriate contractors and consultants with respect to the Remediation and that they shall conduct all aspects of the Remediation in a manner that complies with all Environmental Laws. Delphi agrees that any and all such contractors and consultants shall carry insurance in commercially standard amounts for such work in Mexico for companies such as Delphi and Prudential and that Buyer and Prudential shall be named as an additional insured with respect to such contractors' and consultants' liability and errors and omissions insurance coverage. Delphi and Delphi Mexico shall not allow the Remediation to interfere with Buyer's or Buyer's tenant's use of the Property.

Delphi Mexico agrees to use its best efforts to cause SEMARNAT and/or PROFEPA to name Buyer and Prudential as an additional named beneficiary in the SEMARNAT Letter such that Prudential receives the same protections and benefits as Delphi. Delphi Mexico shall furnish to Prudential with a copy of all draft and final reports, correspondence and other documents relating to the Remediation, including the action program as authorized by SEMARNAT ("Remediation Report"), together with evidence of the lawful disposal of waste materials, if any.

Section 3.9    PROHIBITED ACTIVITIES. Delphi and Delphi Mexico shall not do or allow any other party or other user of the Property to do any act or thing that violates any Environmental Law.

Section 3.10    NOTICE OF RELEASE. Delphi or Delphi Mexico shall immediately notify Prudential in writing of (a) any presence or Releases or future Releases of Hazardous Substances in, on, above, under or from the Property; (b) any non-compliance with any Environmental Laws related in any way to the Property; (c) any actual or potential Environmental Lien; (d) any required or proposed Remediation of environmental conditions relating to the Property; and (e) any written or oral notice or other communication of which Delphi becomes aware from any source whatsoever (including but not limited to a governmental entity) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any person or entity pursuant to any Environmental Law, other environmental conditions in connection with the Property, or any actual or potential administrative or judicial proceedings in connection with anything referred to in this Agreement.

Section 3.11    GENERAL. Nothing in this Section shall obligate Delphi or Delphi Mexico to take action with respect to contamination caused subsequent to Closing by parties other than Delphi, Delphi Mexico, or party or parties acting on their behalf or at their direction or its or their invitees, employees, contractors, consultants or agents.

## ARTICLE 4 - INDEMNIFICATION

Section 4.1    INDEMNITY. Delphi and Delphi Mexico, jointly and severally, covenant and agree at its or their sole cost and expense, to protect, defend, indemnify, release and hold harmless Indemnified Parties from and against any and all Losses imposed upon or incurred by

chi-fs1\431920v05                                                    6

or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any presence of any Hazardous Substances in, on, above, or under the Property; (b) any past, present or to the extent caused by Delphi or Delphi Mexico or its or their agents, employees or invitees, future Release of Hazardous Substances in, on, above, under or from the Property; (c) any activity by Delphi or Delphi Mexico, any person or entity affiliated with Delphi or Delphi Mexico in connection with any use, treatment, storage, holding, existence, disposition or other Release, generation, production, manufacturing, processing, refining, control, management, abatement, removal, handling, transfer or transportation to or from the Property of any Hazardous Substances at any time located in, under, on or above the Property; (d) any activity by Delphi or Delphi Mexico, any person or entity affiliated with Delphi or Delphi Mexico, in connection with any actual or proposed Remediation of any Hazardous Substances at any time located in, under, on or above the Property, whether or not such Remediation is voluntary or pursuant to a PROFEPA request or requirement or court or administrative order, including but not limited to any removal, remedial or corrective action; (e) any past, present or future non-compliance or violations of any Environmental Laws (or permits issued pursuant to any Environmental Law) in connection with the Property or operations thereon by Delphi or Delphi Mexico, any person or entity affiliated with Delphi or Delphi Mexico, or their failure to comply with any order of any governmental authority in connection with any Environmental Laws; (f) the imposition, recording or filing of any Environmental Lien encumbering the Property; (g) any administrative processes or proceedings or judicial proceedings in any way connected with any matter addressed in this Agreement; (h) any misrepresentation or inaccuracy in any representation or warranty or material breach or failure to perform any covenants or other obligations pursuant to this Agreement, and (i) failure to timely act under this Agreement or to diligently commence and complete the investigation and Remediation required by this Agreement.

This indemnity shall terminate with respect to contamination on, under or from the Property on the date which is the later of (i) Prudential receiving from SEMARNAT or PROFEPA a SEMARNAT Letter, (ii) no PCE is present at the Property above 500 ppb and (iii) no PCE is migrating from the Property to off-site at a level in excess of 500 ppb or such lower level which is not allowed by Environmental Laws as determined by PROFEPA or SEMARNAT or which presents a risk to human health or the environment as determined by PROFEPA OR SEMARNAT. Notwithstanding the foregoing, this indemnity shall terminate with respect to contamination not known or discovered during the activities performed pursuant to Article 3 hereof and not known or discovered prior to Prudential's receipt of the SEMARNAT Letter on the date which is five (5) years after the date of this Agreement, except with respect to indemnity claims made by any Indemnified Party prior to said date. Delphi and Delphi Mexico's indemnification obligations hereunder shall not apply with respect to the presence of any chlorinated solvents first brought to the Property after the date of Closing by any party which is not Delphi or Delphi Mexico or any parties engaged by them or under their control.

Nothing in this Section shall obligate Delphi or Delphi Mexico to indemnify Buyer with respect to contamination caused subsequent to Closing by parties other than Delphi, Delphi Mexico or a party or parties acting on their behalf and at their direction or its or their invitees, employees, contractors, consultants or agents.

## ARTICLE 5 - DUTY TO DEFEND AND ATTORNEYS
## AND OTHER FEES AND EXPENSES

In the event that any Indemnified Party becomes aware of an actual or threatened claim or judicial or administrative proceeding presenting a risk of Losses for which the Indemnified Party is entitled to indemnification pursuant to this Agreement, the Indemnified Party may request that Delphi and Delphi Mexico shall defend same (and if requested by any Indemnified Party, in the name of the Indemnified Party) by attorneys and other professionals approved by the Indemnified Parties, said approval not to be unreasonably withheld. If Indemnified Parties believe that such counsel is not adequately representing its or their interests, Indemnified Parties may request that Delphi and Delphi Mexico change counsel and such request shall not be unreasonably denied.    Notwithstanding the foregoing, any Indemnified Parties may, alternatively, in their sole and absolute discretion and at their own cost, engage their own attorneys and other professionals to defend or assist them, and, at the option of Indemnified Parties, their attorneys shall control the resolution of any claim or proceeding. If Indemnified Parties have elected to use their own counsel at their cost with respect to a claim or proceeding and they desire to accept or provide a settlement with respect to that claim or proceeding, it or they will consult with Delphi and Delphi Mexico and shall not accept or provide such settlement if Delphi and Delphi Mexico advise the Indemnified Parties and acknowledge in writing (within fifteen (15) days of receiving notice of the proposed settlement from Indemnified Parties) that: (i) Delphi or Delphi Mexico do not want Indemnified Parties to enter into such settlement, and (ii) Delphi and Delphi Mexico have an obligation to indemnify Indemnified Parties with respect to the claim.

## ARTICLE 6 - SURVIVAL

Except as described in Article 4: (i) the obligations and liabilities of Delphi and Delphi Mexico under this Agreement shall fully survive as provided for in this Agreement notwithstanding any expiration or termination of the lease by which Delphi leases the Property or any portion thereof, and (ii) this Agreement and the obligations and rights of the parties hereunder shall survive in perpetuity and shall not be merged into the Deed by which Delphi Mexico conveys the Property to Buyer.

## ARTICLE 7 - JURY TRIAL WAIVER

Delphi and Delphi Mexico hereby waive, to the fullest extent permitted by law, the right to trial by jury in any action, proceeding or counterclaim, whether in contract, tort or otherwise, relating directly or indirectly to this Agreement.

## ARTICLE 8 - NOTICE OF LEGAL ACTIONS

Each party hereto shall, within five (5) business days of receipt thereof, give written notice to the other party hereto of (i) any notice, advice or other communication from any governmental entity or any source whatsoever with respect to Hazardous Substances on, from or affecting the Property or any Remediation of the Property, and (ii) any Legal Action brought against such party or related to the Property, with respect to which Delphi or Delphi Mexico may have liability under this Agreement.

chi-fs1\431920v05                                     8

## ARTICLE 9 – INVESTIGATION DEPOSIT

In order to secure the funding of the contamination investigation, on the date of Closing, Seller shall deposit with Buyer and Buyer shall retain as a deposit $200,000 (the "Deposit Funds"), as described more fully below.

Buyer shall return the Deposit Funds to Delphi Mexico when Delphi Mexico provides Buyer a certification (with a copy to Prudential) that (i) Delphi Mexico has fully delineated the vertical and horizontal contamination at the Property, (ii) there is no threat to human health or the environment (iii) that no PCE is present at the Property in excess of 500 ppb, and (iv) and that it has delivered to PROFEPA a request to PROFEPA to issue a SEMARNAT Letter.

In the event Delphi Mexico fails to commence within forty-five (45) days of the signing of this Agreement, and diligently and as soon as practicable complete the investigation required by Section 3.5 hereof, Prudential may conduct such investigation and may use the Deposit Funds to do so (in which case it shall have no obligation to pay the Deposit Funds to Delphi Mexico).

## ARTICLE 10 – MISCELLANEOUS PROVISIONS

Section 10.1    TIMING.    All actions required by Delphi or Delphi Mexico hereunder shall be performed diligently and as soon as practicable after the date hereof.    Time is of the essence for all actions required by this Agreement.

Section 10.2    THIRD PARTY BENEFICIARY.    Those persons included in the definition of Indemnified Parties are intended third party beneficiaries of this Agreement and may enforce this Agreement and be entitled to the benefits of this Agreement to the full extent as if they were signatories hereto.

Section 10.3    NO ORAL CHANGE.    This Agreement, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Delphi or any Indemnified Party, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 10.4    HEADINGS, ETC.    The headings and captions of various paragraphs of this Agreement are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 10.5    SUCCESSORS AND ASSIGNS.    The term Delphi and Delphi Mexico shall include the executors, administrators, legal representatives, successors and assigns of Delphi and Delphi Mexico, all of whom shall be bound by the provisions of this Agreement, provided that no obligation of Delphi or Delphi Mexico may be assigned except with the written consent of Prudential. Each reference herein to Prudential shall be deemed to include all of the other Indemnified Parties and its or their successors and assigns. This Agreement shall inure to the benefit of the Indemnified Parties and their respective successors and assigns forever. One or more of the Indemnified Parties may assign its or their rights under this Agreement in whole or in part.

chi-fs1\431920v05

9

Section 10.6  INDEMNIFIED PERSONS' NON-RELEASE AND NON-WAIVER. Each and every Indemnified Person hereby explicitly retains forever and does not release or waive any right, demand claim, expense, or action, which they may have against Delphi or Delphi Mexico or any other party at law or in equity, including but not limited to any claims arising under any applicable Environmental Law or with respect to Hazardous Materials at, on, under or from the Property even after the termination of the indemnification obligations contained in this Agreement.

Section 10.7  JOINT AND SEVERAL LIABILITY.  The obligations and liabilities of Delphi and Delphi Mexico hereunder are joint and several.

Section 10.8  RELEASE OF LIABILITY.  Any one or more parties liable upon or in respect of this Agreement may be released by Prudential without affecting the liability of any party not so released.

Section 10.9  RIGHTS CUMULATIVE.  The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies which the parties hereto or the Indemnified Parties have at law or in equity.

Section 10.10  INAPPLICABLE PROVISIONS.  If any term, c ondition or covenant of this Agreement shall be held to be invalid, illegal or unenforceable in any respect, this Agreement shall be construed without such provision.

Section 10.11  GOVERNING LAW, JURISDICTION.   This Agreement shall be governed by and construed in accordance with the applicable federal laws and laws of the State of New York, without reference or giving effect to any choice of law doctrine.  Delphi and Delphi Mexico hereby irrevocably submit to the jurisdiction of any court of competent jurisdiction located in the State of New York in connection with any proceedings arising out of or relating to this Agreement.

Section 10.12  NOTICES.  All notices hereunder shall be given in the manner specified in the Option Agreement except that a copy of a ll notices Delphi or Delphi Mexico provides shall also be sent to Michael T. Fishman at Greenberg Traurig, LLP, 77 West Wacker Drive, Suite 2500, Chicago, Illinois 60601, Tel: 312.476.5075, Fax: 312.456.8400 and notice to Delphi shall be sent to Delphi Legal Staff, Assistant General Counsel – Environmental & Energy, 5725 Delphi Drive, Troy, Michigan 48098-2815.

IN WITNESS WHEREOF, this Agreement is effective as of the day and year first above written.

DELPHI CORPORATION

By: _____
Name: Jeffrey J. Owens
Title: Vice President – Delphi
President – Delphi Electronics &
Safety

**DELPHI DELCO ELECTRONICS
DE MEXICO, S.A. DE C.V.**

By: _____

Name: _JOHN W. SCHONRM_

Title: _SENIOR FINANCE ADMINISTRATOR_

**PRUDENTIAL INVESTMENT
MANAGEMENT, INC.,**
on its own behalf and on behalf of the Indemnified
Parties

By: _____

Name: FRANCISCO ANDRADES

Title: VICE PRESIDENT

EXHIBIT A

(Legal description of land)

(i) The real property located at brecha E 99 sin numero, Parque Industrial Reynosa, in Reynosa, Tamaulipas, Mexico, with a surface area of approximately 1,665,304 square feet, upon which two (2) industrial buildings, commonly known as "Building 1 and Building 2" have been constructed which contain in the aggregate approximately rentable 327,168 square feet.

(ii) The real property located at brecha E 99 sin numero, Parque Industrial Reynosa, in Reynosa, Tamaulipas, Mexico, with a surface area of approximately 1,807,852 square feet, upon which two (2) industrial buildings commonly known as "Building 3 and Building 4" have been constructed which contain in the aggregate approximately rentable 321,444 square feet.

(iii) The lot located at Calle Fomento Industrial, sin número Parque Industrial Del Norte, in Reynosa, Tamaulipas, Mexico, with a total surface of 9.31 hectares (equivalent to 23.01 acres)

873307
chi-191\431920v05

A - 1



Del-E&S Reynosa, Mexico
Exhibit B – Delineation Scope of Work

Privileged and Confidential
Prepared at Request of Counsel

DELPHI
Facilities Services Group

**DELPHI**

Facilities Services Group

FSG Due Diligence Team

Privileged and Confidential
Prepared at Request of Counsel

Del-E&S Reynosa, Mexico
Exhibit B – Delineation Scope of Work

- Install and collect 1 soil and groundwater sample from each proposed monitoring well for PCE analysis

- Collect 1 groundwater sample from each existing monitoring well for PCE analysis

- Collect 1 groundwater sample from each of the 2 existing production wells for PCE analysis

- If the groundwater sample result is above 500 ppb PCE in a monitoring well, then PCE impact about this location will be delineated on-site further by installation of an additional monitoring well at a 100 yard distance in north, south, east and west locations, unless an existing monitoring well is near or within this 100 yard distance.

LEASE CONTRACT


Between


Banco J.P. Morgan, S.A., Institucion de Banca Multiple, J.P. Morgan Grupo Financiero, Division Fiduciaria, not individually, but in its capacity as trustee (together with its successors and assigns under a Business Administration Trust Agreement, dated January 19, 2005 and known as Trust F/121, benefiting the beneficiaries thereunder


("*Lessor*")


and


DELPHI DELCO ELECTRONICS DE MEXICO, S.A. DE C.V.


("*Lessee*")


April 11, 2005

THIS LEASE CONTRACT (THIS "LEASE CONTRACT") IS MADE AND ENTERED INTO
AS OF THIS 11TH DAY OF APRIL, 2005, BY AND BETWEEN Banco J.P. Morgan, S.A.,
Institucion de Banca Multiple, J.P. Morgan Grupo Financiero, Division Fiduciaria, not
individually, but in its capacity as trustee (together with its successors and assigns under a
Business Administration Trust Agreement ("Trust Agreement"), dated January 19, 2005 and
known as Trust F/121, benefiting the beneficiaries thereunder ( AS AMENDED, RESTATED
OR SUPPLEMENTED FROM TIME TO TIME, HEREINAFTER REFERRED TO AS THE
"LESSOR"), REPRESENTED HEREIN BY MR. FRANCISCO ANDRAGNES, IN HIS
CAPACITY AS LEGAL REPRESENTATIVE, AND DELPHI DELCO ELECTRONICS DE
MEXICO, S.A. DE C.V (HEREINAFTER REFERRED TO AS THE "LESSEE"),
REPRESENTED HEREIN BY JOHN WADE SCHWARM JENKINS, IN HIS CAPACITY AS
ATTORNEY IN FACT, IN ACCORDANCE WITH THE FOLLOWING:

## RECITALS

I.       Lessor, through its legal representative, hereby states that:

(a)      Lessor is duly incorporated under Mexican laws, as evidenced by Notarized Instrument
number 46,449 granted on December 5, 1994, before Miguel Alessio Robles, Notary Public number 19 of
the Federal District, Mexico, and registered in the Public Registry of Commerce of the Federal District,
Mexico under number 195238 on March 7, 1995.

(b)      Lessor's legal representative has sufficient powers and authority to enter into this Lease
Contract on behalf of Lessor, as evidenced in the special power of attorney attached hereto as Exhibit "B"
which powers and authority have not been limited nor revoked in any manner whatsoever.

II.      Lessee, through its legal representative, hereby states that:

(a)      Lessee is duly incorporated under Mexican laws, as evidenced by Notarized Instrument
number 5,228 granted on May 31, 1985, before Anibal Perez Vargas, Notary Public number 51 of the City
of Reynosa, Tamaulipas, Mexico, and registered in the Public Registry of Commerce of Reynosa,
Tamaulipas, Mexico under number 529 Volume XXXVII of the book of corporations, powers of attorney
and contracts.  By Notarized Instrument number 17,358 granted on December 29, 1999, before Eduardo
Romero Ramos, Notary Public number 4 of the City of Juarez, Chihuahua, Mexico, that contains the
formalization of a shareholders' meeting held on November 5, 1999, in which the corporate name was
changed into the actual denomination DELPHI DELCO ELECTRONICS DE MEXICO, S.A. DE
C.V.

(b)      Lessee's legal representative has sufficient powers and authority to enter into this Lease
Contract on behalf of Lessee, as evidenced in the special power of attorney attached hereto as Exhibit
"C", which powers and authority have not been limited nor revoked in any manner whatsoever.

II.      Lessor and Lessee, through their respective legal representatives, hereby state that:

(a)      Lessor and Lessee have entered into that certain Purchase Option Agreement ("Option
Agreement"), dated as of December 16, 2004, pursuant to which, among other things, Lessee shall sell to
Lessor (i) the real property located at brecha E 99 sin numero, Parque Industrial Reynosa, in Reynosa,
Tamaulipas, Mexico, with a surface area of approximately 1,665,304 square feet, upon which two (2)
industrial buildings, commonly known as "Building 1 and Building 2" have been constructed which
contain in the aggregate approximately rentable 327,168 square feet ("Delphi Site A") and (ii) the real
property located at brecha E 99 sin numero, Parque Industrial Reynosa, in Reynosa, Tamaulipas, Mexico,

chi-fs1\433124v05                                      S-1

with a surface area of approximately 1,807,852 square feet, upon which two (2) industrial buildings commonly known as "Building 3 and Building 4" have been constructed which contain in the aggregate approximately rentable 321,444 square feet ("Delphi Site B"; collectively with Delphi Site A, the "Leased Property"). The Leased Property is more specifically described in Exhibit "A" attached hereto, which is incorporated by reference and becomes a part hereof.

      (b)    Upon Lessor's acquisition of the Leased Property from Lessee pursuant to the terms of the Option Agreement, Lessor desires to lease the Leased Property to Lessee, under the terms and conditions set forth herein.

      In consideration of the above recitals (which are hereby made a part of this Lease Contract), the parties hereto agree on the following:

FIRST.            **LEASING OF THE LEASED PROPERTY.**

      1.1    **Leasing of the Leased Property.**  Subject to the express terms and conditions of this Lease Contract, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor the Leased Property.

SECOND.     **ACCEPTANCE OF THE LEASED PROPERTY.**

      2.1    **Acceptance of the Leased Property.**  Lessee shall accept the Leased Property on the Commencement Date in its "AS-IS" condition, subject to all applicable laws, ordinances, regulations, covenants and restrictions, and Lessor shall have no obligation to perform or pay for any repair or other work therein. Lessor has made no representation or warranty as to the suitability of the Leased Property for the conduct of Lessee's business, and Lessee waives any implied warranty that the Leased Property is suitable for Lessee's intended purposes. LESSEE ACKNOWLEDGES THAT (1) IT HAS INSPECTED AND ACCEPTS THE LEASED PROPERTY IN AN "AS IS, WHERE IS" CONDITION, (2) THE BUILDINGS COMPRISING THE SAME ARE SUITABLE FOR THE PURPOSE FOR WHICH THE LEASED PROPERTY IS LEASED AND LESSOR HAS MADE NO WARRANTY, REPRESENTATION, COVENANT, OR AGREEMENT WITH RESPECT TO THE MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF THE LEASED PROPERTY, (3) THE LEASED PROPERTY IS IN GOOD AND SATISFACTORY CONDITION, (4) NO REPRESENTATIONS AS TO THE REPAIR OF THE LEASED PROPERTY, NOR PROMISES TO ALTER, REMODEL OR IMPROVE THE LEASED PROPERTY HAVE BEEN MADE BY LESSOR, AND (5) THERE ARE NO REPRESENTATIONS OR WARRANTIES, EXPRESSED, IMPLIED OR STATUTORY, THAT EXTEND BEYOND THE DESCRIPTION OF THE LEASED PROPERTY. In no event shall Lessor have any obligation for any defects in the Leased Property or any limitation on its use. The taking of possession of the Leased Property shall be conclusive evidence that Lessee accepts the Leased Property and that the Leased Property was in good condition at the time possession was taken.

THIRD.      **LEASE TERM.**

      3.1    **Lease Term.**

      (a)    This Lease Contract shall be effective upon the date hereof (the "Commencement Date"). The term of this Lease Contract shall commence upon the Commencement Date and (i) with respect to Delphi Site A, shall terminate on the date four (4) years following signature of this Lease Contract (the "Delphi Site A Lease Term"), (ii) with respect to Building 3, shall terminate on the date six (6) months following the execution of the Public Deed conveying the Leased Property to Lessor (the "Building 3 Lease Term"), and (iii) with respect to Building 4, shall terminate on June 30, 2005 (the

"Building 4 Lease Term" and pursuant to section 3.2.; and collectively with Building 3 Lease Term and Delphi Site A Lease Term, the "Lease Term"), unless sooner terminated as provided herein or extended as provided in Section 3.2 hereof.

**3.2   Renewal Option for Leased Property.**

(a)   **Delphi Site A.**

(i)   Subject to the terms and conditions of this Section 3.2(a), Lessee shall have two (2) options to extend the Delphi Site A Lease Term for a period of five (5) years each (each, a "Delphi Site A Renewal Term"). During each Delphi Site A Renewal Term, Delphi Site A will be leased to Lessee upon the same terms, provisions and conditions contained in this Lease Contract; provided, that the annual Lease Price for the Delphi Site A Renewal Term shall be in an amount equal to one-hundred ten percent (110%) of the rental rate in effect on the last day of the initial Delphi Site A Lease Term or the last day of the first Delphi Site A Renewal Term, as the case may be, and shall thereafter be adjusted in accordance with Section 5.2 of this Lease Contract.

(ii)   If Lessee desires to exercise its option with respect to the Delphi Site A Renewal Term, then it shall provide written notice thereof (a "Renewal Notice") to Lessor on or before the date which is twelve (12) months prior to the end of the initial Delphi Site A Lease Term or twelve (12) months prior to the end of the first Delphi Site A Renewal Term, as the case may be. If Lessee does not deliver a Renewal Notice by the applicable date, then Lessee will be conclusively deemed to have elected not to have exercised its option with respect to the Delphi Site A Renewal Term and all Lessee's rights with respect to the Delphi Site A Renewal Term will automatically terminate and be of no further force or effect.

(iii)   Lessee's right to exercise its option to extend the Delphi Site A Lease Term for each Delphi Site A Renewal Term shall be expressly conditioned upon the satisfaction of each of the following matters:

(i)   The existence of no default or Event of Default by Lessee under this Lease Contract;

(ii)   The timely delivery of a Renewal Notice; and

(iii)   This Lease Contract shall not have been assigned or sublet by Lessee to any person (other than a Lessee Affiliate or as otherwise consented to by Lessor).

(b)   **Building 3.** Lessee shall have one (1) option to extend the Building 3 Lease Term for a period of sixty (60) days (the "Building 3 Renewal Term"). During the Building 3 Renewal Term, Building 3 will be leased to Lessee upon the same terms, provisions and conditions contained in this Lease Contract.

(ii)   If Lessee desires to exercise its option with respect to the Building 3 Renewal Term, then it shall provide written notice thereof (a "Renewal Notice") to Lessor on or before the date which is sixty (60) days prior to the end of the initial Building 3 Lease Term. If Lessee does not deliver a Renewal Notice by the applicable date, then Lessee will be conclusively deemed to have elected not to have exercised its option with respect to the Building 3 Renewal Term and all Lessee's rights with respect to the Building 3 Renewal Term will automatically terminate and be of no further force or effect.

**FOURTH.   USE OF THE LEASED PROPERTY.**

4.1    The Leased Property shall be used only (a) light industrial activities such as the assembly of electronic components and auto parts and (b) for such other lawful purposes as may be incidental thereto (collectively, the "Authorized Use").  Lessee will use the Leased Property in a careful, safe and proper manner and will not commit waste, overload the floor or structure of the Leased Property or subject the Leased Property to use that would damage the Leased Property. Lessee shall not permit any objectionable or unpleasant odors, smoke, dust, gas, noise, or vibrations to emanate from the Leased Property, or take any other action that would constitute a nuisance or would disturb, unreasonably interfere with, or endanger Lessor or any adjacent property. Under no conditions whatsoever will Lessee be permitted to use the Leased Property for chemical or heavy industrial operations or for any other activities, nor any activities which are in violation of any applicable federal, state or municipal laws, regulations or ordinances or which require the prior special authorization of the competent environmental authorities.

4.2    Lessee, at its sole expense, shall use and occupy the Leased Property and perform its activities in the Leased Property pursuant to its Authorized Use in compliance with all applicable laws, regulations and decrees, whether federal, state or municipal including, without limitation, orders, judgments, ordinances, regulations, codes, directives, permits, licenses, Official Mexican Norms, covenants and restrictions now or hereafter applicable to the Leased Property (collectively, "Legal Requirements").  Lessee will not use or permit the Leased Property to be used for any purpose or in any manner that would void Lessee's or Lessor's insurance or increase the insurance risk.

4.3    Without limiting the provisions of Section 4.2 above, Lessee shall be responsible, at its own cost and expense, for all governmental authorizations, licenses and permits as may be necessary for the Authorized Use or to lawfully occupy the Leased Property, each of which Lessee shall maintain in full force and effect during the Lease Term and any extension thereof.  Lessee shall provide Lessor with true, correct and complete copies of all such authorizations, licenses and permits and any other permits, licenses and authorizations that it has available prior to the Commencement Date.

## FIFTH.    LEASE PRICE; OPERATING EXPENSES, UTILITIES AND TAXES.

5.1    Lease Price.

(a)    The monthly lease price (the "Lease Price") from the Commencement Date for the Leased Property shall be the sum of (i) (A) with respect to Delphi Site A, $104,693.76 (One Hundred Four Thousand Six Hundred Ninety Three and 76/100 Dollars currency of the United States of America) and (ii) with respect to Delphi Site B, $102,862.08 (One Hundred Two Thousand Eight Hundred Sixty Two and 08/100 Dollars) currency of the United States of America), provided however that upon the expiration of the Building 4 Lease Term pursuant Section 3.1, the rent with respect to Building 3 shall thereafter be $51,431.40 ( Fifty-One Thousand Four Hundred and Thirty-One and 40/100 Dollars) currency of the United States of America, plus (ii) the corresponding Value Added Tax ("VAT").

(b)    Lessee shall pay to Lessor the "Lease Price" on or before the first ten (10) calendar days of each month, in advance, commencing upon the Commencement Date and continuing through the last calendar month which falls within the applicable Lease Term.  In the event the 10th calendar day of a particular month is not a business day, then the payment for such month shall be due on the last business day prior to the date ten (10) calendar days after the first day of the month.  In the event the Commencement Date is not the first day of a calendar month, then the Lease Price due for such first month of the Lease Term shall be prorated based upon the number of days in the month in which the Commencement Date falls.  Lessor shall use its best efforts to deliver to Lessee an invoice for the next

Execution Copy                                                    -4-

rental payment due on or prior to the 25th day of each month provided in no event shall Lessor's failure to deliver an invoice delay Lessee's obligation to pay rent within the time period required herein.

(c)   The Lessee shall pay the Lease Price to Lessor in Dollars, lawful currency of the United States of America, at Lessor's domicile or by wire transfer to Lessor's bank account:

BANK: JP MORGAN CHASE BANK
ACCOUNT NO: 507947533
ACCOUNT HOLDER:   INTERNATIONAL PROJECT FINANCE INCOMING WIRE
ABA:  021-000-021
FFC:  10221696 FIDEICOMISO # 121

Lessor may change the recipient account at any time upon thirty (30) days prior written notice, together with delivery of updated wire instructions, to Lessee.  If for any reason payment of the Lease Price is made in Pesos, legal tender of the United Mexican States, the applicable conversion rate to calculate such amount shall be based upon the rate determined by Banco de Mexico and published in the Official Daily of the Federation *Diario Oficial de la Federación* on the date the corresponding payment is made.

5.2   **Escalation.**

(a)   As used herein, the following terms shall have the following meanings:

(i)   "Base CPI" means the CPI most recently published three months prior to, as applicable, (i) January 1, 2006 for the first CPI adjustment, (ii) each January 1st thereafter for each subsequent CPI adjustment;

(ii)   "CPI" means the Consumer Price Index for All Urban Consumers, All Items, All Cities, issued by the U.S. Department of Labor, Bureau of Labor Statistics (1982-1984 =100).  If the CPI is converted to a different standard reference base or otherwise revised, then the formula for Lease Price escalation shall take into account the conversion factor published by the U.S. Department of Labor, Bureau of Labor Statistics; Prentice-Hall, Inc.; or another U.S. recognized publisher of similar statistical information, in that order.  If the CPI ceases to be published, Lessor and Lessee shall agree on another index to be used in the formula.

(iii)   "Current CPI" means the CPI most recently published three months prior to the date such adjustment is to occur;

(iv)   "Percentage Factor" means the percentage obtained by dividing: (y) the positive difference, if any, between the Current CPI and the Base CPI, by (z) the Base CPI; provided the Percentage Factor shall never be negative.

(b)   Commencing on January 1, 2006 and continuing each subsequent January 1st thereafter during the Lease Term, Lease Price shall be increased to an amount equal to the sum of:

(i)   the Lease Price (as increased by any prior rental adjustments pursuant to these provisions) for the period then ending, plus

(ii)   the product of (x) the Lease Price (as increased by any prior rental adjustments pursuant to these provisions) for the period then ending, multiplied by (y) the Percentage

Factor. Prior to the commencement of each adjustment period, starting on January 1, 2006, Lessor shall prepare a statement reflecting the Lease Price as adjusted in accordance herewith, which shall become the Lease Price due and payable thereafter until the next adjustment.

### 5.3   Operating Expenses.

(a)   Lessee shall be responsible for the maintenance of the Leased Property, pursuant to the maintenance standards contained in the "Delphi's Preventive Maintenance Manual" enclosed herewith as Exhibit D, which is based upon Lessor's baseline condition as established during Lessor's due diligence inspection process. In the event Lessor determines at any time during the Lease Term that the standards set forth in Delphi's Preventive Maintenance Manual are inadequate to property maintain the Leased Premises, Lessor may, upon notice to Lessee, require such modifications as it deems reasonably necessary in order to ensure the proper maintenance of the Leased Property. Should Lessee disagree with Lessor's requested modifications to Delphi's Preventive Maintenance Manual and Lessor and Lessee are unable to reach an agreement within the sixty (60) days following the date Lessee notifies Lessor that it disagrees with the requested modifications, then both parties shall choose an independent facilities consultant to decide whether the requested modifications are needed and both parties shall abide by the independent consultant's recommendations. Lessee may directly carry out maintenance of the Leased Property or select a professional third party to carry out such maintenance. Such activities shall include maintenance, repair and replacement of all portions of the Leased Property, including without limitation, paving and parking areas, roads, roofs and roof membrane (except for the structural matters that Lessor is expressly responsible for under Section 8.1(a) of this Lease Contract), alleys and driveways; mowing, landscaping, and exterior painting; maintaining utility lines, fire sprinklers and fire protection systems (subject to Section 8.1(e)), exterior lighting and mechanical and building systems serving the Leased Property. In the event that during the Lease Term Lessee determines that it is necessary to replace the roof membrane, then Lessee shall provide written notice to Lessor of its determination. If Lessor disagrees with Lessee's finding that the roof membrane requires replacement, then both parties shall choose an independent roof consultant to decide whether the replacement is needed and both parties shall abide by the independent consultant's recommendations. In the event the independent consultant determines that the roof membrane needs to be replaced and provided Tenant has fulfilled its obligations hereunder with respect to the upkeep and maintenance of the roof membrane, then the cost to replace the roof membrane shall be the sole responsibility of Lessor;

(b)   In the event Lessee fails to perform its maintenance obligations with respect to the Leased Property as provided in subsection (a) above, Lessor shall have the right, at its option, to perform such maintenance obligations. Thereafter, Lessee shall reimburse Lessor immediately upon demand for all costs and expenses incurred by Lessor in performing Lessee' maintenance obligations, together with interest thereon at the Interest Rate from the date incurred until paid in full;

(c)   Lessee shall reimburse Lessor for (i) Taxes (herein after defined) for each calendar year during the Lease Term, (ii) the cost of insurance maintained by Lessor for the Leased Property for each calendar year during the Lease Term and (iii) any other amount that pursuant to the terms of this Lease Contract must be reimbursed by Lessee to Lessor (the foregoing shall constitute "Reimbursable Expenses"). Upon the expiration of the Lease Term for Building 3, Lessor shall reimburse Lessee for that portion of the 2005 Taxes paid by Lessee with respect to Building 3 for the period of time commencing on the date Lessee vacates Building 3 through December 31, 2005. Upon the expiration of the Lease Term for Building 4, Lessor shall reimburse Lessee for that portion of the 2005 Taxes paid by Lessee with respect to Building 4 for the period of time commencing on the date Lessee vacates Building 4 through December 31, 2005.

Execution Copy                                                -6-

**(d) Proportionate Share.** Upon the expiration of the Building 4 Lease Term, Lessee's proportionate share shall be reduced by 24.78%. Upon the expiration of the Building 3 Lease Term, Lessee's proportionate share shall be reduced by 24.78%. For the purpose of this Lease Contract, after the expiration of the Lease Term for Delphi Site B pursuant to Section 3.1., the operating expenses shall be paid by the Lessee on the basis of a proportionate share considering that the rentable surface area for Delphi Site A is 50.44% ( fifty point forty four percent) of the total Leased Property.

(e)   Lessee shall pay to Lessor, upon written demand by Lessor, Lessee's share of the Reimbursable Expenses on the Property.

(f)   If Lessee's total payments of Reimbursable Expenses for any year are less than the actual Reimbursable Expenses for such year, then Lessee shall pay the difference to Lessor within thirty (30) days after demand, and if more, then Lessor shall retain such excess and credit it against Lessee's next payments. For purposes of calculating Reimbursable Expenses, a year shall mean a calendar year except the first year, which shall begin on the Commencement Date, and the last year, which shall end on the expiration of this Lease Contract.

5.4   Utilities.

Lessee shall pay for all water, gas, electricity, heat, light, power, telephone, sewer, sprinkler services, refuse and trash collection, security services and other utilities and services used on the Leased Property, all maintenance charges for utilities, and any storm sewer charges or other similar charges for utilities imposed by any governmental entity or utility provider, together with any taxes, penalties, surcharges or the like pertaining to Lessee's use of the Leased Property. Lessor may cause at Lessee's expense any utilities to be separately metered or charged directly to Lessee by the provider. No interruption or failure of utilities shall result in the termination of this Lease Contract or the abatement of the Lease Price.

After expiration of the Lease Term for Delphi Site A and Delphi Site B pursuant to Sections 3.1. and 3.2., water, gas, electricity, telephone, security services and other utilities and services at the Leased Property must be separately metered at Lessor's cost and Lessee will assign, at Lessee's sole cost and expense, all the currently existing electric capacity or Kilo-Volts-Ampere (KVA's) at the Leased Property in favor of Lessor.

The parties acknowledge that the Leased Property is subject to that certain Service Agreement dated April 30, 2003 with Custom Energy de Mexico, S. de R.L. pursuant to which Custom Energy has agreed to provide heat, ventilation, air conditioning equipment and service for the Leased Property. The Service Agreement expires on April 30, 2013. A copy of the Service Agreement is attached hereto as Exhibit E. Lessee shall be responsible for all obligations and costs under the Service Agreement until such time as Lessor has obtained a replacement tenant for both Building 1 and Building 2. Once a replacement tenant for both Building 1 and Building 2 has been obtained, then Lessor shall use reasonable efforts to solicit bids for a replacement service agreement which will be adequate to meet the needs of the replacement tenant. In the event that a new bidder is found for services similar to those under the Service Agreement and it is provided at a lower cost to the Lessor and/or new tenant, Lessee shall pay the difference between the cost under the new service agreement and the existing Service Agreement. Notwithstanding anything to the contrary contained herein, in the event the replacement tenant elects to terminate the Service Agreement, Lessee shall be responsible for the payment of any breakage fee owed in connection with the termination of such agreement.

The parties agree that upon the expiration of both the Building 3 Lease Term and the Building 4 Lease Term, the service and utility splitting process for Building 3 and Building 4 will be performed in accordance with the utility separation process set forth in Exhibit F attached hereto. Lessor and Lessee agree that the cost of the service and utility splitting process for Building 3 and Building 4 shall be split equally between Lessor and Lessee up to $70,000.00 (Seventy Thousand and 00/100 Dollars) currency of the United States of America). All costs in excess of $70,000.00 (Seventy Thousand and 00/100 Dollars) currency of the United States of America) shall be paid by Lessee. The parties agree that any service and utility splitting between Delphi Site A and Delphi Site B will be performed at Lessor's expense.

## 5.5    Taxes.

(a)    Lessor shall pay the local real estate property tax (Impuesto Predial) on the Leased Property or other similar taxes, assessments or charges (collectively referred to as "Taxes") that either (a) accrue against the Leased Property during the Lease Term if such Taxes are payable in advance, or (b) are assessed against the Leased Property during the Lease Term if such Taxes are payable in arrears. Taxes shall be charged to Lessee during each year of the Lease Term, based upon Lessor's reasonable estimate of the amount of Taxes, and shall be subject to reconciliation and adjustment once the actual amount of Taxes is known.

(b)    Except for the Taxes (which shall be paid by Lessor as part of the Reimbursable Expenses), the income tax (Impuesto sobre la Renta) and asset tax (Impuesto al Activo), if any, assessed upon Lessor, Lessee shall be liable for, and shall pay on time all other taxes, assessments, charges assessed against Lessee or the Leased Property accruing from and after the Commencement Date and continuing through the Lease Term

## 5.6    Late Payment.

If Lessee does not pay on time any amount due to Lessor hereunder, the unpaid amount shall bear default interest at a rate of interest (the "Interest Rate") equal to 16 per cent (16%) per annum.

## 5.7    Invoices.

Before the first day of each month, Lessor shall deliver to Lessee the relevant invoices for the Lease Price and all of the corresponding charges, which shall comply with Mexican legal tax requirements and include a breakdown of the corresponding VAT. All invoices shall be sent to Lessee to the following address:

DELPHI DELCO ELECTRONICS DE MEXICO, S.A. DE C.V.
Brecha E-99 S/N,
Parque Industrial Reynosa.
Código Postal, 88780
Cd. Reynosa, Tamaulipas, México
Atención: Cuentas por Pagar

The invoices shall incluye the following information:
1. RFC:  DDE 850531NI2
2. Claves Catastrales 31-01-18-897-004 (Delphi Site A)
   and 31-01-18-897-005 (Building 3 and Building 4)
3. Dun & Bradstreet Number for Lessor
4. Amount in numbers and letters
5. Concept: Arrendamiento de Inmuebles

Should future tax provisions require additional information be contained in the invoices, Lessee shall notify Lessor of such additional required information and Lessor shall use reasonable efforts to thereafter include such additional information in any invoice sent after Lessor's receipt of notification from Lessee of the required additional information.

## 5.8    Dun & Bradstreet Identification Number.

Additionally, Lessor must obtain an identification number in Mexico, from the credit information database company Dun & Bradstreet. It is understood by Lessee that receipt of the Dun & Bradstreet identification number shall not delay the date the first payment of the rent is due.

In the event payments are made in U.S. Dollars, the corresponding invoice will additionally reflect the exchange rate used for converting U.S. Dollars to Mexican Pesos, as set forth in the Official Daily of the Federation *Diario Oficial de la Federación* on the date of payment.

## 5.9. Security Deposit.

Lessee shall deposit with Lessor an amount equal to six months of the Lease Price for Delphi Site A to guarantee the timely payment of the rent and other monetary obligations under this Lease Contract (the "Security Deposit"). The principal amount of this deposit (plus interest at a rate equal to 180 Day Libor for the term of the Security Deposit) and accessories shall be returned to Lessee at the expiration of the Delphi Site A Lease Term (or any extension thereof) pursuant to Sections 3.1 and 3.2. Lessee shall not assign or in any way encumber the Security Deposit. During the continuance of any event of default by Lessee, Lessor may, without prejudice to any other remedy, use any portion of the portion of the Security Deposit to cure such default. Following any such application of all or any portion of the Security Deposit, Lessee shall pay to Lessor, on demand, the amount so applied in order to restore the Security Deposit to it original amount. If no event of default is then continuing at the termination of this Lease Contract, any remaining balance of the Security Deposit shall be returned to Lessee, provided Lessee timely surrenders Delphi Site A in accordance with this Lease Contract. If Lessor transfers its interest in the Premises during the Term, Lessor shall assign the Security Deposit to the transferee, and thereafter Lessor shall have no further liability to Lessee for the Security Deposit.

## SIXTH.            LESSEE IMPROVEMENTS.

### 6.1.    Lessee Made Alterations and Trade Fixtures.

(a)    Any alterations, additions, or improvements made by or on behalf of Lessee to the Leased Property ("Lessee-Made Alterations") shall be subject to Lessor's prior written consent. Lessee shall cause, at its expense, all Lessee-Made Alterations to comply with all insurance requirements and with all Legal Requirements and shall construct at its expense any alteration or modification required by Legal Requirements as a result of any Lessee-Made Alterations.

(b)    All Lessee-Made Alterations shall be constructed in a good and workmanlike manner by contractors reasonably acceptable to Lessor and only good grades of materials shall be used. All plans and specifications for any Lessee-Made Alterations shall be submitted to Lessor for its approval. Lessor may monitor construction of the Lessee-Made Alterations. Lessee shall reimburse Lessor for its actual documented out-of-pocket third party costs reasonably incurred in reviewing plans and specifications and in monitoring construction. Lessor's right to review plans and specifications and to

monitor construction shall be solely for its own benefit, and Lessor shall have no duty to see that such plans and specifications or construction comply with applicable Legal Requirements.

(c)     Lessee expressly acknowledges and agrees that Lessee shall be solely and exclusively liable for any losses, costs, expenses, claims or damages in the event that (i) the Lessee-Made Alterations are not carried out in conformity with the plans and specifications and other related permits and approvals of the competent authorities, (ii) any contractors, subcontractors and other workers hired to carry out the Lessee-Made Alterations are not paid in full in a timely manner, (iii) Lessee and/or its contractors and subcontractors have not discharged all of their respective obligations, including the payment of any indebtedness to governmental entities, whether federal, local, municipal, including the *Instituto Mexicano del Seguro Social (IMSS)*, the *Instituto del Fondo Nacional para la Vivienda de los Trabajadores (INFONAVIT)* or the *Sistema de Ahorro para el Retiro (SAR)* or (iv) Lessee fails to obtain all required permits from the competent authorities to carry out the relevant Lessee-Made Alterations. Lessee shall deliver to Lessor the identities and mailing addresses of all persons performing work or supplying materials, prior to beginning such construction, and Lessor may post on and about the Leased Property notices of non-responsibility pursuant to applicable Legal Requirements. Upon completion of any Lessee-Made Alterations, Lessee shall deliver to Lessor statements setting forth the names of all contractors and subcontractors who constructed work on the Lessee-Made Alterations and confirmation in the form of architect's or contractor's certifications, that all amounts owing to contractors and subcontractors have been paid.

(d)     Upon surrender of the Leased Property, all Lessee-Made Alterations and any leasehold improvements constructed by Lessor or Lessee shall remain on the Leased Property as Lessor's property, except to the extent Lessor requires removal at Lessee's expense of any such items or Lessor and Lessee have otherwise agreed in writing in connection with Lessor's consent to any Lessee-Made Alterations. Prior to the expiration or termination of this Lease Contract, Lessee, at its sole expense, shall repair any and all damage caused by such removal and restore the Leased Property to its condition existing upon the Commencement Date.

(e)     Lessee, at its own cost and expense and without Lessor's prior approval, may erect such shelves, bins, machinery and trade fixtures (collectively "Trade Fixtures") in the ordinary course of its business provided that such items do not alter the basic character of the Leased Property, do not overload or damage the Leased Property, and may be removed without injury to the Leased Property, and the construction, erection, and installation thereof complies with all Legal Requirements and with Lessor's requirements set forth above. Prior to the expiration or termination of this Lease Contract, Lessee, at its sole expense, shall remove its Trade Fixtures and shall repair any and all damage caused by such removal.

6.2     **Waiver.** Lessee expressly waives any right conferred upon it by applicable laws, which require Lessor to pay for any Lessee Made Alterations or Trade Fixtures left with the Leased Property.

6.3     **No Off-set.** Lessee may not offset the cost of any improvements and/or maintenance and/or repairs from the Lease Price or any other payments due to Lessor hereunder.

# SEVENTH.   ASSIGNMENT AND SUBLETTING.

7.1     **Assignment and Subletting by Lessee.**

(a)     Without Lessor's prior written consent, Lessee shall not assign this Lease Contract or sublease the Leased Property or any part thereof or pledge its leasehold interest or grant any concession or license within the Leased Property (each being a "Transfer") and any attempt to do any of the foregoing shall be void and of no effect. Notwithstanding the above, Lessee may assign or sublet the Leased

Execution Copy                                                           -10-

Property, or any part thereof, to any entity controlling, controlled by or under common control with the original Lessee named herein (a "<u>Lessee Affiliate</u>"), without the prior written consent of Lessor; provided, however, Lessee shall provide at least ten (10) days written notice prior to assigning this Lease Contract to, or entering into any sublease with, any Lessee Affiliate. Lessee shall reimburse Lessor for all of Lessor's reasonable out-of-pocket expenses in connection with any Transfer. Any sublease other than to a Lessee Affiliate shall be subject to the prior written consent of Lessor. In the case of any Transfer to a party that is not a Lessee Affiliate, the prior written consent of Lessor shall be specifically subject to, among other things, the credit rating of the proposed assignee being, at least, BBB pursuant to Standard and Poor's Ratings Services, a division of the McGraw Hill Company and at least of Baa2 pursuant to Moody's Investor Services, Inc., for the senior unsecured debts of such proposed assignee.

**(b)** Notwithstanding any Transfer, Lessee shall at all times remain fully responsible and liable for the payment of the Lease Price and for compliance with all of Lessee's other obligations under this Lease Contract.

**(c)** If the Leased Property is subleased (whether in whole or in part), then upon an Event of Default by Lessee hereunder, Lessor may collect rent from the sub-Lessee and apply the amount collected to the Lease Price payment or other amounts payable hereunder, and this provision must be contained in any sublease agreement respecting the Leased Property, or any portion thereof. No such transaction or collection of rent or application thereof by Lessor, however, shall be deemed a waiver of these provisions or a release of Lessee from the further performance by Lessee of its covenants, duties or obligations hereunder and each of Lessee shall remain fully liable hereunder. Any approved assignment or sublease shall be expressly subject to the terms and conditions of this Lease Contract. Lessor's consent to any Transfer shall not waive Lessor's rights as to any subsequent Transfers.

**7.2** <u>Assignment by Lessor</u>. Lessor may assign all of its rights and obligation hereunder (including the Lease Price proceeds) to any party, without Lessee's consent. In such event, Lessor shall notify Lessee of such assignment no later than thirty (30) days prior to the date the first payment of rent is to be sent to the Lessor's assignee.

# EIGHTH. <u>MAINTENANCE</u>.

**8.1** <u>Maintenance</u>. During the term of this Lease Contract, maintenance, repair and replacement of the Leased Property shall be governed, as follows:

**(a)** Lessor's maintenance and repair obligations to be performed at Lessor's sole cost and expense are <u>limited to the replacement of the roof and maintenance of the foundation piers and structural members of the exterior walls</u>, provided that reasonable wear and tear and uninsured losses and damages caused by Lessee or any Lessee Party shall be excluded (including any act or omission by Lessee or any Lessee Party that results in the full or partial voiding of Lessor's roof warranty). The term "walls" as used in this <u>Section 8.1(a)</u> shall not include windows, glass or plate glass, doors or overhead doors, special store fronts, dock bumpers, dock plates or levelers, or office entries, all of which shall be maintained by Lessee. Lessee shall promptly give Lessor written notice of any repair required by Lessor pursuant to this <u>Section 8.1(a)</u>, after which Lessor shall have a reasonable opportunity to repair such item. Provided that this Section 8.1. (a) applies to Delphi Site B only up to expiration of the Delphi Site B Lease Term pursuant to <u>Sections 3.1. and 3.2</u>

**(b)** Except as otherwise expressly provided for in <u>Section 8.1(a)</u>, subject to normal wear and tear, Lessee shall at all times during the Lease Term maintain and repair, at its own cost and expense, the Leased Property, including but not limited to water pumps, water collection cistern, air

conditioning system, building's roll-up doors, restroom fixtures, plumbing, all parking areas, fire protection system (including pumps and sprinklers), loading areas and access roads on the Leased Property and the interior paint. Provided that this Section 8.1. (a) applies to Delphi Site B only up to expiration of the Delphi Site B Lease Term pursuant to <u>Sections 3.1. and 3.2.</u>

(c)    After the expiration of the Building 3 Lease Term pursuant to Sections 3.1. and 3.2., Lessor shall assume full responsibility for maintenance of Building 3 including but not limited to the fire protection system, parking areas, access routes, as well as roof membranes and any other maintenance and repair that is Lessee's obligation before the expiration of the Lease Term. The foregoing shall in no way diminish or alleviate any obligations of Lessee pursuant to the Option Agreement.

(d)    After the expiration of the Building 4 Lease Term pursuant to Sections 3.1. and 3.2., Lessor shall assume full responsibility for maintenance of Building 4 including but not limited to the fire protection system, parking areas, access routes, as well as roof membranes and any other maintenance and repair that is Lessee's obligation before the expiration of the Lease Term. The foregoing shall in no way diminish or alleviate any obligations of Lessee pursuant to the Option Agreement.

(e)    Upon the expiration of the Building 4 Lease Term, Lessee shall no longer be responsible for the maintenance of the common shared service systems, including the fire protection system, the irrigation system, waste water treatment plant and the electrical substation, provided the cost for the maintenance of the common shared service systems shall, upon expiration of the Building 4 Lease Term, be includable as a Reimbursable Expense and shall be paid by Lessee to Lessor on a pro rata basis as provided in Section 5.3(c). Upon such time as Lessor commences responsibility for the maintenance of the fire protection system, Lessor shall present the relevant invoice for the maintenance and repair expenses, with full support documentation, based upon a quarterly schedule to Lessee, for common service systems including but not limited to the irrigation system, waste water treatment plant and the main electrical substation Delphi Site A, as provided in Section 5.3.(c). Lessee shall have the right to review these quarterly statements and notify Lessor in writing of any disagreement within 30 days following invoice date.    In the event there is no agreement between Lessee and Lessor on such amounts both parties would hire an independent third party expert ('*perito*') to assess the value of the costs and both parties are bound to accept the expert's opinion. Lessee's proportionate share of the foregoing costs shall be included in Reimbursable Expenses provided for in Section 5.3(b).

(f)    In the event Lessor fails to fulfill or commence to fulfill its obligations pursuant to Section (d) above and such failure results in an imminent threat of harm to Lessee's personal property, equipment, fixtures or to any person, then Lessee shall have the right to perform such obligations on behalf of Lessor.

(g)    Lessor and Lessee agree to choose a third party reasonably acceptable to both parties to perform the necessary maintenance for the fire protection system. Further, the parties agree to use reasonable efforts to choose a service provider which will agree to maintain the fire protection system in compliance with the current editions of the NFPA (National Fire Protection Association) 20 Standards for the Installation of Stationary Pumps for Fire Protection; NFPA 24, Standard for the Installation of Private Fire Service Mains and Their Appurtenance; and NFPA 25, Standard for the Inspection, Testing and Maintenance of Water-Based Fire Protection Systems. Each of the listed standards are published by NFPA and approved as an American National Standard.

NINTH.        <u>COVENANTS; RESTORATION AND TAKINGS.</u>

**9.1    Liabilities of the Parties.**  In conformance with applicable Legal Requirements and subject to Lessee observing and performing its obligations under this Lease Contract, Lessor guarantees to Lessee the use and peaceful enjoyment of the Leased Property during the Lease Term and Lessee covenants and agrees to use the Leased Property only for the Authorized Use.

**9.2    Restoration.**

(a)    If at any time during the Lease Term the Leased Property is damaged by a fire or other casualty, Lessor shall notify Lessee within thirty (30) days after such damage as to the amount of time Lessor reasonably estimates it will take to restore the Leased Property.  If the restoration time is estimated to exceed one (1) year from the date Lessor receives all permits, approvals, and licenses required to begin reconstruction, Lessee may elect to terminate this Lease Contract upon notice to Lessor given no later than thirty (30) days after Lessor's notice.  If Lessee does not elect to terminate this Lease Contract or if Lessor estimates that restoration will take one (1) year or less, then, subject to receipt of sufficient insurance proceeds, Lessor shall promptly restore the Leased Property excluding the Lessee Made Alterations or any other property of Lessee subject to delays arising from the collection of insurance proceeds or from events of *Force Majeure* (as that term is defined in Section 26 of this Lease Contract). Lessee at Lessee's expense shall promptly perform, subject to delays arising from the collection of insurance proceeds, or from events of *Force Majeure*, all repairs or restoration not required to be done by Lessor in order to restore the Leased Property to the condition immediately prior to the casualty and shall promptly re-enter the Leased Property.  Notwithstanding the foregoing, either party may terminate this Lease Contract upon thirty (30) days written notice to the other if the Leased Property is damaged during the last year of the Lease Term and Lessor reasonably estimates that it will take more than ninety (90) days to repair such damage.

(b)    If the Leased Property is destroyed or substantially damaged by any peril not covered by insurance or any Lessor's mortgagee requires that insurance proceeds be applied to the indebtedness secured by its mortgage, Lessor may terminate this Lease Contract by delivering written notice of termination to Lessee within thirty (30) days after such destruction or damage or such requirement is made known by any such Lessor's mortgagee, as applicable, whereupon all rights and obligations hereunder shall cease and terminate, except for any liabilities of Lessee which accrued prior to Lease termination.

(c)    Lessee shall pay to Lessor with respect to any damage to the Leased Property the amount of the deductible under Lessor's insurance policy within then (10) days after presentment of Lessor's invoice.

(d)    The Lease Price shall be abated for the period of repair and restoration in the proportion which the area of the Leased Property, if any, which is not usable by Lessee bears to the total area of the Leased Property; provided, however Lessee shall not be entitled to any abatement of the Lease Price in the event such damage or destruction resulted from the negligence or willful misconduct of Lessee or any Lessee Party. Such abatement, if any, shall be the sole remedy of Lessee, and except as provided herein, Lessee waives any right to terminate the Lease Contract by reason of damage or casualty loss.

**9.3    Governmental Appropriation.** If any part of the Leased Property should be taken for any public or quasi-public use under governmental law, ordinance, or regulation, or by right of eminent domain, or by private purchase in lieu thereof (a "Taking" or "Taken"), and (a) the Taking would prevent or materially interfere with Lessee's use of the Leased Property, (b) in Lessor's judgment would materially interfere with or impair its ownership or operation of the Leased Property or (c) as a result of such Taking, Lessor's mortgagee accelerates the payment of any indebtedness securing all or a portion of the Leased Property, or applies any award to the outstanding indebtedness, then upon written notice by either Party

Execution Copy                                            -13-

this Lease Contract shall terminate and the Lease Price shall be apportioned as of said date. If part of the Leased Property shall be Taken, and this Lease Contract is not terminated as provided above, the Lease Price payable hereunder during the unexpired Lease Term shall be reduced to such extent as may be fair and reasonable under the circumstances, and Lessor shall restore the Leased Property to its condition prior to the Taking; provided, however, Lessor's obligation to so restore the Leased Property shall be limited to the award Lessor receives in respect of such Taking that is not required to be applied to the indebtedness secured by a mortgage. In the event of any such Taking, should Lessor or Lessee receive the entire price or award from any such Taking, such price or award shall be distributed between the parties pursuant to their respective interests. Lessee shall have the right, to the extent that same shall not diminish Lessor's award, to make a separate claim against the condemning authority (but not Lessor) for such compensation as may be separately awarded or recoverable by Lessee for moving expenses and damage to Lessee's Trade Fixtures, if a separate award for such items is made to Lessee.

TENTH.    INSURANCE.

10.1    **Insurance by Lessee.**  Lessee shall, at its sole cost and expense, keep in full force and effect the following insurance policies during the Lease Term and any extension thereof:

(a)  Broad Form public liability insurance or local equivalent, covering claims for bodily injury and property damage occurring on or about or arising in respect of the Leased Property, in an amount not less than the equivalent of US$ 1,000,000 per occurrence and coverage for personal injury for an amount not less than the equivalent of US$ 1,000,000 per occurrence. Coverage is to include contractual liability. Such insurance shall include Lessor Parties (as defined in Section 12.1) as additional insureds for their vicarious but not independent liability.

10.2    **Insurance by Lessor.**  Lessor shall provide and maintain in effect the following insurance policies during the period specified below:

(a)    "All Risk" property insurance to include but not limited to Earthquake coverage against any loss or damage by lighting explosion, hurricane and hail, airplanes, vehicles and smoke, earthquake and/or volcanic eruption, strikes, riots and vandalism and any other risks now or hereafter embraced by so called "Extended Coverage" (including glass insurance) in an amount not less than one hundred percent (100%) of the then "full insurable value" (replacement value), which for the purpose of this Section shall be deemed to be the cost of replacing the Leased Property, less the cost of excavations, foundations and footings and without any deductions for physical depreciation of the building. Such "full insurable value" shall be determined from time to time, but no more frequently than every other year by means of an appraisal to be performed by Lessor, at Lessee's expense. The costs of the foregoing insurance shall be includable as a Reimbursable Expense and shall be paid by Lessee to Lessor on a pro rata basis as provided in Section 5.3(c).

(b)  Boiler and Machinery coverage for vessels and equipment installed in the Leased Property in such limits as Lessor reasonably requires but in any event in an amount not less than one hundred percent (100%) of the then "full insurable value". The costs of the foregoing insurance shall be includable as a Reimbursable Expense and shall be paid by Lessee to Lessor on a pro rata basis as provided in Section 5.3(c).

(c)  As part of normal business interruption insurance contained in coverage listed above, Lessor shall provide insurance to cover the risk of loss to Lessor due to losses covered in insurance set forth in Sections 10.2 (a) and (b) in the amount of the Lease Price and all other amounts payable by Lessee

hereunder for a twelve (12) month period. The costs of the foregoing insurance shall be a Reimbursable Expense.

(d) Broad Form public liability insurance or local equivalent, covering claims for bodily injury and property damage occurring on or about or arising in respect of the Leased Property, in an amount not less than the equivalent of US$ 1,000,000 per occurrence and coverage for personal injury for an amount not less than the equivalent of US$ 1,000,000 per occurrence. Coverage is to include contractual liability. Such insurance shall include Lessee Parties (as defined in Section 12.2) as additional insureds for their vicarious but not independent liability. The costs of the foregoing insurance shall be includable as a Reimbursable Expense and shall be paid by Lessee to Lessor on a pro rata basis as provided in Section 5.3(c).

10.3 **Insurance Companies**. All insurance detailed in Section 10.1 and Section 10.2, shall be provided under valid and enforceable policies issued by insurers with a financial rating of A.M Best Insurer Financial Strength rating of A or better (if unavailable, S&P A or better will be acceptable), and Financial Size Category of IX or larger, or as otherwise reasonably acceptable to Lessor and Lessee. If the insurance is provided through the London Market, then Lloyd's of London syndicates shall have a Minimum Stamp Capacity of the equivalent of U.S. $100,000,000, or as otherwise reasonably acceptable to Lessor and Lessee.

10.4 **Certificates**. Both parties will deliver to the other copies of all the respective certificates of insurance (on Accord form 27 or its Mexican equivalent) upon the Commencement Date or within a reasonable time thereafter and within thirty (30) days after such coverage in renewed or replaced or within a reasonable time thereafter. Each party shall cause its insurers to endeavor to give the other party thirty (30) days prior written notice of (i) the cancellation or non-renewal of any insurance policy required to be maintained by such party under this Lease Contract and (ii) any material adverse change in such insurance policy that causes a policy not to comply with the requirements of this Lease Contract.

10.5 **Priority of Insurance, Waiver**. Lessor and Lessee, in the exercise of their commercial business judgment, acknowledge that the use of insurance is the best way to protect against the risk of loss to their respective properties and economic interests in the Leased Property. Accordingly, the parties shall use in the first place the proceeds paid by the insurance company to repair or rebuild the Leased Property. All insurance maintained pursuant to the terms of this Lease Contract shall provide that it is primary to and noncontributory with any and all insurance maintained by or afforded to an additional insured under such insurance, but only to the extent of liabilities falling within the indemnity obligations of a named insured under Section 12 of this Lease Contract. Except where prohibited by law, Lessee will cause its liability insurers to waive all rights of recovery or subrogation against the Lessor Parties, and the Lessor will cause its liability insurers to waive all rights of recovery or subrogation against the Lessee Parties, but only to the extent of liabilities falling within the indemnity obligations of a named insured. Except where prohibited by law, each party will waive and cause its insurers providing "all risk" property insurance to waive all rights of recovery or subrogation against the other party, and the Lessor Parties or Lessee Parties as appropriate, for any claims within the coverage of such "all risk" property coverage, but only with respect to the negligent acts, errors or omissions of such parties.

10.6 **Insurance Proceeds**. In case of casualty to the Leased Property resulting in damage or destruction, less the actual costs, fees and expenses, if any, incurred in connection with adjustment of the loss, shall be made available to Lessor, any creditor of Lessor, any mortgage holder or Lessee, as their respective interests appear/for the purpose of restoring, replacing, rebuilding, or altering the Leased Property as nearly as possible to its value, condition and character immediately prior to such damage or destruction.

10.7    <u>Failure to Carry</u>.  Without limiting Lessor's remedies set forth in <u>Section 15.2</u> hereof, in the event that Lessee shall fail to carry and maintain the insurance coverage set forth in this <u>Section 10</u>, Lessor may obtain insurance coverage to protect Lessor and Lessee and Lessee shall promptly reimburse Lessor the cost thereof with interest thereon at the Interest Rate from the date incurred until the date paid.

ELEVENTH.         <u>SUBORDINATION AND FINANCING MATTERS.</u>

11.1    <u>Subordination.</u>        The parties acknowledge that this Lease Contract shall survive any transfer of the Leased Property pursuant to Article 1721 of the Civil Code for the State of Tamaulipas. Notwithstanding the foregoing, Lessee agrees, at the request of Lessor, to subordinate this Lease Contract to any mortgage created over the Leased Property by Lessor, provided that Lessor requires any holder of a mortgage upon the Leased Property, and as a condition precedent to said mortgage, as appropriate, to agree that such mortgage holder agrees not to disturb the possession and other rights of Lessee under this Lease Contract, so long as Lessee continues to perform its obligations hereunder beyond any applicable grace or notice and cure period; and, in the event of acquisition of title of the Leased Property by said mortgage holder through foreclosure proceedings or otherwise, to accept Lessee as lessee of the Leased Property under the terms and conditions of this Lease Contract, and to perform Lessor's obligations hereunder (but only while owner of the Leased Property); and Lessee agrees to recognize such mortgage holder, or any other person acquiring title to the Leased Property, as Lessor.  Lessee and Lessor agree to execute and deliver any appropriate instruments necessary to carry out the agreements contained herein (and with respect to Lessor's current creditors, Lessor shall obtain an instrument confirming same on or before thirty (30) days after the date hereof).

11.2    <u>Estoppel Certificates</u>.  Lessee agrees, from time to time, within ten (10) business days after request of Lessor, to execute and deliver to Lessor, or Lessor's designee (and shall cause any guarantor of Lessee's obligations hereunder to acknowledge the same and its obligations under its guaranty), an estoppel certificate requested by Lessor, stating that this Lease Contract is in full force and effect, the date to which rent has been paid, that Lessor is not in default hereunder (or specifying in detail the nature of Lessor's default), the termination date of this Lease Contract and such other matters pertaining to this Lease Contract as may be reasonably requested by Lessor.

TWELFTH.  <u>INDEMNIFICATION FROM THIRD PARTY CLAIMS.</u>

12.1    <u>Lessee's Indemnity</u>.  Lessee shall indemnify and save Lessor, Lessor's mortgagee, Lessor's agents, contractors, subcontractors, employees, successors and assigns harmless from and against all penalties, claims, costs, demands, damages, losses, expenses (including reasonable attorneys' fees), suits or liabilities of whatsoever nature (collectively, "<u>Claims</u>") brought by third parties and that arise from Lessee's or its subLessee's, assignee's, agent's, licensee's, contractor's, subcontractor's, concessionaire's or employee's (herein, Lessee and such other parties are collectively referred to as the "<u>Lessee Parties</u>") use and occupancy of the Leased Property or from any other activity, omission, work or thing done, permitted or suffered by Lessee or the Lessee Parties in or about the Leased Property.  If any such proceeding is filed by a third party against Lessor or any such indemnified party, Lessee agrees to defend Lessor or such party in such proceeding at Lessee's sole cost by legal counsel reasonably satisfactory to Lessor and such indemnified party, if requested by Lessor.  In no event shall Lessee be obligated to indemnify Lessor or any of the other parties identified above for any willful or negligent act or omission of Lessor or such other party.

12.2    <u>Lessor's Indemnity</u>.  Lessor shall indemnify and save Lessee and its agents, contractors, subcontractors, employees, successors and assigns harmless from and against all Claims brought by third parties and that arise from Lessor's or its agent's, licensee's, contractor's, subcontractor's, concessionaire's

or employee's (herein, Lessor and such other parties are collectively referred to as the "Lessor Parties") use and occupancy of the Leased Property or from any other activity, omission, work, or thing done, permitted or suffered by Lessor or Lessor Parties in or about the Leased Property. If any such proceeding is filed by a third party against Lessee or any such indemnified party, Lessor agrees to defend Lessee or such party in such proceeding at Lessor's sole cost by legal counsel reasonably satisfactory to Lessee and such indemnified party, if requested by Lessee. In no event shall Lessor be obligated to indemnify Lessee or any of the other parties identified above for any willful or negligent act or omission of Lessee or such other party.

12.3    **Survival.**    The provisions of this Section 12 shall survive the expiration or termination of this Lease Contract with respect to any Claims asserted against Lessor or Lessee within any applicable statute of limitations.

**THIRTEENTH.**        **SURRENDER.**

13.1    **Surrender and Delivery of the Leased Property.**    Lessee shall, on the last day of the Lease Term, surrender and deliver the Leased Property into the possession and use of Lessor without delay, in condition and repair existing as of the Commencement Date, except for normal wear and tear due to normal use and the passage of time, casualty and those items that are the responsibility of Lessor. Except to the extent otherwise provided in Section 6.1, all signs, inscriptions, canopies and installations of like nature made by Lessee shall be removed prior to delivery of the Leased Property back to Lessor and Lessee shall correct all defects or modifications caused by the installation or removal thereof.

13.2    **Property of Lessee.**    Except to the extent otherwise provided in Section 6.1, all furniture, Lessee's Trade Fixtures and other equipment not permanently attached to the Leased Property installed by Lessee shall remain the property of Lessee and shall be removed by Lessee at any time during or at the end of the Lease Term, and Lessee shall, at its own expense, repair all damages resulting from the installation or removal thereof.

13.3    **Property of Lessor.**    Lessee hereby expressly agrees that any property that remains in the Leased Property for more than thirty (30) days after termination of this Lease Contract may, at the option of Lessor, be deemed to have been abandoned and either may be retained by Lessor as its property or be disposed of, without liability, in such manner as Lessor may see fit at Lessee's expense which shall include the costs to Lessor of the removal process. Except to the extent otherwise provided in Section 6.1, any and all permanent alterations and improvements placed upon the Leased Property by Lessee and/or Lessor shall become the property of Lessor.

## FOURTEENTH.   HOLDING OVER.

14.1   **Holding Over.**        Lessee shall, upon termination of this Lease Contract, by lapse of time or otherwise, yield immediate possession to Lessor.

14.2   **Rent Payments.**   In the event Lessee remains in possession of the Leased Property, or any portion thereof, after the Lease Term, Lessee shall pay monthly or part thereof to Lessor, as rent for the Leased Property, the amount equivalent to the Lease Price then in effect plus 50% (fifty percent) of the Lease Price and other amounts which it was required to pay immediately preceding such holding over and shall continue to pay such amounts until it surrenders the Leased Property to Lessor. Lessee shall also be liable for all maintenance, and all other costs and payment obligations, including Reimbursable Expenses, under this Lease Contract incurred during such holdover period. No holding over by Lessee, whether with or without consent of Lessor, shall operate to extend this Lease Contract. This paragraph shall not be construed as granting any right to remain in possession of the Leased Property beyond the expiration of the Lease Term of this Lease Contract. It is expressly understood and agreed by and between Lessor and Lessee that any holding over by Lessee on the Leased Property after the expiration of this Lease Contract shall be in opposition of Lessor, shall operate and be construed as a tenancy at sufferance and shall be immediately terminable at the will of Lessor.

14.3   **Waiver.**   Lessee acknowledges that its obligation to surrender the Leased Property is governed by these provisions and hereby expressly waives any rights it may have pursuant to the law with respect to such holdover.

## FIFTEENTH.   DEFAULTS AND REMEDIES.

15.1   **Lessee Defaults.**   Each of the following events shall be an event of default ("Event of Default") by Lessee under this Lease Contract, if Lessee fails to correct such event within the applicable cure period. Unless otherwise expressly stated for a specific event, the cure period shall be thirty (30) days after written notice from Lessor specifying the event of default (unless such performance will, due to the nature of the obligation, require a period of time in excess of thirty (30) days, then after such period of time as is reasonably necessary):

(a)   Lessee shall fail to pay any installment of Lease Price or any other payment required herein when due, the cure period for this event being ten (10) calendar days; provided, however, that if Lessee shall fail to pay any installment of Lease Price or any other payment required hereunder when due more than two (2) times in any twelve (12) months period, then the third (3rd) such violation shall be deemed an Event of Default (without any notice or cure period);

(b)   Lessee shall (i) make a general assignment for the benefit of creditors; (ii) commence any case, proceeding or other action seeking to have an order for relief entered on its behalf as a debtor or to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or seeking appointment of a receiver, trustee, custodian or other similar official for it or for all or of any substantial part of its property (collectively a "Proceeding for Relief"); (iii) become the subject of any Proceeding for Relief which is not dismissed within sixty (60) days of its filing or entry; or (iv) fail to maintain its legal existence (if Lessee or Guarantor is a corporation, partnership or other entity), there being no cure period for this event;

(c)   Any insurance required to be maintained by Lessee pursuant to this Lease Contract shall be cancelled or terminated or shall expire or shall be reduced or materially changed, except, in each case, as permitted in this Lease Contract, there being no cure period for this event;

**(d)**     Lessee shall attempt or there shall occur any assignment, subleasing or other Transfer of Lessee's interest in or with respect to this Lease Contract except as otherwise permitted in this Lease, there being no cure period for this event;

**(e)**     Lessee shall fail to execute any instrument of subordination or attornment or the estoppel certificate within the time periods set forth in <u>Section 11</u> following Lessor's request for such instruments or certificates;

**(f)**     Lessee shall breach any of the requirements of <u>Section 24;</u>

**(g)**     Lessee shall operate the Leased Property for any use other than the Authorized Use;

**(h)**     The failure of Lessee or any Lessee Party to observe or comply with any Legal Requirements or the rules and regulations of the Leased Property as the same may be amended from time to time, provided, however, that if Lessee or any Lessee Party shall breach the same rule or regulation more than two (2) times in any twelve (12) month period, then the third (3rd) such violation shall be deemed an Event of Default (without any notice or cure period); and

**(i)**     Lessee shall fail to comply with any provision of this Lease Contract other than those specifically referred to in this <u>Section 15.1.</u>

**15.2    <u>Lessor's Remedies</u>.** Upon the occurrence of an Event of Default, Lessor may, to the extent permitted under applicable Legal Requirements, exercise any of the following remedies:

**(a)**     Terminate this Lease Contract and in such event Lessee shall pay to Lessor, upon demand, the greater of (i) an accelerated lump sum amount equal to the amount by which Lessor's estimate of the aggregate amount of the Lease Price and other amount hereunder owing, including Reimbursable Expenses, from the date of such termination through the scheduled expiration date of the Lease Term exceeds Lessor's estimate of the fair rental value of the Leased Property for the same period (after giving effect to the time needed to relet the Leased Property), or (ii) Lessor's estimate of the aggregate expenses of reletting the Leased Property (which expenses shall include, without limitation, brokerage fees, leasing commissions and Lessee concessions incurred or estimated to be incurred by Lessor and costs of removing and storing Lessee's or any other occupant's property, repairing, altering, remodeling or otherwise putting the Leased Property into condition acceptable to a new lessee or lessees, and all reasonable expenses incurred by Lessor in pursuing its remedies, including attorneys' fees and court costs (collectively, "<u>Reletting Costs</u>"), both discounted to present value at the rate at which U.S. Treasuries are then yielding for a term closest to the scheduled expiration date of the Lease Term; or

**(b)**     Request specific performance of the Lease Contract together with the payment of all damages and costs derived therefrom, and all reasonable expenses incurred by Lessor in pursuing its remedies, including attorneys' fees and court costs; or

**(c)**     Exercise any of its other rights and remedies available to it under applicable laws.

Any and all remedies set forth in this Lease Contract: (i) shall be in addition to any and all other remedies Lessor may have at law, (ii) shall be cumulative, and (iii) may be pursued successively or concurrently as Lessor may elect. The exercise of any remedy by Lessor shall not be deemed an election of remedies or preclude Lessor from exercising any other remedies in the future.

**15.3    Surrender Upon Termination.**  In the event of early termination of this Lease Contract for any reason, Lessee will immediately surrender the Leased Property to Lessor without a court order. Lessee will return the Leased Property to Lessor perfectly clean and in the same conditions as Lessor delivered it, except for normal wear and tear or as otherwise expressly provided in Section 6.1.  Lessee shall repair any damage caused to the Leased Property by the removal of any furniture, equipment and machinery from the same.

**15.4    Lessee's Remedies/Limitation of Liability.**  To the extent permitted under applicable laws, Lessor shall not be in default hereunder unless Lessor fails to perform any of its obligations hereunder within thirty (30) days after written notice from Lessee specifying such failure (unless such performance will, due to the nature of the obligation, require a period of time in excess of thirty (30) days, then after such period of time as is reasonably necessary).  All obligations of Lessor under this Lease Contract will be binding upon Lessor only during the period of its ownership of the Leased Property and not thereafter.  The term "Lessor" in this Lease Contract shall mean only the owner, for the time being of the Leased Property, and in the event of the transfer by such owner of its interest in the Leased Property, such owner shall thereupon be released and discharged from all obligations of Lessor thereafter accruing, but such obligations shall be binding during the Lease Term upon each new owner for the duration of such owner's ownership.  Any liability of Lessor under this Lease Contract or arising out of the relationship between Lessor and Lessee shall be limited solely to Lessor's interest in the Leased Property, and in no event shall any personal liability be asserted against Lessor in connection with this Lease.

**SIXTEENTH.    ENTRY TO LEASED PROPERTY BY LESSOR.**

**16.1    Inspection by Lessor.**    Lessee shall permit Lessor and its authorized representatives to enter the Leased Property at all reasonable times, following reasonable written notice from the Lessor, for the purpose of inspecting the same and performing any necessary work therein that may be required of it or that may be necessary by reason of Lessee's failure to make repairs or perform such work or to commence the same after ten (10) calendar days written notice from Lessor; provided, however, that no notice from Lessor will be required to be given to Lessee in the case of any emergency.  In performance of such work or inspection, Lessor shall attempt to minimize interference with Lessee's operation.  Nothing herein shall imply any duty upon the part of Lessor to do any such work; and performance thereof by Lessor shall not constitute a waiver of Lessee's default in failing to perform the same.

**16.2    Prospective Clients.**  In addition, Lessor shall have the right to enter the Leased Property at all reasonable times during usual business hours pursuant to a prior forty-eight (48) hour written notice to Lessee, for the purpose of showing the same to prospective Lessees, financing parties and purchasers of the Leased Property; provided that in the case of prospective Lessees such right may only be exercised during the last twelve (12) months of the Lease Term.  Such notice will disclose information concerning the prospective Lessee, financing party or purchaser.  Lessee shall have the right to be present at any such tour of the Leased Property; provided, that should any prospective Lessee be a direct competitor of Lessee, Lessee may subject such access to any reasonable conditions that Lessee may consider appropriate to maintain the confidentiality of its proprietary information and knowledge and of its operations within the Leased Property.

**16.3    No Interference.**  The Lessor shall not unreasonably interfere with the Lessee's operation when entering on the Leased Property.

**SEVENTEENTH.    SIGNS.**

17.1    <u>Signs</u>.  All signs, decorations, advertising media, blinds, draperies and other window treatment or bars or other security installations visible from outside the Leased Property shall be subject to Lessor's prior written approval (such approval shall not be unreasonably withheld) and shall conform in all respects to all Legal Requirements and to Lessor's reasonable requirements.

EIGHTEENTH.        <u>NOTICES.</u>

18.1    <u>Notices</u>.  Whenever it shall be necessary or desirable for one of the parties to serve any notice or demand upon the other pursuant to the provisions of this Lease Contract, such notice or demand will be served in writing by facsimile transmission (provided that any transmission by facsimile shall be immediately confirmed by a telephone call to the recipient of the number specified below and followed promptly by delivery of a hard copy thereof), personally, or by recognized international courier service addressed to:

Lessor:

c/o Prudential Real Estate Investors
8 Campus Drive
Parsippany, New Jersey 07054
Telephone:  973-734-1347
Facsimile:  973-683-1789
Attention:  Roberto Ordorica

and:

c/o Prudential Real Estate Investors
Andres Bello 10-401
Col. Polanco
Mexico, D.F. 11560
Telephone:  (52555) 093-2772
Facsimile:  973-683-1789
Attention:  Roberto Charvel Orozco

with a copy to:

Greenberg Traurig, LLP
77 West Wacker Drive
Suite 2500
Chicago, Illinois 60601
Telephone:  312-476-5075
Facsimile:  312-456-8435
Attention:  Michael T. Fishman and Michael J. Baum

and:

c/o Brasa Desarrollos
Av. Campos Eliseos 9050
Cuidad Juarez, Chihuahua, CP 32472
Telephone:  (52656) 688-1359
Facsimile:  (52656) 688-0505
Attention:  Jorge Ortega

Execution Copy                                    21-

and:

Enriquez, Gonzalez, Aguirre y Ochoa, S.C.
Ejercito Nacional 7695-C
Plaza del Camino
Cuidad Juarez, Chihuahua, CP 32530
Telephone:  (52656) 618-2351
Facsimile:  (52656) 618-2391
Attention:  Mr. Carlos Enriquez-Terrazas

**Lessee:**
Brecha E99 al norte, Carr. Matamoros, Parque Ind. Reynosa
Reynosa, Tamaulipas, 88780
Mex. (899)921-5000
From US (956)228-5000

with a copy to :

**Roberto Berry**- Director Jurídico Latinoamérica.
roberto.berry@delphi.com
Av. Hermanos Escobar 5756
Fraccionamiento FOVISSTE Chamizal
Ciudad Juárez, Chihuahua
Fax (656) 649-9074
Tel (656) 629-7400 Extensión 59145

NINETEEN **HEADINGS.**

**Headings.**  The parties mutually agree that the headings contained in this Lease Contract are inserted for convenience of reference only and shall not be used in construing this Lease Contract.  In the event of a conflict between a heading contained in this Lease Contract and the content of the clause, the text of the clause shall govern.

TWENTY    **CHOICE OF LAW; FORUM.**

20.1    **Governing Law, Arbitration, Waiver of Trial by Jury**.

THIS LEASE CONTRACT AND THE RIGHTS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TAMAULIPAS, MEXICO.

ANY DISPUTE ARISING OUT OF, RELATING TO, OR HAVING ANY CONNECTION WITH THIS LEASE CONTRACT, OR ANY DOCUMENT DELIVERED PURSUANT HERETO OR THERETO, INCLUDING ANY QUESTION REGARDING ITS EXISTENCE, VALIDITY, INTERPRETATION, PERFORMANCE OR BREACH OR

TERMINATION ARISING OUT OF OR RELATING TO ITS NEGOTIATION, EXECUTION OR PERFORMANCE SHALL BE EXCLUSIVELY AND FINALLY SETTLED BY ARBITRATION UNDER THE RULES OF ARBITRATION OF THE INTERNATIONAL CHAMBER OF COMMERCE (THE "ICC") BY ARBITRATORS APPOINTED IN ACCORDANCE WITH THE RULES OF THE INTERNATIONAL COURT OF ARBITRATION OF THE ICC. THE PARTIES FURTHER AGREE THAT:

THE NUMBER OF ARBITRATORS SHALL BE THREE;

THE PLACE OF ARBITRATION SHALL BE NEW YORK, NEW YORK;

THE LANGUAGE TO BE USED IN THE ARBITRAL PROCEEDINGS SHALL BE ENGLISH;

THE AWARD MAY INCLUDE INTEREST FROM THE DATE OF ANY BREACH OR VIOLATION OF THIS LEASE CONTRACT AS DETERMINED IN THE ARBITRAL AWARD UNTIL PAID IN FULL, AT THE INTEREST RATE ESTABLISHED IN THE AWARD.

ANY MONETARY AWARD SHALL BE MADE IN UNITED STATES DOLLARS; AND

THE ARBITRATORS MUST BE FLUENT IN THE ENGLISH AND SPANISH LANGUAGES

MORE THAN ONE DISPUTE ARISING OUT OF THIS LEASE CONTRACT AND INVOLVING THE SAME PARTIES, MAY BE COMBINED AT THE REQUEST OF ANY SUCH PARTIES BY RESOLUTION OF THE ARBITRAL TRIBUNAL WHICH SHALL DECIDE ON THE FOREGOING IN ITS SOLE DISCRETION, ONCE CONSIDERING THE NATURE OF SUCH CLAIMS, THE STAGE OF THE ARBITRATION AND OTHER RELEVANT CIRCUMSTANCES.

THIS LEASE CONTRACT AND ANY OTHER DOCUMENTS DELIVERED PURSUANT HERETO, AND ANY ACTIONS TAKEN HEREUNDER, CONSTITUTE CIVIL ACTS BY THE PARTIES. IF MEXICO OR A POLITICAL SUBDIVISION OF MEXICO BECOMES THE OWNER OF THE MAJORITY OF THE SHARES OR OTHER OWNERSHIP INTERESTS OF THE LESSEE, LESSEE HEREBY IRREVOCABLY AND UNCONDITIONALLY AND TO THE FULLEST EXTENT PERMITTED BY LAW AGREES TO WAIVE, AND AGREES NOT TO PLEAD OR CLAIM, ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION, EXECUTION OR OTHERWISE) FOR ITSELF OR ANY OF ITS PROPERTY, ASSETS OR REVENUES WHEREVER LOCATED WITH RESPECT TO ITS OBLIGATIONS, LIABILITIES OR ANY OTHER MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS LEASE CONTRACT, IN EACH CASE FOR THE BENEFIT (DIRECTLY OR INDIRECTLY) OF EACH PARTY AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS, IT BEING INTENDED THAT THE FOREGOING WAIVER AND AGREEMENT SHALL BE EFFECTIVE, IRREVOCABLE AND NOT SUBJECT TO WITHDRAWAL IN ANY AND ALL JURISDICTIONS.

TWENTY FIRST . / FEES AND EXPENSES.

**21.1    Brokerage Fees.** Lessee and Lessor (i) represent and warrant to the other that there is no other commission payable to any agent or broker and (ii) agree to indemnify and protect the other against any claims for any commission brought by any broker claiming by through or under such party.

**21.2    Fees and Expenses.** Except as provided in other provisions of this Lease Contract, each party shall be responsible for its own expenses and those of all other agents, auditors, attorneys and consultants incurred in connection with this Lease Contract and the contemplated transaction.

**TWENTY SECOND.        ENTIRE AGREEMENT; AMENDMENT.**

**22.1    Entire Agreement.** This Lease Contract and all Exhibits attached hereto constitute the entire agreement between the parties with respect to its subject matter, and substitutes any other previous agreements between the parties.

**22.2    Amendment.** This Lease Contract may not be amended in any way without the prior written consent of Lessor and Lessee.

**TWENTY THIRD.  ENVIRONMENTAL REQUIREMENTS**

**23.1.    Environmental Requirements.** Except for Hazardous Materials contained in products used by Lessee in de minimum quantities for ordinary cleaning and office purposes in accordance with all Environmental Requirements, Lessee shall not permit or cause any party to bring any Hazardous Material into the Leased Property or transport, store, use, generate, manufacture, dispose or release any Hazardous Material on or from the Leased Property without Lessor's prior written consent. Lessee, at its sole cost and expense, shall operate its business in the Leased Property in strict compliance with all applicable Environmental Requirements. Lessee shall complete and certify to disclosure statements as requested by Lessor from time to time relating to Lessee's transportation, storage, use, generation, manufacture or release of Hazardous Materials on the Leased Property, and Lessee shall promptly deliver to Lessor a copy of any notice of violation relating to the Leased Property or any Environmental Requirement.

**23.2    Definitions.** For purposes hereof, the following terms shall have the following meanings:

(a)    The term "Environmental Requirements" means all applicable present and future federal, state and/or municipal statutes, regulations, ordinances, rules, Official Mexican Norms, codes, judgments, permits, authorizations, orders, or other similar requirements of any federal, state or municipal governmental authority, agency or court regulating or relating to health, safety or environmental conditions on, under, or about the Leased Property or the environment.

(b)    The term "Hazardous Materials" means and includes any substance, material, waste, pollutant or contaminant that is regulated under any Environmental Requirement or that may adversely affect human health or the environment, including, without limitation, any solid or hazardous waste, hazardous substance, asbestos, petroleum (including crude oil or any fraction thereof, natural gas, synthetic gas, polychlorinated biphenyls (PCBs), and radioactive material). For purposes of Environmental Requirements, to the extent authorized by law, Lessee is and shall be deemed to be the responsible party, including without limitation, the "owner" and "operator" of Lessee's "facility" and the "owner" of all Hazardous Materials brought on the Leased Property by Lessee or any Lessee Party, and the wastes, by-products, or residues generated, resulting or produced therefrom.

**23.3    Removal of Hazardous Materials.** Lessee, at its sole cost and expense, shall remove all Hazardous Materials stored, disposed of or otherwise released by Lessee or any Lessee Party during the Lease Term onto or from the Leased Property, in a manner and to a level protective of human health and

the environment and compliant with all Environmental Requirements, and which does not limit any future uses of the Leased Property or require the recording of any deed restriction or notice regarding the Leased Property beyond that already required by the condition of the property when acquired by Lessor. Lessee shall perform such work at any time during the period of the Lease Contract upon written request by Lessor or, in the absence of a specific request by Lessor, before Lessee's right to possession of the Leased Property terminates or expires. If Lessee fails to perform such work within the time period specified by Lessor or before Lessee's right to possession terminates or expires (whichever is earlier), Lessor may at its discretion, and without waiving any other remedy available under this Lease Contract or at law or equity (including without limitation an action to compel Lessee to perform such work), perform such work at Lessee's cost. Lessee shall pay all costs incurred by Lessor in performing such work within ten (10) days after Lessor's request therefor, together with interest thereon at the Interest Rate from the date incurred until paid in full. Such work performed by Lessor is on behalf of Lessee and Lessee remains the owner, generator, operator, transporter and/or arranger of the Hazardous Materials for purposes of Environmental Requirements. Lessee agrees not to enter into any agreement with any person, including without limitation any governmental authority, regarding the removal of Hazardous Materials that have been disposed of or otherwise released onto or from the Leased Property without the written approval of the Lessor.

23.4   **Indemnification.**   Lessee shall indemnify, defend and hold Lessor harmless from and against any and all losses (including, without limitation, diminution in value of the Leased Property and loss of rental income from the Leased Property), claims, demands, actions, suits, damages (including, without limitation, punitive damages), expenses (including, without limitation, remediation, removal, repair, corrective action or cleanup expenses), and costs (including, without limitation, actual attorneys' fees, consultant fees or expert fees and including, without limitation, removal or management of any Hazardous Materials brought into the Leased Property or disturbed in breach of the requirements of this Section, regardless of whether such removal or management is required by Environmental Requirements) which are brought or recoverable against, or suffered or incurred by Lessor as a result of any release of Hazardous Materials or any breach of the requirements under this section by Lessee or any Lessee Party during the Lease Term, regardless of whether Lessee had knowledge of such noncompliance. The obligations of Lessee under this Section shall survive any termination of this Lease Contract.

23.5   **Inspections.**   Lessor shall have access to, and a right to perform inspections and tests of, the Leased Property to determine Lessee's compliance with Environmental Requirements, its obligations under this Section 24 or the environmental condition of the Leased Property. Access shall be granted to Lessor upon Lessor's prior notice to Lessee and at such times so as to minimize, so far as may be reasonable under the circumstances, any disturbance to Lessee's operations. Such inspections and tests shall be conducted at Lessor's expense, unless Lessee is in default hereunder or such inspections or tests reveal that Lessee has not complied with any Environmental Requirement, in which case Lessee shall reimburse Lessor for the reasonable cost of such inspection and tests. Lessor's receipt of or satisfaction with any environmental assessment in no way waives any rights that Lessor holds against Lessee. Lessee shall promptly notify Lessor of any communication or report that Lessee makes to any governmental authority regarding any possible violation of Environmental Requirements or release or threat of release of any Hazardous Materials onto or from the Leased Property. Lessee shall, within five (5) days of receipt thereof, provide Lessor with a copy of any documents or correspondence received from any governmental agency or other party relating to a possible violation of Environmental Requirements or claim or liability associated with the release or threat of release of any Hazardous Materials onto or from the Leased Property.

23.6   **Further Assurances.**   In addition to all other rights and remedies available to Lessor under this Lease Contract or otherwise, Lessor may, in the event of a breach of the requirements of this

Section that is not cured within sixty (60) days following notice of such breach by Lessor, require Lessee to provide financial assurance (such as insurance, escrow of funds or third party guarantee) of Lessee's ability to comply with its obligations hereunder in an amount and form satisfactory to Lessor. The requirements of this Section are in addition to and not in lieu of any other provision in the Lease Contract.

## TWENTY FOURTH.    CONFIDENTIALITY.

24.1   **Confidential Information.**   Any and all information and advice delivered by the parties hereunder or related to the parties' research, technology, analysis, experience, operation method, methodology or practices, as well as all information contained in manuals, studies, audio, graphic and electronic materials, and any other document or written and oral communication ("Confidential Information") shall be considered and treated as confidential by the recipient party, its affiliates, subsidiaries, shareholders, directors, officers and employees as owned by the other party, and shall not be duplicated, published or disclosed in any form by the recipient party, its shareholders, directors, officers and employees to any third party (except to the parties' consultants on a need-to-know basis) without prior authorization in writing from the delivering party, unless a disclosure of such Confidential Information is required under a court or administrative order issued by competent federal and or state authorities or disclosed in connection with the enforcement of this Lease Contract, in which case the disclosing party shall be deemed free and clear of any responsibility for disclosing the Confidential Information under such an order. The recipient party shall take the appropriate measures to assure confidentiality of such information and shall forbid and prevent non-authorized access thereto at any time.

24.2   **Return of Confidential Information.**      Upon termination of this Lease Contract for any reason whatsoever, the parties hereto shall return to the other any Confidential Information delivered by them, including all and any the copies that may have been obtained therefrom. Confidentiality and non-disclosure obligations included in this Section shall continue in force after termination hereof for any reason.

## TWENTY FIFTH.   ACTS OF GOD; FORCE MAJEURE.

**Acts of God; Force Majeure.** Neither Party shall be responsible for delay or non-compliance with any of its obligations hereunder if such delay or noncompliance is caused by an event of *Force Majeure.* For purposes of this Lease Contract, "*Force Majeure*" shall mean acts of God, fire, earthquake, flood, explosion, actions of the elements, war, invasion, insurrection, riot, mob violence, sabotage, inability to procure or general shortage of labor, equipment, facility, materials or supplies in the open market, failure of transportation, condemnation, requisition, laws, governmental action or inaction, orders of government or civil or military or naval authorities, unforeseen subsurface conditions, adverse weather conditions not reasonably expected for the location of the Leased Property and the time of year in question or any cause, whether similar or dissimilar to the foregoing, not within their reasonable control of, as applicable, the Lessor or the Lessor Parties, or the Lessee or the Lessee Parties. In no event, however, shall a lack of money be grounds for Force Majeure and in no event shall condemnation relieve a party from the obligation to make any monetary payments hereunder.

## TWENTY SIXTH.   WAIVERS.

26.1   **Right of First Refusal; Improvements.**   Lessee expressly waives any right of first refusal to buy the Leased Property, and any right to be reimbursed for any Leased Property improvements, conferred upon it by applicable laws.

26.2    **No Waiver.** Neither party's waiver, delay or non-exercise of its right to enforce any provision of this Lease Contract shall be a waiver or limitation of such party's right to enforce said or any other provision of this Lease Contract in the future.

### TWENTY SEVENTH.    LANGUAGE.

**Language.** This Lease Contract is executed in both English and Spanish languages, both of which shall be binding upon the parties; provided, however, that in the event, any judicial intervention is required, the Spanish version shall prevail.

### TWENTY EIGHT.    PUBLICITY.

**Publicity.** Lessee hereby agrees that Lessor shall have the right, following the Commencement Date, to erect signs or other materials at the Leased Property publicizing Lessor's, its affiliates' or beneficiaries', ownership of the Leased Property and/or advertising that the Leased Property, or any portion thereof, is available for lease or sale.

### TWENTY NINE.    SPANISH TRANSLATION.

**Spanish Translation.** Lessor and Lessee agree to cooperate in good faith to have a Spanish translation of this Lease prepared within sixty (60) days following the signature hereof.

IN WITNESS WHEREOF, the undersigned parties, through their duly authorized representatives, have executed this Lease Contract on the date and year set forth in the introductory paragraph to this Lease Contract.

| Lessor | Lessee |
|---|---|
| Banco J.P. Morgan, S.A., Institucion de Banca Multiple, J.P. Morgan Grupo Financiero, Division Fiduciaria, not individually, but in its capacity as trustee under the Trust Agreement | DELPHI DELCO ELECTRONICS DE MEXICO, S.A. DE C.V |
| By: _____ Name: Francisco Andragnes Its: Legal Representative | By: _____ Name: John Wade Schwarm Jenkins Its: Legal Representative |

## EXHIBITS

A.    Description of the Leased Property

B.    Lessor's Powers of Attorney

C.    Lessee's Powers of Attorney

D.    Delphi Maintenance Manual

E.    Service Agreement

F.    Utility Separation Process