# EXHIBIT A

1159069.1
1159069.1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D
SEP - 7 2004
J. T. NOBLIN, CLERK
BY_____ DEPUTY

DELPHI AUTOMOTIVE SYSTEMS, LLC,

       Plaintiff

v.

                               CIVIL ACTION NO. 3:03CV335WS

LEXTRON CORPORATION,

       Defendant

RECEIVED
APR 0 8 2006
BY:_____

## ANSWER AND COUNTERCLAIM OF LEXTRON CORPORATION

Lextron Corporation ("Lextron") files this Answer and Counterclaim in response to the

Complaint filed by Delphi Automotive Systems, LLC ("Plaintiff") as follows:

### AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

This action is or should be stayed by operation of 11 U.S.C. § 362, due to Lextron's

Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Southern District of

Mississippi ("the Bankruptcy Court") on February 12, 2004.  Delphi has never sought relief from

the automatic stay; nor has it ever been a party to any motion seeking relief from the automatic

stay; nor has this action ever been the subject of an order granting any form of relief from the

automatic stay.  Lextron is reserved of its right to seek relief from the Bankruptcy Court to

impose the stay as to this proceeding, and to seek any damages that may be warranted under the

circumstances.

### Affirmative Defense No. 2

Plaintiff's request for relief is barred or diminished by operation of one or more of the following doctrines: waiver, estoppel, ratification, and/or laches.

### Affirmative Defense No. 3

Plaintiff's request for relief is barred by principles of equity, including but not limited to, unclean hands and unjust enrichment.

### Affirmative Defense No. 4

Plaintiff's request for relief is barred or diminished as a result of its failure to abide by the covenant of good faith and fair dealing inherent in every contract to be performed in Mississippi.

### Affirmative Defense No. 5

Plaintiff's putative claims should be barred or diminished due to its failure to mitigate.

### Affirmative Defense No. 6

Plaintiff's putative claims are subject to setoff and/or recoupment, which are specifically reserved and asserted.

### Affirmative Defense No. 7

Plaintiff's putative claims are subject to treatment in a plan of reorganization to be confirmed by the Bankruptcy Court in Lextron's Chapter 11 case, and the terms of such plan will control and supersede any judgment that might be obtained by Plaintiff, without regard to any judgment obtained by Lextron in it counterclaim.

### Affirmative Defense No. 8

Plaintiff has failed to join a necessary or indispensable party, or necessary or indispensable parties, or a party or parties needed for just adjudication, and should be required to join such party or parties pursuant to Rules 17 and 19 of the Federal Rules of Civil Procedure.

### Affirmative Defense No. 9

Plaintiff's claim for replevin of bailed property is moot, as is its request for damages for wrongful detention, due to Lextron's agreement to relinquish the equipment made the subject of the replevin count, and the Agreed Order Granting Motion for Writ of Replevin ("the Replevin Order") entered by this Court on March 5, 2003. Lextron is reserved of its right to seek damages from Plaintiff for wrongful removal of equipment belonging to Lextron.

### Affirmative Defense No. 10

Plaintiff cannot recover on its putative claims because it is not the real party in interest for purposes of this action, and/or because it lacks standing to pursue putative causes of action belonging to other legally distinct entities. In addition, any attempt by Plaintiff to assign its putative claims to other entities, or to add other entities as Plaintiffs at this stage of the litigation is barred by operation of 11 U.S.C. § 362.

### Affirmative Defense No. 11

Plaintiff's contract claims are barred by one or more of the following: lack of mutuality of obligation; lack of consideration; failure of consideration; duress; impossibility; and failure of conditions precedent and/or conditions subsequent.

## ANSWERS TO NUMBERED PARAGRAPHS OF COMPLAINT

And now, addressing Plaintiff's Complaint, paragraph by numbered paragraph, Lextron answers as follows:

1.      Lextron is without knowledge or information sufficient to form a belief as to the truth of paragraph 1.

2.      Admitted.

3.      Denied.

4.      Admitted as to venue, without admitting jurisdiction. Denied as to allegations regarding Delphi's replevin claim, due to entry of the Replevin Order.

5.      Admitted.

6.      Admitted that Plaintiff and Lextron entered into various Contracts, and admitted that the Contracts speak for themselves. Denied as to any contrary interpretation. Further admitted that Lextron entered into contracts with other legally distinct Delphi entities. All other allegations not admitted herein are denied.

7.      Admitted that Lextron performed work for Delphi Packard Electric Systems Division pursuant to the General Terms and Conditions, which speak for themselves. Denied as to any contrary interpretation or legal effect.

8.      Admitted that Lextron performed work for Delphi Safety & Interior Division pursuant to the General Terms and Conditions, as amended from time to time, which speak for themselves. Denied as to any contrary interpretation or legal effect.

9.      Admitted.

10.     Admitted that the Contracts speak for themselves. Denied as to any contrary interpretation or legal effect.

11.     Admitted that the contractual language speaks for itself. Denied as to any contrary interpretations or legal effect.

12.     Admitted that the contractual language speaks for itself. Denied as to any contrary interpretations or legal effect.

13.     Admitted that Plaintiff transmitted letters terminating the relationship between Plaintiff and Lextron, without admitting to the validity or legal effect of the letters, and admitted

that copies are attached to the Complaint. Admitted that the letters speak for themselves, and denied as to any contrary interpretation or legal effect.

14.    Admitted that Charles Doty ("Mr. Doty") and Sidney Johnson ("Mr. Johnson") engaged in a telephone conversation on February 28, 2003. Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

15.    Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

16.    Denied that Lextron owed a balance to Plaintiff, denied that Lextron had failed to meet its contract obligations to Plaintiff in January, 2003, and denied that Lextron was in breach of its contract with Plaintiff. Admitted that Plaintiff extended certain accommodations to Lextron as an inducement for Lextron to continue working for Plaintiff. Admitted that Lextron was out of formula on a loan from SouthTrust, and admitted that the loan documents speak for themselves. Denied as to any contrary interpretation. Admitted that Lextron was in arrears with respect to certain payroll taxes assessed for 2002, but denied as to the amount asserted by Delphi. Denied that Lextron failed to maintain adequate accounting controls. All other allegations not admitted herein are denied.

17.    Denied to Delphi's claim as to the purpose of the document attached as Exhibit 3A to the Complaint. Denied that Plaintiff had no obligation to pay Lextron in connection with

terminating the contract. Otherwise, admitted, subject to resolution of the replevin counts, as contained in the Replevin Order.

18.    The allegations of paragraph 18 are moot based on the Replevin Order, and therefore denied.

19.    Denied.

20.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

21.    The allegations of paragraph 21 are moot based on the Replevin Order, and therefore denied.

22.    The allegations of paragraph 22 are moot based on the Replevin Order, and therefore denied.

23.    The allegations of paragraph 23 are moot based on the Replevin Order, and therefore denied.

24.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

25.    The allegations of paragraph 25 are moot based on the Replevin Order, and therefore denied.

26.    The allegations of paragraph 26 are moot based on the Replevin Order, and therefore denied.

27.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

28.    Admitted that the Court has the power to issue a declaratory judgment. Denied as to any contrary interpretation.

29.     Admitted that Plaintiff is requesting a declaratory judgment. Denied that it is entitled to the judgment requested.

30.     Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

31.     Denied.

32.     Denied.

33.     Denied. Lextron further denies that Delphi is entitled to any of the relief in the unnumbered *ad damnum* paragraph beginning "WHEREFORE. . . ." All other allegations of the Complaint not specifically admitted herein are denied.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation requests that a judgment of dismissal be entered in its favor as to all counts of Plaintiff's Complaint not previously adjudicated. Lextron requests all other relief appropriate in the premises.

## COUNTERCLAIM

Lextron files this Counterclaim pursuant to F.R.C.P. 13, as follows:

### I. Parties

1.     Counterclaimant Lextron Corporation ("Lextron") is a Mississippi Corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi.

2.     Counterdefendant Delphi Automotive Systems, LLC ("Delphi") is a Delaware limited liability company doing business in the state of Mississippi.

### II. Facts

3.     At the inception of their joint venture, Delphi advised Lextron ("Lextron") and certain of its affiliates that it wanted to work with Lextron to manufacture significant amounts of auto components for use by Delphi. Delphi advised Lextron and Doty that the volume of business Delphi would make available to Lextron as part of the joint venture was such that

Lextron would have to significantly expand its physical plant. Delphi further promised Lextron

and Doty that it would use its "best efforts" to cause the venture to be a success, as Delphi

represented to Lextron that it would cause Lextron's cost of producing products for Delphi to be

as low as possible and its production facilities to be as efficient as possible.

4.      In reliance on Delphi's representations and promises, Lextron acquired at

considerable expense a manufacturing facility, and after consultation, inspection and direction by

Delphi, renovated that facility at even greater expense so as to accommodate Delphi's

manufacturing requirements, all in compliance with Delphi's demand that the facility be

dedicated to manufacturing for Delphi alone (hereinafter sometimes "the Delphi dedicated

facility").

5.      Delphi, at all times relevant herein, represented to Lextron and Doty that Delphi

would provide necessary economic and technical support, guidance and assistance to Lextron,

and, through their combined efforts, Lextron would be a major Delphi supply partner.

6.      Subsequently, Delphi failed to, and intentionally refused to increase the volume

of Delphi manufacturing business as promised, failed to grant modest and reasonable price

increases despite repeated requests from Lextron, and otherwise failed to use its "best efforts" to

cause the joint venture to be a success. In fact, Delphi refused to implement Lextron requested

cost reductions and production efficiencies. As a consequence of Delphi's acts, omissions

and misrepresentations, by late 2002, Lextron had serious financial difficulties.

·7.      Despite Lextron's financial difficulties, Delphi continued to assure Lextron that it

was and would continue to work in Lextron's best interest to cause Lextron to be profitable,

specifically and expressly agreeing by written Contract to use its, Delphi's, "best efforts" to

cause Lextron's costs to be as low as possible and its production facilities and efficiencies to

be as high as possible *(see* Contracts dated October 31, 2002, October 8, 2002 and September 5, 2002 attached hereto as Exhibits A, B and C).

8.      Shortly thereafter, Delphi reassured Lextron's lender, Southtrust Bank, and Doty, that Delphi had an interest in the Lextron venture and was committed to support of it. Delphi reaffirmed its commitment to support Lextron in a letter to Southtrust Bank dated January 9, 2003, a copy of which is attached as Exhibit D. In reliance on Delphi's promises as aforesaid, Lextron committed to incur additional indebtedness from Southtrust Bank in the amount of $800,000.00, and Charles Doty was induced, in reliance on Delphi's promises, to execute a personal guaranty of that debt.

9.      Lextron had earlier incurred substantial indebtedness from Southtrust Bank (guaranteed by Lextron CEO Charles Doty) in reliance on Delphi's promises to support and grow Lextron economically and technologically.

10.     In late February 2003, shortly after Delphi's written assurances of its commitment to the Lextron venture's success (by assuring Lextron that whatever means were necessary to reduce Lextron's costs and increase its efficiencies would be undertaken by Delphi), and just after Delphi confirmed its interest in and obligation to support Lextron, Delphi abruptly and unilaterally breached its agreements and duties by reneging on its commitment to the Lextron venture and by terminating all Contracts between Delphi and Lextron then in existence, including three (3) new contracts (hereinafter referred to as the "Three New Contracts") which had recently (within the last few months) been awarded.

11.     Delphi represented to Doty and Lextron that the basis for termination of its commitments was a provision in a document entitled "General Terms and Conditions" which reads as follows:

> Buyer [Delphi] may immediately terminate this contract
> without liability to Seller [Lextron] in any of the following or
> any similar events:... (f) any accommodation by Buyer, financial
> or otherwise, not contemplated by this contract, that are
> necessary for Seller to meet its obligations under this contract
> [emphasis added].

*See* Letter dated February 27, 2003, from Delphi to Lextron attached as Exhibit E.

    12.    Delphi's termination of the joint venture and of the three then existing

production agreements was knowingly without any lawful basis since, among other things, (a)

the provision referenced above on which the termination was purportedly based has no

application to Delphi's commitment to the success of the Lextron joint venture, and (b) with

respect to the "Three New Contracts" in particular, because they specifically require Delphi

to assist and work with Lextron by using its "best efforts." Because the accommodation provision

in subsection (f) of the General Terms and Conditions document has no application, it

therefore could not be relied upon as a basis for termination.

    13.    Delphi schemed throughout the Lextron venture to make Lextron dependent on it

under the guise that Delphi would use its massive know-how and resources to insure the success

of Lextron's Delphi manufacturing business. Yet, Delphi actually acted to drive Lextron into

debt and then unilaterally and wrongfully terminated their relationship and its obligations to

support Lextron. Among the wrongful conduct in which Delphi engaged, in addition to the

aforedescribed, was Delphi's refusal to honor its commitment which it stated repeatedly, to

significantly increase Lextron's volume of business so as to utilize all, or substantially all,

of the Delphi dedicated facility; Delphi's refusal to adjust Lextron's pricing model so as to

enable Lextron to make a profit from the joint venture; Delphi's refusal to pay Lextron for

commodities at the same higher price paid by Delphi to Lextron's competitors within the

State of Mississippi; Delphi's refusal to allow Lextron to reduce its costs, including

lead wire cost; Delphi's misrepresentation of its intent with regard to the retention of consultants who were represented to be working for the benefit of Lextron while, in reality, they were used by Delphi to obtain information regarding Lextron and its prospective non-Delphi related business ventures and to otherwise sabotage the Lextron-Delphi joint venture; and Delphi's assurances to Lextron and Doty that in the event Lextron incurred indebtedness in pursuit of the Delphi venture, Delphi would support Lextron economically and technologically to ensure its success. As a part of Lextron's effort to restructure its business, Delphi urged, through BBK, Ltd., that Lextron shut down all non-Delphi business activity.

14.    As set forth more fully below, the foregoing acts, omissions and misrepresentations were intentional and reckless and have severely damaged Lextron and Doty.

### COUNT ONE

### BREACH OF JOINT VENTURE AGREEMENT

15.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

16.    Delphi's acts, omissions and misrepresentations as set forth herein constitute a breach of the Delphi agreements to act jointly with Lextron (and Charles Doty) to create a profitable Delphi dedicated manufacturing facility.

17.    Lextron is therefore entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

### COUNT TWO

### BREACH OF CONTRACTS

18.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

19.    Such acts, omissions and misrepresentations constitute a breach of the Lextron-Delphi contracts, including the "Three New Contracts."

20.    Defendant Lextron is entitled to damages as a consequence of the aforesaid contractual breaches as more fully set forth below.

21.    In addition, Lextron is entitled to contractual and damages from Delphi as a result of improperly applied credits, and the failure of Delphi to either pay Lextron or credit it for products assembled and shipped to Delphi.

22.    Specifically, and in contrast to Delphi's claim that Lextron owes certain sums for allegedly breaching the supply contract, Delphi in fact owes Lextron the net amount of $461,197.16 for products assembled and shipped to Delphi, and for which Delphi never paid or properly credited Lextron.

## COUNT THREE

### INTENTIONAL MISREPRESENTATION

23.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

24.    Such misrepresentations were intentional and were relied upon by Lextron in acquiring and renovating a dedicated Delphi facility; incurring substantial indebtedness (including the $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's attention from other business opportunities.

25.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FOUR

### NEGLIGENT MISREPRESENTATION

26.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

27.    Such misrepresentations were relied by Lextron in acquiring and renovating the Delphi dedicated facility; incurring indebtedness (including the additional $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's and Doty's attention from other business opportunities.

28.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH CONTRACT

29.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

30.    Delphi's conduct in unilaterally, intentionally, wrongfully and recklessly terminating the joint venture and aforementioned contracts and in breaching those agreements tortiously interfered with (and was intended to interfere with) Lextron's contracts with Southtrust Bank, other creditors, and with other existing and potential business pursuits.

31.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SIX

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

32.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

33.    Such acts, omissions and misrepresentations, as set forth herein were willful, malicious and undertaken in bad faith, and thus constituted a breach of the duty of good faith and fair dealing implied in all contracts.

34.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SEVEN

### UNFAIR TRADE PRACTICES

35.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

36.    The foregoing acts, omissions and misrepresentations constitute unfair trade practices, including, but not limited to, Delphi's practice of paying more for commodities purchased from Lextron competitors than for those same products purchased from Lextron, in violation of Miss. Code Ann. 75-21-3, and other applicable state statutes.

37.    Defendant Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT EIGHT

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

38.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

39.    Such acts, omissions and misrepresentations interfered with Lextron's prospective business relations with other parties. Delphi intentionally committed such acts, including the wrongful termination of the joint venture and the aforementioned contracts to cause Lextron to be unable to consummate such other prospective business.

40.    Defendants are entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT NINE

### BREACH OF FIDUCIARY DUTY

41.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

42.    As a consequence of the long-standing course of dealing, representations and promises of Delphi and the joint venture arrangement of the parties, Delphi owed Lextron a fiduciary duty, which Delphi breached by the foregoing acts, omissions and misrepresentations.

43.    The foregoing breach of fiduciary duties entitles Defendants to damages as set forth below.

## COUNT TEN

### FRAUD

44.    Lextron and Doty incorporate herein, as if fully set forth, all of the foregoing factual allegations.

45.    Delphi knowingly made the foregoing representations and promises with the knowledge that they were false or with reckless disregard for their truth and intending for and inducing Lextron to rely thereon all to Lextron's extreme detriment. Under the circumstances of the parties' unique, fiduciary, and special relationship, Lextron at all times pertinent hereto, was entitled to rely on the Delphi representations.

46.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

### COUNT ELEVEN

### SUPPRESSION OF MATERIAL FACTS

47.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

48.    Delphi suppressed its true intentions while misrepresenting to Lextron its interest in and support of Lextron, all to the extreme detriment of Lextron.

49.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

### COUNT TWELVE

### CONVERSION

50.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

51.    Despite specific concerns raised by Lextron with respect to the property by Delphi in its count for replevin, and despite assurances by Delphi that it would remove only equipment owned by it, on March 10, 2003, Delphi removed items of equipment belonging to Lextron, and in which Delphi had no interest.

52.    The equipment wrongfully converted by Delphi is listed as follows:

Front Door Harness:        Serial # 16643688
Front Door Harness:        Serial # 16643690
Backdoor Harness:          Serial # 1544-7743
Backdoor Harness:          Serial # 1544-7744
Steering Column Harness:   Serial # 16870022

53.    Delphi's removal of these items of equipment was in direct violation of the

Agreed Order entered into by and between Delphi and Lextron, and filed of record in this Court,

which authorized Delphi to remove only those items of equipment belonging to it.

54.    Delphi's removal and continued detention of these items was deliberate and

intentional, and was performed in furtherance of its calculated business decision to ruin Lextron.

55.    In the alternative, Delphi's removal and continued detention of these items was

the product of gross negligence, mismanagement, and lack of oversight as to amount to an

intentional tort.

56.    Delphi is therefore liable to Lextron for actual, compensatory, incidental, and

punitive damages as a result of its willful or grossly negligent acts of conversion of Lextron's

property, all in violation of an Order of this Court.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation demands judgment

against Delphi Automotive Systems, LLC, including all of its divisions and affiliates named or

referred to in the Complaint filed by Delphi herein, or who may otherwise be liable to Lextron,

for all actual, compensatory, incidental, and punitive damages in an amount to be determined by

the jury at trial, plus all accruing pre- and post-judgment interest and costs of this action, and

such other and further relief as the jury and Court deem appropriate.

Dated, this the 7th day of September, 2004.

LEXTRON CORPORATION

By: _____
    Chad J. Hammons

Alveno N. Castilla, Esq. (MS Bar 5924)
Chad J. Hammons, Esq. (MS Bar #10419)
Watkins Ludlam Winter & Stennis, P.A.
633 North State Street (39202)
Post Office Box 427
Jackson, MS  39205-0427

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has this

day been placed in the United States Mail, postage prepaid, to the following:

Debra Brown, Esq.
Frank Trapp, Esq.
Phelps Dunbar
P. O. Box 23066
Jackson, MS  39225-3066

This 7th day of September, 2004.

_____
Chad J. Hammons

# EXHIBIT "A"



# DELPHI

## DELPHI CORPORATION
## LONG TERM CONTRACT

### 1.  Purchase of Product

Lextron Automotive ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| GX203842 <br> 15447743 | 2004 DCX HB RRAB Leadwire Asm (LH) | $2.01 USD | 25,000 annually (based on maximum of 235 working days and 100 hours per week) |
| GX203843 <br> 15447744 | 2004 DCX HB RRAB Leadwire Asm (RH) | $2.00 USD | 25,000 annually (based on maximum of 235 working days and 100 hours per week) |

### 2.  Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2006.

### 3.  Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms).  Pricing for each subsequent Calendar Year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Part Number | % Red. | Calendar Year 2004 Pricing | % Red. | Calendar Year 2005 Pricing | % Red. | Calendar Year 2006 Pricing |
|---|---|---|---|---|---|---|
| GX203842 | 5% | $1.9095 | 5% | $1.8140 | 5% | $1.7233 |
| GX203843 | 5% | $1.9000 | 5% | $1.8050 | 5% | $1.7148 |

15447743
15447744

MEK
10/24/02

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product.  Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price

RECEIVED
NOV 1 2002
BY:

reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

## 4.   Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer.   If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive.   If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

## 5.   Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract.   Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003.   Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt.   The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

**EXECUTED** by Buyer and Seller as of this ___31ST___ day of ___October___, 2002.

**Buyer:**                                          **Seller:**

**Delphi Corporation LLC**                          **Lextron Automotive**
**acting through its Safety & Interior**
**Systems Division**

By: _____                        By: _____
Name: ___Michelle E. Joseph___                      Name: ___Ray C. Irby___
Title: ___Senior Electrical Buyer___                Title: ___Chief Operating Officer___

## DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2 SHIPPING AND BILLING

**2.1 Shipping.** Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

**2.2 Billing.** Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

**2.3 Delivery Schedules.** Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines th the requirements of Buyer's customers or market, economic or other conditions require changes in de...ery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

Revised June 24, 1999

2. _Premium Shipments_. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 6) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) copy Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

Revised June 24, 1999

## ORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services [cover]ed by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from [d]efect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested [b]y Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for [n]onconforming goods.

7.2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including [c]omputer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately [p]rocess, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st [c]enturies, including leap year calculations.

7.3 Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that [if] Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by [th]is Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

[If] Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all [in]gredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to [th]e ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers [s]ufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous [m]aterial that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures [an]d precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

Revised June 24, 1999

le    requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, tra...portation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER /

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this  contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1  Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to any use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2  Waiver of Claims.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, any  customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -