**EXHIBIT B-1**

EXECUTION COPY

# LIGHTSOURCE FORMATION AGREEMENT

## AMONG

## GENERAL MOTORS CORPORATION,

## LIGHTSOURCE PARENT CORPORATION

## AND

## PEP GUIDE, LLC

Dated as of September 29, 1998

TABLE OF CONTENTS

Page

1.   DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2.   ASSET EXCHANGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
     2.1.   Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.1.1.   Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.1.2    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.1.3.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.1.4.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     2.2.   Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     2.3.   Excluded Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.1.   GM Bailed Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.2.   Personnel and Medical Records . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.3.   Third-Party Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.4.   Certain Current Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
            2.3.5.   Certain Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.6.   Product Evaluation Vehicles, Pooled Vehicles . . . . . . . . . . . 11
            2.3.7.   Tax Refunds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.8.   Intangibles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.9.   Other Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.10. Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
            2.3.11. Certain Environmental, Privileged and Proprietary Documents . . . . . . . 11
     2.4.   Post-Closing Asset Deliveries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     2.5.   Nonassignable Permits and Contracts . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.5.1.   Nonassignability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
            2.5.2.   Efforts to Obtain Consents and Waivers . . . . . . . . . . . . . . . 12
            2.5.3.   If Waivers or Consents Cannot be Obtained . . . . . . . . . . . . 12
            2.5.4.   Obligation of Newco to Perform . . . . . . . . . . . . . . . . . . . . 13

3.   ASSET AMOUNT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     3.1.   Asset Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
     3.2.   Preparation of Closing Inventory Statement . . . . . . . . . . . . . . . . . . . . 13
     3.3.   Asset Amount Adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     3.4.   Prorations, Adjustments of Expenses Following the Closing . . . . . . . . . 15
            3.4.1.   Prorations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            3.4.2.   Further Assurance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
            3.4.3.   Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            3.4.4.   Prosecution of Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
     3.5.   Supplementary Payments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

4.   ASSUMPTION OF LIABILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

5.   REPRESENTATIONS AND WARRANTIES . . . . . . . . . . . . . . . . . . . . . . . . 18
     5.1.   Representations and Warranties of GM . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.1.1.   Organization; Standing . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.1.2.   Authority; Binding Effect . . . . . . . . . . . . . . . . . . . . . . . . . 18
            5.1.3.   Qualification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            5.1.4.   Sufficiency of Acquired Assets . . . . . . . . . . . . . . . . . . . . . 19
            5.1.5.   Personal Property; Third-Party Bailed Assets . . . . . . . . . . . 19
            5.1.6.   Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
            5.1.7.   Intellectual Property Rights . . . . . . . . . . . . . . . . . . . . . . . . 20
            5.1.8.   Compliance with Laws; Permits . . . . . . . . . . . . . . . . . . . . . 21
            5.1.9.   Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
            5.1.10. No Consents Required; Absence of Conflicting Agreements . . . . . . . . 21

Page

5.1.11. Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5.1.12. Undisclosed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5.1.13. Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
5.1.14. Regulatory Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
5.1.15. Real Estate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
5.1.16. Tax Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
5.1.17. Absence of Certain Changes or Events . . . . . . . . . . . . . . . . 26
5.1.18. ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
5.1.19. Labor Relations and Employment . . . . . . . . . . . . . . . . . . . 26
5.1.20. No Misleading Statements . . . . . . . . . . . . . . . . . . . . . . . . 27
5.1.21. Current Products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.1.22. Year 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.1.23. Absence of Other Representations or Warranties . . . . . . . . . 28
5.1.24. Preference Stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
5.2.      Representations and Warranties of PEP Guide and Newco . . . . . . . . . . . . . . . 28
5.2.1.    Corporate Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
5.2.2.    Corporate Power, Due Authorization . . . . . . . . . . . . . . . . . 29
5.2.3.    No Consent Required . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
5.2.4.    Absence of Conflicting Agreements . . . . . . . . . . . . . . . . . . 29
5.2.5.    Salaried Transferred Employees . . . . . . . . . . . . . . . . . . . . 30
5.2.6.    Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
5.2.7.    Brokers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
5.2.8.    Subsidiary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

6.   PERSONNEL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
6.1.     Responsibility for Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
6.2.     Special Provisions Relating to Hourly Employees . . . . . . . . . . . . . . . . . . . 31
6.3.     Return of Certain Hourly Transferred Employees to GM . . . . . . . . . . . . . . . 32
6.4.     Payment of Wages and Benefits of Hourly Transferred Employees . . . . . . . . . . 33
6.5.     Special Provisions Relating to Salaried Employees . . . . . . . . . . . . . . . . . . . 35
6.6.     Retirement Program and Pension Plans . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.6.1.   Hourly Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
6.6.2.   Salaried Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
6.6.3.   Other Plan Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
6.6.4.   Transfer of Liabilities and Assets . . . . . . . . . . . . . . . . . . . . 43
6.6.5.   Amendment or Termination of Newco Plans . . . . . . . . . . . . . 45
6.7.     Health Care and Life and Disability Benefits Programs, Special Benefit . . . . . . 45
6.7.1.   Health Care and Life and Disability Benefit Programs . . . . . . . . . . . . 45
6.7.2.   Special Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
6.7.3.   Miscellaneous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
6.8.     Amendment or Termination of Benefit Plans . . . . . . . . . . . . . . . . . . . . . . 49
6.9.     Employee Information, Cooperation in Establishing Newco Benefit Plans . . . . . 49
6.10.    Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49
6.11.    Savings Plan Transfers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
6.12.    Allocation of Responsibility for Suggestions Existing as of Closing . . . . . . . . 50
6.13.    SUB/GIS and JOBS Programs -- Maximum Liabilities . . . . . . . . . . . . . . . . 50
6.14.    Vehicle Purchase Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
6.15.    Training and Tuition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
6.16.    Tuition Reimbursement Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
6.17.    Workers' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
6.18.    Legal Services Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
6.19.    Liability for Certain Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
6.20.    Approval of Communications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
6.21.    Rehiring of Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Page

7.  REAL ESTATE MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    7.1.  Conveyance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    7.2.  Title . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53
    7.3.  Land Surveys . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

8.  CONDITIONS TO CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    8.1.  Conditions to Obligations of PEP Guide and Newco . . . . . . . . . . . . . . . . . . . . 54
          8.1.1.  Accuracy of Representations and Warranties . . . . . . . . . . . . . . . . . 54
          8.1.2.  Performance of Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . 54
          8.1.3.  No Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
          8.1.4.  Consents to Assignment of Certain Contracts . . . . . . . . . . . . . . . . 54
          8.1.5.  Ancillary Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
          8.1.6.  Material Adverse Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
          8.1.7.  Agreement with Lender. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
          8.1.8.  Lender Acknowledgment and Security Agreement . . . . . . . . . . . . . . 55
          8.1.9.  Missing Items . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
    8.2.  Conditions to Obligations of GM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55
          8.2.1.  Accuracy of Representations and Warranties . . . . . . . . . . . . . . . . . 55
          8.2.2.  Performance of Covenants . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          8.2.3.  No Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          8.2.4.  Certain Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          8.2.5.  Salaried Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          8.2.6.  Agreement with Lender . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          8.2.7.  Lender Acknowledgment and Security Agreement . . . . . . . . . . . . . . 56

9.  ENVIRONMENTAL MATTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
    9.1   Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          9.1.1.  Adverse Consequences . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
          9.1.2.  Anderson Plating Operations . . . . . . . . . . . . . . . . . . . . . . . . . 57
          9.1.3.  Chlorinated Solvent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
          9.1.4.  Clean Closure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
          9.1.5.  Environmental Condition . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
          9.1.6.  Environmental Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
          9.1.7.  Governmental Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
          9.1.8.  Hazardous Material . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
          9.1.9.  Knowledge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
          9.1.10. Monroe Press Pit Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
          9.1.11. Non-Compliance Matter . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58
          9.1.12. Release . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59
    9.2.  Environmental Assessments and Compliance Audits . . . . . . . . . . . . . . . . . . 59
          9.2.1.  Environmental Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . 59
          9.2.2.  Pre-Closing Environmental Assessments . . . . . . . . . . . . . . . . . . 59
          9.2.3.  Pre-Closing Environmental Compliance Audits . . . . . . . . . . . . . . . 59
    9.3.  GM Remediation and Corrective Action . . . . . . . . . . . . . . . . . . . . . . . . . 60
          9.3.1.  GM Remediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
          9.3.2.  Remedial Action Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
          9.3.3.  Remedial Action Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
          9.3.4.  PCBs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
          9.3.5.  ACM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
          9.3.6.  GM Compliance Action Plans . . . . . . . . . . . . . . . . . . . . . . . . . 61
          9.3.7.  No Other Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
          9.3.8.  Non-Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61
          9.3.9.  Newco's Review Period . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                                                                                    Page

        9.3.10. Modification Based on Newco's Input .......................... 62
        9.3.11. Implementation ............................................. 62
        9.3.12. Clean Closure .............................................. 62
        9.3.13. Newco's Obligations ........................................ 63
9.4.    Access ..................................................................... 63
        9.4.1.  GM Access ................................................. 63
        9.4.2.  Access Limitations ......................................... 64
9.5.    Real Property - Use Restrictions ........................................... 64
        9.5.1.  Generator-Only Status ..................................... 64
        9.5.2.  Transfers .................................................. 64
        9.5.3.  Removal of Improvements ................................... 65
        9.5.4.  Specific Restrictions ....................................... 65
        9.5.5.  Notice Filing .............................................. 65
9.6.    Transition - Permits/Environmental Committee ........................... 65
        9.6.1.  Environmental Permits ...................................... 65
        9.6.2.  Transfer ................................................... 65
        9.6.3.  Environmental Committee ................................... 66
9.7.    Waste Management ........................................................ 66
        9.7.1.  Hazardous Waste Removal .................................. 66
        9.7.2.  Post-Closing Waste Management ............................. 67
        9.7.3.  No Arrangement for Disposal ............................... 67
9.8.    Environmental Management System ......................................... 67
9.9.    GM's Representations and Warranties ...................................... 67
        9.9.1.  No Actions ................................................. 67
        9.9.2.  No Notices ................................................. 67
        9.9.3.  No Listing ................................................. 68
        9.9.4.  No Liens ................................................... 68
        9.9.5.  No Chlorinated Solvent Use ................................. 68
9.10.   Newco's Covenants, Obligations and Acknowledgments .................... 68
        9.10.1. Compliance with Environmental Law ......................... 68
        9.10.2. Non-Compliance Notice ..................................... 68
        9.10.3. Newco's Obligations in Connection with GM's Remedial Actions ..... 68
        9.10.4. Equipment Decommissioning – Anderson Plant ................... 69
        9.10.5. Equipment Decommissioning – Monroe Plant .................... 69
        9.10.6. Disclosure and Recordation ................................. 70
        9.10.7. Releases and Hazardous Materials ........................... 70
        9.10.9. Newco's Additional Acknowledgments ......................... 70
9.11.   Defense and Indemnification Obligations ................................... 71
        9.11.1. GM's Defense and Indemnification Obligations ................. 71
        9.11.2. Newco's Defense and Indemnification Obligations .............. 72
        9.11.3. Apportionment ............................................. 72
        9.11.4. Third-Party Claims ......................................... 73
9.12.   Confidentiality ............................................................ 73
        9.12.1. Environmental Confidentiality Agreement ...................... 73
        9.12.2. Confidentiality Obligations .................................. 73
        9.12.3. Disclosures ................................................ 73
        9.12.4. Notification ................................................ 74
        9.12.5. Public Information .......................................... 74
9.13.   Dispute Resolution ........................................................ 74
9.14.   Miscellaneous ............................................................ 75
        9.14.1. Designation of Representatives .............................. 75
        9.14.2. Exclusivity ................................................ 75
        9.14.3. Covenant Not to Sue ........................................ 75
        9.14.4. Reporting .................................................. 76

Page

9.14.5. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

10.   CLOSING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      10.1.   The Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      10.2.   Asset Exchanges . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
      10.3.   Additional Documents and Papers . . . . . . . . . . . . . . . . . . 79

11.   CERTAIN ADDITIONAL COVENANTS . . . . . . . . . . . . . . . . . . . . . 79
      11.1.   Operation of the Business . . . . . . . . . . . . . . . . . . . . . . . 79
      11.2.   Further Assurances . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
      11.3.   Reasonable Access . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
      11.4.   Transition Services and Arrangements . . . . . . . . . . . . . . . 80
      11.5.   Books and Records . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
      11.6.   Technical Documentation . . . . . . . . . . . . . . . . . . . . . . . 82
      11.7.   Payment and Collections . . . . . . . . . . . . . . . . . . . . . . . 83
      11.8.   Non-Competition . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
      11.9.   Subsequent Financial Statements . . . . . . . . . . . . . . . . . . 84
      11.10.  Injunctions/Orders . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
      11.11.  Supplements to Schedules . . . . . . . . . . . . . . . . . . . . . . 84
      11.12.  Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85
      11.13.  Intellectual Property Licenses . . . . . . . . . . . . . . . . . . . . 85
              11.13.1. Licenses to Newco . . . . . . . . . . . . . . . . . . . . . 85
              11.13.2. Licenses to GM . . . . . . . . . . . . . . . . . . . . . . . 85
              11.13.3. Sublicense to Newco . . . . . . . . . . . . . . . . . . . 86
      11.14.  Pre-Emptive Right . . . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.15.  Management Dilution . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.16.  Capital Contribution . . . . . . . . . . . . . . . . . . . . . . . . . . 86
      11.17.  Warrants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.1. Issuance . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.2. Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.3. Exercise . . . . . . . . . . . . . . . . . . . . . . . . . . . 87
              11.17.4. Transfer Restrictions . . . . . . . . . . . . . . . . . . . 87
              11.17.5. Registration Rights . . . . . . . . . . . . . . . . . . . . 87
              11.17.6. Other Terms . . . . . . . . . . . . . . . . . . . . . . . . 87
      11.18.  Put Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

12.   INDEMNIFICATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
      12.1.   Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88
      12.2.   Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
              12.2.1. Indemnification Provisions for Benefit of Newco . . . . . . 89
              12.2.2. Indemnification Provisions for Benefit of GM . . . . . . . 89
      12.3.   Indemnification Procedure as to Third-Party Claims . . . . . . . 90
      12.4.   Exclusive Remedy . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
      12.5.   Dispute Resolution . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

13.   TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      13.1.   Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
      13.2.   Effect of Termination . . . . . . . . . . . . . . . . . . . . . . . . . 92

14.   MISCELLANEOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      14.1.   Bulk Sales Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      14.2.   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
      14.3.   Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
      14.4.   Pledge to Lenders . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

|  |  | Page |
|---|---|---|
| 14.5. | Entire Agreement | 94 |
| 14.6. | Waiver | 95 |
| 14.7. | Failure or Delay Not Waiver, Remedies Cumulative | 95 |
| 14.8. | Specific Performance | 95 |
| 14.9. | Amendment | 95 |
| 14.10. | Expenses | 95 |
| 14.11. | Third Parties | 96 |
| 14.12. | Severability | 96 |
| 14.13. | Headings | 96 |
| 14.14. | Counterparts | 96 |
| 14.15. | Governing Law; Jurisdiction; Consent to Service of Process | 96 |
| 14.16. | Public Announcements | 97 |
| 14.17. | Sales or Transfer Taxes | 97 |
| 14.18. | Other Tax Matters | 97 |
| 14.19. | Solely Corporate Obligations | 97 |
| 14.20. | Transfer of Series A Senior Preferred Stock | 98 |
| 14.21. | The Closing | 98 |

## TABLE OF EXHIBITS AND SCHEDULES

| | |
|---|---|
| Component Supply Agreement | Exhibit A |
| GM Note | Exhibit B |
| Right of Access Agreement | Exhibit C |
| Shareholders and Registration Rights Agreement | Exhibit D |
| Warrants Certificate | Exhibit E |
| Environmental Confidentiality Agreement | Exhibit 9.2.1 |
| Form of License or Sublicense | Exhibit 11.13.1 |
| | |
| Certain Acquired Assets | Schedule 2.1.1A |
| Pre-existing Agreements | Schedule 2.1.1B |
| GM Bailed Assets | Schedule 2.3.1 |
| Third Party Assets | Schedule 2.3.3 |
| Excluded Contracts | Schedule 2.3.5 |
| Other Assets | Schedule 2.3.9 |
| Nonassignable Contracts | Schedule 2.5.1A |
| Contracts Requiring Consents | Schedule 2.5.1B |
| Liens on Personal Property and Inventory | Schedule 5.1.5A |
| Personal Property | Schedule 5.1.5B |
| Bailed Personal Property | Schedule 5.1.5D |
| Litigation | Schedule 5.1.6A |
| Material Litigation | Schedule 5.1.6B |
| Product Liability Claims | Schedule 5.1.6C |
| Intellectual Property | Schedule 5.1.7A |
| Claims Against Intellectual Property | Schedule 5.1.7B |
| Licenses Requiring Consents | Schedule 5.1.7C |
| Permits | Schedule 5.1.8 |
| Compliance with Laws | Schedule 5.1.8A |
| Certain Permits in Default | Schedule 5.1.8B |
| Certain Other Permits in Default | Schedule 5.1.8C |
| Financial Statements | Schedule 5.1.11A |
| Reconciliation | Schedule 5.1.11B |
| Liabilities | Schedule 5.1.12 |
| Material Contracts | Schedule 5.1.13A |
| Contracts in Default | Schedule 5.1.13B |
| Contracts to be Assigned | Schedule 5.1.13D |
| Required Permits | Schedule 5.1.14 |
| Owned Real Estate and Anderson, Indiana Real Estate | Schedule 5.1.15A |
| Leased Real Estate | Schedule 5.1.15B |
| Government Notices | Schedule 5.1.15E |
| Impairment of Utilities | Schedule 5.1.15G |
| Changes in Business | Schedule 5.1.17 |
| ERISA | Schedule 5.1.18 |
| Labor Relations and Employment | Schedule 5.1.19A |
| Current Products | Schedule 5.1.21 |
| Year 2000 | Schedule 5.1.22 |
| Hourly Employees | Schedule 6.1A |
| Salaried Employees | Schedule 6.1B |
| SUB Fund | Schedule 6.13 |

Contract Consents Required on Closing Date      Schedule 8.1.4
Changes in Business after Date of Agreement     Schedule 8.1.6
Monroe Press Pit Area                           Schedule 9.1.10
GM Environmental Assessments                    Schedule 9.2.2A
Newco Pre-Closing Environmental Assessments     Schedule 9.2.2B
GM Compliance Audit Reports                     Schedule 9.2.3A
Newco and PEP Guide Compliance Audit Reports    Schedule 9.2.3B
Remedial Actions                                Schedule 9.3.1(a)
Non-Compliance Matters                          Schedule 9.3.6
Chlorinated Solvents                            Schedule 9.5.4
Environmental Permits                           Schedule 9.6.1
Environmental Permits (GM)                      Schedule 9.6.1A
Environmental Permits (Newco)                   Schedule 9.6.1B
Environmental Permits (Not Transferred)         Schedule 9.6.1C
Environmental Actions                           Schedule 9.9.1
Environmental Notices                           Schedule 9.9.2
Environmental Listings                          Schedule 9.9.3
Environmental Liens                             Schedule 9.9.4
Part Numbers                                    Schedule 9.10.3
Support Services                                Schedule 11.4.1
Products Covered by Non-compete Provision       Schedule 11.8.1
Management Dilution                             Schedule 11.15

LIGHTSOURCE FORMATION AGREEMENT

LIGHTSOURCE FORMATION AGREEMENT dated as of September 29, 1998, among General Motors Corporation, a Delaware corporation ("GM"), Lightsource Parent Corporation, a Delaware corporation ("Newco"), and PEP Guide, LLC, a Delaware limited liability company ("PEP Guide").

### WITNESSETH

1.      GM and PEP Guide have caused Newco to be incorporated and will each transfer certain assets to it in exchange for Newco securities and payments on the terms and subject to the conditions set forth in this Agreement.

2.      In furtherance of the foregoing, (a) GM will contribute the Business (as defined below) and the GM Note (as defined below) to Newco, or one or more designees of Newco, and (b) PEP Guide will contribute $15,000,000 cash, subject to adjustment as provided herein, to Newco.

3.      In exchange (a) GM will receive $15,000,000 cash, subject to adjustment as provided herein, 50 shares of Series A Senior Preferred Stock, 5 shares of Series A Preference Stock (as defined below), 5 shares of Series B Preference Stock (as defined below), 375,000 shares of Class B Common Stock (as defined below) and certain Warrants (as defined below) issued by Newco to GM from time to time, and (b) PEP Guide will receive 50 shares of Series A Senior Preferred Stock (as defined below) and 375,000 shares of Class A Common Stock (as defined below).

4.      The Parties also desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby.

NOW THEREFORE, in consideration of the premises, mutual promises, representations, warranties, and covenants contained in this Agreement, the Parties agree:

1.      DEFINITIONS.

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in the Sections to which they pertain):

"1997 Financial Statements" has the meaning set forth in Section 5.1.11.

"Acquired Assets" means the assets referred to in Section 2.1.

"Administrative Assets" means books, records and other administrative assets of every kind and nature, wherever located, including, price lists, correspondence, mailing lists, lists of customers and potential customers, vendor lists, production data, sales materials and records, market studies, penetration data, and other market information, sales and marketing plans, programs and strategies, sales, costs and other financial data, purchasing materials and records, personnel records of employees, billing records, accounting records (including documentation supporting all amounts and disclosures included in the 1997 Financial Statements), other financial records, sale order files, tool routings, labor routings, facility blueprints, service blueprints, and plant layouts, including trade secrets, know-how, show-how, designs and proprietary commercial information, methods, practices,

procedures, processes and formulae with respect to any of the foregoing, in each case, other than such as constitute Intellectual Property.

"Affiliate" means with respect to any Person any other Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, control means ownership of more than 50% of the shares or other equity interest having power to elect directors or persons performing a similar function.

"Agreement" means this Newco Formation Agreement, including its Schedules and Exhibits.

"Ancillary Agreements" means the Anderson, Indiana Lease, the Component Supply Agreement, the GM Note, the Intellectual Property Licenses, the Memorandum of the Anderson, Indiana Lease, the Right of Access Agreement and the Shareholders and Registration Rights Agreement.

"Anderson, Indiana Lease" means the lease of the Anderson, Indiana Real Estate between GM, as lessor, and Newco (or Newco's designee(s)), as lessee, in form and substance reasonably satisfactory to the parties thereto, to be entered into at the Closing pursuant to Article 10.

"Anderson, Indiana Real Estate" means the Real Estate located in Anderson, Indiana owned by GM and described in Schedule 5.1.15A.

"Anderson Inspection Program" has the meaning set forth in Section 9.1.2.

"Anderson Plant" means the Anderson, Indiana Real Estate.

"Anderson Plating Operations" has the meaning set forth in Section 9.1.3.

"Asset Amount" means the amount of the Acquired Assets as set forth in Section 3.1A.

"Associates" has the meaning set forth in Rule 12b-2 promulgated under the Securities Exchange Act of 1934, as amended.

"Assumed Liabilities" has the meaning set forth in Article 4.

"Benefit Plans" has the meaning set forth in Section 6.1.13A(x).

"Business" means the (i) forward lighting products business (and operations relating thereto) at the Monroe, Louisiana plant and (ii) signal lighting products and Lighting Systems Engineering Center business (and operations relating thereto) at the Anderson, Indiana plant, in each case as currently conducted by GM through the Business Sector.

"Business Sector" means the Delphi Interior and Lighting Systems Division of Delphi Automotive, including operations in Rimir, Mexico.

"Business Target Number" has the meaning set forth in Section 6.3B.

"Cash Amount" has the meaning set forth in Section 3.1C.

"CHR" has the meaning set forth in Section 6.15.

3

"Class A Common Stock" means the voting Class A common stock, par value $1.00, of Newco.

"Class B Common Stock" means the non-voting Class B common stock, par value $1.00, of Newco.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" means the date of Closing.

"Closing Inventory Amount" has the meaning set forth in Section 3.2.

"Closing Inventory Statement" has the meaning set forth in Section 3.2.

"Code" means the Internal Revenue Code of 1986, as amended.

"Component Supply Agreement" means the Component Supply Agreement between GM and Newco in the form of Exhibit A hereto to be entered into at the Closing pursuant to Article 10.

"Confidentiality Agreement" has the meaning set forth in Section 11.3.

"Consent" has the meaning set forth in Section 5.1.10B.

"Consolidated EBITDA" means, for any Person, for any period, an amount equal to the sum of (i) Consolidated Net Income for such period, plus (ii) the provision for taxes for such period based on income or profits to the extent such income or profits were included in computing Consolidated Net Income and any provision for taxes utilized in computing net loss under clause (i) hereof, plus (iii) Consolidated Interest Expense for such period, plus (iv) depreciation for such period, plus (v) amortization for such period (including the amortization of deferred financing costs and expenses), minus, (vi) to the extent added in computing Consolidated Net Income, all non-cash gains for such period, minus, (vii) management fees to Palladium and (viii) $500,000 on a monthly basis, all for such Person and its subsidiaries determined on a consolidated basis in accordance with GAAP.

"Consolidated Interest Expense" for any period means the total interest expense of a Person and its subsidiaries determined on a consolidated basis in accordance with GAAP for such period.

"Consolidated Net Income" for any period means the net income from continuing operations (after taxes) of a Person and its subsidiaries determined on a consolidated basis in accordance with GAAP, excluding the effect of extraordinary or non-recurring cash gains or cash losses (as such gains or losses are determined in accordance with GAAP) for such period.

"Contracts" means, purchase orders, sales agreements, service contracts, distribution agreements, quotations and bids, leases, license agreements, product warranty, technical assistance or service agreements, and other commitments, agreements, and undertakings entered into by GM or any of its Affiliates with respect to the Business or any of the Acquired Assets, including the Listed Contracts, in each case other than such as constitute Intellectual Property.

"Delphi Automotive" means the Delphi Automotive Systems Group, currently a business unit of GM, regardless of whether GM continues to own the unit or a separate entity if such unit becomes a separate entity in the future.

"EDS" means Electronic Data Systems Corporation, a Delaware corporation.

"EDS Agreements" means, together, the agreements between GM and EDS pursuant to which, among other things, GM purchases and EDS provides information technology services.

"Employee Benefit Plan" means any Employee Pension Benefit Plan, Employee Welfare Benefit Plan, or any other material employee vacation, severance, bonus, or other benefit plan or program, whether or not subject to ERISA.

"Employee Pension Benefit Plan" has the meaning set forth in ERISA Section 3(2).

"Employee Welfare Benefit Plan" has the meaning set forth in ERISA Section 3(1).

"Environmental Confidentiality Agreement" means the Environmental Confidentiality Agreement dated as of February 26, 1998 between GM and Palladium.

"Environmental Law" has the meaning set forth in Section 9.1.6.

"Environmental Permits" has the meaning set forth in Section 9.6.1.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.3.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"GM" means General Motors Corporation, a Delaware corporation.

"GM Applicable Supplement" has the meaning set forth in Section 6.6.1(b)(ii).

"GM Bailed Assets" means the assets referred to in Section 2.3.1.

"GM Hourly Pension Plan" has the meaning set forth in Section 6.6.1.

"GM Indemnitee" has the meaning set forth in Section 12.2.2A.

"GM JOBS Program" has the meaning set forth in the UAW Agreement.

"GM Leave Employee" has the meaning set forth in Section 6.1B.

"GM Note" means the promissory note in the form of Exhibit B hereto to be issued by GM to Newco at the Closing pursuant to Article 10.

"GM Salaried Retirement Program" has the meaning set forth in Section 6.6.2.

"GM Service Fraction" has the meaning set forth in Section 6.6.1(b)(ii).

5

"GM's knowledge" or "to the knowledge of GM" means actual knowledge of GM employees who, in the Ordinary Course of Business, would be expected to know or have reason to know, after reasonable inquiry, information called for by the particular subject matter identified.

"Governmental Authority" means any court, agency, or commission, or other governmental entity, authority or instrumentality, whether federal, state, local, or foreign, for all purposes other than Article 9.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Hourly Participants" has the meaning set forth in Section 6.6.1.

"Hourly Returned Employee" has the meaning set forth in Section 6.3A.

"Hourly Transferred Employees" has the meaning set forth in Section 6.1A.

"Improvements" means buildings, fixtures, and other improvements.

"including" means including without limitation.

"Intellectual Property" means intellectual and similar intangible personal property and rights of every kind and nature, including United States and foreign (i) patents and patent applications, inventions, invention disclosures, which may or may not form the basis of patent applications, and shop rights, (ii) trademarks, service marks and trade names (including trademarks and trade names associated with the name "Guide") and all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent & Trademark Office, any state of the United States or any other Governmental Authority, all goodwill symbolized thereby or associated therewith and all extensions and renewals thereof, (iii) copyrights (including all copyrights, whether registered or unregistered, copyright registrations and applications to register copyrights), (iv) Software, (v) Technical Documentation and (vi) licenses and rights with respect to any of the foregoing or property of like nature, including, but not limited to, confidentiality agreements, invention assignments or agreements, non-competition agreements with current or former employees of the Business or third parties, and other intellectual property agreements relating to the Business.

"Intellectual Property Licenses" has the meaning set forth in Section 11.13.

"Intended Return Date" has the meaning set forth in Section 6.3C.

"Inventory" means inventory, including raw materials, work-in-process, finished products, supplies and spare parts of the Business, wherever located (but not at the Rimir, Mexico plant), and reflected as assets on the books and records of the Business.

"Laws" means, for all purposes other than Article 9 hereof, laws, statutes, ordinances, codes, standards, rules, administrative rulings, judgments, orders, decrees, or regulations of any Governmental Authority.

"Lien" means any lien, charge, claim, pledge, covenant, security interest, conditional sale agreement or other title retention agreement, lease, tenancy, right of occupancy, mortgage, restriction, reservation, reversion, license, easement, security agreement, option, covenant,

6

restriction, right to purchase or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Listed Contracts" means the Contracts listed in Schedule 5.1.13A.

"Losses" has the meaning set forth in Section 12.2.1.

"Material Adverse Effect" means a material adverse effect on the business, assets, properties, condition (financial or otherwise), results of operations or prospects of the Business as currently conducted, taken as a whole, or on the ability of the Parties to consummate the transactions contemplated hereby.

"Memorandum of the Anderson, Indiana Lease" means the memorandum of the Anderson, Indiana Lease between GM, as lessor, and Newco (or Newco's designee(s)), as lessee, in form and substance reasonably satisfactory to the parties thereto, to be entered into at the Closing pursuant to Article 10.

"Monroe Plant" means the Owned Real Estate located in Monroe, Louisiana.

"Monroe Press Pit Area" has the meaning set forth in Section 9.1.13.

"MOU" has the meaning set forth in Section 6.2D.

"Mutual Retirement" has the meaning set forth in Section 6.6.1(i).

"Newco" means Lightsource Parent Corporation, a Delaware corporation.

"Newco Hourly Pension Plan" has the meaning set forth in Section 6.6.1.

"Newco Indemnitee" has the meaning set forth in Section 12.2.1A.

"Newco Interim Supplement" has the meaning set forth in Section 6.6.1(c)(i).

"Newco Return Notice" has the meaning set forth in Section 6.3C.

"Newco Salaried Retirement Program" has the meaning set forth in Section 6.6.2.

"Newco Service Fraction" has the meaning set forth in Section 6.6.1(b)(i).

"NLRB" means the United States National Labor Relations Board.

"North America" means the United States, the present territory of Canada and Mexico.

"Ordinary Course of Business" means, for all purposes other than Article 9 hereof, the ordinary course of business of the Business consistent with past practice.

"Owned Real Estate" means the Real Estate located in Monroe, Louisiana owned by GM and described in Schedule 5.1.15A.

"Palladium" means Palladium Equity Partners, LLC, a Delaware limited liability company.

"Party" or "Parties" means Newco, PEP Guide and/or GM.

"PEP Guide" means PEP Guide, LLC, a Delaware limited liability company.

"Permits" means permits, concessions, grants, franchises, licenses, consents, certificates, orders, and other authorizations and approvals of any Governmental Authority necessary for the conduct of the Business as currently conducted or the ownership of the Acquired Assets, other than Environmental Permits and other than those relating to the formation and/or qualification to do business of the corporate entity operating the Business.

"Permitted Exceptions" means, with respect to the Owned Real Estate and the Anderson, Indiana Real Estate: (a) liens for any current real estate or ad valorem taxes or assessments not yet due and payable or being contested in good faith by appropriate proceedings; (b) inchoate mechanic's, materialmen's, laborer's, and carrier's liens and other similar inchoate liens arising by operation of Law in the Ordinary Course of Business for obligations which are not due and payable and which will be paid or discharged in the Ordinary Course of Business; (c) matters disclosed in the Survey on the date hereof; (d) rights of the public and adjoining property owners in streets and highways abutting and adjacent to the Owned Real Estate; (e) zoning ordinances; and (f) those Liens listed in Schedule 5.1.15E.

"Person" means any individual, corporation, organization, partnership, joint venture, trust, firm, association (whether or not Incorporated), Governmental Authority or other entity.

"Personal Property" means tangible personal property (other than Inventory) of the Business, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production fixtures, material handling equipment, business machines, office furniture and fixtures, in-factory vehicles, trucks, model shop equipment, laboratory test fixtures, and other tangible personal property, wherever located.

"Pre-October 1, 1999 Retirees" has the meaning set forth in Section 6.6.1(f)

"Pre-October 1, 1999 Returned Employees" has the meaning set forth in Section 6.6.1(g).

"Prime Rate" means the rate of interest from time to time announced publicly by Citibank, N.A. at its offices in New York, New York as the prime rate.

"Products" means those automotive components, including forward and signal lights and related components, as manufactured, assembled, designed, processed, marketed, offered for sale, sold, imported, installed or serviced by, or in the conduct of, the Business on or immediately prior to the Closing Date.

"REA" means the Retirement Equity Act.

"Real Estate" means real property and interests in real property including Improvements.

"Real Property" means the Anderson Plant and the Monroe Plant.

"Right of Access Agreement" means the Right of Access Agreement between GM and Newco in the form of Exhibit C hereto to be entered into at the Closing pursuant to Article 10.

"Salaried Participants" has the meaning set forth in Section 6.6.2.

"Salaried Transferred Employees" has the meaning set forth in Section 6.1A.

"Series A Preference Stock" means the Series A preference stock, $1,000,000 liquidation value per share, having such other terms as set forth in the "Term Sheet for Series A Preference Stock", to be issued by Newco to GM pursuant to Section 2.1.1.

"Series B Preference Stock" means the Series B convertible preference stock, $1,000,000 liquidation value per share, convertible into 250,000 shares of the Class B Common Stock, having such other terms as set forth in the "Term Sheet for Series B Preference Stock", to be issued by Newco to GM pursuant to Section 2.1.1.

"Series A Senior Preferred Stock" means the 15% senior preferred stock, $150,000 liquidation value per share, having such other terms as set forth in the "Term Sheet for Series A Senior Preferred Stock", to be issued by Newco to GM and PEP Guide pursuant to Section 2.1.1.

"Shareholders and Registration Rights Agreement" means the shareholders and registration rights agreement among Newco, GM and PEP Guide in the form of Exhibit D hereto to be entered into at the Closing pursuant to Article 10.

"Software" means programs, routines, subroutines, translators, object, source and microcode, operating and related systems, compilers, assemblers, hardware and accessories, in each case, that cause a computer to perform in an expected manner and all documentation related thereto, including flow charts, instructions, end-user manuals, models and test aids, and any and all updates and modifications thereto, wherever located.

"Special Unvested Participant" has the meaning set forth in Section 6.6.1(e) and 6.6.2(a)(i).

"Survey" has the meaning set forth in Section 7.3.

"Targeted Inventory Amount" means Inventory in the amount of $51,227,000 (based on the 1997 Financial Statements on a FIFO basis).

"Tax Return" means any return, declaration, report, claim for refund or information return, amended return or statement, or any other similar filings, related to Taxes, including any schedule or attachment thereto.

"Tax" or "Taxes" means any federal, state, local, or foreign income, profits, franchise, gross receipts, payroll, sales, employment, use, personal property, real property, excise, value added, estimated, stamp, alternative or add-on minimum, environmental, withholding and any other tax, duty or assessment (including any interest, penalties or additions).

"Technical Documentation" means, wherever located, (i) all proprietary technical information of every kind and nature, including manuals and documentation, advertising and promotional material, catalogues, and photographs; (ii) trade secrets, confidential and non-confidential know-how, confidential and non-confidential show-how, designs and proprietary technical information, methods, practices, procedures, processes and formulae with respect to the manufacture, assembly, design, processing, marketing, offer for sale, import, installation and servicing of the Products; and (iii) information concerning sources of supply, components and services.

9

"Transfer Documents" means such bills of sale, assignments, and other good and sufficient instruments of transfer, including (i) a covenant or limited warranty deed warranting against grantor's acts to the Owned Real Estate and (ii) assignments with respect to the Intellectual Property included in the Acquired Assets, in each case, in form and substance reasonably satisfactory to PEP Guide and its counsel providing for the contribution to Newco of title to the Acquired Assets as provided in this Agreement and as PEP Guide may reasonably request.

"Transferred Employees" has the meaning set forth in Section 6.1A.

"UAW" means the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, and/or its Local Unions 1977 and 662.

"UAW Agreement" means the collective bargaining agreement executed between the UAW and GM, effective November 18, 1996 to September 14, 1999, including all supplemental and local agreements and memoranda of understanding.

"Valuation Date" has the meaning set forth in Section 6.6.4(d).

"WARN Act" means Worker Adjustment and Retraining Notification Act of 1988.

"Warrants" has the meaning assigned to such term in Section 11.17.1.

"Warrants Certificate" means the Warrants Certificate in the form of Exhibit E hereto.

"$" or "U.S. $" or "dollars" means the lawful currency of the United States.

2.    ASSET EXCHANGES.

2.1.    Asset Exchanges.

2.1.1.    Asset Exchanges.  At Closing GM shall (i) lease the Anderson, Indiana Real Estate to Newco (or Newco's designee(s)) pursuant to the Anderson, Indiana Lease free and clear of any and all Liens except Permitted Exceptions, and (ii) contribute to Newco (or Newco's designee(s)) free and clear of any and all Liens, except Permitted Exceptions, the following assets and properties, wherever located, together with all of the right, title and interest of GM and its Affiliates therein (collectively, the "Acquired Assets"): (A) Owned Real Estate, (B) Inventory, (C) to the extent used or held for use primarily in the Business, Personal Property including the equipment listed on Schedule 2.1.1A (including all property, plant or equipment located at the Monroe Plant or the Anderson Plant, whether or not paid for, and whether or not an obligation is due or recordable as a liability under GAAP), Intellectual Property and Administrative Assets,  (D) to the extent used or held for use significantly in the Business, Contracts, Permits, Environmental Permits, subject to and in accordance with Article 9, together with any and all goodwill, rights, claims, rights of setoff, deposits and rights of recovery relating thereto, and (E) the GM Note, subject, in each case, to Section 2.3. and in the case of Intellectual Property, further subject to the pre-existing agreements and rights of joint owners identified in Schedule 2.1.1B.

2.1.2    At Closing PEP Guide shall contribute to Newco the Cash Amount.

10

2.1.3.  At Closing Newco shall distribute (a) to GM the Cash Amount and issue to GM 50 shares of Series A Senior Preferred Stock, 5 shares of Series A Preference Stock, 5 shares of Series B Preference Stock and 375,000 shares of Class B Common Stock, and (b) to PEP Guide 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class A Common Stock.

2.1.4.  Newco shall issue Warrants to GM from time to time in accordance with Section 11.17.

2.2.    Payments.

All cash payments under Section 2.1 shall be made in U.S. dollars by wire transfer in immediately available funds to an account designated by the applicable Party.

2.3.    Excluded Assets.

Notwithstanding anything to the contrary in Section 2.1 of this Agreement, the following properties and assets (collectively, the "Excluded Assets") shall not be included in the Acquired Assets:

2.3.1.  GM Bailed Assets.

The machinery, equipment, special tools or tooling, dies, molds, patterns, jigs, gauges and production fixtures, and special material handling equipment listed in Schedule 2.3.1, and all dunnage and containers ("GM Bailed Assets").  The GM Bailed Assets shall remain in the possession of the Business at the Closing and shall be provided to Newco after the Closing on a bailment basis, subject to GM's standard purchase order terms and conditions applicable to bailed assets set forth in Schedule 2.3.1, for the purpose of furnishing to GM and its Affiliates and others all or part of their respective requirements for automotive components, including Products.

2.3.2.  Personnel and Medical Records.

All personnel and medical records of employees and former employees of GM who worked at any time for any reason at the Business for whom a record exists at the Business at the time of Closing; provided, however, Newco will be provided the originals of all personnel and medical records of employees and former employees of GM who have accepted employment with Newco, after notice to such employees. All such personnel and medical records of such employees shall be books and records governed by Section 12.5 of this Agreement.  Upon written request of GM, Newco shall promptly return any and all of these records to GM at which time GM shall provide Newco with copies of the personnel and medical records of such employees.  If an employee objects to provision of personnel or medical records to Newco, the records will not be provided, except as permitted by applicable Law.

2.3.3.  Third-Party Assets.

All computer hardware or equipment, Software, or other assets owned by EDS or other Persons (other than the Parties) located at the Owned Real Estate or Anderson, Indiana Real Estate, as listed in Schedule 2.3.3.

2.3.4.  Certain Current Assets.

Cash, bank accounts, accounts receivable and prepaid expenses of the Business as of the Closing.

### 2.3.5.  Certain Contracts.

Contracts or commitments for the borrowing or lending of money, lines of credit, or guarantees of indebtedness; credit cards issued to or through GM; letters of credit, performance or payment bonds, or guarantees of performance; contracts or commitments with any investment banker, financial advisor, finder, or broker (collectively, "Excluded Contracts").  Schedule 2.3.5 sets forth a list of all Excluded Contracts that Newco will be required to replace in order to conduct the Business as currently conducted.

### 2.3.6.  Product Evaluation Vehicles, Pooled Vehicles.

Any vehicles assigned pursuant to GM's "Product Evaluation Program" and pooled vehicles.

### 2.3.7.  Tax Refunds.

Any refund of Taxes, or claim for refund of Taxes, of any kind relating to any period prior to the Closing Date.

### 2.3.8.  Intangibles.

All Intellectual Property other than items included in the Acquired Assets; provided, however, that Newco and its Affiliates may continue to sell or dispose of any existing inventories or service materials of the Business bearing any such trademark, service mark, or trade name, or related corporate name of GM or any of its Affiliates, to third parties for a period of 18 months after the Closing Date in a manner consistent with past practice of the Business and the name and reputation associated therewith; and provided further, that Newco may sell any existing or future inventories, whether of Products or otherwise, or service materials of the Business bearing any such trademark, service mark, or trade name, or related corporate name of GM or its Affiliates (other than trademarks, service marks, trade names or corporate names involving the word "Delphi" or its symbols), to GM or any such Affiliate without limitation.

### 2.3.9.  Other Assets.

All of the Inventory that shall have been transferred or disposed of by GM prior to Closing in the Ordinary Course of Business, and the other assets listed on or prior to the date hereof in Schedule 2.3.9.

### 2.3.10.  Real Estate.

Fee title to the Anderson, Indiana Real Estate.

### 2.3.11.  Certain Environmental, Privileged and Proprietary Documents.

Certain privileged environmental documents of GM that are the subject of the representation in Section 9.9.6 hereof.

### 2.4.  Post-Closing Asset Deliveries.

Should GM and Newco reasonably determine after the Closing that any Acquired Assets are still in the possession of GM or any of its Affiliates, GM shall or shall cause such Affiliates to promptly deliver any and all such Acquired Assets to Newco, at GM's sole cost and expense.  Should GM and

Newco reasonably determine after the Closing that any properties or assets not constituting Acquired Assets were delivered to Newco, Newco shall promptly return any and all such properties and assets to GM, at GM's sole cost and expense.

2.5.    Nonassignable Permits and Contracts.

2.5.1.    Nonassignability.

To the extent that any Contract or Permit, or license or right with respect to Intellectual Property, is not capable of being assigned to Newco at the Closing or without the Consent of the issuer thereof or the other party thereto or any Person (including a Governmental Authority), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, unless any such Consent is obtained. All Listed Contracts listed in Schedule 5.1.13D and Permits that are not capable of being assigned to Newco at or prior to the Closing are listed in Schedule 2.5.1A, and all Listed Contracts listed in Schedule 5.1.13D and Permits that may be so assigned only upon receipt of a Consent are listed in Schedule 2.5.1B.

2.5.2.    Efforts to Obtain Consents and Waivers.

In the event that any of the Consents referred to in Section 2.5.1 is not obtained prior to the Closing, GM shall, at GM's sole cost and expense, use all reasonable best efforts, and Newco shall cooperate with GM, to obtain the Consents and to resolve the impracticalities of assignment referred to in Section 2.5.1 after the Closing; provided, however, that GM and Newco shall bear its own costs and expenses, and neither GM nor Newco shall be obligated to pay any material consideration therefor to the Person from whom the Consent is requested (other than filing and similar fees payable to any Governmental Authority).

2.5.3.    If Waivers or Consents Cannot be Obtained.

If the Consents referred to in Section 2.5.1 with respect to Permits assignable under applicable Law and Contracts and licenses or rights are not obtained by GM, or until the impracticalities of assignment referred to therein are resolved, GM's sole responsibility with respect to such Consents, notwithstanding Section 2.1, shall be to, during the 18-month period commencing on the Closing Date, use all reasonable best efforts, at GM's sole cost and expense, to (i) provide to Newco the benefits of any such Permit or Contract or license or right referred to in Section 2.5.1 (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Newco, without incurring any financial obligation to Newco other than to provide such benefits, and (iii) enforce for the account and benefit of Newco any rights of GM arising from such Permits or Contracts or licenses or rights referred to in Section 2.5.1 against such issuer thereof or other party or parties thereto (including the right to elect to terminate in accordance with the terms thereof on the advice of Newco). No action taken pursuant to this Section 2.5 shall be deemed to satisfy the condition set forth in Section 8.1.4 hereof.

### 2.5.4.  Obligation of Newco to Perform.

To the extent that Newco is provided the benefits, pursuant to Section 2.5.3, of any such Permit or Contract or license or right, Newco shall perform, on behalf of GM, for the benefit of the issuer thereof or the other party or parties thereto the obligations of GM thereunder or in connection therewith, but only to the extent that (i) such action by Newco would not result in any material default thereunder or in connection therewith, and (ii) such obligation would have been a liability assumed by Newco pursuant to Article 4 but for the non-assignability or non-transferability thereof, and if Newco shall fail to perform in any material respect as required herein, GM, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 2.5.3 in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied.

## 3.    ASSET AMOUNT.

### 3.1.    Asset Amount.

A.  The amount of the Acquired Assets (the "Asset Amount") is $39,750,582 minus the amount, if any, by which the Closing Inventory Amount, as finally determined pursuant to Section 3.2, is less than (or plus the amount, if any, by which the Closing Inventory Amount is more than) the Targeted Inventory Amount.

B.  At least five business days, but in no event more than 12 business days, prior to the Closing Date, GM shall provide to PEP Guide and Newco its good faith estimate of the amount of the Inventory as of the Closing Date, which estimate shall be certified in writing by an appropriate officer of GM (the "Estimated Inventory Amount").

C.  The term "Cash Amount" means one-half of (x) $29,750,582 cash minus (y) the amount, if any, by which the Estimated Inventory Amount is less than the Targeted Inventory Amount.

### 3.2.    Preparation of Closing Inventory Statement.

A.  Within 90 days after the Closing, GM shall deliver to Newco, at GM's sole cost and expense, a statement (the "Closing Inventory Statement") setting forth the amount of Inventory existing at the Closing Date, consisting of the book value of the Inventory on a FIFO basis less the $500,000 of "tool crib" Inventory and, if present on the Closing Date, $2,000,000 of service parts that have not been sold since January 1, 1997 (the "Closing Inventory Amount"), accompanied by an audit report of Deloitte & Touche LLP or other independent public accountants of recognized national standing stating that (i) they have audited the Closing Inventory Statement in accordance with generally accepted auditing standards and (ii) in their opinion, the Closing Inventory Statement has been prepared in accordance with GAAP consistently applied with the 1997 Financial Statements, except that Inventory is costed on a FIFO basis rather than a LIFO basis.  It is understood that, in applying GAAP, all accounting methods, policies, practices, procedures, classifications, judgments or estimation methodologies shall be consistent with those used to prepare the 1997 Financial Statements, except that Inventory is costed on a FIFO basis rather than a LIFO basis, but only if and to the extent that they are not inconsistent with GAAP and without any leeway for materiality. Contemporaneously, GM shall deliver to Newco a schedule setting forth a calculation of the Asset Amount and the amount of any payment or note to be made or issued, and by whom, pursuant to Section 3.3.

B. Newco and GM, each at its own expense, shall cooperate fully and shall use their reasonable best efforts to cause their respective accountants to consult in advance in determining the procedures for taking inventories and other matters. If so requested by Newco, GM shall, and shall cause Deloitte & Touche LLP or other independent public accountants of recognized national standing to, deliver to Newco, or permit Newco and its accountants to review, the working papers of GM and such accountants relating to the Closing Inventory Statement (collectively, the "Working Papers").

C. In the event that Newco is in disagreement with the Closing Inventory Amount set forth on the Closing Inventory Statement or with GM's calculation of the Asset Amount, and in the event that such disagreements exceed an aggregate amount of $750,000, Newco shall, within 30 business days after receipt of the Closing Inventory Statement, the accompanying audit report, the schedule setting forth the calculation of the Asset Amount and, if requested, the Working Papers, notify GM of such disagreements. If Newco and GM shall not have resolved all such disagreements within 20 business days immediately following notice thereof by Newco, both GM and Newco shall immediately refer those items of disagreement to a three-member dispute resolution panel. The panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for resolution of the disagreements, including a requirement that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision of the dispute resolution panel shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Resolution of the matters in dispute shall be made as soon as practicable in accordance with this Agreement. Any costs and fees of such dispute resolution panel shall be shared equally by GM and Newco. Each of the Parties agrees that neither it nor any of its Affiliates will initiate other legal action with respect to the Closing Inventory Statement, the Closing Inventory Amount or the calculation of the Asset Amount unless and until such efforts have been unsuccessful in resolving the disagreements for at least 60 days after a written notice of disagreement was delivered to GM with respect to such matter.

3.3.    Asset Amount Adjustment.

On the fifth business day following the determination of the Asset Amount pursuant to Section 3.2, either (i) GM shall pay Newco the total amount, if any, by which the Target Inventory Amount (or if lower, the Estimated Inventory Amount) exceeds the Closing Inventory Amount, together with simple interest at the Prime Rate from the Closing Date through and including the date of payment, or (ii) Newco shall pay GM the total amount, if any, by which the Closing Inventory Amount exceeds the Target Inventory Amount (or if lower, the Estimated Inventory Amount); provided that the maximum cash payments to be made by Newco pursuant to this Section 3.3 shall not exceed $30,000,000 minus the sum of all payments made by PEP Guide and Newco under Articles 2 and 3, and to the extent that GM is entitled to any excess, it shall be paid in the form of a Newco note to GM with a six-month maturity in a principal amount equal to such excess and payable in equal monthly installments of principal together with simple interest at the Prime Rate from the date of issuance through and including each payment date. All cash payments under this Section shall be made by wire transfer in U.S. dollars in immediately available funds to an account designated by the receiving Party. In the event Newco is in disagreement with a portion of the Closing Inventory Statement, the Closing Inventory Amount or the calculation of the Asset Amount, Newco or GM, as the case may be, shall pay any undisputed amounts pursuant hereto, and any disputed amounts shall be paid at such time as all disagreements are resolved in accordance with Section 3.2C hereof.

15

3.4.    Prorations, Adjustments of Expenses Following the Closing.

   3.4.1.    Prorations.

       (i) To the extent that GM makes any payment with respect to the Business prior to, on or following the Closing Date with respect to any item listed in any of clauses (ii)(a) through (e) below relating to any period following the Closing Date, Newco shall reimburse GM that portion of such payment relating to such period following the Closing Date, and

       (ii) To the extent PEP Guide or Newco makes any payment relating to the Business following the Closing Date with respect to any item listed in any of the clauses (a) through (e) below relating to any period on or prior to the Closing Date, GM shall reimburse PEP Guide or Newco that portion of such payment relating to such period on or before the Closing Date, in each case for the following:

           (a) personal property, real property and other ad valorem Taxes.

           (b) water, wastewater treatment and sewer charges, and any other assessments payable with respect to the Owned Real Estate or the Anderson, Indiana Real Estate, together with Taxes thereon.

           (c) electric, fuel, gas, telephone and other utility charges.

           (d) reimbursable employee business expenses.

           (e) payments and charges, including rentals and other charges under leases, due pursuant to any Contracts (other than pursuant to collective bargaining agreements or Benefit Plans) or Permits or licenses or rights with respect to Intellectual Property, in each case, to which GM is a party or is obligated and which are being assumed by Newco pursuant to this Agreement.

In connection with the foregoing, at the Closing GM shall deliver to PEP Guide and Newco a list of all outstanding bills and invoices for, and setting forth the amount of, Taxes, water, sewer, and other assessments, and electric, fuel, gas, and other utility charges due within 30 days following the Closing, where the failure to pay such amounts within such thirty-day period will result in interest, penalties and/or late charges in excess of $5,000 individually.

   3.4.2.    Further Assurance.

A. To the extent that after Closing, GM, on the one hand, or Newco, on the other hand, receives any bills or invoices for any of the items listed in this Section 3.4 or similar items, relating to both pre-Closing and post-Closing periods, such Party shall within 10 business days send a copy of any such bills or invoices to the other Party.

B. If necessary to avoid incurring interest, penalties and/or late charges, the Party receiving any such bill or invoice shall pay all amounts shown to be due thereon, and shall invoice the other Party for reimbursement of all amounts owed by such other Party thereunder, and such other Party shall reimburse such amounts in accordance with Section 3.4.3.

### 3.4.3.  Payments.

Except as set forth in Section 3.4.2, any reimbursement due under this Section 3.4 shall be made by wire transfer of immediately available funds or check (A) with respect to the disputed portion of any item, within 15 days after the end of the month during which a final determination thereof has been made with respect thereto and (B) with respect to the undisputed portion of any item, within 15 days after the end of the month during which a written notice which sets forth the nature and amount of such payment, together with the manner in which such amounts were calculated, has been received. When a Party makes a payment to a third party which is required to be reimbursed to it by another Party, the reimbursement payments shall be considered the repayment of an advance.

### 3.4.4.  Prosecution of Claims.

Any Party liable for more than 50% of the amount apportioned or to be borne under this Agreement with respect to any item referred to in this Section 3.4, may, at its option, prosecute by litigation or administrative proceeding, at its sole expense and risk, including the obligation to pay such amount and full penalties thereon, if any, in its own name and in the name of the other Party, and receive any and all claims for refund, abatement or recovery without any subsequent obligation to remit or prorate any portion thereof to the other Party, subject to its reimbursement obligation under Section 3.4.1; provided, however, that if such Party is liable for less than 75% of the amount apportioned or to be borne under this Agreement with respect to any item referred to in this Section 3.4, then such Party shall not consent to the entry of any judgment or enter into any settlement with respect to any such item without the written consent of the other Party, which shall not be unreasonably withheld or delayed. The other Parties shall cooperate with any such prosecution of any claim with respect to any such item at the expense of the Party prosecuting such claim, but shall not be required to incur any risk or expense.

### 3.5.  Supplementary Payments.

A.  As soon as practicable after December 31, 1998, Newco shall deliver to GM, at Newco's sole cost and expense, copies of audited financial statements of the Business, with appropriate footnotes, similar to the 1997 Financial Statements, for the period beginning on the Closing Date and ending on December 31, 1998 (the "Stub Period Financial Statements"). The Stub Period Financial Statements shall be prepared in accordance with GAAP consistently applied with the 1997 Financial Statements (except for the effects of purchase accounting and, if applicable, change in method of valuing Inventory) and shall fairly present the balance sheet as of December 31, 1998 and the results of operations and cash flows of the Business for the period indicated and shall be accompanied by an unqualified report thereon of independent public accountants of recognized national standing. Contemporaneously, Newco shall deliver to GM a statement (the "Supplementary Payment Statement") setting forth the calculation of Consolidated EBITDA (plus or minus, as the case may be, the impact of the effects of the use of purchase accounting and, if applicable, the change in the method of Inventory) and the Supplementary Payment (as defined below). If so requested by GM, Newco shall, and shall cause independent public accountants of recognized national standing to, deliver to GM, or permit GM and its accountants to review, the working papers of Newco and such accountants relating to the Supplementary Payment Statement (collectively, the "Stub Period Working Papers").

B.  If the Closing Date is after August 31, 1998 and on or before October 1, 1998, and if Consolidated EBITDA of the Business for the period from October 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $115,000 less than $7,800,000,

17

GM shall pay to Newco the total amount by which Consolidated EBITDA for such period is less than $7,800,000.

If the Closing Date is after October 1, 1998 and on or before October 31, 1998, and if Consolidated EBITDA of the Business for the period from November 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $30,000 less than $2,100,000, GM shall pay to Newco the total amount by which Consolidated EBITDA (including the amount of any negative number) for such period is less than $2,100,000.

If the Closing Date is after November 1, 1998 and on or before November 30, 1998, and if Consolidated EBITDA of the Business for the period from December 1, 1998 to December 31, 1998, represented in the Stub Period Financial Statements, is more than $10,000 less than $700,000, GM shall pay to Newco the total amount by which Consolidated EBITDA (including the amount of any negative number) for such period is less than $700,000.

The "Supplementary Payment" shall be any such amount refunded to Newco together with simple interest at the Prime Rate from the Closing Date through and including the date of payment.

C. Subject to Section 3.5D, GM shall pay Newco the Supplementary Payment within five business days of Newco's delivery to GM of the Stub Period Financial statements and the Supplementary Payment Statement, pursuant to Section 3.5A, by wire transfer in U.S. dollars in immediately available funds to an account designated by Newco.

D. In the event that GM is in disagreement with the calculation of Consolidated EBITDA or the Supplementary Payment set forth on the Supplementary Payment Statement, and in the event that such disagreement exceeds, in either case, $50,000, GM shall, within 30 business days after receipt of the Supplementary Payment Statement, the accompanying Stub Period Financial Statements and, if requested, the Stub Period Working Papers, notify Newco of such disagreement(s). If Newco and GM shall not have resolved all such disagreements within 20 business days immediately following notice thereof by GM, both GM and Newco shall immediately refer those items of disagreement to a three-member dispute resolution panel. The panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for resolution of the disagreements, including a requirement that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision of the dispute resolution panel shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Resolution of the matters in dispute shall be made as soon as practicable in accordance with this Agreement. Any costs and fees of such dispute resolution panel shall be shared equally by GM and Newco. Each of the Parties agrees that neither it nor any of its Affiliates will initiate other legal action with respect to the Supplementary Payment Statement or the calculation of Consolidated EBITDA or the Supplementary Payment unless and until such efforts have been unsuccessful in resolving the disagreements for at least 60 days after a written notice of disagreement was delivered to Newco with respect to such matter.

4. ASSUMPTION OF LIABILITIES.

From and after the Closing Date, Newco shall assume and shall pay, perform and discharge, subject to the provisions of Article 6, the obligations of GM with respect to the Business to be paid, performed or discharged after the Closing Date under the Contracts and Permits and licenses and rights with respect to Intellectual Property, in each case, included in the Acquired Assets and assigned to Newco pursuant to this Agreement, and for goods ordered by GM or its Affiliates prior

18

to the Closing Date in the Ordinary Course of Business that are necessary for use in the Business and which are received by Newco after the Closing Date, except to the extent included in the Closing Inventory Amount to be reflected on the Closing Inventory Statement (collectively, the "Assumed Liabilities").

Newco shall not assume, nor shall it be liable or otherwise responsible for, any obligations or liabilities of GM or any of its Affiliates, whether relating to the Business or otherwise, except for the Assumed Liabilities. Without limiting the generality of the foregoing, except for the Assumed Liabilities, Newco shall not assume, or become liable or otherwise responsible for, any liabilities, obligations, or commitments of GM or any of its Affiliates, whether contingent or otherwise, fixed or absolute, known or unknown, present or future or otherwise, whether relating directly or indirectly to the conduct of the Business or the ownership of the Acquired Assets on or prior to the Closing Date, including accounts payable and accrued liabilities, accruable liabilities in accordance with GAAP, obligations or future obligations whether or not recordable as a liability under GAAP for property, plant or equipment located at the Monroe Plant or the Anderson Plant, wages, employee benefits, employment discrimination claims, product liability claims, litigation (including litigation with respect to intangibles described in Section 2.3.8 or Intellectual Property), product returns, environmental liabilities, Tax liabilities, license fees and utility charges.

Notwithstanding the foregoing, no provision of this Article 4 is intended to limit or otherwise restrict the obligations and liabilities of Newco under the Permitted Exceptions or pursuant to Section 3.4, Article 6 and Article 9 hereof, but this sentence shall not cause Newco to become liable for Taxes that are not Assumed Liabilities.

5.   REPRESENTATIONS AND WARRANTIES.

    5.1.   Representations and Warranties of GM.

GM represents and warrants to PEP Guide and Newco as follows:

        5.1.1.   Organization; Standing.

GM is a corporation duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has the requisite corporate power and corporate authority to own, lease and operate the Acquired Assets and to carry on the Business as currently conducted.

        5.1.2.   Authority; Binding Effect.

GM has the requisite corporate power and corporate authority to execute and deliver this Agreement and the Ancillary Agreements to which GM is a party, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of, and consummation of the transactions contemplated by, this Agreement and the Ancillary Agreements to which GM is a party have been duly authorized by all necessary corporate action on the part of GM and its Affiliates, and no other corporate action or proceeding on the part of GM or any of its Affiliates is required to authorize the execution, delivery or performance of, or consummation of the transactions contemplated by, this Agreement or any Ancillary Agreement. This Agreement has been duly executed and delivered by GM, and is, and the Ancillary Agreements to which GM is a party will be when executed and delivered, valid and binding obligations of GM, enforceable against GM in accordance with their respective terms.

### 5.1.3.  Qualification.

GM is duly qualified or licensed and in good standing as a corporation duly authorized to do business in the states of Indiana and Louisiana, which are the only jurisdictions where the nature of the Business as currently conducted, or the ownership, lease or operation of the Acquired Assets, makes such qualification or license necessary.

### 5.1.4.  Sufficiency of Acquired Assets.

The Acquired Assets, together with (A) the Intellectual Property rights to be licensed or sublicensed on or prior to the Closing Date pursuant to the Intellectual Property Licenses, (B) the services and contracts to be provided or administered by GM or its Affiliates pursuant to Section 2.5 and (C) the Excluded Assets other than intangibles as described in Section 2.3.8 constitute all properties, assets, agreements, licenses and services necessary for the conduct of the Business as currently conducted.

### 5.1.5.  Personal Property; Third-Party Bailed Assets.

A.  GM has good and valid title to the Personal Property and Inventory included in the Acquired Assets and the Excluded Assets, free and clear of any and all Liens, except those set forth in Schedule 5.1.5A, none of which, individually or in the aggregate, interferes in any material respect with the current use by the Business of the assets to which they relate.

B.  To GM's knowledge, Schedule 5.1.5B sets forth a list of all machinery, equipment and capitalized tools as of August 31, 1998, and a description of substantially all other tangible personal property, in each case, included in the Acquired Assets.  The Personal Property which is required for the conduct of the Business as currently conducted included in the Acquired Assets and the GM Bailed Assets are in good working order and repair with the exception of such assets that need repair or replacement in the Ordinary Course of Business.

C.  The Inventory is in good condition and is usable and of merchantable quality, except to the extent reserved in the books and records of GM with respect to the Business.  All finished goods included in the Inventory are of appropriate quantity and quality and saleable in the Ordinary Course of Business.  All machinery and equipment spare parts are useable in the ordinary course of business.  All raw materials, work-in-process, and finished goods Inventory are of such quality as to meet or exceed GM's "in house" quality control standards and any applicable quality control standards of any Governmental Authority.  All Inventory disposed of by GM since December 31, 1997 has been sold in the Ordinary Course of Business.

D.  To GM's knowledge, Schedule 5.1.5D sets forth a list of the equipment, special tools or tooling, dies, molds, patterns, jigs, gauges and production fixtures and special material handling equipment in the possession of the Business and which is provided to the Business on a bailment basis by the customers identified in Schedule 5.1.5D (other than GM and its Affiliates).

### 5.1.6.  Litigation.

Except as set forth in Schedule 5.1.6A, there is no claim, action, suit, proceeding, investigation or inquiry by or before any Governmental Authority or arbitration tribunal, whether at law or in equity, pending or, to GM's knowledge, threatened by or against GM or any of its Affiliates with respect to, or affecting, (i) the Business or (ii) any of the Acquired Assets, or (iii) which challenges or otherwise questions this Agreement or any of the Ancillary Agreements, or any action taken or to

be taken pursuant hereto or thereto or in connection with the contribution of the Acquired Assets. And except as set forth in Schedule 5.1.6A, there is no judgment, order or decree of any Governmental Authority or arbitration tribunal with respect to the Business or any of the Acquired Assets. Except as set forth in Schedule 5.1.6B, none of the claims, actions, suits, proceedings, investigations or inquiries, or the judgments, orders or decrees, in each case, set forth in Schedule 5.1.6A (i) has had or is reasonably likely to have a Material Adverse Effect, (ii) is reasonably likely to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement or to consummate the transactions contemplated hereby or thereby or (iii) is reasonably likely to impair the ability of Newco to conduct the Business after the Closing as currently conducted. Schedule 5.1.6C sets forth a list of all (a) written product liability claims, and oral claims for which GM has a written record, in each case, made against GM or, to GM's knowledge, any other Person with respect to the Products since December 31, 1997 and (b) amounts paid by GM (or any insurance company under any policy issued to GM) or, to GM's knowledge, any other Person with respect to such claims. There is no claim, action, suit, proceeding, investigation or inquiry by or before any Governmental Authority or arbitration tribunal pending or, to the knowledge of GM, threatened by or against GM or any of its Affiliates which relates to any Product alleged to have been, or to be, defective, or improperly designed or manufactured, including pursuant to any warranty, whether expressed or implied.

### 5.1.7.  Intellectual Property Rights.

A. Schedule 5.1.7A sets forth a list of all U.S. and foreign patents, patent applications, inventions, trademarks, service marks, and trade names (including the name of each jurisdiction in which such Intellectual Property has been registered), and registered copyrights (including applications and registrations), as well as all licenses to or by and rights of GM or any of its Affiliates with respect to any of the foregoing, in each case, included in the Acquired Assets. Should GM or Newco reasonably determine after the Closing that items have inadvertently not been included in Schedule 5.1.7A, GM shall take all actions necessary to transfer ownership of such items to Newco.

B. Except as set forth in Schedule 5.1.7B, (i) GM has good and valid title to, or an enforceable right to use, all the Intellectual Property to be assigned, licensed or sublicensed to Newco pursuant to this Agreement, free and clear of any and all Liens; (ii) none of such Intellectual Property has been knowingly misappropriated from any Person; (iii) GM has received no claim or notice that the use of any such Intellectual Property infringes or results in a product that infringes upon the rights of any other Person and, to GM's knowledge, no such infringement exists; (iv) to GM's knowledge, no infringement or improper use by any Person of any such Intellectual Property exists, and there is no claim, action, suit, proceeding, investigation or inquiry instituted by or on behalf of GM in which an act constituting an infringement of any of the rights to any such Intellectual Property has been alleged to have been committed by any Person; and (v) GM has not taken or omitted to take any action which would have the effect of waiving any rights to any such Intellectual Property.

C. No claim, action, suit, proceeding, investigation, or inquiry, whether at law or in equity, is pending or, to GM's knowledge, threatened by or before any Governmental Authority or arbitration tribunal seeking the revocation of any license listed in Schedule 5.1.7A. Except as set forth in Schedule 5.1.7C, each such license is valid, binding and in full force and effect according to its terms; no notice of termination thereof or default thereunder has been sent or received by GM, and neither GM, nor, to GM's knowledge, any other party to any such license, is (or with notice or lapse of time or both would be) in material breach thereof; there are no unresolved material disputes under any such license; and the assignment or sublicense of any such license pursuant to this Agreement will not result in termination of, or result in a right of termination under, any such license, or bring into operation any other provision thereof; and GM has the right to assign or sublicense each such

license and, except as set forth in Schedule 5.1.7C, has obtained the Consent of the licensor where necessary.

D.  The Intellectual Property included in the Acquired Assets, together with (i) the Intellectual Property to be licensed or sublicensed at or prior to the Closing pursuant to the Intellectual Property Licenses and (ii) the Intellectual Property, including Software, to be used by GM, its Affiliates or EDS in providing the services pursuant to Section 11.4, constitute all Intellectual Property necessary for the conduct by Newco (or Newco's designee(s)) of the Business as currently conducted.  Except as set forth in Schedule 5.1.7B, GM has no knowledge of any claim or potential contingent claim that the conduct of the Business by Newco (or Newco's designee(s)) as currently conducted would infringe any patent or intellectual property right of any third party.  None of the intangibles described in Section 2.3.8 and included in the Excluded Assets is used or held for use primarily in the Business.

### 5.1.8.  Compliance with Laws; Permits.

Except as set forth in Schedule 5.1.8A, GM has been since December 31, 1997, and is, and the Business and the Acquired Assets have been since December 31, 1997, and are, in compliance in all material respects with all Permits and all Laws applicable to the Acquired Assets or the conduct of the Business.  GM possesses all such Permits, each of which is listed in Schedule 5.1.8.  Except as set forth in Schedule 5.1.8B, each such Permit is in full force and effect, and there is no claim, action, suit, proceeding, investigation, or inquiry pending or, to GM's knowledge, threatened, that has resulted or is reasonably likely to result in the revocation, cancelation or suspension, or any materially adverse modification, of any such Permit.  Since December 31, 1997, GM has not received from any Governmental Authority any notice alleging any conflict, default or violation, or revocation, cancelation or modification, of any such Permit, or any violation of any Law applicable to the Business or any of the Acquired Assets, except as set forth in Schedule 5.1.8C.

### 5.1.9.  Brokers.

GM has employed no finder, broker, agent, or other intermediary in connection with the negotiation or consummation of this Agreement, any Ancillary Agreement, or any of the transactions contemplated hereby or thereby, other than Morgan Stanley & Co. Incorporated, which is acting for GM and whose fees and expenses will be paid by GM.

### 5.1.10.  No Consents Required; Absence of Conflicting Agreements.

A.  The execution and delivery by GM of this Agreement and the Ancillary Agreements to which GM is a party do not, and the performance by GM of this Agreement and the Ancillary Agreements to which GM is a party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Certificate of Incorporation or By-Laws, in each case as currently in effect, of GM, (ii) conflict with or violate any Law applicable to GM, the Business or any of the Acquired Assets or by or to which GM, the Business or any of the Acquired Assets is bound or subject, (iii) result in a violation of or conflict with or constitute a default under, or result in the revocation, cancelation or modification of, any Permit or (iv) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to any Person any right of termination, amendment, acceleration or cancelation of, or require payment under, or result in the creation of a Lien on any of the Acquired Assets under, any note, bond, mortgage, indenture, contract, agreement, arrangement, commitment, lease, license, permit, franchise or other instrument or obligation to which GM is a party or by or to which GM, the Business or any of the Acquired Assets is bound or subject.

22

B.  No consent, approval, waiver, license, order, authorization or permit of, or registration, declaration, or filing with, or notice to ("Consent"), any Governmental Authority or any other Person is required in connection with the execution, delivery, and performance by GM of this Agreement and the Ancillary Agreements to which GM is a party, or the consummation by GM of the transactions contemplated hereby and thereby, except (i) the Consents required under any Contracts or Permits listed in Schedule 2.5.1B, and (ii) any filing required under the HSR Act.

### 5.1.11.  Financial Statements.

GM has delivered to PEP Guide and Newco copies of the audited financial statements of (i) sales less costs and expenses and cash flows, for the years ended December 31, 1995, 1996 and 1997, and (ii) assets to be sold, as of the end of the years ended December 31, 1996 and 1997, of the Business, with appropriate footnotes (the "1997 Financial Statements"), attached hereto as Schedule 5.1.11A. Such statements have been prepared in accordance with GAAP consistently applied and fairly present the assets to be sold as of December 31, 1996 and 1997 and the related results of operations and cash flows of the Business for each of three years ended December 31, 1997 and are accompanied by an unqualified report thereon of Deloitte & Touche LLP. GM has also provided to PEP Guide and Newco a schedule entitled "Sales Less Costs & Expenses: OM to Statements", attached hereto as Schedule 5.1.11B, and such schedule fairly and accurately reconciles the financial statements contained in the Offering Memorandum dated November 1997 to the 1997 Financial Statements for the three years ended December 31, 1995, 1996 and 1997. GM or any current part of Delphi Automotive shall cooperate in the future with PEP Guide and Newco in (a) providing any additional predecessor information for the Business reasonably required by PEP Guide or Newco and (b) the reissuance of the 1997 Financial Statements or the financial statements to be delivered pursuant to Section 11.9 for unrestricted use by PEP Guide or Newco. Such cooperation shall include providing (without cost to Newco) the 1997 Financial Statements and financial statements to be delivered pursuant to Section 11.9, including unqualified reports thereon from Deloitte & Touche LLP, that are acceptable in form and content to the U.S. Securities and Exchange Commission (the "SEC") in filings under the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended. Should changes to such statements be required in the future in order for them to be acceptable in form and content to the SEC, GM and any current part of Delphi Automotive (without cost to Newco) in cooperation with PEP Guide and Newco will use its best efforts in making such revisions as may be necessary to make such statements acceptable, including obtaining unqualified reports thereon from Deloitte & Touche LLP.

### 5.1.12.  Undisclosed Liabilities.

Except as set forth in Schedule 5.1.12, since December 31, 1997, neither GM nor any Affiliate of GM, with respect to the Business, has incurred any cost or expense other than (i) such as have been reflected as expenses in the 1997 Financial Statements and (ii) such as have been incurred since December 31, 1997 in the Ordinary Course of Business.

### 5.1.13.  Contracts.

A.  Except as listed in Schedule 5.1.13A, and other than licenses or rights with respect to Intellectual Property, neither GM nor any of its Affiliates is, in respect of the Business, a party to, or subject to, any oral or written:

(i)      contract or commitment for the purchase, sale or lease (other than contracts required to be listed under clause (ii) or (iv) below) of tangible or intangible personal property

involving any receipt to or expenditure by GM of more than $250,000 per annum and which is not terminable by GM upon notice of 30 days or less without any penalty or liability to GM;

      (ii)    contract or commitment for the purchase, sale or lease (other than contracts listed under clause (iv)(b) below) of tangible or intangible personal property pursuant to purchase orders which (a) contain no additional or different terms than GM's standard purchase order terms and conditions set forth in Schedule 2.3.1 and (b) other than with respect to direct material purchases (i.e., the purchase of materials incorporated into the Products), involve any receipt or expenditure by GM of more than $250,000 per annum (together, "Standard Purchase Orders");

      (iii)    contract to obtain services involving any expenditure by GM of more than $250,000;

      (iv)    contract for the sale or lease of, or warranty relating to, the Products or the furnishing of services of the Business that (a) contains additional or different terms than GM's standard purchase order terms and conditions set forth in Schedule 2.3.1, or (b) involves any receipt to or expenditure by GM of more $250,000 per annum and which is not terminable by GM upon notice of 30 days or less;

      (v)    sales agency, sales representative, broker, distributor, or similar contract, agreement or arrangement which cannot be canceled by GM without penalty or payment of any premium upon notice of 30 days or less;

      (vi)    joint venture, joint research or development, joint financing, teaming or partnership contract or arrangement or other agreement involving sharing of profits or revenues;

      (vii)    guarantee, performance bond, surety, indemnification, letter of credit or similar commitments relating to the performance of any obligation by any Person other than GM in respect of the Business;

      (viii)    agreement, arrangement, contract or other commitment, including any covenant not to compete or other restrictive covenant, which purports to limit in any respect the manner, or the localities, in which GM or Newco is entitled to conduct all or any portion of the Business or own or operate any of the Acquired Assets;

      (ix)    employment contract, stay, completion bonus or severance agreement with any employee of GM with respect to the Business;

      (x)    plans, contracts or agreements pursuant to which GM, with respect to the Business, has any obligation to the Persons listed in Schedule 6.1A and Schedule 6.1B; Employee Pension Benefit Plans and Employee Welfare Benefit Plans relating to the Business which are sponsored by or contributed to by GM (the "Benefit Plans"); or agreements with any labor union or other representative of employees connected with the Business (including local agreements, amendments, supplements, letters, and memoranda of understanding of any kind); or

      (xi)    contract or commitment relating to the Business and not otherwise referred to above, regardless of whether made in the Ordinary Course of Business, that involves any receipt to or expenditure by GM of more than $250,000 per annum and which is not terminable by GM upon notice of 30 days or less.

24

B. Except as set forth in Schedule 5.1.13B, (i) each of the Contracts is valid, binding and in full force and effect according to its terms; (ii) no notice of termination thereof or material default thereunder has been sent or received by GM, and neither GM, nor, to GM's knowledge, any other party to any of the Contracts, is (or with notice or lapse of time or both would be) in material breach thereof, (iii) there are no unresolved material disputes under any of the Contracts (other than those listed in Schedule 5.1.19A(viii) or referred to in Section 5.1.6A); (iv) all Listed Contracts listed in Schedule 5.1.13D have been entered into on an arm's-length basis; and (v) the assignment of any Listed Contract listed in Schedule 5.1.13D pursuant to this Agreement will not result in termination of, or result in a right of termination under, any Listed Contract, or bring into operation any other provision thereof.

C. GM has furnished to PEP Guide and Newco (i) copies of all written Listed Contracts (other than Standard Purchase Orders and the EDS Agreements), (ii) a written description of any oral Listed Contract, and (iii) copies of GM's standard forms, if any, for contracts for the sale or lease of, and warranties relating to, the Products or the furnishing of services of the Business.

D. Schedule 5.1.13D sets forth a list of all Listed Contracts which will be assigned to Newco at the Closing pursuant to this Agreement.

### 5.1.14. Regulatory Matters.

Except as set forth in Schedule 5.1.14, GM is not required to obtain any Permits with respect to the operation of the Business, ownership of the Acquired Assets or manufacture or sale of the Products.

### 5.1.15. Real Estate.

A. The Owned Real Estate and the Anderson, Indiana Real Estate, together set forth in Schedule 5.1.15A, constitute all of the Real Estate used or held for use in the Business or on which the Acquired Assets are located. Except for Permitted Exceptions and except as set forth on Schedule 5.1.15A, GM has good, marketable and insurable fee simple title to the Owned Real Estate and the Anderson, Indiana Real Estate, free and clear of any and all Liens. Except as set forth in Schedule 5.1.15A, GM is not a party to any contract or option to purchase, sell, assign, lease or otherwise acquire or dispose of, or to grant or create any interest in or restriction on or affecting, any Owned Real Estate or the Anderson, Indiana Real Estate, and since December 31, 1997, GM has not in respect of the Business purchased, sold, assigned or otherwise acquired or disposed of any Real Estate used in, or located in the area of, the Business.

B. Except as set forth in Schedule 5.1.15B, there is no Real Estate leased by GM or its Affiliates which is used or held for use primarily or exclusively in the Business.

C. GM has not received any written notice or communication advising it of any general or special assessment relating to the Owned Real Estate or the Anderson, Indiana Real Estate which is not fully paid. To the knowledge of GM, there are no plans by any Governmental Authority which may result in the imposition of any special assessment relating to the Owned Real Estate or the Anderson, Indiana Real Estate.

D. GM is in compliance in all material respects with, and has not received any written notice of any violation of, any and all building codes, special use permits, zoning ordinances, deed restrictions, covenants, subdivisions and urban redevelopment plans, and other applicable Laws relating to the Owned Real Estate or the Anderson, Indiana Real Estate.