**EXHIBIT B-2**

E. Except for Permitted Exceptions and as set forth in Schedule 5.1.15E, there are no variances, special exceptions, easements or agreements pertaining to the Owned Real Estate or the Anderson, Indiana Real Estate imposed by, or granted by or entered into by GM, with or enforceable by any Governmental Authority. Except as set forth in Schedule 5.1.15E, no written notice from any Governmental Authority has been received by GM requiring or calling attention to the need for any work, repair, construction, alteration or installation on, or in connection with, the Owned Real Estate or the Anderson, Indiana Real Estate.

F. No certificate of occupancy or any equivalent thereof of any jurisdiction is required for the conduct of the Business as currently conducted by GM on any Owned Real Estate or the Anderson, Indiana Real Estate.

G. All of the Owned Real Estate and the Anderson, Indiana Real Estate have access and connections to sanitary sewer, water, electricity, gas, telephone and all other utilities needed to conduct the Business, and, to the knowledge of GM, other than as provided in Schedule 5.1.15G, there is no existing fact or condition which, individually or in the aggregate, is reasonably likely to result in termination of any such access or connection.

H. To the knowledge of GM, no fact or condition exists which would prohibit existing rights of access to and from the Owned Real Estate or the Anderson, Indiana Real Estate from and to public highways and roads, and GM has not received written notice of any pending or threatened restriction or denial, whether from a Governmental Authority or any other Person, upon such ingress or egress.

I. GM has not received any written notice of any pending or threatened condemnation or eminent domain proceeding with respect to the Owned Real Estate or the Anderson, Indiana Real Estate.

J. Neither the Owned Real Estate nor the Anderson, Indiana Real Estate is subject to any right of first refusal or right or option to purchase or right of first refusal or right or option to lease or acquire any interest therein.

### 5.1.16. Tax Matters.

A. GM has duly and timely filed with the appropriate federal, state, local, and foreign authorities or governmental agencies, all Tax Returns required to be filed with respect to the Business and has paid all Taxes due and owing except where the failure to file or to pay such Taxes would not have a Material Adverse Effect on the financial condition of the Business and would not cause a Tax Lien to apply to the Acquired Assets except for Permitted Exceptions.

B. GM has timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee working within the Business, except where the failure to file or to pay such Taxes would not have a Material Adverse Effect on the financial condition of the Business and would not cause a Tax Lien to apply to the Acquired Assets except for Permitted Exceptions.

C. GM is not a party to any Tax allocation or sharing agreement, except as provided in Section 3.4.1 of this Agreement, under which PEP Guide, Newco or the Acquired Assets could be subject to Tax or other liability after the Closing.

D. GM is not a party to, or subject to, any safe harbor leases or sale/leaseback transactions with respect to any of the Acquired Assets.

E. There are no Liens with respect to Taxes upon the Business or any of the Acquired Assets other than with respect to Taxes not currently due and payable.

### 5.1.17. Absence of Certain Changes or Events.

Except as set forth on Schedule 5.1.17, since December 31, 1997, (a) GM has conducted the Business only in the Ordinary Course of Business, (b) GM has not engaged in or taken any action (or failed to take any action) with respect to the Business which would be prohibited by Section 11.1A (ii) or (iii) or Section 11.1B (ii) (other than in the Ordinary Course of Business) or (iii) if taken after the date of this Agreement and (c) there has not occurred, nor has there been any condition, event, circumstance, change or effect which has had or is reasonably likely to have, a Material Adverse Effect.

### 5.1.18. ERISA.

A. Except as set forth in Schedule 5.1.18, with respect to each employee benefit plan, arrangement or agreement that is maintained or contributed to by GM (the "Plans"):

(i)    Each of the Plans is in compliance in all material respects with applicable Law (including, if applicable, ERISA and the Code); each of the Plans intended to be "qualified" within the meaning of Section 401 (a) of the Code is so qualified;

(ii)    No Plan has an accumulated or waived funding deficiency within the meaning of Section 412 of the Code; GM has not incurred, directly or indirectly, any material liability (including any material contingent liability) to or on account of a Plan pursuant to Title IV of ERISA; no proceedings have been instituted to terminate any Plan that is subject to Title IV of ERISA; no "reportable event", as such term is defined in Section 4043(b) of ERISA, has occurred with respect to any Plan; and no condition exists that presents a material risk of incurring a liability to or on account of a Plan pursuant to Title IV of ERISA; and;

(iii)    No Employee Pension Benefit Plan is multiemployer Plan (within the meaning of Section 4001(a)(3) of ERISA); there is no pending or, to the knowledge of GM, threatened or anticipated claim (other than routine claims for benefits) by, on behalf of or against any of the Employee Pension Benefit Plans or any trusts related thereto; each Employee Welfare Benefit Plan has been operated in compliance in all material respects with Section 4980B of the Code and all related rules and regulations at all times.

B. Neither the execution, delivery or performance of this Agreement or any Ancillary Agreement, nor the consummation of the transactions contemplated hereby or thereby, will accelerate the time of payment or vesting, or increase the amount, of compensation due to any Transferred Employee.

### 5.1.19. Labor Relations and Employment.

A. Except as set forth in Schedule 5.1.19A, with respect to the Business and the Acquired Assets: (i) there is no labor strike, lock-out or material dispute, slowdown or stoppage pending or, to the knowledge of GM, threatened against the Business and since December 31, 1997 there has not been any such labor strike or lockout, or material dispute, slowdown or stoppage; (ii) to the knowledge of GM, no union claims to represent the employees of the Business; (iii) GM is not a party to nor bound by any collective bargaining or similar agreement with any labor organization, written work rules or practices or unwritten work rules or practices material to the Business as presently conducted, agreed to with any labor organization or employee association; (iv) none of the

employees of GM is represented by any labor organization and GM has not received notice of any current union organizing petition to the NLRB from other employees of the Business, nor has GM received notice of any NLRB procedure concerning representation of such employees; (v) there are no written personnel policies, rules or procedures with respect to the terms of employment of employees of the Business; (vi) GM is in compliance in all material respects with all applicable Laws respecting employment and employment practices, terms and conditions of employment, wages, hours of work and occupational safety and health; (vii) there is no unfair labor practice charge or complaint against GM pending or, to the knowledge of GM, threatened before the NLRB or any similar Governmental Authority; (viii) there is no grievance arising out of any collective bargaining agreement or other grievance procedure which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair materially the ability of Newco to conduct the Business after the Closing as presently conducted; (ix) there is no charge with respect to or relating to GM pending before the Equal Employment Opportunity Commission or any other agency responsible for the prevention of unlawful employment practices which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair the ability of Newco to conduct the Business after the Closing as presently conducted; (x) GM has not received any written notice of the intent of any Governmental Authority responsible for the enforcement of labor or employment Laws to conduct an investigation or other inquiry with respect to or relating to GM, and no such investigation or other inquiry is in progress; and (xi) there is no claim, action, suit, proceeding, investigation or inquiry pending or, to the knowledge of GM, threatened in any forum by or on behalf of any present or former employee of the Business, any applicant for employment or classes of the foregoing alleging breach of any express or implied contract of employment, any Law governing employment or the termination thereof or other discriminatory, wrongful or tortuous conduct in connection with the employment relationship, which, if adversely determined, is, individually or in the aggregate, reasonably likely (A) to have a Material Adverse Effect, (B) to impair GM's ability to perform its obligations hereunder or under any Ancillary Agreement to which it is a party or to consummate the transactions contemplated hereby or thereby or (C) to impair the ability of Newco to conduct the Business after the Closing as presently conducted.

B.  Since December 31, 1997, with respect to the Business and the Acquired Assets, GM has not effectuated (i) a "plant closing" (as defined in the WARN Act) affecting any site of employment or one or more facilities or operating units within any site of employment or facility of the Business; or (ii) a "mass layoff" (as defined in the WARN Act) affecting any site of employment or facility of the Business; nor has the Business been affected by any transaction or engaged in layoffs or employment terminations sufficient in number to trigger application of any similar state or local law. None of the Business' employees has suffered an "employment loss" (as defined in the WARN Act) during the previous six months.

### 5.1.20. No Misleading Statements.

Neither this Agreement (including the Schedules and Exhibits hereto), or the certificates delivered pursuant to the terms hereof, nor any document or writing delivered by GM at the Closing in connection herewith, contains any untrue statement of a material fact or omits or fails to state any material fact necessary to make the statements contained herein or therein not misleading.

### 5.1.21. Current Products.

Except as set forth on Schedule 5.1.21, the Products manufactured by Delphi Automotive in 1998 at the Monroe Plant and the Anderson Plant and shipped to GM generally complied with (i) all of GM's quality, design, service, technology and delivery requirements and procedures applicable to such Products and such Plants, including those applicable to such Plants in accordance with QS-9000 standards and (ii) the requirements applicable initially to Newco under the Component Supply Agreement.

### 5.1.22. Year 2000.

Except as set forth on Schedule 5.1.22, to the knowledge of GM, the computer software and hardware related to (i) the production, control and manufacturing processes of the Business and (ii) the order and acceptance systems between the Business and GM are and will be able to process all date information prior to and after December 31, 1999 without any material errors, aborts, delays or other material interruptions (collectively, "errors") in operations associated with the Year 2000 Problem. To the extent that any such material errors do occur, Newco shall provide GM reasonable notice of such material errors, and, with cooperation from Newco, notwithstanding Article 12, Newco's exclusive remedy is that GM shall use its best efforts to promptly repair the affected computer software and hardware. GM will continue to manage the investigation, planning, remediation, repair and testing of computer software and hardware with respect to the Year 2000 Problem as part of the current GM Year 2000 Program. GM and Newco will jointly continue to follow all plans and processes under the GM Year 2000 Program. GM and Newco will provide the necessary resources to continue participation in the GM Year 2000 Program, which includes completion of all respective activities and tasks required by the GM Year 2000 Program regarding investigation, planning, remediation, repair and testing of computer software and hardware. The "Year 2000 Problem" means the risk that computer hardware and software may be unable to recognize and properly execute date-sensitive functions involving certain dates prior to and any dates after December 31, 1998.

### 5.1.23. Absence of Other Representations or Warranties.

Except for the representations and warranties set forth in this Agreement, the Ancillary Agreements, and the certificates delivered pursuant to the terms hereof or thereof, GM makes no representations or warranties, express or implied, with respect to the Acquired Assets or the Business.

### 5.1.24. Preference Stock.

Except as provided herein, GM is not party to any agreement, and has no other obligation or intention, to sell, transfer, deliver or otherwise dispose of any Series A Preference Stock or Series B Preference Stock, and until one year after the Closing Date, GM will not do or make any of the foregoing except that after January 1, 1999 it may transfer such stock to Delphi Automotive.

### 5.2. Representations and Warranties of PEP Guide and Newco.

PEP Guide and Newco represent and warrant to GM as follows:

### 5.2.1.  Corporate Data.

Each of Newco and PEP Guide is a corporation or company duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or formation and has the requisite corporate or company power and corporate or company authority to own, lease and operate its properties and assets.

### 5.2.2.  Corporate Power, Due Authorization.

Each of Newco and PEP Guide has the requisite corporate or company power and corporate or company authority to execute and deliver this Agreement and the Ancillary Agreements to which it is a party, and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein.  The execution, delivery and performance of, and consummation of the transactions contemplated by, this Agreement and the Ancillary Agreements to which each of Newco and PEP Guide is a party have been duly authorized by all necessary corporate or company action on the part of Newco or PEP Guide, as a party thereto, and no other corporate or company action or proceeding on the part of Newco or PEP Guide is required to authorize the execution, delivery and performance by it of, or consummation of the transactions contemplated by, this Agreement or any Ancillary Agreement to which it is party.  This Agreement has been duly executed and delivered by PEP Guide and is, and the Ancillary Agreements to which Newco or PEP Guide is a party will be when executed and delivered, valid and binding obligations of Newco and PEP Guide, as a party thereto, enforceable against it in accordance with their respective terms.

### 5.2.3.  No Consent Required.

No Consent of any Governmental Authority or any other Person is required in connection with the execution, delivery, and performance by Newco or PEP Guide of this Agreement or the Ancillary Agreements to which it is a party, or the consummation by Newco or PEP Guide of the transactions contemplated hereby and thereby, except any filing under the HSR Act, if such filing is required.

### 5.2.4.  Absence of Conflicting Agreements.

The execution and delivery by Newco and PEP Guide of this Agreement and the Ancillary Agreements to which it is a party does not, and the performance by Newco and PEP Guide of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby will not, (i) conflict with or violate the Certificate of Incorporation or By-laws or Certificate of Formation or operating agreement, in each case as currently in effect, of Newco or PEP Guide, (ii) conflict with or violate any Law applicable to Newco or PEP Guide or by or to which Newco or PEP Guide is bound or subject, or (iii) result in any breach of, or constitute a default (or an event that with notice or lapse of time or both would constitute a default) under, or give to any Person any right of termination, amendment, acceleration or cancelation of, or require payment under, any note, bond, mortgage, indenture, contract, agreement, arrangement, commitment, lease, license, permit, franchise or other instrument or obligation to which Newco or PEP Guide is a party or by or to which Newco or PEP Guide is bound or subject.

5.2.5.  <u>Salaried Transferred Employees</u>.

Newco has no present intention of terminating the employment of any Salaried Transferred
Employees.

5.2.6.  <u>Financing</u>.

PEP Guide has, or at the Closing will have, sufficient funds to consummate the transactions
contemplated by this Agreement, including equity commitments in the amount of $30,000,000 or
such other amount agreed to by GM and PEP Guide.

5.2.7.  <u>Brokers</u>.

Neither Newco nor PEP Guide has employed any finder, broker, agent, or other intermediary in
connection with the negotiation or consummation of this Agreement, any Ancillary Agreement or
any of the transactions contemplated hereby or thereby for which GM would be liable.

5.2.8.  <u>Subsidiary</u>.

Upon the Closing PEP Guide will be the registered and beneficial owner of all the outstanding
shares of capital stock of Newco it is acquiring pursuant to this Agreement.

6.    <u>PERSONNEL MATTERS</u>.

Capitalized terms used in this Section 6 and not defined in this Section 6 or elsewhere in this
Agreement, shall have their respective meanings set forth in the UAW Agreement, or in the
applicable GM Salaried Policies manuals or Your GM Benefits Handbook for Salaried Employees
in the United States or the plans identified in Schedule 5.1.13(x). Each reference to "seniority" in
this Section 6 shall mean the individual's seniority based on such individual's total service with GM
and Newco.

6.1.    <u>Responsibility for Employees</u>.

A.  Schedule 6.1A identifies all hourly employees of GM who were employed by, or otherwise
accorded employment rights with respect to, the Business, or utilized primarily in the operation of
the Business (including salaried employees who have become hourly employees) as of the date
indicated therein, by name, location, and status (e.g., active, GM JOBS Program, leave of absence,
and layoff) as of such date.  GM agrees to provide to Newco a revised Schedule 6.1A on each of
September 30, 1998 and the Closing Date dated as of such date.  Schedule 6.1B identifies all
salaried employees of GM whom GM will transfer to Newco, including name, location, and status
(e.g., active or leave of absence).  Effective as of Closing, GM will transfer to Newco, and Newco
will employ, all active hourly employees identified on Schedule 6.1A who are employed by GM on
the Closing Date, including those remaining in the GM JOBS Program associated with the Monroe
Plant and the Anderson Plant, but excluding employees on layoff status (hourly employees who are
actually transferred to Newco are referred to herein as "Hourly Transferred Employees"), and all
active salaried employees identified on Schedule 6.1B (salaried employees identified on
Schedule 6.1B who are actually transferred to Newco are referred to herein as "Salaried Transferred
Employees").  Any Salaried Transferred Employee who becomes an hourly employee on or before
the six month anniversary of the Closing Date shall be considered an Hourly Transferred Employee

for purposes of this Agreement.    Hourly Transferred Employees and Salaried Transferred Employees will be collectively referred to herein as "Transferred Employees".

B.  At Closing, hourly employees and salaried employees, in each case, who are identified on Schedule 6.1A or 6.1B, as applicable, and are on leave, including disability leave (whether or not any applicable waiting period relating to such disability leave is then satisfied) (each an "Hourly Leave Employee" or "Salaried Leave Employee" and, collectively, a "GM Leave Employee"), shall remain employed by GM.  GM Leave Employees, however, will commence employment with Newco upon their return to work in accordance with termination of leave eligibility and, at such time, become Transferred Employees.  Any disagreement between GM and Newco regarding termination of disability leave status will be submitted to a binding third party medical arbiter (selected by mutual agreement of GM and Newco).  Cost of such arbitration shall be shared equally.

GM hourly and salaried employees who are absent at Closing due to illness or injury and, prior to reporting to work at Newco, subsequently go on a sick leave of absence for the same condition will be treated as GM Leave Employees.  GM hourly and salaried employees who are absent at Closing and return to work shortly thereafter without going on an approved leave will become Transferred Employees at Closing and report to work at Newco when able or available.

C.  Except as provided in Section 6.21, Newco agrees that it will not knowingly hire, without the prior written consent of GM (which consent shall not unreasonably be withheld), on a regular, contract or other basis, any employee who was employed on a salaried basis and who broke credited service with GM or any of its Affiliates within 18 months prior to Closing.

D.  Newco will provide written notice to GM whenever a Transferred Employee retires or otherwise breaks seniority or length of service with Newco.

E.  GM shall retain all liability (including, but not limited to, the requirements of the WARN Act and Section 4980B of the Code and any related rules and regulations) relating to any employee of GM or its Affiliates who is not and never was a Transferred Employee.

F.  Prior to Closing, GM shall use its best efforts to reduce to zero the number of employees in the GM JOBS Program associated with the Monroe Plant and the Anderson Plant.

   6.2.    Special Provisions Relating to Hourly Employees.

A.  Effective as of the Closing, Newco will assume the UAW Agreement, Supplements and Exhibits, as required by Document 91 of the UAW Agreement.

B.  Newco will maintain or cause to be maintained for the benefit of the Hourly Transferred Employees such employee benefit and pension plans as required by the UAW Agreement.  Newco agrees to assume the GM seniority status of Hourly Transferred Employees for all purposes under the UAW Agreement.  GM agrees to continue GM seniority accumulation for Hourly Transferred Employees pursuant to the provisions of the UAW Agreement applicable to laid off employees.

C.  GM will comply with all its obligations under any and all collective bargaining agreements to which it is a party which affect the operation of or the Transferred Employees at the Monroe Plant and the Anderson Plant.  Newco will comply with all its obligations under any and all collective bargaining agreements to which it is a party which affect the operation of, or the employees at the Monroe Plant and the Anderson Plant.

32

D.  GM and Newco expect to enter into an agreement (the "MOU") with the UAW with respect to the effects of the contribution of the Acquired Assets, the assumption by Newco of the applicable terms of the UAW Agreement and other related matters. The Parties agree that, to the maximum extent possible, this Agreement will be interpreted by GM and Newco in a manner consistent with the provisions of the MOU. To the extent, however, that any provision of the MOU is inconsistent with any provision of this Agreement with respect to the rights of any Hourly Transferred Employee, the provisions of the MOU shall supersede this Agreement.

6.3.    Return of Certain Hourly Transferred Employees to GM.

A.  During the term of the UAW Agreement, Newco will accept written applications from Hourly Transferred Employees to return to employment with GM and these employees will be eligible to accept bona fide active openings within GM on the same basis as laid-off GM UAW hourly employees. Hourly Transferred Employees who so apply may accept bona fide active openings within GM at any time in the future, and GM will make offers to these Hourly Transferred Employees, who have applied, on the basis of seniority GM-wide, within a trade or any non-skilled classification, as bona fide active openings arise. Any Hourly Transferred Employee returned to employment with GM under Section 6.3 shall cease to be a Transferred Employee and shall be referred to herein as an "Hourly Returned Employee" as of the date such employee returns to employment with GM. No Hourly Returned Employee who returns to employment with GM pursuant to this Section 6.3A. shall have any right to return to employment with Newco.

B.  During the period beginning on the Closing Date and ending on the fifth anniversary of the Closing Date (the "Return Period"), Newco shall have the right, but not the obligation, to return Hourly Transferred Employees to employment with GM so that the number of Hourly Transferred Employees of the Business is reduced to 1,600 (The "Business Target Number") These returned employees shall cease to be Transferred Employees and will become Hourly Returned Employees in accordance with the following provisions:  (i) employees who voluntarily return to employment with GM will do so on the basis of applications and seniority within a trade or non-skilled classification (i.e., employees who submit applications to return to employment with GM will be ranked by seniority and the most senior employee within a trade or non-skilled classification will be offered the opportunity to return to employment with GM); provided, however, that to the extent Newco identifies an employee with critical skills who, on the basis of seniority, seeks to return to employment with GM, such employee will remain employed by Newco until Newco trains another employee to replace the employee with critical skills, which training Newco will complete as soon as practicable; (ii) in the absence of sufficient applications, Newco shall notify GM of the number of Hourly Transferred Employees to be returned to GM pursuant to this Section 6.3 at any particular time from either the Monroe Plant or Anderson Plant, which number will be filled by employees beginning with the lowest seniority employees within a trade or non-skilled classification. In the case of (i) or (ii) above, if bona fide openings do not exist within GM sufficient to actively employ such Hourly Transferred Employees whom Newco desires to return from the Monroe Plant or Anderson Plant to employment with GM, then GM will use its best efforts to provide incentives programs to, or to relocate, each such Hourly Transferred Employee at GM's expense within 60 to 90 days of the date such Hourly Transferred Employee becomes idle.  If, after any such incentive payments or relocation, any such Hourly Transferred Employee remains idle, Newco will release all temporary hourly employees from such Plant, if any, prior to returning any Hourly Transferred Employees from such Plant to employment with GM.  If Newco returns Hourly Transferred Employees to employment with GM so that the number of Hourly Transferred Employees of the Business is reduced to below 1,900 (but not below 1,600), Newco shall pay GM $2,000 per month for each full month (and a pro rata amount for any lesser period) remaining in the Return Period that each such returned Hourly Transferred Employee is employed by GM by wire transfer in U.S.

dollars in immediately available funds by the 10th day of each month to an account designated by GM; provided that Newco shall pay a minimum of $12,000 for each such returned Hourly Transferred Employee regardless of the number of months remaining in the Return Period. In no event shall there be any payment by Newco for attrition at Newco or its Affiliates, including retirement, death, termination, voluntary severance or voluntary return.

C. At Closing, Newco will provide GM with a status report outlining the expected monthly flow of employees back to GM (specifying the number of employees within each employee classification), and Newco will promptly provide GM with, from time to time, any changes to this status report in excess of 50 employees. Newco will further provide GM with written notice prior to returning any Hourly Transferred Employees to employment with GM pursuant to Sections 6.3B or 6.3D (the "Newco Return Notice"). The Newco Return Notice shall specify the number of employees which Newco will return to GM, the plant (i.e., Monroe Plant or Anderson Plant) from which such employees will be returned, the number of employees in each classification, and the date on which Newco will return such employees to GM; provided, however, that the date of return of the employees to GM shall be no less than 30 days from the date on which such notice is delivered to GM, and names and social security numbers of such employees shall be provided to GM prior to the expiration of this thirty-day period. As used in this Agreement, the term "Intended Return Date" shall mean the date on which Newco will return employees to GM as specified in the Newco Return Notice. This written notice shall be provided to the director of the GM National Employee Placement Center, Room 9-128, 3044 West Grand Boulevard, Detroit, MI 48202. Notwithstanding the foregoing, in the event that GM notifies Newco that it has an accelerated need for employees which varies from the status report, Newco will use its reasonable efforts to accommodate GM's needs.

D. If any Hourly Leave Employee commences active employment with Newco at either the Monroe Plant or Anderson Plant at a time that the number of Hourly Transferred Employees exceeds the Business Target Number, Newco shall have the right but not the obligation to immediately return one Hourly Transferred Employee from the respective plant to employment with GM in accordance with procedures set forth in Section 6.3B. On the date of such employee's return to employment with GM, such employee will cease to be a Transferred Employee and will become an Hourly Returned Employee.

E. Any employment reductions which Newco seeks to make beyond the Business Target Number will be handled by Newco consistent with applicable labor agreements. Except as provided otherwise in Sections 6.6 and 6.7, Newco shall be solely responsible for the costs associated with such reductions.

F. If before the fifth anniversary of the Closing Date, Newco determines to increase employment levels at the Monroe Plant or the Anderson Plant to fulfill supply agreements between Newco and GM that are in existence at the Closing Date, Newco shall offer to rehire former employees from the Anderson Plant or Monroe Plant, as applicable, on the basis of seniority if any such employees remain in GM's JOBS Program (after application of the separation incentive payments/relocation efforts in accordance with Section 6.3B) or layoff. Any such employee hired by Newco shall, upon such hiring become an Hourly Transferred Employee. If no such employees remain in GM's JOBS Program, Newco may hire new employees.

6.4.   Payment of Wages and Benefits of Hourly Transferred Employees.

A. In accordance with Section 6.19, GM will be responsible for the payment of all wages and benefits of Hourly Transferred Employee relating to, or earned during, any period ending on or prior

to the Closing Date, except specifically provided otherwise in Sections 6.6 and 6.7. In accordance with Section 6.19, Newco will be responsible for the payment of all wages and benefits of Hourly Transferred Employees relating to, or earned during any period after the Closing Date, except as specifically provided otherwise in Sections 6.6 and 6.7.

B. In the event that at the Closing Date the number of Hourly Transferred Employees exceeds the Business Target Number, GM shall, on a monthly basis, reimburse Newco for wages and benefits of the excess Hourly Transferred Employees (excluding temporary employees) at each facility, for such periods of time, subsequent to the Closing Date, that such excess Hourly Transferred Employees are placed in Newco's JOBS Program. The amount of such reimbursement shall be computed as the cost of each excess employee's total wages and Benefits for the applicable period in the JOBS bank. For purposes of any reimbursement made between GM and Newco pursuant to Section 6.4 of this Agreement, "wages" shall mean actual wages paid to the employee and "Benefits" shall equal $71 per person per calendar day.

C. In the event that Newco seeks to return an Hourly Transferred Employee to employment with GM in accordance with Section 6.3B or 6.3D and GM is unable to accept the return of such employee, GM will reimburse Newco on a monthly basis for wages and Benefits of such excess Hourly Transferred Employee for such periods of time, following the Intended Return Date, that such Hourly Transferred Employee is placed in Newco's JOBS Program. The amount of such reimbursement shall be computed as the cost of each such employee's total wages and Benefits determined in accordance with Section 6.4B.

D. Newco shall use its reasonable efforts to enter into a Local Agreement at both the Monroe Plant and the Anderson Plant, and to enter into an MOU with the UAW in accordance with Section 6.2D as soon as practicable following Closing. However, in the event that prior to the later of (i) Newco entering into a Local Agreement at the Monroe Plant or the Anderson Plant whichever is applicable or (ii) Newco entering into an MOU with the UAW, Newco provides a Newco Return Notice with respect to a return of any employee whose job Newco has determined could have been eliminated through legitimate productivity gains, which return either the UAW or the UAW Local 1977 (in the case of Monroe Hourly Transferred Employees) or UAW Local 662 (in case of Anderson Hourly Transferred Employees) will not agree to, GM will reimburse Newco, on a monthly basis, for the wages and Benefits of each employee ("Affected Employee") who could not be returned and is placed in Newco's JOBS bank. The Newco Return Notice shall include written documentation of Newco's proposed productivity improvement as well as the UAW or local union's rejection of such improvement. Such reimbursement from GM shall be paid from the Intended Return Date specified in Newco Return Notice until the date (the "Execution Date") an agreement is signed by Newco and the national or local union which specifically prohibited the return of such employee. Upon the Execution Date, Newco shall either (i) immediately return to GM each Affected Employee or (ii) in the event that Newco is unable to return any Affected Employee, Newco shall promptly refund to GM all amounts received from GM associated with such Affected Employee (with interest at the Prime Rate). Notwithstanding the foregoing, Newco shall immediately notify the General Director, Personnel and Public Affairs, Delphi Interior and Lighting of any events which are likely to result in a request from Newco for reimbursement from GM under this Section 6.4D.

E. The cost of certain employee benefits will be divided between Newco and GM in accordance with Sections 6.6, 6.7 and 6.19. With respect to any reimbursement by GM made under Section 6.4B, C or D, Newco shall submit statements to GM monthly and GM shall pay such statements on a basis of Net 25th prox. Newco may seek reimbursement from GM for any Hourly Transferred Employee's wages and Benefits under either Section 6.4B or Section 6.4C or

Section 6.4D. Newco will not be entitled to simultaneously seek reimbursement under 6.4B, 6.4C or 6.4D for the same employees.

6.5.   Special Provisions Relating to Salaried Employees.

Newco will provide each Salaried Transferred Employee with salary, vacation entitlement, and employee benefit plans and programs (excluding, however, investment features of savings plans, plans and programs limiting coverage to executives, GM's equity plans, and as otherwise provided herein) which are in the aggregate substantially comparable to those provided by GM immediately prior to the Closing, until at least October 1, 1999. Except as otherwise provided in Sections 6.6 and 6.7, Newco will recognize a Salaried Transferred Employee's service with GM for all purposes. Notwithstanding the foregoing, (i) nothing in this Agreement shall be construed to require that Newco employ any Salaried Transferred Employee for any specific length of time and (ii) nothing in this Agreement shall require any Salaried Transferred Employee to be anything other than an "at will" employee of Newco.

6.6.   Retirement Program and Pension Plans.

6.6.1.   Hourly Employees.

Newco will establish or cause to be established, effective at Closing, a new defined benefit pension plan (the "Newco Hourly Pension Plan") covering the Hourly Transferred Employees which, in accordance with this Agreement and Newco's obligation to assume the UAW Agreement, will duplicate the terms and benefits provided to Hourly Transferred Employees under the GM Hourly-Rate Employees Pension Plan (the "GM Hourly Pension Plan"), a copy of which has been provided to Newco and PEP Guide. For purposes of the Anderson Plant, Newco will also duplicate the terms and benefits of the GM Hourly Pension Plan through October 1, 2002, including any changes negotiated between GM and the UAW in conjunction with the 1999 National Agreement. Effective at Closing, Hourly Transferred Employees who were participants in the GM Hourly Pension Plan at Closing (the "Hourly Participants"), shall become participants in the Newco Hourly Pension Plan. The Newco Hourly Pension Plan shall provide for the benefits set forth below, but only to the extent that the applicable collective bargaining agreement with the UAW and any applicable memorandum of understanding with the UAW so requires. GM will amend the GM Hourly Pension Plan to provide the benefits set forth below, but only to the extent that the applicable collective bargaining agreement with the UAW and any applicable memorandum of understanding with UAW so requires. For purposes of this Section 6.6.1, the term "credited service" shall have the meaning set forth in the UAW Agreement. For purposes of Section 6.6.1, credited service at both GM and Newco shall be taken into account by both GM and Newco for purposes of determining eligibility for benefits under the GM Hourly Pension Plan and Newco Hourly Pension Plan, respectively. Following Closing, Transferred Hourly Employees will accrue credited service in the Newco Hourly Pension Plan and will not accrue additional credited service in the GM Hourly Pension Plan except as specifically provided in Sections 6.6.1(f), (g) and (j). Hourly Returned Employees will accrue credited service in the GM Hourly Pension Plan beginning on the date they return to employment with GM and will not accrue additional credited service thereafter in the Newco Hourly Pension Plan.

(a)   With respect to any Hourly Participant who retires from Newco on or after age 62:

(i)   The Newco Hourly Pension Plan will pay such Hourly Participant a benefit which equals the applicable basic benefit rate (as set forth in the Newco Hourly Pension Plan) as

of the date of such retirement multiplied by credited service with Newco after the Closing Date (such benefit, "Basic Newco Benefit").

(ii)   The GM Hourly Pension Plan will pay such Hourly Participant a benefit which equals the applicable basic benefit rate (as set forth in the GM Hourly Pension Plan with respect to hourly employees of GM who are not Transferred Employees, determined as of the date of such retirement and taking into account the Hourly Participant's base hourly wage rate as of the date of retirement), multiplied by credited service with GM and with Newco on or before the Closing Date (such benefit, "Basic GM Benefit").

(b)   With respect to any Hourly Participant who retires from Newco on an early voluntary retirement before attaining age 62, with 30 or more total years of credited service with GM and Newco:

(i)   Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement, as determined under the Newco Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco ("Newco Applicable Supplement"), multiplied by a fraction the numerator of which is the number of years of credited service (including partial years) with Newco after the Closing Date and the denominator of which is the total credited service with GM and Newco as of the date of retirement ("Newco Service Fraction"). Following the date such⁻ Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced by age.

(ii)   Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement to which such Hourly Participant would be entitled using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by a fraction the numerator of which is the sum of credited service with GM and Newco on or before the Closing Date and the denominator of which is the total credited service with GM and Newco as of the date of retirement ("GM Service Fraction"). Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced by age.

(c)   With respect to any Hourly Participant who retires from Newco on an early voluntary retirement before attaining age 62, with less than 30 total years of credited service with GM and Newco:

(i)   Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the interim supplement rate, as determined under the Newco Hourly Pension Plan ("Newco Interim Supplement"), multiplied by such Hourly Participant's credited service with Newco. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic

Newco Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the interim supplement rate, using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement, multiplied by such Hourly Participant's credited service with GM. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan.

(d)    With respect to any Hourly Participant who retires from Newco upon total and permanent disability (by agreement between Newco and GM):

(i)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, unreduced for age and (B) an amount equal to the temporary supplement, as determined under the Newco Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced for age.

(ii)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, unreduced for age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the temporary supplement, using the benefit rates in effect under the GM Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement and taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced for age.

(e)    The Newco Hourly Pension Plan will recognize for participation and vesting, but not for accrual purposes, credited service accrued by Hourly Participants under the GM Hourly Pension Plan as of Closing. In addition, the Newco Hourly Pension Plan will recognize for accrual purposes credited service previously accrued under the GM Hourly Pension Plan for any Hourly Participant who is not vested under the GM Hourly Pension Plan at Closing ("Special Unvested Participant"). Anything in this Agreement to the contrary notwithstanding, Special Unvested Participants shall receive no benefit under the GM Hourly Pension Plan and shall receive a benefit under the Newco Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1 (a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, GM shall direct the trustees of the GM Hourly Pension Plan to transfer, in cash, from the trust under the GM Hourly Pension Plan to the trust under the Newco Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(c).

(f)    The GM Hourly Pension Plan shall recognize, for accrual, vesting and eligibility purposes, credited service accumulated under the Newco Hourly Pension Plan for any Hourly Participants who (i) retire under the Newco Hourly Pension Plan on a normal, early voluntary, or

38

total and permanent disability basis (by agreement between Newco and GM) on or before October 1, 1999, and (ii) at the time of such retirement would have been eligible to retire under the GM Hourly Pension Plan on a normal, early voluntary, or total and permanent disability basis (by agreement between Newco and GM) had they continued to be employed by GM until such retirement (such Hourly Participants, "Pre-October 1, 1999 Retirees"). Anything in this Agreement to the contrary notwithstanding, Pre-October 1, 1999 Retirees shall receive no benefit under the Newco Hourly Pension Plan and shall receive a benefit under the GM Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1(a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, Newco shall direct the Trustees of the Newco Hourly Pension Plan to transfer, in cash, from the trust under the Newco Hourly Pension Plan to the trust under the GM Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(a).

(g)    The GM Hourly Pension Plan shall recognize, for accrual, vesting and eligibility purposes, credited service accumulated under the Newco Hourly Pension Plan for any Returned Hourly Employees who return to GM on or before October 1, 1999 ("Pre-October 1, 1999 Returned Employees"). Anything in this Agreement to the contrary notwithstanding, Pre-October 1, 1999 Returned Employees shall receive no benefit under the Newco Hourly Pension Plan and shall receive a benefit under the GM Hourly Pension Plan determined solely under the terms of such plan and without regard to Sections 6.6.1(a), (b), (c) and (d). In accordance with the provisions of Section 6.6.4, Newco shall direct the Trustees of the Newco Hourly Pension Plan to transfer, in cash, from the trust under the Newco Hourly Pension Plan to the trust under the GM Hourly Pension Plan, an amount determined in accordance with Section 6.6.4(b).

(h)    In the case of any Hourly Participant who has at least 30 years of credited service under the GM Hourly Pension Plan at Closing, there shall be no reduction in the Newco Applicable Supplement payable under the Newco Hourly Pension Plan as of Closing with respect to such Hourly Participant.

(i)    No early retirement under mutually satisfactory conditions ("Mutual Retirement") will be recognized under the GM Hourly Pension Plan after Closing for Hourly Participants. An Hourly Participant who retires from Newco under Mutual Retirement shall receive from the Newco Pension Plan the benefit described in Section 6.6.1(b) or (c), as applicable; provided, however, that in lieu of the portion of the Newco Applicable Supplement or Newco Interim Supplement, if any, that would otherwise be payable from the Newco Hourly Pension Plan under such section, the Hourly Participant shall receive, from the Newco Hourly Pension Plan such supplemental payment as is set forth in the Newco Hourly Plan with respect to Mutual Retirement (based on combined Newco and GM credited service). If an Hourly Participant who is vested at Closing subsequently retires from Newco under a Mutual Retirement, and such Hourly Participant is otherwise eligible to retire on a normal or early voluntary basis under the GM Hourly Pension Plan, then the GM Hourly Pension Plan shall pay benefits in accordance with 6.6.1(a), (b) or (c) as if such Hourly Participant had retired from Newco under a normal or early voluntary retirement, as applicable. If the Hourly Participant is not otherwise eligible to retire on a normal, or early voluntary basis under the GM Hourly Pension Plan as of the date of Mutual Retirement from Newco, then the Hourly Participant shall be eligible under the GM Hourly Pension Plan only for unreduced benefits commencing at age 62 and one month at the benefit levels in effect under the GM Hourly Pension Plan as of the date of retirement from Newco, determined in accordance with 6.6.1(a).

(j)    With respect to any Hourly Participant who is not a Pre-October 1, 1999 Returned Employee, who is vested in the GM Hourly Pension Plan as of Closing and is re-employed by GM thereafter, upon retirement from GM:

(i)    With respect to any Hourly Participant who retires from GM on or after age 62:

(A)    The Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit.

(B)    The GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit.

(ii)    With respect to any Hourly Participant who retires from GM on an early voluntary retirement before attaining age 62, with 30 or more total years of credited service with GM and Newco:

(A)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement to which such Hourly Participant would be entitled using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced by age.

(B)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the early retirement or other supplement, as determined under the GM Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced by age.

(iii)    With respect to any Hourly Participant who retires from GM on an early voluntary retirement before attaining age 62, with less than 30 total years of credited service with GM and Newco:

(A)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan and (B) an amount equal to the interim supplement rate, using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement, multiplied by such Hourly Participant's credited service with Newco. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the Newco Hourly Pension Plan.

(B)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan and (B) an amount equal to the interim supplement rate, as determined under the GM

40

Hourly Pension Plan, multiplied by such Hourly Participant's credited service with GM. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, which, if applicable, shall be reduced for Hourly Participant's age at retirement in accordance with the terms of the GM Hourly Pension Plan.

(iv)    With respect to any Hourly Participant who retires from GM upon total and permanent disability (by agreement between Newco and GM):

(A)    Prior to the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic Newco Benefit, unreduced for age and (B) an amount equal to the temporary supplement, using the benefit rates in effect under the Newco Hourly Pension Plan at the time of such Hourly Participant's retirement, taking into account such Hourly Participant's age at retirement and taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the Newco Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the Newco Hourly Pension Plan will pay such Hourly Participant the Basic Newco Benefit, unreduced for age.

(B)    Prior to the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the sum of (A) the Basic GM Benefit, unreduced for age and (B) an amount equal to the temporary supplement rate, as determined under the GM Hourly Pension Plan, taking into account such Hourly Participant's total credited service with GM and Newco, multiplied by the GM Service Fraction. Following the date such Hourly Participant attains age 62 and one month, the GM Hourly Pension Plan will pay such Hourly Participant the Basic GM Benefit, unreduced for age.

(k)    Eligibility of surviving spouses of Hourly Participants and Hourly Returned Employees will be as follows:

(i)    The surviving spouse of an Hourly Participant, who is vested under the GM Hourly Pension Plan at Closing and who dies while employed by Newco, shall be eligible for payment from the GM Hourly Pension Plan of a pre-retirement monthly survivor benefit equal to the pre-retirement monthly survivor benefit rate, determined based on the benefit levels in effect under the GM Hourly Pension Plan at the time of death, multiplied by the Hourly Participant's credited service accrued under the GM Hourly Pension Plan as of Closing. All other GM Hourly Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

(ii)    The surviving spouse of an Hourly Returned Employee who returns to GM after October 1, 1999, who is vested under Newco's Hourly Pension Plan and who dies while employed by GM, shall be eligible for payment from Newco's Hourly Pension Plan of a pre-retirement monthly survivor benefit equal to the pre-retirement monthly survivor benefit rate, determined based on the benefit levels in effect under Newco's Hourly Pension Plan at the time of death, multiplied by the Hourly Returned Employee's credited service accrued under Newco's Hourly Pension Plan. All other Newco's Hourly Pension Plan terms shall apply, including but not limited to those regarding eligibility and duration of surviving spouse benefits.

(l)    Any break in a Transferred Employee's service under the Newco Hourly Pension Plan also shall break such Transferred Employee's service under the GM Hourly Pension Plan with entitlement only to a deferred vested retirement at the benefit levels in effect under the GM Hourly Pension Plan as of the break in service from Newco. Any break in a Returned Employee's service

under the GM Hourly Pension Plan also shall break such Returned Employee's service under the Newco Hourly Pension Plan with entitlement only to a deferred vested retirement at the benefit levels in effect under the Newco Hourly Pension Plan as of the break of service from GM.

(m)    To the extent permitted by applicable law, all benefit payments to any Hourly Participant under the Newco Hourly Pension Plan shall be discontinued upon re-employment with GM or Newco on a regular, contract, or other basis. To the extent permitted by applicable law, all benefit payments to any Hourly Participant under the GM Hourly Pension Plan shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis.

### 6.6.2.  Salaried Employees.

Newco will establish or cause to be established, effective as of the date of the Closing, a new retirement program (which may include a defined contribution plan) (the "Newco Salaried Retirement Program") which shall provide benefits necessary to ensure compliance by Newco with Section 6.5 of this Agreement. Effective at Closing, Salaried Transferred Employees (the "Salaried Participants") who were participants of the GM Retirement Program for Salaried Employees (the "GM Salaried Retirement Program") at Closing shall become participants in the Newco Salaried Retirement Program. For purposes of this Section 6.6.2, the term "credited service" shall have the meaning set forth in the GM Salaried Retirement Program.

(a)    The Newco Salaried Retirement Program shall contain the following provisions:

(i)    The Newco Salaried Retirement Program shall recognize, for participation and vesting, but not for accrual purposes, all credited service accrued by Salaried Participants under the GM Salaried Retirement Program as of Closing. In addition, Newco shall assume complete responsibility for all retirement benefits owed to Salaried Transferred Employees who are not vested on the Closing Date under the GM Salaried Retirement Program ("Special Unvested Participant") and Newco's Salaried Retirement Program will recognize for benefit accrual purposes credited service accrued under the GM Salaried Retirement Program as of the Closing.

(ii)    In the case of any Salaried Participant who has at least 30 years of credited service under the GM Salaried Retirement Program at Closing, upon such Salaried Participant's retirement from Newco, Newco or the Newco Salaried Retirement Program shall pay such Salaried Participant, in addition to any other applicable amount, an amount equal to the early retirement or other supplement, as determined under the GM Salaried Retirement Program, multiplied by the Newco Service Fraction.

(iii)    To the extent permitted under the applicable law, all benefit payments to any Salaried Participant under the Newco Salaried Retirement Program shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis. Newco shall be responsible for making any payments required by this Section 6.6.2(a) if the Newco Salaried Retirement Program does not contain provisions calling for such payments.

(b)    GM shall amend the GM Salaried Retirement Program to provide Salaried Participants the following as of Closing:

(i)    All Salaried Participants who are vested under the GM Salaried Retirement Program at Closing and retire from Newco, who when taking into account GM and Newco credited service could retire under the GM Salaried Retirement Program, on a normal, early voluntary, or total and permanent disability basis (approved by GM) shall be entitled to payment from the GM

Salaried Retirement Program, upon retirement from Newco, of an amount equal to the total Part A benefits payable under the GM Salaried Retirement Program at the time of retirement from Newco and, for those Salaried Participants who were participants in Part B of the GM Salaried Retirement Program at Closing, (a) a Part B Primary Benefit based on the contributions of the individual Salaried Participant remaining in the GM Salaried Retirement Program as of date of retirement from Newco and the Part B Primary Benefit rates in effect at such time, and (b) a Part B Supplementary Benefit calculated based on the formula under the GM Salaried Retirement Program in effect on the date of retirement from Newco. Such Part B Benefit under the GM Salaried Retirement Program shall be determined as if the Salaried Participant were then retiring from GM on a normal or early voluntary basis or, if applicable, a total and permanent disability basis, and by taking into account solely for eligibility for retirement (but not for the determination of the amount of payment) the additional credited service which would have accrued under the GM Salaried Retirement Program had the service with Newco after the Closing been with GM. The GM Salaried Retirement Program payment will include a Part A Basic Benefit and a Part B Supplementary Benefit (both reduced for age where appropriate) for each year of applicable credited service accrued under the GM Salaried Retirement Program, and any Part B Primary Benefit and any applicable supplement in an amount equal to the difference between the sum of the Part A Basic Benefit and Part B Supplementary Benefit and the pro rata share of the total Part A Benefit. All other GM Salaried Retirement Program terms shall apply.

(ii)    If a Salaried Participant, who is vested under the GM Salaried Retirement Program at Closing, subsequently retires from Newco and is not otherwise eligible to retire on a normal, early voluntary, or total and permanent disability basis under the GM Salaried Retirement Program as of the date of retirement from Newco, the Salaried Participant shall be eligible under the GM Salaried Retirement Program only for unreduced benefits at age 62 and one month at the benefit levels in effect under the GM Salaried Retirement Program as of the date of retirement from Newco, increased as appropriate until age 62 and one month as if the GM Salaried Retirement Program benefits had commenced as of the date the Salaried Participant retired from Newco.

(iii)    The surviving spouse of any Salaried Participant, who was vested under the GM Salaried Retirement Program at Closing and died while employed by Newco, shall be eligible for payment from the GM Salaried Retirement Program of a survivor monthly benefit or REA pre-retirement monthly survivor benefit, whichever is applicable, based on the Salaried Participant's credited service accrued under the GM Salaried Retirement Program at Closing and the benefit levels in effect under the GM Salaried Retirement Program at the time of death. All other GM Salaried Retirement Program terms shall apply, including, but not limited to, those regarding eligibility and duration of surviving spouse benefits.

(iv)    With regard to retirement under subsection (i), (ii) and (iii) above, for Salaried Participants who do not withdraw their Part B contributions prior to separation from service with Newco, the average monthly base salary for calculation of the Part B Supplementary Benefit under the GM Salaried Retirement Program shall be the Salaried Participant's average monthly base salary under the GM Salaried Retirement Program determined at Closing increased 3% per year (non-compounded) for each full year of salaried employment with Newco after Closing until the earlier of age 60, death, or retirement from Newco, but only if such Salaried Participant had continuous salaried employment with Newco from Closing through such event.

(v)    Any other break in service under the Newco Salaried Retirement Program shall also break the Salaried Participant's credited service under the GM Salaried Retirement Program with entitlement only to a deferred vested benefit at the benefit levels in effect under the GM Salaried Retirement Program as of the break in service from Newco and the Salaried

43

Participant's average monthly base salary as of Closing increased by 3% per year as described in subsection (iv) above through the date of such Salaried Participant's break in service.

(vi)    Any benefits payable from the GM Salaried Retirement Program under subsections (i), (ii) and (iii) shall be based on provisions applicable to other GM salaried retirees, including any increase in benefit rates based on the Salaried Participant's years of credited service under the GM Salaried Retirement Program.

(c)    To the extent permitted by applicable law, all benefits to any Salaried Participant under the Newco Salaried Retirement Program shall be discontinued upon re-employment with GM or Newco on a regular, contract, or other basis.  To the extent permitted by applicable law, all benefit payments to any Salaried Participant under the GM Salaried Retirement Program shall be discontinued upon re-employment with Newco or GM on a regular, contract, or other basis; provided that GM shall not discontinue benefits provided to a former salaried employee that Newco is permitted to hire under Section 6.21.

(d)    With respect to a Salaried Special Unvested Participant covered under Section 6.6.2(a)(i), the amount to be transferred in accordance with Section 6.6.4 shall be the present value of each employee's accrued benefit as of the Closing Date using the benefit rate at the closing date and assumption for determining the minimum lump sum distribution under rules of the Internal Revenue Service for qualified plans.

### 6.6.3.    Other Plan Provisions.

Newco and GM acknowledge that neither they nor their respective pension plans or retirement programs shall be required to recognize any grants of additional age or additional credited service given to Salaried Participants or Hourly Participants by the other party and/or their respective pension plans or retirement programs for any reason.  Except as otherwise provided in this Agreement, nothing herein shall be construed to limit GM's or Newco's right to amend the GM Hourly Pension Plan, GM Salaried Retirement Program, Newco Salaried Retirement Program or Newco Hourly Pension Plan (provided that any such amendment or termination is in compliance with Section 411(d)(6) of the Code) to eliminate all or a portion of any supplement or subsidy otherwise payable under their respective plans.

### 6.6.4.    Transfer of Liabilities and Assets.

(a)    With respect to each Pre-October 1, 1999 Retiree, the amount to be transferred in accordance with 6.6.1(f) will be calculated as follows.  First, the monthly benefits which each such retiree would have received from the Newco Hourly Pension Plan had the employee remained in the Newco Hourly Pension Plan (including Newco's Basic Benefit, and if applicable, Newco's retirement supplement in accordance with Sections 6.6.1(a), (b), (c) and (d)) will be determined based on applicable benefit rates under the Newco Hourly Pension Plan as of the Valuation Date. Second, the present value of such benefit payments to each such retiree shall be calculated using the SFAS 87 assumptions (e.g., discount rates, mortality assumptions, etc.) set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expenses for the fiscal year prior to the year in which the Valuation Date occurs.  To this amount will be added any pension payments actually made by GM to each such retiree, multiplied by the Newco Service Fraction for such retiree, plus interest at GM's SFAS 87 interest rate to the Valuation Date.  The amount to be transferred with respect to each Pre-October 1, 1999 Retiree, regardless of whether the employee is alive on the date of the valuation, shall equal such sum.

44

(b)    With respect to each Pre-October 1, 1999 Returned Employee, the amount to be transferred in accordance with 6.6.1(g) will be calculated as follows. First, a Projected Benefit Obligation (as defined under SFAS 87) for each such employee based on combined credited service with GM and Newco will be calculated as of the Valuation Date using benefit rates set forth in the GM-UAW contract in effect on the Valuation Date. All other assumptions for computing the Projected Benefit Obligations (as defined under SFAS 87) shall be taken from the SFAS 87 assumptions set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expense for the fiscal year prior to the year in which the Valuation Date occurs (e.g., retirement assumptions, discount rates, mortality assumptions, etc.). Second, the Projected Benefit Obligation for each such employee shall be multiplied by a fraction determined for each such employee. The numerator of such fraction will be the employee's credited service with Newco and the denominator of such fraction will be the numerator plus the employee's credited service with GM. For Special Unvested Participants, both the numerator and denominator shall reflect credited service transferred at Closing. The amount to be transferred with respect to each Pre-October 1, 1999 Returned Hourly Employee shall equal the product of the Projected Benefit Obligation and such fraction.

(c)    With respect to each Special Unvested Participant, the amount to be transferred in accordance with 6.6.1(e) will be calculated as follows. A Projected Benefit Obligation for each employee will be calculated as of the Closing Date using benefit rates set forth in the UAW Agreement in effect on the Closing Date. All other assumptions for computing the Projected Benefit Obligation shall be taken from the SFAS 87 assumptions set forth in GM's 10k filing for the prior fiscal year that were used to determine GM's net periodic pension expense for the fiscal year prior to the year in which the Closing Date occurs (e.g., retirement assumptions, discount rates, mortality assumptions, etc.). The amount to be transferred with respect to each Special Unvested Participant shall equal such Projected Benefit Obligation plus interest at GM's SFAS 87 discount rate from the Closing Date to the Valuation Date.

(d)    For purposes of this Section 6.6.4, the Valuation Date shall be defined as the date which is 18 months immediately following the Closing Date for all Pre-October 1, 1999 Retirees and all Pre-October 1, 1999 Returned Hourly Employees who retire or return to employment with GM, respectively, prior to the date 18 months immediately following the Closing Date. For all Special Unvested Participants, the Valuation Date shall be defined as the date which is 18 months immediately following the Closing Date.

(e)    The transfer of assets shall comply with Section 414(l) of the Code. However, to the extent that the amount required to be transferred under Section 414(l) is different from the amount determined in accordance with this Section 6.6.4, the amount required under Section 414(l) will be transferred. On the date of such transfer, GM will either pay to (or receive from) Newco, as the case may be, the excess (or the deficit) of the amount computed under this Section 6.6.4, and the amount transferred in accordance with Section 414(l), with interest at GM's SFAS 87 discount rate from the Valuation Date to the date of transfer.

(f)    The determination of amounts to be transferred in accordance with this Section 6.6.4 shall be made by the GM actuary; provided, however, that the GM actuary shall provide the actuary selected by Newco with all the documentation reasonably necessary for Newco to verify such determination within 180 days of the Valuation Date. Newco will verify such determination within 180 days of the receipt of such calculation. Thereafter, Newco and GM shall cooperate to file as soon as reasonably possible all documents, including Forms 5310A, which may be legally required to effect the liability and asset transfer. The transfer shall take place on the 31st day following such filing. Notwithstanding the above, if Newco's actuary informs GM within 60 days of receiving

46

B.      Except as provided in Section 6.17, GM shall have no liability for health care and life and disability benefits claimed by any Transferred Employee with respect to a claim incurred after Closing, regardless of whether the claim is for a same or similar medical condition, for which a claim was made prior to Closing. Newco shall have no liability for health care and life and disability benefits claimed by any Transferred Employee with respect to any claims incurred on or prior to Closing, regardless of when such claim is reported (which shall be the responsibility of GM).

C.      Upon retirement from Newco or GM, GM shall provide post-retirement health care and life insurance coverage to the following Transferred Employees and Hourly Returned Employees:

(i)      For Hourly and Salaried Transferred Employees eligible to retire from GM at Closing on a normal or early voluntary basis with employer provided contributions for post-retirement health care and life insurance coverage.

(ii)      For Hourly and Salaried Transferred Employees who retire on a normal, early voluntary, or total and permanent disability basis (approved by GM) under the GM Hourly Pension Plan or GM Salaried Retirement Plan, as applicable, on or before October 1, 1999, and are then otherwise eligible for employer provided contributions for post-retirement health care and life insurance coverage (including service with Newco for the purpose of determining such eligibility).

(iii)      For all Hourly Returned Employees who are eligible for such benefits.

The provision of post-retirement health care and life insurance coverage by GM is subject to all applicable benefit plan terms, including but not limited to the right to amend, modify, suspend or terminate the plans. In the case of Hourly Transferred Employees, the post-retirement health programs shall satisfy in full the terms of the UAW Agreement, and, for purposes of the Anderson Plant, shall satisfy the full terms through October 1, 2002, including any changes negotiated between GM and the UAW in conjunction with the 1999 National Agreement.

D.      Provision of post-retirement health care and life insurance coverage for all other Transferred Employees shall be the primary responsibility of Newco, and Newco's health and life and disability benefits program shall take into account combined GM and Newco credited service for eligibility; subject, however, to all applicable plan terms, including but not limited to the right to amend, modify, suspend or terminate the plans.

In addition, the provision of optional and dependent life insurance coverage, if any, in retirement shall be the responsibility of whichever of GM or Newco has the responsibility for providing post-retirement life insurance benefits to the applicable Transferred Employee. In this regard, as of the Closing, Newco or GM, as applicable, shall make available post-retirement optional and dependent life insurance (and personal accident insurance) coverage to all Transferred Employees (at such Transferred Employees' sole expense) who are eligible for post-retirement life insurance from GM in an amount equal to that provided by GM to comparably situated GM employees as of the date of retirement from Newco; provided, however, that nothing herein shall limit Newco's or GM's ability to amend or terminate such coverage.

E.      With respect to post-retirement health care and life insurance coverage provided to Transferred Employees pursuant to Section 6.7.1C, Newco will reimburse GM annually for a portion of the cost of such programs allocated on the following basis: (i) with respect to Hourly Transferred Employees, Newco will reimburse GM on a pro rata basis based on years of service at Newco after the Closing Date to the date the Hourly Transferred Employee is first eligible to retire

and receive employer provided postretirement health care and life insurance benefits over total years of service at both Newco and GM to the date the Transferred Employee is first eligible to retire and receive employer provided post-retirement health care and life insurance benefits, and (ii) with respect to Salaried Transferred Employees, Newco will reimburse GM on a pro rata basis based on years of service at Newco after the Closing Date to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits over the total years of service at both Newco and GM to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits. If a Salaried Transferred Employee does not retire on a 30 and Out or Age 55 with 85 Points basis, Newco will reimburse GM annually for the cost of the post-retirement health and life insurance coverage provided to such Salaries Transferred Employee multiplied by the Newco Service Fraction. With respect to post-retirement health care and life insurance coverage provided to Transferred Employees pursuant to Section 6.7.1D, GM will reimburse Newco annually for a portion of the cost of such programs allocated on the following basis: (i) with respect to Hourly Transferred Employees, GM will reimburse Newco on a pro rata basis, based on years of service at GM and Newco to the Closing Date to the date the Transferred Employee is first eligible to retire and receive such post-retirement health care and life insurance benefits over total years of service at both GM and Newco to the date the Transferred Employee is first eligible to retire and receive employer provided post-retirement health care and life insurance benefits, and (ii) with respect to Salaried Transferred Employees, GM will reimburse Newco on a pro rata basis based on years of service at GM and Newco to the Closing Date to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits over the total years of service at both Newco and GM to the earliest date the Salaried Transferred Employee could have retired from GM on a 30 and Out or Age 55 with 85 Points basis with employer-provided post-retirement healthcare and life insurance benefits. If a Salaried Transferred Employee does not retire on a 30 and Out or Age 55 with 85 Points basis, GM will reimburse Newco annually for the cost of the post-retirement health care and life insurance coverage provided to such Salaries Transferred Employee multiplied by the GM Service Fraction. Notwithstanding the foregoing, in the case of Hourly Transferred Employees who retire on a Mutual Retirement or Salaried Transferred Employees who retire on an Incentive Retirement GM's pro rata reimbursement shall not begin until such Transferred Employees otherwise would have been eligible to retire with employer provided post-retirement health care and life insurance coverage. For purposes of this paragraph, "30 and Out" means retirement after 30 or more years of service with GM and Newco, and "Age 55 with 85 Points" means retirement after age 55 with a combined age and service with GM and Newco equal to at least 85.

F.       Newco will be responsible for any incremental health care and life and disability benefits costs (i.e. in excess of the proration assuming the employee retires at the earliest retirement age) associated with any early retirement incentive programs offered by Newco.

### 6.7.2.  Special Benefit.

With respect to any Hourly Participant or Salaried Participant or such Hourly Participant's or Salaried Participant's spouse who would have become entitled to receive a Special Benefit (as defined in the GM Hourly Pension Plan or GM Salaried Retirement Program, as applicable) had such Hourly or Salaried Participant remained employed at GM during the period of time he or she was employed by Newco:

(i)      Such participant or spouse shall receive from the applicable GM pension plan an amount equal to the Special Benefit that would have been payable had the participant remained employed with GM during the period of time he or she was employed by Newco, multiplied by the GM Service Fraction.

(ii)      Such participant or spouse shall receive from the applicable Newco pension plan, a special benefit, determined under the applicable Newco pension plan, taking into account total credited service with GM and Newco, multiplied by the Newco Service Fraction.

### 6.7.3.  Miscellaneous.

A.      Information Requirements.  As provided elsewhere herein, each Party shall reimburse the other Party annually for reasonable and customary health care costs within 45 days after receiving an invoice for same. Said invoice will provide all information necessary for the other Party to review and verify the amount of the pro-rata portion of the cost being invoiced. Further, at a minimum, said invoice will provide data by employee Social Security Number, which details the basis for the pro-rata calculation, the amount of cost incurred, whether the cost incurred was for the retired employee or surviving spouse, whether the cost was for medical, dental, or vision care, and what type of health care insurance plan the employee was enrolled in.

B.      Disputes.  If one Party disputes the amount of any such invoice submitted by the other Party, the disputing Party shall provide the other Party with notice of such dispute within 45 days of receipt for said invoice. The other Party shall provide such additional supporting information as may be necessary to respond to the disputed amount within 15 days after receiving such notice. If the additional supporting information is acceptable to the disputing Party, the disputing party shall promptly pay the invoice. If the disputing Party continues to dispute the amount of the invoice following the receipt of the additional supporting information, the invoice shall be submitted to an independent certified public accountant or benefits consulting firm reasonably acceptable to both GM and Newco who shall resolve the dispute. Such resolution shall be binding, and the Party being invoiced shall promptly pay the amount established by the third party. The costs of such third party reviewer shall be shared equally by both Parties.

C.      Audit Right.  Each Party shall, having first provided reasonable notice to the other Party, have the right to audit the books and records of the Party submitting an invoice for payment with regard to post-retirement benefit costs. Said audit shall be under the terms of a mutually acceptable Proprietary Data Agreement. The audit shall be conducted by an independent certified public accountant, a benefits consulting firm, or as appropriate, GM Audit Services. Such audits may be performed for each annual invoice received. Any overpayment or underpayment disclosed by such audit shall be credited or debited, as the case may be, against the amount owing on the current annual invoice. The cost of the audit shall be paid by the Party conducting the audit.

D.      Administration Cost.  Each Party shall bear its own internal administrative cost associated with post-retirement health care cost.

E.      Personnel Data.  Each year, 30 days after the anniversary of the Closing Date, Newco shall provide to GM a complete list of all transferred employees who continue to be employed by Newco. Said list shall provide the name, Social Security Number, years of credited service with Newco, and current employment status of transferred employees.

49

### 6.8.   Amendment or Termination of Benefit Plans.

Except as otherwise provided in this Article 6, nothing herein shall prejudice the right of Newco or GM to amend or terminate any of its plans, programs, policies or arrangements applicable to any Transferred Employee following the Closing.

### 6.9.   Employee Information, Cooperation in Establishing Newco Benefit Plans.

A.   GM and Newco will each provide the other any relevant information with respect to any Transferred Employee's employment with and compensation from GM or Newco, or rights or benefits under any employee benefit plan which either Party may reasonably request including, without limitation, all direct deposit authorizations provided by any Transferred Employee.

B.   Newco will establish Employee Welfare Benefit Plans, in accordance with the applicable laws, for the Transferred Employees on a timely basis so that such plans will be in effect on Closing. In accordance with the transition services arrangement between GM and Newco, for a period of time after Closing, GM shall administer the Employee Welfare Benefit Plans of Newco. With respect to each such Employee Welfare Benefit Plan, Newco will make all appropriate governmental filings and establish an ERISA benefits claim appeal process (and GM shall provide information relevant to administering such appeal process).

### 6.10.   Grievances.

GM has disclosed to PEP Guide and Newco (or will disclose prior to the Closing) all pending and, to the knowledge of GM, threatened labor grievances and arbitration proceedings which relate to the Business. Prior to the Closing, GM will disclose all labor grievances and arbitration proceedings which relate to the Business which remain unresolved on the Closing Date. GM and Newco will address (i) grievances open as of the date of the Closing and (ii) grievances filed after the date of the Closing relating to an event, occurrence or cause of action arising prior to Closing which affect or relate to the rights of GM or Newco under this Agreement and (iii) grievances filed after Closing relating solely to GM's actions or omissions which prevent an Hourly Transferred Employee from becoming an Hourly Returned Employee or commencing work with GM (collectively, the "Grievances") as set forth below. Newco and GM will cooperate in the defense of the Grievances. Newco will not settle any of the Grievances without GM's consent, if such settlement will result in liability for GM. Such consent will not be unreasonably withheld. GM will not settle any of the Grievances without Newco's consent if such settlement will result in liability for Newco or would require Newco to perform any act, including reinstatement or job assignment or would create any precedent. Such consent will not be unreasonably withheld. If the seniority of a grievant is reinstated as a result of the disposition of a Grievance or a court or administrative order, Newco will reinstate the grievant as if the grievant had been an Hourly Transferred Employee as of the date of the Closing and, in such case, if at the time of such reinstatement the number of employees at the Monroe Plant and Anderson Plant exceed the Business Target Number, as applicable, Newco may immediately return one Hourly Transferred Employee from one of the Plants to employment with GM. In general, for Hourly Transferred Employee who have been continuously employed, back pay liability for all Grievances will be allocated to GM. In general, for employees who become Hourly Transferred Employees because they are reinstated through the grievance procedure, back pay liability will be allocated to GM. The Parties will discuss treatment of Grievances involving unusual circumstances. If Newco withholds consent to a settlement of a Grievance recommended by GM or elects to continue to defend the Grievance jointly with GM, then Newco shall be liable for the portion of the back pay or other liability resulting from the ultimate disposition of such