**EXHIBIT B-3**

Grievance (or subsequent settlement) which is in excess of the liability that would have resulted from the settlement recommended by GM and rejected by Newco or that relates to the period following Newco's election to continue to defend the Grievance jointly, as applicable.

### 6.11. Savings Plan Transfers.

Newco agrees to establish for all Transferred Employees a savings plan (under Section 401(k) of the Code) effective as of Closing. To the extent allowed by applicable law, Newco agrees that Hourly Transferred Employees with account balances in the GM Personal Savings Plan will be eligible to transfer such account balances in accordance with the provisions of the plan to Newco's savings plan applicable to Hourly Transferred Employees. To the extent allowed by applicable law, Salaried Transferred Employees with account balances in the GM Savings-Stock Purchase Program will be eligible to transfer such account balances in accordance with the provisions of the program to Newco's savings plan applicable to Salaried Transferred Employees. The manner of such transfer shall be a direct rollover.

### 6.12. Allocation of Responsibility for Suggestions Existing as of Closing.

Newco will investigate and review any suggestions related to the Business pending as of Closing. GM will cooperate with Newco to facilitate the investigation and review of all such suggestions. With regard to any suggestions submitted on or prior to the Closing Date, GM will be responsible for payment of any suggestion award related to savings realized on or prior to Closing, with Newco responsible for payment related to savings realized after Closing. Newco will assume responsibility for suggestions related to the Businesses submitted by any Transferred Employee after Closing, regardless of whether submitted on Newco or GM suggestion forms.

### 6.13. SUB/GIS and JOBS Programs -- Maximum Liabilities.

Newco acknowledges and agrees that, for purposes of the Newco SUB, GIS and JOBS Programs (or successor programs), Newco's maximum liabilities will be an amount determined as provided on Schedule 6.13.

### 6.14. Vehicle Purchase Program.

Without cost to Newco, (i) Hourly Transferred Employees will continue to be eligible through September 14, 1999 to participate in the GM New Vehicle Purchase Program (the "Program"), and (ii) Salaried Transferred Employees will continue to be eligible through October 1, 1999 to participate in the Program, in each case, in accordance with the terms of the Program.

### 6.15. Training and Tuition.

Newco will participate in joint activities through the UAW-GM Center for Human Resources ("CHR") in the same manner as provided prior to the Closing Date for the duration of the current UAW Agreement. This includes funding levels, the funding approval process, and full participation in jointly developed and negotiated programs. Newco's funding obligations will be met by monthly payments to the CHR in an amount equal to the accumulated funding obligation incurred by Newco, calculated each month pursuant to the current UAW Agreement's Memorandum of Understanding Joint Activities (III. Funding). Newco's funding rate for overtime hours will be based on the procedure in place for determining such funding rate pursuant to the current UAW Agreement.

### 6.16.   Tuition Reimbursement Expenses.

GM shall be responsible for payment of all tuition reimbursement expenses which are properly payable under the Tuition Assistance Plan for Salaried Transferred Employees for classes commenced or approved prior to Closing. Tuition reimbursement expenses with respect to Salaried Transferred Employees will be paid by Newco's tuition assistance plan for classes which commence on or after Closing and which have not been approved prior to Closing.

### 6.17.   Workers' Compensation.

A.   Notwithstanding any applicable state law, GM shall be responsible for (i) workers' compensation claims of Transferred Employees based on injuries or illnesses which arose out of and in the course of employment with GM or Newco on or prior to Closing, regardless of when such claim is made and (ii) workers' compensation claims of Returned Employees based on injuries or illnesses which arose out of and in the course of employment with GM on or after the date such employee returned to employment with GM.

B.   Notwithstanding any applicable state law, Newco will be responsible for (i) workers' compensation claims of Transferred Employees based on injuries and illnesses which arise out of and in the course of employment with Newco after Closing, regardless of whether such injury or illness is the same or similar to a prior injury or illness for which a workers' compensation claim was made on or prior to Closing and (ii) workers' compensation claims of Returned Employees based on injuries or illnesses which arose out of and in the course of employment with Newco prior to the date such employee returned to employment with GM, regardless of when such claim is made.

C.   Notwithstanding any applicable state law, (i) with respect to workers' compensation claims of Transferred Employees based on injuries and illnesses which do not relate to a single occurrence or event and which arise out of and in the course of both employment with GM or Newco on or prior to Closing and employment with Newco after the Closing, GM shall be responsible for any such claims filed on or prior to the first anniversary of the Closing Date and Newco shall be responsible for any such claims filed after the first anniversary of the Closing Date and (ii) with respect to workers' compensation claims of Returned Employees based on injuries or illnesses which do not relate to a single occurrence or event and which arise out of and in the course of both employment with Newco prior to the date such employee returned to employment with GM and employment with GM following such date, Newco shall be responsible for such claims filed on or prior to the date 90 calendar days immediately following the date such employee returned to employment with GM, and GM shall be responsible for any such claims filed thereafter.

D.   With regard to workers' compensation claims for which GM retains responsibility and which involve the payment of lost-time workers' compensation benefits for any GM Leave Employee, Newco will make reasonable efforts consistent with the provisions of the UAW Agreement, the applicable local agreement, and the applicable law, to place such employee in suitable employment. In the event GM and Newco disagree as to any workers' compensation claimant's ability to return to work, both GM and Newco will submit the disagreement to a binding third party medical arbitrator (selected by mutual agreement of Newco and GM). The cost of such arbitrator shall be shared equally by Newco and GM. GM and Newco shall cooperate in good faith to administer the allocation of the workers' compensation benefits provided for in this Section 6.17.

52

### 6.18.  Legal Services Plan.

A.     Newco will provide legal services and administrative support to Transferred Hourly Employees ("Newco Legal Services Plan") through the UAW-GM Legal Services Plan for the duration of the UAW Agreement, including funding required by that Agreement. Prior to Closing, PEP Guide and Newco will elect to pay for this plan either based on Newco's accruals for the plan or at the GM accrual rates. Newco will reimburse the UAW-GM Legal Services Plan on a monthly basis. At Newco's request, GM shall provide Newco such information relating to usage as may be reasonably requested by Newco in order to determine the cost of such usage.

B.     Files open as of the Closing Date with respect to Transferred Employees will be covered by the UAW-GM Legal Services Plan. Files opened after the Closing Date with respect to Transferred Employees and their surviving spouses will be covered by the Newco Legal Services Plan.

### 6.19.  Liability for Certain Benefits.

A.     Except to the extent provided otherwise in this Agreement, Newco shall be responsible for all salaries, wages and benefits of each Transferred Employee earned after the Closing Date, provided, however that except as otherwise provided in this Agreement with respect to Returned Employees, Newco shall not be responsible for any salaries, wages and benefits for periods of time on or after the date of the employee's return to employment with GM. Except to the extent provided otherwise in this Agreement, GM shall be responsible for salaries, wages and benefits of the Transferred Employees earned during or relating to periods on or prior to the Closing Date and, except as otherwise provided in this Agreement with respect to Returned Employees, for periods of time on and following the date of the employee's return to employment with GM.

B.     GM shall pay to Newco (net of relevant offset) an amount equal to the pro rata portion of any unutilized vacation entitlement, if any, that is attributable to Transferred Employees' service with GM before the Closing Date. GM shall pay to each Transferred Employee the amount of all salary and wages earned by such Transferred Employee for all periods ending on or prior to the Closing Date which have not been paid as of the Closing Date.

C.     Within 60 days following the end of each calendar year 1998 and 1999, GM and Newco shall determine the total dollar value of vacation pay, profit sharing and similar compensation-related items accrued for the applicable year with respect to a Transferred Employee or Hourly Returned Employee who was employed at both GM and Newco for such year (the "Accrued Pay"). The Accrued Pay thus determined shall be allocated between GM and Newco pro rata based on pay periods worked before and after the Closing Date (and portions thereof) at GM and Newco, respectively, during the applicable year. From the allocated Accrued Pay amounts both GM and Newco shall subtract any actual payments made by GM or Newco, respectively, during the applicable year to employees who were employed at both GM and Newco for such year (the "Net Accrued Pay"). In the event that Newco's Net Accrued Pay for Hourly Returned Employees exceeds GM's Net Accrued Pay for Transferred Employees, then Newco shall pay to GM the difference between Newco's Net Accrued Pay for Hourly Returned Employees and GM's Net Accrued Pay for Transferred Employees. In the event that GM's Net Accrued Pay for Transferred Employees exceeds Newco's Net Accrued Pay for Hourly Returned Employees, then GM shall pay to Newco the difference between GM's Net Accrued Pay for Transferred Employees and Newco's Net Accrued Pay for Hourly Returned Employees.

53

### 6.20. Approval of Communications.

Where formal communications by GM to GM's employees or Transferred Employees, the public or governmental representatives are contemplated relating to Newco's plans, intentions or obligations with respect to GM employees, such communications shall be reviewed with and approved by PEP Guide. Notwithstanding the foregoing, it is specifically agreed that GM shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit Newco to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter governed by this Article 6, nor shall any such communication by GM expand the specific and limited obligations of Newco set forth herein.

Where formal communications by Newco to GM employees, Transferred Employees, the public or governmental representatives are contemplated relating to GM's plans, intentions or obligations with respect to GM employees, such communications shall be reviewed with and approved by GM. Notwithstanding the foregoing, it is specifically agreed that Newco shall have no authority through any authorized or unauthorized communications with its employees or their representatives, the public, or governmental officials, to commit GM to obligations, hiring arrangements, benefits or other terms or conditions of employment or to any other matter governed by this Article 6, nor shall any such communication by Newco expand the specific and limited obligations of GM set forth herein.

### 6.21. Rehiring of Employees.

Newco may offer employment to, and employ, up to 40 former salaried employees of GM who terminated with GM from the 18th month before the Closing Date through the Closing Date.

## 7. REAL ESTATE MATTERS.

### 7.1. Conveyance.

With respect to the Owned Real Estate, GM will at the Closing execute and deliver to Newco (or Newco's designee(s)) covenant or limited warranty deeds warranting against grantor's acts with respect to the Owned Real Estate in recordable form sufficient to vest in Newco (or Newco's designee(s)) good, marketable and insurable fee simple title to such Owned Real Estate, subject only to the Permitted Exceptions. Notwithstanding any provision of applicable Law to the contrary, the representations, warranties and covenants contained in this Agreement with respect to the Owned Real Estate shall survive the delivery and acceptance of any deed required pursuant to the immediately preceding sentence, shall not be merged into any such deed and shall survive the Closing in accordance with Section 12.1 of this Agreement.

### 7.2. Title.

GM will deliver to PEP Guide and Newco in form and substance satisfactory to them, a commitment for Form B 1992 ALTA Owner's Title Insurance Policies with respect to each of the Monroe Plant and the Anderson Plant issued by title insurer(s) approved by PEP Guide, and will deliver copies of each exception to title referred to therein. The title commitment charges, including charges for title abstract and examination, shall be paid by Newco.

54

### 7.3.  Land Surveys.

GM will deliver recent surveys ("Surveys") to PEP Guide and Newco, the cost of which shall be borne by GM, which surveys shall be ALTA/ACSM Land Title Surveys acceptable to PEP Guide (including 1 through 4, 6, 7 (other than Section (c)), 8 through 11, and 13 of Table A) for each of the Owned Real Estate and the Anderson, Indiana Real Estate, showing, all known easements and rights thereon which can be depicted on the Surveys, all Improvements (including fences and driveways) and access to and from a dedicated and accepted public right-of-way.

## 8.    CONDITIONS TO CLOSING.

### 8.1.  Conditions to Obligations of PEP Guide and Newco.

The obligations of PEP Guide and Newco to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived, to the extent permitted by applicable Law, in whole or in part by PEP Guide):

#### 8.1.1.  Accuracy of Representations and Warranties.

The representations and warranties of GM set forth in this Agreement or in any certificate or document called for in this Agreement which are qualified as to materiality shall be true and correct in all respects, and such representations and warranties as are not so qualified shall be true and correct in all material respects, as of the date when made and at and as of the Closing Date as though made on such date.

#### 8.1.2.  Performance of Covenants.

GM shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by GM at or prior to the Closing.

#### 8.1.3.  No Litigation.

No claim, suit, action, proceeding, investigation or inquiry shall be threatened or pending by or before any Governmental Authority in which it is sought to restrain or prohibit or to obtain material damages or other material relief in connection with this Agreement, any Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby, or which is reasonably likely to affect materially the value or utility of the Acquired Assets or the Business, or to impair the ability of Newco to conduct the Business after the Closing as currently conducted.

#### 8.1.4.  Consents to Assignment of Certain Contracts.

Notwithstanding any provision hereof to the contrary, GM shall have obtained and delivered to PEP Guide and Newco the Consents set forth in Schedule 8.1.4 in a written instrument in form and substance reasonably satisfactory to PEP Guide, or the third parties to any agreement requiring such Consent shall have agreed in writing to terminate such agreement (without penalty to Newco or the Business) and shall have entered into a substantially similar agreement with Newco, each of which shall be in full force and effect and the valid and binding obligation of each party thereto.

### 8.1.5.   Ancillary Agreements.

Each of the Ancillary Agreements to which GM or any of its Affiliates is a party (A) shall have been duly executed and delivered by such of GM and its Affiliates as are parties thereto, (B) shall be in full force and effect, and (C) shall be the valid and binding obligation of such of GM and its Affiliates as are parties thereto.

### 8.1.6.   Material Adverse Effect.

Except as set forth in Schedule 8.1.6, during the period commencing on the date of this Agreement through and including the Closing Date, there shall not have occurred any condition, event, circumstance, change or effect that, individually or in the aggregate, has had or is reasonably likely to have any Material Adverse Effect, other than such as shall have resulted from general economic conditions or conditions affecting the automobile industry generally, including any decline in sales in the North American vehicle markets.

### 8.1.7.   Agreement with Lender.

GM and the lender to Newco, or Newco's subsidiaries, shall have entered into arrangements which are satisfactory to PEP Guide, and such lender shall be prepared to fund working capital loans of at least $30,000,000 to Newco or Newco's subsidiaries.

### 8.1.8.   Lender Acknowledgment and Security Agreement.

The agreement entered into by GM, Newco and the lender to Newco, or Newco's subsidiaries, referenced in Section 8.2.7 and providing for the exercise of GM's rights pursuant to the Right of Access Agreement, shall be satisfactory to PEP Guide and shall not reduce the loan availability, increase the costs or otherwise adversely affect the economic terms to Newco, or Newco's subsidiaries, of incurring financing from such lender.

### 8.1.9.   Missing Items.

If at the date of execution of this Agreement, any Exhibit or Schedule was omitted or incomplete, then the missing item(s) shall be promptly furnished and shall be subject to the satisfaction of Newco and PEP Guide.

### 8.2.   Conditions to Obligations of GM.

The obligations of GM to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived, to the extent permitted by applicable Law, in whole or in part by GM).

### 8.2.1.   Accuracy of Representations and Warranties.

The representations and warranties of PEP Guide and Newco set forth in this Agreement or in any certificate or document called for in this Agreement which are qualified as to materiality shall be true and correct in all respects, and such representations and warranties as are not so qualified shall be true and correct in all material respects, as of the date when made and at and as of the Closing as though made on such date.

### 8.2.2.  Performance of Covenants.

PEP Guide and Newco shall have performed and complied in all material respects with all agreements, obligations, covenants and conditions required by this Agreement to be performed or complied with by it at or prior to the Closing.

### 8.2.3.  No Litigation.

No claim, suit, action, proceeding, investigation or inquiry shall be threatened or pending by or before any Governmental Authority in which it is sought to restrain or prohibit or to obtain material damages or other material relief in connection with this Agreement, any Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby.

### 8.2.4.  Certain Agreements.

Each of the Ancillary Agreements to which PEP Guide or Newco is a party (A) shall have been duly executed and delivered by such Parties, (B) shall be in full force and effect, and (C) shall be the valid and binding obligation of such Parties.

### 8.2.5.  Salaried Employees.

Newco shall have made offers of employment to all salaried employees of the Business.

### 8.2.6.  Agreement with Lender.

GM and the lender to Newco, or Newco's subsidiaries, shall have entered into arrangements which are satisfactory to GM, and such lender shall be prepared to fund working capital loans of at least $30,000,000 to Newco or Newco's subsidiaries.

### 8.2.7.  Lender Acknowledgment and Security Agreement.

GM, Newco and the lender to Newco, or Newco's subsidiaries, shall have entered into an agreement which is satisfactory to GM that provides for the exercise of GM's rights pursuant to the Right of Access Agreement and the Lender's acknowledgement of such right and the granting by Newco to GM of a non-monetary security interest in the assets of Newco.

## 9.   ENVIRONMENTAL MATTERS.

### 9.1   Definitions.

#### 9.1.1.  Adverse Consequences.

"Adverse Consequences" means any liabilities, compensatory or punitive damages, treble damages mandated by statute to the extent recoverable under CERCLA or state CERCLA equivalent statutes, natural resource damages, penalties, costs and fines, including reasonable attorney's and reasonable consultant's fees, but excluding: (a) consequential, special or incidental damages (such as loss of profits, loss of business opportunity, loss of use, diminution in value of any property, or business interruption); (b) any attorney's or consultant's fees or other costs for any matter in which a Party has accepted its defense and indemnity obligations, and so notified the other Party pursuant to

Section 9.12.4 (Notification); and (c) treble (or other multiple) damages mandated by statute except to the extent recoverable under CERCLA or state CERCLA equivalent statutes.

### 9.1.2. Anderson Plating Operations.

"Anderson Plating Operations" means the metal plating operations as conducted at the Anderson Plant as of the Closing Date, including any equipment, piping and appurtenances used in connection with such operations and not used in connection with any other manufacturing operations at the Anderson Plant.

### 9.1.3. Chlorinated Solvent.

"Chlorinated Solvent" means any chemical product containing chlorinated hydrocarbons or an organic solvent, including, without limitation, methylene chloride, carbon tetrachloride, chlorobenzene(s), trichloroethane, trichloroethene, tetrachloroethane, and tetrachloroethene, but not including any chemical compound consisting of less than 1% of such chlorine-containing organic solvent(s).

### 9.1.4. Clean Closure.

An Environmental Condition will be "Clean Closed", when GM can establish the following:

(a)    no Hazardous Material is present at a level which exceeds the highest of: (i) natural background as determined in accordance with sound and accepted scientific and engineering literature, judgment and practice; (ii) the least stringent remediation standard acceptable under applicable Environmental Laws for industrial property in accordance with the requirements of the appropriate Governmental Authority; and (iii) the level determined by a site-specific risk assessment and approved by any Governmental Authority, if applicable Environmental Law requires such approval; and

(b)    the closure is approved in writing by the Governmental Authority if applicable Environmental Law requires such approval.

### 9.1.5. Environmental Condition.

"Environmental Condition" means the presence of any Hazardous Material in the soils, surface water, or ground water on or under the Real Property in concentrations above the least stringent remediation standard acceptable under applicable Environmental Laws for industrial property in accordance with the requirements of the appropriate Governmental Authority. The presence of any Hazardous Material in or on any of the Acquired Assets or the buildings (including fixtures, appurtenances or equipment) is not considered an Environmental Condition. If no appropriate remediation standard is specified under applicable Environmental Laws, the remediation standard shall be established using recognized risk assessment methodologies as set forth in Section 9.3.3 (Remedial Action Factors).

### 9.1.6. Environmental Laws.

"Environmental Laws" means all applicable federal, state and local laws, ordinances, regulations, final orders and final judgments, which have been duly enacted or promulgated and which are legally enforceable concerning the subject of the introduction, emission, discharge or release of any Hazardous Material into the air, soil or surface or ground water; the transportation, storage,

treatment or disposal of any Hazardous Material; or the remediation or investigation of contamination of air, soil, or surface or ground water by any Hazardous Material. Environmental Laws include, but are not limited to, the following federal statutes and similar or implementing state and local laws: the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601, et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986 (collectively "CERCLA"); the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.; the Emergency Planning and Community Right-to-Know Act of 1986,42 U.S.C. §§ 1001, et seq; the Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 et seq.; the Pollution Prevention Act of 1990, 42 U.S.C. §§ 13101, et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901, et seq., as amended by the Hazardous and Solid Waste Amendments of 1984, (collectively "RCRA"); the Safe Drinking Water Act, 42 U.S.C. §§ 3001 et seq.; the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq.; and the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq. ("TSCA"). The following are not considered Environmental Laws: (a) laws, ordinances, regulations, final orders or final judgments concerning primarily worker health or safety, including the Occupational Safety and Health Act "OSHA", and any similar state or local law or regulation; and (b) unpromulgated guidance documents, guidelines or directives from or by any Governmental Authority, which are not legally enforceable or duly promulgated.

### 9.1.7.   Governmental Authority.

"Governmental Authority" means any local, state or federal governmental agency with jurisdiction in the relevant matter pursuant to any Environmental Laws.

### 9.1.8.   Hazardous Material.

"Hazardous Material" means any substance defined as a "hazardous substance", "extremely hazardous substance", "hazardous material", "hazardous chemical", "oil", "petroleum", "hazardous or toxic pollutant", "pollutant", "chemical", "contaminant", "pesticide", "toxic chemical", "toxic substance", "hazardous waste" or similar terms (including constituents) under Environmental Laws.

### 9.1.9.   Knowledge.

"Knowledge" means the actual knowledge of any current GM officers, directors, relevant plant managers and environmental supervisors.

### 9.1.10.   Monroe Press Pit Area.

"Monroe Press Pit Area" means the area at the Monroe Plant identified in Schedule 9.1.10, and any pre-Closing Environmental Condition discovered in that area.

### 9.1.11.   Non-Compliance Matter.

"Non-Compliance Matter" means an on-going violation of an Environmental Law. The Release (except failure to report such a Release in violation of Environmental Law) or presence of any Hazardous Material in, on or under the soils, land surface or substrata, surface water, ground water, air or any other environmental medium in, or in the vicinity of, the Real Property, or in or on any building (including fixtures, appurtenances or equipment) located in or comprising any part of the Real Property are not considered Non-Compliance Matters. Notwithstanding the foregoing, any

independent violation of Environmental Law may constitute a Non-Compliance Matter. By way of example but not limitation, the following, if present, shall not be considered Non-Compliance Matters: (a) the presence of Hazardous Materials in either active or inactive piping or sewers, including any suggestion that such presence constitutes improper storage or disposal of wastes; and (b) the presence of Hazardous Materials on the roof of any building resulting from air borne emissions over time. By way of further example but not limitation, the following, if present, shall be considered Non-Compliance Matters: (i) the storage of hazardous waste in improperly labeled drums or in any containers for a time that exceeds the applicable RCRA time period.

### 9.1.12. Release.

"Release" means any spill, emission, escape, abandonment of any container or receptacle containing any Hazardous Material, leak, pumping, injection, deposit, disposal, discharge, dispersal, leaching, movement or migration into or through the environment (as defined under CERCLA) of any Hazardous Material, including any exacerbation or aggravation thereof, and the movement or migration, gradual or otherwise, of any Hazardous Material through or in the air, soil, surface water, ground water, or land surface or subsurface strata or formation.

### 9.2.    Environmental Assessments and Compliance Audits.

#### 9.2.1.    Environmental Confidentiality.

GM and PEP Guide entered into the Environmental Confidentiality Agreement, as extended, attached to this Agreement as Exhibit 9.2.1. The Environmental Confidentiality Agreement will expire on the Closing Date, unless otherwise modified or extended by agreement between GM and PEP Guide.

#### 9.2.2.    Pre-Closing Environmental Assessments.

GM's consultants conducted environmental assessments of the Real Property and prepared final environmental assessment reports, including all related environmental sampling and analytical data (the "GM Environmental Assessments"). GM has delivered final copies of all GM Environmental Assessments to Newco and PEP Guide. Schedule 9.2.2A lists the GM Environmental Assessments delivered to Newco and PEP Guide. Under the Environmental Confidentiality Agreement, Newco and PEP Guide conducted their own environmental assessments of the Real Property, and prepared final environmental assessment reports, including all related environmental sampling and analytical data (the "Newco and PEP Guide Environmental Assessments"). Newco and PEP Guide have delivered final copies of all Newco and PEP Guide Environmental Assessments to GM. Schedule 9.2.2B lists the Newco and PEP Guide Environmental Assessments delivered to GM.

#### 9.2.3.    Pre-Closing Environmental Compliance Audits.

GM's consultants conducted an environmental compliance audit of the Business operations at each facility and prepared final compliance audit reports (the "GM Compliance Audit Reports"). GM has delivered final copies of all GM Compliance Audit Reports to Newco and PEP Guide. Schedule 9.2.3A lists the GM Compliance Audit Reports delivered to Newco and PEP Guide. Under the Environmental Confidentiality Agreement, Newco and PEP Guide conducted their own environmental compliance audit of the Business operations and prepared final compliance audit reports (the "Newco and PEP Guide Compliance Audits"). Newco and PEP Guide have delivered final copies of all Newco and PEP Guide Compliance Audits to GM. Schedule 9.2.3B lists the Newco and PEP Guide Compliance Audit Reports delivered to GM.

60

9.3.    GM Remediation and Corrective Action.

9.3.1.  GM Remediation.

GM will address or remediate, in accordance with Sections 9.3.4 (PCBs), 9.3.5 (ACM), and 9.11.3 (Apportionment), the following Environmental Conditions:

(a)    the Environmental Conditions listed on Schedule 9.3.1(a);

(b)    All Environmental Conditions at the Monroe Plant that existed on the Closing Date, but only if: (i) Newco notifies GM in writing of the existence of the Environmental Condition and provides to GM a copy of the environmental assessment report, including environmental sampling and analytical data and a description of the surrounding facts and circumstances, within twelve (12) months after the Closing Date; and (ii) GM is unable to demonstrate that the identified Environmental Condition(s) did not exist on the Closing Date.  If either of these conditions is not satisfied, GM will have no remediation, defense, or indemnification obligations with respect to such Environmental Condition(s).

9.3.2.  Remedial Action Plans.  GM will develop and implement remedial action plans for the Environmental Conditions under Section 9.3.1 (GM Remediation) only if remedial action is: (a) required by any Environmental Law; (b) required by a Governmental Authority under a judicial or administrative order issued under an Environmental Law; (c) reasonably required to prevent an actual and immediate threat to human health or the environment at the Real Property or surrounding property; or (d) the subject of a decision by GM, in its sole discretion, to perform remedial activity after conducting a risk-based evaluation.  Except for situations described in Section 9.3.10 (Modification Based on Newco's Input); 9.11.3 (Apportionment) and 9.11.2 (Newco's Defense and Indemnification Obligations), GM is solely responsible for the costs of developing and implementing a remedial action plan under this Section 9.3.2 (Remedial Action Plans).  Each remedial action plan will include a reasonable implementation schedule with milestone dates.  GM will provide Newco the opportunity to review and comment on any remedial action plan as set forth in Section 9.3.9 (Newco's Review Period).

9.3.3.  Remedial Action Factors.

GM will use the following factors to develop remedial action plans:

(a)    the requirements under then existing Environmental Laws;

(b)    technical feasibility;

(c)    cost of the proposed alternatives;

(d)    the continued industrial use of the Real Property; and

(e)    risk based evaluations, human health and environmental risk based factors, including, but not limited to:  (i) reasonable and relevant exposure pathways consistent with continued industrial use of the Real Property; (ii) typical simulated exposure distributions consistent with the relevant exposure pathways; (iii) fate and transport characteristics; (iv) local geology and hydrogeology; (v) toxicity of the materials in question; and (vi) other relevant factors employed in assessing risks to human health and the environment under generally accepted risk assessment principles and methodologies.

### 9.3.4. PCBs.

The Acquired Assets and the Real Property may contain transformers, capacitors, or other equipment with polychlorinated biphenyl ("PCBs") dielectric fluid or other PCB materials. GM will remediate PCB contamination that exceeds the levels set forth in 40 CFR 761.125(c)(3)(iii) (1996), and that is identified pursuant to Section 9.3.1(a) (GM Remediation). GM will remediate the affected area consistent with the PCB Spill Cleanup Policy set forth at 40 CFR Part 761, Subpart G (1996). GM will also, at its option, repair and retrofill, or replace, any leaking transformer or capacitor, if Newco: (a) provides written notice to GM of the leaking transformer or capacitor within 180 days after the Closing Date; (b) demonstrates that the PCB transformer or PCB capacitor was leaking on the Closing Date; and (c) provides to GM all related environmental sampling and analytical data associated with the PCB transformer or PCB capacitor.

### 9.3.5. ACM.

The Acquired Assets and the buildings on the Real Property may contain asbestos-containing material (collectively "ACM"). GM has conducted asbestos surveys in accordance with generally accepted engineering standards. The surveys, to the extent practicable, identified any exposed, damaged and friable ACM in the Acquired Assets and the Buildings on the Real Property. GM has provided written reports of its ACM surveys (the "ACM Reports") to Newco and PEP Guide before the Closing Date. GM, at its sole cost, will repair, encapsulate or replace the exposed, damaged and friable ACM identified in the ACM Reports.

### 9.3.6. GM Compliance Action Plans.

GM will develop and implement compliance action plans to correct the following Non-Compliance Matters:

(a)     the Non-Compliance Matters listed on Schedule 9.3.6;

(b)     Non-Compliance Matters that existed on the Closing Date, but only if: (i) Newco notifies GM in writing of the Non-Compliance Matter and the surrounding facts and circumstances within 12 months after the Closing Date; and (ii) either 1) Newco notifies GM of the Non-Compliance Matter within six months after the Closing Date and GM is unable to demonstrate that the Non-Compliance Matter(s) did not exist on the Closing Date; or 2) Newco notifies GM of the Non-Compliance Matter more than six months, but within 12 months after the Closing Date and Newco is able to demonstrate that the Non-Compliance Matter existed on the Closing Date. If either of these conditions is not satisfied, GM will have no remediation, defense, or indemnification obligations with respect to such Non-Compliance Matter(s).

### 9.3.7. No Other Obligation.

Except as expressly described in this Article 9, GM has no remediation, defense or indemnification obligations for any other Environmental Conditions or Non-Compliance Matters.

### 9.3.8. Non-Interference.

In implementing any remedial action or compliance action required under this Article 9, and subject to Sections 9.3.9 (Newco's Review Period) and 9.3.10 (Modification Based on Newco's Input), or in exercising any right of access, GM will use its best efforts to avoid any unreasonable interference

62

with Newco's operation of the Business or use of the Acquired Assets or the Real Property, unless otherwise required by a Governmental Authority.

### 9.3.9. Newco's Review Period.

GM will provide Newco with a copy of any proposed remedial action plan or compliance action plan at least 30 days before the earlier of: (a) the scheduled start date for activities under the plan; or (b) the date GM is required, under Environmental Law, to submit the plan to a Governmental Authority. Newco is entitled to review or comment on any part of the proposed plan, including without limitation, any institutional control or physical restriction proposed in the plan. Newco will timely notify GM of any future uses of the Real Property proposed by Newco that may impact GM's proposed remedial action plan or compliance action plan. Newco will complete its review and provide its comments to GM promptly, but in no event more than 15 business days after Newco's receipt of any plan, unless required sooner by a Governmental Authority.

### 9.3.10. Modification Based on Newco's Input.

GM must modify or amend a remedial action plan or compliance action plan (unless otherwise required by a Governmental Authority) if Newco can demonstrate that the planned action, including without limitation, any proposed institutional control or physical restriction: (a) would unreasonably interfere with or unreasonably impair the ability of Newco to operate the Business or use the Acquired Assets or the Real Property as currently used or identified by Newco during the review period under Section 9.3.9 (Newco's Review Period) as a future use budgeted for implementation by Newco within Newco's current fiscal year or following fiscal year if, at the time the plan is submitted to Newco, Newco has already prepared and finalized a budget for the following fiscal year; (b) does not meet the remediation requirements of this Article 9; (c) will not remedy a Non-Compliance Matter under Environmental Laws; (d) would fail to correct an actual and immediate threat to human health or the environment; or (e) can be modified, in whole or in part, so that it can be completed in a shorter period of time at a similar cost to GM. If GM modifies a remedial action plan or compliance action plan at Newco's request in order to avoid interference with a proposed future use by Newco, and such proposed future use is not implemented by Newco within the applicable budgeted time period, then Newco shall reimburse GM for any and all costs and expenses incurred by GM in modifying the plan or as a result of the plan modification.

### 9.3.11. Implementation.

After review of proposed changes and comments, in accordance with this Section 9.3 (GM Remediation and Corrective Action), GM will implement the remedial action plans and compliance action plans: (a) in accordance with the time schedule; (b) in a good, safe, workmanlike manner; (c) without placing any physical restrictions on Newco's actual industrial use of the Acquired Assets and Real Property, other than reasonable use restrictions or institutional controls required as part of a remedial action or compliance action; and (d) in a manner that does not unreasonably interfere with Newco's ability to operate the Business, use the Acquired Assets, or use the Real Property, unless otherwise required by a Governmental Authority.

### 9.3.12. Clean Closure.

(a)    Monroe Plant. Once an Environmental Condition at the Monroe Plant is Clean Closed, GM will have no further remediation obligations to Newco. In addition, GM shall have no further defense or indemnification obligations to Newco with respect to actual claims brought by or on behalf of a Governmental Authority (including "citizen suits") arising from such

Environmental Condition. After GM completes Clean Closure of an Environmental Condition at the Monroe Plant, Newco will be solely responsible and liable for claims asserted by a Governmental Authority with respect to such Environmental Condition, and Newco will defend and indemnify GM in accordance with Section 9.11.2 (Newco's Defense and Indemnification Obligations). Clean Closure will not affect GM's indemnity obligations with respect to private third party claims for personal injury or property damage caused by the underlying Environmental Condition or GM's remediation activities.

(b)     Anderson Plant. Once an Environmental Condition at the Anderson Plant is Clean Closed, Newco shall not degrade or disrupt the Clean Closed area in a manner that affects the Clean Closed status. Clean Closure of an Environmental Condition at the Anderson Plant, however, will not affect GM's indemnity obligations with respect to such Environmental Condition.

### 9.3.13. Newco's Obligations.

Newco will cooperate and assist GM in implementing remedial action and compliance action plans in accordance with Section 9.10.3 (Newco's Obligations in Connection with GM's Remedial Actions).

### 9.3.14 Monroe Inspection

The Louisiana Department of Environmental Quality ("LDEQ") conducted an inspection of the Monroe Plant on September 8, 9, 1998 (the "September Inspection"). If the LDEQ issues an inspection report for the September Inspection within 12 months of the Closing Date, then any Non-Compliance Matters identified in the inspection report will be included in Schedule 9.3.6, but only if Newco meets the other requirements set forth in Section 9.3.6(b). If the LDEQ issues an inspection report for the September Inspection more than 12 months after the Closing Date, then GM will work with LDEQ to resolve any notices of violation identified in the inspection report (including payment of fines), but only if (a) the notice of violation is based solely and exclusively on the September Inspection and not on any subsequent or follow-up inspection after the Closing Date, and (b) the notice of violation relates only to activity or operations of the plant up to, and including the dates of the September Inspection. Any notice of violation not meeting these criteria will be dealt with as otherwise provided under this Article 9. Notwithstanding the foregoing, this Section 9.3.14 does not, directly or indirectly, extend, toll, or nullify the notice period in Section 9.3.6(b).

### 9.4.     Access.

#### 9.4.1.   GM Access.

After the Closing Date and upon reasonable notice to Newco, GM and its representatives may enter the Real Property and have access to the Acquired Assets to:

(a)     conduct remedial action or compliance action under Section 9.3 (GM Remediation and Corrective Action);

(b)     perform its obligations or exercise its rights under this Article 9;

(c)     investigate or remediate an environmental matter pertaining to an adjacent GM facility;

64

(d)      install, maintain and use any environmental monitoring or remediation equipment required by a remedial action or compliance action plan or a government agency;

(e)      investigate a claim for indemnification or remediate an underlying Environmental Condition, but only if GM has ongoing remedial, defense or indemnity obligations to Newco under this Article 9; and

(f)      inspect the Acquired Assets and Real Property for Newco's performance of its obligations under this Article 9.

(g)      conduct periodic environmental audits and inspections of conditions, practices, equipment and procedures in connection with Newco's operations of the Anderson Plant during the term of the Anderson, Indiana Lease. Such audits and inspections shall be at GM's cost, utilizing GM employees or consultants, and shall be conducted at times and in a manner so as to avoid unreasonable interference with Newco's ongoing operations at the Anderson Plant. All findings, conclusions and information created during such audits and inspections shall be treated as confidential pursuant to Section 9.12 (Confidentiality).

### 9.4.2.  Access Limitations.

GM's access under this Section 9.4 (Access) is subject to:  (a) Newco's reasonable requirements related to emergency conditions; and (b) Newco's reasonable health, safety or environmental requirements.

### 9.5.  Real Property - Use Restrictions.

### 9.5.1.  Generator-Only Status.

Newco covenants that, except for the existing GM RCRA permit at the Anderson Plant, Newco will not allow any of the Real Property to become a treatment, storage or disposal facility as that term is defined in RCRA and state RCRA equivalent statute, and Newco will maintain "generator-only" status under RCRA and state RCRA equivalent statute.

### 9.5.2.  Transfers.

Except for any transfer by Newco to GM, any agreement for transfer of any interest in the Real Property through sale, lease, lease assignment, license, sublease, easement or otherwise, will (a) incorporate the rights and obligations of Newco and GM under this Article 9 and impose the obligations on any subsequent user, occupant or transferee of the Real Property; (b) restrict use of the Real Property to industrial (including warehouse) use consistent with any deed restrictions that may be placed on the Real Property; (c) provide that deed restrictions may be eliminated as an encumbrance upon the Real Property only with the written consent of GM, and (d) provide that the use restrictions are directly enforceable by GM against Newco and any subsequent user, occupant or transferee of the Real Property.  Notwithstanding the foregoing: (i) any sublease or lease assignment relating to the Anderson Plant will be subject to, and in strict accordance with the terms of this Article 9; and (ii) any deed restriction or other encumbrance placed on the Monroe Plant as a result of the circumstances contemplated by this transaction shall provide that such restriction or encumbrance may be released when warranted by the facts and circumstances, and under reasonable conditions to be negotiated by GM and Newco at the time such release is sought.  Newco shall be responsible for any costs associated with the removal of any restriction or encumbrance, and GM shall not bear any such costs.

### 9.5.3. Removal of Improvements.

With respect to any building, structure or other improvement which: (a) is located above an Environmental Condition for which GM has some responsibility under this Article 9; and (b) was identified as a barrier, institutional control, or engineering control of such Environmental Condition in a Remedial Action Plan prepared by GM, and subject to review and comment by Newco under Section 9.3.9 (Newco's Review Period), if Newco demolishes, removes or otherwise renders less effective as a barrier, institutional control, or engineering control such a building, structure or other improvement, then Newco will, at its sole cost, repair or replace the building, structure or other improvement with a barrier or other institutional control or engineering control with protective capabilities equivalent to those of the original building, structure or other improvement. If Newco fails to repair or replace the building, structure or other improvement, GM shall be relieved of any further remediation, defense or indemnity obligation with respect to such Environmental Condition. Newco will exercise due care during demolition, removal, and construction so as not to exacerbate, aggravate, contribute or add to any Environmental Condition existing as of the Closing Date.

### 9.5.4. Specific Restrictions.

Newco will not use Chlorinated Solvents in the operation of the Business, use of the Acquired Assets, or use of the Real Property, except for use of the materials (or their chemical equivalent) set forth in Schedule 9.5.4.

### 9.5.5. Notice Filing.

After reasonable notice to Newco, and subject to Section 9.3.10 (Modification Based on Newco's Input), GM may file any notice or other instrument: (a) required by any current or future Environmental Law for any remedial or compliance action by GM under this Article 9, (b) necessary to implement any deed restriction or other institutional control authorized to be imposed under this Article 9; or (c) necessary to prohibit the demolition or removal of any Building, structure or other improvement located on the Real Property. An instrument filed under this Section 9.5.5 (Notice Filing) must permit Newco to remove the building, structure or other improvement in accordance with Section 9.5.3 (Removal of Improvements).

## 9.6. Transition - Permits/Environmental Committee.

### 9.6.1. Environmental Permits.

As of the date of this Agreement, GM holds and is in material compliance with the permits, licenses, and authorizations listed in Schedule 9.6.1 (the "Environmental Permits"). GM represents and warrants that as of the date of this Agreement, no action is pending to revoke any of the Environmental Permits. GM has received no written notice from a Governmental Authority that such Governmental Authority intends to deny, or require GM to modify substantially, any of the Environmental Permits.

### 9.6.2. Transfer.

At Closing, GM will transfer to Newco the Environmental Permits listed on Schedule 9.6.1A - permits which can be transferred to Newco as a matter of law. Schedule 9.6.1B lists Environmental Permits which cannot be transferred to Newco as a matter of law or which cannot be transferred before Closing. Schedule 9.6.1C lists Environmental Permits that will not be transferred to Newco by GM, and will remain with GM as permittee, or will be closed by GM. GM will cooperate with

Newco to transfer to Newco or to obtain reissuance to Newco the Environmental Permits listed on Schedule 9.6.1B. However, Newco will be solely responsible for obtaining or effecting the transfer or reissuance to Newco of all Environmental Permits listed on Schedule 9.6.1B. GM and Newco will cooperate with one another to obtain any consents, reviews or approvals necessary to transfer, reissue or obtain the Environmental Permits. Each Party shall be responsible for its own costs and expenses incurred in obtaining such consents, reviews and approvals.

### 9.6.3. Environmental Committee.

Newco and GM will establish an Environmental Committee to facilitate environmental transition issues. The Environmental Committee will:

(a)     consist of an equal number of representatives from each Party;

(b)     meet from time to time as necessary under prevailing circumstances, or at the request of either Party, at a mutually agreed location;

(c)     coordinate the scheduling and implementation of remedial action plans and compliance action plans under Section 9.3 (GM Remediation and Corrective Action);

(d)     coordinate and facilitate the transfer of Environmental Permits;

(e)     coordinate and facilitate the separation or transfer of utility services;

(f)     coordinate the scheduling of transition issues involving utilities, services, or wastes;

(g)     coordinate and consult on the idling and decommissioning of equipment at the Anderson Plant;

(h)     address other scheduling or coordination issues arising under this Article 9.

Each Party will designate from time to time, by written notice to the other, a contact person who will be primarily responsible for coordinating and managing that Party's participation on the Environmental Committee. The Environmental Committee does not have the authority to (i) act as a dispute resolution committee, or (ii) modify or amend the terms of this Agreement.

### 9.7.    Waste Management.

### 9.7.1. Hazardous Waste Removal.

GM will properly dispose of any hazardous waste, as defined under RCRA or state RCRA equivalent statutes generated by GM at the Real Property and accumulated in waste storage containers, as of the Closing Date. GM will use best efforts to remove the hazardous waste containers from the Real Property before the Closing Date. If GM cannot remove the hazardous waste containers before the Closing Date, GM will label, segregate, and secure the hazardous waste containers. Newco must not disturb the containers nor add any materials to the segregated containers or interfere with GM's disposal activities. GM will remove and properly dispose of (under its own generator identification number) the hazardous waste containers by the earliest of the following time frames: (a) as soon as reasonably practicable after the Closing Date, (b) 45 days after the Closing Date, or (c) the period required under Environmental Laws to maintain "generator-only" status. Newco will remove and properly dispose of (under its own generator identification number)

any wastes, including but not limited to hazardous wastes, resulting from PEP Guide's and Newco's Pre-Closing investigation(s) of the Real Property and Acquired Assets.

### 9.7.2. Post-Closing Waste Management.

Newco will obtain new RCRA and TSCA generator identification numbers for hazardous waste and PCBs. Newco is not allowed to use any generator identification numbers issued to GM for the Real Property. Newco will be responsible for all wastes, including but not limited to hazardous wastes, generated or accumulated by Newco after the Closing at the Real Property.

### 9.7.3. No Arrangement for Disposal.

GM, Newco and PEP Guide acknowledge that the transactions contemplated by this Agreement are not intended, nor will be deemed to be, an arrangement for treatment, storage or disposal of any of the Acquired Assets or any substances or materials contained on the Real Property, and Newco and PEP Guide will not assert any claim or cause of action against GM based on the transactions hereunder.

### 9.8. Environmental Management System.

Within 18 months of the Closing Date, Newco must develop and implement an environmental management system ("EMS") for the operation of the Business. Newco shall implement this EMS so long as GM has any outstanding indemnity obligation under this Article 9. At a minimum, the EMS must have the following elements: a written environmental policy; analysis of the environmental impact of the business; environmental objectives; detailed environmental operations and procedures; clear lines of responsibility and accountability for supervision of environmental matters; worker training; a program for regular auditing (at least every two years) of compliance with Environmental Laws, using generally accepted protocols; and management review of overall environmental performance.

### 9.9. GM's Representations and Warranties.

In addition to GM's representations and warranties in Section 9.6.1 (Environmental Permits), to GM's Knowledge, GM represents and warrants that, as of the date of this Agreement:

### 9.9.1. No Actions.

Except as set forth on Schedule 9.9.1, there is no civil, criminal or administrative action, suit, demand, claim, hearing, notice of violation, investigation, proceeding, notice or demand letter, existing or threatened, relating to the Business, the Acquired Assets or the Real Property under any Environmental Law which, as of the Closing Date, has not been cured, resolved or paid, as the case may be.

### 9.9.2. No Notices.

Except as set forth on Schedule 9.9.2, GM has not received from any Governmental Authority any written request for information, notice of claim, demand or notification that GM is or may be potentially responsible for the investigation or cleanup of any Release or any threatened Release at any of the Real Property.

68

### 9.9.3.  No Listing.

Except as set forth on Schedule 9.9.3, none of the Real Property is listed or proposed for listing on the National Priority List promulgated pursuant to CERCLA or any similar list of sites of environmental contamination under state CERCLA equivalent statutes.

### 9.9.4.  No Liens.

Except as set forth on Schedule 9.9.4, no Lien has attached to the Acquired Assets or the Real Property under any Environmental Law which has not been removed or discharged of record.

### 9.9.5.  No Chlorinated Solvent Use.

Except as set forth in Schedule 9.5.4, GM currently neither uses nor stores Chlorinated Solvents at the Real Property.

### 9.9.6  Privileged Documents

Except as otherwise disclosed in the GM Environmental Reports, or in other information obtained by Newco before Closing, there are no material unresolved environmental matters described in the privileged documents that GM will remove from the Anderson and Monroe plants as Excluded Assets pursuant to Section 2.3.11 of this Agreement.

### 9.10.  Newco's Covenants, Obligations and Acknowledgments.

### 9.10.1.  Compliance with Environmental Law.

Except as specifically set forth in this Article 9, Newco, after the Closing Date, at its own cost and expense, covenants to comply with all Environmental Laws and comply with all permits, approvals, or authorizations relating to the operation of the Business, the use of the Acquired Assets, and the use of the Real Property.

### 9.10.2.  Non-Compliance Notice.

Notwithstanding any other provision of this Article 9, Newco will give GM notice in writing of the discovery of any Non-Compliance Matter which Newco believes existed on the Closing Date and the facts, circumstances and all available environmental sampling and analytical data associated with the Non-Compliance Matter within five business days after Newco's discovery.

### 9.10.3.  Newco's Obligations in Connection with GM's Remedial Actions.

Newco will:

(a)     cooperate with GM and its representatives to assist GM in implementing remedial actions or compliance actions in accordance with Section 9.3.11 (Implementation), including, without limitation, assisting GM in obtaining any required governmental approvals, consents, authorizations, waivers, or permits;

(b)     consent to the imposition of institutional controls and engineering controls such as caps, impermeable barriers or any existing Building or other existing structure on the Real Property

in order to assist GM in obtaining Clean Closure of Environmental Conditions identified in Section 9.3.1 (GM Remediation), provided that such controls are consistent with the current industrial use of the Real Property, and are not required to be modified or amended pursuant to Section 9.3.10 (Modification Based on Newco's Input);

(c)    take other actions that are reasonably necessary and appropriate to allow GM to implement any remedial action or compliance action plan, including, without limitation, restricting public access to the Real Property and maintaining equipment or material installed by GM in connection with a remedial action plan or compliance action plan;

(d)    exercise due care so as not to adversely affect the installation, operation, or maintenance of any action, measure or remedy existing or taken at the Real Property before the Closing Date or later under any remedial action or compliance action plan;

(e)    provide GM access to services, including potable water, electric and telephone utilities, security and wastewater treatment or conveyance facilities, in connection with GM's post-closing activities on the Real Property. GM will pay the costs for the services it uses, or reimburse Newco upon receipt of a detailed invoice, as appropriate under the circumstances;

(f)    perform the Environmental Management activities in accordance with Section 9.8 (Environmental Management System); and

(g)    use its best efforts to discontinue the Anderson Plating Operations as soon as practicable, but in no event later than December 31, 1999, and shall refrain from conducting any further plating operations during the remainder of the term of the Anderson, Indiana Lease. For purposes of this Section 9.10.3(g), "best efforts" shall mean fulfilling outstanding orders for part numbers set forth on Schedule 9.10.3 as quickly as practicable, and entering into no further contracts for other parts which would require the continuation of the Anderson Plating Operations.

### 9.10.4. Equipment Decommissioning – Anderson Plant.

(a)    Newco will be responsible for decommissioning and removing any equipment at the Anderson Plant that Newco brings into the Anderson Plant after the Closing Date. Newco will also be responsible for decommissioning any equipment it moves or removes from the Anderson Plant, including equipment it intends to dispose of through scrap sale or otherwise. Decommissioning will be up to the point of connection to building utilities. As to any equipment that Newco moves within or removes from the Anderson Plant, Newco shall ensure that the equipment area is left in a condition that is safe for workers and in conformance with plant safety procedures and housekeeping practices. Newco will not remove any associated parts from any equipment that it abandons.

(b)    Newco will notify GM in writing of its intent to abandon any equipment in place at least 30 days prior to abandonment. GM shall provide to Newco any comments GM may have with respect to the proposed abandonment within 15 business days after receipt of Newco's notice. Any equipment to be abandoned in place will be idled by Newco in accordance with a mutually agreed upon tag-out/lock-out/sign-off procedure. Except as specifically provided in this Section 9.10.4 (Equipment Decommissioning – Anderson Plant), Newco will have no other decommissioning responsibility for the buildings, fixtures, appurtenances or equipment at the Anderson Plant.

### 9.10.5. Equipment Decommissioning – Monroe Plant.

Newco shall be responsible for decommissioning equipment at the Monroe Plant. Except as specifically provided in Sections 9.3.4 (PCBs) and 9.3.5 (ACM), or otherwise related to GM's remediation obligations for Environmental Conditions, GM will have no responsibility for the buildings, fixtures, appurtenances or equipment at the Monroe Plant.

### 9.10.6. Disclosure and Recordation.

Newco acknowledges that the materials, records, reports and documents provided by GM as of the Closing Date comply in form and substance with the disclosure requirements of state Environmental Law disclosure requirements. Newco will record any information or a notice under applicable state Environmental Law disclosure requirements, provided, however, that Newco will not record any information or notice without GM's consent, which will not be unreasonably withheld.

### 9.10.7. Releases and Hazardous Materials.

Newco acknowledges that before the Closing Date: (a) there may have been Releases on the Real Property; (b) GM and others may have used, generated, treated, stored, recycled or disposed of any Hazardous Material on the Real Property.

### 9.10.8 Wastewater Treatment for Anderson Plating Operations

Newco will operate and maintain the wastewater treatment plant, located across the street from the Anderson Facility to process wastewater from the Anderson Plating Operations, in accordance with all applicable Environmental Laws, and will be responsible for all fines, penalties and costs arising from its failure to do so, except as otherwise provided in Sections 9.3.2 and 9.3.6 hereof. No later than 90 days after Newco discontinues the Anderson Plating Operations, Newco will surrender the wastewater treatment facility to GM for decommissioning pursuant to Section 9.10.4. During this 90 day period, GM will have access to the wastewater treatment plant purusant to Section 9.4. Before such surrender, Newco will (i) treat all contaminated wastewater from the Anderson Plating Operations, (ii) remove all free liquids and residual excess treatment chemicals from the wastewater treatment plant, (iii) dispose of any accumulated wastewater treatment plant sludge, to the extent that such sludge can be removed by normal means using existing equipment at the wastewater treatment plant, and (iv) secure all wastewater treatment equipment in accordance with a mutually agreed upon tag-out/lock-out/sign-off procedure consistent with Section 9.10.4.

### 9.10.9. Newco's Additional Acknowledgments.

Newco acknowledges that except as set forth in Sections 9.6.1 (Environmental Permits) and 9.9 (GM's Representations and Warranties), (a) GM has not made any representations or warranties to PEP Guide and Newco with respect to environmental matters; (b) PEP Guide and Newco have examined and investigated the physical nature and environmental condition of the Real Property; and (c) other than as set forth in Newco and PEP Guide's Compliance Audits or PEP Guide and Newco's Environmental Assessments, Newco and PEP Guide have not discovered any facts which are inconsistent with or contrary to GM's representations and warranties in Sections 9.6.1 (Environmental Permits) and 9.9 (GM's Representations and Warranties).

9.11.    Defense and Indemnification Obligations.

     9.11.1.  GM's Defense and Indemnification Obligations.

Subject to Sections 9.3.12 (Clean Closure) and 9.11.3 (Apportionment) GM will indemnify and defend Newco Indemnitees from and against any and all Adverse Consequences to which they may be subjected as a result of a claim based upon any of the following:

    (a)    Monroe Plant

        (1)    Any claim by or on behalf of a Governmental Authority (including "citizen suits") seeking compliance with an Environmental Law or recovery of fines, penalties or other statutory sanctions or impositions, if the claim (i) pertains to an Environmental Condition (other than the Monroe Press Pit Area) or Non-Compliance Matter for which GM has responsibility under Section 9.3 (GM Remediation and Corrective Action) that has not been remedied or eliminated, and (ii) the claim is asserted within 36 months after the Closing Date;

        (2)    Environmental Conditions identified from the Monroe Press Pit Area, if the claim is asserted on or before the tenth anniversary of the Closing Date;

        (3)    Any off-site treatment, off-site transportation, off-site storage or off-site disposal of any Hazardous Material generated by GM at the Monroe Plant before the Closing Date;

        (4)    Any personal injury or property damage to a third party (including any Newco employee) or to Newco's property, and any claim by a Governmental Authority for violations of Environmental Laws, but in any such case, only to the extent caused by GM's acts or omissions during its Post-Closing access to the Acquired Assets or the Real Property pursuant to Section 9.4.1 (GM Access), and only if the claim is asserted within 36 months after such act or omission; and

        (5)    Any private third party claim for personal injury or property damage to the extent that it is alleged that such injury or property damage was caused by Hazardous Materials existing at Closing at the Monroe Plant if the claim is asserted within 84 months after the Closing Date. GM will indemnify and defend Newco under this subSection (5) until GM can demonstrate that Newco is responsible for at least a portion of the claim. At such time, Newco will assume its own defense and GM's indemnity obligation with respect to the specific claim will end.

    (b)    Anderson Plant

        (1)    Any Environmental Condition associated with the Anderson Plant, unless GM can demonstrate that the Environmental Condition was caused by Newco during the Anderson, Indiana Lease Term as such phrase is defined in Section 1.1 of the Anderson Lease;

        (2)    Any claim arising from the presence of any Hazardous Material(s) in or on any building (including fixtures, appurtenances or equipment) located in or comprising any part of the Anderson Plant, unless GM can demonstrate that such presence of Hazardous Materials was caused by Newco during the Anderson, Indiana Lease term other than the presence of Hazardous Materials in or on equipment abandoned in compliance with Section 9.10.4 (Equipment Decommissioning -- Anderson Plant).

(3)     Any off-site treatment, off-site transportation, off-site storage or off-site disposal of any Hazardous Material generated by GM at the Anderson Plant before the Closing Date; and

(4)     Any personal injury or property damage to a third party (including any Newco employee) or to Newco's property to the extent caused by GM's acts or omissions during its Post-Closing access to the Acquired Assets or the Leased Property pursuant to Section 9.4.1 (GM Access);

### 9.11.2. Newco's Defense and Indemnification Obligations.

Subject to Section 9.11.3 (Apportionment), Newco will indemnify, defend and hold harmless GM Indemnitees from and against any and all Adverse Consequences to which they may be subjected as a result of a claim based upon:

(a)     Any Release, Non-Compliance Matter, or Environmental Condition relating to the Real Property, the Business, or the Acquired Assets for which GM does not have responsibility under Section 9.3 (GM Remediation and Corrective Action), if the claim is brought within: (i) 36 months after the Closing Date for the Monroe Plant; and (ii) within 36 months after Newco vacates the Anderson Plant for the Anderson Plant;

(b)     Any Release, Non-Compliance Matter or Environmental Condition existing before the Closing Date to the extent caused by, contributed to, or aggravated by Newco, if the claim is brought within 36 months after the Closing Date;

(c)     Any offsite treatment, offsite transportation, offsite storage, or offsite disposal of any Hazardous Material generated by Newco;

(d)     Claims asserted by or on behalf of a Governmental Authority (including "citizen suits") with respect to any Environmental Condition at the Monroe Plant that has been Clean Closed in accordance with Section 9.3.12 (Clean Closure).

(e)     The presence of PCBs or ACM in or on the Real Property except to the extent that GM has explicitly provided Newco an indemnity under Section 9.11.1 (GM's Defense and Indemnification Obligations).

### 9.11.3. Apportionment.

Newco will be responsible for any additional costs or liability to the extent attributable to the intermingling of a Release on the Real Property with an Environmental Condition for which GM is responsible, but only if the intermingling Release: (a) was caused by Newco; or (b) occurred after the Closing Date and was not caused by GM's activities on the Real Property. Each Party will be responsible for any additional Adverse Consequences caused by its own post closing actions or omissions which contribute to or aggravate any Environmental Condition or Non-Compliance Matter for which the other Party is responsible under Sections 9.11.1 (GM's Defense and Indemnification Obligations) or 9.11.2 (Newco's Defense and Indemnification Obligations). Liability will be determined by the Parties as soon as reasonably practicable based upon each Party's relative contribution to the Environmental Condition or Non-Compliance Matter.

### 9.11.4. Third-Party Claims.

Neither Newco nor GM will initiate any action with any third party, including any Governmental Authority, which could reasonably be expected to lead to a claim against the other Party unless the action is a disclosure in accordance with Section 9.12.3 (Disclosures). Upon a disclosure under Section 9.12.3 (Disclosures), each Party is entitled to pursue any actions reasonably necessary in connection with the claim. If either Party, in performance of this Article 9, remediates or incurs costs or damages from a condition for which a third party may be responsible or liable, the Parties will cooperate in pursuing any claim for recovery of costs and damages against the responsible third party. Cooperation includes but is not limited to a Party acting as the real party in interest and assigning any rights or causes of action against any third party relating to a claim or the proceeds of a claim to the other Party.

## 9.12.   Confidentiality.

### 9.12.1. Environmental Confidentiality Agreement.

This Agreement supersedes the terms and conditions of the Environmental Confidentiality Agreement except for any accrued claims, including but not limited to, accrued claims against third parties who have signed the Environmental Confidentiality Agreement acknowledgment.

### 9.12.2. Confidentiality Obligations.

Except as provided in Section 9.12.3 (Disclosures), no Party will disclose to any third party the following:

   (a)    environmental information, including reports, provided under the Environmental Confidentiality Agreement or this Agreement;

   (b)    information concerning remediation or compliance actions under this Article 9,

   (c)    information concerning investigations, inspections, or audits performed under this Article 9,

### 9.12.3. Disclosures.

Subject to Section 9.12.4 (Notification) any Party may:

   (a)    comply with any Environmental Law that requires disclosure of information about the environmental condition of the Business, the Real Property, or the Acquired Assets;

   (b)    comply with any requirements under applicable laws, regulations, ordinances, rules, orders, codes or permits, to disclose information about the environmental condition of the Business, the Real Property or the Acquired Assets;

   (c)    respond to a Governmental Authority's legally authorized request for information during an on-site inspection of the Acquired Assets or the Real Property but any request for supplementary information will be referred to the Party with primary responsibility under this Article 9;

(d)     mitigate a penalty if the penalty is not subject to any indemnification from under this Article 9; and

(e)     disclose information that is: (i) necessary to operate the Business; (ii) necessary to perform its obligations or exercise its rights under this Agreement; or (iii) necessary for a good faith attempt to obtain debt or equity financing related to the Acquired Assets or the Real Property; provided that before disclosure, the disclosing Party will require the third party to sign an acknowledgment and covenant, enforceable by both GM and Newco, prohibiting the third party from making any further disclosure of the information to any other person or entity without the other Party's written consent.

### 9.12.4. Notification.

GM and Newco will notify the other Party of any disclosure the disclosing Party intends to make under Section 9.12.3 (Disclosures), but only to the extent the disclosure relates to matters for which the other Party has, or may have, primary responsibility under this Article 9. The Party receiving the notification, will have a reasonable time, under the circumstances, to review the intended disclosure. The disclosing Party will consider requests by the other Party to modify the disclosure and will use reasonable efforts to incorporate the other Party's comments in any disclosure and to avoid unnecessarily disclosing information the other Party considers confidential. If either Party receives a demand, request or order for disclosure from a Governmental Authority or a court for any environmental information related to the other Party's obligations under this Article 9, the receiving Party will (a) promptly provide the other Party with a copy of the demand, request or order and, (b) to the extent allowed by law, afford the other Party with the opportunity to contest the disclosure. Both Parties will reasonably cooperate with one another to contest the demand, request or order.

### 9.12.5. Public Information.

This Section 9.12 (Confidentiality) will not apply to any information that already has been disclosed and is in the public domain unless the disclosure is in violation of this Article 9, or any acknowledgment and covenant required under Section 9.12.3 (Disclosures).

### 9.13.   Dispute Resolution.

In the event of any dispute between GM and Newco relating to this Article 9, the Parties shall first submit the dispute to the Director of GM Worldwide Facilities Group and to Newco's designee, who shall be at the level of plant manager or higher, or their respective designees. If, within 30 days of such submission, the Parties are unable to resolve the dispute, the Parties shall refer it to a nationally-recognized environmental consultant chosen by mutual agreement. The environmental consultant shall act as a mediator of the dispute, and the Parties shall use their best efforts to resolve the dispute within 60 days after referral to the environmental consultant. If the environmental consultant is unable to mediate a resolution of the dispute, then it shall be submitted to the three-member dispute resolution panel established in Section 12.5 of this Agreement, and the Parties shall attempt to resolve the dispute as provided therein. All other terms, conditions and provisions of Section 12.5 shall apply to the resolution of disputes arising under this Article 9.

9.14.    Miscellaneous.

### 9.14.1. Designation of Representatives.

Newco and GM will designate, by written notice to the other, a contact person who will be primarily responsible for coordinating and managing that Party's activities and responsibilities under this Article 9.

### 9.14.2. Exclusivity.

Except as provided in other Articles of this Agreement, (a) this Article 9 will exclusively govern all matters related to current and future Environmental Laws and the environmental condition and compliance status of the Acquired Assets, the Real Property and the Business; (b) the rights and obligations provided in this Article 9 contain the exclusive remedies of the Parties with respect to environmental matters and will be in lieu of, and not in addition to, all other remedies which may exist at law, in equity or under any other contract or agreement and the Parties may not assert any claim with respect to any environmental matter against the other which is not authorized in this Article 9; (c) the Parties hereby expressly waive any and all remedies or causes of action with respect to environmental matters that each might otherwise have against the other, but that are not authorized under this Article 9; and (d) all of the representations, warranties, covenants, agreements and indemnities set forth in this Agreement, or any other agreement between the Parties with respect to the transactions contemplated by this Agreement, other than those specifically set forth in this Article 9 will be deemed to exclude all matters relating to the environmental condition of the Acquired Assets and the Real Property or compliance of the Acquired Assets, the Real Property and the Business with current and future Environmental Laws.  The Parties reserve the right to seek injunctive or other relief to the extent available under the law for any breach of this Article 9 and any damage or cost recovery in respect of the breach in any dispute resolution or other proceeding regarding any breach under Section 9.13 (Dispute Resolution) or otherwise will, except as otherwise set forth in Section 9.13 (Dispute Resolution), be limited to the Adverse Consequences caused by the breach.

### 9.14.3. Covenant Not to Sue.

Except for breaches of this Article 9 by the other Party, and except for actions by GM against Newco based on common law or statutory contribution or joint-tortfeasor principles in furtherance of Section 9.11.1(a)(5), or actions by Newco against GM based on common law or statutory contribution or joint tortfeasor principles after the expiration of the GM indemnity set forth in Section 9.11.1(a)(5), each of GM and Newco (and PEP Guide) covenants not to sue the other Party for any Environmental Matter relating to the Business  (a) for which the other Party has no defense or indemnity obligation under this Article 9; or (b) for which the other Party's defense and indemnification obligations under this Article 9 have expired under contract (including this Agreement), current or future Environmental Laws, other laws, or the common law or in equity. In addition, except for matters reserved under Section 9.3.12 (Clean Closure), Newco covenants not to sue GM for any Environmental Matter which has been Clean Closed under Section 9.3.12 (Clean Closure).  If a claim has been asserted before the expiration of an applicable time period, the other Party's obligation to defend and indemnify will continue for that claim.  Nothing in this Article 9, will affect the Parties' rights and causes of action arising under Section 14.3 (Assignment).