**EXHIBIT B-4**

76

### 9.14.4. Reporting.

Except as provided in Section 9.12 (Confidentiality), Newco will submit all required reports to governmental agencies for any environmental matter for which Newco has primary responsibility under this Article 9. Except as provided in Section 9.12 (Confidentiality), GM will submit all required reports to governmental agencies for environmental matters for which GM has primary responsibility under this Article 9. The Parties will cooperate reasonably to prepare and submit the reports. Notwithstanding Section 9.12 (Confidentiality), if Newco is required by Environmental Law to submit a report dealing solely with the operation of the Business before the Closing Date, GM will, at its sole cost, prepare and submit the report. Subject to Section 9.12 (Confidentiality), Newco will, at its sole cost, be responsible for all reports required to operate the Business after the Closing Date. If current or future Environmental Laws require reports which cover a time period that includes some time both before and after the Closing Date, the Parties will cooperate reasonably to prepare and submit a joint report, unless Environmental Laws allow separate reporting for pre- and post-Closing periods. Where a joint report is required or where both Parties are required to submit reports, each Party will provide the other Party the review and comment under Section 9.12.4 (Notification).

### 9.14.5. Notices.

Notices required under this Article 9 will be considered given when provided in accordance with Section 14.2 (Notices) to the persons designated below:

If to GM:

Marilyn J. Dedyne, P.E., CHMM
Worldwide Facilities Group
Remediation Team
General Motors Corporation
Mail Code 482-310-004
485 West Milwaukee
Detroit, MI 48202
(313) 556-0815
(313) 556-0803 (fax)

With a copy to:

Andrew Segovia
Attorney
Office of General Counsel
General Motors Corporation
Mail Code 482-112-149
3044 West Grand Blvd.
Detroit, MI 48202
(313) 556-2684
(313) 556-2199 (fax)

If to PEP Guide or to Newco:

Lightsource Parent Corporation
2915 Pendleton Avenue
Anderson, IN 46016
Attn: Chief Financial Officer
Fax: (765) 608-5173

with a copy to:

Palladium Equity Partners, LLC
Rockefeller Center
1270 Avenue of the Americas
Suite 2200
New York, NY 10020

Attn: Marcos Rodriquez
Fax: (212) 218-5155

and to

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Jeffrey A. Smith
Fax: (212) 765-0979

10.    CLOSING.

   10.1.    The Closing.

The closing (the "Closing") of the transactions contemplated hereby shall take place jointly at the offices of Cravath, Swaine & Moore, in New York, New York and GM Legal Staff in Detroit, Michigan on October 30, 1998, or on such other date or at such other time as GM and PEP Guide may agree in writing.

   10.2.    Asset Exchanges.

At Closing the following transactions shall occur in the order set forth below:

   10.2.1.    The transactions described in Section 2.1.1 shall be consummated as provided therein, and the following documents (in proper form for recording where appropriate) shall be prepared, executed and delivered by the applicable Parties:

   A.    Anderson, Indiana Lease

   B.    Memorandum of the Anderson, Indiana Lease

   C.    Intellectual Property Licenses

   D.    GM Note

   E.    Assignments for the Permits and Contracts.

   F.    Covenant or limited warranty deeds warranting against grantor's acts with respect to the Owned Real Estate.

   G.    Appropriate receipts.

   H.    All other appropriate Transfer Documents necessary to provide for the contribution to Newco (or Newco's designee(s)) of title to Acquired Assets, free and clear of any and all Liens, except the Permitted Exceptions.

I.      All other documents and papers, including the Consents set forth in Section 8.1.4, reasonably requested by PEP Guide or Newco to effect the transactions contemplated hereby.

J.      An appropriate assumption agreement or other document or documents pursuant to which Newco assumes all Assumed Liabilities.

10.2.2.  The transactions described in Section 2.1.2 shall be consummated as provided therein and appropriate, executed documents shall be prepared by the applicable Parties.

10.2.3.  The transactions described in Section 2.1.3 shall be consummated as provided therein and appropriate, executed documents shall be prepared by the applicable Parties.

10.2.4.  The applicable Parties shall execute and deliver each to the other the following agreements:

A.      Component Supply Agreement

B.      Right of Access Agreement

C.      Shareholders and Registration Rights Agreement

10.2.5.  The applicable Parties shall execute and deliver each to the other the following:

A.      An appropriate certificate, dated as of the Closing Date, and signed by an authorized officer of GM which evidences the authorization of the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is a party and fulfillment of the conditions specified in Section 8.1.

B.      An opinion of counsel of GM addressed to PEP Guide and Newco, dated as of the Closing Date, with respect to the due authorization and execution of the GM Note and stating that the GM Note is enforceable in accordance with its terms.

C.      Appropriate certificates, dated as of the Closing Date, and signed by an authorized officer of each of PEP Guide and Newco which evidence the authorization by each of PEP Guide and Newco of the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is party and fulfillment of the conditions specified in Section 8.2.

10.2.6.  The transactions described in Section 2.1.4 shall be consummated as provided therein, and the following documents (in proper form for recording where appropriate) shall be prepared, executed and delivered by the applicable Parties a true, correct and complete affidavit delivered by GM which meets the requirements of Treasury Regulation Section 1.1445-2(b)(2) and which attests to GM's non-foreign status (the "FIRPTA Affidavit"); provided, however, that if GM shall fail to deliver the FIRPTA Affidavit at the Closing, PEP Guide shall withhold at the Closing and pay over to the appropriate taxing authority such portion of the applicable Cash Amount as required pursuant to Section 1445 of the Code.

10.3.   Additional Documents and Papers.

GM, PEP Guide or Newco shall deliver all other documents and papers reasonably requested by the other Party to effect the transactions contemplated hereby.

11.   CERTAIN ADDITIONAL COVENANTS.

11.1.   Operation of the Business.

Except as otherwise provided herein or as mutually agreed by GM and PEP Guide, and subject to any changes that may be required as the result of changes in applicable Laws which become effective after the date hereof, from and after the date hereof until the Closing, GM shall operate the Business only in the Ordinary Course of Business. Without limiting the generality of the foregoing, from the date hereof through the Closing, unless otherwise consented to by PEP Guide in writing, GM shall:  (A) (i) cause the Acquired Assets to be maintained and kept in normal condition, repair and working order as on the date of this Agreement (normal wear and tear excepted); (ii) perform in all material respects all of its obligations under all Contracts and not amend or, in any material respect, modify any provision of any Listed Contract included in the Acquired Assets; (iii) keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; (iv) use its reasonable best efforts to maintain and preserve its business organization intact; (v) maintain the goodwill of the Business; and (vi) promptly advise PEP Guide and Newco of any change, event or circumstance which has had, or is reasonably likely to have, a Material Adverse Effect; and (B) (i) not take any action or permit any action within GM's reasonable control that would render any of GM's representations and warranties hereunder inaccurate at any time after the date hereof through and including the Closing Date; (ii) not take or permit any action reasonably expected to result in the imposition of a Lien on any of the Acquired Assets; (iii) not sell, transfer, assign, lease, pledge or otherwise encumber any of the Acquired Assets, other than the sale of Inventory in the Ordinary Course of Business and the sale or disposition of the assets listed in Schedule 2.3.9; (iv) not increase in any manner the compensation, severance or termination pay of, or pay, loan or provide any additional benefit to, employees of the Business (except as required by any agreements entered into, or retirement programs established prior to the date hereof, in each case as set forth in Schedule 5.1.13A or by the UAW Agreement; (v) not enter into any contract, commitment or transaction relating to the Acquired Assets or the Business, or any related series of such contracts, commitments or transactions, involving expenditures in excess of $250,000 per annum; or (vi) agree to do any of the foregoing.

11.2.   Further Assurances.

If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as another Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

11.3.   Reasonable Access.

Until the Closing, GM shall provide each of PEP Guide and Newco and its respective advisors, accountants, attorneys and other representatives at such times, and in such manner, as is reasonable and as not to interfere with normal operations of the Business (i) reasonable access during normal business hours to all personnel, offices, facilities, properties and books and records of GM with respect to the Business and the Acquired Assets, and (ii) such of the financial and operating data and

other information of the Business as may be reasonably requested by PEP Guide or Newco. Any non-public books and records, data and information so provided shall be subject to the provisions of the letter dated October 31, 1997 between Morgan Stanley & Co. Incorporated, as advisor to, and on behalf of, GM and Palladium (the "Confidentiality Agreement").

11.4.    Transition Services and Arrangements.

11.4.1.(a)    To GM's knowledge, Schedule 11.4.1 sets forth (1) a list of all routine administrative support services, which will be provided by GM, its Affiliates or EDS to the Business after the Closing Date (together, "Transition Services") and (2) the monthly expense currently charged to the Business in respect of each such service ("Monthly Charges").

The Parties further acknowledge that, due to the large number of such services, systems, data and reports, it is not practical to identify and list on Schedule 11.4.1 each and every service, system and report to be provided to Newco pursuant to this Agreement. Accordingly, the Parties intend that, except as otherwise noted on Schedule 11.4.1, each Transition Service shall include (and the definition of "Transition Services" shall be deemed to include) all services, systems, data and reports relating to each Transition Service that GM and its subsidiaries are currently providing to the Business in the ordinary course of business and/or as are reasonably necessary for the orderly transition of the Business to Newco as contemplated by this Agreement after the Closing Date.

The Monthly Charges do not exceed $20,000,000 in the aggregate on an annual basis, and, to GM's knowledge, the Monthly Charges equal the monthly charges allocated to the Business for each such service at least since January 1, 1998. PEP Guide or Newco shall provide written notice to GM no later than 15 days prior to the Closing Date for each Transition Service that it desires to have provided to the Business following the Closing. Newco shall pay to GM, on the 25th day of the month following receipt of the invoice, as compensation for each requested Transition Service, the applicable Monthly Charges of such requested Transition Services, in accordance with the following: (i) from the Closing Date until the ten-month anniversary of the Closing Date, 100% of the applicable Monthly Charges; (ii) thereafter, until the fourteen-month anniversary of the Closing Date, 125% of the applicable Monthly Charges; (iii) thereafter until the twenty-four-month anniversary of the Closing Date, 150% of the applicable Monthly Charges. By mutual agreement of GM and Newco, upon at least thirty days prior written notice from Newco, GM shall provide Transition Services beyond such twenty-four-month anniversary, provided Newco thereafter shall pay to GM as compensation for such services 150% of the applicable Monthly Charges. The above provision notwithstanding, GM shall have no obligation or responsibility to agree to provide any such services beyond the twenty-four-month anniversary.

(b)    GM, solely in the capacity as agent of Newco, shall provide the Business with each Transition Service that PEP Guide or Newco requests GM to provide, in a manner consistent with the provision of such services as provided by GM to its own facilities, until the earlier to occur of (i) as to each Transition Service that PEP Guide or Newco requests GM to provide, the date on which Newco provides GM at least 30 days prior written notice that it no longer requires any or all of such services and (ii) the twenty-four-month anniversary of the Closing Date.

(c)    In addition to the Monthly Charges, Newco during the transition services period, shall be solely responsible for (i) all fees and costs related to additional, different or other non-routine (special reports, etc.) services actually used by Newco, (ii) ensuring that it is duly qualified to commence and carry on business generally, and in particular that it is duly qualified to commence and carry on business as the employer of the Transferred Employees (including the registration and compliance of any Employee Benefit Plan), (iii) all licensing, sublicensing,

conversion, and other costs relating to Newco's implementation of its own systems to handle transition services, and (iv) all costs incurred by GM and Newco to facilitate Newco's discontinuation or transfer to any new system different from that which was provided on the Closing Date (other than for changes to systems implemented by GM, in which event, Newco will be responsible only for its own costs). Newco shall pay to GM any amounts invoiced hereunder on the 25th day of the month following receipt of the invoice.

(d)    GM agrees to provide the Transition Services that PEP Guide or Newco requests GM to provide in a manner consistent with the provision of such services to its own facilities and GM does not warrant the efficiency, quality or effectiveness of such services to Newco. Notwithstanding Article 12 of this Agreement, GM shall be indemnified against, and defended and held harmless by Newco and for any Losses, damages, or expenses incurred by GM in connection with any and all claims, investigations, audits, actions, causes of action and suits arising from or relating to the provision of the Transition Services that PEP Guide or Newco requests GM to provide and provided by GM, and any actions taken by GM in connection therewith, except to the extent that such claim, investigation, audit, action, cause of action or suit arose from the gross negligence, recklessness or intentional malfeasance of GM.

(e)    If GM discontinues, materially modifies or materially changes any system providing services to its own facilities, GM may also discontinue, modify or change such system provided to Newco in relation to the Transition Services upon six months written notice to Newco. GM agrees to negotiate in good faith with Newco in an effort to minimize any disruption of such discontinuance, modification or change on Newco and/or GM.

11.4.2.    From and after the Closing, GM shall cooperate in good faith in assisting Newco in establishing separate and independent services to replace the Transition Services.

11.4.3.    If a Party is requested by another party to this Agreement, or, with proper authorization, on behalf of another Party undertakes, to make payments or advance funds on behalf of such other Party to facilitate the orderly consummation of the transition contemplated by this Section 11.4, the Party on whose behalf such payments are made shall reimburse the Party making such payments within 3 Business Days of receipt of appropriate documentation with respect to the payments. Interest at a rate of 10% per annum will be charged on any late payments.

11.4.4.    Other than with respect to claims by Newco or any Newco Indemnitee against GM or any of its Affiliates, Newco shall from time to time, at the reasonable request of GM, cooperate with GM in providing GM, to the extent possible through Newco employees formerly employed by GM, with technical assistance and information in respect to any claims brought against GM involving the conduct of the Business prior to Closing, including consultation and/or the appearance(s) of such persons on a reasonable basis as expert or fact witnesses in trials or administrative proceedings. GM shall reimburse Newco for all of its reasonable out-of-pocket costs incurred in connection with providing such services.

11.4.5.    Newco may terminate any or all of the Transition Services provided to Newco by GM at any time upon a minimum of 30 days' notice to GM, such that termination would be effective on the last day of the month next following the month in which notice is given.

11.4.6.    All data provided by GM hereunder shall be in the form used by the service provider of GM before the Closing Date. Unless furnished to the service provider by Newco, all media upon which the data is stored is and shall remain the property of such service provider. Special reports and other nonconforming data requests will be provided only if GM and

Newco enter into a separate agreement with respect thereto and will be subject to the cost plus sliding scale set forth in Section 11.4.1(a).

11.4.7.    ·    Newco may use the GM BusinessCard, GM Acquisition Card and EDS Travelcall Card (collectively, "GM Cards") during the Transition Services period. GM and EDS may terminate Newco's use of any of the GM Cards upon 90 days prior written notice. GM shall be indemnified against, and defended and held harmless by Newco for any Losses, damages or expenses incurred by GM in connection with, any and all claims, investigations, audits, actions, causes of action and suits arising from or relating to negligence, recklessness or misuse of the GM Cards.

11.4.8.    Newco shall reimburse GM for additional software license fees charged by a software service provider associated with the transfer of a Transition Service to Newco charged by a software service provider.

11.5.    Books and Records.

A.    Newco shall preserve and keep all books and records, whether in electronic form or otherwise, included in the Acquired Assets and delivered to Newco pursuant hereto for a period of seven years after the Closing Date, or for any longer period as may be required by applicable Law, at Newco's sole cost and expense. During such period, Newco shall make such books and records available to GM as may be reasonably required and upon reasonable advance notice and for reasonable periods by GM in connection with any legal proceedings against GM or investigations of GM by any Governmental Authority or in connection with any Tax examination, audit or appeal of Taxes of GM, the Business or the Acquired Assets. GM shall reimburse Newco for all of its reasonable out-of-pocket expenses incurred in connection with any request by GM to make available any books and records pursuant to the foregoing sentence. In the event Newco wishes to destroy or dispose of such books and records after such seven-year period, it shall first give 90 days' prior written notice to GM, and GM shall have the right at its option and expense, upon prior written notice given to Newco within such ninety-day period, to take possession of said records within 180 days after the date of Newco's notice to GM hereunder.

B.    To the extent that books and records of GM or any of its Affiliates which contain information relating to the Business are not included in the Acquired Assets, GM agrees to cooperate with Newco in providing Newco with any such information upon Newco's reasonable request to the extent that any such Information exists and is reasonably separable from GM information unrelated to the Business. Newco shall reimburse GM for all of its reasonable out-of-pocket costs incurred in connection with any such request.

11.6.    Technical Documentation.

GM and its Affiliates shall deliver at the Closing to Newco at the Monroe Plant and/or the Anderson Plant all Intellectual Property included in the Acquired Assets or licensed to Newco in accordance with this Agreement. For a period of six years commencing at Closing, Newco, at its sole cost and expense, shall use its reasonable best efforts to maintain all Technical Documentation in its possession applicable to Product design, test, release and validation at a location at which such Technical Documentation shall be reasonably accessible to GM upon request (at GM's sole cost and expense). During such six year period, Newco shall not destroy or give up possession of its final copy of such Technical Documentation without offering GM the opportunity, at GM's sole cost and expense but without any payment to Newco, to obtain a copy of such documentation. In the event Newco wishes to destroy or dispose of such Technical Documentation after such six-year period,

it shall first give 90 days' prior written notice to GM, and GM shall have the right, at GM's option and expense, upon prior written notice given to Newco within such ninety-day period, to take possession of such Technical Documentation within 180 days after the date of the notice hereunder.

11.7.   Payment and Collections.

A.      GM shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Newco after Closing, and Newco shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of GM after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement. To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, GM or Newco, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.

B.      GM shall exercise its best efforts to promptly forward to Newco any bills or other payables that GM receives on behalf of Newco.

11.8.   Non-Competition.

11.8.1 For a period of six years after the Closing Date, neither GM, any of its Affiliates nor any current part of Delphi Automotive will (i) hire away any executive officer of Newco or (ii), directly or indirectly, whether by ownership, control, management, operation or financing, compete within North America with Newco, the Business or their respective successors in the manufacture, or sale to original equipment manufacturers (or subcontractors thereto) for production use, of Products listed in Schedule 11.8.1 ("Competitive Business"); provided, however, that the restrictions contained in this Section 11.8.1 will not prohibit in any way (A) the acquisition of a controlling interest or merger with any Person, or a division or business unit thereof, which acquired Person, division or unit is not primarily engaged in a Competitive Business, provided that GM will not and does not obtain from such Competitive Business any of the products theretofore sourced from Newco or its subsidiaries, provided further that GM will take all reasonable steps, promptly after such acquisition or merger, but in no event later than six months thereafter, subject to Section 11.8.2, to offer for sale such portion of such Person, division or unit as constitutes a Competitive Business, (B) the acquisition by GM, directly or indirectly, of an ownership interest in any Person, or a division or business unit thereof, engaged in a Competitive Business, if the Competitive Business accounts for less than $5 million in annual revenues of such Person, division or unit, (C) the acquisition by GM, directly or indirectly, of a non-controlling ownership interest in any Person, or a division or business unit thereof, engaged in a Competitive Business, if the Competitive Business accounts for less than 15% of the operating revenues of such Person, division or unit, (D) the acquisition by GM, directly or indirectly, of less than 5% of the publicly traded stock of any Person engaged in a Competitive Business, (E) subject to compliance by GM and its Affiliates with their respective obligations under the Component Supply Agreement, the sale by GM of any product incorporating a Product made by a Competitive Business, (F) financing activities of General Motors Acceptance Corporation and its subsidiaries in its ordinary course of business, (G) the operations of the Sung San Company, Ltd., in the event that GM's interest in Sung San is not acquired by Newco, and (H) consistent with the Right of Access Agreement and the then generally applicable GM troubled supplier practices, direct or indirect activities of GM to advise, operate, manage or finance a troubled supplier of GM or its Affiliates in order to maintain approximately existing levels of production from such supplier for production requirements of GM and its Affiliates.

11.8.2  Upon the acquisition of any Competitive Business to be disposed of by GM pursuant to Section 11.8.1A, GM shall promptly notify Newco and Newco and afford Newco the right and opportunity to submit a bid to purchase such Competitive Business, which right and opportunity shall be no less timely or favorable than that afforded to any third party.

11.8.3  GM agrees that the provisions of Section 11.8.1 are necessary and reasonable to protect Newco in the conduct of the Business.  If any court of competent jurisdiction shall finally hold any restriction contained in this Section 11.8.1 to be invalid, illegal, or unenforceable by reason of the extent, duration, or geographical scope thereof, or otherwise, then the court making such determination shall have the right to reduce such extent, duration, geographical scope, or other provisions hereof, and in its reduced form such restriction shall then be enforceable in the manner contemplated hereby.

11.8.4  GM agrees that any breach by it of Section 11.8.1 will result in Newco suffering a loss which cannot adequately be compensated for in damages and that Newco shall be entitled to injunctive relief (without the necessity of posting a bond or other security), in addition to any and all other remedies available to it, whether at law or in equity.

11.9.  Subsequent Financial Statements.

As soon as practicable after the date hereof, GM, at its sole cost and expense, shall prepare audited financial statements of the Business, with appropriate footnotes, (i) sufficient for inclusion in a Form S-1 filed pursuant to the Securities Act of 1933, as amended, for the years ended December 31, 1997 and December 31, 1996 (the "Historical Financial Statements") and (ii) similar to the 1997 Financial Statements, for the period beginning on January 1, 1998 and ending on the Closing Date, or as of the Closing Date, as the case may be (the "Supplementary Financial Statements"), and provide copies of such statements to Newco.  The Historical Financial Statements shall be prepared in accordance with GAAP and shall be accompanied by an unqualified report thereon of Deloitte & Touche LLP or other independent public accountants of recognized national standing.  The Supplementary Financial Statements shall be prepared in accordance with GAAP consistently applied with the 1997 Financial Statements and shall fairly present the assets to be sold as of the Closing Date and the results of operations and cash flows of the Business for the period indicated and shall be accompanied by an unqualified report thereon of Deloitte & Touche LLP or other independent public accountants of recognized national standing.  GM shall provide assistance in the preparation of the statements and data and shall cooperate in the future with Newco in providing any additional predecessor information for the Business reasonably required by Newco.

11.10.  Injunctions/Orders.

In the event that any temporary, interim or other non-final injunction, order or decree is issued by a court of competent jurisdiction which restrains, prohibits or limits consummation by any Party of the transactions contemplated hereby or by the Ancillary Agreements, each Party shall use its reasonable best efforts to have such injunction, order or decree lifted, rescinded or revoked as soon as possible.

11.11.  Supplements to Schedules.

GM shall promptly supplement or amend each Schedule with respect to any matter hereafter arising or discovered which, if existing or known at the date of this Agreement, would have been required to be set forth, listed or otherwise disclosed in such Schedule.  No information in any such supplement or amendment of any Schedule shall be deemed to have been set forth, listed or

85

otherwise disclosed as of the date of this Agreement or shall have any other effect on the rights, obligations or interests of the Parties, unless PEP Guide specifically agrees thereto in writing.

11.12. Confidentiality.

GM shall, and shall cause its Affiliates, and its and their respective officers, directors, employees and agents, to keep confidential all information relating to the Business and the Acquired Assets and not use such information except as contemplated by this Agreement, except (A) as may be required by applicable Law and then only after prior consultation with Newco, (B) that GM will not be subject to the obligations of this Section 11.12 with respect to such information that: (a) is or becomes known publicly through no fault of GM; or (b) was already known to GM at the time of disclosure; or (c) is learned by GM from a third party under no obligation of confidentiality, or (d) is independently developed by an employee, agent, or consultant of GM without any use of or reliance on disclosures hereunder; or (e) is approved for release by written authorization of Newco, and (C) subject to Section 11.8, with respect to such of the Technical Documentation as is not included in the Acquired Assets. The standard of care imposed on GM and its Affiliates for protecting such information shall be the reasonable and prudent care necessary to prevent improper disclosure or use of such information, to the same degree employed by GM to protect its own information of such nature.

11.13. Intellectual Property Licenses.

11.13.1. Licenses to Newco.

At the Closing, GM or its Affiliates shall grant to Newco a non-exclusive, irrevocable, perpetual, (other than with respect to trademarks and tradenames not included in the Acquired Assets) royalty-free license or sublicense substantially similar in form and substance to Exhibit 11.13.1 to use such Intellectual Property owned or sublicensable on a royalty-free basis by GM or its Affiliates and used in the Business but not included in the Acquired Assets, including for the purpose of manufacturing, assembling, designing, processing, marketing, offering for sale, selling, importing, installing and servicing the Products. Should GM or Newco reasonably determine after Closing th.·· items necessary for the conduct of the Business as currently conducted have not been included in such license or sublicense, GM shall grant to Newco a license or sublicense of such items. For the purposes of this Section 11.13.1, items necessary for the conduct of the Business shall include those items that have been used, or are reasonably expected to be used, in the conduct of the Business as of the date of this Agreement.

11.13.2. Licenses to GM.

A.     Newco will grant back to GM a non-exclusive, irrevocable, perpetual, royalty-free license, including the right to sublicense its Affiliates, to use all Intellectual Property included in the Acquired Assets (except for trademarks, service marks and trade names included in the Acquired Assets) for (i) products other than products within the Business and (ii) vehicle lighting already awarded to another supplier prior to the date of this Agreement.

B.     Newco will also grant back to GM a limited, non-exclusive, irrevocable, fully-paid right and license to grant sublicenses only to GM suppliers or other parties to whom GM has already granted by written agreement as of the date of this Agreement a license to use, only for the term of such written agreements without renewals or extensions of same, the Intellectual Property included in the Acquired Assets for lighting for past model vehicles sold by GM or its Affiliates so long as such written agreement contains in force and effect provisions that GM will take appropriate steps to

assure that the level of quality of the products supplied by such suppliers under such written agreements meets or exceeds the quality standards of such products existing as of the date of this Agreement, provided that if after the term of any such license, Newco is unwilling to supply past model lighting products to GM at reasonable prices, Newco shall grant at GM's written request a license to GM to the Intellectual Property included in the Acquired Assets for such past models.

C.      This clause 11.13.2 will not affect GM's or its Affiliates' obligations under any other agreement with Newco relating to supply of vehicle lighting.

    11.13.3. Sublicense to Newco.

GM shall grant Newco a nonexclusive, irrevocable, fully paid sublicense under the patents licensed to GM in the 22 May 1998 settlement agreement between the Lemelson Medical, Education and Research Foundation, Limited Partnership, et al. and GM, only to the extent and level of the annual production of products manufactured in the fields licensed in that agreement by GM's Delphi Automotive lighting business unit during the year immediately prior to the date of this Agreement.

    11.14. Pre-Emptive Right.

If prior to an initial public offering of the common stock of Newco, Newco shall sell for cash additional shares of its common stock, GM shall be entitled to maintain its then current equity ownership share (which initially is 33.3%, based on the number of shares issuable upon conversion of the Series B Preference Stock and assuming issuance of the warrants issuable hereunder and exercise thereof) by purchasing from Newco a pro rata number of the additional shares at the same price per share as the other purchasers.

There shall be excepted from the foregoing any issuance of common stock by Newco for management or employee compensation or plans.

    11.15. Management Dilution.

Except as set forth on Schedule 11.15, with respect to the period between January 1, 1998 and the Closing Date, and otherwise from the Closing Date until the third anniversary of the Closing Date, GM has not taken, and will not take, any actions to employ or retain the services of any salaried employees of the Business, including transferring such employees to a business unit other than the Business, soliciting or otherwise requesting such employees to agree to employment by GM or agreeing to employ or utilize the services of any such employee.

    11.16. Capital Contribution.

GM, PEP Guide and Newco agree that all transactions described in Section 2.1.1 through 2.1.4 and in Section 3.5B will be part of a transaction pursuant to Section 351 of the Code for all Tax purposes and agree to report such transactions accordingly. Further, and without limitation, GM, PEP Guide and Newco hereby agree that it is the intent of all Parties that the GM Note be a contribution to the capital of Newco pursuant to such Section 351 transaction and agree to report such transaction accordingly. GM agrees not to claim any deduction for tax purposes with respect to the contribution of the GM Note or with respect to any payments made on the GM Note. No Party shall take any position inconsistent with the provisions of this paragraph for any purpose unless (and then only to the extent) such Party is required to do so by reason of a final determination by a taxing authority.

11.17.  Warrants.

11.17.1.  Issuance.

At the beginning of each 12-month period indicated below, Newco shall issue to GM warrants (the "Warrants") to purchase shares of Class B Common Stock.  Such number of shares and exercise price shall be subject to adjustment on the terms set forth in Section 4 of the Warrants Certificate. Warrants issued at the beginning of a given period shall correspond to the Payments (as defined in the GM Note) scheduled to be made during such period, on a pro rata basis, in accordance with the terms of the GM Note.  The number of Warrants to be issued in connection with each 12-month period of Payments and the aggregate exercise prices are set forth in the table below:

| Period Beginning | Number of Warrants | Aggregate Exercise Price |
|---|---|---|
| October 1, 1998 .......... | 25,000 | $200,000 |
| October 1, 1999 .......... | 25,000 | $200,000 |
| October 1, 2000 .......... | 25,000 | $200,000 |
| October 1, 2001 .......... | 25,000 | $200,000 |
| October 1, 2002 .......... | 25,000 | $200,000 |
| Total | 125,000 | $1,000,000 |

11.17.2.  Form.

The Warrants shall be issued pursuant to a certificate in the form of the Warrants Certificate, which certificate indicates the number of Warrants being issued thereby.

11.17.3.  Exercise.

Any exercise of Warrants must be done in compliance with the terms of Article I of the Warrants Certificate and the holder thereof must complete the Exercise Form attached thereto.

11.17.4.  Transfer Restrictions.

The Warrants shall be subject to the transfer restrictions indicated on the face of the Warrants Certificate and in Section 5 thereof and those set forth in Article III of the Shareholders and Registration Rights Agreement.

11.17.5.  Registration Rights.

GM shall have the right to register the Class B Common Stock underlying any Warrants issued to it on the terms set forth in Article IV of the Shareholders and Registration Rights Agreement.

11.17.6.  Other Terms.

The Warrants shall be governed in all other respects by the terms of the Warrants Certificate and the Shareholders and Registration Rights Agreement, as applicable.

11.18. Put Rights.

11.18.1.

For the 12 month period beginning on the Closing Date, GM has the right to elect to sell, transfer and deliver to PEP Guide, and PEP Guide agrees to purchase from GM unconditionally and despite any legal or other impediment, no less than all of the 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class B Common Stock GM received pursuant to Section 2.1.3 for an aggregate purchase price of $15,000,000, payable by wire transfer of immediately available funds.

11.18.2.

If GM does not exercise its put right under Section 11.18.1, then for the 12 month period beginning 12 months after the Closing Date, PEP Guide has the right to elect to sell, transfer and deliver to GM, and GM agrees to purchase from PEP Guide unconditionally and despite any legal or other impediment, no less than all of the 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class A Common Stock PEP Guide received pursuant to Section 2.1.3 for an aggregate purchase price of $45,000,000, payable by wire transfer of immediately available funds.

11.18.3.

If GM did not exercise its put right under Section 11.8.1 and PEP Guide does not exercise its put right under Section 11.18.2, then for the 12 month period beginning 24 months after the Closing Date, GM has the right to elect to sell, transfer and deliver to PEP Guide and PEP Guide agrees to purchase from GM unconditionally and despite any legal or other impediment, no less than all of the 50 shares of Series A Senior Preferred Stock and 375,000 shares of Class B Common Stock GM received pursuant to Section 2.1.3 for an aggregate purchase price of $75,000,000, payable by wire transfer of immediately available funds.

11.18.4.

To exercise its right hereunder, the exercising Party shall give written notice to the other Party, said notice to be received within the relevant 12 month period. If any Party makes timely exercise of its right hereunder then the Closing shall occur, with respect to a "put" under Section 11.18.1, 30 days and with respect to a "put" under Sections 11.18.2 or 11.18.3, 60 days after such notice is received by the other Party. Time shall be of the essence under the terms and provisions of this Section 11.18. Any transferor of securities under this Section 11.18 shall be deemed to have made to the transferee the warranties provided in the New York Uniform Commercial Code Article 8, Section 8-108(a).

12.    INDEMNIFICATION.

12.1.  Survival.

The representations and warranties contained in this Agreement shall survive the Closing and continue in full force and effect for a period of two years after the Closing; provided, however, that the representations and warranties of GM (A) set forth in Section 5.1.16 shall continue in full force and effect through and until six months after the expiration of the applicable statute of limitations (including any extensions thereto) and (B) set forth in each of Sections 5.1.5A, 5.1.7B(i), 5.1.9, 5.1.15A (but only with respect to the second sentence thereof), 5.1.15D (but only with respect to zoning) and 5.1.6 shall continue in full force and effect indefinitely. If, prior to the close of business

on the date the survival period terminates with respect to any representation or warranty, GM, on the one hand, or PEP Guide or Newco, on the other hand, shall have notified the other of a claim for indemnity hereunder and such claim shall not have been finally resolved or disposed of at such date, then such representation or warranty that is the basis for such claim shall continue to survive as to that claim and shall remain a basis for indemnity until such claim is finally resolved. All of the covenants of each of the Parties set forth in this Agreement shall survive the Closing and continue in full force and effect according to their respective terms.

    12.2.  Indemnification.

        12.2.1.  Indemnification Provisions for Benefit of Newco.

A.     Subject to and in accordance with the terms of this Article 12, from and after the Closing Date, GM shall indemnify, hold harmless and defend Newco and its Affiliates, their successors and assigns, and their partners, officers, directors, employees, shareholders and agents (individually, a "Newco Indemnitee" and, collectively, the "Newco Indemnitees"), from and against all demands, claims, actions or causes of action, assessments, losses, damages, diminution in value, liabilities, costs and expenses (including interest and penalties and reasonable expenses of investigation and attorneys' fees (collectively, "Losses")) to the extent arising out of or related to: (i) any breach of any representation or warranty of GM contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of any covenant of GM set forth in this Agreement; (iii) any failure of GM to pay, perform or discharge any liabilities or obligations of GM (other than (a) the Assumed Liabilities and (b) to the extent that such payment, performance or discharge constitutes an obligation of Newco under Article 6 or 9); or (iv) directly or indirectly, the conduct of the Business or the ownership or operation of the Acquired Assets on or prior to the Closing Date; provided, however, that GM shall not be liable for Losses pursuant to clause (i) of this Section 12.2.1A unless a claim therefor has been made within the applicable survival period set forth in Section 12.1 and until the amount of all Losses (other than those arising out of or related to any breach of the representations and warranties as to which there shall not be any deductible set forth in Section 5.1.1, 5.1.2, 5.1.3, 5.1.5A, 5.1.7B(i), 5.1.9, 5.1.10 (with respect to Consents of Governmental Authorities only), 5.1.15A (but only with respect to the second sentence thereof) or 5.1.16) in the aggregate exceeds $250,000, after which point GM will be obligated to indemnify Newco Indemnitees from and against all Losses in excess of such amount. For purposes of calculating the amount of any Losses with respect to any of the Acquired Assets, "Losses" shall include the full replacement cost of such Acquired Assets.

B.     The Newco Indemnitees' rights under each of clauses (i), (ii), (iii) and (iv) of Section 12.2.1A shall be independent of each other; provided that, the Newco Indemnitees may not recover more than once for a particular indemnifiable Loss.

        12.2.2.  Indemnification Provisions for Benefit of GM.

A.     Subject to and in accordance with the terms of this Article 12, from and after the Closing Date, Newco shall indemnify, hold harmless and defend GM and its Affiliates, their successors and assigns, and their partners, officers, directors, employees, shareholders and agents (individually, a "GM Indemnitee" and, collectively, the "GM Indemnitees") from and against all Losses to the extent arising out of or related to: (i) any breach of any representation or warranty of Newco contained in this Agreement or in any certificate delivered pursuant to this Agreement; (ii) any breach of any covenant of Newco set forth in this Agreement; (iii) any failure of Newco to pay, perform or discharge any of the Assumed Liabilities; or (iv) directly or indirectly, the conduct of the Business or the ownership or operation of the Acquired Assets by Newco after the Closing Date; provided,

90

however, that Newco shall not be liable for Losses pursuant to clause (i) of this Section 12.2.2A unless a claim therefor has been made within the applicable survival period set forth in Section 12.1.

B.      The GM Indemnitees' rights under each of clauses (i), (ii), (iii) and (iv) of Section 12.2.2A shall be independent of each other; provided that, the GM Indemnitees may not recover more than once for a particular indemnifiable Loss.

   12.3.   Indemnification Procedure as to Third-Party Claims.

          12.3.1  Upon receipt by either GM or Newco of written notice of the commencement of any third-party claim, action, suit, or proceeding (any such claim, action, suit, or proceeding being hereinafter referred to in this Section 12.3 as a "Claim"), in respect of which such Party (an "Indemnitee") is entitled to indemnification under this Agreement, such Indemnitee shall promptly notify the indemnitor under this Agreement (the "Indemnitor") of such Claim in writing; provided, however, that any failure to give such notice will not waive any rights of the Indemnitee except to the extent that the rights of the Indemnitor are prejudiced thereby. With respect to any Claim as to which such notice is given by the Indemnitee to the Indemnitor, the Indemnitor may, subject to the provisions of Section 12.3.2 below, assume the defense and settlement of such Claim; provided, however, that, except as otherwise provided in Section 12.3.2, (i) the Indemnitee shall cooperate with the Indemnitor in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitor; (ii) the Indemnitee shall have the right to pay or settle such Claim at any time, in which event the Indemnitee shall be deemed to have waived any right to indemnification therefor by the Indemnitor; and (iii) the Indemnitor shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitee; provided, however, that with respect to any Claim which is solely for money damages, if Indemnitee fails to consent to a written settlement offer (which includes an unconditional release of Indemnitee as a condition to the effectiveness of any such settlement) and judgment is subsequently entered in an amount exceeding the amount of such offer, and such judgment provides for the final and nonappealable resolution of such Claim, then Indemnitor shall have no responsibility for the amount of such excess.

          12.3.2  If (i) the Indemnitor fails to assume the defense of such Claim or, having assumed the defense and settlement of such Claim, fails reasonably to contest such Claim in good faith, or (ii) the remedy sought by the claimant with respect to such Claim is not solely for money damages, the Indemnitee, without waiving its right to indemnification, may assume the defense and settlement of such Claim; provided, however, that (x) with respect solely to clause (ii) above, the Indemnitor shall be permitted to join in the defense and settlement of such Claim, to the extent related to money damages, and to employ counsel at its own expense, (y) the Indemnitor shall cooperate with the Indemnitee in the defense and settlement of such Claim in any manner reasonably requested by the Indemnitee, and (z) with respect solely to clause (ii) above, to the extent related to money damages, the Indemnitee shall not consent to the entry of any judgment or enter into any settlement with respect to such Claim without the written consent of the Indemnitor.

          12.3.3  As used in this Section 12.3, the term Indemnitee shall be deemed to include the plural thereof where the rights or obligations of more than one Indemnitee may be involved.

   12.4.   Exclusive Remedy.

Subject to the following sentence and the provisions of Article 9, GM and Newco agree that before commencing litigation they shall engage in the conciliation process set forth in Section 12.5 below with regard to any dispute as to this Agreement, or in the case of any dispute as to the Closing

Inventory Amount or the Closing Inventory Statement, Section 3.2, or in the case of any dispute as to Consolidated EBITDA, Section 3.5. Nothing contained herein, however, shall limit the rights of a Party to pursue any claim of fraud or to seek and obtain any and all equitable remedies, including injunctive relief to specifically enforce the other Party's obligations hereunder.

### 12.5. Dispute Resolution.

In the event of any dispute between GM and Newco relating to indemnification of any Loss pursuant to Section 12.2, other than with respect to third-party Claims (which shall be handled in the manner set forth in Section 12.3) or matters relating to Article 9 of this Agreement (which shall first be addressed as set forth in Section 9.13 of this Agreement), the Parties shall use all reasonable best efforts to resolve such dispute at an appropriate business level within their respective business organizations. In the event such efforts fail, such dispute shall be submitted to a three-member dispute resolution panel. On a case-by-case basis, the panel shall consist of the Chief Financial Officer of GM and Newco, or such individual's designee, plus one individual designated by them together. The panel may establish procedures for submission of the dispute, including that reasonable requests made by one Party to the other for information shall be honored in order that each of the Parties may be advised of relevant facts. A majority decision shall be the view of the panel but shall not be binding unless the Parties agree in writing in advance of submittal that it shall be binding. Each Party agrees that neither it nor any of its Affiliates will seek to enforce the indemnification provisions of this Article 12 as to any such matter unless and until such efforts have been unsuccessful in resolving the dispute within 60 days after a written claim for indemnification was made with respect to such matter; provided, however, that such restriction shall be inapplicable (i) to the extent that such delay is reasonably likely to prejudice in any material respect the rights of the Party seeking indemnification and (ii) to any action or petition seeking equitable relief. Settlement offers and any non-binding decision of such panel made in connection with any dispute resolution procedure pursuant to this Section 12.5 shall be deemed confidential and not admissible for any purpose in any litigation in which the Parties may be involved among or between themselves or with third parties, unless the Parties otherwise agree.

## 13.    TERMINATION.

### 13.1.    Termination.

This Agreement may be terminated by giving written notice prior to the Closing as follows:

    (a)    by mutual written agreement of GM, Newco and PEP Guide;

    (b)    by GM, Newco or PEP Guide, if there shall be any order that is final and non-appealable preventing the consummation of the transactions contemplated hereby or by any Ancillary Agreement and the Party seeking to terminate the Agreement pursuant to this Section 13.1(b) has complied in all respects with its obligations under Section 11.10 hereof;

    (c)    by Newco or PEP Guide, at any time after November 30, 1998, if the transactions contemplated hereby and by the Ancillary Agreements shall not have been consummated through no fault of PEP Guide, Newco or any of their respective Affiliates;

    (d)    by GM, at any time after November 30, 1998, if the transactions contemplated hereby and by the Ancillary Agreements shall not have been consummated through no fault of GM or any of its Affiliates;

92

(e)    by Newco or PEP Guide, if GM or any of its Affiliates shall have breached or violated in any material respect any of its representations, warranties or covenants set forth in this Agreement, and such breach or violation shall not have been cured within 10 days after written notice thereof has been given by Newco or PEP Guide to GM; or

(f)    by GM, if PEP Guide, Newco or any of their respective Affiliates shall have breached or violated in any material respect any of its representations, warranties or covenants set forth in this Agreement, and such breach or violation shall not have been cured within 10 days after written notice thereof has been given by GM to Newco and PEP Guide.

The right of any Party to terminate this Agreement pursuant to this Section 13.1 shall remain operative and in full force and effect regardless of any investigation made by or on behalf of any Party hereto, any person controlling any such Party or any of their respective partners, officers or directors, whether prior to or after the execution of this Agreement.

13.2.    Effect of Termination.

Except as set forth in this Section 13.2, in the event of the termination of this Agreement pursuant to Section 13.1 hereof, this Agreement shall forthwith become null and void, there shall be no liability on the part of any Party or any of their respective partners, officers, directors, subsidiaries, Affiliates or Associates to any other party and all rights and obligations of any Party hereto shall cease; provided, however, that the foregoing shall not restrict or otherwise limit the liability of any Party arising out of or relating to such Party's willful breach of this Agreement. Without limiting the generality of the foregoing, the representations, warranties, covenants and agreements in this Agreement shall terminate at or upon the termination of this Agreement pursuant to Section 13.1 hereof, except that the agreements set forth in Article 14 hereof and those set forth in this Section 13.2, in the Confidentiality Agreement, and in the Environmental Confidentiality Agreement and Right of Access Agreement shall survive termination of this Agreement, in accordance with their respective terms.

14.    MISCELLANEOUS.

14.1.    Bulk Sales Laws.

PEP Guide and Newco hereby waive compliance by GM with the provisions of the bulk sales law of any state or foreign jurisdiction, and, subject to and in accordance with Section 12.3, GM shall indemnify, hold harmless and defend PEP Guide and Newco and the other Newco Indemnitees from and against any and all Losses arising out of or related to the failure or alleged failure of GM to comply with any such law in respect of the contribution of the Acquired Assets to Newco.

14.2.    Notices.

Except as otherwise set forth herein, all notices, requests, consents, or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight courier or on the third business day after sent by registered or certified first-class mail (with receipt confirmed), to the following:

If to GM:

General Motors Corporation

93

767 Fifth Avenue
New York, NY 10153
Attn: Treasurer
Fax: (212) 418-3623

with a copy to:

General Motors Legal Staff
New Center One Building
3031 W. Grand Boulevard
Detroit, MI 48202
Attn: E. Christopher Johnson
Fax: (313) 974-0373

If to PEP Guide or to Newco:

Lightsource Parent Corporation
2915 Pendleton Avenue
Anderson, IN 46016
Attn: Chief Financial Officer
Fax: (765) 641-5087

with a copy to:

Palladium Equity Partners, LLC
Rockefeller Center
1270 Avenue of the Americas
Suite 2200
New York, NY 10020
Attn: Marcos Rodriguez
Fax: (212) 218-5155

and to

Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Attn: Melvin Bedrick
Fax: (212) 474-3700

if any Party shall have designated a different addressee by notice, then to the last addressee so designated, and provided further, that, notwithstanding the foregoing, any notice given with respect to the designation of a different addressee shall be deemed to have been given when received.

14.3.   Assignment.

This Agreement shall be binding upon and inure to the benefit of each of the Parties and their respective successors and permitted assigns, but no rights, interests or obligations of any Party herein may be assigned without the prior written consent of the other, which shall not be unreasonably withheld or delayed; provided, however, that no assignment of this Agreement or any

rights hereunder shall be made without the assignee, as a condition of such assignment, assuming in writing its assignor's obligations under this Agreement, to the extent applicable to such assignment. Notwithstanding the foregoing, PEP Guide and Newco may, without the prior written consent of GM, assign this Agreement and any or all of its respective rights, interests and obligations hereunder to (A) one or more of their respective Attiliates or (B) a transferee of all or any portion of the Acquired Assets or all or any portion of the Business, or any successor to all or any portion of the Acquired Assets or all or any portion of the Business; provided that such transferee or successor (i) has a net worth immediately after such assignment of not less than $30,000,000, (ii) assumes in writing all of Newco's obligations under this Agreement, to the extent applicable to such assignment, (iii) is not an original equipment manufacturer of fully assembled passenger cars and/or light duty trucks, (iv) has maintained a responsible environmental record and (v) is, or has an Affiliate that is, in good standing as a supplier to GM. For purposes of the foregoing, a potential assignee or successor shall be deemed not to have a responsible environmental record only if such assignee or successor (Y) has a record of continuing or recurring noncompliance with any current or future Environmental Law and (Z) within the 5-year period immediately preceding such proposed assignment or transfer (i) has been convicted in federal or state court of a violation of a current or future Environmental Law, (ii) a federal or state court has issued an injunction, order, judgment, decree (including consent decrees) or other civil ruling as a result of noncompliance with a current or future Environmental Law; (iii) has materially violated an administrative order issued under a current or future Environmental Law; (iv) a Governmental Authority has issued a notice of noncompliance under a current or future Environmental Law; or (v) a Governmental Authority has filed an enforcement action under current or future Environmental Laws. As used in this Section 14.3, the term Environmental Law will also include similar laws of foreign jurisdictions. Notwithstanding the foregoing, GM shall not unreasonably withhold or delay its consent of such assignment to a transferee or successor that is not, or does not have an Affiliate that is, a then current supplier of GM if (a) such transferee or successor satisfies the criteria set forth in clauses (B)(i) through (iv) of the immediately preceding sentence and (b) such transferee or successor or its Affiliate shall not have been terminated as a supplier by GM for reasons other than failure to be price competitive and shall have a reputation for large-scale, quality manufacturing and reliable performance of contracts. In addition, after the Closing, GM may assign, without the prior written consent of Newco, this Agreement and any or all of its rights, interests and obligations hereunder to a corporation or other business entity to which all or substantially all of the assets of Delphi Automotive is sold or otherwise transferred; provided such transferee agrees in writing to be bound by Section 11.8 herein. The provisions of this Section shall be subject to 5.1.24. Notwithstanding any such assignment permitted by this Section 14.3, GM, PEP Guide and Newco shall in each case remain liable for all of its respective obligations hereunder.

14.4.  Pledge to Lenders.

Newco and its Affiliates may pledge its and their rights under this Agreement to their respective lenders as collateral security for indebtedness, provided that, upon any foreclosure by such lenders, such lenders or their designees shall take subject to all of the terms and conditions of this Agreement.

14.5.  Entire Agreement.

This Agreement, together with the Ancillary Agreements and the Confidentiality Agreement, represent the entire agreement and understanding among the Parties with respect to the transactions contemplated herein. This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations, and warranties, written or oral, of any Party dealing with the subject matter hereof.

95

### 14.6.   Waiver.

At any time, GM and PEP Guide may (a) extend the time for the performance of any of the obligations or acts of another Party to this Agreement, (b) waive any inaccuracies in the representations and warranties of another Party to this Agreement contained herein or in any document delivered pursuant hereto and (c) waive compliance by another Party to this Agreement with any of the agreements or conditions contained herein. Any such extension or waiver shall be valid only if set forth in a written instrument signed by the Party sought to be bound thereby. Waiver by GM or PEP Guide of any such inaccuracies or of a failure to comply with any provision of this Agreement shall not constitute, or be construed as, a continuing waiver of such provision, or a waiver of any other inaccuracy of, or failure to comply with, any provision of this Agreement.

### 14.7.   Failure or Delay Not Waiver, Remedies Cumulative.

No failure or delay on the part of any Party in the exercise of any right hereunder shall impair such right or be construed to be a waiver of, or acquiescence in, any inaccuracy or breach of any representation, warranty or agreement herein, nor shall any single or partial exercise of any such right preclude other or further exercise thereof or of any other right.  Except as set forth in Section 12.4, all rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

### 14.8.   Specific Performance.

Each of the Parties acknowledges that money damages would be both incalculable and an insufficient remedy for any breach of this Agreement by such party and that any such breach would cause GM, on the one hand, and PEP Guide and Newco, on the other hand, irreparable harm. Accordingly, each of the Parties also agrees that, in the event of any breach or threatened breach of the provisions of this Agreement by such party, GM, Newco or PEP Guide, as applicable, shall be entitled to equitable relief without the requirement of posting a bond or other security, including in the form of injunctions and orders for specific performance, in addition to all other remedies available to such party, whether at law or in equity.  Notwithstanding the foregoing, in the event that any of the Acquired Assets is destroyed or suffers material damage as the result of an act of God or other event beyond the reasonable control of GM prior to the Closing Date, GM shall have no obligation hereunder to replace such Acquired Asset, but GM shall pay over to Newco the replacement value of such destroyed or damaged property; provided, however, that this provision is not intended to restrict or otherwise limit the respective rights of (A) GM under Section 3.1 (with respect to the Asset Amount) or (B) PEP Guide and Newco under Article 8 (with respect to conditions to closing) or Article 13 (with respect to termination of this Agreement).

### 14.9.   Amendment.

This Agreement may only be terminated or amended in a writing executed and delivered by duly authorized representatives or officers each of the Parties.

### 14.10.   Expenses.

Except as otherwise expressly provided in this Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

96

14.11.  Third Parties.

Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union, or trust other than the Parties and their respective successors and permitted assigns, any claims, rights, or remedies under or by reason of this Agreement.

14.12.  Severability.

Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

14.13.  Headings.

The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part hereof.

14.14.  Counterparts.

More than one counterpart of this Agreement may be executed by each of the Parties, and each fully executed counterpart shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of each of the Parties to and pursuant to this Agreement may be transmitted by facsimile, and such facsimile will for all purposes be deemed to be the original signature of the Person whose signature it reproduces and will be binding upon that Person and on the party on whose behalf that Person signed.

14.15.  Governing Law; Jurisdiction; Consent to Service of Process.

A.      This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, without giving effect to rules governing the conflict of laws, except that Owned Real Estate matters shall be governed by the laws of the State of Louisiana, and that Anderson, Indiana Real Estate matters shall be governed by the laws of the State of Indiana. Article 9 matters shall be governed by the applicable laws of the state in which the Real Estate is located as well as by applicable Federal laws.

B.      Each of the Parties irrevocably submits to the exclusive jurisdiction of the courts of Delaware sitting in Wilmington, Delaware, and any appellate court thereof, for the purposes of any suit, action or other proceeding in connection with or relating to this Agreement or any of the Ancillary Documents and agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from any such court. Each of the Parties hereto waives any right to trial by jury with respect to any action related to or arising out of this Agreement or the Ancillary Agreements. Each of the Parties agrees not to bring any suit, action or proceeding against any other of the other Parties in connection with this Agreement or the Ancillary Documents and the transactions contemplated hereby and thereby in any court outside of Delaware. Each of the Parties further agrees that it has appointed CT Corporation System, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801, as its agent for service of any process, summons, notice or document

97

for any such action, suit or proceeding. Each of the Parties irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the Ancillary Documents or the transactions contemplated hereby or thereby in the courts referred to above, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

### 14.16.  Public Announcements.

GM and PEP Guide will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press release or make any public statement without mutual consent, except as may be required by applicable Law and then only after such prior consultation.

### 14.17.  Sales or Transfer Taxes.

Notwithstanding anything in this Agreement to the contrary, all sales, documentary, stamp, use, transfer, gross receipts, filing, conveyance, recording, and other similar Taxes and fees, including all applicable real estate transfer Taxes, intellectual property filing and recording fees and excluding any taxes based on or measured by income including the Indiana Gross Income Tax imposed by I.C. 6-2.1-1 et seq. (collectively, "Transfer Taxes"), arising out of or in connection with the transactions consummated pursuant to the Agreement shall be borne equally by GM and Newco. The Party which has primary responsibility under applicable Law for the payment of any particular Transfer Tax shall prepare and file the relevant Tax Return, and notify the other Party in writing of the Transfer Taxes shown on such Tax Return and the manner in which such Transfer Taxes were calculated, and such other party shall reimburse the filing Party for the amount of such Transfer Taxes to be borne by such other party by wire transfer of immediately available funds or check within five days after receipt of such notice.

### 14.18.  Other Tax Matters.

GM and Newco shall cooperate in connection with (i) the preparation or filing of any Tax Return, tax election, Tax consent or certification, or any claim for a Tax refund, (ii) any determination of liability for Taxes, and (iii) any audit, examination, or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes direct access to accounting, engineering and contracting personnel during normal business hours, and in a manner so as not to interfere with the normal business operations of GM or Newco. With respect to each Acquired Asset, GM shall provide to Newco, (a) before the Closing Date, its reasonable estimate of the tax basis of such Asset as of December 31, 1997 on the books of GM and, if the asset is depreciable for tax purposes, information concerning GM's tax depreciation of such Asset to the extent relevant to Newco's tax reporting with respect to such Asset, and (b) within 90 days after the Closing Date, definitive information of this type as shown on the books of GM. Information obtained pursuant to this Section 14.18 shall be kept confidential by GM in accordance with Section 11.12 and by Newco in accordance with the Confidentiality Agreement.

### 14.19.  Solely Corporate Obligations.

No recourse for any payment under this Agreement or any Ancillary Document, nor for any claim based hereon or thereon or otherwise in respect hereof or thereof, and no recourse under or upon any obligation, covenant or agreement of PEP Guide or Newco in this Agreement or any Ancillary Document, or because of the creation of any indebtedness represented hereby or thereby, shall be

98

had against any member, incorporator, stockholder, officer or director, as such, past, present or future, of PEP Guide or of Newco or of any successor company or corporation, either directly or through PEP Guide or Newco or any successor corporation, whether by virtue of any constitution, statute or rule of law, or by the enforcement of any assessment or penalty or otherwise, it being expressly understood that all such liability is hereby expressly waived and released as a condition of, and as a consideration for, the execution of this Agreement and the Ancillary Documents.

14.20.  Transfer of Series A Senior Preferred Stock.

Any transferee of the shares of Series A Senior Preferred Stock owned by PEP Guide may elect to assume this Agreement by written agreement delivered to GM and will be entitled to the rights and obligations provided for in Section 11.18.1 and 11.18.2.

14.21.  The Closing.

The Parties agree to use their best efforts to consummate the Closing in a timely manner following the execution of this Agreement.

### [SIGNATURE PAGE FOLLOWS]

99

IN WITNESS WHEREOF, the Parties have caused this Lightsource Formation Agreement to be executed by their duly authorized officers as of the date and year first set forth above.

GENERAL MOTORS CORPORATION

By: _Fred J Bellar_

Name: FRED J. BELLAR III

Title: Director Ventures + Business Development

PEP GUIDE, LLC

By: PEP Guide Management, LLC, its Managing Member

By: Marcos A. Rodriguez, its Managing Member

_____

LIGHTSOURCE PARENT CORPORATION

By: _Adam R Kaer_

Name: ADAM R. KAER

Title: VICE President