ALSTON & BIRD LLP                    **Hearing Date: November 30, 2006, 10:00 am**
Dennis J. Connolly (DC-9932)
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone (404) 881-7000
Facsimile (404) 881-7777

*Counsel to Cadence Innovation LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
                                   :

| | |
|---|---|
| **In re:** | :   **Chapter 11** |
| | : |
| **DELPHI CORPORATION, *et. al.*,** | :   **Case No. 05-44481 (RDD)** |
| | : |
| **Debtors.** | :   **Jointly Administered** |

-----------------------------------------------------------x

**LIMITED OBJECTION OF CADENCE INNOVATION LLC TO
DEBTORS' MOTION FOR ORDER PURSUANT TO 11 U.S.C. § 502(B)
AND 502(C) AND FED. R. BANKR. P. 2002(M), 3007, 7016, 7026, 9006,
9007 AND 9014 ESTABLISHING (I) DATES FOR HEARINGS
REGARDING DISALLOWANCE OR ESTIMATION OF CLAIMS AND
(II) CERTAIN NOTICES AND PROCEDURES GOVERNING HEARINGS
REGARDING DISALLOWANCE OR ESTIMATION OF CLAIMS**

COMES NOW Cadence Innovation LLC ("Cadence"), as successor in interest to

Patent Holding Company ("PHC"), and hereby files this Limited Objection (the

"Objection")[1] to the Delphi Corporation, et al.'s (the "Debtors")[2] Motion for Order

---

[1]    Nothing herein or otherwise, including, but without limitation, any later appearance, pleading, claim, or action, is intended or shall be deemed to be a waiver, release, or modification by Cadence of its (a) right to have final orders in noncore matters entered after de novo review by a District Judge; (b) right to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to these cases; (c) right to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (d) other rights, remedies, claims, actions, defenses, setoffs, or recoupments to which Cadence and/or PHC are or may be entitled, all of which are hereby expressly reserved. Cadence further reserves its right to (i) amend or replace this claim as is appropriate, (ii) assert an administrative expense priority claim with respect to its claim for damages arising out of the Debtors' postpetition infringement of the referenced patents, (iii) file a motion for relief from the automatic stay to allow Cadence to proceed with the Action (as defined below) and enforce any judgment rendered, and (iv) seek withdrawal of the reference with respect to any and all claims that Cadence, may bring against the Debtors.

Pursuant to 11 U.S.C. § 502(b) and 502(c) and Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007 and 9014 Establishing (I) Dates for Hearings Regarding Disallowance or Estimation of Claims and (II) Certain Notices and Procedures Governing Hearings Regarding Disallowance or Estimation of Claims (the "Motion") [Docket No. 5453]. Although counsel to the Debtors has represented to counsel to Cadence that the procedures contemplated by the Motion will not apply to the Cadence Claims (as defined below), because the parties were unable to prepare written documentation of the stipulation Cadence submits the Objection to preserve its rights in respect of the Motion. Accordingly, in support of this Objection, Cadence shows the Court as follows:

## I.    PRELIMINARY STATEMENT

1.    Cadence objects to the entry of an order approving the estimation procedures set forth in the Motion because the procedures contemplated by the Debtors are contrary to the provisions of Section 502(c) of Title 11 of the United States Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"). First and foremost, the Motion should be

---

[2]    The Debtors include: Delphi NY Holding Corporation; Delphi Corporation; ASEC Manufacturing General Partnership; Delphi Medical Systems Colorado Corporation; Delphi China LLC, ASEC Sales General Partnership; Delphi Medical Systems Texas Corporation; Delphi Automotive Systems Overseas Corporation; Delphi Automotive Systems Korea, Inc.; Delphi Automotive Systems International, Inc.; Delphi International Holdings Corp.; Aspire, Inc.; Delphi Connection Systems; Delphi International Services, Inc.; Environmental Catalysts, LLC; Specialty Electronics International, LTD; Delphi Automotive Systems Thailand, Inc.; Delco Electronic Overseas Corporation; Delphi Technologies, Inc.; Delphi Automotive Systems (Holding), Inc.; Exhaust Systems Corporation; Delphi Medical Systems Corporation; Delphi Diesel Systems Corp.; Delphi Integrated Service Solutions, Inc.; Packard Hughes Interconnect Company; Delphi Electronics (Holding) LLC; Delphi Mechatronic Systems, Inc.; Specialty Electronics, Inc.; Delphi Automotive Systems Tennessee, Inc.; Delphi LLC; Dreal, Inc.; Delphi Automotive Systems Risk Management Corp.; Delphi Automotive Systems Services LLC; Delphi Liquidation Holding Company; Delphi Foreign Sales Corporation; Delphi Services Holding Corporation; Delphi Automotive Systems Human Resources LLC; Delphi Automotive Systems Global (Holding) Inc.; Delphi Automotive Systems LLC; Furukawa Wiring Systems LLC; Delphi-Receivables LLC; and MobileAria, Inc.

denied because the procedures fail to preserve Cadence's due process rights.    In

particular, the overreaching summary procedures contemplated by the Motion do not take

into consideration the complex scientific and technical issues in the Action (defined

below).[3]  Second, the Motion should be denied because the procedures contemplated do

not require the Debtors to satisfy their burden of demonstrating that estimation of the

Cadence Claims (defined below) – or any other claim in their cases – is <u>necessary</u> to

avoid undue delay in the administration of their estates or the confirmation of a plan.

Third, the Motion should be denied because the Debtors improperly seek authority to

estimate the value of the Cadence Claims for all purposes.  Fourth, the Motion should be

denied because it fails to explicitly preserve the right to seek reconsideration of any

claims estimation in accordance with Section 502(j) of the Bankruptcy Code and

Bankruptcy Rule 3008.   At bottom, the overall objective of the proposed procedures is to

vest in the Debtors significant (and in some cases, unlimited) discretion to structure the

litigation of contested claims to their own advantage or convenience.  While the Debtors

want the benefit of separate contested matters for each individual claim objection, the

Debtors do not propose to provide any of the procedural protections to claimants that they

normally would obtain under the Bankruptcy Rules and the Local Rules.  Nor do the

proposed procedures contemplate the complexities of the Claims asserted by Cadence.

For all of these reasons, the Motion should be denied, at least in so far as the Claims of

Cadence are concerned.

---

[3]    Attached hereto as Exhibit A is the summary of the Action that Cadence attached to the Cadence
Claims (defined below).

LEGAL02/30151347v1

## II.    BACKGROUND

2.      On December 15, 1999, Cadence's predecessor in interest, PHC,

commenced an action (the "Action") against Delphi Automotive Systems Corp. ("Delphi")

in the District Court for the Eastern District of Michigan, Southern Division (the "District

Court") [Case No. 99-76013] on account of the Debtors' direct and willful infringement[4]

of three patents (the "Patents").   In May 2003, the District Court bifurcated the patent

infringement (i.e., the "liability") phase from the damages and willfulness (i.e.,

"damages") phase of the action and directed that the Action first go forward with respect

to paradigm claims of the Patents (the "Paradigm Claims")[5] and Debtors' six paradigm

infringing airbag covers.[6]   In bifurcating the damages phase of the Action, the District

Court specifically recognized that it was necessary to determine liability – in the liability

phase – prior to ascertaining damages.

3.      Between April and December 2003, Debtors and PHC briefed and argued

their proposed definitions of the Paradigm Claim terms that the Debtors disputed.   The

first hearing on the Paradigm Claim construction, commonly known as a "Markman"

hearing, was held on June 30, 2003.   On December 5, 2003, the District Court ruled in

PHC's favor by selecting PHC's proposed Paradigm Claim definition.

4.      On April 5, 2004, a Special Master issued a recommended Paradigm

Claim construction with respect to 13 remaining issues, ruling in PHC's favor on 11 of

the 13.   Subsequently, the Debtors and PHC participated in an oral Markman hearing

---

[4]    Pursuant to that certain Stipulated Order dated August 15, 2001, Delphi stipulated that they had been on notice of its infringement since October 1997.

[5]    In designating the paradigm claims, Cadence (by its predecessor in interest) expressly reserved its right to assert infringement and/or additional claims with respect to Debtors' infringement of additional patents.

[6]    In designating the paradigm claims, Cadence (by its predecessor in interest) expressly reserved its right to assert infringement and/or additional claims with respect to Debtors' infringement of additional patents.

with respect to the 13 issues before the District Court. On August 6, 2004, the District Court issued its decision (dated August 2, 2004) adopting the Special Master's recommended Paradigm Claim construction in favor of PHC. Taken together, the Special Master and the District Court ruled in PHC's favor on virtually all of the disputed Paradigm Claim terms.

5.      On May 2, 2005, PHC formally assigned the Patents to Cadence.

6.      On October 8 and 14, 2006, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.[7] At the time of the Debtors' bankruptcy filing, the Action was ongoing. Because the parties had not been able to mediate their dispute, the Final Pretrial Order was scheduled to be submitted to the District Court on March 28, 2006.

7.      Due to the imposition of Section 362 of the Bankruptcy Code"), however, the separate liability phase and damages phase of the Action were stayed. As a result, the automatic stay has precluded Cadence from proceeding with discovery concerning (i) the Debtors' infringing airbag covers; (ii) the Debtors' manufacturing of infringing airbag covers; and (iii) technical information used by the Debtors to manufacture the infringing airbag covers, in addition to the ultimate resolution of the Action.

8.      On July 20, 2006, Cadence timely filed Proof of Claim Nos. 10074, 10077, 10078, 10079, 10080, 10081, 10082, 10083, 10084, 10085, 10086, 10087, 10088, 10089, 10090, 10091, 10092, 10093, 10094, 10095, 10096, 10097, 10098, 10099, 10100, 10101, 10102, 10103, 10104, 10105, 10106, 10107, 10108, 10109, 10110, 100111 10112, 10113, 10114, 10115, 10116, (collectively, the "Cadence Claims") against the Debtors

---

[7]    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(b) and 1108 of the Bankruptcy Code.

LEGAL02/30151347v1

and Debtors in Possession, styled "Cadence, as successor in interest to Patent Holding Company" in respect of the claims asserted in the Action. Cadence filed the Cadence Claims against each and every Delphi Debtor to reflect the fact that Delphi works through numerous subsidiaries and affiliates and, depending on discovery, those affiliates may have separate, independent liability for manufacturing airbags that infringe on the Patents.[8]

9.     By filing the Cadence Claims, Cadence asserts (i) a general unsecured claim with respect to the Debtors' prepetition infringement of the Patents and (ii) an administrative expense priority claim with respect to the Debtors' postpetition infringement of the Patents. Although these claims are currently unliquidated, Cadence contends that these claims, once liquidated, will be in an amount not less than $21 million on account of the Debtors' prepetition infringement and an unknown amount (well in excess of $4 million) on account of the Debtors' postpetition infringement. Furthermore, because the Debtors willfully and deliberately infringe the Patents, Cadence is entitled to an award of treble damages and its reasonable attorneys' fees. Because the full extent of the Debtors' infringement is not yet known, including the possible award of treble damages and attorneys' fees, the ultimate value of the patent infringement claim will be determined at trial.[9]

---

[8]     35 U.S.C. § 271 provides that whoever makes, uses offers to sell, or sells any patented invention or actively induces infringement of a patent shall be liable for infringement.

[9]     In connection with the Claims Estimation Motion, the Debtors have filed two (2) separate objections to the Cadence Claims. In the Second Omnibus Objection, the Debtors contend that the Cadence Claims against all Debtors other than Delphi Corporation are "duplicative." In the Third Omnibus Objection, the Debtors contend that the claims against Delphi Corporation and Delphi Automotive Systems LLC are not supported or not shown on the Debtors' books and records; and, as a result, should be disallowed and expunged. Both Objections should be overruled. In respect of the Second Omnibus Claim, as set forth in the contemporaneously filed response thereto, the duplication argument is simply without merit as the claims are not duplicative of the claims against Delphi Corporation, but rather reflect the fact that Delphi works through numerous subsidiaries and affiliates and, depending on discovery, those affiliates may have

LEGAL02/30151347v1

## III. THE DEBTORS' PROPOSED PROCEDURES

10.    In the Motion the Debtors seek, among other things, to establish procedures for estimating the Cadence Claims. The proposed procedures include the following:

- A requirement that Cadence submit all documentation or other evidence in respect of the Cadence Claims which Cadence will rely upon in opposing the Debtors' omnibus claims objection. Motion ¶ 28 (d).

- A requirement that Cadence state the amount that Cadence believes would be the allowable amount of any claim upon liquidation. Motion ¶ 28(e).

- The estimation of claims for all purposes, including voting and distribution, pursuant to Section 502(c) of the Bankruptcy Code. Motion ¶ 36(a)(i)(2).

- Cadence, as the holder of a claim in excess of $250,000, would be required to meet and confer (the "Meet and Confer") with the Debtors in Troy, Michigan, within five days notice of adjournment of its objection to the Debtors' proposed treatment of its claim to a claims estimation hearing. Motion ¶ 36(c)(i).

- Failure by Cadence to participate in the Meet and Confer within five business days of the service of the notice of adjournment, would constitute grounds for disallowance and expungement of its contested claim. Motion ¶ 36(c)(iv).

- To the extent the Debtors schedule a hearing to estimate Cadence's claim, Cadence would be required to file and serve its supplemental response – limited to 15 double spaced pages – no later than five days after the conclusion of the Meet and Confer. Motion ¶ 36(d)(i).

- If Cadence intends to rely on exhibits to support its claim, such exhibits must be included in its supplemental response. Motion ¶ 36(d)(ii).

- If Cadence desires to submit affidavits or declarations in support of its claim, it is limited to two witnesses setting forth the basis of the contested

---

separate, independent patent liability. As to the Third Omnibus Objection, the Debtors reflect the pending Action in their schedules and statement of financial affairs; the claims are simply unliquidated. The fact that the Debtors may not have reflected the amount asserted by Cadence means nothing. The Debtors have failed to adduce any evidence to controvert the allegations contained within the Proof of Claim. As a result, both the Second Omnibus Objection and the Third Omnibus Objection should be overruled.

LEGAL02/30151347v1

claim and evidence in support who must attend the claims estimation hearing; no other witnesses are allowed.  Motion ¶ 36(d)(iii).

- Cadence, as the holder of a claim in excess of $250,000, would be required to participate in non-binding mediation; failure to participate constitutes grounds for disallowance and expungement of the Cadence Claims. Motion ¶ 36(f).

- To the extent the Debtors and Cadence proceed with a claims estimation hearing, Cadence would be constrained by the following discovery procedures:

    o Cadence would be required to produce relevant documents within five business days following the conclusion of non-binding mediation.  Motion ¶ 36(g)(i)(1).

    o The Debtors will respond to no more than five interrogatories, including discrete subparts.  Motion ¶ 36(g)(ii)(2).

    o The Debtors will respond to no more than ten requests for admission.  Motion ¶ 36(g)(ii)(3).

    o No later than 10 days after the conclusion of non-binding mediation Cadence may take the deposition of the Debtors' two proffered witnesses.  Motion ¶ 36(g)(iv).

- At the estimation hearing, Cadence will have one hour to present its action (i.e., fully explain and argue the merits of its complex patent infringement action currently pending before the District Court) and cross examine the Debtors' witnesses.  Motion ¶ 36(h).

11.    These requirements and the Debtors' attempt to impose summary proceedings to estimate the Cadence Claims violate Cadences' due process rights.[10]  The Action, which was commenced prepetition, has lasted more than four years because it

---

[10]    Although certain concepts contemplated by the Debtors – such as the Meet and Confer requirement – may assist the resolution of disputed claims, the majority of the provisions imposed – such as the five (5) day production requirement and automatic disallowance of claims – are unnecessary and overreaching. Another example of the unnecessary and overreaching provisions in the proposed procedures is the authorization for the Debtors to file a reply at 4:00 p.m. before the date of a hearing.  (Motion ¶ 33). Obviously, the Debtors, with their extraordinary resources, do not need the authority for last-minute gamesmanship and places creditors at a significant disadvantage.  The Debtors do provide the potential for a mediation of issues and have filed a list of proposed mediators pursuant to the Motion.  While certain of the proposed mediators are well-known bankruptcy practitioners (for example, Mark Abrams of the Wilke, Farr & Gallagher firm, and former judges Barliant and Katz), the Debtors provide no information as to the qualifications of the mediators in respect of particularized litigation issues and, in particular, the complex patent issues involved in the Action.

- 8 -

involves numerous technical/scientific issues concerning the Patents and the need to introduce technical evidence and expert testimony. Because the Debtors' proposed procedures fail to even contemplate complex litigation or complex factual disputes, the proposed procedures fail to preserve Cadence's due process rights.

12.    Accordingly, the Motion should be denied to the extent it seeks the use of summary proceedings to estimate the value of the Cadence Claims – claims that arise out of the Debtors' willful and intentional decision to infringe the Patents – asserted in the Action.[11]

A.    **The Procedures Set Forth in the Motion Are Improper Because The Summary Nature of The Procedures Are Overreaching and Fail to Preserve Cadence's Due Process Rights**

13.    Section 502(c) of the Bankruptcy Code provides bankruptcy courts with the discretion to establish procedures to estimate the value of contingent or unliquidated claims, for purposes of allowance, when a full adjudication of such claims would unduly delay the administration of the bankruptcy case. See United States v. LTV Corp. (In re Chateaugay Corp.), 944 F.2d 997, 1006 (2d Cir. 1991) (noting that a rough estimation of the EPA's claim was necessary to determine its voice in the Chapter 11 proceedings.); In re Cont'l Airlines, Inc., 981 F.2d 1450, 1461 (5th Cir. 1993) (concluding that bankruptcy

---

[11]    Concurrently herewith, Cadence has submitted its request for relief from the automatic stay so that its claim against the Debtors may be liquidated in the District Court. In addition, Cadence has also contemporaneously filed a motion for the allowance and payment of an administrative expense claim in respect of the damages accruing postpetition by virtue of the Debtors' continuing infringement on the Patents. As set forth therein, the liquidation of that claim should be undertaken by the District Court as well, in the interest of judicial efficiency and economy and the avoidance of inconsistent results. See, e.g. Packerland Packing Co. v. Griffith Brokerage Co. (In re Kemble), 776 F.2d 802, 807 (9th Cir. 1985) ("Many cases have held that a district court may properly consider the factor of judicial economy in deciding whether to lift an automatic stay. The prior extensive preparation for the damages retrial made proceeding with that trial efficient. The decision to lift the stay could be upheld on this ground alone.") (citations omitted); Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc. (In re Mid-Atl. Handling Sys.), 304 B.R. 111, 131 (Bankr. D.N.J. 2003) ("[T]he notion of judicial economy compels this Court to conclude that the stay should be lifted so as to permit the litigation to proceed in state court. Simply stated the substantial time, effort, and resources already expended by the parties, Judge Escala, and the Discovery Master in moving this case closer to trial should not be interfered by this Court.").

courts may estimate claims under Section 502(c) of the Bankruptcy Code to (i) avoid the need to await resolution of outside disputes and (ii) promote a fair distribution to creditors through a realistic assessment of uncertain claims).  This discretion is not, however, without boundaries.

14.    Given the impact that estimation may have on a claimant's rights, in determining whether estimation procedures are proper, courts evaluate whether the procedures meet general due process requirements.  See In re Adelphia Bus. Solutions, Inc., 341 B.R. 415, (Bankr. S.D.N.Y. 2003); see also In re Hoffinger Indus., Inc., 307 B.R. 112, 117 (Bankr. E.D. Ark. 2004); Beatrice Co. v. Rusty Jones, Inc. (In re Rusty Jones, Inc.), 153 B.R. 535 (N.D. Ill. 1993).  Due process is not an inflexible standard, but requires a balancing of interests and a recognition of the circumstances at issue. Hoffinger, 307 B.R. at 122; see also Rusty Jones, 153 B.R. at 537-38 (determining that the estimation of claims was improper after the court balanced the interests of the parties).

15.    Cadence recognizes that the estimation procedures proposed in the Motion may work for many, if not most, of the claims asserted in the Debtors' bankruptcy cases. However, the proposed procedures fail to adequately provide for estimation of complex claims such as those represented by the Cadence Claims.  As summarized above, Cadence's predecessor in interest commenced the Action against the Debtors almost seven years ago, on December 15, 1999, on account of the Debtors' direct and willful infringement of the Patents.  Then, after nearly four and a half years, the District Court

- 10 -

issued its decision adopting the Special Master's recommended Paradigm Claim construction in favor of Cadence's predecessor.[12]

16.    The complexity and scope of discovery that will be required in the Action is evident from the tasks required up to this point in the Action.  Obtaining the Markman Paradigm Claim construction rulings alone required significant discovery, hearings, and pleadings; (i) Cadence took seven (7) depositions, (ii) Delphi took six (6) depositions, (iii) the District Court held one full hearing with respect to one Paradigm Claim term, (iv) after the District Court's Markman hearing, the District Court issued an opinion with respect to one Paradigm Claim term; (v) the District referred the remaining Paradigm Claim terms to a Special Master; (vi) the Special Master held one full hearing on the remaining Paradigm Claim terms, (vii) after the Special Master's hearing, the Special Master issued three opinions with respect to the remaining Paradigm Claim terms; (viii) in response to the Special Master's opinions, the parties filed objections before the District Court that required another round of briefings; and (ix) yet another hearing, an oral Markman hearing, was held before the District Court.

17.    After designating and construing the disputed Paradigm Claim terms, the District Court was prepared to conclude the liability phase of the Action with a jury trial before proceeding with the damages phase.  Together, the liability phase and the damages phase of the Action will require at least: (i) technical experts' reports and depositions concerning the Debtors' "two-shot" airbag covers; (ii) analysis of whether the Debtors' airbag covers infringe on the Patents – as defined during the Markman hearing; (iii) discovery related to the Debtors' production of infringing airbag covers;

---

[12]    Taken together, the Special Master and the District Court ruled in PHC's favor on virtually all of the disputed claim terms; thereby framing the issue for the District Court's determination in the damages phase of the Action.

LEGAL02/30151347v1

(iv) discovery related to Delphi's opinions of counsel; (v) damages experts' reports and depositions; (vi) discovery as to which Debtor or Debtors manufactured infringing airbag covers; (vii) 30(b)(6) depositions of key Delphi/Debtor employees; (viii) a determination with respect to Cadence's damages; and (ix) a determination as to the award of treble damages and attorneys' fees due to  the Debtors' willful and intentional patent infringement.

18.    If the Cadence's Claims are litigated on their merits, the parties would have at their disposal the full spectrum of discovery devices, procedures, and protections. Those rules provide for, among other things, the opportunity of each party to obtain comprehensive written discovery from all parties, the right to depose parties and pertinent third parties, the ability to retain and to depose experts, the opportunity to file dispositive motions and limit the issues for trial, and the right to have the issues heard and resolved in a comprehensive fashion by a trier of fact in a thorough and orderly trial on the merits.

19.    In the proposed procedures, the Debtors seek to replace the full spectrum of discovery required to resolve the Action, and the District Court's specific recognition that it was necessary to conclude the liability phase prior to resolving damages with (i) five interrogatories; (ii) ten requests for admission; (iii) two witnesses; and (iv) one hour of testimony, inclusive of cross examinations.  Motion ¶¶ 36(d)(iii), 6(g)(ii)(2-3), 36(h).  Because the proposed procedures fail to adequately provide for the estimation of the Cadence Claims, the Motion must be denied.[13]

---

[13]    Moreover, the requirement contemplated in Paragraph 28(d) of the Motion to the effect that "all documents" to be relied upon by the Claimant in opposition to the objection be attached to the response to the objection, is entirely inappropriate and without merit.  The documents upon which Cadence will rely are voluminous and many of those documents may well be in the possession of Delphi.  This attempted limitation on the documents available for use by any particular Claimant turns the discovery rules on their head and is entirely inappropriate for the patent litigation at issue in the Action and asserted in the Cadence Claims.

- 12 -

**B.    The Procedures Set Forth in the Motion Are Improper Because They Do Not Require the Debtors to Establish that the Administration of the Case would be Unduly Delayed in the Absence of Estimation**

20.    The Motion should be denied because the proposed procedures are improper under Section 502(c) of the Bankruptcy Code in that the Debtors seek the ability to obtain the estimation of <u>any</u> unliquidated claim – in their sole discretion – without demonstrating that undue delay would result if the claims are not estimated. Pursuant to Section 502(c) of the Bankruptcy Code, "[c]ontingent claims may be estimated if their liquidation 'would unduly delay the administration of the case.'" <u>See</u> <u>Chateaugay</u>, 944 F.2d at 1006 (quoting 11 U.S.C. § 502(c)); <u>see also</u> <u>In re Statewide Realty Co.</u>, 159 B.R. 719, 725 (Bankr. D.N.J. 1993) (denying debtor's request to estimate claims because (i) confirmation was not dependent on the estimation of the claim and (ii) the allowance of the claim would not alter distributions to unsecured creditors).

21.    The Debtors cannot satisfy their burden of establishing undue delay merely by making generalized and conclusory statements such as those set forth in the Motion.    Motion ¶ 51 ("The Debtors' implementation of an expedited claims administration process, of which the relief sought by this Motion is a cornerstone, is critical to the Debtors' ability to emerge from these chapter 11 cases promptly."). Section 502(c) requires the Debtors to make a <u>particularized</u> showing as to why undue delay in the administration of their bankruptcy cases would occur in the absence of estimation of claims.[14]    <u>See, e.g.</u>, <u>In re Dow Corning Corp.</u>, 211 B.R. 545, 562-74 (E.D. Mich. 1997) (denying motions to estimate tort claims under Section 502(c) of the

---

[14]    Recognizing that (i) the claims asserted against the Debtors exceed $36 billion, (ii) the Debtors have global assets of approximately $17 billion, and (iii) the Debtors had net sales of $26.9 billion (in 2005), Debtors will not be able to establish that the Cadence Claims, which total approximately $75 million (assuming treble damages) would unduly delay the confirmation of the Debtors' bankruptcy case or dilute in any significant manner general unsecured claims (including bond and trade claims).

- 13 -

Bankruptcy code because movant did not establish that there would be undue delay); In re Marvin Johnson's Auto Serv., Inc., 192 B.R. 1008 (Bankr. N.D. Ala. 1996) (denying estimation of fraud claims because, *inter alia*, no evidence was presented that established that the case would be delayed); Statewide Realty, 159 B.R. 719 (holding that debtor failed to establish that arbitrating dispute that arose out of management would unduly delay its reorganization).

22.    Further, the Debtors bear the burden of establishing that the estimation of a claim is required to avoid undue delay. See, e.g., Dow Corning, 211 B.R. at 562-74. In particular, as recognized by the court in Dow Corning, "[w]hen dealing with a motion for estimation, a court starts with a baseline knowledge of what is involved with liquidating a claim. Therefore, the party moving for estimation must show that the normal mode of liquidating the claim would create undue delay in the bankruptcy process." Id. at 573 (emphasis added). As a result, the Debtors must be required to make a showing of undue delay at the time they seek to estimate claims, including the Cadence Claims; the Debtors cannot simply decide – in their sole discretion – that estimation is necessary.

23.    On March 31, 2006, the Debtors outlined certain "key" tenets of its transformation plan that the Debtors believe will facilitate the return to stable, profitable business operations and allow the Debtors to emerge from their Chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors contend that they must focus on five key areas: (i) modifying their labor agreements to create a competitive arena in which to conduct business; (ii) concluding negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Debtors; (iii) streamlining their product portfolio to

- 14 -

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus; (iv) transforming their salaried workforce

to ensure that the Debtors' organizational and cost structure is competitive and aligned

with its product portfolio and manufacturing footprint; and (v) devise a workable solution

to their current pension situation.  As of the filing of the Motion, the Debtors have not

fully resolved any of these "key" tenets.  See Motion for Order Extending Debtors'

Exclusive Period (the "Extension Motion") [Docket No. 4035].  In particular, in the

Extension Motion, the Debtors note that: (i) they have not resolved their labor concerns;[15]

(ii) they have not concluded negotiations with GM regarding unprofitable contracts;[16]

(iii) the Debtors have not wound down their product portfolio;[17] and (iv) the Debtors have

failed to resolve their long-term pension liability.

24.    Recognizing these complexities, on June 6, 2006 [Docket No. 4035], the

Debtors sought and on June 19, 2006, obtained [Docket No. 4266] an order extending the

exclusive period within which they may file and solicit acceptances of a plan of

reorganization through February 1, 2007, and April 2, 2007 respectively.  The motion and

order recognize that the Debtors have not been able to formulate a plan of reorganization

that will enable them to exit bankruptcy and, as a result, need additional time to negotiate,

prepare and prosecute any plan of reorganization.  By Orders dated November 13, 2006,

---

[15]  "Delphi has not reached comprehensive agreements with its unions and GM."  Extension Motion ¶ 13.

[16]  "Contemporaneously therewith, the Debtors also moved to reject unprofitable supply contracts with
GM. . . . Although the filing of these motions was a necessary procedural step, the Debtors remain focused
on reaching a consensual resolution with all of Delphi's unions and GM before a hearing on the motions is
necessary."  Extension Motion ¶ 13.

[17]  "The Company will seek to sell or wind down these noncore product lines (which will include
approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and
other stakeholders to carefully manage the transition of such affected product lines. The Company intends
to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008."  Extension
Motion ¶ 15.

- 15 -

this Court set a November 17, 2006 status conference in respect of the Debtors' motion to reject certain executory contracts with General Motors Corporation and the Sections 1113 and 1114 motions filed by the Debtors previously in the cases.  As a result of those conferences, on November 22, 2006, the Court entered further Orders adjourning the hearing on the motion to reject certain executory contracts with General Motors Corporation and the Sections 1113 and 1114 motions and extending the date by which the Court must issue its ruling on the 1113 and 1114 motions to January 31, 2007, for the Company to proceed with what Debtors' counsel has characterized as "very constructive talks with labor unions."  Of course, these very constructive talks have been continuing since the Summer of 2006.  It may well be that the Debtors and the other parties to those negotiations will be before the Court in late January, 2007 asking for yet another extension of the deadlines.  (Yet another closed-door status conference on these motions has been scheduled before this Court on November 30, 2006).

25.    The Motion is devoid of any information concerning the process of formulating a plan of reorganization.  In fact, in Paragraph 51 of the Motion the Debtors contend that the "ability to reach agreement on a framework for the Debtors' emergence is predicated upon a clear understanding of the scope of the claims against the Debtors that will ultimately be allowed in these cases" and that "[s]uch an agreement is a prerequisite for the Debtors to be able to file a consensual plan of reorganization and to proceed with confirmation of such a plan."  Motion ¶ 51.  Because the Debtors have only begun the process of resolving claims asserted against their estates, a clear understanding of the scope of the claims asserted against their estate is not close.

- 16 -

26.     In the absence of a provision that would require the Debtors to make a particularized showing of undue delay for the claims they seek to estimate, including the Cadence Claims, the procedures contemplated by the Motion cannot be approved and must be denied.

## C.    The Procedures Set Forth in the Motion Are Improper Because They Seek to Estimate Claims for All Purposes

27.     Section 502(c) of the Bankruptcy Code provides that "[t]here shall be estimated for purposes of allowance under this section -- (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c). Section 502(c) does not, however, address what, if any, preclusive effect the bankruptcy court's estimation should have with respect to the amount of the claim on its merits.

28.     Courts addressing this issue in the Southern District of New York have properly concluded, however, that a bankruptcy court's estimation of a claim should not be deemed a final determination of the amount of the claim on its merits. See, e.g., Adelphia, 341 B.R. at 423 ("Estimation thus is an essential prerequisite to confirmation of the Plan. However, it is not, in my view, likewise an essential prerequisite to fixing the allowed amount of ACC's admin claim."); In re Ralph Lauren Womenswear, Inc., 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996) ("This being but an estimation hearing, my findings of fact will not have any preclusive effect upon the ultimate disposition of [the creditor's] claim . . . due to the fundamental difference between the adjudication of a claim and its temporary allowance for plan purposes."); United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.), 261 B.R. 800, 808 (B.A.P. 1st Cir. 2001) ("[W]e proceed with the understanding that the bankruptcy court was estimating the

- 17 -

IRS's administrative tax claim only for the limited purpose of approving the final accounts subject to the Colorado district court's adjudication of the tax liability."); Nat'l Labor Relations Bd. V. Greyhound Lines, Inc. (In re Eagle Bus Mfg., Inc.), 158 B.R. 421, 437 (Bankr. S.D. Tex. 1993) ("[T]he bankruptcy court's estimation does not serve as a cap to the administrative law judge's ultimate award, if any, for the [claimant's] claim.").

29.    Here, the Debtors request that the Court estimate the amount of claims not only for purposes of evaluating the feasibility of an unarticulated and unformulated plan of reorganization, but for all purposes. The Debtors offer no support for this proposition, nor is it consistent with the Bankruptcy Code, due process, or the authority addressing the estimation of claims in this district.

30.    Furthermore, as is the case with the Cadence Claims – which assert both a prepetition general unsecured claim and a postpetition administrative expense claim for the Debtors infringement on its patents – if the claim being estimated is an administrative expense claim, the argument against the finality of an estimation finding is particularly compelling.

31.    In In re MacDonald, 128 B.R. 161 (Bankr. W.D. Tex. 1991),[18] the court was asked to estimate, pursuant to section 502(c), certain administrative expense claims arising out of the debtor's purported postpetition tortious conduct. While the court was willing to "adapt" the estimation concepts of section 502(c), which "facially applies only to pre-petition claims," 128 B.R. at 165, to an administrative expense claim, the court admonished

> The estimation of post-petition administrative claims is especially sensitive because such claims must be paid in full and such payment is a

---

[18]   Cited with approval by the court in Adelphia, 341 B.R. at 423.

precondition to confirmation. "Guessing wrong," as it were, can result in confirmation of plans which should never have been confirmed (where the estimate is too low) or in scuttling plans which otherwise could have worked, to the detriment of other creditors (where the court overestimates the value of the claim).

Id. at 166.

32.    The MacDonald court further observed that "if a pre-petition claim is estimated for plan purposes under Section 502(c), it is very likely that the balance of the claim in excess of the estimated amount is discharged by the plan" because of "the precise language of Section 502(c) itself" (which states that a prepetition claim is estimated for purpose of allowance). Id. at 167. In contrast, the court noted:

Congress certainly intended that post-petition administrative claims be paid in full, and that they be paid in advance of pre-petition creditors. Were the estimation process to set the outer limits of allowance for such claims, the due process rights of such claimants would be jeopardized . . .

Id.

33.    As a result, the court concluded that it was "not bound to blindly apply Section 502(c) and all its legal baggage to post-petition administrative claims," particularly where "to do so would defeat the legitimate ends of other provisions of the Bankruptcy Code," such as the requirement that administrative expense claims be paid in full. Id. The court reasoned that "[t]he better rule seems to be that estimation primarily serves to assist the court and parties in interest in evaluating the feasibility of a given plan under section 1129(a)(11)" but "will not . . . set the 'outer limits of a claimant's right to recover.'" Id. at 167-68 (internal quotations omitted).

34.    All the considerations that informed the court's analysis in MacDonald are equally applicable here. Accordingly, because the Debtors seek to impose procedures

- 19 -

that will enable the Debtors to estimate Cadence's claims for all purposes, the Motion

should be denied.

**D.      The Motion Violates Section 502(j) of the Bankruptcy Code and Bankruptcy
Rule 3008**

35.      The procedures contemplated by the Motion also improperly limit the

right of creditors to seek reconsideration of their claims, by failing to explicitly preserve

the rights conferred by Section 502(j) of the Bankruptcy Code and Bankruptcy Rule

3008.[19]

36.      Section 502(j) of the Bankruptcy Code provides that "[a] claim that has

been allowed or disallowed may be reconsidered for cause.  A reconsidered claim may be

allowed or disallowed according to the equities of the case." 11 U.S.C. § 502(j).  Since

Section 502(c) of the Bankruptcy Code allows estimation "for purpose of allowance,"

these estimations must be made subject to Cadence's rights to reconsideration under

Section 502(j) of the Bankruptcy Code.  See, e.g., In re MCorp. Fin., Inc., 137 B.R. 219,

226 (Bankr. S.D. Tex. 1992 ("[A]ny claim estimated under § 502(c) is subject to

adjustment per § 502(j) after the claim has been liquidated or the contingency

removed."); Woburn Assocs. V. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 8 n.8

(1st Cir. 1992) ("Under Bankruptcy Code § 502(j), the holder of a contingent claim

incorrectly estimated at the time of allowance may request reconsideration and the court

'may increase or decrease the amount of [the] prior allowance . . or enter any other

appropriate order.'").  Furthermore, Bankruptcy Rule 3008 provides that: "A party in

interest may move for reconsideration of an order allowing or disallowing a claim against

---

[19]      Although the Motion does not specifically exempt its estimation procedures from Section 502(j) of the
Bankruptcy Code, the summary proceedings contemplated do not provide that this Section is applicable.

- 20 -

the estate." Fed. R. Bankr. P. 3008. Therefore, by failing to provide that Cadence may request reconsideration, the proposed procedures are overreaching.

37.    The Debtors provide no legal basis for depriving Cadence, or other claimants, of their rights under Section 502(j) of the Bankruptcy Code. Therefore, the procedures sought in the Motion cannot be affirmed.

WHEREFORE, for the foregoing reasons, Cadence respectfully requests the following relief:

(i)    That the Court deny, in its entirety, the Motion in respect of the Cadence Claims;

(ii)    That the Court grant the contemporaneously-filed Motion for Relief from the Automatic Stay so as to allow Action to proceed in the United States District Court for the Eastern District of Michigan (Southern Division);

(iii)    That the Court direct that the scheduling orders and trial of the Action by the District Court shall be applicable to the Claims and the Administrative Expense Claim asserted by Cadence; and

(iv)    That the Court grant Cadence such other and further relief as is just and proper.

Respectfully submitted this 22nd day of November 2006.

ALSTON & BIRD LLP

/s/ Dennis J. Connolly
Dennis J. Connolly (DC-9932)
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone (404) 881-7000
Facsimile (404) 881-7777
*Counsel to Cadence Innovation LLC*

- 21 -

# **Exhibit A**

## ATTACHMENT

Patent Holding Company ("PHC") hereby files this proof of claim[1] in the Debtors'[2] Chapter 11 bankruptcy cases.[3]

On December 15, 1999, PHC commenced an action against Delphi Automotive Systems Corp. ("Delphi") in the District Court for the Eastern District of Michigan, Southern Division (the "District Court") Case No. 99-76013, on account of the Debtors' direct and willful infringement[4] of three PHC patents (the "Action").[5] A copy of the Complaint filed in the Action is attached hereto as Exhibit "A." In May 2003 the District Court bifurcated damages and directed that the Action go forward with respect to three paradigm patent claims and six paradigm infringing Debtors airbag covers.[6]

On August 12, 2003, the District Court stayed the Action pending claim construction and a subsequent conference with the District Court to discuss a schedule for the remainder of the Action. Between April and December 2003, Debtors and PHC briefed and argued their proposed definitions of terms that the Debtors disputed. The first hearing on the claim construction, commonly known as a "Markman" hearing, was held on June 30, 2003. On December 5, 2003, the District Court ruled in PHC's favor by selecting PHC's proposed definition. As a result, the District Court found that the Debtors' "two-shot" airbag covers infringed on the PHC patents.

---

[1]    Following the Commencement of the Action, PHC, the named Plaintiff, assigned the three patents at issue to Cadence Innovation LLC ("Cadence"). Due to the filing of the Debtors' bankruptcy cases, and the District Court's decision to stay the Action, Cadence's name has not been substituted for PHC in the Action. Accordingly, Cadence hereby files this proof of claim in the name of PHC against the Debtors.

[2]    The Debtors include: Delphi NY Holding Corporation; Delphi Corporation; ASEC Manufacturing General Partnership; Delphi Medical Systems Colorado Corporation; Delphi China LLC, ASEC Sales General Partnership; Delphi Medical Systems Texas Corporation; Delphi Automotive Systems Overseas Corporation; Delphi Automotive Systems Korea, Inc.; Delphi Automotive Systems International, Inc.; Delphi International Holdings Corp.; Aspire, Inc.; Delphi Connection Systems; Delphi International Services, Inc.; Environmental Catalysts, LLC; Specialty Electronics International, LTD; Delphi Automotive Systems Thailand, Inc.; Delco Electronic Overseas Corporation; Delphi Technologies, Inc.; Delphi Automotive Systems (Holding), Inc.; Exhaust Systems Corporation; Delphi Medical Systems Corporation; Delphi Diesel Systems Corp.; Delphi Integrated Service Solutions, Inc.; Packard Hughes Interconnect Company; Delphi Electronics (Holding) LLC; Delphi Mechatronic Systems, Inc.; Specialty Electronics, Inc.; Delphi Automotive Systems Tennessee, Inc.; Delphi LLC; Dreal, Inc.; Delphi Automotive Systems Risk Management Corp.; Delphi Automotive Systems Services LLC; Delphi Liquidation Holding Company; Delphi Foreign Sales Corporation; Delphi Services Holding Corporation; Delphi Automotive Systems Human Resources LLC; Delphi Automotive Systems Global (Holding) Inc.; Delphi Automotive Systems LLC; Furukawa Wiring Systems LLC; Delphi-Receivables LLC; and MobileAria, Inc.

[3]    PHC files this proof of claim against each and every Delphi debtor to preserve its rights against the Debtor or Debtors that engaged in manufacturing products that infringe its patents.

[4]    Pursuant to that certain Stipulated Order dated August 15, 2001, Delphi stipulated that it had been on notice of its infringement since October 1997.

[5]    Attached hereto as Exhibit A is a true and correct copy of the Complaint.

[6]    In designating the paradigm claims, PHC expressly reserved its right to assert infringement and/or additional claims with respect to Delphi's infringement of additional PHC patents.

On April 5, 2004, a Special Master issued recommended claim construction with respect to 13 remaining issues, ruling in PHC's favor on 11 of the 13. On July 21, 2004, following the parties' objection to the Special Master's recommended claim construction, the Debtors and PHC participated in an oral Markman hearing with respect to the 13 issues before the District Court. On August 6, 2004, the District Court issued its decision (dated August 2, 2004) adopting the Special Masters recommended claim construction in favor of PHC. Taken together, the Special Master and the District Court ruled in PHC's favor on virtually all of the disputed claim terms.

At the time of the Debtors' bankruptcy filing, the Action was ongoing and the parties were in the midst of mediating their dispute. Due to the bankruptcy filing, the Action was stayed in accordance with Section 362 of the Title 11 of the United States Code (the "Bankruptcy Code").

PHC's claims arise out of the stayed Action. By filing this Proof of Claim, PHC seeks allowance of (i) a general unsecured claim with respect to its claim for damages arising out of the Debtors' prepetition infringement of the PHC patents and (ii) an administrative expense priority claim with respect to its claim for damages arising out of the Debtors' postpetition infringement of the PHC patents. In addition, by filing this proof of claim, PHC seeks to preserve its claim against each Delphi debtor entity that willfully and intentionally infringed the PHC patents. Although this claim is currently disputed by the Debtors and is unliquidated, these claims, once liquidated, will be in an amount not less than $21 million on account of the Debtors' prepetition infringement and an unknown amount (well in excess of $4 million) on account of the Debtors' postpetition infringement. In addition, because the Debtors' willfully and deliberately infringed the PHC patents, PHC is entitled to an award of treble damages and its reasonable attorneys' fees. However, because the full extent of the Debtors' infringement is not yet known, including the possible award of treble damages and attorney fees, the ultimate value of the PHC claim will be determined at trial. Accordingly, PHC seeks allowance of the full amount of its general unsecured and administrative expense claims once the same have been reduced to judgment and liquidated.

Nothing herein or otherwise, including, but without limitation, any later appearance, pleading, claim, or action, is intended or shall be deemed to be a waiver, release, or modification by PHC of its (a) right to have final orders in noncore matters entered after de novo review by a District Judge; (b) right to trial by jury in any proceeding so triable in this case or any case, controversy, or proceeding related to these cases; (c) right to have the District Court withdraw the reference in any matter subject to mandatory or discretionary withdrawal; or (d) other rights, remedies, claims, actions, defenses, setoffs, or recoupments to which PHC is or may be entitled, all of which are hereby expressly reserved. PHC further reserves its right to (i) amend or replace this claim as is appropriate and (ii) file a motion for relief from the automatic stay to allow PHC to proceed with the Action and enforce any judgment rendered and (iii) seek withdrawal of the reference with respect to any and all claims that PHC may bring against the Debtors.

**<u>EXHIBIT A</u>**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PATENT HOLDING COMPANY,

      *Plaintiff,*

vs.

    HON. GEORGE WOODS
    HON. MAGISTRATE JUDGE PEPE

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION,

    CIVIL ACTION NO. 99-76013

      *Defendant.*

    JURY TRIAL DEMANDED

---

ROBERT C.J. TUTTLE  (P25222)
JOHN M. HALAN       (P37616)
**BROOKS & KUSHMAN P.C.**
1000 Town Center
Twenty-Second Floor
Southfield, Michigan  48075
(248) 358-4400

    *Attorneys for Plaintiff*

A. SIDNEY KATZ
ROBERT B. BREISBLATT
**WELSH & KATZ, LTD.**
120 South Riverside Plaza, 22nd Floor
Chicago, Illinois  60606
(312) 655-1500

    *Of Counsel For Plaintiffs*

THOMAS N. YOUNG (P22656)
MARSHALL G. MACFARLANE (P27296)
THOMAS E. BEJIN (P56854)
AMANDA CONTI DUHAIME (P48960)
**YOUNG & BASILE, P.C.**
3001 W. Big Beaver Rd., Ste. 624
Troy, Michigan 48084-3107
(248) 649-3333

    *Attorneys for Defendants*

RECEIVED 2000 AUG 29 PM 12: 15
WELSH & KATZ, LTD

---

# SECOND AMENDED COMPLAINT
# FOR PATENT INFRINGEMENT AND DEMAND FOR JURY

BK
LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075
—
(248) 358-4400

## I. THE PARTIES

Plaintiff, Patent Holding Company ("PHC"), is a Michigan corporation having

an address at 33662 James J. Pompo, Fraser, Michigan 48026.

Defendant, Delphi Automotive Systems Corporation ("Delphi"), is a Delaware

corporation having an address at 5725 Delphi Drive, Troy, Michigan 48098-2815.



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075
—
(248) 358-4400

-2-

## II.  JURISDICTION AND VENUE

The claims pleaded herein arise under the Patent Act, 35 U.S.C. §100, *et. seq.*, and subject matter jurisdiction for such claims is conferred on the Court by 28 U.S.C. §1338(a).

Venue is proper in this judicial district under 28 U.S.C. §1400(b).



LAW OFFICES
Brooks & Kushman P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

## III.  FACTUAL BACKGROUND

### A.   PHC And The '485 Patent

5.    United States Patent No. 5,501,485 ("the '485 patent," **Exhibit A**) was duly and lawfully issued on March 26, 1996, to Thomas L. Eckhout for an invention titled "SNAP-ON AIR BAG COVER."

6.    PHC is the owner by assignment of the '485 patent including the right to bring and maintain actions for any past, present or future infringement of such patent in the name and on the behalf of PHC.

### B.   PHC And The '026 Patent

7.    United States Patent No. 5,498,026 ("the '026 patent," **Exhibit B**) was duly and lawfully issued on March 12, 1996, to Thomas L. Eckhout for an invention entitled "AIR BAG COVERING HAVING A HIDDEN BREAK SEAM."

8.    PHC is the owner by assignment of the '026 patent including the right to bring and maintain actions for any past, present or future infringement of such patent in the name and on behalf of PHC.

### C.   PHC And The '031 Switch Patent

9.    United States Patent No. Re. 35,031 ("the '031 patent," **Exhibit C**) was duly and lawfully issued on September 5, 1995, as a reissue of U.S. Patent No. 5,062,661 to Larry J. Winget for an invention entitled "AUTOMOTIVE AIR BAG COVER HAVING A HORN SWITCH FORMED THEREIN."

10.    PHC is the owner by assignment of the '031 patent including the right



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-4-

to bring and maintain actions for any past, present or future infringement of such patent in the

name and on behalf of PHC.

**D.    The Infringing Acts Of Delphi**

11.    Delphi has directly infringed claims of the '485, '026 and '031 patents

by making, using, selling and/or offering for sale, in the United States, certain airbag covers,

including but not limited to, at least the following:

(a)    C/K pickup truck series airbag cover models sold under the "GMC" and

"Chevrolet" brands;

(b)    Buick Century airbag cover models;

(c)    Park Avenue airbag cover models; and

(d)    Cutlass airbag cover models.

12.    Delphi has admitted making, using, selling and/or offering for sale the

allegedly infringing airbag models specifically referred to in Paragraph 11. *See, e.g.,* May 15,

2000, Letter (**Exhibit D**).

13.    PHC avers that a reasonable opportunity for further investigation or

discovery will likely show that Delphi has directly infringed, contributorily infringed and/or

induced the infringement of claims of the '485, '026 and '031 patents with respect to airbag

covers, including but not limited to those specifically referred to in Paragraph 11.

14.    PHC avers that a reasonable opportunity for further investigation or

discovery will likely show that Delphi is liable for infringement of the '485, '026 and '031

patents as a successor to General Motors Corporation ("GM") with respect to the airbag cover

or airbag related business and/or in connection with the design, purchase from others, use,



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-5-

manufacture, sale and/or importation of airbag covers, including but not limited to those covers specifically referred to in Paragraph 11.

15.     Delphi has infringed, or is responsible for the infringement of, the '485, '026 and '031 patents as successor to GM pursuant to the GM-Delphi Technology Transfer Agreement, in that Delphi is to defend any suit or claim against GM arising out of any actual or alleged direct or contributory infringement of, or inducement to infringe, any United States patent by reason of the manufacture, use or sale of products or services purchased by GM or others from Delphi under agreements, projects or ventures entered into prior to January 1, 1999, including those suits and claims involving PHC's '485 and '026 patents.

**F.     Notice Of Infringement To Delphi**

16.     Delphi has been provided, both verbally and in writing, with repeated notice of its infringement of the '485, '026 and '031 patents. *See, e.g.*, May 7, 1998, Letter **(Exhibit E)**.

17.     Delphi continues to infringe despite having been given notice of infringement, and will continue to do so unless preliminarily and permanently enjoined by this Court.

18.     Delphi's infringement has been willful and deliberate.

**E.     Delphi Is Liable To PHC For Patent Infringement**

19.     Delphi has directly infringed the '485, '026 and '031 patents under 35 U.S.C. §271, and is liable to PHC for such infringement.

20.     PHC avers that a reasonable opportunity for further investigation for discovery will likely show that Delphi has induced infringement of and/or contributorily



LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075
—
(248) 358-4400

-6-

infringed the '485, '026 and '031 patents under 35 U.S.C. §271, and is liable to PHC for such infringement.

21.    PHC avers that Delphi has infringed, or is responsible for infringement of, the '485, '026 and '031 patents as a successor to GM pursuant to the GM-Delphi Technology Transfer Agreement, and is liable to PHC for such infringement.

22.    PHC is entitled to a preliminary and permanent injunction against any further infringement of the '485, '026 and '031 patents by Delphi under at least 35 U.S.C. §283.

23.    PHC is entitled to an award of damages adequate to compensate for infringement of the '485, '026 and '031 patents, together with interest and costs as may be fixed by the Court, under at least 35 U.S.C. §284.

LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075
(248) 358-4400

-7-

## IV. DEMAND FOR RELIEF

**WHEREFORE,** PHC demands entry of a judgment against Delphi granting the

following relief:

A.    An award to PHC adequate to compensate for the patent infringement;

B.    A determination that such patent infringement has been willful

and deliberate;

C.    An award of treble damages based on the willful and

deliberate infringement;

D.    A determination that this case is "exceptional" under 35 U.S.C. §285,

and an award to PHC of its reasonable attorney fees;

E.    An order preliminarily and permanently enjoining Delphi, its officers,

agents, servants, employees, and attorneys, and such other persons in active concert or

participation with them who receive actual notice of the order, from further infringement of the

patents-in-suit; and

F.    Such other and further relief as PHC may be entitled to on the proofs.

**BK**

LAW OFFICES
**BROOKS & KUSHMAN P.C.**
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-8-

## V.  DEMAND FOR JURY TRIAL

PHC hereby demands trial by jury for all issues so triable.

Respectfully submitted,

By: 

John M. Halan
Robert C.J. Tuttle
BROOKS & KUSHMAN
1000 Town Center
Twenty-Second Floor
Southfield, Michigan 48075
(248) 358-4400
(248) 358-3351 (FAX)

A. Sidney Katz
Robert B. Breisblatt
Thomas I. Gemmell
WELSH & KATZ, LTD.
120 South Riverside Plaza
Twenty-Second Floor
Chicago, Illinois 60606
(312) 655-1500
(312) 655-1501 (FAX)

Dated: __August 25, 2000__

*Attorneys for Patent Holding Company*



LAW OFFICES
BROOKS & KUSHMAN P.C.
1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075
⸺
(248) 358-4400

-9-

## CERTIFICATE OF SERVICE

I certify that true and correct copies of the following:

**SECOND AMENDED COMPLAINT FOR
PATENT INFRINGEMENT AND DEMAND FOR JURY;**

-and-

**STIPULATION AND ORDER ALLOWING FILING OF SECOND
AMENDED COMPLAINT, AND FOR WITHDRAWAL OF RULE 11
MOTION**

on August 25, 2000

_____    via facsimile and courier

  X    via first-class mail

a copy to:

Thomas N. Young
Young & Basile, P.C.
3001 W. Big Beaver Rd., Suite 624
Troy, Michigan  48084-3107
(248) 649-3333

Jonathan F. Putnam
David S. Brafman
Kirkland & Ellis
Citicorp Center
153 East 53rd Street
New York, New York  10022-4675
(212) 446-4800

*Counsel for Defendant, Delphi Automotive Systems Corporation*

Sandra Darling

**BK**

LAW OFFICES

BROOKS & KUSHMAN P.C.

1000 TOWN CENTER
TWENTY-SECOND FLOOR
SOUTHFIELD, MI 48075

(248) 358-4400

-10-

# EXHIBIT A

**United Stat** **tent** [19]          [11] Pate    nber:        5.501.485

Eckhout                                   [45] Date of Patent:      Mar. 26. 1996

[54] SNAP-ON AIR BAG COVER

[75] Inventor: Thomas L. Eckhout. Waterforc. Mich.

[73] Assignee: Larry J. Winget. Leonard. Mich.

[21] Appl. No.: 479.850

[22] Filed: Jun. 7, 1995

### Related U.S. Application Data

[63] Continuation of Ser. No. 140.669. Oct. 21, 1993. abandoned, which is a continuation-in-part of Ser. No. 984.326. Dec. 2, 1992. abandoned.

[51] Int. Cl.⁶ ..................................... B60R 21/20
[52] U.S. Cl. ................................... 280/728.3
[58] Field of Search ............... 280/728.3. 728.2.
                                    280/731. 732. 728.1

[56]              **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4.325.568 | 4/1982 | Clark et al. | 280/731 |
| 4.934.735 | 6/1990 | Embach | 280/731 |
| 5.064.217 | 11/1991 | Shiraki | 280/728 B |
| 5.085.462 | 2/1992 | Gualtier | 280/731 |
| 5.186.490 | 2/1993 | Adams et al. | 280/728 B |
| 5.239.147 | 8/1993 | Allard et al. | 200/61.54 |
| 5.280.946 | 1/1994 | Adams et al. | 280/728 B |
| 5.283.404 | 2/1994 | Prescaro. Jr. | 200/61.54 |
| 5.306.040 | 4/1994 | Leonelli et al. | 280/728 B |
| 5.314.203 | 5/1994 | Adams et al. | 280/728 A |

| | | | |
|---|---|---|---|
| 5.322.324 | 2/1994 | Hansen et al. | 280/728 |
| 5.338.060 | 8/1994 | Sodercuist | 280/728 B |
| 5.342.086 | 2/1994 | Harris et al. | 280/728 B |
| 5.346.249 | 9/1994 | Hallard et al. | 280/728 B |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0488618 | 6/1992 | European Pat. Off. | 280/728 B |
| 4113591 | 10/1992 | Germany | 280/728 B |
| 01-43752 | 6/1991 | Japan | 280/73. |
| 5139236 | 6/1993 | Japan | 280/728 A |

Primary Examiner—Margaret A. Focanno
Assistant Examiner—Peter C. English
Attorney, Agent, or Firm—Brooks & Kushman

[57]              **ABSTRACT**

A snap-on air bag cover for use with an uninflated air bag container including a retaining member. the snap-on air bag cover comprising. a plastic front cover adapted to directly enclose the uninflated air bag container. a pair of plastic side panels connected to opposite sides of the front cover. a resilient clip member extending from each of the side panels. the clip member having an extending snap-on groove defined therein adapted to cooperate with the retaining member for affixing the air bag cover to the air bag container, wherein the pair of side panels are connected to the front cover such that the side panels and resilient clip members are permitted to pivotably travel away from each other in opposite directions allowing the retaining member to enter and abuttingly engage the snap-on groove thereby retaining the air bag cover on the air bag container.

**20 Claims, 3 Drawing Sheets**



*Exhibit A*

**U.S. Patent**          Mar. 26, 1996          Sheet 1          5.501.485



*Fig. 1*

*Fig. 2*

*Fig. 3*

Copy provided by PTCS from the PTO APS Image Data Base on   06/08/1996



*Fig. 6*

*Fig. 7*

*Fig. 8*

Copy provided by PTCS from the PTO APS Image Data Base on   06/05/1996

5.501.485

1

## SNAP-ON AIR BAG COVER

### CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of application(s) Ser. No. 08/140.669 filed on Oct. 21, 1993, abandoned, which is a continuation-in-part application of U.S. patent application Ser. No. 07/984.326, filed Dec. 2, 1992 and entitled "Air Bag Cover Having A Horn Switch Disposed Thereon", abandoned. This application is further related to co-pending application Ser. Nos. 08/140.549 and 08/140.768 both field Oct. 20, 1993 with this application.

### TECHNICAL FIELD

This invention relates to plastic air bag covers and in particular to air bag covers which are affixable to uninflated air bag containers.

### BACKGROUND ART

Presently, when air bag covers are provided in automobiles on the drivers side of the vehicle, the air bag is stored in the steering column behind an air bag cover. During automatic inflation of the air bag, the air bag cover moves away from the steering column to permit its safety function between the steering column and the operator of the vehicle.

Recent practice in the automotive industry is utilization of all plastic fabricated air bag covers. Conventional air bag covers used in conjunction with occupant restraint systems often include various connection systems for attaching the air bag cover to the uninflated air bag container. As those skilled in the art will recognize, such systems normally include a two piece cover construction wherein a first cover portion, usually manufactured from a relatively stiff material, is initially disposed directly over the uninflated air bag container. A second more resilient cover portion is next affixed over the first cover portion and used as the outer decorative cover.

U.S. Pat. No. 4.325.568 issued to Clark et al. discloses a modular occupant restraint system including an inflator, a cushion, a container for the cushion and an air bag cover for the container assembled as a module. Clark et al. utilizes a two piece air bag cover construction. U.S. Pat. No. 5.085.462 issued to Gaultier discloses an air bag and vehicle horn switch assembly. Gaultier also discloses a conventional two piece cover construction.

U.S. Pat. No. 5.186.490 issued to Adams et al. discloses a cover for a inflatable restraint system for a motor vehicle which contains a slot in the upper wall thereof into which a thin or membrane type switch assembly in inserted. Adams et al. further discloses an air bag cover having an injection molded thermoplastic upper wall and a soft outer cover exposed to the interior of the vehicle manufactured from urethane, vinyl or polyester. The outer cover completely encompasses and overlaps the upper wall structure and uninflated air bag forming two structures the air bag must exit to carry out its function.

### DISCLOSURE OF THE INVENTION

The object of the present invention is to provide a one piece, snap-on air bag cover that is affixable directly to an uninflated air bag container.

In carrying out the above object and other objects of the present invention, an automotive air bag cover cover constructed in accordance with the present invention is pro-

2

vided. The snap-on automotive air bag cover comprises a plastic front cover adapted to directly enclose an uninflated air bag container. A pair of plastic side panels connected to opposite sides of the front cover. A resilient clip member extending from each of the side panels, the clip member having an extending snap-on groove defined therein adapted to cooperate with the retaining member for affixing the air bag cover to the air bag container, wherein the pair of side panels are connected to the front cover such that the side panels and resilient clip members are permitted to pivot or travel away from each other in opposite directions allowing the retaining member to enter and abuttingly engage the snap-on groove thereby retaining the air bag cover on the air bag container.

Preferably the clip member comprises a front engagement section and a rear shoulder section, the front engagement section having an inclined outer surface for cooperating with the retaining member for sliding the air bag cover onto the air bag container, and the snap-on groove is disposed between the front and rear sections.

Also, preferably, the snap-on groove is "L" shaped in cross section, the clip member extends along at least one third the length of said side panel and the snap-on groove extends the entire length of the clip member.

These and other features and additional objects of the invention will occur to those skilled in the art on reading the following description with reference to the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded view of an automotive air bag cover, constructed in accordance with the present invention;

FIG. 2 is a sectional view of the assembled air bag cover of FIG. 1;

FIG. 3 is a top plan view, partially broken away, of the horn switch assembly;

FIG. 4 is a front plan view of an alternative embodiment of an automotive air bag cover constructed in accordance of the present invention;

FIG. 5 is a rear plan view of the alternative embodiment of FIG. 4;

FIG. 6 is an enlarged, fragmentary view of the clip connector of the present invention;

FIG. 7 is enlarged, fragmentary view of the clip connector of the present invention looking along the directions of lines 7—7 in FIG. 6; and

FIG. 8 is a cross sectional view of the clip connector of the present invention taken along lines 8—8 of FIG. 6.

### BEST MODE FOR CARRYING OUT THE INVENTION

Referring now to the drawing Figures, there is illustrated in FIGS. 1 and 2, a first embodiment of an automotive air bag cover, generally indicated at 10, constructed in accordance with the present invention. Typically, the automotive air bag cover 10 is secured at the top end of a vehicle drive column (not shown) at the steering wheel of the vehicle.

A front cover, generally indicated at 12 of the air bag cover 10, is integrally formed with side panels 14, 16 and 18. Typically, the side panels 14, 16 and 18 are apertured, as illustrated in FIGS. 1 and 2, to permit the cover 10 to be fixedly secured to the vehicle drive column. Outer surface 23 is disposed to face the vehicle operator (not shown).

Copy provided by PTCS from the PTO APS Image Data Base on   06/08/1996

5.501.485

3

The front and side panels 12. 14. 16. and 18 are adapted to enclose an uninflated automotive air bag (not shown) between the cover 10 and the steering column (not shown).

The front panel 12 includes upper and lower portions 20 and 22, respectively. The upper and lower portions 20 and 22 are interconnected to the side panels 16 at break seams 24 (only one of which is shown in FIG. 1) and to each other at a break seam 26. The break seams 24 and 26 are of reduced thickness, to permit the air bag, as it is inflating, to exert a force at the inner portion of the front panel 12 to cause the upper and lower portions 20 and 22 of the front panel 12 to separate from the side panels 16 along the break seams 24 and to separate from each other along the break seam 26.

The upper portion 20 of the front panel 12 is hingedly connected to the top panel 18 at a hinge 28 and the lower portion 22 of the front panel 12 is hingedly connected to the bottom side panel 14 at a hinge 30, as best shown in FIG. 2. After separation from the side panels 14 and 16, the upper and lower portions 20 and 22 of the front panel 12 can swing upwardly and downwardly, respectively, and out of the way of the inflating air bag.

Rear panels 31 are fixedly secured about their periphery to the upper and lower portions 20 and 22 of the front panel 12 at their inner surfaces to move therewith and to form sealed, hollow compartments 32, as best shown in FIG. 2. Preferably, the rear panels 31 are hot plate welded, heat staked or otherwise attached to the upper and lower portions 20 and 22 at their outer periphery adjacent the break seam 26 between the upper and lower portions 20 and 22, respectively, and adjacent the break seams 24. The rear panels 31 do not cover any of the break seams 24 or 26 since this would hinder or possibly prevent separation along the break seams 24 and 26.

The air bag cover 10 preferably includes a pair of horn switch assemblies, generally indicated at 34. Each assembly 34 extends substantially the entire width of the front panel 12 between the side panels 16 within its respective hollow compartment 32.

As illustrated in FIG. 2, each assembly 34 substantially fills its respective hollow compartment 32. As illustrated in FIG. 3. each horn switch assembly 34 includes a pair of spaced flexible, transparent, plastic layers 36. On the inner surface of one of the plastic layers 36, there is formed a matrix layer 38 of interconnected hexagonal pads which forms an electrically conductive inner surface for making a circuit path with a corresponding second electrically conductive inner surface of another matrix of interconnected hexagonal pads formed on the other plastic layer 36. Upon manual actuation of the corresponding portion of the front panel 12, the circuit path is made.

The circuit path is made through an insulator layer 40 which is disposed between and spaces the layers 38 apart so that electrical connection is only made between the hexagonal pads of the layers 38. The insulator layer 40 insulates the interconnecting portions of the electrically conductive inner surfaces of the layers 38 from one another. The insulator layer 40 is preferably made of foam and has a honeycomb structure.

Preferably, the horn switch assemblies 34 are foil switch assemblies cut to size from a mat of material commercially available from Illinois Tool Works. Inc. of Glenview. Ill. Then, electrically conductive leads 42 which are encapsulated in plastic are electrically connected to certain pads of each of the layers 38 at one end thereof and to the automobile's electrical system at the opposite end through a break-away connection.

4

Referring now to FIG. 2, there is shown a resilient clip connector 50 extending from side panel 18. A snap-on groove 52 is shown disposed within clip connector 50. Clip connector 50 is comprised of a front engagement section 54 and a rear shoulder section 56 with snap-on groove 52 disposed between front engagement section 54 and rear shoulder section 56. Snap-on groove 52 is configured to cooperate with a retaining rim 51 on uninflated air bag container 53 (shown in phantom). For proper connection and retainment, the snap-on groove should have a cross-sectional shape that corresponds to the shape of the air bag container rim.

As shown, clip connector 50 also includes a biasing groove 58 which extends in a direction parallel with the snap-on groove 52. The biasing groove 58 divides the front engagement section 54 into a first segment 60 and a second segment 62. The biasing groove 58 allows the first segment 60 to deform and move toward the second segment when the air bag container rim 51 is initially engaged with the clip connector just prior to full engagement within the snap-on groove 52.

Referring now to FIG. 1 there is shown four clip connectors 50, 70, 72, and 74 extending from each side panel. It is contemplated in the preferred embodiment that each clip member extend at least one third of the length of the respective side panel and the snap-on groove 52 extend the entire length of the clip connector 50.

Referring now to FIGS. 4 and 5. there is shown generally, air bag cover 76, an alternative embodiment constructed in accordance with the present invention. The air bag cover 76 includes a front cover 78 having an inner surface 82 and an outer surface 80. The inner and outer surfaces 82 and 80 respectively define a thickness of front cover 78 which is in a range from 2.0 to 6.0 millimeters. The air bag cover 76 is designed to be operably located within the automobile interior (not shown) such that the front cover outer surface 80 is exposed to occupant view.

The air bag cover 76 includes four clip connectors 86, 88, 90 and 92 connected to respective side panels 94, 96, 98, and 100. Referring now to FIG. 8, and using clip connector 86 as representative of the other clip connectors, each clip connector includes a front engagement section 102 and a rear shoulder section 104. As with the prior embodiment, a snap-on groove 106 is defined between the front engagement section 102 and the rear shoulder section 104. The snap-on groove 106 of the second embodiment of the present invention has a cross sectional shape which corresponds to the rim 108 of the air bag container 110. The snap-on groove shown in FIG. 8 is L-shaped to correspond to the outer shape of rim 108. Clip connector 86 further includes an outer inclined surface 112 as shown in FIGS. 7 and 8.

Referring now to FIG. 6, there is shown a biasing groove 114. Biasing groove 114, as with the prior embodiment discussed above, extends parallel to the snap-on groove 106. The biasing groove divides clip connector 86 into a first segment 116 and a second segment 118. As those skilled in the art will recognize, the inclined surface 112 in cooperation with the biasing groove 114 assist in locating and abuttingly engaging the rim 108 of the air bag container 110 within the snap-on groove 106.

More specifically, as the rim 108 of the air bag container 110 initially contacts the clip connector 86, the rim slides along the inclined surface 112 towards the snap-on groove 106. Simultaneously, the first segment 116 of the front engagement section is deformed and moves toward second segment 118. In this fashion, the snap-on connection of the

5,501,485

5                                                6

air bag cover to the air bag container is assisted. For structural integrity and material cost savings it is contemplated that the front engagement portion may include a plurality of spaced apart, parallel supports 120 which are disposed perpendicular to the snap-on groove.

It is preferred that the air bag cover of the present invention be manufactured from a flexible thermoplastic rubber such as commercially available "Santoprene" 201-87 provided by Advance Elastomers Systems of Auburn Hills, Mich. Santoprene is a registered trademark of the Monsanto Company. Santoprene 201-87 is a colorable thermoplastic general purpose elastomer with good fluid resistance which is processable by injection molding and extrusion.

The tear strength, ultimate tensile strength, hardness, and elasticity of the material are characteristic important to the choice of the thermoplastic material used to manufacture the air bag. The preferred thermoplastic material used for manufacture of the air bag cover has a tensile strength in a range from 15.0 to 17.0 Mpa's. The preferred material used has a tear strength in a range from 47 to 51 kN/M at 25 degrees celsius and 21 to 25 kN/M at 100 degrees celsius. The preferred material used has a durometer hardness in a range of 70 to 100 on the Shore A scale. The above characteristics in conjunction with the structure of the air bag cover satisfy the necessary conditions related to the inflation and exit of the air bag from the cover.

Having described the structural characteristics of the present invention, attention is now turned to operation of the snap-on air bag cover. Referring to FIGS. 5-8, each clip connector 86, 88, 90 and 92 extends from a respective side panel 94, 96, 98 and 100. Each clip connector is attached to the respective side panel in a live hinge-like fashion such that the clip connectors and associated side panels move away from the front cover upon operative insertion of the air bag container rim 108 within snap-on groove 106.

For example opposing side panels 96 and 100 move away from front cover 82 and also away from each other as the rim 108 is abuttingly engaged against the inclined surfaces 112 of each clip connector 88 and 92. The cooperation of the biasing grooves in the other pair of opposing clip connectors 86 and 90 works to assist in locating and operatively connecting the air bag container 110 to the air bag cover 76.

The particular thermoplastic rubber described above assists in providing the operative resilient characteristics needed to provide an air bag cover which is directly affixable to an air bag container. The air bag cover of the present invention is resilient enough to accept deformation of the side panels and clip connectors while the air bag cover is connected to the air bag container and rigid enough to contain the air bag container on the steering column (not shown) throughout the operative life of the associated vehicle. Thus, the tear strength, ultimate tensile strength, hardness, and elasticity of the thermoplastic rubber material, as described above are important to the overall operation of the air bag cover.

The air bag cover of the present invention is preferably injection molded using conventional injection molding techniques. The preferred embodiment of the present invention will include clip connectors that extend at least one third the length of the respective side panel. It is contemplated that the clip connectors do not extend completely along the length of the side panels because this makes the air bag cover difficult to remove from the mold in the manufacturing process.

While only certain embodiments of the method and apparatus of the present invention have been shown and described, others may be possible without departing from the scope of the following claims.

What is claimed is:

1. A plastic molded, snap-on air bag cover mountable onto an air bag container including a retaining member, said snap-on air bag cover comprising:

a front cover adapted to overlie an inundated air bag container;

first and second side panels connected to opposite sides of said front cover;

a resilient clip member extending from each of said side panels, each said clip member having an extending snap-on groove defined therein adapted to cooperate with said retaining member for affixing said air bag cover to said air bag container, each clip member characterized in cross section as having an engagement section for contacting the retaining member during mounting onto the container and a biasing groove formed therein to facilitate resilient displacement of the engagement section and wherein at least one clip member is attached to its respective side panel in a live hinge-like fashion to assist in a snap-on mounting of the cover onto the container.

2. A snap-on air bag cover as in claim 1 wherein said each clip member comprises a front engagement section and a rear shoulder section, said front engagement section having an inclined outer surface for cooperating with said retaining member for sliding said air bag cover onto said air bag container, and the respective snap-on groove is disposed between said front and rear sections.

3. A snap-on air bag cover as in claim 2 wherein said front engagement section includes a plurality of spaced, parallel supports disposed perpendicular to the respective snap-on groove.

4. A snap-on air bag cover as in claim 1 wherein each said snap-on groove is "L" shaped in cross section.

5. A snap-on air bag cover as in claim 1 wherein each said clip member extends along at least one third the length of each said side panel and each said snap-on groove extends the entire length of each said clip member.

6. A snap-on air bag cover as in claim 1 wherein said side panels are hingedly connected to said front cover for allowing said side panels to move in relation to said front cover.

7. A snap-on air bag cover as in claim 1 molded from a resilient thermoplastic material.

8. A snap-on air bag cover as in claim 7 wherein said thermoplastic material is a thermoplastic rubber.

9. A snap-on air bag cover as in claim 7 wherein said material has a tensile strength in a range from 15.0 to 17.0 Mpa and a tear strength in a range from 47 to 51 kN/m at 25 degrees celsius and 21 to 25 kN/m at 100 degrees celsius.

10. An air bag cover as in claim 7 wherein said material has a durometer hardness ranging from 70 to 100 on the Shore A scale.

11. An improved air bag cover of the type adapted to snap onto the retaining rim of an air bag container, the cover comprising a homogenous thermoplastic molded body including a separable front cover panel from which project toward the container a plurality of transverse panels, each of the transverse panels being flexural relative to the front panel, the improvement characterized in that:

a plurality of the transverse panels are formed with a connector for a snap-on engagement with the container rim, each connector comprising;

a snap-on groove extending along a segment of the transverse panel, the groove having a cross-sectional

Copy provided by PTCS from the PTO APS Image Data Base on   06/08/1996

5,501,485

7

shape adapted to receive and engage the container rim; and

an engagement member positioned ahead of the snap-on groove for guiding the container rim into engagement with the snap-on groove during flexural displacement of the traverse panel.

12. The air bag cover of claim 11, wherein the engagement member is co-extensive with the groove.

13. The air bag cover of claim 11, wherein the engagement member is resiliently displaceable in response to relative movement of the rim toward engagement with the groove.

14. The air bag cover of claim 13, wherein the engagement member is divided into first and second spaced sections which are resiliently displaceable relative to one another to assist guidance of the container rim into engagement with the groove.

15. The air bag cover of claim 11, wherein the engagement member is formed with an inclined surface for contacting the container rim to guide the rim into engagement with the snap-on groove.

8

16. The air bag cover of claim 15, wherein the inclined surface is provided structural support by a plurality of spaced supports disposed perpendicularly to the groove and internally of the inclined surface.

17. The air bag cover of claim 11, wherein the connector further comprises an array of spaced, parallel supports joining the engagement member to the associated transverse wall for structural support.

18. The air bag cover of claim 17, wherein the supports are disposed perpendicularly to the groove.

19. The air bag cover of claim 11, wherein the connectors are formed on at least one pair of oppositely disposed transverse panels.

20. The air bag cover of claim 11, wherein the connectors are formed on first and second pairs of oppositely disposed transverse panels.

*  *  *  *  *

Copy provided by PTCS from the PTO APS Image Data Base on    06/08/1996

# EXHIBIT B

# United Sta' .tent

**Eckhout**

[19]

Pat mber: **5,498,026**

Date of Patent: **Mar. 12, 1996**

[54] **AIR BAG COVER HAVING A HIDDEN BREAK SEAM**

[75] Inventor: **Thomas L. Eckhout**, Waterford, Mich.

[73] Assignee: **Larry J. Winget**, Leonard, Mich.

[21] Appl. No.: 410,559

[22] Filed: **Mar. 24, 1995**

### Related U.S. Application Data

[63] Continuation of Ser. No. 140,768, Oct. 20, 1993, abandoned, which is a continuation-in-part of Ser. No. 984,326, Dec. 2, 1992, abandoned.

[51] Int. Cl.⁶ ........................................ **B60R 21/20**
[52] U.S. Cl. ..................................... **280/728.3**
[58] Field of Search ..................... 280/728 B, 731, 280/732, 728 A, 728.3

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,819,205 | 6/1974 | Dunford et al. ............... 280/731 |
| 4,325,568 | 4/1982 | Clark et al. ................... 280/731 |
| 4,895,389 | 1/1990 | Pack, Jr. .................... 280/728 B |
| 4,934,735 | 6/1990 | Embach ....................... 280/731 |
| 5,060,971 | 10/1991 | Nanbu et al. ............... 280/728 B |
| 5,085,462 | 2/1992 | Gualtier .................... 280/731 |
| 5,125,683 | 6/1992 | Nakajima ................... 280/728 B |
| 5,172,931 | 12/1992 | Baba et al. ................ 280/728 B |
| 5,186,490 | 2/1993 | Adams et al. ................ 280/731 |
| 5,239,147 | 8/1993 | Allard et al. ............... 200/61.54 |
| 5,280,946 | 1/1994 | Adams et al. ............... 280/728 B |
| 5,283,404 | 2/1994 | Prescaro, Jr. .............. 200/61.54 |
| 5,306,040 | 4/1994 | Leonelli et al. ........... 280/728 B |
| 5,320,380 | 6/1994 | Hamada et al. ............. 280/728 B |
| 5,322,324 | 6/1994 | Hansen et al. ............. 280/732 |
| 5,330,223 | 7/1994 | Hiramatsu et al. ......... 280/728 B |
| 5,338,060 | 8/1994 | Soderquist ................. 280/728 B |
| 5,342,086 | 8/1994 | Harris et al. .............. 280/728 B |
| 5,346,249 | 9/1994 | Hallard et al. ............. 280/728 B |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 4113591 | 11/1991 | Germany ................... 280/728 B |
| 0249743 | 10/1990 | Japan ...................... 280/728 B |
| 0143752 | 6/1991 | Japan |
| 3136949 | 6/1991 | Japan ...................... 280/728 B |
| 4328051 | 11/1992 | Japan ...................... 280/728 B |
| 5178147 | 7/1993 | Japan ...................... 280/728 B |
| 2244449 | 12/1991 | United Kingdom ........ 280/728 B |

*Primary Examiner*—Margaret A. Focarino
*Assistant Examiner*—Peter C. English

[57] **ABSTRACT**

A plastic air bag cover for use in an automobile, the air bag cover comprising, a front cover adapted to enclose an uninflated automotive air bag, the front cover having inner and outer surfaces defining a first thickness therebetween and a decorative indicia defined on the outer surface of the front cover and a break seam defined in the inner surface of the front cover for permitting the air bag to inflate and exit the front cover, the break seam further defining a break pattern and having a first wall, a second wall and a break wall connecting the first and second walls, the break wall having inner and outer surfaces defining a second thickness therebetween, wherein the second thickness is less than the first thickness, the break wall and first and second walls are visually imperceptible when viewing the front cover outer surface, and the break seam is substantially non-coincidental with the decorative indicia.

**16 Claims, 2 Drawing Sheets**



Copy provided by PTCS from the PTO APS Image Data Base on  04/30/1996

Exhibit B

**U.S. Pater**    Mar. 12, 1996    Sheet ' '    5,498,026



*Fig. 1*

*Fig. 2*

*Fig. 3*

Copy provided by PTCS from the PTO APS Image Data Base on   04/29/1996



Fig. 7

Fig. 4

Fig. 8

Fig. 5

Fig. 6

Copy provided by PTCS from the PTO APS Image Data Base on   04/19/1996

5,498,026

# AIR BAG COVER HAVING A HIDDEN BREAK SEAM

This is a continuation of application Ser. No. 08/140,768. filed Oct. 20, 1993, abandoned, which is a continuation-in-part of application Ser. No. 07/984,326, filed Dec. 2, 1992, abandoned.

## TECHNICAL FIELD

This invention relates to plastic air bag covers and in particular to air bag covers having hidden break seams.

## BACKGROUND ART

Presently, when air bag covers are provided in automobiles on the driver side of the vehicle, the air bag is stored in the steering column behind an air bag cover. During automatic inflation of the air bag, the air bag cover moves away from the steering column to permit its safety function between the steering column and the operator of the vehicle.

Recent practice in the automotive industry is utilization of all plastic fabricated air bag covers. Conventional air bag covers used in conjunction with occupant restraint systems often include noticeable or visually perceptible break seams or scores disposed on the exterior surface of the air bag cover. The break seams or scores represent selected weakened surfaces where the inflating air bag initially separates or breaks through the air bag cover and moves away from the steering wheel to perform its safety feature.

U.S. Pat. No. 4,325,568 issued to Clark et al. discloses a modular occupant restraint system including an inflator, a cushion, a container for the cushion and an air bag cover for the container assembled as a module. Clark et al. further discloses use of score lines that are visually perceptible from a front view of the air bag cover as it is operably mounted on the steering wheel of the automobile.

U.S. Pat. No. 5,085,462 issued to Gaultier discloses an air bag and vehicle horn switch assembly. The assembly of Gaultier also discloses use of an air bag cover including visually perceptible exterior break seams or score lines in the operable mounted position within the vehicle.

U.S. Pat. No. 5,186,490 issued to Adams et al. discloses a cover for an inflatable restraint system for a motor vehicle which contains a slot in the upper wall thereof into which a thin or membrane type switch assembly is inserted. Adams et al. further discloses an air bag cover having an injection molded thermoplastic upper wall and a soft outer cover exposed to the interior of the vehicle manufactured from urethane, vinyl or polyester. This outer cover completely encompasses and overlaps the upper wall structure and uninflated air bag forming two structures the air bag must exit to carry out its function.

Current trends in the automotive manufacturing industry are oriented towards providing, clean aesthetically pleasing outer surfaces within the interior of the automobile. Inclusion of extraneous exterior break seams or score lines that are perceptible from an occupant's viewpoint in front of the steering wheel detracts from the overall appearance of the interior of the automobile.

It is also known that the provision of noticeable exterior break seams or score lines that are designed for aesthetic purposes is very difficult to achieve as the final design obtained must satisfy engineering requirements related to inflation and exit of the air bag. Thus, use of visually noticeable exterior outer score lines is limited to known

## 2

score and designs such as the "H" shaped score as disclosed in U.S. Pat. No. 5,085,462 to Gaultier.

## DISCLOSURE OF THE INVENTION

An object of the present invention is to provide an automotive air bag cover having a break seam for allowing inflation and exit of the air bag from the air bag cover which is visually imperceptible from the outer exposed front surface of the air bag cover.

In carrying out the above objects and other objects of the present invention, an automotive air bag cover constructed in accordance with the present invention is provided. The air bag cover includes a decorative front cover adapted to enclose an uninflated automotive air bag. The front cover has inner and outer surfaces that define a first thickness therebetween. A break seam is further defined in the front cover inner surface for permitting the air bag to inflate and exit the front cover. The break seam includes a first wall, a second wall and a break wall defined therebetween having a second thickness that is less than the first thickness. The break seam provided in accordance with the present invention is visually imperceptible when viewing the exposed front cover outer surface.

Preferably, the break seam first and second walls are annular in shape and the break wall is substantially planar in relation to said first and second annular walls.

Also, preferably, the first and second annular walls are disposed in a convex facing relationship with respect to the break surface.

These and other features and additional objects of the invention will occur to those skilled in the art on reading the following description with reference to the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an exploded view of an automotive air bag cover, constructed in accordance with the present invention;

FIG. 2 is a sectional view of the assembled air bag cover of FIG. 1;

FIG. 3 is a top plan view, partially broken away, of the horn switch assembly.

FIG. 4 is a front elevational view of an alternative embodiment of an automotive air bag cover constructed in accordance with the present invention;

FIG. 5 is a rear elevational view of the alternative embodiment of FIG. 4;

FIG. 6 is a cross sectional view of the air bag cover of the present invention taken along lines 6—6 of FIG. 4;

FIG. 7 is an enlarged view of a break seam constructed in accordance with the present invention;

FIG. 8 is an enlarged cross section taken along lines 8—8 of FIG. 4.

## BEST MODE FOR CARRYING OUT THE INVENTION

Referring now to the drawing FIGURES, there is illustrated in FIGS. 1 and 2, a first embodiment of an automotive air bag cover, generally indicated at 10, constructed in accordance with the present invention. Typically, the automotive air bag cover 10 is secured at the top end of a vehicle drive column (not shown) at the steering wheel of the vehicle.

Copy provided by PTCS from the PTO APS Image Data Base on    04/30/1996

5,498,026

3

A front cover, generally indicated at 12 of the air bag cover 10, is integrally formed with side panels 14, 16 and 18. Typically, the side panels 14, 16 and 18 are apertured, as illustrated in FIGS. 1 and 2, to permit the cover 10 to be fixedly secured to the vehicle drive column. An outer surface (not shown) is disposed to face the vehicle operator.

The front and side panels 12, 14, 16, and 18 are adapted to enclose an uninflated automotive air bag (not shown) between the cover 10 and the steering column (not shown).

The front panel 12 includes upper and lower portions 20 and 22, respectively. The upper and lower portions 20 and 22 are interconnected to the side panels 16 at break seams 24 (only one of which is shown in FIG. 1) and to each other at a break seam 26. The break seams 24 and 26 are of reduced thickness, to permit the air bag, as it is inflating, to exert a force at the inner portion of the front panel 12 to cause the upper and lower portions 20 and 22 of the front panel 12 to separate from the side panels 16 along the break seams 24 and to separate from each other along the break seam 26.

The upper portion 20 of the front panel 12 is hingedly connected to the top panel 18 at a hinge 28 and the lower portion 22 of the front panel 12 is hingedly connected to the bottom side panel 14 at a hinge 30, as best shown in FIG. 2. After separation from the side panels 16, the upper and lower portions 20 and 22 of the front panel 18 can swing upwardly and downwardly, respectively, and out of the way of the inflating air bag.

Rear panels 31 are fixedly secured about their periphery to the upper and lower portions 20 and 22 of the front panel 12 at their inner surfaces to move therewith and to form sealed, hollow compartments 32, as best shown in FIG. 2. Preferably, the rear panels 31 are hot plate welded, heat staked or otherwise attached to the upper and lower portions 20 and 22 at their outer periphery adjacent the break seam 26 between the upper and lower portions 20 and 22, respectively, and adjacent the break seams 24. The rear panels 31 do not cover any of the break seams 24 or 26 since this would hinder or possibly prevent separation along the break seams 24 and 26.

The air bag cover 10 preferably includes a pair of horn switch assemblies, generally indicated at 34. Each assembly 34 extends substantially the entire width of the front panel 12 between the side panels 16 within its respective hollow compartment 32.

As illustrated in FIG. 2, each assembly 34 substantially fills its respective hollow compartment 32. As illustrated in FIG. 3, each horn switch assembly 34 includes a pair of spaced flexible, transparent, plastic layers 36. On the inner surface of one of the plastic layers 36, there is formed a matrix layer 38 of interconnected hexagonal pads which forms an electrically conductive inner surface for making a circuit path with a corresponding second electrically conductive inner surface of another matrix of interconnected hexagonal pads formed on the other plastic layer 36. Upon manual actuation of the corresponding portion of the front panel 12, the circuit path is made.

The circuit path is made through an insulator layer 40 which is disposed between and spaces the layers 38 apart so that electrical connection is only made between the hexagonal pads of the layers 38. The insulator layer 40 insulates the interconnecting portions of the electrically conductive inner surfaces of the layers 38 from one another. The insulator layer 40 is preferably made of foam and has a honeycomb structure.

Preferably, the horn switch assemblies 34 are foil switch assemblies cut to size from a mat of material commercially

4

available from Illinois Tool Works, Inc. of Glenview, Ill. Then, electrically conductive leads 42 which are interconnected in plastic are electrically connected to certain leads of each of the layers 38 at one end thereof and to the automobile's electrical system at the opposite end through a break-away connection.

Referring now to FIGS. 4 and 5, there is shown generally, air bag cover 50, an alternative embodiment constructed in accordance with the present invention. The air bag cover 50 includes a front cover 52 having an inner surface 54 and an outer surface 56. As shown in FIG. 6, the inner and outer surfaces 54 and 56 respectively define the thickness 58 of front cover 52 which is in a range from 2.0 to 6.0 millimeters. The preferred thickness is 4.0 millimeters. The air bag cover 50 is designed to be operably located within the automobile interior (not shown) such that the front cover outer surface 56 is exposed to occupant view.

A weakened area or break seam 60 is shown in FIGS. 4 and 5. The break seam 60 is, as discussed above, necessarily designed to allow inflation and exit of air bag 62 from the air bag cover 50 to permit its safety function between the steering column and operator (not shown). The break seam 60 is therefore designed to be the primary or sole, break area of the air bag cover during inflation and exit of the air bag 62.

Referring to FIG. 7, the break seam 60 includes, in the preferred embodiment, a first wall 64 and a second wall 66. A break wall 68 extends between the first wall 64 and the second wall 66, a distance of at least 0.3 millimeters. The first and second walls 64 and 66 are each convex in shape and are disposed in a symmetrical, facing relationship with respect to the break wall 68.

More specifically, the first wall has a convex portion 70 that extends from the inner surface 54 of the front cover 52 to the side 71 of the break wall 68. The convex portion 70 is defined in cross section by a curve having a radius in a range from 4.0 to 11.0 millimeters. The preferred range for the radius of the convex portion 70 is between 6.0 and 9.0 millimeters.

Similarly, the second wall 66 has a convex portion 72 that extends from the inner surface 54 of the front cover 52 to the side 73 of the break wall 68. The convex portion 72 is defined in cross section by a curve having a radius in a range from 4.0 to 11.0 millimeters. The preferred range for the radius of the convex portion 72 is between 6.0 and 9.0 millimeters. Additionally, the break wall 68 has an inner surface 75 and an outer surface 77 defining a uniform thickness in a range from 0.2 to 0.9 millimeters, with the preferred thickness being 0.5 millimeters.

Both embodiments of the present invention, air bag cover 10 illustrated in FIG. 1 and air bag cover 50 illustrated in FIG. 5 include a break seam which is visually imperceptible from the exposed outer surfaces of their respective front covers, 12 and 52 respectively. As shown in FIGS. 4, 6 and 7, the break seam constructed in accordance with the present invention provides an outer surface 56 of the front cover which is undisturbed by the inclusion of annular walls 70 and 72, and break wall 68. From the exterior, exposed side of the air bag cover outer surface 56, break seam 60 is visually imperceptible as shown by phantom lines 80, 82 and 84 in FIG. 4.

The air bag cover of the present invention therefor provides a cover which does not require any additional parts or cover-up decorating pieces to afford a clean, aesthetically pleasing outer surface. The common, visually noticeable "U" or "H" shaped designs of the prior art are avoided with

5,498,026

6

the present invention. As such, entirely aesthetic front cover designs can be provided on air bag covers which are unrelated and unaffected by the presence of the break seam 60.

For example, in FIGS. 4 and 8, the air bag cover 50 includes a decorative indicia or contour line 90. Contour line 90 is an extending groove which is molded into the air bag cover in the manufacturing process. Conventional air bag covers include different kinds of indicia including grooves, extending ribs and decorative appliques. Contour line 90 is substantially non-coincidental with the hidden break seam lines 80, 82 and 84. As shown in FIG. 4, the contour line 90 intersects with the break seams at points 81, 83, and 85 but does not form any substantial part of the break seam. Similarly, the break seams 80, 82 and 84 do not form any part of the contour line on outer surface 56. The visual aspects of the contour line 90 are completely unaffected by the break seams 80, 82 and 84.

It is preferred that the air bag cover of the present invention be manufactured from a flexible thermoplastic rubber such as commercially available "Santoprene" 201-87 provided by Advance Elastomers Systems of Auburn Hills, Mich. Santoprene is a registered trademark of the Monsanto Company. Santoprene 201-87 is a colorable thermoplastic general purpose elastomer with good fluid resistance which is processable by injection molding and extrusion. In addition, the thickness of the break wall is dependent upon the force exertable on the air bag cover by the inflating air bag.

The tear strength, ultimate tensile strength, hardness, and elasticity of the material are characteristics important to the choice of thermoplastic material used to manufacture the air bag. The preferred thermoplastic material used for manufacture of the air bag cover has a tensile strength in a range from 15.0 to 17.0 Mpa's and more preferably 15.5 to 16.5 Mpa's. The preferred material used has a tear strength in a range from 47 to 51 kN/m at 25 degrees celsius and 21 to 25 kN/m at 100 degrees celsius. The preferred material used has a durometer hardness in a range of 70 to 100 on the Shore A scale, and more preferably in a range of 85 to 90. The above characteristics in conjunction with the structure of the air bag cover satisfy the necessary conditions related to the inflation and exit of the air bag from the cover.

While only certain embodiments of the method and apparatus of the present invention have been shown and described, others may be possible without departing from the scope of the following claims.

I claim:

1. (Amended) A homogeneous thermoplastic air bag cover for use in an automobile, said air bag cover comprising:

a front cover adapted to enclose an uninflated automotive air bag, the front cover having inner and outer surfaces defining a first thickness therebetween; and

a break seam defined in said inner surface of said front cover for permitting the air bag to inflate and exit the front cover, said break seam further defining a break pattern and having a first convex wall, a second convex wall and a substantially planar break connecting said first and second walls and having a width of at least 0.3 millimeters, said break wall having inner and outer surfaces defining a second thickness therebetween, wherein said second thickness is less than said first thickness, said break pattern being visually imperceptible when viewing from the front cover outer surface.

2. An air bag cover as in claim 1 wherein said first and second walls are disposed in a facing relationship with respect to said break wall inner surface.

3. An air bag cover, as in claim 2 wherein said first and second walls are substantially symmetrical about said break wall.

4. An air bag cover as in claim 1 wherein said break seam has a uniform thickness.

5. An air bag cover as in claim 1 wherein said first thickness is in a range from 2.0 to 6.0 millimeters and said second thickness is in a range from 0.2 to 0.9 millimeters.

6. An air bag cover as in claim 1 wherein each of the first and second walls is characterized in cross section by a curved surface having a central radius in a range from 4.0 to 11.0 millimeters.

7. An air bag cover as in claim 1 wherein each of the first and second walls is characterized in cross section by a curved surface having a central radius in a range from 6.0 to 9.0 millimeters.

8. An air bag cover as in claim 1 wherein the plastic is a thermoplastic rubber.

9. An air bag cover as in claim 1 wherein said front cover is formed of a material having a tensile strength in a range from 15.0 to 17.0 MPa.

10. An air bag cover as in claim 1 wherein said front cover is formed of a material having a tensile strength in a range from 15.5 to 16.5 Mpa.

11. An air bag cover as in claim 1 wherein said front cover is formed of a material having a tear strength in a range from 47 to 51 kN/m at 25 degrees celsius and 21 to 25 kN/m at 100 degrees celsius.

12. An air bag cover as in claim 1 wherein said front cover is formed of a material having a tear strength of approximately 49 kN/m at 25 degrees celsius and 23 kN/m at 100 degrees celsius.

13. An air bag cover as in claim 1 wherein said front cover is formed of a material having a durometer hardness ranging from 70 to 100 on the Shore A scale.

14. An air bag cover as in claim 1 wherein said front cover is formed of a material having a durometer hardness ranging from 85 to 90 on the Shore A scale.

15. An air bag cover as in claim 1 wherein said break seam is integrally formed in said inner surface.

16. A homogeneous thermoplastic air bag cover for use in an automobile, said air bag cover comprising:

a thermoplastic rubber front cover adapted to enclose an uninflated automotive air bag, the front cover having inner and outer surfaces defining a first thickness therebetween, and a decorative indicia defined on the outer surface of said front cover, said front cover inner surface adapted to abuttingly engage said uninflated air bag; and

a break seam defined in said inner surface of said front cover for permitting the air bag to inflate and exit the front cover, said break seam having a first wall defined in cross section by a first curve having a radius in a range from 4.0 to 11.0 millimeters, a second wall defined in cross section by a second curve having a radius in a range from 4.0 to 11.0 millimeters and a substantially planar break wall connecting said first and second walls and having a width of at least 0.3 millimeters, said break wall being linear in cross section in relation to said first and second walls, said break wall having inner and outer surfaces defining a second thickness therebetween, said second thickness in a range from 0.4 to 0.75 millimeters and wherein the break seam provides an outer surface of the front cover which is undisturbed by the inclusion of the first and second walls and the break wall.

•  •  •  •  •

Copy provided by PTCS from the PTO APS Image Data Base on    04/10/1996

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

THOMAS L. ECKHOUT

U.S.P.N. 5,498,026

Issued:  March 12, 1996

**AIR BAG COVER HAVING A HIDDEN
BREAK SEAM**

### "MAKE OF RECORD" LETTER

Commissioner of Patents
and Trademarks
Washington, D.C. 20231

Dear Sir:

The following errors have been found in the original Letters Patent:

Column 6, line 4, claim 4 (old claim 7, page 14, line 9), delete "," and insert therefor --.--; and

Column 6, line 23, claim 10 (old claim 13, page 3, line 16 of Amendment of November 9, 1994) delete "Mpa" and insert therefor --MPa--.

It is hereby respectfully requested that the foregoing errors be made of record in the file of the subject patent.

Respectfully submitted,

BROOKS & KUSHMAN P.C.

David R. Syrowik
Reg. No. 27,956
1000 Town Center - 22nd Floor
Southfield, MI  48075
(810) 358-4400

Dated:  April 24, 1996

# EXHIBIT C

# United States Patent [19]

**Winget**

[11] [E]    Patent Number:    Re. 35,031

[45] Reissued    Date of Patent:    Sep. 5, 1995

[54] **AUTOMOTIVE AIR BAG COVER HAVING A HORN SWITCH FORMED THEREIN**

[76] Inventor:    Larry J. Winget, 1799 Foxknoll, Leonard, Mich. 48038

[21] Appl. No.: 136,324

[22] Filed:    Oct. 13, 1993

### Related U.S. Patent Documents

Reissue of:
[64] Patent No.:    5,062,661
    Issued:    Nov. 5, 1991
    Appl. No.:    555,893
    Filed:    Jul. 20, 1990

[51] Int. Cl.⁶ ............................................. B60R 21/08
[52] U.S. Cl. ................................. 280/731; 280/734
[58] Field of Search ............. 280/728 B, 731, 743 R, 280/734

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,325,568 | 4/1982 | Clark et al. | 280/731 |
| 4,934,735 | 6/1990 | Embach | 280/731 |
| 5,085,462 | 2/1992 | Gualtier | 280/731 |
| 5,186,490 | 2/1993 | Adams et al. | 280/731 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 4113591 | 11/1991 | Germany |
| 0145752 | 6/1991 | Japan |

*Primary Examiner*—Kenneth R. Rice
*Attorney, Agent, or Firm*—David R. Syrowik

[57]    **ABSTRACT**

An automotive air bag cover including a horn switch device incorporated therein, is provided. The air bag cover includes substantially rigid front and side panels which are adapted to enclose an uninflated automotive air bag. The front panel has inner and outer surfaces and is connected to the side panels at seams to permit the inflating air bag to leave the cover as the inflating air bag exerts a force at the inner surface of the front panel sufficient to cause the front panel to separate from the side panels along the seams. The horn switch device includes a flexible, manually operable diaphragm at the outer surface of the front panel. The diaphragm has a first electrically conductive inner surface for making a circuit with a corresponding second electrically conductive inner surface of the front panel upon manual actuation of the diaphragm.

**11 Claims, 1 Drawing Sheet**





Copy provided by PTCS from the PTO APS Image Data Base on   12/19/1998

**U.S. Patent**                    Sep. 5, 1995                    Re. 35,031



Fig. 1

Fig. 2

Copy provided by PTCS from the PTO APS Image Data Base on   12/19/1996

Re. 35.031

1

# AUTOMOTIVE AIR BAG COVER HAVING A HORN SWITCH FORMED THEREIN

Matter enclosed in heavy brackets [ ] appears in the original patent but forms no part of this reissue specification; matter printed in italics indicates the additions made by reissue.

## TECHNICAL FIELD

This invention relates to air bag covers and, in particular, to air bag covers having a horn switch incorporated therein.

## BACKGROUND ART

Presently, when air bags are provided in automotive vehicles the air bag is stored in the steering column of the vehicle behind an air bag cover. During automatic inflation of the air bag, the air bag cover moves away from the steering column to permit the air bag to perform its safety function between the steering column and the operator of the vehicle.

Any manually operable horn switch or switches are typically also located on the steering wheel column on opposite sides of the air bag cover. However, these switches typically are rather small and oftentimes inaccessible for drivers who have large hands or for drivers who have limited manual dexterity.

## SUMMARY OF THE INVENTION

An object of the present invention is to provide an automotive air bag cover having a horn switch device incorporated therein.

In carrying out the above objects and other objects of the present invention, an automotive air bag cover constructed in accordance with the present invention is provided. The air bag cover includes substantially rigid front and side panels adapted to enclose an uninflated automotive air bag. The front panel has inner and outer surfaces. The front panel is interconnected to the side panels at seams which permit the inflated air bag to leave the cover wherein the inflating air bag exerts a force at the inner surface of the front panel sufficient to cause the front panel to separate from the side panels along the seams. The air bag cover further includes a horn switch device, including a flexible manually-operable diaphragm at the outer surface of the front panel. The diaphragm has a first electrically conductive inner surface for making a circuit path with the corresponding second electrically conductive inner surface of the front panel upon manual actuation of the diaphragm.

Preferably, the diaphragm is integrally formed with the front panel.

Also, preferably, the second electrically conductive inner surface is defined by a rigid plate connected to remainder of the front panel.

The automatic air bag cover constructed in accordance with the above invention provides numerous advantages. For example, the horn switch device is easily accessible on the outer surface cover. Furthermore, such a switch device can be relatively inexpensively incorporated in a conventional air bag cover, thereby freeing up additional areas on the steering column.

The objects, features and advantages of the present invention are readily apparent from the following detailed description of the best mode for carrying out the

2

invention when taken in connection with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 illustrates an automotive air bag cover, constructed in accordance with the present invention; and

FIG. 2 is a sectional view, taken along lines 2—2 of FIG. 1, illustrating the horn switch device of the present invention.

## BEST MODE FOR CARRYING OUT THE INVENTION

Referring now to the drawing figures, there is illustrated in FIG. 1 an automotive air bag cover, generally indicated at 10, constructed in accordance with the present invention. Typically, the automotive air bag 13 cover 10 is secured at the top end of a vehicle drive column at the steering wheel of the vehicle.

A substantially rigid front panel, generally indicated at 12 of the cover 10, is integrally formed with side panels 14, 16 and 18 (only one of the side panels 16 is shown). Typically, the side panels 14, 16 and 18 are apertured, as illustrated in FIG. 1, to permit the cover 10 to be fixedly secured to the vehicle steering column.

The front and side panels 12, 14, 16 and 18 are adapted to enclosed an uninflated automotive air bag between the cover 10 and the steering column.

The front pane 12 is interconnected to the side panels 16 and 14 at at seams 24 and 26, which are of reduced thickness, to permit the air bag as it is inflating, to exert a force at the inner surface 22 of the front panel to cause the front panel 12 to separate from the side panels 14 and 16 along the seams 24 and 26.

The front pane 12 is hingedly connected to the top panel 18 at a hinge 28, as best shown in FIG. 2 so that after separation from the side panels 14 and 16, the front panel 18 can swing upwardly and out of the way of the inflating air bag.

The air bag cover 10 includes a horn switch device, generally indicated at 30, which extends substantially the entire width of the front panel 12 between the side panels 16. The horn switch device 30 includes a flexible manually operable diaphragm 32 preferably integrally formed with the rest of the front panel 12 and the side panels 14, 16 and 18 from plastic (preferably TPO). The diaphragm 32 has a convex shape at the outer surface 20 of the front panel 12.

The diaphragm 32 has at its inner surface thereof, a strip of electrically conductive aluminum tape 34 which forms a first electrically conductive inner surface for making a circuit path with a corresponding second electrically conductive inner surface 35 of a substantially rigid plate, generally indicated at 36. The plate 36 may comprise a molded switch with a molded in connector which is heat-staked or otherwise attached to the plastic portion of the front panel 12 at a plurality of locations 38. Alternately, the plate 36 may be made of an electrically conductive metal.

Alternately, the electrically conductive aluminum tape 34 may be replaced by a conductive thermoplastic with a molded-in connector, which, when the diaphragm 32 is manually actuated, electrically engages or is electrically connected to the inner surface 35 of the molded plate 36.

The plate 36, the diaphragm 32 and the electrically conductive aluminum tape 34 define a hollow compartment 40 within the front panel 30. A pair of spaced

Copy provided by PTCS from the PTO APS Image Data Base on   12/19/1996

Re. 35.031

**3**

elongated foam-insulators 42 are disposed between the plate 36 and the conductive tape 34 so that the electrical connection is only made at the top of the electrically conductive surface 37 between the insulators 42.

Referring again to FIG. 1, preferably indicia 44 are formed on the outer surface of the diaphragm 32 to indicate the function of the switch device 30.

The advantages accruing to an automotive air bag cover 10 constructed as described above are numerous. For example, the function provided by the switch horn device 30 can be accomplished relatively inexpensively and can provide a relatively large surface area for manual operation. Also, the air bag cover 10 with the horn switch device 30 formed therein, frees up additional space on the vehicle steering column.

While a preferred embodiment of the subject invention has been shown and described in detail, those skilled in this art will recognize various alternative designs and embodiments for practicing the present invention as defined by the following claims.

What is claimed is:

1. An automotive air bag cover comprising: substantially rigid front cover and side panels adapted to enclose an uninflated automotive air bag, the front panel having inner and outer surfaces and being interconnected to the side panel at seams which permit the inflating air bag to leave the cover, the inflating air bag exerting a force at the inner surface of the front panel sufficient to cause the front panel to separate from the side panels along the seams; and
a horn switch device including a flexible manually operable diaphragm at the outer surface of the front panel, the diaphragm having a first electrically conductive inner surface for making a circuit path with a corresponding second electrically conductive inner surface upon manual actuation of the diaphragm, the second electrically conductive inner surface being defined by a rigid plate attached to the substantially rigid remainder of the front panel to move therewith wherein the first and second electrically conductive inner surfaces define a hollow compartment in the front panel and wherein upon separation from the side panels the front panel including the diaphragm, the hollow compartment and the rigid plate move together to permit the inflating air bag to leave the cover.

2. The air bag cover as claimed in claim 1 wherein the diaphragm is integrally formed with the front panel.

3. The air bag cover as claimed in claim 1 wherein the front panel is hingedly connected to one of the side panels to allow the front panel to swing open during inflation of the air bag.

4. The air bag cover as claimed in claim 1 wherein the first electrically conductive inner surface is defined by an electrically conductive material.

**4**

5. The air bag cover as claimed in claim 1 further comprising at least one insulator disposed in the hollow compartment to insulate portions of the first and second electrically conductive inner surfaces from one another.

6. *An automotive air bag cover comprising:*
*plastic front and side panels adapted to enclose an uninflated automotive air bag, the front panel having inner and outer surfaces and being interconnected to the side panels at seams which permit the inflating air bag to leave the cover;*
*a plate fixedly secured to the inner surface of the front panel to form a hollow compartment with the front panel; and*
*a switch device disposed in the hollow compartment and including a first electrically conductive surface for making a circuit path with a corresponding second electrically conductive surface upon manual actuation of a portion of the front panel at its outer surface thereof and wherein, upon separation from the side panels, the front panel including the hollow compartment, the switch device and the plate move together to permit the inflating air bag to leave the cover, wherein the front panel includes a flexible diaphragm at the outer surface of the front panel for manual operation of the switch device.*

7. *The air bag cover as in claim 6 wherein the diaphragm is integrally formed with the front panel.*

8. *The air bag cover as in claim 6 wherein the front panel is hingedly connected to one of the side panels to allow the front panel to swing open during inflation of the air bag.*

9. *The air bag cover as in claim 6 further comprising at least one insulator disposed between the first and second electrically conductive inner surfaces.*

10. *The air bag cover as in claim 6 wherein the switch device is a horn switch device.*

11. *An automotive air bag cover comprising:*
*plastic front and side panels adapted to enclose an uninflated automotive air bag, the front panel having inner and outer surfaces and being interconnected to the side panels at seams which permit the inflating air bag to leave the cover;*
*a plate fixedly secured to the inner surface of the front panel to form a hollow compartment with the front panel; and*
*a switch device disposed in the hollow compartment and including a first electrically conductive surface for making a circuit path with a corresponding second electrically conductive surface upon manual actuation of a portion of the front plate at its outer surface thereof and wherein, upon separation from the side panels, the front panel including the hollow compartment, the switch device and the plate move together to permit the inflating air bag to leave the cover, wherein the first electrically conductive surface is defined by the plate.*

* * * * *

Copy provided by PTCS from the PTO APS Image Data Base on    12/19/1996

# EXHIBIT D

# KIRKLAND & ELLIS

PARTNERSHIPS INCLUDING PROFESSIONAL CORPORATIONS

Citicorp Center
153 East 53rd Street
New York, New York 10022-4675

212 446-4800

Jonathan F. Putnam
To Call Writer Direct:
212 446-4814

Facsimile:
212 446-4900

May 15, 2000

## BY FACSIMILE AND REGULAR MAIL

John M. Halan, Esq.
Brooks & Kushman, P.C.
1000 Town Center, 22nd Floor
Southfield, MI 48075

Re:    PHC v. General Motors Corporation

Dear John:

As you know, Rule 11 of the Federal Rules of Civil Procedure provides that signing a pleading is a representation by the attorney signing that:

> to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, ... the claims ... therein are warranted by existing law or by a nonfrivolous argument for the extension , modification, or reversal of existing law ... [and that] the allegations and other factual contentions have evidentiary support ....

Fed. R. Civ. P. 11.

We are writing to provide you with advance notice that we, regrettably, are preparing a motion under Rule 11 seeking sanctions for the allegations in PHC's amended complaint that you and your client undeniably know are frivolous and without any conceivable evidentiary support.

For example, PHC's Amended Complaint accuses Delphi of infringing various patents by making, using, selling, and offering for sale air bag covers for the Catera, Malibu, Tracker, Esteem, Swift, Geo Metro, and Alero automobiles. However, as PHC either knows or should have known from a reasonable pre-filing investigation, Delphi does not make, use, sell, or offer for sale any of those airbag covers. Indeed, many of those covers are clearly marked with

John M. Halan, Esq.
May 15, 2000
Page 2

their true manufacturer's name. Suing Delphi over products it has nothing to do with is frivolous.

Likewise, the amended complaint asserts a claim for infringement of the '026 patent relating to the C/K truck airbag cover, among others. As we discussed extensively with you and your client before you filed the amended complaint, the claims of the '026 patent unambiguously require a "homogeneous thermoplastic" air bag cover with a "visually imperceptible" tear seam. However, Delphi's C/K truck airbag cover is made from two shots of two different materials, making it non-homogeneous. You *know* this to be true not only because we discussed it extensively with you, but also because we showed you Delphi's internal production drawings of the C/K truck airbag cover showing the two shots, and even lent you a C/K truck airbag cover sample with only a partial second shot that clearly showed both shots. PHC simply has no good faith basis for alleging infringement of the '026 patent.

Similarly, the only other airbag covers accused in the complaint that are made or sold by Delphi — the Park Avenue and Century covers — are also two shot, non-homogeneous covers.

Finally, Delphi has not made the Cutlass cover in years. Furthermore, that old Delphi cover could not conceivably infringe the '485 patent because it used rivets, and could not conceivably infringe the '026 patent because it had a visible tear seam.

Please let us know by Friday, May 19, 2000 whether PHC will be withdrawing its allegations of infringement under the '026 patent as well as its allegations regarding the Catera, Malibu, Tracker, Esteem, Swift, Geo Metro, Alero, and Cutlass airbag covers. Otherwise, we will have no choice but to serve and file our motion.

Sincerely yours,

Jonathan Putnam

JFP:dmm

# EXHIBIT E

**BROOKS & KUSHMAN P.C.**
Law Offices

*Intellectual Property and Technology Related Causes*

| | | | | | |
|---|---|---|---|---|---|
| Ernie L. Brooks | Ronald M. Nabozny | Timothy G. Newman | Robert C. Brandenburg | William G. Conger | Gigette M. Bejr |
| James A. Kushman | Thomas A. Lewry | John M. Halan | A. Frank Duke | Konstantine J. Diamond | Mark E. Stuart |
| David R. Syrowik | John E. Nemazi | Jeffrey M. Szuma | Mana Franek Anglieri | Rhonda L. McCoy-Pfau | Michael S. Brod |
| Mark A. Cantor | Kevin J. Heinl | George R. Mosher | James R. Ignatowski | David S. Bir | Patent Agents |
| Ralph M. Burton | William G. Abbett | Frederick M. Ritchie | Frank A. Anglieri | James N. Kalis | Robert C. Jones |
| Robert C. J. Tuttle | Donald J. Harrington | John M. Sheriden | Sangeeta G. Shah | Hugo A. Oelevre | Jeremy J. Curcu |
| Earl J. LaFontaine | Paul M. Schwartz | Elizabeth F. Janda | Christopher W. Quinn | Ralph E. Smith | Mark D. Chuey |

May 7, 1998

Ms. Kathryn A. Marra                                **VIA OVERNIGHT COURIER**
General Motors Corporation
Legal Staff
450 New Center One Building
3031 West Grand Boulevard
P.O. Box 33114
Detroit, Michigan  48232

Re:  **Air Bag Cover Patents**

Dear Ms. Marra:

This renews our correspondence ending with your letter of November 25, 1997.  That letter concluded by a statement of your willingness "to address any specific concerns articulated by you related to specific products."

Your attention is invited to the Chevrolet air bag cover shown in the enclosed photographs.  That cover: (i) is molded in thermoplastic, (ii) has a segmented snap-on attachment, (iii) has a hidden tear seam, and (iv) has an internal horn switch.

Please study the Chevrolet air bag cover relative to at least the following patent claims:

* U.S. Patent No. 5,501,485 - Claim 11;

* U.S. Patent No. 5,498,026 - Claims 1 and 16; and

* U.S. Patent No. RE 35,031 - Claim 6.

Copies of these patents were provided in my earlier correspondence.

Please inform of a date and time during the week of May 11 when we may meet in person to discuss the matter.  Mr. Darrius Priesler of Venture Industries Corporation and I request an opportunity to meet at your office to discuss this matter.  We will bring the air bag cover shown in the enclosed photographs.  We ask that you bring the engineering drawings for the cover, and have in attendance a knowledgeable technical person.



1000 TOWN CENTER, TWENTY-SECOND FLOOR, SOUTHFIELD, MICHIGAN 48075
TELEPHONE (248) 358-4400, FACSIMILE (248) 358-3351

Please acknowledge this letter and indicate an available meeting date and time during the week of May 11, as soon as possible. If you decline to meet, please let me know that, too, as soon as possible.

Very truly yours,

BROOKS & KUSHMAN P.C.

Robert C.J. Tuttle

RCJT/kg
Enclosures

cc:  Mr. Darrius Priesler (w/enclosures)

BK