**Hearing Date:  November 30, 2006**
**Hearing Time:  10:00 a.m. Prevailing Eastern Time**

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OBJECTION TO MOTION OF JOHN BLAHNIK, PAUL FREE, MILAN
BELANS, LAURA MARION, PETER JANAK, AND CATHY ROZANSKI
TO MODIFY OCTOBER 13, 2005 ORDER AND TO COMPEL
DELPHI CORPORATION TO ADVANCE LEGAL FEES AND COSTS

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Company" or the

"Debtors"), respectfully submit this Objection (the "Objection") to the Motion of

Creditors/Interested Parties John Blahnik, Paul Free, Milan Belans, Laura Marion, Peter Janak,

and Cathy Rozanski (together, the "Movants") to Modify October 13, 2005, Order And To

Compel Delphi Corporation To Advance Legal Fees and Costs (docket No. 5354) (the

"Advancement Motion"), and respectfully state as follows:[1]

<u>Preliminary Statement</u>

1.       On October 13, 2005, the Court entered the Human Capital Obligations Order

(docket No. 198) (the "Order") granting the Debtors' first-day Human Capital Obligations

Motion.[2]  Among other things, the Order established certain conditions under which the Debtors

would be permitted, but not directed, to advance defense costs incurred by former employees or

directors related to governmental investigations and lawsuits that commenced prior to the

Debtors' chapter 11 filings and that focused on prepetition conduct at Delphi.  The conditions

applicable to these former employees included: (i) that the advancements relate solely to costs

and expenses incurred in responding to the Securities and Exchange Commission ("SEC")

---

[1]      Concurrently with the filing of this Objection, the Debtors have filed a response to the
Motion Of Certain Former Employees Of Debtor For Limited Relief From The
Automatic Stay, To The Extent Applicable, To Pay And/Or Advance Defense Costs
Under The Debtors' Insurance Policies (the "Insurance Motion") (docket No. 5360).
Each of the Movants in the Advancement Motion is also a movant in the Insurance
Motion.

[2]      Docket No. 12 (full title: Motion for Order Under 11 U.S.C. §§ 105(a), 363, 507, 1107,
and 1108 (I) Authorizing the Debtors to Pay Prepetition Wages and Salaries to
Employees and Independent Contractors; (II) Authorizing the Debtors to Pay Certain
Prepetition Benefits and Continue the Maintenance of Human Capital Benefit Programs
in the Ordinary Course; and (III) Directing Banks to Honor Prepetition Checks for
Payment of Prepetition Human Capital Obligations) (hereinafter "Human Capital
Obligations Motion").

investigation (commenced in 2004) and/or defending against related securities and ERISA class

actions; (ii) that the advancements not exceed a $5 million aggregate cap; (iii) that the

advancements cover only expenses not otherwise reimbursable by third parties; and (iv) that the

Company's Compensation Committee determine whether to make any such advancements on a

case-by-case basis. Human Capital Obligations Motion ¶ 39. By contrast with its provisions

governing former employees, the Order does not subject the advancement of defense costs to

current employees to any aggregate cap. Id. Among the key purposes of the Human Capital

Obligations Motion was to preserve employee loyalty and morale essential to a successful

execution of the Debtors' transformation plan.

      2.      Absent the Order, the Debtors could not continue advancing defense costs to any

of the six Movants here. These Movants are former executives or employees whose

advancement claims arose out of their prepetition conduct that led in part to prepetition

governmental investigations and related lawsuits. Under well-established law in this Circuit and

elsewhere, any valid advancement claims from these Movants under the indemnification-related

provisions of Delphi's Bylaws constitute unsecured, prepetition claims and thus – without the

Court's specific authorization under the Order – advancement outside a confirmed plan of

reorganization would have been contrary to the automatic stay and priority provisions of the

Bankruptcy Code. See 11 U.S.C. §§ 362(a)(6), 507. Simply put, the Order permitted the

Debtors to assess whether to advance defense costs to former employees during the postpetition

period when such advancement would otherwise have been stayed pending the confirmation of a

plan of reorganization.

      3.      The Debtors' decision to discontinue advancement of defense costs to the

Movants was entirely consistent with the letter and spirit of this Court's Order. Pursuant to the

Order, the Compensation Committee regularly has reviewed all former employee advancement

3

requests on a case-by-case basis.  In February and in June 2006, the Compensation Committee
decided to discontinue advancement of expenses to certain former employees, including the
Movants here.   This decision was not the result of any pressure from the government to
discontinue advancement.  The Compensation Committee based its decision primarily on the fact
that Delphi's Audit Committee found that these former employees played a role in prepetition
transactions that led to Delphi's restatement of financial results in June 2005.  Although the
Compensation Committee did not reach the question of whether these Movants are ultimately
entitled to indemnification, it reasonably determined that stopping advancement would be fair
and in the best interests of the Debtors' estates and their other creditors and stakeholders.  This
decision was in no respect a determination regarding any former employee's rights to
indemnification under Delaware Law and Delphi's bylaws.  The Movants do not (and cannot)
contend that the Debtors failed to adhere to the terms of this Court's Order.  Instead, the Movants
seek to modify the Order itself, by removing any discretion to stop advancing defense costs to
any former employees, based on three contentions.

4.      First, the Movants contend that the Order violates Delphi's Bylaws, under which
advancement is mandatory, and also thereby violates public policy.  Second, the Movants assert
that the Order "radically curtail[ed] Movants' rights" and, therefore, the Movants should have
received direct notice of the Human Capital Obligations Motion.  Finally, the Movants contend
that the discretion provided under the Order has led to an "unconstitutional" deprivation of their
constitutional right to due process and counsel.  These contentions are without merit.

5.      The Movants' various assertions that that the Order somehow prejudiced their
rights incorrectly assumes that advancement of defense costs would have continued on a
mandatory basis were it not for this Court's Order.  The opposite is true.  The Order gave the
Compensation Committee limited discretion to continue advancing defense costs to former

4

employees <u>notwithstanding</u> <u>that</u> the Movants must otherwise assert unsecured, prepetition claims

(<u>i.e.</u>, to the extent they are ultimately determined to be eligible for advancement or

indemnification under the Delphi's Bylaws).  Granting limited discretion in these circumstances

reflects a sound and balanced exercise of the Courts' powers to permit the Debtors to honor

certain prepetition advancement obligations in the best interests of the Debtors' estates and

creditors.  Second, because the Human Capital Obligations Motion could only improve the

Movants' ability to receive reimbursement for defense costs from the Debtors' estates, they were

in no way "prejudiced" by not receiving direct notice of the Human Capital Obligations Motion.

Finally, there is no factual or legal basis whatsoever to the Movants' contention that undue

pressure from the government forced the Compensation Committee's hand.  For this and other

reasons set forth fully herein, no deprivation of any constitutional rights is remotely implicated

by the Court's October 13, 2005 Order or the Debtors' adherence thereto.  The Movants' request

to modify the Order should be denied.

Background

A.    Events Leading To The Movants' Defense Costs And Expenses

6.    In late July 2004, Delphi received a subpoena from the SEC requesting

information about certain agreements between the Company and one of its information

technology service providers.  Shortly thereafter, Delphi received a copy of the SEC's formal

order of investigation related to those same transactions.  In response, the Company commenced

an independent investigation of matters underlying the SEC's inquiries.  In early October 2004,

the Audit Committee of Delphi's Board of Directors assumed oversight responsibility for the

internal review and directed Delphi's response to the SEC staff's investigation.

7.    In connection with and as a result of the Audit Committee's ongoing investigation,

on October 18, 2004 Delphi announced that its independent auditors had not yet completed their

review of the Company's consolidated financial statements for the period ending September 30, 2004, and that Delphi would not file its Form 10-Q for the third quarter until the Audit Committee and the Company's auditors had completed their respective reviews.  In early December 2004, Delphi reported the preliminary results of the Audit Committee's investigation.  On March 1, 2005, Delphi announced the Audit Committee's position that the Company's financial statements for 2001 and certain subsequent periods should no longer be relied upon, and that a restatement would be required.  On March 22, 2005, Delphi announced that the Audit Committee had substantially completed its internal investigation, and on June 30, 2005, the Company disclosed its restated financial restatements for the affected periods.

8.      In March 2005, shortly after the Company announced its intention to restate certain prior period financial statements, claimants filed several putative securities class actions in various federal district courts.  The suits alleged that Delphi, certain current and former directors and officers of the Company, and others, violated the federal securities laws in connection with matters related to the Company's pending restatement.  Among the defendants named in the securities class action complaints were two of the Movants here, Messrs. Free and Blahnik.  In December 2005, these separate actions (including other actions described below) were consolidated in the United States District Court for the Eastern District of Michigan and assigned to United States District Judge Gerald E. Rosen for coordinated pretrial proceedings. (The matter bears the caption, In re Delphi Corp. Securities, Derivative and "ERISA" Litigation, 2:05–md-01725-GER (E.D. Mich.) (the "Multidistrict Litigation").)

9.      In March 2005, certain claimants filed several putative ERISA class actions. These suits alleged that Delphi, certain current and former directors, officers, and employees of the Company, and others, violated a variety of duties imposed by the Employee Retirement Income Security Act of 1974 in connection with matters related to the Company's pending

6

restatement.  None of the Movants here has been named expressly as a defendant in the ERISA

suits, although the suits generally name as defendants past and current members of Delphi's

Investment Policy Committee.  Each of movants Blahnik and Free is a former member of the

Investment Policy Committee.  In December 2005, the ERISA class actions were also centralized

by the Judicial Panel on Multidistrict Litigation and consolidated in United States District Court

of the Eastern District of Michigan (In re Delphi Corp. Securities, Derivative and "ERISA"

Litigation, No. 05-MD-1725 (GER) (E.D. Mich.)).

        10.     In March 2005, shortly after the Company announced its intention to restate

certain prior period financial statements, a third group of claimants began to file shareholder

derivative actions on behalf of the Company, as a nominal defendant.  A total of four complaints

were filed:  two in federal court (one in the Eastern District of Michigan and another in the

Southern District of New York) and two in Michigan state court (Oakland County Circuit Court

in Pontiac, Michigan).  These suits alleged that certain current and former directors and officers

of the Company breached a variety of duties owed by them to Delphi in connection with matters

related to its pending restatement.  The federal cases were consolidated with the securities and

ERISA class before Judge Rosen in the Eastern District of Michigan.  Following the filing on

October 8, 2005, of the Debtors' petition for chapter 11 relief, all the derivative cases have been

administratively closed.  Among the defendants named in the derivative suits are Movants

Blahnik and Free.

        11.     On October 30, 2006, the SEC filed a civil complaint in the United States District

Court for the Eastern District of Michigan, under the caption United States Securities &

Exchange Comm'n v. Delphi Corp., et al., No. 06–CV–14891 (E.D. Mich.).  Named as

defendants in that action were Delphi, nine former Company officers and employees (including

five of the Movants here – Belans, Blahnik, Free, Marion, and Rozanski), and four others, all of

whom are alleged to have violated the federal securities laws. By agreement and signed consent,
the charges against Delphi and movant Marion provisionally were settled simultaneously with
the filing of the complaint. The district court entered a final judgment accordingly on November
7, 2006, subject to the approval of this Court. The SEC is continuing to prosecute its civil case
against Movants Free, Blahnik, Belans, and Rozanski.

12.    The SEC's investigation is ongoing, notwithstanding the filing of its complaint.
(SEC Litig. Release No. 19891, Oct. 30, 2006, at 4.) The Department of Justice, the Federal
Bureau of Investigation, and other agencies also are investigating matters related to the
Company's June 30, 2005 restatement. The Advancement Motion contends that all of the
Movants have incurred legal fees and expenses as a result of the SEC civil investigation and that
two of the Movants also have incurred fees as a result of the pending Multidistrict Litigation.

B.    The Movants' Claims Under Delphi's Bylaw Provisions

13.    Debtors do not dispute that the Movants are each former executives or managerial
employees as those terms are used in Article V ("Indemnification of Directors, Officers,
Executives, Managerial Employees, Employees, and Agents") of Delphi's Amended Bylaws.[3]
The Movants' former titles at Delphi and approximate resignation dates from Delphi are as
follows:

a.    Milan Belans: former Director of Capital Planning and Pension Analysis
at Delphi; separated effective August 31, 2005.

---

[3]    A copy of Article V of Delphi's Amended Bylaws are attached as Exhibit B to the
Advancement Motion. Delphi amended its Bylaws effective October 8, 2005. The only
change relevant here is that the Amended Bylaws expressly includes "executives" and
"managerial employees" within the scope of mandatory indemnification (section 5.1) and
mandatory advancement of legal expenses (section 5.5). This change does not impact the
effect of the Debtors' chapter 11 filings on the Movants' advancement claims, which is
described herein (see ¶¶ 33-35 herein), and thus does not affect the resolution of the
Advancement Motion.

b.    John Blahnik:  former Vice President – Treasury; separated effective June 8, 2005.

c.    Paul Free:  former Controller; separated effective March 3,  2005.

d.    Peter Janak: former Vice President and Chief Information Officer; separated on July 1, 2003.

e.    Laura Marion:  Director, Financial Accounting and Reporting; separated on April 30, 2006.

f.    Cathy Rozanski:  Director, Financial Accounting and Reporting; separated on September 1, 2005.

Movants Belans, Blahnik, Free, and Rozanski were separated after Delphi's Audit Committee expressed concerns regarding the role that these former employees played in the transactions (or found to have played a key role in such transactions) that were the subject of the June 20, 2005 restatement and the Audit Committee's internal review.  See Declaration of John D. Opie, dated November 22, 2006 ("Opie Decl.") at ¶ 15.  Ms. Marion was separated on April 30, 2006 for similar reasons.  Id.

14.    Section 5.1 of Delphi's Amended Bylaws requires indemnification of legal expenses, attorneys' fees, judgments, fines, and penalties to the fullest extent allowed under Section 145(a) of the Delaware General Corporation Law for persons who are, or were, directors, officers, executives, or managerial employees of Delphi.  Consistent with Delaware law, the Bylaws permit indemnification in connection with civil suits and proceedings only if the director or employee acted "in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation."  No final determination has been made as to whether any of the Movants satisfies this necessary precondition of indemnification.  See Opie

Decl. at ¶ 14.  The issue of entitlement to full indemnification is generally deferred until after questions of liability have been resolved in the underlying civil actions or investigations.

15.     Section 5.5 of Delphi's Amended Bylaws requires advancement of defense costs and expenses to persons potentially indemnifiable under Section 5.1.  Consistent with Section 145(e) of the Delaware General Corporation Law, any such advancement is conditioned upon receipt of an undertaking in writing by the director or employee to repay such amount if it is ultimately determined that the director or employee is not entitled to be indemnified under Bylaw Section 5.1.

16.     The Movants contend that they have incurred certain legal defense costs and expenses in connection with the litigation and investigations referenced above by reason of the fact that they were executives or managerial employees of Delphi.  For purposes of the Advancement Motion, the Debtors do not generally dispute that the Movants have incurred such costs and expenses.[4]  Nor do the Debtors dispute that Section 5.5 of Delphi's Amended Bylaws would ordinarily require payment of defense costs to Movants in advance of the final disposition of the civil actions at issue here, upon receipt of a written undertaking to repay such amounts if the former employees are ultimately determined not to be entitled to indemnification.  In addition, the Debtors do not dispute they have received appropriate written undertakings from these Movants and, prior to the petition date, had been making advancements to the Movants for legal costs and fees incurred.

17.     All but one of the Movants have filed a proof of claim asserting contingent, nonpriority, unsecured claims in connection with their unpaid defense costs and expenses that

---

[4]     The Debtors hereby reserve all of their rights to dispute the reasonableness, validity, and amount of any specific defense costs and expenses claimed by Movants or any former employees – an issue as to which the Debtors need not take a position for the purposes of resolving the Advancement Motion.

they assert are subject to the indemnification and advancement provisions of Delphi's Amended

Bylaws (i.e., section 5.1 and 5.5).[5]

C.      The October 13, 2005 Human Capital Obligations Order

18.      On October 8, 2005, the Debtors filed their Human Capital Obligations Motion.

Like virtually all large chapter 11 debtors, the Debtors sought authority in this first-day motion

to, among other things, pay the prepetition obligations owed to their salaried and hourly

employees and to continue the Debtors' various human capital benefit plans and programs, the

most significant of which were described in detail in the Motion.

19.      Of relevance to this Advancement Motion is the authority requested (and granted

under the Order) with respect to advancement of defense costs relating to prepetition suits and

investigations found in paragraph 39 of the Human Capital Obligations Motion.  Paragraph 39

states in full:

> In addition, the Debtors seek authority but not direction to advance
> expenses to approximately 50 of its Employees and Directors,
> including 19 former Employees, currently engaged (and those who
> may become engaged on account of prepetition acts) in defending
> against shareholder class action suits and ERISA class action suits,
> and participating in the investigation by the Securities and
> Exchange Commission.  The Debtors believe that the claims
> against such Employee or Director relates to his or her actions
> undertaken in good faith on behalf of the Debtors in a manner
> reasonably believed to be lawful and in the best interests of the
> Debtors.  Moreover, in the event that it is determined that the
> Employee or Director is not eligible for indemnification, the
> Employee or Director has agreed to reimburse the Debtors.  For
> current Employees and Directors, the Debtors seek authorization

---

[5]      The Debtors' review of the docket indicates that movant Peter Janak has not filed a proof
of claim.  The remaining Movants' proofs of claim assert contingent, unreimbursed,
liquidated and unliquidated legal defense costs and fees (allegedly subject to
indemnification under Delphi's Bylaws).  Mr. Belans' proof of claim also asserts a
priority unsecured claim under 11. U.S.C. § 507(a)(2).  As discussed herein, however,
none of Mr. Belans' potential advancement or indemnification rights is entitled to any
administrative expense priority.

but not direction to advance all expenses for the defense of these suits. <u>For former Employees and Directors, the Debtors seek to advance expenses limited to an aggregate cap of $5 million, on a case-by-case basis pursuant to approval by the Compensation Committee, and only for advances not otherwise reimbursable from other third parties</u>.

(Docket no. 12 at p. 21 (emphasis added).)

20.    The Debtors served 170 parties with notice of the Human Capital Obligations Motion, including the Debtors' 50 largest unsecured creditors, the agents to the Debtors' prepetition and postpetition credit facilities, and the Debtors' unions. None of these parties objected to the Human Capital Obligations Motion. On October 8, 2005, Judge Gonzalez entered a Bridge Order granting interim relief (docket No. []). This Court conducted a hearing on the Human Capital Objections Motion on October 11, 2005, at which time the Court granted the motion, subject to limited look-back rights awarded to the Creditors' Committee, once appointed.[6]

21.    On October 13, 2005, the Court entered the Order granting the authority sought in the Human Capital Obligations Motion.

D.    <u>The Compensation Committee's Decisions Regarding Advancement Of Defense Costs</u>

22.    At all times relevant to the Insurance Motion, the Compensation and Executive Development Committee of Delphi's Board of Directors (the "Committee") has been comprised of the following independent, outside directors:  Virgis W. Colbert (Committee chairman), Retired Executive Vice President and Director, Miller Brewing Company (a Delphi director since 1999); Craig G. Naylor, Group Vice President, E.I. du Pont de Nemours & Company (a

---

[6]    On October 25, 2005, the Creditors' Committee filed a Statement regarding the Order that noted the Committee's desire for an opportunity to complete its analysis. The Debtors and the Committee ultimately resolved any concerns consensually, and, thus, the Committee did not oppose any aspect of the relief sought and granted under the Order.

Delphi director since 2005); and John D. Opie, former Vice Chairman of General Electric

Corporation (a Delphi director since 1999 and lead outside director since 2002).  In addition,

Raymond J. Milchovich, Chairman, President & CEO, Foster Wheeler Inc. (a Delphi director

since December 2005), joined the Compensation Committee in December 2006.

23.     Pursuant to the specific authority requested in paragraph 39 of the Human Capital

Obligations Motion (and granted in the Order), the Committee has maintained oversight over any

and all advancement of legal expenses to former employees.  In the postpetition period, the

Compensation Committee has reviewed, discussed, and specifically authorized each

advancement of defense costs to former employees prior to the disbursement of any such funds.

See Opie Decl. at ¶ 7.

24.     All members of the Committee have received regular, detailed reports from

Delphi's Legal Staff (i) reviewing the relevant parameters under the Human Capital Objections

Order and (ii) identifying, in an individualized manner, the amounts previously advanced (if

any), the outstanding amounts requested, and any pertinent facts regarding the former employees

at issue.  Id. at ¶ 8.  At most of the Committee's regularly scheduled meetings, David M. Sherbin,

Delphi's Vice President and General Counsel, made a presentation focused in part on a case-by-

case review of pending requests for the advancement of defense costs.  At two of its meetings in

the postpetition period, the Committee either specifically authorized, or declined to authorize, the

advancement of defense costs to former employees on a case-by-case basis.  Id. at ¶ 9.

25.     With respect to the six Movants here, the Compensation Committee made

determinations to stop advancing legal fees at two separate meetings: one on February 8, 2006

and the other on June 7, 2006.

13

a.      February 8, 2006 Meeting

26.      Prior to the February 8, 2006 meeting of the Compensation Committee, the

Committee members received a report (dated February 7, 2006) from Delphi's Legal Staff (i)

noting that no advancement to former employees had been made since October 8, 2005 and (ii)

summarizing outstanding requests from ten former employees for advancement of legal fees and

expenses in connection with the SEC investigation, including requests from all six of the

Movants.  Id. at ¶ 11.  At the Committee's February 8, 2006 meeting, Mr. Sherbin reviewed both

the parameters set forth under the Human Capital Obligations Order and the facts relevant to the

Committee's decision regarding advancement to these former employees, on a case-by-case

basis.  Id. at ¶ 12.

27.      At the February 8 meeting, the Committee members engaged in a thorough

discussion of whether advancement would be in the best interests of the Debtors' estates, with

particular attention to the following factors:  (i) whether the former employee resigned after the

Audit Committee expressed concerns regarding the role such former employee played in the

transactions that were the subject of Delphi's June 30, 2005 restatement (or if the Audit

Committee otherwise found that he or she had played a key role in these transactions); (ii) the

potential impact on employee morale of any decision to stop further advancements; (iii) the

potential views of the other creditors of the Debtors' estates with respect to advancement, in light

of the fact that these former employees are unsecured creditors to the extent they have claims for

indemnification; and (iv) the impact on the Debtors' and other defendants' ability to successfully

defend the pending lawsuits and respond to the ongoing governmental investigations. Id. at ¶ 13.

28.      Based on these considerations, the Compensation Committee ultimately

determined during its February 8 meeting that it would not authorize advancements under the

Human Capital Obligation Order to any former employees who resigned after the Audit

14

Committee expressed concerns regarding the role such employees played in the transactions that were the subject of the Company's June 30, 2005 restatement of financial results (or if the Audit Committee otherwise found that they had played a key role in these transactions). In making this determination, the Compensation Committee took particular heed of the findings of Delphi's Audit Committee following its internal inquiry into these transactions. The Committee determined that the Debtors could not in good faith pay advancements to former employees whose actions were linked to the restatement and all related negative consequences. For this reason, the Compensation Committee determined not to authorize advancements under the Human Capital Obligation Order to Movants Belans, Blahnik, Free, Janak, and Rozanski, as well as two additional former employees, while authorizing advancement to movant Marion and two other former employees. Id. at ¶¶ 14-15.

> b.      June 7, 2006 Meeting

29.      Prior to the June 7, 2006 meeting of the Compensation Committee, the members of the Committee continued to receive detailed reports (dated March 14, April 28, and May 18) from Delphi's legal staff summarizing advancements to former employees made to date pursuant to the committee's prior authorization and providing updates on communications with former employees who had requested advancements. The Compensation Committee learned through these reports that several of the employees about whom the Audit Committee had expressed concern (and to whom advancements had been halted in February 2006) had subsequently received Wells Notices from the SEC.  Id. at ¶ 17.

30.      At the June 7 meeting, Mr. Sherbin reviewed these reports and discussed the guidelines that the Committee had followed, pursuant to the Human Capital Obligations Order, in connection with its discretion regarding advancements of defense costs to former employees.

Mr. Sherbin also reviewed facts relevant to the Committee's decision regarding advancement to

former employees, on a case-by-case basis.  Id. at ¶ 18.

31.     At the June 7 meeting, the members of the Compensation Committee again

engaged in a thorough discussion of whether advancement would be in the best interests of the

Debtors' estates, with particular attention to the same factors considered at its February 8

meeting.  (See ¶ 27 above.)  In light of those factors, the Committee determined that the Debtors

would not continue to pay advancements to additional former employees who had also received

Wells Notices from the SEC.  The Compensation Committee ultimately determined not to

authorize any further advancements under the Human Capital Obligation Order to movant Laura

Marion for this reason.  In addition to Ms. Marion, the Compensation Committee also denied

advancement to a former executive who had also received a Wells Notice, while authorizing

advancement to four other former employees (none of whom had received a Wells Notice).  Id.

at ¶ 19.

<u>Argument</u>

A.     The Court's Grant Of Authority To Make Advancement Determinations For Former
       Employees On A Case-By-Case Basis Does Not Violate Movants' Rights Under
       Delphi's Bylaws And Is Appropriate

32.     The Movants do not contend that the Debtors have failed to adhere to this Court's

October 13, 2005 Human Capital Obligations Order.  Instead, they contend that the Order

violates public policy and the Movants' rights to advancement under Delphi's bylaws.  This

argument is premised on a central misunderstanding of the nature of the Movants'

indemnification-related claims in the chapter 11 context and, thus, of the impact of the relief

granted in the Order.  In short, the Order did not violate or diminish the Movants' "rights" to

advancement because the commencement of these chapter 11 cases itself stayed any

advancements and transformed the Movants into unsecured creditors of the Debtors' estates.

16

33.     Movants cannot deny that their claims for advancement are based on prepetition events and their service to the corporation in the prepetition period.  The SEC investigation and related civil lawsuits all focus on prepetition matters.  Thus, under well-settled law in this Circuit and elsewhere, to the extent the Movants are entitled to advancement or indemnification, they have unsecured, prepetition claims against the Debtors' estates.  See, e.g., In re Adelphia Commc'ns Corp., 302 B.R. 439, 444 (Bankr. S.D.N.Y. 2003) ("Here, as in many (if not most) chapter 11 cases, claims by officers or directors for indemnification, for which the debtors might then seek reimbursement from their insurers, would be pre-petition claims . . . .  None of the Debtors could make payments on account of such pre-petition claims except under a chapter 11 plan."); In re Mid-Am. Waste Sys., Inc., 228 B.R. 816, 821-22 (Bankr. D. Del. 1999) ("An indemnification claim by an officer or director based on that officer's or director's prepetition services is not a claim on account of 'services rendered after the commencement of a case' that is entitled to administrative expense priority.  Instead, the O & D Claimants' indemnification claims are merely claims for prepetition compensation for services rendered, not unlike salary or other benefits.") (collecting cases); In re Baldwin-United Corp., 43 B.R. 443, 454-55 (C.D. Ohio 1984) (same).

34.     Movants' indemnification-related advancement claims are deemed to arise prepetition regardless of whether the Movants actually incur legal fees in the postpetition period.  See, e.g., In re Christian Life Center, 821 F.2d 1370, 1374 (9th Cir.1987) ("It makes no difference that the duty to indemnify . . . for litigation expenses, if such duty exists, did not

17

accrue until after the petition was filed . . . [T]he critical fact is that the claim for indemnity arose

from prepetition services. . . provided [to] the corporation.").[7]

35.    The Advancement Motion nevertheless presumes that the Debtors would have

been <u>required</u> to make advancements to the Movants under Delphi's Bylaws if the Court had not

granted the Debtors' Human Capital Obligations Motion.  Yet the opposite is true.  The

automatic stay and priority provisions of the Bankruptcy Code would have prohibited

advancement.  11 U.S.C. §§ 362(a)(6) (staying "any act to collect, assess, or recover a claim

against the debtor that arose before the commencement of the case") and 507 (setting forth

priority scheme for expenses and claims).  Thus, the Order in no sense "violates" the

advancement or indemnification provisions of Delphi's bylaws.  To the extent the Movants have

such rights, they were required to file proofs of claim, like any other unsecured, prepetition

---

[7]    Broadly speaking, indemnification is a "right conferred by contract, under statutory
auspice." <u>Stifel Fin. Corp. v. Cochran</u>, 809 A.2d 555, 559 (Del. 2002).  When
determining when contractual claims arise, courts in this Circuit focus on whether the
events and relationship giving rise to payment obligations were established in the
prepetition period, even if the right to collect a payment arises in the postpetition period.
The seminal case is <u>United States v. LTV Corp.</u> (<u>In re Chateaugay Corp.</u>), 944 F.2d 997
(2d Cir. 1991), which held that claims brought by the EPA for remediation under
CERCLA are deemed to arise prepetition where the events ultimately giving rise to
EPA's claim (asserted postpetition) occurred in the prepetition period. <u>See</u>, <u>e.g.</u>, <u>In re
Texaco</u>, 254 B.R. 536, 558 (Bankr. S.D.N.Y. 2000) (citing <u>Chateaugay</u> as the leading
case in the Second Circuit on the issue of when claims are deemed to arise).  The
<u>Chateaugay</u> court noted that, in the context of contractual claims, the Code's inclusion of
"unmatured" and "contingent" claims implies that a prepetition contractual relationship
that leads to a claim triggered by a future occurrence "'within the actual or presumed
contemplation of the parties at the time the original relationship between the parties was
created'" should be deemed a prepetition claim. <u>Chateaugay</u>, 944 F.2d at 1004 (quoting
<u>In re All Media Properties, Inc.</u>, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980)).  Here, there is
no question that any claim for advancement or indemnification arises out of prepetition
employment, prepetition events, and investigations and lawsuits that were commenced
prepetition and continue to give rise to claims within the contemplation of the parties.
Thus, the Movants' claims are classic prepetition claims.  Any contention by the Movants
that their claims arise postpetition because of continuing legal expenses must be rejected.
<u>See</u>, <u>e.g.</u>, <u>In re Emons Indus., Inc.</u>, 220 B.R. 182, 193-94 (Bankr. S.D.N.Y. 1998)
(rejecting arguments based on "right to payment" test).

creditor.  The Order, without diminishing the Movants "rights," grants limited discretion to pay

certain unsecured, prepetition claims on a case-by-case basis, in light of the importance of

employee morale and a successful resolution of the pending investigations to the Debtors' ability

to reorganize and emerge successfully.

36.    The Movants also assert that the discretion granted under the Order to discontinue

advancement of defense costs is contrary to public policy.  The Movants cannot explain,

however, why this is so in the context of a complex reorganization under chapter 11 in which all

employees, creditors, and stakeholders must unfortunately feel some adverse effects.  The

Debtors do not deny that indemnification provisions are important aspects of compensation for

key directors, executives, and managerial employees.  This is precisely why the Compensation

Committee evaluated each advancement request from the Debtors' former executives and

managerial employees on a case-by-case basis.

37.    In the end, the determinations that the Compensation Committee made were

reasonable, for they took into account all of the competing public policy concerns, including the

Debtors' interest in ensuring the morale of current employees, the Debtors' fiduciary obligation to

preserve the value of their estates for all unsecured creditors, and the unfairness of paying out the

prepetition claims of former employees whose activities led to a financial restatement.  See Opie

Decl. at ¶ 13.  In light of the various complex and competing interests here, the limited discretion

granted by this Court's Order was an appropriate exercise of this Court's powers to permit the

Debtors to honor certain prepetition advancement obligations.

B.    The Debtors Gave Adequate And Reasonable Notice Of The Human Capital
      Obligations Motion

38.    The Debtors provided notice of their first-day Human Capital Obligations Motion

to the Office of the United States Trustee, the Debtors' 50 largest unsecured creditors, counsel for

the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors'

postpetition credit facility, and the Debtors' unions.  The Debtors also widely publicized the commencement of these chapter 11 cases and the first-day hearings in press releases and Form 8-K filings.  In press releases issued on October 8, 2005 (prior to the hearing on the Human Capital Obligations Motion), the Debtors announced that court documents were available at www.delphidocket.com and that Delphi had set up a toll-free information line for employees, customers, shareholders, and other interested parties.  In addition, in a press release issued on October 11, 2005, the Debtors announced that the "first-day hearing" would be held on October 11, 2005 and provided telephonic participation information.

39.    The Human Capital Obligations Order reflects the Court's determination that "proper and adequate notice of the Motion has been given and that no other or further notice is necessary."  Human Capital Obligations Order at 2.

40.    The Movants nevertheless assert that they "had no notice of the Human Capital Obligations Motion and no opportunity to be heard."  (Motion ¶ 15.)  Movants further contend that this purported lack of notice prejudiced them because the Debtors "sought an order that would affect Movants' rights by radically curtailing Movants' right to advancement of legal fees." (Motion ¶ 11.)  This argument fails at the outset because it assumes incorrectly that the relief requested "curtailed" Movants' "rights."  Not so.  As explained above, the chapter 11 filings themselves affected the Movants' ability to receive advancements through the automatic stay applicable to all prepetiton claimholders.  Contrary to the Movants' assertions, the Order – far from "prejudicing" any of the Movants' "rights" – in fact <u>improved</u> their position by comparison with other general, unsecured creditors.  The Human Capital Obligations Motion did not request (or even address) any adjudication of the Movants' actual <u>rights</u> (<u>i.e.</u>, their indemnification-related unsecured claims) in these chapter 11 cases.  Regardless of how the Court would rule on the Human Capital Objections Motion, therefore, the Movants, like other prepetition creditors,

20

would retain all of their rights in these chapter 11 cases to file proofs of claim and seek recovery

from the Debtors under the Bankruptcy Code.  Because the Movants' "rights" were not affected,

and because the Order stood only to benefit the Movants, the Movants cannot seriously complain

of any prejudice resulting from their alleged unawareness of Delphi's first-day motions.

41.    The Movants' argument that the Debtors' notice failed to satisfy the requirements

of Local Rule 9013-1(c) must also be rejected.  Under the literal interpretation of the Local Rule

urged by the Movants, the Debtors would have been required to serve their first-day Human

Capital Obligations Motion on all 50,600 salaried and hourly employees in the United States at

the time of the Debtors' bankruptcy filing, because every employee had an "interest in the subject

matter" that could be "affected."[8]  Given the size and complexity of the Debtors' chapter 11 cases

and the exigent need for the overall relief requested in the Human Capital Obligations Motion (as

well as in the Debtors' other first-day motions), the Movants' literal approach to the notice

requirements of Local Rule 9013-1(c) would have been unworkable and unreasonably

burdensome.

42.    As the Supreme Court has held, notice must be "reasonably calculated, under all

circumstances, to apprise interested parties of the pendency of the action and afford them an

opportunity to present their objections."  Mullane v. Central Hanover Bank & Trust Co., 339

U.S. 306, 314 (1950).  "Section 102(1)(A) of the Bankruptcy Code defines the phrase, 'after

notice and a hearing' to be 'such notice as is appropriate under the particular circumstances, and

such opportunity for a hearing as is appropriate in the particular circumstances.  Obviously,

---

[8]    The Debtors do not deny that their employees had "interests" that were "affected" by the
Human Capital Obligations Order.  It is worth noting, however, that the relief sought
enhanced the employees' ability to receive payments on certain prepetition claims that
otherwise would be subject to the automatic stay.  This is another factor that supports the
adequacy of the notice given.

21

therefore, the concept of 'notice and a hearing' is a flexible one.  Notice does not need to be

perfect; it must only be reasonable based upon the circumstances of the case."  In re Gonzalez,

341 B.R. 371, 381 (BAP 1st Cir. 2006) (internal citations omitted).  Based on the circumstances

surrounding the filing of the Debtors' chapter 11 cases and the hearing on the first-day motions,

the notice that the Debtors provided regarding the Human Capital Obligations Motion was

reasonable and adequate (as this Court itself found).  Movants cannot seriously claim that the

failure to satisfy Local Rule 9013-1(c) – i.e., the fact that they did not receive copies of the first-

day motions – meant that they did not have reasonable notice under the circumstances.

C.    The Debtors' Decision To Discontinue Advancement Did Not Violate, Or
      Even Implicate, The Movants' Constitutional Rights

43.    Finally, the Movants rely on the recent decision in United States v. Stein, 435 F.

Supp. 2d 330 (S.D.N.Y. 2006), to argue that the Order created a situation in which the

government successfully pressured the Debtors to cease advancement of their legal expenses, in

violation of the Movants' Fifth and Sixth Amendment rights.  This argument fails for two

obvious reasons – one factual and the other legal.

44.    First, as a factual matter, the Debtors received no pressure from the government

with respect to their advancement decisions.  (Opie Decl. ¶ 20.)  By contrast, the Stein court's

holding that constitutional rights were infringed turned squarely on that court's express finding,

following evidentiary hearings, that the federal government caused KPMG to discontinue

advancement of legal expenses to certain former partners who were indicted.  See Stein, 435 F.

Supp. 2d at 353 ("KPMG's decision to cut off all payments of legal fees and expenses . . . was

the direct consequence of the pressure applied by the Thompson Memorandum and the [United

States Attorney's Office].  Absent the Thompson Memorandum and the actions of the USAO,

KPMG would have paid the legal fees and expenses of all of its partners and employees . . . .");

see also id. at 336 (same). [9]  This sort of governmental pressure was completely absent here, as

Mr. Opie's Declaration makes clear. (Opie Decl. ¶ 20.)[10]

45.    Second, as a legal matter, the Stein decision focuses entirely on principles of

fundamental fairness owed to criminal defendants. The Movants here do not contend that they

have been indicted (or even that they have incurred any fees in connection with any criminal

proceeding). Movants themselves note that the Sixth Amendment "attaches upon indictment"

(Motion at 10 n.5). Even in the unusual event that such rights are implicated in the pre-

indictment phase of criminal proceedings, they attach after "the government has committed itself

to prosecute," and a movant finds himself "faced with the prosecutorial forces of organized

society, and immersed in the intricacies of substantive and procedural criminal law." Moore v.

Illinois, 434 U.S. 220, 229-30 (1977) (citation omitted); Kirby v. Illinois, 406 U.S. 682, 689–90

(1972) ("It is this point, therefore, that marks the commencement of the 'criminal prosecutions' to

---

[9]    The relevant provisions of the Thompson Memorandum, then binding on all United
States Attorneys, required prosecutors to consider any advancement by a business entity
to potentially culpable employees or former employees, other than those advancements
strictly required by law, "as a factor weighing in favor of indictment of the entity." Stein,
435 F. Supp. 2d at 338 & n.12. Here, the Movants baldly assert that the Thompson
Memorandum has influenced the Compensation Committee, without any basis in fact.

[10]    Absent government action, any Due Process argument fails: "nothing in the language of
the Due Process Clause itself requires the State to protect the life, liberty, and property of
its citizens against invasion by private actors. The Clause is phrased as a limitation on
the State's power to act . . . . Like its counterpart in the Fifth Amendment, the Due
Process Clause of the Fourteenth Amendment was intended to prevent government 'from
abusing [its] power, or employing it as an instrument of oppression.'" DeShaney v.
Winnebago Cty. Dept. of Soc. Servs., 489 U.S. 189, 195-96 (1989) (emphasis added)
(quoting Daniels v. Williams, 474 U.S. 327, 331 (1986), and citing Davidson v. Cannon,
474 U.S. 344, 348 (1986), and Parratt v. Taylor, 451 U.S. 527, 549, (1981) (Powell, J.,
concurring in result).). Where, as here, there has been no improper governmental
pressure brought to bear, and where the decision to halt the Movants' advancements
turned entirely on private assessments by the Debtors regarding their own (and their
stakeholders') best interests, the Due Process concerns addressed in Stein are not
implicated. Stein, 435 F. Supp. 2d at 336.

which alone the explicit guarantees of the Sixth Amendment are applicable.") (citations omitted).

Nothing in the Advancement Memorandum, however, provides any basis to believe that the

ongoing investigations brought to this Court's attention in the parties' pleadings have reached a

"stage of the prosecution" of a <u>criminal</u> case sufficiently "critical" to implicate the Movants'

constitutional rights.  <u>Kirby</u>, 406 U.S. at 690; <u>Moore</u>, 434 U.S. at 229 (same).

46.    In sum, the central holding of the <u>Stein</u> case – "that the government may not both

prosecute a defendant and then seek to influence the manner in which he or she defends the case"

– is inapposite here.  435 F. Supp. 2d at 357.

CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court deny the

Advancement Motion in its entirety.

Dated: New York, New York
      November 22, 2006

SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP

By: /s/ John Wm. Butler, Jr.
   John Wm. Butler, Jr. (JB 4711)
   Albert L. Hogan III (AH 8807)
   John K. Lyons (JL 4951)
   Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

By: /s/ Kayalyn A. Marafioti
   Kayalyn A. Marafioti (KM 9632)
   Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000