**EXECUTION COPY**

**Environmental Matters Agreement**

Between

Johnson Controls, Inc.

and

Delphi Corporation

June, 2005

## ENVIRONMENTAL MATTERS AGREEMENT

**THIS ENVIRONMENTAL MATTERS AGREEMENT** (this "**Agreement**") is made on _____, 2005, between **Johnson Controls, Inc.**, a Wisconsin corporation ("**Purchaser**") and **Delphi Corporation**, a Delaware corporation ("**Seller**"). As used in this Agreement, the term "**Party**" shall refer individually either to Purchaser or to Seller; the term "**Parties**" shall refer collectively to Purchaser and Seller.

### R E C I T A L S:

A.  By a Master Sale and Purchase Agreement ("**Purchase Agreement**") dated as of the date of this Agreement made between Purchaser and Seller, the Seller agreed to sell and the Purchaser agreed to purchase Business and assets as provided in the Purchase Agreement.

B.  This Agreement is the Environmental Matters Agreement referred to in the Purchase Agreement.

C.  Certain obligations and rights of the Parties are guaranteed pursuant to and in the form provided for in the Purchase Agreement, including the agreement to enter into this Agreement.

D.  Capitalized terms not defined in this Agreement have the same meaning as in the Purchase Agreement

1. **DEFINITIONS:**

    **1.1** "**Ancillary Agreements**" has the same meaning as given in the Purchase Agreement.

    **1.2** "**Business**" has the same meaning as given in the Purchase Agreement.

    **1.3** "**Closing Date**" has the same meaning as given in the Purchase Agreement.

    **1.4** "**Competent Authority**" means a person, agency, department or subdivision thereof having governmental authority under an applicable Environmental Law, and/or a court or tribunal of competent jurisdiction.

    **1.5** "**Compliance Matter**" means an event, condition, activity, practice, action or omission at the Real Property which gives rise to a breach or violation of an Environmental Law, but which excludes Environmental Contamination.

    **1.6** "**Environment**" means any and all organisms (including humans), biota, ecosystems, land, natural resources, property, air, soil gas, water, groundwater, human beings, and buildings, fixtures and installations.

    **1.7** "**Environmental Claim**" means a notice, claim, demand, action, suit, complaint or proceeding by a Competent Authority or a Third Party alleging liability or potential liability arising out of an Environmental Law.

2

**1.8** "**Environmental Contamination**" means the presence of a Hazardous Material at, in, under, on or about the Environment at the Real Property.

**1.9** "**Environmental Damages**" means losses, liabilities, costs, damages fines, penalties and expenses (including reasonable expenses of investigation and attorneys' fees) arising out of an Environmental Law or a breach of the Environmental Warranties, but in all cases excluding losses, liabilities, costs, damages and expenses deemed consequential or loss of profit, and also excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

**1.10** "**Environmental Law**" means, solely for those in force and effect as at the Closing date in the relevant jurisdiction, all applicable civil, criminal, administrative and any other supranational (including without limitation European Union laws and directives, and NAFTA rules), federal, state, county and local (including common law) laws, rules, ordinances, orders, codes, guidance, directives, Environmental Permits (or lack thereof), approvals, decisions, decrees, remediation standards and regulations relating to or having the purpose or effect of the prevention of pollution or harm to the Environment or human health.

**1.11** "**Environmental Permits**" means all licenses, consents, permits, registrations, approvals or authorizations made or issued by a Competent Authority under an Environmental Law in connection with the Business or the Real Property.

**1.12** "**Environmental Warranties**" means those representations and warranties given by the Seller in Section 2 of this Agreement.

**1.13** "**Hazardous Material**" means all matter (whether alone or in combination with other matter, and whether solid, liquid, gas or other state) which is a pollutant, contaminant, chemical, material, substance, constituent, or waste including without limitation petroleum, petroleum-based or petroleum-derived products, polychlorinated biphenyls, asbestos and asbestos-containing materials, and noxious, radioactive, flammable, corrosive, caustic materials, all of which are governed or regulated under an Environmental Law.

**1.14** "**JV Compan(ies)**" has the meaning given to it in the Purchase Agreement.

**1.15** "**New Brunswick Put and Call Agreement**" means the New Brunswick Put and Call Agreement made by Purchaser and Seller dated as of the date of this Agreement.

**1.16** "**New Brunswick Real Property**" means the Real Property as defined in the New Brunswick Put and Call Agreement.

**1.17** "**Notice of Claim**" has the meaning given to it in Section 5 of this Agreement.

**1.18** "**Post-Closing Compliance Matter**" means a Compliance Matter first occurring after the Closing Date, except for the New Brunswick Real Property, in which it means a Compliance Matter first occurring after the Put Completion Date.

**1.19** "**Post-Closing Environmental Contamination**" means Environmental Contamination first occurring after the Closing Date, except for the New Brunswick Real Property, in which it means Environmental Contamination first occurring after the Put Completion Date.

3

**1.20** "**Post-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the Real Property and disposed at a disposal site not at the Real Property after the Closing Date or, in the case of the New Brunswick Real Property, after the Put Completion Date, under an applicable Environmental Law.

**1.21** "**Pre-Closing Compliance Matter**" means a Compliance Matter first occurring at prior to the Closing Date, except in the case of the New Brunswick Real Property, in which it means a Compliance Matter first occurring at the New Brunswick Real Property prior to the Put Completion Date.

**1.22** "**Pre-Closing Environmental Contamination**" means Environmental Contamination first occurring prior to the Closing Date, except in the case of the New Brunswick Real Property, in which it means a Environmental Contamination first occurring at the New Brunswick Real Property prior to the Put Completion Date.

**1.23** "**Pre-Closing Off-Site Disposal Liability**" means liability for a Hazardous Material generated at the Real Property and disposed at a disposal site not at the Real Property prior to the Closing Date or, in the case of the New Brunswick Real Property, prior to the Put Completion Date, under an applicable Environmental Law.

**1.24** "**Purchase Agreement**" has the meaning given in the recitals of this Agreement.

**1.25** "**Purchaser**" has the same meaning as given in the Purchase Agreement.

**1.26** "**Put Completion Date**" means Completion as defined in the New Brunswick Put and Call Agreement.

**1.27** "**Real Property**" means the real property used by the Business and all improvements thereon at the Facilities, as that term is defined in the Purchase Agreement.

**1.28** "**Remedial Works**" means the works, designs, investigations and activities carried out by a Party in relation to Environmental Contamination, but excluding expenses of investigating information for the purposes of making a claim for indemnification under this Agreement.

**1.29** "**Remedy**" has the meaning given to it in Section 6 of this Agreement.

**1.30** "**Seller**" has the same meaning as given in the Purchase Agreement.

**1.31** "**Seller's Knowledge**" means the knowledge of: (i) John Jaffurs, Executive Director of Delphi's Facilities Services Group; (ii) Glenn Howarth, Director of Delphi's Environmental Services; or (iii) Steve Gibbs, Product Line Manager, Batteries. In addition, with respect to the New Brunswick Real Property at the time of the Put Completion, those identified above, or any persons designated to a successor role. For this purpose, an individual will be deemed to have Knowledge of a particular fact or other matter if: (i) such individual is actually aware of such fact or other matter; or (ii) a prudent individual would be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonable inquiry of Delphi employees who, in the ordinary course of their job responsibilities, would reasonably be expected to have actual possession or actual personal knowledge of such information.

4

**1.32**   "**Third Party**" means any person not a Party or a Competent Authority.

**2.   REPRESENTATIONS AND WARRANTIES:**

**2.1**   Except as set forth on Schedule 2.1:

A.  Seller is and has been since January 1, 1999 in compliance in all material respects with Environmental Laws applicable to the Business and the Real Property.

B.  To the best of Seller's Knowledge, there is no pending or threatened Environmental Claim against the Seller relating to the Business or the Real Property.

C.  There are no Hazardous Materials at, under or emanating from and there has been no release at the Real Property that could reasonably be expected to give rise to material liability to the Business under an Environmental Law.

D.  Seller's use, disposal, storage and generation of Hazardous Material at the Real Property is and since January 1, 1999 in material compliance with Environmental Laws.

E.  To the best of Seller's Knowledge, there are no underground storage tanks, surface impoundments or disposal areas, or friable asbestos at, on or under the Real Property.

F.  Seller has provided Buyer all material non-privileged studies, assessments, reports and other documents in Seller's possession or control relating (a) to environmental conditions at the Real Property, or (b) actual or potential liability under or violations of an Environmental Law relating to the Business or the Real Property.

**2.2**   Schedule 2.1 sets forth issues reflecting Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination at the Real Property indicated as requiring Seller's attention. Seller shall take commercially reasonable steps to effect a Remedy (as that term is defined in Section 6.2 of this Agreement) according to applicable Environmental Law of the indicated items as soon as practicable.

**2.3**   Prior to the Closing Date, Seller commissioned certain Phase I and Phase II environmental assessments of the JV Companies (such environmental assessments generally having a scope as set forth in the ASTM E1527-00 Standard (Phase I assessment) and in the ASTM E1903-97 (2003) (Phase II assessment). Reports were prepared for each such assessment, and shared with Purchaser ("**Seller's JV Environmental Reports**"). Prior to the Closing Date, Seller understands that Purchaser commissioned certain environmental assessments of the JV Companies. Reports were prepared of such of Purchaser's assessments, and shared with Seller ("**Purchaser's JV Environmental Reports**"). To Seller's Knowledge, the information as reflected in Seller's JV Environmental Reports and in Purchaser's JV Environmental Reports constitutes Seller's Knowledge of the environmental conditions at the JV Companies.

5

3. **INDEMNIFICATIONS OF SELLER AND PURCHASER:**

   **3.1** Subject to the provisions of this Agreement, and solely with respect to the Real Property and the New Brunswick Real Property, as the case may be, the Seller shall indemnify the Purchaser for Environmental Damages arising from Pre-Closing Environmental Contamination, Pre-Closing Compliance Matters, Pre-Closing Off-Site Liability or a breach of the Environmental Warranties.

   **3.2** Subject to the provisions of this Agreement, and solely with respect to the Real Property and the New Brunswick Real Property, as the case may be, the Purchaser shall indemnify the Seller for Environmental Damages arising from Post-Closing Environmental Contamination, Post-Closing Off-Site Liability and Post-Closing Compliance Matters.

   **3.3** Subject to the provisions of this Agreement, including without limitation the next sentence, for those Environmental Damages arising from circumstances that may be considered both (i) Pre-Closing Environmental Contamination and Post-Closing Environmental Contamination, (ii) Pre-Closing Compliance Matters and Post-Closing Compliance Matters, or (iii) Pre-Closing Off-Site Liability and Post-Closing Off-Site Liability, such Environmental Damages shall be allocated between the Parties in proportion to the extent that such Environmental Damages arose pre- or post-Closing (or, in the case of the Brunswick New Jersey Real Property, pre- or post-Put Completion Date), and each Party shall indemnify the other for its share as determined by such allocation. For those Environmental Damages related to items indicated in Schedule 2.1 as requiring Seller's attention, and for which Seller is unable to effect a Remedy prior to the Closing Date, the Seller shall also indemnify the Purchaser for Environmental Damages resulting from Post-Closing Compliance Matters and Post-Closing Contamination which would have been avoided if the items had been remedied by the Closing Date.

4. **LIMITATIONS ON LIABILITY.** Neither Party shall be liable under this Agreement for Environmental Damages:

   **4.1** In the case of Environmental Claims arising from a breach of an Environmental Warranty, unless written notice of such claim has been served on the Seller on or before one (1) year following the Closing Date or the Put Completion Date, as the case may be;

   **4.2** In the case of Environmental Claims arising from Pre-Closing Compliance Matters or Post-Closing Compliance Matters (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before eighteen (18) months following the Closing Date or the Put Completion Date, as the case may be; provided, however, that with respect to those Pre-Closing Compliance Matters referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matter, Purchaser may make a claim until such Remedy is completed;

   **4.3** In the case of Environmental Claims arising from a Pre-Closing Environmental Contamination or Post-Closing Environmental Contamination (as the case may be), unless written notice of such claim has been served on the non-claiming Party on or before seven (7) years following the Closing Date or the Put Completion Date, as the case may be; provided, however, that with respect to the Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such

6

Pre-Closing Environmental Contamination, Purchaser may make a claim until such Remedy is completed;

**4.4** Subject to clauses 4.1, 4.2 and 4.3 of this Agreement, unless and until the aggregate amount of all Environmental Claims each of which exceeds the amount set forth in clause 4.4 of this Agreement and which are determined to be payable by the Party on which the claim is made exceeds $500,000, and in such event the paying Party is liable solely for the amounts exceeding $500,000; provided, however, that with respect to Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination referred to in Paragraph 2.2 for which Seller has warranted that it will effect the Remedy with respect to such Pre-Closing Compliance Matters and Pre-Closing Environmental Contamination, Seller shall pay all amounts necessary to effect the Remedy of such issues, which amounts shall not be included in determining when the aggregate amount of claims exceed $500,000;

**4.5** Subject to clauses 4.1, 4.2 and 4.3 of this Agreement, where the Seller's liability for the sum of Environmental Damages under this Agreement and Losses defined under the Purchase Agreement exceeds the Cap Amount defined under the Purchase Agreement;

**4.6** In the case of Environmental Damages arising from Pre-Closing Environmental Contamination, unless the claiming Party discovers the facts and circumstances giving rise to such claim solely:

    A.    In connection with cessation of operations or a future property transfer at any Real Property, other than the New Brunswick Real Property, either of which occurs before the second anniversary of the date of this Agreement, and for which an environmental site assessment reasonable in scope is necessary to determine the then current environmental condition of the Real Property and on which the claiming Party shall provide the other Party with an opportunity to review and comment, which comments the claiming Party will consider and incorporate into its assessment as appropriate in the reasonable discretion of the claiming Party; or

    B.    In connection with an investigation required by an applicable Environmental Law, an order by a Competent Authority, a final judgment of a claim by a Third Party, or settlement of a claim by a Third Party to which the non-claiming Party has agreed (such agreement not to be unreasonably withheld).

**4.7** Where Purchaser uses the Real Property for a use other than an industrial use, or seeks to or changes the zoning or land use classification of the Real Property to a classification more sensitive than the industrial classification;

**4.8** Where, subject to clause 4.9 below, and insofar as the Parties agree to treat this Agreement and all information gathered, known or obtained as a result of the sale and purchase of the Business or performing any obligation or exercising any right under this Agreement as confidential, for any Environmental Damages claims to the extent that such claim would not have arisen or was increased or made more costly as a result of the claiming Party or any of its respective employees, agents or contractors volunteering or disclosing information to any Competent Authority or Third Party without the prior written consent of the non-claiming Party;

7

**4.9** The following shall not be deemed to be or to have been volunteering or disclosing of information for the purpose of clause 4.8:

(i) Where the disclosure is required by any law (including any Environmental Law),

(ii) Where the disclosure is specifically and formally required by any securities exchange or regulatory or other Competent Authority to which either Party is subject or submits wherever situated,

(iii) Where the information is clearly in the public domain through no fault of the claiming Party, or

(iv) Where the non-claiming Party has given prior written approval to the disclosure;

**4.10** To the extent the claiming Party did not take reasonable steps to avoid or mitigate any Environmental Damages, acting in a reasonable and cost-effective manner; in the case of an emergency, where a Party takes any action to avoid or mitigate any Environmental Damages, (a) it shall for the avoidance of doubt not be in breach of this Agreement and shall not be precluded from recovering its Environmental Damages provided that the claiming Party notifies the other Party of such circumstances as soon as reasonably practicable and provided that such actions or steps are the minimum necessary to avert the emergency; and (b) the reasonable costs and expenses of all steps taken pursuant to the duty to mitigate contained in this clause 4.10 shall be deemed to be Environmental Damages.

**5.    NOTICE OF POTENTIAL CLAIMS; COMMENCING CLAIMS:**

**5.1** As soon as reasonably practicable after the claiming Party becomes aware of any issue which could reasonably be expected to form the basis of a claim, such Party shall serve written notice of such issue on the other Party. Such notice shall contain, so far as it is reasonably practicable, full details of the facts and circumstances which are relevant and known to the claiming Party, and contain copies of related correspondence and documentation.

**5.2** A claiming Party shall make a claim against the other Party by giving written notice to the other Party ("**Notice of Claim**"). Such Notice of Claim shall contain full details of the facts and circumstances which are relevant and known to the claiming Party and contain copies of related correspondence and documentation.

**5.3** The liability of the non-claiming Party for any claim notified pursuant to clause 5.2 of this Agreement shall terminate absolutely twelve (12) months after a written denial by the non-claiming Party of a Notice of Claim, if legal proceedings in respect of such Notice of Claim have not been commenced within that twelve (12) month period, except that the running of the 12 month period shall be tolled for the same time a pending resolution of an issue is the subject of the dispute resolution procedure described in Section 8 of this Agreement.

**6.    REMEDIATION OF ENVIRONMENTAL DAMAGE:**

**6.1** For the New Brunswick Real Property, Seller shall file such papers, and conduct such investigation and remediation as required by the New Jersey Department of Environmental Protection ("**NJDEP**") to satisfy the requirements of the State of New Jersey's Industrial Site

8

Recovery Act, N.J.S.A. 13.1K-6 *et seq.*, and regulations promulgated thereto, N.J.A.C. Title 7, Chapter 26B (collectively "**ISRA**"), as ISRA is in effect as of the date of the Put Completion Date, as follows: As soon as the Parties mutually agree that it is substantially certain that the third party consent needed prior to any exercise of the Put Option or Call Option will be obtained, Seller shall, pursuant to the requirements of ISRA, promptly prepare and submit to NJDEP a General Information Notice. Thereafter, with reasonable diligence, Seller shall, pursuant to ISRA, continue to undertake the activities and to submit the required documentation to NJDEP necessary to complete its responsibilities under ISRA, according to any schedule approved by NJDEP and consistent with NJDEP requirements. In all cases, Seller shall have the right at its sole discretion to seek reasonable extensions of the schedules approved by NJDEP where site conditions warrant. Where the State of New Jersey requires any consent agreement into which Seller, the State of New Jersey and Purchaser must enter pursuant to ISRA, Purchaser shall sign such consent agreement. Any such consent agreement shall be consistent with a remedial action for industrial property.

    **6.2** Where an Environmental Damage arises out of Environmental Contamination, the non-claiming Party shall be responsible for Remedial Works or the redressing of a Compliance Matter ("**Remedy**") to no less but no more than the minimum standards or levels of Environmental Laws; such Remedial Works may be determined using risk assessment and related risk evaluation methods.

    **6.3** The non-claiming Party shall, where a Remedy is required pursuant to this Agreement, have conduct of such Remedy.

    **6.4** The conduct of a Remedy shall be as follows:

    A. The non-claiming Party shall prepare appropriate work plans or scopes of work to satisfactorily undertake and complete the Remedy under this Agreement; such Party will provide the other Party with an opportunity to review and comment on such work plans or scopes of work, which comments the non-claiming Party may elect to adopt where such comments do not increase any cost or liability of the Remedy;

    B. The non-claiming Party shall, at its sole discretion, either:

    (i) Determine to and obtain approval of the Remedy by the appropriate Competent Authority prior to implementation of the Remedy; when requested, the claiming Party shall cooperate with the non-claiming Party in any communications with the appropriate Competent Authority; after the non-claiming Party has obtained such approval, such Party shall provide notice of such approval to the claiming Party; or

    (ii) Determine to implement the Remedy without first seeking approval from the appropriate Competent Authority; the non-claiming Party shall provide notice to the claiming Party of such determination at the time the non-claiming Party provides the claiming Party with the work plan or scope of work set forth in clause 6.4A of this Agreement;

    C. Where the Seller is the non-claiming Party, Seller will take all reasonable steps to avoid interfering with Purchaser's operation of the Business or use of the Real Property, and Purchaser will reasonably cooperate with Seller including providing access to the Real Property and the use of utilities in the conduct of the Remedy;

9

D.  Where applicable the non-claiming Party shall provide copies of all relevant correspondence sent to and received from a Competent Authority, and keep the claiming Party reasonably apprised of the progress of the conduct of the Remedy; and

E.  The conduct of the Remedy shall be deemed complete when, as the case may be:

(i)  The non-claiming Party has received approval regarding the Remedy by an applicable Competent Authority; or

(ii)  Subject to clause 6.2 of this Agreement, the remedy meets applicable standards which an applicable Environmental Law allows.

7. **TRANSFER OF PERMITS AND LICENSES.** On and after the Closing Date, Seller and Purchaser shall cooperate in taking all reasonable steps to effect the transfer or procure the re-issuance of any Environmental Permits necessary to operate the Business.

8. **DISPUTE RESOLUTION.** The Parties shall conduct dispute resolution in the same manner as set forth in the Purchase Agreement, provided, however, that the arbitrators in any such dispute resolution process shall be skilled in the area of environmental law, investigation and remediation in the jurisdiction in which the dispute arose.

9. **NOTICES.** All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:

**If to Seller:**  **Delphi Corporation**
5725 Delphi Drive
Troy, MI 48098
Attn: President – Delphi Energy & Chassis Systems
Fax No.: (248) 813-4301

**With a copy to:**  **Delphi Corporation**
5725 Delphi Drive
Troy, MI 48098
Attn: Assistant General Counsel - Environmental
Fax No.: (248) 813-1477

**If to Purchaser:**  **Johnson Controls, Inc.**
5757 N. Green Bay Avenue
P.O. Box 591
Milwaukee, WI 53201-0591
Attn: President-Battery Group
Fax No.: (414) 524-3123

**With a copy to:**
**Johnson Controls, Inc.**
5757 N. Green Bay Avenue

10

PO Box 591
Milwaukee, WI 53201-0591
Attn: General Counsel
Fax No.: (414) 524-2077

provided, however, if either Party shall have designated a different addressee by notice, then to the last addressee so designated.

## 10. MISCELLANEOUS:

**10.1 Assignment.** This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties, but no rights, obligations, duties or liabilities of either Party may be assigned without the prior written consent of the other, which shall not be unreasonably withheld. A Party may consider the commercial and environmental reputation of a proposed assignee or transferee in the context of reasonably withholding its consent to a proposed assignment.

**10.2 Entire Agreement.** This Agreement together with the Purchase Agreement and the Ancillary Agreements represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein. This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**10.3 Waiver.** Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be construed as, a continuing waiver of such Provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.

**10.4 Severability.** Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by law.

**10.5 Amendment.** This Agreement may be amended only in writing by duly authorized representatives or officers of the Parties.

**10.6 Expenses.** Except as otherwise expressly provided in this Agreement, the Purchase Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**10.7 Third Parties.** Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**10.8  Headings.**  The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**10.9  Counterparts.**  More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

**10.10  Governing Law.**  This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan, without giving effect to rules governing the conflict of laws.

**10.11  Public Announcements.**  Seller and Purchaser will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement, the transactions contemplated hereby, or any environmental condition or Remedy requiring such public statements, and shall not issue any press release or make any public statement without mutual consent, except as may be required by law and then only with such prior consultation.

**10.12  Signatories Duly Authorized.**  Each respective Party has duly authorized its signatory representatives to enter into this Agreement on behalf of such respective Party.

JUNE 2005 ENVIRONMENTAL MATTERS AGREEMENT
BETWEEN JOHNSON CONTROLS, INC. AND DELPHI CORPORATION

SCHEDULE 2.1

| FACILITY | Description of Pre-Closing Compliance Matter or Pre-Closing Environmental Contamination | Description of Whether Pre-Closing Compliance Matter or Pre-Closing Environmental Contamination Requires Seller's Attention Under Section 2.2, and Current Status |
|---|---|---|
| Sarreguemines, France, a Real Property | | |
| | Two diesel aboveground storage tanks in the fire prevention sprinkler system pump house require secondary containment. | Requires Seller's attention. Seller will install bunding after Closing. |
| Tlaxcala, Mexico, Ca-Le, a Real Property | | |
| | Soil contaminated with lead detected in the generally rectangular area bounded by the following, as depicted on Figure 1 of Seller's Phase II environmental site assessment: north of buildings 20 and 21, west of the "Dirty Room," south of the "Green Area," and east of chemical storage area. | Requires Seller's attention. Will conduct remedial investigation and remediation using 1,500 ppm lead in soil as a screening level and a remediation level, subject to confirmation by Mexican Competent Authority that the applicable screening level and remediation level for lead in soil is 1,500 ppm. |
| | Soil contaminated with lead at soil boring location SS-34 as depicted on Figure 1 of Seller's Phase II environmental site assessment | Requires Seller's attention. Will conduct remedial investigation and remediation using 1,500 ppm lead in soil as a screening level and a |

# JUNE 2005 ENVIRONMENTAL MATTERS AGREEMENT
## BETWEEN JOHNSON CONTROLS, INC. AND DELPHI CORPORATION

### SCHEDULE 2.1

| | | |
|---|---|---|
| | | remediation level, subject to confirmation by Mexican Competent Authority that the applicable screening level and remediation level for lead in soil is 1,500 ppm. |
| Piracicaba, Brazil, a Real Property | | |
| | Purchaser's environmental due diligence identified lead in groundwater samples from groundwater monitoring wells at "P3" and "P4" slightly above relevant reference values. | Does not require Seller's attention. |
| | Lead contained in storm water discharge to local surface water body is above CETESB standards. CETESB notified Seller in writing that Seller must construct a storm water retention basin to collect and therefore prevent storm water discharge to local surface water body. | Requires Seller's attention. Seller is addressing issue with CETESB. |
| New Brunswick, New Jersey, U.S.A., the New Brunswick Real Property. | | |
| | Friable asbestos-containing material noted in certain areas. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |

# JUNE 2005 ENVIRONMENTAL MATTERS AGREEMENT
# BETWEEN JOHNSON CONTROLS, INC. AND DELPHI CORPORATION

## SCHEDULE 2.1

| | | |
|---|---|---|
| | Historic groundwater contamination detected in certain groundwater monitoring wells. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Lead contamination in soils in various locations, including without limitation the lead reclaim area, waste storage areas, acid storage and mixing area, and storm water treatment area. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Possible oil contamination, either electrical transformer oil or other oils, in soils in various locations. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Possible sulfuric acid contamination in soils in various locations. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Soil contamination and/or groundwater contamination from adjacent railroad tracks and historic rail traffic. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Possible impacts to the facility from off-site contamination as set forth in the Environmental Data Resources Report completed for the | Requires Seller's attention either through Seller's independent activities or under New Jersey's |

# JUNE 2005 ENVIRONMENTAL MATTERS AGREEMENT
# BETWEEN JOHNSON CONTROLS, INC. AND DELPHI CORPORATION

## SCHEDULE 2.1

| | facility. | Industrial Site Recovery Act requirements. |
|---|---|---|
| | Possible contamination from operation of a hydraulic lift in the facility. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Possible soil and/or groundwater contamination from historic use of sumps and disposal trenches for solvents, solvent wastes and other process materials and wastes. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Possible soil and/or groundwater contamination from historic existence of underground storage tanks, which tanks are now removed. | Requires Seller's attention either through Seller's independent activities or under New Jersey's Industrial Site Recovery Act requirements. |
| | Historic discharges of wastewater and storm water exceeded permitted limits. | Does not require Seller's attention. |

Seller's disclosures required under paragraphs 2.1E and 2.1F of the Environmental Matters Agreement are made by its provision to Purchaser of environmental reports, studies, assessments which were completed for purposes of Seller's pre-Closing environmental due diligence or other such reports, studies, assessments and the like which were completed prior to 2005.

**IN WITNESS WHEREOF,** this Agreement was executed as of the date and year first set forth above.

**DELPHI CORPORATION**

By: _/s/ Stephen H. Olsen_
Name: Stephen H. Olsen
Title: Director, M+A


**JOHNSON CONTROLS, INC.**

By: _____
Name:
Title:

13

10.7 **Third Parties.** Nothing contained in this Agreement is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

10.8 **Headings.** The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

10.9 **Counterparts.** More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

10.10 **Governing Law.** This Agreement shall be construed and enforced in accordance with the laws of the State of Michigan, without giving effect to rules governing the conflict of laws.

10.11 **Public Announcements.** Seller and Purchaser will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement, the transactions contemplated hereby, or any environmental condition or Remedy requiring such public statements, and shall not issue any press release or make any public statement without mutual consent, except as may be required by law and then only with such prior consultation.

10.12 **Signatories Duly Authorized.** Each respective Party has duly authorized its signatory representatives to enter into this Agreement on behalf of such respective Party.

**IN WITNESS WHEREOF**, this Agreement was executed as of the date and year first set forth above.

**DELPHI CORPORATION**

By: _____
  Name:
  Title:

**JOHNSON CONTROLS, INC.**

By: _____
  Name: Jerome D. Okarma
  Title: VP, Secy + GC

12