# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
## REGION 5

| | |
|---|---|
| IN THE MATTER OF: | ADMINISTRATIVE ORDER ON CONSENT |
| Delphi Automotive Systems, LLC<br>Energy and Chassis Systems<br>480 North Dixie Highway<br>Vandalia, Ohio 45377 | U.S. EPA Docket No: |
| EPA ID#: OHD 052 151 701 | Proceeding under Section 3008(h) of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. § 6928(h). |
| and | |
| Delphi Automotive Systems, LLC<br>Safety and Interior Systems<br>250 Northwoods Boulevard<br>Vandalia, Ohio 45377 | |
| EPA ID#: OH0 000 048 454 | |
| RESPONDENT. | |

## I. JURISDICTION

1. The Administrator of the United States Environmental Protection Agency ("U.S. EPA") is issuing this Administrative Order on Consent ("Order") to Delphi Automotive Systems, LLC under Section 3008(h) of the Solid Waste Disposal Act, commonly referred to as the Resource Conservation and Recovery Act of 1976 (RCRA), as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. § 6928(h). The Administrator has delegated the authority to issue orders under Section 3008(h) of RCRA to the Chief, Enforcement and Compliance Assurance Branch; Waste, Pesticides and Toxics Division; U.S. EPA Region 5.

2. Delphi Automotive Systems, LLC owns and operates two plants located at 480 North Dixie Highway and 250 Northwoods Boulevard, Vandalia, Ohio 45377 (collectively, the "Facility") that fabricate and assemble rubber, plastic, and metal automotive components. The Facility is located on 138.1 acres of land and is immediately bordered by a residential area to the south, the Cox Dayton International Airport to the west, open land to the north (centerline of flight approach for Dayton airport), and Interstate 75 to the east. The property was first developed in 1941 by the Aeroproducts Division of General Motors Corporation for the production of variable pitch propellers for airplanes. In 1961, the Facility began producing automotive components under the Inland Division of General Motors Corporation.

3. Delphi Automotive Systems, LLC represents that General Motors owned and operated the Facility until December 31, 1998, at which time it created a wholly-owned subsidiary, Delphi Automotive Systems, LLC. Further, Delphi Automotive Systems, LLC represents that it has owned and operated the Facility since January 1, 1999, and on May 28, 1999, General Motors completed its divestiture of Delphi Automotive Systems, LLC.

4. Delphi Automotive Systems, LLC (the "Respondent") agrees not to contest U.S. EPA's jurisdiction to issue this Order, or U.S. EPA's jurisdiction to enforce its terms, or U.S. EPA's jurisdiction to impose sanctions for violations of the Order.

5. Respondent waives any rights to request a hearing on this matter pursuant to Section 3008(b) of RCRA and 40 C.F.R. Part 24, and consents to the issuance of this Order without a hearing under Section 3008(b) of RCRA as a Consent Order issued pursuant to Section 3008(h) of RCRA.

## II. DEFINITIONS

6. This Order incorporates the definitions in RCRA, 42 U.S.C. §§ 6901 - 6922k, and the regulations promulgated under RCRA unless otherwise specified.

## III. PARTIES BOUND

7. This Order applies to and binds U.S. EPA, Respondent, and Respondent's agents, successors, assigns, trustees, receivers, and all persons, including but not limited to contractors and consultants, acting on Respondent's behalf. Respondent will be responsible for and liable for any violations of this Order, regardless of its use of employees, agents, contractors, or consultants to perform work required by this Order.

8. No change in ownership or corporate or partnership status relating to the Facility will alter Respondent's obligations under this Order. Any conveyance of title, easement, or other interest in the Facility, or a portion of the Facility, will not affect Respondent's obligations under this Order. Respondent will give written notice of this Order to any successor in interest prior to transferring ownership or operation of the Facility or a portion thereof and will notify U.S. EPA in writing within 30 days prior to the transfer. This written notice will describe how Respondent has assured that, despite the transfer, all institutional controls required now or in the future for the Facility will be implemented and maintained. This paragraph will not apply if U.S. EPA and Respondent agree that this Order has terminated as to the Facility or any relevant portion of the Facility.

## IV. DETERMINATIONS

9. After consideration of the Administrative Record, the Chief, Enforcement and Compliance Assurance Branch; Waste, Pesticides and Toxics Division; U.S. EPA Region 5 has

made the following conclusions of law and determinations:

a. Delphi Automotive Systems is a "person" within the meaning of Section 1004(15) of RCRA.

b. Delphi Automotive Systems is the current owner or operator of a facility that has operated under interim status subject to Section 3005(e) of RCRA. General Motors Corporation is a former owner or operator of a facility that has operated under interim status subject to Section 3005(e) of RCRA.

c. Certain wastes and constituents found at the Facility are hazardous wastes and/or hazardous constituents pursuant to Section 1004(5), 3001 of RCRA and 40 C.F.R. Part 261.

d. There is or has been a release of hazardous wastes or hazardous constituents into the environment from the Facility.

e. The actions required by this Order are necessary to protect human health or the environment.

## V. PROJECT MANAGER

10. U.S. EPA and Respondent must each designate a Project Manager and notify each other in writing of the Project Manager selected within 14 days of the effective date of this Order. Each Project Manager will be responsible for overseeing the implementation of this Project. The parties must provide prompt written notice whenever they change Project Managers.

## VI. WORK TO BE PERFORMED

11. Pursuant to Section 3008(h) of RCRA, Respondent agrees to and is hereby ordered to perform the actions specified in this section, in the manner and by the dates specified here. Respondent represents that it has the technical and financial ability, consistent with this Order, to carry out corrective action at the Facility. Respondent must perform the work undertaken pursuant to this Order in compliance with RCRA and other applicable federal and state laws and their implementing regulations, and consistent with all relevant U.S. EPA guidance documents as appropriate to the Facility. This guidance includes, but is not limited to, the Documentation of Environmental Indicator Determination Guidance dated February 5, 1999, Use of Institutional Controls in the RCRA Corrective Action Program dated March 2000, relevant portions of the Model Scopes of Work as contained in the RCRA Corrective Action Plan dated May 1994, Guidance for Evaluating Technical Impracticability of Groundwater Restoration dated September 1993, Handbook of Groundwater Protection and Cleanup Policies for RCRA Corrective Action dated September 2001, the Advance Notice of Proposed Rulemaking dated May 1, 1996 (61 Fed.

3

Reg. 19432), and applicable U.S. EPA risk assessment guidance.

12. Respondent has initiated interim corrective measures to control releases of hazardous wastes or hazardous constituents at and from the Facility, and to determine the water supplies and associated water quality in the vicinity of the Facility. The results for the interim corrective measures must be reported as follows:

    a.    Respondent must provide to U.S. EPA, within 90 days after the effective date of this Order, an Interim Measures and Implementation Report. The report must document that the groundwater remediation system was installed and is being operated in accordance with Ohio EPA Permit to Install (Application No. 05-10181) and the DNAPL recovery system was installed and is being operated in accordance with Ohio EPA Permit to Install (Application No. 05-10184). The report must include, at a minimum, the following elements:

        i.    Synopsis of the interim measures documenting the design and performance of groundwater migration control and DNAPL recovery systems;

        ii.    Explanation of any modifications to the designs of the groundwater migration control and DNAPL recovery systems and why these were necessary for the project;

        iii.    Listing of performance criteria, established for the groundwater migration control and DNAPL recovery systems to evaluate their effectiveness;

        iv.    Results of groundwater migration control and DNAPL recovery systems monitoring, a discussion of whether the interim measures meet or exceed the performance criteria, and an evaluation of the need to modify the existing system(s) or implement new interim measures to control groundwater migration and recover DNAPL;

        v.    Explanation of the operation and maintenance of the groundwater migration control and DNAPL recovery systems (including monitoring) to be undertaken at the Facility; and

        vi.    Results of Respondent's Water Use Survey and Sampling Plan dated July 10, 2001, including the results of a search of ODNR's well log and drilling reports, and plugging/abandonment records for water wells in the vicinity of the Facility.

The Interim Measures and Implementation Report must also include any available inspection summary reports, inspection data sheets, problem identification and

4

corrective measure reports, block evaluation reports, photographic reporting data sheets, design engineers' acceptance reports, deviations from design and material specifications (with justifying documentation) and as-built drawings concerning the groundwater migration control and DNAPL recovery systems at the Facility.

13. Respondent must perform an investigation to identify and define the nature and extent of any releases of hazardous waste and hazardous constituents at or from the Facility which may pose an unacceptable risk to human health and the environment, and provide a report that summarizes this investigation (the "Investigative Summary Report") to U.S. EPA. The Investigative Summary Report must also describe the nature and extent of any releases of hazardous waste and hazardous constituents at or from the Facility which do not pose an unacceptable risk to human health and the environment, and provide the basis for those conclusions, including an evaluation of the risks. Respondent may prepare and submit the report in two phases to provide timely support for the demonstrations described in paragraphs 15 and 16, below, and for the determinations and proposal described in paragraph 18, below.

14. Respondent may proceed with remedial actions to limit site investigation or risk assessment activities to complete the work as defined in paragraphs 15 through 18, below without obtaining U.S. EPA's prior approval.

15. Respondent must demonstrate by December 31, 2003, through submitting an Environmental Indicators Report and by performing any other necessary activities, consistent with this Section, that all current human exposures to contamination at or from the Facility are under control. This Report must demonstrate that significant or unacceptable exposures do not exist for all media known or reasonably suspected to be contaminated with hazardous wastes or hazardous constituents above risk-based levels, for which there are complete pathways between contamination and human receptors. If technically appropriate, Respondent may use institutional and/or engineering controls to make this determination.

16. Respondent must demonstrate by December 31, 2004, through submitting an Environmental Indicators Report and by performing any other necessary activities, consistent with this Section, that migration of contaminated groundwater at or from the Facility is stabilized. This Report must demonstrate that the migration of all groundwater known or reasonably suspected to be contaminated with hazardous wastes or hazardous constituents above acceptable levels is stabilized to remain within any existing areas of contamination as defined by monitoring locations designated at the time of the demonstration. In addition, this Report must demonstrate that any discharge of contaminated or treated groundwater to surface water at or from the Facility is either insignificant or currently acceptable according to an appropriate interim assessment. Respondent must collect monitoring and measurement data in the future as necessary to verify that migration of any contaminated groundwater at or from the Facility is stabilized.

17. To prepare for and provide the demonstrations required by paragraphs 15 and 16,

5

above, Respondent must:

    a.    Determine appropriate risk screening criteria under current use scenarios and provide the basis and justification for the use of these criteria.

    b.    Determine any current unacceptable risks to human health and the environment and describe why other identified risks are acceptable.

    c.    Control any unacceptable current human exposures Respondent identifies that are within its reasonable control. This includes performing any corrective actions or other response measures ("corrective measures") necessary to control current human exposures to contamination to within acceptable risk levels.

    d.    Stabilize the migration of contaminated groundwater from and at the Facility. This includes implementing any corrective measures necessary to stabilize the migration of contaminated groundwater.

    e.    Conduct groundwater monitoring to confirm that any contaminated groundwater remains within the area of contamination identified in the Environmental Indicators Report.

    f.    Prepare a report, either prior to or as part of the Environmental Indicators Report, that describes and justifies any interim actions performed to meet the requirements of this Section, including sampling documentation, construction completion documentation and/or confirmatory sampling results.

18. Respondent must propose to U.S. EPA by December 31, 2005, for U.S. EPA's approval, final corrective measures necessary to protect human health and the environment from all current and future unacceptable risks due to releases of hazardous waste or hazardous constituents at or from the Facility (the "Final Corrective Measures Proposal"). The Proposal must describe all corrective measures implemented at the Facility since the effective date of this Order. It must also include a description of all other final corrective measures that Respondent evaluated, a detailed explanation of why Respondent preferred the proposed final corrective measures, a detailed explanation of how the proposed final corrective measures are consistent with relevant U.S. EPA guidance documents, and cost estimates for the final corrective measures evaluated. The Proposal must also include a detailed schedule to construct and implement the final corrective measures, and to submit a Final Remedy Construction Completion Report. Respondent must complete as much of the initial construction work as practicable within one year after U.S. EPA selects the final corrective measures. Respondent must timely implement all final corrective measures within a reasonable period of time to protect human health and the environment.

19. As part of developing its Final Corrective Measures Proposal, Respondent must

propose appropriate risk screening criteria, cleanup objectives, and points of compliance under current and reasonably expected future land use scenarios and provide the basis and justification for these decisions.

20. In accordance with its information gathering authority under RCRA, U.S. EPA may request supplemental information in writing from Respondent if U.S. EPA determines that the Proposal and supporting information do not provide an adequate basis to select final corrective measures that will protect human health and the environment from the release of hazardous waste and hazardous constituents at or from the Facility. Respondent must provide timely any such supplemental information that U.S. EPA requests in writing.

21. U.S. EPA will provide the public, including Respondent, with an opportunity to review and comment on its proposed final corrective measures, including a detailed description and justification for the proposal (the "Statement of Basis"). Following the public comment period, U.S. EPA will select the final corrective measures, and will notify the public and Respondent of the decision and rationale in a "Final Decision and Response to Comments" (the "Final Decision").

22. Upon receiving written notice by U.S. EPA, Respondent must implement the final corrective measures selected in U.S. EPA's Final Decision according to the schedule in the Final Decision.

23. Reporting and other requirements:

a. Respondent agrees to supplement the existing publicly accessible repository for information regarding site activities and to continue conduct public outreach and involvement activities required under this Order.

b. Respondent must provide quarterly progress reports to U.S. EPA by the fifteenth day of the month after the end of each quarter concerning its compliance with the Order. The report must list work performed to date, data collected, problems encountered, project schedule, and percent project completed.

c. The parties will communicate frequently and in good faith to assure successful completion of the requirements of this Order, and will meet on at least a semi-annual basis to discuss the work proposed and performed under this Order.

d. Respondent must provide a Final Remedy Construction Completion Report documenting all work that it has performed pursuant to the schedule in U.S. EPA's Final Decision.

e. If ongoing monitoring or operation and maintenance is required after construction or implementation of the final corrective measures, Respondent must include an

7

    operations and maintenance plan in the Final Remedy Construction Completion Report. Respondent must revise and resubmit the Report in response to U.S. EPA's written comments, if any, by the dates U.S. EPA in the exercise of its sound discretion specifies. Upon U.S. EPA's written approval, Respondent must implement the approved operation and maintenance plan according to the schedule and terms of the plan.

    f.    Any risk assessments Respondent conducts must estimate human health and ecological risk under reasonable maximum exposure for both current and reasonably expected future land use scenarios. In conducting the risk assessments, Respondent will follow the Risk Assessment Guidance for Superfund (RAGS) or other appropriate U.S. EPA guidance. Respondent will use appropriate, conservative screening values when screening to determine whether further investigation is required. Appropriate screening values include those derived from Federal Maximum Contaminant Levels, U.S. EPA Region 9 Preliminary Remediation Goals, U.S. EPA Region 5 Ecological Screening Levels, U.S. EPA Region 5 Risk Based Screening Levels, or RAGS, using the values in the most current versions of these documents.

    g.    All sampling and analysis conducted under this Order must be performed in accordance with the Region 5 RCRA Quality Assurance Project Plan Policy (April 1998) as appropriate for the Facility. U.S. EPA may audit laboratories Respondent selects or require Respondent to purchase and have analyzed any performance evaluation samples selected by U.S. EPA which are compounds of concern. Respondent must notify U.S. EPA in writing at least 14 days before beginning each separate phase of field work performed under this Order. At the request of U.S. EPA, Respondent will provide or allow U.S. EPA or its authorized representative to take split or duplicate samples of all samples collected under this Order.

    24.  Project Managers can agree in writing to extend, for 90 days or less, any deadline in this Section. However, extensions of greater than 90 days require obtaining approval from the Chief of the Enforcement and Compliance Assurance Branch; Waste, Pesticides and Toxics Division.

## VII. ACCESS

    25.  For purposes of ensuring the Respondent's compliance with this Order, upon reasonable notice, and at reasonable times, U.S. EPA, its contractors, employees, and any designated U.S. EPA representatives may enter and freely move about the Facility to, among other things: interview Facility personnel and contractors; review Respondent's progress in carrying out the terms of this Order; conduct tests, sampling, or monitoring as U.S. EPA deems necessary; use a camera, sound recording, or other documentary equipment; and verify the

8

reports and data Respondent submits to U.S. EPA. Respondent will permit such persons to inspect and copy all non-privileged photographs and documents, including all sampling and monitoring data, that pertain to work undertaken under this Order and that are within the possession or under the control of Respondent or its contractors or consultants. Respondent may request split samples, or copies of all photographs, tapes, videos or other recorded evidence created by U.S. EPA and releaseable under the Freedom of Information Act.

26. If Respondent must go beyond the Facility's boundary to perform work required by this Order, Respondent must use its best efforts to obtain the necessary access agreements from the present owner(s) of such property within 30 days after Respondent knows of the need for access. Any such access agreement must provide for access by U.S. EPA and its representatives. Respondent must submit a copy of any access agreement to U.S. EPA's Project Manager. If Respondent does not obtain agreements for access within 30 days, Respondent must notify U.S. EPA in writing within 14 additional days of both the efforts undertaken to obtain access and the failure to obtain access agreements. U.S. EPA may, at its discretion, assist Respondent in obtaining access.

27. Nothing in this Section limits or otherwise affects U.S. EPA's right of access and entry under applicable law, including RCRA and the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C. §§ 9601-9675.

## VIII. RECORD PRESERVATION

28. Unless U.S. EPA agrees otherwise, Respondent must retain, during the pendency of this Order and for at least six years after the Order terminates, all data and all final documents now in its possession or control or which come into its possession or control which relate to this Order. Respondent must notify U.S. EPA in writing 90 days before destroying any such records, and give U.S. EPA the opportunity to take possession of any non-privileged documents. Respondent's notice will refer to the effective date, caption, and docket number of this Order and will be addressed to:

> Director
> Waste, Pesticides and Toxics Division
> U.S. EPA, Region 5
> 77 W. Jackson Blvd.
> Chicago, IL 60604-3590

Respondent will also promptly give U.S. EPA's Project Manager a copy of the notice.

29. Within 30 days of retaining or employing any agent, consultant, or contractor (the "agents") to carry out the terms of this Order, Respondent will enter into an agreement with the agents to give Respondent a copy of all data and final non-privileged documents produced under this Order.

9

30. Respondent will not assert any privilege claim concerning any data gathered in the course of any investigations or other actions required by this Order.

## IX. STIPULATED PENALTIES

31. Respondent will be liable for and must pay the following stipulated penalties to the United States for violations of this Order:

a.  For failure to submit quarterly progress reports by the dates scheduled in paragraph 23(b), above: $1,000 per day for the first 14 days and $2,000 per day thereafter.

b.  For failure to adequately demonstrate that current human exposures are under control by December 31, 2003: $3,000 per day.

c.  For failure to adequately demonstrate that groundwater migration is stabilized by December 31, 2004: $3,000 per day.

d.  For failure to submit an adequate Final Corrective Measures Proposal as described in paragraph 18 by December 31, 2005: $1,000 per day for the first 14 days and $2,000 per day thereafter.

e.  For failure to implement according to the approved schedule, the selected final corrective measures as described in paragraphs 21 and 22 to the extent the difference in the estimated cost between U.S. EPA's selected final corrective measures remedy and Respondent's proposed final corrective measures remedy is less than $1.5 million: $3,000 per day for the first 14 days and $6,000 per day thereafter.

f.  For failure to submit the Final Remedy Construction Completion Report as scheduled in paragraph 18: $1,000 per day for the first 14 days and $2,000 per day thereafter.

g.  For failure to submit the Interim Measures and Implementation Report required in paragraph 12(a) within 90 days after the effective date of the Order: $1,000 per day for the first 14 days and $2,000 per day thereafter.

32. Whether or not Respondent has received notice of a violation, stipulated penalties will begin to accrue on the day a violation occurs, and will continue to accrue until Respondent complies. For items b and c, above, stipulated penalties will not accrue during the period, if any, beginning 31 days after the Environmental Indicators Report is due until the date that U.S. EPA notifies Respondent in writing of any deficiency in the required demonstration(s). Separate

10

stipulated penalties for separate violations of this Order will accrue simultaneously.

33. Respondent must pay any stipulated penalties owed to the United States under this Section within 30 days of receiving U.S. EPA's written demand to pay the penalties, unless Respondent invokes the dispute resolution procedures under Section X: Dispute Resolution, and prevails in the dispute resolution process. A written demand for stipulated penalties will describe the violation and will indicate the amount of penalties due.

34. Interest will begin to accrue on any unpaid stipulated penalty balance beginning 31 days after Respondent receives U.S. EPA's demand letter unless Respondent has invoked the dispute resolution procedures, and prevails in the dispute resolution process. Interest will accrue at the current value of funds rate established by the Secretary of the Treasury. Under 31 U.S.C. § 3717, Respondent must pay an additional penalty of six percent per year on any unpaid stipulated penalty balance more than 90 days overdue.

35. Respondent must pay all penalties by certified or cashier's check payable to the United States of America, or by wire transfer, and will send the check or wire transfer to:

> U.S. Department of the Treasury
> Attention: U.S. EPA Region 5, Office of the Comptroller
> P.O. Box 70753
> Chicago, Illinois 60673

A transmittal letter stating the name of the Facility, the Respondent's name and address, and the U.S. EPA docket number of this action must accompany the payment. Respondent will simultaneously send a copy of the check and transmittal letter to the U.S. EPA Project Manager.

36. Respondent may dispute U.S. EPA's assessment of stipulated penalties by invoking the dispute resolution procedures under Section X: Dispute Resolution. The stipulated penalties in dispute will continue to accrue, but need not be paid, during the dispute resolution period. Respondent must pay stipulated penalties and interest, if any, according to the dispute resolution decision or agreement. Respondent must submit such payment to U.S. EPA within 30 days after receiving the resolution according to the payment instructions of this Section.

37. Neither invoking dispute resolution nor paying penalties will affect Respondent's obligation to comply with the terms of this Order not directly in dispute.

38. The stipulated penalties set forth in this Section do not preclude U.S. EPA from pursuing any other remedies or sanctions which may be available to U.S. EPA for Respondent's violation of any terms of this Order. However, U.S. EPA will not seek both a stipulated penalty under this Section and a statutory penalty for the same violation.

## X. DISPUTE RESOLUTION

39. The parties will use their best efforts informally and in good faith to resolve all disputes or differences of opinion.

40. If either party disagrees, in whole or in part, with any decision made or action taken under this Order, that party will notify the other party's Project Manager of the dispute. The Project Managers will attempt to resolve the dispute informally.

41. If the Project Managers cannot resolve the dispute informally, any party may pursue the matter formally by placing its objections in writing. A written objection must state the specific points in dispute, the basis for that party's position, and any matters which it considers necessary for determination.

42. U.S. EPA and Respondent will in good faith attempt to resolve the dispute through formal negotiations within 21 days, or a longer period if agreed in writing by the parties. During formal negotiations, either party may request a conference with appropriate senior management to discuss the dispute.

43. If the parties are unable to reach an agreement through formal negotiations, within 14 business days after any formal negotiations end, Respondent's and U.S. EPA's Project Manager may submit additional written information to the Director of the Waste, Pesticides and Toxics Division, U.S. EPA Region 5. U.S. EPA will maintain a record of the dispute, which will contain all statements of position and any other documentation submitted pursuant to this Section. U.S. EPA will allow timely submission of relevant supplemental statements of position by the parties to the dispute. Based on the record, U.S. EPA will respond to Respondent's arguments and evidence and provide a detailed written decision on the dispute signed by the Director of the Waste, Pesticides and Toxics Division, U.S. EPA Region 5 (the "EPA Dispute Decision").

44. If Respondent disputes U.S. EPA's selection of final Corrective Measures, neither penalties nor interest will accrue or be assessed on matters directly in dispute for one year following U.S. EPA's selection of these final Corrective Measures. Any EPA Dispute Decision regarding final Corrective Measures will not be considered final agency action for purposes of Respondent initiating judicial review. However, if U.S. EPA takes any enforcement action regarding a U.S. EPA Dispute Decision, Respondent reserves the right to assert all arguments or defenses available to it.

45. If, at the conclusion of the Dispute Resolution process, Respondent notifies U.S. EPA that it refuses to implement U.S. EPA's selected final Corrective Measures, U.S. EPA will endeavor to pursue the action(s) it deems necessary, if any, within a reasonable period of time.

## XI.  FORCE MAJEURE AND EXCUSABLE DELAY

46. Force majeure, for purposes of this Order, is any event arising from causes not foreseen and beyond Respondent's control that delays or prevents the timely performance of any obligation under this Order despite Respondent's best efforts. For purposes of this Order, force majeure may include but not be limited to: (a) refusal by affected property owners to abandon impacted drinking water wells or cease use of contaminated groundwater or groundwater wells; and (b) refusal by the offsite property owners to provide reasonable access to Respondent.

47. If any event occurs or has occurred that may delay the performance of any obligation under this Order, whether or not caused by a force majeure event, Respondent must notify U.S. EPA within two business days after learning that the event may cause a delay. If Respondent wishes to claim a force majeure event, within 15 business days thereafter Respondent must provide to U.S. EPA in writing all relevant information relating to the claim, including a proposed revised schedule.

48. If U.S. EPA determines that a delay or anticipated delay is attributable to a force majeure event, U.S. EPA will extend in writing the time to perform the obligation affected by the force majeure event for such time as U.S. EPA in the exercise of its sound discretion determines is necessary to complete the obligation or obligations. U.S. EPA's determination as to the existence of a force majeure event is subject to the dispute resolution procedures set forth in this Order.

## XII.  MODIFICATION

49. This Order may be modified only by mutual agreement of U.S. EPA and Respondent. Any agreed modifications will be in writing, will be signed by both parties, will be effective on the date of signature by U.S. EPA, and will be incorporated into this Order.

## XIII.  RESERVATION OF RIGHTS

50. U.S. EPA reserves all of its statutory and regulatory powers, authorities, rights and remedies both legal and equitable which may pertain to Respondent's failure to comply with any of the requirements of this Order, including without limitation the assessment of penalties under Section 3008(h)(2) of RCRA, 42 U.S.C. § 6928(h)(2), filing an action to enforce this Order, or issuing an administrative order to perform corrective actions or other response measures. This Order shall not be construed as a covenant not to sue, release, waiver, or limitation of any rights, remedies, powers, and/or authorities criminal or civil, which U.S. EPA has under RCRA, CERCLA, or any other statutory, regulatory, or common law authority of the United States.

51. U.S. EPA reserves all of its rights to perform any portion of the work consented to here or any additional site characterization, feasibility study, and remedial work as it deems necessary to protect human health or the environment.

13

SEP 16 '02 18:30 FR                                          TO 919047983273    P.03/04

52. If U.S. EPA determines that Respondent's actions related to compliance with or implementation of this Order have caused or may cause a release of hazardous waste or hazardous constituent(s), or a threat to human health or the environment, or that Respondent cannot perform any of the work ordered, U.S. EPA may order Respondent to stop implementing this Order for the time U.S. EPA determines may be needed to abate the release or threat and to take any action that U.S. EPA determines is necessary to abate the release or threat.

53. Respondent does not admit any of U.S. EPA's factual or legal determinations. Except for the specific waivers in this Order, Respondent reserves all of its rights, remedies and defenses, including all rights and defenses it may have: (a) to challenge U.S. EPA's performance of work; (b) to challenge U.S. EPA's stop work orders; (c) regarding liability or responsibility for conditions at the Facility or offsite; and (d) to challenge any enforcement by U.S. EPA of this Order, except for its right to contest U.S. EPA's jurisdiction to issue or enforce this Order. Respondent has entered into this Order in good faith without trial or adjudication of any issue of fact or law. Respondent reserves its right to seek judicial review of U.S. EPA actions taken under this Order, including a proceeding brought by the United States to enforce the Order or to collect penalties for violations of the Order.

## XIV. OTHER CLAIMS

54. Respondent waives any claims or demands for compensation or payment under Section 106(b), 111, and 112 of CERCLA against the United States or the Hazardous Substance Superfund established by 26 U.S.C. § 9507 for, or arising out of, any activity performed or expense incurred under this Order. Additionally, this Order is not a decision on preauthorization of funds under Section 111(a)(2) of CERCLA.

## XV. INDEMNIFICATION OF THE UNITED STATES GOVERNMENT

55. Respondent agrees to indemnify, save and hold harmless the United States, its agencies, departments, agents, and employees, from all claims or causes of action arising from or on account of acts or omissions of Respondent or its officers, employees, agents, independent contractors, receivers, trustees, and assigns in carrying out activities required by this Order. This indemnification will not affect or limit the rights or obligations of Respondent or the United States under their various contracts. This indemnification will not create any obligation on the part of Respondent to indemnify the United States from claims arising from the acts or omissions of the United States.

## XVI. SEVERABILITY

56. If any judicial or administrative authority holds any provision of this Order to be invalid, the remaining provisions will remain in force and will not be affected.

## XVII. TERMINATION AND SATISFACTION

57. Respondent may request that U.S. EPA issue a determination that Respondent has met the requirements of the Order for all or a portion of the Facility. Respondent may also request that U.S. EPA issue a "no further interest" or "no further action" determination for all or a portion of the Facility.

58. The provisions of the Order will be satisfied upon Respondent's and U.S. EPA's execution of an "Acknowledgment of Termination and Agreement on Record Preservation and Reservation of Rights" (the "Acknowledgment"), consistent with U.S. EPA's Model Consent Order.

59. Respondent's execution of the Acknowledgment will affirm its continuing obligation to preserve all records as required by Section VIII, to maintain any necessary institutional controls or other long terms measures, and to recognize U.S. EPA's reservation of rights as required in Section XIII.

## XVIII. EFFECTIVE DATE

60. This Order is effective on the date that Respondent receives a fully signed copy of this Order.

IT IS SO AGREED:

DATE: 1/9/2002        BY: _____
                          John K. Harris
                          Plant Manager, Delphi E & C Vandalia
                          Delphi Automotive Systems, LLC

IT IS SO ORDERED:

DATE:_____  BY: _____
                          Joseph M. Boyle, Chief
                          Enforcement and Compliance Assurance Branch
                          Waste, Pesticides and Toxics Division
                          U.S. Environmental Protection Agency
                          Region 5

15