BINGHAM McHALE, LLP
10 West Market Street, Suite 2700
Indianapolis, Indiana 46204
Telephone (317) 635-8900
Facsimile (317) 236-9907
John Taylor, Esq.
Michael J. Alerding, Esq.
Whitney L. Mosby, Esq.

Attorneys for Universal Tool &
Engineering Co, Inc.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

## RESPONSE TO THIRD OMNIBUS CLAIMS OBJECTION (CLAIM NOS. 6878, 11114 AND 2175)

Universal Tool & Engineering Co., Inc. ("UTE"), by its undersigned counsel, states the following as its response to the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. §502(b) and Fed. R. Bankr. P. 3007 to Certain (A) Claims with Insufficient Documentation, (B) Claims Unsubstantiated by Debtors' Books and Records, and (C) Claims Subject to Modification and (II) Motion to Estimate Contingent and Unliquidated Claims Pursuant to 11 U.S.C. §502(c) ("Third Omnibus Claims Objection") regarding UTE's Claim Nos. 6878, 11114 and 2175 ("UTE Claims"):

### I. Background

1.    On October 8 and 14, 2005 (the "Petition Date"), Delpi Corporation and certain of its U.S. subsidiaries and affiliates (collectively, the "Debtors") filed Voluntary Petitions for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101, et seq (as amended, the

Bankruptcy Code), thereby commencing the above-captioned Chapter 11 cases. The Debtors continue to operate their businesses and manage their assets as Debtors-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. The Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2.    On or about October 31, 2006, the Debtors filed the Third Omnibus Claims Objection contending that the UTE Claims are not substantiated by the Debtors' books and records and, therefore, should be either eliminated or reduced. The UTE Claims and the Debtors' objections can be summarized as follows:

- UTE's unsecured claim number 6878 ("Claim 6878") was filed on May 25, 2006 in the amount of $85,400. Claim 6878 is for four months of unpaid rent due under a lease of a certain premises located at 7601 East 88th Place, Indianapolis, Indiana 46256 by and between UTE and Delphi Automotive Systems, LLC. In addition, Claim 6878 generally alleges entitlement to amounts expended by UTE to, among other things, investigate and remediate environmental contamination on the premises. The Debtors have objected to Claim 6878 and have sought to eliminate it because, according to their books and records, Claim 6878 is unsubstantiated.

- UTE's unsecured claim number 11114 ("Claim 11114") was filed on July 26, 2006 in the amount of $120,077.19. This claim is for unpaid invoices from January 31, 2002 to October 31, 2005, for, among other things, the development of batteries. The Debtors have objected to Claim 11114 and have sought to reduce it to $76,511.87, which amount is in accordance with the Debtors' books and records.

- UTE's unsecured claim number 2175 ("Claim 2175") was filed on March 3, 2006 in the amount of $1,525,236.87. Claim 2175 is for $585,803.11 of unpaid rent due under a lease on a certain premises located at 8750 North Hague Road, Indianapolis, Indiana 46256 by and between UTE and Delphi Automotive Systems, LLC. In addition, Claim 2175 is for $939,433.76 for unpaid additional improvements to the premises. Finally, Claim 2175 generally alleges entitlement to amounts expended by UTE to, among other things, investigate and remediate environmental contamination on the premises. The Debtors have objected to Claim 2175 and have sought to reduce it to $76,511.87, which amount is in accordance with the Debtors' books and records.

2

3.      As will be shown, the UTE Claims should be allowed for the amounts filed, unless expressly set forth herein, because they are properly documented and supported.

## II. Response

**Claim No. 6878**

4.      On or about January 1, 1986, UTE, as landlord, and General Motors Corporation, as tenant ("GM") entered into a Lease (including all exhibits and amendments, the "GM Lease") for that certain premises located at 7601 East 88th Place, Indianapolis, Indiana 46256. *Affidavit of Robert N. Rossetter* ("*Rossetter Affidavit*"), which is attached hereto and incorporated hereby reference as Exhibit 1, ¶ 4.

5.      The GM Lease was amended by, *inter alia*, (i) Lease Amendment dated November 14, 1990; (ii) Lease Extension and Amendment Agreement dated March 25, 1993; (iii) Lease Extension and Amendment Agreement dated August 18, 1995; (iv) Amendment to the Lease dated August 4, 2000; and (v) Lease Extension and Amendment Agreement dated August 3, 2005 (collectively, the "GM Lease Amendments"). *Rossetter Affidavit*, ¶ 5.

6.      Pursuant to a letter dated January 25, 1999 from GM Worldwide Real Estate to UTE and that certain Assignment and Assumption dated December 10, 1998, by the between GM and Delphi Automotive Systems, LLC, GM purportedly assigned its entire right, title and interest, as tenant, in the GM Lease to Delphi Automotive Systems, LLC as of January 1, 1999 (the "Assignment and Assumption" and with the GM Lease and GM Lease Amendments, the "88th Place Lease"). *Rossetter Affidavit*, ¶ 6, Exhibit A.

7.      Claim No. 6878 involves a claim for unpaid rent. Specifically, Delphi Automotive Systems, LLC has failed to pay rent under the 88th Place Lease for the months of May 1, 2006 through August 31, 2006. *Rossetter Affidavit*, ¶ 7.

3

8.    The amount due and owing to UTE from Delphi Automotive Systems, LLC for unpaid rent under the 88th Place Lease totals $85,400.00. *Rossetter Affidavit*, ¶ 8.

9.    The remaining portion of Claim No. 6878 involves an unliquidated and potential claim for environmental contamination and damages, which may have been caused by Delphi Automotive Systems, LLC as a result of its use and occupation of real estate concerning the 88th Place Lease. UTE has attached as Exhibit 2 the affidavit of Geoff Glanders ("*Glanders Affidavit*"), who is the president of August Mack Environmental, Inc. ("August Mack"), a company that was retained by UTE to conduct a Phase I Environmental Site Assessment of the UTE business park, including the buildings and real estate formerly leased from UTE by Delphi Automotive Systems, LLC. *Glanders Affidavit*, ¶ 2. In his Affidavit, Mr. Glanders has specifically described the investigation performed by August Mack and its findings with respect to the environmental issues relating to the buildings and properties leased from UTE by Delphi Automotive Systems, LLC. Rather than restate Mr. Glanders' averments herein, UTE incorporates them in this Response by reference. As is more fully described by Mr. Glanders, UTE's investigation is not complete and it is much too soon for UTE to be capable of determining or estimating a damage claim.

**Claim No. 11114**

10.    UTE agreed to supply labor and materials to Delphi Automotive Systems, LLC in return for payment. *Rossetter Affidavit*, ¶ 9.

11.    From January 31, 2002 to October 31, 2005, UTE supplied labor and material to Delphi Automotive Systems, LLC for, among other things, the development of batteries. *Rossetter Affidavit*, ¶ 10. UTE then hand delivered invoices to Delphi Automotive Systems, LLC requesting payment for the labor and materials supplied ("Invoices"). *Rossetter Affidavit*, ¶ 10, Exhibits B, C.

4

12.    The Invoices have not been paid in full. *Rossetter Affidavit*, ¶ 11. UTE is still owed

the sum of $120,077.19 from Delphi Automotive Systems, LLC for labor and materials supplied for

the development of batteries. *Rossetter Affidavit*, ¶ 11, Exhibits B, C. UTE is not in possession of

any receiving receipts, as those receipts were kept internally at Delphi Automotive Systems, LLC.

*Rossetter Affidavit*, ¶ 12.

**Claim No. 2175**

13.    UTE, as landlord, and Delphi Automotive Systems, LLC, as tenant, entered into a (i)

Lease of Industrial or Warehouse Facilities on or about June 22, 2001 and (ii) the First Amendment

to Lease of Industrial or Warehouse Facilities on or about July 24, 2002 with respect to premises

located at 8750 North Hague Road, Indianapolis, Indiana 46256 (collectively, the "Hague Road

Lease"). *Rossetter Affidavit*, ¶ 13, Exhibit D.

14.    Claim No. 2175 was filed on March 3, 2006. Claim No. 2175 asserts a claim for

rental payments due and owing to UTE under the Hague Road Lease for the months of February 1,

2006 through January 31, 2007 totaling $585,803.11. *Rossetter Affidavit*, ¶ 14. Since the time of

filing Claim No. 2175, UTE has mitigated its damages and has received payments in partial

satisfaction of the past due rent from Debtors' sub-lessor, Enerdel Lithium Power Systems, in the

approximate amount of $224,000.00. *Id*. Therefore, the rental payment portion of Claim No.

2175 now totals about $361,803.11. *Id*.

15.    Claim No. 2175 also asserts a claim for $939,433.76 for improvements made to

8750 North Hague Road, Indianapolis, Indiana 46256 ("Hague Road Real Estate"). *Rossetter

Affidavit*, ¶ 15, Exhibit E. As set forth in the Hague Road Lease, Delphi Automotive Systems,

LLC agreed to be responsible for the total costs of the Additional Improvements (as that term is

defined in the Hague Road Lease) to the Hague Road Real Estate. *Id*. UTE has not been paid

5

for all of the Additional Improvements made to the Hague Road Real Estate. *Id.* The sum of $939,433.76 is still due and owing by Delphi Automotive Systems, LLC to UTE. *Id.*

16.     The second portion of Claim No. 2175 involves an unliquidated and potential claim for environmental contamination and damages, which may have been caused by Delphi Automotive Systems, LLC as a result of its use and occupation of real estate concerning the Hague Road Lease.   UTE has attached as <u>Exhibit 2</u> the *Glanders Affidavit*, which specifically describes the investigation performed by August Mack and its findings with respect to the environmental issues relating to the buildings and properties leased from UTE by Delphi Automotive Systems, LLC.   Rather than restate Mr. Glanders' averments herein, UTE incorporates them in this Response by reference. As is more fully described by Mr. Glanders, UTE's investigation is not complete and it is much too soon for UTE to be capable of determining or estimating a damage claim.

WHEREFORE, Universal Tool & Engineering Co., Inc. respectfully requests that this Court enter an order denying the Debtors' Third Omnibus Claims Objection as to Claim Nos. 6878, 11114 and 2175, and grant to Universal Tool & Engineering Co., Inc. such other relief as is just and proper.

Respectfully submitted,

John Taylor, Esq.
Michael J. Alerding, Esq.
Whitney L. Mosby, Esq
Counsel for Universal Tool & Engineering Co., Inc.

BINGHAM McHALE LLP
10 West Market Street, #2700
Indianapolis, IN  46204
317-635-8900 (phone)
317-236-9907 (facsimile)

6

## CERTIFICATE OF SERVICE

I certify that on November 21, 2006, a copy of the foregoing was filed via overnight mail and via 3.5 inch disk. I further certify that on November 21, 2006 a copy of the foregoing was served via overnight mail on the following:

The Honorable Robert D. Drain
United States Bankruptcy Judge
Chambers/Courtroom: 610
One Bowling Green
New York, New York 10004-1408

Delphi Corporation
Attn: General Counsel
5725 Delphi Drive
Troy, Michigan 48098

Skadden, Arps, Slate, Meagher & Flom LLP
Attn: John Wm. Butler, Jr.
Attn: Randall G. Reese
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

Simpson Thacher & Bartlett, LLP
Attn: Kenneth S. Ziman
425 Lexington Avenue
New York, New York 10017

Davis Polk & Wardwell
Attn: Donald Bernstein
Attn: Brian Resnick
450 Lexington Avenue
New York, New York 10017

Latham & Watkins LLP
Attn: Robert J. Rosenberg
Attn: Mark A. broude
885 Third Avenue
New York, New York 10022

Fried, Frank, Harris, Shriver & Jacobson LLP
Attn: Bonnie Steingart
One New York Plaza
New York, New York 10004

Office of the U.S. Trustee
For the Southern District of New York
Attn:  Alicia M. Leonard
33 Whitehall Street, Suite 2100
New York, New York 10004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| IN RE: | ) | Chapter 11 |
|  | ) |  |
| DELPHI CORPORATION, et al., | ) | Case No. 05-44481 (RDD) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |

## AFFIDAVIT OF ROBERT N. ROSSETTER

I, Robert N. Rossetter, having been duly sworn under oath, state that, if called upon to testify in the above-referenced matter, my testimony would be as follows:

1. I am over the age of eighteen (18) and otherwise competent to testify to the matters set forth in this Affidavit.

2. This Affidavit is made upon my own personal knowledge.

3. I am an employee of Universal Tool & Engineering Co., Inc. ("UTE"). I am authorized to make this affidavit on behalf of UTE. I have reviewed the records kept by UTE in connection with Claim Nos. 6878, 11114 and 2175 filed by UTE in the above-captioned bankruptcy matter ("UTE Claims"), which are kept in the regular course of its business, and I am personally familiar with the facts surrounding the UTE Claims.

### Claim No. 6878

4. On or about January 1, 1986, UTE, as landlord, and General Motors Corporation, as tenant ("GM") entered into a Lease (including all exhibits and amendments, the "GM Lease") for that certain premises located at 7601 East 88th Place, Indianapolis, Indiana 46256.

5. The GM Lease was amended by, *inter alia*, (i) Lease Amendment dated November 14, 1990; (ii) Lease Extension and Amendment Agreement dated March 25, 1993; (iii) Lease



EXHIBIT

tabbies®

Extension and Amendment Agreement dated August 18, 1995; (iv) Amendment to the Lease dated August 4, 2000; and (v) Lease Extension and Amendment Agreement dated August 3, 2005 (collectively, the "GM Lease Amendments").

6.       Pursuant to a letter dated January 25, 1999 from GM Worldwide Real Estate to UTE and that certain Assignment and Assumption dated December 10, 1998, by the between GM and Delphi Automotive Systems, LLC, GM purportedly assigned its entire right, title and interest, as tenant, in the GM Lease to Delphi Automotive Systems, LLC ("Delphi") as of January 1, 1999 (the "Assignment and Assumption" and with the GM Lease and GM Lease Amendments, the "88th Place Lease"). A true and accurate copy of the Assignment and Assumption is attached hereto as Exhibit A and is incorporated herein by reference.

7.       Claim No. 6878 involves a claim for unpaid rent. Specifically, Delphi has failed to pay rent under the 88th Place Lease for the months of May 1, 2006 through August 31, 2006.

8.       The amount due and owing to UTE from Delphi for unpaid rent under the 88th Place Lease totals $85,400.00.

**Claim No. 11114**

9.       UTE agreed to supply labor and materials to Delphi in return for payment.

10.      From January 31, 2002 to October 31, 2005, UTE supplied labor and material to Delphi for, among other things, the development of batteries. UTE then hand delivered invoices to Delphi requesting payment for the labor and materials supplied ("Invoices"). A true and accurate summary of the Invoices is attached hereto as Exhibit B, which includes the Invoice number, the date, the amount of the Invoice and the amount paid on the Invoice, and is incorporated herein by reference ("Invoice Summary"). Furthermore, true and accurate copies of the Invoices are attached hereto as Exhibit C and are incorporated herein by reference.

11.    The Invoices have not been paid in full. As shown by the Invoice Summary, UTE is still owed the sum of $120,077.19 from Delphi for labor and materials supplied for the development of batteries.

12.    UTE is not in possession of any receiving receipts, as those receipts were kept internally at Delphi.

**Claim No. 2175**

13.    UTE, as landlord, and Delphi Automotive Systems, LLC, as tenant, entered into a (i) Lease of Industrial or Warehouse Facilities on or about June 22, 2001 and (ii) the First Amendment to Lease of Industrial or Warehouse Facilities on or about July 24, 2002 with respect to premises located at 8750 North Hague Road, Indianapolis, Indiana 46256 (collectively, the "Hague Road Lease"). A true and accurate copy of the Hague Road Lease is attached hereto as Exhibit D and is incorporated herein by reference.

14.    Claim No. 2175 was filed on March 3, 2006. Claim No. 2175 asserts a claim for rental payments due and owing to UTE under the Hague Road Lease for the months of February 1, 2006 through January 31, 2007 totaling $585,803.11. Since the time of filing Claim No. 2175, UTE has mitigated its damages and has received payments toward the past due rent from its sub-lessor, Enerdel Lithium Power Systems, in the approximate amount of $224,000.00. Therefore, the rental payment portion of Claim No. 2175 now totals about $361,803.11.

15.    Claim No. 2175 also asserts a claim for $939,433.76, which involves improvements to the 8750 North Hague Road, Indianapolis, Indiana 46256 ("Hague Road Real Estate"). As set forth in the Hague Road Lease, Delphi agreed to be responsible for the total costs of the Additional Improvements (as that term is defined in the Hague Road Lease) to the Hague Road Real Estate. UTE has not been paid for all of the Additional Improvements made to the Hague Road Real Estate.

-3-

A true and accurate copy of the Additional Improvements that were made to the Hague Road Real Estate is attached hereto as Exhibit E and is incorporated herein by reference. The sum of $939,433.76 is still due and owing by Delphi to UTE for the Additional Improvements.

FURTHER AFFIANT SAYTH NOT.
I AFFIRM UNDER PENALTY OF PERJURY THAT THE FOREGOING STATEMENTS ARE TRUE AND ACCURATE TO THE BEST OF MY KNOWLEDGE AND BELIEF.

Date: 11-21-06

Robert N. Rossetter

STATE OF INDIANA          )
                          ) SS:
COUNTY OF MARION          )

Before me the undersigned, a Notary Public in and for said County and State, personally appeared Robert N. Rossetter, and acknowledged the execution of the foregoing instrument this 21ʳᵗ day of November, 2006.

Notary Public

MARK    DAVIDSON
Printed Name

My Commission Expires:

Oct. 19, 2014

County of Residence:

Marion

1105371

-5-

General Form
GM 235—Revised 6-72

# This Lease, dated ___January 1, 1986___ ~~August 3, ___ 19 85~~ between

UNIVERSAL TOOL AND ENGINEERING, INC., an Indiana corporation, whose address is

7601 East 88th Place, Indianapolis, Indiana

hereinafter called the Lessor, and___GENERAL MOTORS CORPORATION, a Delaware corporation,

with principal offices at 3044 West Grand Boulevard, Detroit, Michigan 48202,

___hereinafter called the Lessee,

**PREMISES**

## Witnesseth:

The Lessor hereby lets to the Lessee, and the Lessee hires from the Lessor:

Approximately 43,525 square feet of manufacturing space in the building complex located at 7601 East 88th Place, Indianapolis, Indiana 46256, and comprised of 30,000 square feet in Plant 3; 5,000 square feet in Building 3-A; 5,600 square feet in Building 3-B; and 2,925 square feet in the laboratory addition to the M. G. Corporation Building, together with certain surface parking areas at no additional cost to Lessee, all as more particularly shown on Schedule A attached hereto and made a part hereof;

**USE OF PREMISES**

with the appurtenances, to be used for an automobile showroom, service station, warehouse or garage, or for general automobile, tractor, implement, airplane or truck business, or accessories thereto, or any line of business allied to or connected with any of the foregoing, or any type of business conducted or controlled by General Motors Corporation, or any other lawful purpose not inconsistent with the character of the premises, for a term commencing ~~July 1, 1985~~ January 1, 1986

and expiring ~~June 30, 1990~~ December 31, 1991

**TERM**

**RENT**

at the yearly rent of ___ONE HUNDRED THIRTY THOUSAND FIVE HUNDRED SEVENTY-FIVE DOLLARS

($130,575.00)

payable in installments of $___10,881.25___ in advance on the first business day of each and every month during the term.

The parties hereto covenant and agree with each other as follows:

**FIRST:** That the Lessee shall pay the rent at the times and in the manner aforesaid.

**REPAIRS**

**SECOND:** That the Lessee shall keep and not misuse the premises so that they may be returned to the Lessor in as good order and condition as when delivered to Lessee, excepting ordinary wear and tear, damage by fire, vandalism, the elements and casualty, and damage due to any cause or happening not occasioned by the negligence of the Lessee. The Lessor shall maintain, repair and replace as necessary the plumbing, heating, ventilating and air conditioning equipment, lighting and other electrical and mechanical equipment, sprinkler system, elevators, glass (unless broken or damaged due to the negligence of Lessee), damage by vandals, and make all other repairs or replacements which the Lessee is not hereby required to make. The Lessor shall maintain (including painting as necessary), repair and replace as necessary, the exterior of the building including the roof, exterior walls, drains, eaves troughs, downspouts, gutters, and provide lateral support and make all structural repairs to the building. The Lessor shall also maintain, repair and replace as necessary, the improvements and the lands which are a part of and used in connection with the premises, including but not limited to ditches, drains, sewers, utility lines, driveways, sidewalks, parking areas, landscaping and fencing. In the event the Lessor fails to make any repairs or replacements which it is required to make hereunder within a reasonable time specified in a written notice by Lessee, then in that event the Lessee may make such repairs or replacements and deduct the cost and expense thereof from the rent reserved hereunder, or the Lessee may, at its option, cancel this Lease. If by reason of emergency, repairs or replacements become necessary which by the terms hereof are the



EXHIBIT
A

responsibility of the Lessor, Lessee may make such repairs or replacements which in the opinion of Lessee are necessary for the preservation of the premises or of the Lessee's property, and Lessor shall at the option of the Lessee either reimburse Lessee or Lessee may deduct the cost and expense thereof from the rent reserved hereunder, Provided, however, that in such event Lessee agrees to make reasonable effort to inform Lessor before proceeding with such repairs or replacements.

EASEMENTS

THIRD: That the enjoyment and use of all entrances, exits, approaches and means of entrance and approach, and of light and air now existing in favor of the premises shall not be interfered with or interrupted by any act or assent of the Lessor during the term of this Lease.

ASSIGNMENT

FOURTH: That the Lessee will not assign this Lease without the written consent of the Lessor, except such assignment be to a corporation then owned or controlled by GENERAL MOTORS CORPORATION. The Lessor agrees that such consent will not be unreasonably withheld.

NEGATIVE COVENANTS

FIFTH: That the Lessee will not consent to any use of the premises which shall be contrary to any valid law of the State or to any valid ordinance or bylaw of the Municipality for the time being in force.

COVENANTS BY LESSOR

SIXTH: That the Lessor covenants and agrees that the possession of the premises will be delivered to the Lessee upon the commencement of the term of this Lease in as good condition as the same now are, or as required to be altered pursuant to the provisions of Paragraph Twenty-Second, free from all tenancies and occupancies, and free from all orders, notices and violations filed or entered by any public or quasi-public authority, and free from complaints or reports of violations, noted or existing in or filed with any Federal, State, County, Municipal, Borough, or any other local authority. If any such orders, notices or violations be filed during the term of this Lease, the Lessor will comply therewith, or will cause such orders, notices or violations to be vacated unless they are occasioned by a use of the premises not authorized herein. In the event of Lessor's failure to comply with such orders, notices, or violations, or to cause such orders, notices or violations to be vacated within a reasonable time after written notice, Lessee may comply therewith and deduct the cost and expense of such compliance from the rent reserved hereunder, or Lessee may cancel this Lease.

The Lessor further covenants and agrees that at the commencement of the term the elevator or elevators, the boiler or boilers, air conditioning and heating equipment will all be in good mechanical, operating and insurable condition, acceptable to Lessee's insurance companies, and that the boiler or boilers, air conditioning and heating equipment will be of sufficient capacity to heat and cool the demised premises comfortably. If said equipment is not in the condition specified and Lessor fails to promptly place it in said condition, then Lessee may have the elevator or elevators, boiler or boilers and heating equipment put in the condition above provided and deduct the cost and expense thereof from any installment or installments of rent thereafter becoming due, or at Lessee's option, Lessee may cancel this Lease upon giving five (5) days' notice in the manner herein provided. In any event, the fact that the Lessor does not have said work done shall not render Lessee in any way liable nor relieve Lessor from any liability. The acceptance of possession by Lessee shall not be deemed to be a waiver of any of the aforesaid covenants.

VIEWING PREMISES

SEVENTH: That the Lessor may during the term at reasonable times enter to view the premises and may at any time within three (3) months next before the expiration of the said term, show the said premises and buildings or buildings to others, and affix to any suitable part of the said premises a notice for letting or selling the premises, or building or buildings, and keep the same affixed without hindrance or molestation.

FIRE CLAUSE

EIGHTH: (a) That if the premises shall be so damaged by fire, the elements, casualty, war, insurrection, riot, public disorder, act, authorized or unauthorized, on the part of any governmental authority or any cause or happening as to be substantially destroyed, then this Lease shall cease and come to an end, and any unearned rent paid in advance by the Lessee shall be refunded to it; (b) In case of only partial damage or destruction of the premises or of other portions of the building or buildings containing the premises, then said premises or other portions of said building or buildings shall be restored promptly by the Lessor to their previous condition and a just proportion of the rent herein reserved, according to the extent to which they have been rendered untenantable, shall abate until the said premises shall have been so restored and put in proper condition for use and occupancy, and a just proportion of any rent paid in advance by the Lessee shall be refunded to it. If Lessor shall for any reason fail to restore the premises or other portions of said building or buildings within a reasonable time, Lessee may cancel and terminate this Lease upon giving five (5) days' notice in the manner herein provided and be relieved of all liability hereunder arising subsequent to the aforesaid damage to the said premises or other portions of said building or buildings, and a just proportion of any rent paid in advance by the Lessee shall be refunded to it. The Lessor shall maintain fire and supplemental perils insurance coverage in an amount sufficient to comply with the aforementioned provisions of this clause; (c) In the event that the building or buildings containing the premises shall become unsafe, said building or buildings shall be repaired and restored forthwith by the Lessor, and a just proportion of the rent hereinbefore reserved shall abate until said building or buildings shall have been put in safe and proper condition for use and occupancy, and any unearned rent paid in advance by the Lessee shall be refunded to it, and if the Lessor fails for any reason to restore the premises forthwith to safe and proper condition for use and occupancy, Lessee may at its option cancel this Lease upon giving five (5) days' notice in the manner herein provided; (d) If any authority having jurisdiction shall decide that the said building or buildings should be demolished and removed, then forthwith upon such decision being made and upon the Lessee vacating the premises, this Lease shall cease and come to an end and any unearned rent paid in advance by the Lessee shall be refunded to it.

UNSAFE BUILDING CLAUSE

UNLAWFUL OCCUPATION

NINTH: That the Lessor represents that the premises may be used for the purposes for which they are hereby leased and in the event of the enactment or existence of any law, ordinance, rule, ruling, regulation, covenant or restriction prohibiting or limiting the use of said premises for any one or more of the purposes for which they are hereby leased, then in that event at the option of the Lessor, this Lease shall terminate and all liability hereunder shall cease from and after the date such prohibition becomes effective, and any unearned rent paid in advance by the Lessee shall be refunded to it.

RIGHTS UPON DEFAULT

TENTH: That if the Lessee shall neglect or fail to perform or observe any of the covenants contained herein on its part to be observed and performed for thirty (30) days after written notice by the Lessor, or if the Lessee shall be adjudicated bankrupt or insolvent according to law, or shall make an assignment for the benefit of creditors, then and in any of said cases the Lessor may lawfully enter into

and upon the said premises or any part thereof in the name of the whole, and repossess the same as of the former estate of the Lessor and expell the Lessee and those claiming under and through it and remove its effects (forcibly if necessary), without being deemed guilty of any manner of trespass, and without prejudice to any remedies which might otherwise be used for arrears of rent or preceding breach of covenant and upon entry as aforesaid this Lease shall terminate and the Lessee covenants that in case of such termination it will indemnify the Lessor against all unavoidable loss of rent which the Lessor may incur by reason of such termination during the residue of the term above specified.

**TERMINATION**

**HOLD OVER**

ELEVENTH: That notwithstanding any provision of law or any judicial decision to the contrary, (a) no notice shall be required to terminate the term of this Lease on the date herein specified and the term hereof shall expire on the date herein mentioned without notice being required from either party; (b) in the event that the Lessee, any assignee or sublessee, remains beyond the expiration date of the term herein, it is the intention of the parties and it is hereby agreed that a tenancy from month to month shall arise upon all the same terms and conditions contained herein, including the monthly rental rate.

**QUIET POSSESSION**

TWELFTH: Lessor herein represents that it is the fee owner of the premises hereby leased and hereby covenants that Lessee, on paying the rent and performing all and singular the covenants and conditions of this Lease on its part to be performed, shall and may peaceably and quietly have, hold and enjoy the premises for the term and for the uses aforesaid, and for the term of any renewal or renewals hereof, free from molestation, eviction or destruction by the Lessor, or by any other person or persons lawfully claiming the same, and that the Lessor has good right to make this Lease for the full term hereby granted, including the period for which the Lessee has the right to effect a renewal hereof. Should Lessee be dispossessed from the premises by reason of a superior title, the payment of rent shall cease from and after the date of such dispossession and all rent that may have been prepaid for any period of time Lessee is deprived of its peaceful possession by reason of said dispossession, shall be returned to Lessee forthwith, but the Lessor shall not hereby be relieved of liability to the Lessee for damages sustained by Lessee due to such dispossession. Lessor further agrees that in the event the premises are sold during the term of this Lease or any extension thereof, a certified copy of the Deed of Conveyance or an executed copy of the Assignment of this Lease shall be furnished to Lessee, it being understood that the consideration for such conveyance may be deleted from such instruments.

**SERVICES BY LESSOR**

THIRTEENTH: That the Lessor shall for the rent reserved furnish ~~electric current for all purposes required by the Lessee, janitor service including~~ snow removal, ~~water and elevator service during ordinary business hours, sufficient heat and air conditioning whenever necessary to make the premises comfortable for occupancy, window and glass partition washing at regular intervals~~, toilet facilities, and fluorescent tubes or electric bulbs for lamps for lighting the premises, ~~and the Lessor shall renew all such lamps, fluorescent tubes or bulbs when necessary.~~ Lessor covenants and agrees that the lighting fixtures in the office portion of the premises shall be of sufficient capacity at all times to produce not less than 100-foot candles lighting at desk level. Lessee shall pay the cost of all ~~electric current~~ utilities consumed on the demised premises.

**ALTERATIONS BY LESSEE**

FOURTEENTH: That with the prior written consent of Lessor, which shall not be unreasonably withheld, the Lessee shall have the right at any time during the term or any extension thereof, at its own expense, to make alterations, changes, improvements and remodeling to the premises, provided the same shall be in conformity with the Building Laws of the Municipality, County and State, and the Lessor covenants and agrees upon demand at any time after the execution of this Lease to obtain and deliver to the Lessee all permits, consents and other instruments which may be necessary or required by any public or quasi-public authority, permitting and authorizing such alterations, changes, improvements and remodeling. In case of said alterations, changes, improvements and remodeling, the Lessee shall not be required upon the termination of the Lease or any extension thereof to restore the premises to their original condition.

**FIXTURES AND SO FORTH**

FIFTEENTH: That all movable partitions, fixtures, floor covering, or equipment installed in the premises at the Lessee's expense shall remain the property of the Lessee and may be removed by the Lessee. The Lessee shall, however, repair any damage caused directly and exclusively by said removal.

**SIGNS AND SO FORTH**

SIXTEENTH: That the Lessee shall have the right to install or place signs or posters anywhere on or about the premises and upon removal of said signs and posters at the termination of this Lease shall repair any damage caused by such installation and removal.

**CONDEM-NATION**

SEVENTEENTH: That in the event the premises or any part thereof are taken or condemned by a temporary or permanent public or quasi-public use so as to interfere with Lessee's use, Lessee may at its option terminate this Lease and, in such event, any unearned rent paid in advance shall be returned to Lessee, but nothing herein contained shall prevent Lessee from recovering any damages sustained by Lessee due to such taking.

**MORTGAGE SUBORDINATION**

EIGHTEENTH: That this Lease shall be subject and subordinate to the lien of any mortgages hereafter placed on the premises and Lessee agrees to execute and deliver upon demand, in confirmation of such subordination, such further instruments as shall be required by any mortgagees or proposed mortgagees: Provided, that if and when such mortgage or mortgages are placed, the mortgagee shall agree for itself and for every subsequent holder or owner of the mortgage and for any receiver or purchaser of the premises in the event of foreclosure, Lessee's quiet possession of the premises will not be disturbed on account of said mortgage or by reason of anything done thereunder so long as Lessee pays the rent and keeps the other covenants on its part to be performed. Lessor agrees that in the event a mortgage is placed on the premises and a collateral assignment is given as security for the loan, Lessee will be furnished with a copy of such collateral assignment.

**WAIVER OF SUBROGATION**

NINETEENTH: The Lessor and the Lessee waive all rights, each against the other, and against those holding under or through the Lessor and Lessee, for damages caused by fire or other perils covered by insurance where such damages are sustained in connection with the occupancy of the leased premises.

TICES

**TWENTIETH:** That all notices to be given hereunder shall be in writing and given by personal delivery to the Lessor or to one of the executive officers of the Lessee or shall be sent by telegram or by registered mail addressed to the party intended to be notified at the post office address of such party last known to the party giving such notice and notice given as aforesaid shall be a sufficient service thereof, and shall be deemed given as of the date when deposited in any post office, or in any post office box regularly maintained by the Federal Government or, in the case of a telegram, when given to an employe of the telegraph company for transmission. Provided, however, that it is mutually agreed that the Lessee appoints the President, the Executive Vice Presidents and the Vice President in Charge of Real Estate, General Motors Corporation, and the ~~Supervisor in Charge of Real Estate, the Manager and the Director, Real Estate Department of Argonaut Realty Division~~, General Motors Corporation, ~~Argonaut Building~~ 485 West Milwaukee Avenue, Detroit, Michigan 48202, as its agents, and that any one of them may give all notices and receive all notices to be given hereunder, and may pay the rent, and notices shall be sent to any one of said agents and not otherwise. The right is hereby reserved by the Lessee to countermand such appointments and make others consistent herewith, due notice of which shall be given by the Lessee to the Lessor.
*Director, GM Facilities, and Director of Real Estate,

TENSION

**TWENTY-FIRST:** That the Lessee may at its option extend the term of this Lease for three further period(s) of one year each at a rate ~~to be negotiated~~ upon all the same terms and conditions contained herein, or as hereafter amended, by giving Lessor written notice at least 60 days prior to the expiration of the then current term.

TERATIONS
' LESSOR

**TWENTY-SECOND:** That the Lessor, at the Lessor's own expense, shall make the alterations, changes and improvements, according to the plan annexed hereto and made a part hereof, and shall fully complete the same, in a good workmanlike manner and shall have the premises ready for lawful occupancy by the Lessee in the condition herein provided on or before JAN 1, 1986 . In the event said work is not completed as above provided, the Lessee may, at its option, (a) enter and complete said work and deduct the cost and expense thereof from the rent reserved hereunder, or (b) cancel this Lease. In no event, however, shall rent accrue until the above alterations, changes and improvements have been completed and the premises have been made ready for lawful occupancy by the Lessee as herein provided.

NCELLATION

~~**TWENTY-THIRD:** That the Lessee may cancel this Lease effective~~ or at any time thereafter by giving Lessor _____ days' written notice prior ~~thereto.~~

**TWENTY-FOURTH:** Lessor and Lessee agree to execute a short form Memorandum of Lease to be prepared and recorded by Lessee at Lessee's expense.
The covenants and agreements contained in the foregoing Lease are binding upon the parties hereto and their respective heirs, executors, administrators, successors, legal representatives and assigns.

**In Witness Whereof,** Lessor has signed and sealed this instrument this 5th day of December A.D. 19 85, and Lessee has signed and sealed this instrument this _____ day of _____ A.D. 19 _____.

In the presence of:

UNIVERSAL TOOL AND ENGINEERING, INC.

BY _Carl A. Grumann_

Carl A. Grumann          President

ATTEST _____

F. S. Jenkins          Secretary

In the presence of:

GENERAL MOTORS CORPORATION

BY _____

Vice President

ATTEST _____

Assistant Secretary





Current Engineering and
Manufacturing Services Staff
General Motors Corporation

April 11, 1991

Mr. F. S. Jenkins
Universal Tool & Engineering
7601 E. 88th Place
Indianapolis, Indiana 46256

     Re:    Lease Extension
           Delco Remy Division
           7601 E. 88th Place
           Indianapolis, Indiana
           <u>Project No. 23424</u>

Dear Bud:

Attached are fully executed Agreements extending
the lease term for the subject two buildings.

Thanks for your help and patience in resolving
the renewal term and conditions.

           Sincerely,

           G. S. Gillikin

sr:gsgper408-3

## LEASE AMENDMENT

AGREEMENT made this 14th day of November, 1990, between UNIVERSAL TOOL & ENGINEERING, INC., an Indiana Corporation, whose address is 7601 East 88th Place, Indianapolis, Indiana, as Lessor and GENERAL MOTORS CORPORATION, a Delaware Corporation, with its principal office at 3044 West Grand Boulevard, Detroit, Michigan, as Lessee.

### RECITALS

1.    That there is a Lease (the "Lease") dated January 1, 1986, covering approximately 43,525 square feet in the building complex more fully described in said Lease for a term commencing January 1, 1986, and expiring December 31, 1990. The yearly rental on said Lease was set at One Hundred Thirty Thousand Five Hundred Seventy Thousand and 00/100 ($130,570) Dollars per year payable in monthly installments of Ten Thousand Eight Hundred Eighty One & 25/100 ($10,881.25) and also included a three year renewal option.

2.    The parties wish to amend the Lease by extending the term of the Lease, increasing the annual rental, modifying the Renewal Option, modifying the cancellation clause and adding a cross-indemnification clause as more specifically set forth below.

NOW, THEREFORE, IT IS AGREED BETWEEN THE PARTIES AS FOLLOWS:

1.    **TERM**.

The Lease dated January 1, 1986, which commenced on January 1, 1986, and expired on December 31, 1990, is hereby extended for a period of one year and eight months commencing January 1, 1991 and expiring August 31, 1992.

2.   RENTAL AMOUNT.

Effective January 1, 1991, the annual base rent shall be One
undred Fifty Six Thousand Six Hundred Ninety and 00/100
$156,690.00) Dollars payable at monthly installments of Thirteen
housand Fifty Seven and 50/100 ($13,057.50) Dollars.

3.   RIGHT TO CANCEL.

Lessee may terminate the Lease upon 60 days prior written
otice to Lessor and have no further obligations hereunder.

4.   OPTION TO RENEW.

Lessee may, at its option and by giving Lessor 60 days prior
rritten notice, extend the Lease for a period of two years.

5.   LANDLORD'S AND TENANT'S REPRESENTATIONS AND WARRANTIES.

Tenant warrants and represents that it will comply with all specifically
applicable federal, state or local environmental laws, regulations or ordinanc
governing hazardous material.  Tenant shall indemnify and hold Landlord harmle
from any claim arising from its use of the premises which results in a violati
of said laws and regulations.

Landlord shall be responsible for any pre-existing environmental conditio
or violations of said laws and regulations pertaining to the premises, and,
Landlord shall indemnify and hold Tenant harmless from any claim arising from
its negligence.

6.   REMAINING PROVISIONS

As heretofore and hereby amended and extended, said Lease
dated January 1, 1986, is in all other respects ratified an

WITNESS the signature of Lessor and Lessee the day and date adjacent to their respective signatures.

In the presence of:

*Cynthia N. Morris*

*Wm. H. T___*

UNIVERSAL TOOL & ENGINEERING
LESSOR

BY: _____

ATTEST: _____

DATE: _____

In the presence of:

*Shirley Rose*

*Bernice C. Heady*

GENERAL MOTORS CORPORATION
LESSEE

BY: _____

ATTEST: _____

DATE: *April 8, 1991*

By:   John P. Hartwig
      COLOMBO & COLOMBO
      1500 North Woodward, Ste.300
      Birmingham, MI 48-012-3012
      (313) 645-9300

## LEASE EXTENSION AND AMENDMENT AGREEMENT

AGREEMENT made this 25th day of March, 1993, between UNIVERSAL TOOL & ENGINEERING, INC., an Indiana corporation, with its principal address at 7601 East 88th Place, Indianapolis, Indiana, hereinafter referred to as Lessor, and GENERAL MOTORS CORPORATION, a Delaware corporation, with its principal address at 3044 West Grand Boulevard, Detroit, Michigan 48202, hereinafter referred to as Lessee,

### WITNESSETH:

That the Lease Agreement dated January 1, 1986, as amended and extended, between the parties hereto covering approximately 43,525 square feet of space in the building complex located at 7601 East 88th Place, Indianapolis, Indiana, for a term as extended commencing January 1, 1986, and expiring August 31, 1992, is hereby extended and amended as follows:

(1)    Effective September 1, 1992, the term of said Lease is extended for a further period so as to expire August 31, 1995, at the yearly rent of ONE HUNDRED FIFTY-SIX THOUSAND SIX HUNDRED NINETY AND 00/100 DOLLARS ($156,690.00), payable in advance in equal monthly installments of $13,057.50.

(2)    Lessee may at its option extend the term of this Lease for one (1) additional term of two (2) years by providing Lessor with at least sixty (60) days written notice prior to the expiration of the then current term. Rental for the renewal period shall be mutually agreed upon prior to the date the renewal notice is to be provided to Lessor.

Except as heretofore and hereby amended and extended, said Lease Agreement dated January 1, 1986, is in all respects ratified and confirmed.

IN WITNESS WHEREOF, the Lessor has signed and sealed this instrument this __2nd__

day of ___April_____, 1993, and the Lessee has signed and sealed this instrument
this _10th_ day of _MARCH_____, 1993.

In the presence of:

UNIVERSAL TOOL & ENGINEERING,
INC.,

BY _Carl A. Drumann_

President

ATTEST _Francis S. Gamkins_

Secretary


In the presence of:

GENERAL MOTORS CORPORATION

BY _____

ATTEST _____

Assistant Secretary

**DOCUMENT SHIPPER**

 GM Argonaut Realty

DATE: April 17, 1993

TO: (GM DIVISION): Delco Remy

FROM: B. C. Heady, Property Records Section

RE NO: 13195

The attached documents are being forwarded for your files. All future rents payments will be made by GM Facilities (Financial) in Detroit, with the exception of GMAC and Canadian leases, or unless other arrangements have been made for the Division to make payments directly to Lessor. Should you have any questions regarding rental payments, please call Greg Fekin on 8+346-5525. Questions regarding this document other than rental should be directed to B. C. Heady on 8+346-2758.

FORWARDED    LAR dated 07/14/92
HEREWITH:    Lease Amendment dated 03/25/93

**DOCUMENT SUMMARY**

NEW LEASE:___  EXTN:___  RENEWAL:___  AMDT: _X_  LICENSE:___  EASEMENT:___  OTHER:_____

IF NEW LEASE: NEW REQUIREMENT ___  OR RELOCATED FROM _____
IF TERMINATION: NOT RELOCATED ___  OR RELOCATED TO _____

FIRST PARTY: _Universal Tool & Engineering, Inc._
SECOND PARTY: _Declo Remy_
FORMER PARTY (First ___) (Second ___): _____
PROPERTY ADDRESS: ___7601 East 88th Place_
CITY: _Indianapolis_    ST: _IN_ ZIP: _46256_    COUNTRY: _USA_

RENT PAYABLE TO: _Universal Tool & Engineering, Inc._    FED. ID#: _____
MAIL TO: _7601 East 88th Place_
CITY: _Indianapolis_    ST: _IN_ ZIP: _46256_    COUNTRY: _USA_

COMMENCEMENT DATE: _09/01/92_  IS COMMENCEMENT DATE FIRM? _Y_ EXP. DATE: _08/31/95_
TERM: _3 years_    SUGGESTED FOLLOW-UP DATE: _____
RENEWAL OPTIONS (Clause # _2_): _1 - 2 year on 60 days notice (rent to be negotiated)_
OPTION MUST BE EXERCISED BY: _6/30/95_ ; CANCEL PROVISIONS: _60 days notice *_
USE OF PREMISES: _Manufacturing (Product Development)_
RENT: AVG. ANNUAL $156,690.00  AVG. MONTHLY $13,057.50  MONTHS FREE RENT: _N/A_
DEMISED AREA: (Rentable) _____ S/F Rate _____ (Usable) _43,525_ S/F Rate _3.60_
PAID BY: TAXES _Lessor_    INSURANCE _Lessor_    UTILITIES _Lessee_
ESCALATION (Clause # _N/A_): CPI _____ STOP AMT. $_____    BASE YR: ___ NET: _
LESSOR SERVICES: ALL ___ ALL EXCEPT ELECTRICITY ___  USE ONLY _X_  SPECIAL: ___
SPECIAL REPAIR OBLIGATIONS: _____
NOTICE TO MORTGAGEE IS REQUIRED: _____

SPECIAL PROVISIONS: _* Clause 4 of Amendment dated 11/14/90 - 60 days notice._

PREPARED BY: _Holly A. Earls_    DATE: _4/17/93_

THIS DOCUMENT DOES NOT CONTAIN ALL TERMS OF THE ORIGINAL AGREEMENT.  CONSULT FILE.

Copies (w/encl.): GM Facilities-Financial; (w/original) Property Records Dept.

FINANCIAL: Audit _____; Audit _____; Audit _____

DOCSHIP.LTR:REV:  06/03/92

## LEASE EXTENSION AND AMENDMENT AGREEMENT

AGREEMENT made this 18th day of August, 1995, between UNIVERSAL TOOL & ENGINEERING, INC., an Indiana corporation, with its principal address at 7601 East 88th Place, Indianapolis, Indiana, hereinafter referred to as Lessor, and GENERAL MOTORS CORPORATION, a Delaware corporation, with its principal address at 3044 West Grand Boulevard, Detroit, Michigan 48202, hereinafter referred to as Lessee,

### W I T N E S S E T H:

That the Lease Agreement dated January 1, 1986, as amended and extended, between the parties hereto covering approximately 43,525 square feet of space in the building complex located at 7601 East 88th Place, Indianapolis, Indiana, for a term as extended commencing January 1, 1986, and expiring August 31, 1995, is hereby extended and amended as follows:

(1)    Effective September 1, 1995, the term of said Lease is extended for a further period so as to expire August 31, 2000.

(2)    Effective September 1, 1995, through ~~November 30,~~ October 31 1995, the rental shall be at the rate of ONE HUNDRED FIFTY-SIX THOUSAND SIX HUNDRED NINETY AND 00/100 DOLLARS ($156,690.00) per year, payable in equal monthly installments of $13,057.50. Effective ~~December~~ November 1, 1995, through August 31, 2000, the rental shall be at the rate of TWO HUNDRED SEVENTEEN THOUSAND SIX HUNDRED TWENTY-FIVE AND 04/100 DOLLARS ($217,625.04) per year, payable in advance in equal monthly installments of $18,135.42.

(3)    Lessee may at its option extend the term of this Lease for two (2) additional terms of five (5) years each by providing Lessor with at least sixty (60) days written notice prior to the expiration of the then current term. Rental for the first renewal period shall be TWO HUNDRED THIRTY-NINE THOUSAND THREE HUNDRED EIGHTY-SEVEN AND

50/100 DOLLARS ($239,387.50) per year, payable in advance in equal monthly installments of $19,948.96, and rental for the second renewal period shall be TWO HUNDRED SIXTY-ONE THOUSAND ONE HUNDRED FIFTY AND 00/100 DOLLARS ($261,150.00) per year, payable in advance in equal monthly installments of $21,762.50.

Except as heretofore and hereby amended and extended, said Lease Agreement dated January 1, 1986, is in all respects ratified and confirmed.

IN WITNESS WHEREOF, the Lessor has signed and sealed this instrument this _____ day of _____, 1995, and the Lessee has signed and sealed this instrument this 25ᵗʰ day of _October_, 1995.

In the presence of:                          UNIVERSAL TOOL & ENGINEERING, INC.

_____      BY _____
                                                                              President

_____      ATTEST_____
                                                                              Secretary


In the presence of:                          GENERAL MOTORS CORPORATION

_____      BY _____
                                                          M.P. CULLEN, DIRECTOR
                                                          Worldwide Real Estate

_____      ATTEST_____
                                                                              Assistant Secretary

REVIEWED AND APPROVED
BY_____
R.D. HERRINGTON, ATTORNEY

- 2 -

### AMENDMENT TO LEASE

THIS AMENDMENT TO LEASE (this "Amendment") is entered into as of the ___4th___ day of ___August___, 2000, between UNIVERSAL TOOL AND ENGINEERING, INC., an Indiana corporation, whose address is 7601 East 88th Place, Indianapolis, Indiana 45256 ("Lessor") and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, whose address is 5725 Delphi Drive, Troy, Michigan 48098 ("Lessee"), based upon the following:

A.    Lessor and Lessee's predecessor in interest, General Motors Corporation, entered into a Lease, dated January 1, 1986, which was amended by Lease Amendment dated November 14, 1990, Lease Extension and Amendment Agreement dated March 25, 1993, and a Lease Extension and Amendment Agreement dated August 18, 1995 (as amended, the "Lease") with respect to certain premises consisting of approximately 43,525 square feet of space in the building complex located at 7601 East 88th Place, Indianapolis, Indiana, as more particularly described in the Lease (the "Premises").

B.    Lessor and Lessee desire to extend the term of the Lease and to modify certain terms of the Lease, upon the terms and conditions set forth in this Amendment.

NOW, THEREFORE, for good and valuable consideration, the adequacy of which Lessor and Lessee acknowledge, Lessor and Lessee agree as follows:

1.    Capitalized Terms.  Unless otherwise defined in this Amendment, all words used in this Amendment with initial capital letters have the meaning ascribed to them in the Lease.

2.    Extension of Term.  The term of the Lease is hereby extended for a period of five (5) years, commencing on September 1, 2000, and continuing through August 31, 2005.

3.    Rent.  Notwithstanding the provisions of Section 3 of the Lease Extension and Amendment dated August 18, 1995 to the contrary, rental for the period from September 1, 2000 through August 31, 2005 shall be Two Hundred Fifty-Six Thousand Two Hundred and 00/100ths Dollars ($256,200.00) per year, payable in advance in equal monthly installments of Twenty-One Thousand Three Hundred Fifty and 00/100ths Dollars ($21,350.00).

4.    Excluded Space.  Effective September 1, 2000, the approximately 2,925 square feet of space in the laboratory addition to the M.G. Corporation Building, as more particularly described and depicted in the Lease, is excluded from the Premises and is no longer a part of the Lease.

5.    Additional Space.  Effective September 1, 2000, (i) Lessor leases to Lessee and Lessee leases from Lessor an additional 2,100 square feet of space in the garage area attached to Building 6 (as depicted on the attached Exhibit A) (the "Garage"), upon the terms and conditions set forth in this Amendment, (ii) the Garage is incorporated into and made a part of the Premises, and (iii) the Premises shall consist of approximately 42,700 square feet of floor area.

{W0066538.DOC;2}

6.    <u>Change in Description of Premises</u>.    Building 3-A and Building 3-B, as described and depicted in the Lease, are now known respectively as Building 5 and Building 6, as depicted on the attached Exhibit A.

7.    <u>Payment</u>.    On September 1, 2000, Lessee shall pay to Lessor the sum of Seven Thousand and 00/100ths Dollars ($7,000.00) in full payment of Lessee's use of the Garage for the period from January 1, 2000 through August 31, 2000.

8.    <u>Ratification and Confirmation</u>.    To the extent of any inconsistency between the terms and provisions of this Amendment and the Lease, the terms and provisions of this Amendment shall control.    Except as amended by this Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.

9.    <u>Successors and Assigns</u>.    This Amendment shall be binding upon and shall inure to the benefit of the parties to this Amendment and their respective successors and assigns, if permitted pursuant to the terms and conditions of the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the day and year first above written.

LESSOR:

UNIVERSAL TOOL AND ENGINEERING,
INC., an Indiana corporation

By:    _____

Its:    _____


LESSEE:

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company,

By:    DELPHI AUTOMOTIVE SYSTEMS
       INC., a Delaware Corporation
Its:   Managing Member

By:    _____

Its:    Authorized Signatory

EXECUTION RECOMMENDED          APPROVED / LEGAL
DELPHI REAL ESTATE            MIRO WEINER & KRAMER

BY: _____

{W0066538.DOC;2}

2

## ACKNOWLEDGMENT

STATE OF _____ )
                      ) SS
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this _____ day of _____, 2000, by _____, the _____, of United Tool and Engineering, Inc., an Indiana corporation, on behalf of said corporation.

                                            _____
                                            Notary Public
                                          _____ County, _____
                                          My Commission Expires:_____

                                                          (SEAL)

## ACKNOWLEDGMENT

STATE OF MICHIGAN )
                        ) SS
COUNTY OF *Macomb* )

    The foregoing instrument was acknowledged before me this *4* day of *August*, 2000, by *Robert Smalskas*, an Authorized Representative of Delphi Automotive Systems Inc., a Delaware corporation, which is the Managing Member of Delphi Automotive Systems LLC, a Delaware limited liability company, on behalf of said company.

**TRAUTE A. VALUET**
**NOTARY PUBLIC, MACOMB COUNTY, MI**
**ACTING IN OAKLAND COUNTY, MI**
**MY COMMISSION EXPIRES APR 8, 2004**

                                      *Traute A. Valuet*
                                      Notary Public
                                        *Macomb* County, *Michigan*
                                        My Commission Expires: *4-8-2004*

                                                          (SEAL)

## LEASE EXTENSION AND AMENDMENT AGREEMENT

THIS LEASE EXTENSION AND AMENDMENT AGREEMENT (this "Amendment"), is made and entered into this _3rd_ day of ~~June~~ August, 2005, by and between UNIVERSAL TOOL AND ENGINEERING, INC., an Indiana corporation, whose address is 7601 East 88th Place, Indianapolis, Indiana 45256 ("Lessor"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, whose address is 5725 Delphi Drive, Troy, Michigan 48098 ("Lessee"), based upon the following:

A.    Lessor and Lessee's predecessor in interest, General Motors Corporation, entered into a Lease dated January 1, 1986, which was amended by Lease Amendment dated November 14, 1990, Lease Extension and Amendment Agreement dated March 25, 1993, Lease Extension and Amendment Agreement dated August 18, 1995, and Amendment to Lease dated August 4, 2000 (as so amended, the "Lease"), with respect to certain premises consisting of approximately 42,700 square feet of space in the building complex located at 7601 East 88th Place, Indianapolis, Indiana, as more particularly described in the Lease.

B.    Lessor and Lessee desire to amend the Lease as set forth in this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Lessor and Lessee agree as follows:

1.    Capitalized Terms. Unless otherwise defined in this Amendment, all words used in this Amendment with initial capital letters have the meaning ascribed to them in the Lease.

2.    Extension of Term. The term of the Lease is hereby extended for a period of one (1) year, commencing on September 1, 2005, and continuing through August 31, 2006 (the "Renewal Term").

3.    Rent. The rent during the Renewal Term shall be Two Hundred Fifty-Six Thousand Two Hundred and 00/100ths Dollars ($256,200.00) per annum, payable in equal monthly installments of Twenty-One Thousand Three Hundred Fifty and 00/100ths Dollars ($21,350.00).

1

4.    <u>Ratification and Confirmation</u>.  To the extent of any inconsistency between the terms and provisions of this Amendment and the Lease, the terms and provisions of this Amendment shall control.  Except as amended by this Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.

5.    <u>Successors and Assigns</u>.  This Amendment shall be binding upon and shall inure to the benefit of the parties to this Amendment and their respective successors and assigns, if permitted pursuant to the terms and conditions of the Lease.

**IN WITNESS WHEREOF**, the undersigned have executed this Lease Extension and Amendment Agreement as of the date first above written.

In the Presence of:

UNIVERSAL TOOL AND ENGINEERING, INC.,
an Indiana corporation

By: _____

Its:    *CFO*

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By: _____
     John A. Jaffurs

Its:    Authorized Signatory

2

GM | **Worldwide Real Estate**
General Motors Corporation

January 25, 1999

VIA CERTIFIED MAIL

Universal Tool and Engineering, Inc.
7601 East 88th Place
Indianapolis, Indiana  46256

RE:  Assignment of Lease
    Assignor:  General Motors Corporation
    Assignee:  Delphi Automotive Systems LLC
    Plant 39-UTE, 7601 East 88th Place, Indianapolis, In.
    GMC File No. RE13195

Dear Sir/Madam;

This is to inform you that Delphi Automotive Systems, formerly a division of General Motors Corporation, has recently become a separate legal entity known as Delphi Automotive Systems LLC.

Effective January 1, 1999, General Motors Corporation has assigned its interest in the above referenced Lease to Delphi Automotive Systems LLC.  A photocopy of the Assignment and Assumption document is enclosed for your records.

Please direct any future notices in connection with the above referenced Lease to Delphi Automotive Systems LLC at the following address:

        Delphi Automotive Systems LLC
        5725 Delphi Drive
        Troy, Michigan 48098
        Attn: Assistant Corporate Counsel-Commercial Practices

Thank you for your attention to this matter.  Please contact me at (313) 556-2930 if you require any further information.

Very truly yours,

*Betty Stichler*

Betty Stichler

## ASSIGNMENT AND ASSUMPTION

Know all men by these presents that for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, GENERAL MOTORS CORPORATION, whose address is 3044 West Grand Boulevard, Detroit, Michigan 48202 ("Assignor"), hereby assigns, upon the terms and conditions herein contained, to DELPHI AUTOMOTIVE SYSTEMS LLC, whose address is 5725 Delphi Drive, Troy, Michigan 48098 ("Assignee") its entire right, title and interest, as Tenant, in and to that certain Lease more particularly described on Exhibit "A" hereto (the "Lease"). The terms and conditions above referred to are as follows:

A.    This Assignment shall be effective as of January 1, 1999 (the "Effective Date").

B.    Assignee hereby assumes and agrees to perform all of the obligations of Tenant under the Lease from and after the Effective Date.

C.    Assignor shall indemnify Assignee, its officers, directors, stockholders, representatives, agents and employees and save them harmless from and against any and all claims, actions, damages, liability, costs and expenses, including reasonable attorney's fees, in connection with any obligations of Tenant under the Lease and all losses, including loss of life, personal injury and/or damage to property, arising from or out of any occurrence in, upon or at the premises covered by the Lease arising prior to the Effective Date.

D.    Assignee shall indemnify Assignor, its officers, directors, stockholders, representatives, agents and employees and save them harmless from and against any and all claims, actions, damages, liability, costs and expenses, including reasonable attorney's fees, in connection with any obligations of Tenant under the Lease and all losses, including loss of life, personal injury and/or damage to property, arising from or out of any occurrence in, upon or at the premises covered by the Lease from and after the Effective Date.

Dated: ~~November~~ Dec 10 , 1998

GENERAL MOTORS CORPORATION

By _____
JOHN J. DUES, General Director
Worldwide Real Estate

DELPHI AUTOMOTIVE SYSTEMS LLC

By _____

Its Director Real Estate    SJS

EXECUTION RECOMMENDED
WORLDWIDE REAL ESTATE
BY

152.RE13195
Prepared 11/23/98

## EXHIBIT "A"

Lease between UNIVERSAL TOOL AND ENGINEERING, INC., as Landlord, and General Motors Corporation, as Tenant, dated January 1, 1986, as amended, covering premises at 7601 East 88th Place, Indianapolis, Indiana 46256.

| INVOICE # | DATE | AMOUNT | AMT PAID | OWING |
|---|---|---|---|---|
| 25606 | 1/31/02 | $221,885.44 | $204,090.10 | $17,795.34 |
| 25696 | 10/31/02 | $182,260.64 | $179,765.10 | $2,495.54 |
| 25711 | 12/31/02 | $145,765.09 | $133,575.37 | $12,189.72 |
| 25775 | 9/29/03 | $7,721.00 | $0.00 | $7,721.00 |
| 25781 | 9/30/03 | $107,611.40 | $104,019.16 | $3,592.24 |
| 25804 | 12/31/03 | $77,424.69 | $76,205.01 | $1,219.68 |
| 25942 | 5/31/05 | $192,243.94 | $186,129.82 | $6,114.12 |
| 25956 | 07/31/05 | $140,780.01 | $116,245.09 | $24,534.92 |
| 25960 | 8/31/05 | $1,050.00 | $0.00 | $1,050.00 |
| 25961 | 8/31/05 | $3,489.89 | $0.00 | $3,489.89 |
| 25962 | 8/31/05 | $190,003.57 | $152,891.95 | $37,111.62 |
| 25970 | 9/30/05 | $1,050.00 | $0.00 | $1,050.00 |
| 25978 | 10/31/05 | $154,557.92 | 147,919.66 | $1,713.12 |

**TOTAL OWING**       $120,077.19



**EXHIBIT**

B

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place   Indianapolis, Indiana 46256
(317) 842-8999

GENERAL MOTORS CORP.
WORLDWIDE PURCHASING

P.O. BOX 1360
FLINT,  MI  48501-1360

| | | |
|---|---|---|
| **INVOICE #** | | **25606** |
| Date | | **January 31, 2002** |
| Purchase Order # | | JBB00302 |
| Requisition # | | DRD 243699 |
| Our # | | SEE ATTACHED |
| Terms:  Net 10th & 25th | | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|
| | TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF ELECTRIC VEHICLEBATTERY PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B. | | |
| | ITEM 001:  GPR-JGB00302001 | | |
| | PLANT 1 LABOR: 785.75 Hrs @ 28.00 | | 22,001.00 |
| | DOUBLETIME _____ Hrs @ 42.00 | | |
| | ITEM 002:  GPR-JGB00302002 | | |
| | PLANT 3 LABOR 4,167.25 Hrs @ 28.00 | | 116,683.00 |
| | DOUBLETIME _____ Hrs @ 42.00 | | |
| | ITEM 003:  GPR-JGB00302003 | | |
| | PLANT 3 MATERIAL: (SEE ATTACHED) 72,349.07 | | |
| | Plus 15% 10,852.37 | | 83,201.44 |

**TOTAL**     $     **221,885.44**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections 6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938, as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."



EXHIBIT
C

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place   Indianapolis, Indiana  46256
(317)  842-8999

| | | |
|---|---|---|
| GENERAL MOTORS CORP. | **INVOICE #** | **25696** |
| WORLDWIDE PURCHASING | Date | October 31, 2002 |
| | Purchase Order # | JBB00302 |
| P.O. BOX 1360 | Requisition # | DRD 243699 |
| FLINT,  MI  48501-1360 | Our # | SEE ATTACHED |
| | Terms: Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

| | | | |
|---|---|---|---|
| ITEM 001:  GPR-JGB00302001 | | | |
| PLANT 1 LABOR: | 495.75 Hrs. @ $27.72 | | 13,742.19 |
| DOUBLETIME | _____ Hrs. @ $42.00 | | |
| | | | |
| ITEM 002:  GPR-JGB00302002 | | | |
| PLANT 3 LABOR | 4,529.25 Hrs. @ $27.72 | | 125,550.81 |
| DOUBLETIME | _____ Hrs. @ $42.00 | | |
| | | | |
| ITEM 003:  GPR-JGB00302003 | | | |
| PLANT 3 MATERIAL: (SEE ATTACHED) | 37,363.16 | | |
| Plus 15% | 5,604.48 | | 42,967.64 |

**TOTAL**      **$**      **182,260.64**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment.
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

**TOOL & ENGINEERING CO., INC.**
7601 E. 88th Place   Indianapolis, Indiana  46256
(317) 842-8999

| | |
|---|---|
| GENERAL MOTORS CORP.<br>WORLDWIDE PURCHASING | **INVOICE #**   **25711** |
| | Date   December 31, 2002 |
| | Purchase Order #   JBB00302 |
| P.O. BOX 1360 | Requisition #   DRD 243699 |
| FLINT,  MI  48501-1360 | Our.#   SEE ATTACHED |
| | Terms:  Net 10th & 25th |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

ITEM 001:  GPR-JGB00302001
PLANT 1 LABOR:          999.75 Hrs. @ $27.72                          27,713.07
 DOUBLETIME                      Hrs. @ $42.00


ITEM 002:  GPR-JGB00302002
PLANT 3 LABOR          3,560.50 Hrs. @ $27.72                         98,697.06
 DOUBLETIME           103.75 Hrs. @ $42.00                             4,357.50

ITEM 003:  GPR-JGB00302003
PLANT 3 MATERIAL: (SEE ATTACHED)     13,041.26
                    Plus 15%           1,956.20                       14,997.46


                                          **TOTAL**   $   **145,765.09**

                                          PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
 6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL
## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place   Indianapolis, Indiana 46256

GENERAL MOTORS CORPORATION
WORLDWIDE PURCHASING
P.O. Box 1360
FLINT, MI 48501-1360

**INVOICE #** -25775

Date            Sept. 29, 2003
Purchase Order #      JGS 14921
Our #
Terms:          Net 10th & 25th

| Quantity | | Unit Price | Amount |
|---|---|---|---|
| INSTALLATION OF SPRINKLER SYSTEM PER ED WRIN | | | |
| LABOR & MATERIALS PROVIDED BY KOORSEN PROTECTION SERVICES. | | | |
| INSTALLATION  LABOR | | | 5152.00 |
| TRUCK CHARGES | | | 100.00 |
| FABRICATION | | | 448.00 |
| MATERIALS | | | 1925.00 |
| 5% SALES TAX ON MATERIALS - WORK COMPLETED 10/18/02 | | | 96.00 |
| | | TOTAL ...    $ | 7,721.00 |

COMPLETE

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."

"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:

"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

### TOOL & ENGINEERING CO., INC.
7601 E. 88th Place  Indianapolis, Indiana 46256
(317) 842-8999

GENERAL MOTORS CORP.
WORLDWIDE PURCHASING

P.O. BOX 1360
FLINT, MI  48501-1360

**INVOICE #**        **25781**
Date                September 30, 2003
Purchase Order#          JBB00302
Requisition #          DRD 243699
Our#            SEE ATTACHED
Terms:  Net 10th & 25th

==================================================================

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|
==================================================================

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

ITEM 001:  GPR-JGB00302001
PLANT 1 LABOR:        138.50 Hrs.@        $27.72                3,839.22
    DOUBLETIME            Hrs.@        $42.00

ITEM 002:  GPR-JGB00302002
PLANT 3 LABOR        3,084.00 Hrs.@        $27.72            85,488.48
    DOUBLETIME            Hrs.@        $42.00

ITEM 003:  GPR-JGB00302003
PLANT 3 MATERIAL: (SEE ATTACHED)        15,898.87
            Plus 15%        2,384.83                18,283.70

**TOTAL**        **$**        **107,611.40**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
 6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

### TOOL & ENGINEERING CO., INC.
7601 E. 88th Place   Indianapolis, Indiana 46256
(317) 842-8999

GENERAL MOTORS CORP.
WORLDWIDE PURCHASING
P.O. BOX 1360
FLINT,  MI  48501-1360

| | |
|---|---|
| **INVOICE #** | **25804** |
| Date | December 31, 2003 |
| Purchase Order # | JBB00302 |
| Requisition # | DRD 661042 |
| Our # | see attached |
| Terms:  Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR BATTERY DEVELOPMENT
PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

ITEM 001:  GPR-JGB00302001
PLANT 1 LABOR: _____ Hrs. @    $27.72
 DOUBLETIME _____ Hrs @ 42.00

ITEM 002:  GPR-JGB00302002
PLANT 3 LABOR   110.25 Hrs. @    $27.72           3,056.13
 DOUBLETIME _____ Hrs @ 42.00

ITEM 003:  GPR-JGB00302003
PLANT 3 MATERIAL: (SEE ATTACHED)    64,668.31
         Plus 15%     9,700.25                  74,368.56

**TOTAL**        $        **77,424.69**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.

7601 E. 88th Place   Indianapolis, Indiana 46256
(317) 842-8999

GENERAL MOTORS CORP.
WORLDWIDE PURCHASING

P.O. BOX 1360
FLINT, MI  48501-1360

| | |
|---|---|
| **INVOICE #** | **25942** |
| Date | May 31, 2005 |
| Purchase Order | JBB00302 |
| Requisition # | DRD 243699 |
| Our # | SEE ATTACHED |
| Terms: Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

ITEM 001:  GPR-JGB00302001
PLANT 1 LABOR:          999.25 Hrs.@      $27.72                   27,699.21
 DOUBLETIME                    Hrs.@      $42.00

ITEM 002:  GPR-JGB00302002
PLANT 3 LABOR           3,473.00 Hrs.@      $27.72                   96,271.56
 DOUBLETIME                    Hrs.@      $42.00

ITEM 003:  GPR-JGB00302003
PLANT 3 MATERIAL: (SEE ATTACHED)      59,367.96
          Plus 15%              8,905.21                       68,273.17

**TOTAL**          $          192,243.94

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
 6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
 Department of Labor issued under Section 14 thereof."
 "Seller agrees, in connection with the production of the articles and/or the performance of the services
 specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
 as amended.  All invoices must carry the following certificate in order to be passed for payment:
 "Seller represents that with respect to the production of the articles and/or the performance of the services
 covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

**UNIVERSAL**

**TOOL & ENGINEERING CO., INC.**

7601 E. 88th Place   Indianapolis, Indiana 46256

(317) 842-8999

| GENERAL MOTORS CORP. | INVOICE # | 25956 |
|---|---|---|
| WORLDWIDE PURCHASING | Date | July 31, 2005 |
| | Purchase Order | JBB00302 |
| P.O. BOX 1360 | Requisition # | DRD 243699 |
| FLINT,  MI  48501-1360 | Our # | SEE ATTACHED |
| | Terms: Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

ITEM 001:  GPR-JGB00302001

| | | | |
|---|---|---|---|
| PLANT 1 LABOR: | 913.75 Hrs.@ | $27.72 | 25,329.15 |
| DOUBLETIME | Hrs.@ | $42.00 | |

ITEM 002:  GPR-JGB00302002

| | | | |
|---|---|---|---|
| PLANT 3 LABOR | 2,330.00 Hrs.@ | $27.72 | 64,587.60 |
| DOUBLETIME | Hrs.@ | $42.00 | |

ITEM 003:  GPR-JGB00302003

| | | | |
|---|---|---|---|
| PLANT 3 MATERIAL: (SEE ATTACHED) | 44,228.92 | | 50,863.26 |
| Plus 15% | 6,634.34 | | |

**TOTAL**      $      **140,780.01**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invioces must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place    Indianapolis, Indiana 46256
(317) 842-8999

| | |
|---|---|
| GENERAL MOTORS CORPORATION<br>WORLDWIDE PURCHASING<br>P.O. BOX 1360<br>FLINT, MI 48501-1360 | **INVOICE #**  **25960**<br>Date    August 31, 2005<br>Purchase Order #    JGB00302<br>Our #    243771/RENT<br>Terms:  Net 10th & 25th |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

MONTHLY RENTAL RATE FOR THE FOLLOWING TYPES OF EQUIPMENT.  DOES NOT INCLUDE
FUEL OR MAINTENANCE COSTS.

| | | |
|---|---|---|
| ITEM 002:  GPR-0243771002<br>    B.  MATERIAL HANDLING EQUIPMENT | 700.00 / MONTH | $700.00 |
| ITEM 004:  GPR-0243771004<br>    D.  HIGHWAY VEHICLE | 350.00 / MONTH | $350.00 |

FOR:    **August 2005**                                    $1,050.00

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

**TOOL & ENGINEERING CO., INC.**
7601 E. 88th Place — Indianapolis, Indiana 46256
(317) 842-8999

| | |
|---|---|
| GENERAL MOTORS CORP.<br>WORLDWIDE PURCHASING<br>P.O. BOX 1360<br>FLINT, MI  48501-1360 | **INVOICE #**     **25961**<br>Date            August 31, 2005<br>Purchase Order #     JBB00302<br>Requisition #     DRD 661042<br>Our #            501<br>Terms:  Net 10th & 25th |

======================================================================

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|
======================================================================

TO COVER LABOR AND MATERIALS FOR BATTERY DEVELOPMENT
PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

| | | | |
|---|---|---|---|
| ITEM 001:  GPR-JGB00302001 | | | |
| PLANT 1 LABOR: | _____ Hrs. @    $27.72 | | |
| DOUBLETIME | _____ Hrs @ 42.00 | | |
| | | | |
| ITEM 002:  GPR-JGB00302002 | | | |
| PLANT 3 LABOR | _____ Hrs. @    $27.72 | | |
| DOUBLETIME | _____ Hrs @ 42.00 | | |
| | | | |
| ITEM 003:  GPR-JGB00302003 | | | |
| PLANT 3 MATERIAL: (SEE ATTACHED) | 3,034.69 | | |
| Plus 15% | 455.20 | | 3,489.89 |

**TOTAL**        **$**        **3,489.89**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place    Indianapolis, Indiana 46256
(317) 842-8999

| | | |
|---|---|---|
| GENERAL MOTORS CORP. | **INVOICE #** | **25962** |
| WORLDWIDE PURCHASING | Date | August 31, 2005 |
| | Purchase Order | JBB00302 |
| P.O. BOX 1360 | Requisition # | DRD 243699 |
| FLINT, MI 48501-1360 | Our # | SEE ATTACHED |
| | Terms: Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

**ITEM 001: GPR-JGB00302001**

| | | | |
|---|---|---|---|
| PLANT 1 LABOR: | 750.75 Hrs.@ | $27.72 | 20,810.79 |
| DOUBLETIME | Hrs.@ | $42.00 | |

**ITEM 002: GPR-JGB00302002**

| | | | |
|---|---|---|---|
| PLANT 3 LABOR | 2,583.50 Hrs.@ | $27.72 | 71,614.62 |
| DOUBLETIME | Hrs.@ | $42.00 | |

**ITEM 003: GPR-JGB00302003**

| | | | |
|---|---|---|---|
| PLANT 3 MATERIAL: (SEE ATTACHED) | 84,850.57 | | |
| Plus 15% | 12,727.59 | | 97,578.16 |

**TOTAL**    $    190,003.57

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended. All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place   Indianapolis, Indiana  46256
(317)  842-8999

GENERAL MOTORS CORPORATION
WORLDWIDE PURCHASING
P.O. BOX 1360
FLINT, MI 48501-1360

| | |
|---|---|
| **INVOICE #** | **25970** |
| Date | September 30, 2005 |
| Purchase Order # | JGB00302 |
| Our # | 243771/RENT |
| Terms:  Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

MONTHLY RENTAL RATE FOR THE FOLLOWING TYPES OF EQUIPMENT.  DOES NOT INCLUDE
FUEL OR MAINTENANCE COSTS.

ITEM 002:  GPR-0243771002
    B.  MATERIAL HANDLING EQUIPMENT    700.00 / MONTH    $700.00

ITEM 004:  GPR-0243771004
    D.  HIGHWAY VEHICLE    350.00 / MONTH    $350.00

        FOR:    **September 2005**    $1,050.00

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

# UNIVERSAL

## TOOL & ENGINEERING CO., INC.
7601 E. 88th Place    Indianapolis, Indiana  46256
(317) 842-8999

GENERAL MOTORS CORP.
WORLDWIDE PURCHASING

P.O. BOX 1360
FLINT,  MI  48501-1360

| | |
|---|---|
| **INVOICE #** | **25978** |
| Date | October 31, 2005 |
| Purchase Order | JBB00302 |
| Requisition # | DRD 243699 |
| Our # | SEE ATTACHED |
| Terms:  Net 10th & 25th | |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|

TO COVER LABOR AND MATERIALS FOR DEVELOPMENT OF
BATTERIES PER COST REIMBURSEMENT CONTRACT BA006 & EXHIBIT B.

**ITEM 001:  GPR-JGB00302001**

| | | | |
|---|---|---|---|
| PLANT 1 LABOR: | 647.50 Hrs.@ | $27.72 | 17,948.70 |
| DOUBLETIME | Hrs.@ | $42.00 | |

**ITEM 002:  GPR-JGB00302002**

| | | | |
|---|---|---|---|
| PLANT 3 LABOR | 2,772.75 Hrs.@ | $27.72 | 76,860.63 |
| DOUBLETIME | Hrs.@ | $42.00 | |

**ITEM 003:  GPR-JGB00302003**

| | | |
|---|---|---|
| PLANT 3 MATERIAL: (SEE ATTACHED) | 51,955.30 | |
| Plus 15% | 7,793.29 | 59,748.59 |

**TOTAL**           $           **154,557.92**

PARTIAL

"We hereby certify that these goods were produced in compliance with all applicable requirements of Sections
6,7, and 12 of the Fair Labor Standards Act, as amended, and of regulations and orders of the United States
Department of Labor issued under Section 14 thereof."
"Seller agrees, in connection with the production of the articles and/or the performance of the services
specified herein, to comply with the requirements of section 12 (a) of the Fair Labor Standards Act of 1938,
as amended.  All invoices must carry the following certificate in order to be passed for payment:
"Seller represents that with respect to the production of the articles and/or the performance of the services
covered by this invoice, it has fully complied with Section 12 (a) of the Fair Labor Standards Act of 1938, as amended."

## LEASE OF INDUSTRIAL OR WAREHOUSE FACILTIES

**THIS LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES (this "Lease"),** is made and entered into as of the _____ day of June, 2001, between UNIVERSAL TOOL AND ENGINEERING COMPANY, INC., an Indiana corporation, with its principal address at 7601 E. 88th Place, Indianapolis, Indiana 46256 ("Landlord"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, with its principal address at 5725 Delphi Drive, Troy, Michigan 48098 ("Tenant").

### ARTICLE 1
### BASIC LEASE PROVISIONS

This Article contains basic information regarding several of the principal terms of this Lease.

Section 1.1    Building and Premises Information:

A.    The "Premises" consist of the 78,930 square foot office and light manufacturing Building located at 8750 N. Hague Road, Indianapolis, IN 46256, and the "Land." The Premises is depicted on Exhibit A to this Lease.

B.    The "Land" is described on Exhibit B-1 to this Lease and is depicted on Exhibit B-2 to this Lease and includes all easements, access rights and other appurtenances which are related to the property which is described and depicted on Exhibits B-1 and B-2.

C.    The building in which the Premises are or will be located (the "Building") is depicted on Exhibit C to this Lease.

D.    The "Project" consists of the Building and the Land. (If the Premises consist of the entire Building and entire Land, then the terms "Premises" and "Project" may be used interchangeably in this Lease. If the Premises do not include the entire Building and Land, then each reference in this Lease to the Project shall be deemed to refer to the "Project, including the Premises" unless a different construction is clearly intended.)

Section 1.2    Term:

A.    Initial Term: The initial term of this Lease (the "Initial Term") will be Five (5) years, commencing upon the "Commencement Date" (as defined in Section 1.2.B) and expiring at 12:00 AM on the Sixth (6th) anniversary of the Commencement Date.

B.    Commencement Date: The "Commencement Date" shall be the later of (i) January 2, 2002, and (ii) five (5) days after the date on which Landlord delivers to Tenant possession of the Premises with "Landlord's Work" (as defined in Article 6 of this Lease) "Substantially Complete" (as defined in Article 6 of this Lease) and in accordance with the other requirements of this Lease. If Landlord delivers to Tenant possession of the "Lead Acid Battery Area," the "LIPO Area" or the "Office Area" (as such areas are depicted on Exhibit C (each an "Early Delivery Area") with Landlord's Work in the applicable Early Delivery Area Substantially Complete, and Tenant commences the conduct of business activities in the applicable Early Delivery Area, then Tenant shall pay to Landlord for the period during which Tenant is conducting business activities in the applicable Early Delivery Area, "Interim Rent" at an annual rate equal to Eight Dollars ($8.00) per

{W0098589.DOC;4}
INDUSTRIAL/WAREHOUSE LEASE
03/07/01


EXHIBIT
D

square foot of floor area in the applicable Early Delivery Area(s) for the period from the date on which Tenant commences business activities in the applicable Early Deliver Area until the Commencement Date.

C.   Projected Delivery of Possession Date:  January 2, 2002.

D.   Projected Access Date:  December 15, 2001.

E.   Option Term(s):  Three (3) option terms of Five (5) years each.

F.   Option Exercise Date:  No later than Sixty (60) days before the expiration of the Initial Term or the then-current Option Term.

G.   Permitted Cancellation Date:  No early termination.

H.   Notice of Cancellation Date:  Not applicable

I.   Daily Delay Charge:  None

Section 1.3   Annual Rent:  $631,440.00

| PERIOD | ANNUAL RENT | MONTHLY INSTALLMENTS |
|--------|-------------|----------------------|
| 1/2/02 – 1/31/07 | $631,440.00 | $52,620.00 |

Section 1.4   Broker(s):   EQUIS Corporation
11611 N. Meridian St., Suite 100
Carmel, IN 46032

Section 1.5   Notice Addresses:  All notices to Landlord shall be addressed to:

Universal Tool and Engineering, Inc.
7601 E. 88th Place
Indianapolis, IN 46256

All notices to Tenant shall be addressed to:

Delphi Automotive Systems LLC
1450 West Long Lake Drive
MC: 480-414-250
Troy, Michigan  48098
Attention:  Director of Real Estate

With a copy to:

Delphi Automotive Systems LLC
1450 West Long Lake Drive
MC: 480-414-250
Troy, Michigan  48098
Attention:  Philip W. Mann

Section 1.6    Permitted Use:  Tenant shall have the right to use the Premises for any lawful purpose.

Section 1.7    Current Zoning:  The Project is currently zoned I-1-S which permits research and development as a conforming use.

Section 1.8    Incorporation of Exhibits and Riders:  Each Exhibit and Rider (if any) which is attached to this Agreement is incorporated in and made a part of this Lease.  In the event of any conflict between the body of this Lease and the provisions of the Exhibits, the provisions in the Exhibits shall be deemed to control.  The Exhibits and Riders (if any) to this Lease are as follows:

| Exhibit | Description | Reference Sections |
| --- | --- | --- |
| A | Depiction of the Premises | 1.1.A |
| B-1 | Description of the Land | 1.1.B |
| B-2 | Site Plan | 1.1.B |
| C | The Building | 1.1.C |
| D | Landlord's Work | Article 6 |
| E | Tenant's Work | Article 7 |
| F | Environmental Condition | Article 18 |
| G | Prior Use of the Project | Article 18 |
| H | Mortgages/Encumbrances/Restrictions | Article 18 |
| I | Memorandum of Lease | Section 31.9 |
| J | Fair Market Rent | Section 3.2 |
| Rider | Single Tenant Building Rider | Section 1.8 |

## ARTICLE 2
## DEMISE OF PREMISES

Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises for the "Term" (as defined in Section 3.3).

## ARTICLE 3
## TERM

Section 3.1    Initial Term:  The Initial Term shall be for the period specified in Section 1.2.A.

Section 3.2    Option Terms:  Tenant shall have the option to extend the Term for the Option Terms identified in Section 1.2.E, upon the same terms and conditions as apply to the Initial Term except for Annual Rent, which shall be equal to Fair Market Rent as determined in accordance with Exhibit J.  If Tenant does not notify Landlord of Tenant's election to extend the Term on or before the Option Exercise Date set forth in Section 1.2.F, then Tenant's right to further extend the Term

{W0098589.DOC;4}

shall expire unless Tenant notifies Landlord that Tenant is exercising its right to extend the Term within ten (10) business days after Tenant receives notice that Tenant did not exercise this right on or before the Option Exercise Date.

Section 3.3    Term:  The "Term" shall consist of the Initial Term and all Option Terms for which Tenant exercises its extension rights.

Section 3.4    Cancellation Option:  Tenant shall have the right to terminate this Lease at any time after the Permitted Cancellation Date set forth in Section 1.2.G.  The termination of this Lease pursuant to this Section 3.4 shall be effective upon the date set forth in the notice of termination Tenant sends to Landlord, which shall be no sooner following the date of Tenant's notice of termination than the Notice of Cancellation Date set forth in Section 1.2.H.  Upon the date of termination, the Term shall expire as if the date of termination was the scheduled date for the expiration of the Term.

## ARTICLE 4
## RENT

Tenant shall pay the Annual Rent to Landlord in equal monthly installments in the amount set forth in Section 1.3.  The monthly installments of Annual Rent shall be due on the Commencement Date and on the first business day of each subsequent calendar month during the Term.  The monthly installments of Annual Rent for partial months at the inception or expiration of the Term shall be prorated.

## ARTICLE 5
## POSSESSION OF PREMISES

Section 5.1    Delivery of Possession; Condition:  Landlord shall deliver possession of the Premises to Tenant in a tenantable condition, free of any debris and equipment or other personal property of Landlord or any prior occupant, with all "Building Systems" (as defined in Section 11.1(c)) and other improvements in good working order and condition and with Landlord's Work Substantially Complete.  Landlord shall use its best efforts to deliver possession of the Premises to Tenant as required under this Lease no later than the Projected Delivery of Possession Date.  If Landlord fails to deliver possession of the entire Premises to Tenant in the condition required under this Lease by May 31, 2002, Tenant shall have the right, in addition to all other remedies available under this Lease, at law or in equity, to terminate this Lease by notifying Landlord before Landlord delivers possession of the Premises to Tenant in the condition required under this Lease.

Section 5.2    Tenant's Right of Entry:  Tenant shall have the right, at any time after Landlord's Work (or Landlord's Work in any Early Delivery Area) is completed to the extent necessary to permit Tenant to commence its installations, and in any event at least three (3) weeks prior to the Commencement Date, to enter upon the Premises to perform "Tenant's Work" (as defined in Article 7), if any, and to install trade fixtures, machinery, equipment and personal property.  Landlord shall use its best efforts to permit Tenant to exercise its rights under this Section 5.2 no later than the Projected Access Date.  Tenant shall not be obligated to pay any Annual Rent or other charges to Landlord with respect to periods prior to the Commencement Date, except as set forth in Section 1.2.B.

## ARTICLE 6
## LANDLORD'S WORK

No later than the Delivery of Possession Date, Landlord shall Substantially Complete the work set forth in Exhibit D-1 in accordance with the "Project Description" which is attached as Exhibit D-2 and the plans and specifications that are listed on Exhibit D-2. (The work referred to in this Article 6 and Exhibits D-1, D-2 and D-3 constitutes "Landlord's Work.") Landlord shall perform Landlord's Work in a good and workmanlike manner, in accordance with all present and future laws, ordinances, rules, regulations, orders, codes, restrictions and other requirements of all governmental authorities that have jurisdiction over the Project (collectively, "Legal Requirements") and in accordance with the other requirements of this Lease. In addition, Landlord shall cooperate with Tenant in scheduling Landlord's Work in a manner that permits Tenant to install Tenant's trade fixtures, equipment, and machinery at such time as will not materially interfere with the performance of Landlord's Work. The phrase "Substantially Complete" means that (i) Landlord's Work has been completed to the extent necessary to permit Tenant to fully utilize the Premises, (ii) only minor items, the completion of which will not interfere with Tenant's ability to use and enjoy the Premises, remain to be completed and (iii) Landlord has received and delivered to Tenant a certificate of occupancy for the Premises.

## ARTICLE 7
## TENANT IMPROVEMENTS

Section 7.1    Tenant's Right to Construct Improvements: Tenant shall have the right to improve, alter, renovate and perform related work in the Premises by painting, decorating, redecorating, and installing partitions, floor coverings, wall coverings, drop ceilings, light fixtures, and by performing the work set forth in Exhibit E (the "Tenant's Work"). Landlord's consent shall be required for any structural alterations to the Premises or any major changes to any Building Systems (collectively, "Major Alterations"). Landlord shall not unreasonably withhold its consent to any Major Alterations which will not materially reduce the value of the Premises. If Landlord does not notify Tenant, within ten (10) business days after Tenant requests Landlord's consent, of the specific reasonable grounds upon which Landlord objects to any Major Alterations for which Tenant requests Landlord's consent, Landlord shall be deemed to have consented to the Major Alterations set forth in Tenant's request for consent. Tenant shall perform all alterations and improvements in a good and workmanlike manner and in accordance with all applicable Legal Requirements. Unless otherwise agreed in writing by the parties, any improvements, alterations, and renovations to the Premises which are made by Tenant shall remain on the Premises upon the expiration or earlier termination of this Lease.

Section 7.2    Liens: If, because of any act or omission of Tenant, any mechanics' lien or similar lien shall be filed against Landlord or any portion of the Project, Tenant shall cause the lien to be discharged of record or bonded within thirty (30) days after Tenant receives from Landlord notice of the filing of the lien. Tenant shall also indemnify and hold harmless Landlord against any "Losses" (as defined in Article 22) resulting from any such lien.

## ARTICLE 8
## UTILITIES

Tenant shall pay for all utility services consumed by Tenant upon the Premises.

## ARTICLE 9
## TAXES

Section 9.1    Landlord's Tax Obligations:    Landlord shall pay all real estate taxes and assessments against the Project (or any portion of the Project) when they are due.

Section 9.2    Tenant's Tax Obligations:    Tenant shall pay all taxes and assessments against Tenant's trade fixtures, equipment, machinery and other personal property at the Premises.

## ARTICLE 10
## TENANT'S PROPERTY

Tenant shall have the right to install, use, replace, substitute, and remove its trade fixtures, equipment, machinery and personal property, including, but limited to, telephone and other communication and information systems equipment and lines, machinery, conveyor systems, task lights, office furniture, and rooftop antennae. Tenant shall repair all damage to the Premises which is caused by Tenant's removal of Tenant's property, subject to reasonable wear and tear, (unless this Lease has been terminated as a result of casualty or condemnation). Landlord waives any statutory, common law or judicial lien on any of Tenant's property.

## ARTICLE 11
## MAINTENANCE AND REPAIRS BY LANDLORD

Section 11.1    General Requirements:  Landlord shall maintain, repair, and replace:

(a)    the Building's roof and roof membranes, walls, floors, foundations, supports, windows, overhead doors, dock levelers, skylights and roof vents, drains, downspouts, and structural components;

(b)    the exterior improvements on the Land, including the parking areas, driveways, curbs, sidewalks and other hard-surfaced areas, and landscaping which are a part of or otherwise serve any part of the Project; and

(c)    all mechanical, electrical, plumbing, utility and other systems which serve any part of the Project, including the heating, ventilating, air conditioning, lighting, electrical, plumbing, gas, water supply, sanitary and storm sewer, storm water drainage, septic and sprinkler systems, the telephone and computer data lines, cables and conduits, and the electrical and other utility supply lines (collectively, the "Building Systems") except as expressly set forth in Article 12.

Section 11.2    Standard of Maintenance:    Landlord shall perform its maintenance, repair and replacement obligations in accordance with all Legal Requirements and in a manner which assures that the portions of the Project which are Landlord's responsibility remain in a good and fully functional condition at all times during the Term.

## ARTICLE 12
## MAINTENANCE AND REPAIRS BY TENANT

During the Term, Tenant shall maintain the Premises and perform routine maintenance (as opposed to replacements or major repairs which would be treated as capital expenses in accordance with generally accepted accounting principals) of the Building Systems which are both located within and exclusively serve the Premises, including the performance of standard

maintenance of the heating, ventilating and air conditioning in the Tenant's office area at Tenant's cost. Landlord shall assign to Tenant or otherwise assure that Tenant has the benefit of all warranties covering any components of the Premises (including the Building Systems located within the Premises) which Tenant is responsible for maintaining.

**ARTICLE 13**
**INSURANCE**

Section 13.1   Tenant's Obligations:   During the Term, Tenant shall maintain Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of at least Two Million Dollars ($2,000,000) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability coverage with limits of not less than $250,000. Upon Landlord's request, Tenant shall deliver to Landlord certificates evidencing the required insurance. The required insurance policies shall provide for no cancellation or material alteration unless Landlord receives thirty (30) days' prior written notice.

Section 13.2   Landlord's Obligations:   During the Term, Landlord shall maintain All Risk Property Insurance for the Project upon a full replacement cost basis, with no co-insurance requirement; Comprehensive General Liability Insurance, including Blanket Contractual Liability coverage, with limits of at least Two Million Dollars ($2,000,000) Combined Single Limit for Personal Injury and Property Damage; Comprehensive Automobile Liability Insurance covering all owned, non-owned and hired vehicles with limits of not less than One Million Dollars ($1,000,000) Combined Single Limit for Personal Injury and Property Damage; and Statutory Workers Compensation and Employers Liability coverage with limits of not less than $250,000. Upon Tenant's request, Landlord shall deliver to Tenant certificates evidencing the required insurance. The required insurance policies shall provide for no cancellation or material alteration without thirty (30) days prior written notice to Tenant.

Section 13.3   Waiver of Subrogation:   Landlord shall cause each insurance policy Landlord carries against loss to any portion of the Project by fire and causes covered by All Risk Property Insurance, and Tenant shall cause each insurance policy Tenant carries against loss to Tenant's equipment, trade fixtures and other personal property at the Premises by All Risk Property Insurance, to provide that the insurance company waives all right of recovery by way of subrogation against Landlord or Tenant in connection with any loss or damage that is covered by Landlord's or Tenant's casualty policies. Neither party shall be liable to the other for any loss or damage caused by fire or any of the risks enumerated in standard extended coverage casualty insurance.

**ARTICLE 14**
**CASUALTY**

Section 14.1   Repair and Restoration:   If the Premises, or any portion of the Project which serves the Premises, is damaged or destroyed and Tenant does not terminate this Lease pursuant to Section 14.2, Landlord shall promptly repair the damage or destruction and restore the Premises and remainder of the Project to substantially the condition that existed immediately before the damage or destruction. If Tenant occupies any portion of the Premises during the repair and restoration, Landlord shall repair and restore the Premises and remainder of the Project in a manner which does not materially interfere with Tenant's use of the Premises. Tenant's obligation

{W0098589.DOC;4}                                    -7-

to pay Annual Rent and other amounts payable by Tenant under this Lease shall abate from the date of the damage or destruction until the completion of all repairs and restoration, in proportion to the extent that the use and occupancy of the Premises by Tenant is materially interfered with, as determined by Tenant, in good faith.

Section 14.2    Tenant's Rights of Termination:  Tenant may terminate this Lease if:

(a)    more than fifty percent (50%) of the Premises is damaged or destroyed;

(b)    the conduct of Tenant's business is materially interfered with as a result of any damage or destruction to the Premises or any other portion of the Project, and Tenant reasonably anticipates that repair and restoration will not be completed within ninety (90) days after the damage or destruction;

(c)    if any repair or restoration of the Premises or any portion of the Project which serves the Premises is not actually completed to the extent necessary to permit Tenant to conduct its business operations without material interference within ninety (90) days after the damage or destruction; or

(d)    a significant casualty which materially affects Tenant's ability to conduct business operations at the Premises occurs during the last twelve (12) months of the Term.

Any notice of termination pursuant to this Section 14.2 must be given by Tenant within ninety (90) days after Tenant's right to terminate becomes effective.   Upon delivery of any notice of termination pursuant to this Section 14.2, this Lease shall terminate as of the date of the damage or destruction unless otherwise provided in the notice, and Tenant shall be relieved of any liabilities or obligations that would arise under this Lease after the date of termination.

## ARTICLE 15
## EMINENT DOMAIN

Section 15.1    Repair and Restoration:  Landlord shall notify Tenant within five (5) business days after Landlord becomes aware that any portion of the Project will be taken or is threatened to be taken under the power of eminent domain or will be conveyed or is proposed to be conveyed in lieu of a taking (each, a "Taking").    If Tenant does not terminate this Lease pursuant to Section 15.2, Landlord shall promptly restore the remaining portion of the Project to as near the condition as existed before the taking as is practicable.   If Tenant occupies any portion of the Premises during the repair and restoration, Landlord shall repair and restore the Premises and remainder of the Project in a manner which does not materially interfere with Tenant's use of the Premises.  Tenant's obligation to pay Annual Rent and other amounts payable by Tenant under this Lease shall abate from the date on which possession of any portion of the Project is taken by the public or quasi-public body in proportion to the extent that the use and occupancy of the Premises by Tenant is materially interfered with, as determined by Tenant in good faith.

Section 15.2    Tenant's Rights of Termination:  Tenant may terminate this Lease if:

(a)    any portion of the Building is the subject of a Taking; or

(b)    any portion of the Project outside of the Building is the subject of a Taking and such Taking materially interferes with Tenant's use of or access to the Premises.

Any notice of termination pursuant to this Section 15.2 must be given within ninety (90) days after the date on which Tenant receives notice of the Taking in sufficient detail to permit Tenant to assess the impact of the Taking. If Tenant delivers a notice of termination pursuant to this Section 15.2, this Lease shall terminate on the date on which possession is given to the Taking authority or its designee unless otherwise provided in the notice from Tenant, and Tenant shall be relieved of any liabilities or obligations that would arise under this Lease after the date of termination.

Section 15.3   <u>Automatic Termination</u>: If the entire Premises is the subject of a Taking, this Lease shall automatically terminate on the date the Taking authority or its designee receives possession of the Premises.

Section 15.4   <u>Condemnation Award</u>: Landlord and Tenant will cooperate in applying for and prosecuting any claim for any Taking or for the negotiation of any payment for a conveyance in lieu of a Taking. All damages awarded for any Taking and any payment for a conveyance in lieu of a Taking, relating to (i) the value of Tenant's unexpired Term (as if all rights to extend this Lease had been exercised), (ii) any improvements made to the Premises by Tenant at its expense, (iii) depreciation to, and cost of removal of, Tenant's stock and trade fixtures, (iv) moving expenses and (v) loss of business shall be paid to Tenant. The balance of the award shall belong to Landlord.

## ARTICLE 16
## DEFAULT; REMEDIES

Section 16.1   <u>Tenant's Default</u>: Each of the following occurrences shall constitute a "Tenant Default":

(a)      if Tenant fails to pay any Annual Rent or other amount due under this Lease within five (5) business days after Tenant receives notice that the unpaid amount is past due; or

(b)      if Tenant fails to perform any other obligation under this Lease within thirty (30) days after Tenant receives notice describing the failure, provided that if Tenant is unable to complete the cure within thirty (30) days due to events beyond the reasonable control of Tenant, the thirty (30) day period will be extended for an additional reasonable period if Tenant commences diligent efforts to cure within thirty (30) days after Tenant receives notice from Landlord and continues to exercise diligent efforts to cure the breach.

Section 16.2   <u>Landlord's Remedies</u>: During the continuance of a Tenant Default, Landlord may exercise any of the following remedies:

(a)      enter upon and repossess the Premises and terminate this Lease, and recover from Tenant all Annual Rent accrued under this Lease on the date of termination;

(b)      enter upon and repossess the Premises by summary proceedings or other lawful means without terminating this Lease, and recover from Tenant any deficiency, as it accrues, between the amount obtained and the Annual Rent payable by Tenant under this Lease; provided, however, that Landlord shall be obligated in such event to exercise good faith efforts to mitigate its damages by reletting the Premises;

(c)      to cure any Tenant Default which relates to a failure of Tenant to maintain the Premises, at Tenant's sole cost and expense, provided that before Landlord exercises this remedy Landlord shall provide to Tenant at least ten (10) business days' written notice; and

(d)    to pursue all other rights and remedies at law or in equity which are consistent with the provisions of this Lease.  Landlord shall not have the right to accelerate Tenant's obligations for the payment of Annual Rent and other charges.

Section 16.3    Landlord Default and Tenant's Remedies:    If Landlord fails to perform any obligation under this Lease within thirty (30) days after Landlord receives notice from Tenant (provided that (i) if Landlord is unable to complete the cure within thirty (30) days due to events beyond the control of Landlord, then the thirty (30) day period will be extended for an additional reasonable period if Landlord commences diligent efforts to cure within thirty (30) days after Landlord receives notice from Tenant and continues to exercise diligent efforts to cure the breach and (ii) notice from Tenant shall not be required in an emergency), then Tenant (in addition to all other rights and remedies to which Tenant may be entitled under this Lease or at law or in equity) may perform the obligation of Landlord, at Landlord's sole cost and expense.  Landlord shall reimburse Tenant for the costs incurred by Tenant for performing Landlord's obligations within thirty (30) days after Tenant delivers to Landlord an invoice evidencing the costs incurred by Tenant, or Tenant may offset the costs and expenses against any Annual Rent or other amounts payable by Tenant under this Lease.

## ARTICLE 17
## BANKRUPTCY

If, during the Term:  (a) Tenant is adjudicated a bankrupt or adjudged to be insolvent; (b) a receiver or trustee is appointed for Tenant's property and affairs; (c) Tenant makes an assignment for the benefit of creditors or files a petition in bankruptcy or insolvency or for reorganization or makes application for the appointment of a receiver; or (d) any execution or attachment is issued against Tenant or any of Tenant's property and the Premises are taken or occupied or attempted to be taken or occupied by someone other than Tenant (except as is permitted under this Lease), and such adjudication, appointment, assignment, petition, execution or attachment is not set aside, vacated, discharged or bonded within one hundred and twenty (120) days after it is issued, then a Tenant Default shall be deemed to have occurred so that the provisions of Section 16.2 shall become effective.  Notwithstanding anything to the contrary set forth in this Article 17, if the Annual Rent due and payable under this Lease shall continue to be paid and the other covenants, conditions and agreements of this Lease on Tenant's part to be kept and performed shall continue to be kept and performed, no Tenant Default shall have been deemed to have occurred and the provisions of Article 16 shall not become effective.

## ARTICLE 18
## REPRESENTATIONS, WARRANTIES AND COVENANTS

Landlord represents, warrants and covenants to Tenant as follows:

(a)    the Project (including the Premises) complies with all Legal Requirements.

(b)    the Project does not contain any "Hazardous Substances" (as defined in Section 20.3), except as disclosed on Exhibit F;

(c)    the Project does not contain any underground or aboveground fuel storage tanks or related piping, venting, or dispensing systems (collectively, "Fuel Tanks"), and Landlord shall not

install, cause to be installed, or permit the installation of any Fuel Tanks within the Project during the Term;

(d)       the past uses of the Project are as disclosed in Exhibit G and there has not been any storage, treatment, recycling, or disposal of waste on the Project, except for storage of trash in containers in compliance with applicable federal, state, and local laws, ordinances, and other governmental requirements;

(e)       Landlord is the fee simple owner of the Premises with full authority to execute, deliver, and perform this Lease;

(f)       no mortgage or deed of trust or other lien or restriction encumbers the Premises, except as set forth in Exhibit H, and the encumbrances set forth on Exhibit H will not interfere with Tenant's use of the Premises for Permitted Uses purposes or increase any of Tenant's obligations under this Lease;

(g)       the Premises are currently zoned as set forth in Section 1.7;

(h)       there is no action pending or, to the best of Landlord's knowledge, threatened by any government agency claiming that the Premises violates any Legal Requirements or to restrict the use of the Premises;

(i)       there is no pending or threatened Taking with respect to the Project;

(j)       there are no actions, suits, petitions, notices or proceedings pending, given or, to the best of Landlord's knowledge, threatened by any person or government agency before any court, government agency or instrumentality, administrative or otherwise, which if given, commenced, or concluded could have a material adverse effect upon the Project or the conduct of business at the Premises by Tenant;

(k)       there are no pending or threatened assessments, special or otherwise, on or with respect to the Project imposed by any taxing authority; and

(l)       no third party has any right, title, or interest adverse to Tenant's right, title, and interest in or to the Premises.

### ARTICLE 19
### COMPLIANCE WITH LEGAL REQUIREMENTS

Section 19.1   Compliance by Landlord: Notwithstanding any other provision of this Lease, if any improvements, alterations, or renovations to any portion of the Project is required by any Legal Requirement, then Landlord shall promptly perform the required improvements, alterations, or renovations, provided that Landlord shall not be responsible for any alterations or improvements to the Premises that are required under Legal Requirements (i) solely as a result of the use and occupancy of the Premises by Tenant for the conduct of its particular business operations (as opposed to industrial or warehouse use in general) or (ii) solely as a result of any alterations or improvements Tenant makes to the Premises.

Section 19.2   Compliance by Tenant:   Tenant shall comply with all Legal Requirements that apply to Tenant's particular business operations at the Premises or to any alterations or improvements Tenant makes to the Premises.   No alleged violation by Tenant of any Legal

Requirement shall be deemed to constitute a Tenant Default if Tenant contests, in good faith, the validity of the applicable Legal Requirement, or the existence of the alleged violation. If required by any law, ordinance, or requirement in effect at the time, Landlord shall join in any proceedings initiated by Tenant pursuant to this Section 19.2 or permit the same to be brought in its name, as applicable, provided that Tenant shall pay all costs and expenses in connection therewith, including reasonable costs and expenses incurred by Landlord.

## ARTICLE 20
## ENVIRONMENTAL MATTERS

Section 20.1    Landlord Responsibility for Hazardous Substances:  If any Hazardous Substances are discovered on or at any portion of the Project in violation of any Legal Requirements or in quantities that present any threat of harm to human health or safety other than as a result of the acts or wrongful omissions of Tenant or its employees or contractors, then Landlord shall (i) promptly notify Tenant of such condition and (ii) immediately cause such condition to be remediated in compliance with all Legal Requirements. Landlord shall indemnify Tenant pursuant to the provisions of Article 22 against any Losses which Tenant incurs in connection with any such condition.

Section 20.2    Tenant Responsibility for Hazardous Substances:    If Tenant releases any Hazardous Substances at the Project in violation of any Legal Requirements or in quantities that present any threat of harm to human health or safety, then Tenant shall (i) promptly notify Landlord of such condition and (ii) immediately cause such toxic or hazardous condition to be remediated in compliance with all Legal Requirements.    Tenant shall indemnify Landlord pursuant to the provisions of Article 22 against any Losses which Landlord incurs in connection with any such condition.

Section 20.3    Definition of Hazardous Substances:  As used in this Lease, the phrase "Hazardous Substances" means any hazardous substances as defined in Section 101(14) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended, 42 U.S.C. §9601(14), hazardous wastes as defined in Section 1004(5) of the Resource Conservation and Recovery Act, as amended, 42 U.S.C. §6903(5), extremely hazardous substances as defined in the Emergency Planning and Community Right-To-Know Act of 1986, 42 U.S.C. §11001 et seq. and any other hazardous or toxic substances or wastes as defined in any federal, state, county or local statutes, laws, regulations, rules, ordinances, or codes relating to environmental matters, including the Clean Air Act, the Federal Water Pollution Control Act of 1972, the Resource, Conservation and Recovery Act of 1976, the Comprehensive Environmental, Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, the Federal Hazardous Materials Transportation Act, the Toxic Substance Control Act, any amendments or extensions of any such acts, any rules, regulations, orders, standards or guidelines issued pursuant to any such acts, and all other applicable environmental standards or requirements. Hazardous Substances also include any petroleum or asbestos containing materials.

## ARTICLE 21
## LANDLORD'S RIGHT OF ENTRY

Following reasonable notice to Tenant, Landlord may enter upon the Premises at reasonable times to perform maintenance and repairs, inspect the Premises, offer the Premises for lease during the period which commences sixty (60) days before the expiration of the Term or offer the Project for sale. Landlord shall not unreasonably or materially interfere with the use of the

Premises by Tenant when Landlord exercises its rights under this Article 21.   Landlord
acknowledges that Tenant may conduct operations in all or a portion of the Premises which are
of a highly confidential and sensitive nature.  Accordingly, Landlord agrees that Tenant shall
have the right to impose conditions upon any entry and related activities of Landlord as Tenant
determines to be necessary or appropriate to maintain the confidentiality of Tenant's activities,
including requiring that the representatives of Landlord, and its agents, employees and
contractors, be accompanied at all times by representatives of Tenant, and establishing
particular secured areas into which Landlord and its agents, employees and contractors shall
have no right of entry until the activities and operations being conducted in such secured areas
can be moved to another area or screened from view.

### ARTICLE 22
### MUTUAL INDEMNIFICATION

Subject to the waivers set forth in Section 13.3, Landlord and Tenant each agree to
indemnify, hold harmless and, at the option of the indemnified party, defend the indemnified party
from and against any and all damages, losses, settlement payments, obligations, liabilities,
claims, actions, causes of action, encumbrances, fines, penalties, costs and expenses of any
nature (including reasonable fees and disbursements of attorneys, engineers, laboratories,
contractors and consultants) which are suffered, sustained, incurred or required to be paid by
the indemnified party (collectively, "Losses") as a result of (a) any breach of any warranty,
representation, covenant or agreement of the indemnifying party under this Lease and (b) any
injury to or death of persons or damage to property on or about the Project which is attributable to
the negligence or misconduct of the indemnifying party, or its officers, employees, agents,
contractors, or invitees.  Neither party shall be obligated to indemnify the other party against any
Losses arising out of the negligence or misconduct of the other party or any of its officers,
employees, agents, contractors, or invitees.

### ARTICLE 23
### TRANSFERS

Section 23.1   Landlord's Consent to Assignment:  Except as provided in Section 23.2, Tenant
shall not assign this Lease unless Landlord consents, which consent shall not be unreasonably
withheld or delayed and shall be deemed to have been granted if Landlord does not notify Tenant
of Landlord's specific reasonable basis for any denial of consent within ten (10) days after Tenant
requests the consent.

Section 23.2   Permitted Assignments:   Tenant shall have the right, without the consent of
Landlord, to assign this Lease to any affiliate of Tenant or any entity which acquires the business
conducted at the Premises.

Section 23.3   No Release of Tenant:  Unless Landlord agrees, no assignment of this Lease or
subletting of all or any portion of the Premises shall relieve Tenant of any of Tenant's obligations
under this Lease.

Section 23.4   Notice of Transfer by Landlord:  If Landlord transfers, assigns, or otherwise conveys
all or any portion of its interest in and to the Project, Landlord shall notify Tenant of the name and
address of the transferee at least ten (10) days prior to the date of the transfer.  Tenant shall have
no obligation to any transferee until Tenant receives notice from Landlord which identifies the
transferee and evidence that the transferee has assumed Landlord's obligations arising under this
Lease.

## ARTICLE 24
## HOLDING OVER

If Tenant occupies the Premises after the expiration of the Term, this Lease shall continue on a month-to-month basis, provided that Tenant shall only remain liable for payment of Annual Rent and other charges under this Lease until Tenant vacates the Premises.

## ARTICLE 25
## QUIET ENJOYMENT

Landlord covenants that Tenant shall have the peaceful and quiet possession and enjoyment of the Premises during the Term without hindrance by Landlord or any other party.

## ARTICLE 26
## SUBORDINATION AND ATTORNMENT; ESTOPPEL CERTIFICATES

Section 26.1   Subordination:  This Lease shall be subordinate to any existing or future mortgage or deed of trust in favor of an institutional lender (each, a "Mortgage") that encumbers the Premises if the mortgagee or the beneficiary of the deed of trust (each, a "Mortgagee") executes and delivers to Tenant a non-disturbance, attornment and subordination agreement which is not inconsistent with the provisions of this Lease and which states (in addition to any other reasonable terms) that (i) if Landlord is not exercising its remedies for a default by Tenant under this Lease, the Mortgagee will not interfere with Tenant's rights under this Lease in the exercise of any rights under its Mortgage, and any sale of the Premises pursuant to the exercise of any rights under its Mortgage or otherwise shall be made subject to Tenant's rights under this Lease; (ii) Tenant shall attorn to any mortgagee or purchaser at a foreclosure sale (a "Purchaser") upon acquisition of title to the Premises by the Mortgagee or Purchaser and notice to Tenant evidencing the acquisition by the Mortgagee or Purchaser; and (iii) the Mortgagee or Purchaser shall agree to perform all of the obligations of Landlord that arise after the date it acquires the Premises, and this Lease shall continue in full force and effect between Tenant and such Mortgagee or Purchaser.

Section 26.2   Existing Mortgagees:  Within thirty (30) days after the date of this Lease, Landlord shall deliver to Tenant a non-disturbance and attornment agreement from the Mortgagee under each Mortgage covering the Premises, including all Mortgages set forth in Exhibit H.  If Landlord fails to obtain all required non-disturbance and attornment agreements within the required thirty (30) day period, then Tenant may, at its option, terminate this Lease.

Section 26.3   Estoppel Certificates:  Each party agrees to execute estoppel certificates containing the substance of the following statements (together with other reasonable terms), modified as may be necessary to reflect the then-current state of facts:  (i) that the copy of the Lease attached to the certificate is true and complete and there are no amendments, modifications, or alterations of the Lease, except as stated; (ii) the date on which Tenant accepted possession of the Premises; (iii) that Tenant now occupies the Premises; (iv) the date on which Tenant began paying monthly installments of Annual Rent under the Lease; (v) that no installment of Annual Rent has been paid more than one month in advance; (vi) that the Lease is in full force and effect; and (vii) to the actual knowledge of the certifying party, there are no defenses or offsets to enforcement of the Lease by the other party, and the other party is not in default under the Lease.

{W0098589.DOC;4}                                          – 14 –

### ARTICLE 27
### SURRENDER OF PREMISES

Upon the expiration of the Term, Tenant shall deliver up and surrender the Premises to Landlord subject to (a) Tenant's permitted improvements, alterations, and renovations to the Premises, including Tenant's Work; (b) normal wear and tear; (c) damage by fire, explosion, or other insurable casualty; (d) repairs and restoration for which Tenant is not responsible under this Lease; and (e) Tenant's removal of its trade fixtures and other property in accordance with Article 10.

### ARTICLE 28
### BROKERS

Landlord and Tenant each warrant and represent that it has not dealt with any real estate broker, finder, or agent in connection with this Lease other than the broker, finder, or agent identified in Section 1.4.

### ARTICLE 29
### NOTICES

No notice, approval, consent or other communication authorized or required by this Lease shall be effective unless it is in writing and sent postage prepaid by United States registered or certified mail, return receipt requested, or by recognized overnight delivery service, and addressed to the other party at the addresses set forth in Section 1.5, or such other address as the addressee may designate by notice given from time to time in accordance with this Article 29. Notices shall be effective upon receipt or refusal or failure to accept receipt.

### ARTICLE 30
### SIGNS

Tenant shall have exclusive sign rights for the Premises, exterior and interior, and shall have the right to erect and display signs on the Premises and on such other areas of the Project as Landlord approves in Landlord's reasonable discretion. Tenant's signage shall comply with all Legal Requirements.

### ARTICLE 31
### MISCELLANEOUS

Section 31.1   Entire Agreement; Amendments:   This Lease contains the entire agreement between the parties.   No promise, representation, warranty, covenant, agreement, or understanding that is not specifically set forth in this Lease shall be binding upon or inure to the benefit of either party. This Lease may not be amended, altered, modified, or supplemented in any manner except by an instrument in writing duly executed by the party against which enforcement is sought.

Section 31.2   Governing Law:  This Lease shall be construed and enforced in accordance with the laws of the state in which the Project is located.

Section 31.3   Landlord's Liability:

(a)    If Landlord sells or conveys the Premises after Landlord's Work is Substantially Complete, all liabilities and obligations on the part of Landlord that accrue under this Lease after the sale or conveyance shall terminate, and all such liabilities and obligations shall be binding upon the new owner; provided such new owner assumes in writing all of Landlord's obligations under this Lease.

(b)    If Landlord fails to perform any covenant, term or condition of this Lease upon Landlord's part to be performed after Landlord's Work is Substantially Complete, and Tenant recovers a money judgment against Landlord, the judgment shall be satisfied only against the right, title and interest of Landlord in the Project and out of rents or other income from the Project receivable by Landlord  or out of the consideration received by Landlord from the sale or other disposition of all or any part of Landlord's right, title and interest in the Project, and neither Landlord nor any of the members or partners of Landlord shall be personally liable for any deficiency.

Section 31.4   Authority: If Landlord or Tenant is a corporation, trust, or general or limited partnership, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on behalf of such entity.

Section 31.5   Binding Effect: The provisions of this Lease shall be binding upon and shall inure to the benefit of the parties and their respective heirs, executors, administrators, personal and legal representatives, successors, and assigns.

Section 31.6   Approval/Consent:  Whenever Landlord's approval is required under this Lease, such approval shall not be unreasonably withheld (except as expressly permitted under this Lease) or delayed.  If Tenant requests Landlord's approval or consent and Landlord fails to respond in writing within seven (7) business days following delivery of Tenant's written request, then Tenant's request shall be deemed approved.

Section 31.7   Force Majeure:  In the event that Landlord or Tenant are delayed, hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor troubles, inability to procure materials, failure of power, restrictive governmental laws or regulations, riots, insurrection, the act, failure to act or default of the other party, war or other reason beyond their control (collectively, "Force Majeure Events"), then performance of such act shall be excused for the period of the delay attributable to the Force Majeure Event and the period for the performance of any such act shall be extended for a period equivalent to the period of delay attributable to the Force Majeure Event.  Force Majeure Events shall not (a) delay Tenant's obligations to pay Annual Rent and other charges under this Lease or (b) extend the dates on which Tenant may exercise its rights under Section 5.1.

Section 31.8   No Waiver:  The failure of Landlord or Tenant to insist upon strict performance of any of the terms, conditions, covenants, and obligations contained in this Lease shall not be deemed a waiver of any rights or remedies for any subsequent breach or default in the terms, conditions, covenants, and obligations contained in this Lease, provided that Landlord shall not assert against Tenant any claims arising under this Lease unless Landlord notifies Tenant of the claim within sixty (60) days after Landlord becomes aware of the facts or circumstances which give rise to the claim and, in any event, within six (6) months following the expiration of the Term or earlier termination of this Lease.

Section 31.9   Recording:   If Landlord or Tenant requests, the parties shall execute and acknowledge a short form of lease in the form attached as Exhibit I for recording purposes, which

short form of lease shall be recorded at the expense of the party requesting the same, which party shall pay any documentary transfer tax or other special tax or assessment associated with or triggered by such recording.

Section 31.10  Rules of Construction:

(a)    Section headings in this Lease are intended for convenience and reference purposes only and shall not be used to construe or interpret this Lease.

(b)    When the word "including" is used in this Lease, it means "including, but not limited to" unless it is clearly intended to mean "including only."

(c)    Whenever this Lease states that Landlord or Tenant shall perform any act, the act shall be performed at the sole cost and expense of the party which is obligated to perform, unless this Lease expressly provides to the contrary.

(d)    The fact that this Lease has been prepared by the attorney for either Landlord or Tenant shall not be used to construe or interpret this Lease for or against either party; the parties intend that the provisions of this Lease shall be given their fair meaning and no court shall construe this Lease more stringently against one party than against the other.

Section 31.11  Severability:  If any provision of this Lease shall be determined by any court to be invalid, illegal, or unenforceable to any extent, then the remainder of this Lease shall not be affected, and this Lease shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in this Lease.

Section 31.12  Transmittal:  Submission of this Lease for examination, even though executed by Landlord or Tenant, shall not bind the other party in any manner, and no lease or other obligation on the part of either party shall arise until this Lease has been executed by Landlord and Tenant and fully executed copies of this Lease have been delivered to Landlord and Tenant.

Section 31.13  Counterparts:  This Lease may be executed in two (2) or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Delivery by facsimile of this Lease or an executed counterpart hereof shall be deemed a good and valid execution and delivery hereof.

**IN WITNESS WHEREOF,** Landlord and Tenant have entered into this Lease of Industrial or Warehouse Facilities as of the date set forth in the Preamble to this Lease of Industrial or Warehouse Facilities.

In the presence of:

_Robert L. Lassetter_

_____

UNIVERSAL TOOL AND ENGINEERING COMPANY, INC., an Indiana corporation

BY _F. S. Jenkins_

                                President

ATTEST_____

                                Secretary

In the presence of:

_Philip TD Mann_

_Melissa R. Dalton_

DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company

By:   Delphi Automotive Systems Corporation, a Delaware corporation

Its:   Managing Member

By: _____

Its:   Authorized Signatory

LEGAL APPROVED for execution
Miro Weiner & Kramer
By: Sean P. Corcoran   SPC

STATE OF  INDIANA   )
                    ) ss.
COUNTY OF  MARION   )

The foregoing instrument was acknowledged before me this __18TH__ day of __JUNE__, 2001, by __F.S. JENKINS__, the __PRESIDENT__ of Universal Tool and Engineering Company, Inc., an Indiana corporation, on behalf of said corporation.

_Cynthia N. Morris_

CYNTHIA N. MORRIS  , Notary Public
MARION        County,
My commission expires: __03-14-08__

STATE OF _Michigan_ )
                        ) ss.
COUNTY OF _Oakland_ )

TRAUTE A. VALUET
NOTARY PUBLIC, MACOMB COUNTY, MI
ACTING IN OAKLAND COUNTY, MI
MY COMMISSION EXPIRES APR 8, 2004

The foregoing instrument was acknowledged before me this _27_ day of _June_, 2001, by _John A. Jaffurs_, the Authorized Signatory of Delphi Automotive Systems Corporation, a Delaware corporation, which is the Managing Member of Delphi Automotive Systems LLC, a Delaware limited liability company, on behalf of it.

_Traute A. Valuet_
_____, Notary Public
_Macomb_ County, _MI_
My commission expires: _4-8-2004_



## EXHIBIT B-1

## LEGAL DESCRIPTION

A part of the Southeast Quarter of Section 14, Township 17 North, Range 4 East, situated in Lawrence township, Marion County, Indiana, being more particularly described as follows:

Commencing at the Northeast corner of the said Southeast Quarter Section; thence South 00 degrees 00 minutes 00 seconds West (assumed bearing) on and along the South line of said Quarter Section, 1, 486.75 feet to the POINT OF BEGINNING of this description; thence continuing South 00 degrees 00 minutes 00 seconds West on and along said South line 400.00 feet; thence South 89 degrees 42 minutes 40 seconds West 1,231.05 feet; thence North 00 degrees 03 minutes 38 seconds West 400.00 feet; thence North 89 degrees 42 minutes 40 seconds East 1,231.47 feet to the POINT OF BEGINNING and containing 11.3062 acres, more of less.

Subject to a certain Grant of Easement executed by the Grantor on the 2nd day of August, 1977, and recorded as Instrument #77-77901 on November 18, 1977 in the Office of the Recorder, Marion County, State of Indiana.

Subject to a certain Right of Way Grant in and along the Easternmost boundary consisting of approximately 0.1469 acres

Subject to Zoning commitments undertaken in zoning cases #77-Z-25 and #77-Z-26 as modified under approval cases #77-AP-170

## EXHIBIT B-2

### SITE PLAN

**SEE EXHIBIT A**

{W0098589.DOC;4}





EXHIBIT D-1

LANDLORD'S WORK

I.    DESCRIPTION  OF  BASE  BUILDING  IMPROVEMENTS  AND  ADDITIONAL
      IMPROVEMENTS

         Landlord's  Work  shall  consist  of  the  "Base  Building  Improvements"  and  the
"Additional  Improvements."  The  "Base  Building  Improvements"  shall  consist  of  the
improvements  described  in  the  Project  Description  which  is  attached  at  Exhibit  D-2  (the
"Project  Description")  and  described  or  shown  in  the  plans  and  specifications  which  are
listed  on  Exhibit  D-3  (the  "Plans  and  Specifications")  and  shall  include  all  work  which  is
reasonably  inferable  from  the  Project  Description  or  the  Plans  and  Specifications.  The  Base
Building  Improvements  are  being  provided  by  Landlord  in  the  base  Annual  Rent  lease  rate
at  no  additional  cost  to  Tenant.  The  cost  of  the  Additional  Improvements  which  is
approved  by  Tenant  as  set  forth  in  this  Exhibit  D-1  shall  be  payable  as  "Improvements
Rent"  as  set  forth  in  this  Exhibit  D-1.

II.   PROCEDURE  FOR  DESIGN  AND  CONSTRUCTION  OF  ADDITIONAL
      IMPROVEMENTS

         The  following  procedural  steps  shall  be  followed  to  design,  determine  the  cost  of,
and  construct  the  Additional  Improvements:

      A.    Preparation of Plans

            1)    Landlord,  at  Tenant's  reasonable  cost  and  expense,  shall  retain  an
                  architect  and  an  engineer,  each  of  which  are  licensed  by  the  State  of
                  Indiana  and  are  approved  by  Tenant,  in  the  exercise  of  its  reasonable
                  discretion  (as  so  approved,  the  "Architect"  and  the  "Engineer"),  to
                  prepare  preliminary  plans  and  specifications  (the  "Preliminary  Plans")  for  the
                  construction  of  the  Additional  Improvements  in  accordance  with  the
                  criteria  established  by  Tenant  (the  "Design  Criteria").  The  Preliminary
                  Plans  shall  be  delivered  to  Tenant  no  later  than  ten  (10)  business  days
                  after  Tenant  delivers  the  Design  Criteria  to  Landlord.

                  The  Preliminary  Plans  shall  address  all  architectural  and  mechanical
                  components  of  the  Additional  Improvements;  including,  without  limitation,
                  all  utility,  electrical,  plumbing,  sewer,  and  heating,  ventilating  and  air
                  conditioning  systems  and  all  other  improvements  that  are  necessary  to
                  construct  the  Additional  Improvements  in  accordance  with  the  Design
                  Criteria.  Nothing  contained  in  this  Exhibit  D-1  or  in  the  Design  Criteria
                  shall  make  Tenant  responsible  for  the  cost  of  any  Base  Building
                  Improvements.

                  After  Tenant  receives  the  Preliminary  Plans,  Tenant  shall  provide  notify
                  Landlord  of  any  changes  or  modifications  which  are  required  in  order  to
                  satisfy  the  Design  Criteria  or  any  other  reasonable  requirements  of

{W0099961.DOC;4}                          1

Tenant. Within five (5) business days after Landlord receives written notice identifying Tenant's required changes, Landlord shall incorporate the required changes into the Preliminary Plans and resubmit the Preliminary Plans to Tenant for its approval. This process will be repeated until the Preliminary Plans are approved by Tenant, at which time the Preliminary Plans that have been approved by Tenant shall constitute the "Approved Preliminary Plans."

2) Within ten (10) days after Tenant approves the Approved Preliminary Plans, Landlord shall prepare and submit to Tenant for its approval, working drawings and specifications prepared by the Architect and the Engineer for the Additional Improvements (the "Preliminary Working Drawings"). The Preliminary Working Drawings shall include complete, detailed, biddable and buildable plans and specifications with respect to all matters that are addressed in the Approved Preliminary Plans. Tenant's approval of the Preliminary Working Drawings shall not be unreasonably withheld to the extent the same are consistent with the Design Criteria, the Approved Preliminary Plans and the other requirements of the Lease. Within five (5) business days after Landlord receives written notice identifying Tenant's required changes to the Preliminary Working Drawings, Landlord shall incorporate the required changes into the Preliminary Working Drawings and resubmit the Preliminary Working Drawings to Tenant for its approval. This process will be repeated until the Preliminary Working Drawings are approved by Tenant, at which time the Preliminary Working Drawings that have been approved by Tenant shall constitute the "Approved Working Drawings."

B. Establishment of Cost of Additional Improvements

1) Landlord and Tenant shall agree on a minimum of two (2) qualified vendors, at least one of which shall have been selected by each party and approved by the other party, which approval shall not be unreasonably withheld or delayed, to bid on each of the components of the Additional Improvements.

2) Landlord shall have an open book approach for all costs related to each component of the Additional Improvements, including design costs, material costs, and installation costs. These costs are to be formally reviewed by a representative of Tenant, and that individual will approve and authorize such work on the behalf of Tenant. No contracts or subcontracts for the Additional Improvements shall be awarded without the prior written approval of Tenant.

3) When an unrelated third party subcontractor or materialman is awarded the contract for construction of any Additional Improvements, Tenant acknowledges that Landlord is to mark-up the final Tenant-approved cost by 20% as the sole payment for Landlord's management of the Additional Improvements and the timely execution of said work, including all general conditions, overhead and profit.

4)   Within ten (10) business days (or such additional period of time as is reasonably required to obtain cost information) after Tenant approves the Approved Working Drawings for each component of the Additional Improvements, Landlord shall advise Tenant in writing as to the costs of constructing the applicable component of the Additional Improvements. Landlord's written statement of the costs of constructing the Additional Improvements shall include (a) all items of work to be done, (b) the contractor or subcontractor to perform each item of work or the materialmen to supply materials, (c) the cost to complete each item, (d) the total cost, and (e) any and all estimates or proposals or similar information establishing such costs.

5)   Tenant shall have ten (10) working days after Tenant receives Landlord's written statement of the costs of the Additional Improvements within which either to modify the Additional Improvements, accept Landlord's cost figures or notify Landlord that Tenant and Landlord must negotiate in good faith regarding the cost of any portions of the Additional Improvements with respect to which Landlord and Tenant have not reached agreement upon cost. (Tenant shall always have the right to require that Landlord accept the lowest bid.) Failure of Tenant to modify its plans or to give Landlord notice of its election to further negotiate the cost of any Additional Improvements within such ten (10) working day period shall constitute acceptance by Tenant of Landlord's cost.

6)   No leasehold improvement work or payment of said work will be the responsibility of Tenant unless authorized by a representative of Tenant. Authorization will only be given in a written format to proceed with any Additional Improvements.

7)   The cost to complete the Additional Improvements shall be established by Waivers of Liens and a Sworn Statement itemizing the work done, the contractor performing each item of work, the cost to complete each item, and the total cost, certified by Landlord and its general contractor and architect (if any), and supported by evidence that the Additional Improvements have been paid for in full. Upon Tenant's written request and at reasonable times, Tenant shall have the right to examine and audit Landlord's and any affiliated contractors' books and records covering the cost to complete the Additional Improvements, in order to substantiate the information contained in the Sworn Statement and Waivers of Liens.

8)   Prior to the actual Commencement Date of the Term of the Lease, Landlord and Tenant will review, finalize, and fully agree to the total cost of the Additional Improvements, to the extent such costs can be determined at that time, it being understood and agreed that if the total costs cannot be confirmed prior to the actual Commencement Date, Landlord and Tenant shall agree upon the total costs as soon as possible following the actual Commencement Date and any necessary adjustments of the "Improvements Rent" (as defined below) shall be made at such time as they have so agreed. Once this is completed

and agreed upon by both parties, the Additional Improvements cost will be divided by 120 to arrive at the additional monthly obligation of Tenant to be paid for the construction of the Additional Improvements (the "Improvements Rent"). This amount, on a per square foot basis will be in addition to the Annual Rent rate of $8.00 per square foot, gross industrial. Both parties will agree by no later than December 15, 2001, as to the amount that has been spent on the Additional Improvements and agree on the amount that will constitute the Improvements Rent. Tenant will pay the Improvements Rent in monthly installments together with the Annual Rent, for the Initial Term and, if applicable, the first five (5) year Option Term of the Lease. If Tenant does not renew the Lease for one (1) additional five (5) year Option Term, it will be the Tenant's responsibility to pay Landlord fifty percent (50%) of the total cost of the Additional Improvements.

For example:

If the total cost of the Additional Improvements is $1,000,000.00, then $1,000,000/120 months = $8,333.33 per month additional lease payments to Tenant, or an additional $1.27 per square foot based upon a base building size of 78,930 SF.

Base Annual Rent rate is $8.00 PSF ($631,440.00 annually) plus $1.27 PSF Improvements Rent ($100,000.00 annually). New lease rate for aggregate Annual Rent and Improvements Rent for Tenant would be $9.27 PSF, gross industrial or $731,440.00 of annual lease obligation.

The following components (not limited to this list) are considered Additional Improvements:

Building Infrastructure Improvements
1.    480 V Bus Duc Distribution System
2.    A/C System (60,000 ft2, Dry Room not included)
3.    (2) 50 hp Compressed Air System (3" Loop)
4.    Specialty Task Lighting

LiPo Lab & Offices:
1.    Office Furniture System (60 people)
2.    Additional Fire Protection
3.    Argon Pad & Distribution
4.    CO2 Pad & Distribution
5.    Ventilation System
6.    IT Infrastructure (Security, Comm, Etc.)

Battery Lab:
1.    1,000 ft2 Acid Brick – Teardown Area

2.    Additional 4,000 ft2 Acid Res. Floor Area – Opt'l
3.    Ventilation System with Scrubber
4.    RO Water System
5.    Additional Fire Protection

III.    INSPECTIONS BY TENANT; PROGRESS

Throughout the construction process, Tenant shall have the right to inspect or have a consultant retained by Tenant inspect and observe the construction of Landlord's Work. Tenant's observation of construction and approval of plans and other matters shall not waive or limit any of Landlord's obligations to complete Landlord's Work in accordance with the requirements of the Lease.

IV.    CHANGE ORDERS

Tenant shall have the right to require (i) that Landlord construct improvements at the Premises in addition to or different than those required under the Approved Working Drawings and (ii) changes to the Landlord's Work, by issuing a change order ("Change Order") to Landlord. Tenant shall have the right to require that Change Orders be competitively bid, and to approve the final bids before Change Orders are implemented.  Landlord agrees to promptly bid any change orders which Tenant requests be bid, with at least two bidders selected in accordance with Paragraph II.B.1) if so required by Tenant.

V.    WARRANTIES

Landlord shall assign to Tenant or otherwise permit Tenant to have the benefit of all warranties by Landlord's contractor and its subcontractors, as well as all manufacturers' warranties with respect to materials that are incorporated into the Additional Improvements. Landlord further guarantees the Landlord's Work against defects in workmanship and materials for a period of one (1) year following the Commencement Date.

**EXHIBIT D-2**

# PROJECT DESCRIPTION

## GENERAL CHARACTETISTICS

   A. Building Size & Location

      8750 N. Hague Road Building 7

| | | |
|---|---|---|
| Warehouse | 178' x 375' | 66,750 SF |
| Office  1ˢᵗ.floor | 84' x 145' | 12,180 SF |
| | Total | 78,930 SF |

   B. Building Dimensions:
          178' x 459'

## GENERAL CONDITIONS

   A. UTE will provide all support personnel, temporary utilities, and structures for on-site supervision. All testing for soils, concrete, and structural connections will be provided before occupancy.

   B. All architectural, civil, structural, mechanical, electrical engineering, interior color selection, landscape design and construction documents will be provided.

   C. Building permit and site work related permits have been included.

## SITEWORK

   A. All site work costs including site clearing, topsoil stripping, storm sewers, utilities, and preparation will be provided to accommodate all paving areas, building pad, and landscape area for the Building 7 plans.

   B. Granular fill shall be placed under slab-on-grade and used as interior backfill at the continuous footings. The fill depth shall be 6"mimunim.

   C. Heavy duty asphalt paving at the dock area and truck access shall have a base of #2 stone at 6" deep and #53 stone at 3" deep. The base shall have a final density of 90% of maximum density as determined by the Modified Proctor test. Asphalt binder shall be 3" deep, having (1) layer of crushed stone and sand with 4.5% to 5.0% asphalt. The surface course shall be 1" deep, having one (1) layer of sand-stone composition with 6% to 6.5% asphalt.

   D. Regular duty asphalt paving at the car parking lot shall have a base of #2 stone at 4" deep and #53 stone at 2" deep. The base shall have a final density of

### PROJECT DESCRIPTION

90% of maximum density as determined by the Modified Proctor test. The surface course shall be 1"deep, having one (1) layer of crushed course stone and sand with 4.5% to 5% asphalt. The surface course shall be 1" deep, having one (1) layer of sand stone composition with 6% to 6.5% asphalt. Pavement striping is included as shown on enclosed site layouts.

E. Site concrete consists of 60" wide six-inch (6") thick (increased to 8" the last 20') concrete dolly area located along length of dock walls. Concrete strength shall be 4,000 psi at 28 days. 6" stone base of # 8 under truck paving is included.

F. 5' wide 4,000-psi concrete sidewalk with integral curb along office area is provided.

G. Dock and car parking areas to sheet drain to slotted drain per site drawings. There will be 120 parking spaces provided around the facility.

H. The following utilities will be provided from the main and into the building. Gas, water, sanitary sewer and electrical power as detailed in the site drawings. We will coordinate and provide access (empty 4" PVC conduit from building to 10' outside footing wall) for telephone and data communication contractors.

I. Control joint sealant of the truck dolly and sidewalk is included.

J. Parking lot and dock area lighting will be provided via building mounted fixtures. See Electrical for description of site lighting.

K. Erosion control will be provided as required for swales and sloped areas.

L. Site seeding, landscaping, and irrigation systems to be provided by landlord. This design to be provided in the spring of 2002 and by their discretion.

M. Concrete stoops and steps at all pedestrian doors and emergency exits will be provided as required by code.


### FOUNDATIONS AND SLABS

A. Building foundation systems are included in this proposal. We have included all wall and column foundations based upon 2,500 PSF bearing capacity. Final Foundation size will be determined once borings and structural loads are complete.

B. The office floor slab shall be 4" thick, 4000 psi concrete at 28 days, on a minimum of 6" compacted aggregate base. The warehouse floor slab shall be 6" or thicker 4,000 psi concrete at 28 days, on a minimum of 6" compacted aggregate base. The floor shall be sealed with a good quality sealer.

C. All floors will receive a smooth trowel finish and crack control at owners' discretion. All construction joints shall be dowelled at 24" centers.

2

## *PROJECT DESCRIPTION*

**STRUCTURAL**

    A. Column bay spacing for the facility shall be 41' 8" x 44' 6" on center and the nominal clear height for the building as measured to lowest horizontal structural member shall be 18 lineal feet.

    B. The structural system shall be steel joist girders and open web bar joists supported by steel tube columns.

    C. Metal roof deck shall be primed metal deck welded in accordance to SDI criteria to resist all lateral forces. All other structural steel shall be painted with a gray, rust-inhibiting shop primer. Metal deck painted white to be priced as alternative.

    D. Design loads for the framing is as follows:

|  |  | Roof |
|---|---|---|
| Live Load |  | 25#/SF |
| Dead Load |  | 23#/SF |
|  |  | 48#SF |

    E. Miscellaneous metal items provided as follows:

- Roof equipment support frames for HVAC equipment as described in this proposal.
- Roof ladders and hatches per drawings.
- Guard post at drive-in doors.
- Loading dock guardrails ramps.

3

## PROJECT DESCRIPTION

## ROOFING

A. The manufacturer shall warrant all roofing for 10 years on labor and material. The warranty shall cover material only for an additional 10 years. Acceptable roofing manufacturers are Firestone Co., Rubbergard, and Carslisle Syntec-Design B.

B. The roof will be drained via perimeter gutters and downspouts and taken to an outside swale system.

C. The floor membrane shall be a single-ply .060 inch thick EPDM, loose laid, ballasted system. The roofing system shall have a UL Class A rating and a Factory Mutual Class 1 fire rating non-combustible). The stone ballast shall be applied at a uniform rate of 1,000 LB per 100 SF distributed evenly in the field. The ballast shall be sound, washed, rounded, and light colored stone ¾" minimum and 1 ½ maximum river gravel.

D. The roof insulation shall be 4" thick of rigid closed cell polyisocyanurate with glass fiber reinforced black felt or fiberglass face, a minimum compressive strength of 16 psi and a permanent "R" value of 5.56 per inch.

E. Coping, Flashing and Curbs
   1. All tapered insulation shall slope at a minimum rate of ¼" per foot down to the drainage points of the roof. All parapet and curb flashing shall be a flexible EPDM with materials and installation in accordance with the roof mfgr's standard details.
   2. All rooftop mechanical units and other miscellaneous rooftop equipment shall be mounted on an insulated curb. All piping and vents, which penetrate the roof membrane, will be flashed using molded or fabricated EPDM or neoprene flashing.
   3. Two (2) 30" x 36" roof hatches with steel ladders will be provided. One hatch and ladder in the west lab area and one hatch and ladder in the east office area.
   4. All sheet metal copings shall be a minimum of .063 prefinished aluminum with a medium bronze anodized finish to match the aluminum window finish.

F. Manufacturers walk pads will be provided adjacent to roof hatch and mechanical HVAC equipment described here in.

4

## *PROJECT DESCRIPTION*

### EXTERIOR SKIN

   A. Exterior walls to consist of 9" load bearing 5,000 psi concrete precast panels.
      Panel cores to be insulated to a total R=6.5. Exterior of panel to be determined
      by both parties before contract is let to panel fabricator.
   B. The first floor office glazing shall consist of 12 punched openings varing in
      size from 3' –4"w X 6' –0"h to 6' 6" w X 6' –0" h. the second floor office
      area has 13 punched openings varying in size from 3' –4" w X 5' –4" h, plus 2
      arears of aluminum and glass curtain wall construction. All the punched
      openings have thermally broken aluminum frames with 1" insulating solar
      reflecting fixed glazing. The curtain wall arrears are of similar framing and
      glazing. All framing finishes are an anodized medium bronze..
   C. The exterior main entry doors, sidelights and transom frames are aluminum
      storefront construction with an anodized medium bronze finish and solar
      reflecting glazing. The doors are a pair of 3'-0"w x 7'-0" h medium stile with
      solar reflecting glaze. The interior entry assembly is similar frame and door
      construction with clear uninsulated glazing.
   D. Precast concrete panels to receive joint sealant at all exterior and interior panel
      joints.
   E. The office area entries to consist of metal stud framing a with brick veneer
      and glass/aluminum storefront system as described in paragraph "C".

### WAREHOUSE AREA FINISHES

   A. Two (2) 10"-0" w X 9"-0" h dock doors have been included. All doors shall
      have 24 ga. galvanized flush steel face and a polystyrene core or better. The
      doors will be finished with a factory-applied, baked-on, polyester primer. All
      doors shall have the appropriate metal track and vertical lift hardware.
      Motorized operator is provided for dock doors
   B. Five (5) additional 12' w X 14' h drive-in doors have been included. The door
      shall have a 24 ga. galvanized flush steel face and a polystyrene core or better.
      The doors will be finished with a factory-applied, baked-on, polyester primer.
      All doors shall have the appropriate metal track and vertical lift hardware.
      Motorized operator is provided for dive-in doors.
   C. Each dock door shall have a 6'-0" wide x 8'-0" deep, 20,000 lb., dynamically
      rated capacity manual dock leveler as manufactured by Rite Hite, Kelly,
      McGuire or equal or better. Dock height shall be 48". Dock lights, dock
      bumpers and a dock seal will be provided for each truck dock door.
   D. 3'-0" wide X 7'-0" high X 1 ¾" exterior doors shall be insulated hollow metal
      flush doors with a half light 1" solar cool glazing having an 16 ga. cold rolled
      steel face. The frames fabricated of 14 ga. cold-rolled steel. Both doors and
      frames shall receive a factory-applied, baked-on, rust-inhibitive primer. All

## PROJECT DESCRIPTION

doors and frames to be prepared to receive hardware as required by the specific door and its location.

E. The door hardware schedule will be coordinated between the Owner and the contractor and shall conform to the requirements of the Indiana Building Code. All door hardware will be satin chrome finish.

F. No finish other than factory priming on all structural steel including columns, joist, roof deck and miscellaneous steel has been included.

G. The floor will be finished with a sealer as provided in Foundations and Slab Section.

H. Demising wall at interior perimeter of office and manufacturing areas will be 6", 12' high metal studs and drywall. The warehouse side of the wall shall be painted with a quality primer and two coats of a high quality semi-gloss latex paint. The office side of the wall shall have a 5/8" drywall on metal stud furring offset 2" to accommodate the adjacent 2" wide building expansion joint.

## OFFICE FINISHES

A. The interior office build-out for the space shall include interior walls, ceiling, flooring, painting / wall covering, millwork doors and hardware, specialties, mechanical, fire protection and electrical systems as detailed further in the following paragraphs. The build out is based upon space plan drawings by Delphi proposed office layout dated May 2001.

B. All interior partitions will be metal stud or furring on the exterior walls with 5/8" drywall. The wall finishes are to be 2-coat latex paint finish in all areas.

C. The ceilings will be standard 2' X 2' acoustic ceiling at 9' –6" above finished floor on first floor and 9'0" above finished floor on 2nd floor.

D. The office areas will receive the following floor treatments:

Vinyl Composition Tile (VCT) equal to Armstrong Excelon:
  Break room
  Storage Rooms
  Electrical Closets
  Communications Rooms

Ceramic Tile
  Restrooms
  Janitor's Closet

All other areas including:
  Entry Vestibule
  Main Lobby
  Stair Towers
  General Office

6

### PROJECT DESCRIPTION

Private Offices
Conference Rooms
will receive Interface Caribbean #3071 St. Thomas carpet squares or equal.

E.  All doors in the office space shall be a pre-finished, solid core wood door in a pre-finished steel frame. The Landlord will supply all locksets.

F.  The door hardware schedule will be coordinated between Landlord and the contractor and shall conform to the requirements of the Indiana Building Code. All door hardware will be satin chrome finish.

G.  Toilet partitions will be provided as painted metal finish in the following numbers: (2) handicapped, (1) standard, and (1) urinal screens. Accessories supplied will be paper towel dispenser and receptacle, toilet paper dispenser, sanitary napkin disposal.

H.  Millwork will be supplied as follows:
    *Plastic laminate lavatory tops in restrooms
    *Plastic laminate base cabinets (6'), countertop and wall cabinets in Break room

## PLUMBING

A.  Floor drains shall be provided in all multi-stall restrooms.

B.  Under slab sanitary line serving fixtures and equipment noted herein terminating at the city main.

C.  Office plumbing shall be provided in accordance with the counts detailed as follows:

Men's Room #128
    (1) floor-mounted, flush valve watercloset handicapped
    (1) floor-mounted, flush valve watercloset
    (2) wall-hung, flush-valve urinal
    (2) Self-rimming vitreous china lavatory

Men's Room #118
    (1) floor-mounted, flush valve watercloset handicapped
    (1) floor-mounted, flush valve watercloset
    (3) wall-hung, flush-valve urinal
    (3) Self-rimming vitreous china lavatory

Women's Room #125
    (1) Floor-mounted, flush-valve wartercloset handicapped
    (1) Floor-mounted, flush-valve wartercloset
    (2) Self-rimming vitreous china lavatory

Women's Room #116
    (1) Floor-mounted, flush-valve wartercloset handicapped
    (2) Floor-mounted, flush-valve wartercloset
    (3) Self-rimming vitreous china lavatory

7

# *PROJECT DESCRIPTION*

Toilet Room #103
     (1) Floor-mounted, flush-valve wartercloset handicapped
     (2) Self-rimming vitreous china lavatory
Break room #120
     (1) Stainless steel double bowl sink

## PROJECT DESCRIPTION

### H.V.A.C.

A. The warehouse area will be heated using a roof-mounted, gas-fired, make-up air unit with discharge plenums, thermostat, and night setback controls.

B. The warehouse system shall be designed to perform according to the following criteria:
   Winter:  65° F inside when –2° F outside

C. The office space will be conditioned via gas/electric rooftop units.

D. The office system shall be designed to perform according to the following criteria:

| | |
|---|---|
| Winter: | 72° F inside when –2° outside |
| Summer: | 75° F inside when 95° outside |
| Lighting Load: | 2.5watts/SF |
| Misc. Load: | 1.0 watt /SF |
| People Load: | 1 person/150 SF |
| | 10cfm/person |

### FIRE SUPPRESSION SYSTEMS

A. The facility shall be completely protected by wet pipe automatic sprinkler system including all piping, valves, risers, fittings, post indicator valves, check valves, fire department connections, contacts for fire protection monitoring, flow switches, supports, anchors, hangers, sprinkler heads, accessories, test connections, drains, testing, inspections, fire pump, design and engineering, permits and fees, approval by all governmental and fire department agencies, and any other items required for the complete design and installation of the wet pipe system.

B. Fire Protection Contractor will provide all calculations, installation drawings, etc., required to obtain insurance agency approvals and deliver them to the owner. Each system shall be hydraulically calculated to meet the demand for the different areas of the building occupancy.

C. Fire protection system in the warehouse area shall be ESFR designed as per NFPA for a design pressure of 75 psi. Hose reels are proposed throughout as required by code.

D. The office system shall be designed as per NFPA #13, Light Hazard group with a density of 0.10 over the most remote 2,000 SF. The office system shall be installed in accordance with the allowance limits set forth previously.

E. Hose racks shall be placed throughout the manufacturing area as per code, and shall consist of 100 feet of 1 ½" single jacket lined linen hose, a 1 ½" hose valve, storage rack and an 1 ½" adjustable brass nozzle.

F. At the completion of this project, the fire protection contractor will submit three (3) copies of "As-Built" drawings and documentation to the owner's representative.

9

*PROJECT DESCRIPTION*

## ELECTRICAL

A. Service equipment
   1. Electrical service shall be provided by a ground-mounted, transformer located at the north side of the building and shall provide 2000 amp, 480/277 volt, three phase, four-wire power. Step-down transformers and panels boards shall be provided as required for described herein.
   2. All electrical work will be coordinated with other trades and shall comply with all applicable codes.
B. Interior Lighting
   1. The warehouse areas shall be lighted with metal halide lighting fixtures to provide an illumination level of 70 foot-candles average maintained at 36" above finished floor.
   2. All lighting in the warehouse areas shall be switched from a lighting panel located within that space.
   3. Emergency lighting and exit signage shall be installed as required by the Indiana Building Code for both the office and warehouse arrears.
   4. The office lighting shall be lighted using 2' X 4' recessed fluorescent fixtures with acrylic lenses, T-8 lamps and electronic ballasts to provide an average maintained lighting level of 40 foot-candles at 36" above finished floor. All switching in the office area will be via single pole ad three-way switches as required.
C. Exterior Lighting
   1. The parking areas shall be illuminated by building mounted high pressure sodium light fixtures and provide a light level of 1.0 foot-candles average maintained.
   2. The dock area shall be illuminated with wall packs mounted on exterior building walls. The dock area shall have an average maintained level 0f .5 foot-candles.
   3. Soffit or surface-mounted HID fixtures will be installed at all doors and entryways to provide safety.
   4. All exterior lighting shall be controlled by photocells and time clocks.
D. Power Requirements
   1. Power will be provided to all heating and ventilation equipment as outlined in this building description.
   2. Single-phase duplex outlets shall be installed at an average of 20' around perimeter of building.
   3. Office electrical power shall be provided in accordance with the office layout.

10

Exhibit D-3
Landlord's Work

The following list of plans and designs compliment the Building Description that is referenced as Exhibit D-1 for Base Building Improvements:

1) Site work and related plans have been prepared by Scott Bordenet of SCE and Benchmark Surveying, Inc. Project # 2001-004.Prelimentary plans were submitted to Owner, reviewed by Tenant, and agreed upon by both parties as of June 11, 2001.

2) Building Foundation and Structural systems have been prepared by Vince Roberts of SRA, project # 01-054. Stamped plans were submitted to Owner, reviewed by Tenant, and agreed upon by both parties as of June 11, 2001.

3) Architectural Drawings for the building have been prepared by Gary Stock, Architect. Stamped plans were submitted to Owner, reviewed by Tenant, and agreed upon by both parties as of June 11, 2001.

4) HVAC preliminary design for the fully conditioned office area has been prepared by William Kahle of Kahle Engineering Preliminary plans were submitted to Owner, reviewed by Tenant, and agreed upon by both parties as of June 11, 2001.

5) Electrical design is being done by Babcock Electric and will be checked by a P.E.. Preliminary plans were submitted to Owner, reviewed by Tenant, and agreed upon by both parties as of June 11, 2001.

6) Plumbing specifications and design are being done by William Kahle of Kahle Engineering. Preliminary plans were submitted to Owner, reviewed by Tenant, and agreed upon by both parties as of June 11, 2001.

7) Fire Suppression systems for both office and production areas of the building will be designed at a later date with both parties to approve plans at that time.

## EXHIBIT E

### TENANT'S WORK

### NOT APPLICABLE

## EXHIBIT F

ENVIRONMENTAL CONDITION


**NONE**

## **EXHIBIT G**

### PRIOR USE OF THE PROJECT

Universal Tool & Engineering bought this land in 1978. This had been farmland up to that time. From 1978 until 1994 this land had an agricultural use for Universal Tool & Engineering, but more recently this parcel has been utilized as greenspace.

## EXHIBIT H

MORTGAGES/ENCUMBRANCES/RESTRICTIONS

Universal Tool & Engineering Co., Inc. owns this land free and clear. Owner purchased this
11.23-acre parcel in 1978. Parcel number is 4021569.
There are no mortgages, liens, or other encumbrances on this parcel of ground.

## EXHIBIT I

### MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "**Memorandum**") is made as of the _____ day of _____, 2001, by and between UNIVERSAL TOOL AND ENGINEERING COMPANY, INC., an Indiana corporation, with its principal address at 7601 E. 88th Place, Indianapolis, Indiana 46256 ("Landlord"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, with its principal address at 5725 Delphi Drive, Troy, Michigan 48098 ("Tenant"), for the purpose of notifying all parties that:

(1)     Landlord has leased to Tenant and Tenant has leased from Landlord, pursuant to the terms of a Lease dated as of _____, 2001 (the "Lease"), [a portion of] the real estate described in Exhibit A (the "Land") attached to and made a part of this Memorandum, which portion is depicted as the "Premises" on Exhibit B attached to and made a part of this Memorandum.

(2)     The Term shall commence on _____, and, unless earlier terminated pursuant to the terms of the Lease, shall expire on _____.

(3)     Tenant has the right and option to extend the Term for _____ (_____) additional term(s) of _____ (_____) years each.

(4)     Tenant has the right of first refusal to purchase the Land upon the giving of notice to Landlord on the terms set forth in the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have entered into this Memorandum of Lease as of the date set forth in the Preamble to this Memorandum of Lease.

In the presence of:

_____

_____

UNIVERSAL TOOL AND ENGINEERING COMPANY, INC., an Indiana corporation

BY _____

                                        President

ATTEST _____

                                        Secretary

[SIGNATURES CONTINUED ON FOLLOWING PAGE]

{W0098589.DOC;4}

In the presence of:

**DELPHI AUTOMOTIVE SYSTEMS LLC,**
a Delaware limited liability company

By:   Delphi Automotive Systems
      Corporation, a Delaware corporation

Its:  Managing Member

By:   _____

Its:   Authorized Signatory

STATE OF _INDIANA_____ )
                       ) ss.
COUNTY OF _MARION____ )

The foregoing instrument was acknowledged before me this __18TH__ day of
_JUNE_____, 2001, by __F.S. JENKINS_____, the
_PRESIDENT_____ of Universal Tool and Engineering Company, Inc.,
an Indiana corporation, on behalf of said corporation.

_Cynthia N. Morris_____
CYNTHIA N. MORRIS____, Notary Public
_MARION_____ County, _IN____
My commission expires:_03-14-08_____

STATE OF _____ )
                       ) ss.
COUNTY OF _____ )

The foregoing instrument was acknowledged before me this _____ day of
_____, 2001, by _____, the Authorized
Signatory of Delphi Automotive Systems Corporation, a Delaware corporation, which is the
Managing Member of Delphi Automotive Systems LLC, a Delaware limited liability company, on
behalf of it.

_____, Notary Public
_____ County, _____
My commission expires:_____

{W0098589.DOC;4}

EXHIBIT J

FAIR MARKET RENT

The Annual Rent for each year of each Renewal Term shall be equal to the "Fair Market Rent" (as hereinafter defined) for comparable facilities in a comparable location in the "Northeast Indianapolis, Indiana" sub-market. "Fair Market Rent" shall mean the annual effective fair market rental value, on a gross basis, for the Premises as of the commencement of the applicable Renewal Term. All market rental concessions, including, without limitation, free rent and cash allowances for moving expenses and tenant improvements, and other tenant inducements shall be taken into account in determining "Fair Market Rent." Within thirty (30) days after Tenant requests, Landlord shall send Tenant a notice (the "Renewal Rental Notice") stating the amount which Landlord reasonably believes shall constitute the Fair Market Rent for the Premises as of the commencement of the applicable Renewal Term. Within thirty (30) days following Tenant's receipt of the Renewal Rental Notice, Tenant may either (i) accept the same, in which event the Fair Market Rent amount set forth therein shall become the Annual Rent under this Lease during the Renewal Term, (ii) send Landlord notice of Tenant's dispute of Landlord's determination of the Fair Market Rent for the Premises or (iii) decline to exercise Tenant's renewal option. If Landlord and Tenant are unable to agree upon the Fair Market Rent for the Premises, within thirty (30) days following Tenant's notice to Landlord that Tenant disputes Landlord's determination, then Tenant shall have the right to submit such dispute to arbitration as hereinafter set forth. If, within ten (10) business days following the date on which Tenant notifies Landlord that Tenant is submitting such dispute to arbitration, Landlord and Tenant shall agree on a single arbitrator, such arbitrator shall determine the amount of Fair Market Rent within thirty (30) days following its appointment and Tenant shall have thirty (30) days following such determination to either accept the same or rescind Tenant's exercise of the option. If Landlord and Tenant do not agree upon a single arbitrator within the ten (10) business day period set forth in the preceding sentence, then Landlord and Tenant shall each designate their own arbitrator within five (5) business days following the expiration of such ten (10) business day period. Such arbitrators shall meet within ten (10) business days following their appointment and, if the two (2) arbitrators are unable to agree upon the amount of Fair Market Rent by the expiration of such ten (10) business day period, then they shall appoint a third arbitrator within such ten (10) business day period. If the two (2) arbitrators cannot agree upon a third arbitrator within such ten (10) business day period, then either party may request that the American Arbitration Association (or any successor thereto) make such appointment within ten (10) business days. In the event of such appointment of three (3) arbitrators, they shall, by majority decision, determine the Fair Market Rent for the Premises as of the commencement of the Renewal Term based on the criteria set forth above within ten (10) business days following their appointment. After such determination, Tenant shall have thirty (30) days to confirm or rescind its exercise of the option. The arbitrators shall be M.A.I. approved real estate appraisers or consultants with at least ten (10) years continuous experience in appraising or managing commercial real estate properties or acting as commercial real estate agents or brokers in the Indianapolis, Indiana area. If there is a single arbitrator, such arbitrator's fees and expenses shall be shared equally by the parties. If there are two (2) arbitrators, each party shall pay the fees and expenses of its arbitrator. The fees and expenses of a third arbitrator, and all other expenses, other than attorneys' fees, witness fees and similar expenses of the individual parties, shall be shared equally by the parties hereto.

## RIDER TO LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES
## (FOR USE IN NET LEASE OF PREMISES IN A SINGLE TENANT BUILDING)

THIS RIDER TO LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES (this "Rider") is attached to and made a part of the Lease dated _____, 2001, between UNIVERSAL TOOL AND ENGINEERING COMPANY, INC., as Landlord, and DELPHI AUTOMOTIVE SYSTEMS LLC, as Tenant. Terms used with initial capital letters in this Rider have the meaning set forth in the Lease (unless they are defined in this Rider).

**Article 8      Utilities:**

Article 8 of the Lease is supplemented by adding the following sentence to the end of Article 8:

"Landlord represents and warrants to Tenant that the Premises will be separately metered for all utility services throughout the Term."

**Article 14      Casualty:**

Article 14 of the Lease is supplemented by adding the following new Section at the end of Article 14:

Section 14.3    Restoration by Tenant. Notwithstanding anything to the contrary in this Article 14 or in Article 15, Tenant shall have the right to repair and restore any damage to the Premises which results from a casualty or Taking. If Tenant elects to perform the repair and restoration, then Landlord shall cause the insurance proceeds or condemnation award to be available to Tenant to pay for the repair and restoration, and shall be responsible for any deficiency in the insurance proceeds or condemnation award. Tenant shall notify Landlord whether Tenant is electing to exercise its rights under this Section 14.3 within thirty (30) days after the date of the casualty or Taking (but not after Landlord commences substantial repair and restoration work).

**Article 15      Eminent Domain:**

Section 15.4 of the Lease is supplemented by adding the following sentence to the end of Section 15.4:

If any compensation paid to Landlord in connection with a Taking is not utilized to restore the Premises, then the Annual Rent for the remainder of the then-current Term (Initial or Option) shall be reduced by an amount equal to the quotient which is obtained when the excess proceeds of the Taking are divided by the number of full and partial years remaining in the then-current Term.

**Article 31      Miscellaneous:**

The following new Articles 32 through 34 are added at the end of Article 31:

## "ARTICLE 32
## TITLE

Simultaneously with Tenant's execution of this Lease, Landlord shall furnish to Tenant, at Landlord's sole cost and expense, a leasehold policy of title insurance (the "Leasehold Policy"). The Leasehold Policy (I) shall be in an amount equal to the product of (x) the initial

{W0098589.DOC;4}

Annual Rent and (y) the number of years in the Initial Term and each Option Term, (ii) shall be issued by a title company selected by Tenant and licensed to do business in the State in which the Premises are located, and (iii) shall insure Tenant's interest in the leasehold estate under this Lease free and clear of all liens and encumbrances of any nature, except as set forth on Exhibit H (the "Permitted Exceptions").

## ARTICLE 33
### RIGHT OF FIRST REFUSAL TO PURCHASE

(a)     Landlord grants to Tenant the right of first refusal to purchase the Premises on the same terms and conditions as are stated in any offer for the sale of the Premises made by Landlord or submitted by a prospective purchaser and acceptable to Landlord (an "Offer"). Within five (5) business days after making or receiving any Offer, Landlord shall deliver to Tenant a true, correct and complete copy of the Offer. Tenant shall have thirty (30) days after Tenant receives the Offer to elect to purchase the Premises on the terms and conditions that are stated in the Offer. If Tenant does not exercise this right, Landlord may sell the Premises in accordance with the terms and provisions of the Offer during the six (6) month period after Tenant receives the Offer. If a sale in accordance with an Offer does not close within six (6) months after submission of the Offer, Tenant's right of first refusal as set forth in this Article 34 shall be reinstated.

(b)     Notwithstanding anything contained in this Article 34, upon receipt of Landlord's notice pursuant to Article 34(a), Tenant may exercise its right to purchase the Premises pursuant to Article 33.

(c)     Tenant may specifically enforce, or seek injunctive relief with respect to, its rights under this Article 34.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Rider to Lease of Industrial or Warehouse Facilities as of the day and year first above written.

LANDLORD:
UNIVERSAL TOOL AND ENGINEERING
COMPANY, INC., an Indiana corporation

By: _____

Its:   PRESIDENT

TENANT:
DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:   Delphi Automotive Systems Corporation,
      a Delaware corporation

Its:   Managing Member

By: _____

Its:     Authorized Signatory
LEGAL APPROVED for execution
Miro Weiner & Kramer
By: Sean P. Corcoran   SPC

{W0098589.DOC;4}

## FIRST AMENDMENT TO LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES

THIS FIRST AMENDMENT TO LEASE OF INDUSTRIAL OR WAREHOUSE FACILITIES (this "Amendment"), is made and entered into this 24th day of July, 2002, between UNIVERSAL TOOL AND ENGINEERING COMPANY, INC., an Indiana corporation, with its principal address at 7601 E. 88th Place, Indianapolis, Indiana 46256 ("Landlord"), and DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company, with its principal address at 5725 Delphi Drive, Troy, Michigan 48098 ("Tenant"), based upon the following:

A.     Landlord and Tenant entered into a Lease of Industrial or Warehouse Facilities dated June 22, 2001 (the "Lease"), with respect to Premises located at 8750 N. Hague Road, in the City of Indianapolis, State of Indiana.

B.     Landlord and Tenant desire to confirm the cost of improvements in addition to the Base Building Improvements which have been constructed by Landlord pursuant to Exhibit D-1 to the Lease (the "Additional Improvements") and the amount of the Improvements Rent under Exhibit D-1 to the Lease.

C.     Landlord and Tenant further desire to evidence certain other agreements as set forth in this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Amendment, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord and Tenant agree as follows:

1.     Terms used with initial capital letters and not otherwise defined in this Amendment have the meaning ascribed to them in the Lease.

2.     Landlord and Tenant agree as follows with respect to the Additional Improvements:

(a)     The total cost of the Additional Improvements for which Tenant is responsible is One Million Five Hundred Sixty-Five Thousand Seven Hundred Twenty-Two and 96/100ths Dollars ($1,565,722.96);

(b)     The Improvements Rent is One Hundred Fifty-Six Thousand Five Hundred Seventy-Two and 30/100ths Dollars ($156,572.30) per year, payable in monthly installments of Thirteen Thousand Forty-Seven and 69/100ths Dollars ($13,047.69), commencing on February 1, 2002; and

(c)     Tenant shall have the right to remove the Additional Improvements identified in Work Order Nos. PRJ 111-02, PRJ 111-09, PRJ 111-11, PRJ 111-14 and PRJ 111-15 from the Premises at the expiration or sooner termination of the Term. Copies of such Work Orders are attached to this Amendment as Exhibit K.

3.     Tenant shall commence the payment of Improvements Rent in August 2002 and shall make a payment of the Improvements Rent for the months of February through July, 2002, in the amount of Seventy Eight Thousand Two Hundred Eighty-Six and 14/100ths Dollars ($78,286.14), together with Tenant's Annual Rent payment for the month of August, 2002.

4.     Section 1.5 of the Lease is hereby amended by changing Tenant's address for notices to the following:

        Delphi Automotive Systems LLC
        5825 Delphi Drive
        Troy, Michigan  48098
        Attn:  Executive Director, Facilities Services Group

        with a copy to:

        Delphi Automotive Systems LLC
        5725 Delphi Drive
        Troy, Michigan  48098
        Attn:  Assistant General Counsel, Commercial and Transactional

5.     To the extent of any inconsistency between the terms and provisions of this Amendment and the Lease, the terms and provisions of this Amendment shall control. Except as amended by this Amendment, all of the terms, covenants and conditions of the Lease are in full force and effect and the Lease is hereby ratified and confirmed.

- 2 -

**IN WITNESS WHEREOF,** Landlord and Tenant are entering into this First Amendment to Lease of Industrial or Warehouse Facilities as of the day and year first above written.

In the presence of:                       UNIVERSAL TOOL AND ENGINEERING
                                          COMPANY, INC., an Indiana corporation

_____     By: _____

_____     Its: _____


In the presence of:                       DELPHI AUTOMOTIVE SYSTEMS LLC,
                                          a Delaware limited liability company

                                     By:  Delphi Corporation,
                                          a Delaware corporation

                                     Its: Managing Member
                                     By: _____

_____     Its: Authorized Signatory

_____          Execution Recommended
                                          Equis Corporation
rev.10/00                                 By: _____
                                          By: _____

- 3 -

**EXHIBIT K**

**WORK ORDERS**

[TO BE PROVIDED]

**Delphi**
Facilities Services Group

## Work Order No: PRJ111-02

| Location: 8750 N. Hague Road Building 7 | Page:1 | of:1 | |
|---|---|---|---|
| Contractor's Name: Universal Tool & Engineering<br>Subcontractor: Commercial Office Environments | Project AR/LAR Number(s): 4390-1; 6309-1; PRJ111 | | |
| City, State, Zip: Indianapolis, Indiana 46256 | Date(s): 12/20/02 - 04/15/02 | | |

The Contractor is hereby authorized and directed to proceed with the work described below in accordance with the terms and conditions of the lease contract.

| Item | Pricing Method | Description of Job Scope | Cost |
|---|---|---|---|
| 1 | 3 | Provide Hayworth furniture systems and the labor to install to the new Lithium building. The order will include furniture systems for the following:<br><br>The main office space - reception area, conference rooms 1,2, and 3; breakroom, workstations and general seating. Cluster 1 offices; Cluster 2 office; Cluster 3 (3) workstation; Spare parts for (2) workstations; miscellaneous spare parts; VCR console and telephone cabinet.<br><br>All prices are per Delphi Corporation agreement with Haworth Furniture.<br><br><br>All items per COE Invoices 33762 - 33769; 31802; 33923; 33831;33818;33996 34082; 34289 and misc invoice dated 2/26/02.<br><br>Universal Tool & Engineering Co. 20% Markup | $274,443<br><br><br><br><br>$54,889 |
| **Totals:** | | | **$329,331** |

### Pricing Methods
1 - Unit Prices
2 - Estimated Cost Plus
     Percentage Fees

3 - Cost Plus 20% Fees

### Distribution

| | | |
|---|---|---|
| | | |
| | | |
| | | |

### Authorization

| UTE: _(signature)_ | Delphi: _Mark E. Goodwin_ |
|---|---|
| Title:   UTE Property Manager | Title:   FSG Facilities Engineer |
| Date:   4/24/02 | Date:   4/24/02 |
| Approved by: | Authorized by: |

Notice to Contractor: This Work Order does not authorize you to invoice for this work. All cost will be paid per the lease contract.

PRJ111-02 xls

JUL-25-02  12:03  FROM:DELPHI E WFG ENVIRM        ID:                        PAGE  2/2

**Delphi**
**Facilities Services Group**

**Work Order No:** PRJ111-09

| Location:  8750 N. Hague Road Building 7 | Page:1 | of:1 | |
|---|---|---|---|
| Contractor's Name:  Universal Tool & Engineering  Subcontractor:  Air Applications | Project AR/LAR  Number(s): 4390-1; 6309-1; PRJ111 | | |
| City, State, Zip:  Indianapolis, Indiana 46256 | Date(s):  March 21, 2002. | | |

The Contractor is hereby authorized and directed to proceed with the work described below in accordance with the terms and conditions of the lease contract.

| Item | Pricing Method | Description of Job Scope | Cost |
|---|---|---|---|
| 1 | 3 | Provide Harrington fiberglass(FRP) exhaust fan with a 2 micron mist eliminator assembly.    The following equipment will be supplied: One(1) HPCA series 4025 fiberglass AMCA approved arrangement 9, class II fan assembly. The fan bearing shall be heavy duty self alligning grease lubricated ball type with a minimum of 100,000 hours B-10 life.  Fan shall be belt driven with constant speed drivesrated at 23,000 CFM @ 5" static pressure, complete with a 40 hp TEFC motor.  Scrubber shall be a complete system with all accessories as described in proposal #2614A from Steve Carr of Air Application dated March 21, 2002. | $35,566 |
| | | Universal Tool & Engineering Co. 20% Markup | $7,113 |
| | | | |
| **Totals:** | | | $42,679 |

**Pricing Methods**
1 - Unit Prices
2 - Estimated Cost Plus
   Percentage Fees

3 - Cost Plus 20% Fees

**Distribution**

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**Authorization**

| UTE: | Delphi: |
|---|---|
| Title:   UTE Property Manager | Title:    FSG Facilities Engineer |
| Date:   4/24/0C | Date:   4/24/02 |
| Approved by: | Authorized by: |

Notice to Contractor:   This Work Order does not authorize you to invoice for this work.  All cost will be paid per the lease contract.

PRJ111-09.xls

**Delphi**
**Facilities Services Group**

## Work Order No: PRJ111-11

| Location: 8750 N. Hague Road Building 7 | Page:1 | of:1 | |
|---|---|---|---|
| Contractor's Name: Universal Tool & Engineering Subcontractor: Capital Machinery Systems, Inc. | Project AR/LAR Number(s): 4390-1; 6309-1; PRJ111 | | |
| City, State, Zip: Indianapolis, Indiana 46256 | Date(s): January 18, 2002. | | |

The Contractor is hereby authorized and directed to proceed with the work described below in accordance with the terms and conditions of the lease contract.

| Item | Pricing Method | Description of Job Scope | Cost |
|---|---|---|---|
| 1 | 3 | Provide GA VSD single stage, oil injected rotary screw air compressor. Compressor to include all features, options and accessories as stated in Quote # Q-6866 dated October 29, 2001 from Capital Machinery Systems, Inc.<br><br>System to also include startup assistance and training as required. | $14,125 |
| | | Universal Tool & Engineering Co. 20% Markup | $2,825 |
| Totals: | | | $16,950 |

**Pricing Methods**
1 - Unit Prices
2 - Estimated Cost Plus Percentage Fees
3 - Cost Plus 20% Fees

**Distribution**

**Authorization**

| UTE: _C. Fiorelli_ | Delphi: _Mark E. Bosch_ |
|---|---|
| Title: UTE Property Manager | Title: FSG Facilities Engineer |
| Date: 4/24/02 | Date: 4/24/02 |
| Approved by: | Authorized by: |

**Notice to Contractor:** This Work Order does not authorize you to invoice for this work. All cost will be paid per the lease contract.

PRJ111-11.xls

**Delphi**
**Facilities Services Group**

## Work Order No:   PRJ111-14

| Location:   8750 N. Hague Road Building 7 | Page:1 | of:1 | |
|---|---|---|---|
| Contractor's Name:  Universal Tool & Engineering<br>Subcontractor:  Bastian Material Handling, Inc. | Project AR/LAR  Number(s): 4390-1; 6309-1; PRJ111 | | |
| City, State, Zip:  Indianapolis, Indiana 46256 | December 12, 17, January 28, 2002. | | |

The Contractor is hereby authorized and directed to proceed with the work described below in accordance with the terms and conditions of the lease contract.

| Item | Pricing Method | Description of Job Scope | Cost |
|---|---|---|---|
| 1 | 3 | Provide Starrco two(2) Inplant buildings as follows:<br><br>A. 4-wall office, Model #SS3000-DL, 8' high panel, 12' 6" X 12' 6" overall dimensions(non-loadbearing)<br><br>B. 4-wall office, Model #SS3000-DL, 9' high panel, 12' 6" X 28' 6" overall dimensions(non-loadbearing)<br><br>In plant office shall be as specified in quote dated December 12, 2001 and letter dated December 17, 2001 from Bastian Material Handling, Inc. | $24,056 |
| | | Universal Tool & Engineering Co. 20% Markup | $4,811 |
| | | | |
| | | | |
| **Totals:** | | | **$28,867** |

**Pricing Methods**
1- Unit Prices
2- Estimated Cost Plus
    Percentage Fees

3- Cost Plus 20% Fees

**Distribution**

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**Authorization**

| UTE: _(signature)_ | Delphi: _(signature)_ Mark E Goodin |
|---|---|
| Title:   UTE Property Manager | Title:   FSG Facilities Engineer |
| Date:   4/24/02 | Date:   4/24/02 |
| Approved by: | Authorized by: |

Notice to Contractor:  This Work Order does not authorize you to invoice for this work.  All cost will be paid per the lease contract.

PRJ111-14.xls

JUL-25-02 12:04 FROM:DELPHI E WFG ENVIRM        ID:                          PAGE    6/7

**Delphi**
**Facilities Services Group**

**Work Order No:** PRJ111-15

| Location: 8760 N. Hague Road Building 7 | Page:1 | of:1 | |
|---|---|---|---|
| Contractor's Name: Universal Tool & Engineering<br>Subcontractor: Peters Industrial Equipment, Inc.<br>City, State, Zip: Indianapolis, Indiana 46256 | Project AR/LAR Number(s): 4390-1; 6309-1; PRJ111 | | |
| | Date(s): January 21, 2002. | | |

The Contractor is hereby authorized and directed to proceed with the work described below in accordance with the terms and conditions of the lease contract.

| Item | Pricing Method | Description of Job Scope | Cost |
|---|---|---|---|
| 1 | 3 | Provide one(1) IMAX 28 advance walkie scrubber. | $8,925 |
| | | Universal Tool & Engineering Co. 20% Markup | $1,785 |
| | | | |
| **Totals:** | | | **$10,710** |

**Pricing Methods**
1 - Unit Prices
2 - Estimated Cost Plus
    Percentage Fees
3 - Cost Plus 20% Fees

**Distribution**

**Authorization**

| UTE: | Delphi: Mark E. Goodwin |
|---|---|
| Title: UTE Property Manager | Title: FSG Facilities Engineer |
| Date: 4/24/02 | Date: 4/24/02 |
| Approved by: | Authorized by: |

Notice to Contractor:  This Work Order does not authorize you to invoice for this work.  All cost will be paid per the lease contract.

PRJ111-15.xls

# DELPHI

**Lithium Building Improvements**
**Work Order Approval Summary**

| Work Order | Date | Description | Contractor/Sub | Amount |
|---|---|---|---|---|
| PRJ111-01 | 10/03/01 | Provide electrical infrastructure upgrades | James Babcock Inc. | $365,330 |
| PRJ111-02 | 10/18/01 | Provide Haworth Furniture Systems | COE Inc. | $329,331 |
| PRJ111-03 | 10/17/01 | Provide building security sys.- Sensormatic | Siemens Building Technologies, Inc. | $63,832 |
| PRJ111-04 | 11/01/01 | Provide voice and data network system | EDS; Avaya; MVD; Anixter | $159,549 |
| PRJ111-05 | 11/22/01 | Provide HVAC Sys./Mech design & Steel | Kirkoff Mechnical /Khale/ Faulkner/ Parker | $328,320 |
| PRJ111-06 | 11/22/01 | Provide Cooling tower repair & pipe supplies | Keller Rivest/Plummer Sup/Etc. | $19,584 |
| PRJ111-07 | 11/10/01 | Provide acid resistant floor coating | Indianapolis Floor Coatings | $76,201 |
| PRJ111-08 | 10/03/01 | Concrete Pads for HVAC Equip | IMI/Doug Allen | $18,437 |
| PRJ111-09 | 10/03/01 | Ventilation Scrubber | Harrington Ind. Plastics | $42,679 |
| PRJ111-10 | 10/03/01 | Provide building perimeter surveillance | Moore Security Systems | $5,815 |
| PRJ111-11 | 10/03/01 | Provide Compressed Air Equipment | Capital Machinery Systems | $16,950 |
| PRJ111-12 | 02/18/02 | Construct walls for Lead Acid office area | UTE | $7,496 |
| PRJ111-14 | 12/10/01 | Provide (2) Inter-plant offices in Li area. | Bastian Material Handling | $28,867 |
| PRJ111-15 | 1/15/2002 | Floor Scrubber | Peters Industrial Equipment | $10,710 |
| PRJ111-16 | 2/15/2002 | Misc.-Welder rental/core drill/fire stop/fedex | Sutton-Gatren/Hilt/Fedex/Lewis | $9,433 |
| PRJ111-17 | 11/15-3/31 | UTE/MG Corp. Labor Charges Elec. & Piping | UTE/MG | $83,190 |
| | | | **TOTALS** | **$1,565,722.96** |

Authorizations/Approvals

| UTE: | Delphi: | Delphi: | Date: |
|---|---|---|---|
| Bob Rossetter | Mark E. Goodwin | Gary A. Cameron  5/15/02 | 5/15/02 |
| Title:    UTE Property Manager | Title:    FSG Facilities Engineer | Title:    Manager Lithium Battery | |

Summary Work Order 051402.xls



EXHIBIT

E

tabbies®

## AFFIDAVIT OF GEOFFREY A. GLANDERS

I, Geoffrey A. Glanders, am over the age of eighteen (18) and have personal knowledge of the facts stated herein. I suffer from no disabilities that would render my testimony incompetent.

1.      I am President of August Mack Environmental, Inc. ("August Mack").

2.      August Mack was retained by Universal Tool & Engineering Company, Inc. ("UTE") to conduct a Phase I Environmental Site Assessment of the UTE business park, including buildings formerly leased by Delphi Automotive Systems, LLC ("Delphi"). August Mack was also retained to conduct a Phase II Environmental Investigation in and around Plant 3, where Delphi primarily produced lead acid batteries; Building 5, formerly used as a machine shop by Delphi; an unidentified warehouse south of Plant 3 used for raw materials storage by Delphi; and, Building 6, formerly used as a vehicle garage by Delphi. Delphi's operations involved the use of hazardous substances, including sulfuric acid and lead and generated hazardous waste including lead oxide. The Phase I and Phase II investigations were completed in the summer of 2006 and reports were generated for and delivered to UTE.

3.      The ambient air and interior surfaces of Plant 3 contain high concentrations of lead dust and sulfuric acid deposits. In addition, liquid within the interior drains of Plant 3 and Building 5 contain hazardous concentrations of lead and elevated levels of petroleum constituents. Based on these findings, Plant 3 is not suitable for occupation or use. Decontamination by removing the lead and sulfuric acid contamination is recommended. Additional testing of the soil and groundwater in and around the site are also warranted.



EXHIBIT

2

4.     The recommended decontamination process would generally consist of power washing, collection and disposal of water used in the decontamination process, sealing the interior concrete floor and post-decontamination sampling of the ambient air and interior surfaces within the building. It is premature to provide an accurate estimated cost for decontamination of Plant 3 other than to estimate that it could be in excess of $150,000.

5.     Hazardous concentrations of lead and elevated levels of petroleum constituents were also identified in the drains of Building 5. Air and surface sampling of this building is recommended. Once air and surface sampling is completed additional investigation may be appropriate to determine if remediation is necessary and what remedial process is best suited for Building 5.

6.     Building 7 is currently occupied by another tenant and portions of the building were not accessible to August Mack during the Phase I investigation. Delphi reportedly used the building to test lead acid batteries. Given the historical use of the building and documented past regulatory violations, it is recommended that an investigation of this building be conducted as well to determine the necessity and method of remedial action.

7.     August Mack recommends sampling of the areas surrounding the remaining buildings Delphi occupied and used to rule out contamination of soil and groundwater or to address these hazards if they are found to exist.

8.     A review of records obtained from the Indiana Department of Environmental Management (IDEM) indicates that the IDEM found evidence of past improper storage and disposal of hazardous wastes at the buildings at the time they may

have been occupied by Delphi. These past activities will need to be further investigated to determine the extent of impact on UTE's property and Delphi's liability.

9.  August Mack has billed UTE $16,800.

10.  August Mack estimates that it will cost an additional $100,000 to conduct further investigation of the buildings formerly occupied by Delphi and the surrounding areas.

11.  Until additional testing of Building 5, Building 7 and the surrounding areas is completed, we are unable to provide an estimate of the total cleanup costs for the property formerly occupied by Delphi.

I AFFIRM UNDER THE PENALTIES FOR PERJURY THAT THE FOREGOING REPRESENTATIONS ARE TRUE TO THE BEST OF MY KNOWLEDGE.

Dated: _11-21-06_

_____
Geoffrey A. Glanders

STATE OF INDIANA        )
                        ) SS:
COUNY OF MARION         )

Before me the undersigned, a Notary Public in and for said County and State, personally appeared Geoffrey A. Glanders, and acknowledge the execution of the foregoing instrument this _21st_ day of November, 2006.

SANDRA J. MAINE
Notary Public, State of Indiana
Hamilton County
My Commission Expires
August 13, 2009

_____
Notary Public

_____
Sandra J. Maine
Printed Name

My Commission Expires:                County of Residence:

_8-13-09_                             _Hamilton_
1106477