**Proposed Hearing Date and Time:  March 22, 2007 at 10:00 a.m.**
**Proposed Objection Deadline:  March 15, 2007 at 4:00 p.m.**

O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, DC 20006
(202) 383-5300
Robert A. Siegel (RS 0922)
Tom A. Jerman (TJ 1129)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
        In re                                         :    Chapter 11
                                                      :
DELPHI CORPORATION, et al.,                           :    Case No. 05-44481 (RDD)
                                                      :
                              Debtors.                :    (Jointly Administered)
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**THIRD INTERIM APPLICATION OF O'MELVENY & MYERS LLP**
**FOR ORDER AUTHORIZING AND APPROVING COMPENSATION AND**
**REIMBURSEMENT OF EXPENSES**

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE:

        O'Melveny & Myers LLP ("O'Melveny"), special labor counsel for Delphi Corporation

("Delphi") and certain of its subsidiaries and affiliates, debtors, and debtors-in-possession in the

above-captioned case (collectively, the "Debtors"), hereby submits its third interim application

for the interim allowance of compensation and reimbursement of expenses (the "Third Interim

Application"), pursuant to sections 330(a)(1) and 331 of Chapter 11, Title 11 of the United States

Code (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure

(the "Bankruptcy Rules"), the proposed form of which is attached hereto as Exhibit "A".

O'Melveny submits this Third Interim Application for (a) allowances of compensation for

professional services rendered by O'Melveny to the Debtors, and (b) reimbursement of actual

and necessary disbursements incurred by O'Melveny in rendition of required professional

services on behalf of the Debtors.  In support of the Third Interim Application, O'Melveny

respectfully represents as follows:

# I.
## PRELIMINARY STATEMENT

1.    As hereinafter set forth in detail, the activities performed by O'Melveny, in

conjunction with the Debtors and the Debtors' other retained professionals, were extensive

during the period from June 1, 2006 through September 30, 2006 (the "Third Interim Period"),

and yielded significant benefits to the estates and their creditors.

2.    O'Melveny requests that this Court authorize total compensation to

O'Melveny in the amount of $1,510,056.30, which includes reimbursement of fees in the amount

of $958,052.25, including the 20 percent holdback in the amount of $191,610.45, and expenses

in the amount of $552,004.05 for the Third Interim Period.[1]

---

[1]    The aggregate total sought for compensation during the Third Interim Period reflects O'Melveny's
voluntary write-off in the amount of $2,592.00 for certain fees charged to the Debtors.  Detail on the write-off
amount is provided below.

## II.
## BACKGROUND

A.    The Chapter 11 Filings

3.    On October 8, 2005 (the "Initial Filing Date"), Delphi and certain of its U.S. subsidiaries (the "Initial Filers") filed voluntary petitions in this Court for reorganization relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, three additional U.S. subsidiaries of Delphi (together with the Initial Filers, collectively, the "Debtors") also sought reorganization relief.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On October 8, 2005 and October 19, 2005, this Court entered orders directing the joint administration of the Debtors' chapter 11 cases (Docket Nos. 28 and 404 respectively).

4.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity security holders (the "Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

5.    The Debtors have not yet filed a plan of reorganization or disclosure statement.

6.    This Court has jurisdiction over this Third Interim Application pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.    The statutory predicates for relief requested herein are §§ 330 and 331 of the Bankruptcy Code, Rule 2016 of the Bankruptcy Rules, and Local Rule 2014-1.

B.    Current Business Operations Of The Debtors

8.    Delphi had global 2005 net sales of approximately $26.9 billion and global

assets as of August 31, 2005 of approximately $17.1 billion.[2]  At the time of its chapter 11 filing,

Delphi ranked as the fifth largest public company business reorganization in terms of revenues,

and the thirteenth largest public company business reorganization in terms of assets.  Delphi's

non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without

supervision from the Bankruptcy Court.

9.    Delphi is a leading global technology innovator with significant engineering

resources and technical competencies in a variety of disciplines, and is one of the largest global

suppliers of vehicle electronics, transportation components, integrated systems and modules, and

other electronic technology.  Delphi supplies products to nearly every major global automotive

original equipment manufacturer.

10.    As part of its growth strategy, Delphi has established an expansive global

presence with a network of manufacturing sites, technical centers, sales offices, and joint

ventures located in every major region of the world.  As of the Initial Filing Date, the Debtors

employed approximately 180,000 employees worldwide.  The Debtors' 50,600 U.S. employees

worked in approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy,

Michigan headquarters.  Approximately 34,750 of the Debtors' U.S. employees were hourly

employees as of the Initial Filing Date, and 96 percent of these were represented by

approximately 49 different international and local unions.  Outside the United States, Delphi's

foreign entities employed more than 134,000 people on the Initial Filing Date, supporting 120

manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

---

[2]    The aggregated financial data used in this Third Interim Application generally consists of consolidated
information from Delphi and its worldwide subsidiaries and affiliates.

11.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of GM.  Prior to January 1, 1999, GM conducted Delphi's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to Delphi in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still Delphi's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading to Chapter 11 Filing

12.    In the first two years following Delphi's separation from GM, Delphi generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, Delphi has suffered losses.  In calendar year 2004, Delphi reported a net operating loss of $482 million on $28.6 billion in net sales.[3]  Reflective of a downturn in the marketplace, in 2005 Delphi incurred  net losses of approximately $2.8 billion on net sales of $26.9 billion.

13.    The Debtors believe that Delphi's financial performance has deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-strategic, non-profitable operations, all of which have the effect of creating largely fixed labor costs; (b) a competitive U.S. vehicle production environment for domestic OEMs

---

[3]    Reported net losses in calendar year 2004 were $4.8 billion, reflecting a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.

resulting in the reduced number of motor vehicles that GM produces annually in the United

States and related pricing pressures; and (c) increasing commodity prices.

14.    In light of these factors, Delphi determined that it would be imprudent and

irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio,

operational issues, and forward looking revenue requirements.  Because discussions with its

unions and GM were not progressing sufficiently, Delphi commenced these chapter 11 cases for

its U.S. businesses to complete the Debtors' transformation plan and preserve value for its

stakeholders.

15.    Through the reorganization process, the Debtors intend to achieve

competitiveness for Delphi's core U.S. operations by modifying or eliminating non-competitive

legacy liabilities and burdensome restrictions under current labor agreements and realigning

Delphi's global product portfolio and manufacturing footprint to preserve Delphi's core

businesses.  This requires negotiation with key stakeholders over their respective contributions to

the restructuring plan or, absent consensual participation, the utilization of the chapter 11 process

to achieve the necessary cost savings and operational effectiveness.  The Debtors believe that a

substantial segment of Delphi's U.S. business operations must be divested, consolidated, or

wound-down during these cases.

16.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver value and high-quality products to its customers globally.

Additionally, Delphi will preserve and continue the strategic growth of its non-U.S. operations

and maintain its prominence as the world's premier auto supplier.

## III.
## RETENTION OF O'MELVENY

17.    The Debtors filed their application to employ O'Melveny with the Court on

October 8, 2005.  O'Melveny charges legal fees on an hourly basis at its attorneys' individual

hourly rates, which are based on the attorney's seniority and experience, and which are adjusted

from time to time.  O'Melveny also charges the Debtors for reasonable and actual out-of-pocket

expenses incurred, such as court services, computerized research, delivery services, photocopies,

long distance phone calls, fees associated with ongoing litigation, travel and other costs

necessarily incurred in connection with its representation of the Debtors.[4]  O'Melveny's fee

structure and reimbursement policies were disclosed in the Debtors' application to employ

O'Melveny, to which no party objected and this Court approved by order entered on November

4, 2005, a copy of which is attached hereto as Exhibit "B".

## IV.
## FEE PROCEDURES AND MONTHLY FEE STATEMENTS

18.    On November 4, 2005, this Court entered an Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  On March 8, 2006,

this Court entered a Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for

Interim Compensation and Reimbursement of Expense of Professionals (Docket No. 2747) (the

"Supplemental Interim Compensation Order"), which, among other things, clarified the

deadlines for retained professionals to submit interim and final fee applications.  On March 28,

2006, this Court entered a Second Supplemental Order Under 11 U.S.C. § 331 Establishing

Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (Docket

---

[4]        As discussed more fully below, O'Melveny provides discounts to the Debtors, as regards certain expenses. Specifically, O'Melveny does not charge the Debtors for outgoing facsimiles and charges the Debtors for only one-half of total travel time.

No. 2986) (the "Second Supplemental Interim Compensation Order") extending the deadline for

retained professionals to (a) file and serve their first interim fee applications and (b) serve

monthly fee statements.  On May 5, 2006, this Court entered its Third Supplemental Order Under

11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement of

Expenses of Professionals (Docket No. 3630) (the "Third Supplemental Interim Compensation

Order"), which established a Fee Review Committee (as defined below), approved a protocol for

reviewing fees and reimbursement of expenses sought by retained professionals and further

extended the deadline (a) to file and serve the first interim fee application and (b) to serve

monthly fee statements.  On July 12, 2006, this Court entered its Fourth Supplemental Order

Under 11 U.S.C. § 331 Establishing Procedures for Interim Compensation and Reimbursement

of Expenses of Professionals (Docket No. 3630) (the "Fourth Supplemental Interim

Compensation Order"), which rescheduled the hearing on the First and Second Interim Fee

Applications and further authorized and directed the Debtors to release one-half of the holdback

for all periods ended on or before May 31, 2006.  On October 13, 2006, this Court entered its

Fifth Supplemental Order Under 11 U.S.C. § 331 Establishing Procedures for Interim

Compensation and Reimbursement of Expenses of Professionals (the "Fifth Supplemental

Interim Compensation Order," together with the Initial Interim Compensation Order,

Supplemental Interim Compensation Order, Second Supplemental Interim Compensation order,

the Third Supplemental Interim Compensation Order, and the Fourth Supplemental Interim

Compensation  Order, the "Interim Compensation Order"), which again rescheduled the hearing

on the First and Second Interim Fee Applications.  Pursuant to the UST Guidelines, O'Melveny

certifies that the Debtors have received a copy of this Third Interim Application but have not yet

completed its review.  In addition, pursuant to paragraph 2(a) and 2(j) of the Interim

Compensation Order, as supplemented, as well as the Fee Review Protocol (as defined below),

O'Melveny certifies that a copy of this Third Interim Application is being served via overnight

mail upon (i) the Debtors, (ii) co-counsel for the Debtors, (iii) the United States Trustee for the

Southern District of New York, (iv) the Creditors' Committee, (v) counsel for the agent under

the Debtors' prepetition credit facility, (vi) counsel for the agent under the Debtors' postpetition

credit facility, (vii) counsel to the Equity Committee, (viii) the members of the Fee Review

Committee (defined below), and (ix) the Fee and Expense Analyst to the Fee Review Committee.

O'Melveny is also serving, concurrently with this filing, notice of the filing of and the hearing on

the Third Interim Application on parties as required by paragraph 8 of the Interim Compensation

Order.  O'Melveny submits that no other or further notice need be given.

          19.   To minimize costs to the Debtors' estates and avoid duplicative efforts in

the review of fee applications filed in these Reorganization Cases, the Debtors, the official

committee of unsecured creditors (the "Creditors' Committee"), and the U.S. Trustee negotiated

the formation of a joint fee review committee (the "Fee Review Committee") to review,

comment on, and if necessary, object to the various fee applications filed in these Reorganization

Cases.  As part of the Third Supplemental Interim Compensation Order, this Court authorized the

establishment of the Fee Review Committee and approved a protocol regarding the Fee Review

Committee, its composition, mandate, and procedures (the "Fee Review Protocol").  One aspect

of the Fee Review Protocol institutes a series of procedures (the "Budget Procedures") with

regard to the submission and review of budgets (each, a "Budget") for professionals working on

these Reorganization Cases.  Pursuant to the Budget Procedures each professional must prepare

and submit to the Fee Review Committee a Budget for professional fees for each application

period.  As directed by the Fee Review Committee, application of the Budget Procedures was

waived through the Third Interim Period, with the first required Budget submission due October

31, 2006 for the time period of October 1, 2006 through January 31, 2007. The Fee Review

Committee held its initial meeting on May 17, 2006. On November 15, 2006, the Fee Review

Committee filed its Report Of The Delphi Joint Fee Review Committee Regarding Applications

For Award Of Compensation And Reimbursement Of Expenses For The Periods From October

8, 2005 Through January 31, 2006 And February 1, 2006 Through May 31, 2006, And Request

That The Court Resolve Dispute With Respect To Fee Committee Statements (Docket No. 5559)

(the "Fee Review Committee Report"). On November 28, 2006, the Fee Review Committee

filed its Supplemental Report Of The Delphi Joint Fee Review Committee Regarding

Applications For Award Of Compensation And Reimbursement Of Expenses For The Periods

From October 8, 2005 Through January 31, 2006 And February 1, 2006 Through May 31, 2006,

And Request That The Court Resolve Dispute With Respect To Fee Committee Statements

(Docket No. 5887) (the "Fee Review Committee Supplemental Report," together with the Fee

Review Committee Report, the "Fee Review Committee Reports"). The Fee Review Committee

Reports provided certain recommendations concerning the Retained Professionals' fee

applications[5] and suggested a schedule for future fee applications, which includes a proposed

March 22, 2007 hearing for the Third Interim Application.

      20.   In compliance with the Interim Compensation Order, on or before the last

day of the month following each calendar month for which compensation was sought,

O'Melveny served by overnight delivery to (i) the Debtors, (ii) co-counsel for the Debtors, (iii)

the United States Trustee for the Southern District of New York, (iv) counsel for the official

committee of unsecured creditors, (v) counsel for the agent under the Debtors' prepetition credit

---

[5]     O'Melveny continues to review its invoices in light of the recently received Fee Review Committee
recommendations. If after review O'Melveny determines that changes to its fee applications are warranted,
O'Melveny will file an amended fee application alerting this Court to any subsequent changes.

facility, (vi) counsel for the agent under the Debtors' postpetition credit facility, and (vii) the

members of the Fee Review Committee a monthly statement of all professional fees and

disbursements incurred during the preceding calendar month. The parties had at least 15 days

after receipt to review any such statement. In the event any party had an objection to the

compensation or reimbursement sought in a particular statement, such person was required to

serve the objection no later than the 45th day following the month for which compensation was

sought. If there were no objections, at the expiration of the 45 day period, the Debtors were

ordered to promptly pay 80 percent of the fees and 100 percent of the expenses identified in each

monthly statement. O'Melveny submitted monthly statements for each month during the Third

Interim Period and no objections were received.

   21. O'Melveny received from Debtors a retainer of $300,000 prepetition.

Pursuant to the terms of its Engagement Letter, a copy of which is attached hereto as Exhibit

"C," O'Melveny applied $190,886.56 of that retainer in the First Interim Period and an

additional $21,588.19 of that retainer during the Second Interim Period to pay certain invoices of

Paycraft Consulting LLC.[6] No monies, however, were used from the retainer during the Third

Interim Period, and the retainer balance remains $87,525.25.

   22. To the best of O'Melveny's knowledge, information and belief, the Debtors

have paid all postpetition expenses in the ordinary course, and there are currently no unpaid,

undisputed ordinary course, prepetition operating expenses in these cases.[7]

---

[6] Paycraft Consulting LLC ("Paycraft") was retained by O'Melveny to provide labor costing services to
Delphi and, as a result, Paycraft's invoices are sent to O'Melveny and then forwarded to Delphi as a bankruptcy
expense on O'Melveny's invoices. In order to expedite payment to Paycraft, O'Melveny paid certain Paycraft
invoices out of its retainer with the intent of replenishing the retainer when Delphi reimbursed O'Melveny for the
payments. While Delphi has since reimbursed O'Melveny for most of the Paycraft invoices, there are still two
invoices outstanding. It is O'Melveny's intent, upon receipt of the funds from Delphi, to replenish the retainer, and
seek approval during the applicable fee application period.
[7] As of the date of filing of the Third Interim Application, O'Melveny had not yet received payment for its
September invoice, dated October 25, 2006, totaling $109,155.25 in fees and $64,069.56 in expenses.

23.    To the best of O'Melveny's knowledge, information and belief, the Debtors

have sufficient funds on hand to pay the compensation and reimbursement of expenses requested

herein.

24.    To the best of O'Melveny's knowledge, information and belief, the Debtors

have filed with the United States Trustee all monthly operating reports presently due, and have

paid all quarterly fees to the United States Trustee which are presently due.

25.    O'Melveny is providing in this Third Interim Application a general

description of services rendered during the Third Interim Period.  Moreover, the actual time

records of each professional are appended as Exhibit "D" to the Third Interim Application,

thereby providing a detailed accounting of the services provided for consideration by the United

States Trustee and this Court.

**V.**

**<u>SUMMARY OF COMPENSATION REQUESTED AND SERVICES</u>**
**<u>RENDERED TO THE ESTATES DURING THIS PERIOD</u>**[8]

26.    O'Melveny seeks approval of professional fees in the amount of

$958,052.25 and reimbursement of expenses in the amount of $552,004.05 for the Third Interim

Period.  In accordance with the United States Trustee Guidelines for Reviewing Applications for

Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28

C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines"), O'Melveny has classified all services

performed for which compensation is sought for this period.  Exhibit "E" is a table listing the

names of all attorneys and paraprofessionals who have worked for the Debtors during the Third

Interim Period, and their respective hourly rates and amounts billed, in addition to other

summary information required by the UST Guidelines.  Exhibit "F" to this Third Interim

---

[8]    O'Melveny has taken every effort to ensure that this Third Interim Application is prepared in accordance
with the Guidelines for Reviewing Applications For Compensation & Reimbursement of Expenses filed under 11
U.S.C. § 330 (the "UST Guidelines") to the extent applicable.

Application sets forth with particularity each category of expenses incurred by O'Melveny on behalf of the Debtors.

27. In staffing this case, in budgeting and incurring charges and disbursements, and in preparing and submitting this Third Interim Application, O'Melveny has been mindful of the need to be efficient while providing adequate and vigorous representation to the Debtors. As described in detail herein, O'Melveny believes that the requests made in this Third Interim Application comply with this Court's standards in the context of the unique circumstances surrounding these unusually large and complex cases.

28. During the Third Interim Period, O'Melveny had primary responsibility for directing the Debtors' efforts to secure necessary relief from its collective bargaining agreements and modifications to its hourly retiree benefits. Specifically, O'Melveny took the lead in preparing for and participating in hearings on the Debtors' motion for relief from its collective bargaining agreements pursuant to 11 U.S.C. § 1113(c) and for modification to hourly retiree benefits pursuant to 11 U.S.C. § 1114(g),[9] ("Sections 1113 and 1114 Motion") before this Court, and provided regular advice to the Debtors regarding the restructuring of their labor costs.

29. Because O'Melveny was retained as special labor counsel to the Debtors as relates only to 11 U.S.C. §§ 1113 and 1114 ("Sections 1113 and 1114") advice, and related labor law advice, the activities of O'Melveny during the Third Interim Period were recorded under only one internal matter number, which therefore does not correspond to the UST Guidelines suggestions.[10] All O'Melveny professionals keep a record of the time spent rendering such

---

[9]     Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035) (the "Sections 1113 and 1114 Motion").

[10]     The Fee Review Committee has directed that all work performed on or after October 1, 2006 be recorded using the U.S. Trustee's Project Codes; accordingly, O'Melveny's billing practice has been adjusted effective October 1, 2006.

services in billing increments of one-tenth of an hour.[11]  As noted above, Exhibit "D" contains

O'Melveny's detailed invoices for this matter number.

  30. The tasks to which O'Melveny gave attention during the Third Interim

Period are summarized more fully below.  Although recitation of every item of professional

services that O'Melveny performed would unduly burden the Court, the following summary

highlights the major tasks to which O'Melveny devoted substantial time and attention during the

Third Interim Period.

  31. <u>Sections 1113/1114 Advice – Labor (-0001)</u>.  During the Third Interim

Period, O'Melveny worked with the Debtors in all aspects of the Debtors' attempts to negotiate

significant labor cost and employee benefit savings with unions representing its hourly

employees.  As discussions with the unions and other stakeholders continued during the Third

Interim Period, O'Melveny worked closely with numerous financial, operational and labor

relations personnel of the client, as well as advisors to the client, to assist in negotiations

strategy, information sharing, and to direct continuing efforts to secure relief from the various

bargaining agreements under Sections 1113 and 1114.  O'Melveny, as a part of these efforts,

provided extensive advice and counseling on labor and benefit cost analyses, the legal

requirements of Sections 1113 and 1114 of the Bankruptcy Code, strategic labor planning, and

labor aspects of the Debtors' restructuring and transformation plans.  In addition, O'Melveny

consulted with Delphi regarding proposed attrition programs and, at the Debtors' request,

reviewed the UAW's supplemental special hourly attrition program as well as similar special

hourly attrition programs proposed to the IUE-CWA and the USW.  O'Melveny attorneys also

---

[11] Although all professionals record time in increments of one-tenth of an hour, due to O'Melveny's voluntary write-off of one-half of travel time as discussed below, the total hours billed for certain professionals are expressed in one-hundredths of an hour.

communicated regularly with the Debtors and their advisors to provide advice regarding the

Debtors' information sharing with the unions.

32.    At the request of the client, the bulk of O'Melveny's efforts during the

Third Interim Period were concentrated on working with the Debtors to continue to prepare for

and participate in hearings and related proceedings regarding the Sections 1113 and 1114 Motion

and to prepare for, take, and defend ongoing discovery.  Specifically, O'Melveny participated

extensively in the hearings on Sections 1113 and 1114 Motion, held on the 2nd and 5th of June

2006, in which Debtors' concluded its presentation of the direct case in support of its Sections

1113 and 1114 Motion.  O'Melveny attorneys also participated in meet and confer sessions with

the unions and in Chambers conferences.  In addition, subsequent to each of this Court's orders

postponing further hearing dates for the Sections 1113 and 1114 Motion to encourage ongoing

discussions for a consensual resolution, O'Melveny's attorneys, at the request of the client,

engaged in the preparation necessary to respond to the unions' objections in the event the

hearings proceeded as scheduled.  As a part of these hearing preparations, O'Melveny took the

lead in taking the depositions of an additional two union fact witnesses, as well as in preparing

and defending the deposition of Debtors' additional expert witness.  O'Melveny also conferred

with and prepared witnesses, including expert witnesses, for deposition and hearing, and drafted

and filed supplemental declarations on behalf of several of the Debtors' expert and fact

witnesses.  Additionally, O'Melveny reviewed depositions and trial testimony from the Debtors'

case-in-chief and drafted and prepared a detailed summary of trial evidence to be used to draft

trial cross-examinations of the unions' fact and expert witnesses.  Finally, O'Melveny took the

lead in drafting the Debtors' opposition to the IAM and the IBEW's motion seeking dismissal of the Debtors' 1113/1114 Motion,[12] and an initial draft of the Debtors' post-hearing brief.

33.    During the Third Interim Period, attorneys and paraprofessionals at O'Melveny billed an aggregate of 1862.70 hours[13] working on Sections 1113 and 1114 matters. As noted above, Exhibit "E" sets forth the name, hourly rate, hours billed, and total fees incurred by each O'Melveny attorney and paraprofessional[14] during this time.

## VI.
## PREPARATION OF FEE APPLICATION

34.    During the Third Interim Period, O'Melveny expended 116.20 hours and $32,384.00 in fees in preparation of the Second Interim Application, which totaled $3,118,474.00 in fees and $874,459.13 in expenses. These efforts included reviewing the Fee Review Committee Protocol and Billing Guidelines, first provided to the Retained Professionals in June 2006, and ensuring compliance with the relevant provisions.

## VII.
## LIST OF EXPENSES

35.    In connection with its representation of the Debtors during the Third Interim Period, O'Melveny advanced necessary expenses totaling $552,004.05.[15] A detailed description of expenses incurred during the case is attached hereto as Exhibit "F".

36.    O'Melveny requests reimbursement for expenses including costs advanced for computerized research, delivery services, photocopies, long distance phone calls, fees

---

[12]    Debtors' Response To International Association Of Machinists And Aerospace Workers, District 10 And International Brotherhood Of Electrical Workers, Local 663 Motion For Judgment On Partial Findings (Docket No. 4944).

[13]    The aggregate number of hours worked has been reduced to reflect a voluntary write-off of 16.20 hours billed by a summer associate and inadvertently charged to the Debtors.

[14]    During the Third Interim Period, there were certain paraprofessionals whose skills were needed on a single project and therefore performed only a discrete number of hours in a given month. For example, Keith Whitman and Michael Montalto assisted with the electronic filing of the Second Interim Application, Patrick McKegney helped prepare trial exhibits, and Steve Mauriello maintained and updated the electronic databases as necessary.

[15]    The majority of these expenses are expert witnesses and consultant fees.

associated with ongoing litigation, travel, and other costs necessarily incurred in connection with

its representation of the Debtors.  O'Melveny made every effort to limit expenditures and to use

the most economical means available for accomplishing the tasks requiring such expenditures.

37.    Of the expenses, copying charges total $3,584.10.  O'Melveny's standard

in-house charge for photocopying is $0.15 per page.  The Debtors, however, are charged only

$0.10 per page.

38.    O'Melveny also incurred costs for sending correspondence regarding the

case.  O'Melveny charges $1.25 per page for outgoing facsimiles plus long distance phone

charges, if applicable, but does not charge for incoming facsimiles.  The Debtors, however, have

not been charged for facsimiles other than for long distance charges associated with the

transmissions.  O'Melveny attempted to avoid overnight delivery expenses whenever possible.

39.    In addition to the above expenses, O'Melveny incurred expenses in

connection with the travel of its attorneys, including travel to meetings and hearings before this

Court in New York City, in connection with travel from its offices in Washington, D.C., New

York City, and Los Angeles to Michigan for meetings with the client and others at the client's

request, and in connection with travel to Michigan, Ohio and New York for depositions of union

and expert witnesses.  These airfare and travel-related expenses totaled $49,011.08.[16]  In

addition, O'Melveny's standard practice is to charge for 100 percent of travel time, which is also

the charge for non-bankruptcy clients generally.  The Debtors, however, are charged for only 50

percent of travel time.[17]

---

[16]    As shown in Exhibit "F", this figure includes $40,810.66 for general travel expenses (including hotel, car rental, parking, taxis and meal expenses, and the like), $3,367.59 for meals while on travel, $2,102.50 in direct bill airfare, and $2,730.33 in local travel costs (of which $782.66 were overtime taxi charges and $1,947.67 were taxi charges for non-overtime purposes, such as taxis to court, meetings or airports).
[17]    This 50 percent discount is taken into account up-front, with O'Melveny's invoices to the client reflecting only one-half of total travel time.

**VII.**
**HOURLY RATES**

40.    The hourly rates of all professionals and paraprofessionals rendering

services in this case for the Third Interim Period are set forth in Exhibit "E".  O'Melveny

submits that these rates are reasonable and within the range of customary rates in the Southern

District of New York for professionals of similar experience and expertise in cases other than

those under title 11.  Exhibit "E" also sets forth the year of admittance to each attorney's bar, the

number of hours billed during the Third Interim Period, and the total fees attributable to each

professional and paraprofessional, as well as other summary information required by the UST

Guidelines.

41.    O'Melveny sought to control its fees by administering the case efficiently

and coordinating the efficient prosecution of matters.  Staffing of matters within the case was

done with the intent to provide the optimal level of representation given the importance and

complexity of a particular matter, and to avoid duplication of other professional efforts,

including those of bankruptcy counsel Skadden, Arps, Slate, Meagher & Flom (Illinois).

**IX.**
**LEGAL ARGUMENT**

A.    The Legal Standard

42.    Section 331 of the Bankruptcy Code provides for interim compensation of

professionals and incorporates the substantive standards of section 330, as applies to final

allowances, to govern the Court's award of such compensation.  11 U.S.C. § 331.  Section 330

provides that a court may award a professional employed under section 327 of the Bankruptcy

Code "reasonable compensation for actual, necessary services rendered . . . and reimbursement

for actual, necessary expenses."  11 U.S.C. § 330(a)(1).  Section 330 also sets forth the criteria

for the award of such compensation and reimbursement:

> In determining the amount of reasonable compensation to be
> awarded . . . the court should consider the nature, the extent, and
> the value of such services, taking into account all relevant factors,
> including –
>
> > (A)    the time spent on such services;
> >
> > (B)    the rates charged for such services;
> >
> > (C)    whether the services were necessary to the administration of, or
> > beneficial at the time at which the service was rendered toward the
> > completion of, a case under this title;
> >
> > (D)    whether the services were performed within a reasonable amount
> > of time commensurate with the complexity, importance, and nature
> > of the problem, issue, or task addressed; [and] . . .
> >
> > (F)    whether the compensation is reasonable based on the customary
> > compensation charged by comparably skilled practitioners in cases
> > other than cases under this title.

11 U.S.C. § 330(a)(3).

43.    To grant a request for compensation, this Court must find that such request

is reasonable.  The Second Circuit, in evaluating the reasonableness of a requested fee, has

adopted the twelve-factor test of Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th

Cir. 1974), which includes such factors as the time and labor involved; the novelty and difficulty

of the questions; the skill requisite to perform the legal service properly; customary fee; the

amount involved and the results obtained; experience, reputation, and ability of the attorneys;

and awards in similar cases.  See United States Football League v. Nat'l Football League, 887

F.2d 408, 425 (2d Cir. 1989) (awarding plaintiffs-appellees attorney's fees against defendants-

appellants for work done in connection with an antitrust suit).  The reasonableness of a

compensation request is determined by taking into account the nature, extent and value of the

services provided by the professional and the cost of comparable services.  See Colbert v.

Furumoto Realty, Inc., 144 F. Supp. 2d 251, 260 (S.D.N.Y. 2001); see also Zolfo, Cooper & Co.

v. Sunbeam-Oster Co., 50 F.3d 253 (3d Cir. 1995); In re Busy Beaver Bldg. Ctr., Inc., 19 F.3d 833, 849 (3d Cir. 1994).[18]

B.    O'Melveny's Fees Are Reasonable

44.    The professional services rendered by O'Melveny during the Third Interim Period required a high degree of professional competence and expertise. The provision of such services, therefore, has required the expenditure of substantial time and effort. O'Melveny submits that the services rendered were performed efficiently, effectively and economically and that the results obtained thus far have provided a significant benefit to the estates of the Debtors and their creditors.

45.    In accordance with its practice in other matters, O'Melveny has utilized the lodestar method for calculating its compensation requested in this Third Interim Application. There is a strong presumption that the lodestar product is reasonable. See Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986); In re Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).

46.    In awarding attorneys' fees, courts will also consider whether the services rendered were reasonably likely to benefit the debtor's estate. See e.g., In re Ames Dep't Stores, Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. United States Trustee, 540 U.S. 526 (2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997); In re Drexel Lambert Group, 133 B.R. at 22. Thus, the Court should focus on what a reasonable lawyer would have done at the time and not invoke a hindsight analysis.

---

[18]    In the "market-driven approach" to compensation requests, the primary focus of the inquiry is the cost of comparable services in non-bankruptcy contexts. See Zolfo, Cooper, & Co., v. Sunbean-Oster Co., 50 F.3d 253, 258; see also In re Busy Beaver Bldg. Ctr., Inc., 19 F.3d 833, 849-50; In re Fine Paper Antitrust Litig., 751 F.2d 562, 583 (3d Cir. 1984) ("[t]he value of an attorney's time generally is reflected in his normal billing rate"). This market-based approach permits flexibility in billing arrangements. The "lodestar" method (hourly rate multiplied by hours worked) is currently the most widely utilized method for compensation arrangements, but regardless of the manner in which compensation is calculated, "[t]he baseline rule is for firms to receive their customary rates." Zolfo, Cooper, 50 F.3d at 259.

> [I]t is important for a court to maintain a sense of overall proportion and not become enmeshed in meticulous analysis of every detailed facet of the professional representation.  It is easy to speculate that the work could have been done in less time or with fewer attorneys or with an associate rather than a partner.  On the other hand, it is also possible that [the debtor] would not have enjoyed the success it did had its counsel managed matters differently.

Boston & Maine Corp. v Moore, 776 F.2d 2, 10 (1st Cir. 1985) (citations omitted).

47.    O'Melveny's fees during the Third Interim Period were reasonable under the prevailing legal standard and should be allowed.  The amount of these fees is not unusual given the size of the Debtors' business and the capacity in which O'Melveny served as special counsel.  These fees are commensurate with fees that O'Melveny and other attorneys of comparable experience and expertise have charged for similar services.

C.    O'Melveny's Expenses Were Actual And Necessary

48.    Section 330(a)(1)(B) of the Bankruptcy Code permits reimbursement for actual, necessary expenses.  Moreover, reimbursement for actual, necessary expenses is permitted in the Second Circuit.  Accordingly, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.  See United States Football League, 887 F.2d at 416; see also Kuzma v. IRS, 821 F.2d 930, 933-34 (2d Cir. 1987) see also Zolfo, Cooper, 50 F.3d at 258.  As noted above, O'Melveny has conducted a review to ensure compliance of expenses with the UST Guidelines.  Accordingly, those expenses for which reimbursement is sought in this Application satisfy the standards set forth in section 330(a)(1)(B) of the Bankruptcy Code as well as in United States Football League and Kuzma, and should therefore be allowed.

## X.
## DESCRIPTION OF PROFESSIONAL EDUCATION AND EXPERIENCE

49.   The biographies of the primary attorneys[19] employed by O'Melveny who

rendered services in this case are attached as Exhibit "G".

## XI.
## NO SHARING OF COMPENSATION

50.   No agreement has been made, directly or indirectly, and no understanding

exists, for a division of compensation herein between O'Melveny and any other person or

persons, contrary to any applicable provisions of the Bankruptcy Code, the Bankruptcy Rules,

the local rules or state law.

## XII.
## COMPLIANCE WITH THE UNITED STATES TRUSTEE GUIDELINES, THE LOCAL GUIDELINES, AND THE INTERIM COMPENSATION ORDER

51.   As set forth in the Certification of Tom A. Jerman With Respect To The

Third Interim Application of O'Melveny & Myers LLP For Order Authorizing And Approving

Compensation And Reimbursement Of Expenses (attached hereto as Exhibit "H"), O'Melveny

has complied fully with the UST Guidelines, the Amended Guidelines for Fees and

Disbursements for Professionals in Southern District of New York Bankruptcy Cases adopted by

the Court on April 19, 1995 (the "Local Guidelines"), and the Interim Compensation Order, to

the extent applicable.

## XIII.
## NOTICE OF THIS THIRD INTERIM APPLICATION

52.   In compliance with the Interim Compensation Order, notice of the filing of

this Third Interim Application will be provided to all parties who have filed a notice of

appearance with the Clerk of this Court and requested notice of pleadings in these chapter 11

---

[19]     As noted in Exhibit "G", biographies are provided for only those primary attorneys employed by
O'Melveny who billed more than $10,000 in fees to the Debtors during the Third Interim Period.

cases.  In addition, the Third Interim Application in its entirety will be served on the following

parties: (i) Delphi Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: David Sherbin,

Esq.), (ii) counsel to the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West

Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for

the agent under the Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017 (Att'n: Marissa Wesley, Esq.), (iv) counsel for

the agent under the postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue,

New York, New York 10017 (Att'n:  Marlane Melican, Esq.), (v) counsel for the Official

Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York,

New York 10022 (Att'n: Robert J. Rosenberg), (vi) the Office of the United States Trustee for

the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New York

10004 (Att'n:  Alicia M. Leonhard), and (vii) the members of the Delphi Fee Review Committee.

In light of the nature of the relief requested, the Debtors submit that no other or further notice is

required.

## XIV.
## MEMORANDUM OF LAW

53.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

## XV.
## CONCLUSION

WHEREFORE, O'Melveny requests that this Court authorize and approve the

compensation in the amount of $958,052.25, including the 20 percent Holdback in the amount of

$191,610.45, and reimbursement of expenses in the amount of $552,004.05 for the Third Interim

Period.  O'Melveny also requests that this Court grant such further relief as may be deemed just

and proper.


DATED:  November 30, 2006

                                    ROBERT A. SIEGEL (RS 0922)
                                    TOM A. JERMAN (TJ 1129)
                                    O'MELVENY & MYERS LLP


                          By ____/s/ Tom A. Jerman_____
                                    Tom A. Jerman
                                    Attorney for Delphi Corporation,
                                    et al., Debtors and Debtors-in-
                                            Possession