**Hearing Date: March 22, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
        In re                           :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :    Case No. 05-44481 (RDD)
                                        :
                                        :    (Jointly Administered)
        Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THIRD INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("THIRD SKADDEN INTERIM FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | June 1, 2006 through September 30, 2006 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | **$10,025,538** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | **$848,232** |
| Voluntary Reductions: | |
| Monthly Fee Statements: | **$1,162,112** |
| Third Fee Application: | **$52,227** |
| Total Voluntary Reductions: | **$1,214,339** |
| Additional Fee Correction | **$3,024** |
| Total Voluntary Reduction and Fee Correction | **$1,217,363** |

This is an/(a):      X    Interim            Final Application.

Aggregate Amounts Paid to Date:  $29,034,551[1]

---

[1]    This amount reflects the aggregate amounts that will be paid upon payment of 80% of the fees and 100% of the charges and disbursements billed for the period covered by this Interim Application.

### PRIOR FEE APPLICATIONS

| Prior Fee Application | Date Filed | Period Covered | Interim Fees Requested (Awarded) | Interim Expense Reimbursement Requested (Awarded) |
|---|---|---|---|---|
| First | 05/31/06 | 10/08/05 – 01/31/06 | $9,200,920 (Pending) | $622,420 (Pending) |
| Second | 07/31/06 | 02/01/06 – 05/31/06 | $11,310,231 (Pending) | $825,854 (Pending) |

TIME SUMMARY TO THIRD INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
JUNE 1, 2006 – SEPTEMBER 30, 2006

| Name | Year Of Admission | Rate[2] | Hours | Amount |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Butler, Jr., John Wm. | 1980 | $744 | 980.9 | $730,178 |
| Marafioti, Kayalyn A. | 1980 | $795 | 609.2 | $484,328 |
| Hogan, III, Albert L. | 1997 | $605 | 712.7 | $431,210 |
| Cochran, Eric L. | 1987 | $795 | 477.2 | $379,378 |
| Lyons, John K. | 1989 | $640 | 586.5 | $375,444 |
| Panagakis, George N. | 1990 | $697 | 353.3 | $246,097 |
| Furfaro, John P. | 1981 | $760 | 205.5 | $156,118 |
| Berke, Jay S. | 1972 | $735 | 185.3 | $136,241 |
| Berlin, Kenneth | 1974 | $745 | 142.3 | $105,991 |
| Krakaur, Keith D. | 1986 | $664 | 120.7 | $80,143 |
| Wexler, Marian P. | 1977 | $731 | 92.6 | $67,722 |
| Gunther, Christopher J. | 1992 | $588 | 42.2 | $24,816 |
| Gross, Cliff | 1989 | $770 | 30.6 | $23,562 |
| Hiestand, N. Lynn | 1981 | $835 | 24.1 | $20,124 |
| Brewster, Jody J. | 1986 | $695 | 26.5 | $18,419 |
| Levi, Stuart D. | 1987 | $785 | 14.4 | $11,304 |
| Gibson, Marie L. | 1997 | $585 | 16.5 | $9,654 |
| **Partner Total** | | | **4,620.5** | **$3,300,729** |
| **COUNSEL** | | | | |
| Matz, Thomas J. | 1976 | $560 | 892.9 | $500,024 |
| Shivakumar, Dhananjai | 1998 | $532 | 618.5 | $328,888 |
| Garner, Lee P. | 1995 | $540 | 435.4 | $235,218 |
| Ramlo, Kurt | 1993 | $560 | 223.4 | $125,104 |
| Sensenbrenner, Eric B. | 1996 | $560 | 137.8 | $77,168 |
| Amodeo, John A. | 1977 | $580 | 40.9 | $23,722 |
| Schneider, David A. | 1988 | $560 | 38.6 | $21,616 |
| **Counsel Total** | | | **2,387.5** | **$1,311,740** |
| **ASSOCIATES** | | | | |
| Meisler, Ron E. | 1999 | $506 | 854.0 | $432,432 |
| Reese, Randall G. | 2001 | $431 | 936.0 | $403,720 |
| Fern, Brian M. | 1996 | $479 | 693.2 | $332,087 |
| Hardin, Adlai S. | 1998 | $540 | 558.3 | $301,482 |
| Wharton, Joseph N. | 1998 | $450 | 663.0 | $298,499 |
| Stuart, Nathan L. | 2002 | $435 | 654.2 | $284,438 |
| Jjingo, M. Janine | 2006 | $335 | 813.0 | $272,363 |
| Herriott, Allison Verderber | 2004 | $351 | 686.2 | $240,665 |
| Campanario, Nick D. | 2002 | $450 | 519.1 | $233,502 |
| Wilson, Louis D. | 2000 | $510 | 366.6 | $186,966 |

---

[2]    The blended rates set forth for certain professionals reflect the average billing rate for the entire Application Period and incorporate a reduced billing rate for nonworking travel time.

| Name | Year Of Admission | Rate[2] | Hours | Amount |
|------|-------------------|---------|-------|--------|
| Houston, Brett M. | 2003 | $375 | 479.7 | $179,889 |
| VanLonkhuyzen, Courtney E. | 2004 | $359 | 469.9 | $168,695 |
| Diaz, Lisa B.* | 2006 | $284 | 520.9 | $148,112 |
| Perl, Michael W. | 2004 | $375 | 360.4 | $135,157 |
| Krebs, Peter E. | 2003 | $410 | 324.5 | $133,045 |
| Guzzardo, John | 2004 | $363 | 324.1 | $117,600 |
| Zambrano, Kathy | 2003 | $398 | 292.3 | $116,419 |
| Grant, Kellan | 2000 | $410 | 256.0 | $104,960 |
| Rohner, William M. | 2002 | $440 | 219.3 | $96,492 |
| Pehlke, David R. | 2005 | $335 | 215.2 | $72,093 |
| Willenken, Karen E. | 2000 | $475 | 140.2 | $66,555 |
| Ziegler, Venera E. | 2003 | $510 | 129.6 | $66,096 |
| Kohut, Ronald D. | 2004 | $410 | 135.8 | $55,678 |
| Danz, Catherine E. | 2001 | $465 | 118.7 | $55,197 |
| Toussi, Sina | 1995 | $540 | 97.6 | $52,704 |
| MacDonald, F. Neil | 1997 | $489 | 93.4 | $45,711 |
| Feinberg, Aaron S. | 2002 | $465 | 68.9 | $32,039 |
| Phillips, Daniel P. | 1998 | $540 | 54.7 | $29,538 |
| Shih, Jonathan L.* | | $295 | 94.3 | $27,819 |
| Olasky, Peter | 2005 | $375 | 33.8 | $12,677 |
| Pilkington, Christian | Foreign (1999) | $540 | 21.2 | $11,448 |
| Stenger, Allen | 2004 | $410 | 27.8 | $11,398 |
| Ubani, John | 2000 | $440 | 16.2 | $7,128 |
| Naguiat, Ramon M. | 2000 | $440 | 12.9 | $5,676 |
| Ogunsanya, Gregory O. | 2004 | $440 | 12.1 | $5,324 |
| MacDonald, Thomas W. | 2005 | $335 | 12.4 | $4,154 |
| **Associate Total** | | | **11,275.5** | **$4,747,758** |
| **PARAPROFESSIONALS** | | | | |
| Rosen, Ruth | N/A | $230 | 566.8 | $130,364 |
| Demma, Jeffrey | N/A | $230 | 565.1 | $129,973 |
| Zsoldos, Andrew F. | N/A | $151 | 587.7 | $88,805 |
| Salazar, Adriana | N/A | $182 | 442.3 | $80,320 |
| Klimek, Marsha V. | N/A | $230 | 244.6 | $56,258 |
| Jacobson, Susan J. | N/A | $230 | 160.2 | $36,846 |
| Donnelly, Neal P. | N/A | $180 | 163.1 | $29,439 |
| DiBella, Joseph B. | N/A | $210 | 130.1 | $27,321 |
| Worscheck, Toby M. | N/A | $75 | 277.7 | $20,829 |
| Rivera, Maira | N/A | $75 | 165.9 | $12,443 |
| Nowicki, John A. | N/A | $230 | 52.9 | $12,167 |
| Gilchrist, Julie M. | N/A | $230 | 32.7 | $7,521 |
| Yoeli, Matthew E. | N/A | $145 | 50.8 | $7,366 |
| Driscoll, Brandon C. | N/A | $95 | 62.1 | $5,900 |
| Millican, Ian S. | N/A | $145 | 28.3 | $4,104 |
| Terry, William C. | N/A | $260 | 14.7 | $3,822 |
| Morong, Christine | N/A | $230 | 13.4 | $3,082 |
| Chavali, Aruna | N/A | $145 | 21.0 | $3,046 |

| Name | Year Of Admission | Rate[2] | Hours | Amount |
|---|---|---|---|---|
| Senner, Jaclyn | N/A | $95 | 31.0 | $2,945 |
| Chow, Pauline P. | N/A | $230 | 12.0 | $2,760 |
| **Paraprofessional Total** | | | **3,622.4** | **$665,311** |
| **TOTAL ALL PROFESSIONALS** | | | **21,905.9** | **$10,025,538** |
| This summary excludes voluntary fee reductions of $1,103,448, of which $1,051,221 was reduced on the monthly statements and $52,227[3] is an additional accommodation on this Interim Application. | | | | |

\* These timekeepers are "Law Clerks."  Law Clerks are law school graduates who have not yet been admitted to practice.  For purposes of billing statistics, law clerks are included with associates.  Lisa B. Diaz was admitted to practice in November 2006, however, after the Application Period.

---

[3]     In accordance with Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995, Skadden has identified those entries within Exhibits D-1 through D-34 for which accommodations are being provided pursuant to this Interim Application.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
JUNE 1, 2006 – SEPTEMBER 30, 2006

| Activities | Hours | Fees |
|---|---|---|
| Customer Matters (GM) | 3,448.3 | $1,699,180 (16.9%) |
| Employee Matters (Labor Unions) | 2,752.5 | $1,387,983 (13.8%) |
| Reorganization Plan / Plan Sponsors | 1,341.0 | $820,818 (8.2%) |
| Customer Matters (Reviews/Investigations) | 1,590.0 | $743,110 (7.4%) |
| Case Administration | 2,133.8 | $604,443 (6.0%) |
| Asset Dispositions (General) | 1,125.9 | $554,644 (5.5%) |
| Claims Administration (General) | 1,142.2 | $467,214 (4.7%) |
| Automatic Stay (Relief Actions) | 794.2 | $356,684 (3.6%) |
| Nonworking Travel Time | 1,205.8 | $351,261 (3.5%) |
| Creditor Meetings / Statutory Committees | 755.4 | $341,135 (3.4%) |
| Supplier Matters | 807.1 | $331,877 (3.3%) |
| Tax Matters | 592.4 | $319,866 (3.2%) |
| Employee Matters (General) | 602.4 | $308,544 (3.1%) |
| Business Operations / Strategic Planning | 518.1 | $304,824 (3.0%) |
| Retention / Fee Matters / Objections (Others) | 679.3 | $241,482 (2.4%) |
| Claims Administration (Reclamation/Trust Funds) | 462.2 | $217,669 (2.2%) |
| General Corporate Advice | 248.6 | $161,208 (1.6%) |
| Secured Claims | 354.5 | $153,028 (1.5%) |
| Retention / Fee Matters (SASM&F) | 339.5 | $134,152 (1.3%) |
| Environmental Matters | 196.3 | $129,158 (1.3%) |
| Leases (Real Property) | 169.0 | $81,111 (0.8%) |
| Executory Contracts (Personalty) | 160.4 | $69,027 (0.7%) |
| Liquidation/Feasibility | 96.9 | $41,946 (0.4%) |
| Global Subsidiaries (Non-U.S.) | 48.7 | $32,906 (0.3%) |
| Intellectual Property | 65.9 | $32,050 (0.3%) |

| Activities | Hours | Fees |
|---|---|---|
| Real Estate (Owned) | 56.3 | $31,005 (0.3%) |
| Employee Matters (Pension) | 66.6 | $28,202 (0.3%) |
| Asset Dispositions (Real Property) | 30.8 | $21,490 (0.2%) |
| Customer Matters (General) | 31.2 | $15,305 (0.2%) |
| Utilities | 37.0 | $13,398 (0.1%) |
| Insurance | 21.4 | $11,417 (0.1%) |
| Litigation (General) | 18.3 | $11,076 (0.1%) |
| Reports and Schedules | 13.9 | $8,325 (0.1%) |
| **Total** | **21,905.9** | **$10,025,538** |

**Hearing Date: March 22, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                         :
        In re                           :     Chapter 11
                                         :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                         :
                                       :     (Jointly Administered)
                Debtors.             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

THIRD INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("THIRD SKADDEN INTERIM FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),

debtors and debtors-in-possession in the above-captioned cases (the "Reorganization Cases"),

submits this third interim application (the "Interim Application") seeking interim allowance and

payment of compensation and reimbursement of expenses under 11 U.S.C. §§ 330 and 331 for the

period from June 1, 2006 through September 30, 2006 (the "Application Period").  Skadden

submits this Interim Application for (a) allowance of compensation for professional services

rendered by Skadden to the Debtors and (b) reimbursement of actual and necessary charges and

disbursements incurred by Skadden in the rendition of required professional services on behalf of

the Debtors.  In support of this Interim Application, Skadden represents as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005 (the "Petition Dates"), Delphi and certain of its

U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the

"Bankruptcy Code").  The Debtors continue to operate their businesses and manage their

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11

cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the

"Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

2

3.       On May 5, 2006, this Court authorized the establishment of a joint fee review committee (the "Fee Review Committee") and approved a protocol regarding the committee, its composition, mandate, and procedures (Docket No. 3630).  The Fee Review Committee is comprised of a representative of each of: (a) the U.S. Trustee for this District; (b) the Debtors; and (c) the Creditors' Committee.

4.       This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.       The statutory predicates for the relief requested herein are sections 330 and 331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules").  This Interim Application has been prepared in accordance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995 (the "Local Guidelines"), and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines" and, together with the Local Guidelines, the "Guidelines").  Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is attached hereto as Exhibit A.

Retention Of Skadden

6.       Upon the commencement of the Reorganization Cases, the Debtors applied to this Court for an order approving the retention of Skadden as their principal restructuring and bankruptcy counsel (the "Retention Application") to perform legal services under a general

3

retainer that was necessary to enable the Debtors to faithfully execute their duties as

debtors-in-possession.  On November 4, 2005, this Court entered an order (the "Retention

Order")[4] authorizing the Debtors to employ Skadden as their counsel under the terms set forth in

the Retention Application.[5]

       7.    In the Retention Application, the Debtors disclosed that Skadden's fees for

professional services are based on its guideline hourly rates, which are periodically adjusted.  The

Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are

invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy

of which is attached to the Engagement Agreement.  Certain charges and disbursements are not

charged separately under the bundled rate structure as described in the Retention Application.

Other than an arrangement between Skadden and its members, there is no agreement or

understanding between Skadden and any person for the sharing of compensation to be received

for services rendered in this case.

<u>Fee Procedures And Monthly Fee Statements</u>

       8.    On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331

Establishing Procedures for Interim Compensation and Reimbursement of Expenses of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  This order was

subsequently amended on March 8, 2006 (Docket No. 2747), March 28, 2006 (Docket No. 2986),

May 5, 2006 (Docket No. 3630), July 12, 2006 (Docket No. 4545), and October 13, 2006 (Docket

No. 5310) (collectively and together with the Initial Interim Compensation Order, the "Interim

---

[4]    A copy of the Retention Application, the supporting declaration, and the Retention Order are attached hereto as <u>Exhibit B</u>.  These materials include factual information regarding the experience and standing at the bar of certain of Skadden's senior attorneys.

[5]    The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement"), between Skadden and the Debtors, a copy of which is attached as <u>Exhibit A</u> to the declaration supporting the Retention Application.

Compensation Order").  Pursuant to the fourth supplemental order entered on July 12, 2006

(Docket No. 4545), this Court approved the release of 50% of the holdback amount accrued

through May 31, 2006.  Moreover, in the fifth supplemental order entered on October 13, 2006,

(Docket No. 5310), the Court adjourned the hearing date for professionals' first and second

interim fee applications from October 19, 2006 to November 30, 2006, and, except as provided

below, maintained October 12, 2006 as the objection deadline for the first and second interim fee

applications (in accordance with the supplemental case management order), while extending the

Fee Committee's objection deadline with respect to the first and second interim fee applications to

November 15, 2006.

9.      To monitor costs to the Debtors' estates and avoid duplicative efforts in the

review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors'

Committee, and the U.S. Trustee negotiated the formation of the Fee Review Committee to

review, comment on, and, if necessary, object to the various fee applications filed in these

Reorganization Cases.  On May 5, 2006, this Court authorized the establishment of the Fee

Review Committee and approved a protocol regarding the Fee Review Committee, its

composition, mandate, and procedures (Docket No. 3630) (the "Fee Review Protocol").  On

August 17, 2006, this Court entered an order authorizing the Fee Review Committee to retain

Legal Cost Control, Inc. as fee analyst to assist the Fee Review Committee (Docket No. 4959).

10.      Pursuant to paragraphs 2(a), 2(j), and 7 of the Interim Compensation Order,

as supplemented, and the Fee Review Protocol, Skadden is submitting this Interim Application to

the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the

Debtors' prepetition credit facility, counsel to the agent under the Debtors' postpetition credit

facility, and the members of the Fee Review Committee and its advisors.

5

## Overview Of Delphi Corporation

11.     Delphi and its subsidiaries and affiliates (collectively, the "Company"), as of December 31, 2005 had global 2005 net sales of $26.9 billion, and global assets as of December 31, 2005 of approximately $17.0 billion.[6]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

12.     The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer (each an "OEM").

13.     Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

---

[6]     The aggregated financial data used in this Interim Application generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

## Events Leading To Chapter 11 Filing

14.     In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[7]  Reflective of a

continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4

billion on net sales of $26.9 billion.

15.     The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

original equipment manufacturers resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (c) increasing

commodity prices.

16.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

---

[7]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss
in calendar year 2004 was approximately $482 million.

<u>The Debtors' Transformation Plan</u>

17.    On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to a stable,

profitable business operation and allow the Debtors to emerge from these chapter 11 cases in the

first half of 2007.  To complete their restructuring process, the Debtors must focus on five key

areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to

conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for Delphi's legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a

workable solution to their current pension situation.

18.    In connection with the first two elements of the Company's transformation

plan, Delphi continues to participate in discussions with its unions and GM.  Because Delphi was

not able to achieve comprehensive agreements with its unions and GM during the first six months

of these chapter 11 cases, however, on March 31, 2006, Delphi moved under sections 1113 and

1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify

retiree benefits.[8]  On May 9, 2006, the hearing on the Debtors' 1113/1114 Motion commenced.

Contemporaneously with the filing of the 1113/1114 Motion, the Debtors also moved to reject

---

[8]    <u>See</u> Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035) (the
"1113/1114 Motion").

unprofitable supply contracts with GM.[9]  Among the reasons for the GM Contract Rejection

Motion was the Debtors' belief that GM must cover a greater portion of the costs of

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This

initial motion covers approximately half of the Debtors' North American annual purchase volume

revenue from GM but only 10% of the Debtors' total contracts with GM.  Although the filing of

these motions was a necessary procedural step, the Debtors continued to pursue a consensual

resolution with all of Delphi's unions and GM before the merits of the motion are determined by

the Court.  In fact, due to the continued negotiations among the parties, during the Application

Period, the Debtors, Delphi's unions, and GM agreed to adjourn the 1113/1114 Motion and the

GM Contract Rejection Motion and have scheduled periodic status hearings to apprise this Court

of progress and, if necessary, to set a date to resume the litigation.

　　　　　19.　　　Throughout these cases and notwithstanding the 1113/1114 Motion and the

GM Contract Rejection Motion, Delphi has consistently communicated a clear message to both

its hourly workforce and GM:  Delphi is committed to finding a consensual resolution and intends

to continue to discuss with its unions and GM ways to become competitive in the Debtors' U.S.

operations.  To that end, prior to the Application Period, Delphi, GM, and the United Automobile,

Aerospace and Agricultural Implement Workers of America (the "UAW") received this Court's

approval of a tripartite agreement providing for a special hourly attrition program for Delphi's

---

[9]    See Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033) (the "GM Contract Rejection
Motion").

9

UAW-represented employees.[10]  During the Application Period, on July 7, 2006, this Court

entered an order approving a similar special attrition program with the International Union of

Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of

America, (the "IUE-CWA") and a Supplement to the UAW special attrition program (Docket No.

4461).[11]  As of September 26, 2006, approximately 12,400 of UAW-represented employees of

Delphi have opted to retire by January 1, 2007 and approximately 1,400 additional

UAW-represented employees of Delphi elected a buyout.  Furthermore, as of August 18, 2006,

approximately 6,300 IUE-CWA-represented employees of Delphi, representing approximately

83% of the eligible IUE-CWA-represented workforce, opted to participate in the attrition

program.  Although these special hourly attrition programs will provide nearly two-thirds of

Delphi's existing UAW and IUE-CWA-represented long-term hourly employees (as of

September 26, 2006 and August 18, 2006, respectively) with "soft landings" through a

combination of retirement programs, attrition programs, and GM flowbacks, the attrition

programs do not resolve the issues related to Delphi's uncompetitive labor agreements.

       20.     To implement the third element of the Debtors' transformation plan, the

Company announced plans to focus its product portfolio on those core technologies for which the

Company has significant competitive and technological advantages and expects the greatest

opportunities for increased growth.  To that end, the Company will focus the organization around

---

[10]    On May 8, 2006, the Court entered an order approving the agreement relating to the UAW's special hourly attrition program (Docket No. 3648), and that order was amended by this Court on May 12, 2006 (Docket No. 3754).  On May 18, 2006, Wilmington Trust Company, as indenture trustee, filed a notice of appeal related to both the May 8, 2006 order and the May 12, 2006 amended order approving the agreement related to the UAW's special hourly attrition program (Docket No. 3813).

[11]    On July 17, 2006, Wilmington Trust Company, as indenture trustee, filed a notice of appeal related to the July 7, 2006 order approving a special attrition program with the IUE-CWA and a Supplement to the UAW special attrition program (Docket No. 4572).  Furthermore, Delphi is currently negotiating the terms of similar programs with the United Steelworkers of America and Delphi's other unions, which, if agreed upon, would provide those hourly employees with comparable retirement programs and incentives.

the following core strategic product lines: (a) Controls & Security (Body Security, Mechatronics, and Displays), (b) Electrical/Electronic Architecture (Electrical/Electronic Distribution Systems, Connection Systems, and Electrical Centers), (c) Entertainment & Communications (Audio, Navigation, and Telematics), (d) Powertrain (Diesel and Gas Engine Management Systems), (e) Safety (Occupant Protection and Safety Electronics), and (f) Thermal (Climate Control & Powertrain Cooling).[12]

21.    In contrast, the Company similarly identified certain non-core product lines that do not fit into its future strategic framework, including Brake & Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches, Power Products, Ride Dynamics, Steering, and Wheel Bearings.  The Company will sell or wind down these non-core product lines (which will include approximately one-third of its global manufacturing sites) and will consult with its customers, unions, and other stakeholders to carefully manage the transition of such affected product lines.  The Company intends to sell or wind down the non-core product lines and manufacturing sites by January 1, 2008.

22.    As part of its organizational restructuring, the fourth element of the Debtors' transformation plan, the Company expects to reduce its global salaried workforce by as many as 8,500 employees as a result of portfolio and product rationalizations and initiatives adopted following an analysis of the Company's selling, general, and administration ("SG&A") cost saving opportunities.  The Company believes that once its SG&A plan is fully implemented, the Company should realize savings of approximately $450 million per year in addition to savings

---

[12]    The Company does not expect the portfolio changes to have a significant impact on its independent aftermarket or consumer electronics businesses.  Similarly, the Company does not expect an impact on medical, commercial vehicles, or other adjacent-market businesses and product lines.

realized from competitive measures planned for its core businesses and the disposition of non-core assets.

23.    As noted above, the final element of the transformation plan is to devise a workable solution to the Debtors' current pension situation.  The Debtors' goal is to retain the benefits accrued under the existing defined benefit U.S. pension plans for both the Debtors' hourly and salaried workforce.  To do so, however, the Debtors anticipate freezing the current hourly U.S. pension plan and the current salaried U.S. pension plan as of a date certain during the first-half of calendar year 2007.  Devising a workable solution to the Debtors' current pension situation is being discussed among the Debtors, GM, and various constituencies and stakeholders and the Debtors anticipate that the current pension situation will be resolved through these discussions and a plan of reorganization.

24.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will continue to marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Significant Events During The Application Period</u>

25.    The most significant events to occur during the Application Period arose from multi-party negotiations concerning the framework of a potential consensual restructuring of the Debtors' capital structure and operations consistent with the Debtors' previously announced transformation plan.  Approximately 25% of the professional fees for which the approval is sought in this Interim Application relate to the Debtors' development of a draft framework, which

12

has included intense negotiations with their largest customer and would provide for a global

settlement among the Debtors, GM, the Creditors' Committee, the Equity Committee, and

potential investors in a reorganization plan.  The framework agreement remains a work in

progress, and material issues remain outstanding.  Nevertheless, these discussions have advanced

the Debtors' reorganization in several meaningful respects and the Debtors continue to believe

that they will be able to emerge from these chapter 11 cases during the first half of 2007.

A.    Negotiations With Unions And GM

26.    As this Court is aware and as mentioned above, on March 31, 2006, the

Debtors filed the 1113/1114 Motion and the GM Contract Rejection Motion.  During the

Application Period, and as a result of the negotiations among the Debtors, GM, the IUE-CWA,

and the UAW, approval was sought and gained for special attrition programs.

27.    Also during the Application Period, the Debtors have been negotiating key

business points with GM that will likely be incorporated into a comprehensive agreement with

GM that would govern various operational aspects of their commercial relationship.  Among

other things, the Debtors and GM are negotiating forward looking revenue commitments and

economic support with respect to legacy liabilities.  The negotiations on these matters began on a

standalone basis and toward the latter half of the Application Period were incorporated into

discussions with the Creditors' Committee, the Equity Committee, and the potential plan

sponsors.

28.    Four days prior to the commencement of the formal "framework

discussions," on July 28, 2006, the Creditors' Committee filed its Motion For An Order

Authorizing The Official Committee Of Unsecured Creditors To Prosecute The Debtors' Claims

And Defenses Against General Motors Corporation (Docket No. 4718) (the "STN Motion")

requesting this Court's authority to prosecute the Debtors' claims and defenses against GM and

certain former officers of the Debtors on Delphi's behalf.  Attached under seal to the STN Motion

was a draft complaint against GM asserting numerous allegations against the Debtors' former

parent.  As a result of the progress achieved thus far in the framework discussions, however, the

Creditors' Committee agreed to adjourn the STN Motion.  The Debtors and other

parties-in-interest also agreed to adjourn the 1113/1114 Motion and the GM Contract Rejection

Motion, with periodic chambers conferences in the interim, with the trial calendar on these

matters resuming on a date to be determined by the Court as may be requested by the Debtors.[13]

The adjournment of these motions has permitted the Debtors and their professionals to focus their

attention on negotiations with key stakeholders to develop the basis for a successful plan of

reorganization and is consistent with the Debtors' previously stated goal of achieving a

consensual reorganization.

B.      Framework Discussions

29.      As stated, the framework discussions began in earnest on August 1, 2006

with "leveling-up" meetings between the Debtors and its statutory committees.  Promptly

thereafter, the Debtors, GM, and the Creditors' Committee began exchanging proposals that

addressed issues such as possible capital structures for the reorganized Debtors, disposition of the

Debtors' legacy obligations, and various aspects of the Debtors' relationship with GM.  On August

3, 2006, the Debtors, GM, the Creditors' Committee, and various professionals held the first of a

series of extended meetings and negotiating sessions at Skadden's offices in New York.  The

parties have exchanged various draft agreements and term sheets which, taken together, have

advanced negotiations considerably.

---

[13]    The Debtors have reserved their right to seek a hearing on these motions should circumstances so require.

30.    By late September 2006, other stakeholders had joined the discussions. Specifically, the Debtors and their advisors met several times with representatives from the Equity Committee and an investor group led by Appaloosa Management L.P. and Harbinger Capital Partners, both separately and together with GM and the Creditors' Committee.  The Debtors and their advisors also have met with representatives from several other potential plan investors.  The Debtors, with the assistance of Skadden, have negotiated and executed confidentiality agreements with all of these parties and have responded to multiple diligence requests.

31.    Ultimately, these framework discussions produced multiple framework proposals from the stakeholders described above, which the Debtors carefully evaluated.  All of the proposals were intended to provide a basis for developing a plan of reorganization.  The proposals addressed various matters including the following:  (a) allocation of legacy liabilities; (b) wind down or divestiture of non-core North American facilities; (c) GM contribution and recovery; (d) plan treatment for various stakeholders; (e) limitations on general unsecured claims; (f) future capital structure; and (g) corporate governance upon emergence.

32.    As of the end of the Application Period on September 30, 2006, the Debtors had not accepted any of the proposals, and the positions of some parties remained far apart on several issues.  In fact, while the Debtors are optimistic that a consensual arrangement can be achieved, there is no guarantee that this process ultimately will produce an agreement.  The Debtors believe, however, that the framework discussions nonetheless have yielded significant progress.  In connection with these discussions, the Debtors and their advisors, including

15

Skadden,[14] have worked diligently with the Debtors' senior management and continued

negotiations with key constituencies.  As a result, the framework discussions, have produced

multiple proposals, have drawn the committed interest of several unaffiliated potential plan

sponsors, and they have focused the energies of core stakeholders on identifying the basic

requirements for a successful reorganization of the Debtors and their businesses.  The framework

agreement, if successful, will likely be the basis for a plan of reorganization and a strategy to

emerge from chapter 11.

C.    Claims Administration

        33.    As of November 2, 2006, the Debtors received more than 16,000 proofs of

claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors

have compared proofs of claim received to scheduled liabilities and determined that there are

certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, these proofs

of claim and scheduled liabilities assert more than $37 billion in liquidated amounts plus certain

unliquidated amounts.  Although the Debtors have not completed the process of reconciling the

Proofs of Claim, the Debtors believe that the aggregate amount of claims filed is likely to exceed

the amount that will ultimately be allowed by the Court.

        34.    During the ongoing framework discussions, it has become clear to all of the

participants that the parties' ability to reach agreement on a plan for the Debtors' emergence from

chapter 11 is predicated upon a clear understanding of the scope of the claims against the Debtors

which will ultimately be allowed in these cases.  Accordingly, the Debtors have commenced an

---

[14]    Skadden is an integral part of a team of professionals retained by the Debtors to assist in their reorganization
efforts.  Skadden's assistance to the Debtors during the Application Period generally was part of a collaborative
effort with the Debtors' other retained professions, including Rothschild Inc. as financial advisors and investment
bankers, FTI Consulting, Inc. as restructuring and financial advisors, Groom Law Group Chartered as special
employee benefits counsel, Jones Lang LaSalle Americas, Inc. as real estate transaction and services providers,
O'Melveny & Myers LLP as special labor counsel, Shearman & Sterling LLP as special counsel, and Togut, Segal
& Segal LLP as conflicts counsel.

16

active reconciliation process and on September 19, 2006, filed their First Omnibus Objection

Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Duplicate And

Amended Claims And (ii) Equity Claims ("First Omnibus Claims Objection") (Docket No. 5151).

In the First Omnibus Claims Objection, the Debtors objected to approximately 3,500 of the

Proofs of Claim asserting liquidated claims of approximately $1.7 billion against the Debtors.  On

October 24, 2006, the Court entered an order disallowing and expunging most of the claims

subject to the First Omnibus Claims Objection.  Moreover, following the Application Period, the

Debtors filed their second and third omnibus objections to claims, which objected to 2,853 and

1,017 proofs of claim, respectively asserting liquidated claims in the approximate amounts of

$5.7 billion and $1.3 billion, respectively, and also filed a motion to establish certain claims

procedures for reconciling proofs of claims.[15]

Requested Fees And Reimbursement Of Expenses

35.     Skadden has played an important role in advising the Debtors with respect

to implementing their restructuring strategy and developing and negotiating a framework

agreement that may provide the foundation for a plan of reorganization.  As a result of its efforts

during the Application Period, Skadden now seeks interim allowance of $10,025,538 in fees

calculated at the applicable guideline hourly billing rates of the firm's personnel who have worked

---

[15]     On October 31, 2006, the Debtors filed the Debtors' Second Omnibus Objection (Procedural) Pursuant To 11
U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Equity Claims, (ii) Claims Duplicative Of
Consolidated Trustee Or Agent Claims, And (iii) Duplicate And Amended Claims (Docket No. 5451); the
Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007
To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And
Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated
Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452); and the Motion for Order Pursuant to 11 U.S.C. §§
502(b) and 502(c) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I)
Dates For Hearings Regarding Disallowance Or Estimation of Claims And (II) Certain Notices And Procedures
Governing Hearings Regarding Disallowance Or Estimation Of Claims (Docket No. 5453).

17

on the Reorganization Cases, and $848,232 in charges and disbursements actually and necessarily incurred by Skadden while providing services to the Debtors during the Application Period.

36.    This Interim Application reflects (a) a voluntary reduction by Skadden in connection with each monthly statement in the aggregate amount of $1,051,221 with respect to fees (generally including the elimination from any matter of any timekeeper who recorded less than one hour and the elimination of any timekeeper who recorded less than $2,500 in the aggregate on all Delphi matters) and $110,891 with respect to charges and disbursements (including, among other things, certain reductions to catering services), (b) an additional voluntary reduction in the amount of $52,227 in connection with this Interim Application to reflect, among other things, the elimination of all fees related to (i) any timekeeper who billed fewer than ten total hours during the Application Period, (ii) any timekeeper who billed less than $1,000 during the Application Period, (iii) any instance in which a timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iv) the elimination of any matter to which fewer than ten hours were billed during the Application Period, and (c) an adjustment to reduce the proposed fees sought by $3,024 to correct a discrete billing error related to one timekeeper.  Accordingly, including the voluntary client accommodations in connection with each monthly statement, Skadden is voluntarily reducing its fees by $1,103,448, or approximately 9.9%, and its charges and disbursements by $110,891, or approximately 11.6%, for a total reduction of $1,214,339 for items that Skadden normally would bill its clients.[16]

---

[16]    Skadden believes that the amounts requested in this Interim Application are reasonable in relation to the services rendered.  The amounts requested are already reduced to reflect the client accommodations described herein.  To the extent that a party objects to this Interim Application, Skadden reserves the right to recapture such client accommodations and seek up to the full amount of fees and expenses actually incurred in connection with this engagement.  Furthermore, Skadden reserves it right to recapture and seek allowance of all client accommodations as part of its final fee application, including by way of illustration, $179,282 in fees incurred by summer associates working on these cases.

18

37.    In staffing this case, in budgeting and incurring charges and disbursements, and in preparing and submitting this Interim Application, Skadden has been mindful of the need to be efficient while providing appropriate and vigorous representation of the Debtors.  As described in detail herein, Skadden believes that the requests made in this Interim Application comply with this Court's standards in the context of the unique circumstances surrounding these unusually large and complex cases.

Summary Of Services Rendered By
<u>Skadden During The Application Period</u>

38.    Throughout the Application Period, Skadden has worked closely with the Debtors and their advisors to administer these estates and maximize the return for parties-in-interest.  These services have been directed towards a myriad of tasks necessary to achieve this result.  To meet the Debtors' needs, Skadden has provided multi-disciplinary services on a daily basis, often working nights, weekends, and holidays.  Throughout this process, certain of the principal Skadden attorneys working on the Reorganization Cases were required to devote the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of the efforts of the Debtors and their professionals, the Debtors have made substantial progress in evaluating their businesses; preparing and pursuing a transformation plan; negotiating a framework agreement with GM, the statutory committees, and other key parties-in-interest; and reconciling claims asserted against the Debtors, all of which is meant to facilitate the Debtors' goal of emerging from chapter 11 in the first half of 2007.

39.    At the commencement of the Reorganization Cases, Skadden created 45 different matter numbers or subject-matter categories (the "Matter Categories") to which its professionals assigned the time billed by them, all of which are related to the tasks performed by

19

Skadden on behalf of the Debtors.[17]  Skadden has kept a contemporaneous record of the time

spent rendering such services and, consistent with the Guidelines, separated tasks in billing

increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in

nature and necessary for the proper administration of the Reorganization Cases.

       40.     Skadden devoted approximately <u>61.8%</u> of its time to the following seven

matters, each of which was responsible for fees <u>in excess of $400,000</u> during the Application

Period: Customer Matters (GM), Employee Matters (Labor Unions), Reorganization Plan/Plan

Sponsors, Customer Matters (Reviews/Investigations), Case Administration, Asset Dispositions

(General), and Claims Administration (General).

       41.     Skadden devoted approximately <u>34.5%</u> of its time in the aggregate to the

following 13 matters, billings for each of which were <u>between $100,000 and $400,000</u> during the

Application Period: Automatic Stay (Relief Actions), Nonworking Travel Time, Creditor

Meetings/Statutory Committees, Supplier Matters, Tax Matters, Employee Matters (General),

Business Operations/Strategic Planning, Retention/Fee Matters/Objections (Others), Claims

Administration (Reclamation/Trust Funds), General Corporate Advice, Secured Claims,

Retention / Fee Matters (SASM&F), and Environmental Matters.

       42.     The remainder of time  billed by Skadden (approximately <u>3.7%</u>) was

devoted to the following 13 matters, each of which accounted for <u>less than $100,000</u> during the

Application Period: Leases (Real Property), Executory Contracts (Personalty),

Liquidation/Feasibility, Global Subsidiaries (Non-U.S.), Intellectual Property, Real Estate

---

[17]    Skadden recently added an additional matter category for Customer Matters (Review and Investigations) so that
there are now 46 Matter Categories.  <u>Exhibit C</u> contains a table of all matter numbers used by Skadden in these
Reorganization Cases, as well as a description of certain business statistics of Skadden in these Reorganization
Cases.

(Owned), Employee Matters (Pension), Asset Dispositions (Real Property), Customer Matters

(General), Utilities, Insurance, Litigation (General), and Reports and Schedules.

<u>Matters Exceeding $400,000</u>

A.    <u>Customer Matters (GM)</u>

      43.    During the Application Period, Skadden assisted the Debtors with many

matters related to GM, the Debtors' largest customer and former parent.  Due to the progress and

development of the Reorganization Cases, the Debtors pursued a dual-track approach to GM

related issues.  Specifically, during the Application Period the Debtors, with the assistance of

Skadden, actively pursued both the litigation of the GM Contract Rejection Motion and

negotiations with GM regarding framework and plan of reorganization issues.

      44.    On June 13, 2006, this Court entered an order adjourning the hearing on the

GM Contract Rejection Motion to August 15, 2006 (Docket No. 4169).  In the same order, the

Court also ordered GM and the Debtors to "meet and confer" during the week of July 31, 2006 to

discuss certain pretrial matters.  The Debtors and Skadden continued to prepare, throughout the

Application Period, for the potential litigation of the GM Contract Rejection Motion.  The

Debtors' preparation included the filing of the Debtors' response to GM's objection to the GM

Contract Rejection Motion, the preparation of trial exhibits, and the preparation of various direct-

and cross-examination materials.  GM and the Debtors appeared before the Court for a status

conference on August 15, 2006 and, as discussed above, the hearing on the GM Contract

Rejection Motion was ultimately adjourned to a date to be determined by the Court at the Debtors'

request.

      45.    In addition to the GM Contract Rejection Motion, throughout July 2006, the

Debtors, with the assistance of Skadden, and GM also began to focus on bilateral negotiations

concerning operational and structural issues.  These negotiations grew into broader framework discussions with the statutory committees and later with several potential plan investors.  The goal of these framework discussions was to set the terms for a global settlement of disputes and establish the basis for the Debtors' plan of reorganization.  Progress in these discussions caused the Debtors in August to agree to adjourn the GM Contract Rejection Motion as discussed above.

46.     Moreover, during the Application Period, the Debtors spent significant time working on an agreement with GM that would govern various operational aspects of their commercial relationship.  The Debtors view such an agreement, which is now incorporated into the framework discussions, as an essential component to their reorganization.  This agreement is being drafted with Skadden's assistance, to establish uniform baseline standards and procedures across various lines of business and includes various commercial terms and conditions.

47.     Skadden professionals participated in these discussions and assisted in the drafting of portions of these agreements during the Application Period.  This process has been labor-intensive and has required frequent consultations with the Debtors' senior management and division leaders.  Moreover, Skadden participated in the negotiations with GM and assisted in drafting conceptual documents to address framework issues.

48.     In connection with the foregoing services, Skadden expended 3,448.3 hours during the Application Period for which Skadden seeks compensation of $1,699,180.[18]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-1.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[18]     This compares to $458,182, or 5.0%, of the total fees requested in Skadden's first interim fee application for this matter and $1,789,803, or 15.8%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Dhananjai Shivakumar | $560 | 408.2 | $228,592 |
| Adlai S. Hardin | $540 | 415.8 | $224,532 |
| Nathan L. Stuart | $440 | 440.9 | $193,996 |
| Albert L. Hogan III | $620 | 304.7 | $188,914 |
| Eric L. Cochran | $795 | 155.4 | $123,543 |
| Courtney E. VanLonkhuyzen | $375 | 306.4 | $114,901 |
| Nick D. Campanario | $465 | 206.8 | $96,162 |
| Kayalyn A. Marafioti | $795 | 120.6 | $95,878 |
| John (Jack) Wm. Butler, Jr. | $835 | 104.8 | $87,509 |
| John Guzzardo | $375 | 183.5 | $68,813 |
| Lee P. Garner | $565 | 57.7 | $32,608 |
| Sina Toussi | $540 | 53.5 | $28,890 |
| Thomas J. Matz | $560 | 50.3 | $28,168 |
| Peter E. Krebs | $410 | 56.0 | $22,960 |
| M. Janine Jjingo | $335 | 43.6 | $14,607 |
| Kellan Grant | $410 | 34.6 | $14,186 |
| Ron E. Meisler | $540 | 23.2 | $12,528 |
| Lisa B. Diaz | $295 | 34.3 | $10,119 |
| John A. Amodeo | $580 | 13.5 | $7,830 |
| George N. Panagakis | $755 | 8.6 | $6,493 |
| Kathy Zambrano | $410 | 8.2 | $3,362 |
| Michael W. Perl | $375 | 4.9 | $1,838 |
| Randall G. Reese | $465 | 3.7 | $1,721 |
| Paraprofessional Total | | 409.1 | $91,030 |
| **Total** | | **3,448.3** | **$1,699,180 (16.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$57,728** |

B.      Employee Matters (Labor Unions)

      49.      As of the Petition Dates, nearly all of the Debtors' approximately 34,750

hourly employees in the United States were represented by three principal unions – the UAW, the

IUE-CWA, and the United Steelworkers of America, Local 87 (the "USWA").  The Debtors have

master collective bargaining agreements with each of these three unions as well as "local

23

agreements" with affiliated local unions covering primarily local issues that are worksite or

business specific.  The Debtors also have collective bargaining agreements with three other

unions – the International Association of Machinists and Aerospace Workers (the "IAM"), the

International Brotherhood of Electrical Workers (the "IBEW"), and the International Union of

Operating Engineers (the "IUOE") (the six foregoing unions (the UAW, IUE-CWA, USWA,

IAM, IBEW, and IUOE) being referred to herein collectively as the "Unions") – representing

approximately 125 employees in the U.S. hourly workforce

50.     During the Application Period, Skadden worked with the Debtors and other

professionals to further the negotiations between the Debtors and their Unions.  Throughout the

Application Period, Skadden worked closely (being mindful not to duplicate efforts) with

O'Melveny & Myers, LLP ("O'Melveny") and Groom Law Group, special labor counsel and

special employee benefits counsel, respectively, retained by the Debtors to advise with respect to

the prosecution and continuances of the Debtors' 1113/1114 Motion.

51.     Prior to the Application Period, on March 31, 2006, the Debtors filed their

1113/1114 Motion.  At the commencement of the Application Period, Skadden continued to

prepare for and participated in the contested hearing on the 1113/1114 Motion.  On June 5, 2006,

the contested hearing on the 1113/1114 Motion was adjourned following the close of the Debtors'

direct case.  The Court subsequently entered a series of scheduling orders providing for further

adjournments and an adjournment of the contested hearing on the 1113/1114 Motion to allow the

Debtors, the Unions, and other key constituencies to continue to focus their attention on the

pursuit of a consensual resolution to the 1113/1114 Motion.

52.     Throughout the Application Period, the Debtors, with the assistance of

Skadden, have continued to provide information to, and engage in discussions and negotiations

24

with, the Unions and the Debtors' stakeholders in an effort to resolve the labor matters forming

the basis of the 1113/1114 Motion.  To apprise the Court of the progress of the framework

discussions and other matters, the Court held six in camera status conferences during the

Application Period.  Skadden advised and represented the Debtors at each of these conferences.

In addition, Skadden and counsel for the Unions and the other respondents to the 1113/1114

Motion participated in four meet and confer conferences during the Application Period to discuss

matters relating to the potential resumption of the contested hearing on the 1113/1114 Motion.

Pursuant to the Sixth Amended Section 1113 And 1114 Scheduling Order entered by the Court on

September 28, 2006 (Docket No. 5221), the contested hearing on the 1113/1114 Motion was

adjourned to a date to be determined by the Court at the Debtors' request so that the various

constituencies could conduct further negotiations.

53.    In connection with the 1113/1114 Motion, on August 10, 2006, the IBEW

and IAM filed a Motion for Judgment on Partial Findings Dismissing the IBEW and IAM

Pursuant to Rule 7052(c) (Docket No. 4890) (the "IBEW/IAM Motion for Judgment"), in which

the IBEW and IAM requested that the Court deny the relief sought in the 1113/1114 Motion as

applied to the IBEW and IAM.  Skadden assisted the Debtors and O'Melveny in analyzing the

IBEW/IAM Motion for Judgment and in drafting an objection to the motion that was submitted

on August 16, 2006 (Docket No. 4944).  The IBEW/IAM Motion for Judgment has been

adjourned pending resumption of the contested hearing on the 1113/1114 Motion and this has not

yet been ruled upon.

54.    Furthermore, as discussed above, during the Application Period the

Debtors, with Skadden's assistance, also successfully negotiated the establishment of a

supplement to the UAW Special Attrition Program that was previously approved by this Court

(the "UAW Supplement"). The UAW Supplement provides additional incentives for

UAW-represented employees to voluntarily attrit from Delphi. In addition to the UAW

Supplement, Delphi, with the assistance of Skadden, also negotiated with GM and the IUE-CWA

and agreed upon a special attrition program for the benefit of hourly employees represented by the

IUE-CWA (the "IUE-CWA Special Attrition Program"). The IUE-CWA Special Attrition

Program is similar to the UAW Special Attrition Program that was previously approved by this

Court, and it is a significant step to enable realignment of the Debtors' global product portfolio

and manufacturing footprint, as well as reduction of the Debtors' traditional-rate hourly U.S.

workforce to levels needed to run its realigned U.S. operations. Skadden drafted a motion

seeking approval of both the UAW Supplement and the IUE-CWA Special Attrition Program,

which was finalized and filed on June 19, 2006 (Docket No. 4269). After filing that motion,

Skadden responded to objections and discovery requests and prosecuted the motion on behalf of

the Debtors ten days later at a special hearing held on June 29, 2006. On July 7, 2006, this Court

entered an order approving the motion (Docket No. 4461). This order was appealed by

Wilmington Trust Company, as indenture trustee ("Wilmington Trust").[19] Skadden advised the

Debtors with respect to matters raised by these appeals. The Debtors, with the assistance of

Skadden, are continuing to negotiate with the USWA, as well as their other unions, regarding

similar programs.

      55. In connection with the foregoing services, Skadden expended 2,752.5 hours

during the Application Period for which Skadden seeks compensation of $1,387,983.[20] Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

---

[19]   As noted above, Wilmington Trust also appealed from the order approving the UAW special attrition program.

[20]   This compares to $414,991, or 4.5%, of the total fees requested in Skadden's first interim fee application for this matter and $2,590,790, or 22.9%, of the total fees requested in Skadden's second interim fee application for this matter.

D-2.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Louis D. Wilson | $510 | 364.3 | $185,793 |
| John P. Furfaro | $770 | 198.3 | $152,691 |
| Thomas J. Matz | $560 | 262.3 | $146,888 |
| Jay S. Berke | $755 | 175.6 | $132,579 |
| John (Jack) Wm. Butler, Jr. | $835 | 128.3 | $107,132 |
| Dhananjai Shivakumar | $560 | 147.9 | $82,824 |
| Albert L. Hogan III | $620 | 122.6 | $76,012 |
| Kayalyn A. Marafioti | $795 | 74.5 | $59,229 |
| Ronald D. Kohut | $410 | 130.1 | $53,341 |
| George N. Panagakis | $755 | 68.4 | $51,643 |
| Courtney E. VanLonkhuyzen | $375 | 123.4 | $46,275 |
| Nick D. Campanario | $465 | 93.3 | $43,385 |
| Neil MacDonald | $540 | 65.9 | $35,586 |
| Nathan L. Stuart | $440 | 77.7 | $34,188 |
| Brian M. Fern | $485 | 58.6 | $28,422 |
| Ron E. Meisler | $540 | 32.0 | $17,280 |
| John Guzzardo | $375 | 38.8 | $14,550 |
| Allison V. Herriott | $375 | 25.1 | $9,413 |
| William M. Rohner | $440 | 20.2 | $8,888 |
| Randall G. Reese | $465 | 7.5 | $3,488 |
| Kathy Zambrano | $410 | 7.8 | $3,198 |
| Adlai S. Hardin | $540 | 4.5 | $2,430 |
| Brent M. Houston | $375 | 6.4 | $2,400 |
| Joseph N. Wharton | $485 | 2.8 | $1,358 |
| Paraprofessional Total | | 516.2 | $88,990 |
| **Total** | | **2,752.5** | **$1,387,983 (13.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$80,515** |

27

C.    Reorganization Plan/Plan Sponsors

56.    The primary advancement of the Reorganization Cases during the Application Period relates to the development of a draft framework agreement intended to serve as the basis for the Debtors' plan of reorganization.  The framework agreement would provide for a global settlement of disputes among the Debtors, GM, the statutory committees, and various other parties-in-interest.  These discussions commenced in earnest when on August 1 and 2, 2006 the Debtors, the Creditors' Committee, the Equity Committee, and the Ad Hoc Equity Committee (as defined below) conducted "leveling up" meetings to exchange information and facilitate dialogue and then on August 3, 2006, the Debtors, GM, the Creditors' Committee, and various professionals, including Skadden, held the first of a series of extended meetings and negotiating sessions at Skadden's offices in New York.

57.    Skadden professionals participated in, and advised the Debtors throughout, these various negotiations and meetings.  By late September 2006 other stakeholders had joined the discussions.  By the end of the Application Period, the Debtors, with the assistance of Skadden, had elicited four separate framework proposals from the statutory committees and potential plan investors, but the Debtors had not accepted any of the proposals, and in fact, gaps remained to be bridged with respect to certain issues.  The Debtors believe, however, that the framework discussions have yielded significant progress because the discussions have produced multiple proposals and have drawn the committed interest of several unaffiliated potential plan investors.

58.    Throughout the Application Period, Skadden has assisted the Debtors and contributed to the framework discussions in numerous ways.  Skadden has participated in drafting and negotiating various iterations of the framework documents and predecessor term sheets,

28

organizing and participating in large scale negotiations as well as smaller caucuses and preparation sessions, assisting with document productions in response to due diligence requests from various stakeholders and potential plan investors, and researching multiple legal issues necessary to carefully assess the proposals submitted.

59.     Specifically, during the Application Period, Skadden assisted the Debtors in responding to and complying with various due diligence requests by various potential plan sponsors so that these potential plan sponsors could complete their due diligence of the Debtors in connection with the framework proposals.  Skadden assisted the Debtors by drafting non-disclosure agreements between the Debtors and the potential plan sponsors to preserve the confidentiality of all documents provided to these parties and their respective counsel and representatives.  Moreover, a limited number of Skadden professionals assisted in setting up a dataroom in Troy, Michigan.  Additionally, Skadden coordinated the Debtors' responses to the various information requests that were submitted after the documents in the dataroom were reviewed.  These document requests often consisted of hundreds of pages of reports and other confidential materials.  Throughout this process, Skadden participated in numerous conference calls and in-person meetings between the Debtors' and counsel for the potential plan sponsors to ensure a timely and efficient flow of information between the parties.  Following the on-site visits, Skadden also assisted the Debtors in responding to supplemental information requests submitted by the various potential plan sponsors.  As of the end of the Application Period and the filing of this Interim Application, the framework agreement remains a work in progress, and substantial differences among the parties remain to be resolved.  Nevertheless, the discussions held during the Application Period have facilitated considerable progress towards the Debtors' reorganization.

60.    In addition, the Debtors, with the assistance of Skadden, prepared and filed a motion to extend the Debtors' exclusive periods for filing a plan of reorganization and soliciting acceptances thereof.  The Debtors requested that the Court extend (a) the exclusive right to file a plan of reorganization from August 5, 2006 to and including February 1, 2007 and (b) the solicitation period from October 4, 2006 to and including April 2, 2007.  Prior to and during the Application Period, the Debtors, through Skadden, consulted with their major constituents, including the Creditors' Committee, regarding this motion, which resulted in this matter being uncontested.  Accordingly, on June 19, 2006, the Court granted the Debtors' motion to extend the exclusivity period (Docket No. 4266).

61.    In connection with the foregoing services, Skadden expended 1,341.0 hours during the Application Period for which Skadden seeks compensation of $820,818.[21]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-3.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Eric L. Cochran | $795 | 238.2 | $189,370 |
| John (Jack) Wm. Butler, Jr. | $835 | 194.7 | $162,575 |
| Kayalyn A. Marafioti | $795 | 117.8 | $93,652 |
| George N. Panagakis | $755 | 93.1 | $70,291 |
| Ron E. Meisler | $540 | 108.6 | $58,644 |
| Lisa B. Diaz | $295 | 150.5 | $44,398 |
| Adlai S. Hardin | $540 | 72.3 | $39,042 |
| Thomas J. Matz | $560 | 55.0 | $30,800 |
| Brian M. Fern | $485 | 60.6 | $29,391 |
| Kurt Ramlo | $560 | 51.5 | $28,840 |

---

[21]    This compares to, $14,195, or 0.2%, of the total fees requested in Skadden's first interim fee application for this matter and $20,728, or 0.2%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|---|---|---|---|
| Kellan Grant | $410 | 50.8 | $20,828 |
| Randall G. Reese | $465 | 27.2 | $12,649 |
| Allison V. Herriott | $375 | 27.3 | $10,238 |
| Peter Olasky | $375 | 12.2 | $4,575 |
| Michael W. Perl | $375 | 12.1 | $4,538 |
| Gregory O. Ogunsanya | $440 | 9.6 | $4,224 |
| Kenneth Berlin | $770 | 4.0 | $3,080 |
| Kathy Zambrano | $410 | 5.1 | $2,091 |
| Paraprofessional Total | | 50.4 | $11,592 |
| **Total** | | **1,341.0** | **$820,818 (8.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$12,466** |

D.      Customer Matters (Reviews/Investigations)

62.      On January 20, 2006, the Debtors filed their Schedules of Assets and
Liabilities (Docket No. 1854) and their Statement of Financial Affairs (Docket No. 1855) listing
certain unliquidated claims that the Debtors held against GM.  Additionally, on March 24, 2006,
the Creditors' Committee filed a Motion For An Order Compelling The Production Of Documents
By General Motors Corporation Pursuant To Rule 2004 Of The Federal Rules Of Civil Procedure
(Docket No. 2961) requesting this Court's direction for GM to turn over certain documents to the
Creditors' Committee so that the Creditors' Committee could evaluate certain claims that the
Debtors hold against GM and that GM allegedly holds against the Debtors.  The Debtors did not
object to the Creditors' Committee's motion, which resulted in the Creditors' Committee and GM
entering into a stipulation and agreed order on April 11, 2006 whereby the Creditors' Committee
and GM agreed that the Creditors' Committee was authorized to seek document production from
GM and that GM would produce certain documents.

31

63.     On March 28, 2006, the Debtors filed their Motion For Approval Of Joint

Interest Agreement Between the Debtors And The Official Committee Of Unsecured Creditors,

Implementation Of Protective Order, And Approval Of Procedures To Protect Information In Fee

Statements (Docket No. 3000) seeking this Court's authority to share certain confidential

information with the Creditors' Committee to facilitate the Creditors' Committee's ability to

investigate various on going investigations.

64.     On May 11, 2006, the Creditors' Committee sent a letter (the "Demand

Letter") and subsequently a draft complaint (the "Draft Complaint") to Delphi's Board of

Directors demanding that the Debtors promptly pursue certain claims and defenses that the

Debtors may have against GM.  The Draft Complaint was based in part on documents provided to

the Creditors' Committee under a joint interest agreement previously approved by this Court and

contained 408 numbered paragraphs and 19 separate causes of action.  Skadden professionals

spent a significant amount of time reviewing and analyzing the allegations included in the

Demand Letter and Draft Complaint.  Skadden's review and analysis assisted the Debtors in

evaluating the Demand Letter and the Draft Complaint by conducting extensive legal analysis and

research regarding the claims and defenses asserted in the Demand Letter and Draft Complaint.

In addition, throughout June and July 2006, Skadden participated in numerous meetings with

representatives of the Debtors and the Creditors' Committee, at which the respective

representatives discussed, among other things, the Demand Letter and Draft Complaint.

65.     On July 28, 2006, the Creditors' Committee filed its motion seeking court

authority to prosecute the Debtors' claims and defenses against GM and certain former officers of

the Debtors on Delphi's behalf (also known as the STN Motion) (Docket No. 4718).  Skadden

evaluated the merits of this motion and researched, drafted, and filed a preliminary objection to

32

the STN Motion on August 4, 2006 (Docket No. 4859).  Skadden also prepared and served

discovery requests on the Creditors' Committee.  As of the end of the Application Period, the STN

Motion was adjourned to the November 30, 2006 omnibus hearing and has subsequently been

adjourned to the January 11, 2007 omnibus hearing.

        66.     Shortly after the formation of the Equity Committee, the Debtors solicited

the Equity Committee's views regarding potential estate claims against GM.  On July 29, 2006,

the Debtors entered into a Joint Interest Agreement with the Equity Committee and, during

August 2006, shared confidential information with the Equity Committee concerning claims and

defenses against GM.  On August 24, 2006, the Equity Committee delivered a letter to the

Debtors stating that the Equity Committee's view of the Debtors' claims and defenses against GM,

and on September 5, 2006, the Equity Committee filed its objection to the STN Motion (Docket

No. 5070).  In light of the various filings and demand letters, during September 2006 and

continuing after the Application Period, Skadden assisted the Debtors in conducting a further

factual inquiry and further legal analysis regarding the evaluation of the Debtors' potential claims

and defenses against GM.  In conducting the factual inquiry, Skadden reviewed thousands of

documents, conducted thirty-two interviews, and kept detailed records of its investigation.

        67.     In connection with the foregoing services, Skadden professionals expended

1,590.0 hours during the Application Period for which Skadden seeks compensation of

$743,110.[22]  Detailed time entries of each Skadden professional related to these services are

attached hereto as <u>Exhibit D-4</u>.  A summary of the hours incurred and value of the services

performed by each professional is provided in the following table:

---

[22]    Skadden did not request compensation or reimbursement for this matter in its first or second interim fee
     applications.

33

| Name | Rate | Time | Value |
|---|---|---|---|
| Lee P. Garner | $560 | 345.8 | $193,678 |
| Peter E. Krebs | $410 | 268.5 | $110,085 |
| George N. Panagakis | $755 | 104.9 | $79,201 |
| David R. Pehlke | $335 | 215.2 | $72,093 |
| Keith D. Krakauer | $755 | 91.6 | $69,158 |
| Karen E. Willenken | $510 | 120.8 | $61,608 |
| Jonathan L. Shih | $295 | 94.3 | $27,819 |
| Albert L. Hogan III | $620 | 41.8 | $25,916 |
| Christopher J. Gunther | $660 | 33.0 | $21,780 |
| Nathan L. Stuart | $440 | 32.1 | $14,124 |
| John (Jack) Wm. Butler, Jr. | $835 | 13.5 | $11,273 |
| Kellan Grant | $410 | 17.0 | $6,970 |
| Thomas J. Matz | $560 | 9.9 | $5,544 |
| Thomas W. McDonald | $335 | 12.4 | $4,154 |
| Lisa B. Diaz | $295 | 8.9 | $2,626 |
| Kayalyn A. Marafioti | $795 | 3.1 | $2,465 |
| Michael W. Perl | $375 | 3.1 | $1,163 |
| Paraprofessional Total | | 174.1 | $33,453 |
| **Total** | | **1,590.0** | **$743,110 (7.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$13,753** |

E.     Case Administration

        68.     This category is comprised of matters relating to, among other things, (a) general preparation for, and attendance at, court hearings, (b) general communications with creditors and other parties-in-interest, (c) general case administration, including duties pertaining to service of process, (d) general advice with respect to the prosecution of the Reorganization Cases, and (e) general advice with respect to the rights and duties of debtors-in-possession in the administration of the Reorganization Cases.

        69.     Skadden devoted significant time preparing for and attending the omnibus and special hearings that this Court established.  The omnibus hearings have streamlined the

34

administration of these Reorganization Cases by establishing a schedule known to all

parties-in-interest for Court hearings and consolidating multiple matters in a single hearing, thus

eliminating unnecessary time and expense spent appearing before the Court on numerous

occasions each month regarding disparate matters.  Indeed, despite the fact that the Debtors are

the largest manufacturing company ever to have sought reorganization relief, the Debtors have

held only 12 omnibus hearings to date and four omnibus hearings during the Application Period.

At these four omnibus hearings, 75 discrete matters were heard.  This omnibus hearing schedule

requires a carefully coordinated, but limited, team of Skadden attorneys to attend the hearings, to

meet with numerous parties-in-interest who appear, and to resolve as many issues as possible

without court intervention.  In fact, it is not unusual for differences to be bridged at the courthouse

steps just prior to the applicable hearing.  Indeed, the Debtors, with the assistance of Skadden and

the Debtors' other professionals, have succeeded in presenting the great majority of these matters

as uncontested or resolved.  To date, there have been relatively few contested matters in these

cases, and even fewer matters that actually required contested evidentiary hearings.  Following

the hearings, Skadden must occasionally modify proposed orders to comply with the Court's

rulings and subsequently submit those orders to this Court for entry and docketing.  But for the

coordinated efforts of Skadden (as well as the Debtors' other retained professionals) in connection

with these hearings, this simply would not be possible.

> 70.    The internal coordination of motions, responses, objections, witnesses, and

other related matters requires close and careful attention by the entire Skadden team.  The

omnibus hearing schedule established in these Reorganization Cases is designed to efficiently

address nearly all matters arising in these cases but requires that multiple professionals and

paraprofessionals to provide various functions with respect to each omnibus hearing.  For

example, the monthly omnibus hearing agendas that Skadden prepares require significant

attention by Skadden paraprofessionals.  Skadden attorneys are then requested to review and

approve the particular matter(s) on the agenda for which they have principal responsibility to

ensure that all relevant filings are properly reflected.

      71.     Moreover, given the size and complexity of these Reorganization Cases, the

Debtors and Skadden were presented with a unique set of challenges in administering the cases,

tracking motions filed by others, responding to inquiries from parties-in-interest, and maintaining

organization and control over a case that could quickly have become disorganized if attention

were not provided to case administration matters on a continual basis.  Thus, for instance,

Skadden worked closely with the Debtors, this Court's Clerk's Office, representatives of this

Court's Chambers, the U.S. Trustee's Office, the Debtors' notice and claims agent (Kurtzman

Carson Consultants LLC ("KCC")), the Debtors' public relations advisors, and the Debtors' other

advisors in coordinating the various procedures and processes to aid in the administration of the

Reorganization Cases, including a dedicated website, telephone hotlines, and e-mail information

sites to assist in responding to the numerous inquiries that this case has generated.  At the

commencement of the Reorganization Cases, for example, the Debtors and Skadden established a

telephone hotline that provides basic information to callers and allows them to leave voicemail

messages to be returned by an appropriate Skadden attorney.  During the Application Period,

approximately 194 messages were submitted to the hotline.  In addition, numerous parties

contacted Skadden directly with their inquires.  When necessary, Skadden researched responses

to more complicated voicemail messages and otherwise responded to inquiries tendered directly

on the hotline.  A considerable amount of time was devoted to these efforts.

72.    Skadden also estimates that it received approximately 300 pieces of written correspondence during the Application Period, all of which were routed to appropriate professionals within Skadden and answered either orally or in writing.  Skadden necessarily devoted significant resources responding to these matters.  These efforts assured responsive answers to parties, ensured that the Debtors continued to conduct their affairs in accordance with the Bankruptcy Code and applicable nonbankruptcy law, and also assisted the Debtors and their estates by resolving numerous matters that might otherwise have resulted in pleadings filed with this Court.

73.    In addition to communications matters, Skadden maintained various files that were critical to the ability of Skadden and others to address promptly issues that arose during the Application Period.  Skadden reviewed all pleadings and orders filed in the Reorganization Cases and worked with KCC to ensure that entities entitled to notice were kept informed of significant events in the Reorganization Cases.  The efficient management of administrative matters in a paper-intensive case of this size is a significant task.  Each week, the Debtors and Skadden are inundated with correspondence, documents, requests, pleadings, and other papers.  During the Application Period, nearly 1,265 items were docketed.  On average, at least 11 pleadings were filed and docketed each day (including weekends and holidays) during the 120 days in the Application Period.  As of September 30, 2006, approximately 5,241 items had been docketed.

74.    Given this volume of activity, Skadden maintained various procedures to create efficiencies in the management of the Reorganization Cases and to avoid unnecessary duplication of effort between its own professionals and its advisors.  For instance, during the Application Period, Skadden kept detailed calendars of future events in the Reorganization Cases

37

and maintained other planning tools to ensure that critical deadlines were met in this large and highly complex case and that an individual professional was assigned principal responsibility for nearly each discrete task to be completed.

75.    Skadden is also required to devote substantial attention and resources to notice and related matters in these cases.  As of the end of the Application Period, there were approximately 458 parties on the core service lists, including approximately 60 parties on the Master Service List[23] and an additional 398 parties who had filed a notice of appearance or request for notice in these cases (the "2002 List Parties").  Skadden, through its paraprofessionals, updates and maintains these lists to ensure proper notice by reviewing each pleading filed and updating the entities the entities that firms represent as well as recording relevant addresses, reviewing all electronic and written correspondence to ensure that all lists are accurate, and reviewing all notices of appearance to minimize the chance that a party-in-interest is inadvertently excluded from a mailing.

76.    Obviously the great number of parties who have appeared in these cases and the time-sensitive nature of many of the pleadings and replies that must be filed require a great deal of coordinated effort by Skadden professionals.  There are many matters that require special notices of particular items that significantly expand these duties.  Thus, Skadden maintains and continually updates separate notice lists for various parties including the DIP lenders, lessors, and Unions and their respective advisors.

77.    Moreover, on almost a daily basis, Skadden advises the Debtors' management of the Debtors' rights and duties as debtors-in-possession, noting proscribed,

---

[23]    The Master Service List is comprised of (a) the Debtors and their counsel, (b) the Office of the United States Trustee, (c) the members of and counsel for the Creditors' Committee and the Equity Committee, (d) counsel for the agent under the Debtors' prepetition credit facility, (e) counsel for the agent under the Debtors' postpetition credit facility, and (f) those parties which may be added to the Master Service List upon written request to the Debtors or as may be otherwise ordered by the Court for good and sufficient cause.

permitted, and required conduct.  Skadden frequently advises the Debtors' management with

respect to specific business questions posed by management that arise from events occurring in

the Reorganization Cases.  Part of Skadden's advice in this regard involves the participation of

Skadden professionals in periodic planning and strategy conferences with the Debtors' senior

management team.

78.     To assist the Debtors in continuing to perform their fiduciary duties,

Skadden works with the Debtors in implementing procedures for the Debtors to operate their

businesses in accordance with the requirements of the Bankruptcy Code.  Skadden reviews

certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property

and other transactions to aid the Debtors in evaluating whether the contemplated transactions are

within the ordinary course of business or are outside the ordinary course of business and require

Court approval.

79.     In connection with the foregoing services, Skadden expended 2,133.8 hours

during the Application Period for which Skadden seeks compensation of $604,443.[24]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-5.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Ron E. Meisler | $540 | 126.5 | $68,310 |
| Thomas J. Matz | $560 | 105.7 | $59,192 |
| Kayalyn A. Marafioti | $795 | 67.3 | $53,505 |
| M. Janine Jjingo | $335 | 75.3 | $25,226 |
| Allison V. Herriott | $375 | 55.0 | $20,626 |

---

[24]   This compares to $1,136,809, or 12.4%, of the total fees requested in Skadden's first interim fee application for
this matter and $603,278, or 5.3%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| John K. Lyons | $695 | 21.9 | $15,221 |
| Brian M. Fern | $485 | 28.1 | $13,629 |
| John (Jack) Wm. Butler, Jr. | $835 | 14.6 | $12,192 |
| Kathy Zambrano | $410 | 25.0 | $10,250 |
| Joseph N. Wharton | $485 | 18.1 | $8,780 |
| Kurt Ramlo | $560 | 14.4 | $8,064 |
| Randall G. Reese | $465 | 15.2 | $7,068 |
| Kellan Grant | $410 | 17.0 | $6,970 |
| Nathan L. Stuart | $440 | 9.1 | $4,004 |
| Lisa B. Diaz | $295 | 12.3 | $3,629 |
| George N. Panagakis | $755 | 4.1 | $3,096 |
| Michael W. Perl | $375 | 7.3 | $2,738 |
| Venera E. Ziegler | $510 | 5.3 | $2,703 |
| Albert L. Hogan III | $620 | 4.0 | $2,480 |
| Brent M. Houston | $375 | 5.3 | $1,988 |
| Paraprofessional Total | | 1,502.3 | $274,772 |
| **Total** | | **2,133.8** | **$604,443 (6.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$55,192** |

F.    Asset Dispositions (General)

80.    The Debtors have stated that to achieve the necessary cost savings and operational effectiveness envisioned in their transformation plan, a substantial segment of Delphi's U.S. business operations will need to be divested, consolidated, or wound-down through the chapter 11 process.  During the Application Period, Skadden allocated significant resources advising the Debtors with respect to various contemplated divestitures of significant assets.

81.    Of particular note, during the Application Period, Skadden advised the Debtors with respect to the transfer of the Company's battery manufacturing facility in New Brunswick, New Jersey to Johnson Controls, Inc. ("JCI") and the planned transition to JCI of battery production out of the Fitzgerald, Georgia facility.  The New Brunswick facility was losing

40

approximately $3 million per month and the Fitzgerald facility was losing approximately $2 million per month. Accordingly, just prior to the Application Period, Skadden worked with the Debtors to file a motion (the "New Brunswick Transfer Motion") (Docket No. 3927) to obtain approval of a transfer agreement between the Debtors and JCI, which provided for (a) the sale of the New Brunswick facility to JCI, (b) the continued supply of batteries as well as the orderly transition of production to JCI from the Fitzgerald facility, (c) the implementation of a specific attrition plan with the IUE-CWA, the union representing the hourly employees at the New Brunswick facility, providing for a reduction to encourage the consensual separation of approximately 200 of the facility's 300 hourly employees (the "New Brunswick Attrition Plan"), (d) the payment of $12.5 million from JCI to mitigate a majority of the costs of that attrition plan, and (e) the IUE-CWA's waiver of the no-sale clause and certain neutrality obligations with respect to the New Brunswick facility.

82.    During the Application Period, Wilmington Trust Company, as indenture trustee ("WTC") filed a limited objection to the New Brunswick Transfer Motion, opposing Delphi's funding of the New Brunswick Attrition Plan. WTC served expedited discovery on the Debtors and in response, during a five-day period, the Debtors reviewed and produced hundreds of documents related to the New Brunswick Attrition Plan and defended Delphi's supporting witness in a deposition. WTC's objection was resolved pursuant to a compromise between the Debtors and WTC at the June 19, 2006 omnibus hearing on the New Brunswick Transfer Motion, and this Court entered an order approving that motion (Docket No. 4363).

83.    In addition, during the Application Period, Skadden assisted the Debtors in undertaking and consummating their first sale of assets in chapter 11 through an auction process. In connection with the sale of substantially all of the assets of MobileAria, Inc. ("MobileAria"),

41

an Affiliate Debtor, during the Application Period, Skadden worked closely with DLA Piper

Rudnick Gray Cary US LLP, MobileAria's outside corporate counsel, and Pagemill Partners,

LLC, MobileAria's investment banker, to advise MobileAria with respect to the various

bankruptcy considerations at issue in connection with the sale.  Specifically, Skadden assisted

MobileAria in preparing the necessary pleadings to seek authority to undertake a competitive

bidding process and seek approval of the sale of substantially all of its assets,[25] obtained the

Court's approval of bidding procedures and aided in the process of identifying potential

competing bidders.  Pursuant to the bidding procedures approved by the Court, an auction was

held at Skadden's New York office, where the successful bidder offered consideration that was

nearly twice the consideration offered by the stalking horse bid.

        84.    Following conclusion of the auction and prior to the sale hearing,

significant disputes arose between the successful bidder at the auction, @Road, and MobileAria's

largest customer.  Skadden devoted significant around-the-clock efforts to support MobileAria's

consensual resolution of these disputes, but such disputes ultimately resulted in @Road

attempting to terminate its agreement to acquire MobileAria's assets on the eve of the sale

hearing.  MobileAria, with Skadden's assistance, was nevertheless able to reach agreement with

its largest customer and its alternate bidder, hold the sale hearing as scheduled, and obtain

approval of the sale of substantially all of MobileAria's assets to the alternate bidder.  The

purchase price was only approximately $200,000 less than the @Road bid, still yielding nearly

---

[25]    On June 6, 2006, MobileAria filed a Motion For Orders Under 11 U.S.C. §§ 363 And 365 And Fed. R. Bankr. P.
2002, 6004, 6006, And 9014 (A) Approving (I) Bidding Procedures, (II) Certain Bid Protections, (III) Form And
Manner Of Sale Notices, And (IV) Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of Certain Of
The Debtors' Assets Comprising Substantially All Assets Of MobileAria, Inc. Free And Clear Of Liens, Claims,
And Encumbrances, (II) Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases,
And (III) Assumption Of Certain Liabilities (Docket No. 4040).  On June 22, 2006 , this Court entered the Order
Under 11 U.S.C. § 105(a) And Fed. R. Bankr. P. 2002 And 9014 Approving (I) Bidding Procedures, (II) Certain
Bid Protections, (III) Form And Manner Of Sale Notices, and (IV) Setting Of A Sale Hearing  (Docket No. 4328).
The auction for the assets of MobileAria was held on July 6, 2006 and the sale hearing was held on July 19, 2006.

double the purchase price offered by the stalking horse.  Thereafter, Skadden assisted MobileAria

in consummating the sale of its assets and in reaching an agreement with @Road to retain part of

its good faith deposit as a result of walking away from this transaction.

85.    Finally, with the assistance of their advisors, the Debtors have begun the

process of identifying additional assets that may be subject to divestiture, consolidation, or

wind-down.  During the Application Period, the Debtors also began the process of marketing

those assets for divestiture and soliciting stalking horse bids.  These efforts are anticipated to

result in additional asset sale transactions pursuant to section 363 of the Bankruptcy Code in

subsequent periods.

86.    In connection with the foregoing services, Skadden expended 1,125.9 hours

during the Application Period for which Skadden seeks compensation of $554,644.[26]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-6.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 302.6 | $140,710 |
| John K. Lyons | $695 | 190.7 | $132,537 |
| Joseph N. Wharton | $485 | 142.4 | $69,064 |
| Ron E. Meisler | $540 | 70.3 | $37,962 |
| Brent M. Houston | $375 | 98.8 | $37,050 |
| Allison V. Herriott | $375 | 83.8 | $31,425 |
| Albert L. Hogan III | $620 | 44.1 | $27,342 |
| M. Janine Jjingo | $335 | 37.9 | $12,697 |

---

[26]    This compares to $117,199, or 1.3%, of the total fees requested in Skadden's first interim fee application for this
matter and $375,042, or 3.3%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kurt Ramlo | $560 | 19.2 | $10,752 |
| Kayalyn A. Marafioti | $795 | 8.5 | $6,758 |
| Venera E. Ziegler | $510 | 13.2 | $6,732 |
| John (Jack) Wm. Butler, Jr. | $835 | 7.8 | $6,513 |
| Thomas J. Matz | $560 | 10.2 | $5,712 |
| Kathy Zambrano | $410 | 10.6 | $4,346 |
| Kellan Grant | $410 | 8.0 | $3,280 |
| Marie L. Gibson | $585 | 5.0 | $2,926 |
| Lisa B. Diaz | $295 | 9.9 | $2,921 |
| N. Lynn Hiestand | $835 | 1.7 | $1,420 |
| Peter Olasky | $375 | 2.9 | $1,088 |
| Paraprofessional Total | | 58.3 | $13,409 |
| **Total** | | **1,125.9** | **$554,644 (5.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$35,334** |

G.    Claims Administration (General)

87.    Prior to the Application Period, on April 12, 2006, the Court entered an order establishing July 31, 2006 as the bar date for filing proofs of claims (the "Bar Date"). Pursuant to the Bar Date procedures approved by this court, proofs of claim were sent to the Bankruptcy Court and docketed by KCC, who maintains the official claims register of the Bankruptcy Court in these cases.

88.    Because the Bar Date passed during the Application Period, the Debtors, with the assistance of Skadden and other representatives of KCC, FTI Consulting, Inc. ("FTI"), and other outside advisors and service providers, devoted a significant amount of time to reviewing, reconciling, validating, and if appropriate, objecting to various proofs of claims that were filed.  As part of the Debtors' reconciliation process, the Debtors classified proofs of claim by nature of claim (e.g., legal, trade payable, tax, treasury, equity, or human capital) and then assigned the claims to an analyst and a team leader for reconciliation.  During the Application

44

Period, Skadden assisted the Debtors' claims reconciliation team in developing a strategy to reconcile proofs of claim and worked with the Debtors and FTI to formulate a process for review of, and objecting to, claims.  Skadden also advised the Debtors' claims reconciliation team regarding the legal requirements for assessing properly filed proofs of claim and the bases for objecting to proofs of claim.  Finally, both prior to and after the Bar Date, Skadden spent considerable time responding to claimants' questions left on the Delphi legal hotline regarding the filing and reconciling of proofs of claim.

89.    As of November 2, 2006, the Debtors received more than 16,000 proofs of claim, a portion of which assert, in part or in whole, unliquidated claims.  In addition, the Debtors have compared proofs of claim received to scheduled liabilities and determined that there are certain scheduled liabilities for which no proof of claim was filed.  In the aggregate, these proofs of claim and scheduled liabilities assert more than $37 billion in liquidated amounts plus certain unliquidated amounts.  During the Application Period, Skadden assisted the Debtors in reviewing this voluminous number of claims to help the Debtors evaluate and estimate the amount and types of claims being asserted against the Debtors.

90.    In connection with the claims reconciliation process, during the Application Period, the Debtors, with the assistance of Skadden and other members of the claims reconciliation team, identified numerous proofs of claim subject to objection on procedural grounds.  Specifically, the Debtors identified approximately 500 liquidated claims in the approximate amount of $1.69 billion that were either duplicates of other claims or were amended or superseded by other proofs of claim, and approximately 3,000 proofs of claim were filed based solely on ownership of Delphi common stock in the approximate liquidated amount of $6.7 million plus unliquidated amounts.

45

91.    Therefore, on September 19, 2006 the Debtors, with the assistance of

Skadden, filed their first omnibus claims objection (Docket No. 5151) requesting the court to

disallow and expunge certain proofs of claims that were either (i) duplicates of another proof of

claim, (ii) subsequently amended or superseded by a later-filed proof of claim, or (iii) filed solely

on account of ownership of Delphi Corporation common stock.  The Debtors received numerous

formal and informal responses to the first omnibus claims objection.  During the Application

Period the Debtors, with the assistance of Skadden, worked to resolve as many of the informal

responses as possible, and after the Application Period, filed an omnibus reply to the responses

formally filed by claimants (Docket No. 5342).  Finally, after the Application Period, Skadden

prosecuted the Debtors' first omnibus claims objection at the October 19, 2006 omnibus hearing

and on October 24, 2006, this Court entered an order granting the Debtors' first omnibus claims

objection (Docket No. 5390).

92.    In addition, following the Bar Date, the Debtors noticed certain anomalies

in the number of entries on the claim register that appeared to be proofs of claim that were

received after the Bar Date.  Consequently, the Debtors, with the assistance of Skadden, began an

extensive factual inquiry of the procedures of KCC and The DRS Group ("DRS"), which was

hired by KCC to serve as the agent for the clerk of the Court for the purpose of retrieving and date

stamping proofs of claims that were submitted in these cases.  This investigation revealed that

some proofs of claim that may have been timely filed may not have been collected until the

morning of August 1, 2006.  In fact, further investigation by the Debtors and Skadden revealed

that the vast majority of proofs of claim that were received by DRS beginning with the morning

mail retrieval on August 1, 2006 and continuing through the mail retrievals on August 9, 2006

were stamped with an August 9, 2006 receipt date regardless of the actual retrieval date.

93.    Skadden assisted the Debtors in investigating and evaluating this issue and
determining the best approach to rectify the situation.  On September 29, 2006, Skadden filed a
motion seeking to have certain proofs of claim that were executed and dated by the claimant on or
prior to the Bar Date, but which were stamped by DRS as having been received after the Bar Date
on or prior to August 9, 2006, deemed timely filed.[27]

94.    In addition, due to the size and nature of these Reorganization Cases,
Skadden anticipated that many disputes would regularly arise between the Debtors and other
parties concerning a host of matters.  These anticipated disputes include claims of governmental
agencies regarding environmental, health, safety, and other regulations; terms and conditions of
various contracts; and disagreements regarding accounts receivable and payable between the
Debtors and businesses with which the Debtors interact.  Given the number of disputes the
Debtors anticipate resolving during the course of these Reorganization Cases, the Debtors
determined that a streamlined procedural approach to resolving non-ordinary course disputes
would be more economical than an individualized approach which would require obtaining court
approval of each settlement.  To benefit the Debtors' estates, creditors, shareholders, and other
parties-in-interest, Skadden assisted the Debtors by drafting a motion (the "Settlement Procedures
Motion") seeking authority to implement settlement procedures (the "Settlement Procedures")
that would streamline the process of settling claims and controversies that are outside the Debtors'
ordinary course of business without further hearing and notice, subject to certain limitations
provided in the Settlement Procedures.

---

[27]    The Creditors' Committee objected to the relief requested and in preparation for the October 19, 2006 omnibus
hearing, the Debtors and Skadden attempted to resolve the Creditors' Committee's concerns.  An agreement was
not reached and the parties anticipated litigating the motion at the omnibus hearing.  At the hearing, this Court
suggested a resolution to the dispute and the Debtors, with the assistance of Skadden, have been working to
implement the resolution with the Creditors' Committee.  Despite negotiations between the parties after the
hearing, the resolution of this matter had not yet been determined, and Skadden continues to advise and assist the
Debtors regarding the possible resolution of this matter.

95.    The Settlement Procedures Motion was objected to by Appaloosa

Management L.P., Wexford Capital LLC, Lampe Conway & Co., LLC, Harbinger Capital

Partners LLC, and Marathon Asset Management LLC (the "Ad Hoc Equity Committee").  The

Debtors also received limited objections from Riverside Claims LLC and the Equity Committee.

On June 19, 2006, a hearing was held on the Settlement Procedures Motion the Court granted the

Motion with certain modifications to thresholds and notice requirements of the Settlement

Procedures.  Skadden consulted with counsel to the Creditors' Committee on proposed changes,

and negotiated the terms of the order with counsel to the Ad Hoc Equity Committee and counsel

to the Equity Committee.  Ultimately, the Debtors, with the assistance of Skadden, reached an

agreement with all of these parties on the terms of the proposed order.  On June 29, 2006, the

Court entered an order authorizing the Debtors to enter into the Settlement Procedures (Docket

No. 4414) (the "Settlement Procedures Order").

96.    In connection with the foregoing services, Skadden expended 1,142.2 hours

during the Application Period for which Skadden seeks compensation of $467,214.[28]  Detailed

time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit

D-7</u>.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 149.2 | $69,378 |
| Allison V. Herriott | $375 | 162.7 | $61,014 |
| John K. Lyons | $695 | 66.8 | $46,427 |
| M. Janine Jjingo | $335 | 126.5 | $42,378 |
| Lisa B. Diaz | $295 | 128.5 | $37,909 |

---

[28]    This compares to $31,974, or 0.3%, of the total fees requested in Skadden's first interim fee application for this
matter and $151,245, or 1.3%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Thomas J. Matz | $560 | 61.6 | $34,496 |
| Brian M. Fern | $485 | 65.5 | $31,769 |
| Michael W. Perl | $375 | 84.7 | $31,763 |
| Ron E. Meisler | $540 | 38.9 | $21,006 |
| Nathan L. Stuart | $440 | 33.9 | $14,916 |
| Kayalyn A. Marafioti | $795 | 17.6 | $13,993 |
| John (Jack) Wm. Butler, Jr. | $835 | 14.0 | $11,691 |
| Kenneth Berlin | $770 | 10.5 | $8,085 |
| Brent M. Houston | $375 | 18.8 | $7,050 |
| Kurt Ramlo | $560 | 4.0 | $2,240 |
| Kathy Zambrano | $410 | 4.1 | $1,681 |
| Kellan Grant | $410 | 3.2 | $1,312 |
| John Guzzardo | $375 | 3.4 | $1,275 |
| Paraprofessional Total | | 148.3 | $28,831 |
| **Total** | | **1,142.2** | **$467,214 (4.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$41,612** |

### Matters Between $100,000 And $400,000

H.    Automatic Stay (Relief Actions)

97.    As of the Petition Dates, the Debtors were parties to more than two hundred active and threatened lawsuits.  Although section 362 of the Bankruptcy Code generally prohibits parties from pursuing actions against the Debtors on account of prepetition claims, during the Reorganization Cases, a limited number of complaints were filed postpetition on account of prepetition liabilities.  The Debtors, with the assistance of Skadden, communicated effectively with opposing counsel to have such complaints withdrawn.  Moreover, the Debtors have received numerous requests since the Petition Dates, including approximately forty-five motions, two of which were filed during the Application Period, seeking modification of the stay to allow the claimants to proceed against the Debtors in non-bankruptcy courts.  Skadden worked with the

49

Debtors' legal department and other employees of the Debtors to reach a consensual resolution in

response to many of the requests for modification or relief from the stay.  In certain cases,

however, the Debtors and the movant were unable to resolve their differences, and on those

occasions, Skadden (and in certain instances Togut, Segal & Segal LLP ("Togut")) drafted

objections to these lift stay motions.  Five of these motions were litigated by Skadden attorneys

during the Application Period.

    98. To establish procedures to work with these parties and other similarly

situated parties in an orderly fashion, minimizing the need for costly litigation, Skadden

professionals worked with the Debtors' legal department, other employees of the Debtors, and the

Debtors' insurance providers to develop procedures for consensually modifying the automatic

stay to permit cost-effective and timely liquidation and settlement of certain pre-petition litigation

claims that are covered under the Debtors' insurance policies.  Skadden assisted the Debtors in

drafting and presenting a Motion for Order Approving Procedures For Modifying The Automatic

Stay To Allow for (i) Liquidating And Settling And/Or (ii) Mediating Certain Prepetition

Litigation Claims (Docket No. 4038), and this Court entered an order approving such procedures

on June 26, 2006 (Docket No. 4366) (the "Lift Stay Procedures").  Following entry of that order,

Skadden attorneys worked closely with the Debtors and local attorneys representing the Debtors

in various non-bankruptcy litigations to implement the Lift Stay Procedures.  During the

Application Period, Skadden participated in informal negotiations in an effort to resolve various

lift-stay claims.  In certain instances, mediation dates have been set to resolve numerous lift-stay

claims, as provided for in the Lift Stay Procedures.

    99. In addition, Skadden created guidelines to aid the Debtors' legal department

and other employees of the Debtors in determining whether a particular claim would qualify for

participation under the Lift Stay Procedures.  Skadden also assisted the Debtors' legal department almost daily regarding the application of these Lift Stay Procedures to various claims, and created forms for tracking information to be included in reports, as well as the format of such reports, that are required to be provided to the Creditors' Committee and its financial advisors under this Court's order approving the Lift Stay Procedures.  Finally, Skadden drafted a form settlement and release agreement to be used when claims are successfully resolved under the Lift Stay Procedures.

100.   In connection with the foregoing services, Skadden expended 794.2 hours during the Application Period for which Skadden seeks compensation of $356,684.[29]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-8.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Brent M. Houston | $375 | 304.0 | $114,000 |
| Kurt Ramlo | $560 | 115.0 | $64,400 |
| Brian M. Fern | $485 | 123.6 | $59,946 |
| Kathy Zambrano | $410 | 101.0 | $41,410 |
| Ron E. Meisler | $540 | 39.2 | $21,168 |
| Thomas J. Matz | $560 | 25.8 | $14,448 |
| Kayalyn A. Marafioti | $795 | 18.0 | $14,311 |
| John (Jack) Wm. Butler, Jr. | $835 | 7.4 | $6,180 |
| Ramon M. Naguiat | $440 | 12.9 | $5,676 |
| Kellan Grant | $410 | 10.8 | $4,428 |
| Albert L. Hogan III | $620 | 4.0 | $2,480 |
| Lisa B. Diaz | $295 | 5.9 | $1,741 |

---

[29]   This compares to $64,079, or 0.7%, of the total fees requested in Skadden's first interim fee application for this matter and $140,233, or 1.2%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| M. Janine Jjingo | $335 | 3.6 | $1,206 |
| Paraprofessional Total | | 23.0 | $5,290 |
| **Total** | | **794.2** | **$356,684 (3.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$20,436** |

I.    Nonworking Travel Time

101.   Because of the extensive breadth of services that Skadden is providing to the Debtors in these Reorganization Cases, Skadden draws upon the experience and talent of a number of professionals from its worldwide organization including offices located in Chicago, New York, Washington, D.C., Los Angeles, and London, England.  As this Court is aware, the Debtors are headquartered in Troy, Michigan, members of the Creditors' Committee are based in several states across the United States, the Debtors' postpetition lenders are based in New York, and many of the Debtors' other primary constituencies, including its unions and GM, are based in Michigan.  As a consequence of these disparate locations and the Debtors' expectation and determined need that certain Skadden partners and associates be on site in Michigan on a regular basis as well as in other locations, including New York, for specific events, Skadden professionals frequently must necessarily travel among these and other locations.  Among other things, Skadden professionals travel to meet with the Debtors' Board of Directors and senior management, creditor and equity constituencies, and to attend Court hearings.  Skadden's professionals who spend time traveling, but not otherwise working, allocate their time to this billing category.

102.    Skadden expended 1,205.8 hours during the Application Period devoted to non-working travel time for which Skadden seeks compensation of $351,261.[30]  This amount reflects a fifty-four percent (54%)[31] reduction from Skadden's guideline hourly rates.  Detailed time entries of each Skadden professional are attached hereto as <u>Exhibit D-9</u>.  A summary of the hours incurred and value of the travel time for each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| John (Jack) Wm. Butler, Jr. | $418 | 212.9 | $88,886 |
| John K. Lyons | $348 | 92.6 | $32,179 |
| Randall G. Reese | $233 | 135.6 | $31,528 |
| Ron E. Meisler | $270 | 106.4 | $28,728 |
| Joseph N. Wharton | $243 | 95.1 | $23,063 |
| George N. Panagakis | $377 | 54.7 | $20,649 |
| Dhananjai Shivakumar | $280 | 62.4 | $17,472 |
| Allison V. Herriott | $188 | 88.9 | $16,670 |
| Keith D. Krakaur | $377 | 29.1 | $10,985 |
| Albert L. Hogan III | $310 | 34.4 | $10,664 |
| Lee P. Garner | $280 | 31.9 | $8,932 |
| Nick D. Campanario | $233 | 33.9 | $7,882 |
| Courtney E. VanLonkhuyzen | $188 | 40.1 | $7,519 |
| Lisa B. Diaz | $148 | 37.7 | $5,561 |
| Karen E. Willenken | $255 | 19.4 | $4,947 |
| Neil MacDonald | $270 | 17.5 | $4,725 |
| Brian M. Fern | $243 | 17.0 | $4,123 |
| John Guzzardo | $187 | 21.0 | $3,937 |
| Jay S. Berke | $378 | 9.7 | $3,662 |

---

[30]    This compares to $290,270, or 3.2%, of the total fees requested in Skadden's first interim fee application for this matter and $376,303, or 3.3%, of the total fees requested in Skadden's second interim fee application for this matter.

[31]    This reduction is comprised of the following:  the elimination of approximately 116.2 hours of billed time during the Application Period as an additional accommodation to the Debtor, and thereafter, a fifty-percent (50%) reduction to the guideline hourly rates.  The eliminated time charges primarily related to extended travel time occasioned by weather and air traffic.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kenneth Berlin | $385 | 9.3 | $3,581 |
| Marian P. Wexler | $385 | 9.3 | $3,581 |
| Kathy Zambrano | $205 | 16.7 | $3,423 |
| Nathan L. Stuart | $220 | 15.5 | $3,410 |
| Christopher J. Gunther | $330 | 9.2 | $3,036 |
| John P. Furfaro | $385 | 5.5 | $2,118 |
| **Total** | | **1,205.8** | **$351,261 (3.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$405,014** |

J.    Creditor Meetings/Statutory Committees

103.    This category of time relates to meetings with various creditor and equity constituencies, and, in particular, with the Creditors' Committee and the Equity Committee (the "Statutory Committees") and their respective legal and financial advisors.  Throughout the Application Period, Skadden regularly communicated with the Statutory Committees and their respective advisors regarding the progress and status of the Reorganization Cases.

104.    In addition to day-to-day communication, during the Application Period, Skadden represented the Debtors at four formal meetings with the Creditors' Committee and its professional advisors, as well as four formal meetings with the Equity Committee and its advisors.  The formal monthly meetings have provided a forum for the Statutory Committees (including their members) to address general and specific concerns.  In addition to the formal meetings with the Statutory Committees, during the Application Period, the Debtors also held smaller sessions with the professionals for the Statutory Committees.  These meetings have allowed the Debtors to keep the Statutory Committee members and professionals informed as to upcoming issues, such as motions to be heard at the monthly omnibus hearings, the status of the Debtors' transformation plan, development and negotiations concerning the framework

54

agreement, and actions to be undertaken in furtherance of the transformation plan and the

framework agreement.  The Debtors believe that these efforts have likely eliminated potential

objections that the Statutory Committees might have filed to some of the Debtors' motions by

communicating with the Statutory Committees in advance of filings and anticipated transactions,

thus avoiding some unnecessary litigation expenses.  Skadden assisted the Debtors in preparing

for these meetings, including the coordination of information and status reports regarding

implementation of various orders and other relevant matters.

       105.    In addition, during the Application Period, Skadden was required to devote

resources to various motions affecting the Statutory Committees.  In particular, on July 28, 2006,

Skadden assisted the Debtors in obtaining Court approval of the Debtors' Motion For Approval

Of Joint Interest Agreement Between Debtors And Official Committee of Equity Security

Holders And Implementation Of Protective Order With Respect Thereto (Docket No. 4722).  The

Joint Interest Agreement between the Debtors and the Equity Committee allows the Debtors to

share certain confidential, and sometimes privileged, information with the Equity Committee

regarding primarily the Debtors relationship with GM.  Additionally, during the Application

Period, the Debtors, with Skadden's assistance, worked to develop information sharing protocols

with the Equity committee to govern the sharing of relevant information between the parties.

Once a protocol was reached, Skadden assisted the Debtors in providing information to the Equity

committee pursuant to that protocol.

       106.    Finally, during the Application Period, the Debtors received a request for

document production by an ad hoc committee of trade claimants.  Skadden assisted the Debtors in

reviewing and analyzing this request, and negotiating a non-disclosure agreement to produce

certain requested documents.

107.    In connection with the foregoing services, Skadden expended 755.4 hours during the Application Period for which Skadden seeks compensation of $341,135.[32]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-10.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Kayalyn A. Marafioti | $795 | 84.5 | $67,179 |
| Thomas J. Matz | $560 | 97.7 | $54,712 |
| Allison V. Herriott | $375 | 131.3 | $49,238 |
| John (Jack) Wm. Butler, Jr. | $835 | 56.4 | $47,095 |
| Ron E. Meisler | $540 | 56.8 | $30,672 |
| John Guzzardo | $375 | 32.8 | $12,300 |
| Adlai S. Hardin | $540 | 20.6 | $11,124 |
| M. Janine Jjingo | $335 | 31.4 | $10,520 |
| Nathan L. Stuart | $440 | 22.1 | $9,724 |
| Kathy Zambrano | $410 | 22.7 | $9,307 |
| Eric L. Cochran | $795 | 3.9 | $3,101 |
| Michael W. Perl | $375 | 8.2 | $3,076 |
| Marian P. Wexler | $770 | 3.8 | $2,926 |
| Lisa B. Diaz | $295 | 7.4 | $2,183 |
| Peter Olasky | $375 | 2.9 | $1,088 |
| Randall G. Reese | $465 | 2.2 | $1,023 |
| Paraprofessional Total | | 170.7 | $25,867 |
| **Total** | | **755.4** | **$341,135 (3.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$18,455** |

---

[32]    This compares to $415,954, or 4.5%, of the total fees requested in Skadden's first interim fee application for this matter and $1,527,032, or 13.5%, of the total fees requested in Skadden's second interim fee application for this matter.

K.    Supplier Matters

108.    As previously stated, Delphi is the largest industrial company ever to seek chapter 11 relief.  The Debtors' manufacturing operations depend upon the timely delivery of goods and services from thousands of separate suppliers that are party to more than 96,000 distinct supply agreements.  Management of the Debtors' supply chain issues was further complicated by the Debtors' reliance, consistent with normal automotive industry practice, on "just-in-time" inventory management systems and "sole source" supply methods.  As discussed in detail in motions filed earlier in these cases,[33] use of the just-in-time supply method means that the Debtors do not maintain a significant inventory of the components supplied by many of their suppliers.  Pursuant to the sole source supply method, the Debtors frequently purchase all their requirements for a particular part from one supplier, each of which must meet demanding specifications imposed by both the Debtors and their OEM customers before they can be used in manufacturing the Debtors' products.

109.    The Debtors' use of just-in-time inventory management and sole source supply methods results in, among other things, the following unique risks to the Debtors' businesses:  (a) a failure by a supplier to timely ship goods may force the Debtors' manufacturing facilities using those parts to shut down less than 24 hours after the missed shipment and the Debtors' OEM customer's manufacturing facilities to shut down less than 48 hours after the missed shipment and (b) the Debtors are unable to re-source parts to another supplier in the short term.  The Debtors' postfiling supply chain management has been further complicated by the fact

---

[33]    See, e.g., Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and 9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, dated October 13, 2005 (Docket No. 17); Motion for Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 18, 2005 (Docket No. 1098).

that many of the Debtors' suppliers are facing similar financial pressures to those faced by the Debtors.  The financial instability of some of such suppliers was significantly exacerbated by the Debtors' chapter 11 filings and the large prepetition amounts owed to suppliers at the time of the Debtors' filings.

110.    During the Application Period, Skadden continued to assist the Debtors in managing numerous supply chain issues to avoid any interruptions in the supply of goods and services to the Debtors' manufacturing operations.  In particular, the Debtors continued to address supplier issues pursuant to the various supplier-related "first day" orders that were approved by the Court early in these cases, as well as this Court's order dated December 12, 2005 (Docket No. 1494) (the "SAAP Order") granting the Debtors authority to assume agreements covering the supply of goods that the Debtors determine are critical to their on-going business operations.  This required the Debtors, with the assistance of Skadden, to negotiate a significant number of agreements with multiple suppliers pursuant to such orders.  During the Application Period, Skadden also devoted time to negotiations with suppliers regarding the extension or replacement of expiring supply agreements, including pursuant to the procedures approved by the Court in the SAAP Order.

111.    In connection with the foregoing services, Skadden expended 807.1 hours during the Application Period for which Skadden seeks compensation of $331,877.[34]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-11.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

---

[34]    This compares to $1,032,388, or 11.2%, of the total fees requested in Skadden's first interim fee application for this matter and $539,862, or 4.8%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| John K. Lyons | $695 | 144.3 | $100,290 |
| Randall G. Reese | $465 | 212.2 | $98,674 |
| William M. Rohner | $440 | 121.3 | $53,372 |
| Lisa B. Diaz | $295 | 80.3 | $23,689 |
| Kellan Grant | $410 | 28.4 | $11,644 |
| Ron E. Meisler | $540 | 20.0 | $10,800 |
| Allison V. Herriott | $375 | 23.3 | $8,738 |
| Michael W. Perl | $375 | 17.5 | $6,563 |
| Kurt Ramlo | $560 | 2.3 | $1,288 |
| Thomas J. Matz | $560 | 2.3 | $1,288 |
| Paraprofessional Total | | 155.2 | $15,531 |
| **Total** | | **807.1** | **$331,877 (3.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$20,207** |

L.    Tax Matters

112.    In connection with the development and negotiation of the framework agreement and to lay the ground work for a potential plan of reorganization and emergence from chapter 11, during the Application Period Skadden began analyzing certain tax ramifications of various framework agreement proposals.  In particular, Skadden professionals researched the Debtors' ability to utilize certain advantageous tax rules available under section 382 of the Internal Revenue Code that could arise under the various scenarios proposed in the framework discussions.  These issues include, among other things, matters related to change in control and potential limitations on the uses of net operating losses and other tax assets after emerging from chapter 11.  In addition, Skadden began researching certain income tax ramifications resulting from the framework agreement proposals.

113.    Additionally, during the Application Period, the Debtors filed their Form 1120 with respect to certain taxes that were due for fiscal year 2005.  In connection with this

59

filing, Skadden assisted the debtors in analyzing various issues regarding the ability of a chapter

11 debtor to make payment of certain taxes under the Bankruptcy Code. Finally, Skadden began

researching whether the Debtors would be able to set off certain tax obligations that may be owed

by Delphi against other amounts owed to Delphi by other governmental agencies.

   114. In connection with the foregoing services, Skadden expended 592.4 hours

during the Application Period for which Skadden seeks compensation of $319,866.[35] Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-12. A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Eric B. Sensenbrenner | $560 | 137.8 | $77,168 |
| Aaron S. Feinberg | $465 | 68.9 | $32,039 |
| Daniel P. Phillips | $540 | 54.7 | $29,538 |
| Kayalyn A. Marafioti | $795 | 35.3 | $28,064 |
| Michael W. Perl | $375 | 66.5 | $24,938 |
| Cliff Gross | $770 | 30.6 | $23,562 |
| David A. Schneider | $560 | 38.6 | $21,616 |
| Thomas J. Matz | $560 | 37.6 | $21,056 |
| Jody J. Brewster | $695 | 26.5 | $18,419 |
| Joseph N. Wharton | $485 | 28.6 | $13,871 |
| Allen Stenger | $410 | 27.8 | $11,398 |
| M. Janine Jjingo | $335 | 20.5 | $6,868 |
| John K. Lyons | $695 | 4.5 | $3,128 |
| Kurt Ramlo | $560 | 5.3 | $2,968 |
| Ron E. Meisler | $540 | 5.0 | $2,700 |
| Eric L. Cochran | $795 | 1.6 | $1,272 |

---

[35] This compares to $932,086, or 10.1%, of the total fees requested in Skadden's first interim fee application for this
matter and $82,775, or 0.7%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Brian M. Fern | $485 | 2.6 | $1,261 |
| **Total** | | **592.4** | **$319,866 (3.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,179** |

## M.    Employee Matters (General)

115.    As of the Petition Dates, the Company employed approximately 180,000 employees worldwide, of which 50,600 were employees in the United States at approximately 44 manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters. Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition Dates, and 96% of these are union-represented. Outside the United States, the Company's foreign entities employed more than 134,000 people on the Petition Dates, supporting 120 manufacturing sites and 20 technical centers in nearly 40 countries around the globe.

116.    During the Reorganization Cases, the Debtors have been attempting to restructure the compensation programs of all of their employees to market-competitive levels. Among other human capital programs, Skadden, along with the Debtors' other advisors, continue to advise the Debtors in connection with the Debtors' reassessment of the employment proposition that the Company could offer its executive workforce in light of current U.S. and marketplace economic realities. The result of this evaluation led to Skadden's drafting, prior to the Application Period, of a motion (the "KECP Motion") to implement a key employee compensation program ("KECP") based on recommendations made by the Debtors' outside compensation consultant as adopted by the Compensation Committee of Delphi's Board of Directors. The Court subsequently conducted an evidentiary hearing on the Debtors' request to restore a limited portion of the at-risk compensation opportunities available to the Debtors' executives prepetition by implementing a short-term annual incentive program ("AIP") for the

61

first six months of 2006 which was approved pursuant to an order entered by this Court on

February 17, 2006 (Docket No. 2441) (the "AIP Order").

117.    During the Application Period, Skadden drafted a supplement to the KECP

Motion (the "KECP Supplement") seeking this Court's authority to fix second half 2006 AIP

targets and continue the AIP program under substantially the same terms and conditions outlined

in the AIP Order.  Six unions and "the Court-appointed Lead Plaintiffs" in the consolidated

multi-district securities class action entitled In re Delphi Corp. Securities Litigation, Master File

No. 05 MD 1725 (E.D. Mich.) (Rosen, J.) (the "Lead Plaintiffs") objected to the KECP

Supplement (collectively, the "KECP Supplement Objectors").  Skadden reviewed and produced

to the KECP Supplement Objectors several hundred pages of documents related to the KECP

Supplement.  Skadden also prepared for a contested hearing related to the KECP Supplement.  At

the July 19, 2006 Omnibus Hearing, the Court approved the Debtors' request to (a) continue the

AIP and fix second half 2006 AIP targets and (b) further adjourn the KECP emergence incentive

program.  In addition, continuation of the AIP and fixing 2007 AIP targets was adjourned to a

later hearing, now set for January 11, 2007.  Subsequently, Skadden continued discussions with

the Creditors' Committee on issues related to the KECP emergence incentive program, and a

hearing on this matter has been consensually adjourned to January 11, 2007.

118.    In connection with the foregoing services, Skadden expended 602.4 hours

during the Application Period for which Skadden seeks compensation of $308,544.[36]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

---

[36]    This compares to $879,786, or 9.6%, of the total fees requested in Skadden's first interim fee application for this
matter and $359,097, or 3.2%, of the total fees requested in Skadden's second interim fee application for this
matter.

D-13. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Nick D. Campanario | $465 | 178.0 | $82,771 |
| Brian M. Fern | $485 | 155.7 | $75,515 |
| Albert L. Hogan III | $620 | 102.8 | $63,736 |
| John (Jack) Wm. Butler, Jr. | $835 | 46.9 | $39,163 |
| John Guzzardo | $375 | 44.6 | $16,725 |
| Thomas J. Matz | $560 | 16.1 | $9,016 |
| Neil MacDonald | $540 | 10.0 | $5,400 |
| Ron E. Meisler | $540 | 7.7 | $4,158 |
| Kayalyn A. Marafioti | $795 | 4.4 | $3,498 |
| Kurt Ramlo | $560 | 3.0 | $1,680 |
| Paraprofessional Total | | 33.2 | $6,882 |
| **Total** | | **602.4** | **$308,544 (3.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$12,807** |

N.    Business Operations/Strategic Planning

119.    This matter covers Skadden's work with the Debtors' senior management, investment bankers, financial advisors, and other business and legal advisors in considering restructuring strategies and initiatives. Among other matters, senior Skadden lawyers participate in weekly meetings at the Company's headquarters, including Delphi Transformation Committee meetings. Skadden also participated in numerous strategy sessions, meetings, and calls to consider such major case issues as the Debtors' development of (a) their transformation plan, (b) a comprehensive, go-forward, and a 2006-2010 restructuring business plan, (c) the framework discussions, and (d) various scenarios, considerations, and ramifications regarding the Reorganization Cases. Furthermore, Skadden assisted the Debtors with respect to operational issues as they relate to these Reorganization Cases, including, without limitation, conducting

negotiations with the Creditors' Committee and Equity Committee as well as analyzing certain

proposed strategic intercompany transactions.

120.    In furtherance of the Debtors' transformation plan, during the Application

Period the Debtors, with the assistance of Skadden and other outside counsel, entered into two

agreements for the outsourcing of certain information technology services.  One agreement was

with Electronic Data Systems Corporation and EDS Information Services, LLC, which provides

for the outsourcing of global desktops, service desks, and mainframe systems hosting (the "EDS

Agreement").  The second agreement was between Delphi and Hewlett Packard Company to

allow the Debtors to outsource server systems hosting (and together with the EDS Agreement, the

"IT Infrastructure Outsourcing Agreements").  The aggregate projected cost of the IT

Infrastructure Outsourcing Agreements is approximately $700-$800 million over the seven-year

term of the agreements, but after one-time transition costs of $80 million, the Debtors expect that

the IT Infrastructure Outsourcing Agreements will result in a net operating savings of $155 over

the term of the agreements.

121.    Skadden took the lead role in drafting and preparing the necessary motions

to obtain this Court's approval of the IT Infrastructure Outsourcing Agreements and assisted the

Debtors throughout the process of communicating the substance of the Debtors' getting approval,

including, without limitation, preparing material for and holding working group sessions with the

Creditors' Committee to communicate the substance of the Debtors' request and apprise the

Creditors' Committee of the rationale behind the Debtors' business judgment.  Due to proprietary

and confidential information contained in the IT Infrastructure Outsourcing Agreements, on

September 26, 2006, the Debtors, with the assistance of Skadden, filed an ex parte motion for

authority to file the IT Infrastructure Outsourcing Agreements under seal (Docket No. 5198),

which was granted on September 28, 2006 (Docket No. 5231).  On September 29, 2006, the

Debtors filed the motion seeking authority to enter into the IT Infrastructure Outsourcing

Agreements (Docket No. 5237) and on October 23, 2006 the Court entered an order approving the

IT Infrastructure Outsourcing Agreements (Docket No. 5378).  Although the motion seeking

authority to enter into the IT Outsourcing Agreements was heard and the order approving such

Agreements was entered after the Application Period, all of the negotiations and drafting took

place during the Application Period.

        122.   In connection with the foregoing services, Skadden expended 518.1 hours

during the Application Period for which Skadden seeks compensation of $304,824.[37]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-14.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| John (Jack) Wm. Butler, Jr. | $835 | 97.7 | $81,580 |
| Brian M. Fern | $485 | 149.7 | $72,606 |
| Eric L. Cochran | $795 | 37.0 | $29,416 |
| Ron E. Meisler | $540 | 52.9 | $28,566 |
| Thomas J. Matz | $560 | 37.0 | $20,720 |
| Kayalyn A. Marafioti | $795 | 17.7 | $14,072 |
| George N. Panagakis | $755 | 15.5 | $11,704 |
| John K. Lyons | $695 | 12.4 | $8,618 |
| Nathan L. Stuart | $440 | 17.1 | $7,524 |
| Michael W. Perl | $375 | 19.0 | $7,126 |
| Allison V. Herriott | $375 | 10.0 | $3,751 |
| Kellan Grant | $410 | 9.0 | $3,690 |
| Kathy Zambrano | $410 | 7.0 | $2,870 |

---

[37]   This compares to $258,753, or 2.8%, of the total fees requested in Skadden's first interim fee application for this matter and $192,132, or 1.7%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| Marian P. Wexler | $770 | 3.3 | $2,541 |
| Brent M. Houston | $375 | 6.7 | $2,512 |
| Kurt Ramlo | $560 | 4.2 | $2,352 |
| John P. Furfaro | $770 | 1.7 | $1,309 |
| Paraprofessional Total | | 20.2 | $3,867 |
| **Total** | | **518.1** | **$304,824 (3.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$10,534** |

O.    Retention/Fee Matters/Objections (Others)

123.    Reorganization cases as large and complex as these require the coordinated efforts of a number of restructuring advisors and professionals.  To this end, during the Application Period, Skadden assisted the Debtors in retaining PricewaterhouseCoopers LLP to provide certain services in connection with Sarbanes-Oxley compliance, tax and financial planning, and other general tax consulting services to the Debtors.  Skadden, on behalf of the Debtors, also worked with FTI to expand the scope of its employment as restructuring and financial advisor to the Debtors to include the provision of certain economic consulting services, including, without limitation, an evaluation of potential liability related to the multi-district litigation class action litigations filed against, among others, Delphi and certain current and/or former officers and directors.  In addition, during the Application Period, the Debtors, with the assistance of Skadden, began the process of preparing additional retention and supplemental retention applications for various other professional firms, which applications the Debtors anticipate will be filed during subsequent applications periods.  When necessary, Skadden conferred with the Debtors and the professionals to be retained and provided assistance with evaluating discrete issues affecting the Debtors' retention of these professionals.

124.    Furthermore, during the Application Period, Skadden advised the Debtors regarding the retention, pursuant to the Order Under 11 U.S.C. §§ 327, 330, and 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course Professionals Order"), of approximately five ordinary course professionals who provide the Debtors with various non-restructuring legal, accounting, and other professional services. Because the Ordinary Course Professional Order requires any ordinary course professional to file an affidavit prior to being retained and compensated by the Debtors, Skadden assisted the Debtors in tracking which professionals had filed such affidavits and when the expiration of the individual objection periods had occurred, permitting the Debtors then to pay such ordinary course professionals.

125.    In accordance with the requests of the U.S. Trustee, the Ordinary Course Professionals Order requires that any ordinary course professional whose fees exceed $50,000 per month or $500,000 in the aggregate during the pendency of these Reorganization Cases must be retained pursuant to a formal retention application to receive future compensation from the Debtors. Accordingly, during the Application Period, Skadden, on behalf of the Debtors, assisted DLA Piper US LLP, one of the Debtors' ordinary course professionals, in preparing its formal retention application, which was ultimately filed after the Application Period on October 30, 2006 (Docket No. 5439).

126.    In connection with the foregoing services, Skadden expended 679.3 hours during the Application Period for which Skadden seeks compensation of $241,482.[38]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit

---

[38]    This compares to  $377,176, or 4.1%, of the total fees requested in Skadden's first interim fee application for this matter and $431,545, or 3.8%, of the total fees requested in Skadden's second interim fee application for this matter.

D-15.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| M. Janine Jjingo | $335 | 316.9 | $106,162 |
| Thomas J. Matz | $560 | 72.2 | $40,432 |
| Venera E. Ziegler | $510 | 74.2 | $37,842 |
| John K. Lyons | $695 | 16.8 | $11,676 |
| John (Jack) Wm. Butler, Jr. | $835 | 4.6 | $3,842 |
| Ron E. Meisler | $540 | 6.9 | $3,726 |
| Kayalyn A. Marafioti | $795 | 4.6 | $3,658 |
| Nathan L. Stuart | $440 | 5.8 | $2,552 |
| Allison V. Herriott | $375 | 3.9 | $1,463 |
| Brent M. Houston | $375 | 3.7 | $1,388 |
| Paraprofessional Total | | 169.7 | $28,741 |
| **Total** | | **679.3** | **$241,482 (2.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$32,112** |

P.     Claims Administration (Reclamation/Trust Funds)

127.    As previously disclosed to this Court, the Debtors received roughly 855 unique reclamation demands containing nearly 100,000 lines of data, with a total face amount of more than $285 million.  During the Application Period, Skadden continued to work with the Debtors and their business advisors in negotiating with suppliers regarding disagreements over the amount of individual reclamation claims.  As part of these negotiations, Skadden reviewed reclamation demands and supporting documents and drafted a significant amount of correspondence, including reclamation response statements and settlement letters.

128.    These efforts required substantial assistance from Skadden in advising the Debtors regarding their legal obligations under the reclamation procedures, including, for example, analyzing demands covering various types of inventory.  As in prior application periods, Skadden continued to correspond with numerous claimants and work with the Debtors and their

68

financial advisors to design training materials and process protocols for on-going negotiations with suppliers.  As a result of these continual negotiations with reclamation claimants since the Petition Dates and through the end of the Application Period, more than 725 of the original 855 non-duplicate claims were resolved (either consensually or by default) as of September 30, 2006, subject to reservations of further defenses.

129.    In addition, the Debtors, with Skadden's assistance, successfully objected to the motion of Speedline Technologies, Inc. ("Speedline Technologies"), a reclamation claimant who sought the immediate return of its reclaimed goods or, in the alternative, payment of an administrative expense claim.  The Creditors' Committee also objected to Speedline's motion, arguing that the lien on the Debtors' assets held by the Debtors' prepetition secured lenders rendered valueless the administrative priority of Speedline Technologies' reclamation claims.

130.    The Debtors, with the assistance of Skadden, disagreed with both Speedline Technologies and the Creditors' Committee.  The Debtors asserted that it could not then be known whether the existence of a prior perfected lien negated the potential administrative priority of reclamation claims, and that a reclamation claimant must wait until it could be determined how the secured debt would be satisfied pursuant to a confirmed plan of reorganization.  As a result of the efforts of the Debtors and Skadden, the Debtors prevailed at the hearing on the motion on August 17, 2006, and this Court issued a ruling denying Speedline Technologies' motion and not granting the Creditors' Committee's objection (Docket No. 5372).

131.    In connection with the foregoing services, Skadden expended 462.2 hours during the Application Period for which Skadden seeks compensation of $271,669.[39]  Detailed

---

[39]    This compares to $134,926, or 1.5%, of the total fees requested in Skadden's first interim fee application for this matter and $142,265, or 1.3%, of the total fees requested in Skadden's second interim fee application for this matter.

time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-16</u>. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Joseph N. Wharton | $485 | 322.6 | $156,462 |
| John K. Lyons | $695 | 30.5 | $21,198 |
| M. Janine Jjingo | $335 | 53.3 | $17,856 |
| Ron E. Meisler | $540 | 11.8 | $6,372 |
| Albert L. Hogan III | $620 | 8.0 | $4,960 |
| John (Jack) Wm. Butler, Jr. | $835 | 2.4 | $2,004 |
| Thomas J. Matz | $560 | 3.3 | $1,848 |
| Paraprofessional Total | | 30.3 | $6,969 |
| **Total** | | **462.2** | **$217,669 (2.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$25,837** |

Q.    <u>General Corporate Advice</u>

132.    During the Application Period, Skadden attended meetings of the Delphi Board of Directors which required, among other things, working with the Debtors' various professionals and the Debtors' senior management to prepare detailed materials for distribution and discussion. In connection with these meetings and in the course of the Debtors' daily operations, in addition to general restructuring advice, Skadden devoted time advising the Debtors' management and Board of Directors on other general corporate governance matters as they relate to the reorganization.

133.    Also during the Application Period, Skadden advised the Debtors in connection with the preparation of the Debtors' regulatory filings with the Securities and Exchange Commission, including the Debtors' Form 8-Ks, which are issued in connection with disclosure issues on matters such as material agreements, financial matters, and the Debtors' monthly operating reports, as well as in connection with internal and external communication

70

matters.  In addition, during the Application Period, Skadden assisted the Debtors in preparing

and filing the Form 10-K for the year ended December 31, 2005, which was filed on July 11,

2006, and the Form 10-Q quarterly reports for the periods ending on March 31, 2006 and June 30,

2006, which were filed on August 15, 2006.

          134.    In addition, during the Application Period, Skadden assisted the Debtors on

various matters relating to the trust preferred securities.  Delphi is a party to two declarations of

trust pursuant to which two series of trust preferred securities, the 8.25% Cumulative Trust

Preferred Securities and the Adjustable Rate Trust Preferred Securities, were issued in 2003.

Pursuant to the declarations of trust, the trusts that issued these preferred securities were

liquidated shortly after the conclusion of the Application Period as a result of the filing of these

chapter 11 cases.  In exchange for their book-entry interests in the global certificates issued

pursuant to the declarations of trust, holders of the preferred securities received pro rata interests

in two global notes issued by Delphi.  Skadden assisted in connection with the liquidation of the

trusts and the exchange of the preferred securities for interests in the global notes.  During the

Application Period, the Debtors, with Skadden's assistance, negotiated the arrangements with the

indenture trustee and Skadden reviewed and commented on relevant documentation.

          135.    In connection with the foregoing services, Skadden expended 248.6 hours

during the Application Period for which Skadden seeks compensation of $161,208.[40]  Detailed

time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit

D-17</u>.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

---

[40]    This compares to $340,687, or 3.7%, of the total fees requested in Skadden's first interim fee application for this
matter and $249,312, or 2.2%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|------|------|------|-------|
| John (Jack) Wm. Butler, Jr. | $835 | 57.4 | $47,930 |
| Eric L. Cochran | $795 | 41.1 | $32,676 |
| Adlai S. Hardin | $540 | 45.1 | $24,354 |
| Kayalyn A. Marafioti | $795 | 17.8 | $14,151 |
| Thomas J. Matz | $560 | 16.5 | $9,240 |
| Marie L. Gibson | $585 | 11.5 | $6,728 |
| Peter Olasky | $375 | 15.8 | $5,926 |
| Kathy Zambrano | $410 | 10.4 | $4,264 |
| Ron E. Meisler | $540 | 6.2 | $3,348 |
| George N. Panagakis | $755 | 4.0 | $3,020 |
| Brian M. Fern | $485 | 5.6 | $2,717 |
| Marian P. Wexler | $770 | 2.1 | $1,617 |
| Allison V. Herriott | $375 | 4.1 | $1,538 |
| Louis D. Wilson | $510 | 2.3 | $1,173 |
| Gregory O. Ogunsanya | $440 | 2.5 | $1,100 |
| Paraprofessional Total | | 6.2 | $1,426 |
| **Total** | | **248.6** | **$161,208 (1.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$17,091** |

R.    Secured Claims

136.    Throughout the Application Period, the Debtors, with Skadden's assistance continued to work with and meet with their prepetition lenders to keep them reasonably informed with respect to these Reorganization Cases.

137.    Skadden also devoted time to reconciling requests for setoff under the DIP Financing Order.[41]  Paragraph 18 of the DIP Financing Order sets forth comprehensive procedures by which customers and suppliers of the Debtors can exercise and resolve their setoff rights without having to file motions to lift the automatic stay.  Accordingly, during the Application Period, the Debtors and their advisors devoted time to analyzing and resolving

---

[41]    Skadden and Togut, the Debtors' conflicts counsel, work cooperatively to handle the dozens of setoff requests received to date with careful attention to ensure no duplication of efforts.

72

numerous setoff requests by customers and suppliers who sought to exercise setoff rights under

the DIP Financing Order, including certain setoff requests by GM.  In seeking to resolve these

setoff claims, Skadden tracked the setoff claims, researched their validity, and ultimately

negotiated resolutions of the claims.

138.    Skadden also dealt with a number of issues regarding assertion of liens

against the Debtors.  Prior to the Application Period, four complaints were filed to establish the

validity, extent, and priority of liens, three of which were previously resolved consensually.  With

regard to the fourth complaint, which was filed by L&W Engineering, Co. and Southtec, LLC (the

"L&W Plaintiffs"), during the Application Period, the Debtors, with the assistance of Skadden,

continued to review the allegations and researched the legal issues raised by the complaint, in

connection with completing and filing an answer and counterclaim on June 2, 2006.

139.    Furthermore, on June 27, 2006 the L&W Plaintiffs filed their answer to the

Debtors' counterclaim.  Subsequently and throughout the Application Period, both the Debtors

and the L&W Plaintiffs filed dispositive motions and related pleadings for a ruling on the merits

of the claims, including, without limitation, motions for judgment on the pleadings, statements of

material facts, responses, and replies.  In connection with reviewing and preparing these

pleadings, Skadden professionals conducted legal research and otherwise developed their

litigation strategy in an effort to prevail on the merits in this adversary proceeding.

140.    In addition, Skadden advised the Debtors about potential settlement of

pending adversary proceeding, and Skadden participated in several discussions with the L&W

Plaintiffs' attorneys about the prospects for settling this matter.  Due to the ongoing negotiations

on this matter, as of the end of the Application Period, the parties agreed to adjourn this matter to

the November 30, 2006 omnibus hearing.  Subsequently, the parties further adjourned this matter to the omnibus hearing scheduled for April 2007.

141.    In connection with the foregoing services, Skadden expended 354.5 hours during the Application Period for which Skadden seeks compensation of $153,028.[42]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-18.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| William M. Rohner | $440 | 77.8 | $34,232 |
| Sina Toussi | $540 | 44.1 | $23,814 |
| Ron E. Meisler | $540 | 33.1 | $17,874 |
| Albert L. Hogan III | $620 | 27.3 | $16,926 |
| Venera E. Ziegler | $510 | 32.8 | $16,728 |
| Kellan Grant | $410 | 36.5 | $14,965 |
| M. Janine Jjingo | $335 | 25.5 | $8,543 |
| Thomas J. Matz | $560 | 6.7 | $3,752 |
| Allison V. Herriott | $375 | 9.1 | $3,413 |
| John (Jack) Wm. Butler, Jr. | $835 | 3.7 | $3,090 |
| John K. Lyons | $695 | 3.2 | $2,224 |
| Brent M. Houston | $375 | 3.0 | $1,125 |
| Paraprofessional Total | | 51.7 | $6,342 |
| **Total** | | **354.5** | **$153,028 (1.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$7,580** |

---

[42]    This compares to $236,983, or 2.6%, of the total fees requested in Skadden's first interim fee application for this matter and $266,437, or 2.4%, of the total fees requested in Skadden's second interim fee application for this matter.

S.      Retention/Fee Matters (SASM&F)

142.    Skadden is one of the largest law firms in the world, with more than 1,700 attorneys located in 22 offices in 11 countries. Because of the number of the Debtors' business relationships and the number of Skadden's business clients, Skadden has been required to spend significant time since the commencement of the Reorganization Cases with respect to retention and fee issues. In particular, Skadden conducted an extensive relationship and disclosure search in connection with being retained as Debtors' counsel. In addition, as new parties have become involved in aspects of these cases, Skadden has conducted supplementary disclosure searches and Skadden also periodically refreshes its searches to ensure the disclosure of new clients when warranted. Finally, pursuant to the requirements of the Interim Compensation Order, Skadden prepares detailed monthly compensation packages for distribution and is required to prepare and file interim fee applications in accordance with the established procedures.

143.    In connection with the foregoing services, Skadden expended 339.5 hours during the Application Period for which Skadden seeks compensation of $134,152.[43] Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-19. A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Michael W. Perl | $375 | 72.8 | $27,301 |
| Kathy Zambrano | $410 | 54.5 | $22,345 |
| Ron E. Meisler | $540 | 32.8 | $17,712 |
| Joseph N. Wharton | $485 | 33.8 | $16,394 |

---

[43]    This compares to $58,023, or 0.6%, of the total fees requested in Skadden's first interim fee application for this matter and $191,088, or 1.7%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|---|---|---|---|
| John (Jack) Wm. Butler, Jr. | $835 | 13.8 | $11,523 |
| Lisa B. Diaz | $295 | 21.6 | $6,373 |
| Allison V. Herriott | $375 | 14.1 | $5,288 |
| Kayalyn A. Marafioti | $795 | 5.2 | $4,135 |
| Ronald D. Kohut | $410 | 5.7 | $2,337 |
| M. Janine Jjingo | $335 | 5.1 | $1,709 |
| Randall G. Reese | $465 | 3.4 | $1,581 |
| Nick D. Campanario | $465 | 3.0 | $1,395 |
| Thomas J. Matz | $560 | 1.8 | $1,008 |
| Paraprofessional Total | | 71.9 | $15,051 |
| **Total** | | **339.5** | **$134,152 (1.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$39,656** |

T.    <u>Environmental Matters</u>

144.    Skadden assisted the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code.  Analysis of the Debtors' potential environmental liabilities raises particularly complex factual issues because, among other reasons, a large portion of those liabilities arise from actions or operations that took place before the Debtors' separation from GM.  As a result, research many legal issues was required.

145.    In addition, many of the U.S. plants that Delphi intends to wind down may present environmental concerns.  Therefore, Skadden, assisted the Debtors in developing startegy regarding potential alternatives for addressing these potential environmental liabilities in connection with emergence from chapter 11 and analyzing the legal issues that may arise from implementation of such strategies.  One alternative that the Debtors are evaluating with the assistance of Skadden is the idea of establishing a trust to which some or all of these properties

76

could be transferred prior to emergence.  To date, this concept is still under development and

analysis and additional issues still need to be considered prior to deciding to establish such a trust.

146.    Furthermore, in connection with the ongoing claims review, Skadden has

assisted the Debtors in analyzing various environmental claims that have been filed against the

Debtors.  In addition, Skadden assisted the Debtors with analysis and review of environmental

conditions associated with the Debtors' properties in certain states, and developing provisions for

resolving potential environmental liabilities in connection with possible property sales, lease

rejections, or other transactional agreements.  Finally, Skadden advised the Debtors in connection

with a settlement with the state of New Jersey's environmental agency for environmental

remediation at the Debtors' former battery manufacturing facility in New Brunswick, New Jersey,

which the Debtors sold to JCI pursuant to a Transfer Agreement dated May 26, 2006 and pursuant

to which Delphi Automotive Systems LLC committed to remediate the New Brunswick facility.

In addition, Skadden assisted the Debtors in preparing a notice of that settlement and serving that

notice on certain stakeholders as required under the Settlement Procedures Order.

147.    In connection with the foregoing services, Skadden expended 196.3 hours

during the Application Period for which Skadden seeks compensation of $129,158.[44]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-20.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Kenneth Berlin | $770 | 118.5 | $91,245 |
| John A. Amodeo | $580 | 27.4 | $15,892 |

---

[44]    This compares to $163,396, or 1.8%, of the total fees requested in Skadden's first interim fee application for this
matter and $140,142, or 1.2%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|---|---|---|---|
| Ron E. Meisler | $540 | 20.3 | $10,962 |
| Marian P. Wexler | $770 | 4.9 | $3,773 |
| Joseph N. Wharton | $485 | 3.3 | $1,601 |
| Kathy Zambrano | $410 | 3.6 | $1,476 |
| Paraprofessional Total | | 18.3 | $4,209 |
| **Total** | | **196.3** | **$129,158 (1.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,914** |

Matters Under $100,000

U.    Leases (Real Property)

148.    The Debtors are lessors or lessees with respect to approximately 90 leases of real property.  During the Application Period, Skadden worked closely with the Debtors on matters related to such real property leases including (a) reviewing the Debtors' existing leases and negotiating the renewal of certain leases, (b) reviewing proposed new leases and negotiating entry into certain new leases, and (c) conducting negotiations for the Debtors relating to the rejection of leases and other matters concerning the disposition of the Debtors' nonresidential real property leases.

149.    In addition, during the Application Period, Skadden prepared notices to implement the Debtors' business decisions relating to (a) entering into and renewing certain real property leases pursuant to the order entered by this Court approving procedures for entering into or renewing real property leases and (b) the disposition of certain real property leases pursuant to the order entered by this Court approving procedures for the rejection of real property leases.  In particular, the Debtors entered into or renewed eight leases and rejected one lease during the Application Period.  Moreover, the Debtors, with the assistance of Skadden, are evaluating the consolidation of certain sites in Michigan, Illinois, and Pennsylvania in order to, among other

78

05-44481-rdd    Doc 6002    Filed 11/30/06    Entered 11/30/06 21:03:25    Main Document
Pg 87 of 110

things, improve efficiency of operations and lower the overall costs related to maintaining these
various sites.

150.    Furthermore, in October 2005, Orix Warren, LLC ("Orix") was the only
lessor to file an objection to the Debtors' motion to extend the deadline to assume or reject leases
under section 365(d)(4).  Orix's objection was subsequently resolved, although only temporarily,
as memorialized in the Order Pursuant to 11 U.S.C. § 365(d)(4) Extending Deadline to Assume
Or Reject Unexpired Leases of Nonresidential Real Property entered by the Court on November
29, 2005 (Docket No. 1345).  Specifically, Orix agreed to the eighteen-month extension
applicable to all non-residential real property leases subject to its right, on or prior to October 1,
2006, to file a notice of objection if it was opposed to the final six months of the extension.  In the
event of such an objection, the burden would shift back to the Debtors to show cause for the last
six months of the extension.  On September 21, 2006, Orix filed a notice of a supplemental
objection to the extension under section 365(d)(4) of the Bankruptcy Code of the Debtors'
deadline to assume or reject the unexpired lease of nonresidential real property in Warren, Ohio
(Docket No. 5178).  During the Application Period, the Debtors, with the assistance of Skadden,
began reviewing its anticipated course of action in connection with the Orix lease to determine the
best course of action with respect to this matter.

151.    In connection with the foregoing services, Skadden expended 169.0 hours
during the Application Period for which Skadden seeks compensation of $81,111.[45]  Detailed
time entries of each Skadden professional related to these services are attached hereto as Exhibit

---

[45]    This compares to $143,190, or 1.6%, of the total fees requested in Skadden's first interim fee application for this
matter and $290,834, or 2.6%, of the total fees requested in Skadden's second interim fee application for this
matter.

D-21.  A summary of the hours incurred and value of the services performed by each professional
is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Catherine E. Danz | $465 | 101.6 | $47,245 |
| Marian P. Wexler | $770 | 18.9 | $14,553 |
| M. Janine Jjingo | $335 | 15.2 | $5,092 |
| Ron E. Meisler | $540 | 7.0 | $3,780 |
| Allison V. Herriott | $375 | 5.3 | $1,987 |
| Kayalyn A. Marafioti | $795 | 2.3 | $1,829 |
| Randall G. Reese | $465 | 3.9 | $1,814 |
| Joseph N. Wharton | $485 | 3.4 | $1,649 |
| Kellan Grant | $410 | 3.0 | $1,230 |
| Paraprofessional Total | | 8.4 | $1,932 |
| **Total** | | **169.0** | **$81,111 (0.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$13,442** |

V.    Executory Contracts (Personalty)

        152.    The Debtors estimate that, as of the Petition Dates, they were parties to
347,000 scheduled executory contracts and unexpired leases, which collectively involve billions
of dollars of liabilities.  During the Application Period, Skadden worked closely with numerous
internal and external representatives and employees of the Debtors to coordinate the review of
various executory contracts and, together with the Debtors' senior management and business
advisors, to evaluate contracts and leases for assumption or rejection.  To conduct the analysis,
Skadden participated in meetings with the Debtors' business personnel regarding appropriate
proration of invoices and postpetition payment obligations.  Moreover, Skadden participated in
numerous meetings and teleconferences with contract counterparties regarding contractual
matters, termination notices, and other issues.  Also, the Debtors, with the assistance of Skadden,

80

responded to numerous requests from counterparties to compel the assumption or rejection of their contracts.

153.    In connection with the foregoing services, Skadden expended 160.4 hours during the Application Period for which Skadden seeks compensation of $69,027.[46]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-22.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| M. Janine Jjingo | $335 | 41.2 | $13,803 |
| Ron E. Meisler | $540 | 25.4 | $13,716 |
| Kellan Grant | $410 | 32.9 | $13,489 |
| Kathy Zambrano | $410 | 15.6 | $6,396 |
| Brian M. Fern | $485 | 13.1 | $6,354 |
| Joseph N. Wharton | $485 | 12.9 | $6,257 |
| Thomas J. Matz | $560 | 6.6 | $3,696 |
| Michael W. Perl | $375 | 8.6 | $3,225 |
| Venera E. Ziegler | $510 | 4.1 | $2,091 |
| **Total** | | **160.4** | **$69,027 (0.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$30,683** |

W.    Liquidation / Feasibility

154.    During the Application Period, Skadden assisted the Debtors and FTI in the beginning stages of preliminary liquidation analyses, which the Debtors anticipate will ultimately be required in connection with a plan of reorganization.  Skadden conducted legal research in connection with these liquidation analyses and participated in conference calls with FTI during

---

[46]    This compares to $153,055, or 1.7%, of the total fees requested in Skadden's first interim fee application for this matter and $38,078, or 0.3%, of the total fees requested in Skadden's second interim fee application for this matter.

the process.  In addition, during the Application Period, Skadden assisted the Debtors in

analyzing issues related to the potential substantive consolidation of the Debtors' estates in

connection with a plan of reorganization.

          155.   In connection with the foregoing services, Skadden professionals expended

96.9 hours during the Application Period for which Skadden seeks compensation of $41,946.[47]

Detailed time entries of each Skadden professional related to these services are attached hereto as

Exhibit D-23.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 52.5 | $24,413 |
| Allison V. Herriott | $375 | 42.3 | $15,863 |
| Kayalyn A. Marafioti | $795 | 2.1 | $1,670 |
| **Total** | | **96.9** | **$41,946 (0.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,274** |

X.      Global Subsidiaries (Non-U.S.)

          156.   During the Application Period, Skadden devoted time advising the

Company on matters relating to its non-U.S. global subsidiaries including divestitures,

commercial and corporate transactions, and cash management matters that have arisen in the

Company's overseas operations.  In connection with these matters, Skadden attorneys reviewed

the structure of certain of the transactions from a corporate and bankruptcy perspective and

advised the Debtors global management accordingly.  Furthermore, during the Application

Period, Skadden and the Debtors engaged in analyses regarding several discrete issues involving

---

[47]    Skadden did not request compensation or reimbursement for this matter in its first or second interim fee
applications.

their global subsidiaries including analyzing ongoing U.K. pension issues related to a branch

office owned by an Affiliate Debtor.

157.   In connection with the foregoing services, Skadden expended 48.7 hours

during the Application Period for which Skadden seeks compensation of $32,906.[48]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-24.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| N. Lynn Hiestand | $835 | 22.4 | $18,704 |
| Christian Pilkington | $540 | 21.2 | $11,448 |
| Ron E. Meisler | $540 | 5.1 | $2,754 |
| **Total** | | **48.7** | **$32,906 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$17,905** |

Y.    Intellectual Property

158.   Throughout the Application Period, Skadden provided legal advice

regarding bankruptcy-related issues affecting the Debtors' intellectual property – particularly

patents and licenses.  In particular, Skadden devoted time to reviewing and advising the Debtors

with respect to the relevant terms affecting intellectual property rights implicated in the

agreement for the sale of substantially all of the assets of Affiliate Debtor, MobileAria, Inc.  In

addition, in connection with a patent infringement case, Skadden professional devoted time to

researching and analyzing legal issues related to the nature of claims that could be asserted should

the Debtors not prevail at trial.  Finally, Skadden professionals provided general advice to the

---

[48]   This compares to $330,534, or 3.6%, of the total fees requested in Skadden's first interim fee application for this
matter and $205,234, or 1.8%, of the total fees requested in Skadden's second interim fee application for this
matter.

Debtors with respect to certain bankruptcy implications to ordinary course commercial licensing agreements.

159.    In connection with the foregoing services, Skadden expended 65.9 hours during the Application Period for which Skadden seeks compensation of $32,050.[49]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-25.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Brent M. Houston | $375 | 33.0 | $12,376 |
| Stuart D. Levi | $785 | 14.4 | $11,304 |
| John Ubani | $440 | 16.2 | $7,128 |
| Ron E. Meisler | $540 | 2.3 | $1,242 |
| **Total** | | **65.9** | **$32,050 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$5,048** |

Z.    Real Estate (Owned)

160.    Skadden assisted the Debtors in reviewing the Debtors' owned real estate.  Indeed, Skadden worked closely with employees of the Debtors in coordinating matters related to the Debtors' owned real estate, including (a) resolving claims related to real property issues including statutory liens, (b) advising the Debtors on the disposition of real estate assets generally, and (c) analyzing tax and environmental issues.  These issues required numerous meetings with the Debtors' real estate and facilities personnel.

---

[49]    This compares to $22,186, or 0.2%, of the total fees requested in Skadden's first interim fee application for this matter and, $65,656, or 0.6%, of the total fees requested in Skadden's second interim fee application for this matter.

84

161.    In connection with the foregoing services, Skadden expended 56.3 hours during the Application Period for which Skadden seeks compensation of $31,005.[50]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-26.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Marian P. Wexler | $770 | 26.8 | $20,636 |
| Lisa B. Diaz | $295 | 19.7 | $5,812 |
| Catherine E. Danz | $465 | 9.8 | $4,557 |
| **Total** | | **56.3** | **$31,005 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,176** |

## AA.    Employee Matters (Pension)

162.    Skadden assisted the Debtors during the Application Period in connection with bankruptcy and restructuring matters related to the Debtors' seven defined benefit pension plans covered by termination insurance programs administered by the PBGC.  Among other things, during the Application Period, Skadden communicated with the PBGC regarding pension matters and responded to certain diligence requests regarding the pension plans.  In addition, during the Application Period, Skadden assisted the Debtors in connection with the filing of their Form 5330 relating to certain excise taxes that could potentially be imposed for failure to make minimum funding contributions toward the Debtors' pension plans.

---

[50]    This compares to $63,413, or 0.7%, of the total fees requested in Skadden's first interim fee application for this matter and $44,502, or 0.4%, of the total fees requested in Skadden's second interim fee application for this matter.

163.    In connection with the foregoing services, Skadden expended 66.6 hours during the Application Period for which Skadden seeks compensation of $28,202.[51]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-27</u>.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Michael W. Perl | $375 | 55.7 | $20,888 |
| Kayalyn A. Marafioti | $795 | 5.6 | $4,452 |
| Ron E. Meisler | $540 | 5.3 | $2,862 |
| **Total** | | **66.6** | **$28,202 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,319** |

BB.    <u>Asset Dispositions (Real Property)</u>

164.    During the Application Period, Skadden advised the Debtors regarding the potential sale of certain excess real property assets.  In particular, Skadden advised the Debtors with regard to the potential sale of real property located in Anaheim, California.  Currently, the Debtors, with the assistance of their retained professionals, are soliciting offers for this property. In connection with this effort, Skadden assisted the Debtors with drafting sale disclosure materials, analyzing environmental matters, reviewing purchase agreements, evaluating the offers received, and developing a strategy to maximize value for all stakeholders.  In addition to the Anaheim disposition, during the Application Period, Skadden also continued to assist the Debtors with advice regarding the potential disposition of real property in southeastern Michigan.

---

[51]    This compares to $58,190, or 0.5%, of the total fees requested in Skadden's second interim fee application for this matter.  Skadden's first interim fee application did not request any compensation for this matter.

165.    In connection with the foregoing services, Skadden expended 30.8 hours during the Application Period for which Skadden seeks compensation of $21,490.[52]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-28</u>.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Marian P. Wexler | $770 | 23.5 | $18,095 |
| Catherine E. Danz | $465 | 7.3 | $3,395 |
| **Total** | | **30.8** | **$21,490 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$876** |

CC.    <u>Customer Matters (General)</u>

166.    During the Application Period, Skadden assisted the Debtors by, among other things, responding to questions and working with the Company to address issues arising in connection with potential settlements with customers, collection of outstanding accounts receivable, and outstanding warranty issues.  Skadden assisted the Debtors by facilitating negotiations with the customers and working with the Debtors as they reconcile their books and records.

167.    In connection with the foregoing services, Skadden expended 31.2 hours during the Application Period for which Skadden seeks compensation of $15,305.[53]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit</u>

---

[52]    This compares to  $36,866, or 0.4%, of the total fees requested in Skadden's first interim fee application for this matter and $14,196, or 0.1%, of the total fees requested in Skadden's second interim fee application for this matter.

[53]    This compares to $72,901, or 0.8%, of the total fees requested in Skadden's first interim fee application for this matter and $9,186, or 0.1%, of the total fees requested in Skadden's second interim fee application for this matter.

<u>D-29</u>.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| Randall G. Reese | $465 | 20.8 | $9,673 |
| Brian M. Fern | $485 | 7.6 | $3,686 |
| John K. Lyons | $695 | 2.8 | $1,946 |
| **Total** | | **31.2** | **$15,305 (0.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$710** |

DD.    <u>Utilities</u>

168.    During the Application Period, Skadden occasionally received correspondence related to utility issues and Skadden reviewed and responded to these correspondences.  In addition, during the Application Period, Skadden assisted the Debtors in negotiating a mutually agreeable resolution to a particular utility arrangement.

169.    In connection with the foregoing services, Skadden expended 37.0 hours during the Application Period for which Skadden seeks compensation of $13,398.[54]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-30</u>.  A summary of the hours incurred and value of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Value |
|------|------|------|-------|
| M. Janine Jjingo | $335 | 17.0 | $5,696 |
| Ron E. Meisler | $540 | 6.4 | $3,456 |
| Kellan Grant | $410 | 4.8 | $1,968 |

---

[54]    This compares to $295,549, or 3.2%, of the total fees requested in Skadden's first interim fee application for this matter and $192,060, or 1.7%, of the total fees requested in Skadden's second interim fee application for this matter.

| Name | Rate | Time | Value |
|---|---|---|---|
| Lisa B. Diaz | $295 | 3.9 | $1,151 |
| Paraprofessional Total | | 4.9 | $1,127 |
| **Total** | | **37.0** | **$13,398 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,195** |

EE.    <u>Insurance</u>

170.    During the Application Period, Skadden assisted the Debtors in connection

with the extension and renewal of the Debtors' casualty insurance program.  Skadden assisted the

Debtors in analyzing the conditions requested by each prospective insurer and negotiated terms of

the prospective renewal insurance programs.  In addition, during the Application Period, Skadden

assisted the Debtors in analyzing their director and officer insurance policies, including, without

limitation, reviewing what expenses may be counted when calculating the deductible component

under the policies.

171.    In connection with the foregoing services, Skadden professionals expended

21.4 hours during the Application Period for which Skadden seeks compensation of $11,417.[55]

Detailed time entries of each Skadden professional related to these services are attached hereto as

<u>Exhibit D-31</u>.  A summary of the hours incurred and value of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Albert L. Hogan III | $620 | 5.2 | $3,224 |
| Brian M. Fern | $485 | 5.5 | $2,668 |
| Ron E. Meisler | $540 | 3.9 | $2,106 |

---

[55]    This compares to $83,523, or 0.9%, of the total fees requested in Skadden's first interim fee application for this
matter.  Skadden's second interim fee application did not request any compensation for this matter.

89

| Name | Rate | Time | Value |
|------|------|------|-------|
| Nick D. Campanario | $465 | 4.1 | $1,907 |
| Thomas J. Matz | $560 | 2.7 | $1,512 |
| **Total** | | **21.4** | **$11,417 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,135** |

FF.    Litigation (General)

            172.    During the Application Period, Skadden was required to devote resources to

various litigation matters not within the purview of other billing categories.  This activity in this

billing category relates to efforts by Skadden to ensure that actions arising out of the everyday

operations of the Debtors do not distract the Debtors from their chief goal of successful

emergence from chapter 11.  Skadden assisted the Debtors in negotiations relating to some of the

non-bankruptcy litigation matters.  Additionally, Skadden advised the Debtors on various

litigation matters relating to non-debtor entities related to Delphi, and Skadden continues to assist

the Debtors in monitoring such matters.

            173.    In connection with the foregoing services, Skadden expended 18.3 hours

during the Application Period for which Skadden seeks compensation of $11,076.[56]  Detailed

time entries of each Skadden professional related to these services are attached hereto as Exhibit

D-32.  A summary of the hours incurred and value of the services performed by each professional

is provided in the following table:

---

[56]    This compares to $21,112, or 0.2%, of the total fees requested in Skadden's first interim fee application for this
matter and $33,598, or 0.3%, of the total fees requested in Skadden's second interim fee application for this
matter.

| Name | Rate | Time | Value |
|---|---|---|---|
| Albert L. Hogan III | $620 | 13.8 | $8,556 |
| Kurt Ramlo | $560 | 4.5 | $2,520 |
| **Total** | | **18.3** | **$11,076 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$35,354** |

GG.    Reports And Schedules

174.    The Debtors are required to submit Monthly Operating Reports, which
provide detailed information regarding the Debtors' assets, liabilities, and operations on a
monthly basis.  During the Application Period, Skadden worked with the Debtors' finance and
accounting personnel, as well as the Debtors' financial advisors and the U.S. Trustee, to review
and file Monthly Operating Reports for the months of May, June, July, and August.

175.    In connection with the foregoing services, Skadden expended 13.9 hours
during the Application Period for which Skadden seeks compensation of $8,325.[57]  Detailed time
entries of each Skadden professional related to these services are attached hereto as Exhibit D-33.
A summary of the hours incurred and value of the services performed by each professional is
provided in the following table:

| Name | Rate | Time | Value |
|---|---|---|---|
| Thomas J. Matz | $560 | 11.6 | $6,496 |
| Kayalyn A. Marafioti | $795 | 2.3 | $1,829 |
| **Total** | | **13.9** | **$8,325 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$4,842** |

---

[57]    This compares to $187,152, or 2.0%, of the total fees requested in Skadden's first interim fee application for this matter and $22,844, or 0.2%, of the total fees requested in Skadden's second interim fee application for this matter.

91

Relief Requested

176.    Skadden has submitted monthly fee statements for the period from June 1,
2006 through September 30, 2006, and in accordance with the Interim Compensation Order now
submits this Interim Application covering the Application Period.  Based on the firm's customary
billing practices, the Debtors ordinarily would be billed a total of $11,128,986,[58] for fees and
$959,123 for charges and disbursements.  In keeping with Skadden's commitment to self-policing
its fees, charges, and disbursements, and based on various accommodations to the Debtors,
Skadden voluntarily reduced, as part of its monthly fee statements, its fees by $1,051,221, or
approximately 9.4%, and its charges and disbursements by $110,891, or approximately 11.6%.
As a result, the actual amount billed to the Debtors was $10,080,789 for fees and $848,232 for
charges and disbursements.

177.    Moreover, as an additional accommodation, Skadden has voluntarily
reduced the amount sought in this Interim Application by $52,227 to reflect, among other
accommodations, the elimination of (i) fees related to any timekeeper who billed fewer than ten
total hours during the Application, (ii) fees related to any timekeeper who billed less than $1,000
during the Application Period, (iii) fees related to any instance in which a timekeeper billed less
than $1,000 to a particular matter during the Application Period, and (iv) fees related to any
matter to which fewer than ten hours were billed during the Application Period.  As a result, the
actual amount sought herein is $10,025,538 for fees.  This represents a total reduction with
respect to fees, charges, and disbursements of $1,214,339, or approximately 10.0%, from those
amounts that Skadden would customarily charge.

---

[58]    This interim fee application reflects a deduction of $3,024 to remedy a billing error for one timekeeper.

178.    The Interim Compensation Order provides that when seeking interim compensation, professionals must submit monthly fee statements to the Debtors, counsel to the Debtors, the U.S. Trustee, counsel for the Creditors' Committee, counsel for the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit facility, and members of the Fee Review Committee.  Each person receiving a statement has at least 15 days after its receipt to review it.  If no objection to a monthly fee statement is made within 45 days after the end of the applicable billing period, the Debtors are authorized to pay 80% of the fees requested (with the remaining 20% of the fees requested referred to herein as the "Holdback") and 100% of the charges and disbursements requested.  Skadden has submitted monthly fee statements as described above for each of the months covered by the Application Period.

179.    Upon payment by Delphi for the amount owed to Skadden for the Application Period, Skadden will have received $8,064,632 on account of billed fees and $848,232 on account of billed charges and disbursements and will have accrued a Holdback in the amount of $2,016,157.[59]  After application of an additional client accommodation of $52,227, Skadden is requesting payment of 75% of the Holdback, or $1,512,118, leaving $504,039 of the Holdback for this Application Period outstanding, for which Skadden will later seek payment. Skadden submits that payment of three quarters of the Holdback amount for this Application Period upon approval of this Interim Application is an appropriate balance between the interest of

---

[59]    Skadden's monthly statements for June and July 2006 were submitted on November 19, 2006, and Skadden's monthly statements for August and September 2006 were submitted on November 24, 2006.  Pursuant to the Interim Compensation Order, parties receiving the monthly statements have 15 days after receipt of such monthly statements to object to such statements.  Therefore, the objection deadline for the June and July monthly statements is December 5, 2006 and the objection deadline for the August and September monthly statements is December 11, 2006.

93

professionals in receiving prompt payment and the interest of the estates in ensuring reasonable

professional compensation and reimbursement for actual or necessary expenses.

A.    Allowance Of Professional Fees

180.    During the Application Period, professionals at Skadden billed an aggregate

of 21,905.9 hours reflected in this Interim Application working on matters concerning the

Debtors' Reorganization Cases.[60]  Of such time spent, 4,620.5 hours were spent by partners,

2,387.5 hours were spent by counsel, 11,275.5 hours were spent by associates, and 3,622.4 hours

were spent by legal assistants.  A summary showing the name and position of each such partner,

counsel, associate, and legal assistant, together with that person's date of admission to the bar (as

applicable), net hours during the Application Period, and blended hourly billing rate, is provided

in the Summary of Services found at the beginning of this Interim Application.[61]

B.    Reimbursement Of Charges And Disbursements

181.    As disclosed in the Retention Application that this Court approved, it is

Skadden's standard policy to charge its clients in all areas of practice for certain charges and

disbursements incurred in connection with such clients' cases.  The charges and disbursements

charged to clients include, among others, charges for messenger services, photocopying, court

fees, travel expenses, postage, long distance telephone, computerized legal research, investigative

searches, and other charges customarily billed by law firms.  Certain charges and disbursements

are not separately charged for under the bundled rate structure as described in the Engagement

Agreement.

---

[60]    Skadden maintains records of the time it expended in the rendition of all professional services, which time records
are made concurrently with the rendition of professional services.

[61]    In addition to the matter list, Exhibit C also sets forth the blended hourly rate and certain other business statistics
associated with the Reorganization Cases.

182.    Skadden has attempted to minimize the charges and disbursements

associated with the Debtors' Reorganization Cases, particularly for items such as reproduction

and delivery, which have been lowered as a result of the restricted service list and the ability to

serve the 2002 List Parties electronically, which Skadden proposed and this Court approved.

During the Application Period, Skadden disbursed the following sums for actual and necessary

charges and disbursements in the rendition of professional services in the Reorganization Cases,

and requests that it be reimbursed therefor:

Charges And Disbursements Incurred[62]

| | |
|---|---:|
| Travel Expenses | $399,883 |
| Reproduction And Document Preparation | $228,099 |
| Computer Legal Research | $116,628 |
| Court Reporting | $51,912 |
| Courier, Express Delivery, And Postage | $19,533 |
| Electronic Document Management | $12,955 |
| Telecommunications | $9,802 |
| Outside Research | $9,153 |
| Filing/Court Fees | $150 |
| UCC Research/Opinion | $117 |
| **TOTAL** | **$848,232** |

183.    The above charges and disbursements are reasonable and are consistent

with those incurred by other bankruptcy practitioners in other large, complex chapter 11

reorganization cases in this and other districts.  Moreover, Skadden believes that the unique size

and complexity of these cases, including the terms of this Court's case management order, as

amended, which require, among other things, overnight delivery of most pleadings, warrant

reimbursement of the foregoing charges and disbursements.

---

[62]    The details relating to the charges and disbursements can be found in Exhibits D-1 through D-34 on a matter by matter basis.

Reasonableness Of Fees, Charges, And Disbursements

184.    Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award

to a professional employed by the estates "reasonable compensation for actual, necessary

services" rendered by the professional, plus "reimbursement for actual, necessary expenses." See

11 U.S.C. § 330(a)(1).  See generally In re Cenargo Int'l, 294 B.R. 571 (Bankr. S.D.N.Y. 2003);

In re Childworld, Inc., 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

185.    In determining the amount of "reasonable compensation," the Court must

consider the nature, extent, and value of the services, taking into account all the relevant factors,

including the time spent on such services, the rates charged for such services, whether the services

were necessary and beneficial, whether the services were performed in a reasonable amount of

time commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed, and whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

See 11 U.S.C. § 330(a)(3).

186.    In assessing attorneys' fees, courts use several different approaches.  The

Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method,

which is a determination as to the number of hours of service reasonably devoted to the case

multiplied by the attorney's reasonable rates.  See Savoie v. Merchants Bank, 166 F.3d 456, 460

(2d Cir. 1999) (applying lodestar approach to non-bankruptcy case); In re Masterwear Corp., 233

B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When applying the lodestar approach, courts in this

district incorporate the familiar factors set forth in Johnson v. Georgia Highway Express, 488

F.2d 714 (5th Cir. 1974).[63]  See, e.g., Betancourt v. Giuliani, 325 F. Supp. 2d 330, 332 (S.D.N.Y.

2004) ("In adjusting the lodestar, courts generally consider the . . .  factors set forth in Johnson v.

Georgia Highway Express, Inc."); In re Sucre, 226 B.R. 340, 351-52 (Bankr. S.D.N.Y. 1998)

("To determine the 'lodestar fee' the Court must make an initial objective determination as to the

number of hours reasonably expended and the reasonable hourly rate . . . . After multiplying the

two, the Court may adjust the product by a consideration of [the Johnson] factors.")

   187. In awarding attorneys' fees, courts will also consider whether the services

rendered were reasonably likely to benefit the debtor's estate.  See, e.g., In re Ames Dep't Stores,

Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. United States Trustee, 540

U.S. 526 (2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y.  1997); In re

Drexel Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).  Thus, the Court should

focus on what a reasonable lawyer would have done at the time and not invoke a hindsight

analysis.

> [I]t is important for a court to maintain a sense of overall proportion and not
> become enmeshed in meticulous analysis of every detailed facet of the professional
> representation.  It is easy to speculate that the work could have been done in less
> time or with fewer attorneys or with an associate rather than a partner.  On the other
> hand, it is also possible that [the debtor] would not have enjoyed the success it did
> had its counsel managed matters differently.

In re Boston & Maine Corp., 776 F.2d 2, 10 (1st Cir. 1985) (citations omitted).

   188. In accordance with the factors enumerated in 11 U.S.C. § 330 and

applicable case law, the amount requested herein by Skadden is fair and reasonable, in light of:

(a) the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization

---

[63] The twelve Johnson factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3)
the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney
due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time
limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the
experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length
of the professional relationship with the client, and (12) awards in similar cases.  Johnson, 488 F.2d at 717-19.

Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations

imposed by the Reorganization Cases, (e) the nature and extent of the services rendered,

(f) Skadden's experience, reputation, and ability, (g) the value of Skadden's services, and (h) the

cost of comparable services other than in a case under the Bankruptcy Code.

C.    Nature, Complexity, And Duration Of Cases

189.   As should be evident from the summary of Skadden's services as described

above in this Interim Application, the Debtors' chapter 11 reorganization presents a particularly

unique set of circumstances, and unquestionably is a large and complex case.  The nature and

complexity of the Reorganization Cases has required Skadden to develop case management and

staffing solutions at every stage of the proceedings.  These tasks have been particularly daunting

in light of the Debtors' widespread operations and the relative sophistication of other

parties-in-interest in these Reorganization Cases.  Skadden nonetheless has assisted the Debtors

by employing a streamlined case management structure that generally consists of relatively small,

core teams, and has assigned various attorneys to other discrete tasks to avoid the performance of

duplicative or unnecessary work.

190.   Given the size of these Reorganization Cases and the number of matters that

continually need to be addressed simultaneously, there have been occasions when a number of

Skadden attorneys must be present and participate in the discussions and negotiations.  This is

particularly true of meetings with the Creditors' Committee, and the Equity Committee, and also

with respect to the monthly omnibus hearings.  Skadden believes that, as evident by the

summaries contained in this Interim Application and the time entries attached hereto, it has

articulated specific reasons for attendance by multiple attorneys on such occasions.

D.    Experience Of Skadden

191.    The experience of Skadden also has benefited the estates.  Skadden is among the largest firms and has one of the largest restructuring groups in the world.  As more fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude and fast-paced issues that arise in similar chapter 11 cases.  Accordingly, Skadden's depth of experience in chapter 11 matters has ensured that a number of pressing matters could be addressed promptly.  In addition, Skadden's commitment to monitoring the administrative expenses of the estates, including its own legal fees, has been a constant element of its representation of the Debtors.  Indeed, this emphasis has been manifested in Skadden's careful review of its fees, charges, and disbursements and a voluntary client accommodation of $1,214,339, including a voluntary aggregate accommodation of $1,162,112 on Skadden's monthly fee statements and an additional $52,227 voluntary reduction on this Interim Application.

E.    Comparable Services

192.    An award of compensation also must be based on the cost of comparable services other than in a bankruptcy case.  Skadden's rates are consistent with rate structures charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed clearly in its Retention Application, which this Court approved and as to which none of the major constituents objected.  The amounts sought by Skadden are consistent with the fees, charges, and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and duration.  Accordingly, the cost of comparable services supports the Interim Application, and the

99

services performed during the Application Period more than warrant the allowance of

compensation, particularly in view of the results achieved.

F.    Compliance With Guidelines

193.    Skadden believes that this Interim Application, together with the

attachments hereto, substantially complies in all material respects with the Guidelines and the

Debtors have paid all quarterly fees due and payable to the U.S. Trustee to date. To the extent this

Application does not comply in every respect with the requirements of such guidelines, Skadden

respectfully requests a waiver for any such technical non-compliance.

Notice

194.    In compliance with the Fifth Supplemental Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals, entered by this Court on October 13, 2006 (Docket No. 5310), notice of the filing

of this Interim Application will be provided to all parties who have filed a notice of appearance

with the Clerk of this Court and requested notice of pleadings in these chapter 11 cases.  In

addition, the Interim Application in its entirety will be served on the following parties: (i) Delphi

Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Att'n: David M. Sherbin, Esq., (ii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

Suite 2100, New York, New York 10004, Att'n: Alicia M. Leonhard, Esq., (iii) counsel for the

Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York

10022-4802, Att'n: Robert J. Rosenberg, Esq., (iv) counsel for the Equity Committee, Fried,

Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, NY 10004, Att'n:

Bonnie Steingart, Esq., (v) counsel for the agent under the Debtors' prepetition credit facility,

Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Att'n:

100

Kenneth S. Ziman, Esq. and Robert H. Trust, Esq., (vi) counsel for the agent under the Debtors'

postpetition credit facility, Davis Polk & Wardell, 450 Lexington Avenue, New York, New York

10017, Att'n: Donald S. Bernstein, Esq. and Brian M. Resnick, Esq., and (vii) the members of the

Fee Review Committee and its advisor, Legal Cost Control, Inc., 255 Kings Highway East,

Haddonfield, New Jersey 08033, Att'n: John J. Marquess.  In light of the nature of the relief

requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

195.    Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and filing

of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $10,025,538 to Skadden for professional services rendered as attorneys for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $848,232, (b) authorize and direct the Debtors to pay to Skadden the amount of $1,512,118 to reduce the Holdback accrued during the Application Period with the remaining Holdback amount of $504,039 to be held by the Debtors until further order of this Court, and (c) grant it such other and further relief as is just.

Dated: New York, New York
      November 30, 2006

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


By:    /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -


By:    /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

102