

# W. Y. CAMPBELL & COMPANY
INVESTMENT BANKING

ONE WOODWARD AVENUE • 26TH FLOOR • DETROIT, MI 48226
313-496-9000 • 313-496-9001 FAX

October 17, 2006

Robert J. Dellinger
Executive Vice President &
 Chief Financial Officer
Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098-2815

Dear Mr. Dellinger:

This letter agreement (this "Agreement"), by and among Delphi Corporation (together with its direct and indirect subsidiaries, the "Company") and W.Y. Campbell & Company ("Campbell"), shall confirm the terms and conditions of the retention of Campbell as financial advisor and investment banker to the Company in connection with a possible M&A Transaction (as defined below) and/or other transaction or series of transactions involving the Mount Business of the Company, effective as of September 1, 2006. As used herein, the term "Mount Business" shall mean collectively, the Company's assets, liabilities and business involving the engineering, manufacturing or selling of power train or suspension mounts anywhere in the world.

**Section 1. Services to be Rendered.** In connection with the formulation, analysis, negotiation and implementation of the divestiture or other strategic alternatives relating to the Mount Business, whether pursuant to an M&A Transaction, any series or combination of transactions or otherwise, Campbell will perform the following services, and, in connection therewith advise the Company, as requested by the Company (collectively, the "Services"):

    (a) to the extent deemed desirable by the Company, identify, review, evaluate and initiate potential M&A Transactions or other transactions;

    (b) to the extent Campbell deems necessary, appropriate and feasible, or as the Company may request, review and analyze the assets and the operating and financial strategies of the Mount Business;

    (c) assist in the definition of objectives related to value and terms of divestiture;

    (d) assist in identification of the Mount Business' proprietary attributes;

    (e) assist in the identification and solicitation of appropriate transaction parties;



(f) prepare and distribute of confidentiality agreements and appropriate descriptive selling materials (to include Offering Memorandums, Management Presentations, and other documentation as may be required or appropriate);

(g) the initiation of discussions and negotiations with prospective transaction parties;

(h) assist the Company and its other professionals in reviewing and evaluating the terms of any proposed M&A Transaction or other transaction, in responding thereto and, if directed, in developing and evaluating alternative proposals for an M&A Transaction or other transaction, whether in connection with a Plan (as defined below) or otherwise;

(i) review and analyze any proposals the Company receives from third parties in connection with an M&A Transaction or other transaction;

(j) assist or participate in negotiations with the parties in interest in connection with an M&A Transaction or other transaction;

(k) advise and attend meetings of the Company's Board of Directors, creditor groups, official constituencies and other interested parties, as the Company determines to be necessary or desirable;

(l) if requested, participate in hearings before the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") or such district or other bankruptcy courts as the Company may request and provide relevant testimony with respect to the matters described herein and issues arising with respect thereto in connection with any proposed Plan (as defined below);

(m) assist the Company's internal and external counsel to enable such counsel to provide legal advice to the Company, as contemplated under Section 7 hereof; and

(n) render such other financial advisory and investment banking services as may be reasonably requested by the Company in connection with any of the foregoing.

As used herein, the term "M&A Transaction" shall mean, collectively, whether accomplished in whole or in part pursuant to a plan of reorganization (a "Plan") confirmed in connection with the Chapter 11 cases (the "Chapter 11 Case") commenced on October 8, 2005 and October 14, 2005 by the Debtors listed on Exhibit A hereto ("Debtors"), via a Section 363 Sale, a creditor's sale, or otherwise, (i) any merger, consolidation, reorganization, recapitalization, financing, refinancing, business, combination or other transaction pursuant to which the Mount Business (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquirer"), or (ii) any acquisition, directly or indirectly, by an Acquirer (or one or more persons acting in concert together with an Acquirer pursuant to a written agreement or otherwise), whether in a single transaction, multiple related transaction, or a series of related transactions, of (A) a majority of the assets or operations of the Mount Business, or (B) any outstanding or newly issued shares of the Company's capital stock or any securities convertible into, or options, warrants or other rights to acquire such capital stock or other equity securities of the Company, for the



2

purpose of effecting a recapitalization or change of control of the Mount Business, or (iii) any transaction similar to the foregoing. Notwithstanding the foregoing, an M&A Transaction does not include a transaction involving the acquisition of substantially all of the Company's existing business, whether pursuant to the acquisition of stock or assets under a plan of reorganization or a sale of substantially all of the Company's assts under Section 363 of the Bankruptcy Code under which the Mount Business remains with the reorganized Debtor(s) and/or acquired business regardless of whether the equity of the reorganized Debtor(s) is owned by the existing shareholders, its employees and/or pre-petition creditors; provided, however, that notwithstanding such acquisition of the stock or assets of the Company's business, the provisions in Section 9 hereof shall remain fully enforceable against the Company or its estate following such acquisition in the event the acquirer subsequently undertakes an M&A Transaction with a third party during the eighteen (18) month period set forth in Section 9 hereof.

In performing its services pursuant to this Agreement, and notwithstanding anything to the contrary herein, Campbell is not assuming any responsibility for the Company's decision to pursue (or not to pursue) or to effect (or not to effect) any M&A Transaction, or other transaction; provided that nothing contained herein shall increase the Company's obligations set forth in Exhibit B hereto. Campbell shall not have any obligation or responsibility to provide accounting, audit, "crisis management" or business consultant services to the Company, and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements.

**Section 2.**   Information Provided by the Company.

(a)   The Company will cooperate with Campbell and furnish to, or cause to be furnished to, Campbell any and all information reasonably available to the Company which Campbell deems appropriate to enable Campbell to render services hereunder (all such information being the "Information"). The Company recognizes and confirms that Campbell (i) will use and rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently any such information; (ii) does not assume responsibility for the accuracy or completeness of the Information provided by the Company and such other information, and (iii) will not act in the official capacity of appraiser of specific assets of the Company or any other party. Each party confirms that the information to be furnished by it, when delivered, to the best of its knowledge will be true and correct in all material respects, will be prepared in good faith, and will, to the knowledge of the delivering party, not contain any material misstatement of fact or omit to state any material fact. Each party will promptly notify the other party if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore it delivered to the other party. The Company acknowledges that in the course of this engagement it may be necessary for Campbell and the Company to communicate electronically.

(b)   Each party acknowledges that although it will use commercially reasonable procedures to check for the most commonly known viruses, the electronic transmission of information cannot be guaranteed to be secure or error-free. Furthermore such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, each



party agrees that the other party shall have no liability with respect to any error or omission arising from or in connection with: (i) the electronic communication of information; or (ii) the other party's reliance on such information.

**Section 3.  Application for Retention of Campbell.** Campbell and the Company hereby acknowledge that the Debtors will apply promptly to the Bankruptcy Court pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of this Agreement and Campbell's retention by the Debtors under the terms of this Agreement, *nunc pro* tunc to September 1, 2006, the effective date of this Agreement, substantially in the form of the order attached hereto as Exhibit C (the "Retention Order"). The Debtors shall continue to use their best efforts to obtain Bankruptcy Court approval and authorization of this Agreement, subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in Section 328(a) of the Bankruptcy Code, and not subject to the standard of review set forth in Section 330 of the Bankruptcy Code, except as otherwise provided in the Retention Order. Campbell shall not have any obligation to provide any services under this Agreement unless its retention under the terms of this Agreement is approved by entry of a final order in substantially the form of the Retention Order.

Campbell acknowledges that in the event that the Bankruptcy Court approves its retention by the Debtors pursuant to the application process described in this Section 3, payment of Campbell's fees and expenses hereunder shall be subject to the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any order approving such Advisor's retention except as otherwise provided in the Retention Order. In the event that Campbell's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses hereunder as promptly as practicable in accordance with the terms hereof and the Retention Order. In so seeking Campbell's retention under Section 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that Campbell's general professional experience and expertise, its knowledge of the industry in which the Company operates and the capital markets and its merger and acquisition capabilities will inure to the benefit of the Company in pursuing any M&A Transaction or other transaction that the value to the Company of Campbell's services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the Monthly Fees, the M&A Fee, (as each is defined below), the expense reimbursements provided for herein and the indemnification and exculpation provisions provided herein and in Exhibit B hereto are reasonable regardless of the number of hours to be expended by Campbell's professionals in performance of the services to be provided hereunder.

**Section 4.  Campbell's Fees.** Subject to the provisions of the Retention Order, as compensation for the services rendered hereunder, the Company, and its successors, if any, agree to pay to Campbell (via wire transfer or other mutually acceptable means) the following fees in cash. All amounts to which Campbell becomes entitled under this Agreement, including all fees payable under this Section 4 and Exhibit C hereto, all expense reimbursements payable under Section 6 hereof and any amounts that become payable under Section 8 hereof and Exhibit B hereto, shall be paid directly to Campbell.



4

      (a)    Commencing as of the effective date of this letter, and whether or not a M&A Transaction is proposed or consummated, a cash advisory fee (the "Monthly Fee") of $50,000 per month payable by the Company in advance on the date hereof and on the first day of each subsequent month, which in the aggregate shall not under any circumstance be less than $600,000.

      (b)    A fee (the "M&A Fee") equal to the greater of (i) product of (A) the Aggregate Consideration as defined on Exhibit C hereto, times (B) 1.75%, or (ii) $1,250,000. The M&A Fee shall be due and payable in cash upon the closing of such M&A Transaction.

      (c)    To the extent that services of the type described in Section 1(l) are requested representatives of Campbell shall be paid $750 per hour for all time spent preparing for, attending or testifying at such hearings.

      (d)    To the extent the Company requests Campbell to perform additional services not contemplated by this Agreement, such additional fees as shall be mutually agreed upon by Campbell and the Company, in writing, in advance.

The Company and Campbell acknowledge and agree that (i) the hours worked, (ii) the results achieved and (iii) the ultimate benefit to the Company of the work performed, in each case, in connection with this engagement, may be variable, and that the Company and Campbell have taken such factors into account in setting the fees hereunder; provided, however, that with respect to the hours worked, Campbell shall devote whatever resources as are required to fulfill the purposes of this engagement on a timely basis.

**Section 5.** <u>Credit</u>.  Campbell shall credit against the M&A Fee 100% of the aggregate Monthly Fees.

**Section 6.** <u>Expenses</u>. Without in any way reducing or affecting the Monthly Fees, the M&A Fee or the provisions of Exhibit B hereto, and subject to the provisions of the Retention Order, the Company shall reimburse Campbell for its reasonable expenses incurred in connection with the performance of its engagement hereunder, and the enforcement of this Agreement, including without limitation the reasonable fees, disbursements and other charges of Campbell's counsel. Reasonable expenses shall also include, but not be limited to, expenses incurred in connection with travel and lodging, data processing and communication charges, data base, research, postage and courier services. Consistent with and subject to final approval by the Bankruptcy Court and subject to the provisions of the Retention Order, the Company shall promptly reimburse Campbell for such expenses under this Section 6 upon presentation of an invoice or other similar documentation with reasonable detail. The Company has advised Campbell regarding its expense reimbursement guidelines, and Campbell agrees to comply with such guidelines in the understanding that the Company shall only be obligated to make reimbursements for expenses consistent with such guidelines.

**Section 7.** <u>Sharing of Information with Counsel</u>.  As you are aware, the Company has also retained the law firm of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") to provide legal advice to the Company in connection with the legal aspects of the Chapter 11 Case and the M&A Transactions that may occur. The Company also employs inside counsel to advise the Company on those same matters. The Company believes that

from time to time information or analyses prepared by Campbell may be required to enable Skadden and/or the Company's inside counsel to render appropriate legal services and advice to the Company. The Company also anticipates that from time to time privileged communications may need to be shared with Campbell in order to permit Campbell to provide the most comprehensive advice to the Company and to counsel to the Company in order to support such counsel's provision of legal advice to the Company. In addition, the Company and Campbell share a common interest for this purpose, and the Company intends that any such sharing of privileged information will occur only in pursuit of such common interest and without waiver of the attorney-client privilege or of any other privileges that may apply.

This letter will confirm Campbell's agreement that, to the extent directed by the Company, Campbell will provide information or advice within its field of expertise to assist Skadden and the Company's inside counsel in rendering legal services or advice to the Company.

This letter will also confirm the parties' agreement that, to the extent privileged information is shared with Campbell, such sharing is made solely for the purpose of facilitating Campbell's provision of services pursuant to this Agreement and in recognition that Campbell and the Company share a common interest for that purpose. Campbell will maintain the confidentiality of all privileged communications that are shared with it and will not disclose such privileged matters to any other person without the consent of the Company or as required by law or by court order. In order to assist Campbell in this regard, the Company agrees that privileged communications that are shared with Campbell will be labeled as such.

**Section 8.** Indemnity. Subject to the provisions of the Retention Order, the Company agrees to the provisions of Exhibit B hereto which provides for indemnification and exculpation by the Company of Campbell and certain related persons. Such indemnification and exculpation is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification and exculpation shall survive any termination, expiration or completion of this Agreement or Campbell's engagement hereunder.

**Section 9.** Term. The term of Campbell's engagement shall extend until the later of the consummation of an M&A Transaction, provided that this Agreement may be terminated by either the Company or Campbell at any time, with or without cause, effective upon receipt of written notice. If terminated, Campbell shall be entitled to payment of any fees for any monthly periods which are due and owing to Campbell upon the effective date of termination (including the minimum fee under Section 4(a)), and Campbell will be entitled to reimbursement of any and all reasonable expenses described in Section 6. Termination of Campbell's engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify Campbell and certain related persons as provided in Exhibit B. Without limiting any of the foregoing, if this Agreement is terminated by the Company (other than for a material breach thereof which is not cured within a reasonable period of time, after receipt by Campbell of written notice thereof), the M&A Fee shall be payable in the event that an M&A Transaction for which an M&A Fee would otherwise be due under this Agreement is closed at any time prior to the expiration of eighteen (18) months after such termination, or a letter of intent or definitive agreement with respect thereto is executed at any time prior to eighteen (18) months



after such termination (which letter of intent or definitive agreement subsequently results in the consummation at any time of an M&A Transaction).

**Section 10. Miscellaneous.**

 (a) *Administrative Expense Priority.* The Company agrees that Campbell's post petition compensation as set forth herein and payments made pursuant to reimbursement and indemnification provisions of this Agreement shall be entitled to priority as expenses of administration under Sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect in such Chapter 11 Cases pursuant to one or more financing orders entered by the Bankruptcy Court on an equal basis with all other professionals. The Company represents that the current "carve-out" which exist are sufficient to satisfy all fees and expenses due Campbell hereunder and all other professionals.

 (b) *Survival, Successors & Assigns.* Sections 4 through 10 hereof, inclusive, including the provisions set forth in Exhibits A and B hereto, shall survive the termination or expiration of this Agreement. The benefits of this Agreement and the indemnification and other obligations of the Company to Campbell and certain related persons contained in Exhibit B hereto shall inure to the respective permitted successors and assigns of Campbell and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and Exhibit B by the Company shall be binding upon its successors and assigns. Campbell shall not have the right to assign any of its rights under this Agreement without the prior written consent of the Company.

 (c) *Benefit of Agreement; No Reliance by Third Parties.* The advice (oral or written) rendered by Campbell pursuant to this Agreement is intended solely for the benefit and use of the Company and its affiliates, and their respective officers and directors in considering the matters to which this Agreement relates, and the Company agrees that such advice may not be relied upon by any other person, used for any other purpose or reproduced, disseminated, quoted or referred to at any time, in any manner or for any purpose without the prior written consent of Campbell, which shall not be unreasonably withheld or delayed, provided that nothing contained herein shall prohibit disclosure of such advice in the event and only to the extent the Company has been advised by counsel that such disclosure is necessary to satisfy applicable legal or regulatory requirements.

 (d) *Nature of Relationship.* The relationship of Campbell to the Company hereunder shall be that of independent contractors and Campbell shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company, nor shall Campbell have the authority to manage money or property of the Company. The parties hereto acknowledge and agree that by providing the services contemplated hereunder, Campbell will not act, nor will it be deemed to have acted, in any managerial or fiduciary capacity whatsoever with respect to the Company or any third party including security holders, creditors or employees of the Company.

 (e) *Public Announcements.* With the prior written consent of the Company, which shall not be unreasonably withheld, the Company acknowledges that Campbell may at its option and expense, after announcement of an M&A Transaction or other



transaction, place announcements and advertisements or otherwise publicize such transaction in such financial and other newspapers and journals as it may choose, stating that Campbell acted as financial advisor and investment banker to the Company in connection with such transaction. The Company further consents to Campbell's public use or display of the Company's logo, symbol or trademark as part of Campbell's general marketing or promotional activities after the announcement of an M&A Transaction, provided that such use or display is in the nature of a public record or tombstone announcement in relation to such transaction, and, provided further, that the Company approves of such announcements, advertising or other publication, which approval shall not be unreasonably withheld.

(f)     *CHOICE OF LAW: JURISDICTION.* THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN MICHIGAN. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS.

(g)     *Waiver of Jury Trial.* Each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement, any M&A Transaction, or other transaction. Each of the parties hereto hereby certifies that no representative or agent of any other party hereto has represented expressly or otherwise that such party would not seek to enforce the provisions of this waiver. Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph.

(h)     *Entire Agreement.* This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of the parties hereto.

(i)     *Authority.* Subject to entry of the Retention Order, each party hereto represents and warrants that it has all requisite power and authority to enter into this Agreement, including Exhibits A and B attached hereto and to consummate the transactions contemplated hereby. Subject to entry of the Retention Order, each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms. Campbell will assume that any instructions, notices or requests have been properly authorized by the Company if they are given or purported to be given by a director, officer, employee or authorized agent of the Company, or by a person that is reasonably believed by Campbell to be a director, officer, employee or authorized agent of the Company.

(j)     *Counterparts.* This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an

8



executed counterpart of a signature page to this Agreement by telecopy shall be effective as delivery of a manually executed counterpart to this Agreement.

If the foregoing correctly sets forth the understanding and agreement between Campbell and the Company, please so indicate by signing the enclosed copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

Sincerely

W. Y. CAMPBELL & COMPANY

William Y. Campbell
Managing Director

Confirmed and agreed by:

DELPHI CORPORATION

BY: _____

Its: _EVP & CFO_____

On: _10-19-06_____

### Exhibit A

### Debtors

Delphi Corporation, ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., Specialty Electronics International Ltd., Delphi Furukawa Wiring Systems LLC, Delphi Receivables LLC and MobileAria, Inc.



**Exhibit B**

Subject to the terms of the Retention Order, Delphi Corporation (collectively with its direct and indirect subsidiaries, the "Company") agrees to indemnify and hold harmless W. Y. Campbell & Company ("Campbell") and its affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (Campbell and all of such other persons collectively, the "Indemnified Parties"), from and against any losses, claims or proceedings, including without limitation stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, reasonable costs, reasonable fees and reasonable expenses (collectively, "Losses") (a) directly or indirectly related to or arising out of (i) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or an Indemnified Party provides to any person or entity or (ii) any other action or failure to act by the Company, the Company's employees or other agents or any Indemnified Party at the Company's request or with the Company's consent, in each case in connection with, arising out of, based upon, or in any way related to the letter agreement the "Agreement") entered into between the Company and Campbell regarding the retention of Campbell as financial advisor and investment banker to the Company, the retention of and services provided by Campbell under the Agreement, or any M&A Transaction or other transaction pursuant to the Agreement; or (b) otherwise directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of Campbell under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to indemnify an Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose (x) because of the gross negligence, willful misconduct or fraud of such Indemnified Party or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party.

Subject to the terms of the Retention Order, the Company shall further reimburse any Indemnified Party promptly after obtaining the necessary approval of the Bankruptcy Court, if any, for any reasonable legal or other fees, disbursements or expenses as they are incurred (a) in investigating, preparing or pursuing any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party, in each case to the extent relating to Losses for which indemnification is available hereunder (each, an "Action") and (b) in connection with enforcing such Indemnified Party's rights under the Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose (x) because of the gross negligence, willful misconduct or fraud of such Indemnified Party or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph, plus interest at the annual rate of the Prime Rate (as reported in the Wall Street Journal or, if the Wall Street Journal is no longer published, in a similar publication of national distribution) plus 400 basis points, calculated from the date of the Company's reimbursement to the Indemnified Party to the date of the Indemnified Party's repayment to the Company. Similarly, the Company will pay Campbell interest on any payments



due under this Exhibit B at the Prime Rate plus 400 basis points from the date such payments are due until paid.

Upon receipt by an Indemnified Party of notice of any Action, such Indemnified Party shall notify the Company in writing of such Action, but the failure to so notify shall not relieve the Company from any liability hereunder (i) if the Company had actual notice of such Action or (ii) unless and only to the extent that the Company is prejudiced thereby. The Company shall have the right to assume the defense of any such Action including the employment of counsel reasonably satisfactory to Campbell and will not, without the prior written consent of Campbell (which shall not be unreasonably withheld or delayed), settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent or termination (a) contains an express, unconditional release of each Indemnified Party which is a party to the Action from all liability relating to such Action and (b) does not include an admission of fault, culpability or a failure to act by or on behalf of any Indemnified Party. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which the Agreement relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Company has failed promptly to assume the defense and employ counsel or (y) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided, that the Company shall not in such event be responsible under the Agreement for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

Subject to the terms of the Retention Order, the Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct or fraud of such Indemnified Party or because of a material breach of a term or condition of the Agreement by such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company and such Indemnified Party; provided, that, in no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by Campbell under the Agreement. Benefits received by Campbell shall be deemed to be equal to the compensation paid by the Company to Campbell in connection with the Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by Campbell on the other hand.

Subject to the terms of the Retention Order, the Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or



otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to the Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses of the Company are finally judicially determined by a court of competent jurisdiction to have arisen (x) because of the gross negligence, willful misconduct or fraud of, or (y) because of a material breach of a term or condition of the Agreement by such Indemnified Party in connection with any such advice, actions, inactions or services.

The rights of the Indemnified Parties and the Company hereunder shall be in addition to any other rights that any Indemnified Party or the Company may have at common law, by statute or otherwise. Except as otherwise expressly provided for in the Agreement, if any term, provision, covenant or restriction contained in the Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in the Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of the Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, the Agreement.

Nothing contained in this letter agreement is intended to obligate the Company to enter into the Agreement, it being understood and agreed that the Company will not execute the Agreement unless and until the Company is satisfied, in its sole discretion, with the terms and conditions of the Agreement, and all internal approvals which the management of the Company determines are necessary or desirable have been obtained.



13

### Exhibit C

### W.Y. CAMPBELL & COMPANY

### Aggregate Consideration Definitions

For purposes hereof, the term "Aggregate Consideration" shall mean the total amount of all cash, securities, contractual arrangements (including any put or call agreements) and other properties paid or payable, directly or indirectly in connection with an M&A Transaction (including (i) amounts paid pursuant to covenants not to compete, employment contracts, employee benefit plans, management fees or other similar arrangements, and (ii) amounts paid to holders of any warrants, stock purchase rights or convertible securities of the Company and to holders of any options or stock appreciation rights issued by the Company, whether or not vested). Aggregate Consideration shall also include the amount of any short-term debt and long-term liabilities of the Company (including the principal amount of any indebtedness for borrowed money and capitalized leases and the full amount of any off-balance sheet financings) (x) repaid or retired in connection with or in an effort to consummate an M&A Transaction or (y) existing on the Company's balance sheet at the time of an M&A Transaction (if such M&A Transaction takes the form of a merger, consolidation or a sale of stock or partnership interests) or assumed in connection with an M&A Transaction (if such M&A Transaction takes the form of a sale of assets). For purposes of calculating the amount of revolving credit debt in the preceding sentence, the arithmetic mean of the amount of revolving credit debt outstanding on the last day of each month during the 12 months preceding the closing of the M&A Transaction will be used. In the event such M&A Transaction takes the form of a sale of assets, Aggregate Consideration shall include (i) the value of any current assets not purchased, minus (ii) the value of any current liabilities not assumed. In the event such M&A Transaction takes the form of a recapitalization, restructuring, spin-off, split off or similar transaction, Aggregate Consideration shall include the fair market value of (i) the equity securities of the Company retained by the Company's security holders following such M&A Transaction and (ii) any securities received by the Company's security holders in exchange for or in respect of securities of the Company following such M&A Transaction (all securities received by such security holders being deemed to have been paid to such security holders in such M&A Transaction). The value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the consummation of an M&A Transaction. The value of securities, lease payments and other consideration that are not freely tradable or have no established public market, or if the consideration utilized consists of property other than securities, the value of such property shall be the fair market value thereof as determined in good faith by Campbell and the Company. Aggregate Consideration shall be deemed to include the face amount of any indebtedness for borrowed money, including, without limitation, obligations assumed, retired or defeased, directly or indirectly, in connection with, or which survive the closing of, such M&A Transaction. If the consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable.

Percentages rounded to two decimal places.

DETROIT 21924-1 956457v7





# W. Y. CAMPBELL & COMPANY
INVESTMENT BANKING

ONE WOODWARD AVENUE • 25TH FLOOR • DETROIT, MI 48226
313-496-9000 • 313-496-9001 FAX

November 16, 2006

Robert J. Dellinger
Executive Vice President &
 Chief Financial Officer
Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098-2815

Dear Mr. Dellinger:

As you know, on October 17, 2006, Delphi Corporation (together with its direct and indirect subsidiaries, the "Company") and W.Y. Campbell ("Campbell") entered into a letter agreement to retain Campbell as financial advisor and investment banker to the Company in connection with a possible M&A Transaction and/or other transaction or series of transactions involving the Mount Business of the Company, effective as of September 1, 2006 (the "Engagement Letter").[1]

Section 4(c) of the Engagement Letter is hereby amended to read in its entirety as follows:

"(c)    To the extent that services of the type described in Section 1(l) are requested, representatives of Campbell shall be paid $750 per hour only for time spent testifying at such hearings and <u>shall</u> not <u>be paid</u> for preparation time or time spent in Court while not testifying."

Except as expressly amended hereby, the Engagement Letter is in all respects ratified and confirmed and all the terms thereof shall be and remain in full force and effect.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Engagement Letter.

Please indicate your agreement with the above amendment by signing the enclosed copy of this letter agreement in the space designated below and returning it to us whereupon this amendment shall be binding upon the parties hereto.

        Sincerely,

        W. Y. CAMPBELL & COMPANY

        /s/ André A. Augier

        André A. Augier
        Managing Director

Confirmed and agreed by:

DELPHI CORPORATION

BY: /s/ Robert J. Dellinger

Its: Executive Vice President & Chief Financial Officer

On: November 21, 2006

2