TOGUT, SEGAL & SEGAL LLP                    **HEARING DATE:**      March 22, 2007
Conflicts Counsel for                      **HEARING TIME:**      10:00 a.m.
Debtors and Debtors in Possession          **OBJECTION DEADLINE:** March 15, 2007 at 4:00 PM
One Penn Plaza, Suite 3335
New York, NY  10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                         :
In re                                      :          Chapter 11
                                         :
     DELPHI CORPORATION, et al.,           :          Case No. 05-44481 (RDD)
                                         :
                    Debtors.             :          (Jointly Administered)
                                         :
-------------------------------------------------------------X

**THIRD APPLICATION OF TOGUT, SEGAL & SEGAL LLP
FOR AN ALLOWANCE OF INTERIM COMPENSATION FOR
SERVICES RENDERED AS CONFLICTS COUNSEL FOR
THE DEBTORS FOR THE PERIOD JUNE 1, 2006
THROUGH SEPTEMBER 30, 2006 AND FOR REIMBURSEMENT OF EXPENSES**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

       Togut, Segal & Segal LLP ("TS&S" or "Applicant"), as conflicts counsel for

Delphi Corporation ("Delphi") and the other above-captioned debtors and debtors in

possession (collectively, the "Debtors"), respectfully makes this application (the "Third

Application") for an allowance of interim compensation for professional services

rendered during the period of June 1, 2006 through and including September 30, 2006

(the "Third Interim Period"), and for reimbursement of expenses incurred in connection

with such services.  In support of this Application, TS&S states:

<u>PRELIMINARY STATEMENT</u>

       During the Third Interim Period, TS&S continued to provide legal services

to assist the Debtors including, without limitation, the resolution of setoff claims which

were asserted by customers and vendors who sought to withhold an aggregate of $149 million from the Debtors.  As part of Applicant's efforts to resolve these claims during the Third Interim Period, Applicant helped the Debtors to identify and collect more than $8.8 million of accounts receivable that were being withheld by setoff claimants above the amount of their allowable setoff claims.  Since the Initial Filing Date (defined below), Applicant has helped the Debtors collect more than $31 million of excess accounts receivable from setoff claimants and to settle more than $100 million of setoff claims.  In addition, and as more fully described below, TS&S continued to assist the Debtors with:  (i) the enforcement of pre-petition supply agreements to ensure continued deliveries of product for the Debtors' "just in time" inventory system;  and (ii) the resolution disputes with certain vendors which demanded post-petition payment on account of pre-petition obligations.

## I.    FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

1.    This Application is made pursuant to section 331 of title 11 of the United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of Bankruptcy Procedure, and the November 4, 2005 Order of the Court establishing procedures for compensation and reimbursement of professionals, as amended (the "Administrative Fee Order"), for an allowance of interim compensation for services rendered to the Debtors during the Third Interim Period in the amount of $776,175.50, and for reimbursement of expenses in the amount of $4,879.63.

2.      TS&S attorneys and paraprofessionals expended a total of 1,710.30[1]

hours during the Third Interim Period.  A schedule setting forth the number of hours

expended by the firm's partners, counsel, associates and paraprofessionals, their

respective hourly rates, and the year in which each attorney was admitted to practice is

attached as Exhibit "1".  A schedule specifying the type of expenses for which TS&S is

seeking reimbursement and the total amount of each category is attached as Exhibit "2".

To the extent that time or disbursement charges for services rendered or disbursements

incurred relate to the Third Interim Period, but are not processed until after the date of

this Application, TS&S reserves the right to request additional compensation and

reimbursement in a future application.

3.      TS&S maintains computerized records of the daily time slips

completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart

listing the names, billing rates and time spent by each of the attorneys and

paraprofessionals rendering services on behalf of the Debtors.  In support of this

Application, copies of these computerized records, together with a computer generated

detailed itemization of the expenses incurred, have been filed electronically with the

Bankruptcy Court for the Southern District of New York (the "Court") as a supplement

to this Application and furnished to the service parties who are identified in the

Administrative Order.

4.      On April 26, 2006, TS&S filed its first application (the "First

Application") for an award of interim compensation in the amount of $589,874 and

---

[1]      Consistent with this Court's General Order M-151, Section E, Applicant has reviewed its monthly
invoices for the Third Interim Period and has deemed it appropriate to delete and/or correct time entries
by certain timekeepers, resulting in (a) a reduction of Applicant's request for compensation for the Third
Interim Period by $13,675 and (b) the allocation of $9,240.50 of time entries to more appropriate billing
codes. See Exhibit "3" annexed hereto.

reimbursement of expenses of $14,531.15 for the period of October 8, 2005 through and including January 31, 2006 (the "First Interim Period").

5.      On July 27, 2006, TS&S filed its second application (the "Second Application" and, together with the First Application, the "Prior Applications") for an award of interim compensation in the amount of $1,045,443.50 and reimbursement of expenses of $13,940.08 for the period of February 1, 2006 through and including May 31, 2006 (the "Second Interim Period" and, together with the First Interim Period, the "Prior Interim Periods").  Pursuant to an Order of the Court dated October 31, 2006, the hearing to consider first and second interim applications for compensation and reimbursement of expenses by all retained professionals in this case is scheduled for November 30, 2006.

6.      Other than the payments made by the Debtors to TS&S for fees and expenses incurred during the Prior Interim Periods pursuant to the Administrative Fee Order, as amended by the Court's July 12, 2006 Order, and disclosed in the Prior Applications, and those payments described below made during the Third Interim Period in accordance with the terms of Administrative Fee Order, TS&S has not received payment of compensation or reimbursement of expenses in this Chapter 11 case.

7.      Pursuant to the Administrative Fee Order, TS&S submitted four monthly invoices during the Third Interim Period:  (i) for June 1, 2006 through June 30, 2006 in the amounts of $256,264.00 for fees and $2,024.59 for expenses;  (ii) for July 1, 2006 through July 31, 2006 in the amounts of $182,678.50 for fees and $2,175.02 for expenses;  (iii) for August 1, 2006 through August 31, 2006 in the amounts of $208,623.50 for fees and $1,383.96 for expenses;  and (iv) for September 1, 2006 through September 30, 2006 in the amounts of $134,211.50 for fees and $881.56 for expenses.

8.      As of the date hereof and in accordance with the Administrative Fee Order, TS&S has received payment from the Debtors representing 80% of its fees and 100% of its expenses through and including the period of July 2006.  TS&S has not yet received any payments from the Debtors for fees and expenses for services rendered during August and September 2006.

9.      As confirmed by the Certification of Neil Berger, a member of TS&S, attached as Exhibit "4", all of the services rendered by TS&S during the case for which interim compensation is sought herein were rendered for and on behalf of the Debtors in connection with their chapter 11 cases.

## II.    RETENTION OF TS&S[2]

10.     TS&S was retained by the Debtors just prior to the Initial Filing Date in October 2005 to serve as conflicts counsel and to work with the Debtors' lead bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  TS&S is responsible for handling all bankruptcy-related matters where Skadden has an actual or perceived conflict, and discrete tasks assigned by Skadden that can be more efficiently handled by TS&S.  TS&S has not received a retainer.

11.     By Order dated November 4, 2005, the Debtors were authorized to retain TS&S on a final basis (Docket No. 1034).

12.     Since its retention and through the Third Interim Period, TS&S and Skadden have continued to carefully coordinate their efforts and their work is complementary.[3]

---

[2]      A description of the Debtors' business operations and the commencement of the Debtors' Chapter 11 cases is contained in the First Application and other pleadings filed in this Court.

[3]      A description of TS&S' qualifications to provide services to the Debtors is set forth at length in the First Application, and that description is incorporated herein by reference.

13.     All of the work summarized in this Third Application for which TS&S seeks interim compensation was performed efficiently, at the lowest cost to the Debtors' estates, and with minimal duplication of services in an effort to keep the administration expenses to a minimum.  TS&S staffed its projects in a manner that would permit it to bill fewer hours than would have otherwise been possible.

## III.    SERVICES RENDERED BY TS&S DURING THE THIRD INTERIM PERIOD

14.     All of the professional services provided by TS&S are set forth in TS&S' computerized time records, and the Court is respectfully referred to those records for the details of all of the work performed.

15.     Prior to the filing of the Debtors' chapter 11 cases, the Debtors and Skadden determined that a clear division of litigation-related duties was necessary to avoid potential conflicts that might have arisen had Skadden had been responsible for the resolution of all such matters.

16.     During the Third Interim Period, TS&S continued to take primary responsibility for representing the Debtors in the following matters, among others, that would not be addressed by Skadden:

(a)     motions and demands made by creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and Paragraph "18" of this Court's Final DIP Financing Order, dated October 28, 2005 (the "DIP Order");

(b)     motions and demands by parties-in-interest for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay");

(c)     issues related to the Essential Supplier Motion (as defined below), including the resolution of Orders to Show Cause addressing payments made to non-conforming suppliers;

(d)    issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors;  and

(e)    efforts to collect accounts receivable.

**A.    Setoff Issues:**

17.    As part of their negotiations regarding post-petition financing, the Debtors included a detailed mechanism in the DIP Order to enable the Debtors' suppliers to exercise setoff claims and/or recoupment rights regarding their pre-petition payables, subject to certain conditions.  Following the procedures contained in paragraph 18 of the DIP Order, a supplier may seek to exercise a setoff right that arose during the Debtors' ordinary course of business without such assertion being subject to section 362 of the Bankruptcy Code.[4]  Setoffs that are subject to paragraph 18 of the DIP Order may include claims arising out of, for example, pre-petition warranty and/or product recall, customer adjustments, customer rebates and allowances, overpricing, short shipments and credits for damaged goods.

18.    Any claimant that seeks to exercise setoff rights must submit a written request with supporting documentation to the Debtors and the Committee (with a copy to JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Administrative Agent for the Debtors).  If within 10 business days after sending such request, unless the parties extend that time, the Debtors and any particular claimant have failed to agree on the allowed amount of a requested setoff, they may seek resolution of the matter

---

[4]    Nothing contained herein is meant to modify the provisions of the DIP Order or any right or obligation of any party thereunder.

through an agreed-upon mediator or the Court.  If the mediator cannot resolve the

dispute within thirty days, the parties may submit the matter to binding arbitration.

19.    At the end of the Third Interim Period, 88 non-General Motors

claimants had asserted one or more setoff claims aggregating approximately $149

million.  The Debtors received 14 new setoff demands seeking approximately $7 million

during the Third Interim Period,[5] and TS&S devoted substantial time assisting the

Debtors with the continued resolution of the setoff and/or recoupment requests.

20.    During the Third Interim Period, Applicant worked with the

Debtors and FTI Consultants, Inc. ("FTI"), the Debtors' financial advisors, to resolve 19

setoff demands which sought an aggregate of approximately $65 million.  None of the

resolutions that TS&S negotiated during the Third Interim Period required Court

intervention, mediation or arbitration.

21.    Moreover, Applicant assisted the Debtors in identifying setoff

claimants who had been holding accounts payable for amounts exceeding their setoff

demands.  Applicant obtained agreements with those setoff claimants and collected

approximately $8.8 million of accounts receivable[6], while preserving all of the Debtors'

rights to challenge such claimants' setoff rights and to pursue additional accounts

receivable claims.

22.    To effectively resolve these setoff demands, TS&S (i) regularly

communicated with the Debtors' personnel to facilitate their ability to obtain and

analyze data needed to reconcile the amounts of the receivables against the payables

---

[5]    To date, the Debtors have received 91 setoff requests (including those claims asserted by General
Motors) which total approximately $230 million.

[6]    Since the Initial Filing Date, TS&S has assisted in the collection of more than $31 million of
accounts receivable from setoff claimants.

owed to the setoff claimants;  (ii) develop strategies for responding to setoff motions and prepare for possible litigation if settlement negotiations failed;  (iii) engage in negotiations with counsel for the setoff claimants;  and (iv) conduct necessary legal and factual research regarding issues raised in the motions and letter demands.

23.    TS&S also continued to work with the Debtors to ensure that mutuality existed to prevent setoffs.  In instances where the amounts to be setoff have involved a pre-petition overpayment by the Debtors, TS&S has conducted necessary forensic/factual and legal research.

24.    During the Third Interim Period, TS&S was assigned primary responsibility for all of the unresolved setoff claims that have been asserted pursuant to paragraph 18 of the DIP Order, except those made by General Motors.  Recognizing the number and size of setoff demands made by vendors and the relationship that setoff claims have to other areas of the Debtors' cases (such as claims reconciliation), it has been necessary for the Debtors, TS&S, Skadden and FTI to continue to communicate with each other regularly to know the status of the setoff demands.  TS&S provides periodic status reports to the Debtors, FTI and Skadden concerning progress made in the resolution of setoff claims.

25.    Throughout the Third Interim Period, the Debtors, TS&S, and FTI participated in weekly status calls to review pending setoff demands and to help coordinate the participants' efforts.  During these calls, among other things, the parties: (i) discussed new demands that the Debtors received (including an analysis of the merits of each new demand);  (ii) monitored the status of the Debtors' and setoff claimant's exchange of information to reconcile the accounts;  (iii) analyzed the factual and legal issues implicated by the demands;  and (iv) developed uniform strategies on behalf of the Debtors regarding each of the demands.  These calls have proven essential

in safeguarding the Debtors' interests because they have permitted TS&S to efficiently

address the setoff demands without duplicating the efforts of Skadden or the Debtors.

26.    TS&S' efforts to assist in the resolution of the setoff demand by

Robert Bosch Corporation ("RBC") is illustrative of TS&S' efforts in this area during the

Third Interim Period.  RBC designs, manufactures, and distributes certain car parts and

components in a mutual supplier relationship with the Debtors.  RBC made a formal

request to exercise certain pre-petition setoff rights pursuant to the DIP Order.  TS&S

engaged in extensive negotiations with counsel to RBC regarding the reconciliation of

pre-petition amounts owing between Delphi and RBC, as well as other supply-related

issues.  TS&S performed a detailed review of the underlying documents provided by

RBC, including executed agreements, transaction documents, invoices, correspondence

and other relevant materials so that TS&S could counsel the Debtors.

27.    With TS&S' assistance, the Debtors and RBC eventually negotiated

an interim settlement regarding the pre-petition amounts owed to each other, pursuant

to which the parties agreed upon:  (i) the maximum amount that was due and owing

from RBC to the Debtors;  (ii) the maximum amount that was due and owing from the

Debtors to RBC;  and (iii) the universe of invoices for unpaid pre-petition services that

required research.  Those findings resulted in an agreement that not less than

$14,567,071.24 (the "Interim Payment") was due and owing to the Debtors,

notwithstanding that the completion of a final setoff reconciliation with RBC would

require additional time.

28.    Applicant demanded, on behalf of the Debtors, that the Interim

Payment be made by RBC currently rather than waiting for the completion of the final

setoff reconciliation with RBC.  TS&S assisted in the negotiation and drafting of a letter

agreement that memorialized the parties' interim settlement, which also clarified

several aspects of the business relationship between the Debtors and RBC going forward.  That agreement was fully executed on April 4, 2006 and was approved by the Committee pursuant to paragraph 18 of the DIP Order.  TS&S made certain that the Interim Payment was timely made to the Debtors.

29.    During the Third Interim Period, TS&S continued to work with the Debtors, RBC's counsel and RBC's in-house staff to attempt to complete the final reconciliation.  As a result of these efforts and pursuant to the terms of a letter agreement dated August 22, 2006, RBC made a second, additional interim payment to the Debtors of $856,044.32.  TS&S assisted in the preparation of the letter agreement with RBC concerning the second interim payment, and reviewed it with the Committee. By the end of the Third Interim Period, TS&S had helped the Debtors to collect more than $15.4 million from RBC.

30.    The services provided by TS&S to assist the Debtors in the resolution of setoff claims has been highly beneficial and efficient:  during the Third Interim Period, 19 claims seeking to setoff approximately $65 million were resolved and concluded, and the Debtors collected more than $8.8 million of accounts receivable that were withheld by setoff claimants.  All of these results were achieved without litigation.

31.    Setoff demands continue to be asserted against the Debtors, and TS&S continues to assist the Debtors as they review, analyze and resolve demands.

**B.    Automatic Stay Issues:**

32.    During the Third Interim Period, TS&S continued to share responsibility in addressing contested motions filed by parties-in-interest for relief from the Automatic Stay.  To resolve these requests, TS&S:  (i) had telephone conferences with the Debtors' in-house attorneys and business representatives to discuss strategy for settlement and/or potential responses to the motions;  (ii) communicated with

counsel for movants to discuss legal issues that were implicated by their clients'
motions and attempted to negotiate consensual resolutions;  (iii) reviewed documents
provided by the Debtors and counsel to the movants (e.g., term sheets, contracts, related
pleadings, etc.);  and (iv) performed legal research, when necessary.  In particular, TS&S
continued to devote substantial time addressing and settling automatic stay motions
filed Bank of America, N.A. and BorgWarner Turbo Systems, Inc.

33.    **Bank of America N.A. ("BofA")**:  The Debtors maintain
manufacturing and business facilities throughout the United States, and many of those
facilities are located in remote areas that are not serviced by major or regional air
carriers.  As part of their continuing efforts to achieve maximum profitability and to
eliminate unnecessary cost and delay, the Debtors have historically used two corporate
aircraft (the "Aircraft") to transport personnel.  The Aircraft are leased from BofA, as
successor to Fleet National Bank, which maintains title to the Aircraft.  BofA asserts first
priority liens (the "BofA Liens") against the Aircraft, aircraft engines, parts accessories,
replacements and substitutions (together with the Aircraft, the "Collateral");  BofA also
asserts liens against all charter revenue (the "BofA Cash Collateral") that the Debtors
derive from sub-charter agreements which the Debtors seek when they are not using
the Collateral to defray the operating costs of the Collateral.  In addition, the Debtors
insure and provide for maintenance of the Collateral pursuant to an agreement with
Pentastar Aviation, LLC ("Pentastar").

34.    BofA has repeatedly initiated litigation to enforce its lien rights.
Early in the Debtors' cases, BofA objected to entry of the DIP Order and sought
adequate protection liens.  That objection was overruled after the Debtors modified the
DIP Order to expressly provide that the liens granted therein did not affect BofA's
interest in the Collateral or the BofA Cash Collateral.

35.     Almost immediately after entry of the DIP Order, BofA filed a

Motion (the "BofA Motion") for:  (i) adequate protection of its security interests in the

Collateral;  and (ii) termination of the automatic stay regarding the BofA Cash

Collateral;  BofA requested the same relief that it had unsuccessfully sought in its

objection to the DIP Order (the "BofA Motion").  After extensive negotiations, TS&S

was able to reach a resolution of the BofA Motion by reaching an agreement with the

Debtors, BofA, the Committee and the Agents under the DIP Order.  This Court entered

a Consent Order on January 12, 2006 (the "First BofA Consent Order") memorializing

the agreement of the parties.

36.     On the very next day, BofA commenced an adversary proceeding

by filing a complaint (the "BofA Complaint") against Delphi Automotive Services

Human Resources, LLC ("DASHR"), the Committee and JPMorgan ("JPMorgan"), for a

declaration that: (i) JPMorgan, as the administrative agent for the pre-petition and post-

petition secured lenders (the "Secured Lenders"), does not hold any security interests or

liens in, among other things, the Collateral and the BofA Cash Collateral;  and (ii) BofA

holds valid, perfected and first priority security liens in, among other things, the

Collateral and BofA Cash Collateral.  TS&S was asked to try to achieve a global

settlement of the BofA Complaint.  TS&S' efforts produced a settlement that was

memorialized in a Stipulation that the parties executed on April 6, 2006 (the "BofA

Stipulation").  Pursuant to the BofA Stipulation, among other things, JPMorgan Chase

acknowledged that:  (i) as the agent for the Secured Lenders, it does not hold any

security interests or liens in DASHR's assets;  and (ii) as the agent for the DIP Lenders,

the liens granted pursuant to the DIP Order do not include any assets encompassed by

BofA's Liens.  Finally, the Debtors and the Committee agreed, and the Court found, that

BofA's Liens were valid, perfected, first priority and unavoidable in bankruptcy. The Court approved the BofA Stipulation on April 26, 2006.

37.    The Collateral is managed pursuant to management and charter agreements (the "Pentastar Agreements") among the Debtors, Pentastar and its affiliate, Automotive Air Charter Inc. ("AAC"), respectively. The Pentastar Agreements were set to expire on April 30, 2006. The Debtors sought to continue the efficiencies and benefits provided by the Pentastar Agreements rather than commit to new, long-term agreements and they and Pentastar agreed to a one-year extension of the Pentastar Agreements (the "Extension"). No other terms of the Pentastar Agreements were changed, and most importantly, BofA's position as a secured creditor in the Collateral was not affected. Notwithstanding, and in accordance with the BofA lease agreements, the Debtors sought BofA's consent to the Extension.

38.    BofA responded to the Debtors' request by insisting that BofA be given, among other things, adequate protection and replacement liens in exchange for its consent. In addition, BofA threatened to again seek Court intervention to obtain replacement liens. Neither the Debtors nor the DIP Lenders deemed it appropriate to acquiesce to such a demand, especially given the Court's prior rulings. TS&S engaged in extensive discussions with the Debtors, BofA, the Committee, the Secured Lenders and the DIP Lenders throughout much of the Third Interim Period to address BofA's concerns and to attempt to reach a resolution of BofA's demands.

39.    TS&S' strategies and negotiations were successful: the parties entered into agreements that resolved all of the parties' concerns and required a minimum of Court involvement. The lengthy and complex negotiations that TS&S facilitated and fostered culminated in the entry of a Stipulation and Order of the Court on September 29, 2006 which provided that the BofA Liens continued unaffected

14

against the Collateral and the BofA Cash Collateral notwithstanding any amendments to the Pentastar Agreements.

40.     As part of those negotiations, TS&S also successfully negotiated the settlement of setoff claims asserted by Pentastar in connection with the Pentastar Agreements.  Pursuant to that settlement, the Debtors recovered approximately $194,000 from Pentastar.  TS&S negotiated a Stipulation with Pentastar pursuant to paragraph 18 of the DIP Order, and obtained the Committee's consent to that agreement.

41.     TS&S is confident that absent its efforts to negotiate the resolutions described above, additional, costly motion practice by this Court would have resulted. The services provided by TS&S helped the Debtors and this Court to avoid costly and distracting litigation.

42.     **BorgWarner Turbo Systems, Inc. ("BorgWarner")**:  Prior to the commencement of the Debtors' cases, the Debtors sold and delivered certain components to BorgWarner for incorporation into turbo chargers and actuator kits that BorgWarner, in turn, sold to its customers. Sales were made pursuant to a purchasing agreement between Delphi Automotive Systems LLC ("DASLLC") and BorgWarner (the "Purchasing Agreement").

43.     At some time after the Purchasing Agreement was signed, and prior to the Initial Filing Date, BorgWarner discovered that a certain percentage of the turbochargers that it purchased from DASLLC were defective.  BorgWarner subsequently made a warranty claim against the Debtors (the "Warranty Claim") and alleged that the defects were in the DASLLC components rather than in components that BorgWarner bought from non-Debtor suppliers.  The parties were in the process of reconciling the Warranty Claim on the Initial Filing Date when BorgWarner withheld

payment of approximately $2.6 million of outstanding pre-petition invoices due and owing to the Debtors (the "BorgWarner Invoices").

44.    On October 31, 2005, the Debtors made written demand upon BorgWarner for payment of the BorgWarner Invoices.  Negotiations between the parties failed and on April 12, 2006, BorgWarner filed a Motion for relief from the Automatic Stay to commence a Michigan state court action to liquidate its Warranty Claim (the "BorgWarner Motion").  Moreover, BorgWarner sought to continue to withhold payment of the BorgWarner Invoices pending the resolution of its proposed state court action.

45.    TS&S worked with the Debtors' commercial representatives and in-house attorneys to prepare:  (i) an objection to the BorgWarner Motion;  and (ii) a complaint to commence an adversary proceeding to resolve the BorgWarner issues in this Court rather than in a Michigan state court.  TS&S told BorgWarner of the Debtors' objection to the BorgWarner Motion and advised that the Debtors were prepared to commence an adversary proceeding against BorgWarner in this Court.  In response, BorgWarner agreed to resume settlement negotiations with the Debtors.

46.    Renewed settlement negotiations between the Debtors and BorgWarner succeeded.  Under the terms of the parties' settlement agreement, which was executed on July 13, 2006:  (a) BorgWarner agreed to withdraw the BorgWarner Motion;  and (b) the Warranty Claim was resolved by:  (I) the Debtors' credit of $2.35 million to BorgWarner to satisfy the Warranty Claim;  and (II) BorgWarner's payment to the Debtors not less than $3.2 million, representing pre-petition and post-petition accounts receivable.

47.    The services provided by TS&S enabled the Debtors to avoid the cost, expense and delay of litigation concerning the BorgWarner Motion and litigation

concerning the Warranty Claim.  Moreover, TS&S' efforts fostered a settlement

agreement pursuant to which, among other things, the Debtors obtained payment of

more than $3 million of pre- and post-petition accounts receivable claims that

BorgWarner had withheld.

**C.**     **Essential Supplier Issues/Orders to Show Cause**

48.     During the Third Interim Period, TS&S continued its efforts to

resolve the remaining Order to Show Cause against a vendor which received a post-

petition payment on account of a pre-petition obligation.

49.     The Debtors' manufacturing facilities use a "just-in-time" supply

method for components.  Consequently, the Debtors do not maintain a significant

inventory (and in many cases, less than 24 hours worth) of parts supplied by their most

important suppliers (the "Essential Suppliers").  Moreover, the Debtors rely on the "sole

source" supply method, i.e., they purchase all of their requirements for a particular (and

necessary) part from one supplier.  Accordingly, the Debtors depend upon frequent

and, in many cases, daily shipments of components from the Essential Suppliers to keep

their manufacturing facilities operating.

50.     The Debtors were concerned that the Essential Suppliers would

exploit the Debtors' need for shipments by, among other things, demanding post-

petition payment of pre-petition invoices.  Consequently, on the Initial Filing Date, the

Debtors filed their Motion for an Order Authorizing Continuation of Vendor Rescue

Program and Payment of Pre-petition Claims of Financially-Distressed Sole Source

Suppliers and Vendors Without Contracts (the "Essential Supplier Motion").  Pursuant

to the Essential Supplier Motion, the Debtors sought permission to conditionally pay[7] pre-petition claims (the "Essential Supplier Claims") owing to certain of its suppliers that were "essential" to the uninterrupted function of the Debtors' business operations.

51.    In the Essential Supplier Motion, the Debtors demonstrated that the relief sought was immediate and critically necessary because the failure to pay the Essential Supplier Claims would cause the Essential Suppliers to withhold goods and/or services from the Debtors.  Without "sole source" supplies, the Debtors would suffer substantial delays and disruptions, and be unable to conduct business.  On October 13, 2005, the Court entered an Order approving the Essential Supplier Motion (the "Essential Supplier Order").

52.    Pursuant to the Essential Supplier Order, the Debtors were also authorized, but not directed, to waive (the "Waiver") the conditions outlined in the Essential Supplier Motion (e.g., the execution of a Trade Agreement) to conditionally pay the claim of a threatening supplier (the "Non-Conforming Supplier") subject to the procedures that are contained in the Essential Supplier Order.

53.    During the Third Interim Period, TS&S continued its efforts to negotiate a resolution of the remaining Order to Show Cause filed against Deutsch Dagan Ltd. ("Deutsch Dagan"), a Non-Conforming Supplier, for a conditional payment in the amount of $207,078.[8]  In an attempt to settle this matter, TS&S:  (i) conducted negotiations with counsel to Deutsch Dagan regarding the merits of the payment made

---

[7]    The Debtors explain in the Essential Supplier Motion that they would cause parties to enter into letter agreements (the "Trade Agreements") as a condition for payment of an Essential Supplier Claim.

[8]    During the Prior Interim Periods, TS&S filed eight Notices of Waiver and obtained corresponding Orders to Show Cause for the Debtors against Non-Conforming Suppliers for aggregate conditional payments of $3,512,006.76.  TS&S achieved settlements in all of those matters on terms favorable to the Debtors.

to Deutsch Dagan and the legal issues implicated by its demand for payment;  (ii) participated in telephone conferences with the Debtors' personnel to discuss background and strategy;  (iii) reviewed and analyzed documents provided by the Debtors regarding Deutsch Dagan's corporate structure and historical relationship with the Debtors;  and (iv) performed legal and non-legal research to ensure that service of the Notice of Waiver and Order to Show Cause upon Deutsch Dagan, a German corporation, was in compliance with the Hague Convention, and whether Deutsch Dagan had the necessary "minimum contacts" with the United States to be subject to the jurisdiction of the Court.

54.    As of the date of this Third Application, TS&S and Deutsch Dagan reached a settlement in principle and the parties are negotiating the terms of a letter agreement to memorialize this settlement.  Once that agreement is finalized, TS&S will prepare and submit a Consent Order withdrawing the Order to Show Cause to be entered by the Court.  TS&S's efforts helped prevent the cessation of shipping by Deutsch Dagan, an important supplier of the Debtors, and also enabled the Debtors to achieve a benefit for their estates.

55.    During the Prior Interim Periods, TS&S filed eight Notices of Waiver and obtained corresponding Orders to Show Cause for the Debtors against Non-Conforming Suppliers for aggregate conditional payments of $3,512,006.76.  TS&S achieved settlements in all of those matters on terms favorable to the Debtors.  To date, the Debtors recovered approximately $3.3 million of cash and post-petition credit from Non-Conforming Suppliers with the assistance of TS&S and without the need for any active litigation before the Court.

D.    **Injunction Issues:**

56.    During the Third Interim Period, TS&S continued to prepare

pleadings at the request of the Debtors and Skadden to enjoin suppliers who threatened

to stop shipping parts, despite enforceable "sole source" contracts with the Debtors.

57.    Generally, the Debtors contracted with their suppliers to purchase

parts at a specific time, which is often tied directly to the production run of a particular

Original Equipment Manufacturer ("OEM") vehicle.  These requirements contracts

generally take the form of purchase orders, which constitute the Debtors' requirements

for a particular product over a specified period of time.  The Debtors' standard General

Terms and Conditions (the "Terms and Conditions") are incorporated into these

contracts.  The Terms and Conditions provide that if a supplier "commences any of the

work or services which are the subject of this Contract, [supplier] will be deemed to

have accepted this Contract and these General Terms and Conditions in their entirety

without modification."  The Terms and Conditions also contain the supplier's

acknowledgment that in the event of an actual, anticipatory or threatened breach of the

contract, the Debtors are entitled to specific performance and injunctive or other

equitable relief.

58.    During the Third Interim Period, several suppliers threatened to

stop shipping parts to the Debtors.  These suppliers asserted, among other things, that

the price increases in raw materials made it unprofitable for them to continue to meet

the Debtors' requirements.  The consequences of a supplier unilaterally stopping

shipment of parts would have been catastrophic.  The Debtors' manufacturing facilities

would be forced to shut down within a matter of days after the missed shipment.

Within one to two days after a shutdown of one of the Debtors' facilities, the Debtors'

OEM customers would likely be forced to halt production of their products on one or

more of their assembly lines.  A shutdown of even one assembly line of an OEM could cause the manufacturer millions of dollars of damages which would be asserted against the Debtors.

59.     Consequently, when requested by the Debtors, TS&S immediately prepared comprehensive pleadings against several suppliers that had threatened to stop shipments.  These pleadings sought temporary, preliminary and permanent relief to:  (i) enjoin the suppliers from breaching, terminating, or attempting to terminate the pre-petition requirements contracts between the suppliers and the Debtors;  and (ii) direct the suppliers to continue to perform under those contracts.  For each supplier, TS&S drafted a complaint, motion for a temporary restraining order, a memorandum of law, and a proposed Order.  TS&S was prepared to file each of those documents with the Court in the event that the Debtors were not able to negotiate acceptable business solutions with their suppliers and in that regard, litigation support was unavoidable.

60.     To date, the Debtors' negotiations with suppliers who threatened to stop shipments, with assistance from TS&S, have been successful.  No injunction pleadings have had to be filed, in part because the suppliers' knew that the Debtors and TS&S were prepared to seek expedited relief from this Court.

**E.     Accounts Receivable**

**i.     Askys Adversary Proceeding:**

61.     On or about March 11, 2003, Aksys Ltd. ("Aksys") and Delphi Medical Systems Colorado Corporation ("DMSCC") entered into a Contract Manufacturing Agreement (the "CMA") pursuant to which DMSCC sold and delivered certain medical machinery and provided certain manufacturing services to Aksys with an agreed upon price and value of at least $2,420,487.00 (the "Invoiced Amount").

62.    DMSCC mailed and/or transmitted one or more invoices to Aksys for the Invoiced Amount (the "Invoices").  Aksys did not dispute the Invoices.  By a letter dated March 16, 2006, DMSCC formally notified Aksys that Aksys was in violation of its contractual obligation to DMSCC based upon its failure to pay the Invoices.  On June 5, 2006, DMSCC made written demand upon Aksys for payment on the Invoices (the "June 5 Letter").

63.    Pursuant to the CMA, DMSCC also purchased and stored certain goods for Aksys (the "Stored Materials").  In 2004, Aksys deposited $3,408,813.23 with DMSCC to secure payment for the Stored Materials (the "Materials Deposit").  By a letter dated July 5, 2006 (the "July 5 Letter" and, together with the June 5 Letter, the "Letters"), DMSCC notified Aksys that the Materials Deposit had been fully depleted and that the CMA had been terminated based on Aksys' violation of its terms.

64.    Following the full depletion and application of the Material Deposit to the benefit of DMSCC in accordance with the CMA, Aksys continues to be liable to DMSCC for the Stored Materials in the amount of $1,588,089.38 (the "Stored Materials Balance").  DMSCC had made written demand upon Aksys for payment on account of the Stored Materials Balance in the June 5 Letter.

65.    Aksys neither responded to the Letters nor made any payments to DMSCC on account of the Invoices or the Stored Materials Balance, which are past due and payable by Aksys to DMSCC in the aggregate amount of $4,008,576.38 (the "Receivable").  In the July 5 Letter, DMSCC demanded full payment of the Receivable.

66.    Settlement negotiations between the parties failed.  With the assistance of TS&S, DMSCC analyzed its legal recourse against Akysys regarding the Receivable.  Consistent with instruction from DMSCC, TS&S prepared a Complaint against Aksys and on August 1, 2006, DMSCC commenced an adversary proceeding

against Aksys (the "Aksys Proceeding") to: (a) compel the turnover and payment of the Receivable plus all interest accrued thereon from June 5, 2006 pursuant to section 542(b) of the Bankruptcy Code; and (b) disallow any claims in favor of Aksys in the Debtors' chapter 11 cases pursuant to Bankruptcy Code section 502(d).

67. On August 28, 2006, Aksys demanded that, in accordance with section 27 of the CMA, the issues raised in the Aksys Proceeding be decided pursuant to binding arbitration at the American Arbitration Association in Chicago, Illinois. Aksys also demanded that DMSCC voluntarily dismiss the Amended Complaint in the Court.

68. DMSCC determined to consent to the arbitration requested by Aksys but did not agree to dismiss the Aksys Proceeding. The parties entered into a stipulation staying the Aksys Proceeding that was "So Ordered" by the Court on October 24, 2006 and are continuing negotiations as they continue to prepare for arbitration.

### ii.    **Miscellaneous Accounts Receivable**

69. During the Third Interim Period, the Debtors asked TS&S to assist in the collection of accounts receivable from various customers and shippers. TS&S worked with the Debtors to review and analyze foundation documents and information in support of these accounts receivable claims, and prepared and sent demand letters to account debtors.

70. TS&S engaged in telephone conferences with numerous parties from whom the Debtors sought payment, and participated in status calls and conferences with the Debtors regarding those negotiations. During the Third Interim Period, TS&S helped the Debtors to collect accounts receivable totaling approximately $600,000.

F.              **Miscellaneous Matters Addressed by TS&S:**

71.    In addition to the matters discussed above, TS&S rendered services

for, or on behalf of, the Debtors in connection with other miscellaneous matters during

the Third Interim Period, such as:

(a)    reviewing various motions and other pleadings filed
with the Court regarding case and project strategy;

(b)    continuing to assist in the recovery of open accounts
receivable that are due and payable to the Debtors;

(c)    preparing and filing TS&S's Second Application
(including corresponding exhibits) with the Court,
and reviewing and preparing to comply with
guidelines that were circulated by the Fee Committee
in this case;

(d)    participating in numerous (i) "task" and senior
strategy calls;  and (ii) status and strategy meetings
with the Debtors, the Debtors' professionals, and the
Committee;

(e)    attending omnibus hearings and addressing various
matters at such hearings;

(f)    preparing and regularly updating status charts for
Debtors regarding assorted matters;

(g)    conferring with Skadden regarding the delegation of
responsibilities of certain matters to TS&S to ensure
no duplication of effort between the two firms;  and

(h)    frequently communicating with various third parties,
including the Court, the United States Trustee, the
Committee and individual creditors and other
parties-in-interest concerning the status, conduct and
administration of the Debtors' chapter 11 cases.

## V.    THE COMPENSATION REQUESTED

72.    There are numerous factors to be considered by the Court in

determining allowances of compensation.  *See, e.g., In re First Colonial Corp. of America*,

544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway*

*Express, Inc.,* 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.,* 133

B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.,* 76 B.R. 943 (S.D.N.Y.

1987);  *In re Cuisine Magazine, Inc.,* 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

> 73.    The perspective from which an application for an allowance of

compensation should be viewed in a reorganization case was aptly stated by

Congressman Edwards on the floor of the House of Representatives on September 28,

1978, when he made the following statement in relation to section 330 of the Bankruptcy

Code:

> [B]ankruptcy legal services are entitled to command the
> same competency of counsel as other cases.  In that light, the
> policy of this section is to compensate attorneys and other
> professionals serving in a case under title 11 at the same rate
> as the attorney or other professional would be compensated
> for performing comparable services other than in a case
> under title 11.   Contrary language in the Senate report
> accompanying S.2266 is rejected, and *Massachusetts Mutual
> Life Insurance Company v. Brock,* 405 F.2d 429, 432 (5th Cir.
> 1968) is overruled.  Notions of economy of the estate in
> fixing fees are outdated and have no place in a bankruptcy
> code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re*

*McCombs,* 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.,* 133 B.R.

13 (Bankr. S.D.N.Y. 1991);  *In re Carter,* 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public*

*Service Co. of New Hampshire,* 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor*

*Credit Corp.,* 50 B.R. 885 (Bankr. N.D. Ohio 1985).

> 74.    In awarding compensation pursuant to section 330 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

> •    reasonable compensation for actual, necessary
>      services rendered by the trustee, examiner,

professional person, or attorney and by any
paraprofessional persons employed by such person;
and

• reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

75.     As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy
> Courts in compensation matters, we recognize that creditors
> have agreed to pay rates for retained counsel of their choice
> because of the needs of the particular case.  One could posit
> other situations or cases where a presumption of prior
> informed judgment might not be as strong.  Here, however,
> we have a multi-debtor, multi-committee case involving
> sophisticated creditors who have determined that the rates
> charged and tasks undertaken by attorneys are appropriate.
> We should not, and will not, second guess the determination
> of those parties, who are directed by Congress, under the
> Bankruptcy Code, to shape and resolve the case, and who
> are in fact bearing the cost.  To do so, of course, would be to
> continue what Congress specifically intended to stop in
> 1978: Courts, instead of markets, setting rates, with the
> inevitable consequence that all the legal specialists required
> by the debtor or official committees would demur to
> participate.

*Drexel*, 133 B.R. at 20-21.

76.     The professional services rendered by TS&S have required

expenditure of substantial time and effort.  During the Third Interim Period, TS&S

professionals and paraprofessionals recorded 1,678.6 hours in providing the required

professional services for which TS&S seeks compensation.

77.     Time and labor devoted is only one of many factors to be

considered in awarding attorney compensation.  The number of hours expended must

be considered in light of (i) the amount involved and the results achieved to date,

(ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to

perform properly the legal services, (iv) the preclusion of other employment on behalf

of other clients, (v) the customary fee charged to a private client for the services

rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies

of the case, including the frequency and amount of time required to be devoted other

than during regular business hours, (viii) the experience, reputation and ability of the

attorneys rendering services, and (ix) the nature and length of the professional

relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway

Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys'

fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp.

of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

78.    The majority of the Johnson Factors are codified in section 330(a) of

the Bankruptcy Code, and have been applied by various courts in making

determinations that requested attorneys' fees constitute reasonable compensation.  It is

well settled that the "lodestar method,"[9] as opposed to an application solely of the

Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[10]

The Supreme Court, however, has clearly articulated that the "lodestar method" is

---

[9]    Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

[10]    *See, e.g.*, *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987);  *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*");  *United States Football League v. National Football League*, 887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071  (1990);  *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976);  *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy

Code. *Delaware Valley I*, 478 U.S. at 563; *Cena's Fine Furniture*, 109 B.R. at 581.

79.    TS&S respectfully submits that application of the foregoing criteria

more than justifies the compensation requested in this Third Application.  The

professional services rendered in these chapter 11 cases have been performed by

attorneys with broad expertise and high levels of skill in their practice areas or

specialty.

80.    At all times throughout the Third Interim Period, TS&S

successfully avoided expensive litigation by brokering reasonable settlements among

the parties.  TS&S' efforts have therefore been of significant value to the Debtors and the

creditors of these estates.

81.    TS&S has not sought to burden this Court by setting forth all of the

services rendered to the Debtors and for the benefit of creditors.  TS&S has reviewed all

of its office files which indicate numerous legal situations and problems resolved over

and above those detailed in this Third Application, and which are more fully

summarized in the time sheet entries annexed hereto and made a part hereof which

were contemporaneously prepared when the services were rendered.

82.    TS&S has devoted 1,678.6 hours of actual recorded time during the

Third Interim Period resulting in time charges of $776,175.50 for which compensation is

sought as reflected in Exhibits "1", and "3".

83.    Throughout the Third Interim Period, TS&S sought to assign

projects in this case to associates, law clerks, and paraprofessionals who could most

efficiently and expeditiously handle them.  The blended hourly rate for the time charges

that are subject to this Third Application is $466.25.[11]  TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

84.    In addition to the fees sought for legal services, TS&S has incurred $4,879.63[12] in out-of-pocket expenses during the Third Interim Period directly attributable to the representation of the Debtors.

85.    No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

86.    Copies of this Application have been given to:  (i) the Debtors; (ii) counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  (v) counsel for the agent under the Debtors' pre-petition credit facility; (vi) counsel for the agent under the Debtors' post-petition credit facility;  and (vii) the Joint Fee Review Committee.

---

[11]    By way of example, TS&S delegated the responsibility of gathering the information and detail required by the Court, the United States Trustee, and the Debtors in monthly fee statements and interim fee applications to associates, paraprofessionals and law clerks who could most efficiently and expeditiously handle them rather than assigning such responsibility to more senior attorneys whose hourly billing rate exceed those of associates and paraprofessionals.  Senior attorneys reviewed monthly statements and interim fee applications to make certain that they complied with the level of detail sought and to protect against the disclosure of privileged and other sensitive information.  TS&S believes that this delegation of responsibilities achieved efficiency and at the same time enabled TS&S to comply with the requirements of the Debtors, the Court and the United States Trustee.  *Matter of Ribs of Greenwich Village, Inc.*, 57 B.R. 319 (Bankr. S.D.N.Y. 19860;  *In re Neibart Associates Press, Inc.* 58 B.R. 212 (Bankr. 1985) (Time spent in preparation of requests for compensation is compensable).

[12]    TS&S has reduced its requests for reimbursement of out-of-pocket expenses by $1,585.50 which reflects an adjustment of .10¢ per page for copies made during June, July and August 2006 and that they are now charged at .10¢ per page.

**VI.**    **CONCLUSION**

       **WHEREFORE**, TS&S respectfully requests that this Third Application be granted and that it be awarded an allowance of $776,175.50 for legal services rendered to the Debtors during the Third Interim Period, and $4,879.63 for reimbursement of expenses, and that the Debtors be authorized and directed to pay such amounts to the as may be just and proper.

Dated:    New York, New York
          December 4, 2006

                                     TOGUT, SEGAL & SEGAL LLP,
                                     Conflicts Counsel for the Debtors
                                     and Debtors in Possession

                                     /s/ Albert Togut
                                     ALBERT TOGUT (AT-9759)
                                     NEIL BERGER (NB-3599)
                                     Members of the Firm
                                     One Penn Plaza, Suite 3335
                                     New York, New York 10119
                                     (212) 594-5000