# EXHIBIT "A"

STATE OF MICHIGAN
THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

CLARION CORPORATION OF AMERICA,
a California corporation,

Plaintiff,

vs.

DELPHI AUTOMOTIVE SYSTEMS LLC
(d/b/a Delphi Electronics & Safety),
a Michigan limited liability company,

Defendant.
_____/

Case No. _____

06-078869-CK

OAKLAND JUDGE RAE LEE CHABOT
COUNTY CLARION CORP V DELPHI AUTOMI

Hon.

RECEIVED FOR FILING
OAKLAND COUNTY CLERK
2006 NOV 16 A 8:46
BY: _____ COUNTY CLERK

Scott R. Murphy (P68015)
BARNES & THORNBURG LLP
Attorneys for Plaintiff
300 Ottawa Avenue, N.W. - Suite 500
Grand Rapids, Michigan 49503
(616) 742-3930
_____/

## COMPLAINT

The Plaintiff, Clarion Corporation of America ("Clarion"), for its Complaint against Delphi Automotive Systems LLC (d/b/a Delphi Electronics & Safety) ("Delphi"), alleges and states as follows:

### Overview of Complaint

1. This is a contract claim involving the sale of goods, and, as such, it is governed at least in part by the Uniform Commercial Code as incorporated by Michigan law.

2. Beginning in 2002 and continuing through 2005, Clarion bid for and contracted with Delphi to sell Delphi four different kinds of car-audio equipment. Each of the exclusive requirements contracts for these audio components was bid and awarded based on volume, or volume-bracketed, pricing (i.e., at Delphi's request, Clarion tied its pricing to the volume of product to be ordered).

3. Clarion has been performing on its agreements with Delphi, and has been supplying (and continues to supply) Delphi with product.

4. Historically, Delphi met its volume commitments, entitling it to receive Clarion's agreed-upon high-volume prices. But in the Fall of 2005 (on or after October 8, 2005), Clarion's sales and market-forecast information revealed that Delphi would be unable to meet its volume expectations, and as such, it could not continue to receive the benefit of Clarion's high-volume pricing.

5. Clarion has communicated with and written Delphi several times objecting to Delphi's continued insistence on paying Clarion only at the higher-volume prices, and has demanded that Delphi adjust its pricing to accommodate its lower-volume orders. Delphi has refused, and Delphi's underpayment to Clarion grows, causing Clarion considerable damage.

6. By its Complaint, Clarion seeks to have the Court declare that Delphi is in breach of its agreements with Clarion, and award Clarion damages resulting therefrom.

### Parties and Jurisdiction

7. Plaintiff Clarion Corporation of America is a California corporation with its principal place of business in Cyprus, California. Among other things, Clarion manufactures, sells, distributes, and markets car audio systems and components.

8. Defendant Delphi Automotive Systems LLC (d/b/a Delphi Electronics & Safety) is a Michigan limited liability company with its principal place of business in Troy, Michigan.

9. Venue and jurisdiction are proper in Oakland County because Delphi is a resident of Oakland County and the amount in controversy exceeds $25,000.00.

### Contract Formation

10. Beginning in 2002 and continuing through 2005, Delphi and Clarion engaged in a series of discussions and negotiations with respect to the potential supply of Playback

Mechanisms, specifically DA4.5/4.5C, GIX, GIX-MP3 and DA5C components (collectively, the "Playback Mechanisms"). The relevant negotiations and resulting agreements regarding each of these Playback Mechanisms are delineated in the allegations of this Complaint.

**I. The DA4.5/4.5C Playback Mechanism Contract.**

11. On or about April 24, 2002, Delphi issued Clarion a Request for Quotation on a CD & Cassette Playback Mechanism (which would later come to be termed Clarion product DA4.5/4.5C, and will be referred to herein as the "DA4.5/4.5C Playback Mechanism"). A true and accurate copy of Delphi's Request for Quotation is attached hereto as **Exhibit A**.[1]

12. Delphi's Request for Quotation required a bidder, like Clarion, to quote prices based on particular volume scenarios across calendar years for the product.

13. Further, as part of this bidding process, Clarion was required to assent to the terms contained in agreements entitled Playback Mechanism Conditions (the "Playback Agreements"). An example of the draft Playback Agreement for the DA4.5/4.5C product is attached hereto as **Exhibit B**.

14. The Playback Agreement was drafted by Delphi.

15. The Playback Agreement reflects that, as part of the bidding process for the Playback Mechanism, Clarion was required to tie its price quotes to the volume of Playback Mechanisms to be ordered by Delphi.

16. For example, paragraph 4 of the Playback Agreement provided that "[s]upplier needs to complete all pricing matrices for all volume ranges and all years listed in the quotation."

---

[1] The exhibits referenced herein contain confidential, proprietary information and trade secrets regarding both Clarion and Delphi. Accordingly, Clarion is filing this Complaint without the referenced exhibits pending the entry of a protective order. It should be noted, however, that Clarion will serve Delphi with a complete copy of the Complaint and exhibits as well as a draft stipulated protective order and will supplement its Complaint with the referenced exhibits upon entry of the protective order.

3

17.  Further, paragraph 5 of the Playback Agreement provided that:

> To be considered for Playback Mechanism business, the supplier must fully complete the cost breakdown sheet provided in the quotation. Suppliers will fully cooperate in the Delphi Cost Management Process.

18.  Paragraph 24 of the Playback Agreement further stated that if Clarion was selected as a supplier as a result of the quotation process:

> [T]he agreement between Delphi and the supplier will be documented on the new Delphi Long-Term Agreement (LTA) Form which does not specify volumes. It will have pricing based on an established Estimated Annual Usage (EAU) for the program at the time of the business award. The EAU will not be documented on the LTA.

19.  Finally, the last paragraph of the Playback Agreements provided that:

> The supplier signature below designates that the supplier understands these Playback Mechanism Conditions and agrees to comply with all these requirements to be considered for future Playback Mechanism business. Failure to comply with any of these Conditions will be grounds from removal from the Playback Mechanism bid list.

20.  Therefore, in order to be considered for the Playback Mechanism business, Clarion had to execute the Playback Agreements, which clearly contemplated volume-based pricing; indeed, the Playback Agreements required Clarion to submit volume-based bids.

21.  Clarion submitted a signed Playback Agreement on May 15, 2002, accompanying its first bid for the product. Clarion added the following language to paragraph 24 of the Agreement: "Pricing herein is volume based. Price will be based on actual shipped volume for the given calendar year." A true and accurate copy of this Playback Agreement is attached hereto as **Exhibit C**.

22.  Bidding for the DA4.5/4.5C Playback Mechanism then proceeded through several rounds, including an on-line bidding auction. At all relevant times, Delphi requested and Clarion provided price quotes tied to particular volume scenarios. *See* **Exhibit D**, which is a true and

accurate copy of the quote conditions for the online bidding event for the DA4.5/4.5C product and which reflects this bracketed pricing.

23. Subsequent to the e-bidding process, Clarion submitted a quotation for the DA4.5/4.5C Playback Mechanism on or about September 3, 2002. That quotation is attached hereto as **Exhibit E**. The quote contains the following volume-based pricing scenarios:

|  | CY04 | CY05 | CY06 | CY07 |
|---|---|---|---|---|
| Lot 1 (0.5-1M) | N/A | N/A | N/A | N/A |
| Lot 2 (1-1.5M) | 16.20 | 15.39 | 14.62 | 14.04 |
| Lot 3 (1.5-2M) | 15.26 | 14.50 | 13.78 | 13.22 |
| Lot 4 (2-3M) | 15.26 | 14.50 | 13.78 | 13.22 |

24. Clarion reiterated this pricing offer in a June 4, 2003 bid, which tied its offer of $15.26 for the 2004 calendar year on the DA4.5/4.5C Playback Mechanism to a volume of at least 1.5M in that year. Clarion offered that "[i]f volume does not reach 1.5M, price is $16.20 retroactive to 1/1/04." A true and accurate copy of this quote is attached hereto as **Exhibit F**.

25. Delphi notified Clarion that it had been selected to supply the DA4.5/4.5C Playback Mechanism by sending it a Nomination Letter on or about September 25, 2003. A true and accurate copy of the Nomination Letter is attached hereto as **Exhibit G**.

26. The Nomination Letter, among other things, reflected the $15.26 price quote for the DA4.5/4.5C Playback Mechanism in 2004 calendar year, and expressly noted that such price was "based on more than 1.5M units in CY 04." Further, the Nomination Letter continued, "If volume does not reach 1.5M, price is $16.20 retroactive to 1/1/04," reflecting Clarion's volume-bracketed pricing for the 2004 calendar year on its September 3, 2002 and June 4, 2003 price quotes.

27. The Nomination Letter constituted Delphi's acceptance of Clarion's volume-based offer to supply the DA4.5/4.5C Playback Mechanism.

5

28. Thereafter, Clarion and Delphi entered into the Long Term Agreement, which set forth additional, consistent terms for the supply of the DA4.5/4.5C Playback Mechanism. A true and accurate copy of the Long Term Agreement is attached hereto as **Exhibit H**.

29. The Long Term Agreement provides that Clarion agrees to sell and Delphi agrees to purchase 100% of Delphi's requirements for the Playback Mechanisms. Moreover, all Playback Mechanisms are to be purchased through purchase orders issued by Delphi.

30. The Long Term Agreement reflected the parties' understanding that the pricing on the DA4.5/4.5C Playback Mechanism contained therein was predicated upon Delphi's commitment to purchase 1.5M units annually. The per-unit-price specified in the Long Term Agreement for the 2005 through 2007 calendar years reflects the pricing Clarion submitted for volumes in excess of 1.5M in its September 3, 2002 quote.

31. The Long Term Agreement is silent with respect to what price should govern in the absence of Delphi meeting its volume expectations.

32. The Long Term Agreement does not contain an integration clause.

33. Instead, Delphi's General Terms and Conditions, a separate contract that Delphi drafted, was incorporated by reference into the Long Term Agreement. A true and accurate copy of the General Terms and Conditions is attached hereto as **Exhibit I**.

34. The General Terms and Conditions define the "Contract" to which its terms apply broadly, as follows:

> [T]hese General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition work order, shipping instruction, specification **and other document**, whether expressed in written form, by electronic data interchange or other tangible format, **relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").**

35. Thus, the Playback Agreement, price quotes, Nomination Letter, and the Long Term Agreement, are all, under the terms of Delphi's General Terms and Conditions, part of the operative "Contract."

## II. The GIX & GIX-MP3 Playback Mechanism Contracts.

36. On or about November 8, 2002, Delphi issued a Request for Quotation on an Integrated 6-Disc CD Changer (or ICDX, for short) both with and without MP3 capabilities. These ICDX Playback Mechanisms later came to be termed the Clarion GIX and GIX-MP3 Playback Mechanisms, and will be referred to herein individually as such or collectively as the ICDX Playback Mechanisms.

37. A true and accurate copy of the Request for Quotation, which again solicited volume-bracketed pricing, is attached hereto as **Exhibit J.**

38. Clarion responded to this Request for Quotation on or about November 18, 2002, and submitted prices for each of the volume scenarios requested. A true and accurate copy of Clarion's November 18, 2002 quote is attached hereto as **Exhibit K.**

39. Bidding on the GIX and GIX-MP3 Playback Mechanisms proceeded through several rounds of negotiations.

40. On or about June 4, 2003, Clarion submitted a price quote on the GIX and GIX-MP3 Playback Mechanisms with volume bracketed pricing for two volume ranges: from 500K to 750K and from 750K and up. A true and accurate copy of this quote is attached hereto as **Exhibit L.**

41. A subsequent September 30, 2003 price quote from Clarion reflected that Delphi had already achieved a $1.00 price break on its calendar year 2003 pricing for Clarion's 4.5/4.5C Playback Mechanism on the condition that a minimum volume of 500K ICDX Playback Mechanisms be awarded annually. Clarion's September 30, 2003 price quote again separately

7

quoted the GIX product for the 500K-to-750K and 750K-and-up volume ranges. A true and accurate copy of this quote is attached hereto as **Exhibit M**.

42. On November 7, 2003, Delphi issued a Nomination Letter to Clarion on the GIX Playback Mechanism business. The Nomination Letter reflected volume-bracketed pricing for the GIX Playback Mechanism (500K-to-750K and 750K-plus volume ranges) and further stated that "Delphi DE will guarantee Clarion a minimum of 500,000 units. Delphi's volume forecast shows quantities greater than 750K for Clarion." A true and accurate copy of the Nomination Letter is attached hereto as **Exhibit N**.

43. In the course of negotiations over the GIX and GIX-MP3 business, Delphi had determined that Delphi would purchase a GIX product only, and that it would develop the MP3 technology off-board.

44. However, in the Fall of 2003 (and after Delphi had issued the November 7, 2003 Nomination Letter), Delphi reversed course and decided it would include the MP3 technology on the playback mechanism, pushing the requirement to develop the MP3 technology back on the playback mechanism suppliers.

45. Thus, Delphi advised Clarion that it was soliciting new bids for the GIX and GIX-MP3 Playback Mechanisms, contingent upon a supplier's ability to deliver a GIX-MP3 Playback Mechanism for a 2006 model year launch.

46. Clarion engaged in subsequent rounds of bidding for the GIX and GIX-MP3 Playback Mechanism business.

47. On May 17 and May 19, 2004, Delphi solicited requests for quotations on the GIX and GIX-MP3 Playback Mechanisms, respectively.

48. Clarion submitted a July 14, 2004 quote for the GIX and GIX-MP3 Playback Mechanisms that was "[b]ased on 750K annual ICDX usage" across both products. A true and accurate copy of the July 14, 2004 quote is attached hereto as **Exhibit O**. This quote would serve as the basis for future price negotiations between Delphi and Clarion, reflecting price adjustments made to accommodate different mounting assemblies (brackets) requested by Delphi.

49. On September 9, 2004, Clarion submitted updated price quotes on the GIX and GIX-MP3 Playback Mechanisms based upon the July 14, 2004 pricing letter, plus the cost associated with the bracket that Delphi had requested for each product. Clarion's quote reflected that the price was based upon a "total combined volume for ICDX (with and without MP3)" that would exceed 750K. True and accurate copies of the September 9, 2004 price quotes are attached hereto as **Exhibit P**.

50. Delphi issued Clarion a second Nomination Letter awarding it the ICDX Playback Mechanism business on or about October 21, 2004. The Nomination Letter incorporated the pricing reflected in Clarion's September 9, 2004 quote and the conditions and terms of its July 14, 2004 pricing letter, including the 750K combined minimum volume for both the GIX and GIX-MP3 Playback Mechanisms. A true and accurate copy of the Nomination Letter is attached hereto as **Exhibit Q**.

51. Thereafter, in May 2005, Delphi requested that Clarion submit pricing for the ICDX mechanisms for the 2008 and 2009 model years. Clarion responded with its 2008 and 2009 model year prices, which were conditioned upon an increase in Delphi's product volume from 750K to 1M combined units.

52. In connection with those 2008 and 2009 model year quotes, Clarion submitted a Playback Agreement for the ICDX Playback Mechanism business on or about May 13, 2005. The Playback Agreement contained the same relevant language discussed above in paragraphs 14 to 20 of this Complaint, incorporated herein in their entirety, regarding the submission of volume-bracketed pricing. A true and accurate copy of the ICDX Playback Agreement is attached hereto as **Exhibit R**.

53. In addition, Clarion noted in paragraph 24 of the ICDX Playback Agreement that it "reserve[d] the right to open price negotiations if the actual volume falls below 80% of the established EAU in which the business was awarded." *See* **Exhibit R**.

54. On or about August 9, 2005, Clarion entered into a Long Term Agreement for the GIX and GIX-MP3 Playback Mechanisms. The Long Term Agreement reflected that the pricing for the 2007 and 2008 model years on both Playback Mechanisms was premised on a combined EAU of over 1 M units. A true and accurate copy of the Long Term Agreement is attached hereto as **Exhibit S**.

55. Regarding a new product number for the GIX Playback Mechanism, Delphi and Clarion negotiated a higher price in September 2005 (attached hereto as **Exhibit T** is a true and accurate copy of Clarion's September 20, 2005 price quotation) and issued an amended Long Term Agreement on October 1, 2005. A true and accurate copy of the Long Term Agreement is attached hereto as **Exhibit U**.

56. Once again, the Long Term Agreements for the ICDX Playback Mechanisms are silent with respect to what price should govern in the absence of Delphi meeting its volume expectations.

57. As with the Long Term Agreement for the DA4.5/DA4.5C Playback Mechanism, the Long Term Agreements for the ICDX Playback Mechanisms did not contain an integration clause and incorporated Delphi's General Terms and Conditions, with the same effect described in paragraphs 31 through 35 (incorporated herein in their entirety) as defining the operative "Contract" between Delphi and Clarion to include all documents regarding the negotiations over the GIX and GIX-MP3 Playback Mechanism business.

### III. The DA5C Playback Mechanism Contract.

58. On or about January 16, 2004, Delphi requested that Clarion submit a price quote on its next generation Single Play CD Playback Mechanism for the 2006 to 2008 model years, which would come to be termed the Clarion DA5C Playback Mechanism. A true and accurate copy of this Request for Quotation is attached as **Exhibit V**. As before, Delphi represented that the "quotation was volume based" and that Clarion should provide prices for a variety of product/volume scenarios. *See* **Exhibit V**.

59. Clarion responded to Delphi's request on or about January 27, 2004 and submitted a price quote with volume-bracketed pricing, as well as a Playback Agreement that contained the same terms discussed in paragraphs 14 through 20 of this Complaint, which are incorporated here in their entirety. A true and accurate copy of Clarion's January 27, 2004 response is attached hereto as **Exhibit W**.

60. For many months thereafter, Clarion and Delphi continued to negotiate pricing for Clarion's DA5C next-generation single CD Playback Mechanism. On April 18, 2005, Clarion submitted what would prove to be its final quote for the DA5C Playback Mechanism Business. The quote reflected that the price for the DA5C Playback Mechanism was based upon a total volume of 250K. Clarion stated in the quote that its prior offers were based on a significantly higher unit volume and that the price increase in the April 18, 2005 quote from prior offers was

11

"due to [a] significant drop in EAU." A true and accurate copy of the April 18, 2005 quote is attached hereto as **Exhibit X**.

61. Clarion submitted a new Playback Agreement for the DA5C Playback Mechanism along with its April 18, 2005 quote. The Playback Agreement contained the same relevant language discussed above in paragraphs 14 to 20 of this Complaint, incorporated herein in their entirety, regarding the submission of volume-bracketed pricing. A true and accurate copy of the Playback Agreement is attached hereto as **Exhibit Y**.

62. On or about May 9, 2005, Clarion and Delphi entered into a Long Term Agreement for the DA5C Playback Mechanism. The Long Term Agreement reflected the pricing for the DA5C Playback Mechanism contained in Clarion's April 18, 2005 quote. A true and accurate copy of the Long Term Agreement for the DA5C Playback Mechanism is attached hereto as **Exhibit Z**.

63. The Long Term Agreement for the DA5C Playback Mechanism did not state an EAU, and was silent with respect to what pricing should govern in the absence of Delphi meeting the volume expectations reflected in Clarion's April 18, 2005 price quote.

64. As was the case with respect to the other Playback Mechanisms discussed herein, the Long Term Agreement for the DA5C Playback Mechanism did not contain an integration clause and incorporated Delphi's General Terms and Conditions, with the same effect described in paragraphs 31 through 35 (incorporated here in their entirety) as defining the operative "Contract" between Delphi and Clarion to include all documents regarding the negotiations over the DA5C Playback Mechanism business.

### Delphi Breaches Its Volume-Based Pricing Contracts With Clarion

65. After entering into the Long Term Agreements on the Playback Mechanisms, Delphi issued purchase orders for Playback Mechanisms, and Clarion began supplying product.

66. Historically, Delphi was able to meet its higher-volume commitments.

67. But beginning in the Fall of 2005 (on or after October 8, 2005), Clarion began to notice that Delphi's on-demand orders of product were consistently falling short of monthly expectations, with the effect that Delphi would not be able to meet its high-volume commitments.

68. Clarion is not obligated to continue to supply product at the higher-volume pricing reflected in the Long Term Agreements unless Delphi is able to meet the corresponding volume commitment justifying that price.

69. Clarion has objected in writing to Delphi's continued insistence upon paying only the higher-volume prices for the Playback Mechanisms, despite its inability to meet the targeted volumes.

70. Clarion twice met with Delphi on March 1 and 8, 2006 in an effort to resolve this pricing dispute, but was unsuccessful.

71. Clarion has continued to supply Delphi with the Playback Mechanisms up to the present, under continuing objection to the pricing structure.

### Count I -- Declaratory Judgment

72. Clarion hereby incorporates paragraphs 1 through 71 of its Complaint as if fully contained herein.

73. At all relevant times, Delphi requested and Clarion submitted price quotes for each of the Playback Mechanisms that were premised upon particular product volume expectations.

74. At all relevant times, it was the intent of the parties that Clarion agree to charge a certain price for the Playback Mechanisms in anticipation that Delphi would order sufficient quantities of particular products to justify that price.

13

75. As exemplified by the parties' course of dealing through the negotiations over the Playback Mechanisms and as reflected in the respective "Contracts" for those Playback Mechanisms, the operative pricing contained in the Long Term Agreements was premised upon a particular product-volume expectation, often reflected in the Long Term Agreement as the EAU.

76. As exemplified by the parties' course of dealing and the "Contracts" as defined by Delphi's General Terms and Conditions, the parties agreed that Clarion would charge and Delphi would pay a higher price should Delphi not meet the minimum volume expectations justifying the operative price contained in the Long Term Agreements, and with respect to at least one Playback Mechanism, the parties agreed upon a specific lower-volume price.

77. In addition and/or alternatively, the parties' minds have not met, and no agreement was reached on a price term for the Playback Mechanisms in the circumstances of Delphi not meeting its agreed upon volume expectations.

78. Clarion is not obligated under the terms of the "Contracts" regulating the supply of each of the Playback Mechanisms to continue to supply the Playback Mechanisms at prices that do not reflect the actual order volumes being placed by Delphi.

79. An actual, substantial, and *bona fide* controversy exists between Clarion and Delphi, of immediacy and reality, and which can be resolved by a declaration of the parties' rights. Specifically, Delphi's continued insistence to pay only the higher-volume prices on the Playback Mechanisms, despite its failure to meet the volume expectations justifying those prices, creates a controversy resulting in significant and ongoing economic damage to Clarion.

80. The rights of the parties to this controversy can be finally determined by a declaratory judgment from this Court. A declaratory judgment would serve the useful purpose of

settling the controversy, in that such a judgment would eliminate further litigation by finally establishing the parties' rights.

81. WHEREFORE Clarion requests that this Court declare that:

  a) Delphi requested and Clarion submitted price quotes for each of the Playback Mechanisms that were premised upon specific and particularized product volume expectations;

  b) The parties at all material times and circumstances intended that Clarion would charge a specific price for each of the Playback Mechanisms in anticipation that Delphi would order enough of that product to justify that price;

  c) The parties reached an agreement, as reflected in the documents comprising the respective "Contracts" for each of the Playback Mechanisms, that the operative pricing contained in the Long Term Agreements was premised upon specific and particularized product-volume expectations, often reflected in the Long Term Agreement as the EAU;

  d) The parties agreed that Clarion would charge and Delphi would pay a higher price should Delphi not meet the minimum volume expectations justifying the operative price contained in the Long Term Agreements, and with respect to at least one Playback Mechanism, the parties agreed upon a specific lower-volume price;

  e) In addition and/or alternatively, the parties' minds have not met, and no agreement was reached on a price term for the Playback Mechanisms in the circumstances of Delphi not meeting its agreed upon volume expectations;

  f) Clarion is not obligated under the terms of the "Contracts" regarding each of the Playback Mechanisms to continue to supply the Playback Mechanisms at higher-

volume prices that do not reflect the actual order volumes being placed by Delphi or under any circumstance; and

g) Clarion be awarded all other relief just and proper in the premises, including all available remedies contemplated by the Uniform Commercial Code, as adopted by Michigan law, or otherwise.

### Count II -- Breach of Contract

82. Clarion hereby incorporates paragraphs 1 through 81 of its Complaint as if fully contained herein.

83. At all relevant times, Delphi requested and Clarion submitted price quotes for each of the Playback Mechanisms that were premised upon particular product volume expectations.

84. At all relevant times, it was the intent of the parties that Clarion agree to charge a certain price for the Playback Mechanisms in anticipation that Delphi would order sufficient quantities of particular products to justify that price.

85. As exemplified by the parties' course of dealing through the negotiations over the Playback Mechanisms and as reflected in the respective "Contracts" for those Playback Mechanisms, the operative pricing contained in the Long Term Agreements was premised upon a particular product-volume expectation, often reflected in the Long Term Agreement as the EAU.

86. Clarion has demanded, and Delphi has refused, that Delphi adjust its pricing to recognize its diminished product-volume expectations.

87. Delphi's refusal to adjust its pricing to accommodate lower-product-volume scenarios and its continued insistence upon remitting only on Clarion's higher-volume pricing structure constitutes a breach of Delphi's "Contracts" with Clarion on the Playback Mechanisms.

88. Clarion has suffered economic damage in Delphi's refusal to adjust its pricing on the Playback Mechanisms in an amount to be determined by expert testimony at trial, but in any event, exceeding $25,000.

89. WHEREFORE, Clarion requests that the Court:

a) enter judgment against Delphi and in favor of Clarion in excess of $25,000, together with pre-judgment and post-judgment interest on the entire judgment amount at the highest rate permitted by law until the judgment, with interest, is paid in full; and

b) grant such other and further relief this Court deems just and equitable under the circumstances, including all relief contemplated by the Uniform Commercial Code, as adopted by Michigan law, or otherwise.

Respectfully Submitted,

BARNES & THORNBURG LLP
Attorneys for Plaintiff

Dated: November 14, 2006

By: *Scott R. Murphy*
Scott R. Murphy (P68015)
Business Address and Telephone Number:
  300 Ottawa Avenue, N.W., Suite 500
  Grand Rapids, MI 49503
  (616) 742-3930

335529v2