Hearing Date and Time: January 5, 2007 at 10:00 a.m.
Objection Deadline: January 2, 2007 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :
      In re                    :     Chapter 11
                         :
DELPHI CORPORATION, et al.,   :     Case No. 05-44481 (RDD)
                         :
            Debtors.     :     (Jointly Administered)
                         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1),
364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND
6004(g) (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND (II)
AUTHORIZING DEBTORS TO REFINANCE SECURED POSTPETITION
<u>FINANCING AND PREPETITION SECURED DEBT</u>

("DIP REFINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Expedited Motion (the "Motion") for an Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt. In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 105,

361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001 and 6004(g) of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets

of approximately $17.0 billion.[1]   At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

4

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.      The Debtors' Transformation Plan

        11.      On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

        12.      Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

13.     By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) authorizing debtors to obtain post-petition financing and (ii) authorizing debtors to refinance secured post-petition financing and prepetition secured debt (the "Replacement Financing Facility").

Basis For Relief

14.     The Debtors seek approval to enter into the approximately $4.5 billion Replacement Financing Facility because, after reviewing the current strong conditions in the capital markets and assessing the positive momentum of the Debtors' reorganization cases, the Debtors have determined that they could replace their existing prepetition and postpetition financing on more favorable terms.  Under the terms of the Replacement Financing Facility the Debtors estimate that they would save approximately $8 million per month in financing costs. These savings result from the fact that the interest rate under the Replacement Financing Facility would be lower than the accrual rate for the adequate protection payments in respect of the secured prepetition credit facilities, which the Debtors propose to repay with a portion of the proceeds of the Replacement Financing Facility.  Adequate protection payments are currently required to be made to the secured prepetition lenders pursuant to the existing DIP financing order because the current DIP facility primes the secured prepetition credit facilities.  In recognition of the favorable environment in the capital markets and to minimize the transaction fees payable by the Debtors, the Debtors have accepted the lenders' undertaking on a best efforts basis without underwriting by the lenders.

15.     The Replacement Financing Facility provides an appropriate foundation from which to negotiate and secure emergence financing.  Among other things, the savings

6

generated would preserve additional value of the Debtors' estates and would enhance the

Debtors' ability to implement their transition plan and emerge from chapter 11 protection.

Contemporaneously with the filing of this Motion, the Debtors filed the Expedited Motion for

Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to

Sections 105(a), 363(b), 503(b) And 507(a) of the Bankruptcy Code and the Plan Framework

Support Agreement Pursuant to Sections 105(a), 363(b), And 1125(e) of the Bankruptcy Code

("Plan Investment And Framework Support Approval Motion").  The Plan Investment And

Framework Support Approval Motion seeks approval of (a) a proposed "Plan Framework

Support Agreement," signed by Delphi, the Plan Investors (as defined below) and GM, which

outlines the potential treatment of the Debtors' stakeholders in the Debtors' anticipated plan of

reorganization and provides a framework for several other aspects of the Debtors' chapter 11

reorganization and (b) a proposed equity purchase and commitment agreement (the "Equity

Purchase and Commitment Agreement") with affiliates of Cerberus Capital Management, LP,

Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch,

Pierce, Fenner & Smith, Incorporated and UBS Securities LLC (the "Plan Investors") to invest

up to $3.4 billion in preferred and common equity in the reorganized Debtors to support the

Company's transformation plan announced on March 31, 2006 and the Debtors' plan of

reorganization framework agreement.  The Replacement Financing Facility together with the

Plan Framework Support Agreement and the Equity Purchase and Commitment Agreement

represent significant milestones in the Debtors' reorganization and another major step forward

towards emergence.  While there is much that remains to be accomplished in the Debtors'

reorganization, the Debtors and their stakeholders are together navigating a course that should

lead to consensual resolution with the Debtors' U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.

A.    The Existing Postpetition Credit Agreement

16.    Pursuant to the Final Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001  and 9014 (I) Authorizing Debtors to Obtain Postpetition Financing, (II) To Utilize Cash Collateral and (III) Granting Adequate Protection to Prepetition Secured Parties entered on October 28, 2005 (the "Final DIP Order") (Docket No. 797), the Court authorized the Debtors to enter into a $2 billion postpetition credit facility (the "Existing DIP Facility") governed by a DIP Credit Agreement  (as amended, the "Existing Credit Agreement").  The Existing DIP Facility consists of a $1.75 billion revolving line of credit (the "Existing DIP Revolver") and a $250 million term loan (the "Existing DIP Term Loan").  The Existing DIP Facility is secured by (a) a perfected first-priority lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered assets (subject to certain exclusions), (c) superpriority administrative expense claims under section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the Existing DIP Facility, and (d) a first priority senior priming lien under section 364(d)(1) of the Bankruptcy Code on substantially all of the Debtors' property, which lien primes the obligations under the Prepetition Credit Agreement (as defined below).

17.    The Existing DIP Facility has a current maturity date of October 8, 2007, and is to be used for working capital and general corporate purposes.  The interest rate for the Existing DIP Facility is LIBOR plus 275 basis points (currently 8.12%) for funds drawn.  A more detailed description of the terms of the Existing DIP Facility is contained in the Motion for

Approval of the Final DIP Order dated October 8, 2005 (Docket No. 0042), the Final DIP Order,

and the form of Existing Credit Agreement attached thereto.

B.      The Prepetition Credit Agreement

18.      The Debtors' primary secured obligations arose under that certain Third

Amended and Restated Credit Agreement, dated as of June 14, 2005, among Delphi, as

borrower, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the

"Prepetition Agent"), the lenders from time to time party thereto (the "Prepetition Secured

Lenders"),[3] Citicorp USA, Inc., as syndication agent, and various documentation agents,

bookrunners, and arrangers (as amended, supplemented, or otherwise modified from time to

time, the "Prepetition Credit Agreement").

19.      The Prepetition Credit Agreement provides for revolving loans, term

loans, swingline loans, and the issuance of letters of credit up to an aggregate principal amount

of $2.825 billion.  Proceeds under the Prepetition Credit Agreement were used for Delphi's

general corporate purposes including Investments (as such term is defined in the Prepetition

Credit Agreement) in subsidiaries of Delphi.  The Debtors' obligations as borrower and, in the

case of Delphi's subsidiaries, as guarantors, under the Prepetition Credit Agreement are secured,

with certain exceptions, by substantially all of the Debtors' material tangible and intangible

assets.

20.      As of the Petition Date, Delphi was indebted to the Prepetition Secured

Lenders in the aggregate amount of approximately $2,579,783,051.85 (the "Prepetition Credit

Facility"), consisting of, among other things, (a) revolving loans with an aggregate principal

amount of approximately $1.5 billion, (b) term loans with an aggregate principal amount of

---

[3]      As of December 13, 2006, there were approximately 272 Prepetition Secured Lenders holding positions in the
Prepetition Credit Facility.

approximately $988,329,620.59, and (c) certain reimbursement obligations in respect of letters of

credit in an aggregate amount of approximately $91,453,431.26, in each case plus all accrued

and unpaid interest, fees, costs, expenses, and all charges related thereto.   The Prepetition Credit

Facility and the Existing DIP Facility are referred to collectively as the "Existing Bank Debt."

C.      The Solicitation And Negotiation Of The Replacement Financing Facility

21.      In light of the current strong conditions in the capital markets and the

positive momentum in the Debtors' restructuring process, the Debtors have determined that they

can refinance the Existing Bank Debt on more favorable terms.  Accordingly, the Debtors and

their financial advisor, Rothschild Inc. ("Rothschild") performed a search for replacement

financing.  Due to the Debtors' expected emergence from chapter 11 protection in the first half of

2007 and the time it would take for an unfamiliar lender to complete its diligence, this

solicitation was necessarily limited to lenders who had already conducted extensive due

diligence of the Debtors, and included the current DIP agent, JP Morgan Chase Bank, N.A.

("JPMorgan"), and one other lender group led by two major investment banks.  Bringing in new

lenders at this time would have been too time-consuming in light of the Debtors' planned exit

from bankruptcy, and many of the cost savings available would have been lost by the time new

lenders were sufficiently knowledgeable of the Debtors' financial conditions.  Speed in

completing the transaction is also critical to avoid potential adverse changes in currently

favorable market conditions.

22.      After receiving proposals from JPMorgan and the other bidding

investment banks, the Debtors and Rothschild further negotiated the terms contained in each

proposal with the parties involved and, at the conclusion of this process, the Debtors determined,

with the assistance of Rothschild, that the proposal submitted by JPMorgan offered the most

10

favorable terms.  This decision was based in part on the transaction cost savings and efficiency

that could be obtained by using the Debtors' established lending agent.  In making this decision,

the Debtors were also assisted by Skadden as their principal restructuring and bankruptcy

counsel, and by their special counsel, Shearman & Sterling LLP ("Shearman").    Shearman has

further assisted in the negotiation and evaluation of the transaction, and has taken the primary

role in preparing the transaction documents.  The term sheet submitted by JPMorgan (the "Term

Sheet") reflects the terms of the Replacement Financing Facility and was the culmination of

efforts by the Debtors, Rothschild, Skadden, and Shearman and their arms-length negotiations

with JPMorgan.    A copy of the Term Sheet is attached hereto as <u>Exhibit A</u>.  As set forth in the

Term Sheet, JPMorgan will act as the administrative agent for the lenders under the Replacement

Financing Facility (the "Replacement DIP Lenders").

    23.  In determining to seek approval of the Replacement Financing Facility

from JPMorgan, the Debtors considered many factors.  First, JPMorgan's preexisting knowledge

of the Debtors' businesses and their collateral provides significant benefits, including, but not

limited to, the speed with which JPMorgan is able to close the transaction.  JPMorgan's

institutional knowledge as the Debtors' current agent for the lending group also provides greater

certainty with respect to rapid execution and syndication of the Replacement Financing Facility.

Additionally, JPMorgan has historically worked well with the Debtors to establish favorable

lending terms and is best suited to market the Replacement Financing Facility to the capital

markets.

D.  <u>Terms Of The Replacement Financing Facility</u>

    24.  The Debtors have determined, in the exercise of their sound business

judgment, that the Replacement Financing Facility would allow them to continue to meet their

restructuring goals as well as their ongoing working capital and general business needs on terms

more favorable than those of the Existing DIP Facility, particularly considering the

discontinuation of the adequate protection package for the Prepetition Secured Lenders.  The

Debtors therefore seek approval of the Replacement Financing Facility, which will be

documented by a replacement credit agreement (the "Replacement Credit Agreement"),[4] and

authority to enter into the commitment and pay the fees related thereto.  The purposes for which

the Replacement Financing Facility would be used are working capital and other general

corporate expenses and payment in full of the Existing Bank Debt.

        25.      The Replacement Financing Facility will have essentially the same terms

as the Existing DIP Facility (See ¶¶ 16 and 17 above), save for certain key exceptions

summarized below, all of which are beneficial for the Debtors and their estates.  Most noticeably,

the Debtors' $4.5 billion Replacement Financing Facility increases the size of the Debtors'

secured postpetition financing by approximately $2.495 billion.  This increase is a result of the

refinancing of the Prepetition Credit Facility, which is to be achieved by repaying this debt

(approximately $2.495 billion) with the proceeds of a second-priority DIP term loan (the

"Second-Priority DIP Term Loan").  While the refinancing will thus (subject to certain

exceptions to be preserved) result in an elevated priority for approximately $2.495 billion of the

Debtors' capital structure, the debt under this facility was (subject to certain exceptions to be

preserved) first in priority after the Existing DIP Facility and was expected to be paid in full,

rendering the difference in priority inconsequential.  The super-priority claims and liens granted

to the Second-Priority DIP Term Loan will be junior to those granted to the refinanced DIP

---

[4]    Due to the necessity of filing this Motion on an expedited basis, the Debtors and JPMorgan have not yet
finalized the terms of the Replacement Credit Agreement.  The form of Replacement Credit Agreement will be
filed and served electronically to the parties required by the Scheduling Order (as defined below) and posted on
the Debtors' website, www. delphidocket.com, no later than December 26, 2006.

Revolver and first-priority DIP term loan under the Replacement Financing Facility.

Furthermore, the proposed order granting this Motion is designed to maintain in all material

respects the relative priority of liens of third party creditors (including, without limitation, setoff

claimants) with respect to the Replacement Financing Facility that such parties have with respect

to the Existing DIP Facility under the Final DIP Order.[5]

        26.      The refinancing of the Prepetition Credit Facility would save the Debtors

considerable interest and adequate protection costs for the remainder of their bankruptcy

proceedings.  The interest rate for the Prepetition Credit Facility currently ranges from 400 to

550 basis points over the prime rate, or 12.25% to 13.75%.  Under the refinancing, the interest

rate for this debt would be 325 basis points above LIBOR, or currently 8.62%.  The interest rate

on the refinanced Existing DIP Revolver and the Existing DIP Term Loan will be 25 basis points

lower than the interest rate on the Existing DIP Facility, reducing the current effective interest

rate from 8.12% to 7.87%.  The maturity date would be December 31, 2007, or roughly one year

from the inception of the Replacement Financing Facility, approximately two and a half months

longer than the maturity date of the Existing DIP Facility.  As with the Existing DIP Facility, the

Replacement Financing Facility can mature earlier than the stated maturity date if the Debtors

substantially consummate a plan of reorganization or if the facility is accelerated and terminated

early under the terms of the Replacement Credit Agreement.

        27.      As is typical in all DIP financing, including the Existing DIP Facility, the

Replacement Financing Facility contains a "Carve-Out" memorializing those claims and

expenses that could be superior in right to the Replacement DIP Lenders.  In this case, the Carve-

Out is essentially identical to the carve-out approved in the Final DIP Order (including the same

---

[5]    A blackline of the proposed Order granting this Motion as compared to the Final DIP Order is attached hereto
as <u>Exhibit B</u>.

dollar limitations) but certain fees and expenses of the Plan Investors are included within the

scope of such protection.  Specifically, pursuant to the Equity Purchase and Commitment

Agreement, Delphi has agreed, subject to Bankruptcy Court approval, to reimburse or pay, as

applicable, the Plan Investors' Transaction Expenses (as summarized below and defined in

section 2(j) of the Equity Purchase and Commitment Agreement) incurred from and after entry

of an order approving the Plan Investment and Framework Support Approval Motion.  The

Debtors have also agreed to include such Transaction Expenses in the Carve-Out.  At the

Debtors' request, JPMorgan has reviewed this concept and has agreed to the Debtors' Carve-Out

request. (See ¶ 5 of the proposed order granting this Motion).  In summary the Transaction

Expenses are out-of-pocket costs and expenses reasonably incurred by each Plan Investor on or

before the effective date of a plan of reorganization (and reasonable post-closing costs and

expenses relating to the closing), including reasonable fees, costs, and expenses of counsel to

each of the Plan Investors, and reasonable fees, costs and expenses of any other professionals

retained by any of the Plan Investors in connection with (a) the transactions contemplated

(including investigating, negotiating and completing such transactions), (b) these chapter 11

cases, and (c) judicial and regulatory proceedings related to such transactions and these chapter

11 cases.

28.    Due to the proposed repayment of the Prepetition Credit Facility, the

proposed order approving the Motion provides that the January 18, 2007 deadline (as extended

on multiple occasions) under paragraph 16 of the Existing DIP Order for the Creditors'

Committee to, among other things, (i) challenge the validity, enforceability, priority or extent of

the Prepetition Secured Lenders' collateral and liens, (ii) assert that the debt under the Prepetition

Credit Facility is undersecured, or (iii) bring avoidance actions against the Prepetition Secured

14

Lenders (collectively, the "Lien Claims and Defenses") would be terminated upon entry of the proposed order. This relief is appropriate because the Debtors do not believe that it is conceivable that the Prepetition Credit Facility is undersecured or that the Prepetition Secured Lenders would not be paid in full under any plan of reorganization proposed in these cases. Accordingly, unlike many other prepetition claims, the Debtors are carrying this liability on their books as a liability not subject to compromise. In further support of this conclusion, the Plan Framework Support Agreement filed contemporaneously herewith proposes that the Prepetition Credit Facility would be refinanced and paid in full under an anticipated plan of reorganization. Furthermore and equally important, despite the two week curtailment to the Creditors' Committee deadline, the Debtors' believe that the Creditors' Committee would not be prejudiced by this relief because it has had ample opportunity over the last 14 months to investigate and assert any Lien Claims and Defenses against the Prepetition Secured Lenders.

29.    Moreover, as previously noted, the savings under the Replacement Financing Facility would be significant. These considerable savings are offset by reasonable one-time refinancing fees. Indeed, the savings the Debtors would realize by refinancing the Existing Bank Debt should exceed the one-time fees and costs in less than two months. In addition, the Debtors will reimburse JPMorgan and the lead arrangers of the Replacement Financing Facility for reasonable costs and fees, and indemnify for any liability, incurred in connection with the refinancing, on the same terms as contained in the Existing DIP Facility. The reimbursement, indemnification, and fees are comparable to those sought by the other bidding investment bank group, and the Debtors believe the fees are representative of the market rates for such financing.

15

30.     It is important to note, as mentioned above, that JPMorgan is undertaking the Replacement Financing Facility on a best efforts basis, and the offering of the facility is not being underwritten by JP Morgan.  The rate decreases set forth above are thus not guaranteed, and represent JPMorgan's best estimate of the rates that will be obtained, based on JPMorgan's extensive experience in deals of this nature.  The lack of underwriting on the Replacement Financing Facility, however, has enabled the Debtors to obtain the refinancing with the accompanying low fees set forth in the Term Sheet and described below.

31.     Moreover, the refinancing of the Existing Bank Debt is permitted under the relevant transaction documents.  Article 2.10 of the Prepetition Credit Agreement specifically permits the Debtors to prepay the Prepetition Credit Facility, and in connection with negotiations related to the consummation of the Existing DIP Facility, the Prepetition Secured Lenders waived their right to any prepayment penalties or premiums.  Furthermore, paragraph 12(c) of the Final DIP Order permits prepayment of the Prepetition Credit Facility if such prepayment is part of a transaction in which the obligations of the Existing DIP Facility and the Prepetition Credit Facility are repaid or refinanced in whole.

32.     The Debtors have been unable to obtain credit from any source on terms more favorable than those offered pursuant to the Replacement Financing Facility and, despite the Debtors' efforts, no proposal submitted was without a priming lien structure.  As set forth above, the refinancing provides significant financial benefits with minimal delay, transaction cost, and disruption because the Debtors have selected JPMorgan to act as agent for the refinancing in full.  Although the Replacement Financing Facility will continue with the same priming lien structure as the Existing DIP Facility, the refinancing of the Prepetition Credit Facility will not impair, in any material respect, the lien positions of other holders of secured

16

claims relative to such facilities.  Indeed, the liens primed under the Existing DIP Facility that were pari passu with the Prepetition Secured Lenders' liens will now be pari passu with the Second-Priority Term Loan.  The Replacement Financing Facility thus represents the best alternative available to the Debtors for reducing their financing costs, and is fair and reasonable.

<u>Applicable Law</u>

A.    <u>This Court Should Authorize The Proposed Replacement Financing Facility</u>

    (a)    <u>The Replacement Financing Facility Is Appropriate Under</u>
          <u>Section 364(c) Of The Bankruptcy Code</u>

33.    The Debtors propose to obtain the Replacement Financing Facility by providing security interests and liens as set forth above pursuant to sections 364(c) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. § 364(c).  This Court has already made this finding in entering the Final DIP Order and the proposals received from JPMorgan and the other investment bank group substantiate the Court's finding.

34.    Section 364(c) financing is appropriate when the trustee or debtor-in-possession is unable to obtain unsecured credit allowable as an ordinary administrative claim. See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987), (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

35.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether

(a)    the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

(b)    the credit transaction is necessary to preserve the assets of the estate; and

(c)    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met when it entered the Final DIP Order.  Because the Replacement Financing Facility is merely a refinancing of the obligations already approved, this Court's findings should continue to apply.

(b)    The Replacement Financing Facility Is Appropriate Under
       Section 364(d) Of The Bankruptcy Code

36.    Section 364(d)(1) provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

(a)    the trustee is unable to obtain credit otherwise; and

(b)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

18

37.      In this case, the Debtors have already established that they are unable to get credit without priming liens.  The priming lien structure under the Replacement Financing Facility, including the adequate protection provided to parties whose liens are primed, will continue essentially unchanged from the Existing DIP Facility.  A key change to this structure is that the effect of the priming liens will be lessened going forward because the Prepetition Secured Debt will be refinanced as the Second-Priority Term Loan.  The resultant increase in the size of the DIP facility should not adversely impact other parties because any liens primed under the Existing DIP Facility will continue in the same relative priority as provided in the Final DIP Order.

       (c)      <u>Compliance With General Order No. M-274</u>

38.      In compliance with the Guidelines for Financing Requests (the "Guidelines"), adopted under General Order No. M-274 of the Board of Judges for the Southern District of New York, the Debtors hereby disclose that the refinancing in full of the Prepetition Credit Facility is an "Extraordinary Provision" within the meaning of section II(A) of the Guidelines.  The Debtors submit that, due to the significant benefits to be obtained for their estates through entry into the Replacement Financing Facility, the Debtors have shown substantial cause in compliance with the Guidelines.  Bankruptcy Courts in the Southern District of New York have regularly approved debtor in possession financing facilities that were used, in part, to repay existing secured credit obligations.  See e.g., <u>In re Delta Air Lines, Inc.</u>, Case No. 05-17923 (PCB) (Bankr. S.D.N.Y. Oct. 6, 2005) (Docket No. 652); <u>In re Winn-Dixie Stores, Inc.</u>, Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. March 23, 2005) (Docket No. 501); <u>In re Footstar, Inc.</u>, Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. May 25, 2004) (Docket No. 621); <u>In</u>

re Solutia Inc., Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. Jan. 16, 2004) (Docket No. 278); In

re Twinlab Corp., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 25, 2003) (Docket No. 80).

        39.     Despite the guidance provided by Guidelines, it is important to note that

the proposed refinancing does not preserve a party's right to unwind the paydown of the

prepetition debt owed to the Prepetition Secured Lenders.  Specifically, the Guidelines suggest

that an "order approving a rollup must ordinarily reserve the right of the Court to unwind the

paydown of the prepetition debt in the event that there is a timely and successful challenge to the

validity, enforceability, extent, perfection, and (where appropriate) priority of the prepetition

lender's claims or liens, or a determination that the prepetition debt was undersecured as of the

petition date."  Nevertheless, the Debtors have determined that this relief is appropriate.  First,

unlike a typical case – which is what the Guidelines generally address –  the refinancing of the

Existing Bank Debt is not occurring on the first day of the Debtors' cases, when little is known

about the nature of the Prepetition Secured Lenders' liens.  To the contrary, these cases have been

ongoing for over 14 months.  During this time there has been ample opportunity for parties-in-

interest (and in particular the Creditors' Committee) to analyze their claims and defenses and to

otherwise examine the validity and enforceability of the Prepetition Secured Lenders' liens.

Second, under the facts and circumstances of these cases, the Debtors do not believe that it is

conceivable that the Prepetition Credit Facility is undersecured.  Indeed, as mentioned above, the

Debtors even record the liability on account of the Prepetition Credit Facility as a liability that is

not subject to compromise, i.e., that debt is anticipated to be paid in full pursuant to a confirmed

plan of reorganization.  Accordingly, termination of the right to assert the Lien Claims and

Defenses is appropriate at this time.  To the extent that any other provisions of the Replacement

Financing Facility are Extraordinary Provisions within the meaning of the Guidelines, those

provisions will be disclosed in the proposed order granting this Motion as such and remain

substantially unchanged from the Final DIP Order as already approved.

       (d)    <u>Continued Use Of Cash Collateral</u>

       40.    The Debtors continue to use the cash generated in the ordinary course of

their businesses to finance their operations and to make essential payments such as employee

salaries, payroll, taxes, and the purchase of goods and materials.  Section 363(c)(2) of the

Bankruptcy Code provides that a debtor-in-possession may not use this "cash collateral" unless-

> (A) each entity that has an interest in such collateral consents; or

> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in
> accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  The Debtors were authorized to use cash collateral under the Final DIP

Order.  While limitations on the use of the Debtors' cash collateral would be largely obviated by

the refinancing of the Prepetition Credit Facility, the Debtors, out of an abundance of caution,

seek approval for continued use of cash collateral to the extent any other party may assert an

interest in such collateral.  To the extent that a party does have such an interest in the Debtors'

cash collateral, that party will be afforded the same adequate protection to which it was entitled

under the Final DIP Order.

       (e)    <u>Application Of The Business Judgment Standard</u>

       41.    As described above, after appropriate investigation and analysis and given

the exigencies of the circumstances, the Debtors' management has concluded that entering into

the Replacement Financing Facility would be beneficial to the Debtors' estates.  This decision is

supported by the multi-million dollar monthly savings in financing costs to be attained through

the Replacement Financing Facility.  Bankruptcy courts routinely defer to the debtor's business

judgment on most business decisions, including the decision to borrow money.  <u>See</u> <u>Group of</u>

Institutional Investors v., Milwaukee St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re

Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor

has exercised its business judgment, a court is not free to second-guess particular provisions but

rather determines whether the proposed action "as a whole is within reasonable business

judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

      42.     The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  Once the

debtor articulates a valid business justification, a presumption arises that "in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a

debtor's business judgment have the burden of rebutting the presumption of validity."  Id.  To

satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather,

an objector "is required to produce some evidence respecting its objections." In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983).

      43.     The Debtors have exercised sound business judgment in determining that

the Replacement Financing Facility is appropriate.  The terms of the Replacement Financing

Facility are fair and reasonable, are on more favorable terms than the Existing Bank Debt, will

save the Debtors millions of dollars per month, and are thus in the best interests of the Debtors'

estates.  Accordingly, the Debtors should be granted authority to enter into the Replacement

Financing Facility and borrow funds on the secured, administrative super-priority and priming

basis described above, pursuant to sections 363 and 364 of the Bankruptcy Code, and take the

other actions contemplated by the Replacement Financing Facility and as requested herein.

B.        Request For Modification Of Automatic Stay

44.        Section 362 of the Bankruptcy Code provides for an automatic stay upon

the filing of a bankruptcy petition pursuant to the Bankruptcy Code.  The proposed Replacement

Financing Facility, like the Existing DIP Facility that it refinances, contemplates a modification

of the automatic stay (to the extent applicable), to:  (a) authorize, but not require, the

Replacement DIP Lenders to file financing statements, deeds of trust, mortgages, or other similar

documents to evidence, validate, and perfect the Replacement DIP Lenders' security interests

granted to them under the Replacement Financing Facility; (b) give the Debtors any notice

provided for in the Replacement Credit Agreement; (c) permit the Replacement DIP Lenders to

execute upon their security interests or exercise other remedies under the loan documents upon

the occurrence of an event of default (as defined in the Replacement Credit Agreement), after

giving five business days' notice in writing, served by hand or telefax upon this Court, the

Debtors' counsel, any trustee of the Debtors, if appointed, counsel for any official creditors'

committee, and the U.S. Trustee; and (d) permit the Replacement DIP Lenders to take such other

actions required or permitted by the loan documents.  Stay modification provisions of this kind

are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in

the Debtors' business judgment, are reasonable under the current circumstances.

C.        The Replacement Financing Facility Should Be Accorded The Benefits Of Section 364(e)

45.        No consideration is being provided to any party to, or guarantor of,

obligations arising under the Replacement Financing Facility, other than as disclosed in the Term

23

Sheet.  Accordingly, the Replacement Financing Facility should be accorded the benefits of

section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

D.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

      46.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Courts in this district have waived this ten-day stay

upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175

(Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown,

the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P.

6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring

demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule

6004(g)).  As stated above, the Debtors would save approximately $8 million per month in

financing costs under the Replacement Financing Facility which equates to significant savings if

the Court relieves the Debtors from the ten-day stay.  The Debtors accordingly assert that a

waiver of the ten-day stay provided by Bankruptcy Rule 6004 would benefit the Debtors and all

parties-in-interest.

## Notice Of Motion

      47.    Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418) (the "Supplemental Case Management Order"), as well as Fed. R. Bankr. P.

4001.  In addition, the Debtors have served, among other parties, the setoff claimants and

objectors to the motion for approval of the Existing DIP Facility. The Debtors have also

provided notice to the agent for the Prepetition Credit Facility and all of the known Prepetition

Secured Lenders currently holding positions in the Prepetition Credit Facility as of December 13,

2006. The Debtors have submitted the proposed Order Scheduling Non-Omnibus Hearings On

Debtors' Plan Investment And Framework Support Approval Motion And Dip Refinancing

Motion (the "Scheduling Order"), setting the hearing for this Motion on January 5, 2007 (the

"January 5 Hearing"). The Scheduling Order provides that parties-in-interest will have until

January 2, 2007 at 4:00 p.m. (Prevailing Eastern Time) to file an objection. In light of the nature

of the relief requested, the Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

48.      Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to refinance the Existing DIP Facility and Prepetition Lender Debt by entering into the Replacement Financing Facility and (b) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            December 18, 2006

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

- and –

SHEARMAN & STERLING LLP

By:    /s/ Andrew V. Tenzer
       Douglas P. Bartner (DB 2301)
       Andrew V. Tenzer (AT 2263)
599 Lexington Avenue
New York, New York  10022
(212) 848-4000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession