IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :
In re                        :    Chapter 11
                           :
DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)
                           :
                 Debtors.    :    (Jointly Administered)
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On December 18, 2006, I caused to be served the documents listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

1) Expedited Motion for Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code ("Plan Investment and Framework Support Approval Motion") (Docket No. 6179) [a copy of which is attached hereto as Exhibit D]

2) Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g)(I) Authorizing Debtors to Obtain Postpetition Financing and (II) Authorizing Debtors to Refinance Secured Postpetition Financing and Prepetition Secured Debt ("DIP Refinancing Motion") (Docket No. 6180) [a copy of which is attached hereto as Exhibit E]

3) Order Pursuant to 11 U.S.C. Section 502(b) and Fed. R. Bankr. P. 3007 Disallowing and Expunging Certain Duplicate and Amended Claims Identified in Second Omnibus Claims Objection ("December Adjourned Responses Second Omnibus Claims Objection Order") (Docket No. 6188) [a copy of which is attached hereto as Exhibit F]

4) Order Under 11 U.S.C. Sections 327(a) and 328 and Fed. R. Bankr. P. 2014 Authorizing Amendment of Fee Structure for Merger and Acquisition Transaction Services Involving Debtors' Steering and Interior Divisions Provided by Rothschild Inc. Nunc Pro Tunc to July 19, 2006 ("Rothschild

Supplemental Retention Order")  (Docket No. 6191) [a copy of which is attached hereto as Exhibit G]

5) Order Scheduling Non-Omnibus Hearings on Debtors' Plan Investment and Framework Support Approval Motion and DIP Refinancing Motion (Docket No. 6193) [a copy of which is attached hereto as Exhibit H]

6) Order Granting Motion of Mary P. O'Neill and Liam P. O'Neill for Relief from Automatic Stay (Docket No. 6198) [a copy of which is attached hereto as Exhibit I]

7) Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 16322 (Inovise Medical, Inc.) ("Statement of Disputed Issues - Inovise Medical, Inc.") (Docket No. 6200) [a copy of which is attached hereto as Exhibit J]

8) Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 2479 (Worldwide Battery Company, LLC) ("Statement of Disputed Issues - Worldwide Battery Company, LLC") (Docket No. 6201) [a copy of which is attached hereto as Exhibit K]

9) Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 13409 (Nissan Technical Center North America, Inc.) ("Statement of Disputed Issues - Nissan Technical Center North America, Inc.") (Docket No. 6202) [a copy of which is attached hereto as Exhibit L]

10) Debtors' Statement of Disputed Issues with Respect to Claim Number 14245 (Lightsource Parent Corporation) ("Statement of Disputed Issues - Lightsource Parent Corporation") (Docket No. 6203) [a copy of which is attached hereto as Exhibit M]

11) Debtors' Statement of Disputed Issues with Respect to Claim Number 2558 (Inplay Technologies, Inc.) ("Statement of Disputed Issues - Inplay Technologies, Inc.") (Docket No. 6204) [a copy of which is attached hereto as Exhibit N]

12) Debtors' Statement of Disputed Issues with Respect to Claim Number 2707 (Laborsource 2000, Inc.) ("Statement of Disputed Issues - Laborsource 2000, Inc.") (Docket No. 6205) [a copy of which is attached hereto as Exhibit O]

13) Debtors' Statement of Disputed Issues with Respect to Claim Number 8324 (Ericka Parker, Chapter 7 Trustee) ("Statement of Disputed Issues - Ericka Parker, Chapter 7 Trustee") (Docket No. 6206) [a copy of which is attached hereto as Exhibit P]

14) Debtors' Statement of Disputed Issues with Respect to Claim Number 11627 (Comptrol Incorporated) ("Statement of Disputed Issues - Comptrol

Incorporated") (Docket No. 6207) [a copy of which is attached hereto as Exhibit Q]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on <u>Exhibit R</u> hereto via overnight delivery:

15) Expedited Motion for Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code ("Plan Investment and Framework Support Approval Motion") (Docket No. 6179) [a copy of which is attached hereto as Exhibit D]

16) Order Scheduling Non-Omnibus Hearings on Debtors' Plan Investment and Framework Support Approval Motion and DIP Refinancing Motion (Docket No. 6193) [a copy of which is attached hereto as Exhibit H]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on <u>Exhibit S</u> hereto via overnight delivery:

17) Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g)(I) Authorizing Debtors to Obtain Postpetition Financing and (II) Authorizing Debtors to Refinance Secured Postpetition Financing and Prepetition Secured Debt ("DIP Refinancing Motion") (Docket No. 6180) [a copy of which is attached hereto as Exhibit E]

18) Order Scheduling Non-Omnibus Hearings on Debtors' Plan Investment and Framework Support Approval Motion and DIP Refinancing Motion (Docket No. 6193) [a copy of which is attached hereto as Exhibit H]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on <u>Exhibit T</u> hereto via overnight delivery:

19) Order Pursuant to 11 U.S.C. Section 502(b) and Fed. R. Bankr. P. 3007 Disallowing and Expunging Certain Duplicate and Amended Claims Identified in Second Omnibus Claims Objection ("December Adjourned Responses Second Omnibus Claims Objection Order") (Docket No. 6188) [a copy of which is attached hereto as Exhibit F]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit U hereto via overnight delivery:

20) Order Under 11 U.S.C. Sections 327(a) and 328 and Fed. R. Bankr. P. 2014 Authorizing Amendment of Fee Structure for Merger and Acquisition Transaction Services Involving Debtors' Steering and Interior Divisions Provided by Rothschild Inc. Nunc Pro Tunc to July 19, 2006 ("Rothschild Supplemental Retention Order")  (Docket No. 6191) [a copy of which is attached hereto as Exhibit G]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit V hereto via overnight delivery:

21) Order Granting Motion of Mary P. O'Neill and Liam P. O'Neill for Relief from Automatic Stay (Docket No. 6198) [a copy of which is attached hereto as Exhibit I]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit W hereto via overnight delivery:

22) Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 16322 (Inovise Medical, Inc.) ("Statement of Disputed Issues - Inovise Medical, Inc.") (Docket No. 6200) [a copy of which is attached hereto as Exhibit J]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit X hereto via overnight delivery:

23) Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 2479 (Worldwide Battery Company, LLC) ("Statement of Disputed Issues - Worldwide Battery Company, LLC") (Docket No. 6201) [a copy of which is attached hereto as Exhibit K]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit Y hereto via overnight delivery:

24) Debtors' Statement of Disputed Issues with Respect to Proof of Claim Number 13409 (Nissan Technical Center North America, Inc.) ("Statement of Disputed Issues - Nissan Technical Center North America, Inc.") (Docket No. 6202) [a copy of which is attached hereto as Exhibit L]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit Z hereto via overnight delivery:

25) Debtors' Statement of Disputed Issues with Respect to Claim Number 14245 (Lightsource Parent Corporation) ("Statement of Disputed Issues - Lightsource Parent Corporation") (Docket No. 6203) [a copy of which is attached hereto as Exhibit M]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit AA hereto via overnight delivery:

26) Debtors' Statement of Disputed Issues with Respect to Claim Number 2558 (Inplay Technologies, Inc.) ("Statement of Disputed Issues - Inplay Technologies, Inc.") (Docket No. 6204) [a copy of which is attached hereto as Exhibit N]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit BB hereto via overnight delivery:

27) Debtors' Statement of Disputed Issues with Respect to Claim Number 2707 (Laborsource 2000, Inc.) ("Statement of Disputed Issues - Laborsource 2000, Inc.") (Docket No. 6205) [a copy of which is attached hereto as Exhibit O]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit CC hereto via overnight delivery:

28) Debtors' Statement of Disputed Issues with Respect to Claim Number 8324 (Ericka Parker, Chapter 7 Trustee) ("Statement of Disputed Issues - Ericka Parker, Chapter 7 Trustee") (Docket No. 6206) [a copy of which is attached hereto as Exhibit P]

On December 18, 2006, I caused to be served the document listed below upon the parties listed on Exhibit DD hereto via overnight delivery:

29) Debtors' Statement of Disputed Issues with Respect to Claim Number 11627 (Comptrol Incorporated) ("Statement of Disputed Issues - Comptrol Incorporated") (Docket No. 6207) [a copy of which is attached hereto as Exhibit Q]

Dated: December 20, 2006

_____/s/ Evan Gershbein_____
Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 20th day of December, 2006, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ____/s/ Shannon J. Spencer_____

Commission Expires: ___6/20/10_____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein<br>Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092<br>212-450-4213 | 212-450-3092<br>212-450-3213 | donald.bernstein@dpw.com<br>brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com<br>karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler<br>Bonnie Steingart<br>Vivek Melwani<br>Jennifer L Rodburg<br>Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com<br>slivirj@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com<br>richard.duker@jpmorgan.com<br>gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

12/19/2006 12:22 PM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

12/19/2006 12:22 PM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

12/19/2006 12:22 PM
Master Service List Overnight Mail

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivin@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

12/19/2006 12:24 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

12/19/2006 12:24 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

12/19/2006 12:24 PM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Ajamie LLP | Thomas A. Ajamie | 711 Louisiana | Suite 2150 | Houston | TX | 77002 | | 713-860-1600 | 713-860-1699 | tajamie@ajamie.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | Kimberly J. Robinson | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | kim.robinson@bfkpn.com | Counsel to Motion Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | William J. Barrett | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | william.barrett@bfkpn.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Madison County (Indiana) Treasurer |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Michael J Alerding Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com malerding@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Industries |
| Blank Rome LLP | Bonnie Glantz Fatell | Chase Manhattan Centre | 1201 Market Street, Suite 800 | Wilmington | DE | 19801 | | 302-425-6423 | 302-428-5110 | fatell@blankrome.com | Counsel to Special Devices, Inc. |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennsylvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@engelhard.com | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Aerospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | | 615-321-0555 | 615-321-9555 | amalone@colwinlaw.com | Counsel to Averitt Express, Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | wachstein@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert  Szwajkos | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-8898 | 917-368-8898 | athau@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Daniels & Kaplan, P.C. | Jay Selanders | 2405 Grand Boulevard | Suite 900 | Kansas City | MO | 64108-2519 | | 816-221-3086 | 816-221-3006 | selanders@danielsandkaplan.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Deputy Attorney General | Amina Maddox | R.J. Hughes Justice Complex | P.O. Box 106 | Trenton | NJ | 08625 | | 609-984-0183 | 609-292-6266 | amina.maddox@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representative for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 7411 Highway 51 North | | Southaven | MS | 38671 | | | | akatz@entergy.com | Counsel to Entergy Services, Inc. |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Gazes LLC | Ian J. Gazes | 32 Avenue of the Americas | | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | ian@gazesllc.com | Counsel to Setech, Inc. |
| Gazes LLC | Eric Wainer | 32 Avenue of the Americas | Suite 1800 | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | office@gazesllc.com | Counsel to Setech, Inc. |
| Gibbons, Del Deo, Dolan, Griffinger & Vecchione | David N. Crapo | One Riverfront Plaza | | Newark | NJ | 07102-5497 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinprocter.com | Counsel to UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinprocter.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbeler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Heller Ehrman LLP | Carren Shulman Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | carren.shulman@hellerehrman.com timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Glen Dumont | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4750 | 908-898-4137 | glen.dumont@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SFX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC and Tenneco Inc. |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-836-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Riley | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 212-947-1202 | | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Jean R. Robertson, Esq. | 600 Superior Avenue, East | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | jrobertson@mcdonaldhopkins.com | Counsel to Brush Engineered materials |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiares Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Noma Company and General Chemical Performance Products LLC | James Imbriaco | 90 East Halsey Road | | Parsippanny | NJ | 07054 | | 973-884-6952 | 973-515-3244 | jimbriaco@gentek-global.com | |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | | 908-722-0700 | 908-722-0755 | eabdelmasieh@nmmlaw.com | Counsel to Rotor Clip Company, Inc. |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Anthony Princi Esq Thomas L Kent Esq | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5000 | 212-506-5151 | aprinci@orrick.com tkent@orrick.com | Counsel to Ad Hoc Committee of Trade Claimants |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | mcheney@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | 7th Floor | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pitney Hardin LLP | Ronald S. Beacher | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-682-3485 | rbeacher@pitneyhardin.com | Counsel to IBJTC Business Credit Corporation |
| Pitney Hardin LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@pitneyhardin.com | Counsel to Marshall E. Campbell Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangleg roup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup .com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman, Arlene N. Gelman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | cschulman@sachnoff.com agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | mnewman@schaferandweiner.co m | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Michael Yetnikoff | 623 Fifth Avenue | 28th Floor | New York | NY | 10022 | | 212-753-5000 | 212-753-5044 | myetnikoff@schiffhardin.com | Counsel to Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Rajeteisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Rjafeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to  le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5811 | 860-251-5218 | bankruptcy@goodwin.com | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | lloyd.sarakin@am.sony.com | Counsel to Sony Electronics, Inc. |
| Sotiroff & Abramczyk, P.C. | Robert M. Goldi | 30400 Telegraph Road | Suite 444 | Bingham Farms | MI | 48025 | | 248-642-6000 | 248-642-9001 | rgoldi@sotablaw.com | Counsel to  Michigan Heritage Bank; MHB Leasing, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.c om | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Central Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-3922100 | 609-392-7956 | jposta@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Madison L. Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for The Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Campbell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 16

12/19/2006 12:25 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts counsel to Debtors |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.co m | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center | Suite 807 | Pittsburgh | PA | 15222 | | 412-562-2549 | 412-562-2429 | djury@steelworkers-usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Varnum, Riddering, Schmidt & Howlett LLp | Michael S. McElwee | Bridgewater Place | P.O. Box 353 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Street | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Street | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel to National Instruments Corporation |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.co m | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| APS Clearing, Inc. | Andy Leinhoff | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| APS Clearing, Inc. | Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kirkland & Ellis LLP | Geoffrey A. Richards | 200 East Randolph Drive | | Chicago | IL | 60601 | 312-861-2000 | Counsel to Lunt Mannufacturing Company |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 2

12/19/2006 12:25 PM
Delphi 2002 lists US Mail

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to  Means Industries |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Traub, Bonaquist & Fox LLP | Maura I. Russell Wendy G. Marcari | 655 Third Avenue | 21st Floor | New York | NY | 10017 | 212-476-4770 | Counsel to SPCP Group LLC |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | 817-810-5250 | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| WL Ross & Co., LLC | Oscar Iglesias | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

12/19/2006 12:25 PM
Delphi 2002 lists US Mail

# EXHIBIT D

**Hearing Date and Time: January 5, 2007 at 10:00 a.m.**
**Objection Deadline: January 2, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                :
      In re                       :     Chapter 11
                                :
DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                                :
                                :     (Jointly Administered)
         Debtors.            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING
THE EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE
AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT
<u>TO SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE</u>

("PLAN INVESTMENT AND FRAMEWORK SUPPORT APPROVAL MOTION")

Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"), submit this expedited motion (the "Motion") for an order authorizing and approving the Debtors' entry into the Equity Purchase and Commitment Agreement (as defined below) and certain related agreements pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement (as defined below) pursuant to sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code, as described herein, and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

        1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

        2.    No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

        3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2

4.      The statutory predicates for the relief requested herein are sections 105(a),
363(b), 503(b), 507(a), and 1125(e) of the Bankruptcy Code and rule 6004 of the Federal Rules
of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as
of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets
of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth
largest public company business reorganization in terms of revenues and the thirteenth largest
public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are
not chapter 11 debtors and continue their business operations without supervision from the
Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant
engineering resources and technical competencies in a variety of disciplines, and is one of the
largest global suppliers of vehicle electronics, transportation components, integrated systems and
modules, and other electronic technology.  The Company supplies products to nearly every
major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned
subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the
Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the
assets and liabilities of these divisions and subsidiaries were transferred to the Company in
accordance with the terms of a Master Separation Agreement between Delphi and GM.  In
connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

3

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

        8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.

        9.      The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

        10.      In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

E.     Overview Of The Framework Discussions

12.     As further described below, the multi-lateral and multi-dimensional scope

of the actions that must be taken to address Delphi's restructuring requirements is exceedingly

complex.  Not only is each step, in and of itself, a substantial undertaking, but actions taken to

address one area often have ripple effects on the others.  For example, as this Court has already

observed during the various labor related contested hearings brought before it, the issues

associated with modifying collective bargaining agreements go well beyond wage rates and

5

involve dealing with, among other things, a multitude of site footprint, employee benefits, local

work rules, and operational restrictions, each of which can individually impair the Company's

ongoing viability.  Similarly, the GM negotiations encompass far more than simply dealing with

identifiable uncompetitive contracts currently in existence.  As a practical matter, GM will

remain Delphi's largest customer following successful implementation of Delphi's transformation

plan.  Therefore, a restructuring of Delphi will of necessity require the parties to address long

term planning matters and provide assurance of future business relations.  The ongoing business

arrangements between Delphi and GM, however, must be dealt with against the backdrop of a

host of litigable claims that each company may have against the other for conduct since the time

of the spin-off.  Moreover, compounding the difficulty in dealing with the various labor and GM

issues is the fact that many of these issues are integrally interrelated with gains in one area often

resulting in costs in the other.

        13.     Throughout these chapter 11 cases, the Debtors have endeavored to reach

a consensual resolution regarding their various restructuring initiatives and, with that goal in

mind, have sought input from their statutory committees, their unions, GM and other key

stakeholders.  This has not been an easy task, and progress made to date can best be

characterized as being achieved in increments, with every two steps forward often involving one

step backward.  Nevertheless, through the framework discussions outlined below, the Debtors

were able to initiate multi-lateral negotiations with their statutory committees, GM, and potential

plan investors that have significantly enhanced the prospect for a consensual restructuring.  At

the same time, the Debtors effectuated an unprecedented hiatus in the middle of Section 1113

and 1114 contested hearings (and deferred commencement of Section 365 contract rejection

hearings involving GM) in favor of pursuing discussions with the Debtors' labor unions and GM

6

on parallel paths with the framework discussions.  While the framework discussions have not

necessarily resolved all parties' concerns, they have produced a solid foundation for the Debtors'

potential emergence from these cases and a platform for continued cooperation to deal with yet

unresolved matters.

       14.     The products of the framework discussions are the two agreements

presented by this Motion, the Equity Purchase and Commitment Agreement between Delphi and

certain Investors (the "EPCA"[3]), and the Plan Framework Support Agreement, (the "PSA" and,

together with the Investment Agreements, the "Framework Agreements") between Delphi, the

Commitment Parties, Merrill, UBS, and General Motors Corporation.[4]  While the plan

framework is based on extensive discussions and negotiations among Delphi, GM, the Plan

Investors and Delphi's statutory committees conducted since August of this year, not every one

of the proposed terms and conditions of the PSA are necessarily acceptable to Delphi's

stakeholders, including the Company's statutory committees, each of which may determine to

oppose one or more elements of the PSA.[5]  The PSA as well as the economics and structure of

---

[3]    As referenced in the EPCA and used herein, "Investors" means A-D Acquisition Holdings, LLC (an affiliate of
Appaloosa Management L.P. ("Appaloosa")), Harbinger Del-Auto Investment Co. Ltd. (an affiliate of
Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger")), Dolce Investments LLC (an affiliate of Cerberus
Capital Management, L.P. ("Cerberus")), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and
UBS Securities LLC ("UBS").  In connection with the EPCA, Appaloosa, Harbinger, and Cerberus
(collectively, the "Commitment Parties"), are also executing certain equity commitment letters (the
"Commitment Letters" along with the Investment Proposal Letter (the "Proposal Letter") and the EPCA,
collectively, the "Investment Agreements")) in support of the obligations of their respective affiliate Investors
under the EPCA.  The Investors and the Commitment Parties are collectively referred to herein as the "Plan
Investors"; when the term "Plan Investors" is used in connection with a specific agreement, the term shall
include only those Plan Investors as defined in such agreement.

[4]    Attached as <u>Exhibit A</u> is the execution form of the Proposal Letter dated December 18, 2006 and its
attachments, including the EPCA, the PSA, the Preferred Stock Term Sheet and Commitment Letters from the
three Commitment Parties that are using special purpose transaction entities as signatories to the EPCA and
related agreements.

[5]    That is not to say, however, that the Debtors did not consider the view points of the statutory committees.  In
November 2006, the Debtors received a joint mark-up of certain "discussion points" that formed the basis of the
Framework Agreements from the Creditors' Committee and the Equity Committee.  The Debtors also received

the plan framework itself are expressly conditioned on reaching consensual agreements with

Delphi's U.S. labor unions and GM.  Both Delphi and the Plan Investors are permitted to

terminate the EPCA (which terminates the PSA) if consensual agreements are not reached with

labor and GM by January 31, 2007.

15.    The PSA outlines certain plan terms, including the distributions to be

made to creditors and shareholders, the treatment of GM's claim, the resolution of certain

pension funding issues, and the corporate governance of the reorganized Debtors.  The new

equity funding provided by the EPCA is critical in achieving the recoveries contemplated by the

PSA as it secures the most difficult element of the reorganized Delphi's capital structure.

F.    Events Leading To Framework Discussions

1.    Labor Transformation

16.    Despite early efforts by the Debtors to negotiate comprehensive

agreements with their unions and GM prior to commencing their chapter 11 cases and again

during the first six months of these cases, on March 31, 2006, Delphi moved under sections 1113

and 1114 of the Bankruptcy Code for authority to reject its U.S. labor agreements and to modify

retiree benefits.[6]  The 1113/1114 Motion aimed to address the Debtors' labor costs, the Debtors'

---

comments on the EPCA from the Equity Committee.  The Debtors carefully evaluated the comments and
requests of the statutory committees and have adopted a number of the comments in the final versions of the
Framework Agreements.  By way of example, at the request of one or both statutory committees, the
Framework Agreements include (i) a "proportionality" concept whereby, regardless of the amount of unsecured
claims ultimately allowed in these cases, the proportion of the Debtors' distribution of equity and cash to
holders of unsecured claims remains the same; (ii) the rights distributed to equity security holders will be
transferable and severable from the common stock; and (iii) in the event of a subsequent merger of the
reorganized company, the consideration to be received by the Plan Investors holding the convertible preferred
stock would be subject to certain limitations.

[6]    See Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035) (the
"1113/1114 Motion").  Contemporaneously with the filing of the 1113/1114 Motion on March 31, 2006, the
Debtors also moved to reject unprofitable supply contracts with GM.  See Motion For Order Under 11 U.S.C. §
365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors
Corporation (Docket No. 3033) (the "GM Contract Rejection Motion").  Among the reasons for the GM
Contract Rejection Motion was the Debtors' belief that GM must cover a greater portion of the costs of

ability to streamline their product portfolio, and the Debtors' legacy retirement liabilities.  To

address these factors, the Debtors sought three principal modifications to their labor agreements.

First, the Debtors sought to reduce their wage and benefit costs to levels competitive with other

U.S. auto parts suppliers.  Second, the Debtors sought to eliminate provisions in the labor

agreements that precluded the Debtors from streamlining their product portfolio and making the

necessary adjustments to Delphi's manufacturing footprint.  Finally, the Debtors requested a

reduction in the legacy liabilities for pension and other retiree benefits that Delphi was required

to provide under the labor agreements.  During the pendency of the hearings on the 1113/1114

Motion, the Debtors continued to pursue a consensual resolution with all of Delphi's unions and

GM.

   17.  On May 9, 2006, the hearing on the Debtors' 1113/1114 Motion

commenced.  The initial phase of the hearing on the 1113/1114 Motion spanned nearly a month,

with eight days of contested hearings during which the Debtors presented the testimony of 12

witnesses.  On June 5, 2006, following the close of the Debtors' direct case, the contested hearing

on the 1113/1114 Motion was adjourned, initially for a 60 day hiatus and thereafter from time to

time through the balance of 2006 in order to help create an environment for continuing to explore

a consensual resolution of these cases.  Since the adjournment of the 1113/1114 Motion in June,

the Debtors have continued to provide information to, and engage in discussions and negotiations

with, the unions and the Debtors' stakeholders in an effort to resolve the labor matters forming

the basis of the 1113/1114 Motion.  To allow the progress of the framework discussions and

other matters, the Bankruptcy Court has held numerous in camera status conferences since the

adjournment of the 1113/1114 Motion.  The adjournment period has permitted the Debtors and

---

manufacturing products for GM at plants that bear the burden of the Debtors' legacy costs.  This initial motion
covered approximately half of the Debtors' North American annual purchase volume revenue from GM but only
10% of the Debtors' total contracts with GM.

their professionals to focus their attention on negotiations with key stakeholders to develop the

basis for the Framework Agreements and a consensual reorganization plan.

18.    In addition, throughout these cases and notwithstanding the 1113/1114

Motion, Delphi has consistently communicated a clear message to both its hourly workforce and

GM:  Delphi is committed to finding a consensual labor resolution and intends to continue to

discuss with its unions and GM ways to become competitive in the Debtors' U.S. operations.  To

that end, Delphi, GM, and the United Automobile, Aerospace and Agricultural Implement

Workers of America (the "UAW") obtained this Court's approval of a tripartite agreement

providing for a special hourly attrition program for Delphi's UAW-represented employees.[7]  On

July 7, 2006, this Court entered an order approving a similar special attrition program with the

International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-

Communications Workers of America, (the "IUE-CWA") and a Supplement to the UAW special

attrition program (Docket No. 4461).[8]  As of September 26, 2006, approximately 12,400 of

Delphi's UAW-represented employees have opted to retire by January 1, 2007 and approximately

1,400 additional UAW-represented Delphi employees elected a buyout.  Furthermore, as of

August 18, 2006, approximately 6,300 IUE-CWA-represented Delphi employees, representing

approximately 83% of the eligible IUE-CWA-represented workforce, opted to participate in the

attrition program.  Although these special hourly attrition programs will provide nearly two-

thirds of Delphi's existing UAW and IUE-CWA-represented long-term hourly employees (as of

September 26, 2006 and August 18, 2006, respectively) with "soft landings" through a

---

[7]    On May 8, 2006, the Court entered an order approving the agreement relating to the UAW's special hourly
attrition program (Docket No. 3648).  That order was amended on May 12, 2006 (Docket No. 3754).

[8]    Delphi is currently negotiating the terms of similar programs with the United Steelworkers of America and
Delphi's other unions which, if agreed upon, would provide those hourly employees with comparable retirement
programs and incentives.

combination of retirement programs, attrition programs, and GM flowbacks, the attrition

programs do not resolve the issues related to Delphi's uncompetitive labor agreements.

19.    Accordingly, notwithstanding the success of the attrition programs, the

Debtors still need to address the factors outlined in their 1113/1114 Motion: the Debtors' legacy

liabilities (primarily pension and OPEB), manufacturing footprint, and wage and benefit costs

(including local work rules). Paradoxically, however, the success of the attrition plans confirmed

that the resolution of the remaining labor issues would be inextricably linked to GM, and any

comprehensive settlements with the Debtors' unions would be very difficult and perhaps

impractical without the involvement of GM. Consequently, the Debtors pursued negotiations

with both GM and the unions. Because the discussions between the Debtors, GM, and the

unions naturally involved the interrelated issues of the Debtors' transformation plan, the Debtors'

negotiations with GM and the unions evolved from discussions regarding the Debtors' labor

transformation to discussions related to GM's support for the Debtors' transformation plan. The

Debtors believe that the Framework Agreements create an environment in which the Debtors,

GM, and the unions will be able to resolve the Debtors' remaining labor issues consensually,

while adequately addressing GM's requirements for its participation in the Debtors'

transformation plan.

2.    <u>Negotiations With General Motors</u>

20.    The Debtors believe that the Framework Agreements will allow them to

address many of the issues and claims that resulted from, among other things, GM's spin-off of

Delphi in 1999. Historically GM has been, and likely will continue to be, Delphi's largest single

customer. Since the spin-off in 1999, GM has accounted for the majority of Delphi's North

American business. GM, however, is not just a customer of the Debtors but, absent a

comprehensive and consensual transformation and reorganization of the Debtors, GM could be

the primary defendant in multi-billion dollar litigation that would be commenced on behalf of the

Debtors' estates.  The Debtors and their statutory committees believe that the Debtors hold

multiple claims and causes of action against GM that must be either consensually resolved with

GM or judicially determined by the Bankruptcy Court in connection with any reorganization of

the Debtors.  Consequently, any potential GM support for the Debtors' transformation plan (and

related financial contributions) must be evaluated in light of the potential claims held by the

Debtors against GM.

21.    On January 20, 2006, the Debtors filed their Schedules of Assets and

Liabilities (Docket No. 1854) and their Statement of Financial Affairs (Docket No. 1855) listing

certain unliquidated claims that the Debtors held against GM that related to, among other things,

the spin-off.  Subsequently, after the Debtors provided extensive information to the Creditors'

Committee, the Creditors' Committee filed a motion requesting direct discovery from GM so

that the Creditors' Committee could evaluate certain claims that the Debtors hold against GM

and that GM allegedly holds against the Debtors.[9]  The Debtors did not object to this relief,

which resulted in the Creditors' Committee and GM entering into a stipulation and agreed order

on April 11, 2006, pursuant to which the Creditors' Committee and GM agreed that GM would

produce certain documents requested by the Creditors' Committee.

22.    On May 11, 2006, the Creditors' Committee sent a letter, and

subsequently, a draft complaint, to Delphi's Board of Directors, demanding that the Debtors

promptly pursue certain claims and defenses that the Debtors might have against GM.  The draft

complaint, containing 408 numbered paragraphs and 19 separate causes of action, was based in

---

[9]    See Motion For An Order Compelling The Production Of Documents By General Motors Corporation Pursuant
To Rule 2004 Of The Federal Rules Of Civil Procedure (Docket No. 2961).

substantial part on documents provided to the Creditors' Committee by the Debtors pursuant to a

joint interest agreement previously approved by this Court.[10]

      23.    On July 28, 2006, after the Debtors informed the Creditors' Committee of

the Debtors' conclusion that the immediate prosecution of any complaint for relief against GM

of the kind recommended by the Creditors' Committee was not in the best interests of the

Debtors or their stakeholders, the Creditors' Committee moved for authority to prosecute the

Debtors' claims and defenses against GM and certain former officers of the Debtors on Delphi's

behalf (Docket No. 4718) (the "STN Motion").  The Debtors evaluated the merits of the STN

Motion and filed a preliminary objection to the STN Motion on August 4, 2006 (Docket No.

4859).

      24.    Shortly after the formation of the Equity Committee, the Debtors solicited

the Equity Committee's views regarding potential estate claims against GM.  On July 29, 2006,

the Debtors entered into a Joint Interest Agreement with the Equity Committee and, during

August 2006, shared confidential information with the Equity Committee concerning claims and

defenses against GM.  On August 24, 2006, the Equity Committee delivered a letter to the

Debtors stating the Equity Committee's view of the Debtors' claims and defenses against GM,

and on September 5, 2006, the Equity Committee filed its objection to the STN Motion (Docket

No. 5070).

      25.    Since identifying the Debtors' claims and the potential causes of action

against GM, the Debtors have conducted various investigations including an investigation and

series of interviews based specifically upon claims that were also asserted by the Debtors'

---

[10]   See Order Approving Joint Interest Agreement Between Debtors And Official Committee Of Unsecured Creditors Implementing Protective Order, And Approving Procedures To Protect Information In Fee Statements (Docket No. 3279).

statutory committees. The principal categories of potential claims against GM resulting from the spin-off of Delphi that have been identified to date include legacy liability claims relating to OPEB and pension matters; asset valuation claims; labor agreement-related claims; claims relating to price concessions obtained from Delphi by GM; claims relating to Delphi's indemnification of GM relating to certain labor union benefit guarantees; and warranty related claims. After investigation, the Debtors believe that they hold colorable claims against GM that may result in significant recoveries from GM. At the same time, the Debtors also believe that pursuit of such claims would result in a loss of future business from GM and would require the Debtors to formulate and pursue an alternative business plan to the transformation plan announced on March 31, 2006.

26.    The alternative to protracted litigation with GM is a consensual resolution whereby Delphi is able to successfully implement its transformation plan, develop a reorganization plan with potential recoveries for holders of claims and interests that should imaginably result in their support of a consensual transaction in lieu of litigation, attract adequate debt financing and equity infusions to support such a reorganization framework, and negotiate a comprehensive settlement with GM pursuant to which GM provides sufficient financial and other support to make such a plan framework feasible.

27.    Towards that end, the Debtors have developed a consensual GM business plan model that should produce $2.4 billion in EBITDA following successful implementation of Delphi's transformation plan with an opportunity for further growth. The Debtors believe that with such a business plan, the recoveries available to the Debtors' stakeholders would be significantly higher than if the Debtors pursued the litigation of their claims against GM and

14

therefore that the consensual resolution of the Debtors' claims against GM should significantly

outweigh any recovery gained by pursuing litigation against GM.

28.    Through the negotiation of the Framework Agreements, the Debtors

believe that a platform has been created to effectuate a settlement of the various disputed issues

with GM, while simultaneously gaining the support of the Debtors' stakeholders and achieving

stakeholder recoveries of a scope that would not otherwise be possible.  In order for this

approach to actually work, Delphi must obtain modified labor agreements with its U.S. labor

unions; such agreements are unlikely unless GM ultimately agrees to such items as triggering of

the GM benefit guarantees for Delphi's major U.S. labor unions; assumption by GM of certain

postretirement health and life insurance obligations for certain Delphi hourly employees;

provision of flowback opportunities at certain GM facilities for certain Delphi employees; GM's

payment of certain retirement incentives and buyout costs under current or certain future attrition

programs for Delphi employees; GM's payment of mutually negotiated buy-downs; GM's

payment of certain labor costs for Delphi employees; a revenue plan governing certain other

aspects of the commercial relationship between Delphi and GM; and GM's support of the wind-

down of certain Delphi facilities and the sales of certain Delphi business lines and sites.

3.    The Framework Discussions

29.    The Framework discussions commenced in the summer of 2006 provided

a vehicle for the Debtors to explore with their statutory committees, GM and potential plan

investors whether any viable path existed towards a comprehensive consensual transaction.

After the adjournment of the 1113/1114 Motion and the GM Contract Rejection Motion, the

Debtors began to map out several possible alternative means to resolve these chapter 11 cases.

The Debtors conceptualized potential outcomes ranging from litigating the 1113/1114 Motion

and the GM Contract Rejection Motion to adjourning the motions and attempting to reach a

comprehensive deal with GM and the unions. The Debtors also explored with their statutory

committees, an ad hoc committee, and GM multiple alternative paths for achieving the ultimate

goals of the Debtors' reorganization.  The paths discussed with these stakeholders focused on

near-term resolution of labor and GM issues and on the resolution of the Debtors'

transformation issues without a near-term resolution of labor and GM issues.  The near-term

resolution  approaches discussed among the parties included bifurcated labor and GM

transactions, labor-only settlements, and comprehensive labor and GM transactions.  The

Debtors, after receiving clear and unequivocal input from GM that it would not explore a

consensual path that did not include the determination of GM's net exposure to Delphi and

similar input from the statutory committees that they would not consider settling with GM on a

consensual path that did not include the determination of anticipated recoveries for creditors and

equity interests, decided to seek a comprehensive resolution of the Debtors' transformation plan

issues, including eventual resolution of  GM and labor, through the commencement of

"framework" discussions.

   30. These framework discussions began in earnest on August 1, 2006 with

"leveling-up" meetings between the Debtors and their statutory committees.  Promptly

thereafter, the Debtors, GM, and the Creditors' Committee began exchanging proposals that

addressed issues such as possible capital structures for the reorganized Debtors, disposition of

the Debtors' legacy obligations, and various aspects of the Debtors' relationship with GM.  On

August 3, 2006, the Debtors, GM, the Creditors' Committee, and a number of their professional

advisors held the first of a series of extended meetings and negotiating sessions in New York.

(From time to time, these meetings also included representatives of the Equity Committee, an ad

hoc equity committee and potential plan investors.)  The framework meetings have resulted in

intensive discussions and the exchange of various draft agreements and term sheets which,

taken together, have advanced negotiations considerably.

31.     Very early in the framework discussions, several of the parties were able

to agree upon the potential range of creditor recoveries.  By September, certain of the parties

were able to agree upon the potential range of recoveries available to shareholders.  For these

potential recoveries to be realized, however, the framework discussions still needed to address

the labor issues, the GM issues, and the business plan for the Debtors that would support these

desired recoveries.  The Debtors, as well as the other participants in the framework discussions,

realized that an outside plan investor would be necessary to achieve the expected results.

    4.     Identification Of Potential Plan Investors

32.     By late September 2006, other stakeholders had joined the discussions.

As this Court is aware, Appaloosa has been a very active participant in these chapter 11 cases

and has a substantial interest in the outcome of the Debtors' transformation.  Because of

Appaloosa's status as a significant holder of the Debtors' claims and equity securities, the

Debtors and their advisors met several times with representatives from an investor group led by

Appaloosa and Harbinger, both separately and together with GM and the statutory committees.

33.     At the same time that the Debtors began meeting with Appaloosa and

Harbinger, the Debtors with the assistance of their financial advisor and investment banker,

Rothschild Inc. ("Rothschild") continued to explore alternative investment proposals from

certain other investors with industry experience.  The Debtors worked with these various investor

groups to create a limited and focused competitive bidding process.  The Debtors also enabled

the investor groups to engage in limited due diligence and to explore the opportunities associated

with a transformed Delphi. These framework discussions involved many ideas for a transformed

Delphi, all of which the Debtors evaluated carefully. These discussions were intended to provide

a basis for developing the framework for an eventual reorganization plan. The discussions

addressed various matters, including allocation of legacy liabilities; wind down or divestiture of

non-core North American facilities; GM contribution and recovery; potential plan treatment for

various stakeholders; the anticipated scope of, and potential limitations on, general unsecured

claims; future capital structure; and corporate governance upon emergence. This process led to

the selection of Appaloosa, Harbinger, and Cerberus (together with Merrill and UBS) as

potential plan investors and to the Debtors' decision to pursue earnest negotiation of definitive

documents with the Plan Investors to determine if there was a viable transaction that could be

accomplished.

G.    The Framework Agreements

        34.    These framework discussions led the Debtors to negotiate two separate but

interrelated agreements: the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement.[11] The public announcement of both of these agreements on

December 18, 2006 represents a major milestone in Delphi's reorganization.[12] Since well before

the beginning of these chapter 11 cases, the Debtors have emphasized their commitment to

pursuing a consensual resolution of the principal issues in their restructuring. The Framework

Agreements demonstrate real progress toward that objective. The Plan Investors' conditional

commitment to invest up to $3.4 billion in the reorganized company, together with their support

---

[11]    The discussion of the Framework Agreements contained herein is a summary only. The Framework
Agreements are complex and lengthy agreements, and many provisions of the agreements are not highlighted in
this summary. In the event of any inconsistency between this summary and the Framework Agreements, the
terms of the Framework Agreements control.

[12]    Delphi's press release issued on December 18, 2006 is attached hereto as Exhibit B.

of the Debtors' transformation plan and reorganization plan framework, should provide

additional confidence to the Debtors' customers, suppliers, employees and financial stakeholders.

While there is much that remains to be accomplished in the Debtors' reorganization, the Debtors

and their stakeholders are together navigating a course that should lead to consensual resolution

with the Debtors' U.S. labor unions and GM while providing an acceptable financial recovery

framework for stakeholders

       1.      <u>Equity Purchase And Commitment Agreement</u>

       35.     The EPCA sets forth the terms and conditions upon which the Plan

Investors will (i) commit to purchase $220,500,000 of common stock in the reorganized Delphi

(the "Direct Subscription Shares") and $1.2 billion of preferred shares in the reorganized Delphi

(the "Preferred Shares") and (ii) commit to purchasing any unsubscribed shares of common stock

in connection with a rights offering (the "Rights Offering") to existing common stock holders

(the "Back Stop Commitment").[13]

       36.     The Rights Offering contemplated by the EPCA provides that Delphi will

distribute at no charge to each holder of common stock (an "Eligible Holder"), as of a record date

to be determined, certain rights (the "Rights") to acquire new common stock.  The Rights will

permit Eligible Holders to purchase their pro rata share of 56,700,000 shares of new common

stock at a purchase price of $35 per share.  Under the terms of the EPCA, the Plan Investors will

commit to purchase the number of shares that were offered through the Rights Offering to

Eligible Holders, but whose rights were not properly exercised (the "Unsubscribed Shares").  In

the event that no shareholders subscribe to the Rights Offering, the Plan Investors, through the

---

[13]   The Commitment Letters, in turn, set forth the terms and conditions upon which the Commitment Parties will
provide the funding to the Investors that will be necessary to enable the Investors to make the investment called
for under the EPCA.

Back Stop Commitment, will purchase all of the Unsubscribed Shares for $1.984 billion.

Altogether, through the Back Stop Commitment and the purchase of the Direct Subscription

Shares and the Preferred Shares, the Plan Investors could invest up to $3.4 billion in the

reorganized Debtors.

37.     In connection with the Plan Investors' commitment to purchase the

Preferred Shares, the Debtors will agree to pay the Plan Investors an aggregate commitment fee

of $21 million (the "Preferred Commitment Fee").  In addition, to compensate the Plan Investors

for their undertakings in connection with their purchase of the Direct Subscription Shares and the

Backstop Commitment, the Debtors will agree to pay an aggregate commitment fee of

$55,125,000 (the "Standby Commitment Fee" and, together with the Preferred Commitment Fee,

the "Commitment Fees").  The Debtors will also reimburse or pay the Plan Investors' reasonably

incurred out-of-pocket costs and expenses incurred on or prior to the effective date of a plan of

reorganization or related to the closing of the plan of reorganization (the "Transaction

Expenses").  Under the terms of the EPCA, Transaction Expenses incurred on or prior to

December 1, 2006 will not exceed $13 million and will be paid promptly upon the Court's entry

of the order approving this Motion; provided, however, that such amount will not include

Transaction Expenses incurred by Appaloosa on or before May 17, 2006, which will not exceed

$5 million and will be paid if and when the effective date of any plan of reorganization of the

Debtors occurs and only if such plan results in the holders of Delphi common stock receiving a

recovery under any such plan.  In addition, to the extent permitted under any order authorizing

the Company to obtain post-petition financing and/or to utilize cash collateral then or thereafter

in effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of

entry of the order approving this Motion shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order

38.    The Commitment Fees will be paid by the Debtors in three stages. The first ten million dollars of fees will be paid on the first business date that either (i) each of Appaloosa and Cerberus has waived its due diligence termination right contained in section 12(d)(ii) of the EPCA, or (ii) the due diligence termination right contained in section 12(d)(ii) of the EPCA has expired in accordance with its terms. The payment of the balance of the first 50 percent of the Commitment Fees ($28,062,050) will be made on the first business day following the date that Appaloosa and Cerberus notify Delphi in writing that each has approved the Debtors' ultimate settlement with GM. The remaining 50 percent of the Commitment Fees ($38,062,050) will be paid on the first business day following the entry of an order by the Bankruptcy Court approving the Debtors' Disclosure Statement (as such term is defined in the EPCA).

39.    The Debtors believe that the fee structure described above is appropriate in light of the amount of capital committed by the Plan Investors to the Debtors and the potentially lengthy period of such commitment. The commitment fee on the preferred stock is $21 million, which is 1.75% of the total $1.2 billion preferred investment. The commitment fee on the common equity backstop is $55.125 million, which is 2.5% of the total $2.205 billion equity backstop. In addition, the compensation structure was agreed to following substantial arms-length negotiations between the Debtors and the Plan Investors with substantial input from the Debtors' statutory committees.

40.    The EPCA contains extensive representations and warranties made by the Company, and a customary set of more limited representations and warranties by the Plan

21

Investors.  While in many transactions representations and warranties are qualified by a disclosure schedule prepared in connection with the execution of operative transaction documents, under the terms of the EPCA, Delphi will have additional time to deliver such a disclosure schedule; in this case, until Delphi delivers its business plan to the Plan Investors.

41.    In connection with the EPCA, Delphi has covenanted to use its commercially reasonable efforts to provide to the Plan Investors as soon as practicable a final five-year business plan approved by Delphi's board of directors that will provide certain levels of EBITDA for fiscal years 2007 through 2011.  Delphi will not be required to deliver, and neither Appaloosa nor Cerberus will be required to approve or accept any business plan that does not reflect a final and binding settlement between the Company and GM.  Appaloosa or Cerberus may terminate the EPCA under the terms of their "diligence out" within 20 days of receiving a business plan reflecting the GM settlement if such Plan Investor is not satisfied, in their sole discretion, with the business plan.

42.    The EPCA provides for various bases for termination of the agreement, including by mutual written consent of Delphi and both of Appaloosa and Cerberus.  In addition, either Appaloosa or Cerberus, upon written notice to Delphi can terminate the agreement for a variety of reasons, including (i) if the order approving this Motion has not become a final order within 10 days of the hearing on the Motion, (ii) if the Investors are not satisfied with their due diligence, (iii) if the effective date of the Debtors' plan of reorganization has not occurred by June 30, 2007, (iv) if the Debtors' disclosure statement is not filed with this Court by May 1, 2007, (v) if the Debtor breaches any provisions of the agreement, (vi) if the Investors are not satisfied with the Company's business plan, (vii) if there was change of recommendation by the

Company or the Company enters into an alternate transaction, and (viii) if there are modifications to the agreed forms of certain transaction documents..

43.    If the EPCA is terminated under certain circumstances, an alternate transaction fee of $100 million (the "Alternate Transaction Fee") will be payable to the Plan Investors.  The events that give rise to the payment of the Alternate Transaction Fee are: (i) termination of the EPCA as a result of the Company's entry into an Alternate Transaction (as defined below); (ii) termination of the EPCA by the Investors due to a willful breach by the Company and the Company's entry into or consummation of an Alternate Transaction within a 24 month period following the termination; and (iii) termination of the EPCA due to a change of recommendation by the Company and the Company's entry into or consummation of an Alternate Transaction within a 24 month period following the termination.  For the purposes of the EPCA, an Alternate Transaction is defined to include any plan, proposal, offer or transaction that is inconsistent with the EPCA, the Preferred Stock Term Sheet attached as an Exhibit to the EPCA, the PSA, the Debtors' settlement with GM, or the Debtors' plan of reorganization, other than a liquidation under chapter 7 of the Bankruptcy Code.

44.    The aggregate liability for both the Investors, the Commitment Parties, and the Debtors is limited by the terms of the EPCA to willful breach of the EPCA.  The maximum dollar exposure in the aggregate for all of the Commitment Parties and the Investors (or the Debtors) for willful breaches occurring on or prior to the date this Court approves the Debtors' disclosure statement will not exceed $100 million.  After the order approving the Disclosure Statement is entered, the aggregate liability shall not exceed $250 million.  Liability for any party prior to the waiver or satisfaction of the due diligence condition in the EPCA

attaches only on a several basis; after the due diligence condition is satisfied or waived, liability

attaches on a joint and several basis.

45.    The obligations of the Plan Investors to consummate the transactions

contemplated by the EPCA are subject to numerous conditions in addition to the Plan Investors'

due diligence "out" in their sole discretion (in connection with which the Plan Investors have the

prerogative to approve or disapprove of certain of the Debtors' EBITDA targets and forecasted

restructuring charges in their sole discretion).  The most significant additional conditions involve

the right of each of Appaloosa and Cerberus to approve, in their individual sole discretion, the

GM Settlement and revised labor agreements with each of the UAW, the IUE-CWA, and the

USW.  In addition, the EPCA also contains conditions related to, among other things, the

approval of certain documents related to the Debtors' plan and disclosure statement, consents,

and representations and warranties.

46.    The EPCA also provides for certain indemnification rights to the Plan

Investors, subject in the case of any dispute as to coverage to the determination of this Court,

whether or not the Rights Offering is consummated or the EPCA is terminated or the transactions

contemplated by the EPCA or the Debtors' plan are consummated.

2.    Plan Framework Support Agreement

47.    The PSA, as well as the economics and structure of the plan framework

itself, is expressly conditioned on reaching consensual agreements with Delphi's U.S. labor

unions and GM.  The PSA outlines certain plan terms, including proposed distributions to be

made to creditors and shareholders, the treatment of GM's claim, the resolution of certain

pension funding issues, and the corporate governance of the reorganized Debtors.  In addition,

the PSA describes plan terms related to the terms of the preferred stock to be issued under the

plan, the establishment of a joint claims oversight committee, certain corporate governance provisions, and certain conditions precedent to plan effectiveness.

48.    The plan terms described in the PSA are conditioned on the implementation of the Debtors' transformation plan, including a settlement of the GM issues and fulfillment of the conditions to the proposed equity investment by the Plan Investors in Delphi, as contemplated and described in the EPCA.  The PSA is subject to Delphi and GM reaching a documented settlement agreement on the resolution of the GM issues on or before January 31, 2007.  Under the terms of the PSA, the parties thereto have agreed to work together to attempt to complete the negotiation of the terms of the Debtors' reorganization plan, as well as to resolve other outstanding issues, and to formulate and facilitate confirmation and consummation of the Debtors' reorganization plan and the transactions contemplated thereby.  In so agreeing, the parties to the PSA do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law or the fiduciary duties of the Debtors or any such other party to the PSA having such duties.

49.    The parties to the PSA acknowledge that Delphi and GM presently intend to pursue agreements, to be documented in the Debtors' reorganization plan, the order confirming the reorganization plan and/or the documents related to Delphi's settlement with GM, as applicable, concerning, among other matters: (a) triggering of the GM benefit guarantees; (b) assumption by GM of certain postretirement health and life insurance obligations for certain Delphi hourly employees; (c) funding of Delphi's underfunded pension obligations, including by the transfer to GM, pursuant to a 414(l) transaction, of certain of Delphi's pension obligations; (d) provision of flowback opportunities at certain GM facilities for certain Delphi employees; (e) GM's payment of certain retirement incentives and buyout costs under current or certain future

25

attrition programs for Delphi employees; (f) GM's payment of mutually negotiated buy-downs;

(g) GM's payment of certain labor costs for Delphi employees; (h) a revenue plan governing

certain other aspects of the commercial relationship between Delphi and GM; (i) the wind-down

of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j) the

Debtors' support for GM's efforts to resource products purchased by GM; (k) licensing of the

Debtors' intellectual property to GM or for its benefit; (l) treatment of the environmental matters

agreement between Delphi and GM; (m) treatment of normal course items, such as warranty,

recall and product liability obligations; and (n) treatment of all other executory contracts between

the Debtors and GM.  The parties to the PSA agree to negotiate in good faith all of the

documents and transactions described above, however, the parties to the PSA understand that no

party has any obligation to enter into any such documents or consummate any such transactions.

       50.     The plan framework described in the PSA, which is predicated in part

upon the Debtors' business plan and resolution of the GM issues, outlines the potential recoveries

to the Debtors' stakeholders:

- All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

- Trade and other unsecured claims and unsecured funded debt claims would be satisfied in full with $810 million of common stock (18 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and the balance in cash.  The framework requires that the amount of allowed trade and unsecured claims (other than funded debt claims) not exceed $1.7 billion.

- In exchange for GM's financial contribution to Delphi's transformation plan and in satisfaction of GM's claims against the Debtors, GM will receive 7 million out of a total of 135.3 million shares of common stock in the reorganized Delphi, $2.63 billion in cash, and an unconditional release of any alleged estate claims against GM.  In addition, as with other customers, certain GM claims would flow-through the chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business.  While the actual value of the potential GM contribution cannot be determined until a consensual resolution with GM is completed, Delphi

26

is aware that GM has publicly estimated its potential exposure related to Delphi's chapter 11 filing.

- All subordinated debt claims would be allowed and satisfied with $450 million of common stock (10 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share and the balance in cash.

- Holders of existing equity securities in Delphi would receive $135 million of common stock (3 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and rights to purchase 56.7 million shares of common stock in the reorganized Delphi for $1.984 billion at a deemed exercise price of $35 per share (subject to the Rights Offering becoming effective and other conditions).

51.    The PSA also reaffirms Delphi's earlier commitment to the preservation of its salaried and hourly defined benefit pension plans and will include an arrangement to fund approximately $3.5 billion of its pension obligations.  As much as $2 billion of this amount may be satisfied through GM taking an assignment of Delphi's net pension obligations under applicable federal law.  GM will receive a note in the amount of such assignment on agreed market terms that will be paid in full within ten days following the effective date of the reorganization plan.  Through this funding, Delphi will make up required contributions to the pension plans that were not made in full during the chapter 11 cases.

52.    The PSA will be terminated if the EPCA is terminated.  In addition, after April 1, 2007, any party to the PSA can terminate the PSA for any reason or no reason by delivering a notice of termination to the other parties to the PSA.  Nevertheless, the Debtors believe that the Framework Agreements provide the Debtors with a platform to complete the transactions contemplated by therein and promptly conclude these chapter 11 cases.

Relief Requested

53.    The Framework Agreements represent the culmination of many hours of intense discussions between the Debtors, the statutory committees, GM, and the Plan Investors. The Framework Agreements are an initial and critical step for the Debtors, and form a platform

27

for the resolution of the Debtors' transformation issues and the formulation of a consensual

reorganization plan.  By this Motion, the Debtors seek entry of an order authorizing and

approving the Debtors' entry into the EPCA and the other Investment Agreements pursuant to

sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the PSA pursuant to

sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code.

<u>Applicable Authority</u>

A.    <u>Approval And Authorization Of Relief Requested</u>

54.    Bankruptcy Code section 363(b)(1) permits a chapter 11 debtor to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  This Court may authorize use of estate property outside the ordinary

course of business if a debtor demonstrates a sound business justification for it.  <u>In re Lionel

Corp.</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); <u>In re Delaware Hudson

Ry. Co.</u>, 124 B.R. 169, 179 (Bankr. D. Del. 1991).  This "business judgment" test is premised on

the debtor's business judgment that the proposed use of property of the estate would be beneficial

to the estate.  <u>Cf</u>. <u>Orion Pictures Corp. v. Showtime Networks, Inc.</u> (In re Orion Pictures Corp.),

4 F.3d 1095, 1099 (2d Cir. 1993) (analyzing business judgment standard under section 365).  To

a bankruptcy court, "'business judgment' . . . is just that – a judgment of the sort a businessman

would make." <u>Id</u>.

55.    Once the debtor articulates a valid business justification, the business

judgment rule creates "a presumption that in making a business decision the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action was

in the best interests of the company." <u>In re Integrated Resources, Inc.</u>, 147 B.R. 650, 656

28

(S.D.N.Y. 1992) (citation omitted). The debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)). "Courts are both to interfere with corporate decisions absent a showing of bad faith, self interest or gross negligence." Integrated Resources, 147 B.R. at 656.

56.     The Debtors, in their sound business judgment, believe that the transactions contemplated by the EPCA, the other Investment Agreements, and the PSA should promote a prompt consummation of these chapter 11 cases, will facilitate the Debtors' businesses and financial restructuring, and is in the best interests of their creditors, shareholders, and other parties-in-interest. Moreover, the Debtors believe that the Commitment Fees provided for in the EPCA are reasonable in the context of the Debtors' cases and the transactions contemplated in the Framework Agreements.

57.     The Commitment Fees represent a small fraction of the investment that the Plan Investors will make to acquire the Preferred Shares, the Direct Subscription Shares, and the Unsubscribed Shares. The purchase price for the Preferred Shares and the Direct Subscription Shares totals more than $1.4 billion, with an additional investment to be made, if necessary, to acquire the Unsubscribed Shares. In addition, the Debtors' believe that payment and reimbursement of the Transaction Expenses is reasonable under the circumstances. Moreover, the Debtors' commitment to pay the Commitment Fees and the Transaction Expenses is an integral part of the transactions contemplated under the Framework Agreements, and the Plan Investors would not otherwise enter into the agreements without such commitment. The payment of the Commitment Fees and Transaction Expenses are actual, necessary costs of

29

preserving the estate and should be entitled to administrative priority status under sections 503(b) and 507(a).

58.    The Debtors further submit that the payment of the Alternate Transaction Fee constitutes a material inducement for, and a condition of, the Plan Investors' entry into the EPCA.  See, e.g., Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (break-up fees warranted when necessary to preserve value of estate).  Moreover, the Debtors believe that the requested Alternate Transaction Fee is fair and reasonable in view of the EPCA, which has served as the catalyst for the Debtors' development of a plan of reorganization.  Specifically, the Debtors have determined, with assistance from their investment bankers and other financial advisors, that the amount of the Alternate Transaction Fee is within a range of reasonableness given the nature and size of the proposed Rights Offering and the circumstances under which the Plan Investors have agreed to make their investment.  Finally, similar fees have been granted in connection with rights offerings of similar magnitude.  See, e.g. In re Owens Corning, Case No. 00-03837 (Bankr. D. Del. June 29, 2006) (up to $130 million fee in connection with backstop of $2.2 billion rights offering); In re USG Corp., Case No. 01-2094 (Bankr. D. Del. February 23, 2006) (up to $120 million fee in connection with backstop of $1.8 billion rights offering).

59.    Finally, the Debtors submit that this Court determine that the entry into the PSA by the parties thereto, and the performance of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the parties thereto including, without limitation, the designation of the vote of GM or any Plan Investor under Section 1125(e) of the Bankruptcy Code.  Section 1125(e) of the Bankruptcy Code provides, in relevant part, as follows: "A person that…participates, in good faith and in

compliance with the applicable provisions of this title, in the offer, issuance, sale or purchase of

a security, offered or sold under the plan, of the debtor…is not liable, on account of such

solicitation or participation, for violation of any applicable law, rule or regulation governing

solicitation of acceptance or rejection of…the offer, issuance, sale or purchase or securities." 11

U.S.C. § 1125(e).

      60.    The Debtors believe that the relief requested in the proposed order is

appropriate and is fair and reasonable under the circumstances.  GM and the Plan Investors are

not willing to proceed with the EPCA and the PSA if so doing would expose them to potential

liability for potential claims.

      61.    Based on the foregoing, the Debtors believe that they have exercised

sound business judgment in deciding to execute the Framework Agreements, and this Court

should authorize and approve the Debtors' entry into such agreements.

## B.    Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004

      62.    Under Bankruptcy Rule 6004(g), [a]n: "An order authorizing the use, sale,

or lease of property other than cash collateral is stayed until the expiration of 10 days after entry

of the order, unless the court orders otherwise."  Courts in this district have waived this stay upon

a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr.

S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the

order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr.P. 6004(g).");

In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring demonstration of

"business exigency" for waiver of ten-day stay under Bankruptcy Rule 6004(g)).  In general,

courts will grant waivers when doing so is important to the debtor's financial health.  See In re

Second Grand Traverse School, 100 Fed. Appx. 430, 434-35 (6th Cir. 2004) (affirming decision

waiving 10-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No.

00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that

an immediate closing is required to remedy Debtors' precarious financial and business position.

Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to

close.").

63.    The Framework Agreements are conditioned, among other things, upon

the Debtors' and the Plan Investors' timely compliance with many issues, including the

completion of due diligence, finalizing Delphi's settlement negotiations with GM, negotiating

revised labor agreements, and formulation and drafting of plan and disclosure statement

documents.  The Debtors submit that the waiver of the ten day stay is appropriate here to allow

for the payment of the Commitment Fees and Transaction Expenses, as described in the EPCA,

so that the Plan Investors can continue their diligence and the Debtors can work to consummate

the transactions contemplated by the Framework Agreements.

<u>Notice Of Motion</u>

64.    Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures (Docket No. 5418).  The Debtors have submitted

the proposed Order Scheduling Non-Omnibus Hearings On Debtors' Plan Investment And

Framework Support Approval Motion And Dip Refinancing Motion (the "Scheduling Order"),

setting the hearing for this Motion on January 5, 2007 (the "January 5 Hearing").  The

Scheduling Order provides that parties-in-interest will have until January 2, 2007 to file an

objection.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

65.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the service and filing of a separate memorandum of law required under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) authorizing and approving the Debtors' entry into the PSA pursuant to sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code and (ii) authorizing and approving the Debtors' entry into the EPCA and the other Investment Agreements and the payment of all associated fees, expenses, damage claims, and of all related indemnities as and when provided for therein pursuant to sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code, and (iii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          December 18, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr. (JB 4711)
                                     George N. Panagakis (GP 0770)
                                     Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                      - and -

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti (KM 9632)
                                     Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession

34

# **Exhibit A**

[EXECUTION VERSION]

December 18, 2006


Delphi Corporation
5725 Delphi Drive
Troy, MI  48098

Attn:   Robert S. "Steve" Miller
        Chairman and Chief Executive Officer

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

        As you know, the signatories hereto have been engaged in discussions with Delphi
Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly
administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi
and certain of its subsidiaries (collectively, the "Debtors") regarding a potential global resolution
of the Chapter 11 Cases that would be implemented pursuant to a plan of reorganization for the
Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the "Investment").

        Pursuant to the Company's request, the undersigned severally, not jointly, submit this
proposal (the "Proposal") to make the Investment on the terms and subject to the conditions
contained in the attached form of Equity Purchase and Commitment Agreement (the "Investment
Agreement").  Upon the entry by the Bankruptcy Court of the Initial Approval Order (as defined
and described below) and the other conditions described in this letter, the undersigned will
severally, not jointly, enter into the Investment Agreement and each of A-D Acquisition
Holdings, LLC, Dolce Investments LLC and Harbinger Del-Auto Investment Company, Ltd. will
deliver an Equity Commitment Letter in the form attached hereto.  Our several obligations to
enter into the Investment Agreement, however, are subject to your using your commercially
reasonable efforts to have the Bankruptcy Court enter the Initial Approval Order by, among other
things: (a) preparing and filing with the Bankruptcy Court, no later than December 18, 2006, the
Initial Motion referred to in the Plan Framework Support Agreement  (the "Plan Support
Agreement"); and (b) using commercially reasonable efforts to obtain a hearing on the Initial
Motion on or before January 5, 2007.

        The undersigned and their advisors have devoted substantial time and resources to
preparing this Proposal.  We appreciate the significant amount of time and resources that Delphi
has dedicated to assist our teams in developing a deeper understanding of the Company's
business.  Based on this work, the undersigned are (1) prepared to proceed expeditiously to
complete our business, accounting and legal due diligence review of the Company, and (2) take
appropriate action to move forward toward the full formulation and implementation of the
transactions contemplated by the Investment Agreement and the Plan Support Agreement,
including engaging in the preparation and negotiation of additional definitive documents as

contemplated thereby and supporting the Debtors' efforts to obtain entry of the Initial Approval Order.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery by all signatories thereto of the Investment Agreement and Plan Support Agreement in the form attached to this letter and (2) the entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to each of us (the "Initial Approval Order"): (a) approving, and authorizing the Debtors to enter into and perform their obligations under the Investment Agreement, (b) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and Transaction Expenses (as such terms are defined in the Investment Agreement) on the terms and subject to the conditions set forth in the Investment Agreement, (c) approving, and authorizing the Debtors to enter into, the Plan Support Agreement and (d) determining that the parties' entry into, and performance of their obligations under, the Plan Support Agreement does not violate the Bankruptcy Code and does not give rise to any claim or remedy against the parties, and shall not cause the vote of any party agreeing to vote to accept the Plan pursuant to the Plan Support Agreement to be disregarded.

This Proposal will remain open until 5:00 p.m., Eastern Standard Time on December 18, 2006, at which point it will expire unless Delphi has filed a motion, in form and substance reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Initial Approval Order and requesting a hearing on such motion on or before January 5, 2007.  In addition, even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on or before January 22, 2007: (1) the Initial Approval Order has not been entered by the Bankruptcy Court, (2) the Investment Agreement has not been executed and delivered to us by Delphi, or (3) any of the undersigned determines in its sole discretion that either (a) the conditions to the obligations of the undersigned contained in the Investment Agreement are incapable of being satisfied or (b) the undersigned is entitled to exercise a termination right contained in the Investment Agreement.

*    *    *    *

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement and the Plan Support Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By: /s/ Ronald Goldstein
    Name: Ronald Goldstein
    Title:  Partner

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:/s/ Philip A. Falcone
    Name: Philip A. Falcone
    Title:   Director

DOLCE INVESTMENTS LLC

By: Cerberus Capital Management L.P., it's
    Managing Member

By:/s/ Scott H. Cohen
    Name: Scott H. Cohen
    Title:   Managing Director

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:/s/ Graham Goldsmith
    Name: Graham Goldsmith
    Title:   Managing Director

UBS SECURITIES LLC

By:/s/ Steven D. Smith
    Name: Steven D. Smith
    Title:   Managing Director

By:/s/ Andrew Kramer
    Name: Andrew Kramer
    Title:   Managing Director

Equity Purchase and Commitment Agreement

## EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "Agreement"), dated as of January __, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("Harbinger"), Dolce Investments LLC ("Dolce"), a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("Merrill"), UBS Securities LLC, a Delaware limited liability company ("UBS"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company").  ADAH, Harbinger, Dolce, Merrill and UBS are each individually referred to herein as an "Investor" and collectively as the "Investors".  Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "Debtors") commenced jointly administered cases (the "Chapter 11 Cases") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the PSA;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement;

WHEREAS, the Company has filed a motion and supporting papers (the "Initial Approval Motion") seeking an order of the Bankruptcy Court (the "Initial Approval Order") (i) approving and authorizing the Company to enter into this Agreement, (ii) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and the Transaction Expenses provided for herein, and (iii) approving and authorizing the Company to enter into the PSA, and the Bankruptcy Court has entered the Initial Approval Order; and

WHEREAS, each of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd. and Cerberus Capital Management, L.P. (collectively, the "Commitment Parties") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger, and Dolce, respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Dolce, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.    <u>Rights Offering</u>

    (a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "<u>New Common Stock</u>"), pursuant to a rights offering (the "<u>Rights Offering</u>") whereby the Company will distribute at no charge to each holder (each, an "<u>Eligible Holder</u>") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "<u>Right</u>") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "<u>Record Date</u>") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of 56,700,000 shares in the aggregate of New Common Stock (each, a "<u>Share</u>") at a purchase price of $35.00 per Share (the "<u>Purchase Price</u>").

    (b)    The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "Plan"), which shall reflect the Company's proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as <u>Exhibit A</u> (the "<u>Preferred Term Sheet</u>") and the Plan Framework Support Agreement attached hereto as <u>Exhibit B</u> (the "<u>PSA</u>").

    (c)    The Rights Offering will be conducted as follows:

        (i)    On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

        (ii)    As soon as practicable following the entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "<u>Disclosure Statement Approval Date</u>") and the effectiveness under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), of the Rights Offering Registration Statement to be filed with the Securities and Exchange Commission (the "<u>Commission</u>") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of 56,700,000 Shares in the aggregate and distribute simultaneously the ballot form(s) (the "<u>Ballots</u>") in connection with the solicitation of acceptances of the Plan (the date of such distribution, the "<u>Distribution Date</u>").  The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.  The Ballots shall provide a place whereby each Eligible Holder may indicate its commitment to exercise its Rights.

(iii)    The Rights may be exercised during a period (the "Rights Exercise Period") commencing on the Distribution Date and ending at the Expiration Time.  The Rights shall be transferable.  "Expiration Time" means the date and time by which holders of claims or interests are entitled to vote on the Plan (or if such day is not a Business Day, the next Business Day), or such later date and time as the Company, subject to the prior written approval of each of ADAH and Dolce, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time.  The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "Effective Date") to occur as promptly as reasonably practicable after the Expiration Time and the Confirmation Hearing.  For the purpose of this Agreement, "Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.  Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed Ballot to a subscription agent reasonably acceptable to the Company and each of ADAH and Dolce (the " Subscription Agent") electing to exercise all or a portion of the Rights held by such Eligible Holder and (ii) pay an amount equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase by wire transfer of immediately available funds by a specified date reasonably in advance of the date on which the hearing to confirm the Plan is scheduled to commence (the "Confirmation Hearing") to an escrow account established for the Rights Offering.

(iv)    Unless otherwise required by ADAH and Dolce, there will be no over-subscription rights provided in connection with the Rights Offering.

(v)    As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its Rights the number of Shares to which such Eligible Holder is entitled based on such exercise.

(vi)    The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders pursuant to validly exercised Rights, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in Section 2(a)(iv) is terminated (a "Satisfaction Notice") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "Determination Date").

2.      The Commitment; Fees and Expenses.

(a)      On the terms and subject to the conditions set forth in this Agreement:

(i)      each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of 6,300,000 Shares as is set forth opposite such Investor's name on Schedule 2 hereto (the "Direct Subscription Shares") and (B) for the Purchase Price per Share, that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "Series B Preferred Stock"), as is set forth opposite such Investor's name on Schedule 2 hereto, which shares shall be created pursuant to a Certificate of Designation (the "Series B Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided that prior to the Due Diligence Expiration Date, such terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;

(ii)      Dolce agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "Series A-1 Preferred Stock"), which shares shall be created pursuant to a Certificate of Designations (the "Series A-1 Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;

(iii)      ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-2 Senior Convertible Preferred Stock, par value $0.01 per share (the "Series A-2 Preferred Stock", and together with the Series A-1 Preferred Stock, the "Series A Preferred Stock", which shares shall be created pursuant to a Certificate of Designations (the "Series A-2 Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the

extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion; and

(iv)    each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "Unsubscribed Shares"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, prior to the filing of the Rights Offering Registration Statement with the Commission, each Investor shall have the right to arrange for one or more of its Affiliates (each, a "Related Purchaser") to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in Section 4; provided, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number. The "Maximum Number" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; provided, that, nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws. The Investors agree that each Related Purchaser will be a "Qualified Institutional Buyer" under Rule 144A of the Securities Act.

The Series A-1 Preferred Stock, the Series A-2 Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "Preferred Shares". The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "Investor Shares". The term "Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)    Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited

Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser pursuant to <u>Section 2(a)</u> or an Ultimate Purchaser pursuant to <u>Section 2(k)</u>), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an "<u>Alternative Financing</u>"); <u>provided</u>, that only in the case of a Limited Termination, to the extent that a Limited Termination is attributable to any Investor other than Dolce, ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser pursuant to <u>Section 2(a)</u> or an Ultimate Purchaser pursuant to <u>Section 2(k)</u>) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); <u>provided</u>, <u>further</u>, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term "<u>Investor Default</u>" shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term "<u>Available Investor Shares</u>" shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)     As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; <u>provided</u>, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)     Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the "<u>Closing Date</u>") against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)     All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)     The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)     Subject to the provisions of <u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(k)</u> hereof, any Investor may designate that (i) some or all of the Investor Shares be issued in the name of, and delivered to, one or more Related Purchasers and (ii) some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of Series B Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)     On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with <u>Section 2(i)</u> or <u>12(h)</u>, as the case may be:

    (i)     an aggregate commitment fee of twenty-one million dollars ($21,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in <u>Schedule 2</u> (the "<u>Preferred Commitment Fee</u>");

    (ii)     an aggregate commitment fee of fifty-five million one-hundred twenty-five thousand dollars ($55,125,000) to be paid to the Investors as set forth in <u>Schedule 2</u> to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "<u>Standby Commitment Fee</u>" and together with the Preferred Commitment Fee, the "<u>Commitment Fees</u>"); and

    (iii)     an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in <u>Section 12(h)</u>.

(i)     $10 million of the Commitment Fees shall be paid on the first Business Day following the first date that either (A) each of ADAH and Dolce has waived in writing the due diligence termination right contained in <u>Section 12(d)(ii)</u> or (B) the due diligence termination right contained in <u>Section 12(d)(ii)</u> has expired in accordance with its terms, and $28,062,500, representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the date that each of ADAH and Dolce notify the Company in writing that each of them has approved the GM Settlement.  The balance of $38,062,500, representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the Disclosure Statement Approval Date.  Payment of the Commitment Fees and the Alternate Transaction Fee, if any, will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by each Investor to the Company at least 24 hours prior to such payment. The Commitment Fees and the Alternate Transaction Fee, if any, will be nonrefundable and non-avoidable when paid.  The provision for the payment of the Commitment Fees is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into

the Agreement and such Commitment Fees shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(j)     The Company will reimburse or pay, as the case may be, the out-of-pocket costs and expenses reasonably incurred by each Investor or its Affiliates (which, for the avoidance of doubt, shall not include any Ultimate Purchaser) to the extent incurred on or before the Effective Date (and reasonable post-closing costs and expenses relating to the closing), including reasonable fees, costs and expenses of counsel to each of the Investors or its Affiliates, and reasonable fees, costs and expenses of any other professionals retained by any of the Investors or its Affiliates in connection with the transactions contemplated hereby (including investigating, negotiating and completing such transactions) and the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases other than costs and expenses relating to any transactions with Ultimate Purchasers and, with respect to expenses that would not otherwise be incurred by the related Investor, Related Purchasers (collectively, "Transaction Expenses"), from and after the commencement of negotiations between such Investor or its Affiliates and the Company with respect to its non-disclosure agreements in connection with the Chapter 11 Cases and/or the transactions contemplated hereby, or in the case of UBS and Merrill, from and after July 30, 2006, in the following manner:

(i)     to the extent Transaction Expenses are or were incurred prior to December 1, 2006, such Transaction Expenses, in an amount not to exceed $13,000,000 (which amount does not include Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000), shall be paid promptly upon the Bankruptcy Court's entry of the Initial Approval Order; provided, that Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan;

(ii)    to the extent Transaction Expenses are incurred by any Investor on or after December 1, 2006, such Transaction Expenses shall be paid promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements; and

(iii)   the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR

Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.  In addition, (i) to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of entry of the Initial Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)    The Company acknowledges that the Investors and certain persons and entities (collectively, the "Ultimate Purchasers") may enter into one or more agreements (the "Additional Investor Agreements"), pursuant to which such Investor may arrange for one or more Ultimate Purchasers to purchase certain of the Unsubscribed Shares, the Direct Subscription Shares or the Series B Preferred Stock.  Each Additional Investor Agreement entered into prior to the Closing Date shall contain the Ultimate Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by such Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section 4.  Each Investor proposing to enter into an Additional Investor Agreement prior to the Closing Date with any Ultimate Purchaser or proposing to transfer Investor Shares to any Related Purchaser in either case which would result in the Maximum Number being exceeded agrees to notify the Company prior to entering into such agreement or effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company, which shall not be unreasonably withheld.  The Investors agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they shall not offer any Investor Shares to, or enter into any Additional Investor Agreement with, any person or entity (A) after the initial filing of the Rights Offering Registration Statement with the Commission and (B) that is not a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; provided that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.    Representations and Warranties of the Company.  Except as set forth in a disclosure letter to be delivered pursuant to Section 5(s) (the "Disclosure Letter"), the Company represents and warrants to, and agrees with, each of the Investors as set forth below.  Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other

sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this Section 3.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "Disclosure Letter Delivery Date") and as of the Closing Date:

(a)    Organization and Qualification.  The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For the purpose of this Agreement, "Material Adverse Effect" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in Section 3(g) below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company's financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports; or (vii) any change in the market price or trading volumes of the Company's securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses

(i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect).  For the purposes of this Agreement, (x) a "<u>Subsidiary</u>" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "<u>Significant Subsidiary</u>" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)     <u>Corporate Power and Authority</u>.

(i)     The Company has or, to the extent executed in the future, will have when executed the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement and the PSA (this Agreement and such other agreements collectively, the "<u>Transaction Agreements</u>") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), respectively, to perform its obligations hereunder and thereunder, including the issuance of the Rights and Investor Shares. The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)     Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)  <u>Execution and Delivery; Enforceability</u>.

(i)  Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(ii)  The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)  <u>Authorized and Issued Capital Stock</u>.  The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share.  At the close of business on November 30, 2006 (the "<u>Capital Structure Date</u>") (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "<u>Option</u>" and, collectively, the "<u>Options</u>") granted under any stock option or stock-based compensation plan of the Company or otherwise (the "<u>Stock Plans</u>"), and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "<u>Existing Shareholder Rights Plan</u>").  All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights.  Except as set forth in this <u>Section 3(d)</u> or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding.  Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this <u>Section 3(d)</u> that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the PSA.  Except as described in this <u>Section 3(d)</u>, and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other

right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company. On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company will conform to the description set forth in the Preferred Term Sheet, the PSA and the Plan. On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New Common Stock as shall be set forth in the Amended and Restated Constituent Documents and 34,285,716 shares of new preferred stock. On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) 101,000,000 shares of New Common Stock will be outstanding; (ii) 8,571,429 shares of Series A-1 Preferred Stock will be issued and outstanding; (iii) 8,571,429 shares of Series A-2 Preferred Stock will be issued and outstanding; and (iv) 17,142,858 shares of Series B Preferred Stock will be issued and outstanding.

(e)  <u>Issuance</u>.  The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company's Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)  <u>No Conflict</u>.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the

acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    <u>Arm's Length</u>.  The Company acknowledges and agrees that the Investors are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity.  Additionally, the Investors are not advising the Company or any other person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Investors shall have no responsibility or liability to the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Investors of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Investors and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investors with respect thereto.

(i)    <u>Financial Statements</u>.  The financial statements and the related notes of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure Statement and the Rights Offering Registration Statement and the Rights Offering Prospectus, comply or will comply, as the case may be, in all material respects with the applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, and the rules and regulation of the Commission thereunder (the "<u>Exchange Act</u>") and the Bankruptcy Code, as applicable, and present fairly or will present fairly in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified; such financial statements have been prepared in conformity with U.S. generally accepting accounting principles ("<u>GAAP</u>") applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Company SEC Documents filed prior to the date hereof), and the supporting schedules included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure Statement, the Rights Offering Registration Statement and the Rights Offering Prospectus, present fairly or will present fairly the information required to be stated therein; and the other financial information included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, has been or will be derived from the accounting records of the Company and its Subsidiaries and presents fairly or will present fairly the information shown thereby; and the <u>pro forma</u> financial information and the related notes included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure

Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such pro forma financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)     Company SEC Documents and Disclosure Statement.  Except for the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2006, (which has not been filed as of the date hereof) the Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein) with the Commission ("Company SEC Documents").  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)     Rights Offering Registration Statement and Rights Offering Prospectus.  The Rights Offering Registration Statement or any post-effective amendment thereto, as of the Securities Act Effective Date, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus and any amendment or supplement thereto and as of the Closing Date, the Rights Offering Prospectus will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  On the Distribution Date and the Expiration Date, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the

circumstances under which they were made, not misleading. Each Issuer Free Writing Prospectus, at the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Each Preliminary Rights Offering Prospectus, at the time of filing thereof, will comply in all material respects with the Securities Act and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.

For the purposes of this Agreement, (i) the term "Rights Offering Registration Statement" means the Registration Statement to be filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term "Rights Offering Prospectus" means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term "Investment Decision Package" means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term "Issuer Free Writing Prospectus" means each "issuer free writing prospectus" (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term "Preliminary Rights Offering Prospectus" means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) "Securities Act Effective Date" means the date and time as of which the Rights Offering Registration Statement, or the most recent post-effective amendment thereto, was declared effective by the Commission.

(l)     Free Writing Prospectuses. Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first

use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and all filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act.  The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)     <u>Absence of Certain Changes</u>.  Since December 31, 2005, other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

(i)     there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

(ii)    no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)   neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

(iv)    neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

(v)     other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

(vi)    there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except

for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii) except in a manner consistent with the Company's transformation plan previously disclosed in the Company SEC Documents filed prior to the date hereof, (the "Transformation Plan") neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii) except in a manner consistent with the Transformation Plan, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n) Descriptions of the Transaction Agreement. The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the Initial Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental proceedings or contracts, will constitute accurate summaries in all material respects.

(o) No Violation or Default; Compliance with Laws. Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents. Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases or the failure to file its Quarterly Report on Form 10-Q for the period ended September 30, 2006, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected

to have, individually or in the aggregate, a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)     <u>Legal Proceedings</u>. Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others. There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q)     <u>Independent Accountants</u>. Ernst & Young LLP ("<u>E&Y</u>"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)     <u>Labor Relations</u>. Except as set forth in the Company SEC Documents filed prior to the date hereof:

(i)     neither the Company nor any of its Subsidiaries is a party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization (other than contracts or other agreements or understandings with labor unions or labor organizations in connection with products and services offered and sold to such unions and organizations by the Company or its Subsidiaries);

(ii)     neither the Company nor any of its Subsidiaries is the subject of any proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(iii)    there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any Subsidiary and no such activities have occurred during the past 24 months;

(iv)    no grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or employment matters is pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries which, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)    the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent) except where the failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(vi)    the Company has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any Company policy, practice, agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)    the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)    <u>Title to Intellectual Property</u>.  The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "<u>Intellectual Property</u>") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate, Material Adverse Effect.  All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in

accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions.  The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property. No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  The conduct of the businesses of the Company and its Subsidiaries will not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)     <u>Title to Real and Personal Property</u>.  The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by <u>Section 3(s)</u>) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be

enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)    <u>No Undisclosed Relationships</u>.  As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)    <u>Investment Company Act</u>.  As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)    <u>Licenses and Permits</u>.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign governmental or regulatory authorities that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses as described in the Company SEC Documents except any such licenses, certificates, permits or authorization the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as described in the Company SEC Documents filed prior to the date hereof and except as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, neither the Company nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(x)    <u>Compliance with Environmental Laws</u>.

   (i)    The Company and its Subsidiaries have complied and are in compliance with any and all applicable federal, state, local and foreign laws, rules, regulations, decisions and orders, including all civil and common law, relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "<u>Environmental Laws</u>");

   (ii)    the Company and its Subsidiaries have (a) received and are in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses, (b) are not subject to any action to revoke, terminate, cancel, limit, amend or

appeal any such permits, licenses or approvals, and (c) have paid all fees, assessments or expenses due under any such permits, licenses or approvals;

(iii)     the Company and its Subsidiaries have not received notice from any governmental authority of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, or for any violation of Environmental Laws;

(iv)     there are no facts, circumstances or conditions relating to the past or present business or operations of the Company, its Subsidiaries or any of their predecessors (including the disposal of any hazardous or toxic substances or wastes, pollutants or contaminants), or to any real property currently or formerly owned or operated by the Company, its Subsidiaries or any of their predecessors, that would reasonably be expected to give rise to any claim, proceeding or action, or to any liability, under any Environmental Law;

(v)     neither the Company nor any of its Subsidiaries has agreed to assume or accept responsibility for, by contract or otherwise, any liability of any other person under Environmental Laws;

(vi)     neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws;

(vii)     none of the transactions contemplated under this Agreement will give rise to any obligations to obtain the consent of or provide notice to any governmental or regulatory authority under any Environmental Laws; and

(viii)     none of the Company, nor any of its subsidiaries nor their respective predecessors has manufactured, marketed, distributed, or sold asbestos or any products containing asbestos.

except, in the case of each of subclauses (i) through (vi) and in subclause (viii) above, as disclosed in the Company SEC Documents filed prior to the date hereof, as have been, as of the date of this Agreement, adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof, or as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(y)     Tax Matters.  Except as described in the Company SEC Documents filed with the Commission prior to the date hereof:

(i)     The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material tax returns, statements, forms

and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("Tax Returns") that are required to be filed by, or with respect to, the Company and its Subsidiaries on or prior to the Closing Date. The Tax Returns accurately reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby;

(ii)     all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Closing Date have been or will, prior to the Closing, be timely paid in full or accrued and fully provided for in accordance with GAAP on the financial statements of the Company included in the Company SEC Documents;

(iii)    neither the Company nor any of its Subsidiaries has received any written notices from any taxing authority relating to any material issue that has not been adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof;

(iv)     all material Taxes which the Company and each or any of its Subsidiaries is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable;

(v)      neither the Company nor any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the law of the United States, any foreign jurisdiction or any state or locality with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its subsidiaries are the only members);

(vi)     except for the tax sharing allocations and similar agreements entered into with GM at the time of the spin-off, there are no tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any of its Subsidiaries or any predecessor or affiliate thereof and any other party (including any predecessors or affiliates thereof) under which the Company or any of its Subsidiaries would be liable for any material Taxes or other claims of any party;

(vii)    the Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five-year period ending on the date hereof; and

(viii)   the Company is not a party to any agreement other than certain Change In Control Agreements in the Company SEC Documents filed prior to the date hereof that would require the Company or any affiliate thereof to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

For purposes of this Agreement, "Taxes" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(z)   Compliance With ERISA.

(i)   Correct and complete copies of the following documents, with respect to all material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans (the "Company Plans"), have been or will be delivered or made available to the Investors by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on IRS Form 5500 for each of the past three years and all schedules thereto and the most recent actuarial report; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the two most recently prepared actuarial valuation reports.

(ii)   Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as described in the Company SEC Documents filed prior to the date hereof:

(A) each Company Plan, other than any "multiemployer plans" within the meaning of Section 3(37) of ERISA ("Multiemployer Plans"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended (the "Code") and other applicable laws; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (C) no liability under Subtitle C or D of Title IV of ERISA has been or is reasonably expected to be incurred by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("Single-Employer Plan") currently maintained or contributed to (or with respect to which an obligation to contribute has been undertaken), or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "Company ERISA Affiliate"); (D) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no notice of a "reportable event," within the meaning of Section 4043 of ERISA has occurred or is expected to occur for any Company Plan or by any Company ERISA Affiliate; (F) all contributions required to be made under the terms of any Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company SEC Reports filed prior to the date hereof; and (G) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(iii)    Except as disclosed in the Company SEC Documents filed prior to the date hereof: (A) neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company expects that required minimum contributions to any Company Plan under Section 412 of the Code will not be materially

increased by application of Section 412(l) of the Code; (C) neither the Company nor any of its Subsidiaries has provided, or is required to provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code; and (D) neither the execution of this Agreement, stockholder approval of this Agreement nor the consummation of the transactions contemplated hereby will limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(aa)    <u>Internal Control Over Financial Reporting</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof, the Company and its Subsidiaries (i) make and keep books and records that accurately and fairly represent the Company's transactions, and (ii) maintain and have maintained effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date hereof, to the Company's auditors and the audit committee of the Company's board of directors (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and has identified for the Company's auditors and the audit committee of the Company's board of directors any material weaknesses in internal control over financial reporting and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(bb)    <u>Disclosure Controls and Procedures</u>.  Except as disclosed in the Company SEC Documents filed prior to the date hereof, the Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company's filings with the Commission and other public disclosure documents.

(cc)    <u>Insurance</u>.  The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Company and its Subsidiaries.  Neither the Company nor any of its

Subsidiaries has (i) received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(dd)    <u>No Unlawful Payments</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment in each case other than clause (iii) that has been or would reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(ee)    <u>Compliance with Money Laundering Laws</u>.  The Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "<u>Money Laundering Laws</u>") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ff)    <u>Compliance with Sanctions Laws</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("<u>OFAC</u>").  The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Investor Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person that, to the Company's knowledge, is currently subject to any U.S. sanctions administered by OFAC.

(gg)    <u>No Restrictions on Subsidiaries</u>.  Except as described in the Company SEC Documents filed prior to the date hereof or otherwise set forth in the record of the Chapter 11 Cases on or prior to the date hereof, and subject to the Bankruptcy Code, no Subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from

paying any dividends to the Company, from making any other distribution on such Subsidiary's capital stock, from repaying to the Company any loans or advances to such Subsidiary from the Company or from transferring any of such Subsidiary's properties or assets to the Company or any other Subsidiary of the Company.

(hh)   <u>No Broker's Fees</u>.  Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Investors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(ii)   <u>No Registration Rights</u>.  Except as provided for pursuant to the registration rights agreement contemplated by <u>Section 8(c)(iv)</u>, no person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Rights Offering Registration Statement with the Commission or in connection with Rights Offering or the sale of the Investor Shares.

(jj)   <u>No Stabilization</u>.  The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(kk)   <u>Margin Rules</u>.  Neither the issuance, sale and delivery of the Rights or the Shares in connection with Rights Offering or the sale of the Investor Shares nor the application of the proceeds thereof by the Company as to be described in the Rights Offering Registration Statement and the Rights Offering Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(ll)   <u>Forward-Looking Statements</u>.  No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in the Company SEC Documents has been made or reaffirmed, and in the case of the Rights Offering Registration Statement and the Rights Offering Prospectus, will be made or reaffirmed, without a reasonable basis or has been disclosed other than in good faith.

(mm)   <u>Statistical and Market Data</u>.  Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data to be included in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(nn)   <u>Rights Agreement</u>.  The Board of Directors of the Company has taken all necessary action to render the Existing Shareholder Rights Plan inapplicable to the sale and issuance of the Investor Shares and the other transactions contemplated hereby and by the Preferred Term Sheet, the Plan and the

Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).

(oo)    Takeover Statutes; Charter.  The Board of Directors of the Company has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware (the "DGCL") and Article IX of the Company's Certificate of Incorporation inapplicable to the Investors and the sale and issuance of the Investor Shares and the other transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).  Except for Section 203 of the DGCL (which has been rendered inapplicable), no other "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation (a "Takeover Statute") is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the Plan and the Transaction Agreements.  Other than Article IX of the Company's Certificate of Incorporation, which has been rendered inapplicable, no anti-takeover provision in the Company's certificate of incorporation or by-laws is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Preferred Term Sheet, the Plan or the Transaction Agreements.

4.    Representations and Warranties of the Investors.  Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth below.  Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

(a)    Incorporation.  The Investor has been duly organized and, if applicable, is validly existing as a corporation, limited partnership or limited liability company, in good standing under the laws of the jurisdiction of its incorporation or organization.

(b)    Corporate Power and Authority.  The Investor has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement .

(c)    Execution and Delivery.  This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)    No Registration.  The Investor understands that the Investor Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the

accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

(e)  <u>Investment Intent</u>.  The Investor is acquiring the Investor Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities laws.   Notwithstanding the foregoing, as to ADAH, subject to the provisions of Sections 2(a), 2(b) and 2(k), the Company acknowledges that ADAH may provide for a participation interest or other arrangement whereby the economic benefits of ownership of the Series A-2 Preferred Stock are shared with Merrill and Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock.

(f)  <u>Securities Laws Compliance</u>.  The Investor Shares will not be offered for sale, sold or otherwise transferred by the Investor except pursuant to a registration statement or in a transaction exempt from, or not subject to, registration under the Securities Act and any applicable state securities laws and any sale or placement of Investor Shares pursuant to Sections 2(a), 2(b) or 2(k) will not affect the validity of the private placement to the Investors under this Agreement.

(g)  <u>Sophistication</u>.  The Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Investor Shares being acquired hereunder.  The Investor is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.  The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Investor Shares for an indefinite period of time).

(h)  <u>No Conflict</u>.  The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Investor, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of their

properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(i)    <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties is required to be obtained or made by the Investor for the purchase of the Investor Shares hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein, except filings with respect to and the expiration or termination of the waiting period under the HSR Act or any comparable laws or regulations in any foreign jurisdiction relating to the purchase of Investor Shares and except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(j)    <u>Arm's Length</u>.  The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement.  The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)    <u>No Violation or Default; Compliance with Laws</u>.  The Investor is not in default, and no event has occurred that , with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.  The Investor is not and has not been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(l)    <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the Investor is a party or to which any property of the Investor is the subject that, individually or in the aggregate, has or, if determined adversely to the Investor, would reasonably be expected to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Investor, contemplated and, to the knowledge of the Investor, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(m)    <u>No Broker's Fees</u>.  The Investor is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(n)    <u>No Undisclosed Written Agreements</u>.  The Investor has not entered into any material written agreements between or among the Investors directly relating to such Investor's Investor Shares or the performance of the Transaction Agreements, and any such written agreement hereafter entered into will be disclosed promptly to the Company.

(o)    <u>Available Funds</u>.  To the extent the Investor is ADAH, Dolce or Harbinger, the Investor has provided the Company with a true and complete copy of an executed commitment letter from the parties signatory thereto to provide equity financing to such Investor (the "<u>Equity Commitment Letter</u>").  Each such Investor represents as to itself that its Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the parties thereto enforceable in accordance with its terms except as the enforcement thereof is subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors rights and to general equitable principles.  The Equity Commitment Letters are not subject to any condition or contingency with respect to financing that is not set forth in such letter other than the terms and conditions of this Agreement.

5.    <u>Additional Covenants of the Company</u>.  The Company agrees with each of the Investors as set forth below.

(a)    <u>Initial Approval Motion and Initial Approval Order</u>.  The Company agrees that it shall use reasonable best efforts to cause the Initial Approval Order to become a Final Approval Order as soon as practicable following the filing of the Approval Motion.

(b)    <u>Plan and Disclosure Statement</u>.  The Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure

statement (the "Disclosure Statement")) (i) the terms of which are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, however, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion, (ii) that provides for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (iii) that has conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, however, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion. The Company will (i) provide to each Investor and its counsel a copy of the Plan and the Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel. In addition, the Company will (i) provide to each Investor and its counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, into such Confirmation Order, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

(c)     Rights Offering. The Company shall use its reasonable best efforts to effectuate the Rights Offering as provided herein.

(d)     Securities Laws; Rights Offering Registration Statement. The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Investor Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws. As promptly as practicable following the later of the Due Diligence Expiration Date and the date the GM Settlement is agreed, the Company shall file a Rights

Offering Registration Statement with the Commission. The Company shall: (i) provide the Investors with a reasonable opportunity to review the Rights Offering Registration Statement, and any amendment or supplement thereto, before any filing with the Commission and shall duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel; (ii) advise the Investors, promptly after it receives notice thereof, of the time when the Rights Offering Registration Statement has been filed or has become effective or any Rights Offering Prospectus or Rights Offering Prospectus supplement has been filed and shall furnish the Investors with copies thereof; (iii) advise the Investors promptly after it receives notice of any comments or inquiries by the Commission (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the Commission of any stop order or of any order preventing or suspending the use of the Rights Offering Prospectus or Issuer Free Writing Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Rights Offering Registration Statement or a Rights Offering Prospectus or for additional information, and in each such case, provide the Investors with a reasonable opportunity to review any such comments, inquiries, request or other communication from the Commission and to review any amendment or supplement to the Rights Offering Registration Statement or the Rights Offering Prospectus before any filing with the Commission, and to duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of the Investors and their respective counsel, and not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Rights Offering Prospectus or any Issuer Free Writing Prospectus or suspending any such qualification, to use promptly its reasonable best efforts to obtain its withdrawal.

(e)   Listing. The Company shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on the New York Stock Exchange or, if approved by each of ADAH and Dolce, the Nasdaq Global Select Market.

(f)   Rule 158. The Company will generally make available to the Company's security holders as soon as practicable an earnings statement of the Company covering a twelve-month period beginning after the date of this Agreement, which shall satisfy the provisions of Section 11(a) of the Securities Act.

(g)   Notification. The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five Business Days prior to the Expiration Time (and any

extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(h)    <u>Unsubscribed Shares</u>.  The Company shall determine the number of Unsubscribed Shares, if any, in good faith, shall provide a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined and shall provide to the Investors a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as any Investor may reasonably request.

(i)    <u>HSR</u>.  The Company shall use its reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and seek all approvals or consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Investor Shares hereunder, and shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  The Company shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than 30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day).

(j)    <u>Clear Market</u>.  For a period of 180 days after the Closing Date (the "<u>Restricted Period</u>"), the Company will not (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for capital stock of the Company or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the capital stock of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock of the Company or such other securities, in cash or otherwise, without the prior written consent of each of the ADAH and Dolce, except for (A) Rights and New Common Stock issuable upon exercise of Rights, (B) shares of New Common Stock issued upon the exercise of any stock options outstanding as of the Effective Date and (C) the issuance of New Common Stock and other equity interests as set forth in the Preferred Term Sheet, the PSA and pursuant to the Plan.  Notwithstanding the foregoing, if (i) during the last 17 days of the Restricted Period, the Company

issues an earnings release or material news or a material event relating to the
Company occurs or (ii) prior to the expiration of the Restricted Period, the
Company announces that it will release earnings results during the 16-day period
beginning on the last day of the Restricted Period, the restrictions imposed by this
Agreement shall continue to apply until the expiration of the 18-day period
beginning on the issuance of the earnings release or the occurrence of the material
news or material event.

(k)     <u>Use of Proceeds</u>.  The Company will apply the net proceeds from the sale of the
Rights and the Investor Shares as provided in the Rights Offering Prospectus.

(l)     <u>No Stabilization</u>.  The Company will not take, directly or indirectly, any action
designed to or that would reasonably be expected to cause or result in any
stabilization or manipulation of the price of the Shares.

(m)     <u>Reports</u>.  So long as any Investor holds Shares, the Company will furnish to such
Investor, as soon as they are available, copies of all reports or other
communications (financial or other) furnished to holders of the Rights or the
Shares, as the case may be, and copies of any reports and financial statements
furnished to or filed with the Commission or any national securities exchange or
automatic quotation system.

(n)     <u>Conduct of Business</u>.  During the period from the date of this Agreement to the
Closing Date (except as otherwise expressly provided by the terms of this
Agreement (including the Disclosure Letter), the PSA, the Plan or any other order
of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11
Cases), the Company and its Subsidiaries shall carry on their businesses in the
ordinary course (subject to any actions which are consistent with the
Transformation Plan) and, to the extent consistent therewith, use their
commercially reasonable efforts to preserve intact their current business
organizations, keep available the services of their current officers and employees
and preserve their relationships with customers, suppliers, licensors, licensees,
distributors and others having business dealings with the Company or its
Subsidiaries.  Without limiting the generality of the foregoing, except as set forth
in the Disclosure Letter, on and after the date on which the Business Plan is
approved and accepted by ADAH and Dolce, the Company and its Subsidiaries
shall carry on their businesses in all material respects in accordance with such
Business Plan and shall not enter into any transaction that would be inconsistent
with such Business Plan and shall use its commercially reasonable efforts to effect
such Business Plan.  Without limiting the generality of the foregoing, and except
as otherwise expressly provided or permitted by this Agreement (including the
Disclosure Letter), the PSA, the Plan or any other order of the Bankruptcy Court
entered as of the date hereof in these Chapter 11 Cases, prior to the Closing Date,
the Company shall not, and shall cause its Subsidiaries not to, take any of the
following actions without the prior written consent of each of ADAH and Dolce,
which consent shall not be unreasonably withheld, conditioned or delayed:

(i)     (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (B) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (C) purchase, redeem or otherwise acquire, except in connection with the Plan, any shares of capital stock of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(ii)    except for intercompany transactions and any financing activities which are consistent with the Company's existing financing, issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(iii)   acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except in the ordinary course of business;

(iv)    sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except (A) in the ordinary course of business consistent with past practice and (B) other transactions involving not in excess of $100 million in any 12 month period;

(v)     (A) incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another person (other than a Subsidiary) or enter into any arrangement having the economic effect of any of the foregoing in excess of $100 million in any 12 month period, except for (x) working capital borrowings and increases in letters of credit necessary in the ordinary course of business under the Company's existing or any amended or replacement revolving credit facilities, and (y) indebtedness solely between the Company and its Subsidiaries or between such Subsidiaries or (B) except for transactions between the Company and any of its Subsidiaries or between such Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other individual or entity, other than customary advances of business and travel expenses to employees of the Company in the ordinary course of business consistent with past practice;

(vi)    enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan, this Agreement, the PSA, the Plan and the GM Settlement; or

(vii)    authorize any of, or commit or agree to take any of, the foregoing actions.

(o)    <u>Actions Regarding Conditions</u>.  During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in <u>Section 9</u> not being satisfied.

(p)    <u>GM Settlement</u>.  The Company shall use its reasonable best efforts to agree on, prior to January 31, 2007, a settlement agreement (the "<u>GM Settlement</u>") between the Company and GM that is consistent with this Agreement, the PSA and the Plan, and satisfactory to each of ADAH and Dolce in its sole discretion.  The Company will (i) provide to the Investors and their respective counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of each of ADAH and Dolce and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.  The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the PSA and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company.

(q)    <u>Access to Information</u>.  Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH or Dolce) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; <u>provided</u>, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information

of the Company or any of its Subsidiaries or (iii) to violate any laws; provided, further, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above.  All requests for information and access made pursuant to this Section 5(q) shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)     Financial Information.  For each month, beginning November 2006 until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within 30 days of the end of such month (the "Monthly Financial Statements").  The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices.  The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows  of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)     Business Plan and Disclosure Letter.  The Company shall use its commercially reasonable efforts to provide to the Investors as soon as practicable a final five-year business plan approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "Business Plan"); provided, that the Company shall not be required to deliver and neither ADAH nor Dolce shall be required to approve or accept for consideration by them any Business Plan that does not reflect a final and binding GM Settlement.  The Company shall deliver with the Business Plan a Disclosure Letter which provides for exceptions from the representations and warranties of the Company in Section 3.

(t)     Financing Assistance.  The Company and its Subsidiaries shall obtain the debt financing from financing sources reasonably satisfactory to Dolce and ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees, and otherwise to be on terms that are acceptable to each of ADAH and Dolce not to be unreasonably withheld (the "Debt Financing").  Subject to applicable regulatory or NASD requirements, Merrill Lynch, Pierce, Fenner & Smith, Incorporated and UBS Securities LLC (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms.  The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing.  The Company will (i) provide to the Investors and their respective counsel a copy of all marketing information, term sheets,

commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with the Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel, and (iii) keep the Investors reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

(u)    Labor Agreements.  The Company and its Subsidiaries shall use their reasonable best efforts to enter into (A) tentative labor agreements with each of The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "USW") that each of ADAH and Dolce shall have approved in its sole discretion and which adequately address, among other things, the following matters:  (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan (including plant closings, asset dispositions and resolution of union claims), (ii) permit achievement of the Business Plan and the EBITDA Target; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) acceptable to each of ADAH and Dolce in each of its sole discretion at certain of the Company's facilities.  The Company will (i) provide to the Investors and their respective counsel a copy of any labor agreement and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

(v)    Other Actions by the Company.

        (i)    Existing Shareholder Rights Plan.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "Acquiring Person" as defined in the Existing Shareholder Rights Plan

and that the rights will not separate from the Common Stock pursuant to the Existing Shareholder Rights Plan as a result of entering into this Agreement or the PSA or consummating the transactions contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan, and (B) will take all such action as is necessary to terminate the Existing Shareholder Rights Plan effective as of the Closing Date.

(ii)     <u>Takeover Statutes and Charter</u>.  The Company and the Board of Directors of the Company has taken all action necessary (A) to ensure that no Takeover Statute or similar statue or regulation is or becomes applicable to this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan, (B) if any Takeover Statute is or may become applicable to the transactions contemplated by this Agreement (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or the Plan, to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and the Plan and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions and (C) to ensure that this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan are approved for purposes of Article IX of the Company's Amended and Restated Certificate of Incorporation, dated January 26, 1999, as amended to date, and that such provision shall not apply to the transactions contemplated hereby or by the Preferred Term Sheet, the PSA or the Plan.

(w)     <u>Agreement on Key Documentation</u> .  The Company shall use its commercially reasonable efforts to agree on or prior to January 31, 2007 on (a) the terms of the GM Settlement, (b) the agreements contemplated by <u>Section 5(u)</u>, and (c) the terms of the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH and Dolce.

(x)     Investment Decision Package .  If at any time prior to the Expiration Date, any event occurs as a result of which the Investment Decision Package, as then amended or supplemented, would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it shall be necessary to amend or supplement the Investment Decision Package to comply with applicable law, the Company will promptly notify the Investors of any such event and prepare an amendment or supplement to the Investor Decision Package that is reasonably acceptable in form and substance to each of ADAH and Dolce that will correct such statement or omission or effect such compliance.

6.    <u>Additional Covenants of the Investors</u>.  Each Investor agrees, severally and not jointly, with the Company:

(a)    <u>Information</u>.  To provide the Company with such information as the Company reasonably requests regarding the Investor for inclusion in the Rights Offering Registration Statement and the Disclosure Statement.

(b)    <u>HSR Act</u>.  To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and to obtain all authorizations, approvals and consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder and any applicable notification, authorization, approval or consent shall have been made or obtained with respect to the purchase of Investor Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  Each Investor shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than 30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day).

(c)    <u>Bankruptcy Court Filings</u>.  To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order or the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company's efforts to obtain the entry of the Confirmation Order consistent with this Agreement.

(d)    <u>Reasonable Best Efforts</u>.  Each Investor shall use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan.

7.    <u>Additional Joint Covenant of Company And Each Investor</u>.  Without limiting the generality of the undertakings pursuant to <u>Sections 5(i)</u> and <u>6(b)</u>, the Company and each Investor shall use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements, including furnishing all information required by applicable law in connection with approvals of or filings with any governmental authority, and filing, or causing to be filed, as promptly as practicable, any required notification and report forms under other

applicable competition laws with the applicable governmental antitrust authority.  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings. Subject to appropriate confidentiality safeguards, each party shall (i) respond promptly to any request for additional information made by the antitrust agency; (ii) promptly notify counsel to the other party of, and if in writing, furnish counsel to the other party with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement; (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat; (iv) furnish counsel to the other party with copies of all correspondence, filings and communications between it and the antitrust agency with respect to any of the transactions contemplated by this Agreement; and (v) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency.  The Parties shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.

Notwithstanding anything in this Agreement to the contrary, nothing shall require any Investor or its Affiliates to dispose of any of its or its Subsidiaries' or its Affiliates' assets or to limit its freedom of action with respect to any of its or its Subsidiaries' businesses, or to consent to any disposition of the Company's or the Company Subsidiaries' assets or limits on the Company's or the Company Subsidiaries' freedom of action with respect to any of its or the Company Subsidiaries' businesses, or to commit or agree to any of the foregoing, and nothing in this Agreement shall authorize the Company or any Company Subsidiary to commit or agree to any of the foregoing, to obtain any consents, approvals, permits or authorizations to remove any impediments to the transactions contemplated hereby or by any Transaction Agreement relating to antitrust or competition laws or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action relating to antitrust or competition laws.

8.    <u>Reasonable Best Efforts</u>.

        The Company shall use its reasonable best efforts (and shall cause its Subsidiaries to use their respective reasonable best efforts) to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its or their part under this Agreement and applicable laws to cooperate with the Investors and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, including:

        (a)    preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or governmental entity; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, in connection with

obtaining such consents, the Company shall not, without the prior written consent of each of ADAH and Dolce in their sole discretion, pay or commit to pay any person or entity whose consent is being solicited in cash or other consideration to the extent such payment could reasonably be expected to prevent the Company from achieving the EBITDA targets set forth in <u>Section 9(a)(xviii)</u> hereof;

(b)    defending any lawsuits or other actions or proceedings, whether judicial or administrative, challenging this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or any other agreement contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed;

(c)    executing, delivering and filing, as applicable, any additional ancillary instruments or agreements necessary to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan and to fully carry out the purposes of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan and the transactions contemplated hereby and thereby including, without limitation:  (i) employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); (ii) agreements and other arrangements acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court with respect to claims against the Company of former members of the Company's management and members of the Company's management, if any, who are resigning or being terminated in accordance with the implementation of the Plan; (iii) a shareholders agreement among the Company, ADAH and Dolce reasonably satisfactory to ADAH and Dolce (the "<u>Shareholders Agreement</u>"); (iv) a registration rights agreement (the "<u>Registration Rights Agreement</u>") among the Company and the Investors, reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company, and providing that the Company shall (a) as soon as practicable after the Closing Date, and in any event no later than seven (7) days after the Closing Date, prepare and file with the Commission a registration statement, including all exhibits thereto, pursuant to Rule 415 under the Securities Act registering offers and sales by the Investors and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred Stock (the "<u>Resale Registration Statement</u>" and, together with the final prospectus contained in the Resale Registration Statement as of its effective date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-

effective amendment to the Resale Registration Statement) and any issuer free writing prospectus as defined in Rule 433 under the Securities Act used in connection with the resale of such shares, the "Resale Registration Documents"); (b) cause the Resale Registration Statement to be declared effective by the Commission as soon as practicable after the filing thereof, and in any event no later than thirty (30) days after the Closing Date; (c) obtain such comfort letters from the Company's independent certified public accountants addressed to the Investors covering such matters of the type customarily covered by comfort letters and as ADAH and Dolce reasonably request; and (d) cause a customary opinion or opinions and negative assurance statement, in customary form and scope from counsel to the Company to be furnished to each Investor; (v) an amended and restated certificate of incorporation and amended by-laws of the Company, in each case, that is consistent with this Agreement, the PSA and the Preferred Term Sheet and reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such certificate of incorporation and by-laws would have a material impact on the Investors' proposed investment in the Company; provided, that the amended and restated certificate of incorporation of the Company to be effective immediately following the Effective Date shall prohibit; (A) for so long as ADAH or Dolce, as the case may be, owns any shares of Series A Preferred Stock, any transactions between the Company or any of its Subsidiaries, on the one hand, and ADAH or Dolce or their respective Affiliates, as the case may be, on the other hand (including any "going private transaction" sponsored by ADAH or Dolce) unless such transaction shall have been approved by (x) directors constituting not less than 75% of the number of Common Directors and (y) in the case of any transaction with ADAH or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, ADAH, and (B) any transaction between the Company or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock, unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("GMAC") or General Motors ("GM") as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC (such amended and restated certificate of incorporation and amended bylaws are herein referred to as the "Amended and Restated Constituent Documents"); and (vi) the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations, in each case, that is consistent with the terms set forth in the Preferred Term Sheet and that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce shall be each in its sole discretion. Subject to applicable laws and regulations relating to the exchange of information, the Investors and the

Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan.  In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.    <u>Conditions to the Obligations of the Parties</u>.

(a)    Subject to <u>Section 9(b)</u>, the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

(i)    <u>Initial Approval Order</u>.  The Initial Approval Order shall have become a Final Approval Order.  "<u>Final Approval Order</u>" shall mean an Initial Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek <u>certiorari</u> or request reargument or further review or rehearing has expired and no appeal, petition for <u>certiorari</u> or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for <u>certiorari</u> or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which <u>certiorari</u> was sought or to which the request was made and no further appeal or petition for <u>certiorari</u> or request for reargument or further review or rehearing has been or can be taken or granted.

(ii)    <u>Approval of Plan</u>. To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, each of ADAH and Dolce shall be reasonably satisfied with, prior to filing with the Bankruptcy Court: (i) the Plan and any related documents, agreements or arrangements, (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors  from any liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (ii) a Disclosure Statement that is consistent in all material respects with the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (iii) a Confirmation Order,  that is consistent in all material respects with the provisions of the Plan, this Agreement, the Preferred Term Sheet, the

PSA and the GM Settlement; and (iv) any amendments or supplements to any of the foregoing.  Notwithstanding the foregoing, prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of the documents referred to in subsections (i), (ii), (iii) and (iv) shall be each in its sole discretion.

(iii)    <u>Plan of Reorganization</u>.  The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Closing Date.

(iv)    <u>GM Settlement</u>.  Each of ADAH and Dolce shall have approved in its sole discretion the GM Settlement prior to its filing with the Bankruptcy Court. The GM Settlement shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the GM Settlement shall have performed and complied with all of their respective covenants and agreements contained in the GM Settlement in all material respects through the Closing Date.

(v)    <u>Alternate Transaction</u>.  The Company shall not have entered into any letter of intent, memorandum of understanding, agreement in principle or other agreement (other than a confidentiality agreement with terms that are not materially less favorable to the Company than the terms of that certain Amended Confidentiality Information, Standstill and Nondisclosure Agreement, dated August 25, 2006, among the Company, Appaloosa Management L.P. and Harbinger Capital Partners Master Fund I, Ltd.) or taken any action to seek any Bankruptcy Court approval relating to, any Alternate Transaction (an "<u>Alternate Transaction Agreement</u>").  For the purpose of this Agreement, an "<u>Alternate Transaction</u>" means any plan, proposal, offer or transaction that is inconsistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement or the Plan, other than a Chapter 7 liquidation.

(vi)    <u>Change of Recommendation</u>.  There shall not have been a Change of Recommendation.  For purposes of this Agreement, a "<u>Change of Recommendation</u>" shall mean, (i) the Company or its board of directors or any committee thereof,  or GM shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investors, its approval or recommendation of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or the transactions contemplated hereby or thereby or (ii) the Company or its board of directors or any committee thereof or GM shall have approved or recommended, or proposed to approve or recommend (including by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

(vii)   <u>Confirmation Order</u>.  The Confirmation Order approving the Plan in form and substance approved by each of ADAH and Dolce in accordance with <u>Section 9(a)(ii)</u> above, shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order (the "<u>Confirmation Order</u>").

(viii)   <u>Plan and Confirmation Order</u>.  To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, (a) the Plan confirmed by the Bankruptcy Court in the Confirmation Order (the "<u>Confirmed Plan</u>") and the Confirmation Order shall be in the form and with such terms as are reasonably satisfactory to each of ADAH and Dolce in accordance with <u>Section 9(a)(ii)</u> above and (b) the Disclosure Statement approved by the Bankruptcy Court shall be in form and substance reasonably satisfactory to each of ADAH and Dolce in accordance with <u>Section 9(a)(ii)</u> above.  Notwithstanding the foregoing, prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of the Confirmed Plan, the Confirmation Order and the Disclosure Statement shall be each in its sole discretion.

(ix)   <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and each of ADAH and Dolce in accordance with the Plan.

(x)   <u>Rights Offering Registration Statement</u>.  The Rights Offering Registration Statement shall be effective not later than the Distribution Date and shall continue to be effective and no stop order shall have been entered by the Commission with respect thereto.

(xi)   <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(xii)   <u>Purchase Notice</u>.  Each of the Investors shall have received a Purchase Notice from the Company, dated as of the Determination Date, certifying as to the number of Unsubscribed Shares to be purchased or a Satisfaction Notice.

(xiii)   <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained

from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(xiv)   <u>Consents</u>.  All other governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan shall have been made or received.

(xv)   <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement.

(xvi)   <u>Representations and Warranties</u>.  The representations and warranties of Company contained in this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications, other than such qualifications contained in <u>Sections 3(i)</u> and <u>3(j)</u>) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on and as of the Disclosure Letter Delivery Date and the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect, other than with respect to the representations in <u>Sections 3(b)</u>, <u>3(c)</u>, <u>3(d)</u>, <u>3(e)</u>, and <u>3(m)(ii)</u> and <u>3(oo)</u>, which shall be true and correct in all respects.  The representations and warranties of each Investor (other than the Investor asserting the failure of this condition) contained in this Agreement and in any other document delivered pursuant to this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date which shall be true and correct only as of such specified date); except where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(xvii)   <u>Covenants</u>.  The Company and each Investor (other than the Investor asserting the failure of this condition) shall have performed and complied with all of its covenants and agreements contained in this Agreement and

in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii) EBITDA.  Each of ADAH and Dolce shall be reasonably satisfied that the Company will achieve EBITDA at least equal to the 2008 EBITDA Amount in 2008 and $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA) (the "EBITDA Target").

(xix) Financing.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx) Labor Agreements.  Each of ADAH and Dolce shall have been presented with and approved, in its sole discretion, on or before the Specified Date, tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand.  Such tentative labor agreements as so approved shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the tentative labor agreements shall have performed and complied with all of their respective covenants and agreements contained in such tentative labor agreements approved by each of ADAH and Dolce in all material respects through the Closing Date.

(xxi) Management Compensation. The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); and (ii) resolved any claims of former executive officers, or executive officer's that have resigned or been terminated, on terms acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court.

(xxii) Shareholders Agreement.  The Company shall have entered into the Shareholders Agreement with ADAH and Dolce in accordance with Section 8(c)(iii);

(xxiii) <u>Registration Rights Agreement</u>.  The Company shall have entered into the Registration Rights Agreement with the Investors in accordance with <u>Section 8(c)(iv)</u>, reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company; <u>provided</u>, that prior to the Due Diligence Expiration Date, such Registration Rights Agreement shall be satisfactory to each of ADAH and Dolce in its sole discretion.

(xxiv) <u>Amended and Restated Constituent Documents</u>.  The Company shall have adopted the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations consistent with this Agreement, the PSA and the Term Sheet and otherwise reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such documents would have a material impact on the Investors' proposed investment in the Company; <u>provided</u>, that prior to the Due Diligence Expiration Date, such documents shall be satisfactory to each of ADAH and Dolce in its sole discretion.

(b)     All or any of the conditions set forth in <u>Section 9(a)</u> may be waived in whole or in part with respect to all Investors by both ADAH and Dolce, acting together, in their sole discretion.

(c)     The obligation of the Company to issue and sell the Investor Shares are subject to the following conditions, provided that the failure of a condition set forth in <u>Sections 9(c)(vii)</u> through <u>(x)</u> to be satisfied may not be asserted by the Company if such failure results from the failure of the Company to fulfill an obligation hereunder:

(i)     <u>Initial Approval Order</u>.  The Initial Approval Order shall have become a Final Approval Order.

(ii)    <u>Antitrust Approvals</u>. All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(iii)   <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan

or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement.

(iv)    <u>Representations and Warranties</u>.  The representations and warranties of each Investor, each Related Purchaser and each Ultimate Purchaser contained in this Agreement or pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> or <u>2(k)</u> shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date, which shall be true and correct only as such specified date), except with respect to the Investors' representations in all Sections other than Sections 4(b) and 4(c) where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(v)    <u>Covenants</u>.  Each Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(vi)    <u>Bankruptcy Court Approval</u>.  This Agreement shall have been approved by the Bankruptcy Court and the approval of the Bankruptcy Court shall not have been modified, amended or withdrawn in any manner adverse to the Company.

(vii)    <u>Confirmation Order</u>.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order.

(viii)    <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and each of ADAH and Dolce in accordance with the Plan.

(ix)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(x)    <u>Financing</u>.  The Company shall have received the proceeds of the Debt
Financings and the Rights Offering that, together with the proceeds of the
sale of the Investor Shares, are sufficient to fund fully the transactions
contemplated by this Agreement, the Preferred Term Sheet, the PSA, the
GM Settlement (to the extent the Company is to fund such transactions)
and the Plan.

(d)    All of the conditions set forth in Section 9(c) may be waived in whole or in part
by the Company in its sole discretion.

10.    <u>Indemnification and Contribution.</u>

(a)    Whether or not the Rights Offering is consummated or this Agreement is
terminated or the transactions contemplated hereby or the Plan are consummated,
the Company (in such capacity, the "<u>Indemnifying Party</u>") shall indemnify and
hold harmless each Investor and the Ultimate Purchasers, their respective
Affiliates and their respective officers, directors, employees, agents and
controlling persons (each, an "<u>Indemnified Person</u>") from and against any and all
losses, claims, damages, liabilities and reasonable expenses, joint or several,
arising out of circumstances existing on or prior to the Closing Date ("<u>Losses</u>") to
which any such Indemnified Person may become subject arising out of or in
connection with any claim, challenge, litigation, investigation or proceeding
("<u>Proceedings</u>") instituted by a third party with respect to the Rights Offering, this
Agreement or the other Transaction Documents, the Rights Offering Registration
Statement, any Preliminary Rights Offering Prospectus, the Rights Offering
Prospectus, any Issuer Free Writing Prospectus, the Investment Decision Package,
the Resale Registration Documents, any amendment or supplement thereto or the
transactions contemplated by any of the foregoing and shall reimburse such
Indemnified Persons for any reasonable legal or other reasonable out-of-pocket
expenses as they are incurred in connection with investigating, responding to or
defending any of the foregoing; <u>provided</u> that the foregoing indemnification will
not apply to Losses (i) arising out of or in connection with any Proceedings
between or among any one or more Indemnified Persons, Related Purchasers
and/or Ultimate Purchasers, any Additional Investor Agreement or the failure of
such Indemnified Person to comply with the covenants and agreements contained
in this Agreement with respect to the sale or placement of Investor Shares; or (ii)
to the extent that they resulted from (a) any breach by such Indemnified Person of
this Agreement, (b) gross negligence, bad faith or willful misconduct on the part
of such Indemnified Person or (c) statements or omissions in the Rights Offering
Registration Statement, any Preliminary Rights Offering Prospectus, the Rights
Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration
Documents or any amendment or supplement thereto made in reliance upon or in
conformity with information relating to such Indemnified Person furnished to the
Company in writing by or on behalf of such Indemnified Person expressly for use
in the Rights Offering Registration Statement, any Rights Offering Preliminary
Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus,
the Resale Registration Documents or any amendment or supplement thereto.  If

for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party on the one hand and such Indemnified Person on the other hand as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of the Shares and the Investor Shares contemplated by this Agreement bears to (ii) the Commitment Fees paid or proposed to be paid to the Investors.  The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this <u>Section 10</u> shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall bind and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)        Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u> that (i) the omission so to notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this <u>Section 10</u>.  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; <u>provided</u> that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to

the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investors, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)    The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld).  If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 10.  Notwithstanding anything in this Section 10 to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses aggregating in excess of $250,000 in connection with investigating, responding to or defending any Proceedings in connection with which it is entitled to indemnification or contribution pursuant to this Section 10, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than (x) 60 days after receipt by the Indemnifying Party of such request for reimbursement and (y) 30 days after receipt by the Indemnified Party of the material terms of such settlement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)    All amounts paid by the Company to an Indemnified Person under this Section 10 shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.    <u>Survival of Representations and Warranties, Etc</u>.

(a)    The representations and warranties made in this Agreement shall not survive the Closing Date.  Other than Sections 2(b), 2(c), 2(e), 2(h), 2(i), 2(j), 2(k), 5(e), 5(f),

<u>5(j)</u>, <u>5(k)</u>, <u>5(l)</u>, <u>5(m)</u>, <u>10</u>, <u>11</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>18</u> and <u>20</u>, which shall survive the Closing Date in accordance with their terms (except <u>Section 5(l)</u> which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)        Other than with respect to <u>Sections 2(h), 2(i)</u> and <u>2(j)</u> and <u>Sections 10</u> through <u>18</u>, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims. Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million. The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Due Diligence Expiration Date. The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Due Diligence Expiration Date; <u>provided</u>, that the aggregate liability of Harbinger shall not exceed $38,442,731, the aggregate liability of Merrill shall not exceed $32,038,546 and the aggregate liability of UBS shall not exceed $25,743,392. Subject to the terms, conditions and limitation set forth in this Section 11(b), (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "<u>Assuming Investor</u>") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "<u>Breaching Investor</u>"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection. Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter. Under no circumstances shall the Company (both as Debtors-in-possession and

reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.    <u>Termination</u>.

          This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)     by mutual written consent of the Company and both of ADAH and Dolce;

(b)     by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)     by any party to this Agreement if (i) any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA or the GM Settlement or (ii) the PSA shall have been terminated in accordance with its terms; <u>provided</u>, that the right to terminate this Agreement under this <u>Section 12(c)(ii)</u> shall not be available to any party whose breach of the PSA is the cause of the termination of the PSA;

(d)     by ADAH or Dolce upon written notice to the Company and each other Investor:

          (i)     if the Initial Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the Initial Approval Order, or, if such day is not a Business Day, the next Business Day and (B) January 22, 2007; <u>provided</u>, that notice of termination pursuant to this <u>Section 12(d)(i)</u> must be given on or prior to February 28, 2007;

          (ii)    prior to the later of (A) January 31, 2007 and (B) the date that is twenty (20) calendar days after the date on which the Company has delivered to each Investor both the Business Plan reflecting the GM Settlement and the Disclosure Letter (such date, the "<u>Due Diligence Expiration Date</u>"), if any Investor is not satisfied in its sole discretion with (x) the results of its due diligence investigation of the Company and its Subsidiaries, the Disclosure Letter and the Business Plan (the "<u>Due Diligence Investigation</u>") or (y) the terms of the Shareholders Agreement, Registration Rights Agreement, the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2

Certificate of Designations, the Series B Certificate of Designations or any other Transaction Agreement;

(iii)     on or after the later of (x) June 30, 2007 (such date, being the "Closing Date Outside Date"), or (y) the first Business Day that is one-hundred eighty (180) days after the Due Diligence Expiration Date, provided that, in either case, the Closing Date has not occurred by such date;

(iv)     on or after the later of (x) May 1, 2007 (such date, being the "Disclosure Statement Outside Date"), or (y) the first Business Day that is one-hundred twenty (120) days after the Due Diligence Expiration Date, provided that, in either case, the Disclosure Statement has not been filed for approval with the Bankruptcy Court by such date;

(v)     if the Company or any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(a)(xvi) or (xvii) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; provided, that the right to terminate this Agreement under this Section 12(d)(v) shall not be available to any Investor whose breach is the cause of the failure of the condition in Section 9(a)(xvi) or (xvii) to be satisfied;

(vi)     either of ADAH or Dolce shall have determined in its reasonable discretion that the Company will not achieve EBITDA for 2008 at least equal to the 2008 EBITDA Amount and EBITDA of at least $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA);

(vii)     (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

(viii)     if, subsequent to the Company, ADAH and Dolce having previously approved in writing the form of document referred to in Sections 9(a)(iv), (xx), (xxii), (xxiii) or (xxiv), the conditions set forth in Sections 9(a)(iv), (xx), (xxii), (xxiii) or (xxiv), shall become not satisfied as a result of an amendment or modification thereto.

provided, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH and Dolce shall be entitled to terminate this Agreement as to itself (but not as to any other party) (A) in any of the circumstances described in Section 12(d)(i)-(viii) at any time prior to the Due Diligence Expiration Date, and (B) at any time on or after December 31, 2007 (each of (A) and (B) being a "Limited Termination"); provided, further, that if there is a Limited Termination, any deadline contained in Section 12(d)(i), (ii), (v)

and (vi) by which ADAH must exercise a termination right under Section 12 shall be extended by ten (10) Business Days so as to give it sufficient time to comply with its obligations under Section 2(b);

(e)    on or prior to the Due Diligence Expiration Date, by ADAH or Dolce by notice to the other parties if, on or prior to such date, (i) a target amount of EBITDA for fiscal year 2008  (but in any event not to exceed $2.4 billion) has not been agreed to by each of ADAH and Dolce in its sole discretion and included in the Business Plan (the "2008 EBITDA Amount") or (ii) restructuring charges for 2009 and 2010 have not been agreed to by each of ADAH or Dolce in its sole discretion and included in the Business Plan (the "Restructuring Charges");

(f)    by the Company upon written notice to each Investor:

(i)    subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; or

(ii)    if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if:  (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y) before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "Consideration Period") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by the Investors, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by ADAH and Dolce and again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee.

For the purposes of this Section 12(f), a "Superior Transaction" shall mean an Alternate Transaction, which the board of directors of the Company, after

consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

(g)    by ADAH, Dolce or the Company by notice given to the other parties on or before February 28, 2007 (unless this date is extended by agreement of ADAH, Dolce and the Company (as it may be so extended, the "Specified Date")) if the Company and its Subsidiaries have not entered into on or prior to January 31, 2007, (x) tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand or (y) the GM Settlement, in each case, on terms and conditions presented by the Company and satisfactory to each of ADAH and Dolce in its sole discretion.

(h)    In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise) but subject to Section 11(b), the Company shall pay a fee of $100,000,000 (the "Alternate Transaction Fee") to the Investors in such proportions as are set forth on Schedule 2 hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)    pursuant to (x) Section 12(d)(vii)(B) or (y) Section 12(f)(ii);

(ii)    pursuant to Section 12(d)(vii)(A) and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated; or

(iii)    pursuant to Section 12(d)(v) based on a willful breach by the Company and within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this Section 12(h) will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to Section 12(h)(i)(x), (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to Section 12(h)(i)(y) and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of

an Alternate Transaction in the case of a payment pursuant to <u>Section 12(h)(ii) or (iii)</u>.  Under no circumstances shall the Company be required to pay more than one Alternate Transaction Fee.  The provision for the payment of the Alternate Transaction Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(i)      Upon termination under this <u>Section 12</u>, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (x) nothing contained herein shall release any party hereto from liability for any willful breach and (y) the covenants and agreements made by the parties herein in <u>Sections 2(h)</u>, <u>2(i)</u> and <u>2(j)</u>, and <u>Sections 10</u> through <u>18</u> will survive indefinitely in accordance with their terms.

13.   <u>Notices</u>.  All notices and other communications in connection with this Agreement will be in writing and will be deemed given (and will be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)      If to:

Dolce Investments LLC
c/o Cerberus Capital Management L.P.
299 Park Avenue
New York, New York 10171
Facsimile:  (212) 421-2958 / (212) 909-1409 / (212) 935-8749
Attention:  Scott Cohen / Dev Kapadia / Seth Gardner

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Facsimile:  (212) 822-5899
Attention:  Thomas C. Janson

and

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Facsimile:  (213) 892-4470
Attention:  Gregory A. Bray

(b)    If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street,
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:  Ronald Goldstein

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
                     Gregory Pryor

(c)    If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn: Philip A. Falcone

with a copy to:

Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile:  (205) 987-5505
Attention:  General Counsel

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
           Gregory Pryor

with a copy to:

Kaye Scholer LLP
425 Park Avenue
New York, NY  10022-3598
Facsimile:  (212) 836-8689
Attention:  Benjamin Mintz and Lynn Toby Fisher

(d)    If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York  10080
Facsimile:  (212) 449-0769
Attention:  Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile: (212) 757-3990
Attention:  Andrew N. Rosenberg

(e)     If to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:  Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:  Leslie N. Silverman

(f)     If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention:  John Sheehan – Facsimile:  (248) 813-2612
              David Sherbin / Sean Corcoran – Facsimile:  (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile:  (212) 735-2000/1
Attention:  Eric L. Cochran
              Marie L. Gibson

and

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile:  (312) 407-0411
Attention:  John Wm. Butler, Jr.
              George Panagakis

14.   Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to Sections 2(a), 2(b) and 2(k).  Notwithstanding the previous sentence, subject to the provisions of

Sections 2(a), 2(b) and 2(k): (1) this Agreement, or the Investors' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate of such Investor over which such Investor or any of its Affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; provided, that any such assignee assumes the obligations of such Investor hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as such Investor; and (2) ADAH may provide for a participation interest or other arrangement whereby the economic benefits of ownership of the Series A-2 Preferred Stock are shared with Merrill, Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company, ADAH and Dolce no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in Section 10 with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    Prior Negotiations; Entire Agreement.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties will continue in full force and effect.

16.    GOVERNING LAW; VENUE.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK  AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.    Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18.    <u>Waivers and Amendments</u>.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

19.    <u>Adjustment to Shares</u>.  If, in accordance with the terms of this Agreement, the Company effects a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction with respect to any shares of its capital stock, references to the numbers of such shares and the prices therefore shall be equitably adjusted to reflect such change and, as adjusted, shall, from and after the date of such event, be subject to further adjustment in accordance herewith.

20.    <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21.    <u>Publicity</u>.  The initial press release regarding this Agreement shall be a joint press release. Thereafter, the Company and Investors each shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22.    <u>Knowledge; Sole Discretion</u>.  The phrase "knowledge of the Company" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company, ADAH and Dolce shall reasonably agree.  Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION


By: _____
      Name:
      Title:


A-D ACQUISITION HOLDINGS, LLC


By: _____
      Name:
      Title:


HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.


By: _____
      Name:
      Title:


DOLCE INVESTMENTS LLC

By:  Cerberus Capital Management L.P., its Managing Member


By: _____
      Name:
      Title:


MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED


By: _____
      Name:
      Title:

UBS SECURITIES LLC

By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

SCHEDULE 1

| Defined Term | Section |
|---|---|
| 2008 EBITDA Amount | Section 12 (e) |
| ADAH | Recitals |
| Additional Investor Agreements | Section 2 (k) |
| Affiliate | Section 2 (a) |
| Agreement | Recitals |
| Alternative Financing | Section 2 (b) |
| Alternate Transaction | Section 9 (a)(v) |
| Alternate Transaction Agreement | Section 9 (a)(v) |
| Alternate Transaction Fee | Section 12 (h) |
| Amended and Restated Constituent Documents | Section 8 (c) |
| Assuming Investor | 11(b) |
| Available Investor Shares | Section 2 (b) |
| Ballots | Section 1 (c)(ii) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3 (b)(i) |
| Breaching Investor | 11(b) |
| Business Day | Section 1 (c)(iii) |
| Business Plan | Section 5 (s) |
| Capital Structure Date | Section 3 (d) |
| Change of Recommendation | Section 9 (a)(vi) |
| Chapter 11 Cases | Recitals |
| Closing Date | Section 2 (d) |
| Closing Date Outside Date | Section 12 (d)(iii) |
| Code | Section 3 (z)(ii) |
| Commission | Section 1 (c)(ii) |
| Commitment Fees | Section 2 (h)(ii) |
| Commitment Parties | Recitals |
| Company | Recitals |
| Company ERISA Affiliate | Section 3 (z)(ii) |
| Company Plans | Section 3 (z)(i) |
| Company SEC Documents | Section 3 (j) |
| Confirmation Hearing | Section 1 (c)(iii) |
| Confirmation Order | Section 9 (a)(vii) |
| Confirmed Plan | Section 9 (a)(viii) |
| Consideration Period | Section 12 (f)(ii) |
| Debt Financing | Section 5 (t) |
| Debtors | Recitals |
| Determination Date | Section 1 (c)(vi) |
| DGCL | Section 3 (oo) |
| DIP Order | Section 2(j) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |

| Defined Term | Section |
|---|---|
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section 1 (c)(ii) |
| Disclosure Statement Outside Date | Section 12 (d)(iv) |
| Disinterested Director | Section 8 (c) |
| Distribution Date | Section 1 (c)(ii) |
| Dolce | Recitals |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| Due Diligence Investigation | Section 12 (d)(ii) |
| EBITDA Target | Section 9 (a)(xviii) |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| E&Y | Section 3 (q) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| Final Approval Order | Section 9 (a)(i) |
| GAAP | Section 3 (i) |
| GM | Section 8 (c) |
| GM Settlement | Section 5 (p) |
| GMAC | Section 8 (c) |
| Harbinger | Recitals |
| HSR Act | Section 3 (g) |
| IUE-CWA | Section 5 (u) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Initial Approval Motion | Recitals |
| Initial Approval Order | Recitals |
| Investment Decision Package | Section 3 (k) |
| Investor | Recitals |
| Investors | Recitals |
| Investor Default | Section 2 (b) |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Maximum Number | Section 2(a) |
| Merrill | Recitals |
| Money Laundering Laws | Section 3 (ee) |

| Defined Term | Section |
|---|---|
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Plan | Section 1 (b) |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| PSA | Section 1 (b) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| Related Purchaser | Section 2 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Restructuring Charges | Section 12 (e) |
| Right | Section 1 (a) |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1(a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |
| Securities Act Effective Date | Section 3 (k) |
| Series A-1 Certificate of Designations | Section 2 (a)(ii) |
| Series A-1 Preferred Stock | Section 2 (a)(ii) |
| Series A Preferred Stock | Section 2 (a)(ii) |
| Series A-2 Certificate of Designations | Section 2 (a)(iii) |
| Series A-2 Preferred Stock | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Specified Date | Section 12(g) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |

| Defined Term | Section |
|---|---|
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vii) |
| UAW | Section 5 (u) |
| UBS | Recitals |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

# SCHEDULE 2

| | Direct Subscription Shares | Purchase Price | Series A-1 Preferred Stock | Purchase Price | Series A-2 Preferred Stock | Purchase Price | Series B Preferred Stock | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|
| Dolce Investments LLC | 3,150,000 | $ 110,250,000 | 8,571,429 | $ 300,000,000 | - | $ - | 8,571,429 | $ 300,000,000 | $ 710,250,000 |
| A-D Acquisition Holdings, LLC | 1,890,000 | 66,150,000 | - | | 8,571,429 | 300,000,000 | 5,142,857 | 180,000,000 | 546,150,000 |
| Harbinger Del-Auto Investment Company, Ltd. | 472,500 | 16,537,500 | - | | - | | 1,285,714 | 45,000,000 | 61,537,500 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 393,750 | 13,781,250 | - | | - | | 1,071,429 | 37,500,000 | 51,281,250 |
| UBS Securities LLC | 393,750 | 13,781,250 | - | | - | | 1,071,429 | 37,500,000 | 51,281,250 |
| Total | 6,300,000 | $ 220,500,000 | 8,571,429 | $ 300,000,000 | 8,571,429 | $ 300,000,000 | 17,142,858 | $ 600,000,000 | $1,420,500,000 |

Proportionate Share of Preferred Commitment Fee:

| | |
|---|---|
| Dolce Investments LLC | 50% |
| A-D Acquisition Holdings, LLC | 40% |
| Harbinger Del-Auto Investment Company, Ltd. | 3.750% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 3.125% |
| UBS Securities LLC | 3.125% |
| Total | 100% |

Proportionate Share of Standby Commitment Fee:

| | |
|---|---|
| Dolce Investments LLC | 50% |
| A-D Acquisition Holdings, LLC | 30% |
| Harbinger Del-Auto Investment Company, Ltd. | 7.5% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 6.25% |
| UBS Securities LLC | 6.25% |
| Total | 100% |

Proportionate Share of Alternate Transaction Fee:

| | |
|---|---|
| Dolce Investments LLC | 50% |
| A-D Acquisition Holdings, LLC | 30% |
| Harbinger Del-Auto Investment Company, Ltd. | 7.5% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 6.25% |
| UBS Securities LLC | 6.25% |
| Total | 100% |

<u>EXHIBIT A</u>

## SUMMARY OF TERMS OF
## PREFERRED STOCK

      *Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by (i) certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates and (ii) entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch & Co. and UBS Securities. The Investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, either party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. Neither party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer**: | Delphi Corporation (the "*Company*"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "*Bankruptcy Case*") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors**: | Certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates (collectively, "*Cerberus*"); entities or funds controlled by Appaloosa Management ("*Appaloosa*"), Harbinger Capital Partners ("*Harbinger*"), Merrill Lynch & Co. ("*Merrill*") and UBS Securities ("*UBS*", and, together with Harbinger and Merrill, "*HUM*"), with the economic interests in the Preferred Stock to be purchased by the Appaloosa Investors allocated as follows: (a) Appaloosa—60.0%; (b) Harbinger--15.0%; and (c) UBS and Merrill—12.5% each; provided, that Appaloosa shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-2 Preferred Stock and shall hold and retain all control rights with respect thereto, including voting and disposition rights. HUM and Appaloosa are collectively referred to as the "*Appaloosa Investors*" and Cerberus and the Appaloosa Investors are collectively referred to as the "*Investors*." |

| | |
|---|---|
| **Securities to be Issued**: | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series A-1 Preferred Stock*") |
| | Series A-2 Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series A-2 Preferred Stock* " and, together with the Series A-1 Preferred Stock, the *"Series A Preferred Stock"*) |
| | Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series B Preferred Stock*" and, together with the Series A Preferred Stock, the *"Preferred Stock"*) |
| | Except as set forth below under "Voting Rights" the Series A-1 Preferred Stock and the Series A-2 Preferred Stock are identical in all respects.  In addition, the Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, upon the happening of certain events as outlined below.  The Series B Preferred Stock shall be identical in all respect to the Series A Preferred Stock except with respect to voting rights, as set forth below. |
| **Purchase of Preferred Stock**: | At the Effective Time (the "*Issue Date*") of the Plan of Reorganization (the "Plan") in the Bankruptcy Case, (i) Cerberus shall purchase all of the 8,571,429 shares of Series A-1 Preferred Stock for an aggregate of $300 million;  (ii) Appaloosa will purchase all of the 8,571,429 shares of Series A-2 Preferred Stock for an aggregate purchase price of $300 million, (iii) Cerberus shall purchase 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million and (iv) the Appaloosa Investors shall purchase, in the aggregate, 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million. The Stated Value of the Preferred Stock shall be $35.00 per share. |
| **Mandatory Conversion into Common Stock:** | The Company shall convert all, but not less than all, of the Preferred Stock on or after the seventh anniversary of the Issue Date at the Conversion Price in effect on such conversion date; provided, that no such conversion may be made unless the Closing Price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be in excess of 150% of the initial per share plan value.  The Company may not effect the conversion unless the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.  The holders of the Series A Preferred Stock will agree not to take any action to delay or prevent such registration statement from becoming effective. |

| | |
|---|---|
| **Liquidation Rights**: | In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, each holder of Preferred Stock shall receive, in exchange for each share, out of legally available assets of the Company, a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*"). |
| **Ranking** | The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company.  The Preferred Stock will rank senior to any other class or series of capital stock of the Company  with respect to any distributions upon liquidation, dissolution or winding up of the Company. |
| **Conversion of Preferred Stock into Common Stock**: | Each share of Preferred Stock shall be convertible at any time, without any payment by the Holder thereof, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price.  The Conversion Price shall initially be $35.00, subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "*Conversion Price*").  The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences. |
| **Conversion of Series A Preferred Stock into Class B Preferred Stock:** | If at any time Cerberus and Appaloosa cease to beneficially own, in the aggregate, Series A Preferred Stock with a Liquidation Value of $250 million or more, then all of the shares of Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, without any action on the part of the holder thereof; provided, that no such conversion may occur unless at that time, the Company has in effect a registration statement covering resales of the Series B Preferred Stock and Common Stock issuable upon conversion of the Preferred Stock.  The holders of the Series A Preferred Stock will agree not to take any action to delay or prevent such registration statement from becoming effective.

If any holder transfers shares of Series A Preferred Stock to any person other than an Affiliate of such holder (a "*Permitted Holder*") then all of the shares of Series A Preferred Stock so transferred shall automatically, upon such transfer, convert into shares of Series B Preferred Stock, on a one for one basis.

In addition, any holder of Series A Preferred Stock may convert all or any portion of its Series A Preferred Stock into shares of Series B Preferred Stock, on a one for one basis, at any time at its option.

Subject to compliance with applicable securities laws, shares of Series B Preferred Stock will be freely transferable. |

| | |
|---|---|
| **Dividends**: | The holder of each share of Preferred Stock shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 3.25% of the Liquidation Value thereof, payable quarterly in cash.  Unpaid dividends shall accrue.  In addition, if any dividends are declared on the Common Stock, the Preferred Stock shall be entitled to receive, in addition to the dividend on the Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Preferred Stock had it been converted immediately prior to the record date for such dividend. |
| **Preference with Respect to Dividends**: | Each holder of Preferred Stock shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock. |
| **Restriction on Redemptions of Junior Stock**: | So long as shares of Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Company shall not, and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock except customary provisions with respect to repurchase of employee equity upon termination of employment. |

**Governance – Board
of Directors**

So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:

The board of directors of the Company shall consist of twelve (12) directors, three (3) of whom shall initially be elected by the holders of the Series A-1 Preferred Stock Holders, three (3) of whom shall initially be elected by the holders of the Series A-2 Preferred Stock, one (1) of whom shall be the Executive Chairman selected as described below under "Executive Chairman," one (1) of whom shall be the CEO, and four (4) of whom shall be elected by the holders of the Common Stock and the Series B Preferred Stock, voting as a class (the "Common Directors") (it being understood that the Series A Preferred Stock shall not vote with respect to the Common Directors and any holder of Series A Preferred Stock shall not vote its shares of Series B Preferred Stock in respect of the Common Directors). For the avoidance of doubt, the Executive Chairman and the CEO shall be elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class. The Executive Chairman of the Board shall initially be selected as described below under "Executive Chairman." The initial CEO shall be Rodney O'Neal, who shall become the CEO and President not later than the effective date of the plan of reorganization. The four (4) Common Directors shall be selected by a search committee (the "*Selection Committee*") consisting of a representative of each of Cerberus, Appaloosa, the Unsecured Creditors Committee, the Equity Committee and the Company[1], which selection shall be made by unanimous vote of the Selection Committee with the Appaloosa and Cerberus representatives on the Selection Committee not entitled to vote on such selection. Thereafter, (i) the nominees for election of the Common Directors shall be selected by the Nominating and Corporate Governance Committee of the Board with the Appaloosa and Cerberus representatives on the Committee not entitled to vote on such selection and (ii) any successor Executive Chairman shall be selected as described below under "Executive Chairman." At least one Common Director shall serve on each committee of the Board subject, in the case of the Audit Committee, to applicable qualification requirements.

The directors selected by the holders of the Series A Preferred Stock shall be reallocated between the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock as follows if any changes occur in the number of outstanding shares of Series A Preferred Stock: If either series of Series A Preferred Stock represents less than 33 1/3% and 16 2/3% or more of the outstanding shares of Series A Preferred Stock then the series with the fewer number of shares shall elect two (2) directors and the series with the larger number of shares shall elect four (4) directors; if either series of Series A Preferred Stock represents less than 16 2/3% and more than 0% of the Series A Preferred Stock, then the series with the fewer number of shares shall elect one (1) director and the series with the larger number of shares shall elect five (5) directors; and if any series of the Series A Preferred Stock shall cease to be outstanding, then the holders of the other series shall elect all six (6) directors to which the Series A Preferred Stock is entitled (unless both series shall cease to be outstanding).

---

[1] Company representative shall be John D. Opie, the current lead director of the Company.

**Executive Chairman**    So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:

The initial Executive Chairman shall be selected by the Selection Committee by a supermajority vote of four of the five members of the Selection Committee, including the affirmative vote of both the Appaloosa and Cerberus representatives. Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee with the affirmative approval of the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock.

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman may be removed at any time by the affirmative vote of all of the holders of the Series A Preferred Stock.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the holders of the Series A Preferred Stock with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the holders of the Series A Preferred Stock, acting together as a single class, may remove the Executive Chairman and/or Chief Executive Officer as a director.

**Governance – Voting Rights**

Except with respect to the election of directors, who shall be elected as specified above, the holders of the Preferred Stock shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders.

Until the Liquidation Value of the Preferred Stock beneficially owned by Appaloosa and Cerberus together with all Common Stock directly owned by Appaloosa and Cerberus (valued for this purpose at the Plan Value of $45.00 per share) is less than $600 million, the following Governance – Voting Rights shall be in effect:

The holders of the Series A Preferred Stock shall have the right to select, and to cause the Company to terminate, the Chief Executive Officer, the Chief Operating Officer and the Chief Financial Officer of the Company. The majority of the members of the Company's compensation committee shall initially be made up of directors designated by Cerberus and Appaloosa. Pursuant to a stockholder agreement or other arrangements, the Company shall agree to maintain that majority.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the holders of the Series A Preferred Stock with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the holders of Series A Preferred Stock, written notice from all of the holders of the Series A Preferred Stock that they object to such action:

- any new debt or lease financing or guarantees in excess of $100 million in any twelve-month period after the Issue Date;

- the grant of any new lien, mortgage or security interest in any assets having a value in excess of $100 million in any twelve-month period after the issue Date;

- a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

- any merger or consolidation involving a change of control of the Company;

- any acquisition of or investment in any other person or entity having a value in excess of $100 million in any twelve-month period after the Issue Date;

- any action to liquidate the Company;

- any issuance of equity securities or rights to acquire equity securities at less than fair market value;

▪ other than pursuant to any conversion provisions set forth herein, any redemption, repurchase or other acquisition of shares of capital stock involving aggregate payments in excess of $10 million in any twelve month period after the Issue Date;

▪ payment of any dividends in cash or other assets (other than additional shares of Common Stock); or

▪ any amendment of the charter or bylaws.

The approval rights set forth above shall be in addition to the other voting rights set forth above and any voting rights to which the holders of the shares of Series A Preferred Stock are entitled under Delaware law; provided, however, in a merger or consolidation involving a change of control of the Company, the Series A Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock into which such Series A Shares are then convertible (or a preferred security of equivalent economic value) and (ii) the Liquidation Preference.

These limitations shall not apply to debt or lease financing or guarantees or lien, mortgage or security interests which constitute refinancings, replacements and extensions thereof that are (i) on prevailing market terms with respect to the economics thereof and (ii) on substantially the same terms (including with respect to the obligors, tenor, security and ranking) as the obligations being refinanced, replaced or extended with respect to other terms.

The Series B Preferred Stock shall be identical in all respects to Series A Preferred Stock except the Series B Preferred Stock shall have no voting rights other than (i) the right to vote, together with the Common Stock as one class on an "as converted basis" on all matters submitted to the Common Stock (subject to restrictions on voting by holders of Series A Preferred Stock for Common Directors as set forth above) and (ii) as required by law.

Appaloosa and Cerberus shall not receive compensation or remuneration of any kind in connection with their exercise or non-exercise of voting or other rights under the Series A Preferred Stock.

**Reservation of Unissued Stock**:   The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock.

| | |
|---|---|
| **Transferability and Right of First Offer**: | Holders of Series A Preferred Stock may sell or otherwise transfer such stock as follows: |

- to any Permitted Holder

- to any other person subject to the right of first offer provided below; provided, however, that upon any such transfer, the shares of Preferred Stock so transferred shall automatically convert into shares of Series B Preferred Stock.

If any transfer or conversion of Series A Preferred Stock would result in the holders of the Series A Preferred Stock owning insufficient shares of Series A Preferred Stock to avoid the mandatory conversion of the Series A Preferred Stock, then the other holders of Series A Preferred Stock shall have the right to purchase the shares of Series A Preferred Stock proposed to be transferred or converted at a purchase price equal to the Current Market Value. The selling holder shall give the other holders at least 15 days' notice of a proposed transfer or conversion to which these rights apply. Upon such notice, the holders may elect to purchase the shares, *pro rata*, on the terms offered within 15 days following the date of such notice.

| | |
|---|---|
| **Registration Rights**: | The Investors shall be entitled to registration rights as set forth below. The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions. |

<u>Demand Registrations.</u>  The holders of the Preferred Stock shall be entitled to four demand registrations; *provided*, that following the time that the Company is eligible to use Form S-3, the holders shall be entitled to an unlimited number of demand registrations.  Any demand registration may, at the option of the holder be a "shelf" registration pursuant to Rule 415 under the Securities Act of 1933.  All registrations will be subject to customary "windows."

<u>Piggyback Registrations</u>.  In addition, the holders shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

<u>Registrable Securities</u>:  The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock or the Series B Preferred Stock, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities.  Securities shall cease to be Registrable Securities upon sale to the public pursuant to an registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

<u>Expenses.</u>  All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

| | |
|---|---|
| **Preemptive Rights**: | So long as Cerberus and Appaloosa beneficially own, in the aggregate. Series A Preferred Stock with a Liquidation Value of $250 million or more, the holders of Preferred Stock shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions. |
| **Commitment Fee:** | A commitment fee of $21 million shall be earned by and payable to the Investors as provided for in the Discussion Points. |
| **Stockholders Agreement**: | Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by the Investors and the Company on the Issue Date. |
| **Governing Law**: | State of Delaware |

EXECUTION COPY

**THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

---

PLAN FRAMEWORK SUPPORT AGREEMENT

by and among

DELPHI CORPORATION,

GENERAL MOTORS CORPORATION,

APPALOOSA MANAGEMENT L.P.,

CERBERUS CAPITAL MANAGEMENT, L.P.,

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.,

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED

and

UBS SECURITIES LLC

---

Dated as of December 18, 2006

EXECUTION COPY

## PLAN FRAMEWORK SUPPORT AGREEMENT

This Plan Framework Support Agreement (the "Agreement"), is entered into as of December 18, 2006, by and among Delphi Corporation ("Delphi"), on behalf of itself and its subsidiaries and affiliates operating as debtors and debtors-in-possession (together with Delphi, the "Debtors") in the Chapter 11 Cases (as defined below), General Motors Corporation ("GM"), Appaloosa Management L.P., ("Appaloosa"),  Cerberus Capital Management, L.P., ("Cerberus"), Harbinger Capital Partners Master Fund I, Ltd., ("Harbinger"),  Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill") and UBS Securities LLC ("UBS").  Each of the Debtors, GM, Appaloosa, Cerberus, Harbinger, Merril and UBS is referred to herein individually as a "Party," and collectively, as the "Parties".  As used herein, the phrases "this Agreement", "hereto", "hereunder" and phrases of like import shall mean this Agreement.

## RECITALS

A.    On October 8 and October 14, 2005, the Debtors commenced jointly administered chapter 11 cases (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for the purpose of restructuring their businesses and related financial obligations pursuant to an overall transformation strategy (the "Transformation Plan") that would incorporate the following structural components:

(i)    Modification of the Debtors' labor agreements;

(ii)    Resolution of all issues and disputes between the Debtors and GM regarding (i) certain legacy obligations, including allocating responsibility for various pension and other post-employment benefit obligations; (ii) all alleged claims and causes of action arising from the spin-off of Delphi from GM; (iii) costs associated with the transformation of the Debtors' business (including the establishment of support to be provided by GM in connection with certain of those businesses that the Debtors intend to shut-down or otherwise dispose of); (iv) the restructuring of ongoing contractual relationships with respect to continuing operations; and (v) the amount and treatment of GM's claims in the Chapter 11 Cases (together, the "Designated Issues");

(iii)    Development of a strategically focused product portfolio and realignment of production capacity to support it;

(iv)    Transformation of the Debtors' work force in keeping with a sustainable cost structure and streamlined product portfolio;

(v)    Resolution of the Debtors' pension issues; and

(vi)    Restructuring of the Debtors' balance sheet to accommodate the transformed business.

EXECUTION COPY

B.      In the summer of 2006, Appaloosa and Harbinger, as significant stakeholders of the Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to which they obtained certain information from and about the Debtors and their businesses and engaged in discussions regarding various potential reorganization structures and related matters, including the potential requirement for a substantial equity investment in Delphi to facilitate the Debtors' restructuring.

C.      Separately, the Debtors conducted negotiations with other potential investors, including Cerberus.

D.      At the Debtors' request, Appaloosa, Harbinger and Cerberus engaged in discussions regarding their respective views of the Transformation Plan, the terms of a potential investment in Delphi and the general terms of various potential restructuring strategies for the Debtors.

E.      As a consequence of the foregoing discussions, this Agreement sets forth in Article VI hereof certain material terms of a chapter 11 plan for the Debtors (the "Plan") that is conditioned on (i) the implementation of the Transformation Plan, including a settlement of the Designated Issues, and (ii) a proposed equity investment by certain affiliates of Appaloosa, Cerberus, Harbinger, UBS and Merrill (collectively, the "Plan Investors") in Delphi (the "Investment").

F.      The Plan Investors have committed to Delphi to make the Investment on the terms and on the conditions set forth in the Equity Purchase and Commitment Agreement, the form of which is annexed as Exhibit A hereto (the "Investment Agreement"), which sets forth the obligations of the Plan Investors to (i) purchase any unsubscribed shares issued under a rights offering (the "Rights Offering") of new common stock, and additional shares of common stock, of Delphi to be issued pursuant to the Plan, and (ii) purchase newly issued shares of preferred stock of Delphi.

G.      Subject to the terms of this Agreement, the Parties have agreed to work together to attempt to complete the negotiation of the terms of the Plan, as well as to resolve other outstanding issues, and to formulate and facilitate confirmation and consummation of the Plan and the transactions contemplated hereby; provided, however, that Delphi will be the sole proponent of the Plan.

H.      In so agreeing, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, or the fiduciary duties of the Debtors or any such other Party having such duties.

I.      Settlement of the Designated Issues is contingent upon Delphi and GM reaching agreement on all documents pertinent in any way to GM's participation in the Plan and/or all transactions contemplated thereby, including, without limitation, definitive documentation evidencing all aspects of the commercial, business and labor-related agreements between Delphi and GM and any other Designated Issues (collectively, the "Delphi/GM Definitive Documents").

2

EXECUTION COPY

AGREEMENT

ARTICLE I

OBLIGATIONS OF THE DEBTORS

The Debtors presently believe that, subject to the exercise (after consultation with outside legal counsel) by each Debtor of its fiduciary duties as a debtor and debtor-in-possession in the Chapter 11 Cases, prompt consummation of the Plan will facilitate the Debtors' businesses and financial restructuring and is in the best interests of their creditors, shareholders, and other parties-in-interest.  Accordingly, the Debtors hereby agree, subject to the exercise (after consultation with outside legal counsel) by each Debtor of its fiduciary duties as a debtor and debtor-in-possession in the Chapter 11 Cases, to use commercially reasonable efforts to obtain confirmation and consummation of the Plan; provided, however, that any failure by the Debtors to take any such actions shall not create any claim (administrative or otherwise) or cause of action against the Debtors or any of their affiliates.  Subject to the foregoing and to Delphi and GM reaching agreement on the Delphi/GM Definitive Documents on or before January 31, 2007 or such later date as the Debtors shall agree, for so long as this Agreement remains in effect, the Debtors agree to:

1.1     Subject to the terms of applicable non-disclosure agreements, provide the Plan Investors and their counsel, accountants, financial advisors and other representatives with access to information and personnel so that the Plan Investors can complete their due diligence review of Delphi and its subsidiaries within the timeframe contemplated by the Investment Agreement;

1.2     Subject to the terms of applicable non-disclosure agreements, promptly provide the Plan Investors with information regarding the results of operations and other activities and negotiations related to the Transformation Plan, settlement of the Designated Issues and the Plan;

1.3     Prepare and file with the Bankruptcy Court no later than December 18, 2006, a motion (the "Initial Motion") seeking an order from the Bankruptcy Court (i) approving and authorizing the Debtors to enter into the Investment Agreement; (ii) authorizing payment of Transaction Expenses, the Commitment Fees and the Alternate Transaction Fee (as such terms are defined in the Investment Agreement) on the terms and conditions set forth in the Investment Agreement, (iii) approving and authorizing the Debtors to enter into this Agreement and (iv) determining that the Parties' entry into, and performance of, their obligations under this Agreement does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against the Parties including, without limitation, designating the vote of GM or any Plan Investor on the Plan under section 1125(e) of the Bankruptcy Code;

1.4     Use commercially reasonable efforts to have the Bankruptcy Court enter an order (the "Initial Approval Order") granting the relief requested in the Initial Motion, on or before January 5, 2007;

1.5     Use commercially reasonable efforts to prepare and distribute to each Party no later than January 31, 2007 drafts of (i) the Plan, (ii) a disclosure statement with respect to the Plan (the

3

"Disclosure Statement"), and (iii) a registration statement to be filed with the Securities and Exchange Commission (the "Registration Statement") relating to the Rights Offering;

1.6    Use commercially reasonable efforts to obtain entry by the Bankruptcy Court of an order approving the Disclosure Statement (the "Disclosure Statement Order") on or before April 5, 2007;

1.7    Subject to (and conditioned upon) entry of the Disclosure Statement Order, use commercially reasonable efforts to solicit the requisite votes in favor of the Plan, obtain confirmation by the Bankruptcy Court of the Plan, obtain the debt financings contemplated by the Plan and cause the effective date of the Plan to occur on or before the later of (a) July 31, 2007 or (b) the first business day that is 180 days following the date on which the diligence out in the Investment Agreement is no longer able to be exercised as a result of waiver or the passage of time;

1.8    Use commercially reasonable efforts to cause the Registration Statement to become effective during the period approved for the commencement of solicitation of votes on the Plan; and

1.9    Engage in good faith negotiations with the other Parties regarding the Plan, Disclosure Statement and other definitive documents that are materially consistent with this Agreement and that resolve all unresolved items reflected herein and/or are necessary to the implementation of the transactions contemplated by this Agreement (collectively, the "Definitive Documents").

ARTICLE II

SUPPORT OBLIGATIONS OF THE PLAN INVESTORS AND GM

Unless and until this Agreement has been terminated in accordance with its terms, and subject to GM's and the Plan Investors' obligations in this Article II (other than clauses (i) through (iii) of Section 2.4 hereof) being subject to Delphi and GM reaching agreement on the Delphi/GM Definitive Documents (it being understood that no Party has any obligation to agree to or enter into any such documents), and provided that any failure by any Plan Investor or GM to take or refrain from taking, as the case may be, any actions described below in this Article II shall not create any claim or cause of action against them or any of their affiliates, each of the Plan Investors and GM agree (and shall cause its respective subsidiaries and controlled affiliates to agree) that it will:

2.1    Support entry of the Disclosure Statement Order;

2.2    Not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to entry of the Disclosure Statement Order;

2.3    Not, nor will it encourage any other person or entity to, object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with, entry of the Disclosure Statement Order;

4

EXECUTION COPY

2.4      Until April 1, 2007, or such later date as may be mutually agreed by GM and the Plan Investors (such agreement not to be unreasonably withheld), not, directly or indirectly (i) initiate, solicit, knowingly cooperate with, or knowingly encourage any inquiries or the making of any proposal or offer that constitutes, or can reasonably be expected to lead to, any Alternate Transaction (as defined in the Investment Agreement), (ii) engage in, continue, or otherwise participate in any negotiations regarding any Alternate Transaction, (iii) enter into any letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternate Transaction or (iv) withhold, withdraw, qualify, or modify (or resolve to do so) in a manner adverse to the Plan Investors or the Debtors its approval or recommendation of this Agreement, the Plan or the transactions contemplated thereby; and that it will cause its subsidiaries and controlled affiliates not to undertake, directly or indirectly, any of the actions described in the immediately preceding clauses (i) through (iv); and that it will use its commercially reasonable efforts to cause its respective directors, officers, employees, investment bankers, attorneys, accountants, and other advisors or representatives not to undertake, directly or indirectly, any of such actions; provided, however, that nothing in this Section 2.4 shall preclude GM or any of the Plan Investors or any of their respective subsidiaries or controlled affiliates, or any of their respective directors, officers, employees, investment bankers, attorneys, accountants, and other advisors or representatives from initiating, soliciting, knowingly cooperating with, knowingly encouraging, discussing, negotiating, entering into, consummating or otherwise participating in any transactions relating to (x) the sale and/or wind-down of any of the Debtors' non-core sites and/or business lines as publicly announced by the Debtors on March 31, 2006 and as modified by the Debtors, in writing provided to GM, from time to time, (y) resourcing products purchased by GM and/or (z) discussions engaged in by the Debtors in the performance of their fiduciary duties; provided further however, that if this provision is extended beyond April 1, 2007 as provided above, from and after April 1, 2007, with Delphi's prior consent, any Plan Investor or GM, as applicable, may be released from any and all of the foregoing prohibitions of this Section 2.4.

2.5      Support confirmation of the Plan and entry by the Bankruptcy Court of the order confirming the Plan (the "Confirmation Order"); provided, however, that, for the avoidance of doubt, nothing in this Section 2.5 is an agreement by any of the Plan Investors or GM to vote to accept or reject the Plan;

2.6      Not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to the Plan; and

2.7      Not, nor will it encourage any other person or entity to, delay, object to, impede, appeal, or take any other action, directly or indirectly, to interfere with the acceptance, confirmation or occurrence of the effective date of the Plan.

Notwithstanding any other term or provision of this Agreement, nothing herein shall prevent any Party from taking any action in court as it determines is necessary or appropriate to protect its interests, including, without limitation, objecting (in writing or orally) to any document, such as the Plan or Disclosure Statement, filed in the Chapter 11 Cases by any party in interest.

NEWYORK 5912855 (2K)

## ARTICLE III

## TERMINATION EVENTS

3.1     The occurrence of any of the following shall be a "Termination Event":

a.     Termination of the Investment Agreement, whether pursuant to its terms or otherwise;

b.     Delivery of notice of the termination of this Agreement by any Party to the other Parties for any reason or no reason as determined by the Party delivering such notice in its sole discretion; provided however, that such notice may not be given until April 1, 2007.

3.2     All obligations hereunder of all Parties shall terminate and shall be of no further force and effect:

a.     Immediately and automatically upon the occurrence of the Termination Event described in Section 3.1(a) hereof;

b.     Two (2) business days after receipt by the other non-terminating Parties of the notice described in Section 3.1(b) hereof; provided however, that delivery of such written notice by any Plan Investor other than Cerberus or Appaloosa shall terminate only the obligations of such Plan Investor hereunder; and

c.     Automatically, and without written notice , immediately prior to the issuance of the common stock and preferred stock contemplated by the Plan and the Investment Agreement.

## ARTICLE IV

## GOVERNING LAW; JURISDICTION; VENUE

This Agreement will be governed and construed in accordance with the internal laws of the State of New York without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees for itself that the Bankruptcy Court will retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.  Each Party further agrees to waive any objection based on forum non conveniens.

## ARTICLE V

## ADDITIONAL AGREEMENTS

The Parties acknowledge that Delphi and GM presently intend to pursue agreements, to be documented in the Plan, the Confirmation Order and/or the Delphi/GM Definitive Documents, as applicable, concerning, among other matters:  (a) triggering of the GM benefit guarantees; (b) assumption by GM of certain postretirement health and life insurance

6

obligations for certain Delphi hourly employees; (c) funding of Delphi's underfunded pension obligations, including by the 414(l) Assumption (defined below); (d) provision of flowback opportunities at certain GM facilities for certain Delphi employees; (e) GM's payment of certain retirement incentives and buyout costs under current or certain future attrition programs for Delphi employees; (f) GM's payment of mutually negotiated buy-downs; (g) GM's payment of certain labor costs for Delphi employees; (h) a revenue plan governing certain other aspects of the commercial relationship between Delphi and GM; (i) the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j) the Debtors' support for GM's efforts to resource products purchased by GM; (k) licensing of the Debtors' intellectual property to GM or for its benefit; (l) treatment of the Environmental Matters Agreement between Delphi and GM; (m) treatment of normal course items, such as warranty, recall and product liability obligations; and (n) treatment of all other executory contracts between the Debtors and GM.  The Parties agree to negotiate in good faith all of the documents and transactions described in this Article (it being understood that (i) no Party has any obligation to enter into any such documents or consummate any such transactions and (ii) the delivery by any Party of a termination notice pursuant to Section 3.1(b) hereof shall not constitute a breach of this Article V).

ARTICLE VI

PLAN FRAMEWORK

The Plan shall contain all of the following terms:

6.1    A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, (iii) subordinated debt claims, which shall be treated as set forth below, and (iv) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion.

6.2    All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

6.3    Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest) shall be satisfied in full with (a) $810 million of common stock (18,000,000 out of a total of 135,285,714 shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced

---

[1] References in this Article VI to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock.

7

EXECUTION COPY

proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion.

6.4      (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (as to be agreed by the Debtors and the Plan Investors) and (iii) litigation exposures and other liabilities that are covered by insurance (as to be agreed by the Debtors and the Plan Investors and scheduled in the Plan) ((i), (ii) and (iii) together, the "<u>Flow-Through Claims</u>") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

6.5      GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (<u>excluding</u> in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with (a) 7,000,000 out of a total of 135,285,714 shares of common stock in reorganized Delphi and (b) $2.63 billion in cash.

6.6      All subordinated debt claims (including all accrued interest) will be allowed and will be satisfied with (a) $450 million of common stock (10,000,000 out of a total of 135,285,714 shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash.

6.7      Allowed securities claims will be satisfied solely from available insurance or as otherwise agreed by the Plan Investors.

6.8      Holders of existing equity securities in Delphi shall receive, in the aggregate, (a) $135 million of common stock (3,000,000 out of a total of 135,285,714 shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) rights to purchase 63,000,000 out of a total of 135,285,714 shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $2.205 billion (exercise price: $35/share).

6.9      The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("<u>Summary of Terms of Preferred Stock</u>"), which are incorporated by reference herein.

6.10     Delphi will arrange for payment on the effective date of the Plan of $3.5 billion to fund its pension obligations.  Such payment will include GM taking $2.0 billion of net pension obligations pursuant to a 414(l) transaction (the "<u>414(l) Assumption</u>"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi and the Plan Investors determine that any greater amount will have an adverse impact on the Debtors or (b) the Plan Investors determine that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors.  GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; <u>provided</u>, <u>however</u>, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

8

6.11    A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution.  The composition of the joint claims oversight committee shall be satisfactory to the Plan Investors in their sole and absolute discretion, but in any case, shall include at least one representative appointed by the Plan Investors.

6.12    Reorganized Delphi will be subject to the following corporate governance provisions:

a.    A five-member selection committee (the "Selection Committee") will select a new executive chair of reorganized Delphi.  The Selection Committee will consist of the following members: (i) John D. Opie, currently a member of Delphi's board of directors and its lead independent director; (ii) one (1) representative appointed by the statutory committee of unsecured creditors appointed in the Chapter 11 Cases; (iii) one (1) representative appointed by the statutory committee of equity security holders appointed in the Chapter 11 Cases; and (iv) two (2) representatives appointed by the Plan Investors.  The new executive chair will be chosen by a super majority of four (4) of the five (5) members of the Selection Committee, which must include both representatives appointed by the Plan Investors.

b.    The board of directors of reorganized Delphi will consist of twelve (12) members:  (i) the new executive chair; (ii) Rodney O'Neal, who will be appointed chief executive officer and president of reorganized Delphi not later than the effective date of the Plan; (iii) four (4) members (who may include one (1) existing independent director) chosen by a unanimous vote of the Selection Committee, provided, however, that the representatives of the Selection Committee appointed by the Plan Investors will not be entitled to vote on these four (4) directors (the "Common Directors"); (iv) three (3) members chosen by Appaloosa; and (v) three (3) members chosen by Cerberus.  All twelve (12) new directors will be publicly identified not later than the day that is ten (10) days prior to the date scheduled for the hearing of the Bankruptcy Court to confirm the Plan.  The board of directors of reorganized Delphi will satisfy all applicable exchange/NASDAQ independence requirements.

c.    Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to the Plan Investors; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and the Plan Investors or by court order.  Equity awards will dilute all equity interests pro rata.

d.    The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit; (A) for so long as Appaloosa or Dolce Investments, LLC ("Dolce"), as the case may be, owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or Dolce or their respective Affiliates (as defined in the Investment Agreement), as the case may be, on the other hand (including any

9

"going private transaction" sponsored by Appaloosa or Dolce) unless such transaction shall have been approved by (x) directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement) and (y) in the case of any transaction with Appaloosa or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, Appaloosa, and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "<u>Disinterested Director</u>") constituting not less than 75% of the number of Disinterested Directors; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("<u>GMAC</u>") or GM as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC.

6.13    A condition precedent to the effectiveness of the Plan shall be the ratification (and/or fulfillment of all other prerequisites to the effectiveness) of each of Delphi's definitive labor agreements with each of its U.S. labor unions (including, without limitation, new or amended collective bargaining agreements and withdrawals and/or settlements of all claims of each of Delphi's labor unions) and each of the labor-related Delphi/GM Definitive Documents.

## ARTICLE VII

## IMPLEMENTATION

7.1    Promptly after execution of this Agreement by all Parties, Delphi will seek entry of the Initial Approval Order, in form and substance satisfactory to each Party, by the Bankruptcy Court.  The Plan Investors and GM will timely file statements in support thereof with the Bankruptcy Court.

7.2    The Parties agree to negotiate in good faith all of the documents and transactions described in this Agreement (it being understood that (i) no Party has any obligation to enter into any such documents or consummate any such transactions and (ii) the delivery by any Party of a termination notice pursuant to Section 3.1(b) hereof shall not constitute a breach of this Section 7.2).

## ARTICLE VIII

## GENERAL PROVISIONS

8.1    This Agreement is expressly contingent on, and shall automatically become effective on such date as the Initial Approval Order, in form and substance satisfactory to each Party, has been entered by the Bankruptcy Court and the Investment Agreement, substantially in the form of Exhibit A hereto, has been executed by all parties to the Investment Agreement; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court shall not have entered the Initial Approval Order, in form and substance satisfactory to each Party, on or before January 22, 2007 and all parties to

10

the Investment Agreement shall not have executed the Investment Agreement, substantially in the form of Exhibit A hereto, within three (3) business days following entry of the Initial Approval Order, this Agreement (and all obligations hereunder of all Parties) shall automatically terminate without ever having become effective.

8.2    Except as expressly provided in this Agreement, nothing contained herein (i) is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, (ii) may be deemed an admission of any kind, or (iii) effects a modification of any existing agreement until the occurrence of the effective date of the Plan.  If the transactions contemplated herein are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto are not admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.3    The Plan Investors shall promptly deliver to GM (i) written notice upon the termination of the Investment Agreement, whether pursuant to its terms or otherwise, and (ii) copies of any amendments, waivers, supplements or other modifications to the Investment Agreement.

8.4    Delphi and the Plan Investors have advised GM that (a) the Plan Framework described in Article VI of this Agreement and the planned investments of the Plan Investors described in the Investment Agreement are predicated, in part, on the ability of Delphi to formulate a business plan and projections reflecting that Delphi's reorganized businesses will achieve annual EBITDA of not less than $2.4 billion on a consolidated basis following completion of Delphi's Transformation Plan and (b) Delphi will not be able to achieve such financial results if the Transformation Plan is not implemented.

8.5    Each Plan Investor and GM hereby agrees that it shall not (and shall cause its subsidiaries and controlled affiliates not to) (a) sell, transfer, assign, pledge, or otherwise dispose, directly or indirectly, of its right, title or interest in respect of its claims against or interests in any of the Debtors (to the extent held by it on the date hereof or acquired hereafter), in whole or in part, or (b) grant any proxies, deposit any such claims or interests (to the extent held by it on the date hereof or acquired hereafter) into a voting trust, or enter into a voting agreement with respect to such claims or interests, as the case may be, unless the transferee agrees in writing at the time of such transfer to be bound by all obligations of the transferor contained in this Agreement, including, but not limited to, Article II hereof, and the transferor, within three business days, provides written notice of such transfer to each other Party, together with a copy of the written agreement of the transferee agreeing to be so bound.  Each Party further agrees that it may not create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any member of the Debtors without causing such subsidiary or affiliate to become a Party hereto prior to such acquisition.

8.6    Each of Appaloosa, Harbinger, Cerberus, Merrill and UBS hereby confirms, on a several but not joint basis, that it and its affiliates remains the beneficial holder of, and/or the holder of investment authority over, the claim and interests, if any, previously disclosed in

11

connection with its applicable non-disclosure agreement with the Debtors and that it will advise the Debtors upon any change in its or its affiliates' holdings.

8.7    Each Party hereby acknowledges that this Agreement is not and shall not be deemed to be a solicitation to accept or reject a plan in contravention of section 1125(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitutes an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8.8    Each Party, severally and not jointly, represents, covenants, warrants, and agrees to each other Party, only as to itself and not as to each of the others, that the following statements, as applicable, are true, correct, and complete as of the date hereof:

a.    It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder;

b.    It is duly organized, validly existing, and in good standing under the laws of its state of organization and it has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

c.    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, or limited liability company action on its part; provided, however, that the Debtors' authority to enter into this Agreement is subject to Bankruptcy Court approval;

d.    This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable in accordance with the terms hereof, subject to entry of the Initial Approval Order;

e.    The execution, delivery, and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party; and

f.    There are no undisclosed agreements or commitments between or among the Parties regarding matters subject to the terms of this Agreement.

8.9    Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each Party. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

8.10    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives; provided,

12

<u>however</u>, that nothing contained in this Section 8.10 will be deemed to permit sales, assignments, or transfers of this Agreement.

      8.11    Nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any Party to this Agreement.All notices and other communications in connection with this Agreement will be in writing and will be deemed given (and will be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice):

      If to the Debtors, to:

    a.   Delphi Corporation
       5725 Delphi Drive
       Troy, Michigan 48098
       Attention:  John D. Sheehan – Facsimile:  (248) 813-2612
             David M. Sherbin, Esq./Sean Corcoran – Facsimile: (248) 813-2491

         with a copy to:

         Skadden, Arps, Slate, Meagher & Flom LLP
         Four Times Square
         New York, New York 10036
         Facsimile:  (212) 735-2000/1
         Attention:  Eric L. Cochran, Esq.
                 Kayalyn A. Marafioti, Esq.
                 Thomas J. Matz, Esq.

         and

         Skadden, Arps, Slate, Meagher & Flom LLP
         333 West Wacker Drive
         Chicago, Illinois 60606
         Facsimile:  (312) 407-0411
         Attention:   John Wm. Butler, Jr., Esq.
                 George N. Panagakis, Esq.

b.      If to Appaloosa, to:

        Appaloosa Management L.P.
        26 Main Street
        Chatham, New Jersey 07928
        Facsimile:  (973) 701-7055
        Attention:   Ronald Goldstein

        with a copy to:

        White & Case LLP
        Wachovia Financial Center
        200 South Biscayne Boulevard
        Suite 4900
        Miami, Florida 33131-2352
        Facsimile:  (305) 358-5744/5766
        Attention:   Thomas E Lauria, Esq.

c.      If to Harbinger, to:

        Harbinger Capital Partners Master Fund I, Ltd.
        c/o Harbinger Capital Partners
        555 Madison Avenue, 16th Floor
        New York, New York 10022
        Facsimile: (212) 508-3721
        Attention:  Philip A. Falcone

        with a copy to:

        White & Case LLP
        Wachovia Financial Center
        200 South Biscayne Boulevard
        Suite 4900
        Miami, Florida 33131-2352
        Facsimile:  (305) 358-5744/5766
        Attention:   Thomas E Lauria

        and

        Kaye Scholer LLP
        425 Park Avenue
        New York, New York 10022-3598
        Facsimile:  (212) 836-7157
        Attention:   Benjamin Mintz, Esq.
                   Lynn Toby Fisher, Esq.

    d.    If to Cerberus, to:

    Cerberus Capital Management, L.P.
    299 Park Avenue
    New York, New York 10171
    Facsimile:  (212) 421-2958 / (212) 909-1409 / (212) 935-8749
    Attention:   Scott Cohen / Dev Kapadia / Seth Gardner

    with a copy to:

    Milbank, Tweed, Hadley & McCloy LLP
    601 South Figueroa Street, 30th Floor
    Los Angeles, California 90017-5735
    Facsimile:  (213) 892-4470
    Attention:   Gregory A. Bray, Esq.

    e.    If to GM, to:

    General Motors Corporation
    767 Fifth Avenue
    14th Floor
    New York, New York 10153
    Facsimile:  (212) 418-3695
    Attention:   Michael Lukas

    and

    General Motors Corporation
    300 GM Renaissance Center
    Detroit, Michigan 48265
    Facsimile:  (313) 665-4992
    Attention:   E. Chris Johnson, Esq.
              Frederick A. Fromm, Esq.

    with a copy to:

    Weil, Gotshal & Manges LLP
    767 Fifth Avenue
    New York, New York 10153
    Facsimile:  (212) 310-8007
    Attention:   Martin J. Bienenstock, Esq.
              Jeffrey L. Tanenbaum, Esq.
              Michael P. Kessler, Esq.

    f.    If to Merrill, to:

    Merrill Lynch, Pierce, Fenner & Smith Incorporated.
    4 World Financial Center

EXECUTION COPY

New York, New York  10080
Facsimile:  (212) 449-0769
Attention:   Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile:  (212) 757-3990
Attention:   Andrew N. Rosenberg

g.    If to UBS, to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:   Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:   Leslie N. Silverman

8.13    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile shall be effective as delivery of a manually executed signature page of this Agreement.

8.14    This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether oral or written, with respect to such subject matter.  This Agreement is the product of negotiations among the Parties and represents the Parties' intentions.  In any action to enforce or interpret this Agreement, this Agreement will be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, will be construed more or less favorably to any Party.

8.15    The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.  Any breach of this Agreement by any Party shall not result in liability for any other non-breaching Party.

[Remainder of page intentionally blank; remaining pages are signature pages.]

NEWYORK 5912855 (2K)

IN WITNESS WHEREOF, the undersigned have each caused this Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first above written.

DELPHI CORPORATION

By:    /s/ John D. Sheehan
       Name:  John D. Sheehan
       Title:   Vice President and
                Chief Restructuring Officer

GENERAL MOTORS CORPORATION

By:    /s/ Frederick A. Henderson
       Name:  Frederick A. Henderson
       Title:   Vice Chairman and
                Chief Financial Officer

APPALOOSA MANAGEMENT L.P.

By:    /s/ Ronald Goldstein
       Name:  Ronald Goldstein
       Title:   Partner

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.

By:    Harbinger Capital Partners Offshore Manager,
       L.L.C., as investment manager

By:    /s/ Philip A. Falcone
       Name: Philip A. Falcone
       Title: Senior Managing Director

17

CERBERUS CAPITAL MANAGEMENT, L.P.


By:    /s/ Scott H. Cohen
       Name:  Scott H. Cohen
       Title:   Managing Director


MERRILL LYNCH, PIERCE, FENNER & SMITH,
INCORPORATED


By:    /s/ Graham Goldsmith
       Name:  Graham Goldsmith
       Title:   Managing Director


UBS SECURITIES LLC

By:    /s/ Steven D. Smith
       Name:  Steven D. Smith
       Title:   Managing Director


By:    /s/ Andrew Kramer
       Name:  Andrew Kramer
       Title:   Managing Director


18

Equity Commitment Letter from A-D Acquisition Holdings, LLC

**APPALOOSA MANAGEMENT L.P.**
26 Main Street
Chatham, New Jersey 07928

January __, 2007

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey, 07928
Attention: Ronald Goldstein

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Dolce Investments, LLC, a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, and UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Appaloosa Management L.P. ("AMLP"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,141,500,000, subject to the terms and conditions set forth herein. If (i) a Limited Termination has occurred, (ii) the Agreement has not been terminated by the Investor in accordance with its terms within ten (10) Business Days of the occurrence of such Limited Termination, and (iii) the Investor becomes obligated in accordance with Section 2(b) of the Agreement to purchase the Available Investor Shares as a result of such Limited Termination (an "Escalation Trigger"), the maximum amount of Funds referred to in the immediately preceding sentence shall be increased as follows: (i) by $175,312,500 if an Escalation Trigger arises as a result of a Limited Termination by Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ii) by $175,312,500 if an Escalation Trigger arises as a result of a Limited Termination by UBS Securities LLC; and (iii) by $210,375,000 if an Escalation Trigger arises as a result of a Limited Termination by Harbinger Del-Auto Investments Company, Ltd. The Funds to be provided by or on behalf of AMLP to the Investor will be used to provide the financing for the Investor (i) to purchase the Preferred Shares and the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the

A-D Acquisition Holdings, LLC
Delphi Corporation
January __, 2007
Page 2

aggregate liability of AMLP under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  AMLP shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by AMLP and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of AMLP hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall AMLP be liable for punitive damages and (iii) the liability of AMLP shall be limited to monetary damages only.  There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against AMLP.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  AMLP's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with AMLP, provided that such assignment will not relieve AMLP of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, AMLP's obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide AMLP with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of AMLP's obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred.  Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

AMLP hereby represents and warrants as follows:

A-D Acquisition Holdings, LLC
Delphi Corporation
January __, 2007
Page 3

(a)  AMLP is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  AMLP has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by AMLP and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  AMLP has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of AMLP, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). AMLP AND THE INVESTOR HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Sincerely,

**APPALOOSA MANAGEMENT L.P.**

A-D Acquisition Holdings, LLC
Delphi Corporation
January __, 2007
Page 4

By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**A-D Acquisition Holdings, LLC**

By:_____
    Name:
    Title:

**Delphi Corporation**

By:_____
    Name:
    Title:

Equity Commitment Letter from Dolce Investments LLC

**CERBERUS CAPITAL MANAGEMENT, L.P.**
299 Park Avenue
New York, New York 10171

January __, 2007

Dolce Investments, LLC
299 Park Avenue
New York, New York 10171
Attention: Seth Gardner

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

      Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Co., Ltd., an exempted company formed under the laws of the Cayman Islands, Dolce Investments, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, and UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

      This letter will confirm the commitment of Cerberus Capital Management, L.P. ("Cerberus"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,702,500,000, subject to the terms and conditions set forth herein.  The Funds to be provided by or on behalf of Cerberus to the Investor will be used to provide the financing for the Investor (i) to purchase the Preferred Shares and the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Cerberus under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  Cerberus shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Cerberus and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

      Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Cerberus hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Cerberus be liable for punitive damages, and (iii) the liability of Cerberus shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter

Dolce Investments, LLC
Delphi Corporation
January [  ], 2007
Page 2

agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Cerberus.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  Cerberus's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Cerberus, provided that such assignment will not relieve Cerberus of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Cerberus' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Cerberus with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Cerberus' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred.  Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Cerberus hereby represents and warrants as follows:

(a)  Cerberus is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  Cerberus has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by Cerberus and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  Cerberus has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member, or direct or indirect holder of any equity interests or securities of Cerberus, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

NY1:#3439018

Dolce Investments, LLC
Delphi Corporation
January [  ], 2007
Page 3

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). CERBERUS AND THE INVESTOR HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Sincerely,

CERBERUS CAPITAL MANAGEMENT, L.P.

By: _____
      Name:
      Title:

Agreed to and accepted as of the date first above written:

DOLCE INVESTMENTS, LLC
By:     CERBERUS CAPITAL MANAGEMENT, L.P.,
           Its Managing Member

By: _____
      Name:
      Title:

DELPHI CORPORATION

By:_____
      Name:
      Title:

NY1:#3439018

Equity Commitment Letter from Harbinger Del-Auto Investment Company, Ltd.

**Harbinger Capital Partners Master Fund I, Ltd.**
c/o 555 Madison Avenue
New York, New York 10122

January [  ], 2007

Harbinger Del-Auto Investment Company Ltd.
c/o Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue
New York, New York 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Dolce Investments, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, and UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $210,375,000, subject to the terms and conditions set forth herein.  The Funds to be provided by or on behalf of Harbinger to the Investor will be used to provide the financing for the Investor (i) to purchase the Preferred Shares and the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however that the aggregate liability of Harbinger under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  Harbinger shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean at all times $38,442,731.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Harbinger and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Harbinger hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Harbinger be liable for punitive damages, and (iii) the liability of Harbinger shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
January [  ], 2007
Page 2

hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Harbinger.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  Harbinger's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Harbinger, provided that such assignment will not relieve Harbinger of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Harbinger' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Harbinger with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Harbinger' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred.  Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Harbinger hereby represents and warrants as follows:

(a)  Harbinger is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  Harbinger has the requisite corporate power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by Harbinger and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  Harbinger has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Harbinger, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
January [  ], 2007
Page 3

hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). HARBINGER AND THE INVESTOR HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Sincerely,

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.

By:     Harbinger Capital Partners Offshore
        Manager, L.L.C., as investment manager


By:_____
        Name:   Philip A. Falcone
        Title:     Senior Managing Director


Agreed to and accepted as of the date first
above written:

**Harbinger Del-Auto Investment Company, Ltd.**


By:_____
        Name:
        Title:


Delphi Corporation


By:_____
        Name:
        Title:

5916033_3.DOC
NEWYORK 5916033 (2K)

# **Exhibit B**



**news release**

**FOR RELEASE:** Monday, Dec. 18, 2006        **CONTACT:** Claudia Piccinin – 248-813-2942
                                                              Lindsey Williams – 248-813-2528

## INVESTOR GROUP COMMITS UP TO $3.4 BILLION EQUITY INVESTMENT IN REORGANIZED DELPHI IN SUPPORT OF TRANSFORMATION PLAN AND REORGANIZATION FRAMEWORK; DELPHI ANNOUNCES SEPARATE $4.5 BILLION DIP LOAN TRANSACTION TO REFINANCE EXISTING LOAN FACILITIES

*Cerberus Capital Management, L.P. and Appaloosa Management L.P. Lead Investor Group*

*Delphi Announces Reorganization Framework and Potential Stakeholder Recoveries*

*Plan Investment and Reorganization Framework Subject to Conditions Including Reaching Consensual Agreements with U.S. Labor Unions and General Motors Corporation*

*Delphi and Plan Investors Agree on Separate Executive Chairman /CEO Governance Structure and Designate O'Neal to Serve as Delphi's CEO at Emergence; Delphi Determines to Implement New Structure Effective January 1, 2007 with Miller as Executive Chairman and O'Neal as Chief Executive Officer and President*

*Plan Investors and General Motors Corporation Sign Plan Framework Support Agreement*

*Bankruptcy Court Sets January 5, 2007 Hearing to Consider Approval of Plan Investment Agreement, Plan Support Agreement and DIP Refinancing*

**TROY, Mich.** – Delphi Corp. (OTC:DPHIQ) today announced that it has accepted a proposal for an equity purchase and commitment agreement with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors") to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the company's transformation plan announced on March 31, 2006 and its plan of reorganization framework agreement also filed today.  The Plan Framework Support Agreement, signed by Delphi, the Plan Investors and General Motors Corp. (GM), outlines the expected treatment of the company's stakeholders in its anticipated plan of reorganization and provides a framework for several other aspects of the company's Chapter 11 reorganization.

1

Separately, Delphi accepted a proposal from JPMorgan Chase Bank, N.A. and a group of lenders to refinance in full the company's existing $2.0 billion DIP facility and approximately $2.5 billion prepetition revolver and term loan facilities.  In recognition of the favorable environment in the capital markets and to minimize transaction fees payable by Delphi, the company has accepted the lenders' undertaking on a best efforts basis without underwriting by the lenders.

The company is filing motions seeking approval of the agreements with the U.S. Bankruptcy Court of the Southern District of New York and will be filing the relevant agreements this week with the Securities and Exchange Commission.  The Bankruptcy Court has scheduled a hearing to consider approval of the plan investment, plan support and DIP refinancing agreements at 10:00 a.m. EST on Jan. 5, 2007.  Objections, if any, to the agreements must be filed with the Bankruptcy Court by 4:00 p.m. EST on Jan. 2, 2007.

"Today's agreements represent significant milestones in Delphi's reorganization and another major step forward towards emergence from our Chapter 11 reorganization in the U.S.," said Delphi Chairman and CEO Robert S. "Steve" Miller.  "Delphi has long emphasized its commitment to pursuing a resolution of the principal issues in our restructuring.  The agreements announced today demonstrate real progress toward that objective.  The Plan Investors' conditional commitment to invest up to $3.4 billion in the reorganized company, together with their support of Delphi's transformation plan and our reorganization plan framework, should provide additional confidence to our customers, suppliers, employees and financial stakeholders.  Similarly, our new $4.5 billion DIP financing provides an appropriate foundation from which to negotiate and secure emergence financing.  While there is much that remains to be accomplished in our reorganization, Delphi and its stakeholders are together navigating a course that should lead to consensual resolution with our U.S. labor unions and GM while providing an acceptable financial recovery framework for stakeholders."

**EQUITY INVESTMENT**

Under the terms of the Equity Purchase and Commitment Agreement announced today, the Plan Investors will commit to purchase $1.2 billion of convertible preferred stock and approximately $200 million of common stock in the reorganized company. Additionally, the Plan Investors will commit to purchasing any unsubscribed shares of common stock in connection with an approximately $2.0 billion rights offering that will be made available to existing common stockholders.  The rights offering provides that Delphi will distribute certain rights to its existing shareholders to acquire new common stock subject to the effectiveness of a registration statement to be filed with the SEC, approval of the Bankruptcy Court and satisfaction of other terms and conditions.  The rights, which would be transferable by the original eligible holders, would permit holders to purchase their pro rata share of new common stock at a discount to anticipated reorganization business enterprise value.

2

Under the terms of the agreement, the Plan Investors will commit to purchase the number of shares that were offered through the rights offering to eligible holders, but whose rights were not exercised.  In the event no other shareholders exercised the rights, the Plan Investors would purchase all of the unsubscribed shares for an amount no greater than approximately $2.0 billion. Altogether, the Plan Investors could invest up to $3.4 billion in the reorganized company. The investment agreement is subject to the completion of due diligence to the satisfaction of the Plan Investors in their sole discretion, satisfaction or waiver of numerous other conditions (including Delphi's achievement of consensual agreements with its U.S. labor unions and GM that are acceptable to the Plan Investors in their sole discretion) and the non-exercise by either Delphi or the Plan Investors of certain termination rights, all of which are more fully described in the Equity Purchase and Commitment Agreement.

## PLAN OF REORGANIZATION FRAMEWORK

Delphi also filed today a Plan Framework Support Agreement between Delphi, GM, and the Plan Investors, which outlines Delphi's proposed framework for a plan of reorganization.  While the plan framework is based on extensive discussions and negotiations among Delphi, GM, the Plan Investors and Delphi's statutory committees conducted since August of this year, not every one of the proposed terms and conditions of the plan framework are necessarily acceptable to Delphi's stakeholders, including the Company's statutory committees, each of which may determine to oppose one or more elements of the framework.  The Plan Framework Support Agreement as well as the economics and structure of the plan framework itself are expressly conditioned on reaching consensual agreements with Delphi's U.S. labor unions and GM.  Both Delphi and the Plan Investors are permitted to terminate the Equity Purchase and Commitment Agreement (which terminates the Plan Support Agreement) if consensual agreements are not reached with labor and GM by Jan. 31, 2007.

The Plan Framework Support Agreement outlines certain plan terms, including the distributions to be made to creditors and shareholders, the treatment of GM's claim, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.

"This plan framework agreement forms a platform for the resolution of our transformation issues and the formulation of a consensual reorganization plan," Miller said.

The Plan Framework Support Agreement outlines the following treatment of claims and interests in Delphi's chapter 11 plan of reorganization:

- All senior secured debt would be refinanced and paid in full and all allowed administrative and priority claims would be paid in full.

3

- Trade and other unsecured claims and unsecured funded debt claims would be satisfied in full with $810 million of common stock (18 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and the balance in cash.  The framework requires that the amount of allowed trade and unsecured claims (other than funded debt claims) not exceed $1.7 billion.

- In exchange for GM's financial contribution to Delphi's transformation plan, and in satisfaction of GM's claims against the company, GM will receive 7 million out of a total of 135.3 million shares of common stock in the reorganized Delphi, $2.63 billion in cash, and an unconditional release of any alleged estate claims against GM.  In addition, as with other customers, certain GM claims would flow-through the chapter 11 cases and be satisfied by the reorganized company in the ordinary course of business.  The plan framework anticipates that GM's financial contribution to Delphi's transformation plan would include items to be agreed to between Delphi and GM such as triggering of the GM benefit guarantees; assumption by GM of certain postretirement health and life insurance obligations for certain Delphi hourly employees; provision of flowback opportunities at certain GM facilities for certain Delphi employees; GM's payment of certain retirement incentives and buyout costs under current or certain future attrition programs for Delphi employees; GM's payment of mutually negotiated buy-downs; GM's payment of certain labor costs for Delphi employees; a revenue plan governing certain other aspects of the commercial relationship between Delphi and GM; and GM's support of the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites.  While the actual value of the potential GM contribution cannot be determined until a consensual resolution with GM is completed, Delphi is aware that GM has publicly estimated its potential exposure related to Delphi's chapter 11 filing.

- All subordinated debt claims would be allowed and satisfied with $450 million of common stock (10 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share and the balance in cash.

- Holders of existing equity securities in Delphi would receive $135 million of common stock (3 million out of a total of 135.3 million shares) in the reorganized Delphi, at a deemed value of $45 per share, and rights to purchase approximately 57 million shares of common stock in the reorganized Delphi for $2.0 billion at a deemed exercise price of $35 per share (subject to the rights offering becoming effective and other conditions).

4

Delphi cautioned that nothing in the plan investment or plan support agreements, the Court or regulatory filings being made in connection with the agreements or the company's public disclosures (including this press release) shall be deemed to a solicitation to accept or reject a plan in contravention of the Bankruptcy Code nor an offer to sell or a solicitation of an offer to buy any securities of the company.

## EMERGENCE CORPORATE GOVERNANCE STRUCTURE

The Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement also include certain corporate governance provisions for the reorganized Delphi. Under the terms of the proposed plan, the reorganized Delphi would be governed by a 12 member Board of Directors, 10 of whom would be independent directors and two of whom would be a new Executive Chairman and a new Chief Executive Officer and President.  Most notably as part of the new corporate governance structure, the current Delphi Board of Directors along with the Plan Investors, have mutually recognized that current Delphi President and Chief Operating Officer, Rodney O'Neal, will be appointed CEO and president of the reorganized Delphi no later than the effective date of the plan of reorganization.

Separately, Delphi's Board has decided to make O'Neal's CEO appointment effective Jan. 1, 2007, to allow for the most optimum transition between Miller and O'Neal before the company emerges from bankruptcy. Concurrent with O'Neal's appointment, Miller will become Delphi's first Executive Chair and will continue to oversee the company's chapter 11 reorganization through emergence.

A five member selection committee, consisting of John D. Opie, Delphi Board of Director's lead independent director, a representative of each of Delphi's two statutory committees and a representative of each of Delphi's two lead Plan Investors – Cerberus and Appaloosa -- will select the company's post-emergence Executive Chair as well as four independent directors (one of whom may be from Delphi's current Board of Directors).  The two lead Plan Investors must both concur in the selection of the Executive Chair, but do not vote on the four common independent directors and will each appoint three Board members comprising the remaining six members of the new board of directors.  The new board of directors must satisfy all exchange/NASDAQ independence requirements.  Executive compensation for the reorganized company must be on market terms, must be reasonably acceptable to the Plan Investors, and the overall executive compensation plan design must be described in the company's disclosure statement and incorporated into the plan of reorganization.

## PENSION FUNDING

The Plan Framework Support Agreement reaffirms Delphi's earlier commitment to preserve its salaried and hourly defined benefit U.S. pension plans and will include an arrangement to fund approximately $3.5 billion of its pension obligations.  The company agreed that as much as $2 billion of this amount may be satisfied through GM taking an assignment of Delphi's net pension obligations under applicable federal law. GM will receive a note in the amount of such assignment on market terms that will be paid in full within 10 days following the effective date of a plan of reorganization. Through this funding, Delphi will make up required contributions to the plans that were not made in full during the Chapter 11 process.

The company has previously said that one of the goals of its transformation plan is the retention of existing U.S. defined benefit pension plans for both its hourly and salaried workforce. In order to retain the programs and related benefits accrued, Delphi will freeze the U.S. pension plans no later than at the time of emergence.

"With this funding, Delphi will be able to preserve its pension plans and become fully funded to the extent required by ERISA," said Miller.  "While other major Chapter 11 labor transformation cases have regrettably had to terminate their pension plans as part of their restructuring, Delphi has expended a great deal of effort and energy to save our employees' pensions."

## EXISTING PREPETITION AND DIP LOAN REFINANCING

Given the current favorable conditions in the capital markets, Delphi will be seeking court approval to enter into a $4.5 billion replacement DIP financing facility on more favorable terms than the combined DIP and prepetition term and revolver loan facilities that are being replaced.  Under the terms of the replacement financing facility, Delphi estimates that it will save approximately $8 million per month in financing costs.  These savings result from the interest rate under the replacement financing facility being lower than the accrual rate for the adequate protection payments in respect of the secured prepetition credit facilities, which the company proposes to repay with a portion of the proceeds of the replacement financing facility.

The savings generated would preserve additional value of the company's estates and would enhance the ability to implement its transformation plan and emerge from chapter 11 protection.

The replacement financing facility will have similar terms as the existing DIP facility, with certain key exceptions, all of which are beneficial for Delphi and its estates. The refinancing of the secured prepetition credit facilities will not impair, in any material respect, the lien priorities of other holders of secured claims relative to such facilities. Details of the replacement financing facility and the existing DIP facility can be found in Delphi's DIP refinancing motion filed with the Court.

6

## CONSENSUAL AGREEMENT STATUS

While there have been continuing discussions with the company's U.S. labor unions and GM, the parties have not reached comprehensive agreements and there are significant differences of views that need to be reconciled in order to achieve consensual agreements in a timeframe that would permit Delphi to preserve the plan investment and plan framework and support agreements announced today.

"While today's agreements are an important step forward in our transformation, we remain keenly focused on reaching a consensual resolution with all of our U.S. unions and GM," Miller said. "Our fiduciary responsibility as debtors-in-possession is to maximize the value of our estates. Although today's court filings represent an encouraging and necessary move closer to emergence, we and our counterparts at the negotiating table must complete our work promptly and on a consensual basis if Delphi is to emerge from chapter 11 during the first half of 2007."

Consistent with its prior practice, the company will not comment further regarding the status or substance of its discussions with GM or its unions while discussions are ongoing.

Delphi's Chapter 11 cases were filed on October 8, 2005, in the United States Bankruptcy Court for the Southern District of New York and were assigned to the Honorable Robert D. Drain under lead case number 05-44481 (RDD).  Rothschild Inc. serves as investment banker to Delphi and Skadden, Arps, Slate, Meagher & Flom LLP serves as lead counsel to Delphi on the transactions and in the chapter 11 reorganization cases.

More information on Delphi's U.S. restructuring and access to court documents, the agreements referenced in this press release and other general information about the Chapter 11 cases is available at www.delphidocket.com.  Information on the case can also be obtained on the Bankruptcy Court's website with Pacer registration: http://www.nysb.uscourts.gov.  For more information about Delphi and its operating subsidiaries, visit Delphi's website at www.delphi.com.

## FORWARD LOOKING STATEMENT

This press release, as well as other statements made by Delphi, may contain forward-looking statements that reflect, when made, the company's current views with respect to current events and financial performance. Such forward-looking statements are and will be, as the case may be, subject to many risks, uncertainties and factors relating to the company's operations and business environment which may cause the actual results of the company to be materially different from any future results, express or implied, by such forward-looking statements. Factors that could cause actual results to differ materially from these forward-looking statements include, but are not limited to, the following: the ability of the company to continue as a going concern; the ability of the company to operate pursuant to the terms of the debtor-in-possession facility; the company's ability to obtain court approval with respect to motions in the chapter 11 cases prosecuted by it from time to time; the ability of the company to develop, prosecute, confirm and consummate one or more plans of reorganization with respect to the Chapter 11 cases; the company's ability to satisfy the terms and conditions of the Equity Purchase and Commitment Agreement with its Plan Investors; the company's ability to satisfy the terms and conditions of the Plan Framework Support Agreement with GM and its Plan Investors (including the company's ability to achieve consensual agreements with GM and its U.S. labor unions on a timely basis that are acceptable to the Plan Investors in their sole discretion); risks associated with third parties seeking and obtaining court

approval to terminate or shorten the exclusivity period for the company to propose and confirm one or more plans of reorganization, for the appointment of a chapter 11 trustee or to convert the cases to chapter 7 cases; the ability of the company to obtain and maintain normal terms with vendors and service providers; the company's ability to maintain contracts that are critical to its operations; the potential adverse impact of the Chapter 11 cases on the company's liquidity or results of operations; the ability of the company to fund and execute its business plan (including the transformation plan described in Item 1. Business "Potential Divestitures, Consolidations and Wind-Downs" of the Annual Report on Form 10-K for the year ended December 31, 2005 filed with the SEC) and to do so in a timely manner; the ability of the company to attract, motivate and/or retain key executives and associates; the ability of the company to avoid or continue to operate during a strike, or partial work stoppage or slow down by any of its unionized employees; and the ability of the company to attract and retain customers. Other risk factors are listed from time to time in the company's United States Securities and Exchange Commission reports, including, but not limited to the Annual Report on Form 10-K for the year ended December 31, 2005. Delphi disclaims any intention or obligation to update or revise any forward-looking statements, whether as a result of new information, future events and/or otherwise.

Similarly, these and other factors, including the terms of any reorganization plan ultimately confirmed, can affect the value of the company's various pre-petition liabilities, common stock and/or other equity securities. Additionally, no assurance can be given as to what values, if any, will be ascribed in the bankruptcy proceedings to each of these constituencies. A plan of reorganization could result in holders of Delphi's common stock receiving no distribution on account of their interests and cancellation of their interests. Under certain conditions specified in the Bankruptcy Code, a plan of reorganization may be confirmed notwithstanding its rejection by an impaired class of creditors or equity holders and notwithstanding the fact that equity holders do not receive or retain property on account of their equity interests under the plan. In light of the foregoing and as stated in its October 8, 2005, press release announcing the filing of its Chapter 11 reorganization cases, the company considers the value of the common stock to be highly speculative and cautions equity holders that the stock may ultimately be determined to have no value. Accordingly, the company urges that appropriate caution be exercised with respect to existing and future investments in Delphi's common stock or other equity interests or any claims relating to pre-petition liabilities.

# # #

8

**Hearing Date and Time: January 5, 2007 at 10:00 a.m.**
**Response Date and Time: January 2, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtor and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
        In re                                 :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                    Debtors.                  :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING
THE EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE
AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT
TO SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE

PLEASE TAKE NOTICE that on December 18, 2006, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed an Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To Sections 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (the "Motion").

PLEASE TAKE FURTHER NOTICE that a hearing to consider approval of the Motion will be held on January 5, 2007, at 10:00 a.m. (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004.

PLEASE TAKE FURTHER NOTICE that objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418) (the "Eighth Supplemental Case Management Order"), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi

2

Corporation, 5725 Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to

the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100,

Chicago, Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the

Debtors' prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue,

New York, New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the agent under the

postpetition credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New

York 10017 (Att'n: Donald S. Bernstein and Brian Resnick), (v) counsel for the Official

Committee of Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York,

New York 10022 (Att'n: Robert J. Rosenberg and Mark A. Broude), and (vi) counsel for the

Official Committee of Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP,

One New York Plaza, New York, New York 10004 (Att'n: Bonnie Steingart), and (vii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

Suite 2100, New York, New York 10004 (Att'n:  Alicia M. Leonhard), in each case so as to be

**received** no later than **4:00 p.m. (Prevailing Eastern Time)** on **January 2, 2007** (the

"Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth

herein and in accordance with the Eighth Supplemental Case Management Order will be

considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely

filed and served in accordance with the procedures set forth herein and in the Eighth

Supplemental Case Management Order, the Bankruptcy Court may enter a final order granting

the Motion without further notice

Dated: New York, New York
       December 18, 2006

                                   SKADDEN, ARPS, SLATE, MEAGHER &
                                   FLOM LLP

                                   By:/s/ John Wm. Butler, Jr.
                                       John Wm. Butler, Jr. (JB 4711)
                                       George N. Panagakis (GP 0770)
                                       Ron E. Meisler (RM 3026)
                                   333 West Wacker Drive, Suite 2100
                                   Chicago, Illinois  60606
                                   (312) 407-0700


                                   By:/s/ Kayalyn A. Marafioti
                                       Kayalyn A. Marafioti (KM 9632)
                                       Thomas J. Matz (TM 5986)
                                   Four Times Square
                                   New York, New York 10036
                                   (212) 735-3000

                                   Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession

4

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et al.</u> | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

ORDER AUTHORIZING AND APPROVING THE EQUITY PURCHASE
AND COMMITMENT AGREEMENT PURSUANT TO SECTIONS 105(a),
363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE AND THE
PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT TO
<u>SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE</u>

Upon the motion (the "<u>Motion</u>")[1], dated December 18, 2006, of Delphi Corporation

("<u>Delphi</u>") and certain of its domestic subsidiaries and affiliates, debtors and debtor-in-

possession (collectively, the "<u>Debtors</u>") in the above-captioned cases (the "<u>Chapter 11 Cases</u>"),

for an order authorizing and approving the entry into the Equity Purchase and Commitment

Agreement (the "EPCA") and associated Investment Proposal Letter (the "Proposal Letter") and

Commitment Letters (the "<u>Commitment Letters</u>", and together with the Proposal Letter and

EPCA, the "<u>Investment Agreements</u>") pursuant to sections 105(a), 363(b), 503(b) and 507(a) of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October

8, 2005 (the "<u>Bankruptcy Code</u>"), and the Plan Framework Support Agreement (the "<u>Plan</u>

<u>Framework Support Agreement</u>")[2] pursuant to sections 105(a), 363(b) and 1125(e) of the

Bankruptcy Code; the Court having reviewed the Motion and having heard the statements of

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

[2]    Attached as <u>Exhibit 1</u> to this Order is the execution form of the Investment Proposal Letter dated December
18, 2006 and its attachments, including the EPCA, the Plan Framework Support Agreement, the Preferred Stock
Term Sheet and the Commitment Letters.

counsel and the evidence presented regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); due and appropriate notice of the Motion under the circumstances having been made, and notice of the Hearing having been served on the Debtors and their counsel, the Office of the United States Trustee, the members of and counsel for the official committee of unsecured creditors (the "Creditors' Committee"), the members of and counsel for the official committee of equity security holders (the "Equity Committee"), counsel for the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit facility, those parties on the Debtors' Master Service List, such other parties requesting service of notice under Bankruptcy Rule 2002 and otherwise in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. Sections 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures (Docket No. 5418), and sufficient cause appearing therefor; now, therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, this Order and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are Sections 105(a), 363(b), 503(b), 507(a) and 1125(e) of the Bankruptcy Code.

2.    *Notice*.    The notice given by the Debtors of the Motion and the Hearing constitutes proper, timely, adequate and sufficient notice thereof and complies with the

---

[3] This Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, as made applicable herein by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute findings of fact even if stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if stated as findings of fact.

Bankruptcy Code, the Bankruptcy Rules and applicable local rules, and no further or other notice is necessary.

3.      *Findings.*

(a)      On October 8 and October 14, 2005, the Debtors commenced the Chapter 11 Cases for the purpose of restructuring their businesses and related financial obligations pursuant to an overall transformation strategy (the "Transformation Plan") that would incorporate the following structural components:

(i)      Modification of the Debtors' labor agreements;

(ii)      Resolution of all issues and disputes between the Debtors and General Motors Corporation ("GM") and its subsidiaries and affiliates regarding (A) certain legacy obligations, including allocating responsibility for various pension and other post-employment benefit obligations; (B) all alleged claims and causes of action arising from the spin-off of Delphi from GM; (C) costs associated with the transformation of the Debtors' business (including the establishment of support to be provided by GM in connection with certain of those businesses that the Debtors intend to shut-down or otherwise dispose of); (D) the restructuring of ongoing contractual relationships with respect to continuing operations; and (E) the amount and treatment of GM's claims in the Chapter 11 Cases (together, the "Designated Issues");

(iii)      Development of a strategically focused product portfolio and realignment of production capacity to support it;

(iv)      Transformation of the Debtors' work force in keeping with a sustainable cost structure and streamlined product portfolio;

3

(v)    Resolution of the Debtors' pension issues; and

(vi)    Restructuring of the Debtors' balance sheet to accommodate the transformed business.

(b)    The Debtors continue to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.    No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.    Pursuant to an Order of this Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

(c)    Pursuant to its authority under section 1102 of the Bankruptcy Code, the United States Trustee for the Southern District of New York appointed the Creditors' Committee and the Equity Committee in the Chapter 11 Cases.

(d)    In the summer of 2006, Appaloosa Management L.P. ("Appaloosa") and Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant stakeholders of the Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to which they obtained certain information from and about the Debtors and their businesses and engaged in discussions regarding various potential reorganization structures and related matters, including the potential requirement for a substantial equity investment in Delphi to facilitate the Debtors' restructuring.

(e)    Separately, the Debtors conducted negotiations with other potential investors, including Cerberus Capital Management, L.P. ("Cerberus").

(f)    At the Debtors' request, Appaloosa, Harbinger and Cerberus engaged in discussions regarding their respective views of the Transformation Plan, the terms of a

4

potential investment in Delphi and the general terms of various potential restructuring strategies for the Debtors.

(g)    The foregoing discussions led to an agreement on the Plan Framework Support Agreement, which sets forth the proposed terms of a chapter 11 plan (the "Plan") for the Debtors that would include, *inter alia*, (i) the implementation of the Transformation Plan, including a settlement of the Designated Issues, and (ii) a proposed equity investment by certain affiliates of Appaloosa, Harbinger, and Cerberus, and by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and UBS Securities LLC ("UBS", and together with Merrill and certain affiliates of Appaloosa, Harbinger, Cerberus, the "Investors") in Delphi (the "Investment").

(h)    Subject to the terms of the Plan Framework Support Agreement, the parties thereto have agreed to work together to attempt to complete the negotiation of the terms of the Plan, as well as to resolve other outstanding issues, and to formulate and facilitate confirmation and consummation of the Plan and the transactions contemplated by the Plan Framework Support Agreement; provided, however, that Delphi will be the sole proponent of the Plan.

(i)    The Investment, which would be an integral component of the Plan, would be made pursuant to the EPCA, which sets forth the terms and conditions under which the Investors would (i) purchase any unsubscribed shares issued under a rights offering of new common stock of Delphi to be issued pursuant to the Plan (as defined in the Plan Framework Support Agreement), and (ii) purchase newly issued shares of common stock and preferred stock of Delphi.

(j)　　In connection with the EPCA, Appaloosa, Harbinger and Cerberus (collectively, the "Commitment Parties" and together with the Investors, the "Plan Investors") will provide the Commitment Letters to the Investors and Delphi, whereby each Commitment Party will provide funding to the Investors, under the terms and subject to the limitations set forth in the Commitment Letters.

(k)　　The Plan Framework Support Agreement and the Investment Agreements, all of which are incorporated herein, are fair and equitable to all parties.

(l)　　The Debtors' decision to enter into the Plan Framework Support Agreement and the Investment Agreements is a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

(m)　　The Plan Framework Support Agreement and the Investment Agreements were negotiated at arms' length and in good faith.

(n)　　The Plan Framework Support Agreement and the Investment Agreements are fair, reasonable, and in the best interests of the Debtors, their estates, shareholders, creditors and all parties-in-interest.

(o)　　The entry into the Plan Framework Support Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the parties including, without limitation, the designation of the vote of GM or any Plan Investor or any affiliate of any Plan Investor under Section 1125(e) of the Bankruptcy Code on account of entering into the Plan Framework Support Agreement and the performance and fulfillment of their obligations thereunder.

6

Notwithstanding anything contained herein, except with respect to claims, causes of action, or application of remedies (including the designation of the votes of GM and any of the Plan Investors or any affiliate of any Plan Investor) against any of the parties to the Plan Framework Support Agreement on account of entering into the Plan Framework Support Agreement, or performing or fulfilling their obligations thereunder, nothing contained herein shall limit the rights of any party to raise any issue or objection which could otherwise have been raised at a disclosure statement or confirmation hearing.

(p)    The provisions in the EPCA for the payment of the indemnities provided in Section 10 of the EPCA (the "Indemnity"), the Transaction Expenses, the Commitment Fees and the Alternate Transaction Fee (each as defined in the EPCA) are integral parts of the transactions contemplated by the EPCA and without any one of these provisions, the Plan Investors would not enter into the Investment Agreements.

(q)    The incurrence of the Indemnity, the Transaction Expenses, the Commitment Fees, the Alternate Transaction Fee and any damage claims ("Damage Claims") that may arise against the Debtors pursuant to the terms of the EPCA shall be deemed to have been incurred in good faith, as such term is used in Section 363(m) of the Bankruptcy Code, and the priorities extended to the Plan Investors pursuant to this Order (as described below) shall be entitled to all of the protections provided herein or otherwise contemplated hereby.

(r)    The relief requested in the Motion is in the best interests of the Debtors, their estates, shareholders, creditors and all parties-in-interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED in its entirety.

2.      Any objection to the Motion not withdrawn or otherwise resolved as set forth in this Order is hereby overruled.

3.      Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors and the Plan Investors are hereby authorized, but not directed, to execute, deliver and implement the Plan Framework Support Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Plan Framework Support Agreement, and such agreements and documents shall be binding and enforceable against the Debtors and their estates and the other parties thereto in accordance with their terms and subject to the conditions therein.

4.      The entry into the Plan Framework Support Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and may not give rise to any claim or remedy against any of the parties thereto including, without limitation, the designation of the vote of GM or any Plan Investor or any affiliate of any Plan Investor under Section 1125(e) of the Bankruptcy Code on account of entering into the Plan Framework Support Agreement and the performance and fulfillment of their obligations thereunder.  Notwithstanding anything contained herein, except with respect to claims, causes of action, or application of remedies (including the designation of the votes of GM and any of the Plan Investors or any affiliate of any Plan Investor) against any of the parties to the Plan Framework Support Agreement on account of entering into the Plan Framework Support Agreement, or performing or fulfilling their obligations thereunder, nothing contained herein shall limit the rights of any party to raise any issue which could otherwise have been raised at a disclosure statement or confirmation hearing.

8

5.      Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code, the Debtors and the applicable Plan Investors are hereby authorized, but not directed, to execute, deliver and implement the Investment Agreements and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Investment Agreements, and such agreements and documents shall be binding and enforceable against the Debtors, their estates, and the other parties thereto in accordance with their terms and subject to the conditions therein.

6.      The Debtors are authorized to pay the Indemnity (if applicable), the Transaction Expenses, the Commitment Fees, the Alternate Transaction Fee (if applicable) and any Damage Claim (if applicable, and to the extent allowed), each in accordance with its terms and as and when required by the Investment Agreement, except as otherwise provided below, without further Order of the Court.  The Debtors are authorized to make all other payments to or for the benefit of the Plan Investors as and when required by the Investment Agreements and any exhibit, schedule or attachment thereto, on the terms set forth therein, without further Order of the Court.  Any such payments shall be fully earned when paid, non-refundable and not subject to avoidance or disgorgement under any theory at law or in equity.

7.      Each of the Indemnity (if applicable), the Transaction Expenses, the Commitment Fees, the Alternate Transaction Fee (if applicable) and any Damage Claim against the Debtors (if applicable) provided for or permitted by the Investment Agreements shall constitute allowed claims pursuant to Sections 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be paid as and when provided for in the Investment Agreements without further application to or order of the Bankruptcy Court except that (i) in the case of any Damage Claim against the Debtors provided for or permitted by the Investment Agreements, such Damage Claim shall be allowed

9

in the amount determined by the Bankruptcy Court after notice and a hearing and (ii) in the case

of any Indemnity claim against the Debtors provided for or permitted by the Investment

Agreements, such claim shall be resolved in a manner pursuant to the Investment Agreement

with any disputes to be resolved by the Bankruptcy Court.  In addition, to the extent permitted

under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash

collateral then or thereafter in effect (each a "Financing Order") the Transaction Expenses

incurred from and after the date of entry of the Initial Approval Order shall be protected by and

entitled to the benefits of the carve-out for professionals as provided in any such Financing

Order.

8.      This Order is a final and non-interlocutory order and is immediately subject to

appeal pursuant to 28 U.S.C. Section 158(a).

9.      This Court shall retain jurisdiction to hear and determine all matters arising from

the implementation of this Order.

10.     The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is deemed satisfied by the Motion.


Dated:   January __, 2007
         New York, New York

                                        _____
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Investment Proposal Letter And Attachments**

**(Equity Purchase and Commitment Agreement,
Plan Framework Support Agreement, Preferred
Stock Term Sheet, and Commitment Letters)**

[EXECUTION VERSION]

December 18, 2006

Delphi Corporation
5725 Delphi Drive
Troy, MI  48098

Attn:   Robert S. "Steve" Miller
        Chairman and Chief Executive Officer

Re: Proposed Investment in Delphi Corporation

Dear Mr. Miller:

        As you know, the signatories hereto have been engaged in discussions with Delphi
Corporation ("Delphi" or the "Company") and various other parties in interest in the jointly
administered chapter 11 cases (the "Chapter 11 Cases") pending in the United States Bankruptcy
Court for the Southern District of New York (the "Bankruptcy Court") with respect to Delphi
and certain of its subsidiaries (collectively, the "Debtors") regarding a potential global resolution
of the Chapter 11 Cases that would be implemented pursuant to a plan of reorganization for the
Debtors (the "Plan") and be funded in part by an equity investment in Delphi (the "Investment").

        Pursuant to the Company's request, the undersigned severally, not jointly, submit this
proposal (the "Proposal") to make the Investment on the terms and subject to the conditions
contained in the attached form of Equity Purchase and Commitment Agreement (the "Investment
Agreement").  Upon the entry by the Bankruptcy Court of the Initial Approval Order (as defined
and described below) and the other conditions described in this letter, the undersigned will
severally, not jointly, enter into the Investment Agreement and each of A-D Acquisition
Holdings, LLC, Dolce Investments LLC and Harbinger Del-Auto Investment Company, Ltd. will
deliver an Equity Commitment Letter in the form attached hereto.  Our several obligations to
enter into the Investment Agreement, however, are subject to your using your commercially
reasonable efforts to have the Bankruptcy Court enter the Initial Approval Order by, among other
things: (a) preparing and filing with the Bankruptcy Court, no later than December 18, 2006, the
Initial Motion referred to in the Plan Framework Support Agreement  (the "Plan Support
Agreement"); and (b) using commercially reasonable efforts to obtain a hearing on the Initial
Motion on or before January 5, 2007.

        The undersigned and their advisors have devoted substantial time and resources to
preparing this Proposal.  We appreciate the significant amount of time and resources that Delphi
has dedicated to assist our teams in developing a deeper understanding of the Company's
business.  Based on this work, the undersigned are (1) prepared to proceed expeditiously to
complete our business, accounting and legal due diligence review of the Company, and (2) take
appropriate action to move forward toward the full formulation and implementation of the
transactions contemplated by the Investment Agreement and the Plan Support Agreement,
including engaging in the preparation and negotiation of additional definitive documents as

contemplated thereby and supporting the Debtors' efforts to obtain entry of the Initial Approval Order.

This Proposal is subject to, and expressly conditioned on, (1) the execution and delivery by all signatories thereto of the Investment Agreement and Plan Support Agreement in the form attached to this letter and (2) the entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to each of us (the "Initial Approval Order"): (a) approving, and authorizing the Debtors to enter into and perform their obligations under the Investment Agreement, (b) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and Transaction Expenses (as such terms are defined in the Investment Agreement) on the terms and subject to the conditions set forth in the Investment Agreement, (c) approving, and authorizing the Debtors to enter into, the Plan Support Agreement and (d) determining that the parties' entry into, and performance of their obligations under, the Plan Support Agreement does not violate the Bankruptcy Code and does not give rise to any claim or remedy against the parties, and shall not cause the vote of any party agreeing to vote to accept the Plan pursuant to the Plan Support Agreement to be disregarded.

This Proposal will remain open until 5:00 p.m., Eastern Standard Time on December 18, 2006, at which point it will expire unless Delphi has filed a motion, in form and substance reasonably acceptable to us, seeking entry by the Bankruptcy Court of the Initial Approval Order and requesting a hearing on such motion on or before January 5, 2007.  In addition, even if accepted by Delphi this Proposal shall terminate and be of no further force of effect if, on or before January 22, 2007: (1) the Initial Approval Order has not been entered by the Bankruptcy Court, (2) the Investment Agreement has not been executed and delivered to us by Delphi, or (3) any of the undersigned determines in its sole discretion that either (a) the conditions to the obligations of the undersigned contained in the Investment Agreement are incapable of being satisfied or (b) the undersigned is entitled to exercise a termination right contained in the Investment Agreement.

*    *    *    *

Based on our work to date, we are very enthusiastic about Delphi and look forward to pursuing the transactions contemplated by the Investment Agreement and the Plan Support Agreement to an expeditious and mutually successful conclusion.

A-D ACQUISITION HOLDINGS, LLC

By: /s/ Ronald Goldstein
    Name: Ronald Goldstein
    Title:  Partner

HARBINGER DEL-AUTO INVESTMENT
    COMPANY, LTD.

By:/s/ Philip A. Falcone
    Name: Philip A. Falcone
    Title:  Director

DOLCE INVESTMENTS LLC

By: Cerberus Capital Management L.P., it's
    Managing Member

By:/s/ Scott H. Cohen
    Name: Scott H. Cohen
    Title:  Managing Director

MERRILL LYNCH, PIERCE, FENNER &
    SMITH INCORPORATED

By:/s/ Graham Goldsmith
    Name: Graham Goldsmith
    Title:  Managing Director

UBS SECURITIES LLC

By:/s/ Steven D. Smith
    Name: Steven D. Smith
    Title:  Managing Director

By:/s/ Andrew Kramer
    Name: Andrew Kramer
    Title:  Managing Director

Equity Purchase and Commitment Agreement

EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "Agreement"), dated as of January __, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("Harbinger"), Dolce Investments LLC ("Dolce"), a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("Merrill"), UBS Securities LLC, a Delaware limited liability company ("UBS"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company").  ADAH, Harbinger, Dolce, Merrill and UBS are each individually referred to herein as an "Investor" and collectively as the "Investors".  Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "Debtors") commenced jointly administered cases (the "Chapter 11 Cases") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the PSA;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement;

WHEREAS, the Company has filed a motion and supporting papers (the "Initial Approval Motion") seeking an order of the Bankruptcy Court (the "Initial Approval Order") (i) approving and authorizing the Company to enter into this Agreement, (ii) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and the Transaction Expenses provided for herein, and (iii) approving and authorizing the Company to enter into the PSA, and the Bankruptcy Court has entered the Initial Approval Order; and

WHEREAS, each of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd. and Cerberus Capital Management, L.P. (collectively, the "Commitment Parties") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger, and Dolce, respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Dolce, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.    <u>Rights Offering</u>

(a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "<u>New Common Stock</u>"), pursuant to a rights offering (the "<u>Rights Offering</u>") whereby the Company will distribute at no charge to each holder (each, an "<u>Eligible Holder</u>") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "<u>Right</u>") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "<u>Record Date</u>") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of 56,700,000 shares in the aggregate of New Common Stock (each, a "<u>Share</u>") at a purchase price of $35.00 per Share (the "<u>Purchase Price</u>").

(b)    The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "Plan"), which shall reflect the Company's proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as <u>Exhibit A</u> (the "<u>Preferred Term Sheet</u>") and the Plan Framework Support Agreement attached hereto as <u>Exhibit B</u> (the "<u>PSA</u>").

(c)    The Rights Offering will be conducted as follows:

(i)    On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

(ii)    As soon as practicable following the entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "<u>Disclosure Statement Approval Date</u>") and the effectiveness under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), of the Rights Offering Registration Statement to be filed with the Securities and Exchange Commission (the "<u>Commission</u>") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of 56,700,000 Shares in the aggregate and distribute simultaneously the ballot form(s) (the "<u>Ballots</u>") in connection with the solicitation of acceptances of the Plan (the date of such distribution, the "<u>Distribution Date</u>").  The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.  The Ballots shall provide a place whereby each Eligible Holder may indicate its commitment to exercise its Rights.

(iii)    The Rights may be exercised during a period (the "<u>Rights Exercise Period</u>") commencing on the Distribution Date and ending at the Expiration Time.  The Rights shall be transferable.  "<u>Expiration Time</u>" means the date and time by which holders of claims or interests are entitled to vote on the Plan (or if such day is not a Business Day, the next Business Day), or such later date and time as the Company, subject to the prior written approval of each of ADAH and Dolce, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time.  The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "<u>Effective Date</u>") to occur as promptly as reasonably practicable after the Expiration Time and the Confirmation Hearing.  For the purpose of this Agreement, "<u>Business Day</u>" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.  Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed Ballot to a subscription agent reasonably acceptable to the Company and each of ADAH and Dolce (the "<u>Subscription Agent</u>") electing to exercise all or a portion of the Rights held by such Eligible Holder and (ii) pay an amount equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase by wire transfer of immediately available funds by a specified date reasonably in advance of the date on which the hearing to confirm the Plan is scheduled to commence (the "<u>Confirmation Hearing</u>") to an escrow account established for the Rights Offering.

(iv)    Unless otherwise required by ADAH and Dolce, there will be no over-subscription rights provided in connection with the Rights Offering.

(v)    As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its Rights the number of Shares to which such Eligible Holder is entitled based on such exercise.

(vi)    The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders pursuant to validly exercised Rights, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "<u>Purchase Notice</u>") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in <u>Section 2(a)(iv)</u> is terminated (a "<u>Satisfaction Notice</u>") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "<u>Determination Date</u>").

2.      The Commitment; Fees and Expenses.

(a)     On the terms and subject to the conditions set forth in this Agreement:

(i)     each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of 6,300,000 Shares as is set forth opposite such Investor's name on Schedule 2 hereto (the "Direct Subscription Shares") and (B) for the Purchase Price per Share, that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "Series B Preferred Stock"), as is set forth opposite such Investor's name on Schedule 2 hereto, which shares shall be created pursuant to a Certificate of Designation (the "Series B Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided that prior to the Due Diligence Expiration Date, such terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;

(ii)    Dolce agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "Series A-1 Preferred Stock"), which shares shall be created pursuant to a Certificate of Designations (the "Series A-1 Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;

(iii)   ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-2 Senior Convertible Preferred Stock, par value $0.01 per share (the "Series A-2 Preferred Stock", and together with the Series A-1 Preferred Stock, the "Series A Preferred Stock", which shares shall be created pursuant to a Certificate of Designations (the "Series A-2 Certificate of Designations") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the

extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion; and

(iv)     each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "Unsubscribed Shares"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, prior to the filing of the Rights Offering Registration Statement with the Commission, each Investor shall have the right to arrange for one or more of its Affiliates (each, a "Related Purchaser") to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in Section 4; provided, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number.  The "Maximum Number" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; provided, that, nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws.  The Investors agree that each Related Purchaser will be a "Qualified Institutional Buyer" under Rule 144A of the Securities Act.

The Series A-1 Preferred Stock, the Series A-2 Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "Preferred Shares".  The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "Investor Shares".  The term "Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)     Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited

Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser pursuant to <u>Section 2(a)</u> or an Ultimate Purchaser pursuant to <u>Section 2(k)</u>), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an "<u>Alternative Financing</u>"); <u>provided</u>, that only in the case of a Limited Termination, to the extent that a Limited Termination is attributable to any Investor other than Dolce, ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser pursuant to <u>Section 2(a)</u> or an Ultimate Purchaser pursuant to <u>Section 2(k)</u>) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); <u>provided</u>, <u>further</u>, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term "<u>Investor Default</u>" shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term "<u>Available Investor Shares</u>" shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)     As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; <u>provided</u>, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)     Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the "<u>Closing Date</u>") against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)     All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)      The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)     Subject to the provisions of Sections 2(a), 2(b) and 2(k) hereof, any Investor may designate that (i) some or all of the Investor Shares be issued in the name of, and delivered to, one or more Related Purchasers and (ii) some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of Series B Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)     On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with Section 2(i) or 12(h), as the case may be:

      (i)      an aggregate commitment fee of twenty-one million dollars ($21,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in Schedule 2 (the "Preferred Commitment Fee");

      (ii)    an aggregate commitment fee of fifty-five million one-hundred twenty-five thousand dollars ($55,125,000) to be paid to the Investors as set forth in Schedule 2 to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "Standby Commitment Fee" and together with the Preferred Commitment Fee, the "Commitment Fees"); and

      (iii)   an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in Section 12(h).

(i)      $10 million of the Commitment Fees shall be paid on the first Business Day following the first date that either (A) each of ADAH and Dolce has waived in writing the due diligence termination right contained in Section 12(d)(ii) or (B) the due diligence termination right contained in Section 12(d)(ii) has expired in accordance with its terms, and $28,062,500, representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the date that each of ADAH and Dolce notify the Company in writing that each of them has approved the GM Settlement.  The balance of $38,062,500, representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the Disclosure Statement Approval Date.  Payment of the Commitment Fees and the Alternate Transaction Fee, if any, will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by each Investor to the Company at least 24 hours prior to such payment.  The Commitment Fees and the Alternate Transaction Fee, if any, will be nonrefundable and non-avoidable when paid.  The provision for the payment of the Commitment Fees is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into

the Agreement and such Commitment Fees shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(j)    The Company will reimburse or pay, as the case may be, the out-of-pocket costs and expenses reasonably incurred by each Investor or its Affiliates (which, for the avoidance of doubt, shall not include any Ultimate Purchaser) to the extent incurred on or before the Effective Date (and reasonable post-closing costs and expenses relating to the closing), including reasonable fees, costs and expenses of counsel to each of the Investors or its Affiliates, and reasonable fees, costs and expenses of any other professionals retained by any of the Investors or its Affiliates in connection with the transactions contemplated hereby (including investigating, negotiating and completing such transactions) and the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases other than costs and expenses relating to any transactions with Ultimate Purchasers and, with respect to expenses that would not otherwise be incurred by the related Investor, Related Purchasers (collectively, "Transaction Expenses"), from and after the commencement of negotiations between such Investor or its Affiliates and the Company with respect to its non-disclosure agreements in connection with the Chapter 11 Cases and/or the transactions contemplated hereby, or in the case of UBS and Merrill, from and after July 30, 2006, in the following manner:

(i)    to the extent Transaction Expenses are or were incurred prior to December 1, 2006, such Transaction Expenses, in an amount not to exceed $13,000,000 (which amount does not include Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000), shall be paid promptly upon the Bankruptcy Court's entry of the Initial Approval Order; provided, that Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan;

(ii)    to the extent Transaction Expenses are incurred by any Investor on or after December 1, 2006, such Transaction Expenses shall be paid promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements; and

(iii)    the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR

Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.  In addition, (i) to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of entry of the Initial Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)    The Company acknowledges that the Investors and certain persons and entities (collectively, the "Ultimate Purchasers") may enter into one or more agreements (the "Additional Investor Agreements"), pursuant to which such Investor may arrange for one or more Ultimate Purchasers to purchase certain of the Unsubscribed Shares, the Direct Subscription Shares or the Series B Preferred Stock.  Each Additional Investor Agreement entered into prior to the Closing Date shall contain the Ultimate Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by such Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section 4.  Each Investor proposing to enter into an Additional Investor Agreement prior to the Closing Date with any Ultimate Purchaser or proposing to transfer Investor Shares to any Related Purchaser in either case which would result in the Maximum Number being exceeded agrees to notify the Company prior to entering into such agreement or effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company, which shall not be unreasonably withheld.  The Investors agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they shall not offer any Investor Shares to, or enter into any Additional Investor Agreement with, any person or entity (A) after the initial filing of the Rights Offering Registration Statement with the Commission and (B) that is not a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; provided that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.    Representations and Warranties of the Company.  Except as set forth in a disclosure letter to be delivered pursuant to Section 5(s) (the "Disclosure Letter"), the Company represents and warrants to, and agrees with, each of the Investors as set forth below.  Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other

sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this Section 3.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "Disclosure Letter Delivery Date") and as of the Closing Date:

(a)    Organization and Qualification.  The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For the purpose of this Agreement, "Material Adverse Effect" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in Section 3(g) below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company's financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports; or (vii) any change in the market price or trading volumes of the Company's securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses

(i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect).  For the purposes of this Agreement, (x) a "<u>Subsidiary</u>" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "<u>Significant Subsidiary</u>" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)    <u>Corporate Power and Authority</u>.

(i)    The Company has or, to the extent executed in the future, will have when executed the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement and the PSA (this Agreement and such other agreements collectively, the "<u>Transaction Agreements</u>") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), respectively, to perform its obligations hereunder and thereunder, including the issuance of the Rights and Investor Shares. The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)    Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)    Execution and Delivery; Enforceability.

(i)    Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

(ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)    Authorized and Issued Capital Stock.  The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share.  At the close of business on November 30, 2006 (the "Capital Structure Date") (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "Option" and, collectively, the "Options") granted under any stock option or stock-based compensation plan of the Company or otherwise (the "Stock Plans"), and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "Existing Shareholder Rights Plan").  All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights.  Except as set forth in this Section 3(d) or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding.  Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this Section 3(d) that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the PSA.  Except as described in this Section 3(d), and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other

right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company. On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company will conform to the description set forth in the Preferred Term Sheet, the PSA and the Plan. On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New Common Stock as shall be set forth in the Amended and Restated Constituent Documents and 34,285,716 shares of new preferred stock. On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) 101,000,000 shares of New Common Stock will be outstanding; (ii) 8,571,429 shares of Series A-1 Preferred Stock will be issued and outstanding; (iii) 8,571,429 shares of Series A-2 Preferred Stock will be issued and outstanding; and (iv) 17,142,858 shares of Series B Preferred Stock will be issued and outstanding.

(e)    <u>Issuance</u>.  The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company's Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)    <u>No Conflict</u>.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the

acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    <u>Arm's Length</u>.  The Company acknowledges and agrees that the Investors are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person or entity.  Additionally, the Investors are not advising the Company or any other person or entity as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction.  The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Investors shall have no responsibility or liability to the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives with respect thereto.  Any review by the Investors of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Investors and shall not be on behalf of the Company, its Affiliates, or their respective shareholders, directors, officers, employees, advisors or other representatives and shall not affect any of the representations or warranties contained herein or the remedies of the Investors with respect thereto.

(i)    <u>Financial Statements</u>.  The financial statements and the related notes of the Company and its consolidated Subsidiaries included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure Statement and the Rights Offering Registration Statement and the Rights Offering Prospectus, comply or will comply, as the case may be, in all material respects with the applicable requirements of the Securities Act, the Securities Exchange Act of 1934, as amended, and the rules and regulation of the Commission thereunder (the "<u>Exchange Act</u>") and the Bankruptcy Code, as applicable, and present fairly or will present fairly in all material respects the financial position, results of operations and cash flows of the Company and its Subsidiaries as of the dates indicated and for the periods specified; such financial statements have been prepared in conformity with U.S. generally accepting accounting principles ("<u>GAAP</u>") applied on a consistent basis throughout the periods covered thereby (except as disclosed in the Company SEC Documents filed prior to the date hereof), and the supporting schedules included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure Statement, the Rights Offering Registration Statement and the Rights Offering Prospectus, present fairly or will present fairly the information required to be stated therein; and the other financial information included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, has been or will be derived from the accounting records of the Company and its Subsidiaries and presents fairly or will present fairly the information shown thereby; and the <u>pro forma</u> financial information and the related notes included or incorporated by reference in the Company SEC Documents, and to be included or incorporated by reference in the Disclosure

Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such pro forma financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)    Company SEC Documents and Disclosure Statement.  Except for the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2006, (which has not been filed as of the date hereof) the Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein) with the Commission ("Company SEC Documents").  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)    Rights Offering Registration Statement and Rights Offering Prospectus.  The Rights Offering Registration Statement or any post-effective amendment thereto, as of the Securities Act Effective Date, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus and any amendment or supplement thereto and as of the Closing Date, the Rights Offering Prospectus will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  On the Distribution Date and the Expiration Date, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the

circumstances under which they were made, not misleading. Each Issuer Free Writing Prospectus, at the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Each Preliminary Rights Offering Prospectus, at the time of filing thereof, will comply in all material respects with the Securities Act and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading. Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.

For the purposes of this Agreement, (i) the term "Rights Offering Registration Statement" means the Registration Statement to be filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term "Rights Offering Prospectus" means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term "Investment Decision Package" means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term "Issuer Free Writing Prospectus" means each "issuer free writing prospectus" (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term "Preliminary Rights Offering Prospectus" means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) "Securities Act Effective Date" means the date and time as of which the Rights Offering Registration Statement, or the most recent post-effective amendment thereto, was declared effective by the Commission.

(l)    Free Writing Prospectuses. Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first

use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and all filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act. The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)    <u>Absence of Certain Changes</u>. Since December 31, 2005, other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

(i)    there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

(ii)    no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)    neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

(iv)    neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

(v)    other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

(vi)    there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except

for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii)   except in a manner consistent with the Company's transformation plan previously disclosed in the Company SEC Documents filed prior to the date hereof, (the "Transformation Plan") neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii)  except in a manner consistent with the Transformation Plan, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n)   Descriptions of the Transaction Agreement.  The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the Initial Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental proceedings or contracts, will constitute accurate summaries in all material respects.

(o)   No Violation or Default; Compliance with Laws.  Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents.  Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases or the failure to file its Quarterly Report on Form 10-Q for the period ended September 30, 2006, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected

to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)     <u>Legal Proceedings</u>.  Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others.  There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q)     <u>Independent Accountants</u>.  Ernst & Young LLP ("<u>E&Y</u>"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)     <u>Labor Relations</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof:

(i)     neither the Company nor any of its Subsidiaries is a party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization (other than contracts or other agreements or understandings with labor unions or labor organizations in connection with products and services offered and sold to such unions and organizations by the Company or its Subsidiaries);

(ii)    neither the Company nor any of its Subsidiaries is the subject of any proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(iii)    there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any Subsidiary and no such activities have occurred during the past 24 months;

(iv)    no grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or employment matters is pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries which, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)    the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent) except where the failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(vi)    the Company has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any Company policy, practice, agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)    the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)    <u>Title to Intellectual Property</u>.  The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "<u>Intellectual Property</u>") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate, Material Adverse Effect.  All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in

accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions.  The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property.  No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  The conduct of the businesses of the Company and its Subsidiaries will not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)     Title to Real and Personal Property.  The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by Section 3(s)) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be

enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)    <u>No Undisclosed Relationships</u>.  As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)    <u>Investment Company Act</u>.  As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)    <u>Licenses and Permits</u>.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign governmental or regulatory authorities that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses as described in the Company SEC Documents except any such licenses, certificates, permits or authorization the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as described in the Company SEC Documents filed prior to the date hereof and except as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, neither the Company nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(x)    <u>Compliance with Environmental Laws</u>.

    (i)    The Company and its Subsidiaries have complied and are in compliance with any and all applicable federal, state, local and foreign laws, rules, regulations, decisions and orders, including all civil and common law, relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "<u>Environmental Laws</u>");

    (ii)   the Company and its Subsidiaries have (a) received and are in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses, (b) are not subject to any action to revoke, terminate, cancel, limit, amend or

appeal any such permits, licenses or approvals, and (c) have paid all fees, assessments or expenses due under any such permits, licenses or approvals;

(iii)    the Company and its Subsidiaries have not received notice from any governmental authority of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, or for any violation of Environmental Laws;

(iv)    there are no facts, circumstances or conditions relating to the past or present business or operations of the Company, its Subsidiaries or any of their predecessors (including the disposal of any hazardous or toxic substances or wastes, pollutants or contaminants), or to any real property currently or formerly owned or operated by the Company, its Subsidiaries or any of their predecessors, that would reasonably be expected to give rise to any claim, proceeding or action, or to any liability, under any Environmental Law;

(v)    neither the Company nor any of its Subsidiaries has agreed to assume or accept responsibility for, by contract or otherwise, any liability of any other person under Environmental Laws;

(vi)    neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws;

(vii)    none of the transactions contemplated under this Agreement will give rise to any obligations to obtain the consent of or provide notice to any governmental or regulatory authority under any Environmental Laws; and

(viii)    none of the Company, nor any of its subsidiaries nor their respective predecessors has manufactured, marketed, distributed, or sold asbestos or any products containing asbestos.

except, in the case of each of subclauses (i) through (vi) and in subclause (viii) above, as disclosed in the Company SEC Documents filed prior to the date hereof, as have been, as of the date of this Agreement, adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof, or as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(y)    Tax Matters.  Except as described in the Company SEC Documents filed with the Commission prior to the date hereof:

(i)    The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the appropriate taxing authorities all material tax returns, statements, forms

and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("Tax Returns") that are required to be filed by, or with respect to, the Company and its Subsidiaries on or prior to the Closing Date. The Tax Returns accurately reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby;

(ii)     all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Closing Date have been or will, prior to the Closing, be timely paid in full or accrued and fully provided for in accordance with GAAP on the financial statements of the Company included in the Company SEC Documents;

(iii)    neither the Company nor any of its Subsidiaries has received any written notices from any taxing authority relating to any material issue that has not been adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof;

(iv)    all material Taxes which the Company and each or any of its Subsidiaries is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable;

(v)     neither the Company nor any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the law of the United States, any foreign jurisdiction or any state or locality with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its subsidiaries are the only members);

(vi)    except for the tax sharing allocations and similar agreements entered into with GM at the time of the spin-off, there are no tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any of its Subsidiaries or any predecessor or affiliate thereof and any other party (including any predecessors or affiliates thereof) under which the Company or any of its Subsidiaries would be liable for any material Taxes or other claims of any party;

(vii)   the Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five-year period ending on the date hereof; and

(viii)    the Company is not a party to any agreement other than certain Change In Control Agreements in the Company SEC Documents filed prior to the date hereof that would require the Company or any affiliate thereof to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

For purposes of this Agreement, "Taxes" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(z)    Compliance With ERISA.

(i)    Correct and complete copies of the following documents, with respect to all material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans (the "Company Plans"), have been or will be delivered or made available to the Investors by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on IRS Form 5500 for each of the past three years and all schedules thereto and the most recent actuarial report; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the two most recently prepared actuarial valuation reports.

(ii)    Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as described in the Company SEC Documents filed prior to the date hereof:

(A) each Company Plan, other than any "multiemployer plans" within the meaning of Section 3(37) of ERISA ("Multiemployer Plans"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended (the "Code") and other applicable laws; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (C) no liability under Subtitle C or D of Title IV of ERISA has been or is reasonably expected to be incurred by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("Single-Employer Plan") currently maintained or contributed to (or with respect to which an obligation to contribute has been undertaken), or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "Company ERISA Affiliate"); (D) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no notice of a "reportable event," within the meaning of Section 4043 of ERISA has occurred or is expected to occur for any Company Plan or by any Company ERISA Affiliate; (F) all contributions required to be made under the terms of any Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company SEC Reports filed prior to the date hereof; and (G) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(iii)    Except as disclosed in the Company SEC Documents filed prior to the date hereof: (A) neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company expects that required minimum contributions to any Company Plan under Section 412 of the Code will not be materially

increased by application of Section 412(l) of the Code; (C) neither the Company nor any of its Subsidiaries has provided, or is required to provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code; and (D) neither the execution of this Agreement, stockholder approval of this Agreement nor the consummation of the transactions contemplated hereby will limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(aa)    Internal Control Over Financial Reporting.  Except as set forth in the Company SEC Documents filed prior to the date hereof, the Company and its Subsidiaries (i) make and keep books and records that accurately and fairly represent the Company's transactions, and (ii) maintain and have maintained effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date hereof, to the Company's auditors and the audit committee of the Company's board of directors (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and has identified for the Company's auditors and the audit committee of the Company's board of directors any material weaknesses in internal control over financial reporting and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(bb)    Disclosure Controls and Procedures.  Except as disclosed in the Company SEC Documents filed prior to the date hereof, the Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company's filings with the Commission and other public disclosure documents.

(cc)    Insurance.  The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Company and its Subsidiaries.  Neither the Company nor any of its

Subsidiaries has (i) received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(dd)   <u>No Unlawful Payments</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment in each case other than clause (iii) that has been or would reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(ee)   <u>Compliance with Money Laundering Laws</u>.  The Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "<u>Money Laundering Laws</u>") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ff)   <u>Compliance with Sanctions Laws</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("<u>OFAC</u>").  The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Investor Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person that, to the Company's knowledge, is currently subject to any U.S. sanctions administered by OFAC.

(gg)   <u>No Restrictions on Subsidiaries</u>.  Except as described in the Company SEC Documents filed prior to the date hereof or otherwise set forth in the record of the Chapter 11 Cases on or prior to the date hereof, and subject to the Bankruptcy Code, no Subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from

paying any dividends to the Company, from making any other distribution on such Subsidiary's capital stock, from repaying to the Company any loans or advances to such Subsidiary from the Company or from transferring any of such Subsidiary's properties or assets to the Company or any other Subsidiary of the Company.

(hh)    <u>No Broker's Fees</u>.  Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Investors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(ii)    <u>No Registration Rights</u>.  Except as provided for pursuant to the registration rights agreement contemplated by <u>Section 8(c)(iv)</u>, no person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Rights Offering Registration Statement with the Commission or in connection with Rights Offering or the sale of the Investor Shares.

(jj)    <u>No Stabilization</u>.  The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(kk)    <u>Margin Rules</u>.  Neither the issuance, sale and delivery of the Rights or the Shares in connection with Rights Offering or the sale of the Investor Shares nor the application of the proceeds thereof by the Company as to be described in the Rights Offering Registration Statement and the Rights Offering Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(ll)    <u>Forward-Looking Statements</u>.  No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in the Company SEC Documents has been made or reaffirmed, and in the case of the Rights Offering Registration Statement and the Rights Offering Prospectus, will be made or reaffirmed, without a reasonable basis or has been disclosed other than in good faith.

(mm)    <u>Statistical and Market Data</u>.  Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data to be included in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(nn)    <u>Rights Agreement</u>.  The Board of Directors of the Company has taken all necessary action to render the Existing Shareholder Rights Plan inapplicable to the sale and issuance of the Investor Shares and the other transactions contemplated hereby and by the Preferred Term Sheet, the Plan and the

Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).

(oo)   Takeover Statutes; Charter.  The Board of Directors of the Company has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware (the "DGCL") and Article IX of the Company's Certificate of Incorporation inapplicable to the Investors and the sale and issuance of the Investor Shares and the other transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).  Except for Section 203 of the DGCL (which has been rendered inapplicable), no other "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation (a "Takeover Statute") is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the Plan and the Transaction Agreements.  Other than Article IX of the Company's Certificate of Incorporation, which has been rendered inapplicable, no anti-takeover provision in the Company's certificate of incorporation or by-laws is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Preferred Term Sheet, the Plan or the Transaction Agreements.

4.   Representations and Warranties of the Investors.  Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth below.  Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

(a)   Incorporation.  The Investor has been duly organized and, if applicable, is validly existing as a corporation, limited partnership or limited liability company, in good standing under the laws of the jurisdiction of its incorporation or organization.

(b)   Corporate Power and Authority.  The Investor has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement .

(c)   Execution and Delivery.  This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)   No Registration.  The Investor understands that the Investor Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the

accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

(e)     <u>Investment Intent</u>.  The Investor is acquiring the Investor Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities laws.   Notwithstanding the foregoing, as to ADAH, subject to the provisions of Sections 2(a), 2(b) and 2(k), the Company acknowledges that ADAH may provide for a participation interest or other arrangement whereby the economic benefits of ownership of the Series A-2 Preferred Stock are shared with Merrill and Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock.

(f)     <u>Securities Laws Compliance</u>.  The Investor Shares will not be offered for sale, sold or otherwise transferred by the Investor except pursuant to a registration statement or in a transaction exempt from, or not subject to, registration under the Securities Act and any applicable state securities laws and any sale or placement of Investor Shares pursuant to Sections 2(a), 2(b) or 2(k) will not affect the validity of the private placement to the Investors under this Agreement.

(g)     <u>Sophistication</u>.  The Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Investor Shares being acquired hereunder.  The Investor is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.  The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Investor Shares for an indefinite period of time).

(h)     <u>No Conflict</u>.  The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Investor, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of their

properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(i)     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties is required to be obtained or made by the Investor for the purchase of the Investor Shares hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein, except filings with respect to and the expiration or termination of the waiting period under the HSR Act or any comparable laws or regulations in any foreign jurisdiction relating to the purchase of Investor Shares and except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(j)     <u>Arm's Length</u>.  The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement.  The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)     <u>No Violation or Default; Compliance with Laws</u>.  The Investor is not in default, and no event has occurred that , with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.  The Investor is not and has not been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(l)    <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the Investor is a party or to which any property of the Investor is the subject that, individually or in the aggregate, has or, if determined adversely to the Investor, would reasonably be expected to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement and no such actions, suits or proceedings are threatened or, to the knowledge of the Investor, contemplated and, to the knowledge of the Investor, no investigations are threatened by any governmental or regulatory authority or threatened by others that has or would reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(m)   <u>No Broker's Fees</u>.  The Investor is not a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Company for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(n)    <u>No Undisclosed Written Agreements</u>.  The Investor has not entered into any material written agreements between or among the Investors directly relating to such Investor's Investor Shares or the performance of the Transaction Agreements, and any such written agreement hereafter entered into will be disclosed promptly to the Company.

(o)    <u>Available Funds</u>.  To the extent the Investor is ADAH, Dolce or Harbinger, the Investor has provided the Company with a true and complete copy of an executed commitment letter from the parties signatory thereto to provide equity financing to such Investor (the "<u>Equity Commitment Letter</u>").  Each such Investor represents as to itself that its Equity Commitment Letter is in full force and effect and is a valid and binding obligation of the parties thereto enforceable in accordance with its terms except as the enforcement thereof is subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors rights and to general equitable principles.  The Equity Commitment Letters are not subject to any condition or contingency with respect to financing that is not set forth in such letter other than the terms and conditions of this Agreement.

5.    <u>Additional Covenants of the Company</u>.  The Company agrees with each of the Investors as set forth below.

(a)    <u>Initial Approval Motion and Initial Approval Order</u>.  The Company agrees that it shall use reasonable best efforts to cause the Initial Approval Order to become a Final Approval Order as soon as practicable following the filing of the Approval Motion.

(b)    <u>Plan and Disclosure Statement</u>.  The Company shall authorize, execute, file with the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure

statement (the "Disclosure Statement")) (i) the terms of which are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, however, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion, (ii) that provides for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (iii) that has conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, however, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion. The Company will (i) provide to each Investor and its counsel a copy of the Plan and the Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel. In addition, the Company will (i) provide to each Investor and its counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, into such Confirmation Order, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

(c)     Rights Offering. The Company shall use its reasonable best efforts to effectuate the Rights Offering as provided herein.

(d)     Securities Laws; Rights Offering Registration Statement. The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Investor Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws. As promptly as practicable following the later of the Due Diligence Expiration Date and the date the GM Settlement is agreed, the Company shall file a Rights

Offering Registration Statement with the Commission.  The Company shall: (i) provide the Investors with a reasonable opportunity to review the Rights Offering Registration Statement, and any amendment or supplement thereto, before any filing with the Commission and shall duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel; (ii) advise the Investors, promptly after it receives notice thereof, of the time when the Rights Offering Registration Statement has been filed or has become effective or any Rights Offering Prospectus or Rights Offering Prospectus supplement has been filed and shall furnish the Investors with copies thereof; (iii) advise the Investors promptly after it receives notice of any comments or inquiries by the Commission (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the Commission of any stop order or of any order preventing or suspending the use of the Rights Offering Prospectus or Issuer Free Writing Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Rights Offering Registration Statement or a Rights Offering Prospectus or for additional information, and in each such case, provide the Investors with a reasonable opportunity to review any such comments, inquiries, request or other communication from the Commission and to review any amendment or supplement to the Rights Offering Registration Statement or the Rights Offering Prospectus before any filing with the Commission, and to duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of the Investors and their respective counsel, and not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Rights Offering Prospectus or any Issuer Free Writing Prospectus or suspending any such qualification, to use promptly its reasonable best efforts to obtain its withdrawal.

(e)     Listing.  The Company shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on the New York Stock Exchange or, if approved by each of ADAH and Dolce, the Nasdaq Global Select Market.

(f)     Rule 158.  The Company will generally make available to the Company's security holders as soon as practicable an earnings statement of the Company covering a twelve-month period beginning after the date of this Agreement, which shall satisfy the provisions of Section 11(a) of the Securities Act.

(g)     Notification.  The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five Business Days prior to the Expiration Time (and any

extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(h)     <u>Unsubscribed Shares</u>.  The Company shall determine the number of Unsubscribed Shares, if any, in good faith, shall provide a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined and shall provide to the Investors a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as any Investor may reasonably request.

(i)     <u>HSR</u>.  The Company shall use its reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and seek all approvals or consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Investor Shares hereunder, and shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  The Company shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than 30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day).

(j)     <u>Clear Market</u>.  For a period of 180 days after the Closing Date (the "<u>Restricted Period</u>"), the Company will not (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for capital stock of the Company or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the capital stock of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock of the Company or such other securities, in cash or otherwise, without the prior written consent of each of the ADAH and Dolce, except for (A) Rights and New Common Stock issuable upon exercise of Rights, (B) shares of New Common Stock issued upon the exercise of any stock options outstanding as of the Effective Date and (C) the issuance of New Common Stock and other equity interests as set forth in the Preferred Term Sheet, the PSA and pursuant to the Plan.  Notwithstanding the foregoing, if (i) during the last 17 days of the Restricted Period, the Company

issues an earnings release or material news or a material event relating to the Company occurs or (ii) prior to the expiration of the Restricted Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the Restricted Period, the restrictions imposed by this Agreement shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

(k)    <u>Use of Proceeds</u>.  The Company will apply the net proceeds from the sale of the Rights and the Investor Shares as provided in the Rights Offering Prospectus.

(l)    <u>No Stabilization</u>.  The Company will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(m)    <u>Reports</u>.  So long as any Investor holds Shares, the Company will furnish to such Investor, as soon as they are available, copies of all reports or other communications (financial or other) furnished to holders of the Rights or the Shares, as the case may be, and copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange or automatic quotation system.

(n)    <u>Conduct of Business</u>.  During the period from the date of this Agreement to the Closing Date (except as otherwise expressly provided by the terms of this Agreement (including the Disclosure Letter), the PSA, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Company and its Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions which are consistent with the Transformation Plan) and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their current officers and employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries.  Without limiting the generality of the foregoing, except as set forth in the Disclosure Letter, on and after the date on which the Business Plan is approved and accepted by ADAH and Dolce, the Company and its Subsidiaries shall carry on their businesses in all material respects in accordance with such Business Plan and shall not enter into any transaction that would be inconsistent with such Business Plan and shall use its commercially reasonable efforts to effect such Business Plan.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter), the PSA, the Plan or any other order of the Bankruptcy Court entered as of the date hereof in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of each of ADAH and Dolce, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)        (A) declare, set aside or pay any dividends on, or make any other distributions in respect of, any of its capital stock, (B) split, combine or reclassify any of its capital stock or issue or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock or (C) purchase, redeem or otherwise acquire, except in connection with the Plan, any shares of capital stock of the Company or any other securities thereof or any rights, warrants or options to acquire any such shares or other securities;

(ii)       except for intercompany transactions and any financing activities which are consistent with the Company's existing financing, issue, deliver, grant, sell, pledge, dispose of or otherwise encumber any of its capital stock or any securities convertible into, or any rights, warrants or options to acquire, any such capital stock at less than fair market value;

(iii)      acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the stock, or other ownership interests in, or substantial portion of assets of, or by any other manner, any business or any corporation, partnership, association, joint venture, limited liability company or other entity or division thereof except in the ordinary course of business;

(iv)      sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security interest, charge, claim or other encumbrance of any kind or nature on or otherwise encumber or dispose of any of its properties or assets, except (A) in the ordinary course of business consistent with past practice and (B) other transactions involving not in excess of $100 million in any 12 month period;

(v)       (A) incur any indebtedness for borrowed money or guarantee any such indebtedness of another individual or entity, issue or sell any debt securities or warrants or other rights to acquire any debt securities of the Company, guarantee any debt securities of another individual or entity, enter into any "keep well" or other agreement to maintain any financial statement condition of another person (other than a Subsidiary) or enter into any arrangement having the economic effect of any of the foregoing in excess of $100 million in any 12 month period, except for (x) working capital borrowings and increases in letters of credit necessary in the ordinary course of business under the Company's existing or any amended or replacement revolving credit facilities, and (y) indebtedness solely between the Company and its Subsidiaries or between such Subsidiaries or (B) except for transactions between the Company and any of its Subsidiaries or between such Subsidiaries, make any loans, advances or capital contributions to, or investments in, any other individual or entity, other than customary advances of business and travel expenses to employees of the Company in the ordinary course of business consistent with past practice;

(vi)    enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan, this Agreement, the PSA, the Plan and the GM Settlement; or

(vii)    authorize any of, or commit or agree to take any of, the foregoing actions.

(o)    <u>Actions Regarding Conditions</u>.  During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in <u>Section 9</u> not being satisfied.

(p)    <u>GM Settlement</u>.  The Company shall use its reasonable best efforts to agree on, prior to January 31, 2007, a settlement agreement (the "<u>GM Settlement</u>") between the Company and GM that is consistent with this Agreement, the PSA and the Plan, and satisfactory to each of ADAH and Dolce in its sole discretion.  The Company will (i) provide to the Investors and their respective counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of each of ADAH and Dolce and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.  The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the PSA and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company.

(q)    <u>Access to Information</u>.  Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH or Dolce) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; <u>provided</u>, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information

of the Company or any of its Subsidiaries or (iii) to violate any laws; <u>provided, further</u>, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above.  All requests for information and access made pursuant to this <u>Section 5(q)</u> shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)    <u>Financial Information</u>.  For each month, beginning November 2006 until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within 30 days of the end of such month (the "<u>Monthly Financial Statements</u>").  The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices.  The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows  of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)    <u>Business Plan and Disclosure Letter</u>.  The Company shall use its commercially reasonable efforts to provide to the Investors as soon as practicable a final five-year business plan approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "<u>Business Plan</u>"); <u>provided</u>, that the Company shall not be required to deliver and neither ADAH nor Dolce shall be required to approve or accept for consideration by them any Business Plan that does not reflect a final and binding GM Settlement.  The Company shall deliver with the Business Plan a Disclosure Letter which provides for exceptions from the representations and warranties of the Company in <u>Section 3</u>.

(t)    <u>Financing Assistance</u>.  The Company and its Subsidiaries shall obtain the debt financing from financing sources reasonably satisfactory to Dolce and ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees, and otherwise to be on terms that are acceptable to each of ADAH and Dolce not to be unreasonably withheld (the "<u>Debt Financing</u>").  Subject to applicable regulatory or NASD requirements, Merrill Lynch, Pierce, Fenner & Smith, Incorporated and UBS Securities LLC (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms.  The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing.  The Company will (i) provide to the Investors and their respective counsel a copy of all marketing information, term sheets,

commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with the Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel, and (iii) keep the Investors reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

(u)    Labor Agreements.  The Company and its Subsidiaries shall use their reasonable best efforts to enter into (A) tentative labor agreements with each of The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "USW") that each of ADAH and Dolce shall have approved in its sole discretion and which adequately address, among other things, the following matters:  (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan (including plant closings, asset dispositions and resolution of union claims), (ii) permit achievement of the Business Plan and the EBITDA Target; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) acceptable to each of ADAH and Dolce in each of its sole discretion at certain of the Company's facilities.  The Company will (i) provide to the Investors and their respective counsel a copy of any labor agreement and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

(v)    Other Actions by the Company.

(i)    Existing Shareholder Rights Plan.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "Acquiring Person" as defined in the Existing Shareholder Rights Plan

and that the rights will not separate from the Common Stock pursuant to the Existing Shareholder Rights Plan as a result of entering into this Agreement or the PSA or consummating the transactions contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan, and (B) will take all such action as is necessary to terminate the Existing Shareholder Rights Plan effective as of the Closing Date.

    (ii)   <u>Takeover Statutes and Charter</u>.  The Company and the Board of Directors of the Company has taken all action necessary (A) to ensure that no Takeover Statute or similar statue or regulation is or becomes applicable to this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan, (B) if any Takeover Statute is or may become applicable to the transactions contemplated by this Agreement (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or the Plan, to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and the Plan and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions and (C) to ensure that this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan are approved for purposes of Article IX of the Company's Amended and Restated Certificate of Incorporation, dated January 26, 1999, as amended to date, and that such provision shall not apply to the transactions contemplated hereby or by the Preferred Term Sheet, the PSA or the Plan.

(w)   <u>Agreement on Key Documentation</u> .  The Company shall use its commercially reasonable efforts to agree on or prior to January 31, 2007 on (a) the terms of the GM Settlement, (b) the agreements contemplated by <u>Section 5(u)</u>, and (c) the terms of the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH and Dolce.

(x)   Investment Decision Package .  If at any time prior to the Expiration Date, any event occurs as a result of which the Investment Decision Package, as then amended or supplemented, would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it shall be necessary to amend or supplement the Investment Decision Package to comply with applicable law, the Company will promptly notify the Investors of any such event and prepare an amendment or supplement to the Investor Decision Package that is reasonably acceptable in form and substance to each of ADAH and Dolce that will correct such statement or omission or effect such compliance.

6.     <u>Additional Covenants of the Investors</u>.  Each Investor agrees, severally and not jointly, with the Company:

(a)     <u>Information</u>.  To provide the Company with such information as the Company reasonably requests regarding the Investor for inclusion in the Rights Offering Registration Statement and the Disclosure Statement.

(b)     <u>HSR Act</u>.  To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and to obtain all authorizations, approvals and consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder and any applicable notification, authorization, approval or consent shall have been made or obtained with respect to the purchase of Investor Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  Each Investor shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than 30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day).

(c)     <u>Bankruptcy Court Filings</u>.  To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order or the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company's efforts to obtain the entry of the Confirmation Order consistent with this Agreement.

(d)     <u>Reasonable Best Efforts</u>.  Each Investor shall use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan.

7.     <u>Additional Joint Covenant of Company And Each Investor</u>.  Without limiting the generality of the undertakings pursuant to <u>Sections 5(i)</u> and <u>6(b)</u>, the Company and each Investor shall use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements, including furnishing all information required by applicable law in connection with approvals of or filings with any governmental authority, and filing, or causing to be filed, as promptly as practicable, any required notification and report forms under other

applicable competition laws with the applicable governmental antitrust authority.  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings. Subject to appropriate confidentiality safeguards, each party shall (i) respond promptly to any request for additional information made by the antitrust agency; (ii) promptly notify counsel to the other party of, and if in writing, furnish counsel to the other party with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement; (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat; (iv) furnish counsel to the other party with copies of all correspondence, filings and communications between it and the antitrust agency with respect to any of the transactions contemplated by this Agreement; and (v) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency.  The Parties shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.

Notwithstanding anything in this Agreement to the contrary, nothing shall require any Investor or its Affiliates to dispose of any of its or its Subsidiaries' or its Affiliates' assets or to limit its freedom of action with respect to any of its or its Subsidiaries' businesses, or to consent to any disposition of the Company's or the Company Subsidiaries' assets or limits on the Company's or the Company Subsidiaries' freedom of action with respect to any of its or the Company Subsidiaries' businesses, or to commit or agree to any of the foregoing, and nothing in this Agreement shall authorize the Company or any Company Subsidiary to commit or agree to any of the foregoing, to obtain any consents, approvals, permits or authorizations to remove any impediments to the transactions contemplated hereby or by any Transaction Agreement relating to antitrust or competition laws or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action relating to antitrust or competition laws.

8.    <u>Reasonable Best Efforts</u>.

        The Company shall use its reasonable best efforts (and shall cause its Subsidiaries to use their respective reasonable best efforts) to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its or their part under this Agreement and applicable laws to cooperate with the Investors and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, including:

        (a)    preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or governmental entity; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, in connection with

obtaining such consents, the Company shall not, without the prior written consent of each of ADAH and Dolce in their sole discretion, pay or commit to pay any person or entity whose consent is being solicited in cash or other consideration to the extent such payment could reasonably be expected to prevent the Company from achieving the EBITDA targets set forth in under Section 9(a)(xviii) hereof;

(b)     defending any lawsuits or other actions or proceedings, whether judicial or administrative, challenging this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or any other agreement contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed;

(c)     executing, delivering and filing, as applicable, any additional ancillary instruments or agreements necessary to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan and to fully carry out the purposes of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan and the transactions contemplated hereby and thereby including, without limitation:  (i) employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); (ii) agreements and other arrangements acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court with respect to claims against the Company of former members of the Company's management and members of the Company's management, if any, who are resigning or being terminated in accordance with the implementation of the Plan; (iii) a shareholders agreement among the Company, ADAH and Dolce reasonably satisfactory to ADAH and Dolce (the "Shareholders Agreement"); (iv) a registration rights agreement (the "Registration Rights Agreement") among the Company and the Investors, reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company, and providing that the Company shall (a) as soon as practicable after the Closing Date, and in any event no later than seven (7) days after the Closing Date, prepare and file with the Commission a registration statement, including all exhibits thereto, pursuant to Rule 415 under the Securities Act registering offers and sales by the Investors and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred Stock (the "Resale Registration Statement" and, together with the final prospectus contained in the Resale Registration Statement as of its effective date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-

effective amendment to the Resale Registration Statement) and any issuer free writing prospectus as defined in Rule 433 under the Securities Act used in connection with the resale of such shares, the "Resale Registration Documents"); (b) cause the Resale Registration Statement to be declared effective by the Commission as soon as practicable after the filing thereof, and in any event no later than thirty (30) days after the Closing Date; (c) obtain such comfort letters from the Company's independent certified public accountants addressed to the Investors covering such matters of the type customarily covered by comfort letters and as ADAH and Dolce reasonably request; and (d) cause a customary opinion or opinions and negative assurance statement, in customary form and scope from counsel to the Company to be furnished to each Investor; (v) an amended and restated certificate of incorporation and amended by-laws of the Company, in each case, that is consistent with this Agreement, the PSA and the Preferred Term Sheet and reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such certificate of incorporation and by-laws would have a material impact on the Investors' proposed investment in the Company; provided, that the amended and restated certificate of incorporation of the Company to be effective immediately following the Effective Date shall prohibit; (A) for so long as ADAH or Dolce, as the case may be, owns any shares of Series A Preferred Stock, any transactions between the Company or any of its Subsidiaries, on the one hand, and ADAH or Dolce or their respective Affiliates, as the case may be, on the other hand (including any "going private transaction" sponsored by ADAH or Dolce) unless such transaction shall have been approved by (x) directors constituting not less than 75% of the number of Common Directors and (y) in the case of any transaction with ADAH or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, ADAH, and (B) any transaction between the Company or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock, unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("GMAC") or General Motors ("GM") as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC (such amended and restated certificate of incorporation and amended bylaws are herein referred to as the "Amended and Restated Constituent Documents"); and (vi) the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations, in each case, that is consistent with the terms set forth in the Preferred Term Sheet and that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce shall be each in its sole discretion. Subject to applicable laws and regulations relating to the exchange of information, the Investors and the

Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan.  In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.    <u>Conditions to the Obligations of the Parties</u>.

(a)    Subject to <u>Section 9(b)</u>, the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

(i)    <u>Initial Approval Order</u>.  The Initial Approval Order shall have become a Final Approval Order.  "<u>Final Approval Order</u>" shall mean an Initial Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek <u>certiorari</u> or request reargument or further review or rehearing has expired and no appeal, petition for <u>certiorari</u> or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for <u>certiorari</u> or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which <u>certiorari</u> was sought or to which the request was made and no further appeal or petition for <u>certiorari</u> or request for reargument or further review or rehearing has been or can be taken or granted.

(ii)    <u>Approval of Plan</u>. To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, each of ADAH and Dolce shall be reasonably satisfied with, prior to filing with the Bankruptcy Court: (i) the Plan and any related documents, agreements or arrangements, (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors  from any liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (ii) a Disclosure Statement that is consistent in all material respects with the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (iii) a Confirmation Order,  that is consistent in all material respects with the provisions of the Plan, this Agreement, the Preferred Term Sheet, the

PSA and the GM Settlement; and (iv) any amendments or supplements to any of the foregoing.  Notwithstanding the foregoing, prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of the documents referred to in subsections (i), (ii), (iii) and (iv) shall be each in its sole discretion.

(iii)    <u>Plan of Reorganization</u>.  The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Closing Date.

(iv)    <u>GM Settlement</u>.  Each of ADAH and Dolce shall have approved in its sole discretion the GM Settlement prior to its filing with the Bankruptcy Court.  The GM Settlement shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the GM Settlement shall have performed and complied with all of their respective covenants and agreements contained in the GM Settlement in all material respects through the Closing Date.

(v)    <u>Alternate Transaction</u>.  The Company shall not have entered into any letter of intent, memorandum of understanding, agreement in principle or other agreement (other than a confidentiality agreement with terms that are not materially less favorable to the Company than the terms of that certain Amended Confidentiality Information, Standstill and Nondisclosure Agreement, dated August 25, 2006, among the Company, Appaloosa Management L.P. and Harbinger Capital Partners Master Fund I, Ltd.) or taken any action to seek any Bankruptcy Court approval relating to, any Alternate Transaction (an "<u>Alternate Transaction Agreement</u>").  For the purpose of this Agreement, an "<u>Alternate Transaction</u>" means any plan, proposal, offer or transaction that is inconsistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement or the Plan, other than a Chapter 7 liquidation.

(vi)    <u>Change of Recommendation</u>.  There shall not have been a Change of Recommendation.  For purposes of this Agreement, a "<u>Change of Recommendation</u>" shall mean, (i) the Company or its board of directors or any committee thereof,  or GM shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investors, its approval or recommendation of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or the transactions contemplated hereby or thereby or (ii) the Company or its board of directors or any committee thereof or GM shall have approved or recommended, or proposed to approve or recommend (including by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

(vii)   Confirmation Order.  The Confirmation Order approving the Plan in form
and substance approved by each of ADAH and Dolce in accordance with
Section 9(a)(ii) above, shall have been entered by the Bankruptcy Court
and such order shall be non-appealable, shall not have been appealed
within ten calendar days of entry or, if such order is appealed, shall not
have been stayed pending appeal, and there shall not have been entered by
any court of competent jurisdiction any reversal, modification or vacation,
in whole or in part, of such order (the "Confirmation Order").

(viii)  Plan and Confirmation Order.  To the extent that the material terms of the
following have a material impact on the Investors' proposed investment in
the Company, (a) the Plan confirmed by the Bankruptcy Court in the
Confirmation Order (the "Confirmed Plan") and the Confirmation Order
shall be in the form and with such terms as are reasonably satisfactory to
each of ADAH and Dolce in accordance with Section 9(a)(ii) above and (b)
the Disclosure Statement approved by the Bankruptcy Court shall be in
form and substance reasonably satisfactory to each of ADAH and Dolce in
accordance with Section 9(a)(ii) above.  Notwithstanding the foregoing,
prior to the Due Diligence Expiration Date, the standard for the approval
by each of ADAH and Dolce of the Confirmed Plan, the Confirmation
Order and the Disclosure Statement shall be each in its sole discretion.

(ix)    Conditions to Effective Date.  The conditions to the occurrence of the
Effective Date of the Confirmed Plan shall have been satisfied or waived
by the Company and each of ADAH and Dolce in accordance with the
Plan.

(x)     Rights Offering Registration Statement.  The Rights Offering Registration
Statement shall be effective not later than the Distribution Date and shall
continue to be effective and no stop order shall have been entered by the
Commission with respect thereto.

(xi)    Rights Offering.  The Rights Offering shall have been conducted in all
material respects in accordance with this Agreement and the Disclosure
Statement and the Expiration Time shall have occurred.

(xii)   Purchase Notice.  Each of the Investors shall have received a Purchase
Notice from the Company, dated as of the Determination Date, certifying
as to the number of Unsubscribed Shares to be purchased or a Satisfaction
Notice.

(xiii)  Antitrust Approvals.  All terminations or expirations of waiting periods
imposed by any governmental or regulatory authority necessary for the
consummation of the transactions contemplated by this Agreement,
including under the HSR Act and any comparable regulations in any
foreign jurisdiction, shall have occurred and all other notifications,
consents, authorizations and approvals required to be made or obtained

from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(xiv)   <u>Consents</u>.  All other governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan shall have been made or received.

(xv)    <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement.

(xvi)   <u>Representations and Warranties</u>.  The representations and warranties of Company contained in this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications, other than such qualifications contained in <u>Sections 3(i)</u> and <u>3(j)</u>) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on and as of the Disclosure Letter Delivery Date and the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect, other than with respect to the representations in <u>Sections 3(b)</u>, <u>3(c)</u>, <u>3(d)</u>, <u>3(e)</u>, and <u>3(m)(ii)</u> and <u>3(oo)</u>, which shall be true and correct in all respects.  The representations and warranties of each Investor (other than the Investor asserting the failure of this condition) contained in this Agreement and in any other document delivered pursuant to this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date which shall be true and correct only as of such specified date); except where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(xvii)  <u>Covenants</u>.  The Company and each Investor (other than the Investor asserting the failure of this condition) shall have performed and complied with all of its covenants and agreements contained in this Agreement and

in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii)  EBITDA.  Each of ADAH and Dolce shall be reasonably satisfied that the Company will achieve EBITDA at least equal to the 2008 EBITDA Amount in 2008 and $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA) (the "EBITDA Target").

(xix)  Financing.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx)  Labor Agreements.  Each of ADAH and Dolce shall have been presented with and approved, in its sole discretion, on or before the Specified Date, tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand.  Such tentative labor agreements as so approved shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the tentative labor agreements shall have performed and complied with all of their respective covenants and agreements contained in such tentative labor agreements approved by each of ADAH and Dolce in all material respects through the Closing Date.

(xxi)  Management Compensation. The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); and (ii) resolved any claims of former executive officers, or executive officer's that have resigned or been terminated, on terms acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court.

(xxii)  Shareholders Agreement.  The Company shall have entered into the Shareholders Agreement with ADAH and Dolce in accordance with Section 8(c)(iii);

(xxiii) <u>Registration Rights Agreement</u>.  The Company shall have entered into the Registration Rights Agreement with the Investors in accordance with <u>Section 8(c)(iv)</u>, reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company; <u>provided</u>, that prior to the Due Diligence Expiration Date, such Registration Rights Agreement shall be satisfactory to each of ADAH and Dolce in its sole discretion.

(xxiv) <u>Amended and Restated Constituent Documents</u>.  The Company shall have adopted the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations consistent with this Agreement, the PSA and the Term Sheet and otherwise reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such documents would have a material impact on the Investors' proposed investment in the Company; <u>provided</u>, that prior to the Due Diligence Expiration Date, such documents shall be satisfactory to each of ADAH and Dolce in its sole discretion.

(b)    All or any of the conditions set forth in <u>Section 9(a)</u> may be waived in whole or in part with respect to all Investors by both ADAH and Dolce, acting together, in their sole discretion.

(c)    The obligation of the Company to issue and sell the Investor Shares are subject to the following conditions, provided that the failure of a condition set forth in <u>Sections 9(c)(vii)</u> through <u>(x)</u> to be satisfied may not be asserted by the Company if such failure results from the failure of the Company to fulfill an obligation hereunder:

(i)    <u>Initial Approval Order</u>.  The Initial Approval Order shall have become a Final Approval Order.

(ii)    <u>Antitrust Approvals</u>. All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(iii)    <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan

or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement.

(iv)    Representations and Warranties.  The representations and warranties of each Investor, each Related Purchaser and each Ultimate Purchaser contained in this Agreement or pursuant to Sections 2(a), 2(b) or 2(k) shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date, which shall be true and correct only as such specified date), except with respect to the Investors' representations in all Sections other than Sections 4(b) and 4(c) where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(v)    Covenants.  Each Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(vi)    Bankruptcy Court Approval.  This Agreement shall have been approved by the Bankruptcy Court and the approval of the Bankruptcy Court shall not have been modified, amended or withdrawn in any manner adverse to the Company.

(vii)    Confirmation Order.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order.

(viii)    Conditions to Effective Date.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and each of ADAH and Dolce in accordance with the Plan.

(ix)    Rights Offering.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(x)   <u>Financing</u>.  The Company shall have received the proceeds of the Debt
Financings and the Rights Offering that, together with the proceeds of the
sale of the Investor Shares, are sufficient to fund fully the transactions
contemplated by this Agreement, the Preferred Term Sheet, the PSA, the
GM Settlement (to the extent the Company is to fund such transactions)
and the Plan.

(d)   All of the conditions set forth in Section 9(c) may be waived in whole or in part
by the Company in its sole discretion.

10.   <u>Indemnification and Contribution.</u>

(a)   Whether or not the Rights Offering is consummated or this Agreement is
terminated or the transactions contemplated hereby or the Plan are consummated,
the Company (in such capacity, the "<u>Indemnifying Party</u>") shall indemnify and
hold harmless each Investor and the Ultimate Purchasers, their respective
Affiliates and their respective officers, directors, employees, agents and
controlling persons (each, an "<u>Indemnified Person</u>") from and against any and all
losses, claims, damages, liabilities and reasonable expenses, joint or several,
arising out of circumstances existing on or prior to the Closing Date ("<u>Losses</u>") to
which any such Indemnified Person may become subject arising out of or in
connection with any claim, challenge, litigation, investigation or proceeding
("<u>Proceedings</u>") instituted by a third party with respect to the Rights Offering, this
Agreement or the other Transaction Documents, the Rights Offering Registration
Statement, any Preliminary Rights Offering Prospectus, the Rights Offering
Prospectus, any Issuer Free Writing Prospectus, the Investment Decision Package,
the Resale Registration Documents, any amendment or supplement thereto or the
transactions contemplated by any of the foregoing and shall reimburse such
Indemnified Persons for any reasonable legal or other reasonable out-of-pocket
expenses as they are incurred in connection with investigating, responding to or
defending any of the foregoing; <u>provided</u> that the foregoing indemnification will
not apply to Losses (i) arising out of or in connection with any Proceedings
between or among any one or more Indemnified Persons, Related Purchasers
and/or Ultimate Purchasers, any Additional Investor Agreement or the failure of
such Indemnified Person to comply with the covenants and agreements contained
in this Agreement with respect to the sale or placement of Investor Shares; or (ii)
to the extent that they resulted from (a) any breach by such Indemnified Person of
this Agreement, (b) gross negligence, bad faith or willful misconduct on the part
of such Indemnified Person or (c) statements or omissions in the Rights Offering
Registration Statement, any Preliminary Rights Offering Prospectus, the Rights
Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration
Documents or any amendment or supplement thereto made in reliance upon or in
conformity with information relating to such Indemnified Person furnished to the
Company in writing by or on behalf of such Indemnified Person expressly for use
in the Rights Offering Registration Statement, any Rights Offering Preliminary
Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus,
the Resale Registration Documents or any amendment or supplement thereto.  If

for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party on the one hand and such Indemnified Person on the other hand as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of the Shares and the Investor Shares contemplated by this Agreement bears to (ii) the Commitment Fees paid or proposed to be paid to the Investors.  The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this <u>Section 10</u> shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall bind and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)     Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u> that (i) the omission so to notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this <u>Section 10</u>.  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; <u>provided</u> that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to

the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investors, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)     The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld).  If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this Section 10.  Notwithstanding anything in this Section 10 to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses aggregating in excess of $250,000 in connection with investigating, responding to or defending any Proceedings in connection with which it is entitled to indemnification or contribution pursuant to this Section 10, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than (x) 60 days after receipt by the Indemnifying Party of such request for reimbursement and (y) 30 days after receipt by the Indemnified Party of the material terms of such settlement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     All amounts paid by the Company to an Indemnified Person under this Section 10 shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.     Survival of Representations and Warranties, Etc.

(a)     The representations and warranties made in this Agreement shall not survive the Closing Date.  Other than Sections 2(b), 2(c), 2(e), 2(h), 2(i), 2(j), 2(k), 5(e), 5(f),

<u>5(j)</u>, <u>5(k)</u>, <u>5(l)</u>, <u>5(m)</u>, <u>10</u>, <u>11</u>, <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>18</u> and <u>20</u>, which shall survive the Closing Date in accordance with their terms (except <u>Section 5(l)</u> which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)     Other than with respect to <u>Sections 2(h), 2(i)</u> and <u>2(j)</u> and <u>Sections 10</u> through <u>18</u>, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims.  Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million.  The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Due Diligence Expiration Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Due Diligence Expiration Date; <u>provided</u>, that the aggregate liability of Harbinger shall not exceed $38,442,731, the aggregate liability of Merrill shall not exceed $32,038,546 and the aggregate liability of UBS shall not exceed $25,743,392.  Subject to the terms, conditions and limitation set forth in this Section 11(b), (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "<u>Assuming Investor</u>") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "<u>Breaching Investor</u>"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection.  Under no circumstances shall any Investor be liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter.  Under no circumstances shall the Company (both as Debtors-in-possession and

reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.   <u>Termination</u>.

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)   by mutual written consent of the Company and both of ADAH and Dolce;

(b)   by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)   by any party to this Agreement if (i) any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA or the GM Settlement or (ii) the PSA shall have been terminated in accordance with its terms; <u>provided</u>, that the right to terminate this Agreement under this <u>Section 12(c)(ii)</u> shall not be available to any party whose breach of the PSA is the cause of the termination of the PSA;

(d)   by ADAH or Dolce upon written notice to the Company and each other Investor:

(i)   if the Initial Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court enters the Initial Approval Order, or, if such day is not a Business Day, the next Business Day and (B) January 22, 2007; <u>provided</u>, that notice of termination pursuant to this <u>Section 12(d)(i)</u> must be given on or prior to February 28, 2007;

(ii)   prior to the later of (A) January 31, 2007 and (B) the date that is twenty (20) calendar days after the date on which the Company has delivered to each Investor both the Business Plan reflecting the GM Settlement and the Disclosure Letter (such date, the "<u>Due Diligence Expiration Date</u>"), if any Investor is not satisfied in its sole discretion with (x) the results of its due diligence investigation of the Company and its Subsidiaries, the Disclosure Letter and the Business Plan (the "<u>Due Diligence Investigation</u>") or (y) the terms of the Shareholders Agreement, Registration Rights Agreement, the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2

-59-

Certificate of Designations, the Series B Certificate of Designations or any other Transaction Agreement;

(iii)    on or after the later of (x) June 30, 2007 (such date, being the "<u>Closing Date Outside Date</u>"), or (y) the first Business Day that is one-hundred eighty (180) days after the Due Diligence Expiration Date, <u>provided</u> that, in either case, the Closing Date has not occurred by such date;

(iv)    on or after the later of (x) May 1, 2007 (such date, being the "<u>Disclosure Statement Outside Date</u>"), or (y) the first Business Day that is one-hundred twenty (120) days after the Due Diligence Expiration Date, <u>provided</u> that, in either case, the Disclosure Statement has not been filed for approval with the Bankruptcy Court by such date;

(v)    if the Company or any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in <u>Section 9(a)(xvi)</u> or <u>(xvii)</u> hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; <u>provided</u>, that the right to terminate this Agreement under this <u>Section 12(d)(v)</u> shall not be available to any Investor whose breach is the cause of the failure of the condition in <u>Section 9(a)(xvi)</u> or <u>(xvii)</u> to be satisfied;

(vi)    either of ADAH or Dolce shall have determined in its reasonable discretion that the Company will not achieve EBITDA for 2008 at least equal to the 2008 EBITDA Amount and EBITDA of at least $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA);

(vii)    (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

(viii)    if, subsequent to the Company, ADAH and Dolce having previously approved in writing the form of document referred to in <u>Sections 9(a)(iv)</u>, <u>(xx)</u>, <u>(xxii)</u>, <u>(xxiii)</u> or <u>(xxiv)</u>, the conditions set forth in <u>Sections 9(a)(iv)</u>, <u>(xx)</u>, <u>(xxii)</u>, <u>(xxiii)</u> or <u>(xxiv)</u>, shall become not satisfied as a result of an amendment or modification thereto.

<u>provided</u>, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH and Dolce shall be entitled to terminate this Agreement as to itself (but not as to any other party) (A) in any of the circumstances described in <u>Section 12(d)(i)-(viii)</u> at any time prior to the Due Diligence Expiration Date, and (B) at any time on or after December 31, 2007 (each of (A) and (B) being a "<u>Limited Termination</u>"); <u>provided</u>, <u>further</u>, that if there is a Limited Termination, any deadline contained in <u>Section 12(d)(i)</u>, <u>(ii)</u>, <u>(v)</u>

and (vi) by which ADAH must exercise a termination right under Section 12 shall be extended by ten (10) Business Days so as to give it sufficient time to comply with its obligations under Section 2(b);

(e)     on or prior to the Due Diligence Expiration Date, by ADAH or Dolce by notice to the other parties if, on or prior to such date, (i) a target amount of EBITDA for fiscal year 2008  (but in any event not to exceed $2.4 billion) has not been agreed to by each of ADAH and Dolce in its sole discretion and included in the Business Plan (the "2008 EBITDA Amount") or (ii) restructuring charges for 2009 and 2010 have not been agreed to by each of ADAH or Dolce in its sole discretion and included in the Business Plan (the "Restructuring Charges");

(f)     by the Company upon written notice to each Investor:

   (i)     subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; or

   (ii)     if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if:  (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y) before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "Consideration Period") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by the Investors, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by ADAH and Dolce and again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee.

For the purposes of this Section 12(f), a "Superior Transaction" shall mean an Alternate Transaction, which the board of directors of the Company, after

consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

(g)     by ADAH, Dolce or the Company by notice given to the other parties on or before February 28, 2007 (unless this date is extended by agreement of ADAH, Dolce and the Company (as it may be so extended, the "Specified Date")) if the Company and its Subsidiaries have not entered into on or prior to January 31, 2007, (x) tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand or (y) the GM Settlement, in each case, on terms and conditions presented by the Company and satisfactory to each of ADAH and Dolce in its sole discretion.

(h)     In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise) but subject to Section 11(b), the Company shall pay a fee of $100,000,000 (the "Alternate Transaction Fee") to the Investors in such proportions as are set forth on Schedule 2 hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)      pursuant to (x) Section 12(d)(vii)(B) or (y) Section 12(f)(ii);

(ii)     pursuant to Section 12(d)(vii)(A) and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated; or

(iii)    pursuant to Section 12(d)(v) based on a willful breach by the Company and within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this Section 12(h) will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to Section 12(h)(i)(x), (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to Section 12(h)(i)(y) and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of

an Alternate Transaction in the case of a payment pursuant to <u>Section 12(h)(ii) or
(iii)</u>.  Under no circumstances shall the Company be required to pay more than
one Alternate Transaction Fee.  The provision for the payment of the Alternate
Transaction Fee is an integral part of the transactions contemplated by this
Agreement and without this provision the Investors would not have entered into
this Agreement and shall constitute an allowed administrative expense of the
Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(i)     Upon termination under this <u>Section 12</u>, all rights and obligations of the parties
under this Agreement shall terminate without any liability of any party to any
other party except that (x) nothing contained herein shall release any party hereto
from liability for any willful breach and (y) the covenants and agreements made
by the parties herein in <u>Sections 2(h)</u>, <u>2(i)</u> and <u>2(j)</u>, and <u>Sections 10</u> through <u>18</u>
will survive indefinitely in accordance with their terms.

13.    <u>Notices</u>.  All notices and other communications in connection with this Agreement will
be in writing and will be deemed given (and will be deemed to have been duly given
upon receipt) if delivered personally, sent via electronic facsimile (with confirmation),
mailed by registered or certified mail (return receipt requested) or delivered by an express
courier (with confirmation) to the parties at the following addresses (or at such other
address for a party as will be specified by like notice):

(a)     If to:

Dolce Investments LLC
c/o Cerberus Capital Management L.P.
299 Park Avenue
New York, New York 10171
Facsimile:  (212) 421-2958 / (212) 909-1409 / (212) 935-8749
Attention:  Scott Cohen / Dev Kapadia / Seth Gardner

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Facsimile:  (212) 822-5899
Attention:  Thomas C. Janson

and

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Facsimile:  (213) 892-4470
Attention:  Gregory A. Bray

(b)      If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street,
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:  Ronald Goldstein

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
                  Gregory Pryor

(c)      If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn: Philip A. Falcone

with a copy to:

Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile:  (205) 987-5505
Attention:  General Counsel

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
              Gregory Pryor

with a copy to:

Kaye Scholer LLP
425 Park Avenue
New York, NY  10022-3598
Facsimile:  (212) 836-8689
Attention:  Benjamin Mintz and Lynn Toby Fisher

(d)    If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York  10080
Facsimile:  (212) 449-0769
Attention:  Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile:  (212) 757-3990
Attention:  Andrew N. Rosenberg

(e)     If to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:  Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:  Leslie N. Silverman

(f)     If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention:  John Sheehan – Facsimile:  (248) 813-2612
          David Sherbin / Sean Corcoran – Facsimile:  (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
Facsimile:  (212) 735-2000/1
Attention:  Eric L. Cochran
          Marie L. Gibson

and

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile:  (312) 407-0411
Attention:  John Wm. Butler, Jr.
          George Panagakis

14.     Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to Sections 2(a), 2(b) and 2(k).  Notwithstanding the previous sentence, subject to the provisions of

Sections 2(a), 2(b) and 2(k): (1) this Agreement, or the Investors' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate of such Investor over which such Investor or any of its Affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; provided, that any such assignee assumes the obligations of such Investor hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as such Investor; and (2) ADAH may provide for a participation interest or other arrangement whereby the economic benefits of ownership of the Series A-2 Preferred Stock are shared with Merrill, Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company, ADAH and Dolce no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in Section 10 with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    Prior Negotiations; Entire Agreement.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties will continue in full force and effect.

16.    GOVERNING LAW; VENUE.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK  AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

17.    Counterparts.  This Agreement may be executed in any number of counterparts, all of which will be considered one and the same agreement and will become effective when counterparts have been signed by each of the parties and delivered to the other party (including via facsimile or other electronic transmission), it being understood that each party need not sign the same counterpart.

18. <u>Waivers and Amendments</u>.  This Agreement may be amended, modified, superseded, cancelled, renewed or extended, and the terms and conditions of this Agreement may be waived, only by a written instrument signed by all the parties or, in the case of a waiver, by the party waiving compliance, and subject, to the extent required, to the approval of the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver on the part of any party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.  The rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any party otherwise may have at law or in equity.

19. <u>Adjustment to Shares</u>.  If, in accordance with the terms of this Agreement, the Company effects a reclassification, stock split (including a reverse stock split), stock dividend or distribution, recapitalization, merger, issuer tender or exchange offer, or other similar transaction with respect to any shares of its capital stock, references to the numbers of such shares and the prices therefore shall be equitably adjusted to reflect such change and, as adjusted, shall, from and after the date of such event, be subject to further adjustment in accordance herewith.

20. <u>Headings</u>.  The headings in this Agreement are for reference purposes only and will not in any way affect the meaning or interpretation of this Agreement.

21. <u>Publicity</u>.  The initial press release regarding this Agreement shall be a joint press release.  Thereafter, the Company and Investors each shall consult with each other prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22. <u>Knowledge; Sole Discretion</u>.  The phrase "knowledge of the Company" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company, ADAH and Dolce shall reasonably agree.  Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION


By: _____
        Name:
        Title:


A-D ACQUISITION HOLDINGS, LLC


By: _____
        Name:
        Title:


HARBINGER DEL-AUTO INVESTMENT
COMPANY, LTD.


By: _____
        Name:
        Title:


DOLCE INVESTMENTS LLC

By:    Cerberus Capital Management L.P., its
        Managing Member


By: _____
        Name:
        Title:


MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED


By: _____
        Name:
        Title:

UBS SECURITIES LLC

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

SCHEDULE 1

| Defined Term | Section |
|---|---|
| 2008 EBITDA Amount | Section 12 (e) |
| ADAH | Recitals |
| Additional Investor Agreements | Section 2 (k) |
| Affiliate | Section 2 (a) |
| Agreement | Recitals |
| Alternative Financing | Section 2 (b) |
| Alternate Transaction | Section 9 (a)(v) |
| Alternate Transaction Agreement | Section 9 (a)(v) |
| Alternate Transaction Fee | Section 12 (h) |
| Amended and Restated Constituent Documents | Section 8 (c) |
| Assuming Investor | 11(b) |
| Available Investor Shares | Section 2 (b) |
| Ballots | Section 1 (c)(ii) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3 (b)(i) |
| Breaching Investor | 11(b) |
| Business Day | Section 1 (c)(iii) |
| Business Plan | Section 5 (s) |
| Capital Structure Date | Section 3 (d) |
| Change of Recommendation | Section 9 (a)(vi) |
| Chapter 11 Cases | Recitals |
| Closing Date | Section 2 (d) |
| Closing Date Outside Date | Section 12 (d)(iii) |
| Code | Section 3 (z)(ii) |
| Commission | Section 1 (c)(ii) |
| Commitment Fees | Section 2 (h)(ii) |
| Commitment Parties | Recitals |
| Company | Recitals |
| Company ERISA Affiliate | Section 3 (z)(ii) |
| Company Plans | Section 3 (z)(i) |
| Company SEC Documents | Section 3 (j) |
| Confirmation Hearing | Section 1 (c)(iii) |
| Confirmation Order | Section 9 (a)(vii) |
| Confirmed Plan | Section 9 (a)(viii) |
| Consideration Period | Section 12 (f)(ii) |
| Debt Financing | Section 5 (t) |
| Debtors | Recitals |
| Determination Date | Section 1 (c)(vi) |
| DGCL | Section 3 (oo) |
| DIP Order | Section 2(j) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |

Defined Term                                                    Section

| Defined Term | Section |
|---|---|
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section 1 (c)(ii) |
| Disclosure Statement Outside Date | Section 12 (d)(iv) |
| Disinterested Director | Section 8 (c) |
| Distribution Date | Section 1 (c)(ii) |
| Dolce | Recitals |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| Due Diligence Investigation | Section 12 (d)(ii) |
| EBITDA Target | Section 9 (a)(xviii) |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| E&Y | Section 3 (q) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| Final Approval Order | Section 9 (a)(i) |
| GAAP | Section 3 (i) |
| GM | Section 8 (c) |
| GM Settlement | Section 5 (p) |
| GMAC | Section 8 (c) |
| Harbinger | Recitals |
| HSR Act | Section 3 (g) |
| IUE-CWA | Section 5 (u) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Initial Approval Motion | Recitals |
| Initial Approval Order | Recitals |
| Investment Decision Package | Section 3 (k) |
| Investor | Recitals |
| Investors | Recitals |
| Investor Default | Section 2 (b) |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Maximum Number | Section 2(a) |
| Merrill | Recitals |
| Money Laundering Laws | Section 3 (ee) |

| Defined Term | Section |
|---|---|
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Plan | Section 1 (b) |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| PSA | Section 1 (b) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| Related Purchaser | Section 2 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Restructuring Charges | Section 12 (e) |
| Right | Section 1 (a) |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1(a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |
| Securities Act Effective Date | Section 3 (k) |
| Series A-1 Certificate of Designations | Section 2 (a)(ii) |
| Series A-1 Preferred Stock | Section 2 (a)(ii) |
| Series A Preferred Stock | Section 2 (a)(ii) |
| Series A-2 Certificate of Designations | Section 2 (a)(iii) |
| Series A-2 Preferred Stock | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Specified Date | Section 12(g) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |

| Defined Term | Section |
| --- | --- |
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vii) |
| UAW | Section 5 (u) |
| UBS | Recitals |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

SCHEDULE 2

| | Direct Subscription Shares | Purchase Price | Series A-1 Preferred Stock | Purchase Price | Series A-2 Preferred Stock | Purchase Price | Series B Preferred Stock | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|
| Dolce Investments LLC | 3,150,000 | $ 110,250,000 | 8,571,429 | $ 300,000,000 | - | $ - | 8,571,429 | $ 300,000,000 | $ 710,250,000 |
| A-D Acquisition Holdings, LLC | 1,890,000 | 66,150,000 | - | - | 8,571,429 | 300,000,000 | 5,142,857 | 180,000,000 | 546,150,000 |
| Harbinger Del-Auto Investment Company, Ltd. | 472,500 | 16,537,500 | - | - | - | - | 1,285,714 | 45,000,000 | 61,537,500 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 393,750 | 13,781,250 | - | - | - | - | 1,071,429 | 37,500,000 | 51,281,250 |
| UBS Securities LLC | 393,750 | 13,781,250 | - | - | - | - | 1,071,429 | 37,500,000 | 51,281,250 |
| Total | 6,300,000 | $ 220,500,000 | 8,571,429 | $ 300,000,000 | 8,571,429 | $ 300,000,000 | 17,142,858 | $ 600,000,000 | $1,420,500,000 |

Proportionate Share of Preferred Commitment Fee:

| | |
|---|---|
| Dolce Investments LLC | 50% |
| A-D Acquisition Holdings, LLC | 40% |
| Harbinger Del-Auto Investment Company, Ltd. | 3.750% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 3.125% |
| UBS Securities LLC | 3.125% |
| Total | 100% |

Proportionate Share of Standby Commitment Fee:

| | |
|---|---|
| Dolce Investments LLC | 50% |
| A-D Acquisition Holdings, LLC | 30% |
| Harbinger Del-Auto Investment Company, Ltd. | 7.5% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 6.25% |
| UBS Securities LLC | 6.25% |
| Total | 100% |

Proportionate Share of Alternate Transaction Fee:

| | |
|---|---|
| Dolce Investments LLC | 50% |
| A-D Acquisition Holdings, LLC | 30% |
| Harbinger Del-Auto Investment Company, Ltd. | 7.5% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 6.25% |
| UBS Securities LLC | 6.25% |
| Total | 100% |

<u>EXHIBIT A</u>

## SUMMARY OF TERMS OF
## PREFERRED STOCK

      *Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by (i) certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates and (ii) entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch & Co. and UBS Securities.  The Investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code.  The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization.  While the parties expect to negotiate in good faith with respect to the terms for a transaction, either party shall be free to discontinue discussions and negotiations at any time for any reason or no reason.  Neither party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

| | |
|---|---|
| **Issuer**: | Delphi Corporation (the "*Company*"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "*Bankruptcy Case*") pending in the United States Bankruptcy Court for the Southern District of New York. |
| **Investors**: | Certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates (collectively, "*Cerberus*"); entities or funds controlled by Appaloosa Management ("*Appaloosa*"), Harbinger Capital Partners ("*Harbinger*"), Merrill Lynch & Co. ("*Merrill*") and UBS Securities ("*UBS*", and, together with Harbinger and Merrill, "*HUM*"), with the economic interests in the Preferred Stock to be purchased by the Appaloosa Investors allocated as follows: (a) Appaloosa—60.0%; (b) Harbinger--15.0%; and (c) UBS and Merrill—12.5% each; provided, that Appaloosa shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-2 Preferred Stock and shall hold and retain all control rights with respect thereto, including voting and disposition rights. HUM and Appaloosa are collectively referred to as the "*Appaloosa Investors*" and Cerberus and the Appaloosa Investors are collectively referred to as the "*Investors*." |

| | |
|---|---|
| **Securities to be Issued**: | Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series A-1 Preferred Stock*") |

Series A-2 Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series A-2 Preferred Stock* " and, together with the Series A-1 Preferred Stock, the *"Series A Preferred Stock"*)

Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series B Preferred Stock*" and, together with the Series A Preferred Stock, the *"Preferred Stock"*)

Except as set forth below under "Voting Rights" the Series A-1 Preferred Stock and the Series A-2 Preferred Stock are identical in all respects. In addition, the Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, upon the happening of certain events as outlined below. The Series B Preferred Stock shall be identical in all respect to the Series A Preferred Stock except with respect to voting rights, as set forth below.

**Purchase of Preferred Stock**:

At the Effective Time (the "*Issue Date*") of the Plan of Reorganization (the "Plan") in the Bankruptcy Case, (i) Cerberus shall purchase all of the 8,571,429 shares of Series A-1 Preferred Stock for an aggregate of $300 million; (ii) Appaloosa will purchase all of the 8,571,429 shares of Series A-2 Preferred Stock for an aggregate purchase price of $300 million, (iii) Cerberus shall purchase 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million and (iv) the Appaloosa Investors shall purchase, in the aggregate, 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million. The Stated Value of the Preferred Stock shall be $35.00 per share.

**Mandatory Conversion into Common Stock:**

The Company shall convert all, but not less than all, of the Preferred Stock on or after the seventh anniversary of the Issue Date at the Conversion Price in effect on such conversion date; provided, that no such conversion may be made unless the Closing Price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be in excess of 150% of the initial per share plan value. The Company may not effect the conversion unless the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock. The holders of the Series A Preferred Stock will agree not to take any action to delay or prevent such registration statement from becoming effective.

| | |
|---|---|
| **Liquidation Rights**: | In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, each holder of Preferred Stock shall receive, in exchange for each share, out of legally available assets of the Company, a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*"). |
| **Ranking** | The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company.  The Preferred Stock will rank senior to any other class or series of capital stock of the Company  with respect to any distributions upon liquidation, dissolution or winding up of the Company. |
| **Conversion of Preferred Stock into Common Stock**: | Each share of Preferred Stock shall be convertible at any time, without any payment by the Holder thereof, into a number of shares of Common Stock equal to (i) the Liquidation Value <u>divided by</u> (ii) the Conversion Price.  The Conversion Price shall initially be $35.00, subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "*Conversion Price*").  The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences. |
| **Conversion of Series A Preferred Stock into Class B Preferred Stock:** | If at any time Cerberus and Appaloosa cease to beneficially own, in the aggregate, Series A Preferred Stock with a Liquidation Value of $250 million or more, then all of the shares of Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, without any action on the part of the holder thereof; provided, that no such conversion may occur unless at that time, the Company has in effect a registration statement covering resales of the Series B Preferred Stock and Common Stock issuable upon conversion of the Preferred Stock.  The holders of the Series A Preferred Stock will agree not to take any action to delay or prevent such registration statement from becoming effective.

If any holder transfers shares of Series A Preferred Stock to any person other than an Affiliate of such holder (a "*Permitted Holder*") then all of the shares of Series A Preferred Stock so transferred shall automatically, upon such transfer, convert into shares of Series B Preferred Stock, on a one for one basis.

In addition, any holder of Series A Preferred Stock may convert all or any portion of its Series A Preferred Stock into shares of Series B Preferred Stock, on a one for one basis, at any time at its option.

Subject to compliance with applicable securities laws, shares of Series B Preferred Stock will be freely transferable. |

| | |
|---|---|
| **Dividends**: | The holder of each share of Preferred Stock shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 3.25% of the Liquidation Value thereof, payable quarterly in cash.  Unpaid dividends shall accrue.  In addition, if any dividends are declared on the Common Stock, the Preferred Stock shall be entitled to receive, in addition to the dividend on the Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Preferred Stock had it been converted immediately prior to the record date for such dividend. |
| **Preference with Respect to Dividends**: | Each holder of Preferred Stock shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock. |
| **Restriction on Redemptions of Junior Stock**: | So long as shares of Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Company shall not, and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock except customary provisions with respect to repurchase of employee equity upon termination of employment. |

**Governance – Board of Directors**

So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:

The board of directors of the Company shall consist of twelve (12) directors, three (3) of whom shall initially be elected by the holders of the Series A-1 Preferred Stock Holders, three (3) of whom shall initially be elected by the holders of the Series A-2 Preferred Stock, one (1) of whom shall be the Executive Chairman selected as described below under "Executive Chairman," one (1) of whom shall be the CEO, and four (4) of whom shall be elected by the holders of the Common Stock and the Series B Preferred Stock, voting as a class (the "Common Directors") (it being understood that the Series A Preferred Stock shall not vote with respect to the Common Directors and any holder of Series A Preferred Stock shall not vote its shares of Series B Preferred Stock in respect of the Common Directors). For the avoidance of doubt, the Executive Chairman and the CEO shall be elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class. The Executive Chairman of the Board shall initially be selected as described below under "Executive Chairman." The initial CEO shall be Rodney O'Neal, who shall become the CEO and President not later than the effective date of the plan of reorganization. The four (4) Common Directors shall be selected by a search committee (the "*Selection Committee*") consisting of a representative of each of Cerberus, Appaloosa, the Unsecured Creditors Committee, the Equity Committee and the Company[1], which selection shall be made by unanimous vote of the Selection Committee with the Appaloosa and Cerberus representatives on the Selection Committee not entitled to vote on such selection. Thereafter, (i) the nominees for election of the Common Directors shall be selected by the Nominating and Corporate Governance Committee of the Board with the Appaloosa and Cerberus representatives on the Committee not entitled to vote on such selection and (ii) any successor Executive Chairman shall be selected as described below under "Executive Chairman." At least one Common Director shall serve on each committee of the Board subject, in the case of the Audit Committee, to applicable qualification requirements.

The directors selected by the holders of the Series A Preferred Stock shall be reallocated between the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock as follows if any changes occur in the number of outstanding shares of Series A Preferred Stock: If either series of Series A Preferred Stock represents less than 33 1/3% and 16 2/3% or more of the outstanding shares of Series A Preferred Stock then the series with the fewer number of shares shall elect two (2) directors and the series with the larger number of shares shall elect four (4) directors; if either series of Series A Preferred Stock represents less than 16 2/3% and more than 0% of the Series A Preferred Stock, then the series with the fewer number of shares shall elect one (1) director and the series with the larger number of shares shall elect five (5) directors; and if any series of the Series A Preferred Stock shall cease to be outstanding, then the holders of the other series shall elect all six (6) directors to which the Series A Preferred Stock is entitled (unless both series shall cease to be outstanding).

---

[1] Company representative shall be John D. Opie, the current lead director of the Company.

**Executive Chairman**    So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:

The initial Executive Chairman shall be selected by the Selection Committee by a supermajority vote of four of the five members of the Selection Committee, including the affirmative vote of both the Appaloosa and Cerberus representatives. Any successor Executive Chairman shall be selected by the Nominating and Corporate Governance Committee with the affirmative approval of the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock.

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman may be removed at any time by the affirmative vote of all of the holders of the Series A Preferred Stock.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the holders of the Series A Preferred Stock with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the holders of the Series A Preferred Stock, acting together as a single class, may remove the Executive Chairman and/or Chief Executive Officer as a director.

**Governance – Voting Rights**

Except with respect to the election of directors, who shall be elected as specified above, the holders of the Preferred Stock shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders.

Until the Liquidation Value of the Preferred Stock beneficially owned by Appaloosa and Cerberus together with all Common Stock directly owned by Appaloosa and Cerberus (valued for this purpose at the Plan Value of $45.00 per share) is less than $600 million, the following Governance – Voting Rights shall be in effect:

The holders of the Series A Preferred Stock shall have the right to select, and to cause the Company to terminate, the Chief Executive Officer, the Chief Operating Officer and the Chief Financial Officer of the Company. The majority of the members of the Company's compensation committee shall initially be made up of directors designated by Cerberus and Appaloosa.   Pursuant to a stockholder agreement or other arrangements, the Company shall agree to maintain that majority.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the holders of the Series A Preferred Stock with at least 20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the holders of Series A Preferred Stock, written notice from all of the holders of the Series A Preferred Stock that they object to such action:

- any new debt or lease financing or guarantees in excess of $100 million in any twelve-month period after the Issue Date;

- the grant of any new lien, mortgage or security interest in any assets having a value in excess of $100 million in any twelve-month period after the issue Date;

- a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

- any merger or consolidation involving a change of control of the Company;

- any acquisition of or investment in any other person or entity having a value in excess of $100 million in any twelve-month period after the Issue Date;

- any action to liquidate the Company;

- any issuance of equity securities or rights to acquire equity securities at less than fair market value;

▪ other than pursuant to any conversion provisions set forth herein, any redemption, repurchase or other acquisition of shares of capital stock involving aggregate payments in excess of $10 million in any twelve month period after the Issue Date;

▪ payment of any dividends in cash or other assets (other than additional shares of Common Stock); or

▪ any amendment of the charter or bylaws.

The approval rights set forth above shall be in addition to the other voting rights set forth above and any voting rights to which the holders of the shares of Series A Preferred Stock are entitled under Delaware law; provided, however, in a merger or consolidation involving a change of control of the Company, the Series A Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock into which such Series A Shares are then convertible (or a preferred security of equivalent economic value) and (ii) the Liquidation Preference.

These limitations shall not apply to debt or lease financing or guarantees or lien, mortgage or security interests which constitute refinancings, replacements and extensions thereof that are (i) on prevailing market terms with respect to the economics thereof and (ii) on substantially the same terms (including with respect to the obligors, tenor, security and ranking) as the obligations being refinanced, replaced or extended with respect to other terms.

The Series B Preferred Stock shall be identical in all respects to Series A Preferred Stock except the Series B Preferred Stock shall have no voting rights other than (i) the right to vote, together with the Common Stock as one class on an "as converted basis" on all matters submitted to the Common Stock (subject to restrictions on voting by holders of Series A Preferred Stock for Common Directors as set forth above) and (ii) as required by law.

Appaloosa and Cerberus shall not receive compensation or remuneration of any kind in connection with their exercise or non-exercise of voting or other rights under the Series A Preferred Stock.

**Reservation of Unissued Stock**:    The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock.

**Transferability and Right of First Offer**:

Holders of Series A Preferred Stock may sell or otherwise transfer such stock as follows:

- to any Permitted Holder

- to any other person subject to the right of first offer provided below; provided, however, that upon any such transfer, the shares of Preferred Stock so transferred shall automatically convert into shares of Series B Preferred Stock.

If any transfer or conversion of Series A Preferred Stock would result in the holders of the Series A Preferred Stock owning insufficient shares of Series A Preferred Stock to avoid the mandatory conversion of the Series A Preferred Stock, then the other holders of Series A Preferred Stock shall have the right to purchase the shares of Series A Preferred Stock proposed to be transferred or converted at a purchase price equal to the Current Market Value.  The selling holder shall give the other holders at least 15 days' notice of a proposed transfer or conversion to which these rights apply.  Upon such notice, the holders may elect to purchase the shares, *pro rata*, on the terms offered within 15 days following the date of such notice.

**Registration Rights**:

The Investors shall be entitled to registration rights as set forth below.  The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions.

Demand Registrations.  The holders of the Preferred Stock shall be entitled to four demand registrations; *provided*, that following the time that the Company is eligible to use Form S-3, the holders shall be entitled to an unlimited number of demand registrations.  Any demand registration may, at the option of the holder be a "shelf" registration pursuant to Rule 415 under the Securities Act of 1933.  All registrations will be subject to customary "windows."

Piggyback Registrations.  In addition, the holders shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

Registrable Securities:  The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock or the Series B Preferred Stock, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities.  Securities shall cease to be Registrable Securities upon sale to the public pursuant to an registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

Expenses.  All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

**Preemptive Rights**:

So long as Cerberus and Appaloosa beneficially own, in the aggregate. Series A Preferred Stock with a Liquidation Value of $250 million or more, the holders of Preferred Stock shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions.

**Commitment Fee:**

A commitment fee of $21 million shall be earned by and payable to the Investors as provided for in the Discussion Points.

**Stockholders Agreement**:

Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by the Investors and the Company on the Issue Date.

**Governing Law**:

State of Delaware

EXECUTION COPY

**THIS AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN. SUCH OFFER OR SOLICITATION ONLY WILL BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

---

PLAN FRAMEWORK SUPPORT AGREEMENT

by and among

DELPHI CORPORATION,

GENERAL MOTORS CORPORATION,

APPALOOSA MANAGEMENT L.P.,

CERBERUS CAPITAL MANAGEMENT, L.P.,

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.,

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED

and

UBS SECURITIES LLC

---

Dated as of December 18, 2006

EXECUTION COPY

## PLAN FRAMEWORK SUPPORT AGREEMENT

This Plan Framework Support Agreement (the "Agreement"), is entered into as of December 18, 2006, by and among Delphi Corporation ("Delphi"), on behalf of itself and its subsidiaries and affiliates operating as debtors and debtors-in-possession (together with Delphi, the "Debtors") in the Chapter 11 Cases (as defined below), General Motors Corporation ("GM"), Appaloosa Management L.P., ("Appaloosa"),  Cerberus Capital Management, L.P., ("Cerberus"), Harbinger Capital Partners Master Fund I, Ltd., ("Harbinger"),  Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill") and UBS Securities LLC ("UBS").  Each of the Debtors, GM, Appaloosa, Cerberus, Harbinger, Merril and UBS is referred to herein individually as a "Party," and collectively, as the "Parties".  As used herein, the phrases "this Agreement", "hereto", "hereunder" and phrases of like import shall mean this Agreement.

## RECITALS

A.    On October 8 and October 14, 2005, the Debtors commenced jointly administered chapter 11 cases (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for the purpose of restructuring their businesses and related financial obligations pursuant to an overall transformation strategy (the "Transformation Plan") that would incorporate the following structural components:

(i)    Modification of the Debtors' labor agreements;

(ii)    Resolution of all issues and disputes between the Debtors and GM regarding (i) certain legacy obligations, including allocating responsibility for various pension and other post-employment benefit obligations; (ii) all alleged claims and causes of action arising from the spin-off of Delphi from GM; (iii) costs associated with the transformation of the Debtors' business (including the establishment of support to be provided by GM in connection with certain of those businesses that the Debtors intend to shut-down or otherwise dispose of); (iv) the restructuring of ongoing contractual relationships with respect to continuing operations; and (v) the amount and treatment of GM's claims in the Chapter 11 Cases (together, the "Designated Issues");

(iii)    Development of a strategically focused product portfolio and realignment of production capacity to support it;

(iv)    Transformation of the Debtors' work force in keeping with a sustainable cost structure and streamlined product portfolio;

(v)    Resolution of the Debtors' pension issues; and

(vi)    Restructuring of the Debtors' balance sheet to accommodate the transformed business.

NEWYORK 5912855 (2K)

EXECUTION COPY

B.      In the summer of 2006, Appaloosa and Harbinger, as significant stakeholders of the Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to which they obtained certain information from and about the Debtors and their businesses and engaged in discussions regarding various potential reorganization structures and related matters, including the potential requirement for a substantial equity investment in Delphi to facilitate the Debtors' restructuring.

C.      Separately, the Debtors conducted negotiations with other potential investors, including Cerberus.

D.      At the Debtors' request, Appaloosa, Harbinger and Cerberus engaged in discussions regarding their respective views of the Transformation Plan, the terms of a potential investment in Delphi and the general terms of various potential restructuring strategies for the Debtors.

E.      As a consequence of the foregoing discussions, this Agreement sets forth in Article VI hereof certain material terms of a chapter 11 plan for the Debtors (the "Plan") that is conditioned on (i) the implementation of the Transformation Plan, including a settlement of the Designated Issues, and (ii) a proposed equity investment by certain affiliates of Appaloosa, Cerberus, Harbinger, UBS and Merrill (collectively, the "Plan Investors") in Delphi (the "Investment").

F.      The Plan Investors have committed to Delphi to make the Investment on the terms and on the conditions set forth in the Equity Purchase and Commitment Agreement, the form of which is annexed as Exhibit A hereto (the "Investment Agreement"), which sets forth the obligations of the Plan Investors to (i) purchase any unsubscribed shares issued under a rights offering (the "Rights Offering") of new common stock, and additional shares of common stock, of Delphi to be issued pursuant to the Plan, and (ii) purchase newly issued shares of preferred stock of Delphi.

G.      Subject to the terms of this Agreement, the Parties have agreed to work together to attempt to complete the negotiation of the terms of the Plan, as well as to resolve other outstanding issues, and to formulate and facilitate confirmation and consummation of the Plan and the transactions contemplated hereby; provided, however, that Delphi will be the sole proponent of the Plan.

H.      In so agreeing, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable securities and bankruptcy law, or the fiduciary duties of the Debtors or any such other Party having such duties.

I.      Settlement of the Designated Issues is contingent upon Delphi and GM reaching agreement on all documents pertinent in any way to GM's participation in the Plan and/or all transactions contemplated thereby, including, without limitation, definitive documentation evidencing all aspects of the commercial, business and labor-related agreements between Delphi and GM and any other Designated Issues (collectively, the "Delphi/GM Definitive Documents").

EXECUTION COPY

<u>AGREEMENT</u>

ARTICLE I

OBLIGATIONS OF THE DEBTORS

The Debtors presently believe that, subject to the exercise (after consultation with outside legal counsel) by each Debtor of its fiduciary duties as a debtor and debtor-in-possession in the Chapter 11 Cases, prompt consummation of the Plan will facilitate the Debtors' businesses and financial restructuring and is in the best interests of their creditors, shareholders, and other parties-in-interest.  Accordingly, the Debtors hereby agree, subject to the exercise (after consultation with outside legal counsel) by each Debtor of its fiduciary duties as a debtor and debtor-in-possession in the Chapter 11 Cases, to use commercially reasonable efforts to obtain confirmation and consummation of the Plan; <u>provided</u>, <u>however</u>, that any failure by the Debtors to take any such actions shall not create any claim (administrative or otherwise) or cause of action against the Debtors or any of their affiliates.  Subject to the foregoing and to Delphi and GM reaching agreement on the Delphi/GM Definitive Documents on or before January 31, 2007 or such later date as the Debtors shall agree, for so long as this Agreement remains in effect, the Debtors agree to:

1.1      Subject to the terms of applicable non-disclosure agreements, provide the Plan Investors and their counsel, accountants, financial advisors and other representatives with access to information and personnel so that the Plan Investors can complete their due diligence review of Delphi and its subsidiaries within the timeframe contemplated by the Investment Agreement;

1.2      Subject to the terms of applicable non-disclosure agreements, promptly provide the Plan Investors with information regarding the results of operations and other activities and negotiations related to the Transformation Plan, settlement of the Designated Issues and the Plan;

1.3      Prepare and file with the Bankruptcy Court no later than December 18, 2006, a motion (the "<u>Initial Motion</u>") seeking an order from the Bankruptcy Court (i) approving and authorizing the Debtors to enter into the Investment Agreement; (ii) authorizing payment of Transaction Expenses, the Commitment Fees and the Alternate Transaction Fee (as such terms are defined in the Investment Agreement) on the terms and conditions set forth in the Investment Agreement, (iii) approving and authorizing the Debtors to enter into this Agreement and (iv) determining that the Parties' entry into, and performance of, their obligations under this Agreement does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against the Parties including, without limitation, designating the vote of GM or any Plan Investor on the Plan under section 1125(e) of the Bankruptcy Code;

1.4      Use commercially reasonable efforts to have the Bankruptcy Court enter an order (the "<u>Initial Approval Order</u>") granting the relief requested in the Initial Motion, on or before January 5, 2007;

1.5      Use commercially reasonable efforts to prepare and distribute to each Party no later than January 31, 2007 drafts of (i) the Plan, (ii) a disclosure statement with respect to the Plan (the

3

EXECUTION COPY

"Disclosure Statement"), and (iii) a registration statement to be filed with the Securities and Exchange Commission (the "Registration Statement") relating to the Rights Offering;

1.6    Use commercially reasonable efforts to obtain entry by the Bankruptcy Court of an order approving the Disclosure Statement (the "Disclosure Statement Order") on or before April 5, 2007;

1.7    Subject to (and conditioned upon) entry of the Disclosure Statement Order, use commercially reasonable efforts to solicit the requisite votes in favor of the Plan, obtain confirmation by the Bankruptcy Court of the Plan, obtain the debt financings contemplated by the Plan and cause the effective date of the Plan to occur on or before the later of (a) July 31, 2007 or (b) the first business day that is 180 days following the date on which the diligence out in the Investment Agreement is no longer able to be exercised as a result of waiver or the passage of time;

1.8    Use commercially reasonable efforts to cause the Registration Statement to become effective during the period approved for the commencement of solicitation of votes on the Plan; and

1.9    Engage in good faith negotiations with the other Parties regarding the Plan, Disclosure Statement and other definitive documents that are materially consistent with this Agreement and that resolve all unresolved items reflected herein and/or are necessary to the implementation of the transactions contemplated by this Agreement (collectively, the "Definitive Documents").

ARTICLE II

SUPPORT OBLIGATIONS OF THE PLAN INVESTORS AND GM

Unless and until this Agreement has been terminated in accordance with its terms, and subject to GM's and the Plan Investors' obligations in this Article II (other than clauses (i) through (iii) of Section 2.4 hereof) being subject to Delphi and GM reaching agreement on the Delphi/GM Definitive Documents (it being understood that no Party has any obligation to agree to or enter into any such documents), and provided that any failure by any Plan Investor or GM to take or refrain from taking, as the case may be, any actions described below in this Article II shall not create any claim or cause of action against them or any of their affiliates, each of the Plan Investors and GM agree (and shall cause its respective subsidiaries and controlled affiliates to agree) that it will:

2.1    Support entry of the Disclosure Statement Order;

2.2    Not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to entry of the Disclosure Statement Order;

2.3    Not, nor will it encourage any other person or entity to, object to, delay, impede, appeal, or take any other action, directly or indirectly, to interfere with, entry of the Disclosure Statement Order;

4

EXECUTION COPY

2.4    Until April 1, 2007, or such later date as may be mutually agreed by GM and the Plan Investors (such agreement not to be unreasonably withheld), not, directly or indirectly (i) initiate, solicit, knowingly cooperate with, or knowingly encourage any inquiries or the making of any proposal or offer that constitutes, or can reasonably be expected to lead to, any Alternate Transaction (as defined in the Investment Agreement), (ii) engage in, continue, or otherwise participate in any negotiations regarding any Alternate Transaction, (iii) enter into any letter of intent, memorandum of understanding, agreement in principle, or other agreement relating to any Alternate Transaction or (iv) withhold, withdraw, qualify, or modify (or resolve to do so) in a manner adverse to the Plan Investors or the Debtors its approval or recommendation of this Agreement, the Plan or the transactions contemplated thereby; and that it will cause its subsidiaries and controlled affiliates not to undertake, directly or indirectly, any of the actions described in the immediately preceding clauses (i) through (iv); and that it will use its commercially reasonable efforts to cause its respective directors, officers, employees, investment bankers, attorneys, accountants, and other advisors or representatives not to undertake, directly or indirectly, any of such actions; provided, however, that nothing in this Section 2.4 shall preclude GM or any of the Plan Investors or any of their respective subsidiaries or controlled affiliates, or any of their respective directors, officers, employees, investment bankers, attorneys, accountants, and other advisors or representatives from initiating, soliciting, knowingly cooperating with, knowingly encouraging, discussing, negotiating, entering into, consummating or otherwise participating in any transactions relating to (x) the sale and/or wind-down of any of the Debtors' non-core sites and/or business lines as publicly announced by the Debtors on March 31, 2006 and as modified by the Debtors, in writing provided to GM, from time to time, (y) resourcing products purchased by GM and/or (z) discussions engaged in by the Debtors in the performance of their fiduciary duties; provided further however, that if this provision is extended beyond April 1, 2007 as provided above, from and after April 1, 2007, with Delphi's prior consent, any Plan Investor or GM, as applicable, may be released from any and all of the foregoing prohibitions of this Section 2.4.

2.5    Support confirmation of the Plan and entry by the Bankruptcy Court of the order confirming the Plan (the "Confirmation Order"); provided, however, that, for the avoidance of doubt, nothing in this Section 2.5 is an agreement by any of the Plan Investors or GM to vote to accept or reject the Plan;

2.6    Not commence any proceeding or prosecute, join in, or otherwise support any action to oppose or object to the Plan; and

2.7    Not, nor will it encourage any other person or entity to, delay, object to, impede, appeal, or take any other action, directly or indirectly, to interfere with the acceptance, confirmation or occurrence of the effective date of the Plan.

Notwithstanding any other term or provision of this Agreement, nothing herein shall prevent any Party from taking any action in court as it determines is necessary or appropriate to protect its interests, including, without limitation, objecting (in writing or orally) to any document, such as the Plan or Disclosure Statement, filed in the Chapter 11 Cases by any party in interest.

## ARTICLE III

## TERMINATION EVENTS

3.1    The occurrence of any of the following shall be a "Termination Event":

a.    Termination of the Investment Agreement, whether pursuant to its terms or otherwise;

b.    Delivery of notice of the termination of this Agreement by any Party to the other Parties for any reason or no reason as determined by the Party delivering such notice in its sole discretion; provided however, that such notice may not be given until April 1, 2007.

3.2    All obligations hereunder of all Parties shall terminate and shall be of no further force and effect:

a.    Immediately and automatically upon the occurrence of the Termination Event described in Section 3.1(a) hereof;

b.    Two (2) business days after receipt by the other non-terminating Parties of the notice described in Section 3.1(b) hereof; provided however, that delivery of such written notice by any Plan Investor other than Cerberus or Appaloosa shall terminate only the obligations of such Plan Investor hereunder; and

c.    Automatically, and without written notice , immediately prior to the issuance of the common stock and preferred stock contemplated by the Plan and the Investment Agreement.

## ARTICLE IV

## GOVERNING LAW; JURISDICTION; VENUE

This Agreement will be governed and construed in accordance with the internal laws of the State of New York without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees for itself that the Bankruptcy Court will retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.  Each Party further agrees to waive any objection based on forum non conveniens.

## ARTICLE V

## ADDITIONAL AGREEMENTS

The Parties acknowledge that Delphi and GM presently intend to pursue agreements, to be documented in the Plan, the Confirmation Order and/or the Delphi/GM Definitive Documents, as applicable, concerning, among other matters:  (a) triggering of the GM benefit guarantees; (b) assumption by GM of certain postretirement health and life insurance

6

obligations for certain Delphi hourly employees; (c) funding of Delphi's underfunded pension obligations, including by the 414(l) Assumption (defined below); (d) provision of flowback opportunities at certain GM facilities for certain Delphi employees; (e) GM's payment of certain retirement incentives and buyout costs under current or certain future attrition programs for Delphi employees; (f) GM's payment of mutually negotiated buy-downs; (g) GM's payment of certain labor costs for Delphi employees; (h) a revenue plan governing certain other aspects of the commercial relationship between Delphi and GM; (i) the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j) the Debtors' support for GM's efforts to resource products purchased by GM; (k) licensing of the Debtors' intellectual property to GM or for its benefit; (l) treatment of the Environmental Matters Agreement between Delphi and GM; (m) treatment of normal course items, such as warranty, recall and product liability obligations; and (n) treatment of all other executory contracts between the Debtors and GM.  The Parties agree to negotiate in good faith all of the documents and transactions described in this Article (it being understood that (i) no Party has any obligation to enter into any such documents or consummate any such transactions and (ii) the delivery by any Party of a termination notice pursuant to Section 3.1(b) hereof shall not constitute a breach of this Article V).

ARTICLE VI

PLAN FRAMEWORK

The Plan shall contain all of the following terms:

6.1      A condition precedent to the effectiveness of the Plan (subject to the waiver provisions to be negotiated in connection with the Plan) shall be that the aggregate amount of all trade claims and other unsecured claims (including any accrued interest) (excluding (i) unsecured funded debt claims, (ii) Flow-Through Claims (defined below), (ii) GM claims, which shall be treated as set forth below, (iii) subordinated debt claims, which shall be treated as set forth below, and (iv) securities claims, which shall be treated as set forth below) (collectively, the "Trade and Other Unsecured Claims") that have been asserted or scheduled but not yet disallowed as of the effective date of the Plan shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion.

6.2      All senior secured debt shall be refinanced and paid in full and all allowed administrative and priority claims shall be paid in full.

6.3      Trade and Other Unsecured Claims and unsecured funded debt claims shall be placed in a single class.  All such claims that are allowed (including all allowed accrued interest) shall be satisfied in full with (a) $810 million of common stock (18,000,000 out of a total of 135,285,714 shares,[1] at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash; provided, however, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced

---

[1] References in this Article VI to the total number of shares of common stock gives effect to the conversion of the preferred stock issued pursuant to the Investment Agreement to common stock.

7

EXECUTION COPY

proportionately by the amount that allowed Trade and Other Unsecured Claims are less than $1.7 billion.

6.4     (i) Customer and environmental obligations, (ii) employee-related (excluding collective bargaining-related obligations) and other obligations (as to be agreed by the Debtors and the Plan Investors) and (iii) litigation exposures and other liabilities that are covered by insurance (as to be agreed by the Debtors and the Plan Investors and scheduled in the Plan) ((i), (ii) and (iii) together, the "<u>Flow-Through Claims</u>") will be unimpaired and will be satisfied in the ordinary course of business (subject to the preservation and flow-through of all estate rights, claims and defenses with respect thereto which shall be fully reserved).

6.5     GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (<u>excluding</u> in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with (a) 7,000,000 out of a total of 135,285,714 shares of common stock in reorganized Delphi and (b) $2.63 billion in cash.

6.6     All subordinated debt claims (including all accrued interest) will be allowed and will be satisfied with (a) $450 million of common stock (10,000,000 out of a total of 135,285,714 shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash.

6.7     Allowed securities claims will be satisfied solely from available insurance or as otherwise agreed by the Plan Investors.

6.8     Holders of existing equity securities in Delphi shall receive, in the aggregate, (a) $135 million of common stock (3,000,000 out of a total of 135,285,714 shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) rights to purchase 63,000,000 out of a total of 135,285,714 shares of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $2.205 billion (exercise price: $35/share).

6.9     The preferred stock to be issued pursuant to the Plan in connection with the Investment Agreement shall be subject to the terms listed on the term sheet attached to the Investment Agreement ("<u>Summary of Terms of Preferred Stock</u>"), which are incorporated by reference herein.

6.10     Delphi will arrange for payment on the effective date of the Plan of $3.5 billion to fund its pension obligations. Such payment will include GM taking $2.0 billion of net pension obligations pursuant to a 414(l) transaction (the "<u>414(l) Assumption</u>"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi and the Plan Investors determine that any greater amount will have an adverse impact on the Debtors or (b) the Plan Investors determine that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors. GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred in the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; <u>provided</u>, <u>however</u>, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

8

6.11    A joint claims oversight committee shall be established on the effective date of the Plan or as soon thereafter as practicable to monitor claims administration, provide guidance to the Debtors, and address the Bankruptcy Court if such post-effective date joint claims oversight committee disagrees with the Debtors' determinations requiring claims resolution.  The composition of the joint claims oversight committee shall be satisfactory to the Plan Investors in their sole and absolute discretion, but in any case, shall include at least one representative appointed by the Plan Investors.

6.12    Reorganized Delphi will be subject to the following corporate governance provisions:

a.    A five-member selection committee (the "Selection Committee") will select a new executive chair of reorganized Delphi.  The Selection Committee will consist of the following members: (i) John D. Opie, currently a member of Delphi's board of directors and its lead independent director; (ii) one (1) representative appointed by the statutory committee of unsecured creditors appointed in the Chapter 11 Cases; (iii) one (1) representative appointed by the statutory committee of equity security holders appointed in the Chapter 11 Cases; and (iv) two (2) representatives appointed by the Plan Investors.  The new executive chair will be chosen by a super majority of four (4) of the five (5) members of the Selection Committee, which must include both representatives appointed by the Plan Investors.

b.    The board of directors of reorganized Delphi will consist of twelve (12) members:  (i) the new executive chair; (ii) Rodney O'Neal, who will be appointed chief executive officer and president of reorganized Delphi not later than the effective date of the Plan; (iii) four (4) members (who may include one (1) existing independent director) chosen by a unanimous vote of the Selection Committee, provided, however, that the representatives of the Selection Committee appointed by the Plan Investors will not be entitled to vote on these four (4) directors (the "Common Directors"); (iv) three (3) members chosen by Appaloosa; and (v) three (3) members chosen by Cerberus.  All twelve (12) new directors will be publicly identified not later than the day that is ten (10) days prior to the date scheduled for the hearing of the Bankruptcy Court to confirm the Plan.  The board of directors of reorganized Delphi will satisfy all applicable exchange/NASDAQ independence requirements.

c.    Ongoing management compensation, including the SERP, stock options, restricted stock, severance, change in control provisions and all other benefits will be on market terms (as determined by the Board of Directors, based on the advice of Watson-Wyatt, and such management compensation plan design shall be described in the Disclosure Statement and included in the Plan) and reasonably acceptable to the Plan Investors; claims of former management and terminated/resigning management will be resolved on terms acceptable to Delphi and the Plan Investors or by court order.  Equity awards will dilute all equity interests pro rata.

d.    The amended and restated certificate of incorporation of Delphi to be effective immediately following the effective date of the Plan shall prohibit; (A) for so long as Appaloosa or Dolce Investments, LLC ("Dolce"), as the case may be, owns any shares of Series A Preferred Stock, any transactions between Delphi or any of its Subsidiaries (as defined in the Investment Agreement), on the one hand, and Appaloosa or Dolce or their respective Affiliates (as defined in the Investment Agreement), as the case may be, on the other hand (including any

9

"going private transaction" sponsored by Appaloosa or Dolce) unless such transaction shall have been approved by (x) directors constituting not less than 75% of the number of Common Directors (as defined in the Investment Agreement) and (y) in the case of any transaction with Appaloosa or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, Appaloosa, and (B) any transaction between Delphi or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock (as defined in the Investment Agreement), unless such transaction shall have been approved by directors having no material interest in such transaction (a "<u>Disinterested Director</u>") constituting not less than 75% of the number of Disinterested Directors; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("<u>GMAC</u>") or GM as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC.

6.13    A condition precedent to the effectiveness of the Plan shall be the ratification (and/or fulfillment of all other prerequisites to the effectiveness) of each of Delphi's definitive labor agreements with each of its U.S. labor unions (including, without limitation, new or amended collective bargaining agreements and withdrawals and/or settlements of all claims of each of Delphi's labor unions) and each of the labor-related Delphi/GM Definitive Documents.

## ARTICLE VII

## IMPLEMENTATION

7.1    Promptly after execution of this Agreement by all Parties, Delphi will seek entry of the Initial Approval Order, in form and substance satisfactory to each Party, by the Bankruptcy Court.  The Plan Investors and GM will timely file statements in support thereof with the Bankruptcy Court.

7.2    The Parties agree to negotiate in good faith all of the documents and transactions described in this Agreement (it being understood that (i) no Party has any obligation to enter into any such documents or consummate any such transactions and (ii) the delivery by any Party of a termination notice pursuant to Section 3.1(b) hereof shall not constitute a breach of this Section 7.2).

## ARTICLE VIII

## GENERAL PROVISIONS

8.1    This Agreement is expressly contingent on, and shall automatically become effective on such date as the Initial Approval Order, in form and substance satisfactory to each Party, has been entered by the Bankruptcy Court and the Investment Agreement, substantially in the form of Exhibit A hereto, has been executed by all parties to the Investment Agreement; <u>provided</u>, <u>however</u>, that if the Bankruptcy Court shall not have entered the Initial Approval Order, in form and substance satisfactory to each Party, on or before January 22, 2007 and all parties to

the Investment Agreement shall not have executed the Investment Agreement, substantially in the form of Exhibit A hereto, within three (3) business days following entry of the Initial Approval Order, this Agreement (and all obligations hereunder of all Parties) shall automatically terminate without ever having become effective.

8.2     Except as expressly provided in this Agreement, nothing contained herein (i) is intended to, or does, in any manner waive, limit, impair or restrict the ability of each of the Parties to protect and preserve its rights, remedies, and interests, (ii) may be deemed an admission of any kind, or (iii) effects a modification of any existing agreement until the occurrence of the effective date of the Plan.  If the transactions contemplated herein are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto are not admissible into evidence in any proceeding other than a proceeding to enforce its terms.

8.3     The Plan Investors shall promptly deliver to GM (i) written notice upon the termination of the Investment Agreement, whether pursuant to its terms or otherwise, and (ii) copies of any amendments, waivers, supplements or other modifications to the Investment Agreement.

8.4     Delphi and the Plan Investors have advised GM that (a) the Plan Framework described in Article VI of this Agreement and the planned investments of the Plan Investors described in the Investment Agreement are predicated, in part, on the ability of Delphi to formulate a business plan and projections reflecting that Delphi's reorganized businesses will achieve annual EBITDA of not less than $2.4 billion on a consolidated basis following completion of Delphi's Transformation Plan and (b) Delphi will not be able to achieve such financial results if the Transformation Plan is not implemented.

8.5     Each Plan Investor and GM hereby agrees that it shall not (and shall cause its subsidiaries and controlled affiliates not to) (a) sell, transfer, assign, pledge, or otherwise dispose, directly or indirectly, of its right, title or interest in respect of its claims against or interests in any of the Debtors (to the extent held by it on the date hereof or acquired hereafter), in whole or in part, or (b) grant any proxies, deposit any such claims or interests (to the extent held by it on the date hereof or acquired hereafter) into a voting trust, or enter into a voting agreement with respect to such claims or interests, as the case may be, unless the transferee agrees in writing at the time of such transfer to be bound by all obligations of the transferor contained in this Agreement, including, but not limited to, Article II hereof, and the transferor, within three business days, provides written notice of such transfer to each other Party, together with a copy of the written agreement of the transferee agreeing to be so bound.  Each Party further agrees that it may not create any subsidiary or affiliate for the sole purpose of acquiring any claims against or interests in any member of the Debtors without causing such subsidiary or affiliate to become a Party hereto prior to such acquisition.

8.6     Each of Appaloosa, Harbinger, Cerberus, Merrill and UBS hereby confirms, on a several but not joint basis, that it and its affiliates remains the beneficial holder of, and/or the holder of investment authority over, the claim and interests, if any, previously disclosed in

11

connection with its applicable non-disclosure agreement with the Debtors and that it will advise the Debtors upon any change in its or its affiliates' holdings.

8.7    Each Party hereby acknowledges that this Agreement is not and shall not be deemed to be a solicitation to accept or reject a plan in contravention of section 1125(b) of the Bankruptcy Code. Each Party further acknowledges that no securities of any Debtor are being offered or sold hereby and that this Agreement does not constitutes an offer to sell or a solicitation of an offer to buy any securities of any Debtor.

8.8    Each Party, severally and not jointly, represents, covenants, warrants, and agrees to each other Party, only as to itself and not as to each of the others, that the following statements, as applicable, are true, correct, and complete as of the date hereof:

a.    It has all requisite corporate, partnership or limited liability company power and authority to enter into this Agreement and to perform its obligations hereunder;

b.    It is duly organized, validly existing, and in good standing under the laws of its state of organization and it has the requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

c.    The execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate, partnership, or limited liability company action on its part; provided, however, that the Debtors' authority to enter into this Agreement is subject to Bankruptcy Court approval;

d.    This Agreement has been duly executed and delivered by it and constitutes its legal, valid, and binding obligation, enforceable in accordance with the terms hereof, subject to entry of the Initial Approval Order;

e.    The execution, delivery, and performance by it (when such performance is due) of this Agreement do not and shall not (i) violate any provision of law, rule, or regulation applicable to it or any of its subsidiaries or its certificate of incorporation or bylaws or other organizational documents or those of any of its subsidiaries or (ii) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party; and

f.    There are no undisclosed agreements or commitments between or among the Parties regarding matters subject to the terms of this Agreement.

8.9    Except as otherwise specifically provided herein, this Agreement may not be modified, waived, amended or supplemented unless such modification, waiver, amendment or supplement is in writing and has been signed by each Party. No waiver of any of the provisions of this Agreement shall be deemed or constitute a waiver of any other provision of this Agreement, whether or not similar, nor shall any waiver be deemed a continuing waiver.

8.10    This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, assigns, heirs, executors, administrators, and representatives; provided,

12

however, that nothing contained in this Section 8.10 will be deemed to permit sales, assignments, or transfers of this Agreement.

     8.11    Nothing contained in this Agreement is intended to confer any rights or remedies under or by reason of this Agreement on any person or entity other than the Parties hereto, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third party to any Party to this Agreement, nor shall any provision give any third party any right of subrogation or action over or against any Party to this Agreement.All notices and other communications in connection with this Agreement will be in writing and will be deemed given (and will be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice):

     If to the Debtors, to:

     a.  Delphi Corporation
        5725 Delphi Drive
        Troy, Michigan 48098
        Attention:  John D. Sheehan – Facsimile:  (248) 813-2612
              David M. Sherbin, Esq./Sean Corcoran – Facsimile: (248) 813-2491

        with a copy to:

        Skadden, Arps, Slate, Meagher & Flom LLP
        Four Times Square
        New York, New York 10036
        Facsimile:  (212) 735-2000/1
        Attention:  Eric L. Cochran, Esq.
              Kayalyn A. Marafioti, Esq.
              Thomas J. Matz, Esq.

        and

        Skadden, Arps, Slate, Meagher & Flom LLP
        333 West Wacker Drive
        Chicago, Illinois 60606
        Facsimile:  (312) 407-0411
        Attention:   John Wm. Butler, Jr., Esq.
              George N. Panagakis, Esq.

b.    If to Appaloosa, to:

Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:   Ronald Goldstein

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:   Thomas E Lauria, Esq.

c.    If to Harbinger, to:

Harbinger Capital Partners Master Fund I, Ltd.
c/o Harbinger Capital Partners
555 Madison Avenue, 16th Floor
New York, New York 10022
Facsimile: (212) 508-3721
Attention:  Philip A. Falcone

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:   Thomas E Lauria

and

Kaye Scholer LLP
425 Park Avenue
New York, New York 10022-3598
Facsimile:  (212) 836-7157
Attention:   Benjamin Mintz, Esq.
              Lynn Toby Fisher, Esq.

d.      If to Cerberus, to:

Cerberus Capital Management, L.P.
299 Park Avenue
New York, New York 10171
Facsimile:  (212) 421-2958 / (212) 909-1409 / (212) 935-8749
Attention:   Scott Cohen / Dev Kapadia / Seth Gardner

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Facsimile:  (213) 892-4470
Attention:   Gregory A. Bray, Esq.

e.      If to GM, to:

General Motors Corporation
767 Fifth Avenue
14th Floor
New York, New York 10153
Facsimile:  (212) 418-3695
Attention:   Michael Lukas

and

General Motors Corporation
300 GM Renaissance Center
Detroit, Michigan 48265
Facsimile:  (313) 665-4992
Attention:   E. Chris Johnson, Esq.
                   Frederick A. Fromm, Esq.

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Facsimile:  (212) 310-8007
Attention:   Martin J. Bienenstock, Esq.
                   Jeffrey L. Tanenbaum, Esq.
                   Michael P. Kessler, Esq.

f.      If to Merrill, to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center

15

New York, New York  10080
Facsimile:  (212) 449-0769
Attention:   Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile:  (212) 757-3990
Attention:   Andrew N. Rosenberg

g.    If to UBS, to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:   Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:   Leslie N. Silverman

8.13    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same Agreement.  Delivery of an executed signature page of this Agreement by facsimile shall be effective as delivery of a manually executed signature page of this Agreement.

8.14    This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, whether oral or written, with respect to such subject matter.  This Agreement is the product of negotiations among the Parties and represents the Parties' intentions.  In any action to enforce or interpret this Agreement, this Agreement will be construed in a neutral manner, and no term or provision of this Agreement, or this Agreement as a whole, will be construed more or less favorably to any Party.

8.15    The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.  Any breach of this Agreement by any Party shall not result in liability for any other non-breaching Party.

[Remainder of page intentionally blank; remaining pages are signature pages.]

16

IN WITNESS WHEREOF, the undersigned have each caused this Agreement to be duly executed and delivered by their respective, duly authorized officers as of the date first above written.

DELPHI CORPORATION


By:    /s/ John D. Sheehan
       Name:  John D. Sheehan
       Title:   Vice President and
               Chief Restructuring Officer


GENERAL MOTORS CORPORATION


By:    /s/ Frederick A. Henderson
       Name:  Frederick A. Henderson
       Title:   Vice Chairman and
               Chief Financial Officer

APPALOOSA MANAGEMENT L.P.


By:    /s/ Ronald Goldstein
       Name:  Ronald Goldstein
       Title:   Partner


HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.


By:    Harbinger Capital Partners Offshore Manager,
       L.L.C., as investment manager


By:    /s/ Philip A. Falcone
       Name: Philip A. Falcone
       Title: Senior Managing Director

17

EXECUTION COPY

CERBERUS CAPITAL MANAGEMENT, L.P.


By:     /s/ Scott H. Cohen
        Name:  Scott H. Cohen
        Title:   Managing Director


MERRILL LYNCH, PIERCE, FENNER & SMITH,
INCORPORATED


By:     /s/ Graham Goldsmith
        Name:  Graham Goldsmith
        Title:   Managing Director


UBS SECURITIES LLC

By:     /s/ Steven D. Smith
        Name:  Steven D. Smith
        Title:   Managing Director


By:     /s/ Andrew Kramer
        Name:  Andrew Kramer
        Title:   Managing Director

18

Equity Commitment Letter from A-D Acquisition Holdings, LLC

**APPALOOSA MANAGEMENT L.P.**
26 Main Street
Chatham, New Jersey  07928


January __, 2007


A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street
Chatham, New Jersey, 07928
Attention: Ronald Goldstein


Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098


Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Dolce Investments, LLC, a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce Fenner & Smith Incorporated, a Delaware corporation, and UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand. Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Appaloosa Management L.P. ("AMLP"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,141,500,000, subject to the terms and conditions set forth herein.  If (i) a Limited Termination has occurred, (ii) the Agreement has not been terminated by the Investor in accordance with its terms within ten (10) Business Days of the occurrence of such Limited Termination, and (iii) the Investor becomes obligated in accordance with Section 2(b) of the Agreement to purchase the Available Investor Shares as a result of such Limited Termination (an "Escalation Trigger"), the maximum amount of Funds referred to in the immediately preceding sentence shall be increased as follows: (i) by $175,312,500 if an Escalation Trigger arises as a result of a Limited Termination by Merrill Lynch, Pierce, Fenner & Smith Incorporated; (ii) by $175,312,500 if an Escalation Trigger arises as a result of a Limited Termination by UBS Securities LLC; and (iii) by $210,375,000 if an Escalation Trigger arises as a result of a Limited Termination by Harbinger Del-Auto Investments Company, Ltd.  The Funds to be provided by or on behalf of AMLP to the Investor will be used to provide the financing for the Investor (i) to purchase the Preferred Shares and the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the

A-D Acquisition Holdings, LLC
Delphi Corporation
January __, 2007
Page 2

aggregate liability of AMLP under the immediately preceding clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  AMLP shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless and until, any party to the Agreement, other than the Company, commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by AMLP and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of AMLP hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall AMLP be liable for punitive damages and (iii) the liability of AMLP shall be limited to monetary damages only.  There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against AMLP.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  AMLP's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with AMLP, provided that such assignment will not relieve AMLP of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, AMLP's obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide AMLP with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of AMLP's obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall forever be barred.  Upon the termination or expiration of this letter agreement, all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

AMLP hereby represents and warrants as follows:

A-D Acquisition Holdings, LLC
Delphi Corporation
January __, 2007
Page 3

(a)  AMLP is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  AMLP has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by AMLP and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  AMLP has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of AMLP, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). AMLP AND THE INVESTOR HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Sincerely,

**APPALOOSA MANAGEMENT L.P.**

A-D Acquisition Holdings, LLC
Delphi Corporation
January __, 2007
Page 4

By: _____
    Name:
    Title:

Agreed to and accepted as of the date first
above written:

**A-D ACQUISITION HOLDINGS, LLC**

By:_____
    Name:
    Title:

**DELPHI CORPORATION**

By:_____
    Name:
    Title:

Equity Commitment Letter from Dolce Investments LLC

**CERBERUS CAPITAL MANAGEMENT, L.P.**
299 Park Avenue
New York, New York 10171

January __, 2007

Dolce Investments, LLC
299 Park Avenue
New York, New York 10171
Attention: Seth Gardner

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Co., Ltd., an exempted company formed under the laws of the Cayman Islands, Dolce Investments, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, and UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Cerberus Capital Management, L.P. ("Cerberus"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $1,702,500,000, subject to the terms and conditions set forth herein.  The Funds to be provided by or on behalf of Cerberus to the Investor will be used to provide the financing for the Investor (i) to purchase the Preferred Shares and the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however, that the aggregate liability of Cerberus under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  Cerberus shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean (i) at all times on or prior to the Disclosure Statement Approval Date, $100,000,000 and (ii) after the Disclosure Statement Approval Date, $250,000,000.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Cerberus and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Cerberus hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Cerberus be liable for punitive damages, and (iii) the liability of Cerberus shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party hereto and nothing contained in this letter

Dolce Investments, LLC
Delphi Corporation
January [  ], 2007
Page 2

agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Cerberus.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  Cerberus's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Cerberus, provided that such assignment will not relieve Cerberus of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms; provided, however, that in the event that the Agreement is terminated, Cerberus' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Cerberus with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Cerberus' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred.  Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Cerberus hereby represents and warrants as follows:

(a)  Cerberus is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  Cerberus has the requisite limited partnership power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by Cerberus and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  Cerberus has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member, or direct or indirect holder of any equity interests or securities of Cerberus, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

Dolce Investments, LLC
Delphi Corporation
January [  ], 2007
Page 3

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof).  CERBERUS AND THE INVESTOR HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Sincerely,

CERBERUS CAPITAL MANAGEMENT, L.P.

By: _____
     Name:
     Title:

Agreed to and accepted as of the date first
above written:

DOLCE INVESTMENTS, LLC
By:    CERBERUS CAPITAL MANAGEMENT, L.P.,
     Its Managing Member

By: _____
     Name:
     Title:

DELPHI CORPORATION

By:_____
     Name:
     Title:

NY1:#3439018

Equity Commitment Letter from Harbinger Del-Auto Investment Company, Ltd.

**Harbinger Capital Partners Master Fund I, Ltd.**
c/o 555 Madison Avenue
New York, New York 10122

January [  ], 2007

Harbinger Del-Auto Investment Company Ltd.
c/o Harbinger Capital Partners Master Fund I, Ltd.
555 Madison Avenue
New York, New York 10022

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098

Ladies and Gentlemen:

Reference is made to that certain Equity Purchase and Commitment Agreement (the "Agreement"), dated as of the date hereof, by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware, Harbinger Del-Auto Investment Company, Ltd., an exempted company formed under the laws of the Cayman Islands, Dolce Investments, LLC, a limited liability company formed under the laws of the State of Delaware (the "Investor"), Merrill Lynch, Pierce Fenner & Smith, Incorporated, a Delaware corporation, and UBS Securities LLC, a limited liability company formed under the laws of the State of Delaware, on the one hand, and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company"), on the other hand.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.

This letter will confirm the commitment of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), on behalf of one or more of its affiliated funds or managed accounts to be designated, to provide or cause to be provided funds (the "Funds") to the Investor in an amount up to $210,375,000, subject to the terms and conditions set forth herein.  The Funds to be provided by or on behalf of Harbinger to the Investor will be used to provide the financing for the Investor (i) to purchase the Preferred Shares and the Investor Shares pursuant to the Agreement (the "Purchase Obligation") and (ii) to satisfy the Investor's other obligations under the Agreement, if any; provided, however that the aggregate liability of Harbinger under clauses (i) and (ii) shall under no circumstances exceed the Cap (as defined below).  Harbinger shall not be liable to fund to the Investor any amounts hereunder (other than to fund the Purchase Obligation), unless, and until, any party to the Agreement other than the Company commits a willful breach of the Agreement.  For purposes of this letter agreement, the "Cap" shall mean at all times $38,442,731.  Our commitment to fund the Investor's Purchase Obligation is subject to the satisfaction, or waiver in writing by Harbinger and the Investor, of all of the conditions, if any, to the Investor's obligations at such time contained in the Agreement.

Notwithstanding any other term or condition of this letter agreement, (i) under no circumstances shall the liability of Harbinger hereunder or for breach of this letter agreement exceed, in the aggregate, the Cap for any reason, (ii) under no circumstances shall Harbinger be liable for punitive damages, and (iii) the liability of Harbinger shall be limited to monetary damages only. There is no express or implied intention to benefit any person or entity not party

NEWYORK 5916033 (2K)

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
January [  ], 2007
Page 2

hereto and nothing contained in this letter agreement is intended, nor shall anything herein be construed, to confer any rights, legal or equitable, in any person or entity other than the Investor and the Company.  Subject to the terms and conditions of this letter agreement, the Company shall have the right to assert its rights hereunder directly against Harbinger.

The terms and conditions of this letter agreement may be amended, modified or terminated only in a writing signed by all of the parties hereto.  Harbinger's obligations hereunder may not be assigned, except its obligations to provide the Funds may be assigned to one or more of its affiliated funds or managed accounts affiliated with Harbinger, provided that such assignment will not relieve Harbinger of its obligations under this letter agreement.

This commitment will be effective upon the Investor's acceptance of the terms and conditions of this letter agreement (by signing below) and the execution of the Agreement by the Company and will expire on the earliest to occur of (i) the closing of the transactions contemplated by the Agreement, and (ii) termination of the Agreement in accordance with its terms;  provided,  however, that in the event that the Agreement is terminated, Harbinger' obligations hereunder to provide funds to the Investor to fund the Investor's obligations under the Agreement on account of any willful breach of the Agreement for which the Investor would be liable shall survive; provided further, that the Company shall provide Harbinger with written notice within 90 days after the termination of the Agreement of any claim that a willful breach of the Agreement has occurred for which the Investor would be liable and if the Company fails to timely provide such notice then all of Harbinger' obligations hereunder shall terminate, this letter agreement shall expire and any claims hereunder shall be forever barred.  Upon the termination or expiration of this letter agreement all rights and obligations of the parties hereunder shall terminate and there shall be no liability on the part of any party hereto.

Harbinger hereby represents and warrants as follows:

(a)  Harbinger is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization.

(b)  Harbinger has the requisite corporate power and authority to enter into, execute and deliver this letter agreement and to perform its obligations hereunder and all necessary action required for the due authorization, execution, delivery and performance by it of this letter agreement has been taken.

(c)  This letter agreement has been duly and validly executed and delivered by Harbinger and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d)  Harbinger has, and will have on the Closing Date, available funding necessary to provide the Funds in accordance with this letter agreement.

No director, officer, employee, partner, member or direct or indirect holder of any equity interests or securities of Harbinger, or any of its affiliated funds or managed accounts, and no director, officer, employee, partner or member of any such persons other than any general partner (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter or the transactions contemplated

Harbinger Del-Auto Investment Company Ltd.
Delphi Corporation
January [  ], 2007
Page 3

hereby, and each party hereto hereby waives and releases all claims against such Party Affiliates related to such liability or obligation.

This letter agreement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the conflict of laws principles thereof). HARBINGER AND THE INVESTOR HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND WAIVE ANY OBJECTION BASED ON FORUM NON CONVENIENS.

This letter agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and same instrument.

Sincerely,

HARBINGER CAPITAL PARTNERS MASTER
FUND I, LTD.

By:     Harbinger Capital Partners Offshore
        Manager, L.L.C., as investment manager


By:_____
        Name:   Philip A. Falcone
        Title:   Senior Managing Director


Agreed to and accepted as of the date first
above written:

**Harbinger Del-Auto Investment Company, Ltd.**


By:_____
        Name:
        Title:


DELPHI CORPORATION


By:_____
        Name:
        Title:

5916033_3.DOC
NEWYORK 5916033 (2K)

# EXHIBIT E

Hearing Date and Time: January 5, 2007 at 10:00 a.m.
Objection Deadline: January 2, 2007 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
            In re                           :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                        Debtors.            :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1),
364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND
6004(g) (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING AND (II)
AUTHORIZING DEBTORS TO REFINANCE SECURED POSTPETITION
FINANCING AND PREPETITION SECURED DEBT

("DIP REFINANCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Expedited Motion (the "Motion") for an Order Under 11 U.S.C. §§ 105, 361,

362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002,

4001 and 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II)

Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured

Debt.  In support of this Motion, the Debtors respectfully represent as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered

orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases.  On

October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the

U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

2

4.      The statutory predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and rules 2002, 4001 and 6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

4

with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.    Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

13.    By this Motion, the Debtors seek entry of an order under 11 U.S.C. §§

105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P.

2002, 4001 and 6004(g) (I) authorizing debtors to obtain post-petition financing and (ii)

authorizing debtors to refinance secured post-petition financing and prepetition secured debt (the

"Replacement Financing Facility").

<u>Basis For Relief</u>

14.    The Debtors seek approval to enter into the approximately $4.5 billion

Replacement Financing Facility because, after reviewing the current strong conditions in the

capital markets and assessing the positive momentum of the Debtors' reorganization cases, the

Debtors have determined that they could replace their existing prepetition and postpetition

financing on more favorable terms.  Under the terms of the Replacement Financing Facility the

Debtors estimate that they would save approximately $8 million per month in financing costs.

These savings result from the fact that the interest rate under the Replacement Financing Facility

would be lower than the accrual rate for the adequate protection payments in respect of the

secured prepetition credit facilities, which the Debtors propose to repay with a portion of the

proceeds of the Replacement Financing Facility.  Adequate protection payments are currently

required to be made to the secured prepetition lenders pursuant to the existing DIP financing

order because the current DIP facility primes the secured prepetition credit facilities.  In

recognition of the favorable environment in the capital markets and to minimize the transaction

fees payable by the Debtors, the Debtors have accepted the lenders' undertaking on a best efforts

basis without underwriting by the lenders.

15.    The Replacement Financing Facility provides an appropriate foundation

from which to negotiate and secure emergence financing.  Among other things, the savings

6

generated would preserve additional value of the Debtors' estates and would enhance the

Debtors' ability to implement their transition plan and emerge from chapter 11 protection.

Contemporaneously with the filing of this Motion, the Debtors filed the Expedited Motion for

Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to

Sections 105(a), 363(b), 503(b) And 507(a) of the Bankruptcy Code and the Plan Framework

Support Agreement Pursuant to Sections 105(a), 363(b), And 1125(e) of the Bankruptcy Code

("Plan Investment And Framework Support Approval Motion").  The Plan Investment And

Framework Support Approval Motion seeks approval of (a) a proposed "Plan Framework

Support Agreement," signed by Delphi, the Plan Investors (as defined below) and GM, which

outlines the potential treatment of the Debtors' stakeholders in the Debtors' anticipated plan of

reorganization and provides a framework for several other aspects of the Debtors' chapter 11

reorganization and (b) a proposed equity purchase and commitment agreement (the "Equity

Purchase and Commitment Agreement") with affiliates of Cerberus Capital Management, LP,

Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd., Merrill Lynch,

Pierce, Fenner & Smith, Incorporated and UBS Securities LLC (the "Plan Investors") to invest

up to $3.4 billion in preferred and common equity in the reorganized Debtors to support the

Company's transformation plan announced on March 31, 2006 and the Debtors' plan of

reorganization framework agreement.  The Replacement Financing Facility together with the

Plan Framework Support Agreement and the Equity Purchase and Commitment Agreement

represent significant milestones in the Debtors' reorganization and another major step forward

towards emergence.  While there is much that remains to be accomplished in the Debtors'

reorganization, the Debtors and their stakeholders are together navigating a course that should

7

lead to consensual resolution with the Debtors' U.S. labor unions and GM while providing an

acceptable financial recovery framework for the Debtors' stakeholders.

A.      The Existing Postpetition Credit Agreement

        16.      Pursuant to the Final Order Under 11 U.S.C. §§ 105, 361, 362, 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001  and 9014 (I)

Authorizing Debtors to Obtain Postpetition Financing, (II) To Utilize Cash Collateral and (III)

Granting Adequate Protection to Prepetition Secured Parties entered on October 28, 2005 (the

"Final DIP Order") (Docket No. 797), the Court authorized the Debtors to enter into a $2 billion

postpetition credit facility (the "Existing DIP Facility") governed by a DIP Credit Agreement  (as

amended, the "Existing Credit Agreement").  The Existing DIP Facility consists of a $1.75

billion revolving line of credit (the "Existing DIP Revolver") and a $250 million term loan (the

"Existing DIP Term Loan").  The Existing DIP Facility is secured by (a) a perfected first-priority

lien on substantially all of the Debtors' otherwise unencumbered assets (subject to certain

exclusions), (b) a perfected junior lien on substantially all of the Debtors' previously encumbered

assets (subject to certain exclusions), (c) superpriority administrative expense claims under

section 364(c)(1) of the Bankruptcy Code in respect of the Debtors' obligations under the

Existing DIP Facility, and (d) a first priority senior priming lien under section 364(d)(1) of the

Bankruptcy Code on substantially all of the Debtors' property, which lien primes the obligations

under the Prepetition Credit Agreement (as defined below).

        17.      The Existing DIP Facility has a current maturity date of October 8, 2007,

and is to be used for working capital and general corporate purposes.  The interest rate for the

Existing DIP Facility is LIBOR plus 275 basis points (currently 8.12%) for funds drawn.  A

more detailed description of the terms of the Existing DIP Facility is contained in the Motion for

Approval of the Final DIP Order dated October 8, 2005 (Docket No. 0042), the Final DIP Order,

and the form of Existing Credit Agreement attached thereto.

B.      The Prepetition Credit Agreement

        18.     The Debtors' primary secured obligations arose under that certain Third

Amended and Restated Credit Agreement, dated as of June 14, 2005, among Delphi, as

borrower, JPMorgan Chase Bank, N.A., as administrative agent (in such capacity, the

"Prepetition Agent"), the lenders from time to time party thereto (the "Prepetition Secured

Lenders"),[3] Citicorp USA, Inc., as syndication agent, and various documentation agents,

bookrunners, and arrangers (as amended, supplemented, or otherwise modified from time to

time, the "Prepetition Credit Agreement").

        19.     The Prepetition Credit Agreement provides for revolving loans, term

loans, swingline loans, and the issuance of letters of credit up to an aggregate principal amount

of $2.825 billion.  Proceeds under the Prepetition Credit Agreement were used for Delphi's

general corporate purposes including Investments (as such term is defined in the Prepetition

Credit Agreement) in subsidiaries of Delphi.  The Debtors' obligations as borrower and, in the

case of Delphi's subsidiaries, as guarantors, under the Prepetition Credit Agreement are secured,

with certain exceptions, by substantially all of the Debtors' material tangible and intangible

assets.

        20.     As of the Petition Date, Delphi was indebted to the Prepetition Secured

Lenders in the aggregate amount of approximately $2,579,783,051.85 (the "Prepetition Credit

Facility"), consisting of, among other things, (a) revolving loans with an aggregate principal

amount of approximately $1.5 billion, (b) term loans with an aggregate principal amount of

---

[3]      As of December 13, 2006, there were approximately 272 Prepetition Secured Lenders holding positions in the
         Prepetition Credit Facility.

approximately $988,329,620.59, and (c) certain reimbursement obligations in respect of letters of credit in an aggregate amount of approximately $91,453,431.26, in each case plus all accrued and unpaid interest, fees, costs, expenses, and all charges related thereto.   The Prepetition Credit Facility and the Existing DIP Facility are referred to collectively as the "Existing Bank Debt."

C.     The Solicitation And Negotiation Of The Replacement Financing Facility

21.     In light of the current strong conditions in the capital markets and the positive momentum in the Debtors' restructuring process, the Debtors have determined that they can refinance the Existing Bank Debt on more favorable terms.  Accordingly, the Debtors and their financial advisor, Rothschild Inc. ("Rothschild") performed a search for replacement financing.  Due to the Debtors' expected emergence from chapter 11 protection in the first half of 2007 and the time it would take for an unfamiliar lender to complete its diligence, this solicitation was necessarily limited to lenders who had already conducted extensive due diligence of the Debtors, and included the current DIP agent, JP Morgan Chase Bank, N.A. ("JPMorgan"), and one other lender group led by two major investment banks.  Bringing in new lenders at this time would have been too time-consuming in light of the Debtors' planned exit from bankruptcy, and many of the cost savings available would have been lost by the time new lenders were sufficiently knowledgeable of the Debtors' financial conditions.  Speed in completing the transaction is also critical to avoid potential adverse changes in currently favorable market conditions.

22.     After receiving proposals from JPMorgan and the other bidding investment banks, the Debtors and Rothschild further negotiated the terms contained in each proposal with the parties involved and, at the conclusion of this process, the Debtors determined, with the assistance of Rothschild, that the proposal submitted by JPMorgan offered the most

10

favorable terms.  This decision was based in part on the transaction cost savings and efficiency

that could be obtained by using the Debtors' established lending agent.  In making this decision,

the Debtors were also assisted by Skadden as their principal restructuring and bankruptcy

counsel, and by their special counsel, Shearman & Sterling LLP ("Shearman").    Shearman has

further assisted in the negotiation and evaluation of the transaction, and has taken the primary

role in preparing the transaction documents.  The term sheet submitted by JPMorgan (the "Term

Sheet") reflects the terms of the Replacement Financing Facility and was the culmination of

efforts by the Debtors, Rothschild, Skadden, and Shearman and their arms-length negotiations

with JPMorgan.    A copy of the Term Sheet is attached hereto as <u>Exhibit A</u>.  As set forth in the

Term Sheet, JPMorgan will act as the administrative agent for the lenders under the Replacement

Financing Facility (the "Replacement DIP Lenders").

       23.    In determining to seek approval of the Replacement Financing Facility

from JPMorgan, the Debtors considered many factors.  First, JPMorgan's preexisting knowledge

of the Debtors' businesses and their collateral provides significant benefits, including, but not

limited to, the speed with which JPMorgan is able to close the transaction.  JPMorgan's

institutional knowledge as the Debtors' current agent for the lending group also provides greater

certainty with respect to rapid execution and syndication of the Replacement Financing Facility.

Additionally, JPMorgan has historically worked well with the Debtors to establish favorable

lending terms and is best suited to market the Replacement Financing Facility to the capital

markets.

D.    <u>Terms Of The Replacement Financing Facility</u>

       24.    The Debtors have determined, in the exercise of their sound business

judgment, that the Replacement Financing Facility would allow them to continue to meet their

restructuring goals as well as their ongoing working capital and general business needs on terms

more favorable than those of the Existing DIP Facility, particularly considering the

discontinuation of the adequate protection package for the Prepetition Secured Lenders.  The

Debtors therefore seek approval of the Replacement Financing Facility, which will be

documented by a replacement credit agreement (the "Replacement Credit Agreement"),[4] and

authority to enter into the commitment and pay the fees related thereto.  The purposes for which

the Replacement Financing Facility would be used are working capital and other general

corporate expenses and payment in full of the Existing Bank Debt.

25.    The Replacement Financing Facility will have essentially the same terms

as the Existing DIP Facility (See ¶¶ 16 and 17 above), save for certain key exceptions

summarized below, all of which are beneficial for the Debtors and their estates.  Most noticeably,

the Debtors' $4.5 billion Replacement Financing Facility increases the size of the Debtors'

secured postpetition financing by approximately $2.495 billion.  This increase is a result of the

refinancing of the Prepetition Credit Facility, which is to be achieved by repaying this debt

(approximately $2.495 billion) with the proceeds of a second-priority DIP term loan (the

"Second-Priority DIP Term Loan").  While the refinancing will thus (subject to certain

exceptions to be preserved) result in an elevated priority for approximately $2.495 billion of the

Debtors' capital structure, the debt under this facility was (subject to certain exceptions to be

preserved) first in priority after the Existing DIP Facility and was expected to be paid in full,

rendering the difference in priority inconsequential.  The super-priority claims and liens granted

to the Second-Priority DIP Term Loan will be junior to those granted to the refinanced DIP

---

[4]    Due to the necessity of filing this Motion on an expedited basis, the Debtors and JPMorgan have not yet
finalized the terms of the Replacement Credit Agreement.  The form of Replacement Credit Agreement will be
filed and served electronically to the parties required by the Scheduling Order (as defined below) and posted on
the Debtors' website, www. delphidocket.com, no later than December 26, 2006.

Revolver and first-priority DIP term loan under the Replacement Financing Facility.

Furthermore, the proposed order granting this Motion is designed to maintain in all material

respects the relative priority of liens of third party creditors (including, without limitation, setoff

claimants) with respect to the Replacement Financing Facility that such parties have with respect

to the Existing DIP Facility under the Final DIP Order.[5]

        26.     The refinancing of the Prepetition Credit Facility would save the Debtors

considerable interest and adequate protection costs for the remainder of their bankruptcy

proceedings.  The interest rate for the Prepetition Credit Facility currently ranges from 400 to

550 basis points over the prime rate, or 12.25% to 13.75%.  Under the refinancing, the interest

rate for this debt would be 325 basis points above LIBOR, or currently 8.62%.  The interest rate

on the refinanced Existing DIP Revolver and the Existing DIP Term Loan will be 25 basis points

lower than the interest rate on the Existing DIP Facility, reducing the current effective interest

rate from 8.12% to 7.87%.  The maturity date would be December 31, 2007, or roughly one year

from the inception of the Replacement Financing Facility, approximately two and a half months

longer than the maturity date of the Existing DIP Facility.  As with the Existing DIP Facility, the

Replacement Financing Facility can mature earlier than the stated maturity date if the Debtors

substantially consummate a plan of reorganization or if the facility is accelerated and terminated

early under the terms of the Replacement Credit Agreement.

        27.     As is typical in all DIP financing, including the Existing DIP Facility, the

Replacement Financing Facility contains a "Carve-Out" memorializing those claims and

expenses that could be superior in right to the Replacement DIP Lenders.  In this case, the Carve-

Out is essentially identical to the carve-out approved in the Final DIP Order (including the same

---

[5]    A blackline of the proposed Order granting this Motion as compared to the Final DIP Order is attached hereto
as Exhibit B.

dollar limitations) but certain fees and expenses of the Plan Investors are included within the

scope of such protection.  Specifically, pursuant to the Equity Purchase and Commitment

Agreement, Delphi has agreed, subject to Bankruptcy Court approval, to reimburse or pay, as

applicable, the Plan Investors' Transaction Expenses (as summarized below and defined in

section 2(j) of the Equity Purchase and Commitment Agreement) incurred from and after entry

of an order approving the Plan Investment and Framework Support Approval Motion.  The

Debtors have also agreed to include such Transaction Expenses in the Carve-Out.  At the

Debtors' request, JPMorgan has reviewed this concept and has agreed to the Debtors' Carve-Out

request. (See ¶ 5 of the proposed order granting this Motion).  In summary the Transaction

Expenses are out-of-pocket costs and expenses reasonably incurred by each Plan Investor on or

before the effective date of a plan of reorganization (and reasonable post-closing costs and

expenses relating to the closing), including reasonable fees, costs, and expenses of counsel to

each of the Plan Investors, and reasonable fees, costs and expenses of any other professionals

retained by any of the Plan Investors in connection with (a) the transactions contemplated

(including investigating, negotiating and completing such transactions), (b) these chapter 11

cases, and (c) judicial and regulatory proceedings related to such transactions and these chapter

11 cases.

   28. Due to the proposed repayment of the Prepetition Credit Facility, the

proposed order approving the Motion provides that the January 18, 2007 deadline (as extended

on multiple occasions) under paragraph 16 of the Existing DIP Order for the Creditors'

Committee to, among other things, (i) challenge the validity, enforceability, priority or extent of

the Prepetition Secured Lenders' collateral and liens, (ii) assert that the debt under the Prepetition

Credit Facility is undersecured, or (iii) bring avoidance actions against the Prepetition Secured

14

Lenders (collectively, the "Lien Claims and Defenses") would be terminated upon entry of the

proposed order.  This relief is appropriate because the Debtors do not believe that it is

conceivable that the Prepetition Credit Facility is undersecured or that the Prepetition Secured

Lenders would not be paid in full under any plan of reorganization proposed in these cases.

Accordingly, unlike many other prepetition claims, the Debtors are carrying this liability on their

books as a liability not subject to compromise.  In further support of this conclusion, the Plan

Framework Support Agreement filed contemporaneously herewith proposes that the Prepetition

Credit Facility would be refinanced and paid in full under an anticipated plan of reorganization.

Furthermore and equally important, despite the two week curtailment to the Creditors'

Committee deadline, the Debtors' believe that the Creditors' Committee would not be prejudiced

by this relief because it has had ample opportunity over the last 14 months to investigate and

assert any Lien Claims and Defenses against the Prepetition Secured Lenders.

29.    Moreover, as previously noted, the savings under the Replacement

Financing Facility would be significant.  These considerable savings are offset by reasonable

one-time refinancing fees.  Indeed, the savings the Debtors would realize by refinancing the

Existing Bank Debt should exceed the one-time fees and costs in less than two months.  In

addition, the Debtors will reimburse JPMorgan and the lead arrangers of the Replacement

Financing Facility for reasonable costs and fees, and indemnify for any liability, incurred in

connection with the refinancing, on the same terms as contained in the Existing DIP Facility.

The reimbursement, indemnification, and fees are comparable to those sought by the other

bidding investment bank group, and the Debtors believe the fees are representative of the market

rates for such financing.

30.    It is important to note, as mentioned above, that JPMorgan is undertaking the Replacement Financing Facility on a best efforts basis, and the offering of the facility is not being underwritten by JP Morgan.  The rate decreases set forth above are thus not guaranteed, and represent JPMorgan's best estimate of the rates that will be obtained, based on JPMorgan's extensive experience in deals of this nature.  The lack of underwriting on the Replacement Financing Facility, however, has enabled the Debtors to obtain the refinancing with the accompanying low fees set forth in the Term Sheet and described below.

31.    Moreover, the refinancing of the Existing Bank Debt is permitted under the relevant transaction documents.  Article 2.10 of the Prepetition Credit Agreement specifically permits the Debtors to prepay the Prepetition Credit Facility, and in connection with negotiations related to the consummation of the Existing DIP Facility, the Prepetition Secured Lenders waived their right to any prepayment penalties or premiums.  Furthermore, paragraph 12(c) of the Final DIP Order permits prepayment of the Prepetition Credit Facility if such prepayment is part of a transaction in which the obligations of the Existing DIP Facility and the Prepetition Credit Facility are repaid or refinanced in whole.

32.    The Debtors have been unable to obtain credit from any source on terms more favorable than those offered pursuant to the Replacement Financing Facility and, despite the Debtors' efforts, no proposal submitted was without a priming lien structure.  As set forth above, the refinancing provides significant financial benefits with minimal delay, transaction cost, and disruption because the Debtors have selected JPMorgan to act as agent for the refinancing in full.  Although the Replacement Financing Facility will continue with the same priming lien structure as the Existing DIP Facility, the refinancing of the Prepetition Credit Facility will not impair, in any material respect, the lien positions of other holders of secured

claims relative to such facilities.  Indeed, the liens primed under the Existing DIP Facility that

were pari passu with the Prepetition Secured Lenders' liens will now be pari passu with the

Second-Priority Term Loan.  The Replacement Financing Facility thus represents the best

alternative available to the Debtors for reducing their financing costs, and is fair and reasonable.

<u>Applicable Law</u>

A.    <u>This Court Should Authorize The Proposed Replacement Financing Facility</u>

    (a)    The Replacement Financing Facility Is Appropriate Under
<u>Section 364(c) Of The Bankruptcy Code</u>

    33.    The Debtors propose to obtain the Replacement Financing Facility by

providing security interests and liens as set forth above pursuant to sections 364(c) of the

Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under section

364(c) is a finding, made after notice and hearing, that the debtors are "unable to obtain

unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code]." 11 U.S.C. §

364(c).  This Court has already made this finding in entering the Final DIP Order and the

proposals received from JPMorgan and the other investment bank group substantiate the Court's

finding.

    34.    Section 364(c) financing is appropriate when the trustee or debtor-in-

possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

<u>See</u> <u>In re Ames Dep't Stores, Inc.</u>, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); <u>In re Crouse Group, Inc.</u>, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987),

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

17

35.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether

    (a)     the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

    (b)     the credit transaction is necessary to preserve the assets of the estate; and

    (c)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39.  This Court found that these conditions were met when it entered the Final DIP Order.  Because the Replacement Financing Facility is merely a refinancing of the obligations already approved, this Court's findings should continue to apply.

    (b)     The Replacement Financing Facility Is Appropriate Under
        Section 364(d) Of The Bankruptcy Code

36.     Section 364(d)(1) provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–

    (a)     the trustee is unable to obtain credit otherwise; and

    (b)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "'Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process.'"  Id. (quoting In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

18

37.        In this case, the Debtors have already established that they are unable to

get credit without priming liens.  The priming lien structure under the Replacement Financing

Facility, including the adequate protection provided to parties whose liens are primed, will

continue essentially unchanged from the Existing DIP Facility.  A key change to this structure is

that the effect of the priming liens will be lessened going forward because the Prepetition

Secured Debt will be refinanced as the Second-Priority Term Loan.  The resultant increase in the

size of the DIP facility should not adversely impact other parties because any liens primed under

the Existing DIP Facility will continue in the same relative priority as provided in the Final DIP

Order.

> (c)        <u>Compliance With General Order No. M-274</u>

38.        In compliance with the Guidelines for Financing Requests (the

"Guidelines"), adopted under General Order No. M-274 of the Board of Judges for the Southern

District of New York, the Debtors hereby disclose that the refinancing in full of the Prepetition

Credit Facility is an "Extraordinary Provision" within the meaning of section II(A) of the

Guidelines.  The Debtors submit that, due to the significant benefits to be obtained for their

estates through entry into the Replacement Financing Facility, the Debtors have shown

substantial cause in compliance with the Guidelines.  Bankruptcy Courts in the Southern District

of New York have regularly approved debtor in possession financing facilities that were used, in

part, to repay existing secured credit obligations.  See e.g., <u>In re Delta Air Lines, Inc.</u>, Case No.

05-17923 (PCB) (Bankr. S.D.N.Y. Oct. 6, 2005) (Docket No. 652); <u>In re Winn-Dixie Stores,</u>

<u>Inc.</u>, Case No. 05-11063 (RDD) (Bankr. S.D.N.Y. March 23, 2005) (Docket No. 501); <u>In re</u>

<u>Footstar, Inc.</u>, Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. May 25, 2004) (Docket No. 621); <u>In</u>

re Solutia Inc., Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. Jan. 16, 2004) (Docket No. 278); In

re Twinlab Corp., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. Sept. 25, 2003) (Docket No. 80).

       39.     Despite the guidance provided by Guidelines, it is important to note that

the proposed refinancing does not preserve a party's right to unwind the paydown of the

prepetition debt owed to the Prepetition Secured Lenders.  Specifically, the Guidelines suggest

that an "order approving a rollup must ordinarily reserve the right of the Court to unwind the

paydown of the prepetition debt in the event that there is a timely and successful challenge to the

validity, enforceability, extent, perfection, and (where appropriate) priority of the prepetition

lender's claims or liens, or a determination that the prepetition debt was undersecured as of the

petition date."  Nevertheless, the Debtors have determined that this relief is appropriate.  First,

unlike a typical case – which is what the Guidelines generally address –  the refinancing of the

Existing Bank Debt is not occurring on the first day of the Debtors' cases, when little is known

about the nature of the Prepetition Secured Lenders' liens.  To the contrary, these cases have been

ongoing for over 14 months.  During this time there has been ample opportunity for parties-in-

interest (and in particular the Creditors' Committee) to analyze their claims and defenses and to

otherwise examine the validity and enforceability of the Prepetition Secured Lenders' liens.

Second, under the facts and circumstances of these cases, the Debtors do not believe that it is

conceivable that the Prepetition Credit Facility is undersecured.  Indeed, as mentioned above, the

Debtors even record the liability on account of the Prepetition Credit Facility as a liability that is

not subject to compromise, i.e., that debt is anticipated to be paid in full pursuant to a confirmed

plan of reorganization.  Accordingly, termination of the right to assert the Lien Claims and

Defenses is appropriate at this time.  To the extent that any other provisions of the Replacement

Financing Facility are Extraordinary Provisions within the meaning of the Guidelines, those

provisions will be disclosed in the proposed order granting this Motion as such and remain

substantially unchanged from the Final DIP Order as already approved.

      (d)    <u>Continued Use Of Cash Collateral</u>

      40.    The Debtors continue to use the cash generated in the ordinary course of

their businesses to finance their operations and to make essential payments such as employee

salaries, payroll, taxes, and the purchase of goods and materials.  Section 363(c)(2) of the

Bankruptcy Code provides that a debtor-in-possession may not use this "cash collateral" unless-

> (A) each entity that has an interest in such collateral consents; or

> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in
> accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  The Debtors were authorized to use cash collateral under the Final DIP

Order.  While limitations on the use of the Debtors' cash collateral would be largely obviated by

the refinancing of the Prepetition Credit Facility, the Debtors, out of an abundance of caution,

seek approval for continued use of cash collateral to the extent any other party may assert an

interest in such collateral.  To the extent that a party does have such an interest in the Debtors'

cash collateral, that party will be afforded the same adequate protection to which it was entitled

under the Final DIP Order.

      (e)    <u>Application Of The Business Judgment Standard</u>

      41.    As described above, after appropriate investigation and analysis and given

the exigencies of the circumstances, the Debtors' management has concluded that entering into

the Replacement Financing Facility would be beneficial to the Debtors' estates.  This decision is

supported by the multi-million dollar monthly savings in financing costs to be attained through

the Replacement Financing Facility.  Bankruptcy courts routinely defer to the debtor's business

judgment on most business decisions, including the decision to borrow money.  <u>See</u> <u>Group of</u>

Institutional Investors v., Milwaukee St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re

Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).  In considering whether a debtor

has exercised its business judgment, a court is not free to second-guess particular provisions but

rather determines whether the proposed action "as a whole is within reasonable business

judgment."  In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 888 (Bankr. S.D.N.Y. 1990).

42.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  Once the

debtor articulates a valid business justification, a presumption arises that "in making a business

decision the directors of a corporation acted on an informed basis, in good faith and in the honest

belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc.,

147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a

debtor's business judgment have the burden of rebutting the presumption of validity."  Id.   To

satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather,

an objector "is required to produce some evidence respecting its objections." In re Lionel Corp.,

722 F.2d 1063, 1071 (2d Cir. 1983).

43.    The Debtors have exercised sound business judgment in determining that

the Replacement Financing Facility is appropriate.  The terms of the Replacement Financing

Facility are fair and reasonable, are on more favorable terms than the Existing Bank Debt, will

save the Debtors millions of dollars per month, and are thus in the best interests of the Debtors'

estates.  Accordingly, the Debtors should be granted authority to enter into the Replacement

Financing Facility and borrow funds on the secured, administrative super-priority and priming

basis described above, pursuant to sections 363 and 364 of the Bankruptcy Code, and take the

other actions contemplated by the Replacement Financing Facility and as requested herein.

B.    <u>Request For Modification Of Automatic Stay</u>

44.    Section 362 of the Bankruptcy Code provides for an automatic stay upon

the filing of a bankruptcy petition pursuant to the Bankruptcy Code.  The proposed Replacement

Financing Facility, like the Existing DIP Facility that it refinances, contemplates a modification

of the automatic stay (to the extent applicable), to:  (a) authorize, but not require, the

Replacement DIP Lenders to file financing statements, deeds of trust, mortgages, or other similar

documents to evidence, validate, and perfect the Replacement DIP Lenders' security interests

granted to them under the Replacement Financing Facility; (b) give the Debtors any notice

provided for in the Replacement Credit Agreement; (c) permit the Replacement DIP Lenders to

execute upon their security interests or exercise other remedies under the loan documents upon

the occurrence of an event of default (as defined in the Replacement Credit Agreement), after

giving five business days' notice in writing, served by hand or telefax upon this Court, the

Debtors' counsel, any trustee of the Debtors, if appointed, counsel for any official creditors'

committee, and the U.S. Trustee; and (d) permit the Replacement DIP Lenders to take such other

actions required or permitted by the loan documents.  Stay modification provisions of this kind

are ordinary and standard features of postpetition debtor-in-possession financing facilities and, in

the Debtors' business judgment, are reasonable under the current circumstances.

C.    <u>The Replacement Financing Facility Should Be Accorded The Benefits Of Section 364(e)</u>

45.    No consideration is being provided to any party to, or guarantor of,

obligations arising under the Replacement Financing Facility, other than as disclosed in the Term

Sheet.  Accordingly, the Replacement Financing Facility should be accorded the benefits of

section 364(e) of the Bankruptcy Code for all the reasons set forth herein.

D.    <u>Waiver Of The Ten-Day Stay Provided By Bankruptcy Rule 6004</u>

46.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Courts in this district have waived this ten-day stay

upon a showing of business need.  <u>See</u> <u>In re Adelphia Commc'ns Corp.</u>, 327 B.R. 143, 175

(Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown,

the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P.

6004(g)."); <u>In re PSINet Inc.</u>, 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring

demonstration of "a business exigency" for a waiver of the ten-day stay under Bankruptcy Rule

6004(g)).  As stated above, the Debtors would save approximately $8 million per month in

financing costs under the Replacement Financing Facility which equates to significant savings if

the Court relieves the Debtors from the ten-day stay.  The Debtors accordingly assert that a

waiver of the ten-day stay provided by Bankruptcy Rule 6004 would benefit the Debtors and all

parties-in-interest.

Notice Of Motion

47.    Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418) (the "Supplemental Case Management Order"), as well as Fed. R. Bankr. P.

4001.  In addition, the Debtors have served, among other parties, the setoff claimants and

24

objectors to the motion for approval of the Existing DIP Facility.  The Debtors have also

provided notice to the agent for the Prepetition Credit Facility and all of the known Prepetition

Secured Lenders currently holding positions in the Prepetition Credit Facility as of December 13,

2006.  The Debtors have submitted the proposed Order Scheduling Non-Omnibus Hearings On

Debtors' Plan Investment And Framework Support Approval Motion And Dip Refinancing

Motion (the "Scheduling Order"), setting the hearing for this Motion on January 5, 2007 (the

"January 5 Hearing").  The Scheduling Order provides that parties-in-interest will have until

January 2, 2007 at 4:00 p.m. (Prevailing Eastern Time) to file an objection.  In light of the nature

of the relief requested, the Debtors submit that no other or further notice is necessary.

Memorandum Of Law

48.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing the Debtors to refinance the Existing DIP Facility and Prepetition Lender Debt by entering into the Replacement Financing Facility and (b) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            December 18, 2006

                          SKADDEN, ARPS, SLATE, MEAGHER
                           & FLOM LLP

                          By:    /s/ John Wm. Butler, Jr.
                                John Wm. Butler, Jr. (JB 4711)
                                John K. Lyons (JL 4951)
                                Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois 60606
                          (312) 407-0700


                          By:    /s/ Kayalyn A. Marafioti
                                Kayalyn A. Marafioti (KM 9632)
                                Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                                    - and –

                          SHEARMAN & STERLING LLP


                          By:    /s/ Andrew V. Tenzer
                                Douglas P. Bartner (DB 2301)
                                Andrew V. Tenzer (AT 2263)
                          599 Lexington Avenue
                          New York, New York  10022
                          (212) 848-4000

                          Attorneys for Delphi Corporation, et al.,
                               Debtors and Debtors-in-Possession

26

### Delphi Corporation

**Summary of Terms and Conditions for
Priming Credit Facility
in the Amount of $4,495,820,240.59**

Borrower:

Delphi Corporation, a Delaware corporation, as a Debtor-in-Possession in a case (the "Debtor's Case") pending under Chapter 11 of the Bankruptcy Code (the "Borrower" or "Debtor").

Guarantors:

The obligations of the Borrower shall be guaranteed by substantially all of the direct and indirect domestic subsidiaries (which shall include all of the filed subsidiaries, with specific exceptions set forth in the loan documents (collectively, the "Agreement") of the Borrower (each a "Guarantor" and collectively the "Guarantors"), and each of which will be a Debtor-in-Possession in a case (collectively, the "Guarantors' Cases" and, together with the Debtor's Case, the "Cases") pending under Chapter 11 of the Bankruptcy Code.

Lead Arrangers:

With respect to the First Priority Facilities (as defined below), J.P. Morgan Securities Inc. ("JPMorgan"), Citigroup Global Markets, Inc. and Deutsche Bank Securities Inc., and with respect to the Tranche C Term Loan, JPMorgan (collectively, in such capacities, the "Lead Arrangers"), with JPMorgan given "left placement" in all documentation and other materials relating to the Loans.

Joint Bookrunners:

With respect to the First Priority Facilities, JPMorgan, Citigroup Global Markets, Inc. and Deutsche Bank Securities Inc., and with respect to the Tranche C Term Loan, JPMorgan,  Merrill Lynch, Pierce, Fenner & Smith Incorporated and UBS Securities LLC (collectively, in such capacities, the "Joint Bookrunners", and together with the Lead Arrangers, the "Arrangers/Bookrunners").

Administrative Agent:

With respect to the First Priority Facilities and the Tranche C Term Loan, JPMorgan Chase Bank, N.A. ("JPMCB", in such capacity, the "Administrative Agent").

Syndication Agent:

With respect to the First Priority Facilities, Citicorp USA, Inc. ("CUSA", in such capacity, the "Syndication Agent", and, together with the Administrative Agent, the "Agents").

Documentation Agent:

With respect to the First Priority Facilities, Deutsche Bank AG New York Branch ("DBAGNY", in such capacity, a "Documentation Agent").

Lenders:

A syndicate of banks, financial institutions and other entities in consultation with the Borrower (including JPMCB), arranged by the Arrangers/Bookrunners (collectively, the "Lenders"), which syndicate shall include each of the Arrangers/Bookrunners or their respective affiliates.

Commitment:

A total commitment of $4,495,820,240.59 (the "Commitment"), comprised of three separate tranches as follows: (i) Tranche A shall be a first priority revolving commitment of $1,750,000,000 ("Tranche A" or the "Revolving Facility"), (ii) Tranche B shall be a first priority term loan commitment of $250,000,000 ("Tranche B" or the "Tranche B Term Loan", together with the Revolving Facility, the "First Priority Facilities") and (iii) Tranche C shall be a

second priority term loan commitment of $2,495,820,240.59 ("<u>Tranche C</u>" or the "<u>Tranche C Term Loan</u>" and, together with the Revolving Facility and the Tranche B Term Loan, the "<u>Facility</u>", and any borrowings under the Facility hereinafter referred to as the "<u>Loans</u>").

<u>Letters of Credit</u>:

Up to $325,000,000 of the Revolving Facility shall be available for the issuance of letters of credit (the "<u>Letters of Credit</u>") by JPMCB (or any of its banking affiliates) or such other Lenders (which other Lenders shall be reasonably satisfactory to the Administrative Agent) as may agree with the Company to act in such capacity (in such capacity, the "<u>Issuing Lenders</u>"). No Letter of Credit shall have an expiration date after the earlier of (a) one year after the date of issuance and (b) 180 days after the Maturity Date (as hereinafter defined), <u>provided</u> that any Letter of Credit with a one-year tenor may provide for the renewal thereof for additional one-year periods (which shall in no event extend beyond the date referred to in clause (b) above).

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of Loans under the Revolving Facility) on the next business day. To the extent that the Borrower does not so reimburse the Issuing Lender, the Lenders under the Revolving Facility shall be irrevocably and unconditionally obligated to reimburse the Issuing Lender on a <u>pro rata</u> basis.

If the Termination Date (as hereinafter defined) occurs prior to the expiration of any Letter of Credit, each such Letter of Credit shall be replaced and returned to the Issuing Lender undrawn and marked "canceled" on or prior to the Termination Date, or, to the extent that the Borrower is unable to replace any of the Letters of Credit, such Letters of Credit shall be (a) secured by a back-to-back letter of credit that is in an amount equal to 105% of the face amount of such Letters of Credit, in a form that is reasonably satisfactory to the Administrative Agent and the Issuing Lender and issued by a bank that is reasonably satisfactory to the Administrative Agent and the Issuing Lender, or (b) cash collateralized in an amount equal to 105% of the face amount of such Letters of Credit ("<u>Cash Collateralization</u>") by the deposit of cash in such amount into an account established by the Borrower under the sole and exclusive control of the Administrative Agent ("<u>Letter of Credit Account</u>"), such cash to be promptly remitted to the Borrower upon the expiration or cancellation (or backstop as set forth in clause (a) above) of the related Letter of Credit or other termination or satisfaction of the Borrower's reimbursement obligations.

<u>Purpose</u>:

The First Priority Facilities shall be available (i) to pay in full all obligations under the Revolving Credit, Term Loan and Guaranty Agreement dated as of November 21, 2005 (as amended, restated, modified or waived from time to time, the "<u>Existing DIP Credit Agreement</u>") by and among the Borrower, the lenders party thereto (the "<u>Existing DIP Lenders</u>") (such repayment in full, the "<u>DIP Facility Refinancing</u>"), (ii) for working capital for the Borrower and its domestic and foreign corporate subsidiaries and for other general corporate purposes, including, without limitation, to make pension contributions and (iii) to pay related transaction costs, fees and expenses and to pay restructuring costs. The Tranche C Term Loan shall be available to pay in full all obligations under the 5-Year Third Amended and Restated Credit Agreement dated as of June 14, 2005 (the "<u>Existing Pre-Petition Agreement</u>") by and among the Borrower, the lenders party thereto (the "<u>Existing Pre-Petition Secured Lenders</u>") and JPMCB, as

2

administrative agent (such repayment in full, the "Pre-Petition Facility Refinancing", and together with the DIP Facility Refinancing, the "Refinancing").

Term:

Borrowings shall be repaid in full and the Commitment shall terminate, at the earliest of (i) December 31, 2007 (the "Maturity Date"), (ii) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the effective date) of a plan of reorganization (a "Plan") that is confirmed pursuant to an order entered by the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction (the "Court") over the Cases of the Borrower or the Guarantors (the "Consummation Date") and (iii) the acceleration of the loans and the termination of the Commitment in accordance with the Agreement hereinafter referred to (together with the Maturity Date and the Consummation Date, the "Termination Date"). Upon the occurrence of the Termination Date, the Loans and other obligations shall be repaid in full.

Priority and Liens:

The structure of the Approval Order shall be designed to maintain in all material respects the relative priority of liens of third-party creditors (including, without limitation, setoff claimants) with respect to the Facility that such parties have with respect to the Existing DIP Credit Agreement and Existing Pre-Petition Credit Agreement under the Existing DIP Order.

All direct borrowings and reimbursement obligations under Letters of Credit and other obligations under the Facility (and all obligations owing to Lenders (or their banking affiliates) in respect of cash management services and hedging transactions permitted under the Agreement), and all guaranties of the foregoing by the Guarantors, shall at all times:

(i)     pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority claim status in the Cases;

(ii)    pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all property of the Borrower and the Guarantors' respective estates in the Cases that is not subject to valid, perfected and non-avoidable liens in existence at the time the Approval Order (as defined below) is entered, including without limitation, all inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidiaries of the Borrower and the Guarantors, and on all cash maintained in the Letter of Credit Account, excluding avoidance actions and joint venture interests with respect to which a valid prohibition on pledging exists (it being understood that, notwithstanding such exclusion of joint venture interests, the proceeds of such interests shall be subject to such liens under Section 364(c)(2) of the Bankruptcy Code and available to repay the Loans and all other obligations under the Facility);

(iii)   pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property of the Borrower and the Guarantors' respective estates in the Cases, that is subject to valid, perfected and non-avoidable liens in existence at the time the Approval Order is entered

3

solely to the extent that the order of the Court dated October 28, 2005 approving the Existing DIP Credit Agreement (the "Existing DIP Order") provides that such liens are senior in priority to the DIP Liens (as defined in the Existing DIP Order, the "Existing DIP Liens");

(iv)   pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected first priority, senior priming lien on all of the property of the Borrower and the Guarantors' respective estates in the Cases (including, without limitation, inventory, accounts receivable, general intangibles, chattel paper, owned real estate, real property leaseholds, fixtures and machinery and equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements, and other intellectual property and capital stock of subsidiaries) that is subject to existing liens that pursuant to the terms of the Existing DIP Order are subject and subordinate to the Existing DIP Liens, including, without limitation, all Replacement Liens and Debtor Liens (as each such term is defined in the Existing DIP Order), and any adequate protection liens under the Existing DIP Order, which existing liens, rights and interests (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first priority senior liens to be granted to the Administrative Agent, which senior priming liens in favor of the Administrative Agent shall also prime any liens granted under the Approval Order or thereafter to provide adequate protection in respect of any of the Primed Liens;

provided, however, that the superpriority claims granted under the Approval Order in respect of obligations under the First Priority Facilities shall be senior in priority to the superpriority claims granted under the Approval Order in respect of obligations under the Tranche C Term Loan;

provided, further, that all liens granted under the Approval Order to the Administrative Agent and the Lenders to secure obligations under the First Priority Facilities shall be senior in priority to all liens granted under the Approval Order to the Administrative Agent and the Lenders to secure obligations under the Tranche C Term Loan;

provided, further, that any Primed Liens that under the Existing DIP Order were subject and subordinate only to the Existing DIP Liens, but not to the liens held by the Pre-Petition Secured Lenders (the "Existing Pre-Petition Secured Lenders' Liens") shall be subject and subordinate to the liens securing the Facility under the Approval Order as set forth in clause (iv) above only in respect of the First Priority Facilities, and such Primed Liens shall have the same priority relative to the liens securing the Tranche C Loan that such Primed Liens had relative to the Existing Pre-Petition Secured Lenders' Liens under the Existing DIP Order;

provided, further, that the Borrower shall not be required to pledge in excess of 65% of the voting capital stock of its direct foreign subsidiaries or any of the capital stock or interests of indirect foreign subsidiaries (if, in the good faith judgment of the Borrower, adverse tax consequences would result to the Borrower); and

subject in each case only to the Carve-Out. The "Carve-Out" shall mean (i) all

4

fees required to be paid pursuant to 28 U.S.C. §1930 and Section 726(b) of the Bankruptcy Code, (ii) in the event of the occurrence and during the continuance of an Event of Default, the payment of allowed and unpaid professional fees and disbursements incurred by the Borrower, the Guarantors and any statutory committees appointed in the Cases, and Post-Order Transaction Expenses (as defined below), in an aggregate amount not in excess of $35,000,000 and (iii) all unpaid professional fees and disbursements, and Post-Order Transaction Expenses, incurred or accrued when no Event of Default is continuing that are either (x) reflected in the most recent Borrowing Base Certificate (as defined below) or (y) incurred after the date of such Borrowing Base Certificate in an aggregate amount not to exceed $5,000,000, in each case to the extent allowed by the Bankruptcy Court at any time. Notwithstanding the foregoing, so long as an Event of Default shall not have occurred and be continuing, the Borrower and the Guarantors shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out.

"Post-Order Transaction Expenses" shall mean Transaction Expenses (as defined in the Equity Commitment and Purchase Agreement (the "ECPA") that is attached to the "Plan Investment And Framework Support Approval Motion", filed with the Bankruptcy Court concurrently with the motion to approve the Facility) incurred from and after the date that an order is entered approving the ECPA.

| | |
|---|---|
| <u>Conditions to Priming and Use of Cash Collateral; Exercise of Setoff Rights by Setoff Claimants:</u> | The parties (the "<u>Primed Parties</u>") whose liens are primed as described in clause (iv) of "<u>Priority and Liens</u>" above, and the cash proceeds of whose prepetition collateral shall be authorized for use by the Borrower and the Guarantors as described under "<u>Use of Cash Collateral</u>" below (including, without limitation, any Setoff Claimants who remitted their Pre-Petition Payables (as each such term is defined in the Existing DIP Order) to the Borrower or a Guarantor and received adequate protection in respect thereof under the Existing DIP Order), shall receive adequate protection substantially identical in form and substance to the adequate protection provided for in the Existing DIP Order to the extent the obligations to such parties remain outstanding after giving effect to the Refinancing. |
| | In addition, the provisions of the Existing DIP Order with respect to the exercise of Setoff Rights (as defined therein) shall be incorporated in substantially the same form into the Approval Order. |
| <u>Use of Cash Collateral:</u> | The Commitment shall not be available for use by the Borrower unless the Court shall have authorized the use by the Borrower and the Guarantors of proceeds of pre-petition collateral that constitutes "cash collateral" (within the meaning of the Bankruptcy Code) in respect of the Primed Liens. The Commitment shall not be available for direct borrowings unless the Borrower shall at that time have the use of such cash collateral for the purposes that are described under "<u>Purpose</u>" above. |
| <u>Depository Relationship:</u> | JPMCB shall continue to be the principal concentration bank of the Borrower and the Guarantors. |

5

| | |
|---|---|
| Tranche A Commitment Fee: | 3/8 of 1% per annum on the unused amount of the Tranche A Commitment (with the issuance of Letters of Credit being treated as usage of the Commitment) payable monthly in arrears commencing on the date of the commencement of the Cases. |
| Nature of Fees: | Non-refundable under all circumstances once paid. |
| Letter of Credit Fees: | 2.50% per annum on the outstanding face amount of each Letter of Credit plus customary fees for fronting, issuance, amendments and processing, payable quarterly in arrears to the Issuing Lender for its own account. |
| Interest Rate: | JPMCB's Alternate Base Rate ("ABR") plus (i), with respect to Tranche A borrowings, 1.50%, (ii) with respect to Tranche B borrowings, 1.50% and (iii) with respect to Tranche C borrowings, 2.25%, or, at the Borrower's option, LIBOR plus (x), with respect to Tranche A borrowings, 2.50%, (y) with respect to Tranche B borrowings, 2.50% and (z) with respect to Tranche C borrowings, 3.25%, for interest periods of 1, 3 or 6 months; interest shall be payable monthly in arrears, on the Termination Date and thereafter on demand. |
| Default Interest: | Upon the occurrence and during the continuance of any default in the payment of principal, interest or other amounts due under the Agreement (including, without limitation, in respect of Letters of Credit), interest shall be payable on demand at 2% above the then applicable rate. |
| Borrowing Base: | The sum of the aggregate outstanding amount of direct Tranche A borrowings plus the undrawn amount of outstanding Tranche A Letters of Credit issued for the account of the Borrower (including unreimbursed draws) plus the aggregate outstanding amount of direct Tranche B Term Loan borrowings shall at no time exceed the Borrowing Base. The Borrowing Base shall be substantially as set forth in the Existing DIP Credit Agreement, and Borrowing Base Certificates shall be delivered as set forth in the Existing DIP Credit Agreement. |
| Minimum Revolver Borrowing: | $1,000,000 for direct borrowing of ABR Loans and $5,000,000 for direct borrowing of LIBOR Loans; the Administrative Agent must receive three business days' notice (received by the Administrative Agent by 1:00 p.m., New York City time) for LIBOR Loans. Same day borrowings of ABR Loans will be available if notice is received by the Administrative Agent no later than 12:00 p.m., New York City time, on such day. |
| Mandatory Pre-payments and Cash Collateralization: | If on any date the Borrower or any Guarantor shall receive Net Cash Proceeds (as defined in the Agreement) from (i) any Asset Sale (as defined in the Agreement) or (ii) any Recovery Event (as defined in the Agreement) (except to the extent that Net Cash Proceeds received in connection with such Recovery Event are applied within 180 days of receipt thereof to the replacement or repair of the assets giving rise thereto), and in each case, the aggregate amount of all Net Cash Proceeds from Asset Sales and Recovery Events received by the Borrower and the Guarantors from Asset Sales and Recovery Events occurring on and after the Closing Date (as defined in the Agreement) exceeds $125,000,000, then (without duplication of any reduction to the Borrowing Base as a result of such Asset Sale or Recovery Event) an amount equal to 66-2/3% of such Net Cash Proceeds received on such date shall be promptly, and in any event, within 10 days after such date, at the Company's option, either (i) first, applied to the prepayment of the Tranche B Loans, second, applied to the |

6

prepayment of the Tranche A Loans (with a corresponding permanent reduction of the Tranche A Commitments) and third, subsequent to the repayment in full of the outstanding Loans under the Revolving Facility and the Tranche B Term Loan, the replacement, termination or cash collateralization of all Letters of Credit and the termination of all commitments under the Revolving Facility (the "<u>First Priority Payout Date</u>") and to the extent permitted by the Approval Order, applied to the prepayment of the Tranche C Term Loan or (ii) deposited into a cash collateral account maintained with the Administrative Agent for the benefit of the holders of liens and claims granted under the Approval Order in the order of priority set forth therein; <u>provided</u> that the Borrower shall be permitted to request approval of the Bankruptcy Court to use such proceeds in accordance with Section 363 of the Bankruptcy Code so long as such uses are permitted under the Agreement and subject to the rights of parties in interest to contest such request.

Mandatory prepayments shall also be required to the extent that the sum of the Borrower's direct Tranche A borrowings <u>plus</u> the undrawn amount of outstanding Tranche A Letters of Credit (including unreimbursed draws) <u>plus</u> the aggregate outstanding amount of direct Tranche B Term Loan borrowings exceeds the lesser of (x) the Borrowing Base and (y) the aggregate Commitment in respect of the First Priority Facilities.  If, after giving effect to any such prepayment in full of direct borrowings under the First Priority Facilities, the sum of the undrawn amount of outstanding Letters of Credit (including unreimbursed draws) exceeds either the amount calculated in   clause (x) or clause (y) above, Cash Collateralization in the Letter of Credit Account is required in the amount of such excess.

<u>Optional Prepayment</u>:

Amounts may be prepaid in integral multiples of $1,000,000 without penalty (except for any breakage costs associated with LIBOR Loans) upon (x) same business day's notice for ABR Loans and (y) three business days' notice for LIBOR Loans.  Such optional prepayments shall be applied (A) <u>first</u>, at the Company's option, to (i) repay the outstanding Loans under the Revolving Facility (with no corresponding permanent reduction in the Revolving Facility Commitment) and (ii) repay the Tranche B Term Loan and (B) <u>second</u>, subsequent to the First Priority Payout Date and to the extent permitted by the Approval Order, to repay the Tranche C Term Loan.

<u>Conditions of Initial Extension of Credit</u>:

The obligation to provide the initial extension of credit shall be subject to the satisfaction (or waiver) of the following conditions:

(a)     Entry of an order of the Court in substantially the form set forth as an Exhibit to the Agreement (the "<u>Approval Order</u>") on an application or motion by the Borrower that is reasonably satisfactory in form and substance to the Agents, which Approval Order shall have been entered, approving the  transactions contemplated herein and granting the superpriority claim status and senior priming and other liens referred to above, which Approval Order (x) shall authorize the use of any cash collateral to the same extent as under the Existing DIP Order and provide for adequate protection in favor of the Primed Parties as set forth under "<u>Conditions to Priming and Use of Cash Collateral</u>" above, (y) shall approve the payment by the Borrower of all of the fees provided for herein and the Fee Letters referred to below and (z) shall

7

not have been vacated, reversed, modified, amended or stayed;

(b)    Receipt of closing documents (including security documents granting the liens in favor of the Administrative Agent contemplated hereby) reasonably satisfactory in form and substance to the Agents;

(c)    Legal opinion of counsel to the Borrower and the Guarantors in form and substance reasonably satisfactory to the Agents;

(d)    Receipt of such UCC searches (including tax liens and judgments) conducted in the jurisdictions in which the Borrower and the Guarantors are organized and conduct business as the Agent may reasonably request and as may reasonably be obtained (dated as of a date reasonably satisfactory to the Agents), reflecting the absence of liens and encumbrances on the assets of the Borrower and the Guarantors except as permitted under the Agreement and as may otherwise be reasonably satisfactory to the Agents;

(e)    There shall have been paid to the Agents all fees owed to the Agents, the Lenders and the Arrangers/Bookrunners as set forth in the Agreement and each Fee Letter dated the date hereof among the Company, each Lead Lender and its affiliated Arranger/Bookrunner (collectively, the "Fee Letters") and otherwise as referenced herein; and

(f)    All corporate and judicial proceedings and all instruments and agreements in connection with the transactions among the Borrower, the Guarantors, the Administrative Agent and the Lenders contemplated by the Agreement shall be reasonably satisfactory in form and substance to the Administrative Agent and the Administrative Agent shall have received all information and copies of all documents or papers reasonably requested by the Administrative Agent.

Conditions of Each Extension of Credit:    The obligation to provide each extension of credit (including the initial extension of credit) shall be subject to the satisfaction (or waiver) of the following conditions:

(a)    The Approval Order shall be in full force and effect, and shall not have been vacated, reversed, modified, amended or stayed, or modified or amended in a manner that the Agents reasonably determine to be adverse to the interests of the Agents and the Lenders without the prior written consent of the Administrative Agent and the Required Lenders;

(b)    No Event of Default and no condition which would constitute an Event of Default with the giving of notice or lapse of time or both shall exist;

(c)    Representations and warranties shall be true and correct in all material respects on and at the date of each extension of credit except to the extent such representations and warranties relate to an earlier date;

(d)    Receipt of a notice of borrowing from the Borrower;

(e)    Receipt by the Administrative Agent of a certificate evidencing calculations under the Borrowing Base (a "Borrowing Base

8

Certificate") dated no more than 30 days prior to the extension of credit (or seven (7) days during a Reduced Availability Period (as defined in the Agreement)), which Borrowing Base Certificate shall include supporting schedules as reasonably required by the Administrative Agent; and

(f)    The Borrower shall have paid the balance of all fees then payable as referenced in the Fee Letters and herein.

The request by the Borrower for, and the acceptance by the Borrower of, each extension of credit under the Agreement shall be deemed to be a representation and warranty by the Borrower that the conditions specified above have been satisfied or waived.

| | |
|---|---|
| <u>Representations and Warranties:</u> | Substantially as set forth in the Existing DIP Credit Agreement (with such modifications as may be necessary or appropriate to reflect the different circumstances of this Facility). |
| <u>Affirmative Covenants:</u> | Substantially as set forth in the Existing DIP Credit Agreement (with such modifications as may be necessary or appropriate to reflect the different circumstances of this Facility). |
| <u>Negative Covenants:</u> | Substantially as set forth in the Existing DIP Credit Agreement (with such modifications as may be necessary or appropriate to reflect the different circumstances of this Facility). |
| <u>Events of Default:</u> | Substantially as set forth in the Existing DIP Credit Agreement (with such modifications as may be necessary or appropriate to reflect the different circumstances of this Facility). |
| <u>Yield Protection and Increased Costs; Taxes:</u> | Customary provisions (a) protecting the Lenders against increased costs or loss of yield resulting from changes in reserve, tax, capital adequacy and other requirements of law and from the imposition of or changes in withholding or other taxes and (b) indemnifying the Lenders for "breakage costs" incurred in connection with, among other things, any prepayment of a LIBOR Loan on a day other than the last day of an interest period with respect thereto. |
| <u>Costs and Expenses; Indemnification:</u> | The Borrower shall pay or reimburse the Agents and the Arrangers/Bookrunners (a) all reasonable out-of-pocket fees and expenses of the Agents and Arrangers/Bookrunners associated with the syndication of the facilities contemplated hereby and the preparation, execution, delivery and administration of the Agreement and related documentation and any amendment, modification or waiver of the provisions thereof (including the reasonable fees, disbursements and other charges of one lead counsel and local counsel) and (b) all fees and expenses of the Agents (including the fees, disbursement and other charges of counsel) and the Lenders in connection with the enforcement of the Agreement and related documentation.<br><br>The Borrower shall also pay or reimburse the Agents and Arrangers/Bookrunners for reasonable fees and expenses of the Agents and Arrangers/Bookrunners and their internal and third-party auditors, appraisers and consultants incurred in connection with the Agent's (a) initial and ongoing Borrowing Base examinations, (b) analyses of the systems and processes of the |

9

Borrower and analyses and valuation of the Borrowing Base assets, (c) periodic field examinations and appraisals, (d) monthly and other monitoring of assets and (e) all reasonable fees and expenses in connection with the issuance, amendment, renewal or extension of any Letter of Credit.

All payments or reimbursements pursuant to the foregoing paragraphs shall be payable promptly upon written demand (together with backup documentation supporting such reimbursement request).

The Agents, the Arrangers/Bookrunners and the Lenders (and their respective affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, claims, damages or expense (including reasonable fees, charges, and disbursements of any counsel) incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except resulting from the bad faith, gross negligence or willful misconduct of the indemnified person as determined by a court of competent jurisdiction by final and nonappealable judgment).

| | |
|---|---|
| <u>Assignments and Participations</u>: | Agreement and Notes to be assignable by each of the Lenders to Eligible Assignees (as defined in the Agreement) subject to a minimum amount (unless otherwise agreed to by the Administrative Agent) of $1,000,000. Each assignment shall be (i) subject to the prior written consent (not to be unreasonably withheld ) of (x) the Administrative Agent, (y) in the case of an assignment of a Revolving Facility Commitment, the Issuing Lender, and (z) if after giving effect to such assignment, the assignee lender would have unused commitments and outstanding Loans equal to ten percent (10%) or more of the aggregate amount of the Facility, and so long as no Event of Default has occurred and is continuing, the Borrower and (ii) in the case of any assignment to a new lender after the primary syndication, made in consultation with the Borrower.  The Administrative Agent will receive a processing and recordation fee of $3,500 from each assignee with each assignment. Each assignment will be by novation. Each Lender shall have the right to sell participations in its loans, subject to customary voting limitations. Assignees and participants shall be entitled to the benefit of the yield protection and increased cost provisions referred to above only through proper notification to the Borrower and acceptance of the limitations imposed by the Agreement. |
| <u>Voting</u>: | Required Lenders (defined to mean Lenders holding at least a majority of the sum of the Revolving Facility Commitments <u>plus</u> outstanding borrowings under the Tranche B Term Loan), except as may be otherwise determined by the Agent and set forth in the Agreement. The Agreement will provide that if the Borrower requests an amendment which requires unanimous consent and such amendment is consented to by the Lenders holding at least 66-2/3% of (x) the sum of the Revolving Facility Commitments <u>plus</u> outstanding borrowings under the Tranche B Term Loan, (y) the sum of the Revolving Facility Commitments <u>plus</u> outstanding borrowings under the Tranche B Term Loan <u>plus</u> outstanding borrowings under the Tranche C Term Loan and (z) the affected tranche, if applicable, then with the consent of the Borrower and such requisite Lenders, the Agreement may be amended to replace the Lender(s) which did not consent to the amendment requested by the Borrower. |

10

| | |
|---|---|
| Agency: | Usual and customary agency provisions satisfactory to the Agents. |
| Documentation: | Reasonably satisfactory in form and substance to the Agents and the Borrower. |
| Governing Law: | New York, except as governed by the Bankruptcy Code. |
| Counsel to the Administrative Agent and Arrangers/Bookrunners: | Davis Polk & Wardwell |

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re                                     :    Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :    Case No. 05-44481 (RDD)
                                          :
                        Debtors.          :    (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 9014 6004(g)(I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION POST-PETITION FINANCING, (II) TO UTILIZE CASH COLLATERAL AND (III) GRANTING ADEQUATE PROTECTION TO AND (II) AUTHORIZING DEBTORS TO REFINANCE SECURED POST-PETITION FINANCING AND PREPETITION SECURED PARTIES DEBT

("FINAL DIP FINANCING REFINANCING ORDER")

Upon the motion, dated October 8, 2005 December 18, 2006 (the "Motion"), of

Delphi Corporation (the "Borrower") and certain of its subsidiaries and affiliates, debtors

and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for

interim and final orders an order under sections 105, 361, 362, 363(c), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11

U.S.C. §§ 101, 101-1330 as amended and in effect on October 8, 2005, et seq. (the

"Bankruptcy Code"), and Rules 2002, 4001 and 9014 6004(g) of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

(1)  authorization for the Borrower to obtain post -petition

financing (the "Financing") to refinance its existing debtor-in-possession

financing and certain pre-petition indebtedness of the Borrower, and for

all of the other Debtors (the "Guarantors") to guaranty the Borrower's

obligations in connection with the Financing, up to the aggregate principal

amount of $~~2,000,000,000~~4,495,820,240.59 (the actual available principal

amount at any time being subject to those conditions set forth in the DIP

Documents (as defined below)), pursuant to a credit facility with

JPMorgan Chase Bank, N.A. ("JPMCB"), acting as Administrative Agent

(in such capacity, the "Agent") for itself and a syndicate of financial

institutions (together with JPMCB and including the fronting and issuing

banks for the letters of credit, the "DIP Lenders"), and Citicorp USA, Inc.

("CUSA") as Syndication Agent for the First Priority Facilities (as defined

below), ~~to be arranged by~~ J.P. Morgan Securities Inc. ~~and~~("JPMorgan"),

Citigroup Global Markets, Inc. ~~(~~and Deutsche Bank Securities Inc. as Joint

Lead Arrangers for the First Priority Facilities (the "First Priority Facilities

Joint Lead Arrangers"), and JPMorgan as sole Lead Arranger for the

Tranche C Term Loan (as defined below) (the "Tranche C Lead

Arranger", and together with the First Priority Facilities Joint Lead

Arrangers, the "Joint Lead Arrangers");

(2)  authorization for the Debtors to execute and enter into the DIP

Documents and to perform such other and further acts as may be required

in connection with the DIP Documents;

(3)  the ~~granting of adequate protection to the lenders (the "Pre-~~
~~Petition Secured Lenders")~~use of certain proceeds of the Financing to (a)

irrevocably repay in full all outstanding loans under that certain Third

Amended and Restated Credit Agreement, dated as of June 14, 2005 (as

heretofore amended, supplemented or otherwise modified, the "Pre-

Petition Credit Agreement" and, together with the mortgages and all other

documentation executed in connection therewith, the "Existing Pre-

Petition Facility Documents"), among the Borrower, the several lenders

from time to time party thereto (the "Pre-Petition Secured Lenders"), and

JPMCB, as administrative agent for the Pre-Petition Secured Lenders (in

such capacity, the "Pre-Petition Agent"), and in connection with that

certain Guarantee and Collateral Agreement, (such repayment in full

referred to herein as the "Pre-Petition Facility Refinancing"), the

authorization of which constitutes an "Extraordinary Provision" under

General Order No. M-274 of the United States Bankruptcy Court for the

Southern District of New York (the "General Order"), and (b) irrevocably

repay in full all loans and other obligations under that certain Revolving

Credit, Term Loan and Guaranty Agreement dated as of June 14, 2005, by

the Borrower and certain of its subsidiaries, in favor of the Pre-Petition

AgentOctober 14, 2005 (as heretofore amended, supplemented or

otherwise modified, the "Guarantee and Collateral Agreement" and,

collectively with the Pre-PetitionExisting DIP Credit Agreement, and"

and, together with the mortgages and all other documentation executed in

connection therewith, the "Existing Agreements"), whose liens andDIP

Facility Documents") by and among the Borrower, the several lenders

from time to time party thereto (the "Existing DIP Lenders"), and JPMCB,

as administrative agent for the DIP Lenders (in such capacity, the "Existing DIP Agent") (such repayment in full, the "DIP Facility Refinancing", and together with the Pre-Petition Facility Refinancing, the "Refinancing"),

(4)  the continuation of certain adequate protection with respect to various parties, whose liens, security interests or setoff rights were primed by the Existing DIP Facility Documents and are being primed by some or all of the Financing;

(45)  continuation of the authorization for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) in which ~~the Pre-Petition Secured Lenders~~certain parties have an interest, and the granting of adequate protection to ~~the Pre-Petition Secured Lenders~~such parties with respect to, *inter alia*, such use of their cash collateral and all use and diminution in the value of their interest ~~in the Pre-Petition Collateral (as defined below)~~therein;

~~(5)  approval of certain stipulations by the Debtors with respect to the Existing Agreements and the liens and security interests arising therefrom, that are "Extraordinary Provisions" (each an "Extraordinary Provision") under General Order No. M-274 of the United States Bankruptcy Court for the Southern District of New York (the "General Order");~~

(6)  permission to accelerate Borrowings and the termination of the Commitments under the DIP Credit Agreement upon (a) a Change of Control (as each such term is defined in the DIP Credit Agreement) or (b)

the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any of the Guarantors which have a value in excess of $20 million in the aggregate, which are Extraordinary Provisions under the General Order; and

(7) subject and only effective upon the entry of a final order granting such relief, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code, which is an Extraordinary Provision under the General Order; and authorized under the Existing DIP Order (as hereinafter defined).

(8) pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order") (a) authorizing the Borrower, on an interim basis, to forthwith borrow or obtain letters of credit from the DIP Lenders under the DIP Documents up to an aggregate principal or face amount not to exceed $950,000,000 (subject to any limitations of borrowings under the DIP Documents), (b) authorizing the Debtors' use of cash collateral, and (c) granting the adequate protection described therein; and
(9) that this Court schedule a final hearing (the "Final Hearing") to be held within 45 days of the entry of the Interim Order to consider entry of a final order authorizing the balance of the borrowings and letter of credit issuances under the DIP Documents on a final basis, as set forth in

the Motion and the DIP Documents filed with this Court (the "Final

Order").

The Interim Hearing having been held by this Court on October 11, 2005, at

which the Court issued and entered the Interim Order among other things (a) authorizing

the Borrower to borrow or obtain letters of credit up to an aggregate principal or face

amount of $950,000,000 of the Financing from the DIP Lenders as provided for in the

Interim Order and (b) scheduling the Final Hearing to consider entry of an order

authorizing the balance of the Financing, all as set forth in the Motion, the Interim Order,

this Final Order and the loan documentation filed with this Court; and

The Final Hearing having been held by this Court on October 27, 2005 at 10:00

a.m.; and

Due and appropriate notice of the Motion, and the relief requested therein, the

Interim Hearing and the Final Hearing having been served by the Debtors on the fifty

largest unsecured creditors of the Debtors, on the Agent, the DIP Lenders, the Prepetition

Agent, the Prepetition Secured Lenders, the indenture trustee for the Debtors' senior

noteholders, known holders of prepetition liens against the Debtors' property and the

United States Trustee for the Southern District of New York; and in accordance with the

Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R.

Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And

Certain Notice, Case Management, And Administrative Procedures, entered by this Court

on October 26, 2006.

Objections to the Motion having been filed by Bank of America Leasing &

Capital (Docket Nos. 70 and 565), LLC, the Ad Hoc Committee of Prepetition Secured

Lenders (Docket Nos. 101 and 553), Venture Plastics, Inc. (Docket No. 436), Gibbs Die

Casting Corporation (Docket No. 455), DaimlerChrysler Corporation (Docket No. 450),

Mercedes-Benz U.S. International, Inc. (Docket No. 436), Autocam Corporation (Docket

No. 459), Lorentson Manufacturing Company Southwest, Inc. (Docket No. 461),

Lorentson Manufacturing Company, Inc. (Docket No. 458), Calsonic Kansei North

America, Inc. (442), Decatur Plastic Products, Inc. (Docket No. 451), Pension Benefit

Guaranty Corporation (Docket No. 437), Ford Motor Company (Docket Nos. 495 and

623), Freescale Semiconductor, Inc. (Docket No. 501), Nissan North America, Inc.

(Docket No. 503), Fujikura America, Inc. (Docket Nos. 506 and 648), Murata Electronics

North America, Inc. (Docket Nos. 507 and 649), Flextronics International Asia Pacific

Ltd. and Flextronics Technology (M) Sdn. Bhd. (Docket No. 511) Multek Flexible

Circuits, Inc., Sheldahl de Mexico S.A. de C.V. and Northfield Acquisition Co. (Docket

No. 512) , Omega Tool Corp., L&W Engineering Co., Southtec, LLC, DOTT Industries,

Inc., ALPS Automotive, Inc., Pioneer Automotive Technologies, Inc., Lakeside Plastics

Limited, Android Industries, Inc., Ai-Doraville, LLC, and Ai-Genesee, LLC (Docket No.

551), Honda of America Manufacturing, Inc. (Docket No. 577), OSRAM Opto

Semiconductors Inc. (Docket No. 589), Worthington Steel Company and Worthington

Steel of Michigan, Inc. (Docket No. 590), Hitachi Automotive Products (Docket No.

591), National Molding Corp. and Security Plastics Division/NMC, LLC (Docket No.

600), Arneses Electronics Automotrices, S.A. de C.V. and Cordaflex, S.A. de C.V.

(Docket No. 619), Neuman Aluminum Automotive, Inc., Neuman Aluminum Impact

Extrusion, Inc. (Docket No. 631), Magna International, Inc. and certain of its foreign and

domestic affiliates (Docket No. 632), A. Schulman, Inc. (Docket No. 634), the Creditors'

Committee (as hereinafter defined) (Docket No. 641), Textron Fastening Systems, Inc.

(Docket No. 643), ARC Automotive, Inc. (Docket No. 646), XM Satellite Radio Inc.

(Docket No. 651), General Motors Corporation (Docket No. 658), Benteler Automotive

Corp. (Docket No. 695), Pentastar Aviation, LLC (Docket Nos. 683 and 684) Lear

7

Corporation (Docket Nos. 676 and 678), American Axle & Manufacturing, Inc. (Docket Nos. 679 and 682), Robert Bosch Corporation  (Docket No. 428) and Semiconductor Components Industries, LLC (Docket No. 701)[1] (and any other objections filed or raised at the Final Hearing, collectively, the "Objections"); and

A hearing on the Motion having been held by this Court on January 5, 2007 at 10:00 a.m. (the "Hearing");

Upon the record made by counsel to the Debtors at the Interim Hearing and the Final Hearing, including the representations and clarifications on the record by counsel to the Debtors and for the Agent and the Pre-Petition Agent; and all Objections having been resolved on the recordHearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Under the circumstances, the notice given by the Debtors of the Motion, the Interim Hearing, and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

3.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but subject to the limitations thereon and the reservation of the Debtors' rights contained in paragraph 16 below), the Debtors, for themselves and not for their estates, admit, stipulate, and agree that:

---

[1]    Inclusive of objections filed prior to 11:00 p.m. on October 26, 2005.

(a)      (i) as of the filing of the Debtors' chapter 11 petitions (the "Petition Date"), (x) the Borrower was indebted and liable to the Pre-Petition Secured Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $2,488,329,620.59 in respect of loans made and in the aggregate face amount of approximately $91,453,431.26 in respect of letters of credit issued, in each case, by the Pre-Petition Secured Lenders pursuant to, and in accordance with the terms of, the Existing Agreements, plus, in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Existing Agreements), charges and other obligations incurred in connection therewith including, without limitation, amounts owing under "Specified Swap Agreements" (as defined in the Pre-Petition Credit Agreement), as provided in the Existing Agreements (collectively, the "Pre-Petition Debt"), and (y) each Debtor other than the Borrower was contingently liable to the Pre-Petition Secured Lenders in respect of the Pre-Petition Debt owing by the Borrower pursuant to the Guarantee and Collateral Agreement, (ii) the Pre-Petition Debt constitutes the legal, valid and binding obligation of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (iii) no portion of the Pre-Petition Debt is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iv) the Debtors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Pre-Petition Secured

Lenders, the Pre-Petition Agent and their respective affiliates, subsidiaries, agents, officers, directors, employees and attorneys;

(b)    the liens and security interests granted to the Pre-Petition Agent pursuant to and in connection with the Existing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust, control agreements and other security documents executed by any of the Debtors in favor of the Pre-Petition Agent, for its benefit and for the benefit of the Pre-Petition Secured Lenders) in connection with the Existing Agreements, are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the personal and real property constituting "Collateral" (as defined in the Existing Agreements) immediately prior to the Petition Date (the "Pre-Petition Collateral"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens permitted under the Existing Agreements to the extent such permitted liens are senior to or pari passu with the liens of the Pre-Petition Agent on the Pre-Petition Collateral; and

(c)    the aggregate value of the Pre-Petition Collateral substantially exceeds the aggregate amount of the Pre-Petition Debt.

3.    4.  *Findings Regarding The Financing.*

(a)    Good cause has been shown for the entry of this ~~Final~~ Order.

(b)    The Debtors require the ~~remainder~~proceeds of ~~the~~this Financing and use of Cash Collateral (as defined below) in order to reduce their cost of financing

and to permit, among other things, the orderly continuation of the operation of their
businesses, to maintain business relationships with vendors, suppliers and customers, to
make payroll, to make capital expenditures and to satisfy other working capital and
operational needs.  The reduction in financing costs together with continued access of the
Debtors to sufficient working capital and liquidity through the use of Cash Collateral,
incurrence of new indebtedness for borrowed money and other financial accommodations
is vital to the preservation and ~~maintenance~~enhancement of the going concern values of
the Debtors and to a successful reorganization of the Debtors.

   (c)  The Debtors are unable to obtain financing on more favorable
terms from sources other than the DIP Lenders under the DIP Documents and are unable
to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy
Code as an administrative expense.  The Debtors are also unable to obtain adequate
secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the
Bankruptcy Code without the Debtors granting to the Agent and the DIP Lenders, subject
to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as
defined below) under the terms and conditions set forth in ~~the Interim Order,~~ this Order
and in the DIP Documents.

   (d)  The terms of the Financing and the use of Cash Collateral are fair
and reasonable, reflect the Debtors' exercise of prudent business judgment consistent
with their fiduciary duties and constitute reasonably equivalent value and fair
consideration.

   (e)  The Financing has been negotiated in good faith and at arm's
length between the Debtors, the Agent and the DIP Lenders, and all of the Debtors'

11

obligations and indebtedness arising under, in respect of or in connection with the

Financing and the DIP Documents, including without limitation, (i) all loans made to, and

all letters of credit issued for the account of, the Debtors pursuant to the Revolving

Credit, Term Loan and Guaranty Agreement ~~substantially in the form attached as Exhibit~~

~~A to the Motion, as amended by the Amendment No. 1 thereto dated as of October 27,~~

~~2005,~~, a copy of which was filed with the Court prior to commencement of the ~~Final~~

Hearing ~~(as so amended,~~ the "DIP Credit Agreement"), and (ii) any "Obligations" and all

other "Secured Obligations" (as each such term is defined in the DIP Credit Agreement),

including any hedging obligations of the Debtors permitted under the DIP Credit

Agreement and any Indebtedness (as defined in the DIP Credit Agreement) permitted by

Section 6.03(viii) thereof, in each case owing to JPMCB, any DIP Lender or any of their

respective banking affiliates (all of the foregoing in clauses (i) and (ii) collectively,  the

"DIP Obligations"), shall be deemed to have been extended by the Agent and the DIP

Lenders and their affiliates in good faith, as that term is used in section 364(e) of the

Bankruptcy Code and in express reliance upon the protections offered by section 364(e)

of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of

the Bankruptcy Code in the event that this Order or any provision hereof is vacated,

reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested entry of this Order pursuant to

Bankruptcy Rules 4001(b)(2), 4001(c)(2) and 6004(g).

(g)     ~~(f) The Debtors have requested entry of this Order pursuant to~~

~~Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief sought by this~~

~~Order, the Debtors' estates will be immediately and irreparably harmed.~~

12

~~Consummation~~ For the reasons set forth in the Motion and based on the evidence presented at the Hearing, consummation of the Financing and the use of Cash Collateral in accordance with this Order and the DIP Documents is ~~therefore~~ in the best interest of the Debtors' estates.

4.    ~~5.~~ *Authorization Of The Financing And The DIP Documents.*

(a)    The Debtors are hereby authorized to be a party to the DIP Documents.  The Borrower is hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrower's obligations with respect to such letters of credit, up to an aggregate principal or face amount ~~, inclusive of amounts authorized by the Interim Order, of $2,000,000,000~~ of $4,495,820,240.59 (plus interest, fees and other expenses provided for in the DIP Documents), subject to any limitations of borrowings under the DIP Documents, and in accordance with the terms of this Order and the DIP Documents, which shall be used solely for purposes permitted under the DIP Documents, including, without limitation, (i) with respect to the the Tranche A Loan and the Tranche B Loan (as each such term is defined in the DIP Credit Agreement, as hereinafter defined, referred to herein as the "Tranche A Loan" and "Tranche B Loan", respectively, and collectively as the "First Priority Facilities"), for the DIP Facility Refinancing and to provide working capital for the Borrower and the Guarantors and for other general corporate purposes and to pay interest, fees and expenses in accordance with this Order and the DIP Documents and (ii) with respect to the Tranche C Loan (as defined in the DIP Credit Agreement, the "Tranche C Loan"), for the Pre-Petition Facility Refinancing. In addition to such loans and obligations, the Debtors are authorized to incur overdrafts

and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by JPMCB, CUSA, or any other DIP Lender or any of their respective affiliates; *provided, however*, that nothing herein shall require JPMCB or CUSA or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement) and the mortgages, if any, contemplated thereby (collectively, and together with the letter agreements referred to in clause (iiiiv) below, the "DIP Documents");:

(ii)    the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that (A)(A) no further approval of

14

the Court shall be required for amendments to the DIP Credit Agreement that do not (i) shorten the maturity of the extensions of credit thereunder, (ii) increase the commitments, the rate of interest or the letter of credit fees payable thereunder, (iii) amend the financial covenants in Section 6.04 therein to be more restrictive on the Debtors or (iv) amend the notice provisions of Section 7.01 therein (i.e., notice of exercise of remedies after the occurrence of an Event of Default), and (B)(B) the Debtors shall provide the official committee of unsecured creditors (the "Creditors' Committee") with five (5) business days' prior notice (or such shorter period as the Creditors' Committee and the Debtors may agree) of any amendment to the DIP Credit Agreement that causes the Borrowing Base to be decreased). Notwithstanding any other provision hereof, without further approval of this Court, amendments to the DIP Documents may be made at any time (x) prior to the Successful Syndication (as defined in the Second Amended and Restated Fee Letter dated October 27, 2005 among the Borrower, JPMCB and the Joint Lead Arrangers (the "Fee Letter")), to the extent contemplated by the Fee Letter (permitting certain modifications to the DIP Credit Agreement necessary or advisable to ensure a successful syndication), and (y) as contemplated by the DIP Credit Agreement with respect to the Borrowing Base Amendment.:

In addition, Section 2.13 of the DIP Credit Agreement shall be amended to provide for the application of net cash proceeds from asset sales to be subject to mandatory prepayments and permanent reductions of commitments under the Facility or to be held in a cash collateral account maintained with the DIP Agent for the benefit of holders of the liens and claims granted hereunder in the manner set forth below. Notwithstanding anything to the contrary in this Order or the DIP Credit Agreement, the

amendments to Section 2.13 of the DIP Credit Agreement set forth in this paragraph 5(b)(iii), (x) are intended, in part, for the benefit of the Pre-Petition Agent and the Pre-Petition Secured Lenders, (y) may be enforced by the Pre-Petition Agent and the Pre-Petition Secured Lenders as though they were parties to the DIP Credit Agreement solely for such purposes and (z) shall survive and remain in full force and effect regardless of the permanent repayment in full of the DIP Obligations or the termination of the DIP Credit Agreement or any provision hereof.  This paragraph 5(b)(iii) shall not be amended, supplemented, waived or otherwise modified without the prior written consent of the Pre-Petition Agent.  Specifically, Section 2.13 will be amended to (i) reorder subsection "(b)" to be subsection "(c)" and (ii) adding a new subsection (b) to read as follows:

"If on any date the Borrower or any Guarantor shall receive Net Cash Proceeds from (i) any Asset Sale or (ii) any Recovery Event (except to the extent that Net Cash Proceeds received in connection with such Recovery Event are applied within 180 days of receipt thereof to the replacement or repair of the assets giving rise thereto), and in each case, the aggregate amount of all Net Cash Proceeds from Asset Sales and Recovery Events received by the Borrower and the Guarantors from Asset Sales and Recovery Events occurring on and after the Closing Date exceeds $125,000,000 then (without duplication of any reduction to the Borrowing Base as a result of such Asset Sale or Recovery Event), an amount equal to 66-2/3% of such Net Cash Proceeds received on such date shall be promptly, and in any event, within 10 days after such date either (i) first, applied to the prepayment of the Tranche B Loans (with a corresponding permanent reduction of the Total Tranche B Commitments) and second, applied to the prepayment of the Tranche A Loans (with a corresponding permanent reduction of the Total Tranche A Commitments) or (ii) deposited into a cash collateral account maintained with the DIP Agent for the benefit of the holders of Liens and claims granted under the Final DIP Order in the order of priority set forth therein; *provided* that the Borrower shall be permitted to request approval of the Bankruptcy Court to use such proceeds in accordance with Section 363 of the Bankruptcy Code so long as such uses are permitted under the DIP Credit Agreement and subject to the rights of parties in interest to contest such request."

The following related definitions will also be added to the DIP Credit Agreement:

"Asset Sale":  any Disposition of property or series of related Dispositions of property by the Borrower or any Guarantor (excluding any such Disposition permitted by clauses (i), (ii), (iii), (v), (vii) and (viii) of Section 6.10).

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment (other than for security or collection in the ordinary course of business), conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Net Cash Proceeds":  in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Permitted Investments, net of attorneys' fees, accountants' fees, investment banking fees, commissions, premiums, amounts required to be applied to the repayment of Indebtedness secured by a Lien permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien pursuant to the Security and Pledge Agreement) and other customary fees and expenses actually incurred in connection therewith and net of taxes paid or reasonably estimated to be payable as a result thereof (after taking into account any available tax credits or deductions and any tax sharing arrangements) and a reasonable reserve for purchase price adjustments and indemnification payments that could reasonably be expected to arise during the term of the Tranche A Loans and the Tranche B Loans; *provided* that in the case of any Asset Sale or Recovery Event in respect of which the Net Cash Proceeds do not exceed $2,500,000, such Net Cash Proceeds shall not be deemed to constitute "Net Cash Proceeds" for purposes of Section 2.13 until the aggregate amount of all such excluded Net Cash Proceeds is at least $10,000,000.

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of the Borrower or any Guarantor, in each case in an amount in excess of $5,000,000.

(iii)    the non-refundable payment to the Agent, the Joint Lead Arrangers or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing) and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals retained as provided for in the DIP Documents; and

(iv)     the performance of all other acts required under or in connection with the DIP Documents.

(c)     The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents.  No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.     6. *Superpriority Claims.*

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations, as defined in the Existing DIP Order, referred to herein as the "Adequate Protection Obligations"), Replacement Liens and Junior Adequate Protection Liens (each as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (other than to the extent of any statutory liens or security interests arising after the filing of the Debtors'

18

chapter 11 petitions (the "Petition Date") and permitted under the DIP Credit Agreement

that by operation of law would have priority over a previously perfected security

interest), which allowed claims shall be payable from and have recourse to all pre-

petition and post-petition property of the Debtors and all proceeds thereof, subject only to

the payment of the Carve Out to the extent specifically provided for herein; *provided,*

*however,* that (i) the Superpriority Claims in respect of the First Priority Facilities shall

be senior in priority to the Superpriority Claims in respect of the Tranche C Loan, and (ii)

the Superpriority Claims granted hereunder shall remain subject and subordinate to any

Superpriority Claims arising under the Existing DIP Order (as defined therein) until such

Superpriority Claims under the Existing DIP Order have been irrevocably paid in full.

> (b)     For purposes hereof, the "Carve Out" means (i) all unpaid fees

required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United

States Trustee under section 1930(a) of title 28 of the United States Code, (ii)(ii) all fees

and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii)(iii)

after the occurrence and during the continuance of an Event of Default (as defined in the

DIP Credit Agreement), all allowed and unpaid professional fees and disbursements

incurred by the Debtors and any statutory committees appointed in the Cases (each, a

"Committee"), and Transaction Expenses (as defined in the Equity Purchase and

Commitment Agreement (the "EPCA"), a copy of which is attached to the Expedited

Motion For Order Authorizing And Approving The Equity Purchase And Commitment

Agreement Pursuant To Sections 105(A), 363(B), 503(B) And 507(A) Of The

Bankruptcy Code And The Plan Framework Support Agreement Pursuant To Sections

105(A), 363(B), And 1125(E) Of The Bankruptcy Code (the "Plan Investment And

Framework Support Approval Motion"), filed concurrently with the DIP Refinancing Motion) incurred from and after the date that an order is entered approving the EPCA (the "Post-Order Transaction Expenses"), that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding $35,000,000, which amount may be used subject to the terms of this Order, including, without limitation, paragraph 17 14 hereof, and (iv) (iv) all unpaid professional fees and disbursements incurred or accrued by the Debtors and any Committees, and Post-Order Transaction Expenses, in each case incurred or accrued at any time when no Event of Default is continuing (and promptly upon receipt of a notice of an Event of Default, the Debtors shall provide a copy of such notice to counsel for the Creditors' Committee), that remain unpaid subsequent to the payment, pro rata with other nonpriority administrative creditors, of such fees and expenses and Post-Order Transaction Expenses from available funds remaining in the Debtors' estates for such creditors, in an aggregate amount not exceeding the sum of (x) such unpaid professional fees and disbursements, and Post-Order Transaction Expenses, reflected on the most recent Borrowing Base Certificate (as defined in the DIP Credit Agreement) delivered to the Agent prior to any Event of Default that is then continuing and (y) such unpaid professional fees and disbursements, and Post-Order Transaction Expenses, incurred or accrued after such Borrowing Base Certificate (but at a time when no Event of Default is continuing) in an aggregate amount under this clause (y) not exceeding $5,000,000 (and with amounts included in this clause (y), to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each

20

of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed by the Bankruptcy

Court at any time; *provided*, *however*, that (1) to the extent the dollar limitation in this

clause 65(b) on fees and disbursements and Post-Order Transaction Expenses is reduced

by any amount as a result of the payment of fees and disbursements and Post-Order

Transaction Expenses during the continuance of an Event of Default, and such Event of

Default is subsequently cured or waived and no other Event of Default then exists, then

effective as of the effectiveness of such cure or waiver, such dollar limitation shall be

increased by an amount equal to the amount by which it has been so reduced and (2) (A)

(A) nothing herein shall be construed to impair the ability of any party to object to any of

the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv)

above and (B)(B) following the Termination Date (as defined in the DIP Credit

Agreement), cash or other amounts on deposit in the Letter of Credit Account (as defined

in the DIP Credit Agreement), shall not be subject to the Carve Out.

     6.     7. *DIP Liens.*

     As security for the DIP Obligations, effective and perfected upon the date of entry

of the Interim Order occurrence of the Closing Date (as defined in the DIP Credit

Agreement) and the Refinancing (the "Refinancing Date", at which time all liens,

mortgages and security interests under the Existing DIP Facility Documents and the

Existing Pre-Petition Facility Documents shall be deemed released and of no further force

or effect) and without the necessity of the execution, recordation of filings by the Debtors

of mortgages, security agreements, control agreements, pledge agreements, financing

statements or other similar documents, the following security interests and liens are

hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all

property identified in clauses (a), (b) and (c) below being collectively referred to as the
"Collateral"), subject, only in the event of the occurrence and during the continuance of
an Event of Default, to the payment of the Carve Out (all such liens and security interests
granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to
this Order and the DIP Documents, the "DIP Liens"; the DIP Liens securing the First
Priority Facilities, the "First Priority DIP Liens"; and the DIP Liens securing the Tranche
C Loan, the "Second Priority DIP Liens"):

        (a)    First Lien On Cash Balances And Unencumbered Property.
Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,
enforceable, fully-perfected first priority senior security interest in and lien upon all pre-
petition and post-petition property of the Debtors, whether existing on the Petition Date
or thereafter acquired, to the extent not subject to valid, perfected, non-avoidable and
enforceable liens in existence as of the ~~Petition Date or valid liens in existence as of the
Petition Date that are perfected subsequent to such date to the extent permitted by section
546(b) of the Bankruptcy Code~~Refinancing Date (after giving effect to the release of
liens occurring at such time) (collectively, "Unencumbered Property"), including without
limitation, all cash and cash collateral of the Debtors (whether maintained with the Agent
or otherwise) and any investment of such cash and cash collateral, inventory, accounts
receivable, other rights to payment whether arising before or after the Petition Date,
contracts, properties, plants, equipment, general intangibles, documents, instruments,
interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other
intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing,
*provided*, *however*, that the Borrower and the Guarantors shall not be required to pledge

22

to the Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries
or any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good
faith judgment of the Borrower, adverse tax consequences would result to the Borrower).
Unencumbered Property shall exclude the Debtors' claims and causes of action under
sections 502(d), 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code, or any
other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"),
and any proceeds or property recovered, unencumbered or otherwise the subject of
successful Avoidance Actions.

      (b)     ~~Liens~~ Priming ~~Pre-Petition Secured Lenders'~~ Liens.  Pursuant to
section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable,
fully-perfected first priority senior priming security interest in and lien upon all pre-
petition and post-petition property of the Debtors (including, without limitation, cash
collateral, inventory, accounts receivable, other rights to payment whether arising before
or after the Petition Date, contracts, properties, plants, equipment, general intangibles,
documents, instruments, interests in leaseholds, real properties, patents, copyrights,
trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the
proceeds of all the foregoing), whether now existing or hereafter acquired, that is subject
to the existing liens ~~presently securing the Pre-Petition Debt (including in respect of~~
~~issued but undrawn letters of credit).~~ remaining after the occurrence of the Refinancing
Date that pursuant to the terms of the order of this Court dated October 28, 2005
approving the Borrower's and the Guarantors' entry in the Existing DIP Facility
Documents (the "Existing DIP Order") are subject and subordinate to the DIP Liens as
defined in the Existing DIP Order (the "Existing DIP Liens"), including, without

                                        

limitation, all Replacement Liens and Debtor Liens (as each such term is defined in the Existing DIP Order), and any other liens granted under the Existing DIP Order (collectively, the "Primed Liens").  Such security interests and liens shall be senior in all respects to the interests in such property of the ~~Pre-Petition Secured Lenders arising from current and future liens of the Pre-Petition Secured Lenders (including, without limitation, adequate protection liens granted hereunder)~~holders of the Primed Liens in respect thereof, and shall be subject and subordinate to (i) the Carve Out (except as provided in paragraph ~~6~~5 hereof), (ii) any valid, perfected and unavoidable interests of other parties arising out of liens existing on the Refinancing Date, if any, on such property ~~existing immediately prior to the Petition Date~~, that pursuant to the terms of the Existing DIP Order are senior in priority to the Existing DIP Liens and (iii) ~~any valid, perfected and unavoidable interests in such property arising out of liens to which the liens of the Pre-Petition Secured Lenders become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code and (iv)~~ statutory liens or security interests arising after the ~~Petition~~Refinancing Date and permitted under the DIP Credit Agreement that by operation of law would have priority over a previously perfected security interest.  In addition, notwithstanding anything to the contrary contained in this paragraph 6(b), any valid, perfected and non-voidable liens or security interests that remain in existence after the Refinancing Date and that were senior to or *pari passu* with the liens securing the Pre-Petition Secured Facility prior to the Refinancing Date (including, without limitation, to the extent provided in paragraph 15 of this Order, the Replacement Liens and Junior Adequate Protection Liens) shall maintain such priority or *pari passu* position relative to the liens securing the Tranche C Loan.

24

(c)    <u>Liens Junior To Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon all pre-petition and post-petition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph ~~7~~,6, as to which the liens and security interests in favor of the Agent will be as described in such clauses), whether now existing or hereafter acquired, that <u>as of the Refinancing Date</u> is subject to valid, perfected and unavoidable liens ~~and, as to Pre-Petition Payables and Setoffs (each as defined below) in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code~~, which security interests and liens in favor of the Agent and the Lenders are junior to such valid, perfected and unavoidable liens ~~and Setoffs~~.

(d)    <u>Liens Senior To Certain Other Liens</u>.  The DIP Liens, the ~~Adequate Protection Liens, the~~ Replacement Liens and the Junior Adequate Protection Liens (each as defined below) shall not be subject or subordinate to (i) solely in the case of the DIP Liens, any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the ~~Petition~~Refinancing Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than with respect to any liens or security interests arising after the ~~Petition~~Refinancing Date and permitted under the DIP Credit Agreement to be senior to the DIP Liens.

25

7.        8. Protection Of DIP Lenders' Rights.

(a)        So long as there are any borrowings or letters of credit or other

amounts (other than contingent indemnity obligations as to which no claim has been

asserted when all other amounts have been paid and no letters or credit are outstanding)

outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit

Agreement) under the DIP Credit Agreement, the Existing DIP Agent, the Existing DIP

Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, the holders of

Replacement Liens, the holders of Junior Adequate Protection Liens and the holders of

Debtor Liens (as defined below) shall (i) take no action to foreclose upon or recover in

connection with the liens granted thereto pursuant to the Existing Agreements Pre-Petition

Facility Documents, the Existing DIP Order or this Order, or otherwise exercise remedies

against any Collateral, except to the extent authorized by an order of this Court and (ii) be

deemed to have consented to any release of Collateral authorized under the DIP

Documents, provided that the Pre-Petition Agent and any Pre-Petition Secured Lender

may appear and be heard as a party in interest in connection with any proceeding relating

to the sale, transfer or other disposition of any Collateral and (iii) not file any further

financing statements, trademark filings, copyright filings, mortgages, notices of lien or

similar instruments, or otherwise take any action to perfect their security interests in the

Collateral unless solely as to this clause (iii), the DIP Lenders file financing statements or

other documents to perfect the liens granted pursuant to this Order, or as may be required

by applicable state law to continue the perfection of valid and unavoidable liens or

security interests as of the Petition Date. Notwithstanding the foregoing, the Pre-Petition

Secured Lenders shall be permitted to file pleadings with respect to any proposed sale,

transfer or other disposition of the Collateral by the Debtors outside the ordinary course of business so long as such pleadings do not contravene the provisions of this paragraph 87 and do not otherwise interfere with the exercise of any right or remedy by the Agent or the DIP Lenders.  Nothing herein shall be read to permit the Pre-Petition Agent, the Pre-Petition Secured Lenders, or the holders of Replacement Liens, the holders of Junior Adequate Protection Liens or the holders of Debtor Liens to take any action in violation of the Bankruptcy Code or other applicable law.  This paragraph 87(a) defines the relative rights of the DIP Agent and the DIP Lenders, on the one hand, and the Pre-Petition Agent and the Pre-Petition Secured Lenders, on the other, and is not intended to confer any rights on the Debtors except with respect to the Debtor Liens.

(b)      The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents other than those rights and remedies against the Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of five business days prior written notice to the extent provided for in the DIP Credit Agreement (promptly upon receipt of such notice, the Debtors shall provide a copy of such notice to counsel for the Creditors' Committee), all rights and remedies against the Collateral provided for in the DIP Documents (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the Agent or any DIP Lender).  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is

27

continuing, and the Debtors, the Existing DIP Agent, the Pre-Petition Agent, the Pre-Petition Secured Lenders, and the holders of Replacement Liens or Junior Adequate Protection Liens hereby waive in such capacities, but not in capacities as holders of general unsecured claims, their right to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Agent or the DIP Lenders set forth in this Order or the DIP Documents.  In no event shall the Agent, the DIP Lenders, the Existing DIP Agent, the Pre-Petition Agent, the Pre-Petition Secured Lenders, or the holders of Replacement Liens or Junior Adequate Protection Liens be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

8.    9. *Limitation On Charging Expenses Against Collateral.*  Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent, the Existing DIP Agent or the Pre-Petition Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent, the DIP Lenders, the Existing DIP Agent, the Pre-Petition Agent or the Pre-Petition Secured Lenders.

10.    *The Cash Collateral.*  To the extent any funds of any Debtor party to the Existing Agreements (other than funds in accounts subject to lock-box arrangements under the Debtors' receivables financing) were on deposit with the Pre-Petition Secured Lenders as of the Petition Date, including, without limitation, all such funds deposited in,

28

~~or credited to, an account of any Debtor party to the Existing Agreements with any Pre-Petition Secured Lender immediately prior to the filing of the Debtors' bankruptcy petitions (the "Petition Time") (regardless of whether, as of the Petition Time, such funds had been collected or made available for withdrawal by any such Debtor), such funds (the "Deposited Funds") are subject to rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of such Pre-Petition Secured Lenders pursuant to sections 506(a) and 553 of the Bankruptcy Code.  The Pre-Petition Secured Lenders are obligated, to the extent provided in the Existing Agreements, to share the benefit of such liens and setoff rights with the other Pre-Petition Secured Lenders party to such Existing Agreements.  The cash of the Debtors party to the Existing Agreements, including, without limitation, the Deposited Funds or any other funds on deposit at the Pre-Petition Secured Lenders as of the Petition Date, and any proceeds generated by the collection of accounts receivable, sale of inventory or other disposition of the Pre-Petition Collateral are cash collateral of the Pre-Petition Secured Lenders within the meaning of section 363(a) of the Bankruptcy Code, and all such "cash collateral" is referred to herein as "Cash Collateral."  The Pre-Petition Secured Lenders have objected to the use by the Debtors of the Pre-Petition Collateral, including Cash Collateral, except on the terms of this Order.~~

9.  ~~11.~~ *Use Of Cash Collateral.*  The Debtors are hereby authorized to use all Cash Collateral <u>(as defined in the Existing DIP Order)</u> of the Pre-Petition Secured Lenders and of the holders of Replacement Liens or Junior Adequate Protection Liens, and the Pre-Petition Secured Lenders and the holders of Replacement Liens or Adequate Protection Liens <u>(as defined in the Existing DIP Order)</u> are directed promptly to turn over

29

to the Debtors all Cash Collateral received or held by them, provided that, until the Refinancing Date, the Pre-Petition Secured Lenders and the holders of Replacement Liens or Adequate Protection Liens are granted adequate protection as ~~hereinafter~~ set forth in the Existing DIP Order.  The Debtors' right to use Cash Collateral shall terminate automatically upon the occurrence of the Termination Date or the voluntary reduction by the Borrower of the Total Commitments to zero (as each such term is defined in the DIP Credit Agreement).

~~12.    *Adequate Protection*.  The Pre-Petition Secured Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in the value of their interest in the Pre-Petition Secured Lenders' Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Agent's security interests and liens in the Pre-Petition Collateral by the Agent and the DIP Lenders pursuant to the DIP Documents and this Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  As adequate protection, the Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted the following (collectively, the "Adequate Protection Obligations"), to the extent of such diminution:~~

~~(a)    Adequate Protection Liens.  As security for the payment of the Adequate Protection Obligations, the Pre-Petition Agent (for itself and for the benefit of the Pre-Petition Secured Lenders) is hereby granted (effective and perfected as of the~~

Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and lien upon all the Collateral, subject and subordinate only to (i) the security interests and liens granted to the Agent for the benefit of the DIP Lenders in this Order and pursuant to the DIP Documents and any liens on the Collateral to which such liens so granted to the Agent are junior, (ii) the Replacement Lien (as hereinafter defined) and (iii) the Carve Out, *provided* that the security interest in and lien granted to the Pre-Petition Agent pursuant to this paragraph 12(a) upon Collateral that is not (x) Pre-Petition Collateral or (y) Collateral that would have constituted Pre-Petition Collateral but for the operation of section 552(a) of the Bankruptcy Code as to which, without further action, the Pre-Petition Agent would have had a valid and perfected security interest or lien shall be *pari passu* with the Junior Adequate Protection Liens granted to any Setoff Claimant in such Collateral pursuant to this Order (the "Adequate Protection Liens");

(b)    Section 507(b) Claim.  The Pre-Petition Agent and the Pre-Petition Secured Lenders are hereby granted, subject to the payment of the Carve Out and to the payment of all reasonable fees, costs and expenses (including the professional fees and expenses) incurred by or on behalf of the Debtors' estates in the pursuit of Avoidance Actions, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code equal in priority to the priority granted to the Setoff Claimants in paragraph 18(b) below, limited in amount to the aggregate diminution in value of the Pre-Petition Secured Lenders' interest in the Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value)

31

of Cash Collateral and any other Pre-Petition Collateral, the priming of the Pre-Petition Agent's security interests and liens in the Pre-Petition Collateral by the Agent and the DIP Lenders pursuant to the DIP Documents and this Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, immediately junior to the claims under section 364(c)(1) of the Bankruptcy Code held by the Agent and the DIP Lenders; *provided*, *however*, that the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Existing Agreements unless and until the DIP Obligations have indefeasibly been paid in cash in full;

(c)    Interest, Fees, And Expenses.  The Pre-Petition Agent shall receive from the Debtors (i) immediate cash payment of all accrued and unpaid interest on the Pre-Petition Debt and letter of credit fees at the non-default contract rates provided for in the Existing Agreements, and all other accrued and unpaid fees and disbursements payable to or for the benefit of the Pre-Petition Agent under the Existing Agreements and incurred prior to the Petition Date, including, but not limited to, reasonable fees owed and amounts to be paid or reimbursed for counsel, financial and other consultants for the Pre-Petition Agent pursuant to Section 10.6 of the Pre-Petition Credit Agreement, (ii) current cash payments of all fees and expenses payable to the Pre-Petition Agent under the Existing Agreements, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants for the Pre-Petition Agent,  (iii) on the first business day of each month, all accrued but unpaid interest on the Pre-Petition Debt, and letter of credit and other fees at the non-default contract rate (including at the option of

32

the Borrower, the Eurodollar Rate plus the Applicable Margin (each as defined in the Pre-Petition Credit Agreement)) applicable under the Existing Agreements, *provided* that, (x) without prejudice to the rights of the Debtors or any other party to contest such assertion, the Pre-Petition Secured Lenders reserve their rights to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default rates), or on any other basis provided for in the Existing Agreements, and for the payment of any other amounts provided for in the Existing Agreements, and (y) notwithstanding anything to the contrary in this Order or the Pre-Petition Credit Agreement, as to each Pre-Petition Secured Lender which executes and delivers a written consent in the form to be provided by the Pre-Petition Agent (which consent shall be in form and substance reasonably satisfactory to the Borrower), waiving and releasing all claims, if any, in respect of default interest and any claims related to the early prepayment of the loans, including, without limitation, any prepayment premiums under the Pre-Petition Credit Agreement, interest shall accrue and be paid by the Borrower to such Pre-Petition Secured Lender and its assignee(s) on the first business day of each month at ABR (as defined in the Pre-Petition Credit Agreement) plus the Applicable Margin in respect of the pre-petition loans held by such Pre-Petition Secured Lender from and after the later of (a) the expiry of existing LIBOR contracts and (b) the delivery of such release and waiver, (iv) current cash payment of all reasonable out-of-pocket expenses of the members of any steering committee of Pre-Petition Secured Lenders, in their capacity as such (but excluding any fees and disbursements of counsel, financial or other consultants to such steering committee).  The Debtors shall pay the fees and expenses provided for in the preceding clause (ii) or clause

(iv) only after reasonably detailed invoices for such fees and expenses shall have been submitted to the Debtors and counsel to the official committee of unsecured creditors (the "Creditors' Committee"). The rights of all parties in interest with respect to the application of such payments in clauses (ii), (iii) and (iv) above shall be preserved in accordance with Paragraph 16 below. The Debtors shall pay the reasonable and documented fees and expenses of counsel to the Ad Hoc Committee of Pre-Petition Secured Lenders in connection with the Motion through the date of the Final Hearing in an aggregate amount not to exceed the cap previously agreed upon by the Debtors and such counsel. The Creditors' Committee shall be provided an opportunity to review such fees and expenses prior to the payment thereof. During the pendency of the Chapter 11 Cases, and except as otherwise set forth in any confirmed reorganization plan, the Pre-Petition Debt of any Pre-Petition Secured Lender shall not be repaid or refinanced in whole unless (x) it is part of a transaction in which the obligations under the DIP Credit Agreement and the Pre-Petition Credit Agreement are repaid or refinanced in whole, or (y) such Pre-Petition Secured Lender consents to such repayment.

(d)    Access To Collateral. The Pre-Petition Agent (for the benefit of the Pre-Petition Secured Lenders) and their experts and advisors shall be given reasonable access for purposes of monitoring the business of the Debtors and the value of the Collateral; and

(e)    Information. The Debtors shall provide the Pre-Petition Agent and the Creditors' Committee with any written financial information or periodic reporting that is provided to, or required to be provided to, the Agent or the DIP Lenders; *provided, however*, that to the extent such information is provided to the Creditors' Committee, the

34

Debtors shall be entitled to reasonably restrict access to such information solely to professionals retained by such committee.  The Debtors shall also provide the Agent and the Pre-Petition Agent with information related to payments made to and setoffs taken by the Debtors' suppliers in respect of any pre-petition claims to the extent such information is provided to the Creditors' Committee or is otherwise required to be supplied pursuant to the DIP Documents.

(f)      Pre-Petition Letters of Credit.  Subject to the terms and conditions of the DIP Documents, letters of credit issued and outstanding under the Pre-Petition Credit Agreement shall be replaced by letters of credit issued under the DIP Documents at the earlier of the stated expiry of such letters of credit and the next notice date for non-renewal of such letters of credit.  The Pre-Petition Agent, in consultation with and after prior notice to the Debtors, is authorized to provide notice of non-renewal to letter of credit beneficiaries to prevent the automatic renewal of "evergreen" Letters of Credit.

13.      *Reservation of Rights of Pre-Petition Secured Lenders*.  Under the circumstances and given that the above described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Pre-Petition Secured Lenders. Except as expressly provided herein, nothing contained in this Order (including, without limitation, the authorization of the use of any Cash Collateral and the granting of any Replacement Liens or Junior Adequate Protection Liens) shall impair or modify any rights, claims or defenses available in law or equity, including, without limitation, any right to propose, subject to the provisions of Section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans of reorganization, to the Pre-Petition Agent, any Pre-Petition

35

Secured Lender, the Agent or any DIP Lender including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).  The Pre-Petition Agent and the Pre-Petition Secured Lenders shall have the right to request further or different adequate protection under sections 361, 363(e) and 364(d)(2) of the Bankruptcy Code following the occurrence of any event after the Petition Date, that could reasonably be expected to have a material adverse effect on (A) the Debtors' ability to repay or refinance the Pre-Petition Obligations in full in cash under a Chapter 11 plan of reorganization or (B) the Debtors' ability to satisfy the Adequate Protection Obligations. The Debtors or any other party in interest may object to any such request, and with respect to such objections nothing herein shall operate to shift any applicable burdens of proof from those set forth in the Bankruptcy Code.

10.    *Adequate Protection of Pre-Petition Secured Lenders*.  The Adequate Protection Liens and other rights afforded to the Pre-Petition Agent and the Pre-Petition Secured Lenders under paragraphs 12 and 13 of the Existing DIP Order shall continue in effect until the Refinancing Date, whereupon the Adequate Protection Liens shall be deemed released and the provisions of paragraphs 12 and 13 of the Existing DIP Order shall be of no further force or effect.

11.    14. Perfection Of DIP Liens *And Adequate Protection Liens*.

(a)    Subject to the provisions of paragraph 87(a) above, the Agent and the Pre-Petition Agent areis hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or

36

similar instruments in any jurisdiction or take any other action in order to validate and

perfect the liens and security interests granted to them hereunder.  Whether or not the

Agent on behalf of the DIP Lenders or the Pre-Petition Agent on behalf of the Pre-

Petition Secured Lenders shall, in theirits sole discretion, choose to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar

instruments or otherwise confirm perfection of the liens and security interests granted to

themthe Agent hereunder, such liens and security interests shall be deemed valid,

perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or

subordination, at the time and as of the date of entry of this Order.  Upon the request of

the Agent, each of the Existing DIP Agent and the Existing DIP Lenders, and the Pre-

Petition Agent and Pre-Petition Secured Lenders, without any further consent of any

party, is authorized to take, execute and deliver such instruments (in each case without

representation or warranty of any kind) to enable the Agent to further validate, perfect,

preserve and enforce DIP Liens.

        (b)      A certified copy of this Order may, in the discretion of the Agent,

be filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing

offices are hereby authorized to accept such certified copy of this Order for filing and

recording.

        (c)      Any provision of any lease or other license, contract or other

agreement that requires (i) the consent or approval of one or more landlords or other

parties or (ii) the payment of any fees or obligations to any governmental entity, in order

for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold

interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby
deemed to be inconsistent with the applicable provisions of the Bankruptcy Code. Any
such provision shall have no force and effect with respect to the transactions granting
post-petition liens, in such leasehold interest or the proceeds of any assignment and/or
sale thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of
the DIP Credit Agreement or this Order.

12.    15. *Preservation Of Rights Granted Under The Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with
those granted by this Order to the Agent and the DIP Lenders or to the Pre-Petition
Agent, the Pre-Petition Secured Lenders and the Setoff Claimants, respectively, shall be
granted or allowed while any portion of the Financing (or any refinancing thereof) or the
Commitments thereunder or the DIP Obligations or the Adequate Protection Obligations
remain outstanding, and the DIP Liens, the Adequate Protection Liens, the Replacement
Liens and the Junior Adequate Protection Liens shall not be (i) solely in the case of the
DIP Liens, subject or junior to any lien or security interest that is avoided and preserved
for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii)
subordinated to or made *pari passu* with any other lien or security interest, whether under
section 364(d) of the Bankruptcy Code or otherwise (other than as specifically provided
for in this Order). Nothing in this paragraph 1512(a) shall limit (x) the rights of the
Debtors to refinance the Financing in compliance with the DIP Credit Agreement or (y)
the rights of any party in interest with respect to any such refinancing.

(b)    Unless all DIP Obligations shall have been paid in full (and, with
respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash

collateralized in accordance with the provisions of the DIP Credit Agreement), the

Debtors shall not seek, and it shall constitute an Event of Default and a termination of the

right to use Cash Collateral if any of the Debtors seek, or if there is entered, ~~(i)~~(i) any

modifications or extensions of this Order without the prior written consent of the Agent,

and no such consent shall be implied by any other action, inaction or acquiescence by the

Agent, or ~~(ii)~~(ii) an order dismissing any of the Cases.  If an order dismissing any of the

Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered,

such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy

Code) that (x) the Superpriority Claims, priming liens, security interests and replacement

security interests granted to the Agent ~~and, as applicable, the Pre-Petition Agent~~, the

Setoff Claimants or the holders of the Debtor Liens pursuant to this Order, shall continue

in full force and effect and shall maintain their priorities as provided in this Order until all

DIP ~~Obligations and Adequate Protection~~ Obligations shall have been paid and satisfied

in full (and that such Superpriority Claims, priming liens and replacement security

interests, shall, notwithstanding such dismissal, remain binding on all parties in interest)

and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the

purposes of enforcing the claims, liens and security interests referred to in (x) above.

        (c)     If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity of any DIP Obligations ~~or Adequate Protection Obligations~~ incurred prior

to the actual receipt of written notice by the Agent ~~or Pre-Petition Agent~~, as applicable, of

the effective date of such reversal, stay, modification or vacation or (ii) the validity or

enforceability of any lien or priority authorized or created hereby or pursuant to the DIP

Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations ~~or Adequate Protection Obligations~~ incurred by the Debtors to the Agent~~,~~ or the DIP ~~Lenders, the Pre-Petition Agent or the Pre-Petition Secured~~ Lenders prior to the actual receipt of written notice by the Agent ~~and Pre-Petition Agent~~ of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent~~, DIP Lenders, Pre-Petition Agent and Pre-Petition Secured~~ and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral~~, DIP Obligations~~ and ~~Adequate Protection~~DIP Obligations.

(d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights

and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

16.    *Effect Of Stipulations On Third Parties*.  Subject to the reservation of rights set forth in this paragraph 16, the stipulations and admissions contained in paragraphs 3 and 10 of this Order shall be binding upon the Debtors in all circumstances. The stipulations and admissions contained in paragraphs 3 and 10 of this Order shall be binding upon all other parties in interest, including, without limitation, the Creditors' Committee, unless (a) a party-in-interest has timely filed an adversary proceeding or contested matter, or commenced litigation for authorization to commence such adversary proceeding or contested matter ("Authorization Motion"), (subject to the limitations contained herein, including, *inter alia*, in paragraph 17) by no later than January 16, 2006 in the case of clause (i) below and April 17, 2006 in the case of clauses (ii) and (iii) below (or, in each case, such later date (x) as has been agreed to, in writing, by the Pre-Petition Agent in its sole discretion or (y) as has been ordered by the Court) (i) challenging the validity, enforceability, priority or extent of the Pre-Petition Debt or the Pre-Petition Agent's or the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral, (ii) seeking a determination that the Pre-Petition Debt was under-secured as of the Petition Date, or (iii) otherwise asserting or prosecuting any Avoidance Actions or any other any claims, counterclaims or causes of action , objections, contests or defenses (collectively, "Claims and Defenses") against the Pre-Petition Agent or any of the Pre-Petition Secured Lenders or their respective affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with matters related to the Existing

41

Agreements, the Pre-Petition Debt, or the Pre-Petition Collateral, and (b) there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter, *provided* that as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Petition Date other than any such Claims and Defenses as they relate to the appropriateness of any interest rate, fees or expenses charged or claimed by the Pre-Petition Secured Lenders (except with respect to the payments of interest at ABR plus the Applicable Margin to any Pre-Petition Secured Lender who has executed and delivered the release and waiver, and the other fees and expenses, all as provided in paragraph 12(e) of this Order), including, without limitation, the allowance of any claim for default interest under Section 2.14 of the Pre-Petition Credit Agreement or the allowance of any claim for any prepayment premium under Sections 2.10 or 2.11 of the Pre-Petition Credit Agreement. Subject in each case to the reservation of the Debtors' rights set forth above to contest the allowance of any claim for default interest on the Pre-Petition Debt or any prepayment premium, if no such adversary proceeding or contested matter is timely filed (it being understood that such adversary proceeding or contested matter is commenced promptly following a disposition in favor of a movant of an Authorization Motion), (x) the Pre-Petition Debt and all related obligations of the Debtors (the "Pre-Petition Obligations") shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 cases, (y) the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to defense, counterclaim, recharacterization,

subordination or avoidance and (z) the Pre-Petition Obligations, the Pre-Petition Agent's and the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral and the Pre-Petition Agent and the Pre-Petition Secured Lenders shall not be subject to any other or further challenge by any party-in-interest, and any such party-in-interest shall be enjoined from, seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors). If any such adversary proceeding or contested matter is timely filed (it being understood that such adversary proceeding or contested matter is commenced promptly following a disposition in favor of a movant of an Authorization Motion), the stipulations and admissions contained in paragraphs 3 and 10 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any official committee (including the Creditors' Committee) and on any other person or entity, except to the extent that such findings and admissions were expressly challenged in such adversary proceeding or contested matter (it being understood that such adversary proceeding or contested matter is commenced promptly following a disposition in favor of a movant of an Authorization Motion). Nothing in this Order vests or confers on any Person (as defined in the Bankruptcy Code), standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Existing Agreements or the Pre-Petition Debt other than the Creditors' Committee, which is hereby vested with standing and authority to pursue any cause of action arising from or related to the Debtors' stipulations and admissions in paragraphs 3 and 10 of this Order.

43

13.      *Effect Of Stipulations On Third Parties*.  Notwithstanding the Fourth
Stipulation Between the Creditors' Committee and JPMorgan Chase Bank, N.A., as
Agent for the Pre-Petition Secured Lenders, with Respect to an Extension of Deadlines
Established Pursuant to Final DIP Financing Order, entered by this Court on June 13,
2006, the stipulations and admissions contained in paragraphs 3 and 10 of the Existing
DIP Order shall be binding upon the Creditors' Committee, and the time period during
which the Creditors' Committee is permitted to raise "Claims and Defenses" as provided
in paragraph 16 of the Existing DIP Order, is hereby terminated.

14.      ~~17.~~ *Limitation On Use Of Financing Proceeds And Collateral*.
Notwithstanding anything herein or in any other order by this Court to the contrary, no
borrowings, letters of credit, Cash Collateral, ~~Pre-Petition Collateral,~~ Collateral or the
Carve Out may be used to (a) object, contest or raise any defense to, the validity,
perfection, priority, extent or enforceability of any amount due under the DIP
Documents, the Existing DIP Facility Documents or the Existing ~~Agreements~~Pre-Petition
Facility Documents, or the liens or claims granted under this Order, the Existing DIP
Order, the DIP Documents or the Existing ~~Agreements~~Pre-Petition Facility Documents,
(b) assert any ~~Claims and Defenses or any other~~ causes of action against the Agent, the
DIP Lenders, the Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent
or the Pre-Petition Secured Lenders or their respective agents, affiliates, representatives,
attorneys or advisors, ~~(c)~~ prevent, hinder or otherwise delay the Agent's ~~or the Pre-~~
~~Petition Agent's~~ assertion, enforcement or realization on the Cash Collateral or the
Collateral in accordance with the DIP Documents, ~~the Existing Agreements~~ or this Order,
~~(d)~~(c) seek to modify any of the rights granted to the Agent, the DIP Lenders, the

44

Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent or the Pre-Petition

Secured Lenders hereunder or under the DIP Documents or the Existing Agreements,

under the Existing DIP Order or under the DIP Documents, the Existing DIP Facility

Documents or the Existing Pre-Petition Facility Documents, in each of the foregoing

cases without such parties' prior written consent or (e)(d) pay any amount on account of

any claims arising prior to the Petition Date unless such payments are (i) approved by an

Order of this Court and (ii) in accordance with the DIP Credit Agreement or otherwise

approved by the Agent in its sole discretion; *provided* that, notwithstanding anything to

the contrary herein, the Creditors' Committee shall be limited to $250,000 to perform the

investigations contemplated hereby and no other official committee shall be authorized to

perform such investigations; *provided, further,* that such $250,000 limit shall not include

the fees and expenses of an investment banker in connection with the investigations

contemplated by clause (a)(ii) of paragraph 16 of this Order.

     15.    18. *Setoff, Replacement Liens and Junior Adequate Protection Liens.*  To

the extent that a customer or supplier of the Debtors that has an allowable setoff claim

under section 506 or 553 of the Bankruptcy Code in respect of its payables owed to any

Debtor as of the Petition Date ("Pre-Petition Payables") or a valid right of recoupment

that arose prior to the Petition Date (such setoff claim or right of recoupment, "Setoff"),

such customer or supplier (a "Setoff Claimant") is hereby provided, consistent with the

terms of the Existing DIP Order, with certain rights and adequate protection as described

below.  For the avoidance of doubt, nothing herein shall be construed to be an admission

or acknowledgement, or an increase or decrease in the monetary amount of the pre-

petition setoff or recoupment rights of any person, under the Bankruptcy Code, applicable
non-bankruptcy law or otherwise.

        (a)    <u>Exercise of Set Off</u>.  (1)  Any exercise of a Setoff Right (as defined
below) in accordance with this Order shall not be stayed by section 362 of the
Bankruptcy Code.  Any exercise of any right of Setoff other than in accordance with this
Order is subject to section 362 of the Bankruptcy Code.  Nothing in this Order shall
prevent any holder of a right of Setoff from seeking relief from the automatic stay with
respect to such Setoff, or prevent the Debtors or any party in interest from objecting or
being heard with respect to any such request.  A Setoff Claimant shall, in accordance
with this paragraph, be entitled to exercise its Setoff that arose in the ordinary course of
business for any claims or recoupment defenses arising from or related to the claims for
prepetition warranty and/or product recall claims, customer adjustments, customer
rebates and allowances, overpricing claims, claims for short shipments and damaged
goods, customer/supplier netting and other similar claims arising in the ordinary course
of business of the relevant parties other than any such claims or recoupment defenses
arising as a result of the filing of the cases (a "Setoff Right").  A Setoff Right shall not
include any claims or recoupment defenses arising from or related to employee or
employee benefit matters, retiree benefit or pension matters, including, without
limitation, any related indemnities or guarantees, the rejection of executory contracts, or
consequential or punitive damages.  The determination as to whether a Setoff Claimant
may exercise a "Setoff Right" will be made solely by ~~(i)~~(i) the agreement of the Setoff
Claimant, the Creditors' Committee and the Debtors, ~~(ii)~~(ii) pursuant to the procedures
hereinafter set forth or ~~(iii)~~(iii) order of the Court.

                                                                 

(2)     Any Setoff Claimant seeking to exercise a Setoff Right against payables during any month (whether against Pre-Petition Payables or post-petition payables) shall submit to the Debtors and the Creditors' Committee (with a copy to the Agent) a written request to exercise such Setoff Right, the basis for such Setoff Right and reasonably detailed documentation supporting such Setoff Right.  If the Setoff Claimant, the Creditors' Committee and the Debtors fail to agree in writing that any amount is included in a Setoff Right within 10 business days after submission of such information to the Debtors and the Creditors' Committee (the "Agreement Deadline"), the Debtors and such Setoff Claimant shall (unless all such parties agree to extend such 10 business day period) seek resolution of such matter through a mediator agreed to by the Debtors and such Setoff Claimant or appointed by this Court.  Such mediation shall end not later than 30 days after the Agreement Deadline unless such period is extended by agreement of the Debtors and such Setoff Claimant.  If the Debtors and such Setoff Claimant cannot resolve the matter through such mediation, then such matter may be submitted to binding arbitration to a single arbitrator agreed to by all such parties or appointed by this Court, and such parties shall request that such arbitrator issue its ruling within 90 days after the Agreement Deadline.  Notwithstanding any award in any such arbitration, in no event shall the Setoff Claimant be permitted to exercise its Setoff Right against any payables other than Pre-Petition Payables except as set forth in this paragraph 18.15.

(3)     In the event any Setoff Claimants (the "Non-Exercising Setoff Claimants") have not exercised their asserted Setoff Rights in respect of their respective Pre-Petition Payables and have instead paid their Pre-Petition Payables to the Debtors, in addition to any other adequate protection provided to such Non-Exercising Setoff

47

Claimants herein, the Non-Exercising Setoff Claimants may exercise Setoff Rights

established in accordance with this paragraph against post-petition payables owed by

such Non-Exercising Setoff Claimants to the Debtor or Debtors against which such Non-

Exercising Setoff Claimants have their Setoff Rights; *provided* that (a) in the case of the

exercise of any Setoff Rights by General Motors Corporation or any of its affiliates

("GM"), the aggregate amount of Setoff Rights that may be exercised pursuant to this

subparagraph (3) against Pre-Petition Payables or post-petition payables owed by GM to

the Debtors during any month shall not exceed $35 million (the "Aggregate Monthly Cap

Amount") and (b) to the extent Setoff Rights are recognized in accordance with this

Order or the Existing DIP Order in excess of the Setoff Rights that are permitted to be

exercised pursuant to such limitations, Setoff Claimants may carry forward their Setoff

Right to succeeding months, subject to the applicable monthly limitations, if any, until

such Setoff Rights have been fully exercised.

(4)      (a) Except as set forth above, and subject to the adequate

protection provided to Setoff Claimants as herein set forth, Setoff Claimants shall not be

permitted to exercise any Setoff until the later of (x) the effective date of the Debtors'

confirmed plan of reorganization and (y) allowance of the Setoff as a claim in these

Cases.  Any exercise of Setoff pursuant to (x) or (y) above is subject to the treatment

afforded to such Setoff under a plan of reorganization confirmed by the Bankruptcy

Court.  Nothing contained herein shall limit (i) the discretion of the Debtors to pay

warranty and/or product recall claims in accordance with orders of the Court, (ii) the right

of any party in interest to exercise a post-petition setoff or recoupment against a

post-petition payable or (iii) the right of a Setoff Claimant to request further adequate

protection (or the Debtors or any party in interest to oppose any such request).

(b)    Adequate Protection.  A Setoff Claimant is entitled, pursuant to

sections 361, 362(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of its

Setoff to the extent it does not exercise such Setoff and remits the amount of such Pre-

Petition Payables not setoff or recouped.  As adequate protection therefor, each such

Setoff Claimant is hereby granted, effective upon payment to the Debtors of the amount

subject to such Setoff, the following (collectively, including any Junior Adequate

Protection Liens granted pursuant to the Existing DIP Order, the "Junior Adequate

Protection Liens"), such Junior Adequate Protection Liens to be effective and perfected

without the necessity of the execution by the Debtors of mortgages, security agreements,

pledge agreements, financing statements or other agreements:

(i)      A replacement lien (including any Replacement Liens granted

pursuant to the Existing DIP Order, the "Replacement Lien") on such Setoff Claimant's

post-petition payables to the extent that it is determined that such Setoff Claimant had a

Setoff in respect of the Pre-Petition Payables that have been remitted to the Debtors,

which Replacement Lien is limited to the amount of the Setoff; *provided, however*, that

(i) the Debtors reserve their rights to any and all Claims and Defenses that may be

asserted with respect to such Setoff and (ii) the Replacement Liens are subject and

subordinate to and only to (x) the security interests and liens Existing DIP Liens, the First

Priority DIP Liens granted to the Agent for the benefit of the DIP Lenders in this Order

and pursuant to the DIP Documents, and any liens to which such liens so granted to the

Agent are junior and (y) the Carve-Out.

49

(ii)    As further adequate protection to protect the Setoff Claimant against any diminution in the value of its Replacement Lien, the Setoff Claimant is hereby granted a security interest in and lien upon all the other Collateral, subject and subordinate to and only to ~~(A) the security interests and liens~~(A) the Existing DIP Liens, the DIP Liens granted to the Agent for the benefit of the DIP Lenders in this Order and pursuant to the DIP Documents, and any liens to which such liens so granted to the Agent are junior, ~~(B)~~ (B) the Carve Out and ~~(C)~~(C) until the Refinancing Date, the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral and the Adequate Protection Liens granted to the Pre-Petition Agent and the Pre-Petition Secured Lenders, under the Existing DIP Order; *provided* that the Setoff Claimant's security interest in and lien upon Collateral which is not (x) Pre-Petition Collateral (as defined in the Existing DIP Order), (y) Collateral that would have constituted Pre-Petition Collateral but for the operation of section 552(a) of the Bankruptcy Code as to which, without further action, the Pre-Petition Agent would have had a valid and perfected security interest or lien or (z) subject to the Replacement Lien, shall be *pari passu* with the Adequate Protection Liens granted to the Pre-Petition Agent and the Pre-Petition Secured Lenders ~~in such Collateral~~pursuant to the Existing DIP Order and *pari passu* with the DIP Liens on Collateral that is not included in clauses (x), (y) or (z) solely to the extent such DIP Liens secure the Tranche C Term Loan.

(iii)    As further Adequate Protection, to the extent that the post-petition payables in respect of which the Setoff Claimant is granted a Replacement Lien are less than the Setoff of such Setoff Claimant, such Setoff Claimant is hereby granted an administrative claim under section 507(b) of the Bankruptcy Code in the amount of such

50

deficiency subject to the Carve Out and equal in priority to the administrative claim

granted as adequate protection to the Pre-Petition Secured Lenders in ~~Paragraph 12(b)~~

~~above~~paragraph 12(b) of the Existing DIP Order and the Superpriority Claim in respect

of the Tranche C Loan; *provided, however*, that the Setoff Claimant shall not receive or

retain any payments, property or other amounts in respect of the claims under section

507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations in

respect of the First Priority Facilities have indefeasibly been paid in cash in full and no

letters of credit under the First Priority Facilities remain outstanding.

      16.    ~~19.~~*Debtor Reimbursement Claims and Debtor Liens*.  Without limiting

the joint and several liability of each of the Debtors for the DIP Obligations, the Debtors

shall use their reasonable best efforts to ensure that Debtors that receive the benefit of

funds advanced under the Financing repay their share thereof on a dollar for dollar basis.

To the extent a Debtor ~~(i)~~(i) incurs any of the DIP Obligations (including as a result of

intercompany balances incurred after the Petition Date to the extent such balances arise

from the incurrence of DIP Obligations) or ~~(ii)~~(ii) receives a ~~postpetition~~post-petition

intercompany loan or transfer (including as a result of the Debtors' cash management

system or otherwise) (each a "Beneficiary Debtor"), and such DIP Obligations were

repaid or such ~~postpetition~~post-petition intercompany loan or transfer is made (including

from cash collateral) (each an "Advance") by ~~(A)~~(A) any other Debtor that is a Borrower

or Guarantor under the Financings or ~~(B)~~(B) any non-Debtor affiliate (together (A) and

(B) an "Adequately Protected Entity"), the Adequately Protected Entity shall have,

subject to the limitations set forth in paragraph ~~20~~17 below (a) an allowed claim under

sections 364(c)(1) and 507(b) of the Bankruptcy Code against the Beneficiary Debtor for

the amount of such Advance, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, which claim shall bear interest at a rate agreed between the Debtors from time to time for the period accruing from and after the date such claim arises until repayment thereof (collectively, including Debtor Reimbursement Claims granted pursuant to paragraph 17 of the Existing DIP Order, the "Debtor Reimbursement Claim") and (b)(b) a lien on all Collateral under section 364(c)(3) of the Bankruptcy Code securing such Debtor Reimbursement Claim (including Debtor Liens granted pursuant to paragraph 17 of the Existing DIP Order, a "Debtor Lien").  All Debtor Liens are effective and perfected without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements.

17.    20. All Debtor Reimbursement Claims and Debtor Liens shall be junior, subject and subordinate to and only to the Superpriority Claims, the DIP Liens, the Adequate Protection Obligations, the Junior Adequate Protection Liens, the Replacement Liens and to any claims against such Beneficiary Debtor that are expressly senior to, and on a parity with, or carved out from the Superpriority Claims, the DIP Liens, the Adequate Protection ObligationsObligation, Junior Adequate Protection Liens or the Replacement Liens.  All Debtor Liens shall be "silent" liens and the Adequately Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Debtor Reimbursement Claim or Debtor Lien, including, without limitation, taking any of the actions that the Pre-Petition Agent, the Pre-Petition Secured Lenders and holders of Replacement Liens and Junior Adequate Protection Liens are prohibited from taking pursuant to paragraph 8,7, including, without limitation, as to

52

seeking relief from the automatic stay, or seeking any sale, foreclosure, realization upon

repossession or liquidation of any property of another Debtor, or taking any position with

respect to any disposition of the property, the business operations, or the reorganization

of another Debtor. The Agent shall have the exclusive right to manage, perform and

enforce all rights and remedies described in the DIP Documents.  The Debtor Lien of the

Adequately Protected Entity automatically, and without further action of any person or

entity of any kind, shall be released or otherwise terminated to the extent that property

subject to such Debtor Lien is sold or otherwise disposed of by or on behalf of the Agent

or any other Debtor or to the extent that such property is subject to a lien prior to the DIP

Liens and such lien is permitted under the DIP Documents.

18.    *Sufficiency of Adequate Protection*.  Under the circumstances and given

that the above described adequate protection is consistent with the Bankruptcy Code, the

Court finds that the adequate protection provided herein is reasonable and sufficient to

protect the interests of all parties with liens against or interests in property of the

Borrower or the Guarantors.

19.    21. With respect to the effect of Debtor Liens on any sale of property by

the Debtors, (a)(a) the Debtors may sell property, in accordance with section 363 of the

Bankruptcy Code, free and clear of any Debtor Lien, with such lien attaching to the

proceeds of sale in the same priority and subject to the same limitations and restrictions

as existed in respect of the property sold and (b)(b) the provisions of section 363(k) of the

Bankruptcy Code shall not apply.

20.    22. *JPMCB As Collateral Agent*.  To the extent JPMCB, in its role as

Collateral Agent under the Existing AgreementsPre-Petition Facility Documents, is the

secured party under any Control Agreements (as defined in the Existing ~~Agreements~~Pre-Petition Facility Documents), listed as loss payee under the Debtors' insurance policies as required under ~~the~~that certain Guarantee and Collateral Agreement, dated as of June 14, 2005, by the Borrower and certain of its subsidiaries, in favor of the Pre-Petition Agent, or is the secured party under any other Existing ~~Agreement~~Pre-Petition Facility Document, JPMCB, in its role as Collateral Agent under the DIP Credit Agreement, is also deemed to be the secured party under such Control Agreements, loss payee under the Debtors' insurance policies and the secured party under any other Existing ~~Agreement~~Pre-Petition Facility Document and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Lenders in accordance with the DIP Credit Agreement and second, subsequent to indefeasible payment in full of all DIP Obligations, for the benefit of the Pre-Petition Secured Lenders under the Existing ~~Agreements~~Pre-Petition Facility Documents.

21.    ~~23.~~ *Order Governs.*  In the event of any inconsistency between the provisions of this Order and the ~~DIP~~Existing DIP Order, the DIP Documents or the Existing DIP Facility Documents, the provisions of this Order shall govern.  Subject to the terms of this Order, the provisions of the Existing DIP Order shall remain in full force and effect.  The terms of this Order shall govern to the extent of any inconsistency between this Order and that certain Cash Management Order dated October 14, 2005, including, without limitation, with respect to the matters set forth in paragraphs ~~19~~16 to ~~21~~18 of this Order.

22.    ~~24.~~ *Binding Effect; Successors And Assigns.*  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties in

interest in these Cases, including, without limitation, the Agent, the DIP Lenders, the Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, any party granted a Junior Adequate Protection Lien hereunder or under the Existing DIP Order, any Committee appointed in these Cases, and the Debtors, for themselves and not for their estates, and their respective successors and assigns and shall inure to the benefit of the Agent, the DIP Lenders, the Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, any party granted a Replacement Lien or Junior Adequate Protection Lien, and the Debtors and their respective successors and assigns; *provided*, *however*, that the Agent, the Existing DIP Agent, the Pre-Petition Agent, the DIP Lenders, the Existing DIP Lenders and the Pre-Petition Secured Lenders shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.  In determining to make any loan under the DIP Credit Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the Agent, the Pre-Petition Agent, the Existing DIP Agent, the DIP Lenders, the Existing DIP Lenders and the Pre-Petition Secured Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

23.    25. *Aircraft Leases.*  Notwithstanding anything to the contrary contained in this Order and consistent with this Court's September 29, 2006 order (Docket No. 5234), no DIP Liens or any other liens or interests granted, authorized or contemplated herein shall attach to any interests of Delphi Automotive Systems Human Resources, LLC ("Delphi HR") in two leases of aircraft, both of which are dated March 30, 2001 between Bank of America, N.A., and Delphi HR (the "Aircraft Leases"), or in any personal property, cash collateral or proceeds that is the subject of the Aircraft Leases.

24.    26. *Objections Overruled.*  Any Objectionobjection to the Motion which has not been withdrawn or resolved is, to the extent not resolved, hereby overruled.

(NY) 27011/094/REFI/delphi.refi.approval.order.doc                                              12/17/06 4:41 PM

25.    27. *Committee Notices*.  All notices to be provided to the Creditors'

Committee shall be sent to Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New

York, NY 10022-4834, Attn: Robert Rosenberg, Esq.

26.    Notwithstanding the possible applicability of Bankruptcy Rule 6004(g) or

any other provision of the Bankruptcy Rules or Bankruptcy Code, the terms and

conditions of this Order shall be immediately effective and enforceable upon its entry.

Dated:    October 28,
2005_____, 200_
New York, New York

/s/ROBERT D. DRAIN
_____
UNITED STATES BANKRUPTCY JUDGE

(NY) 27011/094/REFI/delphi.refi.approval.order.doc                    12/17/06 4:41 PM

Document comparison done by DeltaView on Sunday, December 17, 2006 4:43:10 PM

| Input: | |
|---|---|
| Document 1 | file://M:/REFI/DELTAVIEW/Existing.Final.DIP.Order.061217_0957.doc |
| Document 2 | file://M:/REFI/DELTAVIEW/delphi.refi.approval.order.061217_1641.doc |
| Rendering set | DPW -- Color Legislative |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 197 |
| Deletions | 245 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 442 |

Hearing Date and Time: January 5, 2007 at 10:00 a.m.
Objection Deadline: January 2, 2007 at 4:00 p.m.

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022
(212) 848-4000
Douglas P. Bartner (DB 2301)
Andrew V. Tenzer (AT 2263)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :
        In re                     :    Chapter 11
                                   :
DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                                 :
              Debtors.    :    (Jointly Administered)
                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF EXPEDITED MOTION FOR ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363,
364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001
AND 6004(g)(I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING
AND (II) AUTHORIZING DEBTORS TO REFINANCE SECURED POST-PETITION
FINANCING AND PREPETITION SECURED DEBT

("NOTICE OF DIP REFINANCING MOTION")

PLEASE TAKE NOTICE that on December 18, 2006, Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed a Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-Petition Financing And Prepetition Secured Debt (the "DIP Refinancing Motion").

PLEASE TAKE FURTHER NOTICE that the Debtors have submitted the proposed Order Scheduling Non-Omnibus Hearings On Debtors' Plan Investment And Framework Support Approval Motion And Dip Refinancing Motion (the "Scheduling Order"), setting the hearing for this Motion on January 5, 2007 (Prevailing Eastern Time) (the "Hearing") before the Honorable Robert D. Drain, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610, New York, New York 10004 (the "Bankruptcy Court").

PLEASE TAKE FURTHER NOTICE that, pursuant to the Scheduling Order objections, if any, to the Motion must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418), (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) – registered users of the Bankruptcy Court's case filing system must

2

file electronically, and all other parties-in-interest must file on a 3.5 inch disk (preferably in

Portable Document Format (PDF), WordPerfect, or any other Windows-based word processing

format), (d) be submitted in hard-copy form directly to the chambers of the Honorable Robert D.

Drain, United States Bankruptcy Judge, and (e) be served upon (i) Delphi Corporation, 5725

Delphi Drive, Troy, Michigan 48098 (Att'n: General Counsel), (ii) counsel to the Debtors,

Skadden, Arps, Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago,

Illinois 60606 (Att'n: John Wm. Butler, Jr.), (iii) counsel for the agent under the Debtors'

prepetition credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York,

New York 10017 (Att'n: Kenneth S. Ziman), (iv) counsel for the agent under the postpetition

credit facility, Davis Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017

(Att'n:  Donald S. Bernstein and Brian M. Resnick), (v) counsel for the Official Committee of

Unsecured Creditors, Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022

(Att'n: Robert J. Rosenberg and Mark A. Broude), (vi) counsel for the Official Committee of

Equity Security Holders, Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza,

New York, New York 10004 (Att'n: Bonnie Steingart), and (vii) the Office of the United States

Trustee for the Southern District of New York, 33 Whitehall Street, Suite 2100, New York, New

York 10004 (Att'n:  Alicia M. Leonhard), in each case so as to be **received** no later than **4:00**

**p.m. (Prevailing Eastern Time) on January 2, 2007** (the "Objection Deadline").

PLEASE TAKE FURTHER NOTICE that only those objections made as set forth herein and in accordance with the Scheduling Order will be considered by the Bankruptcy Court at the Hearing.  If no objections to the Motion are timely filed and served in accordance with the procedures set forth herein and the Scheduling Order, the Bankruptcy Court may enter an order granting the Motion without further notice.

Dated:      New York, New York
            December 18, 2006

                        SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP

                        By:    /s/ John Wm. Butler, Jr.
                               John Wm. Butler, Jr. (JB 4711)
                               John K. Lyons (JL 4951)
                               Ron E. Meisler (RM 3026)
                        333 West Wacker Drive, Suite 2100
                        Chicago, Illinois 60606
                        (312) 407-0700


                        By:    /s/ Kayalyn A. Marafioti
                               Kayalyn A. Marafioti (KM 9632)
                               Thomas J. Matz (TM 5986)
                        Four Times Square
                        New York, New York 10036
                        (212) 735-3000

                                - and –

                        SHEARMAN & STERLING LLP


                        By:    /s/ Andrew V. Tenzer
                               Douglas P. Bartner (DB 2301)
                               Andrew V. Tenzer (AT 2263)
                        599 Lexington Avenue
                        New York, New York  10022
                        (212) 848-4000
                        Attorneys for Delphi Corporation, et al.,
                               Debtors and Debtors-in-Possession

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                            :
            In re                           :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                          Debtors.          :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 6004(g)(I)
AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND (II)
AUTHORIZING DEBTORS TO REFINANCE SECURED POST-PETITION
FINANCING AND PREPETITION SECURED DEBT

("DIP REFINANCING ORDER")

Upon the motion, dated December 18, 2006 (the "Motion"), of Delphi Corporation

(the "Borrower") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for an

order under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended and in

effect on October 8, 2005, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and

6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking,

among other things:

(1)  authorization for the Borrower to obtain post-petition financing

(the "Financing") to refinance its existing debtor-in-possession financing

and certain pre-petition indebtedness of the Borrower, and for all of the

other Debtors (the "Guarantors") to guaranty the Borrower's obligations in

connection with the Financing, up to the aggregate principal amount of

$4,495,820,240.59 (the actual available principal amount at any time being

subject to those conditions set forth in the DIP Documents (as defined

below)), pursuant to a credit facility with JPMorgan Chase Bank, N.A.

("JPMCB"), acting as Administrative Agent (in such capacity, the "Agent")

for itself and a syndicate of financial institutions (together with JPMCB and

including the fronting and issuing banks for the letters of credit, the "DIP

Lenders"), and Citicorp USA, Inc. ("CUSA") as Syndication Agent for the

First Priority Facilities (as defined below), J.P. Morgan Securities Inc.

("JPMorgan"), Citigroup Global Markets, Inc. and Deutsche Bank

Securities Inc. as Joint Lead Arrangers for the First Priority Facilities (the

"First Priority Facilities Joint Lead Arrangers"), and JPMorgan as sole Lead

Arranger for the Tranche C Term Loan (as defined below) (the "Tranche C

Lead Arranger", and together with the First Priority Facilities Joint Lead

Arrangers, the "Joint Lead Arrangers");

> (2)  authorization for the Debtors to execute and enter into the DIP

Documents and to perform such other and further acts as may be required in

connection with the DIP Documents;

> (3)  the use of certain proceeds of the Financing to (a) irrevocably

repay in full all outstanding loans under that certain Third Amended and

Restated Credit Agreement, dated as of June 14, 2005 (as heretofore

amended, supplemented or otherwise modified, the "Pre-Petition Credit

Agreement" and, together with the mortgages and all other documentation

2

executed in connection therewith, the "Existing Pre-Petition Facility

Documents"), among the Borrower, the several lenders from time to time

party thereto (the "Pre-Petition Secured Lenders"), and JPMCB, as

administrative agent for the Pre-Petition Secured Lenders (in such capacity,

the "Pre-Petition Agent") (such repayment in full referred to herein as the

"Pre-Petition Facility Refinancing"), the authorization of which constitutes

an "Extraordinary Provision" under General Order No. M-274 of the United

States Bankruptcy Court for the Southern District of New York (the

"General Order"), and (b) irrevocably repay in full all loans and other

obligations under that certain Revolving Credit, Term Loan and Guaranty

Agreement dated as of October 14, 2005 (as heretofore amended,

supplemented or otherwise modified, the "Existing DIP Credit Agreement"

and, together with the mortgages and all other documentation executed in

connection therewith, the "Existing DIP Facility Documents") by and

among the Borrower, the several lenders from time to time party thereto

(the "Existing DIP Lenders"), and JPMCB, as administrative agent for the

DIP Lenders (in such capacity, the "Existing DIP Agent") (such repayment

in full, the "DIP Facility Refinancing", and together with the Pre-Petition

Facility Refinancing, the "Refinancing"),

        (4)  the continuation of certain adequate protection with respect to

various parties, whose liens, security interests or setoff rights were primed

by the Existing DIP Facility Documents and are being primed by some or

all of the Financing;

3

(5)  continuation of the authorization for the Debtors to use cash

collateral (as such term is defined in the Bankruptcy Code) in which certain

parties have an interest, and the granting of adequate protection to such

parties with respect to, *inter alia*, such use of their cash collateral and all use

and diminution in the value of their interest therein;

(6)  permission to accelerate Borrowings and the termination of the

Commitments under the DIP Credit Agreement upon (a) a Change of

Control (as each such term is defined in the DIP Credit Agreement) or (b)

the entry of an order or orders granting relief from the automatic stay

applicable under section 362 of the Bankruptcy Code to the holder or

holders of any security interest to permit foreclosure (or the granting of a

deed in lieu of foreclosure or the like) on any assets of the Borrower or any

of the Guarantors which have a value in excess of $20 million in the

aggregate, which are Extraordinary Provisions under the General Order;

and

(7)  the limitation of the Debtors' right to surcharge against

collateral pursuant to section 506(c) of the Bankruptcy Code, which is an

Extraordinary Provision under the General Order and authorized under the

Existing DIP Order (as hereinafter defined).

Due and appropriate notice of the Motion and the relief requested therein having

been served by the Debtors in accordance with the Amended Eighth Supplemental Order

Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures, entered by this Court on October 26, 2006.

A hearing on the Motion having been held by this Court on January 5, 2007 at

10:00 a.m. (the "Hearing");

Upon the record made by counsel to the Debtors at the Hearing, and after due

deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Cases, this Motion,

and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Under the circumstances, the notice given by the Debtors of the

Motion and the Hearing constitutes due and sufficient notice thereof and complies with

Bankruptcy Rules 4001(b) and (c).

3.      *Findings Regarding The Financing.*

(a)      Good cause has been shown for the entry of this Order.

(b)      The Debtors require the proceeds of this Financing and use of Cash

Collateral (as defined below) in order to reduce their cost of financing and to permit,

among other things, the orderly continuation of the operation of their businesses, to

maintain business relationships with vendors, suppliers and customers, to make payroll, to

make capital expenditures and to satisfy other working capital and operational needs.  The

reduction in financing costs together with continued access of the Debtors to sufficient

working capital and liquidity through the use of Cash Collateral, incurrence of new

indebtedness for borrowed money and other financial accommodations is vital to the

preservation and enhancement of the going concern values of the Debtors and to a

successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing on more favorable terms

from sources other than the DIP Lenders under the DIP Documents and are unable to

obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy

Code as an administrative expense.  The Debtors are also unable to obtain adequate secured

credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code

without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out as

provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under

the terms and conditions set forth in this Order and in the DIP Documents.

(d)    The terms of the Financing and the use of Cash Collateral are fair

and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The Financing has been negotiated in good faith and at arm's length

between the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations

and indebtedness arising under, in respect of or in connection with the Financing and the

DIP Documents, including without limitation, (i) all loans made to, and all letters of credit

issued for the account of, the Debtors pursuant to the Revolving Credit, Term Loan and

Guaranty Agreement, a copy of which was filed with the Court prior to commencement of

the Hearing (the "DIP Credit Agreement"), and (ii) any "Obligations" and all other

"Secured Obligations" (as each such term is defined in the DIP Credit Agreement),

including any hedging obligations of the Debtors permitted under the DIP Credit

Agreement and any Indebtedness (as defined in the DIP Credit Agreement) permitted by

6

Section 6.03(viii) thereof, in each case owing to JPMCB, any DIP Lender or any of their respective banking affiliates (all of the foregoing in clauses (i) and (ii) collectively, the "DIP Obligations"), shall be deemed to have been extended by the Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and 6004(g).

(g)    For the reasons set forth in the Motion and based on the evidence presented at the Hearing, consummation of the Financing and the use of Cash Collateral in accordance with this Order and the DIP Documents is in the best interest of the Debtors' estates.

4.    *Authorization Of The Financing And The DIP Documents.*

(a)    The Debtors are hereby authorized to be a party to the DIP Documents. The Borrower is hereby authorized to borrow money and obtain letters of credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to guaranty such borrowings and the Borrower's obligations with respect to such letters of credit, up to an aggregate principal or face amount of $4,495,820,240.59 (plus interest, fees and other expenses provided for in the DIP Documents), subject to any limitations of borrowings under the DIP Documents, and in accordance with the terms of this Order and the DIP Documents, which shall be used solely for purposes permitted under the DIP

7

Documents, including, without limitation, (i) with respect to the the Tranche A Loan and the Tranche B Loan (as each such term is defined in the DIP Credit Agreement, as hereinafter defined, referred to herein as the "Tranche A Loan" and "Tranche B Loan", respectively, and collectively as the "First Priority Facilities"), for the DIP Facility Refinancing and to provide working capital for the Borrower and the Guarantors and for other general corporate purposes and to pay interest, fees and expenses in accordance with this Order and the DIP Documents and (ii) with respect to the Tranche C Loan (as defined in the DIP Credit Agreement, the "Tranche C Loan"), for the Pre-Petition Facility Refinancing.  In addition to such loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated clearing house fund transfers provided to or for the benefit of the Debtors by JPMCB or any other DIP Lender or any of their respective affiliates; *provided, however,* that nothing herein shall require JPMCB or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge

8

Agreement (as defined in the DIP Credit Agreement) and the mortgages, if any, contemplated thereby (collectively, and together with the letter agreements referred to in clause (iv) below, the "DIP Documents");

(ii)     the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that (A) no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not (i) shorten the maturity of the extensions of credit thereunder, (ii) increase the commitments, the rate of interest or the letter of credit fees payable thereunder, (iii) amend the financial covenants in Section 6.04 therein to be more restrictive on the Debtors or (iv) amend the notice provisions of Section 7.01 therein (i.e., notice of exercise of remedies after the occurrence of an Event of Default), and (B) the Debtors shall provide the official committee of unsecured creditors (the "Creditors' Committee") with five (5) business days' prior notice (or such shorter period as the Creditors' Committee and the Debtors may agree) of any amendment to the DIP Credit Agreement that causes the Borrowing Base to be decreased);

(iii)     the non-refundable payment to the Agent, the Joint Lead Arrangers or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement (and in the separate letter agreements between them in connection with the Financing) and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and expenses of the professionals retained as provided for in the DIP Documents; and

(iv)    the performance of all other acts required under or in connection with the DIP Documents.

(c)    The DIP Documents constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents.  No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations, as defined in the Existing DIP Order, referred to herein as the "Adequate Protection Obligations"), Replacement Liens and Junior Adequate Protection Liens (each as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (other than to the extent of any statutory liens or security interests arising after the filing of the Debtors' chapter 11

10

petitions (the "Petition Date") and permitted under the DIP Credit Agreement that by

operation of law would have priority over a previously perfected security interest), which

allowed claims shall be payable from and have recourse to all pre-petition and post-petition

property of the Debtors and all proceeds thereof, subject only to the payment of the Carve

Out to the extent specifically provided for herein; *provided, however*, that (i) the

Superpriority Claims in respect of the First Priority Facilities shall be senior in priority to

the Superpriority Claims in respect of the Tranche C Loan, and (ii) the Superpriority

Claims granted hereunder shall remain subject and subordinate to any Superpriority

Claims arising under the Existing DIP Order (as defined therein) until such Superpriority

Claims under the Existing DIP Order have been irrevocably paid in full.

(b)       For purposes hereof, the "Carve Out" means (i) all unpaid fees

required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United

States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and

expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii) after the

occurrence and during the continuance of an Event of Default (as defined in the DIP Credit

Agreement), all allowed and unpaid professional fees and disbursements incurred by the

Debtors and any statutory committees appointed in the Cases (each, a "Committee"), and

Transaction Expenses (as defined in the Equity Purchase and Commitment Agreement (the

"EPCA"), a copy of which is attached to the Expedited Motion For Order Authorizing And

Approving The Equity Purchase And Commitment Agreement Pursuant To Sections

105(A), 363(B), 503(B) And 507(A) Of The Bankruptcy Code And The Plan Framework

Support Agreement Pursuant To Sections 105(A), 363(B), And 1125(E) Of The

Bankruptcy Code (the "Plan Investment And Framework Support Approval Motion"),

filed concurrently with the DIP Refinancing Motion) incurred from and after the date that

an order is entered approving the EPCA (the "Post-Order Transaction Expenses"), that

remain unpaid subsequent to the payment, pro rata with other nonpriority administrative

creditors, of such fees and expenses from available funds remaining in the Debtors' estates

for such creditors, in an aggregate amount not exceeding $35,000,000, which amount may

be used subject to the terms of this Order, including, without limitation, paragraph 14

hereof, and (iv) all unpaid professional fees and disbursements incurred or accrued by the

Debtors and any Committees, and Post-Order Transaction Expenses, in each case incurred

or accrued at any time when no Event of Default is continuing (and promptly upon receipt

of a notice of an Event of Default, the Debtors shall provide a copy of such notice to

counsel for the Creditors' Committee), that remain unpaid subsequent to the payment, pro

rata with other nonpriority administrative creditors, of such fees and expenses and

Post-Order Transaction Expenses from available funds remaining in the Debtors' estates

for such creditors, in an aggregate amount not exceeding the sum of (x) such unpaid

professional fees and disbursements, and Post-Order Transaction Expenses, reflected on

the most recent Borrowing Base Certificate (as defined in the DIP Credit Agreement)

delivered to the Agent prior to any Event of Default that is then continuing and (y) such

unpaid professional fees and disbursements, and Post-Order Transaction Expenses,

incurred or accrued after such Borrowing Base Certificate (but at a time when no Event of

Default is continuing) in an aggregate amount under this clause (y) not exceeding

$5,000,000 (and with amounts included in this clause (y), to be supported by back-up

documentation in respect of the amounts and dates of incurrence of such fees and

disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the extent allowed

12

by the Bankruptcy Court at any time; *provided*, *however*, that (1) to the extent the dollar

limitation in this clause 5(b) on fees and disbursements and Post-Order Transaction

Expenses is reduced by any amount as a result of the payment of fees and disbursements

and Post-Order Transaction Expenses during the continuance of an Event of Default, and

such Event of Default is subsequently cured or waived and no other Event of Default then

exists, then effective as of the effectiveness of such cure or waiver, such dollar limitation

shall be increased by an amount equal to the amount by which it has been so reduced and (2)

(A) nothing herein shall be construed to impair the ability of any party to object to any of

the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv)

above and (B) following the Termination Date (as defined in the DIP Credit Agreement),

cash or other amounts on deposit in the Letter of Credit Account (as defined in the DIP

Credit Agreement), shall not be subject to the Carve Out.

      6.    *DIP Liens*.

      As security for the DIP Obligations, effective and perfected upon the occurrence of

the Closing Date (as defined in the DIP Credit Agreement) and the Refinancing (the

"Refinancing Date", at which time all liens, mortgages and security interests under the

Existing DIP Facility Documents and the Existing Pre-Petition Facility Documents shall be

deemed released and of no further force or effect) and without the necessity of the

execution, recordation of filings by the Debtors of mortgages, security agreements, control

agreements, pledge agreements, financing statements or other similar documents, the

following security interests and liens are hereby granted to the Agent for its own benefit

and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below

being collectively referred to as the "Collateral"), subject, only in the event of the

13

occurrence and during the continuance of an Event of Default, to the payment of the Carve

Out (all such liens and security interests granted to the Agent, for its benefit and for the

benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "DIP Liens";

the DIP Liens securing the First Priority Facilities, the "First Priority DIP Liens"; and the

DIP Liens securing the Tranche C Loan, the "Second Priority DIP Liens"):

(a)    First Lien On Cash Balances And Unencumbered Property.

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in and lien upon all

pre-petition and post-petition property of the Debtors, whether existing on the Petition

Date or thereafter acquired, to the extent not subject to valid, perfected, non-avoidable and

enforceable liens in existence as of the Refinancing Date (after giving effect to the release

of liens occurring at such time) (collectively, "Unencumbered Property"), including

without limitation, all cash and cash collateral of the Debtors (whether maintained with the

Agent or otherwise) and any investment of such cash and cash collateral, inventory,

accounts receivable, other rights to payment whether arising before or after the Petition

Date, contracts, properties, plants, equipment, general intangibles, documents, instruments,

interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other

intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing,

*provided*, *however*, that the Borrower and the Guarantors shall not be required to pledge to

the Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries or

any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good faith

judgment of the Borrower, adverse tax consequences would result to the Borrower).

Unencumbered Property shall exclude the Debtors' claims and causes of action under

14

sections 502(d), 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code, or any

other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"),

and any proceeds or property recovered, unencumbered or otherwise the subject of

successful Avoidance Actions.

(b)    Priming Liens.  Pursuant to section 364(d)(1) of the Bankruptcy

Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming

security interest in and lien upon all pre-petition and post-petition property of the Debtors

(including, without limitation, cash collateral, inventory, accounts receivable, other rights

to payment whether arising before or after the Petition Date, contracts, properties, plants,

equipment, general intangibles, documents, instruments, interests in leaseholds, real

properties, patents, copyrights, trademarks, trade names, other intellectual property, capital

stock of subsidiaries, and the proceeds of all the foregoing), whether now existing or

hereafter acquired, that is subject to the existing liens remaining after the occurrence of the

Refinancing Date that pursuant to the terms of the order of this Court dated October 28,

2005 approving the Borrower's and the Guarantors' entry in the Existing DIP Facility

Documents (the "Existing DIP Order") are subject and subordinate to the DIP Liens as

defined in the Existing DIP Order (the "Existing DIP Liens"), including, without limitation,

all Replacement Liens and Debtor Liens (as each such term is defined in the Existing DIP

Order), and any other liens granted under the Existing DIP Order (collectively, the "Primed

Liens").  Such security interests and liens shall be senior in all respects to the interests in

such property of the holders of the Primed Liens in respect thereof, and shall be subject and

subordinate to (i) the Carve Out (except as provided in paragraph 5 hereof), (ii) any valid,

perfected and unavoidable interests of other parties arising out of liens existing on the

15

Refinancing Date, if any, on such property, that pursuant to the terms of the Existing DIP

Order are senior in priority to the Existing DIP Liens and (iii) statutory liens or security

interests arising after the Refinancing Date and permitted under the DIP Credit Agreement

that by operation of law would have priority over a previously perfected security interest.

In addition, notwithstanding anything to the contrary contained in this paragraph 6(b), any

valid, perfected and non-voidable liens or security interests that remain in existence after

the Refinancing Date and that were senior to or *pari passu* with the liens securing the

Pre-Petition Secured Facility prior to the Refinancing Date (including, without limitation,

to the extent provided in paragraph 15 of this Order, the Replacement Liens and Junior

Adequate Protection Liens) shall maintain such priority or *pari passu* position relative to

the liens securing the Tranche C Loan.

(c)     Liens Junior To Certain Other Liens.  Pursuant to section 364(c)(3)

of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security

interests in and liens upon all pre-petition and post-petition property of the Debtors (other

than the property described in clauses (a) or (b) of this paragraph 6, as to which the liens

and security interests in favor of the Agent will be as described in such clauses), whether

now existing or hereafter acquired, that as of the Refinancing Date is subject to valid,

perfected and unavoidable liens, which security interests and liens in favor of the Agent

and the Lenders are junior to such valid, perfected and unavoidable liens.

(d)     Liens Senior To Certain Other Liens.  The DIP Liens, the

Replacement Liens and the Junior Adequate Protection Liens (each as defined below) shall

not be subject or subordinate to (i) solely in the case of the DIP Liens, any lien or security

interest that is avoided and preserved for the benefit of the Debtors and their estates under

16

section 551 of the Bankruptcy Code or (ii) any liens arising after the Refinancing Date,

including, without limitation, any liens or security interests granted in favor of any federal,

state, municipal or other governmental unit, commission, board or court for any liability of

the Debtors other than with respect to any liens or security interests arising after the

Refinancing Date and permitted under the DIP Credit Agreement to be senior to the DIP

Liens.

       7.     *Protection Of DIP Lenders' Rights.*

       (a)     So long as there are any borrowings or letters of credit or other

amounts (other than contingent indemnity obligations as to which no claim has been

asserted when all other amounts have been paid and no letters or credit are outstanding)

outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit

Agreement) under the DIP Credit Agreement, the Existing DIP Agent, the Existing DIP

Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, the holders of

Replacement Liens, the holders of Junior Adequate Protection Liens and the holders of

Debtor Liens (as defined below) shall (i) take no action to foreclose upon or recover in

connection with the liens granted thereto pursuant to the Existing Pre-Petition Facility

Documents, the Existing DIP Order or this Order, or otherwise exercise remedies against

any Collateral, except to the extent authorized by an order of this Court and (ii) be deemed

to have consented to any release of Collateral authorized under the DIP Documents and

(iii) not file any further financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments, or otherwise take any action to perfect

their security interests in the Collateral unless solely as to this clause (iii), the DIP Lenders

file financing statements or other documents to perfect the liens granted pursuant to this

17

Order, or as may be required by applicable state law to continue the perfection of valid and

unavoidable liens or security interests as of the Petition Date. Notwithstanding the

foregoing, the Pre-Petition Secured Lenders shall be permitted to file pleadings with

respect to any proposed sale, transfer or other disposition of the Collateral by the Debtors

outside the ordinary course of business so long as such pleadings do not contravene the

provisions of this paragraph 7 and do not otherwise interfere with the exercise of any right

or remedy by the Agent or the DIP Lenders.  Nothing herein shall be read to permit the

Pre-Petition Agent, the Pre-Petition Secured Lenders, or the holders of Replacement Liens,

the holders of Junior Adequate Protection Liens or the holders of Debtor Liens to take any

action in violation of the Bankruptcy Code or other applicable law.  This paragraph 7(a)

defines the relative rights of the DIP Agent and the DIP Lenders, on the one hand, and the

Pre-Petition Agent and the Pre-Petition Secured Lenders, on the other, and is not intended

to confer any rights on the Debtors except with respect to the Debtor Liens.

(b)    The automatic stay provisions of section 362 of the Bankruptcy

Code are vacated and modified to the extent necessary to permit the Agent and the DIP

Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all rights

and remedies under the DIP Documents other than those rights and remedies against the

Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the

continuance of an Event of Default and the giving of five business days prior written notice

to the extent provided for in the DIP Credit Agreement (promptly upon receipt of such

notice, the Debtors shall provide a copy of such notice to counsel for the Creditors'

Committee), all rights and remedies against the Collateral provided for in the DIP

Documents (including, without limitation, the right to setoff monies of the Debtors in

18

accounts maintained with the Agent or any DIP Lender).  In any hearing regarding any

exercise of rights or remedies, the only issue that may be raised by any party in opposition

thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and

the Debtors, the Existing DIP Agent, the Pre-Petition Agent, the Pre-Petition Secured

Lenders, and the holders of Replacement Liens or Junior Adequate Protection Liens hereby

waive in such capacities, but not in capacities as holders of general unsecured claims, their

right to seek relief, including, without limitation, under section 105 of the Bankruptcy

Code, to the extent such relief would in any way impair or restrict the rights and remedies

of the Agent or the DIP Lenders set forth in this Order or the DIP Documents.  In no event

shall the Agent, the DIP Lenders, the Existing DIP Agent, the Pre-Petition Agent, the

Pre-Petition Secured Lenders, or the holders of Replacement Liens or Junior Adequate

Protection Liens be subject to the equitable doctrine of "marshaling" or any similar

doctrine with respect to the Collateral.

> 8.     *Limitation On Charging Expenses Against Collateral*.  Except to the extent

of the Carve Out, no expenses of administration of the Cases or any future proceeding that

may result therefrom, including liquidation in bankruptcy or other proceedings under the

Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to

section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior

written consent of the Agent, the Existing DIP Agent or the Pre-Petition Agent, as the case

may be, and no such consent shall be implied from any other action, inaction, or

acquiescence by the Agent, the DIP Lenders, the Existing DIP Agent, the Pre-Petition

Agent or the Pre-Petition Secured Lenders.

19

9.      *Use Of Cash Collateral.*  The Debtors are hereby authorized to use all Cash Collateral (as defined in the Existing DIP Order) of the Pre-Petition Secured Lenders and of the holders of Replacement Liens or Junior Adequate Protection Liens, and the Pre-Petition Secured Lenders and the holders of Replacement Liens or Adequate Protection Liens (as defined in the Existing DIP Order) are directed promptly to turn over to the Debtors all Cash Collateral received or held by them, provided that, until the Refinancing Date, the Pre-Petition Secured Lenders and the holders of Replacement Liens or Adequate Protection Liens are granted adequate protection as set forth in the Existing DIP Order.  The Debtors' right to use Cash Collateral shall terminate automatically upon the occurrence of the Termination Date or the voluntary reduction by the Borrower of the Total Commitments to zero (as each such term is defined in the DIP Credit Agreement).

10.      *Adequate Protection of Pre-Petition Secured Lenders*.  The Adequate Protection Liens and other rights afforded to the Pre-Petition Agent and the Pre-Petition Secured Lenders under paragraphs 12 and 13 of the Existing DIP Order shall continue in effect until the Refinancing Date, whereupon the Adequate Protection Liens shall be deemed released and the provisions of paragraphs 12 and 13 of the Existing DIP Order shall be of no further force or effect.

11.      *Perfection Of DIP Liens.*

(a)      Subject to the provisions of paragraph 7(a) above, the Agent is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the Agent on behalf of the DIP

20

Lenders shall, in its sole discretion, choose to file such financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise

confirm perfection of the liens and security interests granted to the Agent hereunder, such

liens and security interests shall be deemed valid, perfected, allowed, enforceable,

non-avoidable and not subject to challenge dispute or subordination, at the time and as of

the date of entry of this Order.  Upon the request of the Agent, each of the Existing DIP

Agent and the Existing DIP Lenders, and the Pre-Petition Agent and Pre-Petition Secured

Lenders, without any further consent of any party, is authorized to take, execute and deliver

such instruments (in each case without representation or warranty of any kind) to enable

the Agent to further validate, perfect, preserve and enforce DIP Liens.

(b)    A certified copy of this Order may, in the discretion of the Agent, be

filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing

offices are hereby authorized to accept such certified copy of this Order for filing and

recording.

(c)    Any provision of any lease or other license, contract or other

agreement that requires (i) the consent or approval of one or more landlords or other parties

or (ii) the payment of any fees or obligations to any governmental entity, in order for any

Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or

the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to

be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such

provision shall have no force and effect with respect to the transactions granting

post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale

21

thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the DIP
Credit Agreement or this Order.

12.      *Preservation Of Rights Granted Under The Order.*

(a)      No claim or lien having a priority superior to or *pari passu* with
those granted by this Order to the Agent and the DIP Lenders or to the Setoff Claimants,
respectively, shall be granted or allowed while any portion of the Financing (or any
refinancing thereof) or the Commitments thereunder or the DIP Obligations remain
outstanding, and the DIP Liens, the Replacement Liens and the Junior Adequate Protection
Liens shall not be (i) solely in the case of the DIP Liens, subject or junior to any lien or
security interest that is avoided and preserved for the benefit of the Debtors' estates under
section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any
other lien or security interest, whether under section 364(d) of the Bankruptcy Code or
otherwise (other than as specifically provided for in this Order).  Nothing in this paragraph
12(a) shall limit (x) the rights of the Debtors to refinance the Financing in compliance with
the DIP Credit Agreement or (y) the rights of any party in interest with respect to any such
refinancing.

(b)      Unless all DIP Obligations shall have been paid in full (and, with
respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement, cash
collateralized in accordance with the provisions of the DIP Credit Agreement), the Debtors
shall not seek, and it shall constitute an Event of Default and a termination of the right to
use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modifications
or extensions of this Order without the prior written consent of the Agent, and no such
consent shall be implied by any other action, inaction or acquiescence by the Agent, or (ii)

22

an order dismissing any of the Cases.  If an order dismissing any of the Cases under section

1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide

(in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the

Superpriority Claims, priming liens, security interests and replacement security interests

granted to the Agent, the Setoff Claimants or the holders of the Debtor Liens pursuant to

this Order, shall continue in full force and effect and shall maintain their priorities as

provided in this Order until all DIP Obligations shall have been paid and satisfied in full

(and that such Superpriority Claims, priming liens and replacement security interests, shall,

notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court

shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the

claims, liens and security interests referred to in (x) above.

   (c)  If any or all of the provisions of this Order are hereafter reversed,

modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect

(i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice

by the Agent, as applicable, of the effective date of such reversal, stay, modification or

vacation or (ii) the validity or enforceability of any lien or priority authorized or created

hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or

Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification

or vacation, any use of Cash Collateral, or DIP Obligations incurred by the Debtors to the

Agent or the DIP Lenders prior to the actual receipt of written notice by the Agent of the

effective date of such reversal, stay, modification or vacation shall be governed in all

respects by the original provisions of this Order, and the Agent and the DIP Lenders shall

be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of

the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all

uses of Cash Collateral and DIP Obligations.

(d)    Except as expressly provided in this Order or in the DIP Documents,

the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and

the DIP Lenders granted by the provisions of this Order and the DIP Documents shall

survive, and shall not be modified, impaired or discharged by (i) the entry of an order

converting any of the Cases to a case under chapter 7, dismissing any of the Cases,

terminating the joint administration of these Cases or by any other act or omission, or (ii)

the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant

to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to

any remaining DIP Obligations.  The terms and provisions of this Order and the DIP

Documents shall continue in these Cases, in any successor cases if these Cases cease to be

jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and

the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and

the DIP Lenders granted by the provisions of this Order and the DIP Documents shall

continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

13.    *Effect Of Stipulations On Third Parties*.  Notwithstanding the Fourth

Stipulation Between the Creditors' Committee and JPMorgan Chase Bank, N.A., as Agent

for the Pre-Petition Secured Lenders, with Respect to an Extension of Deadlines

Established Pursuant to Final DIP Financing Order, entered by this Court on June 13, 2006,

the stipulations and admissions contained in paragraphs 3 and 10 of the Existing DIP Order

shall be binding upon the Creditors' Committee, and the time period during which the

Creditors' Committee is permitted to raise "Claims and Defenses" as provided in

paragraph 16 of the Existing DIP Order, is hereby terminated.

14.    *Limitation On Use Of Financing Proceeds And Collateral.*

Notwithstanding anything herein or in any other order by this Court to the contrary, no

borrowings, letters of credit, Cash Collateral Collateral or the Carve Out may be used to (a)

object, contest or raise any defense to, the validity, perfection, priority, extent or

enforceability of any amount due under the DIP Documents, the Existing DIP Facility

Documents or the Existing Pre-Petition Facility Documents, or the liens or claims granted

under this Order, the Existing DIP Order, the DIP Documents or the Existing Pre-Petition

Facility Documents, (b) assert any causes of action against the Agent, the DIP Lenders, the

Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent or the Pre-Petition

Secured Lenders or their respective agents, affiliates, representatives, attorneys or advisors,

prevent, hinder or otherwise delay the Agent's assertion, enforcement or realization on the

Cash Collateral or the Collateral in accordance with the DIP Documents or this Order, (c)

seek to modify any of the rights granted to the Agent, the DIP Lenders, the Existing DIP

Agent, the Existing DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured

Lenders hereunder, under the Existing DIP Order or under the DIP Documents, the

Existing DIP Facility Documents or the Existing Pre-Petition Facility Documents, in each

of the foregoing cases without such parties' prior written consent or (d) pay any amount on

account of any claims arising prior to the Petition Date unless such payments are (i)

approved by an Order of this Court and (ii) in accordance with the DIP Credit Agreement

or otherwise approved by the Agent in its sole discretion.

15.    *Setoff, Replacement Liens and Junior Adequate Protection Liens*.  To the extent that a customer or supplier of the Debtors that has an allowable setoff claim under section 506 or 553 of the Bankruptcy Code in respect of its payables owed to any Debtor as of the Petition Date ("Pre-Petition Payables") or a valid right of recoupment that arose prior to the Petition Date (such setoff claim or right of recoupment, "Setoff"), such customer or supplier (a "Setoff Claimant") is hereby provided, consistent with the terms of the Existing DIP Order, with certain rights and adequate protection as described below. For the avoidance of doubt, nothing herein shall be construed to be an admission or acknowledgement, or an increase or decrease in the monetary amount of the pre-petition setoff or recoupment rights of any person, under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(a)    Exercise of Set Off.  (1)  Any exercise of a Setoff Right (as defined below) in accordance with this Order shall not be stayed by section 362 of the Bankruptcy Code.  Any exercise of any right of Setoff other than in accordance with this Order is subject to section 362 of the Bankruptcy Code.  Nothing in this Order shall prevent any holder of a right of Setoff from seeking relief from the automatic stay with respect to such Setoff, or prevent the Debtors or any party in interest from objecting or being heard with respect to any such request.  A Setoff Claimant shall, in accordance with this paragraph, be entitled to exercise its Setoff that arose in the ordinary course of business for any claims or recoupment defenses arising from or related to the claims for prepetition warranty and/or product recall claims, customer adjustments, customer rebates and allowances, overpricing claims, claims for short shipments and damaged goods, customer/supplier netting and other similar claims arising in the ordinary course of business of the relevant parties other

26

than any such claims or recoupment defenses arising as a result of the filing of the cases (a

"Setoff Right").  A Setoff Right shall not include any claims or recoupment defenses

arising from or related to employee or employee benefit matters, retiree benefit or pension

matters, including, without limitation, any related indemnities or guarantees, the rejection

of executory contracts, or consequential or punitive damages.  The determination as to

whether a Setoff Claimant may exercise a "Setoff Right" will be made solely by (i) the

agreement of the Setoff Claimant, the Creditors' Committee and the Debtors, (ii) pursuant

to the procedures hereinafter set forth or (iii) order of the Court.

(2)    Any Setoff Claimant seeking to exercise a Setoff Right against

payables during any month (whether against Pre-Petition Payables or post-petition

payables) shall submit to the Debtors and the Creditors' Committee (with a copy to the

Agent) a written request to exercise such Setoff Right, the basis for such Setoff Right and

reasonably detailed documentation supporting such Setoff Right.  If the Setoff Claimant,

the Creditors' Committee and the Debtors fail to agree in writing that any amount is

included in a Setoff Right within 10 business days after submission of such information to

the Debtors and the Creditors' Committee (the "Agreement Deadline"), the Debtors and

such Setoff Claimant shall (unless all such parties agree to extend such 10 business day

period) seek resolution of such matter through a mediator agreed to by the Debtors and

such Setoff Claimant or appointed by this Court.  Such mediation shall end not later than

30 days after the Agreement Deadline unless such period is extended by agreement of the

Debtors and such Setoff Claimant.  If the Debtors and such Setoff Claimant cannot resolve

the matter through such mediation, then such matter may be submitted to binding

arbitration to a single arbitrator agreed to by all such parties or appointed by this Court, and

27

such parties shall request that such arbitrator issue its ruling within 90 days after the

Agreement Deadline.  Notwithstanding any award in any such arbitration, in no event shall

the Setoff Claimant be permitted to exercise its Setoff Right against any payables other

than Pre-Petition Payables except as set forth in this paragraph 15.

(3)    In the event any Setoff Claimants (the "Non-Exercising Setoff

Claimants") have not exercised their asserted Setoff Rights in respect of their respective

Pre-Petition Payables and have instead paid their Pre-Petition Payables to the Debtors, in

addition to any other adequate protection provided to such Non-Exercising Setoff

Claimants herein, the Non-Exercising Setoff Claimants may exercise Setoff Rights

established in accordance with this paragraph against post-petition payables owed by such

Non-Exercising Setoff Claimants to the Debtor or Debtors against which such

Non-Exercising Setoff Claimants have their Setoff Rights; *provided* that (a) in the case of

the exercise of any Setoff Rights by General Motors Corporation or any of its affiliates

("GM"), the aggregate amount of Setoff Rights that may be exercised pursuant to this

subparagraph (3) against Pre-Petition Payables or post-petition payables owed by GM to

the Debtors during any month shall not exceed $35 million (the "Aggregate Monthly Cap

Amount") and (b) to the extent Setoff Rights are recognized in accordance with this Order

or the Existing DIP Order in excess of the Setoff Rights that are permitted to be exercised

pursuant to such limitations, Setoff Claimants may carry forward their Setoff Right to

succeeding months, subject to the applicable monthly limitations, if any, until such Setoff

Rights have been fully exercised.

(4)    (a) Except as set forth above, and subject to the adequate protection

provided to Setoff Claimants as herein set forth, Setoff Claimants shall not be permitted to

exercise any Setoff until the later of (x) the effective date of the Debtors' confirmed plan of

reorganization and (y) allowance of the Setoff as a claim in these Cases.  Any exercise of

Setoff pursuant to (x) or (y) above is subject to the treatment afforded to such Setoff under

a plan of reorganization confirmed by the Bankruptcy Court.  Nothing contained herein

shall limit (i) the discretion of the Debtors to pay warranty and/or product recall claims in

accordance with orders of the Court, (ii) the right of any party in interest to exercise a

post-petition setoff or recoupment against a post-petition payable or (iii) the right of a

Setoff Claimant to request further adequate protection (or the Debtors or any party in

interest to oppose any such request).

(b)    Adequate Protection.  A Setoff Claimant is entitled, pursuant to

sections 361, 362(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of its

Setoff to the extent it does not exercise such Setoff and remits the amount of such

Pre-Petition Payables not setoff or recouped.  As adequate protection therefor, each such

Setoff Claimant is hereby granted, effective upon payment to the Debtors of the amount

subject to such Setoff, the following (collectively, including any Junior Adequate

Protection Liens granted pursuant to the Existing DIP Order, the "Junior Adequate

Protection Liens"), such Junior Adequate Protection Liens to be effective and perfected

without the necessity of the execution by the Debtors of mortgages, security agreements,

pledge agreements, financing statements or other agreements:

(i)    A replacement lien (including any Replacement Liens granted

pursuant to the Existing DIP Order, the "Replacement Lien") on such Setoff Claimant's

post-petition payables to the extent that it is determined that such Setoff Claimant had a

Setoff in respect of the Pre-Petition Payables that have been remitted to the Debtors, which

29

Replacement Lien is limited to the amount of the Setoff; *provided, however*, that (i) the

Debtors reserve their rights to any and all Claims and Defenses that may be asserted with

respect to such Setoff and (ii) the Replacement Liens are subject and subordinate to and

only to (x) the Existing DIP Liens, the First Priority DIP Liens granted to the Agent for the

benefit of the DIP Lenders in this Order and pursuant to the DIP Documents, and any liens

to which such liens so granted to the Agent are junior and (y) the Carve-Out.

        (ii)        As further adequate protection to protect the Setoff Claimant

against any diminution in the value of its Replacement Lien, the Setoff Claimant is hereby

granted a security interest in and lien upon all the other Collateral, subject and subordinate

to and only to (A) the Existing DIP Liens, the DIP Liens granted to the Agent for the

benefit of the DIP Lenders in this Order and pursuant to the DIP Documents, and any liens

to which such liens so granted to the Agent are junior, (B) the Carve Out and (C) until the

Refinancing Date, the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral

and the Adequate Protection Liens granted to the Pre-Petition Agent and the Pre-Petition

Secured Lenders under the Existing DIP Order; *provided* that the Setoff Claimant's

security interest in and lien upon Collateral which is not (x) Pre-Petition Collateral (as

defined in the Existing DIP Order), (y) Collateral that would have constituted Pre-Petition

Collateral but for the operation of section 552(a) of the Bankruptcy Code as to which,

without further action, the Pre-Petition Agent would have had a valid and perfected

security interest or lien or (z) subject to the Replacement Lien, shall be *pari passu* with the

Adequate Protection Liens granted to the Pre-Petition Agent and the Pre-Petition Secured

Lenders pursuant to the Existing DIP Order and *pari passu* with the DIP Liens on

Collateral that is not included in clauses (x), (y) or (z) solely to the extent such DIP Liens secure the Tranche C Term Loan.

(iii)    As further Adequate Protection, to the extent that the post-petition payables in respect of which the Setoff Claimant is granted a Replacement Lien are less than the Setoff of such Setoff Claimant, such Setoff Claimant is hereby granted an administrative claim under section 507(b) of the Bankruptcy Code in the amount of such deficiency subject to the Carve Out and equal in priority to the administrative claim granted as adequate protection to the Pre-Petition Secured Lenders in paragraph 12(b) of the Existing DIP Order and the Superpriority Claim in respect of the Tranche C Loan; *provided, however*, that the Setoff Claimant shall not receive or retain any payments, property or other amounts in respect of the claims under section 507(b) of the Bankruptcy Code granted hereunder unless and until the DIP Obligations in respect of the First Priority Facilities have indefeasibly been paid in cash in full and no letters of credit under the First Priority Facilities remain outstanding.

16.    *Debtor Reimbursement Claims and Debtor Liens*.  Without limiting the joint and several liability of each of the Debtors for the DIP Obligations, the Debtors shall use their reasonable best efforts to ensure that Debtors that receive the benefit of funds advanced under the Financing repay their share thereof on a dollar for dollar basis.  To the extent a Debtor (i) incurs any of the DIP Obligations (including as a result of intercompany balances incurred after the Petition Date to the extent such balances arise from the incurrence of DIP Obligations) or (ii) receives a post-petition intercompany loan or transfer (including as a result of the Debtors' cash management system or otherwise) (each a "Beneficiary Debtor"), and such DIP Obligations were repaid or such post-petition

31

intercompany loan or transfer is made (including from cash collateral) (each an "Advance")

by (A) any other Debtor that is a Borrower or Guarantor under the Financings or (B) any

non-Debtor affiliate (together (A) and (B) an "Adequately Protected Entity"), the

Adequately Protected Entity shall have, subject to the limitations set forth in paragraph 17

below (a) an allowed claim under sections 364(c)(1) and 507(b) of the Bankruptcy Code

against the Beneficiary Debtor for the amount of such Advance, having priority over any

and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, which claim shall bear interest at a rate agreed between the Debtors

from time to time for the period accruing from and after the date such claim arises until

repayment thereof (collectively, including Debtor Reimbursement Claims granted

pursuant to paragraph 17 of the Existing DIP Order, the "Debtor Reimbursement Claim")

and (b) a lien on all Collateral under section 364(c)(3) of the Bankruptcy Code securing

such Debtor Reimbursement Claim (including Debtor Liens granted pursuant to paragraph

17 of the Existing DIP Order, a "Debtor Lien").  All Liens are effective and perfected

without the necessity of the execution by the Debtors of mortgages, security agreements,

pledge agreements, financing statements or other agreements.

17.    All Debtor Reimbursement Claims and Debtor Liens shall be junior, subject

and subordinate to and only to the Superpriority Claims, the DIP Liens, Adequate

Protection Obligations, the Junior Adequate Protection Liens, the Replacement Liens and

to any claims against such Beneficiary Debtor that are expressly senior to, and on a parity

with, or carved out from the Superpriority Claims, the DIP Liens, Adequate Protection

Obligation, Junior Adequate Protection Liens or the Replacement Liens.  All Debtor Liens

shall be "silent" liens and the Adequately Protected Entity shall forbear from exercising,

and shall not be entitled to exercise, any right or remedy relating to any Debtor

Reimbursement Claim or Debtor Lien, including, without limitation, taking any of the

actions that the holders of Replacement Liens and Junior Adequate Protection Liens are

prohibited from taking pursuant to paragraph 7, including, without limitation, as to seeking

relief from the automatic stay, or seeking any sale, foreclosure, realization upon

repossession or liquidation of any property of another Debtor, or taking any position with

respect to any disposition of the property, the business operations, or the reorganization of

another Debtor. The Agent shall have the exclusive right to manage, perform and enforce

all rights and remedies described in the DIP Documents.  The Debtor Lien of the

Adequately Protected Entity automatically, and without further action of any person or

entity of any kind, shall be released or otherwise terminated to the extent that property

subject to such Debtor Lien is sold or otherwise disposed of by or on behalf of the Agent or

any other Debtor or to the extent that such property is subject to a lien prior to the DIP

Liens and such lien is permitted under the DIP Documents.

18.    *Sufficiency of Adequate Protection*.  Under the circumstances and given that

the above described adequate protection is consistent with the Bankruptcy Code, the Court

finds that the adequate protection provided herein is reasonable and sufficient to protect the

interests of all parties with liens against or interests in property of the Borrower or the

Guarantors.

19.    With respect to the effect of Debtor Liens on any sale of property by the

Debtors, (a) the Debtors may sell property, in accordance with section 363 of the

Bankruptcy Code, free and clear of any Debtor Lien, with such lien attaching to the

proceeds of sale in the same priority and subject to the same limitations and restrictions as

33

existed in respect of the property sold and (b) the provisions of section 363(k) of the

Bankruptcy Code shall not apply.

20.     *JPMCB As Collateral Agent*.  To the extent JPMCB, in its role as Collateral

Agent under the Existing Pre-Petition Facility Documents, is the secured party under any

Control Agreements (as defined in the Existing Pre-Petition Facility Documents), listed as

loss payee under the Debtors' insurance policies as required under that certain Guarantee

and Collateral Agreement, dated as of June 14, 2005, by the Borrower and certain of its

subsidiaries, in favor of the Pre-Petition Agent, or is the secured party under any other

Existing Pre-Petition Facility Document, JPMCB, in its role as Collateral Agent under the

DIP Credit Agreement, is also deemed to be the secured party under such Control

Agreements, loss payee under the Debtors' insurance policies and the secured party under

any other Existing Pre-Petition Facility Document and shall act in that capacity and

distribute any proceeds recovered or received first, for the benefit of the DIP Lenders in

accordance with the DIP Credit Agreement and second, subsequent to indefeasible

payment in full of all DIP Obligations, for the benefit of the Pre-Petition Secured Lenders

under the Existing Pre-Petition Facility Documents.

21.     *Order Governs*.  In the event of any inconsistency between the provisions of

this Order and the Existing DIP Order, the DIP Documents or the Existing DIP Facility

Documents, the provisions of this Order shall govern.  Subject to the terms of this Order,

the provisions of the Existing DIP Order shall remain in full force and effect.  The terms of

this Order shall govern to the extent of any inconsistency between this Order and that

certain Cash Management Order dated October 14, 2005, including, without limitation,

with respect to the matters set forth in paragraphs 16 to 18 of this Order.

34

22.    *Binding Effect; Successors And Assigns.*  The DIP Documents and the
provisions of this Order, including all findings herein, shall be binding upon all parties in
interest in these Cases, including, without limitation, the Agent, the DIP Lenders, the
Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent, the Pre-Petition
Secured Lenders, any party granted a Junior Adequate Protection Lien hereunder or under
the Existing DIP Order, any Committee appointed in these Cases, and the Debtors, for
themselves and not for their estates, and their respective successors and assigns and shall
inure to the benefit of the Agent, the DIP Lenders, the Existing DIP Agent, the Existing
DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, any party granted a
Replacement Lien or Junior Adequate Protection Lien, and the Debtors and their respective
successors and assigns; *provided*, *however*, that the Agent, the Existing DIP Agent, the
Pre-Petition Agent, the DIP Lenders, the Existing DIP Lenders and the Pre-Petition
Secured Lenders shall have no obligation to permit the use of Cash Collateral or extend any
financing to any chapter 7 trustee or similar responsible person appointed for the estates of
the Debtors.  In determining to make any loan under the DIP Credit Agreement, permitting
the use of Cash Collateral or in exercising any rights or remedies as and when permitted
pursuant to this Order or the DIP Documents, the Agent, the Pre-Petition Agent, the
Existing DIP Agent, the DIP Lenders, the Existing DIP Lenders and the Pre-Petition
Secured Lenders shall not be deemed to be in control of the operations of the Debtors or to
be acting as a "responsible person" or "owner or operator" with respect to the operation or
management of the Debtors (as such terms, or any similar terms, are used in the United
States Comprehensive Environmental Response, Compensation and Liability Act, 29
U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

35

23.    *Aircraft Leases.*  Notwithstanding anything to the contrary contained in this

Order and consistent with this Court's September 29, 2006 order (Docket No. 5234), no

DIP Liens or any other liens or interests granted, authorized or contemplated herein shall

attach to any interests of Delphi Automotive Systems Human Resources, LLC ("Delphi

HR") in two leases of aircraft, both of which are dated March 30, 2001 between Bank of

America, N.A., and Delphi HR (the "Aircraft Leases"), or in any personal property,

cash collateral or proceeds that is the subject of the Aircraft Leases.

24.    *Objections Overruled*.  Any objection to the Motion which has not been

withdrawn or resolved is, to the extent not resolved, hereby overruled.

25.    *Committee Notices*.  All notices to be provided to the Creditors' Committee

shall be sent to Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, NY

10022-4834, Attn: Robert Rosenberg, Esq.

26.    Notwithstanding the possible applicability of Bankruptcy Rule 6004(g) or

any other provision of the Bankruptcy Rules or Bankruptcy Code, the terms and conditions

of this Order shall be immediately effective and enforceable upon its entry.

Dated:    _____ __, 200_
          New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                          :
            In re                         :        Chapter 11
                                          :
DELPHI CORPORATION, <u>et al.</u>,        :        Case No. 05-44481 (RDD)
                                          :
                        Debtors.          :        (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


ORDER PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007
DISALLOWING AND EXPUNGING CERTAIN DUPLICATE AND AMENDED
<u>CLAIMS IDENTIFIED IN SECOND OMNIBUS CLAIMS OBJECTION</u>

("DECEMBER ADJOURNED RESPONSES SECOND OMNIBUS
CLAIMS OBJECTION ORDER")

Upon the Debtors' Second Omnibus Objection (Procedural) Pursuant To 11 U.S.C.

§ 502(b) And Fed. R. Bankr. P. 3007 To Certain (i) Equity Claims, (ii) Claims Duplicative Of

Consolidated Trustee Or Agent Claims, And (iii) Duplicate And Amended Claims, dated

October 31, 2006 (the "Second Omnibus Claims Objection"), of Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"); and upon the record of the hearing held on November 30, 2006 on

the Second Omnibus Claims Objection; and upon the record of the hearing held on December 13,

2006 regarding the Response Of Port City Castings Corp To Debtors' Second Omnibus

Objection To Claims, filed November 22, 2006 (Docket No. 5710), the Limited Response Of

International Rectifier Corporation And IR EPI Services, Inc. To Second Omnibus Objection

(Procedural) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (I) Equity

Claims, (II) Claims Duplicative Of Consolidated Trustee Or Agent Claims, And (III) Duplicate

And Amended Claims, filed November 22, 2006 (Docket No. 5746), and the Response To

Debtor's Second Omnibus Objection Filed By Jeffrey G. Carl, filed November 27, 2006 (Docket

No. 5924) (collectively, the "December Adjourned Responses"); and after due deliberation

thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A.    Each of the claimants that filed a December Adjourned Response was

properly and timely served with a copy of the Second Omnibus Claims Objection, a personalized

Notice Of Objection To Claim, the proposed order, and a notice of the deadline for responding to

the Second Omnibus Claims Objection.  No other or further notice of the Second Omnibus

Claims Objection is necessary.

B.    The Court has jurisdiction over the Second Omnibus Claims Objection

pursuant to 28 U.S.C. §§ 157 and 1334.  The Second Omnibus Claims Objection is a core

proceeding under 28 U.S.C. § 157 (b)(2).  Venue of these cases and the Second Omnibus Claims

Objection in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.    The Claims listed on Exhibit A hereto under the column heading "Claim

To Be Expunged" are either duplicates of Claims filed with the Court or have been amended or

superseded by later-filed Claims.

D.    The relief requested in the Second Omnibus Claims Objection is in the

best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED

THAT:

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact when appropriate.  See Fed. R. Bankr. P. 7052.  Capitalized terms used and not otherwise defined herein
shall have the meanings ascribed to them in the Second Omnibus Claims Objection.

1.      Each "Claim To Be Expunged" listed on Exhibit A hereto is hereby

disallowed and expunged in its entirety.  Those Claims identified on Exhibit A as "Surviving

Claims" shall remain on the Debtors' claims register, but shall remain subject to future objection

by the Debtors and other parties in interest.

2.      Entry of this order is without prejudice to the Debtors' right to object to

any other claims in these chapter 11 cases, or to further object to claims that are the subject of the

Second Omnibus Claims Objection, on any grounds whatsoever; provided, however, that solely

to the extent that (a) a claimant filed duplicative claims against different Debtors for the same

asserted obligation (the "Multiple Debtor Duplicative Claims") and (b) certain of such claimant's

Multiple Debtor Duplicative Claims are being disallowed and expunged hereby, the Debtors

shall not seek to have the claimant's remaining Multiple Debtor Duplicative Claim (the

"Surviving Claim") disallowed and expunged solely on the basis that such Surviving Claim is

asserted against the incorrect Debtor, provided that one of the Multiple Debtor Duplicative

Claims was originally filed against the correct Debtor.  For the avoidance of doubt, except as

expressly provided in the preceding sentence, the Surviving Claims shall remain subject to

further objection on any grounds whatsoever, including, without limitation, that any such

Surviving Claim is asserted against the incorrect Debtor if the claimant did not file a Multiple

Debtor Duplicative Claim against the correct Debtor.  Nothing contained herein shall restrict the

Debtors from objecting to any Surviving Claim or any holder of a Surviving Claim from seeking

relief from this Court for the purposes of requesting that this Court modify the Debtor or Debtors

against which such Surviving Claim is asserted.

3.      Without limiting the generality of paragraph 2 above, any duplicative

claims filed by International Rectifier Corporation ("IRC") and/or IR Epi Services, Inc. ("IR Epi")

3

against different Debtors for the same asserted amount and/or obligation (the "IRC/IR Epi Duplicative Claims") listed on <u>Exhibit D</u> to the Second Omnibus Claims Objection and <u>Exhibit A</u> hereto as a "Claim To Be Expunged", shall be considered expunged, and only the IRC/IR Epi Duplicative Claims which have been designated as a "Surviving Claim" on <u>Exhibit D</u> to the Second Omnibus Claims Objection and <u>Exhibit A</u> hereto, shall survive (the "IRC/IR Epi Surviving Claim"); <u>provided</u> <u>however</u>, that in the event that the Debtors and IRC or IR Epi, as appropriate, later discover and agree that such IRC/IR Epi Surviving Claim has been retained as against the incorrect Debtor or Debtors, the Debtors shall not seek to have such IRC/IR Epi Surviving Claim disallowed and expunged solely on the basis that such is ultimately found to have been retained against the incorrect Debtor or Debtors.  The Debtors further agree to treat such IRC/IR Epi Surviving Claim as a claim against the correct Debtor or Debtors insofar as IRC or IR Epi, as appropriate, had timely filed a IRC/IR Epi Duplicative Claim against such correct Debtor or Debtors, and to request that this Court so modify and correct the Debtor or Debtors against which such IRC/IR Epi Surviving Claim is/are asserted, notwithstanding that such other IRC/IR Epi Duplicative Claim(s) is/are being disallowed and expunged hereby.  For the avoidance of doubt, the IRC/IR Epi Surviving Claims, and any expunged claim which is later reinstated in accordance with this paragraph, shall remain subject to further objection on any grounds whatsoever, including, without limitation, that such IRC/IR Epi Surviving Claim is asserted against the incorrect Debtor if IRC or IR Epi, as appropriate, failed to timely file a IRC/IR Epi Duplicative Claim against the correct Debtor or Debtors.

4.    Nothing contained herein shall constitute, nor shall it be deemed to constitute, the allowance of any claim asserted against any of the Debtors.

4

5.      This Court shall retain jurisdiction over the Debtors and the holders of Claims subject to the Second Omnibus Claims Objection and addressed by the December Adjourned Responses to hear and determine all matters arising from the implementation of this order.

6.      Each Claim and the objections by the Debtors to each Claim addressed in the Second Omnibus Claims Objection and December Adjourned Responses and set forth on Exhibit A hereto constitutes a separate contested matter as contemplated by Fed. R. Bankr. P. 9014.  This order shall be deemed a separate order with respect to each Claim.  Any stay of this order shall apply only to the contested matter which involves such Claim and shall not act to stay the applicability or finality of this order with respect to the other contested matters covered hereby.

7.      The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York for the service and filing of a separate memorandum of law is deemed satisfied by the Second Omnibus Claims Objection.

Dated:  New York, New York
        December 14, 2006

_____/s/Robert D. Drain_____
UNITED STATES BANKRUPTCY JUDGE

5

In re Delphi Corporation, et al.

*Second Omnibus Claims Objection*

**Exhibit A - Duplicate and Amended Claims**

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | |
|---|---|---|
| Claim Number: 9494 | Debtor: DELPHI CORPORATION (05-44481) | |
| Date Filed: 07/14/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | $0.00 |
| CARL JEFFREY G | Administrative: | |
| 6597 PKWOOD DR | Unsecured: | |
| LOCKPORT, NY 14094-6625 | Total: | $0.00 |

| | | |
|---|---|---|
| Claim Number: 9492 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) | |
| Date Filed: 07/14/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | $0.00 |
| CARL JEFFREY G | Administrative: | |
| 6597 PKWOOD DR | Unsecured: | |
| LOCKPORT, NY 14094-6625 | Total: | $0.00 |

| | | |
|---|---|---|
| Claim Number: 13802 | Debtor: DELPHI AUTOMOTIVE SYSTEMS SERVICES LLC (05-44632) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13779 | Debtor: EXHAUST SYSTEMS CORPORATION (05-44573) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13716 | Debtor: DELPHI AUTOMOTIVE SYSTEMS HUMAN RESOURCES LLC (05-44639) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13797 | Debtor: DELPHI INTERNATIONAL SERVICES INC (05-44583) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

| | | |
|---|---|---|
| Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) | |
| Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | |
| | Priority: | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

In re Delphi Corporation, et al.

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | | | Surviving Claim | | |
|---|---|---|---|---|---|
| Claim Number: 13784 | Debtor: | DELPHI MEDICAL SYSTEMS COLORADO CORPORATION (05-44507) | Claim Number: 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | | Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | | Creditor's Name and Address: | Secured: | |
| | Priority | | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | | INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | | SHEPPARD MULLIN RICHTER & HAMPTON L | | |
| 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 | LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |
| Claim Number: 13791 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS RISK MANAGEMENT CORP (05-44570) | Claim Number: 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | | Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | | Creditor's Name and Address: | Secured: | |
| | Priority | | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | | INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | | SHEPPARD MULLIN RICHTER & HAMPTON L | | |
| 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 | LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |
| Claim Number: 13782 | Debtor: | DELPHI LIQUIDATION HOLDING COMPANY (05-44542) | Claim Number: 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | | Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | | Creditor's Name and Address: | Secured: | |
| | Priority | | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | | INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | | SHEPPARD MULLIN RICHTER & HAMPTON L | | |
| 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 | LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |
| Claim Number: 13793 | Debtor: | DELPHI FURUKAWA WIRING SYSTEMS LLC (05-47452) | Claim Number: 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | | Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | | Creditor's Name and Address: | Secured: | |
| | Priority | | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | | INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | | SHEPPARD MULLIN RICHTER & HAMPTON L | | |
| 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 | LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |
| Claim Number: 13786 | Debtor: | PACKARD HUGHES INTERCONNECT COMPANY (05-44626) | Claim Number: 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | | Date Filed: 07/31/2006 | | |
| Creditor's Name and Address: | Secured: | | Creditor's Name and Address: | Secured: | |
| | Priority | | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | Administrative: | | INTERNATIONAL RECTIFIER CORPORATION | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | | SHEPPARD MULLIN RICHTER & HAMPTON L | | |
| 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: | $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: | $1,423,472.76 | LOS ANGELES, CA 90071 | Total: | $1,423,472.76 |

In re Delphi Corporation, et al.

*Second Omnibus Claims Objection*

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | | |
|---|---|---|---|---|
| Claim Number: 13787 | Debtor: DELPHI SERVICES HOLDING CORPORATION (05-44633) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13789 | Debtor: DELPHI AUTOMOTIVE SYSTEMS INTERNATIONAL, INC (05-44589) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13719 | Debtor: DELCO ELECTRONICS OVERSEAS CORPORATION (05-44610) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13795 | Debtor: DREAL INC (05-44627) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13783 | Debtor: DELPHI AUTOMOTIVE SYSTEMS TENNESSEE, INC (05-44558) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | |
|---|---|---|---|
| Claim Number: | 13720 | Debtor: | DELPHI MEDICAL SYSTEMS TEXAS CORPORATION (05-44511) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13798 | Debtor: | DELPHI CONNECTION SYSTEMS (05-44624) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13800 | Debtor: | DELPHI INTERNATIONAL HOLDINGS CORP (05-44591) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13780 | Debtor: | DELPHI NY HOLDING CORPORATION (05-44480) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13712 | Debtor: | ASEC SALES GENERAL PARTNERSHIP (05-44484) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: | 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/31/2006 | | |
| Creditor's Name and Address: | | Secured: | |
| | | Priority | |
| INTERNATIONAL RECTIFIER CORPORATION | | Administrative: | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: | $1,423,472.76 |
| 333 S HOPE ST 48TH FL | | | |
| LOS ANGELES, CA 90071 | | Total: | $1,423,472.76 |

In re Delphi Corporation, et al.

*Second Omnibus Claims Objection*

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | | | | |
|---|---|---|---|---|---|---|
| Claim Number: | 13710 | Debtor: | DELPHI INTEGRATED SERVICE SOLUTIONS, INC (05-44623) | Claim Number: | 13788 | Debtor: | DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |

Claim to be Expunged — Claim Number: 13710; Date Filed: 07/31/2006; Debtor: DELPHI INTEGRATED SERVICE SOLUTIONS, INC (05-44623)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Surviving Claim — Claim Number: 13788; Date Filed: 07/31/2006; Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Claim to be Expunged — Claim Number: 13785; Date Filed: 07/31/2006; Debtor: SPECIALTY ELECTRONICS, INC (05-44539)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Surviving Claim — Claim Number: 13788; Date Filed: 07/31/2006; Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Claim to be Expunged — Claim Number: 13801; Date Filed: 07/31/2006; Debtor: DELPHI DIESEL SYSTEMS CORP (05-44612)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Surviving Claim — Claim Number: 13788; Date Filed: 07/31/2006; Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Claim to be Expunged — Claim Number: 13714; Date Filed: 07/31/2006; Debtor: ASPIRE, INC (05-44618)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Surviving Claim — Claim Number: 13788; Date Filed: 07/31/2006; Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Claim to be Expunged — Claim Number: 13709; Date Filed: 07/31/2006; Debtor: DELPHI ELECTRONICS (HOLDING) LLC (05-44547)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

Surviving Claim — Claim Number: 13788; Date Filed: 07/31/2006; Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)
Creditor's Name and Address:
INTERNATIONAL RECTIFIER CORPORATION
SHEPPARD MULLIN RICHTER & HAMPTON L
333 S HOPE ST 48TH FL
LOS ANGELES, CA 90071
Secured:
Priority:
Administrative:
Unsecured: $1,423,472.76
Total: $1,423,472.76

In re Delphi Corporation, et al.

*Second Omnibus Claims Objection*

**Exhibit A - Duplicate and Amended Claims**

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | | |
|---|---|---|---|---|
| Claim Number: 13717 | Debtor: DELPHI CORPORATION (05-44481) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: $1,423,472.76 | LOS ANGELES, CA 90071 | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13792 | Debtor: DELPHI MEDICAL SYSTEMS CORPORATION (05-44529) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: $1,423,472.76 | LOS ANGELES, CA 90071 | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13804 | Debtor: DELPHI FOREIGN SALES CORPORATION (05-44638) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: $1,423,472.76 | LOS ANGELES, CA 90071 | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13778 | Debtor: SPECIALTY ELECTRONICS INTERNATIONAL LTD (05-44536) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: $1,423,472.76 | LOS ANGELES, CA 90071 | Total: $1,423,472.76 |

| | | | | |
|---|---|---|---|---|
| Claim Number: 13715 | Debtor: DELPHI AUTOMOTIVE SYSTEMS KOREA, INC (05-44580) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/28/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | Total: $1,423,472.76 | LOS ANGELES, CA 90071 | Total: $1,423,472.76 |

In re Delphi Corporation, et al.

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|
| Claim Number: 13803    Debtor: DELPHI LLC (05-44615)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 | Claim Number: 13788    Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 |
| Claim Number: 13796    Debtor: ENVIRONMENTAL CATALYSTS, LLC (05-44503)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 | Claim Number: 13788    Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 |
| Claim Number: 13718    Debtor: DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC (05-44596)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 | Claim Number: 13788    Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 |
| Claim Number: 13711    Debtor: DELPHI AUTOMOTIVE SYSTEMS GLOBAL (HOLDING), INC (05-44636)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 | Claim Number: 13788    Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 |
| Claim Number: 13817    Debtor: ASEC MANUFACTURING GENERAL PARTNERSHIP (05-44482)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 | Claim Number: 13788    Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br> <br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 |

05-44481-rdd    Doc 6238    Filed 12/20/06    Entered 12/20/06 14:15:38    Main Document
Pg 485 of 620
In re Delphi Corporation, et al.

Second Omnibus Claims Objection

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | |
|---|---|---|---|
| Claim Number: 13799 | Debtor: DELPHI AUTOMOTIVE SYSTEMS THAILAND, INC (05-44586) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: 13790 | Debtor: DELPHI AUTOMOTIVE SYSTEMS OVERSEAS CORPORATION (05-44593) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: 13777 | Debtor: DELPHI CHINA LLC (05-44577) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: 13781 | Debtor: MOBILEARIA, INC. (05-47474) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

| | | | |
|---|---|---|---|
| Claim Number: 13713 | Debtor: DELPHI TECHNOLOGIES, INC (05-44554) | Claim Number: 13788 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| INTERNATIONAL RECTIFIER CORPORATION | | INTERNATIONAL RECTIFIER CORPORATION | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 | 333 S HOPE ST 48TH FL | Unsecured: $1,423,472.76 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $1,423,472.76 | | Total: $1,423,472.76 |

In re Delphi Corporation, et al.    *Second Omnibus Claims Objection*

**Exhibit A - Duplicate and Amended Claims**

| Claim to be Expunged | Surviving Claim |
|---|---|

| Claim to be Expunged | | Surviving Claim | |
|---|---|---|---|
| Claim Number: 13708<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071 | Debtor: DELPHI RECEIVABLES LLC (05-47459)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 | Claim Number: 13788<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>INTERNATIONAL RECTIFIER CORPORATION<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $1,423,472.76<br>Total: $1,423,472.76 |
| Claim Number: 15014<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS TENNESSEE, INC (05-44558)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 15010<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071 | Debtor: DELPHI NY HOLDING CORPORATION (05-44480)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 15015<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071 | Debtor: DELPHI SERVICES HOLDING CORPORATION (05-44633)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 15016<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FL<br>LOS ANGELES, CA 90071 | Debtor: DELPHI MEDICAL SYSTEMS CORPORATION (05-44529)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br><br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |

In re Delphi Corporation, et al.

*Second Omnibus Claims Objection*

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | |
|---|---|---|---|
| Claim Number: 15017 | Debtor: DELPHI INTERNATIONAL HOLDINGS CORP (05-44591) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 15045 | Debtor: DELPHI CHINA LLC (05-44577) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 15048 | Debtor: DELPHI INTERNATIONAL SERVICES INC (05-44583) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 15046 | Debtor: DELPHI AUTOMOTIVE SYSTEMS (HOLDING), INC (05-44596) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 15011 | Debtor: DELPHI LIQUIDATION HOLDING COMPANY (05-44542) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

In re Delphi Corporation, et al.

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | | Surviving Claim | |
|---|---|---|---|
| Claim Number: 15013 | Debtor: DELPHI AUTOMOTIVE SYSTEMS OVERSEAS CORPORATION (05-44593) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |
| Claim Number: 15012 | Debtor: DELPHI ELECTRONICS (HOLDING) LLC (05-44547) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |
| Claim Number: 14217 | Debtor: DELPHI RECEIVABLES LLC (05-47459) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FL | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |
| MEXICO | | | |
| Claim Number: 15116 | Debtor: ENVIRONMENTAL CATALYSTS, LLC (05-44503) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FLOOR | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |
| Claim Number: 14834 | Debtor: DELPHI AUTOMOTIVE SYSTEMS SERVICES LLC (05-44632) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FLOOR | | 333 S HOPE ST 48TH FLOOR | |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

In re Delphi Corporation, et al.

Second Omnibus Claims Objection

**Exhibit A - Duplicate and Amended Claims**

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | |
|---|---|---|---|
| Claim Number: 15047 | Debtor: DELPHI MEDICAL SYSTEMS TEXAS CORPORATION (05-44511) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 14237 | Debtor: DELPHI MEDICAL SYSTEMS COLORADO CORPORATION (05-44507) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 14216 | Debtor: DELPHI AUTOMOTIVE SYSTEMS RISK MANAGEMENT CORP (05-44570) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 15108 | Debtor: DELPHI AUTOMOTIVE SYSTEMS INTERNATIONAL, INC (05-44589) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 14977 | Debtor: DELPHI AUTOMOTIVE SYSTEMS HUMAN RESOURCES LLC (05-44639) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| Claim to be Expunged | | Surviving Claim | |
|---|---|---|---|

| | | | |
|---|---|---|---|
| Claim Number: 14220 | Debtor: DELPHI AUTOMOTIVE SYSTEMS KOREA, INC (05-44580) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | SHEPPARD MULLIN RICHTER & HAMPTON L | |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $588,927.08 | | Total: $588,927.08 |
| Claim Number: 15104 | Debtor: PACKARD HUGHES INTERCONNECT COMPANY (05-44626) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | SHEPPARD MULLIN RICHTER & HAMPTON L | |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $588,927.08 | | Total: $588,927.08 |
| Claim Number: 15111 | Debtor: DELPHI CORPORATION (05-44481) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | SHEPPARD MULLIN RICHTER & HAMPTON L | |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $588,927.08 | | Total: $588,927.08 |
| Claim Number: 15105 | Debtor: ASEC MANUFACTURING GENERAL PARTNERSHIP (05-44482) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | SHEPPARD MULLIN RICHTER & HAMPTON L | |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $588,927.08 | | Total: $588,927.08 |
| Claim Number: 14219 | Debtor: DELPHI AUTOMOTIVE SYSTEMS THAILAND, INC (05-44586) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | Administrative: | IR EPI SERVICES INC | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | SHEPPARD MULLIN RICHTER & HAMPTON L | |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | | LOS ANGELES, CA 90071 | |
| | Total: $588,927.08 | | Total: $588,927.08 |

In re Delphi Corporation, et al.

Second Omnibus Claims Objection

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | Surviving Claim |
|---|---|

| | | | |
|---|---|---|---|
| Claim Number: 15110 | Debtor: DELPHI DIESEL SYSTEMS CORP (05-44612) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 15107 | Debtor: DELPHI CONNECTION SYSTEMS (05-44624) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 14372 | Debtor: DELPHI TECHNOLOGIES, INC (05-44554) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 14235 | Debtor: DELPHI LLC (05-44615) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| | | | |
|---|---|---|---|
| Claim Number: 14218 | Debtor: DELPHI FURUKAWA WIRING SYSTEMS LLC (05-47452) | Claim Number: 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: 07/31/2006 | | Date Filed: 07/31/2006 | |
| Creditor's Name and Address: | Secured: | Creditor's Name and Address: | Secured: |
| | Priority | | Priority |
| IR EPI SERVICES INC | | IR EPI SERVICES INC | |
| SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: | SHEPPARD MULLIN RICHTER & HAMPTON L | Administrative: |
| 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 | 333 S HOPE ST 48TH FLOOR | Unsecured: $588,927.08 |
| LOS ANGELES, CA 90071 | Total: $588,927.08 | LOS ANGELES, CA 90071 | Total: $588,927.08 |

| Claim to be Expunged | Surviving Claim |
|---|---|

| | |
|---|---|
| Claim Number: 15114<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: SPECIALTY ELECTRONICS INTERNATIONAL LTD (05-44536)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 15115<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: MOBILEARIA, INC. (05-47474)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 14371<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: EXHAUST SYSTEMS CORPORATION (05-44573)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 15044<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: SPECIALTY ELECTRONICS, INC (05-44539)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 15109<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: DELPHI FOREIGN SALES CORPORATION (05-44638)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071<br><br>Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority:<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |

In re Delphi Corporation, et al.

*Second Omnibus Claims Objection*

**Exhibit A - Duplicate and Amended Claims**

| Claim to be Expunged | Surviving Claim |
|---|---|

| Claim to be Expunged | | Surviving Claim | |
|---|---|---|---|
| Claim Number: 15106<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS GLOBAL (HOLDING), INC (05-44636)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 14210<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELCO ELECTRONICS OVERSEAS CORPORATION (05-44610)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 14208<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DREAL INC (05-44627)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 14209<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: ASPIRE, INC (05-44618)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |
| Claim Number: 14238<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI INTEGRATED SERVICE SOLUTIONS, INC (05-44623)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 | Claim Number: 14236<br>Date Filed: 07/31/2006<br>Creditor's Name and Address:<br><br>IR EPI SERVICES INC<br>SHEPPARD MULLIN RICHTER & HAMPTON L<br>333 S HOPE ST 48TH FLOOR<br>LOS ANGELES, CA 90071 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640)<br>Secured:<br>Priority<br>Administrative:<br>Unsecured: $588,927.08<br>Total: $588,927.08 |

Exhibit A - Duplicate and Amended Claims

| Claim to be Expunged | | | Surviving Claim | | |
|---|---|---|---|---|---|
| Claim Number: | 15112 | Debtor: ASEC SALES GENERAL PARTNERSHIP (05-44484) | Claim Number: | 14236 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/31/2006 | | Date Filed: | 07/31/2006 | |
| Creditor's Name and Address: | | Secured: | Creditor's Name and Address: | | Secured: |
| | | Priority: | | | Priority: |
| IR EPI SERVICES INC | | Administrative: | IR EPI SERVICES INC | | Administrative: |
| SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: $588,927.08 | SHEPPARD MULLIN RICHTER & HAMPTON L | | Unsecured: $588,927.08 |
| 333 S HOPE ST 48TH FLOOR | | | 333 S HOPE ST 48TH FLOOR | | |
| LOS ANGELES, CA 90071 | | Total: $588,927.08 | LOS ANGELES, CA 90071 | | Total: $588,927.08 |
| Claim Number: | 12189 | Debtor: DELPHI CORPORATION (05-44481) | Claim Number: | 12187 | Debtor: DELPHI AUTOMOTIVE SYSTEMS LLC (05-44640) |
| Date Filed: | 07/28/2006 | Secured: $100,551.70 | Date Filed: | 07/28/2006 | Secured: $100,551.70 |
| Creditor's Name and Address: | | Priority | Creditor's Name and Address: | | Priority |
| PORT CITY CASTINGS CORP AFFILIATE OF | | Administrative: | PORT CITY CASTINGS CORP AFFILIATE OF PORT | | Administrative: |
| PORT CITY DIE CAST INC | | Unsecured: | CITY DIE CAST INC | | Unsecured: |
| PORT CITY CASTINGS CORP | | | PORT CITY CASTINGS CORP | | |
| 601 TERRACE ST | | | 601 TERRACE ST | | |
| MUSKEGON, MI 49443-0786 | | Total: $100,551.70 | MUSKEGON, MI 49443-0786 | | Total: $100,551.70 |

**Total Claims to be Expunged:**　82

**Total Asserted Amount to be Expunged:**　$80,596,545.30

# EXHIBIT G

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND FED. R. BANKR. P. 2014
AUTHORIZING AMENDMENT OF FEE STRUCTURE FOR
MERGER AND ACQUISITION TRANSACTION SERVICES INVOLVING
DEBTORS' STEERING AND INTERIOR DIVISIONS PROVIDED BY
ROTHSCHILD INC. NUNC PRO TUNC TO JULY 19, 2006

("ROTHSCHILD SUPPLEMENTAL RETENTION ORDER")

Upon the supplemental application, dated November 28, 2006 (the "Rothschild

Supplemental Retention Application"),[1] of Delphi Corporation and certain of its domestic

subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), for an order (the "Order") under 11 U.S.C. §§ 327(a) and 328 and

Fed. R. Bankr. P. 2014 authorizing the amendment of the fee structure for M&A Transaction

services involving the Debtors' Steering Division and/or Interior Division provided by

Rothschild Inc. as financial advisor and investment banker to the Debtors in these chapter 11

cases; and this Court having determined that the relief requested in the Rothschild Supplemental

Retention Application is in the best interests of the Debtors, their estates, their creditors, and

other parties-in-interest; and it appearing that proper and adequate notice of the Rothschild

Supplemental Retention Application has been given and that no other or further notice is

---

[1]    Any initially capitalized terms used but not defined herein shall have the meanings ascribed to them in the
Rothschild Supplemental Retention Application.

necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED THAT:

1.     The Rothschild Supplemental Retention Application is GRANTED.

2.     Pursuant to the Rothschild Supplemental Retention Application and that certain Supplemental Engagement Letter, dated as of July 19, 2006, the Debtors' retention of Rothschild as their financial advisor and investment banker is hereby amended in accordance with 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014 and the Minimum M&A Fee outlined in that certain Supplemental Engagement Letter is hereby approved so as to enable Rothschild to be compensated as set forth therein for any services provided related to any M&A Transaction involving the Debtors' Steering Division and/or Interior Division, with approval of such fee structure being effective as of July 19, 2006.

3.     Rothschild shall continue to file fee applications for interim and final allowance of compensation (which shall include any fees requested by Rothschild and agreed to by the Debtors under the Supplemental Engagement Letter arising from the Debtors' decision not to complete an M&A Transaction for the Debtors' Steering Division and/or Interior Division) and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as amended, any applicable Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York, the guidelines established by the Office of the United States Trustee, and further orders of this Court.

4.     Other than as specifically set forth herein, the terms of the Final Order Under §§ 327(a) And 328 Authorizing Employment And Retention Of Rothschild Inc. As Financial

2

Advisor And Investment Banker To The Debtors (Docket No. 1363) shall remain in full force

and effect.

       5.   This Court shall retain jurisdiction to hear and determine all matters arising

from the implementation of this Order.

       6.   The requirement under Local Rule 9013-1(b) for the service and filing of a

separate memorandum of law is satisfied by the Supplemental Retention Application.

Dated:    New York, New York
          December 18, 2006

                   /s/Robert D. Drain
                   UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT H

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

In re                        :     Chapter 11
                              :

DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                              :

                Debtors.    :     (Jointly Administered)
                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

### ORDER SCHEDULING NON-OMNIBUS HEARINGS ON DEBTORS' PLAN INVESTMENT AND FRAMEWORK SUPPORT APPROVAL MOTION AND DIP REFINANCING MOTION

Upon the Debtors' oral motion of December 13, 2006 for an order

scheduling non-omnibus hearing dates for (i) the Debtors' Expedited Motion for Order

Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant

to Sections 105(a), 363(b), 503(b) And 507(a) of the Bankruptcy Code and the Plan

Framework Support Agreement Pursuant to Sections 105(a), 363(b), And 1125(e) of the

Bankruptcy Code ("Plan Investment And Framework Support Approval Motion") and (ii)

the Debtors' Expedited Motion for Order Under 11 U.S.C. §§ 105, 361, 362, 363,

364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001,

And 6004(g) (I) Authorizing Debtors to Obtain Post-Petition Financing and (II)

Authorizing Debtors to Refinance Secured Post-Petition Financing and Prepetition

Secured Debt (the "DIP Refinancing Motion"); and after due deliberation thereon, and

sufficient cause appearing therefor, it is hereby

          ORDERED that the hearing for the Plan Investment And Framework

Support Approval Motion and the DIP Refinancing Motion shall be held on January 5,

2007 at 10:00 a.m. (Prevailing Eastern Time).  The Objection Deadline for the Plan

Investment And Framework Support Approval Motion and the DIP Refinancing Motion shall be 4:00 p.m. (Prevailing Eastern Time) on January 2, 2007 and the reply deadline shall be no later than 4:00 p.m. on January 4, 2007; and it is further

ORDERED that, with respect to the DIP Refinancing Motion, the Debtors will file the Replacement Credit Agreement (as defined in the DIP Refinancing Motion) no later than December 26, 2006, and that the Debtors are required to serve the Replacement Credit Agreement, via electronic service, only on counsel for (i) the statutory committees, (ii) the U.S. Trustee, (iii) General Motors Corporation, (iv) the Plan Investors (as defined in the Plan Investment And Framework Support Approval Motion ), and (v) any parties that have filed objections to the DIP Refinancing Motion as of the date and time the Replacement Credit Agreement is filed; provided that the Debtors will post the Replacement Credit Agreement on the Delphi Legal Information Website, www.delphidocket.com; and it is further

ORDERED that the Plan Investment And Framework Support Approval Motion, the DIP Refinancing Motion, and any objections, responses, or replies with respect thereto shall be filed with this Court and served in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418).

Dated:    New York, New York
          December 18, 2006


                                    /s/Robert D. Drain
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
_____
                                          :
In re:                                    :        Chapter 11
DELPHI CORPORATION, et al.,               :
                                          :        Case No. 05-44481 (RDD)
                Debtors.                  :
                                          :        (Jointly Administered)
_____:
```

## ORDER GRANTING MOTION OF MARY P. O'NEILL AND LIAM P. O'NEILL FOR RELIEF FROM AUTOMATIC STAY

Mary P. O'Neill and Liam P. O'Neill having moved for relief from the Automatic Stay to the limited extent of permitting them to continue prosecution of the civil action entitled *Mary P. O'Neill and Liam P. O'Neill v. General Motors Corp. et al.*, Circuit Court of Cook County, Illinois, No. 03 L 7792 (the "Motion"), and due notice of the Motion having been given to the Debtor and all other parties entitled to notice, and the Court having considered all objections to the Motion, and the Court having concluded that it has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and this being a core proceeding pursuant to 28 U.S.C § 157, and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief provided herein;

**NOW, THEREFORE**, it is hereby,

**ORDERED**, that the Motion of Mary P. O'Neill and Liam P. O'Neill for relief from the automatic stay to the limited extent of permitting them to continue and complete the prosecution of the civil action entitled *Mary P. O'Neill and Liam P. O'Neill v. General Motors Corp. et al.*, Circuit Court of Cook County, Illinois, No. 03 L 7792, be and the same hereby is granted; and it is further

**ORDERED**, that the automatic stay be and the same hereby is lifted to permit the conclusion of said civil action on the condition that recovery on the claim be limited to insurance proceeds.

**ORDERED**, that except as otherwise provided in this order, the automatic stay shall remain in full force and effect for any other purpose.

**ORDERED**, this Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this order.

Dated: New York, New York
      December 18, 2006.

              /s/Robert D. Drain_____
              Hon. Robert D. Drain
              United States Bankruptcy Judge

# EXHIBIT J

Hearing Date:  **February 14, 2007**
Hearing Time:  **10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :
      In re                 :      Chapter 11
                        :
DELPHI CORPORATION, et al.,     :      Case No. 05-44481 (RDD)
                        :
              Debtors.    :      (Jointly Administered)
                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO
## PROOF OF CLAIM NUMBER 16322 (INOVISE MEDICAL, INC.)

### ("STATEMENT OF DISPUTED ISSUES – INOVISE MEDICAL, INC.")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement Of Disputed Issues (the "Statement Of Disputed Issues") With

Respect To Proof Of Claim Number 16322 (the "Proof Of Claim") filed by Inovise Medical, Inc.

("Inovise") (which was subsequently transferred to Longacre Master Fund Ltd. ("Longacre"))

and respectfully represent as follows:

<u>Background</u>

1.      Inovise filed the Proof Of Claim on or about September 18, 2006.  The

Proof Of Claim asserts an unsecured nonpriority claim in the amount of $600,000.00 (the

"Claim") against Delphi Automotive Systems LLC ("DAS LLC") for amounts allegedly owed

pursuant to a OEM License and Supply Agreement between Inovise and Delphi Medical

Systems Corporation ("Delphi Medical"), dated April 11, 2005 (the "Agreement").[1]  Specifically,

the Claim is comprised of alleged obligations under an invoice dated September 30, 2005 in the

amount of $150,000.00 (the "Prepetition Invoice") and guaranteed payments under section 4.3 of

the Agreement in the amount of $450,000.00 (the "Asserted Rejection Damages").  <u>See</u>

Attachment to Proof Of Claim at p. 1.

2.      Inovise had previously filed two proofs of claim asserting the same Claim.

Inovise filed proof of claim number 8983 against Delphi on or about July 5, 2006.  Inovise

subsequently filed proof of claim number 16315 against "Delphi Automotive Systems

---

[1]      The Agreement contains a confidentiality provision which limits the Debtors' ability to
disclose certain terms thereof.  The Debtors are therefore not attaching the Agreement as
an exhibit hereto, but will make a copy available to Inovise, upon its request, or to
Longacre, upon its request and receipt of written consent from Inovise for the Debtors to
provide a copy of the Agreement to Longacre.

2

Corporation" on or about September 14, 2006.[2]  The Debtors have not yet objected to either

proof of claim number 8983 or proof of claim number 16315 and such claims are therefore not

the subject of this Statement Of Disputed Issues and the Debtors expressly reserve the right to

object to such proofs of claim at a later date.

        3.      On April 11, 2005, Delphi Medical and Inovise entered into the

Agreement, pursuant to which Inovise granted Delphi Medical a license of certain intellectual

property for use in Delphi Medical's electrocardiography products.  Pursuant to the Agreement,

Delphi Medical made certain minimum royalty commitments for the initial portion of the

Agreement's term.  See Agreement, § 4.3.  However, the Agreement also includes a provision

granting Delphi Medical the right to terminate the Agreement for any reason, and provides a

separate measure of damages in the event that Delphi Medical elected to terminate the

Agreement.  See Agreement, Appendix 2.6, ¶11.  The Agreement was rejected by Delphi

Medical, effective as of May 12, 2006, pursuant to this Court's Order Under 11 U.S.C. § 365

And Fed. R. Bankr. P. 6006 Authorizing Rejection Of OEM License and Supply Agreement

With Inovise Medical, Inc. (Docket No. 3947) dated May 30, 2006.

        4.      The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

---

[2]      Delphi Automotive Systems Corporation is the former name of Delphi and proof of claim
number 16315 listed Delphi's case number (05-44481).  The claims and noticing agent
therefore docketed proof of claim number 16315 against Delphi.

3

5.        Longacre filed its Response Of Longacre Master Fund Ltd. To Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5810) (the "Response") on November 24, 2006.

<u>Disputed Issues</u>

A.        Delphi Medical Has No Obligation For
Any Damages Arising From Rejection Of The Agreement.

6.        The Agreement includes, in Appendix 2.6 thereto, certain General Terms And Conditions (the "Terms and Conditions") which govern each of Inovise's and Delphi Medical's rights and obligations under the Agreement and any ancillary agreements entered into pursuant thereto.  <u>See</u> Agreement, Appendix 2.6, ¶1 ("[Inovise] acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, the OEM License and Supply Agreement by and between Inovise Medical, Inc. ('Seller') and Delphi Medical Systems Corporation ('Buyer') . . ..").  The Terms and Conditions provide Delphi Medical with an express "termination for convenience" right:

> In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing.  Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work in process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition.  The purchase price for such finished goods, raw materials and work in process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work in process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such

4

costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent.  In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable.  Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination.  Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

Agreement, Appendix 2.6, ¶11.

7.    Therefore, Inovise's claim for Rejection Damages should be limited to the amount that Inovise was entitled to recover upon a termination of the Agreement for convenience by Delphi Medical under paragraph 11 of the Terms and Conditions.  Pursuant to paragraph 11, Inovise has no right to collect any damages as a result of a termination for convenience by Delphi Medical, as the paragraph expressly provides that Delphi Medical "may, at its option, purchase from Seller any or all raw materials, work in process and finished goods inventory related to the goods under this Contract."  Agreement, Appendix 2.6, ¶11 (emphasis added).  As the provision is permissive not mandatory, Inovise has no right to receive any payment of damages from Delphi Medical upon a termination of the Agreement.  Furthermore, even if paragraph 11 of the General Terms and Conditions were interpreted to provide Inovise a right to recover damages upon a termination of the Agreement, Inovise's damages would be limited to:

(a)    the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus

(b)    the actual costs of work in process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are

reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract <u>less</u>

(c)   the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent.

8.     No goods or services were being provided by Inovise under the Agreement as of the effective date of the rejection.  Inovise also had no work in process or raw materials inventory as of the effective date of the rejection.  Therefore, even if Inovise did have a right to recover damages in an amount measured by paragraphs (a), (b), and (c) above, the amount of Inovise's Rejection Damages would be $0.00.

B.     If Any Portion Of The Claim For Rejection
       <u>Damages Is Valid, It Must Be Discounted To Present Value</u>.

9.     Even if the Court were to determine that any portion of the Claim for Rejection Damages is valid, the entire claim was unmatured as of October 8, 2005 (the "Petition Date").  Pursuant to the Agreement, Delphi Medical was required to provide Inovise with minimum royalties for the first, second, and third "Royalty Years" in the amount of $150,000.00 per Royalty Year.  <u>See</u> Agreement, § 4.3.  A "Royalty Year" is defined in the Agreement as "each of the twelve-month periods commencing on the earlier of (a) the date the first Product is offered for commercial sale, and (b) September 30, 2005, and each anniversary thereof thereafter."  Agreement, § 1.23.  No Products (as defined in the Agreement) were ever offered for commercial sale and the first, second, and third Royalty Years therefore would have ended September 29, 2006, September 29, 2007, and September 29, 2008, respectively.

10.    Payment of the minimum royalties for each Royalty Year were due with the next regular royalty payment, which royalty payments were made quarterly.  <u>See</u> Agreement, §§ 4.3, 4.4.  Regular quarterly royalty payments were due "within forty-five (45) days following the end" of a "Royalty Quarter," which was defined as "each three-month period ending March

6

31, June 30, September 30 and December 31 within a Royalty Year." See Agreement, §§ 1.23,

4.4.  Therefore, the next regular royalty payment after the end of each of the first, second, and

third Royalty Years would have been due on November 14, 2006, November 14, 2007, and

November 14, 2008, respectively.  Each portion of the Claim for Rejection Damages, if

ultimately determined to be valid, must be discounted to its value as of the Petition Date utilizing

an appropriate discount rate.  Discounting those portions of the Claim to their value as of the

Petition Date would result in a significant reduction in the amount of the Claim.

C.    Inovise Has Provided No Evidence That It Has Fully Mitigated Its Claim.

11.    A claimant is required to mitigate its damages arising as a result of a

breach of an agreement, including as a result of the rejection of such agreement pursuant to 11

U.S.C. § 365.  Neither the Proof Of Claim nor the Response contain any evidence that Inovise

has undertaken any attempt to mitigate its damages, if any, arising as a result of Delphi Medical's

rejection of the Agreement.  Pursuant to the Agreement, Inovise granted Delphi Medical an

exclusive license with respect to certain technology in certain markets.  As Delphi Medical's

rejection of the Agreement allowed Inovise to license the technology covered by the Agreement

to any other party, the Debtors believe that Inovise should have been able to mitigate its damages,

at least in part, which would further reduce the amount of the Claim.

D.    The Proof Of Claim Is Untimely.

12.    Pursuant to the Order Under 11 U.S.C. §§ 107(b), 501, 502, And 1111(a)

And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates For

Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No. 3206)

(the "Bar Date Order"), claimants, including Inovise, were required to file proofs of claim on or

before July 31, 2006 at 4:00 p.m. (the "Bar Date").  The Proof Of Claim, however, was not filed

until September 18, 2006.  As described below, the Bar Date Order also required claimants to file a separate proof of claim against each Debtor entity which such claimant believed was, or may be, liable to such claimant.

13.    Prior to the Bar Date, Inovise elected to file a proof of claim against only Delphi, and not to file any proofs of claim against any of the other Debtors, including DAS LLC. As Delphi and DAS LLC are separate and distinct legal entities, Inovise's attempt to amend its earlier proof of claim to modify the Debtor entity against which it is asserted is a substantive amendment and may affect recoveries of other creditors of DAS LLC.  Furthermore, freely allowing the untimely amendment of proofs of claim to modify the Debtor entity against which such claim is asserted runs afoul of the express provisions of the Bar Date Order and may prejudice the Debtors' on-going efforts to formulate a plan of reorganization, as the Debtors will have no certainty as to the potential claims against any individual Debtor.  Therefore, the Proof Of Claim should be disallowed in its entirety as being untimely pursuant to the Bar Date Order.

E.    DAS LLC Has No Obligation For Rejection Damages Under The Agreement.

14.    The Claim is asserted by Inovise against DAS LLC.  The Debtors dispute that DAS LLC owes any obligation for Rejection Damages, if any, to Inovise.[3]  As noted above, the basis for the Rejection Damages portion of the Claim is Delphi Medical's rejection of the Agreement, which is between Inovise and Delphi Medical.  Delphi Medical and DAS LLC are separate and distinct legal entities.  Neither the Proof Of Claim nor the Response assert any basis upon which DAS LLC would be liable for Delphi Medical's obligations, if any, for Rejection

---

[3]    The Debtors acknowledge that Schedule F of the Schedules of Liabilities of DAS LLC reflects an undisputed unsecured prepetition obligation owing to Inovise in the amount of $150,000.00, which is incorporated in the Proof Of Claim.  As provided herein, the Debtors do not dispute the portion of the Claim that asserts the obligation listed on DAS LLC's Schedule F.

Damages under the Agreement.  Similarly, the Agreement provides no basis for claims to be

asserted against DAS LLC.  The Agreement clearly and unambiguously identifies Delphi

Medical as the party to the Agreement.  See, e.g., Agreement at pp. 1 and 23.  DAS LLC is not,

and has never been, a party to the Agreement.

15.    Furthermore, pursuant to the Bar Date Order, claimants, including Inovise,

were required to file proofs of claim against the appropriate Debtor entity.  Specifically,

paragraph 3(f) of the Bar Date Order provides:

> Proofs of Claim must clearly indicate the name of the applicable Debtor against
> which the Claim is asserted and the applicable reorganization case number for
> such Debtor, and if a Claim is asserted against more than one of the Debtors, a
> separate Proof of Claim must be filed in each such Debtor's reorganization case.

16.    Furthermore, the Notice Of Bar Date For Filing Proofs Of Claim (the "Bar

Date Notice") which was approved by the Court pursuant to Bar Date Order also specifically

stated that "each holder of a claim must identify on its proof of claim the specific Debtor against

which its claim is asserted and the case number of that Debtor's reorganization case."  See Bar

Date Notice at p. 2.  Exhibit A to the Bar Date Notice specifically identified Delphi Medical as a

Debtor and identified its case number.  See Exhibit A to Bar Date Notice at p. 2.

17.    Nonetheless, Inovise filed its Proof Of Claim only against DAS LLC, and

did not file any proofs of claim against Delphi Medical.  The July 31, 2006 bar date passed over

four and one-half months ago and a further untimely amendment should not be permitted for the

reasons set forth above.  As the Proof Of Claim was asserted against DAS LLC and DAS LLC

clearly has no obligation under the Agreement, including, but not limited to, the payment of any

Rejection Damages arising with respect thereto, the Claim for Rejection Damages is invalid and

should be reduced to the $150,000.00 reflected on DAS LLC's Schedule F.

<u>Reservation Of Rights</u>

18.    This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

and (b) the Debtors' right to later identify additional documentation supporting the disallowance,

expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim, (b) in the alternative, reducing the Claim to $150,000.00, (c) further in the alternative, discounting the Claim to its value as of the Petition Date utilizing an appropriate discount rate, and (d) granting the Debtors such other and further relief as is just.

Dated: New York, New York
　　　　December 18, 2006

SKADDEN, ARPS, SLATE, MEAGHER
　& FLOM LLP


By: /s/ John Wm. Butler, Jr.
　　John Wm. Butler, Jr. (JB 4711)
　　John K. Lyons (JL 4951)
　　Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -


By: /s/ Kayalyn A. Marafioti
　　Kayalyn A. Marafioti (KM 9632)
　　Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
　Debtors and Debtors-in-Possession

11

# EXHIBIT K

Hearing Date:  February 14, 2007
Hearing Time:  10:00 a.m. (Prevailing Eastern Time)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                              :
        In re                                 :      Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :      Case No. 05-44481 (RDD)
                                              :
                                              :      (Jointly Administered)
              Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF CLAIM NUMBER 2479 (WORLDWIDE BATTERY COMPANY, LLC)

("STATEMENT OF DISPUTED ISSUES – WORLDWIDE BATTERY COMPANY, LLC")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement of Disputed Issues (the "Statement of Disputed Isssues") With

Respect To Proof Of Claim Number 2479 (the "Proof of Claim") filed by WorldWide Battery

Company, LLC ("WorldWide"), and respectfully represent as follows:

<u>Background</u>

1.     WorldWide filed the Proof of Claim on or about April 3, 2006.  The Proof

of Claim asserts an unsecured nonpriority claim in the amount of $2,819,166.35 (the "Claim")

pursuant to a Recycled Battery Sales Agreement dated March 16, 2004 entered into by Delphi

and WorldWide (the "Agreement") in which Delphi agreed to sell recyclable batteries to

WorldWide.  The Proof of Claim asserts that the Claim constitutes 35 months of average income

of $80,547.61 per month that WorldWide lost due to an alleged breach of the Agreement by

Delphi when the Debtors sold its battery-related assets to Johnson Controls, Inc. ("JCI").

WorldWide attached the Agreement to the Proof of Claim.

2.     The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

3.     On November 27, 2006,[1] WorldWide filed WorldWide Battery's (i)

Response In Opposition To Third Omnibus Claims Objection (Ref. Claim No. 2479), And (ii)

Motion For Enlargement Of Time To Submit Additional Evidence In Support Of Proof Of Claim

---

[1]     The deadline to file a response to the Third Omnibus Claims Objection was November 24, 2006 at 4:00 p.m.
(Prevailing Eastern Time).  <u>See</u> Third Omnibus Claims Objection, ¶ 46.

(Docket No. 5864) (the "Response").  The Response asserts that the maximum allowable amount
of the Claim is less than or equal to $250,000.

Disputed Issues

A.      The Debtors Have Not Breached The Agreement

4.      The Debtors dispute that they are in breach of the Agreement.  The
Agreement did not commit Delphi to sell a specific quantity of batteries to WorldWide.  In fact,
the Agreement expressly states that "no quantity is guaranteed by Delphi hereunder."  See
Agreement, ¶ 1.1.

5.      When the Debtors sold their battery-related assets to JCI, Delphi no longer
owned any batteries to sell to WorldWide.  And, because Delphi never agreed to sell a specific
quantity of batteries to WorldWide, Delphi had no duty to continue to sell batteries to
WorldWide after the sale of the Debtors' battery business line.  Accordingly, the cessation of
battery sales did not constitute a breach of the Agreement.  Because Delphi has not breached the
Agreement, the Claim should be disallowed and expunged.

B.      At Most, The Claim Is Limited To 90 Days Of Lost Profits

6.      Even if the Debtors did breach the Agreement (which the Debtors dispute),
the Claim should be limited to 90 days of WorldWide's lost profits.

7.      As WorldWide acknowledged in the Response, the Agreement allows
Delphi to terminate the Agreement upon 90 days written notice upon certain conditions,
including the sale of the Debtors' battery manufacturing operations.  See Agreement, ¶ 4.5.
Because the Debtors sold their battery manufacturing operations to JCI, Delphi was entitled to
terminate the Agreement upon 90 days notice.  Thus, an alleged breach of the Agreement would
entitle WorldWide to a damage claim for, at most, 90 days of lost profits.  Accordingly, even if

3

the Debtors breached the Agreement, the Claim is limited to 90 days of WorldWide's lost

profits.[2]

C.      The Response Was Untimely

8.      Pursuant to the Amended Eighth Supplemental Order Under 11 U.S.C. §§

102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus

Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered

on October 26, 2006 (Docket No. 5418) and the Third Omnibus Claims Objection, responses to

the Third Omnibus Claims Objection were due by November 24, 2006.  The Response was filed

after the deadline, and thus was not timely.  WorldWide's failure to file a timely response to the

Third Omnibus Claims Objection lends further support for the disallowance and expungement of

the Claim.

Reservation of Rights

9.      This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

---

[2]    The Debtors are without sufficient information to either dispute or confirm WorldWide's calculation of its
       alleged monthly lost profits.  Nothing contained herein is an acceptance, or acknowledgment of the accuracy, of
       WorldWide's calculation.

and (b) the Debtors' right to later identify additional documentation supporting the disallowance,

expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim, (b) in the alternative, reducing the amount of the Claim,

and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
        December 18, 2006

                                SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP


                                By: /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr. (JB 4711)
                                    John K. Lyons (JL 4951)
                                    Ron E. Meisler (RM 3026)
                                333 West Wacker Drive, Suite 2100
                                Chicago, Illinois  60606
                                (312) 407-0700

                                - and -


                                By: /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                                Four Times Square
                                New York, New York  10036
                                (212) 735-3000

                                Attorneys for Delphi Corporation, et al.,
                                  Debtors and Debtors-in-Possession

# EXHIBIT L

Hearing Date:  **February 14, 2007**
Hearing Time:  **10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                          :
          In re                           :   Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :   Case No. 05-44481 (RDD)
                                          :
                                          :   (Jointly Administered)
          Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

### DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF CLAIM NUMBER 13409 (NISSAN TECHNICAL CENTER NORTH AMERICA, INC.)

("STATEMENT OF DISPUTED ISSUES – NISSAN
TECHNICAL CENTER NORTH AMERICA, INC.")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement of Disputed Issues (the "Statement of Disputed Isssues") With

Respect To Proof Of Claim Number 13409 (the "Proof of Claim") filed by Nissan Technical

Center North America, Inc. ("Nissan"), and respectfully represent as follows:

<u>Background</u>

1.      Nissan filed the Proof of Claim on or about July 31, 2006.  The Proof of

Claim asserts a secured claim (the "Secured Claim"), an unsecured nonpriority claim (the

"Unsecured Nonpriority Claim," and together with the Secured Claim, the "Prepetition Claim"),

and an administrative expense claim (the "Administrative Expense Claim," and together with the

Prepetition Claim, the "Claim") in an unknown amount pursuant to a lease dated October 12,

2001 between Delphi Automotive Systems, LLC ("DAS LLC") and Nissan (the "Lease"), a

Landlord Consent and Lien Waiver dated August 5, 2005 (the "Consent and Lien Waiver"), and

a Test Track Agreement dated September 4, 2002 (the "Test Track Agreement," and together

with the Lease and the Consent and Lien Waiver, the "Agreements").  Nissan attached the

Agreements to the Proof of Claim.

2.      The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

2

3.          On November 22, 2006, Nissan filed its Response By Nissan Technical

Center North America, Inc. To Debtors' Third Omnibus Claims Objection (Docket No. 5703)

(the "Response").

4.          The Proof of Claim asserts that the Prepetition Claim includes unpaid

prepetition rent under the Lease, two unpaid invoices pursuant to the Test Track Agreement,

indemnification for any damages for testing pursuant to the Test Track Agreement, any damages

resulting from the Debtors' use of Nissan's property, and any other claims arising under the

Agreements.  The Proof of Claim asserts that the Prepetition Claims are secured by any personal

property left by the Debtors on the real property subject to the Lease (the "Leased Property"),

and by rights of setoff and/or recoupment.

5.          The Proof of Claim asserts that the Administrative Claim includes

amounts for which the Debtors will become liable to Nissan pursuant to the Agreements.  The

Response asserts that the Agreements expired by their terms on October 14, 2006, and that the

Debtors vacated the Leased Property in September 2006 and continue to owe rent for the period

after which it vacated.  The Response asserts the Administrative Claim includes postpetition rent,

any damage to the Lease Property incurred postpetition, and any other claim arising under the

Agreements postpetition.

Disputed Issues

A.          The Prepetition Claim

6.          The Debtors do not dispute that Nissan has an unsecured nonpriority claim

for the unpaid July and August 2005 invoices.  According to the Debtors' books and records, the

amount due and owing under the two invoices is $32,734.44.  Attached as Exhibit A is the

Debtors' payment history from January 1, 2005 through October 8, 2005 (the "Petition Date")

3

under the Track Agreement.  Attached as <u>Exhibit B</u> is the Debtors' payment history from January

1, 2005 through the Petition Date under the Lease, which demonstrates that no prepetition rent is

due under the Lease.  Nissan does not assert that there are any outstanding obligations under the

Consent and Lien Waiver.  Therefore, to the extent Nissan asserts an unsecured nonpriority claim

in excess of $32,734.44, the Debtors dispute the same.

    7.   Additionally, to the extent that Nissan asserts that the Prepetition Claim is

secured, the Debtors dispute the same.  Specifically, the Debtors do not believe that any personal

property was left on the Leased Property, nor that any amounts are owed by Nissan to the

Debtors under the Agreements that would give rise to rights of setoff and/or recoupment.

B.  <u>The Administrative Claim</u>

    8.   Nissan has attempted to assert the Administrative Claim through the filing

of a proof of claim form.  However, a postpetition administrative expense claim must be asserted

through the filing of a request for payment in the form of a motion under section 503 of the

Bankruptcy Code and cannot be asserted by the filing of a proof of claim form.  Therefore,

Nissan's assertion of the Administrative Claim is procedurally improper and the Claim should be

disallowed and expunged, without prejudice to Nissan's ability to properly assert an

administrative claim and the Debtors' rights to dispute the same.

<u>Reservation of Rights</u>

    9.   This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

4

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

and (b) the Debtors' right to later identify additional documentation supporting the disallowance,

expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order

modifying the Claim consistent with the amounts set forth above, and granting the Debtors such

other and further relief as is just.

Dated: New York, New York
        December 18, 2006

                             SKADDEN, ARPS, SLATE, MEAGHER
                               & FLOM LLP


                     By: /s/ John Wm. Butler, Jr.
                        John Wm. Butler, Jr. (JB 4711)
                        John K. Lyons (JL 4951)
                        Ron E. Meisler (RM 3026)
                     333 West Wacker Drive, Suite 2100
                     Chicago, Illinois  60606
                     (312) 407-0700

                     - and -


                     By: /s/ Kayalyn A. Marafioti
                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                     Four Times Square
                     New York, New York  10036
                     (212) 735-3000

                     Attorneys for Delphi Corporation, et al.,
                      Debtors and Debtors-in-Possession

**Nissan Technical Center N.A.**
**Vendor DUNS # RD 088328109**
**Payment History 1/1/05 - 10/8/05**
**Test Track Agreement**

| Process # | Plant Code | Doc Type # | Document # | Document Date | Total Amount | Bill Of Lading | Purchase Order # | Status | Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|---|
| '9000029202344 | EA | 2 | '059441590001 | 1/13/2005 | $813.49 | AZ1452 | AES34597 | PAID | 3/2/2005 | 900488736 |
| '9000029202345 | EA | 2 | '059441630001 | 1/13/2005 | $15,000.00 | AZ1452 | AES34599 | PAID | 3/2/2005 | 900488736 |
| '9000029431934 | EA | 2 | '059446660001 | 2/5/2005 | $869.26 | AZ1455 | AES34889 | PAID | 4/4/2005 | 900493335 |
| '9000029431935 | EA | 2 | '059446680001 | 2/5/2005 | $15,000.00 | AZ1455 | AES34890 | PAID | 4/4/2005 | 900493335 |
| '9000029745102 | EA | 2 | '059454520001 | 3/5/2005 | $682.50 | AZ1458 | AES35280 | PAID | 5/2/2005 | 900497806 |
| '9000029745103 | EA | 2 | '059454530001 | 3/5/2005 | $15,000.00 | AZ1458 | AES35282 | PAID | 5/2/2005 | 900497806 |
| '9000030311558 | EA | 2 | '059465300001 | 4/11/2005 | $929.76 | AZ1463 | AES35881 | PAID | 6/2/2005 | 900502455 |
| '9000030311559 | EA | 2 | '059465310001 | 4/11/2005 | $15,000.00 | AZ1463 | AES35882 | PAID | 6/2/2005 | 900502455 |
| '9000030628940 | EA | 2 | '059472170001 | 5/11/2005 | $15,000.00 | AZ1468 | AES36224 | PAID | 7/5/2005 | 900506885 |
| '9000030628941 | EA | 2 | '059472180001 | 5/11/2005 | $1,398.67 | AZ1468 | AES36225 | PAID | 7/5/2005 | 900506885 |
| '9000031014141 | EA | 2 | '059480870001 | 6/9/2005 | $1,103.62 | AZ1473 | AES36699 | PAID | 8/2/2005 | 900510770 |
| '9000031014142 | EA | 2 | '059480880001 | 6/9/2005 | $15,000.00 | AZ1473 | AES36700 | PAID | 8/2/2005 | 900510770 |
| '9000031263467 | EA | 2 | '059486210001 | 7/8/2005 | $999.43 | AZ1475 | AES36925 | PAID | 9/2/2005 | 900515761 |
| '9000031263468 | EA | 2 | '059486220001 | 7/8/2005 | $15,000.00 | AZ1475 | AES36926 | PAID | 9/2/2005 | 900515761 |
| '9000031804415 | EA | 2 | '059492620001 | 8/9/2005 | $15,000.00 | AZ1479 | AES37173 | Ready To Pay | 10/2/2005 | 0 |
| '9000031804416 | EA | 2 | '059492630001 | 8/9/2005 | $1,222.87 | AZ1479 | AES37174 | Ready To Pay | 10/2/2005 | 0 |
| '9000033049379 | H2 | 2 | '5204224473001 | 9/19/2005 | $6,462.38 | AZ1482 | D0450178698 | Ready To Pay | 12/31/2049 | 0 |
| '9000033191529 | J6 | 2 | '5204514560001 | 9/19/2005 | $6,695.06 | AZ1482TI | D0450215151 | Ready To Pay | 12/31/2049 | 0 |
| '9000032095494 | K9 | 2 | '051878630001 | 9/19/2005 | $3,354.13 | AZ1479 | S2S55331 | Ready To Pay | 12/31/2049 | 0 |

**Nissan Technical Center N.A.**
**Vendor DUNS # LM 909900000**
**Payment History 1/1/05 - 10/8/05**
**Real Estate Lease**

| Process # | Plant Code | Doc Type # | Document # | Document Date | Total Amount | Bill Of Lading | Status | Payment Date | Payment # |
|---|---|---|---|---|---|---|---|---|---|
| '9000029025976 | EW | 2 | 'ZZ34530 | 1/21/2005 | $16,333.33 | 34530 | PAID | 1/25/2005 | 900482242 |
| '9000029406735 | EW | 2 | 'ZZ37542 | 2/21/2005 | $16,333.33 | 37542 | PAID | 2/23/2005 | 900487122 |
| '9000029766321 | EW | 2 | 'ZZ38354 | 3/23/2005 | $16,333.33 | 38354 | PAID | 3/29/2005 | 900491746 |
| '9000030114949 | EW | 2 | 'ZZ56937 | 4/21/2005 | $16,333.33 | 56937 | PAID | 4/25/2005 | 900496257 |
| '9000030449592 | EW | 2 | 'ZZ57351 | 5/20/2005 | $16,333.33 | 57351 | PAID | 5/24/2005 | 900500799 |
| '9000030799278 | EW | 2 | 'ZZ57792 | 6/21/2005 | $16,333.33 | 57792 | PAID | 6/23/2005 | 900505162 |
| '9000031020480 | EW | 2 | 'ZZ58272 | 7/21/2005 | $16,333.33 | 58272 | PAID | 7/25/2005 | 900509079 |
| '9000031421341 | EW | 2 | 'ZZ58589 | 8/23/2005 | $16,333.33 | 58589 | PAID | 8/25/2005 | 900514025 |
| '9000031785145 | EW | 2 | 'ZZ58932 | 9/22/2005 | $16,333.33 | 58932 | PAID | 9/26/2005 | 900518697 |

# EXHIBIT M

**Hearing Date:  February 14, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
|  |  |  |
|---|---|---|
|  | : |  |
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF CLAIM NUMBER 14245 (LIGHTSOURCE PARENT CORPORATION)

### ("STATEMENT OF DISPUTED ISSUES – LIGHTSOURCE PARENT CORPORATION")

        Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement Of Disputed Issues (the "Statement Of Disputed Issues") With

Respect To Proof Of Claim Number 14245 (the "Proof Of Claim") filed by Lightsource Parent

Corporation ("Lightsource") and respectfully represent as follows:

Background

1.      Lightsource filed the Proof Of Claim on or about July 31, 2006.  The

Proof Of Claim asserts that Delphi owes Lightsource, or its subsidiary Guide Corporation

("Guide"), approximately $29 million related to postemployment retiree healthcare and life

insurance benefits (collectively, "OPEB Obligations") for certain Lightsource and Guide retired

employees (the "Claim").  Lightsource bases its Claim on the Lightsource Formation Agreement

Among General Motors Corporation, Lightsource Parent Corporation And PEP Guide, LLC,

dated as of September 29, 1998 (the "LFA") and the Master Separation Agreement dated as of

December 22, 1998 Among General Motors Corporation, Delphi Automotive Systems

Corporation, Delphi Automotive Systems LLC, Delphi Technologies, Inc. And Delphi

Automotive Systems (Holding), Inc. (the "MSA").[1]

2.      Specifically, Lightsource alleges that under the LFA, Lightsource agreed

to pay OPEB Obligations to certain employees that had previously been employed by General

Motors Corporation ("GM") but were transferred to employment with Lightsource or Guide, as

applicable.  Pursuant to the LFA, GM purportedly agreed to reimburse Lightsource for a portion

of the OPEB Obligations on an annual basis (the "Reimbursement Liability").  Lightsource

further states that under the LFA, GM had the unilateral right to assign such liabilities in whole

---

[1]      Because Lightsource has acknowledged in its Response (defined below) that it possesses a copy of the
MSA and because the MSA was filed as an exhibit to the Form S-1/A filed with the Securities and
Exchange Commission by Delphi on January 27, 1999, the Debtors have not attached it hereto.
Nonetheless, the MSA will be provided upon request to Lightsource.

2

or in part to its Delphi Automotive business unit or any such business entity to which the assets

of the Delphi Automotive business unit was sold or transferred.[2]

3.      Lightsource further alleges that GM exercised its right to transfer the

Reimbursement Liability to its Delphi Automotive business unit and did so in the MSA.

Lightsource thus asserts that Delphi owes Lightsource and/or Guide approximately $1,018,302

for Reimbursement Liability incurred between January 1, 2003 and June 30, 2006 for salaried

employees and approximately $28,215,799 in unliquidated amounts for the present value of

future Reimbursement Liability for periods after June 30, 2006 for salaried employees.  Finally,

Lightsource asserts that additional amounts of Reimbursement Liability are owed for periods

prior to January 1, 2003 for salaried employees and for all periods for hourly employees, but that

Lightsource does not know the total amount of these liabilities.

4.      The Debtors objected to the Claim pursuant to the Debtors' (I) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (II) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

5.      Lightsource filed its Response Of Lightsource Parent Corporation To

Debtors' (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R.

Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims

Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And

---

[2]      As the LFA predates GM's spinoff of Delphi and its subsidiaries and affiliates, the assets which now
comprise such entities were then a business unit of GM.

(II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c)

(Docket No. 5759) (the "Response") on November 22, 2006.  Attached to the Response was the

Proof Of Claim and a copy of the LFA.  In its Response, Lightsource reiterated its position that

the LFA and MSA establish liability for OPEB Obligations from Delphi to Lightsource.

<u>Disputed Issues</u>

6.    The Debtors dispute that Delphi owes any obligation to Lightsource.  As

noted above, Lightsource states that the basis for the Claim is the LFA between GM and

Lightsource and the MSA between GM and Delphi.  Delphi is not, and has never been, a party to

the LFA.  Lightsource is not, and has never been, a party to the MSA.  Because Lightsource is

not a party to the MSA and Lightsource and Delphi share no privity of contract, Delphi cannot be

directly liability to Lightsource under the MSA.

7.    The MSA allocated certain liabilities between Delphi and GM when

Delphi was spun-off from GM.  Specifically, section 2.02(b) of the MSA defined Delphi's

obligations for liabilities arising from certain divestitures.  As stated therein,

> <u>Divested Business</u>.  Delphi shall, with respect to the businesses and
> operations divested by the Delphi Automotive Systems Business, assume all
> Liabilities of GM related thereto; <u>provided</u>, <u>however</u>, that Delphi shall not assume
> those Liabilities relating to operations divested by the Delphi Automotive
> Systems Business to the extent such Liabilities are expressly retained by GM
> pursuant to the terms of this Agreement or the Ancillary Agreements. . .and the
> Liabilities assumed by Delphi shall include, without limitation, the obligation to
> satisfy all of the obligations of GM under the various agreements pursuant to
> which the Delphi Automotive Systems Business effected such divestitures (the
> "Divestiture Agreements"); <u>provided</u>, <u>further</u>, <u>however</u>, that notwithstanding the
> foregoing or any other provision of this Agreement or any Ancillary Agreement,
> responsibility for certain obligations relating to certain divestitures shall be
> allocated between the parties as set forth on Schedule I hereto.

8.    Schedule I to the MSA (titled "Certain Agreements With Respect To

Divested Businesses") provides that Delphi shall assume any "restructuring and support

payments, subsidies and supplements" relating to the businesses divested to Lightsource Parent

Corporation.  See MSA, Schedule I, ¶2.  Notably, Schedule I does not assign the LFA to Delphi

nor create a right of payment from Delphi to Lightsource.  In fact, Delphi has never accepted

assignment of the LFA from GM pursuant to the MSA or otherwise.  Section 2.02(b) and

Schedule I, at most, create an obligation from Delphi to GM.

        9.     Moreover, the MSA specifically provides that no party was intended to be,

or can assert a right as, a third party beneficiary to the MSA.  Specifically, section 9.05 states

that "nothing in this Agreement, express or implied, is intended to confer upon any other Person

any rights or remedies of any nature whatsoever under or by reason of this Agreement. . . ."

MSA § 9.05.  Because Lightsource is not a party to the MSA, it may not claim that under the

MSA it has any remedy from Delphi for the Reimbursement Liability, or that Delphi owes

Lightsource any obligation as a result of any provision of the MSA.

        10.    Similarly, the LFA creates a right of payment from GM to Lightsource but

does not independently create a right of payment from Delphi because Delphi is not a party to

the LFA and has not accepted assignment of the LFA.  Thus, Lightsource's recourse for the

Reimbursement Liability, if any, is from GM, not Delphi.

        11.    In addition to the above, in its Claim, Lightsource asserts liabilities that

even it is unable to quantify.  Although it asserts that the formula for quantifying such

obligations is set forth in the LFA, Lightsource is unable to state what those liabilities are for its

hourly employees, even for obligations supposedly owing for periods dating as far back as 2003.

Moreover, certain of these claimed liabilities are contingent and the contingencies which must

occur to result in a liquidated obligation may never occur.

12.     Because no right of payment exists between Delphi and Lightsource and Lightsource has not substantiated its right to payment from Delphi for the asserted Claim, Lightsource's claim should be disallowed and expunged.  Furthermore, because the Debtors do not believe that there is a basis for liability from Delphi to Lightsource, the Debtors are not addressing the appropriate calculation of liability herein but reserve the right to do so at a later time should it be determined that such liability exists.

<u>Reservation Of Rights</u>

13.     This Statement Of Disputed Issues is submitted by the Debtors pursuant to paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims (Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim and (b) the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim and (b) granting the Debtors such other and further relief

as is just.

Dated: New York, New York
        December 18, 2006

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                       & FLOM LLP


                                    By: /s/ John Wm. Butler, Jr.
                                        John Wm. Butler, Jr. (JB 4711)
                                        John K. Lyons (JL 4951)
                                        Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois  60606
                                    (312) 407-0700

                                    - and -


                                    By: /s/ Kayalyn A. Marafioti
                                        Kayalyn A. Marafioti (KM 9632)
                                        Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York  10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                       Debtors and Debtors-in-Possession

7

# EXHIBIT N

**Hearing Date:  February 14, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
            In re                            :        Chapter 11
                                                                 :
DELPHI CORPORATION, et al.,                  :        Case No. 05-44481 (RDD)
                                                                 :
                        Debtors.             :        (Jointly Administered)
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO
## PROOF OF CLAIM NUMBER 2558 (INPLAY TECHNOLOGIES, INC.)

## ("STATEMENT OF DISPUTED ISSUES – INPLAY TECHNOLOGIES, INC.")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement Of Disputed Issues (the "Statement Of Disputed Issues") With

Respect To Proof Of Claim Number 2558 (the "Proof Of Claim") filed by InPlay Technologies,

Inc. ("InPlay") and respectfully represent as follows:

<u>Background</u>

1.      InPlay filed the Proof Of Claim on or about April 4, 2006.  The Proof Of

Claim asserts an unsecured nonpriority claim in the amount of $9 million (the "Claim") for

royalties allegedly owed pursuant to a License Agreement between InPlay (f/k/a DuraSwitch

Industries, Inc.) and Delphi Automotive Systems LLC ("DAS LLC"), dated April 20, 2000 (the

"License Agreement").  Specifically, the Claim is comprised of an alleged $3 million royalty

payment due July 2006 and an alleged $6 million royalty payment due July 2007.  <u>See</u>

Attachment to Proof Of Claim at p. 1.

2.      The License Agreement was rejected by DAS LLC, effective as of

October 17, 2005, pursuant to this Court's Order Under 11 U.S.C. § 365(a) Authorizing

Rejection Of License Agreement With DuraSwitch Industries, Inc. (Docket No. 762) dated

October 27, 2005.

3.      The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

4.       InPlay filed its Response Of InPlay Technologies, Inc. To Objection To Claim 2558 (Docket No. 5601) (the "Response") on November 21, 2006.  Attached to the Response was the Affidavit Of Robert J. Brilon In Support Of InPlay Technologies, Inc.'s Objection To Claim 2558 [sic] (the "Brilon Affidavit").

Disputed Issues

A.       <u>If Any Portion Of The Claim Is Valid, It Must Be Discounted To Present Value</u>.

5.       While the Debtors believe that the entire Claim is invalid as set forth below, even if the Court were to determine that any portion of the Claim is valid, the entire claim was unmatured as of October 8, 2005 (the "Petition Date").  The Proof Of Claim acknowledges that $3 million of the amount asserted in the Claim was not due under the License Agreement until July 2006 and the remaining $6 million asserted in the Claim was not due under the License Agreement until July 2007.  Therefore, each portion of the Claim, if ultimately determined to be valid, must be discounted to its value as of the Petition Date utilizing an appropriate discount rate. Discounting the Claim to its value of the Petition Date would result in a significant reduction in the amount of the Claim.

B.       <u>InPlay Has Provided No Evidence That It Has Fully Mitigated Its Claim</u>.

6.       A claimant is required to mitigate its damages arising as a result of a breach of an agreement, including as a result of the rejection of such agreement pursuant to 11 U.S.C. § 365.  Neither the Proof Of Claim nor the Response contain any evidence that InPlay has undertaken any action to attempt to mitigate its damages, if any, arising as a result of DAS LLC's rejection of the License Agreement.

7.       The only statement that InPlay has made with respect to mitigation of its damages is contained in the Brilon Affidavit, in which it is stated that "InPlay has been unable to

3

license the DuraSwitch Patents and DuraSwitch Technology in the Exclusive Licensed Field or

to find others willing to exploit the DuraSwitch Patents and DuraSwitch Technology in that

field" despite undertaking allegedly "extensive" efforts to license the technology to other parties.

See Brilon Affidavit at ¶6.  This, however, is inconsistent with the prior statements of InPlay

made at the time that DAS LLC sought to reject the License Agreement.  At that time, InPlay

asserted that the License Agreement had value to DAS LLC, despite acknowledging that DAS

LLC was not manufacturing any products incorporating the licensed technology, because the

Debtors' competitors would otherwise license and use the technology from InPlay to compete

with the Debtors.  See Objection Of DuraSwitch Industries, Inc. To Debtors' Motion For An

Order Under 11 U.S.C. § 365(a) Authorizing Rejection Of License Agreement With DuraSwitch

Industries, Inc. (Docket No. 629) ("The value to Delphi was present even in the absence of sales

of Licensed Products, because the Agreement allowed Delphi to keep the Licensed Technology

from being used by other manufacturers and competitors of Delphi").

        8.      The conclusory statement contained in the Brilon Affidavit is insufficient

to demonstrate that InPlay has taken appropriate steps to mitigate its damages, if any, arising

from the rejection of the License Agreement.  Pursuant to the License Agreement, InPlay granted

DAS LLC an exclusive license with respect to certain technology  intended to facilitate electrical

connections within a vehicle.  As DAS LLC's rejection of the License Agreement allowed InPlay

to license the technology covered by the License Agreement, which InPlay alleges has

significant value, to any other party, the Debtors believe that InPlay should have been able to

mitigate its damages, at least in part, which would further reduce the amount of the Claim.

C.      Delphi Has No Obligations Under The License Agreement.

9.      The Claim is asserted by InPlay against Delphi.  The Debtors dispute that

Delphi owes any obligation to InPlay.  As noted above, the basis for the Claim is a License

Agreement between InPlay and DAS LLC.  Delphi and DAS LLC are separate and distinct legal

entities.  None of the Proof Of Claim, the Response, or the Brilon Affidavit assert any basis upon

which Delphi would be liable for DAS LLC's obligations, if any, under the License Agreement.

Rather, the Brilon Affidavit expressly acknowledges that DAS LLC was the Debtor party to the

License Agreement and the Response expressly states that the Claim is for "minimum royalty

payments due and owing from Delphi pursuant to Section 3.2 of the License Agreement."  See

Brilon Affidavit at ¶2; Response at ¶2.[1]  Similarly, the License Agreement provides no basis for

claims to be asserted against Delphi.  The License Agreement clearly and unambiguously

identifies DAS LLC as the party to the License Agreement.  See, e.g., License Agreement at pp.

1 and 14.  Delphi is not, and has never been, a party to the License Agreement.  In fact, the

Brilon Affidavit states that the License Agreement has not been amended.  See Brilon Affidavit

at ¶5.

10.      Furthermore, pursuant to the Order Under 11 U.S.C. §§ 107(b), 501, 502,

And 1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar

Dates For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket

No. 3206) (the "Bar Date Order"), claimants, including InPlay, were required to file proofs of

---

[1]      The Response uses the term "Delphi" without defining the specific Debtor entity to which
such term is intended to refer.

claim against the appropriate Debtor entity.  Specifically, paragraph 3(f) of the Bar Date Order

provides:

> Proofs of Claim must clearly indicate the name of the applicable Debtor against
> which the Claim is asserted and the applicable reorganization case number for
> such Debtor, and if a Claim is asserted against more than one of the Debtors, a
> separate Proof of Claim must be filed in each such Debtor's reorganization case.

11.     Furthermore, the Notice Of Bar Date For Filing Proofs Of Claim (the "Bar

Date Notice") which was approved by the Court pursuant to Bar Date Order also specifically

stated that "each holder of a claim must identify on its proof of claim the specific Debtor against

which its claim is asserted and the case number of that Debtor's reorganization case." See Bar

Date Notice at p. 2.  Exhibit A to the Bar Date Notice specifically identified DAS LLC as a

Debtor and identified its case number.  See Exhibit A to Bar Date Notice at p. 4.

12.     Nonetheless, InPlay filed its Proof Of Claim only against Delphi, and did

not file any proofs of claim against DAS LLC.  The July 31, 2006 bar date passed over four and

one-half months ago.  As the Proof Of Claim was asserted against Delphi and Delphi clearly has

no obligations under the License Agreement, including, but not limited to, the payment of any

royalties owing thereunder, the Claim is invalid and should be disallowed in its entirety.

Reservation Of Rights

13.     This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

6

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

and (b) the Debtors' right to later identify additional documentation supporting the disallowance,

expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim, (b) in the alternative, discounting the Claim to its value as of the Petition Date utilizing an appropriate discount rate, and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
      December 18, 2006

           SKADDEN, ARPS, SLATE, MEAGHER
             & FLOM LLP


           By: /s/ John Wm. Butler, Jr.
               John Wm. Butler, Jr. (JB 4711)
               John K. Lyons (JL 4951)
               Ron E. Meisler (RM 3026)
           333 West Wacker Drive, Suite 2100
           Chicago, Illinois  60606
           (312) 407-0700

           - and -


           By: /s/ Kayalyn A. Marafioti
               Kayalyn A. Marafioti (KM 9632)
               Thomas J. Matz (TM 5986)
            Four Times Square
           New York, New York  10036
           (212) 735-3000

           Attorneys for Delphi Corporation, et al.,
            Debtors and Debtors-in-Possession

# EXHIBIT O

**Hearing Date:  February 14, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                          :
          In re                           :     Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :     Case No. 05-44481 (RDD)
                                          :
                                          :     (Jointly Administered)
          Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT
TO PROOF OF CLAIM NUMBER 2707 (LABORSOURCE 2000, INC.)

("STATEMENT OF DISPUTED ISSUES – LABORSOURCE 2000, INC.")


          Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement of Disputed Issues (the "Statement of Disputed Isssues") With

Respect To Proof Of Claim Number 2707 (the "Proof of Claim") filed  by LaborSource 2000,

Inc. ("LaborSource"), and respectfully represent as follows:

<u>Background</u>

1.    LaborSource filed the Proof of Claim on or about April 21, 2006.  The

Proof of Claim asserts an unsecured nonpriority claim in the amount of $2,284,000 (the "Claim")

stemming from an agreement between LaborSource and Delphi Automotive Systems LLC

("DAS LLC") whereby LaborSource agreed to provide certain labor services required by DAS

LLC in conjunction with a certain project (the "Project") to produce automotive cockpits for

General Motors Corporation ("GM"). The Debtors' bid request dated August 27, 2002 (the "Bid

Request"), pursuant to which DAS LLC solicited bids from, among others, LaborSource, and the

Purchase Order dated October 15, 2002 (the "Purchase Order") that contains the terms by which

the Debtors agreed to purchase services from LaborSource, were attached by LaborSource to the

Proof of Claim.

2.    The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

3.       On November 27, 2006,[1] LaborSource filed LaborSource 2000, Inc.'s

Response To Debtors' Third Omnibus Objection To Its Claim No. 2707 (Docket No. 5981) (the

"Response").  In the Response, LaborSource asserts that the Claim constitutes (1) lost profits of

$1,773,000 due to "unexpected down time" of the Project including the time period subsequent

to GM's termination of the Project, (2) "increased" workers compensation premiums of $320,000,

(3) employee medical bills of $65,000 resulting from the apparent cancellation by LaborSource

of medical insurance for its own employees, and (4) interest and expenses of $160,000 from

unspecified "bridge loans LaborSource sought to maintain."

<u>Disputed Issues</u>

4.       The Debtors are not liable to LaborSource for either alleged lost profits or

alleged costs associated with the services provided to the Debtors.  DAS LLC solicited bids for

labor services for the Project, requesting that bidders submit bids by September 17, 2002.  <u>See</u>

Bid Request, attached to the Proof of Claim as Exhibit A.  LaborSource submitted a bid, which

DAS LLC ultimately accepted.  DAS LLC and LaborSource then entered into the Purchase

Order, setting forth the terms upon which DAS LLC would purchase services from LaborSource

for the Project.  <u>See</u> Purchase Order, attached to the Proof of Claim as Exhibit B.

5.       Pursuant to the Purchase Order, DAS LLC agreed to purchase from

LaborSource only those labor services DAS LLC required for the Project.  The Purchase Order

provided fixed and agreed pricing for the labor services.  LaborSource has not asserted that the

Debtors failed to pay for the services actually utilized at the agreed rates provided in the

Purchase Order.  DAS LLC did not commit to purchase a certain volume of services, did not

---

[1]    The deadline to file a response to the Third Omnibus Claims Objection was November 24, 2006 at 4:00 p.m.
(Prevailing Eastern Time).  <u>See</u> Third Omnibus Claims Objection, ¶ 46.

3

promise a certain number of labor hours, and did not agree to be liable for any costs incurred by

LaborSource in providing services to the Debtors.  Indeed, the Bid Request states that the

Debtors "will not incur any costs for employees in excess of the specified template.  The

template will change based on volumes, the manufacturing process, product changes, etc."  Bid

Request, § 2.1.  Further, DAS LLC did not guarantee LaborSource any level of profitability.

6.        During the life of the Project, DAS LLC performed pursuant to the

Purchase Order by purchasing its labor requirements from LaborSource.  When GM terminated

the Project, DAS LLC no longer required services from LaborSource.  Because DAS LLC was

not obligated to purchase services other than those required for the Project, the Debtors are not

liable to LaborSource for any alleged "down time," including the time period subsequent to GM's

termination of the Project, nor for any alleged costs incurred by LaborSource.  Further, pursuant

to Delphi's General Terms and Conditions (the "Terms and Conditions"), which were

incorporated into the Purchase Order, DAS LLC had the right to terminate the Purchase Order

for convenience.  The Terms and Conditions are attached as <u>Exhibit A</u> hereto.  Thus, even if

DAS LLC was obligated to purchase a certain level of labor services, the Debtors are not liable

for lost profits nor costs relating to time periods after the Project was terminated.

7.        Even if LaborSource had a unilateral expectancy of a volume of labor

above that which the Debtors actually required, there is no legal basis upon which the Debtors

are liable to LaborSource for any loss of such expectancy.  The Debtors simply made no

promises with regard to the volume of services they would require from LaborSource.  Rather,

contrary to LaborSource's assertions that it was unaware that DAS LLC's labor needs may vary

over time, the Bid Request expressly stated that DAS LLC's needs would change based upon

"volumes, the manufacturing process, product changes, etc." which is exactly what LaborSource

acknowledges later occurred.  Therefore, if actual volumes were less than LaborSource

anticipated, LaborSource, not the Debtors, must bear any alleged losses resulting therefrom.

8.        Accordingly, because DAS LLC fully performed its obligations under the

Purchase Order by purchasing its required labor for the Project from LaborSource, the Debtors

are not liable for any alleged loses incurred by LaborSource in connection with the supply of

labor to DAS LLC and the Claim should be disallowed and expunged.

9.        Finally, pursuant to the Amended Eighth Supplemental Order Under 11

U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing

Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures,

entered on October 26, 2006 (Docket No. 5418) and the Third Omnibus Claims Objection,

responses to the Third Omnibus Claims Objection were due by November 22, 2007.  The

Response was filed after the deadline, and thus was not timely.  LaborSource's failure to file a

timely response to the Third Omnibus Claims Objection lends further support for the

disallowance and expungement of the Claim.

Reservation of Rights

10.        This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

5

and (b) the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order disallowing and expunging the Claim and granting the Debtors such other and further relief as is just.

Dated: New York, New York
        December 18, 2006

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

6

## DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

### 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

### 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of

the essence with respect to all delivery schedules Buyer establishes.  Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules.  Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules.  If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

2.4   Premium Shipments.   If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible.  Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control.  While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes.  In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes.  In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time.    Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract.  No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections.  Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing.  If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies.  If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to

Revised June 24, 1999

arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3 Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

**Revised June 24, 1999**

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive

termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1   Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards.  Such technical information will not be subject to any use or disclosure restrictions.  Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2   Waiver of Claims.   Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

12.3   Repair and Rebuild.   Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4   Computer Programs and Written Works.   All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1   Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.    Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2   Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3   Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether

such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.   Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.  With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.  The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option  to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1   Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis.  To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller,

Revised June 24, 1999

Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any

**Revised June 24, 1999**

loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5 Development, Engineering And Consulting Services. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT P

**Hearing Date: February 14, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
        In re                                 :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                      Debtors.                :        (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO
PROOF OF CLAIM NUMBER 8324 (ERICKA S. PARKER, CHAPTER 7 TRUSTEE)

("STATEMENT OF DISPUTED ISSUES – ERICKA PARKER, CHAPTER 7 TRUSTEE")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement Of Disputed Issues (the "Statement Of Disputed Issues") With

Respect To Proof Of Claim Number 8324 (the "Proof Of Claim") filed by Ericka Parker

("Parker"), Chapter 7 Trustee for Flex-Tech Professional (n/k/a Toledo Professional Temps, Inc.)

("Flex-Tech") and respectfully represent as follows:

<u>Background</u>

1.    Parker filed the Proof Of Claim on or about June 21, 2006.  The Proof Of

Claim asserts an unsecured nonpriority claim in an undetermined amount.  Specifically, Parker

asserts her claim stems from a confidential settlement agreement[1] (the "Settlement Agreement")

between Delphi Automotive Systems LLC ("DAS LLC"), Flex-Tech, and Initial Transfer FT,

Ltd. ("Initial Transfer").

2.    In 1995, DAS LLC contracted with Flex-Tech to manage its purchasing

function for indirect commodities (the "Commodity Management Agreement").    Some time

thereafter, Flex-Tech failed to pay DAS LLC's suppliers and a number of lawsuits were initiated

against Flex-Tech and DAS LLC.  In August of 2000, DAS LLC initiated litigation in the United

States District Court for the Northern District of Ohio and sought a declaratory judgment with

respect to Commodity Management Agreement.

3.    On or about February 19, 2003, Flex-Tech and DAS LLC entered into the

Settlement Agreement to resolve the pending litigation. The Settlement Agreement divided

supplier claims into two categories — those that filed lawsuits and those that had not filed

---

[1]    A copy of the Settlement Agreement is not attached to the Debtors' Statement of Disputed
Issues because the Settlement Agreement contains a confidentiality provision. A copy will
be provided to Parker upon her request.

2

lawsuits.  The Settlement Agreement provided that DAS LLC would resolve some supplier

claims against Flex-Tech at DAS LLC's own expense.  Additionally, the Settlement Agreement

provided that DAS LLC would deposit a total of $100,000 into an escrow account in the name of

Initial Transfer ($30,000 into Escrow A and $70,000 into Escrow B).  The Settlement Agreement

called for the funds remaining in Escrow B as of a date certain to be split equally between DAS

LLC and Initial Transfer.

      4.    In July 2003, Flex-Tech filed a petition for Chapter 7 of the Bankruptcy Code

in the United States Bankruptcy Court of the Northern District of Ohio (the "Ohio Court").  On

April 8, 2004, DAS LLC commenced an adversary proceeding in the Ohio Court (the

"Adversary Proceeding") against Parker seeking a declaratory judgment as to the rights and

duties of the parties under the Settlement Agreement.  Initial Transfer assigned its rights under

the Settlement Agreement to Parker.

      5.    In the Adversary Proceeding, DAS LLC asserted that it was excused from

performing its remaining obligations under the Settlement Agreement due to certain material

breaches by Flex-Tech thereunder.  Specifically, DAS LLC argued that Flex-Tech had materially

breached the Settlement Agreement by failing to resolve all supplier claims and by rejecting the

Settlement Agreement.

      6.    The Ohio Court granted DAS LLC's motion for summary judgment filed in

the Adversary Proceeding in part, holding that DAS LLC was excused from making payments

under the Settlement Agreement to certain suppliers who had filed lawsuits against Flex-Tech

and found that Flex-Tech was not entitled to funds paid by DAS LLC to Comptrol Incorporated,

a supplier with a prepetition judgment against Flex-Tech.  DAS LLC's motion for summary

judgment as to its obligation to fund Escrow A and Escrow B was denied.

3

7.   The Debtors objected to the Claim pursuant to the Debtors' (i) Third Omnibus

Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain

(a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And

Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And

Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus

Claims Objection"), which was filed on October 31, 2006.

8.   Parker filed her Response of Ericka S. Parker, Chapter 7 Trustee to Debtors'

Third Omnibus Objection (Substantive) to Claims and Request to be Excused from Attending

First Hearing as to Same (Docket No. 5644) (the "Response") on November 21, 2006.

<u>Disputed Issues</u>

A.    <u>DAS LLC's Obligations To Parker Do Not Exceed $65,000</u>

9.    The Memorandum And Order Regarding Motion For Summary Judgment

entered on September 27, 2006 by the Ohio Court in the Adversary Proceeding clearly provides

that DAS LLC's obligations under the Settlement Agreement will not exceed $65,000.

10.    Therefore, DAS LLC asserts that it owes Parker $65,000 at most and

disputes any additional amounts asserted by Parker.

B.    <u>Delphi Has No Obligations Under The Settlement Agreement.</u>

11. The Claim is asserted by Parker against Delphi.  The Debtors dispute that

Delphi owes any obligation to Parker.  As noted above, the basis for the Claim is a Settlement

Agreement between Flex-Tech and DAS LLC.  Delphi and DAS LLC are separate and distinct

legal entities.  Neither the Proof Of Claim nor the Response assert any basis upon which Delphi

would be liable for DAS LLC's obligations, if any, under the Settlement Agreement.  Similarly,

the Settlement Agreement provides no basis for claims to be asserted against Delphi.  The

4

Settlement Agreement clearly and unambiguously identifies DAS LLC as the party to the

Settlement Agreement.  See, e.g., Settlement Agreement at pp. 1 and 5.  Delphi is not, and has

never been, a party to the Settlement Agreement.

12. Furthermore, pursuant to the Order Under 11 U.S.C. §§ 107(b), 501, 502, And

1111(a) And Fed R. Bankr. P. 1009, 2002(a)(7), 3003(c)(3), And 5005(a) Establishing Bar Dates

For Filing Proofs Of Claim And Approving Form And Manner Of Notice Thereof (Docket No.

3206) (the "Bar Date Order"), claimants, including Parker, were required to file proofs of claim

against the appropriate Debtor entity.  Specifically, paragraph 3(f) of the Bar Date Order

provides:

> Proofs of Claim must clearly indicate the name of the applicable Debtor
> against which the Claim is asserted and the applicable reorganization case
> number for such Debtor, and if a Claim is asserted against more than one of the
> Debtors, a separate Proof of Claim must be filed in each such Debtor's
> reorganization case.

13. Furthermore, the Notice Of Bar Date For Filing Proofs Of Claim (the "Bar

Date Notice") which was approved by the Court pursuant to Bar Date Order also specifically

stated that "each holder of a claim must identify on its proof of claim the specific Debtor against

which its claim is asserted and the case number of that Debtor's reorganization case."  See Bar

Date Notice at p. 2.  Exhibit A to the Bar Date Notice specifically identified DAS LLC as a

Debtor and identified its case number.  See Exhibit A to Bar Date Notice at p. 4.

14. Nonetheless, Parker filed her Proof Of Claim only against Delphi, and did not

file any proofs of claim against DAS LLC.  The July 31, 2006 bar date passed over four and one-

half months ago.  As the Proof Of Claim was asserted against Delphi and Delphi clearly has no

obligations under the Settlement Agreement, including, but not limited to, the payment of any

royalties owing thereunder, the Claim is invalid and should be disallowed in its entirety.

5

<u>Reservation Of Rights</u>

15. This Statement Of Disputed Issues is submitted by the Debtors pursuant to paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims (Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim and (b) the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim and granting the Debtors such other and further relief as is just.

Dated: New York, New York
       December 18, 2006

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP


By: /s/ John Wm. Butler, Jr._____
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -


By: /s/ Kayalyn A. Marafioti_____
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

# EXHIBIT Q

**Hearing Date:  February 14, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :
            In re                            :        Chapter 11
                                             :
DELPHI CORPORATION, et al.,                  :        Case No. 05-44481 (RDD)
                                             :
                        Debtors.             :        (Jointly Administered)
                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO
PROOF OF CLAIM NUMBER 11627 (COMPTROL INCORPORATED)

("STATEMENT OF DISPUTED ISSUES – COMPTROL INCORPORATED")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this Statement Of Disputed Issues (the "Statement Of Disputed Issues") With

Respect To Proof Of Claim Number 11627 (the "Proof Of Claim") filed by Comptrol

Incorporated ("Comptrol") and respectfully represent as follows:

<u>Background</u>

1.    Comptrol filed the Proof Of Claim on or about July 27, 2006.  The Proof

Of Claim asserts an unsecured nonpriority claim in the amount of $157,801.93[1] (the "Claim") for

goods sold to Delphi Automotive Systems LLC ("DAS LLC") through its alleged agent Flex-

Tech Professional (n/k/a Toledo Professional Temps, Inc.) ("Flex-Tech").  Specifically,

Comptrol asserts that the Claim is comprised of $107,719.65 from a 2001 state court judgment in

favor of Comptrol against Flex-Tech for goods sold in 1999 by Comptrol (the "Judgment"), plus

post judgment interest at a rate of 10% per annum through and including October 8, 2005 (the

"Petition Date").

2.    Comptrol asserts that DAS LLC is liable for the Judgment because, on

February 21, 2003, DAS LLC and Flex-Tech entered a settlement agreement[2] ("Settlement

---

[1]    In its Response (defined below) Comptrol asserts that the allowable amount of its Claim
upon liquidation would be either (a) $143,826.26 based on DAS LLC's alleged liability for
goods sold to DAS LLC through Flex-Tech; (b) $157,801.93 allegedly based on cost of
goods sold and post judgment interest; or (c) $107,719.65 based on liability DAS LLC
allegedly acknowledged it was owed to Comptrol in the Delphi Automotive Systems, LLC's
Amended Complaint For Interpleader and Declaratory Judgment in the Northern District of
Ohio Bankruptcy Court  (Case No. 05-44481; Docket No. 59) ("Amended Complaint For
Interpleader and Declaratory Judgment").

[2]    A copy of the Settlement Agreement is not attached to the Debtors' Statement of Disputed
Issues because the Settlement Agreement contains a confidentiality provision, however, a
copy will be provided to Comptrol upon request.

2

Agreement") resolving the case pending between them in United States District Court for the

Northern District of Ohio.  Pursuant to the Settlement Agreement, DAS LLC agreed to resolve,

at its own expense, the lawsuit brought against Flex-Tech by Comptrol.   On or about July 16,

2003, Flex-Tech sought chapter 7 relief in the United States Bankruptcy Court for the Northern

District of Ohio (the "Ohio Court") and the Settlement Agreement was subsequently deemed

rejected under Section 365(d) of the Bankruptcy Code.

        3.      Prior to the Petition Date, DAS LLC and Comptrol orally agreed that a

payment by DAS LLC in the sum of $107,719.65 to Comptrol (the amount of the state court

judgment against Flex-Tech) would result in full and final satisfaction of DAS LLC's obligations

to Comptrol and that such payment would result in Comptrol releasing DAS LLC.  Prior to

making any payment to Comptrol, DAS LLC filed an Amended Complaint For Interpleader and

Declaratory Judgment in Flex-Tech's bankruptcy case (the "Flex-Tech Case") pending in the

Ohio Court.  Among other matters, DAS LLC sought to pay through interpleader $107,719.65 to

Comptrol and extinguish any rights or claims by Flex-Tech to the payment to Comptrol.  On

September 27, 2006, the Ohio Court entered an order finding that Flex-Tech was not entitled to

any funds due to Comptrol by DAS LLC (Flex-Tech Case Docket No. 102).

        4.      The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

5.      Comptrol filed its Response Of Comptrol Incorporated To Debtors' (I)

Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b) And Fed. R.

Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B) Claims

Unsubstantiated By Debtors' Books and Records, And (C) Claims Subject to Modification And

(II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. Section

502(c)  (Docket No. 5918) (the "Response") on November 22, 2006.

<u>Disputed Issues</u>

6.      Prior to the Petition Date, DAS LLC and Comptrol had an oral agreement

that payment of $107,719.65 by DAS LLC to Comptrol would constitute full and final

satisfaction of all of DAS LLC's obligations to Comptrol and that upon such payment Comptrol

would release DAS LLC from any additional claims.[3]

7.      Therefore, DAS LLC asserts that it owes Comptrol $107,719.65 and

disputes any additional amounts asserted by Comptrol.

<u>Reservation Of Rights</u>

8.      This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

---

[3]      In any event, the $157,801.93 claim asserted by Comptrol is not appropriate because it is
not consistent with the calculation of statutory interest on a judgment of an Ohio state
court.

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

and (b) the Debtors' right to later identify additional documentation supporting the disallowance,

expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order

reducing the Claim to $107,719.65, and (c) granting the Debtors such other and further relief as

is just.

Dated:  New York, New York
          December 18, 2006

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP


By: /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -


By: /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

# EXHIBIT R

Delphi Corporation
Framework Agreement Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Appaloosa Management L.P. | Ronald Goldstein | 26 Main Street | | Chatham | NJ | 07928 |
| Cerberus Capital Management, L.P. | Lenard Tessler | 299 Park Avenue | | New York | NY | 10171 |
| Cleary Gottlieb Steen & Hamilton LLP | Leslie N. Silverman | One Liberty Plaza | | New York | NY | 10006 |
| Delphi Corporation | John D. Sheehan, David M. Sherbin | 5725 Delphi Drive | | Troy | MI | 48098 |
| General Motors Corporation | Michael Lukas | 767 Fifth Avenue | 14th Floor | New York | NY | 10153 |
| General Motors Corporation | Chris Johnson, Frederick Fromm | 300 GM Renaissance Center | | Detroit | MI | 48265 |
| Greenhill & Co. | Harvey R. Miller | 300 Park Avenue | | New York | NY | 10022 |
| Harbinger Del-Auto Investment Co. Ltd. c/o Harbinger Capital Partners | Philip A. Falcone | 555 Madison Avenue | 16th Floor | New York | NY | 10022 |
| Kaye Scholer LLP | Lynn Fisher, Benjamin Mintz | 425 Park Avenue | | New York | NY | 10022-3598 |
| Merrill Lynch & Co. | Robert Spork, Rick Morris | 4 World Financial Center | | New York | NY | 10080 |
| Milbank, Tweed, Hadley & McCoy | Gregory Bray, Thomas R. Keller | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017-5735 |
| Milbank, Tweed, Hadley & McCoy | Thomas C. Janson | One Chase Manhattan Plaza | | New York | NY | 10005-1413 |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Andrew N. Rosenberg | 1285 Avenue of the Americas | | New York | NY | 10019 |
| UBS Securities LLC | Osamu Watauabe | 299 Park Avenue | | New York | NY | 10171 |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Jeffrey L. Tanenbaum, Michael P. Kessler | 767 Fifth Avenue | | New York | NY | 10153 |
| White & Case LLP | Thomas E. Lauria | Wachovia Financial Center | 200 South Biscayne Blvd, Suite 4900 | Miami | FL | 33131-2352 |
| White & Case LLP | Gregory Pryor | 1155 Avenue of the Americas | | New York | NY | 10036-2787 |

12/19/2006 12:34 PM
Framework Special Parties

# EXHIBIT S

Delphi Corporation
Union Counsel Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|
| Cohen, Weiss & Simon LLP | Joseph J. Vitale/ Bruce Simon/ Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | 212-356-0238 | 646-473-8238 | Counsel for International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| IUE-CWA | James D Clark/ Peter Mitchell | 501 Third St NW | Sixth Fl | Washington | DC | 20001 | | 202-434-1343 | |
| Kennedy, Jennick & Murray, P.C. | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | | Attorneys for the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America |
| United Auto Workers | Daniel Sherrick | 8000 E Jefferson Ave | | Detroit | MI | 48214 | | | |

Delphi Corporation
Combined DIP Objectors and Setoff claimants

| Objector | Contact | Counsel | Address 1 | Address 2 | City | State | Zip | Country |
|---|---|---|---|---|---|---|---|---|
| A. Shulman, Inc. | Carrie M. Caldwell | Vorys, Sater, Seymour and Pease LLP | 2100 One Cleveland Center | 1375 East Ninth Street | Cleveland | Ohio | 44114 | USA |
| Ad Hoc Committee of Prepetition Lenders DK Acquisition LP | Allan S. Brilliant Emanuel C. Grillo Brian W. Harvey | Goodwin Procter LLP | 599 Lexington Avenue | | New York | NY | 10022 | USA |
| Administrative Agent for the Prepetition Secured Lenders | Bruce D. Angiolillo Kenneth S. Ziman William T. Russell, Jr. | Simpson Thacher & Bartlett LLP | 425 Lexington Avenue | | New York | New York | 10017 | USA |
| AGFA-Gevaert N.V. | Jonathan R. Doolittle | Verrill Dana LLP | One Portland Square | | Portland | ME | 04112 | USA |
| American Axle & Manufacturing, Inc. | Robert J. Diehl, Jr. Ralph E. McDowell | Bodman LLP | 100 Renaissance Center | 34th Floor | Detroit | Michigan | 48243 | USA |
| ARC Automotive | Alan D. Halperin Christopher J. Battaglia | Halperin Battaglia Raicht, LLP | 555 Madison Avenue | 9th Floor | New York | New York | 10022 | USA |
| Arneses Electronics Automotrices, S.A. de C.V. and Cordaflex, S.A. de C.V. | Deborah M. Buell | Cleary Gottlieb Steen & Hamilton LLP | One Liberty Plaza | | New York | New York | 10006 | USA |
| Autocam Corporation | John T. Gregg, Esq. | Barnes & Thornburg LLP | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | Michigan | 49503 | USA |
| Autoliv North America, Inc. | Anthony Nellis | Ryan Wolf | 5350 Airport Road | | Ogden | UT | 84405 | USA |
| Automodular Assemblies Inc. | Brian F. Moore | McCarter & English, LLP | 245 Park Avenue | | New York | NY | 10167 | USA |
| Benteler Automotive Corp. | Thomas P. Sarb | Miller Johnson | 250 Monroe Avenue, N.W. Suite 800 | P.O. Box 306 | Grand Rapids | Michigan | 49501-0306 | USA |
| CAMI Automotive | Susan Nicholson, Esq. | Susan Nicholson, Esq. | 300 Ingersoll Street | P.O. Box 1005 | Ingersoll | ON | N5C4A6 | Canada |
| Dekko Stamping (aka Pent Technologies) / Dekko Technologies | Martin E. Seifert | Haller & Colvin, P.C. | 444 East Main Street | | Fort Wayne | IN | 46802 | USA |
| Essex Group | Michael R. Seidl | Pachulski Stang Ziehl Young Jones & Weintraub | 919 North Market Street, | 17th Floor | Wilmington | DE | 19801 | USA |
| Federal-Mogul Corporation | Jonathan Gordon | Sidley Austin Brown & Wood LLP | 555 West Fifth Street | | Los Angeles | CA | 90013 | USA |
| ForHealth Technologies, Inc. | John G. Loughnane | McCarter & English, LLP | 225 Franklin Street | | Boston | MA | 02110 | USA |
| Freescale Semiconductor, Inc. | Sandra A. Riemer Canadice Frost | Phillips Nizer LLP | 666 Fifth Avenue | | New York | NY | 10103-0084 | USA |
| Fujikura America, Inc. | Paul M. Baisier Robert W. Dremluk | Seyfarth Shaw LLP | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | USA |
| Furukawa Electric North American ADP | Michael S. McElwee | Michael S. McElwee | 333 Bridge Street, N.W. | Suite 1700 | Grand Rapids | MI | 49504 | USA |
| General Electric Company/ Metaldyne Corporation/ PBR Columbia LLC / Yazaki North America, Inc. | David G. Dragich | Foley & Lardner, LLP | One Detriot Center | 500 Woodward Avenue/ Suite 2700 | Detroit | MI | 48226 | USA |
| General Motors Corporation | Martin J. Bienenstock Michael P. Kessler Jeffrey L. Tanenbaum | Weil, Gotshal & Manges LLP | 767 Fifth Avenue | | New York | New York | 10153-0119 | USA |
| Gibbs Die Casting Corporation | Michael K. McCrory Wendy D. Brewer | Barnes & Thornburg LLP | 11 S. Meridian Street | | Indianapolis | Indiana | 46204 | USA |
| GW Plastics, Inc. | J. Eric Charlton | Hiscock & Barclay | One Park Place | P.O. Box 4878 | Syracuse | NY | 13221 | USA |
| Harco Industries, Inc. | Ronald S. Pretekin | Coolidge Wall | 33 West First Street | Suite 600 | Dayton | OH | 45402 | USA |
| Hewlett-Packard | Andrew H. Sherman | Sills Cummins Epstein & Gross | One Riverfront Plaza | | Newark | NJ | 07102 | USA |
| Hitachi Automotive Products (USA), Inc. | Brian D. Spector, Esq. | Spector & Ehrenworth, P.C. | 30 Columbia Turnpike | | Florham Park | New Jersey | 07932 | USA |
| Honda Entities | Robert J. Sidman Robert A. Bell | Vorys, Sater, Seymour and Pease LLP | 52 East Gay Street | P.O. Box 1008 | Columbus | Ohio | 43215 | USA |
| Honda Entities | Cherie Macdonald J. Patrick Bradley | Greensfelder, Hemker & Gale, P.C. | 12 Wolf Creek Drive | Suite 100 | Swansea | Illinois | 62226 | USA |
| ISI of Indiana | Michael J. Hebenstreit | Whitman, Hebenstreit & Zubek LLP | Market Square Center-Suite 2000 | 151 North Delaware Street | Indianapolis | IN | 46204 | USA |
| Itapsa S.A. de C.V. | Robert J. Taylor | Kane Russell Coleman & Logan LLP | 3700 Thanksgiving Tower | 1601 Elm Street | Dallas | TX | 75201 | USA |
| Kaiser Aluminum & Chemical Corporation | Timothy Mehok | Heller Ehrman LLP | 7 Times Square | | New York | NY | 10036-6524 | USA |
| Lorenston Manufacturing Company Southwest, Inc./Kokomo | Jeannette Eisan Hinshaw, Esq. | Bose McKinney & Evans LLP | 135 North Pennsylvania Street | Suite 2700 | Indianapolis | Indiana | 46204 | USA |
| Magna International Group | Max Newman | Schafer & Weiner, PLLC | 40950 Woodward Avenue | Suite 100 | Bloomfield Hills | MI | 48304 | USA |
| Magna International, Inc. and Certain of its Affiliates | Sanford P. Rosen Kenneth M. Lewis | Sanford P. Rosen & Associates, P.C. | 747 Third Avenue | | New York | New York | 10017 | USA |

Delphi Corporation
Combined DIP Objectors and Setoff claimants

| Objector | Contact | Counsel | Address 1 | Address 2 | City | State | Zip | Country |
|----------|---------|---------|-----------|-----------|------|-------|-----|---------|
| Means Industries, Inc. | Michael Yetnikoff | Schiff Hardin LLP | 6600 Sears Tower | | Chicago | IL | 60606 | USA |
| Mid-American Products | Mark H. Shapiro | Steinberg, Shapiro & Clark | 24901 Northwest Highway | Suite 611 | Southfield | MI | 48075 | USA |
| Multek Flexible Circuits, Inc. Sheldahl de Mexico S. de C.V., and Northfield Acquisition Co. | Steven J. Reisman | Curtis, Mallet-Prevost, Colt & Mosle LLP | 101 Park Avenue | | New York | NY | 10178-0061 | USA |
| Murata Electronics North America | Paul M. Baisier Robert W. Dremluk | Seyfarth Shaw LLP | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | USA |
| National Molding Corporation and Security Plastics Division/NMC, LLC | Kenneth A. Reynolds | Pryor & Mandelup, LLP | 675 Old Country Road | | Westbury | New York | 11590 | USA |
| Newman Aluminum Automotive, Inc. and Newman Aluminium Impact Extrusion, Inc. | John S. Mairo Brett S. Moore | Porzio, Bromberg & Newman, P.C. | 156 West 56th Street | | New York | New York | 10019 | USA |
| Norsk Hydro Canada, Inc. | Patricia A. Borenstein | Miles & Stockbridge P.C. | 10 Light Street | | Baltimore | MD | 21202 | USA |
| Omega Tool Corp., L&W Engineering Co., Southtec, LLC, DOTT Industries, Inc., ALPS Automotive, Inc., Pioneer Automotive Technologies, Inc. Lakeside Plastics Limited, Android Industries, Inc., Ai-Doraville, LLC, and Ai-Genesee, LLC | Sanford P. Rosen Kenneth M. Lewis | Sanford P. Rosen & Associates, P.C. | 747 Third Avenue | | New York | NY | 10017-2803 | USA |
| Pension Benefit Guaranty Corporation | Merrill B. Stone Mark I. Bane Mark R. Somerstein | Kelley Drye & Warren LLP | 101 Park Avenue | | New York | NY | 10178 | USA |
| Power & Signal Group | John J. Monaghan | Holland & Knight LLP | 10 St. James Avenue | | Boston | MA | 02116 | USA |
| Robert Bosch Corp. & Affiliates | Gordon J. Toering | Warner Nordcross & Judd LLP | 900 Fifth Third Center | 111 Lyon St. NW | Grand Rapids | Michigan | 49503-2487 | USA |
| Semiconductor Components, L.L.C. | John J. Dawson John A. Harris Scott Goldberg | Quarles & Brady Streich Lang LLP | Renaissance One 2 North Central Avenue | | Phoenix | Arizona | 85004-2391 | USA |
| Source Electronics Corporation | Steven E. Boyce | Sheehan Phinney Bass & Green PA | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105 | USA |
| Tawas Industries | Kennth R. Karble | Braun Kendrick Finkerbeiner, PLC | 4301 Fashion Square Blvd. | | Saginaw | MI | 48603 | USA |
| Textron Fastening Systems, Inc. | Tracy L. Klestadt | Klestadt & Winters, LLP | 292 Madison Avenue | 17th Floor | New York | New York | 10017-6314 | USA |
| The Worthington Steel Company and Worthington Steel of Michigan, Inc. | Tiffany Strelow Cobb | Vorys, Sater, Seymour and Pease LLP | 52 East Gay Street | P.O. Box 1008 | Columbus | Ohio | 43215 | USA |
| ThyssenKrupp Budd Systems, LLC | Mark A. Shaiken | STINSON MORRISON HECKER LLP | 1201 Walnut Street | | Kansas City | MO | 64106 | USA |
| Viasystems Group, Inc. | Daniel J. Weber | Daniel J. Weber | 101 South Harley Road | Suite 400 | St. Louis | MO | 63105 | USA |
| W.C. Heraeus | Peter A. Clark | McDermott Will & Emery | 327 West Monroe Street | | Chicago | IL | 60606 | USA |
| Wabash Technologies, Inc. | Richard DeLaney | Bendall DeLaney Hartburg McNeely & Roth LLP | 533 Warren Street | | Huntington | IN | 46750 | USA |
| Wireless Matrix Corporation | Gregg S. Kleiner | Cooley Godward Kronish LLP | 101 California Street | 5th Floor | San Francisco | CA | 94111-5800 | USA |
| Worthington Steel Company | Robert A. Bell, Jr. | Vorys, Sater, Seymour & Pease LLP | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | USA |
| XM Satellite Radio, Inc. | Scott A. Golden | Hogan & Hartson, L.L.P. | 875 Third Avenue | | New York | New York | 10022 | USA |

12/19/2006 2:48 PM
Combined DIP Objectors and Setoff Claimants nyc4-639617-1

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| A3 Funding Lp | Kari Dziemiela | Dymas Capital | 1 North Franklin Ste 3500 | Chicago | IL | 60606 | |
| A3 Funding Lp | Ken Kohrs | 299 Pk Ave | 23rd Fl | New York | NY | 10171 | |
| Ableco Finance Llc | Kari Dziemiela | 450 Pk Ave | 28th Fl | New York | NY | 10022 | |
| Abn Amro Bank Nv Chicago | Loan Administration | 208 South Lasalle | Ste 1500 | Chicago | IL | 60604-1003 | |
| Aca Clo 2005 1 Ltd | Susan Bowers | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Access Institutional Loan Fund | Dina Kalnitsky | 8700 West Bryn Mawr | 12th Fl | Chicago | IL | 60631 | |
| Acm Income Fund Inc | Evan Kriegshaber | 1345 Ave Of The Americas | | New York | NY | 10105 | |
| Adar Investment Fund Ltd | Aaron Morse | 156 W 56th St | Ste 801 | New York | NY | 10019 | |
| Addison Cdo Limited | Bank Loan Settlements | Pacific Investment Management | 840 Newport Ctr Dr | Newport Beach | CA | 92660 | |
| Ag Alpha Credit Master Ltd | Christopher Brescio | 245 Pk Ave 6th Fl | | New York | NY | 10167 | |
| Agricultural Bank Of China | Zhang Yue Yvonne Zhang | No 26 Rd Zhongshan East 1 | | Shanghai | | 200002 | Peoples Republic Of China |
| Ahab Partners Lp | Anthea Chan | 299 Pk Ave 21st Fl | | New York | NY | 10171 | |
| Aim Floating Rate Fund | Angela Gambardella Shirley Brannan | Invesco | 1166 Ave Of The Americas | New York | NY | 10036-2789 | |
| Airlie Opportunity Master Fund Ltd | Michael Lee | 115 East Putnam Ave | | Greenwich | CT | 06830 | |
| Akanthos Arbitrage Master Fund Lp | Christie Kim | 21700 Oxhard St Ste 1520 | | Woodland Hills | CA | 91367 | |
| Alaska Cbna Loan Funding Llc | Janet Haack | 181 W Madison Ave Ste 32 | | Chicago | IL | 60602 | |
| Amaranth Llc | Sean Foronjy | 1 American Ln | | Greenwich | CT | 06831 | |
| Amaranth Partners Llc Trading | Chris Capozzalo | One American Ln | | Grennwich | CT | 06831 | |
| American Express Certificate Company Nka | Donna Emmett | American Express Asset Mgt | 100 North Sepulveda | El Segundo | CA | 90245 | |
| Ammc Clo Iii Limited | Todd Abramson | American Money Management Corp | One East Fourth St 3rd Fl | Cincinnati | OH | 45202 | |
| Ammc Clo Iv Limited | Todd Abramson | Jpmorgan Chase Bank | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| Anchorage Capital Master Offshore Ltd | Laura Caruthers | 650 Madison Ave | 26th Fl | New York | NY | 10022 | |
| Anchorage Crossover Credit Offshore Master Fd Ltd | Elina Gokh | 650 Madison Ave | 26th Fl | New York | NY | 10022 | |
| Apollo Trading Llc | B O A Loan Operations | 214 North Tryon St | | Charlotte | NC | 28255 | |
| Apollo Value Investment Fund Lp Fka/ Apollo Value Investment Offshore Fund Ltd Fka | David Ruditzky | 9 West 57th St 41st Fl | | New York | NY | 10019 | |
| Appaloosa Invest Ltd Partnership I | Peter Dougherty | 51 Jfk Pkwy | | Short Hills | NJ | 07078 | |
| Arab Bank Plc | Justo Haupaya | 520 Madison Ave | | New York | NY | 10022 | |
| Archimedes Funding Iv Cayman Ltd | Stacey Alexander | Ing Capital Advisors Llc | 333 South Grand Ave Ste 4250 | Los Angeles | CA | 90071 | |
| Ares Enhanced Loan Investment Strategy Ltd | David Gorder | 1999 Ave Of The Stars 1900 | | Los Angeles | CA | 90067 | |
| Ares Total Value Fund Lp/ Ares Viii Clo Ltd/ Ares Ix Clo Ltd/ Ares Vii Clo Ltd/ Ares X Clo Ltd | Hardy Moat Anne Chlebnik | 1999 Ave Of The Stars 1900 | Co Ares Management | Los Angeles | CA | 90067 | |
| Arx Global High Yield Securities Master Fund Ltd | Tom Stummtelos | 750 Lexington Ave | 17th Fl | New York | NY | 10022 | |
| Aslan Capital Master Fund Lp | Brian Sheehan | 375 Pk Ave Ste 1305 | | New York | NY | 10152 | |
| Assignment Pool | Missing John | 140 East 45th St | | New York | NY | 10017 | |
| Atlas Capital Funding Ltd/ Atlas Loan Funding Navigator Llc/ Atlas Loan Funding 2 Llc | Robert Consoli Janet Haack | 201 S College St | Nc0601 | Charlotte | NC | 28244-0002 | |
| Atrium Iv | Lori Varga | 13455 Noel Rd Ste 1150 | | Dallas | TX | 75240 | |
| Aurelius Capital Master Ltd/ Aurelius Capital Partners Lp | William Corcoran | 53 Forest Ave 2nd Fl | | Old Greenwich | CT | 06870 | |
| Aurum Clo 2002 1 Ltd | Amy Richards | 1185 Ave Of Americas | Ny5 509 16 04 | New York | NY | 10036 | |
| Australia And New Zealand Bank Group Limited | Doreen Klingenbeck | 1177 Ave Of The Americas | | New York | NY | 10036-2798 | |
| Avenue Clo Fund Ltd/ Avenue Clo Ii Ltd/ Avenue Investments Lp | Eric K Lee Esther Posner | 535 Madison Ave | | New York | NY | 10022 | |
| Avery Point Clo Ltd | Cameron Schulens | Jpmorgan Chase Bank | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| Avl Loan Funding Llc | Mat Thomason Cdo Trust Services | 390 Greenwich St 4th Fl | | New York | NY | 10013 | |
| Balboa Cdo I Limited | Bank Loan Settlement | Pimco | 840 Newport Ctr Dr | Newport Beach | CA | 92660 | |
| Banca Intesa Spa | Alex Papace | One William St | | New York | NY | 10004 | |
| Banca Nazionale Del Lavoro Spa New York | Anna Hernandez | 51 West 52nd St | | New York | NY | 10019 | |
| Banco Bilbao Vizcaya Argentaria Sa | Javier Granero | Via De Los Poblados Sn | 4th Fl | Madrid | | 28033 | Spain |

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Banco Bilbao Vizcaya Argentaria Sa | Patricia Kunert | 1345 Ave Of The Americas | 45th Fl | New York | NY | 10105 | |
| Banco Santander Central Hispano Sa | Ligia Castro O Martha Vasques | 45 East 53rd St | | New York | NY | 10022 | |
| Bank Austria Creditanstalt Ag | Inge Grienauer | Administrative International Busine | A 1090 Vienna Wasagasse 2 | Vienna | | a-1090 | Austria |
| Bank Hapoalim Bm | Donna Gindoff | 1177 Ave Of The Americas | | New York | NY | 10036-2790 | |
| Bank Of America Na | Servicing Team Tlc004 | 101 N Tryon St | 15th Fl | Charlotte | NC | 28255-0001 | |
| Bank Of China Luxembourg Sa | Nguyen Thi Kim Quy | 3739 Blvd Prince Henri | L 1724 Luxembourg | | | L-1724 | Luxembourg |
| Bank Of New York | Diana Johnson | One Wall St | | New York | NY | 10286 | |
| Bank Of Nova Scotia | Demetria January | 600 Peachtree St | Ne Ste 2700 | Atlanta | GA | 30308 | |
| Bank Of Tokyo Mitsubishi Trust Company New York/ Bank Of Tokyo Mitsubishi Trust Co | Rolando Uy | 1251 Ave Of The Americas | 12th Fl | New York | NY | 10020-1104 | |
| Bank One Na | Delilah Smith | 131 S Dearborn | Ste 14 0079 | Chicago | IL | 60670 | |
| Barclays Bank Plc | Sandra Friedman | 200 Cedar Knolls Rd | | Whippany | NJ | 07981 | |
| Battery Park High Yield Long Short Fund Ltd | Cynthia Yen | 2 World Financial Ctr Building B | 17th Fl | New York | NY | 10281 | |
| Battery Park Hy Oppormaster Fdltd | Cynthia Yen | Nomura Corpresearch&asset Mgt | 33 Wood Ave South Ste 600 | Iselin | NJ | 08830 | |
| Bayerische Hypo Und Vereinsbank Ag New York | Arelis Cepeda | 150 East 42nd St | | New York | NY | 10017 | |
| Bayerische Landesbank Girozentrale | Patricia Sanchez | 560 Lexington Ave | | New York | NY | 10022 | |
| Bbt Fund Lp | Wilynn Arnold | Bbt Genpar Lp | 201 Main St Ste 3200 | Fort Worth | TX | 76102 | |
| Bdc Finance Llc | Loan Administrator | One Conway Pk | 100 Field Dr Ste 140 | Lake Forest | IL | 60045 | |
| Bear Stearns Corporate Lending Inc | Gloria Dombrowski | 245 Pk Ave | | New York | NY | 10167 | |
| Bear Stearns Credit Products Inc/ Bear Stearns Investment Products Inc | Ian Mcclay Evan Kaufman | 383 Madison Ave | | New York | NY | 10179 | |
| Bismarck Cbna Loan Funding Llc | Janet Haack | 181 W Madison Ave Ste 32 | | Chicago | IL | 60602 | |
| Black Diamond Offshore Limited | Amy Gribnau | 227 Elgin Ave | PO Box 509gt | George Town | | 99999 | Cayman Islands |
| Blackport Capital Fund Ltd | Jennifer Box | 345 Pk Ave 28th Fl | | New York | NY | 10154 | |
| Blackrock Debt Strategies Fund Inc/ Blackrock Diversified Income Strategies Portfolio | Laura Caruthers | Merrill Lynch Investmtmanagers | 800 Scudders Mill Rd Area 1b | Plainsboro | NJ | 08536 | |
| Blue Cross Of California | Andre Nelson | 11 Martine Ave 11th Fl | | White Plains | NY | 10606 | |
| Blue Square Funding Ltd Series 3 | Marco Ruggiero | Highland Capital Managementltd | 1300 Two Galleria Tower 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Bnp Paribas | Gabriel Candamo | 919 Third Ave 3rd Fl | | New York | NY | 10022 | |
| Boldwater Cbna Loan Funding Llc | Mark Johnson | 135 South Lasalle St Ste 151 | | Chicago | IL | 60603 | |
| Boldwater Credit Opportunities Master Fund Lp | Martin E Kalisker | PO Box 2199 Gt | Grand Pavilion Centre 802 West Bay Rd Ste 14 | Grand Cayman | | | BWI Cayman Islands |
| Boston Harbor Clo 2004 1 Ltd | Lara Jameson | 600 Travis St Fl 51 | | Houston | TX | 77002 | |
| Boston Income Portfolio | Michael Devlin | Eaton Vance Management | 255 State St 11th Fl Att High Yield Department | Boston | MA | 02109 | |
| Brascan High Yield Value Opportunity Fund Lp | David Lagasse | 1 Liberty Plaza 36th Fl | | New York | NY | 10006 | |
| Brencourt Distress Securities Master Ltd | Thomas Schmitt | Brencourt Advisors Llc | 600 Lexington Ave 8th Fl | New York | NY | 10022 | |
| Brookville Capital Master Fund Lp | Brian Shim | Brookville Capital Management | 470 Pk Ave South Ste 1700s | New York | NY | 10016 | |
| Brookville Master Fund Ltd | Brian Shim | 470 Pk Ave South | | New York | NY | 10016 | |
| Bryn Mawr Clo Ltd | Phyllis Zavala | Deerfield Capital Management | 8700 West Bryn Mawr 12th Fl | Chicago | IL | 60631 | |
| C Squared Cdo Ltd | Melanie Ecter | Trust Company Of The West | 200 Pk Ave | New York | NY | 10166 | |
| California Public Employees Retirement System | Cynthia Yen | Highland Capital Management | 1300 Two Galleria Tower 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Callidus Debt Partners Cdo Fund I | Terence Botha | Callidus Capital Management Llc | 527 Madison Ave 17th Fl | New York | NY | 10022 | |
| Calyon New York Branch Fka Credit Lyonnais Sa Ny | Jai Sanichar | 1301 Ave Of The Americas | | New York | NY | 10019 | |
| Canadian Imperial Bank Of Commerce | Helen Ng | 425 Lexington Ave | | New York | NY | 10017 | |
| Candlewood Capital Partners Llc | Nirmala Durgana | 11 Madison Ave | | New York | NY | 10010 | |
| Canpartners Investments Iv Llc | Faith Kim | 9665 Wilshire Blvd | Ste 200 | Beverly Hills | CA | 90212 | |
| Canyon Capital Cdo 2002 1 Ltd | Syndicated Loan Servicing | Bank Of New York | 600 E Los Colinas Blvd Ste 200 | Irving | TX | 75039 | |
| Canyon Capital Clo 2004 1 Ltd | Anita Ram | 60 Wall St 39th Fl | | New York | NY | 10005-2858 | |
| Cap Fund Lp | Wilynn Arnold | Ste 3200 Chase Bank Tower | 201 Main St | Fort Worth | TX | 76102 | |

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Capitalia Spa Fka Banca Di Roma | Aurora Pensa | 225 West Washington Ste 1200 | | Chicago | IL | 60606 | |
| Capitalia Spa Fka Banca Di Roma | Lino Caldera | 34 East 51 St St | | New York | NY | 10022 | |
| Capitalsource Finance Llc | Terry Grant | 4445 Willard Ave 12 Fl | | Chevy Chase | MD | 20815 | |
| Cargill Financial Services Intlinc | Brett Adams | 12700 Whitewater Dr | | Minnetonka | MN | 55343 | |
| Carlyle High Yield Partners Iiiltd/ Carlyle High Yield Partners Iv Ltd/ Carlyle High Yield Partners Vii Ltd/ Carlyle Loan Investment Ltd/ Carlyle Loan Opportunity Fund | Shawn Teel | 520 Madison Ave | 41st Fl | New York | NY | 10022 | |
| Castle Garden Funding | Yvette Mcqueen | Eleven Madison Ave 5th Fl | | New York | NY | 10010 | |
| Castle Hill I Ingots Ltd Fka Castle Hill I Min/ Castle Hill Ii Ingots Ltd Fka Castle Hill Ii Min/ Castle Hill Iii Clo Limited | Bryan Patrick James Engelbrecht Andy Ruiz Sankaty Advisors Llc | | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| Cdl Loan Funding Llc | Jason Trala | 390 Greenwich St | 4th Fl | New York | NY | 10013 | |
| Cedar Creek Spiret Loan Trust | Ubs Trs Servicing Unit | 1100 North Market St | | Wilmington | DE | 19890 | |
| Cedarview Opportunities Master Fund Lp | Jason Langkpf | 405 Lexington Ave 39th Fl | | New York | NY | 10174 | |
| Celerity Clo Ltd Fka Lightspeed Clo Limited | Agnes Leung | 200 Pk Ave | Ste 2200 | New York | NY | 10017 | |
| Centurion Cdo 8 Limited/ Centurion Cdo 9 Limited/ Centurion Cdo Ii Ltd/ Centurion Cdo Vi Ltd/ Centurion Cdo Vii Limited/ Centurion Cdo Vii Limited | Sara Hays Agnes Leung Adrian Coininigel | 100 N Sepulveda Blvd Ste 650 | C O Amer Express Asset Mgt Group | El Segundo | CA | 90245 | |
| Chatham Light Ii Clo Limited | Mike Flores | 111 Huntington Ave | | Boston | MA | 02199 | |
| Citadel Hill 2000 Ltd | Kevin Stephens | 401 South Tryon St 12th Fl | | Charlotte | NC | 28288-1179 | |
| Citibank Na | Askia Abdul Qadir | Two Penns Way | Ste 110 | New Castle | DE | 19720 | |
| Citicorp North America Inc/ Citicorp Usa Inc | David Graber Paul Joseph | 399 Pk Ave | | New York | NY | 10043 | |
| Citigroup Financial Products Inc Fka Sb Hld Co | Fofi S Baimba | 7 World Trade Ctr | | New York | NY | 10048 | |
| Colonial Funding Llc | Colonial Funding Llc | 101 N Tryon St | Nc 001 15 01 | Charlotte | NC | 28273 | |
| Comerica Bank Michigan | Munther Abukhader | 500 Woodward Ave | 9th Fl Mc3265 | Detroit | MI | 48226 | |
| Commerzbank Aktiengesellschaft New York Branch | Wendy Lau | 2 World Financial Ctr | New York Branch | New York | NY | 10281 | |
| Concentrated Alpha Partners Lp | Wilynn Arnold | Ste 3200 Chase Bank Tower | 201 Main St | Fort Worth | TX | 76102 | |
| Concordia Distressed Debt Fund Lp/ Concordia Mac 29 Ltd | Dawn Anderson | 1350 Ave Of The Americas | Ste 3202 | New York | NY | 10019 | |
| Concordia Partners Lp | Dawn Anderson | 1350 Ave Of The Americas | Ste 3202 | New York | NY | 10019 | |
| Continental Casualty Company | John Tsokolas | Cna Plaza | 23 South | Chicago | IL | 60685 | |
| Contrarian Funds Llc | Larry Herzing | 411 West Putnam Ave | Ste 225 | Greenwich | CT | 06830 | |
| Courage Special Situations Master Fund Lp | Richard Horton | 4400 Harding Rd Ste 503 | | Nashville | TN | 37205 | |
| Credit Genesis Clo 2005 1 Ltd | Ilan Mandel | Five Greenwich Office Pk | | Greenwich | CT | 06831 | |
| Credit Industriel Et Commercial/ Credit Industriel Et Commercial Cic | Annick Merard | Centre Administratif Dgc Cel | 95091 Cergy Pontoise Cedex | Paris | | 75009 | France |
| Credit Industriel Et Commercial/ Credit Industriel Et Commercial Cic | Patrice Duchemin | 6 Ave De Provence | | Paris | | 75009 | France |
| Credit Suisse Asset Managemnt Syndicated Loan Fund/ Credit Suisse Capital Llc Fka Credit Suisse First/ Credit Suisse New York & Cayman Islands Branches | Lisa Ferrara Maria Cabrera Sonia Shillingford | Eleven Madison Ave | | New York | NY | 10010 | |
| Csam Funding Iv | Naushin Mehdi | 600 Travis | 48th Fl | Houston | TX | 77002 | |
| Csfb Cayman Islands | Ed Markowski | One Madison Ave | | New York | NY | 10010 | |
| Cumberland Ii Clo Ltd | Kim Koenig | 8700 West Bryn Mawr | | Chicago | IL | 60631 | |
| Cypress Point Trading Llc | Loan Operations | 100 North Tryon St | Nc1 007 06 07 | Charlotte | NC | 28255 | |
| Cypresstree Claif Funding Llc | Cypresstree Claif Funding Llc | 101 N Tryon St | Nc1 001 15 01 | Charlotte | NC | 28273 | |
| Dayton Cbna Loan Funding Llc | Janet Haack | 390 Greenwich St | | New York | NY | 10013 | |
| Dbz Acquisition Partners Ii Llc Fka Hz | Michelle Laryea | 757 Fifth Ave 18th Fl | | New York | NY | 10151 | |
| Deephaven Event Trading Ltd | Matt Halbower | 130 Cheshire Ln Ste 102 | | Minnetonka | MN | 55305 | |

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Delaware Corp Bond Fund A Series Of Del Grp Inc F/ Delaware Delchester Fund A Series Of Delaware | Joseph Fiorilla | 2005 Market St | | Philadelphia | PA | 19103 | |
| Desjardins Financial Security Life Assurance Co | Anthony Martucci | Marathon Asset Management Llc | 461 Fifth Ave 10th Fl | New York | NY | 10017 | |
| Deutsche Bank Ag Cayman Island Branch | Joseph Regan | PO Box 1984 Gt | Elizabethan Square Georgetown | Grand Cayman | | | Cayman Islands |
| Deutsche Bank Ag London Branch | David Williams | 99 Bishopsgate Fl 21 | | London | | 0EC2P- 2AT | United Kingdom |
| Deutsche Bank Ag/ Deutsche Bank Trust Company Americas | Joe Cusmai Joseph Regan | 90 Hudson St | | Jersey City | NJ | 07302 | |
| Diversified Investors High Yield Bond Fund | Michael Delvin | Eaton Vance | 255 State St 11th Fl High Yield Department | Boston | MA | 02109 | |
| Dk Acquisition Partners Lp | Fernando Moreyra | Citibank Agnecy And Trust | 388 Greenwich St 14th Fl | New York | NY | 10013 | |
| Dkr Wolf Point Holding Fund Ltd | Christopher Keywork | 181 W Madison St Ste 3625 | | Chicago | IL | 60602 | |
| Double Black Diamond Offshore Ldc | Amy Gribnau | 2100 Mckinney Ave | Ste 1600 | Dallas | TX | 75201 | |
| Drawbridge Dtnj Ltd/ Drawbridge Special Opportunities Fund Lp/ Drawbridge Special Opportunities Fund Ltd | Amy Wong Susan Ng | 1251 Ave Of The Americas | 16th Fl C O Fortress Investment Group | New York | NY | 10020 | |
| Drawbridge Global Macr0 Master Fund Ltd | Amy Wong | 1251 Ave Of The Americas | 16th Fl | New York | NY | 10020 | |
| Dresdner Bank Ag 2 | Grace Brathwaite | 75 Wall St | | New York | NY | 10005 | |
| Dryden Iii Leveraged Loan Cdo 2002/ Dryden Iv Leveraged Loan Cdo 2003/ Dryden Leveraged Loan Cdo 2002 Ii | Tracey Buckley | 600 E Las Colinas Blvd | Ste 1300 | Irving | TX | 75039 | |
| Dryden Investments Bv | Laurie Hinkle | 4400 Harding Rd Ste 503 | | Nashville | TN | 37205 | |
| Dryden Viii Leveraged Loan Cdo 2005 | Cheriese G Brathwaite | 60 Wall St 39th Fl | | New York | NY | 10005 | |
| Duane Street Clo 1 Ltd | Kim Koenig | 245 Pk Ave | 44th Fl | New York | NY | 10167 | |
| Duma Master Fund Lp | Michael Maroof | 1370 Ave Of The Americas | 23rd Fl | New York | NY | 10019 | |
| Dunes Funding Llc | Dunes Funding Llc | 214 North Tryon St | | Charlotte | NC | 28255 | |
| Durham Acquisition Co Llc Fka Comac Acquisition | Ilan Mandel | Five Greenwich Office Pk | Bear Stearns | Greenwich | CT | 06831 | |
| Dymas Funding Company Llc | Kari Dziemiela | 1 North Franklin | | Chicago | IL | 60606 | |
| Elf Funding Trust I | Bryan Katri | Highland Capital Management Lp | 1150 Two Galleria Tower 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Employers Insurance Of Wausau | Brian Katri | 175 Berkeley St | | Boston | MA | 02117 | |
| Empyrean Investments Llc | Mike Lim | 10250 Constellation Blvd | Ste 2950 | Los Angeles | CA | 90067 | |
| Endurance Clo I Ltd | Stacey Alexander | Ing Capital Advisors Llc | 333 South Grand Ave Ste 4100 | Los Angeles | CA | 90071 | |
| Event Partners Debt Acquisitionllc | Josh Spierer | John A Levin & Co Inc | One Rockefeller Plaza 19th Fl | New York | NY | 10020 | |
| Fairway Loan Funding Company | Bank Loan Accounting Group | 840 Newport Ctr Dr | | Newport | CA | 92660 | |
| Feingold Okeeffe Credit Fund Cbna Loan Fundingllc | Cdo Trust Services | 135 South Lesalle St | Ste 1511 | Chicago | IL | 60603 | |
| Fidelity Adv Series Iifa Floating Rt High Inc Fd/ Fidelity Puritan Trust Fidelity Puritan Fund | John Roche Anthony Tracy | Fidelity Investments | 82 Devonshire St E31c | Boston | MA | 02109 | |
| Field Point I Ltd/ Field Point Ii Ltd | Terence Botha | 13455 Noel Rd Ste 1150 Lb 22 | | Dallas | TX | 75240 | |
| Field Point Iii Ltd/ Field Point Iv Ltd | Stuart Stanford | Two Greenwich Plaza | | Greenwich | CT | 06830 | |
| Fifth Third Bank | Evette N Riep | 1000 Towncenter | Ste 1500 | Southfield | MN | 48075 | |
| Fifth Third Bank Eastern Michigan | Evette Riep | 5050 Kingsley Dr | Mdmoczb | Cincinatti | OH | 45263 | |
| First Trust Highland Capital Floating Rate Inc Fd/ First Trust Highland Capital Floating Rate Inc Fd/ First Trust Highland Capital Floating Rt Inc Fd Ii | Kim Wilcox Bryan Katri | 13455 Noel Rd Ste 1300 | | Dallas | TX | 75240 | |
| Flagship Clo 2001 1/ Flagship Clo Ii/ Flagship Clo Iii/ Flagship Clo Iv | Eric Donaghey | One Federal St 3rd Fl | | Boston | MA | 02110 | |
| Fleet National Bank/ Fleet National Bank Fka Bankboston Na | Scott Nathan | 100 Federal St | | Boston | MA | 02110 | |
| Forest Creek Clo Ltd | Dina Kalnitsky | Deerfield Capital Mgt Llc | 8700 West Bryn Mawr 12th Fl | Chicago | IL | 60631 | |
| Fortis Bank Sa Nv Cayman Island Branch | Laurie Albright Mike Halovatch | 3 Stamford Plaza | 301 Tresser Blvd 9th Fl | Stamford | CT | 06901-3239 | |

12/19/2006 2:54 PM
Pre-Petition Lender Service List

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Fortress Credit Funding I Lp/ Fortress Credit Funding Ii Lp | Roy Castromonte | 1251 Ave Of The Americas | | New York | NY | 10020 | |
| Galaxy Clo 2003 1 Ltd/ Galaxy V Clo Ltd/ Galaxy V Clo Ltd | Silvana Olsen T Ajaz | Sai Investment Advisors Inc | 1 Sunamerica Ctr 34th Fl | Los Angeles | CA | 90067-6022 | |
| Galaxy Iii Clo Ltd/ Galaxy Iv Clo Ltd | Silvana Olsen Kyle Edwards | Jpmc | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| General Electric Capital Corporation | George Greene | 201 Merritt 7 PO Box 5201 | 60 Long Ridge Rd | Norwalk | CT | 06856-5201 | |
| Gk Debt Opportunity Fund Ltd | Josh Spierer | 900 Third Ave | Ste 1101 | New York | NY | 10022 | |
| Gleneagles Clo Ltd | Evan Kriegshbaer | 1300 Two Galleria Tower | 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Gleneagles Trading Llc | Loan Operations | Highland Capital Management Lp | 1150 Two Galleria Tower 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Global Enhanced Loan Fund Sa | Haseeb Shaikh | 600 Travis | 51 Fl | Houston | TX | 77002 | |
| Global Stocksplus Income Fund | Bank Loan Settlements Group | 840 Newport Ctr Dr | Co Pacific Investment Management | Newport Beach | CA | 92660 | |
| Goldentree Loan Opportunities I Limited Fka | David Stander | Goldentree Asset Management | 300 Pk Ave 25th Fl | New York | NY | 10022 | |
| Goldentree Loan Opportunities Ii Limited | David Stander | Goldentree Asset Management Lp | 300 Pk Ave 25th Fl | New York | NY | 10022 | |
| Goldman Sachs Credit Partners Lp | Philip Green | Goldman Sachs & Co | 85 Broad St 6th Fl | New York | NY | 10004 | |
| Gpc Xii Llc | John Gebbia | 135 East 57th St 11th Fl | | New York | NY | 10022 | |
| Gracie Capital Lp | Sam Konz | 527 Madison Ave | 11th Fl | New York | NY | 10022 | |
| Grand Central Asset Trust Abc Series/ Des Series/ Dhv Series/ Gaia Series/ Hld Series/ Kmt Series/ Mm3 Series/ Sil Series/ Stk Series/ Svco Series/ Single Name Series | Janet Haack Jeff Pkinson Mark Johnson Beata Konopko Cdo Trust Services Ryan Wofford Adam Lehnertz Matt Thomason | 135 South Lasalle St | Ste 1511 | Chicago | IL | 60603 | |
| Grand Central Asset Trust Ced Series/ Dbf Series/ Rbn Series | Janet Haack | 181 W Madison St Ste 3200 | | Chicago | IL | 60602 | |
| Greenwich International Limited | Michael Vaysman | 600 Steamboat Rd | | Greenwich | CT | 06830 | |
| Greenwich International Limited | Michael Vaysman | 600 Steamboat Rd | | Greenwich | CT | 06830 | |
| Greywolf Loan Participation Llc | Doug Gold Jeff Silva | 411 West Putnam | Ste 265 | Greenwich | CT | 06830 | |
| Gruss Global Investors Master Fund Ltd | Tina Guberman | 667 Madison Ave 3rd Fl | | New York | NY | 10021 | |
| Guggenheim Portfolio Company Xii Llc | John Gebbia | 135 East 57th St | 11th Fl | New York | NY | 10022 | |
| Gulf Stream Compass Clo 2005 1 Ltd/ Clo 2002 1/ Clo 2004 1 Ltd | Matt Frawley | One Federal St | 3rd Fl | Boston | MA | 02110 | |
| Halcyon Fund Lp | Eric Potter | 477 Madison Ave 8th Fl | | New York | NY | 10022 | |
| Hammerman Capital Master Fund Lp | Andrew St Pierre | 101 Huntington Ave 25th | | Boston | MA | 02199 | |
| Hammerman Counterpoint Master Fund Lp | Andrew St Pierre | 101 Huntington Ave | 25th Fl | Boston | MA | 02199 | |
| Harbour Town Funding Llc Fka Harbour Town Fd Trust | Harbour Town Funding Llc | Banc Of America Securities Llc | 100 North Tryon St Nc1 007 06 07 | Charlotte | NC | 28255 | |
| Hbk Master Fund Lp | Stacy Jaynes | Hbk Investments Lp | 300 Crescent Court Ste 700 | Dallas | TX | 75201 | |
| Hfr Ed Special Situations Master Fund | Laurie Hinkle | 4400 Harding Rd Ste 503 | | Nashville | TN | 37205 | |
| Hibiscus Cbna Loan Funding Llc | Cdo Trust Services | 135 South Lasalle St | Ste 1511 | Chicago | IL | 60603 | |
| High Income Portfolio | Michael Devlin | Eaton Vance Management | 225 State St 11th Fl Att High Yield Department | Boston | MA | 02109 | |
| Highland Credit Opportunities Cdo Ltd/ Highland Credit Strategies Fund/ Highland Floating Rate Advantage Fund Fka Columbia/ Highland Floating Rate Llc Fka Columbia/ Highland Offshore Partners Lp | Darren Britt Brooke Palmer Bryan Katri | Highland Capital Management Lp | 13455 Noel Rd Ste 1300 Two Galleria Tower | Dallas | TX | 75240 | |
| Hsbc Bank Usa National Association | Donna Riley | One Hsbc Ctr | 26th Fl | Buffalo | NY | 14203 | |
| Ids Life Insurance Company | Donna D Emmett | American Express Asset Mgt | 100 N Sepulveda Blvd | El Segundo | CA | 90245 | |
| Ind And Comm Bk Of China Shanghai Municipal Branc | Gao Junhang | No 9 Pu Dong Ave | | Shanghai | | PRC20-0120 | Peoples Republic Of China |
| Ing Capital Llc | Annette Miller Lewis | 1325 Ave Of The Americas | | New York | NY | 10019 | |
| Ing Investment Management Clo I Ltd | Michael Kam | 1 Federal St | | Boston | MA | 02110 | |
| Ing Prime Rate Trust/ Ing Senior Income Fund | Katie Marino | Ing Investments Llc | 7337 East Doubletree Ranch Rd | Scottsdale | AZ | 85258-2034 | |

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Investment Cbna Loan Funding Llc | Mark Johnson | 135 South Lasalle St | Ste 1511 | Chicago | IL | 60603 | |
| Investors Bank And Trust Co Sub Cust Agent Ctilhc | Katie Mcgarrell | One Washington Mall | 6th Fl | Boston | MA | 02108 | |
| Jasper Clo Ltd | Bryan Katri | 1300 Two Galleria Tower | 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Jay Street Market Value Clo I Ltd | Nicah Anderson | 245 Pk Ave 44th Fl | | New York | NY | 10167 | |
| Jp Morgan Whitefriars Inc/ Jpmorgan Chase Excess | Nicole Adams Khuyen Ta | 125 London Wall | | London | | 0EC2Y- 5AJ | United Kingdom |
| Jpmorgan Chase Bank Na | Cliff Trapani | 1111 Fannin | 10th Fl | Houston | TX | 77002 | |
| Kamunting Street Master Fund Ltd | Jason Abrams | 140 E 45th St | | New York | NY | 10017 | |
| Katonah Ii Ltd/ Katonah Iii Ltd/ Katonah Iv Ltd | Charles Janz | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Kbc Bank Nv | Robert Pacifi | 125 West 55th St | | New York | NY | 10019 | |
| Kensington International Ltd | Elliot Greenberg | Midland Bank Trust Corp Ltd | PO Box 1109 Mary St | Grand Cayman | | | Cayman Islands |
| Keybank National Association | Carrie Zielski | 127 Public Square | | Cleveland | OH | 44114-1306 | |
| Kil Loan Funding Llc | Shoheb Merchant | 600 Travis St | 50th Fl | Houston | TX | 77002 | |
| Kingsland I Ltd | Charles Janz | 787 Seventh Ave Ste 911 | | New York | NY | 10019 | |
| Kkr Financial Clo 2005 1 Ltd | Kim Koenig | 600 Travis St | 50th Fl | Houston | TX | 77002 | |
| Kzh Pondview Llc/ Kzh Soleil Llc/ Kzh Soleil 2 Ltd | Kevin Rowe | Jpmorgan Chase Bank | 4 Metrotech Ctr 10th Fl | Brooklyn | NY | 11245 | |
| La Funding Llc | La Funding Llc | 214 North Tryon St | | Charlotte | NC | 28255 | |
| Latigo Master Fund Ltd | Joe Mause | 590 Madison Ave | 9th Fl | New York | NY | 10022 | |
| Lehman Commercial Paper Inc | Michael Herr | 745 Seventh Ave | 16th Fl | New York | NY | 10019 | |
| Liberty Clo Ltd | Sachin Patel | 1300 Two Galleria Tower | 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Liberty Mutual Fire Insurance Company/ Liberty Mutual Ins Company | Brian Katri | 175 Berkeley St | | Boston | MA | 02117 | |
| Libertyview Loan Fund Llc | Mandy Gauntt | Fcs Data Services Group | 13455 Noel Rd Lb 22 Sutie 1150 | Dallas | TX | 75240 | |
| Lincoln National Life Insurance Co | Joseph Fiorilla | 2005 Market St | | Philadelphia | PA | 19103 | |
| Lincoln Natl Life Insur Co Sep Acct 12 | Joseph Fiorilla | 2005 Market St | | Philadelphia | PA | 19103 | |
| Linden Capital Lp | Peter Greenberg | 450 Pk Ave Ste 3001 | | New York | NY | 10022 | |
| Lispenard Street Credit Master Ltd | Holly Hom | 245 Pk Ave | 44th Fl | New York | NY | 10167 | |
| Loan Funding I Llc | William Lovett | The Bank Of New York | 101 Barclay St 8th Fl | New York | NY | 10286 | |
| Loan Funding Iii Llc/ Loan Funding Xi Llc/ Loan Star State Trust | Tim Schaller Karen Kwan Shelly Sterling | 600 Travis St 50th Fl | 51 Fl | Houston | TX | 77002 | |
| Loan Funding V Llc | Tracey Buckley | 600 E Las Colinas Blvd | Ste 1300 | Irving | TX | 75039 | |
| Loeb Partners Corporation | Jo Russo | 61 Broadway | | New York | NY | 10006 | |
| Long Grove Clo Limited | Lydia Mistretta | Deerfield Capital Management Llc | 8700 West Bryn Mawr | Chicago | IL | 60631 | |
| Longacre Capital Partners Qp Lp | Daphne Coelho Adam | 810 Seveth Ave 22nd Fl | | New York | NY | 10019 | |
| Longacre Master Fund Ltd | Tom Regal | Longacre Management Llc | 1700 Broadway Ste 1403 | New York | NY | 10019 | |
| Loxias Master Fund Ltd | Ken Chapple | 374 Millburn Ave Ste 202e | | Millburn | NJ | 07041 | |
| Mac Capital Ltd Fka Vector Capital Fund Ltd | Whitney Poole | 383 Madison Ave | | New York | NY | 10179 | |
| Madison Park Funding I Ltd | Fang Li | 600 Travis St 48th Fl | | Houston | TX | 77002 | |
| Madison Park Funding Ii Ltd | Judith Drummond | Eleven Madison Ave 13th Fl | | New York | NY | 10017 | |
| Man Mac Schreckhorn 14b Ltd | Thomas Schmitt | 600 Lexington Ave 8th Fl | | New York | NY | 10022 | |
| Marathon Clo I Ltd | Ted Grove | 600 Travis 51 Fl | | Houston | TX | 77002 | |
| Marathon Finance I Bv/ Marathon Special Opportunity Master Fund | Nadeem Poonwala Anthony Martucci | Marathon Asset Mgt Llc | 461 Fifth Ave 10th Fl | New York | NY | 10017 | |
| Market Square Clo Ltd | Chris Erico | 8700 West Bryn Mawr 12th Fl | | Chicago | IL | 60631 | |
| Marquette Park Clo Ltd | Thora Frihart | 8700 West Bryn Mawr | 12th Fl | Chicago | IL | 60631 | |
| Mason Sunnyside Credit Master Fund Ltd | John Grizzetti | 110 East 59th St 30th | | New York | NY | 10022 | |
| Mauretania Partners Lp | Michael Holmdahl | 261 School Ave Ste 400 | | Excelsior | MN | 55331 | |
| Mayport Clo Ltd | Neil Moore | 840 Newport Ctr Dr | | Newport Beach | CA | 92660 | |
| Mcdonnell Loan Opportunity Ltd | Rhondda Colombatto | 1515 West 22nd St | 11th Fl | Oak Brook | IL | 60523 | |
| Merced Partners Limited Partnership | Mary Fahey No Intralinks Acces | 601 Carlson Pkwy | Ste 200 | Minnentonka | MN | 55305 | |
| Merrill Lynch Bank Usa | Julie Young | 15 West South Temple St | Ste 300 | Salt Lake City | UT | 84101 | |
| Merrill Lynch Credit Products Llc | Brian Buttenmuller | 4 World Financial Ctr | 16th Fl | New York | NY | 10080 | |

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Metropolitan West High Yield Bond Fund/ Metropolitan West Strategic Income Fund | Nora Estrella Bibi Khan | 11766 Wilshire Blvd Ste 1580 | | Los Angeles | CA | 90025 | |
| Millcreek Cbna Loan Funding Llc | James Spaulding | Jpmorgan Chase | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| Millennium Partners Lp | Sandra Costa | 701 E Lake St Ste 300 | | Wayzata | MN | 55391 | |
| Mizuho Corp Bank Ltd Fka Ind Bank Of Japan Ltd/ Mizuho Corporate Bank Ltd Fka Dkb New York/ Mizuho Corporate Bank Ltd | Shirly Wu | Harborside Financial Ctr | 1800 Plaza Ten 18 Th Fl | Jersey City | NJ | 07311 | |
| MI Global Investment Series Income Strategies Port | Laura Caruthers | 800 Scudders Mill Rd | Area Ib | Plainsboro | NJ | 08536 | |
| Monumental Life Insurance Company | Inv Bank Loans | Aegon Usa Investment Mgt Inc | 4333 Edgewood Rd Ne | Cedar Rapids | IA | 52499 | |
| Morgan Stanley Bank | Larry Benison | 2500 Lake Pk Blvd | Ste 300 C | West Valley | UT | 84120 | |
| Morgan Stanley Senior Funding Inc | Larry Benison | 1633 Broadway | 26th Fl | New York | NY | 10019 | |
| Mountain Capital Clo Ii Ltd/ Clo Iii Ltd | Douglas Neaves Todd Abramson | 600 Travis | 9th Fl | Houston | TX | 77002 | |
| Mountain Capital Clo Iv Ltd | Cherisee Brathwaite | 60 Wall St | 39th Fl | New York | NY | 10005 | |
| Muirfield Trading Llc | Muirfield Trading Llc | 101 North Tryon St | Nc1 001 15 01 | Charlotte | NC | 28273 | |
| Mulberry Master Fund Ltd | Yolanda Cafiero | 910 Sylvan Ave | | Englewood | CA | 07632 | |
| National City Bank | Dave Gregory | 23000 Milcreek Blfd Loc 7520 | | Highland Hills | OH | 44129 | |
| National Westminster Bank Plc | Sheila Shaw | 65 East 55th St | | New York | NY | 10022 | |
| Nemean Clo Ltd | Stacey Alexander | Ing Capital Advisors Llc | 333 South Grand Ave Ste 4100 | Los Angeles | CA | 90071 | |
| Newstart Factors Inc | Lucy Galbraith | 2 Stamford Plaza Ste 1501 | 281 Tresser Blvd | Stamford | CT | 06901 | |
| Norinchukin Bank | Sophia Tsororos | 245 Pk Ave | 29th Fl | New York | NY | 10167 | |
| Northwoods Capital Iv Limited Fka Mason Point Ltd | Myrta Calvillo | Jpmorgan Chase Bank | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| Northwoods Capital V Limited | David Bosh | 245 Pk Ave 26th Fl | | New York | NY | 10167 | |
| Oak Hill Credit Alpha Fund Offshore Ltd/ Alpha Fund Lp | Annmarie Costantini | 65 East 55th St | 32nd Fl | New York | NY | 10022 | |
| Oak Hill Credit Partners I Limited/ Partners Ii Limited/ Partners Iii Limited/ Partners Iv Limited | Terence Botha Susie Johnson | 600 Travis St | 50th Fl | Houston | TX | 77002 | |
| Oak Hill Securities Fund Ii Lp/ Oak Hill Securities Fund Lp | Annmarie Costantini | Oak Hill Advisors | 65 East 55th St 32nd Fl | New York | NY | 10022 | |
| Och Ziff Capital Structure Arbitrage Master Fund L | Peter Kraft | 9 West 57th St | 39th Fl | New York | NY | 10019 | |
| Ocm High Yield Plus Fund Lp | Brad Howard | 333 South Grand Ave 28th Fl | | Los Angeles | CA | 90071 | |
| Octagon Investment Partners Ii Llc/ Partners Iii Ltd/ Partners Iv Ltd/ Partners Vii Ltd | Margaret Harvey | Octogon Credit Investors Llc | 1211 Ave Of The Americas 41st Fl | New York | NY | 10036 | |
| Octagon Investment Partners V Ltd | Margaret B Harvey | 1211 Ave Of The Americas | 41st Fl | New York | NY | 10036 | |
| Octagon Investment Partners Vi Ltd | Margaret Harvey | Queensgate House | South Church St | Georgetown | | | Cayman Islands |
| Octagon Investment Partners Viii Ltd | Daqve Bosh | 52 Vanderbilt Ave 18th Fl | | New York | NY | 10017 | |
| Oligra43 | Denton Robinson | 1300 Two Galleria Tower | 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Olympic Clo I Ltd | Ruben Luna | Jpmorgan Chase Bank | 600 Travis St 50th Fl | Houston | TX | 77002 | |
| Oppenheimer Senior Floating Rate Fund | Art Zimmer Linda Supaswud | Oppenheimer Funds | 6803 South Tuscon Way | Englewood | CO | 80112 | |
| Oregon State Treasury | Tracey Powers | 1345 Ave Of The Americas | 37 Fl | New York | NY | 10105 | |
| Orix Finance Corp | Ann Erickson | Orix Capital Markets | 1717 Main St9th Fl | Dallas | TX | 75201 | |
| Ows Clo 1 Ltd | Tracey Buckley | One Wall St 18th Fl | | New York | NY | 10286 | |
| Panton Master Fund Lp | Benjamin Baker | 666 Fifth Ave 14th Fl | | New York | NY | 10103 | |
| Para Omnibus Llc | Ron Ray | 520 Madison Ave | | New York | NY | 10022 | |
| Park Avenue Loan Trust | Teresa Galindez | Tcw | 200 Pk Ave Ste 2200 | New York | NY | 10166 | |
| Pimco Floating Income Fund/ Pimco Floating Rate Income Fund/ Pimco Floating Rate Strategy Fund/ Pimco High Yield Fund | Beth Cesari Bank Loan Settlements Group Caesar Giagnaco | 840 Newport Ctr Dr | | Newport Beach | CA | 92660 | |
| Pinewood Credit Markets Master Fund Ltd | Sean Hidey | 140 Greenwich Ave | | Greenwich | CT | 06830 | |
| Pioneer Floating Rate Trust | Bryan Katri | 1300 Two Galleria Tower | 13455 Noel Rd Lb 45 | Dallas | TX | 75240 | |
| Pnc Bank Na | Barbara Patterson | 500 First Ave P7 Pfsc 04 Z | | Pittsburgh | PA | 15219 | |
| Polygon Global Opportunities Master Fund | Sean Cote | Polygon Investment Partners Llp | 10 Duke Of York Square | London | | SW3 4LY | United Kingdom |

12/19/2006 2:54 PM
Pre-Petition Lender Service List

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Pond View Credit Master Lp | Holly Hom | 245 Pk Ave | 44th Fl | New York | NY | 10167 | |
| Post Leveraged Loan Master Fund Lp/ Post Opportunity Fund Lp/ Post Total Return Fund Lp | Mark Porrazzo | 11755 Wilshire Blvd Ste 1400 | | Los Angeles | CA | 90025 | |
| President And Fellows Harvard College | Andre Nelson | 600 Atlantic Ave | | Boston | MA | 02210 | |
| Principal Life Insurance Company | Leveraged Loan Specialist | Principal Capital Management | 801 Grand Ave | Des Moines | IA | 50392-0800 | |
| Prospect Funding I Llc | Jose Mayorga | 1111 Huntington Ave | | Boston | MA | 02199 | |
| Protective Life Insurance Company | Belinda Bradley | 2801 Hwy 280 South | | Birmingham | AL | 35223 | |
| Putnam Floating Rate Income Fund | Cherise Bartwait | One Post Office Square | | Boston | MA | 02109 | |
| Putnam High Yield Advantage Fund | Cherise Barthwait | Putnam Investments | One Post Office Square 8th Fl | Boston | MA | 02109 | |
| Putnam High Yield Trust/ Putnam Variable Trust Pvt High Yield Fund | Cherise Barthwait | 60 Wall St | Ms Nyc60 2610 | New York | NY | 10005 | |
| Q Funding Iii Lp | Trading Wall Nazim Zilkha Esq | 301 Commerce St | Ste 2975 | Fox Worth | TX | 76102 | |
| Quadrangle Master Funding Ltd | Michael Gillin | 375 Pk Ave | 14th Fl | New York | NY | 10152 | |
| Quattro Distressed Opportunity Fund Lp/ Quattro Multi Strategy Master Fund Lp | Greg Riana | 546 Fifth Ave | 19th Fl | New York | NY | 10036 | |
| Quattro Fund Ltd | Greg Riana | 546 Fifth Ave | 19th Fl | New York | NY | 10036 | |
| Qvt Fund Lp | Umesh Mittal | 527 Madison Ave 8th Fl | | New York | NY | 10022 | |
| R2 Top Hat Lcd | Nazim Zilkkha | Amalgamated Gadget Lp | 301 Commerce St Ste 2975 | Fort Worth | TX | 76102 | |
| Race Point Clo Limited/ Race Point Ii Clo Limited | Cameron Schulena Jose Mayorga | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Race Point Iii Clo | Matt Massier | 135 S Lasalle | Ste 1511 | Chicago | IL | 60603 | |
| Raeburn Overseas Partners A Ltd | Daniel Ellen | 1251 Ave Of The Americas | 23rd Fl | New York | NY | 10020 | |
| Raven Credit Opportunities Master Fund Ltd | Kevin Gerlitz | 195 Maplewood Ave | | Maplewood | NJ | 07040 | |
| Rcg Carpathia Master Fund Ltd | Nick Vouloumanos | Ramius Capital | 666 Third Ave 26th Fl | New York | NY | 10017 | |
| Red Fox Funding Llc | Red Fox Funding Llc | 101 N Tryon St | | Charlotte | NC | 28273 | |
| Redwood Master Fund Ltd | Toni Maloney | 910 Sylvan Ave | Ste 130 | Englewood Cliff | NJ | 07632 | |
| Resolution Master Fund Lp | Michael Soranno | 909 Third Ave 30th Fl | | New York | NY | 10022 | |
| Ritchie Special Credit Investments Ltd | Pat Maxwell | 2100 Enterprise Ave | | Geneva | IL | 60134 | |
| Riviera Funding Llc | Rivera Funding Llc | Bank Of America | 101 N Tryon St | Charlotte | NC | 28273 | |
| Robson Trust | Lori Varga | 600 Travis | 50th Fl | Houston | TX | 77002 | |
| Rockview Trading Ltd | Everett Crawford | 900 Third Ave 11th Fl | | New York | NY | 10022 | |
| Rockwall Cdo Ltd | Judith Drummond | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Rosemont Clo Ltd | Dina Kalnitsky | Deerfield Capital Managmnt Llc | 8700 West Bryn Mawr 12th Fl | Chicago | IL | 60631 | |
| Royal Bank Of Scotland Plc | Sheila Shaw | 65 East 55th St | 21st Fl | New York | NY | 10022 | |
| Salomon Brothers Variable Rate Strategic Fund Inc | Paul Su | 399 Pk Ave 4th Fl | | New York | NY | 10022 | |
| Sankaty Credit Opportunities Ii Lp | Nadeem Poonawala | 111 Huntington Ave | | Boston | MA | 02199 | |
| Sankaty Credit Opportunities Lp/ Sankaty High Yield Asset Partners/ Sankaty High Yield Partners Ii/ Sankaty High Yield Partners Iii Lp | Julia Sun Yvetter Haynes Tulay Spicker Jose Mayorga | Sankaty Advisors Llc | 111 Huntington Ave | Boston | MA | 02199 | |
| Satellite Senior Income Fund Ii Llc | Beth Weiner | 623 Fifth Ave | 21st Fl | New York | NY | 10022 | |
| Satellite Senior Income Fund Llc | Beth Weiner | Satellite Asset Management | 623 Fifth Ave 21st Fl | New York | NY | 10022 | |
| Saturn Trust | Silvana Olsen | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Scoggin Worldwide Fund Ltd | Nicole Cramer | 660 Madison Aveue 20th Fl | | New York | NY | 10021 | |
| Scottwood Partners Lp | Brian Goldenberg | Scottwood Capital Management | 1 Pickwick Plaza Ste 125 | Greenwich | CT | 06830 | |
| Sea Pines Funding Llc | Scott Hoch | 100 North Tryon St Nci 007 06 07 | | Charlotte | NC | 56152-9375 | |
| Secondary Loan And Distressed Credit Trading | Michael Samalonis | Chase Manhattan Bank | 1 Chase Manhattan Plaza 8th Fl | New York | NY | 10081 | |
| Sei High Yield Fixed Income Fund Nomura | Cynthia Yen | 2 World Financial Ctr Building B | 17th Fl | New York | NY | 10281 | |
| Sei Institutional Managed Tst High Yield Bond Fund/ Sei Institutional Investment Trust High Yield Bond | Carol Chang Cynthia Yen | 11766 Wilshire Blvd | Sutie 1580 | Los Angeles | CA | 90025 | |
| Seneca Capital Lp | Marina Smirnov | 950 3rd Ave | 29th Fl | New York | NY | 10022 | |
| Sequils Centurion V Ltd | Agnes Leung | Amer Express Asset Mgt Group | 100 North Sepulveda Blvd Ste 1010 | El Segundo | CA | 90245 | |

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Sequils Ing I Hbdgm Ltd | Stacey Alexander | Ing Capital Advisors Inc | 333 South Grand Ave Ste 4250 | Los Angeles | CA | 90071 | |
| Sequils Magnum Ltd | Bank Loan Settlements Group | Pimco | 840 Newport Ctr Dr | Newport Beach | CA | 92660 | |
| Seven Bridges Master Fund Ltd | Ian Johnson | 280 Pk Ave | | New York | NY | 10017 | |
| Severn River Master Fund Ltd | Eric Wood | 8 Greenwich Office Pk | | Greenwich | CT | 06831 | |
| Sierra Clo I Ltd | Ruben Luna | 600 Travis 50th Fl | | Houston | TX | 77002 | |
| Sil Loan Funding Llc | Jennifer Pker | 390 Greenwich St 4th Fl | | New York | NY | 10013 | |
| Silverado Clo 2006 I Ltd | Adrian Cioinigel | 60 Wall St 39th Fl | Ms Nyc60 3915 | New York | NY | 10005 | |
| Sky Cbna Loan Funding Llc | Ruben Diaz | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Smbc Mvi Spc On Behalf Of And For The Account | Claire M Kowalski | 277 Pk Ave | | New York | NY | 10172 | |
| Societe Generale Sa New York | Elise Cheung | 1221 Ave Of The Americas | | New York | NY | 10020 | |
| Sof Investment Lp | Marc Ostiguy | 645 Fifth Ave 21st Fl | | New York | NY | 10022 | |
| Southport Clo Limited | Bank Loan Settlements | 840 Newport Ctr Dr | | Newport Beach | CA | 92660 | |
| Spcp Group Llc | Kate Mccabe | Silver Point Capital | 600 Steamboat Rd | Greenwich | CT | 06830 | |
| Special Situations Investing Group Inc | Philip Green | Goldman Sachs | 85 Broad St 28th Fl | New York | NY | 10004 | |
| Spf Cdo I Llc | Terence Botha | 2 Greenwich Plaza | | Greenwich | CT | 06830 | |
| Spiret Iv Loan Trust 2003 A | Lorraine Conti | 1100 N Market St | | Wilmington | DE | 19890 | |
| Spring Point Institutional Partners Lp/ Spring Point Offshore Master Fund Lp/ Spring Point Partners Lp | Bridget Watkin | 101 California St Ste 4350 | | San Francisco | CA | 94111 | |
| Spring Point Opportunity Master Fund Ii Lp/ Spring Point Opportunity Master Fund Lp/ Spring Point Special Situations Master Fund Lp | Bridget Watkin Ted Johann | 101 California St Ste 4350 | | San Francisco | CA | 94111 | |
| Springfield Associates Llc | Michael Stephan | 712 Fifth Ave | 36th Fl | New York | NY | 10019 | |
| Sri Fund Lp | Wilynn Arnold | 201 Main St | Ste 3200 | Fort Worth | TX | 76102 | |
| Standard Chartered Bank | Victoria Faltine | One Evertrust Plaza | | Jersey City | NJ | 07302 | |
| Stanfield Arbitrage Cdo Ltd/ Stanfield Carrera Clo Ltd | Doug Waddill Mona Nguyen | Us Bank Na | One Federal St 3rd Fl | Boston | MA | 02110 | |
| Stanfield Bristol Clo Ltd | Charles Janz | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Stanfield Vantage Clo Ltd | Buck Toney | 600 Travis St 50th Fl | | Houston | TX | 77002 | |
| Stichting Pensioenfonds Hoogovens | Cynthia Yen | 2 World Financial Ctr Building B | 17th Fl | New York | NY | 10281 | |
| Stk Cbna Loan Funding Llc | Julio Velasco | 2 Penns Way 1st Fl | | New York | NY | 19720 | |
| Stonehill Institutional Partners Lp | Steven D Nelson | 885 Third Ave 30th Fl | Co Stonehill Cap Management Llc New York | New York | NY | 10022 | |
| Sumitomo Mitsui Banking Corporation | Noel Swift | 277 Pk Ave | | New York | NY | 10172 | |
| Sunamerica Income Funds Sunamerica Hy Bond Fund/ Sunamerica Series Trust Sunamerica Hy Bd Portfolio | Laura Ortiz | Aig Global Investment Corp | 2929 Allen Pkwy A37 01 | Houston | TX | 77019 | |
| Sunamerica Life Insurance Co | Silvana Olsen | 11601 Wilshire Blvd | 12th Fl | Los Angeles | CA | 90025 | |
| Sunamerica Senior Floating Rate Fund Inc | Silvana Olsen | Stanfield Capital Partners Llc | 330 Madison Ave 27th Fl | New York | NY | 10017 | |
| Sunrise Partners Limited Partnership | Craig Jarvis Joan Utarid | Two American Ln | | Greenwich | CT | 06836 | |
| Suntrust Bank Atlanta | Greg Ponder | 303 Peachtree St Ne | | Atlanta | GA | 30308 | |
| Symphony Clo I Ltd | Mike Flores | 600 Travis | 50th Fl | Houston | TX | 77002 | |
| Talon Total Return Partners Lp/ Talon Total Return Qp Partners Lp | Heidi Hahutton | One North Franklin Ste 900 | | Chicago | IL | 60606 | |
| Tamarack International Ltd | Mary Fahey No Intralinks Acces | Hunter Capital Management Lp | 601 Carlson Pkwy Ste 200 | Minnetonka | MN | 55305 | |
| Tcw Bass Lake Partners Lp | Joseph Viola | 965 S Figueroa St | Ste 1800 | Los Angeles | CA | 90017 | |
| Tcw Select Loan Fund Limited | Agnes Leung | Trust Company Of The West | 200 Pk Ave Ste 2200 | New York | NY | 10166 | |
| Tcw Senior Secured Loan Fund Lp | Lori Dahl | 200 Pk Ave Ste 2200 | | New York | NY | 10166 | |
| Tenor Opportunity Master Fund Ltd | Matthew Starr | 65 E 55 St | 35th Fl | New York | NY | 10022 | |
| Thales Holdings Ltd | Melody Tsai | 140 Broadway 45th Fl | | New York | NY | 10005 | |
| The Bank Of Tokyo Mitsubishi Ufj Ny Fka Ufj Ny | Marlin Chin | 55 East 52nd St | | New York | NY | 10055 | |
| The Drake Offshore Master Fund Ltd | Ben Bresnahan | Drake Management Llc | 660 Madison Ave 16th Fl | New York | NY | 10021 | |
| The Foothill Group Incorporated | Elizabeth Eipe Nikhil Aggarwal | 2450 Colorado Ave | 3000 West | Santa Monica | CA | 90404 | |
| The Hartford Floating Rate Fund | Kevin Cedorchuk | 2 Ave De Lafayette | | Boston | MA | 02111 | |

12/19/2006 2:54 PM
Pre-Petition Lender Service List

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| The Northern Trust Company | Ms Linda Honda | 50 South Lasalle St | | Chicago | IL | 60690 | |
| The Regents Of The University Of California | Cynthia Yen | 111 Broadway Ste 1400 | | Oakland | CA | 94607 | |
| The Royal Bank Of Scotland Plc | Li Yao Li | 101 Pk Ave | 12th Fl | New York | NY | 10178 | |
| Thracia Llc Formerly Psam Nominees Llc | Ashley Thacher | P Schoenfeld Asset Management | 1330 Ave Of The Americas34th Fl | New York | NY | 10019 | |
| Thrivent High Yield Fund/ Thrivent High Yield Fund Ii/ Thrivent High Yield Portfolio Ii | Jeremy Anderson | 55 Water St | Plaza Level 3rd Level | New York | NY | 10041 | |
| Thrivent High Yield Portfolio | Jeremy Anderson | 625 Tourth Ave S | | Minneapolis | MN | 55415-1665 | |
| Toronto Dominion Texas Llc | Alva J Jones | 909 Fannin St | 17th Fl | Houston | TX | 77010 | |
| Tpg Credit Opportunities Fund Lp/ Tpg Credit Opportunities Investors Lp | Brett Barbour Shelley Hartman | 4600 Wells Fargo Ctr | 90 South Seventh St | Minneapolis | MN | 55402 | |
| Travelers Ser Fd Inc Smith Barney High Income Prf | Frank Calicchio | 399 Pk Ave | | New York | NY | 10022 | |
| Trilogy Portfolio Company Llc | Don Rubin | 780 Third Ave | 16th Fl | New York | NY | 10017 | |
| Trs Callisto Llc | Steve Gardner | 90 Hudson St | Ms Jcy05 0511 | Jersey City | NJ | 07302 | |
| Trs Elara Llc | Marco Ruggiero | De Shaw & Co | 120 West 45th St 39th St | New York | NY | 10036 | |
| Trs Leda Llc/ Trs Thebe Llc/ Trs Venor Llc | Bilal Aman Steve Gardner | Deatsche Bank Ag | 90 Hudson St Ms Jcy05 0511 Co Db Services New Jersey Inc | Jersey City | NJ | 07302 | |
| Ubs Ag Stamford Branch/ Ubs Loan Finance Llc | Anthony Joseph Marie Haddad | 677 Washington Blvd | | Stamford | CT | 06901 | |
| Ulysses Partners Lp | Nancy Alexander | 1177 Ave Of The Americas | | New York | NY | 10036 | |
| Velocity Clo Ltd | Erica Lei | 270 Pk Ave | | New York | NY | 10017 | |
| Venor Capital Master Fund Ltd | David S Zemel | 7 Times Square Ste 3505 | | New York | NY | 10036 | |
| Venture Cdo 2002 Limited/ Venture Ii Cdo 2002 Limited/ Venture Iii Cdo Limited/ Venture Iv Cdo Limited | David Hugenberg | 600 Travis | 49th Fl | Houston | TX | 77002 | |
| Venture V Cdo Ltd Fka Horizon Income Fund Ltd | Manisha Singh | 12 East 49th St 29th Fl | | New York | NY | 10017 | |
| Vge Iii Portfolio Ltd | Lee Mysel | 55 Railroad Ave | | Greenwich | CT | 06830 | |
| Viking Global Equities Lp | Lee Mysel | 55 Railroad Ave | | Greenwich | CT | 06830 | |
| Vista Leverage Income Fund | Karen Love Boriack | 600 Travis St | 49th Fl | Houston | TX | 77002 | |
| Vitesse Clo Ltd Fka Darien Loan Funding Company | Kim Koenig | Tcw Trust Company Of The West | 200 Pk Ave Ste 2200 | New York | NY | 10166 | |
| Vulcan Ventures Inc | Archana Mehta | 417 Montgomery St 5th Fl | | San Francisco | CA | 98104 | |
| Wachovia Bank National Association | Todd Tucker | PO Box 3099 | Corp Tax Nc 31038 | Winston Salem | NC | 27152 | |
| Wachovia Bank National Association Fka First Union | Stephanie Hatley | 201 South College St | Charlotte Plaza | Charlotte | NC | 28288 | |
| Watershed Capital Institutional Partners Lp/ Watershed Capital Partners Offshore Ltd/ Watershed Capital Partners Lp | Ken Liu | Watershed Asset Mgt Llc | One Maritime Plaza Ste 1525 | San Francisco | CA | 94111 | |
| Waterville Funding Llc | Waterville Funding | 401 North Tryon St | | Charlotte | NC | 28255 | |
| Waveland Ingots Ltd | Bank Loan Settlements | Pimco | 840 Newport Ctr Dr | Newport Beach | CA | 92660 | |
| Wells Capital Management 12222133/ 12831400/ 13702900/ 13823100/ 13923602/ 16017000/ 16463700/ 16896700/ 16959700/ 16959701/ 17299500/ 18866500/ 14945000 | Archana Mehta | 525 Market St 10th Fl | | San Francisco | CA | 94105 | |
| Western Asset Floating Rate High Income Fund Llc | Tim Ahn | 100 Colonial Ctr | Pkwy 2nd Fl | Lake Mary | FL | 32746 | |
| Whippoorwill Associates Inc Profit Sharing Plan/ Whippoorwill Offshore Distressed Opportunity Fund | Andre Nelson | 11 Martine Ave 11th Fl | | White Plains | NY | 10606 | |
| Whippoorwill Distressed Opportunity Fund Lp | Andre Nelson | 11 Martine Ave 11th Fl | | White Plains | NY | 10606 | |
| Whitney Private Debt Fund Lp | Jennifer Pker | 600 Travis St 49th Fl | | Houston | TX | 77002 | |
| Wind River Clo I Ltd | Rhondda Colombatto | 1515 West 22nd St | | Oak Brook | IL | 60532 | |

12/19/2006 2:54 PM
Pre-Petition Lender Service List

Delphi Corporation
DIP Refinancing Motion Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY |
|---|---|---|---|---|---|---|---|
| Windmill Master Fund Lp | Jeffrey S Werner | PO Box 896 Gt | Harbour Centre 2nd Fl North Church St | Grand Cayman | | BWI | Cayman Islands |
| Winterset Master Fund Lp | Wake Doub | 1500 Main St Ste 2800 | | Springfield | MA | 01115 | |
| Wrigley Cdo Ltd | James Spaulding | 600 Travis | | Houston | TX | 77002 | |
| Xerion Partners Ii Master Fund Limited | Joan Utarid | Two America Ln | | Greenwich | CT | 06836 | |

12/19/2006 2:54 PM
Pre-Petition Lender Service List

# EXHIBIT T

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip |
|---|---|---|---|---|---|---|
| Carl Jeffrey G | | 6597 Pkwood Dr | | Lockport | NY | 14094-6625 |
| Parmenter O Toole | James R. Scheuerle | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 |
| Port City Castings Corp affiliate of Port City Die Cast Inc | c o Parmenter O Toole | Port City Castings Corp | 601 Terrace St | Muskegon | MI | 49443-0786 |
| Sheppard Mullin Richter & Hampton LLP | Richard Brunette and Theresa Wardle | 333 S Hope St 48th Fl | International Rectifier Corp IR Epi Services Inc | Los Angeles | CA | 90071 |
| Sheppard, Mullin, Richter & Hampton LLP | Mary L. Johnson Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 |

12/19/2006 2:56 PM
Second Omnibus Objection Response Special Parties

# EXHIBIT U

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Debevoise & Plimpton LLP | Maureen A. Cronin | 919 Third Avenue | | New York | NY | 10022 | 212-909-6292 | 212-521-7292 | macronin@debevoise.com | Counsel to Rothschild Inc. |
| Rothschild Inc. | David L. Resnick | Managing Director | 1251 Avenue of the Americas | New York | NY | 10020 | 212-403-5252 | 212-403-5454 | | Managing Director |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

12/19/2006 2:57 PM
Rothschild special parties

# EXHIBIT V

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Clark & Scott | Anthony N. Fox | P.O. Box 380548 | | Birmingham | AL | 35238-0548 |
| Ferguson, Frost & Dodson, LLP | Jinny M. Ray | P.O. Box 430189 | | Birmingham | AL | 35243-0189 |
| Ferguson, Frost & Dodson, LLP | John W. Dodson | P.O. Box 430189 | | Birmingham | AL | 35243-0189 |
| Gene T. Moore Attorney at Law, P.C. | Gene Moore | 1802 15th Street | | Tuscaloosa | AL | 35401 |
| Huie, Fernambucq & Stewart, LLP | Christopher S. Rodgers | Three Protective Center | 2801 Highway 280 S., Suite 200 | Birmingham | AL | 35223 |
| Lightfoot, Franklin & White, LLC | J. Banks Sewell | The Clark Building | 400 – 20th Street North | Birmingham | AL | 35203-3200 |
| Lightfoot, Franklin & White, LLC | S. Andrew Kelly | The Clark Building | 400 – 20th Street North | Birmingham | AL | 35203-3200 |
| Menaker & Herrmann LLP | Richard G, Menaker | 10 East 40th Street, 43rd Floor | | New York | NY | 10016 |
| Porterfield, Harper, Mills & Motlow, PA | Keith J. Pflaum | P.O. Box 530790 | | Birmingham | AL | 35253-0790 |
| Porterfield, Harper, Mills & Motlow, PA | Larry W. Harper | P.O. Box 530790 | | Birmingham | AL | 35253-0790 |
| Rieck and Crotty, P.C. | Jerome F. Crotty and Maria E. Mazza | 55 West Monroe Street, Suite 3390 | | Chicago | IL | 60603 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

12/19/2006 2:57 PM
O'Neill Special Parties

# EXHIBIT W

Delphi Corporation
Inovise Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Inovise Medical Inc | Douglas Pahl | Perkins Coie | 1120 Nw Couch St Tenth Fl | Portland | OR | 97209 |
| Longacre Master Fund Inovise Medicl | Adam L Shiff | Kasowitz Benson Torres & Friedman | 1633 Broadway | New York | NY | 10019 |

12/19/2006 3:05 PM
Statements special parties

# EXHIBIT X

Delphi Corporation
Worldwide Battery Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Worldwide Battery | Elizabeth A Roberge | Roberge & Roberge | 9190 Priority Way West Dr Ste 100 | Indianapolis | IN | 46240 |

12/19/2006 3:06 PM
Statements special parties

# EXHIBIT Y

Delphi Corporation
Nissan Technical Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Nissan Technical Ctr | Michael R Paslay | Waller Lansden Dortch & Davis | 511 Union St Ste 2700 | Nashville | TN | 37219 |
| Nissan Technical Ctr | Robert Welhoelter | Waller Lansden Dortch & Davis | 511 Union St Ste 2700 | Nashville | TN | 37219 |

12/19/2006 3:06 PM
Statements special parties

# EXHIBIT Z

Delphi Corporation
Lightsource Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| Lightsource Parent Corporation | Michael Thomas | Lightsource Parent Corporation | 600 Corporation Dr | Pendleton | IN | 46064 |
| Lightsource Parent Corporation | E Todd Sable Honigman Miller | 2290 First National Bldg | 660 Woodward Ave | Detroit | MI | 48226-3506 |

12/19/2006 3:06 PM
Statements special parties

# EXHIBIT AA

Delphi Corporation
Inplay Technologies Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Inplay Technologies | Bob Brilon | Inplay Technologies | 234 S Extension Rd | Mesa | AZ | 85210 |
| Inplay Technologies | Richard Smolev | Kaye Scholer Llp | 425 Pk Ave | New York | NY | 10022 |

# EXHIBIT BB

Delphi Corporation
Laborsource 2000 Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Laborsource 2000 Inc | Harvey Altus | Law Offices Of Harvey Altus Pc | 30500 Northwestern Hwy Ste 500 | Farmington Hills | MI | 48334 |

12/19/2006 3:06 PM
Statements special parties

# EXHIBIT CC

Delphi Corporation
Erika S Parker Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Erika S Parker Chapter 7 Trustee | Patricia B Fugee | Roetzel & Andress | One Seagate Ste 900 | Toledo | OH | 43604 |

12/19/2006 3:05 PM
Statements special parties

# EXHIBIT DD

Delphi Corporation
Comptrol Inc Special Parties

| Company | Contact | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP |
|---------|---------|----------|----------|------|-------|-----|
| Comptrol Inc | Joseph A Carbone | 800 Standard Building | 1370 Ontario St Ste 800 | Cleveland | OH | 44113 |
| Comptrol Inc | M Colette Gibbons | Schottenstein Zox & Dunn Co Lpa | 1350 Euclid Ave Ste 1400 | Cleveland | OH | 44115 |

12/19/2006 3:05 PM
Statements special parties