Bonnie Steingart (BS-8004)
Debra M. Torres (DT-9093)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone:  212.859.8000
Facsimile:  212.859.4000

*Counsel for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |   |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| Delphi Corporation, <u>et</u> <u>al</u>., | : | Case No.  05-44481 (RDD) |
|  | : | (Jointly Administered) |
| Debtors. | : |  |
|  | : |  |
|  | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**FIRST SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE OF
EQUITY SECURITY HOLDERS IN OPPOSITION TO DEBTORS'
EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING THE
EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE
AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE**

TO:    THE HONORABLE JUDGE ROBERT D. DRAIN
        UNITED STATES BANKRUPTCY JUDGE

        The Official Committee of Equity Security Holders (the "Equity Committee"), of Delphi

Corporation ("Delphi") and the other above-captioned debtors (collectively, the "Debtors") by

and through its counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, files this preliminary

objection (the "Objection") to the Debtors' expedited motion (the "Motion") for an order

authorizing and approving the Equity Purchase and Commitment Agreement (the "Investment

Agreement") pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and

the Plan Framework Support Agreement (the "Support Agreement") pursuant to Sections 105(a),

363(b), and 1125(e) of the Bankruptcy Code.  In support of the Objection, the Equity Committee

respectfully states as follows:

## PRELIMINARY STATEMENT

1.        Approval of the Investment Agreement and Support Agreement (together, the

"Agreements") at this time is premature, because the parties' obligations under the Agreements

are so highly conditional as to be illusory.  As a review of the Agreements makes clear, the

Debtors, the Debtors' former parent company, General Motors Corporation ("GM") and the Plan

Investors[1] have not yet reached agreement among themselves on the terms of a consensual

restructuring.  The Agreements leave open several of the most critical elements of a

restructuring, including: (a) specific commitments by GM to contribute towards the Debtors'

labor and manufacturing transformation costs, and to provide the Debtors with ongoing business

(the "transformation costs"); and (b) settlements of the Debtors' claims against GM for various

acts of malfeasance leading to the Debtors' chapter 11 filing, and the Debtors' defenses to

unsecured pre-petition claims that might be asserted by GM against the Debtors' estates (the

"GM settlement").  The Debtors acknowledge that their claims against GM are potentially worth

billions of dollars, and must be resolved consensually or litigated before the Debtors'

restructuring can be effected.  Motion ¶20.  Yet, as the Debtors themselves cautioned in a press

release issued upon the filing of the Motion:

- the Debtors, its labor unions and GM "have not reached comprehensive agreements
  and there are significant differences of views that need to be reconciled in order to

---

[1]        The term "Plan Investors" refers to A-D Acquisition Holdings, LLC, Dolce Investments LLC, Harbinger
Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and UBS
Securities LLC.

achieve consensual agreements in a timeframe that would permit Delphi to preserve" the Support and Investment Agreements  (Delphi Press Release, dated December 18, 2006, at 7);

- "the actual value of the potential GM contribution [to transformation costs and the GM settlement] cannot be determined until a consensual resolution is completed (*id.* at 4); and

- the Plan Investors may terminate the Investment Agreement "if consensual agreements are not reached with labor and GM by January 31, 2007" on terms acceptable to the Plan Investors in their sole discretion (*id.* at 3) — less than a month after the date on the Motion will be heard.

2.    GM's obligations under the Support Agreement are limited to "pursu[ing] agreement" on the unresolved issues between Debtors and GM (Support Agreement §6), "it being understood" that GM has *no obligation* to enter into or consummate definitive agreements on these issues at any time. *Id.* §6.  Further, as of April 1, 2007, GM will be free to terminate the Support Agreement "for any reason or no reason at all…." *Id.* §3.1(b).  This termination right is not conditioned on any act or omission by the Debtors, or the parties' failure to achieve any milestone in connection with the restructuring.  If GM terminates the Support Agreement pursuant to §3.1(b), the Plan Investors may immediately terminate the Investment Agreement pursuant to §12(c)(ii) thereof; in addition, the Plan Investors may themselves terminate the Support Agreement "for any reason or no reason at all" on or after April 1, 2007.  In short, if GM or the Plan Investors decide *tomorrow*, for any reason at all, to walk away and leave the Debtors high and dry, all they need do is wait until April 1, 2007.

3.    Additionally, the Plan Investors may terminate the Investment Agreement if, quite apart from a termination by GM of the Support Agreement pursuant to Section 3.1(b) thereof, the Plan Investors determine in their sole discretion that one or more conditions have arisen.  *See, e.g.,* Investment Agreement §§12(d)(ii), (v), (vi), 12(e), and 12(g).  Many of the conditions triggering the Plan Investors' unilateral termination rights do not involve any breach of the

Agreements by the Debtors.  *Id.*  §12(d)(ii), (vi), (vii), 12(e), and 12(g).

4.      Despite the illusory, non-binding nature of "obligations" of GM and the Plan

Investors under the Agreements, the Plan Investors are entitled to retain non-refundable

Commitment Fees of up to $76 million if the Investment Agreement is terminated for any reason.

Additionally, the Debtors could be obligated to pay the Plan Investors a $100 Alternative

Transaction Fee even if (a) the Plan Investors terminate the Investment Agreement as a result of

action by GM, rather than the Debtors; (b) at the time of the termination no Alternate

Transaction has been considered by or even proposed to the Debtors; and (c) it takes the Debtors

as much as *two years* to identify and enter into an Alternate Transaction.  *See* Investment

Agreement §§9(a)(vi), 12(d)(vii)(A), 12(h)(ii).  The Motion omits any reference to this

possibility, and inaccurately represents that the Debtors will only be liable for the Alternative

Transaction Fee if: (x) the Investment Agreement is terminated because Debtors enter into an

Alternative Transaction; (y) the Plan Investors terminate due to the Debtors' "willful breach" of

the Investment Agreement and the Debtors enter into an Alternate Transaction within two years;

or (c) the Plan Investors terminate due to a "change in recommendation" *by the Debtors* and the

Debtors enter into an Alternate Transaction within two years.  The Motion's misleading failure

to address the possibility that the Debtors could be abandoned by the Plan Investors due to GM's

actions, and then incur a $100 million liability to the Plan Investors is a tacit acknowledgment

that payment of the Alternative Transaction Fee under such circumstances would be an

unjustifiable waste of the Debtors' estates.

5.      Efforts by the Equity Committee and the Official Committee of Unsecured

Creditors (the "UCC") to engage and be at the table with the Debtors and Plan Investors on these

and other issues prior to the filing of the Motion did not succeed. Relying on the overused saw of

time being of the essence and the need to limit the cooks in the kitchen, the role of the statutory

committees was reduced to after the fact bystander.  Input by the Committee was limited to

periodic review of already negotiated drafts of the Agreements and an opportunity to provide the

Debtors with written comments on the drafts.  Some comments were incorporated, albeit in

unilateral form, while others were unilaterally rejected or ignored by the Debtors, Plan Investors,

and GM.

6.       As a result of this flawed process, the Agreements not only leave critical issues

unresolved, they also include provisions concerning matters directly affecting equity holders that

are inconsistent with the parties' prior understandings and agreements.  For example, the

Agreements contain provisions concerning an offering by the Debtors to current equity holders

of rights to purchase newly issued common shares of the reorganized Debtors (the "Rights

Offering").  Although the Rights Offering is a significant source of the value that equity holders

may realize from the restructuring, the Agreements' provisions concerning the timing and

structure of the offering would, if approved, significantly diminish the potential value of the

rights to equity holders, and instead improperly benefit the Plan Investors.  The Equity

Committee has repeatedly indicated in its written comments to the Debtors that it does not and

cannot consent to approval of the Agreements so long as they contain these provisions.

7.       Additionally, the Rights Offering is conditioned on approval by the Securities and

Exchange Commission ("SEC") of a Rights Offering Registration Statement (the "Registration

Statement"), and the Registration Statement becoming effective.  Distributing the rights pursuant

to the Registration Statement, which creates yet another layer of conditions to the ability of

equity holders to realize value from the restructuring, makes no sense in light of the ability of the

Debtors to distribute the rights on an exempt basis pursuant to Section 1145 of the Bankruptcy

5

Code.  The Motion does not explain how or why the Debtors' board of directors decided to register the rights prior to their distribution — with all of the costs, contingencies and potentials for delay inherent in the registration process — rather than on the exempt basis authorized under the Bankruptcy Code for offerings made in connection with a reorganization plan.

## BACKGROUND

8.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

9.    On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed the UCC.

10.    On April 28, 2006, the U.S. Trustee appointed the Equity Committee.

11.    On May 8, 2006, the Equity Committee engaged Fried, Frank, Harris, Shriver & Jacobson LLP as counsel, with such retention approved by this Court on June 19, 2006.

## OBJECTION

I.    **The Investment Agreement Unfairly Diminishes the Value That Current Equity Holders Will Obtain From the Restructuring**

12.    Current equity holders, who have borne the brunt of malfeasance perpetrated upon the Debtors by GM and other parties, will realize value from the restructuring by means of the Debtors' distribution of

- $135 million of common stock (3 million shares out of a total of 135.3 million shares) in the reorganized Delphi (the "New Equity Shares"), at a deemed value of $45 per

share, and

- rights ("Rights") to purchase an additional 56.7 million shares of the New Equity Shares for $1.984 billion at an exercise price of $35 per share (the "Rights Offering").

Support Agreement §6.8. The Investment Agreement provides that the Rights will be distributed to holders of the Debtors' equity as soon as practicable after (a) this Court approves the Disclosure Statement and (b) the Registration Statement becomes effective (the "Distribution Date"). Investment Agreement §1(c)(ii). The Debtors must use "commercially reasonable efforts" to

(x) obtain court approval of the Plan Disclosure Statement by April 5, 2007 (Support Agreement §1.6), and

(y) cause the Registration Statement to become effective "*during* the period approved for the commencement of solicitation of votes on the Plan." *Id.* §1.8 (emphasis added).

13.     Because the Rights Offering is a significant source of the value that current equity holders are to obtain from the Debtors' restructuring, the terms upon which the Rights may be exercised, including the timing of the Rights Offering, are critical. The value of the Rights to current equity holders is directly related to the timing of the Rights Offering. To the extent that rights issued pursuant to a reorganization plan may be exercised after confirmation of the plan — even if the post-confirmation period for exercise is relatively short — such rights will have significantly greater value to their holders, because they may be exercised after any uncertainty concerning the ability of the plan to be confirmed has been resolved, and the plan is highly likely to become effective.

14.     The terms and structure of the Rights Offering set by the Investment Agreement — requiring issuance and exercise of the Rights prior to confirmation — results in an unnecessary discount and forfeiture of the value of the Rights, and makes it less likely that the Rights will be exercised, benefiting the Plan Investors and at the expense of equity holders.

      A.      The Premature Termination of the Rights Offering Results
in the Unnecessary Registration of the Rights, Creates Unnecessary Risks and
<u>Contingencies, and Significantly Reduces the Value of the Rights</u>

15.     Pursuant to the Agreements, the Debtors will seek to register the Rights and will issue them only after the Registration Statement has become effective, instead of issuing the Rights pursuant to Section 1145 of the Bankruptcy Code. Section 1145 exempts the offering of securities and other instruments in connection with a plan of reorganization from the registration requirements of the Securities Act of 1933 (the "Securities Act"). Specifically, Section 1145(a) exempts

    (1)     the offer or sale under a plan of a security of the debtor…(A) in exchange for a claim against, an interest in, or a claim for administrative expense in the case concerning the debtor…or, (B) principally in such exchange and partly for cash or property; or

    (2)     the offer of a security through any warrant, option, right to subscribe, or conversion privilege that [is] sold in the manner prescribed by [Section 1145(a)(1)], or the sale of a security upon the exercise of such a warrant, option, right or privilege."

11 U.S.C. § 1145(a).

16.     Given that the Rights are to be issued to equity holders who hold a claim against or interest in the Debtors, and that the New Equity Shares will be purchased pursuant to the exercise of the Rights, the Debtors' decision to embark upon the burdensome, expensive registration process instead of the far simpler Section 1145 process is puzzling, to say the least. Requiring the Rights to be registered, and the Registration to become effective (the "Registration Condition") creates a host of additional contingencies and uncertainties, and imposes additional costs on the Debtors' restructuring.

17.     Section 1145 by its terms exempts rights offerings only if they are made "in exchange for" a claim against or interest in the debtor. Rights that are issued and must be

exercised prior to plan confirmation may not qualify for the Section 1145 exemption. Sections 1(c)(ii) and 1(c)(iii) of the Investment Agreement provide that (subject to various conditions) the Rights will be issued and must be exercised *during* the Plan solicitation period, with the exercise period for the Rights expiring at the same time as the Plan solicitation period.[2] As such, Section 1145 would not appear to apply to the Rights Offering.

18.    The inapplicability of Section 1145 to rights offerings that terminate prior to confirmation may explain why the Rights Condition was included in the Investment Agreement, but it does not support the reasonableness of the Debtors' decision to close the Rights Offering prior to confirmation. There is no legitimate reason to cut off exercise of the Rights when the Plan solicitation period ends, or at any time prior to confirmation, and the Motion does not even attempt to offer one. Because the Rights are transferable (*id.* §1(c)(iii)), the right to exercise the Rights is severable and independent from the right of equity holders to vote on the Plan. Expiration of the Rights Offering at any time prior to confirmation would reduce the value of the Rights, but the combined impact of the Registration Condition and the limitation on exercise of the Rights to the Plan solicitation period threatens to make the Rights completely worthless. This is because the Rights, while exercisable only during the Plan solicitation period, will not necessarily be issued by the end of the Plan solicitation period.

19.    Although Section §1(c)(ii) of the Investment Agreement effectively conditions the Rights Offering on the commencement of the Plan solicitation period, commencement of the

---

[2]    Since the Equity Committee first became aware of the proposed timing of the Rights Offering, it has repeatedly advised the Debtors that this timing provision, in and of itself, was unacceptable to the Equity Committee because it significantly reduces the value of the Rights to the committee's constituency, quite apart from the Registration Condition. *See* ¶¶ 41-45, *infra.*

Plan solicitation period is *not* conditioned on the effectiveness of the Registration Statement.[3]

Because the Investment Agreement permits the Plan solicitation period to commence before the

Rights Offering but requires the Rights Offering to end upon the expiration the Plan solicitation

period (*id.* §1(c)(iii)), it is possible for the "clock" on the Rights Offering to start ticking down

before the Rights have even been issued, reducing — or possibly even eliminating — the

window of opportunity for exercise of the Rights.  Indeed, if the effectiveness of the Registration

Statement is sufficiently delayed, the Rights might not be issued before the Plan solicitation

period expires, making them worthless unless the Debtors and the Plan Investors are willing to

establish a new time period for exercising the Rights — something the Investment Agreement

permits, but does not require, the Debtors and the Plan Investors to do.  In short, the combined

impact of the Registration Condition and the prohibition on exercise of the Rights after

expiration of the Plan solicitation period creates an unacceptably high risk that the Rights will be

stripped of some, if not all, of their value.

20.    This unfair and potentially disastrous result could be easily avoided by

conducting the Rights Offering after the confirmation of the Plan.  As a threshold matter,

conducting the Rights Offering after Plan confirmation would eliminate any possible concern

about issuing the Rights pursuant to Section 1145 on an exempt basis.  There is no procedural or

legal reason why the ability to exercise the Rights must be limited to the Plan exercise period,

and the Debtors have not even attempted to articulate one.

21.    Imposing the Registration Condition in order to permit the Rights Offering to

---

[3]    The Investment Agreement requires only that Debtors use "commercially reasonable efforts" to cause the
Registration Statement to become effective "*during* the period approved for commencement of the
solicitation of votes" to approve the plan (*id.* §1.8), thus expressly contemplating that the Plan solicitation
period may commence before the Rights Offering commences.

expire before the confirmation date stands logic on its head.  Instead, as discussed below, the

Rights Offering should be conducted after plan confirmation so that it qualifies for the

exemption provided by Section 1145.  Conducting the Rights Offering after Plan confirmation

would ensure that the Debtors' equity holders are able to realize the full value of the Rights, and

are not forced to accept Rights that have been stripped of a portion of their value.  The reduced

value of the Rights in light of the current terms for the Rights Offering is reflected in several

ways.  For example, equity holders who are relatively unsophisticated or have limited resources

may find it impractical to exercise the Rights by the end of the Plan solicitation period, because

doing so would require them to raise and place the exercise price in escrow at the same time

(Investment Agreement §1(c)(iii)), while significant uncertainty still exists as to whether the

Plan will be approved, confirmed and become effective.  If such equity holders decide to realize

value from their Rights by selling them, they may find that potential purchasers have discounted

the Rights, perhaps significantly, in light of the uncertainty of confirmation.

22.     The Investment Agreement further diminishes the value of the Rights by failing to

provide a workable mechanism for exercise by purchasers of the Rights.  Although the Rights

are transferable upon issuance (Investment Agreement §1(c)(iii), the Investment Agreement

establishes no mechanism for exercising the Rights other than submission a ballot on the Plan.

Investment Agreement §1(c)(ii) & (iii)).  Transferees, however, will not receive a ballot as they

will have no right to vote on the Plan.  Equity holders cannot transfer the Rights by selling their

ballots, and even if they could, they should not be expected to give up their right to vote on the

Plan in order to transfer their Rights.  Unless the Investment Agreement provides additional

procedures for trading and exercising the Rights, the transferability of the Rights will be

impaired, further impeding the ability of equity holders to realize the full value of the Rights.

23.    The proposed structure of the Rights Offering inflicts the most harm on

unsophisticated individual investors, particularly those of relatively limited means.

Sophisticated investors are far more likely to understand immediately upon announcement of the

Rights Offering that they can obtain at least partial value from the Rights by selling their shares

in the open market prior to the Distribution Date of the Rights.  Unsophisticated individual

investors, however, may not become aware of this until they receive the Disclosure Statement,

by which point (if the Registration Statement has become effective) they may no longer be able

to sell their shares with the discounted value of the Rights embedded within.  Given the

Investment Agreement's failure to provide a mechanism for post-Distribution Date transfer of

the Rights, or for the exercise of transferred Rights, the transferability of the Rights may be of

little practical value to unsophisticated equity holders.

24.    The restrictions, obstacles and impediments imposed by the Investment

Agreement on equity holders seeking to realize the Rights' full value are a reflection of the Plan

Investors' strong economic interest in maximizing the number of New Equity Shares that remain

unsubscribed after the close of the Rights Offering.  The Plan Investors' "commitment" (subject

to the numerous conditions outlined, *supra*) to provide "stand by" or "back stop" financing for

these unsubscribed shares (Investment Agreement §3(a)(iv))[4] is not just an obligation; it is also

an opportunity for the Plan Investors to increase their control over the reorganized Debtors.

While the Plan Investors would hold only approximately 30% of the New Equity Shares if all of

---

[4]    The Plan Investors' back-stop commitment will extend until the outside effective date of the Plan, which is
currently expected to be on or about July 31, 2007.   Investment Agreement §§12(d)(ii) & (iii).    In
consideration for extending the back-stop commitment until the outside date for effectiveness of the Plan,
the Plan Investors are to be paid $55 million in Commitment Fees (out of  total Commitment Fees of $76
million).  *Id.* §§3(a)(iv) &(h).  The remaining $21 million in Commitment Fees is payable in consideration
of the Plan Investors' commitment to purchase newly issued Series A Preferred Shares.  *Id.*

the Rights were fully exercised by equity holders or their transferees, the Plan Investors' share of

the New Equity Shares would jump to approximately 72% if none of the Rights were exercised.[5]

25.     While issuance of the Preferred Stock to the Plan Investors will give them

effective control over the reorganized Debtors even if the Rights are fully exercised,[6] the Plan

Investors have a significant motive to limit the number of New Equity Shares held by the public.

One of the Plan Investors, which has a history of taking public companies private, made a

proposal to take the Debtors private prior to joining with the other Plan Investors to propose the

transactions contemplated by the Agreements.  The Equity Committee believes that the

Investment Agreement reflects the Plan Investors' desire to preserve the ability of some or all of

them to pursue a going private transaction at some future date.  The fewer public shareholders

the Debtors have following their emergence from bankruptcy, the easier such a transaction

would be.

26.     The Plan Investors' desire to maximize their ability to purchase New Equity

Shares does not justify their insertion of terms in the Investment Agreement that diminish the

value of the Rights to equity holders, nor does it make the Debtors' apparent willingness to agree

to such terms an appropriate exercise of business judgment.  The Plan Investors are already

being handsomely rewarded for extending the back-stop commitment until the outside date for

effectiveness of the Plan — to the tune of $55 million — and are being granted effective control

over the post-emergence Debtors through the issuance of the Preferred Shares.  There is no

justification to permitting the Plan Investors to improve the economics of the restructuring for

---

[5]     These percentages are exclusive of the Plan Investors' current debt and equity holdings.

[6]     See Preferred Stock Term Sheet at pp. 5-8.

themselves at the expense of current equity holders.

27.    In sum, the Agreements should not be approved without modifications that would require the Rights Offering to be conducted after Plan confirmation.

**II.    The Plan Investors May Collect Up To $176 Million in Non-Refundable Fees Even If They Terminate the Investment Agreement for Reasons Unrelated to A Breach, Rejection or Termination of the Investment Agreement by the Debtors**

28.    The Investment Agreement provides that the $76 million Commitment Fee is payable in three stages upon the occurrence of certain events. Investment Agreement §2(i).  Two of these three events, entitling the Plan Investors to 50% of the Commitment Fee, are within the Plan Investors' control: (a) the satisfaction, waiver or expiration of the Plan Investors' right to terminate the Investment Agreement, in their sole discretion, as a result of its due diligence investigation; and (b) the satisfaction, waiver or expiration of the Plan Investors' right to terminate the Investment Agreement if, in their sole discretion, they do not approve of the terms of the Debtors' agreements with GM concerning transformation costs and the terms of the GM settlement.  The final 50% of the Commitment Fee is payable upon approval of the Disclosure Statement (Investment Agreement §2(i)), which is expected to occur no later than April 5, 2007.  Support Agreement §1.6.  Each of these incremental payments, once made, is non-refundable if the Investment Agreement is terminated for any reason by the Plan Investors or any other party.

29.    For example, the Plan Investors may terminate the Investment Agreement after they have been paid all or part of the Commitment Fee, if: (a) GM terminates the Support Agreement by its terms, including the "for no reason at all" provision of Section 3.1(b) (Investment Agreement §12(c)); (b) the Debtors and GM are unable to reach agreement on transformation costs or the GM settlement (Investment Agreement §12(g)); or (c) there is a "Change of Recommendation" because GM has "withheld, withdrawn, qualified, or modified"

14

(or resolved or proposed to do so) "its approval or recommendation" of the Investment

Agreement in a manner adverse to the Plan Investors. *Id.* §§9(a)(vi), 12(d)(vii)(A).

30.     In addition, Section 12(h)(ii) of the Investment Agreement permits the Plan

Investors to obtain the Alternative Transaction Fee if (a) they terminate the Investment

Agreement for reasons having nothing to do with the existence of a potential Alternative

Transaction; and (b) the Debtors enter into an "Alternate Transaction" within two years of the

termination — contrary to the Debtors' representation in the Motion that the Alternative

Transaction Fee is only payable if an Alternate Transaction follows *the Debtors'* breach or

termination of the Investment Agreement.  Motion ¶¶42-43.  The Motion fails to acknowledge,

much less explain, the Debtors' obligation to pay the Alternative Transaction Fee under such

circumstances.  The Motion also does not address the Debtors' obligation to pay the Alternative

Transaction Fee if GM's actions trigger the termination, as might occur if:

- GM "change[s its] recommendation" of the Investment Agreement by "withholding, withdrawing, qualifying or modifying" its approval or recommendation for the Investment Agreement, the Support Agreement, the Preferred Stock Term Sheet, the GM settlement, the Plan, or any of the other transactions contemplated by the Agreements, or "resolve[s] or propose[s] to do," within the meaning of Investment Agreement §9(a)(vi);

- The Plan Investors' terminate the Investment Agreement pursuant to §12(d)(vii)(A) thereof as a result of GM's action; and

- Two years after the Plan Investors' termination, the Debtors enter into a transaction to help finance their restructuring with parties other than the Plan Investors.

In considering whether the Debtors' agreement to pay the Alternative Transaction Fee represents

a reasonable exercise of business judgment, it must be noted that GM has the unconditional,

unilateral right as of and at any time after April 1, 2007 to terminate the Support Agreement "for

any reason or no reason at all " pursuant to Support Agreement §3.1(b).  Such a termination

would clearly fall within the broad definition of a "change of recommendation" as used in Sections 9(a)(vi) and Section 12(d)(vii)(A) of the Investment Agreement, which triggers the potential obligation to pay the Alternative Transaction Fee.

31.     In short, the Investment Agreement puts the Debtors in the unconscionable position of having to pay the Plan Investors $100 million if the Debtors are left high and dry, first by GM and then the Plan Investors, are thus forced to seek an Alternative Transaction in order to emerge from bankruptcy, and manage to do so within two years of having been abandoned.  There is no conceivable justification, under the business judgment rule or otherwise, for the payment of a $100 million Alternative Transaction Fee to the Plan Investors under such circumstances, or under any other circumstances that do not involve termination of the Investment Agreement as a result of a breach, termination, change in recommendation, or other act *by the Debtors*.

32.     In addition, the definition of "Alternate Transaction" should be narrowed to apply only to transactions involving a change in control of the Debtors, as was the case in an earlier draft of the Investment Agreement.  In the current version of the Investment Agreement, the definition has been expanded to mean *any* plan, proposal, offer or transaction that is inconsistent with the agreement, the preferred term sheet, the PSA and the GM Settlement or the Plan, other than a chapter 7 liquidation, regardless of whether the plan, proposal or transaction had anything to do with, or was even known to, the Debtors at the time of the termination.  In addition, the "tail" provision of the Alternative Transaction Fee — two years — is far too long, and should be shortened.

33.     The Equity Committee recognizes that commitment fees and break-up fees are common features in transactions where a buyer or investor assumes the risk that its agreement

will serve as a "stalking horse" that attracts a competing bid from another party.  The Equity

Committee does not object to the amounts of either the Commitment Fee or the Alternative

Transaction Fee, or the payment of these fees, where the Agreements have attracted an actual or

potential competing bid that causes the Debtors to change their position concerning the

Agreements.  However, the Equity Committee never agreed, and cannot agree, that the Plan

Investors should be entitled to such fees when the Debtors have complied with all of their

obligations under the Agreements and the termination of the Investment Agreement occurs in the

absence of any indication of an Alternate Transaction.

34.     While the Debtors' Motion represents that the Debtors and the Plan Investors

agreed on the terms of the Commitment and Alternative Transaction Fees with "substantial

input" from the Equity Committee (Motion ¶ 39), the limited "input" the Equity Committee has

been permitted has not included direct negotiation or discussion of these provisions.  The Equity

Committee does not know why its written comments concerning payment of the Alternative

Transaction Fee in the absence of a breach or change of recommendation have not been reflected

in the Agreements.

35.     In addition, at some point in the nine days between the last time the Equity

Committee was permitted to review a draft, and the time the Motion was filed, the provisions

concerning payment of the Alternate Transaction Fee were revised to make them significantly

*worse.*  A draft given to the Equity Committee on December 9, 2006 limited payment of the

Alternative Transaction Fee to situations in which the Debtors entered into or consummated an

Alternate Transaction within six months after termination of the Investment Agreement.

However, the "final" version for which approval is sought *quadruples* this period to twenty-four

months.  No "input" was sought concerning this provision from the Equity Committee.

17

Increasing the "tail" provision of the Alternative Transaction Fee from six months to two years significantly increases the possibility that payment of the fee could be triggered by transactions unrelated to the termination, and beyond the parties' contemplation or awareness at the time of the termination.

36.     Requiring the Debtors to pay the Plan Investors an Alternative Transaction Fee because GM walked away from the Debtors' restructuring would perpetuate GM's historic practice of shifting its own obligations and liabilities to the Debtors; it would also give GM a heavy club to hold over the Debtors, as well as the Debtors' stakeholders, during and even after the parties' negotiations over transformation costs and settlement issues.  Not only can GM threaten to withhold or withdraw its support from the Debtors' restructuring, causing it to collapse, it can make it impossible for the Debtors to then seek an Alternate Transaction without incurring a $100 million liability to the Plan Investors.

37.     The Alternative Transaction Fee crosses the line from unreasonable to unconscionable where the termination occurs because the Debtors have been left at the altar by GM, for reasons of its own "or no reason at all."  Payment of the Alternative Transaction Fee under such circumstances would constitute a waste of the Debtors' estates, and the Debtors' agreement to make the Alternative Transaction Fee payable on such terms cannot be justified as an exercise of business judgment.  The Alternative Transaction Fee should only be payable if the Plan Investors' termination is the result of the Debtors' (a) entry into or consummation of an Alternative Transaction, or (b) breach or change of recommendation followed within six months (not twenty four months) of the Debtors' entry into an Alternate Transaction that was proposed to or considered by the Debtors prior to the termination of the Investment Agreement.

III.    **Approval of the Agreements Is Premature Because the Debtors and the Plan
Investors Have Refused to Engage Directly with the Equity Committee And Many
Material Issues Affecting Current Equity Holders Remain Unresolved**

38.    The materiality of the open issues remaining between the Equity Committee on

the one hand, and GM, the Plan Investors and the Debtors on the other, cannot be overstated.

These open issues include: the structure and timing of the Rights Offering; the terms of the

Preferred Stock to be issued to the Plan Investors, including matters of corporate governance; the

settlement of the Debtors' claims against GM; GM's contributions towards the Debtors' labor

transformation; the Debtors' projections for 2008 EBITDA, which can trigger two different

rights of termination by the Plan Investors; and a newly added provision that artificially caps the

liability of the Plan Investors and GM upon termination of the Agreements.

39.    Because, as explained above, the Equity Committee and the UCC were not

included in framework negotiations after mid-November, the Agreements negotiated among the

Debtors, the Plan Investors and GM either (a) do not reflect substantive economic deal points

previously discussed with the statutory committees; (b) include other terms that have never been

discussed with or explained to the statutory committees, or (c) leave other critical issues

unresolved.

40.    The lack of direct involvement by the Equity Committee in the negotiation of

provisions directly affecting equity holders may make it impossible for the Equity Committee to

support the Plan, and is inconsistent with the Debtors' professed desire to "reach a consensual

resolution regarding their various restructuring initiatives…."  Motion ¶13.  Approval of the

illusory Agreements will not further that goal, and will accomplish little beyond providing the

Plan Investors with the ability to collect up to $176 million in fees payable out of estate assets.

A.    The Rights Offering

41.    Because of the importance of the timing and structure of the Rights Offering to the ability of current equity holders to realize value from the Debtors' restructuring, it is imperative that unnecessary impediments created by the Agreements to exercise or transfer the Rights are eliminated.  As explained above (¶¶18-25), the Investment Agreement currently structures the Rights Offering in a manner that significantly diminishes the value of Rights by cutting off the ability of Rights holders to exercise the Rights when the Plan solicitation period ends — well in advance of the confirmation of the Plan, and even farther in advance of the outside date for the effectiveness of the Plan.  This problem is further complicated by the Registration Condition, which creates the possibility that the duration of the Rights Offering will be artificially shortened if the Registration Statement does not become effective before the Plan solicitation period begins.

42.    Furthermore, the sole mechanism provided under the Agreements for exercise of the Rights — the submission of a "duly executed Ballot" voting on the Plan — is inconsistent with the Investment Agreement's explicit provision that the Rights shall be transferable as of the Distribution Date.  The right of equity holders as of the Distribution Date to vote for or against the Plan, and the right of Rights holders to exercise the Rights, are separate and independent.  Just as a Plan ballot cannot be the sole mechanism by which the Rights are exercised, the expiration of the Plan solicitation period cannot determine when the ability to exercise the Rights is cut off.  Accordingly, the Investment Agreement must be revised to address these issues.

43.    The Investment Agreement further limits the ability of certain categories of equity holders to realize value from the Rights.  While current equity holders who become aware of the proposed Rights Offering prior to the Distribution Date may realize value from the Rights (albeit

at a heavy discount) by selling their shares in the open market, the restrictions on trading in the

Debtors' common shares imposed on members of the Equity Committee may limit their ability to

sell their shares during this period.  On the other hand, equity holders who do not learn about the

Rights Offering until they receive the Disclosure Statement may not be able to realize value from

the Rights by selling their shares.

44.    All of these problems can be avoided by conducting the Rights Offering after the

confirmation of the Plan, when the exemption provided by Section 1145 of the Bankruptcy Code

indisputably applies.  If the Rights are distributed after the Plan has been approved by the

Debtors' stakeholders and confirmed, all equity holders will be on a level playing field, with the

ability to decide, on the basis of the requisite disclosures in the Disclosure Statement, whether

the best way for them to realize value from the Rights is to sell their shares in advance of the

Distribution Date, transfer the Rights, or exercise them.

45.    Conducting the Rights Offering after confirmation of the Plan would also make it

easier for equity holders of limited means to exercise the Rights, as they would not have to

decide whether to raise and place the exercise price in escrow while many uncertainties and

contingencies relating to the Plan remained.  Accordingly, the Record Date for the distribution of

the Rights should be the date the Plan is confirmed (the "Confirmation Date"), the Rights should

be issued shortly after the Confirmation Date and should be exercisable or transferable for a

period of 30 days.  The Plan could then become effective immediately after the close of the

offering period.  Such a structure would afford all equity holders, including the small and

unsophisticated holders, with a meaningful opportunity to decide how best to proceed with

respect to the Rights in view of their own financial situation, and all the facts and circumstances

concerning the Plan.

B.    Right to Review and Comment On Fundamental Restructuring Documents

46.    The inconsistency between the Investment Agreement's explicit requirement that the Rights be transferable and severable from the underlying equity shares, and the Investment Agreement's limited mechanism for exercising the Rights, illustrates the importance of review of fundamental restructuring documents by the statutory committees.  It is not enough for the Debtors and Plan Investors to permit the Equity Committee to review a draft in isolation, make written comments, and thereafter watch the comments disappear into a black box, without any opportunity to explain the importance of the comments, or to hear the Debtors' and Plan Investors' explanation of their positions.

47.    The Agreements afford certain rights to the Plan Investors and GM to review and provide comments to certain documents before the Debtors file those documents.  Specifically, such rights exist with respect to the Plan, Disclosure Statement and Registration Statement. Investment Agreement §§ 5(b) and (d).  Because equity holders are the constituency most affected by Rights Offering, and because the Disclosure Statement and the Registration Statement will be most equity holders' first opportunity to learn about the terms of the Plan, and the terms of the Rights Offering, equity holders also have the greatest interest in the accuracy and fulsomeness of the disclosures in those documents.  As such, it is imperative that the Equity Committee receives the same rights to review, comment on, and approve the restructuring documents including the Plan, Disclosure Statement and the Registration Statement.

C.    The Preferred Stock

48.    The Preferred Stock Term Sheet includes provisions that are objectionable and that denigrate the rights of holders of Delphi's common stock.  These provisions are unnecessary and unjustifiable under any standard and must be modified.  The offensive provisions are those

dealing with automatic conversion of Series A Preferred Stock,[7] governance, and preemptive rights.

49.    The Preferred Stock Term Sheet provides that if a holder of Series A Preferred Stock transfers shares of Series A Preferred Stock to any person other than an Affiliate, such shares automatically convert into shares of Series B Preferred Stock.  This type of provision is necessary so that only Appaloosa and Cerberus may retain the special voting rights inherent in the Series A Preferred Stock.  However, this automatic conversion provision is too limited as drafted.  It must be the case that shares of Series A Preferred Stock automatically convert to shares of Series B Preferred Stock unless the transfer is made to an entity that is controlled by Cerberus or Appaloosa, and only for so long as the affiliation continues.  Broadening the automatic conversion provision is necessary to ensure that if the Series A Preferred Stock is transferred to an Affiliate, those shares would retain the status of Series A Preferred Stock (and the corresponding rights) only so long as the Affiliate remains an Affiliate of either Cerberus or Appaloosa.  If the entity holding the Series A Preferred Stock ceases to be controlled by Cerberus or Appaloosa, they have no entitlement to the rights of holders of Series A Preferred Stock and conversion to Series B Preferred Stock should be automatic.  It is contrary to the purpose of the provision if an entity is entitled to hold Series A Preferred Stock if it is not a controlled Affiliate of Cerberus or Appaloosa.

50.    With regard to governance, holders of Series B Preferred Stock are permitted to vote with holders of common stock to select Common Directors.  However, holders of Series A Preferred Stock are not entitled to vote the Series B Preferred Stock they own for the Common

---

[7]    Capitalized terms used in this Section C and not defined shall have the meaning ascribed to them in the Preferred Stock Term Sheet.

Directors.  This provision is in place because the Common Directors should and must be

independent of Cerberus and Appaloosa.  However, as drafted, Affiliates of the holders of Series

A Preferred Stock would be permitted to vote their Series B Preferred Stock for Common

Directors.  Allowing such a result is against the spirit of this governance provision and taints the

independent nature of the Common Directors.  As such, the prohibition should be broadened to

make it clear that consistent with the purpose of the provision, Affiliates of holders of Series A

Preferred Stock may not vote for Common Directors.  Otherwise, a holder of Series A Preferred

Stock could inappropriately affect the election of the Common Directors through its Affiliate.

Such a result would be inconsistent with the intention of this governance provision, would

prejudice holders of Delphi's common stock, and could affect the independence of the Common

Directors.

51.      Additionally, with regard to governance, we note that the agreement should be

clear that directors elected by the holders of Series A Preferred Stock should be required to

resign from Delphi's board of directors if holders of Series A Preferred Stock are no longer

entitled to elect Series A Directors.  The Series A Directors were not elected by holders of

common stock, and if holders of Series A Preferred Stock no longer have the right to appoint

directors, equity dictates that common stockholders should be afforded the opportunity to elect

directors of their choosing.  While we assume such a result was intended, the agreement should

clearly so state.

52.      With regard to preemptive rights, the Preferred Stock Term Sheet provides

holders of Preferred Stock with certain participation rights in equity securities offerings by

Delphi so long as Cerberus and Appaloosa beneficially own, in the aggregate, Series A Preferred

Stock with a Liquidation Value of $250 million or more.  As such, as drafted, any holder of

Preferred Stock has such rights.  These rights should be limited to Appaloosa and Cerberus.  In addition, the documents should clarify that any participation by holders of Series A Preferred Stock in a securities offering should be on an "as converted" basis.

D.    Transactions With Affiliates

53.    The Investment Agreement provides that for so long as Appaloosa or Dolce Investments LLC, the Cerberus entity that will be the actual holder of the Series A Preferred Stock ("Dolce") own share of Series A Preferred Stock, a transaction with an Affiliate of Plan Investors Appaloosa or Cerberus (including any "going private transaction" that is "sponsored" by Appaloosa or Cerberus) must be approved by at least 75% of the Common Directors.  As currently drafted, the Affiliate transaction provision only applies when either Dolce or Appaloosa own Series A Preferred Stock – for the provision to have any meaning, it must be revised to clarify that the provision applies when Appaloosa, Dolce, *or any of their Affiliates*, own Series A Preferred Stock.  As currently drafted, this provision, which is of critical importance, could be avoided if Appaloosa or Dolce transferred their Series A Stock to an Affiliate.  Again, it is hard to understand how this change can be controversial, but the Agreement has failed to reflect the change.

54.    In addition, as the Equity Committee commented on an earlier draft of the Investment Agreement, the restrictions on going private transactions should be clarified to include those "involving" Appaloosa, Dolce, or their Affiliates (as opposed to being limited to those "sponsored" by these entities).  While the Equity Committee believes that going private transactions "involving" Appaloosa, Dolce, or their Affiliates will be picked up by this provision and Delaware law and would require the 75% approval of Common Directors discussed above, it is unclear why the Investors and Delphi refused to make the clarifying change.

25

E.      The Alternative Transaction Fee

55.     As explained above, the Equity Committee would not object to the size of the

Commitment Fee and Alternative Transaction Fee if the obligations of GM and the Plan

Investors were not illusory, and if the Alternative Transaction Fee were not payable in the

absence of a breach of the Investment Agreement or change in recommendation *by the Debtors*.

Further, the definition of "Alternate Transaction" in Sections 9 and 12 of the Investment

Agreement is too broad.  To trigger payment of the Alternative Transaction Fee, an Alternate

Transaction should have been pursued by, considered by or proposed to the Debtors prior to the

termination of the Investment Agreement.

F.      Cap on Plan Investors' Liability

56.     In the version that was ultimately filed, a cap on the liability of the Plan Investors

under the Investment Agreement was added.  This cap limits the aggregate liability of the Plan

Investors to $100 million for any reason on or prior to the date the Disclosure Statement is

approved and to $250 million for any reason subsequent to that date.  Significantly and highly

inappropriately, this cap applies even to willful breaches of the Investment Agreement by the

Plan Investors.  The Plan Investors, however, are receiving a significant Commitment Fee and

are eligible to receive a significant Alternative Transaction Fee.  As a result, the Debtors are

relying on the Plan Investors to act in good faith with respect to their obligations.  To the extent

the Plan Investors derogate their obligations and willfully breach the Investment Agreement,

there can be no justification as to why a cap on their liability is appropriate.

G.      Uncertain EBITDA Target for 2008

57.     The Plan Investors previously agreed to commit to the transactions contemplated

by the restructuring on the assumption that EBITDA levels for each of 2009 and 2010 would be

$2.4 billion on a pro forma basis.  Additionally, the Investment Agreement creates two contingencies relating to the Debtors' EBITDA target for 2008 that would permit the Plan Investors to terminate the agreement.  Section 12(e) provides that the Plan Investors may terminate the agreement if a target amount for 2008 EBITDA acceptable to the Plan Investors, in their sole discretion (not to exceed $2.4 billion), has not been agreed between the Plan Investors and the Debtors by the end of the due diligence period.

58.    Section 12(d)(vi) also allows the Plan Investors to terminate the Investment Agreement *after* they approve the Debtors' target amount for 2008 EBITDA, if in their "reasonable discretion" they determine that the Debtors are unlikely to achieve either the agreed upon 2008 EBITDA target, or the $2.4 billion EBITDA targets for 2009 and 2010.  Termination pursuant to §12(d)(vi) would permit the Plan Investors to retain any portions of the Commitment Fee already paid to them — at a minimum, the $10 million payable at the end of the due diligence period, as much as 50% of the total Commitment Fee if the Plan Investors had by the time of the termination approved an agreement with GM on transformation costs and the GM settlement, and the entire $76 million if the Plan Investors reached this determination after the approval of the Disclosure Statement.

59.    The Plan Investors should not have an unlimited right to terminate the Investment Agreement based on their concerns about an EBITDA target that they themselves approved in their sole discretion.  This provision should be narrowed prior to the approval of the Agreements.

H.    <u>GM's Responsibility for Transformation Costs, and the GM Settlement</u>

60.    As explained more fully in the Equity Committee's objection to the UCC's <u>STN</u> motion, GM's conduct leading up to and following the spin-off of Delphi gives rise to significant affirmative claims and causes of action of the Debtors against GM, as well as significant

defenses and objections to any claims GM may assert against the Debtors. The Debtors' Motion seeking approval of the Agreements acknowledges this. *See* Motion ¶¶ 20-25. The relationship between GM and the Debtors, and fraudulent pattern of conduct by GM towards both before and after GM's spin-off of the Debtors as a nominally independent company, caused devastating harm and damage to the Debtors and their estates and, consequently, to the value of the equity held by the Debtors' common shareholders. As such, any settlement between the Debtors and GM must be acceptable to the statutory committees, especially the Equity Committee.

61.     In particular, any releases granted to GM in connection with a settlement must not limit, impair or waive the rights of equity holders (if any) to participate in or receive value from any fund established by the Securities and Exchange Commission (or any other governmental or regulatory agency) for the benefit of Delphi's equity holders. Equity holders suffered the greatest harm as a result of GM's conduct and, therefore, any settlement with GM must not further disadvantage this group.

62.     Additionally, the Support and Investment Agreements should explicitly provide that any labor or transformation costs incurred in connection with the restructuring must be borne by GM, including settlements with the unions on account of their unsecured pre-petition claims against the Debtors' estates. GM marketed the spin-off to potential equity investors largely on the strength of its representations that the spin-off would significantly *reduce* Delphi's labor costs, but instead GM deliberately shifted much of the above-market cost of its own labor arrangements, and pension and benefit obligations, to the Debtors on an underfunded basis. The resulting costs to the Debtors should be borne, as they always should have been, by GM.

I.     Waiver of Ten Day Period

63.     The Debtors request for a waiver of the 10-day stay period under Rule 6004(g) of

28

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") is inappropriate and

unnecessary.  Bankruptcy Rule 6004(g) provides that "[a]n order authorizing the use, sale, or

lease of property other than cash collateral is stayed until the expiration of 10 days after entry of

the order, unless the court orders otherwise."  Bankruptcy Rule 6004(g).  While courts have

waived the stay in certain circumstances, the stay should be eliminated or reduced only upon a

showing that there is a sufficient business need to close the transaction within the 10-day period

and the interests of the objecting party, taking into account the likelihood of success on appeal,

are sufficiently protected.  Collier on Bankruptcy, 15th ed. Revised,  6004.10.

64.    There has not been, nor can there be, a showing of sufficient business need to

warrant the elimination of the 10-day stay period under Bankruptcy Rule 6004(g).  Under the

Investment Agreement, the Debtors are obligated to pay Transaction Expenses upon the entry of

an order granting the Motion and the Debtors' liability to pay the Alternate Transaction Fee and

Commitment Fees upon the occurrence of certain conditions is triggered upon the entry of the

order granting the Motion, as the Agreements will become effective at that time.  However, as

discussed at length in this Objection, approval of the Motion is premature at this time as the key

terms of the transactions contemplated by the Agreements have yet to be negotiated.  There is

thus no basis for the Debtors to assert that any business exigency exists to warrant the

elimination of the 10-day stay and, as a result, there is no basis for the Court to waive the stay.

See e.g., In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (request to dispense with

the 10-day period of Bankruptcy Rule 6004(g) denied where debtor made no evidentiary

showing of a business exigency requiring a closing within 10 days).

J.    Ongoing Negotiations

65.    Consideration of the Motion is premature.  Much work remains in order to reach

agreement among all interested parties on the consensual deal the Debtors say they want to achieve. The Equity Committee and its professionals stand willing, able and at the ready to resolve all issues and facilitate the restructuring transaction for the best interests of the estates and all creditors and equity holders. The Equity Committee's goal is to maximize value, but it is wrong and unacceptable to line the pockets of the Plan Investors and to allow undue recoveries to GM to the detriment of equity holders.

## CONCLUSION

66.    In order to adequately preserve the rights of parties in interest in the Debtors' chapter 11 cases and for the foregoing reasons, the Equity Committee respectfully requests that the Motion be denied until final Agreement with all material terms and conditions negotiated and agreed to exist and are submitted to the Court. The Equity Committee reserves the right to further supplement its objection to the Motion prior to the deadline for objections based on additional information obtained through discovery.

Dated: December 20, 2006
New York, New York

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP

By:   /s/ Debra M. Torres
Bonnie Steingart (BS-8004)
Debra M. Torres (DT-9093)

One New York Plaza
New York, New York 10004
Telephone: 212.859.8000
Facsimile: 212.859.4000

*Counsel for the Official Committee of Equity Security Holders*

542789