**Hearing Date and Time: January 12, 2007 at 10:00 a.m.**
**Objection Deadline: January 4, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
     In re                                    :     Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :     Case No. 05-44481 (RDD)
                                              :
                                              :     (Jointly Administered)
                    Debtors.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 1121(d) EXTENDING
DEBTORS' EXCLUSIVE PERIODS WITHIN WHICH TO FILE
AND SOLICIT ACCEPTANCES OF REORGANIZATION PLAN

("THIRD 1121(d) EXCLUSIVITY EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"), debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 1121(d) further extending the Debtors' exclusive periods within which to file and solicit acceptances of a plan of reorganization and respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and its Affiliate Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtor's chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

2

4.      The statutory predicate for the relief requested herein is section 1121(d) of the Bankruptcy Code, as amended and in effect on October 8, 2005.

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi

---

[1]      The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.      The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined the key tenets of its transformation plan.  The Company believes that this plan should enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in 2007.  To complete their restructuring process, the Debtors must focus on five key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

12.     Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

13.     As set forth in the Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan (Docket No. 4266) entered by this Court on June 19, 2006, the Debtors have the exclusive right to file one or more reorganization plans through and including February 1, 2007 (the "Plan Proposal Period") and the exclusive right to solicit and obtain acceptances for those plans through and including April 2, 2007 (the "Solicitation Period," and, together with the Plan Proposal Period, the "Exclusive Periods").

14.     Although the Debtors have publicly projected emergence from bankruptcy by the end of the second quarter in 2007 and remain committed to this timeline, the Debtors believe that a further extension of the Exclusive Periods is prudent and in the bests interests of the estates and their stakeholders because of, among other reasons, the size and complexity of the Debtors' cases and the need to protect the estates against the downside risks that the actions required to be taken under the Framework

6

Agreements (defined below) and the possibility that the transactions contemplated by the

Framework Agreements cannot be consummated, each of which might result in a delay in

emergence from bankruptcy.  Accordingly by this Motion, the Debtors seek entry of an

order further extending (a) the Plan Proposal Period through and including July 31, 2007[3]

and (b) the Solicitation Period through and including September 30, 2007, to facilitate

emergence from bankruptcy before the 2-year anniversary of theses cases,[4] without

prejudice to the Debtors' right to seek further extensions of the Exclusive Periods.

<u>Basis For Relief</u>

15.    The Exclusive Periods are intended to afford chapter 11 debtors a

full and fair opportunity to rehabilitate their businesses and to negotiate and propose a

reorganization plan without the deterioration and disruption of their businesses that might

be caused by the filing of competing reorganization plans by non-debtor parties.  A further

extension of the Exclusive Periods is justified by the significant progress the Debtors have

made toward reorganization since they last sought an extension of the Exclusive Periods.

After the Debtors adjourned their 1113/1114 Motion[5] and GM Contract Rejection Motion[6]

---

[3]    July 30, 2006, or 180 days after the due diligence period expires, is the current deadline for closing under the EPCA (defined and discussed below).  <u>See</u> Section § 12(d)(iii) thereof (attached as Exhibit A to Framework Motion (defined below)).  The length of the requested extension, just short of six months, is also consistent with the approximately six-month extensions sought by the Debtors in their two prior motions.

[4]    These cases are not subject to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) ("BAPCPA"), most provisions of which became effective in cases commenced on or after October 17, 2005.  Thus, these cases are not subject to the 18- and 20-month limitations on plan and solicitation exclusivity found under the current version of 11 U.S.C. § 1121(d)(2).

[5]    <u>See</u> Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035).

in June of 2006, they initiated a series of multi-lateral negotiations with their statutory

committees, GM, and potential plan investors to formulate a framework to address the

Debtors' transformation issues and a potential reorganization plan.

    16.    These discussions led to the announcement[7] made by the Debtors on

December 18, 2006 that, after intensive negotiations with these various constituencies over

this period of months, the Debtors were successful in negotiating a framework for a

potential reorganization plan and securing a commitment from an investor group (the "Plan

Investors")[8] to invest substantial sums in the reorganized Debtors.  These agreements (the

"Framework Agreements") have now been memorialized and on December 18, 2006, the

Debtors filed a motion[9] seeking this Court's approval of the Framework Agreements.

Although the Framework Agreements contemplate the need for further negotiation and

agreement among various parties, the Framework Agreements represent a major milestone

in Delphi's reorganization, illustrate the Debtors' continuing commitment to a consensual

---

[6]   See Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain Executory Contracts With General Motors Corporation (Docket No. 3033).

[7]   Delphi's press release issued on December 18, 2006 is attached hereto as Exhibit A.

[8]   As used herein, "Investors" means A-D Acquisition Holdings, LLC (an affiliate of Appaloosa Management L.P. ("Appaloosa")), Harbinger Del-Auto Investment Co. Ltd. (an affiliate of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger")), Dolce Investments LLC (an affiliate of Cerberus Capital Management, L.P. ("Cerberus")), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and UBS Securities LLC ("UBS").  In connection with the EPCA (as defined below), Appaloosa, Harbinger, and Cerberus (collectively, the "Commitment Parties"), are also executing certain equity commitment letters (the "Commitment Letters") in support of the obligations of their respective affiliate Investors under the EPCA.  The Investors and the Commitment Parties are collectively referred to herein as the "Plan Investors."

[9]   See Expedited Motion For Order Authorizing And Approving Equity Purchase And Commitment Agreement Pursuant To Sections 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6179 ) (the "Framework Motion").

resolution of the principal issues in their restructuring, and signify demonstrable progress toward a plan of reorganization.

17.    The Framework Agreements also provide for the delivery of the Debtors' five-year business plan (which must reflect a settlement with GM) to the Investors and the date by which the Debtors must submit a disclosure statement and plan of reorganization to this Court for approval, the latter date being the later of May 1, 2007 and the first business day that is 120 days after the Investors' due diligence period has expired (the "Due Diligence Expiration Date").  Accordingly, the Debtors require more time than the current Exclusive Periods allow to conduct the further negotiations contemplated by the Framework Agreements, as well as to formulate and submit a disclosure statement and plan of reorganization that conform to the requirements of the Framework Agreements. Although a significant amount of progress has been achieved and the Debtors hope to submit a consensual reorganization plan during the first quarter of 2007, a substantial amount of work remains to be done.

18.    The Debtors' good-faith progress toward reorganization and the related contingencies that remain to be resolved, however, are not the only factors that support the Debtors' request to extend the Exclusive Periods.  The size and complexity of the Debtors' cases alone justify a further extension of the Exclusive Periods.  For example,

- a cursory review of the EPCA and the Plan Framework Support Agreement demonstrate the many barriers to emergence that the Debtors must navigate to successfully implement those two agreements, including: (a) the Debtors must reach an agreement

9

with GM that is consistent with the Framework Agreements and the

potential plan contemplated therein; (b) the Debtors must reach

tentative labor agreements with certain of its unions located in the

United States that would permit achievement of the transactions

contemplated by the Framework Agreements; and (c) timely

completion of a due diligence investigation of the Debtors in

accordance with the Framework Agreements.

- The Debtors believe that the preliminary objections to the

  Framework Motion received by the Debtors to date reflect the

  various stakeholders' efforts to negotiate changes to the Framework

  Agreements to their advantage.  The four objections received to date

  have already necessitated a continuance of the hearing on the

  Framework Motion to January 11, 2007.[10]

- On December 21, 2006, without any prior discussions with the

  Debtors, Highland Capital Management, L.P. ("Highland Capital")

  announced[11] that it had delivered a letter to Delphi's Board of

  Directors in opposition to the Framework Agreements, making a

  proposal that it become the plan investor under the Framework

  Agreements.

---

[10]   See Pretrial and Scheduling Order Relating to Debtors' Expedited Motion for Order Authorizing and
       Approving Equity Purchase and Commitment Agreement Pursuant to 11 U.S.C. Section 105(a), 363(b),
       503(b), and 507(a) and Plan Framework and Support Agreement Pursuant to 11 U.S.C. Sections 105(a),
       363(b), and 1125(e) (Docket No. 6272) (referring to objections at Docket Nos. 6209, 6211, 6247, 6254).

[11]   Highland Capital's press release and related article from the Wall Street Journal are attached as
       Exhibit B.

19.    The Framework Agreements clearly evidence the fact that the

Debtors have not used their exclusivity period to pressure stakeholders to submit to the

Debtors' reorganization demands.  Instead, the Debtors have actively utilized this period to

negotiate the framework terms in good faith with their diverse constituencies.  Finally, the

Debtors are timely paying their bills, and will continue to do so in reliance on their current

$2.0 billion debtor-in-possession financing facility and their recently proposed refinanced

$4.5 billion debtor-in-possession financing facility.[12]

20.    Therefore, the Debtors submit that under these circumstances the

Debtors' requested extension of the Plan Proposal Period through July 31, 2007 and the

Solicitation Period through September 30, 2007 is justified.

<u>Applicable Authority</u>

21.    Section 1121(d) of the Bankruptcy Code permits the court to extend

a debtor's exclusive periods upon a demonstration of cause:

> On request of a party in interest made within the respective
> periods specified in subsections (b) and (c) of this section
> and after notice and a hearing, the court may for cause
> reduce or increase the 120-day period or the 180-day period
> referred to in this section.

11 U.S.C. § 1121(d).  Although the term "cause" is not defined in the statute, the

legislative history states that it is intended to be a flexible standard to balance the

competing interests of a debtor and its creditors.  <u>See</u> H.R. Rep. No. 95-595 at 232 (1977),

---

[12]    <u>See</u> Expedited Motion For Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2),
364(c)(3), 364(d)(1), And 364(e) And Fed. R. Bankr. P. 2002, 4001 And 6004(g)  (I) Authorizing
Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To Refinance Secured Post-
Petition Financing And Prepetition Secured Debt (Docket No. 6180).

reprinted in 1978 U.S.C.C.A.N. 5963, 6191 (bankruptcy courts are given flexibility to increase 120-day period depending on circumstances of case). Moreover, whether "cause" exists to extend a debtors' exclusive periods to file and solicit acceptances of a plan is a decision committed to the sound discretion of the bankruptcy court based upon the facts and circumstances of each particular case. See In re Texaco, Inc., 76 B.R. 322, 325 (Bankr. S.D.N.Y. 1987). In determining whether a debtor has had an adequate opportunity to negotiate a plan of reorganization and solicit acceptances thereof, a court should consider a variety of factors to assess the totality of circumstances. See In re Ames Dep't Stores, Inc., 1991 WL 259036, at *2 (S.D.N.Y. Nov. 25, 1991); In re McLean Indus., Inc., 87 B.R. 830, 833-34 (Bankr. S.D.N.Y. 1987).

22.    The court in McLean Indus. identified the following factors as relevant to the determination of "cause" to extend a debtor's Exclusive Periods:

(a)    the existence of good faith progress toward reorganization;

(b)    existence of an unresolved contingency;

(c)    the size and complexity of the debtor's case;

(d)    a finding that the debtor is not seeking to extend exclusivity to pressure creditors "to accede to [the Debtor's] reorganization demands"; and

(e)    the fact that the debtor is paying its bills as they come due.

In re McLean Indus., 87 B.R. at 834; accord In re Hoffinger Indus., Inc., 292 B.R. 639, 644 (B.A.P. 8th Cir. 2003) (stating that not all factors "are relevant in every case" and court has discretion to "decide which factors are relevant and give the appropriate weight to each"). When evaluating these factors, the goal is to determine whether a debtor has had a reasonable opportunity to negotiate an acceptable plan with various interested parties and

to prepare adequate financial and non-financial information concerning the ramifications of any proposed plan for disclosure to creditors.  See, e.g., In re McLean, 87 B.R. at 833-34; In re Texaco, 76 B.R. at 326.

23.    In other cases of similar size and complexity to the Debtors' cases, courts have extended the debtors' exclusivity rights to propose a plan of reorganization for periods similar to those requested by the Debtors.  See, e.g., In re Delaco Co., Case No. 04-10899 (PCB) (Bankr. S.D.N.Y. 2004) (granting initial extension of five months and total extensions of approximately 16 months); In re Enron, Case. No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2001) (granting initial extension of six months and total extensions of approximately 15 months); In re Bethlehem Steel, Case No. 01-15288 (BRL) (Bankr. S.D.N.Y. 2001) (granting initial extension of five and a half months and total extensions of more than 17 months); In re Kmart Corporation, Case No. 02-02474 (Bankr. N.D. Ill. 2002) (granting initial extension of nine months and aggregate exclusivity for more than 17 months);  In re Kaiser Aluminum Corp., Case No. 02-10429 (Bankr. D. Del. 2002) (granting initial extension of six months and total extensions of approximately 43 months). In this case, based upon the preceding factors and in line with other cases of similar size and complexity, sufficient cause exists for a [five]-month extension of the Exclusive Periods.

A.    The Debtors Have Made Good-Faith Progress Toward Reorganization

24.    An extension of a debtor's exclusive periods also is justified by a debtor's progress in resolving issues facing its creditors and estates. In re Amko Plastics, Inc., 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996).  The Debtors' progress in these cases thus far is significant and compels a further extension of the Exclusive Periods.

13

1.    The Framework Discussions

25.    The framework discussions commenced in the summer of 2006 provided a vehicle for the Debtors to explore with their statutory committees, GM, and potential plan investors whether any viable path existed toward a comprehensive consensual transaction.  As set forth in the Debtors' Framework Motion, after the adjournment of the 1113/1114 Motion and the GM Contract Rejection Motion, the Debtors began to map out several possible alternative means to resolve these chapter 11 cases and provide for a global settlement of disputes among the Debtors, GM, the statutory committees, and various other parties-in-interest.  The Debtors conceptualized potential outcomes ranging from litigating the 1113/1114 Motion and the GM Contract Rejection Motion to adjourning the motions and attempting to reach a comprehensive deal with GM and the unions. The Debtors also explored with their statutory committees, an ad hoc committee, and GM multiple alternative paths for achieving the ultimate goals of the Debtors' reorganization.  The Debtors, after receiving clear and unequivocal input from GM that it would not explore a consensual path that did not include the determination of GM's net exposure to Delphi and similar input from the statutory committees that they would not consider settling with GM on a consensual path that did not include the determination of anticipated recoveries for creditors and equity interests, decided to seek a comprehensive resolution of the Debtors' transformation plan issues, including eventual resolution of  GM and labor issues, through the commencement of "framework" discussions.

26.    These framework discussions began in earnest on August 1, 2006 with "leveling-up" meetings between the Debtors and their statutory committees.  Promptly thereafter, the Debtors, GM, and the Creditors' Committee began exchanging proposals that addressed such issues as possible capital structures for the reorganized Debtors, disposition of the Debtors' legacy obligations, and various aspects of the Debtors' relationship with GM.  Very early in the framework discussions, several of the parties were able to agree upon the potential range of creditor recoveries.  By September, certain of the parties were able to agree upon the potential range of recoveries available to shareholders.  For these potential recoveries to be realized, however, the framework discussions still needed to address the labor issues, the GM issues, and the business plan for the Debtors that would support these desired recoveries.  The Debtors, as well as the other participants in the framework discussions, realized that an outside plan investor would be necessary to achieve the expected results.

2.    Identification Of Potential Plan Investors

27.    By late September 2006, other stakeholders had joined the discussions.  As this Court is aware, Appaloosa has been a very active participant in these chapter 11 cases and has a substantial interest in the outcome of the Debtors' transformation.  Because of Appaloosa's status as a significant holder of the Debtors' claims and equity securities, the Debtors and their advisors met several times with representatives from an investor group led by Appaloosa and Harbinger, both separately and together with GM and the statutory committees.

15

28.     At the same time that the Debtors began meeting with Appaloosa and Harbinger, the Debtors with the assistance of their financial advisor and investment banker, Rothschild Inc. ("Rothschild"), continued to explore alternative investment proposals from certain other investors with industry experience.  The Debtors worked with these various investor groups to create a limited and focused competitive bidding process. The Debtors also gave the investor groups the opportunity to engage in limited due diligence and to explore the opportunities associated with a transformed Delphi.  These framework discussions involved many ideas for a transformed Delphi, all of which the Debtors evaluated carefully with the goal of developing the framework for an eventual reorganization plan. The discussions addressed various matters, including allocation of legacy liabilities; wind down or divestiture of non-core North American facilities; GM contribution and recovery; potential plan treatment for various stakeholders; the anticipated scope of, and potential limitations on, general unsecured claims; future capital structure; and corporate governance upon emergence.  This process led to the selection of Appaloosa, Harbinger, and Cerberus (together with Merrill and UBS) as potential plan investors and to the Debtors' decision to pursue earnest negotiation of definitive documents with the Plan Investors to determine if there was a viable transaction that could be accomplished.

3.     <u>The Framework Agreements</u>

29.     These framework discussions led the Debtors to negotiate two separate but interrelated agreements:  the Equity Purchase and Commitment Agreement (together with the Equity Commitment Letters between Delphi and the Commitment Parties, the "EPCA") and the Plan Framework Support Agreement ("PSA").  The EPCA

sets forth the terms and conditions upon which the Plan Investors will (i) commit to purchase $220,500,000 of common stock in the reorganized Delphi and $1.2 billion of preferred shares in the reorganized Delphi and (ii) commit to purchasing any unsubscribed shares of common stock in connection with a rights offering to existing common stock holders.[13]

30.    The PSA, as well as the economics and structure of the plan framework itself, is expressly conditioned on reaching consensual agreements with Delphi's U.S. labor unions and GM.  The PSA outlines certain plan terms, including proposed distributions to be made to creditors and shareholders, the treatment of GM's claim, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  In addition, the PSA describes plan terms related to the terms of the preferred stock to be issued under the plan, the establishment of a joint claims oversight committee, certain corporate governance provisions, and certain conditions precedent to plan effectiveness. The Debtors believe that the Framework Agreements will provide the Debtors with a platform to complete the transactions contemplated therein and will help to bring these chapter 11 cases to a timely close.[14]

---

[13]    The Commitment Letters, in turn, set forth the terms and conditions upon which the Commitment Parties will provide the funding to the Investors that will be necessary to enable the Investors to make the investment called for under the EPCA.

[14]    As noted above, Highland Capital has made a proposal, which in its view represents up to a $4.7 billion equity commitment.  In accordance with their fiduciaries duties, the Debtors have begun to evaluate the Highland Capital proposal and to continue that process have scheduled meetings for the first week of January 2007.

    4.      <u>Ongoing Negotiations With Unions</u>

    31.      In addition to the issues addressed in the Framework Discussions with other constituencies, the Debtors have continued their discussions with their six U.S. labor unions to achieve the goals of their Transformation Plan.

    5.      <u>Claims Reconciliation</u>

    32.      A condition precedent to the effectiveness of the potential plan contemplated by the PSA is that the amount of all trade claims and unsecured claims scheduled or asserted in these cases, as allowed or estimated, will total no more than $1.7 billion.  Although creditors have filed approximately 16,000 proofs of claim asserting more than $37.0 billion in liquidated amounts plus certain unliquidated amounts, the Debtors have made significant strides in the claims reconciliation process.

    33.      Between September 19, 2006 and December 8, 2006, the Debtors objected to approximately 8,300 claims totaling approximately $8.9 billion.  To streamline the adjudication or resolution of the remaining claims that the Debtors anticipate disputing, the Debtors obtained Court approval to (i) schedule special hearings to consider contested claims matters, (ii) establish certain procedures governing the filing and contents of responses of claimants to omnibus claims objections, and (iii) establish certain procedures governing the adjudication of contested claims matters and service of omnibus claims objections.

    6.      <u>Other Matters</u>

    34.      In addition to the foregoing, since the Debtors last sought an extension of the Exclusivity Periods, the Debtors have also:

      (a)      undertaken and consummated the sale of substantially all of the assets of MobileAria, Inc.;

      (b)      completed the sale of their New Brunswick, New Jersey battery manufacturing facility to Johnson Controls, Inc.;

      (c)      entered into (i) an agreement with Electronic Data Systems Corporation and EDS Information Services, LLC for the outsourcing of global desktops, service desk, and mainframe systems hosting and (ii) an agreement with Hewlett Packard Company which provides for the outsourcing of server systems hosting;

      (d)      settled certain claims and allegations asserted by the Securities and Exchange Commission;

      (e)      entered into attrition plans with the Debtors' unions under which approximately 83% of the eligible IUE-CWA workforce elected to participate; and

      (f)      sought approval to enter into a replacement financing facility which would result in an estimated financing costs savings of approximately $8 million per month.

35.      In summary, the Debtors are clearly making good-faith progress toward their reorganization.  Nevertheless the Debtors still have significant tasks to complete before proposing a plan of reorganization.

B.      <u>Unresolved Contingencies Still Exist</u>

36.      Courts have also cited the need to resolve an important contingency as justification for extending a debtor's exclusivity periods.  Under the terms of the PSA, the Debtors must reach agreements with a number of parties and constituencies, including reaching agreements on new or amended collective bargaining agreements with each of their U.S. labor unions and agreements resolving the Debtors' many significant GM-related issues.  These issues are significant for both their magnitude and complexity, and amply satisfy the contingency component described in the <u>McLean</u> test.

C.    These Cases Are Large And Complex

37.    The size and complexity of the Debtors' chapter 11 cases alone constitute sufficient cause to extend the Exclusive Periods.  See, e.g., In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987); see also H.R. Rep. No. 595, 95th Cong., 1st Sess. 231, 232, 406 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6191, 6362 ("[I]f an unusually large company were to seek reorganization under Chapter 11, the Court would probably need to extend the time in order to allow the debtor to reach an agreement."); In re Express One  Int'l, Inc., 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) ("The traditional ground for cause is the large size of the debtor and the concomitant difficulty in formulating a plan of reorganization").  These and other authorities show that in large, complex chapter 11 cases courts consistently extend the debtor's exclusive periods to afford the debtor time to stabilize its business, analyze reliable information to diagnose problems, and formulate a long-term business plan before commencing the plan of reorganization process.

38.    The Debtors' cases are indisputably large and the multi-lateral and multi-dimensional scope of actions that must be taken to address Delphi's restructuring requirements are exceedingly complex.  A review of certain basic statistics make the foregoing conclusion self-evident:

(a)    as noted above, at the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets;

(b)    the Debtors' global 2005 net sales were approximately $26.9 billion, and their global assets totaled approximately $17.0 billion;

(c)    as of the filing, the Debtors employed approximately 50,600 people in the technical centers.  Ninety-six percent of the

Debtors' 34,750 hourly employees were represented by approximately 49 different international and local unions under various collective bargaining agreements.  The Debtors' foreign entities employed more than 134,000 people supporting 120 manufacturing sites and 20 technical centers across nearly 40 countries worldwide;

(d)    as of November 2, 2006, more than 16,000 proofs of claim had been filed.  In the aggregate, these proofs of claim and scheduled liabilities assert more than $37.0 billion in liquidated amounts plus certain unliquidated amounts. Between September and December 2006, the Debtors objected to claims totaling nearly $8.9 billion (plus additional unliquidated amounts) and this Court granted relief with respect to approximately $6.4 billion in asserted liquidated claims (plus additional unliquidated claims); and

(e)    in the 14 months since the Debtors' chapter 11 filings, more than 6,180 entries have been filed on the docket, an average of approximately 22 entries per business day.

39.    A debtor's chapter 11 case need not even approach the size of these cases to justify an extension of the exclusive periods based on size and complexity.  See, e.g., In re United Press Int'l, 60 B.R. 265, 270 (Bankr. D.D.C. 1986) ($40 million company granted extension of exclusive periods based on size and complexity of case; "In many much smaller cases, involving far less complications, two or three years go by before the debtor is in a position to file a plan").  Thus, by any measure, the Debtors' chapter 11 cases are sufficiently large and complex to warrant an extension of the Exclusive Periods under the foregoing authorities.  Moreover, in addition to the typical issues that can be anticipated to arise in a large chapter 11 case, the Debtors face numerous significant issues that are unique to the automobile industry (an industry which, as a whole, is in distress) affecting the Debtors' ability to formulate and execute a viable business plan.

21

D.      The Debtors Are Using Exclusivity For A Proper Purpose

40.      Courts have denied extensions of exclusive periods when plan negotiations among parties in interest have broken down and the continuation of exclusivity would merely give the debtor unfair bargaining leverage over the other parties in interest.  See In re Lake in the Woods, 10 B.R. 338, 345 (Bankr. E.D. Mich. 1981).  Here, the Debtors' request for an extension of the Exclusive Periods is not a negotiation tactic.  To the contrary, a further extension would permit the Debtors to continue in their successful efforts to make concrete steps toward formulating and confirming of a viable plan of reorganization.

41.      As one example, the Debtors used the current extension period, after consultation with and upon the recommendation of the statutory committees, to seek a comprehensive resolution of the GM and labor issues through the framework discussions.  Both statutory committees played an active role in the negotiations and framework discussions with GM and potential plan investors.  Although the EPCA and PSA require further agreements among various constituencies, the PSA creates a springboard from which the Debtors, GM and the unions should be able to reach consensus on all remaining issues.  Thus, the EPCA and the PSA aptly demonstrate that the Debtors have been using (and will continue to use) exclusivity to negotiate in good faith with their stakeholders.

42.      Moreover, the Debtors and their professionals have consistently conferred with their constituencies on all major substantive and administrative matters in these cases, often incorporating other positions in deference to the views of the Creditors' Committee, the Equity Committee, the prepetition and postpetition lenders, their largest shareholders, and the U.S. Trustee.  The Debtors will, of course, continue to meet with

22

each of these constituencies to facilitate constructive and consensual negotiations going forward.

E.      The Debtors Are Paying Their Bills As They Come Due

43.      Courts considering an extension of exclusivity may also assess a debtor's liquidity and solvency.  See In re Ravenna Indus., 20 B.R. 886, 890 (Bankr. N.D. Ohio 1982).  The Debtors are paying their bills as they come due.

44.      In addition, the Debtors have sought approval of a new debtor-in-possession financing facility, which would refinance their $2.495 billion prepetition secured debt facilities and their current $2 billion debtor-in-possession financing facility. The Debtors entertained proposals to refinance their secured facilities in an effort to take advantage of favorable conditions in the capital markets and the positive momentum of their reorganization cases.  The result is the proposed refinancing, which will allow the Debtors to satisfy their working capital needs and continue to meet operating expenses on significantly more favorable terms than those contained in the Debtors' current financing facilities.  The refinancing proposal would result in decreased financing expenses of approximately $8 million per month, which would increase the Debtors' liquidity and enable the Debtors to continue to meet their obligations as they come due.

F.      The Debtors Have Shown Cause To Further Extend the Exclusive Periods

45.      As shown above, the Debtors have made significant and productive strides in these chapter 11 cases.  Based on this progress and all the other applicable factors, sufficient cause exists to extend the Exclusive Periods without prejudice to the Debtors' rights to seek a further extension. There is no harm in granting the requested extensions now because they will be without prejudice to the right of any party to request a

23

termination of exclusivity for cause at any time under section 1121(d) of the Bankruptcy Code.  Accordingly, the Debtors submit that the relief requested herein is in the best interests of the Debtors, their estates, and other parties-in-interest.

## Notice

46.    Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on March 20, 2006 (Docket No. 2883) ("Supplemental Case Management Order").  In addition, the Debtors have complied with the Supplemental Case Management Order with respect to the filing of this Motion.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

47.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order (i) extending the Debtors' exclusive periods to file and solicit acceptance of a plan of

reorganization through and including July 31, 2007 and September 30, 2007, respectively,

and (ii) granting the Debtors such other further relief as is just.

Dated:          New York, New York
                December 22, 2006

                          SKADDEN, ARPS, SLATE, MEAGHER
                          & FLOM LLP


                          By:    /s/ John Wm. Butler, Jr.
                                 John Wm. Butler, Jr. (JB 4711)
                                 George N. Panagakis (GP 0770)
                                 Ron E. Meisler (RM 3026)
                          333 West Wacker Drive, Suite 2100
                          Chicago, Illinois 60606
                          (312) 407-0700

                                       - and -


                          By:    /s/ Kayalyn A. Marafioti
                                 Kayalyn A. Marafioti (KM 9632)
                                 Thomas J. Matz (TM 5986)
                          Four Times Square
                          New York, New York 10036
                          (212) 735-3000

                          Attorneys for Delphi Corporation, et al.,
                            Debtors and Debtors-in-Possession