Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:   (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
    In re                             :    Chapter 11
                                      :
DELPHI CORPORATION, et al.,           :    Case No. 05-44481 (RDD)
                                      :
                          Debtors.    :    (Jointly Administered)
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328
AND FED. R. BANKR. P. 2014 EXPANDING THE SCOPE OF RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE DUE DILIGENCE SERVICES
NUNC PRO TUNC TO DECEMBER 15, 2006

("PWC SUPPLEMENTAL RETENTION APPLICATION")

Delphi Corporation ("Delphi"), debtor and debtor-in-possession in the above-captioned cases, hereby submits this supplemental retention application (this "PwC Supplemental Retention Application") for a supplemental order under 11 U.S.C. §§ 327(a) and 328 and Fed. R. Bankr. P. 2014 expanding the scope of its retention of PricewaterhouseCoopers LLP ("PwC"), nunc pro tunc to December 15, 2006.  Specifically, Delphi proposes to retain PwC to perform due diligence services for Delphi that will facilitate due diligence by plan investors working with the Company (as defined below) to facilitate its emergence from chapter 11.  In support of this PwC Supplemental Retention Application, Delphi submits the Supplemental Declaration Of Colin Wittmer, executed on December 29, 2006 (the "Wittmer Declaration"), and respectfully represents as follows:

Background

A.  The Chapter 11 Filings

1.  On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates (the "Affiliate Debtors" and together with Delphi, the "Debtors")[1], filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended and in effect on October 8, 2005 (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2.  No trustee or examiner has been appointed in the Debtors' cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the "Equity Committee").

---

[1] In addition to Delphi, the following entities are debtors in these related cases: ASEC Manufacturing General Partnership, ASEC Sales General Partnership, Aspire, Inc., Delco Electronics Overseas Corporation, Delphi Automotive Systems (Holding), Inc., Delphi Automotive Systems Global (Holding), Inc., Delphi Automotive Systems Human Resources LLC, Delphi Automotive Systems International, Inc., Delphi Automotive Systems Korea, Inc., Delphi Automotive Systems LLC, Delphi Automotive Systems Overseas Corporation, Delphi Automotive Systems Risk Management Corp., Delphi Automotive Systems Services LLC, Delphi Automotive Systems Tennessee, Inc., Delphi Automotive Systems Thailand, Inc., Delphi China LLC, Delphi Connection Systems, Delphi Diesel Systems Corp., Delphi Electronics (Holding) LLC, Delphi Foreign Sales Corporation, Delphi Integrated Service Solutions, Inc., Delphi International Holdings Corp., Delphi International Services, Inc., Delphi Liquidation Holding Company, Delphi LLC, Delphi Mechatronic Systems, Inc., Delphi Medical Systems Colorado Corporation, Delphi Medical Systems Corporation, Delphi Medical Systems Texas Corporation, Delphi NY Holdings Corporation, Delphi Services Holding Corporation, Delphi Technologies, Inc., DREAL, Inc., Environmental Catalysts, LLC, Exhaust Systems Corporation, Packard Hughes Interconnect Company, Specialty Electronics, Inc., and Specialty Electronics International Ltd.

2

3. This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4. The statutory predicates for the relief requested herein are sections 327(a) and 328 of the Bankruptcy Code and rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.   Current Business Operations Of The Debtors

5. Delphi and its subsidiaries and affiliates (collectively, the "Company") as of December 31, 2005 had global 2005 net sales of approximately $26.9 billion and global assets of approximately $17.0 billion.[2] At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

6. The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology. The Company supplies products to nearly every major global automotive original equipment manufacturer.

7. Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM"). Prior to January 1, 1999, GM conducted the Company's

---

[2] The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates.

3

business through various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM. In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28. billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

10. In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.  The Debtors' Transformation Plan

11. On March 31, 2006, the Company outlined the key tenets of its transformation plan. The Company believes that this plan will enable it to return to stable, profitable business operations and allow the Debtors to emerge from these chapter 11 cases in the first half of 2007. To complete their restructuring process, the Debtors must focus on five key areas. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint. Finally, the Debtors must devise a workable solution to their current pension situation.

12. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

### Relief Requested

13. Delphi respectfully requests the entry of a supplemental order under sections 327(a) and 328 of the Bankruptcy Code expanding the scope of its retention of PwC nunc pro tunc to December 15, 2006 for PwC to provide due diligence services to the Company on the terms and conditions of that certain Master Professional Services Agreement dated as of March 17, 2006 (the "Master Agreement"), a copy of which is attached as Exhibit 1 to the Wittmer Declaration, and the Statement of Work For Transaction Services dated as of December 15, 2006 (the "Transaction Services Statement Of Work"), a form of which is attached as Exhibit 2 to the Wittmer Declaration, nunc pro tunc to December 15, 2006.

### Overview Of Delphi's Retention Of PwC

14. On June 5, 2006, the Debtors filed an application (Docket No. 4028) (the "Initial PwC Application") to employ PwC to provide assistance to Delphi in complying with the provisions of the Sarbanes-Oxley Act of 2002 including, but not limited to, section 404 of the Sarbanes-Oxley Act, as well as to provide certain compliance, tax and financial planning, and other general tax consulting services to the Debtors in these chapter 11 cases on the terms and conditions of the Master Agreement and applicable statements of work (the "Statements Of Work") between PwC and the Debtors.

15. On June 21, 2006, this Court approved the Initial PwC Application and entered the Order Under 11 U.S.C. §§ 327(a) And 328 Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of PricewaterhouseCoopers LLP To Provide Certain Sarbanes-

Oxley Compliance, Tax And Financial Planning, And Other General Tax Consulting Services To Debtors <u>Nunc</u> <u>Pro</u> <u>Tunc</u> to January 1, 2006 (Docket No. 4310) (the "Initial PwC Retention Order").  The Initial PwC Retention Order authorized the Debtors to enter into additional Statements Of Work with PwC for the provision of additional services under the Master Agreement and the Initial PwC Application, <u>provided</u>, <u>however</u>, that if PwC sought to perform services which were not covered by the Master Agreement and the Initial PwC Application, the Debtors would be required to file a supplemental application seeking court approval for the performance of such additional services.  The services described in this PwC Supplemental Retention Application and the Transaction Services Statement Of Work are not covered under the Master Agreement and the Initial PwC Application.  Accordingly, Delphi submits this PwC Supplemental Retention Application.

        16.    Delphi seeks to employ PwC to help facilitate its plan of reorganization diligence process.  As more fully described below, PwC's work under the terms of the Transaction Services Statement Of Work should facilitate plan investors' diligence process.  PwC has been providing such services to Delphi since December 15, 2006.

Services To Be Rendered

        17.    The work that PwC will perform under the terms of the Transaction Services Statement Of Work will include, but will not be limited to, holding discussions with certain officers, employees, and outside consultants of Delphi, performing financial analysis of the historical results and trends of Delphi, commenting on projected financial information prepared by management, and performing certain other procedures, as described in more detail below.  Throughout this project, PwC will provide Delphi with oral reports, various outlines, executive summaries, analytical schedules, and similar work product, as requested.

Responsibilities And Limitations

18. The Master Agreement and the Transaction Services Statement Of Work provide for various responsibilities and limitations of the expanded retention which are summarized below:[4]

    (a) <u>Limitations Regarding Information Provided By Delphi</u>. PwC assumes no responsibility and makes no representations with respect to the accuracy or completeness of information provided by Delphi. Moreover, PwC's work cannot provide assurance that matters of significance to the financial information or to Delphi's plan of reorganization process will be disclosed and that a plan investor's due diligence will not identify significant matters not previously identified by PwC or management of Delphi.

    (b) <u>Responsibilities Of Delphi</u>. It is Delphi's responsibility to determine the adequacy of the work to be performed for its purposes. Also, it is understood that it is Delphi's right and responsibility to (1) designate a management-level individual or individuals to be responsible for overseeing the services being provided, (2) evaluate the adequacy of the services performed and any findings that result, (3) make all management decisions and perform all management functions, including accepting responsibility for the results of the services to be rendered by PwC, and (4) determine exclusively the scope of work (as described further below) included in Exhibit I to the Transaction Services Statement Of Work. Delphi is solely responsible for all information provided to plan investors.

    (c) <u>Limitation Of Liability</u>.

        (i) The Transaction Services Statement Of Work is between Delphi and PwC only. In the course of providing services under the Transaction Services Statement Of Work, PwC, in its discretion, may draw on the resources of other firms affiliated with PwC. Provision of services, however, remains PwC's responsibility alone and Delphi agrees that no other firm affiliated with PwC, nor the partners,

---

[4] The discussion of the Master Agreement and the Transaction Services Statement Of Work contained herein is a summary only. In the event of any inconsistency between this summary and either the Master Agreement or the Transaction Services Statement Of Work, the terms of the Master Agreement or the Transaction Services Statement Of Work, as the case may be, control.

8

        principals, or employees of PwC or other firms affiliated with PwC who perform work in connection with the Transaction Services Statement of Work, will have any liability to Delphi in connection with the Master Agreement or the Transaction Services Statement Of Work or services provided thereunder.  Delphi therefore agrees that it will not bring any claim under the Master Agreement or Transaction Services Statement Of Work against PwC or any affiliated firm relating to the services provided thereunder, except where such claim cannot be excluded by law.

     (ii)    Delphi agrees to release PwC from any and all claims, liabilities, costs, and expenses attributable to any knowing misrepresentation by Delphi or Delphi management.

     (iii)    Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence, or other tort committed by PwC, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to PwC for services provided under the Transaction Services Statement of Work.

    (d)    <u>Termination</u>.  The Master Agreement provides that either PwC or Delphi may terminate it or any Statement Of Work if a material breach of the Master Agreement is not cured within 30 days after receipt of written notice of such breach.  In addition, Delphi may terminate the Master Agreement or any Statement Of Work for convenience at any time upon 30 days' prior written notice.  If Delphi terminates the Master Agreement or any Statement Of Work for any other reason or if PwC terminates for a material breach by Delphi, then Delphi will be responsible for fees and expenses incurred through the actual date of termination.

<u>Procedures To Be Followed By PwC</u>

19.    Subject to a work plan to be authorized by Delphi, PwC will perform certain due diligence procedures covering the general areas outlined below and more fully set forth in the Transaction Services Statement Of Work and Exhibit I thereto:

    (a)    Obtain an understanding of the Company's accounting policies and how those policies impact reported results.  Assess the overall

9

    adequacy of the Company's compliance with Sarbanes-Oxley rules and reporting responsibilities.

 (b) Obtain an understanding of the status of significant "investigations" into the Company's financial reporting and the Company's current estimate, if any, of the range of the potential effects to its reported earnings.

 (c) Understand significant joint-venture agreements and how their accounting treatment impacts reported EBITDA and cash flow.

 (d) Summarize the key financial aspects of transactions and agreements/arrangements between the Company and General Motors.

 (e) Perform appropriate due diligence procedures on the following subject areas pursuant to a work plan to be authorized by Delphi:

  (i) Quality Of Earnings/Cash Flow (performed for each operating division as appropriate);

  (ii) Operating Division Analysis And Corporate Headquarters (performed for each operating division as appropriate);

  (iii) 2007 To 2012 Business Plan (performed for each operating division as appropriate);

  (iv) Balance Sheet;

  (v) Tax Due Diligence; and

  (vi) Employee Benefits Due Diligence

20. Subject to this Court's approval of the PwC Supplemental Retention Application, PwC is willing to perform the services described in the Transaction Services Statement Of Work on the terms set forth therein and in the Master Agreement.

<u>Disinterestedness Of Professionals</u>

21. The Declaration of Brian D. Decker executed on June 5, 2006 (Docket No. 4028) (the "Original Declaration"), filed in support of the Initial PwC Application, and the Wittmer Declaration (together with the Original Declaration, the "PwC Declarations"), filed in

10

support of this PwC Supplemental Retention Application, contain information available as of the date hereof with respect to PwC's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a). Based on the information set forth in the PwC Declarations, Delphi submits that PwC and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

22. Moreover, the Transaction Services Statement Of Work provides that the PwC team assigned to this engagement will not have access to the team members, working papers, or reports of any other PwC engagements in these chapter 11 cases without Delphi's prior consent.

Professional Compensation

23. Consistent with the Master Agreement and the Transaction Services Statement Of Work and as described in the Wittmer Declaration, Delphi has agreed to compensate PwC reasonable sums in accordance with the normal rates charged by PwC for the services provided. In addition, as set forth in the Master Agreement, PwC will bill Delphi for pre-approved and reasonable out of pocket and travel expenses according to the guidelines set forth in Exhibit A to the Master Agreement (Delphi Travel and Expense Reimbursement Policy For Contractors).[5] As stated in the Wittmer Declaration, PwC estimates that its fees for this engagement will range from $3.5 million to $5.5 million. If, during the course of PwC's work pursuant to the Transaction Services Statement Of Work, it appears that PwC's fee will exceed this estimate, PwC will advise Delphi immediately and will not undertake additional work

---

[5] Pursuant to the Master Agreement, included in travel expenses will be PwC internal ticket charges for booking travel (as agreed from time to time between PwC and Delphi). The internal per ticket charge is an allocation of estimated costs of running PwC's travel department in a manner to maximize cost savings.

11

without Delphi's prior approval. This estimate is based upon PwC's hourly rates for the individuals to be assigned to this engagement. The agreed upon range of rates are:

| | |
|---|---|
| Partner & Managing Director | $775 to $900 |
| Director | $515 to $600 |
| Manager | $390 to $450 |
| Senior | $325 to $375 |
| Associate | $290 to $325 |
| Administration | $100 to $150 |

These rates are PwC's normal and customary rates for the type of services to be provided. Delphi is advised that these rates are subject to change but that any changes will remain in line with market rates for comparable services.

24. In the event that this Court approves Delphi's retention of PwC, (a) PwC's fees and expenses will be subject to (i) the jurisdiction and approval of this Court with regard to PwC's retention, (ii) the Interim Compensation Order (Docket No. 869), the Supplemental Interim Compensation Order (Docket No. 2747), the Second Supplemental Interim Compensation Order (Docket No. 2986), the Third Supplemental Interim Compensation Order (Docket No. 3630), the Fourth Supplemental Interim Compensation Order (Docket No. 4545), the Fifth Supplemental Interim Compensation Order (Docket No. 5310), and the Sixth Supplemental Interim Compensation Order (Docket No. 6145) (collectively, the "Interim Compensation Orders") and any amendments thereto, and (iii) any requirements governing interim and final fee applications as set forth in the Interim Compensation Orders and (b) Delphi will pay all fees and expenses of PwC under the Transaction Services Statement Of Work as promptly as practicable in accordance with the terms thereof, the Interim Compensation Orders, as may be amended, and any other orders of this Court governing interim and final fee applications, and after obtaining all necessary further approvals from this Court, if any.

25.     PwC will continue to file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code, any applicable Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"), the guidelines established by the Office of the United States Trustee, and further orders of this Court.

Dispute Resolution Procedures

26.     As set forth in the Transaction Services Statement Of Work, Delphi and PwC have agreed, subject to this Court's approval of this PwC Supplemental Retention Application, that: (a) any controversy or claim with respect to, in connection with, arising out of, or in any way related to this PwC Supplemental Retention Application or the Transaction Services Statement Of Work or the services provided by PwC to Delphi as outlined in this PwC Supplemental Retention Application or the Transaction Services Statement Of Work, including any matter involving a successor in interest or agent of any of Delphi or of PwC, will be brought in this Court or the United States District Court for the Southern District of New York if such District Court withdraws the reference, (b) PwC and Delphi and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have or retain jurisdiction over such claims or controversies) for the resolution of such claims, causes of actions or lawsuits, (c) PwC and Delphi, and any and all successors and assigns thereof, waive trial by jury, such waiver being informed and freely made, (d) if this Court, or the District Court if the reference is withdrawn, does not have or retain jurisdiction over the foregoing claims and controversies, PwC and Delphi, and any and all successors and assigns thereof, will submit first to non-binding mediation; and, if mediation is

not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit III to the Transaction Services Statement Of Work, and (e) judgment on any arbitration award may be entered in any court having proper jurisdiction.

27.   PwC has agreed, as set forth in the Transaction Services Statement Of Work, not to raise or assert any defense based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of this Court or the United States District Court for the Southern District of New York (if such District Court withdraws the reference) to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to this PwC Supplemental Retention Application or the services provided hereunder.

### Conclusion

28.   For the foregoing reasons, Delphi submits that the relief requested herein is in the best interests of Delphi and its estates and stakeholders and should be approved.

### Notice

29.   Notice of this PwC Supplemental Retention Application has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, Delphi submits that no other or further notice is necessary.

### Memorandum Of Law

30.   Because the legal points and authorities upon which this PwC Supplemental Retention Application relies are incorporated herein, Delphi respectfully requests that the

14

requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

WHEREFORE, Delphi respectfully requests that this Court enter a supplemental order (a) authorizing the expansion of the scope of retention of PwC to perform the services set forth in the Transaction Services Statement Of Work nunc pro tunc to December 15, 2006 and (b) granting Delphi such other and further relief as is just.

Dated:    December 29, 2006

DELPHI CORPORATION, as Debtor and Debtor-in-possession

By:  /s/ John D. Sheehan  
Name: John D. Sheehan  
Title:  Vice President and Chief Restructuring Officer