UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SUPPLEMENTAL DECLARATION AND STATEMENT OF COLIN WITTMER
UNDER FED. R. BANKR. P. 2014 IN SUPPORT OF SUPPLEMENTAL
APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a) AND 328 AND
FED. R. BANKR. P. 2014 EXPANDING THE SCOPE OF RETENTION OF
PRICEWATERHOUSECOOPERS LLP TO PROVIDE DUE DILIGENCE
SERVICES NUNC PRO TUNC TO DECEMBER 15, 2006

Colin Wittmer, under penalty of perjury, declares and says:

1.    I am a Certified Public Accountant and a partner of

PricewaterhouseCoopers LLP ("PwC"), a professional services firm.  I am authorized to

execute this declaration (this "Declaration") on behalf of PwC.

2.    I submit this Declaration under sections 327(a) and 328 of title 11 of

the United States Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8,

2005 (the "Bankruptcy Code") and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") in support of the Supplemental Application For

Order Under 11 U.S.C. §§ 327(a) And 328 And Fed. R. Bankr. P. 2014 Expanding The

Scope Of Retention Of PricewaterhouseCoopers LLP To Provide Due Diligence Services

Nunc Pro Tunc To December 15, 2006 (the "PwC Supplemental Retention Application"),

filed contemporaneously herewith by Delphi Corporation ("Delphi"), debtor and debtor-

in-possession in the above-captioned cases.  The PwC Supplemental Retention

Application requests entry of an order authorizing Delphi to expand the scope of its

retention of PwC to perform due diligence services for Delphi that will facilitate due
diligence by plan investors working with Delphi to facilitate its emergence from chapter
11.  These services will be provided on the terms and conditions of that certain Master
Professional Services Agreement dated as of March 17, 2006 (the "Master Agreement"),
a copy of which is attached hereto as <u>Exhibit 1</u>, and the Statement of Work For
Transaction Services dated as of December 15, 2006 (the "Transaction Services
Statement Of Work"), a form of which is attached hereto as <u>Exhibit 2</u>, <u>nunc</u> <u>pro</u> <u>tunc</u> to
December 15, 2006.  Except as otherwise indicated, I have personal knowledge of the
matters set forth herein and if called as a witness, would testify competently thereto.

<u>Delphi's Retention Of PwC</u>

3.    On June 5, 2006, the Debtors filed an application (Docket No. 4028)
(the "Initial PwC Application") to employ PwC to provide assistance to the Debtors in
complying with the provisions of the Sarbanes-Oxley Act of 2002 including, but not
limited to, section 404 of the Sarbanes-Oxley Act, as well as to provide certain
compliance, tax and financial planning, and other general tax consulting services to the
Debtors in these chapter 11 cases on the terms and conditions of the Master Professional
Services Agreement dated as of March 17, 2006 (the "Master Agreement") and applicable
statements of work (the "Statements Of Work") between PwC and the Debtors.

4.    On June 21, 2006, this Court approved the Initial PwC Application
and entered the Order Under 11 U.S.C. §§ 327(a) And 328 Fed. R. Bankr. P. 2014
Authorizing Employment And Retention Of PricewaterhouseCoopers LLP To Provide
Certain Sarbanes-Oxley Compliance, Tax And Financial Planning, And Other General
Tax Consulting Services To Debtors <u>Nunc</u> <u>Pro</u> <u>Tunc</u> to January 1, 2006 (Docket No.

2

4310) (the "Initial PwC Retention Order").  The Initial PwC Retention Order authorized

the Debtors to enter into additional Statements Of Work with PwC for the provision of

additional services under the Master Agreement and the Initial PwC Application,

provided, however, that if PwC sought to perform services which were not covered by the

Master Agreement and the Initial PwC Application, the Debtors would be required to file

a supplemental application seeking court approval for the performance of such additional

services.

Transaction Services Statement Of Work

5.    The work that PwC will perform under the terms of the Transaction

Services Statement Of Work will include, but will not be limited to, holding discussions

with certain officers, employees, and outside consultants of Delphi, performing financial

analysis of the historical results and trends of Delphi, commenting on projected financial

information prepared by management, and performing certain other procedures, as

described in more detail below.  Throughout this project, PwC will provide Delphi with

verbal reports, various outlines, executive summaries, analytical schedules, and similar

work product, as requested.

6.    It is my understanding that, subject to the execution of a non-

disclosure agreement and satisfaction of certain conditions set forth in the Transaction

Services Statement Of Work,  Delphi may make PwC's work product available to plan

investors.

7.    Subject to a work plan to be authorized by Delphi, PwC will perform

certain due diligence procedures covering the general areas outlined below and a more

fully set forth in the Transaction Services Statement Of Work and Exhibit I thereto:

3

(a)     Obtain an understanding of the Company's accounting policies and how those policies impact reported results. Assess the overall adequacy of the Company's compliance with Sarbanes-Oxley rules and reporting responsibilities.

(b)     Obtain an understanding of the status of significant "investigations" into the Company's financial reporting and the Company's current estimate, if any, of the range of the potential effects to its reported earnings.

(c)     Understand significant joint-venture agreements and how their accounting treatment impacts reported EBITDA and cash flow.

(d)     Summarize the key financial aspects of transactions and agreements/arrangements between the Company and General Motors.

(e)     Perform appropriate due diligence procedures on the following subject areas pursuant to a work plan to be authorized by Delphi:

(i)      Quality Of Earnings/Cash Flow (performed for each operating division as appropriate);

(ii)     Operating Division Analysis And Corporate Headquarters (performed for each operating division as appropriate);

(iii)    2007 To 2012 Business Plan (performed for each operating division as appropriate);

(iv)     Balance Sheet;

(v)      Tax Due Diligence; and

(vi)     Employee Benefits Due Diligence

8.     Subject to this Court's approval of the PwC Supplemental Retention Application, PwC is willing to perform the services described in the Transaction Services Statement Of Work on the terms set forth therein and in the Master Agreement.

4

<u>Dispute Resolution Procedures</u>

9.    As set forth in the Transaction Services Statement Of Work, Delphi and PwC have agreed, subject to this Court's approval of the PwC Supplemental Retention Application, that:  (a) any controversy or claim with respect to, in connection with, arising out of, or in any way related to the PwC Supplemental Retention Application or the Transaction Services Statement Of Work or the services provided by PwC to Delphi as outlined in the PwC Supplemental Retention Application or the Transaction Services Statement Of Work, including any matter involving a successor in interest or agent of any of Delphi or of PwC, shall be brought in this Court or the United States District Court for the Southern District of New York if such District Court withdraws the reference, (b) PwC and Delphi and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have or retain jurisdiction over such claims or controversies) for the resolution of such claims, causes of actions or lawsuits, (c) PwC and Delphi, and any and all successors and assigns thereof, waive trial by jury, such waiver being informed and freely made, (d) if this Court, or the District Court if the reference is withdrawn, does not have or retain jurisdiction over the foregoing claims and controversies, PwC and Delphi, and any and all successors and assigns thereof, will submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit III to the Transaction Services Statement Of Work, and (e) judgment on any arbitration award may be entered in any court having proper jurisdiction.

10.    As set forth in the Transaction Services Statement Of Work, PwC has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of this Court or the United States District Court for the Southern District of New York (if such District Court withdraws the reference) to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to the PwC Supplemental Retention Application or the services provided thereunder.

<u>Disinterestedness Of Professionals</u>

11.    The Declaration of Brian D. Decker executed on June 5, 2006 (Docket No. 4028) (the "Original Declaration"), filed in support of the Initial PwC Application and this Declaration (together with the Original Declaration, the "PwC Declarations") filed in support of the PwC Supplemental Retention Application contain information on PwC's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  PwC maintains procedures on an ongoing basis to evaluate its connections with parties-in-interest in the Debtors' chapter 11 cases (the "Conflicts Procedures").  Based on the information set forth in the PwC Declarations and the Conflicts Procedures, PwC and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

12.    PwC's identification of material relationships is ongoing.  If and when additional information becomes available with respect to any other relationships which may exist between PwC and the Debtors, creditors, or any other parties-in-interest

which may affect these chapter 11 cases, supplemental declarations describing such

information will be filed with this Court.

13.    Moreover, the Transaction Services Statement Of Work provides

that the PwC team assigned to this engagement will not have access to the team members,

working papers, or reports of any other PwC engagements in these chapter 11 cases

without Delphi's prior consent.

Professional Compensation

14.    Consistent with the Master Agreement and the Transaction Services

Statement Of Work and as described in this Declaration, Delphi has agreed to

compensate PwC reasonable sums in accordance with the normal rates charged by PwC

for the services provided. In addition, as set forth in the Master Agreement, PwC will bill

Delphi for pre-approved and reasonable out of pocket and travel expenses according to

the guidelines set forth in Exhibit A to the Master Agreement (Delphi Travel and

Expense Reimbursement Policy For Contractors). [1]    PwC estimates that its fees for this

engagement will range from $3.5 million to $5.5 million.  If, during the course of PwC's

work pursuant to the Transaction Services Statement Of Work, it appears that PwC's fee

will exceed this estimate, PwC will advise Delphi immediately and will not undertake

additional work without Delphi's prior approval.  This estimate is based upon PwC's

hourly rates for the individuals to be assigned to this engagement.  The agreed upon rates

are:

---

[1]    Pursuant to the Master Agreement, included in travel expenses will be PwC internal ticket charges for booking travel (as agreed from time to time between PwC and Delphi).  The internal per ticket charge is an allocation of estimated costs of running PwC's travel department in a manner to maximize cost savings.

| | |
|---|---|
| Partner & Managing Director | $775 to $900 |
| Director | $515 to $600 |
| Manager | $390 to $450 |
| Senior | $325 to $375 |
| Associate | $290 to $325 |
| Administration | $100 to $150 |

These rates are PwC's normal and customary rates for the type of services to be provided. These rates are subject to change but that any changes will remain in line with market rates for comparable services.

15.    In the event that this Court approves the expanded scope of Delphi's retention of PwC, (a) PwC's fees and expenses under the Transaction Services Statement Of Work will be subject to (i) the jurisdiction and approval of this Court with regard to PwC's retention, (ii) the Interim Compensation Order (Docket No. 869), the Supplemental Interim Compensation Order (Docket No. 2747), the Second Supplemental Interim Compensation Order (Docket No. 2986), the Third Supplemental Interim Compensation Order (Docket No. 3630), the Fourth Supplemental Interim Compensation Order (Docket No. 4545), the Fifth Supplemental Interim Compensation Order (Docket No. 5310), and the Sixth Supplemental Interim Compensation Order (Docket No. 6145) (collectively, the "Interim Compensation Orders") and any amendments thereto, and (iii) any requirements governing interim and final fee applications as set forth in the Interim Compensation Orders and (b) Delphi will pay all fees and expenses of PwC under the Transaction Services Statement Of Work as promptly as practicable in accordance with the terms thereof, the Interim Compensation Orders, as may be amended, and any other orders of this Court governing interim and final fee applications, and after obtaining all necessary further approvals from this Court, if any.

16.    PwC will continue to file fee applications for interim and final allowance of compensation and reimbursement of expenses pursuant to the procedures set forth in sections 330 and 331 of title 11 of the Bankruptcy Code, any applicable Bankruptcy Rules, the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York, the guidelines established by the Office of the United States Trustee, and further orders of this Court.

17.    This declaration is provided in accordance with section 327 of the Bankruptcy Code and Bankruptcy Rule 2014.

18.    Pursuant to section 1746 of title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 29th day of December, 2006, in New York, New York.


  /s/ Colin Wittmer
Colin Wittmer
Partner

<u>EXHIBIT 1</u>

Master Professional Services Agreement dated as of March 17, 2006

# MASTER PROFESSIONAL SERVICES AGREEMENT

This is a MASTER PROFESSIONAL SERVICES AGREEMENT, dated as of March 17, 2006 (this "Agreement"), between PricewaterhouseCoopers LLP, a Delaware limited liability partnership ("PwC"), and Delphi Corporation, a Delaware corporation ("Client"), each a Party, and together Parties, to this Agreement.

## Background

PwC and Client desire to establish a contract pursuant to which Client may, from time to time, obtain from PwC, and PwC may provide to Client, certain professional Services (as defined in Section 1(a)), all on the terms and subject to the conditions set forth in this Agreement and in the applicable statement of work ("SOW").

## Terms and Conditions

In consideration of the premises and of the mutual covenants and agreements contained herein, and intending to be legally bound, the Parties hereby agree as follows:

1.    Services.

    (a)    This Agreement establishes the standard terms and conditions pursuant to which PwC may provide to Client certain professional services (the "Services"), as may be performed or agreed upon from time to time in writing in an SOW. Notwithstanding any provision to the contrary contained herein, audit, attest and other assurance services are not within the definition of "Services" and such engagements are not covered by this Agreement. An executed SOW, attached and incorporated into a Client purchase order, may expressly identify and amend terms and conditions in this Agreement, or list special terms and conditions, effective for that SOW only. Unless modified by provisions contained in an SOW, the terms and conditions in this Agreement are incorporated into and made part of each SOW. To the extent of any express conflict or inconsistency between the terms and conditions of an SOW and the terms and conditions of this Agreement, the terms and conditions of the SOW will control.

    (b)    An SOW shall contain the following, as applicable: (i) the term or period of time during which PwC will perform the Services, provide resources or otherwise perform its obligations as specified in the SOW; (ii) a description of the obligations of, and Services to be performed by, PwC; (iii) a description of Client's responsibilities related to the SOW, including any facilities, equipment, personnel and tasks or other support to be provided or performed by Client; (iv) PwC's fees and expenses under the SOW, or, if applicable, the basis on which such fees and expenses will be computed; (v) any provision limiting the liability of either Party other than, or in addition to, those provision set forth herein, and (vi) any other terms and conditions

1

appropriate to the Services to be performed and the obligations of the Parties under that SOW. Forms of Statements of Work are attached hereto as Attachment A.

2.    Term.

The term of this Agreement shall commence as of October 8, 2005, and shall continue until March 31, 2007, whereupon Client and PwC may agree to extend the Agreement for successive one (1) year periods. Each SOW shall become effective as of the date of the commencement of the Services or, if earlier, the date of execution of such SOW. Each SOW executed by the Parties prior to the effective date of a termination (as provided for in Section 7) shall remain in full force and effect in accordance with its terms, including the terms and conditions of this Agreement. If PwC commenced the performance of the Services prior to the execution of this Agreement, this Agreement shall be effective as of the commencement of such Services and shall cover such Services, unless the performance of such Services are governed by an existing executed agreement. The Parties agree that any such existing executed agreements shall be converted to SOWs within ninety (90) days of the execution of this Agreement, unless the services under such existing executed agreements have been completed by such date.

3.    Fees, Expenses and Taxes.

(a)    In addition to professional fees outlined in the applicable SOW, PwC will also bill Client for pre-approved, reasonable out-of-pocket and travel expenses according to the guidelines set forth in Exhibit A: Delphi Travel and Expense Reimbursement Policy for Contractors; provided, however, that instead of submitting all expenses on Delphi expense vouchers, PwC shall account for such expenses within PwC's normal expense reimbursement system. Included in travel expenses shall be PwC internal per ticket charges for booking travel (as agreed from time to time between PwC and Delphi). The internal per ticket charge is an allocation of estimated costs of running PwC's travel department in a manner to maximize cost savings. PwC shall provide Client with a summary of such expenses and Client shall have the right to audit such expenses.

(b)    Client shall pay for all taxes, other than withholding taxes and taxes based on or measured by PwC's or PwC's personnel's net income, including any interest and penalties from any related deficiency if due to an act by Client and not that of PwC, in connection with this Agreement, including any sales, use, excise, value-added, services, consumption, and other taxes and duties assessed on the provision of Services by PwC to Client or on PwC's charges to Client under this Agreement including the reimbursement of expenses, so long as such taxes are listed in the applicable SOW. The parties shall cooperate in good faith to minimize such tax liabilities to the extent legally permissible.

2

4.    Invoices.

Unless otherwise provided in an SOW, PwC will submit an invoice to Client at the end of every
month for all hours of service provided to Client by PwC, together with all expenses incurred by
PwC, during the preceding month period.  The invoices shall be in the form and contain all
information required by the rules and procedures of the United States Bankruptcy Court for the
Southern District of New York.  Each such invoice shall be due and payable pursuant to Client's
Multilateral Netting System ("MNS-2"), which provides, on average, that payment shall be on
the second day of the second month following the date of the invoice, recognizing that the rules
and procedures of the United States Bankruptcy Court for the Southern District of New York
will apply.  In no event shall Client pay Supplier interest or other late charges on any fees due
under this Agreement.

5.    Client Responsibilities.

    (a)    Client shall provide PwC with all information relevant to the Services and any
reasonable assistance as may be required to properly perform the Services.  Unless otherwise
indicated, Client represents and warrants to PwC that all such information will be accurate and
complete in all material respects, to the best of Client's knowledge.  The overall definition and
scope of the work to be performed, and the adequacy of such definition and scope in addressing
Client's needs, is Client's responsibility.  Client shall perform all management functions and
make all management decisions in connection with the Services, and shall assign competent
individuals to oversee the Services.  Client is also responsible for the implementation of actions
identified in the course of this engagement and results achieved from using any Services or
Deliverables as defined in Section 6(a) below.

    (b)    Each Party shall use commercially reasonable procedures to check for the then
most commonly known viruses and to check the integrity of data before sending information to
the other electronically, but each Party recognizes that such procedures cannot be a guarantee
that transmissions will be virus free.  It remains the responsibility of the Party receiving an
electronic communication from the other to carry out a virus check on any attachments before
launching any documents whether received on disk or otherwise.

    (c)    Neither Party shall be responsible for any delay, cost increase or other
consequences due to the other Party's failure to perform any of its obligations under this
Agreement or an SOW or otherwise due to factors beyond its reasonable control.  Each Party
will use commercially reasonable efforts to mitigate such costs or expenses.  Any PwC deadline
that is affected by any Client default shall be extended by a reasonable amount of time provided
that PwC has provided timely communication to Client.

6.    Deliverables.

    (a)    Ownership.  PwC shall own any general skills, know-how, expertise,
ideas, concepts, methods, techniques, processes, software, materials or other intellectual property
or information which may have been discovered, created, developed or derived by PwC either
prior to or as a result of its provision of Services under this Agreement ("PwC Materials").
Subject to the restrictions in this Agreement, Client will own all tangible written material

3

originally prepared expressly for Client and delivered to Client under this Agreement (the "Deliverables"), excluding any PwC Materials contained or embodied therein. PwC's working papers and PwC's Confidential Information (as defined in Section 9(a)) belong exclusively to PwC; provided, however, PwC shall provide a copy of such working papers to Client after consultation and agreement with Client. Client will have a non-exclusive, non-transferable license to use PwC Materials for Client's own internal use and only for the purposes for which they are delivered to the extent that they form part of the Deliverables.

(b)    Use of Deliverables.    Except as otherwise expressly stated in the applicable SOW, all Deliverables are solely for Client's internal use and benefit. Client shall not authorize any third party ("Third Party") to rely upon any of the Deliverables except as set forth in an SOW or, if not set forth in an SOW, without PwC's prior written consent. Except that Deliverables may be disclosed to (i) taxing authorities, (ii) an accounting firm providing attest services to Client (solely to the extent necessary for the performance of such attest services), and (iii) as set forth in this Section 9(b) or (iv) as set forth in an SOW; Client shall not distribute to, discuss with, or otherwise disclose the Deliverables to any Third Party without PwC's prior written consent. Oral or preliminary information, drafts or advice given by PwC may not be relied upon or attributed to PwC unless PwC specifically confirms such information or advice or otherwise reduces such draft to a final writing.

7.    Termination.

(a)    Either Party may terminate this Agreement or any SOW under this Agreement in the event of a material breach of this Agreement that is not cured within thirty (30) days after receipt of written notice of such breach. Unless otherwise provided in the applicable SOW, Client may terminate this Agreement or any SOW for convenience at any time upon thirty (30) days prior written notice. In the event of Client termination for breach by PwC, Client shall be responsible for fees earned and expenses incurred only up to the date of written notice to PwC of the breach. In the event of other termination by Client or termination by PwC for breach by Client, Client will be responsible for fees earned and expenses incurred through the actual date of termination. In the event of termination by mutual agreement, the Parties shall jointly determine the fees due or to be refunded.

(b)    PwC may also resign from performing all or any portion of the Services and terminating this Agreement and/or any Schedule immediately upon written notice in the event that circumstances arise that would make continuation of all or any portion of the Services by PwC in conflict with any independence or other professional regulations, standards or guidelines to which PwC conforms. If Client is or becomes an SEC registrant audit client of PwC and the Services performed and/or Deliverables provided under a particular SOW will be relied upon by the PwC audit team, the limitation of liability and Client's obligation to indemnify under this Agreement will not apply to such Services and/or Deliverables.

8.    Warranty.

PwC warrants that it has the requisite power and authority to enter into and perform its obligations under this Agreement and each SOW. PwC further warrants that the Services will be

4

performed by qualified personnel. PwC warrants that it will provide its non-tax related Services in a manner consistent with the terms and conditions of this Agreement and in accordance with the applicable Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA") as well as any applicable standards (as agreed to between the Parties) of the Public Company Accounting Oversight Board ("PCAOB"). PwC warrants that it will provide its tax services in a manner consistent with the terms and conditions of this Agreement and in accordance with the AICPA Statements on Standards for Tax Services and any applicable standards (as agreed to between the Parties) of the PCAOB. THE WARRANTIES IN THIS SECTION 8 AS WELL AS ANY EXPRESS WARRANTY IN ANY APPLICABLE SOW (BUT ONLY IF EXPRESSLY IDENTIFIED AS A "WARRANTY" IN SUCH SOW) ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OR WHETHER ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR PROFESSION OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.    Confidentiality.

(a)    All data relating specifically to a Party's business and any other information which reasonably should be understood to be confidential in nature are confidential information of such Party. PwC's proprietary software, tools, methodologies, techniques, ideas, discoveries, inventions, know-how and any other information which reasonably should be understood to be confidential to PwC are confidential information of PwC. Client confidential information and PwC confidential information are collectively referred to as "Confidential Information." Each Party shall use Confidential Information of the other Party only in furtherance of the purposes of this Agreement and shall not disclose such Confidential Information to any third party without the other Party's prior written consent. Each Party agrees to take reasonable measures to protect the confidentiality of the other Party's Confidential Information and to advise its employees of the confidential nature of the Confidential Information and of the confidentiality provisions and use prohibitions herein.

(b)    Notwithstanding any terms or conditions in this Agreement to the contrary, no conditions of confidentiality within the meaning of Internal Revenue Code §6111(d) or U.S. Treasury regulations §1.6011-4 are intended, and Client (and each employee, representative, or other agent of Client) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of any transaction and all materials of any kind (including opinions or other tax analysis) that are provided to the Client relating to such tax treatment and tax structure, subject to the limitations set forth in the following sentence. In the event that a Deliverable includes discussion of such tax treatment or tax structure, disclosure of the Deliverable will be limited solely to the section or sections discussing the tax treatment or tax structure; all other information in the Deliverable unrelated to the tax treatment or tax structure remains subject to the restrictions set forth in Section 9(a) and all references to "PwC" or "PricewaterhouseCoopers" and all branding and other identifiers of PwC shall be redacted from the tax treatment and tax structure portions of such Deliverable, and/or shall otherwise not be distributed to any other third party, except as may be expressly provided for in this Agreement.

5

This Section 9(b)) is effective as of the commencement of any discussions the Parties may have had regarding any transaction related to any Services.

(c)    Notwithstanding anything to the contrary contained in this Agreement, neither Party shall be obligated to treat as confidential any information disclosed by the other Party (the "Disclosing Party") which: (i) is rightfully known to the recipient prior to its disclosure by the Disclosing Party except that which was disclosed under a prior confidentiality agreement between the Parties; (ii) is released by the Disclosing Party to any other person or entity (including governmental agencies) without restriction; (iii) is independently developed by the recipient without any use of or reliance on Confidential Information; or (iv) is or later becomes publicly available without violation of this Agreement or may be lawfully obtained by a Party from any nonparty. Notwithstanding the foregoing, either Party may disclose Confidential Information of the other to a third party as may be required by law, statute, rule or regulation, including any subpoena or other similar form of process, or by the standards of the AICPA or other professional self-regulatory authority, provided that (and without breaching any legal or regulatory requirement) the Party to which the request is made provides the other Party with prompt written notice thereof and, if practicable under the circumstances, allows the other Party to seek a restraining order or other appropriate relief.    Subject to PwC's confidentiality obligations in this Agreement, nothing herein shall preclude or limit PwC from providing services similar to the Services to other PwC clients.

10.    Indemnification.

(a)    Subject to the provisions hereof, each Party shall indemnify, defend and hold harmless the other from and against any and all amounts payable under any judgment, verdict, court order or settlement for death or bodily injury or the damage to or loss or destruction of any real or tangible personal property, but only to the extent the foregoing arise out of the indemnitor's gross negligence or intentional misconduct in the performance of this Agreement.

(b)    PwC agrees to indemnify, defend and hold harmless Client from and against any and all amounts payable under any judgment, verdict, court order or settlement for Third Party claims of infringement or misappropriation of any trade secrets, copyrights, trademarks, trade names or other intellectual property rights alleged to have occurred and arising from the Deliverables. Should Client's use of such Deliverables be determined to have infringed, or if, in PwC's judgment, such use is likely to be infringing, PwC may, at its option: (i) procure for Client the right to continue using such Deliverables provided, or (ii) replace or modify them to make their use non-infringing while yielding substantially equivalent results. If neither of the above options are or would be available on a basis that PwC finds commercially reasonable, then, PwC may terminate this Agreement, Client shall return such Deliverables provided to PwC and PwC will refund to Client the fees paid for the Deliverables provided. This infringement indemnity does not cover claims to the extent arising from: (1) the combination of such Deliverables with products or services not provided by PwC; (2) the modification of such Deliverables by any person, other than PwC; (3) Deliverables complying with or based upon: (A) designs provided by or at the direction of Client or (B) specifications or other information provided by or at the direction of the Client; or (4) use of systems, materials or work performed in a manner not permitted or contemplated hereunder or by another obligation of Client to PwC.

6

11.    <u>Limitation of Liability</u>.

(a)    PwC is the US member firm of the global network of PricewaterhouseCoopers firms (exclusive of PwC, the "PricewaterhouseCoopers Firms").  In the course of providing the Services and/or Deliverables hereunder, PwC, may, in its discretion, draw on the resources of and subcontract to other PricewaterhouseCoopers Firms.  Client agrees that PwC may provide any information PwC receives in connection with this engagement to other PricewaterhouseCoopers Firms for the purpose of providing the Services and/or for internal administrative and regulatory compliance purposes.    The provision of Services and/or Deliverables will remain the responsibility of PwC.  Client agrees that in relation to the Services and this Agreement, its relationship is solely with PwC.    Client further agrees that no PricewaterhouseCoopers Firms, nor the partners, principals or employees of PwC or the PricewaterhouseCoopers Firms (together the "Beneficiaries"), who perform work in connection with the Services and/or Deliverables will have any liability to Client in connection with the Services or this Agreement.  Client therefore agrees to bring any claim under this Agreement against PwC and not to bring a claim of any nature against any such PricewaterhouseCoopers Firm relating to the Services, Deliverables or this Agreement except where such a claim cannot be excluded by law.

(b)    The provisions of this Agreement and any SOWs relating to the Beneficiaries, have been stipulated by PwC expressly for their benefit.    Client agrees that each of the Beneficiaries shall have the right to rely on said provisions as if they were Parties to this Agreement.  Client likewise agrees on behalf of all of its business operations in which Client has a direct or indirect controlling interest and that are receiving Services or Benefits of Services under this Agreement ("Service Recipients"), that they are bound by these provisions as if they were Parties to this Agreement.  Without limiting any other indemnification provision set forth in this Agreement, Client agrees to indemnify and hold harmless PwC and the Beneficiaries from and against any claim that is asserted by any Service Recipient other than Client arising out of or relating to the Services and/or Deliverables provided under this Agreement, and all liabilities, costs, damages and expenses imposed or incurred in connection therewith, including reasonable attorneys' fees.

(c)    Each SOW shall include a provision setting forth any applicable limitation of liability.  The parties acknowledge and agree that no SOW shall be valid unless it contains such a provision.

In addition, neither party will be liable in any event for lost profits or any consequential, indirect, punitive, exemplary or special damages.  Further, PwC shall have no liability to Client arising from or relating to any third party hardware, software, information or materials supplied by Client.

(d)    PwC accepts no liability to third parties with respect to the Services and Deliverables.  Client agrees (without limiting any other indemnification provision set forth in this Agreement) to indemnify and hold PwC and the Beneficiaries (as defined in Section 11(a)) harmless from and against any and all Third Party claims, suits and actions, and all associated damages, settlements, losses, liabilities, costs, and expenses, including without limitation reasonable attorneys fees, arising from or relating to the Services and/or Deliverables under this

7

Agreement, except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC relating to such Services and/or Deliverables.

12.    Changes; Additional Services.

PwC will not be responsible for work that is beyond the scope of Services set forth in this Agreement or the applicable SOW. Either Party may request changes to the Services. Changes must be agreed between the Parties and may be subject to reasonable adjustments to fees and schedules. Changes to an SOW that amount to the provision of additional Services, rather than adjustments to the Services already agreed, must be in writing and signed by both Parties.

13.    Subcontracts.

PwC may subcontract any of the Services hereunder, with written approval of Client, provided that PwC shall be responsible for the fulfillment of its obligations hereunder. For purposes of this section, PwC firms outside of the US are not considered subcontractors. Notwithstanding anything to the contrary in this Agreement, PwC may disclose Client's Confidential Information to such approved subcontractors involved in the provision of the Services.

14.    Engagement Limitations Applicable to All Services.

(a)    The Services do not include the provision of legal advice and PwC makes no representations regarding questions of legal interpretation. Client should consult with its attorneys with respect to any legal matters or items that require legal interpretation, under federal, state or other type of law or regulation. Changes in the law and/or its interpretation may take place before PwC's advice is acted upon, or may be retrospective in effect; PwC accepts no responsibility for changes in the law or its interpretation which may occur after the provision of the Services. Without limiting the generality of the foregoing, Client acknowledges that tax laws and regulations are subject to change at any time, and such changes may be retroactive in effect and may be applicable to advice given or other Services rendered before their effective dates. PwC does not assume responsibility (and will have no liability) for such changes occurring after the date it has completed its Services under a particular SOW.

(b)    PwC will provide no opinion, attestation or other form of assurance with respect to its work or the information upon which its work is based. The procedures PwC will be performing under this Agreement will not constitute an examination or a review in accordance with generally accepted auditing standards or attestation standards. PwC will not audit or otherwise verify the information supplied to it in connection with any engagement under this Agreement, from whatever source, except as may be specified in the applicable SOW.

(c)    PwC has not been engaged to, nor will PwC provide any management functions or make management decisions for Client under this Agreement. It is Client's responsibility to establish and maintain its internal controls. In addition, it is Client's responsibility to determine the procedures deemed necessary in connection with its compliance with the provisions of the Sarbanes-Oxley Act of 2002 (the "Act") and related SEC rules, to execute those procedures and to assess the results of its procedures and the adequacy thereof. PwC provides no opinion or

8

other form of assurance with respect to Client's compliance with the Act, related SEC rules, or Client's procedures. PwC makes no representation as to the sufficiency of Client's procedures for its own purposes. The Services should not be taken to supplant inquiries and procedures that Client should undertake for purposes of obtaining and using the information necessary in connection with Client's compliance with the provisions of the Act and related SEC rules.

15.    <u>General</u>.

(a)    PwC, in furnishing Services to Client, is acting only as an independent contractor and is not acting as a fiduciary of Client. PwC does not undertake to perform any obligation of Client, whether regulatory or contractual, or to assume any responsibility for Client's business or operations. PwC has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed all work to be performed by PwC, except as otherwise provided in this Agreement or any SOW. PwC accepts full and exclusive liability for the payment of all employer contributions and taxes measured by the remuneration paid to PwC employees as required by all applicable United States federal, state and local laws, rules and regulations.

(b)    This Agreement may only be amended by written agreement signed by a duly authorized representative of each Party.

(c)    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT GIVING EFFECT TO THE PROVISIONS RELATING TO CONFLICT OF LAWS.

(d)    No delay or omission by either Party in exercising any right or power shall impair such right or power or be construed to be a waiver. A waiver by either Party of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach or of any other covenant. No waiver or discharge shall be valid unless in writing and signed by an authorized representative of the Party against whom such waiver or discharge is sought to be enforced.

(e)    This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their permitted successors and assigns, and, except as expressly provided herein, nothing in this Agreement shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Neither Party may, nor shall have the power to, assign or transfer this Agreement or any rights or obligations hereunder or claims arising hereunder, without the prior written consent of the other Party. Any attempt to assign or transfer this Agreement in violation of this subsection shall be void and of no force and effect.

(f)    This Agreement and the applicable SOW constitutes the entire agreement between the Parties with respect to the Services and the rights and responsibilities of the Parties with respect to such applicable SOW.

9

(g)    Neither Party shall publicize their relationship or the terms of this Agreement or any SOW or use the other Party's name or other trademarks or service marks in any advertisement or publication without the other Party's prior written approval.

(h)    The provisions of this Agreement, which expressly or by implication are intended to survive its termination or expiration, will survive and continue to bind both Parties.

(i)    If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both Parties shall be relieved of all obligations arising under such provision, but if the remainder of this Agreement shall not be affected by such declaration or finding and is capable of substantial performance, then each provision not so affected shall be enforced to the extent permitted by law.

(j)    Except as expressly provided herein, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

(k)    Where agreement, approval, acceptance, consent or similar action by Client or PwC is required, such action shall not be unreasonably delayed or withheld.

(l)    Headings in this Agreement are for convenience only. The headings shall not be used in interpreting this Agreement or any provision of it.

(m)    Neither Party shall be liable to the other for any delay or failure to perform any of the Services or obligations set forth in this Agreement due to causes beyond its reasonable control.

(n)    The engagement limitations set forth on Addendum A are incorporated by reference herein.

(o)    All of PwC's agents, employees, subcontractors and/or independent contractors furnished by PwC to perform the Services (collectively, "Personnel") are and will remain PwC's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by PwC be deemed to be Client's employees or agents. PwC is solely responsible, at PwC's sole cost and expense, for (i) the fulfillment of all obligations to Personnel, and (ii) the compliance by PwC and personnel with Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

(BALANCE OF THIS PAGE INTENTIONALLY BLANK)

10

(p)    PwC will assure that all Personnel who are performing Services on behalf of PwC are competent to perform the Services.  PwC will require all Personnel who are performing any work on Client's premises to comply with all of Client's reasonable instructions, regulations and policies that have been provided to PwC in writing in a timely manner.  Client, in its sole discretion, has the right to: (i) bar any of Personnel from Client's premises for failure to observe Client's regulations or policies, (ii) require that PwC promptly remove from Client's premises any Personnel who violate any of Client's regulations or policies, and (iii) require that PwC cease using any Personnel to perform the Services who are reasonably unacceptable to Client.  Client will confer with PwC to discuss Client's concerns prior to requiring removal of any Personnel.  PwC will replace any barred or removed Personnel with Personnel reasonably acceptable to Client.

        In witness whereof, each of the Parties has caused this Agreement to be executed on its behalf by its duly authorized representative as of the date first above written.

Delphi Corporation                                      PricewaterhouseCoopers LLP


By:  _Kevin Smith_____            By:  _Mark Mendola_____
Name:  Kevin Smith                                  Name:  Mark J Mendola
Title:  Director, Indirect and MRE            Title:  Partner
        Procurement


11

**Exhibit A**

**Delphi Travel and Per Diem Expense Reimbursement Policy for
Contractors**

A.    If Contractor is required by Delphi to travel as an incidental requirement in performing
services for Delphi, then such travel and per diem expenses, subject to prior written approval of
Delphi, will be reimbursable as follows:

1. Air Travel    Economy/Coach class only.  Business class is permitted only
upon prior written consent by Delphi.

2. Hotel    Contractor will exercise good, sound business judgment and
discretion in choosing hotels, such as moderately priced chain
hotels or hotels that offer discounted corporate rates.  Where
extended travel is involved, reduced rates may be available and
should be requested.

3. Rental Cars    Compact or intermediate class only.  The cost of collision
damage waiver and personal accident insurance is the
responsibility of Contractor.

4. Mileage
Allowance    Reimbursement will be at the then current IRS rate (currently
$0.44 per mile) for the miles which are in excess of his or her
normal commute from home to work and back.  When
permanently assigned to another location, even if the new
location is temporary, Contractor will not be reimbursed for
excess miles, additional driving time, etc.

5. Expense Reports    If requested, Contractor will provide receipts for all
reimbursable expenses, including meals and other expenditures,
in excess of $25.00 or more.

6. Meals    Meals will not be reimbursed for non-overnight trips, except in
the case of late return occasioned by travel outside normal
working hours.  Reimbursement for meals will be the actual and
reasonable expenses paid by Contractor.

7. Extended Travel    Contractor should review the home visit policy prior to a trip. Generally, the following provisions apply:

If the travel expense is less than the living expense in the temporary location, Contractor will be reimbursed for travel to the permanent location every week.

If the travel expense is more than the living expense in the temporary location, Contractor will be reimbursed for travel to the permanent location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

8. Miscellaneous    When Contractor chooses an alternative method of transportation, *e.g.,* to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Contractor is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Contractor will make all travel arrangements through Global Experts in Travel, using a special account set up for such purposes.

Any cash advance by Contractor to its employee is the responsibility of Contractor.

9. Per Diem    In certain instances, a per diem will be paid to Contractor in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which Contractor seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

13

## ADDENDUM A

1.    **Engagement Limitations Applicable to Tax Services.**

(a)    With regard to any tax Services provided pursuant to this Agreement, Client shall bring to PwC's attention any matters that may reasonably be expected to require further consideration to determine the proper treatment of any relevant item and any changes in the information as originally presented as soon as such information becomes available. PwC is not responsible (and shall not be liable) for any penalties assessed against Client as a result of Client's failure to provide PwC with all the relevant information relative to the issue under consultation and Client agrees to reimburse PwC for any penalties imposed on PwC, its partners or staff, as the result of Client's failure to provide such information.

(b)    Some of the tax matters on which PwC may be asked to advise Client may have implications to other persons or entities. However, PwC shall have no responsibility or liability to these persons or entities unless PwC specifically is engaged to address these issues to such persons or entities, and PwC expressly agrees to do so in an SOW.

(c)    Tax jurisdictions may impose penalties for certain failures. Relative to the Services provided under the terms of this Agreement, PwC will discuss with Client any tax positions of which PwC is aware that PwC believes may subject Client to penalties. PwC will also discuss with Client possible courses of action related to the Client's tax return, where applicable, to avoid the imposition of any penalty (e.g., disclosure). PwC will use its judgment in resolving questions where the tax law may be unclear, or where there are conflicts between taxing authorities' interpretations of the law and other supportable positions, and discuss them with Client. PwC is not responsible for any penalties imposed for positions that have been discussed with Client where PwC recommended a course of action to avoid penalties and Client elected not to pursue such course.

(d)    US Treasury regulation §1.6011-4 requires that taxpayers disclose to the IRS their participation in certain "reportable transactions." Client shall advise PwC if it determines that any matter covered by this Agreement is a reportable transaction that is required to be disclosed under §1.6011-4. Similar Treasury regulations issued under Internal Revenue Code §6112 require that PwC maintain lists of certain client engagements where it is a material advisor to clients that have participated in either a reportable transaction or a transaction that is required to be registered with the IRS as a tax shelter. If PwC determines, after consultation with Client, that Client has participated in either a reportable transaction or one required to be registered under Internal Revenue Code §6111, PwC will place Client's name and other required information on a list and will so advise Client. Sometime in the future the IRS may request PwC's lists of reportable or §6011 transactions, and PwC may be compelled to provide the IRS with the contents of its lists, including Client's name. PwC will advise Client if it is ultimately required to provide Client's name to the IRS in connection with any matter covered by this Agreement.

14

**2.    Engagement Limitations Applicable to Transaction Services/Due Diligence Services.**

(a)    Where PwC's work expressly includes consideration of prospective financial information, PwC will comment on the bases and assumptions underlying the prospective financial information adopted as the case may be by Client or by the management of the company who is the subject of a due diligence investigation (the "Target Company"), but PwC's work will not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the AICPA, and PwC will not express any opinion or provide any assurance (in the sense in which "opinion" and "assurance" are used in the AICPA standards). Where PwC comments on bases and assumptions underlying the prospective financial information, PwC reports may include tables aggregating quantified vulnerabilities and sensitivities in order to illustrate effects of possible alternative assumptions. Those tables should not be regarded as a restatement of the Target's and/or management's prospective financial information, or preparation of revised prospective financial information; they are provided as a means of summarising PwC comments to assist Client in considering Client's implications for the transaction. It is Client's responsibility to consider PwC comments and make Client's own decision based on the information available to the Client. Client must make its own decision about likely future profitability and the cash flows likely to be generated by the Target and Client understands that, with regard to illustrations of sensitivities that may be included in our Deliverables, there may be other, equally valid ways of assessing the sensitivities and possible outcomes. Client understands that our Deliverables are not prepared for the purposes of managing the Target's business and because events and circumstances frequently do not occur as expected, there will usually be differences between predicted and actual results, and those differences may be material. PricewaterhouseCoopers LLP is not responsible for developing the underlying assumptions of the prospective financial information and we take no responsibility and accept no liability for the achievement of predicted results.

(b)    Except to the extent expressly agreed to the contrary in writing, where PwC comments on use of Internet technologies in key business processes, PwC does so as business advisors rather than as information technology specialists.

(c)    Where the work expressly includes consideration of potential operational improvements, PwC will comment on the Client and/or Target Company's view of such improvements. PwC's comments will be provided solely in the light of our business experience of operational matters but will not be based on direct experience of Client's operations or the Target Company's operations, specific industry or commercial sector. PwC's comments may not represent the optimal operational solution and there may be other, equally valid, views. Further, the results which can be achieved will depend upon the detailed circumstances at the time and on the way in which planned operational improvements are implemented. PwC takes no responsibility for the achievement of potential operational improvements.

(d)    PwC assumes no responsibility and makes no representations with respect to the accuracy or completeness of information provided by any Target Company. PwC will not provide assurance that matters of significance to the financial information or to Client's due diligence investigation will be disclosed. We have not been engaged to, nor will we provide any management functions or make management decisions for Client. Further, PwC's work is not

15

designed to and is not likely to reveal fraud or misrepresentation by the management of a Target Company.

(e)     Advice and comments that PwC may provide in the course of a due diligence engagement regarding the accounting and tax treatment of a proposed transaction should not be viewed as a formal accounting or tax opinion of PwC. If such opinions are desired and PwC determines that such an opinion can be issued, the terms of an engagement to provide such an opinion will be subject to a separate SOW.

(f)     Client acknowledges that PwC may be asked to provide services to other clients who may be in competition with Client or whose interests may conflict with Client's interests, or regarding the possible purchase or sale of a Target Company that may be in competition with Client or whose interests may conflict with Client's interests. PwC will not be prevented or restricted by virtue of its relationship with Client under this Contract from providing services to other clients. Except as required by law or professional regulations, PwC will maintain the information obtained during the course of each engagement it performs for Client confidentially in accordance with Section 9 of the Agreement.

**3.     Circular 230: Limitations.**

(a)     <u>For Tax Services:</u>

i.     *Other Written Advice.* It is anticipated that the written advice PwC provides during the course of this engagement will be Other Written Advice as defined by Treasury Circular 230. Accordingly, unless otherwise prohibited or PwC agrees to issue a Covered Opinion as defined by Circular 230, PwC written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed. PwC advice will contain any other disclosures required by Circular 230.

ii.     *Covered Opinion.* If expressly set forth in the applicable Statement of Work, or in the deliverable itself, PwC's final written deliverable will be a Covered Opinion as defined by Circular 230. All other written advice provided prior to PwC's final deliverable may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed on the taxpayer. In the event Client does not proceed with the transaction that is the subject of PwC's advice or proceeds with the transaction but choose not to receive a final deliverable from PwC, Client may not rely on any of the advice provided by PwC for the purpose of avoiding any penalties that the IRS may impose. To the extent Client is entitled to rely on PwC's written advice for purposes of penalty protection, Client understands that such reliance will be limited to the issues expressly addressed, therein. PwC's final deliverable may contain certain disclosures required by Circular 230.

(b)     <u>For Transaction Services/Due Diligence:</u>

The Tax advice provided in PwC reports or other forms of written communication relative to PwC's due diligence work may be considered written tax advice subject to the rules of Treasury Circular 230. Accordingly, unless otherwise prohibited or agreed to with the Client in

16

advance to the contrary, such tax advice in any written form will constitute "Other Written Advice" as defined by Circular 230. Accordingly, tax information and/or advice provided in the report or other forms of written communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties that may be imposed on the taxpayer. In accordance with these regulations, PwC's written communications will include a disclosure to this effect. Further, PwC reports or other forms of written communication relating to the provision of due diligence services will not be written to support the promotion or marketing of this or any transaction or matters addressed in the report or other forms of written communication and should not be considered a Marketed Opinion under Circular 230.

4.     **Engagement Limitations Applicable to Dispute Analysis/Expert Witness Services.**

(a)     Client acknowledges that PwC is a large firm who is engaged by new clients every day throughout the United States. PwC will undertake a reasonable review of its records to determine its professional relationships with any persons or entities Client identifies in connection with any dispute analysis/expert witness engagement that PwC undertakes for Client. PwC will advise Client of any conflicts of interest of which PwC becomes aware that would preclude PwC from performing such work.

(b)     PwC may be engaged by parties adverse to Client to perform dispute analysis/expert witness services in litigation matters that are unrelated to any dispute analysis/expert witness services that PwC may perform for Client under this Agreement. Client agrees not to use the fact of any current or previous PwC engagement for expert witness services by opposing parties in other matters as a means of enhancing or diminishing PwC's credibility in conjunction with any appearance before a trier of fact.

17

Master Services Agreement
Dated _____, 200__

**ATTACHMENT A**
**SAMPLE FORM**

**Statement of Work ("SOW")**
**Between Delphi Corporation and PricewaterhouseCoopers LLP**


Project Name: _____


This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated _____, 200___ between _____ ("Client") and PricewaterhouseCoopers LLP, ("PwC") and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.


**I.    PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers _____ [describe project generally]. This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project/effort.


**II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW**

    **2.1    Services to be provided by PwC:**


    **2.2    Deliverables:**


    **2.3    Client's Responsibilities:**


    **2.4    Timing**

The timing of the services to be provided hereunder is as follows:

| | |
|---|---|
| Project Start Date: | |
| Estimated Project Completion Date: | |

18

**Master Services Agreement**
**Dated _____, 200__**

III.    **RESOURCES ASSIGNED TO THIS SOW**

The PricewaterhouseCoopers personnel assigned to provide services and deliverables under this SOW are as follows:

IV.    **PAYMENT; EXPENSES; AND INVOICES**

   **4.1    Payment Terms**

   **4.2    Professional Fees and Expenses [list any taxes applicable]**

V.    **OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW**

   **5.1    Limitation of Liability:** Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by Client as a result of breach of contract, negligence or other tort committed by PwC, regardless of the theory of liability asserted, is limited to no more than [_____ ( ) times] the total amount of fees paid to PwC for the Services provided under this SOW. Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Client or in connection with Client's violation of its obligations under Section 6(b) of the Agreement, Client's liability to pay damages for any losses incurred by PwC as a result of breach of contract, negligence or other tort committed by Client, regardless of the theory of liability asserted, is limited to no more than [_____ (__) times] the total amount of fees paid to PwC for the services provided under this SOW.

   **5.2    [Insert terms specific to Project – [*consult sample SOWs for practice group*]]**

   **5.3 For engagements that will take over a year:** Because adverse income tax consequences may result from assignment of personnel at project sites for an engagement for a year or more, such personnel may annually be required by PwC to break from providing services to Client. PwC will monitor its staff on the long-term expense reimbursement policy and will inform Client prior to such break. If Client does not want to release personnel from performing Services for the aforementioned period, Client shall pay to PwC the amount of compensation provided by PwC to its personnel to cover the tax consequences thereof.

   **5.4 If applicable:** Client shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform

19

**Master Services Agreement**
**Dated _____, 200__**

the Services.    Client shall perform the tasks and provide the assistance described in this SOW.    Client shall ensure that it has appropriate back up, security and virus-checking procedures for any computer facilities, information or materials it provides.    Client consents to the use, by staff visiting or working from the Client site, of the Client's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources.    Client agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| PricewaterhouseCoopers LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| Signature | Printed Name | Title | Date |
| **DELPHI CORPORATION** | | | |
| Authorized Signature | Printed Name | Title | Date |
| Authorized Signature | Printed Name | Title | Date |

<u>EXHIBIT 2</u>

Transaction Services Statement Of Work



**PricewaterhouseCoopers LLP**
300 Madison Avenue
New York NY 10017
Telephone (646) 471-3000
Direct Phone (646) 471-3542
Direct Fax (813) 375-6478
www.pwc.com

### Statement of Work ("SOW") - Number ____
### Between Delphi Corporation and PricewaterhouseCoopers LLP

**Project Name:** Transaction Services
**Project Date:** December 15, 2006

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated March 17, 2006 between Delphi Corporation ("Delphi" or the "Company") and PricewaterhouseCoopers LLP (PwC), and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

## I.    PURPOSE AND SCOPE OF THIS SOW:

The purpose of this SOW is to confirm our understanding of the terms and objectives of our engagement to provide you advice and assistance with the due diligence analysis of Delphi in preparation for a potential transaction.

## II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW:

### 2.1    Services to be provided by PwC:

The work that we will perform will include, but will not necessarily be limited to, holding discussions with certain officers, employees and outside consultants of the Company, performing financial analysis of the historical results and trends of the Company, commenting on projected financial information prepared by management, and performing certain other procedures which generally follow those outlined in Exhibit I. The procedures outlined in Exhibit I represent our current understanding of the scope of work we anticipate performing.

During various stages of our work, we will provide you with verbal reports, various outlines, executive summaries, analytical schedules, etc. as requested. We understand that you may make information available to potential investors, whether in a data room or by other means, that we may have advised on or assisted in the analysis thereof. Our work is undertaken on the basis that we are working for you alone. We make no representation about the suitability of any such information for disclosure to third parties and any responsibility for

# PRICEWATERHOUSECOOPERS 🅿

representations made to third parties remains yours alone.  Any written material we may advise you on that you wish to make available to potential investors should only be provided where you have first carefully considered the contents of such documents and have adopted them as your own and should be prepared without PricewaterhouseCoopers' branding and you should not make any attribution to PricewaterhouseCoopers' advice thereon.

We will assume no responsibility and make no representations with respect to the accuracy or completeness of information provided by the Company.  Moreover, our work cannot provide assurance that matters of significance to the financial information or to your plan process will be disclosed and that an investor's due diligence will not identify significant matters not previously identified by us or management of the Company.  Further, our work is not designed to and is not likely to reveal fraud or misrepresentation by the management of the Company or any other person.

PricewaterhouseCoopers LLP is not a registered broker/dealer as defined by Federal securities laws.  Our role is that of an advisor to the Company, not a broker of securities, and any fee paid to PricewaterhouseCoopers LLP is not contingent on a transaction closing nor is it based on the value of the Company.  Further, it is understood that PricewaterhouseCoopers LLP is not authorized to make any decisions or to negotiate with others on behalf of the Company and will not hold itself out as having any authority to do so for the Company.  Any descriptive information which PricewaterhouseCoopers LLP advises and assists the Company in preparing will be the sole responsibility of the Company and should not be referenced to PricewaterhouseCoopers LLP by name.

## 2.2    Deliverables:

If requested, upon the completion of our work, we will provide you with a written report setting forth the significant matters that came to our attention.  You understand that any report we prepare on the business will not be written from an investor's perspective. This report in either draft or final form or portions thereof including our oral comments, should neither be associated with the financial statements of the Company nor be communicated or distributed to any party who is not a member of the management of the Company, other than the Company's legal counsel, nor should they be referred to or quoted, in whole or in part, in any offering memorandum, prospectus, registration statement, public filing, loan, other agreement or document, in any such case without our express written consent (which is not to be unreasonably withheld) or except as required by law, regulation, or legal process.  In the event that our report is to be distributed to another party, a release letter similar to that set forth in Exhibit II must be received from that party prior to the distribution.  It is agreed that the terms of such release letter are to be determined exclusively by PricewaterhouseCoopers LLP, provided that PwC shall not require a release letter from a potential investor that is less favorable to that party than as set forth on Exhibit II.  In the event that our report is to be distributed to a potential investor, we will require your assurance that any potential investor receiving our report will be given an opportunity to carry out its own due diligence.

(2)

# PRICEWATERHOUSECOOPERS ⓡ

During the engagement we may provide oral comments, or drafts of: written reports, presentations, letters, schedules or hard or soft copies of electronic work products. As these represent work in progress and/or not our final findings, we do not assume any responsibility in respect of them. The final results of our work will be contained in our final report.

**2.3    Delphi's Responsibilities:**

It is your responsibility to determine the adequacy of the work to be performed for your purposes. We make no representations as to whether these procedures are sufficient for your purposes. Also it is understood that it is your right and responsibility to (1) designate a management-level individual or individuals to be responsible for overseeing the services being provided, (2) evaluate the adequacy of the services performed and any findings that result, (3) make all management decisions and perform all management functions, including accepting responsibility for the results of the our services, and (4) determine exclusively the scope of work included in Exhibit I, which will be subject to a work plan to be authorized by you. The Company is solely responsible for the plan process; for implementation of any advice; for the materials created in connection with this engagement and for all information provided to potential investors, including but not limited to any descriptive memoranda, management presentations and projected financial information, for all negotiations with third parties and for determining the adequacy and acceptability of any offers received by third parties.

**2.4    Timing:**

The timing of our services to be provided hereunder is as follows:

Project Start Date:                              December 15, 2006
Estimated Project Completion Date:    March 31, 2007

## III.    RESOURCES ASSIGNED TO THIS SOW:

The PricewaterhouseCoopers personnel assigned to lead the services under this SOW are as follows:

Colin Wittmer, Lead Engagement Partner
Michael Burwell, Concurring Review Partner
Pete Smidt, Lead Engagement Director
Dave Dilcher, Lead Human Resources Partner
Eric Miller, Lead Tax Partner

(3)



## IV.    PAYMENT; EXPENSES; AND INVOICES:

### 4.1    Payment Terms:

Payment terms are consistent with the terms in Section 4 of the Agreement.

### 4.2    Professional Fees and Expenses:

Completion of the procedures is subject to, among other things, appropriate cooperation from Company personnel including providing necessary information and timely responses to our inquiries.  We will advise you promptly should we believe we would be unable to complete the procedures and issue our report.

Our fees will be based on applying the hourly rates for the individuals assigned to the engagement.  Our agreed upon rates are as set forth below:

|                              | Low   | High  |
|------------------------------|-------|-------|
| Partner & Managing Director  | $775  | $900  |
| Director                     | $515  | $600  |
| Manager                      | $390  | $450  |
| Senior                       | $325  | $375  |
| Associate                    | $290  | $325  |
| Administration               | $100  | $150  |

We estimate our fees for this engagement will range from $3,500,000 to $5,500,000.

If, during the course of our work, it appears that our fee will exceed our estimate, we will advise you immediately and we will not undertake additional work without prior approval.

We also will bill you for our reasonable out-of-pocket expenses and our internal per-ticket charges for booking travel.  Our fees and expenses will be billed in accordance with Sections 3 and 4 of the Agreement.

## V.    OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW:

### 5.1    Limitation of Liability

Because of the importance of oral and written representations by Delphi or Delphi management on PwC's ability to effectively perform the services as set forth in this SOW, Delphi releases PwC from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by Delphi or Delphi management.

Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by

(4)

# PRICEWATERHOUSECOOPERS ⓡ

Delphi as a result of a breach of contract, negligence or other tort committed by PwC, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to PwC for Services provided under this SOW.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, Delphi and PricewaterhouseCoopers have agreed that: (1) any controversy or claim with respect to, in connection with, arising out of, or in any way related to this SOW or the services provided by PricewaterhouseCoopers to Delphi as outlined in this SOW, including any matter involving a successor in interest or agent of Delphi or of PricewaterhouseCoopers, shall be brought in the Bankruptcy Court or the District Court for the Southern District of New York if such District Court withdraws the reference; (2) PricewaterhouseCoopers and Delphi and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have or retain jurisdiction over such claims or controversies) for the resolution of such claims, causes of actions or lawsuits; (3) PricewaterhouseCoopers and Delphi, and any and all successors and assigns thereof, waive trial by jury, such waiver being informed and freely made; (4) if the Bankruptcy Court, or the District Court if the reference is withdrawn, does not have or retain jurisdiction over the foregoing claims and controversies, PricewaterhouseCoopers and Delphi, and any and all successors and assigns thereof, will submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit III to this SOW; and (5) judgment on any arbitration award may be entered in any court having proper jurisdiction.

Further, PricewaterhouseCoopers has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of the Bankruptcy Court or the District Court for the Southern District of New York (if such District Court withdraws the reference) to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to this SOW or the services provided hereunder.

## 5.2    Other matters:

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

There are other PricewaterhouseCoopers teams assigned to engagements for Delphi that have been completed or are underway. The PricewaterhouseCoopers team assigned to this engagement will not have access to the team members, working papers or reports of those other PricewaterhouseCoopers engagements without Delphi's prior consent.

If there are any questions, please call Colin Wittmer, Partner, at (646) 471 3542 or Mike Burwell, Partner, at (313) 394 3504 who will lead our engagement team. If the services

(5)

# PRICEWATERHOUSE COOPERS 🅿️

outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter signed in the space provided below and return it to us.

**IN WITNESS WHEREOF**, the parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| PwC LLP | | | |
|---|---|---|---|
| Signature<br><br>_____ | Printed Name<br><br>Colin Wittmer | Title<br><br>Partner | Date<br><br>Dec. 15, 2006 |
| **Delphi Corporation** | | | |
| Authorized Signature<br><br>_____ | Printed Name<br><br>John Sheehan | Title<br>Vice President,<br>Chief Restructuring<br>Officer | Date<br><br>Dec. 15, 2006 |

(6)



**Exhibit I**

The following is a summary of the due diligence areas for which we propose to perform due diligence procedures.  Given our understanding of the Company's organization and reporting structure, we expect to perform and report on certain procedures for each operating division as appropriate using separate teams, all coordinated via a central team located at Delphi Headquarters in Troy, MI.

**Financial Due Diligence**

1.  Obtain an understanding of the Company's accounting policies and how those policies impact reported results.  Assess the overall adequacy of the Company's compliance with Sarbanes-Oxley rules and reporting responsibilities.

2.  Obtain an understanding of the status of significant "investigations" into the Company's financial reporting and the Company's current estimate, if any, of the range of the potential effects to its reported earnings.

3.  Understand significant joint-venture agreements and how their accounting treatment impacts reported EBITDA and cash flow.

4.  Summarize the key financial aspects of transactions and agreements/arrangements between the Company and General Motors.

5.  Perform appropriate due diligence procedures on the following subject areas pursuant to a work plan to be authorized by you:

    (a)    Quality of Earnings / Cash Flow (performed for each operating division as appropriate)

    (b)    Operating Division Analysis and Corporate Headquarters (performed for each operating division as appropriate)

    (c)    2007 to 2012 Business Plan (performed for each operating division as appropriate)

    (d)    Balance Sheet

    (e)    Tax Due Diligence

    (f)    Employee Benefits Due Diligence

(7)



## Exhibit II

**Standard Release Letter - Report Access Requested by Client for Nonclient**


[Nonclient Recipient Letterhead]


[Date]

Colin Wittmer
PricewaterhouseCoopers LLP
PricewaterhouseCoopers Center
300 Madison Ave.
New York, NY 10017

Dear Mr. Wittmer:

Delphi Corporation (the "Company") has informed [name of recipient] that
PricewaterhouseCoopers LLP has performed certain procedures to assist the Company in
connection with its own due diligence of the Company.  We understand that the work
performed by PricewaterhouseCoopers LLP was performed in accordance with instructions
provided by Company and was performed exclusively for the Company's sole benefit and use.

The Company has requested that PricewaterhouseCoopers LLP provide [name of recipient]
access to the report of their findings dated [date].  [name of recipient] acknowledges that this
report was prepared at the direction of the Company and may not include all procedures
deemed necessary for the purposes of [name of recipient] and that certain findings and
information may have been communicated to the Company that are not reflected in the report.
Potential investors should take note that this document is different in scope and content from a
due diligence report typically prepared for potential investors.  The report is provided to
potential investors solely to assist the Company in providing relevant information about the
business; it has not been prepared as, and it should not be used in place of, the due diligence
enquiries and procedures potential investors would normally carry out prior to investing in a
business.

In consideration of PricewaterhouseCoopers LLP allowing [name of recipient] access to the
report and, if requested by [name of recipient], discussing the report, [name of recipient]
agrees that it does not acquire any rights as a result of such access that it would not otherwise
have had and acknowledges that neither PricewaterhouseCoopers LLP nor any other
PricewaterhouseCoopers Firm involved in performing the work or preparing the report
("Released Firm") assumes any duties or obligations to [name of recipient] in connection with
such access.

(8)

# PRICEWATERHOUSECOOPERS ⬛

[name of recipient] agrees to release PricewaterhouseCoopers LLP, each Released Firm and their personnel from any claim by [name of recipient] that arises as a result of PricewaterhouseCoopers LLP permitting [name of recipient] access to the report.  Further, [name of recipient] agrees not to disclose or distribute the report, or information received, orally or in writing from PricewaterhouseCoopers LLP or a Released Firm to any other parties (including, if applicable, to any other members of a lending syndicate) without PricewaterhouseCoopers LLP's prior written consent, except as required by law, regulation, or legal process, provided that, except in the case of routine supervisory examinations by bank regulatory authorities, [name of recipient] provides PricewaterhouseCoopers LLP with prompt notice of any request that [name of recipient] disclose such information (so long as such notice is not prohibited by law), so that PricewaterhouseCoopers LLP may at its option object to the request and/or seek an appropriate protective order.  It is understood and agreed that any objection of PricewaterhouseCoopers LLP to such a request shall not affect [name of recipient]'s obligations to produce materials called for by appropriate legal or regulatory process.

Acknowledged by [name of recipient] representative:

By: _____
    (Name of company official)

_____
    (Title)

_____
    (Date)

(9)



**Exhibit III**

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in this SOW. If any of these procedures are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

<u>Mediation</u>
A dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by the parties. If the parties cannot agree on the mediator, a mediator will be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party. Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and will be agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

<u>Arbitration</u>
If a dispute has not been resolved in 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA ("AAA Rules").