| | | |
|---|---|---|
| UNITED STATES BANKRUPTCY COURT | | Hearing Date: January 5, 2007 |
| SOUTHERN DISTRICT OF NEW YORK | | Hearing Time: 10:00 a.m. |
| ------------------------------------------------------- | | |
| In re: | : | Chapter 11 |
| | : | |
| DELPHI CORP., *et al.*, | : | Case No. 05-44481 (RDD) |
| | : | |
| Debtors. | : | (jointly administered) |
| ------------------------------------------------------- | x | |

**OBJECTION OF THE UNITED STATES TRUSTEE TO EXPEDITED MOTION
FOR ORDER AUTHORIZING AND APPROVING THE EQUITY PURCHASE
AND COMMITMENT AGREEMENT PURSUANT TO SECTIONS 105(a), 363(b),
503(b), AND 507(a) OF THE BANKRUPTCY CODE AND THE PLAN
FRAMEWORK AGREEMENT PURSUANT TO SECTIONS 105(a),
363(b), AND 1125(e) OF THE BANKRUPTCY CODE**

**I.     INTRODUCTION**

The United States Trustee for Region 2 (the "United States Trustee") hereby submits her objection (the "Objection") to the Motion (the "Motion"), of Delphi Corp., *et al.*, (the "Debtors"), to Approve the Equity Purchase and Commitment Agreement (the "Equity Agreement") and the Plan Framework Support Agreement (the "Framework Agreement") (collectively, the "Agreements"). The United States Trustee objects to the Agreements on two grounds.

First, the Equity Agreement calls for the payment of millions of dollars of fees and expenses, as allowed administrative claims under 11 U.S.C. §§ 503(b)(1), to non-retained professionals for the entities that will fund the Debtors' emergence from bankruptcy (the "Investors"). These fees and expenses will be paid with no oversight by the statutory committees, the Fee Committee, the United States Trustee or the Bankruptcy Court. In at least one case, the non-retained professionals acted as counsel for an *ad hoc* committee, which clearly

- 1 -

implicates the substantial contribution standard of 11 U.S.C. § 503(b)(4). In the other cases, the identities of the professionals and their involvement in the bankruptcy cases have not been disclosed. The United States Trustee cannot determine whether the fees and expenses are reasonable, "actual and necessary" under 11 U.S.C. § 503(b)(1), subject to the substantial contribution standard of § 503(b)(4), or a reasonable exercise of the Debtors' business judgment under 11 U.S.C. § 363 as the Debtors contend. The United States Trustee, therefore, requests that before any fees and expenses are disbursed, the Court order the non-retained professionals to file applications under the appropriate provision of 11 U.S.C. § 503, upon proper notice and hearing.

Second, the Framework Agreement appears to be a *sub rosa* plan of reorganization that circumvents the disclosure statement and plan confirmation approval processes set forth in 11 U.S.C. §§ 1123, 1125, and 1129. The Framework Agreement also restricts the rights of creditors and parties in interest to meaningfully participate in plan negotiations. Under the Framework Agreement, which was negotiated and executed only by the Debtors, the Investors, and General Motors ("GM"), many of the plan terms have been dictated, and the Debtors **must** confirm a plan that is "materially consistent with" the Framework Agreement. The Court should not approve the Framework Agreement. The Framework Agreement is no more than a term sheet for a plan that has yet to be filed. It should only be considered in the context of continued plan negotiations.

## II.     FACTS

### A.     The Debtors

Delphi and a number of its subsidiaries (collectively, the "Debtors") filed chapter 11 petitions on October 8 and 14, 2005. The cases are jointly administered. The Debtors make up a global public company that supplies vehicle electronics, transportation components, integrated

systems and modules, and other electronic technologies to automotive manufacturers. The Debtors were spun off from General Motors ("GM") in 1999, and GM remains the Debtors' largest customer.

One of the Debtors' stated goals in chapter 11 is to implement its "Transformation Plan." The Transformation Plan is composed of (a) modification of the Debtors' labor agreements, (b) resolution of issues with GM, (c) strategic development and realignment of its product portfolio; (d) transformation of the Debtors' workforce in keeping with a sustainable cost structure and streamlined a product portfolio, (e) resolution of pension issues, and (f) restructuring of the balance sheet. *See* Framework Agreement at 1, § A.

### B.    Statutory and Ad Hoc Committees

On October 20, 2005, the United States Trustee appointed an Official Committee of Unsecured Creditors (the "Creditors' Committee") under 11 U.S.C. § 1102. *See* Docket, Doc. No. 469. The United States Trustee amended the appointment on March 6, 2006 due to the resignation of a member from the Creditors' Committee. *See* Docket, Doc. No. 2685

On December 22, 2005, Appaloosa Management, L.P. ("Appaloosa") and an *ad hoc* committee of equity security holders (the "Ad Hoc Equity Committee"), filed a motion to compel the United States Trustee to appoint an official committee of equity security holders. *See* Docket, Doc. No. 1604. After significant discovery and a trial, the Court entered an order granting the Motion on March 30, 2006. *See* Docket, Doc. No. 3024.

On April 28, 2006, the United States Trustee appointed an Official Committee of Equity Security Holders (the "Equity Committee"). The United States Trustee did not appoint Appaloosa to the Equity Committee. On May 3, 2006, Appaloosa filed an emergency motion to compel the United States Trustee to enlarge the Equity Committee to include Appaloosa (the "Emergency Motion"). *See* Docket, Doc. No. 3580. The United States Trustee amended the

- 3 -

appointment of the Equity Committee on May 11, 2005.  *See* Docket, Doc. No. 3726.  On May 30, 2006, Appaloosa withdrew the Emergency Motion.  *See* Docket, Doc. No. 3928.

### C. The Equity Agreement

#### 1. The Parties

Under the Equity Agreement, the "Investors" are A-D Acquisition Holdings, LLC ("ADAH"), Harbinger Del-Auto Investment Company ("Harbinger"), Dolce Investments LLC ("Dolce"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill"), and UBS Securities LLC ("UBS").  *See* Equity Agreement, at 1.  ADAH is an affiliate of Appaloosa; Harbinger is an affiliate of Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger Capital"); and Dolce is an affiliate of Cerberus Capital Management, L.P. ("Cerberus").  *See* Motion, at 7 n.3.  Appaloosa, Harbinger Capital and Cerberus are the "Commitment Parties," which will provide equity financing to the Investors.  *See* Equity Agreement, at 1.  The Equity Agreement does not disclose whether any of the Investors or Commitment Parties are current equity security holders of the Debtors.

#### 2. Equity Agreement: The Investment

Each Investor will purchase a proportionate share of the Debtors' common and preferred stock in connection with a Rights Offering, as set forth in § 2 of the Equity Agreement and Schedule 2 to the Equity Agreement.  *See* Equity Agreement at 4-5, § 2(a) and Schedule 2.  The proposed total investment will be up to $3.4 billion.  *See* Schedule 2 and Motion at 18, ¶ 14.  The Debtors' current shareholders will also be given an opportunity to purchase new shares of common stock in the Rights Offering in proportion to the number of shares owned at $35 per share.  *See* Equity Agreement, at 3, § 1(c)(ii).

### 3. Equity Agreement: Commitment Fees

The Debtors have agreed to pay the following fees to the Investors:

(I) an aggregate commitment fee of twenty-one million dollars ($21,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in Schedule 2 (the "Preferred Commitment Fee");

(ii) an aggregate commitment fee of fifty-five million one-hundred twenty five thousand dollars ($55,125,000) to be paid to the Investors as set forth in Schedule 2 to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "Standby Commitment Fee" and together with the Preferred Commitment Fee, the "Commitment Fees"); and

(iii) an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in Section 12(h).

Equity Agreement, at 7, § 2(h).

The Debtors will pay the Commitment Fee on the following schedule:

$10 million of the Commitment Fees shall be paid on the first Business Day following the first date that either (A) each of ADAH and Dolce has waived in writing the due diligence termination right contained in Section 12(d)(ii) or (B) the due diligence termination right contained in Section 12(d)(ii) has expired in accordance with its terms, and $28,062,500, representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the date that each of ADAH and Dolce notify the Company in writing that each of them has approved the GM Settlement. The balance of $38,062,500, representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the Disclosure Statement Approval Date. Payment of the Commitment Fees and the Alternate Transaction Fee, if any, will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by each Investor to the Company at least 24 hours prior to such payment. The Commitment Fees and the Alternate Transaction Fee, if any, will be nonrefundable and non-avoidable when paid. . . .

*See* Equity Agreement, at 7 § 2(i).

The Commitment Fee on the preferred stock transaction of $21 million is 1.75% of the total $1.2 billion preferred investment. See Motion, at 21, ¶ 39. The Commitment Fee for the common stock investment is $55.125 million, which is 2.5% of the total $2.205 billion

- 5 -

investment. *Id*.

### 3. Equity Agreement: Transaction Expenses

The Investors are also entitled to their costs and expenses, including attorneys fees and costs under § 2(j) of the Equity Agreement:

> The [Debtors] will reimburse or pay, as the case may be, the out-of-pocket costs and expenses reasonably incurred by each Investor or its Affiliates (which, for the avoidance of doubt, shall not include any Ultimate Purchaser) to the extent incurred on or before the Effective Date (and reasonable post-closing costs and expenses relating to the closing), including reasonable fees, costs and expenses of counsel to each of the Investors or its Affiliates,(including investigating, negotiating and completing such transactions) and the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases other than costs and expenses relating to any transactions with Ultimate Purchasers and, with respect to expenses that would not otherwise be incurred by the related Investor, Related Purchasers (collectively,"Transaction Expenses"), from and after the commencement of negotiations between such Investor or its Affiliates and the Company with respect to its nondisclosure agreements in connection with the Chapter 11 Cases and/or the transactions contemplated hereby, or in the case of UBS and Merrill, from and after July 30, 2006, in the following manner:
>
>> (i) to the extent Transaction Expenses are or were incurred prior to December 1, 2006, such Transaction Expenses, in an amount not to exceed $13,000,000 (which amount does not include Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000), shall be paid promptly upon the Bankruptcy Court's entry of the Initial Approval Order; provided, that Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan;
>>
>> (ii) to the extent Transaction Expenses are incurred by any Investor on or after December 1, 2006, such Transaction Expenses shall be paid promptly upon submission to the Company of summary statements therefor by such Investor, in each case, **without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements**; and

- 6 -

> (iii) the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.
>
> The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and **such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.** In addition, (i) to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of entry of the Initial Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

*See* Equity Agreement, at 8-9, § 2(j) (emphasis added).[1]

### D.    The Framework Agreement

The parties to the Framework Agreement are the Debtors, GM, Appaloosa, Cerberus, Harbinger Capital (the last three being the "Commitment Parties" to the Equity Agreement), UBS and Merrill.  *See* Framework Agreement, at 1.  The Creditors Committee, the Equity Committee, the Unions, the Pension Benefit Guaranty Corporation (the "PBGC"), and others are not parties to the Framework Agreement and have not joined in the Motion.  Whether the non-parties to the Framework Agreement support approval of the Motion is unclear.

The Framework Agreement is designed to implement the Debtors' Transformation Plan, through Plan terms agreed to by GM, the Debtors, Appaloosa, Cerberus, Harbinger Capital, UBS and Merrill.  *See* Framework Agreement, at 1-2.  The Framework Agreement requires that the

---

[1]    The United States Trustee assumes, based on the language of § 2(j)(i), that the Debtors have not paid any of the Transaction Expenses to date and will not do so unless the Initial Approval Order is entered.

- 7 -

Plan "be "materially consistent with this Agreement." *Id.* at 4, § 1.8.

The Framework Agreement provides that "the Plan shall contain all of the following terms," (*id*. at 7, § 6) including:

> A. All unsecured claims, excluding GM claims, subordinated claims, and securities claims,
>
> shall be allowed or estimated for distribution purposes by the Bankruptcy Court to be no more than $1.7 billion.

*Id*. at 7, § 6.1.

> B. Trade and other unsecured claims shall be placed in a single class, and if allowed,
>
> shall be paid in full with $810 of common stock (18,000,000 out of a total of 135,285,714 shares, at a deemed value of $45.00 per share for Plan Distribution purposes) in reorganized Delphi and (b) the balance in cash; <u>provided</u> <u>however</u>, that the common stock and cash to be distributed pursuant to the immediately preceding clause shall be reduced proportionately by the amount that allow Trade or Other Unsecured Claims are less than $1.7 billion.

*Id.* at 7-8, § 6.3 (emphasis in original).

> C. GM will receive an allowed general unsecured claim for all claims and rights of GM and its affiliates (excluding in respect of the 414(l) Assumption, all Flow Through Claims and all other claims and amounts to be treated in the normal course or arising or paid pursuant to the Delphi/GM Definitive Documents) that will be satisfied with (a) 7,000,000 out of a total of 135,285,714 shares of common stock in reorganized Delphi and (b) $2.63 billion in cash.

*Id*. at 8, § 6.5

> D. All subordinated debt claims (including all accrued interest) will be allowed and will be satisfied with (a) $450 million of common stock (10,000,000 out of a total of 135,285,714 shares, at a deemed value of $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) the balance in cash.

*Id*. at 8, § 6.7.

> E. Holders of existing equity securities in Delphi shall receive, in the aggregate, (a) 135 million of common stock (3,000,000 out of a total of 135,285,714 shares, at a deemed value $45.00 per share for Plan distribution purposes) in reorganized Delphi and (b) rights to purchase 63,000,000 out of a total of 135,285,714 shares

- 8 -

of common stock (to be reduced by the guaranteed minimum of 10% of the rights for the Plan Investors) in reorganized Delphi for $2.205 billion (exercise price: $35/share).

*Id.* at 8, § 6.8

    F.    Delphi will arrange for payment on the effective date of the Plan of $3.5 billion to fund its pension obligations. Such payment will include GM taking $2.0 billion of net pension obligations pursuant to a 414(l) transaction (the "414(l) Assumption"), which amount shall be reduced to no less than $1.5 billion if (a) Delphi and the Plan Investors determine that any greater amount will have an adverse impact on the Debtors or (b) the Plan Investors determine that any greater amount will have an adverse impact on the Plan Investors' proposed investment in the Debtors. GM will receive a note from Delphi in the amount of the 414(l) Assumption transferred the 414(l) transaction, subject to agreed market terms to be specified in the Delphi/GM Definitive Documents; provided, however, that such note will be due, payable and paid in full at par plus accrued interest in cash within ten (10) days following the effective date of the Plan.

*Id.* at 8, § 6.10

### III. OBJECTIONS

    **A.**    **The Court Should Order the Investors' Professionals to File Applications for Payment of Administrative Expenses Under § 503 Subject to Review By the Court and Other Parties in Interest Under the Appropriate Standard.**

The United States Trustee objects to the entry of an order approving the Equity Agreement because it provides for the payment of professional fees and costs to professionals for an *ad hoc* committee and the Investors, without requiring those professionals to comply with 11 U.S.C. § 503.

Under § 503 of the Bankruptcy Code,

(a) An entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause.
(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –
    (1) the actual, necessary costs and expenses of preserving the estate . . .
    (2) compensation and reimbursement awarded under section 330(a) of this title;
    (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by
        . . .

- 9 -

>   (D) a creditor, an indenture trustee, an equity security holder, or committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;
>
>   . . .
>
>   (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant . . . .

Under § 503(b), professionals may seek compensation and reimbursement of expenses from the estate as an administrative expense under two conditions. A professional retained under 11 U.S.C. § 330 is entitled to its fees and expenses under § 503(b)(2) upon proper application. A professional who is not retained by the estate is not entitled to payment of its fees and costs as an administrative expense. *In re Keren Limited Partnership*, 189 F.3d 86, 88 (2d Cir. 1999).

A non-retained professional may be entitled to an administrative claim for fees and expenses if it represented a creditor, indenture trustee, equity security holder or committee, other than a statutory committee, in making a substantial contribution to the estate. 11 U.S.C. § 503(b)(3)(D)&(4). This provision is to be narrowly construed "and limited to those rare occasions when the creditor's involvement truly fosters and enhances the administration of the estate'." *In re Randall's Island*, 300 B.R. 590, 598 (Bankr. S.D.N.Y. 2003). The applicant must prove substantial contribution by a preponderance of the evidence. *Id*. Substantial contribution claims are only heard at the end of a bankruptcy case. *In re Adelphia*, 336 B.R. 610, 662 n.30 (Bankr. S.D.N.Y. 2006).

The Equity Agreement provides for the payment of $13 million in fees and expenses to unidentified professionals, excluding Appaloosa's, incurred prior to December 1, 2006, upon approval of the Equity Agreement and Framework Agreement, without complying with 11 U.S.C. § 503, and with no oversight by the statutory committees, the Fee Committee, the United States

Trustee or the Court. The Debtors will continue to pay the fees and expenses of the non-retained professionals, including Appaloosa's, incurred after December 1, 2006, in an unspecified amount, again, with no oversight, upon the receipt of "summary statements." *See* Equity Agreement, at 8, § 2(j)(ii).

Appaloosa's professionals will be paid $5 million on the Effective Date of a Plan "if and only if such plan results in holders of Common Stock receiving any recovery under such plan . . ." Equity Agreement, at 8, § 2(j)(i). The Investors and the Debtors appear to acknowledge that Appaloosa's fees must be reviewed under the substantial contribution standard; however, the Equity Agreement does not require Appaloosa to file an application under § 503(b).

The Debtors contend that the payment of the fees and expenses of the Investors' professionals is an appropriate exercise of their business judgment under 11 U.S.C. § 363.[2] *See* Motion, at 29, ¶ 57. The Equity Agreement contemplates that the fees and expenses be treated as administrative claims. *See* Equity Agreement, at 9, § 2(j).

As administrative claimants, the Investors professionals should file applications under § 503, rather than obtain blanket approval of retroactive and prospective fees and expenses without any review by parties in interest or the Court.[3] With respect to all of the professionals except Appaloosa, without more information, the United States Trustee cannot determine whether the fees and expenses are reasonable, "actual and necessary," subject to § 503(b)(4), or a reasonable

---

[2] 11 U.S.C. § 363(b)(1) provides, in part, that "the trustee, after notice and hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate. 11 U.S.C. § 363(b)(1). The Court may approve a transaction under § 363(b) if "there is a good business reason to grant" the motion. *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

[3] The Investors' professionals are not seeking fees and expenses under a pre-petition contract, which is outside the purview of § 503. However, even if they were, parties in interest, including the United States Trustee, would retain the right to review their fees and costs..

- 11 -

exercise of the Debtors' business judgment. Moreover, Appaloosa must demonstrate that it made a substantial contribution to the Debtors' cases in representing the *Ad Hoc* Committee under § 503(b)(4). Therefore, the United States Trustee respectfully requests that the Court order the Investors' professionals to file applications under § 503 for review and approval under the appropriate standard prior to any payment of fees and expenses under the Equity Agreement.

### B.     The Framework Agreement Appears to Be a *Sub Rosa* Plan.

Chapter 11 Debtors may not use 11 U.S.C. § 363 "to short circuit the requirements of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a proposed transaction." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1227 (5th Cir 1986) (internal quotation marks omitted). Among other things, *sub rosa* plans dictate terms of the plan, restructure the debtor's business or restrict creditors' rights. *See In Re Tower Automotive, Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006), *aff'd,* — F. Supp. —, 2006 WL 3751360 (S.D.N.Y. Dec 15, 2006).

The Framework Agreement dictates many of the terms of the plan and deprives creditors, equity holders and other parties in interest of the ability to meaningfully participate in plan negotiations. For example, it determines the maximum aggregate of allowed unsecured claims. § 6.1. The Framework Agreement codifies a settlement of GM's claim apparently without the agreement of the Creditors' Committee or the Equity Committee. § 6.5. The parties to the Framework Agreement have determined the value of the shares of stock for plan distribution purposes. § 6.8. The parties have decided how much is needed to resolve the pension obligations in an agreement that does not include the PBGC. § 6.10. There has been no disclosure as to how the terms were derived or opportunity for those affected to vote.

The Framework Agreement chills the disclosure statement and plan approval processes set forth in 11 U.S.C. §§ 1123, 1125, and 1129, which are meant to ensure that all creditors and

- 12 -

equity security holders participate in the reorganization.  The Framework Agreement tips the balance of power to the Investors.  It inhibits meaningful negotiations with the Creditors' Committee, the Equity Committee, the Unions, and other parties in interest, forcing them to accept plan terms without question.  For this reason, the United States Trustee requests that the Court deny approval of the Framework Agreement as a *sub rosa* plan.

WHEREFORE, the United States Trustee requests that the Court sustain her objections and grant other relief as is just.

Dated: New York
      January 3, 2007

                                Respectfully submitted,

                                DIANA G. ADAMS
                                ACTING UNITED STATES TRUSTEE

By:   */s/ Alicia M. Leonhard*
        Alicia M. Leonhard (AML-6060)
        Attorney
        33 Whitehall Street
        21st Floor
        New York, New York  10004
        Tel. No. (212) 510-0500
        Fax (212) 668-2255