**Hearing Date:  March 1, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
: 
        In re                                                    :        Chapter 11
                                                                 :
DELPHI CORPORATION, et al.,                                      :        Case No. 05-44481 (RDD)
                                                                 :
                                    Debtors.                     :        (Jointly Administered)
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF CLAIM NUMBER 9956 (JOSEPH RENO)

### ("STATEMENT OF DISPUTED ISSUES – JOSEPH RENO")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Statement of Disputed Issues (the "Statement of Disputed Issues") with respect to Proof of Claim Number 9956 (the "Proof of Claim") filed by Joseph Reno ("Reno" or the "Claimant") and respectfully represent as follows:

<u>Background</u>

1.      Reno filed the Proof of Claim on or about July 19, 2006.  The Proof of Claim asserted an unsecured claim for $15,892,592.73 plus unliquidated amounts (the "Claim") against Delphi.   The Claimant attached, as the basis of his Claim, the First Amended Complaint from underlying litigation (United States District Court for the Southern District of Ohio, Case No. 3:04-CV-00321) (the "Underlying Matter") against Delphi.

2.      In the Underlying Matter, Reno alleged that he was wrongfully discharged in violation of Ohio public policy and Ohio Revised Code Section 4113.52 (the "Whistleblower Protection Act"), denied continuing health benefits after his termination in violation of the Consolidated Omnibus Reconciliation Act ("COBRA"), not paid certain wages and vacation benefits upon termination in violation of the Employee Retirement Income Security Act ("ERISA") and Ohio Revised Code Section 4113.15, subjected to defamation in violation of Ohio law, and not provided with a summary from an outside investigator in violation of the Fair Credit Reporting Act ("FCRA").  Reno claimed that he reported safety violations and expressed objections to the Debtors' decisions about how to handle repairs and maintenance of chromium tanks at the Debtors' chemical treatment plant, that he submitted a letter to Delphi, and that his employment was terminated because of his letter.

3.      The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors'

Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate

Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

4.      The Claimant filed his Response To Debtors' Objection To Claim No.

9956 (Docket No. 5920) (the "Response") on November 21, 2006.

Disputed Issues

A.      <u>Debtors Did Not Violate Reno's Rights</u>

5.      Reno was not discharged in violation of Ohio public policy or the

Whistleblower Protection Act.  Reno was suspended with pay pending the Debtors' investigation

into Reno's suspected attempt to have the Debtors pay for Reno's personal use of equipment

supplied by a vendor and for disposal of Reno's personal waste materials.  Following the

investigation, Reno was terminated for gross misconduct.  The United States Department of

Labor ("DOL") subsequently determined that the Debtors discharged Reno for misappropriating

company assets, taking personal advantage of his business relationship with a supplier, and

trying to obstruct and mislead the Debtors' subsequent investigation.  (<u>See</u> Letter from DOL to

Mr. Reno dated May 20, 2004, attached as Exhibit A).  The DOL further concluded that the

Debtors' actions towards Reno were not in retaliation for Reno's complaint regarding safety

issues.

6.      Contrary to Reno's allegations, the Debtors performed all appropriate and

required maintenance and repairs at its wastewater treatment facility.  Reno's supervisor

3

informed Reno that testing had confirmed tank integrity and that any necessary repairs would be made.  The Debtors retained a consulting engineering firm to evaluate repairs, and the firm determined that the Debtors' response to the suspected leak was immediate and appropriate.  (See Letter from Hubbell, Roth & Clark, Inc. Consulting Engineers to the Debtors dated March 26, 2004, attached as Exhibit B).  A similar finding was later made by the Montgomery County Department of Sanitary Engineering.  (See Letter from Montgomery County Department of Sanitary Engineering to the Debtors dated May 18, 2004, attached as Exhibit C).

B.      The Debtors Do Not Owe Reno Any Obligations

7.      With respect to Reno's COBRA claim, it was lawful for the Debtors not to offer continued group health insurance coverage to Reno after his discharge.  Pursuant to COBRA, Reno was not entitled to those benefits because he was discharged for gross misconduct.

8.      The Debtors do not owe Reno any wages, vacation pay, or any other employment benefits.  Reno has no claim for such benefits under ERISA or Ohio law, and he was not entitled to additional wages or benefits.

9.      Reno was not defamed.  Any statements made about him either were true, were not published, or were privileged.

10.     Reno has no claim under the FCRA because that statute does not apply to any of Reno's claims.  Moreover, the Debtors can establish defenses available under that statute, including the defense of qualified immunity.

11.     Because the Debtors are not liable to Reno and Reno has not substantiated his right to payment from Delphi for the asserted Claim, Reno's Claim should be disallowed and expunged.

4

<u>Reservation Of Rights</u>

12.     This Statement Of Disputed Issues is submitted by the Debtors pursuant to
paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),
3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding
Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims
(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions
of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of
Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional
legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim
and (b) the Debtors' right to later identify additional documentation supporting the disallowance,
expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim  and (b) granting the Debtors such other and further relief

as is just.

Dated: New York, New York
        January 3, 2007

                                        SKADDEN, ARPS, SLATE, MEAGHER
                                          & FLOM LLP


                                        By: /s/ John Wm. Butler, Jr.
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois  60606
                                        (312) 407-0700

                                        - and -


                                        By: /s/ Kayalyn A. Marafioti
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York  10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                          Debtors and Debtors-in-Possession

# Exhibit A

**U.S. Department of Labor**

Occupational Safety & Health Administration
Cincinnati Area Office
36 Triangle Park Dr.
Cincinnati, OH 45246
(513) 841-4132
Fax: (513) 841-4114



MAY 20 2004

Joseph M. Reno
5012 Lytle Road
Waynesville, Ohio 45068

Re:    Delphi Corporation/Reno/5-1610-04-034
       Secretary's Findings

Dear Mr. Reno:

This is to advise you that we have completed our investigation of the above-referenced complaint which you filed against Delphi Corporation ("Respondent") under the employee protection provisions of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c). Complainant, Joseph M. Reno, claimed that Respondent terminated him for writing a letter to corporate about the safety and environmental issues surrounding the wastewater treatment plant

Following an investigation of this matter by a duly authorized investigator, the Secretary of Labor, acting through her agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region V, finds no reasonable cause to believe that Respondent violated the complainant's rights under Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c).

Respondent is a manufacturing facility that has a waste removal and wastewater treatment plant with wastewater containing hexavalent chromium. Respondent's principal place of business is located in Kettering Ohio. Therefore, Respondent is a company within the meaning of EPA.

Respondent hired Complainant in August 1981, and at all relevant times he was employed as a Senior Environmental Engineer with responsibility for waste removal and wastewater treatment at Respondent's Kettering and Moraine, Ohio manufacturing facilities. Complainant was an employee within the meaning of the EPA.

Complainant was discharged on or about March 17, 2004. On or about March 17, 2004, Complainant filed a complaint with the Occupational Safety and Health Administration alleging that Respondent discriminated against him in violation of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c). This complaint was timely filed.

The findings show that Respondent terminated Complainant for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest, and trying to obstruct and mislead Delphi's subsequent investigation.

For the reasons noted above, this investigation finds no reasonable cause to believe that Complainant was terminated in violation of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c) and the complaint is therefore dismissed.

Complainant and Respondent have 30 days from receipt of these Findings to file objections and request a hearing on the record, or they will become final and not subject to court review.  Objections must be filed with the Chief Administrative Law Judge, U.S. Department of Labor, 800 K Street NW Suite 400, Washington, D.C. 20001, with this office and with the Regional Administrator, U.S. Department of Labor – OSHA, 230 S. Dearborn St. 32nd Floor, Chicago, IL  60604. The Respondent and any named party must also be provided notice of objections and requests for a hearing on the record.

If you have any questions, please do not hesitate to call me at (513) 841-4132.

Sincerely,


Richard T. Gilgrist, CIH
Area Director


cc:   Chief Administrative Law Judge
      Respondent
      EPA

# Exhibit B

# HRC
## HUBBELL, ROTH & CLARK, INC.
### CONSULTING ENGINEERS

Walter H. Alix
George E. Hubbell
Peter T. Roth
Michael D. Waring
Keith D. McCormack
Curt A. Christeason

CHIEF FINANCIAL OFFICER
J. Bruce McFarland

SENIOR ASSOCIATES
Frederick C. Nevarre
Gary J. Trepcol
Lawrence R. Ancypa
Kenneth A. Melchior
Dennis M. Monsere
Randal L. Ford
David P. Wilcox

Nancy M.D. Faught
Jonathan E. Booth
Michael C. MacDonald
Marvin A. Olane
James C. Hanson
Richard F. Beaublen
Margaret Synk Kuhn
William R. Davis
James J. Aiello
Daniel W. Mitchell
Joel E. Bowdan
Jesse B. VanDeCreek
Robert F. DeFrain
Marshall J. Grazioli

March 26, 2004

Delphi
M/C 480-410-166
5825 Delphi Drive
Troy, MI 48098

Attention:  Mr. Mark Hester, Asst. General Counsel

Re:  Summary of Site Visit
     Kettering, Ohio WWTP Tank Evaluation                    HRC Job No. 20040218.02

Dear Mr. Hester:

Thank you for the opportunity to assist Delphi with evaluating the wastewater treatment tanks at your Kettering, Ohio facility.  Mr. Ed Cote, P.E. of HRC visited the site on March 6, 2004 and the following is a report of the visit as well as follow-up tasks.

## Background

Mr. Cote visited the site and met with the following Delphi employees:

- Marty Cristo
- Mark Gooding
- Jerald Lee
- Roy Knapp

Wastewater containing hexavalent chromium (chrome) is treated in two parallel, 75,000 gallon coated, carbon steel batch treatment tanks.  The process consists of filling one tank while the other is in the treatment mode.  The first step is to adjust the pH to between 2.0 and 2.5 with sulfuric acid while adding sodium bisulfite to reduce the hexavalent chrome to its trivalent state.

The tanks were constructed in 1977 from carbon steel with an epoxy coating.  The foundation consists of a concrete ringwall with the welded steel floor installed over oiled sand.  The area around the tank consists of gravel and is reportedly built on backfill.  The wastewater tank farm is surrounded by a concrete retaining wall which extends approximately 4 feet above grade.

## Tank Inspection and Repairs

Crown Environmental's second shift personnel noticed a very small leak emanating from the bottom of one of the two batch chrome treatment tanks, Tank 2, and immediately took action.  A 50,000 gallon sludge

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 2

holding tank was put into service with heavy duty hose connections (camlock fittings) to provide storage for incoming wastewater while the suspect batch tank was taken out of service.

Delphi drained Tank 2 and cleaned the inside with a high pressure water spray. It was immediately evident that the coating had failed in a number of small areas where the coating was blistered or missing. It was also evident that the wastewater formed a tenacious coating on top of the epoxy coating because the sludge layer was very difficult to remove with high pressure water blasting.

Delphi retained American Testing Services, Ltd. (ATS), a local testing service, to perform a tank inspection per the American Society of Welding D1.1 code. They reported that 100% of the welds on the floor were inspected and they found that the thickness was approximately equal to the original design of 0.25 inch thickness. ATS also reported a 15 inch long crack in the weld on the tank bottom, which was the source of the leak. ATS' report also showed that the metal thickness on the blistered paint areas was approximately equal to the original design.

Delphi personnel also found a small area of corrosion on the bottom of the sidewall. This area and the 15 inch crack were repaired with welded patches (steel plates). The welding was performed by a local industrial welding service.

The tank coating was found to be in poor condition on the bottom and along the sides up to almost three feet. The entire tank bottom plus 3 feet up the side of the tank from the bottom was recoated. The individual blisters were also recoated. Coating was accomplished by sandblasting to white metal and coating with an epoxy novolac material. Delphi reported that this coating is used in the chrome plating areas with very good success. This coating is considered superior to the original coatings which were believed to be epoxy.

The tank was put back into service and it was found that the repair of the small leak was successful. The tank was then drained prior to HRC's visit to allow a visual inspection. Mr. Cote inspected the coating from the opened manway and the overhead walkway. The repaired surfaces appeared to be professionally applied similar to a new tank.

The Delphi team and Mr. Cote met after the inspection and reasoned that Tank 2 was not in danger of structural failure. The thickness testing showed that the tank was of similar thickness to a new tank, so there was no reason to suspect additional concerns. Based upon a review of the tank thickness testing and Mr. Cote's visual inspection, the team saw no immediate threat of a catastrophic tank collapse. The Delphi team and Mr. Cote decided to put the tank back into service as soon as practical since we deemed the risk of utilizing hoses with camlock fittings greater than the likelihood of a catastrophic tank failure.

The team discussed the need to drain and inspect all of the facility's wastewater tanks as soon as possible or instead wait for the July shutdown when the incoming wastewater flow is very small. We discussed the fact that these tanks are of similar construction and age as hundreds of others in the U.S. Automotive industry. HRC shared some information about another large manufacturing client's program to repair tanks and HRC was asked to learn more (see HRC's Findings and Recommendations section below). In particular, the Delphi team was interested in the qualifications of those that repaired the tanks.

## Secondary Containment

The team agreed that wastewater treatment tanks are exempt from the federal SPCC regulations. Mr. Cote noted that many corporations have a mixture of sites with and without secondary containment of

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 3

wastewater treatment tanks. The tank farm is surrounded by a poured concrete retaining wall which has several relatively small cracks or expansion joints which would allow an escape of spilled liquid. The team agreed that most of the contents of a spill would be contained by the walls surrounding the porous stone over the large area, however, so the urgency of repairing cracks is minimal.

There is one area of the retaining wall which was damaged by a truck and the team recommended that it be repaired.

A storm sewer runs through the containment area with two manholes with solid covers. The team agreed that covers should be inspected and the gaskets replaced, if necessary, to prevent a possible migration offsite in the event of a spill. The team noted that a large spill could leave the site if it found its way through the soil into joints in the storm sewer.

## HRC's Findings and Recommendations

HRC contacted several tank companies and our other contacts in the automotive industry with the following to report:

1. Delphi responded to the suspected leak on the sidewall immediately and appropriately. The tank was emptied and inspected both visually and with thickness testing. Two isolated areas were repaired with steel plates. The coatings were repaired with an epoxy novolac coating which is superior to the original coating. The new patched areas and the original coatings effectively protect the steel tank.

2. The Delphi team stated that they would prefer to repair Tank 1 during the July 2004 shutdown when flows are very low. Delphi further stated that they would perform thickness testing of Tank 1 immediately to substantiate their belief that there is no immediate threat of tank failure. HRC received a faxed report from Delphi on March 17 which showed that the thickness was approximately 0.25 inches at four points taken on the sidewall. This testing indicates that the tank wall thickness is approximately equal to the original. HRC recommends that Tank 1 be taken out of service during the July shutdown, cleaned, inspected, and repaired as was done with Tank 2. This statement is based upon the fact that Tank 2 operated since 1977 under similar conditions and did not pose an imminent risk of catastrophic failure as demonstrated by a thorough tank inspection.

3. In general, the automotive industry's tanks were constructed per the American Petroleum Institute (API) Specification No. 650. API's standard for inspection and repair is covered under API 653. In general, the automotive industry uses certified API tank inspectors to inspect the tanks after they are drained and cleaned with water blasting.

4. The automotive industry generally uses experienced tank repair crews who are familiar with API's repair requirements. There are instances when a certified inspector has been used to oversee the repair work of local welders. Delphi's tank repairs were performed by a local industrial welding service, but it should be noted that the bottom is fully supported by a sand cushion and is subject to less stress than the sidewalls. Therefore, these welded patches are not as significant as on the sidewall.

5. The condition of tanks within the automotive industry varies depending upon the service, but in general, the situation is similar to Delphi's chrome tanks; the coatings have failed on the bottom, along the sidewall up to the baffles, and the baffles themselves. This is probably due to the fact that heavy abrasive materials tend to reside in the bottom of a batch tank.

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 4

6. Automotive tanks appear to last longer than those in the municipal water and wastewater industry, for example. HRC suspects that a protective coating of sludge is formed over the original tank lining which protects the carbon steel. This coating is probably composed of precipitated metals combined with oils.

We appreciate the opportunity to provide Delphi with engineering services. Please contact us with any questions you may have.

Very truly yours,

HUBBELL, ROTH & CLARK, INC.

Curt A. Christeson, P.E.
Principal/Vice President

Edward L. Cote, P.E. DEE
Department Head, Industrial Facilities

CAC/jjb/scb

Y:\200402\200402\0218\Proposals\Corrs\Summary.doc

# Exhibit C



**DEPARTMENT OF SANITARY ENGINEERING**

1850 Spaulding Road
Kettering, Ohio 45432

www.mcohio.org

**COUNTY COMMISSIONERS**
Charles J. Curran
Don Lucas
Vicki D. Pegg

**COUNTY ADMINISTRATOR**
Deborah A. Feldman

**DEPARTMENT DIRECTOR**
James A. Brueggeman

May 18, 2004

JoAnne C. Rau, Environmental Coordinator
Kettering Operations Delphi Corporation
2000 Forrer Boulevard
Kettering, Ohio 45420

Dear Ms. Rau:

I would like to thank you for your May 14, 2004, correspondence in which you detail the repair work that is being performed on the chrome treatment tanks at the Delphi Chassis Systems, Kettering Operations wastewater treatment facility.

During my site visit on April 27, 2004, you showed me photographs of the repair work being done on the inside of one of the tanks. Moving on to the actual tank, I saw the repair work that had been done on the tanks outer surface.

Based on the information provided and my observations, it appeared to me that Delphi was proceeding responsively with their chrome tank repairs.

If you have any questions concerning this letter, I can be reached at (937) 781-2562.

Sincerely,

Donald Tucker

Donald Tucker, Pretreatment Coordinator
Water Reclamation Division

DT/bp
Cc:    Carl Guenther
       Susan Schleman, U.S. Department of Labor OSHA
       Marianne Piekutowski, Ohio EPA

1