UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                             :

        In re                        :     Chapter 11
                             :

DELPHI CORPORATION, et al.,      :     Case No. 05-44481 (RDD)
                             :

               Debtors.      :     (Jointly Administered)
                             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3),
364(d)(1), AND 364(e) AND FED. R. BANKR. P. 2002, 4001 AND 6004(g)(I)
AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING AND (II)
AUTHORIZING DEBTORS TO REFINANCE SECURED POST-PETITION
<u>FINANCING AND PREPETITION SECURED DEBT</u>

("DIP REFINANCING ORDER")

Upon the motion, dated December 18, 2006 (the "Motion"), of Delphi Corporation

(the "Borrower") and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), for an

order under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 as amended and in

effect on October 8, 2005, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and

6004(g) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking,

among other things:

           (1)  authorization for the Borrower to obtain post-petition financing

           (the "Financing") to refinance its existing debtor-in-possession financing

           and certain pre-petition indebtedness of the Borrower, and for all of the

           other Debtors (the "Guarantors") to guaranty the Borrower's obligations in

connection with the Financing, up to the aggregate principal amount of $4,495,820,240.59 (the actual available principal amount at any time being subject to those conditions set forth in the DIP Documents (as defined below)), pursuant to a credit facility with JPMorgan Chase Bank, N.A. ("JPMCB"), acting as Administrative Agent (in such capacity, the "Agent") for itself and a syndicate of financial institutions (together with JPMCB and including the fronting and issuing banks for the letters of credit, the "DIP Lenders"), and Citicorp USA, Inc. ("CUSA") as Syndication Agent for the First Priority Facilities (as defined below), J.P. Morgan Securities Inc. ("JPMorgan"), Citigroup Global Markets, Inc. and Deutsche Bank Securities Inc. as Joint Lead Arrangers for the First Priority Facilities (the "First Priority Facilities Joint Lead Arrangers"), and JPMorgan as sole Lead Arranger for the Tranche C Term Loan (as defined below) (the "Tranche C Lead Arranger", and together with the First Priority Facilities Joint Lead Arrangers, the "Joint Lead Arrangers");

(2)  authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)  the use of certain proceeds of the Financing to (a) irrevocably repay in full all outstanding loans under that certain Third Amended and Restated Credit Agreement, dated as of June 14, 2005 (as heretofore amended, supplemented or otherwise modified, the "Pre-Petition Credit Agreement" and, together with the mortgages and all other documentation

2

executed in connection therewith, the "Existing Pre-Petition Facility

Documents"), among the Borrower, the several lenders from time to time

party thereto (the "Pre-Petition Secured Lenders"), and JPMCB, as

administrative agent for the Pre-Petition Secured Lenders (in such capacity,

the "Pre-Petition Agent") (such repayment in full referred to herein as the

"Pre-Petition Facility Refinancing"), the authorization of which constitutes

an "Extraordinary Provision" under General Order No. M-274 of the United

States Bankruptcy Court for the Southern District of New York (the

"General Order"), and (b) irrevocably repay in full all loans and other

obligations under that certain Revolving Credit, Term Loan and Guaranty

Agreement dated as of October 14, 2005 (as heretofore amended,

supplemented or otherwise modified, the "Existing DIP Credit Agreement"

and, together with the mortgages and all other documentation executed in

connection therewith, the "Existing DIP Facility Documents") by and

among the Borrower, the several lenders from time to time party thereto

(the "Existing DIP Lenders"), and JPMCB, as administrative agent for the

DIP Lenders (in such capacity, the "Existing DIP Agent") (such repayment

in full, the "DIP Facility Refinancing", and together with the Pre-Petition

Facility Refinancing, the "Refinancing"),

(4)  the continuation of certain adequate protection with respect to

various parties, whose liens, security interests or setoff rights were primed

by the Existing DIP Facility Documents and are being primed by some or

all of the Financing;

(5)  continuation of the authorization for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) in which certain parties have an interest, and the granting of adequate protection to such parties with respect to, *inter alia*, such use of their cash collateral and all use and diminution in the value of their interest therein;

(6)  permission to accelerate Borrowings and the termination of the Commitments under the DIP Credit Agreement upon (a) a Change of Control (as each such term is defined in the DIP Credit Agreement (defined below)) or (b) the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any of the Guarantors which have a value in excess of $20 million in the aggregate, which are Extraordinary Provisions under the General Order; and

(7)  the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code, which is an Extraordinary Provision under the General Order and authorized under the Existing DIP Order (as hereinafter defined).

Due and appropriate notice of the Motion and the relief requested therein having been served by the Debtors in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014

Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And

Administrative Procedures, entered by this Court on October 26, 2006.

A hearing on the Motion having been held by this Court on January 5, 2007 at

10:00 a.m. (the "Hearing");

Upon the record made by counsel to the Debtors at the Hearing, and after due

deliberation and consideration and sufficient cause appearing therefor,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1. *Jurisdiction*.  This Court has core jurisdiction over the above-captioned

cases (the "Cases"), this Motion, and the parties and property affected hereby pursuant to

28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§

1408 and 1409.

2. *Notice*.  Under the circumstances, the notice given by the Debtors of the

Motion and the Hearing constitutes due and sufficient notice thereof and complies with

Bankruptcy Rules 4001(b) and (c).

3. *Findings Regarding The Financing.*

(a)     Good cause has been shown for the entry of this Order.

(b)     The Debtors require the proceeds of this Financing and use of Cash

Collateral (as defined below) in order to reduce their cost of financing and to permit,

among other things, the orderly continuation of the operation of their businesses, to

maintain business relationships with vendors, suppliers and customers, to make payroll, to

make capital expenditures and to satisfy other working capital and operational needs.  The

reduction in financing costs together with continued access of the Debtors to sufficient

working capital and liquidity through the use of Cash Collateral, incurrence of new

5

indebtedness for borrowed money and other financial accommodations is vital to the

preservation and enhancement of the going concern values of the Debtors and to a

successful reorganization of the Debtors, and an exercise of the Debtors' good business

judgment, in light of, among other things, the benefits of the Refinancing compared to the

reasonable cost to the Debtors of performing under the Existing DIP Facility Documents

and the Pre-Petition Secured Lenders' rights and projected distributions under the Existing

Pre-Petition Facility Documents.

(c)     The Debtors are unable to obtain financing on more favorable terms

from sources other than the DIP Lenders under the DIP Documents and are unable to

obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy

Code as an administrative expense.  The Debtors are also unable to obtain adequate secured

credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code

without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out as

provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under

the terms and conditions set forth in this Order and in the DIP Documents.

(d)     The terms of the Financing and the use of Cash Collateral are fair

and reasonable, and reflect the Debtors' exercise of good and prudent business judgment

consistent with their fiduciary duties and constitute reasonably equivalent value and fair

consideration.

(e)     The Financing has been negotiated in good faith and at arm's length

between the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations

and indebtedness arising under, in respect of or in connection with the Financing and the

DIP Documents, including without limitation, (i) all loans made to, and all letters of credit

issued for the account of, the Debtors pursuant to the Revolving Credit, Term Loan and

Guaranty Agreement, a copy of which was filed with the Court prior to commencement of

the Hearing (the "DIP Credit Agreement"), and (ii) any "Obligations" and all other

"Secured Obligations" (as each such term is defined in the DIP Credit Agreement),

including any hedging obligations of the Debtors permitted under the DIP Credit

Agreement (the "Secured Hedging Obligations") and any Indebtedness (as defined in the

DIP Credit Agreement) permitted by Section 6.03(viii) thereof (the "Cash Management

Obligations"), in each case owing to JPMCB, any DIP Lender or any of their respective

banking affiliates (all of the foregoing in clauses (i) and (ii) collectively,  the "DIP

Obligations"), shall be deemed to have been extended by the Agent and the DIP Lenders

and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy

Code and in express reliance upon the protections offered by section 364(e) of the

Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the

Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed

or modified, on appeal or otherwise.

(f)      The Debtors have requested entry of this Order pursuant to

Bankruptcy Rules 4001(b)(2), 4001(c)(2) and 6004(g).

(g)      For the reasons set forth in the Motion and based on the

uncontroverted proffers of evidence presented at the Hearing, consummation of the

Financing and the use of Cash Collateral in accordance with this Order and the DIP

Documents are in the best interest of the Debtors' estates.

4.      *Authorization Of The Financing And The DIP Documents.*

(a)      The Debtors are hereby authorized to be a party to the DIP
Documents.  The Borrower is hereby authorized to borrow money and obtain letters of
credit pursuant to the DIP Credit Agreement, and the Guarantors are hereby authorized to
guaranty such borrowings and the Borrower's obligations with respect to such letters of
credit, up to an aggregate principal or face amount of $4,495,820,240.59 (plus interest, fees
and other expenses provided for in the DIP Documents), subject to any limitations of
borrowings under the DIP Documents, and in accordance with the terms of this Order and
the DIP Documents, which shall be used solely for purposes permitted under the DIP
Documents, including, without limitation, (i) with respect to the Tranche A Loan and the
Tranche B Loan (as each such term is defined in the DIP Credit Agreement referred to
herein as the "Tranche A Loan" and "Tranche B Loan", respectively, and collectively as
the "First Priority Facilities"), for the DIP Facility Refinancing and to provide working
capital for the Borrower and the Guarantors and for other general corporate purposes and to
pay interest, fees and expenses in accordance with this Order and the DIP Documents and
(ii) with respect to the Tranche C Loan (as defined in the DIP Credit Agreement, the
"Tranche C Loan"), for the Pre-Petition Facility Refinancing.  In addition to such loans and
obligations, the Debtors are authorized to incur overdrafts and related liabilities arising
from treasury, depository and cash management services or in connection with any
automated clearing house fund transfers provided to or for the benefit of the Debtors by
JPMCB or any other DIP Lender or any of their respective affiliates; *provided, however*,
that nothing herein shall require JPMCB or any other party to incur overdrafts or to provide
any such services or functions to the Debtors.

8

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)    the execution, delivery and performance of the Loan Documents (as defined in the DIP Credit Agreement) and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement, the Security and Pledge Agreement (as defined in the DIP Credit Agreement) and the mortgages, if any, contemplated thereby (collectively, and together with the letter agreements referred to in clause (iv) below, the "DIP Documents");

(ii)    the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that (A) no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not (i) shorten the maturity of the extensions of credit thereunder, (ii) increase the commitments, the rate of interest or the letter of credit fees payable thereunder, (iii) amend the financial covenants in Section 6.04 therein to be more restrictive on the Debtors or (iv) amend the notice provisions of Section 7.01 therein (i.e., notice of exercise of remedies after the occurrence of an Event of Default), and (B) the Debtors shall provide the official committee of

unsecured creditors (the "Creditors' Committee") with five (5) business days' prior notice

(or such shorter period as the Creditors' Committee and the Debtors may agree) of any

amendment to the DIP Credit Agreement that causes the Borrowing Base to be decreased);

(iii)    the non-refundable payment to the Agent, the Joint Lead

Arrangers or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit

Agreement (and in the separate letter agreements between them in connection with the

Financing) and reasonable costs and expenses as may be due from time to time, including,

without limitation, reasonable fees and expenses of the professionals retained as provided

for in the DIP Documents; and

(iv)    the performance of all other acts required under or in

connection with the DIP Documents.

(c)    The DIP Documents constitute valid and binding obligations of the

Debtors, enforceable against each Debtor party thereto in accordance with the terms of the

DIP Documents.  No obligation, payment, transfer or grant of security under the DIP

Documents or this Order shall be stayed, restrained, voidable, or recoverable under the

Bankruptcy Code or under any applicable law (including, without limitation, under section

502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or

counterclaim.

5.    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP

Obligations shall constitute allowed claims against the Debtors with priority over any and

all administrative expenses, diminution claims (including all Adequate Protection

Obligations, as defined in the Existing DIP Order, referred to herein as the "Adequate

Protection Obligations")), Replacement Liens and Junior Adequate Protection Liens (each

as defined below)) and all other claims against the Debtors, now existing or hereafter

arising, of any kind whatsoever, including, without limitation, all administrative expenses

of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any

and all administrative expenses or other claims arising under sections 105, 326, 328, 330,

331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the

"Superpriority Claims"), whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy or attachment (other than to the extent of

any statutory liens or security interests arising after the filing of the Debtors' chapter 11

petitions (the "Petition Date") and permitted under the DIP Credit Agreement that by

operation of law would have priority over a previously perfected security interest), which

allowed claims shall be payable from and have recourse to all pre-petition and post-petition

property of the Debtors and all proceeds thereof, subject only to the payment of the Carve

Out (defined below) to the extent specifically provided for herein; *provided, however*, that

(i) the Superpriority Claims in respect of the First Priority Facilities shall be senior in

priority to the Superpriority Claims in respect of the Tranche C Loan, (ii) the Superpriority

Claims granted hereunder shall remain subject and subordinate to any Superpriority

Claims arising under the Existing DIP Order (as defined therein) until such Superpriority

Claims under the Existing DIP Order have been irrevocably paid in full and (iii) the

Superpriority Claims in respect of the Tranche C Loan shall be equal in priority to the

claims granted to the Setoff Claimants in paragraph 16(b)(iii) below (subject to the proviso

thereof).

(b)        For purposes hereof, the "Carve Out" means (i) all unpaid fees

required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United

States Trustee under section 1930(a) of title 28 of the United States Code, (ii) all fees and

expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code, (iii) after the

occurrence and during the continuance of an Event of Default (as defined in the DIP Credit

Agreement), all allowed and unpaid professional fees and disbursements incurred by the

Debtors and any statutory committees appointed in the Cases (each, a "Committee"), and

Transaction Expenses (as defined in the Equity Purchase and Commitment Agreement (the

"EPCA"), a copy of which is attached to the Expedited Motion For Order Authorizing And

Approving The Equity Purchase And Commitment Agreement Pursuant To Sections

105(A), 363(B), 503(B) And 507(A) Of The Bankruptcy Code And The Plan Framework

Support Agreement Pursuant To Sections 105(A), 363(B), And 1125(E) Of The

Bankruptcy Code (the "Plan Investment And Framework Support Approval Motion"),

filed concurrently with the DIP Refinancing Motion) incurred from and after the date that

an order is entered approving the EPCA (the "Post-Order Transaction Expenses"), that

remain unpaid subsequent to the payment, pro rata with other nonpriority administrative

creditors, of such fees and expenses from available funds remaining in the Debtors' estates

for such creditors, in an aggregate amount not exceeding $35,000,000, which amount may

be used subject to the terms of this Order, including, without limitation, paragraph 15

hereof, and (iv) all unpaid professional fees and disbursements incurred or accrued by the

Debtors and any Committees, and Post-Order Transaction Expenses, in each case incurred

or accrued at any time when no Event of Default is continuing (and promptly upon receipt

of a notice of an Event of Default, the Debtors shall provide a copy of such notice to

counsel for the Creditors' Committee), that remain unpaid subsequent to the payment, pro

rata with other nonpriority administrative creditors, of such fees and expenses and

Post-Order Transaction Expenses from available funds remaining in the Debtors' estates

for such creditors, in an aggregate amount not exceeding the sum of (x) such unpaid

professional fees and disbursements, and Post-Order Transaction Expenses, reflected on

the most recent Borrowing Base Certificate (as defined in the DIP Credit Agreement)

delivered to the Agent prior to any Event of Default that is then continuing and (y) such

unpaid professional fees and disbursements, and Post-Order Transaction Expenses,

incurred or accrued after such Borrowing Base Certificate (but at a time when no Event of

Default is continuing) in an aggregate amount under this clause (y) not exceeding

$10,000,000 if this Court has entered an order approving the EPCA, or $5,000,000 if this

Court has not entered such an order (and with amounts included in this clause (y), to be

supported by back-up documentation in respect of the amounts and dates of incurrence of

such fees and disbursements), in each of the foregoing clauses (i), (ii), (iii) and (iv), to the

extent allowed by the Bankruptcy Court at any time; *provided*, *however*, that (1) to the

extent the dollar limitation in this clause 5(b) on fees and disbursements and Post-Order

Transaction Expenses is reduced by any amount as a result of the payment of fees and

disbursements and Post-Order Transaction Expenses during the continuance of an Event of

Default, and such Event of Default is subsequently cured or waived and no other Event of

Default then exists, then effective as of the effectiveness of such cure or waiver, such dollar

limitation shall be increased by an amount equal to the amount by which it has been so

reduced, and (2) (A) nothing herein shall be construed to impair the ability of any party to

object to any of the fees, expenses, reimbursement or compensation described in clauses

(iii) and (iv) above, and (B) following the Termination Date (as defined in the DIP Credit

Agreement), cash or other amounts on deposit in the Letter of Credit Account (as defined

in the DIP Credit Agreement), shall not be subject to the Carve Out.

      6.    *DIP Liens*.

      As security for the DIP Obligations, effective and perfected upon the occurrence of

the Closing Date (as defined in the DIP Credit Agreement, hereinafter referred to as the

"Refinancing Date") and without the necessity of the execution, recordation of filings by

the Debtors of mortgages, security agreements, control agreements, pledge agreements,

financing statements or other similar documents, the following security interests and liens

are hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all

property identified in clauses (a), (b) and (c) below being collectively referred to as the

"Collateral"), subject, only in the event of the occurrence and during the continuance of an

Event of Default, to the payment of the Carve Out (all such liens and security interests

granted to the Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this

Order and the DIP Documents, the "DIP Liens"; the DIP Liens securing the First Priority

Facilities, the "First Priority DIP Liens"; and the DIP Liens securing the Tranche C Loan,

the "Second Priority DIP Liens"):

      (a)    <u>First Lien On Cash Balances And Unencumbered Property</u>.

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in and lien upon all

pre-petition and post-petition property of the Debtors, whether existing on the Petition

Date or thereafter acquired, to the extent not subject to valid, perfected, non-avoidable and

enforceable liens in existence as of the Refinancing Date (after giving effect to the release

of liens occurring at such time) (collectively, "Unencumbered Property"), including

without limitation, all cash and cash collateral of the Debtors (whether maintained with the

Agent or otherwise) and any investment of such cash and cash collateral, inventory,

accounts receivable, other rights to payment whether arising before or after the Petition

Date, contracts, properties, plants, equipment, general intangibles, documents, instruments,

interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other

intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing,

*provided*, *however*, that the Borrower and each Guarantor shall not be required to pledge to

the Agent in excess of 65% of the voting capital stock of its direct Foreign Subsidiaries or

any of the capital stock or interests of its indirect Foreign Subsidiaries (if, in the good faith

judgment of the Borrower, adverse tax consequences would result to the Borrower).

Unencumbered Property shall exclude the Debtors' claims and causes of action under

sections 502(d), 544, 545, 547, 548, 549, 550 and 553(b) of the Bankruptcy Code, or any

other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"),

and any proceeds or property recovered, unencumbered or otherwise the subject of

successful Avoidance Actions.

(b)    Priming Liens.  Pursuant to section 364(d)(1) of the Bankruptcy

Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming

security interest in and lien upon all pre-petition and post-petition property of the Debtors

(including, without limitation, cash collateral, inventory, accounts receivable, other rights

to payment whether arising before or after the Petition Date, contracts, properties, plants,

equipment, general intangibles, documents, instruments, interests in leaseholds, real

properties, patents, copyrights, trademarks, trade names, other intellectual property, capital

stock of subsidiaries, and the proceeds of all the foregoing), whether now existing or

hereafter acquired, that is subject to the existing liens remaining after the occurrence of the

Refinancing Date that pursuant to the terms of the order of this Court dated October 28,

2005 approving the Borrower's and the Guarantors' entry in the Existing DIP Facility

Documents (the "Existing DIP Order") are subject and subordinate to the DIP Liens as

defined in the Existing DIP Order (the "Existing DIP Liens"), including, without limitation,

all Replacement Liens and Debtor Liens (as each such term is defined in the Existing DIP

Order), and any other liens granted under the Existing DIP Order (collectively, the "Primed

Liens").  Such security interests and liens shall be senior in all respects to the interests in

such property of the holders of the Primed Liens in respect thereof, and shall be subject and

subordinate to (i) the Carve Out (except as provided in paragraph 5 hereof), (ii) any valid,

perfected and unavoidable interests of other parties arising out of liens existing on the

Refinancing Date, if any, on such property, that pursuant to the terms of the Existing DIP

Order are senior in priority to the Existing DIP Liens and (iii) statutory liens or security

interests arising after the Refinancing Date and permitted under the DIP Credit Agreement

that by operation of law would have priority over a previously perfected security interest.

In addition, notwithstanding anything to the contrary contained in this paragraph 6(b), any

valid, perfected and non-voidable liens or security interests that remain in existence after

the Refinancing Date and that were senior to or *pari passu* with the liens securing the

Pre-Petition Secured Facility prior to the Refinancing Date (including, without limitation,

to the extent provided in paragraph 16 of this Order, the Replacement Liens and Junior

Adequate Protection Liens) shall maintain such priority or *pari passu* position relative to

the liens securing the Tranche C Loan.

(c)    <u>Liens Junior To Certain Other Liens</u>.  Pursuant to section 364(c)(3)

of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security

interests in and liens upon all pre-petition and post-petition property of the Debtors (other

than the property described in clauses (a) or (b) of this paragraph 6, as to which the liens

and security interests in favor of the Agent will be as described in such clauses), whether

now existing or hereafter acquired, that as of the Refinancing Date is subject to valid,

perfected and unavoidable liens, which security interests and liens in favor of the Agent

and the DIP Lenders are junior to such valid, perfected and unavoidable liens.

(d)    <u>Liens Senior To Certain Other Liens</u>.  The DIP Liens, the

Replacement Liens and the Junior Adequate Protection Liens (each as defined below) shall

not be subject or subordinate to (i) solely in the case of the DIP Liens, any lien or security

interest that is avoided and preserved for the benefit of the Debtors and their estates under

section 551 of the Bankruptcy Code or (ii) any liens arising after the Refinancing Date,

including, without limitation, any liens or security interests granted in favor of any federal,

state, municipal or other governmental unit, commission, board or court for any liability of

the Debtors other than with respect to any liens or security interests arising after the

Refinancing Date and permitted under the DIP Credit Agreement to be senior to the DIP

Liens.

7.    *Protection Of DIP Lenders' Rights.*

(a)    So long as there are any borrowings or letters of credit or other

amounts (other than contingent indemnity obligations as to which no claim has been

asserted when all other amounts have been paid and no letters or credit are outstanding)

outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit

Agreement) under the DIP Credit Agreement, the Existing DIP Agent, the Existing DIP

Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, the holders of

Replacement Liens, the holders of Junior Adequate Protection Liens and the holders of

Debtor Liens (as defined below) shall (i) take no action to foreclose upon or recover in

connection with the liens granted thereto pursuant to the Existing Pre-Petition Facility

Documents, the Existing DIP Order or this Order, or otherwise exercise remedies against

any Collateral, except to the extent authorized by an order of this Court and (ii) be deemed

to have consented to any release of Collateral authorized under the DIP Documents and

(iii) not file any further financing statements, trademark filings, copyright filings,

mortgages, notices of lien or similar instruments, or otherwise take any action to perfect

their security interests in the Collateral unless solely as to this clause (iii), the DIP Lenders

file financing statements or other documents to perfect the liens granted pursuant to this

Order, or as may be required by applicable state law to continue the perfection of valid and

unavoidable liens or security interests as of the Petition Date. Notwithstanding the

foregoing, the Pre-Petition Secured Lenders shall be permitted to file pleadings with

respect to any proposed sale, transfer or other disposition of the Collateral by the Debtors

outside the ordinary course of business so long as such pleadings do not contravene the

provisions of this paragraph 7 and do not otherwise interfere with the exercise of any right

or remedy by the Agent or the DIP Lenders.  Nothing herein shall be read to permit the

Pre-Petition Agent, the Pre-Petition Secured Lenders, or the holders of Replacement Liens,

the holders of Junior Adequate Protection Liens or the holders of Debtor Liens to take any

action in violation of the Bankruptcy Code or other applicable law.  This paragraph 7(a)

defines the relative rights of the DIP Agent and the DIP Lenders, on the one hand, and the

Pre-Petition Agent and the Pre-Petition Secured Lenders, on the other, and is not intended

to confer any rights on the Debtors except with respect to the Debtor Liens.

(b)    The automatic stay provisions of section 362 of the Bankruptcy

Code are vacated and modified to the extent necessary to permit the Agent and the DIP

Lenders to exercise, (i) immediately upon the occurrence of an Event of Default, all rights

and remedies under the DIP Documents other than those rights and remedies against the

Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the

continuance of an Event of Default and the giving of five business days prior written notice

to the extent provided for in the DIP Credit Agreement (promptly upon receipt of such

notice, the Debtors shall provide a copy of such notice to counsel for the Creditors'

Committee), all rights and remedies against the Collateral provided for in the DIP

Documents (including, without limitation, the right to setoff monies of the Debtors in

accounts maintained with the Agent or any DIP Lender).  In any hearing regarding any

exercise of rights or remedies, the only issue that may be raised by any party in opposition

thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and

the Debtors, the Existing DIP Agent, the Pre-Petition Agent, the Pre-Petition Secured

Lenders, and the holders of Replacement Liens or Junior Adequate Protection Liens hereby

waive in such capacities, but not in capacities as holders of general unsecured claims, their

right to seek relief, including, without limitation, under section 105 of the Bankruptcy

Code, to the extent such relief would in any way impair or restrict the rights and remedies

of the Agent or the DIP Lenders set forth in this Order or the DIP Documents.  In no event

shall the Agent, the DIP Lenders, the Existing DIP Agent, the Pre-Petition Agent, the

Pre-Petition Secured Lenders, or the holders of Replacement Liens or Junior Adequate

Protection Liens be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

8.    *Limitation On Charging Expenses Against Collateral.*  Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the Agent, the Existing DIP Agent or the Pre-Petition Agent, as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the Agent, the DIP Lenders, the Existing DIP Agent, the Pre-Petition Agent or the Pre-Petition Secured Lenders.

9.    *Use Of Cash Collateral.*  The Debtors are hereby authorized to use all Cash Collateral (as defined in the Existing DIP Order) of the Pre-Petition Secured Lenders and of the holders of Replacement Liens or Junior Adequate Protection Liens, and the Pre-Petition Secured Lenders and the holders of Replacement Liens or Adequate Protection Liens (as defined in the Existing DIP Order) are directed promptly to turn over to the Debtors all Cash Collateral received or held by them, provided that, until the Refinancing Date, the Pre-Petition Secured Lenders and the holders of Replacement Liens or Adequate Protection Liens are granted adequate protection as set forth in the Existing DIP Order.  The Debtors' right to use Cash Collateral shall terminate automatically upon the occurrence of the Termination Date or the voluntary reduction by the Borrower of the Total Commitments to zero (as each such term is defined in the DIP Credit Agreement).

10.    *Payments to Existing DIP Agent and Existing DIP Lenders.*  (a) On the

Refinancing Date, the Debtors are hereby authorized and directed to (i) use the proceeds of

borrowings under the DIP Credit Agreement to irrevocably repay in full all obligations

then due and payable to the Existing DIP Agent and the Existing DIP Lenders under the

Existing DIP Facility Documents and the Existing DIP Order, (ii) cancel or "cash

collateralize" all outstanding letters of credit issued pursuant to the Existing DIP Credit

Agreement in accordance with the provisions thereof and (iii) pay or secure all (x) hedging

obligations of the Debtors permitted under the Existing DIP Credit Agreement and (y)

Indebtedness (as defined in the Existing DIP Credit Agreement) permitted by Section

6.03(viii) thereof, in each case under collateral arrangements reasonably satisfactory to the

respective obligee of such obligations, whereupon all liens, mortgages and security

interests granted to the Existing DIP Agent and the Existing DIP Lenders under the

Existing DIP Order and the Existing DIP Facility Documents shall be deemed released and

of no further force or effect.

(b)    Subsequent to the Refinancing Date, (x) the Debtors shall promptly

pay and/or reimburse the Existing DIP Agent and/or Existing DIP Lenders for any and all

fees, costs, expenses, losses and damages (including, without limitation, any fees, costs,

expenses, losses and damages contemplated by Section 10.05 of the Existing DIP Credit

Agreement) incurred thereafter to the extent that the Existing DIP Credit Agreement or any

other Existing DIP Facility Document entitles them to such payment, indemnity or

reimbursement after termination of such Existing DIP Facility Document (subject to all

parties' reservation of rights to contest whether the Existing DIP Agent or Existing DIP

Lender is entitled to such payment, indemnity or reimbursement by the Debtors) and (y)

such amounts shall, until paid in full in cash, constitute superpriority administrative

expense claims under section 507(b) of the Bankruptcy Code, senior in all respects to the

Superpriority Claims granted in paragraph 5(a) above.

        11.    *Adequate Protection of Pre-Petition Secured Lenders.*  (a) The Adequate

Protection Liens and other rights afforded to the Pre-Petition Agent and the Pre-Petition

Secured Lenders under paragraphs 12 and 13 of the Existing DIP Order shall continue in

effect until the Debtors repay the amounts outstanding under the Existing Pre-Petition

Facility Documents and the Existing DIP Order in accordance with this paragraph 11.  On

the Refinancing Date, the Debtors are hereby authorized and directed to use the proceeds of

borrowings under the DIP Credit Agreement to irrevocably repay in full all obligations

then due and payable to the Pre-Petition Agent and the Pre-Petition Secured Lenders under

the Existing Pre-Petition Facility Documents and the Existing DIP Order.  Upon repayment

of all such obligations, all liens, mortgages and security interests granted to the Pre-Petition

Agent and the Pre-Petition Secured Lenders under the Existing Pre-Petition Facility

Documents and the Existing DIP Order shall be deemed released and of no further force or

effect, and the provisions of paragraphs 12 and 13 of the Existing DIP Order shall be of no

further force or effect.

        (b)    Subsequent to the Refinancing Date, (x) the Debtors shall promptly

pay and/or reimburse the Pre-Petition Agent and/or Pre-Petition Secured Lenders for any

and all reasonable fees, costs, expenses, losses and damages (including, without limitation,

any fees, costs, expenses, losses and damages contemplated by Section 10.6 of the

Pre-Petition Credit Agreement) incurred thereafter to the extent that the Pre-Petition Credit

Agreement or any other Existing Pre-Petition Facility Document entitles them to such

payment, indemnity or reimbursement after termination of such Existing Pre-Petition

Facility Document (subject to all parties' reservation of rights to contest whether the

Pre-Petition Agent or Pre-Petition Secured Lender is entitled to such payment, indemnity

or reimbursement by the Debtors) and (y) such amounts shall, until paid in full in cash,

constitute superpriority administrative expense claims under section 507(b) of the

Bankruptcy Code to the extent allowed, subject and junior in all respects to the

Superpriority Claims granted in paragraph 5(a) above and to the claims granted to the

Setoff Claimants in paragraph 16(b)(iii) below.

    12.    *Perfection Of DIP Liens.*

        (a)    Subject to the provisions of paragraph 7(a) above, the Agent is

hereby authorized, but not required, to file or record financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments in any

jurisdiction or take any other action in order to validate and perfect the liens and security

interests granted to them hereunder.  Whether or not the Agent on behalf of the DIP

Lenders shall, in its sole discretion, choose to file such financing statements, trademark

filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise

confirm perfection of the liens and security interests granted to the Agent hereunder, such

liens and security interests shall be deemed valid, perfected, allowed, enforceable,

non-avoidable and not subject to challenge dispute or subordination, at the time and as of

the date of entry of this Order.  Upon the request of the Agent, each of the Existing DIP

Agent and the Existing DIP Lenders, and the Pre-Petition Agent and Pre-Petition Secured

Lenders, without any further consent of any party, is authorized to take, execute and deliver

23

such instruments (in each case without representation or warranty of any kind) to enable

the Agent to further validate, perfect, preserve and enforce DIP Liens.

(b)    A certified copy of this Order may, in the discretion of the Agent, be

filed with or recorded in filing or recording offices in addition to or in lieu of such

financing statements, mortgages, notices of lien or similar instruments, and all filing

offices are hereby authorized to accept such certified copy of this Order for filing and

recording.

(c)    Any provision of any lease or other license, contract or other

agreement that requires (i) the consent or approval of one or more landlords or other parties

or (ii) the payment of any fees or obligations to any governmental entity, in order for any

Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or

the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed to

be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such

provision shall have no force and effect with respect to the transactions granting

post-petition liens, in such leasehold interest or the proceeds of any assignment and/or sale

thereof by any Debtor, in favor of the DIP Lenders in accordance with the terms of the DIP

Credit Agreement or this Order.

13.    *Preservation Of Rights Granted Under This Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with

those granted by this Order to the Agent and the DIP Lenders or to the Setoff Claimants,

respectively, shall be granted or allowed while any portion of the Financing (or any

refinancing thereof) or the Commitments thereunder or the DIP Obligations remain

outstanding, and the DIP Liens, the Replacement Liens and the Junior Adequate Protection

Liens shall not be (i) solely in the case of the DIP Liens, subject or junior to any lien or

security interest that is avoided and preserved for the benefit of the Debtors' estates under

section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any

other lien or security interest, whether under section 364(d) of the Bankruptcy Code or

otherwise (other than as specifically provided for in this Order).  Nothing in this paragraph

13(a) shall limit (x) the rights of the Debtors to refinance the Financing in compliance with

the DIP Credit Agreement or (y) the rights of any party in interest with respect to any such

refinancing.

        (b)      Unless all DIP Obligations shall have been paid in full (or (x) with

respect to outstanding letters of credit issued pursuant to the DIP Credit Agreement,

cancelled or "cash collateralized" in accordance with the provisions thereof and (y) with

respect to Secured Hedging Obligations and Cash Management Obligations, secured under

collateral arrangements reasonably satisfactory to the respective obligee of such

obligations), the Debtors shall not seek, and it shall constitute an Event of Default and a

termination of the right to use Cash Collateral if any of the Debtors seek, or if there is

entered, (i) any modifications or extensions of this Order without the prior written consent

of the Agent, and no such consent shall be implied by any other action, inaction or

acquiescence by the Agent, or (ii) an order dismissing any of the Cases.  If an order

dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at

any time entered, such order shall provide (in accordance with sections 105 and 349 of the

Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and

replacement security interests granted to the Agent, the Setoff Claimants or the holders of

the Debtor Liens pursuant to this Order, shall continue in full force and effect and shall

maintain their priorities as provided in this Order until all DIP Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (x) above.

(c)    If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations incurred prior to the actual receipt of written notice by the Agent, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations incurred by the Debtors to the Agent or the DIP Lenders prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent and the DIP Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral and DIP Obligations.

(d)    Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and the DIP Lenders granted by the provisions of this Order and the DIP Documents shall

survive, and shall not be modified, impaired or discharged by (i) the entry of an order

converting any of the Cases to a case under chapter 7, dismissing any of the Cases,

terminating the joint administration of these Cases or by any other act or omission, or (ii)

the entry of an order confirming a plan of reorganization in any of the Cases, and, pursuant

to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to

any remaining DIP Obligations.  The terms and provisions of this Order and the DIP

Documents shall continue in these Cases, in any successor cases if these Cases cease to be

jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and

the DIP Liens, the Superpriority Claims and all other rights and remedies of the Agent and

the DIP Lenders granted by the provisions of this Order and the DIP Documents shall

continue in full force and effect until the DIP Obligations are indefeasibly paid in full.

        14.    *Effect Of Stipulations On Third Parties*.  Notwithstanding the Fourth

Stipulation Between the Creditors' Committee and JPMorgan Chase Bank, N.A., as Agent

for the Pre-Petition Secured Lenders, with Respect to an Extension of Deadlines

Established Pursuant to Final DIP Financing Order, entered by this Court on June 13, 2006,

the stipulations and admissions contained in paragraphs 3 and 10 of the Existing DIP Order

shall be binding upon the Creditors' Committee, and the period during which the

Creditors' Committee is permitted to raise "Claims and Defenses" as provided in

paragraph 16 of the Existing DIP Order, is hereby terminated subject to the occurrence of

the closing on the Refinancing.  As a consequence of the foregoing and the stipulations and

admissions contained in paragraphs 3 and 10 of the Existing DIP Order, (a) the Pre-Petition

Debt and all related obligations of the Debtors under the Existing Pre-Petition Facility

Documents (the "Pre-Petition Obligations") shall hereby be deemed to constitute allowed

secured claims against the Borrower and each of the other Debtors that are guarantors

under the Existing Pre-Petition Facility Documents, not subject to counterclaim, setoff,

subordination, recharacterization, defense or avoidance, for all purposes in these Cases and

any subsequent chapter 7 cases, (b) as of the Petition Date, the aggregate value of the

Pre-Petition Collateral (as defined below) in which the Pre-Petition Agent held, for the

ratable benefit of the Pre-Petition Secured Lenders, valid, binding, perfected, enforceable

first priority liens, exceeded the aggregate amount of the Pre-Petition Obligations and (c)

the Pre-Petition Obligations, the Pre-Petition Agent's and the Pre-Petition Secured

Lenders' liens on the Pre-Petition Collateral, and the Pre-Petition Agent and the

Pre-Petition Secured Lenders shall not be subject to any Claims and Defenses (as defined

in the Existing DIP Order) or any other challenge by the Debtors, any other party in interest

or any successor to the Debtors (including, without limitation, any estate representative or

a chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors).

   15. *Limitation On Use Of Financing Proceeds And Collateral.*

Notwithstanding anything herein or in any other order by this Court to the contrary, no

borrowings, letters of credit, Cash Collateral or the Carve Out may be used to (a) object,

contest or raise any defense to, the validity, perfection, priority, extent or enforceability of

any amount due under the DIP Documents, the Existing DIP Facility Documents or the

Existing Pre-Petition Facility Documents, or the liens or claims granted under this Order,

the Existing DIP Order, the DIP Documents or the Existing Pre-Petition Facility

Documents, (b) assert any causes of action against the Agent, the DIP Lenders, the

Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent or the Pre-Petition

Secured Lenders or their respective agents, affiliates, representatives, attorneys or advisors,

prevent, hinder or otherwise delay the Agent's assertion, enforcement or realization on the

Cash Collateral or the Collateral in accordance with the DIP Documents or this Order, (c)

seek to modify any of the rights granted to the Agent, the DIP Lenders, the Existing DIP

Agent, the Existing DIP Lenders, the Pre-Petition Agent or the Pre-Petition Secured

Lenders hereunder, under this Order, the Existing DIP Order or under the DIP Documents,

the Existing DIP Facility Documents or the Existing Pre-Petition Facility Documents, in

each of the foregoing cases without such parties' prior written consent or (d) pay any

amount on account of any claims arising prior to the Petition Date unless such payments

are (i) approved by an Order of this Court and (ii) in accordance with the DIP Credit

Agreement or otherwise approved by the Agent in its sole discretion.

16.    *Setoff, Replacement Liens and Junior Adequate Protection Liens.*  To the

extent that a customer or supplier of the Debtors that has an allowable setoff claim under

section 506 or 553 of the Bankruptcy Code in respect of its payables owed to any Debtor as

of the Petition Date ("Pre-Petition Payables") or a valid right of recoupment that arose

prior to the Petition Date (such setoff claim or right of recoupment, "Setoff"), such

customer or supplier (a "Setoff Claimant") is hereby provided, consistent with the terms of

the Existing DIP Order, with certain rights and adequate protection as described below.

For the avoidance of doubt, nothing herein shall be construed to be an admission or

acknowledgement, or an increase or decrease in the monetary amount of the pre-petition

setoff or recoupment rights of any person, under the Bankruptcy Code, applicable

non-bankruptcy law or otherwise.

(a)    Exercise of Set Off.  (1)  Any exercise of a Setoff Right (as defined

below) in accordance with this Order or the Existing DIP Order shall not be stayed by

section 362 of the Bankruptcy Code.  Any exercise of any right of Setoff other than in

accordance with this Order is subject to section 362 of the Bankruptcy Code.  Nothing in

this Order shall prevent any holder of a right of Setoff from seeking relief from the

automatic stay with respect to such Setoff, or prevent the Debtors or any party in interest

from objecting or being heard with respect to any such request.  A Setoff Claimant shall, in

accordance with this paragraph, be entitled to exercise its Setoff that arose in the ordinary

course of business for any claims or recoupment defenses arising from or related to the

claims for prepetition warranty and/or product recall claims, customer adjustments,

customer rebates and allowances, overpricing claims, claims for short shipments and

damaged goods, customer/supplier netting and other similar claims arising in the ordinary

course of business of the relevant parties other than any such claims or recoupment

defenses arising as a result of the filing of the cases (a "Setoff Right").  A Setoff Right shall

not include any claims or recoupment defenses arising from or related to employee or

employee benefit matters, retiree benefit or pension matters, including, without limitation,

any related indemnities or guarantees, the rejection of executory contracts, or

consequential or punitive damages.  The determination as to whether a Setoff Claimant

may exercise a "Setoff Right" will be made solely by (i) the agreement of the Setoff

Claimant, the Creditors' Committee and the Debtors, (ii) pursuant to the procedures

hereinafter set forth or (iii) order of the Court.

    (2)  Any Setoff Claimant seeking to exercise a Setoff Right against

payables during any month (whether against Pre-Petition Payables or post-petition

payables) shall submit to the Debtors and the Creditors' Committee (with a copy to the

Agent) a written request to exercise such Setoff Right, the basis for such Setoff Right and

reasonably detailed documentation supporting such Setoff Right.  If the Setoff Claimant,
the Creditors' Committee and the Debtors fail to agree in writing that any amount is
included in a Setoff Right within 10 business days after submission of such information to
the Debtors and the Creditors' Committee (the "Agreement Deadline"), the Debtors and
such Setoff Claimant shall (unless all such parties agree to extend such 10 business day
period) seek resolution of such matter through a mediator agreed to by the Debtors and
such Setoff Claimant or appointed by this Court.  Such mediation shall end not later than
30 days after the Agreement Deadline unless such period is extended by agreement of the
Debtors and such Setoff Claimant.  If the Debtors and such Setoff Claimant cannot resolve
the matter through such mediation, then such matter may be submitted to binding
arbitration to a single arbitrator agreed to by all such parties or appointed by this Court, and
such parties shall request that such arbitrator issue its ruling within 90 days after the
Agreement Deadline.  Notwithstanding any award in any such arbitration, in no event shall
the Setoff Claimant be permitted to exercise its Setoff Right against any payables other
than Pre-Petition Payables except as set forth in this paragraph 16.

(3)    In the event any Setoff Claimants (the "Non-Exercising Setoff
Claimants") have not exercised their asserted Setoff Rights in respect of their respective
Pre-Petition Payables and have instead paid their Pre-Petition Payables to the Debtors, in
addition to any other adequate protection provided to such Non-Exercising Setoff
Claimants herein, the Non-Exercising Setoff Claimants may exercise Setoff Rights
established in accordance with this paragraph against post-petition payables owed by such
Non-Exercising Setoff Claimants to the Debtor or Debtors against which such
Non-Exercising Setoff Claimants have their Setoff Rights; *provided* that (a) in the case of

31

the exercise of any Setoff Rights by General Motors Corporation or any of its affiliates

("GM"), the aggregate amount of Setoff Rights that may be exercised pursuant to this

subparagraph (3) against Pre-Petition Payables or post-petition payables owed by GM to

the Debtors during any month shall not exceed $35 million (the "Aggregate Monthly Cap

Amount") and (b) to the extent Setoff Rights are recognized in accordance with this Order

or the Existing DIP Order in excess of the Setoff Rights that are permitted to be exercised

pursuant to such limitations, Setoff Claimants may carry forward their Setoff Right to

succeeding months, subject to the applicable monthly limitations, if any, until such Setoff

Rights have been fully exercised.

        (4)        (a) Except as set forth above, and subject to the adequate protection

provided to Setoff Claimants as herein set forth, Setoff Claimants shall not be permitted to

exercise any Setoff until the later of (x) the effective date of the Debtors' confirmed plan of

reorganization and (y) allowance of the Setoff as a claim in these Cases.  Any exercise of

Setoff pursuant to (x) or (y) above is subject to the treatment afforded to such Setoff under

a plan of reorganization confirmed by the Bankruptcy Court.  Nothing contained herein or

in the Existing DIP Order shall limit (i) the discretion of the Debtors to pay warranty and/or

product recall claims in accordance with orders of the Court, (ii) the right of any party in

interest to exercise a post-petition setoff or recoupment against a post-petition payable or

(iii) the right of a Setoff Claimant to request further adequate protection (or the Debtors or

any party in interest to oppose any such request).

        (b)        Adequate Protection.  A Setoff Claimant is entitled, pursuant to

sections 361, 362(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of its

Setoff to the extent it does not exercise such Setoff and remits the amount of such

Pre-Petition Payables not setoff or recouped.  As adequate protection therefor, each such Setoff Claimant is hereby granted, effective upon payment to the Debtors of the amount subject to such Setoff, the following (collectively, including any Junior Adequate Protection Liens granted pursuant to the Existing DIP Order, the "Junior Adequate Protection Liens"), such Junior Adequate Protection Liens to be effective and perfected without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements:

(i)        A replacement lien (including any Replacement Liens granted pursuant to the Existing DIP Order, the "Replacement Lien") on such Setoff Claimant's post-petition payables to the extent that it is determined that such Setoff Claimant had a Setoff in respect of the Pre-Petition Payables that have been remitted to the Debtors, which Replacement Lien is limited to the amount of the Setoff; *provided, however*, that (i) the Debtors reserve their rights to any and all Claims and Defenses that may be asserted with respect to such Setoff and (ii) the Replacement Liens are subject and subordinate to and only to (x) the Existing DIP Liens, the First Priority DIP Liens granted to the Agent for the benefit of the DIP Lenders in this Order and pursuant to the DIP Documents, and any liens to which such liens so granted to the Agent are junior and (y) the Carve-Out.

(ii)       As further adequate protection to protect the Setoff Claimant against any diminution in the value of its Replacement Lien, the Setoff Claimant is hereby granted a security interest in and lien upon all the other Collateral, subject and subordinate to and only to (A) the Existing DIP Liens, the DIP Liens granted to the Agent for the benefit of the DIP Lenders in this Order and pursuant to the DIP Documents, and any liens to which such liens so granted to the Agent are junior, (B) the Carve Out and (C) until the

33

Refinancing Date, the Pre-Petition Secured Lenders' liens on the Pre-Petition Collateral

and the Adequate Protection Liens granted to the Pre-Petition Agent and the Pre-Petition

Secured Lenders under the Existing DIP Order; *provided* that the Setoff Claimant's

security interest in and lien upon Collateral which is not (x) Pre-Petition Collateral (as

defined in the Existing DIP Order, the "Pre-Petition Collateral"), (y) Collateral that would

have constituted Pre-Petition Collateral but for the operation of section 552(a) of the

Bankruptcy Code as to which, without further action, the Pre-Petition Agent would have

had a valid and perfected security interest or lien or (z) subject to the Replacement Lien,

shall be *pari passu* with the Adequate Protection Liens granted to the Pre-Petition Agent

and the Pre-Petition Secured Lenders pursuant to the Existing DIP Order and *pari passu*

with the DIP Liens on Collateral that is not included in clauses (x), (y) or (z) solely to the

extent such DIP Liens secure the Tranche C Term Loan.

        (iii)    As further Adequate Protection, to the extent that the post-petition

payables in respect of which the Setoff Claimant is granted a Replacement Lien are less

than the Setoff of such Setoff Claimant, such Setoff Claimant is hereby granted an

administrative claim under section 507(b) of the Bankruptcy Code in the amount of such

deficiency subject to the Carve Out and equal in priority to the administrative claim

granted as adequate protection to the Pre-Petition Secured Lenders in paragraph 12(b) of

the Existing DIP Order and the Superpriority Claim in respect of the Tranche C Loan;

*provided, however*, that the Setoff Claimant shall not receive or retain any payments,

property or other amounts in respect of the claims under section 507(b) of the Bankruptcy

Code granted hereunder unless and until the DIP Obligations in respect of the First Priority

Facilities have indefeasibly been paid in cash in full and no letters of credit under the First

Priority Facilities remain outstanding unless "cash collateralized" in accordance with the DIP Credit Agreement.

17.    *Debtor Reimbursement Claims and Debtor Liens*.  Without limiting the joint and several liability of each of the Debtors for the DIP Obligations, the Debtors shall use their reasonable best efforts to ensure that Debtors that receive the benefit of funds advanced under the Financing repay their share thereof on a dollar for dollar basis.  To the extent a Debtor (i) incurs any of the DIP Obligations (including as a result of intercompany balances incurred after the Petition Date to the extent such balances arise from the incurrence of DIP Obligations) or (ii) receives a post-petition intercompany loan or transfer (including as a result of the Debtors' cash management system or otherwise) (each a "Beneficiary Debtor"), and such DIP Obligations were repaid or such post-petition intercompany loan or transfer is made (including from cash collateral) (each an "Advance") by (A) any other Debtor that is a Borrower or Guarantor under the Financings or (B) any non-Debtor affiliate (together (A) and (B) an "Adequately Protected Entity"), the Adequately Protected Entity shall have, subject to the limitations set forth in paragraph 18 below (a) an allowed claim under sections 364(c)(1) and 507(b) of the Bankruptcy Code against the Beneficiary Debtor for the amount of such Advance, having priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, which claim shall bear interest at a rate agreed between the Debtors from time to time for the period accruing from and after the date such claim arises until repayment thereof (collectively, including Debtor Reimbursement Claims granted pursuant to paragraph 18 of the Existing DIP Order, the "Debtor Reimbursement Claim") and (b) a lien on all Collateral under section 364(c)(3) of the Bankruptcy Code securing

such Debtor Reimbursement Claim (including Debtor Liens granted pursuant to paragraph 18 of the Existing DIP Order, a "Debtor Lien").  All Debtor Liens are effective and perfected without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements.

18.    All Debtor Reimbursement Claims and Debtor Liens shall be junior, subject and subordinate to and only to the Superpriority Claims, the DIP Liens, Adequate Protection Obligations, the Junior Adequate Protection Liens, the Replacement Liens and to any claims against such Beneficiary Debtor that are expressly senior to, and on a parity with, or carved out from the Superpriority Claims, the DIP Liens, Adequate Protection Obligations, Junior Adequate Protection Liens or the Replacement Liens.  All Debtor Liens shall be "silent" liens and the Adequately Protected Entity shall forbear from exercising, and shall not be entitled to exercise, any right or remedy relating to any Debtor Reimbursement Claim or Debtor Lien, including, without limitation, taking any of the actions that the holders of Replacement Liens and Junior Adequate Protection Liens are prohibited from taking pursuant to paragraph 7, including, without limitation, as to seeking relief from the automatic stay, or seeking any sale, foreclosure, realization upon repossession or liquidation of any property of another Debtor, or taking any position with respect to any disposition of the property, the business operations, or the reorganization of another Debtor. The Agent shall have the exclusive right to manage, perform and enforce all rights and remedies described in the DIP Documents.  The Debtor Lien of the Adequately Protected Entity automatically, and without further action of any person or entity of any kind, shall be released or otherwise terminated to the extent that property subject to such Debtor Lien is sold or otherwise disposed of by or on behalf of the Agent or

any other Debtor or to the extent that such property is subject to a lien prior to the DIP

Liens and such lien is permitted under the DIP Documents.

19.    *Sufficiency of Adequate Protection*.  Under the circumstances and given that

the above described adequate protection is consistent with the Bankruptcy Code, the Court

finds that the adequate protection provided herein is reasonable and sufficient to protect the

interests of all parties with liens against or interests in property of the Borrower or the

Guarantors.

20.    With respect to the effect of Debtor Liens on any sale of property by the

Debtors, (a) the Debtors may sell property, in accordance with section 363 of the

Bankruptcy Code, free and clear of any Debtor Lien, with such lien attaching to the

proceeds of sale in the same priority and subject to the same limitations and restrictions as

existed in respect of the property sold and (b) the provisions of section 363(k) of the

Bankruptcy Code shall not apply.

21.    *JPMCB As Collateral Agent*.  To the extent JPMCB, in its role as Collateral

Agent under the Existing Pre-Petition Facility Documents or the Existing DIP Facility

Documents (the "Existing Facilities Documents"), is the secured party under any Control

Agreements (as defined in such documents), listed as loss payee under the Debtors'

insurance policies as required under the Existing Facilities Documents, or is the secured

party under any other Existing Facilities Document, JPMCB, in its role as Collateral Agent

under the DIP Credit Agreement, shall, as of the Refinancing Date, be deemed to be the

secured party under such Control Agreements, the loss payee under the Debtors' insurance

policies and the secured party under any other Existing Facilities Document and shall act in

such capacities.

22.     *Order Governs*.  In the event of any inconsistency between the provisions of
this Order and the Existing DIP Order, the DIP Documents or the Existing DIP Facility
Documents, the provisions of this Order shall govern.  Subject to the terms of this Order,
the provisions of the Existing DIP Order, including, without limitation, paragraphs 3 and
16 thereof, shall remain in full force and effect.  The terms of this Order shall govern to the
extent of any inconsistency between this Order and that certain Cash Management Order
dated October 14, 2005, including, without limitation, with respect to the matters set forth
in paragraphs 17 to 19 of this Order.

23.     *Binding Effect; Successors And Assigns*.  The DIP Documents and the
provisions of this Order, including all findings herein, shall be binding upon all parties in
interest in these Cases, including, without limitation, the Agent, the DIP Lenders, the
Existing DIP Agent, the Existing DIP Lenders, the Pre-Petition Agent, the Pre-Petition
Secured Lenders, any party granted a Junior Adequate Protection Lien hereunder or under
the Existing DIP Order, any Committee appointed in these Cases, and the Debtors, for
themselves and not for their estates, and their respective successors and assigns and shall
inure to the benefit of the Agent, the DIP Lenders, the Existing DIP Agent, the Existing
DIP Lenders, the Pre-Petition Agent, the Pre-Petition Secured Lenders, any party granted a
Replacement Lien or Junior Adequate Protection Lien, and the Debtors and their respective
successors and assigns; *provided*, *however*, that the Agent, the Existing DIP Agent, the
Pre-Petition Agent, the DIP Lenders, the Existing DIP Lenders and the Pre-Petition
Secured Lenders shall have no obligation to permit the use of Cash Collateral or extend any
financing to any chapter 7 trustee or similar responsible person appointed for the estates of
the Debtors.  In determining to make any loan under the DIP Credit Agreement, permitting

38

the use of Cash Collateral or in exercising any rights or remedies as and when permitted

pursuant to this Order or the DIP Documents, the Agent, the Pre-Petition Agent, the

Existing DIP Agent, the DIP Lenders, the Existing DIP Lenders and the Pre-Petition

Secured Lenders shall not be deemed to be in control of the operations of the Debtors or to

be acting as a "responsible person" or "owner or operator" with respect to the operation or

management of the Debtors (as such terms, or any similar terms, are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

24.     *Aircraft Leases.*  Notwithstanding anything to the contrary contained in this

Order and consistent with this Court's September 29, 2006 order (Docket No. 5234), no

DIP Liens or any other liens or interests granted, authorized or contemplated herein shall

attach to any interests of Delphi Automotive Systems Human Resources, LLC ("Delphi

HR") in two leases of aircraft, both of which are dated March 30, 2001 between Bank of

America, N.A., and Delphi HR (the "Aircraft Leases"), or in any personal property,

cash collateral or proceeds that is the subject of the Aircraft Leases.

25.     *Objections.*  On January 2, 2007, Howard County, Indiana ("Howard

County") filed a limited objection to the Motion (Docket No. 6369) (the "Howard County

Objection").  The Howard County Objection has been consensually resolved by the parties

prior to the Hearing and is hereby deemed withdrawn.  There were no other objections to

the Motion.

26.     *Committee Notices.*  All notices to be provided to the Creditors' Committee

shall be sent to Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, NY

10022-4834, Attn: Robert Rosenberg, Esq.

27.    Notwithstanding the possible applicability of Bankruptcy Rule 6004(g) or

any other provision of the Bankruptcy Rules or Bankruptcy Code, the terms and conditions

of this Order shall be immediately effective and enforceable upon its entry.


Dated:    January 5, 2007
          New York, New York

                                  /s/ Robert D. Drain
                                  UNITED STATES BANKRUPTCY JUDGE