Thomas M. Kennedy (TK-0993)
Susan Jennik (SJ-4607)
**KENNEDY, JENNIK & MURRAY, P.C.**
**113 University Place**
**New York, NY  10003**
**(212) 358-1500**

Return Date:
**January 11, 2006**
**10:00 a.m.**

**Attorneys for International Union of Electronic,**
**Electrical, Salaried, Machine and Furniture Workers,**
**Communications Workers of America ("IUE-CWA")**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | **Chapter 11** |
| In re DELPHI CORPORATION, et al., | ) | |
| | ) | **05-44481 (RDD)** |
| Debtors. | ) | **(Jointly Administered)** |

## SUPPLEMENTAL OBJECTION OF IUE-CWA TO MOTION FOR ORDER AUTHORIZING AND APPROVING THE EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT TO SECTIONS 105(a), 363(b) AND 1125(e) OF THE BANKRUPTCY CODE

The IUE-CWA, by and through its counsel, hereby files this Supplemental Objection (the

"Supplemental Objection") to the Expedited Motion for Order Authorizing and Approving the

Equity Purchase and Commitment Agreement pursuant to sections 105(a), 363(b), 503(b) and

507(a) of the Bankruptcy Code and the Plan Framework Support Agreement pursuant to sections

105(a), 363(b) and 1125(e) of the Bankruptcy Code ("Motion").  In support of this Supplemental

Objection, the IUE-CWA  respectfully states as follows:

### INTRODUCTION

1.       For a case that since its inception has been labeled a "labor transformation" case

by all parties, including Delphi Corp. ("Delphi" or "the Debtors"), the proposed framework for a

resolution of this case contains remarkably little reference to the IUE-CWA and Delphi's other unions. The Equity Purchase and Commitment Agreement ("EPCA") assumes (without saying how) that definitive labor agreements will be reached by January 31, 2007 but it does not address what the substance of those agreements will be.[1] (Motion, Ex. A, ¶ 12(g), Docket No. 6179.) The EPCA does not otherwise include any reference to the IUE-CWA. The IUE-CWA has not been consulted by any party concerning the terms of this proposed framework, did not take part in any of the negotiations that led up to it, was not asked to review any of the terms of the proposed agreements and has generally been kept apart from these discussions. (Exhibit 57, Declaration of David L. Resnick, dated January 7, 2007 ("Resnick Dec."), ¶¶ 15-23.) The result is a proposed framework that does not reflect the sacrifices that IUE-CWA members have made and will be asked to make in the future and does not have the support of the IUE-CWA.

2.    The proposed framework presumes that Delphi has an enterprise value of $14 billion dollars and will generate positive EBITDA, going forward in and after 2008, of $2.4 billion per year. (Exhibit 57, Resnick Dec., Ex. G at 9.) It is no secret that the turnaround in Delphi's value is predicated upon the agreements its unions have made that will allow for a substantial reduction in Delphi's manufacturing footprint in America. The New York Times reported on December 22, 2006 that an analyst at Morningstar "said the bidding war for Delphi underscored the value unlocked by a restructuring plan that calls for closing or selling 21 of

---

[1] At this point, apart from the earlier Special Attrition Program ("SAP"), the IUE-CWA does not have an agreement or understanding with Delphi on what the terms of any future national labor agreement will be.

Delphi's 29 plants in the United States."[2]  While the members of Delphi's unions have obtained

substantial severance payments and a protection of their pension and other post-employment

benefits in the course of this proceeding and under the proposed framework, that does not fully

compensate them for their sacrifice.  They also expect to participate in the value of the newly

created company to the extent of their contributions and sacrifice.

## BACKGROUND

3.      On October 8, 2005 (the "Petition Date"), thirty-nine of the Debtors filed

voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On October 14, 2005, the

three remaining Debtors also filed voluntary petitions. (Motion, ¶ 1, Docket No. 6179.)

4.      On December 18, 2006, the Debtors filed this Motion, seeking an order (a)

approving and authorizing them to enter into the EPCA dated December 18, 2006, among Delphi

Corporation, A-D Acquisition Holdings, LLC ("Appaloosa"), Harbinger Del-Auto Investment

Company, Ltd., Dolce Investments LLC ("Cerberus"), Merrill Lynch, Pierce, Fenner & Smith

Incorporated and UBS Securities LLC, (collectively "the Proposed Investors");  (b) authorizing

them to pay certain fees to the Proposed Investors; and (c) approving and authorizing them to

enter into the Plan Framework Support Agreement ("PSA"), dated December 18, 2006 among

Delphi Corporation, General Motors Corp. ("GM") and the Proposed Investors.  (Motion, Ex. A,

Docket No. 6179).  (Together, these documents constitute the "Proposed Framework".)

---

[2]  See http://select.nytimes.com/search/restricted/ article?res=F70E14FF3A550C718ED
DAB0994DE404482. The Washington Post carried a similar article on December 21, 2006, see
http://www.washingtonpost.com/wp-dyn/content/article/2006/12/21/AR2006122100309.html?na
v=rss_business/industries.

5.    The IUE-CWA has represented employees of Delphi and its predecessor, GM, continuously since its founding in 1949.  At the inception of this case, these IUE-CWA Local unions were the sole and exclusive representatives at the Delphi facilities noted:

| Local | Facility |
|-------|----------|
| Local 416 | New Brunswick, N J |
| Local 698 | Clinton, Mississippi |
| Local 711 | Gadsden, Alabama |
| Local 717 | Warren, Ohio |
| Local 718 | Brookhaven, Mississippi |
| Local 755 | Kettering, Ohio |
| Local 801 | Moraine, Ohio |

These facilities employed approximately 8,000 IUE-CWA members until the implementation of the Special Attrition Program ("SAP").  Approximately 2,000 IUE-CWA represented employees will remain at Delphi after the SAP is completed. (Declaration of Kevin M. Butler in Support of Delphi's Motion for Authority to Reject Collective Bargaining Agreements under 11 U.S.C. § 1113(c) and Modify Retiree Welfare Benefits under 11 U.S.C. § 1114(g), dated March 31, 2006, ¶11, Delphi Docket No. 3038.)

6.    The IUE-CWA also represents approximately 3,000 Delphi retirees.

7.    IUE-CWA represented Delphi employees were permitted to participate in employee benefit plans that allowed them to purchase Delphi common stock and many of them did so.  In fact, Delphi encouraged its employees to purchase this stock.  On information and belief, thousands of IUE-CWA employees purchased thousands of shares of Delphi stock

-4-

between 1999 and 2005 and many of them still hold these shares today. They have suffered

severe losses due to the decline in the value of this stock.[3]  IUE-CWA members have interests in

this case as holders of common stock who may chose to convert them into shares in the newly

reorganized Delphi.

    8.    The IUE-CWA will continue to bargain collectively with Delphi, both locally and

nationally on behalf of its members after Delphi emerges from this Chapter 11 proceeding.   The

IUE-CWA and its members (both as shareholders and as union members) have an interest in

insuring that the post-emergence Delphi is commercially viable, properly structured and

burdened by as little debt as possible.

---

[3]  Illustrative of these losses is the letter posted on the web from an IUE-CWA Local 717
member at Congressman Miller's E Hearing on Crisis in the Automobile Industry at
http://edworkforce.house.gov/democrats/autoworkerstestimony.html:

> I have been a Millwright and Fabber for the last 15 years with Packard Electric,
> previously employed as an outside construction tradesman for 24 years. My personal
> situation: I came to Packard electric because they were hiring "The Best of the Best" and
> supposedly paying top wages and benefits (retirement). Hourly wages were not then nor
> are now superior to outside wages but the work is inside where it is warm. Warren
> Packard Electric has always and to this day shown a profit. Major problems began when
> profits designed for investments in the future (pensions and modernization) were invested
> overseas. For many years there were no overseas profits only potential. Now that there is
> profit those profits should be used for investment return on the seed money. Monthly and
> yearly pension contributions were not made due to poor executive decisions and poor
> governmental restrictions. I have put two daughters through college while investing 10%
> of my average $60,000/year wages in individual retirement. Delphi bankrupted my
> retirement (stock) in the amount of $75,000. If allowed to take my actual pension my wife
> and I will have no choice by to join the public assistance sector. The last six years of my
> job 2006-2012 were to save for retirement with my pension and my stock; A decent
> retirement. My stock is gone and now because of EXECUTIVE corporate greed my
> wages and pension are threatened. Discrimination is: executives who are the poorest
> decision makers get raises and the workers that show a profit are penalized! IT IS TIME
> TO FIGHT!!!! Lowell Seibert Canfield, Ohio.

9.    The IUE-CWA preliminarily objected to the following aspects of the Proposed

Framework:  (a) the payment of commitment fees in excess of $76 million to the Proposed

Investors when they have nothing at risk; (b) the payment of $13 million of expenses by the

Proposed Investors before they have committed to full participation in this potential transaction;

(c) the payment of an alternate transaction fee of $100 million to the Proposed Investors in

certain circumstances; (d) certain unprecedented corporate governance terms created by the

Proposed Framework, including extraordinarily broad powers to be granted to the Proposed

Investors; and (e) the Debtors' indemnification obligations to the Proposed Investors.

(Preliminary Objection of IUE-CWA to Motion for Order Authorizing and Approving the Equity

Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of

the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a),

363(b) and 1125(e) of the Bankruptcy Code, December 20, 2006 ("Preliminary Objection"),

Docket No. 6242.)

10.    The IUE-CWA filed its Preliminary Objection to the Motion before it was aware

of the alternative investment proposal by Highland Capital Management, L.P. ("Highland

Capital")  While there may well be as yet unknown problems or contingencies in the Highland

Capital proposal, it is apparent that it is a serious alternative that should be fully explored before

a determination is made on the Motion.  The Highland Capital proposal does not require the

same extraordinarily broad corporate governance powers that are to be granted to the Proposed

Investors under the Motion. (Highland Capital Management, LP's Objection and Response to

Expedited Motion for Order Authorizing and Approving the Equity Purchase and Commitment

Agreement pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and

the Plan Framework Support Agreement pursuant to Sections 105(a), 363(b), and 1125(c) of the

Bankruptcy Code, at ¶¶ 27-32 , Docket No. 6330.) That difference alone is a sufficient basis for

the Court to exercise its authority under Section 105(a) of the Bankruptcy Code to issue any

order "that is necessary or appropriate to carry out the provisions of this title" by adjourning the

consideration of the Motion until the Highland Capital proposal is fully vetted by the Debtor and

the other stakeholders in this proceeding.

11.    Given the other objections that are pending to the Motion, the IUE-CWA will

confine this Supplemental Objection to three  basic points:

A. The Proposed Framework is a *sub rosa* plan that does not include a sufficient

grant of value to the labor unions whose sacrifices have led to the current net enterprise

value of Delphi;

B. The Proposed Framework provides for fees to the Proposed Investors that are

too easily obtainable without a corresponding level of commitment by the Proposed

Investors; and

C. The Proposed Framework provides for abusive corporate governance

provisions that are against public policy and harmful to common shareholders.

## ARGUMENT

## I.    THE PROPOSED FRAMEWORK IS A *SUB ROSA* PLAN THAT DOES NOT INCLUDE AN APPROPRIATE RECOVERY OF VALUE BY DELPHI'S UNIONS

12.    The reality is that the Proposed Framework is the effective determination of the

ultimate Plan of Reorganization ("POR") and its terms must be measured against the standards

applicable to such plans. That in itself is objectionable. Chapter 11 debtors may not use 11

-7-

U.S.C. § 363 "to short circuit the requirements of a reorganization plan by establishing the terms

of the plan *sub rosa* in connection with a proposed transaction." *In re Continental Airlines, Inc.*,

780 F.2d 1223, 1227 (5th Cir 1986). *Sub rosa* plans are inappropriate because they dictate plan

terms, and restructure the debtor's business or restrict creditors' rights without the consent of

affected parties. *See In Re Tower Automotive, Inc.*, 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006),

*aff'd,* — F. Supp. —, 2006 WL 3751360 (S.D.N.Y. Dec 15, 2006) (a copy of which is attached in

the Appendix).

13.    The Proposed Framework dictates many of the terms of the plan and deprives the

IUE-CWA of the ability to meaningfully participate in plan negotiations. For example, ¶ 6.1 of

the EPCA imposes a ceiling of $1.7 billion as the maximum aggregate of allowed unsecured

claims. The allowed unsecured claims under the Proposed Framework include $145 million for

the UAW/GM Joint Training Center but no recovery whatsoever for the IUE-CWA or its similar

Joint Activities Center ("IUE-CWA JAC"). (Exhibit 49, Presentation entitled "Meeting of the

Official Committee of Unsecured Creditors, dated November 16, 2006, at 82.) The Proposed

Framework retards the disclosure statement and plan approval processes set forth in 11 U.S.C. §§

1123, 1125, and 1129. The Proposed Framework will freeze out the IUE-CWA JAC, and other

parties in interest, from meaningful negotiations concerning the POR, force them to accept plan

terms without question and limit the ability of the parties to finalize an acceptable labor deal.

(Motion, Ex. A, EPCA, Docket No. 6179).

14.    The Proposed Framework assumes that final negotiations for a labor agreement

with the IUE-CWA will be concluded by January 31, 2006 but the Proposed Framework

erroneously assumes that the IUE-CWA will not demand some form of participation in the

reorganized Delphi as an element of a final labor settlement. Approval of the Proposed

Framework will tie the hands of IUE-CWA and Delphi negotiators in the critical period prior to

January 31, 2007 when the Proposed Framework anticipates a final labor agreement.

15.    The Proposed Framework and the newly made offer by Highland Capital presume

an enterprise value of $14 billion for Delphi, with sufficient value to permit recovery by existing

equity shareholders. Delphi's substantially improved value is primarily a function of the

sacrifices its unionized workforce has accepted and the agreement of GM to contribute

substantial assets in various ways to Delphi. But GM is receiving in return for its contributions

to Delphi many things of value, including $2.63 billion in cash, seven million common shares in

Delphi worth $315,000,000 and a resolution of the billions in dollars of claims that could

otherwise be asserted against it in connection with its domination of Delphi. The secured and

unsecured creditors under the Proposed Framework are obtaining at least the par plus accrued

value of their claims (if not more, given the apparent premium involved in their eighteen million

shares of Delphi that is a portion of their recovery). The Delphi salaried workforce and top

executives of Delhi have received millions of dollars in bonuses since this case was commenced

under the KECP plan. The emergence KECP envisions yet more millions of dollars in recovery

for Delphi's managers. The IUE-CWA, in contrast, is apparently expected under the Proposed

Framework to abandon any claims for equitable participation in the value of the transformed

Delphi. (Exhibit 57, Resnick Dec., Ex. G,).

16.    Discovery in connection with the Motion has revealed that union claims were not

always so treated. The spreadsheet reflecting proposed deal terms once offered by Cerberus

shows that as late as October 22, 2006, the unions were to receive up to $325 million in value in

the new Delphi. (Exhibit 57, Resnick Dec., Ex. G at 6, 11, 27.)  The Rothschild analysis of the

various proposals for a restructured Delphi generated as late as December 22, 2006 also included

categories for  "equity grant to unions" and "Unions" cash recovery.  (Exhibit 57, Resnick Dec.,

Ex. I at 12-14.)  Rothschild's analysis of the Highland Capital proposal also reviewed how much

cash would go to the unions. (*Id*.)  At some point, difficult to now ascertain, the union share of

enterprise value was granted to others.  Since IUE-CWA was not at the table for these

negotiations, it is hard to tell who benefitted from this value, but it is clear who lost: IUE-CWA

and its members and retirees.

## II.    THE  PROPOSED $189 MILLION DOLLARS IN COMMITMENT  FEES, BREAK UP FEES AND EXPENSES ARE TOO EASILY OBTAINABLE,  WILL BE A BURDEN ON THE ESTATE, AND ARE UNNECESSARY SINCE THE BIDDERS ALREADY HAVE A SUBSTANTIAL INVESTMENT  IN DELPHI

17.    The Motion seeks approval to pay a potential total of $189,000,000 to the

Proposed Investors: $76,125,000 of commitment fees; $13,000,000 in expenses to date upon

approval of the Motion.; and an alternative transaction fee of $100,000,000.  The commitment

fees include a $21 million fee for the Proposed Investors' commitment to purchase the Preferred

Stock and a $55 million fee in connection with the Proposed  Investors' commitment to backstop

the common stock rights offering. Ten million dollars of the commitment fees are payable upon

the waiver or expiration of the Proposed Investors' due diligence out.  Another $28 million is

payable after the Proposed Investors notify the Debtors that they have approved a settlement

agreement between the Debtors and GM.  Finally, the remaining $38 million in commitment fees

are payable upon entry of an order approving a disclosure statement with respect to a plan of

reorganization contemplated by the Motion.  The total of fees and expenses payable under the

Motion is $189,125,000. (Motion, ¶ 37, Docket No. 6179.)

18.    The Proposed Investors could obtain their first $23,000,000 of fees and expenses

from Delphi upon approval of this Motion by waiver of their due diligence out.  That money is

not subject to recapture by the Debtors even if the Proposed Investors refuse to accept any future

deal negotiated by the Debtors with the IUE-CWA, other unions or GM. (Motion, ¶ 38, Docket

No. 6179.)

19.    The Motion also provides for a $100 million Alternate Transaction Fee that is

payable to the Proposed Investors upon one of the following conditions:

A.  The Debtors terminate the EPCA because the Debtors enter into an "Alternate

Transaction Agreement."

B.  The Proposed Investors terminate the EPCA because there is a "Change of

Recommendation," and the Debtors either enter into an Alternate Transaction Agreement

or consummate an Alternate Transaction within 24 months after the EPCA is terminated.

C. The Proposed Investors terminate the EPCA because of a breach of the EPCA

by the Debtors that causes the conditions relating to the Debtors' representations,

warranties and covenants to be incapable of satisfaction, and the Debtors either enter into

an Alternate Transaction Agreement or consummate an Alternate Transaction within 24

months after the EPCA is terminated.

(Motion, ¶¶ 42-44, Docket No. 6179.)

20.    To put the impact of these monies in a labor context, the $189,000,000 in fees and

expenses that could be payable to the Proposed Investors even if this deal does not go forward

-11-

would be sufficient to fund a $10 an hour wage increase for each of the expected 2,000 IUE-CWA members who will remain throughout the next four years. At 2080 paid hours in a year, that would increase each workers' compensation by $20,800 for each of those four years. That is enough money to change the lives of Delphi's working men and women; enough to buy or save their homes, start or keep their kids in college, avoid bankruptcy and maintain their version of the American dream. It is highly doubtful that the fees and expenses would have a similar impact on the lives of the Proposed Investors. The proposed fees and expenses are large enough that they will further burden the ability of this estate to pay fair and reasonable wages and benefits to its unionized workers.

21.    As this Court remarked at the April 7, 2005 hearing in *In re Westpoint Stevens Inc*, Case 03-13532 (S.D.N.Y. April 7, 2005): "the courts are quite reluctant to approve break up fees" especially where there are competing bidders already and "a break up fee is not necessary to keep the bidding going" and "the bidders have already invested in the capital structure of [the debtor]". (Excerpts of the transcript, at 93-94, are attached in the Appendix.) Each of those considerations applies to Delphi. Highland Capital has emerged as a competing bidder and a break up fee is not necessary to retain these bidders since each has already invested millions of dollars in Delphi and reaped millions of dollars in profits from those investments. For example, the Detroit News reported on November 1, 2006 that Appaloosa bought its stake in the company for about $16 million; that stake was worth about $150 million as of November 1, 2006 and has substantially increased since then.

22.    The standard for determining whether breakup fees are allowable in bankruptcy in the Second Circuit is found in *In re Integrated Resources, Inc.,* 147 B.R. 650 (S.D.N.Y. 1992).

-12-

In *Integrated*, a proposed cash investor was held entitled to expense reimbursement and a break-

up fee. *Integrated*, 147 B.R. at 653.   The breakup fee was payable if (1) Integrated sold to

anyone other than the proposed investor any material assets proposed to be acquired by the

investor; (2) a plan of reorganization based on that proposal was abandoned; or (3) the creditors

of Integrated received a material dividend or distribution respecting their claims.   The breakup

fee would <u>not</u> be payable if the investor abandoned its proposal because of a material adverse

change, was unable to obtain any necessary approvals, or materially breached its agreement with

Integrated. *Id.* at 655.

        23.     In contrast here, the Proposed Investors are entitled to retain their commitment

fees if they abandon their proposal because of a material adverse change that renders the Debtors'

representations in the EPCA incapable of satisfaction.   For example, if the GM and labor

agreements are reached and approved but a subsequent forecast for raw material costs drop the

Debtors' expected 2009 EBIDTA below $2.4 billion, the Proposed Investors can terminate the

proposed deal and still retain millions of dollars in fees and expenses and the Alternative

Transaction Fee if Debtors either enter into an Alternate Transaction Agreement or consummate

an Alternate Transaction within 24 months after the EPCA is terminated. That does not pass

muster under the *Integrated* standard. (Motion, ¶ 42, EPCA § 12(d)(vi), Docket No. 6179.)

        24.     A key issue under *Integrated* is whether the proposed fees hamper, rather than

encourage, bidding.   In assessing whether the break-up fee hampered, rather than encouraged,

bidding, the *Integrated* court noted that "Break-up fees are important tools to encourage bidding

and to maximize the value of the debtor's assets.   The usual rule is that if break-up fees

encourage bidding, they are enforceable; if they stifle bidding they are not enforceable."   *Id.* at

-13-

659. In this case, the proposed Alternate Transaction Fee of $100 million dollars will hang over this proceeding and potentially influence subsequent bidding for 24 months.

25.     The ultimate concern under *Integrated* is whether a break up fee can be said to have been earned by attracting the alternate bidder . "If, on the other hand, the fee ultimately becomes payable because a higher bidder than [the proposed investor] prevails, then in all probability [the proposed investor] will have attracted that bidder and thus earned its fee." *Id.* at 661. In this case, the Highland Capital proposal has been made even before this Motion is being heard. Appaloosa and Highland Capital are the first and second largest shareholders of Delphi. They already have substantial incentive to participate in its emergence from Chapter 11. It was not the Appaloosa offer, but Highland Capital's already existing equity position in Delphi, that brought about the Highland Capital offer.

26.     Since *Integrated*, courts have been reluctant to approve break up fees except where they clearly add value to the estate. In *Gey Associates General Partnership v. 310 Associates, L.P.,* 2002 WL 31426344 (S.D.N.Y. October 29, 2002) (a copy of which is attached hereto in the Appendix), the court noted that "Breakup fees are designed to reward those bidders who function as 'stalking horses,' allowing the seller to search for higher offers and setting a floor price on the transaction." *Gey* at *2. "The appropriate question is whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid, (2) to establish a bid standard or minimum for other bidders to follow, or (3) to attract additional bidders." *Id.* at 661. The Highland Capital  proposal demonstrates that the proposal by the Proposed Investors was not necessary to attract other interested investors.

27.     In *In re O'Brien Environmental Energy, Inc.,* 181 F.3d 527 (3d Cir. 1999),  a Bankruptcy Court refused to approve a proposed breakup fee and expenses provision, but indicated it would be willing to permit the potential investor  to seek them at the end of the process. *Id.* at 529. After the same disappointed investor filed an application for payment of fees

-14-

and expenses, seeking a $2 million breakup fee and $2.25 million in breakup expenses and interest, the Bankruptcy Court denied the application. *Id.* at 530. The court concluded that break up fees had to be addressed as administrative expenses under Bankruptcy Code Section 503: "In other words, the allowability of break-up fees, like that of other administrative expenses, depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Id.* at 535. The court required a showing that the original investors' bid had served as a catalyst for the eventually successful bid and observed that "in some cases a potential purchaser will bid whether or not break-up fees are offered". That is exactly the case with Appaloosa, which is a major shareholder and bondholder of Delphi and has substantial economic motivation to be involved in this transaction whether or not there are commitment or break up fees. Since Highland Capital has offered to do this deal at a much lower break up fee, there is no reason to believe that the Proposed Investors need these proposed fees and expenses to remain interested in acquiring Delphi.

## III.    THE PROPOSED LIMITATIONS ON COMMON SHAREHOLDER RIGHTS ARE A VIOLATION OF PUBLIC POLICY

28.    Under the Motion, the Proposed Investors are entitled to acquire 6.3 million shares of Common Stock as Direct Subscription Shares. The Proposed Investors are also granted the exclusive right to acquire 17.143 million shares of Series A Convertible Preferred Stock and 17.143 million shares of Series B Convertible Preferred Stock (for an aggregate amount of $1.2 billion). Preferred Stock is reserved for a few investors to the exclusion of all others. The Proposed Investors' exclusive right to acquire the Preferred Shares and the Direct Subscription Shares gives the Proposed Investors almost 30% of the reorganized company on the effective date of a plan, exclusive of Rights Offering shares that the Proposed Investors may also purchase. (Motion, ¶ 36, Docket No. 6179.)

-15-

29.    The Proposed Investors' exclusive right to acquire Preferred Stock gives them effective control over the Delphi Board of Directors in that they have the right to name six of the twelve directors, an effective veto over a seventh director by their ability to influence selection of a Chairman, and a further right to name an eighth director if they determine in their sole discretion that the Delphi CEO is to be replaced.  In addition to their control over the Board of Directors, the Proposed Investors have exclusive approval rights over certain of Delphi's business decisions.  These powers are available only to the holders of Series A Preferred Stock. Rank and file holders of Common Stock are effectively limited in their expected ability to participate in the democratic affairs of the corporation.  The special abilities and powers conferred upon the Proposed Investors and denied to other shareholders include the right to approve or veto:

> (i) new debt or lease financing in excess of $100 million within twelve months from the Issue Date;
>
> (ii) granting any liens or mortgages on assets having a value in excess of $100 million within twelve months from the Issue Date;
>
> (iii) a sale of substantially all of the assets of the Company;
>
> (iv) a merger or consolidation involving a change of control, as well as any acquisition or investment with a value in excess of $100 million from the Issue Date;
>
> (v) any issuance of equity securities at less than fair market value,
>
> (vi) payment of any cash dividends; and
>
> (vii) any amendment of the Company's articles or bylaws.

(Exhibit 57, Resnick Dec., Ex. G,).

30.    The Supreme Court aptly summarized a bankruptcy court's responsibility to enforce the interest of the public when it stated:

-16-

"A court of equity may in its discretion in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest." ... These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization.... Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, or the need for protection of investors against an inside few, <u>or of one class of investors from the encroachments of another,</u> the court has ample power to adjust the remedy to meet the need.

*American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145 (1940) (quoting *SEC v. United States Realty & Improvement Co.*, 310 U.S. 434, 455 (1940)). (Empahsis added.) *See also In re Allegheny Intern., Inc.* 118 B.R. 282, 301- 304 (W.D. PA., 1990) (After reviewing the broad powers of bankruptcy courts to ensure a just and fair result, the court ordered that a major shareholder be enjoined from voting its shares to dominate the Board of Directors.)

31.    The proposed EPCA is tantamount to a POR but it is not consistent with the terms required for a plan of emergence from Chapter 11. Code § 1129(a)(5) requires that appointment to or continuance in office of any individual who will serve as a director or officer must be "consistent with the interests of creditors and equity security holders and with public policy." Code § 1123(a)(7) gives the court control over the manner of selection of any officer or director under a plan, and any successor to such officer or director. The corporate control provisions of a plan must be consistent with the interests of creditors and equity security holders and with public policy. Finally, Code § 1123(a)(6) requires that the corporate charter prohibit the issuance of nonvoting equity securities, and that the plan grant "an appropriate distribution" of voting power among equity classes.

32.    Public policy presumes that corporate shareholders have a right to a fair and effective corporate suffrage. *See Mills v. Electric Auto-Lite Co.*, 396 U. S. 375, 381 (1970).

-17-

Courts have recognized that actions in derogation of that right are not to be encouraged. *See e.g.,*
*Holly Sugar Corp. v. Buchsbaum* 1981 WL 1708, 10 (D.Colo. October 28, 1981) (a copy of
which is attached in the Appendix). It is not in the public interest for a publically traded and
listed corporation the size of Delphi to be given the corporate governance attributes of a privately
held company. The corporate control provisions that devolve effective management of the
corporation solely upon the holders of Preferred Stock and not the remaining holders of common
stock are not an appropriate distribution of voting power among equity classes.

## CONCLUSION

**WHEREFORE,** the IUE-CWA respectfully requests that this Court deny the Motion and
Proposed Framework as presently stated and grant the IUE-CWA such other relief as is just and
proper.

Dated: New York, New York
     January 9, 2007

                     Respectfully submitted,

                     KENNEDY, JENNIK & MURRAY, P.C.
                     Counsel for IUE-CWA

                     By:    Thomas M. Kennedy (TK 0093)
                            Susan M. Jennik (SJ 4607)
                     113 University Place
                     New York, NY  10003
                     (212) 358-1500