REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

Bonnie Steingart (BS-8004)
Debra M. Torres (DT-9093)
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
One New York Plaza
New York, New York 10004
Telephone: 212.859.8000
Facsimile: 212.859.4000

*Counsel for the Official Committee of Equity Security Holders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
  Delphi Corporation, et al.,                                    :    Case No.  05-44481 (RDD)
                                                                 :    (Jointly Administered)
                        Debtors.                                 :
                                                                 :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SECOND SUPPLEMENTAL OBJECTION OF THE OFFICIAL COMMITTEE
OF EQUITY SECURITY HOLDERS IN OPPOSITION TO DEBTORS'
EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING THE
EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE
AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE**

TO:    THE HONORABLE JUDGE ROBERT D. DRAIN
       UNITED STATES BANKRUPTCY JUDGE

The Official Committee of Equity Security Holders (the "Equity Committee"), of Delphi

Corporation ("Delphi") and the other above-captioned debtors (collectively, the "Debtors") by

and through its counsel, Fried, Frank, Harris, Shriver & Jacobson LLP, files this second

supplemental objection (the "Objection") to the Debtors' expedited motion (the "Motion") for an

order authorizing and approving the Equity Purchase and Commitment Agreement (the

"Investment Agreement") pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

Bankruptcy Code and the Plan Framework Support Agreement (the "Support Agreement")

pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code.  In support of the

Objection, the Equity Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The limited discovery that the Equity Committee has received in connection with

the Motion has only further illustrated the most glaring problem with the Investment Agreement

and the Support Agreement (together, the "Agreements"): they are wholly illusory.  In the real

world, contracts embody mutual promises made by the parties to each other.  But the careful

reader of the Investment Agreement and the Support Agreement cannot find a single promise

that the Plan Investors have made to the Debtors.[1]  As long as the Plan Investors can abandon the

proposed transaction "for any reason or no reason" (Support Agreement § 3.1), there is no

promise whatsoever that has been made.

2.      The Debtors' directors and senior management have defended the Agreements by

claiming variously that



---

[1]      The term "Plan Investors" refers to A-D Acquisition Holdings, LLC ("ADAH"), Dolce Investments LLC
("Dolce"), Harbinger Del-Auto Investment Company, Ltd., Merrill Lynch, Pierce, Fenner & Smith
Incorporated, and UBS Securities LLC.  The Debtors' former parent company, General Motors Corporation
("GM") is a party only to the Support Agreement.

[2]      The deposition transcripts of Messrs. Sheehan, Miller, Opie and Resnick are Exhibits [A] through [D] to
the Declaration of Bonnie Steingart submitted herewith and are cited as, e.g., "Sheehan Tr."  Other exhibits

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

████████████████████████████ The Agreements do not even

constitute half a loaf, because they will cause the Debtors to pay lavish, and non-refundable fees

to the Plan Investors, but the Plan Investors will have no obligations whatsoever.

3.    The complex structure the Debtors have created of setting different "triggers" for

the payment of portions of the fees as various "milestones" occur ████████████████

cannot obscure the plain fact that while each of these milestones will trigger payments on the

part of the Debtors, none will trigger a commitment of any kind on the part of the Plan Investors.

Due diligence may be completed, agreements may be reached with GM and the unions, a

disclosure statement may be approved, a plan confirmed, and the Plan Investors may nonetheless

change their mind and walk away "for any reason or no reason" the day before the effective date,

without returning any of the tens of millions in fees already received.  Thus, Debtors will be

paying tens of millions of dollars in fees for absolutely nothing.

4.    Moreover, since the filing of the Equity Committee's First Supplemental

Objection (as defined below) , there has been a key development.  Highland Capital

Management, LP ("Highland"), an alternative bidder, has provided the Debtors with a

commitment letter to pursue transactions similar to those contemplated in the Agreements on

terms more favorable to the Debtors and their estates than those proposed by the Plan Investors.

The Highland proposal provides for a vastly improved capital and governance structure

compared to the that contemplated by the Agreements. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

to that declaration are generally cited as Exh. __, except for Exhibit E, the Omnibus Response to
Statements of Purported Ambiguities Concerning Framework Agreements Propounded by Statutory and Ad
Hoc Trade Committees, dated December 29, 2006, which is cited as "Omnibus Response."

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

████████████████████████████████████████████████████

██████████████████████████████████████

5.    The fees and other payments and value transfers to the Plan Investors are, thus,
whether with or without the Highland proposal on the table, excessive and unjustified under the
standard for approval of extraordinary transactions pursuant to Section 363(b) of the Bankruptcy
Code for a number of separate and independently sufficient reasons:

- First and foremost, there is no consideration for their payment because the Plan Investors
  are making no commitment, not even a conditional one, to proceed with the proposed
  transaction. In addition to the numerous earlier points at which the Plan Investors can
  unilaterally abandon the process, they can terminate the Agreements on or after April 1,
  2007 "for any reason or no reason."

- The transaction cannot proceed without agreement with GM on over a dozen different
  subjects, but GM has no obligation to reach agreement on any of these issues, much less
  reach agreement on terms that would result in the overall transaction being a satisfactory
  resolution of the estate's numerous and valuable litigation claims against GM. Even if
  GM reaches agreement initially, it, too, will have the subsequent opportunity to
  withdraw its support "for any reason or no reason," thus scuttling the transaction and
  enabling it to evade those commitments. The Plan Investors will still retain their fees,
  and may indeed be able to demand a subsequent Alternate Transaction Fee.

- While GM is not obligated to reach agreement, it is, however, purportedly restricted from
  talking to any potential alternative bidder without the Debtors' consent. Since no
  restructuring can be carried out without resolution of the Debtors' issues with GM
  (consensual or otherwise), no superior proposal can emerge if the alternative bidder is

4

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

subject to greater restrictions on communications with GM than it is as to

communications with the Debtors. Even worse, it is clear that GM wishes to pursue its

own agenda and exercise de facto veto power over potential alternative bidders, while

hiding behind these purported contractual restrictions as a fig leaf for its own self-serving

conduct. Thus, the fees to be reaped by the Plan Investors cannot be justified as

compensation for the possibility that the Plan Investors' proposal may serve as a

"stalking horse" eliciting a better alternative, when the possibility of such an alternative is

(i) vitiated by the terms of the Agreements, (ii) ████████████████████████

███████████████ and (iii) not even a limited auction process has been set up.

- An admittedly superior alternative proposal has already been made by Highland. If the
  Agreements were approved, subsequent acceptance of the Highland proposal would cost
  the Debtors' estates at least $113 million in fees and possibly more, without the Debtors
  ever having received any meaningful benefit from the Agreements.

6.    Perhaps unsurprisingly, as has already been shown through discovery and as will

be developed at the hearing through live testimony of Messrs. Opie and Miller, the Debtors'

board of directors was uninformed or affirmatively misinformed about the numerous glaring

flaws with the Agreements as presented. The board members neither read the documents nor

were given a comprehensive and accurate overview of their terms and implications at any time.

Reliance on unsupported assurances from management that the terms had been presented by the

Plan Investors on a take it or leave it basis and no better terms could be obtained cannot

substitute for informed judgment. Accordingly, no deference under the business judgment rule

would be due, even if the Agreements were not illusory and substantively unacceptable.

7.    As will also be detailed below, there are other substantive problems with the

5

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

Agreements as currently presented which would render them unreasonable even if not illusory.

These include: (i) the excessive value transfer to Plan Investors at the expense of other

stakeholders ██████████████████████████████████████████████

██████████████; (ii) the mechanics of the Rights Offering,[3] which is also set up to maximize

benefit to the Plan Investors (thereby making the Rights Offering's purported function of

providing the bulk of the recovery to existing equity a sham); and (iii) the unjustified 24-month

"tail" on the Alternate Transaction Fee, which would entitle the Plan Investors to reap a reward

for a transaction they had nothing to do with causing.

8.    The amendments to the Agreements proposed in the Omnibus Response did not

cure any these fatal defects. Indeed, as detailed below, in some instances the Omnibus Response

simply misdescribed the Agreements and refused to acknowledge the problem, and in another

instance the Omnibus Response struck out the language which had been objected to while

inserting other language that would lead to exactly the same perverse result by a different path.

## BACKGROUND

9.    After filing an initial objection to have standing to seek discovery, on December

20, 2006, the Equity Committee filed the First Supplemental Objection of the Official

Committee of Equity Security Holders in Opposition to Debtors' Expedited Motion for Order

Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to

Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework

Support Agreement Pursuant to Sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code

(Docket No. 6247) (the "First Supplemental Objection").[4] The background of the cases set forth

---

[3]    Capitalized terms not defined herein shall have the meaning ascribed to them in the First Supplemental
Objection or the Motion and its supporting documentation.

[4]    The focus of this current Objection is on developments occurring subsequent to the filing of the First
Supplemental Objection, such as the Highland proposal, the Omnibus Response, and the limited discovery

6

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

in the First Supplemental Objection is incorporated herein by reference.

## OBJECTION

**I.     The Agreements are Wholly Illusory and Must Be Rejected on That Basis.**

10.     Any party to the Support Agreement can unilaterally walk away from that agreement at any time after April 1, 2007, for "any reason or no reason." (§ 3.1). This provision renders the Support Agreement so illusory as to be meaningless. That the Investment Agreement can be terminated by the Plan Investors as of right as a result of their own termination of the Support Agreement on this basis likewise renders the Investment Agreement meaningless. See Investment Agreement § 12(c)(ii); ███████████████████████████████████████████
███████████████████████.

11.     As a matter of fact, the Agreements effectively permit the Plan Investors to terminate "for any reason or no reason" at any stage of the process:

* As soon as the Agreements receive court approval, the Plan Investors would receive $13 million in non-refundable expense reimbursements, but would remain free to walk away for any of a number of reasons, including finding the results of due diligence unsatisfactory "in its sole discretion." EPCA §§ 2(i), 12(d)(ii). As soon as the Plan Investors complete or waive due diligence, they would receive a further $10 million in non-refundable Commitment Fees, for a cumulative total of $23 million (not including additional non-refundable expense reimbursements), but would remain free to walk away for any of a number of reasons, including finding a proposed GM Settlement unsatisfactory "in their sole discretion." EPCA §§ 2(i), 12(g). ████████████████████

---

received. If and when the Agreements actually are amended as was indicated in the Omnibus Response, the specific concerns regarding affiliate transactions set forth in paragraphs 49, 50, and 53 of the First Supplemental Objection would no longer apply. All of the other issues raised, however, would not be satisfactorily addressed by the amendments proposed to date. In particular, all of the other corporate governance issues previously identified remain unacceptable to the Equity Committee.

**REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL**

- As soon as the Plan Investors approve a GM Settlement, they would receive a further $28 million in non-refundable Commitment Fees, for a cumulative total of $51 million (not including additional non-refundable expense reimbursements), but would remain free to walk away for any of a number of reasons, including invoking the "any or no reason" out discussed in detail below.   EPCA § 2(i).

- As soon as a disclosure statement is approved, the Plan Investors would receive the final $38 million in non-refundable Commitment Fees, for a cumulative total of $89 million (not including additional non-refundable expense reimbursements), but would remain free to walk away for any of a number of reasons, including invoking the "any or no reason" out.  EPCA § 2(i). ██████████████████████████
██████████████

- Indeed, even after a plan is confirmed, the Plan Investors would remain free to walk away for "any reason or no reason," up to the day before a scheduled closing, and retain all of the $89 million (not including additional expense reimbursements) already received.[5]

---

[5]     Section 3.2(b) of Support Agreement provides that the Support Agreement shall terminate "Two (2) business days after receipt by the other non-terminating parties of the notice described in Section 3.1(b) hereof." Section 3.1(b) provides that a notice of termination of the Support Agreement may be delivered "any any Party to the other Parties for any reason or no reason as determined by the Party delivering such notice in its sole discretion; provided, however, that such notice may not be given until April 1, 2007." Therefore any Party, including Cerberus and Appaloosa can terminate the Support Agreement at any time after April 1 for any reason whatsoever.

Section 12(c)(ii) of the Investment Agreement provides that the Investment Agreement may be terminated and the transactions contemplated thereby may be abandoned at any time prior to the Closing Date (which is defined as the Effective Date of the Plan), for a number of reasons, including if "the [Support Agreement] shall have been terminated in accordance with its terms; provided, that the right to terminate this Agreement under this [Section] shall not be available to any party whose breach of the [Support Agreement] is the cause of the termination of the [Support Agreement] . . ." Therefore, Cerberus and Appaloosa could, for example, choose the day before the Effective Date to terminate the Support Agreement pursuant to Section 3.2(b) (which termination would not be a breach of the Support Agreement) and immediately thereafter terminate the Investment Agreement pursuant to Section 12(c)(ii) thereof, free

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

12.    Adding insult to injury, the new amendments to the Agreements set forth in the

Omnibus Response now preclude the Debtors from terminating the Investment Agreement as a

result of their own (or GM's) termination of the Support Agreement, but impose no symmetric

restriction on the Plan Investors.  Under section 12(c)(ii) of the Investment Agreement, the Plan

Investors remain free to terminate the Investment Agreement (avoiding any possibility they

could be compelled to fund the transaction) once the Support Agreement is terminated according

to its own terms, including a termination by themselves pursuant to the "any reason or no

reason" clause.  Moreover, as described below at ¶¶ 26, 31, termination "for no reason" by GM

could make the Plan Investors richer still (by making the Plan Investors eligible for an Alternate

Transaction Fee in addition to the other nonrefundable fees received and retained) while the

Debtors and their stakeholders scrambled to find alternatives.

13.    As a matter of New York law, the Agreements fail for lack of mutual

consideration.   Mutuality of agreement and mutuality of obligation must exist for an agreement

to be legally binding.  See Ruppert v. Secretary of U.S. Dept. of Health and Human Svcs., 671

F.Supp. 151, 166 (E.D.N.Y. 1987), aff'd in part, reversed in part, Ruppert v. Bowen, 871 F.2d

1172 (2d Cir. 1989); Dorman v. Cohen, 413 N.Y.S.2d 377, 381 (1st Dep't 1979).  The need for

mutuality of agreement and mutuality of obligation essentially means that "the parties involved

in the transaction must each have agreed to the terms of the arrangements and taken upon

themselves certain obligations they are bound to perform."  Ruppert, 671 F.Supp. at 166.

Further, an agreement is illusory and will not be enforced when a party is not under any

obligation to perform its promises.  See Rupert, 671 F.Supp. at 166; Ivor B. Clark, Inc. v. Boston

Road Shopping Center, 24 Misc.2d 84, 89 (N.Y. Sup. Ct. 1960).  As such, New York law

---

from any liability or exposure and under no duty or obligation to return the significant commitment fees
and expense reimbursement they would have received.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

requires that the parties to an agreement must each agree to be obligated to perform some

obligation, and the agreement to do so must not be illusory.  See Ivor B. Clark, Inc., 24 Misc.2d

at 89 ("The rule of law requires that there must be a mutuality of obligation to effect a binding

contract, and, … if one of the promissory parties is free to perform it or not, as he wills, it is

illusory and will not be enforced.").

14.    Because the Plan Investors have an unfettered right to determine whether or not

they ever want to perform any of their obligations under the Agreements, the "promises" that the

Plan Investors have made under the Agreements are illusory.  See Chiapparelli v. Baker, Kellogg

& Co., 252 N.Y. 192, 200 (N.Y. 1929) ("Where a promisor retains an unlimited right to decide

later the nature or extent of his performance, the promise is too indefinite for legal enforcement.

The unlimited choice in effect destroys the promise and makes it illusory."); Eastern Transp. Co.

v. Blue Ridge Coal Corp., 159 F.2d 642, 643 (2d Cir. 1947) ("a promise whose performance

depends upon the mere will or inclination of the promisor imposes no obligation upon him and is

insufficient consideration to support the promise of the other party to the supposed contract.").

15.    The consequence of the Debtors' failure to present agreements to the Court that

bind the Plan Investors to perform any obligation is that the Court must find the Agreements

illusory and deny the relief requested in the Motion.  See Adirondack Railway Corp. v. Ehre, 95

B.R. 867, 874 (N.D.N.Y 1988) (refusing to approve settlement under Section 9019 of the

Bankruptcy Code and finding, under ordinary rules of contract interpretation, that a promise by

one party that amounted to "I will if I want to" was not binding and resulted in an illusory

contract); Dorman, 413 N.Y.S.2d 377 (holding that consultant under an employment contract

who had a unilateral right to cancel the agreement did not bind itself to do anything); Ivor B.

Clark, Inc., 24 Misc.2d at 89 (holding that because parties to an agreement could decide not to

10

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

proceed if they were not satisfied with essential conditions a binding obligation was not created).

Approving the Agreements would only cause the estates to incur substantial fees, without the

estates receiving any corresponding benefit.

16.

## II.    The Obligation for Payment of Fees is Unreasonable.

17.    The Debtors seek authority to enter into the Agreements pursuant to section

363(b)(1) of the Bankruptcy Code, which provides that the trustee "after notice and a hearing,

may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11

U.S.C. § 363(b)(1). "When a debtor desires to sell an asset, its main responsibility, and the

primary concern of the Bankruptcy Court, is the maximization of the value of the asset sold. In

general, to receive approval of a proposed sale of assets, the debtor will need to demonstrate to

the bankruptcy court that the proffered purchase price is the highest and best offer." In re

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992), aff'd 147 B.R. 650

(S.D.N.Y. 1992) (internal citation omitted).  "These tenets also apply to the outright purchase of

a debtor or its primary assets, as well as the effective acquisition of a debtor through the funding

of a plan of reorganization."  Id.

18.    In order to encourage the making of bids, and create an auction environment

designed to maximize value for the estates, a debtor may entice a potential purchaser by offering

it a breakup fee, such as the fees at issue here.  See id.; see also In re 995 Fifth Ave. Associates,

L. P., 96 B.R. 24, 29, n.6 (Bankr. S.D.N.Y. 1989) (a breakup fee is "a negotiated figure designed

to compensate the purchaser for more than simply [its] documented expenses.").  "Breakup fees

are sometimes authorized in the bankruptcy auction sale context because they provide an

incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due

diligence, and subsequent bid may encourage later bidders."  Gey Assocs. Gen. P'ship v. 310

Assocs. (In re 310 Assocs.), 346 F.3d 31, 34 (2d Cir. 2003).  There are at least "three questions

for courts to consider in assessing break-up fees: (1) is the relationship of the parties who

negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper,

rather than encourage, bidding; (3) is the amount of the fee unreasonable relative to the proposed

purchase price?"  In re Integrated Resources, Inc., 147 B.R. at 657.

19.    Here, not only do the Agreements "hamper, rather than encourage, bidding," but

also as discussed supra, the amount of the fees is wholly unreasonable given the lack of any

commitments on the part of the Plan Investors.  Indeed, the one-sided fee obligations are the only

aspect of the Agreements that are concrete rather than illusory.

20.    It is important to recognize that all of the fees contemplated by the Agreements

effectively act as break-up fees, not just the $100 million Alternate Transaction Fee.  The $76

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

million in Commitment Fees and the $13 million immediately payable in "reimbursement," once received, are non-refundable, even if the Plan Investors are never obligated to provide the equity capital which was "committed." If the transaction goes forward, these up-front fees will serve as a transfer of value to the Plan Investors above and beyond the transfer of value represented by the purchase of equity at $10 per share below the plan value. On the other hand, if the transaction does not go forward, these payments will be retained by the Plan Investors and will serve to compensate them for the same interests as any break-up fee would. The $100 million Alternate Transaction Fee, for any alternate transaction that provides even a de minimis equity recovery, would be paid on top of those fees. In most transactions one would expect a break-up fee to be paid instead of, rather than in addition to, fees such as the Commitment Fees. The complicated structure may have been intended to disguise the true amount the Plan Investors could reap without actually closing a transaction.

21.    Labels aside, this double-dipping raises the total amount of de facto break-up fees substantially, and makes the total sufficiently high in comparison to the total value offered by the Plan Investors (just over 5% of the $3.3 billion maximum possible investment contemplated) as to be subject to scrutiny. See Phelps Dodge Corp. v. McAllister, 1999 Del. Ch. LEXIS 202, at *5 (Sept. 27, 1999) (6.3% termination fee "probably stretches the definition [of reasonableness] beyond its breaking point"). Further, the Board did not receive or discuss any analysis of typical breakup fees in the market or breakup fees in comparable transactions. ████████████████

████████████████

22.    The unreasonableness of the fees here, however, is not only primarily a function of their amount in the abstract, but also of the lack of any benefit to the estates. "A break-up fee may also ensure that a bidder does not retract its bid." In re Integrated Resources, Inc., 147 B.R.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

at 661; see also Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614, 625 (S.D.N.Y. 1987).

23.    Here, the Plan Investors are admittedly not locked in to their bid now.[6] Furthermore, they will not become locked in under any circumstances, because they can always terminate the Support Agreement and then the Investment Agreement "for no reason" even after receiving all $76 million in commitment fees and the first $13 million in expense reimbursements, plus whatever additional expenses had been paid. They would not be obligated to return any of those funds, despite the obvious predicament their abandonment of the transaction would create. ████████████████ The Plan Investors' potential lack of eligibility for the Alternate Transaction Fee if the Debtors managed to find an alternative would be cold comfort.

A.    *The Transactions Cannot Be Accomplished Without Agreement with GM, But GM Has No Obligation to Reach Agreement*

24.    Even if the Plan Investors do not elect to walk away, the Investment Agreement assumes and requires a resolution with GM to be reached in the future, but GM is not a party to that Agreement. GM is a party to the Support Agreement, but that agreement provides no meaningful commitments whatsoever. GM indicates that it will "pursue agreement" (§ 6) on the multitude of outstanding issues – at least fourteen are specified[7] – but with "it being understood"

---

[6]    ████████████████████████████████████████████████████████████████

[7]    Pursuant to Article V of the Support Agreement, Delphi and GM presently intend to pursue agreements relating to, among other matters: "(a) triggering of the GM benefit guarantees; (b) assumption by GM of certain postretirement health and life insurance obligations for certain Delphi hourly employees; (c) funding of Delphi's underfunded pension obligations, including by the 414(l) Assumption (defined below); (d) provision of flowback opportunities at certain GM facilities for certain Delphi employees; (e) GM's payment of certain retirement incentives and buyout costs under current or certain future attrition programs for Delphi employees; (f) GM's payment of mutually negotiated buy-downs; (g) GM's payment of certain labor costs for Delphi employees; (h) a revenue plan governing certain other aspects of the commercial

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

that GM has <u>absolutely no obligation</u> to enter into or consummate definitive agreements on these issues at any time, much less on any particular terms.  <u>Id</u>. §6.  ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████  The Omnibus Response further confirms (p. 13) that "[n]othing in Article 2.4 of the [Support Agreement] would prevent GM from declining, refusing, or otherwise failing to reach agreement on the Delphi/GM Definitive Documents or any other aspect of the Plan."[8]

25.    It is possible that resolution of all of the open issues with GM might provide sufficient benefit to the Debtors' financial circumstances and business going forward to make the total package an acceptable deal that could justify approval of the release of the causes of action under Bankruptcy Rule 9019, but that determination cannot be made until a resolution binding on GM and specific enough to be valued has been reached.  The Debtors' claim that settlement is better than litigation (Motion ¶ 27) necessarily requires an understanding of the value of the settlement that no one is presently in a position to have, as the Debtors themselves admit.  <u>See</u> Motion ¶ 50 ("the actual value of the potential GM contribution cannot be determined until a consensual resolution with GM is completed.").  ████████████████

████████████████████████████████████████

██████████████

---

relationship between Delphi and GM; (i) the wind-down of certain Delphi facilities and the sales of certain Delphi business lines and sites; (j) the Debtors' support for GM's efforts to resource products purchased by GM; (k) licensing of the Debtors' intellectual property to GM or for its benefit; (l) treatment of the Environmental Matters Agreement between Delphi and GM; (m) treatment of normal course items, such as warranty, recall and product liability obligations; and (n) treatment of all other executory contracts between the Debtors and GM."

[8]    As described below at ¶ 31, however, the Support Agreement would benefit GM by giving it an excuse to interfere with the restructuring process by declining to deal with superior alternative bidders it wishes to freeze out for motives of its own.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

26.    If GM does not reach agreement on the open issues acceptable to the Plan

Investors in their sole discretion, the Plan Investors are free to walk away with impunity.

(Indeed, they even after consenting to a GM Settlement they will remain free to walk away with

impunity under the "any reason or no reason" out.)  But they will not walk away empty-handed.

As already noted, they would retain the $13 million in "reimbursement" paid immediately after

court approval of the Agreements and would also retain the first $10 million in Commitment

Fees.  ████████████████████████

27.    Even worse, even if GM enters into agreements on the many open issues that are

acceptable to the Plan Investors, GM will also still retain the option to walk away from the

transaction after April 1, 2007 for any reason or no reason, thus effectively rendering its earlier

agreements null and void.  ████████████

28.    Moreover, if GM unilaterally determines to abandon the transaction pursuant to

the "any reason or no reason" clause after April 1, the obligation to pay the Plan Investors the

Alternate Transaction Fee will likely be triggered, even if the "Alternate Transaction" ultimately

pursued is a "standalone" plan ████████████ and even if the alternative offers lower

recoveries to stakeholders.  While the Omnibus Response claims to have fixed the language that

previously made the Alternate Transaction Fee payable in the event of a GM change of heart,

this assertion is false because the parties simultaneously added other language which will simply

lead to the same result by a different path.  ██████████████████████

████████████████████████████████████

████████████████████

29.    As originally drafted, the Investment Agreement provided for the payment of the

Alternate Transaction Fee upon a termination due to a Change of Recommendation, with that

16

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

term defined as to include not only the Debtors but GM having "withheld, withdrawn, qualified, or modified" (or resolved or proposed to do so) "its approval or recommendation" of the Investment Agreement in a manner adverse to the Plan Investors. Investment Agreement, §§ 9(a)(vi), 12(d)(vii)(A). In the First Supplemental Objection (¶¶ 29–36), the Equity Committee noted that it is wholly inappropriate for the Debtors to be obligated to pay the Alternate Transaction Fee because GM determined to abandon the contemplated transaction. In the Omnibus Response, the Debtors and others purported to resolve the Equity Committee's concerns by revising the definition of "Change of Recommendation" so it would no longer include action by GM.

30.    However, the Debtors then took away with one hand what they appeared to give with the other. As originally drafted, any party to the Investment Agreement could terminate the agreement if the Support Agreement was terminated in accordance with its terms (which included for any reason or no reason at all). However, pursuant to the Omnibus Response (at page 6), the Investment Agreement is being revised to explicitly provide that the Debtors no longer have the right to terminate the Investment Agreement if the Support Agreement is terminated by GM pursuant to section 3.1(b), which is the provision permitting any party to terminate for any reason or no reason at all on or after April 1, 2007. This amendment, as a practical matter, strips the Debtors of the ability to avoid liability for the Alternate Transaction Fee if GM unilaterally walks away.

31.    If GM terminates the Support Agreement and renounces its support for the contemplated transactions, it will be difficult, if not impossible, to consummate them. Since the "binding" agreements GM is hoped, but not obligated, to reach with the Debtors as a next step would presumably be conditioned on subsequent confirmation of a plan consistent with the

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

Investment Agreement, this would enable GM to renege on those commitments if it has any second thoughts. The Plan Investors would under those circumstances be entitled to terminate the Investment Agreement and keep the Commitment Fees and expense reimbursements already received. However, they would not be obligated to do so. Omnibus Response at 8, 9 (CC 1.1, 4.1 It would in fact be in their interest to leave the Investment Agreement in place while the Debtor scrambled for an alternative plan. Virtually any course of action available to the Debtor to pursue its restructuring efforts under those circumstances would either (a) require it to take action inconsistent with the now-failed transaction, thus constituting a willful breach of the Investment Agreement and entitling the Plan Investors to potential receipt of the Alternate Transaction Fee; or (b) require the Debtor to make a Change of Recommendation to avoid other breaches, which would also entitle the Plan Investors to potential receipt of the Alternate Transaction Fee.[9]

32.    Thus, the current structure gives GM the ability both to blow up the deal without any reason (separate and apart from its ability to simply fail to agree to any deal in the first place) and cost the Debtors an additional $100 million by doing so. This gives GM even more negotiating leverage, which can only be abused to the detriment of all relevant stakeholders. It is perhaps unsurprising that the Plan Investors should not want to bear the risk of a unilateral GM walkaway and have arranged matters so that they will be compensated in that event. But that simply underscores that the lack of any commitment by the Plan Investors renders the Agreements as a whole illusory.

---

[9] ████████████████████████████████████████████

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

B.    *Approval of the Agreements Will Have a Chilling Effect on the Bidding Process*

33.    A breakup fee can often be justified as an "incentive payment to an unsuccessful

bidder who placed the estate property in a sales configuration mode to attract other bidders to the

auction." In re Integrated Resources, 147 B.R. at 659 (internal citation marks omitted).  In that

regard, "the best way to determine value is exposure to a market."  Bank of America NT&SA v.

203 N. LaSalle St. P'Ship, 526 U.S. 434, 457 (1999).  Here, however, the Agreements do not

create an auction environment aimed at maximizing the chances of the best possible alternative

bid.  Indeed, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████  Moreover, given

the closed process to date, the Plan Investors' proposal does not represent the results of a true

market test.

34.    The Agreements, and the payment of fees contained therein, are not designed to

maximize the value of the Debtors' estates by facilitating higher and better bids.  As described

more fully at ¶¶ 42-44 below, they do not create or imply a process by which alternative bidders

can make offers and know they will be considered.  Rather, the Agreements are likely to chill

bidding from other parties, which is a sufficient justification for this court to decline to approve

them.  See In re Integrated Resources, Inc., 147 B.R. at 663 ("Of course, a court may decline to

approve a break-up fee if that fee seems to be part of a plan to thwart the efforts of an unwanted

suitor for reasons unrelated to the maximization of shareholder profit.").

35.    In particular, while the Debtors do retain a "fiduciary out" allowing them to

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

respond to, but not solicit, alternative offers (unlike the sort of auction process often conducted

pursuant to Section 363 where better offers are affirmatively solicited prior to judicial approval

of the sale to the opening bidder), GM's ability to communicate with potential alternative bidders

is even more hampered than the Debtors'.  Indeed, following public announcement of the

Highland bid, GM publicly stated that it did not consider itself at liberty to communicate with

Highland, even though the Support Agreement was not yet binding by its terms since the Motion

had not yet been ruled on.  See Exh. G ("Delphi Jan 5 Equity Plan Delayed Until Jan 11," The

Wall Street Journal Online, Dec. 22, 2006 (1:47 p.m. EST)).

36.    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████    Further, GM's counsel made

clear to the UCC and to the Equity Committee that GM will only engage in discussions with

alternative bidders if and when the Support Agreement is not approved:

> GM remains committed to the Delphi restructuring process as
> defined in the Plan Support Agreement currently up for
> Bankruptcy Court approval, to which GM is a signatory.  If for any
> reason that agreement is not approved or if it is not implemented,
> GM would be open to alternative resolutions that meet the needs of
> Delphi and its stakeholders, including GM. . . . Again, GM is
> currently committed to pursuing a Delphi restructuring plan
> according to the parameters set forth in the agreements with
> Delphi, Appaloosa and Cerberus submitted to the Bankruptcy
> Court for approval.  It would be speculative and premature to
> comment further on potential alternative arrangements.  Exh. H
> (January 5, 2007 email).

37.    The Debtors themselves have made clear that no credible restructuring is possible

without dealing with GM.  See, e.g., Exh. I (Delphi Corporation Form 10-Q for the Quarter

**REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL**

Ended 3/31/2006 (filed on August 15, 2006) at page 9) ("The Debtors' ability to achieve their

[restructuring] objectives is conditioned, in most instances, on the approval of the Court, and the

support of their stakeholders, including GM and the Debtors' labor unions."). Despite this,

section 2.4 of the Support Agreement generally prohibits GM from any communication

whatsoever with alternative bidders, with a few confusingly-drafted exceptions, one of which

(subsection (z)) refers to "discussions engaged in by the Debtors in the performance of their

fiduciary duties." In the Omnibus Response, the Debtors together with GM and the Plan

Investors asserted (p. 13, with emphasis added) that this exception applies only "when GM

participates in third-party discussions <u>with the Debtors' consent</u> in connection with the Debtors'

performance of their fiduciary duties."[10]

     38.     The effort to constrain GM from talking with other potential investors is no

accident. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████

███████████████████████████████████

███████████████████ Here, of course, GM is far from locked in to the Plan

Investors' proposal, but forbidding communications with other bidders would put such other

bidders at an even greater disadvantage. ████████████████████

███████████████████████████████████

---

[10]     This assertion is incorrect. Given that the text of 2.4 expressly provides that the Debtors may consent to
additional contacts by GM not otherwise permitted, the exception under (z) created by "discussions
engaged in by the Debtors" necessarily does not include a separate consent requirement.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

39.    As already noted, GM is acting right now as if it is restricted from communications even though there is no restriction in place. See Omnibus Response at 12-13 (confirming that Support Agreement is not yet effective and that restrictions on GM communications would be in place only after it becomes effective). The Equity Committee believes that the Debtors' fiduciary duties would affirmatively require it not merely to consent to but affirmatively to facilitate discussions between GM and any bona fide bidder which might offer superior value. There is no legitimate reason for the spurious consent condition put forth in the Omnibus Response, and the signal it sends can only serve to chill potential bidders.

40.    Just as significantly, it is clear from GM's conduct to date that it wishes to exercise veto rights over potential alternatives to the Plan Investors. Its response thus far to the emergence of Highland (with whom it has apparently previously engaged in litigation), indicates that it hopes to use purported contractual restrictions as a fig leaf to cover up its own self-motivated refusal to deal. GM is seeking to receive $3 billion in value under the transaction, and, more importantly, obtain releases from billions of dollars of liability from the

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

estate and its stakeholders.  In that regard, GM has an obligation to act in good faith and ensure

that its conduct does not chill bidding.  This Court can and should refuse to approve an

agreement that would give GM an excuse for its self-serving conduct.

41.    As this Court has recognized previously in the context of the proposed asset sale

in the matter In re Refco, Inc., et al., Case No. 05-60006 (RDD), stalking horse bids and break up

fees that hinder, rather than encourage bidders, and fail to create a level playing field among

potential bidders in order to obtain the highest and best offer are unjustifiable.  In the Refco case,

various parties and this Court raised serious concerns about the Debtors' proposed stalking horse

bid and the proposed break up fees, because, based on the bid, it was unclear to potential bidders

what the terms were of the existing bid constituting the "target" for any superior offer, rendering

it difficult to submit higher and better offers.  See Exh. K (In re Refco, Transcript of Hearing,

October 24, 2005 ("Refco Transcript") at 9:5-8; 16:16-17:4; 19:15-17).  In addition, the bidding

procedures established in the stalking horse bid unjustifiably favored the initial bidder in terms of

access to due diligence and other bid procedures chilling the bidding process.  See Refco

Transcript at 13:24-14:7; 15:12-20.  Moreover, at the time court approval was sought for the

stalking horse bid and break up fees, higher and better offers were already submitted and

available to the debtors rendering bidding protections for the stalking horse bidder unnecessary.

See Refco Transcript at 91:16-23; 92:13-93:2.

42.    Similar to the Refco case, in which this Court went to great lengths to ensure that

the bidding procedures established were fair and designed to solicit the highest and best offer, the

Agreements chill any potential bidding process.  Like Refco, the Agreements are illusory in

substance making it difficult for competing bidders to propose alternative bids yet providing the

Plan Investors with absolute walk away rights making any bidding protections, such as the break

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

up fees, unjustifiable.

43.    In addition, as explained in detail below, here as in <u>Refco</u> there exists an alternative bidder that has proposed a better deal for all constituencies, making the exorbitant fee protections for the Plan Investors unsustainable.  Further and unlike <u>Refco</u>, the Agreements fail to even attempt to establish an organized bidding process and procedures that are at least arguably designed to provide prospective bidders a fair opportunity to participate in the process so that the Debtors obtain the highest and best offer.  The Debtors have not sought to establish any sort of auction process aimed at maximizing value and instead have set up roadblocks to undermine potential competing bidders.

44.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Right now, a potentially interested party has no guidance whatsoever as to whether and how it might be deemed a qualified bidder with which the relevant parties would be willing to communicate, or when any alternate proposal should be made by in order to be seriously considered.  Given the illusory nature of the Plan Investors' proposal, it is even difficult to ascertain the true "price" being offered in order to determine what financial terms of a better-structured deal would be necessary to represent a topping bid.

45.    ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ When combined with the total lack of any commitment from the Plan Investors, it is obvious that the

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

fees cannot be justified and should not be approved.

C.   *It is Premature to Grant the Motion While Highland's Bid Is Under Active Consideration*

46.    The Debtors are currently considering the Highland proposal, which appears on its face to offer superior value to all relevant constituencies. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ According to Highland, progress has been slowed by the Debtors' imposition of unreasonable conditions on a confidentiality agreement that would facilitate further discussions.  See Highland Capital Management, LP's Limited Objection to the Motion for Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Period Within Which to File and Solicit Acceptances of Reorganization Plan (Docket No. 6442) at ¶ 10.

47.    ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

_____

11  ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

48.    Court approval of the Agreements might not by itself cause the Highland proposal to fail, since the Debtors could, and must, continue to consider it pursuant to their fiduciary out. However, approval of the Agreements as presented would tilt the playing field heavily in favor of the Plan Investors and would immediately make the Highland proposal less beneficial to the estates' stakeholders.  Once the Investment Agreement is approved by this Court, the debtors could not elect to pursue the Highland proposal, after determining that it provided superior value, without a Change of Recommendation which would obligate payment of the $100 million Alternate Transaction Fee.  Moreover, the Plan Investors would have already received the first $13 million in expense reimbursements, quite probably the first $10 million in Commitment Fees, and, upon implementation of the Highland proposal Appaloosa would be entitled to the additional $5 million in expense reimbursements.

49.    ███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████

50.    In total, approval of the Agreements would likely enable the Plan Investors to receive $128 million from the Debtors' estates without providing any benefit in return.  Given the Highland proposal's ████████ superior economics and governance provisions, this is far from an unlikely scenario.  This Court should not permit such a waste of estate assets.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

III.    **The Decision by Delphi's Board of Directors to Approve the Agreements Does Not
Constitute an Appropriate Exercise of Business Judgment**

51.    Given all of the glaring deficiencies described above, it is difficult to understand
why the Debtors' board of directors could have endorsed the Agreements and requested that this
Court approve them.    The explanation appears in part to be that they simply did not understand
the extent to which the Agreements imposed costs on the Debtors while providing no binding
commitment in return.    Because there was no judgment made by an appropriately informed
board, the business judgment rule does not apply and no deference is due the board's decision.

52.    Courts apply the business judgment standard in determining whether to authorize
a transaction pursuant to section 363(b)(1) of the Bankruptcy Code.    See In re Lionel Corp., 722
F.2d 1063, 1071 (2d Cir. 1983).    "The business judgment rule creates a presumption that in
making a business decision, the directors of a corporation acted on an informed basis [i.e., with
due care], in good faith and in the honest belief that the action taken was in the best interest of
the company."    CVC Claims Litig. LLC v. Citicorp Venture Capital, Ltd., 2006 U.S. Dist.
LEXIS 31395 (S.D.N.Y. 2006) , citing MM Cos v. Liquid Audio, 813 A.2d 1118, 1127-28 (Del.
2003).    "Under Delaware law, proper business judgment means the exercise of substantive due
care – the terms of the transaction – and procedural due care – an informed decision.
Particularized allegations that create a reasonable doubt whether due care in either sense was
exercised will deprive the defendants of the benefit of the business judgment rule."    RCM Sec.
Fund, Inc. v. Stanton, 928 F.2d 1318, 1331 (2d Cir. 1991) (internal citation omitted).

53.    Indeed, the business judgment rule is based on the assumption that a court "must
not reflexively decline to consider the content of [a board's] 'judgment' and the extent of the
information on which it is based."    Hanson Trust PLC v. ML SCM Acquisition, Inc., 781 F.2d
264, 275 (2d Cir. 1986).    Although the standard of review for business judgments is deferential,

27

**REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL**

to receive the protection of the business judgment rule a director must show an exercise of

judgment, not simply the existence of a business decision.  Directors' fiduciary duties require

them to do more than passively rubber-stamp the decisions of the active managers.  RSL

Communs. PLC v. Bildirici, 2006 U.S. Dist. LEXIS 67548, at *17 (S.D.N.Y. 2006) (internal

quotations and citations omitted).

54.    As we will demonstrate at the hearing through the testimony of Delphi Board

members ███████████████████████████, when Delphi's board of

directors (the "Board") determined to authorize entry into the Agreements it was not acting in an

informed manner after a review of all reasonably available material facts. ██████████

███████████████████████

55.    ██████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████████

██████████████████████████████

██████████████████████████████

████████████████████████

██████████████████████████████

████████████

---

12 ███████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

56.

57.

58.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL



59.

. See, e.g., Roselink Investors, L.L.C. v.

Shenkman, 386 F. Supp. 2d 209, 220 (S.D.N.Y. 2004) ("To invoke the [business judgment]

rule's protection directors have a duty to inform themselves, prior to making a business decision,

of all material reasonably available to them.").

## IV.   The Agreements Contain Additional Unreasonable Provisions that Would Mandate Denial of the Motion Even if the Agreements Were Not Illusory

60.    The Agreements also contain specific provisions that mandate the denial of the

Motion.  First, the total amount of fees and value diverted to the Plan Investors is

unconscionable.  Second, the timing and mechanics of the Rights Offering are designed to ensure

that it fails to maximize value to all equity holders and instead provides the Plan Investors with

the opportunity to purchase as many Rights as possible for their own benefit.  Lastly, the 24-

month "tail" period with respect to the payment of the Alternate Transaction Fee is so excessive

as to be commercially unreasonable.

A.    *The Agreements Would Lead to A Massive and Unreasonable Diversion of Value to the Plan Investors that the Board Apparently Never Considered and Cannot Justify*

61.    As described in detail above, the Plan Investors stand to receive and retain

---

13

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

massive fees if the proposed transaction never occurs for any of a myriad of reasons, including

the Plan Investors' own unilateral decision to walk away.  Just as disturbing, however, is the

massive transfer of value they would receive – disproportionate to the new capital they were

providing – if the proposed transaction does occur.

      62.        They would likely receive over $100 million in fees (the $76 million in

Commitment Fees, the $13 million and $5 million fee reimbursements for prior expenses and

unspecified going-forward expenses in an amount that could easily well exceed $6 million).  But

that would be only the tip of the iceberg.  They are also being provided value in the form of the

$10 per share discount on the stock they are to acquire. ██████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████

      63.    ██████████████████████████████████████ The Plan Investors are the

only parties eligible to acquire the $1.2 billion in newly-issued tranches of preferred stock, which

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

are structurally senior to the common stock from a risk perspective and also include various
governance and control rights not available to the common stockholders.  If the common stock
has a plan value of $45 per share, the convertible stock is presumably worth even more than that
it light of its seniority, veto rights, and board control.  Despite this, the Plan Investors may
purchase the preferred stock at the $35 discount price.  The special rights associated with the
preferred stock assure the Plan Investors control of the reorganized Debtors, yet instead of
paying a control premium, they are apparently being offered what might be called a "control
discount" – ███████████████████████████████████████████
███████████████.

     64.    The Plan Investors are to acquire 34,285,716 shares of convertible preferred at the
$35/share discount pricing.  Even at the plan value for common stock of $45/share, this would
represent a transfer of value of almost $343 million from the estates' other stakeholders to the
Plan Investors on top of the $63 million transfer associated with the Direct Subscription Shares
and the $100 million plus in fees, roughly tripling the value transferred away from the Debtors.
Any fair estimate of the additional value embedded in the preferred stock when compared to the
common would make the sum even higher.

     65.    There is thus over a half billion dollars in estate value transferred to the Plan
Investors even if they do not acquire any additional shares at a discount pursuant to the backstop.

████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████ Buying
up to 56.7 million additional shares at a $10/share discount would provide up to $567 million in
additional value transferred to the Plan Investors, more than doubling their profit at the

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

stakeholders' expense to over a billion dollars.

66.    Netting out the fees they would have already received from the cash they would

provide at closing (and without assigning any premium to the preferred stock), at the low end the

Plan Investors would receive stock worth approximately $1.83 billion in return for providing net

cash of $1.32 billion and at the high end they would receive stock worth approximately $4.38

billion in return for providing net cash of $3.3 billion.[14] ███████████████████

███████████████  neither of these results, nor any result on the spectrum in between

can be justified as reasonable or defended as an appropriate business judgment.

67.    Obviously, if the stock is worth more than $45 per share at closing, the Plan

Investors' profits would increase even further.  But they do not bear any downside risk.  Should

it appear that the stock will not actually be worth that sum or such other sum as the Plan

Investors might consider adequate, they will always be able to walk away from the deal, for "any

reason or no reason," at any time before the effective date.

B.    *The Timing of the Rights Offering Prejudices Equityholders In Order to Provide
       Additional Unjustified Compensation to the Plan Investors*

68.    As currently drafted, the Rights Offering is scheduled to take place during the

solicitation period of the Plan (with some risk that it would not occur at all, infra at ¶¶ 75-77).

This timing will require that the Debtors register the Rights Offering with the SEC, with all

attendant costs and potential for delay.  Indeed, the Debtors are currently engaged in discussions

with the SEC over a potential need to restate their financials, which could create further

---

[14]    The low end figures assumes the Plan Investors will receive only the 6.3 million Direct Subscription Shares
of common stock along with the approximately 34.3 million preferred shares.  These approximately 40.6
million shares would be worth approximately $1.83 billion at $45 per share.  The Plan Investors, however,
would have paid only approximately $1.42 billion for them (the same number of shares at $35 per share),
from which must be netted out the approximately $100 million in Commitment Fees and expense
reimbursements which would have previously been paid to the Plan Investors.  The high end figures use the
same methodology but assume the Plan investors would receive an additional 56.7 million shares of
common stock.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

uncertainty and potential delay for the registration statement process and the entire transaction.

███████████████████████████████████████████████████████████████████

██████████████████████    The expense, complexity, and possibility for delay of the

registration statement requirement may potentially be avoided if the Debtors relied on Section

1145 of the Code and conducted the Rights Offering post-confirmation.  ██████████████████

███████████████████████████████████████████████████████████████████

It is worth noting that the Highland proposal contemplates a rights offering commencing on or

after the confirmation of a plan.

     69.    This issue of timing is not simply an administrative one.  As the Equity

Committee has previously explained, the proposed timing will make it systematically more

difficult for the Rights to be exercised by the equityholders or otherwise provide value, as by

transfer to a third party at a time when confirmation of the plan remains uncertain.  <u>See</u> First

Supplemental Objection at ¶¶ 21-23.  ██████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████

    70.    ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████

    71.    ██████████████████████████████████████████████

███████████████████████████████████████████████████████████

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████

72.    First, the commitment fee for the backstop is $55.125 million, which is 2.5% of

$2,205,000.00, the maximum possible payment required for the common stock, assuming 100%

of the shares offered to the other equityholders in the Rights Offering are unsubscribed and thus

are purchased in addition to the Direct Subscription Shares.  There is no indication that that is an

insufficient or below market fee for a 180-day commitment, especially given the additional value

represented by the discount on the Direct Subscription Shares.  ████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

73.    More substantively, however, the earlier timing of the Rights Offering makes it

systematically less likely that Rights will be exercised and thus systematically more likely that

the amount of unsubscribed shares will be higher than would be the case if the Rights Offering

occurred post-confirmation.  ████████████████████████

████████████████████████████████████

████████████████████████████████████████

██████  The timing demanded by the Plan Investors will thus cause additional transfer of value

to them from other stakeholders in two separate ways.  First, it will enable them to purchase

more shares at a discount.  Given the discount, from the Plan Investors' perspective spending

more money rather than less money pursuant to the backstop is an advantage, not a cost.  As a

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

bonus, they may also reap some incidental savings in terms of their cost of capital from a

potentially earlier closing date and greater advance notice about the exact amount they would

have the opportunity to purchase.

74. ████████████████████████████████

████████████████████████████████████

████████████████████████ Each additional unsubscribed share they purchase pursuant to

the backstop will be purchased at a $10 discount to the Plan value of $45 per share (which the

market believes to be significantly understated). If the earlier timing of the Rights Offering

increases the unsubscribed shares available to them by only 10% of the total, the cumulative

incremental benefit to the Plan Investors from the $10 per share discount will be worth almost

$57 million – more than the entire Commitment Fee associated with the backstop, and

dramatically more than the perhaps $5 or $10 million in savings that their purported rationale for

the timing could possibly imply. ██████████████████████

████████████████████████████████████

████████████████████████████████████

The timing of the Rights Offering is nothing more than a way for the Plan Investors to increase

the value they receive from the transaction while diminishing the real value offered to the

common shareholders and adding increased complexity and execution risk for all concerned.

75. Indeed, the Equity Committee's legitimate concerns that the Rights Offering is

designed to fail are further heightened by the fact that it remains possible for the entire

transaction to go forward without the Rights Offering ever taking place. The Debtors have

asserted that this could not happen, but they have conspicuously failed to offer to amend the

documents to conform to their assertions.

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

76.    The Equity Committee previously noted that the Investment Agreement does not condition the Plan solicitation period on the effectiveness of the Registration Statement and that it is therefore possible for the Plan solicitation period to begin, and possibly even conclude, prior to the Registration Statement becoming effective.  See, e.g., First Supplemental Objection at ¶19. The Omnibus Response attempted to dismiss these concerns by noting that pursuant to section 1(c)(ii) the Registration Statement must become effective prior to the "Distribution Date" – the date on which Rights and ballots to vote on the chapter 11 plan are to be sent to eligible equity holders.  However, there is no provision in the Investment Agreement that precludes the Debtors from soliciting votes from any other classes of claims and interests prior to the effectiveness of the Registration Statement.

77.    ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████  If it were not for the express right of the Debtors and the Plan Investors to waive the Rights Offering as a precondition for closing (a provision that makes no sense if closing without the Rights Offering would be impossible for other reasons), this might be dismissed as merely a drafting glitch.  Be that as it may, the Debtors have not offered to amend the Investment Agreement to cure the problem, as by expressly requiring that (i) the plan solicitation process will not commence as to any class unless and until the Registration Statement is effective and the Rights Offering has commenced or (ii) the Plan cannot become effective unless the Rights Offering has concluded.  Absent such an amendment,

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

it cannot be disputed that the terms of the Investment Agreement permit the elimination of the Rights Offering.

C.    *The 24-Month "Tail" on the Alternate Transaction Fee Cannot be Justified*

78.    As noted above, one of the objectionable features of the Alternate Transaction Fee is the 24-month "tail" period, entitling the Plan Investors to receive $100 million in the event of an Alternate Transaction which occurs as much as 24 months after termination of the Investment Agreement. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████

79.    A break-up fee such as the alternate transaction fee can sometimes be justified as an "incentive payment to an unsuccessful bidder who placed the estate property in a sales configuration mode to attract other bidders." Integrated Resources, 147 B.R. at 659.[15] Here, however, it is simply unreasonable to assume that an alternative transaction that occurs a year or even as much as 23 months after the proposed transaction is abandoned will represent a "topping bid" which occurred as a result of the Plan Investors putting the company in "play" – especially since the broad definition of Alternate Transaction does not require that the subsequent transaction be one that had been proposed or considered prior to termination of the Investment Agreement. See Miller Tr. 62:5 – 63:9 (acknowledging that fee could be triggered by "stand-alone" restructuring without a topping bid). That long a gap will almost certainly occur only if

---

[15] ████████████████████████████████████████████████

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

the collapse of the proposed transaction (such as by the GM abandonment described at ¶¶ 27-28, 31-32 above) leaves the Debtors essentially back at square one.

80.    Indeed, there is no requirement that an Alternate Transaction triggering the fee obligation actually be economically superior to the current proposal, and if the Debtors are left in the lurch it is entirely possible that the best available option for emergence from chapter 11 might end up being inferior.  Unlike a solvent seller who could always elect to take its business or property off the market until a "tail" period expired, the Debtors could not afford to avoid pursuing an Alternate Transaction on the best terms obtainable, even if less favorable than those currently under discussion.[16]  Requiring a $100 million payment under those circumstances after so substantial a time lag would add insult to injury.

81.    Thus, because the 24-month tail period imposes an unjustifiable cost on the Debtors' estates without any corresponding benefit, it is unreasonable and the Agreements should not be approved with that provision in them.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[16]    The only way of avoiding a restructuring that would not be deemed an Alternate Transaction would be to convert to chapter 7, or languish in chapter 11 for over 24 more months without confirming a plan, neither of which suggests a positive outcome for the Debtors and their stakeholders.

39

REDACTED – CONFIDENTIAL/
HIGHLY CONFIDENTIAL

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Equity Committee respectfully requests

that the Court deny the Motion and grant such other and further relief as is appropriate.

Dated:  January 9, 2007
New York, New York

FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP

By:   /s/ Bonnie Steingart
      Bonnie Steingart (BS-8004)
      Debra M. Torres (DT-9093)

One New York Plaza
New York, New York 10004
Telephone:  212.859.8000
Facsimile:  212.859.4000

*Counsel for the Official Committee of Equity
Security Holders*

574102