Thomas M. Kennedy (TK-0993)
Susan Jennik (SJ-4607)
Larry Magarik (LM-3748)
KENNEDY, JENNIK & MURRAY, P.C.
113 University Place
New York, NY  10003
(212) 358-1500

Return Date:
January 5, 2006
10:00 a.m.

Attorneys for International Union of Electronic,
Electrical, Salaried, Machine and Furniture Workers,
Communications Workers of America (IUE-CWA)

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| In re DELPHI CORPORATION, et al., | ) | |
| | ) | 05-44481 (RDD) |
| Debtors. | ) | (Jointly Administered) |

**SUPPLEMENTAL OBJECTION OF IUE-CWA TO MOTION FOR ORDER
AUTHORIZING AND APPROVING THE EQUITY PURCHASE AND COMMITMENT
AGREEMENT PURSUANT TO SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE
BANKRUPTCY CODE AND THE PLAN FRAMEWORK SUPPORT AGREEMENT
PURSUANT TO SECTIONS 105(a), 363(b) AND 1125 (e) OF THE BANKRUPTCY
CODE**

**APPENDIX**

1

1
2  UNITED STATES BANKRUPTCY COURT
3  SOUTHERN DISTRICT OF NEW YORK
4
5  ------------------------------------------x
6
7
8                   In the Matter
9
                      of       Case No.
10                             03-13532
11     WESTPOINT STEVENS INC.,
12                      Debtor.
13 ------------------------------------------x
14
15                        April 7, 2005
16            United States Customs House
              One Bowling Green
17            New York, New York 10004
18 Re: Doc. #830; motion for an order
   approving bidding procedures, forms of
19 notice, and breakup fee and bidding
   protections for stalking horse bid and to
20 sell substantially all their assets
21
   B E F O R E:
22              HON. ROBERT D. DRAIN,
23                   Bankruptcy Judge.
24
25

93

WESTPOINT STEVENS INC.

1
2  transaction to be a catalyst an ultimately
3  whether the Court concludes that the
4  breakup fee is likely to benefit the
5  estate, particularly where it is clear that
6  there are already competing bidders in
7  place and also where it is clear as a
8  secondary matter that the stalking horse
9  did not elicit the competing bidder.
10         The courts are quite reluctant
11  to approve breakup fees as instanced by
12  Judge Gerber's Gay case affirmed by the
13  District Court in the Second Circuit.
14         One also needs to consider
15  whether the fee itself is reasonable in
16  relation to the proposed purchase price.
17  Weighing those factors I find the breakup
18  fee and expense reimbursement as proposed
19  here does not meet the test for the
20  following reasons.
21         Primarily because I believe
22  that not only do we have competing bidders
23  here already and, therefore, a breakup fee
24  is not necessary to keep the bidding going
25  but also with the exception of Mr. Ross,

94

1          WESTPOINT STEVENS INC.

2    and I will come back to that in a moment,

3    the bidders have already invested in the

4    capital structure of this company and

5    unless they are deemed to sell their

6    investment to someone else willing to buy

7    it, they are here and I do not believe that

8    a breakup fee, apparently 80 to 75 percent

9    of it which would be payable to creditors

10   who are already here and asserting their

11   rights under are 363(k) is necessary to

12   keep them here as a catalyst to their

13   bidding.

14             That does leave Mr. Ross, and

15   the Court has to evaluate whether the

16   denial of this motion will scare him away

17   over what is apparently 20 percent of a

18   potential breakup fee and expense

19   reimbursement.

20             It is never something that a

21   Court likes to do, and that is to speculate

22   whether a potentially interested third

23   party will stay around or will be

24   discouraged from continuing to participate

25   in the process but, unfortunately, that is

Westlaw.

--- F.Supp.2d ----

Page 1

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

**H**
Briefs and Other Related Documents
In re Tower Automotive Inc.S.D.N.Y.,2006.Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re TOWER AUTOMOTIVE INC., et al.,
Debtors.
OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOWER AUTOMOTIVE, et al.,
Appellants,
v.
DEBTORS AND DEBTORS IN POSSESSION, the Official Committee of Retired Employees, and the Smith Steel Workers D.A.L.U. 19806 AFL-CIO and Other Milwaukee Unions, Appellees.
OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TOWER AUTOMOTIVE, et al.,
Appellants,
v.
TOWER AUTOMOTIVE, INC., Untied Automobile, Aerospace and Agricultural Implement Workers of America, and the IUE, The Industrial Division of the Communications Workers of America AFL-CIO, CLC, Appellees.
**No. 05-10578 (ALG), 06CV4996 (VM), 06CV7877 (VM).**

Dec. 15, 2006.

Christine Elizabeth Jennings, Jones, Day, New York, NY, Marianne Goldstein Robbins, Previant, Goldberg, Uelmem, et al., Milwaukee, MI, for Debtors.

### DECISION AND ORDER
MARRERO, District J.
**\*1** The Official Committee of Unsecured Creditors (the "Creditors Committee") appeals from a decision of the Bankruptcy Court dated May 19, 2006, and subsequent order dated May 22, 2006, approving the proposed settlements of debtor Tower Automotive, Inc. (the "Debtor" or "Tower") with the unions representing employees and retirees

at Tower's Milwaukee facility (the "Milwaukee Unions") [FN1] and with the Official Committee of Retired Employees (the "Retiree Committee"). The Creditors Committee also appeals from the Bankruptcy Court's order dated August 30, 2006 approving Tower's proposed settlement with the United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the IUE, the Industrial Division of the Communications Workers of America AFL-CIO, CLC (the "IUE-CWA"). As both of the Creditors Committee's appeals challenge similar provisions of the respective settlements and raise the same objections in both appeals regarding the guaranteed retirement benefits provided to the retirees (" Retirees") under each of the settlements (collectively, the "Retiree Settlements"), the Court has consolidated these proceedings.

### I. BACKGROUND

#### A. *PROCEDURAL HISTORY*

Tower, a supplier of automotive components, filed a voluntary petition for relief under Chapter 11 in the United State Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). On February 14, 2005, the Office of the United States Trustee appointed the Creditors Committee to represent all of Tower's unsecured creditors, " including, e.g., tier two and tier three auto parts suppliers, tradesmen, vendors, large equipment operators-in short, virtually everyone who did business with Tower." (Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al., dated July 18, 2006 (" Creditors Committee July 18 B.R., at 4.)

On January 4, 2006, Tower filed a motion to reject its collective bargaining agreements pursuant to 11 U.S.C. § 1113 and to modify retiree benefits pursuant to 11 U.S.C. § 1114 of the Bankruptcy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Code (the " § 1113/1114 Motion"). Tower's motion, which the Creditors Committee joined in support, would have "eliminated medical benefits for future retirees, frozen defined benefit pension plans, cut off the company's contributions to two-multi-employer pension plans, and temporarily suspended 401(k) contributions." (*Id., citing* Debtor's § 1113/1114 Motion at 40-42 (Docket No. 1159).) It would also have allowed Tower to cease making any contributions toward retirees' medical and prescription drug benefits other than a $5 million cash contribution to a Voluntary Employees Beneficiary Association ("VEBA") trust on behalf of existing retirees. (*See id., citing* Debtor's 1113/1114 Motion at 43.)

On the eve of trial on Tower's § 1113/1114 Motion, Tower reached a settlement in principle with the Milwaukee Unions. After five days of trial, Tower reached a similar settlement with the Retiree Committee. On April 5, 2006 the settlements were submitted to the Bankruptcy Court for approval. Over the objections of the Creditors Committee, after an evidentiary hearing on April 26, 2006, the settlements were approved by the Bankruptcy Court in a decision dated May 19, 2006.

**\*2** The Creditors Committee moved for a stay pending appeal, which motion was denied by the Bankruptcy Court. The Creditors Committee then moved to stay the settlement in the district court, which motion was denied by Judge Swain following a hearing on June 29, 2006.

Subsequently, Tower also reached a settlement with the UAW and the IUE-CWA, which is patterned after the settlements with the Milwaukee Unions and the Retiree Committee. The Bankruptcy Court approved these settlements as well, declining to write a separate opinion as the issues raised were previously addressed in the Bankruptcy Court's May 19, 2006 opinion.

### B. *SETTLEMENT TERMS*

The Retiree Settlements allow Tower to cease payment of retirement benefits, resulting in significant cash savings that Tower believes to be essential to its successful reorganization.[FN2] In exchange, Tower has established VEBA trusts to provide future benefits for the Retirees and has made and will make certain scheduled cash payments to each of the trusts during the pendency of the bankruptcy proceeding.[FN3]

Additionally, on the bankruptcy distribution date (the date Tower makes initial distributions to holders of allowed unsecured claims), Tower has agreed to contribute to each of the VEBA trusts created by the Retiree Settlements, in either cash or equity, an amount not less than 20 percent of the Retirees outstanding claims against Tower for the value of the benefits lost as a result of the modifications embodied in each of the Retiree Settlements. For example, under the Milwaukee Unions's settlement, which settlement covers by far the largest group of Retirees, the terms provide for an allowed unsecured claim of $150 million. This $150 million represents the agreed upon value of the Milwaukee Unions's lost benefits. Under this settlement, the VEBA payments Tower is required to make during the pendency of the bankruptcy proceeding are deducted from this $150 million figure, and on the bankruptcy distribution date, the Milwaukee Unions are entitled to at least [FN4] a 20 percent recovery on the outstanding balance of their $150 million claim.[FN5] Similarly, the Retiree Committee, the UAW and the IEU-CWA are all guaranteed a minimum 20 percent recovery on their unsecured claims against Tower for benefits lost. The 20 percent recovery is understood by the parties to the Retiree Settlements to be a recovery floor. If the distributions on unsecured claims under Tower's reorganization plan ultimately call for payment on unsecured claims at an amount greater than 20 cents on the dollar, the Retirees are entitled to recovery on their unsecured claims at this higher amount. However, if unsecured creditors are to recover, for example, only five percent on their claims, the Retirees are still guaranteed a 20 percent recovery.

The objections raised by the Creditors Committee in opposing the Bankruptcy Court's approval of the Retiree Settlements, and the arguments it now raises before this Court, concern this guaranteed claim recovery and whether settlements so structured are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

permissible under the Bankruptcy Code.

### C. *THE BANKRUPTCY COURT'S DECISION*

**\*3** As stated by the Bankruptcy Court, the Creditors Committee objected to the Retiree Settlements on three grounds: "(i) the Settlements violate the Bankruptcy Code because they guarantee a level of recovery for certain creditors, while other similarly situated creditors do not, as of yet, have any assurance as to their recovery; (ii) the Settlements comprise a *sub rosa* plan of reorganization; and (iii) the Settlements do not satisfy Fed. R. Bankr.P. 9019. " (Memorandum of Opinion Approving Settlement Agreements, dated May 19, 2006 ("Mem."), at 4.) The Bankruptcy Court found the Creditors Committee's arguments unpersuasive.

The Bankruptcy Court held that under § 1114 of the Bankruptcy Code general unsecured creditors are not similarly situated to retirees. It also held that the Retiree Settlements do not constitute a *sub rosa* plan of reorganization because the settlements " do not dictate any of the terms of a future plan of reorganization, do not restructure the Debtor's business or finances generally, and do not restrict any rights afforded to creditors in the chapter 11 process, such as the right to vote on a proposed plan of reorganization in the manner they see fit." (*Id.* at 10.) Finally, the Bankruptcy Court, having heard a week of testimony on the § 1113/1114 Motions, found that the Retiree Settlements were in fact reasonable and thus approval was warranted under Bankruptcy Rule 9019.

### II. DISCUSSION

### A. *STANDARD OF REVIEW*

In general, a district court reviews a bankruptcy court's factual findings under a clearly erroneous standard and reviews its legal conclusions de novo. *See Truck Drivers Local 807 v. Carey Transp. Inc.,* 816 F.2d 82, 88 (2d Cir.1987); *In re Duffy,* 344 B.R. 237, 242 (S.D.N.Y.2006); *In re DG Acquisition Corp.,* 213 B.R. 883, 884

(S.D.N.Y.1997). The Bankruptcy Court's interpretation of specific sections of the Bankruptcy Code is therefore reviewed by this Court de novo. *See In Re Caldor Corp.,* 303 F.3d 161, 166 (2d Cir.2002). Similarly, a district court reviews de novo whether the settlements constitute a *sub rosa* plan of reorganization. *See In Re Cajun Elec. Power Cooperative, Inc.,* 119 F.3d 349, 354 (5th Cir.1997). However, "the bankruptcy judge is uniquely positioned to consider the equities and reasonableness of a particular compromise, and his evaluations and acceptance of the compromised settlements are entitled to deference on a review." *In re Drexel Burnham lambert Group, Inc.,* 140 B.R. 347, 349 (S.D.N.Y.1992); *see also In re Liu,* 166 F.3d 1200, 1200 (2d Cir.1998) (bankruptcy court's approval of settlement is reviewed " extremely deferentially"). Thus the Bankruptcy Court's determination that the settlements are reasonable should not be overturned unless it is manifestly erroneous or an abuse of discretion. *See In re Iridium Operating LLC,* No. 01 Civ. 5429, 2005 WL 756900, at *4 (S.D.N.Y. April 4, 2005).

### B. *WHETHER THE SETTLEMENTS IMPERMISSIBLY FAVORS RETIREES OVER OTHER UNSECURED CREDITORS*

**\*4** Bankruptcy Code § 1114 requires that Tower " shall timely pay and shall not modify any retiree benefits, except that-(A) the court, on motion ... and after notice and a hearing, may order modification of such payments ...; or (B) the trustee and the authorized representative of the recipients of those benefits may agree to modification of such payments, after which such benefits as modified shall continue to be paid by the trustee." 11 U.S.C. § 1114(e)(1). Section 1114 was added to the Bankruptcy Code as part of the Retiree Benefits Bankruptcy Protection Act of 1998 ("RBBPA"), Pub.L. No. 100-334, 102 Stat. 610, along with § 1129(a)(13), which requires as a condition of plan confirmation that the debtor provide retiree benefits at the level established under § 1114 "for the duration of the period that the debtor has obligated itself to provide such benefits." 11 U.S.C. § 1129(a)(13). Congress's purpose in enacting the RBBPA was "to ensure that the debtors did not seek

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                      Page 4

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

to effect reorganization 'on the back of retirees' for the benefit of other parties in interest." *In re Ionosphere Clubs, Inc.,* 134 B.R. 515, 523 (Bankr.S.D.N.Y.1991). Section 1114 "provides a status quo safeguard" that requires a debtor to continue timely paying retirement benefits in full unless modified in accordance with § 1114(e)(1)(A) or (B). *Id.* Any payments required to be made by the debtor prior to when plan confirmation is effective are treated as allowed administrative expenses. 11 U.S.C. § 1114(e)(2). As for the benefits lost as a result of § 1114 modification, the legislative history of the RBBPA makes clear that " retirees will ... have an unsecured claim payable in accordance with the provisions of the Bankruptcy Code and the reorganization plan, for those retiree benefits lost as a result of section 1114 modification. " RBBPA, S.Rep. No. 100-119, at 689 (1988) ( " RBBPA Senate Report"); *see also id.* at 691 ("Any required payment [due as a result of modification] is treated as an administrative expense; any benefits lost due to modification remain unsecured claims." ); *In re Ionosphere Clubs,* 134 B.R. at 527; *In re GF Corp.,* 120 B.R. 421, 423 n. 1 (Bankr.N.D.Ohio 199).

The Creditors Committee argues that the Retiree Settlements' guarantee of 20 percent recovery on the Retirees' unsecured claims impermissibly favors Retirees over other unsecured creditors and effectively seeks reorganization "on the backs of the other unsecured creditors (many with economic woes of their own), who have no guarantees, and, thus, are left with both diminished recoveries and all the risk that the Debtors will under-perform economically." (Reply Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al., dated Aug. 7, 2006 (" Creditors Committee Aug. 7 Reply Br."), at 9.)

It is undisputed that "preferential treatment of a class of creditors is in order only when clearly authorized by Congress." *Howard Delivery Services, Inc. v. Zurich American Ins.,* --- U.S. ----, ----, 126 S.Ct. 2105, 2109, 165 L.Ed.2d 110 (2006). As there is no explicit support in the Bankruptcy Code or case law for favoring retirees' unsecured claims over the unsecured claims of other creditors, the Creditors Committee argues that Retiree

Settlements are improper.

**\*5** While it is true that the Bankruptcy Code does not anywhere expressly prescribe the preferential treatment of the Retirees' unsecured claims over other unsecured claims, the Creditors Committee's objection to the Retiree Settlements is premised on a fundamental misapprehension of the nature of the settlements. The 20 percent guaranteed recovery is not itself an unsecured claim. The Retirees have an unsecured claim for *lost* benefits." The 20 percent guaranteed recovery by definition cannot be considered a lost benefit. It is part of the Retirees' *modified* benefits. While this guaranteed recovery is tied to, or more accurately, requires reference to, the Retiree's unsecured claim recovery, it does not itself constitute an unsecured claim.

Thus, while the settlements do shift some of the risk of Tower's future economic under-performance away from the Retirees to the possible detriment of unsecured creditors generally, this shift is permissible under § 1114, which specifically provides retirees with rights not afforded general unsecured creditors. The presumption under § 1114 is that retiree benefits will continue to be paid in full, unless modified by agreement or court order. *See* 11 U.S.C. § 1114(e)(1). Any retiree payments " required to be made before" plan confirmation is effective have priority as administrative expenses. *See* 11 U.S.C. § 1114(e)(2). The guaranteed 20 percent recovery, although due post-confirmation, was required to be made as part of the pre-confirmation settlement. It does not guarantee the value of the Retirees' unsecured claims; rather, it guarantees the minimum value of the modifications to the Retirees' benefits.

The Creditors Committee argues the settlements are at odds with §§ 1114(f) & (g). Section 1114(f) requires the debtor to make a proposal to the authorized representatives of the retirees for those modifications "that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1114(f)(1)(A). The debtor must then meet with the authorized representative of the retirees in an effort to reach a "mutually satisfactory" modification of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

benefits. 11 U.S.C. § 1114(f)(2). Section 1114(g) allows the court to enter an order modifying benefits if the debtor has made a proposal that satisfies the requirements of § 1114(f), the authorized representative of the retirees refuses to accept the proposal without good cause and the modification is necessary to permit reorganization, is fair and equitable to all parties, and is "clearly favored by the balance of the equities." 11 U.S.C § 1114(g).

Here, as a "mutually satisfactory" modification of benefits has been agreed to, a § 1114(g) court order, based on a determination that the settlement is necessary to permit reorganization and is fair and equitable to all parties, is not required. The Creditors Committee nonetheless argues that the bankruptcy court must review the settlement in accordance with the standard set forth in § 1114(g), as it would be illogical for a debtor to be allowed to make an agreement with retirees that is not fair and equitable to other unsecured creditors, when the bankruptcy court is expressly prohibited from doing so. However, it is entirely logical that the standard set forth in § 1114(g) would not be implicated in the case of a settlement. Under a provision expressly enacted to safeguard retirees' benefits, if the Retirees voluntarily agree to a significant reduction in benefits, other unsecured creditors should not be able to argue that fairness and equity would require the retirees to agree to an even larger reduction in benefits. As discussed below, this does not mean that unsecured creditors are left without protection from unreasonable settlements, as the Bankruptcy Court must review the settlement under Bankruptcy Rule 9019.

**\*6** Section 1114(g) also provides that anytime after an order is entered or an agreement modifying benefits is made, the authorized representative of the retirees or the debtor may apply to the court to seek increases or decreases in modified benefits based on the debtor's current financial circumstances, as long as further modification will still allow the debtor to reorganize and is fair and equitable to all parties. *See id.* The Creditors Committee asserts that this procedure allowing for multiple modifications represents Congress's intended means of ensuring that the level of benefits

remains properly aligned with the debtor's financial performance. *See* RBBPA Senate Report at 688 (" [t]he modification process under section 1114 need not be a one-time occurrence. The financial circumstances of the debtor may warrant subsequent modification."). The Creditors Committee argues that the settlements undermine Congress's intentionally flexible scheme for benefits modification by locking in a guaranteed recovery for retirees. The Retiree Settlements, however, are completely in line with Congress's concern that retirees not be locked in to a drastically reduced level of benefits even if the debtor's economic situation unexpectedly improves. The Retiree Settlements lock in only the minimum amount of recovery that the Retirees believe necessary to provide any sort of ongoing meaningful benefits. If Tower ends up in a financial situation that allows all unsecured creditors to receive more than 20 percent on their claims, the Retirees will be entitled to this recovery as well.

Of course, the Creditors Committee is also concerned with the opposite outcome, where Tower's economic situation continues to deteriorate and general unsecured creditors end up receiving only pennies on the dollar. While this outcome is always a possibility in bankruptcy, it is not grounds to unwind the Retiree Settlements. The RBBPA clearly evidences Congress's special concern for the rights of retirees. *See* RBBPA Senate Report at 684 ("This bill recognizes the conflict between the interests of all other unsecured creditors in a Chapter 11 proceeding and the special problems associated with the cut-off of health and insurance benefits to retirees. The special treatment accorded retiree benefit payments is appropriate because of the hardship imposed on elderly recipients when such benefits are suddenly curtailed.").

### C. *WHETHER THE SETTLEMENTS CONSTITUTE A SUB ROSA PLAN*

A settlement which has the effect of dictating the terms of the debtor's plan of reorganization prior to the confirmation process cannot not be approved. *See In Re Braniff,* 700 F.2d 935, 940 (5th Cir.1983) ("The debtor and the bankruptcy court should not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* ...."); *In re Iridium,* 2005 WL 756900 at *7 ("the trustee is not authorized to enter into a settlement if it results into a de facto or *sub rosa* plan of reorganization."); *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 887 (Bankr.S.D.N.Y.1990) ("A transaction which would effect a lock-up of the terms of a plan will not be permitted.").

**7** The Creditors Committee asserts that the guaranteed recovery under the Retiree Settlements represents an enormous portion of Tower's unencumbered estate; thus, it argues the Retiree Settlements in large measure sets the terms of Tower's reorganization without affording general unsecured creditors the protections afforded them by the reorganization plan approval process.

This Court agrees with the Bankruptcy Court that the Retiree Settlements are not the type of transactions that courts have found to be impermissible *sub rosa* plans. Here, the Bankruptcy Court's review of the relevant case law correctly distinguishes between those circumstances in which pre-plan transactions constitute de facto reorganization plans and circumstances in which such transactions are permissible:

In extreme circumstances, courts have refused to approve settlements or other transactions by a debtor, such as the sale of all or substantially all assets, without the benefit of a confirmed plan or court-approved disclosure statement and without an adequate business justification. [citations omitted]. Such settlements encroached "on a right afforded creditors or equity holders in the chapter 11 process. " *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877, 885 (Bankr.S.D.N.Y.1990).

On the other hand, courts have approved even large and important settlements prior to confirmation of a plan, notwithstanding a "*sub rosa* plan" objection, where the settlements did not dispose of all of the debtor's assets, restrict creditors' rights to vote as they deem fit on a plan of reorganization, or dictate the terms of a plan of reorganization. [citations omitted]. As the Court stated in the *Cajun Electric Power* case, rejecting a *sub rosa* plan argument, the settlement there did "not dispose of all claims

against [the debtor], nor does it restrict creditors' rights to vote as they deem fit on a proposed reorganization plan [nor does it] dispose of virtually all of [the debtor's] assets ...." 119 F.3d at 355.

Mem. at 9-10.

The Retiree Settlements do not dispose of all of Tower's assets. Evidence admitted at the trial of the 1113/1114 Motion indicates that Tower expects to emerge from bankruptcy with an enterprise value of approximately $1.2 billion. (*See* Retiree Committee Aug. 2 B.R. at 5, *citing* Lazard Valuation Report (marked as Ex. 64 at § 1113/1114 Hearing.)) The Creditors Committee emphasizes that the Milwaukee Unions's $150 million claim alone represents 56 percent of Tower's total unsecured claims. (*See* Creditors Committee July 18 Br. at 18). While payment of at least 20 percent on this significant claim may represent a substantial portion of Tower's unencumbered estate (although this is disputed), the Retiree Settlements cannot be said to dispose of all or substantially all of Tower's assets. *Cf. In re Cajun Power,* 119 F.3d at 355 (settlement not a *sub rosa* plan where it removed "$107 million in cash and transmission lines worth $20 million from the debtor's estate," as debtor retained as much as $1.1 billion in other assets). Nor do the Retiree Settlements in any way dispose or release the claims of general unsecured creditors, or restrict their rights to vote on the eventual plan of reorganization. *See In Re Iridium,* 2005 WL 756900 at * 8 (finding settlement was not a *sub rosa* plan were it only bound the parties to the settlement and did not prevent objecting creditor "from voting in whatever manner it chooses on any proposed plan. ")

**8** In fact, the Retiree Settlements resolve a necessary pre-condition to any proposed plan of reorganization, as the Bankruptcy Code requires that any proposed plan must provide for the continuation of retiree benefits. *See* 11 U.S.C. § 1129(a)(13). Moreover, the Retiree Settlements actually free up cash Tower believes to be necessary to its reorganization.[FN6] The Retiree Agreements, therefore, are "essential to, and the first step in facilitating, an ultimate plan of reorganization." *In re Iridium,* 2005 WL 756900 at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

Page 7

*8.

### D. *APPROVAL OF SETTLEMENT UNDER BANKRUPTCY RULE 9019*

Bankruptcy Rule 9019 ("Rule 9019") applies to bankruptcy settlements generally and provides, in relevant part, that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Bankr.R. 9019(a); *see also In re GF Corp.,* 120 B.R. at 425 (reviewing § 1114 settlement pursuant to Rule 9019). In reviewing a settlement, it is the Bankruptcy Court's responsibility, and this Court's upon review, to " canvass the issues raised and see whether the settlement falls below the lowest point of reasonableness." *In re W.T. Grant & Co.,* 699 F.2d 599, 608 (2d Cir.1983) (internal citations omitted). The reviewing court, however, "may not simply rubber stamp the recommendation of a trustee or debtor in possession but, instead, must make an independent, full and fair assessment of the wisdom of the proposed compromise." *In re Remsen Partners, Ltd.,* 294 B.R. 557, 565 (Bankr.S.D.N.Y.2003).

Courts reviewing proposed settlements under Rule 9019 generally consider the following factors: (1) the probability of success in litigation, (2) the difficulties, if any, that might be encountered in collecting a judgment, (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it, and (4) "the paramount interest of creditors and a proper deference to their reasonable views." *Id.* While the Bankruptcy Court's decision approving the settlement did not explicitly reference these factors, the Bankruptcy Court's decision did state:
[H]aving heard five days of testimony on the 1113/1114 Motions, the Court has no reason not to endorse a settlement that satisfies the Debtor's principal goal, saving cash, while affording significant protection for the rights that Congress required be preserved for retirees. The litigation posed significant risks for both sides. Despite the Committee's contentions, it is in the best interest of all parties to go forward with these Settlements so that the Debtors and the Committee can proceed to

negotiate a plan and end to these cases.

Mem. at 11.

Thus, contrary to the Creditors Committee's contentions, the Bankruptcy Court did consider the probability of success in litigation and concluded, after a week of testimony, that it posed significant risks for both sides. As for the difficulty of collecting a judgment absent the settlement, as Tower's § 1113/1114 Motion sought monetary reductions, collection is not an issue.

**\*9** The Creditors Committee argues that since the settlement occurred after an evidentiary hearing, there would not be any significant further litigation necessary, and thus no attendant inconvenience and delay absent settlement. The Creditors Committee ignores that the Milwaukee Union settled before the § 1113/1114 trial and did not participate in it. If the current settlement were retroactively disapproved, further litigation would be required before the Bankruptcy Court could order a modification of the Milwaukee Unions benefits. [FN7] More importantly, as the Bankruptcy Court points out, the Retiree Settlements "also resolve a host of complicated grievance, NLRB, arbitration and litigation proceedings between the Debtors and the Milwaukee Unions." (Mem. at 3.) Thus, the complexity, scope and expense of litigation facing the parties if the Retiree Settlements are not approved is a significant factor weighing in favor of approval.

Additionally, as the parties to the Retiree Settlements all emphasize, and as the Bankruptcy Court expressly concluded, the Retiree Settlements are in the best interests of all parties, including unsecured creditors. Thus, the Bankruptcy Court did not fail to consider "the paramount interests of creditors with proper deference to their reasonable views." *In Re Remsen,* 294 B.R. at 565. The Retirees have all agreed to substantial reductions that reduce the value of their benefits to less than a third of their pre-modification level, which reductions free up significant cash essential for Tower's reorganization, increasing the likelihood that Tower will be able to repay its creditors. [FN8] Moreover, the deferred recovery, in either cash or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                                                                                    Page 8

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

equity, that the Retirees have agreed to is certainly a more favorable arrangement for general unsecured creditors than the equivalent value being paid in cash at present into the VEBA trusts.[FN9]

While the Creditors Committee wishes to gloss over the extent of the Retirees' concessions, the Retiree Settlements force Retirees to survive on significantly reduced health and welfare benefits. In order to maintain benefits at the pre-modification level, individual Retirees must elect COBRA and pay the COBRA premiums out of their own pockets. (*See* Hearing Transcript, June 29, at 8.)

Finally, while it would not be grounds to confirm the Bankruptcy Court's approval of the Retiree Settlements if the settlements were otherwise unreasonable, this Court cannot completely ignore the practical difficulties involved in unwinding the settlements at this point. As the Bankruptcy Court noted in its decision denying the Creditors Committee's motion to stay the settlements pending appeal, "What should a retiree do if he or she has obtained other medical coverage and is now told the settlement is on hold?" (Order Denying Stay Pending Appeal, dated June 28, 2006, at 6.) The additional expense and inconvenience to the Retirees, who have already been asked to make significant concessions, would be substantial if the Retiree Settlements were unwound at this point. Moreover, the Retiree Settlements were driven in large part by Tower's belief that avoiding the substantial benefits payments due on July 1, 2006 was essential to Tower's reorganization prospects. If this Court were to strike the Retiree Settlements, Tower would again be obligated to make substantial cash payments that may make any reorganization impossible. Under such circumstances, where the Bankruptcy Court as well as District Court Judge Swain both expressed serious concerns about the harm even staying the settlements would have on the bankruptcy reorganization process, this Court is particularly cautious in its review and "extremely" deferential, *see In Re Liu,* 166 F.3d at 1200, to the Bankruptcy Court's determination that the Retiree Settlements are in the best interest of all parties. For all the reasons discussed above, the Court finds that the Bankruptcy Court's determination was neither " clearly erroneous" or "a clear abuse of discretion,"

*see In re Iridium,* 2005 WL 756900 at *4, and thus affirms the Bankruptcy Court's approval of the Retiree Settlements.

### VI. ORDER

*10 For the reasons described above, it is hereby

ORDERED that the order of the bankruptcy court dated May 22, 2006, based on its decision dated May 19, 2006, approving the settlements between appellee debtor Tower Automotive, Inc. ("Tower") and the appellee unions representing employees and retirees at Tower's Milwaukee facility (the " Milwaukee Unions") and the appellee Official Committee of Retired Employees (the "Retiree Committee") is hereby affirmed and the appeal (Docket No. 1, 06cv4006) of the appellant Official Committee of Unsecured Creditors ("Creditor's Committee) is hereby dismissed; and it is further

ORDERED that order of the bankruptcy court dated August 30, 2006, approving the settlements between Tower and the appellees United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), and the IUE, the Industrial Division of the Communications Workers of America AFL-CIO, CLC (the "IUE-CWA") is hereby affirmed, and the appeal of the appellant Creditor's Committee (Docket No. 1, 06cv7877) is hereby dismissed.

The Clerk of the Court is directed to close these cases.

SO ORDERED.

FN1. The Milwaukee Unions include: Smith Steel Workers D.A.L.U. 19806, AFL-CIO; International Association of Machinists and Aerospace Workers District No. 10; Technical Engineers Association; International Brotherhood of Electrical Workers, Local 663; Service Employees International Union Local 1; UA-Steamfitters Local 601; and the Chicago Council of Carpenters.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                                                    Page 9

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
(Cite as: --- F.Supp.2d ----)

FN2. Tower's projected costs for funding retiree welfare benefits for 2006 was estimated to be approximately $20 million. (*See* Brief of Appellees Tower Automotive, Inc., et al, dated Aug. 2, 2006 ("Tower Aug. 2 B.R., at 8.)

FN3. Under the terms of the Milwaukee Unions settlement, Tower is to make VEBA payments of $2,487,500 on July 1, 2006 and October 1, 2006, with quarterly payments of $1,475,000 thereafter during the pendency of the bankruptcy proceeding. (*See* Brief of Appellees Milwaukee Unions, dated Aug. 1, 2006 (" Milwaukee Aug. 1 Br."), at 4.) The Retiree Committee settlement calls for VEBA payments of $500,000 on July 1, 2006, $140,000 for each remaining quarter of 2006, $80,000 per quarter beginning in 2007, and a $1,350,000 contribution (which can be in part equity in Tower) on the effective date of the plan of reorganization. (See Brief of Appellee Official Committee of Retired Employees of Tower Automotive, Inc., dated Aug. 2, 2006 ("Retiree Committee Aug. 2 B.R., at 7). Finally, Tower "will distribute $500,000 to the IUE-CWA VEBA Trust and $125,000 to the UAW Trust, with additional distributions to be made upon the earlier of (a) January 1, 2007 and (b) the effective date of Debtor's plan of reorganization." (*See* Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al., dated Oct. 16, 2006 ("Creditors Committee Oct. 16 Br."), at 7.)

FN4. Under the Milwaukee Unions's settlement, the claim floor may be adjusted upward if the bond holders recover more than eighty-five percent on their claims, and there is also a provision for additional back end payments depending on Tower's credit rating in 2009. (*See* Milwaukee Aug. 1 Br. at 5.)

FN5. Counsel for Tower explained at the

hearing before Judge Swain that "20 percent is fixed on a number for the Milwaukee Unions of $150 million ... That $150 million will be reduced by the amount of money we contribute to the VEBA tomorrow. That is why it wasn't a fixed recovery on the claim; it is a percentage based on whatever the reduced amount of the claim is." (Hearing Transcript, June 29, 2006, at 9.)

FN6. Counsel for Tower stressed at the Bankruptcy Court hearing in opposition to the Creditors Committee's motion to stay the settlements, "without these concessions, our LRP, our long-range plan does not work. We remain cash-flow negative for the entire LRP without these concessions..." (Hearing Transcript, June 28, 2006, at 35.)

FN7. As the Milwaukee Unions point out, " litigation will require the testimony of all Debtors witnesses to provide the Milwaukee Unions with the opportunity to hear the testimony and cross-examine witnesses. In addition, there are seven Milwaukee Unions which would have to provide testimony together with Milwaukee Unions's retained experts." (Milwaukee Unions Aug. 1 Br. at 15.)

FN8. The Creditors Committee's second set of briefs, filed in support of its appeal of the UAW/IUE-CWA settlements, focuses primarily on the allegedly hastily declining financial situation of Tower, particularly in the months since the Retiree Settlements were approved. The parties vigorously dispute whether this Court can consider the financial information cited by the Creditors Committee, as it is not part of the record on appeal. While the Creditors Committee contends that this Court can take judicial notice of the publicly available information it cites, the Court notes that the § 1114 process normally begins, as it did in this case, with a proposal by the debtor to modify benefits

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 10

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)
**(Cite as: --- F.Supp.2d ----)**

based "on the most complete and reliable information available at the time of such proposal." 11 U.S.C. § 1114(e). Similarly, and necessarily, the Bankruptcy Court's approval of the settlements was limited to the information available at that time. This Court's review is limited to "all documents and evidence bearing on the proceedings below and considered by the bankruptcy judge in reaching his decision." *In re Prudential Lines, Inc.,* No. 93 Civ. 1481, 1994 WL 142017, at *2 (S.D.N.Y. Apr.20, 1994). This Court does not assess anew whether the settlements, based on the debtor's financial circumstances as of today, are reasonable.

FN9. As the Bankruptcy Court reasoned, " cash is more risky for the other unsecured creditors because it's funneled. The cash is gone. There's no safety net for the other creditors if you don't ever get to that distribution date. They've taken their cash and they've gone and they're no longer part of the estate, by taking a recovery, the retirees have agreed to take some degree of risk, the risk that we will get there." (Hearing Transcript, June 28, 2006, at 40.)

S.D.N.Y.,2006.

In re Tower Automotive Inc.

--- F.Supp.2d ----, 2006 WL 3751360 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 3607769 (Trial Motion, Memorandum and Affidavit) Response Brief of Appellees Tower Automotive, Inc. et al. (Oct. 31, 2006)
• 2006 WL 3670082 (Trial Motion, Memorandum and Affidavit) Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al. (Oct. 16, 2006)
• 1:06cv07877 (Docket) (Sep. 29, 2006)
• 2006 WL 2582210 (Trial Motion, Memorandum and Affidavit) Reply Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al. (Aug. 7, 2006) Original Image of this Document (PDF)
• 2006 WL 2582208 (Trial Motion, Memorandum and Affidavit) Brief of Appellee Official Committee

of Retired Employees of Tower Automotive, Inc. and Its Debtor Affiliates (Aug. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 2582209 (Trial Motion, Memorandum and Affidavit) Brief of Appellees Tower Automotive, Inc. et al. (Aug. 2, 2006) Original Image of this Document (PDF)
• 2006 WL 2582207 (Trial Motion, Memorandum and Affidavit) Brief of Appellees Milwaukee Unions (Aug. 1, 2006) Original Image of this Document (PDF)
• 2006 WL 2429518 (Trial Motion, Memorandum and Affidavit) Brief of Appellant Official Committee of Unsecured Creditors of Tower Automotive, Inc., et al. (Jul. 18, 2006) Original Image of this Document (PDF)
• 1:06cv04996 (Docket) (Jun. 28, 2006)
• 1:05cv10578 (Docket) (Dec. 15, 2005)
• 2005 WL 2207752 (Trial Motion, Memorandum and Affidavit) Combined (a) Limited Objection of General Foods Credit Investors No. 2 Corporation to Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts (Docket No. 538); and (b) Declaration of Intent to A ssert Rights under 11 U.S.C. | 365(h) (Aug. 5, 2005) Original Image of this Document (PDF)
• 2005 WL 4517229 () Declaration of Jeffery J. Stegenga in Support of the Debtors' Objection to Motion of the Automotive Supplier Creditors for Entry of an Order Appointing an Official Committee of Automotive Supplier Creditors (Apr. 13, 2005) Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2002 WL 31426344 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Gey Associates General Partnership v. 310 Associates, L.P.S.D.N.Y.,2002.Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
GEY ASSOCIATES GENERAL PARTNERSHIP,
Appellant,
v.
310 ASSOCIATES, L.P., Debtor-Appellee.
**No. 02 Civ.0710 (SHS).**

Oct. 29, 2002.

Chapter 11 debtor sought vacation of order granting relief to potential purchaser of estate's real property. The United States Bankruptcy Court for the Southern District of New York, Robert Gerber, J., vacated order, and potential purchaser appealed. The District Court, Stein, J., held that vacation of order, upon determination that it had been based on factual errors, was not abuse of discretion.

Affirmed.
West Headnotes
**[1] Bankruptcy 51 ⟜3070**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3070 k. Order of Court and Proceedings Therefor in General. Most Cited Cases
Bankruptcy court's vacation of prior order granting relief to potential purchaser of Chapter 11 debtor's real property, upon determination that it had been based on factual errors, was not abuse of discretion.
Fed.Rules Civ.Proc.Rule 60, 28 U.S.C.A.

**[2] Bankruptcy 51 ⟜3072(1)**

51 Bankruptcy
    51IX Administration
        51IX(B) Possession, Use, Sale, or Lease of Assets
            51k3067 Sale or Assignment of Property
                51k3072 Manner and Terms
                    51k3072(1) k. In General. Most Cited Cases
Denial of breakup fee to potential purchaser of Chapter 11 debtor's real property was reasonable, absent showing that such fee would encourage bidding; there were already multiple bidders for property, and fee would have hampered debtor's ability to sell property to higher bidder.

*OPINION AND ORDER*
STEIN, J.
*1 This appeal arises out of the bankruptcy proceedings of appellee 310 Associates, L.P. ("310") in the United States Bankruptcy Court for the Southern District of New York. That court issued an order on June 8, 2001 that, among other matters, approved a provision granting appellant Gey Associates General Partnership ("Gey") a breakup fee in connection with the sale of 310's real property. Approximately six weeks later-on July 18th, 2001-Judge Robert Gerber issued an order vacating his June 8 Order on the grounds that it had been based on factual errors by him. Gey appeals from the July 18 Order. Because the bankruptcy judge did not abuse his discretion when he vacated the June 8 Order, the order appealed from is affirmed.

I. BACKGROUND

Appellee 310 was the debtor in possession of real estate situated at 310-318 West 53rd Street, New York, New York (the "Property"). 310 had been actively seeking to sell the Property since the previous October and had entered into a contract with Richard Kramisen on October 12, 2000 to sell the Property. 310 also entered into a contract with Gey on February 6, 2001 that provided for the sale

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2002 WL 31426344 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

of the Property to Gey in the event that the sale to Kramisen fell through. A dispute subsequently arose between Kramisen and 310 over the exact terms of their contract, and immediately prior to the scheduled closing date of March 15, 2001, Kramisen filed a specific performance action in New York State Supreme Court with an accompanying lis pendens against the Property. According to 310, its subsequent inability to sell the Property forced it to file a petition pursuant to Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 1101 et seq., on May 11, 2001.

The next month, 310 applied to the bankruptcy court for authority to schedule a sale of the Property to Gey (or any other entity making a higher and better offer than Gey's), free and clear of any existing liens, claims and encumbrances. In response, the bankruptcy court issued its June 8 Order, which scheduled a sale of the property to Gey for $3.1 million (or to any entity making a higher and better offer) and granted Gey a breakup fee of $100,000 (or, in the alternative, one half of the difference between the accepted bid and Gey's bid, whichever was higher) in the event Gey was outbid.

After learning of the impending sale to Gey, Kramisen went on the offensive: he filed an objection in the bankruptcy court to the proposed sale, removed his state specific performance action to the bankruptcy court and announced his intention to move to temporarily restrain the sale from taking place. In an effort to resolve the specific performance action, Kramisen met with 310 on July 2, 2001 and offered to purchase the Property for $3.2 million. 310 then informed Judge Gerber of the higher Kramisen offer and requested the court vacate its June 8 Order and schedule a new sale process based on the Kramisen bid. The court, determining that its June 8 decision authorizing the breakup fee "was based upon [the court's] misunderstanding" of the facts (Record on Appeal, Ex. F. at 65), agreed and vacated its decision on July 18.

## II. DISCUSSION

*2 [1] A bankruptcy court has the authority to modify a final order pursuant to Fed.R.Civ.P. 60, which is made applicable to bankruptcy courts by Bankruptcy Rule 9024. Appellate review of a decision made pursuant to Fed.R.Civ.P. 60 is restricted to determining whether the lower court abused its discretion. *See Montco, Inc. v. Barr (In re Emergency Beacon Corp.)*, 666 F.2d 754, 760 (2d Cir.1981). Therefore, unless the bankruptcy judge abused his discretion either by denying authorization of Gey's breakup fee or by vacating the June 8 Order that had authorized Gey's breakup fee, his determination should not be overturned. Because the bankruptcy judge did not abuse his discretion in this case, the July 18 Order should be affirmed.

[2] A breakup fee, also known as a termination fee, " is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction." *Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources)*, 147 B.R. 650, 653 (S.D.N.Y.1992). Breakup fees are designed to reward those bidders who function as "stalking horses," allowing the seller to search for higher offers and setting a floor price on the transaction. Breakup fees outside bankruptcy proceedings are presumptively valid pursuant to the business judgment rule. Within bankruptcy proceedings, breakup fees are also valid unless: (1) the relationship of the parties who negotiated the breakup fee is tainted by self-dealing or manipulation; (2) the fee hampers, rather than encourages, bidding; or (3) the amount of the fee is unreasonable relative to the proposed purchase price. *See id.* at 657. In making its final determination on the validity of the Gey breakup fee, the court found that prior to June 8 it had "two buyers drooling to make this purchase." (Record on Appeal, Ex. F. at 7). The breakup fee in this action did not encourage bidding. Indeed, Judge Gerber found that in this context, a breakup fee to Gey was both unnecessary (as there were already multiple bidders) and inappropriate (in that it hampered 310's ability to sell the Property to Kramisen). Thus, the court's determination not to authorize a breakup fee to Gey was reasonable.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 3

Not Reported in F.Supp.2d, 2002 WL 31426344 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Fed.R.Civ.P. 60(b)(1) permits a court to vacate a decision on the grounds of "mistake, inadvertence, surprise, or excusable neglect." Relief may be sought pursuant to Rule 60(b)(1) for an error of the court. *See e.g., Schindhaus v. Moe,* 335 F.2d 539, 531 (2d Cir.1964); *Tarkington v. U.S. Lines Co.,* 222 F.2d 358 (2d Cir.1955). Although the Second Circuit has never squarely ruled on this issue, Courts of Appeal outside of this Circuit have said explicitly that Rule 60(b)(1) is available for a court to correct its own including mistakes of either law or fact. *See e.g, Cacevic v. City of Hazel Park,* 226 F.3d 483, 490 (6th Cir.2000); *Cashner v. Freedom Stores, Inc.,* 98 F.3d 572, 576 (10th Cir.1996).

**\*3** In its June 8 Order the bankruptcy court found the Gey breakup fee valid, but later determined that its conclusion was based upon its misunderstanding of two material facts. First, when the court initially considered the breakup fee, it "was not even aware of the presence of Mr. Kramisen"; and second, the court "was not aware of the continuing and active interest" in the Property by both Gey and Kramisen. (Record on Appeal, Ex. F. at 65) Indeed, Judge Gerber was quite forthright in admitting what he viewed to be an error, as follows:
I can not look any of you in the eye and tell you that I think that I was, with the the knowledge of matters that I now know, I would have issued [the June 8] Order, and that Order is being vacated. (Id. at 66).

It is clear from the record that the court made a substantive mistake of fact in issuing the June 8 order, and vacated that order in order to correct this error. Therefore, its decision to vacate that order pursuant to Rule 60(b)(1) was not an abuse of discretion.

### III. Conclusion

Because Judge Gerber acted within his discretion in issuing the July 18 Order, that order is affirmed.

S.D.N.Y.,2002.
Gey Associates General Partnership v. 310 Associates, L.P.
Not Reported in F.Supp.2d, 2002 WL 31426344 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:02cv00710 (Docket) (Jan. 29, 2002)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

Page 1

C

Holly Sugar Corp. v. Buchsbaum
    United States District Court; D. Colorado.
            **Holly Sugar Corporation**
                        **v.**
                **Buchsbaum, et al.**
                    **No. 81-C-743**
81-C-743
                    October 28, 1981

CARRIGAN, District Judge.

*1 THIS MATTER is before the Court on cross motions for preliminary injunctions filed by the defendants, Michael Buchsbaum and Arcanum 1 Partners, and the plaintiff, Holly Sugar Corporation. Defendants seek an injunction ordering Holly to hold a valid shareholders meeting for the purpose of electing directors. Holly seeks to enjoin the defendants from soliciting proxies pending a final disposition of this case after trial on the merits.

On September 22, 1981, extensive legal arguments were heard. Prior to that hearing, a vast array of briefs, affidavits, depositions and other supporting documents had been submitted. Since that argument both sides have submitted extensive additional documents. Unfortunately sufficient time is not available to permit writing the quality of opinion I would like to provide. This memorandum constitutes my findings of fact, conclusions of law and order. Findings here stated are based on non-contested allegations of pleadings, depositions, affidavits or other submitted evidence.

Plaintiff, Holly Sugar Corporation ("Holly"), is a New York corporation with its principal executive offices in Colorado. As of May 11, 1981, Holly had issued an outstanding 1.583,140 shares of common stock. (Second Amended and Supplemental Complaint P 1; Bushnell Aff. P 71).

Defendant Michael Buchsbaum ("Buchsbaum") resides in Mamaroneck, New York. Until December 24, 1980, Buchsbaum was employed at the New York stock brokerage firm of Ladenburg Thalmann & Company, Inc. ("Ladenburg").

Defendant Arcanum 1 Partners ("Arcanum") is a New York limited partnership. Buchsbaum is its general partner. This partnership was formed after Buchsbaum left Ladenburg.

Buchsbaum and Arcanum own over 86,900 shares, representing approximately 5.5 percent of Holly's outstanding common stock. (Bushnell Aff. Exh. F at 8).

The Arcanum Committee (the "Committee") was formed to conduct a proxy contest at Holly's annual meeting scheduled for June 26, 1981. The Committee members include the defendants and Messrs. John Evans, John L. Bushnell, J. E. A. Rich, Richard G. Marcus, Geoffrey P. Pickett, and Leo Seaman, all of whom, along with Buchsbaum, were the Committee nominees for election to the Holly Board of Directors. Evans, Bushnell and Rich are former Holly employees. (Evans Aff. Exhs. X, Z).

Prior to the June annual meeting, Holly commenced this litigation. Holly has twice amended its complaint, and its counsel stated at the September 22, 1981 hearing that it intends to amend its complaint again to add new claims under the Williams Act. Defendants have represented in their brief and at the hearing that, upon receipt of the Third Amended Complaint, they intend to move to dismiss all counts of that complaint.

Prior to its June annual meeting, Holly moved for a preliminary injunction asserting violations by the defendants of sections 14(a) and 13(d) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U. S. C. §§ 77n(a) and 78m(d), and seeking an order enjoining the defendants from: (a) further solicitation of proxies from Holly shareholders pending trial (b) voting their own Holly shares; (c) exercising proxies solicited by them; and (d)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

manipulating Holly's stock. No specific relief was sought at that hearing with respect to the defendants' Schedule 13(d) filings.

**\*2** A hearing, with live testimony, was held on June 23 and 24, by Judge Zita L. Weinshienk of this Court. She granted Holly's request for a preliminary injunction barring use at the June 26, 1981 annual meeting of the proxies solicited prior to that hearing. Her order was based on her narrow finding that Holly had shown that it would probably succeed in proving at a trial on the merits that the defendants' proxy solicitation material was misleading and thus violated section 14(a). She did not, however, find that Holly had shown a probability of success on any of its other claims.

Judge Weinshienk did not have before her the issue of whether the defendants had violated sections 9 and 10 of the 1934 Act by manipulating the market in Holly stock, and she made no finding with respect to that allegation. Sections 14(a) and 13(d), the two provisions invoked in Holly's motion before Judge Weinshienk, are disclosure sections and do not regulate manipulation as that term is used in the 1934 Act.

Thus, the net effect of Judge Weinshienk's preliminary injunction order was to bar the defendants, pending a trial on the merits, from voting proxies they had solicited before June 25, 1981. She denied the other relief requested by Holly.

On June 26, 1981, Holly convened its annual meeting. Despite repeated requests from shareholders, the chairman refused to have the Inspectors of Election determine whether there was a quorum present.

The annual meeting agenda was followed and the chairman took votes on the agenda items including election of directors. The polls were then closed and the chairman adjourned the meeting, stating that it would "be reconvened solely for the purpose of receiving the final report of the inspectors which shall be rendered after the final adjudication of the litigation now pending in the federal court in Denver, but not later than 20 days thereafter."

Proxies or ballots for only about 342,451 of the outstanding 1,583,140 Holly shares were filed with the Inspectors of Election at the annual meeting. (Bloom Depos. 6).

Holly management must have known at the time of the annual meeting, or shortly thereafter, that there was not a quorum present. (Bloom Depos. 8, 27, 28). The proxies had been mailed directly to management.         (Bloom         Depos.         21-22). Consequently, management had to know that they had far fewer proxies than needed to constitute a quorum. The proxies for the 342,451 shares filed with the Inspectors of Election at the annual meeting represent only about 22 percent of the outstanding shares entitled to vote. New York Law (N. Y. Bus. Corp. Law, Section 608), and Holly's By-Laws, Act. III, Section 4, require that a majority of the outstanding shares entitled to vote be present in order to transact any business except adjournment.

Despite their apparent awareness that the election of directors and other business had been transacted without a quorum present, Holly management has not rescheduled another meeting or election. Moreover, Holly management failed to notify the Holly shareholders of the absence of a quorum. The Inspectors of Election, following the Chairman's statements during the meeting, "left it with Holly management . . . that we would not release any figures until the court action was settled in Denver." (Bloom Depos. 29-30; Bushnell Aff. Exh. B at 78-79). Nothing in Judge Weinshienk's order required or justified these actions by Holly management. The practical effect of the chairman's adjournment *sine die* was to grant Holly the very preliminary injunctive relief that Judge Weinshienk had expressly denied-prohibiting the defendants from soliciting and voting new proxies. (Opinion at 11, 12, 13; Bushnell Aff. Exh. A at 7, 12).

**\*3** Since the adjournment, Holly has persisted in denying its shareholders a new opportrnuity to vote on the election of the directors. Bushnell, a Committee member, filed a petition in New York Supreme Court seeking a determination that no quorum was present at the annual meeting and requesting a prompt rescheduling of that meeting.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

Holly resisted that petition and the New York court stayed that action, finding that the matter ought more appropriately be raised in this Court. (Bushnell Aff. Exh. D).

The day after that decision, on July 28, 1981, the defendants filed a Schedule 13D amendment, received by Holly, indicating an intention to solicit proxies to call a special shareholders meeting to elect directors pursuant to Article III, Section 2 of Holly's By-Laws. (Bushnell Aff. Exh. F at 7). Nothing in Judge Weinshienk's order precluded such a solicitation. She later stated:
"[T]here is certainly nothing in my injunction or anything in any law that I am aware of which would prevent your resoliciting and properly resoliciting proxies." (Bushnell Aff. Exh. A, at 7).

Following the defendants' filing of the Schedule 13D amendments, on August 12, 1981, Holly's Board of Directors amended Article III, Section 2 of Holly's By-Laws to provide that special meetings "may not be called at the request of any stockholder or by any person acting in concert with or at the behest of such stockholder, who has been enjoined from voting shares at a previous meeting of stockholders and with respect to whom court proceedings regarding the right to vote and/or solicit proxies are still pending." The amendment apparently was intended to prevent the defendants' calling a special meeting of shareholders to elect directors. (Bushnell Aff. P 19-20 and Exhs. G-I).

This By-Law amendment also purports to bar *any* Holly shareholder from calling a special meeting " to vote on any matters voted on at a prior meeting the result of which is or may be dependent upon the outcome of court proceedings." (Bushnell Aff. Exh. G). Thus the amendment attempts to preclude *any* shareholders from calling a special meeting to elect directors because the election of directors was a matter voted on at the June 26 annual meeting.

Defendants assert that through the indefinite adjournment of the meeting, and the By-Law amendment, Holly management has unilaterally changed the status quo existing after Judge Weinshienk entered her preliminary injunction.

That injunction was intended only to protect against use of invalid proxy materials to elect directors. The Court there sought only to insure shareholders an opportunity to validly elect directors. Defendants claim that Holly management has now frustrated Judge Weinshienk's intent. (Opinion at 12-13, 17; Bushnell Aff. Exh. A at 7, 13).

Holly conceded at the instant hearing, as well as in its brief and in correspondence, that the meeting adjournment and By-Law amendment were intended to prevent the defendants' seeking election of the Committee's slate of director nominees until after final disposition of this case. (Bushnell Aff. Exhs. G, H; Holly Br. 35).

**\*4** Absent an election, present Holly management will continue in office, able to utilize the corporation's funds to pursue this litigation and to enjoy advantages of incumbent management to defeat the efforts of the Committee or any other shareholders to change the Board. Thus, the defendants contend, the present management may frustrate corporate democracy by delaying an election indefinitely.

Holly management attempts to excuse or explain its amendment of the By-Laws to delay a new election of directors by arguing that: (1) elections are expensive, and (2) if, after trial, Holly obtains the order it seeks, barring the defendants from soliciting proxies for two years, that election expense can be avoided. Holly further argues that, if such an order were obtained only after the deefndants had already been elected by the shareholders in a new election, the company's management would be disrupted by the necessity of removing the defendants from office. Holly management also argues that, if the defendants are permitted an election now, they may win and dismiss this lawsuit.

I find that the predicted future harm relied upon by Holly is too speculative to entitle Holly to the injunctive relief it here seeks. I further find that it cannot justify the amendment to the company by-laws made to delay an election.

Defendants, on the other hand, claim immediate and actual legal harm to themselves and all other Holly

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

shareholders is resulting from Holly's actions. Defendants, who under general law and Judge Weinshienk's order, are permitted to take their case to the shareholders and to seek their votes in an election, have been denied this important legal right by incumbent Holly management's acts. Thus, the defendants, who own 5.5 percent of the shares, have been frustrated in their attempts to exercise their franchise. (*See* Bushnell Aff. P 11, Evans Aff. Exh. X at 8-9). The incumbent management group, with only nominal holdings of Holly shares, remains in office and apparently intends to prevent any election until after the ultimate determination of this lawsuit. (Evans Aff. Exh. 2 at 3).

Holly shareholders have been denied the annual meeting and election guaranteed them by law. N. Y. Bus. Corp. Law § 602(b). Each day they are denied that right, they are further injured. Numerous courts have recognized that voting rights are among the most important rights of shareholders. *See e. g., Mills v. Electric Auto-Lite Co.,* 396 U. S. 375, 381 (1970); *J. I. Case Co. v. Borak,* 377 U. S. 426, 431 (1964); *Studebaker Corp. v. Allied Products Corp.,* 256 F. Supp. 173, 189 (W. D. Mich. 1966).

Holly contends that Judge Weinshienk found that the possibility that this lawsuit might be dismissed, if the defendants were voted into control, constituted irreparable injury. Judge Weinshienk, however, made no such finding. She merely found that there would be irreparable injury if a board elected by proxies obtained through false proxy solicitation material were to dismiss the lawsuit. (Opinion at 11). She did not preclude new proxy solicitation, based on truthful information, seeking a new election. In fact, that is what she contemplated.

**\*5** The imbalance of hardship or irreparable injury in this case is apparent. The Holly shareholders and the defendants are suffering real, direct and immediate harm. On the Holly side of the scale, the asserted harm is speculative. Unless after a trial this Court were to grant Holly an injunction preventing some stockholders from exercising their franchise to solicit other shareholders' proxies, there most likely will be a resolicitation. Waiting until after trial would merely postpone, not eliminate, the expense of a contested election of directors.

Finally, Holly's suggestion that the defendants might win the election and dismiss this lawsuit, while speculative, may prove true. In that case, the deposed management group would have to decide whether they are willing to invest their personal funds, rather than Holly's funds, in litigating this case. That is not harm cognizable under the law. Present Holly management has no vested right of access to the corporate treasury. That decision is for the shareholders, not present management or this Court.

As mentioned above, Holly responded to the defendants' preliminary injunction motion by a cross motion asking this Court to enjoin further proxy solicitations by the defendants until after trial on the merits in this case. Holly asserts that even though the proxy materials found to be misleading by Judge Weinshienk will not be used in the new solicitation, such solicitation should be enjoined until Holly can be given an opportunity to prove, at trial, its other claims, including its claim of stock manipulation by Buchsbaum and its claim that the defendants intend to liquidate the company.

Judge Weinshienk did find that "defendant Buchsbaum's activities, in 1979 at least, were instrumental in creating a substantial rise in the market price of [Holly's] stock." (Opinion at 2). She required that certain disclosures be made in that regard. She made no finding, however, that any of those activities were illegal, or constituted market manipulation or deception. Nor did she find that Holly had standing to raise any claim that such activities were illegal under sections 9 or 10 of the 1934 Act. Moreover she did not find that such activities caused any injury suffered by Holly today, in 1981, except, of course, injuries that can be remedied by truthful proxy statement disclosures. She only found that the defendants' proxy statement "omitted to indicate that defendant Buchbaum took part in activities during 1979 which were instrumental in creating a substantial rise in the market price of [Holly] stock" (Opinion at 4), and further found that such nondisclosure would be material to investors. (Opinion at 8-9).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

Judge Weinshienk refused to disturb the ruling of Judge Okin of the New York Supreme Court that Buchsbaum had no intent to liquidate Holly in 1981. (Opinion at 2). No new evidence has been presented to this Court, which was not presented to Judge Weinshienk, on which I can base a finding that Buchsbaum intends, in 1981, to liquidate Holly. He has repeatedly stated, in his Schedule 13D filings, in statements to the press, and in sworn testimony, that he does not now intend a liquidation. (Evans Aff. Exh. W at 5-6, X at 5-6, DD; Buchsbaum April 7, 1981 Depos. 19-30; Pl. Exhs. 47, 48).

**\*6** Holly has presented no new evidence that any of Buchsbaum's 1979 activities are causually related to any harm to Holly in 1981. Virtually all the market professionals cited by Holly in its brief sold out their positions in the stock before the 1981 annual meeting. The investors Holly points to who still own Holly shares, few of whom are professionals, nearly all bought in 1980 or 1981, well after the alleged market manipulation of November-December 1979. (Lasker Dep. 13-14, 18-19, 32, 51 & Exh. 3; Nye Dep. 8, 43 & Exh. 3; Ruggles Dep. 5, 7-11, 23-25, 30-31, 47, 55-56; Lambert Dep. 6, 10, 22-23; Gruss Dep. 12, 14-15, 17, 19-21, 23-25, 35-37, 45, 47-48 & Exhs. 2, 3; Bodkin Dep. 7, 15-17, 24; Kellner Dep. 6-8, 30-31, 38-40, 45-46, 61-63; Goldner Dep. 6, 22-23, 29-30, 32-33, 35, 42-44, 48-50 & Exh. 2; Goodstein Dep. 14-15 27-28, 41-43, 46-47, 49, 51; R. Berger Dep. 9-10, 22-24, 28, 31-32; S. Berger Dep. 9, 16, 19-26). None has testified that he vested for the Arcanum Committee nominees in hope that Holly would be liquidated if they were elected.

Plaintiff has not demonstrated a probability of success in proving its allegation that the present Holly shareholders bought the stock expecting a liquidation, and are holding the stock in expectation of voting Buchsbaum into control of the company and having him liquidate it. (*See* citations above, and Muldoon Dep. 40-41; Gould Dep. 5-6, 11-14, 22, 46-49, 52; Storch Dep. 52, 55, 57-58; Moore Dep. 12-13, 20-22, 29-31, 37-38).

Judge Weinshienk did not make any finding as to

whether any of Buchsbaum's comments in 1979 concerning the value of Holly stock were deceptive, or were not his true opinion. There is testimony in the record, however, that other expert investors believed Holly's liquidation value might be in a range approaching $100. (Jacobs SEC 57; Ruggles Dep. 12, 13).

Holly was fully cognizant in November, 1979 of the salient facts which give rise to its present claim of market manipulation. (Evans Aff. Exh. BB; Bunker Dep. 28-31, 36-39, 48-52 & Exh. E). Buchsbaum has changed his position during the period of Holly's delay. (Evans Aff. Exhs. Y, X at 4).

Amendment No. 5 to Buchsbaum's Schedule 13D, filed on July 28, 1981, and Amendment No. 1 to Arcanum Committee's Schedule 13D, filed on August 5, 1981, describe the preliminary injunction entered by Judge Weinshienk, and a copy of Judge Weinshienk's bench opinion was attached there-to. (Evans Aff. Exhs. W. X).

Defendants have announced their intention-through the statement of counsel in open court-not to use the proxy solicitation materials which Judge Weinshienk found were probably false and misleading and not to vote any proxies obtained from those materials.

Holly has not alleged in its complaint that it was either a purchaser or seller of its stock or that it suffered direct injury from any of the defendants' allegedly unlawful acts.

Holly management is not precluded from communicating to Holly's stockholders its own complaints about Buchsbaum, including its views of his character and past conduct, so long as such statements are not materially false or misleading.

*Conclusions of Law*

**\*7** To obtain a preliminary injunction the moving party must demonstrate (1) that it has a substantial likelihood of prevailing on the merits; (2) that it will suffer irreparable injury unless the injunction

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 6

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F. 2d 61 (10th Cir. 1980); *Valdez v. Applegate,* 616 F. 2d 570 (10th Cir. 1980).

I conclude that the defendants have established these four elements, but that Holly has not.

Defendants have shown a substantial probability that they will prevail in a full trial on the merits. The evidence indicates a likelihood that present management has improperly employed the corporate machinery and by-laws to the advantage of incumbent management and to the disadvantage of the defendants, the Committee, and Holly shareholders. The evidence of the manner in which the June 26 annual meeting was conducted and adjourned, the evidence of failure to advise shareholders that no quorum was present, and the evidence of expedient amendment of by-laws to deny the defendants and all other shareholders the right of calling a special meeting to validly elect directors, all tend to indicate a probability that the defendants ultimately will prevail at trial. *See Lerman v. Diagnostic Data Inc.,* 421 A. 2d 906 (Del. Ch. 1980); *Coalition to Advocate Public Utility Responsibility, Inc. v. Engels,* 364 F. Supp. 1202 (D. Minn. 1973); *Schnell v. Chris-Craft Indus., Inc.,* 285 A. 2d 437 (Del. 1971); *cf. Tanzer Economic Assoc., Inc. Profit Sharing Plan v. Universal Food Specialties, Inc.,* 87 Misc. 2d 167; 176, 383 N. Y. S. 2d 472, 479 (N. Y. Sup. Ct. 1976); *Condec Corp. v. Lukenheimer Co.,* 230 A. 2d 769 (Del. Ch. 1967). Moreover, this same evidence justifies my concluding, and I do conclude, that there is a reasonable probability that the defendants will be entitled to the specific relief here sought, an injunction.

I cannot conclude that the present Holly management's actions were motivated or intended solely to avoid corporate expense and disruption. The obvious and intended effect of these actions has been to deprive Holly shareholders of their valid right to vote in an election of directors in 1981, and, further, to preclude the defendants from soliciting shareholder support for their candidates. Such behavior by fiduciaries is *per se* wrongful. *E. g., Schnell v. Chris-Craft supra; Lerman v. Diagnostic Data Inc., supra.*

Holly management has invoked the business judgment rule to defend its actions, claiming that their purpose was not to entrench themselves in office. That rule does not insulate such acts.

Holly management advances two additional arguments in defense of the defendants' motion attacking the adjournment of the annual meeting. First, Holly says that the defendants, by not filing at the annual meeting the proxies which Judge Weinshienk enjoined them from voting, and by not voting their own shares, procurred the absence of a quorum. Holly asserts that under New York law, the defendants are thus barred from attacking actions taken at the meeting. None of the cases cited by Holly, however, supports that proposition.

**\*8** Nor can I find any indication in Judge Weinshienk's opinion or order that the defendants were required to file these proxies for quorum purposes. Quite the opposite was indicated. Judge Weinshienk stated at page 17 of her decision: ". . . if there are let's say, a substantial number of people *who vote for Holly, enough to establish a quorum,* then at least you have an election. If there is not enough, then there is no quorum and it has to be redone anyway." (Emphasis added).

To accept Holly's argument would be to permit incumbent management to be elected by 22 percent of the shares by forcing the remaining shareholders, who wished to vote against management, to have their shares counted for quorum purposes only. Thus the defendants would be forced to procure the election of directors they wanted to vote against. Equity should not countenance such a strained and unjust result. *See e. g., In re P. F. Keogh, Inc.,* 192 App. Div. 624, 183 N. Y. S. 408, 413 (1st Dept. 1920).

I find equally unpersuasive Holly's attempt to utilize Proxy Rule 14a-4(e), 17 C. F. R. Section 240.14a-4(e). That rule at most requires a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 7

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

representation in the proxy statement or form of proxy "that the shares represented by the proxy will be voted." Here Judge Weinshienk's order prevented voting them. Under these circumstances it cannot be said that the rule cited required presenting these non-votable proxies to be counted for quorum purposes.

Finally, Holly has argued that because Judge Weinshienk enjoined the defendants from exercising proxies, the shares represented by the proxies were not "entitled to vote." Judge Weinshienk did not so rule. In fact she invited the shareholders owning those shares to either come to Colorado Springs personally and vote them or submit new proxies. (Opinion at 15). The underlying shares were clearly "entitled to vote." N. Y. Bus. Corp. Law § 608. Holly's claim that the 342,000 shares constituted a quorum cannot be floated on this thin reed.

Holly has not urged, and the Court cannot find, any substantial harm to the public interest if the defendants' motion for preliminary injunction is granted. The only harm suggested by incumbent Holly management is to itself and is speculative. That the shareholders might turn present management out of office is not legally cognizable harm to Holly Sugar Corporation.

I conclude that the harm to Holly shareholders and to the defendants is real, immediate and irreparable. They are being denied their right to vote for directors.

Holly's cross-motion for preliminary injunctive relief is likewise subject to the standards of *Lundgrin v. Claytor, supra.*

Although Holly's motion for a preliminary injunction does not set forth any statute or case law upon which Holly premises its asserted right to the relief sought, I conclude that Holly's motion is premised on its claims that one or more of the defendants violated sections 14(a) and 13(d) of the 1934 Act, 15 U. S. C. §§ 78n(a) and 78m(d). Sections 14(a) and 13(d) require full disclosure and are satisfied if such disclosure is made. Holly's factual presentation has been devoted primarily to

its allegations of "manipulation" which, even if shown, would not be itself involve violation of sections 14(a) or 13(d). Holly does not now seek relief based upon the allegations in Count III of its complaint that the defendants have engaged in market manipulation in violation of sections 9 and 10 of the 1934 Act, 15 U. S. C. §§ 78i and j.

**\*9** For several reasons, I conclude that Holly his not shown a reasonable probability of success on the merits of its section 14(a) claim. First, Holly's section 14(a) claim is moot. There are not before me for decision any claimed violations by the defendants of section 4(a). No proxy materials are extant at this time, and the defendants have represented to this Court that they have no intention of utilizing either the proxy materials found by Judge Weinshienk to be defective or the proxies obtained through them. *Cohen v. Ahers,* 449 F. Supp. 298, 315 (N. D. Ill. 1978), *aff'd,* 596 F. 2d 733 (7th Cir. 1979).

Second, if Holly has a justiciable claim against the defendants under section 14(a), it cannot show a probability that it will ultimately be entitled to the relief sought. No new claims have been presented with respect to the defendants' prior proxy materials, nor has there been any new evidence to warrant this Court reversing Judge Weinshienk's decision not to grant Holly the broad relief it again seeks here. Judge Weinshienk has already enjoined use of the offensive proxy materials and voting of proxies obtained through them. I cannot see how Holly could be entitled to greater relief on its section 14(a) claim. *See General Aircraft Corp. v. Lampert,* 556 F. 2d 90 (1st Cir. 1977); *Cohen v. Ayers,* 449 F. Supp. 298 (N. D. Ill. 1978), *aff'd* 596 F. 2d 733 (7th Cir. 1979); *Dillon v. Berg,* 326 F. Supp. 1214 (D. Del. 1971), *aff'd* 453 F. 2d 876 (3d Cir. 1971). Moreover, it seems unlikely that Holly could prove entitlement to the ultimate relief it seeks on the section 14(a) violations, *i. e.,* an injunction restraining the defendants for *two years* from soliciting proxies or voting their Holly shares. No authority for such relief has been cited.

I further conclude that Holly has not shown a substantial probability of succeeding on the merits of its section 13(d) claim. First, Holly probably

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                              Page 8

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

has no standing to assert this claim. *American Bakeries v. Pro-Met Trading,* [Current] FED. SEC. L. REP. (CCH) P 97, 925 (N. D. Ill. 1981); *Sta-Rite Industries v. Nortek,* 494 F. Supp. 358 E. D. Wis. 1980); *Gateway Industries v. Agency Rent-A-Car,* 495 F. Supp. 92 (N. D. Ill. 1980).

Second, Holly is probably collateraly estopped from claiming that the defendants' Scheduled 13D filings falsely disclaimed defendant Buchsbaum's intent to liquidate Holly since, as found by Judge Weinshienk, that issue was determined by the Supreme Court of the State of New York when it granted Buchsbaum's petition to inspect Holly's shareholder list in a proceeding contested by Holly. Judge Weinshienk refused to disturb the New York court's finding and Holly has not offered any evidence in addition to that on which she based her decision.

Moreover, I conclude that Holly has failed to demonstrate irreparable injury to it as a result of the defendants' conduct. Holly's claim that an election now will waste time and money is too speculative to satisfy the requirements for preliminary injunctive relief. The alleged harm is made all the more speculative in view of my conclusion that Holly has failed to demonstrate a probability of success on its manipulation and other claims.

**\*10** The only other harm Holly claims will occur if the relief it seeks is not granted, is that the defendant, following resolicitation with truthful proxy materials, could obtain control of Holly and dismiss this lawsuit. This is not a cognizable harm. Management should neither continue their stewardship of Holly's affairs, nor spend Holly's funds in this litigation unless the majority of shareholders so desire.

By contrast, if Holly's motion is granted, the harm to the defendants and other stockholders will be great. Their right to corporate suffrage and to elect Holly's directors will have been further abrogated. *Studebaker Corp. v. Allied Products Corp.,* 256 F. Supp. 173, 189-90 (W. D. Mich. 1966). Holly's shareholders will have been forced to continue financing, from the corporate treasury, this costly lawsuit without any opportunity to vote on the

question whether Holly management should be retained and permitted to continue this litigation.

Defendants will also be irreparably injured by the continued denial of their right to take their case to the Holly shareholders in a proper corporate election.

Finally, I conclude that Holly has failed to show that the injunction it seeks, if issued, would not be adverse to the public interest recognized in section 14(a). That section is intended to promote shareholders' rights to fair and effective corporate suffrage. *Mills v. Electric Auto-Lite Co.,* 396 U. S. 375, 381 (1970). That salutary public policy would be disserved by granting Holly a preliminary injunction.

*Order*

In accordance with the above findings and conclusions it is:

ORDERED that the defendants' motion for a preliminary injunction is granted pending completion of a trial on the merits of this lawsuit.

It is further ORDERED that Holly Sugar Corporation and the Counterclaim Defendants shall notice a shareholders meeting of the Holly Sugar Corporation to be convened on or before December 10, 1981, for the purpose of electing directors and conducting such other business as may properly be presented at that meeting.

It is further ORDERED that Holly Sugar Corporation and the Counterclaim Defendants are preliminarily enjoined, pending a trial on the merits, from enforcing the amendment of Article III. Section 2 of the Holly Sugar Corporation's By-Laws enacted by the plaintiff's board of directors on or about August 12, 1981, which purports to limit the rights of Holly shareholders to call special meetings of shareholders.

It is further ORDERED that the defendants shall post security in the amount of $10,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 9

Not Reported in F.Supp., 1981 WL 1708 (D.Colo.), Fed. Sec. L. Rep. P 98,366
**(Cite as: Not Reported in F.Supp.)**

It is further ORDERED that the plaintiff's cross
motion for preliminary injunction is denied.

Holly Sugar Corp. v. Buchsbaum
Not Reported in F.Supp., 1981 WL 1708 (D.Colo.),
Fed. Sec. L. Rep. P 98,366

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.