IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                  :

In re                         :      Chapter 11
                  :

DELPHI CORPORATION, et al.,     :      Case No. 05-44481 (RDD)
                  :

               Debtors.    :      (Jointly Administered)
                  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>AFFIDAVIT OF SERVICE</u>

       I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

       On January 4, 2007, I caused to be served the document listed below upon the parties listed on <u>Exhibit A</u> hereto via overnight delivery:

1) Debtors' (1) Objection to Cadence Innovations LLC's Motion for Relief from Automatic Stay to Proceed with Patent Litigation Against Debtors, and (2) Response to Cadence Innovations LLC's Application Pursuant to 11 U.S.C. § 503 for Allowance and Payment of Administrative Expense Claim (Docket No. 6445) [a copy of which is attached hereto as Exhibit B]

Dated: January 9, 2007

                                */s/ Evan Gershbein*
                                Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 9th day of January, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:      */s/ Shannon J. Spencer*

Commission Expires:    *6/20/10*

# EXHIBIT A

Delphi Corporation
Cadence Objection Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|
| Alston & Bird, LLP | Dennis J. Connolly | 1201 West Peachtree Street | | Atlanta | GA | 30309-3424 | Counsel to Cadence Innovation, LLC |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | Counsel to Equity Security Holders Committee |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | Prepetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | Counsel to Official Committee of Unsecured Creditors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | Counsel to the Debtor |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | Counsel to United States Trustee |

# EXHIBIT B

**Hearing Date: January 12, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                        :
            In re                       :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :    Case No. 05-44481 (RDD)
                                        :
                                        :    (Jointly Administered)
                        Debtors.        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' (1) OBJECTION TO CADENCE INNOVATIONS LLC'S MOTION FOR
RELIEF FROM AUTOMATIC STAY TO PROCEED WITH PATENT LITIGATION
AGAINST DEBTORS, AND (2) RESPONSE TO CADENCE INNOVATIONS LLC'S
APPLICATION PURSUANT TO 11 U.S.C. § 503 FOR ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this objection and response (the "Objection") to Cadence Innovations LLC's ("Cadence") (1) Motion For Relief From The Automatic Stay To Proceed With Its Patent Litigation Against The Debtors, dated November 22, 2006 (the "Lift Stay Motion") (Docket No. 5777), and (2) Application Pursuant To 11 U.S.C. § 503, For Allowance And Payment Of An Administrative Expense Claim, dated November 22, 2006 (the "503 Application" and together with the Lift Stay Motion, the "Motions") (Docket No. 5774), and respectfully represent as follows:

<u>Preliminary Statement</u>

1.    Cadence seeks stay relief merely to continue its prepetition patent litigation (the "Litigation") to establish liability on its unliquidated and disputed prepetition general unsecured patent infringement claim (the "Unsecured Claim") that purportedly exceeds $21 million.  Cadence also seeks to pursue the Litigation to establish liability on its unliquidated and disputed postpetition administrative patent infringement claim (the "Administrative Claim" and, together with the Unsecured Claim, the "Claim")[1]

---

[1]    On July 20, 2006, Cadence filed identical proofs of claim in each of the Debtors' cases (proof of claim nos. 10074, 10077, 10078, 10079, 10080, 10081, 10082, 10083, 10084, 10085, 10086, 10087, 10088, 10089, 10090, 10091, 10092, 10093, 10094, 10095, 10096, 10097, 10098, 10099, 10100, 10101, 10102, 10103, 10104, 10105, 10106, 10107, 10108, 10109, 10110, 10111, 10112, 10113, 10114, 10115, 10116, and 10117).  On October 31, 2006, the Debtors submitted their Second Omnibus Objection (Procedural) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (I) Equity Claims, (II) Claims Duplicative Of Consolidated Trustee Or Agent Claims, And (III) Duplicate And Amended Claims (the "Second Omnibus Claims Objection") (Docket No. 5451), objecting to all of the Claims against Debtors, other than Delphi Automotive Systems Corp., as duplicative.  On the same date, the Debtors also filed their (I) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, And (C) Claims Subject To Modification And (II) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (the "Third Omnibus Claims Objection") (Docket No. 5452), objecting to the Claims as either not supported or not on the Debtors' books and records.

2

that Cadence asserts is likely to exceed $4 million.  The Court should deny the Lift Stay

Motion.  Among other reasons, this litigation has been going on for more than six years

and is likely to continue for another year or two—if not more.  The limited delay caused

by these chapter 11 cases—especially in light of the Debtors' progress and targeted

emergence in the first half of 2007—does not and could not possibly satisfy cause

sufficient to lift the automatic stay.

2.      Indeed, Cadence's own 14-month delay in bringing these Motions

is, by itself, a tacit admission that there will be little prejudice in waiting for Cadence's

claim to be liquidated following emergence.  The Lift Stay Motion reveals no change in

circumstances other than Cadence's desire to have its Claim determined ahead of other

creditors, at a time and in a forum of its choosing.  This would be particularly unfair in

light of the claims resolution procedures (the "Claims Procedures") recently approved by

the Court to govern the orderly administration of more than 16,000 claims that have been

filed in these cases.  Despite the fact that Cadence requested to opt out of the Claims

Procedures, this maneuver should not give Cadence license to jump ahead of all other

creditors that are subject to the Claims Procedures.  It is exactly this type of conduct that

runs contrary to the policy behind the automatic stay.

3.      In addition, the Debtors and its management are focused on their

reorganization, as evidenced by the recent filing of the Debtors' Expedited Motion For

Order Authorizing And Approving The Equity Purchase And Commitment Agreement

Pursuant To Sections 105(a), 363(b), 503(b), And 507(a) Of The Bankruptcy Code And

The Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), And

1125(e) Of The Bankruptcy Code (the "Plan Investment And Framework Support

3

Approval Motion") (Docket No. 6179).  Three days after the Plan Investment And

Framework Support Approval Motion was filed, on December 21, 2006, Highland

Capital Management, L.P. ("Highland Capital") made an unsolicited proposal, which in

Highland's view represents up to a $4.7 billion equity commitment.  In accordance with

their fiduciary obligation to maximize values for all stakeholders, the Debtors have begun

evaluating the Highland Capital proposal.  Now is not the time for the Debtors to be

unnecessarily distracted by the Cadence Litigation.

4.      Furthermore, although Cadence gives short shrift to the Debtors'

lack of insurance to cover this matter, this lack of insurance is an important fact that

should be considered here.  Even if Cadence prevails in its Litigation (which the Debtors

think is unlikely), there would be no insurance proceeds available with which to pay

Cadence.

5.      Finally, the 503 Application should be denied because it is simply

premature.  Cadence's Claim is still disputed and unliquidated and is likely to remain so

for at least one or two or more years.  Cadence should be permitted to seek such relief

only after its Claim is liquidated.  Even then, this Court has discretion regarding when

administrative claims are to be paid.  At this time, it is a waste of the Court's resources to

adjudicate the 503 Motion.

<u>Background</u>

6.      On December 15, 1999, Cadence's predecessor in interest, Patent

Holding Company ("PHC"), commenced the Litigation against Delphi Automotive

Systems Corp. ("Delphi") in the District Court for the Eastern District of Michigan,

Southern Division (the "District Court") (Case No. 99-76013), asserting damages for

4

Delphi's alleged infringement of three patents (the "Patents") related to the design of

certain automotive airbag covers (the "Airbag Covers").[2]

7.      As Cadence states in its Motions, on August 6, 2004, after

bifurcating the Litigation into liability and damages phases, the District Court issued its

Memorandum And Order On Claim Construction (the "Memorandum") (attached hereto

as "Exhibit A") accepting several of Cadence's recommendations on claim construction.[3]

The Memorandum also contained several key rulings that favor Delphi's noninfringement

defenses and undercut Cadence's patent claim, however.  Delphi also believes that it

possesses other strong defenses against Cadence's patent and damages claims.[4]

8.      After mediation attempts in respect of the Litigation proved

unsuccessful, but before the Debtors sought chapter 11 relief, the District Court set

March 28, 2006 as the date upon which the parties were to submit a final pretrial order.

Prior to the commencement of these chapter 11 cases, however, the parties had not yet

begun discovery with respect to the damages phase of the Litigation and had not

---

[2]    Cadence asserts that after PHC commenced the Litigation, on May 2, 2005, PHC assigned the Patents
to Cadence.  Cadence's name has not been substituted for PHC in the Litigation, but for ease of
reference the Litigation is referred to as if Cadence had been the original owner of the Patents and the
original plaintiff in the Litigation.

[3]    Before a court can decide if a patent has been infringed, it must first interpret the meaning of disputed
claim limitations with the patent claims.  A court defines the meaning of the patent claims during the
claim construction process (often called a "Markman" hearing).  The determination of whether an
accused product infringes a patent claim is an independent issue for the court or jury that follows the
claim construction process after the close of discovery.

[4]    The Debtors have asserted substantial patent invalidity and unenforceability defenses against each of
Cadence's asserted Patents, success at trial on any of which would render one or more of Cadence's
Patents invalid or unenforceable and thereby defeat Cadence's asserted patent infringement claims.
Furthermore, Cadence fails to mention that the District Court ruled, in its November 19, 2003 Order
Granting Summary Judgment Of Non-Liability For Acts Of Patent Infringement Committed By
General Motors Corporation Prior To January 1, 1999 (attached hereto as "Exhibit B"), that Delphi is
not liable for any alleged infringement of the Patents that occurred prior to January 1, 1999.
Accordingly, the Debtors submit that Cadence's assertion of its potential damages for alleged
prepetition patent infringement are most likely substantially overstated.

completed discovery with regard to the liability phase.  In addition, the parties had not yet

filed substantive dispositive pre-trial motions addressing the parties' claims and defenses,

which are commonly considered in patent cases.

9.    To properly defend the estates against Cadence's Claim at trial, the

Debtors would need to allocate resources that are otherwise being used in their

restructuring efforts and claims resolution process.  Indeed, the Debtors' in-house

attorneys are involved in this suit, and most other litigation against the Debtors, and will

continue to be involved, despite the retention of Quinn Emanuel Urquhart Oliver &

Hedges, LLP as special litigation counsel for the Debtors.  Continuation of this Litigation

would be a distraction from the Debtors' focus on their reorganization and eventual

emergence.  Specifically, the Debtors are engaged in continuing progress to ensure a

successful transaction with plan investors.  Consummation and realization of a

transaction with plan investors would facilitate, among other things, the inflow of

significant investments to support the Debtors' transformation plan and plan of

reorganization framework.  The Debtors' ability to consummate a transaction with plan

investors, however, is dependent upon the Debtors' successful and timely resolution of

many obstacles to emergence, including: (a) achieving agreements with General Motors

Corporation ("GM") and (b) reaching tentative labor agreements with certain of its unions

located in the United States that would permit achievement of a transaction with plan

investors.  Any distraction at this time would be detrimental to all of the Debtors'

stakeholders.

10.    In addition, the deadline for creditors to file proofs of claim has

passed and the Debtors are working steadily to liquidate and process the thousands of

6

claims subject to the Claims Procedures in a timely, orderly, and efficient manner.[5]  To

grant Cadence's request would allow Cadence to jump ahead of the line and have its

claims liquidated ahead of other creditors.  This would be unfair to the Debtors, their

estates and other creditors at this critical juncture in the chapter 11 cases.  Accordingly,

Cadence's Motions should be denied.

Argument

I.     The Lift Stay Motion Should Be Denied

11.     The automatic stay imposed by section 362 of title 11 of the United

States Code (the "Bankruptcy Code") is one of the most fundamental and significant

protections that the Bankruptcy Code affords a debtor.  Midlantic Nat'l Bank v. N.J. Dep't

of Envt'l. Prot., 474 U.S. 494, 503 (1986); see also In re Drexel Burnham Lambert Group

Inc., 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("[A]utomatic stay is key to the

collective and preservative nature of a bankruptcy proceeding.").  The automatic stay is

designed to, among other things, give the debtor a "breathing spell" after the

commencement of a chapter 11 case, shielding debtors from creditor harassment and a

multitude of litigation in a variety of forums at a time when the debtor's personnel should

be focusing on restructuring.  See Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999), cert.

denied, 528 U.S. 1079 (2000).

---

[5]    Indeed, on December 7, 2006, this Court entered an Order (Docket No. 6089) approving the Debtors'
Motion For Order Pursuant To 11 U.S.C. Sections 502(b) And 502(c) And Fed. R. Bankr. P. 2002(m),
3007, 7016, 7026, 9006, 9007, And 9014 Establishing (I) Dates For Hearings Regarding Disallowance
Or Estimation Of Claims And (II) Certain Notices And Procedures Governing Hearings Regarding
Disallowance Or Estimation Of Claims (Docket No. 5939).  Upon Cadence's objections to the Claims
Procedures, the parties have agreed and the Order reflects that the Claims Procedures will not apply to
Cadence's Claims.  Nevertheless, the automatic stay should remain in place while the Debtors
prosecute all claims objections.

7

12.    The automatic stay broadly extends to all matters which may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that debtors have the opportunity to rehabilitate and reorganize their operation.  See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62-64 (2d Cir. 1986); see also Fid. Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir. 1976) ("Such jurisdiction is necessary 'to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted).

13.    Section 362(d)(1) of the Bankruptcy Code provides that the court may grant relief from the automatic stay "for cause."  While debtors still retain the exclusive right to formulate a plan of reorganization, "an unsecured, unliquidated claim holder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown."  See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990) (emphasis added).   As more fully described below, Cadence has failed to show sufficient, extraordinary cause to obtain relief from the automatic stay.

14.    The lifting of the stay is committed to the sound discretion of the Court.  In re Sonnax Indus., 907 F.2d 1280, 1288 (2d Cir. 1990).  Because of the unstructured nature of the issues that are often contemplated in lift stay proceedings, certain courts, including the Second Circuit, have used a list of twelve factors when determining whether cause exists to modify or lift the automatic stay.  The Second Circuit in Sonnax set forth the list of twelve factors that may be considered when

8

deciding whether the stay should be lifted to allow litigation against a Debtor to continue

in another forum:

> (1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

In re Sonnax Indus., 907 F.2d  at 1286.  See also In re Curtis, 40 B.R. 795, 799-800

(Bankr. D. Utah 1984).  All twelve factors will not be relevant in every case, Mazzeo v.

Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), nor must the Court afford

equal weight to each of the twelve factors.  See Burger Boys, Inc. v. S. St. Seaport Ltd.

P'ship (In re Burger Boys, Inc.), 183 B.R. 682, 688 (S.D.N.Y. 1994).

15.    As demonstrated below, as it pertains to the Litigation, Cadence

has not, and indeed cannot, carry the burden of establishing that sufficient cause exists to

lift the automatic stay.  "If the movants fail to make an initial showing of cause . . . the

court should deny relief without requiring any showing from the debtor that it is entitled

to continued protection."  In re Sonnax Indus., 907 F. 2d at 1285; see also In re Metro

Transp. Co., 82 B.R. 351, 353 (Bankr. E.D. Pa. 1988) (noting unsecured creditors face

difficult task of producing evidence to establish balance of hardships tips in their favor to

obtain stay relief).

9

A.    Lifting The Stay Would Unnecessarily Interfere
      With The Debtors' Restructuring Efforts

16.    The Debtors and their estates would be prejudiced if the automatic stay were modified now to permit the Litigation to proceed.  As already stated, the Debtors are in the midst of navigating the many obstacles to emergence that must be timely resolved if the Debtors are to realize the benefits of a transaction with plan investors that, among other things, will provide billions of dollars in investments to support the Debtors' transformation plan and plan of reorganization framework.

17.    Instead, Cadence seeks to force the Debtors to proceed with a potentially time-consuming and costly lawsuit.  The Debtors' management and in-house legal team are in a critical period.  The Debtors are parties to more than 200 active and threatened lawsuits across the country.  If the automatic stay is lifted to allow Cadence to pursue its Litigation, this might encourage other parties with general unsecured litigation claims against the Debtors to seek similar relief, thereby forcing the Debtors to defend against numerous motions to modify the automatic stay.  This has the potential of creating a situation where the Debtors' management and in-house legal team would be forced to expend time and resources to defend litigation rather than focus on the steps necessary for the Debtors to emerge from chapter 11.  The Debtors' management should be allowed to focus intensely on the touchstone issues in these cases.  Modification of the automatic stay at this crucial stage of these cases to allow Cadence to go forward is simply unwarranted.

18.    Allowing Cadence to proceed with its Litigation at this time would distract the Debtors from these and other critical challenges facing them and will thus cause significant prejudice to the Debtors' estates.  In re U.S. Brass Corp., 173 B.R. 1000,

10

1006 (Bankr. E.D. Tex. 1994) ("When balancing the hardships in lifting the stay, the

most important factor is the effect of such litigation on the administration of the estate;

even slight interference with the administration may be enough to preclude relief.")

(citing In re Curtis, 40 B.R. 795, 806 (Bankr. D. Utah 1984)); see In re Comdisco, 271

B.R. 273, 280 (Bankr. N.D. Ill. 2002) (finding that "it would be irresponsible and

subversive of the purpose of the automatic stay to allow any resources and attention of

the Debtor to be diverted to other matters not directly related to its reorganization").

Denying Cadence's Lift Stay Motion is consistent with one of the purposes of the

automatic stay, which is to allow the Debtors breathing space.

19.    Indeed, the fundamental purpose of the stay imposed by section

362(a)(i) of the Bankruptcy Code is to provide a debtor with a breathing spell, by giving

the debtor the time and an opportunity "to attempt a repayment or reorganization plan."

Borman v. Raymark Indus., 946 F.2d 1031, 1033 (3d Cir. 1991) (quoting H.R. Rep. No.

95-595, 95th Cong., 1st Sess. 340 (1977)); see, e.g., In re Enron Corp., 300 B.R. at 211

(finding that "'[t]he purpose of the automatic stay is to give the debtor a breathing spell

from creditors'") (citations omitted).  Bankruptcy Code section 362(a)(i), therefore, stays

pending prepetition litigation to "avoid interference with the . . . rehabilitation of the

debtor."  Borman, 946 F.2d at 1036 (quoting Association of St. Croix Condominium

Owners v. St. Croix Hotel Corp., 682 F.2d 446, 448 (3d Cir. 1982)).

B.    The Court Should Not Allow Cadence To Jump Ahead
Of Other Creditors

20.    The Debtors should not be forced to divert their attention from

their current endeavors to appease Cadence.  Permitting Cadence to proceed with its

Litigation at this time would be an improper preference of this creditor over all other

11

holders of disputed, unliquidated claims in these cases.  As stated above, the Debtors

have established the Claims Procedures to ensure an orderly reconciliation of all claims.

Cadence's decision to opt out of the Claims Procedures does not give it the right to make

an end-run around the claims reconciliation process.  Cadence simply should not be

allowed to cut in line ahead of other creditors.  See, e.g., LTV Steel Co. v. Bd. of Educ.

(In re Chateaugay Corp.), 93 B.R. 26, 30 (S.D.N.Y. 1988) (noting that automatic stay is

intended to prevent "chaotic and uncontrolled scramble for the debtor's assets in a variety

of uncoordinated proceedings in different courts"); Midlantic Nat'l Bank, 474 U.S. at 503;

In re Drexel Burnham Lambert Group, Inc., 113 B.R. at 837; AP Indus. Inc. v. SN Phelps

& Co. (In re AP Indus., Inc.), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic

stay prevents creditors from reaching the assets of the debtor's estate piecemeal and

preserves the debtor's estate so that all creditors and their claims can be assembled in the

bankruptcy court for a single organized proceeding.").

> C.   The Debtors And Their Creditors Will Be Prejudiced
>      Because The Debtors Do Not Have Insurance To Cover
>      The Liability Asserted By Cadence

21.   The Debtors have no insurance coverage for the Cadence Claims

and thus, the continuation of the Litigation now will not benefit Cadence, but will directly

affect the Debtors and their estates to the detriment of all other creditors.  Even if

Cadence were ultimately to prevail in its Litigation, all Cadence could possibly receive is

an allowed claim against the Debtors' estates.  Then, Cadence would again have to wait in

line with all other similarly situated claimants because there are no insurance proceeds

available to satisfy Cadence's Claim.  All costs associated with defending the Litigation

and any liability that might ultimately arise on account of the Litigation, however, would

be borne directly by the Debtors to the detriment of their stakeholders.  As a result, the

Debtors and their estates would be prejudiced if the automatic stay were modified to

permit the Litigation to proceed at this point in these chapter 11 cases.

D.      The Parties Are Not Ready For Trial

22.      As stated above, the Litigation is not staged for trial.  No discovery

has been conducted with regard to the damages phase and the parties have not completed

discovery with regard to the liability phase.  Furthermore, neither party has filed

substantive dispositive pre-trial motions.  See In re Comdisco, 271 B.R. at 277-80

(denying motion to lift stay regarding securities class action in its early stages).  The

Debtors estimate that the Litigation cannot possibly be concluded before the end of 2008

and an appeal would likely delay the ultimate conclusion another year or two.

Furthermore, the Debtors estimate that the costs of briefing and defending the Litigation

will cost hundreds of thousands of dollars.  The parties are not ready for trial and the

Debtors should not now be forced to turn their attention to preparing to defend the

Litigation.

E.      The Balance Of Harms Weighs In The Favor Of The Debtors

23.      The Debtors and their estates would be prejudiced if the automatic

stay were modified to permit the Litigation to proceed at this point in these chapter 11

cases.  Cadence has disregarded the continuing intensity of these cases.  The Debtors

should not be distracted at this time by prepetition litigation.

24.      As stated above, allowing Cadence to proceed with the Litigation,

would likely encourage other parties with general unsecured litigation claims against the

Debtors to seek similar relief and potentially create a situation where the Debtors'

13

management and in-house legal team are being forced to expend time and resources to defend a multitude of lift stay actions or litigation, rather than focus on what is necessary to emerge from chapter 11.  In re U.S. Brass Corp., 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994) ("When balancing the hardships in lifting the stay, the most important factor is the effect of such litigation on the administration of the estate; even slight interference with the administration may be enough to preclude relief.") (citing In re Curtis, 40 B.R. 795, 806 (Bankr. D. Utah 1984)).  Clearly, the purpose of the automatic stay is to allow the Debtors breathing space to avoid spending the Debtors' and the estates' time and resources on briefing and arguing a very significant matter to the Debtors.  See, e.g., In re U.S. Brass Corp., 173 B.R. 1000 (Bankr. E.D. Tex. 1994) (finding debtor would be prejudiced and denying motion to lift stay, reasoning that debtor's insurance coverage was in dispute and "even claims against Debtors' insurance impacts upon property of the estate and Debtor must expend its resources to some degree to defend even claims which are ultimately totally covered for payment by insurance.") (citing In re Metro Transp. Co., 82 B.R. 351, 354 (Bankr. E.D. Pa. 1988)).

25.    In addition, the Litigation will require management involvement and significant monetary resources to defend this matter.  Cadence seeks millions of dollars in damages from the Debtors and injunctive relief, potentially prohibiting Delphi from using important vehicle safety devices.  As stated above, briefing has not yet begun and the Debtors estimate the cost of briefing this Litigation and defending at the District Court will most likely cost hundreds of thousands of dollars.

26.    In stark contrast to the prejudice that the Debtors and the Debtors' other creditors similarly situated with Cadence would suffer if the Motion were granted,

14

Cadence cannot demonstrate that it would be prejudiced if the Motion were denied.  In

fact, the delay should not prejudice Cadence at all.  Specifically, assuming the stay is not

lifted, should the Debtors ultimately prevail at trial then Cadence is no worse off because

the Debtors will not owe Cadence anything.  Should Cadence ultimately prevail at trial,

then once again the delay will not prejudice Cadence because Cadence would be entitled

to a claim for damages, which will be accorded appropriate treatment under any plan of

reorganization to be confirmed.  Accordingly, the delay does not put Cadence in any

worse position.

        27.      Nevertheless, the Debtors recognize that this Court may not be the

appropriate forum for ultimate liquidation of Cadence's claim, either because the District

Court is a specialized tribunal or because judicial economy may be served by allowing

the Litigation to be resolved in front of the District Court at a later point.  Cadence has

shown no prejudice that it has suffered during the past 14 months.  Nor has Cadence

demonstrated any prejudice that might arise between now and the resolution of its claim

through an orderly claims reconciliation process.  At most, Cadence would face only the

ordinary delay that all creditors face in complex chapter 11 cases.  See In re Comdisco,

271 B.R. at 277-80 (finding that "the automatic stay almost always delays litigants . . .

[t]hat, after all, is its purpose, and the reason they call it a 'stay'").

II.      The 503 Motion Is Improper At This Time And Should Be Denied

        28.      The 503 Motion seeks allowance of and administrative expense

priority status under Bankruptcy Code section 503 for a disputed and unliquidated claim.

Until the Claim is liquidated in this forum or another, however, the Claim is not ripe for

allowance.  Indeed, the very structure of the Bankruptcy Code makes it clear that

unliquidated claims do not fall under Bankruptcy Code section 503, but rather

Bankruptcy Code section 502(c) instead, which deals specifically with unliquidated

claims.[6]  The 503 Motion should be denied because Cadence's request is simply

inappropriate at this time.

        29.     The 503 Motion also requests that this Court make a determination

that the Claim be paid by the Debtors immediately upon liquidation of the Claim.

"Bankruptcy courts have broad discretion over the timing of payment of administrative

expenses."  Child World, Inc. v. Campbell/Massachusetts Trust (In re Child World, Inc.),

161 B.R. 571, 575 (S.D.N.Y. 1993) (quoting In re Photo Promotion Associates, Inc., 881

F.2d 6, 8-9 (2d Cir. 1989)); see also In re TLI, Inc., 213 B.R. 946, 952 (N. D. Tex. 1997)

(holding that bankruptcy courts have considerable discretion in addressing timing of post-

confirmation administrative expense payments).  Furthermore, "often in Chapter 11

cases, administrative expenses are not required to be paid until confirmation."  In re Child

World, Inc., 161 B.R. at 575 (quoting In re Appletree Markets Inc., 139 B.R. 417, 419

(Bankr. S.D. Tex. 1992)); see also In re HQ Global Holdings, Inc., 282 B.R. 169, 173-74

(Bankr. D. Del. 2002) (administrative expense claims may be deferred if subsequent

events may moot such claims).  Even if it were likely that the Claim could be liquidated

before the Debtors submit and obtain confirmation of a plan of reorganization, the

Debtors should not have to pay the Claim until a plan is confirmed and the Claim is

---

[6]    Bankruptcy Code section 502(c) provides, in pertinent part, that:
        There shall be estimated for purpose of allowance under this section—
        (1) any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be,
        would unduly delay the administration of the case; or
        (2) any right to payment arising from a right to an equitable remedy for breach of performance.
    11 U.S.C. § 502(c).

liquidated.  Because the 503 Motion is premature, the Debtors request that the Court deny

the 503 Motion.

## Conclusion

30.    For all of the reasons set forth above, the Motions should be

denied.

## Notice

31.    Notice of this Objection has been provided in accordance with the

Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R.

Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and

Certain Notice, Case Management, and Administrative Procedures, entered October 26,

2006.  The Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

32.    Because the legal points and authorities upon which this Objection

relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the

Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District

of New York be deemed satisfied.

17

WHEREFORE the Debtors respectfully request that the Court enter an order (i) denying the Lift Stay Motion in its entirety, (ii) denying the 503 Application in its entirety, and (iii) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       January 4, 2007

SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP

By:  /s/ John Wm. Butler, Jr.
     John Wm. Butler, Jr. (JB 4711)
     John K. Lyons (JL 4951)
     Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

   - and -

By:  /s/ Kayalyn A. Marafioti
     Kayalyn A. Marafioti (KM 9632)
     Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

AUG 0 6 2004

CLER...
U. S. DISTRICT COURT
EASTERN MICHIGAN

PATENT HOLDING COMPANY,

    Plaintiff,

v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION,

    Defendant.

_____/

Case No. 99-76013

HONORABLE AVERN COHN

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

# Table of Contents

I.  Introduction                                                             1

II. Legal Standards                                                          2

    A.  Standard of Review                                                    2

    B.  Claim Interpretation                                                  3

III. The '485 Patent: The Snap-On Patent                                     6

    A.  The '485 Patent Generally                                             6

    B.  Analysis                                                              9

        1.  "Connector"                                                   9

        2.  "Groove"                                                     11

        3.  "Receive"                                                    15

        4.  "Engage"                                                     18

        5.  "Engagement Member"                                          23

        6.  "Engagement"                                                23

IV. The '026 Patent: The Tear Seam Patent                                   24

    A.  The '026 Patent Generally                                            24

    B.  Analysis                                                             26

        1.  "Break Seam"                                                 26

        2.  "Defining" and "Defined"                                    30

        3.  "Break Pattern"                                              33

        4.  "First Convex Wall" and "Second Convex Wall"                 36

        5.  "Break Wall"                                                40

V.  The '031 Patent: The Horn Switch Patent                                    41

    A.  The '031 Patent Generally                                              41

    B.  Analysis                                                                44

        1.  Prosecution History of the '031 Patent                          44

        2.  "Disposed In"                                                   45

        3.  "Flexible Diaphragm"                                            47

VI.  Conclusion                                                               49

## I. Introduction

This is a patent case. Plaintiff Patent Holding Company (PHC), holder of U.S.

Patent No. 5,501,485 (the '485 patent), U.S. Patent No. 5,498,026 (the '026 patent),

and U.S. Patent Re. 35,031 (the '031 patent), is suing defendant Delphi Automotive

Systems Corporation (Delphi) for infringement in the making, etc. of air bag covers

which fall within the scope of one or more of the claims of the three patents. At this

time the sole claims in issue are claim 11 of the '485 patent, claim 1 of the '026 patent,

and claim 6 of the '031 patent.[1] The Court previously interpreted four ambiguous terms

in the three patents.[2] Before the Court are the parties' papers relating to interpretation

of the remaining ambiguous terms. The papers were referred to a Special Master,[3] who

issued a Report and Recommendation for each of the three patents. The Court

conducted a hearing on the parties' objections on July 21, 2004 and issued a Decision

on Claim Construction on August 2, 2004. This memorandum details the reasons and

analysis for each interpretation.[4]

---

[1]See Patent Holding Company's Amended Designation of Paradigm Claims
(March 27, 2003).

[2]See First Decision on Claim Construction: U.S. Patent No. 5,501,485 (Dec. 5,
2003) (interpreting "cover," "panel," "segment," and "homogenous thermoplastic molded
body").

[3]See Appointment and Order of Reference to Special Master (Nov. 21, 2003);
Order Amending Order of Reference to Special Master (Dec. 8, 2003).

[4]The respective positions of the parties on the ambiguous terms in the three
patents, along with the Special Master's recommended interpretations and the Court's
interpretations, are displayed in Exhibits A, B, and C.

1

## II. Legal Standards

The following legal standards apply to the analysis for all three patents.

### A. Standard of Review

The Appointment and Order of Reference to Special Master of November 21,

2003 stated that "[r]eview of the recommendation of the Special Master by the Court

shall be governed by 28 U.S.C. § 636(b)(1)(B) and (C)," which provide:

> Within ten days after being served with a copy, any party may serve and
> file written objections to such proposed findings and recommendations as
> provided by rules of court. A judge of the court shall make a **de novo
> determination of those portions of the report or specified proposed
> findings or recommendations to which objection is made**. A judge of
> the court may accept, reject, or modify, in whole or in part, the findings or
> recommendations made by the magistrate judge. The judge may also
> receive further evidence or recommit the matter to the magistrate judge
> with instructions.

The Special Master issued a Report and Recommendation for each of the three

patents[5] and both parties filed objections.[6]  Where either PHC or Delphi object to the

Special Master's recommended interpretation, the Court must evaluate the parties'

arguments de novo.  Where neither party objects to the Special Master's recommended

interpretation, the interpretation will be adopted by the Court.

---

[5]The Special Master's well reasoned and focused reports have been very helpful
to the Court.

[6]The objections filed by the parties largely repeated their previous arguments
made in the original Markman briefing rather than responding specifically to the Special
Master's recommendations.  This is unfortunate and is illustrative of the excessiveness
demonstrated by the parties' papers and their efforts to look to extrinsic evidence
without justifying the need to do so.  Also, the parties' efforts to incorporate the accused
air bag covers in this Markman proceeding are not appreciated.

2

## B. Claim Interpretation

Claim interpretation is a matter of law for the Court. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). The focus is on "what one of ordinary skill in the art at the time of the invention would have understood the term to mean." Id. at 986. The first step in construing a patent claim is to examine the intrinsic evidence:

> First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.

> Thus, second, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication. . . . The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it. Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.

> Third, the court may also consider the prosecution history of the patent, if in evidence. This history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. As such, the record before the Patent and Trademark Office is often of critical significance in determining the meaning of the claims. Included within an analysis of the file history may be an examination of the prior art cited therein.

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citations omitted).

There is a "'heavy presumption' that claim terms carry their ordinary meaning as viewed by one of ordinary skill in the art." Altiris, Inc. v. Symantec Corp., 318 F.3d 1363, 1369 (Fed. Cir. 2003). Dictionaries, encyclopedias, and treatises, which were publicly available at the time the patent was issued, are relevant sources for ascertaining how a person of skill in the art would understand the meaning of a claim. Id.; Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202-03 (Fed. Cir. 2002); see also Vanderlande Indus. Nederland BV v. ITC, 366 F.3d 1311, 1321 (Fed. Cir. 2004) (cautioning that technical dictionaries, not non-scientific general-usage dictionaries, should be used when "artisans would attach a special meaning to a claim term, or . . . would attach no meaning at all to that claim term (independent of the specification)"). However, the abstract definition of an individual term does not always reflect its ordinary meaning; claim terms must always be read in the context of the surrounding claim language. Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1299-1300 (Fed. Cir. 2003). Further, when a term has multiple dictionary definitions, "the intrinsic record must always be consulted to identify which of the different possible dictionary meanings is most consistent with the use of the words by the inventor." Id. at 1300; Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998). "If more than one dictionary definition is consistent with the use of the words in the intrinsic record, the claim terms may be construed to encompass all consistent meanings." Brookhill-Wilk, 334 F.3d at 1300.

Because of the presumption, a claim term must be given its ordinary meaning unless the patentee acted as his own lexicographer and redefined the term in the specification, Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001), or

4

characterized "the invention in the intrinsic record using words or expressions of

manifest exclusion or restriction, representing a clear disavowal of claim scope,"

Teleflex, Inc. v. Ficosa North America Corp., 299 F.3d 1313, 1327 (Fed. Cir. 2002).

Claim terms must also be "construed consistently with [their] appearance in other

places in the same claim or in other claims of the same patent." Rexnord, 274 F.3d at

1342. Additionally, the doctrine of claim differentiation holds that "two claims of a

patent are presumptively of different scope." Kraft Foods, Inc. v. International Trading

Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000).

> There is presumed to be a difference in meaning and scope when
> different words or phrases are used in separate claims. To the extent that
> the absence of such difference in meaning and scope would make a claim
> superfluous, the doctrine of claim differentiation states the presumption
> that the difference between claims is significant. Where some claims are
> broad and others narrow, the narrow claim limitations cannot be read into
> the broad whether to avoid invalidity or to escape infringement.

United States v. Telectronics, Inc., 857 F.2d 778, 783-84 (Fed. Cir. 1988) (citations and

quotation marks omitted). Claim differentiation, however, cannot be used to broaden a

claim beyond its proper scope. Multiform Desiccants Inc. v. Medzam, Ltd., 133 F.3d

1473, 1480 (Fed. Cir. 1998).

If the meaning of a claim term can be determined from the intrinsic evidence

alone, it is improper to review extrinsic evidence. Bell Atlantic Network Servs., Inc. v.

Covad Communications Group, Inc., 262 F.3d 1258, 1268-69 (Fed. Cir. 2001).

"However, in the rare circumstance that the court is unable to determine the meaning of

the asserted claims after assessing the intrinsic evidence, it may look to additional

evidence that is extrinsic to the complete document record to help resolve any lack of

clarity." Id. at 1269. Extrinsic evidence includes "expert testimony, articles, and

5

inventor testimony." Id. While extrinsic evidence may also be used to aid in

comprehension of the relevant technology, it may never be used to expand or limit

claim language as it is defined, even by implication, in the specification or prosecution

history. Id.; Altiris, 318 F.3d at 1369; Pitney Bowes, Inc. v. Hewlett-Packard Co., 182

F.3d 1298, 1308 (Fed. Cir. 1999).[7]

### III. The '485 Patent: The Snap-On Patent

### A. The '485 Patent Generally

The ABSTRACT describes the invention of the '485 patent as follows:

A snap-on air bag cover for use with an uninflated air bag container
including a retaining member, the snap-on air bag cover comprising, a
plastic front cover adapted to directly enclose the uninflated air bag
container, a pair of plastic side panels connected to opposite sides of the
front cover, a resilient clip member extending from each of the side
panels, the clip member having an extending snap-on groove defined
therein adapted to cooperate with the retaining member for affixing the air
bag cover to the air bag container, wherein the pair of side panels are
connected to the front cover such that the side panels and resilient clip
members are permitted to pivotably travel away from each other in
opposite directions allowing the retaining member to enter and abuttingly
engage the snap-on groove thereby retaining the air bag cover on the air
bag container.

----

[7]See Order, Apotex, Inc. v. Eon Labs Mfg., Inc. Case No. 01-0482 (E.D.N.Y.
June 28, 2004) (directing the parties to first file papers setting forth the ordinary and
customary meaning of the disputed terms and then file papers stating whether the
intrinsic record rebuts the ordinary and customary meanings according to the Federal
Circuit's direction in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193
(2002)).

Figures 1 and 2 illustrate the invention:



*Fig. 1*

*Fig. 2*

The BACKGROUND ART generally describes the advance in the art as follows:

Presently, when air bag covers are provided in automobiles on the
drivers side of the vehicle, the air bag is stored in the steering column
behind an air bag cover. During automatic inflation of the air bag, the air
bag cover moves away from the steering column to permit its safety
function between the steering column and the operator of the vehicle.

Recent practice in the automotive industry is utilization of all plastic
fabricated air bag covers. Conventional air bag covers used in
conjunction with occupant restraint systems often include various
connection systems for attaching the air bag cover to the uninflated air
bag container. As those skilled in the art will recognize, such systems
normally include a two piece cover construction wherein a first cover
portion, usually manufactured from a relatively stiff material, is initially
disposed directly over the uninflated air bag container. A second more
resilient cover portion is next affixed over the first cover portion and used
as the outer decorative cover.

Claim 11 of the '485 patent (broken down into appropriate clauses) reads:

11. An improved air bag cover of the type adapted to snap onto the
retaining rim of an air bag container, the cover comprising a homogenous
thermoplastic molded body including a separable front cover panel from
which project toward the container a plurality of transverse panels, each of
the transverse panels being flexural relative to the front panel, the
improvement characterized in that:

a plurality of the transverse panels are formed with a
<u>connector</u> for a snap-on engagement with the container rim,
each connector comprising,

a snap-on <u>groove</u> extending along a segment of the
transverse panel, the groove having a cross-sectional shape
adapted to <u>receive</u> and <u>engage</u> the container rim, and

an <u>engagement member</u> positioned ahead of the snap-on
groove for guiding the container rim into <u>engagement</u> with
the snap-on groove during flexural displacement of the
traverse panel.

The underlined words require interpretation by the Court. The six terms in claim 11 to

be construed are:

8

(1) "connector,"

(2) "groove,"

(3) "receive,"

(4) "engage,"

(5) "engagement member," and

(6) "engagement."

### B. Analysis

#### 1. "Connector"

Claim 11 recites that "a plurality of the transverse panels are formed with a connector for a snap-on engagement with the container rim."

PHC says that "connector" means "a feature of the airbag cover that connects the cover to an airbag container." Delphi says that the term means "a structural feature formed with a transverse panel which connects the cover to the air bag container." The Special Master recommends that the term be interpreted to mean "a feature that connects."

Clearly, the term "connector" ordinarily means something that connects, see Webster's Third New International Dictionary 481 (1993) [hereinafter Webster's Third] ("something that connects"); Random House Dictionary of the English Language 432 (2d ed. 1987) [hereinafter Random House] ("a person or thing that connects" or "any of various devices for connecting one object to another"), and according to the express language of claim 11, the connector connects the air bag cover to the air bag container rim. Thus, the only real difference between the proffered interpretations is where each

9

party locates the connector. Delphi's interpretation specifically states that it must be located on the transverse panel, while PHC's interpretation implies that it can be located anywhere on the air bag cover.

As the Special Master correctly recognized, however, the claim language surrounding "connector" already requires that the transverse panel be "formed with a connector for a snap-on engagement with the [air bag] container rim." The specification confirms the location of the connector in relation to the transverse panel. See, e.g., '485 patent, col. 2, ll. 1-5 ("snap-on automotive air bag cover comprises . . . a pair of plastic side panels connected to opposite sides of the front cover [and] a resilient clip member extending from each of the side panels"); id., col. 4, ll. 1-3 ("Referring now to FIG. 2, there is shown a resilient clip connector 50 extending from side panel 18."); id., col. 4, ll. 22-23 ("Referring now to FIG. 1 there is shown four chip connectors 50, 70, 72, and 74 extending from each side panel."); id., col. 4, ll. 39-41 ("The air bag cover 76 includes four clip connectors 86, 88, 90 and 92 connected to respective side panels 94, 96, 98, and 100."). Consequently, it would be redundant to further specify the location of the connector when claim 11 already requires that the transverse panels be "formed with a connector" to connect the air bag cover to the rim of the air bag container. Even if it were necessary to specify the location of the connector, though, Delphi's argument that the connector is "formed with a transverse panel" is incorrect because it reverses the language of the claim, which requires that the transverse panel be "formed with a connector."

The Special Master's recommendation that the connector is a "feature"–not a "feature of the airbag cover" (PHC's interpretation) and not a "structural feature formed

10

with a transverse panel" (Delphi's interpretation)—is correct.  The fact that it does not

specify the location of the connector does not make the interpretation misleading in light

of the surrounding claim language.  The jury will be told that "connector" means:

> A feature that connects.

## 2.  "Groove"[8]

Claim 11 requires "a snap-on groove extending along a segment of the

transverse panel, the groove having a cross-sectional shape adapted to receive and

engage the container rim."

PHC says that "groove" is defined by the function it performs and should be

interpreted to mean a "feature of the airbag cover so shaped in cross sectional

construction to receive and engage the rim of the airbag container."  Delphi says that

the term means "a long, narrow channel or furrow."  The Special Master recommends

that the term be interpreted to mean "a narrow channel."

Delphi submits numerous dictionary definitions of "groove," each of which it says

reflects the ordinary meaning of "groove" as a long, narrow channel or furrow.  See

Random House 842 ("a long, narrow cut or indentation in a surface, as the cut in a

board to receive the tongue of another board"); Webster's Third 1001 ("a long narrow

hollow or channel made artificially in a surface").  Delphi further submits a similar

technical dictionary definition to show that its dictionary definitions are appropriate in the

context of mechanical devices.  See McGraw-Hill Dictionary of Engineering 234 (1997)

("[DESIGN ENGINEERING] A long, narrow channel in a surface").

---

[8]The parties have identified "groove," not "snap-on groove," for interpretation.

11

PHC says that Delphi's dictionary definitions do not apply because the claim itself defines the snap-on groove as anything "having a cross-sectional shape adapted to receive and engage the container rim." According to PHC, "groove" is defined by what it does ("snap-on" and "receive and engage the container rim") rather than what it is, which is a permissible method of claim drafting. See In re Schreiber, 128 F.3d 1473, 1478 (Fed. Cir. 1997) ("A patent applicant is free to recite features of an apparatus either structurally or functionally.").

The functional feature of the snap-on groove apparatus in the context of the air bag cover as a whole is that it receives and engages the air bag container rim. The functional feature, though, does not subsume the apparatus itself. While the groove must have a certain cross-sectional shape to fit with the air bag container rim, it must still be a "groove." Therefore, simply defining "groove" by its shape and function as stated in the claim would be insufficient. Indeed, if "groove" were solely defined by a limitation appearing later in the claim, the term itself would be rendered meaningless. Claim terms are obviously used for a reason making it improper to read out any limitation in a claim. See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp., 93 F.3d 1572, 1582 (Fed. Cir. 1996).

Importantly, although the specification does not specifically refer to the groove as a narrow channel, the two embodiments of the snap-on groove disclosed in the specification are consistent with the term's ordinary meaning and do not demonstrate that the patentee intended to act as his own lexicographer and redefine "groove" contrary to its ordinary meaning. Snap-on groove 52 is shown in Figure 2 and described as follows:

12

> Referring now to FIG. 2, there is shown a resilient clip connector 50
> extending from side panel 18. A snap-on groove 52 is shown disposed
> within clip connector 50. Clip connector 50 is comprised of a front
> engagement section 54 and a rear shoulder section 56 with snap-on
> groove 52 disposed between front engagement section 54 and rear
> shoulder section 56. **Snap-on groove 52 is configured to cooperate
> with a retaining rim 51 on uninflated air bag container 53 (shown in
> phantom). For proper connection and retainment, the snap-on
> groove should have a cross-sectional shape that corresponds to the
> shape of the air bag container rim.**

'485 patent, col. 4, ll. 1-12 (emphasis added). Likewise, snap-on groove 106 shown in

Figure 8 is a space between front engagement section 102 and rear shoulder section

104 where an L-shaped air bag container rim fits. Id., col. 4, ll. 39-52. Further, the term

"groove" appears in more than one place in the patent. The specification describes a

"biasing groove" with a different function than the snap-on groove. Id., col. 4, ll. 17-21.

Hence, the term "groove" in claim 11 cannot be defined functionally.

PHC argues that interpreting "groove" to mean a narrow channel would be

impermissibly reading in a limitation from the specification, citing Teleflex, 299 F.3d at

1328 (holding that the district court erred by importing a limitation from the specification

into the claim). Each embodiment of the snap-on groove disclosed in the specification

is a space between a "front engagement section" and a "rear shoulder section." Claim

11, however, only requires an "engagement member" and lacks a "rear shoulder

section" limitation. Therefore, according to PHC, the claim does not have the second

portion necessary to form a channel and interpreting "groove" to mean a narrow

channel would be reading the claim as the preferred embodiment, not the claimed

invention. PHC also argues under the principle of claim differentiation that because

claim 2 explicitly requires both a "front engagement section" and "rear shoulder section"

13

while claim 11 only requires an "engagement member," the term "groove" in claim 11 should not be interpreted to require a rear shoulder section.

Contrary to PHC's assertions, interpreting "groove" to mean a narrow channel does not require grafting a "rear shoulder section" limitation onto claim 11 nor does it violate the principle of claim differentiation. The terms "groove" and "channel" connote a hollow space or opening between two surfaces. Unlike claim 2, which requires that the groove be between a "front engagement section" and "rear shoulder section," claim 11 does not explicitly state what surfaces the groove is disposed between. Therefore, interpreting "groove" to mean a channel merely requires an opening between two surfaces; it does not require the "rear shoulder section" that is present in the preferred embodiments (rear shoulder section 56 in Figure 2 and rear shoulder section 104 in Figure 8). Claim differentiation also does not apply for two reasons. First, claim 2 depends from claim 1, not claim 11. Independent claims 1 and 11 have many different limitations. Claim 2 would not be rendered superfluous if the claim 11 "groove" is interpreted to mean a narrow channel. Second, claim 1 and claim 2 merely provide that a "resilient clip member" has "an extending snap-on groove defined therein" and the "snap-on groove is disposed between said front and rear sections." As the Special Master correctly points out, the rear shoulder section is not a defining structural part of the snap-on groove. "Groove" stands or falls on its own and has nothing to do with a "rear shoulder section."

Finally, the term "groove" in claim 11 is fundamentally different from the claim term "clip" at issue in Teleflex. In that case, the district court interpreted "clip" to mean "a single pair of legs" performing a duel function as specified in the claim. Id. at 1327.

14

The Federal Circuit held that although the specification described only one embodiment (having a single pair of legs), the specification and prosecution history did not contain an "expression of manifest exclusion or restriction demonstrating an intent to limit" the invention to a single pair of legs. Id. at 1327. Also, the ordinary meaning of the term was broader than the district court's narrow definition. Id. at 1328. Consequently, the court interpreted the term to mean "a structure that provides the dual functions" listed in the claim. Id. Here, however, the ordinary meaning of the term "groove" is abundantly clear and would not require importing anything from the specification into the claim. The functional feature of the "groove" (having a shape to receive and engage the air bag container rim) is listed **later in the claim** and is not the definition of "groove" itself.

The Special Master's recommended interpretation of "a narrow channel" is correct. There is nothing to suggest that a person of ordinary skill in the art would read the term contrary to its ordinary meaning. There is also no need to define the length of the channel as "long" as Delphi suggests because claim 11 already specifies that the groove "extend[s] along a segment of the transverse panel." The jury will be told that "groove" means:

A narrow channel.

### 3. "Receive"

Claim 11 provides that the snap-on groove has "a cross-sectional shape adapted to receive and engage the container rim."

PHC says that "receive" means "take or accept." Delphi says that the term means "to hold, bear or contain." The Special Master recommends that "receive" be

15

interpreted to mean "accept or take in."

Both parties cite dictionary definitions in support of their position. PHC submits "to take back, take, accept, receive." See Webster's Third 1894. Delphi submits "to hold, bear, or contain." See Random House 1610; see also Webster's New World College Dictionary 1195 (4th ed. 1999) [hereinafter Webster's New World] ("to have room for; hold; contain"); Webster's II New Riverside University Dictionary 981 (1988) [hereinafter Webster's II New Riverside] ("To take in or hold").

Because there are multiple dictionary definitions for the term "receive," the specification must be consulted to determine which definition is most consistent with the use of "receive" in claim 11. The specification states that "the snap-on groove should have a cross-sectional shape that corresponds to the shape of the air bag container rim." '485 patent, col. 4, ll. 9-12; id., col. 4, ll. 46-51. The interaction between the snap-on groove and the container rim is generally described as follows:

> The snap-on automotive air bag cover comprises . . . a resilient clip member extending from each of the side panels, the clip member having an extending snap-on groove defined therein adapted to cooperate with the retaining member for affixing the air bag cover to the air bag container, wherein the pair of side panels are connected to the front cover such that the **side panels and resilient clip members are permitted to pivotably travel away from each other in opposite directions allowing the retaining member to enter and abuttingly engage the snap-on groove thereby retaining the air bag cover on the air bag container**.

Id., col. 2, ll. 1-14 (emphasis added). In the preferred embodiments, the connector has a biasing groove, which allows the front engagement section to deform when the container rim "is initially engaged with the clip connector just prior to full engagement with the snap-on groove." Id., col. 4, ll. 17-21; id., col. 4, ll. 57-61 ("the inclined surface

16

112 in cooperation with the biasing groove 114 assist in locating and abuttingly

engaging the rim 108 of the air bag container 110 within the snap-on groove 106"). The

actual snap-on connection between the air bag cover and the air bag container is also

described as follows:

> Each clip connector is attached to the respective side panel in a live
> hinge-like fashion such that **the clip connectors and associated side
> panels move away from the front cover upon operative insertion of
> the air bag container rim 108 within snap-on groove 106.**
>
> For example opposing side panels 96 and 100 move away from
> front cover 82 and also away from each other as the rim 108 is abuttingly
> engaged against the inclined surfaces 112 of each clip connector 88 and
> 92. Further the cooperation of the biasing grooves in the other pair of
> opposing clip connectors 86 and 90 works to assist in locating and
> operatively connecting the air bag container 110 to the air bag cover 76.

Id., col. 5, ll. 33-45 (emphasis added). Thus, when the air bag cover snaps on to the air

bag container, the transverse panel flexes allowing the container rim to enter and

abuttingly engage the snap-on groove, which has a shape that corresponds with the

container rim.

PHC says that its interpretation of "take or accept" conforms with the

specification's disclosure that the air bag cover is designed to allow the container rim to

"enter" the snap-on groove when the transverse panel flexes. Delphi, however, says

that "take or accept" only applies in the context of receiving things like mail or visitors.

Delphi says that its interpretation of "to hold, bear or contain" is more appropriate in the

context of a mechanical structure. See Random House 1610 (giving two example

phrases: "[t]he nut receives a bolt and a washer" and "[t]he plaster receives the

impression of the mold"). Delphi emphasizes that the air bag container rim is inserted

17

**within** the snap-on groove, not next to it. See '485 patent, col. 5, ll. 33-37. Therefore, the snap-on groove is adapted to hold, bear, or contain the container rim.

Delphi's interpretation of "to hold, bear or contain" is contrary to both the specification and the language of the claim because it implies some degree of retention in the term "receive." Claim 11 clearly separates the two operations of "receive" and "engage"–the snap-on groove must be capable of both receiving **and** engaging the container rim. Likewise, the specification discloses that the container rim both enters **and** abuttingly engages the snap-on groove. Id., Abstract ("enter and abuttingly engage"); id., col. 2, 12-14 ("enter and abuttingly engage"). The level of retention, which the parties dispute, see infra Part III.B.4, is imparted in the term "engage," not "receive." Simply because the container rim is inserted within the snap-on groove does not mean that the insertion operation itself should be characterized as "holding" the container rim. The specification clearly establishes that the container rim enters and goes within the snap-on groove, which is specifically shaped to receive the container rim.

The Special Master's interpretation of "accept or take in" is consistent with the language in the specification stating that the air bag container rim is inserted into and enters the snap-on groove. Therefore, the jury will be told that "receive" means:

Accept or take in.

### 4. "Engage"

Claim 11 provides that the snap-on groove has "a cross-sectional shape adapted to receive and engage the container rim."

18

PHC says that "engage" means "contact for the purpose of connecting."[9]  Delphi says that the term means "to attach or secure."  The Special Master recommends that "engage" be interpreted to mean "attach or secure."

The parties agree that "engage" implies some degree of retention of the air bag cover on the air bag container.  Anticipating infringement issues, though, the parties disagree over the level of such retention.  PHC says that it must be less permanent; Delphi says that it must be more permanent.  Further complicating the analysis is the difficulty of language in characterizing the retention levels that each party ascribes to the term "engage."

Once again, both parties cite different dictionary definitions of the commonly used term "engage."  PHC submits "to come into contact or interlock with."  See Webster's Third 751.  Delphi submits "to cause (gears or the like) to become interlocked; interlock with" and "to attach or secure."  See Random House 644; Webster's II New Riverside 433 ("To interlock or cause to interlock"); see also Oxford English Dictionary (2d ed. 1989), available at OED Online <http://dictionary.oed.com> ("To interlock with, fit into a corresponding part.").

Also once again, the specification must be referenced to determine which definition is appropriate.  The object of the invention "is to provide a one piece, snap-on air bag cover that is **affixable** directly to an uninflated air bag container."  '485 patent, col. 1, ll. 62-64; id., col. 1, ll. 16-18; id., col. 2, ll. 6-8 ("an extending snap-on groove

---

[9]In its reply brief, PHC proposes an alternative interpretation of "non-permanently snap-on" where "the snapping-on is only that sufficient to prevent easy removal."  PHC does not provide any argument regarding this interpretation.

19

defined therein adapted to cooperate with the retaining member for **affixing** the air bag

cover to the air bag container"); id., col. 5, ll. 48-49 ("provide an air bag cover which is

directly **affixable** to an air bag container").  At four places in the specification, the

container rim is described as entering and "abuttingly engaging" the snap-on groove.

Id., Abstract ("allowing the retaining member to enter and **abuttingly engage** the

snap-on groove thereby retaining the air bag cover on the air bag container"); id., col. 2,

ll. 11-14 (same); id., col. 4, ll. 59-61 ("locating and **abuttingly engaging** the rim 108 of

the air bag container 110 within the snap-on groove 106"); id., col. 5, ll. 39-41 ("the rim

108 is **abuttingly engaged** against the inclined surfaces 112 of each clip connector 88

and 92").  Through the snap-on engagement, the air bag cover is "retained" on the air

bag container.  See id., Abstract, id., col. 2, ll. 11-14; id., col. 4, ll. 7-12 ("Snap-on

groove 52 is configured to cooperate with a **retaining** rim 51 on uninflated air bag

container 53 (shown in phantom).  For proper connection and **retainment**, the snap-on

groove should have a cross-sectional shape that corresponds to the shape of the air

bag container rim.").  Indeed, claim 11 itself calls the rim of the air bag container a

"retaining rim."  The specification similarly discloses an air bag container with a

"retaining member."  Id., Abstract; id., col. 2, ll. 5-20.

Delphi says that based on the specification and the language of the claim, the

only structure that performs the retention function is the snap-on groove.  The container

rim goes within the groove, which "attaches or secures" the container rim.  Delphi says

that the terms "affix" and "retain" as used in the specification are synonymous with

"attach" and "secure" and all of the terms appropriately convey the concept of

20

retention.[10]

PHC, by contrast, says that the specification's use of "abuttingly engage" implies a snap-on connection by contact, not a permanent bond. As support, PHC cites portions of the specification using the term "attach" in a more permanent sense. See '485 patent, col. 3, ll. 26-28 ("Preferably, the rear panels 31 are **hot plate welded, heat staked or otherwise attached** to the upper and lower portions 20 and 2 . . ."); id., col. 5, ll. 32-36 ("Each clip connector is **attached** to the respective side panel in a live hinge-like fashion such that the clip connectors and associated side panels move away from the front cover upon operative insertion of the air bag container rim 108 within snap-on groove 106."). PHC says that the air bag cover and air bag container certainly do not need to be integrally molded or welded together like the panels and connectors that are "attached" in the specification. PHC further points out that while the object of the invention as a whole is to "affix" the air bag cover to the air bag container, the specification only discloses that the snap-on groove "abuttingly engages" the container rim. Therefore, requiring "attachment" between the snap-on groove and the container rim would improperly require one element of the invention (the groove) to carry the burden of the invention as a whole (the air bag cover).

---

[10]Roget's International Thesaurus (4th ed. 1977) indexes the term "engage" under the following headings:

affiance, attempt, attract, contract, employ, engross, fight with, induce, interact, involve, occupy, promise

None of the headings seem to apply in the context of a mechanical structure. The term "retain," however, lists "engage 780.13," which lists synonyms for an employment context such as "give a job to" and "sign up for." Again, the thesaurus is not useful because "engage" is used in a mechanical context.

PHC is correct that the terms "affix" and "attach" are too restrictive in light of their use in the specification. However, PHC's vague interpretation of "contact for the purpose of connecting" is also inadequate because it essentially provides no retention at all. As Delphi correctly points out, the only structure in claim 11 that allows the air bag cover to snap on to the container rim, and thereby be retained on the container rim, is the snap-on groove. Thus, the groove must be adapted to do more than merely contact the container rim. Further, retention is accomplished through the specific action of snapping on as recited in claim 11, not by any other means of retention. A person of ordinary skill in the art reading claim 11 in light of the specification would understand the term "engage" (in light of the surrounding language) to mean that the snap-on groove has a cross-sectional shape adapted to secure the air bag cover in place by snapping on to the container rim.[11] The Special Master's recommended interpretation of "attach or secure" is incorrect because it encompasses two different levels of retention, one of which ("attach") is too restrictive based on the specification. Further, the Special Master's recommended interpretation does not account for the fact that the snap-on groove engages the container rim in a specific way–by snapping on to the container rim. The concept of snapping on is certainly easy for a jury to understand. The jury will be told that "engage" means:

Secure in place by snapping on.

---

[11]There is no claim differentiation problem with this interpretation because none of the claims that depend from claim 11 recite that the snap-on groove engages the container rim by snapping on.

22

### 5. "Engagement Member"

Claim 11 requires "an engagement member positioned ahead of the snap-on groove for guiding the container rim into engagement with the snap-on groove during flexural displacement of the transverse panel."

PHC says that "engagement member" means "part of the cover that guides the container rim into the groove." Delphi says that the term means "a structure feature of an air bag cover connector that guides the connector rim into the groove." The Special Master recommends that the term be interpreted to mean "a feature of the air bag cover connector."

Because neither party objects to the Special Master's recommended interpretation, the jury will be told that "engagement member" means:

A feature of the air bag cover connector.

### 6. "Engagement"

Claim 11 requires that the air bag container rim be guided "into engagement with the snap-on groove during flexural displacement of the transverse panel."

Essentially repeating their arguments for "engage," PHC says that "engagement" means "contact for the purpose of connecting" while Delphi says that the term means "attachment." The Special Master recommends that the term be interpreted to mean "attachment."

The parties acknowledge that "engagement" must be interpreted the same as "engage." Therefore, because "engage" has been interpreted to mean "secure in place by snapping on," the jury will be told that "engagement" means:

Securing in place by snapping on.

23

## IV.  The '026 Patent: The Tear Seam Patent

### A.  The '026 Patent Generally

The ABSTRACT describes the invention of the '026 patent as follows:

A plastic air bag cover for use in an automobile, the air bag cover comprising, a front cover adapted to enclose an uninflated automotive air bag, the front cover having inner and outer surfaces defining a first thickness therebetween and a decorative indicia defined on the outer surface of the front cover and a break seam defined in the inner surface of the front cover for permitting the air bag to inflate and exit the front cover, the break seam further defining a break pattern and having a first wall, a second wall and a break wall connecting the first and second walls, the break wall having inner and outer surfaces defining a second thickness therebetween, wherein the second thickness is less than the first thickness, the break wall and first and second walls are visually imperceptible when viewing the front cover outer surface, and the break seam is substantially non-coincidental with the decorative indicia.

Figures 4 and 7 illustrate the invention:



*Fig. 4*

*Fig. 7*

24

The BACKGROUND ART generally describes the advance in the art as follows:

Presently, when air bag covers are provided in automobiles on the driver side of the vehicle, the air bag is stored in the steering column behind an air bag cover. During automatic inflation of the air bag, the air bag cover moves away from the steering column to permit its safety function between the steering column and the operator of the vehicle.

Recent practice in the automotive industry is utilization of all plastic fabricated air bag covers. Conventional air bag covers used in conjunction with occupant restraint systems often include noticeable or visually perceptible break seams or scores disposed on the exterior surface of the air bag cover. The break seams or scores represent selected weakened surfaces where the inflating air bag initially separates or breaks through the air bag cover and moves away from the steering wheel to perform its safety feature.

Claim 1 of the '026 patent (broken down into appropriate clauses) reads:

1. A homogeneous thermoplastic air bag cover for use in an automobile, said air bag cover comprising:

a front cover adapted to enclose an uninflated automotive air bag, the front cover having inner and outer surfaces defining a first thickness therebetween; and

a break seam defined in said inner surface of said front cover for permitting the air bag to inflate and exit the front cover, said break seam further defining a break pattern and having a first convex wall, a second convex wall and a substantially planar break wall connecting said first and second walls and having a width of at least 0.3 millimeters, said break wall having inner and outer surfaces defining a second thickness therebetween, wherein said second thickness is less than said first thickness, said break pattern being visually imperceptible when viewing from the front cover outer surface.

The underlined words require interpretation by the Court. The seven terms in claim 1 to

be construed are:

(1) "break seam,"

(2) "defining,"

25

(3) "defined,"

(4) "break pattern,"

(5) "first convex wall,"

(6) "second convex wall," and

(7) "break wall."

## B. Analysis

### 1. "Break Seam"

Claim 1 requires "a break seam defined in said inner surface of said front cover for permitting the air bag to inflate and exit the front cover, said break seam further defining a break pattern and having a first convex wall, a second convex wall and a substantially planar break wall."

PHC says that "break seam" means a "selected weakened zone of the airbag cover that tears to allow the inflating airbag to exit through the cover during deployment." Delphi says that the term means "a linear indentation in the air bag cover which is sufficient to ensure tearing and separation of the air bag cover on deployment of the air bag." The Special Master recommends that "break seam" be interpreted to mean "a weakened linear area."

There are two major differences between the parties' interpretations: (1) PHC calls the break seam a "weakened zone" while Delphi calls it a "linear indentation," and (2) Delphi's interpretation incorporates the concept that the break seam is sufficiently indented to guarantee tearing of the cover when the air bag inflates.

26

**a.**

The first issue is whether the "break seam" is a "weakened zone" or a "linear

indentation." The parties agree that the ordinary meaning of "break" in the context of

claim 1 is "tear"--when the air bag inflates and expands, it exerts a force on the inner

side of the air bag cover causing it to tear. See '026 patent, col. 3, ll. 14-19. Next,

Delphi says that the ordinary meaning of "seam" is a "linear indentation," see Random

House 1726 (defining "seam" as "any line formed by abutting edges" and "any linear

indentation or mark, as a wrinkle or scar"), while PHC says that the term "seam" as

used in the specification means a "weakened zone."

The specification describes the break seam and its operation:

> The **break seams 24 and 26 are of reduced thickness,** to permit the air
> bag, as it is inflating, to exert a force at the inner portion of the front panel
> 12 to cause the upper and lower portions 20 and 22 of the front panel 12
> to separate from the side panels 16 along the break seams 24 and to
> separate from each other along the break seam 26.

'026 patent, col. 3, ll. 14-19 (emphasis added). The specification also provides:

> A **weakened area or break seam 60** is shown in FIGS. 4 and 5. The
> break seam 60 is, as discussed above, necessarily designed to allow
> inflation and exit of air bag 62 from the air bag cover 50 to permit its safety
> function between the steering column and operator (not shown). The
> break seam 60 is therefore designed to be the primary or sole, break area
> of the air bag cover during inflation and exit of the air bag 62.

Id., col. 4, ll. 18-25 (emphasis added). The prior art visually perceptible break seams

are called "selected weakened surfaces," id., col. 1, ll. 27-30, and "score lines," id., col.

1, ll. 35, 41, 57, 62, 67; id., col. 2, l. 1. Hence, Delphi is partially correct that the break

seam is a weakened area of the inner surface of the front cover between two portions

of the inner surface. At this specific location, the portions of the front cover tear apart

27

from each other allowing the air bag to inflate and exit the air bag cover. The term "break seam" therefore has a linear dimensional connotation, which is supported by the dictionary definitions of "seam." However, the specification does not describe the break seam as an "indentation" or a "zone." Indeed, later claim language describes the specific structure of the break seam as a substantially planar break wall between first and second convex walls. "Break seam" means a weakened linear area.

b.

Second, Delphi asserts that the meaning of "break seam" must include the concept that the break seam is sufficient to ensure tearing and separation of the air bag cover on deployment of the air bag. Delphi says that during prosecution of the '026 patent, the applicant disclaimed an inner surface break seam that is not capable of tearing the cover by itself. Therefore, "break seam" must be interpreted to include the concept of sufficiency. See Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).

During prosecution of the '026 patent, claim 1 was rejected under 35 U.S.C. § 103 as unpatentable over U.S. Patent No. 3,819,205 to Dunford et al. in view of U.S. Patent No. 4,895,389 to Pack, Jr. The examiner found that based on these references, it would have been obvious to provide "the break seam with first and second convex walls connected by a flat break wall, as taught by Pack, Jr., because the convex walls act as a fulcrum placing additional stress on the break wall, thereby insuring that the air bag cover opens along the break seam." Figure 5 of Pack, Jr. is a cross-sectional view of the disclosed air bag cover:

28



FIG. 5

The applicant responded by eliminating certain language from the claim (e.g., "said break seam is substantially non-coincidental with said decorative indicia") and arguing as follows (emphasis added):

> The Pack, Jr. reference requires a **"break wall 6" in the outer surface** of the air bag cover to ensure separation upon air bag deployment. **The first and second convex walls 22 and 24 on the inner surface of the air bag cover are together insufficient to ensure tearing and separation of the air bag cover. Instead, the convex walls 22 and 24 act as a fulcrum by concentrating tensile forces at the outer groove 6 to assist in the tearing of the groove upon deployment of the air bag.** Again, the interior convex walls 22 and 24 are inadequate t[o] effect shearing of the cover; the shearing is piloted by the exterior groove 6. The Pack, Jr. reference therefore neither recognizes, nor solves, the underlying concern of break seams in the exposed surface of the air bag cover.

The applicant stated that unlike Dunford et al. and Pack, Jr., his invention used "hidden break seams without dependence on double-acting mechanical movements to achieve breakage and separation."[12]  Delphi says that by doing so, the applicant specifically disclaimed a break seam with a double-acting mechanical arrangement.

---

[12]After the claim was again rejected in view of the Pack, Jr. reference, the examiner conducted an interview with the applicant and discussed Pack, Jr. and Great Britain Patent No. 2,244,449 to Zushi.  The applicant then overcame the prior art by limiting claim 1 to a "homogeneous" thermoplastic air bag cover with "convex" walls and a "substantially planar" break wall.

29

To the extent the prosecution history confirms that the air bag must be allowed to break through the front cover at the break seam, Delphi is correct. However, that concept is already embodied in the language of the claim. Claim 1 recites that the break seam is defined in the inner surface of the front cover "for permitting the air bag to inflate and exit the front cover." The specification is consistent with the claim language. See '026 patent, col. 3, II. 14-19 (the break seams "are of reduced thickness, to permit the air bag, as it is inflating, to exert a force" on the front panel and cause it to tear); id., col. 4, II. 19-25 (the break seam is "necessarily designed to allow inflation and exit of air bag 62 from the air bag cover 50"). It would therefore be redundant to force the concept of sufficiency into the term "break seam" when the concept is already present in the claim. See Renishaw, 158 F.3d at 1248 ("the claim construction inquiry . . . begins and ends in all cases with the actual words of the claim").

Because claim 1 expressly provides that the break seam is "defined in said inner surface of said front cover for permitting the air bag to inflate and exit the front cover," there is no need to further interpret "break seam" to include either its location or function. The jury will be told that "break seam" means:

A weakened linear area.

### 2. "Defining" and "Defined"

Claim 1 requires:

a front cover adapted to enclose an uninflated automotive air bag, the front cover having inner and outer surfaces defining a first thickness therebetween; and

a break seam defined in said inner surface of said front cover for permitting the air bag to inflate and exit the front cover, said break seam further defining a break pattern and having a first convex wall, a second

30

convex wall and a substantially planar break wall connecting said first and
second walls and having a width of at least 0.3 millimeters, said break wall
having inner and outer surfaces <u>defining</u> a second thickness
therebetween, wherein said second thickness is less than said first
thickness, said break pattern being visually imperceptible when viewing
from the front cover outer surface.

The underlined terms "defining" and "defined" require interpretation.

The parties propose the following interpretations:

| Disputed Claim Term | PHC's Interpretation | Delphi's Interpretation | Special Master's Recommendation |
|---|---|---|---|
| defining | having or determining | having boundaries which are located at | determining |
| defined | located | fixing the location of | located |

Again, the parties submit different dictionary definitions of "define," which must

be reconciled by reference to the specification.  PHC cites "to determine the essential

qualities of" for "define" and "clearly outlined, characterized, or delimited" for "defined."

<u>See</u> Webster's Third 592.  Delphi cites "to determine or fix the boundaries or extent of"

and "to make clear the outline or form of."  <u>See</u> Random House 523.

The Special Master correctly recognized that while both terms come from the

root "define," claim 1's "use of 'defined' has a locational connotation, that is, specifying

where the break seam is located, while the claim's use of 'defining' has a determining or

having boundaries connotation."  The specification reflects the locational connotation of

the term "defined."  <u>See</u> '026 patent, Abstract ("a decorative indicia defined on the outer

surface of the front cover"); <u>id</u>., col. 2, ll. 17-18 ("[a] break seam is further defined in the

front cover inner surface"); <u>id</u>., col. 2, ll. 19-20 ("[t]he break seam includes a first wall, a

second wall and a break wall defined therebetween").  The specification also reflects

31

the determining connotation of the term "defining." See id., col. 4, ll. 47-49 ("the break

wall 68 has an inner surface 75 and an outer surface 77 defining a uniform thickness").

Hence, the Special Master's recommendations that "defined" means "located" and

"defining" means "determining" are clearly supported by the specification.

Delphi says that its interpretations properly limit claim 1 to break seams that are

exclusively located in the inner surface, while PHC's interpretations might be read to

encompass break seams that are located in part on the inner surface and in part on the

outer surface. Delphi is correct that the "break seam" that is claimed in claim 1 must be

"defined" in the inner surface of the front cover–it is a weakened linear area that must

be "located" in the inner surface, **not** the outer surface. PHC's argument that a

"portion" of the "break seam" of claim 1 may be located in the outer surface is therefore

incorrect. Importantly, though, the terms "defining" and "defined" have nothing to do

with other parts of the air bag cover (including decorative indicia) that appear on the

outer surface. For an air bag cover to infringe claim 1, it must have as an element a

weakened linear area "located" in the inner surface of the cover. No additional

interpretation is needed.

Moreover, Delphi's proffered interpretations do not make sense when read in

conjunction with the surrounding claim language. For instance, if Delphi's interpretation

of "defined" were used, claim 1 would read: "a break seam fixing the location of said

inner surface." If Delphi's interpretation of "defining" were used, claim 1 would read:

"the front cover having inner and outer surfaces having boundaries which are located at

a first thickness therebetween." By contrast, the Special Master's recommended

interpretations can be inserted directly into the claim in place of "defined" and "defining."

32

The jury will be told that "defining" means:

Determining.

The jury will be told that "defined" means:

Located.

### 3. "Break Pattern"

Claim 1 requires a "break seam further defining a break pattern, . . . said break pattern being visually imperceptible when viewing from the front cover outer surface."

PHC says that "break pattern" means the "shape of the tear in the airbag cover at the break seam to be caused by the airbag exiting the cover during deployment." Delphi says that "break pattern" means "the outline of where the air bag cover tears on deployment of the air bag." The Special Master recommends that "break pattern" be interpreted to mean "the shape of the tear formed by the break seam in the front cover caused by the deployment of the air bag."

At first glance, the parties' interpretations seem very similar and really differ only in that PHC uses the term "shape" while Delphi uses "outline." Once again, the parties submit different dictionary definitions of the term "pattern" as evidence of ordinary meaning. PHC cites "an arrangement of form; disposition of parts or elements; design." See Webster's New World 1056. Delphi cites "a design or figure corresponding in outline to an object that is to be fabricated, and serving as a guide for determining its shape and dimensions." See The New Webster Encyclopedic Dictionary of the English Language 609 (1971).

The specification must be consulted to determine whether the break pattern is a "shape" or an "outline:"

33

Both embodiments of the present invention, air bag cover 10 illustrated in FIG. 1 and air bag cover 50 illustrated in FIG. 5 include a **break seam which is visually imperceptible** from the exposed outer surfaces of their respective front covers, 12 and 52 respectively. As shown in FIGS. 4, 6 and 7, the break seam constructed in accordance with the present invention provides an outer surface 56 of the front cover which is undisturbed by the inclusion of annular walls 70 and 72, and break wall 68. From the exterior, exposed side of the air bag cover outer surface 56, **break seam 60 is visually imperceptible** as shown by phantom lines 80, 82 and 84 in FIG. 4.

The air bag cover of the present invention therefor provides a cover which does not require any additional parts or cover-up decorating pieces to afford a clean, aesthetically pleasing outer surface. **The common, visually noticeable "U" or "H" shaped designs of the prior art are avoided with the present invention.** As such, entirely aesthetic front cover designs can be provided on air bag covers which are unrelated and unaffected by the presence of the break seam 60.

'026 patent, col. 4, l. 51-col. 5, l. 4 (emphasis added). Thus, the specification

contemplates (and the parties seem to agree) that the break seam is a physical

structure, while the break pattern is more abstract: the break seam is a weakened linear

area in the inner surface of the front cover where the air bag cover tears, while the

break pattern is a "shaped design" of that area, such as a "U" or "H" or "i"–not an

"outline." Because the break seam that tears also "defines," or "determines," the break

pattern, the break pattern is the "shape" of that tear.

Again, though, the real dispute between the parties goes beyond the actual

words "shape" and "outline" to how each side thinks the other's interpretation might be

used at the infringement stage. Here, the parties are really interpreting the entire

phrase "said break pattern being visually imperceptible when viewing from the front

cover outer surface"[13] and disputing the relationship between the inner surface break

---

[13]Only "break pattern" has been identified for interpretation. The "visually imperceptible when viewing from the front cover outer surface" limitation has not been

34

seam and things that appear on the outer surface of the front cover like decorative

indicia. Delphi says that because "break seam" and "break pattern" are separate

limitations, the break pattern can be visible even when the inner surface break seam is

not. Thus, Delphi apparently thinks that "outline" could be read to encompass lines that

are drawn on the outer surface of the front cover.[14]  PHC, by contrast, says that

highlighting the break seam location on the outside would not render the break pattern

visually perceptible.

PHC is correct. Despite being separate limitations, claim 1 clearly requires a

connection between the break seam and the break pattern—the break seam "defines,"

or "determines," the break pattern. Therefore, the two concepts cannot be completely

divorced as Delphi suggests. Lines drawn on the outer surface are not defined by the

break seam on the inner surface; they are independent. The '026 patent clearly

contemplates "decorative indicia" or "contour lines" on the outer surface of the front

cover that are not defined by the break seam in the inner surface:

> For example, in FIGS. 4 and 8, the air bag cover 50 includes a decorative
> indicia or contour line 90. Contour line 90 is an extending groove which is
> molded into the air bag cover in the manufacturing process. Conventional
> air bag covers include different kinds of indicia including grooves,
> extending ribs and decorative appliques. Contour line 90 is substantially
> non-coincidental with the hidden break seam lines 80, 82 and 84. **As**

---

identified.  Therefore, while the term "break pattern" must be read in light of the
surrounding claim language, the "visually imperceptible" limitation must not be read into
the interpretation of "break pattern."  To the extent the parties argue over how much of
the break pattern must be "visually imperceptible," that is a question of infringement, not
claim interpretation.  See Suntiger, Inc. v. Scientific Research Funding Group, 189 F.3d
1327, 1335-36 (Fed. Cir. 1999).

[14]Presumably, such an interpretation would allow Delphi to escape infringement
by using decorative indicia lines that completely overlap the inner surface break seam
because the decorative indicia would not be "visually imperceptible."

**shown in FIG. 4, the contour line 90 intersects with the break seams
at points 81, 83, and 85 but does not form any substantial part of the
break seam. Similarly, the break seams 80, 82 and 84 do not form
any part of the contour line on outer surface 56. The visual aspects
of the contour line 90 are completely unaffected by the break seams
80, 82 and 84.**

Id., col. 5, ll. 5-18 (emphasis added). Therefore, the break pattern is not an "outline" but

rather the shape of the tear that is defined by the break seam.

The Special Master's recommended interpretation of "break pattern" is correct.

The jury will be told that "break pattern" means:

The shape of the tear formed by the break seam in the front cover caused
by the deployment of the air bag.

### 4. "First Convex Wall" and "Second Convex Wall"

Claim 1 recites that the break seam has "a first convex wall, a second convex

wall and a substantially planar break wall connecting said first and second walls and

having a width of at least 0.3 millimeters."

PHC says that the terms mean a "first/second surface of the break seam that

includes an outwardly curved shape." Delphi says that the terms mean a "first/second

continuous surface of the break seam which is outwardly curved like a circle or sphere."

The Special Master recommends that the terms be interpreted to mean a "first/second

surface of the break seam that is outwardly curved."

The dictionary definitions of "convex" offered by the parties are similar, see

Webster's Third 499 ("curved line viewed from without"); Random House 444 ("having a

surface that is curved or rounded outward"), and the parties agree that the "first/second

convex wall" is a "surface of the break seam." Delphi also offers the following definition

of "wall:" "any of various permanent upright constructions having a length much greater

36

than the thickness and presenting a **continuous** surface except where pierced by

doors, windows, etc." See Random House 2139 (emphasis added). PHC points to

another definition in the same dictionary: "the outermost film or layer of structural

material protecting, surrounding, and defining the physical limits of an object: the wall of

a blood cell." See id.

The essential dispute is whether the first and second convex walls must be

"continuous"[15] and "like a circle or sphere."

The relevant portion of the specification merely describes the two walls as

"convex," not "continuous" or "like a circle or sphere:"

> Referring to FIG. 7, the break seam 60 includes, in the preferred
> embodiment, a first wall 64 and a second wall 66. A break wall 68
> extends between the first wall 64 and the second wall 66, a distance of at
> least 0.3 millimeters. The **first and second walls 64 and 66 are each
> convex in shape** and are disposed in a symmetrical, facing relationship
> with respect to the break wall 68.

> More specifically, **the first wall has a convex portion 70 that
> extends from the inner surface 54 of the front cover 52 to the side 71
> of the break wall 68**. The convex portion 70 is defined in cross section
> by a curve having a radius in a range from 4.0 to 11.0 millimeters. The
> preferred range for the radius of the convex portion 70 is between 6.0 and
> 9.0 millimeters.

> Similarly, **the second wall 66 has a convex portion 72 that
> extends from the inner surface 54 of the front cover 52 to the side 73
> of the break wall 68**. The convex portion 72 is defined in cross section
> by a curve having a radius in a range from 4.0 to 11.0 millimeters. The
> preferred range for the radius of the convex portion 72 is between 6.0 and
> 9.0 millimeters. Additionally, the break wall 68 has an inner surface 75
> and an outer surface 77 defining a uniform thickness in a range from 0.2
> to 0.9 millimeters, with the preferred thickness being 0.5 millimeters.

---

[15]According to PHC, Delphi is arguing for a "continuous" limitation so that air bag
covers with "energy dissipating ribs molded across the break seam" will not infringe.

'026 patent, col. 4, ll. 34-50 (emphasis added). Figure 7 shows a first wall 64 with a

convex portion 70 that extends all the way from the inner surface 54 to the left side 71

of the break wall 68. The convex portion 70 is defined by a curve with a uniform radius

and is uninterrupted from beginning to end.

Simply because the preferred embodiment of a convex wall is "continuous" and

"like a circle or sphere," however, does not mean that the claim should automatically be

limited to such a structure. The ordinary meaning of "convex" is "outwardly curved."

Certainly, a curve may have a uniform radius (like a circle) or it may bend from one end

to the other (like a French curve or the side of a heart). Delphi has not pointed to

anything in the specification to rebut the ordinary meaning and suggest that "convex

wall" should be limited to curves of uniform radius. Indeed, while claim 1 does not

expressly require a uniform radius for the convex walls, claim 6 requires "first and

second walls . . . characterized in cross section by a curved surface having a central

radius in a range from 4.0 to 11.0 millimeters." Likewise, there is nothing in the

specification limiting the convex walls to "continuous" walls.

Next, the prosecution history also does not demonstrate a clear intent to limit

"convex wall" to a "continuous" surface that is curved "like a circle or sphere." After

claim 1 was rejected for the second time based on the Pack, Jr. reference, see supra

Part IV.B.1, n.11, the applicant submitted a declaration discussing various prior art air

bag covers. The applicant stated that "[n]one of the known prior art disclose a hidden

tear seam having shape and dimensions sufficient to realize the design objective of the

present invention." Delphi says that the applicant thereby distinguished and disclaimed

walls that are convex near the inner surface and linear near the break wall, as shown in

38

the following figures (convex portion circled):



| US 5,342,086, Fig. 6 (relevant portion) | US 5,125,683, Fig. 1 (relevant portion) | US 5,186,490, Fig. 2 (relevant portion) |

However, as the Special Master correctly recognized, the applicant generally distinguished the "shape" and "dimensions" of the prior art break seams; he did not expressly distinguish the invention on the basis that the convex walls were "continuous" or "like a circle or sphere." Consequently, the prosecution history does not overcome the ordinary meaning of the term.

The ordinary meaning of "first/second convex wall" applies.[16] The jury will be told that "first convex wall" means:

Outwardly curved first surface of the break seam.

---

[16]At the Markman hearing, Delphi correctly pointed out that the Special Master rejected PHC's interpretation of a surface "that includes an outwardly curved shape" in favor of a surface "that is outwardly curved." Indeed, the Special Master correctly found that the "express language of Claim 1 describes the 'first wall' and 'second wall' as being 'convex' and nothing more." The claim language is simple and clearly states that the wall is "convex." It does not say that the wall "includes" a convex shape or that the wall "includes" a convex portion or that the wall is "substantially" convex. To read the claim as PHC suggests would require ignoring the ordinary meaning of "convex wall" in favor of the specification. There is no indication in the specification that the patentee intended to deviate from the ordinary meaning of the term: a "convex wall" is simply an "outwardly curved" wall. There is no need to interpret the claim further.

39

The jury will be told that "second convex wall" means:

Outwardly curved second surface of the break seam.

### 5. "Break Wall"

Claim 1 recites that the break seam has "a first convex wall, a second convex wall and a substantially planar break wall connecting said first and second walls and having a width of at least 0.3 millimeters."

PHC says that "break wall" means a "structure of reduced thickness of the airbag cover that tears to allow the inflating airbag to exit through the cover during deployment." Delphi says that the term means "a continuous surface between the first and second convex walls of the break seam which will split when the air bag deploys." The Special Master recommends that "break wall" be interpreted to mean "a surface of the break seam that tears when the air bag deploys."

The basic dispute is whether the break wall is a "structure of reduced thickness" or a "continuous" surface. Like "first/second convex wall," the parties agree that the break wall is a surface of the break seam. The relevant portions of the specification read:

> Referring to FIG. 7, the break seam 60 includes, in the preferred embodiment, a first wall 64 and a second wall 66. A break wall 68 extends between the first wall 64 and the second wall 66, a distance of at least 0.3 millimeters. . . .

> . . . [T]he break wall 68 has an inner surface 75 and an outer surface 77 defining a uniform thickness in a range from 0.2 to 0.9 millimeters, with the preferred thickness being 0.5 millimeters.

'026 patent, col. 4, ll. 26-50. As shown in Figure 7, the break seam of the preferred embodiment is of reduced thickness in comparison to the rest of the front cover and

40

continuous. See also id., col. 3, ll. 14-19 ("The break seams 24 and 26 are of reduced thickness, to permit the air bag, as it is inflating, to exert a force at the inner portion of the front panel 12 to cause the upper and lower portions 20 and 22 of the front panel 12 to separate from the side panels 16 along the break seams 24 and to separate from each other along the break seam 26."). However, like "first/second convex wall," there are no words of restriction in the specification limiting the invention to the preferred embodiment.

The Special Master's recommended interpretation of "break wall" is correct. There is no need to specify the location or thickness of the break wall because claim 1 already provides that the break wall "connect[s] said first and second [convex] walls and ha[s] a width of at least 0.3 millimeters." The jury will be told that "break wall" means:

A surface of the break seam that tears when the air bag deploys.

## V. The '031 Patent: The Horn Switch Patent

### A. The '031 Patent Generally

The ABSTRACT describes the invention of the '031 patent as follows:

An automotive air bag cover including a horn switch device incorporated therein, is provided. The air bag cover includes substantially rigid front and side panels which are adapted to enclose an uninflated automotive air bag. The front panel has inner and outer surfaces and is connected to the side panels at seams to permit the inflating air bag to leave the cover as the inflating air bag exerts a force at the inner surface of the front panel sufficient to cause the front panel to separate from the side panels along the seams. The horn switch device includes a flexible, manually operable diaphragm at the outer surface of the front panel. The diaphragm has a first electrically conductive inner surface for making a circuit with a corresponding second electrically conductive inner surface of the front panel upon manual actuation of the diaphragm.

41

Figures 1 and 2 illustrate the invention:



Fig. I

Fig. 2

The BACKGROUND ART generally describes the advance in the art as follows:

Presently, when air bags are provided in automotive vehicles the air bag is stored in the steering column of the vehicle behind an air bag cover. During automatic inflation of the air bag, the air bag cover moves away from the steering column to permit the air bag to perform its safety function between the steering column and the operator of the vehicle.

Any manually operable horn switch or switches are typically also located on the steering wheel column on opposite sides of the air bag cover. However, these switches typically are rather small and oftentimes inaccessible for drivers who have large hands or for drivers who have limited manual dexterity.

Claim 6 of the '031 patent (broken down into appropriate clauses) reads:

6. An automotive air bag cover comprising:

plastic front and side panels adapted to enclose an uninflated automotive air bag, the front panel having inner and outer surfaces and being interconnected to the side panels at seams which permit the inflating air bag to leave the cover;

a plate fixedly secured to the inner surface of the front panel to form a hollow compartment with the front panel; and

a switch device <u>disposed in</u> the hollow compartment and including a first electrically conductive surface for making a circuit path with a corresponding second electrically conductive surface upon manual actuation of a portion of the front panel at its outer surface thereof and wherein, upon separation from the, side panels, the front panel including the hollow compartment, the switch device and the plate move together to permit the inflating bag to leave the cover, wherein the front panel includes a <u>flexible diaphragm</u> at the outer surface of the front panel for manual operation of the switch device.

The underlined words require interpretation by the Court. The two terms in claim 6 to

be construed are:

(1) "disposed in," and

43

(2) "flexible diaphragm."

## B. Analysis

### 1. Prosecution History of the '031 Patent

A brief review of the prosecution history of the '031 patent is necessary before addressing the parties' arguments.

While the '485 "snap-on" patent and the '026 "tear seam" patent both derived from the same original application, the '031 patent came from an entirely separate application, which ultimately issued as U.S. Patent No. 5,062,661 (the '661 patent).[17] The '031 patent is a reissue of the '661 patent.

The '661 patent had one independent claim for an air bag cover comprising, among other things, "a horn switch device including a flexible manually operable diaphragm at the outer surface of the front panel." The inventor sought a reissue of the '661 patent on the basis that his invention was broader than what was originally claimed. He added new independent claim 6 and new dependent claims 7-12 to the reissue application. The new claim 7 was directed to the air bag cover of claim 6 "wherein the front panel includes a flexible diaphragm at the outer surface of the front panel for manual operation of the switch device." The examiner rejected claim 6 under 35 U.S.C. § 102(b) as anticipated by U.S. Patent No. 4,934,735 to Embach but stated that claim 7 would be allowable if rewritten in independent form. The inventor then added the "flexible diaphragm" limitation to claim 6 and the claim was allowed.

---

[17]The prosecution histories of the '485 patent and the '026 patent are therefore irrelevant to the interpretation of claims in the '031 patent. See Abbott Labs. v. Dey, L.P., 287 F.3d 1097, 1105 (Fed. Cir. 2002).

44

## 2. "Disposed In"

Claim 6 requires "a plate fixedly secured to the inner surface of the front panel to form a hollow compartment with the front panel; and a switch device disposed in the hollow compartment."

PHC says that "disposed in" means "located in." Delphi says that the phrase means "locationally forming." The Special Master recommends that "disposed in" be interpreted to mean "located in."

Beginning with the language of the claim itself, claim 6 clearly recites that the plate is fixedly secured to the inner surface of the front panel to thereby "form" a hollow compartment. Claim 6 then states that the switch device is "disposed in" that hollow compartment. Thus, as the Special Master correctly recognized, the hollow compartment is formed between the plate and the front panel, not between the switch device and the front panel. Requiring that the switch device "locationally form" the hollow compartment as Delphi suggests would change the relationship of the elements and cause the hollow compartment to be "formed" twice in the claim.

Next, the only evidence of ordinary meaning is a dictionary definition proffered by PHC. See Webster's Third 654 (defining "dispose" as "to assign to a particular place or position"). PHC is correct that the phrase "disposed in" ordinarily connotes location.

The specification does not clearly show an intent to deviate from the ordinary meaning of the phrase. The specification does not use the phrase "disposed in" but does use the phrase "disposed between" in a location sense. '031 patent, col. 2, l. 68-col.3, l. 2 ("[a] pair of spaced, elongated foam-insulators 42 are **disposed between** the plate 36 and the conductive tape 34"). Other claims also use the phrases in a similar

45

manner.  See id., claim 5 ("at least one insulator **disposed in** the hollow

compartment"); id., claim 9 ("at least one insulator **disposed between** the first and

second electrically conductive inner surfaces"); id., claim 11 ("switch device **disposed**

**in** the hollow compartment").

Delphi says that the ordinary meaning of "disposed in" does not apply because it

is inconsistent with the single embodiment disclosed in the specification.  Delphi points

to the following language: "The plate 36, the diaphragm 32 and the electrically

conductive aluminum tape 34 define a hollow compartment 40 within the front panel

30."  Id., col. 2, ll. 66-68.  While it is true that in the preferred embodiment of the

invention the switch device itself forms part of the hollow compartment, the specification

does not contain any language restricting the invention to such embodiments.

Consequently, it would be improper to read in a limitation that the switch device "form"

the hollow compartment with the front panel.

Delphi also says that if "disposed in" means "located in," claim 6 would

improperly read on removable "membrane switches," which it says are "very thin, self-

contained switches that are separate from the rear panels and inner surfaces" of air bag

covers.  According to Delphi, this would render claim 6 invalid under the written

description and enablement requirements of 35 U.S.C. § 112 because there is no

description of "membrane switches" in the specification.  Claim interpretation and claim

validity are separate issues, however.  See Liebel-Flarsheim Co. v. Medrad, Inc., 358

F.3d 898, 911 (Fed. Cir. 2004) ("unless the court concludes, after applying all the

available tools of claim construction, that the claim is still ambiguous, the axiom

regarding the construction to preserve the validity of the claim does not apply").  The

46

term "disposed in" can be interpreted by reference to the surrounding claim language, a dictionary definition, and the specification; there is no need to address the parties' validity arguments.  Further, the term "switch device" has not been identified for interpretation.

Finally, the prosecution history of the '031 patent does not overcome ordinary meaning.  Delphi says that the applicant disclaimed "membrane switches" during prosecution, but the only statement it can point to is a statement from the unrelated Application No. 08/248,556 (the '556 application).  The '556 application derived from the parent of the '485 and '026 patents and is completely separate from the prosecution that led to the '661 and '031 patents.  Hence, the applicant's statement in the '556 application distinguishing the invention of the '661 patent cannot affect the interpretation of terms in the '661 patent or the broadening reissue of the '031 patent. Further, the statement is not a clear disavowal of claim scope as it does not specifically relate to the meaning of "disposed in."

The Special Master's recommended interpretation of "disposed in" is correct. The jury will be told that "disposed in" means:

Located in.

### 3. "Flexible Diaphragm"

Claim 6 recites that the "front panel includes a flexible diaphragm at the outer surface of the front panel for manual operation of the switch device."

PHC says that "flexible diaphragm" means a "pliable element included in the airbag cover's front panel that the vehicle occupant presses/flexes to actuate the horn." Delphi says that the phrase means a "thinned, pliable structural element included in the

47

air bag cover's front panel that the vehicle occupant presses/flexes to actuate the horn located in." The Special Master recommends that "flexible diaphragm" be interpreted to mean a "pliable element included in the airbag cover's front panel that the vehicle occupant presses/flexes to actuate the horn."

The parties agree that the term "flexible" means "capable of flexing" or "pliable" but submit different dictionary definitions for "diaphragm." PHC cites the following definition: "[a] membranous part that separates or divides." See Webster's II New Riverside 373. Delphi cites "a dividing membrane or thin partition especially in a tube." See Merriam-Webster Online Dictionary (2004), available at Merriam-Webster Online <http://www.m-w.com>. Delphi further cites the definition of "membrane" as "a thin soft pliable sheet or layer." See Webster's Third 1408. Delphi says that a "membrane" is therefore "thin" by definition.

At the Markman hearing, the parties agreed that the proper interpretation of "flexible diaphragm" is "pliable membrane." There is no need to further define the term for a jury to understand it, especially because there is nothing in the intrinsic record to indicate that the flexible diaphragm must be "thinned" in relation to some other structure:

> The air bag cover 10 includes a horn switch device, generally indicated at 30, which extends substantially the entire width of the front panel 12 between the side panels 16. The horn switch device 30 includes a **flexible manually operable diaphragm 32** preferably integrally formed with the rest of the front panel 12 and the side panels 14, 16 and 18 from plastic (preferably TPO). The diaphragm 32 has a convex shape at the outer surface 20 of the front panel 12.

48

'031 patent, col. 2, ll. 40-48 (emphasis added).[18]  It would also be redundant to specify

the location or function of the flexible diaphragm because the claim already states that

the flexible diaphragm is "at the outer surface of the front panel for manual operation of

the switch device."

The jury will be told that "flexible diaphragm" means:

Pliable membrane.

### VI. Conclusion

This is a tentative decision.[19]  Experience in patent cases shows that subsequent

proceedings and particularly trial may reveal aspects of claim interpretation not

apparent at this point of the case in the papers.

---

[18]In the preferred embodiment shown in Figure 2, the plastic of the flexible diaphragm 32 is visibly thinner than the plastic of the front panel 12. However, there is nothing in the specification requiring that every embodiment be thinned. Indeed, the flexible diaphragm does not even need to be "integrally formed" of the same material as the front panel; this implies that it can be comparatively thicker or thinner. See '031 patent, col. 2, ll. 44-45 ("preferably integrally formed"); id., claim 7 (claiming the air bag cover of claim 6 "wherein the diaphragm is integrally formed with the front panel").

[19]The Court recognizes that the rules of claim interpretation may change with the forthcoming en banc decision from the Federal Circuit in Phillips v. AWH Corp., No. 03-1269, 2004 WL 1627271 (Fed. Cir. July 21, 2004). However, there is no need to delay interpreting the claims in this case because, as always, a Markman decision is tentative. If after the Federal Circuit issues its decision in Phillips either party believes the Court's claim interpretations are incorrect, it may move to reconsider this order.

49

**A.**

The disputed terms in claim 11 of the '485 patent are interpreted as follows:

| Claim Term | Claim Interpretation |
|---|---|
| homogenous thermoplastic molded body | body molded throughout of plastic material or materials which can be repeatedly softened by heating and hardened again on cooling |
| cover | the thing that is placed over or about the container for the air bag |
| panel | a particular surface of the air bag cover |
| segment | part |
| connector | a feature that connects |
| groove | a narrow channel |
| receive | accept or take in |
| engage | secure in place by snapping on |
| engagement member | a feature of the air bag cover connector |
| engagement | securing in place by snapping on |

**B.**

The disputed terms in claim 1 of the '026 patent are interpreted as follows:

| Claim Term | Claim Interpretation |
|---|---|
| break seam | a weakened linear area |
| defining | determining |
| defined | located |
| break pattern | the shape of the tear formed by the break seam in the front cover caused by the deployment of the air bag |
| first convex wall | outwardly curved first surface of the break seam |
| second convex wall | outwardly curved second surface of the break seam |
| break wall | a surface of the break seam that tears when the air bag deploys |

50

## C.

The disputed terms in claim 6 of the '031 patent are interpreted as follows:

| Claim Term | Claim Interpretation |
|---|---|
| disposed in | located in |
| flexible diaphragm | pliable membrane |

SO ORDERED.

Dated:    **AUG 0 6 2004**

Detroit, Michigan

AVERN COHN
UNITED STATES DISTRICT JUDGE

A TRUE COPY
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
BY
DEPUTY CLERK

51

## EXHIBIT A: CLAIM 11 OF THE '485 PATENT

| | Disputed Claim Term | PHC's Interpretation | Delphi's Interpretation | Special Master's Recommendation | Court's Interpretation |
|---|---|---|---|---|---|
| 1 | connector | a feature of the airbag cover that connects the cover to an airbag container | a structural feature formed with a transverse panel which connects the cover to the air bag container | a feature that connects | a feature that connects |
| 2 | groove | feature of the airbag cover so shaped in cross sectional construction to receive and engage the rim of the airbag container | a long, narrow channel or furrow | a narrow channel | a narrow channel |
| 3 | receive | take or accept | to hold, bear or contain | accept or take in | accept or take in |
| 4 | engage | contact for the purpose of connecting | to attach or secure | attach or secure | secure in place by snapping on |
| 5 | engagement member | part of the cover that guides the container rim to the groove | a structure feature of an air bag cover connector that guides the connector rim into the groove | a feature of the air bag cover connector | a feature of the air bag cover connector |
| 6 | engagement | contact for the purpose of connecting | attachment | attachment | securing in place by snapping on |

**EXHIBIT B: CLAIM 1 OF THE '026 PATENT**

| | Disputed Claim Term | PHC's Interpretation | Delphi's Interpretation | Special Master's Recommendation | Court's Interpretation |
|---|---|---|---|---|---|
| 1 | break seam | selected weakened zone of the airbag cover that tears to allow the inflating airbag to exit through the cover during deployment | a linear indentation in the air bag cover which is sufficient to ensure tearing and separation of the air bag cover on deployment of the air bag | a weakened linear area | a weakened linear area |
| 2 | defining | having or determining | having boundaries which are located at | determining | determining |
| 3 | defined | located | fixing the location of | located | located |
| 4 | break pattern | shape of the tear in the airbag cover at the break seam to be caused by the airbag exiting the cover during deployment | the outline of where the air bag cover tears on deployment of the air bag | the shape of the tear formed by the break seam in the front cover caused by the deployment of the air bag | the shape of the tear formed by the break seam in the front cover caused by the deployment of the air bag |
| 5 | first convex wall | first surface of the break seam that includes an outwardly curved shape | a first continuous surface of the break seam which is outwardly curved like a circle or sphere | first surface of the break seam that is outwardly curved | outwardly curved first surface of the break seam |

| | | | | |
|---|---|---|---|---|
| 6 | second convex wall | second surface of the break seam that includes an outwardly curved shape | a second continuous surface of the break seam which is outwardly curved like a circle or sphere | second surface of the break seam that is outwardly curved | outwardly curved second surface of the break seam |
| 7 | break wall | structure of reduced thickness of the airbag cover that tears to allow the inflating airbag to exit through the cover during deployment | a continuous surface between the first and second convex walls of the break seam which will split when the air bag deploys | a surface of the break seam that tears when the air bag deploys | a surface of the break seam that tears when the air bag deploys |

## EXHIBIT C: CLAIM 6 OF THE '031 PATENT

| | Disputed Claim Term | PHC's Interpretation | Delphi's Interpretation | Special Master's Recommendation | Court's Interpretation |
|---|---|---|---|---|---|
| 1 | disposed in | located in | locationally forming | located in | located in |
| 2 | flexible diaphragm | pliable element included in the airbag cover's front panel that the vehicle occupant presses/flexes to actuate the horn | thinned, pliable structural element included in the air bag cover's front panel that the vehicle occupant presses/flexes to actuate the horn | pliable element included in the airbag cover's front panel that the vehicle occupant presses/flexes to actuate the horn | pliable membrane |

EXHIBIT B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**FILED**

NOV 19 2003

CL.
U. S.                     ICE
EASTERN MICHIGAN COURT

PATENT HOLDING COMPANY,

Plaintiff,

v.

DELPHI AUTOMOTIVE SYSTEMS
CORPORATION,

Defendant.

_____/

Case No. 99-76013

HONORABLE AVERN COHN

## ORDER GRANTING SUMMARY JUDGMENT OF NON-LIABILITY FOR ACTS OF PATENT INFRINGEMENT COMMITTED BY GENERAL MOTORS CORPORATION PRIOR TO JANUARY 1, 1999

For reasons stated on the record on October 21, 2003, and for the additional

reasons that follow, Defendant's motion for summary judgment of non-liability for acts of

patent infringement committed by General Motors Corporation prior to January 1, 1999

is GRANTED. The additional reasons are:

1. Defendant did not conduct any business as a separate corporation prior to
   January 1, 1999.

2. Any manufacture, use and/or sale of accused air bag covers prior to January 1,
   1999, was done by General Motors Corporation or a third party vendor and not
   by defendant.

3. Pursuant to the agreement which transferred the assets of the Delphi Automotive
   Systems Division of General Motors Corporation to defendant, General Motors
   Corporation retained liability for patent infringement prior to January 1, 1999.

4.    Defendant did not assume liability for General Motors Corporation's infringing

acts prior to January 1, 1999.

SO ORDERED.

**AVERN COHN**
**UNITED STATES DISTRICT JUDGE**

DATED:    NOV 19 2003

Detroit, Michigan

A TRUE COPY
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

DEPUTY CLERK

2