ALSTON & BIRD LLP
Dennis J. Connolly (DC-9932)
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Telephone (404) 881-7000
Facsimile (404) 881-7777

Hearing Date:  January 12, 2007 at 10:00 a.m.
Objection Deadline: January 4, 2007 at 4:00 p.m.
Reply Deadline: January 10, 2007 at 4:00pm

*Counsel to Cadence Innovation LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                                                             :
**In re:**                                                   :   **Chapter 11**
                                                             :
   **DELPHI CORPORATION, *et. al.*,**            :   **Case No. 05-44481 (RDD)**
                                                             :
            **Debtors.**   :   **Jointly Administered**
-------------------------------------------------------------x

**OMNIBUS REPLY OF CADENCE INNOVATION LLC IN SUPPORT OF
ITS MOTION FOR RELIEF FROM THE AUTOMATIC STAY TO
PROCEED WITH ITS PATENT LITIGATION AGAINST THE DEBTORS
AND APPLICATION PURSUANT TO 11 U.S.C. § 503 FOR ALLOWANCE
<u>AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM</u>**

Cadence Innovation LLC ("Cadence"), as successor in interest to Patent Holding Company ("PHC"), hereby submits this Omnibus Reply (the "Reply"): (i) in Support of Cadence's (A)  Motion for Relief from the Automatic Stay to Proceed with Its Patent Litigation Against the Debtors (the "Motion"), and (B) Application Pursuant to 11 U.S.C. § 503 for Allowance and Payment of an Administrative Expense Claim (the "Application"); and (ii) in Opposition to Debtors' (A) Objection to Cadence Innovation LLC's Motion for Relief from the Automatic Stay to Proceed with Patent Litigation Against Debtors, and (B) Response to Cadence Innovation LLC's Application Pursuant to 11 U.S.C. § 503 for Allowance and Payment of Administrative Expense Claim (the "Objection").

## I.    PRELIMINARY STATEMENT

1.    Cadence seeks relief from the automatic stay so that it may continue the prepetition patent infringement action (the "Action") against Delphi Automotive Systems Corp. ("Delphi") in the District Court for the Eastern District of Michigan, Southern Division (the "District Court") [Case No. 99-76013], to obtain a judgment and a determination as to whether the Debtors are actively infringing three of its patents (the "Patents"); not to "jump in front" of other creditors or to enforce its judgment.[1]  As described in greater detail below and in the Motion, there is cause to grant Cadence relief from the automatic stay because: (i) contrary to the Debtors' assertions, the automatic stay does not impose a permanent bar on a party's ability to continue litigation in another forum;[2] (ii) relief from the automatic stay will not prejudice the Debtors, their bankruptcy estates, or creditors; (iii) the balance of the equities establishes that relief from the automatic stay is proper; (iv) allowing the Action to proceed before the District Court prior to confirmation is in the parties' best interests; and (v) continuing the automatic stay would reward the Debtors' dilatory tactics.

2.    The Debtors' contention that relief from the automatic stay would somehow "open the flood gates" to other creditors seeking relief from the stay and would

---

[1]  In the Motion, Cadence is not seeking authority to enforce the judgment rendered by the District Court. Instead, Cadence will return to this Court to seek payment on account of that judgment.

[2]  The Debtors' present position is no different from the logic utilized by Goldilocks in her search for porridge and a comfortable place to sleep.  Had Cadence sought relief from the automatic stay during the early stages of the case, Debtors would have argued – as they argue in their Objection and argued in opposition to other creditors' motions for relief from the automatic stay – that relief from the automatic stay is improper because the automatic stay is intended to provide the Debtors with a "breathing spell" (the porridge is too hot).  The Debtors' earlier rationale was that the Debtors needed time to attempt to negotiate issues with its unions, retirees, and GM.  Now that "substantial progress" has been made, and a plan term sheet is now on the table, the Debtors contend that somehow Cadence has waited too long (the porridge is too cold) and that stay relief is now somehow inappropriate.  The Debtors apparently take the position that no time is "just right" for the adjudication of the Cadence Claims notwithstanding the Debtors' acknowledgement that the complex patent issues must be tried in a district court (the District Court) and notwithstanding the Debtors' continued postpetition violation of Cadence's intellectual property rights which continues with each production day.

create a chaotic and uncontrolled scramble for the Debtors' assets simply ignores the record and the procedural posture of these bankruptcy cases. Except with respect to a mere handful of unsecured creditors (nineteen in total), all other creditors are now bound by the Order Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, and 9014 Establishing (I) Dates for Hearings Regarding Objections to Claims and (II) Certain Notices and Procedures Governing Objections to Claims (the "Claims Procedures Order") [Docket No. 6089] and, as a result, are now subject to the ADR and adjudication procedures set forth therein. Thus, far from having to adjudicate some 16,000 claims in the context of individual stay relief and individual actions in other fora, Cadence is one of the few creditors that has actually sought relief from the automatic stay to seek redress of the Debtors' wrongs in an appropriate nonbankruptcy forum.[3] No mad scramble ensued prior to the Motion, and no such scramble will ensue upon granting Cadence the requested relief. Because allowing the Action to proceed will not severely burden the Debtors or their outside bankruptcy counsel, the balance of the equities clearly favors relief in this context and the Motion should be granted in its entirety.

3.    Furthermore, the relief sought in the Application – allowance of an as yet unliquidated administrative priority claim for all purposes – is proper at this time. In particular, without this Court's recognition that Cadence is entitled to an allowed, albeit unliquidated, claim against the Debtors' bankruptcy estates, Cadence will be unable to preserve the rights conferred by Section 1129 of the Bankruptcy Code. In addition,

---

[3] Although the Claims Procedure Order provided that nothing therein precluded the right of creditors to seek relief from the automatic stay, Claims Procedure Order ¶ 13, the Debtors will likely maintain that this Court should take into consideration a party's failure to object to or obtain an exemption from the Claims Procedures Order in determining whether the party is able to establish "cause" for relief from the automatic stay.

because Cadence's administrative priority claim arises out of the Debtors' intentional violation of Cadence's federally protected patent rights, the Debtors should be required to pay Cadence immediately upon liquidation of the Cadence Claims.

## II.     ARGUMENT IN SUPPORT

### A.     Cause Exists to Grant Relief from the Automatic Stay

4.     The automatic stay contained in Section 362 of the Bankruptcy Code is designed to give a "breathing spell" after the commencement of a bankruptcy case to shield debtors from attempts by creditors to obtain control over property so that the reorganization can proceed efficiently and unimpeded by uncoordinated proceedings in other areas.  See 11 U.S.C. § 362(a); Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs, Inc.), 922 F.2d 984, 989 (2d Cir. 1990).

5.     Contrary to the Debtors' present position, the automatic stay is not intended to provide a permanent shield against all litigation.  See, e.g., Greenwald v. Axelrod (In re Greenwald), 34 B.R. 954, 957-58 (Bankr. S.D.N.Y. 1983); In re Cinnabar 2000 Haircutters, Inc., 20 B.R. 575, 577 (Bankr. S.D.N.Y. 1982) ("the bankruptcy laws should not be a haven for contumacious conduct in violation of a party's judicially-determined tradename rights which will be diluted by a continuation of such conduct behind the shield of the automatic stay.")  As recognized by the court in Greenwald, the legislative history in respect of the automatic stay establishes that

> The stay is not permanent.  There is adequate provision for relief from the stay elsewhere in the section.  However, it is important that the trustee have an opportunity to inventory the debtor's position before proceeding with the administration of the case.  Undoubtedly the court will lift the stay for proceedings before specialized or nongovernmental tribunals to allow those proceedings to come to a conclusion.  Any party desiring to enforce an order in such a proceeding would thereafter have to come before the bankruptcy court to collect assets.  Nevertheless, it will often be

more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

Greenwald, 34 B.R. at 958 (quoting H.R. Rep. No. 95- 595 at 341 (1977), as reprinted in 1978 U.S.C.C.A.N. 5963, 6297; S. Rep. No. 95-989 at 50 (1978), as reprinted in 1978 U.S.C.C.A.N. 5787, 5836).   Similar to the contumacious conduct in Cinnabar 2000 Haircutters, the bankruptcy laws do not provide a haven for the Debtors' continued violation of Cadence's intellectual property rights.  Indeed, the Debtors seem to ignore their responsibilities under 28 U.S.C. § 959 in this respect and seek authority from this Court to continue to operate in violation of federal law.

6.     In these bankruptcy cases generally, and specifically in respect of the Action, the Debtors proposed two options: (i)  agree to their summary and facially insufficient claims resolution procedures or (ii) await the confirmation of the Debtors' bankruptcy cases and their independent determination as to when the Action may proceed.  The Debtors have agreed (and in their responsive papers have acknowledged) that the proposed claims objections and estimation procedures were simply inappropriate for the resolution of the complex patent claims at issue in the Action and have acknowledged the validity of Cadence's position with respect to this particular proposed set of procedures.  As a result, the procedures do not apply to any litigation in respect of any of the Cadence Claims for any purpose.  Despite this acknowledgment, the Debtors now seek to delay, for their own convenience, the adjudication of Action to some time after plan confirmation, without regard to Cadence's intellectual property rights.[4]

---

[4]  It should also be noted that, contrary to the Debtors' assertion in Paragraph 2 of the Objection, Cadence is not seeking to "jump ahead" of other creditors.  Instead, Cadence has merely sought relief from the automatic stay so that its litigation may proceed to judgment before the District Court.  The alleged

7.       Despite the Debtors' apparent assertion that no litigation should proceed
while they are in bankruptcy, relief from the automatic stay is proper "for cause."   11
U.S.C. § 362(d); see also Sonnax Industries, Inc. v. Tri Component Products Corp. (In re
Sonnax Industries, Inc.), 907 F.2d 1280, 1285 (2d Cir.1990) (adopting the twelve factor
test to determine whether there is "cause" for relief from the automatic stay.).   Similarly,
despite the Debtors' contention that Cadence must demonstrate "extraordinary cause" to
obtain relief from the automatic stay,[5] this contention is also misplaced.   First, Section
362(d) of the Bankruptcy Code simply does not require for "extraordinary" cause.   See
11 U.S.C. § 362(d) (authorizing relief from the stay for "cause.").   Second, Debtors'
reliance on In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y
1990) , is misplaced because the Court in Pioneer specifically concluded that:

> [m]anifestly, during the first four months in a Chapter 11 case in which the
> debtor is given the exclusive right to put together a plan pursuant to 11
> U.S.C. § 1121(b), an unsecured, unliquidated claimholder should not be
> permitted to pursue litigation against the debtor in another court unless
> extraordinary circumstances are shown.   The debtor in this case should
> have at least until August 20, 1990[,] before it loses the benefit of the
> automatic stay and is forced to litigate in two courts, especially if the only
> cause shown by the unsecured claimholder for lifting the stay, one month
> after the commencement of the Chapter 11 case, is judicial economy and
> administrative efficiency.

Id. at 48 (emphasis added).   Contrary to the facts in Pioneer, in this case, the Debtors
have been in bankruptcy for more than fourteen months, and seven of the twelve Sonnax

---

deleterious impact on other creditors is no different than the liquidation of any disputed claim in any
bankruptcy case.  Here, the Debtors protest too much in that unsecured prepetition claims (putting aside
any purported classification and treatment of those claims pursuant to the term sheet presently on the table)
total in the billions of dollars and the impact of the adjudication and liquidation of the Cadence claims will
not materially alter creditor distributions.  This is quite different from a bankruptcy case such as In re
Paragon Trade Brands, Inc., in which the adjudication of patent claims materially affected the outcome and
distributions to other creditors.  C.F. Lambert v. Weyerhaeuser Co. (Paragon Trade Brands, Inc.), 324 B.R.
829 (Bankr. N.D. Ga. 2005).
[5]   Objection ¶ 13 (quoting In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y
1990)).

factors, as opposed to two, support the relief sought in the Motion.  Third, Debtors'
reliance on In re Metro Transportation Co., 82 B.R. 351 (Bankr. E.D. Pa. 1988), and
Anderson v. Hoechst Celanese Corp. (In re U.S. Brass Corp.), 173 B.R. 1000 (Bankr.
E.D. Tex. 1994), is also misplaced.  For example, the court's holding in Metro
Transportation is readily distinguishable.  In that case, the movant presented no evidence
in support of its motion for relief from the automatic stay.  Metro Transportation, 82 B.R.
at 354.  Instead, "the Movant here seemed to consider it sufficient for him to carry the
day on his motion to argue vigorously that the Debtor was responsible for the liability
and that insurance coverage for the liability existed."  Id.  Furthermore, because the
movant failed to produce any evidence tending to establish that the balance of the
hardships favored relief from the automatic stay, the court concluded that relief from the
automatic stay was unwarranted.  Id. at 354.  Here, unlike the movant in Metro
Transportation, Cadence has demonstrated in the Motion and this Reply that relief from
the automatic stay for cause is proper.[6]

8.      In applying the Sonnax factors, as the Debtors acknowledge, "[o]nly those
factors relevant to a particular case need be considered, and the Court need not assign
them equal weight.  When applying these factors and considering whether to modify the
automatic stay, the Court should take into account the particular circumstances of the
case, and ascertain what is just to the claimants, the debtor and the estate."  In re Keene
Corp., 171 B.R. 180, 183 (Bankr. S.D.N.Y. 1994).

9.      In the Motion, Cadence set forth that seven of the twelve factors support
Cadence's request for relief from the automatic stay and that four of the factors were

---

[6]  The court's holding in U.S. Brass is also readily distinguishable because in that case the movant sought
relief from the automatic stay during the early stages of the debtor's reorganization efforts.  173 B.R. at
1006.

wholly inapplicable.[7]  In the Objection, the Debtors specifically recognize that two
factors support Cadence's request: (i) the District Court is a specialized tribunal or
(ii) judicial economy may be served by allowing the Action to proceed in the District
Court.  See Objection ¶ 27.[8]  Although the Debtors contend that four factors oppose the
relief sought in the Motion, as discussed in greater detail below, even if the Debtors'
arguments were substantive or supported by evidence – which they are not – the Debtors'
arguments fail to rebut Cadence's showing that cause exists to grant relief from the
automatic stay.

> (i)    *Granting the Motion Will Not Unnecessarily Interfere with the Debtors' Restructuring Efforts*

10.    The Debtors have not offered any proof to support their position that
granting relief to Cadence will negatively impact their efforts to reorganize or negatively
impact creditors.  In fact, the Debtors merely rely on the same argument that they have
raised in response to each and every request for relief from the automatic stay previously
filed in their bankruptcy cases; that relief "would distract the Debtors from these and
other critical challenges facing them and will thus cause significant prejudice to the
Debtors' estates."   Objection ¶ 17; see, e.g., Debtors' Objection to Motion of H.E.
Services Company for Relief from Automatic Stay [Docket No. 4108]; Debtors'
Objection to Motion of Nutech Plastics Engineering, Inc. for Relief from Automatic Stay,
[Docket No. 4559].   While Cadence recognizes and supports the Debtors' efforts to

---

[7]  Although one of the remaining five – whether the Debtors' insurer has accepted responsibility – is not supportive of the Motion, this factor does not preclude the relief requested therein because Cadence is merely seeking to liquidate its claim at this time.  Once the claim is liquidated, Cadence will seek to have the claim administered before this Court.  As noted above, the ultimate allowance of Cadence's prepetition claim will be dilutive of other creditors' recoveries; however, not to any material degree.  Moreover, the absence of insurance coverage for the claim has never been dispositive on the issue of stay relief.
[8]  In addition, the Debtors do not dispute that the Action would conclusively determine their liability for manufacturing infringing airbag covers.

reorganize and maximize the value of their estates, the simple fact that (i) the Debtors'
cases are complex, (ii) the Debtors are in the process of seeking approval of a plan
investment agreement or (iii) there are other so-called "critical" issues cannot – without
more – rebut Cadence's showing that cause exists to grant its request for relief from the
automatic stay.[9]

11.    First, the Debtors' purported need to focus on so-called "critical" issues is
without merit.  According to the Debtors' own pleadings, due to various negotiations first
with GM and their unions, and now with potential plan investors, their cases have been at
a critical stage since at least June 6, 2006, and, as a result, all of their efforts have been
and must be focused on resolving these issues.  See, e.g., Debtors' Objection to Motion of
H.E. Services Company for Relief from Automatic Stay [Docket No. 4108]; Debtors'
Objection to Motion of Nutech Plastics Engineering, Inc. for Relief from Automatic Stay,
filed July 14, 2006 [Docket No. 4559]; Objection ¶¶ 16-18.  Despite the presence of these
so-called "critical" issues and the need to obtain a resolution, the Debtors have not been
prevented from (i) moving forward with their bankruptcy cases, (ii) negotiating
significant new agreements (i.e, the plan investor agreements), or (iii) renegotiating their
debtor in possession financing.  See Expedited Motion for Order Authorizing and
Approving Equity Purchase and Commitment Agreement [Docket No. 6179] (the "Equity

---

[9]  There are no guarantees that the Debtors will be able to confirm a plan by the middle of 2007.  Indeed, in
the fourteen months that the Debtors have had the exclusive right within which to file and solicit
acceptances of a plan of reorganization that is satisfactory to the Debtors' constituencies, the Debtors have
failed to do so.  In particular, as of the filing of this Reply, the Official Committee of Unsecured Creditors;
the Equity Committee; the Ad Hoc Trade Committee; the IUE/CWA; the International Union of Operating
Engineers Local Union Nos. 18S, 101S, and 832S; the Internal Brotherhood of Electrical Workers Local
663; the International Association of Machinists and Aerospace Workers, District 10; the United States
Trustee; and Highland Capital Management, L.P. have each filed objections to the Equity Purchase and
Commitment Agreement – which lays out one possible framework plan.

Purchase and Commitment Agreement"); Expedited Motion for Order Authorizing
Debtors to Refinance Postpetition Financing [Docket No. 6180].

12.    Second, despite the Debtors' asserted need to focus all of their efforts on
GM, their unions, the Equity Purchase and Commitment Agreement and overall
restructuring goals since June, and not the resolution of claims, the Debtors have had
sufficient breathing room to commence the claims resolution process.  In particular, the
Debtors have had the opportunity to: (i) review in excess of 16,000 claims; (ii) file five
omnibus objections to claims;[10] (iii) propose onerous procedures in respect of the
allowance, disallowance, and estimation of claims;[11] and (iv) take affirmative steps to
resolve claims filed against their estates.[12]  In addition, in respect of the Cadence Claims,
in the Second and Third Omnibus Objection to Claims, the Debtors specifically raised
putatively "substantive" objections to the validity of the Cadence Claims in an attempt to
limit the relief available to Cadence.

13.    Third, the Debtors cannot maintain that liquidating the Action will distract
their attorneys from addressing the "critical issues" in their cases.  Even assuming
arguendo that Skadden, Arps, Slate, Meagher & Flom ("Skadden"), the Debtors' main
bankruptcy counsel, does not have the resources to devote time to both the Debtors' main
bankruptcy cases and the Action (a contention that is highly doubtful at best), this "fact"
would not preclude the relief sought in the Motion because Skadden's ability to devote
time to the Action is irrelevant.  The Debtors have specifically retained Quinn Emanuel

---

[10]    In the First, Second, Third, Fourth, and Fifth Omnibus Objections, Debtors objected to approximately
3,500; 2,853; 1,017; 772 and 179 Proofs of Claim respectively.  As a result, approximately 6,800 claims
have either been disallowed and expunged or are pending the entry of orders disallowing and expunging
those claims.  See Debtor's Fourth Omnibus Objection to Claims ¶ 16.
[11]    See Debtors' Motion for Certain Procedures Governing Disallowance or Estimation of Claims.  [Docket
5453].
[12]    See, e.g., Debtors' Statement of Disputed Issues with Respect to Claim [Docket Nos. 6200-6207].

Urquhart Oliver & Hedges ("Quinn Emanuel") as Special Litigation Counsel in respect of five pending lawsuits – including the Action. <u>See</u> Debtors' Application for Order Authorizing Retention of Quinn Emanuel (the "Quinn Emanuel Application") [Docket No. 2126]; Order Authorizing Retention of Quinn Emanuel (the "Quinn Emanuel Order") [Docket No. 2784]. As described in the Quinn Emanuel Application and the Quinn Emanuel Order, Quinn Emanuel was responsible for representing the Debtors in the Action prior to the filing of their bankruptcy cases and remains responsible post filing. Accordingly, Quinn Emanuel is able to represent the Debtors in the Action at this juncture in the bankruptcy cases and, as a result, the Action will not distract Debtors' main bankruptcy counsel.

14.    Fourth, the Debtors' doomsday prediction that granting the Motion will encourage other parties to seek similar relief does not overcome Cadence's showing that cause exists to grant relief in respect of the Action. The Debtors' dire predictions are simply unsupported by the record in these bankruptcy cases. As noted by the Debtors in their Omnibus Response in Support of Estimation Procedures, the overwhelming majority of claimants did not oppose the claims resolution procedures proposed by the Debtors. <u>See</u> Debtors' Omnibus Response in Support of Estimation Procedures ¶ 2 ("Indeed, of the approximately 1,300 parties served with the [Estimation Procedures Motion], only 16 have filed timely objections and joinders.") [Docket No. 5939]. In addition, only nineteen creditors were excluded from the claims resolution procedures (the court having eviscerated the Debtors' proposal with respect to estimation of claims)

and, as a result, the "rush to the courthouse" that the Debtors so fearfully predict may be at best but a ripple, as opposed to a tsunami.[13]

15.     Because (i) the Debtors' reorganization cannot permanently preclude parties from obtaining relief from the automatic stay; (ii) the Debtors have already shifted their focus to the claims resolution process and, have specifically sought to address the Cadence Claims;[14] (iii) the Debtors have retained special counsel in respect of the Action; and (iv) the relief sought in the Motion will not start a race to the courthouse by other creditors, granting the Motion will not prejudice the Debtors.  Accordingly, there is cause for relief from the stay so that Cadence may continue the Action.

> (ii)     *The Balance of the Equities Supports the Relief Sought in the Motion*

16.     For each day the Debtors continue manufacturing infringing air bag covers, they are violating Cadence's rights and incurring additional damages.   The Patents are a diminishing asset as the time period for exclusivity of those patent rights is limited by federal law. See 35 U.S.C. § 154(a)(2) ("Subject to the payment of fees under this title, such grant shall be for a term beginning on the date on which the patent issues and ending 20 years from the date on which the application for the patent was filed in the

---

[13]   Based upon a review of the Debtors' schedules and statements of affairs, it is not at all clear that there is other significant intellectual property litigation ongoing in any event.  Pursuant to the Debtors' Amended and Restated Schedule F, there appear to be only nine "Litigation – Intellectual Property" cases scheduled. While there is no doubt that patent litigation may be complex and fact intensive, the fact that only one other party (Automotive Technologies International, Inc.) has sought relief from the automatic stay to pursue its intellectual property rights against the Debtors 14 months into their bankruptcy cases demonstrates that the Debtors' fears in this respect are overblown.  Furthermore, although the docket in these bankruptcy cases indicates that 39 motions for relief from the automatic stay have been filed, the majority of these motions sought relief to pursue setoff/recoupment rights; only 16 sought relief from the automatic stay to pursue litigation.

[14]   Even now the Debtors seek to dispute the Cadence Claims by asserting, without support, that Cadence's valuation of the Cadence Claims is most likely overstated because Cadence failed to consider the District Court's determination that Delphi was not liable for GM's pre spin-off  activities.  Cadence's valuation of the Cadence Claims fully recognizes the District Court's prior determination and, as a result, only asserts damages on account of the Debtors' post spin-off infringement.

United States."). In fact, the three Patents expire in 2010, 2012 and 2012.[15] As a result, there are six primary bases that establish that the equitable grounds for relief from the automatic stay tip in favor of Cadence.

17.    First, the automatic stay cannot be used to facilitate the Debtors' continuing violation of Cadence's federally protected rights in the Patents. See In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig., 140 B.R. 969, 977 (N.D. Ill. 1992) ("None of this implies that debtors in bankruptcy may violate federal law with impunity, selling patented products or, say, going into the cocaine distribution business."). Accordingly, courts may grant a movant's request for relief from the automatic stay to allow another court to consider claims that debtors are violating the law. Id.

18.    Second, to the extent the Debtors are allowed to continue manufacturing infringing airbag covers, the Debtors' creditors are being harmed. In particular, for each infringing airbag cover manufactured, Cadence will be entitled to a postpetition administrative priority claim against the Debtors' estates that must be paid in full – in cash – prior to the Debtors' exit from bankruptcy. See, e.g., Institut Pasteur v. Cambridge Biotech Corp. (In re Cambridge Biotech Corp.), 186 B.R. 9, 14 (Bankr. D. Mass. 1995) (concluding that to the extent the debtor's postpetition conduct constitutes infringement, the claimant would be entitled to a first priority administrative expense claim and if the infringement continued postconfirmation such conduct would "create a claim that is not discharged at confirmation."); In re Armorflite Precision, Inc., 48 B.R. 994, 1000 (D. Me. 1985) (concluding that the estate was liable for the increased

---

[15] Patent '031 expires, July 20, 2010; Patent '026 expires, March 24, 2012; and Patent '485 expires June 7, 2012.

transportation costs incurred after the trustee delayed returning certain equipment to the creditor postpetition).  Accordingly, to the extent the Debtors' business activities (i.e., the postpetition manufacturing of infringing airbag covers) give rise to postpetition damages, Cadence will be entitled to a postpetition administrative priority claim against the Debtors' estates, with such amount to be determined by the District Court.  Thus, contrary to the Debtors' assertion that relief from the automatic stay would harm the Debtors' creditors, relief from the automatic stay would actually preserve value for the Debtors' creditors.

19.    Third, because the Debtors have argued that determining the cost associated with their bankruptcy estates is crucial to the formulation and confirmation of a plan of reorganization,[16] liquidating the Action is crucial to the Debtors' estates.  Rather than delaying liquidation, the Action should be allowed to go forward as it is not only in Cadence's best interests, but it is in the best interests of the Debtors' estates.

20.    Fourth, Cadence will be substantially prejudiced if the Debtors are allowed to continue manufacturing infringing airbag covers.  As noted above, the Patents are valuable assets to Cadence because federal patent laws grant Cadence, as a patentee, the exclusive right to manufacture products based on the Patents (or license such right to third parties) for an exclusive period of time.[17]  See 35 U.S.C. § 154(a)(2).  As a result, every day that the Action is stayed, Cadence's business and future operations are severely prejudiced.

---

[16]   The Debtors have argued that their "ability to reach agreement on a framework for the Debtors' emergence from chapter 11 is predicated upon a clear understanding of the scope of the general unsecured claims against the Debtors which will ultimately be allowed in these cases."  Debtors' Omnibus Response in Support of Estimation Procedures p. 2 [Docket No. 5939].
[17]   Patent '031 expires, July 20, 2010; Patent '026 expires, March 24, 2012; and Patent '485 expires June 7, 2012.

21.     Fifth, allowing the Action to proceed will not result in a piecemeal
scramble for the Debtors' assets and will not otherwise prejudice other creditors.
Cadence seeks relief from the automatic stay so that it may liquidate its claim in the
Action because the Debtors' summary claims resolution procedures fail to contemplate
the requirements of complex patent litigation or properly preserve Cadence's due process
rights.  To the extent Cadence obtains a favorable determination in the Action from the
District Court, Cadence will return to this Court so that its judgment may be properly
administered in the context of the Debtors' cases.  Thus, contrary to the Debtors'
assertion, granting the Motion will not short-cut the "process" or result in a disorderly
claims resolution process.

22.     Sixth, to the extent the Cadence Claims remain unliquidated, it is clear that
the Debtors will continue their efforts to impermissibly limit Cadence's ability to obtain
full relief.  In the Debtors' Second Omnibus Objection to Claims, the Debtors sought to
limit Cadence's ability to recover from the Debtors liable under 35 U.S.C. § 271 for
infringing the Patents by claiming that the Cadence Claims are duplicative.  The Debtors'
duplication argument is simply without merit as the Cadence Claims are not duplicative
of the claims against Delphi Corporation, but, rather, reflect the fact that the Debtors
operate through numerous subsidiaries and affiliates and those entities may have separate,
independent liability for manufacturing airbags that infringe on the Patents.  Pursuant to
35 U.S.C. § 271:

> (a) Except as otherwise provided in this title, whoever without authority
> makes, uses, offers to sell, or sells any patented invention, within the
> United States or imports into the United States any patented invention
> during the term of the patent therefor, infringes the patent.
>
> (b) Whoever actively induces infringement of a patent shall be liable as an
> infringer.

(c) Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

35 U.S.C. § 271.

23.    Although the Debtors now contend that Cadence waited too long to seek relief from the automatic stay, and that this delay demonstrates a lack of "cause," had Cadence sought relief from the automatic stay immediately after the Debtors commenced their bankruptcy cases, they would have argued that the automatic stay is intended to provide Debtors with a "breathing spell" from such requests.  Recognizing that the automatic stay is designed to provide the Debtors with a "breathing spell" during the early stages of the case, Cadence initially delayed seeking relief from the automatic stay – because such a request would have been fruitless and potentially detrimental to the Debtors' reorganization efforts.  However, given the passage of time, the Debtors' movement towards the resolution of the so-called "critical" issues in these cases, and the Debtors' attempts to limit the relief available to Cadence, there is now "cause" to lift the stay.

          (iii)    *Allowing the Action to Proceed in the District Court is in the Best Interests of Judicial Resources, Judicial Economy and the Debtors Bankruptcy Estates*

24.    While the Debtors spend much of the Objection reiterating their need for a breathing spell and the purported prejudice to unsecured creditors, the Debtors only grudgingly acknowledge the appropriateness of relief from the stay as a matter of judicial economy and to avoid inconsistent results.  Ultimately, the Debtors' litigation position is

- 16 -

driven by their own convenience rather than by any grounded basis for adjudicating the Action in any forum other than the District Court and at a time other than now.

25.    The parties spent more than four years proceeding before the District Court, educating the Court as to the Patents and obtaining Paradigm Claim construction determinations.    The District Court has become intimately involved with, and knowledgeable about, the Action as (i) the parties briefed and argued their proposed definitions of Paradigm Claim terms to the District Court; (ii) the District Court held and ruled on its first Markman hearing; (iii) the parties participated in a second oral Markman hearing; and (iv) the District Court ruled on the remaining Paradigm Claim definitions at issue in the second Markman hearing.    Accordingly, the District Court has obtained a specialized knowledge with respect to the Action and, as a result, is now a specialized forum.

26.    In addition, because the Action involves an analysis of federal patent rights, even if the Action could proceed before this Court, mandatory withdrawal of the reference will apply.    See Singer Co., B.V. v. Groz-Beckert KG (In re Singer Co., N.V.), No. 01Civ.0165, 2002 WL 243779, at *3 (S.D.N.Y. Feb. 20, 2002).    In Singer, the Court recognized and concluded that:

> Here, withdrawal is mandatory because resolution of the adversary proceeding requires substantial and material consideration of domestic patent law, a statutory creation. In their complaint, the Singer plaintiffs seek a declaration that they own an implied license in Groz's '330 patent. All of the complaint's related bankruptcy law issues that follow depend upon whether a court finds that the Singer plaintiffs indeed have a property interest in the '330 patent . Thus, the patent law issues are central to the complaint."

2002 WL 243779, at *3; <u>see</u> <u>also</u> <u>U.S. Gypsum Co. v. Nat'l Gypsum Co. (In re Nat'l</u>

<u>Gypsum Co.)</u>, 145 B.R. 539 (N.D. Tex. 1992) (holding that mandatory withdrawal of

reference was required due to the nature of the alleged patent infringement action).

27.    Should the parties be forced to proceed before this Court (in the event this

Court has jurisdiction) or a court other than the District Court, the parties would be

required to reeducate that court.  As a result, granting relief from the automatic stay to

allow the Action to proceed before the District Court is in the interests of judicial

economy and the expeditious resolution of the Action.  <u>See, e.g.</u>, <u>Packerland Packing Co.</u>

<u>v. Griffith Brokerage Co. (In re Kemble)</u>, 776 F.2d 802, 807 (9th Cir. 1985) ("Many

cases have held that a district court may properly consider the factor of judicial economy

in deciding whether to lift an automatic stay.  The prior extensive preparation for the

damages retrial made proceeding with that trial efficient.  The decision to lift the stay

could be upheld on this ground alone.") (citations omitted); <u>Maintainco, Inc. v.</u>

<u>Mitsubishi Caterpillar Forklift Am., Inc. (In re Mid-Atlantic Handling Sys., LLC)</u>, 304

B.R. 111, 131 (Bankr. D.N.J. 2003) ("the notion of judicial economy compels this Court

to conclude that the stay should be lifted so as to permit the litigation to proceed in state

court.  Simply stated, the substantial time, effort, and resources already expended by the

parties, Judge Escala, and the Discovery Master in moving this case closer to trial should

not be interfered with by this Court.").

28.    Furthermore, the Debtors' assertion that relief from the automatic stay

must be denied due to the costs associated with litigating the Action now is simply

misplaced.  While the Debtors will likely incur costs in respect of the Action, these costs

will not prejudice creditors or the Debtors' estates.  Furthermore, regardless of when the

Action proceeds, be it during the Debtors' bankruptcy cases or postconfirmation, the costs of defending the Action and the Debtors' liability for manufacturing infringing airbag covers will be incurred by the Debtors.  Accordingly, the Debtors' assertions regarding the costs associated with the Action are merely a red herring.[18]  As such, the Debtors have not established that relief from the automatic stay is improper.

*(iv)    Denying the Motion Would Reward the Debtors' Dilatory Tactics*

29.    In determining whether relief from the automatic stay should be granted, this Court may properly take into consideration the Debtors' dilatory tactics before the District Court.  See Kemble, 776 F.2d 802.  As described in detail below, the Debtors' dilatory tactics and their attempt to delay the resolution of the Action while they continue manufacturing infringing airbag covers demonstrate cause for relief from the automatic stay.  The District Court has itself described Delphi as putting the case in a "siege modality" with its "Stalingrad-like defense." See 6/30/03 Tr. at 71:8-13.[19]

30.    In particular, at each turn in the Action, Delphi sought to delay the resolution of the Action.  First, Delphi unilaterally imposed its own stay on discovery early on in the Action, after it had moved for summary judgment, by refusing to engage in discussions regarding the execution of a protective order that would facilitate document production and review.  PHC had to file a motion with the District Court, which Delphi opposed, in order to obtain a protective order.  See Motion by Plaintiff PHC for Protective Order [Action, Docket No. 43]; Response by Delphi to Motion for Protective Order, [Action Docket No. 52].

---

[18]  For the First, Second, and Third Interim Fee Periods, professionals retained in the Debtors' bankruptcy cases have already incurred legal fees totaling in excess of $134 million.  Thus, the fees incurred by Quinn Emanuel on account of the Action will be incremental.
[19]  Attached hereto as Exhibit A.

31.    Second, after the District Court concluded that discovery should proceed, Delphi continued to delay by withholding essential discovery on the air bag covers at issue in the case.  In particular, Delphi refused to produce versions of its infringing airbag covers and, as a result, PHC had to move to compel Delphi to the production thereof. See Action, Docket No. 157.    Although the Magistrate appointed by the District Court ultimately ordered Delphi to produce its infringing airbag covers, Delphi's tactics caused approximately five additional months of litigation activity and delay.

32.    Third, the claim construction facet of the Action took a very long time because, as described by the District Court, Delphi was putting the case in a "siege modality" with its "Stalingrad-like defense." See 6/30/03 Tr. at 71:8-13.[20]  A vignette on the Stalingrad-like conduct of the litigation by Delphi can be seen in Delphi's efforts to obstruct even the simplest type of activity, such as memorializing the orders of the Court. Delphi's obstructing of even that simple task was noted by the Court on the record:

> Mr. Gemmell [PHC] wrote a letter to Mr. Hansen [Delphi] on July 21, summarizing the substance of the July 11 conference. I thought it was an unexceptional letter.  That letter relates to my recollection [of] precisely what I said should take place. I think it was entirely proper for Mr. Gemmell [PHC] to attempt to memorialize those directions in the letter that he wrote.
>
> [court recites the specifics of the discovery decisions]
>
> Mr. Hansen's [Delphi] response is simply inadequate.  I'm not going to say anything more.  It was also unprofessional.
>
> Mr. Gemmell's [PHC] followup letter asking what was inaccurate was not inappropriate.  The letter of July 25th from Hansen [Delphi] back was also unprofessional.

7/28/03 Tr. at 2.[21]

---

[20]  Attached hereto as Exhibit A.
[21]  Attached hereto as Exhibit B.

33.     Through the use of dilatory tactics prior to the commencement of their bankruptcy cases, the Debtors were able to preclude Cadence from obtaining discovery in respect of the Cadence Claims and which Debtor infringed its federally protected rights. Accordingly, because it would be inequitable to reward the Debtors for their dilatory tactics – to Cadence's prejudice – relief from the automatic stay is necessary so that the parties may proceed with the Action and liquidate Cadence's claims.  Kemble, 776 F.2d 802.

### B.      Cadence's Administrative Priority Claim Should be Allowed and, Once Determined, Paid

*(i)      Cadence's Administrative Priority Claim Should be Allowed*

34.     Section 503 of the Bankruptcy Code provides in pertinent part that "an entity may timely file a request for payment of an administrative expense," and "after notice and a hearing, there shall be allowed administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate."   11 U.S.C. § 503(a), (b)(1)(A).

35.     For each day the Debtors manufacture infringing air bag covers, they are violating Cadence's patent rights and incurring additional damages.  As a result, for each infringing airbag cover manufactured, Cadence will be entitled to a postpetition administrative priority claim against the Debtors' estates that must be paid in full – in cash – prior to the Debtors' exit from bankruptcy.  See 11 U.S.C. § 1129(a)(9)(A); see, e.g., Cambridge Biotech, 186 B.R. at 14; Armorflite Precision, 48 B.R. at 1000.

36.     It is well-accepted that a debtor's postpetition business activities that cause harm to third parties must be remedied by administrative expense status for such parties. See Reading Co. v. Brown, 391 U.S. 471 (1968); Cramer v. Mammoth Mart, Inc. (In re

- 21 -

Mammoth Mart, Inc.), 536 F.2d 950, 954 (1st Cir. 1976) ("[F]airness requires that any

claims incident to the debtor-in-possession's operation of the business be paid before

those of creditors for whose benefit the continued operation of the business was

allowed.").    The Third Circuit summarized the logic underlying the Supreme Court's

ruling in Reading as follows:

> The [Reading] Court believed that those who continue to transact business
> with the debtor during the Chapter 11 case, and who suffer financially as a
> result, are entitled to priority over other creditors who have not
> affirmatively assumed such risk.    The [Reading] Court reasoned that
> fairness dictates that those injured by the operation of a bankrupt business
> by a receiver acting within the scope of his authority be compensated for
> the injury.    The [Reading] Court concluded that it simply is not fair to
> deny innocent victims compensation for injuries they would not have
> incurred had the law not allowed the debtor to continue operating its
> business.

Pa. Dep't of Envtl. Res. v. Tri-State Clinical Labs., Inc., 178 F.3d 685, 690 (3d Cir.

1999).    Accordingly, to the extent the Debtors' business activities (i.e., the postpetition

manufacturing of infringing airbag covers) give rise to postpetition damages, Cadence is

entitled to an allowed postpetition administrative expense claim, with such amount to be

determined by the District Court.[22]

---

[22]    Should the Debtors continue manufacturing infringing airbag covers postconfirmation, Cadence will be
entitled to assert a postconfirmation claim – not subject to discharge – against the Debtors immediately.
See, e.g., Hazelquist v. Guchi Moochie Tackle Co., Inc., 437 F.3d 1178 (Fed. Cir. 2006); In re Pan Am.
School of Travel, Inc., 47 B.R. 242, 244 (Bankr. S.D.N.Y. 1985) ("A debtor is not to be insulated from its
post-confirmation liabilities merely because it was successful in reorganizing its affairs and composing its
debts.").    In particular, in Hazelquist, the court concluded that:

> Our case law clearly states that each act of patent infringement gives rise to a separate cause
> of action.    Thus, to the extent that Mr. Yamaguchi has engaged in infringing activities since
> the discharge of his debts, each of those infringing activities gives rise to a cause of action
> that dates from the moment of infringement, after the discharge of Mr. Yamaguchi's debts.
> As Mr. Hazelquist is alleging that Mr. Yamaguchi engaged in infringing activity after the
> bankruptcy discharge, Mr. Hazelquist has a cause of action, or multiple causes of action,
> which arose after the bankruptcy discharge and which is not enjoined by section 524.    Thus,
> Mr. Yamaguchi's bankruptcy discharge did not immunize him from suit for those causes of
> action that arose after the discharge.

Id. at 1180-81 (internal citations omitted).

37.    The Debtors' apparent position on the merits as articulated in their Third Omnibus Objection to Claims is without merit.  The Debtors have simply stated that the Cadence Claims assert liabilities or dollar amounts "not owing pursuant to Debtors' books and records."   Objection, ¶ 28.   This is rather incredible given the Debtors' acknowledgement of the outstanding litigation.  See, e.g., Delphi Corporation Amended and Restated Schedule F, p. 160; Delphi Corporation Statement of Financial Affairs Suits, Executions Garnishments and Attachments, p. 45.   In any event, the Debtors provide no basis for deferral of the adjudication of the administrative expense claim and provide no basis for "recreating the wheel" by inviting a new lawsuit based on the postpetition conduct of the Debtors and infringing Cadence's intellectual property.[23]

(ii)    Once Determined, Cadence's Administrative Priority Claim Should be Paid

38.    As discussed above, the Cadence Postpetition Claim is entitled to administrative priority treatment because this portion of Cadence's Claims is directly attributable to the Debtors' postpetition infringement of the Patents.

39.    Delaying the payment of Cadence's Postpetition Claim would unfairly prejudice Cadence in light of the fact that, in addition to obtaining authority to pay their postpetition professionals, the Debtors have paid prepetition and postpetition expenses associated with (i) prepetition salaries, wages and benefits; (ii) prepetition suppliers; (iii) the postpetition receipt of goods ordered prepetition; (iv) goods in transit as of the

---

[23]    Of course, Cadence could choose to simply sue the Debtors for the postpetition infringement.  Larami Ltd. v. Yes Entm't Corp., 244 B.R. 56, 58 (D.N.J. 2000) ("The automatic stay of § 362(a)(3) does not impede a plaintiff's post-petition claim for damages."); Montclair Prop. Owners Ass'n v. Reynard (In re Reynard), 250 B.R. 241, 244 (Bankr. E.D. Va. 2000).  Moreover, the bankruptcy discharge would not, in any event, bar any claim for postconfirmation patent infringement.  Hazelquist. 437 F.3d at 1180-81.  The Debtors seemingly argue that this court should ignore the strong policy reasons of judicial economy and the avoidance of inconsistent factual and legal determinations in taking the position that somehow these claims should be adjudicated other than in the context of the Action.

commencement of their cases; and (v) prepetition customer obligations – all of which are either lower in priority or *pari passu* in priority with Cadence's Postpetition Claim. Because the Cadence Postpetition Claim is *pari passu* or higher in priority than these claims, once the District Court renders a determination as to the Debtors' liability to Cadence, the portion of the award attributable to the Debtors' postpetition infringement should be paid immediately as a current expense of the Debtors' bankruptcy cases. To the extent the Debtors are not directed to pay Cadence's Postpetition Claim immediately, Cadence would be prejudiced because Cadence would apparently be the only administrative expense claimant not being paid by the Debtors.[24]

## IV.    MEMORANDUM OF LAW

40.    Because the legal points and authorities upon which this Reply relies are incorporated herein, Cadence respectfully requests that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

## IV.    CONCLUSION

WHEREFORE, for the above-stated reasons, Cadence respectfully requests the entry of an Order granting the following relief:

---

[24]    Cadence recognizes that to the extent the Action is not finally adjudicated before the confirmation of a plan in these bankruptcy cases, the administrative claim may not be subject to payment at that time. Nonetheless, the Debtors seem to take the position that the claim should never be adjudicated. The most efficient and logical thing to do in this circumstance is to lift the automatic stay and further provide that the adjudication of the damages due Cadence in the Action will apply both in respect of any prepetition damages as well as the postpetition damages sustained by Cadence by virtue of the Debtors' misconduct.

(i) terminating and vacating the automatic stay of 11 U.S.C. § 362 so as to allow the Action to proceed in respect of the determination of liability and damages;

(ii) authorizing and directing the adjudication of the Claim in respect of the postpetition infringement by the Debtors to the District Court for the Eastern District of Michigan (Southern Division) presently adjudicating the Action;

(iii) allowing an administrative priority claim against the Debtors' estate, with such amount to be determined in the Action, on account of the Debtors' postpetition infringement of the Patents;

(iv) directing the Debtors to immediately pay the portion of the damages, once determined in the Action, that are attributable to the Debtors postpetition manufacture of infringing airbag covers;

(v) providing for the entry of a scheduling order transferring the adjudication of the claim for liability and amount purposes to the United States District Court for the Eastern District of Michigan (Southern Division); and

(vi) granting Cadence such other and further relief as is just and proper.

Respectfully submitted this 10th day of January 2007.

     ALSTON & BIRD LLP

     /s/ Dennis J. Connolly
     Dennis J. Connolly (DC-9932)
     One Atlantic Center
     1201 West Peachtree Street
     Atlanta, Georgia 30309-3424
     Telephone (404) 881-7000
     Facsimile (404) 881-7777

     *Counsel to Cadence Innovation LLC*