**Hearing Date: January 11, 2007**
                                              **Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO
<u>PLAN INVESTMENT AND FRAMEWORK SUPPORT APPROVAL MOTION</u>

       Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries

and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"),

hereby submit this response (the "Reply") to the six unresolved objections timely filed to the

Debtors' Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To Sections 105(a), 363(b), 503(b), And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), And 1125(e) Of The Bankruptcy Code, dated December 18, 2006 (the "Motion").

The Debtors have resolved two objections to the Motion:  (a) Preliminary Objection Of The Official Committee of Unsecured Creditors (the "Creditors' Committee"), dated December 19, 2006 (Docket No. 6209) (to be withdrawn subject to documentation of settlement), and (b) Preliminary Objection Of The Ad Hoc Committee of Delphi Trade Claim Holders (the "Trade Committee"), dated December 21, 2006 (Docket No. 6254), withdrawn by Notice Of Withdrawal, dated January 9, 2006 (Docket No. 6501).

The six remaining objections include:  (a) Preliminary Objection Of The Official Committee of Equity Security Holders (the "Equity Committee"), dated December 19, 2006 (Docket No. 6211), supplemented by First Supplemental Objection Of The Equity Committee, dated December 20, 2006 (Docket No. 6247), supplemented by Second Supplemental Objection Of The Equity Committee, dated January 9, 2007 (Docket No.6497), (b) Preliminary Objection Of International Union Of Electronic, Electrical, Salaried, Machine And Furniture Workers, Communications Workers of America ("IUE-CWA"), dated December 20, 2006 (Docket No. 6242); supplemented by Supplemental Objection Of IUE-CWA (Docket Nos. 6496, 6500), (c) Highland Capital Management, LP's Objection And Response, dated December 28, 2006 (Docket No. 6330), (d) Preliminary Objection and Response of International Union of Operating Engineers Local Union Nos. 18S, 101S, and 832S (the "IUOE"), dated December 29, 2006 (Docket No. 6344), (e) Preliminary Objection of the International Brotherhood of Electrical Works Local 663 ("IBEW") and International Association of Machinists and Aerospace Workers

2

District 20 ("IAMAW") (6367), and (f) Objection of the United States Trustee (the "U.S. Trustee"), dated January 3, 2007 (Docket No. 6401) (collectively, the "Objections" by the "Objectors"). A chart summarizing the Objections and the Debtors' responses is attached hereto as Exhibit A.

Preliminary Statement

1.  The Framework Agreements are the product of more than five months of intense effort and arms-length negotiation by the Debtors, the Plan Investors, General Motors, and the Debtors' statutory committees. It is the business judgment of the Debtors that the Framework Agreements create a path to a consensual plan of reorganization that would implement part of the Debtors' Transformation Plan by resolving open issues with the Debtors' unions and General Motors, which would allow for emergence from reorganization in the near term, provide full recovery to unsecured creditors, and provide significant value to current equity holders.

2.  The primary authority for the approval sought by this motion is Bankruptcy Code section 363(b)(1), which permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). The _maximum_ exposure to the property of the Debtors' estates from approval of the Framework Agreements, including _all_ potential liability for Commitment Fees, Transaction Expenses, Alternate Transaction Fee, Indemnification payments, and even damages for the Debtors' willful breach of the Framework Agreements, is capped at $100 million until the Court enters an order approving a disclosure statement in these cases. (This represents approximately 3% of the equity to be offered under the ECPA.) The Motion seeks the Court's approval of the Debtors' business judgment that it is in the best interest of the estates to accept these burdens in exchange for the benefits that the Framework Agreements provide to the estates.

3

3. In arguing to the contrary that the Framework Agreements comprise an impermissible <u>sub rosa</u> plan of reorganization, or objecting to certain of the plan terms contemplated among the Parties to the Framework Agreements, the Objectors fail to appreciate that the only "property of the estate" at issue in the Motion are the potential fees, costs, and liabilities described in the preceding paragraph.  Although the Framework Agreements touch on elements of a potential plan of reorganization, the Motion does not seek, or require, the Court's approval of any elements of a plan, and does not impair any of the Objectors' rights with respect to objecting to or voting on any plan of reorganization.

4. Three days after the debtors filed the Motion, Highland submitted its unsolicited Proposal And Commitment Letter For Up To $4.7 Billion Common Equity Commitment (the "Highland Proposal").  Highland had made no prior contact with the Debtors regarding participation in the reorganization.  As set forth more fully below, the Debtors nevertheless immediately engaged in discussions with Highland so as to better understand and explore Highland's proposal.  At the same time, the Debtors determined to preserve the Framework Agreements, which are subject to termination by the Plan Investors if not finally approved by the Court by January 22, 2007.

5. On January 9 and 10, 2007, the Board of Directors met to further consider the Highland Proposal.

<u>Argument</u>

6. Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1). Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel</u>

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

7. The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993). The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Orion Pictures, 4 F.3d at 1098-99.

8. Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992). Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id. To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071. .

9. Courts have given deference to a debtor's business decisions when those decisions follow thorough financial analyses and the considered deliberation of senior management and directors. In re Adelphia Commc'ns Corp., No. 02-41729 (REG), 2003 WL 22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); In re Global Crossing Ltd., 295 B.R. 726,

5

744-46 (Bankr. S.D.N.Y. 2003); In re Brooklyn Hosp. Ctr., Inc., 341 B.R. 405, 412 (Bankr. E.D.N.Y. 2006). Furthermore, courts have also found that arms-length negotiations between entities that result in agreement are evidence of the exercise of sound business judgment. In re EaglePicher Holdings, Inc., No. 05-12601, 2005 WL 4030132, at *4 (Bankr. S.D. Ohio Aug. 26, 2005). As discussed herein and in the Motion, and as the testimony to be introduced at the hearing on this matter will show, the Debtors have been involved in extensive discussions and negotiations with the statutory committees, the Plan Investors, and GM for more than five months to achieve the Framework Agreements. The Board has been continually apprised and is fully informed of all these developments. There is no basis to disturb the Debtors decision to enter into the Framework Agreements.

A.    Modifications To Framework Agreements

10.    On December 29, 2006, the Debtors submitted a response, acknowledged by GM, Appaloosa, and Cerberus, to various statements propounded by the Creditors' Committee, the Equity Committee, and the Trade Committee in which the committees purported to set forth ambiguities in the Framework Agreements.

11.    In connection with their review of the Framework Agreements and the statements by the committees, as set forth in the Debtors' response and summarized below, the Parties agreed to make certain clarifications to the Framework Agreements and the Debtors agreed to provide black-lined versions of the Framework Agreements with this reply.

- The list of events constituting a Change of Recommendation in the Equity Purchase and Commitment Agreement (the "EPCA") was clarified to exclude actions taken by GM.
- The termination rights under the EPCA were clarified so that (i) neither the Debtors' nor GM's termination of the Plan Framework Support Agreement ("PSA") provides the Debtors with a termination right under the EPCA, and (ii) the Debtors and the Plan Investors have, in addition to their other respective

6

termination rights, an unconditional right to terminate the EPCA on or after August 31, 2007 if the Closing Date has not occurred.

- Various provisions of the EPCA governing the Rights Offering were clarified so that holders of Rights may exercise those rights via a document separate from the ballot forms to be used in connection with solicitation of acceptances of the Plan.

- The EPCA, the PSA, and the Preferred Stock Term Sheet were clarified so that various restrictions applicable to A-D Acquisition Holdings, LLC, Dolce Investments LLC, and/or the holders of Series A Preferred Stock apply to their respective affiliates.

- The Preferred Stock Term Sheet was clarified so that, if an event would cause shares of Series A Preferred Stock automatically to convert into shares of Series B Preferred Stock but for the lack of a registration statement covering resales of Series B Preferred Stock, such conversion would occur when such registration statement became effective.

12. Since that time, negotiations have continued in a further attempt to resolve the Objections. The parties have agreed to additional modifications to the Framework Agreements since December 29, 2006. Attached to this response as Exhibits B, C, D, E, and F, are a blacklined version of the EPCA, a supplement to the EPCA, a blacklined version of the Preferred Stock Term Sheet, and a supplement to the PSA, which reflect the current status of the transaction documents, as well as a form of order.

B.   <u>Fees And Expenses In The Framework Agreements</u>

13. The principal objections to the Commitment Fees, Transaction Fees, and the Alternate Transaction Fee go to the circumstances under which they purportedly could become due rather than to the amount of the fees. For example:

> The Equity Committee recognizes that commitment fees and break-up fees are common features in transactions where a buyer or investor assumes the risk that its agreement will serve as a "stalking horse" that attracts a competing bid from another party. The Equity Committee does not object to the amounts of either the Commitment Fees or the Alternat[e] Transaction Fee, or the payment of these fees, where the Agreements have attracted an actual or potential competing bid that causes the Debtors to change their position concerning the Agreements.

(Docket No. 6247, at 16-17.)

7

14.     <u>Commitment Fees</u>.  Under the EPCA, the Debtors will agree to pay total Commitment Fees of up to $76 million:  $21 million in connection with the Preferred Shares (which is 1.75% of the preferred offering) and $55.125 million in connection with the Direct Subscription Shares and the backstop Standby Commitment (which is 2.5% of the offering). The Equity Committee and the three union objectors all object to approval of the Commitment Fees because the Plan Investors allegedly have nothing at risk.

15.     No amount of the Commitment Fees becomes payable merely upon approval of the Framework Agreements.  Rather, appropriate milestones ensure that the payment of Commitment Fees is commensurate with progress in achieving major steps toward consummation of the transaction:

- The first $10 million becomes payable only <u>after</u> the Plan Investors' due diligence condition has been satisfied or waived.
- An additional $28,062,050 (the balance of the first 50%) will be paid only <u>after</u> GM and the Debtors have reached agreement on definitive settlement documents, and the Plan Investors have approved the terms of the GM Settlement.
- The final $38,062,050 (the second 50%) will not be paid until <u>after</u> the Court has approved the terms of the disclosure statement.

(EPCA § 2(i).)

16.     The Equity Committee incorrectly suggests that the condition for payment of the second milestone ($28,062,050), the Plan Investors' approval of the GM Settlement, is controlled by the Plan Investors. (Docket No. 6247 at 14.)  This stage can only be reached, however, after the Debtors and GM have reached a definitive settlement agreement and the Debtors have presented the GM Settlement to the Plan Investors for approval.  The Plan Investors are in no position to dictate when that occurs. (EPCA § 12(d)(ii).)  Unlike the due diligence condition applicable to the first $10 million milestone, approval of the GM Settlement is not waivable by the Plan Investors.

8

17.     Furthermore, payment of the third milestone (the remaining 50% of the Commitment Fees) is not due until after the Court has approved a disclosure statement. The expected predicates to approval of the disclosure statement and GM Settlements would be consensual. The risk that the transaction would not be consummated would be significantly reduced.

18.     The Equity Committee also raises the prospect that the Plan Investors could abandon the Framework Agreements after collecting all $76 million in Commitment Fees by terminating the PSA after April 1, 2007. In a further attempt to resolve objections, the parties have agreed to modify the termination rights under the PSA so that termination of the PSA by the Plan Investors or the Debtors after the disclosure statement approval date is no longer allowed. This modification resolves many of the objections repeatedly made in the first 16 pages of the Equity Committee's Second Supplemental Objection. (See Docket No. 6497, at 2-4, 7-8, 10, 14, 16.)

19.     <u>Alternate Transaction Fee</u>.  Under the EPCA, the Debtors will pay a $100 million Alternate Transaction Fee in certain circumstances. (EPCA § 12(h).) None of the Objectors acknowledges that the Debtors' aggregate liability from <u>all</u> provisions of the Framework Agreement, however, is capped at $100 million until after the Court approves the disclosure statement. Section 12(h) of the EPCA expressly states that the Alternate Transaction Fee is subject to Section 11(b)(y) of the EPCA, which provides that "the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the disclosure statement Approval Date shall not exceed $100 million . . . ." This means that, until the Court approves the disclosure statement, each payment of Commitment Fees and each payment of Transaction Expenses effectively reduces the

9

Alternate Transaction Fee, dollar for dollar. Thus, contrary to the Equity Committee's assertion, for example, approval of the Framework Agreements do not put $176 million at risk without further action of the Court. (Docket No. 6247, at 14.)

20. Initially, one of the Equity Committee's primary objections was that, under certain scenarios, the Debtors could become obligated to pay the Alternate Transaction Fee based on conduct of GM, with no alternate transaction in sight. For example, the Equity Committee stated that:

> In short, the Investment Agreement puts the Debtors in the unconscionable position of having to pay the Plan Investors $100 million if the Debtors are left high and dry, first by GM and then the Plan investors .... There is no conceivable justification, under the business judgment rule or otherwise, for the payment of a $100 million Alternat[e] Transaction Fee to the Plan Investors under such circumstances, or under any circumstances that do not involve termination of the Investment Agreement as a result of breach, termination, change in recommendation, or other act <u>by the Debtors</u>.

(Docket No. 6247, at 16.)

21. In an attempt to resolve this objection and remove this (unintended) possibility, the Parties agreed to modify the Framework Agreements to remove action taken by GM from the definition of a Change of Recommendation by the Debtors. (<u>See</u> Omnibus Response To Purported Statements Of Ambiguities, at 6.) Thus, as explained in the Motion, there are only three circumstances under which the Alternate Transaction Fee is payable:

- Termination of the EPCA by the Debtors or by the Plan Investors as a result of the Company's entry into an Alternate Transaction (other than a liquidation under Chapter 7 of the Bankruptcy Code). (EPCA §§ 12(d)(7)(B), (f)(ii).)
- Termination of the EPCA by the Investors due to the Debtors' willful breach of the EPCA, followed by entry into an Alternate Transaction within 24 months. (EPCA § 12(d)(v).)
- Termination of the EPCA as a result of a Change of Recommendation by the Debtors, followed by entry into an Alternate Transaction within 24 months. (EPCA § 12(d)(vii)(A).)

10

22.     Despite the clear language, the Equity Committee still contends that GM can walk away from the deal after April 1, 2007 and cause the Debtors to pay an Alternate Transaction Fee. (Docket No. 6500, at 16-18.) Under Section 3.1(b) of the PSA, GM (or any party) can terminate the PSA at any time after April 1, 2007 and, under Section 12(c)(ii) of the of the EPCA, such a termination by GM would give the Plan Investors the right to terminate the EPCA. But, such a termination is not one of the events giving rise to an Alternate Transaction Fee.

23.     Moreover, the objectors' argument ignores the practical realities of the Framework Agreements as a whole. The Framework Agreements contemplate near-term settlements with GM and Delphi's labor union. If a settlement with GM is in place on April 1, 2007, it is highly unlikely that GM would be able to "walk away.". But even if such a scenario is theoretically possible, the risk to the Debtors is only that they might be tied to the EPCA until August 31, 2007, as the Equity Committee acknowledges. (See Docket No. 6500, at 18 n.9.) Based on the amendments negotiated in connection with the Statements of Ambiguities, the Debtors now have the right to terminate the EPCA without paying an Alternate Transaction Fee after August 31, 2007. (See EPCA Section 12(c)(iii).)

24.     The Equity Committee also appears unaware that, until February 28, 2007, the Debtors retain the right to terminate the EPCA for any reason without paying an Alternate Transaction Fee or any more than $10 million of the Commitment Fees unless the Debtors have reached tentative labor agreements and a GM Settlement, and such settlements have been approved by the Plan Investors.

25.     As Mr. Sheehan repeatedly explained at his deposition, the various provisions of the Framework Agreements provide the Debtors sufficient control and flexibility to

11

ensure that estate assets are not wasted in the manner assumed by the Objectors' imagined hypotheticals.

26. Both within and outside of the bankruptcy context, parties to large corporate transactions commonly employ a variety of "incentives" designed to encourage the parties' open and active participation in the proposed transaction. Such "incentives" take a variety of forms, including break-up fees, awards of due diligence-related expenses and lost opportunity costs, and the inclusion of limited-shop provisions. As the cases on which the Objectors rely make clear, there are a variety of legitimate and widely-recognized reasons why bidders ask for, and sellers are willing to agree to, the inclusion of break-up fee provisions in proposed transactions.

27. For example, absent such protections, bidders often are reluctant to invest substantial resources in making the first bid, out of concern that the deal then "will be shopped around and 'topped' by an entity relying on the initial offeror's due diligence." In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (approving a bidder's break-up fee in connection with an externally-funded reorganization plan). Conversely, the presence of a break-up fee acts to deter gamesmanship by prospective later bidders, who otherwise might be inclined to delay bidding until late in the process, and thereby free-riding on the efforts and resources of the initial bidder. See id. Indeed, because break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's assets[,] . . . [and] because the directors have a duty to encourage bidding, break-up fees can be <u>necessary</u> to discharge the directors' duties to maximize value. . . ." In re Integrated Resources, Inc., 147 B.R. 650, 659–60, 663 (S.D.N.Y. 1992) (the appellant's own expert testified in connection with an externally-financed restructuring plan that the "average break-up fee in the industry is 3.3 percent").

28. A bankruptcy court therefore should consider three questions in assessing break-up fees negotiated in connection with a proposal to fund a plan of reorganization: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?" In re Integrated Resources, Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992).

29. Based on these factors, "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." Id. at 658. While an "exorbitant" fee carries the potential to chill subsequent bidding, "the amount of the fee is merely one of the factors to consider under the business judgment rule." Id. at 660. The court also must assess the prospective bidder's investment of time and money, determine whether the fee is reasonably related to the bidder's efforts, and consider both the magnitude of the proposed transaction, as well as the risks faced by all parties in connection with the transaction. See id. at 660–63. "When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. at 662 (quoting In re 995 Fifth Ave. Assoc., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

30. As noted above, the Equity Committee previously conceded the reasonableness of the amount of the Alternate Transaction Fee. Moreover, the Board received advice from its financial advisor, David Resnick of Rothschild Inc., that the fees involved in the Framework Agreements were within a reasonable range for a transaction of this size, nature, and complexity.

31. The Equity Committee raises additional points regarding better terms it wishes the Debtors had been able to negotiate with the Plan Investors. For example, the Equity

13

Committee contends that the Alternate Transaction Fee should be payable only in the event of a change of control of the Debtors (Docket No. 6247, at 16), and contends that the "tail" provision governing the Debtors' entry into an Alternate Transaction should be narrowed from 24 months to six months. (Docket No. 6247, at 18.)  Whether or not one provision would be more attractive than another from the Debtors point of view, however, the Framework Agreements were negotiated at arms length and the Debtors cannot make unilateral changes.

32. <u>Transaction Expenses</u>.  The Framework Agreements provide that the Debtors will reimburse "out-of-pocket costs and expenses reasonably incurred by each Investor" prior to the Effective Date, whether or not the transaction closes.  These amounts will be treated as follows:

- Upon approval of the Framework Agreements, the Debtors will pay up to $13 million to the Investors for actual expenses reasonably incurred prior to December 1, 2006 -- excluding any amounts incurred by Appaloosa prior to May 17, 2006.
- Appaloosa may recover up to $5 million for actual expenses reasonably incurred prior to May 17, 2006, but only after the effective date of a plan of reorganization that includes a recovery for equity holders.
- Going forward, the Debtors will reimburse actual expenses reasonably incurred on an ongoing basis, without further review by the Court.

33. The U.S. Trustee contends that the Plan Investors should submit applications for reimbursement of these fees under 503(b)(1) of the Bankruptcy Code as "actual necessary costs and expenses of preserving the estate," and, in the case of Appaloosa's fees incurred prior to May 17, 2006, an application under 503(b)(3)(D) of the Bankruptcy Code based on the "substantial contribution" standard.

34. The Debtors' agreement to reimburse the Investors' actual expenses, reasonably incurred, is an integral part of the Framework Agreements, without which the Plan Investors would not have entered into the Framework Agreements.  As such, payment of these expenses is made pursuant to the Debtors' business judgment under 11 U.S.C. § 363(b).

14

C.  Terms Regarding Potential Plan Of Reorganization

35.  The U.S. Trustee and the IUE-CWA object to approval of the Framework Agreements because they purportedly constitute a sub rosa plan of reorganization.  This objection belies a mixing of concepts that leads to a wholly incorrect conclusion.  The term sub rosa plan refers to an attempt to effect a reorganization by disposing of all or substantially all of the assets of a debtor's estate through asset sales under section 363 of the Bankruptcy Code while circumventing the plan disclosure, solicitation, and confirmation process.  The Framework Agreements do not fit this mold in any way.  First of all, the Framework Agreements do not dispose of any property other than the various fees and transaction expenses discussed above.  Second, the Framework Agreements expressly contemplate the filing of a disclosure statement, solicitation of votes for a plan, and confirmation by the Court.  By definition, an agreement to comply with all the procedures of 11 U.S.C. § 1125 is not an effort to subvert those procedures.

36.  The U.S. Trustee asserts that "the Framework Agreement dictates many of the terms of the plan," citing In re Continental Airlines, Inc., 780 F.2d 1223, 1227 (5th Cir. 1986) and dictum from the lower court opinion in In re Tower Automotive, Inc., 342 B.R. 158, 163 (Bankr. S.D.N.Y. 2006), aff'd, __ F. Supp. 2d __, 2006 WL 3751360 (S.D.N.Y. Dec. 15, 2006).  In Tower Automotive, however, the Second Circuit applied the standard articulated by the Fifth Circuit (in cases more recent than Continental Airlines), such as In re Cajun Electric Power, 119 F.3d 349 (5th Cir. 1997):

> As the Court stated in the Cajun Electric Power case, rejecting a sub rosa plan argument, the settlement there did "not dispose of all claims against [the debtor], nor does it restrict creditors' rights to vote as they deem fit on a proposed reorganization plan [nor does it] dispose of virtually all of [the debtor's] assets ...."

Tower Automotive, 2006 WL 3751360 at *7.  Indeed, the Second Circuit cited with approval In re Iridium, 2005 WL 756900 at * 8, as holding that a "settlement was not a sub rosa plan [where]

15

it only bound the parties to the settlement and did not prevent [an] objecting creditor 'from voting in whatever manner it chooses on any proposed plan.'" Tower Automotive, 2006 WL 3751360 at *7; see also In re Alleghany Intern., Inc. 117 B.R. 171, 176 (W.D. Pa. 1990) (rejecting sub rosa plan argument when "the commitment letter contains certain terms which might dictate the terms of a future plan or reorganization, but the commitment letter does not dictate the terms of any plan of reorganization").

37. The Objectors raise a number of objections to particular plan provisions that the Parties have agreed to among themselves. For example:

- The Equity Committee further challenges the timing and procedures for the Rights Offering.[1]
- The IUOE and Highland object to the proposed treatment of unsecured claims.[2]
- The IUOE and the IBEW & IAMAW raise issues regarding future labor negotiations.

38. Although the Debtors have worked with the Objectors to attempt to resolve some of the objections surrounding these issues, none of these provisions is before the Court for approval and none of them becomes effective until put forth in a disclosure statement and plan and approved by the Court.

---

[1] In an effort to resolve two of the Equity Committee's three objections to the Rights Offering procedures, the Parties have clarified the Framework Agreements to provide a document separate from the Plan solicitation ballot for the exercise of Rights and have confirmed their common understanding that the Framework Agreements require that the Registration Statement be effective prior to Plan solicitation. The Equity Committee's third objection that the Rights Offering should be conducted post-confirmation is based primarily on the Equity Committee's belief that the Rights Offering would be exempt from the registration requirement under section 1145 of the Bankruptcy Code if conducted post-confirmation. The Debtors are willing to consider whether the Rights Offering can be accomplished with the Section 1145 exemption, but do not believe the timing of the Rights Offering is determinative. In any event, the timing is an economic deal point that resulted from the negotiations.

[2] The Framework Agreements contemplate paying unsecured trade claims in full with approximately 80% cash and 20% in stock at a deemed value of $45 per share. The $45 treatment value is calculated to provide full recovery to creditors. A $35 strike price is applicable to the Rights Offering, Direct Subscription Shares, and the Preferred Shares. Highland claims that the $45 treatment value would overpay creditors, while the IUOE claims that the $45 treatment value could underpay creditors.

D.   Corporate Governance

39.   The Equity Committee, the IUE-CWA, and Highland all take issue with the preferred stock structure and associated corporate governance rights that would accrue to the Plan Investors in the event that a plan like the one contemplated in the Framework Agreements were approved. The corporate governance provisions in the Framework Agreements were the product of arms-length negotiations, as reflected by improvements the Debtors were able to obtain in the structure initially proposed by the Plan Investors after pressing the requests raised by the statutory committees. The Debtors concluded that the governance structure was acceptable in light of the benefits of concluding the overall transaction on the terms negotiated.

E.   The Highland Proposal

40.   Promptly after receiving the Highland Proposal, Delphi acknowledged publicly on December 21, 2006 that it "would carefully analyze and consider Highland's proposal and discuss its merit with its Board of Directors." Delphi also said that it recognizes it has a fiduciary obligation to maximize value for all stakeholders in its Chapter 11 process and will carefully consider all aspects of this proposal against others it has received." That same day, John Sheehan, Delphi's Chief Restructuring Officer, commenced discussions with Highland. These discussion included a lengthy meeting on January 2, 2007 at Delphi's headquarters in Troy, Michigan in which legal and financial advisors for each of Delphi and Highland participated.

41.   As a result of these meetings and discussions, Highland agreed to provide additional information to Delphi later in the week of January 2, 2007, including proposed markups of the existing Framework Agreements, its due diligence requests and timetable, and its visions statement regarding execution of the transaction and the value Highland brings to the Debtors as a plan investor.

17

42.     On January 3, 2007, Delphi met with General Motors and obtained its preliminary input regarding the Highland proposal. Similarly, the Debtors met with the statutory committees on January 4, 2007, in New York City, and discussed the Highland Proposal. Finally, the Debtors have sought informal feedback on the Highland Proposal from certain of its unions and other stakeholders.

43.     The Board immediately commenced review of the Highland proposal. On December 22, 2006, Rothschild, Debtors' financial advisor, delivered to the Board of Directors a document entitled Preliminary Comparison of Investment/Framework Proposals, which contained summarized the key terms, similarities, and differences between the Framework Agreements and the Highland proposal. On January 3, 2007, the Board of Directors met and continued its evaluation of the Highland proposal. At its meeting on January 10, 2007, the Board considered the Highland Proposal.

44.     In preparation for the January 10, 2007 Board meeting, the Debtors requested certain information from the Plan Investors regarding their view of the Highland proposal, and also asked them to consider beneficial modifications to the Framework Agreements in light of the Highland Proposal.

45.     On January 5, 2007, prior to providing its due diligence list and the other items discussed at the January 2, 2007 meeting, Highland stated in a letter that its sought a due diligence period lasting 60 days from the date the Debtors' made the due diligence materials available to Highland.

46.     Delphi's Board of Directors met on January 3, 2007 and again on January 9 and 10, 2007 to consider two decisions: (a) whether to proceed with the Framework Hearing on

18

January 11, 2007 and (b) what to communicate to Highland in response to its December 21st proposal.

47. Earlier today (January 10, 2007), Delphi advised Highland that the Debtors had decided to proceed to seek approval of the Framework Motion at the January 11, 2007 hearing in the Bankruptcy Court having concluded that it continues to be in the best interests of the Company and its stakeholders, taken as a whole, for the Debtors to be permitted to enter into the PSA and EPCA and perform those agreements in accordance with their terms.

48. Delphi advised Highland that based on the information presently available to the Debtors, the Debtors could not conclude that the Highland proposal, as a matter of fact, would deliver superior value to Delphi stakeholders and that, like the EPCA and PSA, there is significant conditionality and risks of execution. Delphi also advised Highland that the Debtors had concluded that it is premature to move forward with Highland regarding a transaction at the present time but would consider reviewing this assessment consistent with the requirements of the EPCA and PSA should Highland choose to address various issues outlined to Highland by Delphi. Delphi also acknowledged to Highland that time is of the essence and, at some point in the future, the mere passage of time, the progress made under the EPCA and PSA, and/or other considerations may preclude further practical consideration of Highland's interest in Delphi.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) overruling the Objections; (ii) granting the Motion, and (iii) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         January 10, 2006

        SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

        By:   /s/ John Wm. Butler, Jr.
              John Wm. Butler, Jr. (JB 4711)
              George N. Panagakis (GP 0770)
              Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        (312) 407-0700

                - and -

        By:   /s/ Kayalyn A. Marafioti
              Kayalyn A. Marafioti (KM 9632)
              Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

        Attorneys for Delphi Corporation, et al.,
          Debtors and Debtors-in-Possession