Judith Elkin (JE-4112)  
Brian D. Hail (BH-1857)  
HAYNES AND BOONE, LLP  
153 East 53rd Street  
Suite 4900  
New York, NY 10022  
Telephone: (212) 659-7300  
Facsimile:  (212) 918-8989  

Lenard M. Parkins (TX-15518200)  
*(admitted pro hac vice)*  
Kenric D. Kattner (TX-11108400)  
*(admitted pro hac vice)*  
HAYNES AND BOONE, LLP  
1 Houston Center  
1221 McKinney, Suite 2100  
Houston, Texas  77010  
Telephone:  (713) 547-2000  
Facsimile:  (713) 547-2600  

Attorneys for Highland Capital Management, LP

Hearing Date and Time:  January 11, 2007 at 10:00  a.m.  
Objection Deadline: January 2, 2007 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X
|  |  :  |  |
| --- | --- | --- |
| In re: | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, *et al.*, | : | Case No.  05-44481 (RDD) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

------------------------------------------------------------------------X

**DECLARATION OF PATRICK H. DAUGHERTY IN SUPPORT OF HIGHLAND CAPITAL MANAGEMENT, LP'S OBJECTION AND RESPONSE TO EXPEDITED MOTION FOR ORDER AUTHORIZING AND APPROVING THE EQUITY PURCHASE AND COMMITMENT AGREEMENT PURSUANT TO SECTIONS 105(a), 363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE AND THE PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT TO SECTIONS 105(a), 363(b) <u>AND 1125(e) OF THE BANKRUPTCY CODE</u>**

Pg 2 of 13

I, Patrick H. Daugherty, declare as follows:

1.      I am a partner at Highland Capital Management, L.P. ("Highland Capital") and the head of Distressed and Special Situations Investing, and a Senior Portfolio Manager. My responsibilities include managing the Distressed Investments Group, and co-managing the Private Equity Investments Group. I formerly served as General Counsel to Highland Capital. Prior to joining Highland Capital in April 1998, I served as Vice President in the Corporate Finance Group at Bank of America Capital Markets, Inc (formerly NationsBanc Capital Markets, Inc.) where I originated and structured leveraged transactions of mid-cap companies located in the Southwest. I have over 15 years of experience in distressed, high yield and corporate restructuring. I have been involved in over 100 restructurings and held steering committee positions in over 40 bankruptcies. I received a BBA in Finance from The University of Texas at Austin and a Juris Doctorate from The University of Houston School of Law.

2.      This Declaration addresses the objections of Highland Capital to the Expedited Motion for Order Authorizing and Approving the Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code (the "Motion") filed by Delphi Corporation ("Delphi") and its subsidiaries and affiliates (collectively, the "Debtors").

3.      Highland Capital is an SEC-registered investment adviser specializing in credit and alternative investing and equity investments. Highland Capital currently manages approximately $35 billion in leveraged loans, high yield bonds, structured products, distressed assets, equity investments and other assets for banks, insurance companies, pension plans,

foundations and endowments. Highland Capital has wide ranging experience in Chapter 11 cases throughout the United States.

4. Currently, certain of Highland Capital's affiliates and related entities collectively are the second largest beneficial stockholder in Delphi with aggregate holdings of approximately 8.8% of the currently issued and outstanding common stock, par value $0.01 per share of Delphi. These investment funds also hold $30 million of junior debt, $211 million of bond debt and $84 million of pre-petition bank debt dating back to October, 2005.

5. I am head of the team that has monitored the investment of Highland Capital's affiliates and related entities in Delphi, and I have been personally involved in the matters described in this Declaration. I head a team of ten investment professionals that includes a former vice president of Ewing Management Group (f/k/a Carlyle Management Group), a private equity sponsor that focuses on manufacturing companies with special expertise in the automotive sector. That professional was an officer of Key Safety Systems, Inc., a billion dollar, global Tier 1 supplier of automotive safety systems. In addition, I co-manage Highland's private equity investments group which includes approximately 10 professionals, some of whom currently manage manufacturing companies and others who have significant operational management experience. If I were called upon to testify, I could and would testify to the facts set forth herein which are based on my personal knowledge and knowledge obtained from the Highland Capital Delphi case team that reports to me. I am authorized to submit this Declaration on behalf of Highland Capital.

6. On December 18, 2006, the Debtors filed the Motion seeking an order authorizing and approving the Debtors' entry into an equity investment and plan framework (the "Appaloosa/Cerberus Proposal") proposed by Appaloosa Management, L.P. ("Appaloosa"),

3

Cerberus Capital Management, L.P. ("Cerberus"), Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), Merrill Lynch & Co. and UBS Securities, LLC. (collectively, the "Appaloosa/Cerberus Group").  The Appaloosa/Cerberus Proposal is set out in the Equity Purchase and Commitment Agreement (defined in the Motion as the "EPCA")[1] and the Plan Framework Support Agreement (defined in the Motion as the "PSA"), and certain related agreements.  Both the EPCA and PSA are attached to the Motion.

7.  Although Highland Capital had been aware that the Debtors were discussing potential reorganization strategies and scenarios with potential investors, Highland Capital was not aware of the terms or structure of any proposed transaction.  Highland Capital first became aware of the terms and structure of the Appaloosa/Cerberus Proposal when it was publicly announced on December 18, 2006.

8.  I and others at Highland Capital reviewed the Motion, with all its exhibits and attachments, immediately after it was received.  Highland Capital expressed its opposition to the Appaloosa/Cerberus Proposal to Delphi on December 21, 2006 through a letter to the Delphi board of directors which outlined Highland Capital's alternative proposal (the "Highland Commitment").  Highland Capital has the financial wherewithal to satisfy all obligations under the Highland Commitment, including the backstop.  Certain terms of the Highland Commitment were clarified in a subsequent letter to the Delphi board of directors dated December 29, 2006.  I was personally involved in the drafting of these two letters, which constitute the Highland Commitment, and signed each of these letters.  To the extent such letters are to be introduced into evidence at the hearing on the Motion, I can verify the authenticity of these letters and the

---

[1]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

4

veracity of the substance set forth therein. Approval of the Highland Commitment is not before the Court at this time.

9. On January 9, 2007, Highland Capital sent a letter to Delphi's board of directors and counsel updating the board on Highland Capital's progress in furtherance of its Commitment and to respond to certain inquires made of Highland Capital from Delphi.

10. I and my team at Highland Capital have analyzed the Appaloosa/Cerberus Proposal as set forth in the Motion. Highland Capital regularly generates financial analyses of transactions and restructuring proposals relating to its investments, and such analyses are prepared by Highland Capital personnel with expertise in this regard and are prepared and maintained in the ordinary course of Highland Capital's business. As part of Highland Capital's analysis of the Appaloosa/Cerberus Proposal, we prepared certain analyses, including those entitled: (i) "Implied Equity Value Calculation Under Cerberus/Appaloosa Plan" (HCM 0003); (ii) "Value Transferred to Cerberus/Appaloosa in the Existing Plan" (HCM 0004); (iii) "Scenario Analysis" (HCM 0005); (iv) "Shareholder Value Lost Under Cerberus/Appaloosa Plan" (HCM 154); and (v) Implied Equity Value Calculation Under Cerberus/Appaloosa Plan" (HCM 155). These analyses were prepared under my direction in the ordinary course of Highland Capital's business, were produced to the Debtors during discovery relating to the Motion with the production numbers indicated, and I can verify the authenticity of such analyses. The analyses referred to herein are attached hereto as Exhibit A.

11. The Motion initially drew objections from every major constituency in these cases: both official committees, the *ad hoc* trade committee, all the Debtors' unions and the US Trustee. Up until undisclosed settlements were reached with the *ad hoc* trade committee and the Unsecured Creditors' Committee on January 9, 2006, which was two days before the scheduled

5

hearing on the Motion, the only supporters of the Motion were the Debtors themselves (who are not stakeholders) and the Appaloosa/Cerberus Group.

12.     Based on Highland Capital's analysis, Highland Capital believes that the Appaloosa/Cerberus Proposal wrongfully and unnecessarily strips enormous value and corporate control from the common stockholders of Delphi and effectively gives that value and control to the Appaloosa/Cerberus Group.

**A.     Transfer of Value to the Appaloosa/Cerberus Group**

13.     The Appaloosa/Cerberus Proposal, if approved by the Court, would give the Appaloosa/Cerberus Group the exclusive right to own a significant portion, and potentially the majority, of the reorganized Delphi.  Pursuant to the Appaloosa/Cerberus Proposal, the Appaloosa/Cerberus Group is entitled to acquire 6.3 million shares of Common Stock called the Direct Subscription Shares, at $35 per share for an aggregate amount of $220,500,000, which price is significantly below the stated emergence price of $45 per share, and an implied equity value of $57.90 per share (as calculated below).  No other common stockholder is given the right to acquire any Common Stock from this reserved block of 6.3 million shares.  This advantageous provision gives the Appaloosa/Cerberus Group a starting potential upside of $63 million. Further, the Appaloosa/Cerberus Group is also granted the exclusive right to acquire 17.143 million shares of Series A Convertible Preferred Stock and 17.143 million shares of Series B Convertible Preferred Stock (for an aggregate amount of $1.2 billion).  Likewise, under the EPCA, no other common stockholder is given the right to acquire any Preferred Stock.  The Preferred Stock is reserved for a select few investors to the exclusion of all others.  As set forth in Section B of this Declaration, the holders of the Preferred Stock are also given extremely powerful control and veto rights over the Delphi board of directors and the conduct of the

6

company to the detriment of commons shareholders.

14.    The Appaloosa/Cerberus Proposal takes the value current stockholders are entitled to receive and gives it to a small group of investors who have the exclusive right to buy Common Stock at not only a discount to market price, but at a substantial discount to the price at which Delphi stock is expected to trade upon emergence.

15.    As stated on Joint Exhibit 73 (HCM 003) and Joint Exhibit 119 (HCM 155), Highland Capital calculated the value of the Delphi's post-emergence share price as implied by (i) the market price of Delphi common stock on December 19, 2006 (the day after announcement of the Appaloosa/Cerberus Proposal); and (ii) the dollar value contributed by existing equity holders in the Rights Offering.  This calculation produced implied equity value of $57.90 per share.  This calculation is the market's reflection of the value of Delphi's shares on a post-emergence basis.  This calculation reflects the market's view of the value of Delphi's equity (as opposed to the projected emergence price of $45.00 share) because it relies on market values.

16.    As reflected on Joint Exhibit 73 (HCM 004) and Joint Exhibit 118 (HCM 154), using the implied market value of $57.90, approximately $785.1 million is taken from common stockholders as a result of the exclusive issuance of the Preferred Shares and approximately $144.3 million is taken from common stockholders as a result of the exclusive issuance of the Direct Subscription Shares to the Appaloosa/Cerberus Group.  The total value taken from stockholders totals $1.29 billion.  (Even using an emergence price of $45 per share, the transfer of value to the Appaloosa/Cerberus Group is approximately $482 million.)  This transfer of enormous value from current stockholders to a small alliance of investors limited to Cerberus, Appaloosa and Harbinger not only constitutes an inappropriate raid on the corporate treasury, but also violates the concept of equal distribution of assets and equal treatment of similarly situated

7

creditors and equity holders.

17. The exclusive right of the Appaloosa/Cerberus Group to acquire the Preferred Shares and the Direct Subscription Shares also gives the Appaloosa/Cerberus Group almost 30% of the reorganized Delphi on the effective date of a plan, exclusive of the Rights Offering shares that the Appaloosa/Cerberus Group may also purchase. Because the Appaloosa/Cerberus Group has the exclusive right to purchase approximately 30% of the reorganized Delphi's capital structure at below market prices, this excess equity value is being taken from the existing common stockholders. In effect, the Appaloosa/Cerberus Group is given a 30% head start over all other common stockholders in the future capital structure of the reorganized Delphi. Even worse, Delphi is paying the Appaloosa/Cerberus Group huge commitment fees to support its exclusive right to buy the shares. Specifically, the Appaloosa/Cerberus Group is receiving a 1.75% commitment fee worth $20 million to purchase Preferred Stock that they are only offering to themselves.

18. Highland Capital believes the Appaloosa/Cerberus Proposal, as currently presented, disenfranchises stockholders, freezes them out of an equal opportunity to purchase Common Stock and represents a failure of Delphi's board to uphold its fiduciary duties to current stockholders.

**B.     Corporate Governance Issues**

19. As to corporate governance, the Appaloosa/Cerberus Group's exclusive right to acquire Preferred Stock also gives it disproportionate control of the board of directors and exclusive approval rights over future business decisions of the reorganized Delphi. Appaloosa and Cerberus are granted "super powers" as the only holders of Series A Preferred Stock. Rank and file holders of Common Stock are subject to the management whim and control of

8

Appaloosa and Cerberus after Delphi successfully reorganizes. Specifically,

- Out of a twelve member board of directors, Appaloosa and Cerberus (as the only entities allowed to acquire Series A Preferred Shares) are entitled to **elect six** of the initial twelve directors.

- The initial Executive Chairman, who holds one of the twelve seats on the board, is selected by a super-majority vote of four of the five members of the Selection Committee. Appaloosa and Cerberus are two of the members of the Selection Committee, and as a result, they can block the selection of any Executive Chairman that they deem inappropriate. Accordingly, Appaloosa and Cerberus control the selection of seven of the twelve board members – a majority of the board.

- Moreover, Appaloosa and Cerberus, as the only holders of Series A Preferred Shares, have the exclusive right to remove the Executive Chairman at any time.

- Finally, Cerberus and Appaloosa have exclusive veto rights over various corporate actions. Instead of giving holders of Common Stock an equal voice in these corporate actions, Appaloosa and Cerberus can exercise their veto rights even if a majority of holders of Common Stock are in favor of the proposed action. Corporate actions subject to this veto right include: (i) new debt or lease financings in excess of $100 million within twelve months from the Issue Date; (ii) granting any liens or mortgages on assets having a value in excess of $100 million within twelve months from the Issue Date; (iii) a sale of substantially all of the assets of the Company; (iv) a merger or consolidation involving a change of control, as well as any acquisition or investment with a value in excess of $100 million from the Issue Date; (v) any issuance of equity securities at less than fair market value, (vi) payment of any cash dividends; and (vii) any amendment of the Company's articles or bylaws.

20. Although the rights offering makes 56.7 million shares of new Common Stock available to existing common shareholders, these shareholders are only entitled to select four of the twelve board seats. This representation on the board is further diluted by the "super powers" given to Appaloosa and Cerberus as the only holders of Series A Preferred Stock.

C. **Overpayment of Creditor Claims**

21. In addition to the exclusive right to acquire the reorganized Delphi's capital structure and the management super powers granted to Appaloosa and Cerberus, the plan

9

framework described in the Appaloosa/Cerberus Proposal significantly overpays creditor claims, diverting value that common stockholders are entitled to receive under the priority scheme mandated by the Bankruptcy Code. Delphi's operations and outlook have improved during 2006 and they continue to improve. Based on earning thresholds established in the EPCA, it appears that Delphi's earnings are projected to increase dramatically in 2007 based on labor cost reductions and a number of operational improvements made in 2006. Delphi's shares are more valuable in the market than the emergence price of $45 per share ascribed to them under the Appaloosa/Cerberus Proposal. Highland Capital believes that Delphi's value is substantially in excess of its debt obligations. Current stockholders should receive this excess value.

22.   Because Common Stock is being used to partially pay creditor claims at lower than market values, creditor claims are being overpaid. Unsecured creditors are being overpaid by approximately $232.2 million and junior creditors are being overpaid by approximately $129 million.

**D.   Unnecessary and Inappropriate Break-Up Fees**

23.   If the Motion is granted, Delphi will put an additional $100 million breakup fee price tag on the better transaction from Highland Capital which is ripe for consideration by Delphi and its stakeholders. No good reason exists to grant the Motion before Delphi has engaged in discussions with Highland Capital to try and implement the $4.7 billion Highland Commitment. Highland Capital is willing to commit to a much lower breakup fee in the range of $20 million.

24.   Before Delphi locks up with anyone, including the Appaloosa/Cerberus Group, the Debtors should engage in negotiations with Highland Capital to explore the $4.7 billion Highland Commitment. Highland Capital is in the process of negotiating a nondisclosure

10

agreement with Delphi so as to enable Highland Capital to meet with major constituencies in these cases, including the statutory committees, General Motors Corporation ("GM") and Delphi's unions, meet with potential investors in the transactions outlined in the Highland Commitment, and conduct due diligence. Highland Capital has also provided the Debtors with its draft Plan Framework and Support Agreement and Equity Purchase and Commitment Agreement black-lined to those of the Appaloosa/Cerberus Group.

25. In order to facilitate resolution of issues with GM and Delphi's unions, Highland Capital has retained Peter Pastillo. According to his resume, Mr. Pastillo is the former chairman and CEO of Visteon Corporation, one of the leading automotive systems suppliers. Prior to joining Visteon, Mr. Pastillo was vice chairman and chief of staff at Ford Motor Company, with responsibility for Ford Government Affairs, Human Resources, and the Office of the General Counsel and Public Affairs. During his time at Ford, he was employed in numerous capacities, including vice-president of Labor Relations. Mr. Pastillo has extensive experience in the automotive industry, and has worked closely with the automotive unions.

26. The scope of the relief requested in the Motion is of dramatic consequence to all constituencies in these Chapter 11 cases. An order approving the relief requested in the Motion shapes the course of Delphi's reorganization because the Appaloosa/Cerberus Proposal effectively dictates all the terms and conditions of the Debtors' plan of reorganization, including creditor treatment and corporate governance, all without meeting the statutory requirements of a disclosure statement containing adequate information and creditor vote. An order approving the Motion and the agreements contained therein commits the Debtors and their estates to a course of action that is fundamentally unfair and in derogation of the rights of the common stockholders of Delphi. Instead of being "frozen out," as would result from the Appaloosa/Cerberus Proposal,

Highland Capital believes that existing stockholders should be engaged in the reorganization process, be permitted to participate in an equity based funding and be given the opportunity to maintain control of the reorganized Delphi at the common stockholder level. Under the Appaloosa/Cerberus Proposal, the existing stockholders will receive only 2.2% (compared to their 100% current ownership) of the equity of the reorganized Delphi, with the opportunity to increase ownership up to 44.1% under the limited and narrow rights offering made available to existing stockholders under the Appaloosa/Cerberus Proposal.

27.    Highland Capital believes the Delphi and the major creditor and equity constituencies should be allowed the time for due consideration of the Highland Commitment without the imposition of a needless $100 million break up fee. Highland Capital believes the Debtors' fiduciary duties demand that the process accommodate consideration of better offers.

F.    **Lock-Up Agreement Makes Alternative Transaction a Sham**

28.    The PSA negotiated among the Debtors, GM and the Appaloosa/Cerberus Group contains a provision that prohibits GM from entering into any discussions or negotiations with third parties concerning any Alternative Transaction for an extended period of time until April 1, 2007. *See PSA § 2.4.* In addition, the PSA cannot be terminated by the Debtor or the other parties thereto, including GM, until April 1, 2007. *See PSA § 3.1(b).* No Alternative Transaction is possible because a critical element of any plan of reorganization is GM's consent – which cannot be obtained because GM is contractually prohibited from negotiating or discussing an Alternative Transaction. Any effort toward an Alternative Transaction would be completely stymied by GM's absence from the negotiating table. While GM may use a "fiduciary out" to commence discussions with other possible suitors, the existence of the lock-up provision in the PSA in and of itself chills the bidding and shows that the Appaloosa/Cerberus Group is not

interested in a level playing field or maximizing value for all Delphi stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 10th day of January, 2007 at New York, New York.

_____
Patrick H. Daugherty