IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :

In re                          :    Chapter 11

                            :

DELPHI CORPORATION, et al.,    :    Case No. 05-44481 (RDD)

                            :

                 Debtors.    :    (Jointly Administered)

                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On January 10, 2007, I caused to be served the document listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via facsimile:

    1)    Proposed Plan Investment and Framework Support Approval Motion Non-Omnibus Hearing Agenda (Docket No. 6524) [a copy of which is attached hereto as Exhibit D]

On January 10, 2007, I caused to be served the document listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

    2)    Debtors' Omnibus Reply to Objections to Plan Investment and Framework Support Approval Motion (Docket No. 6531) [a copy of which is attached hereto as Exhibit E]

Dated: January 15, 2007

                                      _____
                                      Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 15th day of January, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____

Commission Expires: _____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 | donald.bernstein@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| | Brian Resnick | | | | | | 212-450-4213 | 212-450-3213 | brian.resnick@dpw.com | |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivinj@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

1/10/2007 6:52 PM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason D. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

1/10/2007 6:52 PM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/10/2007 6:53 PM
Delphi 2002 lists Overnight

Delphi Corporation

Framework Agreement Special Parties

| CREDITORNAME | CREDITORNOTICENAME | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY/FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Appaloosa Management L.P. | Ronald Goldstein | 26 Main Street | | Chatham | NJ | 07928 | | 973-701-7055 | r.goldstein@amlp.com | Appaloosa Management L.P. |
| Cerberus Capital Management, L.P. | Lenard Tessler | 299 Park Avenue | | New York | NY | 10171 | | | LTessler@cerberuscapital.com | Cerberus Capital Management, L.P. |
| Cleary Gottlieb Steen & Hamilton LLP | Leslie N. Silverman | One Liberty Plaza | | New York | NY | 10006 | 212-225-2000 | 212-225-3999 | lsilverman@cgsh.com | Counsel to UBS Securities LLC |
| Delphi Corporation | John D. Sheehan, David M. Sherbin | 5725 Delphi Drive | | Troy | MI | 48098 | | | john_sheehan@delphi.com david.sherbin@delphi.com | Delphi Corporation |
| Fried, Frank, Harris, Shriver & Jacobson | Bonnie Steingart Debra M. Torres | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | steinbo@friedfrank.com torrede@friedfrank.com | Counsel to Equity Security Holders Committee |
| General Motors Corporation | Michael Lukas | 767 Fifth Avenue | 14th Floor | New York | NY | 10153 | | | michael.lukas@gm.com | General Motors Corporation |
| General Motors Corporation | Chris Johnson, Frederick Fromm | 300 GM Renaissance Center | | Detroit | MI | 48265 | | | echris.johnson@gm.com fred.fromm@gm.com | General Motors Corporation |
| Greenhill & Co. | Harvey R. Miller | 300 Park Avenue | | New York | NY | 10022 | 212-389-1580 | 212-389-1780 | hmiller@greenhill-co.com | Greenhill & Co. |
| Harbinger Del-Auto Investment Co. Ltd. c/o Harbinger Capital Partners | Philip A. Falcone | 555 Madison Avenue | 16th Floor | New York | NY | 10022 | 212-521-6970 | 212-521-6972 | pfalcone@harbingercap.net | Harbinger Del-Auto Investment Co. Ltd. c/o Harbinger Capital Partners |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Kasowitz, Benson, Torres & Friedman LLP | David S. Rosner Michael M. Fay Adam L. Shiff | 1633 Broadway | | New York | NY | 10019 | 212-506-1700 | 212-506-1800 | drosner@kasowitz.com mfay@kasowitz.com ashiff@kasowitz.com | Counsel to the Ad Hoc Trade Committee |
| Kaye Scholer LLP | Lynn Fisher, Benjamin Mintz | 425 Park Avenue | | New York | NY | 10022-3598 | 212-836-8000 | 212-836-8689 | lfisher@kayescholer.com Bmintz@kayescholer.com | Counsel to Harbinger-Del Auto Investment Company, Ltd. c/o Harbinger Capital Partners |
| Kennedy, Jennick & Murray | Thomas Kennedy Susan Jennik Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers, Communicaitons Workers of America (IUE-CWA) |
| Latham & Watkins LLP | Robert J. Rosenberg Mitchell A. Seider Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | 212-906-1200 | 212-751-4864 | robert.rosenberg@lw.com mitchell.seider@lw.com mark.broude@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Merrill Lynch & Co. | Robert Spork, Rick Morris | 4 World Financial Center | | New York | NY | 10080 | 212-449-4969 | 212-449-0769 | robert_spork@ml.com frederick_morris@ml.com | Merrill Lynch Pierce Fenner & Smith Incorporated |
| Milbank, Tweed, Hadley & McCoy | Gregory Bray | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017-5735 | 213-892-4000 | 213-892-4470 | gbray@milbank.com | Counsel to Cerberus Capital Management, L.P. |
| Milbank, Tweed, Hadley & McCoy | Thomas C. Janson | One Chase Manhattan Plaza | | New York | NY | 10005-1413 | 212-530-5000 | 212-822-5899 | TJanson@milbank.com | Counsel to Cerberus Capital Management, L.P. |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Andrew N. Rosenberg | 1285 Avenue of the Americas | | New York | NY | 10019 | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com | Counsel to Merrill Lynch Pierce Fenner & Smith Incorporated |
| Previant Goldberg Uelmen Gratz Miller & Brueggeman | Marianne Goldstein Robbins Jill M. Hartley | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | 414-271-4500 | 414-271-6308 | mgr@previant.com | Counsel to IBEW Local 663 and IAM District 10 |
| UBS Securities LLC | Osamu Watanabe | 299 Park Avenue | | New York | NY | 10171 | 212-821-2841 | 212-821-3008 or 212-821-4042 | osamu.watanabe@ubs.com sd.smith@ubs.com gavin.kagan@ubs.com | UBS Securities LLC |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Jeffrey L. Tanenbaum, Michael P. Kessler | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com jeff.tanenbaum@weil.com michael.kessler@weil.com | Counsel to General Motors Corporation |
| White & Case LLP | Thomas E. Lauria | Wachovia Financial Center | 200 South Biscayne Blvd, Suite 4900 | Miami | FL | 33131-2352 | 305-371-2700 | 305-358-5744 or 305-358-5766 | TLauria@miami.whitecase.com | Counsel to Appaloosa Management L.P. and Harbinger Del-Auto Investment Company, Ltd. c/o Harbinger Capital Partners |
| White & Case LLP | Gregory Pryor | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | 212-819-8389 | 212-354-8113 | gpryor@ny.whitecase.com | Counsel to Appaloosa Management L.P. and Harbinger Del-Auto Investment Company, Ltd. c/o Harbinger Capital Partners |

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2670 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivin@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc, | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | James Le | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-751-1511 | 310-751-1561 | jle@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Daniel R. Fisher | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Patrick J. Healy | 767 Third Ave. | 31st Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

1/10/2007 6:52 PM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Ajamie LLP | Thomas A. Ajamie | 711 Louisiana | Suite 2150 | Houston | TX | 77002 | | 713-860-1600 | 713-860-1699 | tajamie@ajamie.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | Kimberly J. Robinson | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | kim.robinson@bfkpn.com | Counsel to Motion Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | William J. Barrett | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | william.barrett@bfkpn.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Madison County (Indiana) Treasurer |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Rjafeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Michael J Alerding Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com malerding@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Industries |
| Blank Rome LLP | Bonnie Glantz Fatell | Chase Manhattan Centre | 1201 Market Street, Suite 800 | Wilmington | DE | 19801 | | 302-425-6423 | 302-428-5110 | fatell@blankrome.com | Counsel to Special Devices, Inc. |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennslyvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@engelhard.com | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Aerospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co., Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | | 615-321-0555 | 615-321-9555 | amalone@colwinlaw.com | Counsel to Averitt Express, Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | 203-862-8200 (230) 862-8231 | 203-629-1977 (203) 629-1977 | mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | wachstein@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert  Szwajkos | 250 N. Pennslyvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau | 101 Park Avenue | | New York | NY | 10178-0061 | | 212-696-8898 | 917-368-8898 | athau@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Daniels & Kaplan, P.C. | Jay Selanders | 2405 Grand Boulevard | Suite 900 | Kansas City | MO | 64108-2519 | | 816-221-3086 | 816-221-3006 | selanders@danielsandkaplan.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Deputy Attorney General | Amina Maddox | R.J. Hughes Justice Complex | P.O. Box 106 | Trenton | NJ | 08625 | | 609-984-0183 | 609-292-6266 | amina.maddox@dol.lps.state.nj.us | Deputy Attorney General - State of New Jersey |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.com | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representative for Electronic Data Systems Corporation |
| Entergy Services, Inc. | Alan H. Katz | 7411 Highway 51 North | | Southaven | MS | 38671 | | | | akatz@entergy.com | Counsel to Entergy Services, Inc. Company |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Gazes LLC | Ian J. Gazes | 32 Avenue of the Americas | | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | ian@gazesllc.com | Counsel to Setech, Inc. |
| Gazes LLC | Eric Wainer | 32 Avenue of the Americas | Suite 1800 | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | office@gazesllc.com | Counsel to Setech, Inc. |
| Gibbons, Del Deo, Dolan, Griffinger & Vecchione | David N. Crapo | One Riverfront Plaza | | Newark | NJ | 07102-5497 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinprocter.com | Counsel to UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinprocter.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbeler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J.Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Carren Shulman Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | carren.shulman@hellerehrman.com timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Glen Dumont | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4750 | 908-898-4137 | glen.dumont@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald P. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SPX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC and Tenneco Inc. |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Rlly | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel for Millwood, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert. Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel in Charge for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichtong Pensioenfords ABP |
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative of Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr., Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Jean R. Robertson, Esq. | 600 Superior Avenue, East | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | jrobertson@mcdonaldhopkins.com | Counsel to Brush Engineered materials |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuirewoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Technetral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel of Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiaries Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankfer Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Noma Company and General Chemical Performance Products LLC | James Imbriaco | 90 East Halsey Road | | Parsippanny | NJ | 07054 | | 973-884-6952 | 973-515-3244 | jimbriaco@gentek-global.com | |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | | 908-722-0700 | 908-722-0755 | eabdelmasieh@nmmlaw.com | Counsel to Rotor Clip Company, Inc. |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-746-4488 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa aenglund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5187 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Anthony Princi Esq Thomas L Kent Esq | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5000 | 212-506-5151 | aprinci@orrick.com tkent@orrick.com | Counsel to Ad Hoc Committee of Trade Claimants |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | mcheney@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | 7th Floor | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pitney Hardin LLP | Ronald S. Beacher | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-682-3485 | rbeacher@pitneyhardin.com | Counsel to IBJTC Business Credit Corporation |
| Pitney Hardin LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@pitneyhardin.com | Counsel to Marshall E. Campbell Company |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangleroup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup.com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Charles S. Schulman, Arlene N. Gelman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | cschulman@sachnoff.com agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher R. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | mnewman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Michael Yetnikoff | 623 Fifth Avenue | 28th Floor | New York | NY | 10022 | | 212-753-5000 | 212-753-5044 | myetnikoff@schiffhardin.com | Counsel to Means Industries |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Automotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael L. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to  le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5811 | 860-251-5218 | bankruptcy@goodwin.com | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co., |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Jack E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | lloyd.sarakin@am.sony.com | Counsel to Sony Electronics, Inc. |
| Sotiroff & Abramczyk, P.C. | Robert M. Goldi | 30400 Telegraph Road | Suite 444 | Bingham Farms | MI | 48025 | | 248-642-6000 | 248-642-9001 | rgoldi@sotablaw.com | Counsel to  Michigan Heritage Bank; MHB Leasing, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.com | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Central Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-3922100 | 609-392-7956 | jposta@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Madison L. Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 20007 | | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Taft, Stettinius & Hollister LLP | Richard L. Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennessee Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Thompson & Knight | Rhett G. Campbell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts counsel to Debtors |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center | Suite 807 | Pittsburgh | PA | 15222 | | 412-562-2549 | 412-562-2429 | djury@steelworkers-usw.org | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Varnum, Riddering, Schmidt & Howlett LLp | Michael S. McElwee | Bridgewater Place | P.O. Box 353 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5131 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz Gerard Uzzi Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com guzzi@whitecase.com dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, Inc. |
| White & Case LLP | Thomas Lauria Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com featon@miami.whitecase.com | Counsel to Appaloosa Management, Inc. |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel to National Instruments Corporation |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 17 of 17

1/10/2007 6:52 PM
Delphi 2002 lists Email

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | 866-609-0888 | aswiech@akebono-usa.com | Vice President of Administration for Akebono Corporation |
| APS Clearing, Inc. | Andy Leinhoff | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | 512-314-4462 | aleinoff@amph.com | Counsel to APS Clearing, Inc. |
| APS Clearing, Inc. | Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | 512-314-4462 | mhamilton@amph.com | Counsel to APS Clearing, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-6065 | 212-697-1559 | dkarp@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co. |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | 305-349-2310 | crieders@gjb-law.com | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | 302-622-7100 | gjarvis@gqelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employes's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | 850-763-8425 | gerdekomarek@bellsouth.net | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kirkland & Ellis LLP | Geoffrey A. Richards | 200 East Randolph Drive | | Chicago | IL | 60601 | 312-861-2000 | 312-861-2200 | grichards@kirkland.com | Counsel to Lunt Mannufacturing Company |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | 212-947-1202 | rcovino@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | 216-579-0212 | mmharner@jonesday.com | Counsel to WL. Ross & Co., LLC |
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | 312-849-2021 | mmoody@okmlaw.com | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | 212-373-2053 | cweidler@paulweiss.com | Counsel to Ambrake Corporation; Akebono Corporation |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | 330-670-3020 | jlapinsky@republicengineered.co m | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | 213-312-2001 | cnorgaard@ropers.com | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | 312-258-5600 | wkohn@schiffhardin.com | Counsel to  Means Industries |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | 212-806-6006 | jminias@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Traub, Bonaquist & Fox LLP | Maura I. Russell Wendy G. Marcari | 655 Third Avenue | 21st Floor | New York | NY | 10017 | 212-476-4770 | 212-476-4787 | DBR@tbfesq.com | Counsel to SPCP Group LLC |
| WL Ross & Co., LLC | Oscar Iglesias | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | 212-317-4893 | oiglesias@wlross.com | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

1/10/2007 6:53 PM
Delphi 2002 lists Fax/US Mail

# EXHIBIT D

**Hearing Date: January 11, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - And -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                        :
    In re                               :    Chapter 11
                                        :
DELPHI CORPORATION, et al.,             :    Case No. 05-44481 (RDD)
                                        :
                        Debtors.        :    (Jointly Administered)
                                        :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

PROPOSED PLAN INVESTMENT AND FRAMEWORK SUPPORT APPROVAL MOTION
NON-OMNIBUS HEARING AGENDA

Location Of Hearing:        United States Bankruptcy Court for the Southern District of New
                            York, Alexander Hamilton Custom House, Room 610, 6th Floor,
                            One Bowling Green, New York, New York 10004-1408

### A. Matter Set for Hearing

1. **"Plan Investment And Framework Support Approval Motion"**-
Expedited Motion For Order Authorizing And Approving The
Equity Purchase And Commitment Agreement Pursuant To §§
105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And
The Plan Framework Support Agreement Pursuant To §§ 105(a),
363(b), And 1125 (e) Of The Bankruptcy Code (Docket No. 6179)

*Responses Filed:*          *Preliminary Objection Of The Official
Committee Of Unsecured Creditors To The
Expedited Motion For Order Authorizing
And Approving The Equity Purchase And
Commitment Agreement Pursuant To §§
105(a), 363(b), 503(b) And 507(a) Of The
Bankruptcy Code And The Plan Framework
Support Agreement Pursuant To §§ 105(a),
363(b), And 1125(e) Of The Bankruptcy
Code (Docket No. 6209)*

*Preliminary Objection Of The Official
Committee Of Equity Security Holders To
Expedited Motion For Order Authorizing
And Approving The Equity Purchase And
Commitment Agreement Pursuant To §§
105(a), 363(b), And 507(a) Of The
Bankruptcy Code And The Plan Framework
Support Agreement Pursuant To §§ 105(a),
363(b), And 1125(e) Of The Bankruptcy
Code (Docket No. 6211)*

*Preliminary Objection Of IUE-CWA To
Motion For Order Authorizing And
Approving The Equity Purchase And
Commitment Agreement Pursuant To §§
105(a), 363 (b), 503(b) And 507(a) Of The
Bankruptcy Code And The Plan Framework
Support Agreement Pursuant To §§ 105(a),
363(b) And 1125(e) Of The Bankruptcy Code
(Docket No. 6242)*

*First Supplemental Objection Of The Official
Committee Of Equity Security Holders In
Opposition To Debtors' Expedited Motion
For Order Authorizing And Approving The
Equity Purchase And Commitment
Agreement Pursuant To §§ 105(a), 363(b),
503(b) And 507(a) Of The Bankruptcy Code*

2

*And The Plan Framework Support
Agreement Pursuant To §§ 105(a), 363(b),
And 1125(e) Of The Bankruptcy Code
(Docket No. 6247)*

*Preliminary Objection Of The Delphi Trade
Committee To The Expedited Motion For
Order Authorizing And Approving The
Equity Purchase And Commitment
Agreement Pursuant To §§ 105(a), 363(b),
503(b) And 507(a) Of The Bankruptcy Code
And The Plan Framework Support
Agreement Pursuant To §§ 105(a), 363(b),
And 1125(e) Of The Bankruptcy Code
(Docket No. 6254); Notice Of Withdrawal Of
The Delphi Trade Committee's Preliminary
Objection At Docket No. 6254, And Its
Participation In, And Support For, Docket
Nos. 6470, 6471, 6493 (Docket No. 6501);
Statement Of The Delphi Trade Committee In
Support Of The Expedited Motion For Order
Authorizing And Approving The Equity
Purchase And Commitment Agreement
Pursuant To §§ 105(a), 363(b), 503(b) And
507(a) Of The Bankruptcy Code And The
Plan Framework Support Agreement
Pursuant To §§ 105(a), 363(b) And 1125(e)
Of The Bankruptcy Code (Docket No. 6508)*

*Highland Capital Management, LP's
Objection And Response To Expedited
Motion For Order Authorizing And
Approving The Equity Purchase And
Commitment Agreement Pursuant To §§
105(a), 363(b), 503(b) And 507(a) Of The
Bankruptcy Code And The Plan Framework
Support Agreement Pursuant To §§ 105(a),
363(b), And 1125(e) Of The Bankruptcy
Code (Docket No. 6330)*

*Preliminary Objection And Response Of
International Union Of Operating Engineers
Local Union Nos. 18S, 101S And 832S To
Expedited Motion For Order Authorizing
And Approving The Equity Purchase And
Commitment Agreement Pursuant To §§
105(a), 503(b) And 507(a) Of The
Bankruptcy Code And The Plan Framework
Support Agreement Pursuant To §§ 105(a),*

*363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6344)*

*Preliminary Objection Of The IBEW And IAMAW To Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6367)*

*Objection Of The United States Trustee To Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b), And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6401)*

*Joinder/Support Of Certain Parties To Debtors' Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b) And 1125(a) Of The Bankruptcy Code (Docket No. 6460)*

*Supplemental Objection Of IUE-CWA To Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b) And 1125(e) Of The Bankruptcy Code (Docket No. 6496)*

*Second Supplemental Objection Of The Official Committee Of Equity Security Holders In Opposition To Debtors' Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework*

|  | *Support Agreement Pursuant To §§ 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6497)* |
|---|---|
|  | *Supplemental Objection Of The IUE-CWA To Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b) And 1125(e) Of The Bankruptcy Code - Appendix (Docket No. 6500)* |
| *Reply Filed:* | *A reply will be filed.* |
| *Related Filings:* | *Order Scheduling Non-Omnibus Hearings On Debtors' Plan Investment And Framework Support Approval Motion and DIP Refinancing Motion (Docket No. 6193)* |
|  | *Pretrial And Scheduling Order Relating To Debtors' Expedited Motion For Order Authorizing And Approving Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) And Plan Framework And  Support Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), And 1125(e) (Docket No. 6272)* |
|  | *Motion Under Fed. R. Bankr. P. 9016 And Fed. R. Civ. P. 45 To Quash Trial Subpoenas Served By The Official Committee Of Unsecured Creditors, The Official Committee Of Equity Security Holders, And The Ad Hoc Trade Committee On Robert S. Miller And John D. Opie (Docket No. 6469)* |
|  | *Joint Opposition Of The Official Committee Of Unsecured Creditors, Official Committee Of Equity Security Holders And The Ad Hoc Committee To The Debtor's Motion Under Fed. R. Bankr. P. 9016 And Fed. R. Civ. P. 45 To Quash Trial Subpoenas Served On Robert S. Miller And John D. Opie (Docket No. 6470); Notice Of Withdrawal Of The Delphi Trade Committee's Preliminary Objection At Docket No. 6254, And Its Participation In, And Support For, Docket Nos. 6470, 6471, 6493 (Docket No. 6501)* |

5

*Joint Emergency Motion Of The Official Committee Of Unsecured Creditors, Official Committee Of Equity Security Holders And The Ad Hoc Trade Committee To Preclude Testimony Of David L. Resnick Relating To Debtors' Expedited Motion For Order Authorizing And Approving Equity Purchase And Commitment Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), 503(b), And 507(a) And Plan Framework And Support Agreement Pursuant To 11 U.S.C. §§ 105(a), 363(b), And 1125(e) (Docket No. 6471); Notice Of Withdrawal Of The Delphi Trade Committee's Preliminary Objection At Docket No. 6254, And Its Participation In, And Support For, Docket Nos. 6470, 6471, 6493 (Docket No. 6501)*

*Ex Parte Motion For Order Authorizing The Official Committee Of Equity Security Holders To File A Redacted Version Of Its Second Supplemental Objection To Debtors' Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6480); Order Authorizing The Official Committee Of Equity Security Holders To File A Redacted Version Of Its Second Supplemental Objection To Debtors Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To §§ 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To §§ 105(a), 363(b), and 1125 (e) Of The Bankruptcy Code (Docket No. 6494)*

*Motion Pursuant To §§ 105(a) And 107(b) Of The Bankruptcy Code And Bankruptcy Rule 9018 For Order Authorizing Movants To File Under Seal The Joint Expedited Motion To Compel Documents And Testimony Improperly Withheld As Privileged (Docket No. 6493); Notice Of Withdrawal Of The Delphi Trade Committee's Preliminary*

*Objection At Docket No. 6254, And Its
Participation In, And Support For, Docket
Nos. 6470, 6471, 6493 (Docket No. 6501)*

*Stipulation And Agreed Protective Order
Governing Production And Use Of
Confidential And Highly Confidential
Information In Connection With The
Debtors' Expedited Motion For Order
Authorizing And Approving The Equity
Purchase And Commitment Agreement
Pursuant To §§ 105(a), 363(b), 503(b) And
507(a) Of The Bankruptcy Code And The
Plan Framework Support Agreement
Pursuant To §§ 105(a), 363(b), And 1125(e)
Of The Bankruptcy Code (Docket No. 6511)*

*Stipulation And Agreed Protective Order
Governing Production And Use Of
Confidential And Highly Confidential
Information In Connection With The
Debtors' Expedited Motion For Order
Authorizing And Approving The Equity
Purchase And Commitment Agreement
Pursuant To §§ 105(a), 363(b), 503(b) And
507(a) Of The Bankruptcy Code And The
Plan Framework Support Agreement
Pursuant To §§ 105(a), 363(b), And 1125(e)
Of The Bankruptcy Code (Docket No. 6512)*

*Status:*          *The hearing with respect to this matter will
be proceeding.*

Dated:    New York, New York
          January 10, 2007

SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP


By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 9331)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606

      - and -


By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

# EXHIBIT E

**Hearing Date: January 11, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
George N. Panagakis (GP 0770)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                    :
        In re                                       :    Chapter 11
                                                    :
DELPHI CORPORATION, et al.,                         :    Case No. 05-44481 (RDD)
                                                    :
                                                    :    (Jointly Administered)
        Debtors.                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO
PLAN INVESTMENT AND FRAMEWORK SUPPORT APPROVAL MOTION

        Delphi Corporation ("Delphi" or the "Company") and certain of its subsidiaries

and affiliates, debtors and debtors-in-possession in the above-captioned cases (the "Debtors"),

hereby submit this response (the "Reply") to the six unresolved objections timely filed to the

Debtors' Expedited Motion For Order Authorizing And Approving The Equity Purchase And

Commitment Agreement Pursuant To Sections 105(a), 363(b), 503(b), And 507(a) Of The

Bankruptcy Code And The Plan Framework Support Agreement Pursuant To Sections 105(a),

363(b), And 1125(e) Of The Bankruptcy Code, dated December 18, 2006 (the "Motion").

The Debtors have resolved two objections to the Motion:  (a) Preliminary

Objection Of The Official Committee of Unsecured Creditors (the "Creditors' Committee"),

dated December 19, 2006 (Docket No. 6209) (to be withdrawn subject to documentation of

settlement), and (b) Preliminary Objection Of The Ad Hoc Committee of Delphi Trade Claim

Holders (the "Trade Committee"), dated December 21, 2006 (Docket No. 6254), withdrawn by

Notice Of Withdrawal, dated January 9, 2006 (Docket No. 6501).

The six remaining objections include:  (a) Preliminary Objection Of The Official

Committee of Equity Security Holders (the "Equity Committee"), dated December 19, 2006

(Docket No. 6211), supplemented by First Supplemental Objection Of The Equity Committee,

dated December 20, 2006 (Docket No. 6247), supplemented by Second Supplemental Objection

Of The Equity Committee, dated January 9, 2007 (Docket No.6497), (b) Preliminary Objection

Of International Union Of Electronic, Electrical, Salaried, Machine And Furniture Workers,

Communications Workers of America ("IUE-CWA"), dated December 20, 2006 (Docket No.

6242); supplemented by Supplemental Objection Of IUE-CWA (Docket Nos. 6496, 6500),

(c) Highland Capital Management, LP's Objection And Response, dated December 28, 2006

(Docket No. 6330), (d) Preliminary Objection and Response of International Union of Operating

Engineers Local Union Nos. 18S, 101S, and 832S (the "IUOE"), dated December 29, 2006

(Docket No. 6344), (e) Preliminary Objection of the International Brotherhood of Electrical

Works Local 663 ("IBEW") and International Association of Machinists and Aerospace Workers

2

District 20 ("IAMAW") (6367), and (f) Objection of the United States Trustee (the "U.S.

Trustee"), dated January 3, 2007 (Docket No. 6401) (collectively, the "Objections" by the

"Objectors").  A chart summarizing the Objections and the Debtors' responses is attached hereto

as Exhibit A.

Preliminary Statement

1.    The Framework Agreements are the product of more than five months of

intense effort and arms-length negotiation by the Debtors, the Plan Investors, General Motors,

and the Debtors' statutory committees.  It is the business judgment of the Debtors that the

Framework Agreements create a path to a consensual plan of reorganization that would

implement part of the Debtors' Transformation Plan by resolving open issues with the Debtors'

unions and General Motors, which would allow for emergence from reorganization in the near

term, provide full recovery to unsecured creditors, and provide significant value to current equity

holders.

2.    The primary authority for the approval sought by this motion is

Bankruptcy Code section 363(b)(1), which permits a debtor-in-possession to use property of the

estate "other than in the ordinary course of business" after notice and a hearing.  11 U.S.C.

§ 363(b)(1).  The maximum exposure to the property of the Debtors' estates from approval of the

Framework Agreements, including all potential liability for Commitment Fees, Transaction

Expenses, Alternate Transaction Fee, Indemnification payments, and even damages for the

Debtors' willful breach of the Framework Agreements, is capped at $100 million until the Court

enters an order approving a disclosure statement in these cases.  (This represents approximately

3% of the equity to be offered under the ECPA.)  The Motion seeks the Court's approval of the

Debtors' business judgment that it is in the best interest of the estates to accept these burdens in

exchange for the benefits that the Framework Agreements provide to the estates.

3

3.      In arguing to the contrary that the Framework Agreements comprise an
impermissible <u>sub rosa</u> plan of reorganization, or objecting to certain of the plan terms
contemplated among the Parties to the Framework Agreements, the Objectors fail to appreciate
that the only "property of the estate" at issue in the Motion are the potential fees, costs, and
liabilities described in the preceding paragraph.  Although the Framework Agreements touch on
elements of a potential plan of reorganization, the Motion does not seek, or require, the Court's
approval of any elements of a plan, and does not impair any of the Objectors' rights with respect
to objecting to or voting on any plan of reorganization.

4.      Three days after the debtors filed the Motion, Highland submitted its
unsolicited Proposal And Commitment Letter For Up To $4.7 Billion Common Equity
Commitment (the "Highland Proposal").  Highland had made no prior contact with the Debtors
regarding participation in the reorganization.  As set forth more fully below, the Debtors
nevertheless immediately engaged in discussions with Highland so as to better understand and
explore Highland's proposal.  At the same time, the Debtors determined to preserve the
Framework Agreements, which are subject to termination by the Plan Investors if not finally
approved by the Court by January 22, 2007.

5.      On January 9 and 10, 2007, the Board of Directors met to further consider
the Highland Proposal.

<u>Argument</u>

6.      Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use
property of the estate "other than in the ordinary course of business" after notice and a hearing.
11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be
authorized if the debtor demonstrates a sound business justification for it.  <u>See</u> <u>In re Lionel</u>

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

       7.     The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's

consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a

means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift

administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a

lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

       8.     Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." Id.   To satisfy its burden, it is not enough for an objector

simply to raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections." Lionel, 722 F.2d at 1071. .

       9.     Courts have given deference to a debtor's business decisions when those

decisions follow thorough financial analyses and the considered deliberation of senior

management and directors.  In re Adelphia Commc'ns Corp., No. 02-41729 (REG), 2003 WL

22316543, at *31 (Bankr. S.D.N.Y. Mar. 4, 2003); In re Global Crossing Ltd., 295 B.R. 726,

744-46 (Bankr. S.D.N.Y. 2003); In re Brooklyn Hosp. Ctr., Inc., 341 B.R. 405, 412 (Bankr.

E.D.N.Y. 2006).  Furthermore, courts have also found that arms-length negotiations between

entities that result in agreement are evidence of the exercise of sound business judgment.  In re

EaglePicher Holdings, Inc., No. 05-12601, 2005 WL 4030132, at *4 (Bankr. S.D. Ohio Aug. 26,

2005).  As discussed herein and in the Motion, and as the testimony to be introduced at the

hearing on this matter will show, the Debtors have been involved in extensive discussions and

negotiations with the statutory committees, the Plan Investors, and GM for more than five

months to achieve the Framework Agreements.  The Board has been continually apprised and is

fully informed of all these developments.  There is no basis to disturb the Debtors decision to

enter into the Framework Agreements.

A.    Modifications To Framework Agreements

        10.    On December 29, 2006, the Debtors submitted a response, acknowledged

by GM, Appaloosa, and Cerberus, to various statements propounded by the Creditors'

Committee, the Equity Committee, and the Trade Committee in which the committees purported

to set forth ambiguities in the Framework Agreements.

        11.    In connection with their review of the Framework Agreements and the

statements by the committees, as set forth in the Debtors' response and summarized below, the

Parties agreed to make certain clarifications to the Framework Agreements and the Debtors

agreed to provide black-lined versions of the Framework Agreements with this reply.

- The list of events constituting a Change of Recommendation in the Equity Purchase and Commitment Agreement (the "EPCA") was clarified to exclude actions taken by GM.

- The termination rights under the EPCA were clarified so that (i) neither the Debtors' nor GM's termination of the Plan Framework Support Agreement ("PSA") provides the Debtors with a termination right under the EPCA, and (ii) the Debtors and the Plan Investors have, in addition to their other respective

6

termination rights, an unconditional right to terminate the EPCA on or after August 31, 2007 if the Closing Date has not occurred.

- Various provisions of the EPCA governing the Rights Offering were clarified so that holders of Rights may exercise those rights via a document separate from the ballot forms to be used in connection with solicitation of acceptances of the Plan.

- The EPCA, the PSA, and the Preferred Stock Term Sheet were clarified so that various restrictions applicable to A-D Acquisition Holdings, LLC, Dolce Investments LLC, and/or the holders of Series A Preferred Stock apply to their respective affiliates.

- The Preferred Stock Term Sheet was clarified so that, if an event would cause shares of Series A Preferred Stock automatically to convert into shares of Series B Preferred Stock but for the lack of a registration statement covering resales of Series B Preferred Stock, such conversion would occur when such registration statement became effective.

12.    Since that time, negotiations have continued in a further attempt to resolve the Objections.  The parties have agreed to additional modifications to the Framework Agreements since December 29, 2006.  Attached to this response as Exhibits B, C, D, E, and F, are a blacklined version of the EPCA, a supplement to the EPCA, a blacklined version of the Preferred Stock Term Sheet, and a supplement to the PSA, which reflect the current status of the transaction documents, as well as a form of order.

B.    Fees And Expenses In The Framework Agreements

13.    The principal objections to the Commitment Fees, Transaction Fees, and the Alternate Transaction Fee go to the circumstances under which they purportedly could become due rather than to the amount of the fees.  For example:

The Equity Committee recognizes that commitment fees and break-up fees are common features in transactions where a buyer or investor assumes the risk that its agreement will serve as a "stalking horse" that attracts a competing bid from another party.  The Equity Committee does not object to the amounts of either the Commitment Fees or the Alternat[e] Transaction Fee, or the payment of these fees, where the Agreements have attracted an actual or potential competing bid that causes the Debtors to change their position concerning the Agreements.

(Docket No. 6247, at 16-17.)

7

14.    <u>Commitment Fees</u>.  Under the EPCA, the Debtors will agree to pay total Commitment Fees of up to $76 million:  $21 million in connection with the Preferred Shares (which is 1.75% of the preferred offering) and $55.125 million in connection with the Direct Subscription Shares and the backstop Standby Commitment (which is 2.5% of the offering). The Equity Committee and the three union objectors all object to approval of the Commitment Fees because the Plan Investors allegedly have nothing at risk.

15.    No amount of the Commitment Fees becomes payable merely upon approval of the Framework Agreements.  Rather, appropriate milestones ensure that the payment of Commitment Fees is commensurate with progress in achieving major steps toward consummation of the transaction:

- The first $10 million becomes payable only <u>after</u> the Plan Investors' due diligence condition has been satisfied or waived.
- An additional $28,062,050 (the balance of the first 50%) will be paid only <u>after</u> GM and the Debtors have reached agreement on definitive settlement documents, and the Plan Investors have approved the terms of the GM Settlement.
- The final $38,062,050 (the second 50%) will not be paid until <u>after</u> the Court has approved the terms of the disclosure statement.

(EPCA § 2(i).)

16.    The Equity Committee incorrectly suggests that the condition for payment of the second milestone ($28,062,050), the Plan Investors' approval of the GM Settlement, is controlled by the Plan Investors.  (Docket No. 6247 at 14.)  This stage can only be reached, however, after the Debtors and GM have reached a definitive settlement agreement and the Debtors have presented the GM Settlement to the Plan Investors for approval.  The Plan Investors are in no position to dictate when that occurs.  (EPCA § 12(d)(ii).)  Unlike the due diligence condition applicable to the first $10 million milestone, approval of the GM Settlement is not waivable by the Plan Investors.

8

17.     Furthermore, payment of the third milestone (the remaining 50% of the Commitment Fees) is not due until after the Court has approved a disclosure statement. The expected predicates to approval of the disclosure statement and GM Settlements would be consensual. The risk that the transaction would not be consummated would be significantly reduced.

18.     The Equity Committee also raises the prospect that the Plan Investors could abandon the Framework Agreements after collecting all $76 million in Commitment Fees by terminating the PSA after April 1, 2007. In a further attempt to resolve objections, the parties have agreed to modify the termination rights under the PSA so that termination of the PSA by the Plan Investors or the Debtors after the disclosure statement approval date is no longer allowed. This modification resolves many of the objections repeatedly made in the first 16 pages of the Equity Committee's Second Supplemental Objection. (See Docket No. 6497, at 2-4, 7-8, 10, 14, 16.)

19.     Alternate Transaction Fee. Under the EPCA, the Debtors will pay a $100 million Alternate Transaction Fee in certain circumstances. (EPCA § 12(h).) None of the Objectors acknowledges that the Debtors' aggregate liability from all provisions of the Framework Agreement, however, is capped at $100 million until after the Court approves the disclosure statement. Section 12(h) of the EPCA expressly states that the Alternate Transaction Fee is subject to Section 11(b)(y) of the EPCA, which provides that "the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the disclosure statement Approval Date shall not exceed $100 million . . . ." This means that, until the Court approves the disclosure statement, each payment of Commitment Fees and each payment of Transaction Expenses effectively reduces the

9

Alternate Transaction Fee, dollar for dollar.  Thus, contrary to the Equity Committee's assertion,

for example, approval of the Framework Agreements do not put $176 million at risk without

further action of the Court.  (Docket No. 6247, at 14.)

20.    Initially, one of the Equity Committee's primary objections was that, under

certain scenarios, the Debtors could become obligated to pay the Alternate Transaction Fee based

on conduct of GM, with no alternate transaction in sight.  For example, the Equity Committee

stated that:

> In short, the Investment Agreement puts the Debtors in the unconscionable
> position of having to pay the Plan Investors $100 million  if the Debtors are left
> high and dry, first by GM and then the Plan investors . . . .  There is no
> conceivable justification, under the business judgment rule or otherwise, for the
> payment of a $100 million Alternat[e] Transaction Fee to the Plan Investors under
> such circumstances, or under any circumstances that do not involve termination of
> the Investment Agreement as a result of breach, termination, change in
> recommendation, or other act by the Debtors.

(Docket No. 6247, at 16.)

21.    In an attempt to resolve this objection and remove this (unintended)

possibility, the Parties agreed to modify the Framework Agreements to remove action taken by

GM from the definition of a Change of Recommendation by the Debtors.  (See Omnibus

Response To Purported Statements Of Ambiguities, at 6.)  Thus, as explained in the Motion,

there are only three circumstances under which the Alternate Transaction Fee is payable:

- Termination of the EPCA by the Debtors or by the Plan Investors as a result of the
  Company's entry into an Alternate Transaction (other than a liquidation under
  Chapter 7 of the Bankruptcy Code).  (EPCA §§ 12(d)(7)(B), (f)(ii).)

- Termination of the EPCA by the Investors due to the Debtors' willful breach of
  the EPCA, followed by entry into an Alternate Transaction within 24 months.
  (EPCA § 12(d)(v).)

- Termination of the EPCA as a result of a Change of Recommendation by the
  Debtors, followed by entry into an Alternate Transaction within 24 months.
  (EPCA § 12(d)(vii)(A).)

10

22.    Despite the clear language, the Equity Committee still contends that GM can walk away from the deal after April 1, 2007 and cause the Debtors to pay an Alternate Transaction Fee.  (Docket No. 6500, at 16-18.)  Under Section 3.1(b) of the PSA, GM (or any party) can terminate the PSA at any time after April 1, 2007 and, under Section 12(c)(ii) of the of the EPCA, such a termination by GM would give the Plan Investors the right to terminate the EPCA.  But, such a termination is not one of the events giving rise to an Alternate Transaction Fee.

23.    Moreover, the objectors' argument ignores the practical realities of the Framework Agreements as a whole.  The Framework Agreements contemplate near-term settlements with GM and Delphi's labor union.  If a settlement with GM is in place on April 1, 2007, it is highly unlikely that GM would be able to "walk away.".  But even if such a scenario is theoretically possible, the risk to the Debtors is only that they might be tied to the EPCA until August 31, 2007, as the Equity Committee acknowledges.  (See Docket No. 6500, at 18 n.9.) Based on the amendments negotiated in connection with the Statements of Ambiguities, the Debtors now have the right to terminate the EPCA without paying an Alternate Transaction Fee after August 31, 2007.  (See EPCA Section 12(c)(iii).)

24.    The Equity Committee also appears unaware that, until February 28, 2007, the Debtors retain the right to terminate the EPCA for any reason without paying an Alternate Transaction Fee or any more than $10 million of the Commitment Fees unless the Debtors have reached tentative labor agreements and a GM Settlement, and such settlements have been approved by the Plan Investors.

25.    As Mr. Sheehan repeatedly explained at his deposition, the various provisions of the Framework Agreements provide the Debtors sufficient control and flexibility to

11

ensure that estate assets are not wasted in the manner assumed by the Objectors' imagined hypotheticals.

26.    Both within and outside of the bankruptcy context, parties to large corporate transactions commonly employ a variety of "incentives" designed to encourage the parties' open and active participation in the proposed transaction.  Such "incentives" take a variety of forms, including break-up fees, awards of due diligence-related expenses and lost opportunity costs, and the inclusion of limited-shop provisions.  As the cases on which the Objectors rely make clear, there are a variety of legitimate and widely-recognized reasons why bidders ask for, and sellers are willing to agree to, the inclusion of break-up fee provisions in proposed transactions.

27.    For example, absent such protections, bidders often are reluctant to invest substantial resources in making the first bid, out of concern that the deal then "will be shopped around and 'topped' by an entity relying on the initial offeror's due diligence." In re Integrated Resources, Inc., 135 B.R. 746, 750 (Bankr. S.D.N.Y. 1992) (approving a bidder's break-up fee in connection with an externally-funded reorganization plan).  Conversely, the presence of a break-up fee acts to deter gamesmanship by prospective later bidders, who otherwise might be inclined to delay bidding until late in the process, and thereby free-riding on the efforts and resources of the initial bidder.  See id.  Indeed, because break-up fees are "important tools to encourage bidding and to maximize the value of the debtor's assets[,] . . . [and] because the directors have a duty to encourage bidding, break-up fees can be necessary to discharge the directors' duties to maximize value. . . ." In re Integrated Resources, Inc., 147 B.R. 650, 659–60, 663 (S.D.N.Y. 1992) (the appellant's own expert testified in connection with an externally-financed restructuring plan that the "average break-up fee in the industry is 3.3 percent").

12

28.    A bankruptcy court therefore should consider three questions in assessing break-up fees negotiated in connection with a proposal to fund a plan of reorganization: "(1) is the relationship of the parties who negotiated the break-up fee tainted by self-dealing or manipulation; (2) does the fee hamper, rather than encourage, bidding; [and] (3) is the amount of the fee unreasonable relative to the proposed purchase price?" In re Integrated Resources, Inc., 147 B.R. 650, 657 (S.D.N.Y. 1992).

29.    Based on these factors, "[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's-length negotiations." Id. at 658.  While an "exorbitant" fee carries the potential to chill subsequent bidding, "the amount of the fee is merely one of the factors to consider under the business judgment rule." Id. at 660. The court also must assess the prospective bidder's investment of time and money, determine whether the fee is reasonably related to the bidder's efforts, and consider both the magnitude of the proposed transaction, as well as the risks faced by all parties in connection with the transaction. See id. at 660–63.  "When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id. at 662 (quoting In re 995 Fifth Ave. Assoc., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

30.    As noted above, the Equity Committee previously conceded the reasonableness of the amount of the Alternate Transaction Fee.  Moreover, the Board received advice from its financial advisor, David Resnick of Rothschild Inc., that the fees involved in the Framework Agreements were within a reasonable range for a transaction of this size, nature, and complexity.

31.    The Equity Committee raises additional points regarding better terms it wishes the Debtors had been able to negotiate with the Plan Investors.  For example, the Equity

13

Committee contends that the Alternate Transaction Fee should be payable only in the event of a change of control of the Debtors (Docket No. 6247, at 16), and contends that the "tail" provision governing the Debtors' entry into an Alternate Transaction should be narrowed from 24 months to six months.  (Docket No. 6247, at 18.)  Whether or not one provision would be more attractive than another from the Debtors point of view, however, the Framework Agreements were negotiated at arms length and the Debtors cannot make unilateral changes.

32.    Transaction Expenses.  The Framework Agreements provide that the Debtors will reimburse "out-of-pocket costs and expenses reasonably incurred by each Investor" prior to the Effective Date, whether or not the transaction closes.  These amounts will be treated as follows:

- Upon approval of the Framework Agreements, the Debtors will pay up to $13 million to the Investors for actual expenses reasonably incurred prior to December 1, 2006 -- excluding any amounts incurred by Appaloosa prior to May 17, 2006.
- Appaloosa may recover up to $5 million for actual expenses reasonably incurred prior to May 17, 2006, but only after the effective date of a plan of reorganization that includes a recovery for equity holders.
- Going forward, the Debtors will reimburse actual expenses reasonably incurred on an ongoing basis, without further review by the Court.

33.    The U.S. Trustee contends that the Plan Investors should submit applications for reimbursement of these fees under 503(b)(1) of the Bankruptcy Code as "actual necessary costs and expenses of preserving the estate," and, in the case of Appaloosa's fees incurred prior to May 17, 2006, an application under 503(b)(3)(D) of the Bankruptcy Code based on the "substantial contribution" standard.

34.    The Debtors' agreement to reimburse the Investors' actual expenses, reasonably incurred, is an integral part of the Framework Agreements, without which the Plan Investors would not have entered into the Framework Agreements.  As such, payment of these expenses is made pursuant to the Debtors' business judgment under 11 U.S.C. § 363(b).

14

C.    Terms Regarding Potential Plan Of Reorganization

35.    The U.S. Trustee and the IUE-CWA object to approval of the Framework

Agreements because they purportedly constitute a sub rosa plan of reorganization.  This

objection belies a mixing of concepts that leads to a wholly incorrect conclusion.  The term sub

rosa plan refers to an attempt to effect a reorganization by disposing of all or substantially all of

the assets of a debtor's estate through asset sales under section 363 of the Bankruptcy Code while

circumventing the plan disclosure, solicitation, and confirmation process.  The Framework

Agreements do not fit this mold in any way.  First of all, the Framework Agreements do not

dispose of any property other than the various fees and transaction expenses discussed above.

Second, the Framework Agreements expressly contemplate the filing of a disclosure statement,

solicitation of votes for a plan, and confirmation by the Court.  By definition, an agreement to

comply with all the procedures of 11 U.S.C. § 1125 is not an effort to subvert those procedures.

36.    The U.S. Trustee asserts that "the Framework Agreement dictates many of

the terms of the plan," citing In re Continental Airlines, Inc., 780 F.2d 1223, 1227 (5th Cir. 1986)

and dictum from the lower court opinion in In re Tower Automotive, Inc., 342 B.R. 158, 163

(Bankr. S.D.N.Y. 2006), aff'd, __ F. Supp. 2d __, 2006 WL 3751360 (S.D.N.Y. Dec. 15, 2006).

In Tower Automotive, however, the Second Circuit applied the standard articulated by the Fifth

Circuit (in cases more recent than Continental Airlines), such as In re Cajun Electric Power, 119

F.3d 349 (5th Cir. 1997):

> As the Court stated in the Cajun Electric Power case, rejecting a sub rosa plan
> argument, the settlement there did "not dispose of all claims against [the debtor],
> nor does it restrict creditors' rights to vote as they deem fit on a proposed
> reorganization plan [nor does it] dispose of virtually all of [the debtor's] assets ...."

Tower Automotive, 2006 WL 3751360 at *7.  Indeed, the Second Circuit cited with approval In

re Iridium, 2005 WL 756900 at * 8, as holding that a "settlement was not a sub rosa plan [where]

it only bound the parties to the settlement and did not prevent [an] objecting creditor 'from voting in whatever manner it chooses on any proposed plan.'" <u>Tower Automotive</u>, 2006 WL 3751360 at *7; <u>see also In re Alleghany Intern.</u>, Inc. 117 B.R. 171, 176 (W.D. Pa. 1990) (rejecting <u>sub</u> <u>rosa</u> plan argument when "the commitment letter contains certain terms which might dictate the terms of a future plan or reorganization, but the commitment letter does not dictate the terms of <u>any</u> plan of reorganization").

37.    The Objectors raise a number of objections to particular plan provisions that the Parties have agreed to among themselves.  For example:

- The Equity Committee further challenges the timing and procedures for the Rights Offering.[1]

- The IUOE and Highland object to the proposed treatment of unsecured claims.[2]

- The IUOE and the IBEW & IAMAW raise issues regarding future labor negotiations.

38.    Although the Debtors have worked with the Objectors to attempt to resolve some of the objections surrounding these issues, none of these provisions is before the Court for approval and none of them becomes effective until put forth in a disclosure statement and plan and approved by the Court.

---

[1]    In an effort to resolve two of the Equity Committee's three objections to the Rights Offering procedures, the Parties have clarified the Framework Agreements to provide a document separate from the Plan solicitation ballot for the exercise of Rights and have confirmed their common understanding that the Framework Agreements require that the Registration Statement be effective prior to Plan solicitation.  The Equity Committee's third objection that the Rights Offering should be conducted post-confirmation is based primarily on the Equity Committee's belief that the Rights Offering would be exempt from the registration requirement under section 1145 of the Bankruptcy Code if conducted post-confirmation.  The Debtors are willing to consider whether the Rights Offering can be accomplished with the Section 1145 exemption, but do not believe the timing of the Rights Offering is determinative.  In any event, the timing is an economic deal point that resulted from the negotiations.

[2]    The Framework Agreements contemplate paying unsecured trade claims in full with approximately 80% cash and 20% in stock at a deemed value of $45 per share.  The $45 treatment value is calculated to provide full recovery to creditors.  A $35 strike price is applicable to the Rights Offering, Direct Subscription Shares, and the Preferred Shares.  Highland claims that the $45 treatment value would overpay creditors, while the IUOE claims that the $45 treatment value could underpay creditors.

D.    <u>Corporate Governance</u>

39.    The Equity Committee, the IUE-CWA, and Highland all take issue with the preferred stock structure and associated corporate governance rights that would accrue to the Plan Investors in the event that a plan like the one contemplated in the Framework Agreements were approved.  The corporate governance provisions in the Framework Agreements were the product of arms-length negotiations, as reflected by improvements the Debtors were able to obtain in the structure initially proposed by the Plan Investors after pressing the requests raised by the statutory committees.  The Debtors concluded that the governance structure was acceptable in light of the benefits of concluding the overall transaction on the terms negotiated.

E.    <u>The Highland Proposal</u>

40.    Promptly after receiving the Highland Proposal, Delphi acknowledged publicly on December 21, 2006 that it "would carefully analyze and consider Highland's proposal and discuss its merit with its Board of Directors."  Delphi also said that it recognizes it has a fiduciary obligation to maximize value for all stakeholders in its Chapter 11 process and will carefully consider all aspects of this proposal against others it has received."  That same day, John Sheehan, Delphi's Chief Restructuring Officer, commenced discussions with Highland.  These discussion included a lengthy meeting on January 2, 2007 at Delphi's headquarters in Troy, Michigan in which legal and financial advisors for each of Delphi and Highland participated.

41.    As a result of these meetings and discussions, Highland agreed to provide additional information to Delphi later in the week of January 2, 2007, including proposed markups of the existing Framework Agreements, its due diligence requests and timetable, and its visions statement regarding execution of the transaction and the value Highland brings to the Debtors as a plan investor.

17

42.    On January 3, 2007, Delphi met with General Motors and obtained its preliminary input regarding the Highland proposal.  Similarly, the Debtors met with the statutory committees on January 4, 2007, in New York City, and discussed the Highland Proposal. Finally, the Debtors have sought informal feedback on the Highland Proposal from certain of its unions and other stakeholders.

43.    The Board immediately commenced review of the Highland proposal.  On December 22, 2006, Rothschild, Debtors' financial advisor, delivered to the Board of Directors a document entitled Preliminary Comparison of Investment/Framework Proposals, which contained summarized the key terms, similarities, and differences between the Framework Agreements and the Highland proposal.  On January 3, 2007, the Board of Directors met and continued its evaluation of the Highland proposal.  At its meeting on January 10, 2007, the Board considered the Highland Proposal.

44.    In preparation for the January 10, 2007 Board meeting, the Debtors requested certain information from the Plan Investors regarding their view of the Highland proposal, and also asked them to consider beneficial modifications to the Framework Agreements in light of the Highland Proposal.

45.    On January 5, 2007, prior to providing its due diligence list and the other items discussed at the January 2, 2007 meeting, Highland stated in a letter that its sought a due diligence period lasting 60 days from the date the Debtors' made the due diligence materials available to Highland.

46.    Delphi's Board of Directors met on January 3, 2007 and again on January 9 and 10, 2007 to consider two decisions: (a) whether to proceed with the Framework Hearing on

January 11, 2007 and (b) what to communicate to Highland in response to its December 21st proposal.

47.    Earlier today (January 10, 2007), Delphi advised Highland that the Debtors had decided to proceed to seek approval of the Framework Motion at the January 11, 2007 hearing in the Bankruptcy Court having concluded that it continues to be in the best interests of the Company and its stakeholders, taken as a whole, for the Debtors to be permitted to enter into the PSA and EPCA and perform those agreements in accordance with their terms.

48.    Delphi advised Highland that based on the information presently available to the Debtors, the Debtors could not conclude that the Highland proposal, as a matter of fact, would deliver superior value to Delphi stakeholders and that, like the EPCA and PSA, there is significant conditionality and risks of execution.   Delphi also advised Highland that the Debtors had concluded that it is premature to move forward with Highland regarding a transaction at the present time but would consider reviewing this assessment consistent with the requirements of the EPCA and PSA should Highland choose to address various issues outlined to Highland by Delphi.  Delphi also acknowledged to Highland that time is of the essence and, at some point in the future, the mere passage of time, the progress made under the EPCA and PSA, and/or other considerations may preclude further practical consideration of Highland's interest in Delphi.

WHEREFORE the Debtors respectfully request that the Court enter an order (i) overruling the Objections; (ii) granting the Motion, and (iii) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         January 10, 2006

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP


                              By:   /s/ John Wm. Butler, Jr.
                                    John Wm. Butler, Jr. (JB 4711)
                                    George N. Panagakis (GP 0770)
                                    Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                        - and -


                              By:   /s/ Kayalyn A. Marafioti
                                    Kayalyn A. Marafioti (KM 9632)
                                    Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                Debtors and Debtors-in-Possession

## Exhibit A

# EXHIBIT A
## SUMMARY OF OBJECTIONS TO PLAN INVESTMENT AND
## FRAMEWORK SUPPORT APPROVAL MOTION
### (Organized by Objection)

Eight parties filed objections.  The filing deadline for objections was January 2, 2007, and for supplemental objections was January 9, 2007 at 12:00 p.m.

| Summary of Objection | Docket Nos. | Resolution, Response or Proposal |
|---|---|---|
| 1.  Commitment Fees<br>(a)  Payment of commitment fees is inappropriate when Plan Investors have nothing at risk and/or their commitment is illusory. | 6209 (CC)<br>6211/6247 (EC)<br>6496 (IUE-CWA)<br>6501 (TC)<br>6344 (IUOE)<br>6367 (IBEW & IAMAW) | The commitment fees were negotiated at arms-length and approved in the exercise of the Debtors' business judgment.  There are appropriate milestones such that only $10 million becomes payable on the Due Diligence Expiration Date, the balance of the first 50% becomes payable only after the Investors approve the GM Settlement, and the final 50% becomes payable only after the court has approved the Plan disclosure statement. |
| 2.  Alternate Transaction Fee<br>(a)  General objection. | 6209 (CC)<br>6496 (IUE-CWA) | The Alternate Transaction Fee was negotiated at arms-length and approved in the exercise of the Debtors' business judgment.  Such "topping" fees are common and the $100 million amount is reasonable (approx. 3% of new money raised).  Also, prior to the Court's approval of the Plan disclosure statement, Debtors' aggregate liability for commitment fees, Alternate Transaction Fee, investor expenses and breach damages, inclusive, is capped at $100 million. |
| (b)  Alternative Transaction Fee should not be payable because of GM's actions. | 6211/6247 (EC)<br>6344 (IUOE) | The EPCA is clarified to remove GM actions from definition of Change of Recommendation. |
| (c)  Alternative Transaction Fee should be narrowed to change in control of debtors. | 6211/6247 (EC) | The Alternate Transaction Fee was negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| (d)  Alternative Transaction Fee "tail" should be six months, not two years. | 6211/6247 (EC)<br>6344 (IUOE) | The Alternate Transaction Fee was negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| (e)  Alternate Transaction Fee should only be payable upon closing of an alternate transaction. | 6501 (TC) | Withdrawn. |
| (f)  Approval of the Alternate Transaction Fee is inappropriate prior to consideration of Highland's offer. | 6330 (HCM)<br>6367 (IBEW & IAMAW)<br>6497 (EC) | The Debtors are considering Highland's offer prior to the January 11, 2007 hearing.  The Investors may terminate if the approval order has not been entered and become final by January 22, 2007. |

**Objecting Parties (Docket Number(s))**
Official Committee of Unsecured Creditors ("CC") (6209) -- To Be Withdrawn Subject To Settlement
Official Committee of Equity Security Holders ("EC") (6211, 6247, 6497)
International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, Communications Workers of America ("IUE-CWA") (6242, 6496, 6500)
*Ah Hoc* Committee of Delphi Trade Claim Holders ("TC") (6254, 6501, 6508) -- To Be Withdrawn Subject To Settlement
Highland Capital Management, LP ("HCM") (6330)
International Union of Operating Engineers, Local Unions Nos. 18S, 101S, and 832S ("IUOE") (6344)
International Brotherhood of Electrical Works Local 663 ("IBEW") and International Association of Machinists and Aerospace Workers District 20 ("IAMAW") (6367)
United States Trustee ("UST") (6401)

| Summary of Objection | Docket Nos. | Resolution, Response or Proposal |
|---|---|---|
| 3. Investor Expenses<br>  (a)  Payment of transaction expenses is inappropriate before Investors have committed to transaction. | 6496 (IUE-CWA) | The investor expenses were negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
|   (b)  Court should not give blanket approval but should reimburse on application only "reasonable, actual and necessary" expenses or for "substantial contribution." | 6401 (UST) | The investor expenses were negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| 4. Indemnification<br>  (a)  The Debtors' indemnification obligations to new money investors are too broad. | 6209 (CC)<br>6496 (IUE-CWA) | The indemnification provisions were negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| 5. Motion Premature<br>  (a)  Consideration of the Motion is premature due to ongoing negotiations. | 6211/6247 (EC) | The Debtors are considering Highland's offer prior to the January 11, 2007 hearing. The Investors may terminate if the approval order has not been entered and become final by January 22, 2007. |
|   (b)  Approval of the EPCA is premature prior to Plan confirmation. | 6254 (TC)<br>6367 (IBEW & IAMAW) | The Investors may terminate if the approval order has not been entered and become final by January 22, 2007. Bankruptcy courts often approve investment agreements prior to plan confirmation. |
|   (c)  Expedited consideration of the motion is unfair, particularly in light of the Alternate Transaction Fee. | 6330 (HCM) | The Motion is no longer expedited because the hearing on the Motion was continued to January 11, 2007. |
|   (d)  The time for approval of Motion is artificially foreshortened. | 6344 (IUOE) | The Motion is no longer expedited because the hearing on the Motion was continued to January 11, 2007. |
|   (e)  There is no basis for waiver of the 10-day stay period under rule 6004(g). | 6211/6247 (EC) | The Investors may terminate if the approval order has not been entered and become final by January 22, 2007. |
| 6. Corporate Governance/Preferred Stock<br>  (a)  Extraordinarily broad corporate governance powers granted to new money investors as holders of convertible preferred stock are unacceptable. | 6209 (CC)<br>6496 (IUE-CWA) | The corporate governance provisions were negotiated at arm-length and approved in the Debtors' business judgment. The Motion does not seek approval of the Plan. |
|   (b)  Affiliates of Series A Preferred Stock holders should not be able to vote Series B stock for Common Directors. | 6211/6247 (EC) | Resolved. The Preferred Stock Term Sheet is clarified to restrict affiliates from voting for Common Directors. |
|   (c)  Directors elected by Series A Preferred Stock holders should be required to resign when Series A loses power to appoint. | 6211/6247 (EC) | The corporate governance provisions were negotiated at arm-length and approved in the Debtors' business judgment. The Motion does not seek approval of the Plan. |
|   (d)  Series A Preferred Stock should convert to Series B Preferred Stock when affiliated holder ceases to be affiliated. | 6211/6247 (EC) | Automatic conversion of Series A Preferred Stock is governed by beneficial ownership test. |
|   (e)  Agreements should clarify that restrictions on Appaloosa, ADAH, Cerberus, and Dolce, respectively, apply to their affiliates. | 6211/6247 (EC) | Resolved. Agreements are clarified to apply restrictions on Appaloosa and Cerberus to affiliates. |
|   (f)  The Plan Investors will have disproportionate control of the board and exclusive approval rights over future business decisions of the reorganized company. | 6330 (HCM) | The corporate governance provisions were negotiated at arm-length and approved in the Debtors' business judgment. The Motion does not seek approval of the Plan. |

| Summary of Objection | Docket Nos. | Resolution, Response or Proposal |
|---|---|---|
| 7. Rights Offering<br>(a) The Rights Offering should be conducted post-confirmation under section 1145 rather than pre-confirmation subject to a Rights Offering Registration Statement. | 6211/6247 (EC) | The terms of the Rights Offering were negotiated at arm-length and approved in the Debtors' business judgment. The Motion does not seek approval of the Plan. |
| (b) The Registration Condition means that it is possible the Rights Offering will be negated if the Registration Statement does not become effective during the Plan solicitation period | 6211/6247 (EC) | EPCA Section 1(c)(ii) requires that the Registration Statement be effective prior to Plan solicitation. |
| (c) Transferability of the Rights is impaired because marking the Plan solicitation ballot is the only means for exercising Rights | 6211/6247 (EC) | Resolved. The EPCA is clarified to provide a separate document for the exercise of Rights |
| 8. Treatment of Claims<br>(a) Difference in purchase price of common stock ($35) and treatment value for creditor recoveries ($45) either overstates creditor recoveries (and renders Plan unconfirmable) or provides unfair "pricing fee" to investors. | 6254 (TC) | Withdrawn. |
| (b) Plan pays trade claims in part with common stock at a deemed value of $45 per share, but allows equity holders to purchase common stock at a deemed value of $35 per share | 6344 (IUOE) | The Motion does not seek approval of the Plan. The $45 treatment value is calculated to provide full recovery for creditors. The $35 strike price applicable to the Rights Offering provides an additional implied recovery to current equity holders. |
| (c) The proposed plan framework will significantly overpay creditor claims due to deemed value of $45 per share. | 6330 (HCM) | The Motion does not seek approval of the Plan. The $45 treatment value is calculated to provide full recovery for creditors. |
| (d) The proposed plan discriminates against trade creditors in favor of bond creditors. | 6254 (TC) | Withdrawn. |
| (e) The $1.7 billion cap on allowed trade and unsecured claims potentially further reduces creditor recoveries. | 6254 (TC) | Withdrawn. |
| (f) PSA treats employee obligations as flow-through claims, but excludes collective bargaining related employee claims. | 6344 (IUOE)<br>6367 (IBEW & IAMAW) | The Motion does not seek approval of the Plan. The Agreements assume resolution of collective bargaining-related claims prior to Plan Confirmation. |
| 9. Statutory Committee Consent<br>(a) There is no provision for Creditors' Committee input and consent with respect to any of the transaction documents. | 6209 (CC) | Withdrawn. |
| (b) The Equity Committee must have the right to review, comment on and approve restructuring documents. | 6211/6247 (EC) | The Motion does not seek approval of the Plan. The Equity Committee has had, and continues to have, opportunity for input, including statutory rights. The Equity Committee is not entitled to a right of consent. |
| (c) Any GM Settlement, including any release of GM, must be approved by the Equity Committee. | 6211/6247 (EC) | The Motion does not seek approval of the GM Settlement or the Plan. The Equity Committee is not entitled to an approval right. |

| Summary of Objection | Docket Nos. | Resolution, Response or Proposal |
|---|---|---|
| 10. Other Equity Committee Objections<br>(a) The cap on the Plan Investors' liability should not apply to willful breach. | 6211/6247 (EC) | The liability caps were negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| (b) The Plan Investors' termination rights based on projected EBITDA levels are too broad. | 6211/6247 (EC) | The Investors termination rights were negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| (c) Documents should confirm that GM will be responsible for transformation costs. | 6211/6247 (EC) | The documents assume a GM Settlement in the future. The Debtors have not yet reached a settlement with GM setting the extent of GM's responsibility for transformation costs. |
| (d) Delphi's directors were uninformed when they approved the Framework Agreements | 6497 (EC) | The record shows that the directors were fully informed. |
| (e) The Plan Investors receive an unconscionable return on investment (in addition to fees paid to them) | 6497 (EC) | The preferred share structure and pricing were negotiated at arms-length and approved in the exercise of the Debtors' business judgment. |
| 11. Other Highland Objections<br>(a) The EPCA takes the value from current stockholders and gives it to a small group of investors who have the exclusive opportunity to buy stock at a discount. | 6330 (HCM)<br>6497 (EC) | There is no value for current equity without a GM deal. The terms of the Rights Offering were negotiated at arm-length and approved in the Debtors' business judgment. The Motion does not seek approval of the Plan. |
| (b) The EPCA grants the Plan Investors the exclusive right to acquire Preferred Stock. | 6330 (HCM)<br>6497 (EC) | The terms of the Rights Offering were negotiated at arm-length and approved in the Debtors' business judgment. The Motion does not seek approval of the Plan. |
| (c) The Motion should be denied because the Highland proposal is superior. | 6330 (HCM)<br>6497 (EC) | The Debtors are considering Highland's offer prior to the January 11, 2007 hearing. |
| (d) The PSA lock-up provision makes any alternate proposal a sham because it prohibits GM from entering negotiations and GM is critical to any alternate proposal. | 6330 (HCM)<br>6497 (EC) | GM may participate with the Debtors in considering any alternate proposal in the exercise of the Debtors' fiduciary duties, and after April 1, 2007, negotiate with the Debtors' consent. |
| 12. *Sub rosa* Plan<br>(a) The Agreements dictate critical plan provisions making them an improper *sub rosa* plan. | 6254 (TC)<br>6401 (UST)<br>6496 (IUE-CWA) | The Motion does not seek approval of the Plan. |
| (b) The EPCA provides for liability protection under section 1125(e) (applicable to plan solicitation and to the offer, issuance, sale, or purchase of a security pursuant to a plan) without the approval of a disclosure statement. | 6254 (TC) | Withdrawn. |
| 13. Other Union Objections<br>(a) Requirement that Plan Investors consent to consensual agreements with labor unions, and pattern bargaining, puts union agreements in the hands of Plan Investors and the UAW. | 6344 (IUOE)<br>6367 (IBEW & IAMAW) | The Motion does not seek approval of the Plan. Neither the EPCA nor the PSA precludes the Debtors from negotiating with any party, including the IUOE, IBEW, and IAMAW. Likewise, the approval rights afforded to the Plan Investors with respect to tentative labor agreements does not limit the rights of any union or any other party in interest to negotiate with the Debtors. |
| (b) PSA calls for Pension Plan spin-off without regard to collective bargaining agreements; IUOE locals want to negotiate a spin off for IUOE represented plan participants to a multiemployer plan but have been stonewalled by the Debtors. | 6344 (IUOE) | The Motion does not seek approval of the Plan. The Debtors are unwilling to negotiate the type of multiemployer spin off the IUOE is seeking. |

## **Exhibit B**

## EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "Agreement"), dated as of January __, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("Harbinger"), Dolce Investments LLC ("Dolce"), a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("Merrill"), UBS Securities LLC, a Delaware limited liability company ("UBS"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company").  ADAH, Harbinger, Dolce, Merrill and UBS are each individually referred to herein as an "Investor" and collectively as the "Investors".  Capitalized terms used in the agreement have the meanings assigned thereto in the sections indicated on Schedule 1 hereto.

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "Debtors") commenced jointly administered cases (the "Chapter 11 Cases") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Company intends to propose and submit to the Bankruptcy Court for its approval a plan of reorganization for the Debtors that is consistent with this Agreement and the PSA;

WHEREAS, the Company has requested that the Investors participate in the plan of reorganization, and the Investors are willing to participate in the plan of reorganization, on the terms and subject to the conditions contained in this Agreement;

WHEREAS, the Company has filed a motion and supporting papers (the "Initial Approval Motion") seeking an order of the Bankruptcy Court (the "Initial Approval Order") (i) approving and authorizing the Company to enter into this Agreement, (ii) authorizing the payment of the Commitment Fees, the Alternate Transaction Fee and the Transaction Expenses provided for herein, and (iii) approving and authorizing the Company to enter into the PSA, and the Bankruptcy Court has entered the Initial Approval Order; and

WHEREAS, each of Appaloosa Management L.P., Harbinger Capital Partners Master Fund I, Ltd. and Cerberus Capital Management, L.P. (collectively, the "Commitment Parties") will provide, on the date hereof, commitment letters addressed to ADAH, Harbinger, and Dolce, respectively, and the Company whereby each Commitment Party will confirm its commitment to provide equity financing to ADAH, Harbinger and Dolce, respectively, on the terms and subject to the limitations set forth in the commitment letters.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.    <u>Rights Offering</u>

(a)    The Company proposes to offer and sell shares of its new common stock, par value $0.01 per share (the "<u>New Common Stock</u>"), pursuant to a rights offering (the "<u>Rights Offering</u>") whereby the Company will distribute at no charge to each holder (each, an "<u>Eligible Holder</u>") of Common Stock, including, to the extent applicable, the Investors, that number of rights (each, a "<u>Right</u>") in respect of shares of Common Stock outstanding and held of record as of the close of business on a record date (the "<u>Record Date</u>") to be set by the Board of Directors of the Company that will enable each Eligible Holder to purchase up to its pro rata portion of 56,700,000 shares in the aggregate of New Common Stock (each, a "<u>Share</u>") at a purchase price of $35.00 per Share (the "<u>Purchase Price</u>").

(b)    The Company will conduct the Rights Offering pursuant to a plan of reorganization of the Debtors (such plan of reorganization, the "Plan"), which shall reflect the Company's proposed restructuring transactions described in this Agreement, the Summary of Terms of Preferred Stock attached hereto as <u>Exhibit A</u> (the "<u>Preferred Term Sheet</u>") and the Plan Framework Support Agreement attached hereto as <u>Exhibit B</u> (the "<u>PSA</u>").

(c)    The Rights Offering will be conducted as follows:

(i)    On the terms and subject to the conditions of this Agreement and subject to applicable law, the Company shall offer Shares for subscription by holders of Rights as set forth in this Agreement.

(ii)    As soon as practicable following the entry of an order by the Bankruptcy Court approving the Disclosure Statement (the "<u>Disclosure Statement Approval Date</u>") and the effectiveness under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), of the Rights Offering Registration Statement to be filed with the Securities and Exchange Commission (the "<u>Commission</u>") relating to the Rights Offering, the Company shall issue to each Eligible Holder, Rights to purchase up to its pro rata portion of 56,700,000 Shares in the aggregate and distribute simultaneously the ballot form(s) ~~(the "Ballots")~~ in connection with the solicitation of acceptances of the Plan (the date of such distribution, the "<u>Distribution Date</u>").  The Company will be responsible for effecting the distribution of certificates representing the Rights, the Rights Offering Prospectus and any related materials to each Eligible Holder.  ~~**The Ballots shall provide a place whereby each Eligible Holder may indicate its commitment to exercise its Rights.**~~

-2-

(iii)    The Rights may be exercised during a period (the "Rights Exercise Period") commencing on the Distribution Date and ending at the Expiration Time.  The Rights shall be transferable.  "Expiration Time" means the date and time by which holders of claims or interests are entitled to vote on the Plan (or if such day is not a Business Day, the next Business Day), or such later date and time as the Company, subject to the prior written approval of each of ADAH and Dolce, may specify in a notice provided to the Investors before 9:00 a.m., New York City time, on the Business Day before the then-effective Expiration Time.  The Company shall use its reasonable best efforts to cause the effective date of the Plan (the "Effective Date") to occur as promptly as reasonably practicable after the Expiration Time and the Confirmation Hearing.  For the purpose of this Agreement, "Business Day" means each Monday, Tuesday, Wednesday, Thursday and Friday that is not a day on which banking institutions in New York City are generally authorized or obligated by law or executive order to close.  Each Eligible Holder who wishes to exercise all or a portion of its Rights shall (i) during the Rights Exercise Period return a duly executed ~~Ballot~~document to a subscription agent reasonably acceptable to the Company and each of ADAH and Dolce (the " Subscription Agent") electing to exercise all or a portion of the Rights held by such Eligible Holder and (ii) pay an amount equal to the full Purchase Price of the number of Shares that the Eligible Holder elects to purchase by wire transfer of immediately available funds by a specified date reasonably in advance of the date on which the hearing to confirm the Plan is scheduled to commence (the "Confirmation Hearing") to an escrow account established for the Rights Offering.

(iv)    Unless otherwise required by ADAH and Dolce, there will be no over-subscription rights provided in connection with the Rights Offering.

(v)    As soon as reasonably practicable following the Effective Date, the Company will issue to each Eligible Holder who validly exercised its Rights the number of Shares to which such Eligible Holder is entitled based on such exercise.

(vi)    The Company hereby agrees and undertakes to give each Investor by electronic facsimile transmission the certification by an executive officer of the Company of either (i) the number of Shares elected to be purchased by Eligible Holders pursuant to validly exercised Rights, the aggregate Purchase Price therefor, the number of Unsubscribed Shares and the aggregate Purchase Price therefor (a "Purchase Notice") or (ii) in the absence of any Unsubscribed Shares, the fact that there are no Unsubscribed Shares and that the commitment set forth in Section 2(a)(iv) is terminated (a "Satisfaction Notice") as soon as practicable after the Expiration Time and, in any event, reasonably in advance of the Closing Date (the date of transmission of confirmation of a Purchase Notice or a Satisfaction Notice, the "Determination Date").

2.      <u>The Commitment; Fees and Expenses</u>.

(a)      On the terms and subject to the conditions set forth in this Agreement:

(i)      each Investor agrees, severally and not jointly, to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell and issue, on the Closing Date (A) for the Purchase Price per Share, each Investor's proportionate share of 6,300,000 Shares as is set forth opposite such Investor's name on <u>Schedule 2</u> hereto (the "<u>Direct Subscription Shares</u>") and (B) for the Purchase Price per Share, that number of shares of Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "<u>Series B Preferred Stock</u>"), as is set forth opposite such Investor's name on <u>Schedule 2</u> hereto, which shares shall be created pursuant to a Certificate of Designation (the "<u>Series B Certificate of Designations</u>") that is consistent with the terms set forth in the Preferred Term Sheet and, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; <u>provided</u> that prior to the Due Diligence Expiration Date, such terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;

(ii)      Dolce agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "<u>Series A-1 Preferred Stock</u>"), which shares shall be created pursuant to a Certificate of Designations (the "<u>Series A-1 Certificate of Designations</u>") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; <u>provided</u>, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion;

(iii)      ADAH agrees to subscribe for and purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to subscribe for and purchase, and the Company agrees to sell, on the Closing Date, for the Purchase Price per share, 8,571,429 shares of Series A-2 Senior Convertible Preferred Stock, par value $0.01 per share (the "<u>Series A-2 Preferred Stock</u>", and together with the Series A-1 Preferred Stock, the "<u>Series A Preferred Stock</u>", which shares shall be created pursuant to a Certificate of Designations (the "<u>Series A-2 Certificate of Designations</u>") that is consistent with the terms set forth in the Preferred Term Sheet and with such other terms that, to the

extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, such other terms shall be satisfactory to each of ADAH and Dolce in its sole discretion; and

(iv)     each Investor agrees, severally and not jointly, to purchase, or cause one or more Related Purchasers pursuant to the following paragraph and otherwise in accordance with this Agreement to purchase, on the Closing Date, and the Company agrees to sell for the Purchase Price per Share that number of Shares issuable pursuant to the aggregate number of Rights that were not properly exercised by the Eligible Holders thereof during the Rights Exercise Period, in proportion to the Investor's share of the Direct Subscription Shares (such Shares in the aggregate, the "Unsubscribed Shares"), rounded among the Investors as they may determine, in their sole discretion, to avoid fractional shares.

In connection with each of clauses (i) through (iv) above, prior to the filing of the Rights Offering Registration Statement with the Commission, each Investor shall have the right to arrange for one or more of its Affiliates (each, a "Related Purchaser") to purchase Investor Shares, by written notice to the Company, which notice shall be signed by the Investor and each Related Purchaser, shall contain the Related Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by the Related Purchaser of the accuracy with respect to it of the representations set forth in Section 4; provided, that the total number of Investors, Related Purchasers and Ultimate Purchasers shall not exceed the Maximum Number.  The "Maximum Number" shall be 35 unless the Company consents to a higher number, such consent not to be unreasonably withheld; provided, that, nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interests therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and subject to applicable state securities laws.  The Investors agree that each Related Purchaser will be a "Qualified Institutional Buyer" under Rule 144A of the Securities Act.

The Series A-1 Preferred Stock, the Series A-2 Preferred Stock and the Series B Preferred Stock are referred to herein collectively as the "Preferred Shares".  The Unsubscribed Shares, the Direct Subscription Shares and the Preferred Shares are referred to herein collectively as the "Investor Shares".  The term "Affiliate" shall have the meaning ascribed to such term in Rule 12b-2 under the Securities Exchange Act of 1934 in effect on the date hereof.

(b)     Upon the occurrence of an Investor Default or a Limited Termination, within five (5) Business Days of the occurrence of such Investor Default or Limited Termination, the Investors (other than any non-purchasing Investor) shall have the right to agree to purchase on the Closing Date, in the case of a Limited

Termination, or to purchase, in the case of an Investor Default (or, in either case, arrange for the purchase through a Related Purchaser pursuant to <u>Section 2(a)</u> or an Ultimate Purchaser pursuant to <u>Section 2(k)</u>), all but not less than all, of the Available Investor Shares on the terms and subject to the conditions set forth in this Agreement and in such proportions as determined by the Investors in their sole discretion (an "<u>Alternative Financing</u>"); <u>provided</u>, that only in the case of a Limited Termination, to the extent that a Limited Termination is attributable to any Investor other than Dolce, ADAH will be required within ten (10) Business Days of the occurrence of such Limited Termination to agree to purchase on the Closing Date (or arrange for the purchase through a Related Purchaser pursuant to <u>Section 2(a)</u> or an Ultimate Purchaser pursuant to <u>Section 2(k)</u>) any Available Investor Shares attributable to the Limited Termination and not otherwise purchased pursuant to the Alternative Financing (unless ADAH has otherwise terminated this Agreement in accordance with its terms); <u>provided</u>, <u>further</u>, that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number.  The term "<u>Investor Default</u>" shall mean the breach by any Investor of its obligation to purchase any Investor Shares which it is obligated to purchase under this Agreement.  The term "<u>Available Investor Shares</u>" shall mean any Investor Shares which any Investor is not purchasing as a result of an Investor Default or Limited Termination.  The exercise by any Investor of the right to purchase (or arrange a purchase of) any Available Investor Shares shall not relieve any defaulting Investor of any obligation to each other Investor or the Company of such defaulting Investor's breach of this Agreement.

(c)     As soon as practicable after the Expiration Time, and in any event reasonably in advance of the Closing Date, the Company will provide a Purchase Notice or a Satisfaction Notice to each Investor as provided above, setting forth a true and accurate determination of the aggregate number of Unsubscribed Shares, if any; <u>provided</u>, that on the Closing Date, on the terms and subject to the conditions in this Agreement, the Investors will purchase, and the Company will sell, only such number of Unsubscribed Shares as are listed in the Purchase Notice, without prejudice to the rights of the Investors to seek later an upward or downward adjustment if the number of Unsubscribed Shares in such Purchase Notice is inaccurate.

(d)     Delivery of the Investor Shares will be made by the Company to the account of each Investor (or to such other accounts as any Investor may designate in accordance with this Agreement) at 10:00 a.m., New York City time, on the Effective Date (the "<u>Closing Date</u>") against payment of the aggregate Purchase Price for the Investor Shares by wire transfer of immediately available funds in U.S. dollars to the account specified by the Company to the Investors at least 24 hours prior to the Closing Date.

(e)     All Investor Shares will be delivered with any and all issue, stamp, transfer, sales and use, or similar Taxes or duties payable in connection with such delivery duly paid by the Company.

(f)     The documents to be delivered on the Closing Date by or on behalf of the parties hereto and the Investor Shares will be delivered at the offices of White & Case LLP, 1155 Avenue of the Americas, New York, New York 10036 on the Closing Date.

(g)     Subject to the provisions of <u>Sections 2(a)</u>, <u>2(b)</u> and <u>2(k)</u> hereof, any Investor may designate that (i) some or all of the Investor Shares be issued in the name of, and delivered to, one or more Related Purchasers and (ii) some or all of the Unsubscribed Shares, Direct Subscription Shares or shares of Series B Preferred Stock be issued in the name of, and delivered to, one or more Ultimate Purchasers.

(h)     On the basis of the representations and warranties herein contained, the Company shall pay the following fees to the Investors in accordance with <u>Section 2(i)</u> or <u>12(h)</u>, as the case may be:

     (i)     an aggregate commitment fee of twenty-one million dollars ($21,000,000) to be paid to the Investors in proportion to their undertakings herein relative to Preferred Shares as set forth in <u>Schedule 2</u> (the "<u>Preferred Commitment Fee</u>");

     (ii)    an aggregate commitment fee of fifty-five million one-hundred twenty-five thousand dollars ($55,125,000) to be paid to the Investors as set forth in <u>Schedule 2</u> to compensate the Investors for their undertakings herein relative to Investor Shares other than Preferred Shares (the "<u>Standby Commitment Fee</u>" and together with the Preferred Commitment Fee, the "<u>Commitment Fees</u>"); and

     (iii)   an Alternate Transaction Fee, if any, which shall be paid by the Company as provided in <u>Section 12(h)</u>.

(i)     $10 million of the Commitment Fees shall be paid on the first Business Day following the first date that either (A) each of ADAH and Dolce has waived in writing the due diligence termination right contained in <u>Section 12(d)(ii)</u> or (B) the due diligence termination right contained in <u>Section 12(d)(ii)</u> has expired in accordance with its terms, and $28,062,500, representing the balance of the first fifty percent (50%) of the Commitment Fees, on the first Business Day following the date that each of ADAH and Dolce notify the Company in writing that each of them has approved the GM Settlement.  The balance of $38,062,500, representing the remaining fifty percent (50%) of the Commitment Fees, shall be paid on the first Business Day following the Disclosure Statement Approval Date.  Payment of the Commitment Fees and the Alternate Transaction Fee, if any, will be made by wire transfer of immediately available funds in U.S. dollars to the account specified by each Investor to the Company at least 24 hours prior to such payment.  ~~The~~ **Except as provided in the third proviso of Section 12(c)(ii) hereof, the** Commitment Fees and the Alternate Transaction Fee, if any, will be nonrefundable and non-avoidable when paid.  The provision for the payment of

the Commitment Fees is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into the Agreement and such Commitment Fees shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(j)    The Company will reimburse or pay, as the case may be, the out-of-pocket costs and expenses reasonably incurred by each Investor or its Affiliates (which, for the avoidance of doubt, shall not include any Ultimate Purchaser) to the extent incurred on or before the Effective Date (and reasonable post-closing costs and expenses relating to the closing), including reasonable fees, costs and expenses of counsel to each of the Investors or its Affiliates, and reasonable fees, costs and expenses of any other professionals retained by any of the Investors or its Affiliates in connection with the transactions contemplated hereby (including investigating, negotiating and completing such transactions) and the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions and the Chapter 11 Cases other than costs and expenses relating to any transactions with Ultimate Purchasers and, with respect to expenses that would not otherwise be incurred by the related Investor, Related Purchasers (collectively, "Transaction Expenses"), from and after the commencement of negotiations between such Investor or its Affiliates and the Company with respect to its non-disclosure agreements in connection with the Chapter 11 Cases and/or the transactions contemplated hereby, or in the case of UBS and Merrill, from and after July 30, 2006, in the following manner:

(i)    to the extent Transaction Expenses are or were incurred prior to December 1, 2006, such Transaction Expenses, in an amount not to exceed $13,000,000 (which amount does not include Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000), shall be paid promptly upon the Bankruptcy Court's entry of the Initial Approval Order; provided, that Transaction Expenses incurred by ADAH or its Affiliates on or prior to May 17, 2006 in an amount not to exceed $5,000,000 shall be paid if and when the effective date of any plan of reorganization for the Company occurs and only if such plan results in holders of Common Stock receiving any recovery under such plan;

(ii)    to the extent Transaction Expenses are incurred by any Investor on or after December 1, 2006, such Transaction Expenses shall be paid promptly upon submission to the Company of summary statements therefor by such Investor, in each case, without Bankruptcy Court review or further Bankruptcy Court order, whether or not the transactions contemplated hereby are consummated and, in any event, within 30 days of the submission of such statements; and

(iii)    the filing fee, if any, required to be paid in connection with any filings required to be made by any Investor or its Affiliates under the HSR Act or

any other competition laws or regulations shall be paid by the Company on behalf of the Investors or such Affiliate when filings under the HSR Act or any other competition laws or regulations are made, together with all expenses of the Investors or its Affiliates incurred to comply therewith.

The provision for the payment of the Transaction Expenses is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and such Transaction Expenses shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.  In addition, (i) to the extent permitted under any order authorizing the Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of entry of the Initial Approval Order shall be protected by and entitled to the benefits of the carve-out for professional fees provided in any such Financing Order.

(k)     The Company acknowledges that the Investors and certain persons and entities (collectively, the "Ultimate Purchasers") may enter into one or more agreements (the "Additional Investor Agreements"), pursuant to which such Investor may arrange for one or more Ultimate Purchasers to purchase certain of the Unsubscribed Shares, the Direct Subscription Shares or the Series B Preferred Stock.  Each Additional Investor Agreement entered into prior to the Closing Date shall contain the Ultimate Purchaser's agreement to be bound by this Agreement and shall contain a confirmation by such Ultimate Purchaser of the accuracy with respect to it of the representations set forth in Section 4.  Each Investor proposing to enter into an Additional Investor Agreement prior to the Closing Date with any Ultimate Purchaser or proposing to transfer Investor Shares to any Related Purchaser in either case which would result in the Maximum Number being exceeded agrees to notify the Company prior to entering into such agreement or effecting such transfer and will not undertake such agreement or effect such transfer without the consent of the Company, which shall not be unreasonably withheld.  The Investors agree that with respect to any offer or transfer to an Ultimate Purchaser prior to the Closing Date, they shall not offer any Investor Shares to, or enter into any Additional Investor Agreement with, any person or entity (A) after the initial filing of the Rights Offering Registration Statement with the Commission and (B) that is not a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; provided that the total number of Investors, Related Purchasers and Ultimate Purchasers pursuant to this Agreement shall not exceed the Maximum Number; provided, further, that nothing in this Agreement shall limit or restrict in any way any Investor's ability to transfer or otherwise dispose of any Investor's Shares or any interest therein after the Closing Date pursuant to an effective registration statement under the Securities Act or an exemption from the registration requirements thereunder and pursuant to applicable state securities laws.

3.     Representations and Warranties of the Company.  Except as set forth in a disclosure letter to be delivered pursuant to Section 5(s) (the "Disclosure Letter"), the Company

represents and warrants to, and agrees with, each of the Investors as set forth below.  Any item disclosed in a section of the Disclosure Letter shall be deemed disclosed in all other sections of the Disclosure Letter to the extent the relevance of such disclosure or matter is reasonably apparent and shall qualify the representations and warranties contained in this Section 3.  Except for representations, warranties and agreements that are expressly limited as to their date, each representation, warranty and agreement shall be deemed made as of the date of delivery of the Disclosure Letter (the "Disclosure Letter Delivery Date") and as of the Closing Date:

(a)     Organization and Qualification.  The Company and each of its Significant Subsidiaries has been duly organized and is validly existing in good standing under the laws of its respective jurisdiction of incorporation, with the requisite power and authority to own its properties and conduct its business as currently conducted.  Each of the Company and its Subsidiaries has been duly qualified as a foreign corporation or organization for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties or conducts any business so as to require such qualification, except to the extent that the failure to be so qualified or be in good standing has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  For the purpose of this Agreement, "Material Adverse Effect" means (i) any material adverse effect on the business, results of operations, liabilities, property or condition (financial or otherwise) of the Company or its Subsidiaries, taken as a whole, or (ii) any material adverse effect on the ability of the Company, subject to the approvals and other authorizations set forth in Section 3(g) below, to consummate the transactions contemplated by this Agreement or the Plan other than, in either case, any effect relating to or resulting from (i) changes in general economic conditions or securities or financial markets in general that do not disproportionately impact the Company and its Subsidiaries; (ii) general changes in the industry in which the Company and its Subsidiaries operate and not specifically relating to, or having a disproportionate effect on, the Companies and its Subsidiaries taken as a whole (relative to the effect on other persons operating in such industry); (iii) any changes in law applicable to the Company or any of its Subsidiaries or any of their respective properties or assets or interpretations thereof by any governmental authority which do not have a disproportionate effect on, the Company and its Subsidiaries; (iv) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism which do not have a disproportionate effect on, the Company and its Subsidiaries; (v) the announcement or the existence of, or compliance with, this Agreement and the transactions contemplated hereby (including without limitation the impact thereof on relationships with suppliers, customers or employees); (vi) any accounting regulations or principles or changes in accounting practices or policies that the Company or its Subsidiaries are required to adopt, including in connection with the audit of the Company's financial statements in accordance with GAAP or any failure to timely file periodic reports or timely prepare financial statements and the costs and effects of completing the preparation of the Company's financial statements and periodic reports; or (vii) any change in the market price or trading

volumes of the Company's securities (it being understood for the purposes of this subclause (vii) that any facts underlying such change that are not otherwise covered by the immediately preceding clauses (i) through (vi) may be taken into account in determining whether or not there has been a Material Adverse Effect). For the purposes of this Agreement, (x) a "<u>Subsidiary</u>" of any person means, with respect to such person, any corporation, partnership, joint venture or other legal entity of which such person (either alone or through or together with any other subsidiary), owns, directly or indirectly, more than 50% of the stock or other equity interests, has the power to elect a majority of the board of directors or similar governing body, or has the power to direct the business and policies, and (y) a "<u>Significant Subsidiary</u>" is a Subsidiary that satisfies the definition contained in Article 1, Rule 1-02 of Regulation S-X promulgated pursuant to the Securities Act of 1933, as amended.

(b)    <u>Corporate Power and Authority</u>.

(i)    The Company has or, to the extent executed in the future, will have when executed the requisite corporate power and authority to enter into, execute and deliver this Agreement and each other agreement to which it will be a party as contemplated by this Agreement and the PSA (this Agreement and such other agreements collectively, the "<u>Transaction Agreements</u>") and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Rules 6004(h) and 3020(e) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), respectively, to perform its obligations hereunder and thereunder, including the issuance of the Rights and Investor Shares. The Company has taken or will take all necessary corporate action required for the due authorization, execution, delivery and performance by it of this Agreement, including the issuance of the Rights and Investor Shares.

(ii)    Prior to the execution by the Company and filing with the Bankruptcy Court of the Plan, the Company and each Subsidiary entering into the Plan will have the requisite corporate power and authority to execute the Plan and to file the Plan with the Bankruptcy Court and, subject to entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), to perform its obligations thereunder, and will have taken by the Effective Date all necessary corporate actions required for the due authorization, execution, delivery and performance by it of the Plan.

(c)     <u>Execution and Delivery; Enforceability</u>.

    (i)     Each Transaction Agreement has been, or prior to its execution and delivery will be, duly and validly executed and delivered by the Company, and, upon the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 6004(h), each such document will constitute the valid and binding obligation of the Company, enforceable against the Company in accordance with its terms.

    (ii)    The Plan will be duly and validly filed with the Bankruptcy Court by the Company and each of its Subsidiaries executing the Plan and, upon the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rule 3020(e), will constitute the valid and binding obligation of the Company and such Subsidiary, enforceable against the Company and such Subsidiaries in accordance with its terms.

(d)     <u>Authorized and Issued Capital Stock</u>.  The authorized capital stock of the Company consists of (i) 1,350,000,000 shares of Common Stock and (ii) 650,000,000 shares of preferred stock, par value $0.10 per share.  At the close of business on November 30, 2006 (the "<u>Capital Structure Date</u>") (i) 561,781,500 shares of Common Stock were issued and outstanding, (ii) no shares of the preferred stock were issued and outstanding, (iii) 3,244,317 shares of Common Stock were held by the Company in its treasury, (iv) 85,978,864 shares of Common Stock were reserved for issuance upon exercise of stock options and other rights to purchase shares of Common Stock and vesting of restricted stock units (each, an "<u>Option</u>" and, collectively, the "<u>Options</u>") granted under any stock option or stock-based compensation plan of the Company or otherwise (the "<u>Stock Plans</u>"), and (v) 200,000 shares of Series A participating preferred stock were reserved for issuance pursuant to that certain Rights Agreement by and between the Company and BankBoston, N.A., as Rights Agent, dated as of February 1, 1999, as amended (the "<u>Existing Shareholder Rights Plan</u>").  All issued and outstanding shares of capital stock of the Company and each of its Subsidiaries have been duly authorized and validly issued and are fully paid and nonassessable, and the holders thereof do not have any preemptive rights.  Except as set forth in this <u>Section 3(d)</u> or issuances pursuant to the Stock Plans, at the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company were issued, reserved for issuance or outstanding.  Since the close of business on the Capital Structure Date, no shares of capital stock or other equity securities or voting interest in the Company have been issued or reserved for issuance or become outstanding, other than shares described in clause (iv) of the second sentence of this <u>Section 3(d)</u> that have been issued upon the exercise of outstanding Options granted under the Stock Plans and other than the shares to be issued hereunder or pursuant to the PSA.  Except as described in this <u>Section 3(d)</u>, and except as will be required by the Plan, neither the Company nor any of its Subsidiaries is party to or otherwise bound by or subject to any outstanding option, warrant, call, subscription or other

right (including any preemptive right), agreement or commitment which (w) obligates the Company or any of its Subsidiaries to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any shares of the capital stock of, or other equity or voting interests in, the Company or any security convertible or exercisable for or exchangeable into any capital stock of, or other equity or voting  interest in, the Company, (x) obligates the Company or any of its Subsidiaries to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, contract, arrangement or undertaking, (y) restricts the transfer of any shares of capital stock of the Company or (z) relates to the voting of any shares of capital stock of the Company.  On the Effective Date, the authorized capital stock of the Company and the issued and outstanding shares of capital stock of the Company will conform to the description set forth in the Preferred Term Sheet, the PSA and the Plan.  On the Effective Date, the authorized capital stock of the Company shall consist of such number of shares of New Common Stock as shall be set forth in the Amended and Restated Constituent Documents and 34,285,716 shares of new preferred stock.  On the Effective Date, assuming consummation of the transactions contemplated by this Agreement: (i) 101,000,000 shares of New Common Stock will be outstanding; (ii) 8,571,429 shares of Series A-1 Preferred Stock will be issued and outstanding; (iii) 8,571,429 shares of Series A-2 Preferred Stock will be issued and outstanding; and (iv) 17,142,858 shares of Series B Preferred Stock will be issued and outstanding.

(e)    Issuance.  The Investor Shares to be issued and sold by the Company to the Investors hereunder, when the Investor Shares are issued and delivered against payment therefor by the Investors hereunder, shall have been duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and free and clear of all Taxes, liens, preemptive rights, rights of first refusal, subscription and similar rights, other than (i) any rights contained in the terms of the Preferred Shares as set forth in the Company's Certificate of Incorporation and (ii) any rights contained in any shareholders agreement to which one or more of the Investors shall be a party.

(f)    No Conflict.  Subject to the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, the distribution of the Rights, the sale, issuance and delivery of the Shares upon exercise of the Rights, the consummation of the Rights Offering by the Company and the execution and delivery (or, with respect to the Plan, the filing) by the Company of the Transaction Agreements and the Plan and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein (including compliance by each Investor with its obligations hereunder and thereunder) (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, except to the extent to be specified in the Plan, in the

acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the Certificate of Incorporation or Bylaws of the Company or any of its Subsidiaries, (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties, and (iv) will not trigger the distribution under the Existing Shareholders Rights Plan of Rights Certificates (as defined therein) or otherwise result in any Investor being or becoming an Acquiring Person, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(g)     <u>Consents and Approvals</u>.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Company or any of its Subsidiaries or any of their properties is required for the distribution of the Rights, the sale, issuance and delivery of Shares upon exercise of the Rights or the Investor Shares to each Investor hereunder and the consummation of the Rights Offering by the Company and the execution and delivery by the Company of the Transaction Agreements or the Plan and performance of and compliance by the Company with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein, except (i) the entry of the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 10-day period set forth in Bankruptcy Rules 6004(h) and 3020(e), as applicable, (ii) the registration under the Securities Act of the issuance of the Rights and the Shares pursuant to the exercise of Rights, (iii) filings with respect to and the expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "<u>HSR Act</u>"), and any other comparable laws or regulations in any foreign jurisdiction relating to the sale or issuance of Investor Shares to the Investors, (iv) the filing with the Secretary of State of the State of Delaware of the Certificate of Incorporation to be applicable to the Company from and after the Effective Date and (v) such consents, approvals, authorizations, registrations or qualifications (x) as may be required under the rules and regulations of the New York Stock Exchange or the Nasdaq Stock Exchange to consummate the transactions contemplated herein, (y) as may be required under state securities or Blue Sky laws in connection with the purchase of the Investor Shares by the Investors or the distribution of the Rights and the sale of Shares to Eligible Holders or (z) the absence of which will not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)    Arm's Length.  The Company acknowledges and agrees that the Investors are
acting solely in the capacity of an arm's length contractual counterparty to the
Company with respect to the transactions contemplated hereby (including in
connection with determining the terms of the Rights Offering) and not as a
financial advisor or a fiduciary to, or an agent of, the Company or any other
person or entity.  Additionally, the Investors are not advising the Company or any
other person or entity as to any legal, tax, investment, accounting or regulatory
matters in any jurisdiction.  The Company shall consult with its own advisors
concerning such matters and shall be responsible for making its own independent
investigation and appraisal of the transactions contemplated hereby, and the
Investors shall have no responsibility or liability to the Company, its Affiliates, or
their respective shareholders, directors, officers, employees, advisors or other
representatives with respect thereto.  Any review by the Investors of the
Company, the transactions contemplated hereby or other matters relating to such
transactions will be performed solely for the benefit of the Investors and shall not
be on behalf of the Company, its Affiliates, or their respective shareholders,
directors, officers, employees, advisors or other representatives and shall not
affect any of the representations or warranties contained herein or the remedies of
the Investors with respect thereto.

(i)    Financial Statements.  The financial statements and the related notes of the
Company and its consolidated Subsidiaries included or incorporated by reference
in the Company SEC Documents, and to be included or incorporated by reference
in the Disclosure Statement and the Rights Offering Registration Statement and
the Rights Offering Prospectus, comply or will comply, as the case may be, in all
material respects with the applicable requirements of the Securities Act, the
Securities Exchange Act of 1934, as amended, and the rules and regulation of the
Commission thereunder (the "Exchange Act") and the Bankruptcy Code, as
applicable, and present fairly or will present fairly in all material respects the
financial position, results of operations and cash flows of the Company and its
Subsidiaries as of the dates indicated and for the periods specified; such financial
statements have been prepared in conformity with U.S. generally accepting
accounting principles ("GAAP") applied on a consistent basis throughout the
periods covered thereby (except as disclosed in the Company SEC Documents
filed prior to the date hereof), and the supporting schedules included or
incorporated by reference in the Company SEC Documents, and to be included or
incorporated by reference in the Disclosure Statement, the Rights Offering
Registration Statement and the Rights Offering Prospectus, present fairly or will
present fairly the information required to be stated therein; and the other financial
information included or incorporated by reference in the Company SEC
Documents, and to be included or incorporated by reference in the Disclosure
Statement, Rights Offering Registration Statement and the Rights Offering
Prospectus, has been or will be derived from the accounting records of the
Company and its Subsidiaries and presents fairly or will present fairly the
information shown thereby; and the pro forma financial information and the
related notes included or incorporated by reference in the Company SEC
Documents, and to be included or incorporated by reference in the Disclosure

Statement, Rights Offering Registration Statement and the Rights Offering Prospectus, have been or will be prepared in accordance with the applicable requirements of the Securities Act and the Exchange Act, as applicable, and the assumptions underlying such pro forma financial information are reasonable and are set forth in the Company SEC Documents and will be set forth in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus.

(j)    Company SEC Documents and Disclosure Statement.  Except for the Company's Quarterly Report on Form 10-Q for the period ended September 30, 2006, (which has not been filed as of the date hereof) the Company has filed all required reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated therein) with the Commission ("Company SEC Documents").  As of their respective dates, each of the Company SEC Documents complied in all material respects with the requirements of the Securities Act or the Exchange Act and the rules and regulations of the Commission promulgated thereunder applicable to such Company SEC Documents.  The Company has filed with the Commission all "material contracts" (as such term is defined in Item 601(b)(10) of Regulation S-K under the Exchange Act) that are required to be filed as exhibits to the Company SEC Documents.  No Company SEC Document filed after December 31, 2005, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, will conform in all material respects to the requirements of the Bankruptcy Code.  The Disclosure Statement, when submitted to the Bankruptcy Court and upon confirmation and effectiveness, and any future Company SEC Documents filed with the Commission prior to the Closing Date, when filed, will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they are made, not misleading.

(k)    Rights Offering Registration Statement and Rights Offering Prospectus.  The Rights Offering Registration Statement or any post-effective amendment thereto, as of the Securities Act Effective Date, will comply in all material respects with the Securities Act, and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; and as of the applicable filing date of the Rights Offering Prospectus and any amendment or supplement thereto and as of the Closing Date, the Rights Offering Prospectus will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  On the Distribution Date and the Expiration Date, the Investment Decision Package will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the

circumstances under which they were made, not misleading.  Each Issuer Free Writing Prospectus, at the time of use thereof, when considered together with the Investment Decision Package, will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Each Preliminary Rights Offering Prospectus, at the time of filing thereof, will comply in all material respects with the Securities Act and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.  Notwithstanding the foregoing, the Company makes no representation and warranty with respect to any statements or omissions made in reliance on and in conformity with information relating to each Investor or the Ultimate Purchasers furnished to the Company in writing by such Investor or the Ultimate Purchasers expressly for use in the Rights Offering Registration Statement and the Rights Offering Prospectus and any amendment or supplement thereto.

For the purposes of this Agreement, (i) the term "Rights Offering Registration Statement" means the Registration Statement to be filed with the Commission relating to the Rights Offering, including all exhibits thereto, as amended as of the Securities Act Effective Date, and any post-effective amendment thereto that becomes effective; (ii) the term "Rights Offering Prospectus" means the final prospectus contained in the Rights Offering Registration Statement at the Securities Act Effective Date (including information, if any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Rights Offering Registration Statement; (iii) the term "Investment Decision Package" means the Rights Offering Prospectus, together with any Issuer Free Writing Prospectus used by the Company to offer the Shares to Eligible Holders pursuant to the Rights Offering, (iv) the term "Issuer Free Writing Prospectus" means each "issuer free writing prospectus" (as defined in Rule 433 of the rules promulgated under the Securities Act) prepared by or on behalf of the Company or used or referred to by the Company in connection with the Rights Offering, (v) the term "Preliminary Rights Offering Prospectus" means each prospectus included in the Rights Offering Registration Statement (and any amendments thereto) before it becomes effective, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Rights Offering Registration Statement, at the time of effectiveness that omits information permitted to be excluded under Rule 430A under the Securities Act; and (vi) "Securities Act Effective Date" means the date and time as of which the Rights Offering Registration Statement, or the most recent post-effective amendment thereto, was declared effective by the Commission.

(l)    Free Writing Prospectuses.  Each Issuer Free Writing Prospectus will conform in all material respects to the requirements of the Securities Act as of the date of first

use or as otherwise provided for in Rule 433 under the Securities Act, and the Company will comply with all prospectus delivery and all filing requirements applicable to such Issuer Free Writing Prospectus under the Securities Act. The Company has retained in accordance with the Securities Act all Issuer Free Writing Prospectuses that were not required to be filed pursuant to the Securities Act.

(m)     <u>Absence of Certain Changes</u>.  Since December 31, 2005, other than as disclosed in the Company SEC Documents filed prior to the date hereof, and except for actions to be taken pursuant to the Transaction Agreements and the Plan:

(i)      there has not been any change in the capital stock from that set forth in <u>Section 3(d)</u> or any material change in long-term debt of the Company or any of its Subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of capital stock;

(ii)     no event, fact or circumstance has occurred which has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(iii)    neither the Company nor any of its Subsidiaries has made any changes with respect to accounting policies or procedures, except as required by law or changes in GAAP;

(iv)     neither the Company nor any of its Subsidiaries has paid, discharged, waived, compromised, settled or otherwise satisfied any material Legal Proceeding, whether now pending or hereafter brought, (A) at a cost materially in excess of the amount accrued or reserved for it in the Company SEC Documents filed prior to the date hereof, (B) pursuant to terms that impose material adverse restrictions on the business of the Company and its Subsidiaries as currently conducted or (C) on a basis that reveals a finding or an admission of a material violation of law by the Company or its Subsidiaries;

(v)      other than in the ordinary course of business, neither the Company nor any of its Subsidiaries has (A) made, changed or revoked any material Tax election, (B) entered into any settlement or compromise of any material Tax liability, (C) filed any amended Tax Return with respect to any material Tax, (D) changed any annual Tax accounting period, (E) entered into any closing agreement relating to any material Tax, (F) knowingly failed to claim a material Tax refund for which it is entitled, or (G) made material changes to their Tax accounting methods or principles;

(vi)     there has not been (A) any increase in the base compensation payable or to become payable to the officers or employees of the Company or any of its Subsidiaries with annual base compensation in excess of $500,000 (except

for compensation increases in the ordinary course of business and consistent with past practice) or (B) except in the ordinary course of business and consistent with past practice, any establishment, adoption, entry into or material amendment of any collective bargaining, bonus, profit sharing, thrift, compensation, employment, termination, severance or other plan, agreement, trust, fund, policy or arrangement for the benefit of any director, or for the benefit of a group of employees or for any individual officer or employee with annual base compensation in excess of $500,000, in each case;

(vii)    except in a manner consistent with the Company's transformation plan previously disclosed in the Company SEC Documents filed prior to the date hereof, (the "Transformation Plan") neither the Company nor any of its Subsidiaries have sold, transferred, leased, licensed or otherwise disposed of any assets or properties material to the Company and its Subsidiaries, taken as a whole, except for (A) sales of inventory in the ordinary course of business consistent with past practice and (B) leases or licenses entered into in the ordinary course of business consistent with past practice; and

(viii)    except in a manner consistent with the Transformation Plan, neither the Company nor any of its Subsidiaries have acquired any business or entity material to the Company and its Subsidiaries, taken as a whole, by merger or consolidation, purchase of assets or equity interests, or by any other manner, in a single transaction or a series of related transactions, or entered into any contract, letter of intent or similar arrangement (whether or not enforceable) with respect to the foregoing.

(n)    Descriptions of the Transaction Agreement.  The statements in the Rights Offering Registration Statement and the Rights Offering Prospectus insofar as they purport to constitute summaries of each of the Transaction Agreements, the Plan, the Initial Approval Order and the Confirmation Order, or the terms of statutes, rules or regulations, legal or governmental proceedings or contracts, will constitute accurate summaries in all material respects.

(o)    No Violation or Default; Compliance with Laws.  Neither the Company nor any of its Significant Subsidiaries is in violation of its charter or by-laws or similar organizational documents.  Neither the Company nor any of its Subsidiaries is, except as a result of the Chapter 11 Cases or the failure to file its Quarterly Report on Form 10-Q for the period ended September 30, 2006, in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject, except for any such default that has not had and would not reasonably be expected

-19-

to have, individually or in the aggregate, a Material Adverse Effect.  Neither the Company nor any of its Subsidiaries is, or has been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(p)     <u>Legal Proceedings</u>.  Except as described in the Company SEC Documents filed prior to the date hereof, there are no legal, governmental or regulatory actions, suits, proceedings or, to the knowledge of the Company, investigations pending to which the Company or any of its Subsidiaries is or may be a party or to which any property of the Company or any of its Subsidiaries is or may be the subject that, individually or in the aggregate, has had or, if determined adversely to the Company or any of its Subsidiaries, would reasonably be expected to have a Material Adverse Effect, and no such actions, suits or proceedings or, to the knowledge of the Company, investigations are pending, threatened or contemplated, by any governmental or regulatory authority or by others.  There are no current or pending legal, governmental or regulatory actions, suits or proceedings that are required under the Exchange Act to be described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not or will not be so described, and there are no statutes, regulations or contracts or other documents that are required under the Exchange Act to be filed as exhibits to the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus or described in the Company SEC Documents or the Rights Offering Registration Statement or Rights Offering Prospectus that are not so filed or described.

(q)     <u>Independent Accountants</u>.  Ernst & Young LLP ("<u>E&Y</u>"), the Company's public accountants, are independent public accountants with respect to the Company and its Subsidiaries as required by the Securities Act.

(r)     <u>Labor Relations</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof:

(i)     neither the Company nor any of its Subsidiaries is a party to, or bound by, any material collective bargaining agreement, contract or other agreement or understanding with a labor union or labor organization (other than contracts or other agreements or understandings with labor unions or labor organizations in connection with products and services offered and sold to such unions and organizations by the Company or its Subsidiaries);

(ii)     neither the Company nor any of its Subsidiaries is the subject of any proceeding asserting that it or any Subsidiary has committed an unfair labor practice or sex, age, race or other discrimination or seeking to compel it to bargain with any labor organization as to wages or conditions of employment, which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect;

(iii)     there are no material current or, to the knowledge of the Company, threatened organizational activities or demands for recognition by a labor organization seeking to represent employees of the Company or any Subsidiary and no such activities have occurred during the past 24 months;

(iv)     no grievance, arbitration, litigation or complaint or, to the knowledge of the Company, investigations relating to labor or employment matters is pending or, to the knowledge of the Company, threatened against the Company or any of its Subsidiaries which, except as has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(v)     the Company and each of its Subsidiaries has complied and is in compliance in all respects with all applicable laws (domestic and foreign), agreements, contracts, and policies relating to employment, employment practices, wages, hours, and terms and conditions of employment and is not engaged in any material unfair labor practice as determined by the National Labor Relations Board (or any foreign equivalent) except where the failure to comply has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(vi)     the Company has complied in all respects with its payment obligations to all employees of the Company and its Subsidiaries in respect of all wages, salaries, commissions, bonuses, benefits and other compensation due and payable to such employees under any Company policy, practice, agreement, plan, program or any statute or other law, except to the extent that any noncompliance, either individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect; and

(vii)     the Company has complied and is in compliance in all material respects with its obligations pursuant to the Worker Adjustment and Retraining Notification Act of 1988 (and any similar state or local law) to the extent applicable, and all material other employee notification and bargaining obligations arising under any collective bargaining agreement or statute.

(s)     Title to Intellectual Property. The Company and its Subsidiaries own or possess valid and enforceable rights to use all material patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, copyrights, licenses and know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures) (collectively, "Intellectual Property") used in the conduct of their respective businesses other than Intellectual Property, the failure to own or possess which has not had and would not reasonably be expected to have, individually or in the aggregate, Material Adverse Effect. All registrations with and applications to governmental or regulatory authorities in respect of such Intellectual Property are valid and in full force and effect, have not, except in

accordance with the ordinary course practices of the Company and its Subsidiaries, lapsed, expired or been abandoned (subject to the vulnerability of a registration for trademarks to cancellation for lack of use), are not the subject of any opposition filed with the United States Patent and Trademark Office or any other applicable Intellectual Property registry.  The consummation of the transaction contemplated hereby and by the Plan will not result in the loss or impairment of any rights to use such Intellectual Property or obligate any of the Investors to pay any royalties or other amounts to any third party in excess of the amounts that would have been payable by Company and its Subsidiaries absent the consummation of this transactions.  The Company and its Subsidiaries have taken reasonable security measures to protect the confidentiality and value of its and their trade secrets (or other Intellectual Property for which the value is dependent upon its confidentiality), and no such information, has been misappropriated or the subject of an unauthorized disclosure, except to the extent that such misappropriation or unauthorized disclosure has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  The Company and its Subsidiaries have not received any notice that it is or they are, in default (or with the giving of notice or lapse of time or both, would be in default) under any contract relating to such Intellectual Property.  No Intellectual Property rights of the Company or its Subsidiaries are being infringed by any other person, except to the extent that such infringement has not had and would not have, individually or in the aggregate, a Material Adverse Effect.  The conduct of the businesses of the Company and its Subsidiaries will not conflict in any respect with any Intellectual Property rights of others, and the Company and its Subsidiaries have not received any notice of any claim of infringement or conflict with any such rights of others which has had or would in any such case be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

(t)    Title to Real and Personal Property.  The Company and its Subsidiaries have good and marketable title to all real property owned by the Company and its Subsidiaries and good title to all other tangible and intangible properties (other than Intellectual Property covered by Section 3(s)) owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (i) are described in the consolidated balance sheets included in the Company SEC Documents filed prior to the date hereof or (ii) individually and in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.  All of the leases and subleases to which the Company or its Subsidiaries are a party are in full force and effect and enforceable by the Company or such Subsidiary in accordance with their terms, and neither the Company nor any Subsidiary has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or any Subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such Subsidiary to the continued possession of the leased or subleased property by under any such lease or sublease, except where any such claim or failure to be

enforceable would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(u)     <u>No Undisclosed Relationships</u>.  As of the date hereof, no relationship, direct or indirect, exists between or among the Company or any of its Subsidiaries, on the one hand, and the directors, officers, stockholders, customers or suppliers of the Company or any of its Subsidiaries, on the other, that is required by the Exchange Act to be described in the Company SEC Documents and that are not so described, except for the transactions pursuant to this Agreement.

(v)     <u>Investment Company Act</u>.  As of the date hereof, the Company is not and, after giving effect to the consummation of the Plan, including the offering and sale of the Investor Shares and Shares upon exercise of Rights, and the application of the proceeds thereof, will not be required to register as an "investment company" or an entity "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder.

(w)     <u>Licenses and Permits</u>.  The Company and its Subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate federal, state, local or foreign governmental or regulatory authorities that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses as described in the Company SEC Documents except any such licenses, certificates, permits or authorization the absence of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Except as described in the Company SEC Documents filed prior to the date hereof and except as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect, neither the Company nor any of its Subsidiaries has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course.

(x)     <u>Compliance with Environmental Laws</u>.

(i)     The Company and its Subsidiaries have complied and are in compliance with any and all applicable federal, state, local and foreign laws, rules, regulations, decisions and orders, including all civil and common law, relating to the protection of human health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants (collectively, "<u>Environmental Laws</u>");

(ii)    the Company and its Subsidiaries have (a) received and are in compliance with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses, (b) are not subject to any action to revoke, terminate, cancel, limit, amend or

-23-

appeal any such permits, licenses or approvals, and (c) have paid all fees, assessments or expenses due under any such permits, licenses or approvals;

(iii)    the Company and its Subsidiaries have not received notice from any governmental authority of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, or for any violation of Environmental Laws;

(iv)    there are no facts, circumstances or conditions relating to the past or present business or operations of the Company, its Subsidiaries or any of their predecessors (including the disposal of any hazardous or toxic substances or wastes, pollutants or contaminants), or to any real property currently or formerly owned or operated by the Company, its Subsidiaries or any of their predecessors, that would reasonably be expected to give rise to any claim, proceeding or action, or to any liability, under any Environmental Law;

(v)    neither the Company nor any of its Subsidiaries has agreed to assume or accept responsibility for, by contract or otherwise, any liability of any other person under Environmental Laws;

(vi)    neither the Company nor any of its Subsidiaries is required or reasonably expected to incur material capital expenditures during the current and the subsequent five fiscal years to reach or maintain compliance with existing or reasonably anticipated Environmental Laws;

(vii)    none of the transactions contemplated under this Agreement will give rise to any obligations to obtain the consent of or provide notice to any governmental or regulatory authority under any Environmental Laws; and

(viii)    none of the Company, nor any of its subsidiaries nor their respective predecessors has manufactured, marketed, distributed, or sold asbestos or any products containing asbestos.

except, in the case of each of subclauses (i) through (vi) and in subclause (viii) above, as disclosed in the Company SEC Documents filed prior to the date hereof, as have been, as of the date of this Agreement, adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof, or as, individually and in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

(y)    <u>Tax Matters</u>.  Except as described in the Company SEC Documents filed with the Commission prior to the date hereof:

(i)    The Company has timely filed or caused to be timely filed (taking into account any applicable extension of time within which to file) with the

appropriate taxing authorities all material tax returns, statements, forms and reports (including elections, declarations, disclosures, schedules, estimates and information Tax Returns) for Taxes ("Tax Returns") that are required to be filed by, or with respect to, the Company and its Subsidiaries on or prior to the Closing Date. The Tax Returns accurately reflect all material liability for Taxes of the Company and its Subsidiaries for the periods covered thereby;

(ii)    all material Taxes and Tax liabilities due by or with respect to the income, assets or operations of the Company and its Subsidiaries for all taxable years or other taxable periods that end on or before the Closing Date have been or will, prior to the Closing, be timely paid in full or accrued and fully provided for in accordance with GAAP on the financial statements of the Company included in the Company SEC Documents;

(iii)    neither the Company nor any of its Subsidiaries has received any written notices from any taxing authority relating to any material issue that has not been adequately provided for in accordance with GAAP in the financial statements of the Company included in the Company SEC Documents filed prior to the date hereof;

(iv)    all material Taxes which the Company and each or any of its Subsidiaries is (or was) required by law to withhold or collect in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder or other third party have been duly withheld or collected, and have been timely paid to the proper authorities to the extent due and payable;

(v)    neither the Company nor any of its subsidiaries has been included in any "consolidated," "unitary" or "combined" Tax Return provided for under the law of the United States, any foreign jurisdiction or any state or locality with respect to Taxes for any taxable period for which the statute of limitations has not expired (other than a group of which the Company and/or its subsidiaries are the only members);

(vi)    except for the tax sharing allocations and similar agreements entered into with GM at the time of the spin-off, there are no tax sharing, allocation, indemnification or similar agreements in effect as between the Company or any of its Subsidiaries or any predecessor or affiliate thereof and any other party (including any predecessors or affiliates thereof) under which the Company or any of its Subsidiaries would be liable for any material Taxes or other claims of any party;

(vii)    the Company has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the five-year period ending on the date hereof; and

(viii)    the Company is not a party to any agreement other than certain Change In Control Agreements in the Company SEC Documents filed prior to the date hereof that would require the Company or any affiliate thereof to make any material payment that would constitute an "excess parachute payment" for purposes of Sections 280G and 4999 of the Code.

For purposes of this Agreement, "Taxes" shall mean all taxes, assessments, charges, duties, fees, levies or other governmental charges, including, without limitation, all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, social security, withholding and other taxes, assessments, charges, duties, fees, levies or other governmental charges of any kind whatsoever (whether payable directly or by withholding and whether or not requiring the filing of a Tax Return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest and shall include any liability for such amounts as a result either of being a member of a combined, consolidated, unitary or affiliated group or of a contractual obligation to indemnify any person or other entity.

(z)    Compliance With ERISA.

(i)    Correct and complete copies of the following documents, with respect to all material domestic and foreign benefit and compensation plans, programs, contracts, commitments, practices, policies and arrangements, whether written or oral, that have been established, maintained or contributed to (or with respect to which an obligation to contribute has been undertaken) or with respect to which any potential liability is borne by the Company or any of its Subsidiaries, including, but not limited to, "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and deferred compensation, stock option, stock purchase, restricted stock, stock appreciation rights, stock based, incentive and bonus plans (the "Company Plans"), have been or will be delivered or made available to the Investors by the Company, to the extent applicable: (i) all material Company Plan documents, together with all amendments and attachments thereto (including, in the case of any Company Plan not set forth in writing, a written description thereof); (ii) all material trust documents, declarations of trust and other documents establishing other funding arrangements, and all amendments thereto and the latest financial statements thereof; (iii) the most recent annual report on IRS Form 5500 for each of the past three years and all schedules thereto and the most recent actuarial report; (iv) the most recent IRS determination letter; (v) summary plan descriptions and summaries of material modifications; and (vi) the two most recently prepared actuarial valuation reports.

(ii)    Except as has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or except as described in the Company SEC Documents filed prior to the date hereof:

(A) each Company Plan, other than any "multiemployer plans" within the meaning of Section 3(37) of ERISA ("Multiemployer Plans"), is in compliance with ERISA, the Internal Revenue Code of 1986, as amended (the "Code") and other applicable laws; (B) each Company Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination letter from the IRS covering all Tax law changes prior to the Economic Growth and Tax Relief Reconciliation Act of 2001 or has applied to the IRS for such favorable determination within the applicable remedial amendment period under Section 401(b) of the Code, and the Company is not aware of any circumstances likely to result in the loss of the qualification of such Company Plan under Section 401(a) of the Code; (C) no liability under Subtitle C or D of Title IV of ERISA has been or is reasonably expected to be incurred by the Company or any of its Subsidiaries with respect to any ongoing, frozen or terminated "single-employer plan," within the meaning of Section 4001(a)(15) of ERISA ("Single-Employer Plan") currently maintained or contributed to (or with respect to which an obligation to contribute has been undertaken), or the Single-Employer Plan of any entity which is considered one employer with the Company under Section 4001 of ERISA or Section 414 of the Code (a "Company ERISA Affiliate"); (D) the Company and its Subsidiaries have not incurred any withdrawal liability (including any contingent or secondary withdrawal liability) with respect to a Multiemployer Plan under Subtitle E of Title IV of ERISA (regardless of whether based on contributions of a Company ERISA Affiliate) that has not been satisfied in full and no condition or circumstance has existed that presents a risk of the occurrence of any withdrawal from or the partition, termination, reorganization or insolvency of any such Multiemployer Plan; (E) no notice of a "reportable event," within the meaning of Section 4043 of ERISA has occurred or is expected to occur for any Company Plan or by any Company ERISA Affiliate; (F) all contributions required to be made under the terms of any Company Plan have been timely made or have been reflected in the financial statements of the Company included in the Company SEC Reports filed prior to the date hereof; and (G) there has been no amendment to, announcement by the Company or any of its Subsidiaries relating to, or change in employee participation or coverage under, any Company Plan which would increase the expense of maintaining such plan above the level of the expense incurred therefor for the most recent fiscal year.

(iii)     Except as disclosed in the Company SEC Documents filed prior to the date hereof: (A) neither any Company Plan nor any Single-Employer Plan of a Company ERISA Affiliate has an "accumulated funding deficiency" (whether or not waived) within the meaning of Section 412 of the Code or Section 302 of ERISA and neither the Company nor any of its Subsidiaries nor any Company ERISA Affiliate has applied for or obtained a funding waiver; (B) the Company expects that required minimum contributions to any Company Plan under Section 412 of the Code will not be materially

increased by application of Section 412(l) of the Code; (C) neither the Company nor any of its Subsidiaries has provided, or is required to provide, security to any Company Plan or to any Single-Employer Plan of a Company ERISA Affiliate pursuant to Section 401(a)(29) of the Code; and (D) neither the execution of this Agreement, stockholder approval of this Agreement nor the consummation of the transactions contemplated hereby will limit or restrict the right of the Company to merge, amend or terminate any of the Company Plans.

(aa)    <u>Internal Control Over Financial Reporting</u>.  Except as set forth in the Company SEC Documents filed prior to the date hereof, the Company and its Subsidiaries (i) make and keep books and records that accurately and fairly represent the Company's transactions, and (ii) maintain and have maintained effective internal control over financial reporting as defined in Rule 13a-15 under the Exchange Act and a system of internal accounting controls sufficient to provide reasonable assurance that: (A) transactions are executed in accordance with management's general or specific authorizations; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.  The Company has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date hereof, to the Company's auditors and the audit committee of the Company's board of directors (i) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and has identified for the Company's auditors and the audit committee of the Company's board of directors any material weaknesses in internal control over financial reporting and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

(bb)    <u>Disclosure Controls and Procedures</u>.  Except as disclosed in the Company SEC Documents filed prior to the date hereof, the Company maintains disclosure controls and procedures required by Rule 13a-15 or 15d-15 under the Exchange Act.  Such disclosure controls and procedures are effective to ensure that information required to be disclosed by the Company is recorded and reported on a timely basis to the individuals responsible for the preparation of the Company's filings with the Commission and other public disclosure documents.

(cc)    <u>Insurance</u>.  The Company and its Subsidiaries have insurance covering their respective properties, operations, personnel and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are customary for companies whose businesses are similar to the Company and its Subsidiaries.  Neither the Company nor any of its

Subsidiaries has (i) received written notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(dd)    <u>No Unlawful Payments</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or other person associated with or acting on behalf of the Company or any of its Subsidiaries has: (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977; or (iv) made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment in each case other than clause (iii) that has been or would reasonably be expected to be, individually or in the aggregate, material to the Company and its Subsidiaries, taken as a whole.

(ee)    <u>Compliance with Money Laundering Laws</u>.  The Company and its Subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Bank Secrecy Act, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any governmental agency (collectively, the "<u>Money Laundering Laws</u>") and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its Subsidiaries with respect to Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(ff)    <u>Compliance with Sanctions Laws</u>.  Neither the Company nor any of its Subsidiaries nor, to the knowledge of the Company, any director, officer, agent, employee or affiliate of the Company or any of its Subsidiaries is currently subject to any U.S. sanctions administered by the Office of Foreign Assets Control of the U.S. Treasury Department ("<u>OFAC</u>").  The Company will not directly or indirectly use the proceeds of the Rights Offering or the sale of the Investor Shares, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other person or entity, for the purpose of financing the activities of any person that, to the Company's knowledge, is currently subject to any U.S. sanctions administered by OFAC.

(gg)    <u>No Restrictions on Subsidiaries</u>.  Except as described in the Company SEC Documents filed prior to the date hereof or otherwise set forth in the record of the Chapter 11 Cases on or prior to the date hereof, and subject to the Bankruptcy Code, no Subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from

paying any dividends to the Company, from making any other distribution on such Subsidiary's capital stock, from repaying to the Company any loans or advances to such Subsidiary from the Company or from transferring any of such Subsidiary's properties or assets to the Company or any other Subsidiary of the Company.

(hh)   <u>No Broker's Fees</u>.  Neither the Company nor any of its Subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against the Investors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the Investor Shares.

(ii)   <u>No Registration Rights</u>.  Except as provided for pursuant to the registration rights agreement contemplated by <u>Section 8(c)(iv)</u>, no person has the right to require the Company or any of its Subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Rights Offering Registration Statement with the Commission or in connection with Rights Offering or the sale of the Investor Shares.

(jj)   <u>No Stabilization</u>.  The Company has not taken and will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(kk)   <u>Margin Rules</u>.  Neither the issuance, sale and delivery of the Rights or the Shares in connection with Rights Offering or the sale of the Investor Shares nor the application of the proceeds thereof by the Company as to be described in the Rights Offering Registration Statement and the Rights Offering Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(ll)   <u>Forward-Looking Statements</u>.  No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) contained in the Company SEC Documents has been made or reaffirmed, and in the case of the Rights Offering Registration Statement and the Rights Offering Prospectus, will be made or reaffirmed, without a reasonable basis or has been disclosed other than in good faith.

(mm)   <u>Statistical and Market Data</u>.  Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data to be included in the Disclosure Statement, Rights Offering Registration Statement and the Rights Offering Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(nn)   <u>Rights Agreement</u>.  The Board of Directors of the Company has taken all necessary action to render the Existing Shareholder Rights Plan inapplicable to the sale and issuance of the Investor Shares and the other transactions contemplated hereby and by the Preferred Term Sheet, the Plan and the

Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser).

(oo) <u>Takeover Statutes; Charter</u>. The Board of Directors of the Company has taken all such action necessary to render the restrictions contained in Section 203 of the General Corporation Law of the State of Delaware (the "<u>DGCL</u>") and Article IX of the Company's Certificate of Incorporation inapplicable to the Investors and the sale and issuance of the Investor Shares and the other transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the Plan and the Transaction Agreements (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser). Except for Section 203 of the DGCL (which has been rendered inapplicable), no other "fair price," "moratorium," "control share acquisition", "business combination" or other similar anti-takeover statute or regulation (a "<u>Takeover Statute</u>") is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the Plan and the Transaction Agreements. Other than Article IX of the Company's Certificate of Incorporation, which has been rendered inapplicable, no anti-takeover provision in the Company's certificate of incorporation or by-laws is applicable to the Company, the Common Stock, the Shares, the sale and issuance of the Investor Shares or the other transactions contemplated by the Preferred Term Sheet, the Plan or the Transaction Agreements.

4.    <u>Representations and Warranties of the Investors</u>. Each Investor represents and warrants as to itself only, and agrees with the Company, severally and not jointly, as set forth below. Each such representation, warranty and agreement is made as of the date hereof and as of the Closing Date.

(a) <u>Incorporation</u>. The Investor has been duly organized and, if applicable, is validly existing as a corporation, limited partnership or limited liability company, in good standing under the laws of the jurisdiction of its incorporation or organization.

(b) <u>Corporate Power and Authority</u>. The Investor has the requisite corporate, limited partnership or limited liability company power and authority to enter into, execute and deliver this Agreement and to perform its obligations hereunder and has taken all necessary corporate, limited partnership or limited liability company action required for the due authorization, execution, delivery and performance by it of this Agreement .

(c) <u>Execution and Delivery</u>. This Agreement has been duly and validly executed and delivered by the Investor and constitutes its valid and binding obligation, enforceable against it in accordance with its terms.

(d) <u>No Registration</u>. The Investor understands that the Investor Shares have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends upon, among other things, the bona fide nature of the investment intent and the

accuracy of such Investor's representations as expressed herein or otherwise made pursuant hereto.

(e)     <u>Investment Intent</u>.  The Investor is acquiring the Investor Shares for investment for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities laws, and such Investor has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities laws.   Notwithstanding the foregoing, as to ADAH, subject to the provisions of Sections 2(a), 2(b) and 2(k), the Company acknowledges that ADAH may provide for a participation interest or other arrangement whereby the economic benefits of ownership of the Series A-2 Preferred Stock are shared with Merrill and Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock.

(f)     <u>Securities Laws Compliance</u>.  The Investor Shares will not be offered for sale, sold or otherwise transferred by the Investor except pursuant to a registration statement or in a transaction exempt from, or not subject to, registration under the Securities Act and any applicable state securities laws and any sale or placement of Investor Shares pursuant to Sections 2(a), 2(b) or 2(k) will not affect the validity of the private placement to the Investors under this Agreement.

(g)     <u>Sophistication</u>.  The Investor has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of its investment in the Investor Shares being acquired hereunder.  The Investor is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act.  The Investor understands and is able to bear any economic risks associated with such investment (including, without limitation, the necessity of holding the Investor Shares for an indefinite period of time).

(h)     <u>No Conflict</u>.  The execution and delivery by the Investor of each of the Transaction Agreements to which it is a party and the compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein (i) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result, in the acceleration of, or the creation of any lien under, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor or any of its Subsidiaries is subject, (ii) will not result in any violation of the provisions of the certificate of incorporation or bylaws or similar governance documents of the Investor, and (iii) will not result in any material violation of, or any termination or material impairment of any rights under, any statute or any license, authorization, injunction, judgment, order, decree, rule or regulation of any court or governmental agency or body having jurisdiction over the Investor or any of their

properties, except in any such case described in subclause (i) for any conflict, breach, violation, default, acceleration or lien which has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(i)     Consents and Approvals.  No consent, approval, authorization, order, registration or qualification of or with any court or governmental agency or body having jurisdiction over the Investor or any of its properties is required to be obtained or made by the Investor for the purchase of the Investor Shares hereunder and the execution and delivery by the Investor of this Agreement or the Transaction Agreements to which it is a party and performance of and compliance by the Investor with all of the provisions hereof and thereof and the Preferred Term Sheet and the PSA and the consummation of the transactions contemplated herein and therein, except filings with respect to and the expiration or termination of the waiting period under the HSR Act or any comparable laws or regulations in any foreign jurisdiction relating to the purchase of Investor Shares and except for any consent, approval, authorization, order, registration or qualification which, if not made or obtained, has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(j)     Arm's Length.  The Investor acknowledges and agrees that the Company is acting solely in the capacity of an arm's length contractual counterparty to the Investor with respect to the transactions contemplated hereby (including in connection with determining the terms of the Rights Offering).  Additionally, the Investor is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, except as specifically set forth in this Agreement.  The Investor shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby.

(k)     No Violation or Default; Compliance with Laws.  The Investor is not in default, and no event has occurred that , with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Investor is a party or by which the Investor is bound or to which any of the property or assets of the Investor is subject, individually or in the aggregate, that would prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.  The Investor is not and has not been at any time since January 1, 2002, in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except for any such violation that has not and would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(l)     <u>Legal Proceedings</u>.  There are no actions, suits or proceedings to which the
Investor is a party or to which any property of the Investor is the subject that,
individually or in the aggregate, has or, if determined adversely to the Investor,
would reasonably be expected to prohibit, materially delay or materially and
adversely impact the Investor's performance of its obligations under this
Agreement and no such actions, suits or proceedings are threatened or, to the
knowledge of the Investor, contemplated and, to the knowledge of the Investor,
no investigations are threatened by any governmental or regulatory authority or
threatened by others that has or would reasonably be expected, individually or in
the aggregate, to prohibit, materially delay or materially and adversely impact the
Investor's performance of its obligations under this Agreement.

(m)     <u>No Broker's Fees</u>.  The Investor is not a party to any contract, agreement or
understanding with any person (other than this Agreement) that would give rise to
a valid claim against the Company for a brokerage commission, finder's fee or
like payment in connection with the Rights Offering or the sale of the Investor
Shares.

(n)     <u>No Undisclosed Written Agreements</u>.  The Investor has not entered into any
material written agreements between or among the Investors directly relating to
such Investor's Investor Shares or the performance of the Transaction
Agreements, and any such written agreement hereafter entered into will be
disclosed promptly to the Company.

(o)     <u>Available Funds</u>.  To the extent the Investor is ADAH, Dolce or Harbinger, the
Investor has provided the Company with a true and complete copy of an executed
commitment letter from the parties signatory thereto to provide equity financing
to such Investor (the "<u>Equity Commitment Letter</u>").  Each such Investor
represents as to itself that its Equity Commitment Letter is in full force and effect
and is a valid and binding obligation of the parties thereto enforceable in
accordance with its terms except as the enforcement thereof is subject to
bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and
similar laws of general applicability relating to or affecting creditors rights and to
general equitable principles.  The Equity Commitment Letters are not subject to
any condition or contingency with respect to financing that is not set forth in such
letter other than the terms and conditions of this Agreement.

5.     <u>Additional Covenants of the Company</u>.  The Company agrees with each of the Investors
as set forth below.

(a)     <u>Initial Approval Motion and Initial Approval Order</u>.  The Company agrees that it
shall use reasonable best efforts to cause the Initial Approval Order to become a
Final Approval Order as soon as practicable following the filing of the Approval
Motion.

(b)     <u>Plan and Disclosure Statement</u>.  The Company shall authorize, execute, file with
the Bankruptcy Court and seek confirmation of, a Plan (and a related disclosure

statement (the "Disclosure Statement")) (i) the terms of which are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, however, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion, (ii) that provides for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors from liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (iii) that has conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement and with such other terms that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably satisfactory to each of ADAH and Dolce; provided, however, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of such other terms shall be each in its sole discretion. The Company will (i) provide to each Investor and its counsel a copy of the Plan and the Disclosure Statement, and any amendments thereto, and a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel. In addition, the Company will (i) provide to each Investor and its counsel a copy of the Confirmation Order and a reasonable opportunity to review and comment on such order prior to such order being filed with the Bankruptcy Court and (ii) duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, into such Confirmation Order, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

(c)     Rights Offering.  The Company shall use its reasonable best efforts to effectuate the Rights Offering as provided herein.

(d)     Securities Laws; Rights Offering Registration Statement.  The Company shall take all action as may be necessary or advisable so that the Rights Offering and the issuance and sale of the Investor Shares and the other transactions contemplated by this Agreement will be effected in accordance with the Securities Act and the Exchange Act and any state or foreign securities or Blue Sky laws. As promptly as practicable following the later of the Due Diligence Expiration Date and the date the GM Settlement is agreed, the Company shall file a Rights

Offering Registration Statement with the Commission. The Company shall: (i) provide the Investors with a reasonable opportunity to review the Rights Offering Registration Statement, and any amendment or supplement thereto, before any filing with the Commission and shall duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel; (ii) advise the Investors, promptly after it receives notice thereof, of the time when the Rights Offering Registration Statement has been filed or has become effective or any Rights Offering Prospectus or Rights Offering Prospectus supplement has been filed and shall furnish the Investors with copies thereof; (iii) advise the Investors promptly after it receives notice of any comments or inquiries by the Commission (and furnish the Investors with copies of any correspondence related thereto), of the issuance by the Commission of any stop order or of any order preventing or suspending the use of the Rights Offering Prospectus or Issuer Free Writing Prospectus, of the initiation or threatening of any proceeding for any such purpose, or of any request by the Commission for the amending or supplementing of the Rights Offering Registration Statement or a Rights Offering Prospectus or for additional information, and in each such case, provide the Investors with a reasonable opportunity to review any such comments, inquiries, request or other communication from the Commission and to review any amendment or supplement to the Rights Offering Registration Statement or the Rights Offering Prospectus before any filing with the Commission, and to duly consider in good faith any comments consistent with this Agreement, the Preferred Term Sheet and the PSA, and any other reasonable comments of the Investors and their respective counsel, and not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel; and (iv) in the event of the issuance of any stop order or of any order preventing or suspending the use of a Rights Offering Prospectus or any Issuer Free Writing Prospectus or suspending any such qualification, to use promptly its reasonable best efforts to obtain its withdrawal.

(e)   <u>Listing</u>. The Company shall use its commercially reasonable efforts to list and maintain the listing of the New Common Stock on the New York Stock Exchange or, if approved by each of ADAH and Dolce, the Nasdaq Global Select Market.

(f)   <u>Rule 158</u>. The Company will generally make available to the Company's security holders as soon as practicable an earnings statement of the Company covering a twelve-month period beginning after the date of this Agreement, which shall satisfy the provisions of Section 11(a) of the Securities Act.

(g)   <u>Notification</u>. The Company shall notify, or cause the Subscription Agent to notify the Investors, on each Friday during the Rights Exercise Period and on each Business Day during the five Business Days prior to the Expiration Time (and any

extensions thereto), or more frequently if reasonably requested by any of the Investors, of the aggregate number of Rights known by the Company or the Subscription Agent to have been exercised pursuant to the Rights Offering as of the close of business on the preceding Business Day or the most recent practicable time before such request, as the case may be.

(h)     <u>Unsubscribed Shares</u>.  The Company shall determine the number of Unsubscribed Shares, if any, in good faith, shall provide a Purchase Notice or a Satisfaction Notice that accurately reflects the number of Unsubscribed Shares as so determined and shall provide to the Investors a certification by the Subscription Agent of the Unsubscribed Shares or, if such certification is not available, such written backup to the determination of the Unsubscribed Shares as any Investor may reasonably request.

(i)     <u>HSR</u>.  The Company shall use its reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and seek all approvals or consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder with respect to the purchase of Investor Shares hereunder, and shall not take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  The Company shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than 30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day).

(j)     <u>Clear Market</u>.  For a period of 180 days after the Closing Date (the "<u>Restricted Period</u>"), the Company will not (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of the Company or any securities convertible into or exercisable or exchangeable for capital stock of the Company or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the capital stock of the Company, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock of the Company or such other securities, in cash or otherwise, without the prior written consent of each of the ADAH and Dolce, except for (A) Rights and New Common Stock issuable upon exercise of Rights, (B) shares of New Common Stock issued upon the exercise of any stock options outstanding as of the Effective Date and (C) the issuance of New Common Stock and other equity interests as set forth in the Preferred Term Sheet, the PSA and pursuant to the Plan.  Notwithstanding the foregoing, if (i) during the last 17 days of the Restricted Period, the Company

issues an earnings release or material news or a material event relating to the Company occurs or (ii) prior to the expiration of the Restricted Period, the Company announces that it will release earnings results during the 16-day period beginning on the last day of the Restricted Period, the restrictions imposed by this Agreement shall continue to apply until the expiration of the 18-day period beginning on the issuance of the earnings release or the occurrence of the material news or material event.

(k)    <u>Use of Proceeds</u>.  The Company will apply the net proceeds from the sale of the Rights and the Investor Shares as provided in the Rights Offering Prospectus.

(l)    <u>No Stabilization</u>.  The Company will not take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(m)    <u>Reports</u>.  So long as any Investor holds Shares, the Company will furnish to such Investor, as soon as they are available, copies of all reports and other communications (financial or other) furnished to holders of the Rights or the Shares, as the case may be, and copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange or automatic quotation system.

(n)    <u>Conduct of Business</u>.  During the period from the date of this Agreement to the Closing Date (except as otherwise expressly provided by the terms of this Agreement (including the Disclosure Letter), the PSA, the Plan or any other order of the Bankruptcy Court entered on or prior to the date hereof in the Chapter 11 Cases), the Company and its Subsidiaries shall carry on their businesses in the ordinary course (subject to any actions which are consistent with the Transformation Plan) and, to the extent consistent therewith, use their commercially reasonable efforts to preserve intact their current business organizations, keep available the services of their current officers and employees and preserve their relationships with customers, suppliers, licensors, licensees, distributors and others having business dealings with the Company or its Subsidiaries.  Without limiting the generality of the foregoing, except as set forth in the Disclosure Letter, on and after the date on which the Business Plan is approved and accepted by ADAH and Dolce, the Company and its Subsidiaries shall carry on their businesses in all material respects in accordance with such Business Plan and shall not enter into any transaction that would be inconsistent with such Business Plan and shall use its commercially reasonable efforts to effect such Business Plan.  Without limiting the generality of the foregoing, and except as otherwise expressly provided or permitted by this Agreement (including the Disclosure Letter), the PSA, the Plan or any other order of the Bankruptcy Court entered as of the date hereof in these Chapter 11 Cases, prior to the Closing Date, the Company shall not, and shall cause its Subsidiaries not to, take any of the following actions without the prior written consent of each of ADAH and Dolce, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)     (A) declare, set aside or pay any dividends on, or make any other
distributions in respect of, any of its capital stock, (B) split, combine or
reclassify any of its capital stock or issue or authorize the issuance of any
other securities in respect of, in lieu of or in substitution for shares of its
capital stock or (C) purchase, redeem or otherwise acquire, except in
connection with the Plan, any shares of capital stock of the Company or
any other securities thereof or any rights, warrants or options to acquire
any such shares or other securities;

(ii)    except for intercompany transactions and any financing activities which
are consistent with the Company's existing financing, issue, deliver, grant,
sell, pledge, dispose of or otherwise encumber any of its capital stock or
any securities convertible into, or any rights, warrants or options to
acquire, any such capital stock at less than fair market value;

(iii)   acquire or agree to acquire by merging or consolidating with, or by
purchasing a substantial portion of the stock, or other ownership interests
in, or substantial portion of assets of, or by any other manner, any business
or any corporation, partnership, association, joint venture, limited liability
company or other entity or division thereof except in the ordinary course
of business;

(iv)    sell, lease, mortgage, pledge, grant a lien, mortgage, pledge, security
interest, charge, claim or other encumbrance of any kind or nature on or
otherwise encumber or dispose of any of its properties or assets, except
(A) in the ordinary course of business consistent with past practice and (B)
other transactions involving not in excess of $100 million in any 12 month
period;

(v)     (A) incur any indebtedness for borrowed money or guarantee any such
indebtedness of another individual or entity, issue or sell any debt
securities or warrants or other rights to acquire any debt securities of the
Company, guarantee any debt securities of another individual or entity,
enter into any "keep well" or other agreement to maintain any financial
statement condition of another person (other than a Subsidiary) or enter
into any arrangement having the economic effect of any of the foregoing
in excess of $100 million in any 12 month period, except for (x) working
capital borrowings and increases in letters of credit necessary in the
ordinary course of business under the Company's existing or any amended
or replacement revolving credit facilities, and (y) indebtedness solely
between the Company and its Subsidiaries or between such Subsidiaries or
(B) except for transactions between the Company and any of its
Subsidiaries or between such Subsidiaries, make any loans, advances or
capital contributions to, or investments in, any other individual or entity,
other than customary advances of business and travel expenses to
employees of the Company in the ordinary course of business consistent
with past practice;

(vi)    enter into any new, or amend or supplement any existing, collective bargaining agreement, which is inconsistent with the Transformation Plan, this Agreement, the PSA, the Plan and the GM Settlement; or

(vii)    authorize any of, or commit or agree to take any of, the foregoing actions.

(o)    <u>Actions Regarding Conditions</u>. During the period from the date of this Agreement to the Closing Date, the Company shall not take any action or omit to take any action that would reasonably be expected to result in the conditions to the Agreement set forth in <u>Section 9</u> not being satisfied.

(p)    <u>GM Settlement</u>. The Company shall use its reasonable best efforts to agree on, prior to January 31, 2007, a settlement agreement (the "<u>GM Settlement</u>") between the Company and GM that is consistent with this Agreement, the PSA and the Plan, and satisfactory to each of ADAH and Dolce in its sole discretion. The Company will (i) provide to the Investors and their respective counsel a copy of the GM Settlement and a reasonable opportunity to review and comment on such documents prior to such documents being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of each of ADAH and Dolce and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of each of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel. The Company shall not enter into any other agreement with GM that (i) is materially inconsistent with this Agreement, the PSA and the Plan, (ii) is outside the ordinary course of business or (iii) the terms of which would have a material impact on the Investors' proposed investment in the Company.

(q)    <u>Access to Information</u>. Subject to applicable law and existing confidentiality agreements between the parties, upon reasonable notice, the Company shall (and shall cause its Subsidiaries to) afford the Investors (and any prospective Ultimate Purchaser that executes a confidentiality agreement reasonably acceptable to the Company, which agreement will provide that, unless otherwise determined by the Company, all contact between such Ultimate Purchaser and the Company shall be through ADAH or Dolce) and their directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, reasonable access, throughout the period prior to the Closing Date, to its employees, properties, books, contracts and records and, during such period, the Company shall (and shall cause its Subsidiaries to) furnish promptly to the Investors all information concerning its business, properties and personnel as may reasonably be requested by any Investor; <u>provided</u>, that the foregoing shall not require the Company (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Company would cause the Company to violate any of its obligations with respect to confidentiality to a third party if the Company shall have used commercially reasonable efforts to obtain the consent of such third party to such inspection or disclosure, (ii) to disclose any privileged information

-40-

of the Company or any of its Subsidiaries or (iii) to violate any laws; provided, further, that the Company shall deliver to the Investors a schedule setting in forth in reasonable detail a description of any information not provided to the Investors pursuant to subclauses (i) through (iii) above.  All requests for information and access made pursuant to this Section 5(q) shall be directed to the Chief Restructuring Officer or such other person as may be designated by such person.

(r)     Financial Information.  For each month, beginning November 2006 until the Closing Date, the Company shall provide to each Investor an unaudited consolidated balance sheet and related unaudited consolidated statements of operations, consolidated statements of stockholders' equity and consolidated statements of cash flows for the month then ended within 30 days of the end of such month (the "Monthly Financial Statements").  The Monthly Financial Statements, except as indicated therein, shall be prepared in accordance with the Company's normal financial reporting practices.  The Monthly Financial Statements shall fairly present in all material respects the financial position, results of operations and cash flows  of the Company and its Subsidiaries as of the dates indicated and for the periods specified.

(s)     Business Plan and Disclosure Letter.  The Company shall use its commercially reasonable efforts to provide to the Investors as soon as practicable a final five-year business plan approved by the Company's board of directors and prepared in good faith and based on reasonable assumptions, which business plan shall provide for the amount of EBITDA for each of fiscal years 2007 through 2011 (the "Business Plan"); provided, that the Company shall not be required to deliver and neither ADAH nor Dolce shall be required to approve or accept for consideration by them any Business Plan that does not reflect a final and binding GM Settlement.  The Company shall deliver with the Business Plan a Disclosure Letter which provides for exceptions from the representations and warranties of the Company in Section 3.

(t)     Financing Assistance.  The Company and its Subsidiaries shall obtain the debt financing from financing sources reasonably satisfactory to Dolce and ADAH and in amounts sufficient to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, such financing to be on then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees, and otherwise to be on terms that are acceptable to each of ADAH and Dolce not to be unreasonably withheld (the "Debt Financing").  Subject to applicable regulatory or NASD requirements, Merrill Lynch, Pierce, Fenner & Smith, Incorporated and UBS Securities LLC (or their Affiliates) shall be entitled to participate in such Debt Financing on market terms.  The Company and its Subsidiaries shall execute and deliver any commitment letters, underwriting or placement agreements, registration statements, pledge and security documents, other definitive financing documents, or other requested certificates or documents necessary or desirable to obtain the Debt Financing.  The Company will (i) provide to the Investors and their respective counsel a copy of all marketing information, term sheets,

commitment letters and agreements related to the Debt Financing and a reasonable opportunity to review and comment on such documents prior to such document being distributed, executed or delivered or filed with the Bankruptcy Court, (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with the Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel, and (iii) keep the Investors reasonably informed on a timely basis of developments in connection with the Debt Financing and provide the Investors with an opportunity to attend and participate in meetings and/or roadshows with potential providers of the Debt Financing.

(u)     Labor Agreements.  The Company and its Subsidiaries shall use their reasonable best efforts to enter into (A) tentative labor agreements with each of The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW"), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers – Communications Workers of America ("IUE-CWA") and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC (the "USW") that each of ADAH and Dolce shall have approved in its sole discretion and which adequately address, among other things, the following matters:  (i) permit achievement of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan (including plant closings, asset dispositions and resolution of union claims), (ii) permit achievement of the Business Plan and the EBITDA Target; and (B) an agreement that GM will be responsible for certain hourly labor costs (compensation, benefits and other labor costs) acceptable to each of ADAH and Dolce in each of its sole discretion at certain of the Company's facilities.  The Company will (i) provide to the Investors and their respective counsel a copy of any labor agreement and a reasonable opportunity to review and comment on such document prior to such document being executed or delivered or filed with the Bankruptcy Court, and (ii) duly consider in good faith any comments of the Investors and their respective counsel consistent with this Agreement, the Preferred Term Sheet and the PSA and any other reasonable comments of the Investors and their respective counsel, and shall not reject such comments without first discussing the reasons therefor with ADAH and Dolce or their counsel and giving due consideration to the views of ADAH and Dolce and their counsel.

(v)     Other Actions by the Company.

        (i)     Existing Shareholder Rights Plan.  The Company and the Board of Directors of the Company (A) has taken all necessary action to amend the Existing Shareholder Rights Plan to provide that none of the Investors (including any Related Purchaser or Ultimate Purchaser) shall be deemed an "Acquiring Person" as defined in the Existing Shareholder Rights Plan

and that the rights will not separate from the Common Stock pursuant to the Existing Shareholder Rights Plan as a result of entering into this Agreement or the PSA or consummating the transactions contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan, and (B) will take all such action as is necessary to terminate the Existing Shareholder Rights Plan effective as of the Closing Date.

(ii)     <u>Takeover Statutes and Charter</u>.  The Company and the Board of Directors of the Company has taken all action necessary (A) to ensure that no Takeover Statute or similar statue or regulation is or becomes applicable to this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan, (B) if any Takeover Statute is or may become applicable to the transactions contemplated by this Agreement (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or the Plan, to grant such approvals and take such actions as are necessary so that such transactions may be consummated as promptly as practicable on the terms contemplated by this Agreement and the Plan and otherwise act to eliminate or minimize the effects of such statute or regulation on such transactions and (C) to ensure that this Agreement or any transaction contemplated hereby (including any transfer of Investor Shares to any Related Purchaser or Ultimate Purchaser) or by the Preferred Term Sheet, the PSA or the Plan are approved for purposes of Article IX of the Company's Amended and Restated Certificate of Incorporation, dated January 26, 1999, as amended to date, and that such provision shall not apply to the transactions contemplated hereby or by the Preferred Term Sheet, the PSA or the Plan.

(w)     <u>Agreement on Key Documentation</u> .  The Company shall use its commercially reasonable efforts to agree on or prior to January 31, 2007 on (a) the terms of the GM Settlement, (b) the agreements contemplated by <u>Section 5(u)</u>, and (c) the terms of the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations, the Shareholders Agreement and the Registration Rights Agreement with ADAH and Dolce.

(x)     <u>Investment Decision Package</u> .  If at any time prior to the Expiration Date, any event occurs as a result of which the Investment Decision Package, as then amended or supplemented, would include an untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it shall be necessary to amend or supplement the Investment Decision Package to comply with applicable law, the Company will promptly notify the Investors of any such event and prepare an amendment or supplement to the Investor Decision

Package that is reasonably acceptable in form and substance to each of ADAH and Dolce that will correct such statement or omission or effect such compliance.

6.    <u>Additional Covenants of the Investors</u>.  Each Investor agrees, severally and not jointly, with the Company:

(a)    <u>Information</u>.  To provide the Company with such information as the Company reasonably requests regarding the Investor for inclusion in the Rights Offering Registration Statement and the Disclosure Statement.

(b)    <u>HSR Act</u>.  To use reasonable best efforts to promptly prepare and file all necessary documentation and to effect all applications and to obtain all authorizations, approvals and consents that are necessary or advisable under the HSR Act and any comparable laws or regulations in any foreign jurisdiction so that any applicable waiting period shall have expired or been terminated thereunder and any applicable notification, authorization, approval or consent shall have been made or obtained with respect to the purchase of Investor Shares hereunder, and not to take any action that is intended or reasonably likely to materially impede or delay the ability of the parties to obtain any necessary approvals required for the transactions contemplated by this Agreement.  Each Investor shall file, to the extent that it is required to file, the Notification and Report Form required under the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission no later than 30 calendar days following the date the Initial Approval Order is entered by the Bankruptcy Court (and if such date is not a Business Day on the next succeeding Business Day).

(c)    <u>Bankruptcy Court Filings</u>.  To not file any pleading or take any other action in the Bankruptcy Court with respect to this Agreement, the Plan, the Disclosure Statement or the Confirmation Order or the consummation of the transactions contemplated hereby or thereby that is inconsistent in any material respect with this Agreement or the Company's efforts to obtain the entry of the Confirmation Order consistent with this Agreement.

(d)    <u>Reasonable Best Efforts</u>.  Each Investor shall use its reasonable best efforts to take all actions, and do all things, reasonably necessary, proper or advisable on its part under this Agreement and applicable laws to cooperate with the Company and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan.

7.    <u>Additional Joint Covenant of Company And Each Investor</u>.  Without limiting the generality of the undertakings pursuant to <u>Sections 5(i)</u> and <u>6(b)</u>, the Company and each Investor shall use its reasonable best efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary under the HSR Act and any comparable laws or regulations in any foreign jurisdiction to consummate and make effective the transactions contemplated by this Agreement and the other Transaction Agreements,

including furnishing all information required by applicable law in connection with approvals of or filings with any governmental authority, and filing, or causing to be filed, as promptly as practicable, any required notification and report forms under other applicable competition laws with the applicable governmental antitrust authority.  The parties shall consult with each other as to the appropriate time of filing such notifications and shall agree upon the timing of such filings. Subject to appropriate confidentiality safeguards, each party shall (i) respond promptly to any request for additional information made by the antitrust agency; (ii) promptly notify counsel to the other party of, and if in writing, furnish counsel to the other party with copies of (or, in the case of material oral communications, advise the other party orally of) any communications from or with the antitrust agency in connection with any of the transactions contemplated by this Agreement; (iii) not participate in any meeting with the antitrust agency unless it consults with counsel to the other party in advance and, to the extent permitted by the agency, give the other party a reasonable opportunity to attend and participate thereat; (iv) furnish counsel to the other party with copies of all correspondence, filings and communications between it and the antitrust agency with respect to any of the transactions contemplated by this Agreement; and (v) furnish counsel to the other party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the antitrust agency.  The Parties shall use their reasonable best efforts to cause the waiting periods under the applicable competitions laws to terminate or expire at the earliest possible date after the date of filing.

Notwithstanding anything in this Agreement to the contrary, nothing shall require any Investor or its Affiliates to dispose of any of its or its Subsidiaries' or its Affiliates' assets or to limit its freedom of action with respect to any of its or its Subsidiaries' businesses, or to consent to any disposition of the Company's or the Company Subsidiaries' assets or limits on the Company's or the Company Subsidiaries' freedom of action with respect to any of its or the Company Subsidiaries' businesses, or to commit or agree to any of the foregoing, and nothing in this Agreement shall authorize the Company or any Company Subsidiary to commit or agree to any of the foregoing, to obtain any consents, approvals, permits or authorizations to remove any impediments to the transactions contemplated hereby or by any Transaction Agreement relating to antitrust or competition laws or to avoid the entry of, or to effect the dissolution of, any injunction, temporary restraining order or other order in any action relating to antitrust or competition laws.

8.   <u>Reasonable Best Efforts</u>.

        The Company shall use its reasonable best efforts (and shall cause its Subsidiaries to use their respective reasonable best efforts) to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable on its or their part under this Agreement and applicable laws to cooperate with the Investors and to consummate and make effective the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement and the Plan, including:

        (a)      preparing and filing as promptly as practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as

practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or governmental entity; provided, however, that, notwithstanding the foregoing, in connection with obtaining such consents, the Company shall not, without the prior written consent of each of ADAH and Dolce in their sole discretion, pay or commit to pay any person or entity whose consent is being solicited in cash or other consideration to the extent such payment could reasonably be expected to prevent the Company from achieving the EBITDA targets set forth in Section 9(a)(xviii) hereof;

(b)     defending any lawsuits or other actions or proceedings, whether judicial or administrative, challenging this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or any other agreement contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining order entered by any court or other governmental entity vacated or reversed;

(c)     executing, delivering and filing, as applicable, any additional ancillary instruments or agreements necessary to consummate the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan and to fully carry out the purposes of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement, the Plan and the transactions contemplated hereby and thereby including, without limitation:  (i) employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); (ii) agreements and other arrangements acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court with respect to claims against the Company of former members of the Company's management and members of the Company's management, if any, who are resigning or being terminated in accordance with the implementation of the Plan; (iii) a shareholders agreement among the Company, ADAH and Dolce reasonably satisfactory to ADAH and Dolce (the "Shareholders Agreement"); (iv) a registration rights agreement (the "Registration Rights Agreement") among the Company and the Investors, reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company, and providing that the Company shall (a) as soon as practicable after the Closing Date, and in any event no later than seven (7) days after the Closing Date, prepare and file with the Commission a registration statement, including all exhibits thereto, pursuant to Rule 415 under the Securities Act registering offers and sales by the Investors and the Ultimate Purchasers of the Unsubscribed Shares, the Direct Subscription Shares and the Series B Preferred Stock (the "Resale Registration Statement" and, together with the final prospectus contained in the Resale Registration Statement as of its effective date (including information, if

any, omitted pursuant to Rule 430A and subsequently provided pursuant to Rule 424(b) under the Securities Act ), and any amended form of such prospectus provided under Rule 424(b) under the Securities Act or contained in a post-effective amendment to the Resale Registration Statement) and any issuer free writing prospectus as defined in Rule 433 under the Securities Act used in connection with the resale of such shares, the "Resale Registration Documents"); (b) cause the Resale Registration Statement to be declared effective by the Commission as soon as practicable after the filing thereof, and in any event no later than thirty (30) days after the Closing Date; (c) obtain such comfort letters from the Company's independent certified public accountants addressed to the Investors covering such matters of the type customarily covered by comfort letters and as ADAH and Dolce reasonably request; and (d) cause a customary opinion or opinions and negative assurance statement, in customary form and scope from counsel to the Company to be furnished to each Investor; (v) an amended and restated certificate of incorporation and amended by-laws of the Company, in each case, that is consistent with this Agreement, the PSA and the Preferred Term Sheet and reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such certificate of incorporation and by-laws would have a material impact on the Investors' proposed investment in the Company; provided, that the amended and restated certificate of incorporation of the Company to be effective immediately following the Effective Date shall prohibit: (A) for so long as ADAH or Dolce **or their respective Affiliates**, as the case may be, owns any shares of Series A Preferred Stock, any transactions between the Company or any of its Subsidiaries, on the one hand, and ADAH or Dolce or their respective Affiliates, as the case may be, on the other hand (including any "going private transaction" sponsored by ADAH or Dolce **or their respective Affiliates**) unless such transaction shall have been approved by (x) directors constituting not less than 75% of the number of Common Directors and (y) in the case of any transaction with ADAH or its Affiliates, Dolce, and in the case of any transaction with Dolce or its Affiliates, ADAH, and (B) any transaction between the Company or any of its Subsidiaries, on the one hand, and a director, on the other hand, other than a director appointed by holders of Series A Preferred Stock, unless such transaction shall have been approved by directors having no material interest in such transaction (a "Disinterested Director") constituting not less than 75% of the number of Disinterested Directors; provided, that nothing in this provision shall require any approval of any arrangements in effect as of December 18, 2006 with either General Motors Acceptance Corporation ("GMAC") or General Motors ("GM") as a result of the ownership by Dolce and its Affiliates of securities of GMAC or Dolce's and its Affiliates' other arrangements in effect as of December 18, 2006 with GM with respect to GMAC (such amended and restated certificate of incorporation and amended bylaws are herein referred to as the "Amended and Restated Constituent Documents"); and (vi) the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations, in each case, that is consistent with the terms set forth in the Preferred Term Sheet and that, to the extent they have a material impact on the Investors' proposed investment in the Company, are reasonably

satisfactory to each of ADAH and Dolce; provided, that prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce shall be each in its sole discretion. Subject to applicable laws and regulations relating to the exchange of information, the Investors and the Company shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Investors or the Company, as the case may be, and any of their respective Subsidiaries, that appears in any filing made with, or written materials submitted to, any third party and/or any governmental entity in connection with the transactions contemplated by this Agreement or the Plan.  In exercising the foregoing rights, each of the Company and the Investors shall act reasonably and as promptly as practicable.

9.    Conditions to the Obligations of the Parties.

(a)    Subject to Section 9(b), the obligations of each of the Investors hereunder to consummate the transactions contemplated hereby shall be subject to the satisfaction prior to the Closing Date of each of the following conditions:

(i)    Initial Approval Order.  The Initial Approval Order shall have become a Final Approval Order.  "Final Approval Order" shall mean an Initial Approval Order of the Bankruptcy Court, which has not been reversed, stayed, modified or amended, and as to which (a) the time to appeal, seek certiorari or request reargument or further review or rehearing has expired and no appeal, petition for certiorari or request for reargument or further review or rehearing has been timely filed, or (b) any appeal that has been or may be taken or any petition for certiorari or request for reargument or further review or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed, from which certiorari was sought or to which the request was made and no further appeal or petition for certiorari or request for reargument or further review or rehearing has been or can be taken or granted.

(ii)    Approval of Plan. To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, each of ADAH and Dolce shall be reasonably satisfied with, prior to filing with the Bankruptcy Court: (i) the Plan and any related documents, agreements or arrangements, (A) the terms of which are consistent in all material respects with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement, (B) that provide for the release and exculpation of each Investor, its Affiliates, shareholders, partners, directors, officers, employees and advisors  from any liability for participation in the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan to the fullest extent permitted under applicable law and (C) that have conditions to confirmation and the Effective Date of the Plan (and to what extent any such conditions can be waived and by whom) that are consistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (ii) a Disclosure

Statement that is consistent in all material respects with the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; (iii) a Confirmation Order, that is consistent in all material respects with the provisions of the Plan, this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement; and (iv) any amendments or supplements to any of the foregoing. Notwithstanding the foregoing, prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of the documents referred to in subsections (i), (ii), (iii) and (iv) shall be each in its sole discretion.

(iii)    <u>Plan of Reorganization</u>. The Company shall have complied in all material respects with the terms and conditions of the Plan that are to be performed by the Company prior to the Closing Date.

(iv)    <u>GM Settlement</u>. Each of ADAH and Dolce shall have approved in its sole discretion the GM Settlement prior to its filing with the Bankruptcy Court. The GM Settlement shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion. The parties to the GM Settlement shall have performed and complied with all of their respective covenants and agreements contained in the GM Settlement in all material respects through the Closing Date.

(v)    <u>Alternate Transaction</u>. The Company shall not have entered into any letter of intent, memorandum of understanding, agreement in principle or other agreement (other than a confidentiality agreement with terms that are not materially less favorable to the Company than the terms of that certain Amended Confidentiality Information, Standstill and Nondisclosure Agreement, dated August 25, 2006, among the Company, Appaloosa Management L.P. and Harbinger Capital Partners Master Fund I, Ltd.) or taken any action to seek any Bankruptcy Court approval relating to, any Alternate Transaction (an "<u>Alternate Transaction Agreement</u>"). For the purpose of this Agreement, an "<u>Alternate Transaction</u>" means any plan, proposal, offer or transaction that is inconsistent with this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement or the Plan, other than a Chapter 7 liquidation.

(vi)    <u>Change of Recommendation</u>. There shall not have been a Change of Recommendation. For purposes of this Agreement, a "<u>Change of Recommendation</u>" shall mean, (i) the Company or its board of directors or any committee thereof~~, or GM~~ shall have withheld, withdrawn, qualified or modified (or resolved or proposed to withhold, withdraw, qualify or modify), in a manner adverse to the Investors, its approval or recommendation of this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement or the Plan or the transactions contemplated hereby or thereby or (ii) the Company or its board of directors or any committee

thereof ~~or GM~~ shall have approved or recommended, or proposed to approve or recommend (including by filing any pleading or document with the Bankruptcy Court), any Alternate Transaction.

(vii)    <u>Confirmation Order</u>.  The Confirmation Order approving the Plan in form and substance approved by each of ADAH and Dolce in accordance with <u>Section 9(a)(ii)</u> above, shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order (the "<u>Confirmation Order</u>").

(viii)    <u>Plan and Confirmation Order</u>.  To the extent that the material terms of the following have a material impact on the Investors' proposed investment in the Company, (a) the Plan confirmed by the Bankruptcy Court in the Confirmation Order (the "<u>Confirmed Plan</u>") and the Confirmation Order shall be in the form and with such terms as are reasonably satisfactory to each of ADAH and Dolce in accordance with <u>Section 9(a)(ii)</u> above and (b) the Disclosure Statement approved by the Bankruptcy Court shall be in form and substance reasonably satisfactory to each of ADAH and Dolce in accordance with <u>Section 9(a)(ii)</u> above.  Notwithstanding the foregoing, prior to the Due Diligence Expiration Date, the standard for the approval by each of ADAH and Dolce of the Confirmed Plan, the Confirmation Order and the Disclosure Statement shall be each in its sole discretion.

(ix)    <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and each of ADAH and Dolce in accordance with the Plan.

(x)    <u>Rights Offering Registration Statement</u>.  The Rights Offering Registration Statement shall be effective not later than the Distribution Date and shall continue to be effective and no stop order shall have been entered by the Commission with respect thereto.

(xi)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(xii)    <u>Purchase Notice</u>.  Each of the Investors shall have received a Purchase Notice from the Company, dated as of the Determination Date, certifying as to the number of Unsubscribed Shares to be purchased or a Satisfaction Notice.

(xiii)    <u>Antitrust Approvals</u>.  All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the

consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(xiv)   Consents.  All other governmental and third party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan shall have been made or received.

(xv)   No Legal Impediment to Issuance.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement.

(xvi)   Representations and Warranties.  The representations and warranties of Company contained in this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality, Material Adverse Effect or similar qualifications, other than such qualifications contained in Sections 3(i) and 3(j)) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on and as of the Disclosure Letter Delivery Date and the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect, other than with respect to the representations in Sections 3(b), 3(c), 3(d), 3(e), and 3(m)(ii) and 3(oo), which shall be true and correct in all respects.  The representations and warranties of each Investor (other than the Investor asserting the failure of this condition) contained in this Agreement and in any other document delivered pursuant to this Agreement shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date which shall be true and correct only as of such specified date); except where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(xvii)  Covenants.  The Company and each Investor (other than the Investor asserting the failure of this condition) shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(xviii) EBITDA.  Each of ADAH and Dolce shall be reasonably satisfied that the Company will achieve EBITDA at least equal to the 2008 EBITDA Amount in 2008 and $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA) (the "EBITDA Target").

(xix)   Financing.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(xx)    Labor Agreements.  Each of ADAH and Dolce shall have been presented with and approved, in its sole discretion, on or before the Specified Date, tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand.  Such tentative labor agreements as so approved shall remain in full force and effect and shall not have been rescinded, terminated, challenged or repudiated by any party thereto and shall not have been amended in any manner that is not acceptable to each of ADAH and Dolce in its sole discretion.  The parties to the tentative labor agreements shall have performed and complied with all of their respective covenants and agreements contained in such tentative labor agreements approved by each of ADAH and Dolce in all material respects through the Closing Date.

(xxi)   Management Compensation. The Company shall have (i) entered into employment agreements and other compensation arrangements with senior management of the Company relating to compensation, benefits, supplemental retirement benefits, stock options and restricted stock awards, severance and change in control provisions and other benefits on market terms (as determined by the Company's board of directors based on the advice of Watson-Wyatt and reasonably acceptable to ADAH and Dolce); and (ii) resolved any claims of former executive officers, or executive officer's that have resigned or been terminated, on terms acceptable to each of ADAH and Dolce or otherwise ordered by the Bankruptcy Court.

(xxii) <u>Shareholders Agreement</u>.  The Company shall have entered into the Shareholders Agreement with ADAH and Dolce in accordance with <u>Section 8(c)(iii)</u>;

(xxiii) <u>Registration Rights Agreement</u>.  The Company shall have entered into the Registration Rights Agreement with the Investors in accordance with <u>Section 8(c)(iv)</u>, reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such Registration Rights Agreement would have a material impact on the Investors' proposed investment in the Company; <u>provided</u>, that prior to the Due Diligence Expiration Date, such Registration Rights Agreement shall be satisfactory to each of ADAH and Dolce in its sole discretion.

(xxiv) <u>Amended and Restated Constituent Documents</u>.  The Company shall have adopted the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations and the Series B Certificate of Designations consistent with this Agreement, the PSA and the Term Sheet and otherwise reasonably satisfactory to each of ADAH and Dolce to the extent that the material terms of such documents would have a material impact on the Investors' proposed investment in the Company; <u>provided</u>, that prior to the Due Diligence Expiration Date, such documents shall be satisfactory to each of ADAH and Dolce in its sole discretion.

(b)     All or any of the conditions set forth in <u>Section 9(a)</u> may be waived in whole or in part with respect to all Investors by both ADAH and Dolce, acting together, in their sole discretion.

(c)     The obligation of the Company to issue and sell the Investor Shares are subject to the following conditions, provided that the failure of a condition set forth in <u>Sections 9(c)(vii)</u> through <u>(x)</u> to be satisfied may not be asserted by the Company if such failure results from the failure of the Company to fulfill an obligation hereunder:

(i)     <u>Initial Approval Order</u>.  The Initial Approval Order shall have become a Final Approval Order.

(ii)    <u>Antitrust Approvals</u>. All terminations or expirations of waiting periods imposed by any governmental or regulatory authority necessary for the consummation of the transactions contemplated by this Agreement, including under the HSR Act and any comparable regulations in any foreign jurisdiction, shall have occurred and all other notifications, consents, authorizations and approvals required to be made or obtained from any competition or antitrust authority shall have been made or obtained for the transactions contemplated by this Agreement.

(iii)  <u>No Legal Impediment to Issuance</u>.  No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority, and no judgment, injunction, decree or order of any federal, state or foreign court shall have been issued, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the GM Settlement.

(iv)  <u>Representations and Warranties</u>.  The representations and warranties of each Investor, each Related Purchaser and each Ultimate Purchaser contained in this Agreement or pursuant to <u>Sections 2(a)</u>, <u>2(b)</u> or <u>2(k)</u> shall be true and correct (disregarding all qualifications and exceptions contained therein relating to materiality or material adverse effect on the Investor's performance of its obligations or similar qualifications) as of the Disclosure Letter Delivery Date and as of the Closing Date with the same effect as if made on the Disclosure Letter Delivery Date and the Closing Date (except for the representations and warranties made as of a specified date, which shall be true and correct only as such specified date), except with respect to the Investors' representations in all Sections other than Sections 4(b) and 4(c) where the failure to be so true and correct, individually or in the aggregate, has not and would not reasonably be expected, to prohibit, materially delay or materially and adversely impact the Investor's performance of its obligations under this Agreement.

(v)  <u>Covenants</u>.  Each Investor shall have performed and complied with all of its covenants and agreements contained in this Agreement and in any other document delivered pursuant to this Agreement (including in any Transaction Agreement) in all material respects through the Closing Date.

(vi)  <u>Bankruptcy Court Approval</u>.  This Agreement shall have been approved by the Bankruptcy Court and the approval of the Bankruptcy Court shall not have been modified, amended or withdrawn in any manner adverse to the Company.

(vii)  <u>Confirmation Order</u>.  The Confirmation Order approving the Plan shall have been entered by the Bankruptcy Court and such order shall be non-appealable, shall not have been appealed within ten calendar days of entry or, if such order is appealed, shall not have been stayed pending appeal, and there shall not have been entered by any court of competent jurisdiction any reversal, modification or vacation, in whole or in part, of such order.

(viii)  <u>Conditions to Effective Date</u>.  The conditions to the occurrence of the Effective Date of the Confirmed Plan shall have been satisfied or waived by the Company and each of ADAH and Dolce in accordance with the Plan.

(ix)    <u>Rights Offering</u>.  The Rights Offering shall have been conducted in all material respects in accordance with this Agreement and the Disclosure Statement and the Expiration Time shall have occurred.

(x)    <u>Financing</u>.  The Company shall have received the proceeds of the Debt Financings and the Rights Offering that, together with the proceeds of the sale of the Investor Shares, are sufficient to fund fully the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA, the GM Settlement (to the extent the Company is to fund such transactions) and the Plan.

(d)    All of the conditions set forth in Section 9(c) may be waived in whole or in part by the Company in its sole discretion.

10.    <u>Indemnification and Contribution.</u>

(a)    Whether or not the Rights Offering is consummated or this Agreement is terminated or the transactions contemplated hereby or the Plan are consummated, the Company (in such capacity, the "<u>Indemnifying Party</u>") shall indemnify and hold harmless each Investor and the Ultimate Purchasers, their respective Affiliates and their respective officers, directors, employees, agents and controlling persons (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, arising out of circumstances existing on or prior to the Closing Date ("<u>Losses</u>") to which any such Indemnified Person may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding ("<u>Proceedings</u>") instituted by a third party with respect to the Rights Offering, this Agreement or the other Transaction Documents, the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Investment Decision Package, the Resale Registration Documents, any amendment or supplement thereto or the transactions contemplated by any of the foregoing and shall reimburse such Indemnified Persons for any reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing; <u>provided</u> that the foregoing indemnification will not apply to Losses (i) arising out of or in connection with any Proceedings between or among any one or more Indemnified Persons, Related Purchasers and/or Ultimate Purchasers, any Additional Investor Agreement or the failure of such Indemnified Person to comply with the covenants and agreements contained in this Agreement with respect to the sale or placement of Investor Shares; or (ii) to the extent that they resulted from (a) any breach by such Indemnified Person of this Agreement, (b) gross negligence, bad faith or willful misconduct on the part of such Indemnified Person or (c) statements or omissions in the Rights Offering Registration Statement, any Preliminary Rights Offering Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto made in reliance upon or in conformity with information relating to such Indemnified Person furnished to the

Company in writing by or on behalf of such Indemnified Person expressly for use in the Rights Offering Registration Statement, any Rights Offering Preliminary Prospectus, the Rights Offering Prospectus, any Issuer Free Writing Prospectus, the Resale Registration Documents or any amendment or supplement thereto.  If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Losses in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party on the one hand and such Indemnified Person on the other hand but also the relative fault of the Indemnifying Party on the one hand and such Indemnified Person on the other hand as well as any relevant equitable considerations.  It is hereby agreed that the relative benefits to the Indemnifying Party on the one hand and all Indemnified Persons on the other hand shall be deemed to be in the same proportion as (i) the total value received or proposed to be received by the Company pursuant to the sale of the Shares and the Investor Shares contemplated by this Agreement bears to (ii) the Commitment Fees paid or proposed to be paid to the Investors.  The indemnity, reimbursement and contribution obligations of the Indemnifying Party under this <u>Section 10</u> shall be in addition to any liability that the Indemnifying Party may otherwise have to an Indemnified Person and shall bind and inure to the benefit of any successors, assigns, heirs and personal representatives of the Indemnifying Party and any Indemnified Person.

(b)      Promptly after receipt by an Indemnified Person of notice of the commencement of any Proceedings with respect to which the Indemnified Person may be entitled to indemnification hereunder, such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; <u>provided</u> that (i) the omission so to notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (ii) the omission so to notify the Indemnifying Party will not relieve it from any liability that it may have to an Indemnified Person otherwise than on account of this <u>Section 10</u>.  In case any such Proceedings are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, to the extent that it may elect by written notice delivered to such Indemnified Person, to assume the defense thereof, with counsel reasonably satisfactory to such Indemnified Person; <u>provided</u> that if the defendants in any such Proceedings include both such Indemnified Person and the Indemnifying Party and such Indemnified Person shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Proceedings on behalf of such Indemnified Person.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election so to assume the defense of such Proceedings and approval by such Indemnified Person of counsel, the Indemnifying Party shall not be liable to such

Indemnified Person for expenses incurred by such Indemnified Person in connection with the defense thereof (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel in connection with the assertion of legal defenses in accordance with the proviso to the next preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel in any jurisdiction, approved by the Investors, representing the Indemnified Persons who are parties to such Proceedings), (ii) the Indemnifying Party shall not have employed counsel reasonably satisfactory to such Indemnified Person to represent such Indemnified Person within a reasonable time after notice of commencement of the Proceedings or (iii) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.

(c)     The Indemnifying Party shall not be liable for any settlement of any Proceedings effected without its written consent (which consent shall not be unreasonably withheld).  If any settlement of any Proceeding is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Proceedings, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment in accordance with, and subject to the limitations of, the provisions of this <u>Section 10</u>.  Notwithstanding anything in this <u>Section 10</u> to the contrary, if at any time an Indemnified Person shall have requested the Indemnifying Party to reimburse such Indemnified Person for legal or other expenses aggregating in excess of $250,000 in connection with investigating, responding to or defending any Proceedings in connection with which it is entitled to indemnification or contribution pursuant to this <u>Section 10</u>, the Indemnifying Party shall be liable for any settlement of any Proceedings effected without its written consent if (i) such settlement is entered into more than (x) 60 days after receipt by the Indemnifying Party of such request for reimbursement and (y) 30 days after receipt by the Indemnified Party of the material terms of such settlement and (ii) the Indemnifying Party shall not have reimbursed such Indemnified Person in accordance with such request prior to the date of such settlement.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall not be unreasonably withheld), effect any settlement of any pending or threatened Proceedings in respect of which indemnity has been sought hereunder by such Indemnified Person unless (i) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Proceedings and (ii) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     All amounts paid by the Company to an Indemnified Person under this <u>Section 10</u> shall, to the extent the transactions contemplated hereby or the Plan are consummated and to the extent permitted by applicable law, be treated as adjustments to Purchase Price for all Tax purposes.

11.    <u>Survival of Representations and Warranties, Etc</u>.

(a)    The representations and warranties made in this Agreement shall not survive the Closing Date.  Other than <u>Sections 2(b)</u>, <u>2(c)</u>, <u>2(e)</u>, <u>2(h)</u>, <u>2(i)</u>, <u>2(j)</u>, <u>2(k)</u>, <u>5(e)</u>, <u>5(f)</u>, <u>5(j)</u>, <u>5(k)</u>, <u>5(l)</u>, <u>5(m)</u>, <u>10</u>, <u>11</u>, **the third proviso of 12(c)(ii),** <u>13</u>, <u>14</u>, <u>15</u>, <u>16</u>, <u>18</u> and <u>20</u>, which shall survive the Closing Date in accordance with their terms (except <u>Section 5(l)</u> which shall survive for 90 days following the Closing Date), the covenants contained in this Agreement shall not survive the Closing Date.

(b)    Other than with respect to <u>Sections 2(h)</u>, <u>2(i)</u> and <u>2(j)</u> and <u>Sections 10</u> through <u>18</u>, which shall continue and survive any termination of this Agreement, (i) none of the Investors may assert any claim against the Company (both as Debtors-in-possession or the reorganized Debtors), and the Company (both as Debtors-in-possession or the reorganized Debtors), may not assert any claim against any Investor, in either case, arising from this Agreement other than for willful breach, and (ii) the Investors hereby release the Company (both as Debtors-in-possession and the reorganized Debtors) from any such claims, and the Company (both as Debtors-in-possession or the reorganized Debtors) hereby releases the Investors from any such claims.  Notwithstanding the foregoing (w) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, (x) the aggregate liability of all of the Investors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million, (y) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring on or prior to the Disclosure Statement Approval Date shall not exceed $100 million, and (z) the aggregate liability of all of the Debtors under this Agreement for any reason (under any legal theory) including for any willful breach occurring after the Disclosure Statement Approval Date shall not exceed $250 million.  The Investors and the Company acknowledge that such liability under subclauses (w) and (x) shall be on a several and not joint basis with respect to any willful breach occurring on or prior to the Due Diligence Expiration Date.  The Investors and the Company acknowledge and agree that such liability under subclauses (w) and (x) shall be on a joint and several basis with respect to any willful breach occurring after the Due Diligence Expiration Date; <u>provided</u>, that the aggregate liability of Harbinger shall not exceed $38,442,731, the aggregate liability of Merrill shall not exceed $32,038,546 and the aggregate liability of UBS shall not exceed $25,743,392.  Subject to the terms, conditions and limitation set forth in this Section 11(b), (i) the joint and several obligations referred to in the immediately preceding sentence mean that each Investor (an "<u>Assuming Investor</u>") assumes liability on a joint and several basis for any willful breach of this Agreement by any other Investor (a "<u>Breaching Investor</u>"), whether or not the Assuming Investor has breached this Agreement or is in any way responsible for such willful breach by the Breaching Investor and (ii) the Assuming Investors' obligations shall be a commitment to assure payment, not collection.  Under no circumstances shall any Investor be

liable to the Company (as Debtors-in-possession or reorganized Debtors) for any punitive damages under this Agreement or any Equity Commitment Letter. Under no circumstances shall the Company (both as Debtors-in-possession and reorganized Debtors) be liable to any Investor for any punitive damages under this Agreement.

12.   <u>Termination</u>.

This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(a)   by mutual written consent of the Company and both of ADAH and Dolce;

(b)   by any Investor if any of the Chapter 11 Cases shall have been dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or an interim or permanent trustee shall be appointed in any of the Chapter 11 Cases, or a responsible officer or an examiner with powers beyond the duty to investigate and report (as set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(c)   by any party to this Agreement if (i) any statute, rule, regulation or order shall have been enacted, adopted or issued by any federal, state or foreign governmental or regulatory authority or any judgment, injunction, decree or order of any federal, state or foreign court shall have become final and non-appealable, that prohibits the implementation of the Plan or the Rights Offering or the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA or the GM Settlement or (ii) the PSA shall have been terminated in accordance with its terms; <u>provided</u>, that the right to terminate this Agreement under this Section 12(c)(ii) shall not be available to any party whose breach of the PSA is the cause of the termination of the PSA; **provided, further, that the Company shall not have any right to terminate this Agreement under this Section 12(c)(ii) if the PSA is terminated in accordance with Article 3.2(b) of the PSA as a result of or arising from a notice of termination of the PSA delivered by either the Company or GM as described in Article 3.1(b) of the PSA; and provided, further, that if the PSA is terminated in accordance with Article 3.2(b) of the PSA as a result of or arising from a notice of termination of the PSA delivered by any Investor as described in Article 3.1(b) of the PSA and this Agreement is subsequently terminated by any Investor pursuant to this Section 12(c)(ii), any Commitment Fees previously paid to any Investor pursuant to Section 2(h)(i) or (ii) shall be repaid to the Company by the Investors no later than the close of business on the next Business Day following the date of such termination;**

(d)   by ADAH or Dolce upon written notice to the Company and each other Investor:

(i)   if the Initial Approval Order has not become a Final Approval Order on or prior to the earlier of (A) the tenth (10th) day after the Bankruptcy Court

enters the Initial Approval Order, or, if such day is not a Business Day, the next Business Day and (B) January 22, 2007; <u>provided</u>, that notice of termination pursuant to this <u>Section 12(d)(i)</u> must be given on or prior to February 28, 2007;

(ii)     prior to the later of (A) January 31, 2007 and (B) the date that is twenty (20) calendar days after the date on which the Company has delivered to each Investor both the Business Plan reflecting the GM Settlement and the Disclosure Letter (such date, the "<u>Due Diligence Expiration Date</u>"), if any Investor is not satisfied in its sole discretion with (x) the results of its due diligence investigation of the Company and its Subsidiaries, the Disclosure Letter and the Business Plan (the "<u>Due Diligence Investigation</u>") or (y) the terms of the Shareholders Agreement, Registration Rights Agreement, the Amended and Restated Constituent Documents, the Series A-1 Certificate of Designations, the Series A-2 Certificate of Designations, the Series B Certificate of Designations or any other Transaction Agreement;

(iii)    on or after the **<u>earlier of (A) August 31, 2007, or (B) the</u>** later of (x) June 30, 2007 (such date, being the "<u>Closing Date Outside Date</u>"), or (y) the first Business Day that is one-hundred eighty (180) days after the Due Diligence Expiration Date, <u>provided</u> that, in either case, the Closing Date has not occurred by such date;

(iv)     on or after the later of (x) May 1, 2007 (such date, being the "<u>Disclosure Statement Outside Date</u>"), or (y) the first Business Day that is one-hundred twenty (120) days after the Due Diligence Expiration Date, <u>provided</u> that, in either case, the Disclosure Statement has not been filed for approval with the Bankruptcy Court by such date;

(v)      if the Company or any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in <u>Section 9(a)(xvi)</u> or <u>(xvii)</u> hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; <u>provided</u>, that the right to terminate this Agreement under this <u>Section 12(d)(v)</u> shall not be available to any Investor whose breach is the cause of the failure of the condition in <u>Section 9(a)(xvi)</u> or <u>(xvii)</u> to be satisfied;

(vi)     either of ADAH or Dolce shall have determined in its reasonable discretion that the Company will not achieve EBITDA for 2008 at least equal to the 2008 EBITDA Amount and EBITDA of at least $2.4 billion in each of 2009 and 2010 (exclusive of the Restructuring Charges to the extent the same had been deducted to determine EBITDA);

(vii)    (A) there shall have been a Change of Recommendation or (B) the Company shall have entered into an Alternate Transaction Agreement; or

(viii)   if, subsequent to the Company, ADAH and Dolce having previously approved in writing the form of document referred to in Sections 9(a)(iv), (xx), (xxii), (xxiii) or (xxiv), the conditions set forth in Sections 9(a)(iv), (xx), (xxii), (xxiii) or (xxiv), shall become not satisfied as a result of an amendment or modification thereto.

provided, that notwithstanding anything in the foregoing to the contrary, any Investor other than ADAH and Dolce shall be entitled to terminate this Agreement as to itself (but not as to any other party) (A) in any of the circumstances described in Section 12(d)(i)-(viii) at any time prior to the Due Diligence Expiration Date, and (B) at any time on or after December 31, 2007 (each of (A) and (B) being a "Limited Termination"); provided, further, that if there is a Limited Termination, any deadline contained in Section 12(d)(i), (ii), (v) and (vi) by which ADAH must exercise a termination right under Section 12 shall be extended by ten (10) Business Days so as to give it sufficient time to comply with its obligations under Section 2(b);

(e)    on or prior to the Due Diligence Expiration Date, by ADAH or Dolce by notice to the other parties if, on or prior to such date, (i) a target amount of EBITDA for fiscal year 2008  (but in any event not to exceed $2.4 billion) has not been agreed to by each of ADAH and Dolce in its sole discretion and included in the Business Plan (the "2008 EBITDA Amount") or (ii) restructuring charges for 2009 and 2010 have not been agreed to by each of ADAH or Dolce in its sole discretion and included in the Business Plan (the "Restructuring Charges");

(f)    by the Company upon written notice to each Investor:

(i)     subject to the establishment of Alternative Financing in accordance with Section 2(b), if any Investor shall have breached any provision of this Agreement, which breach would cause the failure of any condition set forth in Section 9(c)(iv) or (v) hereof to be satisfied, which failure cannot be or has not been cured on the earliest of (A) the tenth (10th) Business Day after the giving of written notice thereof to the Company or such Investor by any Investor and (B) the third (3rd) Business Day prior to the Closing Date Outside Date; or

(ii)    if the Company enters into any Alternate Transaction Agreement; provided, that the Company may only terminate this Agreement under the circumstances set forth in this Section 12(f)(ii) if: (x) the Company's board of directors has determined in good faith, after having consulted with its outside legal counsel and its independent financial advisors, that such Alternate Transaction is a Superior Transaction and the failure to enter into such an Alternate Transaction Agreement would result in a breach of the applicable fiduciary duties of the board of directors, (y)

before taking such action the Company has given the Investors at least ten (10) Business Days' (or, in the event of any Alternate Transaction that has been materially revised or modified, at least five (5) Business Days') prior written notice (the "Consideration Period") of the terms of such Alternate Transaction and of its intent to take such action, and, during the Consideration Period, the Company has, if requested by the Investors, engaged in good faith negotiations regarding any revisions to this Agreement, the Plan or any other agreement or document proposed by ADAH and Dolce and again has determined in good faith, after consultation with its outside legal counsel and its independent financial advisors, that such Alternate Transaction remains a Superior Transaction and (z) prior to or contemporaneously with such termination the Company shall pay to the Investors the Alternate Transaction Fee**.; or**

(iii)    **on or after August 31, 2007; provided, that the Closing Date has not occurred by such date.**

For the purposes of this Section 12(f), a "Superior Transaction" shall mean an Alternate Transaction, which the board of directors of the Company, after consultation with its outside legal counsel and its independent financial advisors, determines in good faith to be more favorable to the bankruptcy estate of the Company than the transactions contemplated by this Agreement, the Preferred Term Sheet, the PSA and the Plan, taking into account, all legal, financial, regulatory and other aspects of such Alternate Transaction, the likelihood of consummating the Alternate Transaction, the likely consummation date of the Alternate Transaction and the identity of the parties or proposed parties to such Alternate Transaction and after taking into account any revisions to the terms of this Agreement, the Plan and/or any other agreement or document proposed during the Consideration Period.

(g)    by ADAH, Dolce or the Company by notice given to the other parties on or before February 28, 2007 (unless this date is extended by agreement of ADAH, Dolce and the Company (as it may be so extended, the "Specified Date")) if the Company and its Subsidiaries have not entered into on or prior to January 31, 2007, (x) tentative labor agreements between the Company and its applicable Subsidiaries, on the one hand, and each of the UAW, the IUE-CWA and the USW, on the other hand or (y) the GM Settlement, in each case, on terms and conditions presented by the Company and satisfactory to each of ADAH and Dolce in its sole discretion.

(h)    In addition to any other rights or remedies any Investor may have under this Agreement (for breach or otherwise) but subject to Section 11(b), the Company shall pay a fee of $100,000,000 (the "Alternate Transaction Fee") to the Investors in such proportions as are set forth on Schedule 2 hereto, and, in any case, the Company shall pay to the Investors any Transaction Expenses and any other amounts certified by the Investors to be due and payable hereunder that have not

been paid theretofore if this Agreement is terminated pursuant to one of the following:

(i)     pursuant to (x) <u>Section 12(d)(vii)(B)</u> or (y) <u>Section 12(f)(ii);</u>

(ii)    pursuant to <u>Section 12(d)(vii)(A)</u> and, within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated; or

(iii)   pursuant to <u>Section 12(d)(v)</u> based on a willful breach by the Company and within the twenty-four (24) month period following the date of such termination, an Alternate Transaction Agreement is entered into or an Alternate Transaction is consummated.

Payment of the amounts due under this <u>Section 12(h)</u> will be made (i) no later than the close of business on the next Business Day following the date of such termination in the case of a payment pursuant to <u>Section 12(h)(i)(x),</u> (ii) prior to or contemporaneously with such termination by the Company in the case of a payment pursuant to <u>Section 12(h)(i)(y)</u> and (iii) prior to or contemporaneously with the entry into an Alternate Transaction Agreement or the consummation of an Alternate Transaction in the case of a payment pursuant to <u>Section 12(h)(ii) or (iii).</u>  Under no circumstances shall the Company be required to pay more than one Alternate Transaction Fee.  The provision for the payment of the Alternate Transaction Fee is an integral part of the transactions contemplated by this Agreement and without this provision the Investors would not have entered into this Agreement and shall constitute an allowed administrative expense of the Company under Section 503(b)(1) and 507(a)(1) of the Bankruptcy Code.

(i)     Upon termination under this <u>Section 12</u>, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party except that (x) nothing contained herein shall release any party hereto from liability for any willful breach and (y) the covenants and agreements made by the parties herein in <u>Sections 2(h)</u>, <u>2(i)</u> and <u>2(j)</u>, and <u>Sections 10</u> through <u>18</u> will survive indefinitely in accordance with their terms.

13.   <u>Notices</u>.  All notices and other communications in connection with this Agreement will be in writing and will be deemed given (and will be deemed to have been duly given upon receipt) if delivered personally, sent via electronic facsimile (with confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address for a party as will be specified by like notice):

(a)     If to:

Dolce Investments LLC
c/o Cerberus Capital Management L.P.
299 Park Avenue
New York, New York 10171
Facsimile:  (212) 421-2958 / (212) 909-1409 / (212) 935-8749
Attention:  Scott Cohen / Dev Kapadia / Seth Gardner

with a copy to:

Milbank, Tweed, Hadley & McCloy LLP
One Chase Manhattan Plaza
New York, New York 10005-1413
Facsimile:  (212) 822-5899
Attention:  Thomas C. Janson

and

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017-5735
Facsimile:  (213) 892-4470
Attention:  Gregory A. Bray

(b)     If to:

A-D Acquisition Holdings, LLC
c/o Appaloosa Management L.P.
26 Main Street,
Chatham, New Jersey 07928
Facsimile:  (973) 701-7055
Attention:  Ronald Goldstein

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787

Facsimile:  (212) 354-8113
Attention:  John M. Reiss
          Gregory Pryor

(c)      If to:

Harbinger Del-Auto Investment Company, Ltd.
c/o Harbinger Capital Partners Offshore Manager, LLC
555 Madison Avenue, 16th Floor
New York, NY 10022
Attn: Philip A. Falcone

with a copy to:

Harbert Management Corp.
One Riverchase Parkway South
Birmingham, AL 35244
Facsimile:  (205) 987-5505
Attention:  General Counsel

with a copy to:

White & Case LLP
Wachovia Financial Center
200 South Biscayne Boulevard
Suite 4900
Miami, Florida 33131-2352
Facsimile:  (305) 358-5744/5766
Attention:  Thomas E. Lauria

White & Case LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Facsimile:  (212) 354-8113
Attention:  John M. Reiss
          Gregory Pryor

with a copy to:

Kaye Scholer LLP
425 Park Avenue
New York, NY  10022-3598
Facsimile:  (212) 836-8689

Attention:  Benjamin Mintz and Lynn Toby Fisher

(d)     If to:

Merrill Lynch, Pierce, Fenner & Smith Incorporated.
4 World Financial Center
New York, New York  10080
Facsimile:  (212) 449-0769
Attention:  Robert Spork / Rick Morris

with a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York  10019-6064
Facsimile:  (212) 757-3990
Attention:  Andrew N. Rosenberg

(e)     If to:

UBS Securities LLC
299 Park Avenue
New York, New York  10171
Facsimile:  (212) 821-3008 / (212) 821-4042
Attention:  Steve Smith / Osamu Watanabe

with a copy to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York  10006
Facsimile:  (212) 225-3999
Attention:  Leslie N. Silverman

(f)     If to the Company, to:

Delphi Corporation
5725 Delphi Drive
Troy, Michigan 48098
Attention:  John Sheehan – Facsimile:  (248) 813-2612
              David Sherbin / Sean Corcoran – Facsimile:  (248) 813-2491

with a copy to:

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036

Facsimile:  (212) 735-2000/1
Attention:  Eric L. Cochran
            Marie L. Gibson


and

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Chicago, IL 60606
Facsimile:  (312) 407-0411
Attention:  John Wm. Butler, Jr.
            George Panagakis

14.    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except to an Ultimate Purchaser or to a Related Purchaser pursuant to Sections 2(a), 2(b) and 2(k).  Notwithstanding the previous sentence, subject to the provisions of Sections 2(a), 2(b) and 2(k): (1) this Agreement, or the Investors' obligations hereunder, may be assigned, delegated or transferred, in whole or in part, by any Investor to any Affiliate of such Investor over which such Investor or any of its Affiliates exercise investment authority, including, without limitation, with respect to voting and dispositive rights; provided, that any such assignee assumes the obligations of such Investor hereunder and agrees in writing to be bound by the terms of this Agreement in the same manner as such Investor; and (2) ADAH may provide for a participation interest or other arrangement whereby the economic benefits of ownership of the Series A-2 Preferred Stock are shared with Merrill, Harbinger or their Affiliates, but ADAH shall not, pursuant to such arrangements, transfer any voting or investment power or control over the Series A-2 Preferred Stock.  Notwithstanding the foregoing or any other provisions herein, except pursuant to an Additional Investor Agreement acceptable to the Company, ADAH and Dolce no such assignment will relieve an Investor of its obligations hereunder if such assignee fails to perform such obligations.  Except as provided in Section 10 with respect to the Indemnified Persons, this Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Agreement.

15.    Prior Negotiations; Entire Agreement.  This Agreement (including the agreements attached as exhibits to and the documents and instruments referred to in this Agreement constitutes the entire agreement of the parties and supersedes all prior agreements, arrangements or understandings, whether written or oral, between the parties with respect to the subject matter of this Agreement, except that the parties hereto acknowledge that any confidentiality agreements heretofore executed among the parties will continue in full force and effect.

16.    GOVERNING LAW; VENUE.  THIS AGREEMENT WILL BE GOVERNED AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK.  THE INVESTORS HEREBY IRREVOCABLY SUBMIT TO THE

JURISDICTION OF, AND VENUE IN, THE UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK  AND WAIVE ANY
OBJECTION BASED ON FORUM NON CONVENIENS.  EACH PARTY
ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY
ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED
AND DIFFICULT ISSUES, AND THEREFORE EACH SUCH PARTY HEREBY
IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY
MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION
DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS
AGREEMENT, OR THE BREACH, TERMINATION OR VALIDITY OF THIS
AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED BY THIS
AGREEMENT.

17.    Counterparts.  This Agreement may be executed in any number of counterparts, all of
which will be considered one and the same agreement and will become effective when
counterparts have been signed by each of the parties and delivered to the other party
(including via facsimile or other electronic transmission), it being understood that each
party need not sign the same counterpart.

18.    Waivers and Amendments.  This Agreement may be amended, modified, superseded,
cancelled, renewed or extended, and the terms and conditions of this Agreement may be
waived, only by a written instrument signed by all the parties or, in the case of a waiver,
by the party waiving compliance, and subject, to the extent required, to the approval of
the Bankruptcy Court.  No delay on the part of any party in exercising any right, power or
privilege pursuant to this Agreement will operate as a waiver thereof, nor will any waiver
on the part of any party of any right, power or privilege pursuant to this Agreement, nor
will any single or partial exercise of any right, power or privilege pursuant to this
Agreement, preclude any other or further exercise thereof or the exercise of any other
right, power or privilege pursuant to this Agreement.  The rights and remedies provided
pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies
which any party otherwise may have at law or in equity.

19.    Adjustment to Shares.  If, in accordance with the terms of this Agreement, the Company
effects a reclassification, stock split (including a reverse stock split), stock dividend or
distribution, recapitalization, merger, issuer tender or exchange offer, or other similar
transaction with respect to any shares of its capital stock, references to the numbers of
such shares and the prices therefore shall be equitably adjusted to reflect such change
and, as adjusted, shall, from and after the date of such event, be subject to further
adjustment in accordance herewith.

20.    Headings.  The headings in this Agreement are for reference purposes only and will not
in any way affect the meaning or interpretation of this Agreement.

21.    Publicity.  The initial press release regarding this Agreement shall be a joint press release.
Thereafter, the Company and Investors each shall consult with each other prior to issuing
any press releases (and provide each other a reasonable opportunity to review and
comment upon such release) or otherwise making public announcements with respect to

the transactions contemplated by this Agreement and the Plan, and prior to making any filings with any third party or any governmental entity (including any national securities exchange or interdealer quotation service) with respect thereto, except as may be required by law or by the request of any governmental entity.

22.    <u>Knowledge</u>; <u>Sole Discretion</u>.  The phrase "knowledge of the Company" and similar phrases shall mean the actual knowledge of the Chief Restructuring Officer of the Company and such other officers as the Company, ADAH and Dolce shall reasonably agree.  Whenever in this Agreement any party is permitted to take an action or make a decision in its "sole discretion," the parties hereto acknowledge that such party is entitled to make such decision or take such action in such party's sole and absolute and unfettered discretion and shall be entitled to make such decision or take such action without regard for the interests of any other party and for any reason or no reason whatsoever.  Each party hereto acknowledges, and agrees to accept, all risks associated with the granting to the other parties of the ability to act in such unfettered manner.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____
      Name:
      Title:


A-D ACQUISITION HOLDINGS, LLC

By: _____
      Name:
      Title:


HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____
      Name:
      Title:


DOLCE INVESTMENTS LLC

By:  Cerberus Capital Management L.P., its Managing Member

By: _____
      Name:
      Title:


MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
      Name:
      Title:

UBS SECURITIES LLC

By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

SCHEDULE 1

| Defined Term | Section |
|---|---|
| 2008 EBITDA Amount | Section 12 (e) |
| ADAH | Recitals |
| Additional Investor Agreements | Section 2 (k) |
| Affiliate | Section 2 (a) |
| Agreement | Recitals |
| Alternative Financing | Section 2 (b) |
| Alternate Transaction | Section 9 (a)(v) |
| Alternate Transaction Agreement | Section 9 (a)(v) |
| Alternate Transaction Fee | Section 12 (h) |
| Amended and Restated Constituent Documents | Section 8 (c) |
| Assuming Investor | 11(b) |
| Available Investor Shares | Section 2 (b) |
| ~~Ballots~~ | ~~Section 1 (c)(ii)~~ |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Rules | Section 3 (b)(i) |
| Breaching Investor | 11(b) |
| Business Day | Section 1 (c)(iii) |
| Business Plan | Section 5 (s) |
| Capital Structure Date | Section 3 (d) |
| Change of Recommendation | Section 9 (a)(vi) |
| Chapter 11 Cases | Recitals |
| Closing Date | Section 2 (d) |
| Closing Date Outside Date | Section 12 (d)(iii) |
| Code | Section 3 (z)(ii) |
| Commission | Section 1 (c)(ii) |
| Commitment Fees | Section 2 (h)(ii) |
| Commitment Parties | Recitals |
| Company | Recitals |
| Company ERISA Affiliate | Section 3 (z)(ii) |
| Company Plans | Section 3 (z)(i) |
| Company SEC Documents | Section 3 (j) |
| Confirmation Hearing | Section 1 (c)(iii) |
| Confirmation Order | Section 9 (a)(vii) |
| Confirmed Plan | Section 9 (a)(viii) |
| Consideration Period | Section 12 (f)(ii) |
| Debt Financing | Section 5 (t) |
| Debtors | Recitals |
| Determination Date | Section 1 (c)(vi) |
| DGCL | Section 3 (oo) |
| DIP Order | Section 2(j) |
| Direct Subscription Shares | Section 2 (a)(i) |
| Disclosure Letter | Section 3 |

<u>Defined Term</u>                                                          <u>Section</u>

| Defined Term | Section |
|---|---|
| Disclosure Letter Delivery Date | Section 3 |
| Disclosure Statement | Section 5 (b) |
| Disclosure Statement Approval Date | Section 1 (c)(ii) |
| Disclosure Statement Outside Date | Section 12 (d)(iv) |
| Disinterested Director | Section 8 (c) |
| Distribution Date | Section 1 (c)(ii) |
| Dolce | Recitals |
| Due Diligence Expiration Date | Section 12 (d)(ii) |
| Due Diligence Investigation | Section 12 (d)(ii) |
| EBITDA Target | Section 9 (a)(xviii) |
| Effective Date | Section 1 (c)(iii) |
| Eligible Holder | Section 1 (a) |
| Environmental Laws | Section 3 (x)(i) |
| E&Y | Section 3 (q) |
| Equity Commitment Letter | Section 4 (o) |
| ERISA | Section 3 (z)(i) |
| Exchange Act | Section 3 (i) |
| Existing Shareholder Rights Plan | Section 3 (d) |
| Expiration Time | Section 1 (c)(iii) |
| Final Approval Order | Section 9 (a)(i) |
| GAAP | Section 3 (i) |
| GM | Section 8 (c) |
| GM Settlement | Section 5 (p) |
| GMAC | Section 8 (c) |
| Harbinger | Recitals |
| HSR Act | Section 3 (g) |
| IUE-CWA | Section 5 (u) |
| Indemnified Person | Section 10 (a) |
| Indemnifying Party | Section 10 (a) |
| Intellectual Property | Section 3 (s) |
| Initial Approval Motion | Recitals |
| Initial Approval Order | Recitals |
| Investment Decision Package | Section 3 (k) |
| Investor | Recitals |
| Investors | Recitals |
| Investor Default | Section 2 (b) |
| Investor Shares | Section 2 (a) |
| Issuer Free Writing Prospectus | Section 3 (k) |
| Limited Termination | Section 12 (d) |
| Losses | Section 10 (a) |
| Material Adverse Effect | Section 3 (a) |
| Maximum Number | Section 2(a) |
| Merrill | Recitals |
| Money Laundering Laws | Section 3 (ee) |

| Defined Term | Section |
|---|---|
| Monthly Financial Statements | Section 5 (r) |
| Multiemployer Plans | Section 3 (z)(ii) |
| New Common Stock | Section 1 (a) |
| OFAC | Section 3 (ff) |
| Option | Section 3 (d) |
| Options | Section 3 (d) |
| Plan | Section 1 (b) |
| Preferred Commitment Fee | Section 2 (h)(i) |
| Preferred Shares | Section 2 (a) |
| Preferred Term Sheet | Section 1 (b) |
| Preliminary Rights Offering Prospectus | Section 3 (k) |
| Proceedings | Section 10 (a) |
| PSA | Section 1 (b) |
| Purchase Notice | Section 1 (c)(vi) |
| Purchase Price | Section 1 (a) |
| Record Date | Section 1 (a) |
| Related Purchaser | Section 2 (a) |
| Registration Rights Agreement | Section 8 (c) |
| Resale Registration Documents | Section 8 (c) |
| Resale Registration Statement | Section 8 (c) |
| Restricted Period | Section 5 (j) |
| Restructuring Charges | Section 12 (e) |
| Right | Section 1 (a) |
| Rights Exercise Period | Section 1 (c)(iii) |
| Rights Offering | Section 1(a) |
| Rights Offering Prospectus | Section 3 (k) |
| Rights Offering Registration Statement | Section 3 (k) |
| Satisfaction Notice | Section 1 (c)(vi) |
| Securities Act | Section 1 (c)(ii) |
| Securities Act Effective Date | Section 3 (k) |
| Series A-1 Certificate of Designations | Section 2 (a)(ii) |
| Series A-1 Preferred Stock | Section 2 (a)(ii) |
| Series A Preferred Stock | Section 2 (a)(ii) |
| Series A-2 Certificate of Designations | Section 2 (a)(iii) |
| Series A-2 Preferred Stock | Section 2 (a)(iii) |
| Series B Certificate of Designations | Section 2 (a)(i) |
| Series B Preferred Stock | Section 2 (a)(i) |
| Share | Section 1 (a) |
| Shareholders Agreement | Section 8 (c) |
| Significant Subsidiary | Section 3 (a) |
| Single-Employer Plan | Section 3 (z)(ii) |
| Specified Date | Section 12(g) |
| Standby Commitment Fee | Section 2 (h)(ii) |
| Stock Plans | Section 3 (d) |

SCHEDULE 1
Page 4

| Defined Term | Section |
|---|---|
| Subscription Agent | Section 1 (c)(iii) |
| Subsidiary | Section 3 (a) |
| Superior Transaction | Section 12 (f) |
| Takeover Statute | Section 3 (oo) |
| Taxes | Section 3 (y) |
| Tax Returns | Section 3 (y)(i) |
| Transaction Agreements | Section 3 (b)(i) |
| Transaction Expenses | Section 2 (j) |
| Transformation Plan | Section 3 (m)(vii) |
| UAW | Section 5 (u) |
| UBS | Recitals |
| Ultimate Purchasers | Section 2 (k) |
| Unsubscribed Shares | Section 2 (a)(iv) |
| USW | Section 5 (u) |

SCHEDULE 2

| | Direct Subscription Shares | Purchase Price | Series A-1 Preferred Stock | Purchase Price | Series A-2 Preferred Stock | Purchase Price | Series B Preferred Stock | Purchase Price | Total Purchase Price |
|---|---|---|---|---|---|---|---|---|---|
| Dolce Investments LLC .................... | 3,150,000 | $ 110,250,000 | 8,571,429 | $ 300,000,000 | - | $ - | 8,571,429 | $ 300,000,000 | $ 710,250,000 |
| A-D Acquisition Holdings, LLC....... | 1,890,000 | 66,150,000 | - | - | 8,571,429 | 300,000,000 | 5,142,857 | 180,000,000 | 546,150,000 |
| Harbinger Del-Auto Investment Company, Ltd...................................... | 472,500 | 16,537,500 | - | - | - | - | 1,285,714 | 45,000,000 | 61,537,500 |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated........................... | 393,750 | 13,781,250 | - | - | - | - | 1,071,429 | 37,500,000 | 51,281,250 |
| UBS Securities LLC......................... | 393,750 | 13,781,250 | - | - | - | - | 1,071,429 | 37,500,000 | 51,281,250 |
| Total............................................... | 6,300,000 | $ 220,500,000 | 8,571,429 | $ 300,000,000 | 8,571,429 | $ 300,000,000 | 17,142,858 | $ 600,000,000 | $1,420,500,000 |

Proportionate Share of Preferred Commitment Fee:

| | |
|---|---|
| Dolce Investments LLC .................... | 50% |
| A-D Acquisition Holdings, LLC....... | 40% |
| Harbinger Del-Auto Investment Company, Ltd...................................... | 3.750% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated........................... | 3.125% |
| UBS Securities LLC......................... | 3.125% |
| Total............................................... | 100% |

Proportionate Share of Standby Commitment Fee:

| | |
|---|---|
| Dolce Investments LLC .................... | 50% |
| A-D Acquisition Holdings, LLC....... | 30% |
| Harbinger Del-Auto Investment Company, Ltd...................................... | 7.5% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated........................... | 6.25% |
| UBS Securities LLC......................... | 6.25% |
| Total............................................... | 100% |

Proportionate Share of Alternate Transaction Fee:

| | |
|---|---|
| Dolce Investments LLC .................... | 50% |
| A-D Acquisition Holdings, LLC....... | 30% |
| Harbinger Del-Auto Investment Company, Ltd...................................... | 7.5% |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated........................... | 6.25% |
| UBS Securities LLC......................... | 6.25% |
| Total............................................... | 100% |

Document comparison done by DeltaView on Wednesday, January 10, 2007 12:03:19 PM

| Input: | |
|---|---|
| Document 1 | interwovenSite://NYDMS/NEWYORK/5938604/1 |
| Document 2 | interwovenSite://NYDMS/NEWYORK/5938604/5 |
| Rendering set | W&C Setting 4 |

| Legend: |
|---|
| **Insertion** |
| ~~Deletion~~ |
| ~~Moved from~~ |
| Moved to |
| Style change |
| Format change |
| Moved deletion |
| Inserted cell |
| Deleted cell |
| Moved cell |
| Split/Merged cell |
| Padding cell |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 18 |
| Deletions | 10 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 28 |

## **Exhibit C**

SUPPLEMENT TO THE EQUITY PURCHASE AND COMMITMENT AGREEMENT

THIS SUPPLEMENT TO THE EQUITY PURCHASE AND COMMITMENT AGREEMENT (this "Supplement"), dated as of January __, 2007, is made by and among A-D Acquisition Holdings, LLC, a limited liability company formed under the laws of the State of Delaware ("ADAH"), Harbinger Del-Auto Investment Company, Ltd., an exempted company incorporated in the Cayman Islands ("Harbinger"), Dolce Investments LLC ("Dolce"), a limited liability company formed under the laws of the State of Delaware, Merrill Lynch, Pierce, Fenner & Smith Incorporated, a Delaware corporation ("Merrill"), UBS Securities LLC, a Delaware limited liability company ("UBS"), and Delphi Corporation, a Delaware corporation (as a debtor-in-possession and a reorganized debtor, as applicable, the "Company").  ADAH, Harbinger, Dolce, Merrill and UBS are each individually referred to herein as an "Investor" and collectively as the "Investors".  Capitalized terms used and not defined in this Supplement have the meanings assigned thereto in the EPCA (as defined below).

WHEREAS, the Company and certain of its subsidiaries and affiliates (the "Debtors") commenced jointly administered cases (the "Chapter 11 Cases") under United States Bankruptcy Code, 11 U.S.C. §§ 101-1330, as amended and in effect on October 8, 2005 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court");

WHEREAS, the Company and the Investors have entered into an Equity Purchase and Commitment Agreement (the "EPCA") dated as of even date herewith;

WHEREAS, on the terms and subject to the conditions contained in this Supplement, the Company and the Investors agree to implement the provisions set forth herein with respect to the EPCA; and

WHEREAS, the Debtors, the Investors and General Motors Corporation have entered into an amendment and supplement to the Plan Framework Support Agreement, dated as of January [____], 2007 (the "PSA Supplement").

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the parties hereto hereby agrees as follows:

1.      Amendment and Supplement of EPCA.

So long as the official committee of unsecured creditors appointed on October 17, 2005 in the Chapter 11 Cases (the "Creditors' Committee") shall support the implementation of the EPCA, the PSA, and each of the transactions contemplated by the EPCA and the PSA, the EPCA shall be amended and supplemented by the provisions set forth below; provided, that if the Creditors' Committee, in the exercise of its fiduciary duties, shall subsequently withdraw, qualify or modify in a manner adverse to the Investors (or resolve to do any of the foregoing) its support for the implementation of the EPCA, the PSA, or any of the transactions contemplated by the EPCA or the PSA, or shall have approved or recommended any competing or other transaction inconsistent with the

EPCA or the PSA, this Supplement shall terminate and shall be of no further force or effect and as a result, all additions contained in this Supplement shall be deleted, all deletions resulting from this Supplement shall be reinserted and the EPCA will remain in full force and effect as if this Supplement had never existed (a "Withdrawal of Support"); provided, that if the Creditors' Committee (a) objects in any pleading to (i) any the terms of any Plan Document (as such term in defined in the PSA) solely on the basis of comments provided by such committee pursuant to Section 2.3 of the PSA Supplement, but rejected by the Company or the Investors or (ii) the position that the Debtors, any Investor or any other party takes as to the appropriate rate of interest on Trade and Other Unsecured Claims (as defined in the PSA) as reserved under section 6.3 of the PSA as amended by the PSA Supplement, or (b) unsuccessfully seeks the termination of the EPCA pursuant to Section 2(h) below, then in each such case such objection or action shall not be considered a Withdrawal of Support for the purposes of this Supplement.

2.    Amended and Supplemented Provisions of EPCA.

On the terms and subject to the conditions set forth in Section 1:

(a)    In Section 2(j) of the EPCA, after the words "to the extent incurred on or before" shall be added "the first to occur of the date on which this Agreement terminates in accordance with its terms and".

(b)    At the end of the first sentence of Section 5(t) of the EPCA, the following provision shall be added:

"; provided, that if the Company delivers to ADAH and Dolce definitive term sheets for such proposed debt financing that have been approved by the Company's board of directors and executed by the banks or other financing sources providing such debt financing reflecting then-prevailing market terms with respect to the applicable interest rate, redemption provisions and fees (a "Company Financing Proposal"), then each of ADAH and Dolce shall inform the Company in writing (a "Financing Notice") whether or not the Company Financing Proposal is acceptable to it within five (5) Business Days of its receipt of the definitive term sheets for such Company Financing Proposal.  If after the Company delivers to ADAH and Dolce a Company Financing Proposal either ADAH or Dolce fails to deliver a Financing Notice within five (5) Business Days or each of the following circumstances occurs, then the Company may terminate this Agreement and the transactions contemplated hereby may be abandoned:  (x) either ADAH or Dolce delivers a Financing Notice in which it does not approve the Company Financing Proposal, (y) ADAH and Dolce do not present to the Company, within 30 days of the delivery of the Financing Notice by each of ADAH and Dolce (the "Financing Decision Date"), an alternative written expression of interest to provide the Debt Financing on terms more favorable to the Company than the Company Financing  Proposal (a "Preferred Debt Financing") and (z) ADAH and Dolce do not provide to the Company

commitment letters executed by the banks or other financing sources providing such Preferred Debt Financing within 60 days of the Financing Decision Date. Delphi shall use its reasonable best efforts to implement any Preferred Debt Financing and to fulfill its other obligations pursuant to this Section 5(t)."

Schedule I to the EPCA shall be amended to include the defined terms in the above-referenced provision.

(c)     At the end of the proviso in Section 8(c)(v)(B) of the EPCA but immediately preceding the parenthetical containing the definition of "Amended and Restated Constituent Documents", the following provision shall be added:

"and provided, further, that any transaction between GMAC and the Company and/or any of its Subsidiaries shall not be subject to the exclusion of the immediately preceding proviso".

(d)     The word "or" at the end of Section 12(f)(ii) shall be deleted, the period at the end of Section 12(f)(iii) shall be replaced with "; and" immediately following Section 12(f)(iii) a new Section 12(f)(iv) shall be added as follows:

"in accordance with Section 5(t)."

(e)     At the end of the second paragraph under the heading "Conversion of Series A Preferred Stock into Class B Preferred Stock" in the Preferred Term Sheet, the following provision shall be added:

"The direct or indirect transfer of ownership interests in any Permitted Holder that owns shares of Series A Preferred Stock such that such Permitted Holder ceases to be an Affiliate of Cerberus or Appaloosa shall constitute a transfer of such Series A Preferred Stock to a person other than a Permitted Holder for the purposes of this provision."

(f)     At the end of the third paragraph under the heading "Governance – Board of Directors" in the Preferred Term Sheet, the following provision shall be added:

"A mechanism agreed among the Investors and Delphi shall be implemented providing for the resignation and replacement of the directors selected by the holders of the Series A Preferred Stock after the conversion of all Series A Preferred Stock into Series B Preferred Stock."

(g)     In the fifth paragraph under the heading "Governance – Voting Rights" in the Preferred Term Sheet, the following provision shall be added immediately after the parenthetical "(or a preferred security of equivalent economic value)":

", such fair market value shall not reflect the value of the governance rights attributable to the Series A Preferred Stock,".

(h)     In the event that the Debtors and the Plan Investors agree to (i) substantive and material changes in the overall deal as set forth in the Investment Agreement and the PSA after the date of the Initial Approval Order, (ii) Flow-Through Claims (as defined in Section 6.4 of the PSA) other than claims arising out of or resulting from customer claims and environmental claims, or (iii) any alternative treatment of securities claims from estate assets other than available insurance, any of which would have a material adverse effect on the economics of the recovery of general unsecured creditors under the plan of reorganization to be funded through the EPCA, the Creditors' Committee shall have the right to seek termination of the EPCA by the Bankruptcy Court by establishing by a preponderance of the evidence that there has been a material adverse effect on the economics of the recovery to general unsecured creditors under the plan of reorganization to be funded through the EPCA as a result of such actions.

3.      Effectiveness.  This Supplement shall become effective (the "Effective Date") immediately upon its execution by the parties hereto.  Subject to Section 1, on and after the Effective Date, each reference in the EPCA to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the EPCA, and each reference in the PSA to the "EPCA", "thereunder", "thereof" or words of like import referring to the EPCA shall mean and be a reference to the EPCA as amended and supplemented by this Supplement.  This Supplement shall operate as an amendment of the provisions of the EPCA referred to specifically herein.  Except as specifically amended or supplemented by this Supplement and as set forth in the preceding sentence, the EPCA shall remain in full force and effect and are hereby ratified and confirmed.

4.      Assignment.  Neither this Supplement nor any of the rights, interests or obligations under this Supplement will be assigned by any of the parties (whether by operation of law or otherwise) without the prior written consent of the other parties, except in accordance with Section 14 of the EPCA.

5.      Third Party Beneficiaries.  Except as otherwise provided in the EPCA, this Supplement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any person other than the parties hereto any rights or remedies under this Supplement.

6.      Prior Negotiations; Entire Agreement.  This Supplement (including the documents and instruments referred to in this Supplement) constitutes the entire agreement of the parties with respect to the subject matter of this Supplement and supersedes all prior agreements, arrangements or understandings, whether written or oral, among the parties.

7.      Miscellaneous Provisions.  The provisions of Sections 14, 16, 17, 18 and 20 of the EPCA shall apply to this Supplement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Supplement to be signed by their respective officers thereunto duly authorized, all as of the date first written above.

DELPHI CORPORATION

By: _____
      Name:
      Title:

A-D ACQUISITION HOLDINGS, LLC

By: _____
      Name:
      Title:

HARBINGER DEL-AUTO INVESTMENT COMPANY, LTD.

By: _____
      Name:
      Title:

DOLCE INVESTMENTS LLC

By:  Cerberus Capital Management L.P., its
      Managing Member

By: _____
      Name:
      Title:

MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED

By: _____
      Name:
      Title:

UBS SECURITIES LLC

By: _____
     Name:
     Title:


By: _____
     Name:
     Title:

# Exhibit D

## SUMMARY OF TERMS OF
## PREFERRED STOCK

*Set forth below is a summary of indicative terms for a potential investment in Delphi Corporation by (i) certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates and (ii) entities or funds controlled by Appaloosa Management, Harbinger Capital Partners, Merrill Lynch & Co. and UBS Securities. The Investment is being made in connection with a Plan of Reorganization of Delphi Corporation under chapter 11 of the Bankruptcy Code. The terms set forth below are intended solely to provide a framework for the parties as they proceed with discussions of the proposed transaction and do not constitute any agreement with respect to the definitive terms for any transaction or any agreement to agree or any solicitation of acceptances or rejections of any plan of reorganization. While the parties expect to negotiate in good faith with respect to the terms for a transaction, either party shall be free to discontinue discussions and negotiations at any time for any reason or no reason. Neither party shall be bound by the terms hereof and only execution and delivery of definitive documentation relating to the transaction shall result in any binding or enforceable obligations of any party relating to the transaction.*

**Issuer**:    Delphi Corporation (the "*Company*"), a corporation organized under the laws of Delaware and a successor to Delphi Corporation, as debtor in possession in the chapter 11 reorganization case (the "*Bankruptcy Case*") pending in the United States Bankruptcy Court for the Southern District of New York.

**Investors**:    Certain funds and accounts, to be designated, managed, directly or indirectly, by Cerberus Capital Management L.P. and its affiliates (collectively, "*Cerberus*"); entities or funds controlled by Appaloosa Management ("*Appaloosa*"), Harbinger Capital Partners ("*Harbinger*"), Merrill Lynch & Co. ("*Merrill*") and UBS Securities ("*UBS*", and, together with Harbinger and Merrill, "*HUM*"), with the economic interests in the Preferred Stock to be purchased by the Appaloosa Investors allocated as follows: (a) Appaloosa—60.0%; (b) Harbinger--15.0%; and (c) UBS and Merrill—12.5% each; provided, that Appaloosa shall be the exclusive purchaser and sole beneficial owner for all purposes hereunder of the Series A-2 Preferred Stock and shall hold and retain all control rights with respect thereto, including voting and disposition rights. HUM and Appaloosa are collectively referred to as the "*Appaloosa Investors*" and Cerberus and the Appaloosa Investors are collectively referred to as the "*Investors.*"

**Securities to be Issued**:    Series A-1 Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series A-1 Preferred Stock*")

Series A-2 Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series A-2 Preferred Stock* " and, together with the Series A-1 Preferred Stock, the *"Series A Preferred Stock"*)

Series B Senior Convertible Preferred Stock, par value $0.01 per share (the "*Series B Preferred Stock*" and, together with the Series A Preferred Stock, the *"Preferred Stock"*)

Except as set forth below under "Voting Rights" the Series A-1 Preferred Stock and the Series A-2 Preferred Stock are identical in all respects. In addition, the

Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, upon the happening of certain events as outlined below.  The Series B Preferred Stock shall be identical in all respect to the Series A Preferred Stock except with respect to voting rights, as set forth below.

**Purchase of Preferred Stock**:  At the Effective Time (the "*Issue Date*") of the Plan of Reorganization (the "Plan") in the Bankruptcy Case, (i) Cerberus shall purchase all of the 8,571,429 shares of Series A-1 Preferred Stock for an aggregate of $300 million;  (ii) Appaloosa will purchase all of the 8,571,429 shares of Series A-2 Preferred Stock for an aggregate purchase price of $300 million, (iii) Cerberus shall purchase 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million and (iv) the Appaloosa Investors shall purchase, in the aggregate, 8,571,429 shares of Series B Preferred Stock, representing 50% of the shares of Series B Preferred Stock to be outstanding, for an aggregate of $300 million. The Stated Value of the Preferred Stock shall be $35.00 per share.

**Mandatory Conversion into Common Stock:**  The Company shall convert all, but not less than all, of the Preferred Stock on or after the seventh anniversary of the Issue Date at the Conversion Price in effect on such conversion date; provided, that no such conversion may be made unless the Closing Price for the Common Stock for at least 35 trading days in the period of 45 consecutive trading days immediately preceding the date of the notice of conversion shall be in excess of 150% of the initial per share plan value.  The Company may not effect the conversion unless the Company has at the conversion date an effective shelf registration covering resales of the shares of Common Stock received upon such conversion of the Preferred Stock.  The holders of the Series A Preferred Stock will agree not to take any action to delay or prevent such registration statement from becoming effective.

**Liquidation Rights**:  In the event of any liquidation, dissolution or winding up of the business of the Company, whether voluntary or involuntary, each holder of Preferred Stock shall receive, in exchange for each share, out of legally available assets of the Company, a preferential amount in cash equal to (i) the Stated Value plus (ii) the aggregate amount of all accrued and unpaid dividends or distributions with respect to such share (such amount being referred to as the "*Liquidation Value*").

**Ranking**  The Series A Preferred Stock and the Series B Preferred Stock shall rank *pari passu* with respect to any distributions upon liquidation, dissolution or winding up of the Company.  The Preferred Stock will rank senior to any other class or series of capital stock of the Company  with respect to any distributions upon liquidation, dissolution or winding up of the Company.

**Conversion of Preferred Stock into Common Stock**:  Each share of Preferred Stock shall be convertible at any time, without any payment by the ~~Holder~~holder thereof, into a number of shares of Common Stock equal to (i) the Liquidation Value divided by (ii) the Conversion Price.  The Conversion Price shall initially be $35.00, subject to adjustment from time to time pursuant to the anti-dilution provisions of the Preferred Stock (as so adjusted, the "*Conversion Price*").    The anti-dilution provisions will contain customary provisions with respect to stock splits, recombinations and stock dividends and customary weighted average anti-dilution provisions in the event of, among other things, the issuance of rights, options or convertible securities with an exercise or

conversion or exchange price below the Conversion Price, the issuance of additional shares at a price less than the Conversion Price and other similar occurrences.

| | |
|---|---|
| **Conversion of Series A Preferred Stock into Class B Preferred Stock:** | If at any time Cerberus and Appaloosa cease to beneficially own, in the aggregate, Series A Preferred Stock with a Liquidation Value of $250 million or more, then all of the shares of Series A Preferred Stock shall automatically convert into shares of Series B Preferred Stock, on a one for one basis, without any action on the part of the holder thereof; provided, ~~that no~~if at such ~~conversion may occur unless at that~~ time~~,~~ the Company ~~has~~does not have in effect a registration statement covering resales of the Series B Preferred Stock and Common Stock issuable upon conversion of the Preferred Stock, the conversion shall occur at the time such registration statement becomes effective.  The holders of the Series A Preferred Stock will agree not to take any action to delay or prevent such registration statement from becoming effective.

If any holder transfers shares of Series A Preferred Stock to any person other than an Affiliate of such holder (a "*Permitted Holder*") then all of the shares of Series A Preferred Stock so transferred shall automatically, upon such transfer, convert into shares of Series B Preferred Stock, on a one for one basis.

In addition, any holder of Series A Preferred Stock may convert all or any portion of its Series A Preferred Stock into shares of Series B Preferred Stock, on a one for one basis, at any time at its option.

Subject to compliance with applicable securities laws, shares of Series B Preferred Stock will be freely transferable. |
| **Dividends**: | The holder of each share of Preferred Stock shall be entitled to receive dividends and distributions on the Preferred Stock at an annual rate of 3.25% of the Liquidation Value thereof, payable quarterly in cash.  Unpaid dividends shall accrue.  In addition, if any dividends are declared on the Common Stock, the Preferred Stock shall be entitled to receive, in addition to the dividend on the Preferred Stock at the stated rate, the dividends that would have been payable on the number of shares of Common Stock that would have been issued on the Preferred Stock had it been converted immediately prior to the record date for such dividend. |
| **Preference with Respect to Dividends**: | Each holder of Preferred Stock shall, prior to the payment of any dividend or distribution in respect of the Common Stock or any other class of capital stock of the Company ranking junior to the Preferred Stock, be entitled to be paid in full the dividends and distributions payable in respect of the Preferred Stock. |
| **Restriction on Redemptions of Junior Stock**: | So long as shares of Preferred Stock having a Liquidation Value of $250 million or more remain outstanding, the Company shall not, and shall not permit any of its subsidiaries to, purchase, redeem or otherwise acquire for value any shares of Common Stock or any shares of any other class of capital stock of the Company ranking junior to the Preferred Stock except customary provisions with respect to repurchase of employee equity upon termination of employment. |
| **Governance – Board of Directors** | So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:

The board of directors of the Company shall consist of twelve (12)  directors, |

three (3) of whom shall initially be elected by the holders of the Series A-1 Preferred Stock ~~Holders~~, three (3) of whom shall initially be elected by the holders of the Series A-2 Preferred Stock, one (1) of whom shall be the Executive Chairman selected as described below under "Executive Chairman," one (1) of whom shall be the CEO, and four (4) of whom shall be elected by the holders of the Common Stock and the Series B Preferred Stock, voting as a class (the "Common Directors") (it being understood that the Series A Preferred Stock shall not vote with respect to the Common Directors and any ~~holder~~holders of Series A Preferred Stock and their Affiliates shall not vote ~~its~~their shares of Series B Preferred Stock in respect of the Common Directors).  For the avoidance of doubt, the Executive Chairman and the CEO shall be elected to the board by the holders of the Common Stock and the Preferred Stock, voting as a class.  The Executive Chairman of the Board shall initially be selected as described below under "Executive Chairman." The initial CEO shall be Rodney O'Neal, who shall become the CEO and President not later than the effective date of the plan of reorganization.  The four (4) Common Directors shall be selected by a search committee (the "*Selection Committee*") consisting of a representative of each of Cerberus, Appaloosa, the Unsecured Creditors Committee, the Equity Committee and the Company[1], which selection shall be made by unanimous vote of the Selection Committee with the Appaloosa and Cerberus representatives on the Selection Committee not entitled to vote on such selection.  Thereafter, (i) the nominees for election of the Common Directors shall be selected by the Nominating and Corporate Governance Committee of the Board with the Appaloosa and Cerberus representatives on the Committee not entitled to vote on such selection and (ii) any successor Executive Chairman shall be selected as described below under "Executive Chairman."  At least one Common Director shall serve on each committee of the Board subject, in the case of the Audit Committee, to applicable qualification requirements.

The directors selected by the holders of the Series A Preferred Stock shall be reallocated between the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock as follows if any changes occur in the number of outstanding shares of Series A Preferred Stock:  If either series of Series A Preferred Stock represents less than 33 1/3% and 16 2/3% or more of the outstanding shares of Series A Preferred Stock then the series with the fewer number of shares shall elect two (2) directors and the series with the larger number of shares shall elect four (4) directors; if either series of Series A Preferred Stock represents less than 16 2/3%  and more than 0% of the Series A Preferred Stock, then the series with the fewer number of shares shall elect one (1) director and the series with the larger number of shares shall elect five (5) directors; and if any series of the Series A Preferred Stock shall cease to be outstanding, then the holders of the other series shall elect all six (6) directors to which the Series A Preferred Stock is entitled (unless both series shall cease to be outstanding).

**Executive Chairman** So long as the Series A Preferred Stock is outstanding, the following provisions shall be effective:

The initial Executive Chairman shall be selected by the Selection Committee by a supermajority vote of four of the five members of the Selection Committee, including the affirmative vote of both the Appaloosa and Cerberus representatives. Any successor Executive Chairman shall be selected by the

---

[1] Company representative shall be John D. Opie, the current lead director of the Company.

Nominating and Corporate Governance Committee with the affirmative approval of the holders of the Series A-1 Preferred Stock and the Series A-2 Preferred Stock.

The Executive Chairman shall be a full-time employee of the Company with his or her principal office in the Company's world headquarters in Troy, Michigan and shall devote substantially all of his or her business activity to the business affairs of the Company.

The Executive Chairman may be removed at any time by the affirmative vote of all of the holders of the Series A Preferred Stock.

The Executive Chairman shall cause the Company to and the Company shall be obligated to meaningfully consult with the representatives of the holders of the Series A Preferred Stock with respect to the annual budget and material modifications thereto prior to the time it is submitted to the Board for approval.

The employment agreements entered into by the Company with the Executive Chairman and the Chief Executive Officer shall provide that (i) upon any termination of employment, the Executive Chairman and/or the Chief Executive Officer shall resign as a director (and the employment agreements shall require delivery at the time such agreements are entered into of an executed irrevocable resignation that becomes effective upon such termination) and (ii) the right to receive any payments or other benefits upon termination of employment shall be conditioned upon such resignation. If for any reason the Executive Chairman or the Chief Executive Officer does not resign or the irrevocable resignation is determined to be ineffective, then the holders of the Series A Preferred Stock, acting together as a single class, may remove the Executive Chairman and/or Chief Executive Officer as a director.

**Governance – Voting Rights**

Except with respect to the election of directors, who shall be elected as specified above, the holders of the Preferred Stock shall vote, on an "as converted" basis, together with the holders of the Common Stock, on all matters submitted to shareholders.

Until the Liquidation Value of the Preferred Stock beneficially owned by Appaloosa and Cerberus together with all Common Stock directly owned by Appaloosa and Cerberus (valued for this purpose at the Plan Value of $45.00 per share) is less than $600 million, the following Governance – Voting Rights shall be in effect:

The holders of the Series A Preferred Stock shall have the right to select, and to cause the Company to terminate, the Chief Executive Officer, the Chief Operating Officer and the Chief Financial Officer of the Company.   The majority of the members of the Company's compensation committee shall initially be made up of directors designated by Cerberus and Appaloosa.  Pursuant to a stockholder agreement or other arrangements, the Company shall agree to maintain that majority.

The Company shall not, and shall not permit its subsidiaries to, take any of the following actions (subject to customary exceptions as applicable) unless (i) the Company shall provide the holders of the Series A Preferred Stock with at least

20 business days advance notice and (ii) it shall not have received, prior to the 10th business day after the receipt of such notice by the holders of Series A Preferred Stock, written notice from all of the holders of the Series A Preferred Stock that they object to such action:

- any new debt or lease financing or guarantees in excess of $100 million in any twelve-month period after the Issue Date;

- the grant of any new lien, mortgage or security interest in any assets having a value in excess of $100 million in any twelve-month period after the issue Date;

- a sale, transfer or other disposition of all or substantially all of the assets of the Company and its subsidiaries, on a consolidated basis;

- any merger or consolidation involving a change of control of the Company;

- any acquisition of or investment in any other person or entity having a value in excess of $100 million in any twelve-month period after the Issue Date;

- any action to liquidate the Company;

- any issuance of equity securities or rights to acquire equity securities at less than fair market value;

- other than pursuant to any conversion provisions set forth herein, any redemption, repurchase or other acquisition of shares of capital stock involving aggregate payments in excess of $10 million in any twelve month period after the Issue Date;

- payment of any dividends in cash or other assets (other than additional shares of Common Stock); or

- any amendment of the charter or bylaws.

The approval rights set forth above shall be in addition to the other voting rights set forth above and any voting rights to which the holders of the shares of Series A Preferred Stock are entitled under Delaware law; provided, however, in a merger or consolidation involving a change of control of the Company, the Series A Preferred Stock will be converted into the greater of (i) the consideration with a value equal to the fair market value of the Series B Preferred Stock into which such Series A Shares are then convertible (or a preferred security of equivalent economic value) and (ii) the Liquidation Preference.

These limitations shall not apply to debt or lease financing or guarantees or lien, mortgage or security interests which constitute refinancings, replacements and extensions thereof that are (i) on prevailing market terms with respect to the economics thereof and (ii) on substantially the same terms (including with respect to the obligors, tenor, security and ranking) as the obligations being

refinanced, replaced or extended with respect to other terms.

The Series B Preferred Stock shall be identical in all respects to Series A Preferred Stock except the Series B Preferred Stock shall have no voting rights other than (i) the right to vote, together with the Common Stock as one class on an "as converted basis" on all matters submitted to the Common Stock (subject to restrictions on voting by holders of Series A Preferred Stock for Common Directors as set forth above) and (ii) as required by law.

Appaloosa and Cerberus shall not receive compensation or remuneration of any kind in connection with their exercise or non-exercise of voting or other rights under the Series A Preferred Stock.

**Reservation of Unissued Stock**:

The Company shall maintain sufficient authorized but unissued securities of all classes issuable upon the conversion or exchange of shares of Preferred Stock and Common Stock.

**Transferability and Right of First Offer**:

Holders of Series A Preferred Stock may sell or otherwise transfer such stock as follows:

- to any Permitted Holder

- to any other person subject to the right of first offer provided below; provided, however, that upon any such transfer, the shares of Preferred Stock so transferred shall automatically convert into shares of Series B Preferred Stock.

If any transfer or conversion of Series A Preferred Stock would result in the holders of the Series A Preferred Stock owning insufficient shares of Series A Preferred Stock to avoid the mandatory conversion of the Series A Preferred Stock, then the other holders of Series A Preferred Stock shall have the right to purchase the shares of Series A Preferred Stock proposed to be transferred or converted at a purchase price equal to the Current Market Value. The selling holder shall give the other holders at least 15 days' notice of a proposed transfer or conversion to which these rights apply. Upon such notice, the holders may elect to purchase the shares, *pro rata*, on the terms offered within 15 days following the date of such notice.

**Registration Rights**:

The Investors shall be entitled to registration rights as set forth below. The registration rights agreement shall contain customary terms and provisions consistent with such terms, including customary hold-back, cutback and indemnification provisions.

Demand Registrations. The holders of the Preferred Stock shall be entitled to four demand registrations; *provided*, that following the time that the Company is eligible to use Form S-3, the holders shall be entitled to an unlimited number of demand registrations. Any demand registration may, at the option of the holder be a "shelf" registration pursuant to Rule 415 under the Securities Act of 1933. All registrations will be subject to customary "windows."

Piggyback Registrations. In addition, the holders shall be entitled to unlimited piggyback registration rights, subject to customary cut-back provisions.

<u>Registrable Securities</u>:  The Series B Preferred Stock, any shares of Common Stock issuable upon conversion of the Preferred Stock or the Series B Preferred Stock, any other shares of Common Stock held by any Investor (including shares acquired in the rights offering or upon the exercise of preemptive rights), and any additional securities issued or distributed by way of a dividend or other distribution in respect of any securities.  Securities shall cease to be Registrable Securities upon sale to the public pursuant to an registration statement or Rule 144, or when all shares held by an Investor may be transferred without restriction pursuant to Rule 144(k).

<u>Expenses.</u>   All registrations shall be at the Company's expense (except underwriting fees, discounts and commissions agreed to be paid by the selling holders), including, without limitation, fees and expenses of one counsel for any holders selling Registrable Securities in connection with any such registration.

**Preemptive Rights**:  So long as Cerberus and Appaloosa beneficially own, in the aggregate. Series A Preferred Stock with a Liquidation Value of $250 million or more, the holders of Preferred Stock shall be entitled to participate *pro rata* in any offering of equity securities of the Company, other than with respect to (i) shares issued or underlying options issued to management and employees and (ii) shares issued in connection with business combination transactions.

**Commitment Fee:**  A commitment fee of $21 million shall be earned by and payable to the Investors as provided for in the Discussion Points.

**Stockholders Agreement**:  Certain of the provisions hereof will be contained in a Stockholders Agreement to be executed and delivered by the Investors and the Company on the Issue Date.

**Governing Law**:  State of Delaware

Document comparison done by DeltaView on Tuesday, January 09, 2007 1:55:11 PM

| Input: | |
|---|---|
| Document 1 | pcdocs://ny1/3436209/9 |
| Document 2 | pcdocs://ny1/3436209/10 |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 7 |
| Deletions | 8 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 15 |

## **Exhibit E**

[Draft: (New York) January 10, 2007]

<u>AMENDMENT AND SUPPLEMENT TO THE
PLAN FRAMEWORK SUPPORT AGREEMENT</u>

by and among

DELPHI CORPORATION,

GENERAL MOTORS CORPORATION,

APPALOOSA MANAGEMENT L.P.,

CERBERUS CAPITAL MANAGEMENT, L.P.,

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.,

MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED

and

UBS SECURITIES LLC

Dated as of January __, 2007

## AMENDMENT AND SUPPLEMENT TO THE
## PLAN FRAMEWORK SUPPORT AGREEMENT

This Amendment and Supplement to the Plan Framework Support Agreement (the "Amendment and Supplement"), is entered into as of January __, 2007 by and among Delphi Corporation ("Delphi"), on behalf of itself and its subsidiaries and affiliates operating as debtors and debtors-in-possession (together with Delphi, the "Debtors") in the Chapter 11 Cases, General Motors Corporation ("GM"), Appaloosa Management L.P., ("Appaloosa"),  Cerberus Capital Management, L.P., ("Cerberus"), Harbinger Capital Partners Master Fund I, Ltd., ("Harbinger"), Merrill Lynch, Pierce, Fenner & Smith, Incorporated ("Merrill") and UBS Securities LLC ("UBS").  Each of the Debtors, GM, Appaloosa, Cerberus, Harbinger, Merrill and UBS is referred to herein individually as a "Party," and collectively, as the "Parties".  Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Plan Framework Support Agreement entered into by the Parties dated as of December 18, 2006 (the "PSA").  As used herein, the phrases "this Amendment and Supplement", "hereto", "hereunder" and phrases of like import shall mean this Amendment and Supplement.

## RECITALS

A.    On December 18, 2006, the Debtors filed that certain Expedited Motion for Order Authorizing and Approving the Equity Purchase and Commitment Agreement (the "Investment Agreement") Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant to Sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code (the "Approval Motion"), and on December 22, 2006, the Debtors filed their Motion for Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which to File and Solicit Acceptances of Reorganization Plan (the "Exclusivity Extension Motion").

B.    The Approval Motion was originally scheduled for hearing before the Bankruptcy Court on January 5, 2007, but such hearing was adjourned and is now scheduled for January 11, 2007.  A hearing on the Exclusivity Extension Motion has been scheduled for January 12, 2007.

C.    Several creditors and parties in interest have objected to the Approval Motion and the Exclusivity Extension Motion (the "Objectants"), including, among others, the official committee of unsecured creditors appointed on October 17, 2005 in the Chapter 11 Cases (the "Creditors' Committee", and their objections to the Approval Motion and the Exclusivity Extension Motion filed thereby, the "Committee Objections") and the ad hoc committee of trade creditors (the "Ad Hoc Trade Committee", and their objection to the Approval Motion filed thereby, together with the Committee Objections, the "Objections").

D.    On December 22, 2006, the Court entered that certain Pretrial and Scheduling Order Relating to Debtors' Expedited Motion for Order Authorizing and Approving Equity Purchase and Commitment Agreement Pursuant to 11 U.S.C. Section 105(a), 363(b), 503(b), and 507(a) and Plan Framework and Support Agreement Pursuant to 11 U.S.C. Sections 105(a), 363(b), and 1125(e) (the "Pretrial Order").  Pursuant to the Pretrial Order, the Objecting Parties (as defined therein) were obligated to provide the Debtors, GM, Appaloosa and Cerberus with a written statement identifying any perceived ambiguities in the Investment Agreement.  On

December 26, 2006, the Creditors' Committee, the Ad Hoc Trade Committee and the official committee of equity security holders appointed in the Chapter 11 Cases (the "Equity Committee") each provided the Debtors with a Statement of Ambiguities (each, a "Statement") in accordance with the Pretrial Order.

E.    Pursuant to the Pretrial Order, the Debtors were obligated to deliver to the Objecting Parties a response to each such Statement, stating whether and in what respect the Debtors believe that any such ambiguity exists.  On December 29, 2006, the Debtors delivered their Omnibus Response To Statements Of Purported Ambiguities Concerning Framework Agreements Propounded By Statutory And Ad Hoc Trade Committees (the "Response").

F.    In addition, the Debtors and the Plan Investors have conferred with certain of the Objectants, including the Creditors' Committee and the Ad Hoc Trade Committee in an effort to resolve their objections to the Approval Motion and issues raised in the Statements on a consensual basis.  As a result of these discussions, the Creditors' Committee, subject to its fiduciary duties, and the Ad Hoc Trade Committee, have agreed to withdraw the Objections and to support the Investment Agreement and the PSA and the transactions contemplated thereby, on the condition that certain modifications are made to the Investment Agreement, the PSA and the proposed order approving the Approval Motion (the "Approval Order").

G.    The Parties to this Amendment and Supplement have agreed to amend the PSA as set forth in Article I hereof,  and, conditioned upon the withdrawal of the Objections and the continued support of the Creditors' Committee and the Ad Hoc Trade Committee for entry of the Approval Order, the implementation of the Investment Agreement, the PSA, and each of the transactions contemplated by the Investment Agreement and the PSA, to supplement the PSA as set forth in Article II hereof.

ARTICLE I

AMENDMENT

NOW THEREFORE, the Parties hereto hereby agree as follows:

1.1    Section 3.1(b) of the PSA is hereby amended by adding the words "; provided further however, that such notice may not be given by any Plan Investor or the Debtors after the Disclosure Statement Approval Date (as defined in the Investment Agreement)" immediately following the words "April 1, 2007" in the third line thereof.

1.2    Section 6.1 of the PSA is hereby amended by adding the words "excluding all allowed accrued postpetition interest thereon" immediately following the word "billion" in the 9th line thereof.

1.3    Section  6.3 of the PSA is hereby amended by adding the words "which for Trade Claims shall be at a rate to be agreed to or determined by the Bankruptcy Court, it being understood that the Debtors and Plan Investors will not take the position that there should not be an entitlement to postpetition interest" immediately following the words "(including all allowed

accrued interest" in what is currently the 2nd line thereof, and adding the words "excluding all allowed accrued postpetition interest thereon" after the word "billion" in the 8th line thereof.

1.4     Section 6.12(d) of the PSA is hereby amended by adding the words "or their respective Affiliates" immediately following the word "(Dolce)" in what is currently the 3rd line thereof, and by adding the words "or their respective Affiliates" immediately following the word "Dolce" in what is currently the 7th line thereof.

ARTICLE II

SUPPLEMENT

So long as the Creditors' Committee and the Ad Hoc Trade Committee shall have withdrawn the Objections and support entry of the Approval Order, the implementation of the Investment Agreement, the PSA, and each of the transactions contemplated by the Investment Agreement and the PSA, the following provisions of this Amendment and Supplement shall be in effect, and to the extent such provisions are inconsistent with any provisions of the PSA, the following provisions of this Amendment and Supplement shall supplant and supersede the provisions of the PSA; provided, that if the Creditors' Committee, in the exercise of its fiduciary duties, shall subsequently withdraw, qualify or modify in a manner adverse to the Plan Investors (or resolve to do any of the foregoing) its support for the entry of the Approval Order, the implementation of the Investment Agreement, the PSA, or any of the transactions contemplated by the Investment Agreement or the PSA, or shall have approved or recommended any competing or other transaction inconsistent with the Investment Agreement or the PSA (each such action, a "Withdrawal of Support"), then Sections 2.1 through 2.2 of this Amendment and Supplement shall terminate and shall be of no further force or effect; provided further, that if the Creditors' Committee (a) objects in any pleading to (i) any of the terms of any Plan Document solely on the basis of comments provided by the Creditors' Committee pursuant to Section 2.1 hereof, but rejected by the Debtors or the Plan Investors or (ii) the position that the Debtors, any Plan Investor or any other Party takes as to the appropriate rate of interest on Trade and Other Unsecured Claims as permitted by Section 6.3 of the PSA as amended hereby, or (b) unsuccessfully seeks the termination of the Investment Agreement pursuant to Section 2(h) of that certain Supplement to the Equity Purchase and Commitment Agreement, dated as of __, 2007 by and among the Debtors and the Investors, then in each such case such objection or action shall not be considered a Withdrawal of Support:

2.1     The Debtors will provide the Creditors' Committee with periodic working drafts of the Plan, the Disclosure Statement, the Confirmation Order and any Plan Documents that the Creditors' Committee reasonably believes could have a material impact on the recovery of unsecured creditors, and any amendments thereto, and with a reasonable opportunity to review and comment on such documents prior to such documents being filed with the Bankruptcy Court. The Debtors and the Plan Investors will consider in good faith any comments consistent with the Investment Agreement and PSA, and any other reasonable comments of the Creditors' Committee, and will not reject such comments without first discussing the reasons therefore with counsel to the Creditors' Committee and giving due consideration to the views of the Creditors' Committee.

2.2    The Creditors' Committee will have consultation rights through the Confirmation Date with respect to executive compensation under the Plan and as described in the Disclosure Statement.    The Creditors' Committee shall also have one representative of the Creditors' Committee placed on the joint claims oversight committee contemplated by Section 6.11 of the PSA, it being understood that such member shall not have veto rights over any committee action.

## ARTICLE III

## MISCELLANEOUS

3.1    Subject to Section 8.1 of the PSA, this Amendment and Supplement shall become effective (the "Effective Date") immediately upon its execution by the Parties.

3.2    On and after the Effective Date, each reference in the PSA to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the PSA, and each reference in the Investment Agreement to the "PSA", "thereunder", "thereof" or words of like import referring to the PSA shall mean and be a reference to the PSA as amended and supplemented by this Amendment and Supplement.

3.3    This Amendment and Supplement shall operate as an amendment of the provisions of the PSA referred to specifically herein.    Except as specifically amended or supplemented by this Amendment and Supplement and as set forth in the preceding sentence, the PSA and the Investment Agreement shall remain in full force and effect and are hereby ratified and confirmed.

3.4    Section and subsection headings in this Amendment and Supplement are included herein for convenience of reference only and shall not constitute a part of this Amendment and Supplement for any other purpose or be given any substantive effect.

3.5    **This Amendment and Supplement will be governed and construed in accordance with the internal laws of the State of New York without regard to any conflict of law provision that could require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party hereby irrevocably and unconditionally agrees for itself that the Bankruptcy Court will retain exclusive jurisdiction over all matters related to the construction, interpretation or enforcement of this Agreement.  Each Party further agrees to waive any objection based on forum non conveniens.**

3.6    This Amendment and Supplement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. Delivery of an executed signature page of this Amendment and Supplement by

facsimile shall be effective as delivery of a manually executed signature page of this Amendment and Supplement.

      3.7    It is agreed that the Creditors' Committee shall be a third party beneficiary of Article II of this Amendment and Supplement.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have each caused this Amendment and Supplement to be duly executed and delivered by their respective, duly authorized officers as of the date first above written.

DELPHI CORPORATION

By: _____
        Name:
        Title:

GENERAL MOTORS CORPORATION

By: _____
        Name:
        Title:

APPALOOSA MANAGEMENT L.P.

By: _____
        Name:
        Title:

HARBINGER CAPITAL PARTNERS MASTER FUND I, LTD.

By:    Harbinger Capital Partners Offshore Manager, L.L.C., as investment manager

By: _____
        Name: Philip A. Falcone
        Title: Senior Managing Director

CERBERUS CAPITAL MANAGEMENT, L.P.


By:    _____
          Name:
          Title:


MERRILL LYNCH, PIERCE, FENNER & SMITH,
INCORPORATED


By:    _____
          Name:  Graham Goldsmith
          Title:   Managing Director


UBS SECURITIES LLC

By:    _____
          Name:
          Title:


By:    _____
          Name:
          Title:


2

## **Exhibit F**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Delphi Corporation, <u>et</u> <u>al.</u> | ) | Case No. 05-44481 (RDD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

ORDER AUTHORIZING AND APPROVING THE EQUITY PURCHASE
AND COMMITMENT AGREEMENT PURSUANT TO SECTIONS 105(a),
363(b), 503(b) AND 507(a) OF THE BANKRUPTCY CODE AND THE
PLAN FRAMEWORK SUPPORT AGREEMENT PURSUANT TO
SECTIONS 105(a), 363(b), AND 1125(e) OF THE BANKRUPTCY CODE

Upon the motion (the "<u>Motion</u>")[1], dated December 18, 2006, of Delphi Corporation

("<u>Delphi</u>") and certain of its domestic subsidiaries and affiliates, debtors and debtor-in-

possession (collectively, the "<u>Debtors</u>") in the above-captioned cases (the "<u>Chapter 11 Cases</u>"),

for an order authorizing and approving the entry into the Equity Purchase and Commitment

Agreement ((together with the Supplement to the Equity Purchase and Commitment Agreement,

a copy of which is attached to this Order as <u>Exhibit 1</u>, the "EPCA") and associated Investment

Proposal Letter (the "<u>Proposal Letter</u>") and Commitment Letters (the "<u>Commitment Letters</u>", and

together with the Proposal Letter and EPCA, the "<u>Investment Agreements</u>") pursuant to sections

105(a), 363(b), 503(b) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101-1330,

as amended and in effect on October 8, 2005 (the "<u>Bankruptcy Code</u>"), and the Plan Framework

Support Agreement (together with the  Amendment and Supplement to the Plan Framework

Support Agreement, a copy of which is attached to this Order as <u>Exhibit 2</u>, the "<u>Plan Framework</u>

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in
the Motion.

Support Agreement")[2] pursuant to sections 105(a), 363(b) and 1125(e) of the Bankruptcy Code; the Court having reviewed the Motion and having heard the statements of counsel and the evidence presented regarding the relief requested in the Motion at a hearing before the Court (the "Hearing"); due and appropriate notice of the Motion under the circumstances having been made, and notice of the Hearing having been served on the Debtors and their counsel, the Office of the United States Trustee, the members of and counsel for the official committee of unsecured creditors (the "Creditors' Committee"), the members of and counsel for the official committee of equity security holders (the "Equity Committee"), counsel for the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit facility, those parties on the Debtors' Master Service List, such other parties requesting service of notice under Bankruptcy Rule 2002 and otherwise in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. Sections 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures (Docket No. 5418), and sufficient cause appearing therefor; now, therefore,

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

1.    *Jurisdiction*.  This Court has core jurisdiction over the Cases, the Motion, this Order and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory

---

[2]    Attached as Exhibit 3 to this Order is the execution form of the Investment Proposal Letter dated December 18, 2006 and its attachments, including the EPCA, the Plan Framework Support Agreement, the Preferred Stock Term Sheet and the Commitment Letters.

[3]  This Order constitutes the Court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52, as made applicable herein by Bankruptcy Rules 7052 and 9014.  Any and all findings of fact shall constitute findings of fact even if stated as conclusions of law, and any and all conclusions of law shall constitute conclusions of law even if stated as findings of fact.

2

predicates for the relief requested herein are Sections 105(a), 363(b), 503(b), 507(a) and 1125(e) of the Bankruptcy Code.

2.    *Notice*.    The notice given by the Debtors of the Motion and the Hearing constitutes proper, timely, adequate and sufficient notice thereof and complies with the Bankruptcy Code, the Bankruptcy Rules and applicable local rules, and no further or other notice is necessary.

3.    *Findings.*

(a)    On October 8 and October 14, 2005, the Debtors commenced the Chapter 11 Cases for the purpose of restructuring their businesses and related financial obligations pursuant to an overall transformation strategy (the "Transformation Plan") that would incorporate the following structural components:

(i)    Modification of the Debtors' labor agreements;

(ii)    Resolution of all issues and disputes between the Debtors and General Motors Corporation ("GM") and its subsidiaries and affiliates regarding (A) certain legacy obligations, including allocating responsibility for various pension and other post-employment benefit obligations; (B) all alleged claims and causes of action arising from the spin-off of Delphi from GM; (C) costs associated with the transformation of the Debtors' business (including the establishment of support to be provided by GM in connection with certain of those businesses that the Debtors intend to shut-down or otherwise dispose of); (D) the restructuring of ongoing contractual relationships with respect to continuing operations; and (E) the amount and treatment of GM's claims in the Chapter 11 Cases (together, the "Designated Issues");

3

(iii)    Development of a strategically focused product portfolio and realignment of production capacity to support it;

(iv)    Transformation of the Debtors' work force in keeping with a sustainable cost structure and streamlined product portfolio;

(v)    Resolution of the Debtors' pension issues; and

(vi)    Restructuring of the Debtors' balance sheet to accommodate the transformed business.

(b)    The Debtors continue to operate their respective businesses and manage their respective properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Debtors' Chapter 11 Cases.  Pursuant to an Order of this Court, the Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered.

(c)    Pursuant to its authority under section 1102 of the Bankruptcy Code, the United States Trustee for the Southern District of New York appointed the Creditors' Committee and the Equity Committee in the Chapter 11 Cases.

(d)    In the summer of 2006, Appaloosa Management L.P. ("Appaloosa") and Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as significant stakeholders of the Debtors, negotiated and entered into non-disclosure agreements with the Debtors pursuant to which they obtained certain information from and about the Debtors and their businesses and engaged in discussions regarding various potential reorganization structures and related matters, including the potential requirement for a substantial equity investment in Delphi to facilitate the Debtors' restructuring.

4

(e)    Separately, the Debtors conducted negotiations with other potential investors, including Cerberus Capital Management, L.P. ("Cerberus").

(f)    At the Debtors' request, Appaloosa, Harbinger and Cerberus engaged in discussions regarding their respective views of the Transformation Plan, the terms of a potential investment in Delphi and the general terms of various potential restructuring strategies for the Debtors.

(g)    The foregoing discussions led to an agreement on the Plan Framework Support Agreement, which sets forth the proposed terms of a chapter 11 plan (the "Plan") for the Debtors that would include, *inter alia*, (i) the implementation of the Transformation Plan, including a settlement of the Designated Issues, and (ii) a proposed equity investment by certain affiliates of Appaloosa, Harbinger, and Cerberus, and by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill"), and UBS Securities LLC ("UBS", and together with Merrill and certain affiliates of Appaloosa, Harbinger, Cerberus, the "Investors") in Delphi (the "Investment").

(h)    Subject to the terms of the Plan Framework Support Agreement, the parties thereto have agreed to work together to attempt to complete the negotiation of the terms of the Plan, as well as to resolve other outstanding issues, and to formulate and facilitate confirmation and consummation of the Plan and the transactions contemplated by the Plan Framework Support Agreement; provided, however, that Delphi will be the sole proponent of the Plan.

(i)    The Investment, which would be an integral component of the Plan, would be made pursuant to the Investment Agreements, which sets forth the terms and conditions under which the Investors would (i) purchase any unsubscribed shares issued

5

under a rights offering of new common stock of Delphi to be issued pursuant to the Plan (as defined in the Plan Framework Support Agreement), and (ii) purchase newly issued shares of common stock and preferred stock of Delphi.

(j)        In connection with the EPCA, Appaloosa, Harbinger and Cerberus (collectively, the "Commitment Parties" and together with the Investors, the "Plan Investors") will provide the Commitment Letters to the Investors and Delphi, whereby each Commitment Party will provide funding to the Investors, under the terms and subject to the limitations set forth in the Commitment Letters.

(k)        The Plan Framework Support Agreement and the Investment Agreements, all of which are incorporated herein, are fair and equitable to all parties.

(l)        The Debtors' decision to enter into the Plan Framework Support Agreement and the Investment Agreements is a sound exercise of their business judgment, is consistent with their fiduciary duties and is based on good, sufficient and sound business purposes and justifications.

(m)        The Plan Framework Support Agreement and the Investment Agreements were negotiated at arms' length and in good faith.

(n)        The Plan Framework Support Agreement and the Investment Agreements are fair, reasonable, and in the best interests of the Debtors, their estates, shareholders, creditors and all parties-in-interest.

(o)        The entry into the Plan Framework Support Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and does not give rise to any claim or remedy against any of the parties including, without limitation, the designation of the

6

vote of GM or any Plan Investor or any affiliate of any Plan Investor under Section 1125(e) of the Bankruptcy Code on account of entering into the Plan Framework Support Agreement and the performance and fulfillment of their obligations thereunder. Notwithstanding anything contained herein, except with respect to claims, causes of action, or application of remedies (including the designation of the votes of GM and any of the Plan Investors or any affiliate of any Plan Investor) against any of the parties to the Plan Framework Support Agreement on account of entering into the Plan Framework Support Agreement, or performing or fulfilling their obligations thereunder, nothing contained herein shall limit the rights of any party to raise any issue or objection which could otherwise have been raised at a disclosure statement or confirmation hearing.

(p)    The provisions in the EPCA for the payment of the indemnities provided in Section 10 of the EPCA (the "Indemnity"), the Transaction Expenses, the Commitment Fees and the Alternate Transaction Fee (each as defined in the EPCA) are integral parts of the transactions contemplated by the EPCA and without any one of these provisions, the Plan Investors would not enter into the Investment Agreements.

(q)    The incurrence of the Indemnity, the Transaction Expenses, the Commitment Fees, the Alternate Transaction Fee and any damage claims ("Damage Claims") that may arise against the Debtors pursuant to the terms of the EPCA shall be deemed to have been incurred in good faith, as such term is used in Section 363(m) of the Bankruptcy Code, and the priorities extended to the Plan Investors pursuant to this Order (as described below) shall be entitled to all of the protections provided herein or otherwise contemplated hereby.

(r)    The relief requested in the Motion is in the best interests of the Debtors, their estates, shareholders, creditors and all parties-in-interest.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Motion is GRANTED in its entirety.

2.    Any objection to the Motion not withdrawn or otherwise resolved as set forth in this Order is hereby overruled.

3.    Pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code, the Debtors and the Plan Investors are hereby authorized, but not directed, to execute, deliver and implement the Plan Framework Support Agreement and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Plan Framework Support Agreement, and such agreements and documents shall be binding and enforceable against the Debtors and their estates and the other parties thereto in accordance with their terms and subject to the conditions therein.

4.    The entry into the Plan Framework Support Agreement by the parties thereto, and the performance and fulfillment of their obligations thereunder, does not violate any law, including the Bankruptcy Code, and may not give rise to any claim or remedy against any of the parties thereto including, without limitation, the designation of the vote of GM or any Plan Investor or any affiliate of any Plan Investor under Section 1125(e) of the Bankruptcy Code on account of entering into the Plan Framework Support Agreement and the performance and fulfillment of their obligations thereunder.  Notwithstanding anything contained herein, except with respect to claims, causes of action, or application of remedies (including the designation of the votes of GM and any of the Plan Investors or any affiliate of any Plan Investor) against any of the parties to the Plan Framework Support Agreement on account of entering into the Plan

8

Framework Support Agreement, or performing or fulfilling their obligations thereunder, nothing contained herein shall limit the rights of any party to raise any issue which could otherwise have been raised at a disclosure statement or confirmation hearing.

5.        Pursuant to Sections 105(a), 363(b), 503(b) and 507(a) of the Bankruptcy Code, the Debtors and the applicable Plan Investors are hereby authorized, but not directed, to execute, deliver and implement the Investment Agreements and all exhibits and attachments thereto, and to take any and all actions necessary and proper to implement the terms of the Investment Agreements, and such agreements and documents shall be binding and enforceable against the Debtors, their estates, and the other parties thereto in accordance with their terms and subject to the conditions therein.

6.        The Debtors are authorized to pay the Indemnity (if applicable), the Transaction Expenses, the Commitment Fees, the Alternate Transaction Fee (if applicable) and any Damage Claim (if applicable, and to the extent allowed), each in accordance with its terms and as and when required by the Investment Agreements, except as otherwise provided below, without further Order of the Court.  The Debtors are authorized to make all other payments to or for the benefit of the Plan Investors as and when required by the Investment Agreements and any exhibit, schedule or attachment thereto, on the terms set forth therein, without further Order of the Court.  Any such payments shall be fully earned when paid, non-refundable and not subject to avoidance or disgorgement under any theory at law or in equity; provided however, that notwithstanding the forgoing, so long as the Creditors' Committee shall support the Investment Agreements and the Plan Framework Support Agreement and the transactions contemplated thereby, the Plan Investors shall provide to the Creditors' Committee an itemization of any Transaction Expenses for which payment is being sought, together with appropriate back-up

9

therefore, and 90% of such Transaction Expenses shall be paid in accordance with the terms of

the Investment Agreement as and when required thereby without further Order of the Court, with

the remaining 10% (the "Holdback") to be paid ten days subsequent to the delivery of such

itemization and backup to the Creditors' Committee, unless prior to the expiration of such ten

day period, the Creditors' Committee objects to any of the amounts submitted for payment, in

which case an amount equal to the amount of Transaction Expenses objected to (up to the

maximum amount of the Holdback) shall be retained and not paid to the Investors pending

resolution of the dispute with the Creditors' Committee or further order of the Court.

7.        Each of the Indemnity (if applicable), the Transaction Expenses (to the extent

payable pursuant to the preceding paragraph), the Commitment Fees, the Alternate Transaction

Fee (if applicable) and any Damage Claim against the Debtors (if applicable) provided for or

permitted by the Investment Agreements shall constitute allowed claims pursuant to Sections

503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be paid as and when provided for

in the Investment Agreements without further application to or order of the Bankruptcy Court

except that (i) in the case of any Damage Claim against the Debtors provided for or permitted by

the Investment Agreements, such Damage Claim shall be allowed in the amount determined by

the Bankruptcy Court after notice and a hearing and (ii) in the case of any Indemnity claim

against the Debtors provided for or permitted by the Investment Agreements, such claim shall be

resolved in a manner pursuant to the Investment Agreement with any disputes to be resolved by

the Bankruptcy Court.  In addition, to the extent permitted under any order authorizing the

Debtors to obtain post-petition financing and/or to utilize cash collateral then or thereafter in

effect (each a "Financing Order") the Transaction Expenses incurred from and after the date of

entry of this Order shall be protected by and entitled to the benefits of the carve-out for professionals as provided in any such Financing Order.

8.      If the Committee of Delphi Trade Claim Holders has not subsequently withdrawn, qualified or modified in a manner adverse to the Investors (or resolved to do any of the foregoing) its support for the entry of this Order, the implementation of the Investment Agreements, the Plan Framework Support Agreement, or any of the transactions contemplated by the Investment Agreements and the Plan Framework Support Agreement (as such exists as of the date hereof), the Plan Investors, the Debtors, and the Creditors' Committee shall not oppose any application by the Committee of Delphi Trade Claim Holders for the payment of fees and expenses of their professionals  pursuant to Section 503(b) of the Bankruptcy Code provided that the Plan Investors, the Creditors' Committee and the Debtors may oppose the reimbursement of fees and expenses in excess of $750,000.

9.      This Order is a final and non-interlocutory order and is immediately subject to appeal pursuant to 28 U.S.C. Section 158(a).

10.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

11.     The requirement under Local Rule 9013-1(b) for the service and filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:   January __, 2007
             New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**Investment Proposal Letter And Attachments**

**(Equity Purchase and Commitment Agreement,
Plan Framework Support Agreement, Preferred
Stock Term Sheet, and Commitment Letters)**