UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>DELPHI CORPORATION, <u>et al.</u><br><br>                  Debtors. | Chapter 11<br>Case No. 05-44481 (RDD)<br>(Jointly Administered) |

## SUPPLEMENTAL RESPONSE OF
## DONNA WILSON, PROOF OF CLAIM NUMBER 12083

**Background**

The Proof of Claim of Donna Wilson was filed on or about July 28, 2006, for an unsecured, nonpriority claim in the amount of two hundred fifty thousand dollars ($250,000.00). The claim arises out of a race discrimination lawsuit in state court. Donna Wilson would consent to a remand to state court to determine damages by a jury, subject to a cap on damages in the amount of two hundred fifty thousand dollars ($250,000.00).

**Job Duties & Pertinent Medical Background**

This is a race discrimination case. It involves an African-American woman who worked for Delphi Corporation and its predecessor, General Motors Corporation, for 28½ years at times material. It is undisputed that she was **never** previously disciplined. At times material, she was working multiple overtime shifts to put a fourth daughter through college, having paid for three daughters to attend and graduate from college. She was also caring for a very ill father and one grandson.

Donna R. Wilson was hired as an hourly employee by General Motors in September, 1975.

In the early months of 2004, Ms. Wilson was a third shift machine operator working at Plant 6, Department 32-1. During 2003, in addition to shift differential, she worked overtime on a regular basis, averaging sixty to sixty-four (60 to 64) hours per work and earning approximately one hundred fifteen thousand dollars ($115,000.00) before taxes.

During the fall of 2003, Ms. Wilson was struck by a machine in the right breast. A large bruise developed, which, by early 2004, had evolved into a pus-filled infection. Ms. Wilson began treating for the infection with her family physician. Her medical records have been provided to Defendant and demonstrate that she treated with Dr. Henryk I. Pietrus on February 13, 2004. She was told to return to Dr. Pietrus' care as needed. The condition proved intractable. A second prescription was called in on February 23, 2004. Also, she underwent an ultrasound on her breast and was scheduled for a mammogram. On March 8, 2004, still experiencing sharp pains and heaviness, she called in sick and returned to Dr. Pietrus' care for further treatment. (See Exhibit 1.) Following the appointment, she was sent home and given a return to work slip for March 9, 2004. (See Exhibit 2.)

March 8, 2004, is a date of great significance to this case. It was the first day that Ms. Wilson was scheduled to begin work on the B shift for Plant 6, Department 32-1. It was also the first business day after the former contract foreman of the B Shift, Tommie Gipson, was fired. Mr. Gipson is African-American. Although Ms. Wilson knew Mr. Gipson by sight and had limited contact with him when working overtime, she had never worked for him. In addition, she did not personally like him, dislike him, or have any allegiance to him, because she thought he was an ineffective supervisor.

March 8, 2004, has additional significance. It is the day that all of the rest of the African-

American workers on the B shift called in sick or did not show up for work for various reasons. Hence, of the thirteen workers scheduled, four white workers were present and the nine African-American workers, including Donna Wilson, were absent.

Delphi concluded that an unauthorized work stoppage, or wildcat strike, was occurring involving the African-American workers. Delphi reasoned that the absent workers were protesting the firing of Tommie Gipson. Following six months of discovery, Delphi never provided any evidence to support its conclusion that there was an unauthorized work stoppage. Delphi allegedly conducted an investigation. The "investigation" consisted of Donna Wilson and others being interviewed by a supervisor and her (their) responses to scripted questions were recorded in longhand. (See Exhibit 3.) Donna Wilson denied being involved in an unauthorized work stoppage and denied any knowledge of an unauthorized work stoppage.

Donna Wilson presented her doctor's slip excusing her from work. The doctor's slip was ultimately verified. (See Exhibit 4.) However, it was decided that Donna Wilson was lying and she had participated in the unauthorized work stoppage.

Nothing further was done to investigate the matter. No African-American worker implicated Donna Wilson. No individual with knowledge was identified or has been identified by Delphi. Sam Cozzolino, the UAW representative, and a white male, strongly condemned this personnel action. (See Exhibit 5.) Mr. Cozzolino wrote that Delphi was trying to make an example of the African-American workers without any evidence. During his deposition, Mr. Cozzolino described the investigation as a sham and the discipline imposed as lacking any factual basis. (See Exhibit 6, pp. 8, 11, 12, 14, 18, 19.) His attempts to find out about the factual basis were stonewalled by management. (Id., pp. 12-13.)

The plant manager, Leigh Ochoa, accused Donna Wilson of participating in the racially-based work stoppage. When Ms. Ochoa was deposed, **she did not know and could not provide the name of the individual whom she claimed had knowledge of this unauthorized work stoppage.** (See Exhibit 7, pp. 34-5.) The only reason for including the plaintiff in this group was that all other African-American workers were absent from work on March 8, 2004, the plaintiff was absent from work on that date, and the plaintiff was African American (Id. pp. 36-7, 43-4.)

The labor relations representative, Rebecca Oster, testified to the same effect. (See Exhibit 8, pp. 10-11.) She knew that all workers disciplined were African-American because she was told so by Ms. Ochoa. (Id. p. 20.) She denied knowing the identity of the individual who was the source of information about an unauthorized work stoppage. (Id. pp. 23-4.) She also stated that it wouldn't have made any difference to her whether the plaintiff was legitimately ill or not. That is because she had decided that the plaintiff was lying about not participating in this illegal work stoppage. (Id. pp. 15-17.)

After Delphi's "investigation," Donna Wilson was suspended for four weeks (reduced to two weeks), removed from her position as a machine operator and placed on the line. She was denied any opportunity for overtime. Also, she was informed that she could not return to work in Plant 6, Department 32-1. Finally, she was placed on probation for six months.

During 2004, Donna Wilson's income was approximately seventy-five thousand dollars ($75,000.00), approximately thirty thousand dollars ($30,000.00) less than the previous year. Hence, the economic impact was clear.

Donna Wilson found this incident so upsetting that she sought professional counseling. After 28 ½ years of faithful and discipline-free, if not exemplary, service, Donna Wilson found it

mortifying that management would simply assume that she was lying and treat her as if she were lying without any evidence that she was a participant in this alleged conspiracy. It is undisputed that Rebecca Oster, age 26, had never before even experienced an illegal work stoppage. Nevertheless, she testified that, "in her experience," the plaintiff must have been involved, because all of the other African-Americans were absent from work. When asked if it made any difference to her that the plaintiff might, in fact, have been ill, she stated, "Probably not." It is this type of attitude which the plaintiff found so psychologically disturbing. She testified that she cried repeatedly for months afterwards. She is now taking an anti-depressant medication (Paxil) and continues to receive therapy.

**Analysis**

This action was brought in state court in Michigan under the Elliott-Larsen Civil Rights Act (ELCRA). The ELCRA prohibits employers from basing employment decisions on race. MCLA 37.2202; MSA 3.548(202). The ELCRA prohibits an agent of an employer from discriminating against persons because of race. *In re Lewis*, 845 F2d 624 (6th Cir, 1988).

Generally, Michigan courts use the "shifting burden" analysis set forth in *McDonnell-Douglas Corp. v Green*, 41 US 792; 93 SCT 1817; 36 LED 2d 668 (1973) in evaluating discrimination claims under the ELCRA. Michigan courts have held that federal precedent, while not binding, is persuasive authority. *Featherly v Teledyne Industries*, 194 Mich App 352, 357-8 (1982) (age discrimination).

There is no dispute that the plaintiff establishes a prima facie case under the *McDonnell Douglas* formula. Delphi does not dispute that the plaintiff is a member of a protected class, that

she was qualified for her position, that she suffered an adverse employment action, and that she was treated differently than other similarly situated employees. Thus, it is undisputed that the plaintiff is an African-American, that she was qualified for her position as a machine operator, that she suffered an adverse employment action including suspension, and that similarly-situated persons who were not in a protected class were treated differently than the plaintiff (off-work slips provided by physicians for medical treatment are honored).

If the plaintiff successfully proves her prima facie case, the burden of production, but not proof, shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 US at 802. If the defendant meets its burden of production, the presumption arising from plaintiff's prima facie case drops away. *St. Mary's Honor Ctr v Hicks*, 509 US 502 (1993). To prevail at that point, the plaintiff must carry the ultimate burden of persuasion by proving by a preponderance of evidence that the defendant intentionally discriminated against her because of membership in the protected class. *United States Postal Service Board of Governors v Aikins*, 460 US 711, 715-716 (1983); *Texas Department of Community Affairs v Burdine*, 450 US 248, 252-256; *McDonnell Douglas*, 411 US 802-805; *Lytle v Malady*, 458 Mich 153, 579 NW 2d 906 (1998). The plaintiff must prove that the reason articulated is a pretext for discrimination. *Hicks*, 509 US 504-516; *Lytle*, 458 Mich 174.

In the instant cause, Delphi claims that Donna Wilson was a member of a conspiracy to participate in an unauthorized strike. Delphi uses syllogistically simple reasoning: All black workers were missing from work on March 8, 2004, in protest over the firing of Tommie Gipson, the shift supervisor; the plaintiff is a black worker who was missing from work on March 8, 2004; the Plaintiff must have been involved in the conspiracy to miss work on March 8, 2004.

However, **no** evidence of a conspiracy has ever been produced.  The plant manager, Leigh Ochoa, was deposed extensively and was asked repeatedly to provide a basis for her conclusion that the plaintiff participated in this unauthorized strike.  She stated that she did not know the source of the information that an unauthorized strike was occurring.  She identified the labor relations representative, Rebecca Oster, as the source of her information that an unauthorized strike was taking place.

Rebecca Oster denied knowing the individual who was the source of the individual about an unauthorized work stoppage.  She testified that the person who would know was the plant manager, Leigh Ochoa.

In effect, Leigh Ochoa and Rebecca Oster have created a miniature "Mr. Tweed's Ring" to support Delphi's claim of a conspiracy by the plaintiff and the other African-American workers to conduct an unauthorized work stoppage. However, it is undisputed that absolutely **no** evidence has ever been produced that there was such conspiracy.  Hence, Delphi's alleged legitimate nondiscriminatory reason is not supported by any evidence, begs the question of the plaintiff's involvement, and, in short, is false.

More to the point, Delphi has produced no evidence of an unauthorized work stoppage by Donna Wilson.  She presented an off-work slip from her physician, Dr. Pietrus.  That off-work slip was verified with Dr. Pietrus' office.  She had previously treated for a breast infection.  Moreover, Donna Wilson called in sick and received a call in number.  She indicated she was taking a sick day. When she returned to work, she presented her off-work slip to management, where it was rejected and she was charged with participating in the illegal work stoppage.  It would certainly appear that Donna Wilson was treated differently than all other workers who present off-work slips from their

physicians in order to return to work.

The only reason for rejecting Donna Wilson's return to work slip was because a decision was reached that she was participating in an unauthorized work stoppage by African-American workers. The only common thread linking all of those workers and Donna Wilson is that they are all African-American. Hence, the syllogistic reasoning of Delphi: All African-American workers were missing from work on March 8, 2004; Donna Wilson is an African-American worker missing from work on March 8, 2004; therefore, Donna Wilson must have been missing from work on March 8, 2004, because she was participating in an unauthorized work stoppage (of which Delphi admits to have no evidence).

Pretext may be shown directly or indirectly. *Seay v Tennessee Valley Authority*, 339 F3d 454, 463 (6th Cir, 2003), quoting *Hopson v Daimler Chrysler Corporation*, 306 F3d 427, 434 (6th Cir, 2002). When there is no direct evidence of pretext, a plaintiff may establish pretext indirectly, "by showing that the employer's proffered explanation is unworthy of credence." *Cline v Catholic Diocese of Toledo*, 206 F3d 651, 667 (6th Cir, 2000), quoting *Burdine*, 450 US 256. In *Manzer v Diamond Shamrock Chemicals Co.*, 29 F3d 1078, 1084 (6th Cir, 1994), a framework is described providing for three separate methods to demonstrate pretext indirectly. See Peters v Lincoln Electric Co., 205 F3d 456, 471-472 (6th Cir, 2002); Gray v Toshiba American Consumer Products, Inc., 263 F3d 595, 600 (6th Cir, 2001). To make a submissible case on the credibility of the employer's explanation, the plaintiff is required to show (1) that the proffered reason had no basis in fact; or (2) that it did not actually motivate the challenged conduct; or (3) that it was insufficient to warrant the conduct.

In the instant cause, this case falls squarely under the "first" type of showing. Despite six

months of discovery and countless depositions, no evidence was ever produced by Delphi of any conspiracy relating to a work stoppage. As importantly, no evidence was produced that Donna Wilson participated as a co-conspirator in an unauthorized work stoppage. Hence, there is no basis to sanction Donna Wilson for taking a sick day on March 8, 2004. She was simply implicated because of the color of her skin, because she was absent when all other African-American workers on her particular shift were absent. Her doctor's excuse was ignored. The proffered reason of Delphi is false and a pretext for discrimination.

**Damages**

Sara Terry-Moton, CSCU, has served as Donna Wilson's therapist over the last 2½ years. She will testify to Donna Wilson's extreme mental distress, shock and outrage over this event and her continuing residuals. (See Exhibit 9.) A unanimous five-figure case evaluation in state court demonstrates that this case is meritorious **and** has significant settlement value. This is not a "nuisance value" case.

**Conclusion**

The plaintiff is a woman who tried her best to do her best for her employer. Twenty-eight-and-a half years of trying her best and doing her best proved insufficient for her employer to treat her as an individual and with respect. In the words of Mr. Cozzolino, the union representative, there was not one shred of evidence in support of an illegal work stoppage. None was produced during discovery and none has been produced to date. More importantly, there is absolutely **no** evidence that Donna Wilson participated in a work stoppage, had knowledge of it, was not sick, or had not

appropriately treated with her family physician for a breast infection. There was **no** evidence that she did not appropriately notify Delphi of her medical condition or appropriately provide a work slip which was verified. If, as Delphi maintains, it had a legitimate nondiscriminatory reason for taking the action that it did for the alleged striking workers, that begs the question whether Donna Wilson was a participant. Phrased another way, what is the legitimate nondiscriminatory reason for disregarding Donna Wilson's doctor's slip and sanctioning her for taking a sick day? This claimed defense is a mere pretext to justify the warrantless sanctioning of Donna Wilson based on the color of her skin.

This is a claim that should be heard by a jury. Like most civil rights claims, it is fact-sensitive. There is no smoking gun. Numerous depositions were taken over six months. Properly presented, it will involve the testimony of a family physician, a psychiatrist and a certified social worker who has functioned as Ms. Wilson's therapist for the last 2½ years. As a result, Donna Wilson would consent to a remand of this case to state court to determine damages by a jury, subject to a cap on damages in the amount of two hundred fifty thousand dollars ($250,000.00).

Respectfully submitted,

MAHLBERG, BRANDT, GILBERT
THOMPSON & BOMMARITO

By: 

THOMAS C. WIMSATT
Attorney for Donna Wilson

January 17, 2007

EXHIBIT

1

tabbies

# HENRYK C. PIETRUS, M.D.
## PROGRESS NOTES

Patient name *Donna Wilson*                    Birthdate 9-23-55

FEB 1 3 2004 — *Return ✓ — Having pain again in R Breast —*

02-13-04                         Donna Wilson

S:   Donna was seen today complaining of having pain in her right breast. She has had this in the past. She also stated that she had some discharge from the nipple. She denies any injury at this time and she denies fever.

O:   Blood pressure is 148/88. Pulse is 82. Temperature is 96.5. Weight 268 pounds. On examination of her right breast there are no masses and no cysts palpable; however, with pressure to the nipple I was able to obtain a greenish-yellowish discharge. Cultures were taken.

A:   Mastitis.

P:   The patient received a prescription for Keflex 500 mg 1 tablet p.o. t.i.d. and she will called with the report of her cultures. If it is not better she needs to call.

Henryk C. Pietrus, M.D.\vt-eeg  t:  02-16-04

2/23/04  Pt calling - finished Keflex - Still having discharge from nipple. Is any better. What should she do.  Rx R/A Sport   MBr

D Ultrasound

2/25/04  Msg x2 left for pt.                   MBr
3/4 Message left on answering service to call this office      J Hurd L
3/5 Message left to call —           J Hurd L
3-8-04 — No more discharge from nipple, but the breast feels very full & heavy —       DH On

03-08-04                         Donna Wilson

S:   Donna was seen today complaining of right breast pain, it feels tender. She stated that she had an ultrasound done and they recommended a mammogram and she has already scheduled the mammogram.

O:   Blood pressure is 150/88. Pulse is 82. Weight is 271 pounds. Chest is clear to auscultation. No wheezes or rhonchi appreciated. The right breast reveals no redness, however, she does have some tenderness and fullness, but no specific mass palpated. Chest is clear to auscultation. No wheezes or rhonchi appreciated.

A:   1.      Right breast pain.
     2.      Hypertension.

P:   The patient is scheduled for a mammogram, will be off of work 03-08-04, and received a prescription for Augmentin XR 1000 mg 1 tablet p.o. b.i.d.

Henryk C. Pietrus, M.D.\vt-eeg  t:  03-09-04

P12

EXHIBIT

2

Henryk C. Pietrus, M.D.
6940 Dixie Hwy
Bridgeport, MI 48722
989-746-0933  Fax: 989-746-5070

## CERTIFICATE TO RETURN TO WORK/SCHOOL:

Name: _Donna Wilson_

was under my care from _03-08-04_ to _03-08-04_

Return to work/school on _03-09-04_

REMARKS/LIMITATIONS: _Ø_

Dr. _Pietrus H. M.D_

Date: _03-08-04_



DEPOSITION
EXHIBIT
1
61505 mk

EXHIBIT

_3_

EXHIBIT

4

## Paragraph 76(a) Interview

Date: ___3/9/04___     Time: _5:54 pm_     Advisor: _B. E. Blossom_

<u>Diana Wilson</u>, this is a Paragraph 76(a) interview per the N/A. This interview is for the purpose of allowing you to give information, provide clarification and present answers to questions in regards to your potential violation of Paragraph 117 of the N/A that prohibits "any member of the Union take part in any sitdown, stay in or slow down, in any plant of the corporation or any curtailment of work or restriction of production or interference with production of the corporation." You are being interviewed for your involvement in the actions that occurred in department 32 on the B shift of March 8, 2004 that are in violation of Paragraph 117. These actions may result in discipline or termination of your employment.

Do you understand that the action of conspiring with other employees about not coming into work is a violation of the National Agreement?

*I understand but I didn't conspire with anyone.*

Why were you not at work on Monday, March 8, 2004?

*Sick*

Did you call into the system? If yes, what was your call-in #?

*Twice - I have them at home*

Do you have any documentation for your absence?

*yes. I have a paper from the doctor.*

What other department 32 employees did you talk with about not showing up to work on March 8, 2004?

*I didn't talk to anyone about not showing up to work.*

We've been told that you've talked with the following employees about not coming to work on Monday March 8, 2004: Murry Culberson, Daniel Clapp, Eva Gross, Marcus Brown, Russell Kubik, Linda Johnson, Kareem Vaughn, Bruce Simmons, Kenneth Williams, Guy Wonch, Stanley Waters, and Eugene Jones.

*That is a complete lie. I don't even talk to Dan or Guy. Jesus Christ!*

Why would someone tell us that you and other department 32 employees talked about not coming to work on Monday March 8, 2004?

*I don't know what is going on. I have been sick for the last three months under doctors care. I'm not part of this. I don't even talk to Guy. I'm not about*

Why did employees in your department decide not to come into work on March 8, 2004?

*I don't know anything about anyone else, just me.*

Did your absence have anything to do with the separation of Tommie Gipson from his employment at Delphi?

*I don't give a dam about Tommie, why do I care about Tommie, I don't even know Tommie.*

Did you speak with Murry Culberson Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't*

Did you speak with Murry Culberson Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *X Saturday I worked 12 hrs*

Did you speak with Murry Culberson Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *I don't speak I seen him on Saturday*

Did you speak with Tommie Gipson Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No. This is crazy. I didn't speak with anyone*

Did you speak with Tommie Gipson Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Tommie Gipson Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *This is terrible.*

Did you speak with Daniel Clapp Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't speak with anyone He told me on*

Did you speak with Daniel Clapp Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *Saturday that he will see me on Monday.*

Did you speak with Daniel Clapp Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Eva Gross Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I haven't talk to Eva in two or three weeks. She*

Did you speak with Eva Gross Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *was on telling a lie.*

Did you speak with Eva Gross Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Marcus Brown Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *I talk to no one about not coming in*

Did you speak with Marcus Brown Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Marcus Brown Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Stanley Waters Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No, I don't think I seen Stan on Friday.*

Did you speak with Stanley Waters Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *I don't have Stans phone # & I didn't speak w. h*

Did you speak with Stanley Waters Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *...him on Saturday. No I did not*

Did you speak with Russell Kubik Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No, I did not. I didn't even talk to Russ.*

Did you speak with Russell Kubik Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Russell Kubik Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Eugene Jones Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No, I didn't talk to Eugene about not working*

Did you speak with Eugene Jones Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Eugene Jones Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *I got ok Sun. No*

Did you speak with Linda Johnson Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No*

Did you speak with Linda Johnson Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Linda Johnson Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *Got ok Sun either days   No*

Did you speak with Kareem Vaughn Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No  I didn't*

Did you speak with Kareem Vaughn Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *No*

Did you speak with Kareem Vaughn Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Bruce Simmons Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No  I didn't*

Did you speak with Bruce Simmons Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Bruce Simmons Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?  *No   I didn't.*

Did you speak with Kenneth Williams Friday March 5, 2004 about not coming to work on Monday March 8, 2004?  *No   I didn't*

Did you speak with Kenneth Williams Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Kenneth Williams Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?  *No   I didn't*

Did you speak with Guy Wonch Friday March 5, 2004 about not coming to work on Monday March 8, 2004?  *I don't think I seen Guy on Friday. No, I didn't*

Did you speak with Guy Wonch Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Guy Wonch Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?  *No, I didn't.*

*If they answer negatively to all the above questions:* Did you talk with Murry Culberson Sunday, March 7, 2004 about not coming to work on Monday, March 8, 2004?

*No I did not*

Why would Management be told that Department 32 employees talked about not coming into work on March 8, 2004 if it wasn't true?

*I don't know. I will be honest with you, I have always been by myself.*

For the record, do you have anything further that you would like to add?

*I really want to know why you are messing with me. You call me and make a threat to me. I'm sick. I'm not entitled to get sick. If someone told you that, bring them to me.*

Time out: *6:31 pm*                Time back: _____

This concludes the questions that we have.  We reserve the right to continue this interview if further information pertinent to this case comes available.

EXHIBIT

4

## Henryk C. Pietrus, M.D.
6940 Dixie Hwy
Bridgeport, MI 48722
989-746-0933  Fax: 989-746-5070

## CERTIFICATE TO RETURN TO WORK/SCHOOL:

Name: _Donna Wilson_

was under my care from _03-08-04_ to _03-08-04_

Return to work/school on _03-09-04_

REMARKS/LIMITATIONS: ____

Dr. _Pietrus H. M.D_

Date: _03-08-04_

Wilson, Donna F
3·10·04

363.64 4731
6321 A

Urgent/Rebecca

1:59 · 0.89 · 10.6

3/10
4:20  Kelly   excused by dr.?  yes
                sun dr?         "
        utco MR?                "

## Henryk C. Pietrus, M.D.
6940 Dixie Hwy
Bridgeport, MI 48722
989-746-0933  Fax: 989-746-5070

## CERTIFICATE TO RETURN TO WORK/SCHOOL:

Name: _Donna Wilson_

was under my care from _03-08-04_ to _03-08-04_

Return to work/school on _03-09-04_

REMARKS/LIMITATIONS: _Ø_

Dr. _Pietrus H. M.D_

Date: _03-08-04_

Seen & examined
by dr. on 3/8

3/10/04 Verified Chidler Par' Attendance 75644
( unable to work due to medical reason )



EXHIBIT
16

EXHIBIT

5





*SETTLED*
*3-15-04*

# Local 699
# Grievance Fact Sheet

PLEASE PRINT

1. Grievant's Name: _Donna Wilson_

2. Social Security No.: _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_

3. Address: _____

4. Phone No.: _____

5. Date: _____

Date Grievant Notified of Settlement _____

Shop Committeeperson: _Dave Schabel_

1. Plant: _6_          Grievance No.: _56423_

2. Department: _32_          Appeal Case No.: _____

3. Shift: _B_          Umpire Appeal Case: _____

4. Classification: _ED¢2_

5. Seniority: _____

Which Rep. Notified Grievant _____

When Notified _____

How Notified _____

District Committeeperson: _Sam Cozzolino_

Exact Wording of Grievance: _I PROTEST mgts excessive & unjust Discipline of 3-9 & 3-10-04. I WAS ILL And Brought in Doc. from my Doctor for 3-8-04. Union Demands mgt Return employee to Work, Clear Record, and Pay All lost WAGES including O.T._

Amendments
Shop Committee _____

Date Grievance Arose: _____

Date Grievance Was Filed: _____

Grievant's Foreman: _____

General Foreman: _____

Superintendent: _____

Rate of Pay $ _____ Per Hour _____

Cost of Living Per Hour $ _____

How Long Has Employee Been In Classification? _____

Has Employee Had Any Disciplinary Action On Record? _____ Yes _____ No          If Yes, List As Follows:

Rule No.: _____ Date: _____ Extent of Penalty: _____

EXHIBIT
17
ENGAD 800-631-6989

Who Is Involved In This Grievance? _Donna Wilson, Mgt, UAW_

When Did It Happen? _3-9-04_

Where Did It Occur? _PL + 6_

What Time of Day Did It Happen? _6:38 pm._

Why Is This A Grievance? _Mgt Handing out Discipline w/out any proof of wrong doing and they want to make a point._

What Do We Want? _Record Cleared, All Lost Wages_

Supervisor's Statement? _1 of the employees told us they had planned 3-8-04. (Rebecca ~~Pope~~)_

Grievant's Statement: _I was sick I went to the Doc. - I've been working 14 hrs a day. I did call in._

Your Observations: _① Mgt cannot proof there was a conspiracy they have nothing in writing
② these were all Black people and I believe mgt wanted to make a example out of them.
③ On any given day we have 6-8 people missing from a dept.
④ Met w/ Leigh O. at step ½. She made offer To settle griev. (see griev) I told her I would have to talk to Donna first_

Submitted By Grievance Handler: _Sam Gyl_

District: _15_          Shift: _B_

UNION NOTE: The above facts are basic requirements to the grievance procedure. They must be filled out.
Additional facts may be filled in on extra sheets and attached.

# DELPHI

☐ Delphi HQ          ☐ Interior System
☐ Energy & Chassis Systems   ☐ Packard Electric
☐ Harrison Thermal      ☒ Saginaw Steering

**EMPLOYEE GRIEVANCE FORM**

| DATE RECEIVED 3-10-04 | TIME | ☐ A.M. ☐ P.M. | PRESENTED ☐ VERBAL ☒ IN WRITING | NUMBER 5642 |

| NAME Donna Wilson | CLASSIFICATION E00Z | DEPT./SHIFT 32-B | ☐ DAY ☐ AFT. ☐ MID. | SOCIAL SECURITY NO. 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 | BADGE / CLOCK NO. |

GRIEVANCE / CONCERN:

I PROTEST mgts EXCESSIVE & uNJUST Discipline of 3-9 &
3-10-04. I WAS ILL AND Brought iN Doc. from my Doctor
for 3-8-04. UNioN Demands mgt Return employee to woRK, CLEAR Record,
AND PAY ALL LOST WAGES, INcludiNg O.T.

Donna R. Wilson  03-09-04

| EMPLOYEE SIGNATURE | DATE | SUPERVISOR'S SIGNATURE | DATE | COMMITTEE PERSON SIGNATURE  Sam Cyr | DATE 3-10-04 |

DISPOSITION BY SUPERVISOR:

Based on the 76a interview and the serious nature of the
violation the discipline was fair and just.

| SUPERVISOR'S SIGNATURE  Brian Edson  3-10-04 | DATE | ACTION ☐ SATISFACTORY ☒ UNSATISFACTORY | REFERRED  NEXT STEP  svc | DATE 3-10-04 | RIDER TO FOLLOW ☐ YES ☐ NO |

DISPOSITION BY HIGHER SUPERVISOR:

Management agrees to reduce discipline to BOST 2 weeks. Employee is to re-
ceive no lost wages. Infraction will be removed from employees record
in 6 months if no further violation of Para 117 occurs. Employee will be
assigned to a dept. other than 6321 at managements discretion. This disciplinar

| HIGHER SUPERVISOR'S SIGNATURE  LaOchoa 15 MAR04 | DATE | ACTION ☒ SATISFACTORY ☐ UNSATISFACTORY | REFERRED  Settled  svc | DATE 3-15-04 |

DISPOSITION BY SHOP COMMITTEE PERSON:

action will not be taken into account when assessing discipline for shop
rule violations other than Para 117 violations during the next 6 months

| COMMITTEE PERSON SIGNATURE | DATE | ACTION ☐ SATISFACTORY ☐ UNSATISFACTORY | REFERRED | DATE |

DISPOSITION BY MANAGEMENT:

| MANAGEMENT SIGNATURE | DATE | GRIEVANCE HAS BEEN: ☐ SATISFACTORILY SETTLED ☐ TURNED IN ☐ REFERRED BACK | ☐ EXTENDED ☐ WITHDRAWN ☐ APPEALED |

DAS0006 0103

**THE FOLLOWING INFORMATION MUST ACCOMPANY GRIEVANCES APPEALED TO THE BARGAINING COMMITTEE**

Have you shown the Supervisor's disposition to the aggrieved?_____   If not, please do and list additional information:_____

_____

_____

_____

_____

What other employees are affected?  (Other than the aggrieved):_____

_____

Name any witnesses:_____

_____

*(If possible, get individual signed statements from the witnesses)*

What has the past practice been in regard to similar violations?_____

_____

_____

Has a violation of this nature been called to the company's attention before?_____

_____

_____

When?_____   What action did the company then take?_____

_____

_____

Did the management make any effort to settle this problem in the oral discussion?_____

_____

_____

Did they make you an offer?_____   Exactly what were they willing to do?   _____

_____

_____

Which of the management's statements are true? _____

_____

_____

Which are false?_____

_____

_____

What do you think a reasonable settlement would be?_____

_____

_____

Any other suggestions or comments?_____

_____

---

**NOTE TO GRIEVANCE HANDLER**

Use the following pages to complete your written observations, comments, facts and results of your discussion with the grievant, management, and interviews with other witnesses.  REMEMBER:  This grievance committee fact sheet is **NOT** to be shown to any member of management.  It is the property of the union and should be kept with the union's records of this grievance.  (List anything else that you think would be helpful, even if you have to use additional paper.)

⑤ Talked to Donna 3-12-04 She Accepted offer by Leigh O.

⑥ Settled griev. on 3-15-04

⑦ Called Donna and told Her She was going To dept. 83. (3-18-04) Donna didn't Like Assignment

⑧ Talked to Leigh O. 3-19-04 She would not change where Donna was being Sent to

⑨ Talked to Donna 3-19-04. She Stated She wasn't Guilty and settlement made it Look as if She was. Wanted to Know what She Could do.
   I Told Her to Come back to Work as the griev. Was Settled and that She Could Appeal Settlement.

EXHIBIT

6

WILSON V. DELPHI

**DEPO. SALVATORE COZZOLINO**

JUL 1 3 2005

TAKEN: 6-16-05

SHEET 1    PAGE 1

1

1           STATE OF MICHIGAN

2      IN THE CIRCUIT COURT FOR THE COUNTY OF SAGINAW

3

4    DONNA R. WILSON,

5           Plaintiff,

6           vs.      File No. 04-54594-NZ-5
                         HONORABLE LEOPOLD P. BORRELLO

7    DELPHI CORPORATION,

8           Defendant,
                                                          /

9           Deposition of SALVATORE COZZOLINO, taken

10    in the above-entitled matter before Stenograph

11    Reporter, Jeanette L. Roberts, CSR-5275, at the

12    Offices of Ripka, Boroski & Associates, One Tuscola

13    Street, Morley Building, Saginaw, Michigan, 48607, on

14    Thursday, June 16, 2005, commencing at about 2:50

15    p.m.

16    APPEARANCES

17    CHAKLOS, JUNGERHELD, HAHN & WASHBURN, PC
           BY:  THOMAS C. WIMSATT, ESQ. (P31971)
18    5525 Colony Drive N
           Saginaw, Michigan 48608
19    (989) 790-0000

20           Appearing on behalf of the Plaintiff.

21    FOSTER, SWIFT, COLLINS & SMITH, PC
           BY: WILLIAM R. SCHULZ, ESQ. (P29147)
22    313 South Washington Square
           Lansing, Michigan 48933
23    (517) 371-8100

24           Appearing on behalf of the Defendant.

25    ALSO PRESENT:
           James Ling, Delphi Representative

WILSON V. DELPHI

**DEPO. SALVATORE COZZOLINO**

TAKEN: 6-16-05

SHEET 2   PAGE 2

2

1         INDEX OF WITNESSES
2    NAME                              PAGE
3
4    SALVATORE COZZOLINO
5
6    Examination by Mr. Wimsatt.....................3
7    Examination by Mr. Schulz.....................22
8    Further-examination by Mr. Wimsatt.............70
9    Further-examination by Mr. Schulz.............72
10
11              EXHIBITS
12
13   NUMBER                            PAGE
14
15   Deposition Exhibit Number 17...................9
16   Deposition Exhibit Number 18...................9
17   Deposition Exhibit Nbmer 19...................19
18   Deposition Exhibit Number 20..................19
19   Deposition Exhibit Number 21..................20
20   Deposition Exhibit Number 22..................21
21
22
23
24
25

PAGE 3

3

1              Saginaw, Michigan
2            Thursday, June 16, 2005
3                   -o0o-
4            SALVATORE COZZOLINO
5    CALLED BY THE PLAINTIFF AND SWORN, TESTIFIED:
6              EXAMINATION
7    BY MR. WIMSATT:
8    Q.   Mr. Cozzolino, my name is Tom Wimsatt, I represent
9    Donna Wilson.  Do you know Donna Wilson?
10   A.   Yes, I do.  I was her district committeeman.
11   Q.   You say you were or you are?
12   A.   I was.
13   Q.   Would you state your name and address for the record.
14   A.   Salvatore Cozzolino, 3702 State Street, Saginaw,
15   Michigan.
16   Q.   And how old are you, sir?
17   A.   Fifty-three.
18   Q.   What is your educational background?
19   A.   Skilled trades, some college.
20   Q.   Have you graduated from high school?
21   A.   GED.
22   Q.   And are you from this area?
23   A.   Yes, I am.
24   Q.   And then where did you attain college credit?
25   A.   Delta College.

PAGE 4

4

1    Q.   When you were getting college credit at Delta, was
2    this towards a degree program or was it general
3    classes or what?
4    A.   Started off for physician assistant and then I
5    switched and went under the apprenticeship program.
6    Q.   How long ago was that?
7    A.   '73 through '79.
8    Q.   For whom do you work, sir?
9    A.   Saginaw Delphi.
10   Q.   And what is your job title?
11   A.   Pipefitter.
12   Q.   Now, on March 8 of 2004, was that your job title?
13   A.   It was my job title.  I also had the job title as
14   district committeeman for district 26, B shift, class
15   six.
16   Q.   Was your employer Delphi on March 8th of 2004?
17   A.   Yes, it was.
18   Q.   So you weren't -- you're working for the union?
19   A.   As a union steward, a representative I guess.
20   Q.   I'm sorry.
21   A.   As a union steward or representative, yes.
22   Q.   But you weren't an employee of the union?
23   A.   No.
24   Q.   And as a district committeeman for district 26, B
25   shift, Plant 6, what were your duties?

PAGE 5

5

1    A.   Represent the contract for UAW.
2    Q.   And how do you do that?
3    A.   That's a good question.  Any violations of the
4    contract by Delphi, it is my job to correct it or
5    grieve it.
6    Q.   When did you stop being a district committeeman?
7    A.   Approximately a month ago.
8    Q.   How long were you a district committeeman?
9    A.   Ten years.  Actually, if I can correct that.  I was
10   an hourly committeeman, then I became a district
11   almost three years ago.
12   Q.   So total time would be ten years, and three years as
13   a district committeeman?
14   A.   Right.
15   Q.   Incidentally, have you ever given a deposition
16   before?
17   A.   No.
18   Q.   I got so caught up in getting started, I sort of
19   forgot my manners.  I'm asking you questions and
20   everything I ask is being taken down by the court
21   reporter to my right.  I would request that you
22   respond to my questions verbally so that the court
23   reporter can get down all of your answers.
24   A.   Right.
25   Q.   From time to time, you may say uh-huh or uhn-uhn or

**WILSON V. DELPHI**

**DEPO. SALVATORE COZZOLINO**

**TAKEN: 6-16-05**

SHEET 3   PAGE 6

**6**

1  nod your head or shake your head. And if you do so,
2  I'm very likely to say, is that a yes. I'm not being
3  rude, I'm just trying to --
4  A. Uh-huh, I understand.
5  Q. If you don't understand a question, say, I don't
6  understand it. It is okay to say I don't know. And
7  I don't want you to guess. Fair enough?
8  A. Fair enough.
9  Q. Do you have any personal knowledge that Donna Wilson
10  engaged in an unauthorized work stoppage?
11  A. No, I do not.
12  Q. How did you become involved in the alleged work
13  stoppage which occurred on March 8th of 2004?
14  A. I was called by Bryan Ehlman, general foreman at the
15  time, that he wanted to do a 76(a) interview on Donna
16  and other employees for missing work the day before,
17  that they considered the work stoppage -- or at the
18  time, I think the word was a wildcat strike.
19  Q. And what did you do when you received that phone call
20  from Mr. Ehlman?
21  A. Besides telling him he is crazy, I did the 76(a)
22  interviews.
23  Q. So you were present when the 76(a) interviews
24  occurred?
25  A. Yes, I was.

PAGE 7

**7**

1  Q. Did any individual say that Donna Wilson was involved
2  in an unauthorized work stoppage?
3  A. No.
4  Q. Did Donna Wilson admit to being involved?
5  A. No, she did not.
6  Q. You gotta let me finish my question. Did Donna
7  Wilson admit to being involvement in an unauthorized
8  work stoppage?
9  A. No, she did not.
10  Q. Did Donna Wilson inform Mr. Ehlman, in your presence,
11  that she had a doctor's certificate?
12  A. Yes, she did.
13  Q. Did she offer to produce her medical records in your
14  presence?
15  A. She offered the slip.
16  Q. Did she, at any point, offer to produce medical
17  records?
18  A. If I can look at --
19  Q. Sure. What is it that you're looking at?
20  A. Copy of the 76(a) interview. I don't have anything
21  about bringing in the medical records, just that she
22  had been sick for three months.
23  Q. Did Donna Wilson say to you at any point after the
24  76(a) interview that she would make her medical
25  records available?

PAGE 8

**8**

1  A. Not that I recall, no.
2  Q. Do you recall --
3  A. Not in my presence.
4  Q. Do you recall telling her that they weren't
5  interested in her medical records?
6  A. No, I don't. It may have came up as talking, you
7  know. She may have said something and I said they
8  don't care, as long as you have the slip.
9  Q. Having sat through all the 76(a) interviews, did you
10  reach an opinion that Donna Wilson was involved in an
11  illegal work stoppage?
12  A. No, I did not.
13  Q. Did you reach an opinion that the other workers were
14  involved in an illegal work stoppage?
15  A. No, I did not.
16  Q. What is a plan A?
17  A. Under plan A, employees are required to work nine
18  hours a day for two Sundays a month -- or two Sundays
19  in a row -- excuse me, not Sunday, Saturdays.
20  Q. So it would either be working nine hours a day during
21  a regular workweek, or a Saturday?
22  A. No.
23  Q. But it would be two Saturdays in a row?
24  A. Right. It would be nine hours during the week and
25  two Saturdays.

PAGE 9

**9**

1  MR. SCHULZ: That is as opposed to?
2  THE WITNESS: And/or, depending on the
3  company's --
4  Q. (BY MR. WIMSATT:) Is -- as a committeeman, would you
5  become involved in a violation of a plan A event by
6  workers?
7  A. A violation of plan A by workers?
8  Q. Yeah.
9  A. Only if management decided to put those people on
10  notice, write them up.
11  Q. So if a plan A were to be called, and if all the
12  white workers in the department determined not to
13  show up on any given Saturday, the only way you would
14  become involved were if management were to do
15  something about that?
16  A. Right.
17  Q. Otherwise, you wouldn't know about it?
18  A. No, I would not.
19  Q. I see you have a file before you. Could I see that
20  file, please.
21  MR. SCHULZ: Tom, when you're done if you
22  could just pass the pages down.
23  (Whereupon a short recess was held.)
24  (Whereupon Deposition Exhibits Numbers 17
25  and 18 were marked for identification.)

**WILSON V. DELPHI**

## DEPO. SALVATORE COZZOLINO

TAKEN: 6-16-05

SHEET 4  PAGE 10

**10**

1  Q.  (By MR. WIMSATT:) Mr. Cozzolino, I have requested
2  the opportunity to look at the file which you
3  brought, and you very graciously showed me that file.
4  We've marked the contents of the file. Turning first
5  to what has been marked as Deposition Exhibit 17,
6  that is -- roughly speaking, it is about five pages
7  of print that is entitled Local 699 grievance fact
8  sheet. Is that correct?
9  A.  Yes.
10  Q.  And we don't -- some of the pages are back to back,
11  so what we have are individual sheets and you have a
12  document that has kind of been stapled together?
13  A.  Right.
14  Q.  Page two of that document on my copy begins, who was
15  involved in this grievance. And it has Donna Wilson,
16  management, UAW. Is this your writing?
17  A.  Yes, it is.
18  Q.  And that -- is this your writing throughout this
19  particular Exhibit?
20  A.  Yes, it is.
21  Q.  Okay. Is this your conclusion when it says -- where
22  it says, why is this a grievance, and it -- is this
23  your conclusion about why it is a grievance?
24  A.  Yes, it is.
25       MR. SCHULZ:  I'm sorry, where are you?

PAGE 11

**11**

1       MR. WIMSATT:  About one-third of the way
2  down on page two.
3  Q.  (By MR. WIMSATT:) What did you write here?
4  A.  Management --
5       MR. SCHULZ:  I'm sorry, I have no idea
6  where you are.
7       MR. WIMSATT:  Right here.
8       MR. SCHULZ:  I'm sorry. Go ahead,
9  witness.
10  Q.  (By MR. WIMSATT:) Does MGT stand for management?
11  A.  Yes.
12  Q.  So you have written -- correct me if I'm wrong --
13  management handing out discipline without any proof
14  of wrongdoing, and they want to make a point?
15  A.  Yes.
16  Q.  What did you mean by that?
17  A.  At the time that this was written, this was
18  happening, management buffaloed and railroaded these
19  people through a 76(a) interview and determined that
20  they were all suspended, and walked out of the office
21  at the end of each interview and within a
22  minute-and-a-half or two minutes walked back in with
23  a disciplinary paper, and you have 30 days off work.
24  It was not enough time to take each case
25  individually, go back, fill one of these out and come

PAGE 12

**12**

1  back and present it. They had to have had it
2  prewritten before they went in. They had
3  predisposition on these.
4  Q.  So you're saying that they had decided what the
5  discipline would be before they conducted the 76(a)
6  interview?
7       MR. SCHULZ:  Objection, foundation. Go
8  ahead.
9       THE WITNESS:  I believe that they had
10  these people convicted before they ever talked to
11  them.
12  Q.  (BY MR. WIMSATT:) Right below that -- or two
13  questions before that there is a question, supervisor
14  statement. What did you write?
15  A.  One of employees told us they had planned 3/8/04.
16  And this was from Rebecca, the labor rep.
17  Q.  This would be Rebecca Oster?
18  A.  Yes.
19  Q.  So she told -- she told you --
20  A.  She told me.
21  Q.  -- that one of the employees told us, meaning
22  management?
23  A.  Management.
24  Q.  Or her?
25  A.  Told management.

PAGE 13

**13**

1  Q.  That this was a planned work stoppage?
2  A.  Yes.
3  Q.  Did she identify who that employee was?
4  A.  No, she did not.
5  Q.  Did you ask?
6  A.  Yes.
7  Q.  And what did she tell you?
8  A.  I was told by both her and Leigh Ochoa, which is the
9  superintendent for the area, that at that time they
10  would not tell me who the person was, but if the
11  grievances went farther they would present that
12  person to the shop committeeman.
13  Q.  Have you ever found out who that person was?
14  A.  No, I have not.
15  Q.  And has it ever been revealed to you or anyone else
16  associated with the union?
17  A.  No.
18       MR. SCHULZ:  I'll object to any testimony
19  about anyone else. Certainly he can say what he was
20  told.
21  Q.  (By MR. WIMSATT:) Well, to your knowledge?
22  A.  To my knowledge, no.
23  Q.  The grievance statement is apparently what Donna
24  Wilson said in your presence, that she was sick, she
25  went to the doctor --

**WILSON V. DELPHI**

**DEPO. SALVATORE COZZOLINO**

TAKEN: 6-16-05

SHEET 5  PAGE 14

**14**

1  A.  Yes.
2  Q.  -- et cetera?
3  A.  Yes.
4  Q.  Are these your observations at the bottom of this
5       page?
6  A.  Yes, they are.
7  Q.  And turning to item number two, you've written, these
8       were all black people, and I believe management
9       wanted to make an example out of them.  Why?
10      MR. SCHULZ:  Objection, foundation.
11 Q.  (By MR. WIMSATT:)  You can answer.
12 A.  As stated on number three in this, on any given day
13      on any line or any department, there can be six/eight
14      people missing for different reasons and nothing is
15      said, they are each taken on an individual case.
16      Whereas these people, they came to work on Tuesday,
17      they took them right off their jobs as a group, put
18      them into a room, segregated them from everybody and
19      told them to stay there until their 76(a) was done.
20      And as they got done, Bryan Ehlman would walk out of
21      the office, be gone two minutes, and walk back in
22      with a paper all filled out.
23 Q.  Did you participate in 76(a) interviews involving
24      Betty Stange?
25 A.  No, I did not.

PAGE 15

**15**

1  Q.  Because we have -- it would appear that Bryan Ehlman
2       conducted only three 76(a) interviews.
3  A.  Excuse me, yes, Bryan Ehlman did.
4  Q.  Then Betty Stange took over and conducted the
5       balance?
6  A.  Right.  As Bryan Ehlman had -- was going home at that
7       time, Betty Stange took over.
8  Q.  And did you participate -- or were you present for
9       the Betty Stange 76(a) interviews?
10 A.  Yes.
11 Q.  Did she also complete the interview, walk out and
12      return within a minute or two --
13 A.  Yes.
14 Q.  -- with the discipline?
15 A.  Yes.
16 Q.  Explain to me what you mean in number 4 where it
17      says, met with Leigh -- is that Ochoa?
18 A.  Yes.
19 Q.  And it says, at step-and-one-half.  What does that
20      mean?
21 A.  Step and a half.  If you notice on the employee
22      grievance form, the first part is the grievance that
23      I wrote.  The second part, disposition by supervisor,
24      was Bryan Ehlman's statement or his disposition on my
25      grievance.  That is the first step.  Step-and-a-half.

PAGE 16

**16**

1       I met with Leigh Ochoa, which is the next step in the
2       process.
3  Q.  And then that grievance is, in fact, the third page
4       of this particular Exhibit?
5  A.  Yes.
6  Q.  There is nothing written on the fourth page and on
7       the fifth page, which is in the nature of the
8       supplemental.  It continues with the list that you
9       started on page 3?
10 A.  Yes.
11 Q.  When you talked with Donna Wilson on March 19th --
12      this would be number nine -- did you make this note
13      immediately after you talked with her?
14 A.  Yes, I did, probably within five or ten minutes.
15 Q.  And based upon your information, based upon your
16      recollection of that conversation, she indicated that
17      she wasn't guilty and the settlement made it look as
18      if she were?
19 A.  Yes.
20 Q.  So she apparently wanted to know what she could do?
21 A.  Uh-huh.
22 Q.  That is a yes?
23 A.  As far as taking it further.
24 Q.  That is a yes?
25 A.  Yes.

PAGE 17

**17**

1  Q.  Okay.  And -- because you said uh-huh.
2  A.  Oh, okay.
3  Q.  And what did you tell her?
4  A.  I told her at that time that she could appeal my
5       settlement with the upper union.
6  Q.  Was she upset?
7  A.  She was upset with the department that they were
8       sending her to.
9  Q.  Let me show you what's been marked as Deposition
10      Exhibit 18, also from your records.  Could you
11      identify that for the record, please.
12 A.  Number 18 is a copy of the suspension of Donna
13      Wilson, also a copy of the disciplinary layoff of
14      Donna Wilson.
15 Q.  That would be signed by Rebecca Oster, the second
16      one?
17 A.  The second one, yes.
18 Q.  And what is the next page?
19 A.  Next page is employee 72-week history that shows on
20      Monday, even though she had a doctor's slip, they
21      give her an unacceptable code on Monday, and
22      disciplinary action after that.
23 Q.  And then what is the next page?
24 A.  Next page is a copy of the grievance that I have and
25      the fax sheet.

RIPKA, BOROSKI & ASSOCIATES, L.L.C.
(800) 542-4531  (810) 234-7785  FAX: (810)234-0660

**WILSON V. DELPHI**

## DEPO. SALVATORE COZZOLINO

TAKEN: 6-16-05

SHEET 6  PAGE 18

**18**

1  Q.  And then what is the next page?
2  A.  Next page is a copy of a committeeman call that was
3      taken after department -- or Donna came back to the
4      plant and was moved to Department 83. Committeeman
5      was Steve Lapeak this time.
6  Q.  So this isn't your writing?
7  A.  No.
8  Q.  What is the next page?
9  A.  Next six pages are the 76(a) interview that Bryan
10     Ehlman took on 3/9 with Donna Wilson.
11  Q.  Were you given a copy of the document that Mr. Ehlman
12      was working from?
13  A.  I was -- did not.
14  Q.  Did you see that he was reading questions from that
15      document?
16  A.  He had some questions in front of him and he
17      ad-libbed at times.
18  Q.  Let me show you what's been previously marked as
19      Deposition Exhibit 4. Does that look like the
20      document that Mr. Ehlman had in front of him?
21  A.  Yes, and I believe you will -- the other people were
22      in here, they would have had one the same way, all
23      typed up like that.
24  Q.  Is that unusual for 76(a) interviews to be typed up
25      like that?

PAGE 19

**19**

1  A.  Yes, it is.
2  Q.  Do you know who typed this up?
3  A.  No, I do not.
4  Q.  How unusual is that?
5  A.  Very.
6  Q.  Are most 76(a) interviews conducted without the
7      benefit of a sheet like this?
8  A.  Most sheets for a 76(a) interview will come basically
9      a short paragraph stating -- and that would be a
10     fill-in, what the violation was, and do the people
11     understand what a 76(a) interview is.
12  Q.  Let me show you the next item, which we're going to
13      mark as Exhibit 19.
14          (Whereupon Deposition Exhibit Number 19
15      was marked for identification.)
16  Q.  (BY MR. WIMSATT:) What is this document, sir?
17  A.  This is basically a note that I had to myself after I
18      talked to Leigh Ochoa, and I tried to reach each one
19      of these people at home to call them and let them
20      know what was being offered and ask them if --
21      whether or not they wanted to accept it or if they
22      wanted me to push further with their grievances.
23          (Whereupon Deposition Exhibit Number 20
24      was marked for identification.)
25  Q.  (BY MR. WIMSATT:) Okay. Let me show you what's been

PAGE 20

**20**

1      marked as Deposition Exhibit 20, also from your
2      file. What is this, sir?
3  A.  Before --
4          MR. SCHULZ:  What order should this be
5      in, number 20.
6          THE WITNESS:  I believe Gene was the
7      first person I talked to.
8          MR. SCHULZ:  Thank you.
9          THE WITNESS:  This is just some notes
10     that I made. I talked to each person before the
11     76(a) interviews started and asked them why they were
12     absent from work and what was going on, and this is
13     just a short statement from each one of why they had
14     missed work that day.
15  Q.  (BY MR. WIMSATT:) What did Donna Wilson tell you?
16  A.  Donna, she was sick, she went to the doctor, she had
17      been working 14 hours a day, she had documentation
18      for missing work, she still needed lab work on 1/16,
19      1:30 p.m. Did call in to work saying she would be
20      absent, and do not call her at home as her -- she has
21      a sick father.
22          (Whereupon Deposition Exhibit Number 21
23      was marked for identification.)
24  Q.  (BY MR. WIMSATT:) Let me show you what's been
25      marked as Exhibit Number 21. Can you identify that

PAGE 21

**21**

1      for the record, please?
2  A.  This is from a call with Steve Lapeak.
3  Q.  This isn't your handwriting?
4  A.  No.
5  Q.  And then finally let me show you what's been marked
6      as Deposition Exhibit --
7          (Whereupon Deposition Exhibit Number 22
8      was marked for identification.)
9  Q.  (BY MR. WIMSATT:) Can you identify what has been
10      marked as Deposition Exhibit Number 22?
11  A.  These are notes I made of a talk I had with Donna
12      Wilson on 3/26/04 after she was back to work.
13  Q.  And would it be fair to say that she was agitated
14      with the result of the settlement?
15  A.  In the beginning, talking to her, no, she was calm.
16      As we talked, she became more and more agitated,
17      upset.
18  Q.  And as I understand it from -- is this all in your
19      writing?
20  A.  Yes.
21  Q.  As I understand it, she left the office, and did she
22      come back and continue to pursue this issue with you?
23          MR. SCHULZ:  I'm sorry --
24          THE WITNESS:  During this time?
25  Q.  (BY MR. WIMSATT:) No, after this time. Eventually

**EXHIBIT**

7

WILSON V. DELPHI

**DEPO. LEIGH OCHOA**

JUL 1 3 2005

**TAKEN: 6-16-05**

SHEET 1   PAGE 1

1

```
1            STATE OF MICHIGAN

2     IN THE CIRCUIT COURT FOR THE COUNTY OF SAGINAW

3

4    DONNA R. WILSON,

5          Plaintiff,

6          vs.      File No. 04-54594-NZ-5
                         HONORABLE LEOPOLD P. BORRELLO
7    DELPHI CORPORATION,

8          Defendant,
     _____/

9          Deposition of LEIGH OCHOA, taken in the

10   above-entitled matter before Stenograph Reporter,

11   Jeanette L. Roberts, CSR-5275, at the Offices of

12   Ripka, Boroski & Associates, One Tuscola Street,

13   Morley Building, Saginaw, Michigan, 48607, on

14   Thursday, June 16, 2005, commencing at about 11:10

15   a.m.

16   APPEARANCES

17   CHAKLOS, JUNGERHELD, HAHN & WASHBURN, PC
         BY:  THOMAS C. WIMSATT, ESQ. (P31971)
18   5525 Colony Drive N
         Saginaw, Michigan 48608
19   (989) 790-0000

20          Appearing on behalf of the Plaintiff.

21   FOSTER, SWIFT, COLLINS & SMITH, PC
         BY: WILLIAM R. SCHULZ, ESQ. (P29147)
22   313 South Washington Square
         Lansing, Michigan 48933
23   (517) 371-8100

24          Appearing on behalf of the Defendant.

25   ALSO PRESENT:
         James Ling, Delphi Representative
```

**RIPKA, BOROSKI & ASSOCIATES, L.L.C.**
**(800) 542-4531  (810) 234-7785  FAX: (810)234-0660**

WILSON V. DELPHI

**DEPO. LEIGH OCHOA**

TAKEN: 6-16-05

SHEET 10    PAGE 34

**34**

1    him or with Rebecca.
2   Q.  In the sense of reviewing what had been written down?
3   A.  Uh-huh.
4   Q.  That is a yes?
5   A.  Yes. I'm sorry.
6   Q.  Who drafted the questions that were used on the 76(a)
7    interviews?
8   A.  I don't know.
9   Q.  Did you review those questions?
10         MR. SCHULZ:  You mean before they were
11    used at the 76(a) or when they were answered?
12   Q.  (By MR. WIMSATT:)  When you looked at the 76(a)
13    interviews, to the extent you looked at them, did you
14    look at the questions?
15   A.  Yes.
16   Q.  Let me show you what's been marked as Exhibit Number
17    4.  Turn to the questions -- is there something that
18    I'm --
19   A.  The Diane Wilson showed up again on her 76(a).
20   Q.  Actually, it is showing up as Diana Wilson.
21   A.  Or Diana.
22   Q.  About the 7th question down, it says we've been told
23    that you've talked with the following employees about
24    not coming to work on Monday, March 8.  Who told you
25    that Donna Wilson had talked with the following

PAGE 35

**35**

1    employees about not coming to work?
2   A.  No one told me.
3   Q.  Do you have any knowledge as to who that was?
4   A.  No.
5   Q.  Pardon?
6   A.  No, I don't.
7   Q.  Is there a reason why Murry -- there is a question
8    about whether Donna Wilson talked with Murry
9    Culberson about not coming in to work at the top of
10    page two.  And then one of those questions is
11    repeated in the middle of page four.  It says, did
12    you talk with Murry Culberson about not coming to
13    work on Monday, March 8th.  Is there a reason why the
14    same question is asked twice relating to Murry
15    Culberson?
16   A.  I don't know.
17   Q.  Right below that question it says, why would
18    management be told the Department 32 employees talked
19    about not coming in to work if it was not true.  Who
20    told management that these workers had talked about
21    not coming in to work?
22   A.  I don't know.
23   Q.  So you have no knowledge about who that informant
24    was?
25   A.  I couldn't give you a definite name of a person, no.

PAGE 36

**36**

1   Q.  Now, when Donna Wilson was questioned by Mr. Ehlman,
2    she denied involvement in any illegal work stoppage
3    several times in this interview.  And he asked her
4    where she was, and she said she was sick and at a
5    doctor's appointment.  When you decided that it was
6    appropriate for her to be suspended, were you aware
7    of her denials?
8   A.  Yes.
9   Q.  And why is it, then, that you decided to suspend her?
10   A.  I need to change that.  The suspension -- the initial
11    suspension, I was not aware of --
12   Q.  I'm talking about the discipline.
13   A.  The discipline, yes, I was aware.
14   Q.  So why was it you decided to discipline her anyway?
15   A.  Because I believe it was nine out of twelve or
16    thirteen employees chose to not come in to work, it
17    was seventy-five, eighty percent of the department.
18    You know, they -- I agree they did deny that they in
19    any way, shape or form had an agreement that they
20    weren't going to come in to work.  To my knowledge,
21    there had been at least one and maybe two
22    employees -- I do not know their names -- who had
23    informed management that they had been approached and
24    told that they were gonna teach me a lesson and not
25    come in to work, for firing Tommie Wilson.  And,

PAGE 37

**37**

1    again, never in my career or experience had I had
2    that percentage of the department chose to not come
3    in to work at the same time.
4   Q.  And you assumed because she didn't come in to work
5    she was part of the group?
6   A.  Correct.
7   Q.  And that would be true notwithstanding the fact that
8    she had a doctor's certificate which had been
9    verified?
10   A.  I'm sorry.
11   Q.  That would be true despite the fact that she had a
12    doctor's certificate that had been verified?
13         MR. SCHULZ:  Objection, she hasn't
14    indicated -- this witness hasn't indicated she was
15    aware of the certificate, or verification of the
16    certificate.
17   Q.  (By MR. WIMSATT:)  Were you aware of a certificate,
18    doctor's certificate?
19   A.  I don't know if I was or not.  You're talking about
20    the day after when we decided to assess the
21    discipline?  I don't know.  I don't know if I knew
22    who had slips and who didn't.  In fact, I didn't know
23    who didn't have slips.  I knew some employees had
24    slips, I knew some did not.
25   Q.  Well, if you knew that she had a slip, a doctor's

WILSON V. DELPHI

**DEPO. LEIGH OCHOA**

TAKEN: 6-16-05

SHEET 12  PAGE 42

PAGE 44

**42**

1  Q.  She may have worked overtime, but she didn't work for
2  him.
3  A.  In that capacity, she would have worked for him. I
4  don't know who she reported to during the hours that
5  she worked in that department. No, I don't know
6  that.
7  Q.  Would it surprise you if she would have worked for
8  Dan Ridlewski and not Tommie Gipson in those hours
9  when she worked overtime?
10 A.  The way our shift structure works -- and I don't know
11 what shift structure she had been on, but the
12 employees -- based on what we talked about with the
13 production in the department, there was a lot of
14 overtime available. And a lot of it -- it was not
15 atypical for an employee to come in four hours early
16 and then work four hours after their shift. So at
17 that point in time the employee really is exposed to
18 all three supervisors that cover three shifts.
19 Q.  So because of the fact that you knew she had worked
20 overtime, you decided that she would have known
21 Tommie Gipson, so it was reasonable to believe she
22 was upset when Gipson was fired?
23 A.  I never gave it that deep of a thought.
24 Q.  What were the other reasons -- other than the fact
25 that nine of the thirteen didn't show up, and in your

**44**

1  mad at me.
2  Q.  So your conclusion was because she didn't show up and
3  none of the others didn't show up, that she must be
4  part of the group?
5  A.  Correct.
6  Q.  And then this is based upon Murry saying, we're upset
7  with you?
8  A.  Correct.
9  Q.  Any other reasons?
10 A.  Nothing I can think of right now.
11 Q.  Is this your signature on Deposition Exhibit 6?
12 A.  Yes.
13 Q.  Did you conduct a further investigation after Bryan
14 Ehlman concluded his investigation?
15 A.  No.
16 Q.  So any investigation which occurred in connection
17 with this matter as it pertains to Donna Wilson ended
18 when Bryan Ehlman ended his investigation; is that
19 fair?
20 A.  To my knowledge.
21 Q.  Well, you didn't conduct it further?
22 A.  No, I did not.
23 Q.  Do you know of anybody else who did?
24 A.  Not to my knowledge.
25 Q.  Is there somebody lurking out there who might have

PAGE 43

PAGE 45

**43**

1  experience you said that doesn't happen, what were
2  the other reasons for concluding that Donna Wilson's
3  denials in the 76(a) interview were not to be
4  believed?
5  A.  What I said earlier, that Murry had told me -- not
6  only had I heard it from other people, but Murry had
7  told me, we're very upset with you, it was wrong what
8  you did, you shouldn't have let him go, it was wrong.
9  And it was we are very upset. And so if I had heard
10 it before as a rumor, it was in my opinion confirmed
11 when Murry told me, yes, they were very upset with
12 me. So that, contributing to the fact that a lot of
13 people didn't come in to work that night, I concluded
14 that they had chosen not to come in because they were
15 upset.
16 Q.  And because Donna Wilson didn't show up, you
17 concluded that she must be one of the group?
18 A.  Correct.
19 Q.  Did Murry say that -- who the we are?
20 A.  No, he did not.
21 Q.  Did you have the sense that the we would be the black
22 workers who didn't show up?
23 A.  I didn't have the sense that it was the black workers
24 that would not show up. It was just that there were
25 workers that weren't gonna come in because they were

**45**

1  conducted an investigation?
2  A.  I don't know.
3  Q.  Would it be fair to say that Bryan Ehlman was in
4  charge of the investigation that resulted in the
5  discipline handed out to Donna Wilson?
6  A.  I think so, yes.
7  Q.  You weren't in charge?
8  A.  No.
9  Q.  And you were his supervisor?
10 A.  Yes.
11 Q.  And your supervisor wasn't in charge?
12 A.  No.
13 Q.  So it would have been Bryan Ehlman?
14 A.  Yes.
15 Q.  And you don't know who contacted or ordered Cherry
16 Ridler to contact Donna Wilson's physician?
17 A.  No.
18 Q.  And you don't know what information she received?
19 A.  No.
20 Q.  And you don't know to whom she reported any
21 information she derived?
22 A.  No.
23 Q.  To your knowledge, did any other workers involve
24 Donna Wilson being involved in the work stoppage?
25     MR. SCHULZ:  Did they involve her?

**EXHIBIT**

tabbies

_8_

SHEET 1   PAGE 1

1

1          STATE OF MICHIGAN

2      IN THE CIRCUIT COURT FOR THE COUNTY OF SAGINAW

3

4    DONNA R. WILSON,

5          Plaintiff,

6          vs.      File No. 04-54594-NZ-5
                         HONORABLE LEOPOLD P. BORRELLO

7    DELPHI CORPORATION,

8          Defendant,
     _____/

9          Deposition of REBECCA OSTER, taken in the

10   above-entitled matter before Stenograph Reporter,

11   Jeanette L. Roberts, CSR-5275, at the Offices of

12   Ripka, Boroski & Associates, One Tuscola Street,

13   Morley Building, Saginaw, Michigan, 48607, on

14   Thursday, June 16, 2005, commencing at about 2:27

15   p.m.

16   APPEARANCES

17   CHAKLOS, JUNGERHELD, HAHN & WASHBURN, PC
          BY:  THOMAS C. WIMSATT, ESQ. (P31971)
18   5525 Colony Drive N
          Saginaw, Michigan 48608
19   (989) 790-0000

20          Appearing on behalf of the Plaintiff.

21   FOSTER, SWIFT, COLLINS & SMITH, PC
          BY: WILLIAM R. SCHULZ, ESQ. (P29147)
22   313 South Washington Square
          Lansing, Michigan 48933
23   (517) 371-8100

24          Appearing on behalf of the Defendant.

25   ALSO PRESENT:
          James Ling, Delphi Representative

WILSON V. DELPHI

**DEPO. REBECCA OSTER**

TAKEN: 6-16-05

SHEET 4   PAGE 10

10

1  observed?
2         MR. SCHULZ  This being whether
3  something --
4         MR. WIMSATT:  The work stoppage involving
5  Donna Wilson.
6         MR. SCHULZ:  And whether she was involved
7  in it?
8         THE WITNESS:  I would have to say yes.
9  Q.  (By MR. WIMSATT:)  So would it be fair to say you
10  have an opinion she was involved in a work stoppage,
11  but you don't have any personal knowledge that she
12  was involved in a work stoppage?
13  A.  Yes.
14  Q.  And your opinion is based upon reviewing the 76(a)
15  interviews?
16  A.  That, and the fact that we had a large group of
17  employees that did not come to work on the same day.
18  Q.  So it was the size of the group and their comments in
19  the 76(a) interviews which caused you to believe
20  there was an unauthorized work stoppage?
21  A.  Yes.
22  Q.  And it was the fact that she was part of the group
23  that caused you to believe that she personally was
24  involved in this work stoppage?
25  A.  Yes.

PAGE 11

11

1  Q.  The she being Donna Wilson?
2  A.  Yes.
3  Q.  Did any of the interviews indicate that Donna Wilson
4  was involved in the work stoppage?
5  A.  No.
6  Q.  Well, I guess, why did you think she was?
7  A.  She was one of the group of employees that did not
8  come, we got the same answers from all employees in
9  the interviews.
10  Q.  And those answers were that the employees denied
11  being involved in a work stoppage?
12  A.  Yes.
13  Q.  Who was in charge of the investigation?
14  A.  There is multiple people. Myself, the
15  superintendents for the area. You use any resources
16  that you need to get the information.
17  Q.  So it would be your testimony that Leigh Ochoa was
18  involved -- was in charge of the investigation?
19  A.  Correct.
20  Q.  And that you were in charge of the investigation?
21  A.  Correct.
22  Q.  What about Bryan Ehlman, was he in charge of the
23  investigation?
24  A.  He was a party to it.
25  Q.  And what about Betty Stange, was she in charge of it?

PAGE 12

12

1  A.  She was a party to it as well.
2  Q.  Was there anybody else in charge of it other than
3  yourself and Leigh Ochoa?
4  A.  No.
5  Q.  Did you conduct any investigation independent of the
6  76(a) interviews?  Did you personally conduct any
7  investigation independent of the 76(a) interviews?
8  A.  Personally, no.
9  Q.  Did you authorize anyone to conduct an investigation
10  independent of the 76(a) interviews?
11  A.  In regards to what specifically?
12  Q.  In regards to the work stoppage or in regards to
13  Donna Wilson's involvement in the work stoppage,
14  either?
15  A.  I guess I would have to say no, without
16  understanding --
17         MR. SCHULZ:  What's that?
18         THE WITNESS:  I said without any
19  additional clarification as to what you're looking
20  for.
21  Q.  (By MR. WIMSATT:)  Did you have anybody else do any
22  other digging and finding out whether the statements
23  in the 76(a) interviews were true and correct?
24  A.  No.
25  Q.  Did you ever attempt to verify Donna Wilson's

PAGE 13

13

1  statements that she was at a doctor's office?
2  A.  Yes.
3  Q.  And how did you do that?
4  A.  We have an employee who verifies all doctor's notes.
5  Q.  And that employee would be whom?
6  A.  Cherry Ridler.
7  Q.  And she apparently called -- she apparently was
8  presented with Donna Wilson's doctor's certificate or
9  doctor's slip?
10  A.  That among other ones that would have been submitted.
11  Q.  Have you seen that doctor's slip?
12  A.  Yeah, at one time I did.
13  Q.  Now, when you saw the doctor's slip, was it attached
14  to a piece of paper or was it individually, the small
15  little slip?
16  A.  I don't recall.
17  Q.  Does this look like the slip, if you can remember,
18  that you saw?
19  A.  I don't remember for sure.
20  Q.  That -- what you're looking at has been marked as
21  Deposition Exhibit 13, I believe.
22  A.  Yeah, that is what it says.
23  Q.  Do you recognize the writing beneath the doctor's
24  certificate right there?
25  A.  Looks similar to Cherry's.

**WILSON V. DELPHI**

**DEPO. REBECCA OSTER**

**TAKEN: 6-16-05**

SHEET 5  PAGE 14

**14**

1  Q.  And how about this writing to the right, do you
2      recognize that?
3  A.  It looks like Cherry's as well.
4  Q.  So if you -- would you have seen the doctor's
5      certificate with Cherry's writing on it or would you
6      have just seen it before she put any writing on it or
7      near it?
8  A.  Probably after.
9  Q.  So this was marked as Deposition Exhibit 1.  This is
10     without any writing whatsoever.  You probably -- what
11     would the procedure be, you attached this to -- the
12     doctor's certificate to a piece of paper and then you
13     make notes on it?
14 A.  Typically, the advisor, the people that the hourly
15     people report to, submit the notes to Cherry Ridler,
16     they don't go through me first.
17 Q.  So you wouldn't actually know what the procedure
18     would be, I should find this out from Cherry?
19 A.  Cherry could tell you much more, yes.
20 Q.  Would you have been aware of Cherry Ridler's findings
21     with respect to her investigation before you -- well,
22     let me rephrase that.
23         Did you become aware of Cherry Ridler's
24     findings with respect to that particular doctor's
25     slip?

PAGE 15

**15**

1  A.  Yes.
2  Q.  Okay.  And when did you become aware of that?
3  A.  That, I don't recall.
4  Q.  You said that you and Leigh Ochoa were involved in
5      the investigation.  Actually, in charge of the
6      investigation.  Would you have become aware of the
7      results of Cherry Ridler's investigation before or
8      after discipline was imposed in this particular case?
9  A.  I don't remember.
10 Q.  Would it have made a difference to you?
11 A.  Probably not.
12 Q.  And why is that?
13 A.  Because the majority of the employees submitted
14     doctor's notes.
15 Q.  And does that mean that they were to be ignored
16     because the majority submitted doctor's notes?
17 A.  It was deemed as too convenient for all the employees
18     at one time to attend a doctor.
19 Q.  They didn't all attend the same doctor, did they?
20 A.  I don't recall.
21 Q.  And who deemed it as too convenient?
22 A.  Myself.
23 Q.  When you said it was deemed too convenient, what you
24     meant is that you thought it was too convenient that
25     all these people were going to the doctor on this

PAGE 16

**16**

1      same day?
2  A.  Uh-huh.
3  Q.  Yes?
4  A.  Yes.
5  Q.  And why did you deem it too convenient?
6  A.  It is just too much of a coincidence that you're
7      going to have that many employees in one department
8      on the same exact date go to a doctor and not come to
9      work.
10 Q.  Would it be fair to say that one of the nine
11     employees might actually have gone to the doctor?
12 A.  Yes.
13 Q.  Okay.  Did you consider the possibility that one of
14     the nine, in fact, really was sick that day?
15 A.  Not really.
16 Q.  Okay.  Why not?
17 A.  It -- we just looked at it as too much of a
18     coincident.
19 Q.  So when you say we, are you saying yourself again?
20 A.  Yes.
21 Q.  Which --
22 A.  When I say we, I always refer to we as management.
23 Q.  So because of the coincidence, then, the -- any
24     individual difference -- for example, somebody really
25     being sick -- wouldn't have made a difference?

PAGE 17

**17**

1  A.  No.
2  Q.  That's a true statement?
3  A.  In my opinion.
4  Q.  It is a true statement?
5  A.  Yes.
6          MR. SCHULZ:  Tom, before you move on, I
7      want to make sure that we have given you all of the
8      -- I want the record to reflect that I've given you
9      doctor's slips for Donna Wilson reportedly provided
10     by Dr. Pietrus, some have markings on, some do not.
11     I see one in my possession now that I'm not certain
12     we've previously given to you.  And since I think
13     this witness may have done the writing, I want to
14     address that now, if you don't mind.
15         MR. WIMSATT:  Okay.
16         MR. SCHULZ:  I'm not certain you have
17     this, so what I want to do is request the court
18     reporter to make me copies of this so we can mark it
19     at this time.
20         (Whereupon Deposition Exhibit Number 16
21     was marked for identification.)
22         MR. SCHULZ:  Let the record reflect that I
23     have produced today a document marked Exhibit 16
24     which is a doctor's note provided by Dr. Pietrus, I
25     am told, and there is some handwriting on it.  I am

**WILSON V. DELPHI**

**DEPO. REBECCA OSTER**

**TAKEN: 6-16-05**

SHEET 6   PAGE 18

18

1   uncertain whether I have or have not produced this in
2   the past. I know I have produced a number of
3   doctor's -- or a number of copies of Dr. Pietrus's
4   statement, some with handwriting on them, some not.
5   I am uncertain whether I did this or not. I want to
6   produce it now so that you can -- if I haven't
7   produced it previously and you think it is
8   appropriate to ask questions of this witness about
9   it, that you can do so. But I'm told this is Cherry
10  Ridler's handwriting, and she is yet to appear
11  today. So that being said, I'm done.
12  Q.  (By MR. WIMSATT:) Let me direct your attention to
13      what has been marked Deposition Exhibit 16. Can you
14      identify the writing beneath the doctor's slip?
15  A.  That looks like Cherry's writing.
16  Q.  Did you and Leigh Ochoa agree on the discipline in
17      this particular case?
18  A.  Yes.
19  Q.  Did you -- how was it that the 30-day suspension came
20      up; did you suggest the 30-day suspension?
21  A.  Yes.
22  Q.  Or did she?
23  A.  I did.
24  Q.  Did you derive the 30-day suspension from your own
25      experience or in consultation with your supervisor,

PAGE 19

19

1       Mr. Berg?
2   A.  In consultation with my supervisor.
3   Q.  That would be Mr. Berg?
4   A.  Yes.
5   Q.  And Ms. Ochoa went along with the 30 days?
6   A.  Yes.
7   Q.  And at the time that the 30 days was suggested for
8       purposes of discipline, would you have been aware of
9       the fact that Cherry -- is it Cherry?
10  A.  Cherry.
11  Q.  -- Cherry Ridler had apparently verified that Donna
12      Wilson had been at her doctor on March 8th?
13  A.  I don't remember.
14  Q.  Again, would it have made a difference?
15  A.  Probably not.
16  Q.  And that's because of the number of employees?
17  A.  Correct.
18  Q.  Did you form an opinion as to why these employees
19      were all out of work on that day?
20  A.  I only know from the information I received from
21      Leigh.
22  Q.  And what was that information?
23  A.  That they had released an African-American male
24      supervisor the Friday before, and they were
25      retaliating for that.

PAGE 20

20

1   Q.  They being the --
2   A.  The employees in the department.
3   Q.  And did you know that all of the employees who were
4       out on Monday were black?
5       MR. SCHULZ:  Did she know that when?
6   Q.  (BY MR. WIMSATT:) When you -- did you know at any
7       time that all the employees who were out on Monday
8       were black?
9       MR. SCHULZ:  Even through today, you
10      mean?
11      MR. WIMSATT:  Sure.
12      THE WITNESS:  I do now.
13  Q.  (BY MR. WIMSATT:) Did you know it at the time the
14      discipline was imposed?
15  A.  Yes.
16  Q.  And when did you find out that all the employees who
17      were out of work on March 8 of 2004 were black?
18  A.  That day, because Leigh had informed me.
19  Q.  So she told you that only the white workers showed up
20      and the black workers did not?
21  A.  Correct.
22  Q.  And of course you knew that Donna Wilson was black?
23  A.  I didn't know. I didn't know the race of any of
24      them.
25      MR. SCHULZ:  You didn't know?

PAGE 21

21

1       THE WITNESS:  I did not know until Leigh
2       told me.
3   Q.  (BY MR. WIMSATT:) If I recall, you said that you
4       had Cherry Ridler verify the doctor's certificate?
5   A.  Correct.
6   Q.  So that was one form of investigation that you
7       authorized. Did you conduct any other investigation?
8   A.  I don't recall.
9   Q.  Is there any other investigation that you could have
10      conducted?
11  A.  I don't think so.
12  Q.  So your contribution to the investigation was that
13      you had Cherry Ridler verify the doctor's
14      certificates?
15  A.  Correct.
16  Q.  And she verified that Donna Wilson was indeed at her
17      doctor's office?
18  A.  If that is what the finding was, yes.
19  Q.  And do you know what Cherry Ridler's findings were
20      with respect to the other workers?
21  A.  I would have received all the information.
22  Q.  Did you receive information that one or more of the
23      doctor's certificates of the other workers were
24      fraudulent or false?
25  A.  I don't remember.

**WILSON V. DELPHI**

### DEPO. REBECCA OSTER

**TAKEN: 6-16-05**

---

SHEET 7    PAGE 22

**22**

1  Q.  Do you know of anybody else who conducted an
2     investigation into this matter other than the 76(a)
3     interviews and the investigation that you ordered?
4  A.  No.
5  Q.  That means there was no other investigation?
6  A.  I don't know if there was.
7  Q.  Do you have a recollection of Donna Wilson's answers
8     in connection with her 76(a) interview?
9  A.  No.
10 Q.  Let me show you what's been previously marked as
11    Deposition Exhibit 4. Would that have -- well, it
12    has been pointed out to us by Leigh Ochoa that it
13    probably has the wrong name on top, because it says
14    Diana Wilson. But I want you to assume for purposes
15    of this, these questions, that that is Donna Wilson's
16    76(a) interview conducted by Bryan Ehlman. Are you
17    able to tell from that 76(a) interview whether or not
18    Donna Wilson admitted that she was involved in an
19    illegal work stoppage?
20 A.  Without even having to look at it, I recall that no
21    one admitted that they did.
22 Q.  Are you able to tell from that 76(a) interview that
23    Donna Wilson provided a doctor's slip?
24     MR. SCHULZ:  During the interview, you
25    mean?

---

PAGE 23

**23**

1     MR. WIMSATT:  Yeah.
2     MR. SCHULZ:  You're asking her whether
3     that means she --
4     MR. WIMSATT:  She said she reviewed this
5     and I'm asking her if it appears that Donna Wilson
6     stated that she -- gee, I can't read this.
7     MR. SCHULZ:  It says, do you have any
8     documentation for your absence. Yes. It says,
9     quote, question, what is it?
10    MR. WIMSATT:  A paper from the doctor.
11 Q.  (BY MR. WIMSATT:)  Do you see that Donna Wilson has
12    indicated that she had a doctor's certificate?
13 A.  Yes.
14 Q.  And she apparently provided it, based on what we've
15    seen with other documents?
16 A.  Yes.
17 Q.  The bottom of the first page of that Exhibit says,
18    we've been told that you talked to the following
19    employees about not coming to work on Monday. Do you
20    know who told the we, meaning management?
21 A.  No, I do not know.
22 Q.  Who drafted this 76(a) interview?
23 A.  Me.
24 Q.  So this is -- you drafted this, and it says we've
25    been told. But who told you?

---

PAGE 24

**24**

1     MR. SCHULZ:  She just said --
2     THE WITNESS:  It says why would someone
3     tell us --
4  Q.  (BY MR. WIMSATT:)  Look at the we. It says we've
5     been told you talked to the following employees about
6     not coming to work on Monday.
7  A.  Uh-huh.
8  Q.  That's a yes?
9  A.  Yes.
10 Q.  Who told you that she talked with the following
11    employees?
12 A.  That was the way we formed the question.
13 Q.  So nobody had told you that?
14 A.  No one had told me that.
15 Q.  Had anyone told anybody that?
16 A.  Leigh had informed me that someone had inform her of
17    that.
18 Q.  She didn't give you the name?
19 A.  If she did, I don't remember.
20 Q.  So Leigh told you that somebody told her that these
21    various workers had talked with the other workers?
22 A.  Yes.
23 Q.  But she didn't tell you who it was?
24     MR. SCHULZ:  She said, if she did, she
25    doesn't remember.

---

PAGE 25

**25**

1  Q.  (BY MR. WIMSATT:)  She didn't tell you who it was or
2     if you did, you don't remember, that is your
3     testimony?
4  A.  Right. Yes.
5  Q.  So that was the basis for the next question, which
6     was, why would somebody tell us that you and other
7     Department 32 members talked about not coming to
8     work?
9  A.  I guess.
10 Q.  You don't sound really sure about that.
11 A.  When I draft a 76(a) interview, I ask a lot of
12    questions.
13 Q.  Why did you address Murry Culberson at the top of
14    page two and then make another reference to Murry
15    Culberson in the middle of page four?
16 A.  It was a strategy we were trying.
17 Q.  And what was the nature of the strategy?
18 A.  Was to find out if he was one who had tried to get
19    the group together to do this.
20 Q.  Okay. So at that point you didn't know that there
21    had been an illegal work stoppage?
22 A.  It was our interpretation that it was.
23 Q.  But you didn't have any proof of it; is that a fair
24    statement?
25 A.  Yes.

---

**RIPKA, BOROSKI & ASSOCIATES, L.L.C.**
**(800) 542-4531  (810) 234-7785  FAX: (810)234-0660**

EXHIBIT

9



# RECORD COPY SERVICES

LAUREL PARK PLACE - 200 WEST · 18136 LAUREL PARK DRIVE NORTH
LIVONIA MICHIGAN 48152-3958 · 734-591-4100

3095151 - 155655

8463

# RECORD IDENTIFICATION

Records from:
    MS. SARA MOTON
    C/O STM CLINIC

Regarding:
    04 54594 NZ 5

    DONNA R. WILSON

    VS.

    DELPHI CORPORATION

RCS #:  03095151

APR 1 9 2005

Thank you.
We appreciate your order.

**STM CLINIC**
MENTAL HEALTH & SUBSTANCE ABUSE SERVICES

**DISCLOSURE ACCOMPANIMENT/INFORMATION REQUESTED**

THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM THE MEDICAL RECORDS OF _Donna R. Wilson_ WHOSE CONFIDENTIALITY IS PROTECTED BY FEDERAL LAW. THIS INFORMATION HAS BEEN DISCLOSED TO YOU FROM RECORDS PROTECTED BY FEDERAL CONFIDENTIALITY RULES (42 CFR PART 2). THE FEDERAL RULES PROHIBIT YOU FROM MAKING ANY FURTHER DISCLOSURE OF THIS INFORMATION UNLESS FURTHER DISCLOSURE IS EXPRESSLY PERMITTED BY THE WRITTEN CONSENT OF THE PERSON TO WHOM IT PERTAINS OR AS OTHERWISE PERMITTED BY 42 CFR PART 2. A GENERAL AUTHORIZATION FOR THE RELEASE OF MEDICAL OR OTHER INFORMATION IS **NOT** SUFFICIENT FOR THIS PURPOSE. THE FEDERAL RULES RESTRICT ANY USE OF THE INFORMATION TO CRIMINALLY INVESTIGATE OR PROSECUTE ANY ALCOHOL OR DRUG ABUSE PATIENT.

_Sara Terry-Moton_                     _04/07/05_
SIGNATURE                              DATE

INFORMATION REQUESTED

_____ PROGRESS NOTES            _____ LETTERS

_____ DISCHARGE SUMMARY         _____ MEDICAL INFORMATION

___✓___ PSYCHIATRIC EVALUATION      ___✓___ CLIENT ASSESSMENT

_____ PSYCHOLOGICAL TESTING     _____ AFTERCARE PLAN


SENT TO: _William R. Schulz, ESQ_   BY: _Sara Terry-Moton, BCD_
_313 S. Washington Sq._             DATE: _04-07-05_
_Lansing MI 48933_

_____

_____

11/94

_W_

CONFIDENTIAL

# INITIAL PSYCHIATRIC EVALUATION

**PATIENT BACKGROUND:**                                   MR# W 03M

Name: Donna Wilson                                        Age: 49 yrs.

Date of Birth: 09/23/1955          Date/Time of Evaluation: 12/02/04 ⑤

Race: African American   Gender: Female        Marital Status: Divorced.

REASON FOR EVALUATION: Pt. was referred for evaluation + treatment of Symptoms suggestive of anxiety & depression.

**HISTORY OF PRESENT ILLNESS:**
*Major Presenting problem includes:* (Depression)  Thought Disorder  (Anxiety Attacks)  Hyperactivity
Impulsivity  Marital Problems  Family Problems  (Vocational Problems)  Oppositionality  Alcohol
Abuse  Drug Abuse  Legal Problems  Physical Abuse  Sexual Abuse  Suicidal Ideations
Aggressive Ideations  Other: Raped several yrs ago by an acquaintance

*Current Symptomatology includes:*  Poor Appetite   Increased Appetite (Loss in interests)
(Inappropriate Guilt) (Psychomotor Retardation)  Psychomotor Agitation  (Sleep Disturbance)
(Weight Gain)  Weight Loss   Low Sexual Desire   Hopelessness (Worthlessness) (Nightmares)
Flashbacks (Intrusive thoughts about Traumatic Experiences) (Social Withdrawal) (Chest Pain)
(Shortness of Breath) (Palpitations)  Dizziness  Excessive Sweating  Paresthesias  Muscle Aches
Cold Hands (Gastrointestinal symptoms) Dry Mouth  Obsessions:_____
Compulsions:_____  Phobias:_____
(Poor Concentration) (Lethargy)  Hallucinations:_____
Memory Problems   Somatic Concerns   Impotence (Increased Irritability) (Anxiety Attacks)
(Hypervigilance)  Paranoia   Chronic Pain (Mood Swings) Other: Crying spells

*Recent Stressful Life Events:*  None

Married   Engaged   Separated   Divorced   Serious Argument   Breakup of Important Relationship
Death in the Family   Failing Health of Family Member   Personal Injury and Illness   Sexual Problems
Difficulty at School (Difficulties at Work) Retired   Job Loss   Changed Residences   Legal Problems
Financial Strain   Recent Surgery  Other:_____

COMMENTS AND PAST PSYCHIATRIC HISTORY: Pt. has experienced losses in the past but never grieved. She was raped several yrs ago but never dealt with the PTSD. She has never attempted suicide. She has never been on any psychotropic medications. She has never been hospitalized for psychiatric reasons. Further history is well documented in chart.

ALCOHOL AND ILLICIT DRUG ABUSE HISTORY: None.
Smokes 1pk/day

MEDICAL HISTORY: Allergies: NKDA
Health Problems: S/p Hysterectomy, Breast abscess, Arthritis, Nausea + Obesity.  NA on any medications

W1

**FAMILY HISTORY:** _-ve for mental illness_

**PERSONAL & SOCIAL HISTORY:** *Relevant findings include:* She was born a raised religious. Parents divorced when she was 10 yrs old. Then raised by her older half sister who passed away 6 yrs ago. Pt got divorced 6 yrs ago. She has worked for GM for 29 yrs. Further details are well documented in chart & were reviewed

**MENTAL STATUS EXAMINATION:** *Relevant findings include:*

Affect: _Sad & tearful_    Mood: _Anxious & depressed_

Suicidal Ideations Present ✓ No ___ Yes    Homicidal Ideations Present ✓ No ___ Yes

Hallucinations Present ✓ No ___ Yes    Delusions Present ✓ No ___ Yes

Reality Testing is: ___ Good ✓ Fair ___ Poor

Alert and Oriented To: ✓ Person ✓ Place ✓ Time ✓ Situation

Memory is: ___ Intact ✓ Fairly Intact ___ Poor ___ Not tested

Cognition: ___ Good ✓ Fair ___ Impaired ___ Poor

Judgement is: ___ Good ✓ Fair ___ Impaired ___ Poor

Insight is: ___ Good ✓ Fair ___ Impaired ___ Poor

Currently Harmful to Self: ✓ No ___ Yes    Currently Harmful to Others ✓ No ___ Yes

**DSM-IV Diagnostic Impressions:**

Axis I: _Major Depression - recurrent - Moderate · Anxiety disorders_
_A/o PTSD - Chronic_

Axis II: _Dependent Personality disorder_

Axis III: _Obesity & Osteoarthritis of knees_

Axis IV: _Problems at work, victim of grief, problems in social environment_

Axis V: _Current GAF = 59_

**RECOMMENDATIONS/TREATMENT PLAN:** (1) Lexapro 10 mg po qd for depression. (2) Side effects & risks & benefits discussed with verbal consent. (3) Pt needs to continue weekly psychotherapy to address PTSD related issues & grieve the loss. (4) Supportive psychotherapy was provided.

**PROGNOSIS:**  Guarded   Poor  (Fair)   Good

**RETURN TO CLINIC IN:** _6-8 wks_   SIGNATURE: _[signature]_

W2

CONFIDENTIAL

## STM CLINIC

## ASSESSMENT

CLIENT NAME: _Donna Wilson_          SERVICE CODE: _90801_

DATE: _04-07-04_     DATE: _____     DATE: _____

CLIENT ID: (Include referral source) _Donna is a 5'5", 258 lbs Afro American female. She is 49 yrs. old, divorced with four daughters. All in college except older one who is married, divorced, but living on own. She keep daughters older son. Donna has 28½ yrs. in Delphi Steering plant._

PRESENTING PROBLEM (Include Client's own words) _Donna was referred to us by her EAP due to her anxiety (excessive tearing & inability to talk about job threat of firing. She was on medical leave at the same time of walk-out by gr. at work. Donna was accused of being a part. upsetting. Stressors mainly situational. Cl's always found her work a refudge from other stressors she's experienced._

HISTORY OF PRESENTING PROBLEM: _Donna is the youngest of 3 girls from her mother. She is the only child for her dad. Donna's relationship has always been a strained in growing up w/mom. Dad would rescue her from being whipped by mother. Donna has devoted her life to her daughters rearing & her father._

_____

_____

_____

_____

(over for more? Y/N)

_Sara Terry-Moton, MSW, ACSW, CSW_          _04/21/04_
Therapist Signature and Credential(s)                    Date

1

N3

STM CLINIC
MENTAL HEALTH & SUBSTANCE ABUSE SERVICES

MENTAL STATUS:

APPEARANCE          (MULTIPLE CHOICES OK)

ATTIRE & GROOMING:                    PHYSICAL CHARACTERISTICS
1. appropriate  ✓                        1. unremarkable _____
2. inappropriate                         2. atypical_____
3. meticulous____
4. unusual_____
5. disheveled_____             ADD: "With reference to physical APPEARANCE".......
6. dirty_____              *ct over weight*
7. _____

BEHAVIOR:  (Multiple Choice OK)

| POSTURE | BODY MOVEMENTS | SPEECH | RELATIONSHIP / CLINICIAN |
|---|---|---|---|
| 1. Erect_____ | 1. Typical_____ | 1. Articulate ✓ | 1.Cooperative_____ |
| 2. Stooped_____ | 2. Accelerated_____ | 2. Typical_____ | 2. Domineering_____ |
| 3. rigid/tense____ | 3. Slowed_____ | 3. Loud_____ | 3. Submissive_____ |
| 4. Relaxed_____ | 4. Restless/fidgety____ | 4. Soft ✓ | 4. Provocative_____ |
| 5. _____ | 5. _____ | 5. Slurred _____ | 5. Suspicious_____ |
| | | 6. Stammering_____ | 6. Uncooperative_____ |
| | | 7. _____ | 7. _____ |

ADD: " With reference to Behavior" . . . . . .

THOUGHT PROCESS

FORM of thought processes:      ✓ 1. Realistic      _____ 2. Unrealistic

(MULTIPLE CHOICE OK)

PROGRESSION of thought processes:          CONTENT of thought processes:
1. Spontaneous____✓                        1. Appropriate  ✓        10. Superstitous__
2. Slow_____                        2. Delusional_____     11. Phobic____
3. Vague_____                        3. Depersonalizing_____  12. Hostile____
4. Cogent_____                        4. Paranoid_____     13. Suicidal____
5. Dream-Like_____                       5. Dream-Like_____     14. Homicidal__
6. Echoialia_____             (Audio)6. Hallucinatory_____        15. _____
7. Stereotypic_____         (Visual) 7. Hallucinatory_____
8. Tangential_____                       8. Obsessive_____
9. Associational_____                      9. Compulsive_____

ADD "With regard for THOUGHT PROCESS. . . . . .
"With reference to SUICIDAL or HOMICIDAL TENDENCIES IN SELF OR SIGNIFICANT
OTHERS. . .
     *Donna* (denies) (Admits) to (Thoughts) and (Intentions) of harm to self and others.
(ADD the clients data about thoughts/intentions)
(2)

N4

MENTAL STATUS (Continues)

FEELINGS (MULTIPLE CHOICE OK)

| GENERAL ATTITUDE | MOOD | AFFECT |
|---|---|---|
| 1. Cooperative ✓ | 1. Even | 1. Appropriate |
| 2. Manipulative | 2. Anxious | 2. Blunted ✓ |
| 3. Evasive | 3. Fearful ✓ | 3. Flattened |
| 4. Hostile | 4. Angry ✓ | 4. |
| 5. Resistive | 5. Depressed ✓ | |
| 6. Ambivalent | 6. Elated | |
| 7. Withdrawn | 7. Mixed ✓ | |
| 8. | 8. | |

ADD: With regard for FEELINGS...... *Cl crying excessively embarrassed & angry.*

INTELLIGENCE   (ONE CHOICE)

| INTELLIGENCE | FORMULATE CONCEPTS | MEMORY |
|---|---|---|
| 1. Above average ✓ | 1. Able to ✓ | Immediate___ 1. adequate ✓ 2. impaired___ |
| 2. Average | 2. Unable to | Recent ___ 1. adequate ✓ 2. impaired___ |
| 3. Below | | Longterm ___ 1. adequate ✓ 2. impaired___ |
| 4. | | |

MANAGE DAILY LIFE: ✓ 1. Able _____ 2. Unable  MAKE LIFE DECISIONS: _____ 1. Able _____ Unable
ORIENTATION _____ ✓ 0-X-3; _____ 2. Barely in contact _____ 3. Out of Control
FUND OF KNOWLEDGE...r.t FUNCTIONAL LEVEL: ✓ 1. Adequate _____ 2. Inadequate
DIGIT SPAN: 1. Above aver.____ 2. Average ✓ 3. Below aver.____ 4. Untested____

"With reference to ORIENTATION, MENTAL GRASP, AND CAPACITY.....

DEFENSE MECHANISMS:

| | |
|---|---|
| ____ 1. Denial | ____ 7. Regression |
| ____ 2. Displacement | ✓ 8. Repression |
| ____ 3. Interjection | ____ 9. Sublimation |
| ✓ 4. Isolation | ____ 10. Undoing |
| ____ 5. Projection | |
| ____ 6. Reaction Formation | |

With regards to Mechanisms. *Cl is a Caretaker – Co dependent personality.*

(3)

WS

## CHEMICAL USE HISTORY

SYMPTOMS: Tolerance Increase _____ Tolerance Decrease _N/A_ Use of drink of more than intended _____ blackouts _____ excessive amount of time spent in drug related activities _____ one or more attempts to stop _____ withdrawal symptoms _____ continued to use despite negative consequences _____ use of drug of choice to remove withdrawal symptoms _____ paranoia _____ panic attacks _____ weight loss _____ liver problems _____ takes more and more of the drug to get high or drunk _____ problems due to drug use: Family _____ School _____ Work _____ Financial _____ Legal _____ Social _____.

NOTE # 1 FOR PRIMARY SUBSTANCE        NOTE # 2 FOR SECONDARY SUBSTANCE

Where do you do most of your using? _____

With whom do you drink and drug? _____

Longest non-use period in the last six months? _____

| Drug Category (Place (*) by Drug(s) of Choice) | Age First used | Maximum use, how much, how often | Current use, how much, how often | Date last used method of use |
|---|---|---|---|---|
| Prescription drugs, Percoset, Xanex, Darvon, Librium Valium, Darvocet | D | | | |
| Alcohol, Beer, Wine, Liquor | 34 | Social Drinking 1 drink | | 1 yr. ago |
| Marijuana, Pot, Hashish | D | | | |
| Amphetamines, Speed, Crystal meth, Diet Pills | D | | | |
| Opiates, Heroin, Dilaudid, Codeine, Talwin, Methadone | D | | | |
| Cocaine/Crack | D | | | |
| Hallucinogenics, LSD-Acid, PCP Mescaline, Mushrooms | D | | | |
| Barbituates, Sedatives, Thorazine Stelazine, Mellaril, Haldol | D | | | |
| Nicotine (Tobacco) | 23 | quit f/ 5 yrs. at front quit again in Jan. but back in March after being fired. | dey 1 pk g a Prob yes None Coffee | |
| Caffeine (Coffee, tea, sodas, colas) | | | | |

W6

## ORGANIZATION OF SYMPTOMS INTO DIAGNOSTIC PATTERNS

### DEPRESSIVE SYMPTOMS:

Depressive mood consistently for:

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Two Weeks | ☐ 6 Months | | | |
| ☐ | Worries | ☐ a.m. | ☐ p.m. | ☐ Seasonal | |
| ☑ | Loss of Pleasure | | ☐ | Increased indecisiveness | |
| ☑ | Loss of Interest | | ☐ | Thoughts of death | |
| ☐ | Weight Loss/Gain___lbs time___ | | ☐ | Hopeless vs. helplessness | |
| ☐ | Worthlessness | | ☑ | Low-self Esteem | |
| ☐ | Excessive guilt | | ☑ | Terminal sleep disturbance | |

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Suicidal thoughts | | | | |
| ☐ | Previous History | ☐ Ideation | ☐ Plan | ☐ Attempts | |
| ☐ | Suicidality is: | ☐ High | ☐ Moderate | ☐ Low | |

### BEHAVIORAL SYMPTOMS:

| | | | | |
|---|---|---|---|---|
| ☐ | Psychomotor agitation | ☐ | Conflicts with others | |
| ☑ | Psychomotor retardation | ☑ | Tearfulness | |
| ☑ | Fatique/Low energy | ☑ | Crying jags | |
| ☐ | Conduct | ☑ | Work inhibition *go, don't want to* | |
| ☐ | Socialized aggressive | ☐ | Undersocialized aggressive | |

### ANXIETY SYMPTOMS:

| | | | | |
|---|---|---|---|---|
| ☑ | Feels nervous/anxious | ☐ | Chills | |
| ☐ | R/O Caffeine/Stimulants | ☐ | Chest Pain | |
| ☐ | Shortness of Breath | ☐ | Fear of dying | |
| ☐ | Dizzy, faint, unsteady | ☐ | Fear of being crazy | |
| ☐ | Heart palpitations | ☑ | Fear of being controlled | |
| ☐ | Tremble/shake | ☑ | Fear of not being able to escape *of situation* | |
| ☐ | Sweating | ☐ | Avoidance | |
| ☐ | Choking | ☐ | Social Phobia   ☐ Simple Phobia | *don't like company mostly family visits* |
| ☑ | Nausea/abdominal distress | ☐ | Obsessive compulsive | |
| ☐ | Numbness/tingle | ☐ | Intrusive recurrent thoughts | |
| ☑ | Sleep disturbance (initial) | ☐ | Repetitive unpurposeful behavior | |
| ☐ | Insomnia (difficulty getting to sleep) | ☐ | Behavior neutralizes anxiety | |
| ☐ | Hypersomnia—Hyperphagia | ☐ | Exaggerated startle response | |
| ☐ | Flushes | ☐ | Check for PTSD Syndrome | |

**DIAGNOSTIC IMPRESSION:** (Summary of clinical impressions regarding problems, level of insight/ motivation, factors negatively/positively affecting treatment, etc.) Donna has experienced several trauma events in her life. She comes from situation whereis being her father's only child, dad is independent but very dependent upon her, close relationship. She was in an abusive relationship, divorcing spouse & raising 4 daughters; started a relationship w/a man who raped & tried to kill her; sister who was a mother figure died & being off work to care for her father, being accused of walking off job w/ other wild cat strikers was the breaking point. Cl's job had been her refudge from all other problems. She loved her job & find what she was accused of repulsive & an affront to her.

W7

Strength: _Good Character_

Weakness: _No recreational activities, Workaholic)_

AXIS I: Primary code _300.02_    _Generalized Anxiety Disorder_
Justification: _Excessive Worry. unable to control. Restlessness unable to relax, on edge. Irritability. Muscle tensions. Sleep disturbances. Serving excessively._

Secondary code _309.81_    _Post Traumatic Disorder_
Justification: _Having two prior experiences of traumatic stressful events. Reoccurrence of a threat to losing job, not just security, but the only pleasant outlook for her life._

AXIS II CODE: _V71,_    _No Dx    (Co-Dependent Features)_
(Personality and Development Disorders or V Codes)

AXIS III: (Physical issues) _Swelling in Knees; Lumps-Breast_

AXIS IV: PSYCHOSOCIAL STRESSOR (S) Severity #    acute/enduring

| | Severity # | acute/enduring |
|---|---|---|
| _Divorce)_ | | 4 |
| _Sisters Death_ | | 4 |
| _Abusive relationships_ | | 4 |
| _job lost threat_ | 4 | |
| | | |
| | | |

AXIS V: GAF CURRENT GAF __59__    HIGHEST PAST YEAR __75__
**PROGNOSIS**: _Good, but guarded._

STM/jc REVISED 12/95

14

_W8_

**STM CLINIC**

**SESSION TRACKING SHEET**

Patient Name *Donna Wilson*          Insured Name *Donna Wilson*

Therapist Name *Sara Terry-Moton*      Insured SSN *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*

                                        Case manager *— Q —*

**CONNECTICUT GENERAL**

                                        EAP *— 0 —*

| First 12 Sessions | | | Next 12 Sessions | | | Last 11 Sessions | | |
|---|---|---|---|---|---|---|---|---|
| Date of Session | Patient Pays | Paid | Date of Session | Patient Pays | Paid | Date of Session | Patient Pays | Paid |
| 1) 4-7-04 | | Pd | 13) 07-08-04 | | | 25) 12-02-04 | | |
| 2) 4-19-04 | | Pd | 14) 07-21-04 | | | 26) 12-22-04 | | |
| 3) 4-21-04 | | Pd | 15) 8-4-04 | | | 27) 1-6-05 | | |
| 4) 5-6-04 | | | 16) 8-11-04 | | | 28) 1-19-05 | | |
| 5) 5-12-04 | | | 17) 8-25-04 | | | 29) 2-2-05 | | |
| 6) 5-18-04 | | | 18) 9-8-04 | | | 30) 2-23-05 | | |
| 7) 5-25-04 | | | 19) 9-22-04 | | | 31) 3-3-05 | | |
| 8) 6-02-04 | | | 20) 10-06-04 | | | 32) 3-16-05 | | |
| 9) 06-09-04 | | | 21) 10-20-04 | | | 33) 4-6-05 | | |
| 10) 06-16-04 | | | 22) 11-3-04 | | | 34) 4-27-05 | | |
| 11) 06-23-04 | | | 23) 11-17-04 | | | 35) 5-10-05 | | |
| 12) 06-30-04 | | | 24) 11-23-04 | | | | | |

1. Authorization Period *4-7-04* to *10-31-04*       No. Sessions *15+1 Sherila*

2. Authorization Period *8-26-04* to *12-31-04*       No. Sessions *9 Bernard*

3. Authorization Period *1-1-05* to *6-30-05*         No. Sessions *12 Irene (1 add. 2004*

4. Authorization Period _____ to _____         No. Sessions _____

5. Authorization Period _____ to _____         No. Sessions _____

## STM CLINIC

### SESSION TRACKING SHEET

Patient Name _Donna Wilson_          Insured Name _Donna Wilson_

Therapist Name _Sara Terry-Moton_     Insured SSN _363 - 64 - 4731_

## CONNECTICUT GENERAL

Case manager _, - 0 -_

EAP _- 0 -_

| First 12 Sessions | | | Next 12 Sessions | | | Last 11 Sessions | | |
|---|---|---|---|---|---|---|---|---|
| Date of Session | Patient Pays | Paid | Date of Session | Patient Pays | Paid | Date of Session | Patient Pays | Paid |
| 1) 6-7-05 | | | 13) | | | 25) | | |
| 2) 6-16-05 | | | 14) | | | 26) | | |
| 3) 6-21-05 | | | 15) | | | 27) | | |
| 4) 7-13-05 | | | 16) | | | 28) | | |
| 5) | | | 17) | | | 29) | | |
| 6) | | | 18) | | | 30) | | |
| 7) | | | 19) | | | 31) | | |
| 8) | | | 20) | | | 32) | | |
| 9) | | | 21) | | | 33) | | |
| 10) | | | 22) | | | 34) | | |
| 11) | | | 23) | | | 35) | | |
| 12) | | | 24) | | | | | |

1. Authorization Period _6-22-05_ to _12-31-05_          No. Sessions _8 Marnie_

2. Authorization Period _____ to _____          No. Sessions _____

3. Authorization Period _____ to _____          No. Sessions _____

4. Authorization Period _____ to _____          No. Sessions _____

5. Authorization Period _____ to _____          No. Sessions _____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DELPHI CORPORATION, et al.

Debtors.

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

## PROOF OF SERVICE

The undersigned certifies that a true copy of Supplemental Response of Donna Wilson, Proof

of Claim Number 12083 was served upon those in the attached list via overnight delivery on January

17, 2007.

I declare under the penalty of perjury that the statement above is true to the best of my

information, knowledge and belief.

_____

Thomas C. Wimsatt

U.S. Bankruptcy Court
for the Southern District of New York
One Bowling Green
New York, NY 10004

Honorable Robert D. Drain
United States Bankruptcy Judge
for the Southern District of New York
One Bowling Green, Room 610
New York, NY 10004

Delphi Corporation
Attn. General Counsel
5725 Delphi Drive
Troy, MI 48098

Skadden, Arps, Slate, Meagher & Flom, LLP
Attn. John Wm. Butler, Jr.
333 West Wacker Drive, Suite 2100
Chicago, IL 60606