

PricewaterhouseCoopers LLP
300 Madison Avenue
New York NY 10017
Telephone (646) 471-3000
Direct Phone (646) 471-3542
Direct Fax (813) 375-6478
www.pwc.com

## Statement of Work ("SOW") - Number \_\_\_\_
## Between Delphi Corporation and PricewaterhouseCoopers LLP

**Project Name:** Transaction Services
**Project Date:** December 15, 2006

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated March 17, 2006 between Delphi Corporation ("Delphi" or the "Company") and PricewaterhouseCoopers LLP (PwC), and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

### I. PURPOSE AND SCOPE OF THIS SOW:

The purpose of this SOW is to confirm our understanding of the terms and objectives of our engagement to provide you advice and assistance with the due diligence analysis of Delphi in preparation for a potential transaction.

### II. PARTIES' RESPONSIBILITIES UNDER THIS SOW:

**2.1 Services to be provided by PwC:**

The work that we will perform will include, but will not necessarily be limited to, holding discussions with certain officers, employees and outside consultants of the Company, performing financial analysis of the historical results and trends of the Company, commenting on projected financial information prepared by management, and performing certain other procedures which generally follow those outlined in Exhibit I. The procedures outlined in Exhibit I represent our current understanding of the scope of work we anticipate performing.

During various stages of our work, we will provide you with verbal reports, various outlines, executive summaries, analytical schedules, etc. as requested. We understand that you may make information available to potential investors, whether in a data room or by other means, that we may have advised on or assisted in the analysis thereof. Our work is undertaken on the basis that we are working for you alone. We make no representation about the suitability of any such information for disclosure to third parties and any responsibility for

**PricewaterhouseCoopers**

representations made to third parties remains yours alone. Any written material we may advise you on that you wish to make available to potential investors should only be provided where you have first carefully considered the contents of such documents and have adopted them as your own and should be prepared without PricewaterhouseCoopers' branding and you should not make any attribution to PricewaterhouseCoopers' advice thereon.

We will assume no responsibility and make no representations with respect to the accuracy or completeness of information provided by the Company. Moreover, our work cannot provide assurance that matters of significance to the financial information or to your plan process will be disclosed and that an investor's due diligence will not identify significant matters not previously identified by us or management of the Company. Further, our work is not designed to and is not likely to reveal fraud or misrepresentation by the management of the Company or any other person.

PricewaterhouseCoopers LLP is not a registered broker/dealer as defined by Federal securities laws. Our role is that of an advisor to the Company, not a broker of securities, and any fee paid to PricewaterhouseCoopers LLP is not contingent on a transaction closing nor is it based on the value of the Company. Further, it is understood that PricewaterhouseCoopers LLP is not authorized to make any decisions or to negotiate with others on behalf of the Company and will not hold itself out as having any authority to do so for the Company. Any descriptive information which PricewaterhouseCoopers LLP advises and assists the Company in preparing will be the sole responsibility of the Company and should not be referenced to PricewaterhouseCoopers LLP by name.

**2.2    Deliverables:**

If requested, upon the completion of our work, we will provide you with a written report setting forth the significant matters that came to our attention. You understand that any report we prepare on the business will not be written from an investor's perspective. This report in either draft or final form or portions thereof including our oral comments, should neither be associated with the financial statements of the Company nor be communicated or distributed to any party who is not a member of the management of the Company, other than the Company's legal counsel, nor should they be referred to or quoted, in whole or in part, in any offering memorandum, prospectus, registration statement, public filing, loan, other agreement or document, in any such case without our express written consent (which is not to be unreasonably withheld) or except as required by law, regulation, or legal process. In the event that our report is to be distributed to another party, a release letter similar to that set forth in Exhibit II must be received from that party prior to the distribution. It is agreed that the terms of such release letter are to be determined exclusively by PricewaterhouseCoopers LLP, provided that PwC shall not require a release letter from a potential investor that is less favorable to that party than as set forth on Exhibit II. In the event that our report is to be distributed to a potential investor, we will require your assurance that any potential investor receiving our report will be given an opportunity to carry out its own due diligence.

(2)

**PRICEWATERHOUSECOOPERS**

During the engagement we may provide oral comments, or drafts of: written reports, presentations, letters, schedules or hard or soft copies of electronic work products.  As these represent work in progress and/or not our final findings, we do not assume any responsibility in respect of them.  The final results of our work will be contained in our final report.

**2.3    Delphi's Responsibilities:**

It is your responsibility to determine the adequacy of the work to be performed for your purposes.  We make no representations as to whether these procedures are sufficient for your purposes.  Also it is understood that it is your right and responsibility to (1) designate a management-level individual or individuals to be responsible for overseeing the services being provided, (2) evaluate the adequacy of the services performed and any findings that result, (3) make all management decisions and perform all management functions, including accepting responsibility for the results of the our services, and (4) determine exclusively the scope of work included in Exhibit I, which will be subject to a work plan to be authorized by you.  The Company is solely responsible for the plan process; for implementation of any advice; for the materials created in connection with this engagement and for all information provided to potential investors, including but not limited to any descriptive memoranda, management presentations and projected financial information, for all negotiations with third parties and for determining the adequacy and acceptability of any offers received by third parties.

**2.4    Timing:**

The timing of our services to be provided hereunder is as follows:

Project Start Date:                             December 15, 2006
Estimated Project Completion Date:              March 31, 2007


**III.    RESOURCES ASSIGNED TO THIS SOW:**

The PricewaterhouseCoopers personnel assigned to lead the services under this SOW are as follows:

Colin Wittmer, Lead Engagement Partner
Michael Burwell, Concurring Review Partner
Pete Smidt, Lead Engagement Director
Dave Dilcher, Lead Human Resources Partner
Eric Miller, Lead Tax Partner



### IV.   PAYMENT; EXPENSES; AND INVOICES:

**4.1   Payment Terms:**

Payment terms are consistent with the terms in Section 4 of the Agreement.

**4.2   Professional Fees and Expenses:**

Completion of the procedures is subject to, among other things, appropriate cooperation from Company personnel including providing necessary information and timely responses to our inquiries.  We will advise you promptly should we believe we would be unable to complete the procedures and issue our report.

Our fees will be based on applying the hourly rates for the individuals assigned to the engagement.  Our agreed upon rates are as set forth below:

|  | Low | High |
|---|---|---|
| Partner & Managing Director | $775 | $900 |
| Director | $515 | $600 |
| Manager | $390 | $450 |
| Senior | $325 | $375 |
| Associate | $290 | $325 |
| Administration | $100 | $150 |

We estimate our fees for this engagement will range from $3,500,000 to $5,500,000.

If, during the course of our work, it appears that our fee will exceed our estimate, we will advise you immediately and we will not undertake additional work without prior approval.

We also will bill you for our reasonable out-of-pocket expenses and our internal per-ticket charges for booking travel.  Our fees and expenses will be billed in accordance with Sections 3 and 4 of the Agreement.

### V.   OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW:

**5.1   Limitation of Liability**

Because of the importance of oral and written representations by Delphi or Delphi management on PwC's ability to effectively perform the services as set forth in this SOW, Delphi releases PwC from any and all claims, liabilities, costs and expenses attributable to any knowing misrepresentation by Delphi or Delphi management.

Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of PwC, PwC's liability to pay damages for any losses incurred by

PRICEWATERHOUSECOOPERS ⓟ

Delphi as a result of a breach of contract, negligence or other tort committed by PwC, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to PwC for Services provided under this SOW.

In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, Delphi and PricewaterhouseCoopers have agreed that: (1) any controversy or claim with respect to, in connection with, arising out of, or in any way related to this SOW or the services provided by PricewaterhouseCoopers to Delphi as outlined in this SOW, including any matter involving a successor in interest or agent of Delphi or of PricewaterhouseCoopers, shall be brought in the Bankruptcy Court or the District Court for the Southern District of New York if such District Court withdraws the reference; (2) PricewaterhouseCoopers and Delphi and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole and exclusive forum (unless such court does not have or retain jurisdiction over such claims or controversies) for the resolution of such claims, causes of actions or lawsuits; (3) PricewaterhouseCoopers and Delphi, and any and all successors and assigns thereof, waive trial by jury, such waiver being informed and freely made; (4) if the Bankruptcy Court, or the District Court if the reference is withdrawn, does not have or retain jurisdiction over the foregoing claims and controversies, PricewaterhouseCoopers and Delphi, and any and all successors and assigns thereof, will submit first to non-binding mediation; and, if mediation is not successful, then to binding arbitration, in accordance with the dispute resolution procedures set forth in Exhibit III to this SOW; and (5) judgment on any arbitration award may be entered in any court having proper jurisdiction.

Further, PricewaterhouseCoopers has agreed not to raise or assert any defense based upon jurisdiction, venue, abstention or otherwise to the jurisdiction and venue of the Bankruptcy Court or the District Court for the Southern District of New York (if such District Court withdraws the reference) to hear or determine any controversy or claims with respect to, in connection with, arising out of, or in any way related to this SOW or the services provided hereunder.

**5.2    Other matters:**

PricewaterhouseCoopers LLP is owned by professionals who hold CPA licenses as well as by professionals who are not licensed CPAs. Depending on the nature of the services we provide, non-CPA owners may be involved in providing services to you now or in the future.

There are other PricewaterhouseCoopers teams assigned to engagements for Delphi that have been completed or are underway. The PricewaterhouseCoopers team assigned to this engagement will not have access to the team members, working papers or reports of those other PricewaterhouseCoopers engagements without Delphi's prior consent.

If there are any questions, please call Colin Wittmer, Partner, at (646) 471 3542 or Mike Burwell, Partner, at (313) 394 3504 who will lead our engagement team. If the services

# PRICEWATERHOUSECOOPERS 🅿

outlined herein are in accordance with your requirements and if the above terms are acceptable, please have one copy of this letter signed in the space provided below and return it to us.

**IN WITNESS WHEREOF**, the parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| **PwC LLP** | | | |
|---|---|---|---|
| Signature _____ | Printed Name Colin Wittmer | Title Partner | Date Dec. 15, 2006 |
| **Delphi Corporation** | | | |
| Authorized Signature _____ | Printed Name John Sheehan | Title Vice President, Chief Restructuring Officer | Date Dec. 15, 2006 |



**Exhibit I**

The following is a summary of the due diligence areas for which we propose to perform due diligence procedures.  Given our understanding of the Company's organization and reporting structure, we expect to perform and report on certain procedures for each operating division as appropriate using separate teams, all coordinated via a central team located at Delphi Headquarters in Troy, MI.

**Financial Due Diligence**

1. Obtain an understanding of the Company's accounting policies and how those policies impact reported results.  Assess the overall adequacy of the Company's compliance with Sarbanes-Oxley rules and reporting responsibilities.

2. Obtain an understanding of the status of significant "investigations" into the Company's financial reporting and the Company's current estimate, if any, of the range of the potential effects to its reported earnings.

3. Understand significant joint-venture agreements and how their accounting treatment impacts reported EBITDA and cash flow.

4. Summarize the key financial aspects of transactions and agreements/arrangements between the Company and General Motors.

5. Perform appropriate due diligence procedures on the following subject areas pursuant to a work plan to be authorized by you:

    (a)    Quality of Earnings / Cash Flow (performed for each operating division as appropriate)

    (b)    Operating Division Analysis and Corporate Headquarters (performed for each operating division as appropriate)

    (c)    2007 to 2012 Business Plan (performed for each operating division as appropriate)

    (d)    Balance Sheet

    (e)    Tax Due Diligence

    (f)    Employee Benefits Due Diligence



**Exhibit II**

**Standard Release Letter - Report Access Requested by Client for Nonclient**


[Nonclient Recipient Letterhead]


[Date]

Colin Wittmer
PricewaterhouseCoopers LLP
PricewaterhouseCoopers Center
300 Madison Ave.
New York, NY 10017

Dear Mr. Wittmer:

Delphi Corporation (the "Company") has informed [name of recipient] that PricewaterhouseCoopers LLP has performed certain procedures to assist the Company in connection with its own due diligence of the Company.  We understand that the work performed by PricewaterhouseCoopers LLP was performed in accordance with instructions provided by Company and was performed exclusively for the Company's sole benefit and use.

The Company has requested that PricewaterhouseCoopers LLP provide [name of recipient] access to the report of their findings dated [date].  [name of recipient] acknowledges that this report was prepared at the direction of the Company and may not include all procedures deemed necessary for the purposes of [name of recipient] and that certain findings and information may have been communicated to the Company that are not reflected in the report.  Potential investors should take note that this document is different in scope and content from a due diligence report typically prepared for potential investors.  The report is provided to potential investors solely to assist the Company in providing relevant information about the business; it has not been prepared as, and it should not be used in place of, the due diligence enquiries and procedures potential investors would normally carry out prior to investing in a business.

In consideration of PricewaterhouseCoopers LLP allowing [name of recipient] access to the report and, if requested by [name of recipient], discussing the report, [name of recipient] agrees that it does not acquire any rights as a result of such access that it would not otherwise have had and acknowledges that neither PricewaterhouseCoopers LLP nor any other PricewaterhouseCoopers Firm involved in performing the work or preparing the report ("Released Firm") assumes any duties or obligations to [name of recipient] in connection with such access.



[name of recipient] agrees to release PricewaterhouseCoopers LLP, each Released Firm and their personnel from any claim by [name of recipient] that arises as a result of PricewaterhouseCoopers LLP permitting [name of recipient] access to the report.  Further, [name of recipient] agrees not to disclose or distribute the report, or information received, orally or in writing from PricewaterhouseCoopers LLP or a Released Firm to any other parties (including, if applicable, to any other members of a lending syndicate) without PricewaterhouseCoopers LLP's prior written consent, except as required by law, regulation, or legal process, provided that, except in the case of routine supervisory examinations by bank regulatory authorities, [name of recipient] provides PricewaterhouseCoopers LLP with prompt notice of any request that [name of recipient] disclose such information (so long as such notice is not prohibited by law), so that PricewaterhouseCoopers LLP may at its option object to the request and/or seek an appropriate protective order.  It is understood and agreed that any objection of PricewaterhouseCoopers LLP to such a request shall not affect [name of recipient]'s obligations to produce materials called for by appropriate legal or regulatory process.

Acknowledged by [name of recipient] representative:

By: _____
    (Name of company official)

_____
    (Title)

_____
    (Date)



**Exhibit III**

**Dispute Resolution Procedures**

The following procedures shall be used to resolve any controversy or claim ("dispute") as provided in this SOW.  If any of these procedures are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

<u>Mediation</u>
A dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.  The mediator will be selected by the parties.  If the parties cannot agree on the mediator, a mediator will be designated by the American Arbitration Association ("AAA") or JAMS/Endispute at the request of a party.  Any mediator so designated must be acceptable to all parties.

The mediation will be conducted as specified by the mediator and will be agreed upon by the parties.  The parties agree to discuss their differences in good faith and to attempt, with the assistance of mediator, to reach an amicable resolution of the dispute.

The mediation will be treated as a settlement discussion and therefore will be confidential.  The mediator may not testify for either party in any later proceeding relating to the dispute.  No recording or transcript shall be made of the mediation proceedings.

Each party will bear its own costs in the mediation.  The fees and expenses of the mediator will be shared equally by the parties.

<u>Arbitration</u>
If a dispute has not been resolved in 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.  The arbitration will be conducted in accordance with the procedures in this document and the Arbitration Rules for Professional Accounting and Related Services Disputes of the AAA ("AAA Rules").