## AFFIDAVIT OF JAMES H. NGUYEN

I, James H. Nguyen, under penalty of perjury, declare that the following is true and correct.

1. My name is James H. Nguyen, I am a competent adult, and I have personal knowledge of the following facts.

2. In about 1985, I began work for the predecessor of Delphi in Anderson, Indiana, Delco Remy Division of General Motors Corporation, collectively referred to here as "Delphi."

3. I have always had good performance ratings at Delphi.

4. In 1986, I received a bachelor's degree in engineering from Purdue University.

5. At Delphi, I was called Chink and other names and he was not promoted.

6. In about 1993, I transferred to the job of electrician apprentice.

7. In 1996, I became a journeyman electrician.

8. At Delphi when I was an electrician, employees called me offensive national origin names such as Chink, Gook, Vietnamese bastard, Viet Cong, and other names.

9. Some of the electricians who were friends of mine told me that I was being called those names, and they told me to watch out for myself.

10. In 1999, the name calling and harassment of me became worse and I complained about the discrimination to Delphi.

11. I complained to my supervisor Chuck Whaley about the discrimination, but Mr. Whaley refused to listen to me or investigate the discrimination.

12. In September, 1999, I was assigned to work in Department 2050 on Second Shift from 3:00 p.m. to 11:30 p.m. to work by myself.

13. In the Fall of 1999, Supervisors Dwight Barr and Chuck Whaley refused to provide help to me when I requested help, but they provided help to other electricians when they requested help.

14. On about Saturday, December 11, 1999, electrician Jerry Dickey gave me a copy of his note for that day noting that electrician Ed Bronner was taken off a job in Department 46 and reassigned, and I was given that job and another job at the same time, while electricians Mel Bennett and Mike Clarkson were available and were given no job assignment.

15. A true and accurate copy of the note of Jerry Dickey is attached.

16. I complained to the supervisors that they was giving me two jobs while other electricians had no jobs.

17. Just a few days later, on December 14, 1999, supervisor Chuck Whaley issued to me a disciplinary lay-off for the balance of the shift plus one day for sleeping on the job and hiding from him, but I was not sleeping on the job or hiding, and he saw me sitting with another electrician Jerry Dickey waiting for a job assignment.

18. I complained to Mr. Whaley about the discrimination, falsely accusing me of sleeping on the job, and suspending me when other employees similarly situated like Jerry Dickey were not suspended.

19. I asked Mr. Whaley to interview the other employees who were present with me, such as Jerry Dickey, Henry Prince and Willie Woods, and Mr. Whaley refused to do so.

20. Delphi employees continued to ridicule me because of my national origin by calling me names and by refusing to assist me.

21. In May of 2000, a vulgar poster in Asian writing was left on my briefcase on

my workbench at Delphi.

22. I complained to Delphi and gave a copy of the vulgar poster with Asian writing to Mr. Whaley and First Shift Supervisor Matt Klein, but they did not do anything about it.

23. Supervisor Matt Klein took the poster, laughed, and threw it in the trash.

24. I asked Mr. Klein if I could have it from the trash, and he got it from the trash and gave it to me.

25. A true and accurate copy of the poster is in the attached ICRC documents.

26. About a week later, another vulgar poster with Asian writing on it like the first poster was placed on my tool wagon.

27. I again complained to Chuck Whaley and Matt Klein about the second vulgar poster, but they took no action.

28. In June, 2000, Mr. Whaley started following me around, watching me work, but he did not do so to other electricians.

29. For example, on June 8, 2000, Mr. Whaley stood five feet away from me and watched me do my job, I asked Mr. Whaley if he was checking up on me, and he said yes.

30. Mr. Whaley followed me around and watched me do my job, until it was done. but he did not do that to other electricians.

31. For other electricians, Mr. Whaley assigned them a job and let them go to the machine and do it without him watching them.

32. On about June 9, 2000, Mr. Whaley asked me to work 4 hours overtime, and I did so.

33. Mr. Whaley asked me to report to the office for the overtime, but he did not ask other electricians to do so, and I complained about the different treatment of me.

34. On about June 13, 2000, I saw that the time record showed that I worked 4 hours overtime, but Mr. Whaley had not approved it.

35. I asked Mr. Whaley to approve the 4 hours of overtime for Friday, June 9, and Mr. Whaley said that he would check it out.

36. On about June 14, 2000, at about 5:30 p.m., I again asked Mr. Whaley about Friday's overtime pay, and Mr. Whaley said that he had not followed through.

37. At about 9:15 p.m. Mr. Whaley told me that Mr. Klein did not want to pay me the overtime pay.

38. I complained to Mr. Whaley about the discrimination of telling me to report to the office, but not telling other electricians, and not paying me for overtime.

39. Mr. Whaley did not process the pay for my overtime, and I did not receive the overtime pay.

40. On June 14, 2000, Mr. Whaley asked me if I wanted to work overtime on June 15, 2000.

41. I asked Mr. Whaley if I was going to be paid for the overtime, and Mr. Whaley did not answer my question.

42. I complained to Mr. Whaley that I did not want to work overtime again and not be paid.

43. Mr. Whaley did not respond to me.

44. I lost overtime for June 15, 2000, because Delphi would not state that I would be paid overtime if I worked overtime, like other employees.

45. On about July 7, 2000, the Delphi dispatcher called Marvin Barker to Department 2050 to help me.

46. Mr. Barker refused to help me in Department 2050, but Mr. Barker on other occasions helped native born American electricians.

47. Mr. Whaley laughed and did not require Mr. Barker to help me.

48. While Mr. Whaley required Delphi employees to assist other electricians, Mr. Whaley did not require Delphi employees to assist me.

49. During 2000, on several occasions, my tool box was taken which contained tools needed for me to work at Delphi.

50. I looked all over the plant and complained to the supervisors.

51. Usually, my tools were returned by Supervisor Dwight Barr.

52. In about July, 2000, my doctor recommended that I take medical leave because of the stress of the harassment and discriminatory treatment.

53. I lost two weeks of work while on medical leave from August 1, 2000 to August 14, 2000, when I was only paid about 60 percent of my regular pay.

54. In August and September of 2000, Mr. Whaley refused to require Mr. Barker to assist me when I requested assistance.

55. In October of 2000, Mr. Barker on Third Shift refused to do his job in our Department 2050 unless Mr. Whaley provided him with a helper, and Mr. Whaley provided Mr. Barker, who is a native born American, with a helper, Junior Oliver, who is native-born.

56. I asked Mr. Whaley why he provided a helper to Mr. Barker, but Mr. Whaley would not provide a helper to me.

57. Mr. Whaley said he had a right to assign the jobs to whoever he wanted because he was a supervisor, and he gave no other reason.

58. I complained to Mr. Whaley that his actions were discrimination.

59.    Mr. Whaley and Delphi did not provide help to me.

60.    On about October 30, 2000, I was forced to transfer out of Department 2050 in order to try to avoid the stress from the harassment and discrimination.

61.    I was assigned as an electrician to Departments 2038, 2039, 2041, 2942, 2046, 2057, and 2071 with partner John Watson, who noticed and told me about the discrimination also.

62.    On about November 17, 2000, I complained, with the permission of the union, to the Indiana Civil Rights Commission ("ICRC") about the national origin discrimination.

63.    Delphi still failed to take action against the employees discriminating against me, and instead, made it worse for me.

64.    In about December, 2000, my tool box which contained tools needed for my work was taken again at Delphi and this time, it was no returned for about four months.

65.    I complained to Delphi that my tool box was taken at Delphi, and Delphi did not replace my tools box, but when David Boys' tools were taken, Delphi replaced all of his within two to three weeks.

66.    I was required to work for more than four months as an electrician without any tool box and with only the tools on my tool belt and those I could borrow.

67.    In about May, 2001, Supervisor Dwight Barr brought my tool box to me, but the lock was gone and there were no tools in the box.

68.    Mr. Barr began replacing some tools, but not all of the tools taken from me which the employer had originally provided and which I needed to do my job.

69.    On September 7, 2001, the Indiana Civil Rights Commission issued a Notice of Finding that Delphi discriminated against me, and a true and accurate copy of the

finding and the supporting documents are attached hereto.

70. The ICRC had a pre-hearing conference on November 19, 2001.

71. In December, 2001, General Supervisor Dick Falkenberry asked me if I had filed a complaint against the company, and I told him that I had.

72. On March 21, 2002, I filed a complaint in the United States District Court.

73. On May 9, 2002, Delphi filed its answer to my complaint.

74. On June 21, 2002, Supervisor Dick Falkenberry transferred me from Second Shift, which I preferred and transferred to in order to avoid the harassment and discrimination, to Day Shift, where supervisors watched, followed, and harassed me.

75. Supervisor Falkenberry put a white electrician Todd Tieman, who just came back from lay-off and had lower seniority than me, in Departments 2001 and 2002, where I had a right by seniority to be assigned, and instead Falkenberry gave me the floater job all over the plant, which was a harder job.

76. I complained to Delphi that I was discriminated against and retaliated against by not being assigned in accordance with my seniority.

77. On July 22, 2002, I was assigned to do a job that required tools which had not been replaced after my tool wagon was stolen, and I had to search for the tools in other places.

78. While I was working other electricians who were not working did not loan their tools to me, and teased me about continuing to work on the job.

79. Instead of helping me, on about July 22, 2002, Supervisor Mike Hess gave me a disciplinary layoff of the balance of a shift and three days for failure to put forth work effort, when I was making an extra effort to do the job without proper tools.

80. Delphi claimed that it was relying on the word of Mark Silney, but at the meeting on my complaint, he did not appear.

81. To this day, Delphi has not replaced all of the tools which were taken from me.

82. On August 13, 2002, the dispatcher told me that Matt Klein told her to tell me to abandon a job in Department 2006 and go to another job in Department 2046 and have electrician Bill Mitchell complete my job, but Delphi has not moved other electricians from a job in progress.

83. I did not request help on the job and was doing fine.

84. If an electrician needs help, an assistant is sent to other electricians and they are not moved to another job in progress.

85. On August 16, 2002, I went to the emergency room for chest pain from the stress of being moved around, followed, harassed, and discriminated and retaliated against.

86. In September, 2002, my cardiologist scheduled me for heart catheterization on October 7, 2002.

87. On September 30, 2002, Matt Klein took my job away and gave it to two white electricians, Virgil Hall and Mike Brown, to replace me in my Department 2001 and 2002.

88. Matt Klein assigned me to be a floater electrician all over the plant.

89. The stress of the harassment, discrimination, retaliation, taking my job away from me, and telling me that I had to cover the entire plant caused me great stress.

90. On October 1, 2002, I had a heart attack in the plant, another electrician called an ambulance, and I was taken to the emergency room of St. Johns' Hospital in Anderson, and released about 7:00 p.m. that day and told not to return to work until the catheterization was performed.

91. On October 7, 2002, I had a heart catheterization performed by my cardiologist.

92. On about October 28, 2002, my cardiologist performed another heart catheterization.

93. On November 27, 2002, I returned to work with a release from my doctor and a release from the Delphi doctor, but the supervisors did not allow me to work for about five hours because I did not have a written release from the Delphi doctor, and the Delphi doctor usually does not write a release and he calls instead.

94. When Delphi finally allowed me to work on November 27, 2002, the supervisors refused to let me work in my assigned area of Departments 2001 and 2002 with which I was familiar, and instead, required me to work in several departments all over the plant, which was not good for my heart condition.

95. I complained to the supervisors about the discrimination of not allowing me to work in my assigned area and requiring me to move all around the plant, but he said he had the right to assign jobs.

96. On December 10, 2002, I gave a deposition to the defendant in which I detailed my complaints of discrimination and retaliation, and I requested that the supervisors be removed from their positions.

97. On about December 11, 2002, I saw Delphi Human Resources representative David Shade talking in his office with Phil Webber, General Supervisor of Plant 20 skilled trades, with the yellow legal pad that David Shade took notes on December 10, 2002 during my deposition.

98. On December 16, 2002, I had worked early from 5:00 a.m. to 1:30 p.m. so I could go to cardiac rehabilitation at 1:30 p.m.

99. Matt Klein asked me to work overtime, and I told him I would come back and do so after my cardiac rehabilitation, and he said o.k.

100. I did not clock out at 1:30, because I was coming back to work, and employees do not clock out for lunch, breaks, or when they are coming back to work and it is approved by the supervisor.

101. However, on December 16, 2002, Supervisor Matt Klein laid me off for three days for not clocking out to go to the doctor, when I had his permission to go, and employees do not clock out when they go to a doctor's appointment with the permission of the supervisor.

102. Matt Klein said that Phil Webber told him to watch for me when I came back and to lay me off.

103. Submitted herewith is a true and accurate copy of a video of the main entrance door of Delphi which I took to show what I see every day by employees going in and out of the main entrance door for lunch, breaks, and doctors' appointments, which do not require clocking out and in, before the employees finally ring out for the day.

104. On January 17, 2003, Matt Klein laid me off for balance of a shift and one week for excessive time off the job, but I was working on two jobs in one department until 10:00 and took two fifteen minute breaks to 10:30, because I had been working since 5:00 a.m.

105. After washing my hands, I was with Mike Westervelt on a break, and he confirmed that I was properly on a break, and he was not disciplined when he took a longer break than I did.

106. A couple days later, I suffered chest pains, went to the doctor, and was placed on sick leave from February 17, 2003 to September 11, 2003.

107. In about February, 2003, my cardiologist performed another heart

catheterization.

108.  In about May, 2003, my cardiologist performed another catheterization.

109.  In about June, 2003, my cardiologist performed another catheterization.

110.  I am not overweight, I do not have diabetes, do not have high blood pressure, and the only factor for my heart problems was stress from the harassment, discrimination, and retaliation.

111.  On about September 11, 2003, I returned to work and was laid off that day, when there was no lay-off posted, and I should not have been laid off.

112.  When an employee is on sick leave, and a lay-off occurs at Delphi, the sick employee is allowed to return to work when released by his doctor, and not be laid off until the next lay-off.

113.  I was not treated equally to the other employees who had been on sick leave during a lay-off.

114.  I am still on lay-off and have been prevented by Delphi from working like other employees who have returned to work from sick leave in the past.

115.  As a result of the actions of Delphi, I have suffered lost back pay and benefits, front pay and benefits, lost future earnings, loss of reputation, lost job opportunities, humiliation, embarrassment, inconvenience, mental anguish, emotional distress, loss of enjoyment of life, attorney fees and costs, and other damages.

I declare under penalty of perjury that the foregoing is true and correct, pursuant to Title 28, United States Code, Section 1746.

Executed on December 22, 2003.

_____
James H. Nguyen