**Bidding Procedures Hearing Date And Time: February 15, 2007 at 10:00 a.m.**
**Bidding Procedures Objection Deadline: February 8, 2007 at 4:00 p.m.**
**Sale Hearing Date And Time: March 22, 2007 at 10:00 a.m.**
**Sale Hearing Objection Deadline: March 15, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)


     - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)


Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession


Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698


Delphi Legal Information Website:
http://www.delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                    :
    In re                                           :     Chapter 11
                                                    :
DELPHI CORPORATION, et al.,                         :     Case No. 05-44481 (RDD)
                                                    :
                                                    :     (Jointly Administered)
          Debtors.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x


MOTION FOR ORDERS UNDER 11 U.S.C. §§ 363 AND 365 AND FED. R. BANKR. P. 2002,
6004, 6006, AND 9014 (A) APPROVING (I) BIDDING PROCEDURES, (II) CERTAIN BID
PROTECTIONS, (III) FORM AND MANNER OF SALE NOTICES, AND (IV) SALE
HEARING DATE AND (B) AUTHORIZING AND APPROVING (I) SALE OF CERTAIN
OF DEBTORS' ASSETS COMPRISING ASSETS EXCLUSIVELY USED IN DEBTORS'
BRAKE HOSE BUSINESS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES,
(II) ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
<u>AND UNEXPIRED LEASES, AND (III) ASSUMPTION OF CERTAIN LIABILITIES</u>

("BRAKE HOSE BUSINESS SALE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for orders under 11 U.S.C. §§ 363 and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 approving (i) the bidding procedures set forth herein and attached hereto as <u>Exhibit A</u> (the "Bidding Procedures"), (ii) the granting of certain bid protections, (iii) the form and manner of sale notices (the "Notice Procedures"), and (iv) the setting of a sale hearing (the "Sale Hearing") and (b) authorizing and approving (i) the sale (the "Sale") of certain of the Debtors' assets (the "Acquired Assets") comprising substantially all of the assets exclusively used in the brake hose product line of DAS LLC (as defined below) (the "Business") and certain intellectual property of DTI (as defined below) related to the Business (the "Purchased Intellectual Property," together with the Acquired Assets, the "Purchased Assets") for $9.8 million and other consideration, free and clear of liens, claims, and encumbrances, to Harco Manufacturing Group, LLC (the "Purchaser") pursuant to the Sale And Purchase Agreement dated January 25, 2007 by and among Delphi Automotive Systems LLC ("DAS LLC"), Delphi Technologies, Inc. ("DTI" and, collectively with DAS LLC, the "Selling Debtor Entities"), the Purchaser, and Harco Brake Systems, Inc. (the "Agreement")[1] or to the Successful Bidder (as hereinafter defined) submitting a higher or otherwise better bid, (ii) the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") to the Purchaser or the Successful Bidder, and (iii) the assumption of certain liabilities (the "Assumed Liabilities") by the Purchaser or the Successful Bidder.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Agreement.

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2.    On October 17, 2005, the Office of the United States Trustee appointed an official committee of unsecured creditors (the "Creditors' Committee"). On April 28, 2006, the Office of the United States Trustee appointed an official committee of equity security holders (the "Equityholders' Committee"). No trustee or examiner has been appointed in the Debtors' cases.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

B.    <u>Current Business Operations Of The Debtors</u>

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") had global 2005 net sales of approximately $26.9 billion, and global assets as of August 31, 2005 of

approximately $17.1 billion.[2] At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues, and the thirteenth largest

public company business reorganization in terms of assets. Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from this

Court.

      6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology. The Company supplies products to nearly every

major global automotive original equipment manufacturer.

      7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of GM. Prior to January 1, 1999, GM conducted the Company's business through

various divisions and subsidiaries. Effective January 1, 1999, the assets and liabilities of these

divisions and subsidiaries were transferred to the Company in accordance with the terms of a

Master Separation Agreement between Delphi and GM. In connection with these transactions,

Delphi accelerated its evolution from a North American-based, captive automotive supplier to a

global supplier of components, integrated systems, and modules for a wide range of customers

and applications. Although GM is still the Company's single largest customer, today more than

half of Delphi's revenue is generated from non-GM sources.

C.      <u>Events Leading To The Chapter 11 Filing</u>

      8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income. Every year thereafter, however,

---

[2]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates.

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.8 billion on net sales of $26.9 billion.

9.     The Debtors believe that the Company's financial performance has

deteriorated because of: (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

10.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.     On March 31, 2006, the Company outlined the key tenets of its

transformation plan.  The Company believes that this plan will enable it to return to stable,

profitable business operations and allow the Debtors to emerge from these chapter 11 cases in

---

[3]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
       valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
       loss in calendar year 2004 was $482 million.

the first half of 2007.  To complete their restructuring process, the Debtors must focus on five

key areas.  First, Delphi must modify its labor agreements to create a competitive arena in which

to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize

GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise

a workable solution to their current pension situation.

        12.      On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was an

equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred

and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The

Equity Purchase and Commitment Agreement is subject to the completion of due diligence,

satisfaction or waiver of numerous other conditions (including Delphi's achievement of

consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by

either Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with the Plan

Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of

the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors

and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues,

and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements

with their U.S. labor unions and GM.

13.     On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  Although much remains to be accomplished

in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a

course that should lead to a consensual resolution with their U.S. labor unions and GM while

providing an acceptable financial recovery framework for the Debtors' stakeholders.

14.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

<u>Relief Requested</u>

15.     On January 25, 2007, the Selling Debtor Entities and the Purchaser

entered into the Agreement which provides for the Sale of the Purchased Assets, which comprise

the assets exclusively used in the Business, to the Purchaser, an affiliate of the contract

assembler of DAS LLC's brake hose assemblies, for $9.8 million and other consideration.  The

7

proposed Sale is subject to approval by this Court and additional competitive bidding pursuant to the proposed Bidding Procedures.  By this Motion, the Debtors[4] seek entry of two orders.  First, at the omnibus hearing scheduled to be held on February 15, 2007, the Debtors request entry of an order substantially in the form attached hereto as <u>Exhibit B</u> (the "Bidding Procedures Order") approving the Bidding Procedures, Notice Procedures, and certain bid protections to be provided to the Purchaser pursuant to the Agreement and as described more fully herein.  Second, subject to the terms of the Bidding Procedures Order, at the omnibus hearing scheduled to be held on March 22, 2007, the Debtors request entry of an order substantially in the form attached hereto as <u>Exhibit C</u> (the "Sale Order") authorizing and approving the Sale, the assumption and assignment of the Assigned Contracts, and the assumption of the Assumed Liabilities.

16.    As more fully set forth below, after a comprehensive strategic review, the Debtors believe that the Sale is its best opportunity under the circumstances to maximize the underlying core value of the Business and that, therefore, the sale is in the best interests of their estates and their creditors.

<u>Basis For Relief</u>

A.    <u>The Brake Hose Business</u>

17.    The Debtors supply a complete array of brake hose assemblies, including brake hoses and fittings, brackets, and clips, for a wide range of vehicles from small automobiles to mid-size trucks.  These brake hose assemblies are specifically designed to transmit hydraulic brake fluid from a vehicle's rigidly mounted brake pipes to a caliper or drum brake, allowing the brake/tire combination the flexibility to move throughout its full range of operation.  The

---

[4]    For the purpose of convenience, references to "the Debtors" or "Delphi" herein shall mean, as the context requires, (i) DAS LLC, the Debtor entity that manufactures and sells brake hose products for the Business and enters into contracts in connection with the Business or (ii) DTI, the Debtor entity that holds the intellectual property relating to the Business.

Debtors' brake hose assemblies are designed, constructed, and tested to withstand extremes of weather and driving conditions, including water, salt, road dirt, and temperature changes, and the assemblies exceed engineering and safety standards.

18.    The Debtors' brake hoses consist of a number of layers, beginning with an inner tube layer made from a rubber compound manufactured by the Debtors and covered with two layers of braid.  The hose is then wrapped in a tough sheath of rubber and brackets and armoring and end fittings are added to complete the brake hose assembly.  For installation of brake hoses onto vehicles, the Debtors provide connective end fittings, tube and block fittings, brass banjo and junction block fittings, and a wide variety of brackets and clips.

19.    The Debtors, in operating the Business as part of the Chassis Systems Product Business Unit within their Automotive Holdings Group Division, mix the rubber hose compound and manufacture the rubber hose and fittings at their Home Avenue facility in Dayton, Ohio.[5]  The Debtors then deliver those brake hose components to Harco Brake Systems, Inc. ("Harco"), Delphi's brake hose contract assembler in Clayton, Ohio and an affiliate of the Purchaser, for final assembly prior to direct shipment by Harco to GM, Delphi's sole OEM customer of the Business.  The Debtors are a Tier I supplier to GM and a Tier II supplier to several Tier I brake hose assembly suppliers to GM.

20.    The brake hose product line has been an ongoing business concern since 1936.  In 1997, the brake hose final assembly operation was moved to Harco.  Because Delphi's long term supply agreement with Harco expired at the end of 2004, DAS LLC and Harco executed an extension effective January 1, 2005 and continuing until December 31, 2007 under a

---

[5]    The Home Avenue facility also fabricates the rubber compound used in the Delphi Powertrain Mounts product line and.  Under a contractual relationship, the facility will continue to manufacture that compound for Harco for up to 18 months after the Closing..

"Brake Hose Assembly Contract Policy Statement" (the "Extension").  The Extension provides, among other things, for DAS LLC to pay Harco $2.5 million in cancellation costs if the brake hose business is in-sourced or completely exited by DAS LLC.  The Extension also gives Harco a right of first refusal to buy the brake hose business before any alternative purchaser is considered by DAS LLC.  If Harco were to decide not to purchase the Business, then DAS LLC would be responsible only for transfer costs to the new supplier.  Under the terms of the Agreement, the Purchaser or an alternative purchaser of the Business must assume the Extension and the Debtors would have no further obligations thereunder.

B.      Factors Leading To The Sale

21.      Although the Debtors believe that the brake hose product line is fundamentally strong, the Business does not fit within the Debtors' anticipated product portfolio under their transformation plan.  In particular, the Debtors have determined that they lack a global manufacturing presence in this particular product line to grow the Business.  In addition, the Debtors lack the fitting capacity and designs for brake hose assemblies in non-GM vehicles.

22.      The Debtors believe, however, that as a standalone business, unencumbered by legacy costs, the brake hose product could be a profitable and competitive business line.  The Debtors have therefore determined that the value of the Business will be maximized through the divestiture of its assets.  To achieve that goal, the Debtors are willing to support transition of the Business to a prospective buyer.

23.      In mid-2005, the Debtors sought potential acquirers of the Business.  In late 2005, the Debtors identified six potential bidders based upon those companies' strategic fit, financial characteristics, and their ability to satisfy customer requirements.  The Debtors determined that three of the six potential bidders would satisfy such requirements.

10

24.     The Debtors assembled an electronic data room and prepared management presentations to provide for an organized and efficient transmission of significant amounts of data related to the Business.  During June 2005, management presentations were made to three of the potential bidders.  Following this initial round of diligence, on or about June 23, 2006, three of the potential bidders submitted proposals for the acquisition of the Business.  The Debtors evaluated the terms and benefits of each proposal, as well as the benefits of other alternatives. The Debtors, in their business judgment, concluded that the proposal from the Purchaser, which formed the basis of the Agreement attached hereto as <u>Exhibit D</u>, offered the most advantageous terms and the greatest economic benefit to the Debtors.

25.     The Purchaser's offer is the highest and best offer because not only is the Purchaser offering the highest amount of consideration for the Business but also because of certain intangible factors.  The Purchaser and its affiliate, Harco, are experienced in the field of brake hose manufacture and have assembled products for the Business and provided other services to the Business since 1997.  The Debtors have determined that a sale of the Business to an experienced brake hose manufacturer such as the Purchaser would cause less disruption to customers, thereby maximizing the value of the Business.  Moreover, pursuant to the Agreement the Debtors will assume current executory agreements with Harco, curing the prepetition amount owed to Harco in an amount approximating $1.6 million.

C.     <u>The Need For An Expedited Sale Process</u>

26.     As noted above, the Debtors face decreased revenues from brake hose sales.  The Debtors have determined, however, that as a standalone product line, unencumbered by legacy costs, the brake hose product could be a profitable and competitive business line.  In light of the Debtors' desire to focus their available free cash on investments in those business

11

lines which are more likely to comprise their restructured product portfolio, there is a risk of value erosion if a sale of the brake hose business is not effected promptly. The overall value of the Business will be maintained and maximized through an expedited sale process."

D.    The Agreement

27.    Pursuant to the Agreement, (a) the Selling Debtor Entities will (i) sell the Acquired Assets for $9.75 million and other consideration, free and clear of all liens, claims, interests, and encumbrances, (ii) sell the Purchased Intellectual Property for $50,000.00, free and clear of all liens, claims, interests, and encumbrances, and (iii) assume and assign the Assigned Contracts to the Purchaser and (b) the Purchaser will assume the Assumed Liabilities.

28.    The significant terms of the Agreement are as follows:[6]

(a)    General Terms. The Purchaser will acquire the Purchased Assets, which comprise substantially all of the assets exclusively used by the Business through an asset sale. Among others, certain bailed assets, personnel records, financial assets, contracts, tax refunds, intellectual property, personnel and medical records, real property, services offered under a transition services agreement, manufacturing services agreement, or a rubber supply agreement, benefits arising under insurance policies, and the Debtors' rights under chapter 5 of the Bankruptcy Code are excluded from the Purchased Assets.[7]

(b)    Bankruptcy Approval. The Sale is subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

(c)    Documentation. The Sale will be effected pursuant to the Agreement and related documentation. At the closing, the Selling Debtor Entities and the Purchaser will enter into, among others, the following agreements: (i) an Intellectual Property Assignment granting the Purchaser certain rights in certain Purchased Intellectual Property owned by DTI, (ii) an indemnity escrow agreement by and among the Selling Debtor Entities, the Purchaser, and an Escrow Agent for the purposes described below, (iii) a Manufacturing Services Agreement, (iv) a Rubber Compound Supply Agreement, and (v) a Transition Services Agreement.

---

[6]    In the event of any discrepancy between the Agreement and this summary of the Agreement, the provisions of the Agreement are controlling.

[7]    Copies of the (i) schedules to the Agreement and (ii) the above-referenced transition services agreement, manufacturing services agreement, and rubber supply agreement are available upon request to parties-in-interest who can show that they would be impacted by the relief requested by this Motion.

(d)    Purchase Price.  The purchase price to be paid by the Purchaser is $9.8 million, which is an aggregate of $9.75 million to be paid by the Purchaser to DAS LLC for the Acquired Assets and $50,000.00 to be paid by the Purchaser to DTI for the Purchased Intellectual Property.

(e)    Deposit Escrow.  Upon execution of the Agreement, the Purchaser will place $500,000.00 of the purchase price into an escrow account.  Upon Closing, or if the Agreement is terminated prior to Closing because of certain actions of the Purchaser, the Debtors are entitled to keep the funds in the escrow account.  Any such payment shall constitute the Debtors' sole recourse in the event that the Purchaser terminates the Agreement prior to the date of the Auction (as defined below).  Upon any breach by the Purchaser on the date of or after the date of the Auction, the Selling Debtor Entities will be entitled to all available remedies in law or equity.  If the Agreement is terminated for any other reason, the escrow amount will be returned to the Purchaser.

(f)    Representations And Warranties.  Pursuant to the Agreement, the Selling Debtor Entities will provide comprehensive representations and warranties relating to the Sale and the Purchased Assets.  The representations and warranties of the Selling Debtor Entities will survive the closing of the Sale and generally expire on the first anniversary of the date of closing.  The Purchaser will also provide standard representations and warranties which will survive the closing of the Sale and expire on the first anniversary of the date of closing.

(g)    Covenants.  Between the date of signing the Agreement and the closing, the Selling Debtor Entities will be required to, among other things: (i) carry on their business in substantially the same manner as they have heretofore and perform in all material respects all of its obligations under certain enumerated contracts, (ii) use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, and employees, and (iii) use commercially reasonable efforts to take all actions necessary, proper, or advisable to effectuate the Sale in accordance with the Agreement.  For a period of two years after the closing, the Selling Debtor Entities will be required not to take certain actions which would place it in competition with the Purchaser with respect to the Business.

(h)    Indemnification.  Upon the Closing, the Purchaser will place $750,000.00 of the purchase price in to an indemnity escrow account (the "Indemnity Escrow Account").  The Selling Debtor Entities have agreed to indemnify the Purchaser for damages related to the following items: (i) those liabilities and excluded assets retained by the Debtors at closing, but only to the extent the Sale Order, the Bankruptcy Code, and other applicable Laws fail to discharge liabilities with respect to any claims brought by a third party against the Purchaser relating thereto, (ii) the Selling Debtor Entities' breach of any representation or warranty in the Agreement, (iii) a breach of any agreement or covenant of the Selling Debtor Entities in the Agreement, and (iv) failure by the Debtors to pay any amount owed with respect to a purchase money security interest under the Permitted Liens.  The sole and exclusive recourse of the Purchaser with respect to breaches of representations and warranties described above is a claim against the Indemnity Escrow Account described above.

(i)    Closing Conditions.  In addition to certain other customary closing conditions relating to bankruptcy court approvals and regulatory matters, the obligation of the

13

Purchaser to close the Sale is subject to the satisfaction of the following conditions: (i) the performance in all respects by the Selling Debtor Entities of their covenants under the Agreement and (ii) the accuracy of the Selling Debtor Entities' representations and warranties in all material respects.  Furthermore, the obligation of the Purchaser and the Selling Debtor Entities to close the Sale is subject to the Debtors' obtaining the waiver by the United Steel Workers of America Union, Local 871, AFL-CIO/CLC (the "USW") (the union representing the Business's hourly workforce) of any "no-sale" clause contained in any agreement between Delphi and the USW.

(j)      Termination.  The Agreement may be terminated in the following circumstances (but not by a party that is in breach of the Agreement): (i) upon mutual written consent of the Debtors and the Purchaser, (ii) by either the Debtors or the Purchaser if consummation of the Sale would violate any final non-appealable order of any regulatory governmental entity other than this Court, (iii) by either the Selling Debtor Entities or the Purchaser if the Debtors consummate an alternative transaction, (iv) by either the Selling Debtor Entities or the Purchaser if the closing has not occurred within 90 days after entry of the Sale Order, (v) by either the Debtors or the Purchaser if the Sale Order is not entered by this Court by May 25, 2007 or if the Sale Order is subject to a stay or injunction, (vi) by the Purchaser within ten business days of becoming aware that a material adverse effect has occurred and is continuing, or (vii) by the Selling Debtor Entities if they accept or are about to accept a qualified bid at the auction other than that of the Purchaser (provided that such termination under (vii) will be of no effect unless the Selling Debtor Entities enter into an agreement with respect to such qualified bid within two business days of termination and subsequently complete the Sale pursuant thereto).

(k)      Break-up Fee.  Subject to Court approval, the Selling Debtor Entities will be required to pay a Break-Up Fee to the Purchaser in the amount of $294,000.00 – 3.0% of the preliminary purchase price – if the Selling Debtor Entities sell, transfer, lease, or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Acquired Assets in a transaction or a series of transactions with one or more parties other than the Purchaser.

(l)      Expense Reimbursement.  Subject to Court approval, the Selling Debtor Entities will be required to reimburse the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement in an amount not to exceed $100,000.00 to the Purchaser upon (i) a termination of the Agreement by reason of the failure of the Closing to occur within 90 days after entry of the Sale Order or (ii) a termination of the Agreement by reason of (A) the failure of the Sale Order to be entered on or before May 25, 2007 or (B) the Sale Order being subject to a stay or injunction, in any case provided that the Purchaser is not then in breach of the Agreement for which the Selling Debtor Entities had previously notified the Purchaser.  The Purchaser has agreed that, in the event that it is entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the Purchaser shall only be entitled to receive the larger of the two and in no case shall be entitled to receive payment of both.

(m)    <u>Assumption Of Extension</u>.  Upon the Closing, the Successful Bidder must assume the Extension.  Following such assumption, the Debtors would have no further obligations under the Extension.

E.    <u>Workforce Provisions And Union Waiver Of No-Sale Clause</u>

29.    The Agreement does not provide for a transfer of the Business's workforce to the Purchaser.  Under a manufacturing services agreement to be entered into at the Closing, hourly employees of the Debtors will continue to produce brake hose products for a maximum period of 12 months.  Under a transition services agreement, salaried employees of the Business will support such activities for a similar period.

30.    As noted above, the Business's hourly workforce is represented by the USW.  The Debtors are negotiating with the USW to obtain the USW's waiver of any no-sale clause contained in agreements between Delphi and the USW, with the objective of obtaining such waiver prior to the Closing.

F.    <u>Bidding Procedures</u>

31.    The Sale of the Purchased Assets is subject to higher or otherwise better offers pursuant to the Bidding Procedures.  Accordingly, the Debtors seek approval of the Bidding Procedures for the Sale of the Purchased Assets.  The Debtors have determined that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors, and other interested parties.

32.    The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders, the receipt and negotiation of bids received, the conduct of any

15

subsequent Auction (as defined below), the ultimate selection of the Successful Bidder(s), and

this Court's approval thereof (collectively, the "Bidding Process").

33.     The proposed Bidding Procedures attached hereto as <u>Exhibit A</u> provide, in

relevant part, as follows:[8]

(a)     <u>Assets To Be Sold</u>:  The assets proposed to be sold are the
Purchased Assets.

(b)     <u>"As Is, Where Is"</u>:  The sale of the Purchased Assets will be on an
"as is, where is" basis and without representations or warranties of any kind, nature, or description
except as set forth in the Agreement or the purchase agreement of a Successful Bidder.

(c)     <u>Free Of Any And All Claims And Interests</u>: The Purchased Assets
are to be sold free and clear of all pledges, liens, security interests, encumbrances, claims,
charges, options, and interests thereon (collectively, the "Claims and Interests") and the Claims
and Interests are to attach to the net proceeds of the sale of such Purchased Assets except as set
forth in the Agreement or the purchase agreement of a Successful Bidder.

(d)     <u>Participation Requirements</u>:  To ensure that only bidders with a
serious interest in the purchase of the Purchased Assets participate in the Bidding Process, the
Bidding Procedures provide for minimal requirements for a potential bidder to become a
"Qualified Bidder:"  (i) executing a confidentiality agreement substantially in the form attached to
the Bidding Procedures, (ii) providing the Debtors with certain financial assurances as to such
bidders' ability to close a transaction, and (iii) submitting a preliminary proposal reflecting the
purchase price range, any Purchased Assets expected to be excluded, the structure and financings
of the transaction, any anticipated regulatory approvals, anticipated time frame and any
anticipated impediments to obtaining such approval, any additional conditions to closing it may
wish to impose, and the nature and extent of any due diligence it may wish to conduct and the
date by which such due diligence will be completed.

(e)     <u>Due Diligence</u>:  All Qualified Bidders an opportunity to participate
in the diligence process.  The Debtors will coordinate the diligence process and provide due
diligence access and additional information as reasonably requested by any Qualified Bidders.

(f)     <u>Assumption Of Extension</u>.  The Debtors expect that the Purchaser
or an alternative purchaser of the Business must assume the Extension, which is an extension of
the Debtors' long term supply agreement with Harco, until December 31, 2007.  Following such
assumption, the Debtors would have no further obligations under the Extension.

---

[8]   In the event of any conflict between the Bidding Procedures and this summary of the Bidding Procedures, the
provisions of the Bidding Procedures control.  Capitalized terms used but not otherwise defined in this summary
have the meanings ascribed to them in the Bidding Procedures.

16

(g)     Bid Deadline: A bid deadline of 11:00 a.m. (prevailing Eastern time) on March 2, 2007 (the "Bid Deadline") has been established. As soon as reasonably practicable following receipt of each Qualified Bid, the Debtors will deliver to the Purchaser and its counsel complete copies of all items and information set forth in section (g) below.

(h)     Bid Requirements: All bids must include the following documents: (i) a letter stating that the bidder's offer is irrevocable for the period set forth in the Bidding Procedures, (ii) an executed copy of the Agreement, together with all schedules, marked to show amendments and modifications to the agreement, purchase price, and proposed schedules, (iii) a good faith deposit of $500,000.00, and (iv) satisfactory written evidence of a commitment for financing or other ability to consummate the proposed transaction.

(i)     Qualified Bids: To be deemed a "Qualified Bid," a bid must be received by the Bid Deadline and, among other things, must (i) be on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to the Debtors than those contained in the Agreement, (ii) not be contingent on obtaining financing or the outcome of unperformed due diligence, (iii) have a value greater than the purchase price reflected in the Agreement, plus the amount of the Break-Up Fee, plus $500,000.00 initially, then in increments of $250,000.00, (iv) not be conditioned on bid protections, other than those contemplated in the Bidding Procedures, (v) contain acknowledgements and representations as set forth in the Bidding Procedures, and (vi) include a commitment to consummate the purchase or the Purchased Assets within not more than 15 days after entry of a bankruptcy court order approving such purchase. With certain limited exceptions, the Debtors retain the sole right to deem a bid a Qualified Bid, if such bid does not conform to one or more of the aforementioned requirements; provided, however, that such bid must have a value greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus $500,000.00, taking into account all material terms of any such bid. Each Qualified Bid other than that of the Purchaser will be referred to as a "Subsequent Bid."

(j)     Conduct Of Auction: If the Debtors receive at least one Qualified Bid in addition to that of the Purchaser, they will conduct an auction (the "Auction") of the Purchased Assets at 10:00 a.m. (prevailing Eastern time) on or before March 16, 2007, or such later time as the Debtors shall notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than March 20, 2007), in accordance with the procedures outlined in the Bidding Procedures which include: (i) attendance at the Auction will be limited to specified parties as outlined in the Bidding Procedures, (ii) at least two business days prior to the Auction, each Qualified Bidder with a Qualified Bid must inform the Debtors whether it intends to participate in the Auction and at least one business day prior to the Auction the Debtors must provide such bidders with copies of the Qualified Bid which the Debtors believe is the highest or otherwise best offer for the Purchased Assets, (iii) all Qualified Bidders will be entitled to be present for all Subsequent Bids, and (iv) bidding at the Auction will begin with the highest or otherwise best Qualified Bid, continue in minimum increments of at least $250,000, and conclude after each participating bidder has had the opportunity to submit one or more additional Subsequent Bids.

17

(k)    <u>Selection Of Successful Bid</u>:  As soon as practicable after the conclusion of the Auction, the Debtors will review each Qualified Bid and identify the highest or otherwise best offer for the Purchased Assets (the "Successful Bid") and the bidder making such bid (the "Successful Bidder").  The Debtors will sell the Purchased Assets for the highest or otherwise best Qualified Bid to the Successful Bidder upon the approval of such Qualified Bid by this Court after the hearing (the "Sale Hearing").

(l)    <u>Sale Hearing</u>: The Debtors request that the Sale Hearing be scheduled for March 22, 2007 at 10:00 a.m. (prevailing Eastern time) and that the Sale Hearing may be adjourned or rescheduled by the Debtors without notice other than by an announcement of the adjourned date at the Sale Hearing.  If no Qualified Bids other than that of the Purchaser are received, the Debtors will proceed with the sale of the Purchased Assets to the Purchaser following entry of the order approving the Sale.  If the Debtors do receive additional Qualified Bids, then at the Sale Hearing, the Debtors will seek approval of the Successful Bid, as well as the second highest or best Qualified Bid (the "Alternate Bid" and such bidder, the "Alternate Bidder").  A bid will not be deemed accepted by the Debtors unless and until approved by theis Court.  Following approval of the sale to the Successful Bidder, if the Successful Bidder fails to consummate the sale for specified reasons, then the Alternate Bid will be deemed to be the Successful Bid and the Debtors will effectuate a sale to the Alternate Bidder without further order of this Court.

(m)    <u>Return Of Good Faith Deposits</u>:  Good faith deposits of all Qualified Bidders (except for the Successful Bidder) will be held in an interest-bearing escrow account and all Qualified Bids will remain open until two business days following the closing of the Sale (the "Return Date").  Notwithstanding the foregoing, the good faith deposit submitted by the Successful Bidder, together with interest thereon, will be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder.  If a Successful Bidder fails to consummate an approved sale, the Debtors will not have any obligation to return such good faith deposit and such deposit will irrevocably become property of the Debtors.  On the Return Date, the Debtors will return the good faith deposits of all other Qualified Bidders, together with the accrued interest thereon.

(n)    <u>Reservation Of Rights</u>:  The Debtors, after consultation with the Creditors' Committee:  (i) may determine which Qualified Bid, if any, is the highest or otherwise best offer and (ii) may reject, at any time, any bid (other than the Purchaser's bid) that is:  (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (c) contrary to the best interests of the Debtors, their estate, and their creditors as determined by the Debtors in their sole discretion.

G.    <u>Bid Protections</u>

34.    The Purchaser has expended, and likely will continue to expend, considerable time, money, and energy pursuing the Sale and has engaged in extended arms' length and good faith negotiations.  The Agreement is the culmination of these efforts.

18

35.    In recognition of this expenditure of time, energy, and resources, the Debtors have agreed to provide certain bid protections to the Purchaser (the "Bid Protections"). Specifically, the Agreement provides for, and the Debtors respectfully request that the Bidding Procedures Order approve, a break-up fee payable by the Selling Debtor Entities to the Purchaser in the amount of $294,000.00 – 3.0% of the preliminary purchase price – if (a) the Selling Debtor Entities sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, or other similar transaction, all or substantially all or a material portion of the Purchased Assets in a transaction or a series of transactions with one or more parties other than the Purchaser. The Selling Debtor Entities' obligation to pay the Bid Protections, as provided by the Agreement, will survive termination of the Agreement and, until paid, will constitute a superpriority administrative expense claim.

36.    In addition, the Agreement provides, and the Debtors respectfully request that the Bidding Procedures Order approve, reimbursement of the Purchaser's reasonable, actual out-of-pocket fees and expenses incurred in connection with the transactions contemplated by the Agreement not to exceed $100,000.00, subject to this Court's approval pursuant to the Bidding Procedures Order, upon (y) a termination of the Agreement by reason of the failure of the Closing to occur within 90 days after entry of the Sale Order or (z) a termination of the Agreement by reason of (1) the failure of the Sale Order to be entered on or before May 25, 2007 or (2) the Sale Order's being subject to a stay or injunction, in any case provided that the Purchaser is not then in breach of the Agreement for which the Debtors had previously notified the Purchaser. The Purchaser has agreed that, in the event that it would otherwise be entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the

Purchaser would only be entitled to receive the larger of the two and in no case would be entitled to receive payment of both.

37.    The Bid Protections were a material inducement for, and a condition of, the Purchaser's entry into the Agreement.  The Debtors believe that the Bid Protections are fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Purchaser in connection with the Sale and (b) the fact that the Purchaser's efforts have increased the chances that the Debtors will receive the highest or otherwise best offer for the Purchased Assets, to the benefit of the Debtors, their estates, their creditors, and all other parties-in-interest.

38.    The Purchaser is unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of the Agreement unless the Bidding Procedures Order authorizes payment of the Bid Protections.  Thus, absent entry of the Bidding Procedures Order and approval of the Bid Protections, the Debtors  may lose the opportunity to obtain what they believe to be the highest and best offer for the Purchased Assets.

39.    Payment of the Bid Protections will not diminish the Debtors' estates.  The Debtors would not expect to terminate the Agreement so as to incur the obligation to pay either of the Bid Protections unless they do so to accept an alternative Successful Bid, which must exceed the price offered by the Purchaser by an amount sufficient to pay the applicable Bid Protections.  The Debtors thus request that this Court authorize payment of the Bid Protections pursuant to the terms and conditions of the Agreement.

H.    Notice Of Bid Procedures

40.    Notice Of Sale Hearing.  Within five days after entry of the Bidding Procedures Order (the "Mailing Date"), the Debtors (or their agent) propose to serve the Motion,

20

the Agreement, the proposed Sale Order, the Bidding Procedures, and a copy of the Bidding

Procedures Order by first-class mail, postage prepaid, upon (a) all entities known to have

expressed an interest in a transaction with respect to the Purchased Assets during the past six

months,[9] (b) all entities known to have asserted any lien, claim, interest, or encumbrance in or

upon the Purchased Assets, (c) all federal, state, and local regulatory or taxing authorities or

recording offices which have a reasonably known interest in the relief requested by the Motion,

(d) all parties to the Assigned Contracts, (e) all parties to the Post-Petition Contracts, (f) the

United States Attorney's office, (g) the Securities and Exchange Commission, (h) the Internal

Revenue Service, (i) all entities on the 2002 List, and (j) counsel to the Creditors' Committee and

the Equityholders' Committee.

I.      Assumption And Assignment Of Contracts

41.      In connection with the proposed Sale, the Debtors seek authority to

assume and assign the Assigned Contracts to the Purchaser or the Successful Bidder.  With

respect to the Assigned Contracts, on or before February 23, 2007, the Debtors will file with this

Court and serve on each non-Debtor party to an Assigned Contract a cure notice substantially in

the form attached hereto as Exhibit E (the "Cure Notice").  The Cure Notice would state the cure

amount that the Debtors believe is necessary to assume such contract or lease pursuant to section

365 of the Bankruptcy Code (the "Cure Amount") and notify each party that such party's lease or

contract will be assumed and assigned to the Purchaser or the Successful Bidder to be identified

at the conclusion of the Auction.  In addition, such Cure Amounts would be listed on a schedule

to the Sale Order.

---

[9]      All such entities will also be served by electronic mail to the extent the Debtors have electronic mail addresses
for such parties.

42.    In addition, on or before February 23, 2007, the Debtors propose to file with this Court and serve on each non-Debtor party to an Assigned Contract a notice, substantially in the form of the notice attached hereto as <u>Exhibit F</u> (the "Purchaser Assumption/Assignment Notice").  The Purchaser Assumption/Assignment Notice would identify the Purchaser as the party that will be assigned all of the Debtors' rights, title, and interest in the Postpetition Contracts, subject to completion of the bidding process provided under the Bidding Procedures.  Any objection to the assumption and assignment of any Assigned Contract would be required to be filed within ten days from the service of the Purchaser Assumption/Assignment Notice and would be required to state, with specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

43.    Any objection to the Cure Amount would be required to be filed by within ten days of the date of the Cure Notice (the "Cure Objection Deadline").  Any objection to the Cure Amount would be required to state with specificity what cure the party to the Assigned Contract believes is required with appropriate documentation thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice would be controlling notwithstanding anything to the contrary in any Assigned Contract, Post-Petition Contract, or other document and the non-Debtor party to the Assigned Contract or Post-Petition Contract will be forever barred from asserting any other claims against the Debtors, the Purchaser, or the Successful Bidder (as appropriate) or the property of any of them, as to such Assigned Contract or Post-Petition Contract, as the case may be.

44.    On March 5, 2007, the business day following the Bid Deadline, the Debtors would send a notice (the "Qualified Bidder Assumption/Assignment Notice"), substantially in the form attached hereto as <u>Exhibit G</u>, to each non-Debtor party to an Assigned

Contract identifying the Successful Bidder.  Any objection to the assumption and assignment of

any Assigned Contract would be required to be filed within ten days from service of the

Qualified Bidder Assumption/Assignment Notice and would be required to state, with

specificity, the legal and factual basis of its objection, unless otherwise ordered by this Court.

Applicable Authority

A.    Bidding Procedures

45.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

46.    The Second Circuit has held that, although the bankruptcy court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's

consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a

means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift

administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a

lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

47.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

23

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity." Id.  To satisfy its burden, it is not enough for an objector

simply to raise and argue an objection. Rather, an objector "is required to produce some evidence

respecting its objections." Lionel, 722 F.2d at 1071.

48.     As a rule, the debtor's business judgment "should be approved by the court

unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound

business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74,

81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo.

1991)).

49.     As set forth above, the Debtors have sound business justifications for

pursuing a sale process at this time.  Although the Debtors believe that their brake hose product

line is fundamentally strong, the Business does not fit the Debtors' anticipated product portfolio

under their transformation plan.  Thus, the Debtors have determined that the Business' value will

be maximized through the divestiture of its assets.  Moreover, delaying the sale of the Purchased

Assets may result in the erosion of the Business' value.  Accordingly, there is a sound business

purpose for pursuing the sale process promptly and in accordance with the Bidding Procedures..

50.     Moreover, a prospective purchaser of assets from a chapter 11 debtor may

be reluctant to make an offer, because it knows that even if it reaches agreement with the debtor,

its offer is subject to overbid.  Pre-approved bidding procedures address these concerns, by

assuring initial bidders that any auction procedure will be reasonable.  Thus, the Debtors submit

that the use of the Bidding Procedures also reflects sound business judgment.

B.      Sale Of The Purchased Assets Free And
        Clear Of Liens, Claims, Encumbrances, And Interests

51.      Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may

sell property free and clear of any lien, claim, or interest in such property if, among other things:

(1)  applicable nonbankruptcy law permits sale of such property free and clear of such
     interest;

(2)  such entity consents;

(3)  such interest is a lien and the price at which such property is sold is great that the
     aggregate value of all liens on such property;

(4)  such interest is in bona fide dispute; or

(5)  such entity could be compelled in a legal or equitable proceeding, to accept a
     money satisfaction of such interest.

11 U.S.C. § 363(f).

52.      Therefore, section 363(f) permits the Debtors to sell the Purchased Assets

free and clear of all liens, claims, and encumbrances, except the liabilities specifically assumed

by a Successful Bidder or the Permitted Liens.  Each lien, claim, or encumbrance that is not the

result of an assumed liability satisfies at least one of the five conditions of 11 U.S.C. § 363(f),

and the Debtors submit that any such lien, claim, or encumbrance will be adequately protected

by attachment to the net proceeds of the Sale, subject to any claims and defenses the Debtors

may possess with respect thereto.  Accordingly, the Debtors request that the Purchased Assets be

transferred to the Successful Bidder(s) free and clear of all liens, claims, and encumbrances,

except for the liens resulting from the Assumed Liabilities or the Permitted Liens, with such

liens, claims, and encumbrances to attach to the proceeds of the Sale of the Purchased Assets.

C.    The Purchaser Is A Good Faith Purchaser Pursuant To
      Section 363(m) Of The Bankruptcy Code And The Transaction
      Contemplated By The Agreement Should Carry The
      Protections Of Section 363(n) Of The Bankruptcy Code

    53.    Section 363(m) of the Bankruptcy Code provides:

    The reversal or modification on appeal of an authorization under
subsection (b) or (c) of this section of a sale or lease of property does not
affect the validity of a sale or lease under such authorization to an entity
that purchased or leased such property in good faith, whether or not such
entity knew of the pendency of the appeal, unless such authorization and
such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  Although the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci held that the

    good faith of a purchaser is shown by the integrity of his conduct during
the course of the sale proceedings; where there is a lack of such integrity,
a good faith finding may not be made.  A purchaser's good faith is lost by
'fraud, collusion between the purchaser and other bidders or the trustee, or
an attempt to take grossly unfair advantage of other bidders.'

126 F.3d at 390 (quoting In re Rock Industries Machinery Corp., 572 F.2d 1195, 1198 (7th Cir.

1978) (interpreting Bankruptcy Rule 805, the precursor of section 363(m))); see also Evergreen

Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Case Nos. 91 Civ. 8319 (LMM) to 91

Civ. 8324 (LMM), 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992); In re Sasson Jeans, Inc., 90

B.R. 608, 610 (S.D.N.Y. 1988).

    54.    Section 363(n) of the Bankruptcy Code further provides, in relevant part,

that:

    The trustee may avoid a sale under this section if the sale price was
controlled by an agreement among potential bidders at such sale, or may
recover from a party to such agreement any amount by which the value of
the property sold exceeds the price at which such sale was consummated,
and may recover any costs, attorneys' fees, or expenses incurred in
avoiding such sale or recovering such amount.

26

55.    The Debtors submit, and will present evidence at the Sale Hearing, that as set forth above, the Agreement reflects an intensely negotiated, arm's-length transaction. Throughout the negotiations respecting the Agreement, the Purchaser has at all times acted in good faith.  The Debtors, therefore, request that this Court make a finding that the Purchaser has purchased the Purchased Assets and assumed the Assigned Contracts and Assumed Liabilities in good faith within the meaning of section 363(m) of the Bankruptcy Code.  Further, the Debtors submit that any asset purchase agreement reached as a result of the Bidding Procedures will be an arm's-length, intensely-negotiated transaction entitled to the protections of section 363(m) of the Bankruptcy Code and the Debtors will present evidence of the same at the Sale Hearing. Because a key element of a good faith finding is that the Purchaser's successful bid is not the product of fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders, the Debtors further request that this Court make a finding that the transactions contemplated by the Agreement are not avoidable under section 363(n) of the Bankruptcy Code.

D.    The Assumption And Assignment Of The Assigned Contracts

56.    Section 365(f)(2) of the Bankruptcy Code provides that:

[t]he trustee may assign an executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

27

57.     Under section 365(a) of the Bankruptcy Code a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor.  It provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of the assumption of such contract or lease, the trustee –
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

58.     Courts give the phrase "adequate assurance of future performance" a "practical, pragmatic construction."  See In re Sanshoe Worldwide Corp., 139 B.R. 585, 592 (S.D.N.Y. 1992) (the presence of adequate assurance should be "determined under the facts of each particular case"); see also In re Fifth Avenue Originals, 32 B.R. 648, 652 (Bankr. S.D.N.Y. 1983) (holding that adequate assurance was furnished on two separate grounds).  Courts have consistently held that the phrase does not provide total assurances.  In re Natco Industries, Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) ("[I]t does not mean absolute insurance that the debtor will thrive and make a profit."); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  In fact, adequate assurance has been provided by demonstrating the assignee's financial health and experience in managing the

28

type of enterprise or property assigned.  See In re Bygraph, Inc., 56 B.R. 596, 605-06 (Bankr.

S.D.N.Y. 1986) (adequate assurance of future performance exists when prospective assignee of

lease from debtor has financial resources and has expressed willingness to devote sufficient

funding to business in order to give it strong likelihood of succeeding).

59.    To the extent that any defaults exist under any executory contract or

unexpired lease that is to be assumed and assigned in connection with the sale of the Purchased

Assets or any portion thereof, the Debtors will cure any such default prior to such assumption

and assignment.  Moreover, the Debtors will adduce facts at the Sale Hearing demonstrating the

financial wherewithal of any Successful Bidder, its experience in the industry, and its willingness

and ability to perform under the contracts to be assumed and assigned to it.

60.    The Sale Hearing therefore will provide this Court and other parties-in-

interest ample opportunity to evaluate and, if necessary, challenge the ability of the Successful

Bidder(s) to provide adequate assurance of future performance under the contracts to be

assumed.  This Court therefore should have a sufficient basis to authorize the Debtors to assume

and assign contracts as set forth in the Agreement.

E.    Approval Of The Bid Protections

61.    Bidding incentives encourage potential bidders to invest the requisite time,

money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to

the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11

process.  See, e.g., In re 995 Fifth Ave. Associates, L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992)

(bidding incentives may "be legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citation

omitted).  Bankruptcy courts often approve bidding incentives under the business judgment rule.

<u>In re Global Crossing Ltd.</u>, 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) ("[N]o litigant has seriously argued the inapplicability of the business judgment test, and if any such argument had been made, the Court would be compelled . . . to reject it."); <u>In re Bethlehem Steel Corp.</u>, Case No. 02 Civ. 2854 (MBM), 2003 WL 21738964 at *8 n.13 (S.D.N.Y. July 28, 2003) (the court should approve agreements providing bidding incentives "unless they are unreasonable or appear more likely to chill the bidding process than to enhance it"). One court, explaining the force of the business judgment rule in this context, stated "the business judgment rule does not become inapplicable simply because a court decides a break-up fee is too large." <u>In re Integrated Resources</u>, 147 B.R. at 660.

62.     This district has established a three part test for determining when to permit bidding incentives. <u>Id.</u> at 657-58. The three factors are: "whether (1) relationship of parties who negotiated breakup fee is tainted by self-dealing or manipulation; (2) whether fee hampers, rather than encourages, bidding; and (3) amount of fee is unreasonable relative to purchase price." <u>Id.</u>

63.     Here, the Debtors seek authority to utilize the Bidding Process and Bid Protections in the event that the Purchaser is not ultimately the Successful Bidder or must increase the Purchaser's bid price to become the Successful Bidder. The Bid Protections are fair and reasonable in amount, particularly in view of the efforts to be made by the Purchaser and the risk to the Purchaser of being used as a stalking horse. Indeed, the maximum amount of the Break-Up Fee – $294,000.00 (3.0% of the preliminary purchase price) – not only constitutes a fair and reasonable percentage of a proposed purchase price, but also is customary for similar transactions of this type in the bankruptcy context. In addition, the payment of expenses and the indemnification and expense reimbursement provisions of the Agreement are reasonable in light

30

of the significant investment in time and resources that the Purchaser will have contributed as the stalking horse bidder.  Further, the Purchaser has agreed that the break-up fee and the expense reimbursement will be mutually exclusive – in the event that it would otherwise be entitled to receive both the break-up fee and the expense reimbursement under the Agreement, the Purchaser will only be entitled to receive the larger of the two and in no case will be entitled to receive payment of both.  Moreover, the amount of the proposed Break-Up Fee is within the range of breakup fees typically approved by courts in this district.  See, e.g., In re Allegiance Telecom, Inc., Case No. 03-13057 (RDD) (Bankr. S.D.N.Y. 2004) (allowing 2.8% break-up fee and expense reimbursement provision in asset sale agreement); In re Enron Corp., Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. 2004) (approving 3% break-up fee if debtor closes a superior transaction); In re Loral Space & Communications Ltd., Case Nos. 03-41710 and 03-41709 (RDD) (Bankr. S.D.N.Y. 2003) (allowing 2% for break-up fee and .8% for expense reimbursement allowed only if court enters order approving alternative transaction).

64.    The Debtors submit that the Bidding Procedures and the Bid Protections have encouraged competitive bidding in that the Purchaser would not have entered into the Agreement without such provisions.  The Bidding Procedures and the Bid Protections have thus induced a bid that otherwise would not have been made and without which bidding would be limited.  Finally, the mere existence of the Bidding Procedures and Bid Protections permits the Debtors to insist that competing bids be materially higher or otherwise better than the Agreement, which will produce a clear benefit to the Debtors, their estates, their creditors, and all other parties-in-interest.

G.    Waiver Of The Ten-Day Stays Provided By Bankruptcy Rules 6004 And 6006

65.    Bankruptcy Rule 6004(g) provides: "An order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides: "An order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."

66.    Courts in this district have waived these ten-day stays upon a showing of business need.  See In re Adelphia Commc'ns Corp., 327 B.R. 143, 175 (Bankr. S.D.N.Y. 2005) ("As I find that the required business need for a waiver has been shown, the order may provide for a waiver of the 10-day waiting period under Fed. R. Bankr. P. 6004(g)."); In re PSINet Inc., 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (requiring a demonstration of "a business exigency" for a waiver of the ten-day stays under Bankruptcy Rules 6004(g) and 6006(d)).  In general, courts will grant waivers when doing so is important to the Debtor's financial health.  See In re Second Grand Traverse School, 100 Fed.Appx. 430, 434-35 (6th Cir. 2004) (affirming decision waiving ten-day stay because "time was of the essence"); In re Decora Industries, Inc., Case No. 00-4459 (JJF), 2002 WL 32332749, at *9 (D. Del. May 20, 2002) ("[T]he Court understands that an immediate closing is required to remedy Debtors' precarious financial and business position. Accordingly, the Court will waive the Rules 6004(g) and 6006(d), allowing the parties to close.").

67.    As described above, although the Business is strong, the Debtors face decreased revenues from brake hose sales.  The Debtors have determined, however, that as a standalone product line, unencumbered by legacy costs, the brake hose product could be a

32

profitable and competitive business line.  In light of the Debtors' desire to focus their available

free cash on investments in those business lines which are more likely to comprise their

restructured product portfolio, there is a risk of value erosion if a sale is not effectuated

promptly.  Moreover, a delay in the ability of a Successful Bidder to close the Sale could chill

prospective bidders from entering the sale process out of a reluctance to keep bids open for an

extended period of time and thus could prevent the Debtors from maximizing the value of its

assets.  Finally, the Purchaser has insisted upon the ability to close the transactions contemplated

by the Agreement, assuming that the Debtors do not receive a higher or otherwise better bid at

the auction, quickly following entry of the Sale Order and has therefore required that the Sale

Order include a waiver of the ten-day stays provided under Bankruptcy Rules 6004(g) and

6006(d) by the terms of the Agreement.

68.    Because the Debtors have demonstrated a business need requiring closing

within ten days, this Court should exercise its authority under Bankruptcy Rules 6004(g) and

6006(d) and waive the ten-day stays.

H.    Conclusion

69.    The Debtors submit that the granting of the Bidding Procedures, Bid

Protections, and Notice Procedures, the setting of the Sale Hearing, and entry of an order

approving the Sale of the Purchased Assets free and clear of liens, claims, and encumbrances to

the Purchaser or to the Successful Bidder, the assumption and assignment of the Assigned

Contracts to the Purchaser or the Successful Bidder, and the assumption of the Assumed

Liabilities by the Purchaser or the Successful Bidder, are in the best interests of the Debtors'

estates and will maximize value for all creditors as described above.

<u>Notice Of Motion</u>

70.     Notice of this Motion has been provided in accordance with the Amended

Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),

9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case

Management, And Administrative Procedures, entered by this Court on October 26, 2006

(Docket No. 5418).  Further notice with respect to the Sale will be provided in accordance with

the Notice Procedures described herein.[10]  In light of the nature of the relief requested, the

Debtors submit that no other or further notice is necessary.

<u>Memorandum Of Law</u>

71.     Because the legal points and authorities upon which this Motion relies are

incorporated herein, the Debtors respectfully request that the requirement of the service and

filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy

Rules for the United States Bankruptcy Court for the Southern District of New York be deemed

satisfied.

---

[10]     In addition, notice of this Motion has also been provided by electronic mail to potential bidders for the
Purchased Assets.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) approving (i) the Bidding Procedures, (ii) the Bid Protections, (iii) the Notice Procedures, and (iv) the setting of the Sale Hearing; (b) approving (i) the Sale of the Purchased Assets free and clear of liens, claims, and encumbrances to the Purchaser or to the Successful Bidder, (ii) the assumption and assignment of the Assigned Contracts to the Purchaser or the Successful Bidder, and (iii) the assumption of the Assumed Liabilities by the Purchaser or the Successful Bidder; and (c) granting them such other and further relief as is just.

Dated:  New York, New York
       January 26, 2007

SKADDEN, ARPS, SLATE, MEAGHER
   & FLOM LLP

By:  /s/  John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

By:  /s/  Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession