## Exhibit D

**Sale And Purchase Agreement**

**SALE AND PURCHASE AGREEMENT**

**BY AND AMONG**

**HARCO MANUFACTURING GROUP, LLC and HARCO BRAKE SYSTEMS, INC.**

**AND**

**DELPHI AUTOMOTIVE SYSTEMS LLC**

**AND**

**DELPHI TECHNOLOGIES, INC.**

**January 25, 2007**

# TABLE OF CONTENTS

**PAGE**

**1. CONVEYANCE OF THE ACQUIRED ASSETS** ......................................................... 11
   1.1 Acquired Assets Transaction ........................................................................ 11
   1.2 Intellectual Property Rights and Licenses ................................................... 14

**2. ASSUMPTION OF LIABILITIES** ............................................................................... 15
   2.1 Assumed Liabilities ....................................................................................... 15
   2.2 No Expansion of Third Party Rights ............................................................. 15
   2.3 Retained Liabilities ....................................................................................... 15

**3. RESERVED** .............................................................................................................. 16

**4. PURCHASE PRICE** ................................................................................................. 16
   4.1 Preliminary Purchase Price, Deposit Amount, Purchase Price ................... 16
   4.2 Preparation of Inventory Valuation ............................................................... 18
   4.3 Preliminary Purchase Price Adjustment ....................................................... 18
   4.4 Allocation of Purchase Price ........................................................................ 19

**5. REPRESENTATIONS AND WARRANTIES** ............................................................. 19
   5.1 Warranties of Seller ...................................................................................... 19
   5.2 Warranties of Purchaser ............................................................................... 25
   5.3 Survival of Representations, Warranties and Covenants .............................. 27

**6. CONDITIONS TO CLOSING** .................................................................................... 27
   6.1 Conditions to Obligations of Seller, DTI and Purchaser .............................. 27
   6.2 Conditions to Obligations of Purchaser ....................................................... 28
   6.3 Conditions to Obligations of Seller and DTI ................................................. 29

**7. CLOSING** ................................................................................................................. 29
   7.1 The Closing ................................................................................................... 29
   7.2 Ancillary Agreements .................................................................................... 29
   7.3 Seller's Deliveries ......................................................................................... 30
   7.4 Purchaser's Deliveries .................................................................................. 31

**8. CERTAIN ADDITIONAL COVENANTS** ................................................................... 31
   8.1 Bankruptcy Actions ....................................................................................... 31
   8.2 Registrations, Filings and Consents; Further Actions .................................. 31
   8.3 Operation of the Business Pending Closing .................................................. 32
   8.4 Assumed Contracts; Cure Amounts .............................................................. 32
   8.5 Post-Closing Covenants ................................................................................ 32
   8.6 Further Assurances ....................................................................................... 35
   8.7 Purchaser's Financing Activities ................................................................... 35
   8.8 Certain Transactions ..................................................................................... 36
   8.9 Guarantee by Affiliate of Purchaser .............................................................. 36
   8.10 NHTSA Requirements .................................................................................. 36
   8.11 Communications with Customers and Suppliers .......................................... 36

**9. TERMINATION** ............................................................................................... **36**
  9.1 Termination ....................................................................................... 36
  9.2 Notice of Termination ....................................................................... 37
  9.3 Break-Up Fee; Expense Reimbursement ........................................ 38
  9.4 Procedure and Effect of Termination ............................................... 38

**10. OTHER TAX MATTERS** ................................................................................ **39**

**11. BIDDING PROCEDURES** ............................................................................. **40**
  11.1 Delphi Initial Bankruptcy Actions.................................................... 40
  11.2 Court Approval ................................................................................ 40
  11.3 Qualified Bidder.............................................................................. 41
  11.4 Bid Deadline ................................................................................... 42
  11.5 Due Diligence ................................................................................. 42
  11.6 Bid Requirements ........................................................................... 43
  11.7 Qualified Bids ................................................................................. 43
  11.8 Bid Protection ................................................................................. 44
  11.9 Auction, Bidding Increments and Bids Remaining Open ................ 44
  11.10 Acceptance of Qualified Bids........................................................ 46
  11.11 Sale Hearing.................................................................................. 46
  11.12 Return of Good Faith Deposit ....................................................... 46
  11.13 Reservations of Rights ................................................................. 46

**12. INDEMNIFICATION** ...................................................................................... **47**
  12.1 Seller's Agreement to Indemnify..................................................... 47
  12.2 Purchaser's Agreement to Indemnify.............................................. 47
  12.3 Limitations on Agreements to Indemnify ........................................ 47
  12.4 Third Party Indemnification ............................................................. 49

**13. MISCELLANEOUS** ....................................................................................... **49**
  13.1 Bulk Sales Laws ............................................................................. 49
  13.2 Notices ........................................................................................... 50
  13.3 Assignment .................................................................................... 50
  13.4 Entire Agreement ........................................................................... 50
  13.5 Waiver............................................................................................. 50
  13.6 Severability..................................................................................... 51
  13.7 Amendment..................................................................................... 51
  13.8 Expenses........................................................................................ 51
  13.9 Third Parties ................................................................................... 51
  13.10 Headings ....................................................................................... 51
  13.11 Counterparts.................................................................................. 51
  13.12 Governing Law .............................................................................. 51
  13.13 Public Announcements.................................................................. 51
  13.14 Sales or Transfer Taxes ............................................................... 52
  13.15 Venue and Retention of Jurisdiction ............................................ 51
  13.16 Risk of Loss................................................................................... 51
  13.17 Enforcement of Agreement........................................................... 51
  13.18 Dispute Resolution ....................................................................... 52
  13.19 No Right of Setoff ......................................................................... 52
  13.20 Dollar Amounts............................................................................. 53
  13.21 Limitation on Damages ................................................................. 53

# LIST OF SCHEDULES

| Schedule Designation | Schedule Description |
|---|---|
| A | Seller's Knowledge |
| B | Deposit Escrow Agreement |
| 1.1.1.B | Personal Property and Software |
| 1.1.1.C | Permits |
| 1.1.1.D | Inventory |
| 1.1.1.E | Transferred Contracts |
| 1.1.2.A | Third Party Bailed Assets |
| 1.1.2.L | Other Excluded Assets |
| 4.2.1 | Initial Inventory Valuation |
| 4.4.1 | Allocation of Preliminary Purchase Price |
| 5.1.3 | Third Party Requirements |
| 5.1.5.A | Title to Personal Property |
| 5.1.5.C | Other Inventory Locations |
| 5.1.5.D | Machinery, Equipment and Capitalized Tools |
| 5.1.6 | Litigation |
| 5.1.7.A.1 | Owned Intellectual Property |
| 5.1.7.A.2 | Licensed Intellectual Property |
| 5.1.7.A.3 | Software |
| 5.1.7.B | Intellectual Property Litigation Claims |
| 5.1.7.C | Rights Granted to Third Parties |
| 5.1.8 | Permit Compliance |
| 5.1.11 | December 31, 2003, 2004 and 2005 Unaudited Pro forma Income Statements for the Business |
| 5.1.12 | Absence of Certain Changes |
| 5.1.13.A | Listed Contracts |
| 5.1.13.B | Listed Contracts - Exceptions |
| 5.1.16 | Insurance |
| 5.2.3 | No Violations |
| 6.3.3 | Wire Transfer Instructions |
| 7.2.1 | Manufacturing Services Agreement |
| 7.2.2 | Assignment of Patent Rights |
| 7.2.3 | Assignment and Assumption Agreement |
| 7.2.4 | Transition Services Agreement |
| 7.2.6 | Bill of Sale |
| 7.2.7 | Indemnity Escrow Agreement |
| 7.2.8 | Guarantee by Harco |
| 7.2.9 | Rubber Compound Supply Agreement |
| 8.4 | Assumed Contracts |

## SALE AND PURCHASE AGREEMENT

**THIS SALE AND PURCHASE AGREEMENT** dated **January 25, 2007,** by and among **Harco Manufacturing Group, LLC,** an Ohio limited liability company ("**Purchaser**" or "**AcquisitionCo**"), **Harco Brake Systems, Inc.**, an Ohio corporation ("**Harco**"), **Delphi Automotive Systems LLC.**, a Delaware limited liability company ("**Delphi**" or "**Seller**"), and **Delphi Technologies, Inc.**, a Delaware corporation ("**DTI**"). For convenience, AcquisitionCo, and Harco are sometimes jointly and severally referred to in this Agreement as "**Purchaser**".

### R E C I T A L S:

**WHEREAS**, Delphi is engaged in the Business (as hereinafter defined).  DTI owns the Purchased Intellectual Property used in the Business.

**WHEREAS**, on October 8, 2005 (the "**Petition Date**"), Delphi, DTI and certain of their affiliates filed voluntary petitions for relief (the "**Bankruptcy Cases**") under Chapter 11 of Title 11, U.S.C. §§101 et seq. (as amended) (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

**WHEREAS**, All of the capital stock of Harco is owned and controlled by Larry G. Harris, an individual ("**Harris**").  Harco and Purchaser  are Affiliates of one another by virtue of Harris's common control.

**WHEREAS**, upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 105, 363, 365 and 1146 of the Bankruptcy Code, Delphi desires to sell to Purchaser all right, title and interest of Delphi in and to the Acquired Assets (as hereinafter defined), DTI desires to sell to Purchaser the Purchased Intellectual Property, and Purchaser (as hereinafter defined) desires to make such purchases, subject to Purchaser's assumption of the Assumed Liabilities and the conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the premises, mutual promises, representations, warranties and covenants contained in this Agreement and other good and valuable consideration, and intending to be legally bound hereby, the Parties agree:

### DEFINITIONS

The following terms, as used in this Agreement, shall have the following meanings whether used in the singular or plural (other terms are defined in Sections or Schedules to which they pertain):

"**Accounts Payable**" means all trade accounts payable and other obligations to pay suppliers and third parties to the extent arising from the conduct of the Business or relating to the Acquired Assets to the extent not settled prior to the Closing Date.

"**Accounts Receivable**" means all trade accounts receivable and other rights to payment from customers and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in

respect of Products delivered to customers, all other accounts or notes receivable and the full benefit of all security for such accounts or notes and any claim, remedy or other right related to any of the foregoing.

"**Acquired Assets**" means the assets referred to in Section 1.1.1.

"**AcquisitionCo**" shall have the meaning set forth in the Recitals.

"**Administrative Assets**" means books, records and other administrative assets including advertising and promotional materials, catalogues, price lists, correspondence, mailing lists, customer lists, vendor lists, photographs, production data, sales materials and records, purchasing materials and records, billing records, accounting records, other financial records, and sale order files; provided, however that Administrative Assets do not include Technical Documentation.

"**Affiliate**" means with respect to any Party any business or other entity directly or indirectly controlling, controlled by or under common control with such specified entity. For purposes of this definition, control means ownership of at least fifty percent (50%) of the shares or other equity interest having power to elect directors or persons performing a similar function.  For the purposes of this definition, a Party shall be deemed to control the shares or other equity interest of said Party's spouse.

"**Agreement**" means this Sale And Purchase Agreement, including its Schedules.

"**Allocation**" means allocation of the Purchase Price, as described in Section 4.4.1.

"**Alternate Bid(s)**" shall have the meaning set forth in Section 11.11.

"**Alternate Bidder(s)**" shall have the meaning set forth in Section 11.11.

"**Alternative Transaction**" shall have the meaning set forth in Section 9.3.1.

"**Ancillary Agreements**" means the agreements referred to in Section 7.2.

"**Assumed Contracts**" means assumed Contracts of the Seller as further described in Section 8.4.

"**Assumed Liabilities**" means the obligations assumed by Purchaser pursuant to Article 2.

"**Auction**" shall have the meaning set forth in Section 11.9.

"**Bankruptcy Cases**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Code**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Court**" shall have the meaning set forth in the Recitals.

"**Bankruptcy Rules**" means the U.S. Federal Rules of Bankruptcy Procedure.

"**Bid Deadline**" shall have the meaning set forth in Section 11.4.

2

"**Bidding Procedures**" means the bidding procedures set forth in Section 11.1.

"**Bidding Procedures Order**" means the order of the Bankruptcy Court approving the Bidding Procedures.

"**Bidding Process**" shall have the meaning set forth in Section 11.1.

"**Book Assets**" means: (i) all rights to or in connection with prepaid expenses; and (ii) all claims and similar rights (and benefits arising from such claims or rights) owing to Seller, whether or not yet due and payable, including the benefit of all security therefor and of all guarantees, indemnities and rights (including warranty rights against suppliers) in respect of the same.

"**Break-Up Fee**" shall have the meaning set forth in Section 9.3.1.

"**Business**" means Seller's brake hose Product line, including, but not limited to, brake hoses, components, fittings, assemblies and the design and validation processes associated therewith.

"**Business Day**" means any day other than a Saturday, a Sunday or a day on which banks in New York, New York are authorized or obligated by law or executive order to close.

"**Claims**" mean losses, liabilities, claims (as defined in Section 101 of the Bankruptcy Code), damages or expenses (including reasonable legal fees and expenses) whatsoever, whether known or unknown, fixed, liquidated, contingent or otherwise.

"**Closing**" shall have the meaning set forth in Section 7.1.

"**Closing Date**" means the date of Closing.

"**Commitment Letter**" shall have the meaning set forth in Section 5.2.7.

"**Competitive Business**" shall have the meaning set forth in Section 8.5.1.A.

"**Contracts**" mean all written or oral purchase orders, sales agreements, service contracts, distribution agreements, sales representative agreements, employment or consulting agreements, leases (real property, personal property, or otherwise), product warranty or service agreements and other commitments, agreements and undertakings of any kind outstanding on the Closing Date.

"**Copyrights**" mean: (i) copyrights existing anywhere (registered, statutory or otherwise) and registrations, renewals, revivals, reissuances, extensions and applications for registration thereof, and all rights therein, provided by international treaties or conventions; (ii) moral rights (including, without limitation, rights of paternity and integrity), and waivers of such rights by others; (iii) database and data protection rights whether or not based on copyright; (iv) semiconductor chip mask work registrations and applications for registration thereof; (v) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (vi) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (vii) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

3

"**Creditors Committee**" means the official committee of unsecured creditors appointed in the Bankruptcy Cases as set forth in Section 11.4.

"**Cure Amounts**" means all cure amounts payable by Seller or DTI in order to cure any monetary defaults required to be cured under Section 365(b)(1) or otherwise effectuate, pursuant to the Bankruptcy Code, the assumption by Seller and assignment to Purchaser of Assumed Contracts assigned to Purchaser under the Sale Approval Order.

"**Debt**" means financing-type indebtedness consisting of obligations for borrowed money as evidenced by bonds, debentures, notes or other similar instruments, and including principal and interest thereon.

"**Defending Party**" shall have the meaning set forth in Section 13.18.

"**Delphi**" shall have the meaning set forth in the Recitals.

"**Demanding Party**" shall have the meaning set forth in Section 13.18.

"**Deposit Amount**" shall have the meaning set forth in Section 4.1.1.

"**Deposit Escrow Agent**" means JPMorgan Trust Company, National Association, a national banking association.

"**Deposit Escrow Agreement**" means the Deposit Escrow Agreement entered into among Seller, Purchaser and the Deposit Escrow Agent as of the date of this Agreement in the form attached hereto as <u>Schedule B</u>.

"**Direct Material Inventory**" means finished goods, raw materials and work-in-progress that is used to produce Products.

"**Disclosure Schedule**" means, collectively, the Schedules to Seller's Representations and Warranties contained in Section 5.1.

"**DTI**" means Delphi Technologies, Inc.

"**Equityholders Committee**" means the Official Committee of Equity Security Holders as set forth in Section 11.4.

"**Escrow Period**" shall have the meaning set forth in Section 4.1.3.

"**Excess Direct Material Inventory**" shall have the meaning set forth in Section 4.2.2.

"**Excluded Assets**" means assets not included in the Acquired Assets, as set forth in Section 1.1.2.

"**Excluded Contracts**" shall have the meaning set forth in Section 1.1.2.C.

"**Excluded Intellectual Property**" shall have the meaning set forth in Section 1.1.2.E.

"**Expense Reimbursement**" shall have the meaning set forth in Section 9.3.2.

4

"**Expiration Date**" shall have the meaning set forth in Section 5.3.

"**Final Order**" means an order or judgment: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending; or (ii) if an appeal, writ of certiorari, re-argument or rehearing has been filed or sought, the order or judgment has been affirmed by the highest court to which such order or judgment was appealed or certiorari has been denied, or re-argument or rehearing shall have been denied or resulted in no modification of such order or judgment, and the time to take any further appeal or to seek certiorari or further re-argument or rehearing has expired; provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order or judgment shall not prevent such order or judgment from being considered a Final Order.

"**Financial Assets**" means the assets referred to in Section 1.1.2.B.

"**Financial Statements**" shall have the meaning set forth in Section 5.1.11.

"**Financing**" shall have the meaning set forth in Section 5.2.7.

"**Good Faith Deposit**" shall have the meaning set forth in Section 11.6.3.

"**Governmental Entity**" means any United States federal, state or local, tribunal, legislative, executive, governmental, quasi-governmental or regulatory authority, self-regulatory authority, agency, department, commission, instrumentality or body having governmental authority with respect to the transactions contemplated hereby, under applicable law.

"**Guarantee by Harco**" shall have the meaning set forth in Section 7.2.8.

"**Harco**" means Harco Brake Systems, Inc., an Ohio corporation.

"**Harris**" means Larry G. Harris, an individual.

"**Indemnification Claim**" shall have the meaning set forth in Section 12.4.

"**Indemnity Escrow Agent**" shall have the meaning set forth in Section 4.1.3.

"**Indemnity Escrow Agreement**" shall have the meaning set forth in Section 4.1.3.

"**Indemnity Escrow Amount**" shall have the meaning set forth in Section 4.1.3.

"**Independent Accounting Firm**" shall have the meaning set forth in Section 4.2.2.

"**Initial Inventory Valuation**" shall have the meaning set forth in Section 4.2.1.

"**Intellectual Property**" means the Patent Rights, Copyrights, Software, Technical Documentation, Trade Secrets and Know-How.

"**Intellectual Property Purchase Price**" shall have the meaning set forth in Section 4.1.2.

"**Inventory**" means finished goods, raw materials, work-in-process, and packaging, spare parts, stores, stock, supplies and other inventory, wherever located.

"**Inventory Valuation**" shall have the meaning set forth in Section 4.2.2.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Know-How**" means proprietary technical and business knowledge and information, including specifications, designs, methodologies, processes and production techniques resulting from research and development, technology, manufacturing and production processes, research and development information, drawings, specifications, designs, plans, proposals, technical data, vendor and marketing and business data and customer and vendor lists and information, whether or not confidential.

"**Laws**" means laws, ordinances, codes, standards, administrative rulings or regulations of any applicable federal, state, local or foreign governmental authority.

"**Licensed Intellectual Property**" means Seller and DTI rights with respect to all Intellectual Property licensed or sublicensed to Seller from an affiliated or unaffiliated third party.

"**Lien**" means any lien, charge, claim, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"**Listed Contracts**" means the Business' contracts and commitments listed on Schedule 5.1.13.A.

"**Manufacturing Services Agreement**" shall have the meaning set forth in Section 7.2.1.

"**Marked Agreement**" shall have the meaning set forth in Section 11.6.2.

"**Material Adverse Effect**" means any change or event that has a material adverse effect on the business, assets, properties, financial condition or results of operations of the Business taken as a whole, except any change or event resulting from, relating to or arising out of: (a) any act or omission of a Seller taken with the prior written consent of the Purchaser; (b) any action taken by Seller or Purchaser or any of their respective representatives required by the terms of this Agreement; (c) general business or economic conditions; (d) conditions affecting the industry and markets in which the Business generally operates; (e) increases in energy, electricity, natural gas, raw materials or other operating costs; (f) changes resulting from the filing of the Bankruptcy Cases or from any action required by the Bankruptcy Court; (g) national or international political or social conditions, including the engagement by the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon such country, or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment

or personnel of any of such countries; (h) acts of God; (i) financial, banking or securities markets (including any disruption thereof and any decline in the price of any security or any market index); (j) changes in United States generally accepted accounting principles or generally accepted accounting principles of any foreign jurisdiction; (k) changes in any Law; (l) any existing event, occurrence or circumstance listed in the Disclosure Schedules as of the date hereof; (m) any adverse change in or effect on the Business that is cured, in its entirety, by Seller before the earlier of: (1) the Closing Date; and (2) the date on which this Agreement is terminated pursuant to Section 9.1 hereof; or (n) the regulatory status of the Purchaser.

"**Notice**" shall have the meaning set forth in Section 13.18.

"**OFAC**" shall have the meaning set forth in Section 5.2.9.

"**Ordinary Course of Business**" means, with respect to the Business, the ordinary course of business consistent with custom and practice of the Business from and after the Petition Date or to the extent consistent with orders issued in the Bankruptcy Cases.

"**Organizational Documents**" means: (a) the articles of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles or certificate of organization and the operating agreement or other document intended to govern the structure and/or internal affairs of a limited liability company; (e) any charter, agreement, indenture, or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to the foregoing.

"**Owned Intellectual Property**" means all Intellectual Property in and to which DTI or Sellers holds, or has a right to hold, in whole or in part, right, title and interest.

"**Party**" or "**Parties**" means Purchaser, Harco, DTI and Seller.

"**Patent Rights**" means: (i) patentable inventions, whether or not reduced to practice, and whether or not yet made the subject of a pending patent application or applications; (ii) designs, ideas and conceptions of patentable subject matter, including, without limitation, any patent disclosures and inventor certificates, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications; (iii) national (including the United States) and multinational statutory invention and design registrations, patents, and patent applications (including all provisionals, substitutions, reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by international treaties or conventions, and all patentable improvements to the inventions disclosed in each such registration, patent or application; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Permits**" means permits, concessions, grants, franchises, licenses and other governmental authorizations and approvals issued to Seller and that are currently used exclusively for the purpose of carrying on the Business or that relate exclusively to the Acquired Assets.

"**Permitted Lien**" means: (i) purchase money security interests arising in the Ordinary Course of Business; (ii) security interests relating to customer tooling arising in the Ordinary Course of Business; and (iii) Liens of Seller's pre-Petition Date secured lenders and post-Petition Date secured lenders which will be released on or prior to the Closing of the Sale; provided that, if not practicable to obtain prior to Closing, then within five (5) Business Days thereafter.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, an association, a trust or other entity or organization.

"**Personal Property**" means tangible personal property other than Inventory, including production machinery, equipment, tools, dies, jigs, molds, patterns, gauges, production and process fixtures, material handling equipment, computer hardware and other IT assets other than Intellectual Property, model shop equipment, laboratory test fixtures, and other tangible personal property, whether located on the Seller's premises, at the place of business of a vendor or elsewhere.

"**Petition Date**" shall mean October 8, 2005.

"**Policy Statement**" shall have the meaning set forth in Section 8.4.

"**Post-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Post-Petition Contracts**" means the Contracts of Delphi relating exclusively to the Business entered into on or after the Petition Date.

"**Potential Bidder**" shall have the meaning set forth in Section 11.3.

"**Pre-Closing Portion**" shall have the meaning set forth in Section 10.3.

"**Pre-Petition Contracts**" means the Contracts of the Seller relating exclusively to the Business entered into before the Petition Date.

"**Preliminary Purchase Price**" means the payment referred to in Section 4.1.

"**Products**" means components, hose, fittings and assemblies of brake hoses manufactured both directly at Delphi's facility located in Dayton, Ohio, U.S.A. and, indirectly through contract manufacturers.

"**Purchase Price**" means the final purchase price paid on the Closing Date, after taking into account the Purchase Price Adjustment, pursuant to Article 4.

"**Purchase Price Adjustment**" means the adjustment to the Preliminary Purchase Price described in Section 4.3.

"**Purchase Price Decrease**" shall have the meaning set forth in Section 4.3.

"**Purchase Price Increase**" shall have the meaning set forth in Section 4.3.

"**Purchased Intellectual Property**" means all Owned Intellectual Property and Licensed Intellectual Property exclusively used in, exclusively arising from, or exclusively relating to the Business.

8

"**Purchaser**" means Harco Manufacturing Group, LLC, an Ohio limited liability company.

"**Purchaser Damages**" shall have the meaning set forth in Section 12.1.

"**Purchaser's Disclosure Schedules**" means, collectively, the Schedules to Purchaser's Representations and Warranties contained in Section 5.2.

"**Qualified Bid**" shall have the meaning set forth in Section 11.7.7.

"**Qualified Bidder**" shall have the meaning set forth in Section 11.3.

"**Required Bid Documents**" shall have the meaning set forth in Section 11.6.

"**Retained Liabilities**" shall have the meaning set forth in Section 2.3.

"**Return Date**" shall have the meaning set forth in Section 11.12.

"**Sale**" means the sale of the Business in accordance with the Bidding Procedures.

"**Sale Approval Order**" means an order or orders of the Bankruptcy Court approving the Sale issued pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably satisfactory to Purchaser, authorizing and approving, among other things, the sale, transfer and assignment of the Acquired Assets, Purchased Intellectual Property and Assumed Liabilities to the Purchaser in accordance with the terms and conditions of this Agreement, free and clear of all Liens other than Permitted Liens.

"**Sale Hearing**" shall have the meaning set forth in Section 11.10.

"**Sale Motion**" means the motion filed by Seller with the Bankruptcy Court for approval of the Sale Approval Order.

"**SDN List**" shall have the meaning set forth in Section 5.2.9.

"**Seller**" means Delphi Automotive Systems LLC, a Delaware limited liability company.

"**Seller Damages**" shall have the meaning set forth in Section 12.2.

"**Seller's Knowledge**" or "**Knowledge of Seller**" means the actual knowledge after reasonable investigation of the individuals listed on Schedule A in each of their respective functional areas without imputation of the knowledge of any other Person.

"**Software**" means Seller or DTI computer software and programs, including, without limitation, source code, shareware, firmware, middleware, courseware, open source code, operating systems and specifications, system data, record and table layouts, databases, files documentation, storage media, manuals and other materials related thereto.

"**Straddle Period**" means any taxable period that begins on or prior to the Closing Date and ends after the Closing Date.

"**Subsequent Bid**" shall have the meaning set forth in Section 11.7.7.

"**Successful Bid(s)**" shall have the meaning set forth in Section 11.9.6.

"**Successful Bidder(s)**" shall have the meaning set forth in Section 11.9.6.

"**Tax Return**" means any return, declaration, report, claim for refund or information return, or statement, or any other similar filings, related to Taxes, including any Schedule or attachment thereto.

"**Tax(es)**" means any tax or similar governmental charge, impost or levy whatsoever (including, without limitation, income, franchise, transfer taxes, use, gross receipts, value added, employment, excise, ad valorem, property, withholding, payroll, social contribution, customs duty, minimum or windfall profit taxes or transfer fees), together with any related penalties, fines, additions to tax or interest, imposed by the United States or any state, county, local or foreign government or subdivision or agency thereof.

"**Technical Documentation**" means all documented technical information currently in the files of the Business used in the Business owned by Seller, in each case pertaining to the design or manufacture of the Products of the Business.

"**Termination Date**" shall have the meaning set forth in Section 9.1.1.E.

"**Third Party Bailed Assets**" shall have the meaning set forth in Section 1.1.2.A.

"**Third-Party Requirements**" shall have the meaning set forth in Section 5.1.3.

"**Trade Secrets**" means: (i) all forms and types financial, business, scientific, technical, economic, manufacturing or engineering information, including patterns, plans, compilations, specifications, tooling, program devices, formulas, designs, prototypes, testing plans, methods, techniques, processes, procedures, programs, customer and vendor lists, pricing and cost data, whether tangible or intangible, and whether or how stored, compiled or memorialized physically, electronically, graphically, photographically or in writing, if: (a) the owner thereof has taken reasonable measures to keep such information secret; and (b) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, the public, and confidential technical and business information (including ideas, formulas, compositions, inventions and conceptions of inventions whether patentable or un-patentable and whether or not reduced to practice); (ii) all copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; (iii) all rights to file and apply for, prosecute, defend and enforce any of the foregoing; and (iv) all rights to sue or recover and retain damages, costs and attorneys' fees for present and past misappropriation of any of the foregoing.

"**Trademark Rights**" means: (i) trademarks, trade names and service marks; (ii) the good will associated with trademarks, trade names and service marks; (iii) registrations and applications for registration of trademarks, trade names and service marks; (iv) copies, files and tangible embodiments of all of the foregoing, in whatever form or medium; and (v) all rights to sue or recover and retain damages and costs and attorneys' fees for present and past infringement of any of the foregoing.

"**Transferred Contracts**" shall have the meaning set forth in Section 1.1.1.E.

"**Transition Services Agreement**" shall have the meaning set forth in Section 7.2.4.

"**Union**" means the United Steel Workers of America, Local 87L, AFL-CIO/CLC.

"**United States**" or "**U.S.**" means the fifty (50) states and the District of Columbia of the United States of America.

"**USA PATRIOT Act**" shall have the meaning set forth in Section 5.2.9.

"**Warranties**" refers to the representations and warranties provided by Seller to Purchaser, or by Purchaser to Seller, as the case may be, in each case as referred to in Article 5 of this Agreement.

1.    **CONVEYANCE OF THE ACQUIRED ASSETS**:

   1.1.    **Acquired Assets Transaction**. Upon the terms and subject to the conditions set forth in this Agreement at Closing Seller shall sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser shall purchase, accept and acquire from the Seller, free and clear of all Liens except Permitted Liens, all of the assets and properties wherever located (collectively, the "**Acquired Assets**") described in Section 1.1.1 below, subject in each case to Section 1.1.2.

      1.1.1.    **Acquired Assets**.  The Acquired Assets consist of all of Seller's right, title and interest in and to the rights and assets exclusively used in, exclusively arising from, or exclusively relating to the Business (other than the Excluded Assets and the Purchased Intellectual Property), including:

         A.    Book Assets of the Business;

         B.    Only the Personal Property and Software set forth on Schedule 1.1.1.B;

         C.    Only the Permits set forth on Schedule 1.1.1.C;

         D.    Only the Inventory set forth on Schedule 1.1.1.D, as modified in the Inventory Valuation;

         E.    Only the Contracts set forth on Schedule 1.1.1.E ("**Transferred Contracts**");

         F.    Administrative Assets of the Business; and

         G.    All going concern value of the Business, if any.

The parties agree that Schedules 1.1.1.B, 1.1.1.D and 1.1.1.E shall be updated by mutual agreement of the parties (such agreement not to be unreasonably withheld) at Closing for those significant items acquired or Contracts of any significance entered into after the execution of this Agreement, if any.

**1.1.2. Excluded Assets.** Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, the following properties and assets of Seller and DTI shall not be included in the Acquired Assets:

**A.** **Bailed Assets.** Any machinery, equipment, tools, Inventory, tooling, dies, molds, patterns, jigs, gauges, production fixtures, special material handling equipment, customer dunnage and containers owned by any other third party, including such items set forth on Schedule 1.1.2.A ("**Third Party Bailed Assets**"). To Seller's Knowledge, the items set forth on Schedule 1.1.2.A were the only items provided by General Motors Corporation relating exclusively to the Business.

**B.** **Certain Financial Assets.** Accounts Receivable, cash, cash equivalents and bank accounts ("**Financial Assets**").

**C.** **Excluded Contracts.** All Contracts that are not Transferred Contracts ("**Excluded Contracts**").

**D.** **Tax Refunds.** Any refund of Taxes, or claim for refund of Taxes, of any kind relating to the Acquired Assets for any period prior to the Closing Date.

**E.** **Excluded Intellectual Property.** All Intellectual Property not exclusively used, exclusively arising from or exclusively relating to the Business as currently conducted (collectively, the "**Excluded Intellectual Property**") subject to the limited rights granted to Purchaser pursuant to Section 1.2.1. In particular, without limiting the foregoing, "Delphi" and all other trademarks, service marks, trade names and logos not listed on Schedule 5.1.7.A.1, and all Software is excluded, except for the Software listed on Schedule 1.1.1.B or that may be a deliverable to Delphi under a Contract set forth on Schedule 1.1.1.E.

**F.** **Privileged Information and Materials.** Information and materials protected by the attorney-client privilege or that Seller considers to be proprietary information; and the lack of which excluded information and materials are not material to the operation of the Business.

**G.** **Personnel and Medical Records.** All employees of Seller operating or supporting the Business and all work histories, personnel and medical records of employees and former employees of Seller who worked at any time for any reason at the Business for whom a record exists at the Business as of the Closing Date.

**H.** **Real Property.** All real property and interests of any kind or nature in real property, including any and all buildings, fixtures (except as explicitly set forth in Schedule 1.1.1.B) and other improvements, owned, leased, controlled, or used by Seller or any Affiliate or subsidiary of Seller.

**I.** **Transition Services Agreement, Manufacturing Services Agreement and Rubber Supply Agreement.** All services and products offered to be provided directly or indirectly under the Transition

12

Services Agreement, the Manufacturing Services Agreement and/or the Rubber Supply Agreement.

**J.**     **Insurance.**     The benefit of any of Seller's or Seller's Affiliates' insurance policies relating to the operation of the Business (including any right to proceeds thereunder).

**K.**     **Certain Rights.**   All of the rights and claims of the Seller available to Seller under the Bankruptcy Code, of whatever kind or nature, as set forth in Sections 544 through 551, inclusive, and any other applicable provisions of the Bankruptcy Code, and any related claims and actions arising under such sections by operation of law or otherwise, including any and all proceeds of the foregoing.

**L.**     **Other Assets.**   (i) All finished goods Inventory and all inventories, products, rights, properties, assets and businesses of the Business which shall have been transferred or disposed of by Seller prior to Closing not in breach of this Agreement; (ii) any document, information, Permit, Contract, Intellectual Property or other asset the transfer of which is prohibited by any Law; and (iii) all computer hardware, equipment, or other assets listed on Schedule 1.1.2.L.

**1.1.3.   Post-Closing Asset Deliveries.**   Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Acquired Assets or Purchased Intellectual Property are still in the possession of Seller and/or DTI, Seller and/or DTI, as applicable, shall promptly deliver them to Purchaser at no cost to Purchaser.   Should Seller or Purchaser, in its reasonable discretion, determine after the Closing that books, records or other materials constituting Excluded Assets were delivered to Purchaser, Purchaser shall promptly return them to Seller at no cost to Seller other than reimbursing Purchaser's reasonable out-of-pocket costs.

**1.1.4.   Non-Assignable Permits and Contracts:**

**A.**     **Non-Assignability.**   To the extent that any Transferred Contract or Permit included in the Acquired Assets is not capable of being assigned to Purchaser at the Closing without the consent or waiver of the issuer thereof or the other party thereto or any third party (including a Governmental Entity), or if such assignment or attempted assignment would constitute a breach thereof, or a violation of any Law, this Agreement shall not constitute an assignment thereof, or an attempted assignment, unless any such consent or waiver is obtained.

**B.**     **Efforts to Obtain Consents and Waivers.**     At Purchaser's request, Seller shall, at its expense, use commercially reasonable efforts, and Purchaser shall, at Seller's expense, cooperate with Seller, to obtain the consents and waivers and to resolve the impracticalities of assignment referred to in Section 1.1.4.A after the Closing.

**C.**     **If Waivers or Consents Cannot be Obtained.**   To the extent that the consents and waivers referred to in Section 1.1.4.A are not

13

obtained by Seller, or until the impracticalities of assignment referred to therein are resolved, Seller's sole responsibility with respect to such matters, notwithstanding Section 1.1, shall be to use, during the one hundred eighty (180) day period commencing with the Closing, all commercially reasonable efforts, at no cost to Purchaser (other than pursuant to Section 1.1.4.D) to: (i) provide to Purchaser the benefits of any Permit or Transferred Contract, all as referred to in Section 1.1.4.A, included in the Acquired Assets; (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Purchaser, without incurring any financial obligation to Purchaser; and (iii)  at the request and direction of Purchaser, enforce for the account of Purchaser and at the cost of Purchaser any rights of Seller arising from the Permits or Transferred Contracts included in the Acquired Assets referred to in Section 1.1.4.A against such issuer thereof or other party or parties thereto.

**D.**     **Obligation of Purchaser to Perform.**  To the extent that Purchaser is provided the benefits pursuant to Section 1.1.4.C of any Permit or Transferred Contract included in the Acquired Assets, Purchaser shall perform, on behalf of Seller, for the benefit of the issuer thereof or the other party or parties thereto the obligations of Seller thereunder or in connection therewith and if Purchaser shall fail to perform to the extent required herein, Seller, without waiving any rights or remedies that it may have under this Agreement or applicable Laws, may suspend its performance under Section 1.1.4.C in respect of the instrument which is the subject of such failure to perform unless and until such situation is remedied; or at Purchaser's request, Seller may perform at Purchaser's sole reasonable cost and expense, in which case Purchaser shall reimburse Seller's reasonable costs of such performance immediately upon receipt of an invoice therefor.

**1.2.**   **Intellectual Property Rights and Licenses**:

**1.2.1.  License to Purchaser.**  DTI and Seller, as applicable, hereby grant to Purchaser, as of the date of Closing, but subject to any restrictions arising from rights granted to third parties prior to the Closing Date, a worldwide, perpetual, paid-up, royalty free, non-exclusive license, without the right to sublicense except as provided in Section 1.2.3, to develop, manufacture, use, import, export and sell Products using Excluded Intellectual Property embodied in or used in the manufacture of Products as of the Closing Date by Seller, including US Patent No. 6689243, and other than: (i) Trademark Rights; and (ii) third-party Software.  The license granted to Purchaser under this Section 1.2.1 shall not be assignable in whole or in part except to a purchaser of all or substantially all of the Business.

**1.2.2.  License Retained by DTI.**  DTI will retain a worldwide, perpetual, paid-up, royalty free, non-exclusive license allowing it and its Affiliates to develop, manufacture, use, import, export and sell products and services (other than Products), and sublicense others to do so (other than Products), using any Purchased Intellectual Property, subject to any restrictions arising from rights granted to third parties prior to the Closing Date.

14

**1.2.3. Further Understandings.** It is further understood and agreed that the licenses granted or retained in this Section 1.2: (i) include the right for the licensed party to sub-license to any of its Affiliates; (ii) include the right for the Purchaser to sub-license to any of its subcontractors, provided that such subcontractors use the licensed material for the benefit of making Products for Purchaser and/or Purchaser's customer; and (iii) do not include any right to use any Trademark Rights.

## 2.    ASSUMPTION OF LIABILITIES:

**2.1. Assumed Liabilities.** At and as of the Closing, Purchaser shall assume and agree to pay, perform and discharge when due, and shall be liable with respect to, all obligations, liabilities and responsibilities specifically referred to in this Section 2.1 ("**Assumed Liabilities**"), other than the Retained Liabilities, as follows:

**2.1.1.** The executory obligations of Seller to be performed under the Transferred Contracts and the obligations of Seller to be performed under, licenses, Permits and leases included in the Acquired Assets and assigned or otherwise transferred to Purchaser pursuant to this Agreement.

**2.1.2.** Any and all liabilities, claims and other obligations relating to ownership or use of the Acquired Assets arising after the Closing Date.

**2.1.3.** The obligation to pay for assets, goods or services ordered by Seller on or prior to the Closing in the Ordinary Course of Business and that are reasonably anticipated by the Seller to be received by the Purchaser after the Closing Date, provided that the individual amounts of such purchases do not exceed $10,000.00 unless otherwise approved by Purchaser.

**2.1.4.** Liabilities and obligations arising out of, resulting from, or relating to sales of Products pursuant to the Transferred Contracts after the Closing Date, including all Product warranty, Product returns, Product liability and Product recall liability related thereto. Purchaser and Seller acknowledge and agree that nothing in this Agreement is intended to alter the allocation of responsibilities or obligations, including, but not limited to, liability for Product warranty, Product returns, Product liability and Product recall liability, for Products assembled by Harco and purchased by Seller prior the Closing Date.

**2.1.5.** All obligations to fulfill orders relating to Products of the Business outstanding on the Closing Date.

**2.2. No Expansion of Third Party Rights.** The assumption by Purchaser of the Assumed Liabilities shall in no way expand the rights or remedies of any third party against Purchaser or Seller as compared to the rights and remedies which such third party would have had against Seller absent the Bankruptcy Cases, had Purchaser not assumed such Assumed Liabilities. Without limiting the generality of the preceding sentence, the assumption by Purchaser of the Assumed Liabilities shall not create any third-party beneficiary rights other than with respect to the Person that is the obligee of such Assumed Liability.

**2.3. Retained Liabilities.** Notwithstanding anything in this Agreement to the contrary, Purchaser shall not assume or be deemed to have assumed, and shall have no

liability or obligation with respect thereto, any other liability or obligation of the Seller or DTI (collectively, "**Retained Liabilities**"), including, but not limited to, the following: (i) liabilities in respect of employment or services performed on or prior to the Closing; (ii) product liability claims for Products manufactured prior to the Closing Date; (iii) existing litigation for which a claim has made or threatened in writing against Seller on or before the Closing Date; (iv) Tax liabilities for periods ending on or before the Closing Date; (v) any liability or obligation of Seller for administrative fees and expenses, including, without limitation, "allowed administrative expenses" under Section 503(b) of the Bankruptcy Code; (vi) any liability or obligation of Seller for transaction fees and expenses and fees and expenses payable to lenders, brokers, financial advisors, legal counsel, accountants and other professionals in connection with this Agreement;  (vii) Accounts Payable; (viii) all Debt owed by Seller to any person or entity; and (ix) any liability or obligation not expressly assumed pursuant to Section 2.1.

3.    **RESERVED.**

4.    **PURCHASE PRICE**:

4.1.    **Preliminary Purchase Price, Deposit Amount, Purchase Price.** Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Acquired Assets shall be the amount of: (i) Nine Million Seven Hundred Fifty Thousand Dollars ($9,750,000.00); plus or minus (ii) the Purchase Price Adjustment (as finally determined in accordance with Sections 4.2 and 4.3 below); plus (iii) assumption of the Assumed Liabilities.  The term  "**Preliminary Purchase Price**" refers to the sum of the amount referred to in clause (i) above plus the Intellectual Property Purchase Price.   The final aggregate purchase price, as determined in accordance with this Article 4, is referred to herein as the "**Purchase Price**".

4.1.1.  **Deposit Amount.**  Upon execution of this Agreement, Purchaser shall pay $500,000.00 in immediately available funds to the Deposit Escrow Agent pursuant to the terms of the Deposit Escrow Agreement (such amount, together with the interest accrued thereon prior to the Closing, the "**Deposit Amount**"), to be held by the Deposit Escrow Agent in an interest bearing account reasonably acceptable to Purchaser to serve as an earnest money deposit under this Agreement, and to be released in accordance with the following procedures:

A.    **Deposit Instructions.**  At Closing, Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price).  The costs and expenses of the Deposit Escrow Agent will be paid from and borne solely by the Deposit Amount;

B.    **Termination of Agreement.**  Upon any failure by Purchaser to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 7 hereof, the Deposit Escrow Agent shall deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement, to be retained by Seller. Any such payment shall constitute Seller's sole recourse in the event Purchaser notifies

16

Seller, prior to the Auction date, of Purchaser's intent to terminate this Agreement. Upon any breach by Purchaser on or after the Auction date, Seller will be entitled to all available remedies in law or equity.

   **C.**   **Other Reason.**   Upon termination of this Agreement for any other reason or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Section 7, Seller and Purchaser shall jointly instruct the Deposit Escrow Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Purchaser in the Deposit Escrow Agreement, to be retained by Purchaser.

   **4.1.2.**   **Transfer of Purchased Intellectual Property and Purchase Price of Purchased Intellectual Property.**   Upon the terms and subject to the conditions set forth in this Agreement at Closing Seller and DTI shall sell, transfer, assign, convey and deliver to the Purchaser, and Purchaser shall purchase, accept and acquire from DTI, free and clear of all Liens except Permitted Liens; the Purchased Intellectual Property, subject to Section 1.1.2.

   Subject to the terms and conditions of this Agreement, in consideration of the Sale, the aggregate purchase price for the Purchased Intellectual Property shall be the amount of Fifty Thousand Dollars ($50,000.00) ("**Intellectual Property Purchase Price**").

   **4.1.3.**   **Delivery of Purchase Price and Intellectual Property Purchase Price.**   At Closing, Purchaser shall pay to Seller an aggregate amount equal to the Preliminary Purchase Price less the Deposit Amount (apportioned pursuant to the allocation referred to in Section 4.4) and less the Indemnity Escrow Amount (as described below) by wire transfer in U.S. Dollars in immediately available funds to the account of the appropriate Seller, pursuant to this Agreement and a notice delivered by Seller to Purchaser prior to Closing. At Closing, Purchaser shall pay to "**Indemnity Escrow Agent**" hereunder $750,000.00 of the Purchase Price (hereinafter referred to as the "**Indemnity Escrow Amount**") to be held by the Indemnity Escrow Agent, in an interest bearing account, as collateral to secure the rights of the Purchaser under Article 12 hereof. The Indemnity Escrow Amount shall be held pursuant to the provisions of an escrow agreement substantially in the form of Schedule 7.2.7 (the "**Indemnity Escrow Agreement**"). The Indemnity Escrow Amount will be held by the Indemnity Escrow Agent from the Closing Date until twelve (12) months after the Closing Date (the "**Escrow Period**"); provided, however, that in the event Purchaser has made a claim under Article 12 prior to the end of the Escrow Period, then the Escrow Period shall continue (and the Indemnity Escrow Agent will continue to hold in escrow that portion of the Indemnity Escrow Amount which is equal to the amount which is necessary to satisfy such indemnity claim) until such claim is fully and finally resolved. The costs and expenses of the Indemnity Escrow Agent will be paid from and borne solely by the Escrow Amount. Purchaser's recourse for any indemnification under Article 12 hereunder shall be limited to the Indemnity Escrow Amount.

4.2.    **Preparation of Inventory Valuation:**

**4.2.1.** Commencing on the Closing Date, Purchaser and Seller shall jointly conduct a physical count of the Direct Material Inventory as of the Closing Date. Following the physical count, the parties shall calculate the value of the Direct Material Inventory (the "**Initial Inventory Valuation**") using the same methods used by Seller in calculating the value of Direct Material Inventory as of April 27, 2006, as set forth in Schedule 4.2.1. Purchaser and Seller will receive a copy of the Initial Inventory Valuation. Within thirty (30) days following the Closing Date, Purchaser and Seller shall agree upon the Initial Inventory Valuation.

**4.2.2.** If Purchaser and Seller do not agree upon the Initial Inventory Valuation within thirty (30) days after the Closing Date, any disagreement shall be submitted for final determination to an independent regional accounting firm (the "**Independent Accounting Firm**"). The Independent Accounting Firm shall follow such procedures as it deems appropriate for obtaining the necessary information in considering the positions of Purchaser and Seller. The Independent Accounting Firm shall render its determination on the matter within twenty (20) days of its submission by Purchaser and Seller, and such determination shall be final, conclusive and binding upon Purchaser and Seller. The fees and expenses of the Independent Accounting Firm shall be paid equally by Purchaser and Seller. The term "**Inventory Valuation**" refers to the final Initial Inventory Valuation as agreed by the parties or as determined by the Independent Accounting Firm. Under no circumstances shall the Inventory Valuation under this Agreement include: (i) any obsolete or other non-saleable Direct Material Inventory; or (ii) any Excess Direct Material Inventory. "**Excess Direct Material Inventory**" shall mean any Inventory held for service parts in excess of reasonable amounts needed for projects that have been terminated or will be terminated within one (1) year of the Closing which exceed the Inventory necessary to complete any such project, as reasonably determined by Seller consistent with current customer forecasts and historical requirements and agreed by Purchaser (such agreement not to be unreasonably withheld).

4.3.    **Preliminary Purchase Price Adjustment.** The Preliminary Purchase Price shall be adjusted ("**Purchase Price Adjustment**") as follows:

The Purchase Price shall be increased (the "**Purchase Price Increase**") by the amount, if any, by which the Inventory Valuation is greater than Four Million Seven Hundred Thousand Dollars ($4,700,000.00). The Purchase Price shall be decreased (the "**Purchase Price Decrease**") by the amount, if any, by which the Inventory Valuation is less than Four Million Seven Hundred Thousand Dollars ($4,700,000.00). Within twenty (20) days following the date upon which the Inventory Valuation is mutually agreed upon by Purchaser and Seller or determined pursuant to Section 4.2.2, Purchaser shall pay by wire transfer in U.S. Dollars in immediately available funds to an account designated by Seller any Purchase Price Increase or Seller shall pay by wire transfer in U.S. Dollars in immediately available funds to an account designated by Purchaser any Purchase Price Decrease.

18

**4.4.    Allocation of Purchase Price**:

**4.4.1.**  The Parties agree to allocate the Purchase Price (i.e., both the
Preliminary Purchase Price and the Purchase Price Adjustment) among the
Business and the agreements provided herein for transfer of the Business to
Purchaser, for all purposes (including financial, accounting and tax) (the
"**Allocation**") in a manner consistent with the Allocation Schedule attached as
Schedule 4.4.1.

**4.4.2.**  Purchaser and Seller shall each report the federal, state and local
income and other Tax consequences of the purchase and sale contemplated
hereby in a manner consistent with the Allocation, including, if applicable, the
preparation and filing of Forms 8594 under Section 1060 of the Internal Revenue
Code (or any successor form or successor provision of any future tax law) with
their respective federal income Tax Returns for the taxable year which includes
the Closing Date, and neither will take any position inconsistent with the
Allocation unless otherwise required under applicable law.  Seller shall provide
Purchaser and Purchaser shall provide Seller with a copy of any information
required to be furnished to the Secretary of the Treasury under Internal Revenue
Code Section 1060.

## 5.    REPRESENTATIONS AND WARRANTIES:

**5.1.    Warranties of Seller**.  Seller and DTI, represent and warrant, severally
but not jointly with respect to the Acquired Assets being sold by Seller and the
Purchased Intellectual Property being sold by DTI, to Purchaser as follows:

**5.1.1.  Organization and Good Standing.**  Each of Seller and DTI is a
legal entity duly organized, validly existing and in good standing under the laws
of Delaware, and has all requisite corporate or other organizational power and,
subject to any required Bankruptcy Court approval, authority to own, lease and
operate their respective properties and assets and to carry on the Business as
presently conducted, and is in good standing in all jurisdictions where it owns or
leases real property, except where the failure so to qualify or to be so licensed
would not have a Material Adverse Effect.

**5.1.2.  Corporate Power; Due Authorization.**  Each of Seller and DTI
has the corporate or other organizational power and authority to execute and
deliver this Agreement and the Ancillary Agreements, subject to Bankruptcy
Court approval, to which it is a party, and to perform its respective obligations
hereunder and thereunder, and to consummate the transactions contemplated
herein and therein.  The execution, delivery and performance of this Agreement
and the Ancillary Agreements by the Seller and DTI and the consummation of the
contemplated transactions have been duly authorized by all necessary action on
the part of Seller and DTI, as the case may be.  Subject to the entry and
effectiveness of the Bidding Procedures Order and the Sale Approval Order, this
Agreement, and the Ancillary Agreements, have been duly and validly executed
and delivered by or on behalf of each of the Seller and DTI, and (assuming this
Agreement constitutes a valid and binding obligation of Purchaser) constitutes a
legal, valid and binding agreement of Seller and DTI, enforceable against Seller
and DTI in accordance with its terms, subject to applicable bankruptcy,

reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles.

5.1.3. **No Violations.**   No consent, approval, authorization of, declaration, filing or registration with any domestic or foreign government, regulatory authority, union, or any other third party is required to be made or obtained by Seller or DTI in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, except for: (i) consents, approvals, authorizations of, declarations or filings with, the Bankruptcy Court; (ii) waiver of any "no sale" provision contained in any agreement between Delphi Corporation and the Union; and (iii) other consents, approvals, authorizations, declarations, filings and registrations set forth on Schedule 5.1.3.  The items referred to in clauses (i) and (ii) of this Section 5.1.3 are hereinafter referred to as the "**Third Party Requirements**".

5.1.4. **Sufficiency of Assets.**  The Acquired Assets and the Purchased Intellectual Property comprise all of the assets reasonably necessary to carry on the Business in all material respects as it is now being conducted, except for the Excluded Assets.

5.1.5. **Personal Property; Condition of Personal Property**:

A.   **Title to Personal Property.**   Except for the Personal Property leases and other Personal Property referred to in Schedule 5.1.5.A, Seller has good, valid and marketable title to the Personal Property and Inventory included in the Acquired Assets. Upon entry by the Bankruptcy Court of the Sale Approval Order, Seller shall transfer the Acquired Assets free and clear of any Lien, except as otherwise expressly indicated on Schedule 5.1.5.A.

B.   **Condition of Personal Property.**   To the Seller's Knowledge and subject further to the last sentence of this Section 5.1.5.B, the Personal Property included in the Acquired Assets are in such condition (considering age and purpose for which used) as to enable the Business to be conducted as currently conducted without material disruption.  With respect to all Personal Property included in the Acquired Assets, Seller has performed maintenance consistent with divisional maintenance policies and procedures and will continue to perform such maintenance through the Closing Date.   NO REPRESENTATION OR WARRANTIES OF ANY KIND ARE MADE AS TO ANY PERSONAL PROPERTY LOCATED AT ANY PURCHASER OR HARCO FACILITY.

C.   **Inventory.**   Except to the extent identified in Schedule 5.1.5.C, the Inventory included in the Acquired Assets will, as of the Closing, be located at Delphi's Dayton, Ohio, Home Ave. site buildings number 25 and 27 and at all the contract manufacturers supporting component and fitting machining and the brake hose assembly as set forth on Schedule 5.1.5.C, and will be fit for the purpose for which it is ordinarily acquired, merchantable in the Ordinary Course of Business,

and saleable in the Ordinary Course of Business. NO REPRESENTATION OR WARRANTIES OF ANY KIND ARE MADE AS TO ANY INVENTORY LOCATED AT ANY PURCHASER OR HARCO FACILITY.

**D.**  **Machinery, Equipment and Tools.** Regarding the Acquired Assets, Schedule 5.1.5.D sets forth a list of substantially all machinery, equipment and capitalized tools with an acquisition value greater than $1,000.00, included in the Acquired Assets and exclusively used in or exclusively related to the Business.

**5.1.6.**  **Litigation.**  Except for the pendency of the Bankruptcy Cases and any Claims referred to in Schedule 5.1.6, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to any of the Seller's Knowledge, threatened against or affecting Seller, the outcome  of which would have, individually or in the aggregate, a Material Adverse Effect, nor is there an Order outstanding against Seller that would have a Material Adverse Effect.

**5.1.7.**  **Intellectual Property Assets:**

**A.**  Schedule 5.1.7.A.1 sets forth a true and complete list, including a complete identification of each patent, trademark registration, copyright registration, domain name registration and application therefor included in the Owned Intellectual Property; and Schedule 5.1.7.A.2 sets forth a true and complete list of all Licensed Intellectual Property. Schedule 5.1.7.A.3 sets forth a true and complete list, in all material respects, of all material Software currently used by the Business.  To Seller's Knowledge, there are no impediments to the ability of DTI under applicable Laws to maintain in effect or renew their respective rights, in all material respects, in and to the Owned Intellectual Property.

**B.**  To Seller's Knowledge, Seller is conducting the Business in a manner that does not violate the intellectual property right of another Person and no Claim has been made by any third party against Seller of Intellectual Property infringement or misappropriation resulting from the operation of the Business, except as set forth in Schedule 5.1.7.B.  In particular, Seller has received no notice from General Motors that Seller is conducting the business in a manner that violates any intellectual property rights granted exclusively by General Motors to a third party.

**C.**  DTI has not granted any license, sublicense or other permission to use the Owned Intellectual Property to any third party, that would materially affect Purchaser's conduct of the Business, except as set forth on Schedule 5.1.7.C.

**D.**  Seller or DTI have good, valid and marketable title to the Purchased Intellectual Property consisting of Owned Intellectual Property and upon entry by the Bankruptcy Court of the Sale Approval Order, Seller or DTI, as applicable, shall transfer such Purchased Intellectual Property free and clear of any encumbrances thereon.

21

**E.**    Seller and DTI have taken commercially reasonable steps to protect rights in confidential information (and that of third parties that the Seller has received under an obligation of confidentiality), except where the failure to do so would not have a Material Adverse Effect.

**F.**    The Seller has secured from all named inventors who have created any material portion of, or otherwise have any rights in or to, Patents included in the Purchased Intellectual Property set forth in Schedule 5.1.7.A.1, valid and enforceable written assignments or licenses to the Seller or DTI, as applicable.

**5.1.8.**    **Compliance with Other Instruments and Laws; Permits.**    To Seller's Knowledge, the Business is in compliance with all Laws applicable to the conduct of the Business and all Permits, except where the failure to be in compliance would not have a Material Adverse Effect.    All Permits that are necessary for the conduct of the Business and the ownership and operation of the Acquired Assets have been duly obtained and, except as indicated on Schedule 5.1.8, are in full force and effect.    There are no proceedings pending or, to Seller's Knowledge, threatened, which may result in the revocation, cancellation or suspension, or any materially adverse modification, of any such Permit, except in each case as would not, individually or in the aggregate, result in a Material Adverse Effect.    The execution, delivery and performance of, and compliance with, this Agreement and the Ancillary Agreements by Seller will not, with or without the passage of time or the giving of notice, result in any such violation or be in conflict with or constitute a default under any Permit.

**5.1.9.**    **Brokers.**    Seller has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Purchaser would be liable.

**5.1.10.** **Consents and Approvals.**    Assuming that the Third Party Requirements have been obtained or satisfied as of Closing, neither the execution, delivery or performance of this Agreement and the Ancillary Agreements by the Seller, nor the consummation by Seller of the Sale, nor compliance by Seller with any of the provisions hereof and of the Ancillary Agreements, will, with or without the passage of time or the giving of notice: (i) result in any breach of any provisions of the articles of incorporation or bylaws or similar organizational documents of Seller; (ii) result in a violation, or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, amendment, vesting, payment, exercise, acceleration, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage, deed of trust, security interest, indenture, loan or credit agreement, license, permit, contract, lease, agreement, plan or other instrument, commitment or obligation to which Seller is a party or by which its properties or assets may be bound or affected; (iii) violate any order, writ, governmental authorization, injunction, decree, statute, rule or regulation applicable to Seller or to any of its properties or assets; or (iv) result in the creation or imposition of any Lien other than a Permitted Lien on any asset of Seller, except in the case of clauses (ii), (iii) and (iv) above, for violations, breaches, defaults, terminations, cancellations, accelerations, creations,

impositions, suspensions or revocations that: (a) would not individually or in the aggregate have a Material Adverse Effect; or (b) are excused by or unenforceable as a result of the filing of the Bankruptcy Cases or the applicability of any provision of or any applicable law of the Bankruptcy Code.

5.1.11. **Financial Statements.**   Since the Business is a product line within Delphi's Chassis Systems Product Business Unit and not a separate corporate entity, independent financial statements have not been required or maintained for the Business.  Accordingly, the pro forma statements of income, as of and for the fiscal years ended December 31, 2003, December 31, 2004 and December 31, 2005, for the Business are set forth in Schedule 5.1.11 have not been audited and have been derived from unaudited management reports and forecast systems and have, to Seller's Knowledge, been adjusted and modified to reflect in-house estimates of the Business' financial operations as if it were operating as a stand-alone business, and they were calculated solely in conjunction with the proposed transaction (such financial statements are collectively referred to as the "**Financial Statements**").

5.1.12. **Events Subsequent to Latest Financial Statements.**  Except as referred to on Schedule 5.1.12 or as otherwise contemplated by or referred to in this Agreement or the Ancillary Agreements, since June 14, 2006: (i) there has not been any Material Adverse Effect; and (ii) the Business has been conducted and carried on only in the Ordinary Course of Business.

5.1.13. **Contracts:**

A.     Schedule 5.1.13.A lists all material Contracts exclusively used in, exclusively arising from, or exclusively relating to the Business as it is currently conducted by Seller ("**Listed Contracts**").   Seller has delivered or made available to Purchaser either: (i) true, correct and complete copies in all material respects; or (ii) accurate written descriptions in all material respects, of the Listed Contracts.

B.     Each of the Transferred Contracts is valid, binding and, subject to payment of all Cure Amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption and assignment to Purchaser of such of those Transferred Contracts which are also Assumed Contracts under the Sale Approval Order, if applicable, enforceable against Seller, to the extent set forth therein, and, to Seller's Knowledge, the other parties thereto, in accordance with its terms, and is in full force and effect. Except as set forth on Schedule 5.1.13.B(i), and other than with respect to monetary defaults by Seller under Transferred Contracts that are curable by payment of all Cure Amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption and assignment to Purchaser of such Transferred Contracts under the Sale Approval Order, if applicable, Seller, and to Seller's Knowledge each of the other parties thereto, has performed all obligations required to be performed by it to date under, and is not in default in respect of, any of such Transferred Contracts, and there is not a default thereunder or claim of default and there has not occurred any event which, with the passage of time or the giving of notice or both, would constitute a default thereunder, on the part of Seller, or to Seller's Knowledge, on the part of any other party thereto; in each case,

other than where the failure to perform or such default would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.    Except as set forth in <u>Schedule 5.1.13.B(ii)</u>, and other than with respect to monetary defaults by Seller under Transferred Contracts that are curable by payment of all Cure Amounts payable to effectuate, pursuant to the Bankruptcy Code, the assumption and assignment to Purchaser of such Transferred Contracts under the Sale Approval Order, if applicable, to Seller's Knowledge, Seller has received no claim or notice from any other party to any such Transferred Contract that Seller has breached any obligations to be performed by it thereunder, where the consequence of such breach or default would be reasonably expected to have a Material Adverse Effect. <u>Schedule 5.1.13.B(iii)</u> identifies all Post-Petition Contracts included within the Transferred Contracts  (including open purchase orders) entered into in the Ordinary Course of Business.    Except as set forth on <u>Schedule 5.1.13.B(iv)</u>, none of the Post-Petition Contracts included within the Transferred Contracts contains any provisions restricting its assumption and assignment to Purchaser pursuant to the terms of this Agreement.

**5.1.14. <u>Tax Matters</u>:**

**A.**    Seller has: (i) duly and timely filed with the appropriate federal, state, local and foreign authorities or governmental agencies, all Tax Returns required to be filed and such Tax Returns were true, correct and complete; and (ii) and have paid all Taxes shown thereon as due and owing, except where the failure to file or to pay such Taxes would not result in any liability to the Purchaser or result in any lien on the Acquired Assets.

**B.**    Seller has properly and timely withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor or other third party (including, without limitation, federal income taxes, sales and use taxes, personal property taxes, Federal Insurance Contribution Act taxes and Federal Unemployment Tax Act taxes) and has properly and timely paid the same to the proper Tax receiving officers or authorized depositories, except in each case where such failure would not result in any liability to the Purchaser or any Lien on the Acquired Assets.

**C.**    There are no Tax liens on any of Seller's assets, except for liens for Taxes not yet due and payable.

**5.1.15. <u>Absence of Other Representations or Warranties</u>.**  Except for the Warranties expressly set forth in this Agreement and the Ancillary Agreements, neither Seller nor DTI make any representations or warranties, express or implied, with respect to the Acquired Assets, the Purchased Intellectual Property, the Assumed Liabilities, the sale of the Business, and in particular but without limitation, neither Seller nor DTI make any representation with respect to any plan(s) of Purchaser for the future conduct of the Business. For the avoidance of doubt, no warranty or representation is given on the contents of the documents provided in due diligence, on any other documents or

other information  not contained in this Agreement or the Ancillary Agreements, or on any projected volumes of the Business, all which were produced only for information purposes.

**5.1.16. Insurance.** Schedule 5.1.16 contains a complete and correct list, in all material respects, of all material policies of insurance covering any of the assets primarily used in or relating to the Business, indicating for each policy the carrier, risks insured, the amounts of coverage, deductible, expiration date and any material pending claims thereunder. All such policies are outstanding and in full force and effect.

**5.1.17. Fair Disclosure.** Any matter fairly disclosed in any Schedule to this Agreement shall be deemed an exception for all other representations and warranties contained in this Agreement whether or not such other representations or warranties contain a reference to such Schedule.

**5.2.    Warranties of Purchaser.** For purposes of this Section 5.2, the term "**Purchaser**" shall include both Harco and AcquisitionCo. Harco and AcquisitionCo, as Purchaser, jointly and severally, warrant and represent to Seller as follows:

**5.2.1. Corporate Data.** Purchaser is a legal entity duly organized, validly existing and in good standing under the laws of Ohio, and has all requisite corporate or other organization power and authority to own, lease and operate its properties and assets.

**5.2.2. Corporate Power; Due Authorization.** Purchaser has the corporate or other organizational power and authority to execute and deliver this Agreement and the Ancillary Agreements and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated herein and therein. The execution, delivery and performance of this Agreement and the Ancillary Agreements have been duly authorized by all necessary action on the part of Purchaser. This Agreement is, and the Ancillary Agreements to which Purchaser is a party will be, when executed and delivered (assuming this Agreement constitutes a legal, valid and binding obligation of the Seller), valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as enforcement of such terms may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws or proceedings affecting the enforcement of creditors' rights generally and by the availability of equitable remedies and defenses.

**5.2.3. No Violations.** Except as set forth on Schedule 5.2.3, neither the execution, delivery or performance of this Agreement by Purchaser, nor the consummation by Purchaser of the transactions contemplated herein, nor compliance by Purchaser with any of the provisions hereof, will: (i) except for the Third Party Requirements, require Purchaser to obtain any consent, approval or action of, or make any filing with or give notice to, any domestic or foreign governmental or regulatory body or any other Person; (ii) conflict with or result in any breach of any provisions of the certificate of incorporation or bylaws of Purchaser; or (iii) result in a violation or breach of, or constitute (with or without due notice or lapse of time) a default (or give rise to any right of termination, cancellation, acceleration, vesting, payment, exercise, suspension or revocation) under any of the terms, conditions or provisions of any note, bond, mortgage,

deed of trust, security interest, indenture, license, contract, agreement, plan or other instrument or obligation to which Purchaser is a party or by which Purchaser or Purchaser's properties or assets may be bound or affected; (iv) violate any order, writ, injunction, decree, statute, rule or regulation applicable to Purchaser or Purchaser's properties or assets; or (v) result in the creation or imposition of any Lien on any asset of Purchaser (except for any loan of Purchaser or its Affiliates to consummate the transaction contemplated hereunder).

5.2.4. **Litigation.**  Except for the pendency of the Bankruptcy Cases, there is no suit, action, proceeding or investigation (whether at law or equity, before or by any federal, state or foreign commission, court, tribunal, board, agency or instrumentality, or before any arbitrator) pending or, to the knowledge of Purchaser, threatened against or affecting Purchaser which could reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

5.2.5. **Brokers.**  Purchaser has employed no finder, broker, agent or other intermediary in connection with the negotiation or consummation of this Agreement or any of the transactions contemplated hereby for which Seller would be liable.

5.2.6. **Solvency.**  Upon the consummation of the transactions contemplated by this Agreement: (i) Purchaser will not be insolvent; (ii) Purchaser will not be left with unreasonably small capital; (iii) Purchaser will not have incurred debts beyond its ability to pay such debts as they mature; (iv) the capital of Purchaser will not be impaired; and (v) immediately following closing, Purchaser will have sufficient capital to continue the Business as a going concern (it being understood that Purchaser will have no obligation to continue all or any portion of the Business as a going concern).

5.2.7. **Availability of Funds.**  Purchaser has or will have available, at or prior to Closing, sufficient cash in immediately available funds to pay the Purchase Price and all costs, fees and expenses necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements. Purchaser has delivered to Seller the executed commitment letter (the "**Commitment Letter**") with respect to the financing arrangements for the transactions contemplated by this Agreement and the Ancillary Agreements (the "**Financing**").  As of the date of this Agreement: (i) the Commitment Letter is in full force and effect and has not been amended or rescinded; and (ii) Purchaser has delivered to Seller written confirmation, satisfactory to Seller in its sole discretion, of National City Bank that Purchaser's Financing is not contingent upon additional or further due diligence, agreement of loan structures, or collateral matters. The aggregate proceeds of the Financing provided for in the Commitment Letter, together with cash available to Purchaser, will be sufficient to pay the Purchase Price and satisfy the other obligations of Purchaser necessary to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.  Purchaser expressly acknowledges and agrees that its obligation to consummate the transactions contemplated by this Agreement and the Ancillary Agreements is not subject to any condition or contingency with respect to financing.

**5.2.8.  Compliance with Law.**  Purchaser is in compliance with all Laws applicable to it, except with respect to those violations that could not reasonably be expected to result in the issuance of an Order outstanding restraining, enjoining or otherwise prohibiting Purchaser from consummating the transactions contemplated by this Agreement.

**5.2.9.  Anti-Money Laundering.**  Purchaser is in compliance with: (i) all applicable provisions of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-57) ("**USA PATRIOT Act**") as amended and all regulations issued pursuant to it; (ii) Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibited Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism; (iii) the International Emergency Economic Power Act (50 U.S.C. 1701 et seq.), and any applicable implementing regulations; (iv) the Trading with the Enemies Act (50 U.S.C. 50 et seq.), and any applicable implementing regulations; and (v) all applicable legal requirements relating to anti-money laundering, anti-terrorism and economic sanctions in the jurisdictions in which Purchaser operates or does business.  Neither the Purchaser nor any of its directors, officers or Affiliates is identified on the United States Treasury Department Office of Foreign Asset Control's ("**OFAC**") list of "Specially Designated Nationals and Blocked Persons" (the "**SDN List**") or otherwise the target of an economic sanctions program administered by OFAC, and Purchaser is not affiliated in any way with, or providing financial or material support to, any such persons or entities. Purchaser agrees that should it, or any of its directors, officers or Affiliates be named at any time in the future on the SDN List, or any other similar list maintained by the U.S. Government, Purchaser shall inform the Seller in writing immediately.

**5.2.10. Adequate Assurance of Future Performance.**  Purchaser has provided or will be able to provide, at or prior to Closing, adequate assurance of its future performance under each Assumed Contract to the parties thereto (other than Seller) in satisfaction of Section 365(f)(2)(B) of the Bankruptcy Code, and no other or further assurance shall be necessary thereunder with respect to any Assumed Contract.

**5.3.    Survival of Representations, Warranties and Covenants.**    The representations and warranties made by the Seller or DTI in Section 5.1 or by the Purchaser in Section 5.2 shall survive the Closing and shall expire on the first anniversary of the Closing Date or, in the case of patents described in Schedule 5.1.7.A.1, the date that is eighteen (18) months after the Closing Date (the "**Expiration Date**").  The covenants set forth in Section 8 shall survive for a period of one (1) year following the Closing Date, except for those covenants that expressly have a longer period.  Any claim based on breach of a covenant must be made within sixty (60) days after a party knows or should know of any failure of the other party to perform such covenant.

**6.     CONDITIONS TO CLOSING:**

**6.1.    Conditions to Obligations of Seller, DTI and Purchaser.**    The respective obligations of each party to effect the transactions contemplated by this

Agreement shall be subject to the satisfaction or waiver at or prior to the Closing Date of the following conditions precedent:

**6.1.1.  Sale Approval Order.** The Sale Approval Order, in form and substance reasonably satisfactory to Purchaser, shall be entered by the Bankruptcy Court and shall not be subject to a stay or injunction.

**6.1.2.  No Law, Judgments, etc.** No provisions of any applicable Law and no judgment, injunction (preliminary or permanent), order or decree that prohibits, makes illegal or enjoins the consummation of the transactions contemplated by this Agreement shall be in effect (each party taking any and all steps required by Section 8.2 of this Agreement).

**6.1.3.  Other Approvals.** All consents, approvals and filings in connection with Third Party Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Parties.

**6.2.  Conditions to Obligations of Purchaser.** The obligation of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Purchaser):

**6.2.1.  Accuracy of Warranties.** Except as otherwise permitted by this Agreement, and after giving effect to the Sale Approval Order, the representations and warranties of Seller and DTI contained in this Agreement shall be true and correct as of the Closing Date as if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time). Subject to the preceding sentence, Seller and/or DTI may update or supplement the Disclosure Schedule prior to Closing by written notice to Purchaser, but any such update or supplement shall not be taken into account in determining whether the condition set forth in this Section 6.2.1 has been satisfied. Any claim that Purchaser may have based on matters disclosed by Seller or DTI in such updated or supplemented Disclosure Schedule will be deemed waived by Purchaser if Purchaser nonetheless completes the transactions contemplated herein.

**6.2.2.  Performance of Covenants.** Each of the Ancillary Agreements to which Seller or DTI is a party shall have been executed and delivered by the appropriate party to Purchaser, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Seller or DTI on or before the Closing shall have been performed in all respects.

**6.2.3.  Payment of Cure Amounts.** Seller shall have made sufficient provisions to satisfy all Cure Amounts with respect to Assumed Contracts as set forth in Section 8.4 hereof.

**6.2.4.  Other Approvals.** Except as expressly obviated by the terms of the Sale Approval Order, all consents, approvals and filings in connection with Third-Party Requirements shall have been obtained or made in form and substance reasonably satisfactory to the Purchaser.

**6.3.    Conditions to Obligations of Seller and DTI.**    Except as otherwise permitted by this Agreement, the obligation of Seller and DTI to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions (any one or more of which may be waived in whole or in part by Seller and DTI):

**6.3.1.    Accuracy of Warranties.**    The representations and warranties of Purchaser and Harco contained in this Agreement (without taking into account any materiality or Material Adverse Effect qualification therein), shall be true and correct as of the Closing Date if made on such date (except for representations and warranties that speak as of a specific date or time, which shall be true and correct only as of such date or time), except where the failure of such representation and warranty to be true and correct would not have a material adverse effect on either Purchaser's or Harco's ability to consummate the transactions contemplated by this Agreement.

**6.3.2.    Performance of Covenants.**    Each of the Ancillary Agreements to which Purchaser and/or Harco is a party shall have been executed and delivered by such Party to Seller and/or DTI, and all other agreements and transactions contemplated hereby or in any Ancillary Agreement to be performed by Purchaser and/or Harco on or before the Closing shall have been performed in all material respects.

**6.3.3.    Delivery of Purchase Price.**    Purchaser shall have delivered to: (i) Seller the Purchase Price by wire transfer, in immediately available funds, to the bank account designated on Schedule 6.3.3; and (ii) DTI the Intellectual Property Purchase Price by wire transfer, in immediately available funds, to the bank account designated on Schedule 6.3.3.

**7.    CLOSING:**

**7.1.    The Closing.**    Subject to the satisfaction of the conditions set forth in Article 6 of this Agreement, the closing (the "**Closing**") of the transactions contemplated hereby shall take place at the offices of Delphi at 10:00 a.m. on the second Business Day after the conditions set forth in Article 6 shall have been satisfied or waived (other than conditions which by their nature can be satisfied only at the Closing), or on such other date or at such other time as the Parties may agree.    For tax and accounting purposes, the effective time of the transaction shall be 11:59 p.m. EDST on the Closing Date.

**7.2.    Ancillary Agreements.**    At the Closing, the Parties shall execute and deliver each to the other the following agreements to which they are a party:

**7.2.1.**    Manufacturing Services Agreement substantially in the form attached hereto as Schedule 7.2.1.

**7.2.2.**    An Intellectual Property Assignment from DTI to Purchaser of the Patent Rights set forth in Schedule 5.1.7.A.1 substantially in the form attached hereto as Schedule 7.2.2.

29

**7.2.3.**  Assignment and Assumption Agreement relating to the Assumed Contracts and Permits, consistent with the Sale Approval Order, substantially in the form attached hereto as <u>Schedule 7.2.3</u>.

**7.2.4.**  Transition Services Agreement (which shall, among other things, provide for the supply of brake hose rubber compound) substantially in the form attached hereto as <u>Schedule 7.2.4</u>.

**7.2.5.**  Intentionally omitted.

**7.2.6.**  Bill of Sale substantially in the form attached hereto as <u>Schedule 7.2.6</u>.

**7.2.7.**  Indemnity Escrow Agreement between Seller, Purchaser and the Indemnity Escrow Agent substantially in the form attached hereto as <u>Schedule 7.2.7</u>.

**7.2.8.**  Guarantee of Harco Brake Systems, Inc. substantially in the form attached hereto as <u>Schedule 7.2.8</u> ("**Guarantee by Harco**").

**7.2.9.**  Rubber Compound Supply Agreement substantially in the form attached hereto as <u>Schedule 7.2.9</u>.

**7.3.**  <u>Seller's Deliveries.</u>  At the Closing, Seller shall deliver to Purchaser the following, in proper form for recording where appropriate:

**7.3.1.**  Executed assignments for the Permits and Assumed Contracts to be acquired by Purchaser pursuant to Article 1.

**7.3.2.**  An officer's certificate, dated as of the Closing Date, executed on behalf of each of Seller and DTI, certifying that the conditions specified in Section 6.2 have been fulfilled.

**7.3.3.**  A certificate, dated as of the Closing Date, executed on behalf of each of Seller and DTI by a Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Seller's or DTI's Organizational Documents as the case may be; and (ii) a true and correct copy of the resolutions of Seller's and DTI's, as the case may be, board authorizing the execution, delivery and performance of this Agreement and any Ancillary Agreement to which Seller and/or DTI, as the case may be, is a party and the consummation of the transactions contemplated hereby and thereby.

**7.3.4.**  Certified copies of all orders of the Bankruptcy Court pertaining to the contemplated transactions contemplated by this Agreement and the Ancillary Agreements, including the Bidding Procedures Order and the Sale Approval Order.

**7.3.5.**  Duly executed Bill of Sale transferring the Acquired Assets to Purchaser.

**7.3.6.**  Appropriate receipts.

**7.4.    Purchaser's Deliveries.**  At the Closing, Purchaser shall deliver to each of Seller and DTI, in proper form for recording where appropriate:

**7.4.1.**  To Seller, the Preliminary Purchase Price less the Escrow Amount, less the Deposit Amount, and less any other amounts required by, and in accordance with, Article 4.

**7.4.2.**  To DTI, the Intellectual Property Purchase Price as required by and in accordance with Section 4.1.

**7.4.3.**  Assignment and Assumption Agreement pursuant to which the Purchaser assumes the Assumed Liabilities.

**7.4.4.**  An officer's certificate, dated as of the Closing Date, executed on behalf of Purchaser, certifying that the conditions specified in Section 6.3 have been fulfilled.

**7.4.5.**  A certificate, dated as of the Closing Date, executed on behalf of the Purchaser by its Secretary or an Assistant Secretary, certifying: (i) a true and correct copy of Purchaser's Organizational Documents; and (ii) a true and correct copy of the resolutions of the Purchaser's board authorizing the execution, delivery and performance of this Agreement by Purchaser and the consummation of the transactions contemplated hereby.

**8.    CERTAIN ADDITIONAL COVENANTS:**

**8.1.    Bankruptcy Actions:**

**8.1.1.**  The Bidding Procedures are set forth in Section 11.1.  As soon as practicable after the execution of this Agreement, Seller shall file a motion or motions (and related notices and proposed orders) with the Bankruptcy Court seeking approval of the Bidding Procedures Order and the Sale Approval Order.

**8.1.2.**  Seller shall use commercially reasonable efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the Bankruptcy Code and Federal Rules of Bankruptcy Procedure in connection with obtaining approval of the sale of the Acquired Assets under the Agreement, including serving on all required Persons in the Bankruptcy Cases, notice of the Sale Approval Motion, the Sale Hearing (as hereinafter defined) and the objection deadline in accordance with Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure, the Bidding Procedures Order or other orders of the Bankruptcy Court, and any applicable local rules of the Bankruptcy Court.

**8.2.    Registrations, Filings and Consents; Further Actions.** Upon the terms and subject to the conditions of this Agreement, each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements as promptly as practicable including, without limitation, using their reasonable best efforts to cause the satisfaction of all conditions to Closing.

31

**8.3.    Operation of the Business Pending Closing.**  Except: (i) as otherwise provided herein; (ii) required by or resulting from the Bankruptcy Cases or otherwise approved by the Bankruptcy Court; (iii) subject to any changes that may be required under applicable Laws; and (iv) as set forth in the following sentence, until the Closing, Seller will: (a) carry on the Business in substantially the same manner as heretofore; and (b) will perform in all material respects all of its obligations under all Transferred Contracts and not amend, alter or modify in any significant respect that is adverse to the Business any provision of any Transferred Contract; keep in full force and effect insurance comparable in amount and scope to coverage maintained by it on the date of this Agreement; use commercially reasonable efforts to maintain and preserve relations with customers, suppliers, employees and others having business relations with the Business; endeavor to maintain the goodwill of the Business; and promptly advise Purchaser of any material and adverse change in the business condition (financial or other) of the Business or the Acquired Assets. Seller shall promptly notify Purchaser if Seller becomes aware of the occurrence of any event or circumstance that could reasonably be expected to cause the conditions set forth in Sections 6.1.1, 6.1.2 or 6.2.1 hereof to be satisfied including, without limitation, any event or circumstance that, upon the occurrence of such event or circumstance, causes any representation or warranty of the Seller to be untrue.

**8.4.    Assumed Contracts; Cure Amounts.**  As soon as practicable after the date hereof, Seller shall, pursuant to a motion in form and substance reasonably acceptable to Purchaser (which motion may be incorporated into the Sale Motion) move to assume and assign to Purchaser the Pre-Petition  Contracts that the Purchaser has identified for assumption and assignment to the Purchaser set forth on Schedule 8.4 (collectively, the "**Assumed Contracts**") and shall provide notice thereof in accordance with all applicable Bankruptcy Rules as modified by orders of the Bankruptcy Court. Upon the Closing, Purchaser will assume the Delphi Energy Chassis (AHG) & Harco Brake Systems Brake Hose Assembly Contract Policy Statements dated as of January 1, 2005 (the "**Policy Statement**") and immediately thereafter any obligations of the Seller under the Policy Statement shall be terminated pursuant to Section (A) of the Policy Statement under the heading "Future Business Strategies". Alternatively, if Seller consummates an Alternative Transaction, as contemplated in Section (B) of such "Future Business Strategies", the Successful Bidder shall assume the Policy Statement as a Transferred Contract, and Seller will have no further obligations under the Policy Statement.  Subject to the preceding two (2) sentences, Seller shall pay Cure Amounts required to effect assumption and assignment of the Assumed Contracts as agreed to by the Seller and each party to an Assumed Contract or, absent such agreement, by order of Court in the time and manner specified by the Sale Approval Order.

**8.5.    Post-Closing Covenants.**  From and after the Closing, each of the Parties will perform its respective covenants and agreements set forth below:

**8.5.1.  Seller Post-Closing Covenants:**

**A.    Non-Competition.**  Seller has as at Closing, established the reputation of the Business. Seller undertakes and agrees with Purchaser that for a period of two (2) years after the Closing Date, except with the consent of Purchaser, Seller shall not either on its own account or in conjunction with or on behalf of any person, firm or company whether by sales, marketing, investing, managing or other activities, carry

on, or be engaged, concerned or interested, directly or indirectly, whether as a equity owner, lender, officer, director, employee, partner, agent or otherwise in carrying on any business, in North America, which is engaged in the design, development, manufacture or sale of Products as carried on by the Business at the Closing Date (a "**Competitive Business**"); provided, however, that the restrictions contained in this Section 8.5.1 will not prohibit, in any way: (i) the acquisition of a controlling interest or merger with any person, or a division or business unit thereof, acquired by or merged, directly or indirectly, into Seller or any of its Affiliates after the Closing Date if the Competitive Business accounts for five (5%) percent or less of the sales or five (5%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater) and the Competitive Business is not anticipated to become greater than fifteen (15%) percent of such acquired business's sales or value; (ii) the acquisition by Seller or any of its Affiliates, directly or indirectly, of a non-controlling ownership interest in any person or a division or business unit thereof, or any other entity engaged in a Competitive Business, if the Competitive Business accounts for fifteen (15%) percent or less of the sales or fifteen (15%) percent or less of the value of the acquired business at the date of such acquisition (whichever is the greater) and the Competitive Business is not anticipated to become greater than twenty percent (20%) of such acquired business's sales or value; (iii) the acquisition by Seller or any of its Affiliates, directly or indirectly, of less than five (5%) percent of the publicly traded stock of any person engaged in a Competitive Business; and (iv) provision of consulting services to any Person for the purpose of designing or manufacturing on behalf of Seller or any Seller Affiliate or selling to Seller or any Seller Affiliate components and parts solely for automotive applications other than those that would constitute Products.

**B.**     While the restrictions contained in this Section 8.5.1 are considered by the parties to be reasonable in all the circumstances, it is recognized that restrictions of the nature in question may fail for technical reasons and, accordingly, it is hereby agreed and declared that if any of such restrictions shall be adjudged to be void as going beyond what is reasonable in all the circumstances for the protection of the interests of Purchaser and/or the Business but would be valid if part of the wording thereof were deleted or the periods thereof reduced or the range of activities or area dealt with thereby reduced in scope the said restriction shall apply with such modifications as may be necessary to make it valid and effective.

**8.5.2.   Technical Documentation.**  Seller and DTI have delivered, or will deliver on or before the Closing, to the Purchaser, a copy of all Technical Documentation included in the Acquired Assets.  For a period of not less than one (1) year commencing at Closing, Purchaser and its Affiliates shall use reasonable efforts to maintain all Technical Documentation applicable to product design, test, release, validation and manufacture it acquires from Seller and its Affiliates in connection with the purchase of the Acquired Assets under Article 1 of this Agreement at a location at which they shall be reasonably accessible to Seller and its Affiliates upon request.  During such one (1) year period, Purchaser shall not destroy or give up possession of its final copy of such documentation

without offering Seller the opportunity, at Seller's expense but without any payment to Purchaser, to obtain a copy of such documentation.

### 8.5.3.  Books and Records and Litigation Assistance From and After Closing:

**A.**    Purchaser and its Affiliates shall use commercially reasonable efforts to preserve and keep all books, records, computer files, software programs and any data processing files delivered to Purchaser by Seller and its Affiliates pursuant to the provisions of this Agreement for a period of not less than one (1) year from the Closing Date or for any longer period as may be required by any government agency, ongoing litigation, law, regulation, audit or appeal of Taxes, or Tax examination at Purchaser's sole cost and expense.   During such period, Purchaser shall: (i) provide Seller or its Affiliates with such documents and information as necessary, consistent with past practice, to complete the accounting books and records of the Business as of December 31, 2006; and (ii) make such books and records available to Seller and its Affiliates as may be reasonably required by Seller and its Affiliates in connection with any legal proceedings against or governmental investigations of Seller and its Affiliates or in connection with any Tax examination, audit or appeal of Taxes of Seller and its Affiliates, the Business or the Acquired Assets during such period.  Seller or its Affiliates shall reimburse Purchaser for the reasonable out-of-pocket expenses incurred in connection with any request by Seller to make available records pursuant to the foregoing sentence.   In the event Purchaser wishes to destroy or dispose of such books and records after one (1) year from the Closing Date, or such other longer period as may be required by any governmental agency, ongoing litigation, law, regulation, audit or appeal of Taxes, or Tax examination, it shall first give not less than ninety (90) days' prior written notice to Seller or its Affiliates, and Seller or its Affiliates shall have the right, at its option, upon prior written notice given to Purchaser within sixty (60) days of receipt of Purchaser's notice, to take possession of said records within ninety (90) days after the date of Purchaser's notice to Seller hereunder.

**B.**    Purchaser, for itself and on behalf of its Affiliates, agrees to: (i) retain all documents required to be maintained by federal, state, national or local legislation or regulations and all documents that may be reasonably required to establish due care or to otherwise assist Seller and its Affiliates in pursuing, contesting or defending such claims; (ii) make available documents and records delivered to it by Seller reasonably necessary in connection with any pursuit, contest or defense related to the Business, including documents that may be considered to be "confidential" or subject to trade secret protection (except that: (a) no documents or records protected by the attorney client privilege in favor of Purchaser must be made available if making these documents or records available would cause the loss of this privilege (in any case, however, Purchaser must notify Seller of the existence of such privileged documents); and (b) Seller and its Affiliates will agree to keep confidential and not use for any other purpose documents and records that are confidential or are subject to trade secret protection); (iii) make available,

as may be reasonably necessary and upon reasonable advance notice and for reasonable periods so as not to interfere materially with Purchaser's business, mutually acceptable engineers, technicians or other knowledgeable individuals to assist Seller and its Affiliates in connection with such claim.

    **8.5.4.  <u>Payment and Collections</u>.**  Seller shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Purchaser after Closing, and Purchaser shall take such action as may be reasonably necessary to segregate payments made or collections received on behalf of Seller after Closing, in order to ensure that the cost of the related liability or the benefits of the related assets accrue to the appropriate Party in accordance with the terms of this Agreement.  To the extent that any such collections are received after Closing in the form of checks or other negotiable instruments payable to the other Party, Seller or Purchaser, as appropriate, shall promptly take all necessary action to endorse such checks or instruments to permit the appropriate Party to collect the proceeds of such checks and instruments.  Seller shall promptly send Purchaser copies of all remittance advices and checks related to payments received by Seller with respect to such items.  Purchaser shall notify the Business' customers of the change in address of the owner of the Acquired Assets as may be required in order for such customers to properly remit any payments required under any applicable Acquired Asset and Seller shall cooperate with Purchaser as is reasonably necessary to so notify such customers, including providing appropriate contact information for each such customer.

    **8.6.  <u>Further Assurances</u>.**  If at any time after the Closing any further action is necessary or desirable to carry out the purposes of this Agreement, each of the Parties will take such further action (including the execution and delivery of such further instructions and documents) as any other Party reasonably may request, all at the sole cost and expense of the requesting Party (unless the requesting Party is entitled to indemnification therefor under this Agreement).

    **8.7.  <u>Purchaser's Financing Activities</u>:**

    **8.7.1.**  Purchaser acknowledges and agrees that Seller and its Affiliates have no responsibility for any financing that Purchaser may raise in connection with the transactions contemplated hereby, including, with respect to any offering materials and other documents prepared by or on behalf of or utilized by Purchaser or its Affiliates, or Purchaser's financing sources, in connection with Purchaser's financing activities in connection with the transactions contemplated hereby which include any information provided by Seller or any of its Affiliates (including the Business).

    **8.7.2.**  Purchaser shall use its reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to: (i) maintain in effect the Financing and the Commitment Letter; (ii) enter into definitive financing agreements with respect to the Financing, so that such agreements are in effect as promptly as practicable but, in any event, no later than the Closing Date; and (iii) consummate the Financing at or prior to Closing.  Purchaser shall keep Seller reasonably informed of material developments in respect of the financing process relating thereto.  Prior to the

Closing, Purchaser shall not agree to, or permit, any amendment or modification of, or waiver under, the Commitment Letter or other documentation relating to the Financing without the prior written consent of Seller. In the period between the date hereof and the Closing Date, upon request of Purchaser, Seller shall reasonably cooperate with Purchaser in connection with the Financing. If, notwithstanding the use of reasonable best efforts by Purchaser to satisfy its obligations under this Section 8.7, any of the Financing or the Commitment Letter (or any definitive financing agreement entered with respect thereto) expire or are terminated prior to the Closing, in whole or in part, for any reason, Purchaser shall: (i) promptly notify Seller of such expiration or termination and the reasons therefor; and (ii) use commercially reasonable efforts promptly to arrange for alternative financing (which shall not contain any conditions in addition to those contained in such expired or terminated commitments or agreements) to replace the financing contemplated by such expired or terminated commitments or agreements in an amount sufficient to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

**8.8.   Certain Transactions.**   Purchaser shall not acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof, or otherwise acquire or agree to acquire any assets if the entering into of a definitive agreement relating to or the consummation of such acquisition, merger or consolidation would reasonably be expected to: (i) impose any material delay in the obtaining of, or significantly increase the risk of not obtaining, any authorizations, consents, orders, declarations or approvals of any Governmental Entity necessary to consummate the transactions contemplated by this Agreement or the Ancillary Agreements or the expiration or termination of any applicable waiting period; (ii) significantly increase the risk of any Governmental Entity entering an order prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements; (iii) significantly increase the risk of not being able to remove any such order on appeal or otherwise; or (iv) materially delay or prevent the consummation of the transactions contemplated by this Agreement or the Ancillary Agreements.

**8.9.   Guarantee by Affiliate of Purchaser.**   Harco agrees to unconditionally guarantee all obligations of Purchaser pursuant to the terms of this Agreement, including, without limitation, to pay the Purchase Price and any indemnification obligations of Purchaser. Harco shall also reimburse Seller and/or DTI for reasonable fees and expenses (including reasonable fees of counsel) incurred in successfully enforcing the guarantee obligations set forth in this Section 8.9.

**8.10.   NHTSA Requirements.**   Effective as of the Closing Date and at Purchaser's sole cost and expense, the Parties shall work together in good faith to terminate Seller's and obtain Purchaser's National Highway Transportation Safety Administration code(s) relating to the sale of Products.

**8.11.   Communications with Customers and Suppliers.**   Prior to the Closing, Purchaser shall not, and shall cause its Affiliates and representatives not to, contact, engage in any discussions or otherwise communicate with any of the Business' customers, suppliers and others with whom it has material commercial dealings without obtaining the prior written consent of Seller (which shall not be unreasonably withheld but which may be conditioned on Seller having the right to participate in any meetings or

36

discussion with any such customers, suppliers or others). Purchaser and Seller shall work together in good faith to arrange for an orderly transition of customer, supplier, and other third party relationships, including, without limitation, at the request of Purchaser, meetings and other correspondence with such customers, suppliers, and other third parties to ensure such orderly transition.

## 9.  TERMINATION:

**9.1.    Termination.** Anything contained herein to the contrary notwithstanding, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

### 9.1.1.  By either Party:

**A.**    By mutual written consent of Seller and Purchaser.

**B.**    Provided the terminating Party is not in default of its obligations under this Agreement, if consummation of the Sale would violate any non-appealable Final Order of any regulatory Governmental Entity, other than the Bankruptcy Court.

**C.**    If Seller consummates an Alternative Transaction.

**D.**    Provided the terminating Party is not in default of its obligations under this Agreement, by either Seller or Purchaser if the Closing shall not have occurred within ninety (90) days after entry of the Sale Approval Order.

**E.**    If the Bankruptcy Court has not entered the Sale Approval Order, within one hundred twenty (120) days after the date of this Agreement (the "**Termination Date**") or such Sale Approval Order is subject to a stay or injunction; provided, however, that the right to terminate this Agreement pursuant to this Section 9.1.1.E shall not be available to Purchaser if Purchaser shall have failed to perform, or caused any of its respective Affiliates to perform, any of its respective material obligations under this Agreement.

**9.1.2.  By Purchaser.**  By Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) at any time prior to Closing,  if a Material Adverse Effect shall have occurred, Purchaser may terminate within ten (10) Business Days after becoming aware of such event so long as such event is continuing at the time of any such termination.

**9.1.3.  By Seller.**  If Seller accepts or is about to accept a Qualified Bid at the Auction other than that of Purchaser, provided that such termination shall be of no effect if Seller does not: (i) enter into an agreement with respect to such Qualified Bid within two (2) Business Days after termination hereunder; and (ii) subsequently complete the Sale to an Alternative Bidder.

**9.2.    Notice of Termination.**  In the event of any termination pursuant to this Article 9, written notice thereof setting forth the reasons therefor shall promptly be given

to the other Party and the transactions contemplated by this Agreement shall be terminated, without further action by any Party.

**9.3.    Break-Up Fee; Expense Reimbursement:**

**9.3.1.    Break-Up Fee.**  Subject to Section 9.3.4, in the event that Seller sells, transfers, leases or otherwise disposes, directly or indirectly, including through an asset sale, stock sale, merger or other similar transaction, all or substantially all or a material portion of the Business or the Acquired Assets in a transaction or a series of transactions with one or more parties other than Purchaser  (such event being an "**Alternative Transaction**"), Seller shall, within two (2) Business Days after the consummation of an Alternative Transaction(s), pay to Purchaser an amount equal to $294,000.00 (the "**Break-Up Fee**"), unless: (i) the Agreement is then terminable under Sections 9.1.1.B; or (ii) Seller is entitled to keep the Deposit Amount under Section 4.1.1.B, in which case no Break-Up Fee shall be payable.  The claim of Purchaser for a Break-up Fee shall be paid to Purchaser from the sale proceeds of an Alternative Transaction and, until paid in full, shall constitute a superpriority administrative expense claim .

**9.3.2.    Expense Reimbursement.**   In the event this Agreement is terminated pursuant to Sections 9.1.1.D or 9.1.1.E, and provided that Purchaser is not then in breach of this Agreement for which Seller had previously notified Purchaser, and, in the case of Section 9.1.1.D, the failure or occurrence of the event giving rise to any such termination results solely from the status of Seller or any intentional action or conduct of Seller and not from the status of Purchaser or any action or conduct of Purchaser, then Seller shall be obligated to pay Purchaser an amount equal to Purchaser's reasonable, actual out-of-pocket fees and expenses (including, without limitation, reasonable attorneys' fees, expenses of its financial advisors, and expenses of other consultants) incurred in connection with the transactions contemplated by this Agreement (the "**Expense Reimbursement**") up to a maximum of $100,000.00.  Any Expense Reimbursement payable upon termination of this Agreement shall be immediately earned upon such termination and payable by Seller to Purchaser promptly upon the delivery of an invoice related to such Expense Reimbursement to Seller by Purchaser to be delivered to Seller within ten (10) Business days of termination of this Agreement.  The claim of Purchaser for an Expense Reimbursement shall constitute a superpriority administrative expense claim.

**9.3.3.**  Payments to Purchaser pursuant to this Section 9.3 shall be by wire transfer of immediately available funds in U.S. Dollars, to such account or accounts as Purchaser shall designate in writing.

**9.3.4.**  Purchaser acknowledges and agrees that, in the event that it terminates this Agreement or Seller terminates this Agreement and Purchaser becomes entitled to receive or receives any Expense Reimbursement, Purchaser shall not be entitled to receive nor shall it receive the Break-Up Fee or any portion thereof, and, conversely, that in the event that Purchaser becomes entitled to receive or receives any Break-Up Fee, it shall not be entitled to receive nor shall it receive the Expense Reimbursement or any portion thereof.  In the event that Purchaser would be entitled to receive both the Break-Up Fee and Expense Reimbursement but for the operation of this Section 9.3.4, Purchaser shall be entitled to receive the greater of such amounts.

**9.4.    Procedure and Effect of Termination.** In the event of termination and abandonment of the transactions contemplated hereby pursuant to Section 9.1, written notice thereof shall forthwith be given to the other Parties to this Agreement, and this Agreement shall terminate (subject to the provisions of this Article 9) and the transactions contemplated by this Agreement shall be abandoned, without further action by any of the parties hereto.  If this Agreement is terminated as provided herein no Party shall have any liability or further obligation to any other Party resulting from such termination except for the provisions of: (i) (a) Purchasers' obligations under that certain confidentiality agreement between the Parties dated June 28, 2005, and extended by agreement dated June 27, 2006; (b) Article 9 (Termination); and (c) Sections 4.1.1 (Deposit Amount), 13.2 (Notice), 13.3 (Assignment), 13.4 (Entire Agreement), 13.5 (Waiver), 13.8 (Expenses), 13.12 (Governing Law), 13.13 (Public Announcements), 13.15 (Venue and Retention of Jurisdiction) and 13.18 (Dispute Resolution), all of which shall remain in full force and effect; and (ii) no party waives any claim or right against a breaching party in respect of any of its representations, warranties, covenants or agreements set forth in this Agreement occurring prior to such termination; provided, however, that in the event Purchaser is entitled to receive the Break-Up Fee, the right of Purchaser to receive such amount shall constitute Purchaser's sole remedy for (and such amount shall constitute liquidated damages in respect of) any breach by Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement.  Any payment to Seller of the Deposit Amount under Section 4.1.1.B shall constitute Seller's sole recourse in the event Purchaser notifies Seller, prior to the Auction date, of Purchaser's intent to terminate this Agreement.  Upon any breach by Purchaser on or after the Auction Date, Seller will be entitled to all available remedies in law or equity.    In connection with any termination of this Agreement, all filings, applications and other submissions made pursuant to the transactions contemplated by this Agreement shall, to the extent practicable, be withdrawn from the agency or Person to which made.

## 10.    OTHER TAX MATTERS:

**10.1.**    Seller will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due prior to the Closing, including amended returns, applications for loss carryback refunds and applications for estimated tax refunds.    Purchaser shall make available to Seller (and to Seller's accountants and attorneys) any and all books and records and other documents and information in its possession or control reasonably requested by Seller to prepare these Tax Returns.    Seller will make all payments required with respect to any such Tax Return.

**10.2.**    Purchaser will be responsible for the preparation and filing of all Tax Returns for the Business for all periods for which Tax Returns are due after the Closing (other than for Taxes with respect to periods for which the consolidated, unitary and Tax Returns of Seller will include the operations of the Business).    Purchaser shall be responsible for and shall pay when due all Taxes attributable, levied or imposed upon or incurred in connection with the Acquired Assets and the Business pertaining to: (a) any period ending after the Closing Date; and (b) the portion of any Taxes for which Purchaser is liable as determined in accordance with Section 10.3 below.

**10.3.**    For purposes of this Article 10 and Section 2.3, whenever it is necessary to allocate the liability for Taxes for a Straddle Period, the determination of the Taxes of

the Business for the portion of the Straddle Period ending at the end of the Closing Date (the "**Pre-Closing Portion**") and the portion of the Straddle Period beginning after the Closing Date (the "**Post-Closing Portion**") will be determined by assuming that the Straddle Period consisted of two taxable years or periods, one of which ended at the close of business on the Closing Date and the other of which began at the beginning of the day after the Closing Date, and items of income, gain, deduction, loss or credit related to the Acquired Assets and the Business for the Straddle Period will be allocated between such two (2) taxable years or periods on a "closing of the books basis" by assuming that the books associated with the Business were closed at the end of the Closing Date; provided, however, that all real property taxes, personal property taxes, ad valorem obligations and similar taxes imposed on a periodic basis, in each case levied with respect to the Acquired Assets (other than Taxes resulting from the transactions described herein as provided for in Section 13.14) for a Straddle Period shall be apportioned between Seller and Purchaser as of the Closing Date based on the number of days of such taxable period up to and including the Closing Date and the number of days of such taxable period following the Closing Date. Seller shall be liable for the proportionate amount of such taxes that is attributable to the period up to and including the Closing Date; Purchaser shall be liable for the proportionate amount of such taxes that is attributable to the period following the Closing Date.

**10.4.**   Seller and Purchaser will cooperate in connection with: (i) the preparation of filing of any Tax Return, Tax election, Tax consent or certification or any claim for a Tax refund; (ii) any determination of liability for Taxes; and (iii) any audit, examination or other proceeding in respect of Taxes related to the Business or the Acquired Assets. Such cooperation includes a reasonable amount of direct access to accounting, engineering and contracting personnel, subject to availability, which shall not be unreasonably restricted, and advance notice to Purchaser's chief financial officer.

**10.5.**   Seller shall not, and shall not cause the Business to make, revoke or amend any tax election, execute any waiver of restrictions or tax assessments or collections or extensions if there will be any impact on the Purchaser as a result of doing so.

## 11.    **BIDDING PROCEDURES:**

**11.1.**   **Delphi Initial Bankruptcy Actions.**  This Article 11 sets forth the bidding procedures (the "**Bidding Procedures**") to be employed with respect to the Agreement and the sale (the "**Sale**") of the Acquired Assets.  The Sale is subject to competitive bidding as set forth herein and approval by the Bankruptcy Court in the Sale Approval Order.  The following overbid provisions and related bid protections are designed to compensate the Purchaser for its efforts and agreements to date and to facilitate a full and fair process (the "**Bidding Process**") designed to maximize the value of the Acquired Assets for the benefit of Seller and its Affiliates' creditors, shareholders and bankruptcy estate.

**11.2.**   **Court Approval.** Promptly after the execution of this Agreement, Seller shall file the Sale Motion with the Bankruptcy Court seeking: (i) entry of the Bidding Procedures Order approving the Bidding Procedures, the Break-Up Fee and the Expense Reimbursement; and (ii) subject to the competitive bidding process provided under the Bidding Procedures, entry of the Sale Approval Order approving this Agreement and the transaction specified herein. It is a material inducement to Purchaser to be able to acquire the Acquired Assets pursuant to the provisions of Sections 363 and

365 of the Bankruptcy Code, including in particular free and clear of Liens pursuant to Section 363(f) of the Bankruptcy Code. Therefore, notwithstanding anything in this Agreement to the contrary, any and all obligations of Purchaser under this Agreement are subject to the entry of the Sale Approval Order approving this Agreement and the transaction specified herein, and ordering, finding or concluding that, among other things: (a) notice of the Sale Motion and the transactions contemplated hereunder was proper and sufficient to all parties entitled to such notice; (b) the sale of the Acquired Assets to Purchaser is approved pursuant to Section 363(b) of the Bankruptcy Code; (c) the assumption and assignment of the Assumed Contracts to the Purchaser is approved pursuant to Section 365 of the Bankruptcy Code and that the Cure Amounts to be paid by the Seller on the Closing Date to the non-debtor parties to the Assumed Contracts satisfy all monetary obligations and defaults of the Seller to those non-debtor third parties required to be cured pursuant to Section 365(b)(1) of the Bankruptcy Code; (d) the sale of the Acquired Assets to the Purchaser pursuant to this Agreement will be free and clear of all known and unknown Liens pursuant to Section 363(f) of the Bankruptcy Code; (e) Purchaser is not a continuation of Seller or its estate, there is no continuity of enterprise between Seller and Purchaser, Purchaser is not a successor to Seller or its estate and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or de facto merger of Purchaser and Seller or its estate; (f) Purchaser has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code; (g) the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code; (h) Purchaser is not assuming or acquiring any of Seller's liabilities except as specifically provided in this Agreement; and (i) the Sale Approval Order shall be effective immediately notwithstanding the provisions of Bankruptcy Rules 6004(g) and 6006(d). Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted to the Purchaser as far prior to their filing with the Bankruptcy Court as reasonably practicable for the Purchaser's prior review and, solely with respect to the Bidding Procedures Order and the Sale Approval Order, approval, which shall not be unreasonably withheld or delayed. Should Seller not have received Purchaser's approval of the Bidding Procedures Order and the Sale Approval Order prior to Seller's deadline for filing with the Bankruptcy Court, Seller may file such documents with the Bankruptcy Court and may submit a revised Bidding Procedures Order and/or Sale Approval Order reflecting agreed modifications thereto, if any, to the Bankruptcy Court prior to the hearing thereon.

**11.3.    Qualified Bidder.**  Unless otherwise ordered by the Bankruptcy Court, for cause shown, or as otherwise determined by the Seller, in order to participate in the bidding process, each person (a "**Potential Bidder**"), other than the Purchaser, must deliver (unless previously delivered) to Seller:

**11.3.1.** An executed confidentiality agreement in form and substance satisfactory to Seller.

**11.3.2.** Current audited financial statements of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Acquired Assets and the Purchased Intellectual Property, current audited financial statements of the equity holders of the Potential Bidder who shall guarantee the obligations of the Potential Bidder, or such other form of financial disclosure and credit-quality support or enhancement acceptable to Seller and its financial advisors; and

**11.3.3.** A preliminary (non-binding) written proposal regarding: (i) the purchase price; (ii) any assets expected to be excluded; (iii) the structure and financing of the transaction (including, but not limited to, the sources of financing for the Purchase Price and the requisite Good Faith Deposit); (iv) any anticipated regulatory approvals required to close the transaction, the anticipated time frame and any anticipated impediments for obtaining such approvals; (v) any conditions to closing that it may wish to impose in addition to those set forth in this Agreement; and (vi) the nature and extent of additional due diligence it may wish to conduct and the date by which such due diligence will be completed.

**11.3.4.** A Potential Bidder that delivers the documents described in the previous subparagraphs above and whose financial information and credit-quality support or enhancement demonstrate the financial capability of the Potential Bidder to consummate the Sale, if selected as a successful bidder, and that the Seller determines in its sole discretion is likely (based on availability of financing, experience and other considerations) to be able to consummate the Sale within the time frame provided by this Agreement shall be deemed a "**Qualified Bidder**". Notwithstanding the foregoing, Purchaser shall be deemed a Qualified Bidder for purposes of the Bidding Process. As promptly as practicable, after a Potential Bidder delivers all of the materials required above, Seller shall determine, and shall notify the Potential Bidder, whether such Potential Bidder is a Qualified Bidder. At the same time that Seller notifies the Potential Bidder that it is a Qualified Bidder, Seller shall allow the Qualified Bidder to begin to conduct due diligence with respect to the Acquired Assets and the Business as provided in Section 11.5 below.

**11.4.     Bid Deadline.**  A Qualified Bidder, other than Purchaser, that desires to make a bid shall deliver written copies of its bid to: Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan 48098, Attention: Steve Daniels with copies to: (i) Delphi Automotive Systems LLC, 5725 Delphi Drive, Troy, Michigan, 48098, Attention: Margaret M. Fukuda, Legal Staff; (ii) Seller's bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP, at 333 West Wacker Drive, Chicago, Illinois 60606-1285, Attention: John K. Lyons; (iii) counsel to the official committee of unsecured creditors appointed in the Bankruptcy Cases (the "**Creditors Committee**"), Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Attention: Mark A. Broude; (iv) the Creditors' Committee's financial advisor, Mesirow Financial Consulting LLC, 666 Third Avenue, 21st Floor, New York, New York 10017, Attention: Ben Pickering; and (v) counsel to the debtors' post-petition secured lenders, Davis, Polk & Wardwell, 450 Lexington Avenue, New York, New York 10017, Attention: Donald Bernstein and Brian Resnick so as to be received not later than 11:00 A.M. (New York Time), on March 2, 2007 (the "**Bid Deadline**").  As soon as reasonably practicable following receipt of each Qualified Bid, Seller shall deliver   complete copies of all items and information enumerated in Section 11.6 of this Agreement to: (a) Purchaser and its counsel; and (b) counsel for the Official Committee of Equity Security Holders (the "**Equityholders' Committee**").

**11.5.     Due Diligence.**  Seller shall afford each Qualified Bidder due diligence access to the Acquired Assets and the Business.  Due diligence access may include management presentations as may be scheduled by Seller, access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Seller, in its sole discretion, may agree to.  Seller shall designate an employee or other representative to coordinate all reasonable requests for additional information and

due diligence access from Qualified Bidders. Any additional due diligence shall not continue after the Bid Deadline. Seller may, in its discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at management presentations or site inspections. Neither Seller nor any of its Affiliates (or any of their respective representatives) shall be obligated to furnish any information relating to Acquired Assets and the Business to any Person other than to Qualified Bidders who make an acceptable preliminary proposal.

**11.6.** **Bid Requirements.** All bids must include the following documents (the "**Required Bid Documents**"):

**11.6.1.** A letter stating that the bidder's offer is irrevocable until two (2) Business Days after the closing of the Sale of the Acquired Assets.

**11.6.2.** An executed copy of the Agreement, together with all Schedules marked (a "**Marked Agreement**") to show those amendments and modifications to such agreement that the Qualified Bidder proposes, including the Purchase Price (as defined in the Agreement).

**11.6.3.** Except for Purchaser, a good faith deposit (the "**Good Faith Deposit**") in the form of a certified bank check from a U.S. bank or by wire transfer (or other form acceptable to Seller in its sole discretion) payable to the order of Seller (or such other party as Seller may determine) in an amount equal to $500,000.00.

**11.6.4.** Written evidence of a commitment for financing or other evidence of ability to consummate the proposed transaction satisfactory to Seller and its advisors.

**11.7.** **Qualified Bids.** A bid will be considered only if the bid:

**11.7.1.** Is on terms and conditions (other than the amount of the consideration and the particular liabilities being assumed) that are substantially similar to, and are not materially more burdensome or conditional to Seller than, those contained in the Agreement.

**11.7.2.** Is not conditioned on obtaining financing or on the outcome of unperformed due diligence by the bidder.

**11.7.3.** Proposes a transaction that Seller determines, in its sole discretion, is not materially more burdensome or conditional than the terms of the Agreement and has a value, either individually or, when evaluated in conjunction with any other Qualified Bid, greater than or equal to the sum of the Purchase Price plus the amount of the Break-Up Fee, plus: (i) in the case of the initial Qualified Bid, $500,000.00; and (ii) $250,000.00 in the case of any subsequent Qualified Bids, over the immediately preceding highest Qualified Bid.

**11.7.4.** Is not conditioned upon any bid protections, such as a break-up fee, termination fee, expense reimbursement or similar type of payment.

**11.7.5.** An acknowledgement and representation that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Acquired Assets and Purchased Intellectual Property prior to making its offer; (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Acquired Assets and Purchased Intellectual Property in making its bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Acquired Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Agreement or the Marked Agreement.

**11.7.6.** Includes a commitment to consummate the purchase of the Acquired Assets and Purchased Intellectual Property (including the receipt of any required governmental or regulatory approvals) within not more than fifteen (15) days after entry of an order by the Bankruptcy Court approving such purchase, subject to the receipt of any governmental or regulatory approvals which must be obtained within sixty (60) days after entry of such order.

**11.7.7.** The bid is received by the Bid Deadline.  A bid received from a Qualified Bidder will constitute a "**Qualified Bid**" only if it includes all of the Required Bid Documents and meets all of the above requirements, provided, however, that Seller shall have the right, in its sole discretion, to entertain bids for the Acquired Assets and Purchased Intellectual Property that do not conform to one or more of the requirements specified herein and deem such bids to be Qualified Bids.  Notwithstanding the foregoing, the Purchaser shall be deemed a Qualified Bidder, and the Agreement shall be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the Sale.  A Qualified Bid will be valued based upon factors such as the net value provided by such bid and the likelihood and timing of consummating such transaction.  Each Qualified Bid other than that of the Purchaser is referred to as a "**Subsequent Bid**".

If Seller does not receive any Qualified Bids other than the Agreement received from the Purchaser, Seller will report the same to the Bankruptcy Court and will proceed with the Sale pursuant to the terms of the Agreement.

**11.8.   Bid Protection.  Reserved.**

**11.9.   Auction, Bidding Increments and Bids Remaining Open.**  If Seller receives at least one (1) Qualified Bid in addition to the Agreement, Seller will conduct an auction (the "**Auction**") of the Acquired Assets and the Business upon notice to all Qualified Bidders who have submitted Qualified Bids at 10:00 a.m. EST on or before the tenth (10th) Business Day following the expiration of the Bid Deadline, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or 333 West Wacker Drive, Chicago, Illinois  60606, or such later time or other place as Seller shall notify all Qualified Bidders who have submitted Qualified Bids (but in no event later than the second (2nd) Business Day prior to the Sale Hearing), in accordance with the following procedures:

**11.9.1.** Only Seller, Delphi, Purchaser, any representative of the Creditors' Committee, any representative of the Equityholders' Committee, any

representative of the secured lenders (and the legal and financial advisers to each of the foregoing) and any Qualified Bidder who has timely submitted a Qualified Bid shall be entitled to attend the Auction, and only Purchaser and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

**11.9.2.** At least two (2) Business Days prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform Seller whether it intends to participate in the Auction and at least one (1) Business Day prior to the Auction, Seller shall provide copies of the Qualified Bid or combination of Qualified Bids which Seller believes is the highest or otherwise best offer to all Qualified Bidders who have informed Seller of their intent to participate in the Auction.  Should an Auction take place, Purchaser shall have the right, but not the obligation, to participate in the Auction. Purchaser's election not to participate in an Auction shall in no way impair its entitlement to receive the Break-Up Fee or Expense Reimbursement, as applicable.

**11.9.3.** All bidders shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

**11.9.4.** Seller may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Bidding Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

**11.9.5.** Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid or combination of Qualified Bids and continue in minimum increments of at least $250,000.00 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.  For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by Purchaser), Seller shall give Purchaser a credit in an amount equal to the greater of any Break-Up Fee or Expense Reimbursement that may be payable to Purchaser under the Agreement and shall give effect to any assets and/or equity interests to be retained by Seller.

**11.9.6.** At the conclusion of the Auction, or as soon thereafter as practicable, Seller, in consultation with its financial advisors, shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the sale; and (ii) identify the highest or otherwise best offer(s) for the Acquired Assets and the Purchased Intellectual Property received at the Auction (the "**Successful Bid(s)**" and the bidder(s) making such bid, the "**Successful Bidder(s)**").

**11.10.  Acceptance of Qualified Bids.**  Seller shall sell the Acquired Assets for the highest or otherwise best Qualified Bid upon the approval of such Qualified Bid by the Bankruptcy Court after the hearing (the "**Sale Hearing**"). If, after an Auction in which the Purchaser: (i) shall have bid an amount in excess of the consideration presently provided for in the Agreement with respect to the transactions contemplated under the Agreement; and (ii) is the Successful Bidder, it shall, at the Closing under the Agreement, pay, in full satisfaction of the Successful Bid, an amount equal to: (a) the amount of the Successful Bid; less (b) the Break-Up Fee.

Seller's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Seller's acceptance of the bid. Seller will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

**11.11.  Sale Hearing.**  The Sale Hearing will be held before the Honorable Robert D. Drain on March 22, 2007 at 10:00 a.m. (prevailing Eastern time) at the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, Room 610, New York, New York  10044, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.  If Seller does not receive any Qualified Bids (other than the Qualified Bid of the Purchaser), Seller will report the same to the Bankruptcy Court at the Sale Hearing and will proceed with a sale of the Acquired Assets to the Purchaser following entry of the Sale Order.  If Seller does receive additional Qualified Bids, then, at the Sale Hearing, Seller shall seek approval of the Successful Bid(s), as well as the second highest or best Qualified Bid(s) (the "**Alternate Bid(s)**" and such bidder(s), the "**Alternate Bidder(s)**").  Seller's presentation to the Bankruptcy Court of the Successful Bid(s) and Alternate Bid(s) shall not constitute Seller's acceptance of either or any such bid(s), which acceptance shall only occur upon approval of such bid(s) by the Bankruptcy Court at the Sale Hearing.  Following approval of the sale to the Successful Bidder(s), if the Successful Bidder(s) fail(s) to consummate the sale because of: (i) failure of a condition precedent beyond the control of either Seller or the Successful Bidder; or (ii) a breach or failure to perform on the part of such Successful Bidder(s), then the Alternate Bid(s) shall be deemed to be the Successful Bid(s) and Seller shall effectuate a sale to the Alternate Bidder(s) without further order of the Bankruptcy Court.

**11.12.  Return of Good Faith Deposit.**  Good Faith Deposits of all Qualified Bidders (except for the Successful Bidder) shall be held in an interest-bearing escrow account and all Qualified Bids shall remain open (notwithstanding Bankruptcy Court approval of a sale pursuant to the terms of one or more Successful Bids by one or more Qualified Bidders), until two (2) Business Days following the closing of the Sale (the "**Return Date**").  Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Successful Bidder(s), together with interest thereon, shall be applied against the payment of the Purchase Price upon closing of the Sale to the Successful Bidder(s).  If a Successful Bidder fails to consummate a sale because of a breach or failure to perform on the part of such Successful Bidder, Seller will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit shall irrevocably become property of Seller.   On the Return Date, Seller shall return the Good Faith Deposits of all other Qualified Bidders, together with the accrued interest thereon.

**11.13.  Reservations of Rights.**  Seller, after consultation with the Creditors Committee: (i) may determine, which Qualified Bid, if any, is the highest or otherwise

best offer; and (ii) may reject at any time, any bid (other than the Purchaser's bid) that is: (a) inadequate or insufficient; (b) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Sale; or (c) contrary to the best interests of Seller, its estate and creditors as determined by Seller in its sole discretion.

## 12.    INDEMNIFICATION:

**12.1.    Seller's Agreement to Indemnify.** If the Closing occurs and Purchaser makes a written claim for indemnification against Seller or DTI in accordance with the procedures set forth in this Article 12, from and after the Closing, then Seller or DTI, as appropriate, agrees to indemnify and hold harmless Purchaser from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Purchaser Damages**") incurred by Purchaser as a result of or arising out of: (i) to the extent that the Sale Approval Order, the Bankruptcy Code and other applicable Laws fail to discharge liability with respect to any claims brought by a third party against Purchaser relating thereto, those Retained Liabilities and those Excluded Assets that are retained at Closing by Seller or DTI; (ii) of a breach of any representation or warranty contained in this Agreement (other than Inventory representations for which an adjustment is made in the Purchase Price Adjustment); (iii) a breach of any covenant to be performed by Seller or DTI under this Agreement; or (iv) failure by Seller to pay any amount owed with respect to a purchase money security interest under the Permitted Liens. The sole source to satisfy any remedy with respect to (ii) above shall be the Indemnity Escrow Amount. As soon as possible after the Expiration Date, the Indemnity Escrow Amount, including all cash, interest accrued thereon and other property retained by the Indemnity Escrow Agent, will be delivered to Seller by the Indemnity Escrow Agent, less an estimated amount, if any, reasonably sufficient to satisfy the amount of all then outstanding claims, if any, by Purchaser for Purchaser Damages in accordance with the terms of the Indemnity Escrow Agreement provided such claims exceed or have already exceeded the amount set forth in Section 12.3.5.

**12.2.    Purchaser's Agreement to Indemnify.** If the Closing occurs and Seller and/or DTI makes a written claim for indemnification against Purchaser in accordance with the procedures set forth in this Article 12, then, from and after the Closing, Purchaser shall indemnify and hold harmless Seller and/or DTI, as appropriate, from and against all out-of-pocket liabilities, claims, assessments, losses, judgments, settlements, damages, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, the "**Seller Damages**") incurred by Seller and/or DTI, as appropriate, as a result of or arising out of: (i) the Assumed Liabilities; (ii) a breach of any representation or warranty of Purchaser contained herein; (iii) a breach of any covenant to be performed by Purchaser in connection with this Agreement; or (iv) the use, operation or ownership of the Business or any of the Acquired Assets or Purchased Intellectual Property after the Closing unless such matters are of a nature also subject to indemnification pursuant to Section 12.1.

**12.3.    Limitations on Agreements to Indemnify.** The obligations of either Party to indemnify the other pursuant to this Article 12 are subject to the following limitations:

**12.3.1.** Each Party agrees that, from and after the Closing, the indemnification provided in this Article 12 is the exclusive remedy for a breach by the other Party of any representation, warranty, agreement or covenant contained in this Agreement, and that there shall be no other remedy for any breach by a party in respect of any claim for monetary damages arising out of or under this Agreement.

**12.3.2.** In calculating amounts payable to an indemnified party, the amount of any indemnified Purchaser Damages or Seller Damages, as the case may be, shall be determined without duplication of any other damages for which a claim has been made or could be made under any other representation, warranty or covenant included herein.

**12.3.3.** Any written notice delivered by an indemnified party to an indemnifying party seeking indemnification pursuant to this Agreement shall set forth, with as much specificity as is reasonably practicable, the basis of the claim, the sections of this Agreement which form the basis for the claim, and, to the extent reasonably practicable, a reasonable estimate of the amount of the Purchaser Damages or Seller Damages, as the case may be, that have been or may be sustained by such indemnified party.

**12.3.4.** Notwithstanding any other provision of this Agreement, in no event shall an indemnified party be entitled to indemnification pursuant to this Agreement to the extent any Purchaser Damages or Seller Damages, as the case may be, were attributable solely to the indemnified party's own gross negligence or willful misconduct.

**12.3.5.** No indemnifying party shall be liable to an indemnified party until the amount of all indemnifiable damages of such indemnified party in the aggregate exceeds $50,000.00, after which point the indemnifying party will be obligated to the indemnified party for all damages (and not just the amount in excess of such amount).

**12.3.6.** To the extent an indemnifying party makes any indemnification payment pursuant this Article 12 for which the indemnified party has a right to recover against a third party (including an insurance company), the indemnifying party shall be subrogated to the right of the indemnified party to seek and obtain recovery from such third party.

**12.3.7.** Any indemnity amounts payable pursuant to this Agreement (including, without limitation, any indemnity payment made under this Article 12) shall be reduced by any Tax benefit arising from the claim, loss or damage for which the indemnity is being paid, including any increase in deductions, credits or losses of the indemnified Party.  In the case of Tax benefits consisting of depreciation, amortization or other similar deductions, the Tax benefit amount will be based on the net present value of such deductions using a discount rate equal to the mid-term applicable federal rate in effect on the day on which the indemnification payments are due.  Any calculations of the Tax benefit under this Section 12.3.7 shall be determined assuming the paying Party pays Taxes at the highest combined marginal Tax rate for applicable U.S. federal, foreign, state and local Taxes.

**12.4.    Third Party Indemnification.**  The obligations of any indemnifying party to indemnify any indemnified party under Sections 12.1 or 12.2 with respect to Purchaser Damages or Seller Damages, as the case may be, resulting from the assertion of liability by third parties (including Governmental Entities) (an "**Indemnification Claim**"), shall be subject to the following terms and conditions:

**12.4.1.** Any party against whom any Indemnification Claim is asserted shall give the party required to provide indemnity hereunder written notice of any such Indemnification Claim promptly after learning of such Indemnification Claim (with such notice satisfying the requirements of Section 12.3.3), and to the extent such matter involves a third party claim, the indemnifying party may, at its option, undertake the defense thereof by representatives of its own choosing and shall provide written notice of any such undertaking to the indemnified party.  Failure to give prompt written notice of an Indemnification Claim hereunder shall not affect the indemnifying party's obligations under this Article 12, except to the extent that the indemnifying party is actually prejudiced by such failure to give prompt written notice.  The indemnified party, at the indemnifying party's expense, shall, and shall cause its employees and representatives to, reasonably cooperate with the indemnifying party in connection with the settlement or defense of such Indemnification Claim and shall provide the indemnifying party with all available information and documents concerning such Indemnification Claim. If the indemnifying party, within thirty (30) days after written notice of any such Indemnification Claim, fails to assume the defense of such Indemnification Claim, the indemnified party against whom such claim has been made shall (upon further written notice to the indemnifying party) have the right to undertake the defense, compromise or settlement of such claim on behalf of and for the account and risk, and at the expense, of the indemnifying party.

**12.4.2.** Anything in this Section 12.4 to the contrary notwithstanding: (i) the indemnified party shall not settle a claim for which it is indemnified without the prior written consent of the indemnifying party, which consent shall not be unreasonably withheld, conditioned or delayed; and (ii) the indemnifying party shall not enter into any settlement or compromise of any action, suit or proceeding, or consent to the entry of any judgment for relief other than monetary damages to be borne exclusively by the indemnifying party, without the prior written consent of the indemnified party, which consent shall not be unreasonably withheld, conditioned or delayed.

**12.4.3.**  Nothing in this Agreement, the Sale Approval Order or any Ancillary Agreements including, without limitation, any right to indemnification in favor of Purchaser, shall alter or otherwise vitiate the legal effect of the bar date order and discharge injunction under a confirmation on any third party claim against Seller or DTI that would otherwise be barred or discharged thereunder. Notwithstanding anything to the contrary in this Agreement or in any Ancillary Agreement, upon receipt of any such third party claim, Seller and/or DTI, as appropriate, in its sole discretion, may elect to defend against such claim and settle or otherwise resolve such claim without Purchaser's consent.

**13.    MISCELLANEOUS:**

**13.1.    Bulk Sales Laws.**  Seller and Purchaser hereby waive compliance by Seller with the provisions of the bulk sales Law of any state or foreign jurisdiction.

**13.2.  Notices.**  All notices, requests, consents or other communications permitted or required under this Agreement shall be in writing and shall be deemed to have been given when personally delivered, or when sent if sent via facsimile (with receipt confirmed), or on the first business day after sent by reputable overnight carrier, or on the third business day after sent by registered or certified first class mail (with receipt confirmed), to the following:

<table>
<tr><td><u>If to Seller or DTI:</u></td><td><b>DELPHI AUTOMOTIVE SYSTEMS LLC</b><br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:  AHG – Manager, Mergers & Acquisitions<br>      – Brake Hose Transaction<br>Fax No.: 248-813-2410</td></tr>
<tr><td><u>With a copy to:</u></td><td><b>DELPHI AUTOMOTIVE SYSTEMS LLC</b><br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:  Deputy General Counsel – Transactional<br>and Restructuring<br>Fax No.:  248-813-2491</td></tr>
<tr><td><u>If to Purchaser or Harco</u>:</td><td><b>HARCO BRAKE SYSTEMS, INC.</b><br>707 Harco Drive<br>Clayton, Ohio 45315<br>Attn:  Larry G. Harris, President<br>Fax No.: (937) 832-1097</td></tr>
<tr><td><u>With a copy to:</u></td><td><b>COOLIDGE WALL CO., L.P.A.</b><br>33 West First Street<br>Dayton, Ohio 45402<br>Attn: Ronald S. Pretekin, Esq.<br>Fax No.:  (937) 223-6705</td></tr>
</table>

<u>provided</u>, <u>however</u>, if a Party shall have designated a different addressee by notice, then to the last addressee so designated.

**13.3.  Assignment.**  This Agreement shall be binding and inure to the benefit of the successors and assigns of each of the Parties and their Affiliates, but no rights, obligations, duties or liabilities of any Party may be assigned without the prior written consent of the others, which shall not be unreasonably withheld.

**13.4.  Entire Agreement.**  This Agreement, together with the Ancillary Agreements, represents the entire agreement and understanding between the Parties with respect to the transactions contemplated herein.  This Agreement supersedes all prior agreements, understandings, arrangements, covenants, representations or warranties, written or oral, by any officer, employee or representative of either Party dealing with the subject matter hereof.

**13.5.  Waiver.**  Any waiver by Seller or Purchaser of any breach or of a failure to comply with any provision of this Agreement: (i) shall be valid only if set forth in a written instrument signed by the Party to be bound; and (ii) shall not constitute, or be

construed as, a continuing waiver of such provision, or a waiver of any other breach of, or failure to comply with, any provision of this Agreement.  At any time prior to the Closing Date, the Parties may: (a) extend the time for the performance of any of the obligations or other acts of the other Parties hereto; (b) waive any inaccuracies in the representations and warranties contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements or conditions contained herein.  Except as otherwise expressly provided herein, any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in an instrument in writing signed on behalf of such Party.

**13.6.   Severability.**   Should any provision, or any portion thereof, of this Agreement for any reason be held invalid or unenforceable, such decision shall not affect the validity or enforceability of any of the other provisions, or portions thereof, of this Agreement, which other provisions, and portions, shall remain in full force and effect, and the application of such invalid or unenforceable provision, or portion thereof, to persons or circumstances other than those as to which it is held invalid or unenforceable shall be valid and be enforced to the fullest extent permitted by Law.

**13.7.   Amendment.**   This Agreement may only be amended only in writing by duly authorized representatives or officers of the Parties.

**13.8.   Expenses.**   Except as otherwise expressly provided in Section 9.3 of this Agreement or an Ancillary Agreement, each Party shall be responsible for its own expenses incurred in connection with the preparation of this Agreement, the performance of its obligations hereunder and the consummation of the transactions contemplated hereby.

**13.9.   Third Parties.**   Nothing contained in this Agreement, express or implied, is intended to or shall be construed to confer upon or give to any person, firm, corporation, association, labor union or trust (other than the Parties, their Affiliates and their respective permitted successors and assigns), any claims, rights or remedies under or by reason of this Agreement.

**13.10.  Headings.**   The headings contained in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement.

**13.11.  Counterparts.**   More than one counterpart of this Agreement may be executed by the Parties, and each fully executed counterpart shall be deemed an original.

**13.12.  Governing Law.**   This Agreement shall be construed and enforced in accordance with the laws of the State of New York and, to the extent applicable the Bankruptcy Code, without giving effect to rules governing the conflict of laws.

**13.13.  Public Announcements.**   Seller may inform its employees, customers, suppliers and/or any of the constituents in the Bankruptcy Cases (including, without limitation, the Union, the unsecured creditors committee, the equity committee, ad hoc committees and the plan investors and other stakeholders and General Motors) of the substance of this Agreement. Seller and Purchase will consult with each other before issuing any press releases or otherwise making any public statements with respect to this Agreement or the transactions contemplated hereby, and shall not issue any press

release or make any public statement without mutual consent, except as may be required by Law and then only with such prior consultation.

**13.14.** **Sales or Transfer Taxes.**   All sales taxes, documentary and stamp taxes, transfer taxes, use taxes, gross receipts taxes, excise taxes, value-added gross receipt taxes or similar charges and all charges for filing and recording documents in connection with the transfer of the Acquired Assets (including intellectual property filing and recording fees) shall be paid by Purchaser.

**13.15.** **Venue and Retention of Jurisdiction.**   All actions brought, arising out of or related to the transactions contemplated in this Agreement shall be brought in the Bankruptcy Court, and the Bankruptcy Court shall retain jurisdiction to determine any and all such actions.

**13.16.** **Risk of Loss.**   Prior to the Closing, all risk of loss, damage or destruction to all or any part of the Acquired Assets or the Business shall be borne exclusively by the Seller.

**13.17.** **Enforcement of Agreement.**   The Parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement was not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity.

**13.18.** **Dispute Resolution.**   Seller and Purchaser will, in the first instance, attempt to settle any and all claims or disputes arising in connection with this Agreement or any Ancillary Agreement by good faith negotiations by senior management of each party.  If the dispute is not resolved by senior management within thirty (30) days after delivery of a written request for such negotiation by either party to the other, either party may make a written demand (the "**Demanding Party**") for formal dispute resolution (the "**Notice**") and specify therein in reasonable detail the nature of the dispute.  Within fifteen (15) business days after receipt of the Notice, the receiving party (the "**Defending Party**") shall submit to the other a written response.  The Notice and the response shall include: (i) a statement of the respective party's position and a summary of arguments supporting that position; and (ii) the name and title of the executive who will represent that party and of any other person who will accompany the executive to meetings of the parties.  Within fifteen (15) business days after such written notification, the executives (and others named in the Notice or response) will meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute.  All reasonable requests for information made by one party to the other will be honored promptly.  All negotiations pursuant to this Section 13.18 are confidential and shall be treated as compromise and settlement negotiations for purposes of applicable rules of evidence.  In any case, the Parties agree not to commence any litigation actions until the expiration of ninety (90) days after the date of the Notice, and all such actions are subject to Section 13.15 above.

**13.19.** **No Right of Setoff.**   Neither party hereto nor any Affiliate thereof may deduct from, set off, holdback or otherwise reduce in any manner whatsoever any amount owed to it hereunder or pursuant to any Ancillary Agreement against any amounts owed hereunder or pursuant to any Ancillary Agreement by such Persons to the other party hereto or any of such other party's Affiliates.

**13.20.  Dollar Amounts.**  All amounts referenced herein are in US dollars.

**13.21.  Limitation on Damages.**    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, INCLUDING ARTICLE 12, IN NO EVENT SHALL PURCHASER, DTI OR SELLER BE LIABLE FOR, OR BEAR ANY OBLIGATION IN RESPECT OF, ANY PUNITIVE, INCIDENTAL, INDIRECT, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER OR ANY DAMAGES RELATING TO, OR ARISING OUT OF, DIMINUTION IN VALUE, LOST PROFITS OR CHANGES IN RESTRICTIONS ON BUSINESS PRACTICES.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized officers.

**DELPHI AUTOMOTIVE SYSTEMS LLC**          **HARCO MANUFACTURING GROUP, LLC**

By: /s/ John Arle                         By: /s/ Larry G. Harris
Print Name: **John Arle**                 Print Name: **Larry G. Harris**
Title: **Vice President**                 Title: **President**


**DELPHI TECHNOLOGIES, INC.**             **HARCO BRAKE SYSTEMS, INC.**

By: /s/ John Arle                         By: /s/ Larry G. Harris
Print Name: **John Arle**                 Print Name: **Larry G. Harris**
Title: **Vice President**                 Title: **President**