**Hearing Date and Time: March 1, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
| | (Jointly Administered) |
| Debtors. | |

## DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO
## PROOF OF CLAIM NO. 2707 (LABORSOURCE 2000, INC.)

("SUPPLEMENTAL REPLY – LABORSOURCE 2000, INC.")

       Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit their Supplemental Reply With Respect To Proof Of Claim No. 2707 (LaborSource 2000, Inc.) (this "Supplemental Reply"), and respectfully represent as follows:

Introduction

1.      The claimant, LaborSource 2000, Inc. ("LaborSource"), provided labor services to Delphi Automotive Systems, LLC ("DAS LLC") to produce automotive cockpits. To procure this business, LaborSource made a successful bid in response to DAS LLC's bid request of August 2002, which was expressly subject to "change based on volumes, the manufacturing process, product changes, etc." Subsequently, LaborSource entered into an agreement (the "Purchase Order") with DAS LLC to supply labor to assemble the cockpits.

2.      LaborSource was unable to profitability perform under the Purchase Order and, in 2004, requested a price increase from DAS LLC. Although under no obligation to do so, DAS LLC acquiesced in LaborSource's request and entered into a settlement agreement in June 2004 (the "Settlement Agreement"). In the Settlement Agreement, DAS LLC granted a price increase to LaborSource and agreed to pay a surcharge on certain billable hours to cover one-half of LaborSource's unsecured obligation to its lender. In exchange, LaborSource expressly acknowledged in the Settlement Agreement that "[n]either the Purchase Order nor [the Settlement] Agreement create any obligation of [DAS LLC] to purchase, obtain or pay for any minimum number of hours of any personnel, and [LaborSource] and [DAS LLC] agree that [DAS LLC] is under no such obligation." LaborSource also granted DAS LLC a full and unconditional release of all claims arising prior to the date of the Settlement Agreement.

3.      Even with the accommodations provided by DAS LLC, LaborSource still could not operate profitably under the clear constraints of the Purchase Order and Settlement

2

Agreement. LaborSource subsequently filed its proof of claim to recover over $2.2 million on account of its alleged losses associated with the contract.

4.  Contrary to LaborSource's contentions, DAS LLC never made promises with respect to a particular volume of services nor to a certain level of profitability. Indeed, the parties expressly acknowledged in the Settlement Agreement that Delphi was not obligated to purchase any minimum amount of services. Like any party that contracts for goods or services, DAS LLC is not an insurer of the profitability of the contracts that it awards to suppliers.

5.  Further, in April 2006, LaborSource filed for chapter 7 bankruptcy relief. As a result, LaborSource is a defunct company that lacks standing to assert a claim in these bankruptcy proceedings. Accordingly, LaborSource's proof of claim should be disallowed and expunged in its entirety.

Background

6.  On April 21, 2006, LaborSource filed proof of claim number 2707 (the "Proof of Claim") against DAS LLC. The Proof of Claim asserts an unsecured nonpriority claim in the amount of $2,284,000 (the "Claim") stemming from an agreement between LaborSource and DAS LLC, the terms of which were first embodied in the Purchase Order dated October 15, 2002. Under the Purchase Order, LaborSource agreed to provide certain labor services required by DAS LLC in conjunction with a certain project (the "Project") to produce automotive cockpits for General Motors Corporation ("GM"). Declaration Of James N. Robbins In Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 2707 (LaborSource 2000, Inc.) ¶ 4 (the "Robbins Decl." or "Robbins Declaration"), a copy of which is attached hereto as <u>Exhibit A</u>. A copy of the Purchase Order is attached as <u>Exhibit 2</u> to the Robbins Declaration.

3

7. The agreement between LaborSource and DAS LLC was the result of a bid request dated August 27, 2002 (the "Bid Request"), pursuant to which DAS LLC solicited bids from, among others, LaborSource, to provide labor services for the Project. Robbins Decl. ¶ 5. A copy of the Bid Request is attached as <u>Exhibit 1</u> to the Robbins Declaration. The Bid Request expressly provides that the Debtors' labor requirements "will change based on volumes, the manufacturing process, product changes, etc." Bid Request, § 2.1.

8. LaborSource was the successful bidder for the Project, and the Purchase Order was subsequently issued by DAS LLC and accepted by LaborSource. Robbins Decl. ¶ 5. The Purchase Order, which provided fixed and agreed pricing for labor services for the Project, covered DAS LLC's "order of the . . . services identified during the period from 12/02/02 to 12/31/2005." Purchase Order, p. 1. The Purchase Order expressly provided that it "contains the complete and final agreement between [DAS LLC] and [LaborSource] and no other agreement in any way modifying any of [its] terms and conditions will be binding upon [DAS LLC] unless made in writing and signed by [DAS LLC]'s authorized representative." <u>Id</u>. At or shortly after the time of the Purchase Order, LaborSource was well aware that its workforce at Delphi's manufacturing plant was unionized. Robbins Decl. ¶ 6.

9. Subsequent to the acceptance of, and partial performance under, the terms of the Purchase Order, LaborSource informed DAS LLC that it faced financial losses with respect to the provision of labor services for the Project, that its debt to its primary lender was under-collateralized by approximately $1.1 million, and that it risked default and foreclosure of its loan. Robbins Decl. ¶ 7. Although under no obligation to do so, DAS LLC agreed to provide support to LaborSource, and the parties entered into a Settlement And Accommodation Agreement in June 2004 (the "Settlement Agreement"). Robbins Decl. ¶ 9. A copy of the

Settlement Agreement is attached as <u>Exhibit 3</u> to the Robbins Declaration. Pursuant to the Settlement Agreement, the bill rate under the Purchase Order for certain of LaborSource's employees was increased from $21.58 per hour to $23.00 per hour. Robbins Decl. ¶ 9; Settlement Agreement ¶ 1(a)(i). Additionally, DAS LLC agreed to cover approximately half of the $1.1 million unsecured debt owed by LaborSource to its lender through the payment of a surcharge in the amount of $4.10 per billable hour (the "Surcharge") until DAS LLC had purchased 137,000 billable hours from LaborSource. Robbins Decl. ¶ 9; Settlement Agreement § 1(a)(ii).

10. Further, pursuant to the Settlement Agreement, the parties expressly agreed that "[n]either the Purchase Order nor [the Settlement] Agreement create any obligation of [DAS LLC] to purchase, obtain or pay for any minimum number of hours of any personnel, and [LaborSource] and [DAS LLC] agree that [DAS LLC] is under no such obligation." Robbins Decl. ¶ 10; Settlement Agreement, ¶ 1(b). Also pursuant to the Settlement Agreement, LaborSource agreed to a general release of all claims against DAS LLC "based upon acts o[r] occurrences at any time prior to the date of [the Settlement] Agreement." Robbins Decl. ¶ 8; Settlement Agreement ¶ 3(a). Finally, LaborSource agreed that the Settlement Agreement and the Purchase Order constitute the entire understanding of the parties with respect to the subject matter of the Settlement Agreement. <u>See</u> Settlement Agreement, ¶ 13.

11. After the parties executed the Settlement Agreement, LaborSource continued to incur losses with respect to its provision of labor services for the Project. Robbins Decl. ¶ 11. However, DAS LLC continued to help support LaborSource in an effort to offset some of LaborSource's losses. Id. at ¶¶ 11-12. Although not obligated to do so, DAS LLC offered to pay for LaborSource's fixed costs of $28,000 per week that the Project was down in

5

2005 (prior to the termination of the Project). Id. at ¶ 11. Additionally, DAS LLC offered to pay up to $85,000 in vacation pay and retention bonuses for both hourly and salaried LaborSource employees. Id. at ¶ 12; see also Exhibit 5 attached to the Robbins Declaration.

12.    During the life of the Project, DAS LLC performed pursuant to the Purchase Order by purchasing its labor requirements from LaborSource. However, in May 2005, GM terminated the Project, obviating DAS LLC's need for labor services from LaborSource. Robbins Decl. ¶ 14.

13.    On April 25, 2006, LaborSource filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Michigan, case no. 06-45106. On October 26, 2006, a final decree was entered in LaborSource's chapter 7 case.

14.    On October 31, 2006, the Debtors filed the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated by Debtors' Books and Records, and (C) Claims Subject to Modification and (II) Motion to Estimate Contingent and Unliquidated Claims Pursuant to 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"). In the Third Omnibus Claims Objection the Debtors objected to, and sought an order disallowing and expunging, inter alia, the Proof of Claim.

15.    On November 27, 2006,[1] LaborSource filed LaborSource 2000, Inc.'s Response To Debtors' Third Omnibus Objection To Its Claim No. 2707 (Docket No. 5981) (the "Response"). In the Response, LaborSource calculates its alleged claim as follows: (1) lost

---

[1]    The deadline to file a response to the Third Omnibus Claims Objection was November 24, 2006 at 4:00 p.m. (Prevailing Eastern Time). See Third Omnibus Claims Objection, ¶ 46. The response therefore was untimely.

6

profits of $1,773,000 due to "unexpected down time" of the Project including the time period subsequent to GM's termination of the Project, (2) "increased" workers compensation premiums of $320,000, (3) employee medical bills of $65,000 resulting from the apparent cancellation by LaborSource of medical insurance for its own employees, and (4) interest and expenses of $160,000 from unspecified "bridge loans LaborSource sought to maintain."[2]  Additionally, without setting forth any specific facts as support, LaborSource makes broad allegations that DAS LLC used but did not pay for a "job bank" idea belonging to LaborSource and that LaborSource is a third party beneficiary of a contract between GM and DAS LLC.

### Argument

16.    As an initial matter, because LaborSource filed its own bankruptcy petition under chapter 7 of the Bankruptcy Code, LaborSource is now a defunct entity that, as a matter of law, cannot assert a claim against the Debtors.  LaborSource's claim also fails on the merits.  LaborSource's asserted Claim consists of alleged losses it incurred when DAS LLC did not purchase the volume of services that LaborSource had hoped.  However, as expressly stated in the Bid Request and later explicitly acknowledged by LaborSource in the Settlement Agreement, DAS LLC was not obligated to purchase a certain volume of services.  Thus, as a matter of law, LaborSource has no claim against DAS LLC based on any losses it incurred pursuant to the Purchase Order.  LaborSource also expressly agreed to waive any claims it may have against Delphi as of July 2004. LaborSource's vague allegations of representations and

---

[2]    The Debtors note that LaborSource has not filed a supplemental response to the Third Omnibus Claims Objection.  Pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims (the "Claims Objection Procedures Order"), the deadline for LaborSource to file a supplemental response was January 18, 2007.

7

promises made outside the scope of the Purchase Order are nothing more than a desperate attempt to evade the clear language of the Purchase Order and Settlement Agreement. This Court should therefore sustain the Debtors' objection and disallow and expunge LaborSource's claim.

A. LaborSource Is A Defunct Corporation That Lacks Standing To Assert A Claim Against The Debtors

17. Regardless of the merits of LaborSource's claim, LaborSource has filed a chapter 7 bankruptcy petition and is a defunct corporation, rendering it unable, as a matter of law, to assert a claim against the Debtors.

18. Under chapter 7 of the Bankruptcy Code, a corporation is not entitled to a discharge of its debts. See 11 U.S.C. § 727(a)(1) ("The court shall grant the debtor a discharge unless the debtor is not an individual."). Instead, "the corporation's assets are liquidated, and, at the close of the bankruptcy proceedings, the corporation becomes 'defunct.'" U.S. Dismantlement Corp. v. Brown Assocs., Inc., No. Civ. A. 97-1309, 2000 WL 433971, at *2 (E.D. Pa. Apr. 13, 2000); see also In re Rack Eng'g Co., 212 B.R. 98, 103 (Bankr. W.D. Pa. 1997) (a corporation that has been through chapter 7 bankruptcy is defunct); Liberty Trust Co. Employees Profit Sharing Trust v. Holt (In re Liberty Trust Co.), 130 B.R. 467, 471 (W.D. Tex. 1991) (same); In re Tri-R Builders, Inc., 86 B.R. 138, 141 (Bankr. N.D. Ind. 1986) (same).

19. "Congress' purpose in denying discharge to corporations . . . was to 'avoid the trafficking in corporate shells . . . .'" (quoting H.R.Rep. No. 95-595 (1978), as reprinted in 1978 U.S.C.C.A.N. 5963, 6340). Accordingly, courts have held that chapter 7 corporate debtors cannot maintain pre-petition claims or causes of action, even if the chapter 7 trustee has abandoned the claims or causes of action. See U.S. Dismantlement Corp., 2000 WL 433971 at

8

*4 (granting defendant's motion to dismiss because corporate plaintiff filed for chapter 7 bankruptcy after its cause of action accrued); Liberty Trust Co., 130 B.R. at 472 (holding that chapter 7 corporate debtor's cause of action was asset of bankruptcy estate to be disposed of by the chapter 7 trustee, not the debtor); Thornton v. Mankovitch, 626 S.E.2d 189, 191 (Ga. Ct. App. 2006) (holding that corporation that had been through a chapter 7 bankruptcy lacked standing to assert a pre-petition cause of action).

20.     Here, the trustee of the bankruptcy estate of LaborSource filed a Report of No Distribution on August 30, 2006.  Thus, LaborSource's creditors, which held $985,259.14 in scheduled priority and non-priority unsecured claims, have received nothing on account of such claims.[3]  See Voluntary Petition, Summary of Schedules.  LaborSource's Voluntary Petition is attached hereto as Exhibit B.  A final decree was entered in LaborSource's bankruptcy case on October 26, 2006.  As a result, LaborSource is a defunct corporation that, as a matter of law, cannot assert a claim against the Debtors.

B.    **DAS LLC Was Not Obligated To Purchase A Certain Volume Of Services**

21.     LaborSource's claims also would fail on the merits.  The Purchase Order was simply a requirements contract, pursuant to which DAS LLC agreed to purchase only those labor services it required for the Project.  As LaborSource expressly acknowledged, DAS LLC was not obligated to purchase a certain volume of services from LaborSource.  Thus,

---

[3] LaborSource has asserted that its Claim includes certain costs that it incurred with respect to the Project, including workers compensation premiums totaling $320,000, unpaid employee medical bills totaling $65,000, and interest and expenses for "bridge loans" totaling $160,000.  However, on its Schedule F, LaborSource scheduled unsecured claims for workers compensation premiums, unpaid employee medical bills, and business loans. See LaborSource's Voluntary Petition, Schedule F.  Thus, LaborSource has apparently failed to pay its creditors the same costs for which it now asserts constitute a claim against the Debtors.  The Debtors assert that, even if LaborSource has a claim, such claim cannot include costs that LaborSource has not paid, and apparently has no intention of paying because, to the extent it does not actually pay the costs, LaborSource is not actually damaged in the amount of such costs.

9

LaborSource is not entitled to a claim for its alleged costs and lost profits for periods for which it feels DAS LLC did not purchase enough services.

22. Common law governs the interpretation of requirements contracts. See J & B Sausage Co. v. Dep't of Mgmt & Budget, LC No. 04-000091-MK, 2007 WL 28409, at *1 (Mich. Ct. App. Jan. 4, 2007) ("Contracts for services are governed by the common law").[4] Michigan courts recognize "the validity of 'requirements' contracts," including "in the context of service agreements." Id. at *3 (citing E.C. Dailey Co. v. Clark Can Co., 87 N.W. 761 (Mich. 1901); Hickey v. O'Brien, 82 N.W. 241 (Mich. 1900)).

23. In a similar requirements contract context, Michigan courts have held that a party's requirements may, in good faith, be reduced to zero without constituting a breach of contract if that reduction in requirements is based in sound business judgment and not in an effort to avoid the output contract or agreement. Tigg Corp. v. Dow Corning Corp., 962 F.2d 1119, 1126 (3d Cir. 1992) (confirming that a party may have a good faith reason for supplying or demanding no goods, and in such a case, there is no breach); see also Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 689, 171 N.E.2d 865, 868 (1961) (where seller in output contract ceased operation and thus reduced output to zero, court found no breach of contract and noted that "any loss to [plaintiff] is a consequence of the kind of agreement into which it entered").[5]

---

[4] Although the Purchase Order is silent on the issue, Delphi Automotive Systems General Terms and Conditions, revised June 24, 1999 (the "Terms and Conditions"), which were incorporated into the Purchase Order, state that contracts are to be construed according to the law of the state from which the contract is issued, which is the address listed for the buyer (i.e. DAS LLC), which in this case is Michigan. See Terms and Conditions ¶ 26, attached hereto as Exhibit C. Further, the Settlement Agreement expressly states that it is governed by Michigan law. See Settlement Agreement, ¶ 14.

[5] These cases interpret section 2-306 of the Uniform Commercial Code (the "UCC"). Under Michigan's version of the UCC, "[a] term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith . . . ." MCL 440.2306(1). There is no

*(cont'd)*

10

Thus, DAS LLC could in good faith, as it did here, reduce its requirements to zero and not be in breach of the Purchase Order. Delphi's requirements were reduced because GM terminated the Project in May 2005, and there is no evidence to contradict that sound business reason. See Tigg Corp., 962 F.2d at 1123-24 (holding that the seller in a requirements contract context bears the burden of showing a seller reduced its requirements in bad faith).

24. Here, because the Purchase Order is clearly a requirements contract, it does not under Michigan law guarantee LaborSource to any specific volume. Not only did the Bid Request state that DAS LLC's requirements "will change based on volumes, the manufacturing process, product changes, etc.," see Bid Request, § 2.1, and not only is the Purchase Order devoid of any promise of the purchase of a particular volume of services, see generally Purchase Order, but LaborSource expressly agreed pursuant to the Settlement Agreement that the Purchase Order does not "create any obligation of [DAS LLC] to purchase, obtain or pay for any minimum number of hours of any personnel, and . . . that [DAS LLC] is under no such obligation." Settlement Agreement, ¶ 1(b).

25. The primary basis of LaborSource's alleged Claim is its alleged costs and lost profits for "unexpected down time," which it asserts was 22 weeks during the life of the Project[6] and 53 weeks after the Project was terminated.[7] See Response at 4-5. However,

---

*(cont'd from previous page)*
reason why such reasoning would not also apply in the context of service requirements contracts. Indeed, as other courts have recognized: "Both at common law (pre-code) and under the [UCC], a requirements contract is simply an agreement by the buyer to buy his good faith requirements of goods exclusively from the seller. If in good faith the buyer has no requirements, then he is not obligated to buy anything." Wilsonville Concrete Prods. v. Todd Building Co., 574 P.2d 1112, 1114-15 (Or. 1978) (construing Oregon law).

[6] LaborSource does not specify the dates of the alleged "down time." However, pursuant to the Settlement Agreement, LaborSource waived any claim against DAS LLC "based upon acts of occurrences at any time prior to the date of [the Settlement] Agreement." Settlement Agreement, ¶3(a). Thus, even if DAS LLC was obligated to purchase a certain level of labor services (which the Debtors dispute), LaborSource waived any claim based on any alleged "down time" occurring prior to the Settlement Agreement.

11

LaborSource does not cite to any provision of the Purchase Order, Bid Request, or any other writing or communication that promises DAS LLC will purchase any services during these weeks of so-called "down time." LaborSource's failure to tie its Claim to a specific provision of the Purchase Order, or any other alleged agreement, is not surprising in light of the fact that LaborSource expressly acknowledged in the Settlement Agreement that DAS LLC was not obligated to purchase a minimum volume of services from LaborSource other than that which it required for the Project.[8]

26.    LaborSource also suggests that DAS LLC failed to inform it of certain circumstances, including the existence of a union contract and the possibility for "down time." See Response at 2. However, even if LaborSource was unaware of certain costs or had a unilateral expectancy of a volume of labor above that which DAS LLC actually required, there is no legal basis upon which DAS LLC is liable to LaborSource for such costs or any loss of such expectancy. DAS LLC simply made no promises with regard to the volume of services it would require from LaborSource. Rather, contrary to LaborSource's assertions that it was unaware that DAS LLC's labor needs may vary over time, the Bid Request expressly stated that DAS LLC's needs would change based upon "volumes, the manufacturing process, product changes, etc." which is exactly what LaborSource acknowledges later occurred. Therefore, if actual volumes were less than LaborSource anticipated or its costs were greater than anticipated, LaborSource –

_____
*(cont'd from previous page)*

[7]    Pursuant to the Terms and Conditions, DAS LLC had the right to terminate the Purchase Order for convenience. Thus, even if DAS LLC was obligated to purchase a certain level of labor services (which the Debtors dispute), the Debtors are not liable for lost profits nor costs relating to time periods after the Project was terminated.

[8]    Not only does LaborSource omit any reference to a written agreement that would establish a duty on the part of DAS LLC to purchase a certain volume of services, but it also fails to cite to any legal authority to support such a position. Again, this is not surprising, given the well-settled acceptance of requirements contracts by courts.

not DAS LLC – must bear any alleged losses resulting therefrom. Furthermore, any such claims related to LaborSource's expectancy of a certain volume of services, a certain cost structure, or the absence of a union contract clearly would have arisen at the time the parties entered into the Purchaser Order and were therefore released by LaborSource pursuant to the Settlement Agreement. See Robbins Decl. ¶ 6.

27. Because DAS LLC complied with the Purchase Order by purchasing from LaborSource all the labor services it required – indeed, LaborSource does not allege that DAS LLC purchased labor from elsewhere, or that it failed to pay for services actually performed – LaborSource has no claim based on alleged lost profits and costs associated with "down time" of the Project. LaborSource presents neither contractual provisions nor legal authority to support allegations to the contrary.

C. LaborSource's Allegations Of Promises And Representations Outside Of The Purchase Order Are Factually Unsupported And, As A Matter Of Law, Irrelevant

28. Because LaborSource cannot cite to any provision of the Purchase Order requiring DAS LLC to purchase a certain volume of services, it is forced to make vague allegations of promises and representations made by DAS LLC outside the scope of the Purchase Order. See generally Response. Of course, LaborSource fails to provide any specific evidence of such allegations, and the Debtors assert that they made no such promises or representations. See generally, Robbins Decl.; Declaration Of Jay Hudson In Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 2707 (LaborSource 2000, Inc.) (the "Hudson Decl." or "Hudson Declaration,") a copy of which is attached hereto as Exhibit D. However, even if there was some factual support for LaborSource's allegations, the Purchase Order and the Settlement Agreement constitute the entire agreement between LaborSource and DAS LLC with respect to

13

the Project, and thus any alleged promises or representations were integrated into those documents and did not modify the terms thereof.

       1.      <u>LaborSource Has Provided No Evidentiary Support For Its Allegations</u>

       29.      LaborSource has provided little to no factual detail to support its sweeping allegations. Reviewing the Response, and exhibits attached thereto, the only promises outside the scope of the Purchase Order that LaborSource alleges DAS LLC made was that it had "more profitable projects that it would grant to LaborSource in order to compensate for the losses being incurred with respect to [the Project]." Response at 2. LaborSource asserts that this promise was made "in order to keep LaborSource servicing the [P]roject." <u>Id</u>.

       30.      As a result of LaborSource's failure to file a Supplemental Response or declarations of any witnesses, LaborSource must rely on its Proof of Claim and Response. Both the Proof of Claim and Response, however, fail to provide any specific facts to support its allegation that DAS LLC made representations or promises outside the scope of the Purchase Order and Settlement Agreement. They do not specify whether such representations were made in writing or orally. They also fail to identify either the representative from DAS LLC who made such representations or the date that such individual allegedly made the representations. The Proof of Claim and Response also fail to provide any evidentiary support for LaborSource's allegations that it was the third party beneficiary of a contract between GM and DAS LLC or that DAS LLC used but failed to pay for a "job bank" idea of LaborSource.

       31.      A claimant's proof of claim is entitled to the presumption of <u>prima facie</u> validity under Bankruptcy Rule 3001(f) only until such time an objecting party refutes "'at least one of the allegations that is essential to the claim's legal sufficiency.'" <u>In re WorldCom, Inc.</u>, No. 02-13533, 2005 WL 3832065, at *4 (Bankr. S.D.N.Y. Dec. 29, 2005) (quoting <u>In re</u>

Allegheny Int'l., Inc., 954 F.2d 167, 174 (3d Cir. 1992)).  Once such an allegation is refuted, "'the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.'"  Id.

32.    Here, the Debtors refute the allegations essential to LaborSource's Claim.  In contrast to the lack of evidentiary support provided by LaborSource, the Debtors have attached the declarations of James Robbins and Jay Hudson, individuals at Delphi who together have personal knowledge of the relationship between DAS LLC and LaborSource.  As evidenced by these declarations, the Debtors, among other things, (a) deny that they made representations regarding the modification of any terms of either the Purchase Order or the Settlement Agreement, (b) deny that they made promises regarding the granting of future contracts to LaborSource, (c) affirm that the Purchase Order and the Settlement Agreement express the entire agreement between the parties, (d) deny that LaborSource was the intended beneficiary of a contract between GM and DAS LLC, and (e) deny that DAS LLC used but failed to pay for a "job bank" idea of LaborSource.  Thus, the burden of proof reverts to LaborSource.

33.    However, because LaborSource must rely on its Proof of Claim and Response, LaborSource cannot meet its burden of proof because neither the Proof of Claim nor the Response have established, by a preponderance of the evidence, facts sufficient to support a claim.

2.    LaborSource's Allegations Of Promises And Representations Outside The Scope Of The Purchase Order Do Not Entitle It To A Claim

34.    Even if DAS LLC did make promises and/or representations outside the scope of those contained in the written agreements between the parties – which it did not – such promises and/or representations do not form a legal basis for a claim because (1) LaborSource

already had a contractual duty to provide labor services to DAS LLC for the Project, and (2) the Purchase Order and Settlement Agreement contained the entire agreement of the parties, which agreement could not be modified by such representations.

35.     As noted above, LaborSource alleges that DAS LLC promised LaborSource future contracts "in order <u>to keep</u> LaborSource servicing the [P]roject." Response at 2 (emphasis added). However, LaborSource had already agreed to provide labor services for the Project. Indeed, pursuant to the Settlement Agreement, LaborSource "ratifie[d] and confirm[ed] its obligations to provide the Services in accordance with the terms of the Purchase Order." Settlement Agreement, ¶ 2. Thus, LaborSource is essentially alleging that DAS LLC made promises or representations to LaborSource in an attempt to induce LaborSource to do that which it was already obligated to do. Therefore, LaborSource cannot establish that it incurred any damages in relying upon the alleged representations or promises because LaborSource was obligated to provided labor services for the Project whether or not such representations were made. Because it would not have been damaged by its relying on alleged representations or promises, the existence of such representations or promises, even if true, does not establish a claim against DAS LLC.

36.     Furthermore, even if promises or representations were made outside the scope of the Purchase Order or Settlement Agreement, such promises and representations were integrated into the written agreements between the parties and did not modify such written agreements. Because LaborSource has failed to provide factual details supporting its allegations, the Debtors do not know the date(s) on which LaborSource alleges DAS LLC made promises and representations to LaborSource and whether they were allegedly made before or after the parties entered into the Settlement Agreement.

16

37.     With respect to alleged promises or representations made <u>before</u> the parties executed the Settlement Agreement, LaborSource expressly waived those claims. See Settlement Agreement, ¶ 3. Moreover, the Purchase Order and Settlement Agreement are clear and unambiguous and expressly provide that they represent the complete expression of the agreement between DAS LLC and LaborSource.[9] This is yet another reason why evidence of any promises or representations made before the parties executed the Settlement Agreement would not save LaborSource's claim. See <u>Schmude Oil Co. v. Omar Operating Co.</u>, 458 N.W.2d 659, 663 (Mich. Ct. App. 1990) ("Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous. A prerequisite to the application of this rule . . . is a finding that the parties intended the written instrument to be a complete expression of their agreement").

38.     With respect to any alleged representations or promises made to LaborSource <u>after</u> the parties executed the Settlement Agreement, such promises or representations still would not modify the terms of the parties' existing contractual relationship. DAS LLC and LaborSource expressly agreed that neither the Purchase Order nor the Settlement Agreement could be modified other than in a writing signed by the parties. See Purchase Order at 1 ("no other agreement in any way modifying any of [the Purchase Order's] terms and

---

[9]   See Purchase Order at 1 ("This [Purchase Order] contains the complete and final agreement between [DAS LLC] and [LaborSource] "); Settlement Agreement, ¶ 13 ("This [Settlement] Agreement and the Purchase Order constitute the entire understanding of the parties in connection with the subject matter hereof and this [Settlement] Agreement any [sic] and all previous negotiations, representations, covenants, promises, understandings and agreements of the parties regarding the subject matter hereof are merged and integrated into the Purchase Order and this [Settlement] Agreement."); Terms and Conditions, ¶ 29 ("This Contract, together with the attachments, exhibits, supplements of other items of [DAS LLC] specifically referenced in this Contract constitute the entire agreement between [LaborSource] and [DAS LLC] with respect to the matters contained in the Contract and supersede all prior or written representations and agreements.")

conditions will be binding upon [DAS LLC] unless made in writing and signed by [DAS LLC]'s authorized representative."); Settlement Agreement, ¶ 13 ("This [Settlement] Agreement may not be modified, altered, or amended except by an agreement in writing signed by [DAS LLC] and [LaborSource]."); Terms and Conditions, ¶ 1 ("Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which [LaborSource] proposes will be deemed to be rejected by Buyer except to the extent that [DAS LLC] to accept any such proposals in writing."). Thus, to the extent the alleged verbal misrepresentation or promise purported to modify the terms of either the Purchase Order or Settlement Agreement, such a verbal statement is without legal effect because the parties expressly agreed to modify such agreements only in writing.[10] Moreover, even without such an express clause (which is not the case here), such a verbal attempt to modify the Purchase Order and Settlement Agreement would fail where, as here, the verbal attempt to modify is not supported with independent consideration.[11] As discussed above, LaborSource was already obligated to provide labor services to DAS LLC and expressly acknowledged the same in the Settlement Agreement. Settlement Agreement ¶ 2.

39.     As acknowledged by LaborSource, neither the Purchase Order nor the Settlement Agreement created any obligation for DAS LLC to purchase a certain volume of

---

[10] LaborSource does not appear to allege that the Settlement Agreement or the Purchase Order have been modified in writing (other than the modification of the Purchase Order pursuant to the Settlement Agreement).

[11] See Evans v. F.J. Boutell Driveaway Co., 210 N.W.2d 489, 493 (Mich. Ct. App. 1973) (Even if the parties could modify the agreement orally, pursuant to Michigan law, a subsequent oral modification to a written agreement is only valid if "the modification is 'supported by independent consideration such as a promised performance not already required by the original [agreement].'") (citation omitted); see also Adell Broad. Corp. v. Cablevision Indus., 854 F. Supp. 1280, 1292 n.9 (E.D. Mich. 1994) ("It is well-settled that a pre-existing legal duty is insufficient consideration to support a valid contract") (construing Michigan law) (citing Borg-Warner Acceptance Corp. v. Dep't of State, 444 N.W.2d 786, 788 (Mich. 1989)).

services from LaborSource. Because the promises or representations alleged by LaborSource were either integrated into the Purchase Order and Settlement Agreement or lacked consideration to modify the terms contained in those instruments, any such alleged promises and representations – even if they did occur – did not create, as a matter of law, an obligation for DAS LLC to purchase a certain volume of services from LaborSource.

## Conclusion

40.     LaborSource's Proof of Claim should be expunged because LaborSource, as a defunct corporation, lacks standing to assert a claim against the Debtors. In addition, LaborSource has failed to establish a claim against DAS LLC. DAS LLC fully performed its obligations by purchasing labor for the Project from LaborSource pursuant to the terms of the Purchase Order. Although LaborSource's supply of labor to DAS LLC was not as profitable as it had hoped, the Debtors should not be held responsible every time one of their suppliers fails financially. DAS LLC had no obligation to purchase a certain level of services, and made no representations or promises that that it would. Accordingly, DAS LLC is not liable for losses incurred by LaborSource, and the Proof of Claim should be disallowed and expunged.

## Memorandum of Law

41.     Because the legal points and authorities upon which this Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request the Court enter an order (i) sustaining the Third Omnibus Claims Objection as to the Proof of Claim, (ii) disallowing and expunging the Proof of Claim, and (iii) granting such further and other relief the Court deems just and proper.

Dated: New York, New York
January 31, 2007

    SKADDEN, ARPS, SLATE, MEAGHER
      & FLOM LLP

    By:  /s/ John Wm. Butler, Jr.
        John Wm. Butler, Jr. (JB 4711)
        John K. Lyons (JL 4951)
        Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

- and -

    By:  /s/ Kayalyn A. Marafioti
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
Four Times Square
New York, New York  10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession