**Hearing Date and Time: March 1, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
| | : | (Jointly Administered) |
| Debtors. | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

### DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOF OF CLAIM NO. 12083 (DONNA WILSON)

("SUPPLEMENTAL REPLY – DONNA WILSON")

Delphi Corporation and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, "Delphi" or the "Debtors"),

1

hereby submit their Supplemental Reply With Respect To Proof Of Claim No. 12083[1] (Donna Wilson) (this "Supplemental Reply"), and respectfully represent as follows:

Introduction

1.  Donna Wilson ("Wilson"), a former employee of Delphi, asserts a claim based on alleged racial discrimination that occurred when she was suspended without pay for fourteen days and transferred to a different department following an incident in which seventy percent of all of the employees on the B shift at Delphi's Saginaw, Michigan plant – Wilson and eight others – did not show up for their shift that started at 3:30 p.m. on Monday, March 8, 2004. Faced with these circumstances, Delphi management immediately tried to find employees to begin work on the B shift and began investigating the cause of what appeared to be a coordinated work stoppage. Based on events occurring days before the work stoppage, employee statements, and interviews of the employees who failed to report to work that Monday, Delphi management concluded that the employees did so in protest of the termination of a former supervisor at the Saginaw plant one business day earlier.

2.  Despite Wilson's claim that Delphi suspended her because she is African American, the fact is Delphi management clearly had a legitimate business reason for its decision to suspend Wilson and her co-workers. Management imposed the discipline to address the disruptive conduct caused by seventy percent of the B shift workforce failing to report for their shift. The discipline was necessary to thwart future unauthorized work stoppages, such as the one that happened on March 8, which threatened Delphi's ability to meet crucial production demands. Because Delphi's decision to suspend Wilson was based on a legitimate business

---

[1] Claimant's counsel explicitly agreed during the meet and confer meeting pursuant to the Claim Objection Procedures Order held on January 8, 2007 that the amended proof of claim (#16428) should be resolved at the same time as the original proof of claim (#12083) despite the fact that the amended claim was not previously scheduled for resolution on March 1, 2007.

2

reason, and not on Wilson's race, Wilson cannot maintain a racial discrimination claim against the Debtors.

3.  Wilson's only real attempt to undermine Delphi management's legitimate business reason is to argue that she did in fact see a doctor at the precise date and time of the work stoppage. This argument must fail because the issue in this case is not – as Wilson would prefer – whether or not she saw or did not see a doctor on March 8, 2004. Rather, the issue is whether Delphi discriminated against her based on race. Wilson did not timely call in her absence, as she is required to do. Nor did she call in until Delphi management left a message on her home phone after management began wondering where she was. Moreover, under the circumstances of this case, Delphi management came to the conclusion that Wilson participated in the work stoppage by timing her doctor's appointment to coincide with the stoppage. Indeed, Wilson apparently made the March 8 doctor's appointment the same day. Thus, after it's investigation, Delphi management was entitled to believe that Wilson participated in the work stoppage by planning her doctor's appointment to coincide with the precise time of the work stoppage. Accordingly, Wilson cannot show discrimination, and her claim should be disallowed and expunged.

Background

4.  On Thursday, March 4, 2004, Delphi's Component Valve Stream Manager for Plant 6 in Saginaw, Leigh Ochoa ("Ochoa"), notified a B shift supervisor in Department 32, Tommie Gipson, that he would be terminated for performance issues and that March 5 would be his last day. See Declaration Of Leigh Ochoa In Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 12083 (Donna Wilson) (the "Ochoa Dec.") ¶ 5, a true and correct copy of which is attached hereto as Exhibit A.

    5.  Before Ochoa terminated Gipson, Gipson had supervised thirteen hourly persons who worked on Department 32's B shift, including nine African Americans and four Caucasians.  Id. ¶ 7.  Wilson, one of the nine African American employees, transferred to B shift and was scheduled to start on Monday, March 8, 2004.  Id. ¶ 16.  Although March 8 was to be her first full time day on the B shift, Wilson had worked a large amount of overtime on the B shift prior to her full time transfer and was well aware that the start time of the shift was 3:30 p.m.  Id.

    6.  On Monday, March 8, 2004, nine employees failed to report to work for the B shift, while four employees appeared as scheduled.  Id. ¶¶ 7-10; Declaration Of Rebecca Oster In Support of Debtors' Supplemental Reply With Respect To Proof Of Claim 12083 (the "Oster Dec.") ¶ 4, a true and correct copy of which is attached hereto as Exhibit B.  Wilson, one of the employees who failed to report to work as scheduled, failed to notified Delphi that she would be out due to an illness until after 4:00 p.m.  Ochoa Dec. ¶¶ 10, 14.

    7.  Because March 8 was a particularly critical production day for Department 32, Delphi management was concerned about the inordinately large number of employees – seventy percent of the workforce – who did not report to work for the B shift.  Ochoa Dec. ¶ 9.  As a result, Ochoa began calling employees who had not reported in an attempt to get them in to work.  Id. ¶¶ 10-14.  When she began calling the employees, Ochoa was not aware that all of them were African American.  Id. ¶ 10.  As a result both of telephone conversations with a number of the employees who failed to report to work and of internal discussions with other managers, Ochoa was convinced that B shift employees who were absent were likely participating in a work stoppage to protest Gipson's termination the previous week.  Id. ¶¶ 10-15.

4

8.　　　The next day, Tuesday, March 9, 2004, Delphi management conducted interviews (the "76(a) Interviews") pursuant to Paragraph 76(a) of the Collective Bargaining Agreement (the "CBA") between Delphi and the United Automobile Workers (the "UAW"). Ochoa Dec. ¶¶ 19, 21; Oster Dec. ¶ 8. Delphi management also decided to indefinitely suspend all nine employees who it believed likely participated in the unauthorized work stoppage, pending review of the incident. Ochoa Dec. ¶ 19; Oster Dec. ¶ 6.

9.　　　On Wednesday, March 10, 2004, Delphi management, after having its first chance to review the notes of all nine 76(a) Interviews conducted the prior day, converted the indefinite suspensions, including the suspension of Wilson, to unpaid suspensions for the balance of the shift, plus 30 days. Ochoa Dec. ¶ 23; Oster ¶ 10. Although pursuant to Paragraph 117 of the CBA, an unauthorized work stoppage could constitute grounds for termination, Delphi management felt that a 30 day suspension was more appropriate, given that no one directly admitted to the Delphi interviewers their participation in the work stoppage. Ochoa Dec. ¶ 23; Oster ¶ 10.

10.　　　A week or so later when the UAW pursued grievances related to the discipline, Delphi management agreed to settle the grievances with most of the employees, including Wilson, by reducing their suspensions to time off work for the balance of the shift and two weeks. Ochoa Dec. ¶ 24; Oster Dec. ¶ 13. As part of that settlement, to which Wilson consented, Wilson was permitted to return to work in another of the Debtors' departments following the reduced suspension. Ochoa Dec. ¶ 24; Oster Dec. ¶ 13.

11. Delphi management suspended the employees who failed to report to work on March 8, including Wilson, because they failed to report to work and not because of their race. Ochoa Dec. ¶ 26; Oster Dec. ¶ 12.

12. Wilson filed Proof of Claim No. 12083 (the "Proof of Claim") on or about July 28, 2006. The Proof of Claim asserts an unsecured nonpriority claim in the amount of $250,000.00 (the "Claim") based on an alleged civil rights violation by the Debtors.

13. The Debtors objected to the Claim pursuant to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated by Debtors' Books and Records, and (c) Claims Subject to Modification and (ii) Motion to Estimate Contingent and Unliquidated Claims Pursuant to 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), which was filed on October 31, 2006.

14. On November 22, 2006, Wilson filed the Response in Opposition to Debtor's Third Omnibus Objection to Claim of Donna L. Wilson (Docket No. 5856) (the "Response").

15. On January 3, 2007, the Debtors filed their Statement of Disputed Issues With Respect to Proof of Claim 12803 (Wilson) (Docket No. 5856) (the "Statement of Disputed Issues").

16. On January 8, 2007, the Debtors and Wilson, with their legal counsel, conducted a telephonic meet and confer pursuant to the Order Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, and 9014 Establishing (i) Dates

6

for Hearings Regarding Objections to Claims and (ii) Certain Notices and Procedures Governing Objections to Claims (Docket No. 6089) (the "Claims Objection Procedures Order").

17. On January 18, 2007, Wilson filed her Supplemental Response (Re: Claim No. 12803) to Debtors' Third Omnibus Claims Objection and Statement of Disputed Issues (the "Supplemental Response") (Docket No. 6666). Wilson did not file any affidavits or declarations with her Supplemental Response.

<u>Argument</u>

18. Wilson cannot establish a claim against the Debtors because Delphi's suspension of Wilson was clearly not the result of discrimination based on Wilson's race. Instead, it was based on Delphi management's judgment that Wilson had participated in an unacceptable work stoppage. Even if representatives of Delphi were incorrect in their determination that Wilson had participated in a work stoppage, Wilson cannot maintain a claim because the accuracy of Delphi's determination is irrelevant to an analysis of whether Delphi discriminated against Wilson based on her race. Delphi management suspended Wilson because it reasonably believed that she had participated in a work stoppage by timing her doctor's appointment to coincide with the precise time and date of the planned work stoppage.

A. <u>Delphi Did Not Discriminate Against Wilson</u>

19. Delphi did not discriminate against Wilson by suspending her after she and eight other co-workers, out of a 13-worker unit in Department 32, failed to report for work on the March 8, 2004 B shift. Ochoa Dec. ¶ 7-10. Wilson's attempt to focus on the irrelevant question of whether she actually participated in a work stoppage is nothing more than a red herring meant to distract from the fact that she cannot meet her burden to prove that Delphi was

7

motivated by a discriminatory intent. To the contrary, the evidence clearly establishes that representatives of Delphi suspended Wilson because of their reasonable belief that she participated in a work stoppage.

20. Wilson's case is brought pursuant to Michigan's Civil Rights Act ("CRA"), M.C.L. 37.2101, *et seq*. It is permissible under the CRA to prove a case of unlawful discrimination through direct evidence of discrimination. See Sniecinski v. Blue Cross and Blue Shield of Mich., 666 NW. 2d 186, 193-94 (Mich. 2003). In direct evidence matters where there are mixed motives present, "i.e., where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." Id. at 192-93. Wilson has not, and cannot, provide any direct evidence that representatives of Delphi were motivated by discriminatory animus in their decision to suspend Wilson.[2] To the contrary, two of the supervisors directly responsible for the decision to suspend Wilson have stated that such decision had nothing to do with Wilson's race. Ochoa Dec. ¶ 18; Oster Dec. ¶ 5. Wilson therefore has no direct evidence of discrimination.

21. In an indirect or circumstantial evidence case, courts use a burden-shifting approach. Michigan utilizes the framework propounded in a federal context in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). See Hazle v. Ford Motor Co., 628 N.W.2d 515 (Mich. 2001); Lytle v. Malady, 579 N.W.2d 906 (Mich. 1998). To establish a "prima facie case" of racial discrimination under McDonnell-Douglas, a plaintiff must submit "evidence that (1) she

---

[2] The Debtors note that Wilson failed to attach to the Supplemental Response affidavits or declarations of witnesses. Pursuant to Paragraph 9(e)(iii) of the Claims Objection Procedures Order, Wilson may not elicit direct testimony at the hearing on her claim from witnesses under her control, but instead must rely on affidavits or declarations attached to the Supplemental Response. See Claims Objection Procedures Order ¶ 9(e)(iii).

8

belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) [the adverse action] occurred under circumstances giving rise to an inference of unlawful discrimination." Sniecinski, 666 N.W.2d at 193. If a prima facie case is established, "[a] defendant may rebut the presumption of causation by articulating a legitimate, nondiscriminatory reason for the employment decision." Id. at 135. If a defendant meets its burden of articulating a legitimate, non-discriminatory reason for the employment action, then the burden shifts back to plaintiff to establish that defendant's rationale is in fact just "a mere pretext for discrimination." Id.

22. Here, Wilson cannot meet her initial burden because she cannot show that the suspension of Wilson occurred under circumstances giving rise to an inference of unlawful discrimination.

23. Wilson cannot point to non-minority employees who were treated better than she was treated under similar circumstances. In Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992), the Court held that "[i]t is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the 'comparables' are similarly-situated in all respects." (Emphasis in original).[3] Here, the only employees who failed to report to work on March 8 were African Americans. See Supplemental Response at 2-3. Accordingly, there were no non-minority employees involved in the March 8 incident whose situations were nearly identical to Wilson, and thus Wilson cannot establish an inference of unlawful discrimination. Indeed, had any of the Caucasian employee

---

[3] As clarified by Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998), plaintiff is "'required to prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation.'" (Emphasis in original). See also Shumway v. United Parcel Service, Inc., 188 F.3d 60, 64 (2d Cir. 1997). Michigan has adopted a similar view. See Lytle, 579 N.W.2d at 917-18.

9

also fail to show up to work on March 8 – which did not happen – Delphi management would have treated them in the same manner with respect to discipline. Ochoa Dec. ¶ 26; Oster Dec. ¶ 12.

24.     Moreover, the simple fact that every employee who did not show for work on March 8 had the common trait of being African American also does not create an inference of unlawful discrimination. The only reason that all of the employees who were selected for an interview were subsequently suspended was because they all missed work on March 8. Indeed, Ochoa did not know the race of these individuals when selecting them for interview, and selected all individuals who missed work March 8. Ochoa Dec. ¶ 10. Simply put, given the fact that the each employee who failed to report to work from the B shift on March 8 was African American, the single fact that all suspended employees were African American does not give rise to an inference of discrimination.

25.     Even if Wilson could meet her initial burden to establish an inference of discrimination – which she cannot – the Debtors have shown that Delphi management had a legitimate non-discriminatory reason for suspending Wilson, namely that management believed she participated in an unauthorized work stoppage. Ochoa Dec. ¶ 18; Oster Dec. ¶ 5. Indeed, Ochoa disciplined all nine employees who did not show for work because she believed they participated in such a work stoppage. Ochoa Dec. ¶ 18.

26.     Although many employees had explanations as to where they were and why they could not be at work on March 8, including Wilson's excuse that her doctor's appointment was scheduled during that day and time, id. ¶ 25, Ochoa based her decision on the following legitimate considerations: (i) she terminated the supervisor for B shift on Friday,

10

March 5, 2004 one business day before the Monday work stoppage; (ii) employees on the B shift were angry about their supervisor's recent termination and there was discussion about not coming into work on Monday to protest; (iii) approximately seventy percent of employees from B shift called off work; (iv) meeting production deadlines was crucial; and (v) the 76(a) Interviews did not suggest otherwise. Id. ¶ 18.

27.  As Ochoa has stated, in her ten years of management experience, she had never seen seventy percent of a shift fail to report to work. Id. Given the fact that she had fired the workers' supervisor the previous working day, and was even told on March 8 that her handling of the Gipson firing was wrong and that many people were upset, she legitimately concluded that the employees who did not show for work were more likely than not those who were angry with her handling of the situation and those who were also participating in the work stoppage. Id. Had any of the four Caucasian employees on B shift participated in the work boycott, Ochoa would have disciplined them in a similar manner. Id. ¶ 26. Thus, Delphi clearly had a legitimate non-discriminatory reason for suspending Wilson.

28.  Wilson attempts to side-step the relevant issue in the case by stressing that she allegedly scheduled a doctor's appointment for 2:00 p.m. on March 8 for a medical condition that she noticed the prior morning. See Supplemental Response at 7-8. This is a plain attempt to prove that her purpose for missing work was in fact her doctor's appointment and not what Delphi management reasonably believed at the time. The point is made clear by Wilson's argument that Delphi's investigation was not competent or extended. See Suppmental Response at 2. However, these arguments do not save Wilson's claim because whether Delphi management was correct in its conclusion that Wilson participated in a work stoppage is legally irrelevant.

11

29. Under Michigan law, "'[t]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent.'" Town v. Michigan Bell Telephone Co., 568 N.W.2d 64, 72 (Mich. 1997) (quoting Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994)). To raise questions about an employer's "business judgment" is not enough to meet claimant's burden. Town, 568 N.W.2d at 72. In Hazle, the Michigan Supreme Court rejected an attempt to establish discrimination by second-guessing an employer's business judgment. Hazle, 628 N.W.2d at 527-28. That an employer's decision was wrong and mistaken does not establish that it was driven by a discriminatory motive. Indeed, "[t]he law does not require employers to make perfect decisions, nor forbid them from making decisions that others may disagree with. Rather, employers may not hire, fire, or promote for impermissible, discriminatory reasons." Hartsel v. Keys, 87 F.3d 795, 801 (6th Cir. 1996).

30. Accordingly, it does not matter whether Delphi representatives were correct in their belief that Wilson participated in a work stoppage. What matters is whether Delphi representatives had a legitimate business reason for their decision to discipline Wilson. A work stoppage encompassing seventy percent of employees at a time when production is critical is certainly a legitimate business reason to discipline employees whom Delphi management believe likely participated in the work stoppage. Therefore, the Debtors clearly have established a legitimate business reason for suspending Wilson and the other employees absent on March 8.

31. Finally, Wilson cannot meet her burden of establishing that the work stoppage was merely a pretext for discriminatory action. "The inquiry at this final stage of the *McDonnell Douglas* framework is exactly the same as the ultimate factual inquiry made by the

12

jury: whether consideration of a protected characteristic was a motivating factor, namely, whether it made a difference in the contested employment decision." Hazle, 628 N.W.2d at 522. As noted above, Wilson has not presented evidence undermining Delphi management's reasons for disciplining Wilson and believing that Wilson likely scheduled the doctor's appointment around the same time and date as the work stoppage. Accordingly, Wilson cannot meet her burden to establish that Delphi Management's legitimate business decision was a mere pretext.

32. Wilson has not met her burden of showing discrimination. She has failed to show that Delphi management was motivated by unlawful discriminatory animus and that it intentionally discriminated against Wilson. The Debtors, on the other hand, have presented evidence showing that Delphi management had a legitimate business reason in disciplining Wilson. Accordingly, Wilson's Proof of Claim should be disallowed and expunged.

B.   Wilson's Alleged Damages Would Be De Minimis

33. Even if Wilson could establish her claim of unlawful discrimination – which she cannot – her alleged damages are grossly overstated. Wilson alleges that her Claim should be allowed in the amount of $250,000.00 See Response at 2. However, any damage claim would be cut off when Department 32 was disbanded in August 2004. Wilson's shift differential of 80 cents per hour times 40 hours would equal only $32.00 per week or approximately $640.00 for that five-month period. Her lost wages, based on her statement as to her 2003 earnings of $100,000.00, would amount to approximately $1,923.08 per week, for a

13

total of $4,230.00 (two weeks plus one day). At most, economic damages of $4,870.00 are all that are supported by the facts.[4]

34.  Wilson also alleges non-economic damages, including emotional distress. Notably, she alleges that she was treated by a social worker, who found her stressors to be "mainly situational", with three previous and unrelated stressors. See Supplemental Response at 9. However, Wilson voluntarily accepted the grievance resolution regarding this matter, including (a) a reduction in the proposed suspension from 30 days to two weeks plus a part of another day and (b) the requirement that she return to work in a different department. Ochoa Dec. ¶ 24. Under these facts, there is no justification for allowing Wilson's claim for emotional damages.

## Conclusion

35.  Wilson has failed to establish a claim against Debtors. Delphi management did not discriminate against Wilson, and it acted in accordance with a nondiscriminatory, legitimate reason when it suspended Wilson for her participation in an illegal work stoppage. Accordingly, the Debtors are not liable to Wilson, and the Third Omnibus Claims Objection should be sustained with respect to the Proof of Claim, and the Proof of Claim should be disallowed and expunged.

---

[4] In the Complaint attached to the Proof of Claim, Wilson includes a count for an alleged violation of the Bullard-Plawecki Right to Know Act, MCL 423.452 et seq. (the "Bullard-Plawecki Act"). See Complaint attached to Proof of Claim. For a "willful and knowing" violation of the Bullard-Plawecki Act, a plaintiff can only recover $200 plus costs, reasonable attorney's fees and actual damages. MCL 423.511(b). Although the Debtors dispute that they committed a willful and knowing violation of the Bullard-Plawecki Act, such a violation would give rise to, at best, minimal damages.

Memorandum of Law

36.     Because the legal points and authorities upon which this Supplemental Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       February 1, 2007

    SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

    By: /s/ John Wm. Butler
        John Wm. Butler, Jr. (JB 4711)
        John K. Lyons (JL 4951)
        Albert L. Hogan III (AH 8807)
        Ron E. Meisler
    333 West Wacker Drive, Suite 2100
    Chicago, Illinois 60606
    (312) 407-0700

    – and –

    SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP

    By: /s/ Kayalyn A. Marafioti
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
    Four Times Square
    New York, New York 10036
    (212) 735-3000

    Attorneys for Delphi Corporation, et al.,