SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
                                :
    In re                    :        Chapter 11
                                :
DELPHI CORPORATION, et al.,    :        Case No. 05–44481 (RDD)
                                :
               Debtors.    :        (Jointly Administered)
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF LEIGH OCHOA IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM 12083 (DONNA WILSON)

("LEIGH OCHOA – DONNA WILSON")

Leigh Ochoa declares as follows:

1.  Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases ("Delphi" or the "Debtors"). I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proof Of Claim 12083 (Donna Wilson) (the "Supplemental Reply"). Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.  I received a B.S. in Construction Management in 1991 and a M.B.A. in 2005 from Michigan State University. I worked for General Motors ("GM") starting in 1994 and I have been employed at all times by Delphi since it commenced its existence as a separate entity in 1999. My various positions with GM and Delphi have always been in the management capacity. On March 8, 2004 I held the position of Component Valve Stream Manager, with responsibility for Department 32 of Plant 6 in Saginaw ("Plant"), among other departments. I left the Component Valve Stream Manager position in January of 2006, worked for a year as the Lean Implementation Manager, and I have been serving in my current position of Product Control Logistics Manager since December 2006.

3.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Donna Wilson's employment at Delphi. If I were called upon to testify, I could and would testify to the facts set forth herein.

4.  On or before March 1, 2004, Wilson, who until that time worked on the C shift which started around midnight, was notified that she was transferred shifts and told to report to work on the B shift (3:30 p.m. to midnight) starting March 8, 2004.

2

5.  On or about Thursday, March 4, 2004, I informed B shift supervisor Tommie Gipson that I was terminating him from his position in Department 32 effective the end of his shift on the following day, Friday, for performance reasons.

6.  On Friday, March 5, 2004, Gipson reported for his last day of work but became very upset with me regarding his termination. I asked him to leave the Plant without finishing his shift which resulted in him missing a good-bye celebration that was planned in his honor by employees. I had previously attempted to obtain for Gipson other employment at Delphi, but after his behavior that day I ceased my search on his behalf. After Gipson's departure, I asked Dan Rytlewski, supervisor of the A shift (6:30 a.m. to 3:00 p.m.), to stay over to supervise the B shift.

7.  On Monday, March 8, 2004, at or about the start of shift change from A shift to B shift which is about 3:00 p.m. to 3:30 p.m., I began to become aware that some of the thirteen employees on the B shift were calling in sick and that others had not reported to work on time. There are two generally acceptable ways an employee can call in sick. First, the collective bargaining agreement ("CBA") states that employees are to report an absence by calling a 1-800 number on or before the start of a shift. When an employee calls in via the 1-800 number, their work status (e.g., late, absent) is immediately entered into on a computer database to which I have access at my desk. Second, some employees also call in directly to the local number of the plant and inform someone manning the phones. Both means of communicating an absence are generally considered acceptable, so long as the employee calls in before the shift.

8.  Around 3:00 p.m., Rytlewski and general supervisor Bryan Ehlman came to my office and informed me that Murry Culberson called Department 32 directly and stated that that he would be four hours late for his shift because he had church matters to work on.

3

(The CBA allows you to be considered late if you arrive within four hours or less of your shift start time while anytime after four hours is considered an absence.) Rytlewski and Ehlman further explained that a B shift employee who did show up for work said that it would be a difficult night because he overheard conversations of B shift employees on Friday indicating that some individuals were not coming to work that night because they were upset with me terminating Gipson.

9. As of March 8, 2004, Department 32 had critical production schedules to produce shaft assemblies that were being flown to Mexico to meet assembly line requirements there. If Plant employees failed to show up for work, it would be impossible to reach our production demands. Given the business implications, I was extremely worried about employees not showing up for B shift that night. As a result, I quickly checked our computer system that provides real time information as to whether an employee has called in absent or late on the 1-800 number. I verified that an unusually large number of employees were not coming to work on Monday.

10. I immediately decided to personally call all nine of the thirteen B shift employees who had either phoned in absent/late or simply failed to report to work on time. Of the nine employees who were not at work, I personally knew only three: Culberson, Kenny Williams, and Linda Johnson. I did not know the other six individuals and had no idea what those individuals' races were. Because I indirectly supervised over 150 employees at the time and do not directly supervise anyone on the B shift, I could not identify any of the individuals on B shift beyond Culberson, Williams, and Johnson. Wilson, whom I did not know at that time, was one of the nine individuals who did not report for work on March 8, 2004.

11. I decided to call the three absent employees whom I knew. First, I spoke with Culberson and explained that nine of the thirteen B shift employees did not report to work. I explained that I understood that he and others on B shift may be upset with my decision to terminate Gipson. I explained that it was a business decision and not a personal one. Culberson informed me that I was right that "we are upset with you and what you did." I stated that if this was an organized work stoppage, then it was very serious and that he needed to return to work as soon as possible. Culberson responded that he already had spoken to Rytlewski and informed him that he still planned on being four hours late.

12. Next, I spoke with Linda Johnson with whom I had worked with previously in a different position at Delphi. I highlighted the same issues to her that I explained to Culberson. I knew Johnson fairly well so I was shocked when, after I told her that organized work stoppages are very serious, she simply said "thank you for the call" and hung up the phone.

13. I then called Williams. His wife answered the phone and said he was at the dentist's office at the moment. I explained the seriousness of the situation to his wife and asked that he return to work immediately. A few minutes later, Williams called me back directly. I conveyed the same message to him that I did to Culberson and Johnson. Williams said, "I want no part of this. I'm on my way."

14. I proceeded to call the remaining six employees who failed to report for work, including Wilson. I reached a person at the residence of some employees. Other times, I was able only to leave a message on an answering machine. When I was uncertain who the person was that I was speaking with or I reached an answering machine at an employee's residence, I left a message with my contact information and that I was calling in regards to an important and urgent matter about their job. A true and accurate copy of my notes of inquiry is

attached at <u>Exhibit 1</u>.  With respect to Wilson, I left a message on her answering machine.  <u>See Id.</u>  By that time, Wilson had not yet called in to report her absence but proceeded to call in only after I left that message.  A true and accurate copy of Delphi's call in screen for March 8, 2004 is attached at <u>Exhibit 2</u>.

15. Based on the information conveyed to me by Rytlewski and Ehlman regarding their conversations with a B shift employee, the strange conversations I had with Culberson and Williams, and the extremely high, seventy-percent absentee rate that day confirmed to me that many individuals from the B shift were angry with me for terminating Gipson and that the absences that day were most likely planned as part of an organized work stoppage.

16. After completing my calls to all nine employees, I informed Plant Manger Curt Cargile of the situation.  He informed me that my immediate focus should be on making sure the machines kept running in Department 32 so that we could keep making parts and meet our production schedules.  I managed to find a way to fill some of the positions (or cover certain hours of the shift) by having A shift staff stay over for overtime, shutting down less critical equipment and transferring that staff to Department 32, and gathering any other available staff from other departments.  I left the Plant the evening of March 8, 2004 at approximately 8 p.m. We managed to continue making parts in Department 32 that night but unfortunately still did not meet our production schedule.

17. On Tuesday, March 9, 2004, I arrived at the Plant at approximately 6:00 a.m. and I focused my attention to various operational tasks.  By later morning, I returned to speak with Cargile about the incident from the previous day.  I explained all the facts discussed

above to Cargile. He recommended that I consult with Rebecca Oster in our Labor Relations department.

18. I proceeded to Oster's office and I explained the incident from the prior day. I told her that I believed it was an organized work stoppage based on (i) Culberson and Williams comments when I telephoned them; (ii) the comment that a B shift staff member that showed up for work made to Rytlewski about some staff being upset and calling off work; (iii) the sheer coincidence that seventy percent of the staff was absent from work on the same day; and (iv) the close proximity in time between the termination of their shift supervisor and these mass absences. I also mentioned to Oster that never in my ten year career in management (and never since) had I experienced a situation where that large a percentage in a department had chosen not to come to work at the same time. Oster mentioned that she would seek advice from her supervisor, Robert Berg, about how best to handle this situation and then get back to me.

19. A few hours later, Oster contact me and suggested we handle the incident using a certain approach, which we subsequently began implementing. We decided that we would conduct interviews contemplated by Paragraph 76(a) of the CBA with each B shift employee who missed any work that Monday, March 8. We also determined it was appropriate to indefinitely suspend the employees pending our review of the interviews and any other investigation needed because their conduct appeared to be part of an organized work stoppage in violation of Paragraph 117 of the CBA.

20. As each employee arrived to work who had been absent on Monday, Ehlman or Rytlewski verbally informed them that they were on notice, as is required under the CBA of any potential shop rule violation. We did not want the employees to have time to compare and develop consistent stories about the incident on Friday regarding Gipson or their

absence or return to the workplace on Monday after being absent until such time as we were able to interview all of the employees. Accordingly, we arranged to have all employees absent on Monday be led to and remain in a conference room with Oster and another of her colleagues from Labor Relations until they could be interviewed. At some point, I recall going to the conference room because there was a disturbance. This was the first time I remember seeing the six other individuals who were absent on Monday.

21. Oster had developed a set of questions for the person conducting the interview to ask each employee. A true and accurate copy of the question template with Wilson's answers is attached as <u>Exhibit 3</u>. One by one each employee was removed from the conference room and individually interviewed by either Ehlman or Betty Stange, also a general supervisor, pursuant to Paragraph 76(a) the CBA with Union Representative Salvatore Cozzolino also present.

22. Before all of the interviews could be conducted, we determined that Ehlman needed to leave for the evening because he had worked the entire A shift and well into the B shift. Stange finished the remainder of the interviews. I also left when Ehlman left because I understand that they could have lasted until the early morning hours. It was agreed that Oster, Ehlman, and I would read all of the notes of the interviews, including the ones that Stange conducted after we left Tuesday night, and then decide what to do with respect to the employees who were absent on Monday.

23. On Wednesday, March 10, 2004, I arrived at work in the morning and proceeded to read all the 76(a) interviews from the nine employees that did not report to work on March 8, 2004. Later that morning, I spoke with Oster and Ehlman. We determined that the indefinite suspensions should be converted to suspensions for the balance of the shift plus 30

8

days without pay. We decided to give a lighter disciplinary action to Culberson and Williams, inasmuch as I had intimated to them on the phone that if they came in on Monday, the disciplinary action would be lighter. Participating in an illegal work stoppage was a dischargeable offense under the CBA. With respect to the other seven employees, we determined a less severe discipline was appropriate given that our investigations had not to date revealed any direct admissions that the absent employees were engaged in an illegal work stoppage. On the other hand, the offense was very serious and occurred at a particularly critical production time for the department so we needed to respond with appropriate disciplinary action.

24.     That same day, the United Automobile Workers ("UAW") also filed grievances on behalf of all workers suspended as a result of the disciplinary actions resulting from the March 8 incident. As a result of that grievance process, I agreed to reduce the suspension to fourteen days plus the balance of the shift on which the employees were suspended, with the condition that the employees are assigned to a different department. Wilson consented to the grievance settlement.

25.     Most employees involved in the work stoppage provided an excuse for their absence, health-related or otherwise. We investigated one doctor's note that an absent employee submitted, and the doctor's office confirmed that the individual had no appointment and must have forged the note. With respect to Wilson, we did investigate her claim that she was at a doctor appointment on March 8. We contacted her doctor's office, and her doctor's office confirmed that she scheduled and made her appointment on March 8. In my opinion, the fact that Wilson provided a doctor's note or even that she in fact visited her doctor was not sufficient evidence to overcome the likelihood that she participated in the work stoppage by planning a doctor appointment to coincide with the planned work stoppage. In my experience, the

following facts bolster my position that a doctor's note (even one that is verified) does not automatically exonerate an employee under these circumstances: (i) particularly on B shift an employee has the majority of a business day to schedule and attend appointments; (ii) appointments are often scheduled in advance so appropriate notice can be provided to the company (whereas Wilson called after B shift began and only after I left her a message); and (iii) doctor appointments themselves do not always require that an employee miss the entire shift.

26. Wilson was disciplined because she did not report for work on that date. In fact, if any of the Caucasian employees on B shift had failed to report to work, Delphi management would have disciplined them in the same manner as Wilson.

27. Subsequent to Wilson's suspension, I also learned from Stange that she was approached by an employee who claimed Wilson had tried to recruit that employee to participate in a work stoppage in connection with Gipson's termination, but the employee declined Wilson's offer.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on February 1, 2007, in Saginaw, Michigan.

                                        /s/ Leigh Ochoa
                                        Leigh Ochoa

Exhibit 1

**D32 Unplanned Absences for March 8th, 2004**

| Name | ID | Notes |
|---|---|---|
| M. Brown ✓ 13:55 | 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 | Called in Sick. Left message with wife. ✓ |
| ✓ M. Culberson ✓ | 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 | Called in to be 4 hours late. Church Business. |
| L. Johnson ✓ 14:29 | 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 | Called in sick. Called ee at home. She thanked me for my call. ✓ |
| B. Simmons ✓ 3:55 | 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 | Called in sick. Left message on machine. ✓ |
| K. Vaughn ✓ 4:03 | 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 | Called in sick. Left message with a person. - No record ✓ |
| S. Waters ✓ | 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 | No call in. Did not answer phone. ✓ |
| ✓ K. Williams ✓ 2:02 | 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 | Called in sick. Spoke with employee, said he would come in in 30 minutes |
| D. Wilson ✓ 3:35 | 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 | No call in. Left message on machine. - No record ✓   s2c? |
| E. Jones ✓ | 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 | No call in. Left message with a person. ✓ |

Clapp – hw - B *
Gross – hw - B +
Keith – NOT in Dept. 32
Kujuk – hw *
Lussul – @ Ashift
Vensh – hw *

Exhibit 2

```
TISU052                       TIME AND ATTENDANCE                    03/09/04
#043                    PLANT ACCESS DATA - CURRENT WEEK              07:40
=========================== CISCO 44001   DEPT 6321 ===========================
DATE    SEQ #    RTW   S G  EMPLOYE NAME        SSN          ENTRY TYPE    REASON
040308  16085V  03/03  1    DR WILSON       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  SICK
040308  16110V  03/09  1    DR WILSON       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  SICK
040308  13530V  03/09  2    BH SIMMONS      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  SICK
040308  12025V  03/09  2    KB WILLIAMS     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  SICK
040308  13531V  03/09  2    MT BROWN        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  SICK
040308  07552I  03/09  1    RM WEST         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  PERS BUSINSS
040308  14031V  03/09  2    KA VAUGHN       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  SICK
040308  14290V  03/09  2    LD JOHNSON      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  SICK




END OF DATA
(PF KEYS) 1=HELP 3=MENU 7=BKWD 8=FWD                 MENU TRANS CODE:   (   )
          10=RETURN 12=LOGOFF                        SSN (      -    -        )
```

Date: 3/9/2004 Time: 07:40:59 AM

Exhibit 3

## Paragraph 76(a) Interview

Date: __3/9/04__    Time: __5:54 pm__    Advisor: _____

Diana Wilson, this is a Paragraph 76(a) interview per the N/A. This interview is for the purpose of allowing you to give information, provide clarification and present answers to questions in regards to your potential violation of Paragraph 117 of the N/A that prohibits "any member of the Union take part in any sitdown, stay in or slow down, in any plant of the corporation or any curtailment of work or restriction of production or interference with production of the corporation." You are being interviewed for your involvement in the actions that occurred in department 32 on the B shift of March 8, 2004 that are in violation of Paragraph 117. These actions may result in discipline or termination of your employment.

Do you understand that the action of conspiring with other employees about not coming into work is a violation of the National Agreement?
*I understand but I didn't conspire with anyone.*

Why were you not at work on Monday, March 8, 2004?
*Sick*

Did you call into the system? If yes, what was your call-in #?
*Twice — I have them at home.*

Do you have any documentation for your absence?
*Yes — I [illegible] a paper from the [doctor].*

What other department 32 employees did you talk with about not showing up to work on March 8, 2004?
*I didn't talk to anyone about not showing up for work.*

We've been told that you've talked with the following employees about not coming to work on Monday March 8, 2004: Murry Culberson, Daniel Clapp, Eva Gross, Marcus Brown, Russell Kubik, Linda Johnson, Kareem Vaughn, Bruce Simmons, Kenneth Williams, Guy Wonch, Stanley Waters, and Eugene Jones.
*That is a complete lie. I don't even talk to Dan or Guy. Jesus Christ!*

Why would someone tell us that you and other department 32 employees talked about not coming to work on Monday March 8, 2004?
*I don't know what is going on. I have been sick for the last three months under doctors care. I'm not part of this. I don't even talk to Guy, Eva, not about*

Why did employees in your department decide not to come into work on March 8, 2004?
*I don't know anything about anyone else, just me.*

Did your absence have anything to do with the separation of Tommie Gipson from his employment at Delphi? *I don't give a dam about Tommie, why do I care about Tommie, I don't even know Tommie.*

Did you speak with Murry Culberson Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't.*
Did you speak with Murry Culberson Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *On Saturday I worked 12 hrs.*
Did you speak with Murry Culberson Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *I don't think I seen him on Saturday.*

Did you speak with Tommie Gipson Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No. This is crazy, I didn't speak with anyone.*
Did you speak with Tommie Gipson Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?
Did you speak with Tommie Gipson Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *This is horrible.*

Did you speak with Daniel Clapp Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't speak with anyone. He told me on ___*
Did you speak with Daniel Clapp Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *Saturday that he will see me on Monday.*
Did you speak with Daniel Clapp Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Eva Gross Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I haven't talk to Eva in two or three weeks. She*
Did you speak with Eva Gross Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *must be filling in for ___.*
Did you speak with Eva Gross Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Marcus Brown Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *I talk to no one about not coming in.*
Did you speak with Marcus Brown Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Marcus Brown Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Stanley Waters Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No, I don't think I seen Stan on Friday.*

Did you speak with Stanley Waters Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *I don't have Stans phone # + I didn't speak w. h[im]*

Did you speak with Stanley Waters Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *...him on Saturday. No I did not*

Did you speak with Russell Kubik Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No, I did not. I didn't even talk to Russ.*

Did you speak with Russell Kubik Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Russell Kubik Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Eugene Jones Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't talk to Eugene about not working*

Did you speak with Eugene Jones Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Eugene Jones Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *Sat or Sun. No*

Did you speak with Linda Johnson Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No.*

Did you speak with Linda Johnson Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Linda Johnson Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *Sat or Sun either days. No*

Did you speak with Kareem Vaughn Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't*

Did you speak with Kareem Vaughn Saturday March 6, 2004 about not coming to work on Monday March 8, 2004? *No*

Did you speak with Kareem Vaughn Sunday March 7, 2004 about not coming to work on Monday March 8, 2004?

Did you speak with Bruce Simmons Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't*

Did you speak with Bruce Simmons Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?
Did you speak with Bruce Simmons Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *No I didn't.*

Did you speak with Kenneth Williams Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *No I didn't*
Did you speak with Kenneth Williams Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?
Did you speak with Kenneth Williams Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *No I didn't*

Did you speak with Guy Wonch Friday March 5, 2004 about not coming to work on Monday March 8, 2004? *I don't think I seen Guy on Friday. N. I didn't*
Did you speak with Guy Wonch Saturday March 6, 2004 about not coming to work on Monday March 8, 2004?
Did you speak with Guy Wonch Sunday March 7, 2004 about not coming to work on Monday March 8, 2004? *No I didn't*

*If they answer negatively to all the above questions:* Did you talk with Murry Culberson Sunday, March 7, 2004 about not coming to work on Monday, March 8, 2004?
*No I didn't*

Why would Management be told that Department 32 employees talked about not coming into work on March 8, 2004 if it wasn't true?
*I don't know I will be honest with you. I have always been by myself.*

For the record, do you have anything further that you would like to add?
*I really want to know why you are messing with me. You call me and make a threat to me. I'm sick. I'm not [entitled] to get sick. If someone told you that, bring them to me.*

Time out: 6:31 pm    Time back: _____

This concludes the questions that we have. We reserve the right to continue this interview if further information pertinent to this case comes available.