SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York, 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, <u>et al.</u>,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | : | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05–44481 (RDD) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF REBECCA OSTER IN SUPPORT OF DEBTORS' SUPPLEMENTAL
<u>REPLY WITH RESPECT TO PROOF OF CLAIM 12083 (DONNA WILSON)</u>

("REBECCA OSTER – DONNA WILSON")

Rebecca Oster declares as follows:

1.  Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases ("Delphi" or the "Debtors").  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proof Of Claim 12083 (Donna Wilson) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.  I am a Labor Relations Administrator for Delphi, at 3900 Holland Avenue, Saginaw, Michigan, where I have worked since 2002.  I was awarded a Bachelors Degree in Business Administration by Saginaw Valley State University in 1999 and received a Masters Degree in Human Resources from Central Michigan University in 2000.

3.  Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Donna Wilson's employment at Delphi.  If I were called upon to testify, I could and would testify to the facts set forth herein.

4.  On the morning of Tuesday, March 9, 2004 Component Valve Stream Manager Leigh Ochoa informed me of a possible work stoppage, where nine individuals did not report for work at the beginning of their B shift on March 8, 2004, in Department 32 of Plant 6 ("Plant") in Saginaw.

5.  Ochoa explained that she believed it was an organized work stoppage based on (i) Culberson and Williams comments when she telephoned them; (ii) the comment that a B shift staff member that showed up for work made to Dan Rytlewski about some staff being upset about the termination of Tommie Gipson their shift supervisor and calling off work; (iii) the sheer coincidence that seventy percent of the staff was absent from work on the same day;

2

and (iv) the close proximity in time between the termination of their shift supervisor and these mass absences. I explained that I planned to seek advice from my supervisor, Robert Berg, about how best to handle this situation and then get back to her.

6. A few hours later, I contacted Ochoa and suggested we handle the incident using a certain approach, which we subsequently began implementing. We decided that we would conduct interviews contemplated by Paragraph 76(a) of the CBA with each B shift employee who missed any work that Monday, March 8. We also determined it was appropriate to indefinitely suspend the employees pending our review of the interviews and any other investigation needed because their conduct appeared to be part of an organized work stoppage in violation of Paragraph 117 of the CBA.

7. As each employee arrived to work who had been absent on Monday, general supervisors Bryan Ehlman or Rytlewski verbally informed them that they were on notice, as is required under the CBA of any potential shop rule violation. We did not want the employees to have time to compare and develop consistent stories about the incident on Friday regarding Gipson or their absence or return to the workplace on Monday after being absent until such time as we were able to interview all of the employees. Accordingly, we arranged to have all employees absent on Monday be led to and remain in a conference room with Art Huber and me, another of my colleagues from Labor Relations, until they could be interviewed. I do not recall knowing the race of the individuals involved in the work stoppage before seeing them in that conference room.

8. With the input of Robert Berg, I developed a set of questions for the person conducting the interview to ask each employee. One by one each employee was removed

3

from the conference room and individually interviewed by either Ehlman or Stange pursuant to Paragraph 76(a) the CBA with Union Representative Salvatore Cozzolino also present.

9. Before all of the interviews could be conducted, we determined that Ehlman needed to leave for the evening because he had worked the entire A shift and well into the B shift. Stange finished the remainder of the interviews. I stayed until the interviews were completed. It was agreed that Ochoa, Ehlman, and I would read all of the notes of the interviews and then decide what to do with respect to the employees who were absent on Monday.

10. On Wednesday, March 10, 2004, I arrived at work in the morning and proceeded to read all the 76(a) interviews from the nine employees that did not report to work on March 8, 2004. Later that morning, I spoke with Ochoa and Ehlman. We determined that the indefinite suspensions should be converted to suspensions for the balance of the shift plus 30 days without pay. We decided to give a lighter disciplinary action to Culberson and Williams, inasmuch as Ochoa had intimated to them on the phone that if they came in on Monday, the disciplinary action would be lighter. Participating in an illegal work stoppage was a dischargeable offense under the CBA. With respect to the other seven employees, we determined a less severe discipline was appropriate given that our investigations had not to date revealed any direct admissions that the absent employees were engaged in an illegal work stoppage. On the other hand, the offense was very serious and occurred at a particularly critical production time for the department so we needed to respond with appropriate disciplinary action.

11. With respect to Wilson, we did investigate her claim that she was at a doctor appointment on March 8 by contacting her doctor's office, and her doctor's office confirmed that she scheduled and made her appointment on March 8. We agreed that the note and her doctor visit were not sufficient evidence to overcome the likelihood that she participated

4

in the work stoppage by planning a doctor appointment to coincide with the planned work stoppage.

12. Wilson was disciplined because she did not report for work on that date. In fact, if any of the Caucasian employees on B shift had failed to report to work, Delphi management would have disciplined them in the same manner as Wilson.

13. That same day, the United Automobile Workers ("UAW") filed grievances on behalf of all workers suspended as a result of the disciplinary actions resulting from the March 8 incident. As a result of that grievance process, Delphi agreed to reduce the suspension to fourteen days plus the balance of the shift on which the employees were suspended, with the condition that the employees are assigned to a different department. Wilson consented to the grievance settlement.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on February 1, 2007, in Saginaw, Michigan.

                                                /s/ Rebecca Oster
                                                Rebecca Oster