**Hearing Date: March 1, 2007**
                                        **Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                              :
     In re                                                    :    Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :    Case No. 05-44481 (RDD)
                                                              :
                                                              :    (Jointly Administered)
              Debtors.                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

                DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOF
                    OF CLAIM NUMBER 6255 (EDITH JAMES)

                        ("SUPPLEMENTAL REPLY – EDITH JAMES")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this Supplemental Reply (the "Supplemental Reply") With Respect To Proof Of Claim Number 6255 (the "Proof of Claim") filed by Edith James ("James"), and respectfully represent as follows:

Introduction

1. James is a former Manufacturing Advisor at a DAS LLC facility, who, a little more than a year after being hired by DAS LLC, applied for a position in human resources at the same facility after the person holding that position announced his retirement. Despite having less experience at DAS LLC and in the human resources field than two other applicants for the same position, James was offered the human resources position. Despite being offered assistance, training, and clerical help, James struggled in her new position and failed to meet performance objectives. After one year, DAS LLC decided to transfer her back to her prior position, where she had performed successfully, and returned her at the same salary grade. DAS LLC then transferred another employee to handle most of the responsibilities of James' position, because that employee had more experience in the human resources field and at DAS LLC than James had.

2. Contrary to James's contentions, all of DAS LLC's decisions regarding James were based on legitimate business reasons and were not discriminatory. James has not established that she was subject to an adverse employment action or that similarly situated employees were treated more favorably on account of her membership in a protected class. In addition, James's claim is excessive and unfounded because she failed to mitigate her damages

2

and her claim for emotional distress was dismissed in her underlying litigation against DAS LLC. Accordingly, James' proof of claim should be disallowed and expunged in its entirety.

## Background

3.   James filed the Proof of Claim on or about May 18, 2006. The Proof of Claim asserts an unsecured, unliquidated claim in the amount of $1,131,000.00 (the "Claim") against Delphi Automotive Systems LLC ("DAS LLC").

4.   The Debtors objected to the Claim pursuant to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), which was filed on October 31, 2006.

5.   James filed her Response To Debtors' Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification (Docket No. 5655) (the "Response") on November 22, 2006.[1]

6.   On January 3, 2007 the Debtors filed their Statement of Disputed Issues With Respect To Proof Of Claim 6255 (Edith James) (Docket No. 6407) (the "Statement of Disputed Issues").

---

[1] James has not filed a supplemental response to the Third Omnibus Claims Objection. Pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims (the "Claims Objection Procedures Order"), the deadline for James to file a supplemental response and attach affidavits or declarations thereto was January 18, 2007.

Argument

A.     DAS LLC Modified The Position In Question, And Subsequently Removed James From The Position For Legitimate, Non-Discriminatory Reasons

        5.      James was hired as a Manufacturing Advisor at DAS LLC's Columbus, Ohio facility (the "Columbus Facility") in May 1999. Underlying Complaint, attached as Exhibit A to Response, ¶ 6. In that position, she supervised hourly employees working on the assembly line. Exhibit B to Response § A. It was a salaried position, but James received overtime pay. Declaration of James Barr ("Barr") ¶ 13 (the "Barr Decl.") attached here too as Exhibit A.

        6.      In 2000, Frank Cerny ("Cerny"), Supervisor of Salaried Personnel Administration, announced his retirement from DAS LLC. Declaration Of Loretta Woolridge ("Woolridge") ¶ 6 (the "Wooldridge Decl.") a copy of which is attached hereto as Exhibit B. Defendant Loretta Woolridge, an African-American female and Personnel Director of the Columbus Facility, asked him to create a posting for his position. Woolridge Decl. ¶ 7. At the time, DAS LLC was undergoing an internal push to cut costs by reducing the number of salaried employees. Id. Because the Columbus facility had decreased in size over the years, many of the HR positions had become less demanding. Barr Decl. ¶ 16. As part of this reduction in DAS LLC's workforce, the duties of many salaried positions were consolidated with those of existing positions, reducing the overall number of salaried positions in the plant. Woolridge Decl. ¶ 7; Barr Decl. ¶ 16.

        7.      After James expressed interest in the position, Woolridge informed James that the position Cerny left had been modified. Woolridge explained to James that the new position would be a one-person function, that it would no longer be a supervisory position, and that it would include the duties of the Salaried Training and Education job, which was being eliminated. Woolridge Decl. ¶ 10. After explaining these modifications, Woolridge gave James

the opportunity to withdraw from consideration for the Position. Id.

8. Woolridge made a list ranking the applicants she had interviewed. Woolridge's first choice for the Position was a Caucasian male working at Delphi's Sandusky, Ohio plant as a Senior Salaried Personnel Representative. Woolridge Decl. ¶ 11. Management decided against giving the Position to the Caucasian male from the Sandusky Plant, as doing so would have increased the Columbus plant's salaried head count. Id. Her second choice was a Caucasian female employed at the Columbus Facility in the Finance Department. Woolridge Decl. ¶ 12. Management also decided against giving the job to the Caucasian female in the Finance Department, as it was determined that her talents were better utilized in the Finance Department. Id. Woolridge's third choice was James. Woolridge Decl. ¶ 13. Woolridge felt that James had demonstrated some of the attributes needed to perform the Position job, but that, unlike her first two choices, James did not have sufficient Delphi experience or human resources background to allow her to "hit the floor running" in the Position. Id.

9. James was therefore offered the Position of Salaried HRM Administrator in the Salaried Personnel Office of Delphi Columbus's Human Resources Department over both Caucasian and male applicants. Woolridge Decl. ¶ 13. When Woolridge offered James the Position, she reiterated that the Position had been modified, that it was no longer a supervisory position, and that it would now include education and training duties. Woolridge Decl. ¶ 16. Woolridge also stated that management had hoped to give the position to a more qualified candidate, but that, because they were unable to do so, James was being given an opportunity to take the position and "grow into" it. Woolridge Decl. ¶ 17. Because James had been with DAS LLC for just over a year, had no experience with DAS LLC's human resources functions, and would face a steep learning curve in the Position, Columbus management decided to deem her

5

move to the post as a lateral transfer and classify it as a "developmental opportunity." Woolridge Decl. ¶ 14. Nothing about James' race or gender played a role in that decision. Woolridge Decl. ¶ 28. It was common, in situations when taking advantage of a developmental opportunity, for Delphi to replace seventh level with sixth level employees, without promoting the sixth level employee, and Woolridge recalled other instances in which Caucasian employees were treated in the same fashion. Woolridge Decl. ¶ 15.

        10.      DAS LLC placed James in the new position (the "Position") in early January to provide her as much on-the-job training with Cerny as possible. Woolridge Decl. ¶ 18. Upon beginning the Position, James inquired about the lack of a pay increase. Woolridge Decl. ¶ 19. James met with Woolridge to discuss this issue, and Woolridge told James that she was remaining at her level 6 salary code because her move to the new position had been deemed a developmental opportunity by management, and thus a lateral transfer and not a promotion. Id. Woolridge further explained that James would have the opportunity to prove her abilities, grow into the job, and at a future point be considered for a promotional increase to level 7 if one were warranted. Id. Woolridge told James that, if she would like to reconsider her assignment to the new position, the assignment could be reversed and James could return to her Manufacturing Advisor job. Id. James did not elect to return to her Manufacturing Advisor position. Id.

        11.      James spent January shadowing Cerny, except for short periods of time she spent learning about the training and education duties and training her own Manufacturing Advisor replacement. Woolridge Decl. ¶ 20. Cerny trained James in all the essential functions of the Position, including the Merit Compensation Plan, the Affirmative Action Plan, the salaried personnel database, and the plant equal employment opportunity ("EEO") target database. Id. During their month together, James never accepted Cerny's offers to stay late for

6

extra training, and she never requested any additional training from him. Id.

   12. After Cerny retired, he remained available to James to answer any questions she had. Id. Marcia Brown, who had worked under Cerny but who was reassigned elsewhere within the plant, also helped James by answering James' questions. Id. In addition, James was instructed to call Salaried Personnel Representatives at other plants with questions, and members of corporate management for help and advice. Woolridge Decl. ¶ 21. James spent time with Sandy Swanson, Senior Salaried Personnel Representative at Delphi's Vandalia plant, reviewing Swanson's Affirmative Action Plan and asking questions about her job. Woolridge Decl. ¶ 22. Moreover, Sherry Rice, a clerical employee, was assigned to the Salaried Personnel office part-time to assist James by entering training data into the database, which constituted the bulk of the education and training responsibility. Woolridge Decl. ¶ 23. Rice also assisted by answering the phone, typing letters, organizing documents, filing information in employee records, and performing other clerical tasks. Id.

   13. Although in prior years, the Salaried Personnel position at Delphi Columbus had been even more challenging because the individual in that position oversaw many more employees, the new position that James assumed in 2001 was still demanding. The Position, which reported directly to the plant Personnel Director, was responsible for, among other things (i) administering the plant Merit Compensation Plan, by which salaried employees at the Columbus facility receive annual pay increases; (ii) administering the Personal Business Plan process, by which salaried employees receive performance objectives and reviews; (iii) keeping track of the plant salaried "head count," by entering new hires, transfers, and terminations into the human resources ("HR") database and ensuring that the database's accuracy; (iv) administering the plant Affirmative Action Plan and EEO database; (v) providing information to

salaried employees regarding DAS LLC HR policies; and (vi) training.  Woolridge Decl. ¶ 5.

14. James struggled with the new Position and continued to perform poorly even after she had been in the job for several months.  Barr Decl. ¶ 6-8.  Woolridge and her successor, Jim Barr ("Barr"), received numerous complaints from members of DAS LLC's management about James's performance.  Woolridge Decl. ¶ 24; Barr Decl. ¶ 7.  James frequently reported incorrect salary head count data at Human Resources Management ("HRM") meetings, causing significant delays and confusion at those meetings.  Barr Decl. ¶ 10.  James also missed deadlines for the EEO reporting program, the plant Affirmative Action Plan, and the Plant Personal Business Plan program.  Id.

15. When Woolridge reviewed James's performance in August of 2001, Woolridge indicated that James was "behind target" with regard to the Columbus Facility's Affirmative Action Plan, quarterly training schedule, and Personal Business Plan administrative duties.  Woolridge Decl. ¶ 25.  Woolridge also noted mistakes in James's administration of the facility's 2001 Merit Compensation Plan.  Id.

16. By the end of 2001, James's performance still had not improved.  Barr concluded that James had not met five of her ten performance objectives.  Barr Decl. ¶ 8. Specifically, she consistently (i) failed to provide the HRM committee with accurate salaried headcount data; (ii) failed to obtain access to the CTIS system training record system, as she had been instructed to do; (iii) failed to complete the Columbus Facility's Affirmative Action Plan on time, resulting in Columbus being listed as a "no report" at Delphi's annual corporate executive review; (iv) failed to create a quarterly training schedule; and (v) failed to perform a "value stream" analysis of the Position's employment document processing procedures.  Id.  Further, Barr noted that there had been "significant issues with employees not receiving proper

8

compensation" due to James's errors in calculating year 2001 merit compensation increases. Barr Decl. ¶ 9. These were all very serious problems. See Barr Decl. ¶ 8-11.

17. Despite her struggles in the Position, her poor reviews, and the fact that long days are the norm in the Columbus HR Department, James refused to put in long days or to work weekends. Barr Decl. ¶ 11.

18. In light of James's performance and dissatisfaction with the new position, Delphi management decided that James was not the right "fit" for the job and decided to transfer her back to the Manufacturing Advisor position, in which she had performed successfully. Barr Decl. ¶ 12. James was to retain her existing salary grade in the Service Department and was to once again have supervisory authority over hourly employees and receive overtime pay. Barr Decl. ¶ 13. Near the end of January 2002, during his Personal Business Plan review with James, Barr informed James of this decision. Id.

19. In late 2001 or early 2002, Delphi management asked Michael Waters ("Waters"), an Executive Compensation Analyst employed in the Human Resources Department at Delphi's corporate headquarters in Troy, Michigan, to replace James in the Salaried Personnel Position. Barr Decl. 14. In addition to his experience as an Executive Compensation Analyst in Delphi's Corporate HR Department, Waters has a degree in business administration, with a major in human resources management, and had held a Compensation Manager position in the human resources department of another company before working for Delphi. Id. In light of his years of experience, his prior excellent performance at Delphi, and his agreement to relocate to Columbus, Waters was placed in the Salaried Personnel position at a salary code 7C. Id.

20. On or around March 2002, about a month and a half after James returned to the first shift Manufacturing Advisor position, Delphi needed to move a Manufacturing

9

Advisor from the Service Department to the North Business Unit on second shift due to internal shifting of Manufacturing Advisors. Barr Decl. ¶ 14. Because James had been in the Service Department for a shorter length of time than the other Manufacturing Advisors, and because she had previously worked in the North Business Unit, management decided to move James into the position. Id. James's Supervisor, Daryl Thomas, was responsible for informing her that she was going to be transferred to the North Business Unit. Barr, James' former supervisor, was not involved in the decision to move James to the North Business Unit. Barr Decl. ¶ 19. James preferred first shift and refused to move to second shift. James quit without giving notice. Barr Decl. ¶ 19.

21. All of DAS LLC's decisions with respect to James were motivated by legitimate business reasons and were in no way discriminatory. Barr Decl. ¶ 21; Woolridge Decl. ¶ 28.

B. <u>Debtors Did Not Discriminate Against James</u>

22. James has not established valid race or gender discrimination claim. Because James failed to file a Supplemental Response with affidavits or declarations of any witnesses she intends to present at trial, she must rely on her Proof of Claim and Response. Her Proof of Claim and Response fail establish a claim for discrimination.

23. As James pointed out in her Response, to prevail on a race or gender discrimination, she needed to establish (1) that she is a member of a protected class, (2) that she was subject to an adverse employment action, and (3) that there were similarly situated non-protected employees who were treated more favorably. See <u>Shah v. General Electric Co.</u>, 816 F.2d 264, 270 (6th Cir. 1987); <u>Brewer v. Cleveland City Bd. of Educ.</u>, 122 Ohio App. 3d 378, 385 (8th Dist. 1997). Although she established that she is a member of a protected class, James

10

has not established that she was subject to an adverse employment action or that similarly situated employees were treated more favorably on account of her membership in that protected class.

24.  The Debtors have established that DAS LLC's actions were motivated by legitimate, non-discriminatory reasons. Although, under the McDonnell Douglas framework, James has the opportunity to demonstrate that DAS LLC's reasons were merely pretextual, she has not done so. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

25.  Contrary to her assertions, James was not subject to an adverse employment action. A "lateral transfer" not involving a "decrease in title, pay, or benefits" does not constitute an adverse employment action. Henry v. Ohio Dept. of Mental Retardation & Developmental Disabilities, 162 F. Supp. 2d 794, 800-01 (S.D. Ohio 2000); see also Russell v. Drabik, 2001 WL 1556996 at *4 (6th Cir. 2001); Broska v. Henderson, 2003 WL 21518733 at *4 (6th Cir. June 30, 2003). "[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a discrimination suit." Goad v. Sterling Commerce. Inc., 2000 WL 756386 at *7 (Ohio Ct. App. 10th Dist. June 13, 2000) (citation omitted). Her move to the new Position from her old position was a lateral transfer, as was her move back. Woolridge Decl. ¶ 17. When James expressed displeasure that she had not been promoted, Woolridge offered to return her to the Manufacturing Advisor position, which James refused. Woolridge Decl. ¶ 22. In her original position as Manufacturing Advisor, James made more money than she did in the Salaried Personnel Position and had supervisory authority over employees.

26.  Furthermore, James was not constructively discharged. Under Ohio law, the denial of a promotion does not amount to an "intolerable work condition[]" such that a

11

reasonable person would feel compelled to resign her employment.  Goad, 2000 WL 756386 at *9 (citation omitted).  In fact, by James's own admission, when she attempted to resign from the Position in August 2001, her resignation was not accepted.  Resp. Ex. F.  James cannot demonstrate any adverse employment action necessary to prove a prima facie case of discriminatory treatment.

27. Moreover, James failed to establish that similarly situated employees were treated more favorably – an independent reason why her claim fails.  Cerny and Waters were not similarly situated with James.  "[T]o be deemed 'similarly situated,' the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish. . . the employer's treatment of them. . . ."  Mitchell v. Toledo Hospital, 964 F.2d 577, 583. (6th Cir. 1992); Jackson v. Champaign Nat'l Bank & Trust Co., 2000 WL 1376534 at *5, 6 (Ohio Ct. App. 10th Dist. Sept. 26, 2000).

28. Cerny was not similarly situated to James.  Cerny was placed in the Salaried Personnel Position in 1992, when Delphi was still a division of General Motors, after decades of working in other positions in the Columbus Facility's Human Resources Department.  Woolridge Decl. ¶ 6.  Cerny did not enter the Human Resources Department at a level 7 pay code.  He was promoted to a level 7 after years of working in the Department.  Id.  Moreover, unlike James, Cerny was competent in the performance of his duties.  Id.  James has no evidence that the same decision-makers who placed Cerny in the job in 1992 made the decision in 2000 to place her in, or to remove her from, the Position.

29. Nor was Michael Waters similarly situated to James.  Unlike James, who

12

moved to the Human Resources Department from the Manufacturing Department, Waters began his Delphi career in Delphi's Corporate Human Resources Department.  Barr Decl. ¶14.  Waters has a degree in business administration, with a concentration in accounting, and had extensive experience in HR positions.  Id.  Delphi Safety and Interior Divisional Management in Troy, Michigan, not Delphi Columbus management, selected him for the Salaried Personnel Position.  Id.  Furthermore, Waters was not given preferential treatment after accepting the Position.  After he took the Salaried Personnel Position, the part-time clerical assistant, Sherry Rice, was reassigned to another position, leaving Waters with no clerical help.  Id.

30.     The appropriate pool of similarly situated workers would have been those who applied for the Position along with James.  The undisputed facts establish that James was given the Position, even though better qualified Caucasian male and female candidates were denied the Position.  Woolridge Decl. ¶ 11-13.  The record also shows that the additional job duties she complains of were added before James was selected for the job.  Woolridge Decl. ¶ 9.

31.     Even had she established a claim for discrimination, James would also bear the ultimate burden of proving "that the stated non-discriminatory reason for the adverse employment action against [her] is pretextual."  Jones, 162 F. Supp. 2d at 825; Clark v. City of Dublin, 2002 WL 465013 at *7..8 (Ohio Ct. App. 10th Dist. March 28, 2002).  The question is whether James has established that the employer did not give the real explanation for its behavior, not whether the Court disagrees with the reason for the action.  Bush v. Honda of America Motor Co.. Inc., 227 F. Supp. 2d 780, 796-98 (S.D. Ohio 2002).

32.     James has not met her burden.  She has not shown that DAS LLC acted based on anything other than sound business reasons.  The Debtors have established that DAS LLC consolidated salaried personnel positions in response to a mandate to lower head count in

that department and not for any other reason.  The Debtors have also established that James was returned to her Manufacturing Advisor position because she failed to perform the duties of the Salaried Personnel Position and for no other reason.  These legitimate, non-discriminatory reasons for DAS LLC's actions have not been, and cannot be, refuted.

B.		James's Claim Is Excessive And Unfounded

33.	Even if James had made a case for employment discrimination, she failed to mitigate her damages and therefore her damages, if any, should be limited, and her Claim should be reduced accordingly.  In addition, James states that the Claim was based on "unliquidated damages for discrimination and emotional distress." Proof of Claim, § 6. James's emotional distress claims were dismissed by the lower court in the Underlying Matter, and that dismissal was upheld on appeal. See Response Ex. C.  Thus, even if she were able to establish a claim for employment discrimination, James cannot recover for damages associated with her alleged emotional distress.

## Conclusion

34.	James has failed to establish a claim against DAS LLC.  DAS LLC did not discriminate against James.  DAS LLC acted based on legitimate business reasons when it transferred James within the company.  Accordingly, DAS LLC is not liable to James, and the Proof of Claim should be disallowed and expunged.

## Reservation Of Rights

35.	This Supplemental Reply is submitted by the Debtors pursuant to paragraph 9(f) of the Claims Objection Procedures Order.  Consistent with the provisions of the Claims Objection Procedures Order, the Debtors' submission of this Supplemental Reply is without prejudice to (a) the Debtors' right to later identify and assert additional legal and factual

bases for disallowance, expungement, reduction, or reclassification of the Claim and (b) the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Claim.

### Memorandum of Law

36. Because the legal points and authorities upon which this Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
February 1, 2007

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:  /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:  /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession