# **EXHIBIT A**

                                      **Hearing Date: March 1, 2007**
                                      **Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |
| | : | |
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | |
|                 Debtors. | : | (Jointly Administered) |
| | : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | | |

<u>DECLARATION OF JAMES BARR</u>

       Pursuant to 28 U.S.C Section 1746, I, James Barr, declare the following:

           1.      My name is James Barr. I am over age 18 and have personal knowledge of the facts contained in this declaration. I am competent to testify to the facts contained herein.

Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.	Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Edith James. If I were called upon to testify, I could and would testify to the facts set forth herein.

3.	I began working with General Motors in 1978 at its Columbus, Ohio facility on Georgesville Road and which is now Delphi Automotive Systems LLC's ("DAS LLC") Columbus, Ohio Facility. I have been continuously employed at this facility since 1978. I worked in production from 1978 until 1993. From 1978 to 1979, I worked as an hourly employee at the Columbus Facility. From 1979 to 1993, I worked as a production supervisor, which was a salaried position. From 1993 to 1999, I was a productivity coordinator. From 1999 to November 2001, I held the position of supervisor of labor relations and hourly employment.

4.	From September 2001 to November 2001, I was the interim Plant Personnel Director and replaced Loretta Woolridge. In November 2001, I became the Plant Personnel Director. When I assumed the position, Edith James was employed in the Salaried Personnel Position, which was a nonsupervisory position.

5.	Ms. James reported directly to me and her job duties consisted of tracking and maintaining databases concerning head count, which included generating reports related to head count and making sure records properly reflected where employees were assigned. Ms. James was also responsible for Equal Employment Opportunity ("EEO") issues. Ms. James was

3

responsible for overseeing the administrative duties relating to the transfer of salaried people between jobs and between plants. Ms. James also was responsible for managing salaried employees' compensation issues and administering the performance review process. Ms. James was also responsible for administering the affirmative action program at the plant and making timely reports regarding affirmative action.

6. Although there was a training and education component to the salaried personnel representative position that included entering training data into the CTIS system, Ms. James did not complete any of those training duties when she was in that position. Ms. James was unable to perform the core job duties of her salaried personnel representative position and thus did not even begin to address the training and education component. Any CTIS data entry that was completed was done by Sherry Rice, and to the extent any training occurred, it was handled almost exclusively by people other than Ms. James.

7. After I replaced Ms. Woolridge, I reviewed Ms. James's performance and concluded that she had not met five of her ten performance objectives. I also received complaints from several members of Delphi management about Ms. James's performance, which were included in her Personal Business Plan.

8. I conducted Ms. James' performance review on January 28, 2002. Ms. James' performance was not acceptable. Specifically, Ms. James failed to meet almost all of her performance goals. For example, Ms. James had consistently failed to: (1) provide the HRM committee with accurate salaried headcount data; (2) obtain access to the CTIS training record system, as she had been instructed; (3) complete the Columbus facility's Affirmative Action Plan on time, resulting in Columbus being listed as a "no report" at Delphi's annual corporate

executive review; (4) create a quarterly training schedule; and (5) perform a "value stream" analysis of the position's employment document processing procedures.  Additionally, Ms. James failed to expand the knowledge of Delphi employees regarding HRM policies and procedures by initiating periodic review of the Employee Handbook and policy manuals.

        9.      Moreover, Ms. James failed to properly administer the 2001 Merit Compensation Plan, which led to significant issues with salaried employees not receiving proper compensation.  Ms. James also failed to properly administer the 2001 Personal Business Plans, which are performance reviews for employees, and to adhere to audit submission deadlines.

        10.      Ms. James frequently reported incorrect salary headcount data at Human Resources Management meetings, causing significant delays and confusion at those meetings.  Ms. James also missed deadlines for turning in EEO data and for administering the plant Affirmative Action Plan.

        11.      As noted in her evaluation Ms. James did not appear to embrace bottom line accountability or display an appropriate sense of urgency.  She appeared to lack skills to multi-task effectively and appeared to lack initiative and follow-up, resulting in missed assignments.  Ms. James's long learning curve resulted in a credibility gap with the organization.  Ms. James also failed to put in the necessary hours or work weekends, which was the norm in her position.  As a consequence of these serious performance deficiencies, I gave Ms. James the lowest performance rating, which was unsatisfactory.

        12.      In light of Ms. James's poor performance in the Salaried Personnel Position, Delphi HRM Committee determined that Ms. James was not the right fit for the job and

decided to transfer her back to the Manufacturing Advisor position, in which she had in the past performed successfully. I was a member of the HRM Committee and participated in making the decision to transfer Ms. James back to the Manufacturing Advisor position.

        13.    Near the end of January 2002, during my Personal Business Plan review with Ms. James, I informed her of the decision to transfer her back to the Manufacturing Advisor position. On March 1, 2002, Ms. James was transferred to a Manufacturing Advisor position in the Service Department on first shift. She remained at her same salary grade, earned overtime pay, and had supervisory authority over hourly employees.

        14.    Michael Waters, an Executive Compensation Analyst employed in the Human Resources Department at Delphi's corporate headquarters in Troy, Michigan, replaced Ms. James in the Salaried Personnel position. In addition to his experience as an Executive Compensation Analyst in Delphi's Corporate HR Department, Mr. Waters has a degree in business administration, with a major in human resources management, and had held a Compensation Manager position in the human resources department of another company before working for Delphi. Mr. Waters was placed in the Salaried Personnel position at a salary code 7C by Delphi Safety and Interior Divisional Management in Troy, Michigan. When Mr. Waters took on the position, the part-time assistant clerical assistant was reassigned.

        15.    Delphi's salaried positions are continually being re-evaluated and job duties are frequently transferred to people with the appropriate skill set and time to handle projects. In my experience, it is not unusual for Delphi to move Manufacturing Advisors into administrative positions at their existing 6th level salary code, even when they were replacing a 7th level employee because of their relevant experience.

16. Moreover, Delphi's Columbus facility has repeatedly seen a loss of employees. In 1991, the Columbus facility had more than 1,769 hourly employees. When Ms. James worked in the HR Department in 2001, there were 1,068 hourly employees. In 1991, there were 307 salaried employees. In May 2001, there were only 150 salaried employees. As a result, the number of people needed to work in HR has significantly decreased over the years and job duties performed by remaining individuals have changed. Moreover, it was common in this period for Delphi Management to realign and combine job duties among salaried personnel.

17. When Mr. Waters assumed the job, the Salaried Personnel office was in disarray. Ms. James had failed to properly label file drawers. File boxes were not properly stored and were on top of file cabinets, on floors, under chairs, and above coat racks. Mr. Waters found unlabeled boxes filled with miscellaneous documents that needed to be filed. Ms. James also failed to keep personnel files organized and many of the personnel records were misfiled.

18. The education and training function, which had technically been a part of Ms. James's job responsibilities but which she never actually performed, was reassigned to Patricia Scott when Mr. Waters started. Patricia Scott was the Internal Plant Quality Auditor, a salaried employee, in the Quality Department. Delphi' collective bargaining agreement requires that Delphi appoint a salaried employee to help coordinate training with the United Auto Workers ("UAW"). However, the UAW appointee handles most of the hourly training. Ms. Scott had the experience and the capacity to take on these limited education and training functions. Ms. Scott's primary responsibility was to catch up on the backlog of CTIS entries that were not attended to under Ms. James' tenure.

19. About a month and a half after Ms. James returned to the first shift Manufacturing Advisor position Delphi needed to move a Manufacturing Advisor from the Service Department to the North Business Unit on second shift due to internal shifting of Manufacturing Advisors. Because Ms. James had been in the Service Department for a shorter length of time than the other Manufacturing Advisors, and because she had previously worked in the North Business Unit, management decided to move Ms. James into the position. I was not responsible for that decision; it was made by her supervisor and the manager of operations.

20. Ms. James refused to move to second shift and quit without notice.

21. Ms. James' gender and race were not factors in the decisions that were made regarding her employment. Additionally, Ms. James did not suffer any loss of pay or other damages when she transferred to the Manufacturing Advisor position.

22. I declare under penalty of perjury that the foregoing facts contained in this Declaration are true and correct.

Executed on February 1, 2007 in Columbus, Ohio.

  _/s/ James Barr_____
  James Barr