1

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 05-44481

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


DELPHI CORPORATION,


        Debtor.


- - - - - - - - - - - - - - - - - - - - -x


                United States Bankruptcy Court

                One Bowling Green

                New York, New York


                January 11, 2007

                10:14 a.m.


B E F O R E:

HON. ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

2

1    HEARING To Consider Authorization Or Approval Of The Equity

2    Purchasing Commitment Agreement And The Plan Framework Support

3    Agreement Filed At Docket Number 6179.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24    Transcribed By:  Esther Accardi

25

3

1  A P P E A R A N C E S :

2  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

3       Attorneys for Delphi Corporation

4       Four Times Square

5       New York, New York 10036

6

7  BY:   JOHN WM. BUTLER, JR., ESQ.

8        KAYALYN A. MARAFIOTI, ESQ.

9        AL HOGAN, ESQ.

10

11  KENNEDY, JENNIK & MURRAY, P.C.

12       Attorneys for IUE

13       113 University Place

14       New York, New York 10003

15

16  BY:   THOMAS KENNEDY, ESQ.

17

18  FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

19       Attorneys for the Equity Committee

20       One New York Plaza

21       New York, New York 10004

22

23  BY:   BONNIE STEINGART, ESQ.

24

25

4

1    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

2         Attorneys for Steelworkers Union

3         1350 Broadway

4         Suite 501

5         New York, New York 10018

6

7    BY:   LOWELL PETERSON, ESQ.

8

9    PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

10        Attorneys for IBEW and IAM

11        1555 North River Center Drive

12        Suite 202

13        Milwaukee, Wisconsin 53212

14

15   BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

16

17   COHEN, WEISS AND SIMON, LLP

18        Attorneys for UAW

19        330 West 42nd Street

20        New York, New York 10036

21

22   BY:   BRUCE H. SIMON, ESQ.

23        BRUCE LEVINE, ESQ.

24

25

5

1   GORLICK, KRAVITZ & LISTHAUS, P.C.

2        Attorneys for Operating Engineers

3        Locals 18-S, 101-S, 832-S

4        17 State Street, 4th Floor

5        New York, New York 10004

6

7   BY:   BARBARA S. MEHLSACK, ESQ.

8

9   LATHAM & WATKINS

10        Attorneys for the Official Committee

11         of Unsecured Creditors

12        855 Third Avenue

13        New York, New York 10022

14

15   BY:   ROBERT ROSENBERG, ESQ.

16

17   UNITED STATES TRUSTEE

18        33 Whitehall Street

19        New York, New York 10004

20

21   BY:   ALICIA M. LEONHARD, ESQ.

22

23

24

25

6

1   HAYNES & BOONE, LLP

2        Attorneys for Highland Capital

3        153 East 53rd Street

4        New York, New York 10022

5

6   BY:   BRIAN D. HAIL, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

7

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  All right.  Delphi

3     Corporation.  And again, I'm sorry some of you have to stand.

4     There is, as I'm sure you've been told, an overflow courtroom

5     where you can hear, upstairs.  So if you get tired or if you

6     want to go now you can go.  Mr. Butler?

7          MR. BUTLER:  Your Honor, good morning.  Jack Butler,

8     Kayalyn A. Marafioti and Al Hogan from the law firm of Skadden,

9     Arps, Slate, Meagher & Flom, LLP, on behalf of Delphi

10    Corporation for this specially set hearing to consider

11    authorization or approval of the equity purchasing commitment

12    agreement and the plan framework support agreement filed at

13    Docket Number 6179 on December 18th of last year.

14          Your Honor, we have, in our omnibus reply that was

15    filed yesterday by the 2 p.m. deadline that was in the

16    scheduling order, we included as an exhibit a summary of

17    objections to the plan adjustment and framework support

18    approval motion.  That motion indicated that there were

19    objections filed by eight parties.  I want to simply, as we

20    begin the hearing, summarize to the Court, if I may, where we

21    stand on those objections.

22          THE COURT:  Okay.

23          MR. BUTLER:  The official committee of unsecured

24    creditors has withdrawn their objection 6209 and has filed a

25    statement of support of the motion consistent with the black

8

1    lined changes to the proposed agreements that were attached to

2    our omnibus reply.  I'll point out that there is, in the

3    exhibit book, a -- some additional ministerial changes which

4    were cleanups that were done.  But we'll get to those at the

5    appropriate time in the hearing.  But the committee is now

6    supporting the motion.

7           The second objector is the official committee of

8    equity security holders.  They have filed three objections at

9    Docket 6211, 6247 and 6497 and they contend to continue to

10   press those objections at today's hearing.

11          The next objection was filed by the International

12   Union of Electronic Electrical, Machine and Furniture Workers,

13   Communication Workers of America.  We refer to them as the IUE-

14   CWA in these cases.  They filed objections at 6242 and at 6494.

15   I believe also at 6500 but that the -- and they have agreed to

16   withdraw their objections based on some statements I'll make

17   during this opening presentation.

18          The Ad Hoc Committee of Delphi Trade Claim Holders

19   filed objections at 6254, 6501 and 6508 and they have withdrawn

20   those objections and filed a statement of support.  Also

21   consistent with the documents as amended in the debtor's

22   omnibus reply.

23          Highland Capital Management, LP, is an alternative

24   bidder and a stakeholder in these cases, filed an objection at

25   6330 and they intend to prosecute that objection at today's

9

1    hearing.

2              The International Union of Operating Engineers, local

3    unions number 18S, 101S and 832S, the IUOE as we've referred to

4    in these cases, filed an objection at 6344.  They've agreed to

5    withdraw that objection based on some statements I'll make this

6    morning.

7              Similarly, the International Brotherhood of

8    Electrical Works, Local 663, the IBEW and the International

9    Association of Machinist and Aerospace Workers, District 20,

10   the IAMAW, filed objections at 6367 and they have agreed to

11   withdraw their objections based on some statements I'll make at

12   this morning's hearing.

13             And finally, the United States Trustee filed her

14   objection document at Docket number 6401 and Ms. Leonhard, is

15   here to prosecute that objection on behalf of the trustee.

16             So we have three live objectors today, Your Honor.

17   They are the US Trustee, the Equity Committee and Highland

18   Capital who will be prosecuting their objections.

19             With respect to the labor union, four of our six

20   unions filed preliminary objections and one union filed a

21   supplemental objection to the framework motion which are now

22   resolved.  There have been discussions with the leadership

23   and/or counsel of those unions and I have agreed to make

24   certain statements that have been discussed with those unions,

25   on the record, to make clear that the framework agreement not

10

1    only does not preclude but in fact requires the debtors to use

2    reasonable best efforts to go forth and work out consensual

3    arrangements with our six unions, in additional to General

4    Motors and to do a variety of other things set forth in the

5    agreements.

6            With respect to the IUE-CWA, which is our second

7    largest union and had something in access, I think, of over

8    8,000 union members who provided contributions to Delphi in

9    working at the -- our various plants, we've agreed to the

10   following statement and our plan investors have agreed to the

11   statement as well.  "Delphi and the plan investors recognize

12   and appreciate the continuing contributions of the IUE-CWA and

13   its members to Delphi.  Without altering the legal rights of

14   any of the parties, Delphi and the plan investors also

15   recognize that the framework agreements between Delphi and the

16   plan investors require Delphi to use its reasonable best

17   efforts to reach an agreement with the IUE-CWA that, among

18   other matters, includes a resolution of the various potential

19   union claims against Delphi and should recognize the union's

20   contributions.  We've been advised in a meeting yesterday, with

21   the union, that the IUE looks forward to successfully

22   concluding these negotiations with Delphi and the plan

23   investors as part of the framework agreement."

24           Mr. Kennedy, was there anything that you wanted to

25   say?

11

1          MR. KENNEDY:  No, that is the statement that we

2     agreed to withdraw our objection based upon it's entered into

3     the record.

4          THE COURT:  Okay.  Very well.

5          MR. BUTLER:  Similarly, Your Honor, with respect to

6     the IAM, IBEW and IUOE, again Delphi and the plan investors

7     recognize and appreciate their continuing contributions to --

8     and that of their members, to Delphi.  And without altering the

9     legal rights of any of the parties, Delphi and the plan

10    investors recognize that nothing in the framework precludes

11    Delphi from reaching consensual agreement with the IAM, IBEW

12    and IUE on the broad range of issues between them including,

13    but not limited to, appropriate attrition programs, a

14    resolution of OPEB and a resolution of claims.  And the debtors

15    again reaffirm their willingness to proceed on that basis using

16    reasonable best efforts to do so.

17         As Your Honor's aware, and this is not part of the

18    statement, I'll make an editorial statement on behalf of the

19    debtors.  As Your Honor's aware, these three unions do not have

20    the benefit of a GM benefit guarantee.  And one of the

21    challenges that we have is to try to sort out a settlement that

22    is consensual between the parties that resolves the issues that

23    those members in those unions have not having that backstop

24    that is available to all of the other union members at Delphi.

25    And that's a challenge that we've all -- both the unions and

12

1    Delphi need to take squarely.  And we've agreed to use our

2    reasonable best efforts to try to reach a consensual

3    arrangement with them and acknowledge here, obviously, that the

4    framework agreement, in my opinion, does not only not preclude

5    it but in fact requires it.

6           THE COURT:  Okay.

7           MR. BUTLER:  And I don't know if Ms. Mehlsack or Ms.

8    Robbins wants to say something.

9           MS. MEHLSACK:  I do wish to say something, if I may.

10    I don't know if the Court can hear me from here.

11           THE COURT:  I can hear you fine.

12           MS. MEHLSACK:  What I would like to stress to the

13    Court is that the reason that we filed an objection was our

14    concern that this agreement would be used to solidify positions

15    with respect to the company's obligation to the IAM and IBEW.

16    We understand that the company is making a binding commitment

17    that the agreements reached here will not foreclose any of the

18    claims and rights that our unions have, or the negotiation of

19    an appropriate resolution, given that our plant is closing.  We

20    were very concerned and we want -- we want confirmation that

21    this is a commitment that we will not be shut out given the

22    number of things that have been resolved in this set of

23    agreements from an equitable resolution to the contributions

24    that we have made and continue to make.  And we want to be sure

25    that Delphi is acknowledging its commitment to resolve those

13

```
1    issues and will not rely on this agreement to say we've made

2    other commitments and now we cannot address you.

3              THE COURT:  Okay.  Well --

4              MS. MEHLSACK:  Again, I'd like to --

5              THE COURT:  Certainly, as I read it, given the

6    obligation under the agreements of the company to use its

7    reasonable best efforts to reach a consensual resolution.  And

8    obviously consensual means in light of the rights of both

9    parties, which they can certainly interpret on an objective

10   basis.  I think your concern is addressed.

11             MS. MEHLSACK:  Obviously we don't want to be back

12   here in front of you, Your Honor.  If this doesn't hold true we

13   will be, but we certainly hope not to be.  We're looking

14   forward to bargaining a resolution this month.

15             THE COURT:  Okay.  Very well.  Thank you.

16             MS. ROBBINS:  Your Honor, if I may.

17             THE COURT:  Yes.

18             MS. ROBBINS:  Mr. Butler -- just in listening to --

19   there was one piece that was omitted.  And that is your

20   recognition that a resolution should recognize the

21   contributions of the operating engineers and their members.

22   And I assume -- and I'd like to affirm that that is part of

23   Delphi's commitment.

24             MR. BUTLER:  Yeah.  No, I -- I think the phrase, if I

25   did not read it I apologize for doing that.  The phrase that we
```

14

1   mentioned with respect to the IEW -- IUE-CWA would be

2   applicable to the other four unions.  And that is that it would

3   include a resolution to various potential union claims against

4   Delphi and should recognize the unions' contributions.  And

5   then there was some additional language that these three unions

6   wanted, which I've read into the record.  As it relates to OPEB

7   and other things along those lines.

8          MS. ROBBINS:  And, Your Honor, based on your

9   statement and Mr. Butler's statement, we too hope we don't have

10  to be in this courtroom to enforce that commitment.  And we

11  anticipate being at the bargaining table in the very near

12  future, which has not occurred over the last several months.

13         THE COURT:  Okay.

14         MS. ROBBINS:  Thank you.

15         THE COURT:  Very well.  Thank you.

16         MR. BUTLER:  And again, I appreciate, on behalf of

17  the debtors, Your Honor, the work done by representatives of

18  these four unions.  In the company's view this framework is

19  intended to be an enabler to go into those negotiations in a

20  very serious way.  And obviously under the targets here we have

21  to reach agreements in the very near future on those -- on

22  those programs.

23         Your Honor, the -- talking a little bit -- I don't

24  intend, unless Your Honor wants to hear it, but I've been

25  before you enough in this case to know that you don't need

15

1   opening statements in a bench trial so I concluded not to offer

2   one.

3            THE COURT:  Okay.

4            MR. BUTLER:  And --

5            THE COURT:  The parties should assume I've read the

6   pleadings including the ones submitted late yesterday or this

7   morning.  The equity committee's third supplemental objection

8   and the declaration by the person from Highland.  So, I think

9   you should just proceed with the hearing.

10           MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

11  think there are some procedural matters we'll need to address

12  today.  First based on the conversations that our firm has had

13  with the firms representing these objectors that primarily --

14  and these, I think, are all primarily Highland and/or Equity

15  Committee issues.  We have a joint index of exhibits.  It lists

16  121 exhibits.  It actually should list 122.  The 122nd exhibit

17  would be Mr. Doherty's declaration which was submitted on

18  behalf of Highland and should be marked as Exhibit number 122.

19           As I understand it, the -- there are no objections to

20  the admission of those 122 exhibits except for the following

21  items that need to be resolved.  Highland has objected, or

22  indicated they have a continuing objection to documents 14

23  through 34 relating to them not being admitted for the truth of

24  the matter of future materials presented to the Board of

25  Directors.

16

1    The Equity Committee has objected to exhibits marked 45

2    through 54 on relevance grounds.  Both the Equity Committee and

3    Highland have chosen to object to document -- exhibit number

4    62, which is the Sheehan's declaration.  The debtor's are --

5    have a limited objection to Exhibits 73 and 79, as they relate

6    to -- these are either internal financial analyses of Highland,

7    which is what Exhibit 73 is and Exhibit 79 is the Houlihan

8    Lokey letter to the Board of Directors.  And there have been

9    Highland --

10            THE COURT:  On what?  On the whole thing or on some -

11    - what's the basis of the limited objection?

12            MR. BUTLER:  Just that -- I have no objection, Your

13    Honor, that that come in as a letter that was sent from

14    Houlihan Lokey to the Board.  But there has been no foundation

15    for the statements to the letter.  The Equity Committee is not

16    presenting Mr. -- the representatitive of --

17            THE COURT:  Okay.

18            MR. BUTLER:  -- Houlihan Lokey here.  There's going

19    to be no testimony backing it up.  It's a letter.  It says what

20    it says.

21            THE COURT:  Okay.  All right.

22            MR. BUTLER:  And that's our -- you know, that's the

23    issue that we have.  I mean there's no question, as the

24    testimony will indicate here, that the Board considered it,

25    that the Board reviewed it and that the Board received an

17

1    evaluation from Rothschild regarding the letter.  And all that

2    will come in.  But in the absence of the Equity Committee

3    presenting Houlihan Lokey as their witness, to establish the

4    foundation and present cross examination on him -- be available

5    for cross examination as to the truth of what's in that letter

6    or, you know, any of the assertions, that's all.

7             THE COURT:  Okay.

8             MR. BUTLER:  And then -- those are the only -- 73,

9    and 79 are the only debtor objections.  And then, Highland is

10   objecting to 117 and 118, which is the board book that was

11   reused by the Board of Directors at yesterday's board meeting.

12   118 is simply a stray article that was included in the board

13   book which was designated separately.  But it's 117 and 118

14   taken together was the board book that was used regarding a

15   Highland transaction and the Board's evaluation of it at

16   yesterday's board meeting.  And actually January 9th and

17   January 10th board meetings.  And Highland has objected to that

18   on hearsay grounds.

19             So I think, perhaps, it would be useful if Your Honor

20   was to ask for both Highland to come up and address 14 to 34,

21   62, 117 and 118.  And the Equity Committee to address 45 to 54

22   and 62.

23             THE COURT:  Okay.

24             MS. STEINGART:  Your Honor, Bonnie Steingart from

25   Freed Frankel on behalf of the Equity Committee.  I'll go first

18

1   because on this issue, gratefully, I can be very brief.  I

2   don't have any real objection to Mr. Sheehan's affidavit.  The

3   issue is one of timing when it was coming and that it came very

4   late.  But we've all been doing a lot of things very late and I

5   have no objection to Mr. Sheehan's affidavit being marked as an

6   exhibit.

7            THE COURT:  Okay.

8            MS. STEINGART:  As to the exhibits we've objected to

9   as to relevance, we don't think that they prove anything.

10  Certainly to the extent that they're not offered for the truth

11  of what they assert, I have no objection to the Court having

12  that pile of documents.  And to the extent that the debtor

13  wants to offer those documents for the truth of their content,

14  I assume that they'll put on a witness and it can move from one

15  status just being there for the Court to review to something

16  that could be considered for the truth.  Thank you, Your Honor.

17           THE COURT:  All right.  Well, as to the relevance

18  objection, I'll -- I'll admit then notwithstanding the

19  objection now.  I'll give them whatever relevance I ascribe tot

20  hem.  As far as the hearsay objection, we'll deal with that if

21  -- if in fact the debtor's relying on them for more than what

22  the Board considered.  And that can be reserved for when

23  they're being considered.

24           MR. BUTLER:  Your Honor, I think 45 through 54, just

25  so the record's clear, are actually all the presentations made

19

1   between the company and statutory committees.

2            THE COURT:  Okay.  I'm sorry.

3            MR. BUTLER:  And the relevant time periods.

4            THE COURT:  What the company made available to the

5   committees.

6            MR. BUTLER:  Thank you, Your Honor.

7            MR. HAIL:  Your Honor, this is Brian Hail from Haynes

8   and Boone, representing Highland Capital in the matter.  My

9   objections to the board presentations are similar to what Ms.

10  Steingart has said.  Which is simply that analysis done by the

11  Board isn't in Rothschild, isn't necessarily done -- coming in

12  for the truth of the matter.  And when they move from each one

13  we can see what it's getting in for, but I understood your

14  previous decision.

15           THE COURT:  All right.  In fact, my disposition was

16  really as to your objections since this is the one that deals

17  with the Board matters.  And so that'll stand.

18           MR. HAIL:  Okay.  Specifically the declaration of

19  John Sheehan, we don't have any objection except for one of the

20  paragraphs, paragraph 35, specifically reflects information

21  that is told to Mr. Sheehan, apparently by General Motors.  I

22  believe that's Exhibit 62, paragraph 35, page 14.  And

23  specifically we object to the second sentence continuing there

24  through the end.  It talks about comments made to GM.  And I

25  think he is offering that specifically for the truth of what

20

1    was there.

2              THE COURT:  As long as it's -- it's for just what --

3    what he has been informed by GM, I'll admit it.  Otherwise its

4    hearsay and I wouldn't admit it unless there was further

5    testimony from GM itself.

6              MR. BUTLER:  Your Honor, the company -- the debtors

7    understand the Court's ruling.  That's the purpose it's being

8    presented for.

9              THE COURT:  Okay.

10             MR. HAIL:  I have two more, Your Honor.  I think

11   they're -- I think they can be briefed together.  117 is the

12   board book for January 9th and 10th.  That is a large document.

13   It contains many other documents that are in and of themselves

14   hearsay, containing some news stories, other various statements

15   that are obviously hearsay.  And to the extent it's coming into

16   the truth of the matter, it's objectionable.

17             MR. BUTLER:  Your Honor, it's coming in the same way

18   all the other board materials are.  That's the package the

19   Board got and they made their judgments based on that package.

20             THE COURT:  All right.  So it's -- you're not

21   offering it for the truth of what was set forth therein.

22             MR. BUTLER:  It certainly is that the news articles

23   are not offering it as the truth of those news articles where

24   we would -- we would offer it for, you know, the fact that

25   those articles, that was what was widely reported.  And the

21

1    Board received that information and attached whatever weight to

2    it, it attached to it.

3            THE COURT:  Okay.  And if there's other hearsay in

4    there, you're not offering that either unless you're going to

5    somehow get -- get that material in?

6            MR. BUTLER:  That's correct, Your Honor.

7            THE COURT:  Otherwise.  Okay.  Very well.

8            MR. HAIL:  That's all, Your Honor.

9            THE COURT:  Okay.

10           MR. BUTLER:  And if Your Honor would point out as to

11   the Rothschild exhibits, which have not been objected to here,

12   those are part of -- just so we don't -- some of these -- some

13   of the exhibits have been admitted without objection.  They

14   were also not board package.  Obviously Rothschild packages are

15   being submitted -- these are going to be available for cross

16   examination.

17           THE COURT:  Right.

18           MR. BUTLER:  They'll be submitted for what they are.

19           THE COURT:  Right.  Okay.

20           MS. STEINGART:  Your Honor, there are two other

21   procedural issues that we wanted to raise with the Court before

22   we commence --

23           MR. BUTLER:  I haven't finished the exhibits.

24           MS. STEINGART:  Oh, I'm sorry.

25           THE COURT:  Oh, now we're going to the debtor's

22

1    objections.

2           MR. BUTLER:  Yeah.  This is just a quick -- just two

3    more.

4           MS. STEINGART:  I'm truly sorry.

5           THE COURT:  Okay.

6           MR. BUTLER:  Your Honor, we had -- I think we can

7    dispose of the simile.  I mean, Exhibit 73, because this is an

8    issue of business judgment, Exhibit 73 is an analysis, internal

9    analysis, by Highland that was never presented to the Board or

10   presented to the company.  We found it in discovery but it's

11   not anything that Highland asked the company to consider.  So I

12   don't know what -- how it's relevant to the business judgment

13   analysis here.

14          THE COURT:  Well, are you going to offer is

15   separately?

16          MR. HAIL:  Yes, Your Honor.  The reason is, is that

17   is a calculation of the value that is -- it's a calculation --

18   it's a series of calculations about the value of the share

19   price, in this case, and about the value that's being

20   distributed to the plan investors in the case.

21          THE COURT:  But is it -- is it anymore, really, then

22   legal argument on this point.  I mean, I -- I'm trying to

23   figure out -- are you going to have a witness to go through

24   this?

25          MR. HAIL:  Yes.  Yeah, we did, Your Honor.  It's --

23

1   it's actually referenced in the declaration Pat Doherty that

2   was given last night.  It's attached to Exhibit --

3            THE COURT:  Well, is he going to testify?

4            MR. HAIL:  He is.

5            THE COURT:  Okay.  Well, I'll reserve till I -- you

6   can object at the time of his -- he testifies on this.

7            MR. BUTLER:  Okay, Your Honor.  And Item number 79, I

8   think you, sort of, disposed of already.  But that was the

9   Houlihan Lokey letter which we acknowledged the Board received

10  and reviewed and gave consideration to.  But obviously Houlihan

11  Lokey is not participating in these proceedings and the Equity

12  has not produced him as a witness.

13           THE COURT:  Right.  So it would be admitted just for

14  that limited purpose.

15           MR. BUTLER:  Thank you, Your Honor.  Your Honor, I

16  think that then, subject to the reservations you've indicated,

17  I think that resolves all 122 exhibits.

18           THE COURT:  Okay.

19           MR. BUTLER:  Which I would then -- subject to those

20  things, move to be admitted into evidence subject to the bench

21  rulings made by Your Honor this morning.

22           THE COURT:  Okay.  So, subject to those bench

23  rulings, all of the exhibits will be admitted. (All Exhibits

24  were hereby received as Exhibit 1-122 for identification, as of

25  this date.)

24

1          MR. BUTLER:  Thank you.

2          MS. STEINGART:  We have two procedural issues that we

3    raised this morning with counsel for debtor.  One has to do

4    with the fact that there have been, since the affidavits that

5    are before the Court that comprise the direct testimony of Mr.

6    Resnick and Mr. Sheehan; there have been a number of

7    significant events at -- in connection with the debtor's

8    activities on this matter.

9          One significant event was a topic we dealt with just

10   in connection with these documents, Your Honor, and that is the

11   package of materials that the Board considered at the meeting

12   held by the Board on January 9th.  The other significant event

13   was the numerous amendments to the framework agreements that

14   were filed yesterday afternoon.

15         To the extent that the debtors are going to illicit

16   direct testimony from Mr. Resnick and Mr. Sheehan on these

17   matters.  We believe that it's appropriate that that be done

18   before we begin our cross.  The documents there, you know,

19   clearly there's going to be a substantial amount of testimony

20   on these two things.  And to the extent that we're supposed to

21   cross based on direct, it's not part of the direct affidavits

22   now, to the extent that the debtors want them.  And I have no

23   objection but I think that procedurally it should precede the

24   commencement of cross examination.

25         THE COURT:  I don't understand what you're --

25

1          MS. STEINGART:  Okay.

2          THE COURT:  I don't understand the point you're

3     making.

4          MS. STEINGART:  The debtor's are putting in

5     affidavits in lieu of direct examination, Your Honor.  The

6     affidavits do not cover a series of events that occurred

7     subsequent to their preparation.  The debtors want that

8     material, as far as I understand it, to be part of their case

9     in chief on this matter.  They have designated exhibits that go

10    to the events subsequent to the preparation of the affidavits.

11    And it seems that before we begin our cross examination, if

12    there's going to be direct testimony on those topics, it should

13    occur.

14         THE COURT:  All right.  You only have -- who are your

15    witnesses?

16         MR. BUTLER:  Your Honor, here's how we, sort of, see

17    it.  And I can tell her -- I acknowledge -- Ms. Steingart has a

18    point that things happened yesterday that are not in

19    affidavits.  And the question is how to most efficiently get

20    them before the Court and how, most efficiently, to have the

21    objectors be able to delve into those -- inquire in those.  And

22    from our pers -- and what happened is, there was a board

23    meeting.  And, you know, at the board meeting the company

24    decided to go forward with today's hearing and communicated to

25    Highland that which was concluded in our response that we filed

26

1    yesterday at 2 o'clock.  And those are the two -- and the third

2    event, I suppose, is that we reached settlements with most of

3    the objectors to the hearing and those -- those settlements are

4    either reflected in the record as they are with the union

5    representatives or they are -- they are in the black lined

6    documents.

7         THE COURT:  Well, do you have any additional

8    witnesses besides --

9         MR. BUTLER:  Our witnesses would be, Your Honor --

10   here -- we would propose -- here's how we proposed the hearing

11   go.  We would propose to start with Mr. Sheehan, present his --

12   his declaration, which has already been admitted into evidence.

13   Make him available for cross examination on any of the exhibits

14   that are before the -- the -- that have already been admitted

15   into evidence.  Then we would go to Mr. Resnick, present his

16   affidavit and allow cross examination on any of the matters,

17   including anything that happened at the board meeting

18   yesterday.  We're not suggesting that the cross examination

19   here can't cover the full range of exhibits.  And that was

20   really our direct case.  They have also called, as Your Honor's

21   aware, Mr. Miller, the chairman of the board of the company who

22   is here pursuant to Your Honor's rulings, to be cross examined

23   by them or examined by them on --

24        THE COURT:  Examined.

25        MR. BUTLER:  -- examined by them on whatever matters

27

```
1    that they chose to examine him on which, presumably, could
2    include eliciting whatever testimony they want to with respect
3    to yesterday's board meetings.  But the fact of the board
4    meeting -- the fact that the materials reviewed by the board
5    meeting are now in evidence, the fact of what was said is
6    communicated in the debtor's omnibus reply and no, we did not
7    intend to put a witness up and go through every black line
8    change in the agreement.  I mean, that was not our intention.
9               THE COURT:  Okay.
10              MR. BUTLER:  But certainly they're prepared -- they
11   can cross on all those.
12              MS. STEINGART:  Right.  Well, yeah.  It's not -- well
13   then, Your Honor, to the extent that we don't cross on the
14   topic of yesterday's meeting, and I'm only talking, Your Honor,
15   about the debtor's witnesses, and that is Mr. Sheehan and Mr.
16   Resnick.  If they are not cross examined on the topics of
17   yesterday's meeting or the new agreements, are the debtors
18   going to be precluded from offering -- from redirecting them on
19   those topics?
20              MR. BUTLER:  You know, Your Honor, obviously this is
21   simply a benchmark --
22              THE COURT:  There's -- I mean -- I'll decide that
23   when it comes up, but I'm assuming that they would be because
24   there's -- the redirect has to be based on the cross.  And if
25   the cross doesn't cover this topic then I'll rely on the
```

28

1    documents themselves.

2             MS. STEINGART:  Right.  Well, you know, it's just in

3    terms of -- of doing cross, Your Honor.  It's more efficient to

4    do it that way.  Because then we're going to have to do a

5    greater re-cross.

6             THE COURT:  Well, no.  The debtor doesn't -- it's up

7    to the debtor to decide.  The debtor has the burden of proof.

8    The debtor has to decide whether to -- what it wants to illicit

9    in direct testimony, that's all.

10            MS. STEINGART:  Okay.

11            MR. BUTLER:  Your Honor, if -- I mean, so we don't

12   have a procedural, you know, Ms. Steingart is, I think, created

13   a potential procedural infirmity here.  From the debtor's

14   perspective we simply said, hey, the objectors can cross about

15   anything they want to and examine Mr. Miller about anything

16   they want to, including yesterday's board meeting which is now

17   in evidence in terms of materials that were looked at.  If what

18   Ms. Steingart wants us to do is, prior to them beginning to

19   examine Mr. Sheehan that I call Mr. Sheehan and ask him a

20   limited number of questions about yesterday's board meeting,

21   I'm happy to do that.  I mean, I don't know why that's

22   necessary but I don't want to create an infirmity here that,

23   you know, through some technicality in the record.  I mean, I

24   think we all -- all of the counsel here know exactly what

25   happens and they know -- and it's represented by the exhibits -

29

1   -

2           THE COURT:  Well, Mr. Sheehan's -- Mr. Sheehan's

3   affidavit refers to the company's decision --

4           MR. BUTLER:  Right.

5           THE COURT:  -- to go ahead today.

6           MR. BUTLER:  Correct.

7           THE COURT:  Does that affidavit predate the board

8   meeting?

9           MR. BUTLER:  Yes, it was delivered -- it was actually

10  prepared and because they wanted the affidavit, there were

11  changing circumstances, we delivered the declaration at 8

12  o'clock yesterday morning, prior to the vote being taken by the

13  Board.

14          MS. STEINGART:  All right.  And Mr. --

15          MR. BUTLER:  The meeting started on Tuesday,

16  continued on Wednesday.  The Board vote was taken about 11

17  o'clock Wednesday morning.

18          MS. STEINGART:  Right.  And Mr. Resnick's affidavit

19  was delivered a week before that.  And so, there's nothing in

20  there with respect to either the changes to the agreement or to

21  the Board's consideration.  To the extent that the Court

22  believes that it's more convenient -- I was just giving the

23  opportunity -- the debtor the opportunity to put in its direct

24  case, Your Honor, before I began my cross.  If the debtor

25  believes that it would be less --

30

1          THE COURT:  If you want to cover the board meeting,

2    Mr. Butler, separately, then you should go ahead and do it.

3          MR. BUTLER:  Okay.  I will do that.

4          MS. STEINGART:  the other issue, Your Honor, that I

5    wanted to raise, is that there will be testimony by each of the

6    witnesses about events that occurred about discussions and

7    board meetings.  And usually when there's fact testimony from

8    witnesses, witnesses that are going to testify subsequently are

9    excused from the courtroom while the earlier witnesses are

10   testifying.  And I consulted with debtors this morning when I

11   saw some of the witnesses in the room and asked them if they

12   would like to agree to that and they declined.  So I'm asking

13   the Court to have the witnesses, prior to their testimony,

14   excluded while the others are testifying.  Thank you, Your

15   Honor.

16         MR. BUTLER:  Your Honor, in that matter we're

17   entitled to designate a corporate representative, we would

18   designate Mr. Sheehan who's been a corporate -- the CRO who has

19   attended all these hearings.  And we would designate him as our

20   corporate representative.

21         MS. STEINGART:  He's testifying first so that's okay.

22         THE COURT:  So --

23         MS. STEINGART:  He's testifying first so there would

24   be no --

25         MR. BUTLER:  Right.

31

1          MS. STEINGART:  -- reason to exclude him.

2          MR. BUTLER:  All right.  I'm not going to --

3          THE COURT:  All right.  And --

4          MS. STEINGART:  So it's just that Mr. Resnick and Mr.

5     Miller could not be present for Mr. Sheehan's testimony.  And

6     then --

7          THE COURT:  And -- who are your witnesses?

8          MS. STEINGER:  Just Mr. Miller, Your Honor.

9          THE COURT:  And then, how about Highland?

10          MR. HAIL:  Your Honor, we put in the declaration of

11     Pat Doherty and he's available for cross examination.

12          MR. BUTLER:  You know, as a technical matter, Your

13     Honor, I don't think that -- I mean, it's interesting how they

14     want to deal with Mr. Miller, it's their witness.  So --

15          MS. STEINGART:  We'll start with Mr. Miller.  You

16     know, I was expecting the debtor to put Mr. Miller on during

17     the debtor's direct case.  Once the debtor rests, after

18     presenting Mr. Sheehan and Mr. Resnick, I'll put on Mr. Miller.

19          THE COURT:  Okay.  All right.  I don't know.  Mr.

20     Resnick, do you want to go out and read your blackberry for an

21     hour or so?  He's not testifying as an expert so I think it is

22     appropriate to have him leave, but he'd probably be happy to.

23     Just save him a seat.

24          MR. BUTLER:  Could I have just a moment, Your Honor,

25     to confer with counsel?

32

```
1              THE COURT:  Yes.

2              MR. BUTLER:  Your Honor, I just conferred with --

3    excuse me for one more, Your Honor.  Your Honor, I just

4    conferred with counsel for the three remaining objectors.

5    Again, I think we now -- to make this efficient, what we've

6    decided to do, subject to Your Honor's approval, is with

7    respect to the matters of yesterday's board meeting, Mr. Miller

8    is here as the chairman of the company.  He's been called by

9    the equity committee and they've agreed that, as Highland has

10   agreed, that my re-direct of Mr. Miller can expand beyond the

11   cross of the -- the examination they do and can cover anything

12   with respect to the --

13             THE COURT:  All right.  That makes sense.

14             MR. BUTLER:  So I think -- I think we can resolve it

15   in that way.  And if that being the case, then I think that the

16   appropriate thing to do now would be to present the exhibit of

17   Mr. Sheehan.  It's been admitted into evidence as Exhibit

18   number 62, subject to cross examination by the parties.

19             THE COURT:  Okay.  All right.  That's fine.  Do any

20   of the objectors wish to cross examine Mr. Sheehan?

21             MS. STEINGART:  Yes, Your Honor, I do.

22             THE COURT:  Okay.  Why don't you come up to the

23   witness box then?

24             MR. HAIL:  Your Honor, this is Highland, we'll cross

25   after Ms. Steingart.
```

33

1       THE COURT:  Okay.  Do -- would you raise your right

2   hand, Mr. Sheehan?

3       (Witness is duly sworn.)

4       THE COURT:  And would you spell your name for the

5   record, please.

6       THE WITNESS:  John, J-O-H-N, Sheehan, S-H-E-E-H-A-N.

7       THE COURT:  Okay.

8       MS. STEINGART:  Before Mr. Sheehan begin, Your Honor,

9   I had asked that -- because each of the witnesses will be

10  testifying about facts that each of the witnesses should not be

11  present while -- before their testimony is given.  And that

12  would apply to witnesses being called by Mr. Hail as well as

13  witnesses being called by the Equity Committee.

14      THE COURT:  Well, maybe we could make some progress

15  in the case if Mr. Miller and Mr. Doherty go out too, I don't

16  know.  I mean I --

17      MR. HAIL:  Your Honor, I mean -- we're entitled --

18  he's entitled to a designated corporate rep, Mr. Doherty is my

19  corporate rep.

20      THE COURT:  Well, that's true.  That's true.  And Mr.

21  Miller is really your witness, right?

22      MS. STEINGART:  Well, he's my witness but Your Honor,

23  I don't think that there's any -- Mr. Miller -- I would never

24  call Mr. Miller hostile.  He's one of the most gracious

25  gentlemen I've ever met.  But for purposes of this hearing he

34

1    is our hostile witness and I don't think there's any dispute

2    about that.  So I don't think he should be present for the

3    testimony of both Mr. Sheehan and Mr. Resnick.

4                THE COURT:  All right.  That's fair.  So, you can --

5    Mr. Miller you can give up your seat too.  Of course the -- the

6    premise of my denying the motion to quash with regard to Mr.

7    Miller is that this would not be cumulative testimony.  So I'm

8    going to hold you to that Ms. Steingart.  But that being said,

9    we'll call you.

10               MS. STEINGART:  Thank you, Your Honor.

11   CROSS EXAMINATION BY

12   MS. STEINGART:

13   Q.   Good morning, Mr. Sheehan.

14   A.   Good morning, Ms. Steingart.

15               MR. BUTLER:  Your Honor may I -- I'm sorry.  Can

16   counsel approach for one second?

17               THE COURT:  Okay.

18               MS. STEINGART:  Your Honor, I can wait until Mr.

19   Butler returns.

20               THE COURT:  Okay.  Okay.

21   Q.   Now, Mr. Sheehan, you played a role in negotiating the

22   agreements, and when I say agreements I'm referring to the plan

23   support agreement and the EPCA that's currently before the

24   Court this morning, okay?  So you played a role in negotiating

25   the agreements on behalf of the company, correct?

35

```
 1    A.    Yes, I did.

 2    Q.    And you were one of the lead negotiators, weren't you?

 3    A.    Yes, I was.

 4    Q.    Okay.  And in that capacity you are familiar with the

 5    alternate transaction and breakup fees -- or breakup fees in

 6    this case, correct?

 7    A.    There is an alternative transaction fee that is called for

 8    under the agreements.

 9    Q.    And that is in the equity purchase and commitment

10    agreement, right?

11    A.    That is correct.

12    Q.    Now, you understand that those -- that that kind of a fee

13    has a purpose, right?

14    A.    Yes, I do.

15    Q.    That there's a purpose for those kinds of fees.  And

16    that -- and that the purpose is to protect an investor who has

17    committed capital in the case that the transaction doesn't take

18    place, right?

19    A.    I'm sorry.  Ask the question again, I'm sorry.

20    Q.    You understand that the purpose of an alternate

21    transaction fee is to protect an investor who has committed

22    capital in case the transaction doesn't take place?

23    A.    Yes, ma'am.

24    Q.    And such a fee compensates a potential investor for its

25    time and efforts if the deal doesn't happen, right.
```

36

1   A.   That it -- and the cost that it's incurred through --

2   through the work it has put in, yes.

3   Q.   But this case we also have expenses, right?  We have a

4   breakup fee and we have expenses in addition to the breakup

5   fee, right?

6   A.   We have expenses.

7   Q.   And the expenses aren't even capped from December -- from

8   the beginning of December the investors get to put their

9   expenses to the company and there's no limit to those expenses,

10  correct?

11  A.   Your question was, if there was a limit to the expenses

12  that they've incurred up until December?

13  Q.   No, my question was, it's your understanding that in

14  addition to the breakup fee, that there is a provision that

15  provides the investors with their expenses, correct?

16  A.   There is a provision that provides for the plan investors

17  to receive reimbursement for their reasonable expenses incurred

18  in conjunction with the transaction agreements.

19  Q.   Right.  And that's separate from the alternate transaction

20  fee, right.

21  A.   That is correct.

22  Q.   And in addition to it?

23  A.   Yes, ma'am.

24  Q.   Okay.  And -- so the alternate transaction fee here, the

25  primary purpose of it, is to compensate the investor for the

37

1    commitment if the deal doesn't happen, right?

2    A.   As well as the -- all of the time and the cost that the

3    plan investors invested during a long period of time, yes.

4    Q.   Okay.  So -- so -- other than the time they spent, what

5    costs do they have that aren't covered by the expense

6    reimbursement?

7    A.   The other costs that they would have is, the -- let me

8    call it the opportunity to have been spending all of the last

9    six months alternatively investing in another transaction

10   reserving their capital for the -- for Delphi's transaction

11   that they were not able to invest -- they would have been able

12   to spend other time investing in another transaction rather

13   than the Delphi transaction.

14   Q.   Now, in this transaction the investors are getting

15   commitment fees, right?

16   A.   Yes, ma'am.

17   Q.   And that's in addition to the alternative transaction fee,

18   correct?

19   A.   That is correct.

20   Q.   Now, doesn't those -- don't those commitment fees

21   compensate them for the fact that they can have their money

22   otherwise engaged?

23   A.   It does, during the period that the money's at risk, yes.

24   Q.   Okay.  So let's talk about now, again, go back to the

25   alternative transaction fee in this case.

38

1    A.    Uh-huh.

2    Q.    Okay.  So we've ascertained that their expenses and costs

3    are paid because they have an uncapped expense provision,

4    right?  Correct?

5    A.    Uncapped from the perspective that there is no upward

6    ceiling other than we -- the debtors have the opportunity to

7    review them for reasonableness.

8    Q.    Right.  And we don't think they're going to be

9    unreasonable?

10   A.    No, we do not.

11   Q.    No, okay.  But -- so, you're going to pay off all their

12   fees because they're not going to go out and do things that

13   are -- that could embarrass them and the company, right?  Okay.

14   And we've also agreed that they have commitment fees to cover

15   the, how shall we say, tying up of funds.  And we'll deal later

16   with tying -- what's tied up here.  But conceptually the

17   agreements provide that commitment fee, right?

18   A.    Yes, ma'am.

19   Q.    So let's go back to the alternative transaction fee.  The

20   alternative transaction fee here, okay, then the primary

21   purpose of it is to compensate an investor who has committed to

22   a transaction in the case that transaction doesn't take place?

23          MR. BUTLER:  Objection.  Asked and answered twice

24   before.

25          THE COURT:  Why don't you just ask him the next

1   question?  I mean, you're just setting up the question, right?

2           MS. STEINGART:  Well, I'm trying -- I'm trying to,

3   sort of, isolate what the alternate transaction fee is being

4   used for in this case, Your Honor.  And I'm trying to get that

5   information --

6           THE COURT:  Well, let's just then focus on locking up

7   a committed investor, that's where you're going, right?

8           MS. STEINGART:  I'm sorry?

9           THE COURT:  You're going to the purpose of locking up

10  a committed investor?

11          MS. STEINGART:  Yes.

12          THE COURT:  Okay.

13          MS. STEINGART:  Well, and that -- that and other

14  things, Your Honor.

15          THE COURT:  All right.

16          MS. STEINGART:  Okay.

17  Q.   So during your deposition you recognized and you testified

18  that your understanding that the alternative transaction fee

19  compensated the other party or here the plan investors to the

20  extent that the company chose to pursue other transactions or

21  willfully breached the agreements after the time both sides are

22  committed, correct?

23  A.   Yes, I did.

24  Q.   Now, here it was not part of the rewards for your

25  justification the alternate transaction fee that it should

40

1    encourage the plan investors to be the first bidders to come in

2    and make an offer, correct?

3    A.    No, ma'am.

4    Q.    And indeed, the investment agreement has no provisions in

5    place for soliciting expressions of interest, does it?

6    A.    Soliciting exp --

7    Q.    Expressions of interest for person other than AHC?

8    A.    No it does not.

9    Q.    And there's no process in place for the company to

10   consider competing bids, right?

11   A.    There's no formal process in place, no.

12   Q.    Right.  And there's nothing certainly out in the public

13   either in the agreements you filed with the Court or in any

14   other document that provides others who might be interested in

15   approaching the company with a process for doing that, right?

16   A.    There's nothing that precludes that occurring, no.

17   Q.    But there's not a process so that people who might be

18   interested would know how to do that, right?

19   A.    We have not instituted any formal process, if that's your

20   question.

21   Q.    Right.  Well, you're the chief restructuring officer,

22   right?

23   A.    Yes, ma'am.

24   Q.    And in other situations where there are alternate

25   transaction fees the company provides information to people

41

1   about how they become a qualified bidder, right?

2   A.   I have not been involved in such a situation but I could

3   imagine there may be.

4   Q.   And here there's really not information out there about

5   who the company would consider a qualified bidder, right?

6   A.   We've not put in any information such as that out in the

7   market place other than through the fact that Delphi is a very

8   large and public process which there's a lot of people who

9   follow the company, investors who follow the company, excuse

10  me.

11  Q.   So the alternative transaction fee is in place but it's

12  not an alternative transaction fee the company sees as a

13  mechanism for getting other bids, correct?

14  A.   We do not view it as a mechanism for soliciting further

15  bids, no.  I think that's fair.

16  Q.   Now here the alternative transaction fee becomes due and

17  payable when the Board exercises its fiduciary out and goes

18  with the better deal, right?  Under the EPCA?

19  A.   There are two situations.  One of them is that if the

20  company was to pursue an alternative transaction, that's

21  correct.

22  Q.   Okay.  And its payable if Delphi willfully breaches the

23  agreement and then enters into a transaction in twenty-four

24  months, right?

25  A.   That is the second provision, that is correct.

42

1    Q.   Okay.  Now when you were discussing the agreements that

2    are before the Court with the Board, and I'm talking before

3    this last meeting, I'm talking the meetings in the prior time,

4    you didn't intend to do that circumstances would arise where

5    the alternative transaction fee might become due and payable

6    before the parties had agreed to something sufficient to

7    justify that fee, right?

8    A.   I'm sorry, can you ask that question again, excuse me?

9    Q.   When you were talking to the Board about the alternative

10   transaction fee, neither you nor the Board intended that that

11   fee become due and payable until after the parties had agreed

12   to something to justify that, right?

13   A.   I suppose that's correct.

14   Q.   Well, you supposed it when I deposed you so --

15   A.   I beg your pardon?

16   Q.   You supposed it when I deposed you.

17   A.   Okay.

18   Q.   So I guess that's still true then, right?

19   A.   I guess its still true.

20   Q.   Okay.  And when you were negotiating the deal you also

21   thought that the alternative transaction fee should be due and

22   payable, if at all, only after there was a settlement with the

23   labor unions, right?

24   A.   I think that the alternative transaction fee is payable

25   after this agreement is approved.

43

1    Q.    I'm sorry?

2    A.    I said I think the alternative transaction fee, under the

3    investment agreements, is payable if we pursue another

4    alternative -- the Board approves another transaction or it

5    willfully breaches the agreement after these investment

6    agreements are approved.

7    Q.    But I'm asking you about what you and the Board discussed

8    concerning the alternative transaction fees at the time -- in

9    the November/December time frame, okay?

10   A.    The --

11              MS. STEINGART:  Can we have a copy of the witness's

12   transcript?

13   Q.    So during that period of time, when you were negotiating

14   the deal, it was your thought that the transaction fee should

15   not be due and payable, if at all, until there was a settlement

16   with the labor unions, right?

17              THE COURT:  I'm sorry; you're talking now before the

18   agreement was entered into?

19              MS. STEINGART:  Right, Your Honor.  I'm trying --

20              THE COURT:    All right.

21   Q.    Well, sir, would it refresh your recollection if you

22   looked at your deposition transcript with me?

23              MS. STEINGART:  Could we provide one for the Court?

24              THE COURT:  Yes.

25              MR. BUTLER:  It's also in the exhibit binder at

44

1    Exhibit 74.

2              THE COURT:  Oh, okay, never mind.  I got it.

3    Q.   Sir, I'd like you to turn to page 125.  And 125, we could

4    begin on line 21 but he more fulsome question is the question

5    before.  Do you want to read it to yourself, beginning on 15

6    and going to 126, line 12?  Sir, so I asked you when you were

7    negotiating this deal you thought the alternative transaction

8    fee should be due and payable, if at all, only after there was

9    a settlement with labor unions, right?

10             MR. BUTLER:  Objection.  That's not what his

11   deposition testimony says, what is characterized.

12   A.   I think what I said was --

13             THE COURT:  I'll sustain that.

14   Q.   Sir, did you indicate that it was important that the

15   alternative transaction be payable once there was a settlement

16   with General Motors and a settlement with labor?

17   A.   My full response to your question was that I recall that

18   the discussions were that the company needed to make sure that

19   the -- that the company did not -- the debtors did not obligate

20   themselves to be paying an alternative transaction fee before

21   such time as parties were signed up to the transaction.  And,

22   therefore, it was important that the alternative transaction

23   fee be payable once there was a settlement with General Motors

24   and settlement with labor.  I've already described to you the

25   sequence in which this will happen and that the alternative

45

 1   transaction fee will be payable after such time that that takes

 2   place.

 3   Q.   All right.  And that wasn't what happened was it?  There

 4   wasn't -- the alterative transaction fee was not un --

 5            MS. STEINGART:  I'll strike that.

 6   Q.   The alternative transaction fee was not unavailable in the

 7   first round of agreements that you put before this Court until

 8   after the GM and labor settlement, was it?

 9   A.   No.  I think the transaction fee is payable after this

10   agreement is approved by the Court.

11   Q.   When you were talking to the Board --

12   A.   Uh-huh.

13   Q.   You're here describing discussions with the Board --

14   A.   Yes, ma'am.

15   Q.   -- and that its important that the transaction fee be

16   payable once there was a settlement with General Motors and

17   labor, right?

18   A.   After the parties were signed up to the transaction and

19   that once there was a settlement with General Motors and labor

20   that the transaction fee was payable, yes.

21   Q.   Right.  And so in the first set of agreements the

22   transaction fee was payable before there was an agreement with

23   GM or labor, right?

24   A.   I think that's correct.

25   Q.   And even now, if this Court approves the agreements

46

1    before, the alternative transaction can be triggered before

2    there is an agreement with GM or labor, right?

3    A.   I believe that's correct.

4    Q.   Now, as time went on and you presented the first set of

5    transactions -- first set of agreements to this Court, did you

6    go back and tell the Board that the discussion you had about

7    the transaction fee not being available until after the GM and

8    labor settlement was not achieved?  Did you go back and tell

9    them that?

10        MR. BUTLER:  Objection.  That's not what the

11   testimony says.  He didn't testify in his deposition that he

12   told the Board that the alternative transaction would --

13        THE COURT:  I think she's going off the deposition

14   now, right?

15        MS. STEINGART:  I am, I'm going off.

16        THE COURT:  You're saying has the Board been informed

17   that, as currently drafted, the agreement permits the

18   triggering of the alternative transaction fee before there's an

19   agreement with GM or with labor?

20        THE WITNESS:  Yes, I believe, the Board understands

21   that, Your Honor.

22   Q.   And the Board understood that on December 11?

23   A.   I believe they did.

24   Q.   And did you explain to them why you were recommending that

25   they agree to a situation where an alternative transaction fee

47

1   should be payable to the plan investors before an agreement

2   with labor and GM?

3   A.   We negotiated many and all aspects of the agreements and

4   we sought to put in place the best agreement that we could

5   negotiate with the plan investors.  And once we had fully

6   negotiated that we presented it to the Board as, what we

7   believed to be, a fairly and fully negotiated agreement and in

8   the best interest of the estate to move forward.

9   Q.   Did you ever provide the Board with a summary of the

10  different fees that were payable and the different

11  opportunities for the plan investors to terminate the

12  agreement?

13  A.   We presented the Board with a summary of the investment

14  agreement.

15  Q.   And did you explain to the Board in that summary that one

16  day before the effective date that the plan investors could

17  walk away?

18  A.   I think that the summary provides a description of the

19  termination events that are provided for under the investment

20  agreement.

21  Q.   Why don't we look at the summary?  Now can you tell me

22  where in the summary you explain to the Board that the plan

23  investors could cause -- could terminate the day before the

24  effective date?

25  A.    There is on page 4 of the agreement the events that would

48

1    permit either the company or the plan investors, or each of

2    them mutually, or for regulatory reasons to be able to

3    terminate the agreement.

4    Q.   And where does it say that the plan investors can just, on

5    their own, first terminate the plan support agreement and then

6    terminate the EPCA on a day before the effective date?

7              MR. BUTLER:  Objection, Your Honor.  As Ms. Steingart

8    knows, that's not what the agreements before the Court today

9    state.

10             THE COURT:  Well, you can bring that out.

11             MS. STEINGART:  We're getting there.

12             THE COURT:  I'll overrule that one.

13   A.   Can you ask your question again, please?

14   Q.   Where does your summary state that the plan investors, as

15   a result of their own unilateral act, can a day before the

16   effective date terminate both the plan support agreement and

17   EPCA?

18   A.   That specific language is not on that document.

19   Q.   And why don't we try to look at this general --

20             MR. BUTLER:  I'm sorry.  Your Honor, I haven't been

21   provided with a copy of this.

22             MS. STEINGART:  And I haven't been a copy of your

23   documents, that's right.

24             MR. BUTLER:  No.  Ours are in evidence.  Ours have

25   been admitted into evidence, every one of them.

49

1          MS. STEINGART:  We can talk about this, but I reserve

2     the right to not list the demonstratives, Your Honor.  Because

3     it was a moving target.  Last night I had to change them all.

4          MR. BUTLER:  Your Honor, she has to at least share

5     that demonstrative so I know what --

6          MS. STEINGART:  I'll share --

7          THE COURT:  I don't have a problem with demonstrative

8     exhibits.  I assume you all know these triggers inside and out

9     by now and probably recite them in your sleep.  But I'd like a

10    copy.

11         MR. BUTLER:  May I ask, Your Honor, if they have

12    other demonstratives in this Court --

13         THE COURT:  Yeah, that would be helpful.  If you do

14    have others if you could give a copy to the debtor's counsel

15    now so that someone can look at them.

16         MR. BUTLER:  I mean, are there any other

17    demonstratives that Highland or the equity committee have that

18    they're going to use in this hearing.

19         MS. STEINGART:  Do you believe that I have an extra.

20         THE COURT:  You also give those to Skadden now.

21         MS. STEINGART:  I would like not to give it the

22    witness, if that's possible.

23         THE COURT:  No.  Just give it to counsel.

24    Q.   Now you've made numerous presentations to the Board,

25    haven't you, Mr. Sheehan?

50

1   A.   Yes, ma'am.

2   Q.   And would you say that you have a good sense what the

3   Board can understand and extrapolate from documents you place

4   before it?

5   A.   I believe I do.

6   Q.   Okay.  Now looking at the summary that I've handed to you,

7   which is joint exhibit number 30, to the extent that it doesn't

8   say in words of one syllable that the plan investors can walk

9   away one day before the effective date, is there any material

10  here that you think the Board could put together to extrapolate

11  that understanding?

12  A.   I think that you premise is that they can terminate the

13  plan support agreement and hence be able to terminate the EPCA.

14  And since there's not a discussion about the plan support

15  agreement in these pages 4 and 5.

16  Q.   As far as I could see there was no separate summary of the

17  plan support agreement provided to the directors, correct?

18  A.   The plan support agreement was provided to the directors.

19  Q.   The plan support agreement itself, but no summary thereof,

20  correct?

21  A.   Not a summary, the document itself.

22  Q.   Okay.  So let's just look at the chart together, the

23  before chart?  And the before chart is before yesterday when

24  the debtor made certain adjustments to the agreement support,

25  just so you know what I'm trying to depict.  Now, when we get

51

1    to the effective date, Mr. Sheehan, what has already occurred

2    to your understanding?  There's been settlement agreements with

3    labor and GM, correct?

4    A.    Yes, ma'am.

5    Q.    There's been a disclosure statement approved by the Court?

6    A.    Yes, ma'am.

7    Q.    It's not waived by the company and the plan investors,

8    there's been a rights offering?

9    A.    That's correct.

10   Q.    And, there's been a confirmation hearing?

11   A.    Yes, I believe that's correct.

12   Q.    And then there's a period between the confirmation hearing

13   the effective date, right?

14   A.    I believe that's correct.

15   Q.    And both the plan support agreement, if all the

16   transactions move forward as contemplated, both the plan

17   support agreement and the EPCA terminate on the effective date,

18   right?

19   A.    I believe that's correct.

20   Q.    And the effective date is the date when the plan investors

21   take down all the rights that hadn't been exercised, right?

22   A.    That's correct.

23   Q.    They file up all the converted preferred, right?

24   A.    I believe that's correct.

25   Q.    And at that moment, the agreements cease to exist,

52

1    correct?

2    A.    I believe that's correct.

3    Q.    And is it your understanding that even before the plan

4    investors could sit at the end of confirmation and wait to the

5    effective date and look around and say what's this company

6    trading, is it fifty, is it twenty and should I exercise my

7    right to terminate?  Is that what they were able to do before?

8    A.    It may have been, yes.

9    Q.    Okay.  Did anyone describe that to the Board while in your

10   presence?

11   A.    No.  I don't believe they did.

12   Q.    Okay.  Now, let's look at after.  We're talking about,

13   again, plan investors right to terminate.  Okay.  We're talking

14   about a unilateral right to terminate.  That hasn't been

15   eliminated from the agreements has it?

16   A.    From the perspective that the plan investors would have

17   the right to terminate the agreement if its not effective by

18   the later of June 30th or a 180 days after due diligence

19   expires.

20   Q.    They could terminate the EPCA, right?

21   A.    That's correct.

22   Q.    Right.  But they still had the right to terminate the plan

23   support agreement and the EPCA for any reason or notice?

24   A.    After April 1st of 2007, they have the right to terminate

25   the plan support agreement.

53

1   Q.   And then they have the unilateral right to terminate the

2   EPCA, right?

3   A.   I guess I'm not totally sure about that subject.

4           MR. BUTLER:  Your Honor, I haven't objected to this

5   line of question, it's sort of like a pop quiz.  It would be

6   helpful if counsel would point to the documents, they do speak

7   for themselves.  And, you know, Mr. Sheehan can then be

8   questioned about what they say.

9           THE COURT:  Well, I guess that's how I would like to

10  go with this.  I understand that you want to question him as to

11  what the Board was informed and what the company understood,

12  but I think rather than quizzing him about what the documents

13  say, it's best to point to the section of the document and say

14  you understand what this means and was the Board informed of

15  this.

16          MS. STEINGART:  Well, Your Honor, there are two

17  issues here.  Okay.  It's not only was the Board informed.  The

18  Board can only be informed of something that the witness

19  understands enough to think is important, understands enough to

20  tell the Board about.  And these agreements -- this provision

21  it's one of the three big changes that were made to these

22  agreements between Wednesday and today.  And I could ask a

23  further question to help put this witness in --

24          THE COURT:  Again, and this goes back to the chambers

25  conference we had on these evidentiary issues, ultimately,

54

1    notwithstanding the Court's application of the business

2    judgment rule, I have to approve the agreements.  And its more

3    helpful to me to just have the agreements in front of me.  And

4    if there's an ambiguity, certainly, that can be dealt with.

5    And to the extent that the company disagrees with me and

6    really, truly wants me just to defer to the Board's judgment

7    then I should know what the Board considered.  But there's an

8    intermediate step there, I guess, which is quizzing Mr.

9    Sheehan.  I guess I'd like to skip over that.

10            MR. STEINGART:  Okay.  Well, let me see if I could

11   put the witness a little more in the picture then.

12            THE COURT:  Okay.

13   Q.   Mr. Sheehan, were you involved in the discussions that led

14   to the amendment to the agreement that were provided to the

15   Court yesterday?

16   A.   I was one person that was involved, yes.

17   Q.   Well, you said before you were one of the lead

18   negotiators, right?

19   A.   Over the course of the entire process, yes.

20   Q.   And over the course of the process that occurred in the

21   past week, that led to the changes before the Court, you were

22   involved in that too, right?

23   A.   To a certain extent, yes.

24   Q.   And were you involved in the part of the process where

25   people talked about making more limited the right to terminate,

55

1    that we talked about before?

2    A.    Yes.  I was aware that we sought to make sure that the

3    agreement limited those provisions.

4    Q.    And were you involved in those discussions?

5    A.    I guess I'd ask you to be more specific as to what you

6    mean by those discussions?

7    Q.    Were you involved in the discussions that led to the

8    change in the agreements that limited the right of the plan

9    investors to terminate unilaterally?

10   A.    I was not involved in discussions with the plan investors

11   on the subject.  I was involved in discussions with the debtors

12   and with our counsel on the subject.  And those counsel then,

13   who drafted the agreements, made the changes.

14   Q.    Okay.  So the negotiations for the changes that were made

15   just in the past couple of days, those were engaged in

16   primarily by counsel and not by management?

17   A.    Over the last several days that was principally between

18   the law firms, yes.

19   Q.    Okay, fair enough.  Okay.  Why don't we look at Section 12

20   of the EPCA, which begins on page 59?

21   A.    Can you tell me what exhibit it is?

22   Q.    Oh, yes.  I thought we had, I'm sorry.  I apologize.

23   Exhibit 2.

24   A.    Section 12 of the EPCA?

25          MR. BUTLER:  I'm sorry.  Exhibit 2 is the original

56

1   EPCA, I believe, isn't it.  Or is it the amended EPCA?

2            MS. STEINGART:  It doesn't matter which one he looks

3   at, this hasn't changed.  If you'd rather he look at the

4   amended --

5            THE COURT:  No.  Section 12 is changed.

6            MS. STEINGART:  I'm sorry?

7            THE COURT:  Section 12 was definitely changed.  I'm

8   working off what was attached to the debtor's response.  I

9   actually had a question as to whether that document is actually

10  in the exhibit book at this point.  I'm assuming it is but I

11  haven't gone and looked for it.

12           MS. STEINGART:  I have to say it's not an exhibit

13  that I designated.

14           THE COURT:  Okay.

15           MR. BUTLER:  Your Honor, it's Exhibit number 61, I

16  believe.

17           THE COURT:  Okay.  Yeah, that's right.  That's it.  I

18  mean, I already marked up what you gave me in the response, so

19  I didn't look at it in the book.

20           MS. STEINGART:  It's the black line, I think, still

21  page 59.

22           THE COURT:  It's an exhibit to the response.

23  Q.   Okay.  And I direct your attention just so I can try to

24  shortcut it because it is long, to 12(c) to (i).  Which in

25  essence says "this agreement may be terminated and the

57

1    transactions contemplated here by may be abandoned at any time

2    prior to the closing date by any party to this agreement."  And

3    then we go down to (ii) "if the PSA shall have been terminated

4    in accordance with its terms."  That's still in there, right?

5    A.    Yes, ma'am.

6    Q.    Okay.  So isn't it still the case that the plan investors

7    can, for any reason or no reason, after April 1st terminate the

8    PSA and then with impunity terminate the EPCA?

9    A.    I believe that's correct at that point in time that

10   certain fees that if they had been paid to the plan investors

11   would be refunded to the company, repaid to the company by the

12   investors no later than the close of business or the next

13   business day following the date of such termination.

14   Q.    But we're not talking about the assuming, just talking

15   about the right to terminate, correct?

16   A.    That's correct.

17   Q.    Now when we were doing the before, and we can go back to

18   that, because, you know, the fee was resolved and I didn't want

19   to do that, but we can talk about that if you'd like.  Because

20   in the before they got to get all their fees until the date

21   before the effective date and they could terminate this

22   agreement and the other agreement because it's marketed to them

23   and they got to keep like, 100 million dollars?

24            MR. BUTLER:  Objection.  Counsel's testifying at this

25   point.

58

1        MS. STEINGART:  This is what --

2        THE COURT:  I'll overrule the objection.

3   Q.   Wasn't that so?

4   A.   They, without regard to the exact number, yes.

5   Q.   Okay.  And after what we did -- or what you do -- what the

6   debtor did is the debtor eliminated that retention of the fees

7   if the plan investors first terminate the PSA and then

8   terminate the EPCA, if they've gotten commitment fees they have

9   to give them back, right?

10  A.   Yes, ma'am.

11  Q.   But not expenses, no?  They get to keep the expenses?

12  A.   I believe that's correct.

13  Q.   And the expenses, about 100 million dollars, were not

14  assigned a million dollars either, right?

15  A.   Probably won't be but I haven't --

16  Q.   Well, they will get 13 million as soon as the Court

17  approves this agreement?

18  A.   That's correct.

19  Q.   That's right.  And then they get, without cap, paying for

20  all of their reasonable advisor expenses?

21  A.   Yes, ma'am.

22  Q.   And they have lots of advisors, don't they?

23  A.   Everybody in this case does.

24  Q.   And there's more than one investor that you're paying this

25  for, right?  More than one investor that you're paying those

59

1    kinds of uncapped expenses for, right?

2    A.    There is the plan investors under the investment

3    agreements.

4    Q.    So there are three of them?

5    A.    I think there's five.

6    Q.    Oh, there are five.  So they keep the thirteen and the

7    keep whatever over time paid their monthly fees from December

8    to whenever they terminate, am I correct?

9    A.    I believe that's correct.

10   Q.    But putting the fees aside my focus is really on their

11   continuing ability to terminate even in the after picture.  So

12   in the after picture you would agree with me that they could

13   terminate from April 1st until the approval of the disclosure

14   statement, correct?

15   A.    Yes, ma'am.

16   Q.    And the words are important, they could terminate for any

17   reason or no reason, right?

18   A.    Under the PSA.

19   Q.    Under the PSA, right.  And then once the PSA is terminated

20   for any reason or no reason, they can terminate the EPCA,

21   correct?

22   A.    I believe that's correct.

23   Q.    And isn't it correct that -- and the debtor has the same

24   rights, doesn't it?  The debtor as the right, under the PSA to

25   terminate in that escape hatch period we've just given in?

60

1   Under the PSA the debtor has the right, correct?

2   A.   That is correct.

3   Q.   But the debtor does not have the right to terminate the

4   EPCA after it's terminated the PSA?

5   A.   That is correct.

6   Q.   Okay.  So the plan investors, in determining both the

7   impunity or in this stage, escape hatch period, but not the

8   company, right?

9   A.   That's correct.

10  Q.   Okay.  And GM -- let's get to GM just for a moment here.

11  GM also, during this escape hatch period, can terminate the

12  plan support agreement, right?

13  A.   I believe that's correct.

14  Q.   But if GM terminates the plan support agreement, the

15  company may not terminate the EPCA?

16  A.   That is correct.

17  Q.   So the plan investors have a few more options than the

18  company does, don't they?

19  A.   The provisions with respect to the company and the plan

20  investors are different.

21  Q.   Okay.  And this is all before the plan investors have to

22  put up any money at all, right?

23  A.   They have not funded anything at that period of time,

24  that's correct.

25  Q.   And they had the option to walk away without fund paying,

61

1    correct?

2    A.   As you've described it.

3    Q.   And you testified that when someone has the ability to

4    walk away for any reason or no reason, they haven't really made

5    a commitment, right?  Haven't you said that?

6    A.   I understand your point.

7    Q.   I'm sorry?

8    A.   Yes, ma'am.

9         MS. STEINGART:  I think we could put the agreement

10   away for a moment.

11   Q.   Now I'm going to go back to the alternative transaction

12   fee.  The alternative transaction fee has a tail, right?  A

13   period on the continued use and existence?

14   A.   Yes, it does.

15   Q.   And could you describe what the tail is?

16   A.   I believe it's twenty-four months.

17   Q.   When you were evaluating this and telling the Board about

18   it, did you look at any other transaction that had a tail of

19   twenty-four months?

20   A.   I did not personally, no.

21   Q.   And did any of your advisors tell you that there were

22   transactions that had twenty-four month tails?

23   A.   I don't recall specifically asking them that question.

24   Q.   And no one said gee this is a really long time?

25   A.   I think that we sought to negotiate the agreement and each

62

1   individual provision, and as it related to that period of time

2   that was the best we could do.

3   Q.   Okay.  Well, you were the lead negotiator, tell me about

4   the negotiation on the twenty-four months?  They said twenty-

5   four months and what did you say?

6   A.   We originally sought for it to be six months.  It was an

7   area that there was not latitude on their parts and it's not

8   one that was changed.

9   Q.   So they said twenty-four, you said six and they said

10   twenty-four, and that was the end of it?

11   A.   At the end of the day we recognized that this company

12   would be executing an alternative transaction in order to be

13   able to emerge from Chapter 11, an alternative transaction

14   would need to take place.  So it was not a position that we

15   felt that was going to materially affect the outcome in any

16   event.

17   Q.   So having an obligation to pay it for a longer period of

18   time was not a concern to you?

19   A.   What was of concern to us was to negotiate an agreement as

20   a whole for the best -- in the best interest of all the

21   constituencies and we sought on every provision, and there were

22   some that we felt more strongly about than others.

23   Q.   Okay.  What was it that led you to -- we're talking about

24   negotiating of provision, what was that led you to arrive to

25   the investors to walk away here, what led you to do that?

63

1          MR. BUTLER:  Objection.  Just for the record, what

2     does here mean?

3          MS. STEINGART:  The date before the effective date.

4     A.    I think that the agreements as they were drafted reflected

5     the -- I think the agreements as they reflected provided a --

6     perhaps an opportunity that -- as this process has evolved

7     provided a right that perhaps was unintended and over the last

8     week in order to be able to provide a deterrent to the right

9     being exercised, the changes that you see made to the EPCA were

10    made.

11    Q.    And what was the negotiation that led to the difference in

12    the termination of rights that we discussed that the plan

13    investors can terminate both of those with impunity but the

14    company could not.  What led to that?

15    A.    What led to that was discussions between representatives

16    of the debtors and representatives of the plan investors.

17    Q.    And you didn't say then when you get to twenty-four months

18    you need this too?

19    A.    I'm not aware that the twenty-four month so-called tail

20    was a point discussed over the last days.

21    Q.    Well, did you say to them I'm giving you -- I'm still

22    giving you this hash period?  Why can't we have mutual

23    termination rights?  You could go out in the hash period, why

24    can't the company go out.  But that didn't change, right?  Or

25    that actually did change, didn't it?  When you revised the

64

1  agreements the hash period got more restricted for the company,

2  didn't it?

3  A.   The changes that are reflected in Section 5(c) of the EPCA

4  were made and they provide for changes both for the company's

5  obligations or rights as well as the plan investors.

6  Q.   So in the after provision we have now the has period of

7  April 1st until this disclosure statement, right?  April first

8  until the disclosure statement as the has period, right?

9  A.   As set forth in the EPCA with the provisions that are in

10  the EPCA, yes.

11  Q.   That's the current agreement?

12  A.   The one that we were looking at a moment ago.

13  Q.   Right.

14  A.   Uh-huh.

15  Q.   Now, by this time, this hash period comes into play after

16  you have labor agreements and GM settlement, right?

17  A.   That would be correct.

18  Q.   Okay.  And did you know that Mr. Miller testified that

19  when it comes to the value of the company on in merges, the

20  most important factor are settlement of labor and GM?

21  A.   I haven't read Mr. Miller's testimony, deposition?

22  Q.   If he, in fact said that, would you agree with him?

23  A.   The settlements with labor and General Motors are critical

24  for this company to emerge from Chapter 11 and will play a very

25  big part in the value creation process.

65

1    Q.   So here the plan investors get to look and see what the

2    value is of the company and whether they really want to back

3    convertible preferred, whether they really want those rights,

4    whether these agreements had been good enough.  And they could

5    exercise their right to walk, correct?

6    A.   That's correct.

7    Q.   And as we said before, to the extent they had that there

8    is no commitment, right?

9    A.   The plan investors have the rights that set forth in the

10   agreement to be able to terminate.

11   Q.   Right.  And there's no commitment while they could do that

12   for any reason or no reason?  Right, we agreed about that

13   before, right?

14   A.   Yes, ma'am.

15   Q.   Okay.  Let's talk about value.  Let's talk about what kind

16   of value the plan investors are getting in addition to their

17   rights to terminate.  They're getting commitment fees, right?

18   A.   Yes, ma'am.

19   Q.   And the Judge doesn't want us to make this a testimony, so

20   let me give you a chart, okay.  I have a chart on both

21   handouts.

22           MR. BUTLER:  I thought you already produced all your

23   demonstratives?

24           MS. STEINGART:  I'm sorry, it's just an addition.

25           THE COURT:  No.  But you were supposed to give --

66

1          MS. STEINGART:  Was I supposed to give them all then?

2          THE COURT:  Yes.

3          MS. STEINGART:  I'm sorry, Your Honor.  I was caught

4     up in my examination.

5          THE COURT:  Well, maybe they did.  Did you give them?

6          MR. BUTLER:   No.  We have not seen this, Your Honor.

7          THE COURT:  Well, let's take a couple of minutes to

8     look at it before you go forward.

9          MS. STEINGART:  You will receive demonstratives that

10    I won't use during this examination, I ask that you not to

11    reveal them to the other witnesses.

12         MR. BUTLER:  Oh, that's fine.

13         MS. STEINGART:  Thank you.

14         MR. BUTLER:  So are there any other demonstratives

15    for the record, any other demonstratives beyond this one.

16         MS. STEINGART:  There's one more, I'm going to get to

17    it.

18         MR. BUTLER:  Okay.

19         MS. STEINGART:  Now, we're all done with

20    demonstratives, Your Honor, it won't come up again.

21         MR. BUTLER:  Do you have more of the one chart?  I

22    just need more of the other chart.

23         MS. STEINGART:  Sure.  Make sure the witness gets

24    one.

25    Q.   All right.  So let's see if we can talk about value to

67

1    plan investors.  Okay.  Let's start with the easy stuff.  We've

2    talked about these expenses already, but we can recap them

3    briefly.  And this is value transfer to investors to the extent

4    that they don't exercise unilateral rights they have once they

5    look at the economics and walk away.  Okay.  So this is if the

6    deal actually gets done.  So we've already talked about the

7    thirteen million immediately upon approval, correct?

8    A.    Yes, ma'am.

9    Q.    And there's and additional five that Appaloosa gets on the

10   effective date, right?

11   A.    That's correct.

12   Q.    And we have an estimate for these uncapped fees.  And I

13   didn't realize they were five, but I'll stay with my estimate

14   of five to ten.  Do you think that's a fair estimate, Mr.

15   Sheehan, a low estimate?

16   A.    I have no opinion on that subject.  I'll just take your

17   estimate.

18   Q.    Okay.  If between now and the effective date all five plan

19   investors had expenses of ten million would you be glad?

20   A.    I could make a joke at the current time but I'll say yes.

21   Q.    Okay.  And then we have the commitment fees, and the

22   commitment fees are the commitment fees for the rights offering

23   convertible preferred, correct?

24   A.    Yes, ma'am.

25   Q.    And that's seventy-six million dollars?

68

1    A.    That's correct.

2    Q.    And then we have the rights offering itself, where the

3    debtors get allocated to them 6.3 million shares, right?

4              THE COURT:    You mean the investors.

5              MS. STEINGART:    The investors that --

6              THE COURT:    You said the debtors.    The investors.

7              MS. STEINGART:    Oh, I'm sorry, the plan investors.

8    Thank you, Your Honor.

9    Q.    Have allocated to them 6.3 million shares, correct?

10   A.    That's correct.

11   Q.    And plan value of the stock is forty-five dollars, right?

12   A.    That is the expected plan value.

13   Q.    And their exercise price is thirty-five?

14   A.    That's correct.

15   Q.    And so the value of allocating to them for their own use,

16   6.3 million shares, is sixty-three million dollars, correct?

17   A.    That's correct.

18   Q.    And let's look at the convertible preferred.    Now the

19   convertible preferred they get thirty-four million and change

20   for that, right?    Thirty-four million shares?

21   A.    Yes, ma'am.

22   Q.    And with respect to the convertible preferred their

23   exercise price is also ten dollars below plan value, right?

24   A.    That is correct.

25   Q.    And if you multiply the ten dollars by the shares that

69

1   gives them value of 343 million dollars, right?

2   A.   Mathematically, that's correct.

3   Q.   And isn't it true it's unusual for convertible preferred

4   to be offered at a discount?

5   A.   I think that this is a unique transaction and I'm not sure

6   that there are comparable transactions to be able to compare it

7   to.

8   Q.   Didn't Mr. Resnick tell you that he was not aware of even

9   one transaction where a convertible preferred was offered at a

10  discount to the common into which it would convert?

11  A.   I didn't ask Mr. Resnick that question.

12  Q.   Nobody asked Mr. Resnick whether the discount pricing on

13  the convertible preferred was at all the way the market treated

14  these kinds of securities?

15  A.   I think that the discussion surrounded that this is a very

16  unique transaction that the thirty-five dollar per share

17  conversion price is equivalent to that which the rights

18  offering for both the plan investors and our current

19  shareholders is taking place.  And that was the basis for that

20  amount.

21  Q.   And Mr. Resnick didn't say I'm your financial advisor, you

22  should know.  Did he say that to you?  You should know that I'm

23  not aware of any convertible preferred in the market place for

24  a public company that's offered at a discount to those security

25  it converts into.  He didn't tell you that?

70

1    A.    I don't recall him saying that to me.

2    Q.    Now what price did the plan investor say they wanted to

3    have as their discount out of the box?  When they were

4    negotiating what was the offer they first put on the table?

5    A.    The thirty-five dollars per share is what their price was,

6    what their proposal was.

7    Q.    And what did you say back, we want forty-five?

8    A.    We looked at the transaction as a whole and the fact that

9    the rights offering was taking place both, for the plan

10   investors and for our total shareholder base.  And recognized

11   that the transaction would provide the company, the debtors,

12   with the requisite capital it needed to be able to effect its

13   transformation and emergency from Chapter 11.

14   Q.    So you're saying that they said thirty-five and you said

15   okay?

16   A.    We looked at the transaction as a whole as it was proposed

17   and we discussed that transaction, we negotiated that

18   transaction and the thirty-five was not an amount that was

19   changed from the original proposal.

20   Q.    Now were you giving them thirty-five when you agreed to

21   this because you thought there would be a lot of risks along

22   the way.  And that, you know, therefore, they should be

23   discount because who knows what the stock would be by the time

24   of the effective date, so you gave them the discount, is that

25   why?

71

1   A.   The convertible preferred stock will not be converted or

2   will not be realized in value in cash to the plan investors

3   until such time as it is both converted into common stock and

4   sold.  And, quite honestly, that will not be on the effective

5   date.

6   Q.   Okay.  So you gave them a discount because you were

7   concerned or accepted their idea that there was some risk

8   associated with the convertible preferred?

9   A.   The transaction contemplates that all of the shares that

10  are issued to the shareholders, including the plan investors,

11  is issued at thirty-five dollars per share or convertible at

12  thirty-five dollars a share.  It's the same price both, for the

13  plan investors as well as the common shareholders of the

14  company.

15  Q.   Right.  I know that you keep saying that but you're making

16  a distribution to common shareholders on account of the fact

17  that they're stakeholders, right?

18  A.   We're giving them the opportunity to invest in the company

19  at thirty-five dollars per share, it's not a distribution.

20  Q.   Right.  But on account of the fact that their stakeholders

21  of the company, right?

22  A.   That's correct.

23  Q.   And, you're giving it to the plan investors because it's

24  part of the deal, correct?

25  A.   That's correct.

72

1    Q.    And it's value, it has a value, right?

2    A.    It may be value to them in the future if the share price

3    of the company stays above thirty-five dollars per share.  Only

4    time will tell.

5    Q.    As you sit here today, do you seriously contend that at

6    the time this company goes effective that the convertible

7    preferred are going to be worth less then the common?

8    A.    That's not what I said.

9    Q.    So they're getting a discount on the convertible preferred

10   that has value, right?

11   A.    Ask your question again, please?

12   Q.    I said you're giving them a discount on the convertible

13   preferred that has value, correct?

14   A.    We are entering into a transaction to provide them the

15   right to convert their convertible preferred stock into common

16   stock at thirty-five dollars per share at some point in the

17   future.

18   Q.    Right.  And until that time, they get preferential

19   treatment as holders of the convertible preferred, don't they?

20   A.    They have certain corporate governance rights, that's

21   correct.

22   Q.    And don't they have certain rights to other payments?

23   A.    They receive a dividend of the 3.25 percent, that's

24   correct.

25   Q.    Right.  And they receive other protections in connection

73

1   with the convertible preferred, don't they?

2   A.   They do.

3   Q.   And that's why usually convertible preferred, even when

4   they're convertible to common, trade at a premium, right?

5   A.   I think that this is a unique transaction with an overall

6   level of investment and proposal by the plan investors and I'm

7   not -- I can't say whether it is a -- is comparable to other

8   transactions.

9   Q.   So the value -- if we look at the ten dollar discount, and

10  you have a good faith belief that stock is going to be forty-

11  five, don't you?  I mean, you're giving it to your unsecured,

12  right, at that value, right?

13  A.   That's correct.

14  Q.   Okay.  You have a good faith belief that on emergence it

15  will be forty-five dollars, right?

16  A.   That's the value that's set forth in the EPCA.

17  Q.   Okay.  So in order to understand the value that the

18  agreements give the investors we have to multiply the shares by

19  ten dollars, and we get 350 million, right?

20  A.   That's a mathematically correct answer.

21  Q.   Okay.  Now did anyone provide the summary chart like this

22  so that the Board could see in one place what the total implied

23  value of this transaction was to the plan investors?

24  A.   A chart such as that was not provided to the Board of

25  directors, no.

74

1   Q.   And is there anything in the summary, that you see before

2   you that we referenced before --

3        MS. STEINGART:   I'm really bad with exhibit numbers,

4   Your Honor, I'm really sorry.   What was the summary?   30.

5   Q.   Is there anything that's in Exhibit 30 that would give,

6   when the Board was reviewing this on December 11 so that it

7   could approve, bring the agreements to Judge Drain?   Is there

8   anywhere there, you know, anything that you could imply or add

9   together from there that would help you get to this?

10  A.   The provisions of the EPCA are set forth and so the amount

11  of the shares, the thirty-five dollar price, are included.   So,

12  you know, I think the same calculations that you did from the

13  EPCA can be done.

14  Q.   And was that discussed during the December 11 meeting?

15  A.   The provisions of the agreement were reviewed, yes.

16  Q.   You went through the summary, right?

17  A.   Yes, ma'am.

18  Q.   And is the description of value going to the plan

19  investors in the commitment fee section?

20  A.   There's not a chart such as that, that's correct.

21  Q.   Did anyone talk about total value going to the investors,

22  in any way, during that phone conversation?

23  A.   I think the transaction was described to the Board of

24  directors and including the discussions that had taken place

25  over a long period of time.

75

1    Q.   Right.  And as lead negotiator or as one of the lead

2    negotiators, you didn't even think about the transaction this

3    way, did you?

4    A.   I don't think that's true.

5    Q.   Did you add up in your mind every time the plan investors

6    asked for something, how it was increasing the value?

7    A.   I understand that each of those expense categories will be

8    provided to the plan investors.  I understand the amount of the

9    commitment fees that will be paid.  I understand the discount

10   on the director subscription shares.  And I understand that the

11   plan investors will hold a convertible preferred stock that

12   will be convertible at thirty-five dollars a share at some

13   point in the future into approximately thirty-four million

14   shares of the company.  The ability of the plan investors to

15   realize the discount on the convertible preferred stock in the

16   future is subject to the market in the future, the company's

17   performance, and in addition to that, the ability to dispose of

18   such a large lock of the company's common stock at the trading

19   price at that time.

20   Q.   But they really wanted this convertible preferred, didn't

21   they?  Like, you didn't have to beg them to take it, did you?

22   A.   It was a provision of the transaction.

23   Q.   And did you sort of compartmentalize this so that you

24   didn't, in your own mind ever say it could be worth X amount to

25   these guys?

76

1    A.    I'm not sure I understand the question.

2    Q.    Well, I'm trying to understand whether the Board

3    appreciated that the level of value, by doing the arithmetic,

4    where there's a good faith believe in the forty-five dollar

5    number is what we see on the street?  So did anyone give that

6    overall summary to the Board?  Did anyone say he could go as

7    far as 500 million?

8    A.    I remember somebody telling the Board that money and

9    adding all those numbers together, I think I've testified to

10   that.

11   Q.    Right.  And as to the convertible preferred, you don't

12   seriously believe it's going to be worthless in forty-five, do

13   you?

14   A.    I don't -- I can't predict what the future will be.  I

15   believe this customer, after the emergence from Chapter 11, and

16   has transformed itself will perform.  What the market will do

17   depends on a lot of other things.

18   Q.    Well, isn't there even a risk with this convertible

19   preferred, and it has so many characteristics of debt that it's

20   so protected, that it might be regarded by rating agencies as

21   debt rather than equity?

22   A.    I don't believe that our financial advisors believe that?

23   Q.    Sorry?

24   A.    I don't believe that our financial advisors believe that.

25   Q.    But you haven't gotten that determination yet, have you?

77

1    From the rating agencies, have you gotten that determination

2    yet?

3    A.    We have not had a determination from the rating agencies,

4    no.

5    Q.    And being a sophisticated financial person, you know that

6    there are number of convertible preferreds in the market place

7    that are regarded as debt, right?

8    A.    Those convertible preferreds I don't believe would have

9    the pure transfer into equity at all times that this one does.

10   There's no provision for a mandatory deduction.

11   Q.    So this has more ability to transfer into equity if the

12   equity is traded sixty dollars a share than other convertible

13   preferreds?

14   A.    My point is it has no mandatory redemption date, it has no

15   redemption date whatsoever.  It can only be converted into

16   common stock.

17   Q.    Right.  And if the common stock is trading at sixty that's

18   a pretty play, right?

19   A.    If it's trading at sixty that's a good play, yep.

20   Q.    Let's look at the rights offer.  It was the plan

21   investors, not Delphi, who insisted that the rights offering be

22   conducted pre-confirmation rather than post-confirmation,

23   right?

24   A.    That was a requirement of the plan investors, that's

25   correct, for the transaction.

78

1   Q.   They say I want a pre-confirmation, you said I want a

2   different timing and they said no.  And that was the

3   negotiation, right?

4   A.   I think there was a significant amount of negotiation and

5   discussion that took place between the equity committee and the

6   plan investors as they sought to reach a common ground on what

7   the consideration to our common shareholders in conjunction --

8   distribution to our common shareholders in conjunction with

9   this resolution of this Chapter 11 case would be.  The plan

10  investors were unwilling to cede that request of the -- cede to

11  the request of the equity committee.  We sought subsequently to

12  -- subsequent to the equity committee not being successful, we

13  also sought and were unsuccessful on obtaining that right or

14  that change in the timing of the rights offering.

15  Q.   It's not the fee committee it's the debtors as well who

16  are fiduciaries to stakeholders, right?

17  A.   I'm a fiduciary at the estate as a fiduciary to all of our

18  stakeholders, that's correct.

19  Q.   And you said during your deposition that the debtors told

20  the plan investors they wanted the rights offering at a

21  different time, right?

22  A.   We sought to get that provision changed, that's correct.

23  Q.   And the plan investors said no, right?

24  A.   That's correct.

25  Q.   And that's the way it is today, correct?

79

1    A.    Yes, ma'am.

2    Q.    And you know that if the rights offering takes place pre-

3    confirmation, that it's going to be worthless in the hands of

4    equity holders, right?

5    A.    that's a true statement.

6    Q.    And the rights offering occurring pre-confirmation will be

7    more complicated.  So your less sophisticated equity holders

8    will have a harder time accessing those rights, won't they?

9    A.    I think that changes were made to the rights offering to

10   allow the rights to be transferable, allowing our existing

11   common shareholders to -- increasing the ability and likelihood

12   of our existing common shareholders to receive value from the

13   rights.  And as to the difficulty of realizing the value,

14   whether it's immediately after the disclosure statement is

15   approved or at a later point in time, I'm not sure I know.

16   Q.    Well, let's talk about that a little bit.  All right?

17   Because if we have the rights offering pre-confirmation, if the

18   rights offering expires pre-confirmation, people have to mail

19   their money in and put their money in escrow and wait and see

20   if the plan is confirmed in order for them to know if the

21   rights are going to be distributed to them, right?

22   A.    In the event that the transaction didn't close, yes.

23   Q.    That means that the transaction didn't close, or maybe

24   you're right, let's see.  In order to exercise the rights --

25   A.    Uh-huh.

80

1   Q.    -- if the rights are offered, the ability to exercise the

2   rights as far as pre-confirmation, people have to mail in their

3   funds and their funds have to sit in escrow?

4   A.    That's true.

5   Q.    Because there's not rights offering unless the plan is

6   confirmed?

7   A.    That's correct.

8   Q.    All right.  And that's more complicated than having a

9   confirmation and people knowing that they could have their

10  rights and just sending in the check, right?

11  A.    I suppose.

12  Q.    Now in your first day papers you said this company had an

13  excess of 300 thousand shareholders, right?

14  A.    Yes, ma'am.

15  Q.    And a lot of these people are less sophisticated than your

16  plan investors and maybe some of my committee members, right?

17  A.    I don't know who all our shareholders are so I wouldn't

18  want to judge their financial.

19  Q.    But making it pre-confirmation not only makes it less

20  value but makes it a little harder for them, doesn't it?

21  A.    Yes, ma'am.

22  Q.    Okay.  But the reason that you acquiesced is because the

23  plan investors said look, we're not going to make it post-

24  confirmation because it will cost us more.  Isn't that what

25  they told you?

81

1    A.    That isn't -- separate those two statements, if I could.

2    Q.    Um-hmm.

3    A.    It is a true statement that they told us they were not

4    going to acquiesce -- the reason that they were not going to

5    change their timing of the rights offering.  The reason why we

6    chose to go forward with the agreements is because when we had

7    fully negotiated all of the terms and conditions, we believed

8    that it was in the best interest of the estates and all of our

9    constituencies to move forward and that to walk away from the

10   potential to sign up a plan investor, get agreements with the

11   unions and General Motors and to move this company out of

12   Chapter 11 was in the best interest of all of our

13   constituencies.

14   Q.    Now, the plan investors told you that they wanted the

15   rights offering, pre-confirmation, because delaying it to a

16   later time had an economic cost to the plan investors, right?

17   A.    That's their position.

18   Q.    They told you it did, didn't they?

19   A.    That's what I said.

20   Q.    Do you disagree with them?

21   A.    Quite honestly, I don't have a position on that matter.  I

22   understand what they say and I also understand that they said

23   they were not going to acquiesce to the change and --

24   Q.    Well, you have a -- couldn't you ask Rothschild?  They say

25   they're saving money here.  You're an investment banker, you

82

1   know about how much money can be saved by things like that.

2   Tell me how much they're saving.  Did you say that to anybody

3   from Rothschild?

4   A.   The -- I believe that the financial experts, financial

5   advisors, understand the position or the economic arguments

6   that the plan investors were making.  But, as I said, I don't

7   think that this revolves around -- the question revolves around

8   whether there was an economic cost -- an economic cost to the

9   plan investors or not.  That was their -- that's their reason.

10  We sought to get the change made.  We were unable to do so and

11  left between the choice of not recommending or moving forward

12  or not supporting the transaction.  Because of that individual

13  provision versus moving forward and providing a -- the surety

14  of a plan investor to get agreements with the labor unions and

15  General Motors, we believed it was in the best interest of the

16  estate to move forward.

17  Q.   So the plan investors told you I want more and you said

18  yes, right?  They said I want --

19  A.   That's -- that's not what I said.

20  Q.   -- more than this and you said, yes, and then you didn't

21  figure out how much more to tell the Board, did you?

22  A.   That's not what I said.

23  Q.   Okay.  Well, if they said that they were getting value

24  from it, why didn't you figure it out and tell the Board they

25  were getting value from it?

83

1           MR. BUTLER:  Objection.  Value from what?

2           MS. STEINGART:  From the rights offering occurring

3     pre-confirmation.

4     Q.   They said we don't want it later because it's going to

5     cost us money.  And if you're going to say, okay, I'm giving

6     you that, don't you want to know how much it costs to say,

7     okay, I'm giving you that?  Give me some back.  Give me

8     something.  Or at least tell the Board and let the Board know

9     that the Board's giving them more.  Now, did you tell the Board

10    that the rights offering could be waived?

11    A.   I don't believe that we did that, no.

12    Q.   And you understood that -- that under the EPCA, the rights

13    offering can be waived, didn't you?

14    A.   I believe that the debtors and the plan investors

15    clarified in a statement to the Court that the rights offering

16    would go forward and would -- was part of the overall

17    transaction and, therefore, was not intended to be waived.

18    Q.   Well, I understand what people's intent is between now and

19    the end of the day today.  But the agreements permit the

20    company and the plan investors to waive the rights offering,

21    correct?  You didn't take that out, did you?

22    A.   We didn't make any changes.  I believe we filed a

23    statement in response to a request for clarification by the

24    statutory -- by com -- by constituencies.

25    Q.   All right.  But I'm asking you, sir, what the agreements

84

1    say.

2              THE COURT:  Well, let's clear this up.  The statement

3    that was filed, is that incorporated into the agreement?  Are

4    the parties bound by that statement?  Where's counsel for the

5    debtor?

6              MR. BUTLER:  Your Honor, the statement -- the debtors

7    are bound by the entirety of the omnibus response to the

8    ambiguities as they were filed.  I believe the plan investors

9    will say so as well, as GM will say so.  It was signed by all

10   three parties.  Gentlemen?  The document we all signed, we're

11   bound by the document?

12             UNIDENTIFIED SPEAKER:  Yes.  Yes, Your Honor.

13             MS. STEINGART:  Well, I'm sorry.

14             THE COURT:  Okay.

15             UNIDENTIFIED SPEAKER:  The -- is bound by the

16   document.

17   Q.   Sir, the statement of ambigui --

18             MS. STEINGART:  Your Honor, the statement of

19   ambiguities does not negative the explicit --

20             THE COURT:  Well, I think what -- let's be a little

21   clearer.  The statement that I believe Mr. Sheehan was

22   referring to is that the confirmation will not go forward until

23   the rights offering has been completed.

24             MR. BUTLER:  Your Honor, yes.  And the statement also

25   says there was an alleged ambiguity.  The disclosure statement

85

1    hearing process is tied to the rights offering going forward.

2    In fact, there's language in it that point to -- in the

3    statement of ambiguity points out to that a condition according

4    to the disclosure statement is the registration statement to be

5    effective.  That they'll be run in tandem.  That's the

6    requirement in Article, I believe it is 1 or 2 of the EPCA.

7    And that court case remained in the statement filed by -- in

8    the court.

9         MS. STEINGART:  Your Honor, I agree with Mr. Butler.

10   There are conditions to closing in the EPCA.  But the EPCA also

11   has a specific provision, specific provisions that give the

12   company and the plan investors the right to waive.  It's in the

13   document and I would be remiss in my representation of the

14   constituency to leave that in a position where an agreement had

15   that explicit provision regardless of -- what will happen two

16   months from now, I really don't know, Your Honor.  But the

17   agreement is unambiguous in that respect that 9(b) provides the

18   ability of the investors to waive that provision and 9(c)

19   specifically provides that provision for the company to waive.

20   And I'll leave it at that and move on.

21        THE COURT:  But I -- well, I guess --

22        MR. BUTLER:  Your Honor, I can be helpful.  Your

23   Honor had said earlier that counsel should make references to

24   specific provisions.  I'd like to know what specific

25   provision -- if she's just referring to the fact that there's a

86

1   boiler plate in the back of the document that says that any

2   part of this document can be waived by this agreement --

3              MS. STEINGART:  No, Your Honor.  No, Your Honor.

4              MR. BUTLER:  I just want to know where it references.

5              MS. STEINGART:  Well -- I'm sorry, Mr. Butler.  9(a),

6   and I will direct the witness to it, 9(a) has a list of

7   conditions to closing.

8   Q.   Is that correct, Mr. Sheehan?

9   A.   Section 9(a) of the EPCA --

10             MS. STEINGART:  That's 9(a) of the EPCA, Your Honor.

11  And I don't have the blacklined.  Unfortunately, I marked up

12  one agreement and it was too hard to start again, so I kept the

13  one I had.  So I'm on page 48.  And so 9(a) says conditions to

14  the obligation of the party.  Okay?  And it says -- and it

15  begins by saying subject to 9(b) and 9(b) says the plan

16  investors can waive anything in 9(a).  All right?  And so, a

17  condition to closing in 9(a), if we, you know, thumb through

18  it, is the rights offering at items 10 and 11.  9(b), which is

19  on page 53, Your Honor, says all or any of the conditions set

20  forth in 9(a) may be waived in whole or in part.  9(c) -- and

21  that's by the investors.  In 9(c) -- deals with the obligations

22  or deals with the waiver rights of the company and if you go

23  through 9(c), it says the company can waive the rights

24  offering.  You know, I have a constituency to protect, Your

25  Honor, and the statement that somehow people may not intend to

87

1    do something when the Court is being asked to approve an

2    agreement that has an explicit provision for them to do just

3    that, it's --

4              MR. BUTLER:  It doesn't say that, Your Honor.  I

5    mean, we can do this legal argument --

6              MS. STEINGART:  All right.  We'll do it later.

7              MR. BUTLER:  But the fact is, that provision refers

8    to what occurs at closing.  Closing occurs on the effective

9    date.  Under the way this transaction is structured, you don't

10   even get to a disclosure statement hearing until the

11   registration statement is effective.  And the rights offering

12   has to be completed by the time you get to the confirmation

13   hearing.

14             MS. STEINGART:  You know, Your Honor --

15             MR. BUTLER:  And the concept that somehow this can be

16   on the closing date when it's already been completed that it

17   can be waived, you know, which is just a standard boiler plate

18   section saying conditions can be waived at closing which is

19   what conditions say -- just like the conditions of the

20   effective date will have the right to have waivers in them.

21   You know, I --

22             MS. STEINGART:  Well, Your Honor, you know, I don't

23   want to treat Mr. Butler like a country boy but people to

24   agreements have been known prior to the closing date when they

25   want to waive one of the conditions to waive them.  They don't

88

1    wait.  They waive them when they decide that -- and we'll get

2    to questions.  Okay.  We'll argue this later, Your Honor.

3    Excuse me.

4            THE COURT:  I just don't see how it works without

5    doing it.  It's how the investors get there -- I just don't see

6    how it works.

7            MS. STEINGART:  Well, the investors then just buy up

8    all the rights, Your Honor.

9            THE COURT:  But they're not rights, they're not

10   rights.

11           MS. STEINGART:  Then they're shares because it's --

12           THE COURT:  Then you have a stand alone plan.

13           MS. STEINGART:  No -- that's right.  Then they

14   become --

15           THE COURT:  So it's not -- I just -- you can explain

16   it to me in oral argument but it doesn't make sense.

17           MS. STEINGART:  Okay.  Well, you -- okay.  We'll deal

18   with that later.

19   Q.   Okay.  Now, the company has to file a registration

20   statement in connection with the rights if the rights go

21   forward, correct?

22   A.   Yes, ma'am.

23   Q.   And in that registration statement that the company will

24   be filing with the rights, it has to include financial

25   statements, correct?

89

1   A.   Yes, ma'am.

2   Q.   And at this time, the company has on file an 8K that

3   indicates that it may need to restate its financial statements,

4   right?

5   A.   That is correct.

6   Q.   And prior to any registration statement getting filed,

7   that situation is going to have to be resolved with the SEC, is

8   that fair?

9   A.   That's a true statement.

10  Q.   And it's only after that the registration statement can be

11  filed with the SEC, right?

12  A.   That is correct, yes.

13  Q.   And from that point on, it's a period of at least thirty

14  days before the registration statement can be effective, right?

15  A.   Yes, ma'am.

16  Q.   So to the extent that a registration statement is

17  necessary, it adds an element of uncertainty to the entire

18  transaction, doesn't it?

19  A.   It is another matter that we need to deal with, that's

20  correct.  And are dealing with.

21  Q.   You know, the debtors haven't always been completely

22  transparent about what these agreements do?

23       MR. BUTLER:  Objection, Your Honor.  That's

24  testifying.

25       THE COURT:  Sustained.

90

1      MS. STEINGART:  Can we give the witness the expedited

2   motion for authority to enter into the agreements?

3      MR. BUTLER:  I mean, it may be --

4      THE COURT:  I sustained your objection.

5   Q.   Sir, can I put before you what the debtors had filed as an

6   expedited motion for authority for an order authorizing the

7   equity purchase and commitment agreement by the Court?  Do you

8   see that, sir?

9   A.   A doc -- this -- that -- that's what this document that

10  was placed in front of me is.  It's not from the exhibit book

11  so I presume -- I'll assume that it's correct.

12  Q.   A motion filed with the Court.

13  A.   Okay.  Sorry.  I'm just saying.  I'm not --

14      THE COURT:  You'll take her representation that it is

15  what it is?

16      MR. BUTLER:  It's also Exhibit 59, Your Honor, for

17  the record.

18      THE WITNESS:  Thanks.  I wasn't trying to be

19  difficult.

20  Q.   On page 19, sir, does the filing set forth the fees?  I'm

21  sorry.  The commitment -- excuse me, the commitments that are

22  being made by the plan investors under the framework

23  agreements?

24  A.   Paragraph number again, please?

25  Q.   Paragraph number 35 on page 19.

91

1   A.   Paragraph 35 sets forth the individual components of the

2   securities of the company that the plan investors will purchase

3   or backstop in conjunction with the transformation plan or with

4   the investment.

5   Q.   And is there anything in that paragraph that indicates

6   that that if the commitment doesn't occur until immediately

7   before the effective date?

8   A.   This paragraph is only laying out the terms -- the -- the

9   securities that will be purchased and says that the EPCA sets

10  forth the terms and conditions upon which the plan investors

11  will purchase the three various types of -- or the three pieces

12  of its investment.

13  Q.   And paragraph 37?  Could you look at that with me on page

14  20?

15          THE COURT:  This is -- you can put this out at oral

16  argument.  This is silly.

17          MS. STEINGART:  All right.  Your Honor, I have no

18  further questions of this witness.

19          THE COURT:  Okay.  Okay.  Go ahead.

20  CROSS EXAMINATION BY

21  MR. HAIL:

22  Q.   Mr. Sheehan, I'm Brian Hail from Haynes and Boone

23  representing Highland Capital.  I believe in this case you

24  submitted a declaration in support of the debtors' motion.  Do

25  you recall that?

92

1    A.    Yes, I did, sir.

2    Q.    Okay.  I believe it's adjoined to Exhibit 62 and if you

3    wouldn't mind turning to that?  And it's specifically,

4    paragraph 26 of that and I'm going to focus on the first

5    sentence.  The first sentence states "the debtors believe that

6    the proposed fees and expenses that they may pay under the

7    agreements are reasonable under the circumstances and a prudent

8    use of estate assets providing the benefits to the debtor as a

9    result of the agreement."  Do you see that?

10   A.    Yes, sir.

11   Q.    Do you agree with that statement?

12   A.    Yes, sir.

13   Q.    Okay.  When you were talking about the proposed fees and

14   expenses in this sentence, what fees and expenses were you

15   including?

16   A.    In conjunction with the proposed transaction on the

17   investment agreements.  The plan investors will receive

18   reimbursement of their legal and other advisory -- advisory

19   firm expenses.  They will receive commitment fees for their

20   commitment to backstop the right's offering.  Those are the

21   specific fees and expenses that they received in conjunction

22   with the transaction.

23   Q.    Were you -- would you agree that there's other value given

24   to the plan investors in connection with the transaction?

25   A.    Yes, sir.

93

1    Q.   Okay.  And I believe that the equity committee has the

2    chart here which lists certainly the reimbursements up here and

3    the commitment fees here.  Is that right?

4    A.   Yes, sir.

5    Q.   So your statement in paragraph 26 is limited to

6    reasonableness, in your opinion, of these three -- of these

7    sets of pages, is that right?

8    A.   That's correct.

9    Q.   Did you -- well, do you have an opinion whether this is a

10   reasonable fee?

11            THE COURT:  Just for the record, what are you --

12            MR. HAIL:  Oh, just for the record, that is the

13   discount with the rights description feature that's provided

14   sixty-three million dollars based on a forty-five dollar -- the

15   thirty-five dollar rights price and a forty-five dollar stock

16   price.

17            MR. BUTLER:  Objection.  The foundation and

18   characterization is to it being a fee.

19   Q.   Do you know this value transferred to the investors, do

20   you agree with that?

21            THE COURT:  I'm sorry.  You should restate the

22   question.

23   Q.   All right.  Ms. Steingart walked you through the value

24   that is given to the plan investors as involved their ability

25   to purchase 6.3 million shares of common stock at a thirty-five

94

1    dollar price, do you recall that?

2    A.    I do.

3    Q.    Okay.  And I believe that you talked about a forty-five

4    dollar strength in stock price after emergency, do you remember

5    that?

6    A.    Yes, sir.

7    Q.    And that resulted in a ten dollar gain on those shares on

8    day 1, is that fair?

9    A.    To the extent that those prices are realized, yes.

10   Q.    Okay.  And that frees a sixty-three million dollar gain on

11   day 1 for the plan investors, right?

12   A.    On paper, yes.

13   Q.    Okay.  Do you think that's a reasonable fee or expense in

14   connection with this transaction?

15   A.    I think that that is a part of the overall transaction.

16   It's a -- it was a -- the way the transaction was structured

17   and negotiated was that there would be a rights offering of

18   sixty-three million shares at thirty-five dollars a share with

19   ten percent of those shares, or 6.3 million shares, reserved

20   for the plan investors.  We looked at the transaction as a

21   whole and the -- as I describe in my declaration, the

22   investment that was being made, the -- our belief that the plan

23   investors will provide the environment to be able to obtain

24   agreements with the unions and General Motors and, therefore,

25   allow the company -- the estates to emerge from Chapter 11 and

95

1   provide value to all of the constituencies to be in the best

2   interest of the estate.

3   Q.   Did you specifically consider this 6.3 million dollars to

4   be reasonable?

5            THE COURT:  I appreciate you came out for Ms.

6   Steingart, but I got this point.

7            MR. HAIL:  Okay.  Then let's be what it is.  The next

8   point.

9   Q.   This sixty-three million dollars is calculated assuming

10  forty-five post-emergence price, right?

11  A.   That's -- it's the -- is forty-five minus thirty-five

12  times 6.3 million.

13  Q.   If you turned to your declaration, paragraph 30, you state

14  that the frameworks agreements contemplate the value of

15  Delphi's common stock to be forty-five dollars per share at

16  emergence, do you see that?

17  A.   Yes, sir.

18  Q.   What did you mean when you said that?  How did you come up

19  with the forty-five dollar per share value?

20  A.   The forty-five dollar per share value is based upon the

21  plan investors expectation as to what the value of this -- of

22  the estate -- of -- of the -- of Delphi Corporation -- of the

23  enterprises and the number of shares that will be outstanding

24  in the reorganized Delphi.

25  Q.   Did you do any calculations to determine whether or not

96

```
1   that forty-five dollar share prices would be accurate?

2   A.   The company together with its financial advisors

3   considered the reasonableness of that -- that amount and

4   concluded that it was reasonable, yeah, based upon the number

5   of shares that would be outstanding.

6   Q.   Have you heard from anyone that forty-five dollars per

7   share is low?  In fact, that the expected share price at

8   emergence is higher?

9   A.   Have I heard from anybody?  I guess I'm aware that

10  Highland Capital has made representations as to what it

11  believes the value of Delphi would be.

12  Q.   Are you aware that Highland Capital is calculated that the

13  current market -- well, not the current market -- on December

14  19th, the market implied that there would be a $57.90 value for

15  each share of new Delphi's common stock at emergence?

16  A.   I'm aware that that statement that was in, I believe,

17  their objection as well as the declaration of Pat Dougherty.

18  Q.   Have you investigated that or explored that or talked

19  about that with anyone?

20  A.   Yes, I have.

21  Q.   And what have you done?

22  A.   I've talked about it with my financial advisors,

23  Rothschild.

24  Q.   And what did they tell you?

25  A.   That -- that they understand that the calculation that was
```

97

1    done by Highland is based upon the public market price of the

2    stock and the terms of the framework agreements in terms of

3    number of shares that will be outstanding and so forth, and

4    whether or not the value is fifty -- it takes as a premise that

5    the market has all information including all of the non public

6    information that the plan investors and other proposed

7    investors in Delphi have or had in determining that forty-five

8    dollars per share was a -- based upon the number shares

9    expected to be issued was a reasonable price.

10   Q.    If the share price at emergence had actually been $57.90,

11   that increases the gain to the plan investors on two pieces of

12   this chart, isn't that right?

13   A.    It increases the -- those two numbers and it increases

14   value for all of our constituencies.

15   Q.    Well, putting aside the value to the constituents, let's

16   talk about the value to the plan investors.  There's actually

17   twenty-two million dollars -- I'm sorry.  The share price is

18   57.90.  The discount that's being offered --

19          THE COURT:  I can do the math.

20   Q.    -- is $23.90, isn't that right?

21          THE COURT:  Let's move on on this.  This is --

22          MR. HAIL:  Okay.

23   Q.    I think you testified earlier the summary that went to the

24   Board you could calculate the discount and the 343 million

25   dollar value to the investors, do you recall that?

98

1    A.   I think that's what I said.

2    Q.   All right.  Would you take a look at Exhibit 30 again,

3    please?  Is this the summary you were speaking of?

4    A.   Yes, sir.

5    Q.   If you take a look at the description on the first page,

6    it identifies 1.2 billion of preferred shares, do you see that?

7    A.   Yes, sir.

8    Q.   Does it discuss anywhere in there that the preferred stock

9    is convertible?

10   A.   It's not specifically in this document.  The -- I believe

11   you would find that it's set forth in the plan support

12   agreement.

13   Q.   But this was a summary that was given to the Board, right?

14   A.   Plus the entire plan support agreement.  I apologize if I

15   misspoke earlier.

16   Q.   Did you expect that the directors agree to the plan

17   support agreement to determine that it was convertible

18   preferred?

19   A.   The plan support agreement actually was specifically

20   requested by the directors to be provided to them.

21   Q.   Let me ask you another question.  It doesn't mention that

22   it's convertible.  Does it mention a strike price for the

23   conversion of the preferred shares?

24   A.   You're speaking about the --

25            THE COURT:  No, obviously.

99

1          MR. HAIL:  Okay.

2          THE COURT:  I'm going to be a little harder on you

3    because I realize there's a potential given that your client

4    has made this offer for a filibuster nature to this.  I don't

5    sense you really are but I really want you to focus on things

6    that are not cumulative or obvious.

7          MR. HAIL:  Okay.

8    Q.   You testified earlier also that the value to the -- it's

9    not necessarily a value on day 1 to the convertible preferred

10   shareholders because the stock price might go up or down.  And

11   it would only realize that value upon conversion.  Is that

12   fair?

13   A.   That's what I said.

14   Q.   Okay.  Are you familiar with convertible preferred stocks

15   or issuances?

16   A.   Generally.

17   Q.   Have you ever been involved in a transaction in which

18   there's been a convertible preferred issuance?

19   A.   No, sir.

20   Q.   Are you familiar with the way convertible preferred shares

21   trade?

22   A.   Generally?

23   Q.   Are you familiar with hedging strategies involving

24   convertible preferred stocks?

25   A.   No, I'm not.

100

1   Q.   Okay.  Given that this preferred is in the money and you

2   can convert it at any time over seven years, isn't there option

3   value involved with this convertible preferred?

4   A.   There may be.  I'm not an expert in that area.

5   Q.   Doesn't the convertible preferred also pay a coupon rate?

6   A.   It pays 3.25 percent, that's correct.

7   Q.   And what does that on an annual basis cost the company?

8   A.   Approximately fifty million dollars.

9   Q.   Was that pointed out to the Board at any point?

10  A.   I believe it's set forth in the plan support agreement.

11  Q.   Do you recall any discussion with the Board about that?

12  About the specific component of the coupon rate for the

13  convertible preferred?

14  A.   I believe it was discussed with the Board.  I can't tell

15  you specifically the date.

16  Q.   Do you recall --

17        MR. HAIL:  -- and, Al, this is where we might get

18  into the -- Your Honor, I want to talk about a document

19  involved that was presented to the Board and the debtors have

20  labeled it highly confidential.  And I think it is --

21        THE COURT:  What's the exhibit?

22        MR. HAIL:  Just a second, let me get it for you.

23  It's Resnick Exhibit I which is -- I think it's 34.  Let me --

24  yes.  It's Exhibit 34.

25  Q.   And specifically, I would like to focus your attention on

101

1    the page that is Delphi FL1954.  Do you see that?

2    A.   Yes, sir.

3    Q.   Okay.  This lists a series of execution risks associated

4    with the Highland proposal, do you see that?

5    A.   Yes, I do.

6    Q.   When was this document created, do you remember?

7    A.   December 22nd, 2006.

8    Q.   Okay.  And this is a Rothschild presentation, isn't that

9    right?

10   A.   It is a Rothschild document, that's correct.

11   Q.   Okay.  Did you participate in drafting this?

12   A.   I reviewed a draft of it before it was distributed, yes.

13   Q.   Okay.  Now, these were the considerations that were true

14   on December 22nd, isn't that right?  Or, in your opinion were

15   true on that day, is that fair.

16        MR. HAIL:  Let me start the question over.  I'll

17   withdraw the question.

18   Q.   Were these the issues that you considered on December the

19   22nd, 2006.

20   A.   These are -- these were -- these were and are execution

21   risks associated with the Highland proposal on December 22nd,

22   2006.

23   Q.   Let's start with the first risk listed.

24        MR. HAIL:  Are you guys okay with us?

25        MR. BUTLER:  Yeah, I'm -- I mean, I'm okay at this

1    point that you can point to the risk and you don't have to

2    repeat it and ask him to comment on it.  But I guess my

3    question is what the foundation is for this examination

4    relating to the motions?  I mean, he didn't testify as to these

5    issues in his direct testimony, for example.  I'm just trying

6    to figure out -- I mean, I'm not -- I'm just trying to

7    understand where you're going.

8              MR. HAIL:  This witness is not going to testify at

9    all about the execution risks associated with the Highland

10   transaction.

11             THE COURT:  I thought it was going to be Mr. Miller

12   on that one.

13             MR. BUTLER:  Yeah.  I mean, his testimony is what's

14   in his declaration.

15             THE COURT:  The debtors are going to do a direct of

16   Mr. Miller on the --

17             MR. HAIL:  This is from December, though, Your Honor.

18   This is not from the Board meeting yesterday.

19             MR. BUTLER:  No.  This was a -- I mean, again, this

20   is a presentation created by Rothschild on December 22nd and

21   sent to the Board.  It was considered.  There was no Board

22   meeting on December 22nd, as counsel knows.  There was a Board

23   --

24             THE COURT:  Well, let me ask it.  Mr. Sheehan, in

25   your declaration, when you're commenting on the debtors'

103

```
1   decision to go ahead today with this hearing --

2              THE WITNESS:  The framework agreements.

3              THE COURT:  Did you include your consideration of

4   this document as part of your analysis?

5              MR. HAIL:  Your Honor, I don't believe in his

6   declaration he indicates that they plan to go forward with this

7   hearing.

8              THE COURT:  Oh, okay.  I'm sorry.  I'm looking at the

9   debtors' response.  Did you consider this document in

10  connection with your declaration?

11             MR. BUTLER:  I mean, Your Honor, he did describe it -

12  - what was occurred at the beginning of paragraph 32.  There

13  was discussion.  In his declaration, paragraphs 32 to -- I

14  think it's to approximately paragraph 42 describe factual

15  elements relating to the Highland -- consideration of the

16  Highland proposal.

17             MR. HAIL:  And, Your Honor, where I'm going is I just

18  want to talk about the efforts that have been made to overcome

19  these execution risks since the time the document was created

20  and what Mr. Sheehan knows about that.  What the company has

21  done or what the status of the -- of --

22             THE COURT:  Okay.  You can go ahead.

23             MR. HAIL:  What's that?

24             THE COURT:  You can go ahead.

25             MR. HAIL:  Okay.
```

104

1    Q.   The first one is that Highland had not contacted Delphi or

2    its advisors.  Have you -- since December 22nd has Delphi met

3    with Highland to discuss its proposal?

4    A.   Yes, we have.

5    Q.   Okay.  Is it fair to say that you have a dialogue with

6    Highland about its proposal?

7    A.   We met on January 2nd, 2007 at the company's headquarters

8    in Troy and we have had discussions either between the company

9    and Highland or between Highland's legal advisors and Delphi's

10   legal advisors since that time.

11   Q.   Okay.  The next one, Highland's -- well, the next one,

12   addressing Mr. Butler's concern, skipping over the second one,

13   the third one is a timeline and level of commitment are

14   unclear.  Do you see that?

15   A.   Yes, sir.

16   Q.   Has Highland subsequently provided a timeline for its

17   transaction to the debtors?

18   A.   Yes, it has.

19   Q.   Okay.  Has it demonstrated its level of commitment to this

20   transaction to the debtors?

21   A.   It has demon -- it certainly has demonstrated that it --

22   through coming and meeting with the company through its

23   involvement that it is -- it is seeking to execute the

24   transaction, yes.

25   Q.   Skipping the one after that, but the next one, Highland's

105

1    financial ability to underwrite the deal, do you see that?

2    A.    Yes, sir.

3    Q.    Since this document was drafted on December 22nd, has the

4    company learned more about Highland's ability to underwrite a

5    4.2 or 4.7 billion dollar deal?

6    A.    Yes, we have.

7    Q.    And what have you learned?

8    A.    Highland is a thirty -- represents and I believe they

9    do -- have thirty five billion dollars of assets under

10   management, that there are no restrictions among its -- under

11   its -- under the provisions in which it operates to -- that

12   would restrict it from investing such a large percentage of its

13   assets in one investment and that it would be able to move

14   the -- the necessary assets if they weren't sitting within one

15   investment vehicle into an investment vehicle in order to make

16   the transaction happen.

17   Q.    The next one references a financial advisor.  Do you know

18   if Highland has hired a financial advisor in connection with

19   this transaction?

20   A.    It has hired a financial advisor in connection with the

21   transaction.

22   Q.    The last bullet point references Highland's investment in

23   automotive companies.  Do you know if now if Highland has

24   significant investments in automotive companies?

25   A.    I don't believe they do, no.

106

1    Q.    What's the basis of that knowledge?

2    A.    I believe it's the representation of Highland itself.

3    Q.    If Mr. Dougherty were to talk about the automotive

4    investments, would you have any reason to doubt Mr. Dougherty's

5    statements?

6    A.    I think it was Mr. Dougherty at our offices that didn't

7    talk about significant automotive investments, so I'm only

8    basing it on what I think he said to me or to the company on

9    January 2nd.

10   Q.    Are you aware that Highland has a multi-hundred million

11   dollar ownership of a credit facility of Ford Motor Company?

12   A.    I think that the premise in the word "investments" here is

13   actually equity ownership and running of automotive companies

14   as opposed to -- ownership of as opposed to investing in their

15   securities.

16   Q.    Okay.  Mr. Sheehan, do you have an opinion whether the

17   Highland proposal provides greater recovery to the stakeholders

18   in this bankruptcy than the AHC proposal -- if those were

19   effectuated and implemented?

20   A.    I'm not sure that I can draw a conclusion about that yet.

21   Q.    Has the company received any advice on that subject?

22   A.    I think the company hasn't reached a conclusion on that

23   subject yet.

24   Q.    If you take a look at the same Rothschild presentation and

25   take a look at page 14 of that presentation labeled 1963 and it

107

1    is a proposal of recoveries among other things to various

2    stakeholder groups.  Do you see that?

3    A.   Yes, I do.

4    Q.   And it's got -- the second table down, I'm trying to

5    describe it, is -- the second table -- the furthest column to

6    the right is titled "Total."  Do you see that?

7    A.   Yes, I do.

8    Q.   Okay.  And if you look at the page that is 1961, that's a

9    similar analysis for the Highland proposal.  Do you see that?

10   A.   Yes, I do.

11   Q.   And do you see the same number which is the total -- under

12   the Recovery chart, do you see that same number?

13   A.   I see that number, yes.

14   Q.   And is the Highland proposal significantly higher than --

15   the recovery assuming conversion in the Highland proposal

16   significantly higher than the AHC proposal?

17   A.   It is higher presuming that these two transactions were

18   able to be executed in exactly the same way.

19              MR. HAIL:  I have no more questions, Your Honor.

20              THE COURT:  Okay.  Thank you.  All right.  Mr.

21   Butler?

22              MR. BUTLER:  You think we could take a two minute

23   break?

24              THE COURT:  Yeah, why don't we take a five minute

25   break?  So I'll be back at 1.

108

```
1              (Recess from 12:55 p.m. until 1:06 p.m.)

2              THE COURT:  Please be seated.  Okay.  We're back on

3    the record in Delphi.  Mr. Butler?

4              THE COURT:  Please be seated.  Okay.  We're back on

5    the record in Delphi.  Mr. Butler?

6              MR. BUTLER:  Thank you, Your Honor.

7    RE-DIRECT EXAMINATION

8    BY MR. BUTLER:

9    Q.   Good morning, Mr. Sheehan.  Mr. Sheehan, do you have the

10   exhibit book in front of you that has exhibits starting with

11   Exhibit number five running through Exhibit number 63?

12   A.   I have that book.

13             THE COURT:  I don't.

14             MR. BUTLER:  I think --

15             THE COURT:  There's one that begins with 6.

16             MR. BUTLER:  Oh, I'm sorry, maybe it's 6.  Maybe I

17   just can't read, Your Honor.

18             THE COURT:  Okay.

19   Q.   Number 6, right.  Number 6, do you have that book?

20   A.   Yes, I do.

21   Q.   At issue in your cross examination by counsel was what the

22   board was told by you and what they were told by the company at

23   board meetings.  Do you recall that cross examination?

24   A.   Yes, I do.

25   Q.   Okay.  I'd like to walk you through and ask you questions
```

1    about what the board was told, starting with Exhibit 20.  Would

2    you turn to that exhibit?  Did you participate in a board of

3    director's meeting where this exhibit was presented to the

4    board?

5    A.   Yes, I did.

6    Q.   I'd like if you would please turn to page 17-69, as it's

7    marked in the lower right hand corner, 17-69.

8    A.   Yes, sir.

9    Q.   Can you generally describe what this page is?

10   A.   This is labeled an economic analysis of what we refer to

11   as the AHC proposal -- the proposal that's finely embodied in

12   the framework agreements, and it takes the assumed enterprise

13   value of approximately 14 billion dollars, deducts the debt to

14   the expected debt at emergence and comes to the --

15   Q.   Mr. Sheehan, I don't want you to put the numbers in

16   evidence.

17   A.   I'm sorry.

18   Q.   I'm just asking you whether you generally describe the

19   doc --

20   A.   It's a document that sets out an expectation as to what

21   the ownership and economic recoveries of stakeholders would be.

22   Q.   Mr. Sheehan, do you have a specific recollection as to

23   whether this page was presented to the board of directors of

24   Delphi Corporation?

25   A.   Yes, I believe it was.

110

1   Q.   And with respect to this page -- just very quickly going

2   back to Ms. Steingart's chart on plan investors.  She pointed

3   you to the 63 million dollars discounted as institution shares,

4   right?  Do you recall that?

5   A.   Yes, I do.

6   Q.   Do you recall that she asked you if that number was ever

7   presented to the board of directors?

8   A.   Yes, I do.

9   Q.   Having now looked at Exhibit 20, page 17-69, do you see

10  that number in this presentation?  Look at the far right corner

11  table.

12  A.   Yes, I do.  Sorry.

13  Q.   And do you see the 343, the second number.  Is that his

14  presentation?

15  A.   Yes, it is.

16  Q.   In fact, Mr. Sheehan, these numbers that Ms. Steingart

17  asked you about here are both included in the presentation

18  presented to the board.

19  A.   Yes, they are.

20  Q.   Mr. Sheehan, this is another demonstrative Ms. Steingart

21  prepared.  She graciously agreed that I could use it to -- in

22  this redirect examination.  This is a chart that talks about

23  total plan investor compensation.  Do you have a copy of the

24  chart in front of you?  I think you have a copy.

25  A.   No, I do not.

111

1          MR. BUTLER:  May I?

2          MS. STEINGART:  Oh, yes.

3          MR. BUTLER:  Would you mind if I --

4          MS. STEINGART:  No, no, please give them out.

5          MR. BUTLER:  And does the Court have it?

6          MS. STEINGART:  No, no, no.

7          THE COURT:  I have it.  No, I have it.

8          MS. STEINGART:  Oh, you have it.

9          THE COURT:  Yeah.

10         MS. STEINGART:  Okay.

11    Q.   This table has three columns to it.  The first is -- do

12    you see the far left one is -- can you just describe that?

13    A.   That's the proposal that was outstanding from the plan

14    investors on, I believe, November the 9th, 2006.

15    Q.   And are you familiar with the center column?

16    A.   Yes, I am.

17    Q.   And what does the center column represent?

18    A.   It represents the counter proposals by the joint UCC

19    creditors' committee on November 10, 2006.

20    Q.   Prior to seeing this demonstrative chart were you familiar

21    that the equity committee and creditors' committee made such a

22    counter proposal?

23    A.   Yes, I am.

24    Q.   And in what context or in what meetings were those

25    proposals made, if you know?

112

1   A.   There were a series of meetings that were going on between

2   the plan investors, Delphi, and the statutory committees in the

3   early part of November as we sought to reach agreement on the

4   framework for the investment by the plan investors and the

5   recoveries by the various constituencies.

6   Q.   If you recall, where were those meetings held?

7   A.   In New York City.

8   Q.   And where in New York City?

9   A.   At Skadden Arps offices in New York.

10  Q.   Were these part of the framework meetings that had been

11  discussed in these pleadings?

12  A.   Yes, they are.

13  Q.   When did those framework meeting begin?

14  A.   Well they began in the early -- very early in August --

15  the 1st of August in 2006.

16  Q.   Now, in connection with the counteroffer that the equity

17  and creditors' committee made, insofar as you know, did they

18  ask the plan investors not to take a discount with respect to

19  the preferred shares?

20  A.   No, they did not.

21  Q.   And so far as you know, did the equity committee and

22  creditors' committee ask the plan investors not to take a

23  discount on the rights offer?

24  A.   No, they did not.

25  Q.   Okay.  So as to the preferred commitment fees and as to

113

1  the right's offering commitment fees, so far as you know, was

2  the difference between the debtor, the plan investors and the

3  creditors' and the equity committee counter offer simply the

4  rates that are in the middle box?  Is that correct?

5  A.   That's correct.

6  Q.   And the discounts were constant.  Is that correct?

7  A.   Yes, sir.

8  Q.   Now, if you total up the fees in the first two boxes for

9  the equity and creditors' committee, what do those total --

10 just in dollar amounts?

11 A.   78 million dollars.

12 Q.   And what are the actual fees being paid under the plan

13 investment agreement -- the EPCA?

14 A.   The    --

15 Q.   Those same amounts?

16 A.   76 million dollars.

17 Q.   So the amount actually being paid is less than the equity

18 committee and creditors' committee's counter offer.  Is that

19 correct?

20 A.   Yes, sir.

21 Q.   Now, with respect -- just to be clear -- with respect to

22 the alternative transaction fee -- and just in fairness here --

23 there were far more material differences between the committees

24 and the plan investors and Delphi on that subject, isn't that

25 correct?

114

1    A.    Yes, sir.

2    Q.    And this chart fairly summarizes that, so far as you know?

3    A.    As I recall.

4    Q.    Let's go back to the other demonstratives that were used.

5    I want to go to the before demonstrative and the escape hatch

6    period that Ms. Steingart asked you so many questions about.

7    It was true that you were asked about this in your deposition

8    testimony?

9    A.    Yes, I was.

10   Q.    Okay.  I have a question for you and I want you -- not

11   that all your testimony isn't straightforward and honest to the

12   Court -- but I want you to think about this question and just

13   tell the Court your reaction to it.  Before Ms. Steingart asked

14   you these questions -- or you were asked these questions in

15   deposition -- about the ability of the plan investors to

16   theoretically terminate the PSA and then use a backwards escape

17   hatch to terminate the EPCA a day before the effective date of

18   a plan.  Had you ever contemplated that being part of the deal

19   between you and the plan investors?

20   A.    No, sir.

21   Q.    Had you ever recommended to the board that the plan

22   investors have that kind of escape hatch?

23   A.    No, sir.

24   Q.    When that was highlighted to you in your deposition

25   testimony did you view that to be the deal, a mistake or just

115

1    unnoticed operation of the documents, or what?  What did you

2    think that was when you gave your deposition testimony?

3    A.    After the deposition testimony was completed we discussed

4    the subject and determined that it was an unintended

5    consequence which was then engaged in discussions between the

6    respective counsels for the plan investors and the company.

7    Q.    And that's the -- that drafting change is what resulted in

8    the after picture, correct?

9    A.    Yes, sir.

10   Q.    Now, in the after picture, the plan investors still had

11   the right to terminate after April 1st, but prior to disclosure

12   statement approval order.  Is that correct?

13   A.    I believe that's correct.

14   Q.    But they can't keep their fees.  Is that correct?

15   A.    That's correct.

16   Q.    Ms. Steingart asked you about the fact that during that

17   period -- that escape hatch -- that it certainly was possible

18   that -- I think she asked a question that the plan investors

19   could look at the GM and labor agreements then and if they

20   didn't create the right kind of value they could just simply

21   walk away from the company -- something along those lines.  Is

22   that right?

23   A.    That was generally the line of questioning, yes.

24   Q.    Isn't it true -- so far as you know -- doesn't the plan

25   investment agreement require the affirmative consent of both

116

1   the plan investors to the GM settlement?

2   A.   Yes, it does.

3   Q.   And isn't that also true with the labor agreements?

4   A.   I believe that's -- yes, that's definitely correct.

5   Q.   And don't they have independent termination rights much

6   earlier than April 1st if, in fact, they're not satisfied with

7   those agreements?

8   A.   That's correct.

9   Q.   So, when you're thinking about this, when we get to that

10  escape hatch period, are we going to have deals or not?

11  A.   By the time we get to the escape hatch period, we will

12  have deals with General Motors and the labor unions and in

13  addition to that the final business plan would have been

14  approved by the plan investors.  So I guess what I'm trying to

15  say is that all information will be available to them at that

16  point in time.

17          MS. STEINGART:  I'm sorry.  I didn't hear the last

18  part of the answer, Your Honor.

19          THE COURT:  All information will be available to them

20  at that time.

21  Q.   Mr. Sheehan, I'd like you now to look at -- we were on

22  Exhibit 20 a moment ago.  You were asked a number of questions

23  about documents that contain summaries of the EPCA.  It's true

24  isn't it, the board was given other documents as well in

25  connection with their consideration?

117

1    A.   Yes, sir.

2    Q.   Will you look at document number 23, please -- Exhibit

3    number 23?

4    A.   Yes, sir.

5    Q.   These are the -- would you describe these documents to the

6    Court -- this document -- what this exhibit is?

7    A.   During the early part of November 2006 as we were

8    negotiating with the plan investors on the terms of their

9    investment and the other aspects of recoveries under the -- for

10   the constituencies in the Chapter 11 case -- this so-called

11   discussions points document was used as a -- I guess you could

12   call it a term sheet -- by the parties and was exchanged back

13   and forth.

14   Q.   And that eventually was succeeded by the EPCA and the PSA,

15   is that correct?

16   A.   That's correct.

17   Q.   How about exhibit 24?  Describe what that is to the Court.

18   A.   Exhibit 24 represents a summary -- again I guess I would

19   call it a term sheet -- of the terms of the preferred stock

20   investment that would be made by the plan investors -- that

21   would have been made by the plan investors.

22   Q.   And this particular EPCA --

23        MR. BUTLER:  I mean, sorry, withdrawn.

24   Q.   The summary of terms of preferred stock actually is part

25   of the EPCA now, is that correct -- as an exhibit?

118

1   A.   I believe that's correct.  Yes, it is an exhibit to the

2   EPCA.

3   Q.   And were you at the board meeting when this document --

4   Exhibit 24 -- if you recall, were you at the board meeting of

5   Exhibit 24 where the board was presented this document and went

6   through the black lines?

7   A.   Yes, I believe I was.

8   Q.   Do you recall that presentation being made to the board?

9   A.   I believe that was -- yes, I do.

10  Q.   Let's move on now to the Exhibit number 27.  Describe to

11  the Court what Exhibit 27 is.

12  A.   Exhibit 27 represents a resolution of Delphi's board of

13  directors on December 7th, 2006.

14  Q.   Regarding what?

15  A.   Sorry.  Regarding the framework agreements -- specifically

16  the EPCA and the PSA and approving -- the board of directors

17  approving that such documents -- that they're approved, adopted

18  and authorized in all respects and resolving that certain

19  officers of the company were designated to execute and deliver

20  them on behalf of the name of the company --

21  Q.   I think that's -- I'm just trying to get generally

22  identified.  You don't have to read it.

23  A.   Okay.

24  Q.   How many board meetings, if you recall, did the Delphi

25  board of directors hold in the ten days or so prior to the 18th

119

1   when the announcement was made, to consider the announcement

2   that was made on December 18th regarding the framework

3   documents?  Was it more than one?

4   A.   It was one, two -- at least three or four.

5   Q.   And did that include a meeting on December 7th?

6   A.   Yes, that's correct.

7   Q.   If you look at Tab 32 -- Exhibit 32 for a minute, please.

8   What is this document?

9   A.   This represents a summary of the issues that had been

10  discussed or had been provided to the company by the equity

11  committee during the course of the process and what the status

12  of those comments was or is.

13  Q.   And this was on December 11th.  Is that correct?

14  A.   That's correct.  It was as of December 11th.

15  Q.   So if we come back to that diagram -- go back to exhibit

16  27 then -- this resolution was not adopted -- was it adopted or

17  not adopted on December 7th?

18  A.   No, I think that the resolution was actually adopted on

19  December 11th, that originally we had drafted that resolution

20  for that board meeting on that night.  However we weren't in a

21  position yet to finalize the agreements because there were

22  still outstanding deal points.  And hence we updated the board

23  on that date and I think the resolution actually was adopted on

24  December 11th, if I'm not correct.

25  Q.   And is the same thing true with the amendment to the

120

1    right's plan in Tab 28 -- Exhibit 28?  When I say the same --

2    presented on the 7th, adopted on the 11th?

3    A.    It was discussed with the board of directors on December

4    7th, presented to them and prior to the meeting, discussed as

5    to the purpose of the amendment and then it was then formally

6    adopted by the board on December 11th.

7    Q.    On Exhibit 29 what does that document represent?

8    A.    This represents a summary of the open issues with respect

9    to the EPCA -- the investment agreement on December 7th -- and

10   this was the document that was used by us to continue to track

11   the open issues that we had with the plan investors and how we

12   were handling those matters.

13   Q.    Did you present this exhibit to the board of directors?

14   A.    It was provided to the board of directors and reviewed

15   with them.

16   Q.    And did you participate in the discussion with the board

17   where the board went through each of these items and each of

18   the items was reviewed and discussed?

19   A.    Yes, it was.  We wanted --

20   Q.    Please.

21   A.    No, it's okay.

22   Q.    Exhibit 30, is this again the same?  This is a summary of

23   the Equity Purchase Agreement -- was this also discussed on the

24   7th and then again on the 11th?

25   A.    Yes, sir.

121

1    Q.   Exhibit 31, you testified in your cross examination that

2    the plan framework support agreement was requested by the

3    directors.  Do you have any personal knowledge as to why that

4    was requested?

5    A.   My recollection would be is that one individual director

6    believed it was very important that the directors see the

7    document itself and therefore requested that it be distributed

8    to the full board of directors.

9    Q.   Now, going back to Exhibit 32 -- now we're going to the

10   December 11th meeting -- is this the meeting at which the

11   framework documents were approved?

12   A.   Yeah, that's my recollection.

13   Q.   Can you explain to the Court -- first of all, was this a

14   summary prepared at your direction as the chief restructuring

15   officer of the company?

16   A.   Yes, sir.

17   Q.   Can you explain to the Court why you prepared a summary of

18   the 13 items that the equity committee was unhappy about and

19   presented that to the board of directors?

20   A.   The equity committee had provided us with feedback and

21   communication indicating that their comments were not being

22   addressed, and asked us to review that specifically with the

23   board of directors so we felt it was important that the board

24   understand what we had been doing to seek to address the issues

25   that the equity committee had.

122

1   Q.   And was there a discussion of those points after the board

2   meeting on December 11th?

3   A.   Yes, we walked through and pointed it out to the board.

4   Q.   With respect to Exhibit 33, is this the updated issues

5   list as of December 11th, and was this presented to the board?

6   A.   Yes, it was.

7        MR. BUTLER:  Just a moment, Your Honor, if I may.

8   Q.   Ms. Steingart asked you a series of questions about the

9   alternative transaction fee.  Just explain to the Court what

10  your emphasis was during those negotiations.  Was it on the

11  definition of what an alternative transaction fee was, what the

12  tail was, what the triggers were, what the amount was?  What

13  was the structure that you focused on the most and placed your

14  priorities, as chief restructuring officer of the company?

15  A.   Our biggest focus was on making sure that the situations

16  in which an alternative transaction fee was paid were limited

17  to situations were either the creditors' committee selected an

18  alternative transaction, another plan investor, or

19  alternatively willfully breached the document.  We believed

20  that only under those two circumstances was it appropriate to

21  pay an alternative transaction fee.  And we, during the early

22  part of December, narrowed significantly from what we had

23  originally received from the plan investors -- narrowed

24  significantly those events.  And it was the subject, actually,

25  of direct final negotiations between the plan investors and

123

1    myself and Rodney O'Neal, our president.

2    Q.   Mr. Sheehan, just to be fair to the equity committee's

3    concerns and to the Court, I just want to be clear on this

4    record.  An alternative transaction, the way it's defined in

5    this agreement, is essentially anything this company does after

6    this agreement terminates other than to convert to Chapter 7.

7    Isn't that right?

8    A.   I think that's correct.

9    Q.   So a stand alone plan is an alternative transaction,

10   right?

11   A.   We discussed that, yeah.

12   Q.   In fact, you and I actually talked about that the estate

13   of breathing was an alternative transaction, right?

14   A.   I think that's the way you described it.

15   Q.   And therefore tails and other things -- I think you

16   testified -- wasn't a real priority.  Is that correct?

17   A.   That's correct.

18   Q.   You focused on when it could -- what would trigger it

19   because once it's triggered it inevitably is going to be paid.

20   Is that not correct?

21   A.   That's correct.

22   Q.   All right.  And I think you've testified as to the two

23   instances -- willful breach or pick another deal.

24   A.   Yes, sir.

25   Q.   Okay.  Just so the record's clear on this point, what's

124

1    the exercise price of the rights offering under this

2    transaction?

3    A.    Thirty-five dollars per share.

4    Q.    All right.  And the valuations that were done here with

5    Ms. Steingart in terms of the implied value to the plan

6    investors, that's at the same price, is it not?

7    A.    Yes, sir.

8    Q.    When you met with Highland on January 2nd, did they tell

9    you at what level they would be willing to execute the price

10   list for the rights offering?  Was it also thirty-five dollars?

11   A.    Yes, it is.

12   Q.    Is that --

13   A.    Yes, it is.  Sorry.

14   Q.    Did you ask Highland to help you with -- explain how their

15   funds were committed to the December 21st proposal?

16   A.    We did discuss that topic, yes.

17   Q.    Did they provide you with any commitment of any of their

18   affiliates beyond the proposal made by Highland Capital, the

19   management company?

20   A.    I don't believe so at the current time.

21              MR. BUTLER:  I have no further questions, Your Honor.

22              THE COURT:  Okay.  Before you -- I had a couple

23   questions for Mr. Sheehan.  Mr. Sheehan, do you have a copy of

24   the current form of the investment agreement there?  Again, I'm

25   working off of my own copy so I don't know the exhibit number.

125

1              MR. BUTLER:  I recall it to be in the sixties.

2              THE COURT:  It's attached to 61 I think.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Okay.  If you go to page 52.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  You'll see at the bottom of that page

7    there's a -- these are the conditions to the effective date.

8              THE WITNESS:  Yes, sir.

9              THE COURT:  And the last one on this page is labeled

10   management compensation.  It says the company shall have

11   entered into employment agreements and other compensation

12   arrangements with senior management relating to compensation,

13   benefits, supplemental retirement benefits, stock options, and

14   restricted stock award severance and changing control

15   provisions and other benefits on market terms as determined by

16   the company's board of directors based on the advise of Watson

17   Wyatt and reasonably acceptable to ADAH and Dolce.

18             Have there been any -- or are there any agreements or

19   understandings currently between senior management on the one

20   hand and investors on the other, with regard to any of these

21   compensation arrangements beyond what's set forth in this

22   paragraph?

23             THE WITNESS:  There are certainly no agreements, or

24   for that matter understandings.  I think it would be fair to

25   say the only discussion that's taken place is that the

126

 1    compensation of management -- that the plan investors would

 2    expect that the compensation of management, that the total

 3    compensation package would be at market terms.  We've not had

 4    discussion about any specific terms or conditions.

 5            THE COURT:  Okay.  And then if you'll turn to page 44

 6    of the same agreement -- the investment agreement.  You'll see

 7    at the top of that page it says additional covenants of the

 8    investors, paragraph 6.

 9            THE WITNESS:  Yes, sir.

10            THE COURT:  And if you go down to the last one, 6d,

11    it says reasonable best efforts, each investor shall use its

12    reasonable best efforts to take all actions and do all things

13    reasonably necessary, proper, or advisable on its part under

14    this agreement and applicable laws to cooperate with the

15    company and to consummate and make effective the transactions

16    contemplated by this agreement -- the preferred term sheet, the

17    PSA, the GM settlement and the plan.  You see that?

18            THE WITNESS:  Yes, I do.

19            THE COURT:  Is there any additional agreement or

20    gloss on that provision that you're aware of among the parties?

21            THE WITNESS:  I don't remember.  There is -- I can

22    assure you that there are no other agreements between us and

23    the plan investors that have not been made aware to this Court

24    and I don't represent any specific importance that was attached

25    to this particular provision other than a --

127

1          THE COURT:  Other than what it says?

2          THE WITNESS:  Yes, sir.

3        THE COURT:  Okay.  All right.  Okay, Ms. Steingart.

4    RE-CROSS EXAMINATION

5    BY MS. STEINGART:

6    Q.   Why don't I start where the Judge left off, Mr. Sheehan?

7    Is it your understanding that Section 6d limits, in any way,

8    the ability in the PSA for the plan investors to walk away for

9    any reason or no reason?  Your understanding as a businessman

10   who negotiated these agreements.

11   A.   Say it again for me.  I'm sorry.

12   Q.   I said as a businessman who negotiated these agreements --

13   A.   Yeah, yeah.

14   Q.   -- is it your understanding that this provision, 6d,

15   limits in any way the right of the plan investors under the PSA

16   to walk away for any reason or no reason?

17   A.   No, I don't believe it does.

18   Q.   Now, when Mr. Butler was talking to you about this escape

19   hatch, you were talking about all the agreements that would

20   have been entered into by that point, right?

21   A.   Yes, ma'am.

22   Q.   But no matter how many agreements that were entered into

23   at this point, is there anything that says that if there's an

24   agreement with the union, the plan investors can't walk after

25   April 7th -- sorry after April 1st?

128

1   A.   There's nothing that says they can't, no.

2   Q.   Right.  And there's nothing that says that if there's an

3   agreement with GM that that prevents the investors from walking

4   on April 1, is there?

5   A.   Except as -- no, there is nothing that prevents them from

6   doing that.  That's correct.

7   Q.   Right.  And at this point in time the investors will take

8   another economic look at the deal, correct?

9   A.   I can't say what the investors will do.

10  Q.   And then they'll decide if they want to become committed

11  at that point.  Because after the disclosure statement's

12  approved, that's the end of the walk away, right?

13  A.   Yes, ma'am.  Sorry.  Yes, ma'am.

14  Q.   So, they just need to have this economic look at the deal

15  after everything is done and before the disclosure statement is

16  filed, right?

17  A.   Yes, ma'am.

18  Q.   All right. And when that's done -- when the disclosure

19  statement is filed the marketplace will know what these deals

20  are, won't they?

21  A.   Yes, ma'am.

22  Q.   Because they'll be incorporated?

23  A.   Yes, ma'am.

24  Q.   Mr. Butler made a point about unintended results.  Could

25  you look at Exhibit 86 with me, please?

129

1    A.    Yes, ma'am.

2    Q.    And can you read that to yourself, sir.

3             MR. BUTLER:  Your Honor, maybe while the witness is

4    reading this, Ms. Steingart can explain how this exhibit

5    relates to my redirect examination.

6             THE COURT:  I'm sorry.  I was making my -- what

7    exhibit is this -- 81?

8             MR. BUTLER:  86.

9             THE COURT:  86.

10            MS. STEINGART:  I just would direct the Court's

11   attention to the "in as much" paragraph.

12            THE COURT:  I'm sorry.  Did you have a question or

13   are we just asking the witness to read it?

14            MS. STEINGART:  No, I was going to pose a question.

15   I was just waiting for the witness to look up.

16            THE COURT:  Okay.

17   A.    I've read it.

18   Q.    Okay.  So this is an e-mail from your counsel to Mr.

19   Lauria who represents Appaloosa and to Mr. Braid who represents

20   Serbers, correct?

21   A.    That's correct.

22   Q.    And I won't read the material, Your Honor, since it is

23   marked confidential.  That's the way it should stay.  Now, no

24   one slipped section 3, termination event, into the PSA without

25   you looking, did they?

130

1    A.    No, ma'am.

2    Q.    And no one slipped it in without your counsel looking, did

3    they?

4    A.    No, I don't believe so.

5    Q.    And as you were getting to that meeting on December 11th,

6    there was discussion going on about how broad that section was

7    becoming, correct?

8    A.    Yes, ma'am.  I don't know about becoming, but --

9    Q.    And so that was topic that was front and center during

10   that period of time, correct?

11   A.    There were significant discussions going on with respect

12   to the form of PSA and what the -- and how that overall

13   document would be drafted and what plan parties were willing to

14   have stated in that document.

15   Q.    And this e-mail shows that there was a special

16   conversation going on about that termination provision, right?

17   A.    The actual discussion was principally about section --

18   another section of the document and that the individual writing

19   the e-mail then indicates that, you know, as a result the

20   section you're referring to -- it makes an observation about

21   the section you're referring to.

22   Q.    And there's some thinking about that and here, isn't

23   this --

24   A.    I'm sorry?

25   Q.    There's discussion about the broadness of --

131

1   A.   Yes, in the e-mail.

2   Q.   -- that article, right?

3   A.   In the e-mail.

4   Q.   Right.  All right.  And you don't know whether there was

5   continued correspondence on this issue, do you?

6   A.   This was on December 8th and for another roughly ten days,

7   the parties continued to discuss the planned support agreement

8   resulting in the form of agreement that we have today.

9   Q.   And they were discussing article 3 as well, weren't they?

10  A.   As well as the entire agreement, that's correct.

11  Q.   Now, you said you provided the entire PSA to the board,

12  correct?

13  A.   Yes.

14  Q.   Did anyone provide the board with a summary of how the

15  terms of the PSA and the investment agreement interacted?

16  A.   No, ma'am.

17  Q.   Just one last question on Exhibit 20, page 17-69, that you

18  were looking at with your counsel.

19  A.   Page stamp 69?

20  Q.   Um-hum, 17-69.  That's the page that you were looking at

21  with Mr. Butler.

22  A.   Yep.  Got it.

23  Q.   This document was prepared by Rothschild, wasn't it?

24  A.   Yes, ma'am.

25  Q.   And Rothschild listed this and this as discounts that the

132

1    plan investors were getting, didn't they?

2    A.    That's the word that's on the header.

3    Q.    And you have a recollection that this was discussed with

4    the board, right?

5    A.    This was -- this presentation was reviewed with the board

6    of directors.

7    Q.    And did you say to the board, no, no, no, no, they're not

8    getting so much, they're getting less.  Did you say that?

9    A.    No, I didn't say that.

10   Q.    Okay.  And there's another number here which is the 567

11   discount.  Do you see the 567 discount?

12   A.    Yes, I do.

13   Q.    And that's 567 million, right?

14   A.    Yes, ma'am.

15   Q.    And that's the discount that common shareholders are

16   getting, but when they get this distributed to them, aren't

17   they?

18   A.    If there's a full participation of the rights offering,

19   567 million is the value that would be conveyed to the common

20   shareholders.

21   Q.    And the more complicated it is and the harder it is for

22   them to do that, the fewer of those rights will be taken up,

23   right?

24   A.    Presumably.

25   Q.    And then who gets them?

133

1   A.   The plan investors have back stopped the rights offering.

2   Q.   And so they will have additional shares that they're able

3   to enjoy a ten percent discount on, correct?

4   A.   That's the way that transaction is structured.

5          MS. STEINGART:  I have no further questions, Your

6   Honor.

7          THE COURT:  Okay.

8          MR. BUTLER:  Nothing either, Your Honor.

9          THE COURT:  Okay.  You can step down, Mr. Sheehan.

10          THE WITNESS:  Thank you.

11          THE COURT:  All right.  I'm going to take a short

12   break for lunch.  And I know this may be too short for some of

13   you because it takes awhile to get out of the building.  But

14   I'd like to resume at about 2:30 if possible.  So if you can

15   make your way up -- or start making your way up -- maybe it

16   will slip a bit, but that's what I'd like to aim for.

17        (Proceedings concluded at 1:48 p.m.)

18

19

20

21

22

23

24

25

134

1

2                         I N D E X

3

4    WITNESS                 EXAMINATION BY          PAGE

5    Mr. Sheehan             Ms. Steingart          30

6    Mr. Sheehan             Mr. Hail               90

7    Mr. Sheehan             Mr. Butler             107

8    Mr. Sheehan             Ms. Steingart          133

9

10                        E X H I B I T S

11   DEBTOR'S                DESCRIPTION            PAGE

12   1-122                   All Exhibits           19

13

14

15

16

17

18

19

20

21

22

23

24

25

135

1

## C E R T I F I C A T I O N

3

4    I, Esther Accardi, court approved transcriber, certify that the

5    foregoing is a correct transcript from the official electronic

6    sound recording of the proceedings in the above-entitled

7    matter.

8

9    _____ January 12, 2007_____

10   Signature of Transcriber              Date

11

12   Esther Accardi_____

13   typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

**A**

**abandoned** 57:1
**ability** 59:11 61:3
  75:14,17 77:11
  79:11 80:1 85:18
  93:24 105:1,4
  114:15 127:8
**able** 25:21 37:11,11
  48:2 50:13 52:7
  62:13 63:8 65:10
  69:6 70:12 94:23
  105:13 107:18
  133:2
**above-entitled**
  135:6
**absence** 17:2
**Accardi** 2:24 135:4
  135:12
**acceptable** 125:17
**accepted** 71:7
**access** 10:7
**accessing** 79:8
**account** 71:16,20
**accurate** 96:1
**achieved** 46:8
**acknowledge** 12:3
  25:17
**acknowledged** 23:9
**acknowledging**
  12:25
**acquiesce** 81:4,23
**acquiesced** 80:22
**act** 48:15
**actions** 126:12
**activities** 24:8
**actual** 113:12
  130:17
**Ad** 8:18
**ADAH** 125:17
**add** 74:8 75:5
**adding** 76:9
**addition** 36:4,14,22
  37:17 65:16,24
  75:17 116:13
**additional** 8:3 10:3
  14:5 26:7 67:9

126:7,19 133:2
**address** 13:2 15:11
  17:20,21 121:24
**addressed** 13:10
  121:22
**addressing** 104:12
**adds** 89:17
**adjoined** 92:2
**adjustment** 7:17
**adjustments** 50:24
**admission** 15:20
**admit** 18:18 20:3,4
**admitted** 15:23
  21:13 23:13,20,23
  26:12,14 32:17
  48:25
**adopted** 118:17
  119:16,16,17,18
  119:23 120:2,6
**advice** 106:21
**advisable** 126:13
**advise** 125:16
**advised** 10:20
**advisor** 58:20 69:21
  105:17,18,20
**advisors** 58:22
  61:21 76:22,24
  82:5 96:2,22 104:2
  104:9,10
**advisory** 92:18,18
**Aerospace** 9:9
**affect** 62:15
**affidavit** 18:2,5
  26:16 29:3,7,10,18
**affidavits** 24:4,21
  25:5,6,10,19
**affiliates** 14:18
**affirm** 13:22
**affirmative** 115:25
**afternoon** 24:14
**agencies** 76:20 77:1
  77:3
**ago** 64:12 116:22
**agree** 30:12 46:25
  59:12 64:22 85:9
  92:11,23 93:20

98:16
**agreed** 8:15 9:4,10
  9:23 10:9,10 11:2
  12:1 32:9,10 38:14
  42:6,11 65:12
  70:20 110:21
**agreement** 2:2,3
  7:12,12 9:25 10:17
  10:23 11:11 12:4
  12:14 13:1 27:8
  29:20 34:23 35:10
  40:4 41:23 42:25
  43:5,18 45:10,22
  46:2,17,19 47:1,4
  47:7,12,14,20,25
  48:3,5,16 50:13,15
  50:17,18,19,24
  51:15,17 52:17,23
  52:25 54:14 55:3
  56:25 57:2,22,22
  58:17 60:12,14
  61:9,25 62:19
  64:11 65:10 74:15
  84:3 85:14,17 86:2
  86:12 87:2 90:7
  92:9 98:12,14,17
  98:19 100:10
  112:3 113:13
  115:25 120:9,23
  121:2 123:5,6
  124:24 126:6,6,14
  126:16,19 127:24
  128:3 131:7,8,10
  131:15
**agreements** 8:1 10:5
  10:15 12:17,23
  13:6 14:21 24:13
  27:17 34:22,22,25
  35:8 36:18 38:17
  39:21 40:13 42:1
  43:3,6 45:7,21,25
  46:5 47:3 48:8
  51:2,25 52:15
  53:20,22 54:2,3
  55:8,13 59:3 63:4
  63:5 64:1,16 65:4

73:18 74:7 81:6,10
  82:14 83:19,25
  87:24 89:22 90:2
  90:23 92:7,17
  94:24 95:14 97:2
  103:2 109:12
  115:19 116:3,7
  118:15 119:21
  125:11,18,23
  126:22 127:10,12
  127:19,22
**AHC** 40:7 106:18
  107:16 109:11
**ahead** 29:5 30:2
  91:19 103:1,22,24
**aim** 133:16
**AI** 3:9 7:8 100:17
**ALICIA** 5:21
**alleged** 84:25
**allocated** 68:3,9
**allocating** 68:15
**allow** 26:16 79:10
  94:25
**allowing** 79:10
**alterative** 45:4
**altering** 10:13 11:8
**alternate** 35:5,20
  36:19,24 39:3,25
  40:24
**alternative** 8:23
  35:7 37:17,25
  38:19,20 39:18
  41:11,12,16,20
  42:5,9,21,24 43:2
  43:4,8 44:7,15,20
  44:22,25 45:6 46:1
  46:12,18,25 61:11
  61:12 62:12,13
  113:22 122:9,11
  122:16,18,21
  123:4,9,13
**alternatively** 37:9
  122:19
**ambigui** 84:17
**ambiguities** 84:8,19
**ambiguity** 54:4

84:25 85:3
**amended** 8:21 56:1
  56:4
**amendment** 54:14
  119:25 120:5
**amendments** 24:13
**America** 8:13
**amount** 24:19 69:20
  70:18 74:10 75:8
  75:24 78:4 96:3
  113:17 122:12
**amounts** 113:10,15
**analyses** 16:6
**analysis** 19:10 22:8
  22:9,13 103:4
  107:9 109:10
**and/or** 9:23 15:14
**announcement**
  119:1,1
**annual** 100:7
**answer** 73:20
  116:18
**answered** 38:23
**anticipate** 14:11
**anybody** 82:2 96:9
**anymore** 22:21
**apologize** 13:25
  55:22 98:14
**Appaloosa** 67:9
  129:19
**apparently** 19:21
**applicable** 14:2
  126:14
**application** 54:1
**apply** 33:12
**appreciate** 10:12
  11:7 14:16 95:5
**appreciated** 76:3
**approach** 34:16
**approaching** 40:15
**appropriate** 8:5
  11:13 12:19 24:17
  31:22 32:16
  122:20
**approval** 2:1 7:11
  7:18 32:6 59:13

67:7 115:12
**approve** 54:2 74:7
  87:1
**approved** 42:25
  43:6 45:10 51:5
  79:15 116:14
  118:17 121:11
  128:12 135:4
**approves** 43:4 45:25
  58:17
**approving** 118:16
  118:17
**approximately**
  75:13 100:8
  103:14 109:13
**April** 52:24 57:7
  59:13 64:7,7
  115:11 116:6
  127:25,25 128:4
**area** 62:7 100:4
**argue** 88:2
**argument** 22:22
  87:5 88:16 91:16
**arguments** 82:5
**arithmetic** 76:3
**Arps** 3:2 7:9 112:9
**arrangement** 12:3
**arrangements** 10:3
  125:12,21
**arrive** 62:24
**article** 17:12 85:6
  131:2,9
**articles** 20:22,23,25
**ascertained** 38:2
**ascribe** 18:19
**aside** 59:10 97:15
**asked** 22:11 30:11
  33:9 38:23 44:6
  69:12 75:6 87:1
  110:6,17 114:6,7
  114:13,14 115:16
  115:18 116:22
  121:22 122:8
**asking** 30:12 43:7
  61:23 83:25
  109:18 129:13

**aspects** 47:3 117:9
**assert** 18:11
**assertions** 17:6
**assets** 92:8 105:9,13
  105:14
**assigned** 58:14
**associated** 71:8
  101:3,21 102:9
**Association** 9:9
**assume** 13:22 15:5
  18:14 49:8 90:11
**assumed** 109:12
**assuming** 27:23
  56:10 57:14 95:9
  107:15
**assure** 126:22
**attached** 8:1 21:1,2
  23:2 56:8 125:2
  126:24
**attended** 30:19
**attention** 56:23
  100:25 129:11
**Attorneys** 3:3,12,19
  4:2,10,18 5:2,10
  6:2
**attrition** 11:13
**August** 112:14,15
**authority** 90:2,6
**authorization** 2:1
  7:11
**authorized** 118:18
**authorizing** 90:6
**automotive** 105:23
  105:24 106:3,7,13
**available** 11:24 17:4
  19:4 21:15 26:13
  31:11 46:7 116:15
  116:19
**Avenue** 5:12
**award** 125:14
**aware** 11:17,19
  26:21 55:2 63:19
  69:8,23 96:9,12,16
  106:10 126:20,23
**awhile** 133:13
**a.m** 1:19

## B

**B** 1:21 134:10
**back** 13:11 37:24
  38:19 46:6,8 53:24
  57:17 58:9 61:11
  65:2 70:7 83:7
  86:1 107:25 108:2
  108:4 110:2 114:4
  117:12 119:15,15
  121:9 133:1
**backing** 16:19
**backstop** 11:23 91:3
  92:20
**backwards** 114:16
**bad** 74:3
**banker** 81:25
**bankruptcy** 1:2,14
  1:23 106:18
**BARBARA** 5:7
**bargaining** 13:14
  14:11
**base** 70:10
**based** 8:16 9:5,11
  11:2 14:8 15:12
  20:19 24:21 27:24
  93:14 95:20 96:4
  97:1,8 125:16
**basing** 106:8
**basis** 11:15 13:10
  16:11 69:19 100:7
  106:1
**becoming** 130:7,8
**beg** 42:15 75:21
**began** 29:24 112:14
**beginning** 28:18
  36:8 44:5 103:12
**begins** 55:20 86:15
  108:15
**behalf** 7:9 9:15
  11:18 14:16 15:18
  17:25 34:25
  118:20
**belief** 73:10,14
  94:22
**believe** 8:15 19:22
  24:17 46:3,20,23

49:19 50:5 51:11
51:14,19,24 52:2
52:11 56:1,16 57:9
58:12 59:9,22
60:13 61:16 76:4
76:12,15,22,22,24
76:24 77:8 82:4
83:11,14,22 84:8
84:21 85:6 91:23
92:2,5 93:1 94:3
96:16 98:10
100:10,14 103:5
105:8,25 106:2
109:25 111:14
115:13 116:4
118:1,7,9 124:20
127:17 130:4
**believed** 47:7 81:7
82:15 121:6
122:19
**believes** 29:22,25
96:11
**bench** 15:1 23:20,22
**benchmark** 27:21
**benefit** 11:20,20
**benefits** 92:8 125:13
125:13,15
**best** 10:2,16 11:16
12:2 13:7 47:4,8
53:13 62:2,20,20
81:8,12 82:15 95:1
126:11,12
**better** 41:18
**beyond** 32:10 66:15
124:18 125:21
**bidder** 8:24 41:1,5
**bidders** 40:1
**bids** 40:10 41:13,15
**big** 53:21 64:25
**biggest** 122:15
**billion** 98:6 105:5,9
109:13
**binder** 43:25
**binding** 12:16
**bit** 14:23 79:16
133:16

**black** 7:25 26:5 27:7
56:20 118:6
**blackberry** 31:20
**blacklined** 86:11
**board** 15:24 16:8,14
16:24,25,25 17:10
17:11,11,12,14,16
17:17 18:22 19:9
19:11,17 20:12,18
20:19 21:1,14 22:9
23:9 24:11,12
25:22,23 26:17,21
27:3,3,4 28:16,20
29:7,13,16 30:1,7
32:7 41:17 42:2,9
42:10 43:4,7 45:11
45:13 46:6,12,16
46:20,22 47:6,9,13
47:15,22 49:24
50:3,10 52:9 53:11
53:14,17,18,20
54:7 61:17 73:22
73:24 74:6,23 76:2
76:6,8 82:21,24
83:8,8,9 97:24
98:13 100:9,11,14
100:19 102:18,21
102:21,22 108:22
108:23 109:1,2,4
109:23 110:7,18
114:21 116:24
118:3,4,5,8,12,16
118:24,25 119:20
119:22 120:3,6,13
120:14,16,17
121:8,19,23,23
122:1,3,5 125:16
131:11,14 132:4,5
132:7
**Board's** 17:15 29:21
54:6 83:9
**boiler** 86:1 87:17
**Bonnie** 3:23 17:24
**book** 8:3 17:10,13
17:14 20:12 56:10
56:19 90:10

108:10,12,19
**Boone** 6:1 19:8
91:22
**bottom** 125:6
**bound** 84:4,7,11,15
**Bowling** 1:15
**box** 32:23 70:3
113:4
**boxes** 113:8
**boy** 87:23
**Braid** 129:19
**breach** 123:23
**breached** 39:21
122:19
**breaches** 41:22 43:5
**break** 107:23,25
133:12
**breakup** 35:5,5 36:4
36:4,14
**breathing** 123:13
**Brian** 6:6 19:7 91:22
**brief** 18:1
**briefed** 20:11
**briefly** 67:3
**bring** 48:10 74:7
**broad** 11:12 130:6
**broadness** 130:25
**Broadway** 4:3
**Brotherhood** 9:7
**BRUCE** 4:22,23
**BRUEGGEMAN**
4:9
**building** 133:13
**bullet** 105:22
**burden** 28:7
**business** 22:8,12
54:1 57:12,13
116:13
**businessman** 127:9
127:12
**Butler** 3:7 7:6,7,7,23
11:5 12:7 13:18,24
14:16 15:4,10
16:12,18,22 17:8
18:24 19:3,6 20:6
20:17,22 21:6,10

21:18,23 22:2,6
23:7,15,19 24:1
25:16 26:9,25
27:10,20 28:11
29:4,6,9,15 30:2,3
30:16,25 31:2,12
31:24 32:2,14
34:15,19 38:23
43:25 44:10 46:10
48:7,20,24 49:4,11
49:16 53:4 55:25
56:15 57:24 63:1
65:22 66:6,12,14
66:18,21 83:1 84:6
84:24 85:9,22 86:4
86:5 87:4,7,15,23
89:23 90:3,16
93:17 101:25
102:13,19 103:11
107:21,22 108:3,5
108:6,8,14,16
111:1,3,5 117:23
122:7 124:21
125:1 127:18
128:24 129:3,8
131:21 133:8
134:7
**Butler's** 14:9 104:12
**buy** 88:7

---

**C**

**C** 3:1 7:1 135:2,2
**calculate** 97:24
**calculated** 95:9
96:12
**calculation** 22:17,17
96:25
**calculations** 22:18
74:12 95:25
**call** 28:19 33:24
34:9 37:8 117:12
117:19
**called** 26:20 32:8
33:12,13 35:7
**cap** 58:19
**capacity** 35:4

**capital** 6:2 8:23 9:18 19:8 35:17,22 37:10 70:12 91:23 96:10,12 124:18
**capped** 36:7
**case** 1:4 14:25 22:19 22:20 25:8 26:20 29:24 31:17 32:15 33:15 35:6,17,22 36:3 37:25 38:22 39:4 57:6 58:23 78:9 85:7 91:23 117:10
**cases** 8:14,24 9:4
**cash** 71:2
**categories** 75:7
**caught** 66:3
**cause** 47:23
**cease** 51:25
**cede** 78:10,10
**ceiling** 38:6
**center** 4:11 111:15 111:17 130:9
**certain** 9:24 50:24 54:23 57:10 72:20 72:22 118:18
**certainly** 13:5,9,13 18:10 20:22 27:10 40:12 54:4 93:2 104:21 115:17 125:23
**certify** 135:4
**chairman** 26:21 32:8
**challenge** 11:25
**challenges** 11:21
**chambers** 53:24
**change** 27:8 49:3 55:8 63:24,25 68:19 78:14 81:5 81:23 82:10 115:7
**changed** 56:3,5,7 62:8 70:19 78:22
**changes** 8:1,3 29:20 53:21 54:21 55:13 55:14 63:9 64:3,4

79:9 83:22
**changing** 29:11 125:14
**Chapter** 62:13 64:24 70:13 76:15 78:9 81:12 94:25 117:10 123:6
**characteristics** 76:19
**characterization** 93:18
**characterized** 44:11
**chart** 50:22,23,23 65:20,20 66:21,22 73:21,24 74:20 93:2 97:12 107:12 110:2,22,24 111:20 114:2
**check** 80:10
**chief** 25:9 40:21 121:14 122:14
**choice** 82:11
**chose** 27:1 39:20 81:6
**chosen** 16:3
**circumstances** 29:11 42:4 92:7 122:20
**City** 112:7,8
**Claim** 8:18
**claims** 10:19 11:14 12:18 14:3
**clarification** 83:23
**clarified** 83:15
**cleanups** 8:4
**clear** 9:25 18:25 84:2 113:21 123:3 123:25
**clearer** 84:21
**clearly** 24:19
**client** 99:3
**close** 57:12 79:22,23
**closing** 12:19 57:2 85:10 86:7,17 87:8 87:8,16,18,24
**COHEN** 4:17

**column** 107:5 111:15,17
**columns** 111:11
**com** 83:24
**come** 16:13 17:2,20 32:22 40:1 66:20 95:18 119:15
**comes** 27:23 64:15 64:19 109:14
**coming** 18:3 19:11 20:15,17 104:22
**commence** 21:22
**commencement** 24:24
**comment** 102:2
**commenting** 102:25
**comments** 19:24 119:12 121:21
**commitment** 2:2 7:11 12:16,21,25 13:23 14:10 35:9 37:1,15,20 38:14 38:17 58:8 61:5 65:8,11,17 67:21 67:22,22 74:19 75:9 90:7,21 91:6 92:19,20 93:3 104:13,19 112:25 113:1 124:17
**commitments** 13:2 90:21
**committed** 35:17,21 38:21 39:7,10,22 124:15 128:10
**committee** 3:19 5:10 7:23 8:5,7,18 9:17 15:15 16:1,2,15 17:2,21,25 32:9 33:13 49:17 78:5 78:11,12,15 80:16 93:1 111:19,21,21 112:17,21,22 113:3,9,18 119:11 121:18,20,25 122:17
**committees** 19:1,5

112:2 113:23
**committee's** 15:7 113:18 123:2
**common** 69:10 71:3 71:13,16 72:7,15 73:4 75:18 77:16 77:17 78:6,7,8 79:11,12 93:25 95:15 96:15 132:15,19
**communicated** 25:24 27:6
**communication** 8:13 121:21
**companies** 105:23 105:24 106:13
**company** 12:16 13:6 19:1,4 20:6 22:10 22:11 25:23 26:21 32:8 34:25 36:9 38:13 39:20 40:9 40:15,25 41:5,9,9 41:12,20 44:18,19 48:1 51:7 52:5 53:11 54:5 57:11 57:11 60:8,15,18 60:19 62:11 63:14 63:24 64:1,19,24 65:2 69:24 70:11 71:14,18,21 72:3,6 75:14 80:12 81:11 83:20 85:12,19 86:22,23 88:19,23 89:2 91:2 94:25 96:2 100:7 103:20 104:8,22 105:4 106:8,11,21,22 108:22 115:6,21 118:19,20 119:10 121:15 122:14 123:5 124:19 125:10 126:15
**company's** 12:15 14:18 29:3 64:4 75:16,18 104:7 125:16

**comparable** 69:6
73:7
**compare** 69:6
**compartmentalize**
75:23
**compensate** 36:25
37:21 38:21
**compensated** 39:19
**compensates** 35:24
**compensation**
110:23 125:10,11
125:12,21 126:1,2
126:3
**competing** 40:10
**completed** 84:23
87:12,16 115:3
**completely** 89:21
**complicated** 79:7
80:8 132:21
**component** 100:12
**components** 91:1
**comprise** 24:5
**concept** 87:15
**conceptually** 38:16
**concern** 12:14 13:10
62:18,19 104:12
**concerned** 12:20
71:7
**concerning** 43:8
**concerns** 123:3
**concluded** 15:1
25:25 96:4 133:17
**concluding** 10:22
**conclusion** 106:20
106:22
**condition** 85:3 86:17
**conditions** 81:7
85:10 86:7,13,19
87:18,19,19,25
91:10 125:7 126:4
**conducted** 77:22
**confer** 31:25
**conference** 53:25
**conferred** 32:2,4
**confidential** 100:20
129:23

**confirmation** 12:20
51:10,12 52:4 79:3
80:9,24 84:22
87:12
**confirmed** 79:20
80:6
**conjunction** 36:18
78:7,8 91:3 92:16
92:21
**connection** 24:7,10
72:25 88:20 92:24
94:14 103:10
105:18,20 112:16
116:25
**consensual** 10:2
11:11,22 12:2 13:7
13:8
**consent** 115:25
**consequence** 115:5
**consider** 2:1 7:10
22:11 40:10 41:5
95:3 103:9 119:1
**consideration** 23:10
29:21 78:7 103:3
103:15 116:25
**considerations**
101:13
**considered** 16:24
18:16,22,23 24:11
54:7 96:3 101:18
102:21
**consistent** 7:25 8:21
**constant** 113:6
**constituencies** 62:21
81:9,13 83:24 95:1
97:14 112:5
117:10
**constituency** 85:14
86:24
**constituents** 97:15
**consulted** 30:10
**consummate** 126:15
**contacted** 104:1
**contain** 116:23
**containing** 20:14
**contains** 20:13

**contemplate** 95:14
**contemplated** 51:16
57:1 114:18
126:16
**contemplates** 71:9
**contend** 8:9 72:5
**content** 18:13
**context** 111:24
**continue** 8:9 12:24
120:10
**continued** 29:16
61:13 131:5,7
**continuing** 10:12
11:7 15:22 19:23
59:11
**contributions** 10:8
10:12,20 11:7
12:23 13:21 14:4
**control** 125:14
**convenient** 29:22
**conversation** 74:22
130:16
**conversations** 15:12
**conversion** 69:17
98:23 99:11
107:15
**convert** 69:10 72:15
100:2 123:6
**converted** 51:23
71:1,3 77:15
**convertible** 65:3
67:23 68:18,19,22
69:3,9,13,23 71:1
71:8,11 72:6,9,12
72:15,19 73:1,3,4
75:11,12,15,20
76:11,18 77:6,8,12
98:9,17,22 99:9,14
99:18,20,24 100:3
100:5,13
**converts** 69:25
**conveyed** 132:19
**cooperate** 126:14
**copy** 43:11 48:21,22
49:10,14 110:23
110:24 124:23,25

**corner** 109:7 110:10
**corporate** 30:17,18
30:20 33:18,19
72:20
**Corporation** 1:8 3:3
7:3,10 95:22
109:24
**correct** 21:6 29:6
34:25 35:6,11
36:10,15,21 37:18
37:19 38:4 39:22
40:2 41:13,21,25
42:13 45:24 46:3
50:17,20 51:3,9,11
51:14,19,22,24
52:1,2,21 57:9,15
57:16 58:12,18
59:8,9,14,21,22,23
60:1,2,5,9,13,16
60:24 61:1 64:17
65:5,6 67:7,11,23
68:1,9,10,14,16,17
68:24 69:2 71:22
71:24,25 72:13,21
72:24 73:13,20
74:20 77:25 78:18
78:22,24,25 80:7
83:21 86:8 88:21
88:25 89:5,12,20
90:11 93:8 100:6
101:10 113:4,5,6
113:19,25 115:8
115:12,13,14,15
116:4,8 117:15,16
117:25 118:1
119:6,13,14,24
123:8,16,17,20,21
128:6,8 129:20,21
130:7,10 131:10
131:12 133:3
135:5
**correspondence**
131:5
**cost** 36:1 37:2 80:24
81:16 82:8,8 83:5
100:7

**costs** 37:5,7 38:2
  83:6
**counsel** 9:23 24:3
  28:24 31:25 32:4
  34:16 49:14,23
  53:6 55:12,12,16
  84:4 85:23 102:22
  108:21 129:18
  130:2 131:18
**counsels** 115:6
**Counsel's** 57:24
**counter** 111:18,22
  113:3,18
**counteroffer** 112:16
**country** 87:23
**couple** 55:15 66:7
  124:22
**coupon** 100:5,12
**course** 34:5 54:19,20
  119:11
**court** 1:2,14 7:2,20
  7:22 11:4 12:6,10
  12:11,13 13:3,5,15
  13:17 14:13,15
  15:3,5 16:10,17,21
  17:7,23 18:7,11,15
  18:17 19:2,4,15
  20:2,9,20 21:3,7,9
  21:17,19,21,25
  22:5,14,21 23:3,5
  23:13,18,22 24:5
  24:25 25:2,14,20
  26:7,24 27:9,22
  28:6 29:2,5,7,21
  30:1,13,22 31:3,7
  31:9,19 32:1,13,19
  32:22 33:1,4,7,14
  33:20 34:4,17,20
  34:24 38:25 39:6,9
  39:12,15 40:13
  42:2 43:17,20,23
  43:24 44:2,13 45:7
  45:10,25 46:5,13
  46:16 48:8,10,12
  49:7,12,13,20,23
  51:5 53:9,24 54:12

54:15,21 56:5,7,14
  56:17,22 58:2,16
  65:25 66:2,5,7
  68:4,6 83:15 84:2
  84:14,20,25 85:7,8,21
  87:1 88:4,9,12,15
  89:25 90:4,7,12,14
  91:15,19 93:11,21
  95:5 97:19,21
  98:25 99:2 100:21
  102:11,15,24
  103:3,8,22,24
  107:20,24 108:2,4
  108:13,15,18
  111:5,7,9 114:12
  114:13 116:19
  117:6,17 118:11
  121:13,17 122:9
  123:3 124:22
  125:2,4,6,9 126:5
  126:10,19,23
  127:1,3 129:6,9,12
  129:16 133:7,9,11
  135:4
**courtroom** 7:4
  14:10 30:9
**Court's** 20:7 54:1
  129:10
**covenants** 126:7
**cover** 25:6 26:19
  27:25 30:1 32:11
  38:14
**covered** 37:5
**create** 28:22 115:20
**created** 28:12 101:6
  102:20 103:19
**creation** 64:25
**credit** 106:11
**creditors** 5:11 7:24
  111:19,21 112:17
  112:22 113:3,9,18
  122:17
**critical** 64:23
**CRO** 30:18
**cross** 17:4,5 21:15
  24:18,21,24 25:11

26:13,16,18,22
  27:11,13,16,24,25
  28:3,14 29:24
  31:11 32:11,18,20
  32:24 34:11 91:20
  108:21,23 121:1
**cumulative** 34:7
  99:6
**current** 64:11 67:20
  69:18 96:13,13
  124:20,24
**currently** 34:23
  46:17 125:19
**customer** 76:15
**CWA** 8:14

**D**

**D** 1:22 6:6 7:1 134:2
**date** 23:25 47:16,24
  48:6,16 50:9 51:1
  51:13,17,20,20
  52:5 57:2,13,20,21
  63:3,3 67:10,18
  70:24 71:5 77:14
  77:15 87:9,16,20
  87:24 91:7 100:15
  114:17 119:23
  125:7 135:10
**day** 47:16,23 48:6
  48:15 50:9 57:13
  62:11 80:12 83:19
  94:8,11 99:9
  101:15 114:17
**days** 52:18 55:15,17
  63:20 89:14
  118:25 131:6
**deadline** 7:15
**deal** 18:20 31:14
  35:25 37:1 38:15
  41:18 42:20 43:14
  44:7 67:6 71:24
  88:17 89:19 105:1
  105:5 114:18,25
  119:22 123:23
  128:8,14
**dealing** 89:20

**deals** 19:16 86:21,22
  116:10,12 128:19
**dealt** 24:9 54:4
**debt** 76:19,21 77:7
  109:13,14
**debtor** 1:10 17:9
  18:12 24:3 28:6,7
  28:7,8 29:23,24
  31:16,17 50:24
  58:6,6 59:23,24
  60:1,3 84:5 92:8
  113:2
**debtors** 10:1 11:14
  11:19 14:17 20:6
  24:15,22 25:7
  27:17 30:10 38:6
  44:19 55:11 63:16
  68:3,6 70:11 78:15
  78:19 83:14 84:6
  89:21 90:5 91:24
  92:5 100:19
  102:15,25 103:9
  104:17,20
**debtor's** 8:21 16:4
  18:21 21:25 24:7
  25:4 27:6,15 28:13
  31:17 49:14 56:8
  134:11
**December** 7:13 36:7
  36:8,12 46:22 59:7
  74:6,14 96:13
  101:7,14,18,21
  102:17,20,22
  104:2 105:3
  118:13 119:2,5,13
  119:14,17,19,24
  120:3,6,9 121:10
  122:2,5,22 124:15
  130:5 131:6
**decide** 27:22 28:7,8
  88:1 128:10
**decided** 25:24 32:6
**decision** 19:14 29:3
  103:1
**declaration** 15:8,17
  16:4 19:18 23:1

26:12 29:11 31:10
91:24 94:21 95:13
96:17 102:14,25
103:6,10,13
**declined** 30:12
**deduction** 77:10
**deducts** 109:13
**defer** 54:6
**defined** 123:4
**definitely** 56:7 116:4
**definition** 122:11
**delaying** 81:15
**deliver** 118:19
**delivered** 29:9,11,19
**Delphi** 1:8 3:3 7:2,9
8:18 10:8,11,13,14
10:15,16,19,22
11:6,8,9,11,24
12:1,25 14:4 37:13
41:7,22 77:21
95:22,24 96:11
97:7 101:1 104:1,2
108:3,5 109:24
112:2 113:24
118:24
**Delphi's** 13:23 37:10
95:15 96:15 104:9
118:12
**delve** 25:21
**demon** 104:21
**demonstrated**
104:19,21
**demonstrative** 49:5
49:7 110:20
111:20 114:5
**demonstratives** 49:2
49:12,17 65:23
66:9,14,15,20
114:4
**denying** 34:6
**depends** 76:17
**depict** 50:25
**deposed** 42:14,16
**deposition** 39:17
43:22 44:11 46:11
46:13 64:21 78:19

114:7,15,24 115:2
115:3
**describe** 52:9 61:15
94:21 103:11,14
107:5 109:9,18
111:12 117:5,17
118:10
**described** 44:24
61:2 74:23 123:14
**describing** 45:13
**description** 47:18
74:18 93:13 98:5
134:11
**designate** 30:17,18
30:19
**designated** 17:13
25:9 33:18 56:13
118:19
**determination**
76:25 77:1,3
**determine** 95:25
98:17
**determined** 115:4
125:15
**determining** 60:6
97:7
**deterrent** 63:8
**diagram** 119:15
**dialogue** 104:5
**difference** 63:11
113:2
**differences** 113:23
**different** 47:10,10
60:20 78:2,21
**difficult** 90:19
**difficulty** 79:13
**diligence** 52:18
**direct** 24:5,16,21,21
25:5,12 26:20 28:9
29:23 31:17 56:23
86:6 102:5,15
122:25 129:10
**direction** 121:14
**director** 75:10 121:5
**directors** 15:25 16:8
17:11 50:17,18

73:25 74:24 98:16
98:20 109:23
110:7 118:13,16
118:25 120:3,13
120:14 121:3,6,8
121:19,23 125:16
132:6
**director's** 109:3
**disagree** 81:20
**disagrees** 54:5
**disclosure** 51:5
59:13 64:7,8 79:14
84:25 85:4 87:10
115:11 128:11,15
128:18
**discount** 69:4,10,12
69:24 70:3,23,24
71:6 72:9,12 73:9
75:9,15 93:13
97:18,24 112:18
112:23 132:11,11
132:15 133:3
**discounted** 110:3
**discounts** 113:6
131:25
**discovery** 22:10
**discuss** 98:8 104:3
124:16 131:7
**discussed** 9:24 43:7
63:12,20 70:17
74:14 100:14
112:11 115:3
119:10 120:3,4,18
120:23 123:11
132:3
**discussing** 42:1
131:9
**discussion** 46:6
50:14 69:15 78:5
100:11 103:13
120:16 122:1
125:25 126:4
130:6,17,25
**discussions** 9:22
30:6 44:18 45:13
54:13 55:4,6,7,10

55:11 63:15 74:24
104:8 115:5
117:11 130:11
**dispose** 22:7 75:17
**disposed** 23:8
**disposition** 19:15
**dispute** 34:1
**distributed** 22:20
79:21 101:12
121:7 132:16
**distribution** 71:16
71:19 78:8
**District** 1:3 9:9
**dividend** 72:23
**doc** 90:9 109:19
**Docket** 2:3 7:13 8:9
9:14
**document** 9:14 16:3
20:12 40:14 48:18
50:21 53:13 56:9
84:10,11,16 85:13
86:1,2 90:9 98:10
100:18 101:6,10
103:4,9,19 105:3
109:20 117:2,6,11
118:3,5 119:8
120:7,10 121:7
122:19 130:13,14
130:18 131:23
**documents** 8:21
15:22 18:12,13
20:13 24:10,18
26:6 28:1 48:23
50:3 53:6,12 115:1
116:23,24 117:5
118:17 119:3
121:11
**Doherty** 23:1 31:11
33:15,18
**Doherty's** 15:17
**doing** 13:25 18:4
28:3 40:15 57:17
76:3 88:5 121:24
128:6
**Dolce** 125:17
**dollar** 69:16 73:9

74:11 76:4 93:14
93:15,15 94:1,4,7
94:10 95:19,20
96:1 97:25 105:5
106:11 113:10
**dollars** 57:23 58:13
58:14 67:25 68:11
68:16,23,25 69:1
70:5 71:11,12,19
72:3,16 73:15,19
75:12 77:12 93:14
94:18 95:3,9,15
96:6 97:8,17 100:8
105:9 109:13
110:3 113:11,16
124:3,10
**doubt** 106:4
**Dougherty** 96:17
106:3,6
**Dougherty's** 106:4
**draft** 101:12
**drafted** 46:17 55:13
63:4 105:3 119:19
130:13
**drafting** 101:11
115:7
**Drain** 1:22 74:7
**draw** 106:20
**Drive** 4:11
**due** 41:16 42:5,11
42:21 43:15 44:8
52:18
**duly** 33:3

**E**

**E** 1:21,21 3:1,1 7:1,1
134:2,10 135:2
**earlier** 30:9 85:23
97:23 98:15 99:8
116:6
**early** 112:3,14,14
117:7 122:21
**East** 6:3
**easy** 67:1
**economic** 81:16 82:5
82:8,8 109:10,21

128:8,14
**economics** 67:5
**editorial** 11:18
**effect** 70:12
**effective** 47:16,24
48:6,16 50:9 51:1
51:13,17,20 52:5
52:17 57:21 63:3
67:10,18 70:24
71:4 72:6 85:5
87:8,11,20 89:14
91:7 114:17 125:7
126:15
**effectuated** 106:19
**efficient** 28:3 32:5
**efficiently** 25:19,20
**efforts** 10:2,17
11:16 12:2 13:7
35:25 103:18
126:11,12
**eight** 7:19
**either** 16:6 21:4
26:4 29:20 40:13
48:1 58:14 104:8
122:17 133:8
**Electrical** 8:12 9:8
**electronic** 8:12
135:5
**element** 89:17
**elements** 103:15
**eliciting** 27:2
**eliminated** 52:15
58:6
**embarrass** 38:13
**embodied** 109:11
**emerge** 62:13 64:24
94:25
**emergence** 73:14
76:15 95:16 96:8
96:15 97:10
109:14
**emergency** 70:13
94:4
**emphasis** 122:10
**employment** 125:11
**enabler** 14:19

**encourage** 40:1
**enforce** 14:10
**engaged** 37:22 55:15
115:5
**engineers** 5:2 9:2
13:21
**ENGLISH** 4:1
**enjoy** 133:3
**enter** 90:2
**entered** 11:2 43:18
125:11 127:20,22
**entering** 72:14
**enterprise** 109:12
**enterprises** 95:23
**enters** 41:23
**entire** 54:19 89:17
98:14 131:10,11
**entirety** 84:7
**entitled** 30:17 33:17
33:18
**environment** 94:23
**EPCA** 34:23 41:18
48:6,17 50:13
51:17 52:20,23
53:2 55:20,24 56:1
56:1 57:8 58:8
59:20 60:4,15 63:9
64:3,9,10 73:16
74:10,13 83:12
85:6,10,10 86:9,10
91:9 113:13
114:17 116:23
117:14,22,25
118:2,16 120:9
**equitable** 12:23
**equity** 2:1 3:19 7:11
8:8 9:17 15:7,14
16:1,2,15 17:2,21
17:25 23:11 32:9
33:13 35:9 49:17
76:21 77:9,11,12
78:5,11,12 79:4,7
90:7 93:1 106:13
111:21 112:16,21
113:3,9,17 119:10
120:23 121:18,20

121:25 123:2
**equivalent** 69:17
**escape** 59:25 60:7,11
114:5,16,22
115:17 116:10,11
127:18
**escrow** 79:19 80:3
**ESQ** 3:7,8,9,16,23
4:7,15,22,23 5:7
5:15,21 6:6
**essence** 56:25
**essentially** 123:5
**establish** 17:3
**estate** 47:8 78:17
82:16 92:8 95:2,22
123:12
**estates** 81:8 94:25
**Esther** 2:24 135:4
135:12
**estimate** 67:12,13
67:14,15,17
**evaluating** 61:17
**evaluation** 17:1,15
**event** 24:9,12 26:2
62:16 79:22
129:24
**events** 24:7 25:6,10
30:6 47:19,25
122:24
**eventually** 117:14
**Everybody** 58:23
**evidence** 23:20
26:12,15 27:5
28:17 32:17 48:24
48:25 109:16
**evidentiary** 53:25
**evolved** 63:6
**exact** 58:4
**exactly** 28:24 107:18
**examination** 17:4,5
21:16 24:24 25:5
25:11 26:13,16,18
31:11 32:11,18
34:11 66:4,10
91:20 102:3 108:7
108:21,23 110:22

121:1 127:4 129:5
  134:4
**examine** 27:1 28:15
  28:19 32:20
**examined** 26:22,23
  26:24,25 27:16
**example** 102:5
**excess** 80:13
**exchanged** 117:12
**exclude** 31:1
**excluded** 30:14
**excuse** 32:3 41:9
  42:8 88:3 90:21
**excused** 30:9
**execute** 104:23
  118:19 124:9
**executed** 107:18
**executing** 62:12
**execution** 101:3,20
  102:9 103:19
**exercise** 52:6 65:5
  67:4 68:13,23
  79:24 80:1 124:1
**exercised** 51:21 63:9
**exercises** 41:17
**exhibit** 7:16 8:3
  15:16,18 16:3,7,7
  18:6 19:22 22:7,8
  23:2,24 32:16,17
  43:25 44:1 50:7
  55:21,23,25 56:10
  56:12,15,22 74:3,5
  90:10,16 92:2 98:2
  100:21,23,24
  108:10,11,11
  109:1,2,3 110:9
  116:22 117:2,6,17
  117:18,25 118:1,4
  118:5,10,11,12
  119:7,15 120:1,7
  120:13,22 121:1,9
  122:4 124:25
  128:25 129:4,7
  131:17
**exhibits** 15:15,16,20
  16:1,5 18:8 21:11

21:13,23 23:17,23
  23:23 25:9 26:13
  26:19 28:25 49:8
  108:10 134:12
**exist** 51:25
**existence** 61:13
**existing** 79:10,12
**exp** 40:6
**expand** 32:10
**expect** 98:16 126:2
**expectation** 95:21
  109:20
**expected** 68:12 96:7
  97:9 109:14
**expecting** 31:16
**expedited** 90:1,6
**expense** 37:5 38:3
  75:7 94:13
**expenses** 36:3,4,6,7
  36:9,9,11,15,17
  38:2 58:11,11,13
  58:20 59:1 67:2,19
  92:6,14,14,19,21
**expert** 31:21 100:4
**experts** 82:4
**expires** 52:19 79:18
**explain** 46:24 47:15
  47:22 88:15
  121:13,17 122:9
  124:14 129:4
**explicit** 84:19 85:15
  87:2
**explored** 96:18
**expressions** 40:5,7
**extent** 18:10,12
  20:15 24:15,20,22
  27:13 29:21 39:20
  50:7 54:5,23 65:7
  67:3 89:16 94:9
**extra** 49:19
**extrapolate** 50:3,10
**e-mail** 129:18
  130:15,19 131:1,3

—————————
**F**
—————————
**F** 1:21 135:2

**facility** 106:11
**fact** 10:1 12:5 18:21
  19:15 20:24 24:4
  27:3,4,5 30:7
  37:21 41:7 64:22
  70:8 71:16,20 85:2
  85:25 87:7 96:7
  110:16 115:16
  116:6 123:12
**factor** 64:20
**facts** 33:10
**factual** 103:14
**fair** 34:4 41:15
  55:19 67:14 89:8
  94:8 99:12 101:15
  104:5 123:2
  125:24
**fairly** 47:7 114:2
**fairness** 113:22
**faith** 73:10,14 76:4
**familiar** 35:4 99:14
  99:20,23 111:15
  111:20
**far** 18:20 25:8 50:16
  76:7 80:2 110:10
  111:12 112:21
  113:1,23 114:2
  115:24
**feature** 93:13
**fee** 35:7,12,21,24
  36:4,5,14,20,24
  37:17,25 38:17,19
  38:20 39:3,18,25
  41:11,12,16 42:5,7
  42:10,11,21,24
  43:2,14 44:8,20,23
  45:1,4,6,9,15,20
  45:22 46:7,18,25
  57:18 61:12,12
  74:19 78:15 93:10
  93:18 94:13
  113:22 122:9,11
  122:16,21
**feedback** 121:20
**fees** 35:5,5,15 37:15
  37:20 38:12,14

40:25 43:8 47:10
  57:10,20 58:6,8
  59:7,10 65:17
  67:12,21,22,22
  75:9 90:20 92:6,13
  92:14,19,21 93:3
  112:25 113:1,8,12
  115:14
**felt** 62:15,22 121:23
**fewer** 132:22
**fiduciaries** 78:16
**fiduciary** 41:17
  78:17,17
**fifty** 52:6 97:4 100:8
**figure** 22:23 82:21
  82:24 102:6
**file** 51:23 88:19 89:2
**filed** 2:3 7:12,15,19
  7:24 8:8,11,14,19
  8:20,24 9:4,10,13
  9:20,20 12:13
  24:14 25:25 40:13
  83:22 84:3,8 85:7
  89:6,11 90:5,12
  128:16,19
**filibuster** 99:4
**filing** 88:24 90:20
**final** 116:13 122:25
**finalize** 119:21
**finally** 9:13
**financial** 16:6 69:21
  76:22,24 77:5
  80:18 82:4,4 88:24
  89:3 96:2,22 105:1
  105:17,18,20
**find** 98:11
**fine** 12:11 32:19
  66:12
**finely** 109:11
**finished** 21:23
**firm** 7:8 15:12 92:19
**firms** 15:13 55:18
**first** 15:12 17:25
  30:21,23 40:1 45:7
  45:21 46:4,5 48:5
  58:7 64:7 70:4

80:12 92:4,5 98:5
101:23 104:1
111:11 113:8
121:13
**five** 59:5,6 67:9,13
67:14,18 73:11
105:9 107:24
108:11
**Flom** 3:2 7:9
**Floor** 5:4
**FL1954** 101:1
**focus** 39:6 59:10
92:4 99:5 100:25
122:15
**focused** 122:13
123:18
**follow** 41:9,9
**following** 10:10
15:20 57:13
**Ford** 106:11
**foreclose** 12:17
**foregoing** 135:5
**form** 124:24 130:12
131:8
**formal** 40:11,19
**formally** 120:5
**forth** 10:2,4 20:21
64:9 65:9 73:16
74:10 86:20 90:20
91:1,10 97:3 98:11
100:10 117:13
125:21
**forty** 73:10
**forty-five** 68:11 70:7
73:15 76:4,12
93:14,15 94:3
95:10,11,15,19,20
96:1,6 97:7
**forward** 10:21 13:14
25:24 47:8 51:16
66:8 81:6,9 82:11
82:13,16 83:16
84:22 85:1 88:21
103:6
**found** 22:10
**foundation** 16:14

17:4 93:17 102:3
**four** 3:4 9:19 14:2
14:18 62:5 119:4
**frame** 43:9
**framework** 2:2 7:12
7:17 9:21,25 10:15
10:23 11:10 12:4
14:18 24:13 90:22
97:2 103:2 109:12
112:4,10,13
118:15 119:2
121:2,11
**frameworks** 95:14
**FRANK** 3:18
**Frankel** 17:25
**Freed** 17:25
**frees** 94:10
**FRIED** 3:18
**front** 13:12 54:3
90:10 108:10
110:24 130:9
**full** 26:19 44:17
121:8 132:18
**fully** 47:5,7 81:7
**fulsome** 44:4
**fund** 60:25
**funded** 60:23
**funds** 38:15 80:3,3
124:15
**Furniture** 8:12
**further** 20:4 41:14
53:23 91:18
124:21 133:5
**furthest** 107:5
**future** 14:12,21
15:24 72:2,17
75:13,16,16 76:14

――――――――
**G**
――――――――

**G** 7:1
**gain** 94:7,10 97:11
**gee** 61:24
**general** 10:3 19:21
44:16,23 45:16,19
48:19 64:23 81:11
82:15 94:24

116:12
**generally** 99:16,22
109:9,18 115:23
118:21
**gentlemen** 33:25
84:10
**getting** 19:13 37:14
41:13 48:11 65:16
65:17 72:9 82:23
82:25 89:6 130:5
132:1,8,8,16
**give** 18:19 34:5
49:14,20,21,23
58:9 65:20,25 66:1
66:5 73:18 74:5
76:5 83:7,7 85:11
90:1 111:4
**given** 12:19,21 13:5
23:2 33:11 59:25
92:23 93:24 98:13
99:3 100:1 116:24
**gives** 69:1
**giving** 29:22 63:21
63:22 70:20 71:18
71:23 72:12 73:11
83:5,7,9
**glad** 67:19
**gloss** 126:20
**GM** 11:20 19:24
20:3,5 45:8,23
46:2,7,19 47:2
51:3 60:10,10,11
60:14 64:16,20
84:9 115:19 116:1
126:17 128:3
**go** 7:6,6 10:2 14:19
17:25 22:23 25:9
25:24 26:11,15
27:7 29:5 30:2
31:20 33:15 37:24
38:12,19 46:6,8
53:10 57:3,17
61:11 63:23,24
66:8 76:6 81:6
83:16 84:22 86:22
88:20 91:19 99:10

103:1,6,22,24
114:4,5 119:15
125:4 126:10
**goes** 41:17 53:24
72:6
**going** 16:18 21:4,15
21:25 22:14,23
23:3 24:15,19
25:12 27:18 28:4
30:8 31:2 34:8
38:8,11,12 39:7,9
44:6 46:13,15
49:18 61:11 62:15
66:16 72:7 73:10
74:18,21 76:12
79:3,21 80:23 81:4
81:4,23 83:4,5
85:1 89:7 92:4
99:2 102:7,8,11,15
103:17 110:1
112:1 116:10
121:9,9 123:19
129:14 130:6,11
130:16 133:11
**GOLDBERG** 4:9
**GOLDSTEIN** 4:15
**good** 7:7 34:13,14
50:2 65:4 73:10,14
76:4 77:19 108:9
**GORLICK** 5:1
**gotten** 58:8 76:25
77:1
**governance** 72:20
**gracious** 33:24
**graciously** 110:21
**gratefully** 18:1
**GRATZ** 4:9
**greater** 28:5 106:17
**Green** 1:15
**ground** 78:6
**grounds** 16:2 17:18
**groups** 107:2
**guarantee** 11:20
**guess** 42:18,19 53:3
53:9 54:8,9 55:5
85:21 96:9 102:2

116:14 117:11,18
guys 75:25 101:24

**H**

**H** 4:22 134:10
**Hail** 6:6 19:7,7,18
20:10 21:8 22:16
22:25 23:4 31:10
32:24 33:12,17
91:21,22 93:12
95:7 97:22 99:1,7
100:17,22 101:16
101:24 102:8,17
103:5,17,23,25
107:19 134:6
**hand** 33:2 109:7
125:20
**handed** 50:6
**handling** 120:12
**handouts** 65:21
**hands** 79:3
**happen** 35:25 37:1
44:25 85:15
105:16
**happened** 25:18,22
26:17 45:3
**happens** 28:25
**happy** 28:21 31:22
**hard** 86:12
**harder** 79:8 80:20
99:2 132:21
**HARRIS** 3:18
**hash** 63:22,23 64:1
64:15
**hatch** 59:25 60:7,11
114:5,17,22
115:17 116:10,11
127:19
**Haynes** 6:1 19:7
91:22
**header** 132:2
**headquarters** 104:7
**hear** 7:5 12:10,11
14:24 116:17
**heard** 96:6,9
**hearing** 2:1 7:10,20

8:5,10 9:1,12 15:9
25:24 26:3,10
33:25 49:18 51:10
51:12 85:1 87:10
87:13 103:1,7
**hearings** 30:19
**hearsay** 17:18 18:20
20:4,14,15 21:3
**hedging** 99:23
**held** 24:12 112:6
**help** 53:23 74:9
124:14
**helpful** 49:13 53:6
54:3 85:22
**hem** 18:20
**hey** 28:14
**higher** 96:8 107:14
107:16,17
**Highland** 6:2 8:23
9:17 15:8,14,18,21
16:3,6,9 17:9,15
17:17,20 19:8 22:9
22:11 25:25 31:9
32:9,24 49:17
91:23 96:10,12
97:1 101:4,21
102:9 103:15,16
104:1,3,6,9,16
105:8,18,23 106:2
106:10,17 107:9
107:14,15 124:8
124:14,18
**Highland's** 104:9,11
104:25 105:4,22
**highlighted** 114:24
**highly** 100:20
**hired** 105:18,20
**Hoc** 8:18
**Hogan** 3:9 7:8
**hold** 13:12 34:8
75:11 118:25
**holders** 8:8,18 72:19
79:4,7
**HON** 1:22
**honest** 114:11
**honestly** 71:4 81:21

**Honor** 7:7,14 9:16
11:5 13:12,16 14:8
14:17,23,24 15:10
15:10 16:13 17:19
17:24 18:16,24
19:6,7 20:6,10,17
21:6,8,10,20 22:6
22:16,25 23:7,15
23:15,21 24:10
25:5,16 26:9 27:13
27:14,20 28:3,11
29:24 30:4,15,16
31:8,10,13,24 32:2
32:3,3,21,24 33:8
33:17,22 34:10,15
34:18 39:4,14
43:19 46:21 48:7
48:20 49:2,4,11
53:4,16 56:15 66:3
66:6,20 68:8 74:4
84:6,12,18,24 85:9
85:16,22,23 86:3,3
86:10,19,25 87:4
87:14,22 88:2,8
89:23 90:16 91:17
100:18 102:17
103:5,11,17
107:19 108:6,17
116:18 122:7
124:21 129:3,22
133:6,8
**Honor's** 11:17,19
26:20,22 32:6
**hope** 13:13 14:9
**hostile** 33:24 34:1
**Houlihan** 16:7,14,18
17:3 23:9,10
**hour** 31:21

**I**

**IAM** 4:10 11:6,11
12:15
**IAMAW** 9:10
**IBEW** 4:10 9:8 11:6
11:11 12:15
**idea** 71:7

**identification** 23:24
**identified** 118:22
**identifies** 98:6
**IEW** 14:1
**ii** 57:3
**illicit** 24:15 28:8
**imagine** 41:3
**immediately** 67:7
79:14 91:6
**implemented**
106:19
**implied** 73:22 96:14
124:5
**imply** 74:8
**importance** 126:24
**important** 44:14,22
45:15 53:19 59:16
64:20 121:6,23
**impunity** 57:8 60:7
63:13
**include** 14:3 27:2
88:24 103:3 119:5
**included** 7:16 17:12
74:11 110:17
**includes** 10:18
**including** 11:12 15:6
26:17 28:16 71:10
74:24 92:15 97:5
**incorporated** 84:3
128:22
**increases** 97:11,13
97:13
**increasing** 75:6
79:11
**incurred** 36:1,12,17
**independent** 116:5
**index** 15:15
**indicate** 16:24 44:14
**indicated** 7:18 15:22
23:16
**indicates** 89:3 91:5
103:6 130:19
**indicating** 121:21
**individual** 62:1
82:12 91:1 121:5
130:18

**inevitably** 123:19
**infirmity** 28:13,22
**information** 19:20
  21:1 39:5 40:25
  41:4,6 97:5,6
  116:15,19
**informed** 20:3 46:16
  53:11,14,17,18
**inquire** 25:21
**inside** 49:8
**insisted** 77:21
**insofar** 112:17
**instances** 123:23
**instituted** 40:19
**institution** 110:3
**intend** 8:25 14:24
  27:7 42:4 86:25
**intended** 14:19
  42:10 83:17
**intent** 83:18
**intention** 27:8
**interacted** 131:15
**interest** 40:5,7 47:8
  62:20 81:8,12
  82:15 95:2
**interested** 40:14,18
**interesting** 31:13
**intermediate** 54:8
**internal** 16:6 22:8
**International** 8:11
  9:2,7,8
**interpret** 13:9
**invest** 37:11 71:18
**invested** 37:3
**investigated** 96:18
**investing** 37:9,12
  105:12 106:14
**investment** 40:4
  43:3,5 47:13,19
  59:2 73:6 81:25
  91:4,12 92:17
  94:22 105:13,15
  105:15,22 112:4
  113:13 115:25
  117:9,20 120:9
  124:24 126:6

131:15
**investments** 105:24
  106:4,7,12
**investor** 35:16,21,24
  36:25 38:21 39:7
  39:10 58:24,25
  70:2 81:10 82:14
  110:23 122:18
  126:11
**investors** 10:10,11
  10:14,16,23 11:6
  11:10 22:20 36:8
  36:15,16 37:3,14
  39:19 40:1 41:9
  47:1,5,11,16,23
  48:1,4,14 50:8
  51:7,20 52:4,13,16
  55:9,10 57:6,10,12
  58:7 59:2 60:6,17
  60:20,21 62:25
  63:13,16 64:5 65:1
  65:9,16 67:1,3,19
  68:4,5,6,7 69:18
  70:10 71:2,10,13
  71:23 73:6,18,23
  74:19,21 75:5,8,11
  75:14 77:21,24
  78:6,10,20,23
  80:16,23 81:14,16
  82:6,9,17 83:14,20
  84:8 85:12,18
  86:16,21 88:5,7
  90:22 91:2,10
  92:17,24 93:19,24
  94:11,20,23 95:21
  97:6,7,11,16,25
  110:2 111:14
  112:2,4,18,22
  113:2,24 114:15
  114:19,22 115:6
  115:10,18 116:1
  116:14 117:8,20
  117:21 120:11
  122:23,25 124:6
  125:20 126:1,8,23
  127:8,15,24 128:3

128:7,9 132:1
  133:1
**involved** 41:2 54:13
  54:16,22,24 55:4,7
  55:10,11 93:24
  99:17 100:3,19
**involvement** 104:23
**involving** 99:23
**isolate** 39:3
**issuance** 99:18
**issuances** 99:15
**issue** 16:23 18:1,3
  22:8 30:4 108:21
  131:5
**issued** 71:10,11 97:9
**issues** 11:12,22 13:1
  15:15 21:21 24:2
  53:17,25 101:18
  102:5 119:9 120:8
  120:11 121:24
  122:4
**Item** 23:7
**items** 15:21 86:18
  120:17,18 121:18
**IUE** 3:12 8:13 10:21
  11:12
**IUE-CWA** 10:6,12
  10:17 14:1
**IUOE** 9:3 11:6

―――――――
**J**
―――――――
**Jack** 7:7
**JACOBSON** 3:18
**January** 1:18 17:16
  17:17 20:12 24:12
  104:7 106:9 124:8
  135:9
**JENNIK** 3:11
**John** 3:7 19:19 33:6
**joint** 15:15 50:7
  111:18
**joke** 67:20
**JR** 3:7
**judge** 1:23 65:19
  74:7 80:18 127:6
**judgment** 22:8,12

54:2,6
**judgments** 20:19
**June** 52:18
**justification** 39:25
**justify** 42:7,12
**J-O-H-N** 33:6

―――――――
**K**
―――――――
**Kayalyn** 3:8 7:8
**keep** 57:23 58:11
  59:6,7 71:15
  115:14
**Kennedy** 3:11,16
  10:24 11:1
**kept** 86:12
**kind** 35:12 65:15
  114:22 115:20
**kinds** 35:15 59:1
  69:14
**KLEIN** 4:1
**know** 12:7,10 14:25
  16:22 17:6 20:24
  22:12 24:18 25:23
  27:20 28:2,12,21
  28:23,24,25 31:12
  31:16,19 33:16
  40:18 49:5,8 50:25
  53:7 54:7 57:18
  64:18 69:22,22
  70:22 71:15 74:8
  74:12 77:5 79:2,15
  79:20 80:17 82:1
  83:6,8 85:16,24
  86:4,17,24 87:14
  87:17,21,22 89:21
  93:19 105:17,23
  111:25 112:17,21
  113:1 114:2
  115:24 124:25
  128:19 130:8,19
  131:4 133:12
**knowing** 80:9
**knowledge** 106:1
  121:3
**known** 87:24
**knows** 48:8 70:23

102:22 103:20
**KRAVITZ** 5:1

**L**

**labeled** 100:20
  106:25 109:10
  125:9
**labor** 9:19 42:23
  43:16 44:9,16,24
  45:8,17,19,23 46:2
  46:8,19 47:2 51:3
  64:16,20,23 82:14
  115:19 116:3,12
**language** 14:5 48:18
  85:2
**large** 20:12 41:8
  75:18 105:12
**largest** 10:7
**late** 15:6 18:4,4
**LATHAM** 5:9
**latitude** 62:7
**Lauria** 129:19
**law** 7:8 55:18
**laws** 126:14
**laying** 91:8
**lead** 35:2 54:17 62:3
  75:1,1
**leadership** 9:22
**learned** 105:4,7
**leave** 31:22 85:14,20
**led** 54:13,21 55:7
  62:23,24,25 63:11
  63:14,15
**left** 82:11 111:12
  127:6
**legal** 10:13 11:9
  22:22 87:5 92:18
  104:9,10
**Leonhard** 5:21 9:14
**letter** 16:8,13,15,19
  17:1,5 23:9
**let's** 37:24 38:19
  39:6 50:22 52:12
  60:10 65:15,15
  66:7,25 67:1 68:18
  77:20 79:16,24

84:2,20 95:7 97:15
  97:21 101:23
  114:4 118:10
**level** 73:6 76:3
  104:13,19 124:9
**LEVINE** 4:23
**lieu** 25:5
**light** 13:8
**likelihood** 79:11
**limit** 36:9,11
**limited** 11:13 16:5
  16:11 23:14 28:20
  54:25 55:3,8 93:5
  122:16
**limits** 127:7,15
**line** 27:7 44:4,6 53:5
  56:20 115:23
**lined** 8:1 26:5
**lines** 14:7 115:21
  118:6
**list** 15:16 49:2 86:6
  122:5 124:10
**listed** 101:23 131:25
**listening** 13:18
**LISTHAUS** 5:1
**lists** 15:15 93:2
  101:3
**little** 14:23 54:11
  79:16 80:20 84:20
  99:2
**live** 9:16
**LLP** 3:2,18 4:17 6:1
  7:9
**local** 9:2,8
**Locals** 5:3
**lock** 75:18
**locking** 39:6,9
**Lokey** 16:8,14,18
  17:3 23:9,11
**long** 20:2 37:3 56:24
  61:24 74:25
**longer** 62:17
**look** 47:21 48:19
  49:15 50:22 52:5
  52:12 55:19 56:3
  56:19 61:18 65:1

66:8 67:5 68:18
  73:9 77:20 80:23
  91:13 98:2,5
  106:24,25 107:8
  110:10 115:19
  116:21 117:2
  119:7 128:8,14,25
  129:15
**looked** 28:17 43:22
  56:11 70:8,16
  94:20 110:9
**looking** 13:13 50:6
  64:12 103:8
  129:25 130:2
  131:18,20
**looks** 10:21 56:2
**lot** 18:4 41:8 70:21
  76:17 80:15
**lots** 58:22
**low** 67:15 96:7
**LOWELL** 4:7
**lower** 109:7
**LP** 8:23
**lunch** 133:12

**M**

**M** 5:21
**Machine** 8:12
**Machinist** 9:9
**mail** 79:18 80:2
**making** 12:16 25:3
  54:25 71:15 80:19
  82:6 122:15 129:6
  133:15
**management** 8:23
  55:16 105:10
  124:19 125:10,12
  125:19 126:1,2
**mandatory** 77:10,14
**Marafioti** 3:8 7:8
**MARIANNE** 4:15
**marked** 15:18 16:1
  18:5 56:18 86:11
  109:7 129:23
**market** 41:7 69:13
  69:23 75:16 76:16

77:6 96:13,13,14
  97:1,5 125:15
  126:3
**marketed** 57:22
**marketplace** 128:19
**material** 21:5 25:8
  50:9 113:23
  129:22
**materially** 62:15
**materials** 15:24
  20:18 24:11 27:4
  28:17
**math** 97:19
**mathematically**
  69:2 73:20
**matter** 1:6 15:24
  19:8,12 20:16 24:8
  25:9 30:16 31:12
  56:2 81:21 89:19
  125:24 127:22
  135:7
**matters** 10:18 15:11
  19:17 24:17 26:16
  26:25 32:7 120:12
**ma'am** 35:23 36:23
  37:16 38:18 40:3
  40:23 45:14 50:1
  51:4,6 57:5 58:10
  58:21 59:15 61:8
  65:14,18 67:8,24
  68:21 74:17 79:1
  80:14,21 88:22
  89:1,15 127:21
  128:13,13,17,21
  128:23 129:1
  130:1,8 131:16,24
  132:14
**Meagher** 3:2 7:9
**mean** 16:23 22:7,22
  27:8,22 28:11,21
  28:23 31:13 33:16
  33:17 39:1 49:16
  55:6 56:18 63:2
  68:4 73:11 87:5
  90:3 95:18 101:25
  102:4,6,13,19

103:11 117:23
**means** 13:8 53:14
  79:23
**mechanism** 41:13
  41:14
**meeting** 10:20 17:11
  17:16 24:11 25:23
  25:23 26:17 27:4,5
  27:14,17 28:16,20
  29:8,15 30:1 32:7
  42:3 74:14 102:18
  102:22 104:22
  109:3 112:13
  118:3,4 119:5,20
  120:4 121:10,10
  122:2 130:5
**meetings** 17:17 27:3
  30:7 42:3 108:23
  111:24 112:1,6,10
  118:24
**Mehlsack** 5:7 12:7,9
  12:12 13:4,11
**members** 10:8,13
  11:8,23,24 13:21
  80:16
**mention** 98:21,22
**mentioned** 14:1
**merges** 64:19
**met** 33:25 104:2,7
  124:8
**MEYER** 4:1
**middle** 113:4
**Miller** 4:9 26:21
  28:15 31:5,8,14,15
  31:16,18 32:7,10
  33:15,21,23,24
  34:5,7 64:18
  102:11,16
**Miller's** 64:21
**million** 57:23 58:13
  58:14,16 67:7,19
  67:25 68:3,9,16,16
  68:19,20 69:1
  73:19 75:13 76:7
  93:14,25 94:10,18
  94:19 95:3,9,12

97:17,24 100:8
  106:10 110:3
  113:11,16 132:13
  132:19
**Milwaukee** 4:13
**mind** 44:2 75:5,24
  92:3 111:3
**ministerial** 8:3
**minus** 95:11
**minute** 107:22,24
  119:7
**minutes** 66:7
**misspoke** 98:15
**mistake** 114:25
**moment** 31:24 51:25
  60:10 61:10 64:12
  116:22 122:7
**money** 37:21 60:22
  76:8 79:19,19
  81:25 82:1 83:5
  100:1
**money's** 37:23
**month** 13:14 61:22
  63:19
**monthly** 59:7
**months** 14:12 37:9
  41:24 61:16,19
  62:4,5,6 63:17
  85:16
**morning** 7:7 9:6
  15:7 23:21 24:3
  29:12,17 30:10
  34:13,14,24 108:9
**morning's** 9:12
**motion** 7:18,18,25
  8:6 9:21 34:6 90:2
  90:6,12 91:24
**motions** 102:4
**Motor** 106:11
**Motors** 10:4 19:21
  44:16,23 45:16,19
  64:23 81:11 82:15
  94:24 116:12
**move** 18:14 19:12
  23:20 47:8 51:16
  81:9,11 82:16

85:20 97:21
  105:13 118:10
**moving** 49:3 82:11
  82:13
**multiply** 68:25
  73:18
**multi-hundred**
  106:10
**MURRAY** 3:11
**mutual** 63:22
**mutually** 48:2

_____

## N

**N** 3:1 7:1 134:2
  135:2
**name** 33:4 118:20
  135:13
**narrowed** 122:22,23
**nature** 99:4
**near** 14:11,21
**necessarily** 19:11
  99:9
**necessary** 28:22
  89:17 105:14
  126:13
**need** 12:1 14:25
  15:11,21 62:14
  63:18 66:22 89:3
  89:19 128:14
**needed** 44:18 70:12
**negative** 84:19
**negotiate** 47:5 61:25
  62:19
**negotiated** 47:3,6,7
  70:17 81:7 94:17
  127:10,12
**negotiating** 34:21,24
  42:20 43:13 44:7
  62:24 70:4 117:8
**negotiation** 12:18
  62:4 63:11 78:3,4
**negotiations** 10:22
  14:19 55:14
  122:10,25
**negotiator** 62:3 75:1
**negotiators** 35:2

54:18 75:2
**neither** 42:10
**never** 22:9 33:23
  44:2
**new** 1:3,16,16 3:5,5
  3:14,14,20,21,21
  4:5,5,20,20 5:5,5
  5:13,13,19,19 6:4
  6:4 27:17 96:15
  112:7,8,9
**news** 20:14,22,23
**night** 23:2 49:3
  119:20
**non** 97:5
**North** 4:11
**notice** 52:23
**notwithstanding**
  18:18 54:1
**November** 111:14
  111:19 112:3
  117:7
**November/Decem...**
  43:9
**number** 2:3 7:13 9:3
  9:14 12:22 15:18
  16:3 23:7 24:6
  28:20 32:18 50:7
  56:15 58:4 76:5
  77:6 90:24,25
  95:23 96:4 97:3,8
  107:11,12,13
  108:11,11,19,19
  110:6,10,13
  116:22 117:2,3
  118:10 124:25
  132:10
**numbers** 74:3 76:9
  97:13 109:15
  110:16
**numerous** 24:13
  49:24

_____

## O

**O** 1:21 7:1 135:2
**object** 16:3 19:23
  23:6

objected 15:21 16:1
17:17 18:8 21:11
53:4
objecting 17:10
objection 7:24 8:11
8:24,25 9:4,5,14
9:15,21 11:2 12:13
15:7,22 16:5,11,12
18:2,5,11,18,19,20
19:19 21:13 24:23
38:23 44:10 46:10
48:7 57:24 58:2
63:1 83:1 89:23
90:4 93:17 96:17
objectionable 20:16
objections 7:17,19
7:21 8:8,10,14,16
8:19,20 9:10,11,18
9:20 15:19 17:9
19:9,16 22:1
objective 13:9
objector 8:7
objectors 9:16 15:13
25:21 26:3 28:14
32:4,20
obligate 44:19
obligation 12:15
13:6 62:17 86:14
obligations 64:5
86:21
observation 130:20
obtain 94:23
obtaining 78:13
obvious 99:6
obviously 12:3 13:8
13:11 14:20 20:15
21:14 23:10 27:20
98:25
occur 25:13 91:6
occurred 14:12 25:6
30:6 51:1 54:20
103:12
occurring 40:16
79:6 83:2
occurs 87:8,8
offer 15:1 18:13

20:24 22:14 40:2
70:4 77:20 99:4
112:23 113:3,18
offered 18:10 69:4,9
69:24 80:1 97:18
offering 19:25 20:21
20:23 21:4 27:18
51:8 67:22 68:2
69:18 70:9 77:21
78:14,20 79:2,6,9
79:17,18 80:5 81:5
81:15 83:2,10,13
83:15,20 84:23
85:1 86:18,24
87:11 92:20 94:17
113:1 124:1,10
132:18 133:1
officer 40:21 121:15
122:14
officers 118:19
offices 106:6 112:9
official 5:10 7:23 8:7
135:5
Oh 21:24,25 44:2
55:22 59:6 66:12
68:7 93:12 103:8
108:16 111:2,8
okay 7:22 11:4 12:6
13:3,15 14:13 15:3
16:17,21 17:7,23
18:7 19:2,18 20:9
21:3,7,9,19 22:5
23:5,7,18,22 25:1
27:9 28:10 30:3,21
31:19 32:19,22
33:1,7 34:17,20,20
34:24 35:4 36:24
37:4,24 38:2,11,13
38:20 39:12,16
41:22 42:1,17,20
43:9 44:2 50:6,22
52:9,12,13 53:17
54:10,12 55:14,19
55:19 56:14,17,23
57:6 58:5 60:6,10
60:21 62:3,23

64:18 65:15,20
66:18 67:1,5,18,21
70:15 71:6 73:14
73:17,21 80:22
82:23 83:5,7 84:14
86:14 88:2,17,17
88:19 90:13 91:19
91:19 92:2,13 93:1
94:3,10,13 95:7
97:22 99:1,7,14
100:1 101:3,8,11
101:13,24,25
103:8,22,25 104:5
104:11,19 106:16
107:8,20 108:2,4
108:18,25 111:10
112:25 114:10
118:23 120:21
123:25 124:22
125:4 126:5 127:3
127:3 129:16,18
132:10 133:7,9
omitted 13:19
omnibus 7:14 8:2,22
27:6 84:7
once 31:17 44:15,23
45:16,19 47:5
59:19 67:4 123:19
ones 15:6
OPEB 11:14 14:6
open 120:8,11
opening 8:17 15:1
operates 105:11
operating 5:2 9:2
13:21
operation 115:1
opinion 12:4 67:16
93:6,9 101:14
106:16
opportunities 47:11
opportunity 29:23
29:23 37:8 38:6
63:6 71:18
opposed 106:14,14
option 60:25 100:2
options 60:17

125:13
oral 88:16 91:15
order 7:16 62:12
63:8 73:17 79:20
79:24 90:6 105:15
115:12
original 55:25 70:19
originally 62:6
119:19 122:23
outcome 62:15
outstanding 95:23
96:5 97:3 111:13
119:22
overall 73:5 76:6
83:16 94:15
130:12
overcome 103:18
overflow 7:4
overrule 48:12 58:2
ownership 106:11
106:13,14 109:21
o'clock 26:1 29:12
29:17
O'Neal 123:1

**P**

P 3:1,1 7:1
package 20:18,19
21:14 24:11 126:3
packages 21:14
page 19:22 44:3
47:25 55:20 56:21
86:13,19 90:20,25
91:13 98:5 101:1
106:25 107:8
109:6,9,23 110:1,9
125:4,6,9 126:5,7
131:17,19,20
134:4,11
pages 50:15 93:7
paid 38:3 57:10 59:7
75:9 113:12,17
122:16 123:19
paper 94:12
papers 80:12
paragraph 19:20,22

90:24,25 91:1,5,8
91:13 92:4 93:5
95:13 103:12,14
125:22 126:8
129:11
**paragraphs** 19:20
103:13
**pardon** 42:15
**part** 10:23 11:17
13:22 21:12 24:21
25:8 39:24 54:24
64:25 71:24 83:16
86:2,20 94:15
103:4 112:3,10
114:18 116:18
117:7,24 122:22
126:13
**participate** 101:11
109:2 120:16
**participating** 23:11
**participation**
132:18
**particular** 117:22
126:25
**parties** 7:19 10:14
11:9,22 13:9 15:5
32:18 42:6,11
44:21 45:18 84:4
84:10 117:12
126:20 130:13
131:7
**parts** 62:7
**party** 39:19 57:2
86:14
**Pat** 23:1 31:11 96:17
**pay** 38:11 62:17
92:6 100:5 122:21
**payable** 41:17,22
42:5,11,22,24 43:3
43:15 44:8,15,23
45:1,9,16,20,22
47:1,10
**paying** 44:20 58:19
58:24,25 60:25
**payments** 72:22
**pays** 100:6

**people** 40:17,25 41:8
54:25 79:18 80:2,9
80:15 86:25 87:23
**people's** 83:18
**percent** 72:23 94:19
100:6 133:3
**percentage** 105:12
**perform** 76:16
**performance** 75:17
**period** 37:3,23 43:13
51:12 59:25 60:7
60:11,23 61:13
62:1,17 63:22,23
64:1,6,8,15 74:25
89:13 114:6
115:17 116:10,11
130:10
**periods** 19:3
**permit** 48:1 83:19
**permits** 46:17
**pers** 25:22
**person** 15:8 40:7
54:16 77:5
**personal** 121:3
**personally** 61:20
**perspective** 28:14
38:5 52:16
**PETERSON** 4:7
**phone** 74:22
**phrase** 13:24,25
**pick** 123:23
**picture** 54:11 59:11
59:12 115:8,10
**piece** 13:19
**pieces** 91:11 97:11
**pile** 18:12
**place** 3:13 35:18,22
38:22 40:5,9,11
41:7,11 45:2 47:4
50:3 62:14 69:19
69:23 70:9 73:22
74:24 77:6 78:5
79:2 125:25
**placed** 90:10 122:13
**plan** 2:2 7:12,17
10:10,11,14,16,22

11:6,9 22:20 34:22
36:16 37:3 39:19
40:1 47:1,5,11,16
47:22 48:1,4,5,14
48:16 50:8,13,14
50:17,18,19 51:7
51:15,16,20 52:3
52:13,16,22,25
55:8,10 57:6,10
58:7 59:2 60:6,12
60:14,17,19,21
63:12,16 64:5 65:1
65:9,16 67:1,18
68:7,11,12,23
69:18 70:2,9 71:2
71:10,13,23 73:6
73:23 74:18 75:5,8
75:11,14 77:20,24
78:6,9,20,23 79:20
80:5,16,23 81:10
81:14,16 82:6,9,14
82:17 83:14,20
84:8 85:12 86:15
88:12 90:22 91:2,3
91:10 92:17,24
93:24 94:11,20,22
95:21 97:6,11,16
98:11,14,16,19
100:10 103:6
110:2,23 111:13
112:2,4,18,22
113:2,12,24
114:15,18,19,21
115:6,10,18,24
116:1,13,14 117:8
117:20,21 120:1
120:11 121:2
122:18,23,25
123:9 124:5 126:1
126:17,23 127:8
127:15,24 130:13
132:1 133:1
**planned** 131:7
**plant** 12:19
**plants** 10:9
**plate** 86:1 87:17

**play** 64:15,24 77:18
77:19
**played** 34:21,24
**Plaza** 3:20
**pleadings** 15:6
112:11
**please** 7:2 33:5
48:13 72:11 90:24
98:3 108:2,4 109:6
111:4 117:2 119:7
120:20 128:25
**Plus** 98:14
**point** 8:2 21:10
22:22 25:2,18 53:6
53:13 56:10 57:9
57:25 61:6 63:20
72:16 75:13 77:14
79:15 85:2 89:13
95:6,8 100:9 102:1
102:1 105:22
116:16 123:25
127:20,23 128:7
128:11,24
**pointed** 100:9 110:2
122:3
**points** 85:3 117:11
119:22 122:1
**pop** 53:5
**pose** 129:14
**position** 62:14 81:17
81:21 82:5 85:14
119:21
**positions** 12:14
**possible** 49:22
115:17 133:14
**post** 80:23
**post-confirmation**
77:22
**post-emergence**
95:10
**potential** 10:18 14:3
28:13 35:24 81:10
99:3
**pre** 79:2
**precede** 24:23
**preclude** 10:1 12:4

precluded 27:18
precludes 11:10
  40:16
predate 29:7
predict 76:14
preferential 72:18
preferred 51:23
  65:3 67:23 68:18
  68:19,22 69:3,9,13
  69:23 71:1,8 72:7
  72:9,13,15,19 73:1
  73:3 75:11,15,20
  76:11,19 98:6,8,18
  98:23 99:9,14,18
  99:20,24 100:1,3,5
  100:13 112:19,25
  117:19,24 126:16
preferreds 77:6,8,13
preliminary 9:20
premise 34:6 50:12
  97:4 106:12
premium 73:4
preparation 25:7,10
prepared 27:10
  29:10 110:21
  121:14,17 131:23
presence 52:10
present 17:4 26:11
  26:15 31:5 32:16
  33:11 34:2 120:13
presentation 8:17
  101:8 102:20
  106:24,25 110:10
  110:14,17 118:8
  132:5
presentations 18:25
  19:9 49:24
presented 15:24
  20:8 22:9,10 46:4
  47:6,13 100:19
  109:3,23 110:7,18
  118:5 120:2,4
  121:19 122:5
presenting 16:16
  17:3 31:18
president 123:1

press 8:10
presumably 27:1
  132:24
presume 90:11
presuming 107:17
pretty 77:18
prevents 128:3,5
PREVIANAT 4:9
previous 19:14
pre-confirmation
  77:22 78:1 79:6,17
  79:18 80:2,19
  81:15 83:3
price 22:19 68:13,23
  69:17 70:2,5 71:12
  72:2 74:11 75:19
  93:15,16 94:1,4
  95:10 96:7 97:1,9
  97:10,17 98:22
  99:10 124:1,6,9
prices 94:9 96:1
pricing 69:12
primarily 15:13,14
  55:16
primary 36:25
  38:20
principally 55:17
  130:17
printed 135:13
prior 28:18 29:12
  30:13 42:3 57:2
  87:24 89:6 111:20
  115:11 118:25
  120:4
priorities 122:14
priority 123:16
probably 31:22 49:9
  58:15
problem 49:7
procedural 15:11
  21:21 24:2 28:12
  28:13
procedurally 24:23
proceed 11:15 15:9
proceedings 23:11
  133:17 135:6

process 40:9,11,15
  40:17,19 41:8
  54:19,20,24 63:6
  64:25 85:1 119:11
produced 23:12
  65:22
programs 11:13
  14:22
progress 33:14
proof 28:7
proper 126:13
proposal 70:6,19
  73:6 101:4,21
  103:16 104:3,6
  106:17,18 107:1,9
  107:14,15,16
  109:11,11 111:13
  111:22 124:15,18
proposals 111:18,25
propose 26:10,11
proposed 8:1 26:10
  70:16 92:6,13,16
  97:6
prosecute 8:25 9:15
prosecuting 9:18
protect 35:16,21
  86:24
protected 76:20
protections 72:25
prove 18:9
provide 38:17 43:23
  47:9 63:8 64:4
  70:11 72:14 73:21
  94:23 95:1 124:17
  131:14
provided 10:8 47:19
  48:21 50:17,18
  54:14 63:5,7 73:24
  75:8 93:13 98:20
  104:16 119:10
  120:14 121:20
  131:11
provides 36:15,16
  40:14,25 47:18
  85:17,19 106:17
providing 82:13

92:8
provision 36:14,16
  38:3 41:25 53:20
  62:1,21,24 64:6
  75:22 77:10 78:22
  82:13 85:11,15,18
  85:19,25 87:2,7
  126:20,25 127:14
  130:16
provisions 40:4 55:3
  60:19 64:9 74:10
  74:15 85:11,24
  105:11 125:15
prudent 92:7
PSA 57:3,8 58:7
  59:18,19,19,24
  60:1,4 114:16
  117:14 118:16
  126:17 127:8,15
  129:24 130:12
  131:11,15
public 40:12 41:8
  69:24 97:1,5
purchase 35:9 90:7
  91:2,11 93:25
  120:23
purchased 91:9
purchasing 2:2 7:11
pure 77:9
purpose 20:7 23:14
  35:13,15,16,20
  36:25 38:21 39:9
  120:5
purposes 33:25
pursuant 26:22
pursue 39:20 41:20
  43:3
put 18:14 27:7 29:23
  31:10,16,18 36:2,8
  41:6 45:7 47:4
  50:10 53:23 54:11
  60:22 61:9 70:4
  79:19 90:5 91:15
  109:15
putting 25:4 59:10
  97:15

**P.C** 3:11 4:1 5:1
**p.m** 7:15 108:1,1
   133:17

## Q

**qualified** 41:1,5
**quash** 34:6
**question** 16:23
   25:19 35:19 36:11
   36:13 39:1,1 40:20
   42:8 44:4,4,17
   48:13 53:5,10,23
   56:9 61:23 69:11
   72:11 76:1 82:7
   93:22 98:21
   101:16,17 102:3
   114:10,12 115:18
   129:12,14 131:17
**questioned** 53:8
**questioning** 115:23
**questions** 28:20 88:2
   91:18 107:19
   108:25 114:6,14
   114:14 116:22
   122:8 124:21,23
   133:5
**quick** 22:2
**quickly** 110:1
**quite** 71:4 81:21
**quiz** 53:5
**quizzing** 53:12 54:8

## R

**R** 1:21 3:1 7:1 135:2
**raise** 21:21 30:5
   33:1
**raised** 24:3
**range** 11:12 26:19
**rate** 100:5,12
**rates** 113:4
**rating** 76:20 77:1,3
**reach** 10:17 12:2
   13:7 14:21 78:6
   112:3
**reached** 12:17 26:2
   106:22
**reaching** 11:11

**reaction** 114:13
**read** 13:5,25 14:6
   15:5 31:20 44:5
   64:21 108:17
   118:22 129:2,13
   129:17,22
**reading** 129:4
**reaffirm** 11:15
**real** 18:2 123:16
**realize** 67:13 75:15
   99:3,11
**realized** 71:2 94:9
**realizing** 79:13
**really** 19:16 22:21
   26:20 33:21 41:4
   54:6 59:10 61:4,24
   65:2,3 74:3,4
   75:20 85:16 99:5,5
**reason** 12:13 22:16
   31:1 52:23 57:7,7
   59:17,17,20,20
   61:4,4 65:12,12
   80:22 81:4,5 82:9
   106:4 127:9,9,16
   127:16
**reasonable** 10:2,16
   11:16 12:2 13:7
   36:17 58:20 92:7
   93:10 94:13 95:4
   96:4 97:9 126:11
   126:12
**reasonableness** 38:7
   93:6 96:3
**reasonably** 125:17
   126:13
**reasons** 48:2
**recall** 44:17 61:23
   70:1 91:25 94:1
   97:25 100:11,16
   108:23 110:4,6
   112:6 114:3 118:4
   118:8,24 125:1
**recap** 67:2
**receive** 36:17 66:9
   72:23,25 79:12
   92:17,19

**received** 16:25 21:1
   23:9,24 92:21
   106:21 122:23
**Recess** 108:1
**recite** 49:9
**recognition** 13:20
**recognize** 10:11,15
   10:19 11:7,10
   13:20 14:4
**recognized** 39:17
   62:11 70:10
**recollection** 43:21
   109:22 121:5,12
   132:3
**recommended**
   114:21
**recommending**
   46:24 82:11
**record** 9:25 11:3
   14:6 26:4 28:23
   33:5 63:1 66:15
   90:17 93:11,12
   108:3,5 123:4
**recording** 135:6
**record's** 18:25
   123:25
**recoveries** 107:1
   109:21 112:5
   117:9
**recovery** 106:17
   107:12,15
**redemption** 77:14
   77:15
**redirect** 27:24
   110:22 129:5
**redirecting** 27:18
**refer** 8:13 109:10
**referenced** 23:1
   74:2
**references** 85:23
   86:4 105:17,22
**referred** 9:3
**referring** 34:22
   84:22 85:25
   130:20,21
**refers** 29:3 87:7

**reflected** 26:4 63:4,5
   64:3
**reflects** 19:20
**refresh** 43:21
**refunded** 57:11
**regard** 34:6 58:4
   125:20
**regarded** 76:20 77:7
**regarding** 17:1,14
   118:14,15 119:2
**regardless** 85:15
**registration** 85:4
   87:11 88:19,23
   89:6,10,14,16
**regulatory** 48:2
**reimbursement**
   36:17 37:6 92:18
**reimbursements**
   93:2
**relate** 16:5
**related** 62:1
**relates** 14:6 129:5
**relating** 15:23 102:4
   103:15 125:12
**relevance** 16:2 18:9
   18:17,19
**relevant** 19:3 22:12
**rely** 13:1 27:25
**relying** 18:21
**remained** 85:7
**remaining** 32:4
**remember** 76:8 94:4
   101:6 126:21
**remiss** 85:13
**reorganized** 95:24
**rep** 33:18,19
**repaid** 57:11
**repeat** 102:2
**reply** 7:14 8:2,22
   27:6
**reported** 20:25
**represent** 111:17
   120:7 126:24
**representation**
   85:13 90:14 106:2
**representations**

96:10
**representatitive** 16:16
**representative** 30:17,20
**representatives** 14:17 26:5 63:15 63:16
**represented** 28:25
**representing** 15:13 19:8 91:23
**represents** 105:8 111:18 117:18 118:12 119:9 120:8 129:19,19
**request** 78:10,11 83:23
**requested** 98:20 121:2,4,7
**require** 10:16 115:25
**requirement** 77:24 85:6
**requires** 10:1 12:5
**requisite** 70:12
**reservations** 23:16
**reserve** 23:5 49:1
**reserved** 18:22 94:19
**reserving** 37:10
**Resnick** 24:6,16 26:15 27:16 31:4 31:18,20 34:3 69:8 69:11,12,21 100:23
**Resnick's** 29:18
**resolution** 10:18 11:14,14 12:19,23 13:7,14,20 14:3 78:9 118:12 119:16,18,19,23
**resolve** 12:25 32:14
**resolved** 9:22 12:22 15:21 57:18 89:7
**resolves** 11:22 23:17
**resolving** 118:18

**respect** 9:19 10:6 11:5 12:15 14:1 27:2 29:20 32:7,12 60:19 68:22 85:17 110:1 112:18 113:21,21 120:8 122:4 130:11
**respective** 115:6
**respects** 118:18
**response** 25:25 44:17 56:8,18,22 83:23 84:7 103:9
**restate** 89:3 93:21
**restrict** 105:12
**restricted** 64:1 125:14
**restrictions** 105:10
**restructuring** 40:21 121:14 122:14
**rests** 31:17
**result** 48:15 92:9 130:19
**resulted** 94:7 115:7
**resulting** 131:8
**results** 128:24
**resume** 133:14
**retention** 58:6
**retirement** 125:13
**returns** 34:19
**reused** 17:11
**reveal** 66:11
**review** 18:15 38:7 121:22
**reviewed** 16:25 23:10 27:4 74:15 101:12 120:14,18 132:5
**reviewing** 74:6
**revised** 63:25
**revolves** 82:7,7
**rewards** 39:24
**re-cross** 28:5 127:4
**re-direct** 32:10 108:7
**right** 7:2 16:21 18:17 19:15 20:20

21:17,19 23:13 25:14 27:12 28:2 29:4,14,18 30:25 31:2,3,19 32:13,19 33:1,21 34:4 35:10 35:13,18,25 36:3,5 36:19,20 37:1,15 38:4,8,13,17 39:1 39:7,15 40:10,12 40:15,18,21,22 41:1,5,18,24 42:7 42:12,18,23 43:16 43:19,20 44:9 45:3 45:17,21,23 46:2 46:14 48:23 49:2 51:13,18,21,23 52:7,13,14,17,20 52:22,22,24 53:1,2 54:18,22,25 55:8 56:17 57:4,15 58:9 58:14,19,25 59:1 59:17,19,24 60:1,3 60:8,12,22 61:5,12 63:7,8,24 64:7,8 64:13,16 65:5,8,11 65:12,13,17 66:25 67:10 68:3,11,20 68:23 69:1 71:15 71:17,20,21 72:1 72:10,15,18,25 73:4,12,12,15,19 74:16 75:1 76:11 77:7,17,18,23 78:3 78:13,16,21,23 79:4,16,21,24 80:8 80:10,13,16 81:16 82:18 83:25 85:12 86:16 87:6,20 88:13 89:4,11,14 91:17 93:3,7,23 94:11 95:10 97:12 97:20 98:2,13 101:9,14 107:6,20 108:19 109:7 110:4,10 115:11 115:20,22 123:7

123:10,13,22 124:4 127:3,15,20 128:2,7,12,16,18 130:16 131:2,4,4 132:4,13,23 133:11
**rights** 10:13 11:9 12:18 13:8 51:8,21 59:24 63:12,23 64:5 65:3,9,17 67:4,22 68:2 69:17 70:9 72:20,22 77:20,21 78:14,20 79:2,6,8,9,10,13 79:17,18,21,24 80:1,2,5,10 81:5 81:15 83:2,10,12 83:15,20 84:23 85:1 86:18,22,23 87:11 88:8,9,10,20 88:20,24 93:13,15 94:17 112:23 116:5 124:1,10 132:18,22 133:1
**right's** 92:20 113:1 120:1
**risk** 37:23 71:7 76:18 101:23 102:1
**risks** 70:21 101:3,21 102:9 103:19
**River** 4:11
**Robbins** 4:15 12:8 13:16,18 14:8,14
**ROBERT** 1:22 5:15
**Rodney** 123:1
**role** 34:21,24
**room** 30:11
**ROSENBERG** 5:15
**Rothschild** 17:1 19:11 21:11,14 81:24 82:3 96:23 101:8,10 102:20 106:24 131:23,25
**roughly** 131:6
**round** 45:7

**ruling** 20:7
**rulings** 23:21,23
    26:22
**run** 85:5
**running** 106:13
    108:11

_____

**S**

**S** 3:1 5:7 7:1 134:10
**satisfied** 116:6
**save** 31:23
**saved** 82:1
**saving** 81:25 82:2
**saw** 30:11
**saying** 46:16 70:1,14
    71:15 86:15 87:18
    90:13
**says** 16:19,20 44:11
    46:11 56:25 84:25
    86:1,13,14,15,19
    86:23 91:9 125:10
    126:7,11 127:1,23
    128:1,2
**scheduling** 7:16
**seat** 31:23 34:5
**seated** 7:2 108:2,4
**SEC** 89:7,11
**second** 8:7 10:6
    19:23 34:16 41:25
    100:22 104:12
    107:4,5 110:13
**section** 53:13 55:19
    55:24 56:5,7 64:3
    74:19 86:9 87:18
    127:7 129:24
    130:6,17,18,20,21
**securities** 69:14 91:2
    91:9 106:15
**security** 8:8 69:24
**see** 19:13 25:16
    50:16 54:10 63:9
    65:1 66:25 73:22
    74:1 76:5 79:19,24
    88:4,5 90:8 92:9
    95:16 98:6 101:1,4
    104:14 105:1

107:2,6,9,11,12,13
    110:9,13 111:12
    121:6 125:6 126:6
    126:17 132:11
**seeing** 111:20
**seek** 121:24
**seeking** 104:23
**seen** 66:6
**sees** 41:12
**selected** 122:17
**sending** 80:10
**senior** 125:12,19
**sense** 32:13 50:2
    88:16 99:5
**sent** 16:13 102:21
**sentence** 19:23 92:5
    92:5,14
**separate** 36:19
    50:16 81:1
**separately** 17:13
    22:15 30:2
**sequence** 44:25
**Serbers** 129:20
**series** 22:18 25:6
    101:3 112:1 122:8
**serious** 14:20
**seriously** 72:5 76:12
**set** 7:10 10:4 12:22
    20:21 45:21 46:4,5
    64:9 65:9 73:16
    74:10 86:19 90:20
    98:11 100:10
    125:21
**sets** 91:1,9 93:7
    109:20
**setting** 39:1
**settlement** 11:21
    42:22 43:15 44:9
    44:15,16,23,24
    45:8,16,19 46:8
    51:2 64:16,20
    116:1 126:17
**settlements** 26:2,3
    64:23
**seven** 100:2
**seventy-six** 67:25

**severance** 125:14
**share** 22:18 49:4,6
    69:16 70:5 71:11
    71:12,19 72:2,3,16
    75:12 77:12 94:18
    95:15,19,20 96:1,7
    96:7,15 97:8,10,17
    124:3
**shareholder** 70:10
**shareholders** 69:19
    71:10,13,16 78:7,8
    79:11,12 80:13,17
    99:10 132:15,20
**shares** 68:3,9,16,20
    68:25 71:9 73:18
    74:11 75:10,14
    88:11 93:25 94:7
    94:18,19,19 95:23
    96:5 97:3,8 98:6
    98:23 99:20 110:3
    112:19 133:2
**Sheehan** 19:19,21
    24:6,16 26:11
    27:15 28:19,19
    30:18 31:18 32:17
    32:20 33:2,6,8
    34:3,13,21 49:25
    51:1 53:7 54:9,13
    67:15 84:21 86:8
    91:22 102:24
    103:20 106:16
    108:9,9 109:15,22
    110:16,20 116:21
    123:2 124:23,23
    127:6 133:9 134:5
    134:6,7,8
**Sheehan's** 16:4 18:2
    18:5 29:2,2 31:5
**sheet** 117:12,19
    126:16
**short** 133:11,12
**shortcut** 56:24
**shows** 130:15
**SHRIVER** 3:18
**shut** 12:21
**sides** 39:21

**sign** 81:10
**Signature** 135:10
**signed** 44:21 45:18
    84:9,10
**significant** 24:7,9,12
    78:4 105:24 106:7
    130:11
**significantly** 107:14
    107:16 122:22,24
**silly** 91:16
**similar** 19:9 107:9
**Similarly** 9:7 11:5
**simile** 22:7
**SIMON** 4:17,22
**simply** 7:19 17:12
    19:10 27:21 28:14
    113:3 115:20
**sir** 43:21 44:3,6,14
    83:25 84:17 90:5,8
    90:20 92:1,10,12
    92:25 93:4 94:6
    95:17 98:4,7 99:19
    101:2 104:15
    105:2 109:8 113:7
    113:20 114:1,20
    114:23 115:9
    117:1,4 120:25
    121:16 123:24
    124:7 125:3,5,8
    126:9 127:2 129:2
**sit** 52:4 72:5 80:3
**sitting** 105:14
**situation** 41:2 46:25
    89:7
**situations** 40:24
    41:19 122:15,17
**six** 9:19 10:3 37:9
    62:6,9
**sixties** 125:1
**sixty** 77:12,17,19
**sixty-three** 68:16
    93:14 94:10,18
    95:9
**Skadden** 3:2 7:8
    49:20 112:9
**skip** 54:9

**skipping** 104:12,25
**Slate** 3:2 7:9
**sleep** 49:9
**slip** 133:16
**slipped** 129:24
  130:2
**sold** 71:4
**soliciting** 40:5,6
  41:14
**solidify** 12:14
**somebody** 76:8
**soon** 58:16
**sophisticated** 77:5
  79:7 80:15
**sorry** 7:3 19:2 21:24
  22:4 34:15 35:19
  35:19 39:8 42:8
  43:1,17 48:20
  55:22,25 56:6 61:7
  65:24 66:3 68:7
  74:4 76:23 84:13
  86:5 90:13,21
  93:21 97:17 103:8
  108:16 109:17
  110:12 116:17
  117:23 118:15
  124:13 127:11,25
  128:13 129:6,12
  130:24
**sort** 11:21 23:8
  25:16 39:3 53:5
  75:23
**sought** 47:4 55:2
  61:25 62:6,21 78:6
  78:11,13,22 82:10
  112:3
**sound** 135:6
**SOUTHERN** 1:3
**so-called** 63:19
  117:10
**speak** 53:6
**SPEAKER** 84:12,15
**speaking** 98:3,24
**special** 130:15
**specially** 7:10
**specific** 48:18 55:5

85:11,11,24,24
  92:21 100:12
  109:22 126:4,24
**specifically** 19:18,20
  19:23,25 61:23
  85:19 92:3 95:3
  98:10,19 100:15
  100:25 118:15
  121:22
**spell** 33:4
**spend** 37:12
**spending** 37:8
**spent** 37:4
**Square** 3:4
**squarely** 12:1
**stage** 60:7
**stakeholder** 8:24
  107:2
**stakeholders** 71:17
  71:20 78:16,18
  106:17 109:21
**stamp** 131:19
**stand** 7:3,21 19:17
  88:12 123:9
**standard** 87:17
**start** 26:11 31:15
  67:1 86:12 101:16
  101:23 127:6
  133:15
**started** 29:15
**starting** 108:10
  109:1
**state** 5:4 48:9,14
  95:13
**stated** 130:14
**statement** 7:25 8:20
  10:10,11 11:1,18
  11:18 14:9,9 51:5
  59:14 64:7,8 79:5
  79:14 81:3 83:15
  83:23 84:2,4,6,17
  84:18,21,24,25
  85:3,4,4,7 86:25
  87:10,11 88:20,23
  89:6,9,10,14,16
  92:11 93:5 96:16

115:12 128:15,19
**statements** 8:16 9:5
  9:11,24 15:1 16:15
  20:14 81:1 88:25
  89:3 106:5
**statement's** 128:11
**states** 1:2,14 5:17
  9:13 92:5
**status** 18:15 103:21
  119:11
**statutory** 19:1 83:24
  112:2
**stay** 67:13 129:23
**stays** 72:3
**Steelworkers** 4:2
**Steingart** 3:23 17:24
  17:24 18:8 19:10
  21:20,24 22:4 24:2
  25:1,4,17 27:12
  28:2,10,12,18
  29:14,18 30:4,21
  30:23 31:1,4,15
  32:21,25 33:8,22
  34:8,10,12,14,18
  39:2,8,11,13,16
  43:11,19,23 45:5
  46:15 48:7,11,22
  49:1,6,19,21 53:16
  54:10 56:2,6,12,20
  58:1 61:9 63:3
  65:24 66:1,3,9,13
  66:16,19,23 68:5,7
  74:3 83:2 84:13,18
  85:9 86:3,5,10
  87:6,14,22 88:7,11
  88:13,17 90:1
  91:17 93:23 95:6
  110:16,20 111:2,4
  111:6,8,10 114:6
  114:13 115:16
  116:17 122:8
  124:5 127:3,5
  129:4,10,14 133:5
  134:5,8
**Steingart's** 110:2
**STEINGER** 31:8

**step** 54:8 133:9
**stock** 68:11 70:23
  71:1,3 72:15,16
  73:10 75:11,15,18
  77:16,17 93:15,25
  94:4 95:15 96:15
  97:2 98:8 99:10
  117:19,24 125:13
  125:14
**stocks** 99:14,24
**stopped** 133:1
**stories** 20:14
**straightforward**
  114:11
**strategies** 99:23
**stray** 17:12
**street** 4:19 5:4,18
  6:3 76:5
**strength** 94:4
**stress** 12:12
**strike** 45:5 98:22
**strongly** 62:22
**structure** 122:13
**structured** 87:9
  94:16 133:4
**stuff** 67:1
**subject** 23:16,19,20
  23:22 32:6,18 53:3
  55:11,12 67:16
  75:16 86:15
  106:21,23 113:24
  115:4 122:24
**submitted** 15:6,17
  21:15,18 91:24
**subscription** 75:10
**subsequent** 25:7,10
  78:12
**subsequently** 30:8
  78:11 104:16
**substantial** 24:19
**succeeded** 117:14
**successful** 78:12
**successfully** 10:21
**sufficient** 42:6
**suggesting** 26:18
**Suite** 4:4,12

**summaries** 116:23
**summarize** 7:20
**summarizes** 114:2
**summary** 7:16 47:9
  47:13,15,18,21,22
  48:14 50:6,16,19
  50:21 73:21 74:1,4
  74:16 76:6 97:23
  98:3,13 117:18,24
  119:9 120:8,22
  121:14,17 131:14
**SUOZZI** 4:1
**supplemental** 9:21
  15:7 125:13
**support** 2:2 7:12,17
  7:25 8:20 34:23
  48:5,16 50:13,14
  50:17,18,19,24
  51:15,17 52:23,25
  60:12,14 91:24
  98:11,14,17,19
  100:10 121:2
  131:7
**supporting** 8:6
  82:12
**suppose** 26:2 42:13
  80:11
**supposed** 24:20
  42:14,16 65:25
  66:1
**sure** 7:4 12:24 44:18
  53:3 55:2 66:23,23
  69:5 76:1 79:15
  106:20 122:15
**surety** 82:13
**surrounded** 69:15
**sustain** 44:13
**sustained** 89:25 90:4
**sworn** 33:3
**syllable** 50:8
**S-H-E-E-H-A-N**
  33:6
**S.C** 4:9

_____

**T**

**T** 134:10 135:2,2

**Tab** 119:7 120:1
**table** 14:11 70:4
  107:4,5 110:11
  111:11
**tail** 61:12,15,18
  63:19 122:12
**tails** 61:22 123:15
**take** 12:1 35:17,22
  38:22 51:21 62:14
  66:7 67:16 75:21
  83:21 90:14 98:2,5
  106:24,25 107:22
  107:24 112:18,22
  126:12 128:7
  133:11
**taken** 17:14 29:12
  29:16 74:24
  125:25 132:22
**takes** 45:1 79:2 97:4
  109:12 133:13
**talk** 37:24 49:1
  57:19 65:15,15
  66:25 74:21 79:16
  97:16 100:18
  103:18 106:3,7
**talked** 54:25 55:1
  67:2,6 94:3 96:18
  96:22 123:12
**talking** 14:23 27:14
  42:2,3,9 43:17
  45:11 52:12,13
  57:14,14 62:23
  92:13 127:18,19
**talks** 19:24 110:22
**tandem** 85:5
**target** 49:3
**targets** 14:20
**technical** 31:12
**technicality** 28:23
**tell** 25:17 46:6,8
  47:21 53:20 55:21
  61:21 62:3 69:8,25
  72:4 82:2,21,24
  83:8,9 96:24
  100:14 114:13
  124:8

**telling** 61:17 76:8
**ten** 67:14,19 68:23
  68:25 73:9,19 94:7
  94:19 118:25
  131:6 133:3
**term** 117:12,19
  126:16
**terminate** 47:11,23
  48:3,5,6,16 50:12
  50:13 51:17 52:7
  52:13,14,17,20,22
  52:24 53:1 54:25
  55:9 57:7,8,15,21
  58:7,8 59:8,11,13
  59:16,20,25 60:3
  60:11,15 63:13
  65:10,17 114:16
  114:17 115:11
**terminated** 56:25
  57:3 59:19 60:4
**terminates** 60:14
  123:6
**termination** 47:19
  57:13 63:12,23
  116:5 129:24
  130:16
**terms** 28:3,17 57:4
  81:7 91:8,10 97:2
  97:2 117:8,19,24
  124:5 125:15
  126:3,4 131:15
**testified** 39:17 61:3
  64:18 76:9 97:23
  99:8 121:1 123:16
  123:22
**testifies** 23:6
**testify** 23:3 30:8
  46:11 102:4,8
**testifying** 30:10,14
  30:21,23 31:21
  33:10 57:24 89:24
**testimony** 16:19,24
  20:5 24:5,16,19
  25:12 27:2 28:9
  30:5,7,13 31:5
  33:11 34:3,7 44:11

46:11 64:21 65:19
  102:5,13 114:8,11
  114:25 115:2,3
**Thank** 13:15 14:14
  14:15 15:10 18:16
  19:6 23:15 24:1
  30:14 34:10 66:13
  68:8 107:20 108:6
  133:10
**Thanks** 90:18
**theoretically** 114:16
**thereof** 50:19
**thing** 16:10 32:16
  119:25
**things** 10:4 12:22
  14:7 18:4 23:20
  24:20 25:18 38:12
  39:14 76:17 82:1
  99:5 107:1 123:15
  126:12
**think** 10:7 13:10,24
  15:8,11,14 17:19
  18:9,24 19:25
  20:10,11 22:6 23:8
  23:16,17 24:23
  28:12,24 31:13,21
  32:5,14,14,15
  33:23 34:1,2 38:8
  41:15 42:24 43:2
  44:12 45:9,24
  46:13 47:18 50:10
  50:12 53:12,19
  56:20 59:5 61:9,25
  63:4,5 67:14 69:5
  69:15 73:5 74:12
  74:23 75:2,4 76:9
  78:4 79:9 82:7
  84:20 94:13,15
  97:23 98:1 100:20
  100:23 103:14
  106:6,8,12,22
  107:22 108:14
  110:24 114:12
  115:2,18 118:21
  119:18,23 123:8
  123:14,15,22

125:2,24
**thinking** 116:9
    130:22
**third** 5:12 15:7 26:1
    104:13
**thirteen** 59:6 67:7
**thirty** 89:13 105:8,9
**thirty-five** 68:13
    69:16 70:5,14,18
    70:20 71:11,12,19
    72:3,16 74:11
    75:12 93:15,25
    94:18 95:11 124:3
    124:10
**thirty-four** 68:19,20
    75:13
**THOMAS** 3:16
**thought** 42:21 43:14
    44:7 55:22 65:22
    70:21 102:11
**thousand** 80:13
**three** 8:8 9:16 11:19
    14:5 32:4 53:21
    59:4 84:10 91:11
    91:11 93:6 111:11
    119:4
**thumb** 86:17
**tied** 38:16 85:1
**till** 23:5
**time** 8:5 19:3 23:6
    35:25 37:2,3,4,12
    39:21 42:3 43:8,9
    43:13 44:21 45:1
    46:4 57:1,9 59:7
    60:23 61:24 62:1
    62:18 64:15 67:20
    70:23 71:3 72:4,6
    72:18 74:25 75:5
    75:19 78:21 79:8
    79:15 81:16 87:12
    89:2 100:2 103:19
    104:10 116:11,16
    116:20 124:20
    128:7 130:10
**timeline** 104:13,16
**times** 3:4 77:9 95:12

**timing** 18:3 78:2,14
    81:5
**tired** 7:5
**titled** 107:6
**today** 9:16 15:12
    29:5 48:8 53:22
    72:5 78:25 83:19
    103:1 131:8
**today's** 8:10,25
    25:24
**told** 7:4 19:21 46:12
    78:19 80:25 81:3
    81:14,18 82:17
    108:22,22 109:1
**top** 126:7
**topic** 24:9 27:14,25
    124:16 130:9
**topics** 25:12 27:16
    27:19
**tot** 18:19
**total** 70:10 73:22
    74:21 107:6,11
    110:23 113:8,9
    126:2
**totally** 53:3
**track** 120:10
**trade** 8:18 73:4
    99:21
**traded** 77:12
**trading** 52:6 75:18
    77:17,19
**transaction** 17:15
    35:5,7,17,21,22
    36:18,19,24 37:9
    37:10,12,13,14,17
    37:25 38:19,20,22
    38:22 39:3,18,25
    40:25 41:11,12,16
    41:20,23 42:5,10
    42:21,24 43:2,4,8
    43:14 44:7,15,20
    44:21,22 45:1,4,6
    45:9,15,18,20,22
    46:1,7,12,18,25
    61:11,12,18 62:12
    62:13 69:5,9,16

70:8,11,16,17,18
    71:9 72:14 73:5,23
    74:23 75:2,22
    77:25 79:22,23
    82:12 83:17 87:9
    89:18 92:16,22,24
    94:14,15,16,20
    99:17 102:10
    104:17,20,24
    105:16,19,21
    113:22 122:9,11
    122:16,18,21
    123:4,9,13 124:2
    133:4
**transactions** 39:20
    46:5 51:16 57:1
    61:22 69:6 73:8
    107:17 126:15
**Transcribed** 2:24
**transcriber** 135:4
    135:10
**transcript** 43:12,22
    135:5
**transfer** 67:3 77:9
    77:11
**transferable** 79:10
**transferred** 93:19
**transformation**
    70:13 91:3
**transformed** 76:16
**transparent** 89:22
**treat** 87:23
**treated** 69:13
**treatment** 72:19
**trial** 15:1
**trigger** 123:18
**triggered** 46:1
    123:19
**triggering** 46:18
**triggers** 49:8 122:12
**Troy** 104:8
**true** 13:12 33:20,20
    42:18,19 69:3 75:4
    79:5 80:4 81:3
    89:9 101:13,15
    114:7 115:24

116:3,23 119:25
**truly** 22:4 54:6
**trustee** 5:17 9:13,15
    9:17
**truth** 15:23 17:5
    18:10,13,16 19:12
    19:25 20:16,21,23
**try** 11:21 12:2 48:19
    56:23
**trying** 22:22 39:2,2
    39:4 43:19 50:25
    76:2 90:18 102:5,6
    107:4 116:14
    118:21
**Tuesday** 29:15
**turn** 44:3 109:2,6
    126:5
**turned** 95:13
**turning** 92:3
**twenty** 52:6 62:4
**twenty-four** 41:23
    61:16,19,22 62:4,9
    62:10 63:17,19
**twenty-two** 97:17
**twice** 38:23
**two** 20:10 21:20
    22:2 24:2,20 26:1
    41:19 53:16 81:1
    85:15 97:11,13
    107:17,22 113:8
    119:4 122:20
    123:22
**tying** 38:15,16
**typed** 135:13
**types** 91:11

_____
**U**

**UAW** 4:18
**UCC** 111:18
**UELMEN** 4:9
**Uh-huh** 38:1 45:12
    64:14 79:25
**ultimately** 53:25
**Um-hmm** 81:2
**Um-hum** 131:20
**un** 45:4

**unable** 82:10
**unambiguous** 85:17
**unavailable** 45:6
**uncapped** 38:3,5
59:1 67:12
**uncertainty** 89:17
**unclear** 104:14
**understand** 12:16
15:19 20:7 24:25
25:2,8 35:12,20
50:3 53:10,14 61:6
73:17 75:7,8,9,10
76:1,2 81:22,22
82:5 83:18 96:25
102:7 121:24
**understanding**
36:13 39:18 50:11
51:2 52:3 127:7,9
127:14
**understandings**
125:19,24
**understands** 46:20
53:19,19
**understood** 19:13
46:22 53:11 83:12
**underwrite** 105:1,4
**Unfortunately** 86:11
**unhappy** 121:18
**UNIDENTIFIED**
84:12,15
**unilateral** 48:15
52:14 53:1 67:4
**unilaterally** 55:9
**unintended** 63:7
115:4 128:24
**union** 4:2 8:12 9:2
9:19,20 10:7,8,19
10:21 11:24 14:3
26:4 127:24
**unions** 9:3,20,23,24
10:3 11:19,23,25
12:18 14:2,4,5,18
42:23 43:16 44:9
81:11 82:14 94:24
116:12
**union's** 10:19

**unique** 69:5,16 73:5
**United** 1:2,14 5:17
9:13
**University** 3:13
**unnoticed** 115:1
**unreasonable** 38:9
**unsecured** 5:11 7:23
73:11
**unsuccessful** 78:13
**unusual** 69:3
**unwilling** 78:10
**updated** 119:22
122:4
**upstairs** 7:5
**upward** 38:5
**use** 10:1,16 12:1
13:6 49:18 61:13
66:10 68:15 92:8
110:21 114:16
126:11
**useful** 17:19
**usually** 30:7 73:3
**U.S** 1:23

———————

**V**

**valuations** 124:4
**value** 22:17,18,19
64:19,25 65:2,15
65:16 66:25 67:3
68:11,12,15,23
69:1 71:2 72:1,1,2
72:10,13 73:9,12
73:16,17,23 74:18
74:21 75:6 76:3
79:12,13 80:20
82:23,25 83:1
92:23 93:19,23
95:1,14,19,20,21
96:11,14 97:4,14
97:15,16,25 99:8,9
99:11 100:3
109:13 115:20
124:5 132:19
**variety** 10:4
**various** 10:9,18 14:3
20:14 91:11 107:1

112:5
**vehicle** 105:15,15
**versus** 82:13
**view** 14:18 41:14
114:25
**vote** 29:12,16

———————

**W**

**wait** 34:18 52:4
79:19 88:1
**waiting** 129:15
**waive** 83:20 85:12
85:18,19 86:16,23
87:25,25 88:1
**waived** 51:7 83:10
83:13,17 86:2,20
87:17,18
**waiver** 86:22
**waivers** 87:20
**walk** 47:17 50:8
60:25 61:4 62:25
65:5 67:5 81:9
108:25 115:21
127:8,16,24
128:12
**walked** 93:23 122:3
**walking** 128:3
**want** 7:6,19 12:20
12:20,24 13:11
24:22 25:7 27:2
28:15,16,22 30:1
31:14,20 44:5
53:10 57:18 65:2,3
65:19 70:7 78:1,1
80:18 82:17,18
83:4,6 86:4 87:23
87:25 99:5 100:18
103:18 109:15
114:5,10,12 123:3
128:10
**wanted** 10:24 14:6
21:21 29:10 30:5
70:2 75:20 78:20
81:14 120:19
**wants** 12:8 14:24
18:13 28:8,18 54:6

**wasn't** 45:3,4 58:3
90:18 123:16
131:23
**WATKINS** 5:9
**Watson** 125:16
**way** 14:20 20:17
28:4 32:15 69:13
70:22 74:22 75:3
78:25 87:9 94:16
99:20 107:18
123:4,14 127:7,15
129:23 133:4,15
133:15
**Wednesday** 29:16
29:17 53:22
**week** 29:19 54:21
63:8
**weight** 21:1
**WEISS** 4:17
**went** 46:4 74:16
97:23 118:5
120:17
**weren't** 35:2 105:14
119:20 131:9
**West** 4:19
**we'll** 8:4 15:11 18:20
31:15 32:24 34:9
38:15 87:6 88:1,2
88:17
**we're** 13:13 21:25
24:20 26:18 28:4
30:16 33:17 48:11
52:12,13 57:14
62:23 66:19 71:18
80:23 84:10 108:2
108:4 121:9
**we've** 9:3 10:9,20
11:25 12:1 13:1
18:4,8 32:5 38:2
38:14 41:6 59:25
67:1,6 126:3
**whatsoever** 77:15
**Whitehall** 5:18
**widely** 20:25
**willful** 123:23
**willfully** 39:21 41:22

43:5 122:19
**willing** 124:9 130:13
**willingness** 11:15
**Wisconsin** 4:13
**wish** 12:9 32:20
**withdraw** 8:16 9:5
  9:11 11:2 101:17
**withdrawn** 7:24
  8:19 117:23
**witness** 17:3 18:14
  22:23 23:12 27:7
  31:14 32:23 33:3,6
  33:21,22 34:1
  46:20 49:22 53:18
  53:23 54:11 66:23
  86:6 90:1,18 91:18
  102:8 103:2 125:3
  125:5,8,23 126:9
  126:18,21 127:2
  129:3,13,15
  133:10 134:4
**witnesses** 25:15 26:8
  26:9 27:15 30:6,8
  30:8,9,11,13 31:7
  33:9,10,12,13
  66:11
**witness's** 43:11
**WM** 3:7
**word** 106:12 132:2
**words** 50:8 59:16
**work** 10:2 14:17
  36:2
**Workers** 8:12,13
  9:9
**working** 10:9 56:8
  124:25
**works** 9:8 88:4,6
**worth** 72:7 75:24
**worthless** 76:12
  79:3
**wouldn't** 20:4 80:17
  92:3
**writing** 130:18
**Wyatt** 125:17

**X**

**x** 1:5,12 75:24 134:2
  134:10

**Y**

**yeah** 13:24 22:2,25
  27:12 49:13 56:17
  96:4 101:25
  102:13 107:24
  111:9 121:12
  123:11 127:13,13
**year** 7:13
**years** 100:2
**yep** 77:19 131:22
**yesterday** 7:15
  10:20 15:6 24:14
  25:18 26:1,18
  29:12 50:23 54:15
  102:18
**yesterday's** 17:11,16
  27:3,14,17 28:16
  28:20 32:7
**York** 1:3,16,16 3:5,5
  3:14,14,20,21,21
  4:5,5,20,20 5:5,5
  5:13,13,19,19 6:4
  6:4 112:7,8,9

**$**

**$23.90** 97:20
**$57.90** 96:14 97:10

**0**

**05-44481** 1:4

**1**

**1** 85:6 94:8,11 99:9
  107:25 128:4
**1st** 52:24 57:7 59:13
  64:7 112:15
  115:11 116:6
  127:25
**1-122** 23:24 134:12
**1.2** 98:6
**1:06** 108:1
**1:48** 133:17
**10** 86:18 111:19
**10th** 17:17 20:12

**10:14** 1:19
**100** 57:23 58:13
**10003** 3:14
**10004** 3:21 5:5,19
**10018** 4:5
**10022** 5:13 6:4
**10036** 3:5 4:20
**101S** 9:3
**101-S** 5:3
**107** 134:7
**11** 1:18 29:16 46:22
  62:13 64:24 70:13
  74:6,14 76:15 78:9
  81:12 86:18 94:25
  117:10
**11th** 119:13,14,19
  119:24 120:2,6,24
  121:10 122:2,5
  130:5
**113** 3:13
**117** 17:10,13,21
  20:11
**118** 17:10,12,13,21
**12** 44:6 55:19,24
  56:5,7 135:9
**12(c)** 56:24
**12:55** 108:1
**121** 15:16
**122** 15:16,18,20
  23:17
**122nd** 15:16
**125** 44:3,3
**126** 44:6
**13** 58:16 121:18
**133** 134:8
**1350** 4:3
**14** 15:22 17:20 19:22
  106:25 109:13
**15** 44:5
**153** 6:3
**1555** 4:11
**17** 5:4
**17-69** 109:6,7 110:9
  131:17,20
**18S** 9:3
**18th** 7:13 118:25

119:2
**18-S** 5:3
**180** 52:18
**19** 90:20,25 134:12
**19th** 96:14
**1961** 107:8
**1963** 106:25

**2**

**2** 7:15 26:1 55:23,25
  85:6
**2nd** 104:7 106:9
  124:8
**2:30** 133:14
**20** 9:9 91:14 109:1
  110:9 116:22
  131:17
**2006** 101:7,19,22
  111:14,19 112:15
  117:7 118:13
**2007** 1:18 52:24
  104:7 135:9
**202** 4:12
**21** 44:4
**21st** 124:15
**22nd** 101:7,14,19,21
  102:20,22 104:2
  105:3
**23** 117:2,3
**24** 117:17,18 118:4,5
**26** 92:4 93:5
**27** 118:10,11,12
  119:16
**28** 120:1,1
**29** 120:7

**3**

**3** 129:24 131:9
**3.25** 72:23 100:6
**30** 50:7 74:4,5 95:13
  98:2 120:22 134:5
**30th** 52:18
**300** 80:13
**31** 121:1
**32** 103:12,13 119:7,7
  121:9
**33** 5:18 122:4

**330** 4:19
**34** 15:23 17:20
100:23,24
**343** 69:1 97:24
110:13
**35** 19:20,22 90:25
91:1
**350** 73:19
**37** 91:13

---

**4**

**4** 47:25 50:15
**4th** 5:4
**4.2** 105:5
**4.7** 105:5
**42** 103:14
**42nd** 4:19
**44** 126:5
**45** 16:1 17:21 18:24
**48** 86:13

---

**5**

**5** 50:15
**5(c)** 64:3
**500** 76:7
**501** 4:4
**52** 125:4
**53** 86:19
**53rd** 6:3
**53212** 4:13
**54** 16:2 17:21 18:24
**567** 132:10,11,13,19
**57.90** 97:18
**59** 55:20 56:21 90:16

---

**6**

**6** 108:15,16,19,19
126:8
**6d** 126:10 127:7,14
**6.3** 68:3,9,16 93:25
94:19 95:3,12
**61** 56:15 125:2
**6179** 2:3 7:13
**62** 16:4 17:21,22
19:22 32:18 92:2
**6209** 7:24
**6211** 8:9

**6242** 8:14
**6247** 8:9
**6254** 8:19
**63** 108:11 110:3
**6330** 8:25
**6344** 9:4
**6367** 9:10
**6401** 9:14
**6494** 8:14
**6497** 8:9
**6500** 8:15
**6501** 8:19
**6508** 8:19
**663** 9:8
**69** 131:19

---

**7**

**7** 123:6
**7th** 118:13 119:5,17
120:2,4,9,24
127:25
**73** 16:5,7 17:8 22:7,8
**74** 44:1
**76** 113:16
**78** 113:11
**79** 16:5,7 17:9 23:7

---

**8**

**8** 29:11
**8K** 89:2
**8th** 131:6
**8,000** 10:8
**81** 129:7
**832S** 9:3
**832-S** 5:3
**855** 5:12
**86** 128:25 129:8,9

---

**9**

**9th** 17:16 20:12
24:12 111:14
**9(a)** 86:5,6,9,10,13
86:16,17,20
**9(b)** 85:17 86:15,15
86:18
**9(c)** 85:18 86:20,21
86:23

**90** 134:6