```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF NEW YORK
 2

 3    ----------------------------------------X
                                              :
 4    In re:                                  :   Case No. 05-44481
                                              :
 5       DELPHI CORPORATION, et al,           :
                                              :   One Bowling Green
 6                                            :   New York, NY
                                Debtors.      :   November 4, 2005
 7    ----------------------------------------X

 8
                      TRANSCRIPT OF FIRST-DAY HEARINGS
 9              BEFORE THE HONORABLE ROBERT D. DRAIN
                    UNITED STATES BANKRUPTCY JUDGE
10

11    APPEARANCES:

12
      For the Debtors:           JOHN BUTLER, JR., ESQ.
13                               SKADDEN, ARPS, SLATE,
                                 MEAGHER & FLOM, LLP
14                               333 West Wacker Drive, Suite 2100
                                 Chicago, Illinois  60606
15
                                 KAYALYN A. MARAFIOTI, ESQ.
16                               SKADDEN, ARPS, SLATE,
                                 MEAGHER & FLOM, LLP
17                               Four Times Square
                                 New York, NY 10036-6522
18
                                 AL TOGUT, ESQ.
19                               TOGUT, SEGAL & SEGAL, LLP
                                 One Penn Plaza, Suite 335
20                               New York, New York 10119

21    For the Creditors          ROBERT J. ROSENBERG, ESQ.
      Committee:                 LATHAM & WATKINS, LLP
22                               53rd at Third, 885 Third Avenue
                                 New York, New  York  10022-4802
23
      Court Transcriber:         KATHLEEN PRICE, AD/T 550
24                               TypeWrite Word Processing Service
                                 356 Eltingville Boulevard
25                               Staten Island, New York 10312


      Proceedings recorded by electronic sound recording,
      transcript produced by transcription service.
```

2

1          THE COURT: Please be seated.  All right.  Delphi

2    Corporation.

3          MR. BUTLER:  Your Honor, good morning.  Jack Butler

4    from Skadden, Arps, Slate, Meagher & Flom, LLP with my

5    colleague and partner, Kayalyn Marafioti here for the November

6    4th adjourned hearing and set hearing agenda.

7          Your Honor, we did file a proposed hearing agenda.

8    With the Court's permission, we would file the agenda.

9          THE COURT: Right.  That's fine.

10          MR. BUTLER: Your Honor, the first matter on the

11   agenda is a first-day motion involving interim compensation

12   procedures and proposing the establishment of a joint fee

13   review committee.  This matter was adjourned in response to

14   Docket No. 11, has been adjourned from the first-day hearings

15   until today.

16          There was an agreement reached, Your Honor, with the

17   United States Trustee on the form of the order dealing with

18   interim compensation procedures, and at the U.S. Trustee's

19   request, the matters relating to the establishment of a joint

20   fee review committee have been adjourned to November 29th --

21   this hearing further discussion with the committee and the

22   trustee.

23          THE COURT: Okay.  All right.  Are there any comments

24   on the proposed final order?

25          I put in as a noticed party the members of a fee

3

1   committee to the extent it's not duplicative of the other

2   noticed parties, just to indicate that I think -- as all the

3   parties seem to think there should be a fee committee in this

4   case.

5          So -- and the only other change I had is that if

6   someone can't -- for some reason can't get onto ECF to get the

7   applications, then they can make a request in writing to the

8   professional for an application, but other than that, I have no

9   comments and would approve it.

10          MR. BUTLER: Thank you, Your Honor.

11          Your Honor, in addition, just as I think the Court

12   knows, in this case, we're maintaining a virtual docket on

13   delphidocket.com.  So there's another way at all those

14   documents, too, if you can't get them through PACER.

15          THE COURT: Okay.

16          MR. BUTLER: Your Honor, the -- I'd like it if the

17   Court will permit to take matters two, three, four, five, six

18   and seven together.  These are retentions in which the Court

19   has already entered interim orders.

20          The Skadden retention is Item No. 2 at Docket No. 47.

21   The Togut Segal retention is Agenda Item No. 3 at Docket No.

22   48.  The Sherman retention is Agenda Item No. 4 at Docket No.

23   49.  The Groom Law Group retention is Agenda Item 5 and Docket

24   No. 50.  The O'Melveny Meyer's retention is Agenda Item No. 6

25   and Docket No. 51, and the FTI retention is Agenda Item No. 7

4

1   and Docket No. 53.

2       Your Honor had entered interim orders.  These had

3   been set for final hearing on October 27th at the request of

4   the creditors' committee so they could complete their review

5   and due diligence.  They were adjourned to today.  My

6   understanding is the committee has no retention issues, and the

7   U.S. Trustee has approved the form of proposed final orders.

8       THE COURT: Okay.

9       MR. ROSENBERG: Your Honor, just one comment there.  I

10  was -- did you include, Mr. Butler, I'm sorry, the Togut Segal

11  one in that?'

12      MR. BUTLER: Yes, I did.

13      MR. ROSENBERG: Okay.  I looked at the markup that I

14  received at about 7 a.m. this morning focusing particularly on

15  Togut Segal conflicts counsel, and Mr. Butler uses a term in

16  there, something like -- I don't have it in front of me because

17  it was on my Blackberry -- something like, you know, conflict

18  measurement points --

19      THE COURT: Yeah.  I didn't understand that either.

20      MR. ROSENBERG: Yeah.  I think he's referring to the

21  U.S. Trustee's kind of rule of thump of one percent, although

22  he doesn't say that in there.

23      Is that what you intended, Mr. Butler?

24      MR. BUTLER: Actually, Your Honor, those were Ms.

25  Martini's words, not mine.

5

1          THE COURT: All right.

2          MR. BUTLER: The language that was given was given

3    from the U.S. Trustee.

4          THE COURT: All right.

5          MR. BUTLER: It was intended to address the threshold

6    that is applied in this district which is the one for sent

7    threshold, and that language which was reviewed with Mr. Togut

8    and his firm and with us and our firm by Ms. Martini and Ms.

9    Leonard --

10          THE COURT: Well, I don't -- I never heard of that

11   threshold before.  I'm sure the U.S. Trustee has it, but I'm

12   not sure -- does it mean that that is the threshold for

13   retaining conflicts counsel, that it's likely that there will

14   be a --

15          MR. BUTLER: Your Honor --

16          THE COURT:  -- more than a one-percent conflict?

17   Because you always have a -- I mean, you're not relieved of a

18   conflict just because it's less than one percent.

19          MR. BUTLER: Correct.  Your Honor --

20          THE COURT: Okay.

21          MR. BUTLER:  -- the position of the U.S. Trustee as I

22   understand it in this district and Mr. Togut can address it

23   seeing as he is a conflicts counsel in many of the cases in

24   this district is the U.S. Trustee requires whenever the lead

25   327(a) counsel discloses in their disclosure affidavits that

6

1  they have firms -- or that they have clients that represent

2  more than one percent of the revenues of the company -- of the

3  firm, the U.S. Trustee requires the appointment of conflicts

4  counsel in this district.

5          The U.S. Trustee also requires that with respect to

6  things that are directly adverse to those one-percent clients,

7  meaning they file objections, even though it may not be a

8  conflict under the ethical rules, the U.S. Trustee requires the

9  early involvement and potential takeover of that issue --

10          THE COURT: Just in case it gets into a conflict.

11          MR. BUTLER: Right.  As it relates to those that --

12  and below that one percent, the U.S. Trustee leaves it to, in

13  this case, Skadden and Togut to coordinate with each other, and

14  if there's an actual conflict, we're not relieved of the

15  conflict rules.  We have to follow our ethical

16  responsibilities, but that is the line that has been drawn, and

17  in discussions between Mr. Togut and myself and Ms. Martini's

18  office, that is the way she wanted this order to come out.

19          THE COURT: Okay.

20          MR. ROSENBERG: Okay.  Your Honor, I guess my point

21  was simply, and I think that Mr. Butler clarified it somewhat,

22  I read that order to mean automatic referral to Mr. Togut for

23  anything over one percent and that's obviously fine.  I did not

24  read anything in there that said that, you know, anything under

25  one percent which is still a potential conflict issue will be

7

1  discussed and decided what to do but I believe Mr. Butler just

2  said that, and that was the piece I was focused on.

3          THE COURT: Okay.

4          MR. BUTLER: As I did in my separate letter to Mr.

5  Rosenberg this week.

6          THE COURT: Okay.  So this doesn't reduce

7  responsibility to deal with conflicts that actually enhances it

8  in the situation where there's a potential for -- and a need

9  for an automatic turnover.

10         MR. BUTLER: That's correct, Your Honor.

11         THE COURT: So, with that clear on the record, and

12 knowing that where the language came from, I'm comfortable with

13 it.

14         MR. TOGUT: Since I was invited to make a statement, I

15 think I will.

16         THE COURT: Okay.

17         MR. TOGUT: As -- in the discussions between Mr.

18 Butler and me, the starting point which was emphasized

19 repeatedly is that Skadden does things right, and so this order

20 in a large degree I think is just memorializing a concept, but

21 I am quite confident in the discussions we've had that the

22 following will occur.

23         If there is a Skadden client involved in a matter

24 that may turn adverse, Skadden will advise me of that and I

25 will be involved in the matter so that if there needs to be a

8

1   handoff to me to actually take over that matter because it is

2   adverse, I can do that.

3         And I am very comfortable based on the conversations

4   that Skadden's only desire is to do the right thing and the

5   ethical thing in this case.

6         THE COURT: Okay.  All right.  Very well.

7         So, with that clarification, I'm prepared to approve

8   the Togut, Segal & Segal application as well as the others.

9   The only -- I just have a note on the other orders for the

10  various special counsel to remind them that there should be no

11  duplicate charges for duplicate services.

12        My experience is that particularly with non-

13  bankruptcy lawyers, sometimes they get -- they forget about

14  that, and this is just a reminder.

15        MR. BUTLER: Thank you, Your Honor.

16        Your Honor, the next matter on the agenda which is

17  Agenda Item No. 8, Docket No. 54 is the debtors' application

18  for the appointment of Kurtzman Carson Consultants, LLC as

19  claims noticing and balloting agent for the clerk of the

20  Bankruptcy Court.

21        Your Honor, there is a revised form of order that we

22  have submitted to the Court that has been approved by the

23  United States Trustee's Office.  This case also marks I think a

24  point in which the United States Trustee's Office has been

25  working on a protocol for dealing with claims agents and how

1  they -- their compensation is reviewed in a more systematic way

2  than it has in the past, and there's been extensive

3  conversations between KCC and the United States Trustee's

4  Office about that, and the order here unlike some prior orders

5  in the district actually subjects KCC to the review, not

6  necessarily the same legal standards, but to the review of the

7  monthly interim compensation procedures and to the review of a

8  fee committee that's appointed and so forth, which is different

9  than has been occurred in the past.

10         As I understand it, it's been agreed to by KCC -- I'm

11  advised Mr. Howard Glostein (ph) is the senior bankruptcy

12  consultant of Kurtzman Carson is in the courtroom today, but I

13  am advised that KCC has agreed to the protocol requested by the

14  United States Trustee as agreed to the form of the order, and

15  this among other things will address a request of the

16  creditors' committee that they have an opportunity to review on

17  a systematic basis these fees and expenses.

18         THE COURT: Okay.  My understanding of the services

19  provided by KCC and similar firms is that they truly are as th

20  order says stepping into the shoes of the clerk of the court.

21  They're not doing other services beyond what the clerk would

22  do, which include, as the clerk would do if there were a

23  smaller case, doing various runs of claims as requested by the

24  parties to see, you know, what categories they fall into.

25  So...

10

1       And, similarly, my understanding is that the fees

2  they charge are the same fees that the clerk would charge, and

3  therefore, it's not really a 330 type of review process or 331

4  process.  It's just looking to make sure that they're doing the

5  same -- the same schedule.

6       So I think it's probably pretty minimal due

7  diligence, but it's worth doing that due diligence as the case

8  goes on.

9       MR. BUTLER: Thank you, Your Honor.

10      THE COURT: So, with those caveats, I'll approve it.

11      MR. BUTLER: Thank you, Your Honor.

12      Your Honor, the next matter on the agenda, Agenda

13 Item No. 9 and Docket No. 55 is our motion for an ordinary

14 course procedures order in this case.

15      The final order, Your Honor, which has been reviewed

16 with both the United States Trustee and the creditors'

17 committee takes a different tact than had been originally

18 proposed in the motion, and rather than have a multiple-tier

19 arrangement here, the U.S. Trustee has requested and we have

20 agreed that any professional who might otherwise qualify as the

21 ordinary course professional, the charges monthly professional

22 fees that exceed $50,000 in any month or $500,000 in the

23 aggregate over the course of these cases will be required to

24 file a separate retention application and go through that

25 process, and we have agreed to that.

11

1          We had sort of a different approach in the original

2    motion which had sort of a tiered arrangement.  This is where

3    we've ended up, and the form of order that's been submitted,

4    Your Honor, has been agreed to by the trustee -- the Trustee's

5    Office, has been reviewed with the creditors' committee and

6    with the debtors.

7          THE COURT: Okay.  I just had two small questions on

8    this.  Do you really need Sherman & Sterling as one of the

9    parties reviewing the bills?  Do they actually perform that

10   function along with Skadden or can you take them out?

11         MR. BUTLER: We can probably take them out, Your

12   Honor.

13         THE COURT: Just again to avoid duplication, and then

14   I'd put in the fee committee to the extent that there's not

15   duplication of the notice, if there are other people that are

16   already getting the notice on the committee.

17         MR. BUTLER: Thank you, Your Honor.  We'll make those

18   changes.

19         THE COURT: Okay.

20         MR. BUTLER: Your Honor, the next matter on the agenda

21   is Matter No. 10, Docket No. 24, which is our cash management

22   order.  This is the place and time for a final hearing in

23   connection --

24         THE COURT: I'm sorry.  Did we miss FTI?

25         MR. BUTLER: I'm sorry, excuse me.

12

1            THE COURT: Did we cover FTI?  I don't think we did.

2            MR. BUTLER: My apologies.  Yes, FTI I thought was the

3    original -- was one of the original group of applications.

4            THE COURT: Oh, all right.  That's fine.  Well, I

5    thought you were just doing the offerings, but does anyone have

6    anything to say on FTI?  I don't, and I'm prepared to approve

7    it as well.

8            MR. BUTLER: Thank you, Your Honor.

9            THE COURT: Okay.

10           MR. BUTLER: Your Honor, then turning to Matter No.

11   10, which is the cash management matter, and this is Docket No.

12   24, this is, Your Honor -- was put on today's agenda really as

13   a settlement matter of the rulings Your Honor made at the

14   October 27th hearing with respect to cash management.

15           We actually have a final form of order that we are

16   submitting to the Court which is consistent with the rulings

17   last week.  We have agreed to put on the record here in

18   response to some discussions subsequent to the hearing with the

19   creditors' committee that to the extent that we enter into new

20   loan transactions with non-debtors which are not under this

21   cash management order subject to a lien arrangement, that we

22   will give prior notice to the creditors' committee so that

23   they're aware of those transactions.

24           And, if the committee feels that they need to come to

25   court on those issues, then they will have -- they will have

13

1    prior notice so they can take whatever action they think they

2    need to take.

3           MR. ROSENBERG: Your Honor, if I may, a little more

4    background on this, because it is a very, very significant

5    matter to the committee.

6           Unfortunately, we discovered at about 4:59 on the

7    Friday following the Thursday at which we had the dialogue with

8    the Court, and the Court ruled on certain matters that we must

9    have been talking past each other, because when we saw the

10   final form of order that Skadden was prepared to submit and we

11   saw these provisions that are relevant for the first time, we

12   saw that contrary to what the committee believed had been

13   decided that pursuant to the cash management system, the only

14   liens that the debtor was agreeing to grant were in situations

15   where the borrower was also a debtor, thereby excluding

16   entirely from the lien process that we thought had been agreed

17   upon U.S. non-debtors and all of the foreign companies which,

18   of course, are non-debtors.

19          With additional diligence and, again, the usual

20   cooperation that's developed extremely well between FTI and

21   Mesereau (ph), subsequent discussions when I asked that this be

22   held up because, again, this was not at all what we thought we

23   had agreed to, subsequent discussions indicated the following:

24   Number one, it would be a most unusual situation where a loan

25   was made under the cash management process from a debtor to a

14

1    foreign entity, and an even more unusual situation if one were

2    made from a debtor to a U.S. non-debtor, and indeed, only one

3    such was even conceivably contemplated, and that wouldn't be

4    even in calendar year 2005.

5            On that basis and that basis -- and those

6    representations, the committee is agreeing to the entry of this

7    order which again limits the liens to situations where there is

8    a debtor borrower involved with a complete reservation of

9    rights, treating it almost as an adjournment, if you will, if

10   the issue does come up and the other two situations that are

11   not covered, and we can't otherwise resolve it.

12           THE COURT: Okay.

13           MR. BUTLER: All right.

14           THE COURT: All right.  Go ahead.

15           MR. BUTLER: Your Honor, on that, the only thing I

16   would add to the record is that what we did in the cash

17   management order is exactly what was discussed at the October

18   27th hearing; that is, we reached a settlement with the PBGC,

19   and they had a particular universe of liens they wanted to put

20   in place, and the arrangement was supposed to be that the cash

21   management order would track the financing order as to that

22   universe and as to those liens, which is exactly what we did,

23   and the PBGC did not require liens of the foreign entities nor

24   would we have agreed to them, in part because of the bimodal

25   message we explained to the Court when we first came to the

15

1    Court back at the beginning of October.

2            However, in an effort to try to cooperate with the

3    committee, we have agreed to this arrangement that said if we

4    propose a new loan transaction with respect to the non-debtor

5    entities, be they foreign or domestic, we will give prior

6    notice to the financial advisers to the creditors' committee.

7            THE COURT: Okay.  All right.  I added one other point

8    that I think was both implicit and explicit, and usually I

9    don't add these types of things because I think it's

10   unnecessary because it's always there in the law, but just

11   because this deals with this inter-company transactions and

12   could be viewed to bless them as opposed to set out a mechanism

13   for doing them.

14           I've added in Paragraph -- at the end of Paragraph

15   15:

16           "Nothing in this order relieves any debtor or any

17   other person or entity of its fiduciary duties with respect to

18   entering into any inter-company transaction."

19           And that's obviously something that debtors and other

20   parties have anyway, but this just makes it clear that if

21   there's going to be a transaction between companies that the

22   parties need to look at it independently from each side to make

23   sure it makes sense in light of their fiduciary duties, but

24   with those changes, I'm happy to approve this order.

25           MR. BUTLER: Thank you, Your Honor.

16

1          Your Honor, the next matter on the agenda, Matter No.

2    11 and Docket No. 12 on the Court's docket is our motion on

3    human capital obligations.  A final order had been entered in

4    connection with this motion subject to a right of review to the

5    creditors' committee following its organization.

6          On October 25th, the creditors' committee filed a

7    statement with respect to certain matters under the human

8    capital obligations motion.  There been extensive due

9    diligence since that time, and we have submitted a revised

10   order to the Court that resolves all matters under that

11   statement so that the order can -- an amended final order can

12   be entered.

13         The one issue that remains under a continued study by

14   the committee is the performance achieve plan awards under the

15   debtors' 2003 to 2005 long-term incentive program.  We've

16   agreed we'll make no payments on those until the earlier of an

17   agreement with the creditors' committee or January 31, 2006 and

18   there's a mechanism that provides that if the committee has

19   continuing concerns, they can file an objection in December and

20   this matter would come on -- this limited matter of the PAP

21   awards would come on for review by the Court as to whether it's

22   appropriate to be paid at the January 5th omnibus hearing.

23         THE COURT: Okay.  Are those awards usually paid

24   around year end or the first month of the year?

25         MR. BUTLER: They're paid in the first quarter.  These

17

1    will be paid normally in the first quarter of 2006.

2            THE COURT: Okay.  So that sounds reasonable.  All

3    right.  Does anyone else want to be heard on this matter?  Then

4    I'll approve it as resolved by the committee and the debtor.

5            MR. BUTLER: Thank you, Your Honor.

6            Your Honor, the next matter on the agenda and listed

7    on the contested docket but happily resolved is the reclamation

8    motion, Matter No. 12, listed at Docket No. 21.  Here, too,

9    there was a final order of reclamation that had been ordered by

10   the Court subject to review mechanism with the creditors'

11   committee and on October 25th, the creditors' committee filed

12   an objection to the reclamation procedures seeking additional

13   oversight and settlement in payment of the reclamation claims.

14           The long and the short of the resolution here, Your

15   Honor, is found in Paragraph 3 of the proposed amended order in

16   which we have agreed that prior to returning any reclamation

17   goods or paying any -- or allowing any administrative claims or

18   making any payments of reclamation claims, we will provide a

19   comprehensive report containing information set forth in

20   Paragraph 3 to the committee for their review.

21           They will have an opportunity to object and come

22   before Your Honor within -- I think it's ten business days to

23   file an objection, and if they don't object, we can then

24   proceed as the order otherwise would have contemplated.  If

25   they do object, then we come to Your Honor and we deal with

18

1    what we should do on those matters at that time.

2           And, as always, Your Honor, you know, moving forward

3    with reclamation is extremely important to maintaining a supply

4    network.  Our suppliers expect we're going to efficiently go

5    forward and reconcile these reclamation claims.  When that

6    process is completed, we certainly do not object to the

7    committee having a comprehensive look at the claims, both how

8    we've treated them on an individual and collective basis, and

9    also the overall issue of to what extent under applicable law

10   the claims are payable in this case.

11          Our own -- the debtors' own view is that the amount

12   of reclamation claims ultimately will even have to come under

13   that screen will be significantly reduced from the claims that

14   have been submitted because this is as Your Honor has heard in

15   this case, we have just-in-time inventory, and the reality is

16   that much of the inventory that's been claimed under the

17   reclamation procedures was, in fact, consumed prior to the

18   claim, and so that all -- but that all has to be worked

19   through, and the committee has now a process for them to review

20   it and to -- and for us to have a dialogue and try to work it

21   out prior to coming to the Court.

22          THE COURT: Okay.  This contemplates that the first

23   version of the report will cover not the whole universe but 75

24   percent.  It's contemplated that the debtor will be as

25   reasonably practical as possible, promptly as practical

19

 1    updating that report and adding more into it?

 2            MR. BUTLER: Yes, Your Honor.  The idea would be --

 3    the idea was that we don't -- we thought -- the committee had

 4    expressed to us they wanted to have a large enough amount of

 5    the work done that they could get a reasonably good overlook as

 6    to the process, but to wait until the last few claims were

 7    reconciled we thought was prejudicial --

 8            THE COURT: Right.

 9            MR. BUTLER:  -- to the suppliers and to the process,

10    and so we struck this idea that, you know, it can come in

11    multiple reports, but the first report had to have this -- at

12    least a big chunk in it, 75 percent, and then we would submit

13    supplement reports on the balance.

14            THE COURT: Okay.  All right.  Well, with that

15    clarification, I'll approve the agreed-upon order.

16            MR. BUTLER: Thank you, Your Honor.

17            Your Honor, the next matters on the agenda and the

18    last two matters on the agenda which we'd like to take together

19    are the debtors' essential suppliers motion which is Agenda

20    Item No. 13 and Docket No. 17, and the debtors' foreign

21    creditors' motion which is Agenda Item No. 14 and Docket No.

22    18.

23            Your Honor, these also had final orders entered.

24    Both of them were subject to review by the creditors'

25    committee.  The creditors' committee filed statements, one

20

1   statement covering both motions on October 25th raising certain

2   issues, the only one of which that remains unresolved is

3   whether there is a pre-notification and sort of tantamount to

4   an approval process with the committee before we can taken any

5   actions under these orders which respect to transactions

6   exceeding a million dollars.

7            The debtors were and the committee were unable to

8   resolve this.  The debtors believe it is extremely important to

9   the viability of the company and to our supply chain network

10  that we have the ability to move forward and do what needs to

11  be done to protect the supply chain and provide a weekly report

12  and update so every week the committee knows what's going on

13  but not slow down the process.

14           These are -- and we have -- we're prepared on that,

15  Your Honor, to -- we have two witnesses and a slight short

16  evidentiary record on that.  Mr. Rosenberg has been good enough

17  to indicate that he's willing to have us do that by proffer so

18  that we can get Mr. Sheehan's testimony and Mr. Eisenberg's

19  testimony before the Court, but this is not a procedural issue.

20  This is a substantive issue about how the debtors operate both

21  ordinary course and non-ordinary course programs at the

22  company.

23           THE COURT: I -- before we do that, I just had a

24  question about the language that was proposed.  It says that

25  the report would be made to the committee professionals of all

21

 1  transactions affected by the debtors pursuant to the order and

 2  additional report on a transaction-by-transaction basis for

 3  individual transactions in excess of two million.

 4         What is the difference between the two?

 5         MR. BUTLER: Well, Your Honor, what we have and we

 6  have an exhibit to show Your Honor and put into evidence, but

 7  we have developed a very comprehensive reporting system that

 8  FTI and Mesereau worked out, which basically gives them a

 9  weekly report on what's happening both in terms of a

10  distribution of suppliers, distribution of dollars, settlements

11  in progress, amounts that have been expended against what was

12  estimated in the first-day motions, sort of a one-page summary

13  of every transaction, sort of a score card, and that covers

14  everything.

15         THE COURT: And that, of course -- and the Mesereau

16  people can call up someone at FTI and say give me a little more

17  on this one or that one or --

18         MR. BUTLER: In fact -- in fact, Your Honor, they meet

19  every week by telephone to go over this and over the report and

20  then there's -- it's actually -- the report is actually five or

21  six pages long.

22         The next page actually stratifies by motion, it

23  doesn't cover just the foreign creditors and the suppliers but

24  a variety of other motions, what's -- a number of deals that

25  are involved -- implicate matters under 500,000 and then

22

1   between 500,000 and a million, a million and two million, two

2   million and five million and over five million, and then as to

3   anything that is over two million, there is an additional

4   report that gives detail regarding the supplier -- a

5   description of the supplier involved, what their reconciled

6   claim and what's been done with respect to under various

7   programs done with that, and so it gives additional detail.

8            THE COURT: All right.  So the debtor is volunteering

9   more information on that even before Mesereau might ask about

10  it?

11           MR. BUTLER: Oh, absolutely.

12           THE COURT: Okay.

13           MR. BUTLER: And, in fact, there's a -- with respect

14  to the -- and, again, this will come into evidence, Your Honor,

15  with respect to the report, with respect to any matter

16  involving a transaction above two million, there's a

17  description of the business relationship, the financial

18  position, the request that was made and the outcome and the

19  reasons the debtor made the decisions that it made, and that's

20  -- all of this is done, and our proposal of the committee has

21  been that we continue this very detailed reporting system every

22  week until the end of the year, and then monthly thereafter so

23  that they can have a very good handle on what's happening.

24           What we've said we can't live with and Mr. Sheehan,

25  our chief restructuring officer is here to testify why, we

23

1   can't live with the idea that the creditors' committee

2   interjects themselves into the middle of our supply network and

3   says, no, you can't do something until -- you have to stop

4   everything you're doing and come and give us notification and

5   sit down and talk with us about what we -- about what you want

6   to do.

7          THE COURT: Well, let me -- Mr. Rosenberg, I don't

8   understand what the committee's objection is.  Was it to

9   monitor this to make sure the debtors are complying with the

10  order or to have a veto on top of that?

11         MR. ROSENBERG: Your Honor, it is a former -- it is

12  more than the former.  It is certainly not the latter, and with

13  all due respect to Mr. Butler, I think he is misstating what it

14  is we are seeking here.  It is less, considerably less than

15  what Mr. Butler stated.

16         THE COURT: So it's not a veto.

17         MR. ROSENBERG: It is not a veto, it is not even a

18  discussion necessarily.  It is a pre-notification of -- of

19  proposed transactions over a million dollars.  Upon the

20  notification, the burden will be entirely on the committee to

21  do something, seek more information if it wants to, you know,

22  whatever, but we're talking about pre-notification of a very

23  small number of transactions.

24         And to tell you how few, Your Honor -- if this had

25  been in effect on day one of the case through today, there were

24

1  eight over $1 million of foreign and four over $1 million of

2  essential.  All we're asking for here is an email, a telephone

3  call in advance that says the following are over a million

4  dollars, we're letting you know.

5       THE COURT: But then -- let me ask you.  If that comes

6  to the committee or that we're ordering it to be coming to the

7  committee, then the committee wants the right to do what, to

8  come in and say, you know, this one really isn't from what we

9  know really should be -- really shouldn't be as part of the

10  vendor rescue program because it's different than the hallmark

11  so the vendor rescue program --

12       MR. ROSENBERG: Perhaps.

13       THE COURT:  -- or this is over -- this is not a sole

14  source supplier from what we know, and therefore --

15       MR. ROSENBERG:  Any of the above, Your Honor, but we

16  are not --

17       THE COURT: But it's not going beyond those categories

18  that were covered by the motion and the order?

19       MR. ROSENBERG: Oh, of course not, sir.

20       THE COURT: Okay.

21       MR. ROSENBERG: No, no.  We're talking about -- you

22  know, when we're talking about a big one which we are defining

23  as over a million dollars, and I think that's a fair

24  characterization given the number of such transactions I just

25  indicated to you.  We're not talking about hundreds or even

25

1   dozens here, we want to be able to say yeah, that's properly

2   within the program, but not to stop it, only if we then start a

3   process because we feel so strongly about it.

4           We're not seeking consultation automatically.  We're

5   certainly not seeking to veto power.  We're looking for a

6   simple notification.  That's it.

7           MR. BUTLER: Your Honor, that --

8           MR. ROSENBERG: And, by the way, Your Honor, that we

9   settled all the dozens of matters involving hundreds of

10  millions of dollars that Mr. Butler just went through and yet

11  we're here on this seemingly small point tells you how strongly

12  the committee feels about it.

13          THE COURT: Okay.  All right.

14          MR. BUTLER: Your Honor, I think both the committee

15  and the debtors can take equal credit in having worked out all

16  the committee's concerns other than this.

17          THE COURT: That's fair.

18          MR. BUTLER: The company is here because it does not

19  believe that the committee should intervene and inject itself

20  into our ordinary course operations, before we actually do

21  something, and by the way, Your Honor, they say a million

22  dollars is a big deal.  This is a $28 billion revenue company.

23  We have a billion dollars a month in transactions with vendors.

24          A million-dollar issue in this -- in the context of

25  this case is not a big deal, and oh, by the way, the only issue

26

1   between us, the debtors have and that's why we wanted to put

2   the testimony because we think it's a compelling case, Your

3   Honor.  The fact is the debtors are prepared every week to give

4   full detailed comprehensive disclosure to the creditors'

5   committee, and if they've got an issue, they can raise it.  All

6   right.

7           And what you have to balance is the prejudice that

8   somehow or other we might have done a transaction or two they

9   don't like which maybe then can upset although I doubt it given

10  what we have put in place here -- the company has put in place

11  versus having them interfere with our -- the operation of these

12  programs, which are very time sensitive.

13          Some of these decisions are made in a matter of

14  hours, and I can put the testimony on, but Mr. Rosenberg is not

15  saying what his financial advisors have been saying.  They said

16  as to each of these things, they wanted a written presentation,

17  they wanted background documentation, they wanted a telephone

18  conference with the financial advisors, and Mr. Eisenberg will

19  testify as to each of those matters.

20          That was what was requested.  All right.  And it is -

21  - you know, it is -- we think, Your Honor, when we're saying on

22  a weekly basis we'll sit down and give you all this information

23  and go over anything you want to talk about, that should be

24  sufficient for the committee to have a feel for how things are

25  going, and oh, by the way, Your Honor, we've been doing this

27

1   since the inception of the case and the formation of the

2   committee.

3           I think this has gone on for three weeks now, and I

4   don't think that Mesereau has represented, as we get up and

5   testify to today, that they believe that what we have done has

6   been inappropriate in any way.

7           THE COURT: Of course, that cuts both ways.  I mean,

8   that suggests that they wouldn't -- they wouldn't abuse their

9   right to come into court and ask for an order to show cause or

10  something like that because they're working with you all,

11  effectively.

12          I guess what I'm interested in is not a whole

13  showing, particularly given the clarifications on the record,

14  but as a practical matter how much forethought goes into

15  decisions to pay in excess of a million dollars and how long it

16  takes to implement the decision once it's made, so that as a

17  practical matter I can tell whether there's enough time to give

18  some advance notice to the committee, either telephonic -- you

19  know, whatever is practical, telephonic or written so that they

20  can know about it.

21          I mean, I'm assuming that -- maybe I'm wrong, but you

22  know, generally, to make a million-dollar transfer takes a

23  little bit of time, and it usually takes some forethought

24  before it's made, but maybe that's not the case here.  That's

25  what I'm interested in focusing on.

28

1          MR. BUTLER: Your Honor, the testimony would be here,

2   and I think -- and certainly, Mr. Eisenberg and Mr. Sheehan are

3   both here and can answer whatever questions Your Honor wants

4   them to --

5          THE COURT: And I'm happy to take a proffer; that's

6   fine.

7          MR. BUTLER: Okay.  The -- let me just walk through

8   and I'll --

9          THE COURT: You can go through the whole time, but

10  that's really what I want to focus on.

11         MR. BUTLER: Well, let me proffer the testimony.  I'll

12  try and do it briefly, Your Honor, then of Mr. Eisenberg and

13  then of Mr. Sheehan.

14         Mr. Eisenberg, if called to testify would explain --

15         THE COURT: And he's with FTI for the record?

16         MR. BUTLER: Yes, sir.  And would you stand, please,

17  Mr. Eisenberg?

18         Mr. Eisenberg would testify that he is a senior

19  managing director of FTI, and he would testify that the

20  automobile industry and Delphi -- that Delphi is a part of is

21  in severe distress, that that distress is causing the ultimate

22  manufacturing companies including GM and Ford who have suffered

23  double-digit percentage declines in unit sales to pressure

24  suppliers to reduce prices at a time when commodity price

25  increases have hurt the supply base because raw materials have

29

1   increased in price, particularly steel and resin.

2           Mr. Eisenberg would further testify that the volume -

3   - reduced volume of production together with these price

4   pressures and commodity increases has had a severe adverse

5   effect on suppliers in the industry which has also resulted in

6   the Chapter 11 cases of a number of the suppliers in the

7   industry.

8           With respect to the supply chain, Mr. Eisenberg would

9   testify that in the automotive industry, the supply chain

10  management has evolved so that suppliers are most -- in most

11  instances sole source suppliers.  This is a method under which

12  the requirements for a particular part are purchased from one

13  supplier.

14          He would testify those parts are highly customized

15  and rigorously tested, and the ability of a company to go from

16  one supplier to another supplier is severely limited because in

17  that testing and validation process, in order to change a part

18  from a supplier takes months to be able to run the validation

19  tests and qualify a new part from a new supplier, so that it's

20  very difficult to replace suppliers in this industry in a short

21  term.

22          Mr. Eisenberg would also testify that a disruption

23  from any one supplier can cause any number of assembly plants

24  to completely shut down, and the company has estimated that a

25  shutdown caused by just one supplier not being able to get

30

1   their just-in-time inventory to the company could cost as much

2   as $10 million per day per plant.

3          Mr. Eisenberg would testify that Delphi Supply

4   Management System is highly sophisticated and highly dependent

5   on the delivery of parts of its suppliers, and that it adopts

6   this just-in-time supply method that I have described.

7          Mr. Eisenberg would testify that this method means

8   the debtors do not maintain a significant inventory of the

9   components supplied by certain of the vendors.  In many cases,

10  we have on hand less than twenty-four hours supply, and

11  accordingly, the debtors rely on daily shipments of components

12  from the vendors to keep manufacturing facilities operating.

13         Mr. Eisenberg would testify that the debtors' OEM

14  customers similarly do not keep a significant inventory of

15  Delphi's products on hand and rely -- again, a supply of less

16  than twenty-four hours and sometimes less than four to six

17  hours in many instances and rely upon frequent shipments of

18  those products to keep their manufacturing plants open.

19         Mr. -- with respect to the supplier process, Mr.

20  Eisenberg would testify that Delphi's process is designed to be

21  thorough but very rapid in its ability to analyze whether a

22  supplier fits into the program.

23         Mr. Eisenberg would testify that Delphi has dedicated

24  approximately 20 people on a full-time basis to evaluating and

25  processing such requests through a cross-functional team

1  involving global supply management, production control

2  logistics, treasury, legal departments and professional

3  advisors.

4        Mr. Eisenberg would testify that when determining

5  whether a creditor is an essential supplier or foreign

6  creditor, the Delphi has a team of people evaluating that

7  process on a real-time basis, and going through a lengthy

8  series of criteria to evaluate whether or not payments ought to

9  be permitted.

10        Mr. Eisenberg would testify that this process enables

11  Delphi to understand each requesting supplier's financial

12  situation as well as the company's vulnerability in the event

13  the supplier were to shop shipping.

14        Importantly, Mr. Eisenberg would testify that in

15  various instances, Delphi's essential supplier team is required

16  to review, approve and wire funds on the same day that the

17  request comes in because of the difficulty of the particular

18  supply problem that has been presented by the supplier.

19        Mr. Eisenberg would also testify that the company has

20  no way of knowing which of the requests that come in will

21  require same-day activity, but that there have been same-day

22  events that have occurred in the first thirty days of this

23  case.

24        With respect to foreign creditors, Mr. Eisenberg

25  would testify the debtors regularly transact business with

32

1    numerous foreign businesses, many of whom supply goods and

2    services that are crucial to the debtors' ongoing concerns and

3    would testify that it is typical for foreign creditors to

4    refuse to ship unless they get payment of their outstanding

5    liabilities under an order similar to the foreign creditors

6    order that's been approved in this case.

7           Mr. Eisenberg would testify that making sure there is

8    not a disruption in the shipment from foreign vendors is

9    critical since they are also part of Delphi's just-in-time

10   supply chain.

11          Mr. Eisenberg would also point out and testify that

12   pursuant to the authority obtained in this case, Delphi has

13   limited the parties who are eligible for foreign creditor

14   treatment to explicitly exclude foreign vendors, service

15   providers and other non-governmental entities that are known to

16   have substantial assets inside the United States and that the

17   Delphi investigates this matter to the extent it can on a real-

18   time basis to make sure that people otherwise qualify.

19          Mr. Eisenberg would also testify that he's been

20   personally involved in the vendor management process or

21   supplier process over the first three or four weeks of this

22   case and that foreign creditors have been particularly

23   aggressive in this case and have threatened to stop shipping

24   because of unpaid petition -- pre-petition claims which have

25   been largely resolved by the debtors' activities in this.

33

1        With respect to the results of the process, Your

2   Honor, in the first three weeks of the case, Mr. Eisenberg

3   would testify that as of October 28th, the debtors have

4   processed and either approved or rejected a total of 136

5   requests for central supplier treatment of which 116 requests

6   were rejected, but there are also 433 requests that remain in

7   the system that are being -- that are backlogged and being

8   examined.

9        Mr. Eisenberg would testify that in the foreign

10  creditor front, the debtors have resolved either by approval or

11  rejection a total of 86 requests with 49 rejections and 37

12  approvals but are continuing to examine 102 requests that are

13  in the system.

14       As a result, Mr. Eisenberg would say that some

15  requests are dealt with over a period of time, but again, a

16  number of requests and the most emergent requests are dealt

17  with on a same-day basis.

18       Mr. Eisenberg would further testify the debtors have

19  exercised the discretion granted to them extremely judiciously.

20  Again, as of October 28th, the debtors had approved payment of

21  less than six percent of all suppliers requesting payment under

22  the essential supplier order, and less than 15 percent of all

23  creditors requesting payment under the foreign creditor order.

24       And, as of October 28th, the debtors have used less

25  than -- strike that, less than 24 percent of the financial

34

1  authority granted to them under the essential supplier order

2  and less than 60 percent of the financial authority that was

3  estimated as an estimate in the foreign creditor.

4  　　　　With respect to committee reporting date, Your Honor,

5  Mr. Eisenberg would testify that the creditors committee has

6  been fully apprised of the actions that the debtors are taking

7  in connection with essential suppliers and foreign creditors.

8  He would testify that FTI has held conference calls and

9  provided reporting to the committee's financial advisors on a

10 periodic basis and has developed with Mesereau, the committee's

11 financial advisors, Your Honor, a document which I'd like to

12 mark as Exhibit 1, Your Honor, and pass up to the Court if I

13 may.

14 　　　　THE COURT: Okay.

15 　　　　MR. BUTLER: It's been reviewed with Mr. Rosenberg.

16 　　　　THE COURT: All right.

17 　　　　MR. BUTLER: Which provides a tracking system of old

18 transactions under various authorities the debtors obtained in

19 their first-day orders and detailed information about

20 transactions of $2 million or more.

21 　　　　Mr. Eisenberg would testify that the committee's

22 professionals have not expressed any concerns with the

23 company's process or decision-making process and would testify,

24 Your Honor, that in his opinion, in FTI's opinion, the

25 committee's proposed requirement of pre-notification and then

35

1   some process which could include trying to come to court would

2   add another layer of complexity to the debtors' carefully

3   organized and streamlined processes for reviewing payments

4   under these orders and for making determinations as to whether

5   such payments are justified.

6           Mr. Eisenberg would testify that in his opinion the

7   weekly reporting mechanism provides an oversight to the

8   committee and gives the committee to opportunity to come into

9   court at any time if they're dissatisfied with the debtors'

10  operations under these orders.

11          Mr. Eisenberg would testify that in his opinion the

12  added complexity of prior notification to the committee which

13  includes some form of approval process could delay the

14  decision-making process which in turn would endanger the

15  debtors' abilities to avoid interruption in their supply chain.

16          He would testify that while in many instances, the

17  delay would not be overly problematic -- and this is to your

18  point, Your Honor -- in many instances, that delay would not be

19  overly problematic.  In those instances, we're paying in

20  essential suppliers pre-petition claim is urgent, in Mr.

21  Eisenberg's opinion any delay at all in the same-day reaction

22  could be catastrophic and could cause the shutdown of plants.

23          Mr. Eisenberg would testify that the debtors are

24  unable to predict when such an urgent supplier will come in

25  requesting payment, and therefore, in Mr. Eisenberg's opinion,

36

1   the committee's pre-notification procedures are impractical and

2   that the reporting -- the weekly reporting system should

3   provide appropriate oversight, Your Honor.

4          Your Honor, that is the sum and substance of Mr.

5   Eisenberg's testimony.

6          THE COURT: Okay.  Does anyone want to cross-examine

7   Mr. Eisenberg?

8          I have just one question and maybe the next proffer

9   will answer this, which is the proffer said there was basically

10  a group of around twenty people that function on this

11  worldwide.

12         Is there some person or maybe a subset of that group

13  that has the final say or is there delegation in all cases

14  given to, you know, a regional manager or whatever?

15         MR. EISENBERG: As indicated, there are twenty

16  individuals that are part of the essential supplier review

17  process, once that process is complete and the members or a

18  member, a team member on that essential supplier team has a

19  recommendation to treat this vendor as an essential supplier,

20  that recommendation then goes to a committee.

21         That committee is made up of multi-functional --

22  multi-functional departments including treasury, Delphi legal,

23  GSM which is a global supply management team as well as FTI

24  with some support to Skadden to fully review and concur that,

25  in fact, the recommendation is appropriate and that the

37

1   supplier should be treated as an essential supplier on the

2   motion.

3          THE COURT: Okay.  And that applies for the foreign

4   vendors, too?

5          MR. EISENBERG: That applies for the foreign vendors

6   as well.

7          THE COURT: And the committee meets telephonically or

8   by email; it doesn't have to be in person?

9          MR. EISENBERG: The committee actually gets together

10  in person or by phone several times a day, because of the

11  timeliness that the committee needs to make a decision.

12         THE COURT: Okay.  How often in your experience is it

13  that the committee turns down a request?

14         MR. EISENBERG: It's fairly significant in that the

15  number -- the statistics that Mr. Butler shared suggest that

16  the committee is turning down a significant number of the

17  requests or is requesting additional information before making

18  decision.

19         THE COURT: Okay.  Okay.  Thanks.

20         MR. BUTLER: Your Honor, I should indicate for the

21  digital record that's being made that the person that was

22  speaking just now was Randall eisenberg, the FTI witness that

23  was proffered.

24         THE COURT: Okay.  Thank you.

25         MR. BUTLER: Your Honor, our other proffer would be

38

1   the proffer of John Sheehan.  Mr. Sheehan, will you stand,

2   please?

3          Mr. Sheehan, Your Honor, would testify that he is our

4   vice president and chief restructuring officer, and as such,

5   has responsibility and involvement in all aspects of the

6   company's restructuring efforts and is familiar with the

7   debtors' supply chain and the means by which the debtors are

8   paying the suppliers while the company is in Chapter 11.

9          Mr. Sheehan would testify that he is very familiar

10  with the process and determinations are being made regarding

11  various suppliers and whether they should be eligible for

12  essential supplier treatment, foreign vendor treatment or

13  vendor rescue program treatment.

14         Mr. Sheehan would testify that the debtors supply

15  method includes the use of sole source suppliers as has been

16  described in Mr. Eisenberg's testimony where the debtors

17  purchase all of the requirements for a particular part from one

18  supplier.

19         Mr. Sheehan would testify that each of these parts

20  have to meet demanding specifications imposed both by Delphi

21  and OEM customers, and therefore, are not subject to quick

22  replacement, takes months and Mr. Sheehan would testify to make

23  any changes in the sole suppliers.

24         Mr. Sheehan would say that because it is so difficult

25  to replace a supplier that stops performing or cannot continue

1  its business operations because of financial difficult and

2  because the just-in-time supply method causes a situation where

3  suppliers have some amount of leverage on the issues dealing --

4  that the debtor is dealing with right now, because they

5  actually do have -- Mr. Sheehan would testify the ability to

6  shut down aspect parts of Delphi and parts of -- and our OEM

7  customers.

8          And Mr. Sheehan would testify that while the company

9  is very proud of the fact that the company has functioned

10 throughout this Chapter 11 case without any interruption in

11 customer supply, that has not been the case with Delphi Supply.

12 In fact, Delphi Supply has had some interruptions that have had

13 to be dealt with on an emergency basis as some suppliers have

14 had to be dealt with on a very critical time path.

15         Mr. Sheehan would testify that if a supplier were to

16 decide not to -- Delphi, the consequences to Delphi would

17 likely mean that Delphi would have to shut down a line until it

18 received the parts and could start manufacturing product again.

19         Mr. Sheehan would testify that this could mean the

20 debtors would not have sufficient prior to ship customers (sic)

21 and in less than one day, the debtors would shut down or could

22 shut down one of their customer's production lines.

23         Mr. Sheehan would testify that when contemplating a

24 Chapter 11 filing, there was substantial discussions regarding

25 the possible consequences of a filing on Delphi's suppliers

40

1   including certain of Delphi's suppliers' ability to perform

2   under the terms of their contracts if their pre-petition

3   invoices were not paid.

4         Mr. Sheehan would note that because the debtors' use

5   of sole suppliers and just-in-time inventory, the debtors were

6   very concerned that these suppliers could hold Delphi hostage

7   and that Delphi would be placed in a situation where it could

8   end up shutting down its own lines or worse yet, disappointing

9   its customers and not providing just-in-time inventory to its

10  customers.

11        Mr. Sheehan would testify that there are several

12  consequences of a shutdown if that were to occur.    First, Mr.

13  Sheehan would testify there would be direct financial damage to

14  Delphi because of the debtors' high-fixed costs and the fact

15  that the debtors would not be generating revenue in a no-ship

16  situation.

17        Second, Mr. Sheehan would testify there would be

18  financial damages that would occur as a result of the

19  customer's manufacturing facilities being shut down, and that

20  Delphi has been informed by at least one customer that those

21  claims would exceed $10 million per line per day.

22        Mr. Sheehan would testify that the shutdowns would

23  have a negative effect on Delphi's customer relationships and

24  ability to reorganize in this Chapter 11 case and would affect,

25  in Mr. Sheehan's view, Delphi's potential ability to emerge

41

1   from Chapter 11.

2

3          Mr. Sheehan would testify that as a result of these

4   serious concerns, Delphi worked with his advisors to design a

5   program they believed would give Delphi the flexibility to

6   support Delphi suppliers in a way that would ensure that

7   Delphi's operations would be able to continue.

8          The result of that work, in part, is the essential

9   supplier program and vendor -- foreign vendor program that are

10  currently at issue.

11         Mr. Sheehan would also testify that part of the pre-

12  notification that the committee is demanding also involves not

13  just the payment of pre-petition claims, but also Delphi's

14  ordinary course programs including its vendor rescue program.

15         Mr. Sheehan would testify that the vendor rescue

16  program is an ordinary course program.  It's maintained by

17  everybody in the industry in one form or another.  It has been

18  a regular part of Delphi's GSM or purchasing organization since

19  the spinoff from General Motors, and that the company spends

20  somewhere in the general range of $50 million a year in dealing

21  with trade vendor rescue operations and that it's a critical

22  part and just a cost of doing business, and an ordinary course

23  part of its operations.

24         Mr. Sheehan would testify that the reason the debtors

25  did not agree to the creditors' committee pre-notification

42

1   requests is because Delphi is very concerned that it needs to

2   maintain the ability to respond at a moment's notice to a call

3   from a supplier where the supplier found themselves in a

4   situation where they were financially unable to ship or had

5   similar circumstance.

6        Also, Mr. Sheehan would testify that Delphi wanted to

7   have similar flexibility for dealing with its foreign suppliers

8   or any others who refused to ship.  In addition to this

9   flexibility, however, Delphi wants to make sure that when a

10  decision was made to pay a supplier on account of a pre-

11  petition debt, there was a process in place with specific

12  criteria that would make Delphi comfortable that these

13  suppliers should be paid and that that process would be

14  reviewed periodically, as frequently as weekly, with the

15  creditors' committee so they would have adequate oversight of

16  that process.

17       Mr. Sheehan would testify that one of the key reasons

18  as chief restructuring officer that he helped developed the

19  essential supplier program was to provide support for the

20  suppliers in financial distress, and in doing this, Delphi

21  evaluates among other things the supplier's financial condition

22  including reviewing historical and projected financials as well

23  as their various financing arrangements.

24       Because of Delphi's vendor rescue program which as

25  Mr. Sheehan would have testified has been maintained for many

43

1  years, Delphi has much institutional knowledge about troubled

2  suppliers and an entire organization that works in the troubled

3  supplier programs.

4        Mr. Sheehan would testify that these people whose --

5  their job and it's their expertise to deal with the suppliers

6  in distress.

7        Finally, Mr. Sheehan would say that while not every

8  request that comes through the general -- the GSM purchasing

9  organization of Delphi is emergent and needs to be dealt with

10  in the same day, that at least in the first few weeks of this

11  case, many of the requests that have come in have had to be

12  dealt with on a real-time basis.

13        Mr. Sheehan believes and would testify that in his

14  business judgment and that of the debtors, the inability -- the

15  inability to continue that operation subject to a weekly

16  oversight review would significantly jeopardize the debtors'

17  operations because as he understands what the requirement to

18  pre-notify and consult would be.

19        Mr. Sheehan would also testify that as explained to

20  him, the creditors committee's request is not simply an email

21  notification, but rather is a dynamic process where the

22  committee would have the opportunity to review information,

23  make inquiries, consult with the debtors' financial advisors

24  and take other things that would interfere in Mr. Sheehan's

25  view with the ability of the debtors to operate their

44

1  businesses, and that is his concern.

2         And, Your Honor, the one thing I would point out --

3  that would be the sum of Mr. Sheehan's testimony.  I would

4  correct the proffer to the extent that when I was giving the

5  numbers, when I said $10 million per line, it should be $10

6  million per plant per day.

7         THE COURT: Okay.  All right.  Does anyone want to

8  cross-examine Mr. Sheehan?

9         I have a question, because we have not really focused

10 on the vendor rescue aspect of this.

11        Does the debtor provide the same or a similar report

12 on -- you know, a historical report, I guess, currently on a

13 weekly basis on venue rescue as well as sole source and foreign

14 creditor payments?

15        MR. SHEEHAN: The report that we're providing to the

16 creditors' committee comprises all of those elements --

17        THE COURT: It includes vendor rescue?

18        MR. SHEEHAN: Yes, sir.

19        THE COURT: Okay.  I mean, obviously, there are

20 different issues with regard to each one.  I mean, vendor

21 rescue is -- in some sense, it strikes me as probably something

22 that's more -- that's more typical to the industry, but at the

23 same time, may involve more qualitative analysis at some point

24 as to whether, you know, a vendor deserves to be rescued, you

25 know, those sorts of things or how to wean yourself off of a

45

1    vendor.

2         So I'm just -- but, basically, it's all included in

3    this -- in the report.

4         MR. BUTLER: Your Honor, that's the commitment the

5    debtors have made.  In fact, the essential -- the vendor rescue

6    program at certain dollar levels is very diversified around the

7    company's operations in forty countries, and one of the things

8    we're doing right now is working on a protocol to gather that

9    information and report it, but the answer is, yes, the debtors

10   intend to report all activity under the vendor rescue program

11   to the creditors' committee as soon as those protocols can be

12   put in place, and those that are large enough that actually

13   come to headquarters, they would get on a weekly basis.

14        THE COURT:  Okay.  What is -- is there a dollar

15   amount per week where it has to go to headquarters?

16        MR. SHEEHAN: Historically, to the extent that we were

17   extending a financial loan to a supplier, those would come to

18   the headquarters.  To the extent it was other types of

19   financial assistance that was within the management

20   responsibility of the divisional management to extend that

21   financial --

22        THE COURT: Okay.  So it's really not keyed to a

23   dollar amount as opposed to the type of support you give.

24        MR. SHEEHAN: Yes, sir.

25        THE COURT: The form of support.

46

1           MR. SHEEHAN: Yes, sir.

2           THE COURT: Okay.  All right.  Thank you.

3           MR. BUTLER: Your Honor, I'd just like again the

4    digital record to indicate that the individual providing that

5    testimony on the record was John Sheehan, the company's chief

6    restructuring officer.

7           THE COURT: Okay.  All right.  Do you have anything --

8    I mean, I think I understand your argument and the witnesses,

9    but before Mr. Rosenberg speaks, do you have anything more to

10   add or do you want to wait to hear him first?

11          MR. BUTLER: Yeah.  I mean, I certainly appreciate

12   that Mr. Rosenberg and the committee are trying to provide the

13   oversight they think is within their fiduciary responsibility

14   to provide.  We simply would ask the Court, and I'll respond to

15   any comments -- we simply would ask the Court to approve a

16   process which says we report on a weekly basis in retrospect as

17   opposed to stopping the process as transactions come up and

18   have to seek somebody out, provide them information, because

19   it's not just providing information because what happens if the

20   committee calls back and says, well, I have an issue here.

21   Does that mean under this order we're supposed to stop?  I mean

22   --

23          THE COURT: Well, what if it doesn't?  What if the

24   order just says that -- makes it crystal clear that the

25   committee has no consent or veto right, and in fact, would not

47

1  be able to seek any relief ex parte?

2          MR. BUTLER: Well, Your Honor, then I would point out

3  that if that's really what they're asking for, then I would

4  point out that this is really much ado about nothing and almost

5  a trap for the debtors because our ability to make sure we hit

6  that bogey every day during the week as opposed to making sure

7  we've summarized everything properly, it's been vetted by FTI

8  and then submitted in a comprehensive report that's been

9  checked on a weekly basis, that the committee ought to stand

10 down from that now because if what they're saying is all we

11 need to do is send an email and nothing else, then what does

12 that do?  What's the purpose of that?

13         THE COURT: Well, I think they're saying more than

14 that, but that -- no, but they're saying give us reasonable

15 notice of a payment over a million dollars.  If it's a case

16 which I accept may be the case in certain circumstances that

17 it's reasonable to say we're making the payment now or we're

18 making the payment as soon as the check clears or the wire

19 instruction is clear, then that's fine, and that's -- you know,

20 they're going to have to live with that because it came up that

21 morning.

22         On the other hand, if it's something that people have

23 been deliberating over for, you know, a week because it affects

24 how you're going to deal with a particular vendor in the

25 future, you know, maybe they should get more notice than that.

48

1          MR. BUTLER: Well, Your Honor, they do get -- in their

2    reports, they get -- they do get notice of what the backlog and

3    what's being considered over time.

4          I mean, the more important question is -- I mean, and

5    obviously, Your Honor will be the one to decide this.

6          THE COURT:  Well, that's -- I didn't understand that.

7    Are they -- are they being updated as to what's upcoming in the

8    next week if it's predictable?

9          MR. BUTLER: Well, Your Honor, it's not -- I don't

10   know if it's in the next week but part of this report shows

11   them all the open items that are open in the -- the number of

12   items and the items that are actually open here are at least in

13   summary form.  It's not given to them on a format that says

14   gee, you know, here's every single transaction that's been

15   honored, but Your Honor, the question is, I mean, how much, and

16   Your Honor will be the one to tell us, but how much oversight -

17   - our vendor rescue program is an ordinary course program.

18   We're a $28 billion company.  All right.

19         Where in the case law does it say that a creditor

20   committee gets to come in and interfere with that ordinary

21   course process at a million-dollar level.

22         THE COURT: Well, the issue is, you know, what's

23   ordinary course.  There may be -- I mean, even with the

24   critical -- with the vendor rescue program, there may be --

25   there may well be a point when you're dealing with a particular

49

1   vendor where you're making decisions that are more long term.

2           You know, there's -- there are great studies that

3   deal with traders, for example, when they -- you know, they

4   make a bad investment and then to get their money back, they

5   keep investing in the same thing, and that's how hedge funds

6   get into trouble sometimes, and you know, I think that's the

7   type of thing that the committee wants to focus on, not the

8   everyday stuff, but you know, there's a time where this

9   particular vendor even though they're a sole source, we should

10  wean ourselves away from.

11          Those are the types of things I think they're

12  focusing on, and maybe you're right.  Maybe it isn't to give

13  the committee notice of the actual imminent payment but to get

14  more involved in the backlog analysis recognizing that there

15  are some payments that just come up because the guy says, look,

16  we're pulling the trucks away now, and you have to make the

17  payment, but I think -- you know, in their due diligence, they

18  just want to know not just that the money has already gone out

19  the store and we should stop doing this in the future, but

20  what's impending.

21          There may be some things that, you know, I accept,

22  you cannot give them advance notice of that because it just

23  comes up that morning and you only have about three hours to

24  give the wire instructions, but there are other things that,

25  you know, clearly, where there's a review committee at the

50

1   debtor to consider with a lengthy checklist what the first-tier

2   people are recommending, you know, to somehow involve the

3   committee in that process.

4   And, when I say the committee, it's clear to me at

5   least that what's contemplated here is a committee

6   professional, designated professional and with suitable

7   confidentiality so that you're not getting this, you know,

8   deliberate process out there --

9   MR. ROSENBERG: That's correct, Your Honor.  We're

10  talking about a Mesereau process here.

11  THE COURT: I mean, I'm not -- from your testimony and

12  from what Mr. Rosenberg is saying, I get a very clear

13  impression that unlike some cases, the debtors have a

14  reasonable process in place to deal with these very difficult

15  issues and that there's a suitable number of people involved

16  and a suitable reporting process involved so that, you know,

17  there's a governor on the natural instinct of the people who

18  deal directly with these folks to make sure that only the

19  absolute necessary amounts are paid.

20  So I don't think -- and I think the committee accepts

21  that.  So what we're really talking about here is just to give

22  them some eyes into that process to make sure it's happening.

23  Now I know you have the reports and that's where it's mostly

24  looked at, but since it's all retroactive, you know, a fair

25  amount of money could go out the door that way.

51

1            I don't -- there hasn't really been any testimony as

2    to whether in the weekly meetings that Mesereau has with the

3    company and FTI they're also talking about what's in the

4    pipeline.  I think that frankly if they do that, that may be a

5    lot more effective than having a notice process that by and

6    large, you know, really highlights the problem in a way that's

7    probably counterproductive for everybody, which is, you know,

8    either making it so that it's notice -- effectively after the

9    money has gone out of the door anyway or leads to people trying

10   to stop something that's imminent, whereas if you have

11   something where you're talking about what's in the pipeline or

12   what's a backlog, then at least then the company can have the

13   benefit of the committee's thinking on the issue.

14           MR. BUTLER: Your Honor, I don't think we would have

15   any problem listing out backlog items that are in the backlogs

16   where the requests are a million dollars or two million dollars

17   or more.  That's part of a reporting mechanism.  I mean, we've

18   committed to have FTI and Mesereau meet every single week and

19   talk about these things.

20           The issue -- and I don't think we'd have any problem.

21   If we know about a backlog, we're already giving them the

22   backlog information on the front page, and what you're saying

23   is you want us to cull out of the back page, you know, the

24   individual transactions that are over a million or two million

25   dollars.  I don't think we have any issues with that.

52

1          MR. ROSENBERG: Including names, Mr. Butler?  Because

2    you refused to do that until now.

3          MR. BUTLER: Right.  We haven't included names because

4    the names are not relevant, Your Honor.  We believe that the

5    committee should not be sitting around, which is comprised of -

6    -

7          THE COURT: Well, but again, is this just Mesereau?  I

8    mean, is this --

9          MR. ROSENBERG: We're talking Mesereau, Your Honor.

10   We're talking Mesereau pursuant to a confidentiality agreement.

11         THE COURT: I think they need to -- they need to be

12   able to say as part of this -- well, it depends obviously on

13   where you are, but I can certainly contemplate situations where

14   it is important to know who the person is because, you know,

15   maybe they know that that company is going to go out of

16   business anyway no matter what you do.  You know, that's a

17   conceivable thing.

18         So I think unless there are concerns about Mesereau

19   not keeping the names in confidence, I think it's worthwhile to

20   have the name --

21         MR. BUTLER: Your Honor, our concern has been that

22   this is a very sensitive -- very, very sensitive issue, and it

23   was unclear to us why -- you know, when we describe the

24   supplier, why it is that Mesereau has to know the exact name.

25   The only thing that can -- you know, we don't know what good

53

1  comes of that.

2       THE COURT: Well, for example, what if that supplier

3  has already gotten a big payment, you know.  I mean, maybe it's

4  relevant as opposed to just that it's fresh each time.  I could

5  see situations where it would be relevant, but -- you know, and

6  again, Mesereau is not -- they're not stupid.  They know that

7  they face real liability if that gets out.  So...

8       MR. BUTLER: And, Your Honor, just to be clear.  This

9  isn't about Mesereau.  We work them in lots of cases.  They're

10 one of the best people around.  So this is not about them.

11 It's a concern about the very core of this case is our supply

12 network, and the company is extremely proprietary about these

13 issues, and it is devoting enormous time and resources -- I

14 mean, we talk about this committee, Your Honor.  This isn't

15 like a committee that comes together once a week.  These folks

16 are working twelve, sixteen hours a day --

17      THE COURT: No, I appreciate that, but I just think

18 that generally speaking, the creditors' committee has been

19 quite reasonable on these issues.  I could see other committees

20 have a very different reaction although I think that would have

21 been a mistake, but I can see other committees taking that

22 reaction.

23      So I think they're acting responsibly here, and in

24 that context, I don't think this is overreaching to say that

25 they should be involved or one person or one designee from

54

1    Mesereau should be involved in that backlog type of discussion.

2            MR. BUTLER: I think --

3            THE COURT: I think that's money well spent.

4            MR. BUTLER: Your Honor, I think we're fine on the

5    backlog discussion.  I think we'd want to -- if we talk about

6    names, I think we want to talk about orally.  I mean, there's a

7    real sensitivity --

8            THE COURT: Oh, yeah, that's fine.  I don't have a

9    problem with that.

10           MR. BUTLER:  -- about not putting things in writing,

11   about not having our suppliers who are involved in this

12   process, they don't want their names --

13           THE COURT:  This is -- this is all -- seemingly all

14   oral anyway, the governing group so I don't have a problem with

15   that.

16           MR. BUTLER: This is all written.  So we'll keep this

17   the way it is, but if they have questions about specific

18   people, we'll provide the designated Mesereau person with that

19   --

20           THE COURT: Okay.

21           MR. BUTLER:  -- and we'll deal with it, Your Honor,

22   if it's okay with the Court, we'll deal with it on the backlog

23   report.  I think that's fine.  We're not -- we're fine with the

24   reporting.

25           THE COURT: Okay.  I think that's -- as a practical

55

1  matter, that just --

2           MR. ROSENBERG: Mr. Butler, the Mesereau folks did not

3  hear -- oh, excuse me, Your Honor.  I didn't mean to interrupt.

4  Forgive me.

5           THE COURT: No, go ahead.

6           MR. ROSENBERG: The Mesereau folks did not hear your

7  last comment about what would be oral and what would be

8  written.  Could you repeat that, please?

9           MR. BUTLER: I said this report -- the report -- we

10  would include -- we would expand this report to include backlog

11  of approvals over $2 million.  This backlog thing -- so they

12  know what the backlog is.  We would not identify in this

13  report, we'd divide every transaction but not by name, and if

14  they want to have an oral conversation with FTI about

15  particular names, particular -- they can do that on a oral

16  basis with a sole designee from Mesereau because this is just

17  very sensitive.  This information is very, very sensitive.

18           MR. ROSENBERG: Your Honor, how are they supposed to

19  know what they want to have a discussion with unless they ask

20  for all the names to decide --

21           THE COURT:  Well, I think they can ask by -- you

22  know, I think that's okay.  They may ask for the names, but --

23  I think it varies.  I mean, I think the name is more relevant,

24  for example, in some cases for a large transaction with a

25  vendor rescue program.  It may not be that relevant for a

56

 1  foreign vendor, you know, except maybe to see if they have

 2  property in the U.S.

 3          You know, if they've said -- if they say to whoever

 4  is their counterpart, you know, have you run all the traps as

 5  to whether this foreign vendor has real property in the U.S.

 6  and they say yes, and they've done a couple of -- or some --

 7  you know, two or three of their own diligence on whether they

 8  can rely on those representations, then maybe they don't have

 9  to ask for every foreign vendor's name, for example.

10          MR. ROSENBERG: No, that of course is true, Your

11  Honor, but apropos exactly the kinds of examples that you were

12  giving, we want to know who we're talking about.

13          THE COURT: Well --

14          MR. ROSENBERG: Should they be weaning, should they be

15  rescuing --

16          THE COURT: No, but they can ask -- they can ask for

17  that.  I just don't -- I agree.  I think that once there's a

18  piece of paper in their hand, they're going to be under a fair

19  amount of pressure from the committee to, you know, show us

20  that paper, and I understand the company's concern about that.

21          MR. ROSENBERG: Your Honor, they know how to say no.

22          THE COURT: Well, I know, but paper has a life of its

23  own.

24          MR. ROSENBERG: The other point, Your Honor, assuming

25  that that's your ruling is that Mr. Butler said over two --

57

1          THE COURT: Yeah, I caught that.  I caught that.  I

2   thought it should be --

3          MR. ROSENBERG: So did we, Your Honor.  We said one

4   million.

5          THE COURT: I think it should be a million.  It's --

6   you know, a million dollars is still a lot of money.

7          MR. BUTLER: It is, Your Honor.

8          MR. ROSENBERG: I would point out again, Your Honor,

9   there were only two since the filing over two million.  There

10  would be not much reporting if that was --

11         THE COURT: Okay.  And the other caveat is if this

12  doesn't work on either side, you both can come back to me.  If

13  you're getting hung up and feel -- notwithstanding that there's

14  no veto right, there's no consent right, you still feel like

15  this is gumming up the works, you can come back.

16         Mr. Rosenberg, the committee is always free to come

17  back and say we've learned that this program is not being

18  administered properly or we have other concerns or whatever.  I

19  don't think that's going to happen from what I've heard.  This

20  seems to be actually -- it seems to have been run responsibly,

21  and I note -- I've signed four orders to show cause from Mr.

22  Togut's firm so th debtor is clearly looking to enforce its

23  rights on vendors that don't live up to their responsibilities.

24         So it does seem to me like it's being run responsibly

25  and this is more a matter of just clarifying the committee's

58

1    due diligence.

2              MR. BUTLER: Thank you, Your Honor.

3              THE COURT: Okay.

4              MR. BUTLER: We'll make --

5              THE COURT: Is this -- I guess this could be

6    memorialized.  The record is pretty clear what's to be done,

7    but we might as well memorialize it.

8              MR. BUTLER: We'll make some changes in the order

9    because -- we'll submit it this afternoon, Your Honor.

10             MR. ROSENBERG: We'll take a shot at it, Your Honor.

11   If we throw up our hands and say as per the record, we'll let

12   you know.

13             THE COURT: Okay.

14             MR. BUTLER: Thank you, Your Honor.

15             THE COURT: Okay.  That's it.

16             MR. ROSENBERG: Thank you, sir.

17             THE COURT: Okay.  Thank you.

18                         * * * * *

19

20

21

22

23

24

25

59

1      I certify that the foregoing is a court transcript from an

2  electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                                    _____

6                                    Kathleen Price, AD/T 550

7  Dated:  11/8/05