1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481PM

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION,

9

10          Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14                  United States Bankruptcy Court

15                  One Bowling Green

16                  New York, New York

17

18                  January 11, 2007

19                  2:39 PM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1

2    **HEARING to Consider Authorization or Approval of the Equity**

3    **Purchasing Commitment Agreement and the Plan Framework Support**

4    **Agreement**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1

2  A P P E A R A N C E S :

3

4  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

5       Attorneys for Debtor

6       333 West Wacker Drive

7       Chicago, IL 60606

8

9  BY:   JOHN WM. BUTLER, JR., ESQ.

10      ALBERT L. HOGAN, III, ESQ.

11

12  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

13      Attorneys for Debtor

14      Four Times Square

15      New York, NY 10036

16

17  BY:   KAYALYN A. MARAFIOTI, ESQ..

18      THOMAS J. MATZ, ESQ.

19

20

21

22

23

24

25

4

1

2   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP

3         Attorneys for the Official Committee of

4         Equity Holders

5         One New York Plaza

6         New York, NY 10004

7

8   BY:   BONNIE STEINGART, ESQ.

9

10   LATHAM & WATKINS

11         Attorneys for the Official Committee of

12         Unsecured Creditors

13         855 Third Avenue

14         New York, New York 10022

15

16   BY:   ROBERT ROSENBERG, ESQ.

17

18   KENNEDY, JENNIK & MURRAY, P.C.

19         Attorneys for IUE

20         113 University Place

21         New York, New York 10003

22

23   BY:   THOMAS KENNEDY, ESQ.

24

25

```
                                                                5
 1

 2    HAYNES & BOONE, LLP

 3          Attorneys for Highland Capital

 4          153 East 53rd Street

 5          Suite 4900

 6          New York, NY 10022

 7

 8    BY:   BRIAN D. HAIL, ESQ.

 9          LENARD M. PARKINS, ESQ.

10

11    MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

12          Attorneys for Steelworkers Union

13          1350 Broadway

14          Suite 501

15          New York, New York 10018

16

17    BY:   LOWELL PETERSON, ESQ.

18

19    PREVIANAT, GOLDBERG, UELMEN, GRATZ, MILLER & BRUEGGEMAN, S.C.

20          Attorneys for IBEW and IAM

21          1555 North River Center Drive

22          Suite 202

23          Milwaukee, Wisconsin 53212

24

25    BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.
```

6

1

2  COHEN, WEISS AND SIMON, LLP

3        Attorneys for UAW

4        330 West 42nd Street

5        New York, New York 10036

6

7  BY:   BRUCE H. SIMON, ESQ.

8        BRUCE LEVINE, ESQ.

9

10  GORLICK, KRAVITZ & LISTHAUS, P.C.

11        Attorneys for Operating Engineers

12        Locals 18-S, 101-S, 832-S

13        17 State Street, 4th Floor

14        New York, New York 10004

15

16  BY:   BARBARA S. MEHLSACK, ESQ.

17

18  OFFICE OF THE UNITED STATES TRUSTEE

19        33 Whitehall Street

20        21st Floor

21        New York, New York 10004

22

23  BY:   ALICIA M. LEONHARD, ESQ.

24

25

7

1      P R O C E E D I N G S

2          THE COURT:  Please be seated.  All right.  We're back

3      on the record in Delphi Corporation.

4          MR. BUTLER:  Your Honor, good afternoon.  Jack Butler

5      on behalf of the debtors.  The next witness we would offer

6      through the declaration.  It's been admitted into evidence at

7      Exhibit number 63.  That's the declaration of David L. Resnick,

8      and it's been admitted subject to cross-examination.

9          THE COURT:  Okay.  All right.

10         (Witness duly sworn)

11         THE COURT:  And again, just for the record, would you

12     spell your name?

13         THE WITNESS:  David, the last name's Resnick, R-E-S-

14     N-I-C-K.

15     CROSS-EXAMINATION BY

16     MS. STEINGART:

17     Q.   Good afternoon, Mr. Resnick.  You've been acting on behalf

18     of the debtors as a representative in connection with the

19     negotiation of the agreements before the Court, correct?

20     A.   As their investment banker in the negotiations, yes.

21     Q.   And you had been involved in the negotiations from day to

22     day in connection with the framework agreement?

23     A.   For the most part.

24     Q.   And -- now, the reason companies pay a commitment fee is

25     because, as you testified during your deposition, a lender or

8

1   investor is committing significant amounts of capital for a

2   period of time at risk before they actually close the

3   transaction.  Wouldn't you say that?

4   A.   Yes.

5   Q.   But an investor isn't really at risk if he can just decide

6   to walk away for any reason or no reason.  Isn't that right?

7   A.   It depends what the conditions are to the agreement under

8   which an investor decides to invest.

9   Q.   Right.  But I'm asking you about the risk, not about the

10   agreement.  An investor who can walk away for any reason or no

11   reason is not exposing themselves to risk, correct?

12   A.   Theoretically, an investor that can walk away for any

13   reason has no risk, correct.

14   Q.   And it's not only theoretical, that's true in the real

15   world, too.  If you can walk away you have no risk.

16   A.   If there was such an agreement where someone was paid a

17   commitment fee and had absolutely no risk, that would be

18   correct.

19   Q.   Someone who has no risk -- well, okay.  Well, let's see if

20   somebody entered into such an agreement.  Shall we?

21   A.   I -- I couldn't hear you.  I'm sorry.

22   Q.   I said, let's see if somebody did enter into such an

23   agreement.  Now, as you understand the planned framework

24   agreement before they were amended yesterday, isn't it fair to

25   say that because of the ability to walk away for any reason or

9

1   no reason after April 1st, the plan investors had no capital at

2   risk?

3   A.   There were part of the amendment provisions in the

4   agreements that could be read to give the plan investors the

5   ability to walk away, yes.

6   Q.   More than could be read.  That's what they said.

7   A.   That's what they said.

8   Q.   Okay.  And it wasn't inadvertent that that happened, was

9   it?

10  A.   I was not involved in the negotiations of those

11  provisions, so I could not say.

12  Q.   Well, let's look at after.

13          THE COURT:  I don't think Mr. Resnick has a copy of

14  either of these documents.

15          MS. STEINGART:  Okay.  I thought --

16          THE WITNESS:  I can't see it from here.

17          THE COURT:  Okay.

18          MS. STEINGART:  So you have the before and the after?

19          THE WITNESS:  I have the after.

20  Q.   Okay.  Well, we're up to after.  The after is after the

21  amendments.  So after the amendments we still have a walk-away

22  right for any reason or another, correct?

23  A.   Up to April 1st, I believe.

24  Q.   After April 1st.  And that right continues until the Court

25  approves a disclosure statement, right?

10

1    A.    Right.

2    Q.    Okay.  Now, if it was inadvertent in the first -- at the

3    first time, why is it still here?

4    A.    Because you have to look at the totality of the framework

5    agreement rather than focus in on a particular provision, and I

6    think this was a very complex agreement, financial legal

7    conditions and other issues, and upon negotiating a host of

8    issues, including these, we ended up with the agreement that

9    we're presenting to the Court today.

10   Q.    I understand that you ended up with this agreement and I

11   understand the totality mantra but it's here because people

12   want it to be here.  It's not here because people don't know

13   it's here, right?

14        MR. BUTLER:  Objection, foundation.  No one's

15   testified they wanted these provisions.

16        THE COURT:  Well, if your point is that it's not

17   inadvertent --

18        MS. STEINGART:  Yes.

19        THE COURT:  -- I think you can move on.

20        MS. STEINGART:  Okay.  Let's move on then.

21        THE COURT:  It's been amended and it's clearly --

22        MS. STEINGART:  Right.  Exactly.  Thank you, Your

23   Honor.

24        THE COURT:  People have focused on it.

25        MS. STEINGART:  Thank you, Your Honor.

11

1    Q.   At the time that discussions were proceeding on these

2    agreements, you got in touch with David Tepper, didn't you?

3    A.   I was in touch with Mr. Tepper on a regular basis.

4    Q.   Okay.  Why don't we look at the joint trial Exhibit number

5    92?

6    A.   I take it that's in front of me?  Thank you.  Okay.

7    Q.   Okay.  Now, do you recognize this to be an e-mail that you

8    sent to David Tepper on December 4th?

9    A.   Yes, I do.

10   Q.   And did you write to Mr. Tepper that for the Court to

11   approve these there would have to be some deal among the

12   parties?

13   A.   I wrote to Mr. Tepper what's in this e-mail.

14   Q.   Okay.  And did you --

15   A.   And those words that you read are among the words that are

16   in this e-mail, yes.

17   Q.   Okay.  And even at that time, there was certain hesitancy

18   by GM to sign an agreement, wasn't there?

19   A.   I don't know if I'd use the word "hesitancy."  There were

20   discussions with GM around the type of plan support agreement

21   GM would sign, whether it would sign an agreement and we were

22   discussing the issues surrounding, in general, a plan support

23   agreement.

24        MS. STEINGART:  Sorry.  The print here is so small.

25   I'm having difficulty seeing it, Your Honor.  Oh, okay, sorry.

12

1   It's highly confidential.  I'll stop reading from it.

2   Q.   As a result of that reluctance, the plan support agreement

3   contained fairly broad termination provisions, correct?

4   A.   It was a more general agreement than the debtor wished.

5   Q.   I'm sorry.  I didn't hear your last word.

6   A.   I said it was a more general agreement than the debtor

7   wished.  It was broader in form rather than specific in detail.

8   Q.   Well, how many agreements broader than the debtor

9   wished -- how many agreements are you involved in where there's

10   a walk-away for any reason or no reason at all?

11   A.   Again, I think you have to look at the context in which

12   the agreement was negotiated and the specific strategic purpose

13   that at least my client saw this agreement serving.

14   Q.   All right.  And at this point, one of the functions of the

15   agreements before the Court is to get fees for the plan

16   investors, right?

17   A.   Well, part of this motion is to approve fees along with

18   the finance agreement.

19   Q.   And there are a number of different kinds of fees that

20   we'll be looking at, correct?

21   A.   Correct.

22   Q.   Okay.  Now, did you communicate with the board about the

23   changes being made in the agreement that were filed yesterday?

24   A.   I did not, no.

25   Q.   Okay.  Were you involved in any conversations with the

13

1  board concerning those agreements?

2  A.   I participated in the board meeting when the changes in

3  the agreements were discussed but I did not handle that portion

4  of the meeting.

5  Q.   And did you have meetings and conversations with

6  management who negotiated those changes at or about the changes

7  that were negotiated?

8  A.   The most recent changes I was -- I was not involved in the

9  negotiation.

10  Q.   Were you involved in any conversations when the agreements

11  were changed about the fact that the agreement still provided

12  an opportunity for the plan investors to have a breakup fee

13  while they maintained a right to walk away for any reason or no

14  reason?

15  A.   I was aware of the terms of the reimbursement for fees,

16  expenses, including the breakup fee, at the time the board

17  reviewed the agreement yesterday.

18  Q.   Okay.  And in negotiating the agreements, was changing

19  provision so that an alternative transaction fee would not be

20  available during the period that investors could walk away for

21  any reason or no reason a topic?

22  A.   The board had a very extensive discussion on the terms of

23  the fees, not only the amount and how they compare to market,

24  but also the terms and conditions under which the fees would be

25  received and, again, I think the board understood some of the

14

1    issues you're describing but looking at the agreement as a

2    whole felt that the agreement was a reasonable one.

3    Q.   Did anyone explain to the board that it was unusual for

4    investors to have an opportunity to earn an alternate

5    transaction fee during a period that they could walk away for

6    any reason or no reason?

7    A.   Again, I think the board understood the terms under which

8    the fees would be received or not received and assessed those

9    terms in the context of the overall agreement and their

10   extensive experience of understanding how this very complex

11   transaction had been negotiated over months.  I think the board

12   had a very detailed sense of the back and forth among not just

13   the investors that are parties to the framework agreement but

14   the other parties, and that there are a whole host of terms

15   that have to be negotiated to reach the point we are now.  We

16   got what we wanted with some, less with others.  That's the

17   challenge of putting an extraordinarily complex reorganization

18   in place.

19   Q.   And did you advise the board that in your experience as an

20   investment banker that the availability of such fees during

21   such a period was highly unusual?

22   A.   My presentation to the board focused on -- specifically on

23   the amount of the fees and how they related to the market but

24   in general, I commented that the terms of the fees and expenses

25   and reimbursement, again, looking at all the factors, including

15

1    the points that you mentioned, were reasonable in this case.

2    Q.    So when you say "in general", you didn't have a specific

3    conversation with the board about this aspect of the fees that

4    they could be payable during the period when the investors

5    could walk away for any reason or no reason?

6    A.    Well, as I said, I did not have that discussion.  Skadden

7    had that discussion.  I participated.  I spoke to the financial

8    aspects of the fees.  Skadden spoke to the legal terms and

9    conditions of the fees.  And then at the end I gave my view.

10   Q.    But you didn't tell them that in your experience that this

11   was unusual?

12   A.    I think I just answered that question.

13   Q.    Okay.  When the board talked about fees in general, you

14   helped them understand whether the fees were reasonable,

15   correct?

16   A.    Whether they were market.

17   Q.    And you prepared materials for the board on that basis,

18   correct?

19   A.    There -- we, Rothschild, prepared materials and then I

20   spoke to the board and spoke off of, among other things, the

21   exhibit you have in -- in front of me now.

22   Q.    Right.  And that's Exhibit number 20 that's in the book in

23   front of you and it's page 1809.

24   A.    Thanks.

25        MR. BUTLER:  I'm sorry.  What's the page number

16

1  again?

2          MS. STEINGART:  I think it's 1809.

3          MR. BUTLER:  No.  There's no page number --

4          MS. STEINGART:  I'm sorry?  Oh, that's a different --

5  oh, 1769, I'm sorry.  1769.

6          MR. BUTLER:  Nope.

7          MS. STEINGART:  Isn't there a 1769?

8          MR. BUTLER:  There is but it's not joint.  Just tell

9  me what that says and then we'll find it.

10          MS. STEINGART:  It's 1809.  It is.  It says 1809.  Am

11  I in 21 instead of 20?

12          MR. BUTLER:  Yes.

13          THE WITNESS:  So, it's 21 --

14          MS. STEINGART:  Yeah, 1809.

15          THE WITNESS:  Okay.

16  Q.   Okay.  And just to help move this along, you explained

17  during your deposition that you gave the views on November 14th

18  to the board that the fee structure or the fees being

19  proposed -- the amount of the fees being proposed were

20  reasonable, correct?

21  A.   Were market, yes.

22  Q.   Were market, I'm sorry.  And you said that in terms of

23  total amount but not in terms of other terms and conditions

24  that were pertinent to the fees, right?

25  A.   Correct, but I was speaking about and asked to speak about

17

1    was the amount of the fees.

2    Q.    And thereafter, you didn't make another presentation with

3    respect to fees to the board, correct?

4    A.    I think that we provided an update to the board.  I

5    believe there was a call on the 18th because the fees had

6    changed slightly.  That's when we were able to, I think, reach

7    the agreement on the one and three-quarters -- we were going

8    back and forth on that so whenever there was a change usually

9    we touched on that.

10   Q.    And at the time the Board met on December 11th to

11   authorize filing of the agreements for approval with this

12   Court, there was no further review or discussion of the fees,

13   correct?

14   A.    'Cause the amount of the fees hadn't changed.

15   Q.    Okay.  Now, during this period of time, you also provided

16   the board with some information about discounts that the plan

17   investors were receiving, correct, with respect to preferred

18   stock and common stock?

19   A.    Well, that information consistently was in the

20   presentations we made at the same time we had these side by

21   side charts.

22   Q.    Right.  So if we went to Exhibit 20 and to page 1769, we

23   would see another presentation that you made about value in

24   connection with the proposed agreements.

25   A.    Correct.

18

1    Q.   And this page 769 (sic) showed the value being provided to

2    plan investors through their participation in the rights

3    offering, correct?  Or as a backstop, right?

4    A.   No, not necessarily.  I -- and I went through this

5    extensively at my deposition.  I would not describe this as

6    value because it's speculative as to where the stock will

7    trade.  This was a conservative assessment using the difference

8    between the rights offering price and the price we were using

9    for the plan of what that implied or is the number of that

10   implied discount.  And it's very different to describe that as

11   a number and to say that that value they will be receiving.  I

12   don't know they will be receiving that.  I know if the Court

13   approves these fees and conditions apply they will get ten

14   million dollars at a certain period of time.  I can't tell you

15   they will get sixty-three million dollars.  And that's the

16   difference that your partner and I had in communicating this

17   issue during my deposition.

18   Q.   Well, isn't that the assumption that everyone is making?

19   A.   Pardon?

20   Q.   Isn't that the assumption that underlies the negotiation

21   of this transaction?

22   A.   I think that's the assumption of some people, but I don't

23   think that's the assumption of every person.

24   Q.   Well, do you think that the forty-five dollar plan value

25   is unreasonable?

19

1    A.    We have not done a formal evaluation of the plan because

2    the plan reorganization doesn't exist yet.

3    Q.    So when the disclosure statement is filed, the plan value

4    may be an altogether different number, won't it?

5    A.    It could be --

6    Q.    It could be.

7    A.    -- and the market when a disclosure statement is out will

8    have a much better assessment in terms of applying -- implying

9    a value for the plan than it does today when it has incomplete

10   and imperfect information in front of it.

11   Q.    And the people who will also have a much better idea of

12   value when the disclosure statement comes out are the plan

13   investors as well, correct?

14   A.    I think they have the fairly good assessment value now

15   because they've done a very extensive amount of diligence over

16   a fairly significant period of time.

17   Q.    But the value of the company will also be impacted by

18   agreements with labor and GM, won't it?

19   A.    Yes.

20   Q.    And those agreements will be known by the time the

21   disclosure statement is filed, correct?

22   A.    Correct.

23   Q.    And when the disclosure statement is filed and those

24   agreements are known, if the plan investors don't like value

25   anymore, they can terminate, can't they?

20

1   A.   I have to look at what the period of time is and what the

2   terms are under the agreement.

3   Q.   Well, do you think that the disclosure statement is going

4   to be approved before April 1st?

5   A.   Don't know.  Depends how quickly the GM and labor

6   provisions can be negotiated.

7   Q.   Have you seen Mr. Butler's most aggressive timelines?

8   A.   I've seen a lot of timelines from Mr. Butler.

9   Q.   And have you seen any --

10          MR. BUTLER:  Excuse me.  Will you let him finish his

11   answer?

12          MS. STEINGART:  Oh, I'm sorry.

13   A.   I've seen a lot of timelines from Mr. Butler.

14   Q.   And have you seen any in the past week that would have the

15   disclosure statement approved before April 1st?

16   A.   I don't recall.

17   Q.   But you don't think so, do you?

18   A.   I don't believe so but I haven't --

19   Q.   Okay.  So --

20   A.   -- been focused on timelines over the past several weeks.

21   Q.   Fine.  So you say that when the disclosure statement is

22   filed that everyone's going to have a better look at the

23   economics and when it's filed the plan investors get to walk

24   away if they're not getting those kinds of implied value in the

25   discounts, can't they?

21

1   A.   Again, I have to look at the terms that set forth their

2   ability to walk away.

3   Q.   That's right.  And this terrible uncertainty you have

4   about communicating how much the investors are willing to give

5   prevented you from providing the board with an assessment that

6   included those numbers, didn't it, in one document?

7   A.   I --

8           MR. BUTLER:  Objection.  That's argumentative.  It's

9   testified -- I don't know what the question is.  This terrible

10  uncertainty prevented you from doing something?

11  Q.   Did you ever --

12          MR. BUTLER:  He didn't testify to terrible

13  uncertainty.

14          MS. STEINGART:  All right.  I will --

15          THE COURT:  Did you understand the question?

16          MS. STEINGART:  I'll rephrase.  I'll rephrase.

17  Q.   Did you ever provide in one document to the board of

18  directors, information showing what the values would be in

19  terms of the preferred commitment adding up both the commitment

20  fee and the applied value of the discounts?

21  A.   We provided that information the way that we thought was

22  appropriate.  And as I've explained, the way we thought was

23  appropriate is to set forth fees that can actually be

24  determined and would be paid as we did on page 1809 with

25  respect to the commitment fees and the alternative transaction

22

1  fee.  And we indicated the additional amount with respect to a

2  discount should that discount exist in a separate place where

3  we have consistently analyzed it before because we did not view

4  that portion of the fee the same way we viewed the other fees.

5  And in my judgment as an investment banker, it was not

6  appropriate to present it that way --

7  Q.   Okay, but --

8  A.   -- because one was --

9  Q.   Yeah?

10  A.   One is specific and the others are less certain.

11  Q.   So the answer to my question is that you never presented

12  to the board in one document the number that showed the

13  commitment fee and the implied value of the discount, correct?

14  A.   Because it would have been misleading to do so.

15  Q.   Did you do it in one document?

16       THE COURT:  He's already answered it.  He didn't.

17  A.   No.  Because in my professional judgment it wouldn't have

18  been appropriate to do it that way.

19  Q.   And did you ever show the board what this number was in

20  print that was bigger than a sixteenth of an inch?

21       THE COURT:  Ms. Steingart, come on.

22       MS. STEINGART:  I want to know what professional --

23  I'm trying to understand what professional judgment pertains to

24  showing a Board a 343 million dollar number that they're giving

25  away from stakeholders in print that's this big.  So I think I

23

1    need to get behind that professional judgment.

2                 THE COURT:  Ms. Steingart, you read a number of

3    prospectuses, right?

4                 MS. STEINGART:  I'm sorry?

5                 THE COURT:  8Ks, 10Qs?  Maybe that's why you couldn't

6    read the e-mail earlier?

7                 MS. STEINGART:  Well, you know, that's my problem.

8    And you know what?  And you know what?  Though I don't want to

9    cast criticisms on the board, my guess is they're older than

10   me.  They're not by a lot, and that if I can't see it, they

11   can't see it.

12                MR. BUTLER:  Ms. Steingart, would it help you if we

13   told you that it was projected up on a big screen?

14                THE WITNESS:  I was just going to say that.

15                MR. BUTLER:  And that actually it was about four

16   inches high.

17                MS. STEINGART:  You know what?  This is going to have

18   to be projected on the Empire State Building in order to --

19                THE COURT:  All right.  Let's move on.

20                MS. STEINGART:  Okay.  Moving on.

21   Q.   Okay.  So you never provided them the document that looked

22   like this?  And you never provided them one that looked like

23   that either, did you?

24   A.   I can't see that.  Just pulling your leg a little.

25   Q.   You get points for that, Mr. Resnick, you get points.

24

1   A.   No.  We never provided them with the document that looks

2   like this.

3   Q.   Okay.  Now, you said that your advice that the numbers

4   were market -- on this exhibit we're premised on different

5   things, right?

6   A.   Yes.

7   Q.   Okay.  One of the things that you said that it was

8   premised on was the competing proposal by the UCC and EC,

9   correct?

10          THE COURT:  I'm sorry.  I can't see -- what is this,

11   Exhibit 21?

12          MS. STEINGART:  Yeah.  That's 21, it's 1809.

13          THE COURT:  Okay.  All right.

14   Q.   And the other things that you said it was premised on were

15   two data runs that your firm had produced to you, correct?

16   A.   Correct.

17   Q.   Okay.  And if you look at Exhibit number 67 -- and I'm

18   looking -- what number is this?

19   A.   It's 66.

20   Q.   66 --

21          THE COURT:  I'm sorry.  What exhibit is it then?

22          MS. STEINGART:  66, Your Honor, and 67.

23          THE COURT:  Exhibit 66?

24   Q.   These were the two backups that you were looking at when

25   you formulated your view that the amount of the fees were

25

1    market, correct?

2    A.    Exhibit 67 and Exhibit 66 and the document that was

3    provided to the company by the equity committee and the

4    unsecured creditors' committee with their counterproposal that

5    included fees.

6    Q.    Right.  This here.

7    A.    Well, that's the summary of it but --

8    Q.    But that proposal's is right, correct?

9    A.    Pardon?

10   Q.    Yes.  Right?  And that proposal lists three things?

11   A.    Yes.

12   Q.    Okay.  Now, if we look at the -- at Exhibit 66, the POR

13   means Plan of Reorganization rights offerings, correct?

14   A.    Yes.

15   Q.    And is it fair to say that the two that are most close in

16   size to the offering we have before us today are Owens Corning

17   and USG?

18   A.    Most close in total size.  They're the largest, too.

19   Q.    Right.  And in either of those two, did the investor

20   receive shares at a discount in addition to the commitment fee

21   that's listed here?

22   A.    Not in those two.

23   Q.    Any of these?

24   A.    Yes.  In Intermet.

25   Q.    In?

26

1   A.    Intermet.  The third from the bottom.

2   Q.    Did you explain to the board when you were telling them

3   that this arrangement was market that you had backup that

4   showed of fifteen companies listed only one other investor had

5   received rights at a discount in addition to a commitment fee?

6   A.    The purpose of this exhibit was to speak to the board

7   actually on the numbers -- well, again, we did not use this

8   exhibit with the board.  This was an exhibit that was shared

9   with the management team but it was the basis for giving the

10  management team comfort that the fees we were negotiating which

11  it could see on the 2046 in the fee column were reasonable --

12  were market.  I'm sorry.  Were market.

13  Q.    Right.  So, again, Mr. Resnick, I need you to answer my

14  question.  Mr. Butler will be able to ask you questions when

15  I'm done and this will go quicker if you answer my questions.

16  Okay?  So you never told the board that in the backup list that

17  you had that gave you comfort that the fees were market that

18  only one of the approximately fifteen were getting discount

19  shares in addition to a commitment fee, right?

20  A.    I knew that there were a small number of rights offerings

21  in the market, one on this page but there are others where plan

22  investors received shares as part of their fee.  That's my

23  experience in my twenty-two years as a banker.

24          THE COURT:  Your Honor, I would ask for direction to

25  the witness to answer my questions.  Or otherwise we're going

27

1    to be --

2              THE COURT:  Which one?  The last one?

3              MS. STEINGART:  The last one would be nice.

4              THE COURT:  Okay.  Why don't you repeat it again?

5    Q.   Okay.  Did you tell the board when you were advising that

6    this fee was market for the rights offering that in the list

7    that you used of the fifteen or so transactions listed only one

8    investor received discounted shares in addition to a commitment

9    fee?  Did you tell them that?

10   A.   I did not tell them that specific statement, no.

11   Q.   Okay.  Now, there was also information that you received

12   from Rothschild so that you could -- that was called a

13   comparable convertible preferred analysis.  Do you remember

14   that document?

15   A.   Yes.

16   Q.   Okay.  And if we look at it at Exhibit 94, can you tell me

17   if that's that analysis?

18   A.   Yes.  That's the analysis.

19   Q.   Okay.  Now, I have your deposition -- you testified that

20   you didn't know of any other offering of preferred shares -- of

21   convertible preferred in a public company that were offered at

22   a discount, correct?

23   A.   Correct.

24   Q.   And indeed, this chart that is Exhibit 94 attached to the

25   e-mail confirms that, right?

28

1    A.    But that was not the purpose of this chart.

2    Q.    I'm sorry.  You still need to answer my question.  Mr.

3    Butler can ask you what the purpose of the chart was.  Okay?

4              MR. BUTLER:  Could you repeat the question?

5    Q.    That opinion that you gave that there was no other

6    convertible preferred that had been issued in connection with a

7    public company that was sold at a discount, that hadn't been

8    done for, correct?  That's what you testified, right?

9    A.    Yes.  But that's not the reason this exhibit --

10   Q.    Is that confirmed --

11   A.    -- was prepared.  To confirm that point.

12   Q.    I understand that but isn't that confirmed by the data in

13   this chart?  I'm just saying that you're right, Mr. Resnick.

14   A.    Yes.

15   Q.    Okay.  Now, this is not a chart that you provided to the

16   board, was it?

17   A.    No.

18   Q.    And you didn't even tell the board that you had never

19   known of a convertible preferred being issued in connection

20   with a public company that were offered at a discount.  You

21   didn't tell them that?

22   A.    We told the board -- I told the board, when we were

23   describing the terms of the AHC proposal, that the way the

24   convertible preferred was structured at a discount plan

25   valuation was unusual because the reason was AHC was a hybrid

29

 1    deal.  It was taking the Cerberus proposal that the company had

 2    received and combining with the Appaloosa proposal.  The

 3    Appaloosa proposal was a rights offering only driven

 4    restructuring plan.  The Cerberus plan was one that had a

 5    convertible preferred where the company would be private.  Or

 6    if not, the convertible preferred would control the company.

 7    So what happened when the two were combined was to have

 8    elements of each in the discount feature to the convertible

 9    preferred was to make analytically the proposal similar to the

10    Appaloosa deal by having a buy-in value to be converted at a

11    value different than the face amount.

12    Q.    I see.  So it was because you wanted the rights offering

13    to look like a convertible preferred that you're giving the

14    plan investors 343 million dollars in value.  Is that why?

15    A.    No.  It's absolutely not why.

16    Q.    Why?  Because its advantage you -- a deal point is that

17    they can want a discount on the convertible preferred, correct?

18    A.    No.  The reason was because there was a difference in view

19    on value between the unsecured creditors and General Motors and

20    the plan investors.  The plan investors having done substantial

21    due diligence, GM and the unsecured creditors having done

22    substantial due diligence and we were trying to bring the

23    parties together as is typical in every restructuring around

24    the consensual deal.  In valuation of views on a value is an

25    art and not a science and securities like rights offerings,

30

1    like warrants, like convertible preferred securities, are used

2    to bridge different views of value.  And that's what was

3    happening in this case.

4    Q.    Okay.  Again, let's try to answer my question.  Okay?  So

5    the plan investors said we want this at thirty-five even though

6    the plan value is forty-five, right?

7    A.    Absolutely not.

8    Q.    And did you say --

9    A.    That's incorrect.

10   Q.    Well, they didn't say that -- well, that's what Mr.

11   Sheehan said.  Are you saying that Mr. Sheehan was wrong?

12   A.    No.

13   Q.    Okay.  Well, that's what he testified to in this courtroom

14   just an hour ago.  He said the plan investors said I want this

15   for thirty-five even though plan value is forty-five.  And he

16   said yes.

17   A.    I think what Mr. Sheehan was reflecting was a difference

18   in view.  If you understand how this transaction came together,

19   there was a value used for the GM/unsecured creditors' deal

20   which came out at the roughly forty-five dollars a share.  The

21   parties that were putting in new money, Appaloosa and

22   Cerberus -- it's very different to have a value when you're not

23   putting your own money on the line.  People who do that usually

24   have a much sharper view of value because they're putting in

25   their -- their own money.  This was several billion dollars.

31

1    Q.    Have they put in their own money?

2    A.    They're committing to put their own money, yes.

3    Q.    And when will that happen?

4    A.    When the conditions are satisfied.  But when we were

5    structuring a deal, there was new money coming into the

6    transaction.  They had done their diligence and their view on

7    value was at the thirty-five dollar value versus where GM and

8    the unsecured creditors committee was.  And the way we bridged

9    that gap was by having certain parties receive their equity,

10   like the unsecured creditors, and the trust preferred and

11   General Motors at a higher value but the new money that was

12   coming in was doing -- was coming in at a lower number.  And

13   that's how we were able to bring a consensual deal together.

14   Q.    Okay.  So you didn't provide the board with Exhibit 94,

15   correct?

16   A.    No.

17   Q.    And you didn't tell the board that the transactions you

18   looked at to decide if things were market and in your own

19   knowledge -- in your own knowledge of convertible preferreds

20   that discounts didn't occur with public companies, right?

21   A.    The purpose of this exhibit was --

22   Q.    Sir, can you answer my question?

23   A.    -- to negotiate two other features of the preferred.

24   Q.    Mr. Resnick, Mr. Resnick, will you excuse me?  You can

25   answer my question, can't you?

32

1    A.    You can -- you can --

2    Q.    I know you were a lawyer before you became an investment

3    banker but you can give a yes or no answer, can't you?

4    A.    Sometimes.

5    Q.    Okay.  Well, let's see if you can do it today because

6    otherwise we're not going to be done.  Okay?  So at the end of

7    the day, we have a situation where the investors get what is an

8    implied discount from plan value, correct?

9    A.    From a theoretical plan value, correct.

10   Q.    And at the time that they get committed, they get to see

11   that plan value in a much less theoretical way, don't they?

12   Yes or no?

13   A.    Yes.

14   Q.    Okay.  And they have the ability to walk away if they

15   don't like the way that theoretical value looks, correct?

16          THE COURT:  We went over this --

17          MS. STEINGART:  Okay.

18   Q.    Now, Mr. Resnick, can you tell me, does the company -- if

19   after April 1st and this filing the disclosure statement, if

20   the stock is trading implied value seventy dollars, can the

21   company say to the plan investors, oh, you're getting too

22   much -- and walk away without any obligation?

23   A.    I'm sorry.  After April 1st --

24   Q.    After April 1st and after the disclosure statement is

25   filed and before approval, if they say, oh, my goodness, the

33

1    applied value is seven dollars a share.  These guys are getting

2    thirty-five dollars a share.  I have to multiply this really,

3    really big number by thirty-five.  Can the company walk away?

4    A.    As I said, I'm not familiar with the most recent changes

5    that were negotiated in the past --

6    Q.    Okay.  Fair enough.

7    A.    -- day.

8    Q.    Let's talk about how the company was shot, if I could find

9    my outline here.  There was never a time that Rothschild was

10   instructed to go out and make contacts so that Rothschild could

11   determine the universe of financially capable investors who

12   would be interested in this company, correct?

13   A.    What time period are you referring to?

14   Q.    Any time period.  From the time that Rothschild was

15   retained, which was pre-bankruptcy, to today, Rothschild was

16   never instructed to go out on behalf of the company and contact

17   financial capable buyers, identified by Rothschild, who might

18   be interested in providing capital, correct?

19   A.    No.

20   Q.    You did or you didn't?

21   A.    That's not correct.

22   Q.    Okay.  Then when you said at your deposition that what you

23   did was to -- because everyone knew that the company was in

24   bankruptcy and about to file for bankruptcy; that you just

25   waited for people to come and see you and that you didn't go

34

1   out and solicit interest?  That was incorrect?

2           MR. BUTLER:  I'm sorry.  When you -- if you're going

3   to refer to the deposition, will you please give us the cite?

4           MS. STEINGART:  Let me find my notes.

5   Q.   Do you recall that kind of testimony?

6           MR. BUTLER:  I'm sorry.  Could you --

7           MS. STEINGART:  Yes, I will.  Let's start in the

8   period August 2006.  And that would be --

9   Q.   Mr. Resnick, if I could direct you to page 26.

10          THE COURT:  Do you have a copy of your deposition?

11          THE WITNESS:  I'm sorry.

12          MR. BUTLER:  This would be Exhibit 77, page 26.

13  Q.   26, line 2.

14  A.   Well, I think that I said prior to that time period and

15  the reason I was disagreeing with your question was that the

16  time the company originally retained Rothschild, it had a

17  con -- it had received contacts from Cerberus and, I believe,

18  Ripplewood.  And one of the first items we discussed with the

19  company was how we should engage with those parties, if we

20  should, and should we contact other parties.  And we decided

21  that we would contact other parties and that's why I disagreed

22  with your question, because we did.

23  Q.   And how many other parties did you contact?

24  A.   My recollection was we talked about a number of other

25  private equity firms and ultimately the company authorized us

35

1   to contact, I believe, two or three other firms in addition to

2   Cerberus and Ripplewood.

3   Q.    So in addition to Cerberus and Ripplewood, you made

4   contact with two or three others on behalf of the company?

5   A.    Correct.

6   Q.    And after the August time frame, did Rothschild make

7   contact -- initiate contact with any other investor that was

8   determined to be financially responsible in order to ascertain

9   interest?

10  A.    August of what year?

11  Q.    After August of 2006.

12  A.    August 2006?  No.

13  Q.    So, before 2006, there was Cerberus and Ripplewood and

14  maybe two or three others, correct?

15  A.    Correct.

16  Q.    And those were all contacts you initiated?  These weren't

17  contacts of funds that had come to the company who the company

18  referred to you?

19  A.    No.  I'm talking about the period when we were retained,

20  which was May of '05, and we had learned the company had

21  received contacts from Cerberus and Ripplewood and we discussed

22  with management whether we should engage with them or not.  We

23  decided we should and that we should reach out to several other

24  parties but given the complexity of the situation facing Delphi

25  decided to limit to a small group of sophisticated investors

36

1    that knew the automotive industry, that had some familiarity

2    with restructuring transactions and were of the size and had

3    the financial capability, like Cerberus and Ripplewood, to

4    invest in the size that would be required to help Delphi.  And

5    that was some of our work pre-petition.

6    Q.   Okay.  So, pre-petition, Cerberus, Ripplewood, two or

7    three others, right?

8    A.   Correct.

9    Q.   Okay.  Then we get to filing the bankruptcy, right?

10   A.   Yes.

11   Q.   And the bankruptcy was filed in October 2005?

12   A.   Correct.

13   Q.   Okay.  And after the bankruptcy was filed, Rothschild was

14   never asked to contact -- to go out and make contact with

15   financially capable investors.  Yes or no?

16   A.   No.

17   Q.   And when the board began -- I'm sorry.  When the company

18   began to undertake framework discussions in the summer of, I

19   guess, 2006, discussions were had with Cerberus, right?

20   A.   Yes.

21   Q.   With Ripplewood?

22   A.   Yes.

23   Q.   And Appaloosa, who had approached -- and that's a benign

24   way of saying it -- the company.

25   A.   Yes, along with GM and the UCC who had also formulated

37

1   their own restructuring proposal.

2   Q.   And as those discussions developed, eventually we got to

3   the point where the company determined to pursue the

4   transactions proposed by what has now become AHC, right?

5   A.   Yes.

6   Q.   And thereafter, we get from the summer to the fall and the

7   framework agreements are negotiated among the debtors and, I

8   guess, GM and the investors, correct?

9   A.   Yes.

10   Q.   Now, in the course of filing in the omnibus reply that was

11   filed in court today or yesterday, there was a statement that

12   breakup fees are important tools to encourage bidding and can

13   be necessary because the directors have a duty to encourage

14   bidding.  And that's at paragraph 27 of the reply.  Are you

15   familiar with that concept?

16   A.   The concept, yes.

17   Q.   Okay.  And you're familiar with factors that potential

18   bidders consider when determining whether to come into a

19   situation like this to try to become involved, correct?

20   A.   Yes.

21   Q.   And one thing they would consider would be the size and

22   the structure of the breakup fee, right?

23   A.   Yes.

24   Q.   They would consider bidding procedures, correct?

25   A.   Yes.

38

1    Q.    They would consider what the requirements are for a

2    qualified bid?

3    A.    Yes.

4    Q.    They would consider the attitude of the company in dealing

5    with potential bidders, correct?

6    A.    Yes.

7    Q.    Does the EPCA, to your knowledge, establish any procedure

8    for third parties to become a qualified bidder?

9    A.    No.

10    Q.    Does it set up parameters that a bidder might satisfy to

11    engage in discussions?

12    A.    I think by laying out the terms of the AHC transaction it

13    does what you would like a stalking horse proposal to do.  It

14    sets forth the financial parameters.  I think that's why

15    Highland was able so quickly to turn around with the

16    counterproposal.

17    Q.    And at this point in time, is it your understanding that

18    the company is interested in receiving expressions of interest

19    so that it can determine whether in fact the proposal being

20    provided to this support is the highest best offer?

21    A.    I think that's the company's fiduciary obligation.

22    Q.    It is its fiduciary obligations.  And has the company

23    positioned itself to do that?

24    A.    I think so.

25    Q.    Now, has the company let potential bidders know in the

1    EPCA or some other public statement what the company considers

2    to be the timing constraints of potential bidders who might

3    emerge?

4    A.    I think some of the dates by which certain events have to

5    occur is an indication of what the timing is.

6    Q.    And has the company indicated generally that if bidders

7    come forward within a discrete period of time that the company

8    can entertain competing bids so that it can be sure it has the

9    highest best offer?

10    A.    Well, I think two things.  First, I think the company has

11    made clear it's -- it has run what it believes and I believe to

12    be a very effective process for several months leading up to

13    this proposal.  And second, I think the company has indicated

14    that for reasons specific and unique to this case, timing is

15    critical in terms of bringing a transaction to closure.  And I

16    think parties that had contacted the company prior to the

17    announcement of the AHC deal were told that explicitly and

18    parties subsequent to the filing have been told the timing

19    issues as well.  So --

20    Q.    So what's the access --

21    A.    -- I think the company has communicated.

22    Q.    So there are timing constraints that you --

23        MS. STEINGART:  Strike that.

24    Q.    One of the responses in a piece that you prepared with

25    respect to Highland proposal is that there are concerns because

40

1    timing issues must be dealt with in connection with anyone who

2    comes to the table at this point, isn't that fair?

3    A.    Yes.

4    Q.    Now, is there a point where those concerns make it

5    impossible for anyone else to come into this process and offer

6    a greater value to the estate?

7    A.    I wouldn't say impossible.  I would say make it more

8    difficult.

9    Q.    And when is that?

10   A.    I think as we get toward the end of the first quarter,

11   some of the deadlines in the agreement of -- reaching an

12   agreement with GM and the UAW, it becomes more difficult but I

13   think if someone sees tremendous value there is the ability to

14   come in and top the AHC deal.

15   Q.    So you're saying that between now and the end of the first

16   quarter.  And what date do you think of when you say the end of

17   the first quarter?

18   A.    The end of the first quarter is March 31st.

19   Q.    Okay.

20   A.    I mean, I picked out --

21   Q.    Okay.  So between now and March 31st --

22   A.    -- somewhat arbitrarily.

23   Q.    -- you think that there's a window of opportunity for

24   responsible investors to come in and have a real shot, an equal

25   shot, if they offer a better deal to be the plan's sponsor?

41

1    A.    I would say the window of opportunity exists up to the

2    approval of the disclosure statement.  But in trying to respond

3    to your question, I think the window begins to close the closer

4    you get to a disclosure statement hearing which, as you pointed

5    out, is to be sometime after April 1st.

6    Q.    Well, since the window is closing, shouldn't the debtors

7    have procedures in place so that to the extent that there are

8    responsible bidders out there, they can come in and take

9    advantage of this diminishing time frame where a relevant

10   proposal can be made?

11   A.    I think the debtor indicated that it would respond

12   promptly and thoroughly to any proposal that it receives and I

13   think that was demonstrated by how the debtor responded to the

14   Highland proposal.  I think that's the best evidence of the

15   debtors' serious commitment to its fiduciary obligations, to

16   maximize value.

17   Q.    But my question, Mr. -- my question was to the extent that

18   there's a closing window, doesn't it make sense to have

19   procedures in place so that there is some sort of quid pro quo

20   for awarding somebody who hasn't made a commitment a breakup

21   fee?

22   A.    I think there is a procedure which is to respond promptly

23   to any proposal, and we have a breakup fee so that we can take

24   advantage of what we have and if someone else has tremendous

25   value, a hundred million dollars for a transaction of this

42

1    size, if someone sees huge value, I think as I demonstrated in

2    one of the other exhibits, is market for a breakup fee.  We

3    also have to balance the risks to the estate of not moving

4    forward in trying to bring Delphi out of bankruptcy.  That's

5    the other issue that the board has to balance in looking at

6    proposals that come in at a very late date when parties have

7    had ample opportunities to make proposals.

8    Q.   Well, I'm talking about your window.  I'm not talking

9    about a very late date.  I'm talking about the window now that

10   you said that exists between now and the end of March.  You've

11   represented bidders on occasion, correct?  Like, you don't

12   always represent bidders, do you?

13   A.   I've represented bidders.

14   Q.   And isn't it more efficient and more effective for bidders

15   to know what's expected of them, what the rules are, what they

16   have to show, what the timing is, so that they can make the cut

17   and come in and be considered without having to create the

18   rules as they go along?

19   A.   I think any bidder looking at the proposal in the

20   framework agreement knows the bogey that a bidder has to beat,

21   from a financial perspective, and they know the challenges

22   facing them in coming into a transaction like Delphi.  This is

23   not a plain vanilla case where the only issue is value.  There

24   are issues relating to General Motors, to the company's unions,

25   to other stakeholders that have to be addressed.  This is not

43

1   just about money alone.

2   Q.   So are you saying there's no window?

3   A.   No.  I explained --

4   Q.   Okay.  So if there's a win --

5   A.   -- to you I thought there is a window.

6   Q.   Right.  So why can't you --

7   A.   And I think that the debtor --

8          MR. BUTLER:  Please let him answer the question.

9          MS. STEINGART:  Okay.

10  A.   -- that the debtor has laid out clearly the bogeys that

11  parties have to address in coming back with a counterproposal.

12  Q.   Well --

13  A.   I think it's clear in the debtors' response to the

14  Highland proposal.

15  Q.   In your professional opinion, wouldn't the debtors be

16  receiving more of these inquiries if they established a window

17  period and let investors know how they could come in in a

18  meaningful and non-disruptive way?

19  A.   Not necessarily for a case like this, no.

20  Q.   Now, is one of the problems with getting people in and

21  keeping people in the fact that GM has already said publicly

22  it's not talking to anyone else?

23  A.   I don't think so.

24          MS. STEINGART:  Your Honor, I have no further

25  questions.

44

1          THE COURT:  Okay.  Before -- just while we're on this

2    topic, does the company have a data room or data process so

3    that someone like Highland or anyone else wants to pursue due

4    diligence doesn't have to start from scratch?

5          THE WITNESS:  Yes, Your Honor.  Very extensive one

6    that it's used for all the other parties that have come through

7    and have done diligence.

8          THE COURT:  Do you have cross?

9          MR. HAIL:  Your Honor, my partner, Lenny Parkins.

10         THE COURT:  Oh, all right.

11   CROSS-EXAMINATION BY

12   MR. PARKINS:

13   Q.   Good afternoon, Mr. Resnick.  My name is Lenard Parkins.

14   I'm with Haynes & Boone.  I represent Highland Capital.  Mr.

15   Resnick, I just want to follow up on some of the questions

16   asked by counsel for the equity committee and I'll try to be

17   brief.  The Cerberus and Ripplewood due diligence first began

18   in 2005, is that correct?

19   A.   That's correct.

20   Q.   And I think that you testified, and I think it's correct,

21   isn't it, that they did substantial due diligence in 2005

22   before the filing of the Delphi bankruptcy case?

23   A.   I would say they did some extensive due diligence -- they

24   were at the company and they looked at a reasonable amount of

25   financial information so they could understand the company's

45

1    projections and the issues at base but they didn't do things

2    like legal due diligence or environmental, things like that.

3    Q.    All right.  Then turning to 2006, we had Appaloosa

4    Harbinger, I think, signed an NDA and started doing their due

5    diligence May, June, July time frame, is that correct?

6    A.    That's correct.

7    Q.    Of 2006.  And about that time, July, August of 2006, the

8    company sought to re-embrace Cerberus and Ripplewood, is that

9    correct?

10   A.    Yes.

11   Q.    And new NDAs were signed and they restarted their due

12   diligence, is that correct?

13   A.    Yes.

14   Q.    Did anybody just have thirty or sixty days of due

15   diligence time before either of any proposals were made?

16   A.    I'm just trying --

17            MR. PARKINS:  Let me withdraw the question.

18   Q.    I'll ask you another question.  How much due diligence

19   time did Cerberus have before it made its proposal?

20   A.    Cerberus -- we resigned their NDA, I believe, sometime in

21   August but that's based on my --

22   Q.    But they had a history already of some due diligence

23   prior?

24   A.    They had but that financial information that they had seen

25   was stale and -- while they understood the business, the

46

1   financial data on which they might base a proposal was very

2   different.

3   Q.    So Cerberus had -- let's call it a little head start but

4   August, September, October, November before they made their

5   proposal, is that correct?

6   A.    Yes.

7   Q.    At least three, three and a half months plus what they had

8   in '05.  Appaloosa had three months, correct, before they --

9   A.    Yes.

10  Q.    -- really started engaging in discussions.  And it's true,

11  isn't it, that when the company decided that it wanted to seek

12  to embrace outside equity investments, that one of the

13  threshold issues that had to be overcome, not only did it have

14  to be qualified, sophisticated, experienced in bankruptcy,

15  okay, but they had to be able to deliver, in the company's

16  judgment, proposals so that the company could execute and exit

17  bankruptcy by July, August of 2007, is that correct?

18  A.    Yes.

19  Q.    And, in fact, the other people you talked to in the fall

20  of 2006, okay, were unable to, in your judgment, to qualify

21  someone who either was qualified as experienced, knowledgeable,

22  sophisticated, but who could deliver, in your judgment -- your,

23  the company's judgment, closure by July, August of 2007, is

24  that correct?

25  A.    No, that's not correct.

47

1    Q.   Well, what other people signed NDAs other than Ripplewood,

2    Cerberus and Appaloosa and Harbinger?

3    A.   I think one of the other parties we were talking to was

4    someone who was familiar with the company because they had an

5    investment in the capital structure and were considering going

6    forward and signing an NDA, or potentially partnering, or not

7    moving forward.  Had that party come back to us and said they

8    wanted to move forward on their own, I think the company would

9    have been prepared to sign an NDA with them.

10   Q.   But they did not do so?

11   A.   They chose not to do so.

12   Q.   So in November, isn't it a fact -- November of 2006, isn't

13   it a fact that the runners for contention here to do a deal

14   with Delphi were Cerberus, Appaloosa and Ripplewood?

15   A.   At that time, yes.

16   Q.   Okay, at that time.  And, in fact, there was an

17   affirmative undertaking that you were not going to expand --

18   the company was not going to expand the search, really, the

19   net, I think was terms used, to seek out others because of the

20   problem of getting their due diligence done timely so you could

21   exit by the summer of '07, is that correct?

22   A.   We had raised that issue with our board and both of our

23   official committees and that was the consensus from all three

24   of those groups.

25   Q.   Okay.  So the narrowing -- we take a maybe a broader

48

1    pool -- it wasn't so broad but a pool of potential candidates

2    and it narrows down as we get to November to two or three

3    candidates and then it narrowed, am I correct, to two, the

4    joinder of Appaloosa and Cerberus, is that correct?

5    A.   Yes.

6    Q.   Okay.  Now, I just think we just went through that each of

7    those had done at least three and a half -- three to three and

8    a half months of due diligence before they were prepared to

9    make an offer on their own, is that correct?

10   A.   Yes.

11   Q.   Okay.  Now, assuming that a sophisticated investor wanted

12   to do due diligence for an equal amount of time on a three or

13   four billion dollar deal, just as Cerberus and Appaloosa and

14   Ripplewood had done, is there a three, three and a half months

15   for that person to do due diligence now and meet your July 7

16   exit date?

17   A.   I think they would have to expedite their diligence some

18   to meet that timetable but I think the company now has -- very

19   close at having a new business plan that would make diligence

20   easier for potential investors and that one of the complexities

21   of the diligence before was that the company's financial

22   information was a bit complex because of the overlays on its

23   pre-existing plan from the attrition and buyout deals and some

24   of the changes that it made to its prior business plan.  The

25   current business plan that the company discussed with the board

49

1   yesterday, that will be available to the various stakeholders,

2   simplifies all of those overlays and, therefore, I think anyone

3   coming in to do diligence starts from a point that will make it

4   easier to understand the company's financial information.

5   Q.   So it might but you don't know for sure that it might take

6   less time than Cerberus, Appaloosa and Ripplewood did in making

7   their assessment to make offers?

8   A.   I think it could take less time but I can't say that with

9   certainty.

10  Q.   Do you consider Cerberus and Appaloosa and Ripplewood

11  relatively sophisticated, knowledgeable players in this

12  industry and investors?

13  A.   Yes.

14  Q.   And I take it your threshold for looking at qualified

15  investors was probably the same level of sophistication and

16  knowledge and commitment.  Is that true going forward if it was

17  an alternative?

18  A.   Yes.

19  Q.   Okay.  Now, Mr. Resnick, have you heard the phrase used

20  with respect to the corporate governance provisions of the

21  contracts, not the best practice?

22  A.   Yes.

23  Q.   Okay.  That's your phrase, isn't it?

24  A.   Yes.

25  Q.   Okay.  And that phrase, I take it, indicates that the

50

1   result of corporate governance issues as they were resolved in

2   the contracts negotiated that are before the Court reflect the

3   outcome of a negotiation, or do what you would between parties

4   that wanted to really have a private company in a public

5   company setting, true?

6   A.   Correct.

7   Q.   Okay.  And the result was that the proposal before the

8   Court gives control and veto power to the investors who are

9   going to get the convertible preferred stock, isn't that true?

10  A.   It gives certain control rights to those investors.

11  Q.   And you defined that and you said that that was not the

12  best practice in a situation like this to have that result,

13  isn't that what you said?

14  A.   I said for -- I said, speaking generally, for public

15  company -- for a public company corporate governance looking at

16  that issue in isolation, not part of a broader, more complex

17  deal, that governance structure does not represent best

18  practices for a public company.

19  Q.   Okay.  And it's these -- it's this governance structure

20  and the situation it represents not the best practices that you

21  and Delphi are asking the Court to approve today?

22  A.   We are -- no.  We are asking the Court to approve a

23  framework agreement that balances many issues:  financial,

24  governance, settlements with stakeholders and as part of that,

25  we have a corporate governance structure that represents an

51

1    extensively and hotly negotiated deal.  And I think, taken as a

2    whole, it's a deal that the debtor is prepared to support --

3    Q.    Cerberus --

4    A.    -- and does support.

5    Q.    I didn't mean to interrupt, I'm sorry.  Cerberus and

6    Appaloosa wanted this control and veto power, isn't that

7    correct?

8    A.    Yes.

9    Q.    And you acceded to that even though you felt

10   professionally, in your experience, it wasn't the best practice

11   in a public company?

12   A.    Because it allowed us to maximize value for our

13   stakeholders --

14   Q.    Let's go --

15   A.    -- that's correct.

16   Q.    I'm sorry.  Let's go back to the November, December time

17   frame.  When you define the universe of who is really a capable

18   player here to do a deal with Delphi, a capable player was

19   sophisticated, experienced in bankruptcy, had the money,

20   obviously, and was able to deliver an exit by July of 2007,

21   correct?

22   A.    Yes.

23   Q.    Okay.  Once you narrow that universe down to two people,

24   Cerberus and Appaloosa, didn't you basically eliminate your

25   bargaining power and all these tough issues you had to concede

52

1  on throughout the entire agreement?

2  A.   No.

3  Q.   Well, with respect -- we just talked about the corporate

4  governance issue.  Let's talk about the convertible preferred

5  issue.  Okay?  We already had some testimony a little bit -- a

6  little while ago about that, that it was one that you hadn't

7  seen before in a case, is that correct?

8  A.   I said you do not see that in the public arena for

9  convertible preferred.

10  Q.   But it's one that Delphi had to accede to and agree to in

11  order to get the rest of the deal, is that correct?

12  A.   Yes.  That structure is essentially a structure where

13  there were different uses of value and investment value for new

14  money and a higher plan value for existing stakeholders is not

15  unusual in bankruptcy as a way to bridge valuation gaps.  We

16  happen to encapsulate that in a convertible preferred security.

17  That feature in itself is not unusual.  But the point I was

18  making before was that you don't see that in a public market.

19  Of course you don't because those are not companies that are

20  coming out of bankruptcy.

21  Q.   All these negative pieces of the deal, whether it's the

22  convertible preferred terms or things you haven't seen before,

23  the corporate governance which you say is not the best practice

24  for a company like this, issues with respect to, really, a

25  responsible inability to do three months of due diligence and

53

1    have a real competitor process, are driven by the fact that

2    you've limited the universe to two people in December and

3    basically boxed out the rest of competitive bidding.

4              MR. BUTLER:  Objection, Your Honor.  Argumentative

5    and testifying.  What is the precedent?

6              THE COURT:  Well, why not rephrase that?

7    Q.   Do you agree, at least --

8              THE COURT:  Or you can rephrase it.  What is the

9    effect on maximization of value for the debtors in limiting the

10   universe to which the company was, I guess, affirmatively shot?

11             THE WITNESS:  Well, Your Honor, I respectfully

12   disagree with counsel that the universe was limited, number

13   one.  We reached out to the statutory committees.  When we made

14   the decision to move forward with a small group, GM, UCC,

15   Cerberus, Appaloosa, Harbinger and Ripplewood, we made that

16   decision in consultation with our stakeholders as well as with

17   the board.  We had a meeting where we talked about that and we

18   felt that given the concerns over time, the need for the

19   company to emerge in '07, because if it didn't there was

20   significant risk to the value of the estate to get tied up in

21   the fall of '07, the OEM labor negotiations.  That that was a

22   very critical issue for this estate that we would go forward

23   with parties that had consistently expressed an interest that

24   were sophisticated and that could move forward and meet our

25   timetable.  Other people that approached us that were

54

1    sophisticated, like one of the parties I mentioned in my

2    deposition, we encouraged to participate.  We told them about

3    the timing, we told them we'd work with them, we told them what

4    the issues were so they could come in with their eyes open,

5    where they could partner with one of the existing parties.

6    They declined to do it but we encouraged them to do that.  And

7    all the other stakeholders were aware that that other party who

8    was also invested in the capital structure was out there.  I

9    think, again, given the issues facing Delphi and the need to

10   emerge, we went through this process with a group that could

11   give us a competitive dynamic and I believe that we did.  Now,

12   going forward with a new business plan there, I believe there's

13   the ability for someone else to come in.  They'd have to work

14   very hard and not take weeks to try to negotiate an NDA that

15   had been negotiated by several other parties if they really

16   were serious to move forward quickly and to come in and do

17   that.  I'm sorry that's a long answer to your question.

18        MR. PARKINS:  I think your answer is fine for me.  I

19   have no more questions, Your Honor.

20        THE COURT:  Well, can I follow up on one thing?  It's

21   something Mr. Parkins raised.  At some point in this process in

22   the fall, it appears to me, I guess, from reading your

23   declaration, that if the company and the other stakeholders

24   urging Cerberus and Appaloosa teamed up, and you've alluded to,

25   sort of trying to carbonize their two approaches --

55

1          THE WITNESS:  Yes.

2          THE COURT:  -- what was the effect on value to the

3     estate of the two bidders teaming up?

4          THE WITNESS:  Well, I think, Your Honor, it actually

5     maximized value to the estate because it led to increased

6     certainty in the debtors' view that a consensual Delphi

7     transaction with GM and the UAW could actually be achieved.  At

8     that point, we had been working with the Appaloosa proposal and

9     it became clear after the debtor and some of the other

10    stakeholders had embraced that, both committees, frankly, that

11    GM and labor, particularly, UAW, were uncomfortable with that

12    because they weren't familiar with Appaloosa.  Appaloosa didn't

13    have automotive experience, didn't have someone on their team

14    that both parties were familiar with so we tried to encourage

15    both Cerberus and Ripplewood to team up with Appaloosa and

16    created a little competitive framework between the two because

17    Appaloosa had a significant blocking position in part of the

18    capital structure.  So when Appaloosa and Cerberus ultimately

19    reached agreement, the value of the deal was essentially from

20    total enterprise value the same as the GM/UCC deal and the

21    Appaloosa only deal.  But, and this is most important, it

22    provided increased certainty in getting closure because

23    Cerberus was a party that GM and the UAW were comfortable with.

24    So we knew we could come to them and negotiate the two

25    remaining issues in this case, which were the union issues, as

56

1    you heard this morning, and then the open issues we have with

2    General Motors.  So that increased -- the TEV was the same

3    across the proposal but the increased certainty of getting to

4    closure was what I would say maximized value to the estate.

5    Because without it, we'd have a deal on paper but we'd never

6    have a deal in reality.

7              MR. PARKINS:  I'm done, Your Honor.  Thank you.

8              THE COURT:  Okay.

9    REDIRECT EXAMINATION BY

10   MR. BUTLER:

11   Q.   Mr. Resnick, will you look back at Exhibit 20 and 21 --

12   one moment.

13   A.   Yes.

14   Q.   Do you have personal knowledge as to whether these two

15   documents were presented at the November 14th board of

16   directors meeting?

17   A.   Yes.  They were presented together.

18   Q.   And did you participate in that presentation?

19   A.   Yes.

20   Q.   Did you play a role in preparing those two documents?

21   A.   Yes.

22   Q.   Do you, Mr. Resnick, have a view as to whether or not

23   Delphi can or should subject itself to sort of an ordinary

24   auction?

25   A.   Yes, I have a view.

57

1    Q.    And what is your view?

2    A.    I think the circumstances of the Delphi restructuring are

3    such that it would be inappropriate for the debtor to follow

4    such a process in this particular case.

5    Q.    And why is that?

6    A.    Because this case is much more complex.  It has a large

7    number of parties in interest with significant issues that have

8    to be negotiated, particularly, issues surrounding a settlement

9    with General Motors and General Motors's contribution to the

10   plan with the numerous labor unions involved with the company

11   and settlements with them.  So just having an auction over

12   value is not going to solve this case.  It's not like the

13   typical restructuring where there's a dispute over value and

14   you just put the company up for bid.  If there's not a plan

15   investor here with whom GM and the unions feel they want to

16   negotiate with, we're never going to get across the finish

17   line.  And we've -- we've run that play before when we tried to

18   move forward with the Appaloosa only proposal.  This process is

19   going to have to be conducted in a much more negotiated way.

20   Q.    Do you spend time -- do GM and the UAW have financial

21   advisors?

22   A.    Yes.

23   Q.    Do you spend time speaking with them?

24   A.    Yes, I do.

25   Q.    Substantial amount of time or just on occasion?

58

1    A.    Substantial amount of time.

2    Q.    From those discussions, have you developed any

3    understanding --

4    A.    And I'd add -- I'm sorry, Mr. Butler.  The IUE has its own

5    investment banker as well.

6    Q.    From those discussions, have you developed any

7    understanding about how you would assess the ability to

8    negotiate transactions with those unions and General Motors in

9    the face of what I'll call public auction?

10   A.    I think there would be no negotiation.

11   Q.    And why do you say that?

12   A.    Because it's been demonstrated to the debtors and its

13   advisors time and time again that these parties are willing to

14   negotiate it -- I'm sorry, are willing to negotiate resolution

15   of their remaining issues but they would like to know with whom

16   they are negotiating.  Until there's clarity on that, we can

17   discuss certain issues, and we've made some progress on that,

18   but the critical and most significant ones without resolving,

19   Delphi will never get out of bankruptcy, we cannot address.

20   Q.    Mr. Resnick, do you have a view as to whether a plan

21   investor who brings "just money" to the table is capable of

22   executing the transaction that's necessary for this company to

23   reorganize in Chapter 11?

24   A.    I have a view on that, yes.

25   Q.    And what is your view?

59

```
 1   A.    My view is that unfortunately it's not possible.  We've

 2   tried that with the Appaloosa/Harbinger proposal back in the

 3   September time frame and we were rebuffed in pursuing that and

 4   that's why we went back and had discussions with Cerberus and

 5   Ripplewood to try and team up with -- with Appaloosa because

 6   that we felt was the key piece of solving this complex puzzle

 7   of resolving the remaining issues with GM and the UAW to find a

 8   partner with the financial investor that -- the GM and the UAW

 9   were comfortable with.

10   Q.    During the course of the framework discussions, did you

11   have an opportunity on behalf of the company to receive

12   indications of value from more than one group or bidder?

13   A.    Yes.

14   Q.    How many different indications of value did you receive?

15   A.    We received from GM and the UCC and their advisors, from

16   Appaloosa/Harbinger and its advisors, from Cerberus and from

17   Ripplewood.

18   Q.    And were those proposals and indications of value arrived

19   at, so far as you know, independently of each other?

20   A.    Yes.

21   Q.    Without going into the exact dollar amount of those on

22   this public record, I'll ask you were there any material

23   differences in the range of value between those four different

24   groups in terms of total enterprise value anticipated from the

25   company?
```

60

1   A.   In terms of -- in terms of total enterprise value, they

2   were fairly consistent.

3   Q.   How about in terms of the leverage the company could

4   withstand as it emerged from Chapter 11?

5   A.   Ultimately, after a little negotiation, they were fairly

6   consistent but they started in a range that I would say was not

7   very far from one another.

8   Q.   Do those indications of value all assume the company would

9   achieve some -- an estimated level of EBITDA at some point in

10  its post-restructured state?

11  A.   Yes.

12  Q.   And -- and I think this number is public, what is that

13  range of EBITDA that the parties were focused on?

14  A.   Two point four billion of EBITDA in 2009.

15  Q.   Do you have a view as to whether or not the debtors can

16  achieve that objective without comprehensive restructured

17  transactions with labor and General Motors?

18  A.   Yes, I have a view.

19  Q.   And what is your view?

20  A.   It's essential that the debtor have agreements with GM and

21  its unions to achieve the 2.4 billion dollar EBITDA number.

22  Q.   And if either of those groups is not prepared to enter

23  into such transactions, do you have a view as to the debtors'

24  prospects for reorganization?

25  A.   I think they will be much more challenging.  We're going

61

1    to have to go back to the drawing board.

2    Q.   Do you have a view as to the sustainability of that EBITDA

3    range?  Would it be the same?  Could it be achieved?

4    A.   Oh, the -- no.  My -- my point would be that the EBITDA

5    number would be significantly less and the company would have

6    to dramatically rethink its business because the business model

7    is built on new agreements with General Motors and with its

8    unions.  And a footprint, in terms of facilities that it would

9    operate, that would have to be negotiated with General Motors

10   and its unions.

11   Q.   Mr. Resnick, do you have an understanding --

12            MR. BUTLER:  Strike that.

13   Q.   You testified earlier that the company was striving to

14   emerge from Chapter 11 before the 2007 national contract

15   negotiations involved OEMs, is that right?

16   A.   That's right.

17   Q.   Do you have an understanding of why that issue is viewed

18   in that way by the company?

19   A.   Yes, because at that time the UAW will focus on

20   negotiating its agreements with the Big Three, and that will

21   take their primary focus, and if Delphi has not addressed its

22   issues with its unions before then, it's very likely that

23   Delphi will not be able to address its issues until after that

24   time which would mean the company would continue in Chapter 11.

25   It would lead to greater uncertainty because the company's

62

1    customers which have been focused on an earlier emergence

2    before national bargaining begins have been, in some cases,

3    holding off business awards until it sees that Delphi would

4    emerge --

5            MR. PARKINS:  Objection, Your Honor.  That's hearsay.

6    He doesn't have personal knowledge of that.  Move to strike.

7            THE COURT:  Sustained.

8    A.    So it will be much more challenging for the company if it

9    does not emerge prior to the beginning of national bargaining.

10   Q.    Do you have a view as to the relative importance or

11   unimportance of the GM benefit guarantee in the company's

12   restructuring negotiations?

13   A.    Yes.

14   Q.    And what is your view?

15   A.    The benefit guarantee is very important.  It's very

16   important to the unions and that is an issue in the national

17   bargaining.  And I think the unions would like that -- the

18   issue of the benefit guarantee resolved beforehand as part of

19   Delphi's restructuring.

20   Q.    Why is the benefit guarantee important?

21   A.    Because Delphi's labor agreements expire in '07 as well

22   and the benefit guarantee would theoretically expire.

23   Q.    But if the benefit guarantee expires, why would that have

24   any kind of material impact on the restructuring of this

25   company?

63

1    A.    Well, it's very important because under the terms of this

2    agreement, General Motors is taking on the OPEB obligation, and

3    that's one of the items to which the benefit guarantee applies.

4    Q.    If the debtors are unable to pursue a transformation plan

5    that causes it to emerge by September of 2007, do you have a

6    view of what's likely to happen in the third quarter when these

7    contracts expire and the benefit guarantee expires?

8    A.    I think there will be a great deal of uncertainty

9    surrounding what happens with Delphi and its business and the

10   stability the company has been able to achieve by working very

11   hard these past several months to find a consensual

12   reorganization in this very complex case with all its

13   stakeholders is -- will have dissipated and the company will be

14   facing tremendous uncertainty.

15   Q.    As an investment banker, Mr. Resnick, do you have a view

16   of what disruption and uncertainty does to value?

17   A.    Yes, I do.

18   Q.    And what is that view?

19   A.    My view is that disruption and uncertainty is extremely

20   harmful to value and that risk that you described is a very

21   significant one and one that the board and management is very

22   aware of in making the decisions they've made with respect to

23   these agreements.

24         MR. BUTLER:  No further questions, Your Honor.

25         THE COURT:  Before you go, Ms. Steingart, I think,

64

1    focused you in on a provision of the PSA that lets the plan

2    investors -- this goes on the plan investors -- gives them the

3    right to walk from the PSA after April 1st and before a

4    disclosure statement's approved.  And I think she also pointed

5    you to Section 12 of the -- 12(c) of the investment commitment

6    agreement that provides a termination right if the PSA is

7    terminated.  Now, I gather that the company views these

8    agreements, particularly by the plan investors, as a, in

9    essence, getting someone to take key initial steps to let

10   everything else come into place.  Is that right?

11            THE WITNESS:  Yes, Your Honor.

12            THE COURT:  As if you were hiring a key contractor to

13   help you build your house.

14            THE WITNESS:  Yes.

15            THE COURT:  Those provisions, as Mr. Steingart took

16   you through them, though, seem to permit the plan investors,

17   after you've gotten the house half built and perhaps even after

18   GM and the unions have reached the agreements that you're

19   seeking, to say well, I'm going to stop building now.

20   Particularly having heard -- and I'm sure this is no surprise

21   to them, but having heard the company's concerns about timing,

22   why aren't you concerned that at that point the plan investors

23   would say well, we have you under a barrel and, you know, we

24   want to renegotiate.

25            THE WITNESS:  Well, this -- this issue is a very

65

1    difficult one in the agreement, this specific provision.  And,

2    I guess, from a practical perspective, if these agreements with

3    GM and the UAW are reached, I think that everyone sees that as

4    the most critical issue, the -- kind of major final hurdle to a

5    Delphi reorganization and at that time the likelihood is if you

6    can reach those agreements, you will be able to consummate your

7    reorganization.  So, the probability that having reached the

8    agreement, the plan investors would terminate is a risk, but a

9    reasonable risk, that they would have met their diligence

10   requirements and they would sign off on the agreement with GM

11   and the UAW.  Why wouldn't they go forward with the -- with the

12   plan?  That's the last piece of the puzzle.  So, I understand

13   the point she was making, but I think from a practical

14   perspective, having been involved in trying to bring this to

15   the finish line, that the likelihood that the parties at that

16   point wouldn't go forward while theoretically a risk

17   practically we felt was one, again, having negotiated a whole

18   range of points, not getting everything we wanted, that we

19   would take.

20              THE COURT:  Okay.  Any recross?

21   RECROSS-EXAMINATION BY

22   MS. STEINGART:

23   Q.   Now, isn't it true, Mr. Resnick, that during these

24   meetings at Skadden that both you and Mr. Shaw led the

25   stakeholders to believe that permitting Appaloosa and Cerberus

1    to combine and make a bid would lead to a stalking horse for

2    competitive bidding?  Isn't that what you said?

3    A.    I don't remember if that's what I said but I believe that

4    selecting the Appaloosa/Cerberus group would provide the estate

5    with a stalking horse.

6    Q.    And wasn't part of the discussions that the committee

7    should tolerate that and the committee should support that

8    because each committee had fiduciary duties that would permit

9    them to encourage and review and have additional expressions of

10   interest once whatever Cerberus and Appaloosa were doing was on

11   the table and was in public?  Wasn't that a representation that

12   was made to the stakeholders?

13   A.    Can you tell me the meeting at which you're referring?

14   Q.    At each of the meetings and especially the meetings that

15   led to the combination of Cerberus and Appaloosa.

16   A.    I think we -- we had the view that we were running a very

17   competitive process and that at the end of that process we

18   would select a party.  It would give us a stalking horse.  It

19   would give us a bird in the hand.  And then each of the debtor

20   and the statutory committees had fiduciary obligations.  If

21   there were higher proposals, we'd have the ability to review

22   them and compare them.

23   Q.    That's not what I said and that's not what I'm asking you

24   whether you and Mr. Shaw said.  What you and Mr. Shaw said was

25   that this narrowing at an earlier stage than might otherwise

1    occur and this development of a proposal would have a positive

2    impact and would be used, not tolerated, not given some

3    fiduciary duty at minimum, minimum, minimum of any requirement

4    you could do but still wanting to be within the Code.  I'm not

5    saying that anyone was proposing to breach those duties.  But

6    that's not what was said.  It was said that this would be used

7    affirmatively.  Affirmatively in a way that would bring other

8    people in and that would give the committees an opportunity to

9    make sure that that process led to a widening in a responsible

10   way but not in end gain.  And if you don't recall that tell me

11   that you don't recall that.

12   A.   Yeah, I don't recall those specific words that you're

13   trying to put in my mouth.

14   Q.   All right.  But I have a good faith belief for asking the

15   question, Mr. Resnick, I can assure you.

16   A.   I'm sure you do.

17   Q.   You said it was possible for other people to come in and

18   that they would have to work very hard because they weren't

19   going to have the three and a half months that counsel was

20   talking to you about.  Wouldn't that process in that working

21   very hard be easier if the debtors had a structure?

22   A.   We've been through this before.  I think the debtor in the

23   AHC proposal has a very clear structure.  And if you look at

24   the Highland letter --

25   Q.   But you didn't have a structure for people to come in.

68

1   A.   -- we followed that structure.

2   Q.   You don't have a structure for people to come in.

3        MR. BUTLER:  Objection.  Objection.  Can you please

4   let him answer the question?

5        THE COURT:  We're going over the same points.

6        MS. STEINGART:  Your Honor, okay.

7   Q.   But you don't have a structure for people to come in, do

8   you?

9   A.   We have a framework agreement.  A framework means a frame,

10  a structure.

11       THE COURT:  No.  She's talking about a bidding

12  procedure structure.

13  A.   A bidding?  No.  We do not -- this is not a 363 sale.  We

14  don't have a bidding procedures order attached to our motion.

15  Q.   And indeed, there are ways to sort of solicit interest.

16  And you're a sophisticated guy.  I mean, I don't have to lead

17  you by the hand here.  You don't need to have an auction.  You

18  don't need to have a free for all.  There are ways to structure

19  it, to screen people, to be discrete in time, to be discrete in

20  scope, but to make sure that you're getting the interest here

21  that it's possible to get.  You can structure such a thing,

22  couldn't you, Mr. Resnick, if you tried hard?

23  A.   I'm sure I -- I'm sure I could.

24  Q.   And the potential people that you would look for wouldn't

25  have to be just money people.  There are people out there with

69

1    more than just money, right?

2    A.    Yes.

3    Q.    Okay.  And you could eliminate the ones that you wanted to

4    eliminate.  Now, let's move on to indications of value.  Isn't

5    it true that once the initial proposal was made all the other

6    constituencies used that number to structure their proposals?

7    The equity committee didn't do three months of due diligence,

8    did it?

9    A.    I know they did diligence.  I don't know exactly how much.

10   Q.    We didn't have a financial advisor, Mr. Resnick.  You know

11   that.

12   A.    You had a financial advisor at a particular point in time

13   and that financial advisor did do due diligence.

14   Q.    Right.  But not in August, right?  Not until you were well

15   into these discussions, isn't that fair?

16   A.    I don't know their schedule of due diligence.

17   Q.    And what happened was that the range that's in -- that

18   this proposal is premised on was one that was provided and

19   everyone structured proposals that were in that parameter, that

20   had a certain value per share and that had a certain debt load

21   to show the debtor different ways in which capital structure

22   could deliver value to stakeholders assuming that the values

23   provided were reasonable.

24            THE COURT:  I'm sorry.  I -- what time are we --

25            MS. STEINGART:  I said there was an overall value --

70

 1    this was during August, Your Honor.

 2             THE COURT:  Okay.

 3    Q.   Okay.  There was an overall value that emerged from the

 4    initial proposals at Ripplewood and Cerberus, right?

 5    A.   Not in August, no.  Wrong.

 6    Q.   In the fall, correct?

 7    A.   Later in the fall.

 8    Q.   And they jelled on the same general value, the same range,

 9    correct?

10    A.   No, not correct.

11    Q.   What?  It was a million dollars, a billion dollars apart,

12    twelve to thirteen or fourteen, twelve to thirteen?

13    A.   Well, I wouldn't say a billion is an insignificant number.

14    But the facts are that the GM --

15    Q.   Well, it's ten percent -- sir, it's ten percent, right?

16    A.   The GM/UCC proposal used a number.  Other people did look

17    at that number but the bids that came in, in particular from

18    Cerberus, were below that number and there were significant

19    negotiation back and forth to push them higher which, I

20    believe, was the debtors' job and ultimately, they did approach

21    the number used by GM and the UCC.  Why was that?  Because,

22    particularly with the UCC, they and their advisors were very

23    insistent with respect to recoveries and values and to be part

24    of a consensual deal the plan investors had to move up their

25    number to get their support.  They did a very good job for

71

1    their clients.

2    Q.   Right.  Right.  So maybe one or two participants did due

3    diligence but the others jelled around a number that was

4    provided and offered the debtor different kinds of capital

5    structures in which that number would represent different kinds

6    of distributions to stakeholders.  Isn't that the way it

7    happened?

8              MR. BUTLER:  Objection.  That was not the prior

9    testimony.  Mr. Resnick testified he got four --

10             THE COURT:  No.  He --

11             MS. STEINGART:  I am suggesting to him what happened

12   and he can tell me if he disagrees.

13             THE COURT:  Overruled on that basis.

14             MS. STEINGART:  Sorry, Your Honor.  I apologize.

15             THE COURT:  So, can you rephrase the question --

16             MS. STEINGART:  Okay.

17             THE COURT:  -- or restate the question?

18   Q.   Isn't it the fact that stakeholders adopted a value that

19   was being used by Cerberus and Ripplewood and presented varying

20   scenarios of a transaction with different capital structures

21   assuming that value?

22   A.   No.  It is absolutely not the fact.

23   Q.   Well, the equity committee never arrived at its own value,

24   did it?

25   A.   The equity committee did have its own views of value.

72

1    Q.   Now, we were having -- you were having a discussion with

2    the judge about a house and whether people would walk away in

3    the middle of building that house.  And that you had comfort

4    that the plan investors wouldn't walk away, right?  Correct?

5    A.   I said it was a risk but one that the company decided was

6    worth taking.

7    Q.   Right.  And, in fact, you're comfortable that the plan,

8    investors won't walk away because the forty-five dollar plan

9    value for stock is really very low, right?

10   A.   No.

11   Q.   All right.  And isn't it a fact that when the disclosure

12   statement is filed and when the agreements with the unions and

13   with GM are made they're going to find that their ten dollars

14   of implied value on the discount is substantially higher, isn't

15   that right?

16   A.   No.  The forty-five dollars is a 5.9 multiple of 2009

17   EBITDA for this company, which is, if you look at where other

18   publicly traded automotive suppliers trade, it's at the high

19   end of that range.

20   Q.   Indeed, the only way that you can expect the plan

21   investors not to exercise that out, because we assume that they

22   are all commercially rational beings, is that if the value --

23   is that the value of those discounts are maintained, correct?

24   A.   I'm not sure I understand the question.

25   Q.   Is there any reason for the plan investors not to walk

73

1   away if the values that are implied by their discounted

2   consideration here are not realized?

3   A.   I think the plan investors had taken a long term view of

4   the company and believed that the price at which they were

5   investing in their convertible preferred is a reasonable price.

6   I think the other stakeholders, particular the unsecured

7   creditors, agree with that and that the imputed price, the

8   forty-five dollars for the plan, is one that may or may not be

9   realized at the time of consummation.  It may not -- the market

10  may not reflect that.

11  Q.   Right.  But knowing what the investors will know at the

12  time the disclosure statement is approved makes it much more

13  likely that any assumption that's made about plan value stock

14  at the time of confirmation is much less risky, right?

15  A.   I think if the plan investors feel they can get a return

16  on their investment at the price at which they're investing

17  then it's an attractive deal for them.  It doesn't have to be

18  forty-five dollars immediately at the time of consummation.

19          MS. STEINGART:  I have no further questions, Your

20  Honor.

21          THE COURT:  Okay.

22          MR. BUTLER:  I have no further questions.

23          THE COURT:  All right.  You can step down, Mr.

24  Resnick.

25          THE WITNESS:  Thank you, Your Honor.

74

1        MR. BUTLER:  Your Honor, subject to the agreement

2   that was reached by counsel that we announced earlier in the

3   hearing that my redirect of Mr. Miller does not connect and in

4   fact be expanded to cover the board meeting and other matters,

5   it doesn't have to be limited to the cross.  We have nothing

6   further and would turn the podium to Ms. Steingart and to Mr.

7   Parkins to present their witnesses.

8        THE COURT:  Okay.  That's fine.

9        MS. STEINGART:  Well, Your Honor, before I would

10  begin and take more of the Court's time, I would ask that in

11  light of the evidence that's been presented, in light of the

12  substantial issues with respect to the continued illusory

13  nature of the contracts, the massive unconscionable fees, the

14  lack of even a minimum process to permit interested responsible

15  parties to come in and do quick, meaningful due diligence and

16  make other offers, that those infirmities, I think, make it

17  impossible for the Court to approve these agreements in their

18  current form, and that some kind of thirty-day window or

19  something else is required.  And I would ask if that's the

20  case, Your Honor, that we don't have to continue to take up the

21  Court's time and the witnesses' time but I don't think that the

22  debtor has made the case for approval of these agreements.  So

23  I would ask that if that's the Court's view that we can stop

24  now.

25       THE COURT:  No.  It's not my view.

75

 1                MS. STEINGART:  Okay.  Then we would call Mr. Miller.

 2                MR. BUTLER:  We have to go get Mr. Miller.

 3                THE COURT:  All right.  Do people want a five-minute

 4     break?

 5                MR. BUTLER:  I'd love one now.

 6                THE COURT:  Okay.  All right.  So I'll be back about

 7     twenty-five of 5.

 8                (Recess from 4:27 p.m. until 4:38 p.m.)

 9                THE COURT:  Please be seated.  Okay.  We're back on

10     the record with Delphi Corporation.  Would you raise your right

11     hand, please?

12                (Witness is sworn)

13                THE COURT:  Just for the record, would you state and

14     spell your name?

15                THE WITNESS:  Yes.  My name is Robert S. Miller and I

16     am the executive chairman of Delphi Corporation, effective

17     January 1st.  And prior to that I was chairman and chief

18     executive officer.

19                THE COURT:  Okay.

20     CROSS-EXAMINATION BY

21     MS. STEINGART:

22     Q.   Good afternoon, Mr. Miller.

23     A.   Good afternoon.  I was hoping after your opening remarks

24     you'd let me off the hook, but I guess not, huh?

25     Q.   I wish it were up to me.  I'd like to take you back to the

76

1   December 11 meeting of the board of the directors of Delphi.

2   That meeting was telephonic, wasn't it?  And if you'd like to

3   refresh your recollection of that I can refer you to Exhibit

4   JT-42, which is the binders there.

5   A.   Yes, that is correct.  Thank you.

6   Q.   So each of the board members was in a different place with

7   whatever materials had been provided by advisors and company

8   management, correct?

9   A.   That is correct.

10  Q.   And Mr. Opie testified that he didn't believe the board

11  members, because of the length and complexity, were really

12  expected to read the investment agreement but would instead

13  have descriptions from advisors.  Was that your understanding

14  of what most of the directors did?

15  A.   Our objective was to provide each of the directors with as

16  many materials as we could.  We had approximately thirty-seven

17  meetings during last year.  They were apprised at all steps

18  along the way through the very lengthy negotiations, and so

19  they had both materials in hand that they would have seen

20  before, not the final document, but would have been well

21  educated by the time they got to the final meeting.  And,

22  therefore, if they did not actually read in detail, the

23  documents, they certainly had the ability to understand and I

24  think a reasonable ability to rely on advice from the

25  professionals.

77

1   Q.   And that was true of you as well, correct?

2   A.   Well, I would -- in my role, having been personally

3   involved in many of the negotiations, I would guess I had read

4   more materials and was a bit deeper into it than the average

5   independent director.  But I did not necessarily read every

6   legal document myself.

7   Q.   Right.  And before that meeting on December 11 there

8   wasn't even a full version of the investment agreement

9   available for you to read, correct?

10   A.   I do not recall.

11   Q.   And you testified at your deposition that you don't recall

12   having read the agreement prior to the December 11 meeting,

13   correct?

14   A.   I believe that's correct.

15   Q.   So instead of reading them the directors relied on

16   management and advisors of those who were not as involved

17   firsthand as you were, sir, to summarize and explain them,

18   correct?

19   A.   Correct.

20   Q.   And with respect to Rothschild, after the November

21   meetings or the November 14th meetings, there were not written

22   summaries of the material provided by Rothschild, were there?

23   A.   I don't recall.

24   Q.   But at the meeting there was a discussion of the

25   investment agreement and there was a summary that was provided

78

1    by Skadden Arps, right?

2              THE COURT:  This is December 11th still?

3              MS. STEINGART:  The December 11th meeting, Your

4    Honor.

5    A.    I believe that's correct.

6    Q.    And you've characterized this transaction as complex with

7    moving parts, correct?

8    A.    Correct.

9    Q.    And it's fair to say that part of the complexity is the

10   existence of multiple agreements which interact with one

11   another in various ways, wouldn't you agree?

12   A.    Yes.

13   Q.    Now, if we could look together at JT Exhibit 30, which has

14   been identified as the summary that Skadden provided of the

15   investment agreement at the December 11 meeting.  Do you have

16   that in front of you?

17   A.    Yes, I do.

18   Q.    Okay.  Now, you weren't provided with a comparable summary

19   of the plan support agreement, were you?

20   A.    Well, I don't recall exactly what I was provided with at

21   each step along the way.  I was involved day after day after

22   day in these negotiations but I cannot recall exactly which

23   document I was provided with or looked at immediately prior to

24   the meeting.

25   Q.    Do you recall whether the board, in general, at that

79

1    meeting and not you individually, but most of your prior

2    involvement, but the board in general, at that meeting was

3    provided with a summary of the PSA?

4    A.   I do not recall which documents they got at which moment

5    in time.

6    Q.   Do you recall there being a summary of the plan support

7    agreement?

8    A.   I honestly don't recall.

9    Q.   Okay, that's fair.  Do you recall there being any material

10   provided at the meeting on December 11th which explained the

11   interaction of the plan support agreement and the investment

12   agreement?

13   A.   I'm trying to be helpful in responding to your questions.

14   The directors, I would say, approached their duties very

15   seriously.  Different directors had different amounts of time

16   to devote to this, ability to read and digest the documents

17   different, capabilities to understand legally -- legal

18   documents.  They all had the ability to understand business

19   principles.  And both the Skadden team and the Rothschild team

20   and our own negotiating team fully explained what were the

21   critical business issues involved, the views of the committees

22   and so on leading up to the formulation of what they were being

23   asked to approved.  But what I cannot recall is precisely what

24   document they may -- each individual may have read and, you

25   know, at what point they got it.

80

1    Q.   And at this point, we're not trying to fault the board for

2    not having spent a lot of time, that's not -- the thrust of my

3    inquiry is how much information the board had of an analytic

4    nature.  And so my question is whether you recall a summary

5    being prepared and discussed by either Skadden or Rothschild

6    that said these are a handful of agreements and they have

7    meaning separately.  But when you put them together, there are

8    results that one might not expect if you look at them

9    individually.  Was anything of that nature provided on December

10   11th?

11   A.   I do not recall.  Personally, I get several thousand pages

12   a month in going through these negotiations.  And I personally

13   cannot recall which page went with what, which went to which

14   board at what date, and that's my struggle in answering your

15   question.  But what I can tell you was that the board was

16   advised of what the sensitivities were from the viewpoint of

17   the statutory committees and other stakeholders and dealt with

18   it in its totality, but looking at the business issues that had

19   been raised by the various parties.

20   Q.   Well, if we look at Exhibit 30, if you could look at pages

21   4 and 5.   And at determination provision described on page 4

22   to 5?

23   A.   Yes.

24   Q.   Now it's true, is it not, that it doesn't mention anywhere

25   there that plan investors can terminate the investment

1    agreement if the plan support agreement has been terminated,

2    correct?

3    A.   Yes, it so says.

4    Q.   It doesn't say?

5    A.   I'm sorry.  Okay, it doesn't say.

6            MR. BUTLER:  Your Honor, I'm just going to raise a

7    question that you made a chambers ruling --

8            THE COURT:  If this is just going to elicit the same

9    testimony that Mr. Sheehan gave us, that's not why we had Mr.

10   Miller come here.

11           MS. STEINGART:  Right.  I'm just trying to --

12           THE COURT:  If you're setting up another question,

13   that's fine.

14           MS. STEINGART:  Oh, yes, I am, Your Honor.

15           THE COURT:  All right.  That is cumulative of Mr.

16   Sheehan's testimony?

17   Q.   And even after yesterday's fixes, even after the changes

18   made to the agreement yesterday that was filed in court, the

19   plan investors can still terminate the agreement for any reason

20   or no reason as far as you understand, correct?

21   A.   My understanding is that if the plan investors go through

22   the process we are embarking on and conclude that this not an

23   appropriate investment for them, yes, they are able to get out

24   and we will have incurred significant expenses during that

25   time.

82

1    Q.   Right.  But yesterday the window opened up to that was

2    limited?

3    A.   Yes.

4    Q.   But even after yesterday's fixes, GM can still terminate

5    the PSA at any time for any reason or no reason at all,

6    correct?

7    A.   That is correct.  We tried very hard to get a firmer

8    commitment from GM.  They were unwilling to commit to anything

9    until the entire picture was in focus.  We're in the midst of a

10   negotiation that we hope to conclude, that is part of the

11   understanding in this framework agreement.  But I do not

12   challenge your assertion that they are able to not proceed if

13   they so choose.

14   Q.   Right.  And their period of optionality has been limited.

15   I'd like to direction your attention -- if you could keep 30

16   there but also if you could look at JT Exhibit 33?

17   A.   Okay.

18   Q.   And this was a document that stated as of December 11 --

19   in reviewing it -- does looking at it refresh your recollection

20   that the board, in fact, had this on that day?

21   A.   No.

22   Q.   All right.  Fair enough.  But that's day when the board

23   authorized management to go forward and seek board approval to

24   these agreements, right?

25   A.   Yes.

83

1    Q.   If you could turn to page 3 of that agreement, of 33?

2    A.   3?

3    Q.   Yeah, page 3.  And do you see the top box, it says number

4    4?

5    A.   Yes.

6    Q.   And were these kind of summaries prepared for you from

7    time to time?  I mean, this is the kind of thing that you saw

8    that updated the committee on -- updated the board on where the

9    negotiations were?

10   A.   Yes.

11   Q.   And these were prepared by Skadden or by management?

12   A.   In most cases it was a collaborative effort.  Ultimately

13   the work product would have been produced by Skadden.

14   Q.   Okay.  And if we could just run across number 4 on the top

15   of page 3 there, if you could go to the third box, and the

16   third bullet, fourth down.  And if I could read it, it says

17   "plan investors have agreed to be irrevocably bound once they

18   approve the GM settlement."  Do you see that?

19   A.   Yes.

20   Q.   Okay.  Now that wasn't true before the modifications

21   yesterday, right?

22   A.   I don't recall.

23   Q.   And, sir, that's not correct even now, is it?

24   A.   I don't know.

25   Q.   Okay.  But that's what, if you give credence to the date

84

1  on the front of the document, the board had at the time these

2  discussions occurred on December 11, correct?

3  A.   Well, I do not recall all the documentation they may have

4  had.

5  Q.   Let's talk a little bit about what Rothschild did and

6  didn't do.  You got these presentations from time to time on

7  open issues in the negotiation, correct?

8  A.   Yes.

9  Q.   But Rothschild didn't prepare them for you?

10 A.   Well, at times Rothschild prepared documents, at times

11 Skadden prepared documents, at times our own internal

12 negotiating team prepared documents.  And I can't recall from

13 day to day which documents were fallen through.

14 Q.   Did Rothschild ever prepare a sort of summary list of best

15 case/worst case scenario with respect to these framework

16 agreements to the board?

17 A.   I don't recall specifically.  I'm sure either in their

18 oral presentations or perhaps in written presentations they

19 would have discussed such things.

20 Q.   Okay.  But as you sit here today, there's no particular

21 presentation that you recall towards the end of the process

22 where they said, you know, if we get into these sets of

23 agreements, you know, these are the kinds of real worst

24 problems we could have?

25 A.   I don't specifically recall.  We had endless discussions

85

1    about what could go wrong in this process and debating the

2    merits of whether to proceed.

3    Q.    Now, you recognize that the plan investors aren't bound

4    during the period that they can walk away -- by virtue of your

5    last answer, it's clear that you appreciate that and that

6    there's special risk that is associated with that, correct?

7    A.    Yes.

8    Q.    But yet there was not a particular list of issues that --

9    or list of problems that are related to investors walking away

10   or having that ability that was provided by the board, even

11   with respect to that narrow issue?

12   A.    I would just say it was a bedrock principle, very clear to

13   the board that by engaging in this agreement that the estate

14   would be exposed to the possibility that we would have made

15   considerable expenditures to the plan investors and ultimately

16   not have a complete deal.  That was clearly understood that

17   there were risks to proceeding.  And they weighed that against

18   the risks of not proceeding.  And came to a balanced judgment

19   that the estate and all of its stakeholders were better off

20   proceeding than not proceeding.

21   Q.    Well, let's look at those risks in terms of -- or rewards

22   in terms of value that was created in these sets of agreements

23   for the plan investors.  We've used this chart before, this

24   morning, Mr. Miller --

25             THE COURT:  Does he have a copy of it?

86

1          THE WITNESS:  Does.

2          THE COURT:  Okay.

3          THE WITNESS:  Thank you.

4   Q.    There's a separate chart that we've prepared concerning

5   the value transfer to claim investors.  Now, the board prepared

6   it, they were up to thirteen million dollars in expenses that

7   would go to plan investors immediately upon approval, correct?

8   A.    Correct.

9   Q.    And that there was an addition five million that would go

10  to Appaloosa on the effective date.  And also expenses all

11  throughout were going to paid, correct?

12  A.    That is correct.

13  Q.    And we've estimated that -- I heard this morning that

14  there were five different investors who you stayed with you're

15  paying these fees for, correct?

16          MR. BUTLER:  Objection.  I'm trying to figure out

17  what's not cumulative of the earlier testimony on this subject.

18          MS. STEINGART:  I'm going to try to have a sense of

19  what the board discussion was on --

20          MR. BUTLER:  But Mr. Sheehan participated and she

21  cross-examined him about what went on at the board meetings.

22          THE COURT:  It is kind of deja vu all over again.  I

23  mean, I --

24          MR. STEINGART:  Well, let me get to finish the --

25          THE WITNESS:  Okay.

87

1    Q.   Well, during December 11, or as time close before that,

2    did the board understand that there was in terms of the fees

3    expenses and implied valued discounts on the rights offering

4    and the preferred stock, that the value transfer could amount

5    to 500 million dollars to the plan investors?

6    A.   I do not specifically recall a number of 500 million being

7    represented as the possible total benefit to the plan investors

8    if everything worked well.  That number does not surprise or

9    shock me.  I sincerely hope that if we proceed on this deal

10   that they do make a lot of money because it would mean that

11   Delphi would have been a great success.  And whether or not we

12   might have wished that they would have done this cheaper, that

13   was not an option that we were facing.  We had the choice to

14   accept what they had proposed after several months of heavy

15   negotiation, and where they said that's it, this is what we

16   want you to either take or reject.  We concluded that

17   proceeding on that basis was preferable to not having a deal.

18   And we weighed all the risks of failure to conclude this.  We

19   weighed the fact that they might make a lot of money.  But

20   nonetheless, their capital investment willing to invest, which

21   was superior to anyone else on the screen at that time, was the

22   enabler for this company to find its way out of Chapter 11.

23   Q.   And if the company is doing as well, as you hope it will,

24   and be as each of the stakeholders, if it will, that number

25   could be even higher.  And that's something that the board

88

1   understood because of the discount to those stocks, right?

2   A.   Yes.

3   Q.   And did the board discuss that within the convertible

4   preferred because it has a feature that permits it to be

5   converted into common all during the time that the convertible

6   preferred is outstanding, that it had an optionality value that

7   enhanced what the market would view its value?

8   A.   I believe every one of my directors is sufficiently

9   financially sophisticated to understand that the convertible

10  preferred has optionality value.  That it's got some protection

11  on the downside, yet the ability to participate fully on the

12  upside.

13  Q.   So with all due respect, the question I guess I have is

14  that if this 3.3 million and about twenty million of expenses

15  which would be 363 million represents the amount the company

16  paid to get 1.2 billion dollars because that's what's being

17  generated on the preferred.  Just like paying thirty-three

18  cents to get fifty cents or sixty-six cents.  But wouldn't

19  there be a point that -- what would then bring it forth; would

20  fifty cents have moved the board to say the package on this

21  convertible preferred is just not something that we could do?

22  What number would have, you know, sort of made people say that

23  and say that's not just something we could do.

24  A.   I do not recall any particular discussion about -- we did

25  not spend much of any time saying how much would have been too

89

1    much.  We instead focused on this transaction in the best

2    interest of all of our stakeholders versus not proceeding with

3    this transaction.  We also took into account that while they

4    might make a lot of money for a relatively smaller capital

5    investment if everything went well and the common shareholders

6    took the rights offering.  We also bore in mind that if after

7    the point of commitment things didn't go so well and they ended

8    up having to actually implement the backstop, they might be

9    required to make it a much larger investment while at the same

10   time looking at a much smaller return.  And that has happened

11   in other backstop situations.

12   Q.    But on December 11, when that was the case, the investors

13   had the right to walk away a day before the effective date?

14   A.    I understand.

15   Q.    So they didn't have any backstops, did they?

16   A.    At that moment, no.  We did not consider -- we did not

17   spend a lot of time considering what we would like to have as

18   the terms of the offer.  We asked the board to consider the

19   offer on the table.  After heavy negotiations, where we had

20   expended enormous effort to take into account the concerns of

21   the various stakeholders and statutory committees.  We had

22   endless late night meetings.  We arranged one on ones between

23   the plan investors and this committee and that committee.

24   There were enormous changes that were taken to the initial

25   proposals.  This is what we ended up with; this is what we were

90

1    asked to vote on, yes or no.

2            MS. STEINGART:  And I would add for the record, Your

3    Honor, it's not the position of our committee that Mr. Miller

4    has ever been anything other than always available and always

5    receptive.  So to the extent that anyone is implying that there

6    might be anything undercurrent, that's not at all the case.

7            THE WITNESS:  Thank you.

8            MS. STEINGART:  Thank you.

9    Q.   Now, you talked about getting to where the board was on

10   December 11 and having to sort of make this cut about whether

11   this was better than nothing.  And we talked with Mr. Resnick a

12   little bit about those sessions we all had in the fall where

13   Cerberus and Appaloosa came together and then two percent went

14   for proposals for that, everyone could move forward.  Wasn't it

15   the case at that time, when those discussions occurred, that

16   the committees were told that permitting Cerberus and Appaloosa

17   to come together this way, early on to formulate a proposal,

18   would provide an environment where there could be some market

19   testing and competitive bidding for this company?  Not an

20   option.  Isn't that the case?

21   A.   Well, it -- even though the board is recommending that we

22   proceed with this transaction, the board is also fully aware of

23   its fiduciary duty to consider now or in the future proposals

24   that might come along that would further enhance the

25   stakeholder value.  If such an offer comes along it will not

91

1   have the hurdle of overcoming the expenses that will have been

2   paid from the estate to these plan investors.  That is a risk

3   we bore in mind.  So we do not believe we have foreclosed the

4   possibility of yet another investor showing up with a superior

5   proposal.

6   A.   Right.  And indeed, the question was designed because at

7   the time these discussions were had, the premise was a

8   structure will come out of this if you recall it that way, that

9   then can be used to market tests, and if someone has something

10   they will come out and the company will consider it, correct?

11   A.   And so far we have not seen such a thing.

12   Q.   Now, to the extent that that is the hope that this will

13   close if it's the only thing on the table, or if there's

14   something better it will emerge, wouldn't it be helpful if the

15   investment agreement had a process so that interested investors

16   might know how to provide a meaningful proposal to the company?

17   A.   I don't understand the question.

18   Q.   Well, usually in other contexts, breakup bids are provided

19   because someone is serving a stalking horse assumption, and

20   you've had experience with that, haven't you?

21   A.   Yes.

22   Q.   And generally, while one doesn't need to have an open

23   auction contest, to the extent that procedures for identifying

24   a qualified bidder helped a company to engage in discussions,

25   correct?

92

1          MR. BUTLER:  Objection.  Again, this is cumulative of

2     both Mr. Sheehan's testimony and Mr. Resnick's testimony on

3     this point.

4          THE COURT:  Did the board consider the pros and cons

5     of having formal bidding procedures, such as a date by which

6     all bids should be received and how one qualifies to move to

7     the next step of the process?

8          THE WITNESS:  Yes, Your Honor.  We considered and

9     discussed whether we should have an open auction process.  We

10    discussed whether the agreement with AHC should contemplate

11    opening the door to shopping around with others.  We had lots

12    of discussions about that.  We ended up with the agreement we

13    did.  The considerations that went into this are the following:

14    one is that most of the restructuring value being created here

15    is because we have been working our way through agreements with

16    our unions that provide us to get lower labor costs than we had

17    in the past, this is a labor transformation case first and

18    foremost.  Secondly, there is considerable value being created

19    by the fact that the contributions by General Motors far exceed

20    the claims that they are taking back in this framework

21    agreement.  And yet having set that, we are not done in any way

22    with the agreements with the unions nor with our agreements

23    with General Motors.  That is work yet to be done.  We have had

24    the handicap that without knowing who the plan investors are,

25    who the ultimate owners are, what the governing structure is

93

1    going forward, both the unions in particular and also General

2    Motors have been reluctant to proceed.  We are up against a

3    time constraint -- a very important time constraint, in our

4    minds, that if we get bogged down we may see significant value

5    destruction in this company.  And the two big concerns are as

6    follows:  one is a very particular calendar concern -- is the

7    fact that in the third quarter of 2007, this year, there will

8    be labor negotiations at Ford, GM and Chrysler.  And if we do

9    not get our labor deals done before midyear, we could end up in

10   what I call the maelstrom of that turmoil, which is shaping up

11   to be, perhaps, a very difficult labor negotiation and the

12   outcome for Delphi may be significantly worse than it would be

13   if we can do a separate labor agreement in this time frame.

14   The second big consideration is that the performance of this

15   company in 2006, and in particular its ability to attract new

16   businesses, because we have continued to demonstrate and

17   convince to our customers and about two-thirds of our new

18   business comes from customers other than General Motors, they

19   are -- they so far seem to have reasonable confidence that this

20   management group will be able to pull through this enormous

21   restructuring effort on a timely basis without the chaos of

22   labor destructions down the road.  As we would begin to slip

23   our timetable, that confidence may erode, the access to new

24   business may stop and you may see a melting ice cube here where

25   there was significant value destruction.  So those

94

1    considerations, you know, are weighed against having a full-

2    blown, lengthy auction process.  We did talk to Cerberus; we

3    talked to Ripplewood, both of whom had been involved with the

4    company even prior to our filing.  Appaloosa bought heavily

5    into various levels of securities here shortly after filing,

6    and therefore they became a major player.  We started talking

7    with them actively last May.  I went to their offices to talk

8    to them.  We came to a conclusion in the fall that no one

9    bidder had all the keys to unlock this puzzle and that we

10   needed there to be some partnering.  We therefore encouraged

11   partnering.  We weren't quite sure, you know, which partnering

12   might be involved, but we did not think that Appaloosa on their

13   own could conclude this deal, nor either of the others.  There

14   were other people who approached us and wanted to come in to

15   due diligence and kick the tires.  We had seen with the three

16   bidders that we had there was a significant commonality of

17   estimates of total enterprise value, which meant that the game

18   was largely confined to carving up the equity portion of the

19   company.  The Cerberus and Appaloosa team made a strong

20   proposal, may not be the one we'd all wished for, but it was

21   much stronger than with what Ripplewood brought and we made the

22   decisions we did.  On December the 11th and the 18th, we had a

23   Cerbaloosa proposal, Ripplewood had faded and we decided that

24   with all the time constraints we had that it was time to, you

25   know, close the doors.  We needed to provide certainty to the

95

1    unions and General Motors that these are the people who are

2    going to be in a position in a governance structure of this

3    company.  They're the people that you would be dealing with on

4    a go forward basis, and let's now close the door and finish off

5    our very important transactions with the unions and with GM.

6    It was a huge balancing judgment.  Yes, there are expenses we

7    wish weren't there.  Yes, there's other tweaks we wish we could

8    have done to the deal.  But, you know, we had to vote on the

9    one that was in front of us, and we voted.

10   Q.    So is it your view that based on that situation that it's

11   too late?

12   A.    To the contrary.

13   Q.    Okay.  And if it's not too late, wouldn't whatever time

14   window the company has be best used if there is some limited

15   discrete non-open auction process for people to come in and do

16   due diligence in some sort of accelerated way, people who are

17   screened to your satisfaction so that to the extent that

18   there's other value here to be offered, there's a process and

19   there is an uncertainty and sort of one arm as this window,

20   which is limited, no dispute, begins to close.

21   A.    We debated that point at length.  Our board meeting this

22   week lasted from 6 o'clock on Tuesday evening until midday on

23   Wednesday.  Almost all of that time was devoted to considerable

24   discussion and debate as to the alternatives that we faced.

25   One was whether to proceed with the transaction and this

1    hearing today versus a delay.  The second big decision was what

2    to communicate to Highland, which is a bidder that surfaced on

3    December the 21st, as you're well aware of.  I'm sitting here

4    staring at a chart that says, you know, 500 million dollars.

5    Q.    I'll take it back.

6    A.    Excuse me?

7    Q.    I'll take it back.

8    A.    No.  My point is should a Highland proposal develop into

9    something that we regard as attractive and superior, or some

10   other bidder shows up with something that is superior, we would

11   consider.  That is not only our instinct, it is our fiduciary

12   duty.  And the amount we will have expended will be not 500

13   million, it will be a fraction of that which would represent

14   whatever expenses and breakup fee would have been alternative

15   transaction that would be incurred at that point.  Weighing all

16   the pros and cons of delays and the implications of delays

17   versus the risk of an expenditure that might turn out to not

18   bear fruit, we concluded that the expense risk and given

19   everything at stake here was worth the risk.  So we decided to

20   proceed.

21   Q.    Okay.  But wouldn't that risk and wouldn't the time window

22   that the company has left be best used if there was a discrete

23   process and a discrete period during which that process

24   occurred that permitted a selective, screened, controlled group

25   of those who could establish sufficient bona fides to meet your

97

1    standings to do what they needed to do.  They would come in and

2    go out and for you to know thereafter that when the window

3    closed there wasn't going to be other destructions in the

4    process.  Doesn't that have a benefit?

5    A.   I -- well, I'm not an expert, but I cannot myself imagine

6    a timetable that would permit the kind of open auction that you

7    have suggested, or semi-open auction that you have suggested,

8    and yet which gives us reasonable assurance we can conclude our

9    General Motors and union deals prior to slipping into this

10   September '07 timetable that has us very concerned.  That's one

11   point.  And secondly, whether we like it or not -- whether we

12   believe they would enforce it, the fact is that the AHC offer

13   is contingent upon, you know, the approval that requires us to

14   have this hearing today.  If we don't, maybe they might stick

15   around; maybe they might not.  But we would rather have them in

16   hand working with us as a rock to stand on even though we have

17   been quite explicit that if other offers come along we will

18   seriously consider them as well.

19   Q.   Sir, I'm not asking the question as if it's an either/or.

20   What I'm asking is to the extent that the company can proceed,

21   and proceed on all fronts, and have -- and use the limited

22   window in an organized way, wouldn't that -- and you do have

23   investment bankers who could design a process that doesn't

24   create the fears of an open and, you know, a sort of random

25   situation that you have concern about, since the time is

98

1    limited both with respect to someone's ability to come in and

2    someone's ability to satisfy you as to bringing the transaction

3    along to protect the estate.  If there's a window at all, isn't

4    there a way to structure what's here now, given the substantial

5    incentives.  I don't know many people who walk away from,

6    arguably not, and I know that it could be different, and I know

7    it could be lower, but if he thinks at this point, you know,

8    that it's a good investment, could something be structured so

9    that the company can have the best of both worlds?

10   A.    I don't know.  What we were asked to vote on December the

11   11th, and what we tabled on December the 18th, was a heavily

12   negotiated deal.  And we came to a conclusion that it was

13   better to proceed with that, nail it down, have that as the

14   rock to stand on rather than taking our risks elsewhere.  And

15   we reaffirmed that in the meeting we had on January the 10th.

16   There is, of course, a competing proposal that was submitted,

17   it had a lot of merit.  It would be very attractive on its

18   economic concerns.  What we don't know is whether it was

19   executable and we do not know what dynamic it would unleash in

20   our labor negotiations or in negotiations in General Motors.

21   So you cannot just make the bald assumption that the deal is

22   baked, and this is just a refiguring of the equity, you have to

23   consider is it executable and will it change the amount of

24   value that might be racked up among the equity participants.

25   Q.    Right.  The question was not a concern for Highland, sir.

99

1   A.   Yes.

2   Q.   The question was just concern for putting the company in a

3   position where Highland or others who were, from your point of

4   view, worth listening to, had a small window for that to

5   happen.  If that were possible, wouldn't that be something that

6   you would embrace?

7            MR. BUTLER:  Objection.  Asked and answered.  He

8   testified that he didn't know.

9            THE COURT:  I think --

10  Q.   If it were possible, would you embrace it?

11           THE COURT:  Now you're speculating, right?  I think

12  we've been over this.

13  Q.   Okay.  Thank you.  Thank you for your time.

14  A.   Thank you.

15           MS. STEINGART:  I'm finished, Your Honor.

16           THE COURT:  Okay.

17           MR. PARKINS:  Your Honor, at this point we have no

18  questions for Mr. Miller.

19           THE COURT:  Okay.

20  REDIRECT EXAMINATION BY

21  MR. BUTLER:

22  Q.   Mr. Miller, because we agreed in the court while you were

23  sequestered not to talk to you -- with you, I didn't talk with

24  you.  And so you don't know that now what I'm going to do is

25  just ask you some questions about what Ms. Steingart asked you.

100

1    I'm going to also ask you some questions about the board

2    meeting over the last couple of days.

3    A.    Very good.

4    Q.    In order to complete the evidentiary record.  I'll try to

5    make those questions pretty quick.  I'd ask if you could look

6    at a series of documents and we'll give you some help with

7    those documents.  Exhibit 114 through 118.

8    A.    Tab 114 is missing from this book.

9    Q.    That's why -- I understand.  He's going to help you.

10   There's two different books we need you to look at.  114 is in

11   one book, 115 through 117 is in another book, and then 118 is

12   in the back of another book.

13   A.    Thank you.

14   Q.    And I'm just going to ask you very quickly if you recall

15   was the document at Tab 114, the January 9th letter from

16   Highland, was that distributed to and discussed at your board

17   meeting over the last two days?

18   A.    Yes.

19   Q.    With respect to Tab 115, was this document, Exhibit 115,

20   was this document distributed and reviewed at your board

21   meeting over the last several days?

22   A.    Yes.

23   Q.    Same question for Tab 116?

24   A.    Yes.

25   Q.    Looking at Tab 117, there's a board book here, it's quite

101

1    thick.  I just ask you to turn to the second page; it has a

2    document number 2339 on it in the lower, right-hand corner, and

3    is an index of materials.  And I'd ask you whether the index of

4    materials that are listed there were, in fact, reviewed by the

5    board over the last several days at its meeting?

6    A.    Yes.  And in my recollection not only was this distributed

7    and discussed, specifically over dinner, each of the topics

8    here was briefly summarized by you to all of the board members

9    so they could reflect on it overnight and have access to

10   reading those materials.  They were available to them during

11   the meeting as the relevance of each came up.  So this was a

12   very comprehensive package and was thoroughly discussed.

13   Q.    And then -- I'm going to come back to this document in a

14   minute but I'd like you to look at Tab 118.  I'll ask you if

15   that document also was distributed and discussed at the board

16   meeting of the last couple of days.

17   A.    Yes.

18   Q.    Okay.  Let's go back to Tab 117 in that summary.  Without

19   going into each of the individual documents I have a couple of

20   questions about the materials.  First, are you aware -- and it

21   was included in Tab 15, are you aware that Skadden sent a

22   letter to the plan investors on January 4th asking them to

23   consider providing input to the company, to the board, about

24   the Highland offer and about making competitive changes to

25   their agreement in response to the Highland offer?

102

1    A.   Yes.  You and I discussed that letter at length and its

2    significance in our efforts to further improve the offer.

3    Q.   And was that letter sent by Skadden at your direction?

4    A.   Yes, sir.

5    Q.   Did the plan investors provide a written response to the

6    board?

7    A.   I do not recall.

8    Q.   Are you aware of what their response was?

9    A.   Their response was they were not prepared to make changes

10   to their offer.

11   Q.   Also, at Tab 27 there was a note here that there would be

12   a letter from the creditors' committee provided separately to

13   the board when it was received.  In fact, you don't have any

14   recollection that letter was received during the board meeting,

15   do you?

16   A.   I don't believe it was during the board.

17   Q.   Did you receive a letter subsequently?

18   A.   I don't recall.  I believe so.

19   Q.   I also would like to turn your attention to -- I think you

20   may recall but you can turn to the document if you want to.

21   Within item 18, in Tab 117 there was a letter from Houlihan

22   Lokey, on behalf of the equity committee, dated January 7,

23   2007, do you recall that letter?

24   A.   Yes, I do.

25   Q.   Did you read it?

103

1    A.    Absolutely.

2    Q.    Did you talk to your directors about all of them reading

3    it?

4    A.    Yes.  That's one particular document I wanted every

5    director to focus on and to read prior to concluding our

6    discussions to make sure they fully understood an opposing

7    view, if you will, of challenging some of the assertions made

8    by Rothschild.  As chairman of this board, I wanted our

9    directors not only to know what we were telling them, but to

10   know the views were coming from the other side so that they

11   could, in fairness, deliberate and come to a conclusion.

12   Q.    At the board of directors meeting, was the Houlihan Lokey

13   letter, in particular, was that reviewed on a line item by line

14   item by the board during the course of the board meeting?

15   A.    Yes.  There was an analysis prepared that both listed the

16   particular allegations or assertions made by Houlihan and then

17   commentary from us.  But at least the board would see side by

18   side the assertion and the response and then be able to come to

19   their own conclusions about it.

20   Q.    And would it be fair to say that the board thought that

21   certain of the paragraphs in the Houlihan Lokey letter, in

22   fact, raised issues that were meritorious?

23   A.    Yes.

24   Q.    And there are other paragraphs that the board placed less

25   merit to, is that correct?

104

1   A.   Yes.  In summary terms, as we have discussed, there was

2   the tension between the surface economic and government

3   superiority the Highland offer weighed against the

4   executability and possible impact on other stakeholders still

5   in negotiation.  And the delicate balance that we were

6   weighing, I think that it involved a fair and thorough

7   discussion of the points in debate.

8   Q.   You said the board had to make -- you presented two

9   decisions for the board to make.  The first was whether to

10  proceed with this hearing?

11  A.   Yes.

12  Q.   What was the second decision?

13  A.   The second decision involved what to communicate to

14  Highland, a potential source of a yet more attractive deal for

15  our stakeholders.  We debated whether we would be better off to

16  slam the door and say this is it, we're not going to consider

17  anything else, or whether it was the better -- even though the

18  alternative would be -- even though there was some risk of

19  destabilizing our negotiations with unions and GM whether we

20  should leave the door open.  As you know, within minutes after

21  the conclusion of our board meeting I called a principal of

22  Highland to both explain what our decision had been to give

23  some indication of what might constitute a successful proposal

24  but did say we were committing to this, we were bound to the

25  fee commitments if it's approved by the Court.  But at the same

105

1    time, in furtherance of our duty to all of our stakeholders,

2    proposals which could be deemed superior would be considered.

3    We would not slam the door on access to confidential

4    information under terms comparable to other bidders.  And it

5    was the board's desire that we make sure that no stone's left

6    unturned in trying to find best value for our stakeholders.

7    Q.   Who do you speak to at Highland?

8    A.   Patrick Daugherty.

9    Q.   And I don't want you to say on the record -- describe in

10   particular on this public record what you told him, but did you

11   provide him specific guidance about the issues the board wanted

12   Highland to address?

13   A.   Yes.

14   Q.   Ms. Steingart asked you a series of questions about

15   whether we should publish a list of bid procedures or a set of

16   procedures for some process here; do you recall that question

17   and your answers?

18   A.   I recall the question, I don't recall my answers.

19   Q.   Do you have a view of what might occur with the General

20   Motors and labor negotiations if, as part of this process, the

21   debtors were to publish bid procedures to seek in other

22   investors as an alternative to the plan investors?

23   A.   Yes.  If we were to publish bid procedures and say that

24   this was a wide open process where we were going to invite

25   competing bids and so on in a very open, you know, semi/quasi

106

1    auction way, first place, it is our judgment that it would have

2    a chilling effect on our labor negotiations.  The labor unions

3    want to know who they're dealing with.  And on December the

4    18th we were able to provide them with some certainty that we

5    had selected the plan investors.  On December the 21st we saw a

6    pulling back by the unions.  So we are once again at risk of

7    significant delay in getting to the labor transformation that

8    we so badly need if we're going to restructure this company.

9    Proceeding with this action and making the AHC group -- we

10   prefer everyone understands that we have a fiduciary duty to

11   consider alternative proposals.  But at least we can get

12   started down this path and we are hopeful of being able to make

13   progress in our labor negotiations if we get the Court's

14   approval for the motion that we're considering to take.  With

15   respect to General Motors, General Motors made a very public

16   statement.  It went to the notion that if indeed there is more

17   value that can flow to equity, General Motors wants it.  And so

18   there's a big question here as to whether we're looking at a

19   baked deal and simply dividing up the equity implications of it

20   or whether, in fact, the underlying deals that create the

21   equity value are in question if there are different plan

22   investors.  And so that is a complicating factor that says this

23   is not a plain vanilla, you know, possibility for just an

24   ordinary auction, this is an incredibly -- I mean, I've never

25   seen a more complex restructuring than this one where all the

107

1    parts are moving in at the same time.  And we needed to

2    bring -- you know, pin down some of the elements of our

3    restructuring plan.  Not in the way that forecloses a superior

4    offer but at least in a way that we can get started finishing

5    off the rest of the pieces.  Those are things that we brought

6    to bear in the judgments that we made on Wednesday.

7    Q.    Thank you, Mr. Miller.

8              MR. BUTLER:  I have no further questions.

9              MS. STEINGART:  I have no re-cross, Your Honor.

10             THE COURT:  Okay.

11             MR. PARKINS:  None from us, Your Honor.

12             THE COURT:  All right.  You can step down, sir.

13             THE WITNESS:  Thank you.

14             THE COURT:  I'm just checking on some resources for a

15   second.

16             MR. BUTLER:  Can Mr. Miller be excused?

17             THE COURT:  Yes.  All right.  I think that leaves

18   just Mr. Daugherty, correct?

19             MR. BUTLER:  Yes, Your Honor.

20             THE COURT:  Okay.

21             MR. PARKINS:  At this point, Your Honor, we'd like to

22   move what's presubmitted as Exhibit 122, the declaration of

23   Patrick H. Daugherty.  Now, I don't know if it's in your

24   exhibit binder.

25             THE COURT:  I don't know if its in the binder, I read

108

1   it.  I have it.

2               MR. PARKINS:  You have it?

3               THE COURT:  Yes.

4               MR. PARKINS:  Okay.

5               THE COURT:  But that will be number 122?

6               MR. PARKINS:  Yes.

7               THE COURT:  And I'm assuming the debtors want to

8   cross-examine Mr. Daugherty?

9               MR. HOGAN:  That's correct, Your Honor.  Your Honor,

10  Al Hogan from Skadden Arps for the debtors.

11              THE COURT:  Okay.  If you can sit down, Mr. Daugherty

12  and raise your right hand, please?

13      (Witness is sworn)

14              THE COURT:  For the record, would you spell your

15  name?

16              THE WITNESS:  Patrick H. Daugherty, D-A-U-G-H-E-R-T-

17  Y.

18  CROSS-EXAMINATION BY

19  MR. HOGAN:

20  Q.   Good afternoon, Mr. Daugherty.

21  A.   Same to you.

22  Q.   You're aware or not, sir, whether it's Highland or the

23  current plan investors or some other group of plan investors

24  that working with the debtor's unions will be important in

25  terms of the debtor's executing the ultimate restructuring

109

1   plan, are you aware of them?

2   A.   Yes.

3   Q.   You would concede, sir, that Highland itself does not work

4   directly with the labor unions in its portfolio companies, is

5   that correct?

6   A.   That's correct.

7   Q.   While we're on the topic of the labor unions, I want to

8   clear up just one other thing that I'm sure is an inadvertent

9   mistake, but I think it's important.  Do you have your

10  declaration in front of you?

11  A.   Do I?

12          MR. PARKINS:  Yes.

13  A.   Okay.  Thanks.

14  Q.   Could you please take a look at paragraph 11 of your

15  declaration?

16  A.   Okay.

17  Q.   That first sentence is false, is it not?

18  A.   You're talking about as of today -- as of now?

19  Q.   As of the time that you signed your declaration?

20  A.   Oh, that's correct.  I guess.  I mean, it depends on when

21  the creditors got on board.

22  Q.   In particular, Mr. Daugherty, I'm focusing on the language

23  where you are speaking about the people that have objected to

24  the motion.

25  A.   Yes.

110

1    Q.   You say that all the debtor's unions object to the motion,

2    do you see that?

3    A.   Yes, I do.

4    Q.   Are you aware that the United Auto Workers did not object,

5    even initially, to this motion?

6    A.   Thanks for the clarification, I thought they had.  But I

7    understand that as of this morning they weren't.

8    Q.   Actually, as of any time?

9    A.   I accept that, I accept that.

10   Q.   Are you aware that the United Steel Workers never objected

11   to this motion?

12   A.   I accept that as well.

13   Q.   Do you know that those are two of the three largest unions

14   of the debtors?

15   A.   Yes, I do know that.

16   Q.   And it sounds like you are aware that as we sit here right

17   now, no unions are objecting to this motion, correct?

18   A.   That is correct.

19   Q.   And so are you aware that as we sit here right now, no

20   creditor of the estate is objecting to this motion, correct?

21   A.   I think that's the case.

22   Q.   Mr. Daugherty, how much stock of Delphi did Highland own

23   prior to October 8, 2005?

24   A.   I don't know off the top of my head.

25   Q.   Do you have any estimate for us?

111

1    A.   No.

2    Q.   Well, how many shares has Highland accumulated in the

3    sixty days prior to December 18, 2006?

4    A.   All I can tell you is we have about 8.8 percent of the

5    shares outstanding.

6    Q.   And can you tell us how much of that you've accumulated in

7    the last sixty days, since December 18, 2006?

8    A.   No.  I don't have that detail in front of me.  Frankly, I

9    just hadn't paid attention to it.

10    Q.   Do you know what Highland's average basis price is in

11    Delphi's stock?

12    A.   No, I don't.

13    Q.   Do you have any idea whether or not Highland's basis is

14    higher or lower than the current plan investors?

15    A.   Than the current plan investors, I have no idea what their

16    basis is either.

17    Q.   Does Highland currently stand to lose money based on its

18    speculative purchases of Delphi stock?

19    A.   I don't know what you mean by speculative purchases of

20    Delphi stock.

21    Q.   As you sit here today, does Highland stand to lose money

22    on its existing purchases of Delphi stock?

23    A.   Yeah.  Beyond that.  We stand to lose money on our stock,

24    our bonds, and our bank debt.

25    Q.   And can you tell us how much you stand to lose?

112

1    A.    The value of our total investment is about 700 million.

2    Q.    Now, looking at your declaration, in paragraph 14, what

3    you're talking about there, you say that the Appaloosa

4    Cerberus's proposal takes the value current stockholders are

5    entitled to receive.  Can I just stop you right there?  Isn't

6    it true that you acknowledged to the debtors, at a meeting in

7    Troy, Michigan, that these debtors were insolvent, absent a

8    consensual resolution, a consensual deal with GM and the labor

9    unions?

10   A.    You know, I didn't get into the solvency.  I remember the

11   questions.  And as Jack will recall, I didn't want to make a

12   declaration as to whether the company was solvent or not.  One

13   thing I did know was that the company was going to have a hard

14   time going forward without those constituencies on board.  And

15   that was the message I intended to convey.  I agree with that.

16   Q.    Okay.  So focusing on that language in paragraph 14 that

17   we just looked at, you would concede that the value you're

18   talking about, that value doesn't exist for current

19   stockholders absent a consensual deal with GM and the labor

20   unions, is that right?

21   A.    I don't think the value exists for anybody absent a deal,

22   a consensual deal with GM and the labor unions.

23   Q.    Very good.  So focusing a little bit more on the idea of

24   value transfer, there's been a lot of discussion today about

25   what the price of Delphi stock might or might not be in the

113

```
1    future.  What you've done in your declaration here is to take

2    the current market price and come up with an implied value for

3    Delphi stock emergence and compare that to the strike price for

4    the equity interest in the framework agreements.

5    A.   It's based on current market trading.  Actually, I think

6    the number you're referring to is the number as of December

7    19th.  But, yeah.

8    Q.   And on that basis, in your declaration you contend that on

9    beyond the transfer value that we've talked about here today

10   that the plan investors are going to receive north of a billion

11   dollars of value based on the spread between the strike price

12   and your implied equity price, correct?

13   A.   Not only that, but fees and, I think, the 6.3 million of

14   shares that was a holdback on the rights backstop.  I mean, all

15   those things have been spoken about at length.  But in totality

16   it was -- I understand the floor is 500 million, but we think

17   it's closer to a billion.

18   Q.   And that spread between the 500 million and billion is

19   based on the difference between the forty-five dollars that's

20   assumed in the framework agreements and your implied equity

21   value, correct?

22   A.   Well, it's not really my implied equity value, it's a

23   function of where the market's value and shares and what the

24   conversion is going to be at the end of the day with

25   confirmation, based on the deal they proposed.
```

114

1    Q.   Let's talk about that.  The way the markets are currently

2    valued in the shares?

3    A.   As of the 19th.  Obviously, if you add now, since our deal

4    stock's gone up a lot.  But it would be unfair to attribute

5    that amount of value at the time of their plan because the

6    markets basically spoke about our deals, said it was a better

7    deal for equity.  So you wouldn't want to include that.  What

8    we waited is two days after their deal was announced so the

9    market could absorb the effect on equity as it related to their

10   deal.

11   Q.   The so-called transfer of value that you're worried about

12   is based on a calculation of equity value based on current

13   market price for Delphi stock, right?

14   A.   Right.  It was a combination of current -- again, let's

15   use the date December 19th.  And adding to that the new cash

16   coming in via the rights offering.  Obviously, we assume a

17   dollar is worth a dollar.  So on that basis, you add the two

18   together and that implies the value.  But it's not theoretical,

19   it's not conceptual.  As I told you yesterday, it's an is.

20   Q.   It's an is.  Your belief is that makes sense because the

21   market sets the price, right?

22   A.   The market basically valued the shares on that particular

23   day, yes.

24   Q.   The problem, Mr. Daugherty, was that the market may not

25   have perfect information right now about Delphi, isn't that

115

1    right?

2    A.   I'm not sure anybody has perfect information about Delphi

3    right now.  When you look at how subject we are to agreements

4    with GM and the unions and our prospects for being able to bid

5    on future programs with GM, I think it's fair to say there's a

6    lot of ambiguity for everyone.

7    Q.   I mean, it's certainly fair to say that Highland would not

8    commit to a 4.7 billion dollar investment today just based on

9    publicly available information, would you?

10   A.   No.  I think what you see is we're basing our commitment

11   on publicly available data and then we're trying to kind of

12   read between the lines, so to speak, as far as -- currently the

13   plan as proposed has a 2.4 billion dollar minimum.  So we can

14   make the assumption that 2.4 has to be hit.  Otherwise the deal

15   that's been proposed blows up.  So we can use that as a

16   starting point and then we could build around it.  And, in

17   fact, that's exactly what we did.

18   Q.   That's writing a letter.  But what I'm talking about is

19   actually making an investment.  You wouldn't think about doing

20   that based solely on publicly available information, correct?

21   A.   If I understand your question, in order to basically

22   evaluate what we would be willing to do, we did just what I

23   just mentioned now as it relates to going through funding,

24   closing on the deal, certainly where you're subject to due

25   diligence.  And it was important to us not to basically upset

116

```
 1   the apple cart as it previously existed.  So what we agreed to

 2   do in our proposal was step into the shoes, step into the same

 3   amounts, step into the same due diligence as the people before

 4   us.

 5   Q.    And focusing on that due diligence, specifically subject

 6   to due diligence and access to non-public information, right?

 7   A.    Oh, sure, sure.

 8   Q.    Information that the market doesn't currently have,

 9   correct?

10   A.    That's correct.

11   Q.    And that's because in your view the non-public information

12   is going to be the essence and the core of determining the

13   value of Delphi, right?

14   A.    Yeah.  But it's going to be a series of non-public

15   information.  It's going to be the data room that was referred

16   to earlier.  And then it's also going to be ultimately how

17   these negotiations go with GM, how these negotiations go with

18   the unions.  And on top of that, what kind of program

19   assurances we're going to get going down the road.  And,

20   frankly, that's the big question we're all waiting for.

21   Q.    And to evaluate all that non-public information, you've

22   got a team of people ready to go in and look at that, right?

23   A.    Absolutely.

24   Q.    The public shareholders on which you're basing your

25   spread, they don't have any of that, do they?
```

117

1    A.   If they have it, they don't have access to the company.

2    Q.   That's exactly right.  Taking a look at paragraph 24 of

3    your declaration if you could, please.  Going to the last

4    sentence of that paragraph.  It says Highland Capital has also

5    provided the debtors with its draft plan framework and support

6    agreement.  And equity purchase and commitment agreement black

7    lined to those of Appaloosa Cerberus Group, you see that?

8    A.   I do.

9    Q.   You did that on January 9, 2007, correct?

10   A.   Yeah, we did.

11   Q.   That was nineteen days after you delivered your proposal?

12   A.   That's correct.

13   Q.   Now, you would concede that it's correct that the markups

14   that you delivered on January 9th changed other terms and

15   conditions beyond what was stated in your proposal of December

16   22nd, correct?

17   A.   Why don't you refresh my memory?  Because on a material

18   basis, I don't think that's the case.

19   Q.   So I think I can wrap it up this simply.  As you sit here

20   today, you can't tell me one way or the other whether you've

21   amended your proposal through the markup which you submitted?

22   A.   No.  I'm not saying that.  What you asked was did we

23   deliver a plan framework and support agreement on the 9th.  In

24   fact, we did.  What it basically does is it leaves in place, as

25   we said in our letters that we said all along, it leaves in

118

1    place the treatment of the GM framework.  It leaves in place

2    whatever's been done on the union side, which from my analysis

3    it doesn't seem like there's much.  Okay.  And then it leaves

4    in place the treatment of the exit financing.  It leaves in

5    place the treatment -- it leaves in place the treatment of the

6    GM stipulations, the pension obligations.  All those items we

7    left in place.  The only thing we basically changed was instead

8    of the 1.2 billion dollar convertible preferred that was

9    strictly offered to the Cerbaloosa group, we simply took that

10   value and we moved it back down to the shareholders.  All

11   right.  And included that in the rights offering.  We also took

12   the twenty percent that was going to be funded via equity

13   ownership, you know, of the bonds.  The bonds were going to

14   take twenty percent in equity.  We took that and said bonds are

15   entitled to par plus crude so long as the shareholders can come

16   up with the money to pay them out.  So we took that and moved

17   it down.  And then, obviously, we changed the corporate

18   governance.  And made it, from our perspective, more fair.

19   More reflective of an independent public company that didn't

20   necessarily or definitely didn't have Highland in control of

21   frankly anybody else.  Those were the key -- those were the

22   material changes that were made.

23   Q.    Could I direct you to Exhibit 115 in the books, please.

24   Mr. Daugherty, in terms of the differences -- and I won't ask

25   you to accept this characterization, I'll ask you to comment on

1    it in a second, but this document purports to list the

2    differences between your black line and the AHC agreements.

3    Did these look consistent with what you understood Highland was

4    changing in its black lines that it submitted to the company on

5    January 9th?

6              MR. PARKINS:  Objection.  Lack of foundation for that

7    question.

8              THE COURT:  Sustained.  I don't think he could answer

9    it.

10   Q.   Let me ask you one final question.  Can you tell me,

11   sitting here today, one way or the other, whether the black

12   line that you submitted to the company on January 9th changed

13   anything from your proposal of December 21st?

14   A.   Not materially, it shouldn't have.

15   Q.   Okay.

16             MR. HOGAN:  No further questions, Judge.

17             THE COURT:  Okay.  Any redirect?

18             MR. PARKINS:  Your Honor, I have a very brief

19   redirect.

20             THE COURT:  All right.  Before you do that.  I had a

21   couple of questions and I should probably ask them before you

22   do that.  Mr. Daugherty, paragraph 7 of your declaration says

23   "although Highland Capital had been aware that the debtors were

24   discussing reorganization strategies and scenarios with

25   potential investors, Highland Capital was not aware of the

120

1    terms or structure of any proposed transaction."  You see that

2    there?

3              THE WITNESS:  I do.

4              THE COURT:  When, if you can recall, did Highland

5    Capital become aware that the debtors were talking about

6    scenarios with potential investors?

7              THE WITNESS:  I think it was about six weeks prior to

8    December 18th, we were starting to hear rumors in the market.

9    Sources like Debtwire basically talking about contemplated

10   structures.  It turned out the one that we heard about wasn't

11   the one that ultimately came to be.  But as I went in and

12   talked to Jim Dondare I basically said, you know, I feels the

13   sand moving under my feet, something's going on, you need to

14   give David Tepper at Appaloosa a call because there's too much

15   out there.  You need to basically raise your hand and tell him

16   that we're here, what our size is, willing to be proactive,

17   willing to be included.  But that was probably the first time.

18             THE COURT:  And then as I read your proposal it

19   doesn't, by any means, guarantee your company voting control of

20   the debtors, that's correct, right?

21             THE WITNESS:  That was by design.

22             THE COURT:  Well, that's my next question.  Why do

23   you not want to have that level of control?

24             THE WITNESS:  That's a great question.  We basically

25   sprung into action on this thing December 18th.  We literally

1   did.  And when people talk about being able to move, we

2   created, structured and offered this deal in three days, and

3   that's the honest to God's truth.  What we did was we looked at

4   it, what we thought we could live with, we looked at the GM

5   deal.  And instead of getting into who owes what to whoever and

6   what our views might be on that, we needed to come in in a way

7   that could be, from our perspective, viewed as the least

8   offensive as possible and at the same time, defending not only

9   interests as shareholders, but the equity group in general.

10  And so we developed a plan that we felt like we could live

11  with.  And I think that's an important point to note here

12  because this is not -- you know, it was suggested to me that

13  this is a topping bid and even other people have called it

14  that, isn't this really a battle between the hedge funds?  It's

15  not.  It's not a battle between Highland and Cerbaloosa.  What

16  this is is a battle for fairness.  And so we structured our

17  deal accordingly.  And if you look at how we structured it, not

18  only do the corporate governance in the hand of basically the

19  equity as a whole, but we also reached out, and we thought we

20  reached out, sent a good message to GM and said look, we want

21  you to be part of that selection family.  We thought we were

22  sending the right message to management.  We said we want you

23  to have somebody on that selection panel.  And then four people

24  will be representative of equity with, obviously, one from the

25  committee.  We didn't note who goes where because again, we did

```
 1    not want Highland to be a lightning rod.  The other thing we
 2    did was we said okay, as we structure this rights offering
 3    let's make sure we offer to everybody.  Because the last thing
 4    we want to do -- who may think we got any credibility if we
 5    just came in here and said no, pick me, and this is how I
 6    should gobble up the fees.  We think that was just more of the
 7    same, which was what we were fighting in the first place.  So
 8    we came up with a framework where we offered the rights
 9    backstop to basically all material holders.  Really, we picked
10    the number really because of logistics reasons, but we picked
11    anybody that has a half percent or more would be willing to
12    come in and backstop it.  And, of course, we got rid of the
13    convertible preferred that was only available to a select few.
14    We got rid of the 6.3 million dollar holdback that was only
15    available to the select few.  We did keep the 2.5 percent fee
16    but we opened it up to basically all shareholders so they could
17    basically have a first opportunity in self helps.  So you
18    actually have three phases.  You had the shareholders getting
19    the rights offering, you had the material shareholders getting
20    the opportunity to backstop, and then Highland would ultimately
21    backstop that.  We did not want to control this, we still do
22    not want to control this.  We like the investment.  When
23    management asked me why did you make this investment, we like
24    the management team.  We don't agree with everything they do,
25    they had a lot of tough choices.  I wouldn't say that I would
```

123

1    do -- make all those choices.  But when you're in that

2    management seat, you know, that's the hot seat and we certainly

3    understand that we're not going to agree on everything.  But we

4    like the austerity measures.  We like the fact that this thing

5    could turn.  And we thought that at the end of the day it's in

6    the mutual interest of GM, labor, Delphi and its investors to

7    get a deal done.  And we liked that dynamic and we saw progress

8    being made strictly from a public perspective that encouraged

9    us to make the investment in the first place.  And that's it.

10            THE COURT:  Okay.  You want to redirect?

11            MR. PARKINS:  Very brief.

12   REDIRECT EXAMINATION BY

13   MR. PARKINS:

14   Q.    Mr. Daugherty, you heard questions about due diligence

15   today, haven't you?

16   A.    Yes.

17   Q.    Has Highland started its due diligence process yet?

18   A.    Yes.

19   Q.    Has Highland executed a nondisclosure agreement with the

20   company yet?

21   A.    No.

22   Q.    Why hasn't Highland executed a nondisclosure agreement?

23   A.    You know, there's interactions back and forth but the

24   bottom line is there were certain provisions in there that we

25   found that we couldn't live with considering the kind of

124

1    analysis discussions that we need to engage in in order to

2    properly and be real in this transaction.  And what do I mean

3    by that -- I mean, I think we heard Mr. Resnick say earlier

4    that you had to have a dialogue with the unions.  You had to

5    have a dialogue with GM if you're going to be able to be

6    successful in this.  Well, some of the terms -- and then they

7    basically said no, you can't talk to those people unless we

8    approve.  And then we had some interactions where no, you could

9    talk to them but you got invite us to the meeting, and us is

10   Delphi.  And after the meeting, you got to tell us everything

11   you talked about.  Well, it's very hard to have those critical

12   dialogues, building trusts, etcetera, when you basically have

13   to invite your mother with you everywhere you go.  And so we

14   found that hard to contend with.  The other issue that we found

15   problematic was that -- you know, these other players had a lot

16   of months to basically prepare.  They were able to deal with

17   the borrower and then they were able to go out to their

18   syndicate group and develop, you know, a backup investment

19   team.  We got to act quick.  I mean, there's one thing we

20   definitely do buy into, because this thing's got to get

21   resolved by September.  We're with that a hundred percent.  The

22   problem is is that we got to act quicker.  Now, we did tell the

23   company we'll get our due diligence done in sixty days.  In

24   fact, I told them I'll push for six weeks.  And so far I think

25   we've shown that we could deliver pretty quickly.  I mean, in

1   less than a month we delivered a plan, we're sitting here

2   today.  Nobody's arguing that our plan isn't fair, okay?  And I

3   find that to be somewhat of a plus in our column.  But the

4   reality is we'll continue to move quickly but we've got to be

5   able to run a parallel path of working with our fellow

6   financers.  I mean, we've had numerous calls from people in the

7   group raising their hands saying include me, include me,

8   include me.  And so we need to be able to talk to those parties

9   without the company having a right of first refusal.  Those

10  were the critical elements to the NDA that we really felt just

11  froze out the process.  And truth be told, one of the other

12  bidders out there that did side on the NDA has mentioned to

13  third parties that they want to talk to us.  But it's such a

14  tar baby that they feel like they can't even have a dialogue

15  with us without getting sued, and that was a problem.  That's

16  why we couldn't get there.  And, you know, in management's

17  defense we had these calls -- we had discussions through the

18  weekend.  I mean, these guys do work hard, you can't fault them

19  for that.  And management is reasonable, and we think we're

20  getting close, and the next thing you do is you get something

21  sprung off by the law firm that's totally different.  And I'm

22  not going to point fingers at that because I don't think that's

23  management's direct.  But, you know -- I guess I am pointing

24  fingers, sorry.  Guilty.  But anyway, that's it.

25           MR. PARKINS:  No other questions, Your Honor.

126

1          THE COURT:  Okay.  Any cross?  Okay.  You can step

2     down, Mr. Daugherty.

3          THE WITNESS:  Thanks.

4          THE COURT:  Okay.  It's 6 o'clock -- there's no other

5     evidence, right?  The factual record is closed?

6          MR. PARKINS:  Yes, Your Honor.

7          MS. STEINGART:  We submitted the designations of Mr.

8     Opie, Your Honor.  But other than that there is no other

9     evidence.

10          THE COURT:  All right.  As I understood, you were

11     prepared to agree to the designations of Mr. Opie, right?

12          MR. HOGAN:  Yes.  Judge, we have designations to both

13     their solutions.

14          THE COURT:  Okay.

15          MR. STEINGART:  And we have no -- we're good with

16     that.

17          THE COURT:  All right.

18          MR. PARKINS:  We're fine with that too, Your Honor.

19          THE COURT:  Okay.  Very well.  So the factual record

20     is closed.  It's 6 o'clock, and I appreciate there are time

21     constraints with the proposal on the table and I have a number

22     of questions I think could be developed in oral argument.  I

23     won't be able to rule tonight.  I'll have to rule tomorrow.

24     Many of you have the pleasure of coming back here tomorrow

25     anyway.  But I leave it up to you whether you want to have oral

127

```
1    argument tonight or whether you want to gather your thoughts

2    and give me oral argument tomorrow.

3            MR. BUTLER:  I'm prepared to do it, Your Honor.

4    Debtors are prepared to do whatever the Court wants.

5            THE COURT:  I was going to leave it up to you.

6            MR. BUTLER:  We're going to be back here in front of

7    you tomorrow as well.  It's a matter of what the -- I don't

8    know how much time people think they intend to use for

9    argument.

10           THE COURT:  Well, that's a good -- well, part of it

11   is I have some questions.  So it's hard to predict.  I actually

12   think it's probably better to have argument tomorrow.  My best

13   estimate of the omnibus hearing is that it will be about two or

14   three hours, is that fair?

15           MR. BUTLER:  Yeah.  And then there's a claims hearing

16   after that, Your Honor.

17           THE COURT:  And that's about two hours?

18           MR. BUTLER:  I think that's probably right, Your

19   Honor.

20           THE COURT:  Well, the omnibus hearing, the main

21   matter is the exclusivity issue and I assume that would follow

22   on this matter.

23           MR. BUTLER:  The only objector left to exclusivity is

24   Highland.

25           THE COURT:  Right.  And so I don't think the omnibus
```

128

1    hearing would be two or three hours.  I was counting the claim

2    objections in the omnibus hearing together, thinking it might

3    be three hours, is that --

4              MR. BUTLER:  I think we can -- depending on what

5    happens with the exclusivity hearing.  I think that hearing can

6    be done in two hours or less.

7              THE COURT:  All right.

8              MR. BUTLER:  We'll be as expeditious as we can.  What

9    time do you want us to start tomorrow?

10             THE COURT:  Well, I have to prepare for that claim

11   objections, unfortunately.  So can you tell -- since you can

12   get a hold of them that we're going to start at 12 with the

13   omnibus and claim objections and we'll start at 9:30 for the

14   oral argument and then I'll give you a ruling.

15             MR. BUTLER:  Yes, Your Honor.  We'll send out a

16   notice tonight for the best we can do.

17             THE COURT:  Okay.  I mean, obviously, some people

18   will show up.

19             MR. BUTLER:  A lot of the people are here who are

20   going to be here tomorrow.  So we all know it.

21             THE COURT:  The people with the claim objections knew

22   they were at the end anyway.

23             MR. BUTLER:  Yes.

24             THE COURT:  So they're at 1 anyway.  All right.  I

25   thank you for doing this efficiently and I'll see you all

129

1    tomorrow morning.

2              MR. BUTLER:  Thank you, Your Honor.

3              (Whereupon these proceedings were concluded at 6:03

4    p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

130

1

2                         I N D E X

3

4    WITNESS                EXAMINATION BY        PAGE

5    Mr. Resnick            Ms. Steingart         7

6    Mr. Resnick            Mr. Parkins           44

7    Mr. Resnick            Mr. Butler            56

8    Mr. Resnick            Ms. Steingart         65

9    Mr. Miller             Ms. Steingart         75

10   Mr. Miller             Mr. Butler            99

11   Mr. Daugherty          Mr. Hogan             108

12   Mr. Daugherty          Mr. Parkins           123

13

14

15

16

17

18

19

20

21

22

23

24

25

131

1

2                   C E R T I F I C A T I O N

3

4       I, court approved transcriber, certify that the foregoing is a

5       correct transcript from the official electronic sound recording

6       of the proceedings in the above-entitled matter.

7

8       _____ January 17, 2007

9       Signature of Transcriber              Date

10

11      Lisa Bar-Leib

12      typed or printed name

13

14

15

16

17

18

19

20

21

22

23

24

25

**A**

**ability** 8:25 9:5 21:2
  32:14 40:13 54:13
  58:7 66:21 76:23
  76:24 79:16,18
  85:10 88:11 93:15
  98:1,2
**able** 17:6 26:14
  31:13 38:15 46:15
  51:20 61:23 63:10
  65:6 81:23 82:12
  93:20 103:18
  106:4,12 115:4
  121:1 124:5,16,17
  125:5,8 126:23
**above-entitled**
  131:6
**absent** 112:7,19,21
**absolutely** 8:17
  29:15 30:7 71:22
  103:1 116:23
**absorb** 114:9
**accede** 52:10
**acceded** 51:9
**accelerated** 95:16
**accept** 87:14 110:9,9
  110:12 118:25
**access** 39:20 93:23
  101:9 105:3 116:6
  117:1
**account** 89:3,20
**accumulated** 111:2
  111:6
**achieve** 60:9,16,21
  63:10
**achieved** 55:7 61:3
**acknowledged** 112:6
**act** 124:19,22
**acting** 7:17
**action** 106:9 120:25
**actively** 94:7
**add** 58:4 90:2 114:3
  114:17
**adding** 21:19 114:15
**addition** 25:20 26:5
  26:19 27:8 35:1,3

86:9
**additional** 22:1 66:9
**address** 43:11 58:19
  61:23 105:12
**addressed** 42:25
  61:21
**admitted** 7:6,8
**adopted** 71:18
**advantage** 29:16
  41:9,24
**advice** 24:3 76:24
**advise** 14:19
**advised** 80:16
**advising** 27:5
**advisor** 69:10,12,13
**advisors** 57:21
  58:13 59:15,16
  70:22 76:7,13
  77:16
**affirmative** 47:17
**affirmatively** 53:10
  67:7,7
**afternoon** 7:4,17
  44:13 75:22,23
  108:20
**aggressive** 20:7
**ago** 30:14 52:6
**agree** 52:10 53:7
  73:7 78:11 112:15
  122:24 123:3
  126:11
**agreed** 83:17 99:22
  116:1
**agreement** 2:3,4
  7:22 8:7,10,16,20
  8:23,24 10:5,6,8
  10:10 11:18,20,21
  11:23 12:2,4,6,12
  12:13,18,23 13:11
  13:17 14:1,2,9,13
  17:7 20:2 40:11,12
  42:20 50:23 52:1
  55:19 63:2 64:6
  65:1,8,10 68:9
  74:1 76:12 77:8,12
  77:25 78:15,19

79:7,11,12 81:1,1
  81:18,19 82:11
  83:1 85:13 91:15
  92:10,12,21 93:13
  101:25 117:6,6,23
  123:19,22
**agreements** 7:19 9:4
  11:2 12:8,9,15
  13:1,3,10,18 17:11
  17:24 19:18,20,24
  37:7 60:20 61:7,20
  62:21 63:23 64:8
  64:18 65:2,6 72:12
  74:17,22 78:10
  80:6 82:24 84:16
  84:23 85:22 92:15
  92:22,22 113:4,20
  115:3 119:2
**AHC** 28:23,25 37:4
  38:12 39:17 40:14
  67:23 92:10 97:12
  106:9 119:2
**Al** 108:10
**ALBERT** 3:10
**ALICIA** 6:23
**allegations** 103:16
**allowed** 51:12
**alluded** 54:24
**alternate** 14:4
**alternative** 13:19
  21:25 49:17 96:14
  104:18 105:22
  106:11
**alternatives** 95:24
**altogether** 19:4
**ambiguity** 115:6
**amended** 8:24 10:21
  117:21
**amendment** 9:3
**amendments** 9:21
  9:21
**amount** 13:23 14:23
  16:19,23 17:1,14
  19:15 22:1 24:25
  29:11 44:24 48:12
  57:25 58:1 59:21

87:4 88:15 96:12
  98:23 114:5
**amounts** 8:1 79:15
  116:3
**ample** 42:7
**analysis** 27:13,17,18
  103:15 118:2
  124:1
**analytic** 80:3
**analytically** 29:9
**analyzed** 22:3
**announced** 74:2
  114:8
**announcement**
  39:17
**answer** 20:11 22:11
  26:13,15,25 28:2
  30:4 31:22,25 32:3
  43:8 54:17,18 68:4
  85:5 119:8
**answered** 15:12
  22:16 99:7
**answering** 80:14
**answers** 105:17,18
**anticipated** 59:24
**anybody** 45:14
  112:21 115:2
  118:21 122:11
**anymore** 19:25
**anyway** 125:24
  126:25 128:22,24
**apart** 70:11
**apologize** 71:14
**Appaloosa** 29:2,3,10
  30:21 36:23 45:3
  46:8 47:2,14 48:4
  48:13 49:6,10 51:6
  51:24 53:15 54:24
  55:8,12,12,15,17
  55:18,21 57:18
  59:5 65:25 66:10
  66:15 86:10 90:13
  90:16 94:4,12,19
  112:3 117:7
  120:14
**Appaloosa/Cerbe...**

66:4
**Appaloosa/Harbi...**
59:2,16
**appears** 54:22
**apple** 116:1
**applied** 21:20 33:1
**applies** 63:3
**apply** 18:13
**applying** 19:8
**appreciate** 85:5
126:20
**apprised** 76:17
**approach** 70:20
**approached** 36:23
53:25 79:14 94:14
**approaches** 54:25
**appropriate** 21:22
21:23 22:6,18
81:23
**approval** 2:2 17:11
32:25 41:2 74:22
82:23 86:7 97:13
106:14
**approve** 11:11 12:17
50:21,22 74:17
83:18 124:8
**approved** 20:4,15
64:4 73:12 79:23
104:25 131:4
**approves** 9:25 18:13
**approximately**
26:18 76:16
**April** 9:1,23,24 20:4
20:15 32:19,23,24
41:5 64:3
**arbitrarily** 40:22
**arena** 52:8
**arguably** 98:6
**arguing** 125:2
**argument** 126:22
127:1,2,9,12
128:14
**argumentative** 21:8
53:4
**arm** 95:19
**Arps** 3:4,12 78:1

108:10
**arranged** 89:22
**arrangement** 26:3
**arrived** 59:18 71:23
**art** 29:25
**ascertain** 35:8
**asked** 16:25 36:14
44:16 79:23 89:18
90:1 98:10 99:7,25
105:14 117:22
122:23
**asking** 8:9 50:21,22
66:23 67:14 97:19
97:20 101:22
**aspect** 15:3
**aspects** 15:8
**assertion** 82:12
103:18
**assertions** 103:7,16
**assess** 58:7
**assessed** 14:8
**assessment** 18:7
19:8,14 21:5 49:7
**associated** 85:6
**assume** 60:8 72:21
114:16 127:21
**assumed** 113:20
**assuming** 48:11
69:22 71:21 108:7
**assumption** 18:18
18:20,22,23 73:13
91:19 98:21
115:14
**assurance** 97:8
**assurances** 116:19
**assure** 67:15
**attached** 27:24
68:14
**attention** 82:15
102:19 111:9
**attitude** 38:4
**Attorneys** 3:5,13 4:3
4:11,19 5:3,12,20
6:3,11
**attract** 93:15
**attractive** 73:17

96:9 98:17 104:14
**attribute** 114:4
**attrition** 48:23
**auction** 56:24 57:11
58:9 68:17 91:23
92:9 94:2 95:15
97:6,7 106:1,24
**August** 34:8 35:6,10
35:11,12 45:7,21
46:4,17,23 69:14
70:1,5
**austerity** 123:4
**Authorization** 2:2
**authorize** 17:11
**authorized** 34:25
82:23
**Auto** 110:4
**automotive** 36:1
55:13 72:18
**availability** 14:20
**available** 13:20 49:1
77:9 90:4 101:10
115:9,11,20
122:13,15
**Avenue** 4:13
**average** 77:4 111:10
**awarding** 41:20
**awards** 62:3
**aware** 13:15 54:7
63:22 90:22 96:3
101:20,21 102:8
108:22 109:1
110:4,10,16,19
119:23,25 120:5

---

**B**

**B** 1:21
**baby** 125:14
**back** 7:2 14:12 17:8
43:11 47:7 51:16
56:11 59:2,4 61:1
70:19 75:6,9,25
92:20 96:5,7
100:12 101:13,18
106:6 118:10
123:23 126:24

127:6
**backstop** 18:3 89:8
89:11 113:14
122:9,12,20,21
**backstops** 89:15
**backup** 26:3,16
124:18
**backups** 24:24
**badly** 106:8
**baked** 98:22 106:19
**balance** 42:3,5 104:5
**balanced** 85:18
**balances** 50:23
**balancing** 95:6
**bald** 98:21
**bank** 111:24
**banker** 7:20 14:20
22:5 26:23 32:3
58:5 63:15
**bankers** 97:23
**bankruptcy** 1:2,14
1:23 33:24,24 36:9
36:11,13 42:4
44:22 46:14,17
51:19 52:15,20
58:19
**BARBARA** 6:16
**bargaining** 51:25
62:2,9,17
**barrel** 64:23
**Bar-Leib** 131:11
**base** 45:1 46:1
**based** 45:21 95:10
111:17 113:5,11
113:19,25 114:12
114:12 115:8,20
**basically** 51:24 53:3
114:6,22 115:21
115:25 117:24
118:7 120:9,12,15
120:24 121:18
122:9,16,17 124:7
124:12,16
**basing** 115:10
116:24
**basis** 11:3 15:17

93:21 95:4 111:10
111:13,16 113:8
114:17 117:18
**battle** 121:14,15,16
**bear** 96:18 107:6
**beat** 42:20
**bedrock** 85:12
**began** 36:17,18
44:17
**beginning** 62:9
**begins** 41:3 62:2
95:20
**behalf** 7:5,17 33:16
35:4 59:11 102:22
**beings** 72:22
**belief** 67:14 114:20
**believe** 9:23 17:5
20:18 34:17 35:1
39:11 45:20 54:11
54:12 65:25 66:3
70:20 76:10 77:14
78:5 88:8 91:3
97:12 102:16,18
**believed** 73:4
**believes** 39:11
**benefit** 62:11,15,18
62:20,22,23 63:3,7
87:7 97:4
**benign** 36:23
**best** 38:20 39:9
41:14 49:21 50:12
50:17,20 51:10
52:23 84:14 89:1
95:14 96:22 98:9
105:6 127:12
128:16
**better** 19:8,11 20:22
40:25 85:19 90:11
91:14 98:13
104:15,17 114:6
127:12
**beyond** 111:23
113:9 117:15
**bid** 38:2 57:14 66:1
105:15,21,23
115:4 121:13

**bidder** 38:8,10
42:19,20 59:12
91:24 94:9 96:2,10
**bidders** 37:18 38:5
38:25 39:2,6 41:8
42:11,12,13,14
55:3 94:16 105:4
125:12
**bidding** 37:12,14,24
53:3 66:2 68:11,13
68:14 90:19 92:5
**bids** 39:8 70:17
91:18 92:6 105:25
**big** 22:25 23:13 33:3
61:20 93:5,14 96:1
106:18 116:20
**bigger** 22:20
**billion** 30:25 48:13
60:14,21 70:11,13
88:16 113:10,17
113:18 115:8,13
118:8
**binder** 107:24,25
**binders** 76:4
**bird** 66:19
**bit** 48:22 52:5 77:4
84:5 90:12 112:23
**black** 117:6 119:2,4
119:11
**blocking** 55:17
**blown** 94:2
**blows** 115:15
**board** 12:22 13:1,2
13:16,22,25 14:3,7
14:11,19,22 15:3
15:13,17,20 16:18
17:3,4,10,16 21:5
21:17 22:12,19,24
23:9 26:2,6,8,16
27:5 28:16,18,22
28:22 31:14,17
36:17 42:5 47:22
48:25 53:17 56:15
61:1 63:21 74:4
76:1,6,10 78:25
79:2 80:1,3,14,15

82:20,22,23 83:8
84:1,16 85:10,13
86:5,19,21 87:2,25
88:3,20 89:18 90:9
90:21,22 92:4
95:21 100:1,16,20
100:25 101:5,8,15
101:23 102:6,13
102:14,16 103:8
103:12,14,14,17
103:20,24 104:8,9
104:21 105:11
109:21 112:14
**board's** 105:5
**bogey** 42:20
**bogeys** 43:10
**bogged** 93:4
**bona** 96:25
**bonds** 111:24
118:13,13,14
**BONNIE** 4:8
**book** 15:22 100:8,11
100:11,12,25
**books** 100:10 118:23
**Boone** 5:2 44:14
**bore** 89:6 91:3
**borrower** 124:17
**bottom** 26:1 123:24
**bought** 94:4
**bound** 83:17 85:3
104:24
**Bowling** 1:15
**box** 83:3,15
**boxed** 53:3
**breach** 67:5
**break** 75:4
**breakup** 13:12,16
37:12,22 41:20,23
42:2 91:18 96:14
**BRIAN** 5:8
**bridge** 30:2 52:15
**bridged** 31:8
**brief** 44:17 119:18
123:11
**briefly** 101:8
**bring** 29:22 31:13

42:4 65:14 67:7
88:19 107:2
**bringing** 39:15 98:2
**brings** 58:21
**broad** 12:3 48:1
**broader** 12:7,8
47:25 50:16
**Broadway** 5:13
**brought** 94:21 107:5
**BRUCE** 6:7,8
**BRUEGGEMAN**
5:19
**build** 64:13 115:16
**building** 23:18
64:19 72:3 124:12
**built** 61:7 64:17
**bullet** 83:16
**business** 45:25
48:19,24,25 54:12
61:6,6 62:3 63:9
79:18,21 80:18
93:18,24
**businesses** 93:16
**Butler** 3:9 7:4,4
10:14 15:25 16:3,6
16:8,12 20:8,10,13
21:8,12 23:12,15
26:14 28:3,4 34:2
34:6,12 43:8 53:4
56:10 58:4 61:12
63:24 68:3 71:8
73:22 74:1 75:2,5
81:6 86:16,20 92:1
99:7,21 107:8,16
107:19 127:3,6,15
127:18,23 128:4,8
128:15,19,23
129:2 130:7,10
**Butler's** 20:7
**buy** 124:20
**buyers** 33:17
**buyout** 48:23
**buy-in** 29:10

___

**C**

**C** 3:2 7:1 131:2,2

**calculation** 114:12
**calendar** 93:6
**call** 17:5 46:3 58:9
  75:1 93:10 120:14
**called** 27:12 104:21
  121:13
**calls** 125:6,17
**candidates** 48:1,3
**capabilities** 79:17
**capability** 36:3
**capable** 33:11,17
  36:15 51:17,18
  58:21
**capital** 5:3 8:1 9:1
  33:18 44:14 47:5
  54:8 55:18 69:21
  71:4,20 87:20 89:4
  117:4 119:23,25
  120:5
**carbonize** 54:25
**cart** 116:1
**carving** 94:18
**case** 1:4 15:1 30:3
  39:14 42:23 43:19
  44:22 52:7 55:25
  57:4,6,12 63:12
  74:20,22 84:15
  89:12 90:6,15,20
  92:17 110:21
  117:18
**cases** 62:2 83:12
**case/worst** 84:15
**cash** 114:15
**cast** 23:9
**Cause** 17:14
**causes** 63:5
**Center** 5:21
**cents** 88:18,18,18,20
**Cerbaloosa** 94:23
  118:9 121:15
**Cerberus** 29:1,4
  30:22 34:17 35:2,3
  35:13,21 36:3,6,19
  44:17 45:8,19,20
  46:3 47:2,14 48:4
  48:13 49:6,10 51:3

51:5,24 53:15
  54:24 55:15,18,23
  59:4,16 65:25
  66:10,15 70:4,18
  71:19 90:13,16
  94:2,19 117:7
**Cerberus's** 112:4
**certain** 11:17 18:14
  22:10 31:9 39:4
  50:10 58:17 69:20
  69:20 103:21
  123:24
**certainly** 76:23
  115:7,24 123:2
**certainty** 49:9 55:6
  55:22 56:3 94:25
  106:4
**certify** 131:4
**chairman** 75:16,17
  103:8
**challenge** 14:17
  82:12
**challenges** 42:21
**challenging** 60:25
  62:8 103:7
**chambers** 81:7
**change** 17:8 98:23
**changed** 13:11 17:6
  17:14 117:14
  118:7,17 119:12
**changes** 12:23 13:2
  13:6,6,8 33:4
  48:24 81:17 89:24
  101:24 102:9
  118:22
**changing** 13:18
  119:4
**chaos** 93:21
**Chapter** 58:23 60:4
  61:14,24 87:22
**characterization**
  118:25
**characterized** 78:6
**chart** 27:24 28:1,3
  28:13,15 85:23
  86:4 96:4

**charts** 17:21
**cheaper** 87:12
**checking** 107:14
**Chicago** 3:7
**chief** 75:17
**chilling** 106:2
**choice** 87:13
**choices** 122:25
  123:1
**choose** 82:13
**chose** 47:11
**Chrysler** 93:8
**circumstances** 57:2
**cite** 34:3
**claim** 86:5 128:1,10
  128:13,21
**claims** 92:20 127:15
**clarification** 110:6
**clarity** 58:16
**clear** 39:11 43:13
  55:9 67:23 85:5,12
  109:8
**clearly** 10:21 43:10
  85:16
**client** 12:13
**clients** 71:1
**close** 8:2 25:15,18
  41:3 48:19 87:1
  91:13 94:25 95:4
  95:20 125:20
**closed** 97:3 126:5,20
**closer** 41:3 113:17
**closing** 41:6,18
  115:24
**closure** 39:15 46:23
  55:22 56:4
**Code** 67:4
**COHEN** 6:2
**collaborative** 83:12
**column** 26:11 125:3
**combination** 66:15
  114:14
**combine** 66:1
**combined** 29:7
**combining** 29:2
**come** 22:21 33:25

35:17 37:18 39:7
  40:5,14,24 41:8
  42:6,17 43:17 44:6
  47:7 54:4,13,16
  55:24 64:10 67:17
  67:25 68:2,7 74:15
  81:10 90:17,24
  91:8,10 94:14
  95:15 97:1,17 98:1
  101:13 103:11,18
  113:2 118:15
  121:6 122:12
**comes** 19:12 40:2
  90:25 93:18
**comfort** 26:10,17
  72:3
**comfortable** 55:23
  59:9 72:7
**coming** 31:5,12,12
  42:22 43:11 49:3
  52:20 103:10
  114:16 126:24
**comment** 118:25
**commentary** 103:17
**commented** 14:24
**commercially** 72:22
**commit** 82:8 115:8
**commitment** 2:3
  7:24 8:17 21:19,19
  21:25 22:13 25:20
  26:5,19 27:8 41:15
  41:20 49:16 64:5
  82:8 89:7 115:10
  117:6
**commitments**
  104:25
**committed** 32:10
**committee** 4:3,11
  25:3,4 31:8 44:16
  66:6,7,8 69:7
  71:23,25 83:8
  89:23,23 90:3
  102:12,22 121:25
**committees** 47:23
  53:13 55:10 66:20
  67:8 79:21 80:17

89:21 90:16
**committing** 8:1 31:2
  104:24
**common** 17:18 88:5
  89:5
**commonality** 94:16
**communicate** 12:22
  96:2 104:13
**communicated**
  39:21
**communicating**
  18:16 21:4
**companies** 7:24 26:4
  31:20 52:19 109:4
**company** 19:17 25:3
  27:21 28:7,20 29:1
  29:5,6 32:18,21
  33:3,8,12,16,23
  34:16,19,25 35:4
  35:17,17,20 36:17
  36:24 37:3 38:4,18
  38:22,25 39:1,6,7
  39:10,13,16,21
  44:2,24 45:8 46:11
  46:16 47:4,8,18
  48:18,25 50:4,5,15
  50:15,18 51:11
  52:24 53:10,19
  54:23 57:10,14
  58:22 59:11,25
  60:3,8 61:5,13,18
  61:24 62:8,25
  63:10,13 64:7 72:5
  72:17 73:4 76:7
  87:22,23 88:15
  90:19 91:10,16,24
  93:5,15 94:4,19
  95:3,14 96:22
  97:20 98:9 99:2
  101:23 106:8
  112:12,13 117:1
  118:19 119:4,12
  120:19 123:20
  124:23 125:9
**company's** 38:21
  42:24 44:25 46:15

46:23 48:21 49:4
  61:25 62:11 64:21
**comparable** 27:13
  78:18 105:4
**compare** 13:23
  66:22 113:3
**competing** 24:8 39:8
  98:16 105:25
**competitive** 53:3
  54:11 55:16 66:2
  66:17 90:19
  101:24
**competitor** 53:1
**complete** 85:16
  100:4
**complex** 10:6 14:10
  14:17 48:22 50:16
  57:6 59:6 63:12
  78:6 106:25
**complexities** 48:20
**complexity** 35:24
  76:11 78:9
**complicating** 106:22
**comprehensive**
  60:16 101:12
**con** 34:17
**concede** 51:25 109:3
  112:17 117:13
**concept** 37:15,16
**conceptual** 114:19
**concern** 93:6 97:25
  98:25 99:2
**concerned** 64:22
  97:10
**concerning** 13:1
  86:4
**concerns** 39:25 40:4
  53:18 64:21 89:20
  93:5 98:18
**conclude** 81:22
  82:10 87:18 94:13
  97:8
**concluded** 87:16
  96:18 129:3
**concluding** 103:5
**conclusion** 94:8

98:12 103:11
  104:21
**conclusions** 103:19
**conditions** 8:7 10:7
  13:24 15:9 16:23
  18:13 31:4 117:15
**conducted** 57:19
**confidence** 93:19,23
**confidential** 12:1
  105:3
**confined** 94:18
**confirm** 28:11
**confirmation** 73:14
  113:25
**confirmed** 28:10,12
**confirms** 27:25
**connect** 74:3
**connection** 7:18,22
  17:24 28:6,19 40:1
**cons** 92:4 96:16
**consensual** 29:24
  31:13 55:6 63:11
  70:24 112:8,8,19
  112:22
**consensus** 47:23
**conservative** 18:7
**consider** 2:2 37:18
  37:21,24 38:1,4
  49:10 89:16,18
  90:23 91:10 92:4
  96:11 97:18 98:23
  101:23 104:16
  106:11
**considerable** 85:15
  92:18 95:23
**consideration** 73:2
  93:14
**considerations**
  92:13 94:1
**considered** 42:17
  92:8 105:2
**considering** 47:5
  89:17 106:14
  123:25
**considers** 39:1
**consistent** 60:2,6

119:3
**consistently** 17:19
  22:3 53:23
**constituencies** 69:6
  112:14
**constitute** 104:23
**constraint** 93:3,3
**constraints** 39:2,22
  94:24 126:21
**consultation** 53:16
**consummate** 65:6
**consummation** 73:9
  73:18
**contact** 33:16 34:20
  34:21,23 35:1,4,7
  35:7 36:14,14
**contacted** 39:16
**contacts** 33:10 34:17
  35:16,17,21
**contained** 12:3
**contemplate** 92:10
**contemplated** 120:9
**contend** 113:8
  124:14
**contention** 47:13
**contest** 91:23
**context** 12:11 14:9
**contexts** 91:18
**contingent** 97:13
**continue** 61:24
  74:20 125:4
**continued** 74:12
  93:16
**continues** 9:24
**contract** 61:14
**contractor** 64:12
**contracts** 49:21 50:2
  63:7 74:13
**contrary** 95:12
**contribution** 57:9
**contributions** 92:19
**control** 29:6 50:8,10
  51:6 118:20
  120:19,23 122:21
  122:22
**controlled** 96:24

**conversation** 15:3
**conversations** 12:25
  13:5,10
**conversion** 113:24
**converted** 29:10
  88:5
**convertible** 27:13,21
  28:6,19,24 29:5,6
  29:8,13,17 30:1
  31:19 50:9 52:4,9
  52:16,22 73:5 88:3
  88:5,9,21 118:8
  122:13
**convey** 112:15
**convince** 93:17
**copy** 9:13 34:10
  85:25
**core** 116:12
**corner** 101:2
**Corning** 25:16
**corporate** 49:20
  50:1,15,25 52:3,23
  118:17 121:18
**Corporation** 1:8 7:3
  75:10,16
**correct** 7:19 8:11,13
  8:18 9:22 12:3,20
  12:21 15:15,18
  16:20,25 17:3,13
  17:17,25 18:3
  19:13,21,22 22:13
  24:9,15,16 25:1,8
  25:13 27:22,23
  28:8 29:17 31:15
  32:8,9,15 33:12,18
  33:21 35:5,14,15
  36:8,12 37:8,19,24
  38:5 42:11 44:18
  44:19,20 45:5,6,9
  45:12 46:5,8,17,24
  46:25 47:21 48:3,4
  48:9 50:6 51:7,15
  51:21 52:7,11 70:6
  70:9,10 72:4,23
  76:5,8,9 77:1,9,13
  77:14,18,19 78:5,7

78:8 81:2,20 82:6
82:7 83:23 84:2,7
85:6 86:7,8,11,12
86:15 91:10,25
103:25 107:18
108:9 109:5,6,20
110:17,18,20
113:12,21 115:20
116:9,10 117:9,12
117:13,16 120:20
131:5
**costs** 92:16
**counsel** 44:16 53:12
  67:19 74:2
**counterproposal**
  25:4 38:16 43:11
**counting** 128:1
**couple** 100:2 101:16
  101:19 119:21
**course** 37:10 52:19
  59:10 98:16
  103:14 122:12
**court** 1:2,14 7:2,9,11
  7:19 9:13,17,24
  10:9,16,19,21,24
  11:10 12:15 17:12
  18:12 21:15 22:16
  22:21 23:2,5,19
  24:10,13,21,23
  26:24 27:2,4 32:16
  34:10 37:11 44:1,8
  44:10 50:2,8,21,22
  53:6,8 54:20 55:2
  56:8 62:7 63:25
  64:12,15 65:20
  68:5,11 69:24 70:2
  71:10,13,15,17
  73:21,23 74:8,17
  74:25 75:3,6,9,13
  75:19 78:2 81:8,12
  81:15,18 85:25
  86:2,22 92:4 99:9
  99:11,16,19,22
  104:25 107:10,12
  107:14,17,20,25
  108:3,5,7,11,14

119:8,17,20 120:4
120:18,22 123:10
126:1,4,10,14,17
126:19 127:4,5,10
127:17,20,25
128:7,10,17,21,24
131:4
**courtroom** 30:13
**Court's** 74:10,21,23
  106:13
**cover** 74:4
**create** 42:17 97:24
  106:20
**created** 55:16 85:22
  92:14,18 121:2
**credence** 83:25
**credibility** 122:4
**creditor** 110:20
**creditors** 4:12 25:4
  29:19,21 30:19
  31:8,10 73:7
  102:12 109:21
**critical** 39:15 53:22
  58:18 65:4 79:21
  124:11 125:10
**criticisms** 23:9
**cross** 44:8 74:5
  126:1
**cross-examination**
  7:8,15 44:11 75:20
  108:18
**cross-examine**
  108:8
**cross-examined**
  86:21
**crude** 118:15
**cube** 93:24
**cumulative** 81:15
  86:17 92:1
**current** 48:25 74:18
  108:23 111:14,15
  112:4,18 113:2,5
  114:12,14
**currently** 111:17
  114:1 115:12
  116:8

**customers** 62:1
  93:17,18
**cut** 42:16 90:10

**D**

**D** 1:22 5:8 7:1 130:2
**data** 24:15 28:12
  44:2,2 46:1 115:11
  116:15
**date** 40:16 42:6,9
  48:16 80:14 83:25
  86:10 89:13 92:5
  114:15 131:9
**dated** 102:22
**dates** 39:4
**Daugherty** 105:8
  107:18,23 108:8
  108:11,16,20
  109:22 110:22
  114:24 118:24
  119:22 123:14
  126:2 130:11,12
**David** 7:7,13 11:2,8
  120:14
**day** 7:21,22 32:7
  33:7 78:21,21,22
  82:20,22 84:13,13
  89:13 113:24
  114:23 123:5
**days** 45:14 100:2,17
  100:21 101:5,16
  111:3,7 114:8
  117:11 121:2
  124:23
**deadlines** 40:11
**deal** 11:11 29:1,10
  29:16,24 30:19
  31:5,13 39:17
  40:14,25 47:13
  48:13 50:17 51:1,2
  51:18 52:11,21
  55:19,20,21 56:5,6
  63:8 70:24 73:17
  85:16 87:9,17
  94:13 95:8 98:12
  98:21 104:14

106:19 112:8,19
112:21,22 113:25
114:3,7,8,10
115:14,24 121:2,5
121:17 123:7
124:16
**dealing** 38:4 95:3
106:3
**deals** 48:23 93:9
97:9 106:20 114:6
**dealt** 40:1 80:17
**debate** 95:24 104:7
**debated** 95:21
104:15
**debating** 85:1
**debt** 69:20 111:24
**debtor** 1:10 3:5,13
12:4,6,8 41:11,13
43:7,10 51:2 55:9
57:3 60:20 66:19
67:22 69:21 71:4
74:22
**debtors** 7:5,18 37:7
41:6,15 43:13,15
53:9 55:6 58:12
60:15,23 63:4
67:21 70:20
105:21 108:7,10
110:14 112:6,7
117:5 119:23
120:5,20 127:4
**debtor's** 108:24,25
110:1
**Debtwire** 120:9
**December** 11:8
17:10 51:16 53:2
76:1 77:7,12 78:2
78:3,15 79:10 80:9
82:18 84:2 87:1
89:12 90:10 94:22
96:3 98:10,11
106:3,5 111:3,7
113:6 114:15
117:15 119:13
120:8,25
**decide** 8:5 31:18

**decided** 34:20 35:23
35:25 46:11 72:5
94:23 96:19
**decides** 8:8
**decision** 53:14,16
96:1 104:12,13,22
**decisions** 63:22
94:22 104:9
**declaration** 7:6,7
54:23 107:22
109:10,15,19
112:2,12 113:1,8
117:3 119:22
**declined** 54:6
**deemed** 105:2
**deeper** 77:4
**defending** 121:8
**defense** 125:17
**define** 51:17
**defined** 50:11
**definitely** 118:20
124:20
**deja** 86:22
**delay** 96:1 106:7
**delays** 96:16,16
**deliberate** 103:11
**delicate** 104:5
**deliver** 46:15,22
51:20 69:22
117:23 124:25
**delivered** 117:11,14
125:1
**Delphi** 1:8 7:3 35:24
36:4 42:4,22 44:22
47:14 50:21 51:18
52:10 54:9 55:6
56:23 57:2 58:19
61:21,23 62:3 63:9
65:5 75:10,16 76:1
87:11 93:12
110:22 111:18,20
111:22 112:25
113:3 114:13,25
115:2 116:13
123:6 124:10
**Delphi's** 62:19,21

111:11
**demonstrate** 93:16
**demonstrated** 41:13
42:1 58:12
**depending** 128:4
**depends** 8:7 20:5
109:20
**deposition** 7:25
16:17 18:5,17
27:19 33:22 34:3
34:10 54:2 77:11
**describe** 18:5,10
105:9
**described** 63:20
80:21
**describing** 14:1
28:23
**descriptions** 76:13
**design** 97:23 120:21
**designations** 126:7
126:11,12
**designed** 91:6
**desire** 105:5
**destabilizing** 104:19
**destruction** 93:5,25
**destructions** 93:22
97:3
**detail** 12:7 76:22
111:8
**detailed** 14:12
**determination**
80:21
**determine** 33:11
38:19
**determined** 21:24
35:8 37:3
**determining** 37:18
116:12
**develop** 96:8 124:18
**developed** 37:2 58:2
58:6 121:10
126:22
**development** 67:1
**devote** 79:16
**devoted** 95:23
**dialogue** 124:4,5

125:14
**dialogues** 124:12
**difference** 18:7,16
29:18 30:17
113:19
**differences** 59:23
118:24 119:2
**different** 12:19 16:4
18:10 19:4 24:4
29:11 30:2,22 46:2
52:13 59:14,23
69:21 71:4,5,20
76:6 79:15,15,17
86:14 98:6 100:10
106:21 125:21
**difficult** 40:8,12
65:1 93:11
**difficulty** 11:25
**digest** 79:16
**diligence** 19:15
29:21,22 31:6 44:4
44:7,17,21,23 45:2
45:5,12,15,18,22
47:20 48:8,12,15
48:17,19,21 49:3
52:25 65:9 69:7,9
69:13,16 71:3
74:15 94:15 95:16
115:25 116:3,5,6
123:14,17 124:23
**diminishing** 41:9
**dinner** 101:7
**direct** 34:9 118:23
125:23
**direction** 26:24
82:15 102:3
**directly** 109:4
**director** 77:5 103:5
**directors** 21:18
37:13 56:16 76:1
76:14,15 77:15
79:14,15 88:8
103:2,9,12
**disagree** 53:12
**disagreed** 34:21
**disagreeing** 34:15

disagrees 71:12
disclosure 9:25 19:3
  19:7,12,21,23 20:3
  20:15,21 32:19,24
  41:2,4 64:4 72:11
  73:12
discount 18:10 22:2
  22:2,13 25:20 26:5
  26:18 27:22 28:7
  28:20,24 29:8,17
  32:8 72:14 88:1
discounted 27:8
  73:1
discounts 17:16
  20:25 21:20 31:20
  72:23 87:3
discrete 39:7 68:19
  68:19 95:15 96:22
  96:23
discuss 58:17 88:3
discussed 13:3 34:18
  35:21 48:25 80:5
  84:19 92:9,10
  100:16 101:7,12
  101:15 102:1
  104:1
discussing 11:22
  119:24
discussion 13:22
  15:6,7 17:12 72:1
  77:24 86:19 88:24
  95:24 104:7
  112:24
discussions 11:1,20
  36:18,19 37:2
  38:11 46:10 58:2,6
  59:4,10 66:6 69:15
  84:2,25 90:15 91:7
  91:24 92:12 103:6
  124:1 125:17
dispute 57:13 95:20
disruption 63:16,19
dissipated 63:13
distributed 100:16
  100:20 101:6,15
distributions 71:6

DISTRICT 1:3
dividing 106:19
document 21:6,17
  22:12,15 23:21
  24:1 25:2 27:14
  76:20 77:6 78:23
  79:24 82:18 84:1
  100:15,19,20
  101:2,13,15
  102:20 103:4
  119:1
documentation 84:3
documents 9:14
  56:15,20 76:23
  79:4,16,18 84:10
  84:11,12,13 100:6
  100:7 101:19
doing 21:10 31:12
  45:4 66:10 87:23
  115:19 128:25
dollar 18:24 22:24
  31:7 48:13 59:21
  60:21 72:8 114:17
  114:17 115:8,13
  118:8 122:14
dollars 18:14,15
  29:14 30:20,25
  32:20 33:1,2 41:25
  70:11,11 72:13,16
  73:8,18 86:6 87:5
  88:16 96:4 113:11
  113:19
Dondare 120:12
door 92:11 95:4
  104:16,20 105:3
doors 94:25
downside 88:11
draft 117:5
DRAIN 1:22
dramatically 61:6
drawing 61:1
Drive 3:6 5:21
driven 29:3 53:1
due 29:21,22 44:3
  44:17,21,23 45:2,4
  45:11,14,18,22

47:20 48:8,12,15
  52:25 69:7,13,16
  71:2 74:15 88:13
  94:15 95:16
  115:24 116:3,5,6
  123:14,17 124:23
duly 7:10
duties 66:8 67:5
  79:14
duty 37:13 67:3
  90:23 96:12 105:1
  106:10
dynamic 54:11
  98:19 123:7
D-A-U-G-H-E-R-T
  108:16

_____
E
E 1:21,21 3:2,2 7:1,1
  130:2 131:2
earlier 23:6 61:13
  62:1 66:25 74:2
  86:17 116:16
  124:3
early 90:17
earn 14:4
easier 48:20 49:4
  67:21
East 5:4
EBITDA 60:9,13,14
  60:21 61:2,4 72:17
EC 24:8
economic 98:18
  104:2
economics 20:23
educated 76:21
effect 53:9 55:2
  106:2 114:9
effective 39:12
  42:14 75:16 86:10
  89:13
efficient 42:14
efficiently 128:25
effort 83:12 89:20
  93:21
efforts 102:2

either 9:14 23:23
  25:19 45:15 46:21
  60:22 80:5 84:17
  87:16 94:13
  111:16
either/or 97:19
electronic 131:5
elements 29:8 107:2
  125:10
elicit 81:8
eliminate 51:24 69:3
  69:4
embarking 81:22
embrace 46:12 99:6
  99:10
embraced 55:10
emerge 39:3 53:19
  54:10 61:14 62:4,9
  63:5 91:14
emerged 60:4 70:3
emergence 62:1
  113:3
Empire 23:18
enabler 87:22
encapsulate 52:16
encourage 37:12,13
  55:14 66:9
encouraged 54:2,6
  94:10 123:8
ended 10:8,10 89:7
  89:25 92:12
endless 84:25 89:22
enforce 97:12
engage 34:19 35:22
  38:11 91:24 124:1
engaging 46:10
  85:13
Engineers 6:11
ENGLISH 5:11
enhance 90:24
enhanced 88:7
enormous 89:20,24
  93:20
enter 8:22 60:22
entered 8:20
enterprise 55:20

59:24 60:1 94:17
**entertain** 39:8
**entire** 52:1 82:9
**entitled** 112:5
118:15
**environment** 90:18
**environmental** 45:2
**EPCA** 38:7 39:1
**equal** 40:24 48:12
**equity** 2:2 4:4 25:3
31:9 34:25 44:16
46:12 69:7 71:23
71:25 94:18 98:22
98:24 102:22
106:17,19,21
113:4,12,20,22
114:7,9,12 117:6
118:12,14 121:9
121:19,24
**erode** 93:23
**especially** 66:14
**ESQ** 3:9,10,17,18
4:8,16,23 5:8,9,17
5:25 6:7,8,16,23
**essence** 64:9 116:12
**essential** 60:20
**essentially** 52:12
55:19
**establish** 38:7 96:25
**established** 43:16
**estate** 40:6 42:3
53:20,22 55:3,5
56:4 66:4 85:13,19
91:2 98:3 110:20
**estimate** 110:25
127:13
**estimated** 60:9
86:13
**estimates** 94:17
**etcetera** 124:12
**evaluate** 115:22
116:21
**evaluation** 19:1
**evening** 95:22
**events** 39:4
**eventually** 37:2

**everybody** 122:3
**everyone's** 20:22
**evidence** 7:6 41:14
74:11 126:5,9
**evidentiary** 100:4
**exact** 59:21
**exactly** 10:22 69:9
78:20,22 115:17
117:2
**EXAMINATION**
56:9 99:20 123:12
130:4
**exceed** 92:19
**exclusivity** 127:21
127:23 128:5
**excuse** 20:10 31:24
96:6
**excused** 107:16
**executability** 104:4
**executable** 98:19,23
**execute** 46:16
**executed** 123:19,22
**executing** 58:22
108:25
**executive** 75:16,18
**exercise** 72:21
**exhibit** 7:7 11:4
15:21,22 17:22
24:4,11,17,21,23
25:2,2,12 26:6,8,8
27:16,24 28:9
31:14,21 34:12
56:11 76:3 78:13
80:20 82:16 100:7
100:19 107:22,24
118:23
**exhibits** 42:2
**exist** 19:2 22:2
112:18
**existed** 116:1
**existence** 78:10
**existing** 52:14 54:5
111:22
**exists** 41:1 42:10
112:21
**exit** 46:16 47:21

48:16 51:20 118:4
**expand** 47:17,18
**expanded** 74:4
**expect** 72:20 80:8
**expected** 42:15
76:12
**expedite** 48:17
**expeditious** 128:8
**expended** 89:20
96:12
**expenditure** 96:17
**expenditures** 85:15
**expense** 96:18
**expenses** 13:16
14:24 81:24 86:6
86:10 87:3 88:14
91:1 95:6 96:14
**experience** 14:10,19
15:10 26:23 51:10
55:13 91:20
**experienced** 46:14
46:21 51:19
**expert** 97:5
**expire** 62:21,22 63:7
**expires** 62:23 63:7
**explain** 14:3 26:2
77:17 104:22
**explained** 16:16
21:22 43:3 79:10
79:20
**explicit** 97:17
**explicitly** 39:17
**exposed** 85:14
**exposing** 8:11
**expressed** 53:23
**expressions** 38:18
66:9
**extensive** 13:22
14:10 19:15 44:5
44:23
**extensively** 18:5
51:1
**extent** 41:7,17 90:5
91:12,23 95:17
97:20
**extraordinarily**

14:17
**extremely** 63:19
**eyes** 54:4
**e-mail** 11:7,13,16
23:6 27:25

---

**F**

**F** 1:21 131:2
**face** 29:11 58:9
**faced** 95:24
**facilities** 61:8
**facing** 35:24 42:22
54:9 63:14 87:13
**fact** 13:11 38:19
43:21 46:19 47:12
47:13,16 53:1
71:18,22 72:7,11
74:4 82:20 87:19
92:19 93:7 97:12
101:4 102:13
103:22 106:20
115:17 117:24
123:4 124:24
**factor** 106:22
**factors** 14:25 37:17
**facts** 70:14
**factual** 126:5,19
**faded** 94:23
**failure** 87:18
**fair** 8:24 25:15 33:6
40:2 69:15 78:9
79:9 82:22 103:20
104:6 115:5,7
118:18 125:2
127:14
**fairly** 12:3 19:14,16
60:2,5
**fairness** 103:11
121:16
**faith** 67:14
**fall** 37:6 46:19 53:21
54:22 70:6,7 90:12
94:8
**fallen** 84:13
**false** 109:17
**familiar** 33:4 37:15

37:17 47:4 55:12
55:14
**familiarity** 36:1
**family** 121:21
**far** 59:19 60:7 81:20
91:11 92:19 93:19
115:12 124:24
**fault** 80:1 125:18
**fears** 97:24
**feature** 29:8 52:17
88:4
**features** 31:23
**fee** 7:24 8:17 13:12
13:16,19 14:5
16:18 21:20 22:1,4
22:13 25:20 26:5
26:11,19,22 27:6,9
37:22 41:21,23
42:2 96:14 104:25
122:15
**feel** 57:15 73:15
125:14
**feels** 120:12
**fees** 12:15,17,19
13:15,23,24 14:8
14:20,23,24 15:3,8
15:9,13,14 16:18
16:19,24 17:1,3,5
17:12,14 18:13
21:23,25 22:4
24:25 25:5 26:10
26:17 37:12 74:13
86:15 87:2 113:13
122:6
**feet** 120:13
**fellow** 125:5
**felt** 14:2 51:9 53:18
59:6 65:17 121:10
125:10
**fides** 96:25
**fiduciary** 38:21,22
41:15 66:8,20 67:3
90:23 96:11
106:10
**fifteen** 26:4,18 27:7
**fifty** 88:18,20

**fighting** 122:7
**figure** 86:16
**file** 33:24
**filed** 12:23 19:3,21
19:23 20:22,23
32:25 36:11,13
37:11 72:12 81:18
**filing** 17:11 32:19
36:9 37:10 39:18
44:22 94:4,5
**final** 65:4 76:20,21
119:10
**finance** 12:18
**financers** 125:6
**financial** 10:6 15:7
33:17 36:3 38:14
42:21 44:25 45:24
46:1 48:21 49:4
50:23 57:20 59:8
69:10,12,13
**financially** 33:11
35:8 36:15 88:9
**financing** 118:4
**find** 16:9 33:8 34:4
59:7 63:11 72:13
87:22 105:6 125:3
**fine** 20:21 54:18
74:8 81:13 126:18
**fingers** 125:22,24
**finish** 20:10 57:16
65:15 86:24 95:4
**finished** 99:15
**finishing** 107:4
**firm** 24:15 125:21
**firmer** 82:7
**firms** 34:25 35:1
**first** 10:2,3 34:18
39:10 40:10,15,17
40:18 44:17 92:17
101:20 104:9
106:1 109:17
120:17 122:7,17
123:9 125:9
**firsthand** 77:17
**five** 86:9,14
**five-minute** 75:3

**fixes** 81:17 82:4
**FLOM** 3:4,12
**floor** 6:13,20 113:16
**flow** 106:17
**focus** 10:5 61:19,21
82:9 103:5
**focused** 10:24 14:22
20:20 60:13 62:1
64:1 89:1
**focusing** 109:22
112:16,23 116:5
**follow** 44:15 54:20
57:3 127:21
**followed** 68:1
**following** 92:13
**follows** 93:6
**footprint** 61:8
**Ford** 93:8
**foreclosed** 91:3
**forecloses** 107:3
**foregoing** 131:4
**foremost** 92:18
**form** 12:7 74:18
**formal** 19:1 92:5
**formulate** 90:17
**formulated** 24:25
36:25
**formulation** 79:22
**forth** 14:12 17:8
21:1,23 38:14
70:19 88:19
123:23
**forty-five** 18:24 30:6
30:15,20 72:8,16
73:8,18 113:19
**forward** 39:7 42:4
47:6,7,8 49:16
53:14,22,24 54:12
54:16 57:18 65:11
65:16 82:23 90:14
93:1 95:4 112:14
**found** 123:25 124:11
124:14
**foundation** 10:14
119:6
**four** 3:14 23:15

48:13 59:23 60:14
71:9 121:23
**fourteen** 70:12
**fourth** 83:16
**fraction** 96:13
**frame** 35:6 41:9
45:5 51:17 59:3
68:9 93:13
**framework** 2:3 7:22
8:23 10:4 14:13
36:18 37:7 42:20
50:23 55:16 59:10
68:9,9 82:11 84:15
92:20 113:4,20
117:5,23 118:1
122:8
**FRANK** 4:2
**frankly** 55:10 111:8
116:20 118:21
**free** 68:18
**FRIED** 4:2
**front** 11:6 15:21,23
19:10 78:16 84:1
95:9 109:10 111:8
127:6
**fronts** 97:21
**froze** 125:11
**fruit** 96:18
**full** 77:8 94:1
**fully** 79:20 88:11
90:22 103:6
**function** 113:23
**functions** 12:14
**funded** 118:12
**funding** 115:23
**funds** 35:17 121:14
**further** 17:12 43:24
63:24 73:19,22
74:6 90:24 102:2
107:8 119:16
**furtherance** 105:1
**future** 90:23 113:1
115:5

---
**G**

**G** 7:1

**gain** 67:10
**game** 94:17
**gap** 31:9
**gaps** 52:15
**gather** 64:7 127:1
**general** 11:22 12:4,6
14:24 15:2,13
29:19 31:11 42:24
56:2 57:9,9 58:8
60:17 61:7,9 63:2
70:8 78:25 79:2
92:19,23 93:1,18
95:1 97:9 98:20
105:19 106:15,15
106:17 121:9
**generally** 39:6 50:14
91:22
**generated** 88:17
**getting** 20:24 26:18
32:21 33:1 43:20
47:20 55:22 56:3
64:9 65:18 68:20
90:9 106:7 121:5
122:18,19 125:15
125:20
**give** 9:4 21:4 32:3
34:3 54:11 66:18
66:19 67:8 83:25
100:6 104:22
120:14 127:2
128:14
**given** 35:24 53:18
54:9 67:2 96:18
98:4
**gives** 50:8,10 64:2
97:8
**giving** 22:24 26:9
29:13
**GM** 11:18,20,21
19:18 20:5 29:21
31:7 36:25 37:8
40:12 43:21 53:14
55:7,11,23 57:15
57:20 59:7,8,15
60:20 62:11 64:18
65:3,10 70:14,21

72:13 82:4,8 83:18
93:8 95:5 104:19
112:8,19,22 115:4
115:5 116:17
118:1,6 121:4,20
123:6 124:5
**GM/UCC** 55:20
70:16
**GM/unsecured**
30:19
**go** 26:15 33:10,16,25
36:14 42:18 51:14
51:16 53:22 61:1
63:25 65:11,16
75:2 81:21 82:23
83:15 85:1 86:7,9
89:7 95:4 97:2
101:18 116:17,17
116:22 124:13,17
**gobble** 122:6
**God's** 121:3
**goes** 64:2 121:25
**going** 17:7 20:3,22
23:14,17 26:25
32:6 34:2 47:5,17
47:18 49:16 50:9
54:12 57:12,16,19
59:21 60:25 64:19
67:19 68:5 72:13
80:12 81:6,8 86:11
86:18 93:1 95:2
97:3 99:24 100:1,9
100:14 101:13,19
104:16 105:24
106:8 112:13,14
113:10,24 115:23
116:12,14,15,16
116:19,19 117:3
118:12,13 120:13
123:3 124:5
125:22 127:5,6
128:12,20
**GOLDBERG** 5:19
**GOLDSTEIN** 5:25
**good** 7:4,17 19:14
44:13 67:14 70:25

75:22,23 98:8
100:3 108:20
112:23 121:20
126:15 127:10
**goodness** 32:25
**GORLICK** 6:10
**gotten** 64:17
**governance** 49:20
50:1,15,17,19,24
50:25 52:4,23 95:2
118:18 121:18
**governing** 92:25
**government** 104:2
**GRATZ** 5:19
**great** 63:8 87:11
120:24
**greater** 40:6 61:25
**Green** 1:15
**group** 35:25 53:14
54:10 59:12 66:4
93:20 96:24 106:9
108:23 117:7
118:9 121:9
124:18 125:7
**groups** 47:24 59:24
60:22
**guarantee** 62:11,15
62:18,20,22,23
63:3,7 120:19
**guess** 23:9 36:19
37:8 53:10 54:22
65:2 75:24 77:3
88:13 109:20
125:23
**guidance** 105:11
**Guilty** 125:24
**guy** 68:16
**guys** 33:1 125:18

_____

**H**

**H** 6:7 107:23 108:16
**HAIL** 5:8 44:9
**half** 46:7 48:7,8,14
64:17 67:19
122:11
**hand** 66:19 68:17

75:11 76:19 97:16
108:12 120:15
121:18
**handful** 80:6
**handicap** 92:24
**handle** 13:3
**hands** 125:7
**happen** 31:3 52:16
63:6 99:5
**happened** 9:8 29:7
69:17 71:7,11
89:10
**happening** 30:3
**happens** 63:9 128:5
**Harbinger** 45:4 47:2
53:15
**hard** 54:14 63:11
67:18,21 68:22
82:7 112:13
124:11,14 125:18
127:11
**harmful** 63:20
**HARRIS** 4:2
**Haynes** 5:2 44:14
**head** 46:3 110:24
**hear** 8:21 12:5 120:8
**heard** 49:19 56:1
64:20,21 86:13
120:10 123:14
124:3
**hearing** 2:2 41:4
74:3 96:1 97:14
104:10 127:13,15
127:20 128:1,2,5,5
**hearsay** 62:5
**heavily** 94:4 98:11
**heavy** 87:14 89:19
**hedge** 121:14
**help** 16:16 23:12
36:4 64:13 100:6,9
**helped** 15:14 91:24
**helpful** 79:13 91:14
**helps** 122:17
**hesitancy** 11:17,19
**high** 23:16 72:18
**higher** 31:11 52:14

66:21 70:19 72:14
87:25 111:14
**highest** 38:20 39:9
**Highland** 5:3 38:15
39:25 41:14 43:14
44:3,14 67:24 96:2
96:8 98:25 99:3
100:16 101:24,25
104:3,14,22 105:7
105:12 108:22
109:3 110:22
111:2,17,21 115:7
117:4 118:20
119:3,23,25 120:4
121:15 122:1,20
123:17,19,22
127:24
**Highland's** 111:10
111:13
**highly** 12:1 14:21
**hiring** 64:12
**history** 45:22
**hit** 115:14
**Hogan** 3:10 108:9
108:10,19 119:16
126:12 130:11
**hold** 128:12
**holdback** 113:14
122:14
**holders** 4:4 122:9
**holding** 62:3
**HON** 1:22
**honest** 121:3
**honestly** 79:8
**Honor** 7:4 10:23,25
11:25 24:22 26:24
43:24 44:5,9 53:4
53:11 54:19 55:4
56:7 62:5 63:24
64:11 68:6 70:1
71:14 73:20,25
74:1,9,20 78:4
81:6,14 90:3 92:8
99:15,17 107:9,11
107:19,21 108:9,9
119:18 125:25

126:6,8,18 127:3
127:16,19 128:15
129:2
**hook** 75:24
**hope** 82:10 87:9,23
91:12
**hopeful** 106:12
**hoping** 75:23
**horse** 38:13 66:1,5
66:18 91:19
**host** 10:7 14:14
**hot** 123:2
**hotly** 51:1
**Houlihan** 102:21
103:12,16,21
**hour** 30:14
**hours** 127:14,17
128:1,3,6
**house** 64:13,17 72:2
72:3
**huge** 42:1 95:6
**huh** 75:24
**hundred** 41:25
124:21
**hurdle** 65:4 91:1
**hybrid** 28:25

———————
**I**
**IAM** 5:20
**IBEW** 5:20
**ice** 93:24
**idea** 19:11 111:13,15
112:23
**identified** 33:17
78:14
**identifying** 91:23
**III** 3:10
**IL** 3:7
**illusory** 74:12
**imagine** 97:5
**immediately** 73:18
78:23 86:7
**impact** 62:24 67:2
104:4
**impacted** 19:17
**imperfect** 19:10

**implement** 89:8
**implications** 96:16
106:19
**implied** 18:9,10
20:24 22:13 32:8
32:20 72:14 73:1
87:3 113:2,12,20
113:22
**implies** 114:18
**implying** 19:8 90:5
**importance** 62:10
**important** 37:12
55:21 62:15,16,20
63:1 93:3 95:5
108:24 109:9
115:25 121:11
**impossible** 40:5,7
74:17
**improve** 102:2
**imputed** 73:7
**inability** 52:25
**inadvertent** 9:8 10:2
10:17 109:8
**inappropriate** 57:3
**incentives** 98:5
**inch** 22:20
**inches** 23:16
**include** 114:7 125:7
125:7,8
**included** 21:6 25:5
101:21 118:11
120:17
**including** 10:8 13:16
14:25
**incomplete** 19:9
**incorrect** 30:9 34:1
**increased** 55:5,22
56:2,3
**incredibly** 106:24
**incurred** 81:24
96:15
**independent** 77:5
118:19
**independently** 59:19
**index** 101:3,3
**indicated** 22:1 39:6

39:13 41:11
**indicates** 49:25
**indication** 39:5
104:23
**indications** 59:12,14
59:18 60:8 69:4
**individual** 79:24
101:19
**individually** 79:1
80:9
**industry** 36:1 49:12
**infirmities** 74:16
**information** 17:16
17:19 19:10 21:18
21:21 27:11 44:25
45:24 48:22 49:4
80:3 105:4 114:25
115:2,9,20 116:6,8
116:11,15,21
**initial** 64:9 69:5
70:4 89:24
**initially** 110:5
**initiate** 35:7
**initiated** 35:16
**input** 101:23
**inquiries** 43:16
**inquiry** 80:3
**insignificant** 70:13
**insistent** 70:23
**insolvent** 112:7
**instinct** 96:11
**instructed** 33:10,16
**intend** 127:8
**intended** 112:15
**interact** 78:10
**interaction** 79:11
**interactions** 123:23
124:8
**interest** 34:1 35:9
38:18 53:23 57:7
66:10 68:15,20
89:2 113:4 123:6
**interested** 33:12,18
38:18 74:14 91:15
**interests** 121:9
**Intermet** 25:24 26:1

**internal** 84:11
**interrupt** 51:5
**invest** 8:8 36:4
    87:20
**invested** 54:8
**investing** 73:5,16
**investment** 7:20
    14:20 22:5 32:2
    47:5 52:13 58:5
    63:15 64:5 73:16
    76:12 77:8,25
    78:15 79:11 80:25
    81:23 87:20 89:5,9
    91:15 97:23 98:8
    112:1 115:8,19
    122:22,23 123:9
    124:18
**investments** 46:12
**investor** 8:1,5,8,10
    8:12 25:19 26:4
    27:8 35:7 48:11
    57:15 58:21 59:8
    91:4
**investors** 9:1,4
    12:16 13:12,20
    14:4,13 15:4 17:17
    18:2 19:13,24
    20:23 21:4 26:22
    29:14,20,20 30:5
    30:14 32:7,21
    33:11 35:25 36:15
    37:8 40:24 43:17
    48:20 49:12,15
    50:8,10 64:2,2,8
    64:16,22 65:8
    70:24 72:4,8,21,25
    73:3,11,15 80:25
    81:19,21 83:17
    85:3,9,15,23 86:5
    86:7,14 87:5,7
    89:12,23 91:2,15
    92:24 101:22
    102:5 105:22,22
    106:5,22 108:23
    108:23 111:14,15
    113:10 119:25

120:6 123:6
**invite** 105:24 124:9
    124:13
**involved** 7:21 9:10
    12:9,25 13:8,10
    37:19 57:10 61:15
    65:14 77:3,16
    78:21 79:21 94:3
    94:12 104:6,13
**involvement** 79:2
**irrevocably** 83:17
**isolation** 50:16
**issue** 18:17 42:5,23
    47:22 50:16 52:4,5
    53:22 61:17 62:16
    62:18 64:25 65:4
    85:11 124:14
    127:21
**issued** 28:6,19
**issues** 10:7,8 11:22
    14:1 39:19 40:1
    42:24 45:1 46:13
    50:1,23 51:25
    52:24 54:4,9 55:25
    55:25 56:1 57:7,8
    58:15,17 59:7
    61:22,23 74:12
    79:21 80:18 84:7
    85:8 103:22
    105:11
**item** 102:21 103:13
    103:14
**items** 34:18 63:3
    118:6
**IUE** 4:19 58:4

**J**

**J** 3:18
**Jack** 7:4 112:11
**JACOBSON** 4:2
**January** 1:18 75:17
    98:15 100:15
    101:22 102:22
    117:9,14 119:5,12
    131:8
**jelled** 70:8 71:3

**JENNIK** 4:18
**Jim** 120:12
**job** 70:20,25
**JOHN** 3:9
**joinder** 48:4
**joint** 11:4 16:8
**JR** 3:9
**JT** 78:13 82:16
**JT-42** 76:4
**judge** 1:23 72:2
    119:16 126:12
**judgment** 22:5,17
    22:23 23:1 46:16
    46:20,22,23 85:18
    95:6 106:1
**judgments** 107:6
**July** 45:5,7 46:17,23
    48:15 51:20
**June** 45:5

**K**

**KAYALYN** 3:17
**keep** 82:15 122:15
**keeping** 43:21
**KENNEDY** 4:18,23
**key** 59:6 64:9,12
    118:21
**keys** 94:9
**kick** 94:15
**kind** 34:5 62:24 65:4
    74:18 83:6,7 86:22
    97:6 115:11
    116:18 123:25
**kinds** 12:19 20:24
    71:4,5 84:23
**KLEIN** 5:11
**knew** 26:20 33:23
    36:1 55:24 128:21
**know** 10:12 11:19
    18:12,12 20:5 21:9
    22:22 23:7,8,8,17
    27:20 32:2 38:25
    42:15,21 43:17
    49:5 58:15 59:19
    64:23 69:9,9,10,16
    73:11 79:25 83:24

84:22,23 88:22
    91:16 94:1,11,25
    95:8 96:4 97:2,13
    97:24 98:5,6,6,7
    98:10,18,19 99:8
    99:24 103:9,10
    104:20 105:25
    106:3,23 107:2,23
    107:25 110:13,15
    110:24 111:10,19
    112:10,13 118:13
    120:12 121:12
    123:2,23 124:15
    124:18 125:16,23
    127:8 128:20
**knowing** 73:11
    92:24
**knowledge** 31:19,19
    38:7 49:16 56:14
    62:6
**knowledgeable**
    46:21 49:11
**known** 19:20,24
    28:19
**knows** 42:20
**KRAVITZ** 6:10

**L**

**L** 3:10 7:7
**labor** 19:18 20:5
    53:21 55:11 57:10
    60:17 62:21 92:16
    92:17 93:8,9,11,13
    93:22 98:20
    105:20 106:2,2,7
    106:13 109:4,7
    112:8,19,22 123:6
**lack** 74:14 119:6
**laid** 43:10
**language** 109:22
    112:16
**large** 57:6
**largely** 94:18
**larger** 89:9
**largest** 25:18 110:13
**lasted** 95:22

**late** 42:6,9 89:22
    95:11,13
**LATHAM** 4:10
**law** 125:21
**lawyer** 32:2
**laying** 38:12
**lead** 61:25 66:1
    68:16
**leading** 39:12 79:22
**learned** 35:20
**leave** 104:20 126:25
    127:5
**leaves** 107:17
    117:24,25 118:1,3
    118:4,5
**led** 55:5 65:24 66:15
    67:9
**left** 96:22 105:5
    118:7 127:23
**leg** 23:24
**legal** 10:6 15:8 45:2
    77:6 79:17
**legally** 79:17
**Lenard** 5:9 44:13
**lender** 7:25
**length** 76:11 95:21
    102:1 113:15
**lengthy** 76:18 94:2
**Lenny** 44:9
**LEONHARD** 6:23
**letter** 67:24 100:15
    101:22 102:1,3,12
    102:14,17,21,23
    103:13,21 115:18
**letters** 117:25
**let's** 8:19,22 9:12
    10:20 23:19 30:4
    32:5 33:8 34:7
    46:3 51:14,16 52:4
    69:4 84:5 85:21
    95:4 101:18 114:1
    114:14 122:3
**level** 49:15 60:9
    120:23
**levels** 94:5
**leverage** 60:3

**LEVINE** 6:8
**light** 74:11,11
**lightning** 122:1
**liked** 123:7
**likelihood** 65:5,15
**limit** 35:25
**limited** 53:2,12 74:5
    82:2,14 95:14,20
    97:21 98:1
**limiting** 53:9
**line** 30:23 34:13
    57:17 65:15
    103:13,13 119:2
    119:12 123:24
**lined** 117:7
**lines** 115:12 119:4
**Lisa** 131:11
**list** 26:16 27:6 84:14
    85:8,9 105:15
    119:1
**listed** 25:21 26:4
    27:7 101:4 103:15
**listening** 99:4
**LISTHAUS** 6:10
**lists** 25:10
**literally** 120:25
**little** 23:24 46:3 52:5
    52:6 55:16 60:5
    84:5 90:12 112:23
**live** 121:4,10 123:25
**LLP** 3:4,12 4:2 5:2
    6:2
**load** 69:20
**Locals** 6:12
**logistics** 122:10
**Lokey** 102:22
    103:12,21
**long** 54:17 73:3
    118:15
**look** 9:12 10:4 11:4
    12:11 20:1,22 21:1
    24:17 25:12 27:16
    29:13 56:11 67:23
    68:24 70:16 72:17
    78:13 80:8,20,20
    82:16 85:21 100:5

100:10 101:14
    109:14 115:3
    116:22 117:2
    119:3 121:17,20
**looked** 23:21,22
    31:18 44:24 78:23
    112:17 121:3,4
**looking** 12:20 14:1
    14:25 24:18,24
    42:5,19 49:14
    50:15 80:18 82:19
    89:10 100:25
    106:18 112:2
**looks** 24:1 32:15
**lose** 111:17,21,23,25
**lot** 20:8,13 23:10
    80:2 87:10,19 89:4
    89:17 98:17
    112:24 114:4
    115:6 122:25
    124:15 128:19
**lots** 92:11
**love** 75:5
**low** 72:9
**LOWELL** 5:17
**lower** 31:12 92:16
    98:7 101:2 111:14

─────────
**M**
**M** 5:9 6:23
**maelstrom** 93:10
**main** 127:20
**maintained** 13:13
    72:23
**major** 65:4 94:6
**making** 18:18 49:6
    52:18 63:22 65:13
    101:24 106:9
    115:19
**management** 13:6
    26:9,10 35:22
    63:21 76:8 77:16
    82:23 83:11 93:20
    121:22 122:23,24
    123:2 125:19
**management's**

125:16,23
**mantra** 10:11
**MARAFIOTI** 3:17
**March** 40:18,21
    42:10
**MARIANNE** 5:25
**market** 13:23 14:23
    15:16 16:21,22
    19:7 24:4 25:1
    26:3,12,17,21
    27:6 31:18 42:2
    52:18 73:9 88:7
    90:18 91:9 113:2,5
    114:9,13,21,22,24
    116:8 120:8
**markets** 114:1,6
**market's** 113:23
**markup** 117:21
**markups** 117:13
**massive** 74:13
**material** 59:22
    62:24 77:22 79:9
    117:17 118:22
    122:9,19
**materially** 119:14
**materials** 15:17,19
    76:7,16,19 77:4
    101:3,4,10,20
**matter** 1:6 127:7,21
    127:22 131:6
**matters** 74:4
**MATZ** 3:18
**maximization** 53:9
**maximize** 41:16
    51:12
**maximized** 55:5
    56:4
**MEAGHER** 3:4,12
**mean** 40:20 51:5
    61:24 68:16 83:7
    86:23 87:10
    106:24 109:20
    111:19 113:14
    115:7 124:2,3,19
    124:25 125:6,18
    128:17

meaning 80:7
meaningful 43:18
  74:15 91:16
means 25:13 68:9
  120:19
meant 94:17
measures 123:4
meet 48:15,18 53:24
  96:25
meeting 13:2,4
  53:17 56:16 66:13
  74:4 76:1,2,21
  77:7,12,24 78:3,15
  78:24 79:1,2,10
  95:21 98:15 100:2
  100:17,21 101:5
  101:11,16 102:14
  103:12,14 104:21
  112:6 124:9,10
meetings 13:5 65:24
  66:14,14 76:17
  77:21,21 86:21
  89:22
MEHLSACK 6:16
melting 93:24
members 76:6,11
  101:8
memory 117:17
mention 80:24
mentioned 15:1 54:1
  115:23 125:12
merit 98:17 103:25
meritorious 103:22
merits 85:2
message 112:15
  121:20,22
met 17:10 65:9
MEYER 5:11
Michigan 112:7
midday 95:22
middle 72:3
midst 82:9
midyear 93:9
Miller 5:19 74:3
  75:1,2,15,22 81:10
  85:24 90:3 99:18

99:22 107:7,16
  130:9,10
million 18:14,15
  22:24 29:14 41:25
  70:11 86:6,9 87:5
  87:6 88:14,14,15
  96:4,13 112:1
  113:13,16,18
  122:14
Milwaukee 5:23
mind 89:6 91:3
minds 93:4
minimum 67:3,3,3
  74:14 115:13
minute 101:14
minutes 104:20
misleading 22:14
missing 100:8
mistake 109:9
model 61:6
modifications 83:20
moment 56:12 79:4
  89:16
money 30:21,23,25
  31:1,2,5,11 43:1
  51:19 52:14 58:21
  68:25 69:1 87:10
  87:19 89:4 111:17
  111:21,23 118:16
month 80:12 125:1
months 14:11 39:12
  46:7,8 48:8,14
  52:25 63:11 67:19
  69:7 87:14 124:16
morning 56:1 85:24
  86:13 110:7 129:1
mother 124:13
motion 12:17 68:14
  106:14 109:24
  110:1,5,11,17,20
Motors 29:19 31:11
  42:24 56:2 57:9
  58:8 60:17 61:7,9
  63:2 92:19,23 93:2
  93:18 95:1 97:9
  98:20 105:20

106:15,15,17
Motors's 57:9
mouth 67:13
move 10:19,20 16:16
  23:19 47:8 53:14
  53:24 54:16 57:18
  62:6 69:4 70:24
  90:14 92:6 107:22
  121:1 125:4
moved 88:20 118:10
  118:16
moving 23:20 42:3
  47:7 78:7 107:1
  120:13
multiple 72:16
  78:10
multiply 33:2
MURRAY 4:18
mutual 123:6

---

## N

N 3:2 7:1 130:2
  131:2
nail 98:13
name 7:12 44:13
  75:14,15 108:15
  131:12
name's 7:13
narrow 51:23 85:11
narrowed 48:3
narrowing 47:25
  66:25
narrows 48:2
national 61:14 62:2
  62:9,16
nature 74:13 80:4,9
NDA 45:4,20 47:6,9
  54:14 125:10,12
NDAs 45:11 47:1
necessarily 18:4
  43:19 77:5 118:20
necessary 37:13
  58:22
need 23:1 26:13 28:2
  53:18 54:9 68:17
  68:18 91:22

100:10 106:8
  120:13,15 124:1
  125:8
needed 94:10,25
  97:1 107:1 121:6
negative 52:21
negotiate 31:23
  54:14 55:24 57:16
  58:8,14,14
negotiated 12:12
  13:6,7 14:11,15
  20:6 33:5 37:7
  50:2 51:1 54:15
  57:8,19 61:9 65:17
  98:12
negotiating 10:7
  13:18 26:10 58:16
  61:20 79:20 84:12
negotiation 7:19
  13:9 18:20 50:3
  58:10 60:5 70:19
  82:10 84:7 87:15
  93:11 104:5
negotiations 7:20,21
  9:10 53:21 61:15
  62:12 76:18 77:3
  78:22 80:12 83:9
  89:19 93:8 98:20
  98:20 104:19
  105:20 106:2,13
  116:17,17
net 47:19
never 22:11 23:21
  23:22 24:1 26:16
  28:18 33:9,16
  36:14 56:5 57:16
  58:19 71:23
  106:24 110:10
new 1:3,16,16 3:15
  4:5,6,14,14,21,21
  5:6,15,15 6:5,5,14
  6:14,21,21 30:21
  31:5,11 45:11
  48:19 52:13 54:12
  61:7 93:15,17,23
  114:15

nice 27:3
night 89:22
nineteen 117:11
Nobody's 125:2
nondisclosure
123:19,22
non-disruptive
43:18
non-open 95:15
non-public 116:6,11
116:14,21
Nope 16:6
north 5:21 113:10
note 102:11 121:11
121:25
notes 34:4
notice 128:16
notion 106:16
November 16:17
46:4 47:12,12 48:2
51:16 56:15 77:20
77:21
number 7:7 11:4
12:19 15:22,25
16:3 18:9,11 19:4
22:12,19,24 23:2
24:17,18 26:20
31:12 33:3 34:24
53:12 57:7 60:12
60:21 61:5 69:6
70:13,16,17,18,21
70:25 71:3,5 83:3
83:14 87:6,8,24
88:22 101:2 108:5
113:6,6 122:10
126:21
numbers 21:6 24:3
26:7
numerous 57:10
125:6
NY 3:15 4:6 5:6
N-I-C-K 7:14

**O**

O 1:21 7:1 131:2
object 110:1,4

objected 109:23
110:10
objecting 110:17,20
Objection 10:14
21:8 53:4 62:5
68:3,3 71:8 86:16
92:1 99:7 119:6
objections 128:2,11
128:13,21
objective 60:16
76:15
objector 127:23
obligation 32:22
38:21 63:2
obligations 38:22
41:15 66:20 118:6
obviously 51:20
114:3,16 118:17
121:24 128:17
occasion 42:11
57:25
occur 31:20 39:5
67:1 105:19
occurred 84:2 90:15
96:24
October 36:11 46:4
110:23
OEM 53:21
OEMs 61:15
offensive 121:8
offer 7:5 38:20 39:9
40:5,25 48:9 89:18
89:19 90:25 97:12
101:24,25 102:2
102:10 104:3
107:4 122:3
offered 27:21 28:20
71:4 95:18 118:9
121:2 122:8
offering 18:3,8
25:16 27:6,20 29:3
29:12 87:3 89:6
114:16 118:11
122:2,19
offerings 25:13
26:20 29:25

offers 49:7 74:16
97:17
OFFICE 6:18
officer 75:18
offices 94:7
official 4:3,11 47:23
131:5
oh 11:25 16:4,5
20:12 32:21,25
44:10 61:4 81:14
109:20 116:7
okay 7:9 8:19 9:8,15
9:17,20 10:2,20
11:4,6,7,14,17,25
12:22,25 13:18
15:13 16:15,16
17:15 20:19 22:7
23:20,21 24:3,7,13
24:17 25:12 26:16
27:4,5,11,16,19
28:3,15 30:4,4,13
31:14 32:5,6,14,17
33:6,22 36:6,9,13
37:17 40:19,21
43:4,9 44:1 46:15
46:20 47:16,25
48:6,11 49:19,23
49:25 50:7,19
51:23 52:5 56:8
65:20 68:6 69:3
70:2,3 71:16 73:21
74:8 75:1,6,9,19
78:18 79:9 81:5
82:17 83:14,20,25
84:20 86:2,25
95:13 96:21 99:13
99:16,19 101:18
107:10,20 108:4
108:11 109:13,16
112:16 118:3
119:15,17 122:2
123:10 125:2
126:1,1,4,14,19
128:17
older 23:9
omnibus 37:10

127:13,20,25
128:2,13
once 51:23 66:10
69:5 83:17 106:6
ones 58:18 69:3
89:22
one's 10:14
OPEB 63:2
open 54:4 56:1 84:7
91:22 92:9 97:6,24
104:20 105:24,25
opened 82:1 122:16
opening 75:23 92:11
operate 61:9
Operating 6:11
Opie 76:10 126:8,11
opinion 28:5 43:15
opportunities 42:7
opportunity 13:12
14:4 40:23 41:1
59:11 67:8 122:17
122:20
opposing 103:6
option 87:13 90:20
optionality 82:14
88:6,10
oral 84:18 126:22,25
127:2 128:14
order 23:18 35:8
52:11 68:14 100:4
115:21 124:1
ordinary 56:23
106:24
organized 97:22
originally 34:16
outcome 50:3 93:12
outline 33:9
outside 46:12
outstanding 88:6
111:5
overall 14:9 69:25
70:3
overcome 46:13
overcoming 91:1
overlays 48:22 49:2
overnight 101:9

**Overruled** 71:13
**Owens** 25:16
**owes** 121:5
**owners** 92:25
**ownership** 118:13
**o'clock** 95:22 126:4
126:20

---

**P**

**P** 3:2,2 7:1
**package** 88:20
101:12
**page** 15:23,25 16:3
17:22 18:1 21:24
26:21 34:9,12
80:13,21 83:1,3,15
101:1 130:4
**pages** 80:11,20
**paid** 8:16 21:24
86:11 88:16 91:2
111:9
**panel** 121:23
**paper** 56:5
**par** 118:15
**paragraph** 37:14
109:14 112:2,16
117:2,4 119:22
**paragraphs** 103:21
103:24
**parallel** 125:5
**parameter** 69:19
**parameters** 38:10
38:14
**Pardon** 18:19 25:9
**Parkins** 5:9 44:9,12
44:13 45:17 54:18
54:21 56:7 62:5
74:7 99:17 107:11
107:21 108:2,4,6
109:12 119:6,18
123:11,13 125:25
126:6,18 130:6,12
**part** 7:23 9:3 12:17
26:22 50:16,24
55:17 62:18 66:6
70:23 78:9 82:10

105:20 121:21
127:10
**participants** 71:2
98:24
**participate** 54:2
56:18 88:11
**participated** 13:2
15:7 86:20
**participation** 18:2
**particular** 10:5 57:4
69:12 70:17 73:6
84:20 85:8 88:24
93:1,6,15 103:4,13
103:16 105:10
109:22 114:22
**particularly** 55:11
57:8 64:8,20 70:22
**parties** 11:12 14:13
14:14 29:23 30:21
31:9 34:19,20,21
34:23 35:24 38:8
39:16,18 42:6
43:11 44:6 47:3
50:3 53:23 54:1,5
54:15 55:14 57:7
58:13 60:13 65:15
74:15 80:19 125:8
125:13
**partner** 18:16 44:9
54:5 59:8
**partnering** 47:6
94:10,11,11
**parts** 78:7 107:1
**party** 47:7 54:7
55:23 66:18
**path** 106:12 125:5
**Patrick** 105:8
107:23 108:16
**pay** 7:24 118:16
**payable** 15:4
**paying** 86:15 88:17
**pension** 118:6
**people** 10:11,12,24
18:22 19:11 30:23
33:25 43:20,21
46:19 47:1 51:23

53:2,25 67:8,17,25
68:2,7,19,24,25,25
70:16 72:2 75:3
88:22 94:14 95:1,3
95:15,16 98:5
109:23 116:3,22
121:1,13,23 124:7
125:6 127:8
128:17,19,21
**percent** 70:15,15
90:13 111:4
118:12,14 122:11
122:15 124:21
**perfect** 114:25 115:2
**performance** 93:14
**period** 8:2 13:20
14:5,21 15:4 17:15
18:14 19:16 20:1
33:13,14 34:8,14
35:19 39:7 43:17
82:14 85:4 96:23
**permit** 64:16 66:8
74:14 97:6
**permits** 88:4
**permitted** 96:24
**permitting** 65:25
90:16
**person** 18:23 48:15
**personal** 56:14 62:6
**personally** 77:2
80:11,12
**perspective** 42:21
65:2,14 118:18
121:7 123:8
**pertains** 22:23
**pertinent** 16:24
**PETERSON** 5:17
**phases** 122:18
**phrase** 49:19,23,25
**pick** 122:5
**picked** 40:20 122:9
122:10
**picture** 82:9
**piece** 39:24 59:6
65:12
**pieces** 52:21 107:5

**pin** 107:2
**place** 4:20 14:18
22:2 41:7,19 64:10
76:6 106:1 117:24
118:1,1,4,5,5,7
122:7 123:9
**placed** 103:24
**plain** 42:23 106:23
**plan** 2:3 9:1,4 11:20
11:22 12:2,15
13:12 17:16 18:2,9
18:24 19:1,2,3,9
19:12,24 20:23
25:13 26:21 28:24
29:4,4,14,20,20
30:5,6,14,15 32:8
32:9,11,21 48:19
48:23,24,25 52:14
54:12 57:10,14
58:20 63:4 64:1,2
64:8,16,22 65:8,12
70:24 72:4,7,8,20
72:25 73:3,8,13,15
78:19 79:6,11
80:25 81:1,19,21
83:17 85:3,15,23
86:7 87:5,7 89:23
91:2 92:24 101:22
102:5 105:22
106:5,21 107:3
108:23,23 109:1
111:14,15 113:10
114:5 115:13
117:5,23 121:10
125:1,2
**planned** 8:23
**plan's** 40:25
**play** 56:20 57:17
**player** 51:18,18 94:6
**players** 49:11
124:15
**Plaza** 4:5
**please** 7:2 34:3 43:8
68:3 75:9,11
108:12 109:14
117:3 118:23

pleasure 126:24
plus 46:7 118:15
125:3
PM 1:19
podium 74:6
point 10:16 12:14
14:15 28:11 29:16
37:3 38:17 40:2,4
49:3 52:17 54:21
55:8 60:9,14 61:4
64:22 65:13,16
69:12 79:25 80:1
88:19 89:7 92:3
95:21 96:8,15
97:11 98:7 99:3,17
107:21 115:16
121:11 125:22
pointed 41:4 64:4
pointing 125:23
points 15:1 23:25,25
65:18 68:5 104:7
pool 48:1,1
POR 25:12
portfolio 109:4
portion 13:3 22:4
94:18
position 55:17 90:3
95:2 99:3
positioned 38:23
positive 67:1
possibility 85:14
91:4 106:23
possible 59:1 67:17
68:21 87:7 99:5,10
104:4 121:8
post-restructured
60:10
potential 37:17 38:5
38:25 39:2 48:1,20
68:24 104:14
119:25 120:6
potentially 47:6
power 50:8 51:6,25
practical 65:2,13
practically 65:17
practice 49:21 50:12

51:10 52:23
practices 50:18,20
precedent 53:5
precisely 79:23
predict 127:11
prefer 106:10
preferable 87:17
preferred 17:17
21:19 27:13,20,21
28:6,19,24 29:5,6
29:9,13,17 30:1
31:10,23 50:9 52:4
52:9,16,22 73:5
87:4 88:4,6,10,17
88:21 118:8
122:13
preferreds 31:19
premise 91:7
premised 24:4,8,14
69:18
prepare 84:9,14
124:16 128:10
prepared 15:17,19
28:11 39:24 47:9
48:8 51:2 60:22
80:5 83:6,11 84:10
84:11,12 86:4,5
102:9 103:15
126:11 127:3,4
preparing 56:20
present 22:6 74:7
presentation 14:22
17:2,23 56:18
84:21
presentations 17:20
84:6,18,18
presented 22:11
56:15,17 71:19
74:11 104:8
presenting 10:9
presubmitted
107:22
pretty 100:5 124:25
prevented 21:5,10
PREVIANAT 5:19
previously 116:1

pre-bankruptcy
33:15
pre-existing 48:23
pre-petition 36:5,6
price 18:8,8 73:4,5,7
73:16 111:10
112:25 113:2,3,11
113:12 114:13,21
primary 61:21
principal 104:21
principle 85:12
principles 79:19
print 11:24 22:20,25
printed 131:12
prior 34:14 39:16
45:23 48:24 62:9
71:8 75:17 77:12
78:23 79:1 94:4
97:9 103:5 110:23
111:3 120:7
private 29:5 34:25
50:4
pro 41:19
proactive 120:16
probability 65:7
probably 49:15
119:21 120:17
127:12,18
problem 23:7 47:20
114:24 124:22
125:15
problematic 124:15
problems 43:20
84:24 85:9
procedure 38:7
41:22 68:12
procedures 37:24
41:7,19 68:14
91:23 92:5 105:15
105:16,21,23
proceed 82:12 85:2
87:9 90:22 93:2
95:25 96:20 97:20
97:21 98:13
104:10
proceeding 11:1

85:17,18,20,20
87:17 89:2 106:9
proceedings 129:3
131:6
process 39:12 40:5
44:2 53:1 54:10,21
57:4,18 66:17,17
67:9,20 74:14
81:22 84:21 85:1
91:15 92:7,9 94:2
95:15,18 96:23,23
97:4,23 105:16,20
105:24 123:17
125:11
produced 24:15
83:13
product 83:13
professional 22:17
22:22,23 23:1
43:15
professionally 51:10
professionals 76:25
program 116:18
programs 115:5
progress 58:17
106:13 123:7
projected 23:13,18
projections 45:1
promptly 41:12,22
properly 124:2
proposal 24:8 25:10
28:23 29:1,2,3,9
37:1 38:13,19
39:13,25 41:10,12
41:14,23 42:19
43:14 45:19 46:1,5
50:7 55:8 56:3
57:18 59:2 67:1,23
69:5,18 70:16
90:17 91:5,16
94:20,23 96:8
98:16 104:23
112:4 116:2
117:11,15,21
119:13 120:18
126:21

**proposals** 42:6,7
45:15 46:16 59:18
66:21 69:6,19 70:4
89:25 90:14,23
105:2 106:11
**proposal's** 25:8
**proposed** 16:19,19
17:24 37:4 87:14
113:25 115:13,15
120:1
**proposing** 67:5
**pros** 92:4 96:16
**prospects** 60:24
115:4
**prospectuses** 23:3
**protect** 98:3
**protection** 88:10
**provide** 21:17 31:14
66:4 76:15 90:18
91:16 92:16 94:25
102:5 105:11
106:4
**provided** 13:11 17:4
17:15 18:1 21:21
23:21,22 24:1 25:3
28:15 38:20 55:22
69:18,23 71:4 76:7
77:22,25 78:14,18
78:20,23 79:3,10
80:9 85:10 91:18
102:12 117:5
**provides** 64:6
**providing** 21:5
33:18 101:23
**provision** 10:5 13:19
64:1 65:1 80:21
**provisions** 9:3,11
10:15 12:3 20:6
49:20 64:15
123:24
**PSA** 64:1,3,6 79:3
82:5
**public** 27:21 28:7,20
31:20 39:1 50:4,14
50:15,18 51:11
52:8,18 58:9 59:22

60:12 66:11
105:10 106:15
116:24 118:19
123:8
**publicly** 43:21 72:18
115:9,11,20
**publish** 105:15,21
105:23
**pull** 93:20
**pulling** 23:24 106:6
**purchase** 117:6
**purchases** 111:18,19
111:22
**Purchasing** 2:3
**purports** 119:1
**purpose** 12:12 26:6
28:1,3 31:21
**pursue** 37:3 44:3
63:4
**pursuing** 59:3
**push** 70:19 124:24
**put** 31:1,2 57:14
67:13 80:7
**putting** 14:17 30:21
30:23,24 99:2
**puzzle** 59:6 65:12
94:9
**P.C** 4:18 5:11 6:10
**p.m** 75:8,8 129:4

─────────────

**Q**

**qualified** 38:2,8
46:14,21 49:14
91:24
**qualifies** 92:6
**qualify** 46:20
**quarter** 40:10,16,17
40:18 63:6 93:7
**question** 15:12 21:9
21:15 22:11 26:14
28:2,4 30:4 31:22
31:25 34:15,22
41:3,17,17 43:8
45:17,18 54:17
67:15 68:4 71:15
71:17 72:24 80:4

80:15 81:7,12
88:13 91:6,17
97:19 98:25 99:2
100:23 105:16,18
106:18,21 115:21
116:20 119:7,10
120:22,24
**questions** 26:14,15
26:25 43:25 44:15
54:19 63:24 73:19
73:22 79:13 99:18
99:25 100:1,5
101:20 105:14
107:8 112:11
119:16,21 123:14
125:25 126:22
127:11
**quick** 74:15 100:5
124:19
**quicker** 26:15
124:22
**quickly** 20:5 38:15
54:16 100:14
124:25 125:4
**quid** 41:19
**quite** 94:11 97:17
100:25
**quo** 41:19

─────────────

**R**

**R** 1:21 3:2 7:1 131:2
**racked** 98:24
**raise** 75:10 81:6
108:12 120:15
**raised** 47:22 54:21
80:19 103:22
**raising** 125:7
**random** 97:24
**range** 59:23 60:6,13
61:3 65:18 69:17
70:8 72:19
**rational** 72:22
**reach** 14:15 17:6
35:23 65:6
**reached** 53:13 55:19
64:18 65:3,7 74:2

121:19,20
**reaching** 40:11
**read** 9:4,6 11:15
23:2,6 76:12,22
77:3,5,9,12 79:16
79:24 83:16
102:25 103:5
107:25 115:12
120:18
**reading** 12:1 54:22
77:15 101:10
103:2
**ready** 116:22
**reaffirmed** 98:15
**real** 8:14 40:24 53:1
84:23 124:2
**reality** 56:6 125:4
**realized** 73:2,9
**really** 8:5 33:2,3
46:10 47:18 50:4
51:17 52:24 54:15
72:9 76:11 113:22
121:14 122:9,10
125:10
**reason** 7:24 8:6,6,10
8:11,13,25 9:1,22
12:10,10 13:13,14
13:21,21 14:6,6
15:5,5 28:9,25
29:18 34:15 72:25
81:19,20 82:5,5
**reasonable** 14:2
15:1,14 16:20
26:11 44:24 65:9
69:23 73:5 76:24
93:19 97:8 125:19
**reasons** 39:14
122:10
**rebuffed** 59:3
**recall** 20:16 34:5
67:10,11,12 77:10
77:11,23 78:20,22
78:25 79:4,6,8,9
79:23 80:4,11,13
83:22 84:3,12,17
84:21,25 87:6

88:24 91:8 100:14
102:7,18,20,23
105:16,18,18
112:11 120:4
**receive** 25:20 31:9
59:11,14 102:17
112:5 113:10
**received** 13:25 14:8
14:8 26:5,22 27:8
27:11 29:2 34:17
35:21 59:15 92:6
102:13,14
**receives** 41:12
**receiving** 17:17
18:11,12 38:18
43:16
**receptive** 90:5
**Recess** 75:8
**recognize** 11:7 85:3
**recollection** 34:24
76:3 82:19 101:6
102:14
**recommending**
90:21
**record** 7:3,11 59:22
75:10,13 90:2
100:4 105:9,10
108:14 126:5,19
**recording** 131:5
**recoveries** 70:23
**recross** 65:20
**RECROSS-EXA...**
65:21
**redirect** 56:9 74:3
99:20 119:17,19
123:10,12
**refer** 34:3 76:3
**referred** 35:18
116:15
**referring** 33:13
66:13 113:6
**refiguring** 98:22
**reflect** 50:2 73:10
101:9
**reflecting** 30:17
**reflective** 118:19

**refresh** 76:3 82:19
117:17
**refusal** 125:9
**regard** 96:9
**regular** 11:3
**reimbursement**
13:15 14:25
**reject** 87:16
**related** 14:23 85:9
114:9
**relates** 115:23
**relating** 42:24
**relative** 62:10
**relatively** 49:11 89:4
**relevance** 101:11
**relevant** 41:9
**relied** 77:15
**reluctance** 12:2
**reluctant** 93:2
**rely** 76:24
**remaining** 55:25
58:15 59:7
**remarks** 75:23
**remember** 27:13
66:3 112:10
**renegotiate** 64:24
**reorganization**
14:17 19:2 25:13
60:24 63:12 65:5,7
119:24
**reorganize** 58:23
**repeat** 27:4 28:4
**rephrase** 21:16,16
53:6,8 71:15
**reply** 37:10,14
**represent** 42:12
44:14 50:17 71:5
96:13
**representation**
66:11
**representative** 7:18
121:24
**represented** 42:11
42:13 87:7
**represents** 50:20,25
88:15

**required** 36:4 74:19
89:9
**requirement** 67:3
**requirements** 38:1
65:10
**requires** 97:13
**resigned** 45:20
**Resnick** 7:7,13,17
9:13 23:25 26:13
28:13 31:24,24
32:18 34:9 44:13
44:15 49:19 56:11
56:22 58:20 61:11
63:15 65:23 67:15
68:22 69:10 71:9
73:24 90:11 124:3
130:5,6,7,8
**Resnick's** 92:2
**resolution** 58:14
112:8
**resolved** 50:1 62:18
124:21
**resolving** 58:18 59:7
**resources** 107:14
**respect** 17:3,17
21:25 22:1 39:25
49:20 52:3,24
63:22 70:23 74:12
77:20 84:15 85:11
88:13 98:11 100:19
106:15
**respectfully** 53:11
**respond** 41:2,11,22
**responded** 41:13
**responding** 79:13
**response** 43:13
101:25 102:5,8,9
103:18
**responses** 39:24
**responsible** 35:8
40:24 41:8 52:25
67:9 74:14
**rest** 52:11 53:3
107:5
**restarted** 45:11
**restate** 71:17

**restructure** 106:8
**restructured** 60:16
**restructuring** 29:4
29:23 36:2 37:1
57:2,13 62:12,19
62:24 92:14 93:21
106:25 107:3
108:25
**result** 12:2 50:1,7,12
**results** 80:8
**retained** 33:15
34:16 35:19
**rethink** 61:6
**return** 73:15 89:10
**review** 17:12 66:9
66:21
**reviewed** 13:17
100:20 101:4
103:13
**reviewing** 82:19
**rewards** 85:21
**re-cross** 107:9
**re-embrace** 45:8
**rid** 122:12,14
**right** 7:2,9 8:6,9
9:22,24,25 10:1,13
10:22 12:14,16
13:13 15:22 16:24
17:22 18:3 21:3,14
23:3,19 24:5,13
25:6,8,10,19 26:13
26:19 27:25 28:8
28:13 30:6 31:20
36:7,9,19 37:4,22
43:6 44:10 45:3
61:15,16 64:3,6,10
67:14 69:1,14,14
70:4,15 71:2,2
72:4,7,9,11,15
73:11,14,23 75:3,6
75:10 77:7 78:1
81:11,15 82:1,14
82:22,24 83:21
88:1 89:13 91:6
98:25 99:11
107:12,17 108:12

110:16,19 112:5
112:20 114:13,14
114:21,25 115:1,3
116:6,13,22 117:2
118:11 119:20
120:20 121:22
125:9 126:5,10,11
126:17 127:18,25
128:7,24
**rights** 18:2,8 25:13
26:5,20 27:6 29:3
29:12,25 50:10
87:3 89:6 113:14
114:16 118:11
122:2,8,19
**right-hand** 101:2
**Ripplewood** 34:18
35:2,3,13,21 36:3
36:6,21 44:17 45:8
47:1,14 48:14 49:6
49:10 53:15 55:15
59:5,17 70:4 71:19
94:3,21,23
**risk** 8:2,5,9,11,13,15
8:17,19 9:2 53:20
63:20 65:8,9,16
72:5 85:6 91:2
96:17,18,19,21
104:18 106:6
**risks** 42:3 85:17,18
85:21 87:18 98:14
**risky** 73:14
**River** 5:21
**road** 93:22 116:19
**ROBBINS** 5:25
**Robert** 1:22 4:16
75:15
**rock** 97:16 98:14
**rod** 122:1
**role** 56:20 77:2
**room** 44:2 116:15
**ROSENBERG** 4:16
**Rothschild** 15:19
27:12 33:9,10,14
33:15,17 34:16
35:6 36:13 77:20

77:22 79:19 80:5
84:5,9,10,14 103:8
**roughly** 30:20
**rule** 126:23,23
**rules** 42:15,18
**ruling** 81:7 128:14
**rumors** 120:8
**run** 39:11 57:17
83:14 125:5
**runners** 47:13
**running** 66:16
**runs** 24:15
**R-E-S** 7:13

---

**S**

**S** 3:2 6:16 7:1 75:15
**sale** 68:13
**sand** 120:13
**satisfaction** 95:17
**satisfied** 31:4
**satisfy** 38:10 98:2
**saw** 12:13 83:7
106:5 123:7
**saying** 28:13 30:11
36:24 40:15 43:2
67:5 88:25 117:22
125:7
**says** 16:9,10 81:3
83:3,16 96:4
106:22 117:4
119:22
**scenario** 84:15
**scenarios** 71:20
119:24 120:6
**schedule** 69:16
**science** 29:25
**scope** 68:20
**scratch** 44:4
**screen** 23:13 68:19
87:21
**screened** 95:17
96:24
**search** 47:18
**seat** 123:2,2
**seated** 7:2 75:9
**second** 39:13 93:14

96:1 101:1 104:12
104:13 107:15
119:1
**secondly** 92:18
97:11
**Section** 64:5
**securities** 29:25 30:1
94:5
**security** 52:16
**see** 8:19,22 9:16
17:23 23:10,11,24
24:10 26:11 29:12
32:5,10 33:25 52:8
52:18 83:3,18 93:4
93:24 103:17
110:2 115:10
117:7 120:1
128:25
**seeing** 11:25
**seek** 46:11 47:19
82:23 105:21
**seeking** 64:19
**seen** 20:7,8,9,13,14
45:24 52:7,22
76:19 91:11 94:15
106:25
**sees** 40:13 42:1 62:3
65:3
**select** 66:18 122:13
122:15
**selected** 106:5
**selecting** 66:4
**selection** 121:21,23
**selective** 96:24
**self** 122:17
**semi-open** 97:7
**semi/quasi** 105:25
**send** 128:15
**sending** 121:22
**sense** 14:12 41:18
86:18 114:20
**sensitivities** 80:16
**sent** 11:8 101:21
102:3 121:20
**sentence** 109:17
117:4

**separate** 22:2 86:4
93:13
**separately** 80:7
102:12
**September** 46:4
59:3 63:5 97:10
124:21
**sequestered** 99:23
**series** 100:6 105:14
116:14
**serious** 41:15 54:16
**seriously** 79:15
97:18
**serving** 12:13 91:19
**sessions** 90:12
**set** 21:1,23 38:10
92:21 105:15
**sets** 38:14 84:22
85:22 114:21
**setting** 50:5 81:12
**settlement** 57:8
83:18
**settlements** 50:24
57:11
**seven** 33:1
**seventy** 32:20
**shaping** 93:10
**share** 30:20 33:1,2
69:20
**shared** 26:8
**shareholders** 89:5
116:24 118:10,15
121:9 122:16,18
122:19
**shares** 25:20 26:19
26:22 27:8,20
111:2,5 113:14,23
114:2,22
**sharper** 30:24
**Shaw** 65:24 66:24
66:24
**Sheehan** 30:11,11
30:17 81:9 86:20
**Sheehan's** 81:16
92:2
**shock** 87:9

**shoes** 116:2
**shopping** 92:11
**shortly** 94:5
**shot** 33:8 40:24,25
   53:10
**show** 22:19 42:16
   69:21 128:18
**showed** 18:1 22:12
   26:4
**showing** 21:18 22:24
   91:4
**shown** 124:25
**shows** 96:10
**SHRIVER** 4:2
**sic** 18:1
**side** 17:20,21 103:10
   103:17,18 118:2
   125:12
**sign** 11:18,21,21
   47:9 65:10
**Signature** 131:9
**signed** 45:4,11 47:1
   109:19
**significance** 102:2
**significant** 8:1 19:16
   53:20 55:17 57:7
   58:18 63:21 70:18
   81:24 93:4,25
   94:16 106:7
**significantly** 61:5
   93:12
**signing** 47:6
**similar** 29:9
**SIMON** 6:2,7
**simplifies** 49:2
**simply** 106:19
   117:19 118:9
**sincerely** 87:9
**sir** 31:22 70:15
   77:17 83:23 97:19
   98:25 102:4
   107:12 108:22
   109:3
**sit** 84:20 108:11
   110:16,19 111:21
   117:19

**sitting** 96:3 119:11
   125:1
**situation** 32:7 35:24
   37:19 50:12,20
   95:10 97:25
**situations** 89:11
**six** 120:7 124:24
**sixteenth** 22:20
**sixty** 45:14 111:3,7
   124:23
**sixty-six** 88:18
**sixty-three** 18:15
**size** 25:16,18 36:2,4
   37:21 42:1 120:16
**Skadden** 3:4,12 15:6
   15:8 65:24 78:1,14
   79:19 80:5 83:11
   83:13 84:11
   101:21 102:3
   108:10
**slam** 104:16 105:3
**SLATE** 3:4,12
**slightly** 17:6
**slip** 93:22
**slipping** 97:9
**small** 11:24 26:20
   35:25 53:14 99:4
**smaller** 89:4,10
**sold** 28:7
**solely** 115:20
**solicit** 34:1 68:15
**solutions** 126:13
**solve** 57:12
**solvency** 112:10
**solvent** 112:12
**solving** 59:6
**somebody** 8:20,22
   41:20 121:23
**someone's** 98:1,2
**something's** 120:13
**somewhat** 40:22
   125:3
**sophisticated** 35:25
   46:14,22 48:11
   49:11 51:19 53:24
   54:1 68:16 88:9

**sophistication** 49:15
**sorry** 8:21 11:24,25
   12:5 15:25 16:4,5
   16:22 20:12 23:4
   24:10,21 26:12
   28:2 32:23 34:2,6
   34:11 36:17 51:5
   51:16 54:17 58:4
   58:14 69:24 71:14
   81:5 125:24
**sort** 41:19 54:25
   56:23 68:15 84:14
   88:22 90:10 95:16
   95:19 97:24
**sought** 45:8
**sound** 131:5
**sounds** 110:16
**source** 104:14
**Sources** 120:9
**SOUTHERN** 1:3
**so-called** 114:11
**speak** 16:25 26:6
   105:7 115:12
**speaking** 16:25
   50:14 57:23
   109:23
**special** 85:6
**specific** 12:7,12 15:2
   22:10 27:10 39:14
   65:1 67:12 105:11
**specifically** 14:22
   84:17,25 87:6
   101:7 116:5
**speculating** 99:11
**speculative** 18:6
   111:18,19
**spell** 7:12 75:14
   108:14
**spend** 57:20,23
   88:25 89:17
**spent** 80:2
**spoke** 15:7,8,20,20
   114:6
**spoken** 113:15
**sponsor** 40:25
**spread** 113:11,18

116:25
**sprung** 120:25
   125:21
**Square** 3:14
**stability** 63:10
**stage** 66:25
**stake** 96:19
**stakeholder** 90:25
**stakeholders** 22:25
   42:25 49:1 50:24
   51:13 52:14 53:16
   54:7,23 55:10
   63:13 65:25 66:12
   69:22 71:6,18 73:6
   80:17 85:19 87:24
   89:2,21 104:4,15
   105:1,6
**stale** 45:25
**stalking** 38:13 66:1
   66:5,18 91:19
**stand** 97:16 98:14
   111:17,21,23,25
**standings** 97:1
**staring** 96:4
**start** 34:7 44:4 46:3
   128:9,12,13
**started** 45:4 46:10
   60:6 94:6 106:12
   107:4 123:17
**starting** 115:16
   120:8
**starts** 49:3
**state** 6:13 23:18
   60:10 75:13
**stated** 82:18 117:15
**statement** 9:25 19:3
   19:7,12,21,23 20:3
   20:15,21 27:10
   32:19,24 37:11
   39:1 41:2,4 72:12
   73:12 106:16
**statement's** 64:4
**States** 1:2,14 6:18
**statutory** 53:13
   66:20 80:17 89:21
**stayed** 86:14

**Steel** 110:10
**Steelworkers** 5:12
**Steingart** 4:8 7:16
9:15,18 10:18,20
10:22,25 11:24
16:2,4,7,10,14
20:12 21:14,16
22:21,22 23:2,4,7
23:12,17,20 24:12
24:22 27:3 32:17
34:4,7 39:23 43:9
43:24 63:25 64:15
65:22 68:6 69:25
71:11,14,16 73:19
74:6,9 75:1,21
78:3 81:11,14
86:18,24 90:2,8
99:15,25 105:14
107:9 126:7,15
130:5,8,9
**step** 73:23 78:21
92:7 107:12 116:2
116:2,3 126:1
**steps** 64:9 76:17
**stick** 97:14
**stipulations** 118:6
**stock** 17:18,18 18:6
32:20 50:9 72:9
73:13 87:4 110:22
111:11,18,20,22
111:23 112:25
113:3 114:13
**stockholders** 112:4
112:19
**stocks** 88:1
**stock's** 114:4
**stone's** 105:5
**stop** 12:1 64:19
74:23 93:24 112:5
**strategic** 12:12
**strategies** 119:24
**Street** 5:4 6:4,13,19
**strictly** 118:9 123:8
**strike** 39:23 61:12
62:6 113:3,11
**striving** 61:13

**strong** 94:19
**stronger** 94:21
**structure** 16:18
37:22 47:5 50:17
50:19,25 52:12,12
54:8 55:18 67:21
67:23,25 68:1,2,7
68:10,12,18,21
69:6,21 91:8 92:25
95:2 98:4 120:1
122:2
**structured** 28:24
69:19 98:8 121:2
121:16,17
**structures** 71:5,20
120:10
**structuring** 31:5
**struggle** 80:14
**subject** 7:8 56:23
74:1 86:17 115:3
115:24 116:5
**submitted** 98:16
117:21 119:4,12
126:7
**subsequent** 39:18
**subsequently** 102:17
**substantial** 29:20,22
44:21 57:25 58:1
74:12 98:4
**substantially** 72:14
**success** 87:11
**successful** 104:23
124:6
**sued** 125:15
**sufficient** 96:25
**sufficiently** 88:8
**suggested** 97:7,7
121:12
**suggesting** 71:11
**Suite** 5:5,14,22
**summaries** 77:22
83:6
**summarize** 77:17
**summarized** 101:8
**summary** 25:7
77:25 78:14,18

79:3,6 80:4 84:14
101:18 104:1
**summer** 36:18 37:6
47:21
**SUOZZI** 5:11
**superior** 87:21 91:4
96:9,10 105:2
107:3
**superiority** 104:3
**suppliers** 72:18
**support** 2:3 11:20
11:22 12:2 38:20
51:2,4 66:7 70:25
78:19 79:6,11 81:1
117:5,23
**sure** 39:8 49:5 64:20
67:9,16 68:20,23
68:23 72:24 84:17
94:11 103:6 105:5
109:8 115:2 116:7
116:7 122:3
**surface** 104:2
**surfaced** 96:2
**surprise** 64:20 87:8
**surrounding** 11:22
57:8 63:9
**sustainability** 61:2
**Sustained** 62:7
119:8
**sworn** 7:10 75:12
108:13
**syndicate** 124:18
**S.C** 5:19

---

**T**

**T** 131:2,2
**Tab** 100:8,15,19,23
100:25 101:14,18
101:21 102:11,21
**table** 40:2 58:21
66:11 89:19 91:13
126:21
**tabled** 98:11
**take** 11:6 41:8,23
47:25 49:5,8,14,25
54:14 61:21 64:9

65:19 74:10,20
75:25 87:16 89:20
96:5,7 106:14
109:14 113:1
118:14
**taken** 51:1 73:3
89:24
**takes** 112:4
**talk** 33:8 52:4 84:5
94:2,7 99:23,23
103:2 114:1 121:1
124:7,9 125:8,13
**talked** 15:13 34:24
46:19 52:3 53:17
90:9,11 94:3 113:9
120:12 124:11
**talking** 35:19 42:8,8
42:9 43:22 47:3
67:20 68:11 94:6
109:18 112:3,18
115:18 120:5,9
**tar** 125:14
**team** 26:9,10 55:13
55:15 59:5 79:19
79:19,20 84:12
94:19 116:22
122:24 124:19
**teamed** 54:24
**teaming** 55:3
**telephonic** 76:2
**tell** 15:10 16:8 18:14
27:5,9,10,16 28:18
28:21 31:17 32:18
66:13 67:10 71:12
80:15 111:4,6,25
117:20 119:10
120:15 124:10,22
128:11
**telling** 26:2 103:9
**ten** 18:13 70:15,15
72:13
**tension** 104:2
**Tepper** 11:2,3,8,10
11:13 120:14
**term** 73:3
**terminate** 19:25

65:8 80:25 81:19
82:4
**terminated** 64:7
81:1
**termination** 12:3
64:6
**terms** 13:15,22,24
14:7,9,14,24 15:8
16:22,23,23 19:8
20:2 21:1,19 28:23
38:12 39:15 47:19
52:22 59:24 60:1,1
60:3 61:8 63:1
85:21,22 87:2
89:18 104:1 105:4
108:25 117:14
118:24 120:1
124:6
**terrible** 21:3,9,12
**testified** 7:25 10:15
21:9 27:19 28:8
30:13 44:20 61:13
71:9 76:10 77:11
99:8
**testify** 21:12
**testifying** 53:5
**testimony** 34:5 52:5
71:9 81:9,16 86:17
92:2,2
**testing** 90:19
**tests** 91:9
**TEV** 56:2
**thank** 10:22,25 11:6
56:7 73:25 76:5
86:3 90:7,8 99:13
99:13,14 100:13
107:7,13 128:25
129:2
**Thanks** 15:24
109:13 110:6
126:3
**theoretical** 8:14
32:9,11,15 114:18
**theoretically** 8:12
62:22 65:16
**They'd** 54:13

**thick** 101:1
**thing** 37:21 54:20
68:21 83:7 91:11
91:13 109:8
112:13 118:7
120:25 122:1,3
123:4 124:19
125:20
**things** 15:20 24:5,7
24:14 25:10 31:18
39:10 45:1,2 52:22
84:19 89:7 107:5
113:15
**thing's** 124:20
**think** 9:13 10:6,19
12:11 13:25 14:7
14:11 15:12 16:2
17:4,6 18:22,23,24
19:14 20:3,17
22:25 30:17 34:14
38:12,14,21,24
39:4,10,10,13,16
39:21 40:10,13,16
40:23 41:3,11,13
41:14,22 42:1,19
43:7,13,23 44:20
44:20 45:4 47:3,8
47:19 48:6,17,18
49:2,8 51:1 54:9
54:18 55:4 57:2
58:10 60:12,25
62:17 63:8,25 64:4
65:3,13 66:16
67:22 73:3,6,15
74:16,21 76:24
94:12 99:9,11
102:19 104:6
107:17 109:9
110:21 112:21
113:5,13,16 115:5
115:10,19 117:18
117:19 119:8
120:7 121:11
122:4,6 124:3,24
125:19,22 126:22
127:8,12,18,25

128:4,5
**thinking** 128:2
**thinks** 98:7
**third** 4:13 26:1 38:8
63:6 83:15,16 93:7
125:13
**thirteen** 70:12,12
86:6
**thirty** 45:14
**thirty-day** 74:18
**thirty-five** 30:5,15
31:7 33:2,3
**thirty-seven** 76:16
**thirty-three** 88:17
**THOMAS** 3:18 4:23
**thorough** 104:6
**thoroughly** 41:12
101:12
**thought** 9:15 21:21
21:22 43:5 103:20
110:6 121:4,19,21
123:5
**thoughts** 127:1
**thousand** 80:11
**three** 25:10 35:1,4
35:14 36:7 46:7,7
46:8 47:23 48:2,7
48:7,7,12,14,14
52:25 61:20 67:19
69:7 94:15 110:13
121:2 122:18
127:14 128:1,3
**three-quarters** 17:7
**threshold** 46:13
49:14
**thrust** 80:2
**tied** 53:20
**time** 8:2 10:3 11:1
11:17 13:16 17:10
17:15,20 18:14
19:16,20 20:1
32:10 33:9,13,14
33:14 34:14,16
35:6 38:17 39:7
41:9 45:5,7,15,19
47:15,16 48:12

49:6,8 51:16 53:18
57:20,23,25 58:1
58:13,13 59:3
61:19,24 65:5
68:19 69:12,24
73:9,12,14,18
74:10,21,21 76:21
79:5,15 80:2 81:25
82:5 83:7,7 84:1,6
84:6 87:1,21 88:5
88:25 89:10,17
90:15 91:7 93:3,3
93:13 94:24,24
95:13,23 96:21
97:25 99:13 105:1
107:1 109:19
110:8 112:14
114:5 120:17
121:8 126:20
127:8 128:9
**timelines** 20:7,8,13
20:20
**timely** 47:20 93:21
**times** 3:14 84:10,10
84:11
**timetable** 48:18
53:25 93:23 97:6
97:10
**timing** 39:2,5,14,18
39:22 40:1 42:16
54:3 64:21
**tires** 94:15
**today** 10:9 19:9
25:16 32:5 33:15
37:11 50:21 84:20
96:1 97:14 109:18
111:21 112:24
113:9 115:8
117:20 119:11
123:15 125:2
**told** 23:13 26:16
28:22,22 39:17,21
54:2,3,3 90:16
105:10 114:19
124:24 125:11
**tolerate** 66:7

**tolerated** 67:2
**tomorrow** 126:23,24
   127:2,7,12 128:9
   128:20 129:1
**tonight** 126:23
   127:1 128:16
**tools** 37:12
**top** 40:14 83:3,14
   110:24 116:18
**topic** 13:21 44:2
   109:7
**topics** 101:7
**topping** 121:13
**total** 16:23 25:18
   55:20 59:24 60:1
   87:7 94:17 112:1
**totality** 10:4,11
   80:18 113:15
**totally** 125:21
**touch** 11:2,3
**touched** 17:9
**tough** 51:25 122:25
**trade** 18:7 72:18
**traded** 72:18
**trading** 32:20 113:5
**transaction** 8:3
   13:19 14:5,11
   18:21 21:25 30:18
   31:6 38:12 39:15
   41:25 42:22 55:7
   58:22 71:20 78:6
   89:1,3 90:22 95:25
   96:15 98:2 120:1
   124:2
**transactions** 27:7
   31:17 36:2 37:4
   58:8 60:17,23 95:5
**transcriber** 131:4,9
**transcript** 131:5
**transfer** 86:5 87:4
   112:24 113:9
   114:11
**transformation** 63:4
   92:17 106:7
**treatment** 118:1,4,5
   118:5

**tremendous** 40:13
   41:24 63:14
**trial** 11:4
**tried** 55:14 57:17
   59:2 68:22 82:7
**Troy** 112:7
**true** 8:14 46:10
   49:16 50:5,9 65:23
   69:5 77:1 80:24
   83:20 112:6
**trust** 31:10
**TRUSTEE** 6:18
**trusts** 124:12
**truth** 121:3 125:11
**try** 30:4 37:19 44:16
   54:14 59:5 86:18
   100:4
**trying** 22:23 29:22
   41:2 42:4 45:16
   54:25 65:14 67:13
   79:13 80:1 81:11
   86:16 105:6
   115:11
**Tuesday** 95:22
**turmoil** 93:10
**turn** 38:15 74:6 83:1
   96:17 101:1
   102:19,20 123:5
**turned** 120:10
**turning** 45:3
**tweaks** 95:7
**twelve** 70:12,12
**twenty** 88:14 118:12
   118:14
**twenty-five** 75:7
**twenty-two** 26:23
**two** 24:15,24 25:15
   25:19,22 29:7
   31:23 35:1,4,14
   36:6 39:10 48:2,3
   51:23 53:2 54:25
   55:3,16,24 56:14
   56:20 60:14 71:2
   90:13 93:5 100:10
   100:17 104:8
   110:13 114:8,17

   127:13,17 128:1,6
**two-thirds** 93:17
**type** 11:20
**typed** 131:12
**typical** 29:23 57:13

---

### U

**UAW** 6:3 40:12 55:7
   55:11,23 57:20
   59:7,8 61:19 65:3
   65:11
**UCC** 24:8 36:25
   53:14 59:15 70:21
   70:22
**UELMEN** 5:19
**ultimate** 92:25
   108:25
**ultimately** 34:25
   55:18 60:5 70:20
   83:12 85:15
   116:16 120:11
   122:20
**unable** 46:20 63:4
**uncertainty** 21:3,10
   21:13 61:25 63:8
   63:14,16,19 95:19
**uncomfortable**
   55:11
**unconscionable**
   74:13
**undercurrent** 90:6
**underlies** 18:20
**underlying** 106:20
**understand** 8:23
   10:10,11 15:14
   21:15 22:23 28:12
   30:18 44:25 49:4
   65:12 72:24 76:23
   79:17,18 81:20
   87:2 88:9 89:14
   91:17 100:9 110:7
   113:16 115:21
   123:3
**understanding**
   14:10 38:17 58:3,7
   61:11,17 76:13

**81**:21 82:11
**understands** 106:10
**understood** 13:25
   14:7 45:25 85:16
   88:1 103:6 119:3
   126:10
**undertake** 36:18
**undertaking** 47:17
**unfair** 114:4
**unfortunately** 59:1
   128:11
**unimportance** 62:11
**union** 5:12 55:25
   97:9 118:2
**unions** 42:24 57:10
   57:15 58:8 60:21
   61:8,10,22 62:16
   62:17 64:18 72:12
   92:16,22 93:1 95:1
   95:5 104:19 106:2
   106:6 108:24
   109:4,7 110:1,13
   110:17 112:9,20
   112:22 115:4
   116:18 124:4
**unique** 39:14
**United** 1:2,14 6:18
   110:4,10
**universe** 33:11
   51:17,23 53:2,10
   53:12
**University** 4:20
**unleash** 98:19
**unlock** 94:9
**unreasonable** 18:25
**unsecured** 4:12 25:4
   29:19,21 31:8,10
   73:6
**unturned** 105:6
**unusual** 14:3,21
   15:11 28:25 52:15
   52:17
**unwilling** 82:8
**update** 17:4
**updated** 83:8,8
**upset** 115:25

**upside** 88:12
**urging** 54:24
**use** 11:19 26:7 97:21
  114:15 115:15
  127:8
**uses** 52:13
**USG** 25:17
**usually** 17:8 30:23
  91:18
**U.S** 1:23

---

**V**

**valuation** 28:25
  29:24 52:15
**value** 17:23 18:1,6
  18:11,24 19:3,9,12
  19:14,17,24 20:24
  21:20 22:13 29:10
  29:11,14,19,24
  30:2,6,15,19,22,24
  31:7,7,11 32:8,9
  32:11,15,20 33:1
  40:6,13 41:16,25
  42:1,23 51:12
  52:13,13,14 53:9
  53:20 55:2,5,19,20
  56:4 57:12,13
  59:12,14,18,23,24
  60:1,8 63:16,20
  69:4,20,22,25 70:3
  70:8 71:18,21,23
  71:25 72:9,14,22
  72:23 73:13 85:22
  86:5 87:4 88:6,7
  88:10 90:25 92:14
  92:18 93:4,25
  94:17 95:18 98:24
  105:6 106:17,21
  112:1,4,17,18,21
  112:24 113:2,9,11
  113:21,22,23
  114:5,11,12,18
  116:13 118:10
**valued** 87:3 114:2
  114:22
**values** 21:18 69:22

70:23 73:1
**vanilla** 42:23 106:23
**various** 49:1 78:11
  80:19 89:21 94:5
**varying** 71:19
**version** 77:8
**versus** 31:7 89:2
  96:1,17
**veto** 50:8 51:6
**view** 15:9 22:3 24:25
  29:18 30:18,24
  31:6 55:6 56:22,25
  57:1 58:20,24,25
  59:1 60:15,18,19
  60:23 61:2 62:10
  62:14 63:6,15,18
  63:19 66:16 73:3
  74:23,25 88:7
  95:10 99:4 103:7
  105:19 116:11
**viewed** 22:4 61:17
  121:7
**viewpoint** 80:16
**views** 16:17 29:24
  30:2 64:7 71:25
  79:21 103:10
  121:6
**virtue** 85:4
**vote** 90:1 95:8 98:10
**voted** 95:9
**voting** 120:19
**vu** 86:22

---

**W**

**Wacker** 3:6
**waited** 33:25 114:8
**waiting** 116:20
**walk** 8:6,10,12,15,25
  9:5 13:13,20 14:5
  15:5 20:23 21:2
  32:14,22 33:3 64:3
  72:2,4,8,25 85:4
  89:13 98:5
**walking** 85:9
**walk-away** 9:21
  12:10

**want** 10:12 22:22
  23:8 29:17 30:5,14
  44:15 57:15 64:24
  75:3 87:16 102:20
  105:9 106:3 108:7
  109:7 112:11
  114:7 120:23
  121:20,22 122:1,4
  122:21,22 123:10
  125:13 126:25
  127:1 128:9
**wanted** 10:15 14:16
  29:12 46:11 47:8
  48:11 50:4 51:6
  65:18 69:3 94:14
  103:4,8 105:11
**wanting** 67:4
**wants** 44:3 106:17
  127:4
**warrants** 30:1
**wasn't** 9:8 11:18
  48:1 51:10 66:6,11
  76:2 77:8 83:20
  90:14 97:3 120:10
**WATKINS** 4:10
**way** 21:21,22 22:4,6
  22:18 28:23 31:8
  32:11,15 36:24
  43:18 52:15 57:19
  61:18 67:7,10 71:6
  72:20 76:18 78:21
  87:22 90:17 91:8
  92:15,21 95:16
  97:22 98:4 106:1
  107:3,4 114:1
  117:20 119:11
  121:6
**ways** 68:15,18 69:21
  78:11
**Wednesday** 95:23
  107:6
**week** 20:14 95:22
**weekend** 125:18
**weeks** 20:20 54:14
  120:7 124:24
**weighed** 85:17 87:18

87:19 94:1 104:3
**weighing** 96:15
  104:6
**WEISS** 6:2
**went** 17:22 18:4
  32:16 48:6 54:10
  59:4 80:13,13
  86:21 89:5 90:13
  92:13 94:7 106:16
  120:11
**weren't** 35:16 55:12
  67:18 78:18 94:11
  95:7 110:7
**West** 3:6 6:4
**we'll** 12:20 16:9
  100:6 124:23
  125:4 128:8,13,15
**we're** 7:2 9:20 10:9
  24:4 26:25 32:6
  44:1 57:16 60:25
  68:5 75:9 80:1
  82:9 104:16 106:8
  106:14,18 109:7
  115:10,11 116:19
  116:20 120:16
  123:3 124:21
  125:1,19 126:15
  126:18 127:6
  128:12
**we've** 57:17,17
  58:17 59:1 67:22
  85:23 86:4,13
  99:12 113:9
  124:25 125:4,6
**whatever's** 118:2
**Whitehall** 6:19
**wide** 105:24
**widening** 67:9
**willing** 21:4 58:13
  58:14 87:20
  115:22 120:16,17
  122:11
**win** 43:4
**window** 40:23 41:1
  41:3,6,18 42:8,9
  43:2,5,16 74:18

82:1 95:14,19
96:21 97:2,22 98:3
99:4
**Wisconsin** 5:23
**wish** 75:25 95:7,7
**wished** 12:4,7,9
87:12 94:20
**withdraw** 45:17
**withstand** 60:4
**witness** 7:5,10,13
9:16,19 16:13,15
23:14 26:25 34:11
44:5 53:11 55:1,4
64:11,14,25 73:25
75:12,15 86:1,3,25
90:7 92:8 107:13
108:13,16 120:3,7
120:21,24 126:3
130:4
**witnesses** 74:7,21
**WM** 3:9
**word** 11:19 12:5
**words** 11:15,15
67:12
**work** 36:5 54:3,13
67:18 83:13 92:23
109:3 125:18
**worked** 87:8
**Workers** 110:4,10
**working** 55:8 63:10
67:20 92:15 97:16
108:24 125:5
**world** 8:15
**worlds** 98:9
**worried** 114:11
**worse** 93:12
**worst** 84:23
**worth** 72:6 96:19
99:4 114:17
**wouldn't** 8:3 22:17
40:7 43:15 65:11
65:16 67:20 68:24
70:13 72:4 78:11
88:18 91:14 95:13
96:21,21 97:22
99:5 114:7 115:19

122:25
**wrap** 117:19
**write** 11:10
**writing** 115:18
**written** 77:21 84:18
102:5
**wrong** 30:11 70:5
85:1
**wrote** 11:13

---

### X

**x** 1:5,12 130:2

---

### Y

**Y** 108:17
**yeah** 16:14 22:9
24:14 67:12 83:3
111:23 113:7
116:14 117:10
127:15
**year** 35:10 76:17
93:7
**years** 26:23
**yesterday** 8:24
12:23 13:17 37:11
49:1 81:18 82:1
83:21 114:19
**yesterday's** 81:17
82:4
**York** 1:3,16,16 3:15
4:5,6,14,14,21,21
5:6,15,15 6:5,5,14
6:14,21,21

---

### 0

**05** 35:20 46:8
**05-44481PM** 1:4
**07** 47:21 53:19,21
62:21 97:10

---

### 1

**1** 128:24
**1st** 9:1,23,24 20:4,15
32:19,23,24 41:5
64:3 75:17
**1.2** 88:16 118:8
**10Qs** 23:5

**10th** 98:15
**10003** 4:21
**10004** 4:6 6:14,21
**10018** 5:15
**10022** 4:14 5:6
**10036** 3:15 6:5
**101-S** 6:12
**108** 130:11
**11** 1:18 58:23 60:4
61:14,24 76:1 77:7
77:12 78:15 82:18
84:2 87:1,22 89:12
90:10 109:14
**11th** 17:10 78:2,3
79:10 80:10 94:22
98:11
**113** 4:20
**114** 100:7,8,10,15
**115** 100:11,19,19
118:23
**116** 100:23
**117** 100:11,25
101:18 102:21
**118** 100:7,11 101:14
**12** 64:5 128:12
**12(c)** 64:5
**122** 107:22 108:5
**123** 130:12
**1350** 5:13
**14** 112:2,16
**14th** 16:17 56:15
77:21
**15** 101:21
**153** 5:4
**1555** 5:21
**17** 6:13 131:8
**1769** 16:5,5,7 17:22
**18** 102:21 111:3,7
**18th** 17:5 94:22
98:11 106:4 120:8
120:25
**18-S** 6:12
**1809** 15:23 16:2,10
16:10,14 21:24
24:12
**19th** 113:7 114:3,15

### 2

**2** 34:13
**2.4** 60:21 115:13,14
**2.5** 122:15
**2:39** 1:19
**20** 15:22 16:11 17:22
56:11
**2005** 36:11 44:18,21
110:23
**2006** 34:8 35:11,12
35:13 36:19 45:3,7
45:7 46:20 47:12
93:15 111:3,7
**2007** 1:18 46:17,23
51:20 61:14 63:5
93:7 102:23 117:9
131:8
**2009** 60:14 72:16
**202** 5:22
**2046** 26:11
**21** 16:11,13 24:11,12
56:11
**21st** 6:20 96:3 106:5
119:13
**22nd** 117:16
**2339** 101:2
**24** 117:2
**26** 34:9,12,13
**27** 37:14 102:11

---

### 3

**3** 83:1,2,3,15
**3.3** 88:14
**30** 78:13 80:20 82:15
**31st** 40:18,21
**33** 6:19 82:16 83:1
**330** 6:4
**333** 3:6
**343** 22:24 29:14
**363** 68:13 88:15

---

### 4

**4** 80:21,21 83:4,14
**4th** 6:13 11:8 101:22
**4.7** 115:8
**4:27** 75:8

**4:38** 75:8
**42nd** 6:4
**44** 130:6
**4900** 5:5

**5**

**5** 75:7 80:21,22
**5.9** 72:16
**500** 87:5,6 96:4,12
    113:16,18
**501** 5:14
**53rd** 5:4
**53212** 5:23
**56** 130:7

**6**

**6** 95:22 126:4,20
**6.3** 113:13 122:14
**6:03** 129:3
**60606** 3:7
**63** 7:7
**65** 130:8
**66** 24:19,20,22,23
    25:2,12
**67** 24:17,22 25:2

**7**

**7** 48:15 102:22
    119:22 130:5
**700** 112:1
**75** 130:9
**769** 18:1
**77** 34:12

**8**

**8** 110:23
**8Ks** 23:5
**8.8** 111:4
**832-S** 6:12
**855** 4:13

**9**

**9** 117:9
**9th** 100:15 117:14
    117:23 119:5,12
**9:30** 128:13
**92** 11:5

**94** 27:16,24 31:14
**99** 130:10