MICHAEL M. PARKER
FULBRIGHT & JAWORSKI L.L.P.
300 CONVENT STREET, SUITE 2200              Hearing Date: February 15, 2007
SAN ANTONIO, TEXAS  78205                              @ 10:00 a.m.
(210) 224-5575
FAX (210) 270-7205


DAVID ROSENZWEIG
FULBRIGHT & JAWORSKI L.L.P.
666 FIFTH AVENUE
NEW YORK, NY 10103-3198
(212) 318-3000
FAX (212) 318-3400


### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

```
...................................................
IN RE:                                  x
                                        :       CASE NO.  05-44481
DELPHI CORPORATION, ET AL.,             :
                                        :
          DEBTORS.                      :
                                        :
                                        :
...............................................  x
```

### SOUTHWEST RESEARCH INSTITUTE'S
### RESPONSE TO DEBTOR'S SEVENTH OMNIBUS OBJECTION (SUBSTANTIVE) PURSUANT TO 11 U.S.C. §502(B) AND FED. R. BANKR. P. 3007 TO CERTAIN (A) INSUFFICIENTLY DOCUMENTED CLAIMS, (B) CLAIMS NOT REFLECTED ON DEBTOR'S BOOKS AND RECORDS, AND (C) UNTIMELY CLAIMS

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Southwest Research Institute ("**Southwest**") files this response to Debtor's Seventh Omnibus Objection (Substantive) Pursuant to 11 U.S.C. §502(b) and FED. R. BANKR. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not Reflected on Debtor's Books and Records, and (C) Untimely Claims ("**Objection**"), and would show:

1.      The Debtor Delphi Corporation ("**Delphi**") asserts that Southwest's Claim No. 12109 (in the amount of $797.40) asserted against Delphi was not reflected on Delphi's books and records.  Delphi *does not* assert that Claim No. 12109 was either untimely or insufficiently documented.

2.      Southwest asks that the Court overrule Delphi's Objection to Southwest's Claim.

3.      Southwest denies that a claim has to be reflected on Delphi's books and records to be valid or that a debtor's inaccurate record keeping (in this case Delphi's) could somehow shift to Southwest, Delphi's burden to overcome Southwest's prima face claim, established by its timely filing of a proof of claim.

4.      Also, Southwest believes Delphi may be taking an inappropriately narrow view of what constitutes its "books and records".

5.      Delphi issued a purchase order to Southwest to perform certain work.  A copy of that purchase order, invoice and related email authorizations of the work are attached hereto as **Exhibit A**.  Pursuant to that purchase order, Southwest performed the work that was the subject of its Claim No. 12109 (for $797.40).  Delphi filed for bankruptcy protection before Southwest invoiced for the work performed, and Southwest filed a claim for the amount of work performed, as it was entitled and required to do.

6.      Southwest Claim No. 12109 is a valid claim that should be allowed and paid by Delphi.  The Objection provides no valid reason to hold otherwise.

WHEREFORE, premises considered, Southwest requests that the Court enter an order denying Delphi's Objection to Southwest's Claim No. 12109 and allowing such claim in full.

Dated:  February 7, 2007                      Respectfully submitted,

                                              FULBRIGHT & JAWORSKI L.L.P.


                                              By: _/s/ David A. Rosenzweig _____
                                                   David A. Rosenzweig (DR-5742)
                                                   666 Fifth Avenue
                                                   New York, NY 10103-3198
                                                   Telephone

                                                   and

                                                   Michael M. Parker
                                                   State Bar No.  00788163
                                                   300 Convent Street, Suite 2200
                                                   San Antonio, Texas  78205-3792
                                                   Telephone:  (210) 224-5575
                                                   Facsimile:  (210) 270-7205

                                              COUNSEL FOR SOUTHWEST RESEARCH INSTITUTE

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2007, true and correct copies of the foregoing

Response to Debtor's Seventh Omnibus Objection (Substantive) Pursuant to 11 U.S.C. §502(b)

and FED. R. BANKR. P. 3007 To Certain (A) Insufficiently Documented Claims, (B) Claims Not

Reflected on Debtor's Books and Records, and (C) Untimely Claims was served on the entities

listed below by United States first-class mail, postage prepaid.

Honorable Robert D. Drain
U.S. Bankruptcy Judge
United States Bankruptcy Court for the Southern
District of New York
One Bowling Green, Room 610
New York, NY 10004

Delphi Corporation
5725 Delphi Drive
Troy, MI  48098
Attn:  General Counsel

Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive, Suite 2100
Chicago, IL  60606
Attn:  John Wm. Butler, Jr., John K. Lyons, and
Randall G. Reese

*/s/ Michael M. Parker*
Michael M. Parker

**EXHIBIT A**

# SOUTHWEST RESEARCH INSTITUTE®

P. O. BOX 841671
DALLAS, TX 75284-1671

EID NO. 74-1070544

ORIGINAL

| | | |
|---|---|---|
| DELPHI CORPORATION | **INVOICE #** | **FY06-004246** |
| DELPHI DELCO ELECTRONICS CORP | | |
| ATTN: MANUAL RECEIPTS PROCESSING MS-9A241 | DATE: | 20-Oct-05 |
| PO BOX 9005 | | |
| KOKOMO, IL  46904-9005 | TERMS: | NET 20 DAYS |

PROJ. NO:
18.11249.01

REFERENCE / AUTHORIZATION:
450097908

| SERVICES PERFORMED: | 09/03/05 thru 10/14/05 | CHARGES | |
|---|---|---|---|
| PHF INFLATOR DIFFUSER GAS | | | |
| MATERIALS | | $ | 41.40 |
| SERVICES | | $ | 756.00 |
| INVOICE TOTAL | | $ | 797.40 |

QUESTIONS RELATING TO THIS INVOICE SHOULD BE DIRECTED
TO THE UNDERSIGNED AT THE ABOVE ADDRESS OR TELEPHONE
AREA CODE 210-522-2244/2988.

PLEASE PROVIDE INVOICE NUMBER WITH REMITTANCE

| TOTAL CHARGES DUE | USD $ | 797.40 |
|---|---|---|



EXHIBIT
A

*A. Trevino*

SHARON L. TREVINO, MANAGER-ACCOUNTS RECEIVABLE

dit

04/27/05   WED 13:24 FAX 765 451 2049          PURCHASING                                          ☑001

# DELPHI

Delphi Electronics and Safety

Page 1 of 4

| Buyer: |
| --- |
| DELPHI<br>ELECTRONICS & SAFETY<br>P.O. Box 9005<br>KOKOMO IN 46904-9005 |

| Deliver to: |
| --- |
| DELPHI D HEADQUARTERS<br>Delphi E&S-Vandalia<br>250 Northwoods Blvd.<br>VANDALIA OH 45377-5051 |

| SOUTHWEST RESEARCH INSTITUTE<br>P.O. Box 28510<br>SAN ANTONIO TX 78228-0510 |
| --- |

## Purchase Order

| PO Number<br>450097908 | Date Issued<br>03/29/2005 |
| --- | --- |
| Version<br>03/30/2005 03:03:52 EST | |

Delivery date:  04/06/2005

| Vendor No:  1012298 |
| --- |
| DUNS No:   007936842 |

| Payment Terms:  ZMN2 | Currency:  USD |
| --- | --- |
| Payment settled on 2nd, 2nd Month | |

| Incoterms:  FCA Freight Forwarder: Dock |
| --- |

*Jen Henderson*
*Jackie Leadford*

| Item No. | Material No/Item Identifier No | Total Order Quantity | Plant |
| --- | --- | --- | --- |
| | Description | | Requester |
| 00010 | FR10158752 00010 | 18,132 | DAEQ DELPHI D HEADQUARTERS |
| | Task 2. Phase 3 Simulations & Analy. | | Finsenschaum |

Task 2. Phase 3 Simulations & Analysis.
PR 2/4-Refer to PO#450083336.
LRD WITH ARC PH-5 INFLATOR DIFFUSER GAS FLOW CFD ANALYSIS.
Ryan Finsenschaum
Phone:(937)356-2281
Fax:(937)356-2280
PR#601

| Delivery Date | Scheduled Quantity | Price | Price Unit | UOM | Value |
| --- | --- | --- | --- | --- | --- |
| 04/06/2005 | 18,132.000 | 1.00 | 1 | DOL | 18,132.00 |
| | | | | USD | 18,132.00 |

| Total line value: | | USD | 18,132.00 |
| --- | --- | --- | --- |

| Notes: |
| --- |

*JSL attached*
*Staci Harter*

| Purchasing Contact: Harter, Staci | Contact Address |
| --- | --- |
| Phone:  765-451-6877 | Delphi E & S<br>One Corporate Center MS:CTLLM.<br>KOKOMO IN 46902 |
| Fax:  765-451-0265 | |

EST

04/27/05   WED 13:25 FAX 765 451 2049        PURCHASING                                    ⬚002

# DELPHI

Delphi Electronics and Safety

Page  2  of  4

SOUTHWEST RESEARCH INSTITUTE
P.O. Box 28510
SAN ANTONIO TX 78228-0510

**Purchase Order**

| PO Number | Date Issued |
|---|---|
| 450097908 | 03/29/2005 |
| Version | |
| 03/30/2005 03:03:52 EST | |

| Item No.  Material No/Item Identifier No.  Total Order Quantity | Plant |
|---|---|
| Description | Requester |

**Notes Continued:**

```
************************************************
* PAYMENT ISSUES AND QUESTIONS REGARDING SHIPPED *
* MATERIAL SHOULD BE DIRECTED TO:              *
* DISBURSEMENT SERVICES AT (248)574-4636.  (A2) *
************************************************
```

```
*******************
```
Seller acknowledges and agrees that Buyer's General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document issued by Buyer or accepted in writing by Buyer, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). A copy of Buyer's General Terms and Conditions is available upon written request to Buyer or via the internet at Delphi's website, delphi.com.  Seller acknowledges and agrees that it has read and understands Buyer's General Terms and Conditions.  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and Buyer's General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including Buyer's General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

```
***********************
```

```
********************
```
Delphi requires 100% on time delivery performance from suppliers. If you anticipate problems in delivering materials and/or completing services by the date specified on the Buyer's purchase order, the Delphi Buyer should be notified immediately.
```
**********************
```

```
**********************************************
```
DO NOT INVOICE FOR SHIPPED MATERIAL. DELPHI-D IS
'PAY ON RECEIPT' AND INVOICES ARE NOT REQUIRED.

INVOICES ARE REQUIRED AND MUST BE SUBMITTED FOR
SERVICES AND ITEMS WHICH ARE NOT SHIPPED.

PLEASE SUBMIT THESE TO:
DELPHI DELCO ELECTRONICS CORP
ATTN: MANUAL RECEIPTS PROCESSING MS-9A241
P O BOX 9005
KOKOMO, IN 46904-9005
```
------------------------
```
***CALIFORNIA SHIPMENTS*** - DELPHI-D DOES NOT
HAVE A DIRECT PAYMENT PERMIT IN CALIFORNIA.
DELCO DOES HAVE DIRECT PAY PERMITS IN INDIANA,
MICHIGAN, TEXAS AND WISCONSIN.

YOU MUST PLACE THE FOLLOWING ON YOUR PACKING SLIP:
- PURCHASE ORDER (ONLY ONE PURCHASE ORDER NUMBER

04/27/05   WED 13:25 FAX 765 451 2049        PURCHASING                                    @003

# DELPHI

Delphi Electronics and Safety

Page  3  of  4

SOUTHWEST RESEARCH INSTITUTE
P.O. Box 28510
SAN ANTONIO TX 78228-0510

| PO Number | Date Issued |
|---|---|
| 450097908 | 03/29/2005 |
| Version | |
| 03/30/2005 03:03:52 EST | |

| Item No. | Material No/Item Identifier No. | Total Order Quantity | Plant |
|---|---|---|---|
| | Description | | Requester |

Notes Continued:

PER PACKING SLIP)
- DELPHI-D "ITEM IDENTIFICATION NUMBER (ID)" FROM
PURCHASE ORDER FOR EACH DELIVERED ITEM
- LIST DELPHI-D DESCRIPTION PER PURCHASE ORDER FOR
EACH LINE ITEM DELIVERED FOLLOWED BY YOUR
DESCRIPTION IF DESIRED.
- EQUIPMENT SERIAL NUMBER(S)

ADDITIONAL PACKING SLIP INFORMATION:
- EACH BOX/CRATE MUST CONTAIN A COMPLETE PACKING
SLIP FOR THE ENTIRE DELIVERY
- HIGHLIGHT ON THE PACKING SLIP THE APPLICABLE
PURCHASE ORDER ITEM IDENTIFICATION NUMBER FOR
EACH ITEM LOCATED IN THE BOX/CRATE
- PACKING SLIP MUST BE ENCLOSED IN A CLEAR PLASTIC
ENVELOPE AND AFFIXED TO THE OUTSIDE (WITH A COPY
INSIDE) OF EACH BOX/CRATE.
**********************************************
ROUTING: REFER TO ROUTING LETTER DATED 02/13/03 FOR
INSTRUCTIONS. CALL DELPHI-D TRANSPORATION AT
(765)451-4078 OR -4079 FOR ADDITIONAL INFORMATION.
FREIGHT TERMS ARE 'FOB ORIGIN,FREIGHT COLLECT'.
BUYER WILL ONLY PAY FREIGHT CHARGES IF THE SELLER
USES THE BUYER SELECTED CARRIER AND SHIPS COLLECT.
THE SELLER AGREES TO PAY ALL FREIGHT INVOICES WHEN
SELLER DEVIATES FROM BUYER SPECIFIED CARRIER WITHOUT
PRIOR APPROVAL FROM DELPHI-D TRANSPORTATION.

**************************************************

CHANGES IN SPECIFICATIONS AFFECTING PRICE AND/OR
LEADTIME, WHETHER INITIATED BY SUPPLIER OR DELPHI
DELCO ELECTRONICS CORP MUST NOT BE MADE WITHOUT
PRIOR APPROVAL BY DELPHI PURCHASING VIA A PURCHASE
ORDER AMENDMENT. ANY CHANGES IN DELIVERY DATE FOR
ANY REASON WHATSOEVER WILL BE REPORTED PROMPTLY IN
WRITING TO THE BUYER WITH DETAILED EXPLANATION.
**************************************************

IN ACCORDANCE WITH THE PROVISIONS OF ARTICLE #17,
ON THE T&C, SELLER AGREES TO
CARRY AND TO FURNISH CERTIFICATES FROM ITS INSURANCE

# DELPHI

SOUTHWEST RESEARCH INSTITUTE
P.O. Box 28510
SAN ANTONIO  TX  78228-0510

**Purchase Order**

| PO Number | Date Issued |
|---|---|
| 450097908 | 03/29/2005 |

Version
03/30/2005 03:03:52 EST

| Item No.  Material No/Item Identifier No.  Total Order Quantity  Plant | |
|---|---|
| Description | Requester |

**Notes Continued:**

CARRIERS SHOWING THAT IT CARRIES INSURANCE IN THE
MINIMUM LIMITS:

1. WORKER'S COMPENSATION - STATUATORY LIMITS FOR

STATE OR STATES IN WHICH THE WORK IS TO BE PERFORMED.
2. EMPLOYER'S LIABILITY - $250,000.
3. COMPREHENSIVE GENERAL LIABILITY (INCLUDING
PRODUCTS/COMPLETED, OPERATIONS, AND BLANKET

CONTRACTUAL LIABILITY) $1,000,000 PER PERSON,

$1,000,000 PER OCCURRENCE PERSONAL INJURY:

$1,000,000 PER OCCURRENCE PROPERTY DAMAGE,

COMBINED SINGLE LIMIT.
4. AUTOMOBILE LIABILITY (INCLUDING OWNED, NON-

OWNED, AND HIRED VEHICLES) - $1,000,000 PER PERSON,

$1,000,000 PER OCCURRENCE PERSONAL INJURY AND

PROPERTY DAMAGE COMBINED, SINGLE LIMIT.


MAIL ABOVE TO DELPHI-D. PURCHASING, M/S CTLLM  OR
FAX#: 765-451-5750.  (REV 8.15.03)
CONTRACTORS ARE ADVISED THAT THEIR EMPLOYEES MAY HAVE
THE POTENTIAL OF EXPOSURE TO WORKPLACE CHEMICALS.
CONCERNS REGARDING THIS MATTER CAN BE DIRECTED TO
DELPHI DELCO ELECTRONICS CORP ENGINEERING DEPT.

AT (765) 451-5109.
*************************************************************

*************************************************************
** PLEASE NOTE: TO BETTER SERVE OUR SUPPLIERS AND **
* TO HELP THE PAYMENT PROCESS, 'QUANTITY LISTED  *
* FOR SERVICE PROVIDED IS THE ACTUAL DOLLAR AMOUNT *
* TO BE INVOICED BY YOU.          ($1) *
*************************************************************

Effective  March 2004

## DELPHI CORPORATION

## GENERAL TERMS AND CONDITIONS

### 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form, by electronic data interchange or other tangible format, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract").  Seller acknowledges and agrees that it has read and understands these General Terms and Conditions.  If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification.  Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that an authorized employee of Buyer expressly agrees to accept any such proposals in writing.

### 2. SHIPPING AND BILLING

2.1  Shipping.  Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs.  Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires.  The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2  Billing.  Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer.  If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services.  Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3  Taxes.  Unless otherwise stated in this Contract, the price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges.  Seller will separately invoice Buyer for any sales, value added, or similar turnover taxes or charges that Seller is required by law to collect from Buyer.   Seller will provide Buyer with whatever information and documentation that is required under local law in order to enable Buyer to recover any sales, value added, or similar turnover taxes or charges.  Invoices shall also be in the appropriate form as required by local law to permit deduction of payments for income tax purposes by the Buyer.

2.4  Withholding of Taxes by Buyer.  If Buyer is required by law to make any deduction or withholding from any sum otherwise payable to Seller under this Contract, Buyer shall be entitled to deduct or withhold such amount and effect payment thereof to the applicable tax authority.  Buyer will, upon request from Seller, provide Seller official tax receipts or other evidence issued by the applicable tax authorities sufficient to establish that any taxes which are withheld have been paid.

2.5 <u>Delivery Schedules</u>.  Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract.  Time is of the essence with respect to all delivery schedules Buyer establishes.  Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules.  Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules.  If the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other compensation.

2.6 <u>Premium Shipments</u>.  If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible.  Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

2.7 <u>Volume Forecasts</u>.  Buyer may provide Seller with estimates, forecasts or projections of its future anticipated volume or quantity requirements for goods.  Seller acknowledges that any such forecasts are provided for informational purposes only and, like any other forward looking projections, are based on a number of economic and business factors, variables and assumptions, some or all of which may change over time.  Buyer makes no representation, warranty, guaranty or commitment of any kind or nature, express or implied, regarding any such forecasts provided to Seller, including with respect to the accuracy or completeness of such forecasts.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control.  While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes.  Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment (as defined in Article 16) necessary to implement such changes.  In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes.  In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including the manufacture and delivery of goods and prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all engineering release and validation requirements and procedures, including Buyer's production part approval processes, which Buyer specifies from time to time.  Seller will permit Buyer and its representatives and consultants to enter Seller's facilities at reasonable times to inspect such facilities and any goods, inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges and other items and processes related to Seller's performance of this Contract.  No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for only so long as such event or occurrence continues, provided, however, that the affected party gives written notice of each such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to the then current release/revision level (based on date Buyer's release is issued to Seller) of Buyer's applicable specifications and drawings, (b) conform to all samples, descriptions, brochures and manuals furnished by Seller or Buyer, (c) be merchantable, (d) be of good material and workmanship, (e) be free from defect, and (f) be fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 <u>Warranty Period</u>. In the case of goods supplied for use as, or incorporation into, parts, components or systems for automotive vehicles or other finished products, the period for each of the foregoing warranties will commence upon delivery of the goods to Buyer and, except as provided in Section 7.4 or as otherwise

expressly agreed in writing by an authorized employee of Buyer, end forty-eight (48) months following the date the vehicle or other finished product on which such parts, components or systems are installed is first sold and delivered or otherwise utilized for consumer or commercial purposes, provided, however, that if Buyer offers and provides a longer warranty to its customers with respect to any such parts, components or systems, then such longer warranty period will apply to the goods.  In the case of goods supplied for other uses, the period for each of the foregoing warranties will be that provided by applicable law unless otherwise expressly agreed in writing by an authorized employee of Buyer.

7.3  Remedies and Damages.  If any goods are reasonably determined (including by use of statistical analysis or other sampling methodology) to fail to conform to the warranties set forth in this Contract, Seller shall reimburse Buyer for all reasonable losses, costs and damages caused by such nonconforming goods.  Such costs and damages may include, without limitation, costs, expenses and losses of Buyer and/or its customers arising from (i) inspection, sorting, repair or replacement of any nonconforming goods or any system or component that incorporates such nonconforming goods, (ii) production interruptions or slowdowns, (iii) offlining of vehicles or component systems, and (iv) field service campaigns and other corrective service actions, including, without limitation, the amounts paid to distributors and/or dealers for materials and replacement parts (including reasonable markup to recover administrative costs or other capital expenses) and the labor costs to perform such work.

7.4  Recalls.  Notwithstanding the expiration of the warranty period set forth in Section 7.2, if Buyer and/or the manufacturer of the vehicles (or other finished product) on which the goods, or any parts, components or systems incorporating the goods, are installed, voluntarily or pursuant to a government mandate, makes an offer to owners of such vehicles to provide remedial action to address a defect that relates to motor vehicle safety or the failure of the vehicle to comply with any applicable law, safety standard or guideline (a so-called "recall"), Seller will nonetheless be liable for costs and damages associated with the conduct of such recall to the extent that such recall is based upon a reasonable determination (including by use of statistical analysis or other sampling methodology) that the goods fail to conform to the warranties set forth in this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients.  Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

In any of the following or any similar events Buyer may immediately terminate this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11:  (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.  Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11 if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing.  Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition.  The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent.  In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable.  Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination.  Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1 Information Disclosed by Seller.  Seller will create, maintain, update, and provide to Buyer, in compliance with Buyer's drafting and math data standards, all technical information about the goods and their manufacture which is reasonably necessary or requested by Buyer in connection with its use of the goods, including, without limitation, the engineering validation and qualification of the goods for automotive production and other applications and compliance with any legal or regulatory requirements.  Such technical information will not be subject to any use or disclosure restrictions, except as provided in Section 12.2 below.

12.2 Waiver of Claims.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed, or may hereafter disclose, in connection with the goods or services covered by this Contract.

12.3 Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4 Software and Written Works.  Seller grants to Buyer a permanent, paid-up license to use, repair, modify and sell any operating software incorporated in the goods in conjunction with the use or sale of the goods.  In addition, all works of authorship, including without limitation, software, computer programs and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing

5

this Contract, separately or as part of any goods and components, are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller hereby assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship. If such assignment is not possible under any applicable law, Seller hereby grants an exclusive, royalty-free license to Buyer with respect to such works of authorship.

12.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 13.  INDEMNIFICATION

13.1  Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.    Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3  Product Liability . Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or any other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14.  COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval, performance and/or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.   Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

6

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.  With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests.  The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.  The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of goods covered by this Contract (collectively, "Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract, in which event Buyer will, within 45 days following delivery of such Seller's Equipment to Buyer, pay to Seller of the lower of (i) the net book value of such Seller's Equipment (i.e., actual cost less amortization) or (ii) then current fair market value of such Seller's Equipment, in each case less any amounts that Buyer has previously paid to Seller on account of such Seller's Equipment.  The foregoing option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller and are then being sold by Seller to other customers.  Buyer's right to exercise the foregoing option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY AND INFORMATION

17.1 Acquisition of Tooling and Materials.  To the extent that this Contract covers Buyer's purchase of, or reimbursement to Seller for, any tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment, supplies, materials and other items (collectively, "Tooling and Materials") to be used in connection with Seller's actual or anticipated supply of goods to Buyer, Seller will acquire such Tooling and Materials as agent of Buyer and Buyer shall pay to or reimburse Seller the lower of (i) the amount specified in this Contract for such Tooling and Materials or (ii) Seller's actual out-of-pocket cost to acquire the Tooling or Materials from an unrelated third party or, if the Tooling and Materials are constructed or fabricated by Seller or any affiliate of Seller, the actual direct costs for materials, labor and overhead associated with such construction and fabrication.  Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to such Tooling and Materials. Seller shall establish a reasonable accounting system that readily enables the identification of Seller's costs as described above.  Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any such Tooling and Materials.  Upon Seller's acquisition of such Tooling and Materials, title thereto shall vest immediately in Buyer and such Tooling and Materials shall be held as "Buyer's Property" by Seller in accordance with this Article 17.

17.2  Bailment of Buyer's Property.  All Tooling and Materials which Buyer furnishes, either directly or indirectly, to Seller or which Buyer buys from, or gives reimbursement to, Seller in whole or in part (collectively, "Buyer's Property") will be and remain the property of Buyer and be held by Seller on a bailment basis.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on, or utilizing, such property or otherwise.

17.3  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss, theft and damage to Buyer's

7

Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is stolen, damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's applicable shipping location (as shown by the shipping address of Seller) without prior written approval from an authorized employee of Buyer, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.  Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.

17.4  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.  Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (IncoTerms 2000) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.  If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.5  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.  Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages and/or personal injury or death.

17.6  Use of Buyer's Information.  Seller will (i) keep all Buyer's Information (as defined below) confidential and disclose it only to its employees who need to know such Buyer's Information in order for Seller to supply goods and services to Buyer under this Contract and (ii) use the Buyer's Information solely for the purpose of supplying goods and services to Buyer.  Goods manufactured based on Buyer's Information may not be used for Seller's own use or sold by Seller to third parties without prior express written consent from an authorized employee of Buyer.   "Buyer's Information" means all information provided to Seller by Buyer or its representatives or subcontractors in connection with the business, programs, goods and services covered by this Contract, including, without limitation, pricing and other terms of this Contract, specifications, data, formulas, compositions, designs, sketches, photographs, samples, prototypes, test vehicles, manufacturing, packaging or shipping methods and processes and computer software and programs (including object code and source code). Buyer's Information also includes any materials or information that contain, or are based on, any Buyer's Information, whether prepared by Buyer, Seller or any other person.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs.  If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the initial five (5) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES AND INJUNCTIVE RELIEF

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.  To the extent that this Contract is for the supply of goods for use as, or fabrication into, parts, components or systems, Seller acknowledges and agrees that money damages would not be a sufficient remedy for any actual, anticipatory or threatened breach of this Contract by Seller with respect to its delivery of goods to Buyer and that, in addition to all other rights and remedies which Buyer may have, Buyer shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

## 20. CUSTOMS AND EXPORT CONTROLS

20.1  Credits and Refunds.  Transferable credits or benefits associated with or arising from goods purchased under this Contract, including trade credits, export credits or rights to the refund of duties, taxes or fees, belong to Buyer.  Seller will, at its expense, provide all information necessary (including written documentation and electronic transaction records in Buyer-approved formats) to permit Buyer to receive these benefits, credits, or rights.  Seller will furthermore, at its expense, provide Buyer with all information, documentation, and electronic transaction records relating to the goods necessary for Buyer to fulfill any customs -related obligations, origin marking or labeling requirements and certification or local content reporting requirements, to enable Buyer to claim preferential duty treatment for goods eligible under applicable trade preference regimes, and to make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.  Seller will, at its expense, provide Buyer or Buyer's nominated service provider with export documentation to enable the goods to be exported, and obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).

20.2  Customs-Trade Partnership Against Terrorism.  To the extent any good covered by this Contract are to be imported into the United States of America, Seller shall comply with all applicable recommendations or requirements of the Bureau of Customs and Border Protection's Customs-Trade Partnership Against Terrorism ("C-TPAT") initiative.  Upon request, Seller shall certify in writing its compliance with the C-TPAT initiative.

## 21. BUYER'S RECOVERY RIGHT

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, including, without limitation, direct and indirect losses, costs and damages resulting from Seller's failure to timely delivery goods or services, the failure of any goods or service to conform to applicable warranties or other breach by Seller of this Contract, Buyer may at any time, as applicable, recover, recoup or setoff such amounts by

Effective March 2004

deducting such amounts from any sums that are, or will become, owing, due or payable to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's goods, advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No failure or delay in exercising any right or remedy will operate as a waiver thereof nor will any single or partial exercise thereof preclude other or further exercise thereof. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT AND CHANGE IN CONTROL

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without prior written consent from an authorized employee of Buyer. In addition, Buyer may terminate this Contract upon giving at least 60 days notice to Seller, without any liability to Seller or obligation to purchase raw materials, work-in-process or finished goods under Section 11, if Seller (i) sells, or offers to sell, a material portion of its assets or (ii) sells or exchanges, or offers to sell or exchange, or causes to be sold or exchanged, a sufficient amount of its stock or other equity interests that effects a change in the control of Seller or (iii) executes, or otherwise becomes subject to, a voting or other agreement or trust that effects a change in the control of Seller.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

**26.1 U.S. Contracts**. If either (i) this Contract is issued by Buyer from a location within the United States of America or its territories (as shown by the issuing address of Buyer), (ii) this Contract is issued, in whole or part, for goods to be shipped to a Buyer location within the United States of America or its territories (as shown by the ship to or receiving address of Buyer) or (iii) Seller's applicable shipping location is within the United States of America or its territories (as shown by the shipping address of Seller), then: (a) this Contract is to be construed according to the laws of the United States of America and the State of Michigan, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law, and (b) each party hereby agrees that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Contract will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.

**26.2 Non-U.S. Contracts**. In all cases not covered by Section 26.1 above, (a) this Contract is to be construed according to the laws of the country (and state or province, if applicable) where Buyer's receiving location is located (as shown by the ship to or receiving address of Buyer), excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law; (b) any legal or equitable action or proceedings by Buyer against Seller arising out

10

Effective March 2004

of, or in connection with, this Contract may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in any court(s) having jurisdiction over Buyer's receiving location, in which event Seller consents to such jurisdiction and venue, including service of process in accordance with applicable procedures; and (c) any legal or equitable actions or proceedings by Seller against Buyer arising out of, or in connection with, this Contract may be brought by Seller only in the court(s) having jurisdiction over the Buyer's receiving location.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, income statements, balance sheets, cash flow statements, payroll data, receipts and other related supporting data, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to (i) substantiate any charges and other matters under this Contract and (ii) assess Seller's ongoing ability to perform its obligations under the Production Purchase Order. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

## 30. TRANSLATIONS

Buyer may provide various translated versions of these General Terms and Conditions for informational purposes only. However, the original English language version of these General Terms and Conditions will apply in the event of any disagreement over the meaning or construction of any provisions of these General Terms and Conditions.

Heather Mobley

| | |
|---|---|
| **From:** | Kari Nelson [kari.nelson@swri.org] |
| **Sent:** | Tuesday, July 05, 2005 12:50 PM |
| **To:** | Heather Marie Mobley |
| **Subject:** | FW: Extension Date Moved Out-PO 450097908 |

More info.....

-----Original Message-----
From: ryan.pinsenschaum [mailto:ryan.pinsenschaum@delphi.com]
Sent: Tuesday, July 05, 2005 12:47 PM
To: Harter, Staci J
Cc: kari.nelson@swri.org
Subject: RE: Extension Date Moved Out-PO 450097908

Staci,

I apologize with not getting back with you...I do not remember getting the
VME for this move.  We did discussed a move of dates earlier this year.
This should not, however, be a problem.

Thanks,

Ryan Pinsenschaum
Delphi Electronics and Safety
Senior Research Engineer
250 Northwoods Blvd MS 126
Vandalia, OH 45377
937-356-2281
Fax 937-356-2466
Pager 937-851-2593
ryan.pinsenschaum@delphi.com
>  -----Original Message-----
> From:    Harter, Staci J  > Sent:      Tuesday, July 05, 2005 1:40 PM
> To: Pinsenschaum, Ryan > Cc:      'kari.nelson@swri.org'
> Subject:   Extension Date Moved Out-PO 450097908
> > Ryan
> I left you a vme on 6/7/05 that your project (Task 2,Phase 3) with
Southwest Research had been moved out to 8/31/05. If you have any questions
or issues please work directly with Kari (210) 522-6572.
> > Staci J. Harter
> > Global Supply Management
> > Delphi Electronics & Safety
> Indirect Buyer- Engineering & Contract Services
> One Corporate Center MS:CTLLP
> Kokomo, IN 46904-9005
> staci.j.harter@delphi.com
> (765) 451-6877 phone
> (765) 451-5750 fax
>
*****************************************************************************
************

Note: The information contained in this message may be privileged and
confidential and thus protected from disclosure. If the reader of this
message is not the intended recipient, or an employee or agent responsible
for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this

1

**Heather Mobley**

| | |
|---|---|
| **From:** | Kari Nelson [kari.nelson@swri.org] |
| **Sent:** | Tuesday, July 05, 2005 12:46 PM |
| **To:** | Heather Marie Mobley |
| **Subject:** | FW: Extension Date Moved Out-PO 450097908 |

Is this in regard to a phone call you made?????      This is Chris' 11249

-----Original Message-----
From: staci.j.harter [mailto:staci.j.harter@delphi.com]
Sent: Tuesday, July 05, 2005 12:40 PM
To: Pinsenschaum, Ryan
Cc: kari.nelson@swri.org
Subject: Extension Date Moved Out-PO 450097908


Ryan
I left you a vme on 6/7/05 that your project (Task 2,Phase 3) with Southwest
Research had been moved out to 8/31/05. If you have any questions or issues
please work directly with Kari (210) 522-6572.

Staci J. Harter

Global Supply Management

Delphi Electronics & Safety
Indirect Buyer- Engineering & Contract Services
One Corporate Center MS:CTLLP
Kokomo, IN 46904-9005
staci.j.harter@delphi.com
(765) 451-6877 phone
(765) 451-5750 fax


***********************************************************************
************

Note: The information contained in this message may be privileged and
confidential and thus protected from disclosure. If the reader of this
message is not the intended recipient, or an employee or agent responsible
for delivering this message to the intended recipient, you are hereby
notified that any dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this
communication in error, please notify us immediately by replying to the
message and deleting it from your computer. Thank you.
***********************************************************************
************

AR 7/13/05                                    1

communication in error, please notify us immediately by replying to the
message and deleting it from your computer. Thank you.
*************************************************************************
************