**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                :

      In re                       :     Chapter 11
                                 :

DELPHI CORPORATION, et al.,     :     Case No. 05-44481 (RDD)
                                 :

                                 :     (Jointly Administered)
            Debtors.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  - -  x

DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

("SUPPLEMENTAL REPLY – JOSEPH RENO")

      Delphi Corporation and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, "Delphi" or the "Debtors"),

hereby submit their Supplemental Reply With Respect To Proof Of Claim No. 9956 (Joseph

Reno) (this "Supplemental Reply"), and respectfully represent as follows:

Introduction

1.    Joseph Reno ("Reno"), a former employee of Delphi's Kettering, Ohio

manufacturing plant (the "Plant"), alleges that his supervisor at Delphi, Mark Gooding

("Gooding"), suspended and terminated him because of their disagreement over whether a

leaking wastewater container should be totally resurfaced or only patched where appropriate (the

"Wastewater Incident").  Contrary to his allegations, however, Reno was suspended with pay and

subsequently terminated by Elizabeth Patrick ("Patrick"), Delphi's Divisional Salaried Personnel

Director based in Troy, Michigan, after an internal investigation (the "Investigation") revealed,

among other things, that Reno's inappropriately accepted services from a Delphi vendor. to place

a dumpster at his home and then remove it when Reno had filled it up with garbage.

2.    The Investigation – which began well before the wastewater container

started to leak – revealed (i) that Reno misused his relationship with Onyx Industrial Services,

Inc. ("Onyx"), a Delphi vendor to get an employee to haul a dumpster to and from his house, (ii)

that the dumpster, filled with Reno's discarded fencing and aquarium salt bags, was delivered to

Delphi property, and (ii) that Reno attempted to conceal his actions during Investigation.  Based

on these facts, Patrick, not Gooding, decided to suspend and later terminate Reno.

3.    Reno's claim that Delphi terminated him because he and Gooding

disagreed over how to remedy the wastewater leak is unsupported by any admissible evidence.

As an initial matter, Reno did not file a Supplemental Response with affidavits or declarations.[1]

The only evidence Reno did submit was the transcripts of the depositions of the Onyx employee

---

[1]    Because Reno has failed to file his own declaration, he is barred, under the Claims Objection Procedures Order, from offering any testimony in support of his claim.  Claims Objection Procedures Order ¶ 9(e)(i) & (iii).

2

whom Reno convinced to haul away his garbage and a Delphi investigator.  Neither deponent's testimony provides any convincing evidence contradicting Delphi's declaration testimony attached hereto.  Moreover, Patrick was not involved in the Wastewater Incident and was not influenced by any differences of opinion between Reno and Gooding as to how to best fix the leaking tank.  As Patrick's declaration reflects, she decided, after being apprised of the results of the Investigation, to suspend and later fire Reno due to his unacceptable misconduct and subsequent attempts to obstruct the Investigation.  Accordingly, Reno's retaliatory discharge claim against the Debtors has no merit and must fail.

4.      In fact, Reno's retaliatory discharge claim did fail when he presented these same allegations in a proceeding before the Department of Labor.  In March 2004, Reno filed a complaint before the Occupational Safety and Health Administration ("OSHA") alleging that he was terminated for disagreeing with his supervisor over how to fix the wastewater leak.  OSHA conducted an investigation and found "that [Delphi] terminated [Reno] for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest and trying to obstruct and mislead Delphi's subsequent investigation."  Despite the clear warning that he had 30 days to object and request a hearing before the OSHA findings would "become final and not subject to court review," Reno did not object.  Consequently, he is precluded from arguing the retaliatory discharge issue before this Court.

5.      Reno also argues that Delphi's stated reason for terminating his employment was a pretext because the Investigation into Reno's use of the Onyx dumpster was not complete at the time of his firing and thus could not have been Delphi's reason for terminating his employment.  Contrary to Reno's assertion, Patrick had more than sufficient

information to terminate Reno's employment when Michael Brown ("Brown"), a licensed

investigator for Securitas, the company that provided security services at the Plant, reported to

her that Reno paid the Onyx driver $100 in cash to provide him with a dumpster for personal use

and then to return that dumpster to Delphi property.  Accordingly, Reno cannot demonstrate that

Delphi's stated reason for terminating his employment was a pretext, and as such his claim

should be disallowed and expunged.

Background

6.      On January 29, 2004, Delphi's Environmental Coordinator was notified

that a dumpster located on the property of the Plant contained fencing and aquarium salt bags,

not waste that would have normally come from the Plant.  Gooding contacted Brown and asked

Brown to determine the origin of the debris and the reason for its presence on Delphi property.

See Declaration Of Michael Brown In Support Of Debtors' Supplemental Reply With Respect To

Proof Of Claim 9956 (Joseph Reno) (the "Brown Decl.") ¶ 7, a true and correct copy of which is

attached hereto as Exhibit A.  Brown discovered that the dumpster belonged to Onyx. Brown

Decl. ¶ 8(a).  The primary Onyx contact for Delphi was Onyx's supervisor, Troy Calton

("Calton").  As the Onyx contact for Delphi, Calton worked closely with Reno.  Brown Decl. ¶

8(b).  Brown also discovered that Plant employees believed that Reno may have been the source

of the debris in the dumpster.  Brown Decl. ¶ 7.

7.      On February 5, 2004, Brown met with Troy Calton.  Brown Decl. ¶ 9.

Calton initially told Brown that, in early fall 2003, Reno asked him to deliver an empty dumpster

to Reno's residence and that a few months later Reno asked him to return to pick up the

dumpster.  Brown Decl. ¶ 9, 10.  Calton said that he was supposed to take the dumpster from

Reno's residence to a landfill.  However, due to an emergency at the Plant, he drove with the

4

dumpster, straight to the Plant.  Calton then left the dumpster on Delphi property, and forgot to

retrieve it later and take it to a landfill.  Brown Decl. ¶ 11.

       8.      On February 16, 2004, Brown interviewed Reno regarding the dumpster.

Brown Decl. ¶ 12.  Reno told Brown that he had asked Calton to deliver the dumpster to his

house in late November 2003 or early December 2003 – not early fall  2003 as Calton stated

during his February 5 interview with Brown.  Id.  Reno said he filled the dumpster and asked

Calton to pick it up on December 22, 2003.  Id.  Reno explained that December 22, 2003 had

been the first day of Delphi's holiday shut-down for the year, so he was at home that day and

thus able to coordinate Calton's removal of the dumpster.  Id.  Brown later learned that the 2003

holiday shut down began on Tuesday, December 23, not December 22, as Reno had said.  Id

Reno said that until he learned of the investigation in late January 2004 he thought the dumpster

had been taken to the landfill.  Brown Decl. ¶ 13.

       9.      Then, without having been asked to do so by Brown, Reno produced two

prepared written statements from subordinate employees who purported to have overheard a

conversation between Reno and Calton in which Reno purportedly told Calton that Reno would

personally pay the fee for the dumpster.  Brown Decl. ¶ 14.  Brown found it odd that Reno came

to the interview with prepared statements, especially because prior to the interview, Brown had

not raised any issues related to the use of the dumpster, its presence on Delphi property, or

whether any such conversations between Reno and Calton actually occurred.  Id.  Brown later

learned from another employee who worked under Reno, Terry Ruble ("Ruble"), that Reno also

had asked Ruble to provide a statement about Reno's purported offer to personally pay the

expense related to the dumpster.  Ruble told Brown that he refused to do so because such a

statement would have been false.  Brown Decl. ¶ 21.   Because there were significant

discrepancies in the chronologies offered by Reno and Calton, Brown decided to interview

Calton for a second time.  Brown Decl. ¶ 15.

> 10.    On February 18, 2004, Brown conducted a second interview with Calton.

Id.  After Calton repeated the same story he had told Brown in his February 5 interview, he asked

what would happen to him as a result of his involvement in the dumpster incident.  Id.  Brown

explained to Calton that as long as he was telling the truth, nothing would happen to him.  Id.

> 11.    After the interview had ended, while still in the hallway, Calton asked

whether he could resume the interview because he needed to make some changes to his

statement.  Brown Decl. ¶ 16.  Calton explained that he delivered the dumpster to Reno's home

in August 2003 or September 2003 (not November or December 2003 as Reno had told Brown)

and that he picked up the dumpster in late September 2003 or October 2003 (not on December

22, 2003, as Reno had told Brown).  Brown Decl. ¶ 16(a) & (b).  Calton then explained that he

and Reno drove together in the Onyx truck from the Plant and Reno's residence to retrieve the

dumpster and then they both brought it back to the Plant.  Brown Decl. ¶ 16(b).  Calton admitted

that Reno gave him $100  in cash in exchange for the favor of allowing Reno to use the dumpster

at his home and for picking up and dropping the dumpster off at the Plant.  Brown Decl. ¶ 16(c).

Calton admitted that he never gave the $100 to Onyx.  Id.  He also explained that, in February

2004, shortly after the Investigation began, Reno approached Calton and asked him to create a

receipt for the $100 cash payment.  Brown Decl. ¶ 16(d).  Calton said he arbitrarily chose

December 22, 2003 as the date for the receipt.  Id.

> 12.    On February 20, 2004, after having learned of the status of the

Investigation, Patrick decided to suspend Reno with pay.  See Declaration Of Beth Patrick In

Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 9956 (Joseph Reno)

(the "Patrick Decl.") ¶ 9 attached hereto as <u>Exhibit B</u>.[2]  On the date of Reno's suspension, both

Brown and Patrick were unaware of the Wastewater Incident.  Patrick Decl. ¶ 9; Brown Decl. ¶

24.

      13.     On March 5, 2004, Brown conducted a third interview with Calton.

Brown Decl. ¶ 22.  Calton reaffirmed his statement that Reno had paid $100 to Calton personally

and only later requested a receipt.  <u>Id.</u>  Although Calton had agreed after the February 18

interview to provide a written statement, he refused to provide a written statement unless Delphi

agreed not to take action against him.  Brown Decl. ¶ 17.

      14.     After reading Brown's findings from March 5, 2004, Patrick decided that

the information that Brown had uncovered established that Reno abused Delphi's business

relationship with Onyx and obstructed the Investigation by lying about the facts and persuading

Calton to produce a fraudulent receipt.  Patrick Decl. ¶ 13.  Therefore, on March 17, 2004,

Patrick decided to terminate Reno.  <u>Id.</u>

      15.     Coincidently, two weeks after the Investigation had been initiated, there

was a leak from a hexavalent chromium wastewater treatment tank at the Plant.  Reno discovered

the leak on Friday, February 13, 2004, at which time he fashioned a temporary solution to the

leakage problem by creating a bypass to a different holding tank.  <u>See</u> March 20, 2004 letter

from Delphi to the Occupational Safety & Health Administration (the "Delphi OSHA Letter") at

2, attached as Exhibit 3 to Response; Reno's First Amended Complaint (the "Complaint") at 2,

attached to Proof of Claim.

      16.     However, Reno did not inform his supervisor, Gooding, of the leak until

February 17, 2004, which was after Brown already had interviewed Reno on February 16, 2004

about the dumpster matter.  <u>See</u> March 2, 2004, Letter from Reno to Walle (the "March 2

---

[2]  Elizabeth Patrick's name at the time of these events was Elizabeth Meyer.

Letter"), attached as Exhibit 6 to the Response. Delphi retained American Testing Services, Ltd.

("ATS") to inspect the tank on February 20, 2004. See ATS Onsite Inspection Report dated

February 20, 2004 (the "ATS Report"), attached hereto as Exhibit C. Although Reno planned to

have the entire leaking tank re-coated, Gooding, upon learning of the situation, disagreed and

concluded that only the bottom third of the tank and any other visibly cracked areas noted in the

ATS Report needed to be re-coated. See Complaint at 4. Between February 23, 2004 and March

1, 2004, the tank was repaired by patching any cracks and resurfacing the bottom three feet of

the tank and any other damaged areas. See Delphi OSHA Letter at 4.

17.    On March 2, 2004, Reno sent a letter to James Walle, an attorney in

Delphi's Legal Department who dealt with environmental issues. See March 2 Letter. In the

March 2 Letter, Reno expressed general concerns about the safety of the chrome treatment tanks

at the Plant and referred to the Investigation, though he inaccurately reported that Calton had

taken full responsibility for returning the dumpster to Delphi. Id. In response to the March 2

Letter, Delphi arranged for both internal Delphi environmental managers and an independent

consulting engineering firm, Hubbel, Roth & Clark, Inc. ("HRC") to investigate and determine if

the wastewater tanks at the Plant were in fact safe for continued use. Both investigations

concluded that Delphi had taken appropriate action concerning the tanks. See HRC Investigation

Report attached hereto at Exhibit D.

18.    Reno filed Proof of Claim No. 9956 (the "Proof of Claim") on or about

July 19, 2006. The Proof of Claim asserts an unsecured non-priority claim in the amount of

$15,892,592.73 plus unliquidated amounts (the "Claim") against Delphi Corporation.[3]

---

[3]    Reno claims that $1,579,000 of his claim is priority claim for wages, salaries, or commissions. 11 U.S.C.
507(a)(4) provides that priority may be given to up to $10,000 earned within 180 days before the date of the
filing of the petition for wages, salaries, or commissions. Reno not only exceeds the dollar limit imposed by

19.    The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to

Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated by Debtors'

Books and Records, and (c) Claims Subject to Modification and (ii) Motion to Estimate

Contingent and Unliquidated Claims Pursuant to 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

20.    On November 21, 2006, Reno filed the Response To Debtors' Objection

To Claim 9956 (Docket No. 5920) (the "Response").

21.    On January 3, 2007, the Debtors filed their Statement of Disputed Issues

With Respect to Proof of Claim 9956 (Reno) (Docket No. 6414).[4]

22.    On January 8, 2007, the Debtors and Reno, with their legal counsel,

conducted a telephonic meet and confer pursuant to the Claims Objection Procedures Order.  In

preparation for the meet and confer, the Debtors' counsel e-mailed a copy of the Claims

Objection Procedures Order to Reno's counsel.

<u>Argument</u>

23.    Reno's claim fails because he did not object to OSHA's dismissal of his

complaint or its finding that he was terminated because he misappropriated funds and obstructed

the subsequent investigation. <u>See</u> May 20, 2004 Letter from OSHA to Reno ("OSHA Finding"),

attached hereto as <u>Exhibit E</u>.  Because Reno did not challenge the OSHA Finding, he is barred

from arguing here that he was terminated for anything other than good cause.

---

section 507(a)(4), but his claim is not for wages earned within 180 days of the petition date, October 8, 2005.
Therefore, none of Reno's claim should be categorized as a priority claim.

[4]    To date, Reno has not filed a supplemental response to the Third Omnibus Claims Objection.  Pursuant to the
Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014
Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures
Governing Objections To Claims (the "Claims Objection Procedures Order"), the deadline for Reno to file a
supplemental response and attach affidavits or declarations thereto was February 6, 2007.

24.    In addition, the March 2Ltter does not meet the statutory requirements to qualify for whistleblower protection under Ohio law.  Thus, his statutory claim under Ohio law must fail.

25.    Moreover, Reno cannot establish a claim against the Debtors, because Delphi's suspension and later termination of Reno were not in retaliation for the Wastewater Incident.  Instead, Delphi's decision to terminate Reno was based on Patrick's assessment that Reno had misappropriated Delphi resources and obstructed the Investigation.  Reno has not submitted any convincing evidence to the contrary, and therefore his claim should be disallowed and expunged.  Finally, even if he had established a claim for retaliatory discharge – which he clearly has not – Reno's damages would be far less than the nearly $16 million he claims.

A.    Reno Cannot Relitigate Here Because Of The OSHA Finding

26.    Patterned after his March 2 Letter, Reno filed a formal retaliation complaint with OSHA alleging that he had been terminated for engaging in protected activity, namely complaining about the repairs to the waste water tank.  After a full investigation, the Department of Labor dismissed Reno's formal complaint and wrote: "The findings show that [Delphi] terminated [Reno] for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest, and trying to obstruct and mislead Delphi's subsequent investigation."  See OSHA Finding.

27.    The OSHA Finding stated, "Complainant and Respondent have 30 days from receipt of these Findings to file objections and request a hearing on the record, or they will become final and not subject to court review."  Reno did not object to the finding.[5]  The statutory

---

[5]    In Debtors First Set of Requests For Admission, request number seven asked Reno to "Admit that Reno did not object to the finding by the Department of Labor. . . ."  Reno did not deny this request, and thus it is deemed admitted.

provisions on which Reno's OSHA complaint were based preclude judicial review aside from an

appeal within 60 days to the federal circuit court.  See 42 U.S.C. 5851(c)(2); 29 U.S.C. 660(a).

28.    The doctrine of collateral estoppel bars Reno from relitigating the issues

he presented to the Department of Labor in his OSHA complaint.  Where the factual issues are

the same, there is mutuality of parties, and there was the opportunity to be heard, parties are

barred from raising any factual issue that already has been decided in an administrative

proceeding in a trial court later.  See Office of Consumers' Counsel v. Pub. Utils. Comm'n of

Ohio, 475 N.E.2d 782, 783 (Ohio 1985) ("The doctrine of collateral estoppel has been applied to

administrative proceedings."); Superior's Brand Meats, Inc. v. Lindley, 403 N.E.2d 996, 1000

(Ohio 1980) (same).

29.    The issues addressed in the OSHA proceedings were the very issues

presented here, there was complete mutuality of parties, and Reno had the opportunity to be

heard.  Therefore, Reno should not now be allowed to relitigate settled issues.  See Norman v.

Niagara Mohawk Power Corp., 873 F.2d 634 (2d Cir. 1989) (stating that where matter was

properly before ALJ and parties had the opportunity to be heard, res judicata applies); U.S. v. Jan

Hardware Mfg. Co., Inc., 463 F. Supp. 732, 734 (E.D.N.Y. 1979) ("defendant is precluded from

relitigating the merits of the citation and penalties in this action . . . after defendant has had the

opportunity to litigate the merits in a Commission proceeding and in appeal to the Court of

Appeals.").

B.    Neither The Wastewater Incident Nor The March 2 Letter Meet the Stringent
      Requirements of Ohio's Whistleblower Statute

30.    Reno's state law whistleblower claim also suffers an independent flaw: the

Wastewater Incident and his March 2 Letter do not meet the requirements of Ohio's

Whistleblower statute.  Reno, therefore, has no legal basis to assert a claim for retaliatory

11

discharge under the Ohio statute, and his claims based thereon should accordingly be disallowed and expunged.

31.    Ohio's Whistleblower statute R.C. §4113.52 imposes specific requirements on employees attempting to seek protection under the statute.  First, "the employee shall orally notify (his) supervisor or other responsible officer of the violation" the employer is committing.  R.C. §4113.52(A)(1)(a).  Second, the "employee shall file with the supervisor or officer a written report that provides sufficient detail to identify and describe the violation."  Id. Then, if the violation is not corrected within 24 hours of either report or reasonable efforts are not undertaken by the employer to commence corrections, the employee may file a report with the prosecuting attorney or other relevant agency responsible for regulating the conduct at issue. Id.

32.    Reno failed to comply with any of these requirements and therefore cannot rely on the statute for any remedy.  The leak first appeared on February 13, 2004 but Reno did not orally report the leak to Gooding or Delphi's environmental liaison, JoAnne Rau, until February 17, 2004 during a marketing meeting.  Even then, he did not provide sufficient detail to identify any statutory violation.  Reno never filed a written report of the incident with Gooding. Furthermore, while it is undisputed that Reno and Gooding disagreed on how to fix the wastewater leak, they did not disagree over the need to fix the tank and comply with all applicable laws.  In fact, Delphi hired a consulting firm, ATS, to run tests on the tanks in order to assess compliance with applicable statutes.  The tests were completed on February 20, 2004.  See ATS Report.  Although Reno disagreed with the course of action taken to repair the tank, he did not state that it violated any specific regulation. See March 2 Letter.

12

33.     The March 2 letter, while in writing, also fails to meet the requirements of the statute in two important ways: (1) the letter merely describes the disagreement between Reno and Gooding on the extent of repairs and criticizes Gooding's expertise to make appropriate decisions; and (2) the letter ignores the fact that repairs began on February 23, 2004. <u>See</u> March 2 letter. Reno never cited to any specific regulation that Delphi was violating.

34.     The Ohio Supreme Court has repeatedly stated that employees must *strictly* comply with the statute's specific requirements to invoke any protection under the statute. <u>Kulch v. Structural Fibers, Inc.</u>, 78 Ohio St.3d 134, 152-153, 677 N.E.2d 308 (Ohio 1997); <u>Contreras v. Ferro</u>, 73 Ohio St. 3d 244, 652 N.E.2d 940 (Ohio 1995); <u>accord, Haney v. Chrysler Corp.</u>, 121 Ohio App.3d 137, 699 N.E.2d 121 (Ohio Ct. App. 1997). In <u>Contreras</u>, the Court denied protection because the employee failed to provide oral or written complaints before engaging outside investigators to investigate illegal activity. In <u>Haney</u>, the Court denied protection because, like Reno, Haney's written report was delivered to a person other than his direct supervisor and lacked the specificity required by the statute to describe an unlawful violation. <u>See Haney</u>, 121 Ohio St. 3d  at 139. Because Reno has not met the statutory requirements of maintaining a claim for damages under the Ohio Whistleblower Statute, this claim should be disallowed and expunged.

C.     <u>Delphi Did Not Retaliate Against Reno</u>

35.     Even if the Court reaches the merits, Reno's claim fails. The decision to terminate Reno was made by Patrick, who was not involved in any dispute over how to deal with the wastewater leak at the Plant. Patrick's decision was based solely on Reno's misappropriation of Delphi resources and misconduct with respect to the dumpster and subsequent Investigation.

i.    Brown's Investigation Into Reno's Misconduct With Respect To The Dumpster
<u>Began Before The Wastewater Leak</u>

36.    The investigation into the Reno's misconduct concerning his use of the
Onyx dumpster began weeks before the wastewater leak.  Brown conducted interviews with
Reno and with Calton before the Wastewater Incident on February 19 and 20, 2004.  Brown
Decl. ¶ 9, 12, 15.  Reno was suspended with pay on February 20, 2004, the same day that ATS
provided the initial inspection report on the wastewater tank, and nearly two weeks before Reno
submitted the March 2 Letter.

37.    As of February 20, 2004, Investigation into Reno's conduct concerning the
Onyx dumpster already had revealed that (1) Reno's story was contradicted by Calton; (2) $100
cash was given to Calton personally and Calton had not turned the money over to Onyx; (3)
Reno requested a backdated receipt from Calton only after Brown began his investigation into
the matter; and (4) Reno asked subordinate employees to provide exculpatory statements
regarding Reno's transaction with Calton.  <u>See</u> <u>generally</u>, Brown Decl.  This course of conduct
convinced Patrick to suspend Reno on February 20, 2004.  <u>See</u> Patrick Decl. ¶ 9.

38.    Patrick terminated Reno on March 17, 2004, because the Investigation
revealed Reno had breached Delphi's conflict of interest policy and subsequently attempted to
conceal his conduct,.  Patrick Decl. ¶ 13 & Exhibit 1.  The Wastewater Incident had absolutely
no bearing Patrick's decision.  Patrick Decl. ¶ 11.

ii.    The Decision To Suspend And Subsequently Terminate Reno Was Made By
Patrick,<u> Who Was Uninvolved In The Wastewater Leak</u>

39.    Reno inaccurately attributes the decisions to suspend and to subsequently
terminate him to Gooding.  Contrary to Reno's assertions, however, Gooding did not make the
decision to terminate Reno.  Patrick, who was based in Delphi's headquarters in Troy, Michigan

14

and who was not involved in the decisions concerning the wastewater leak, made the decision to terminate Reno.  Patrick Decl. ¶ 13.

      iii.     Delphi Took Reno's Environmental Concerns Seriously, But Such Concerns Could Not Excuse His Misconduct

      40.     From the time they became aware of the wastewater leak, Reno's superiors, including Gooding, took the environmental concerns very seriously.  Delphi commissioned ATS to perform an investigation on February 20, 2004 which allowed Delphi to develop a course of action to repair the problem.  See ATS Report.  After the March 2 Letter, Delphi commissioned two additional inspections to ensure that the repairs were sufficient.  See Delphi OSHA Letter at 5; HRC Report at 3.  Both investigations revealed that Delphi took appropriate steps to repair the wastewater tank and create a plan for inspecting other tanks.  Id.

      41.     Despite taking Reno's concerns seriously, Delphi could not excuse Reno's misconduct.  On April 3, 2001, Reno signed an acknowledgement that he had received Delphi's booklet, *Foundations of Excellence*.  His acknowledgement and the booklet are attached to the Patrick Declaration.  On page 6,  the booklet states, "[W]e must avoid actions or relationships that might conflict or even appear to conflict  with our job responsibilities or Delphi's interests." The policy continues:

> A conflict of interest is an obligation to or relationship with any person or organization that competes or does business with Delphi, that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interest of the corporation *and without regard to personal gain.  A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement.  The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest.*

> Examples of potential conflict of interests include:  . . .  Accepting services or receiving payment from a supplier, **. . . .** (emphasis added).

The policy concludes with the expectation that all employees will disclose promptly any situation that could result in a conflict and to seek out superiors to assist in resolving any questions an employee might have regarding a potential conflict.

42.    Reno sought no advice or counsel from any superior when he made arrangements with Calton to deliver a dumpster at his personal residence, filled it up with his personal debris, and then have it delivered to Delphi.  Patrick could not ignore Reno's breach of Delphi's Conflict of Interest Policy simply because Reno raised environmental concerns a week or two *after* Delphi began investigating his misconduct.

d.    Reno's Evidence Does Not Undermine the Debtors' Legitimate Non-Retaliatory Reason for Terminating His Employment

43.    The only evidence that Reno submitted is the deposition testimony of Brown and Troy Calton.  Neither of these witnesses' deposition testimony undermines Patrick's testimony that she suspended and fired Reno solely because of his misconduct concerning the dumpster matter.

44.    As an initial matter, Reno argues that Patrick's decision must have been pretextual if it was made before Brown considered his investigation complete.  Not so. As Patrick's affidavit clearly demonstrates, she determined that at the time she made the decision to suspend and then later terminate Reno, she had more than enough evidence concerning Reno's misconduct upon which to base her decision.

45.    Moreover, Reno's reliance in his Response on the deposition testimony of Calton is misplaced.  Calton's testimony however, does nothing to show that Patrick's stated reason for terminating Reno was pretextual.  See Response at 3.  In fact, Calton's testimony actually confirms Patrick's grounds for termination in that Calton stated, "I would assume that my boss would just bill [the dumpster fees] to Delphi, once the bill came in."  Calton Dep. at 94.

16

Moreover, Calton's knowledge that Reno and Gooding disagreed about how to handle the wastewater leak does not establish that Patrick was untruthful regarding her reasons for terminating Reno.

46.     Even if the Investigation had been incomplete, or even flawed (which it was not), that would not change the fact that Reno was terminated in response to the Investigation, not in retaliation for any disagreements with Gooding.  Therefore, Reno's claim should be disallowed and expunged.

D.     Reno's Claim For Damages Is Unsubstantiated And Outrageously Excessive

47.     Reno appears to be seeking full front pay for the remainder of his working life.  The propriety of an award of front pay is a matter for the court.  Roush v. KFC Nat'l Mgmt Co., 10 F.3d 392, 398 (6th Cir. 1993); See also Wells v. New Cherokee Corp., 58 F.3d 233, 239 (6th Cir. 1995).  Front pay damages are *temporary* in nature, as they are designed to assist the discharged employee during the *transition* to new employment of equal or similar status.  Bailey v. Container Corp. of Am., 660 F. Supp. 1048, 1055 (S.D. Ohio 1986).  In Worrell v. Multipress, Inc., 543 N.E.2d 1277, 1282-83 (Ohio 1989), the Ohio Supreme Court stated:

> Because front pay is intended to assist the discharged employee to find comparable employment, we agree with those courts that have refused front pay as a matter of right for long-term compensation from the date of discharge until some anticipated retirement date. Front pay should be awarded for an interim period in circumstances where the discharged employee has employable and productive years ahead.

Id. at 1282-83.  Accordingly, even if Delphi had wrongly discharged Reno – which it did not – he would not be entitled to be paid his full salary for every remaining year of his working life, which he has estimated at 15 years.

48.     Reno also was obligated to mitigate his damages by seeking other employment.  Skalka v. Fernald Environmental Restoration, 178 F.3d 414, 426 (6th Cir. 1999).

17

"Damages should ordinarily extend only to the date upon which 'the sting' of any discriminatory conduct has ended." <u>McKnight v. General Motors Corp.</u>, 973 F.2d 1366, 1371 (7th Cir. 1992). A court awarding front pay should consider a plaintiff's ability to mitigate his damages by finding other employment in the future. <u>Gotthardt v. National R.R. Passenger Corp.</u>, 191 F.3d 1148, 1157 (9th Cir. 1999). Because front pay is temporary in nature, it does not contemplate that a claimant will be compensated for doing nothing. <u>Cassino v. Reichhold Che, Inc.</u>, 817 F.2d 1338, 1346 (9th Cir. 1987). Front pay awards must specify an ending date and must take into account any amount that the plaintiff could earn using reasonable efforts. <u>Suggs v. ServiceMaster Educ. Food Management</u>, 72 F.3d 1228, 1235 (6th Cir. 1996). <u>Hutchison v. Amateur Electronics Supply, Inc.</u>, 840 F.Supp. 612 (E.D. Wis. 1993), *aff'd in part, rev'd in part*, 42 F.3d 1037, 1045 (7th Cir. 1994).

49.    Here, Reno was terminated at 49 years of age with a college degree and over twenty years of experience in industrial management and environmental engineering. He has employable skills and productive years ahead of him. Yet, when he had an opportunity to mitigate his damages, he turned down a management position that offered two-thirds of his former compensation. Turning down a reasonable offer of employment within less than a year of his termination is evidence of Reno's unwillingness to mitigate his damages. Accordingly, no front pay should be permitted in any calculation of Reno's alleged damages.

50.    In addition, Reno was not entitled to Consolidated Omnibus Budget Reconciliation Act  ("COBRA") benefits and does not have a claim under the Employee Retirement Income Security Act, or the Fair Credit Reporting Act. Pursuant to COBRA, Reno was not entitled to continued group health insurance coverage because he was discharged for gross misconduct. In addition, the Debtors do not owe Reno any wages, vacation pay, or any

other employment benefits.  Moreover, Reno was not defamed.  Any statements made about him either were true, were not published, or were privileged.

51.     Finally, Reno should not be awarded punitive damages because he has not established that Delphi acted with any malice towards him.  Reno seeks punitive damages in the amount of $14,211,00.00 – nine times the amount of his $1,579,000 inflated and incorrect damages claim.  The statute providing protection for workers discharged in retaliation for "whistleblowing activities," however, does not provide for punitive damages.  Ohio Revised Code § 4113.52(E).  Even if punitive damages were available under some other theory, Reno has failed to provide any evidence of wrongdoing on the part of Delphi – let alone evidence of wrongdoing that would justify a $14 million punitive damage claim.  Accordingly, this Court should reject Reno's punitive damage claim.

Conclusion

52.     Reno failed to establish a claim against Debtors.  Delphi management terminated Reno for legitimate reason.  Accordingly, the Debtors are not liable to Reno, and the Claim should be disallowed and expunged.

Memorandum of Law

53.     Because the legal points and authorities upon which this Supplemental Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim and (b) granting the Debtors such other and further relief

as is just.

Dated: New York, New York
      February 21, 2007

          SKADDEN, ARPS, SLATE,
          MEAGHER & FLOM LLP

          By:    /s/ John Wm. Butler, Jr.
                John Wm. Butler, Jr. (JB 4711)
                John K. Lyons (JL 4951)
                Albert L. Hogan III (AH 8807)
                Ron E. Meisler
          333 West Wacker Drive, Suite 2100
          Chicago, Illinois 60606
          (312) 407-0700

          – and –

          SKADDEN, ARPS, SLATE,
          MEAGHER & FLOM LLP

          By:    /s/ Kayalyn A. Marafioti
                Kayalyn A. Marafioti (KM 9632)
                Thomas J. Matz (TM 5986)
           Four Times Square
          New York, New York 10036
          (212) 735-3000

          Attorneys for Delphi Corporation, et al.,
          Debtors and Debtors-in-Possession