IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                 :
     In re                        :    Chapter 11
                 :
DELPHI CORPORATION, et al.,       :    Case No. 05-44481 (RDD)
                 :
               Debtors.    :    (Jointly Administered)
                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On February 21, 2007, I caused to be served the documents listed below (i) upon the parties listed on Exhibit A hereto via overnight delivery, (ii) upon the parties listed on Exhibit B hereto via electronic notification and (iii) upon the parties listed on Exhibit C hereto via postage pre-paid U.S. mail:

1) Notice of Claims Objection Hearing With Respect to Debtors' Objection to Proof of Claim No. 10179 (Cherry GmbH) (Docket No. 7005) [a copy of which is attached hereto as Exhibit D]

2) Debtors' Supplemental Reply With Respect to Proof of Claim No. 9956 (Joseph Reno) ("Supplemental Reply - Joseph Reno") (Docket No. 7006) [a copy of which is attached hereto as Exhibit E]

3) Debtors' Supplemental Reply With Respect to Proof of Claim No. 12163 (Eva Orlik) ("Supplemental Reply - Eva Orlik") (Docket No. 7008) [a copy of which is attached hereto as Exhibit F]

On February 21, 2007, I caused to be served the document listed below upon the parties listed on Exhibit G hereto via overnight delivery:

4) Notice of Claims Objection Hearing With Respect to Debtors' Objection to Proof of Claim No. 10179 (Cherry GmbH) (Docket No. 7005) [a copy of which is attached hereto as Exhibit D]

On February 21, 2007, I caused to be served the document listed below upon the party listed on <u>Exhibit H</u> hereto via overnight delivery:

5) Debtors' Supplemental Reply With Respect to Proof of Claim No. 9956 (Joseph Reno) ("Supplemental Reply - Joseph Reno") (Docket No. 7006) [a copy of which is attached hereto as <u>Exhibit E</u>]

On February 21, 2007, I caused to be served the document listed below upon the parties listed on <u>Exhibit I</u> hereto via overnight delivery:

6) Debtors' Supplemental Reply With Respect to Proof of Claim No. 12163 (Eva Orlik) ("Supplemental Reply - Eva Orlik") (Docket No. 7008) [a copy of which is attached hereto as <u>Exhibit F</u>]

Dated: February 22, 2007

_/s/ Evan Gershbein_____
Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 22nd day of February, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: ___/s/ Shannon J. Spencer_____

Commission Expires: __6/20/10____

# EXHIBIT A

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 | 212-450-3092 | donald.bernstein@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| | Brian Resnick | | | | | | 212-450-4213 | 212-450-3213 | brian.resnick@dpw.com | |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com  karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler  Bonnie Steingart  Vivek Melwani  Jennifer L Rodburg  Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com  slivinj@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Internal Revenue Service | Attn: Insolvency Department, Maria Valerio | 290 Broadway | 5th Floor | New York | NY | 10007 | 212-436-1038 | 212-436-1931 | mariaivalerio@irs.gov | IRS |
| Internal Revenue Service | Attn: Insolvency Department | 477 Michigan Ave | Mail Stop 15 | Detroit | MI | 48226 | 313-628-3648 | 313-628-3602 | | Michigan IRS |
| IUE-CWA | Conference Board Chairman | 2360 W. Dorothy Lane | Suite 201 | Dayton | OH | 45439 | 937-294-7813 | 937-294-9164 | | Creditor Committee Member |
| Jefferies & Company, Inc. | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com  richard.duker@jpmorgan.com  gianni_russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |

In re. Delphi Corporation, et.al.  
Case No. 05-44481 (RDD)

Page 1 of 3

2/20/2007 11:46 AM  
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Mohsin N. Khambati | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | mkhambati@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | garrick.sandra@pbgc.gov efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

2/20/2007 11:46 AM
Master Service List Overnight Mail

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|-------|-----|-------|------------------|
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Tyco Electronics Corporation | MaryAnn Brereton, Assistant General Counsel | 60 Columbia Road | | Morristown | NJ | 7960 | 973-656-8365 | 973-656-8805 | | Creditor Committee Member |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | 212-510-0500 | 212-668-2255 does not take service via fax | | Counsel to United States Trustee |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

2/20/2007 11:46 AM
Master Service List Overnight Mail

# EXHIBIT B

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Brown Rudnick Berlack Israels LLP | Robert J. Stark | Seven Times Square | | New York | NY | 10036 | 212-209-4800 | 212-2094801 | rstark@brownrudnick.com | Indenture Trustee |
| Cohen, Weiss & Simon | Bruce Simon | 330 W. 42nd Street | | New York | NY | 10036 | 212-356-0231 | 212-695-5436 | bsimon@cwsny.com | |
| Curtis, Mallet-Prevost, Colt & mosle LLP | Steven J. Reisman | 101 Park Avenue | | New York | NY | 10178-0061 | 2126966000 | 2126971559 | sreisman@cm-p.com | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | 212-450-4092 212-450-4213 | 212-450-3092 212-450-3213 | donald.bernstein@dpw.com brian.resnick@dpw.com | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | 248-813-2000 | 248-813-2491 | sean.p.corcoran@delphi.com karen.j.craft@delphi.com | Debtors |
| Electronic Data Systems Corp. | Michael Nefkens | 5505 Corporate Drive MSIA | | Troy | MI | 48098 | 248-696-1729 | 248-696-1739 | mike.nefkens@eds.com | Creditor Committee Member |
| Flextronics International | Carrie L. Schiff | 305 Interlocken Parkway | | Broomfield | CO | 80021 | 303-927-4853 | 303-652-4716 | cschiff@flextronics.com | Counsel to Flextronics International |
| Flextronics International USA, Inc. | Paul W. Anderson | 2090 Fortune Drive | | San Jose | CA | 95131 | 408-428-1308 | | paul.anderson@flextronics.com | Counsel to Flextronics International USA, Inc. |
| Freescale Semiconductor, Inc. | Richard Lee Chambers, III | 6501 William Cannon Drive West | MD: OE16 | Austin | TX | 78735 | 512-895-6357 | 512-895-3090 | trey.chambers@freescale.com | Creditor Committee Member |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | 212-859-8000 | 212-859-4000 | rodbuje@ffhsj.com slivini@ffhsj.com | Counsel to Equity Security Holders Committee |
| FTI Consulting, Inc. | Randall S. Eisenberg | 3 Times Square | 11th Floor | New York | NY | 10036 | 212-2471010 | 212-841-9350 | randall.eisenberg@fticonsulting.com | Financial Advisors to Debtors |
| General Electric Company | Valerie Venable | 9930 Kincey Avenue | | Huntersville | NC | 28078 | 704-992-5075 | 866-585-2386 | valerie.venable@ge.com | Creditor Committee Member |
| Groom Law Group | Lonie A. Hassel | 1701 Pennsylvania Avenue, NW | | Washington | DC | 20006 | 202-857-0620 | 202-659-4503 | lhassel@groom.com | Counsel to Employee Benefits |
| Hodgson Russ LLP | Stephen H. Gross | 152 West 57th Street | 35th Floor | New York | NY | 10019 | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Honigman Miller Schwartz and Cohn LLP | Frank L. Gorman, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | fgorman@honigman.com | Counsel to General Motors Corporation |
| Honigman Miller Schwartz and Cohn LLP | Robert B. Weiss, Esq. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226-3583 | 313-465-7000 | 313-465-8000 | rweiss@honigman.com | Counsel to General Motors Corporation |
| Jefferies & Company, Inc. | William Q. Derrough | 520 Madison Avenue | 12th Floor | New York | NY | 10022 | 212-284-2521 | 212-284-2470 | bderrough@jefferies.com | UCC Professional |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | 212-270-0426 | 212-270-0430 | thomas.f.maher@chase.com richard.duker@jpmorgan.com gianni.russello@jpmorgan.com | Postpetition Administrative Agent |
| JPMorgan Chase Bank, N.A. | Vilma Francis | 270 Park Avenue | | New York | NY | 10017 | 212-270-5484 | 212-270-4016 | vilma.francis@jpmorgan.com | Prepetition Administrative Agent |
| Kramer Levin Naftalis & Frankel LLP | Gordon Z. Novod | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | gnovod@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kramer Levin Naftalis & Frankel LLP | Thomas Moers Mayer | 1177 Avenue of the Americas | | New York | NY | 10036 | 212-715-9100 | 212-715-8000 | tmayer@kramerlevin.com | Counsel Data Systems Corporation; EDS Information Services, LLC |
| Kurtzman Carson Consultants | Sheryl Betance | 12910 Culver Blvd. | Suite I | Los Angeles | CA | 90066 | 310-823-9000 | 310-823-9133 | sbetance@kccllc.com | Noticing and Claims Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | 212-906-1370 | 212-751-4864 | robert.rosenberg@lw.com | Counsel to Official Committee of Unsecured Creditors |
| Law Debenture Trust of New York | Patrick J. Healy | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | patrick.healy@lawdeb.com | Indenture Trustee |
| Law Debenture Trust of New York | Daniel R. Fisher | 400 Madison Ave | Fourth Floor | New York | NY | 10017 | 212-750-6474 | 212-750-1361 | daniel.fisher@lawdeb.com | Indenture Trustee |
| McDermott Will & Emery LLP | David D. Cleary | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | dcleary@mwe.com | Counsel to Recticel North America, Inc. |
| McDermott Will & Emery LLP | Jason J. DeJonker | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | jdejonker@mwe.com | Counsel to Recticel North America, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 3

2/20/2007 11:46 AM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| McDermott Will & Emery LLP | Peter A. Clark | 227 West Monroe Street | Suite 5400 | Chicago | IL | 60606 | 312-372-2000 | 312-984-7700 | pclark@mwe.com | Counsel to Recticel North America, Inc. |
| McTigue Law Firm | J. Brian McTigue | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | bmctigue@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| McTigue Law Firm | Cornish F. Hitchcock | 5301 Wisconsin Ave. N.W. | Suite 350 | Washington | DC | 20015 | 202-364-6900 | 202-364-9960 | conh@mctiguelaw.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Mesirow Financial | Leon Szlezinger | 666 Third Ave | 21st Floor | New York | NY | 10017 | 212-808-8366 | 212-682-5015 | lszlezinger@mesirowfinancial.com | UCC Professional |
| Milbank Tweed Hadley & McCloy LLP | Gregory A Bray Esq Thomas R Kreller Esq James E Till Esq | 601 South Figueroa Street | 30th Floor | Los Angeles | CA | 90017 | 213-892-4000 | 213-629-5063 | gbray@milbank.com tkreller@milbank.com jtill@milbank.com | Counsel to Cerberus Capital Management LP and Dolce Investments LLC |
| Morrison Cohen LLP | Joseph T. Moldovan, Esq. | 909 Third Avenue | | New York | NY | 10022 | 2127358603 | 9175223103 | jmoldovan@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Northeast Regional Office | Mark Schonfeld, Regional Director | 3 World Financial Center | Room 4300 | New York | NY | 10281 | 212-336-1100 | 212-336-1323 | newyork@sec.gov | Securities and Exchange Commission |
| Office of New York State | Attorney General Eliot Spitzer | 120 Broadway | | New York City | NY | 10271 | 212-416-8000 | 212-416-6075 | ServeAG@oag.state.ny.us | New York Attorney General's Office |
| O'Melveny & Myers LLP | Robert Siegel | 400 South Hope Street | | Los Angeles | CA | 90071 | 213-430-6000 | 213-430-6407 | rsiegel@omm.com | Special Labor Counsel |
| O'Melveny & Myers LLP | Tom A. Jerman, Rachel Janger | 1625 Eye Street, NW | | Washington | DC | 20006 | 202-383-5300 | 202-383-5414 | tjerman@omm.com | Special Labor Counsel |
| Pension Benefit Guaranty Corporation | Jeffrey Cohen | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005 | 202-326-4020 | 202-326-4112 | efile@pbgc.gov | Counsel to Pension Benefit Guaranty Corporation |
| Pension Benefit Guaranty Corporation | Ralph L. Landy | 1200 K Street, N.W. | Suite 340 | Washington | DC | 20005-4026 | 2023264020 | 2023264112 | landy.ralph@pbgc.gov | Chief Counsel to the Pension Benefit Guaranty Corporation |
| Phillips Nizer LLP | Sandra A. Riemer | 666 Fifth Avenue | | New York | NY | 10103 | 212-841-0589 | 212-262-5152 | sriemer@phillipsnizer.com | Counsel to Freescale Semiconductor, Inc., f/k/a Motorola Semiconductor Systems |
| Rothchild Inc. | David L. Resnick | 1251 Avenue of the Americas | | New York | NY | 10020 | 212-403-3500 | 212-403-5454 | david.resnick@us.rothschild.com | Financial Advisor |
| Seyfarth Shaw LLP | Robert W. Dremluk | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | 2122185500 | 2122185526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Shearman & Sterling LLP | Douglas Bartner, Jill Frizzley | 599 Lexington Avenue | | New York | NY | 10022 | 212-8484000 | 212-848-7179 | dbartner@shearman.com jfrizzley@shearman.com | Local Counsel to the Debtors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | 212-455-2000 | 212-455-2502 | kziman@stblaw.com rtrust@stblaw.com wrussell@stblaw.com | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | 312-407-0700 | 312-407-0411 | jbutler@skadden.com jlyonsch@skadden.com rmeisler@skadden.com | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | 212-735-3000 | 212-735-2000 | kmarafio@skadden.com tmatz@skadden.com | Counsel to the Debtor |
| Spencer Fane Britt & Browne LLP | Daniel D. Doyle | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | ddoyle@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Spencer Fane Britt & Browne LLP | Nicholas Franke | 1 North Brentwood Boulevard | Tenth Floor | St. Louis | MO | 63105 | 314-863-7733 | 314-862-4656 | nfranke@spencerfane.com | Counsel to Movant Retirees and Proposed Counsel to The Official Committee of Retirees |
| Stevens & Lee, P.C. | Chester B. Salomon, Constantine D. Pourakis | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | 2123198500 | 2123198505 | cp@stevenslee.com cs@stevenslee.com | Counsel to Wamco, Inc. |
| Togut, Segal & Segal LLP | Albert Togut | One Penn Plaza | Suite 3335 | New York | NY | 10119 | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts Counsel to the Debtors |
| Warner Stevens, L.L.P. | Michael D. Warner | 1700 City Center Tower II | 301 Commerce Street | Fort Worth | TX | 76102 | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Proposed Conflicts Counsel to the Official Committee of Unsecured Creditors |
| Weil, Gotshal & Manges LLP | Jeffrey L. Tanenbaum, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | jeff.tanenbaum@weil.com | Counsel to General Motors Corporation |
| Weil, Gotshal & Manges LLP | Martin J. Bienenstock, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | martin.bienenstock@weil.com | Counsel to General Motors Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 3

2/20/2007 11:46 AM
Master Service List Email

Delphi Corporation
Master Service List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|
| Weil, Gotshal & Manges LLP | Michael P. Kessler, Esq. | 767 Fifth Avenue | | New York | NY | 10153 | 212-310-8000 | 212-310-8007 | michael.kessler@weil.com | Counsel to General Motors Corporation |
| Wilmington Trust Company | Steven M. Cimalore | Rodney Square North | 1100 North Market Street | Wilmington | DE | 19890 | 302-636-6058 | 302-636-4143 | scimalore@wilmingtontrust.com | Creditor Committee Member/Indenture Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 3 of 3

2/20/2007 11:46 AM
Master Service List Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Airgas, Inc. | David Boyle | 259 Radnor-Chester Road, Suite 100 | P.O. Box 6675 | Radnor | PA | 19087-8675 | | 610-230-3064 | 310-687-1052 | david.boyle@airgas.com | Counsel to Airgas, Inc. |
| Ajamie LLP | Thomas A. Ajamie | 711 Louisiana | Suite 2150 | Houston | TX | 77002 | | 713-860-1600 | 713-860-1699 | tajamie@ajamie.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Akin Gump Strauss Hauer & Feld, LLP | Peter J. Gurfein | 2029 Centure Park East | Suite 2400 | Los Angeles | CA | 90067 | | 310-552-6696 | 310-229-1001 | pgurfein@akingump.com | Counsel to Wamco, Inc. |
| Allen Matkins Leck Gamble & Mallory LLP | Michael S. Greger | 1900 Main Street | Fifth Floor | Irvine | CA | 92614-7321 | | 949-553-1313 | 949-553-8354 | mgreger@allenmatkins.com | Counsel to Kilroy Realty, L.P. |
| Alston & Bird, LLP | Craig E. Freeman | 90 Park Avenue | | New York | NY | 10016 | | 212-210-9400 | 212-922-3891 | craig.freeman@alston.com | Counsel to Cadence Innovation, LLC |
| Alston & Bird, LLP | Dennis J. Connolly; David A. Wender | 1201 West Peachtree Street | | Atlanta | GA | 30309 | | 404-881-7269 | 404-253-8554 | dconnolly@alston.com dwender@alston.com | Counsel to Cadence Innovation, LLC |
| Ambrake Corporation | Brandon J. Kessinger | 300 Ring Road | | Elizabethtown | KY | 42701 | | 270-234-5428 | 270-737-3044 | bkessinger@akebono-usa.com | Representative for Ambrake Corporation |
| American Axle & Manufacturing, Inc. | Steven R. Keyes | One Dauch Drive, Mail Code 6E-2-42 | | Detroit | MI | 48243 | | 313-758-4868 | | steven.keyes@aam.com | Representative for American Axle & Manufacturing, Inc. |
| Andrews Kurth LLP | Gogi Malik | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | gogimalik@andrewskurth.com | Counsel to ITW Mortgage Investments IV, Inc. |
| Andrews Kurth LLP | Monica S. Blacker | 1717 Main Street | Suite 3700 | Dallas | TX | 75201 | | 214-659-4400 | 214-659-4401 | mblacker@andrewskurth.com | Counsel to  ITW Mortgage Investments IV, Inc. |
| Angelo, Gordon & Co. | Leigh Walzer | 245 Park Avenue | 26th Floor | New York | NY | 10167 | | 212-692-8251 | 212-867-6395 | lwalzer@angelogordon.com | |
| Anglin, Flewelling, Rasmussen, Campbell & Trytten, LLP | Mark T. Flewelling | 199 South Los Robles Avenue | Suite 600 | Pasadena | CA | 91101-2459 | | 626-535-1900 | 626-577-7764 | mtf@afrct.com | Counsel to Stanley Electric Sales of America, Inc. |
| Arent Fox PLLC | Mitchell D. Cohen | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Cohen.Mitchell@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arent Fox PLLC | Robert M. Hirsh | 1675 Broadway | | New York | NY | 10019 | | 212-484-3900 | 212-484-3990 | Hirsh.Robert@arentfox.com | Counsel to Pullman Bank and Trust Company |
| Arnall Golden Gregory LLP | Darryl S. Laddin | 171 17th Street NW | Suite 2100 | Atlanta | GA | 30363-1031 | | 404-873-8120 | 404-873-8121 | dladdin@agg.com | Counsel to Daishinku (America) Corp. d/b/a KDS America ("Daishinku"), SBC Telecommunications, Inc. (SBC) |
| Arnold & Porter LLP | Joel M. Gross | 555 Twelfth Street, N.W. | | Washington | D.C. | 20004-1206 | | 202-942-5000 | 202-942-5999 | joel_gross@aporter.com | Counsel to CSX Transportation, Inc. |
| ATS Automation Tooling Systems Inc. | Carl Galloway | 250 Royal Oak Road | | Cambridge | Ontario | N3H 4R6 | Canada | 519-653-4483 | 519-650-6520 | cgalloway@atsautomation.com | Company |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | Kimberly J. Robinson | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | kim.robinson@bfkpn.com | Counsel to Motion Industries, Inc. |
| Barack, Ferrazzano, Kirschbaum Perlman, & Nagelberg LLP | William J. Barrett | 333 West Wacker Drive | Suite 2700 | Chicago | IL | 60606 | | 312-629-5170 | 312-984-3150 | william.barrett@bfkpn.com | Counsel to Mays Chemical Company |
| Barnes & Thornburg LLP | Alan K. Mills | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | alan.mills@btlaw.com | Counsel to Priority Health; Clarion Corporation of America |
| Barnes & Thornburg LLP | John T. Gregg | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3930 | 626-742-3999 | john.gregg@btlaw.com | Counsel to Clarion Corporation of America |
| Barnes & Thornburg LLP | Mark R. Owens | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | mark.owens@btlaw.com | Counsel to Gibbs Die Casting Corporation; Clarion Corporation of America |
| Barnes & Thornburg LLP | Michael K. McCrory | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | michael.mccrory@btlaw.com | Counsel to Armada Rubber Manufacturing Company, Bank of America Leasing & Leasing & Capital, LLC, & AutoCam Corporation |
| Barnes & Thornburg LLP | Patrick E. Mears | 300 Ottawa Avenue, NW | Suite 500 | Grand Rapids | MI | 49503 | | 616-742-3936 | 616-742-3999 | pmears@btlaw.com | Counsel to Gibbs Die Casting Corporation |
| Barnes & Thornburg LLP | Wendy D. Brewer | 11 S. Meridian Street | | Indianapolis | IN | 46204 | | 317-236-1313 | 317-231-7433 | wendy.brewer@btlaw.com | Counsel to Iron Mountain Information Management, Inc. |
| Bartlett Hackett Feinberg P.C. | Frank F. McGinn | 155 Federal Street | 9th Floor | Boston | MA | 02110 | | 617-422-0200 | 617-422-0383 | ffm@bostonbusinesslaw.com | Counsel to Madison County (Indiana) Treasurer |
| Beeman Law Office | Thomas M Beeman | 33 West 10th Street | Suite 200 | Anderson | IN | 46016 | | 765-640-1330 | 765-640-1332 | tom@beemanlawoffice.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Bernstein Litowitz Berger & Grossman | Hannah E. Greenwald | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1411 | 2125541444 | hannah@blbglaw.com | |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Bernstein Litowitz Berger & Grossman | John P. Coffey | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1409 | 2125541444 | sean@blbglaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississipi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Bernstein Litowitz Berger & Grossman | Wallace A. Showman | 1285 Avenue of the Americas | | New York | NY | 10019 | | 212-554-1429 | 212-554-1444 | wallace@blbglaw.com | Counsel to SANLUIS Rassini International, Inc.; Rassini, S.A. de C.V. |
| Berry Moorman P.C. | James P. Murphy | 535 Griswold | Suite 1900 | Detroit | MI | 48226 | | 313-496-1200 | 313-496-1300 | murph@berrymoorman.com | Counsel to Kamax L.P.; Optrex America, Inc. |
| Bialson, Bergen & Schwab | Kenneth T. Law, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | klaw@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc. |
| Bialson, Bergen & Schwab | Lawrence M. Schwab, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | lschwab@bbslaw.com | Counsel to UPS Supply Chain Solutions, Inc.; Solectron Corporation; Solectron De Mexico SA de CV; Solectron Invotronics; Coherent, Inc.; Veritas Software Corporation |
| Bialson, Bergen & Schwab | Patrick M. Costello, Esq. | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | pcostello@bbslaw.com | Solectron Corporation; Solectron de Mexico SA de CV; Solectron Invotronics and Coherent, Inc. |
| Bialson, Bergen & Schwab | Thomas M. Gaa | 2600 El Camino Real | Suite 300 | Palo Alto | CA | 94306 | | 650-857-9500 | 650-494-2738 | tgaa@bbslaw.com | Counsel to  Veritas Software Corporation |
| Bingham McHale LLP | John E Taylor Michael J Alerding Whitney L Mosby | 10 West Market Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-635-8900 | 317-236-9907 | jtaylor@binghammchale.com malerding@binghammchale.com wmosby@binghammchale.com | Counsel to Universal Tool & Engineering co., Inc. and M.G. Technologies |
| Blank Rome LLP | Bonnie Glantz Fatell | Chase Manhattan Centre | 1201 Market Street, Suite 800 | Wilmington | DE | 19801 | | 302-425-6423 | 302-428-5110 | fatell@blankrome.com | Counsel to Special Devices, Inc. |
| Blank Rome LLP | Marc E. Richards | The Chrysler Building | 405 Lexington Avenue | New York | NY | 10174 | | 212-885-5000 | 212-885-5002 | mrichards@blankrome.com | Counsel to DENSO International America, Inc. |
| Bodman LLP | Ralph E. McDowell | 100 Renaissance Center | 34th Floor | Detroit | MI | 48243 | | 313-393-7592 | 313-393-7579 | rmcdowell@bodmanllp.com | Counsel to Freudenberg-NOK; General Partnership; Freudenberg-NOK, Inc.; Flextech, Inc.; Vibracoustic de Mexico, S.A. de C.V.; Lear Corporation; American Axle & Manufacturing, Inc. |
| Bond, Schoeneck & King, PLLC | Camille W. Hill | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | chill@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp. |
| Bond, Schoeneck & King, PLLC | Charles J. Sullivan | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | csullivan@bsk.com | Counsel to Diemolding Corporation |
| Bond, Schoeneck & King, PLLC | Stephen A. Donato | One Lincoln Center | 18th Floor | Syracuse | NY | 13202 | | 315-218-8000 | 315-218-8100 | sdonato@bsk.com | Counsel to Marquardt GmbH and Marquardt Switches, Inc.; Tessy Plastics Corp; Diemolding Corporation |
| Bose McKinney & Evans LLP | Jeannette Eisan Hinshaw | 135 N. Pennslyvania Street | Suite 2700 | Indianapolis | IN | 46204 | | 317-684-5296 | 317-684-5173 | jhinshaw@boselaw.com | Counsel to Decatur Plastics Products, Inc. and Eikenberry & Associates, Inc.; Lorentson Manufacturing, Company, Inc.; Lorentson Tooling, Inc.; L & S Tools, Inc.; Hewitt Tool & Die, Inc. |
| Boult, Cummings, Conners & Berry, PLC | Austin L. McMullen | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | amcmullen@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Boult, Cummings, Conners & Berry, PLC | Roger G. Jones | 1600 Division Street, Suite 700 | PO Box 34005 | Nashville | TN | 37203 | | 615-252-2307 | 615-252-6307 | rjones@bccb.com | Counsel to Calsonic Kansei North America, Inc.; Calsonic Harrison Co., Ltd. |
| Brembo S.p.A. | Massimiliano Cini | Administration Department via Brembo 25 | 24035 Curno BG | Bergamo | | | Italy | 00039-035-605-529 | 0039-035-605-671 | massimiliano_cini@brembo.it | Creditor |
| Brown & Connery, LLP | Donald K. Ludman | 6 North Broad Street | | Woodbury | NJ | 08096 | | 856-812-8900 | 856-853-9933 | dludman@brownconnery.com | Counsel to SAP America, Inc. |
| Buchalter Nemer, A Profesional Corporation | Shawn M. Christianson | 333 Market Street | 25th Floor | San Francisco | CA | 94105-2126 | | 415-227-0900 | 415-227-0770 | schristianson@buchalter.com | Counsel to Oracle USA, Inc.; Oracle Credit Corporation |
| Burr & Forman LLP | Michael Leo Hall | 420 North Twentieth Street | Suite 3100 | Birmingham | AL | 35203 | | (205) 458-5367 | (205) 244-5651 | mhall@burr.com | Counsel to Mercedes-Benz U.S. International, Inc |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cahill Gordon & Reindel LLP | Jonathan Greenberg | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 732-205-6777 | jonathan.greenberg@engelhard.com | Counsel to Engelhard Corporation |
| Cahill Gordon & Reindel LLP | Robert Usadi | 80 Pine Street | | New York | NY | 10005 | | 212-701-3000 | 212-269-5420 | rusadi@cahill.com | Counsel to Engelhard Corporation |
| Calinoff & Katz, LLp | Dorothy H. Marinis-Riggio | 140 East 45th Street | 17th Floor | New York | NY | 10017 | | 212-826-8800 | 212-644-5123 | driggio@candklaw.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Carson Fischer, P.L.C. | Robert A. Weisberg | 300 East Maple Road | Third Floor | Birmingham | MI | 48009-6317 | | 248-644-4840 | 248-644-1832 | rweisberg@carsonfischer.com | Counsel to Cascade Die Casting Group, Inc. |
| Carter Ledyard & Milburn LLP | Aaron R. Cahn | 2 Wall Street | | New York | NY | 10005 | | 212-732-3200 | 212-732-3232 | cahn@clm.com | Counsel to STMicroelectronics, Inc. |
| Chadbourne & Parke LLP | Douglas Deutsch, Esq. | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-408-5100 | 212-541-5369 | ddeutsch@chadbourne.com | Counsel to EagleRock Capital Management, LLC |
| Clark Hill PLC | Joel D. Applebaum | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | japplebaum@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLC | Shannon Deeby | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8300 | 313-965-8252 | sdeeby@clarkhill.com | Counsel to BorgWarner Turbo Systems Inc.; Metaldyne Company, LLC |
| Clark Hill PLLC | Robert D. Gordon | 500 Woodward Avenue | Suite 3500 | Detroit | MI | 48226-3435 | | 313-965-8572 | 313-965-8252 | rgordon@clarkhill.com | Counsel to ATS Automation Tooling Systems Inc. |
| Cleary Gottlieb Steen & Hamilton LLP | Deborah M. Buell | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Arneses Electricos Automotrices, S.A.de C.V.; Cordaflex, S.A. de C.V. |
| Cleary, Gottlieb, Steen & Hamilton LLP | James L. Bromley | One Liberty Plaza | | New York | NY | 10006 | | 212-225-2000 | 212-225-3999 | maofiling@cgsh.com | Counsel to Bear, Stearns, Co. Inc.; Citigroup, Inc.; Credit Suisse First Boston; Deutsche Bank Securities, Inc.; Goldman Sachs Group, Inc.; JP Morgan Chase & Co.; Lehman Brothers, Inc.; Merrill Lynch & Co.; Morgan Stanley & Co., Inc.; UBS Securities, LLC |
| Cohen & Grigsby, P.C. | Thomas D. Maxson | 11 Stanwix Street | 15th Floor | Pittsburgh | PA | 15222-1319 | | 412-297-4706 | 412-209-1837 | tmaxson@cohenlaw.com | Counsel to Nova Chemicals, Inc. |
| Cohen, Weiss & Simon LLP | Joseph J. Vitale Babette Ceccotti | 330 West 42nd Street | | New York | NY | 10036 | | 212-356-0238 | 646-473-8238 | jvitale@cwsny.com bceccotti@cwsny.com | Counsel to International Union, United Automobile, Areospace and Agriculture Implement Works of America (UAW) |
| Cohn Birnbaum & Shea P.C. | Scott D. Rosen, Esq. | 100 Pearl Street, 12th Floor | | Hartford | CT | 06103 | | 860-493-2200 | 860-727-0361 | srosen@cb-shea.com | Counsel to Floyd Manufacturing Co.. Inc. |
| Conlin, McKenney & Philbrick, P.C. | Bruce N. Elliott | 350 South Main Street | Suite 400 | Ann Arbor | MI | 48104 | | 734-971-9000 | 734-971-9001 | Elliott@cmplaw.com | Counsel to Brazeway, Inc. |
| Connolly Bove Lodge & Hutz LLP | Jeffrey C. Wisler, Esq. | 1007 N. Orange Street | P.O. Box 2207 | Wilmington | DE | 19899 | | 302-658-9141 | 302-658-0380 | jwisler@cblh.com | Counsel to ORIX Warren, LLC |
| Contrarian Capital Management, L.L.C. | Mark Lee, Janice Stanton, Bill Raine, Seth Lax | 411 West Putnam Avenue | Suite 225 | Greenwich | CT | 06830 | | (230) 862-8231 | (203) 629-1977 | 203-862-8200 / 203-629-1977 mlee@contrariancapital.com jstanton@contrariancapital.com wraine@contrariancapital.com solax@contrariancapital.com | Counsel to Contrarian Capital Management, L.L.C. |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Ronald S. Pretekin | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | Pretekin@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Steven M. Wachstein | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | wachstein@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Coolidge, Wall, Womsley & Lombard Co. LPA | Sylvie J. Derrien | 33 West First Street | Suite 600 | Dayton | OH | 45402 | | 937-223-8177 | 937-223-6705 | derrien@coollaw.com | Counsel to Harco Industries, Inc.; Harco Brake Systems, Inc.; Dayton Supply & Tool Company |
| Cornell University | Nancy H. Pagliaro | Office of University Counsel | 300 CCC Building, Garden Avenue | Ithaca | NY | 14853-2601 | | 607-255-5124 | 607-254-3556 | nhp4@cornell.edu | Paralegal/Counsel to Cornell University |
| Covington & Burling | Susan Power Johnston | 1330 Avenue of the Americas | | New York | NY | 10019 | | 212-841-1005 | 646-441-9005 | sjohnston@cov.com | Special Counsel to the Debtor |

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---------|---------|----------|----------|------|-------|-----|---------|-------|-----|-------|------------------|
| Cox, Hodgman & Giarmarco, P.C. | Sean M. Walsh, Esq. | Tenth Floor Columbia Center | 101 W. Big Beaver Road | Troy | MI | 48084-5280 | | 248-457-7000 | 248-457-7001 | swalsh@chglaw.com | Counsel to Nisshinbo Automotive Corporation |
| Curtin & Heefner, LLP | Daniel P. Mazo | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | dpm@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| Curtin & Heefner, LLP | Robert  Szwajkos | 250 N. Pennsylvania Avenue | | Morrisville | PA | 19067 | | 215-736-2521 | 215-736-3647 | rsz@curtinheefner.com | Counsel to SPS Technologies, LLC; NSS Technologies, Inc.; SPS Technologies Waterford Company; Greer Stop Nut, Inc. |
| DaimlerChrysler Corporation | Kim Kolb | CIMS 485-13-32 | 1000 Chrysler Drive | Auburn Hills | MI | 48326-2766 | | 248-576-5741 | | krk4@daimlerchrysler.com | Counsel to DaimlerChrysler Corporation; DaimlerChrysler Motors Company, LLC; DaimlerChrysler Canada, Inc. |
| Damon & Morey LLP | William F. Savino | 1000 Cathedral Place | 298 Main Street | Buffalo | NY | 14202-4096 | | 716-856-5500 | 716-856-5510 | wsavino@damonmorey.com | Counsel to Relco, Inc.; The Durham Companies, Inc. |
| Day Pitney LLP | Richard M. Meth | P.O. Box 1945 | | Morristown | NJ | 07962-1945 | | 973-966-6300 | 973-966-1015 | rmeth@daypitney.com | Counsel to Marshall E. Campbell Company |
| Day Pitney LLP | Ronald S. Beacher  Conrad K. Chiu | 7 Times Square | | New York | NY | 10036 | | 212-297-5800 | 212-916-2940 | rbeacher@daypitney.com  cchiu@daypitney.com | Counsel to IBJTC Business Credit Corporation, as successor to IBJ Whitehall Business Credit Corporation |
| Denso International America, Inc. | Carol Sowa | 24777 Denso Drive | | Southfield | MI | 48086 | | 248-372-8531 | 248-350-7772 | carol_sowa@denso-diam.com | Counsel to Denso International America, Inc. |
| Deputy Attorney General | Amina Maddox | R.J. Hughes Justice Complex | P.O. Box 106 | Trenton | NJ | 08625 | | 609-984-0183 | 609-292-6266 | amina.maddox@dol.lps.state.nj.u s | Deputy Attorney General - State of New Jersey |
| DiConza Law, P.C. | Gerard DiConza, Esq. | 630 Third Avenue, 7th Floor | | New York | NY | 10017 | | 212-682-4940 | 212-682-4942 | gdiconza@dlawpc.com | Counsel to Tyz-All Plastics, Inc.; Furukawa Electric North America APD; and Co-Counsel to Tower Automotive, Inc. |
| Dinsmore & Shohl LLP | John Persiani | 1900 Chemed Center | 255 East Fifth Street | Cincinnati | OH | 45202 | | 513-977-8200 | 513-977-8141 | john.persiani@dinslaw.com | Counsel to The Procter & Gamble Company |
| DLA Piper Rudnick Gray Cary US LLP | Richard M. Kremen  Maria Ellena Chavez-Ruark | The Marbury Building | 6225 Smith Avenue | Baltimore | Maryland | 21209-3600 | | 410-580-3000 | 410-580-3001 | richard.kremen@dlapiper.com | Counsel to Constellation NewEnergy, Inc. & Constellation NewEnergy - Gas Division, LLC |
| Drinker Biddle & Reath LLP | Andrew C. Kassner | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | andrew.kassner@dbr.com | Counsel to Penske Truck Leasing Co., L.P. |
| Drinker Biddle & Reath LLP | David B. Aaronson | 18th and Cherry Streets | | Philadelphia | PA | 19103 | | 215-988-2700 | 215-988-2757 | david.aaronson@dbr.com | Counsel to Penske Truck Leasing Co., L.P. and Quaker Chemical Corporation |
| Duane Morris LLP | Joseph H. Lemkin | 744 Broad Street | Suite 1200 | Newark | NJ | 07102 | | 973-424-2000 | 973-424-2001 | jhlemkin@duanemorris.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Duane Morris LLP | Margery N. Reed, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | dmdelphi@duanemorris.com | Counsel to ACE American Insurance Company |
| Duane Morris LLP | Wendy M. Simkulak, Esq. | 30 South 17th Street | | Philadelphia | PA | 19103-4196 | | 215-979-1000 | 215-979-1020 | wmsimkulak@duanemorris.com | Counsel to ACE American Insurance Company |
| Eckert Seamans Cherin & Mellott LLC | Michael G. Busenkell | 300 Delaware Avenue | Suite 1360 | Wilmington | DE | 19801 | | 302-425-0430 | 302-425-0432 | mbusenkell@eckertseamans.co m | Counsel to Chicago Miniature Optoelectronic Technologies, Inc. |
| Electronic Data Systems Corporation | Ayala Hassell | 5400 Legacy Dr. | Mail Stop H3-3A-05 | Plano | TX | 75024 | | 212-715-9100 | 212-715-8000 | ayala.hassell@eds.com | Representative for Electronic Data Systems Corporation |
| Erman, Teicher, Miller, Zucker & Freedman, P.C. | David H. Freedman | 400 Galleria Officentre | Ste. 444 | Southfield | MI | 48034 | | 248-827-4100 | 248-827-4106 | dfreedman@ermanteicher.com | Counsel to Doshi Prettl International, LLC |
| Ettelman & Hochheiser, P.C. | Gary Ettelman | c/o Premium Cadillac | 77 Main Street | New Rochelle | NY | 10801 | | 516-227-6300 | 516-227-6307 | gettelman@e-hlaw.com | Counsel to Jon Ballin |
| Fagel Haber LLC | Gary E. Green | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | ggreen@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Fagel Haber LLC | Lauren Newman | 55 East Monroe | 40th Floor | Chicago | IL | 60603 | | 312-346-7500 | 312-580-2201 | lnewman@fagelhaber.com | Counsel to Aluminum International, Inc. |
| Filardi Law Offices LLC | Charles J. Filardi, Jr., Esq. | 65 Trumbull Street | Second Floor | New Haven | CT | 06510 | | 203-562-8588 | 866-890-3061 | charles@filardi-law.com | Counsel to Federal Express Corporation |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 4 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Finkel Goldstein Rosenbloom & Nash LLP | Ted J. Donovan | 26 Broadway | Suite 711 | New York | NY | 10004 | | 212-344-2929 | 212-422-6836 | tdonovan@finkgold.com | Counsel to Pillarhouse (U.S.A.) Inc. |
| Foley & Lardner LLP | Jill L. Murch | 321 North Clark Street | Suite 2800 | Chicago | IL | 60610-4764 | | 312-832-4500 | 312-832-4700 | jmurch@foley.com | Counsel to Kuss Corporation |
| Foley & Lardner LLP | John A. Simon | One Detroit Center | 500 Woodward Ave Suite 2700 | Detroit | MI | 48226-3489 | | 313-234-7100 | 313-234-2800 | jsimon@foley.com | Counsel to Ernst & Young LLP |
| Foley & Lardner LLP | Michael P. Richman | 90 Park Avenue | 37th Floor | New York | NY | 10016-1314 | | 212-682-7474 | 212-687-2329 | mrichman@foley.com | Counsel to Ernst & Young LLP |
| Fox Rothschild LLP | Fred Stevens | 13 East 37th Street | Suite 800 | New York | NY | 10016 | | 212-682-7575 | 212-682-4218 | fstevens@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Fox Rothschild LLP | Michael J. Viscount, Jr. | 1301 Atlantic Avenue | Suite 400 | Atlantic City | NJ | 08401-7212 | | 609-348-4515 | 609-348-6834 | mviscount@foxrothschild.com | Counsel to M&Q Plastic Products, Inc. |
| Frederick T. Rikkers | | 419 Venture Court | P.O. Box 930555 | Verona | WI | 53593 | | 608-848-6350 | 608-848-6357 | ftrikkers@rikkerslaw.com | Counsel to Southwest Metal Finishing, Inc. |
| Fulbright & Jaworski LLP | David A Rosenzweig | 666 Fifth Avenue | | New York | NY | 10103-3198 | | 212-318-3000 | 212-318-3400 | drosenzweig@fulbright.com | Counsel to Southwest Research Institute |
| Fulbright & Jaworski LLP | Michael M Parker | 300 Convent St Ste 2200 | | San Antonio | TX | 78205 | | 210-224-5575 | 210-270-7205 | mparker@fulbright.com | Counsel to Southwest Research Institute |
| Gazes LLC | Eric Wainer | 32 Avenue of the Americas | Suite 1800 | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | office@gazesllc.com | Counsel to Setech, Inc. |
| Gazes LLC | Ian J. Gazes | 32 Avenue of the Americas | | New York | NY | 10013 | | 212-765-9000 | 212-765-9675 | ian@gazesllc.com | Counsel to Setech, Inc. |
| Gibbons, Del Deo, Dolan, Griffinger & Vecchione | David N. Crapo | One Riverfront Plaza | | Newark | NJ | 07102-5497 | | 973-596-4523 | 973-639-6244 | dcrapo@gibbonslaw.com | Counsel to Epcos, Inc. |
| Goldberg, Stinnett, Meyers & Davis | Merle C. Meyers | 44 Montgomery Street | Suite 2900 | San Francisco | CA | 94104 | | 415-362-5045 | 415-362-2392 | mmeyers@gsmdlaw.com | Counsel to Alps Automotive, Inc. |
| Goodwin Procter LLP | Allan S. Brilliant | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | abrilliant@goodwinprocter.com | Counsel to UGS Corp. |
| Goodwin Procter LLP | Craig P. Druehl | 599 Lexington Avenue | | New York | NY | 10022 | | 212-813-8800 | 212-355-3333 | cdruehl@goodwinprocter.com | Counsel to UGS Corp. |
| Gorlick, Kravitz & Listhaus, P.C. | Barbara S. Mehlsack | 17 State Street | 4th Floor | New York | NY | 10004 | | 212-269-2500 | 212-269-2540 | bmehlsack@gkllaw.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Goulston & Storrs, P.C. | Peter D. Bilowz | 400 Atlantic Avenue | | Boston | MA | 02110-333 | | 617-482-1776 | 617-574-4112 | pbilowz@goulstonstorrs.com | Counsel to Thermotech Company |
| Grant & Eisenhofer P.A. | Jay W. Eisenhofer | 45 Rockefeller Center | 650 Fifth Avenue | New York | NY | 10111 | | 212-755-6501 | 212-755-6503 | jeisenhofer@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Grant & Eisenhofer P.A. | Sharan Nirmul | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | | 302-622-7000 | 302-622-7100 | snirmul@gelaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Gratz, Miller & Brueggeman, S.C. | Matthew R. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | mrr@previant.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Gratz, Miller & Brueggeman, S.C. | Timothy C. Hall | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | tch@previant.com | Counsel to International Brotherod of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| Graydon Head & Ritchey LLP | J. Michael Debbeler, Susan M. Argo | 1900 Fifth Third Center | 511 Walnut Street | Cincinnati | OH | 45202 | | 513-621-6464 | 513-651-3836 | mdebbeler@graydon.com | Counsel to Grote Industries; Batesville Tool & Die; PIA Group; Reliable Castings |
| Greenberg Traurig, LLP | Maria J. DiConza | 200 Park Avenue | | New York | NY | 10166 | | 212-801-9200 | 212-801-6400 | diconzam@gtlaw.com | Counsel to Samtech Corporation |
| Greenberg Traurig, LLP | Shari L. Heyen | 1000 Louisiana | Suite 1800 | Houston | TX | 77002 | | 713-374-3500 | 713-374-3505 | heyens@gtlaw.com | Counsel to Samtech Corporation |
| Greensfelder, Hemker & Gale, P.C. | Cherie Macdonald J. Patrick Bradley | 10 S. Broadway | Suite 200 | St. Louis | MO | 63102 | | 314-241-9090 | 314-241-8624 | ckm@greensfelder.com jpb@greensfelder.com | Counsel to ARC Automotive, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 5 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Guaranty Bank | Herb Reiner | 8333 Douglas Avenue | | Dallas | TX | 75225 | | 214-360-2702 | 214-360-1940 | herb.reiner@guarantygroup.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation |
| Halperin Battaglia Raicht, LLP | Alan D. Halperin Christopher J. Battaglia Julie D. Dyas | 555 Madison Avenue | 9th Floor | New York | NY | 10022 | | 212-765-9100 | 212-765-0964 | cbattaglia@halperinlaw.net ahalperin@halperinlaw.net jdyas@halperinlaw.net | Counsel to Pacific Gas Turbine Center, LLC and Chromalloy Gas Turbine Corporation; ARC Automotive, Inc |
| Hancock & Estabrook LLP | R John Clark Esq | 1500 Tower I | PO Box 4976 | Syracuse | NY | 13221-4976 | | 315-471-3151 | 315-471-3167 | rjclark@hancocklaw.com | Counsel to Alliance Precision Plastics Corporation |
| Harris D. Leinwand | Harris D. Leinwand | 350 Fifth Avenue | Suite 2418 | New York | NY | 10118 | | 212-725-7338 | 212-244-6219 | hleinwand@aol.com | Counsel to Baker Hughes Incorporated; Baker Petrolite Corporation |
| Haynes and Boone, LLP | Judith Elkin | 153 East 53rd Street | Suite 4900 | New York | NY | 10022 | | 212-659-7300 | 212-918-8989 | judith.elkin@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Haynes and Boone, LLP | Lenard M. Parkins Kenric D. Kattner | 1 Houston Center | 1221 McKinney, Suite 2100 | Houston | TX | 77010 | | 713-547-2000 | 713-547-2600 | lenard.parkins@haynesboone.com kenric.kattner@haynesboone.com | Counsel to Highland Capital Management, L.P. |
| Heller Ehrman LLP | Timothy Mehok | Times Square Tower | Seven Times Square | New York | NY | 10036 | | 212-832-8300 | 212-763-7600 | timothy.mehok@hellerehrman.com | Counsel to @Road, Inc. |
| Herrick, Feinstein LLP | Paul Rubin | 2 Park Avenue | | New York | NY | 10016 | | 212-592-1448 | 212-545-3360 | prubin@herrick.com | Counsel to Canon U.S.A., Inc. and Schmidt Technology GmbH |
| Hewlett-Packard Company | Anne Marie Kennelly | 3000 Hanover St., M/S 1050 | | Palo Alto | CA | 94304 | | 650-857-6902 | 650-852-8617 | anne.kennelly@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Glen Dumont | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4750 | 908-898-4137 | glen.dumont@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hewlett-Packard Company | Kenneth F. Higman | 2125 E. Katella Avenue | Suite 400 | Anaheim | CA | 92806 | | 714-940-7120 | 740-940-7539 | ken.higman@hp.com | Counsel to Hewlett-Packard Company |
| Hewlett-Packard Company | Sharon Petrosino | 420 Mountain Avenue | | Murray Hill | NJ | 07974 | | 908-898-4760 | 908-898-4133 | sharon.petrosino@hp.com | Counsel to Hewlett-Packard Financial Services Company |
| Hiscock & Barclay, LLP | J. Eric Charlton | 300 South Salina Street | PO Box 4878 | Syracuse | NY | 13221-4878 | | 315-425-2716 | 315-425-8576 | echarlton@hiscockbarclay.com | Counsel to GW Plastics, Inc. |
| Hodgson Russ LLP | Julia S. Kreher | One M&T Plaza | Suite 2000 | Buffalo | NY | 14203 | | 716-848-1330 | 716-819-4645 | jkreher@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hodgson Russ LLP | Stephen H. Gross, Esq. | 230 Park Avenue | 17th Floor | New York | NY | 10169 | | 212-751-4300 | 212-751-0928 | sgross@hodgsonruss.com | Counsel to Hexcel Corporation |
| Hogan & Hartson L.L.P. | Audrey Moog | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | amoog@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Edward C. Dolan | Columbia Square | 555 Thirteenth Street, N.W. | Washington | D.C. | 20004-1109 | | 202-637-5677 | 202-637-5910 | ecdolan@hhlaw.com | Counsel to Umicore Autocat Canada Corp. |
| Hogan & Hartson L.L.P. | Scott A. Golden | 875 Third Avenue | | New York | NY | 10022 | | 212-918-3000 | 212-918-3100 | sagolden@hhlaw.com | Counsel to XM Satellite Radio Inc. |
| Holme Roberts & Owen, LLP | Elizabeth K. Flaagan | 1700 Lincoln | Suite 4100 | Denver | CO | 80203 | | 303-861-7000 | 303-866-0200 | elizabeth.flaagan@hro.com | Counsel to CoorsTek, Inc.; Corus, L.P. |
| Honigman, Miller, Schwartz and Cohn, LLP | Donald T. Baty, Jr. | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7314 | 313-465-7315 | dbaty@honigman.com | Counsel to Fujitsu Ten Corporation of America |
| Honigman, Miller, Schwartz and Cohn, LLP | E. Todd Sable | 2290 First National Building | 660 Woodward Avenue | Detroit | MI | 48226 | | 313-465-7548 | 313-465-7549 | tsable@honigman.com | Counsel to Valeo Climate Control Corp.; Valeo Electrical Systems, Inc. - Motors and Actuators Division;Valeo Electrical Systems, Inc. - Wipers Division; Valeo Switches & Detection System, Inc. |
| Hunter & Schank Co. LPA | John J. Hunter | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | jrhunter@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunter & Schank Co. LPA | Thomas J. Schank | One Canton Square | 1700 Canton Avenue | Toledo | OH | 43624 | | 419-255-4300 | 419-255-9121 | tomschank@hunterschank.com | Counsel to ZF Group North America Operations, Inc. |
| Hunton & Wiliams LLP | Michael P. Massad, Jr. | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | mmassad@hunton.com | Counsel to RF Monolithics, Inc. |
| Hunton & Wiliams LLP | Steven T. Holmes | Energy Plaza, 30th Floor | 1601 Bryan Street | Dallas | TX | 75201 | | 214-979-3000 | 214-880-0011 | sholmes@hunton.com | Counsel to RF Monolithics, Inc. |
| Hurwitz & Fine P.C. | Ann E. Evanko | 1300 Liberty Building | | Buffalo | NY | 14202 | | 716-849-8900 | 716-855-0874 | aee@hurwitzfine.com | Counsel to Jiffy-Tite Co., Inc. |
| Ice Miller | Ben T. Caughey | One American Square | Box 82001 | Indianapolis | IN | 46282-0200 | | 317-236-2100 | 317-236-2219 | Ben.Caughey@icemiller.com | Counsel to Sumco, Inc. |
| Infineon Technologies North America Corporation | Greg Bibbes | 1730 North First Street | M/S 11305 | San Jose | CA | 95112 | | 408-501-6442 | 408-501-2488 | greg.bibbes@infineon.com | General Counsel & Vice President for Infineon Technologies North America Corporation |
| Infineon Technologies North America Corporation | Jeff Gillespie | 2529 Commerce Drive | Suite H | Kokomo | IN | 46902 | | 765-454-2146 | 765-456-3836 | jeffery.gillispie@infineon.com | Global Account Manager for Infineon Technologies North America |
| InPlay Technologies Inc | Heather Beshears | 234 South Extension Road | | Mesa | AZ | 85201 | | | | heather@inplaytechnologies.com | Creditor |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 6 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| International Union of Operating Engineers | Richard Griffin | 1125-17th Avenue, N.W. | | Washington | DC | 20036 | | 202-429-9100 | 202-778-2641 | rgriffin@iuoe.org | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10; International Union of Operating Engineers Local Union Nos. 18, 101 and 832 |
| Jaffe, Raitt, Heuer & Weiss, P.C. | Paige E. Barr | 27777 Franklin Road | Suite 2500 | Southfield | MI | 48034 | | 248-351-3000 | 248-351-3082 | pbarr@jaffelaw.com | Counsel to Trutron Corporation |
| James R Scheuerle | Parmenter O'Toole | 601 Terrace Street | PO Box 786 | Muskegon | MI | 49443-0786 | | 231-722-1621 | 231-728-2206 | JRS@Parmenterlaw.com | Counsel to Port City Die Cast and Port City Group Inc |
| Jenner & Block LLP | Ronald R. Peterson | One IBM Plaza | | Chicago | IL | 60611 | | 312-222-9350 | 312-840-7381 | rpeterson@jenner.com | Counsel to SFX Corporation (Contech Division), Alcan Rolled Products-Ravenswood, LLC and Tenneco Inc. |
| Jones Day | Scott J. Friedman | 222 East 41st Street | | New York | NY | 10017 | | 212-326-3939 | 212-755-7306 | sjfriedman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Katten Muchin Rosenman LLP | John P. Sieger, Esq. | 525 West Monroe Street | | Chicago | IL | 60661 | | 312-902-5200 | 312-577-4733 | john.sieger@kattenlaw.com | Counsel to TDK Corporation America and MEMC Electronic Materials, Inc. |
| Kaye Scholer LLP | Richard G Smolev | 425 Park Avenue | | New York | NY | 10022-3598 | | 212-236-8000 | 212-836-8689 | rsmolev@kayescholer.com | Counsel to InPlay Technologies Inc |
| Kegler, Brown, Hill & Ritter Co., LPA | Kenneth R. Cookson | 65 East State Street | Suite 1800 | Columbus | OH | 43215 | | 614-426-5400 | 614-464-2634 | kcookson@keglerbrown.com | Counsel to Solution Recovery Services |
| Keller Rohrback L.L.P. | Lynn Lincoln Sarko Cari Campen Laufenberg Erin M. Riley | 1201 Third Avenue | Suite 3200 | Seattle | WA | 98101 | | 206-623-1900 | 206-623-3384 | lsarko@kellerrohrback.com claufenberg@kellerrohrback.com eriley@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Keller Rohrback P.L.C. | Gary A. Gotto | National Bank Plaza | 3101 North Central Avenue, Suite 900 | Phoenix | AZ | 85012 | | 602-248-0088 | 602-248-2822 | ggotto@kellerrohrback.com | Counsel to Neal Folck, Greg Bartell, Donald McEvoy, Irene Polito, and Thomas Kessler, on behalf of themselves and a class of persons similarly situated, and on behalf of the Delphi Savings-Stock Purchase Program for Salaried Employees in the United States and the Delphi Personal Savings Plan for Hourly-Rate Employees in the United States |
| Kelley Drye & Warren, LLP | Mark I. Bane | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | mbane@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kelley Drye & Warren, LLP | Mark. R. Somerstein | 101 Park Avenue | | New York | NY | 10178 | | 212-808-7800 | 212-808-7897 | msomerstein@kelleydrye.com | Counsel to the Pension Benefit Guaranty Corporation |
| Kennedy, Jennick & Murray | Larry Magarik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | lmagarik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Susan M. Jennik | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | sjennik@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Kennedy, Jennick & Murray | Thomas Kennedy | 113 University Place | 7th Floor | New York | NY | 10003 | | 212-358-1500 | 212-358-0207 | tkennedy@kjmlabor.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 7 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| King & Spalding, LLP | H. Slayton Dabney, Jr. Bill Dimos | 1185 Avenue of the Americas | | New York | NY | 10036 | | 212-556-2100 | 212-556-2222 | sdabney@kslaw.com bdimos@kslaw.com | Counsel to KPMG LLP |
| Kirkpatrick & Lockhart Nicholson Graham LLP | Edward M. Fox | 599 Lexington Avenue | | New York | NY | 10022 | | 212-536-4812 | 212-536-3901 | efox@klng.com | Counsel to Wilmington Trust Company, as Indenture trustee |
| Klett Rooney Lieber & Schorling | Eric L. Schnabel DeWitt Brown | The Brandywine Building | 1000 West Street, Suite 1410 | Wilmington | DE | 19801 | | (302) 552-4200 | | schnabel@klettrooney.com dbrown@klettrooney.com | Counsel to Entergy |
| Krugliak, Wilkins, Griffiths & Dougherty CO., L.P.A. | Sam O. Simmerman | 4775 Munson Street N.W. | P.O. Box 36963 | Canton | OH | 44735-6963 | | 330-497-0700 | 330-497-4020 | sosimmerman@kwgd.com | Counsel to for Millwood, Inc. |
| Kutchin & Rufo, P.C. | Edward D. Kutchin | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | ekutchin@kutchinrufo.com | Counsel to Parlex Corporation |
| Kutchin & Rufo, P.C. | Kerry R. Northrup | 155 Federal Street | 17th Floor | Boston | MA | 02110-1727 | | 617-542-3000 | 617-542-3001 | knorthup@kutchinrufo.com | Counsel to Parlex Corporation |
| Lambert, Leser, Isackson, Cook & Guinta, P.C. | Susan M. Cook | 309 Davidson Building | PO Box 835 | Bay City | MI | 48707-0835 | | 989-893-3518 | | smcook@lambertleser.com | Counsel to Linamar Corporation |
| Latham & Watkins | Erika Ruiz | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | erika.ruiz@lw.com | UCC Professional |
| Latham & Watkins | Henry P. Baer, Jr. | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | henry.baer@lw.com | UCC Professional |
| Latham & Watkins | John W. Weiss | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | john.weiss@lw.com | UCC Professional |
| Latham & Watkins | Mark A. Broude | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1384 | 212-751-4864 | mark.broude@lw.com | UCC Professional |
| Latham & Watkins | Michael J. Riela | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | michael.riela@lw.com | UCC Professional |
| Latham & Watkins | Mitchell A. Seider | 885 Third Avenue | | New York | NY | 10022 | | 212-906-1200 | 212-751-4864 | mitchell.seider@lw.com | UCC Professional |
| Law Offices of Michael O'Hayer | Michael O'Hayer Esq | 22 N Walnut Street | | West Chester | PA | 19380 | | 610-738-1230 | 610-738-1217 | mkohayer@aol.com | Counsel to A-1 Specialized Services and Supplies Inc |
| Lewis and Roca LLP | Rob Charles, Esq. | One South Church Street | Suite 700 | Tucson | AZ | 85701 | | 520-629-4427 | 520-879-4705 | rcharles@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Lewis and Roca LLP | Susan M. Freeman, Esq. | 40 North Central Avenue | Suite 1900 | Phoenix | AZ | 85004-4429 | | 602-262-5756 | 602-734-3824 | sfreeman@lrlaw.com | Counsel to Freescale Semiconductor, Inc. f/k/a Motorola Semiconductor Systems (U.S.A.) Inc. |
| Linear Technology Corporation | John England, Esq. | General Counsel for Linear Technology Corporation | 1630 McCarthy Blvd. | Milpitas | CA | 95035-7417 | | 408-432-1900 | 408-434-0507 | jengland@linear.com | Counsel to Linear Technology Corporation |
| Linebarger Goggan Blair & Sampson, LLP | Diane W. Sanders | 1949 South IH 35 (78741) | P.O. Box 17428 | Austin | TX | 78760-7428 | | 512-447-6675 | 512-443-5114 | austin.bankruptcy@publicans.com | Counsel to Cameron County, Brownsville ISD |
| Linebarger Goggan Blair & Sampson, LLP | Elizabeth Weller | 2323 Bryan Street | Suite 1600 | Dallas | TX | 75201 | | 214-880-0089 | 4692215002 | dallas.bankruptcy@publicans.com | Counsel to Dallas County and Tarrant County |
| Linebarger Goggan Blair & Sampson, LLP | John P. Dillman | P.O. Box 3064 | | Houston | TX | 77253-3064 | | 713-844-3478 | 713-844-3503 | houston_bankruptcy@publicans.com | Counsel to for Taxing Authorities: Cypress-Fairbanks Independent School District, City of Houston, Harris County |
| Loeb & Loeb LLP | P. Gregory Schwed | 345 Park Avenue | | New York | NY | 10154-0037 | | 212-407-4000 | | gschwed@loeb.com | Counsel to Creditor The Interpublic Group of Companies, Inc. and Proposed Auditor Deloitte & Touche, LLP |
| Loeb & Loeb LLP | William M. Hawkins | 345 Park Avenue | | New York | NY | 10154 | | 212-407-4000 | 212-407-4990 | whawkins@loeb.com | Counsel to Industrial Ceramics Corporation |
| Lord, Bissel & Brook | Timothy S. McFadden | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-0370 | 312-896-6394 | tmcfadden@lordbissell.com | Counsel to Methode Electronics, Inc. |
| Lord, Bissel & Brook | Timothy W. Brink | 115 South LaSalle Street | | Chicago | IL | 60603 | | 312-443-1832 | 312-443-896-6432 | tbrink@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. |
| Lord, Bissel & Brook LLP | Kevin J. Walsh | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | | 212-947-8304 | 212-947-1202 | kwalsh@lordbissell.com | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Lowenstein Sandler PC | Bruce S. Nathan | 1251 Avenue of the Americas | | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | bnathan@lowenstein.com | Counsel to Daewoo International (America) Corp. |
| Lowenstein Sandler PC | Ira M. Levee | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | ilevee@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Lowenstein Sandler PC | Kenneth A. Rosen | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | krosen@lowenstein.com | Counsel to Cerberus Capital Management, L.P. |
| Lowenstein Sandler PC | Michael S. Etkin | 1251 Avenue of the Americas | 18th Floor | New York | NY | 10020 | | 212-262-6700 | 212-262-7402 | metkin@lowenstein.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 8 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Lowenstein Sandler PC | Scott Cargill | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | scargill@lowenstein.com | Counsel to Cerberus Capital Management, L.P.; AT&T Corporation |
| Lowenstein Sandler PC | Vincent A. D'Agostino | 65 Livingston Avenue | | Roseland | NJ | 07068 | | 973-597-2500 | 973-597-2400 | vdagostino@lowenstein.com | Counsel to AT&T Corporation |
| Lyden, Liebenthal & Chappell, Ltd. | Erik G. Chappell | 5565 Airport Highway | Suite 101 | Toledo | OH | 43615 | | 419-867-8900 | 419-867-8909 | egc@lydenlaw.com | Counsel to Metro Fibres, Inc. |
| MacDonald, Illig, Jones & Britton LLP | Richard J. Parks | 100 State Street | Suite 700 | Erie | PA | 16507-1459 | | 814-870-7754 | 814-454-4647 | rparks@mijb.com | Counsel to Ideal Tool Company, Inc. |
| Madison Capital Management | Joe Landen | 6143 South Willow Drive | Suite 200 | Greenwood Village | CO | 80111 | | 303-957-4254 | 303-957-2098 | jlanden@madisoncap.com | Representative for Madison Capital Management |
| Margulies & Levinson, LLP | Jeffrey M. Levinson, Esq. Leah M. Caplan, Esq. | 30100 Chagrin Boulevard | Suite 250 | Pepper Pike | OH | 44124 | | 216-514-4935 | 216-514-4936 | jml@ml-legal.com lmc@ml-legal.com | Counsel to Venture Plastics |
| Mastromarco & Jahn, P.C. | Victor J. Mastromarco, Jr. | 1024 North Michigan Avenue | P.O. Box 3197 | Saginaw | MI | 48605-3197 | | 989-752-1414 | | vmastromar@aol.com | Counsel to H.E. Services Company and Robert Backie and Counsel to Cindy Palmer, Personal Representative to the Estate of Michael Palmer |
| Masuda Funai Eifert & Mitchell, Ltd. | Gary D. Santella | 203 North LaSalle Street | Suite 2500 | Chicago | IL | 60601-1262 | | 312-245-7500 | 312-245-7467 | gsantella@masudafunai.com | Counsel to NDK America, Inc./NDK Crystal, Inc.; Foster Electric USA, Inc.; JST Corporation; Nichicon (America) Corporation; Taiho Corporation of America; American Aikoku Alpha, Inc.; Sagami America, Ltd.; SL America, Inc./SL Tennessee, LLC; Hosiden America Corporation and Samtech Corporation |
| Mayer, Brown, Rowe & Maw LLP | Jeffrey G. Tougas | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | jgtougas@mayerbrownrowe.com | Counsel to Bank of America, N.A. |
| Mayer, Brown, Rowe & Maw LLP | Raniero D'Aversa, Jr. | 1675 Broadway | | New York | NY | 10019 | | 212-262-1910 | 212-506-2500 | rdaversa@mayerbrown.com | Counsel to Bank of America, N.A. |
| McCarter & English, LLP | David J. Adler, Jr. Esq. | 245 Park Avenue, 27th Floor | | New York | NY | 10167 | | 212-609-6800 | 212-609-6921 | dadler@mccarter.com | Counsel to Ward Products, LLC |
| McCarter & English, LLP | Eduardo J. Glas, Esq. | Four Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4096 | | 913-622-4444 | 973-624-7070 | eglas@mccarter.com | Counsel to General Products Delaware Corporation |
| McCarthy Tetrault LLP | John J. Salmas Lorne P. Salzman | 66 Wellington Street West | Suite 4700 | Toronto | Ontario | M5K 1E6 | | 416-362-1812 | 416-868-0673 | jsalmas@mccarthy.ca lsalzman@mccarthy.ca | Counsel to Themselves (McCarthy Tetrault LLP) |
| McDermott Will & Emery LLP | James M. Sullivan | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5477 | 212-547-5444 | jmsullivan@mwe.com | Counsel to Linear Technology Corporation, National Semiconductor Corporation; Timken Corporation |
| McDermott Will & Emery LLP | Stephen B. Selbst | 340 Madison Avenue | | New York | NY | 10017 | | 212-547-5400 | 212-547-5444 | sselbst@mwe.com | Counsel to National Semiconductor Corporation |
| McDonald Hopkins Co., LPA | Jean R. Robertson, Esq. | 600 Superior Avenue, East | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | jrobertson@mcdonaldhopkins.com | Counsel to Brush Engineered Materials |
| McDonald Hopkins Co., LPA | Scott N. Opincar, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sopincar@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McDonald Hopkins Co., LPA | Shawn M. Riley, Esq. | 600 Superior Avenue, E. | Suite 2100 | Cleveland | OH | 44114 | | 216-348-5400 | 216-348-5474 | sriley@mcdonaldhopkins.com | Counsel to Republic Engineered Products, Inc. |
| McElroy, Deutsch, Mulvaney & Carpenter, LLP | Jeffrey Bernstein, Esq. | Three Gateway Center | 100 Mulberry Street | Newark | NJ | 07102-4079 | | 973-622-7711 | 973-622-5314 | jbernstein@mdmc-law.com | Counsel to New Jersey Self-Insurers Guaranty Association |
| McGuireWoods LLP | Elizabeth L. Gunn | One James Center | 901 East Cary Street | Richmond | VA | 23219-4030 | | 804-775-1178 | 804-698-2186 | egunn@mcguirewoods.com | Counsel to Siemens Logistics Assembly Systems, Inc. |
| Meyer, Suozzi, English & Klein, P.C. | Hanan Kolko | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | hkolko@msek.com | Counsel to The International Union of Electronic, Salaried, Machine and Furniture Workers - Communicaitons Workers of America |
| Meyer, Suozzi, English & Klein, P.C. | Lowell Peterson, Esq. | 1350 Broadway | Suite 501 | New York | NY | 10018 | | 212-239-4999 | 212-239-1311 | lpeterson@msek.com | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| Meyers, Rodbell & Rosenbaum, P.A. | M. Evan Meyers | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | emeyers@mrrlaw.net | Counsel to Prince George County, Maryland |
| Meyers, Rodbell & Rosenbaum, P.A. | Robert H. Rosenbaum | Berkshire Building | 6801 Kenilworth Avenue, Suite 400 | Riverdale Park | MD | 20737-1385 | | 301-699-5800 | | rrosenbaum@mrrlaw.net | Counsel to Prince George County, Maryland |

In re Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 9 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Michael Cox | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | miag@michigan.gov | Attorney General for State of Michigan, Department of Treasury |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Dennis J. Raterink | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | raterinkd@michigan.gov | Assistant Attorney General for Worker's Compensation Agency |
| Michigan Department of Labor and Economic Growth, Worker's Compensation Agency | Michael Cox | PO Box 30736 | | Lansing | MI | 48909-7717 | | 517-373-1820 | 517-373-2129 | miag@michigan.gov | Attorney General for Worker's Compensation Agency |
| Miles & Stockbridge, P.C. | Kerry Hopkins | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | khopkins@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miles & Stockbridge, P.C. | Thomas D. Renda | 10 Light Street | | Baltimore | MD | 21202 | | 410-385-3418 | 410-385-3700 | trenda@milesstockbridge.com | Counsel to Computer Patent Annuities Limited Partnership, Hydro Aluminum North America, Inc., Hydro Aluminum Adrian, Inc., Hydro Aluminum Precision Tubing NA, LLC, Hydro Alumunim Ellay Enfield Limited, Hydro Aluminum Rockledge, Inc., Norsk Hydro Canada, Inc., Emhart Technologies LLL and Adell Plastics, Inc. |
| Miller Johnson | Thomas P. Sarb Robert D. Wolford | 250 Monroe Avenue, N.W. | Suite 800, PO Box 306 | Grand Rapids | MI | 49501-0306 | | 616-831-1748 616-831-1726 | 616-988-1748 616-988-1726 | sarbt@millerjohnson.com wolfordr@millerjohnson.com | Counsel to Pridgeon & Clay, Inc. |
| Miller, Canfield, Paddock and Stone, P.L.C. | Jonathan S. Green | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8452 | 313-496-7997 | greenj@millercanfield.com | Counsel to Wells Operating Partnership, LP |
| Miller, Canfield, Paddock and Stone, P.L.C. | Timothy A. Fusco | 150 W. Jefferson Avenue | Suite 2500 | Detroit | MI | 48226 | | 313-496-8435 | 313-496-8453 | fusco@millercanfield.com | Counsel to Niles USA Inc.; Techcentral, LLC; The Bartech Group, Inc.; Fischer Automotive Systems |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Paul J. Ricotta | One Financial Center | | Boston | MA | 02111 | | 617-542-6000 | 617-542-2241 | pjricotta@mintz.com | Counsel to Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Mintz, Levin, Cohn, Ferris Glovsky and Pepco, P.C. | Stephanie K. Hoos | The Chrysler Center | 666 Third Avenue | New York | NY | 10017 | | 212-935-3000 | 212-983-3115 | skhoos@mintz.com | Counsel of Hitachi Automotive Products (USA), Inc. and Conceria Pasubio |
| Molex Connector Corp | Jeff Ott | 2222 Wellington Ct. | | Lisle | IL | 60532 | | 630-527-4254 | 630-512-8610 | Jeff.Ott@molex.com | Counsel to Molex Connector Corp |
| Morgan, Lewis & Bockius LLP | Andrew D. Gottfried | 101 Park Avenue | | New York | NY | 10178-0060 | | 212-309-6000 | 212-309-6001 | agottfried@morganlewis.com | Counsel to ITT Industries, Inc.; Hitachi Chemical (Singapore), Ltd. |
| Morgan, Lewis & Bockius LLP | Menachem O. Zelmanovitz | 101 Park Avenue | | New York | NY | 10178 | | 212-309-6000 | 212-309-6001 | mzelmanovitz@morganlewis.com | Counsel to Hitachi Chemical (Singapore) Pte, Ltd. |
| Morgan, Lewis & Bockius LLP | Richard W. Esterkin, Esq. | 300 South Grand Avenue | | Los Angeles | CA | 90017 | | 213-612-1163 | 213-612-2501 | resterkin@morganlewis.com | Counsel to Sumitomo Corporation |
| Moritt Hock Hamroff & Horowitz LLP | Leslie Ann Berkoff | 400 Garden City Plaza | | Garden City | NY | 11530 | | 516-873-2000 | | lberkoff@moritthock.com | Counsel to Standard Microsystems Corporation and its direct and indirect subsidiares Oasis SiliconSystems AG and SMSC NA Automotive, LLC (successor-in-interst to Oasis Silicon Systems, Inc.) |
| Morrison Cohen LLP | Michael R. Dal Lago | 909 Third Avenue | | New York | NY | 10022 | | 212-735-8757 | 917-522-3157 | mdallago@morrisoncohen.com | Counsel to Blue Cross and Blue Shield of Michigan |
| Munsch Hardt Kopf & Harr, P.C. | Raymond J. Urbanik, Esq., Joseph J. Wielebinski, Esq. and Davor Rukavina, Esq. | 3800 Lincoln Plaza | 500 North Akard Street | Dallas | RX | 75201-6659 | | 214-855-7590 214-855-7561 214-855-7587 | 214-855-7584 | rurbanik@munsch.com jwielebinski@munsch.com drukavina@munsch.com | Counsel to Texas Instruments Incorporated |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 10 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nantz, Litowich, Smith, Girard & Hamilton, P.C. | Sandra S. Hamilton | 2025 East Beltline, S.E. | Suite 600 | Grand Rapids | MI | 49546 | | 616-977-0077 | 616-977-0529 | sandy@nlsg.com | Counsel to Lankler Diversified Industries, Inc. |
| Nathan, Neuman & Nathan, P.C. | Kenneth A. Nathan | 29100 Northwestern Highway | Suite 260 | Southfield | MI | 48034 | | 248-351-0099 | 248-351-0487 | Knathan@nathanneuman.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| National City Commercial Capital | Lisa M. Moore | 995 Dalton Avenue | | Cincinnati | OH | 45203 | | 513-455-2390 | 866-298-4481 | lisa.moore2@nationalcity.com | Vice President and Senior Counsel to National City Commercial Capital |
| Nelson Mullins Riley & Scarborough | George B. Cauthen | 1320 Main Street, 17th Floor | PO Box 11070 | Columbia | SC | 29201 | | 803-7255-9425 | 803-256-7500 | george.cauthen@nelsonmullins.com | Counsel to Datwyler Rubber & Plastics, Inc.; Datwyler, Inc.; Datwyler i/o devices (Americas), Inc.; Rothrist Tube (USA), Inc. |
| Nix, Patterson & Roach, L.L.P. | Bradley E. Beckworth | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | bbeckworth@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Nix, Patterson & Roach, L.L.P. | Jeffrey J. Angelovich | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | jangelovich@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Nix, Patterson & Roach, L.L.P. | Susan Whatley | 205 Linda Drive | | Daingerfield | TX | 75638 | | 903-645-7333 | 903-645-4415 | susanwhatley@nixlawfirm.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfonds ABP |
| Norris, McLaughlin & Marcus | Elizabeth L. Abdelmasieh, Esq | 721 Route 202-206 | P.O. Box 1018 | Somerville | NJ | 08876 | | 908-722-0700 | 908-722-0755 | eabdelmasieh@nmmlaw.com | Counsel to Rotor Clip Company, Inc. |
| North Point | David G. Heiman | 901 Lakeside Avenue | | Cleveland | OH | 44114 | | 216-586-3939 | 216-579-0212 | dgheiman@jonesday.com | Counsel to WL. Ross & Co., LLC |
| Office of the Chapter 13 Trustee | Camille Hope | P.O. Box 954 | | Macon | GA | 31202 | | 478-742-8706 | 478-746-4488 | cahope@chapter13macon.com | Office of the Chapter 13 Trustee |
| Office of the Texas Attorney General | Jay W. Hurst | P.O. Box 12548 | | Austin | TX | 78711-2548 | | 512-475-4861 | 512-482-8341 | jay.hurst@oag.state.tx.us | Counsel to The Texas Comptroller of Public Accounts |
| Orbotech, Inc. | Michael M. Zizza, Legal Manager | 44 Manning Road | | Billerica | MA | 01821 | | 978-901-5025 | 978-667-9969 | michaelz@orbotech.com | Company |
| Orrick, Herrington & Sutcliffe LLP | Alyssa Englund, Esq. | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5161 | 212-506-5151 | aenglund@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Anthony Princi Esq Thomas L Kent Esq | 666 Fifth Avenue | | New York | NY | 10103 | | 212-506-5000 | 212-506-5151 | aprinci@orrick.com tkent@orrick.com | Counsel to Ad Hoc Committee of Trade Claimants |
| Orrick, Herrington & Sutcliffe LLP | Frederick D. Holden, Jr., Esq. | 405 Howard Street | | San Francisco | CA | 94105 | | 415-773-5700 | 415-773-5759 | fholden@orrick.com | Counsel to America President Lines, Ltd. And APL Co. Pte Ltd. |
| Orrick, Herrington & Sutcliffe LLP | Jonathan P. Guy | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | jguy@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Matthew W. Cheney | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | mcheney@orrick.com | Counsel to Westwood Associates, Inc. |
| Orrick, Herrington & Sutcliffe LLP | Richard H. Wyron | The Washington Harbour | 3050 K Street, N.W. | Washington | DC | 20007 | | 202-339-8400 | 202-339-8500 | rwyron@orrick.com | Counsel to Westwood Associates, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | Michael R. Seidl | 919 N. Market Street, 17th Floor | P.O. Box 8705 | Wilmington | DE | 19899-8705 | | 302-652-4100 | 302- 652-4400 | mseidl@pszyjw.com | Counsel for Essex Group, Inc. |
| Pachulski Stang Ziehl Young Jones & Weintraub LLP | William P. Weintraub | 780 Third Avenue, 36th Floor | | New York | NY | 10017-2024 | | 212-561-7700 | 212-561-7777 | wweintraub@pszyjw.com | Counsel for Essex Group, Inc. |
| Paul, Weiss, Rifkind, Wharton & Garrison | Andrew N. Rosenberg Justin G. Brass | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | arosenberg@paulweiss.com jbrass@paulweiss.com | Counsel to Merrill Lynch, Pierce, Fenner & Smith, Incorporated |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 11 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Paul, Weiss, Rifkind, Wharton & Garrison | Douglas R. Davis | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | ddavis@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Elizabeth R. McColm | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3000 | 212-757-3990 | emccolm@paulweiss.com | Counsel to Noma Company and General Chemical Performance Products LLC |
| Paul, Weiss, Rifkind, Wharton & Garrison | Stephen J. Shimshak | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | | 212-373-3133 | 212-373-2136 | sshimshak@paulweiss.com | Counsel to Ambrake Corporation |
| Peggy Housner | | Cadillac Place | 3030 W. Grand Blvd., Suite 10-200 | Detroit | MI | 48202 | | 313-456-0140 | | housnerp@michigan.gov | Assistant Attorney General for State of Michigan, Department of Treasury |
| Pepe & Hazard LLP | Kristin B. Mayhew | 30 Jelliff Lane | | Southport | CT | 06890-1436 | | 203-319-4022 | 203-259-0251 | kmayhew@pepehazard.com | Counsel for Illinois Tool Works Inc., Illinois Tool Works for Hobart Brothers Co., Hobart Brothers Company, ITW Food Equipment Group LLC and Tri-Mark, Inc. |
| Pepper, Hamilton LLP | Anne Marie Aaronson | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | aaronsona@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Francis J. Lawall | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | lawallf@pepperlaw.com | Counsel to Capro, Ltd, Teleflex Automotive Manufacturing Corporation and Teleflex Incorporated d/b/a Teleflex Morse (Capro) |
| Pepper, Hamilton LLP | Henry Jaffe | 1313 Market Street | PO Box 1709 | Wilmington | DE | 19899-1709 | | 302-777-6500 | 302-421-8390 | jaffeh@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pepper, Hamilton LLP | Linda J. Casey | 3000 Two logan Square | Eighteenth & Arch Streets | Philadelphia | PA | 19103-2799 | | 215-981-4000 | 215-981-4750 | caseyl@pepperlaw.com | Counsel to SKF USA, Inc. |
| Pierce Atwood LLP | Jacob A. Manheimer | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | jmanheimer@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pierce Atwood LLP | Keith J. Cunningham | One Monument Square | | Portland | ME | 04101 | | 207-791-1100 | 207-791-1350 | kcunningham@pierceatwood.com | Counsel to FCI Canada, Inc.; FCI Electronics Mexido, S. de R.L. de C.V.; FCI USA, Inc.; FCI Brasil, Ltda; FCI Automotive Deutschland Gmbh; FCI Italia S. p. A. |
| Pillsbury Winthrop Shaw Pittman LLP | Karen B. Dine | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | karen.dine@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Margot P. Erlich | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | margot.erlich@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Mark D. Houle | 650 Town Center Drive | 7th Floor | Costa Mesa | CA | 92626-7122 | | 714-436-6800 | 714-436-2800 | mark.houle@pillsburylaw.com | Counsel to Clarion Corporation of America, Hyundai Motor Company and Hyundai Motor America |
| Pillsbury Winthrop Shaw Pittman LLP | Richard L. Epling | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | richard.epling@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Pillsbury Winthrop Shaw Pittman LLP | Robin L. Spear | 1540 Broadway | | New York | NY | 10036-4039 | | 212-858-1000 | 212-858-1500 | robin.spear@pillsburylaw.com | Counsel to MeadWestvaco Corporation, MeadWestvaco South Carolina LLC and MeadWestvaco Virginia Corporation |
| Porzio, Bromberg & Newman, P.C. | Brett S. Moore, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | bsmoore@pbnlaw.com | |
| Porzio, Bromberg & Newman, P.C. | John S. Mairo, Esq. | 100 Southgate Parkway | P.O. Box 1997 | Morristown | NJ | 07960 | | 973-538-4006 | 973-538-5146 | jsmairo@pbnlaw.com | Counsel to Neuman Aluminum Automotive, Inc. and Neuman Aluminum Impact Extrusion, Inc. |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 12 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Previant, Goldberg, Uelman, Gratz, Miller & Brueggeman, S.C. | Jill M. Hartley and Marianne G. Robbins | 1555 N. RiverCenter Drive | Suite 202 | Milwaukee | WI | 53212 | | 414-271-4500 | 414-271-6308 | jh@previant.com mgr@previant.com | Counsel to International Brotherhood of Electrical Workers Local Unions No. 663; International Association of Machinists; AFL-CIO Tool and Die Makers Local Lodge 78, District 10 |
| QAD, Inc. | Jason Pickering, Esq. | 10,000 Midlantic Drive | | Mt. Laurel | NJ | 08054 | | 856-840-2489 | 856-840-2740 | jkp@qad.com | Counsel to QAD, Inc. |
| Quadrangle Debt Recovery Advisors LLC | Andrew Herenstein | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1742 | 866-741-2505 | andrew.herenstein@quadrangleg roup.com | Counsel to Quadrangle Debt Recovery Advisors LLC |
| Quadrangle Group LLC | Patrick Bartels | 375 Park Avenue, 14th Floor | | New York | NY | 10152 | | 212-418-1748 | 866-552-2052 | patrick.bartels@quadranglegroup .com | Counsel to Quadrangle Group LLC |
| Quarles & Brady Streich Lang LLP | John A. Harris | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | jharris@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Quarles & Brady Streich Lang LLP | Kasey C. Nye | One South Church Street | | Tucson | AZ | 85701 | | 520-770-8717 | 520-770-2203 | knye@quarles.com | Counsel to Offshore International, Inc.; Maquilas Teta Kawi, S.A. de C.V.; On Semiconductor Corporation |
| Quarles & Brady Streich Lang LLP | Scott R. Goldberg | Renaissance One | Two North Central Avenue | Phoenix | AZ | 85004-2391 | | 602-229-5200 | 602-229-5690 | sgoldber@quarles.com | Counsel to Semiconductor Components Industries, Inc. |
| Reed Smith | Elena Lazarou | 599 Lexington Avenue | 29th Street | New York | NY | 10022 | | 212-521-5400 | 212-521-5450 | elazarou@reedsmith.com | Counsel to General Electric Capital Corporation, Stategic Asset Finance. |
| Reed Smith | Richard P. Norton | One Riverfront Plaza | 1st Floor | Newark | NJ | 07102 | | 973-621-3200 | 973-621-3199 | rnorton@reedsmith.com | Counsel to Jason Incorporated, Sackner Products Division |
| Riddell Williams P.S. | Joseph E. Shickich, Jr. | 1001 4th Ave. | Suite 4500 | Seattle | WA | 98154-1195 | | 206-624-3600 | 206-389-1708 | jshickich@riddellwilliams.com | Counsel to Microsoft Corporation; Microsoft Licensing, GP |
| Rieck and Crotty PC | Jerome F Crotty | 55 West Monroe Street | Suite 3390 | Chicago | IL | 60603 | | 312-726-4646 | 312-726-0647 | jcrotty@rieckcrotty.com | Counsel to Mary P. O'Neill and Liam P. O'Neill |
| Riemer & Braunstein LLP | Mark S. Scott | Three Center Plaza | | Boston | MA | 02108 | | 617-523-9000 | 617-880-3456 | mscott@riemerlaw.com | Counsel to ICX Corporation |
| Riverside Claims LLC | Holly Rogers | 2109 Broadway | Suite 206 | New York | NY | 10023 | | 212-501-0990 | 212-501-7088 | holly@regencap.com | Riverside Claims LLC |
| Robinson, McFadden & Moore, P.C. | Annemarie B. Mathews | P.O. Box 944 | | Columbia | SC | 29202 | | 803-779-8900 | 803-771-9411 | amathews@robinsonlaw.com | Counsel to Blue Cross Blue Shield of South Carolina |
| Ropes & Gray LLP | Gregory O. Kaden | One International Place | | Boston | MA | 02110-2624 | | 617-951-7000 | 617-951-7050 | gregory.kaden@ropesgray.com | Attorneys for D-J, Inc. |
| Ropes & Gray LLP | Marc E. Hirschfield | 45 Rockefeller Plaza | | New York | NY | 10111-0087 | | 212-841-5700 | 212-841-5725 | marc.hirschfield@ropesgray.com | Attorneys for D-J, Inc. |
| Rosen Slome Marder LLP | Thomas R. Slome | 333 Earle Ovington Boulevard | Suite 901 | Uniondale | NY | 11533 | | 516-227-1600 | | tslome@rsmllp.com | Counsel to JAE Electronics, Inc. |
| Russell Reynolds Associates, Inc. | Charles E. Boulbol, P.C. | 26 Broadway, 17th Floor | | New York | NY | 10004 | | 212-825-9457 | 212-825-9414 | rtrack@msn.com | Counsel to Russell Reynolds Associates, Inc. |
| Sachnoff & Weaver, Ltd | Arlene N. Gelman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | | 312-207-1000 | 312-207-6400 | agelman@sachnoff.com | Counsel to Infineon Technologies North America Corporation |
| Satterlee Stephens Burke & Burke LLP | Christopher P. Belmonte | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | cbelmonte@ssbb.com | Counsel to Moody's Investors Service |
| Satterlee Stephens Burke & Burke LLP | Pamela A. Bosswick | 230 Park Avenue | | New York | NY | 10169 | | 212-818-9200 | 212-818-9606 | pbosswick@ssbb.com | Counsel to Moody's Investors Service |
| Schafer and Weiner PLLC | Daniel Weiner | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | dweiner@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Howard Borin | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | hborin@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Max Newman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | mnewman@schaferandweiner.co m | Counsel to Dott Industries, Inc. |
| Schafer and Weiner PLLC | Ryan Heilman | 40950 Woodward Ave. | Suite 100 | Bloomfield Hills | MI | 48304 | | 248-540-3340 | | rheilman@schaferandweiner.com | Counsel to Dott Industries, Inc. |
| Schiff Hardin LLP | Michael Yetnikoff | 623 Fifth Avenue | 28th Floor | New York | NY | 10022 | | 212-753-5000 | 212-753-5044 | myetnikoff@schiffhardin.com | Counsel to Means Industries |
| Schiffrin & Barroway, LLP | Michael Yarnoff | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7056 | 610-667-7706 | myarnoff@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 13 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Schiffrin & Barroway, LLP | Sean M. Handler | 280 King of Prussia Road | | Radnor | PA | 19087 | | 610-667-7706 | 610-667-7056 | shandler@sbclasslaw.com | Counsel to Teachers Retirement System of Oklahoma; Public Employee's Retirement System of Mississippi; Riafeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Schulte Roth & Sabel LLP | James T. Bentley | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2273 | 212-593-5955 | james.bentley@srz.com | Counsel to Panasonic Autommotive Systems Company of America |
| Schulte Roth & Sabel LLP | Michael J. Cook | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | michael.cook@srz.com | Counsel to Panasonic Automotive Systems Company of America; D.C. Capital Partners, L.P. |
| Schulte Roth & Zabel LLP | Carol Weiner Levy | 919 Third Avenue | | New York | NY | 10022 | | 212-756-2000 | 212-595-5955 | carol.weiner.levy@srz.com | Counsel to D.C. Capital Partners, L.P. |
| Seyfarth Shaw LLP | Paul M. Baisier, Esq. | 1545 Peachtree Street, N.E. | Suite 700 | Atlanta | GA | 30309-2401 | | 404-885-1500 | 404-892-7056 | pbaisier@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | Robert W. Dremluk, Esq. | 1270 Avenue of the Americas | Suite 2500 | New York | NY | 10020-1801 | | 212-218-5500 | 212-218-5526 | rdremluk@seyfarth.com | Counsel to Murata Electronics North America, Inc.; Fujikura America, Inc. |
| Seyfarth Shaw LLP | William J. Hanlon | World Trade Center East | Two Seaport Lane, Suite 300 | Boston | MA | 02210 | | 617-946-4800 | 617-946-4801 | whanlon@seyfarth.com | Counsel to  le Belier/LBQ Foundry S.A. de C.V. |
| Sheehan Phinney Bass + Green Professional Association | Bruce A. Harwood | 1000 Elm Street | P.O. Box 3701 | Manchester | NH | 03105-3701 | | 603-627-8139 | 603-627-8121 | bharwood@sheehan.com | Counsel to Source Electronics, Inc. |
| Sheldon S. Toll PLLC | Sheldon S. Toll | 2000 Town Center | Suite 2550 | Southfield | MI | 48075 | | 248-358-2460 | 248-358-2740 | lawtoll@comcast.net | Counsel to Milwaukee Investment Company |
| Sheppard Mullin Richter & Hampton LLP | Eric Waters | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | ewaters@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Malani J. Sternstein | 30 Rockefeller Plaza | 24th Floor | New York | NY | 10112 | | 212-332-3800 | 212-332-3888 | msternstein@sheppardmullin.com | Counsel to International Rectifier Corp. and Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theodore A. Cohen | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | tcohen@sheppardmullin.com | Counsel to Gary Whitney |
| Sheppard Mullin Richter & Hampton LLP | Theresa Wardle | 333 South Hope Street | 48th Floor | Los Angeles | CA | 90071 | | 213-620-1780 | 213-620-1398 | twardle@sheppardmullin.com | Counsel to International Rectifier Corp. |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 5353 Essen Lane | Suite 650 | Baton Rouge | LA | 70809 | | 225-757-2185 | 225-757-7674 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC | Robert P. Thibeaux | 909 Poydras Street | 28th Floor | New Orleans | LA | 70112-1033 | | 504-299-2100 | 504-299-2300 | rthibeaux@shergarner.com | Counsel to Gulf Coast Bank & Trust Company |
| Shipman & Goodwin LLP | Jennifer L. Adamy | One Constitution Plaza | | Hartford | CT | 06103-1919 | | 860-251-5811 | 860-251-5218 | bankruptcy@goodwin.com | Counsel to Fortune Plastics Company of Illinois, Inc.; Universal Metal Hose Co.. |
| Sills, Cummis Epstein & Gross, P.C. | Andrew H. Sherman | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | asherman@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Sills, Cummis Epstein & Gross, P.C. | Jack M. Zackin | 30 Rockefeller Plaza | | New York | NY | 10112 | | 212-643-7000 | 212-643-6500 | jzackin@sillscummis.com | Counsel to Hewlett-Packard Financial Services Company |
| Silver Point Capital, L.P. | Chaim J. Fortgang | Two Greenwich Plaza | 1st Floor | Greenwich | CT | 06830 | | 203-542-4216 | 203-542-4100 | cfortgang@silverpointcapital.com | Counsel to Silver Point Capital, L.P. |
| Smith, Gambrell & Russell, LLP | Barbara Ellis-Monro | 1230 Peachtree Street, N.E. | Suite 3100 | Atlanta | GA | 30309 | | 404-815-3500 | 404-815-3509 | bellis-monro@sgrlaw.com | Counsel to Southwire Company |
| Smith, Katzenstein & Furlow LLP | Kathleen M. Miller | 800 Delaware Avenue, 7th Floor | P.O. Box 410 | Wilmington | DE | 19899 | | 302-652-8400 | 3026528405 | kmiller@skfdelaware.com | Counsel to Airgas, Inc. |
| Sonnenschein Nath & Rosenthal LLP | D. Farrington Yates | 1221 Avenue of the Americas | 24th Floor | New York | NY | 10020 | | 212-768-6700 | 212-768-6800 | fyates@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sonnenschein Nath & Rosenthal LLP | Robert E. Richards | 8000 Sears Tower | 233 South Wacker Drive | Chicago | IL | 60606 | | 312-876-8000 | 312-876-7934 | rrichards@sonnenschein.com | Counsel to Molex, Inc. and INA USA, Inc. |
| Sony Electronics Inc. | Lloyd B. Sarakin - Chief Counsel, Finance and Credit | 1 Sony Drive | MD #1 E-4 | Park Ridge | NJ | 07656 | | 201-930-7483 | | lloyd.sarakin@am.sony.com | Counsel to Sony Electronics, Inc. |
| Sotiroff & Abramczyk, P.C. | Robert M. Goldi | 30400 Telegraph Road | Suite 444 | Bingham Farms | MI | 48025 | | 248-642-6000 | 248-642-9001 | rgoldi@sotablaw.com | Counsel to  Michigan Heritage Bank; MHB Leasing, Inc. |
| Squire, Sanders & Dempsey L.L.P. | Eric Marcks | One Maritime Plaza | Suite 300 | San Francisco | CA | 94111-3492 | | | 415-393-9887 | emarcks@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| Squire, Sanders & Dempsey L.L.P. | Penn Ayers Butler | 600 Hansen Way | | Palo Alto | CA | 94304 | | 650-856-6500 | 650-843-8777 | pabutler@ssd.com | Counsel to Furukawa Electric Co., Ltd. And Furukawa Electric North America, APD Inc. |
| State of California Office of the Attorney General | Sarah E. Morrison | Deputy Attorney General | 300 South Spring Street Ste 1702 | Los Angeles | CA | 90013 | | 213-897-2640 | 213-897-2802 | sarah.morrison@doj.ca.gov | Attorneys for the State of California Department of Toxic Substances Control |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 14 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State of Michigan Department of Labor & Economic Growth, Unemployment Insurance Agency | Roland Hwang Assistant Attorney General | 3030 W. Grand Boulevard | Suite 9-600 | Detroit | MI | 48202 | | 313-456-2210 | 313-456-2201 | hwangr@michigan.gov | Assistant Attorney General for State of Michigan, Unemployment Tax Office of the Department of Labor & Economic Growth, Unemployment Insurance Agency |
| Steel Technologies, Inc. | John M. Baumann | 15415 Shelbyville Road | | Louisville | KY | 40245 | | 502-245-0322 | 502-245-0542 | jmbaumann@steeltechnologies.c om | Counsel to Steel Technologies, Inc. |
| Stein, Rudser, Cohen & Magid LLP | Robert F. Kidd | 825 Washington Street | Suite 200 | Oakland | CA | 94607 | | 510-287-2365 | 510-987-8333 | rkidd@srcm-law.com | Counsel to Excel Global Logistics, Inc. |
| Steinberg Shapiro & Clark | Mark H. Shapiro | 24901 Northwestern Highway | Suite 611 | Southfield | MI | 48075 | | 248-352-4700 | 248-352-4488 | shapiro@steinbergshapiro.com | Counsel to Bing Metals Group, Inc.; Central Transport International, Inc.; Crown Enerprises, Inc.; Economy Transport, Inc.; Logistics Insight Corp (LINC); Universal Am-Can, Ltd.; Universal Truckload Services, Inc. |
| Sterns & Weinroth, P.C. | Jeffrey S. Posta | 50 West State Street, Suite 1400 | PO Box 1298 | Trenton | NJ | 08607-1298 | | 609-3922100 | 609-392-7956 | jposta@sternslaw.com | Counsel to Doosan Infracore America Corp. |
| Stevens & Lee, P.C. | Chester B. Salomon, Esq. Constantine D. Pourakis, Esq. | 485 Madison Avenue | 20th Floor | New York | NY | 10022 | | 212-319-8500 | 212-319-8505 | cs@stevenslee.com cp@stevenslee.com | Counsel to Tonolli Canada Ltd.; VJ Technologies, Inc. and V.J. ElectroniX, Inc. |
| Stinson Morrison Hecker LLP | Mark A. Shaiken | 1201 Walnut Street | | Kansas City | MO | 64106 | | 816-842-8600 | 816-691-3495 | mshaiken@stinsonmoheck.com | Counsel to Thyssenkrupp Waupaca, Inc. and Thyssenkrupp Stahl Company |
| Stites & Harbison PLLC | Madison L.Cashman | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | robert.goodrich@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison PLLC | Robert C. Goodrich, Jr. | 424 Church Street | Suite 1800 | Nashville | TN | 37219 | | 615-244-5200 | 615-782-2371 | madison.cashman@stites.com | Counsel to Setech, Inc. |
| Stites & Harbison, PLLC | W. Robinson Beard, Esq. | 400 West Market Street | | Louisville | KY | 40202 | | 502-681-0448 | 502-779-8274 | wbeard@stites.com | Counsel to WAKO Electronics (USA), Inc. and Ambrake Corporation |
| Stroock & Stroock & Lavan, LLP | Kristopher M. Hansen | 180 Maiden Lane | | New York | NY | 10038 | | 212-806-5400 | 212-806-6006 | khansen@stroock.com | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. and Etkin Real Properties |
| Swidler Berlin LLP | Robert N. Steinwurtzel | The Washington Harbour | 3000 K Street, N.W. Suite 300 | Washington | DC | 300 | | 202-424-7500 | 202-424-7645 | rnsteinwurtzel@swidlaw.com | Attorneys for Sanders Lead Co., Inc. |
| Taft, Stettinius & Hollister LLP | Richard L .Ferrell | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202-3957 | | 513-381-2838 | | ferrell@taftlaw.com | Counsel to Wren Industries, Inc. |
| Taft, Stettinius & Hollister LLP | W Timothy Miller Esq | 425 Walnut Street | Suite 1800 | Cincinnati | OH | 45202 | | 513-381-2838 | 513-381-0205 | miller@taftlaw.com | Counsel to Select Industries Corporation and Gobar Systems, Inc. |
| Tennessee Department of Revenue | Marvin E. Clements, Jr. | c/o TN Attorney General's Office, Bankruptcy Division | PO Box 20207 | Nashville | TN | 37202-0207 | | 615-532-2504 | 615-741-3334 | marvin.clements@state.tn.us | Tennesse Department of Revenue |
| Terra Law LLP | David B. Draper | 60 S. Market Street | Suite 200 | San Jose | CA | 95113 | | 408-299-1200 | 408-998-4895 | ddraper@terra-law.com | Counsel to Maxim Integrated Products, Inc. |
| Thacher Proffitt & Wood LLP | Jonathan D. Forstot | Two World Financial Center | | New York | NY | 10281 | | 212-912-7679 | 212-912-7751 | jforstot@tpw.com | Counsel to TT Electronics, Plc |
| Thacher Proffitt & Wood LLP | Louis A. Curcio | Two World Financial Center | | New York | NY | 10281 | | 212-912-7607 | 212-912-7751 | lcurcio@tpw.com | Counsel to TT Electronics, Plc |
| The Furukawa Electric Co., Ltd. | Mr. Tetsuhiro Niizeki | 6-1 Marunouchi | 2-Chrome, Chiyoda-ku | Tokyo | Japan | 100-8322 | | | 81-3-3286-3919 | niizeki.tetsuhiro@furukawa.co.jp | Legal Department of The Furukawa Electric Co., Ltd. |
| The Timken Corporation BIC - 08 | Robert Morris | 1835 Dueber Ave. SW | PO Box 6927 | Canton | OH | 44706-0927 | | 330-438-3000 | 1-330-471-4388 | robert.morris@timken.com | Representative for Timken Corporation |
| Thelen Reid Brown Raysman & Steiner LLP | David A. Lowenthal | 875 Third Avenue | | New York | NY | 10022 | | 212-603-2000 | 212-603-2001 | dlowenthal@thelenreid.com | Counsel to American Finance Group, Inc. d/b/a Guaranty Capital Corporation and Oki Semiconductor Company |
| Thompson & Knight | Rhett G. Cambell | 333 Clay Street | Suite 3300 | Houston | TX | 77002 | | 713-654-1871 | 713-654-1871 | rhett.campbell@tklaw.com | Counsel to STMicroelectronics, Inc. |
| Thompson & Knight LLP | Ira L. Herman | 919 Third Avenue | 39th Floor | New York | NY | 10022-3915 | | 212-751-3045 | 214-999-9139 | ira.herman@tklaw.com | Counsel to Victory Packaging |
| Thompson & Knight LLP | John S. Brannon | 1700 Pacific Avenue | Suite 3300 | Dallas | TX | 75201-4693 | | 214-969-1505 | 214-969-1609 | john.brannon@tklaw.com | Counsel to Victory Packaging |
| Thurman & Phillips, P.C. | Ed Phillips, Jr. | 8000 IH 10 West | Suite 1000 | San Antonio | TX | 78230 | | 210-341-2020 | 210-344-6460 | ephillips@thurman-phillips.com | Counsel to Royberg, Inc. d/b/a Precision Mold & Tool and d/b/a Precision Mold and Tool Group |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 15 of 16

2/20/2007 11:45 AM
Delphi 2002 lists Email

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | COUNTRY | PHONE | FAX | EMAIL | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Todd & Levi, LLP | Jill Levi, Esq. | 444 Madison Avenue | Suite 1202 | New York | NY | 10022 | | 212-308-7400 | | jlevi@toddlevi.com | Counsel to Bank of Lincolnwood |
| Togut, Segal & Segal LLP | Albert Togut, Esq. | One Penn Plaza | Suite 3335 | New York | NY | 10119 | | 212-594-5000 | 212-967-4258 | altogut@teamtogut.com | Conflicts counsel to Debtors |
| Tyler, Cooper & Alcorn, LLP | W. Joe Wilson | City Place | 35th Floor | Hartford | CT | 06103-3488 | | 860-725-6200 | 860-278-3802 | jwilson@tylercooper.com | Counsel to Barnes Group, Inc. |
| Underberg & Kessler, LLP | Helen Zamboni | 300 Bausch & Lomb Place | | Rochester | NY | 14604 | | 585-258-2800 | 585-258-2821 | hzamboni@underbergkessler.com | Counsel to McAlpin Industries, Inc. |
| Union Pacific Railroad Company | Mary Ann Kilgore | 1400 Douglas Street | MC 1580 | Omaha | NE | 68179 | | 402-544-4195 | 402-501-0127 | mkilgore@UP.com | Counsel to Union Pacific Railroad Company |
| Varnum, Riddering, Schmidt & Howlett LLP | Michael S. McElwee | Bridgewater Place | P.O. Box 352 | Grand Rapids | MI | 49501-0352 | | 616-336-6827 | 616-336-7000 | msmcelwee@varnumlaw.com | Counsel to Furukawa Electric North America APD and Co-Counsel to Tower Automotive, Inc. |
| Vorys, Sater, Seymour and Pease LLP | Robert J. Sidman, Esq. | 52 East Gay Street | P.O. Box 1008 | Columbus | OH | 43216-1008 | | 614-464-6422 | 614-719-8676 | rjsidman@vssp.com | |
| Vorys, Sater, Seymour and Pease LLP | Tiffany Strelow Cobb | 52 East Gay Street | | Columbus | OH | 43215 | | 614-464-8322 | 614-719-4663 | tscobb@vssp.com | Counsel to America Online, Inc. and its Subsidiaries and Affiliates |
| Wachtell, Lipton, Rosen & Katz | Emil A. Kleinhaus | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | EAKleinhaus@wlrk.com | Counsel to Capital Research and Management Company |
| Wachtell, Lipton, Rosen & Katz | Richard G. Mason | 51 West 52nd Street | | New York | NY | 10019-6150 | | 212-403-1000 | 212-403-2000 | RGMason@wlrk.com | Counsel to Capital Research and Management Company |
| Waller Lansden Dortch & Davis, PLLC | David E. Lemke, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | david.lemke@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Waller Lansden Dortch & Davis, PLLC | Robert J. Welhoelter, Esq. | 511 Union Street | Suite 2700 | Nashville | TN | 37219 | | 615-244-6380 | 615-244-6804 | robert.welhoelter@wallerlaw.com | Counsel to Nissan North America, Inc. |
| Warner Norcross & Judd LLP | Gordon J. Toering | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2185 | 616-222-2185 | gtoering@wnj.com | Counsel to Robert Bosch Corporation |
| Warner Norcross & Judd LLP | Michael G. Cruse | 2000 Town Center | Suite 2700 | Southfield | MI | 48075 | | 248-784-5111 | 248-603-9631 | mcruse@wnj.com | Counsel to Compuware Corporation |
| Warner Norcross & Judd LLP | Stephen B. Grow | 900 Fifth Third Center | 111 Lyon Street, N.W. | Grand Rapids | MI | 49503 | | 616-752-2158 | | growsb@wnj.com | Counsel to Behr Industries Corp. |
| Warner Stevens, L.L.P. | Michael D. Warner | 301 Commerce Street | Suite 1700 | Fort Worth | TX | 76102 | | 817-810-5250 | 817-810-5255 | mwarner@warnerstevens.com | Counsel to Electronic Data Systems Corp. and EDS Information Services, L.L.C. |
| Weiland, Golden, Smiley, Wang Ekvall & Strok, LLP | Lei Lei Wang Ekvall | 650 Town Center Drive | Suite 950 | Costa Mesa | CA | 92626 | | 714-966-1000 | 714-966-1002 | lekvall@wgllp.com | Counsel to Toshiba America Electronic Components, Inc. |
| Weinstein, Eisen & Weiss LLP | Aram Ordubegian | 1925 Century Park East | #1150 | Los Angeles | CA | 90067 | | 310-203-9393 | 310-203-8110 | aordubegian@weineisen.com | Counsel to Orbotech, Inc. |
| Weltman, Weinberg & Reis Co., L.P.A. | Geoffrey J. Peters | 175 South Third Street | Suite 900 | Columbus | OH | 43215 | | 614-857-4326 | 614-222-2193 | gpeters@weltman.com | Counsel to Seven Seventeen Credit Union |
| White & Case LLP | Glenn Kurtz, Gerard Uzzi, Douglas Baumstein | 1155 Avenue of the Americas | | New York | NY | 10036-2787 | | 212-819-8200 | | gkurtz@ny.whitecase.com, guzzi@whitecase.com, dbaumstein@ny.whitecase.com | Counsel to Appaloosa Management, LP |
| White & Case LLP | Thomas Lauria, Frank Eaton | Wachovia Financial Center | 200 South Biscayne Blvd., Suite 4900 | Miami | FL | 33131 | | 305-371-2700 | 305-358-5744 | tlauria@whitecase.com, featon@miami.whitecase.com | Counsel to Appaloosa Management, LP |
| Whyte, Hirschboeck Dudek S.C. | Bruce G. Arnold | 555 East Wells Street | Suite 1900 | Milwaukee | WI | 53202-4894 | | 414-273-2100 | 414-223-5000 | barnold@whdlaw.com | Counsel to Schunk Graphite Technology |
| Winstead Sechrest & Minick P.C. | Berry D. Spears | 401 Congress Avenue | Suite 2100 | Austin | TX | 78701 | | 512-370-2800 | 512-370-2850 | bspears@winstead.com | Counsel to National Instruments Corporation |
| Winstead Sechrest & Minick P.C. | R. Michael Farquhar | 5400 Renaissance Tower | 1201 Elm Street | Dallas | TX | 75270 | | 214-745-5400 | 214-745-5390 | mfarquhar@winstead.com | Counsel to National Instruments Corporation |
| Winthrop Couchot Professional Corporation | Marc. J. Winthrop | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | mwinthrop@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Winthrop Couchot Professional Corporation | Sean A. O'Keefe | 660 Newport Center Drive | 4th Floor | Newport Beach | CA | 92660 | | 949-720-4100 | 949-720-4111 | sokeefe@winthropcouchot.com | Counsel to Metal Surfaces, Inc. |
| Womble Carlyle Sandridge & Rice, PLLC | Lillian H. Pinto | 300 North Greene Street | Suite 1900 | Greensboro | NC | 27402 | | 336-574-8058 | 336-574-4528 | lpinto@wcsr.com | Counsel to Armacell |
| Zeichner Ellman & Krause LLP | Peter Janovsky | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | pjanovsky@zeklaw.com | Counsel to Toyota Tsusho America, Inc. and Karl Kufner, KG aka Karl Kuefner, KG |
| Zeichner Ellman & Krause LLP | Stuart Krause | 575 Lexington Avenue | | New York | NY | 10022 | | 212-223-0400 | 212-753-0396 | skrause@zeklaw.com | Counsel to Toyota Tsusho America, Inc. |

# EXHIBIT C

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| Akebono Corporation (North America) | Alan Swiech | 34385 Twelve Mile Road | | Farminton Hills | MI | 48331 | 248-489-7406 | Vice President of Administration for Akebono Corporation |
| APS Clearing, Inc. | Andy Leinhoff Matthew Hamilton | 1301 S. Capital of Texas Highway | Suite B-220 | Austin | TX | 78746 | 512-314-4416 | Counsel to APS Clearing, Inc. |
| Cage Williams & Abelman, P.C. | Steven E. Abelman | 1433 Seventeenth Street | | Denver | CO | 80202 | 303-295-0202 | Counsel to United Power, Inc. |
| Colbert & Winstead, P.C. | Amy Wood Malone | 1812 Broadway | | Nashville | TN | 37203 | 615-321-0555 | Counsel to Averitt Express, Inc. |
| Curtis, Mallet-Prevost, Colt & Mosle LLP | Andrew M. Thau David S. Karp | 101 Park Avenue | | New York | NY | 10178-0061 | 212-696-8898 | Counsel to Flextronics International, Inc., Flextronics International USA, Inc.; Multek Flexible Circuits, Inc.; Sheldahl de Mexico S.A.de C.V.; Northfield Acquisition Co.; Flextronics Asia-Pacific Ltd.; Flextronics Technology (M) Sdn. Bhd |
| Daniels & Kaplan, P.C. | Jay Selanders | 2405 Grand Boulevard | Suite 900 | Kansas City | MO | 64108-2519 | 816-221-3086 | Counsel to DaimlerChrysler Corporation; DaimlerChrylser Motors Company, LLC; DaimlerChrylser Canada, Inc. |
| Dykema Gossett PLLC | Gregory J. Jordan | 10 Wacker | Suite 2300 | Chicago | IL | 60606 | 312-627-2171 | Counsel to Tremont City Barrel Fill PRP Group |
| Entergy Services, Inc. | Alan H. Katz | 7411 Highway 51 North | | Southaven | MS | 38671 | | Company |
| Genovese Joblove & Battista, P.A. | Craig P. Rieders, Esq. | 100 S.E. 2nd Street | Suite 4400 | Miami | FL | 33131 | 305-349-2300 | Counsel to Ryder Integrated Logistics, Inc. |
| Grant & Eisenhofer P.A. | Geoffrey C. Jarvis | 1201 North Market Street | Suite 2100 | Wilmington | DE | 19801 | 302-622-7000 | Counsel to Teachers Retirement System of Oklahoma; Public Employees's Retirement System of Mississippi; Raifeisen Kapitalanlage-Gesellschaft m.b.H and Stichting Pensioenfords ABP |
| Heller Ehrman LLP | Carren Shulman | Times Square Tower | Seven Times Square | New York | NY | 10036 | 212-832-8300 | Counsel to @Road, Inc. |
| Jason, Inc. | Beth Klimczak, General Counsel | 411 E. Wisconsin Ave | Suite 2120 | Milwaukee | WI | 53202 | | General Counsel to Jason Incorporated |
| Johnston, Harris Gerde & Komarek, P.A. | Jerry W. Gerde, Esq. | 239 E. 4th St. | | Panama City | FL | 32401 | 850-763-8421 | Counsel to Peggy C. Brannon, Bay County Tax Collector |
| Kirkland & Ellis LLP | Geoffrey A. Richards | 200 East Randolph Drive | | Chicago | IL | 60601 | 312-861-2000 | Counsel to Lunt Mannufacturing Company |
| Lord, Bissel & Brook LLP | Rocco N. Covino | 885 Third Avenue | 26th Floor | New York | NY | 10022-4802 | 212-812-8340 | Counsel to Sedgwick Claims Management Services, Inc. and Methode Electronics, Inc. |
| Miami-Dade County Tax Collector | Metro-Dade Paralegal Unit | 140 West Flagler Street | Suite 1403 | Miami | FL | 33130 | 305-375-5314 | Paralegal Collection Specialist for Miami-Dade County |
| North Point | Michelle M. Harner | 901 Lakeside Avenue | | Cleveland | OH | 44114 | 216-586-3939 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 2

2/21/2007 10:32 AM
Delphi 2002 lists US Mail

Delphi Corporation
2002 List

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PHONE | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|---|
| O'Rourke Katten & Moody | Michael C. Moody | 161 N. Clark Street | Suite 2230 | Chicago | IL | 60601 | 312-849-2020 | Counsel to Ameritech Credit Corporation d/b/a SBC Capital Services |
| Paul, Weiss, Rifkind, Wharton & Garrison | Curtis J. Weidler | 1285 Avenue of the Americas | | New York | NY | 10019-6064 | 212-373-3157 | Counsel to Ambrake Corporation; Akebono Corporation |
| Professional Technologies Services | John V. Gorman | P.O. Box #304 | | Frankenmuth | MI | 48734 | 989-385-3230 | Corporate Secretary for Professional Technologies Services |
| Republic Engineered Products, Inc. | Joseph Lapinsky | 3770 Embassy Parkway | | Akron | OH | 44333 | 330-670-3004 | Counsel to Republic Engineered Products, Inc. |
| Ropers, Majeski, Kohn & Bentley | Christopher Norgaard | 515 South Flower Street | Suite 1100 | Los Angeles | CA | 90071 | 213-312-2000 | Counsel to Brembo S.p.A; Bibielle S.p.A.; AP Racing |
| Sachnoff & Weaver, Ltd | Charles S. Schulman | 10 South Wacker Drive | 40th Floor | Chicago | IL | 60606 | 312-207-1000 | Counsel to Infineon Technologies North America Corporation |
| Schiff Hardin LLP | William I. Kohn | 6600 Sears Tower | | Chicago | IL | 60066 | 312-258-5500 | Counsel to Means Industries |
| Stroock & Stroock & Lavan, LLP | Joseph G. Minias | 180 Maiden Lane | | New York | NY | 10038 | 212-806-5400 | Counsel to 975 Opdyke LP; 1401 Troy Associates Limited Partnership; 1401 Troy Associates Limited Partnership c/o Etkin Equities, Inc.; 1401 Troy Associates LP; Brighton Limited Partnership; DPS Information Services, Inc.; Etkin Management Services, Inc. a |
| Traub, Bonaquist & Fox LLP | Maura I. Russell Wendy G. Marcari | 655 Third Avenue | 21st Floor | New York | NY | 10017 | 212-476-4770 | Counsel to SPCP Group LLC |
| United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO | David Jury, Esq. | Five Gateway Center | Suite 807 | Pittsburgh | PA | 15222 | 412-562-2549 | Counsel to United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union (USW), AFL-CIO |
| WL Ross & Co., LLC | Stephen Toy | 600 Lexington Avenue | 19th Floor | New York | NY | 10022 | 212-826-1100 | Counsel to WL. Ross & Co., LLC |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 2 of 2

2/21/2007 10:32 AM
Delphi 2002 lists US Mail

# EXHIBIT D

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                               :
        In re                                  :        Chapter 11
                                               :
DELPHI CORPORATION, et al.,                    :        Case No. 05-44481 (RDD)
                                               :
                           Debtors.            :        (Jointly Administered)
                                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

NOTICE OF CLAIMS OBJECTION HEARING WITH RESPECT TO DEBTORS'
OBJECTION TO PROOF OF CLAIM NO. 10179
(CHERRY GmbH)

PLEASE TAKE NOTICE that on October 31, 2006, Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), objected to proof of claim number 10179 (the "Proof of Claim") filed by Cherry GmbH (the "Claimant") pursuant to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated By Debtors' Books And Records, And (c) Claims Subject To Modification And (ii) Motion To Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Objection").

PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims, entered December 7, 2006 (Docket No. 6089) (the "Order"), a claims objection hearing (the "Claims Objection Hearing") for purposes of holding an evidentiary hearing on the merits of the Proof of Claim is hereby scheduled for April 27, 2007, at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the Southern District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that the Claims Objection Hearing will proceed in accordance with the procedures provided in the Order, unless such procedures are modified in accordance with Paragraph 9(k) thereof.  Please review the Order carefully – failure to comply with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k)) could result in the disallowance and expungement of the Proofs of Claim.  A copy of the Order is attached hereto for your convenience.

2

PLEASE TAKE FURTHER NOTICE that at the Claims Procedure Hearing, the Debtors will seek adjudication of the Proof of Claim to the extent that the Proof of Claim asserts a general unsecured non-priority claim.  This Notice Of Claims Objection Hearing With Respect To Debtors' Objection To Proof Of Claim No. 10179 (Cherry GmbH) (the "Notice") is submitted by the Debtors pursuant to paragraph 9(a)(i)(B) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims (Docket No. 6089) (the "Claims Objection Procedures Order"). Consistent with the provisions of the Claims Objection Procedures Order, the Debtors' submission of this Notice is without prejudice to (a) the Debtors' right to later identify and assert additional legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim to the extent that the Claim asserts a reclamation claim and (b) the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Claim to the extent that the Claim asserts a reclamation claim.


**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

PLEASE TAKE FURTHER NOTICE that the Debtors may further

adjourn the Hearing at any time at least five business days prior to the scheduled hearing upon

notice to the Court and the Claimant.


Dated:  New York, New York
        February 21, 2007

                                        SKADDEN, ARPS, SLATE, MEAGHER &
                                          FLOM LLP

                                        By:   /s/ John Wm. Butler, Jr._____
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois  60606
                                        (312) 407-0700

                                        By:   /s/ Kayalyn A. Marafioti_____
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                            Debtors and Debtors-in-Possession

4

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                  :

In re                           :     Chapter 11
                                  :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                  :
                Debtors.    :     (Jointly Administered)
                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ORDER PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 2002(m),
3007, 7016, 7026, 9006, 9007, AND 9014 ESTABLISHING (I) DATES FOR
HEARINGS REGARDING OBJECTIONS TO CLAIMS AND (II) CERTAIN
<u>NOTICES AND PROCEDURES GOVERNING OBJECTIONS TO CLAIMS</u>

("CLAIM OBJECTION PROCEDURES ORDER")

Upon the Motion For Order Pursuant To 11 U.S.C. §§ 502(b) And 502(c) And

Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For

Hearings Regarding Disallowance Or Estimation Of Claims And (ii) Certain Notices And

Procedures Governing Hearings Regarding Disallowance Or Estimation Of Claims, dated

October 31, 2006 (the "Motion"), of Delphi Corporation and certain of its subsidiaries and

affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the

"Debtors"); and upon the objections to the Motion and the record of the hearing held on the

Motion; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A.    Proper, timely, adequate, and sufficient notice of the Motion has been provided, such notice was good, sufficient and appropriate under the particular circumstances, and no other or further notice of the Motion is or shall be required.

B.    The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  The Motion is a core proceeding under 28 U.S.C. § 157 (b)(2).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.    The relief requested in the Motion and granted herein is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1.    This Court shall conduct special periodic hearings on contested claims matters in these cases (the "Claims Hearing Dates"), to be held in Courtroom 610, United States Bankruptcy Court, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004 unless the Debtors and the parties whose claims are affected are otherwise notified by the Court. The following dates and times have been scheduled as Claims Hearing Dates in these chapter 11 cases:

December 13, 2006 at 10:00 a.m. (prevailing Eastern time)

January 12, 2007 at 10:00 a.m. (prevailing Eastern time)

February 14, 2007 at 10:00 a.m. (prevailing Eastern time)

March 1, 2007 at 10:00 a.m. (prevailing Eastern time)

---

[1]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.  Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion.

2

March 21, 2007 at 10:00 a.m. (prevailing Eastern time)

April 5, 2007 at 10:00 a.m. (prevailing Eastern time)

April 27, 2007 at 10:00 a.m. (prevailing Eastern time)

May 10, 2007 at 10:00 a.m. (prevailing Eastern time)

May 24, 2007 at 10:00 a.m. (prevailing Eastern time)

June 1, 2007 at 10:00 a.m. (prevailing Eastern time)

June 14, 2007 at 10:00 a.m. (prevailing Eastern time)

June 22, 2007 at 10:00 a.m. (prevailing Eastern time)

July 12, 2007 at 10:00 a.m. (prevailing Eastern time)

July 20, 2007 at 10:00 a.m. (prevailing Eastern time)

August 2, 2007 at 10:00 a.m. (prevailing Eastern time)

August 17, 2007 at 10:00 a.m. (prevailing Eastern time)

August 30, 2007 at 10:00 a.m. (prevailing Eastern time)

September 28, 2007 at 10:00 a.m. (prevailing Eastern time)

October 11, 2007 at 10:00 a.m. (prevailing Eastern time)

October 26, 2007 at 10:00 a.m. (prevailing Eastern time)

November 8, 2007 at 10:00 a.m. (prevailing Eastern time)

November 30, 2007 at 10:00 a.m. (prevailing Eastern time)

December 6, 2007 at 10:00 a.m. (prevailing Eastern time)

2.      Any response to a claims objection or an omnibus claims objection (a

"Response") must (a) be in writing, (b) conform to the Federal Rules of Bankruptcy Procedure,

the Local Bankruptcy Rules for the Southern District of New York, and the Amended Eighth

Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006,

3

9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management,
And Administrative Procedures, entered on October 26, 2006 (the "Amended Eighth
Supplemental Case Management Order") (Docket No. 5418), (c) be filed with the Bankruptcy
Court in accordance with General Order M-242 (as amended) – registered users of the
Bankruptcy Court's case filing system must file electronically, and all other parties-in-interest
must file on a 3.5 inch disk (preferably in Portable Document Format (PDF), WordPerfect, or
any other Windows-based word processing format), (d) be submitted in hard copy form directly
to the chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United
States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 610,
New York, New York 10004, and (e) be served upon (i) Delphi Corporation, 5725 Delphi Drive,
Troy, Michigan 48098 (Att'n: General Counsel) and (ii) counsel to the Debtors, Skadden, Arps,
Slate, Meagher & Flom LLP, 333 West Wacker Drive, Suite 2100, Chicago, Illinois 60606 (Att'n:
John Wm. Butler, Jr., John K. Lyons, and Randall G. Reese), in each case so as to be received no
later than 4:00 p.m. (prevailing Eastern time) on the seventh calendar day prior to the Omnibus
Hearing for which the relevant claims objection or omnibus claims objection is scheduled.

        3.      Every Response must contain at a minimum the following:

        (a)      the title of the claims objection to which the Response is directed;

        (b)      the name of the claimant (each holder of a proof of claim, a
"Claimant") and a brief description of the basis for the amount of the claim;

        (c)      a concise statement setting forth the reasons why the claim should
not be disallowed, expunged, reduced, or reclassified, including, but not limited to, the specific
factual and legal bases upon which the Claimant will rely in opposing the claims objection;

        (d)      unless already set forth in the proof of claim previously filed with
the Court, documentation sufficient to establish a prima facie right to payment; provided,
however, that the Claimant need not disclose confidential, proprietary, or otherwise protected
information in the Response; provided further, however, that the Claimant shall disclose to the
Debtors all information and provide copies of all documents that the Claimant believes to be

4

confidential, proprietary, or otherwise protected and upon which the Claimant intends to rely in support of its Claim, subject to appropriate confidentiality constraints;

(e)     to the extent that the claim is contingent or fully or partially unliquidated, the amount that the Claimant believes would be the allowable amount of such claim upon liquidation of the claim or occurrence of the contingency, as appropriate; and

(f)     the address(es) to which the Debtors must return any reply to the Response, if different from the address(es) presented in the claim.

4.      Only those Responses made in writing and timely filed and received will be considered by the Court.  If a Claimant whose proof of claim is subject to a claims objection and who is served with the relevant claims objection fails to file and serve a timely Response in compliance with the foregoing procedures, the Debtors may present to the Court an appropriate order seeking relief with respect to such claim consistent with the relief sought in the relevant claims objection without further notice to the claimant, provided that, upon entry of such an order, the claimant shall receive notice of the entry of such order as provided below; provided, however, that if the claimant files a timely Response, which does not include the required minimum information provided in paragraph 3 above, the Debtors shall seek disallowance and expungement of the relevant claim or claims only in accordance with the Claims Hearing Procedures provided in paragraph 9 below.

5.      To the extent that a Response is filed with respect to any claim listed in a claims objection (each, a "Contested Claim"), each such Claim and the objection to such Claim asserted in the claims objection shall be deemed to constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.

6.      The Debtors are hereby authorized and directed to serve each Claimant whose proof of claim is listed in any omnibus claims objection with (a) a personalized Notice Of Objection To Claim which specifically identifies the Claimant's proof of claim that is subject to objection and the basis for such objection and (b) a complete copy of the relevant omnibus

5

claims objection without exhibits.  Service of omnibus claims objections in such manner shall

constitute good and sufficient notice and no other or further notice to claimants of an omnibus

claims objection shall be required.

    7.  Kurtzman Carson Consultants, LLC (the "Claims Agent") is hereby

authorized and directed to serve all orders entered with respect to any omnibus claims objections,

including exhibits, upon only the master service list and the 2002 list.  The Claims Agent is

hereby further authorized and directed to serve all claimants whose proofs of claim are the

subject of an order entered with respect to an omnibus claims objection with a copy of such order,

without exhibits, and a personalized Notice Of Entry Of Order in the form attached hereto as

Exhibit A specifically identifying such Claimant's proof of claim that is subject to the order, the

Court's treatment of such proof of claim, and the basis for such treatment, and advising the

Claimant of its ability to view the order with exhibits free of charge on the Debtors' Legal

Information Website.  Without limiting the foregoing, the Court hereby directs the Claims Agent

to serve the First Omnibus Claims Order in the manner provided hereby.

    8.  Any order entered by the Court with respect to an objection asserted in an

omnibus claims objection shall be deemed a separate order with respect to each claim covered by

such order.

    9.  The following procedures shall apply with respect to the determination of

Contested Claims (the "Claims Hearing Procedures"):

    (a)  Adjournment Of Claims Hearing.

    (i)  All Contested Claims for which a timely Response is filed shall be
automatically adjourned to a future hearing, the date of which shall be determined by the Debtors,
in their sole discretion, by serving the Claimant with notice as provided herein.  The Debtors
may send such notice to each Claimant when they deem it appropriate to do so, subject to the
requirements of the Bankruptcy Code, the Bankruptcy Rules, and any further order of this Court.

The Debtors shall schedule the further hearing upon each Contested Claim to a Claims Hearing of the Debtors' election:

(A)      for a non-evidentiary hearing to address the legal sufficiency of the particular proof of claim and whether the proof of claim states a claim against the asserted Debtor under Bankruptcy Rule 7012 (a "Sufficiency Hearing"), by serving upon the relevant Claimant by facsimile or overnight delivery, and filing with this Court, a notice substantially in the form attached hereto as <u>Exhibit B</u> (a "Notice Of Sufficiency Hearing") and a copy of this Order at least 20 business days prior to the date of such Sufficiency Hearing, or

(B)      for an evidentiary hearing on the merits of such Contested Claim (a "Claims Objection Hearing"), by serving upon the relevant Claimant by facsimile or overnight delivery, and filing with this Court, a notice substantially in the form attached hereto as <u>Exhibit C</u> (a "Notice Of Claims Objection Hearing" and, collectively with the Notice Of Sufficiency Hearing, the "Notices of Hearing") and a copy of this Order at least 65 calendar days prior to the date of such Claims Objection Hearing.

(ii)      The Debtors, in their sole discretion, are authorized to further adjourn a hearing scheduled in accordance herewith at any time by providing notice to the Court and the Claimant at least five business days prior to the date of the scheduled hearing; <u>provided</u>, <u>however</u>, that the hearing on any Contested Claim shall not be adjourned for more than a total of 180 calendar days from date of service of the initial Notice of Hearing set forth in paragraph 9(a)(i)(A) and (B) above without consent of the Claimant with respect thereto, unless otherwise ordered by the Court.

(b)      <u>Sufficiency Hearing Procedures</u>.

(i)      To the extent that a Contested Claim is adjourned to a Sufficiency Hearing, if the Debtors wish to file a supplemental pleading, they shall file and serve their pleading no later than ten calendar days before the scheduled Sufficiency Hearing.  The supplemental pleading shall not exceed fifteen single-sided, double-spaced pages.

(ii)      To the extent that a Contested Claim is adjourned to a Sufficiency Hearing, if the Claimant wishes to file a supplemental response, the Claimant shall file and serve its response no later than two business days before the scheduled Sufficiency Hearing.  The supplemental response shall not exceed fifteen single-sided, double-spaced pages.

(iii)      To the extent that this Court determines upon conclusion of the Sufficiency Hearing that a Contested Claim cannot be disallowed in whole or in part without further proceedings, the Debtors shall provide to the Claimant a Notice Of Claims Objection Hearing pursuant to the procedures set forth above.

(c)      <u>Mandatory Meet And Confer</u>.

(i)      If (A) (1) the amount in dispute for a Contested Claim exceeds $1,000,000 or (2) a Contested Claim asserts unliquidated claims (unless the Claimant irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000), (B) the Claimant (if an individual) or the Claimant's principal place of

business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located within 90 miles of Troy, Michigan, and (C) such Contested Claim is scheduled by the Debtors for a Claims Objection Hearing, the Debtors and the relevant Claimant  shall hold an in-person meet and confer (an "In-Person Meet and Confer") at a neutral location in Troy, Michigan, or such other location as is reasonably acceptable to the Debtors, within ten business days of service of the Notice Of Claims Objection Hearing.

(ii)    If (A) (1) the amount in dispute for a Contested Claim is less than or equal to $1,000,000, (2) a Contested Claim asserts unliquidated claims and the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000, or (3) the Claimant (if an individual) or the Claimant's principal place of business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located more than 90 miles from Troy, Michigan, and (B) such Contested Claim is scheduled by the Debtors for a Claims Objection Hearing, the Debtors and the relevant Claimant shall hold a telephonic meet and confer (a "Telephonic Meet and Confer" and, collectively with In-Person Meet and Confers, the "Meet and Confers") within ten business days of service of the Notice Of Claims Objection Hearing.

(iii)    The following representatives of each of the Debtors and the Claimant shall attend the Meet and Confer: (A) counsel for each of the parties, except for a Claimant proceeding pro se, who shall be prepared to discuss the matter described in paragraph 9 (k) below, and (B) a person possessing ultimate authority to reconcile, settle, or otherwise resolve the Contested Claim on behalf of the Debtors and the Claimant, respectively; provided, however, that counsel for each of the parties may participate in the Meet and Confer telephonically.

(iv)    The Court will consider appropriate sanctions, including allowance or disallowance of the Contested Claim, if either party does not follow the foregoing procedures or conduct the Meet and Confer in good faith.

(d)    Debtors' Statement Of Disputed Issues.  Within five business days after service of the Notice Of Claims Objection Hearing, the Debtors shall file and serve a written statement of disputed issues (the "Statement Of Disputed Issues") upon the Claimant.  The Statement Of Disputed Issues shall contain a concise statement summarily setting forth the primary reasons why the claim should be disallowed, expunged, reduced, or reclassified as set forth in the claims objection, including, but not limited to, the material factual and legal bases upon which the Debtors will rely in prosecuting the claims objection, without prejudice to the Debtors' right to later identify and assert additional legal and factual bases for disallowance, expungement, reduction, or reclassification of the Contested Claim.  The Statement of Disputed Issues shall also include documentation supporting the disallowance, expungement, reduction, or reclassification of the Contested Claim, without prejudice to the Debtors' right to later identify additional documentation supporting the disallowance, expungement, reduction, or reclassification of the Contested Claim; provided, however, that the Debtors need not disclose confidential, proprietary, or otherwise protected information in the Statement of Disputed Issues; provided further, however, that the Debtors shall disclose to the Claimant all information and

8

provide copies of all documents that the Debtors believe to be confidential, proprietary, or otherwise protected, subject to appropriate confidentiality constraints.

        (e)    <u>Claimant's Supplemental Response</u>. The following procedures apply to the Claimant's written supplemental response (the "Supplemental Response"), subject to modification pursuant to paragraph 9(k), filed in connection with a Claims Objection Hearing for a Contested Claim:

        (i)    The Claimant may file and serve its Supplemental Response (with a copy to chambers) no later than 30 business days prior to commencement of the Claims Objection Hearing. The Supplemental Response shall not exceed 20 single-sided, double-spaced pages (exclusive of exhibits or affidavits).

        (ii)    If the Claimant relies on exhibits, the Claimant shall include such exhibits in its Supplemental Response (other than those previously included with either its Proof of Claim or its Response); <u>provided</u>, <u>however</u>, that the Claimant need not disclose confidential, proprietary, or otherwise protected information in the Supplemental Response; <u>provided</u> <u>further</u>, <u>however</u>, that the Claimant shall disclose to the Debtors all information and provide copies of all documents that the Claimant believes to be confidential, proprietary, or otherwise protected and upon which the Claimant intends to rely in support of its Contested Claim, subject to appropriate confidentiality constraints. The Claimant shall include a certificate of counsel or a declaration or affidavit authenticating any documents attached to the Supplemental Response, as appropriate.

        (iii)    The Supplemental Response may include affidavits or declarations from no more than two witnesses setting forth the basis of the Contested Claim and evidence supporting the Contested Claim; <u>provided</u>, <u>however</u>, that if the Claimant intends to call a person not under such Claimant's control at the hearing, the Claimant shall, in lieu of an affidavit or declaration of such person, identify such person, the Claimant's basis for calling such person as a witness, and the reason that it did not file an affidavit or declaration of such person. If an affiant or declarant does not attend the Claims Objection Hearing, such affiant or declarant's affidavit or declaration shall be stricken. The Claimant shall not be permitted to elicit any direct testimony at the Claims Objection Hearing; instead, the affidavit or declaration submitted with the Supplemental Response, or such witnesses' deposition transcript if the witnesses were not under the Claimant's control, shall serve as the witnesses' direct testimony and the Debtors may cross examine the witnesses at the Claims Objection Hearing, or counter-designate deposition testimony. No other or additional witnesses may introduce evidence at the hearing on behalf of the Claimant.

        (iv)    No later than three business days prior to commencement of the Claims Objection Hearing, if the Claimant timely filed a Supplemental Response, the Claimant may file and serve (with a copy to chambers) an amended Supplemental Response and a supplemental affidavit or declaration on behalf of each of its witnesses solely for the purpose of supplementing the Supplemental Response and the witnesses' prior affidavits or declarations with respect to matters adduced through the discovery provided by these Claims Hearing Procedures; <u>provided</u> that the amended Supplemental Response shall be subject to the page limitations set forth above.

9

(f)    <u>Debtors' Supplemental Reply</u>.  The following procedures shall apply to the Debtors' written supplemental reply, if any (the "Supplemental Reply"), subject to modification pursuant to paragraph 9(k) below, filed in connection with a Claims Objection Hearing with respect to a Contested Claim:

(i)    The Debtors may file and serve (with a copy to chambers) a Supplemental Reply no later than 20 business days prior to commencement of the Claims Objection Hearing.  The Supplemental Reply shall not exceed 20 single-sided, double-spaced pages (exclusive of exhibits or affidavits).

(ii)    If the Debtors rely on exhibits, the Debtors shall include such exhibits in their Supplemental Reply (other than those previously included with either their objection or reply); <u>provided</u>, <u>however</u>, that the Debtors need not disclose confidential, proprietary, or otherwise protected information in the Supplemental Reply; <u>provided further</u>, <u>however</u>, that the Debtors shall disclose to the Claimant all information and provide copies of all documents that the Debtors believe to be confidential, proprietary, or otherwise protected and upon which the Debtors intend to rely in support of their objection, subject to appropriate confidentiality constraints.  The Debtors shall include a certificate of counsel or a declaration or affidavit authenticating any documents attached to the Supplemental Reply.

(iii)    The Supplemental Reply may include affidavits or declarations from no more than two witnesses setting forth the Debtors' basis for objecting to the Contested Claim and evidence in support of such objection to the Contested Claim; <u>provided</u>, <u>however</u>, that if the Debtors intend to call a person not under the Debtors' control at the hearing, the Debtors shall, in lieu of an affidavit or declaration of such person, identify such person, the Debtors' basis for calling such person as a witness, and the reason that it did not file an affidavit or declaration of such person.  If an affiant or declarant does not attend the Claims Objection Hearing, as appropriate, such affiant or declarant's affidavit or declaration shall be stricken.  The Debtors shall not be permitted to elicit any direct testimony at the Claims Objection Hearing, instead, the affidavit or declaration submitted with the Supplemental Reply, or such witnesses' deposition transcript if the witnesses were not under the Debtors' control, shall serve as the witnesses' direct testimony and the Claimant may cross examine the witnesses at the Claims Objection Hearing or counter-designate deposition testimony.  No other or additional witnesses may introduce evidence at the hearing on behalf of the Debtors.

(iv)    No later than three business days prior to commencement of the Claims Objection Hearing, if the Debtors timely filed a Supplemental Reply, the Debtors may file and serve (with a copy to chambers) an amended Supplemental Reply and a supplemental affidavit or declaration on behalf of each of their witnesses solely for the purpose of supplementing the Supplemental Reply and the witnesses' prior affidavits or declarations with respect to matters adduced through the discovery provided by these Claims Hearing Procedures; <u>provided</u> that the amended Supplemental Reply shall be subject to the page limitations set forth above.

(g)    <u>Mandatory Non-Binding Summary Mediation</u>.  Except as set forth below, at least 15 business days prior to commencement of the Claims Objection Hearing, the Debtors and the Claimant shall submit to mandatory non-binding summary mediation (each, a

"Mediation") in an effort to consensually resolve the Contested Claim.  The Mediation shall be governed by General Order M-143 except as follows.  The following procedures shall apply to each Mediation, subject to modification pursuant to paragraph 9(k) below:

(i)    Each Mediation shall be assigned to one of the mediators listed by the Debtors on Exhibit D hereto (each, a "Mediator").  The Debtors and the Claimant shall agree upon the Mediator at the Meet and Confer; provided that, if the Debtors and the Claimant are unable to agree upon a Mediator, the parties shall promptly report such inability to agree to the Court.

(ii)    The Mediator shall not have the authority to require either the Debtors or the Claimant to provide any additional briefing with respect to the Mediation.

(iii)    If (A) (1) the amount in dispute for a Contested Claim exceeds $1,000,000 or (2) a Contested Claim asserts unliquidated claims (unless the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000) and (B) the Claimant (if an individual) or the Claimant's principal place of business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located within 90 miles of Troy, Michigan, the Mediation shall be held at a neutral location in Troy, Michigan.

(iv)    If (A) (1) the amount in dispute for a Contested Claim exceeds $1,000,000 or (2) a Contested Claim asserts unliquidated claims (unless the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000), and (B) the Claimant (if an individual) or the Claimant's principal place of business (if a governmental unit or a person, as defined in section 101(41) of the Bankruptcy Code, other than an individual) is located more than 90 miles from Troy, Michigan, the Mediation shall be held at a neutral location reasonably acceptable to the Debtors and the Claimant; provided that, if the Debtors and the Claimant are unable to agree upon a neutral location at the Meet and Confer, the parties shall promptly report such inability to agree to the Court.

(v)    If (A) the amount in dispute for a Contested Claim is less than or equal to $1,000,000 or (B) the Contested Claim asserts unliquidated claims and the Claimant with respect thereto irrevocably agrees in writing that the allowed amount of such Contested Claim shall be limited to a maximum of $1,000,000, participation in Mediation shall be voluntary and any Mediation may be held telephonically at either the Debtors' or the Claimant's request.

(vi)    A person possessing ultimate authority to reconcile, settle, or otherwise resolve the Contested Claim on behalf of each of the Debtors and the Claimant shall attend an in-person Mediation or participate in a telephonic Mediation, if any; provided, however, that the Debtors' counsel will not be precluded from attending and participating in a Mediation in the event that the claimant elects not to have its counsel attend or participate in a Mediation.

(vii)    Absent consent of each of the Claimant and the Debtors, the length of the Mediation shall be limited to one day.

11

(viii)    The Court will consider appropriate sanctions, including allowance or disallowance of the Contested Claim, if either party does not follow the foregoing procedures or conduct the Mediation in good faith.

(ix)    The Debtors and the Claimant shall each bear its own costs in participating in the Mediation.  The Debtors are hereby authorized to pay the Mediator's fees.

(h)    <u>Claims Objection Hearing Discovery</u>.  If a Claims Objection Hearing is scheduled for a particular Contested Claim, the Debtors and the Claimant shall be bound by the following discovery procedures, which shall otherwise be governed by the Bankruptcy Rules, subject to modification pursuant to paragraph 9(k) below:

(i)    No later than five business days after service of the Supplemental Response, the Debtors may request:

(A)    That the Claimant produce documents relevant to the Contested Claim.  Documents shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(B)    That the Claimant respond to no more than 15 interrogatories, including discrete subparts.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(C)    That the Claimant respond to no more than ten requests for admission.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(ii)    No later than five business days after service of the Supplemental Reply, the Claimant may request:

(A)    That the Debtors produce documents relevant to the Contested Claim.  Documents shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(B)    That the Debtors respond to no more than 15 interrogatories, including discrete subparts.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(C)    That the Debtors respond to no more than ten requests for admission.  Responses shall be produced at least ten business days prior to commencement of the Claims Objection Hearing.

(iii)    No earlier than fifteen business days prior to the commencement of the Claims Objection Hearing, but at least five business days prior to commencement of the Claims Objection Hearing, the Debtors may, at their election, take the deposition upon oral examination of each witness whose affidavit or declaration was proffered in support of the Claimant's Supplemental Response.  Each deposition shall not exceed three hours.

12

(iv)    No earlier than fifteen business days prior to the commencement of the Claims Objection Hearing, but at least five business days prior to commencement of the Claims Objection Hearing, the Claimant may, at its election, take the deposition upon oral examination of each witness whose affidavit or declaration was proffered in support of the Debtors' Supplemental Reply.  Each deposition shall not exceed three hours.

(v)    Except as provided in paragraph 9(g)(vi) above, nothing in this Order alters any obligation of opposing counsel with regard to communications with non-counsel opponents or any applicable law regarding corporations or other business entities to be represented by counsel.

(i)    Conduct Of The Claims Objection Hearing.  The Debtors and the Claimant shall each be permitted, subject to modification pursuant to paragraph 9(k) below, no more than one hour to present their respective cases, inclusive of time cross-examining their opponent's witnesses and making argument to the Court.  The parties shall coordinate with each other in advance of the hearing with respect to, joint exhibit binders, stipulated admission of evidence, anticipated disputes regarding the admission of particular evidence and any designated deposition testimony.

(j)    Estimation Based Upon Claimant's Asserted Estimated Amount.  To the extent that a Contested Claim would be subject to estimation pursuant to section 502(c) of the Bankruptcy Code and the Debtors have sought authority to estimate such Contested Claim pursuant to an omnibus claims objection and/or a motion to estimate claims, if the Claimant has filed a Response in accordance with the procedures outlined above which (i) acknowledges that the Contested Claim is contingent or fully or partially unliquidated and (ii) provides the amount that the Claimant believes would be the allowable amount of such Contested Claim upon liquidation of the Contested Claim or occurrence of the contingency, as appropriate (the "Claimant's Asserted Estimated Amount"), the Debtors are hereby authorized, in their sole discretion, to elect to provisionally accept the Claimant's Asserted Estimated Amount as the estimated amount of such Contested Claim pursuant to section 502(c) of the Bankruptcy Code for all purposes other than allowance, but including voting and establishing reserves for purposes of distribution, subject to further objection and reduction as appropriate and section 502(j) of the Bankruptcy Code.  The Debtors' election shall be made by serving the Claimant with a Notice Of Election To Accept Claimant's Asserted Estimated Amount in the form attached hereto as Exhibit E.  The Contested Claim will otherwise remain subject in all respects to the procedures outlined herein.

(k)    Ability To Modify Procedures By Agreement Or Order Of Court.  At the Meet and Confer, the parties shall discuss discovery parameters, briefing, evidence to be presented, the timing outlined herein, and any modifications thereto that are necessary due to the facts and circumstances of the relevant Contested Claim.  Should the parties be unable to agree on reasonable modifications to these Claim Hearing Procedures, if any, either party may request that the Court promptly schedule a teleconference to consider such proposed modifications.  No discovery, testimony, or motion practice other than that described herein, as modified, shall be permitted, unless otherwise agreed by the parties or ordered by the Court.

13

10.    The procedures approved herein shall not apply to claims filed by Banc of

America Securities LLC (as to proof of claim number 10758), Barclays Capital Inc. (as to proof

of claim number 11658), Bear, Stearns & Co. Inc. (as to proof of claim number 10732), Cadence

Innovation LLC, Citigroup Global Markets, Inc. (as to proof of claim number 10731), Credit

Suisse Securities (USA) LLC (as to proof of claim number 10763), Merrill Lynch, Peirce,

Fenner & Smith Inc. (as to proof of claim number 10761), Morgan Stanley & Co. Inc. (as to

proof of claim number 10762), the Pension Benefit Guaranty Corporation, Robert Bosch GmbH,

the State of California Environmental Protection Agency, the State of Michigan Environmental

Protection Agency, the State of Ohio Environmental Protection Agency, Technology Properties,

Ltd., UBS Securities LLC (as to proof of claim number 10759), the United States Environmental

Protection Agency, and Wachovia Capital Markets, LLC (as to proof of claim number 10760)

(collectively, the "Excluded Parties") for any purpose, including, but not limited to, any

objections to such claims or other litigation in respect of such claims; provided, however, that

nothing contained herein shall preclude any of the Excluded Parties or the Debtors, after notice

and an opportunity to be heard, from seeking to establish appropriate alternative claims

resolution procedures.

11.    With respect to the claim of Gary Whitney ("Mr. Whitney") (claim

number 10157) and NuTech Plastics Engineering, Inc. ("NuTech") (claim number 1279 against

Delphi Automotive Systems LLC), nothing in this Order shall limit Mr. Whitney's or NuTech's

ability to request relief from the automatic stay provisions under section 362 of the Bankruptcy

Code subject to the Debtors' right to object to such request.

12.    The Debtors shall not serve a Notice of Hearing on Orix Warren, LLC

("Orix Warren") with respect to proof of claim number 10202 until the earliest of the following

14

to occur: (a) the Debtors assume the lease between Delphi Automotive Systems LLC and Orix

Warren with respect to property located at 4551 Research Parkway in Warren, Ohio (the "Orix

Lease"), (b) the Debtors reject the Orix Lease, or (c) the Orix Lease terminates or is terminated

pursuant to its terms.

13.     Nothing in this Order shall preclude any right to seek estimation of a claim

under section 502(c) of the Bankruptcy Code, any right to seek relief from the automatic stay

under section 362 of the Bankruptcy Code to liquidate a claim in a different forum, any right to

seek protection of information under section 107(b) of the Bankruptcy Code or any right not

specifically addressed in this Order.

14.     This Court shall retain jurisdiction to hear and determine all matters

arising from the implementation of this order.

15.     The requirement under Rule 9013-1(b) of the Local Bankruptcy Rules for

the United States Bankruptcy Court for the Southern District of New York for the service and

filing of a separate memorandum of law is deemed satisfied by the Motion.

Dated:  New York, New York
        December 6, 2006


        _____/s/Robert D. Drain_____
        UNITED STATES BANKRUPTCY JUDGE

15

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                          Debtors.          :    (Jointly Administered)
                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF ENTRY OF ORDER WITH RESPECT
TO [_____] OMNIBUS CLAIMS OBJECTION

        PLEASE TAKE NOTICE that on _____ _, 200_, the United States Bankruptcy

Court for the Southern District of New York entered a [title of order] (the "Order").

PLEASE TAKE FURTHER NOTICE THAT a copy of the Order, excluding exhibits, is attached hereto.

PLEASE TAKE FURTHER NOTICE that the proof of claim listed below, which you filed against Delphi Corporation and/or other of its subsidiaries and affiliates that are debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), was the subject of the Order and was listed on Exhibit __ to the Order and was accordingly disallowed and expunged, unless otherwise provided below in the column entitled "Treatment Of Claim."

| Date Filed | Claim Number | Asserted Claim Amount[1] | Basis For Objection | Treatment Of Claim | Surviving Claim Number (if any) |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

---

[1] Asserted Claim Amounts listed as $0.00 generally reflect that the claim amount asserted is unliquidated.

2

PLEASE TAKE FURTHER NOTICE that you may view the complete exhibits to the Order by requesting a copy from the claims and noticing agent in the above-captioned chapter 11 cases, Kurtzman Carson Consultants LLC, at 1-888-259-2691 or by accessing the Debtors' Legal Information Website at www.delphidocket.com.

Dated: New York, New York
_____ _, 200_

BY ORDER OF THE COURT

John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois  60606
(312) 407-0700

    - and -

Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
SKADDEN, ARPS, SLATE, MEAGHER
    & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
        In re                             :      Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :      Case No. 05-44481 (RDD)
                                          :
                          Debtors.        :      (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF HEARING WITH RESPECT TO
DEBTORS' OBJECTION TO PROOF OF CLAIM NO. [_____]

        PLEASE TAKE NOTICE that on _____ _, 200_, Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), objected to proof of claim number _____ (the "Proof of Claim")

filed by _____ (the "Claimant") pursuant to the [Title Of Applicable Omnibus Claims

Objection] (the "Objection").

PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December __, 2006 (the "Order"), a

sufficiency hearing (the "Sufficiency Hearing") to address the legal sufficiency of the Proof of

Claim and whether the Proof of Claim states a colorable claim against the asserted Debtor is

hereby scheduled for _____, 200_, at 10:00 a.m. (prevailing Eastern time) in the United

States Bankruptcy Court for the Southern District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that the Sufficiency Hearing will proceed

in accordance with the procedures provided in the Order, unless such procedures are modified in

accordance with Paragraph 9(k) thereof.  Please review the Order carefully – failure to comply

with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k)) could

result in the disallowance and expungement of the Proof of Claim.  A copy of the Order is

attached hereto for your convenience.

PLEASE TAKE FURTHER NOTICE that the Debtors may further adjourn the

Hearing at any time at least five business days prior to the scheduled hearing upon notice to the

Court and the Claimant.


Dated:  New York, New York
            _____ _, 200_

                                        SKADDEN, ARPS, SLATE, MEAGHER &
                                          FLOM LLP

                                        By:_____
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Ron E. Meisler (RM 3026)
                                        333 West Wacker Drive, Suite 2100
                                        Chicago, Illinois  60606
                                        (312) 407-0700

                                        By:_____
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                        Four Times Square
                                        New York, New York 10036
                                        (212) 735-3000

                                        Attorneys for Delphi Corporation, et al.,
                                            Debtors and Debtors-in-Possession

3

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
        In re                                 :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                        Debtors.              :    (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF CLAIMS OBJECTION HEARING WITH
RESPECT TO DEBTORS' OBJECTION TO PROOF OF CLAIM NO. [_____]

            PLEASE TAKE NOTICE that on _____ _, 200_, Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), objected to proof of claim number _____ (the "Proof of Claim")

filed by _____ (the "Claimant") pursuant to the [Title Of Applicable Omnibus Claims

Objection] (the "Objection").

PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December __, 2006 (the "Order"), a

claims objection hearing (the "Claims Objection Hearing") for purposes of holding an

evidentiary hearing on the merits of the Proof of Claim is hereby scheduled for _____, 200_,

at 10:00 a.m. (prevailing Eastern time) in the United States Bankruptcy Court for the Southern

District of New York (the "Court").

PLEASE TAKE FURTHER NOTICE that the Claims Objection Hearing will

proceed in accordance with the procedures provided in the Order, unless such procedures are

modified in accordance with Paragraph 9(k) thereof.  Please review the Order carefully – failure

to comply with the procedures provided in the Order (or as modified pursuant to Paragraph 9(k))

could result in the disallowance and expungement of the Proof of Claim.  A copy of the Order is

attached hereto for your convenience.

2

PLEASE TAKE FURTHER NOTICE that the Debtors may further adjourn the

Hearing at any time at least five business days prior to the scheduled hearing upon notice to the

Court and the Claimant.


Dated:  New York, New York
                _____ _, 200_

                                            SKADDEN, ARPS, SLATE, MEAGHER &
                                              FLOM LLP

                                            By:_____
                                                John Wm. Butler, Jr. (JB 4711)
                                                John K. Lyons (JL 4951)
                                                Ron E. Meisler (RM 3026)
                                            333 West Wacker Drive, Suite 2100
                                            Chicago, Illinois  60606
                                            (312) 407-0700

                                            By:_____
                                                Kayalyn A. Marafioti (KM 9632)
                                                Thomas J. Matz (TM 5986)
                                            Four Times Square
                                            New York, New York 10036
                                            (212) 735-3000

                                            Attorneys for Delphi Corporation, et al.,
                                                Debtors and Debtors-in-Possession

3

<u>EXHIBIT D</u>

<u>LIST OF MEDIATORS</u>

Lawrence Abramcyzk
Marc Abrams
Ronald Barliant
Michael Baum
Morton Collins
Susan Cook
Samuel Damren
Eugene Driker
Jonathan Flaxer
Rozanne Giunta
Erwin Katz
Edward Moran
Alan Nisselson
Thomas Plunkett
Marty Reisig

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                            :
      In re                 :     Chapter 11
                            :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                            :
             Debtors.    :     (Jointly Administered)
                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NOTICE OF DEBTORS' ELECTION TO ACCEPT CLAIMANT'S
ASSERTED ESTIMATED AMOUNT FOR PROOF OF CLAIM NUMBER [_____]

         PLEASE TAKE NOTICE that on _____ _, 200_, Delphi Corporation and certain

of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), objected to proof of claim number _____ (the "Proof of Claim")

filed by _____ (the "Claimant") pursuant to the [Title Of Applicable Omnibus Claims

Objection] (the "Objection").

        PLEASE TAKE FURTHER NOTICE that on _____ _, 200_, the Claimant filed

its response to the objection, wherein Claimant (i) acknowledged that the Proof of Claim asserts

claims that are contingent or fully or partially unliquidated and (ii) stated that the Claimant

believes that the allowable amount of the Proof of Claim upon liquidation of the Contested

Claim or occurrence of the contingency, as appropriate, is $_____ (the "Claimant's Asserted

Estimated Amount").

        PLEASE TAKE FURTHER NOTICE that pursuant to the Order Pursuant To 11

U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014

Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices

And Procedures Governing Objections To Claims, entered December __, 2006 (the "Order"), the

Debtors hereby provide notice that the Debtors elect to accept the Claimant's Asserted Estimated

Amount as the estimated amount of the Proof of Claim pursuant to section 502(c) of the

Bankruptcy Code as set forth in the Objection.  A copy of the Order is attached hereto.

        PLEASE TAKE FURTHER NOTICE that any hearing scheduled pursuant to the

Order is hereby cancelled.

PLEASE TAKE FURTHER NOTICE that the Debtors' election to accept the

Claimant's Asserted Estimated Amount is without prejudice to the Debtors' right to object to any

other claims in these chapter 11 cases, or to further object to the Proof of Claim, on any grounds

whatsoever.

Dated:  New York, New York
        _____ _, 200_

                              SKADDEN, ARPS, SLATE, MEAGHER &
                                FLOM LLP

                              By:_____
                                  John Wm. Butler, Jr. (JB 4711)
                                  John K. Lyons (JL 4951)
                                  Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois  60606
                              (312) 407-0700

                              By:_____
                                  Kayalyn A. Marafioti (KM 9632)
                                  Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                                  Debtors and Debtors-in-Possession

3

# EXHIBIT E

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                            :
                In re                                       :      Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :      Case No. 05-44481 (RDD)
                                                            :
                                                            :      (Jointly Administered)
                        Debtors.                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

("SUPPLEMENTAL REPLY – JOSEPH RENO")

Delphi Corporation and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, "Delphi" or the "Debtors"),

1

hereby submit their Supplemental Reply With Respect To Proof Of Claim No. 9956 (Joseph

Reno) (this "Supplemental Reply"), and respectfully represent as follows:

<u>Introduction</u>

1.    Joseph Reno ("Reno"), a former employee of Delphi's Kettering, Ohio

manufacturing plant (the "Plant"), alleges that his supervisor at Delphi, Mark Gooding

("Gooding"), suspended and terminated him because of their disagreement over whether a

leaking wastewater container should be totally resurfaced or only patched where appropriate (the

"Wastewater Incident").  Contrary to his allegations, however, Reno was suspended with pay and

subsequently terminated by Elizabeth Patrick ("Patrick"), Delphi's Divisional Salaried Personnel

Director based in Troy, Michigan, after an internal investigation (the "Investigation") revealed,

among other things, that Reno's inappropriately accepted services from a Delphi vendor. to place

a dumpster at his home and then remove it when Reno had filled it up with garbage.

2.    The Investigation – which began well before the wastewater container

started to leak – revealed (i) that Reno misused his relationship with Onyx Industrial Services,

Inc. ("Onyx"), a Delphi vendor to get an employee to haul a dumpster to and from his house, (ii)

that the dumpster, filled with Reno's discarded fencing and aquarium salt bags, was delivered to

Delphi property, and (ii) that Reno attempted to conceal his actions during Investigation.  Based

on these facts, Patrick, not Gooding, decided to suspend and later terminate Reno.

3.    Reno's claim that Delphi terminated him because he and Gooding

disagreed over how to remedy the wastewater leak is unsupported by any admissible evidence.

As an initial matter, Reno did not file a Supplemental Response with affidavits or declarations.[1]

The only evidence Reno did submit was the transcripts of the depositions of the Onyx employee

---

[1]    Because Reno has failed to file his own declaration, he is barred, under the Claims Objection Procedures Order,
from offering any testimony in support of his claim.  Claims Objection Procedures Order ¶ 9(e)(i) & (iii).

2

whom Reno convinced to haul away his garbage and a Delphi investigator.  Neither deponent's

testimony provides any convincing evidence contradicting Delphi's declaration testimony

attached hereto.  Moreover, Patrick was not involved in the Wastewater Incident and was not

influenced by any differences of opinion between Reno and Gooding as to how to best fix the

leaking tank.  As Patrick's declaration reflects, she decided, after being apprised of the results of

the Investigation, to suspend and later fire Reno due to his unacceptable misconduct and

subsequent attempts to obstruct the Investigation.  Accordingly, Reno's retaliatory discharge

claim against the Debtors has no merit and must fail.

> 4.    In fact, Reno's retaliatory discharge claim did fail when he presented these

same allegations in a proceeding before the Department of Labor.  In March 2004, Reno filed a

complaint before the Occupational Safety and Health Administration ("OSHA") alleging that he

was terminated for disagreeing with his supervisor over how to fix the wastewater leak.  OSHA

conducted an investigation and found "that [Delphi] terminated [Reno] for misappropriating

company assets, taking personal advantage of his business relationship with a Delphi supplier,

which is a conflict of interest and trying to obstruct and mislead Delphi's subsequent

investigation."   Despite the clear warning that he had 30 days to object and request a hearing

before the OSHA findings would "become final and not subject to court review," Reno did not

object.  Consequently, he is precluded from arguing the retaliatory discharge issue before this

Court.

> 5.    Reno also argues that Delphi's stated reason for terminating his

employment was a pretext because the Investigation into Reno's use of the Onyx dumpster was

not complete at the time of his firing and thus could not have been Delphi's reason for

terminating his employment.  Contrary to Reno's assertion, Patrick had more than sufficient

information to terminate Reno's employment when Michael Brown ("Brown"), a licensed

investigator for Securitas, the company that provided security services at the Plant, reported to

her that Reno paid the Onyx driver $100 in cash to provide him with a dumpster for personal use

and then to return that dumpster to Delphi property.  Accordingly, Reno cannot demonstrate that

Delphi's stated reason for terminating his employment was a pretext, and as such his claim

should be disallowed and expunged.

<u>Background</u>

6.      On January 29, 2004, Delphi's Environmental Coordinator was notified

that a dumpster located on the property of the Plant contained fencing and aquarium salt bags,

not waste that would have normally come from the Plant.  Gooding contacted Brown and asked

Brown to determine the origin of the debris and the reason for its presence on Delphi property.

<u>See</u> Declaration Of Michael Brown In Support Of Debtors' Supplemental Reply With Respect To

Proof Of Claim 9956 (Joseph Reno) (the "Brown Decl.") ¶ 7, a true and correct copy of which is

attached hereto as <u>Exhibit A</u>.  Brown discovered that the dumpster belonged to Onyx. Brown

Decl. ¶ 8(a).  The primary Onyx contact for Delphi was Onyx's supervisor, Troy Calton

("Calton").  As the Onyx contact for Delphi, Calton worked closely with Reno.  Brown Decl. ¶

8(b).  Brown also discovered that Plant employees believed that Reno may have been the source

of the debris in the dumpster.  Brown Decl. ¶ 7.

7.      On February 5, 2004, Brown met with Troy Calton.  Brown Decl. ¶ 9.

Calton initially told Brown that, in early fall 2003, Reno asked him to deliver an empty dumpster

to Reno's residence and that a few months later Reno asked him to return to pick up the

dumpster.  Brown Decl. ¶ 9, 10.  Calton said that he was supposed to take the dumpster from

Reno's residence to a landfill.  However, due to an emergency at the Plant, he drove with the

4

dumpster, straight to the Plant.  Calton then left the dumpster on Delphi property, and forgot to retrieve it later and take it to a landfill.  Brown Decl. ¶ 11.

8.      On February 16, 2004, Brown interviewed Reno regarding the dumpster. Brown Decl. ¶ 12.  Reno told Brown that he had asked Calton to deliver the dumpster to his house in late November 2003 or early December 2003 – not early fall  2003 as Calton stated during his February 5 interview with Brown.  Id.  Reno said he filled the dumpster and asked Calton to pick it up on December 22, 2003.  Id.  Reno explained that December 22, 2003 had been the first day of Delphi's holiday shut-down for the year, so he was at home that day and thus able to coordinate Calton's removal of the dumpster.  Id.   Brown later learned that the 2003 holiday shut down began on Tuesday, December 23, not December 22, as Reno had said.  Id Reno said that until he learned of the investigation in late January 2004 he thought the dumpster had been taken to the landfill.  Brown Decl. ¶ 13.

9.      Then, without having been asked to do so by Brown, Reno produced two prepared written statements from subordinate employees who purported to have overheard a conversation between Reno and Calton in which Reno purportedly told Calton that Reno would personally pay the fee for the dumpster.  Brown Decl. ¶ 14.  Brown found it odd that Reno came to the interview with prepared statements, especially because prior to the interview, Brown had not raised any issues related to the use of the dumpster, its presence on Delphi property, or whether any such conversations between Reno and Calton actually occurred.  Id.  Brown later learned from another employee who worked under Reno, Terry Ruble ("Ruble"), that Reno also had asked Ruble to provide a statement about Reno's purported offer to personally pay the expense related to the dumpster.  Ruble told Brown that he refused to do so because such a statement would have been false.  Brown Decl. ¶ 21.   Because there were significant

5

discrepancies in the chronologies offered by Reno and Calton, Brown decided to interview

Calton for a second time.  Brown Decl. ¶ 15.

       10.     On February 18, 2004, Brown conducted a second interview with Calton.

Id.  After Calton repeated the same story he had told Brown in his February 5 interview, he asked

what would happen to him as a result of his involvement in the dumpster incident.  Id.  Brown

explained to Calton that as long as he was telling the truth, nothing would happen to him.  Id.

       11.     After the interview had ended, while still in the hallway, Calton asked

whether he could resume the interview because he needed to make some changes to his

statement.  Brown Decl. ¶ 16.  Calton explained that he delivered the dumpster to Reno's home

in August 2003 or September 2003 (not November or December 2003 as Reno had told Brown)

and that he picked up the dumpster in late September 2003 or October 2003 (not on December

22, 2003, as Reno had told Brown).  Brown Decl. ¶ 16(a) & (b).  Calton then explained that he

and Reno drove together in the Onyx truck from the Plant and Reno's residence to retrieve the

dumpster and then they both brought it back to the Plant.  Brown Decl. ¶ 16(b).  Calton admitted

that Reno gave him $100  in cash in exchange for the favor of allowing Reno to use the dumpster

at his home and for picking up and dropping the dumpster off at the Plant.  Brown Decl. ¶ 16(c).

Calton admitted that he never gave the $100 to Onyx.  Id.  He also explained that, in February

2004, shortly after the Investigation began, Reno approached Calton and asked him to create a

receipt for the $100 cash payment.  Brown Decl. ¶ 16(d).  Calton said he arbitrarily chose

December 22, 2003 as the date for the receipt.  Id.

       12.     On February 20, 2004, after having learned of the status of the

Investigation, Patrick decided to suspend Reno with pay.  See Declaration Of Beth Patrick In

Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 9956 (Joseph Reno)

6

(the "Patrick Decl.") ¶ 9 attached hereto as <u>Exhibit B</u>.[2]  On the date of Reno's suspension, both

Brown and Patrick were unaware of the Wastewater Incident.  Patrick Decl. ¶ 9; Brown Decl. ¶

24.

13.    On March 5, 2004, Brown conducted a third interview with Calton.

Brown Decl. ¶ 22.  Calton reaffirmed his statement that Reno had paid $100 to Calton personally

and only later requested a receipt.  <u>Id.</u>  Although Calton had agreed after the February 18

interview to provide a written statement, he refused to provide a written statement unless Delphi

agreed not to take action against him.  Brown Decl. ¶ 17.

14.    After reading Brown's findings from March 5, 2004, Patrick decided that

the information that Brown had uncovered established that Reno abused Delphi's business

relationship with Onyx and obstructed the Investigation by lying about the facts and persuading

Calton to produce a fraudulent receipt.  Patrick Decl. ¶ 13.  Therefore, on March 17, 2004,

Patrick decided to terminate Reno.  <u>Id.</u>

15.    Coincidently, two weeks after the Investigation had been initiated, there

was a leak from a hexavalent chromium wastewater treatment tank at the Plant.  Reno discovered

the leak on Friday, February 13, 2004, at which time he fashioned a temporary solution to the

leakage problem by creating a bypass to a different holding tank.  <u>See</u> March 20, 2004 letter

from Delphi to the Occupational Safety & Health Administration (the "Delphi OSHA Letter") at

2, attached as Exhibit 3 to Response; Reno's First Amended Complaint (the "Complaint") at 2,

attached to Proof of Claim.

16.    However, Reno did not inform his supervisor, Gooding, of the leak until

February 17, 2004, which was after Brown already had interviewed Reno on February 16, 2004

about the dumpster matter.  <u>See</u> March 2, 2004, Letter from Reno to Walle (the "March 2

---

[2]    Elizabeth Patrick's name at the time of these events was Elizabeth Meyer.

Letter"), attached as Exhibit 6 to the Response.  Delphi retained American Testing Services, Ltd. ("ATS") to inspect the tank on February 20, 2004.  See ATS Onsite Inspection Report dated February 20, 2004 (the "ATS Report"), attached hereto as Exhibit C.  Although Reno planned to have the entire leaking tank re-coated, Gooding, upon learning of the situation, disagreed and concluded that only the bottom third of the tank and any other visibly cracked areas noted in the ATS Report needed to be re-coated.  See Complaint at 4.  Between February 23, 2004 and March 1, 2004, the tank was repaired by patching any cracks and resurfacing the bottom three feet of the tank and any other damaged areas.  See Delphi OSHA Letter at 4.

17.    On March 2, 2004, Reno sent a letter to James Walle, an attorney in Delphi's Legal Department who dealt with environmental issues.  See March 2 Letter.  In the March 2 Letter, Reno expressed general concerns about the safety of the chrome treatment tanks at the Plant and referred to the Investigation, though he inaccurately reported that Calton had taken full responsibility for returning the dumpster to Delphi.  Id.  In response to the March 2 Letter, Delphi arranged for both internal Delphi environmental managers and an independent consulting engineering firm, Hubbel, Roth & Clark, Inc. ("HRC") to investigate and determine if the wastewater tanks at the Plant were in fact safe for continued use.  Both investigations concluded that Delphi had taken appropriate action concerning the tanks.  See HRC Investigation Report attached hereto at Exhibit D.

18.    Reno filed Proof of Claim No. 9956 (the "Proof of Claim") on or about July 19, 2006.  The Proof of Claim asserts an unsecured non-priority claim in the amount of $15,892,592.73 plus unliquidated amounts (the "Claim") against Delphi Corporation.[3]

---

[3]    Reno claims that $1,579,000 of his claim is priority claim for wages, salaries, or commissions.  11 U.S.C. 507(a)(4)  provides that priority may be given to up to $10,000 earned within 180 days before the date of the filing of the petition for wages, salaries, or commissions.  Reno not only exceeds the dollar limit imposed by

19.     The Debtors objected to the Claim pursuant to the Debtors' (i) Third

Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 to

Certain (a) Claims With Insufficient Documentation, (b) Claims Unsubstantiated by Debtors'

Books and Records, and (c) Claims Subject to Modification and (ii) Motion to Estimate

Contingent and Unliquidated Claims Pursuant to 11 U.S.C. § 502(c) (Docket No. 5452) (the

"Third Omnibus Claims Objection"), which was filed on October 31, 2006.

20.     On November 21, 2006, Reno filed the Response To Debtors' Objection

To Claim 9956 (Docket No. 5920) (the "Response").

21.     On January 3, 2007, the Debtors filed their Statement of Disputed Issues

With Respect to Proof of Claim 9956 (Reno) (Docket No. 6414).[4]

22.     On January 8, 2007, the Debtors and Reno, with their legal counsel,

conducted a telephonic meet and confer pursuant to the Claims Objection Procedures Order.  In

preparation for the meet and confer, the Debtors' counsel e-mailed a copy of the Claims

Objection Procedures Order to Reno's counsel.

<u>Argument</u>

23.     Reno's claim fails because he did not object to OSHA's dismissal of his

complaint or its finding that he was terminated because he misappropriated funds and obstructed

the subsequent investigation.  <u>See</u> May 20, 2004 Letter from OSHA to Reno ("OSHA Finding"),

attached hereto as <u>Exhibit E</u>.  Because Reno did not challenge the OSHA Finding, he is barred

from arguing here that he was terminated for anything other than good cause.

section 507(a)(4), but his claim is not for wages earned within 180 days of the petition date, October 8, 2005.
Therefore, none of Reno's claim should be categorized as a priority claim.

[4]     To date, Reno has not filed a supplemental response to the Third Omnibus Claims Objection.  Pursuant to the
Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, And 9014
Establishing (i) Dates For Hearings Regarding Objections To Claims And (ii) Certain Notices And Procedures
Governing Objections To Claims (the "Claims Objection Procedures Order"), the deadline for Reno to file a
supplemental response and attach affidavits or declarations thereto was February 6, 2007.

24.    In addition, the March 2Ltter does not meet the statutory requirements to qualify for whistleblower protection under Ohio law.  Thus, his statutory claim under Ohio law must fail.

25.    Moreover, Reno cannot establish a claim against the Debtors, because Delphi's suspension and later termination of Reno were not in retaliation for the Wastewater Incident.  Instead, Delphi's decision to terminate Reno was based on Patrick's assessment that Reno had misappropriated Delphi resources and obstructed the Investigation.  Reno has not submitted any convincing evidence to the contrary, and therefore his claim should be disallowed and expunged.  Finally, even if he had established a claim for retaliatory discharge – which he clearly has not – Reno's damages would be far less than the nearly $16 million he claims.

A.    <u>Reno Cannot Relitigate Here Because Of The OSHA Finding</u>

26.    Patterned after his March 2 Letter, Reno filed a formal retaliation complaint with OSHA alleging that he had been terminated for engaging in protected activity, namely complaining about the repairs to the waste water tank.  After a full investigation, the Department of Labor dismissed Reno's formal complaint and wrote: "The findings show that [Delphi] terminated [Reno] for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest, and trying to obstruct and mislead Delphi's subsequent investigation."  <u>See</u> OSHA Finding.

27.    The OSHA Finding stated, "Complainant and Respondent have 30 days from receipt of these Findings to file objections and request a hearing on the record, or they will become final and not subject to court review."  Reno did not object to the finding.[5]  The statutory

---

[5]    In Debtors First Set of Requests For Admission, request number seven asked Reno to "Admit that Reno did not object to the finding by the Department of Labor. . . ."  Reno did not deny this request, and thus it is deemed admitted.

provisions on which Reno's OSHA complaint were based preclude judicial review aside from an

appeal within 60 days to the federal circuit court.  See 42 U.S.C. 5851(c)(2); 29 U.S.C. 660(a).

28.    The doctrine of collateral estoppel bars Reno from relitigating the issues

he presented to the Department of Labor in his OSHA complaint.  Where the factual issues are

the same, there is mutuality of parties, and there was the opportunity to be heard, parties are

barred from raising any factual issue that already has been decided in an administrative

proceeding in a trial court later.  See Office of Consumers' Counsel v. Pub. Utils. Comm'n of

Ohio, 475 N.E.2d 782, 783 (Ohio 1985) ("The doctrine of collateral estoppel has been applied to

administrative proceedings."); Superior's Brand Meats, Inc. v. Lindley, 403 N.E.2d 996, 1000

(Ohio 1980) (same).

29.    The issues addressed in the OSHA proceedings were the very issues

presented here, there was complete mutuality of parties, and Reno had the opportunity to be

heard.  Therefore, Reno should not now be allowed to relitigate settled issues.  See Norman v.

Niagara Mohawk Power Corp., 873 F.2d 634 (2d Cir. 1989) (stating that where matter was

properly before ALJ and parties had the opportunity to be heard, res judicata applies); U.S. v. Jan

Hardware Mfg. Co., Inc., 463 F. Supp. 732, 734 (E.D.N.Y. 1979) ("defendant is precluded from

relitigating the merits of the citation and penalties in this action . . . after defendant has had the

opportunity to litigate the merits in a Commission proceeding and in appeal to the Court of

Appeals.").

B.    Neither The Wastewater Incident Nor The March 2 Letter Meet the Stringent
      Requirements of Ohio's Whistleblower Statute

30.    Reno's state law whistleblower claim also suffers an independent flaw: the

Wastewater Incident and his March 2 Letter do not meet the requirements of Ohio's

Whistleblower statute.  Reno, therefore, has no legal basis to assert a claim for retaliatory

11

discharge under the Ohio statute, and his claims based thereon should accordingly be disallowed and expunged.

31.    Ohio's Whistleblower statute R.C. §4113.52 imposes specific requirements on employees attempting to seek protection under the statute.  First, "the employee shall orally notify (his) supervisor or other responsible officer of the violation" the employer is committing.  R.C. §4113.52(A)(1)(a).  Second, the "employee shall file with the supervisor or officer a written report that provides sufficient detail to identify and describe the violation."  Id. Then, if the violation is not corrected within 24 hours of either report or reasonable efforts are not undertaken by the employer to commence corrections, the employee may file a report with the prosecuting attorney or other relevant agency responsible for regulating the conduct at issue. Id.

32.    Reno failed to comply with any of these requirements and therefore cannot rely on the statute for any remedy.  The leak first appeared on February 13, 2004 but Reno did not orally report the leak to Gooding or Delphi's environmental liaison, JoAnne Rau, until February 17, 2004 during a marketing meeting.  Even then, he did not provide sufficient detail to identify any statutory violation.  Reno never filed a written report of the incident with Gooding. Furthermore, while it is undisputed that Reno and Gooding disagreed on how to fix the wastewater leak, they did not disagree over the need to fix the tank and comply with all applicable laws.  In fact, Delphi hired a consulting firm, ATS, to run tests on the tanks in order to assess compliance with applicable statutes.  The tests were completed on February 20, 2004.  See ATS Report.  Although Reno disagreed with the course of action taken to repair the tank, he did not state that it violated any specific regulation. See March 2 Letter.

12

33.    The March 2 letter, while in writing, also fails to meet the requirements of the statute in two important ways: (1) the letter merely describes the disagreement between Reno and Gooding on the extent of repairs and criticizes Gooding's expertise to make appropriate decisions; and (2) the letter ignores the fact that repairs began on February 23, 2004.  See March 2 letter.  Reno never cited to any specific regulation that Delphi was violating.

34.    The Ohio Supreme Court has repeatedly stated that employees must *strictly* comply with the statute's specific requirements to invoke any protection under the statute. Kulch v. Structural Fibers, Inc., 78 Ohio St.3d 134, 152-153, 677 N.E.2d 308 (Ohio 1997); Contreras v. Ferro, 73 Ohio St. 3d 244, 652 N.E.2d 940 (Ohio 1995); accord, Haney v. Chrysler Corp., 121 Ohio App.3d 137, 699 N.E.2d 121 (Ohio Ct. App. 1997).  In Contreras, the Court denied protection because the employee failed to provide oral or written complaints before engaging outside investigators to investigate illegal activity.  In Haney, the Court denied protection because, like Reno, Haney's written report was delivered to a person other than his direct supervisor and lacked the specificity required by the statute to describe an unlawful violation.  See Haney, 121 Ohio St. 3d  at 139.  Because Reno has not met the statutory requirements of maintaining a claim for damages under the Ohio Whistleblower Statute, this claim should be disallowed and expunged.

C.    Delphi Did Not Retaliate Against Reno

35.    Even if the Court reaches the merits, Reno's claim fails.  The decision to terminate Reno was made by Patrick, who was not involved in any dispute over how to deal with the wastewater leak at the Plant.  Patrick's decision was based solely on Reno's misappropriation of Delphi resources and misconduct with respect to the dumpster and subsequent Investigation.

13

i.    Brown's Investigation Into Reno's Misconduct With Respect To The Dumpster
Began Before The Wastewater Leak

36.    The investigation into the Reno's misconduct concerning his use of the
Onyx dumpster began weeks before the wastewater leak.  Brown conducted interviews with
Reno and with Calton before the Wastewater Incident on February 19 and 20, 2004.  Brown
Decl. ¶ 9, 12, 15.  Reno was suspended with pay on February 20, 2004, the same day that ATS
provided the initial inspection report on the wastewater tank, and nearly two weeks before Reno
submitted the March 2 Letter.

37.    As of February 20, 2004, Investigation into Reno's conduct concerning the
Onyx dumpster already had revealed that (1) Reno's story was contradicted by Calton; (2) $100
cash was given to Calton personally and Calton had not turned the money over to Onyx; (3)
Reno requested a backdated receipt from Calton only after Brown began his investigation into
the matter; and (4) Reno asked subordinate employees to provide exculpatory statements
regarding Reno's transaction with Calton.  See generally, Brown Decl.  This course of conduct
convinced Patrick to suspend Reno on February 20, 2004.  See Patrick Decl. ¶ 9.

38.    Patrick terminated Reno on March 17, 2004, because the Investigation
revealed Reno had breached Delphi's conflict of interest policy and subsequently attempted to
conceal his conduct,.  Patrick Decl. ¶ 13 & Exhibit 1.  The Wastewater Incident had absolutely
no bearing Patrick's decision.  Patrick Decl. ¶ 11.

ii.    The Decision To Suspend And Subsequently Terminate Reno Was Made By
Patrick, Who Was Uninvolved In The Wastewater Leak

39.    Reno inaccurately attributes the decisions to suspend and to subsequently
terminate him to Gooding.  Contrary to Reno's assertions, however, Gooding did not make the
decision to terminate Reno.  Patrick, who was based in Delphi's headquarters in Troy, Michigan

14

and who was not involved in the decisions concerning the wastewater leak, made the decision to

terminate Reno.  Patrick Decl. ¶ 13.

      iii.    Delphi Took Reno's Environmental Concerns Seriously, But Such Concerns
              Could Not Excuse His Misconduct

      40.    From the time they became aware of the wastewater leak, Reno's

superiors, including Gooding, took the environmental concerns very seriously.  Delphi

commissioned ATS to perform an investigation on February 20, 2004 which allowed Delphi to

develop a course of action to repair the problem.  See ATS Report.  After the March 2 Letter,

Delphi commissioned two additional inspections to ensure that the repairs were sufficient.  See

Delphi OSHA Letter at 5; HRC Report at 3.  Both investigations revealed that Delphi took

appropriate steps to repair the wastewater tank and create a plan for inspecting other tanks.  Id.

      41.    Despite taking Reno's concerns seriously, Delphi could not excuse Reno's

misconduct.  On April 3, 2001, Reno signed an acknowledgement that he had received Delphi's

booklet, *Foundations of Excellence*.  His acknowledgement and the booklet are attached to the

Patrick Declaration.  On page 6,  the booklet states, "[W]e must avoid actions or relationships

that might conflict or even appear to conflict  with our job responsibilities or Delphi's interests."

The policy continues:

> A conflict of interest is an obligation to or relationship with any person or
> organization that competes or does business with Delphi, that could affect an
> employee's judgment in fulfilling our responsibilities to Delphi to make business
> decisions solely in the best interest of the corporation *and without regard to
> personal gain.  A conflict of interest can arise when an employee benefits, or even
> appears to benefit, from a Delphi business arrangement.  The appearance of a
> conflict can be just as damaging to reputations as an actual conflict of interest.*

> Examples of potential conflict of interests include:  . . .  Accepting services or
> receiving payment from a supplier, **. . . .** (emphasis added).

The policy concludes with the expectation that all employees will disclose  promptly any situation that could result in a conflict and to seek out superiors to assist in resolving any questions an employee might have regarding a potential conflict.

42.    Reno sought no advice or counsel from any superior when he made arrangements with Calton to deliver a dumpster at his personal residence, filled it up with his personal debris, and then have it delivered to Delphi.  Patrick could not ignore Reno's breach of Delphi's Conflict of Interest Policy simply because Reno raised environmental concerns a week or two *after* Delphi began investigating his misconduct.

> d.    Reno's Evidence Does Not Undermine the Debtors' Legitimate Non-Retaliatory <u>Reason for Terminating His Employment</u>

43.    The only evidence that Reno submitted is the deposition testimony of Brown and Troy Calton.  Neither of these witnesses' deposition testimony undermines Patrick's testimony that she suspended and fired Reno solely because of his misconduct concerning the dumpster matter.

44.    As an initial matter, Reno argues that Patrick's decision must have been pretextual if it was made before Brown considered his investigation complete.  Not so. As Patrick's affidavit clearly demonstrates, she determined that at the time she made the decision to suspend and then later terminate Reno, she had more than enough evidence concerning Reno's misconduct upon which to base her decision.

45.    Moreover, Reno's reliance in his Response on the deposition testimony of Calton is misplaced.  Calton's testimony however, does nothing to show that Patrick's stated reason for terminating Reno was pretextual.  <u>See</u> Response at 3.  In fact, Calton's testimony actually confirms Patrick's grounds for termination in that Calton stated, "I would assume that my boss would just bill [the dumpster fees] to Delphi, once the bill came in."  Calton Dep. at 94.

16

Moreover, Calton's knowledge that Reno and Gooding disagreed about how to handle the wastewater leak does not establish that Patrick was untruthful regarding her reasons for terminating Reno.

46.    Even if the Investigation had been incomplete, or even flawed (which it was not), that would not change the fact that Reno was terminated in response to the Investigation, not in retaliation for any disagreements with Gooding.  Therefore, Reno's claim should be disallowed and expunged.

D.    Reno's Claim For Damages Is Unsubstantiated And Outrageously Excessive

47.    Reno appears to be seeking full front pay for the remainder of his working life.  The propriety of an award of front pay is a matter for the court.  Roush v. KFC Nat'l Mgmt Co., 10 F.3d 392, 398 (6th Cir. 1993); See also Wells v. New Cherokee Corp., 58 F.3d 233, 239 (6th Cir. 1995).  Front pay damages are *temporary* in nature, as they are designed to assist the discharged employee during the *transition* to new employment of equal or similar status.  Bailey v. Container Corp. of Am., 660 F. Supp. 1048, 1055 (S.D. Ohio 1986).  In Worrell v. Multipress, Inc., 543 N.E.2d 1277, 1282-83 (Ohio 1989), the Ohio Supreme Court stated:

> Because front pay is intended to assist the discharged employee to find comparable employment, we agree with those courts that have refused front pay as a matter of right for long-term compensation from the date of discharge until some anticipated retirement date. Front pay should be awarded for an interim period in circumstances where the discharged employee has employable and productive years ahead.

Id. at 1282-83.  Accordingly, even if Delphi had wrongly discharged Reno – which it did not – he would not be entitled to be paid his full salary for every remaining year of his working life, which he has estimated at 15 years.

48.    Reno also was obligated to mitigate his damages by seeking other employment.  Skalka v. Fernald Environmental Restoration, 178 F.3d 414, 426 (6th Cir. 1999).

17

"Damages should ordinarily extend only to the date upon which 'the sting' of any discriminatory conduct has ended." McKnight v. General Motors Corp., 973 F.2d 1366, 1371 (7th Cir. 1992). A court awarding front pay should consider a plaintiff's ability to mitigate his damages by finding other employment in the future. Gotthardt v. National R.R. Passenger Corp., 191 F.3d 1148, 1157 (9th Cir. 1999). Because front pay is temporary in nature, it does not contemplate that a claimant will be compensated for doing nothing. Cassino v. Reichhold Che, Inc., 817 F.2d 1338, 1346 (9th Cir. 1987). Front pay awards must specify an ending date and must take into account any amount that the plaintiff could earn using reasonable efforts. Suggs v. ServiceMaster Educ. Food Management, 72 F.3d 1228, 1235 (6th Cir. 1996). Hutchison v. Amateur Electronics Supply, Inc., 840 F.Supp. 612 (E.D. Wis. 1993), aff'd in part, rev'd in part, 42 F.3d 1037, 1045 (7th Cir. 1994).

49.    Here, Reno was terminated at 49 years of age with a college degree and over twenty years of experience in industrial management and environmental engineering. He has employable skills and productive years ahead of him. Yet, when he had an opportunity to mitigate his damages, he turned down a management position that offered two-thirds of his former compensation. Turning down a reasonable offer of employment within less than a year of his termination is evidence of Reno's unwillingness to mitigate his damages. Accordingly, no front pay should be permitted in any calculation of Reno's alleged damages.

50.    In addition, Reno was not entitled to Consolidated Omnibus Budget Reconciliation Act ("COBRA") benefits and does not have a claim under the Employee Retirement Income Security Act, or the Fair Credit Reporting Act. Pursuant to COBRA, Reno was not entitled to continued group health insurance coverage because he was discharged for gross misconduct. In addition, the Debtors do not owe Reno any wages, vacation pay, or any

18

other employment benefits.  Moreover, Reno was not defamed.  Any statements made about him either were true, were not published, or were privileged.

51.    Finally, Reno should not be awarded punitive damages because he has not established that Delphi acted with any malice towards him.  Reno seeks punitive damages in the amount of $14,211,00.00 – nine times the amount of his $1,579,000 inflated and incorrect damages claim.  The statute providing protection for workers discharged in retaliation for "whistleblowing activities," however, does not provide for punitive damages.  Ohio Revised Code § 4113.52(E).  Even if punitive damages were available under some other theory, Reno has failed to provide any evidence of wrongdoing on the part of Delphi – let alone evidence of wrongdoing that would justify a $14 million punitive damage claim.  Accordingly, this Court should reject Reno's punitive damage claim.

### Conclusion

52.    Reno failed to establish a claim against Debtors.  Delphi management terminated Reno for legitimate reason.  Accordingly, the Debtors are not liable to Reno, and the Claim should be disallowed and expunged.

### Memorandum of Law

53.    Because the legal points and authorities upon which this Supplemental Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim and (b) granting the Debtors such other and further relief

as is just.

Dated: New York, New York
       February 21, 2007

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
       John Wm. Butler, Jr. (JB 4711)
       John K. Lyons (JL 4951)
       Albert L. Hogan III (AH 8807)
       Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

– and –

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By:    /s/ Kayalyn A. Marafioti
       Kayalyn A. Marafioti (KM 9632)
       Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

# **<u>EXHIBIT A</u>**

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
      Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                              :
        In re                                 :       Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :       Case No. 05-44481 (RDD)
                                              :
                                              :       (Jointly Administered)
                  Debtors.                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DECLARATION OF MICHAEL BROWN IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

State of Ohio              )
                           )  ss:
Montgomery County  )

Pursuant to 28 U.S.C Section 1746, I, Michael Brown, declare the following:

1.      My name is Michael Brown.  I am over age 18 and have personal knowledge of the facts contained in this declaration.  I am competent to testify to the facts contained herein.  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno.  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      For more than six years preceding the events described in this declaration, I was employed by Securitas Investigative Services USA, Inc., as an Investigator.  Throughout that entire period, my base of operation was located at Delphi Corporation's manufacturing facilities in Kettering, Montgomery County, Ohio. However, both then and now, it was not uncommon for me to conduct Delphi investigations all over the continental United States, and Mexico.

4.       I receive authorization for my assignments from Delphi's Corporate Security group in Troy, Michigan, not Securitas. Moreover, it was not uncommon for me to be asked by Delphi managers and executives located in the Dayton area to investigate matters of concern to them.  In turn, I would report such requests to Delphi's Corporate Security group and receive clearance to proceed.

**My Investigation Methods and Reporting.**

        5.      It has long been my custom and practice to prepare a written record of

significant findings that arise during the course of my investigations.  As witnesses are

interviewed, as information is gathered, or as facts are learned, I record these events, findings

and facts in a progressive narrative.  Stated another way, with the use of a computer, I record

new information on the original or initial document in the chronological order in which it is

received by me.  It is not my practice to prepare "preliminary reports," "interim reports," or "final

reports."

        6.      It is also my custom and practice to report significant new findings to

those who are using my services via telephone or email.  There is no set pattern to this practice.

If, in the course of such verbal reporting, someone asks for a copy of my written report to date, I

will provide it to them as updated.  I do not keep any records that would identify when I provided

someone with a copy of my ongoing written report.  Attached hereto as <u>Exhibit 1</u> is a true and

correct copy of my report with respect to the investigation into Mr. Reno's involvement with the

dumpster.  As explained, this report was a work in progress in which I added information as my

investigation progressed.  Each entry was made on or around the date referenced at the beginning

of each paragraph.

**The Dumpster Investigation.**

        7.      On February 2, 2004, Delphi's Facilities Manager, Mark Gooding, asked

me to investigate a dumpster on Delphi's property that contained waste materials, i.e., empty

marine sea salt bags, discarded wire fencing, broken concrete and construction debris, that were

not waste products from any Delphi manufacturing operations.  Mr. Gooding informed me that

within the Environmental Group at Delphi's Kettering Operations people had pointed to the

- 3 -

possibility that the material belonged to Joseph Reno, a Senior Environmental Manager for

Delphi, who reported to Gooding.  I relayed Mr. Gooding's request to Delphi's Corporate

Security in Troy and was authorized to proceed with the investigation.

    8.  Through a series of interviews, spelled out in detail in my attached report,

my investigation uncovered the following:

    (a)  The dumpster belonged to Onyx, a Delphi vendor which supplied

liquid or fluid waste containers to Delphi for the collection and eventual disposal of fluid

manufacturing waste that involved environmental concerns.  Onyx managed the filling and

removal of the containers from Delphi and transport for appropriate disposal.  In the ordinary

course, Delphi is charged for Onyx's services.  For solid waste containers and disposal, Delphi

contracted with another vendor, not Onyx.

    (b)  Delphi's direct contact person with Onyx was its

driver/representative, Troy Calton.  Mr. Calton's primary responsibility for Onyx, if not his sole

responsibility, was to manage Onyx' liquid waste account with Delphi.  In this capacity, Calton

had direct contact with and worked on an almost daily basis with Delphi's Joseph Reno.

    (c)  I learned from Mr. Calton that the Onyx dumpster had been

delivered to Joseph Reno's personal residence in late August or early September so that Reno

could collect and eventually dispose of solid trash, rubble and other debris collected from the

Reno residence.

    (d)  My investigation also included a search of corporate records filed

with the Secretary of State in Columbus, Ohio. This search produced records indicating that

either Mr. Reno or his wife, or both, operated an aquarium business out of their home thus

explaining the empty marine sea salt bags found in the dumpster.

**February 5, 2004, Initial Interview With Onyx Driver, Troy Calton.**

9.      On February 5, 2004, I conducted my first interview with Troy Calton

who had delivered the Onyx dumpster to Reno's residence.  In his initial interview, Calton stated

that he had delivered the dumpster to Reno's residence sometime in the early fall of 2003.  A

more precise date could not be determined because, according to Calton, Onyx had no

placement/disposal/tipping records for this particular dumpster.

10.      Approximately two months after placing the dumpster at Reno's residence,

the precise date being unknown, Calton stated that he was summoned by Reno to retrieve the

dumpster because it was digging holes in his driveway. (At a later date in my investigation, Onyx

managers produced  a receipt for $100 received from Reno and dated December 22, 2003.)

11.      Calton further explained that while en route to a landfill to dispose of the

contents of the  Reno dumpster, he received a call from an unknown source at Delphi asking him

to come to the plant to attend to another matter.  Thus, according to Calton, he took the Reno

dumpster to the Delphi plant, off-loaded it, attended to the other pressing matter and forgot about

retrieving the Reno dumpster for disposal.

**February 16, 2004, Initial Interview With Joseph Reno.**

12.      On February 16, 2003, Debbie Field of Delphi's Human Resources in the

Dayton area accompanied me during my interview with Mr. Reno.  I asked Mr. Reno to provide

a complete chronology of events relating to the Onyx dumpster. Contrary to Mr. Calton's

chronology, Mr. Reno stated that he asked Mr. Calton to deliver the dumpster to his residence in

- 5 -

late November or early December and that he, Reno, would pay for the service.  Mr. Reno stated

that he filled the dumpster and, while at home during the year-end Delphi Christmas shutdown,

he telephoned Onyx and asked Mr. Calton to pick it up on December 22, 2003, a Monday.  My

investigation determined that the Christmas shutdown did not start until the following day,

December 23.

13.    Mr. Reno stated that he assumed that Mr. Calton had taken the dumpster

to a landfill and thought nothing further about it until a couple weeks before our interview when

he became aware that someone was taking pictures of the dumpster on Delphi's property and that

an investigation was underway.

14.    Even though I had not asked Mr. Reno to bring anything to the interview,

Reno produced two brief, written statements from other employees, which stated that each had

been present and overheard a conversation between Reno and Calton wherein Reno said he

would pay the "tipping fee" (disposal fee) for the dumpster.   I found it abnormal that Reno had

come prepared with statements to corroborate his story before I ever questioned its validity.  I

have never had anyone else come prepared to an interview with outside statements.  One of the

employees, David Atchison, was subordinate to Reno, but had retired from Delphi before my

investigation commenced.  The other statement was from a contract employee, Dave Low, who

was employed by Crown Solutions, Inc, an environmental company.  Reno ended the interview

by stating that he had given Calton $100 on December 22 and obtained an Onyx receipt from

Calton on that date.

**February 18, 2004, Second Interview With Troy Calton Along With Onyx Managers And
Mark Gooding.**

15.    Two days after the Reno interview, I asked Mr. Calton and his managers
to visit with me at Delphi for further interviews.  I needed to clarify the inconsistencies in the
chronologies provided earlier by Calton and Reno.  I asked Mark Gooding to accompany me at
this second interview with Mr. Calton.  Mr. Gooding was there as a resource to me to answer
questions that arose during the interview regarding the relationships with the various disposal
contractors.  He was also a there as a witness to the interview.  At the outset, and in the presence
of his Onyx managers, Calton stuck with his original version of events.  As Mark Gooding and I
were leaving the interview room, Calton asked what would happen to him as a result of his
involvement with the dumpster.  I replied that he had nothing to worry about as long as his
statement was true.

16.    While Gooding and I were in the hallway, we were approached by the
Onyx managers who stated that Calton wanted to speak further with us.  I resumed the interview
with Mr. Calton during which he recanted his earlier statement and provided the following
information:

(a)    The original request from Reno to deliver the dumpster to his
home was in August or September of 2003, not the fall of the year.

(b)    Sometime near the end of September or early October, both Calton
and Mr. Reno left Delphi in an Onyx truck, traveled to Reno's home to retrieve the dumpster and
both drove it back to Delphi for drop off at the location where I found it when I commenced my
investigation almost four months later.  Calton also stated that no record was kept of the delivery

- 7 -

because Calton assumed that Reno, as a Delphi contact for Onyx,  would not be charged for the storage, use and disposal fees associated with this particular dumpster.

(c)    Reno gave Calton $100 cash in return for the favor and the services. No receipt was given to Reno on that date and Calton did not deliver the $100 in cash to Onyx.

(d)    Mr. Calton also stated that on February 2nd or 3rd, 2004, which was during the early stages of my investigation, Reno approached Calton and asked for a receipt for the $100.  Calton obliged and stated that he picked December 22, 2003 at random as the date for the receipt.  Calton obtained the receipt from an employee in Onyx's office named Jerri Dirks and gave it to Reno.

17.    I then asked Mr. Calton to provide me with a written account of his factual statement.  Mr. Calton and the Onyx managers promised that I would receive the statement the next day, February 19, 2004.  No written statement was delivered as promised.  On Friday, February 20, I received a telephone call from one of the Onyx managers, Mike Webb, who informed me that Mr. Calton had consulted an attorney and would not provide a written statement unless he had written assurance from Delphi that the company would not take action against him for his involvement in the dumpster incident.

**February 20, 2004, Report Of Findings To Corporate Headquarters In Troy Michigan.**

18.    Since Mr. Calton refused to provide a written statement and I was preparing  to leave on vacation, I reported my findings to corporate headquarters in Troy, Michigan.  My present recollection is that I spoke with Beth Polvinen, as well as counsel for Delphi.  I also recall that I spoke with Elizabeth Meyer, the head of Corporate Salaried Personnel for all of Delphi and informed her of my findings and answered her questions.  If any one of

these persons asked me for a report, I would have sent them what had been prepared to that point
in time.

19.    There were other aspects of my investigation that I considered incomplete
at that time and I recall explaining to personnel in Troy that I would need to conduct other
interviews when I returned from vacation.  I was encouraged to do so.  In addition, I recall
discussion about how the corporation should deal with Reno until I returned.  I noted that Reno
had interfered with the investigation by obtaining statements from employees and had lied to me
about the chronology of events, disposal of the trash, the payment for the services and the $100
receipt.  While suspension was discussed, it was not my responsibility to make any decisions as
to Reno's employment status with Delphi so I left the conversations and then went on vacation.

**Return From Vacation.**

20.    On March 1, 2004, I returned from vacation and learned from Mark
Gooding that Reno had been suspended while I was on vacation.

21.    On March 3 and 4, I conducted additional interviews set forth in my
attached report.  Of particular note was an interview with Terry Ruble who was retired at the
time of the interview.  He stated that Reno had approached him near the start of my investigation
and asked for a statement covering conversations Ruble overheard between Reno and Calton
regarding the dumpster.  Ruble refused Reno's request to provide a statement because he could
not recall any such conversations.

22.    On March 5, 2004, I met again with Mr. Calton, the Onyx managers and
Mark Gooding.  Since Calton had refused to give me a written statement, I was seeking
verification of the facts Calton had related during the second interview on February 18, 2004.

- 9 -

Calton only changed one  fact:  he stated that he had received the $100 in cash about two weeks

before he and Reno retrieved the dumpster from Reno's home and dropped it at Delphi.  Thus,

the cash transaction occurred sometime in September, not December 22, 2003.

23.    At some point following my post-vacation interviews, I telephoned my

findings to Beth Meyer in Troy Michigan.  Subsequently, I learned that Reno's suspension had

been changed to a termination.

**Leaking Waste Water Treatment Tank**

24.    Since closing my investigation on March 24, 2004 by arranging for the

removal of the Reno dumpster from Delphi's premises, I have learned that Reno had complained

about a leaking waste water treatment tank on Delphi's premises and that he had filed a

complaint with federal authorities claiming that his termination was in retribution for his

environmental complaint.  Throughout the course of my investigation into the dumpster, no one

at Delphi mentioned the leaking water tank.  Reno did not mention it when I interviewed him.

No other employees that I interviewed mentioned the tank.  Nor did Reno's boss, Mark Gooding,

or any of the executives that I spoke with in Troy Michigan at Delphi corporate headquarters

mention the water tank during my investigation.  I did not learn about the water tank leak until

after Mr. Reno was terminated.  Even then I did not learn the details of that issue.  The water

tank had no bearing on my investigation, my interviews, my findings, or my conclusions about

Joseph Reno's complicity in a scheme to take advantage of Delphi's relationship with a vendor,

Onyx, in order to acquire personal services for himself and then to lie about the facts during the

course of my investigation.

Dated this 21st day of February, 2007 at Kettering, Ohio.



*/s/ Michael Brown*

Michael Brown

- 10 -

# **EXHIBIT 1**

## CONFIDENTIAL INVESTIGATIVE REPORT

| | |
|---|---|
| **Date:** | 2/5/04 |
| **To:** | Investigations File |
| **From:** | Mike Brown - Investigator |
| **Subject:** | Possible waste removal fraud |
| **c:** | Dennis DeLong; Jerry Koplin |

### Investigative Summary

On 2/2/04 this Investigator was advised that a roll-off drop box (portable dumpster) belonging to ONYX had been placed on the ground within the perimeter fence at the Kettering facility. The box contained items that likely did not belong to Delphi and may have been the personal property of a Delphi employee. The investigation has revealed that the property did originate from a Delphi employee's home. The investigation has shown that the Delphi salaried employee, Joe Reno, has attempted to have his waste disposed of at Delphi's expense. There was evidence revealed in this investigation that Mr. Reno has on numerous occasions left the facility earlier than his standard workday permits.

### Incident Location

Delphi – Kettering E&C Facility
2000 Forrer Blvd.
Dayton, OH

### Date / Time Occurred

Drop box delivered to Delphi property sometime in the fall of 2003.

### Persons Interviewed

Tim Delph – ONYX Account Mgr.
Mike Webb – ONYX Division Mgr
Troy Calton – Onyx Industrial Services Inc. employee
Mitch Brown – Crown Solutions Inc. Mgr.
Mike Wittman – Crown Environmental Specialist
Terry Ruble – Crown employee in Waste Treatment plant
Dave Low – Crown employee in Waste Treatment plant
Nesby Brown – Crown employee in Waste Treatment plant

### Investigation Activity

On 2/2/04 this Investigator initiated an investigation into the circumstances surrounding the presence of a roll-off drop box located on the property at the Kettering facility. The box was located on the north side of the coal storage bin, which is inside the perimeter fence. It appeared that the box contained items that did not come from Delphi. I spoke with Mark Gooding, Site Manager for FSG who stated that as a result of numerous employees questioning the contents, and feedback he received from those employees, that the contents may have come from the home and or business of one of his reports, Joe Reno.

Reno is a Sr. Environmental Engineer with responsibility for waste removal for the Kettering E&C and the Moraine Harrison (KBP) facilities. I examined the box and its contents and observed the box is a ONYX container and that it contained empty bags and boxes of aquarium sea salt, old wire fencing, broken pieces of concrete and other items similar to construction scrap. Subsequent investigation revealed that Mr. Reno has or had an aquarium business and recently bought a small farm. All consistent with the contents of the box.

I retrieved gate records for ONYX, ring reports for Mr. Reno, both at Kettering and KBP. I observed that the ring reports for Mr. Reno showed drastic inconsistencies with no pattern common for employees. I found that Troy Calton was the primary contact for ONYX and entered the Kettering facility on a daily basis.

On 2/3/04 I contacted Tim Delphi and arranged for a meeting at ONYX to discuss the circumstances. I met with Tim and Mike Webb and asked why the box was at Delphi and if they knew how and when it arrived there. They advised that they had not yet contacted the driver responsible for the delivery but did have a receipt for $100.00 cash dated 12/22/03 showing Joe Reno as the customer. At that time they assumed that it was a deposit for disposal from Mr. Reno's personal account. ONYX stated that they would further look into the situation and report back to me. On 2/4/04 I received a call from Tim Delph who advised that the driver was Troy Calton and that he was willing to talk to me about the issue. We arranged to meet at ONYX on 2/5/04.

On 2/5/04 I met with Troy, Tim and Mike at ONYX. Troy explained that he had been asked by Mr. Reno, sometime in early fall, to deliver an empty box to Reno's residence near Waynesville, OH for the purpose of using it to remove various debris. Sometime later, approximately two months since ONYX does not show records as to when, Troy stated that Reno asked him to pick up the box as soon as possible as it was digging into his driveway. Troy recalls that on the morning he picked it up, he received a call from an unknown person at the Kettering plant requesting service right away. Troy states that he drove straight to the plant with the box and dropped it where it remains at this time. He stated that he has forgot to retrieve the box during this time.

I asked Troy if Reno has ever asked or insinuated that the box removal and disposal costs be paid by Delphi. Troy stated that Reno has never asked for that to happen, but has never questioned him as to the invoice above the deposit Reno initially paid. When asked if Mr. Reno and Troy were ever together outside of Delphi, he stated that only to give Reno a ride to his car. Troy added that on a daily basis Reno would contact him while Troy was on site and ask him to meet at the ONYX truck and give him a ride around to Reno's car. It should be noted that ONYX vehicles enter through gate 4 (east side) and park near the coal bin. The parking lot that Mr. Reno parks in daily is outside gate 1 which is on the west side of the plant. Troy stated that he does not know where Reno travels to at that point. When exiting through Gate 4 security does not log occupants or passengers of vehicles. It would therefore be my assumption that this activity would only be to avoid turnstile rings. The interview with Troy was terminated.

I reviewed Reno's 2001 and 2002 Conflict of Interest Questionnaire's and read that Reno had disclosed that he assisted his wife in her home based business. The questionnaire does not state what that business is. I researched registered businesses in Ohio through Lexis-Nexis and found records that show Joe Reno as the registered agent for Marine Solutions at his home address in Centerville, OH. Records also show that Joe, his wife and an unknown additional female are the Incorporators/Applicants for Medical Laboratory Services also located at his home address.

On 2/16/04 I interviewed Joe Reno. Debbie Field was also present. I asked Joe to tell me the complete chronological order of events pertaining to the drop box. Joe stated that he had asked Troy in late November or early December of 2003 to drop off a box at his new residence. He stated that he told Troy he would pay for it. Troy delivered the box shortly after the request.

Joe stated that he filled the box with debris from renovations at his residence and had it filled before Dec 22nd. He states that he was present at his house on the 22nd since it was during Christmas shut down (Christmas shut down did not start until Dec.23rd) and that Troy picked up the box in the afternoon. He states that he did not know where the box went at that point and assumed it went to a landfill. Joe stated that he was not aware that the box was on Delphi property until late January when he says he was told that someone was taking pictures of it and understood an investigation was being conducted. At that point Joe produced two witness statements. One is from an hourly worker, David Atchison, and the other is from a contract worker from Crown, Dave Low. Both statements were written at the request of Joe and briefly state that they were present in the waste treatment control room during a conversation with Joe and Troy where Joe stated he would pay for the tipping fee for the box. Joe stated to me that he obtained these as evidence he was doing things right concerning the box. Joe states that he gave Troy $100 cash on Dec. 22nd and got the receipt from Troy on that date. When asked if Joe has ever received any favors, gratuities, kickbacks or any other improper transactions from any contractors he stated that he has not.

I asked Joe about his personal businesses outside of Delphi. Joe stated that he assists his wife in her aquarium service business but only helps part time on nights and weekends. He also stated that she operates a medical laboratory consulting business that he does not participate in. I did not ask Joe to explain the inconsistencies in his Conflict of Interest Questionnaire statement and his answers in this interview at this time.

When asked to explain inconsistencies and gaps in his turnstile records, Joe stated that he visits different facilities and walks through the Gate #4 truck entrance at the Kettering facility and just flashes his badge to the guard to enter the plant. When asked how he exits the plant without swiping he stated that he asks for rides to his car from ONYX *only* on bad weather days. Joe was not asked any further questions regarding time records and did not volunteer any further explanation. The interview with Joe was terminated at that time.

On Wednesday 2/18/04 I re-interviewed ONYX employee Troy Calton. Mark Gooding was present during the interview along with Mike Webb and Tim Delph of ONYX. Calton stated that the information he gave me at the first interview was true. An hour later I concluded the interview. As we were leaving Troy asked me what would happen to him and I stated that as long as his story was true he had nothing to worry about. Mark Gooding and I were still down the hall talking when Webb, Delph and Calton approached us a second time and stated that Troy needed to talk to us again. We went back into a meeting room and resumed the interview. At this time Troy stated that I needed to hear some changes to his story. He stated the following additions/revisions to his original statement.

Troy stated that he was asked by Joe sometime in Aug or Sept 03 to deliver a drop box to Joe's house. Troy scheduled another driver to deliver the box and it was delivered. Troy stated that around the end of Sept or Oct Joe asked that the box be picked up since the box was digging into Joe's asphalt driveway from the heat. Troy does not remember the exact date but states that **he and Joe** left the Delphi site together in an ONYX truck to retrieve the box. They picked it up and returned it to the Kettering facility together and dropped it in the spot that it remains to this date. Troy stated that he knew the final disposal fee would be billed to Delphi. Troy stated that he did not record the date of the delivery since he assumed Joe would not be billed the usual $75/week storage fees due to Joe being a Delphi contact. He had scheduled the box to be picked up by an ONYX driver on a couple of different occasions but due to work loads it was not picked up prior this investigation and could not be picked up at that point. Troy states that Joe gave him the $100 cash the day they dropped the box at Delphi and that it was intended to be for Troy in return for doing Joe a favor. Troy never forwarded the money to ONYX. Troy was aware that this issue was being investigated on 1/30/04. He states that Joe came to him on either 2/2 or 2/3/04 and asked for a receipt for the $100 cash. Troy gave him one and picked 12/22/03 as the date on the receipt at random.

Troy was aware of the statements Joe obtained from the two waste treatment plant employees. He states he had conversation with David Atchison who stated he lied in the statement to Joe and that Davis was not present for the conversation as he stated. Troy also stated that another Crown employee, Terry Ruble, had told Troy he was asked by Joe to write a statement but would not do so since it would be untrue.

Troy still states that he drove Joe out of gate 4 in an ONYX truck daily and took Joe around to Joe's personal vehicle. Troy also states that he nor any other of the treatment plant workers see or talk to Joe in the afternoon. Troy states he does not know where Joe is or what he is doing. When asked about any gratuities given to Joe or anyone else at Delphi, Troy stated that he buys chicken every Wednesday for the treatment plant employees which amounts to approx. $30-$40.00. Joe is present for those lunches. He states that no other money, gifts or services are or have been paid.

At this point Troy stated that this is the complete and truthful account of the incident. I asked Troy, with assistance of Mike Webb, to write a complete statement of the events. I asked that it be completed by 1 pm on 2/19. Troy and Mike Webb agreed and we concluded the meeting. On 2/19 I received a call from Troy stating he had not completed the statement, as he had been very busy at work. I contacted Mike Webb and asked if there were any other reasons that the statement was not completed and he told me that there were not and that he and Troy would complete by Friday.

I received a call on 2/20 from Mike Webb who stated that Troy was concerned that Delphi would take action against him and had contacted an attorney. Mike stated that Troy wanted a letter from Delphi stating that Delphi would not take action against him. I advised Mike Webb that I would get back to him.

On 03/03/04 I met with Mitch Brown, Mgr for Crown Solutions Inc, in reference to this investigation. Mitch has responsibility for supervising Crown employees who work in the Kettering facility waste treatment plant. Another supervisor for Crown, Mike Wittman, also sat in on the meeting. I asked Mitch and Mike if they had any information pertaining to waste removal and any fraud, gratuities or any other improper activity. They were both aware of the focus of this investigation prior to this meeting and stated that they did not have any knowledge of such activity. Mike Wittman did state that his desk is adjacent to Joe Reno's and that he does not see Joe at his desk very often. He stated that he is aware of "Chicken Wednesdays" (lunch bought by ONYX for employees assigned at the treatment plant every Wednesday) but has not participated. Mitch explained that most of his employees dealt with Heritage Waste Systems and not directly with ONYX. I informed Mitch and Mike that I would like to interview their employees that were assigned to waste removal and control and that I would like for Mitch to sit in on those interviews. Mitch agreed and we proceeded to meet and interview the following Crown employees.

On 03/03/04 at approximately 1130hrs I conducted an interview with Crown employee Terry Ruble with Mitch Brown present. Terry is a retired Delphi hourly employee from the Kettering facility waste treatment plant and works part time where needed in waste treatment. Terry stated that Joe Reno had approached him on or about 02/02/04 for a statement regarding a conversation between Joe and Troy Calton concerning the drop box. Terry stated that Reno had asked him for a statement but Terry stated that he did not recall the conversation and could not furnish a written statement to Joe. I asked Terry numerous questions about his knowledge of any improper activity between contractors and any Delphi employees consistently stated he was not aware of any. Terry stated that approximately 3-4 years ago he worked for Reno cleaning fish tanks for Reno's aquarium business but had only cleaned a few at that time and it was always done on his own time during evening or weekend hours. The interview was terminated.

On 03/03/04 at approximately 1230hrs I conducted an interview with Crown employee David Low with Mitch Brown present. Low is assigned every day to the control room at the waste treatment plant at Kettering. David volunteered that he was aware of the current investigation and that Reno was out on suspension regarding the drop box. Low stated that he had been asked by Reno to furnish a statement regarding the conversation between Reno and Calton. David stated that he did write the statement that I showed him and that the conversation was the only involvement he had in the investigation. When asked if he saw Reno on a daily basis he stated that he did not and further stated that he seldom remembered seeing Reno during the afternoons. Low had no further information and the interview was terminated.

On 03/04/04 at approximately 1030hrs I initiated an interview with Nesby Brown, a Crown employee. Present during the interview was Mitch Brown and Securitas Investigator Brent Faust. Nesby is a retired Delphi employee and is now employed full time by Crown. He is assigned part time at the waste treatment control room and part time at the hazardous waste drum pad. Nesby's normal hours are 3am to 11am. When asked about any personal or non-Delphi business he does with Joe Reno he stated that approximately six years ago he helped Reno build a garage at Reno's residence on evenings and weekends. He also stated that approximately 4-5 years ago he would pick up aquarium supplies for Reno in Columbus after work and deliver them to Joe's house the next morning before going to work. Brown had no other pertinent information and the interview was terminated.

On 03/05/04 at approximately 0900hrs I conducted a follow up interview with Troy Calton of ONYX. Present was Tim Delph, Mike Webb of ONYX and Mark Gooding, Delphi. I reviewed the statements made by Troy in my interview with him on 2/18/04. Troy's responses remained the same except that he remembered that he had been given the $100 cash from Reno approximately 1-2 weeks prior to returning the drop box to Delphi. I asked for clarification regarding the written receipt for the $100 and Troy stated that on either 2/2 or 2/3/04 Joe had approached Troy and asked for a written receipt for the cash. Troy stated that he would get one from ONYX. He stated that he went to ONYX the next morning and asked an office employee named Jerri Dirks to give him a receipt for $100 cash to Joe Reno for disposal of a roll off box. He states that he picked the date of 12/22/03 at random and not at the direction of Reno or anyone else. Troy stated that he was given the receipt but had still not given the cash to ONYX. He still states that he understood that the money was from Joe to him and not to ONYX. Troy then gave the receipt to Reno the following day. Troy continued to confirm his statements given to me in the previous interview and the interview was terminated.

On 03/05/04 Investigator Brent Faust, at my request, removed the hard drive from Joe Reno's Delphi issued computer. Investigator Faust took the hard drive to his office in Indianapolis, IN for a search for evidence that Reno may have spent time conducting his personal business on the computer. Investigator Faust informed me on 3/9/04 that he found no evidence of improper activity on the computer.

On 3/23/04 I contacted ONYX to have the drop box in question picked up from the Kettering facility. Troy Calton responded from ONYX at approximately 1030hrs. and after he and inspected the container to ensure that no other items or waste had been added to it, he left the facility.

## Conclusion

Delphi HR personnel discharged employee Reno the week of 3/15/04 with no further investigation activity.

**Evidence Retained**

Ring reports for Joseph Reno for the past six months to present for Kettering and KBP. (In possession of Mark Gooding)

Receipt for cash deposit for roll-off box for Joe Reno from ONYX.

Conflict of Interests for Joe Reno for 2002 and 2003.

Copies of statements given to me by Joe Reno from Dave Low and David Atchison.

Ohio Secretary of State public business records for Marine Solutions and Medical Laboratory

**Personal Data**

Joseph M. Reno
Sr. Environmental Engineer
Level 7
SSN: 277522266

**End of Report**

# **EXHIBIT B**

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)


     - and -


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                         :
          In re                                          :     Chapter 11
                                                         :
DELPHI CORPORATION, et al.,                              :     Case No. 05-44481 (RDD)
                                                         :
                                                         :     (Jointly Administered)
               Debtors.                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


DECLARATION OF BETH PATRICK IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM NO. 9956 (JOSEPH RENO)


State of North Carolina          )
                                 )  ss:
New Hanover County               )


     Pursuant to 28 U.S.C Section 1746, I, Elizabeth Patrick, declare the following:

1

1.      My name is Elizabeth Patrick.  I am over age 18 and have personal knowledge of the facts contained in this declaration.  I am competent to testify to the facts contained herein.  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno.  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      At all times relevant to my involvement with the suspension and termination of Joseph Reno, my last name was Meyer.  I have since married and my last name is now Patrick.

4.      In 2004, I was employed by Delphi Corporation with responsibilities in the field of human resources.  My title was Director of Salaried Personnel for the Energy & Chassis Division of Delphi.  My office was located in Troy, Michigan.  In my position, I had two areas of responsibility: (a) all of the salaried personnel functions which were based out of Delphi's worldwide headquarters located in Troy, Michigan and (b) all salaried personnel and salaried human resource operations located throughout Delphi's Energy & Chassis manufacturing facilities worldwide.

5.      During the referenced time period, my staff was comprised of approximately 20 direct reports who were responsible for assisting and coordinating human resource activities.  This included responsibility over the specific site where Joseph Reno worked.

6.      At the time, I did not know Joseph Reno personally, but came to know of him starting in mid-February of 2004 when I was informed by one of my staff, Mary Ann Polvinen, that she had an investigative report indicating that Mr. Reno was engaged in conduct that violated Delphi's conflict of interest policies set forth in Delphi's *Foundation For Excellence* handbook, a true and correct copy of which is attached hereto as Exhibit 1.  I asked to see the report.

7.      I reviewed the report prepared by Mike Brown.  I learned that Mr. Reno had engaged a Delphi vendor, Onyx Industrial Systems, Inc. ("Onyx"), to deliver a dumpster to his home and later to retrieve it.  The dumpster was found on Delphi property, and Onyx had no record of any arrangements for Mr. Reno to pay for the services.  I had worked previously with Mr. Brown so I called him to discuss his investigation.  At that time it was clear to me from Mr. Brown's investigation that Reno had engaged in conduct that violated Delphi policies relating to conflicts of interest, in particular, and the misappropriation of Delphi resources. It also appeared as if Reno was interfering with Mr. Brown's investigation.  It appeared that Mr. Reno was soliciting fraudulent statements from subordinate employees to corroborate his story, and had made false statements to Mr. Brown.

8.      In addition to Mr. Brown, I also conferred with Ms. Polvinen and Glenn Howarth, the Director over Delphi's environmental operations in the area where Mr. Reno was employed.  As a result of these discussions, Mr. Brown was authorized to complete his investigation by conducting additional interviews he thought would be helpful before I finalized any action involving Mr. Reno.

9.      Within this same time frame, from February 18 to February 20, 2004, I made the decision to suspend Mr. Reno with pay pending the outcome of the investigation.  I

3

considered the suspension to be in the best interests of Delphi because it was apparent from Mr.

Brown's report that Mr. Reno was interfering with the investigation by providing false

information and imposing on subordinates and others to provide false information to Mr. Brown.

I also recall that Mr. Brown was going to be on vacation the following week.  Accordingly, I

gave instructions that Mr. Reno was to be suspended with pay until Mr. Brown returned from

vacation and was able to gather additional information.  Delphi's records show that the

suspension was effective as of February 20, 2004.

**Leaking Waste Water Treatment Tank at Delphi.**

10.     Following Mr. Reno's suspension, but before his termination, I became

aware of and saw a copy of a letter that Reno wrote to attorney James Walle of Delphi's Legal

Staff, which complained about the manner in which Delphi-Kettering Plant was repairing a

leaking waste water treatment tank.  The letter was shown to me because Mr. Reno mentioned

his suspension in the letter, and I needed to be aware of the fact that in his letter Mr. Reno had

linked the water tank issues to his suspension from Delphi.  This was the first I had heard of any

waste water leak.

11.     In my mind, and with my responsibilities, Reno's environmental complaint

and letter had no bearing on the investigation into Reno's conflict of interest with a Delphi

vendor that was uncovered by Mr. Brown's investigation. The water tank issue was not involved

in the matter Mr. Brown was investigating and the substantive handling of environmental issues

was not an area for which I had any responsibility.  Consequently, Mr. Reno's involvement with

the water tank had no bearing on my decisions regarding Mr. Reno's employment and no one

asked for my counsel or guidance on the manner in which that issue, the water tank, should be

handled.  Moreover, no one at Delphi, either subordinate to, equal to, or superior to me instructed

4

me, hinted at, or even suggested that Mr. Reno be terminated because of his complaint about the water tank. The water tank matter was a separate and distinct matter to be handled by persons responsible for environmental operations.

**Suspension with Pay Turns to Termination.**

12.    At some point in March following Mr. Brown's return from vacation, I received and update on Mr. Brown's investigation.  The substance of this latest report was substantially the same as the report I had reviewed in February and the information I had received over the telephone from Mr. Brown.  I recall that Mr. Brown was conducting additional interviews but those additional interviews only corroborated the existing information, and did not provide anything new.

13.    Thus, based on the Brown report, I made the decision to terminate Mr. Reno's employment on March 17, 2004.  My reasons for terminating Reno include the following:

(a)    Reno used his position at Delphi to leverage the use of a Delphi vendor's dumpster for his own personal use on financial terms that were far more favorable to him than the terms would have been had he contracted with the vendor at arms length. Such conduct is directly contrary to Delphi's conflict of interest policies which prohibit employees from using their position at Delphi to seek favors or more favorable terms from our vendors.  In *Foundations For Excellence*, Delphi's policy describes a conflict of interest as

> . . . an obligation to or a relationship with any person or organization that competes or does business with Delphi that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation *and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement.*

See page 6 and 7 of Mr. Reno's acknowledged copy of *Foundations For Excellence*, attached hereto.

Examples of conflicts of interest are set forth in the *Foundations* booklet and include

" * Accepting services . . . from a supplier, . . ."  See page 7.

(b)      Reno paid $100 in cash to our vendor's driver for the "favor" of delivering the Onyx dumpster to Reno's home, retrieving the dumpster after Reno had filled it with debris, and returning the dumpster to an area at the Delphi Plant where it sat for several months.

(c)      After Mr. Brown commenced his investigation, Reno imposed on several subordinate employees to provide statements for Mr. Brown's investigation so that it would appear as if Reno intended to pay for the services.  I was informed by Mr. Brown that one of Reno's subordinates was asked to provide a false statement corroborating Reno's story that he had agreed with the Onyx driver to take full responsibility for the costs of the dumpster.  That subordinate refused to make such a false statement.  As far as I was concerned, such impositions on subordinates is an intolerable abuse of one's supervisory authority.

(d)      After Mr. Brown commenced his investigation, Reno approached the Onyx driver and asked him to obtain an Onyx receipt for the $100 cash payment Reno had given to the driver for the favor of allowing Reno to use the dumpster.

(e)      Reno lied during the investigation.  I consider the Onyx driver's recanted statement to be truthful because he specifically asked what would happen to him after Mr. Brown completed his investigation.  When Mr. Brown assured him that nothing would happen as long as he was telling the truth, the Onyx driver asked to change his statement.  To me, the fear of bad consequences if one knows he can get in trouble for not telling the truth is powerful motivation to tell the truth and avoid consequences.  Thus, in reviewing Mr. Brown's reports I gave more weight to the recanted statement by the Onyx driver than to Mr. Reno's

6

version of what happened.  Moreover, because there was no credible evidence to validate an arms length transaction between Mr. Reno and Delphi's vendor, Onyx, the Reno version - "I will pay for it" - was not at all reliable.  The Onyx driver's second story was substantiated by the fact that Onyx had no independent record of Mr. Reno's order for the dumpster, no any record of the $100 payment.

(f)     Reno's efforts to take advantage of a relationship with a Delphi vendor also resulted in a misappropriation of Delphi assets.

i.     Delphi human resources were diverted to this investigation.  Mr. Brown's investigation required numerous, time consuming interviews in order to clarify inconsistent information supplied by witnesses, including the lies from Reno.

ii.     When witnesses are interviewed or management is required to deal with the results of this kind of investigation, human resources are diverted from Delphi's mission to resolving matters that distract from, take time away from and do not advance Delphi's purpose as a world class producer of automotive parts.  Moreover, significant financial resources are expended when an outside investigator is required to devote time to conduct such an investigation.

(g)     Finally, the fact  that Reno lied about the facts in an effort to misdirect the investigation is equally intolerable and, in my opinion, the lies coupled with the other infractions constituted gross misconduct warranting a termination for cause.

14.     I was the final decision maker in this matter.  Although I got input from Mr. Brown and others regarding his investigation, the final decision was mine.

15.     Based on all of the foregoing, it was my decision, to terminate Mr. Reno effective March 17, 2004.

16.     Reno was terminated for gross misconduct, so he was not eligible to receive COBRA benefits.

Dated this 21 day of February, 2007.

_____*/s/ Elizabeth Patrick*_____
Elizabeth Patrick

# **<u>EXHIBIT 1</u>**

## Employee Acknowledgement

I acknowledge that I have received a
copy of the booklet, "Foundation for
Excellence."

JOSEPH M. RENO
_____
Name

*Joseph M Reno (signature)*
_____
Signature

4/3/01
_____
Date

*Please return this signed form to your
local Human Resources Department.*

**DELPHI**
Automotive Systems



DEFENDANT'S
EXHIBIT
3
RENO

PENGAD 800-631-6989

DC 180

DC 181

# TABLE OF CONTENTS

## *Foundation for Excellence*

A MESSAGE FROM J.T. BATTENBERG III _____ 2

PERSONAL INTEGRITY _____ 3
    Complying with the Law

EXCELLENCE IN THE WORKPLACE _____ 5
    Managing Diversity
    Health & Safety Policy
    Conflicts of Interest
    Protecting Corporate Property
    Accurate Information, Records & Communications
    Responding to Legal Investigations
    Information Requests
    Communicating with the Media
    Internet/Intranet Usage
    Internet Chat Rooms

EXCELLENCE IN THE MARKETPLACE _____ 11
    Product & Service Quality
    Fair Competition
    Suppliers & Fair Treatment
    Honest Communications
    Gifts, Entertainment & Gratuities
    Soliciting Gifts or Favors
    Accepting Gifts or Favors
    Accepting Invitation of Entertainment
    Customer/Supplier Entertainment Policies
    Others

EXCELLENCE IN SOCIETY & OUR COMMUNITIES _____ 16
    Avoiding Improper Payments
    Import/Export Controls
    Delphi Insider Trading Policy
    Corporate Citizenship
    Environmental Principles

THE DELPHI PRINCIPLES _____ 21

DELPHI
Automotive Systems

FOUNDATION
FOR EXCELLENCE

A GUIDE TO REPRESENTING
DELPHI WITH INTEGRITY

DC 182

3

# Personal Integrity

**INTEGRITY** – *We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.*

Integrity begins with each of us – the judgments and decisions that we make as individuals.

How do we define personal integrity? First, it means exemplifying the Principles and Absolutes of Excellence in our own conduct and complying with Delphi policies, even when we may not agree with them. In a global enterprise, legitimate differences of opinion may arise as to the appropriateness of the corporate policies across worldwide operations.

While such differences are understandable, and can lead to a healthy discussion of choices, they do not excuse us from observing the existing policies. We are always welcome to voice our concerns and to request exceptions for special circumstances through appropriate leadership when warranted. It is important that we use our judgment not only to consider the precise meaning of our stated values or policies, but also the spirit and intended purpose of them as we make these choices.

Second, it means we have a responsibility to voice concerns when we believe Delphi or fellow employees are acting contrary to existing policies. Collectively, we are the corporation, and the actions of one individual can damage the reputation of all. When someone compromises the Principles of Excellence or policies, we should either inform them directly, or use other available channels to voice our concerns. The best option is usually to discuss the situation with a manager. Alternatively, we can bring our concerns to functional experts such as the



Dear Colleagues,

*Delphi is establishing a culture based on the Principles and Absolutes of Excellence, a culture encompassing passion, creativity and common business processes. It is a culture that brings us together as a team, and makes each of us responsible for examining our own actions, to ensure that we represent Delphi with excellence.*

*Achieving our vision – to be recognized by our customers as their best supplier – can only be achieved through consideration, fairness and dignity in all that we do. Each of us represents the entire Delphi organization. As we conduct our business, we need to respect the people and environments in which we work.*

*Foundation for Excellence is our guide for employee conduct. I encourage you to read this document thoroughly, while keeping in mind that the guidelines cover a wide range of Delphi's business processes. It is important that we all understand them in order to support our fellow colleagues and our corporate vision. Following these policies and guidelines will help make Delphi an excellent company to work with, both for our customers and our employees.*

Regards,

J. T. Battenberg III
Chairman, CEO and President
Delphi Automotive Systems

2

DC 183

# Excellence in the Workplace

**TRUST IN RELATIONSHIPS** – *We expect our people to build and maintain a foundation of trust and respect in everything we do.*

## MANAGING DIVERSITY

Delphi values its diverse, dedicated global workforce that is committed to Excellence and a culture where individual strengths, combined with teamwork, are a recognized source of our mutual success. As a leader in automotive components, systems and modules, we draw on the unique background of each employee to offer new perspectives and solutions as we strive to be our customers' best supplier.

We believe that attracting and retaining qualified talent is vital to Delphi's continued success. Delphi has an ongoing commitment to diversity, equal opportunity, and non-discrimination. Opportunities are extended to qualified applicants and employees on a non-discriminatory basis. The organization is enriched through the representation of diverse experiences, backgrounds, ethnicity, lifestyles, cultural orientation and beliefs. Reasonable accommodations are made for the physically challenged and persons with disabilities.

Consistent with the above philosophy, Delphi is dedicated to creating a workplace environment that enables every team member to contribute fully. It is our policy to comply with applicable employment laws wherever we conduct business. It is every employee's responsibility to act in a manner that supports this policy and to maintain the workplace environment free from all discrimination, hostility and harassment, including sexual harassment.

---

Legal Staff, Audit Staff, Security or Human Resources. We also have available the EthicsLine (888.679.8848) in many countries for employees who are uncomfortable discussing their concerns with their leadership.

## COMPLYING WITH THE LAW

In order to comply with the law, we must know the law. For many of us, this means we will need advice or training from experts to understand our responsibilities. Common sense, our conscience and good intentions are not always enough. At a minimum, we must learn enough about the laws that affect what we do to spot potential issues and then follow through to get answers about the right way to proceed.

Complying with the law requires more than knowledge, it requires action. This takes a high degree of cooperation and communication – the essential elements of teamwork. As a member of the team, if someone thinks some aspect of Delphi's business may be in violation of the law they should raise the issue with management or the Legal Staff.

The worst thing we can do is to ignore or try to cover up a potential problem and allow it to grow more severe over time.

4

DC 184

Supervisors and managers are held accountable to prevent discrimination and to support equity in addressing employee concerns and/or complaints. Delphi will not tolerate behavior that is inconsistent with this policy and will take appropriate action to prevent such behavior from occurring.

Full support of the corporation's policy on diversity and equal opportunity along with the necessary efforts to ensure that all recruitment, employment, training, promotions and other personnel actions comply with these principles is essential. This policy reflects our belief that a capable and committed workforce perpetuates Delphi's creativity, innovation, growth and success.

## HEALTH & SAFETY POLICY

Delphi is committed to protecting the health and safety of each employee as our overriding priority. We believe that all occupational injuries and illnesses are preventable. There will be no compromise of an individual's well-being in anything we do. The implementation of actions to help our employees realize a healthy, injury-free environment is a leadership responsibility. Continuing support of this effort is the responsibility of everyone. We will lead the Delphi team to ensure that we protect the well-being of every member.

## CONFLICTS OF INTEREST

For us to help Delphi earn and maintain its reputation as a company that conducts business with the utmost integrity, we must avoid actions or relationships that might conflict or even appear to conflict with our job responsibilities or Delphi's interests.

A conflict of interest is an obligation to or relationship with any person or organization that competes or does

business with Delphi, that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement. The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest.

Examples of potential conflicts of interest include:

*   Investing in a supplier, customer or competitor

*   Accepting services or receiving payment from a supplier, customer or competitor

*   Having close family members who work for suppliers, customers or competitors

*   Working outside Delphi without department director approval

Occasionally conflicts of interest may arise through involvement in public service or charitable activities, such as holding public office or involvement in charitable organizations. Before accepting such responsibilities, we need to familiarize ourselves with the extent to which Delphi has interests or business affected by our involvement, and ensure that no corporate assets, including the Delphi name, are used or referred to in connection with such activities.

Outside employment can also create conflicts of interest. We are expected to devote our full time and attention to our work during regular business hours and for whatever additional time may be required.

Delphi expects all employees to disclose promptly any situation that could result in an actual or potential conflict of interest. If we are not sure the situation creates a

interpretation. Litigation is a fact of life in societies governed by many laws that give a variety of authorities broad investigative powers.

Legal papers and investigations normally flow through established channels, but there may be occasions where inquiries and legal papers are received by other employees. If you should receive these types of papers in your capacity as a representative of Delphi, consult the Legal Staff immediately, before submitting to an interview, answering questions about Delphi business, producing any documents or even responding to any requests made in connection with litigation or an investigation.

## INFORMATION REQUESTS

Information is one of Delphi's most valuable assets in the competitive global marketplace for our products and services. We all share a responsibility to protect valuable Delphi information for our mutual benefit.

Delphi information includes all information related to our business, created or acquired using Delphi resources, regardless of the specific nature or form of the information. We will maintain confidentiality of customer information.

## COMMUNICATING WITH THE MEDIA

We strive to maintain integrity in our relationships with the media and general public by providing clear and accurate communication. All Delphi divisions and regions have a designated Public Affairs or Communications function, which is responsible for communicating the Corporation's position on a range of issues.

If you are contacted by a member of the press, you should notify your manager and your division or regional

9

---

conflict, we should seek the help of our supervisor or Human Resources contact person.

## PROTECTING CORPORATE PROPERTY

We have an obligation to safeguard corporate assets by ensuring they are properly maintained and used to further Delphi business interests. We should always consider whether our decision to use or commit a resource is in the best business interest of the corporation.

Business assets should not be used for personal reasons. However, situations may arise where infrequent and limited personal use is acceptable. When such situations arise, use sound judgment, common sense and discuss the issue with your manager if there are doubts about the appropriateness of the use.

## ACCURATE INFORMATION, RECORDS & COMMUNICATIONS

Decisions are made based on the accuracy of information recorded at all levels of the organization. Inaccurate information can lead to poor decision making. Additionally, our customers, suppliers and government officials rely on us to be honest and provide accurate information on subjects ranging from our products and services to Delphi's financial performance and our environmental practices.

It is our responsibility to ensure that all information and records are maintained honestly and accurately, and that any errors are promptly recognized, communicated to appropriate management and corrected.

## RESPONDING TO LEGAL INVESTIGATIONS

Despite our best efforts to comply with all applicable laws and regulations, there will always be matters of

8

DC 186

*Please Note:*
*Amendment to paragraph 2 on preceding page.*

## INTERNET/INTRANET USAGE

The Delphi provided internet connection is intended to be used primarily for business purposes. Any personal use must not interfere with normal business activities, involve solicitation, be associated with any for-profit outside business activity or potentially embarrass Delphi. Users are expected to act responsibly and in Delphi's best interests whenever they use the Delphi provided internet connection.

Communications department to ensure that the most appropriate person or team responds. Employees are generally not authorized to immediately respond to journalists. Responsible members of the media do not expect impromptu answers. As a general rule, even if a Delphi employee is the subject matter expert, media questions should be referred to the Delphi Communications or Corporate Affairs Staff.

## INTERNET/INTRANET USAGE

Use of the intranet, as with other Delphi assets, should be limited to situations related to our work assignments. It is never acceptable to use Delphi equipment to access or create material that is illegal or inappropriate. If in doubt, ask your supervisor or the Information Systems & Services group.

## INTERNET CHAT ROOMS

It is Delphi's policy not to respond to chat room rumor or speculation.

To maintain confidentiality of Delphi information, employees are not to respond to any inquiries or post any information on the Internet relative to Delphi unless specifically asked to do so by their supervisor and the response is cleared through Corporate Affairs and/or Legal.

10

DC 187

# Excellence in the Marketplace

**CUSTOMER ENTHUSIASM** – *Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.*

## PRODUCT & SERVICE QUALITY

It is our goal to be our customers' best supplier. We must be mindful of that goal at every phase of our relationship with customers – from the design of our products to the discussions we may have with them about service issues. We must passionately pursue customer satisfaction by being entrepreneurial, fast, less bureaucratic, customer focused, innovative and excellent in everything we do.

## FAIR COMPETITION

We believe in competing fairly because we all benefit from fair, free and open markets. We compete strictly on the merits of our products and services and make no attempts to restrain or limit trade.

Specifically:

- We never discuss such matters as prices, pricing strategies, product or marketing plans or terms of sale with competitors. Should a prohibited subject come up during a discussion or meeting, leave and inform leadership or the Legal Staff.

- We do not enter into agreements with our competitors concerning prices, production volumes, customers or sales territories.

DC 188

- We do not link purchase of one product to another or compel suppliers to buy from us to retain their Delphi business.

- We do not disparage the products or services of a competitor.

- We collect competitive information through proper public or other lawful channels and do not use information that was obtained illegally or improperly by others, including through misrepresentation, invasion of property or privacy or coercion.

Not only is fair competition a matter of our own values, it is also a matter of law in most every country Delphi conducts business. Competition law requirements may exist in specific countries. Contact the Legal Staff for more information.

## SUPPLIERS & FAIR TREATMENT

Our suppliers are valued partners in the success of our business. Our relationships with suppliers must be characterized by honesty and fairness. They are selected on the basis of quality, service, technology and price. Terms and conditions defining our relationship with suppliers are communicated during the request for quote process and agreements to such terms and conditions, or any acceptable modifications, are reached before work begins. Included in the standard terms and conditions are Delphi's policies regarding payment terms, confidentiality, the use of intellectual property and labor practice expectations.

## HONEST COMMUNICATIONS

Customers, suppliers, government agencies and communities depend on the honesty and accuracy of our communications. We are each responsible to communicate in a forthright and honest way, free of any misleading or inaccurate information. This includes not overcommitting on what we can deliver, and promptly informing affected parties when changes occur. When we make a mistake in what we have told someone, we must take prompt action to correct it.

## GIFTS, ENTERTAINMENT & GRATUITIES

Our policy on gifts, entertainment and gratuities is designed to reflect our values. We are charged with the responsibility to make decisions, based upon business considerations. The terms "suppliers" and "customers" in the policy below are used in the broadest possible sense. A supplier is any person or organization, inside or outside the Corporation, who furnishes goods or services to the Corporation. A customer is an individual or organization, inside or outside the Corporation, who receives goods and services.

## SOLICITING GIFTS OR FAVORS

Employees may not solicit, for personal reasons, any gifts or favors from an individual or an organization that does business with Delphi – or one which seeks to do so. The size of the gift or favor is immaterial. Soliciting gifts or favors – either directly or indirectly – from customers, suppliers, potential customers or suppliers, is strictly prohibited. All conduct in this regard that creates even the appearance of impropriety must be avoided.

12

13

## ACCEPTING GIFTS OR FAVORS

*It is permissible to accept gifts or gratuities from a customer, supplier and/or a potential customer or supplier where they are freely offered, it's legal and a business-related purpose exists.* Acceptance from that particular supplier or customer should be infrequent, and generally the value, not the cost, is less than $50.00 (US$). As a general guideline you should not accept anything that:

1. Compromises, or appears to compromise the integrity of the business relationship

2. Places you or others in an unsafe environment (e.g., alcohol-related activities)

3. Potentially embarrasses or damages your reputation or the reputation of the company

Specific questions should be discussed with your supervisor, the local Human Resources representative or the Legal Staff.

## ACCEPTING INVITATION OF ENTERTAINMENT

Accepting an invitation of entertainment from customers, suppliers and potential customers or suppliers is permissible where the invitations are freely offered, and a business-related purpose exists. Acceptance from that particular supplier or customer should be infrequent and entertainment and meals should not be lavish. Employees are to be accompanied by the person or organization providing the entertainment. As a general guideline you should not accept an invitation of entertainment that: 1) compromises the integrity of the business relationship, or 2) places you or others in an unsafe or inappropriate environment (e.g., alcohol-related activities, adult entertainment clubs).

Specific questions should be discussed with your supervisor, the Human Resources representative or the Legal Staff.

## CUSTOMER/SUPPLIER ENTERTAINMENT POLICIES

To the extent our customers and suppliers discourage or forbid the receiving of gifts, entertainment or other gratuities by their employees, Delphi employees are expected to know and respect those customer and supplier policies and practices.

## OTHERS

Other important relationships that Delphi maintains can impact our business. Examples of this are our relationships with governmental officials, unions and union representatives.

Gifts, entertainment, or other gratuities should never be provided to a governmental official without first getting approval from a senior officer responsible for Delphi operations in the particular country or region involved. Due to the complexity of relevant laws and regulations, and varying cultural and ethical norms, any decision to provide a gift, entertainment or gratuity, including meals, to a government official should be discussed with the Legal Staff.

Similarly, it may be illegal to provide a gift, entertainment, or other gratuity to a union or union official in the United States or other countries. Do not hesitate to obtain advice from the Human Resource or Legal Staffs before providing a gift, entertainment or other gratuity to a union or union official.

DC 190

## Excellence in Society & Our Communities

**RESPONSIBILITY TO SOCIETY** – *We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.*

## AVOIDING IMPROPER PAYMENTS

We believe in promoting good governance and the fair and impartial administration of laws. It is, therefore, strictly prohibited to give anything of value directly or indirectly to a government official in order to influence his or her judgment in the performance of official duties.

In addition, as a United States-incorporated company, bribery payments by any Delphi employee or agent to foreign officials are illegal under the U.S. Foreign Corrupt Practices Act (FCPA). Under FCPA, Delphi is accountable for the actions of its employees, including non-United States citizens and employees of non-U.S. based subsidiaries and agents throughout the world. Similar legislation is being enacted in many countries, including France, Germany and Japan as part of a global effort to combat corruption and bribery. There are circumstances where facilitating payments may be appropriate, but those situations must be discussed with the Legal Staff prior to any action being taken. Any questions as to whether a gift or payment would be considered improper under our guidelines or national laws must be discussed with the Legal Staff.

16

## IMPORT/EXPORT CONTROLS

We must abide by special laws and regulations that apply to the export of products and technical data. All employees who are involved with exports have an obligation to become familiar with the regulations and procedures that apply in their location. We must also comply with anti-boycott and international embargo regulations in all locations where we do business.

## DELPHI INSIDER TRADING POLICY

As employees of Delphi, it is illegal to trade Delphi securities on the basis of material inside information. Inside information is information that is known inside Delphi but is not known to the general investing public. It is sometimes called "non-public information." "Material" information is that which a reasonable investor would consider important in a decision to buy, hold or sell Delphi's stock. If the information could change the price of Delphi's stock, it is material.

Some examples of information, whether positive or negative, that are material include:

- Earnings and dividend amounts
- Projections of future earnings or losses
- Pending labor negotiations or disputes, including possible strikes
- Pending or proposed mergers, acquisitions or tender offers
- Significant sales of assets or the disposition of a subsidiary
- Changes in dividend policies, the offering of additional securities or a stock split
- Changes in top management

DC 191

**Delphi Volunteers** – A philosophy aimed at enabling and inspiring our employees to give to the community in the way they tell us is most meaningful: through the provision of personal time and talent.

Overall, Delphi targets educational opportunities and support systems aimed at helping young people reach their full potential. Special – though not exclusive – consideration is given to educational programs focused on science and technology. Primary consideration is given to requests that:

- Link to Delphi's business vision and mission

- Are innovative in approach

- Demonstrate an ability to measure effectiveness

- Are customer-driven

- Are global programs that encourage international reach and involvement

- Clearly articulate the benefits to Delphi and its local communities

## ENVIRONMENTAL PRINCIPLES

As a responsible corporate citizen, Delphi Automotive Systems is dedicated to protecting human health, natural resources and the global environment. This dedication reaches further than compliance with the law to encompass the integration of sound environmental practices in our business decisions.

The following environmental principles provide guidance to Delphi Automotive Systems personnel worldwide in the conduct of their daily business practices.

- We are committed to actions to restore and preserve the environment

- Significant new products or technological advances

- Significant changes in production schedules or product planning

- The gain or loss of a substantial customer or contract; or extraordinary borrowing, changes in debt ratings or impending bankruptcy or liquidity problems

Every manager is responsible to see that any employee who could learn of material inside information is aware of the complete Delphi Insider Trading Policy and implications of the policy.

The complete Delphi Insider Trading Policy is posted on Delphi's Intranet, Apollo. For questions about Insider Trading, please contact the Delphi Legal Staff, in particular, the Assistant General Counsel – Corporate and Securities.

## CORPORATE CITIZENSHIP

Delphi Automotive Systems strives to achieve an effective global philanthropic program that supports our business objectives while helping society, particularly in the communities in which we reside. Delphi's three-pronged approach to corporate citizenship includes:

**The Delphi Foundation** – The umbrella for our philanthropy effort is our self-funding Foundation. Its priority is education, primarily in the areas of science and technology.

**Delphi Community Relations** – As a corporate citizen in numerous communities around the world, this effort seeks to ensure the presence of the Delphi brand in our local communities in such a way that our company is viewed as a "neighbor of choice." The priority also is largely educational in focus, but contributions are tailored to local needs and priorities as well.

18

DC 192

# The Delphi Principles

**Customer Enthusiasm** – Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.

**Trust in Relationships** – We expect our people to build and maintain a foundation of trust and respect in everything they do.

**Integrity** – We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.

**Responsibility to Society** – We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.

**Dedication to EXCELLENCE** –
We are determined to achieve EXCELLENCE in everything we do. Our future success depends on uncompromising adherence to our vision and the absolutes of EXCELLENCE.

For more information about Excellence visit Apollo, Delphi's employee home page, at http://apollo.delphiauto.com/excellence/.

- We are committed to reducing waste and pollutants, conserving resources and recycling materials at every stage of the product life cycle.

- We will continue to participate actively in educating the public regarding environmental conservation.

- We will continue to pursue vigorously the development and implementation of technologies for minimizing pollutant emissions.

- We will continue to work with all governmental entities for the development of technically sound and financially responsible environmental laws and regulations.

- We will continually assess the impact of our plants and products on the environment and the communities in which we live and operate, with a goal of continuous improvement.

20

DC 193



DC 194

# **EXHIBIT C**

MHR-5-2004  08:57H FROM:                                        TO:4559179              P:2/4



American Testing Services, Ltd.
3060 East River Road
Dayton, OH  45439

## On-Site Inspection Report

---

**Customer Information**

Pyramid Riggers
2076 North Broad Street
Fairborn,        Ohio    45324

**Date:**        2-20-04
**PO Number:**
**Job Number:**  ATS-MPF-471

**Item(s) to be Inspected:**
100% of welds on floor of chromic acid waste tank

**Inspection Method(s) to be Utilized:**
hand yoke S/N 1018 and 10517 dry red powder batch #038707-014

**Specification or Code:**
ASW D1.1 / no cracks allowed

**Results of Inspection:**
100% of welds on floor were inspected and were accepted at time of inspection.  There was one crack
located on the floor at the south end approx. 1.5" from outside wall and 2" west of the center weld.
Crack is approx. 15" long.  This tank is rejected.

**Technician:**   Jeff Adams Level III
                  Signature on File

DC 417

MAR-5-2004  08:57A FROM:                          TO:4559179          P:4/4

## READINGS AND LOCATIONS SIDE WALL
### South



Manway → 

North

*Wall thickness Readings.
Orig. 0.25 in*

| 58. | .253 | 69. | .255 |
| 59. | .254 | 70. | .267 |
| 60. | .252 | 71. | .264 |
| 61. | .248 | 72. | .266 |
| 62. | .246 | 73. | .268 |
| 63. | .249 | 74. | .264 |
| 64. | .252 | 75. | .262 |
| 65. | .255 | 76. | .259 |
| 66. | .260 | 77. | .248 |
| 67. | .260 | 78. | 255 |
| 68. | .256 | 79. | .253 |

DC 418

MHR-5-2004  08:57A FROM:                           TO:4559179                    P:3/4

## READINGS AND LOCATIONS OF FLOOR
### South



Floor reading

Orig - 0.25 in

Manway → 

North

| 1. | .266 | 16. | .272 | 31. | .264 | 46. | .268 |
|----|------|-----|------|-----|------|-----|------|
| 2. | .287 | 17. | .280 | 32. | .263 | 47. | .260 |
| 3. | .283 | 18. | .270 | 33. | .262 | 48. | .270 |
| 4. | .245 | 19. | .221 | 34. | .244 | 49. | .276 |
| 5. | .254 | 20. | .243 | 35. | .268 | 50. | .257 |
| 6. | .246 | 21. | .251 | 36. | .250 | 51. | .256 |
| 7. | .246 | 22. | .246 | 37. | .258 | 52. | .256 |
| 8. | .262 | 23. | .239 | 38. | .246 | 53. | .259 |
| 9. | .257 | 24. | .263 | 39. | .268 | 54. | .258 |
| 10. | .268 | 25. | .230 | 40. | .253 | 55. | .246 |
| 11. | .249 | 26. | .264 | 41. | .248 | 56. | .268 |
| 12. | .239 | 27. | .265 | 42. | .266 | 57. | .263 |
| 13. | .254 | 28. | .247 | 43. | .257 | | |
| 14. | .239 | 29. | .255 | 44. | .253 | | |
| 15. | .265 | 30. | .255 | 45. | .257 | | |

DC 419

# EXHIBIT D

# HRC
## HUBBELL, ROTH & CLARK, INC.
### CONSULTING ENGINEERS

Walter H. Alix
George E. Hubbell
Peter T. Roth
Michael D. Waring
Keith D. McCormack
Curt A. Christianson

CHIEF FINANCIAL OFFICER
J. Bruce McFarland

SENIOR ASSOCIATES
Frederick C. Navarre
Gary J. Tressel
Lawrence R. Ancypa
Kenneth A. Melchior
Dennis M. Monsere
Randal L. Ford
David P. Wilcox

Nancy M.D. Faught
Jonathan E. Booth
Michael C. MacDonald
Marvin A. Olane
James C. Hanson
Richard F. Beaubien
Margaret Synk Kuhn
William R. Davis
James J. Aleo
Daniel W. Mitchell
Joel E. Bowdan
Jesse B. VanDeCreek
Robert F. DeFrain
Marshall J. Grazioli

March 26, 2004

Delphi
M/C 480-410-166
5825 Delphi Drive
Troy, MI 48098

Attention:  Mr. Mark Hester, Asst. General Counsel

Re:  Summary of Site Visit                                    HRC Job No. 20040218.02
     Kettering, Ohio WWTP Tank Evaluation

Dear Mr. Hester:

Thank you for the opportunity to assist Delphi with evaluating the wastewater treatment tanks at your Kettering, Ohio facility.  Mr. Ed Cote, P.E. of HRC visited the site on March 6, 2004 and the following is a report of the visit as well as follow-up tasks.

**Background**

Mr. Cote visited the site and met with the following Delphi employees:

- Marty Cristo
- Mark Gooding
- Jerald Lee
- Roy Knapp

Wastewater containing hexavalent chromium (chrome) is treated in two parallel, 75,000 gallon coated, carbon steel batch treatment tanks.  The process consists of filling one tank while the other is in the treatment mode.  The first step is to adjust the pH to between 2.0 and 2.5 with sulfuric acid while adding sodium bisulfite to reduce the hexavalent chrome to its trivalent state.

The tanks were constructed in 1977 from carbon steel with an epoxy coating.  The foundation consists of a concrete ringwall with the welded steel floor installed over oiled sand.  The area around the tank consists of gravel and is reportedly built on backfill.  The wastewater tank farm is surrounded by a concrete retaining wall which extends approximately 4 feet above grade.

**Tank Inspection and Repairs**                                          DC 480

Crown Environmental's second shift personnel noticed a very small leak emanating from the bottom of one of the two batch chrome treatment tanks, Tank 2, and immediately took action.  A 50,000 gallon sludge

Corporate Office: 555 Hulet Drive • P.O. Box 824 • Bloomfield Hills, MI 48303-0824 (Mailing – P.O. Box) – 48302-0360 (UPS Zip)
Telephone: (248) 454-6300 • FAX: (248) 338-2592 or (248) 454-6312 • www.hrc-engr.com

Y:\200407\20040218\Proposal\Crm\Summary.doc

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 2

holding tank was put into service with heavy duty hose connections (camlock fittings) to provide storage for incoming wastewater while the suspect batch tank was taken out of service.

Delphi drained Tank 2 and cleaned the inside with a high pressure water spray. It was immediately evident that the coating had failed in a number of small areas where the coating was blistered or missing. It was also evident that the wastewater formed a tenacious coating on top of the epoxy coating because the sludge layer was very difficult to remove with high pressure water blasting.

Delphi retained American Testing Services, Ltd. (ATS), a local testing service, to perform a tank inspection per the American Society of Welding D1.1 code. They reported that 100% of the welds on the floor were inspected and they found that the thickness was approximately equal to the original design of 0.25 inch thickness. ATS also reported a 15 inch long crack in the weld on the tank bottom, which was the source of the leak. ATS' report also showed that the metal thickness on the blistered paint areas was approximately equal to the original design.

Delphi personnel also found a small area of corrosion on the bottom of the sidewall. This area and the 15 inch crack were repaired with welded patches (steel plates). The welding was performed by a local industrial welding service.

The tank coating was found to be in poor condition on the bottom and along the sides up to almost three feet. The entire tank bottom plus 3 feet up the side of the tank from the bottom were recoated. The individual blisters were also recoated. Coating was accomplished by sandblasting to white metal and coating with an epoxy novolac material. Delphi reported that this coating is used in the chrome plating areas with very good success. This coating is considered superior to the original coatings which were believed to be epoxy.

The tank was put back into service and it was found that the repair of the small leak was successful. The tank was then drained prior to HRC's visit to allow a visual inspection. Mr. Cote inspected the coating from the opened manway and the overhead walkway. The repaired surfaces appeared to be professionally applied similar to a new tank.

The Delphi team and Mr. Cote met after the inspection and reasoned that Tank 2 was not in danger of structural failure. The thickness testing showed that the tank was of similar thickness to a new tank, so there was no reason to suspect additional concerns. Based upon a review of the tank thickness testing and Mr. Cote's visual inspection, the team saw no immediate threat of a catastrophic tank collapse. The Delphi team and Mr. Cote decided to put the tank back into service as soon as practical since we deemed the risk of utilizing hoses with camlock fittings greater than the likelihood of a catastrophic tank failure.

The team discussed the need to drain and inspect all of the facility's wastewater tanks as soon as possible or instead wait for the July shutdown when the incoming wastewater flow is very small. We discussed the fact that these tanks are of similar construction and age as hundreds of others in the U.S. Automotive industry. HRC shared some information about another large manufacturing client's program to repair tanks and HRC was asked to learn more (see HRC's Findings and Recommendations section below). In particular, the Delphi team was interested in the qualifications of those that repaired the tanks.

## Secondary Containment

The team agreed that wastewater treatment tanks are exempt from the federal SPCC regulations. Mr. Cote noted that many corporations have a mixture of sites with and without secondary containment of

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 3

wastewater treatment tanks.  The tank farm is surrounded by a poured concrete retaining wall which has several relatively small cracks or expansion joints which would allow an escape of spilled liquid. The team agreed that most of the contents of a spill would be contained by the walls surrounding the porous stone over the large area, however, so the urgency of repairing cracks is minimal.

There is one area of the retaining wall which was damaged by a truck and the team recommended that it be repaired.

A storm sewer runs through the containment area with two manholes with solid covers. The team agreed that covers should be inspected and the gaskets replaced, if necessary, to prevent a possible migration offsite in the event of a spill.  The team noted that a large spill could leave the site if it found its way through the soil into joints in the storm sewer.

## HRC's Findings and Recommendations

HRC contacted several tank companies and our other contacts in the automotive industry with the following to report:

1.  Delphi responded to the suspected leak on the sidewall immediately and appropriately.  The tank was emptied and inspected both visually and with thickness testing.  Two isolated areas were repaired with steel plates.  The coatings were repaired with an epoxy novolac coating which is superior to the original coating.  The new patched areas and the original coatings effectively protect the steel tank.

2.  The Delphi team stated that they would prefer to repair Tank 1 during the July 2004 shutdown when flows are very low.  Delphi further stated that they would perform thickness testing of Tank 1 immediately to substantiate their belief that there is no immediate threat of tank failure. HRC received a faxed report from Delphi on March 17 which showed that the thickness was approximately 0.25 inches at four points taken on the sidewall. This testing indicates that the tank wall thickness is approximately equal to the original.  HRC recommends that Tank 1 be taken out of service during the July shutdown, cleaned, inspected, and repaired as was done with Tank 2. This statement is based upon the fact that Tank 2 operated since 1977 under similar conditions and did not pose an imminent risk of catastrophic failure as demonstrated by a thorough tank inspection.

3.  In general, the automotive industry's tanks were constructed per the American Petroleum Institute (API) Specification No. 650.  API's standard for inspection and repair is covered under API 653. In general, the automotive industry uses certified API tank inspectors to inspect the tanks after they are drained and cleaned with water blasting.

4.  The automotive industry generally uses experienced tank repair crews who are familiar with API's repair requirements.  There are instances when a certified inspector has been used to oversee the repair work of local welders.  Delphi's tank repairs were performed by a local industrial welding service, but it should be noted that the bottom is fully supported by a sand cushion and is subject to less stress than the sidewalls.  Therefore, these welded patches are not as significant as on the sidewall.

5.  The condition of tanks within the automotive industry varies depending upon the service, but in general, the situation is similar to Delphi's chrome tanks; the coatings have failed on the bottom, along the sidewall up to the baffles, and the baffles themselves.  This is probably due to the fact that heavy abrasive materials tend to reside in the bottom of a batch tank.

DC 482

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 4

6. Automotive tanks appear to last longer than those in the municipal water and wastewater industry, for example. HRC suspects that a protective coating of sludge is formed over the original tank lining which protects the carbon steel. This coating is probably composed of precipitated metals combined with oils.

We appreciate the opportunity to provide Delphi with engineering services. Please contact us with any questions you may have.

Very truly yours,

HUBBELL, ROTH & CLARK, INC.

Curt A. Christeson, P.E.
Principal/Vice President

Edward L. Cote, P.E. DEE
Department Head, Industrial Facilities

CAC/jjb/scb

DC 483

Y:\200402\200402181\Proposal\CorrSummary.doc

TOTAL P.05

# EXHIBIT E

**U.S. Department of Labor**

Occupational Safety & Health Administration
Cincinnati Area Office
36 Triangle Park Dr.
Cincinnati, OH 45246
(513) 841-4132
Fax: (513) 841-4114



MAY 2 0 2004

Joseph M. Reno
5012 Lytle Road
Waynesville, Ohio 45068

Re:   Delphi Corporation/Reno/5-1610-04-034
      Secretary's Findings

Dear Mr. Reno:

This is to advise you that we have completed our investigation of the above-referenced complaint which you filed against Delphi Corporation ("Respondent") under the employee protection provisions of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c).  Complainant, Joseph M. Reno, claimed that Respondent terminated him for writing a letter to corporate about the safety and environmental issues surrounding the wastewater treatment plant

Following an investigation of this matter by a duly authorized investigator, the Secretary of Labor, acting through her agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region V, finds no reasonable cause to believe that Respondent violated the complainant's rights under Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c).

Respondent is a manufacturing facility that has a waste removal and wastewater treatment plant with wastewater containing hexavalent chromium.  Respondent's principal place of business is located in Kettering Ohio.  Therefore, Respondent is a company within the meaning of EPA.

Respondent hired Complainant in August 1981, and at all relevant times he was employed as a Senior Environmental Engineer with responsibility for waste removal and wastewater treatment at Respondent's Kettering and Moraine, Ohio manufacturing facilities.  Complainant was an employee within the meaning of the EPA.

Complainant was discharged on or about March 17, 2004.  On or about March 17, 2004, Complainant filed a complaint with the Occupational Safety and Health Administration alleging that Respondent discriminated against him in violation of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c). This complaint was timely filed.

The findings show that Respondent terminated Complainant for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest, and trying to obstruct and mislead Delphi's subsequent investigation.

For the reasons noted above, this investigation finds no reasonable cause to believe that Complainant was terminated in violation of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c) and the complaint is therefore dismissed.

Complainant and Respondent have 30 days from receipt of these Findings to file objections and request a hearing on the record, or they will become final and not subject to court review.  Objections must be filed with the Chief Administrative Law Judge, U.S. Department of Labor, 800 K Street NW Suite 400, Washington, D.C. 20001, with this office and with the Regional Administrator, U.S. Department of Labor – OSHA, 230 S. Dearborn St. 32nd Floor, Chicago, IL  60604. The Respondent and any named party must also be provided notice of objections and requests for a hearing on the record.

If you have any questions, please do not hesitate to call me at (513) 841-4132.

Sincerely,


Richard T. Gilgrist, CIH
Area Director

cc:   Chief Administrative Law Judge
      Respondent
      EPA

# EXHIBIT F

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.Delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                         :
      In re                        :     Chapter 11
                                       :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                       :
                                       :     (Jointly Administered)
               Debtors.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 12163 (EVA ORLIK)

("SUPPLEMENTAL REPLY – EVA ORLIK")

     Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-

possession in the above-captioned cases (collectively, the "Debtors"), hereby submit their

1

Supplemental Reply With Respect To Proof Of Claim No. 12163 (Eva Orlik) (this "Supplemental Reply"), and respectfully represent as follows:

Introduction

1.      Eva Orlik ("Orlik"), a former employee of Delphi Automotive Systems Corporation, a/k/a Delphi Automotive Systems LLC ("Delphi"), asserts that she is entitled to over $1.3 million dollars – nearly $900,000 of which is for punitive damages – because she endured a hostile environment, was treated less favorably than non-Polish workers, and was fired from her internal audit position for raising accounting concerns with Delphi auditors.  Orlik received a default judgment in an Indiana court but that court did not, prior to the bankruptcy filing, hold a hearing to determine damages.  On damages, Orlik is not entitled to anywhere close to the damages she seeks.

2.      As an initial matter, the default judgment below did not decide damages, and Orlik failed to timely submit any witness affidavits or declarations.  Thus, because she has not timely submitted evidence of damages, Orlik cannot recover any damages in this hearing.

3.      Even if Orlik's failure to comply with this Court's order could be excused – which it should not – and Orlik could introduce damages testimony, Delphi's actual conduct is relevant at least to the issue of punitive damages notwithstanding the default judgment.  Here, Delphi terminated Orlik after she failed to complete a targeted performance improvement plan that she agreed to complete. The decision was well-documented.  Moreover, Delphi had a policy of encouraging employees to report discrimination of the sort that Orlik claimed happened to her.  Yet Orlik never mentioned any discrimination in her reviews and never made a written complaint concerning it.

2

4.      Lastly, Orlik greatly overstates her pecuniary losses, compensatory

damages, and punitive damages and thus should not recover such damages.[1]

<u>Background</u>

5.      Eva Orlik ("Orlik) began working as an analyst for Delphi's finance

department on or about October 11, 1994.  Declaration of Nancy Mills In Support Of Debtors'

Supplemental Reply With Respect To Proof of Claim No. 12163 (the "Mills Dec.") ¶ 4, a true

and accurate copy is attached hereto as <u>Exhibit A</u>.  In late 1997, Delphi assigned Orlik to an

Internal Auditor position.  <u>Id.</u>

6.      Delphi assigned Nancy Mills to manage its finance department in May of

1998 when Max McNeal was leaving the position.  <u>Id.</u>  As a result of that assignment, Mills

became Orlik's direct manager.  <u>Id.</u>  When Mills joined the department, she had the opportunity

to sit in on Orlik's last evaluation with McNeal.  <u>Id.</u>  Orlik had requested this special evaluation,

outside of the normal review cycle, because she had not been awarded a merit increase in her

salary the previous year, and she wanted to know why.  <u>Id.</u>  During the evaluation, McNeal

explained Orlik's deficiencies during the previous evaluation period, which included poor

communication skills.  <u>Id.</u>

7.      On or about February 5, 1999, Mills completed Orlik's final 1998

performance evaluation.  <u>Id.</u> ¶ 7.  Shortly thereafter, Mills met with Orlik to discuss the

---

[1] Orlik alleges in her untimely Supplemental Response that the Bankruptcy Court does not have jurisdiction over the Claim under 28 U.S.C. § 157(b)(2)(O), and that 28 U.S.C. § 157(b)(5) requires the Bankruptcy Court to remand the case to the district court.  <u>See</u> Supplemental Response ("Supp. Resp.") ¶ 30.  First, Orlik mistakenly relies on section 157(b)(2)(O) as the basis for Bankruptcy Court jurisdiction, but section 157(b)(2)(B) applies here, because the Bankruptcy Court is determining whether or not to allow or disallow an employment discrimination claim – not a "personal injury tort" under section 157(b)(5) because her claims are not torts accompanied by trauma or bodily injury.  <u>See</u> <u>Vinci v. Town of Carmel</u> (In re Vinci), 108 B.R. 439 (Bankr. S.D.N.Y. 1989); <u>Perino v. Cohen</u> (In re Cohen), 107 B.R. 453 (Bankr. S.D.N.Y. 1989).  As such, this Court is not precluded from adjudicating the merits of the Claim.  Orlik also attempts to request relief from the automatic stay, but such relief must be made by a separate motion that is properly noticed for hearing in accordance with the case management procedures adopted in these chapter 11 cases.  In addition, the Rooker-Feldman doctrine is inapplicable to the present matter and does not preclude this Court from allowing or disallowing the Claim.

3

Performance Development Plan ("PDP") that Mills completed as part of Delphi's evaluation process, in which Orlik's overall performance was rated as unsatisfactory. Id. ¶ 8.

8.    Orlik submitted a detailed written response to her 1998 performance evaluation. Id. However, she did not address Delphi's primary concerns in the areas of communication skills or the ability to prioritize and balance multiple tasks, except to state that she accepted the criticism and had not previously been aware of the seriousness of the problem. Id.

9.    With the help of a human resources representative, Mills designed a Performance Improvement Plan ("PIP") to address four primary areas of Orlik's deficient performance: (i) ineffective written and oral communication; (ii) inability to prioritize and balance multiple tasks; (iii) untimely assignments; and (iv) ineffective interpersonal relationships. Id. ¶¶ 10-13. The PIP outlined the behavior or results Delphi desired Orlik to achieve with regard to each problem. Id., Ex. B. Orlik agreed to undertake various actions to address each performance issue identified. Id. She also agreed to maintain a task list, which was a tool designed for Orlik to organize and prioritize her work projects and Mills to provide direct feedback to Orlik on better ways to balance various projects. Id. The completion date for improving all of the four areas was set for July 1, 1999. Id.

10.    As part of Delphi management's commitment to improve Orlik's performance pursuant to the PIP, it agreed to help Orlik enroll in classes and/or training opportunities available at Delphi related to effective communication and time management skills. Id. In fact, on Delphi management's recommendation, Orlik attended the "Getting Organized: How To Do More With Less" program that was offered through Delphi. Mills Dec. ¶ 15. Orlik could not attend various communication classes offered through Delphi because she was

4

studying for the CPA examination.  Id. ¶ 17.  To accommodate Orlik's schedule, Delphi

management mentioned that Indiana University-Kokomo offered classes during Orlik's lunch

hour – a time that did not interfere with her CPA studies.  Id.

11.     From time to time, Orlik would tell Mills any concerns she had about the

way that Delphi handled certain accounting entries or potential conflicts of interests, which was a

normal part of her job in Delphi's internal audit department.  Id. ¶ 20.  Orlik never suggested that

any practice she observed was unlawful or that she personally was asked to do anything

unlawful.  Id.  Mills responded to Orlik's concerns just as she did the concerns of any other

employee.  Id.  Mills did not find Orlik's concerns out of the ordinary and the comments did not

negatively affect any evaluation or employment decision related to Orlik.  Id. ¶¶ 20,25.

12.     By June 25, 1999, the week before Orlik's PIP was to expire, Mills

believed that Orlik's performance remained unsatisfactory but noted some minor improvements

in the previous two weeks.  Id. ¶ 21.  Generally, if an employee fails to meet the goals set forth in

a PIP, Delphi will terminate his or her employment.  Id. ¶ 12.  Mills provided Orlik the benefit of

the doubt and recommended the PIP be extended to allow Orlik a limited amount of additional

time to improve her performance.  Id. ¶ 21.  Accordingly, the completion date for Orlik's PIP was

extended from July 1, 1999 to August 31, 1999.  Id.

13.     On August 13 1999, Orlik received a written employment offer for a

position as a Business Manager from Brightpoint, Inc. ("Brightpoint").  See Brightpoint Letter

dated August 13, 1999 to Orlik ("Brightpoint Letter"), attached hereto as Exhibit B.  The base

salary for a potential position with Brightpoint was $57,000.00 a year, which was significantly

higher than her then Delphi base salary of $48,720.00 a year.  Id.

5

14.     As the end of August neared, Mills was determining whether Orlik had

improved her performance or whether Orlik should be terminated on August 31, 1999.  Mills

Dec. ¶ 24.  Despite a two-week period of improvement before the end of the first PIP deadline on

July 1, 1999, Orlik's overall performance had not significantly improved since that time.  Id.

Thus, shortly thereafter and before August 24, 1999, Mills recommended to Delphi management

that Orlik be terminated for poor job performance.  Id.  At the time Mills made the decision,

Mills was not aware that Orlik had filed charges with the Equal Employment Opportunity

Commission ("EEOC") alleging national origin discrimination.  Id.

15.     Sometime between August 25, 1999, and September 1, 1999, Delphi

personnel in Kokomo learned that Orlik had filed the charge of discrimination with the EEOC.

Id. ¶ 25.  Mills was surprised by the charge because this was the first time she had heard

allegations of national origin discrimination by Orlik.  Id.  Delphi management discussed the

charge, reviewed the grounds for the discharge, consulted with Delphi legal staff, and decided to

proceed with the termination because Orlik's inability to complete her PIP was unrelated to any

EEOC allegations.  Id.

16.     Orlik filed Proof of Claim No. 12163 (the "Proof of Claim") on July 28,

2006.  The Proof of Claim asserts an unsecured nonpriority claim in the amount of

$1,374,322.08 (the "Claim"). On October 31, 2006, the Debtors objected to the Claim pursuant

to the Debtors' (i) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and

Fed. R. Bankr. P. 3007 to Certain (a) Claims With Insufficient Documentation, (b) Claims

Unsubstantiated by Debtors' Books and Records, and (c) Claims Subject to Modification and (ii)

Motion to Estimate Contingent and Unliquidated Claims Pursuant to 11 U.S.C. § 502(c) (Docket

No. 5452).  On November 22, 2006, Orlik filed her Response to Debtors' Second and Third

6

Omnibus Objection to Claims (Docket No. 5789) (the "Response").  On January 3, 2007, the

Debtors filed their Statement of Disputed Issues With Respect to Proof of Claim 12163 (Orlik)

(Docket No. 6406).

17.    On January 8, 2007, the Debtors and Orlik, with their legal counsel,

conducted a telephonic meet and confer pursuant to the Order Pursuant to 11 U.S.C. § 502(b)

and Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, and 9014 Establishing (i) Dates

for Hearings Regarding Objections to Claims and (ii) Certain Notices and Procedures Governing

Objections to Claims (Docket No. 6089) (the "Procedures Order") (a copy of which the Debtors

emailed to Orlik's counsel in preparation for the meet and confer).

<u>Argument</u>

18.    Orlik cannot establish that she is entitled to recover the punitive damages

and other damages that she claims she suffered as a result of her discrimination- and retaliation-

based claims.  As an initial matter, because Orlik failed to timely submit any witness affidavits or

declarations, she cannot introduce evidence of damages at the hearing and, thus, cannot recover

damages on her proof of claim.  Moreover, notwithstanding the default judgment, Delphi's actual

conduct is relevant at least to the issue of punitive damages and clearly demonstrates that the

circumstances in this case do not warrant any punitive damages – let alone the nearly $900,000

that Orlik claims.  Delphi did not terminate Orlik in retaliation for either reporting potential

accounting improprieties or conflicts of interest or for filing a complaint with the EEOC.  Rather,

the decision to terminate Orlik was made *after* the unsatisfactory completion of a well-

documented PIP for poor job performance and *before* she filed the EEOC complaint.  Lastly,

even if Orlik was entitled to some damages for her claims, the damages she seeks are

unsubstantiated, excessive, and duplicative, and thus should not be allowed.

7

A.    <u>Orlik Should Be Precluded From Introducing Evidence on Damages At the Hearing.</u>

19.    On December 26, 2006, the Debtors filed a Notice of Claims Objection

Hearing with Respect to Debtors' Objection to Proof of Claim No. 12389 (Eva Orlik)(Docket

No. 6288), and set the date for the hearing as March 1, 2007. A copy of this Court's Order

Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007,

and 9014 Establishing (i) Dates for Hearings Regarding Objections to Claims and (ii) Certain

Notices and Procedures Governing Objections to Claims (Docket No. 6089) (the "Procedures

Order") was attached to and served with the notice to Orlik.[2]

20.    On January 8, 2007, the Debtors and Orlik, with their legal counsel,

conducted a telephonic meet and confer pursuant to the Procedures Order.  Prior to the meet and

confer the Debtors e-mailed another copy of the Procedures Order to Orlik's counsel.  At the

meet and confer, the parties discussed various aspects of the Procedures Order, including Orlik's

request that the hearing on her claim be adjourned from March 1 to be adjudicated on March 21.

The Debtors agreed and, on February 1, 2007, filed another notice adjourning the matter to

March 21, 2007.  Yet another copy of the Procedures Order was attached to the notice and served

on Orlik's counsel.

21.    The Procedures Order provides: "The Claimant may file and serve its

Supplemental Response no later than 30 business days prior to commencement of the Claims

Objection Hearing. . . .  The Supplemental Response may include affidavits or declarations from

no more than two witnesses setting forth the basis of the Contested Claim and evidence

supporting the Contested Claim. . . . The Claimant shall not be permitted to elicit any direct

testimony at the Claims Objection Hearing. . . ." <u>See</u> Procedures Order,  ¶ 9(e).

---

[2]  Two days later, the Debtors filed an amended notice merely to correct a typographical error in the claim number.
(Docket No. 6328). It attached another copy of the Procedures Order and was served on Orlik.

22.    Here, this Court's Procedures Order required Orlik to file her Supplemental Response along with any witness affidavits or declarations she intended on using at trial on or before February 6, 2007.  Yet, without excuse, Orlik did not choose to file it until February 21, 2007 – over two weeks late.  Indeed, Orlik's counsel was provided a copy of the Claim Procedures Order on no fewer than five separate occasions and the parties specifically discussed it during the meet and confer.  It would be ironic if Orlik now claims that "excusable neglect" justifies her failure to abide by court-ordered deadlines, especially when she argued in the Indiana courts that Delphi could not set aside the default judgment based on excusable neglect.  Because Orlik failed to file her Supplemental Response and affidavits or declarations by the court-ordered deadline, and has not articulated any reason that would excuse such a failure, the affidavit of Randy Gomez that Orlik has submitted should be stricken.

B.    Orlik Cannot Recover Damages on Her Whistleblower Retaliation Claim.

23.    Orlik's cannot recover damages on her state law wrongful discharge claim.[3]  Indiana is an "at-will" employment state:  in the absence of a written employment contract establishing employment for a definite term, an employer may terminate an employee for a good reason, a bad reason, or no reason at all.  See, e.g., Wilmington v. Harvest Ins. Cos., 521 N.E.2d 953 (Ind. Ct. App. 1988).  Indiana courts acknowledge only four narrow common law "exceptions" to the at-will doctrine: (1) termination for exercising a statutory right; (2) termination for refusing to commit an unlawful act; (3) termination after an offer of "permanent" employment; and (4) termination that implicates the equitable doctrine of promissory estoppel.

---

[3] Orlik's allegation that Delphi cannot raise this argument because it did not file a motion to dismiss under Indiana Trial Rule 12(b)(6) is spurious.  Delphi raised the issue of failure to state a claim in its Brief in Support of Motion to Set Aside Default Judgment when arguing to the trial court that it had meritorious defenses to Orlik's claims.  The fact that a complaint fails to state a claim is not grounds for setting aside a default in Indiana.  Henline, Inc. v. Martin, 169 Ind. App. 260, 273; 348 N.E.2d 416, 423 (1976).  Accordingly, a trial court refrained from ruling on the 12(b)(6) motion.  Delphi has done all that is necessary to preserve this argument.

See, e.g., Orr v. Westminster Village North, 689 N.E.2d 712 (Ind. 1997).  Indiana courts

explicitly refuse to create a fifth "exception" to allow a retaliatory discharge tort for "employees

whose employment is terminated for 'whistle-blowing,' or reporting their employer's misdeeds."

McGarrity v. Berlin Metals, Inc., 774 N.E.2d 71, 78 (Ind. Ct. App. 2002).

    24.    In paragraph 36 of her Complaint, Orlik states "Delphi discharged Ms.

Orlik in retaliation for complaining about, and balking at, inappropriate and potentially

actionable conflict of interest problems and accounting practices."  The only possible reading of

this paragraph is that Orlik angered local Delphi management when she complained to the

auditors from the national corporate office about other employee's potentially unlawful

accounting practices.  In other words, she claims she irritated management by blowing the

whistle, which is an action under which damages are not recoverable under Indiana law because

no such cause of action exists.  Her complaint cannot be read as stating an actionable claim for

retaliatory discharge under Indiana law.[4]

C.    Orlik Cannot Recover The Damages She Seeks Under Her Claims.[5]

         *The Underlying Conduct Is Relevant to The Issue of Damages.*

    25.    Notwithstanding the default judgment, Delphi's actual conduct is relevant

at least to the issue of punitive damages and clearly demonstrates that the circumstances in this

case do not warrant any damages – let alone the nearly $900,000 in punitive damages that Orlik

claims.[6]

_____

[4] Orlik has not alleged that she was asked to do anything illegal or that she had a statutory duty under Indiana law to
report accounting improprieties.  Indiana law places a reporting requirement only on licensed accounting
practitioners.  Orlik was not a licensed accounting practitioner as defined by the Indiana Code.  Ind. Code § 25-2.1-
1-3; Ind. Code § 25-2.1-6-1; Ind. Code § 25-1-11-2.
[5] The Debtors note that Section 502(b)(2) of the Code precludes Orlik from claiming any accrued interest on her
Claim after the date of the filing of the bankruptcy petition (October 8, 2005).  See 11 U.S.C. § 502(b)(2).
[6] Despite Orlik's arguments to the contrary, the default judgment is not dispositive here and this Court is not
precluded from adjudicating her Claim.  Default judgments under Indiana law require a two-step process, including

10

26.        Delphi did not terminate Orlik in retaliation for either reporting potential

accounting improprieties or conflicts of interest or for filing a complaint with the EEOC.  Mills

Dec. ¶ 25.  Rather, the decision to terminate Orlik was made *after* the unsatisfactory completion

of a well-documented PIP for poor job performance and *before* she filed the EEOC complaint.

Id. ¶¶ 24,25.

27.        Prior to Mills becoming Orlik's supervisor, Orlik did not claim that she

notified any member of Delphi management about her hostile work environment or that any

member of Delphi management created a hostile work environment.[7]  Also before Mills became

Orlik's manager, Orlik was not meeting Delphi's employment expectations.  Id. ¶ 4.  Orlik's

performance fell below Delphi's legitimate expectations and that Delphi communicated those

performance concerns to Orlik, as reflected in Orlik's 1998 PDP rating of unsatisfactory and the

subsequent PIP documentation.  Id. ¶¶ 7-9.  Delphi's actions were reasonable because it provided

Orlik an extension to complete her PIP program.  Id. ¶ 21.  Yet she failed to successfully

improve her performance even with that additional time.  Id.  In addition, Mills did not harass

Orlik by rating her performance unsatisfactory, placing Orlik on a PIP, suggesting that she

maintain a task prioritization list, or helping her attend classes as part of the PIP.  Id. ¶ 21.  All of

these actions were implemented to improve Orlik's specific performance issues – not because of

---

a separate damage hearing that was not yet held in the present matter.  See Stewart v. Hicks, 395 N.E. 2d 308, 313 (Ind. App. 1979) (citing Carson v. Perkins, 29 N.E.2d 772 (Ind. 1940))  Indiana law provides that:

> At such a hearing, the defendant may cross-examine the plaintiff's witnesses and he may call witnesses of his own to prove any matters which extenuate or mitigate the damages alleged by plaintiff.  The defendant may not however, introduce a substantive defense, but subject to this qualification, *he may show that the plaintiff has no legal claim to any but nominal damages.*

Id. at 314 (emphasis added); see also Henline, Inc. v. Martin, 348 N.E.2d 416, 423 (Ind. App. 2 Dist. 1976) (emphasis added) (stating even after default has been entered, "[t]he failure of [a] complaint to state a claim sufficient to withstand a motion to dismiss may defeat a *recovery* upon that complaint.").  The posture of Orlik's claim makes it particularly appropriate for adjudication by this Court because the default judgment was merely procedural and the Indiana Trial Court has not rendered any findings as to damages.

[7]  Orlik alleged only that "on one occasion" her supervisor made an ethnic remark. Compl. ¶ 8.

Orlik's national origin.  Mills was attempting to help Orlik develop the skills necessary to

succeed in her job.  Id. ¶¶ 10-19.

       28.     Delphi had an extensive anti-harassment policy in place when Orlik

alleges such conduct occurred.  Id. ¶ 26.  Orlik never utilized the existing policy to complain

about any jokes or comments or other grounds for discrimination to any member of Delphi

management.  Id.  In particular, Orlik had ample opportunities to discuss her concerns with

management yet Orlik failed to do so.  For example, Orlik provided Delphi management a

detailed written response to her 1998 negative performance evaluation, but failed to mention any

alleged jokes and comments or other grounds for discrimination in that response.  Id. ¶ 9.  Orlik

also went through a lengthy PIP process that included numerous private meetings with Mills and

a human resources representative.  Id. ¶¶ 10-19.  Yet Orlik failed to mention any alleged jokes

and comments or other grounds for discrimination in any those meetings.  Id. ¶ 19.  Instead,

Orlik apparently decided to raise her claim of discrimination for the first time in August 1999,

contemporaneous with her failure to complete her PIP and contemporaneous with her active

search for a new job.

       29.     The PIP system was a standard practice used at Delphi to address poor

performance, and Orlik's PIP was developed with the advice of human resources personnel who

designed an improvement plan using proven tools and tactics to target Orlik's specific

performance issues.  Id. ¶ 11.  For example, in the past, Mills herself had used the same task

prioritization list that she recommended to Orlik.  Id. ¶ 14.  Delphi offered an entire in-house

curriculum of professional development and training courses, including time management and

communication classes, and therefore requiring Orlik to attend classes was not an unusual

occurrence.  Id. ¶ 15.  Orlik only attended the classes offered by Indiana University-Kokomo

because she was not available to attend the in-house classes.  Id. ¶ 17.  Moreover, Delphi's

standard protocol was to terminate employees, like Orlik, who failed to successfully improve

their performance by the completion date of their PIP.  Id. ¶ 12.  Nowhere does Orlik allege that

she completed the PIP successfully.  Delphi did not treat other similarly-situated employees in

Orlik circumstances more favorably.

        30.     Orlik was not meeting Delphi's legitimate performance expectations and

was not treated differently than other employees who exhibited the same performance

deficiencies but did not file a charge of discrimination.  Mills made the decision to terminate

Orlik because she had not improved her performance as required under the PIP and that decision

was made *before* Mills knew that Orlik had filed a charge of discrimination.  Id. ¶ 24.  In

addition, Mills established a completion date of August 31, 1999, *before* Orlik filed the EEOC

charge.  Id. ¶ 10.  Orlik was terminated one day following her completion date because she failed

to improve her performance pursuant to the PIP – *not* for filing her EEOC charge.  Id. ¶ 24.

          *Orlik's Title VII Pecuniary Loss Would Be De Minimis.*

        31.     In Orlik's Proof of Claim**,** she claims $193,256.03, which she mislabels

compensatory damages, for her alleged pecuniary losses.[8]  Potential Title VII pecuniary damages

must be divided into two parts: back pay and front pay.  Back pay runs from the time of

discharge to the time of trial.  See, e.g., McKnight v. General Motors, 973 F.2d 1366, 1369 (7th

Cir. 1992).  Front pay "is the difference (after discounting to present value) between what the

plaintiff would have earned in the future had [she] been reinstated at the time of trial and what

[she] would have earned in the future in [her] next best employment."  Avita v. Metropolitan

---

[8]Although Orlik attached additional damage calculations to her untimely filed Supplemental Response, she provided
several calculations for each item of damages, and the Debtors were unable to determine which figure Orlik relied
upon.  Therefore, the values and calculations attributed to Orlik throughout this Supplemental Reply are those that
appeared on her damages calculation at Exhibit 3 to her Proof of Claim.

Club of Chicago, Inc. 49 F.3d 1219, 1231 (7th Cir. 1995).  Front pay may only be awarded until

the plaintiff finds "employment comparable or superior to her old job."  Williams v. Pharmacia,

137 F.3d 944, 954 (7th Cir. 1998).  The court has broad equitable discretion regarding the award

of back and front pay; the sole purpose of both of these types of damages is to make the plaintiff

whole.  See Avita 49 F.3d at 1231.

> 32.    Here, Orlik's back pay and front pay calculation is unsubstantiated and

excessive.[9]  Indeed, ability to obtain back and front pay is dependent on the plaintiff receiving

less in new employment with a new employer than she could have otherwise received had she

not been terminated.  Orlik had an offer for comparable employment *before* Delphi terminated

her.  See Brightpoint Letter.  Most important, at the time of her termination, her base salary at

Delphi was $48,720.00/yr, and when she began employment with Brightpoint, her base starting

salary there was $57,000.00/year.  Id.  Because she immediately found comparable employment,

she is entitled neither to back pay nor front pay.

> 33.    Even if Orlik were entitled to pecuniary damages – which she is not – her

calculations are excessive.  For example, Orlik erroneously assumes that she would have been

employed by Delphi until age 65 – a highly speculative assumption.  Likewise, she fails to take

into account her employment offer from Brightpoint at a higher salary than she made at Delphi.

She includes health insurance benefits despite admitting that she has never elected health

insurance at Delphi and her husband carries her on his policy.  A more accurate damage

calculation, accounting for difference in value of the compensation package at Delphi and that at

Brightpoint, indicates that Orlik would not be entitled to more than $34,765.82.  See Declaration

of Steve W. Myers In Support Of Debtors' Supplemental Reply With Respect To Proof of Claim

No. 12163, a true and accurate copy attached hereto as Exhibit C, ¶ 48.

---

[9] Orlik's calculations fail to differentiate between back pay and front pay.

14

*Orlik Cannot Recover Punitive Damages Under Title VII.*

34.    Orlik also claims the $300,000 statutory maximum of punitive damages in
this Title VII case.  Orlik is not entitled to her alleged damages.  Punitive damages may be
awarded in a Title VII case only "[i]f the complaining party demonstrates that the respondent
engaged in a discriminatory practice or discriminatory practices with malice or with reckless
indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. §
1981a(b)(1).  This standard is met if, and only if, the plaintiff establishes:  (1) "that the employer
acted with knowledge that its action may have violated federal law," and (2) "the employees who
discriminated against him are managerial agents acting within the scope of their employment."
See, e.g., Bruso v. United Airlines, Inc., 239 F.3d 848, 857-58 (7th Cir. 2001) (citing Kolstad v.
American Dental Ass'n, 527 U.S. 526 (1999)).  If the plaintiff meets her burden, the "employer
may avoid liability for punitive damages if it can show that it engaged in good faith efforts to
implement an antidiscrimination policy."  Id. at 858.

35.    As discussed above, Orlik has failed to establish that Delphi discriminated
against her at all, much less with malice or reckless indifference.  None of the allegations in the
complaint in the underlying action establishes the facts necessary to support punitive damages.
And Orlik has no evidence that Delphi took any action with knowledge that it would be violating
federal law.  In fact, Delphi engaged in good faith efforts to implement an antidiscrimination
policy in or around May 1999 and distribute a new Delphi Salaried Handbook (which included
the policy) to all of its salaried employees, including Orlik.  Mills Dec. ¶ 26.  The handbook
contained a policy that explicitly prohibited national origin harassment and detailed the reporting
procedure.  Id.  Here, despite Orlik's multiple opportunities to report, she never complained
about any alleged discrimination.  Id.  And, after Delphi received the EEOC charge, Delphi

15

management explicitly reviewed the grounds for charge, consulted with Delphi legal staff, and

proceeded with its prior determination to terminate Orlik because the termination was unrelated

to any EEOC allegations.  Id. ¶ 25.  Under these circumstances, Orlik is not entitled to any

punitive damages much less the statutory maximum of $300,000 for an employer of Delphi's

size.  See 42 U.S.C. § 1981a(b)(3)(D).

> *Orlik Cannot Recover Compensatory Damages For Her State Law Retaliatory Discharge Claim.*

36.     Orlik also claims $193,256.03 for alleged compensatory damages for her

state law retaliatory discharge claim.  Even if Orlik could recover any damages for this claim,

she still could not recover the damages she seeks.  Under Indiana law, "if the employee is able to

find comparable employment, *damages may be recovered for the period in which he is

unemployed*."  Haas Carriage, Inc. v. Berna, 651 N.E.2d 284, 289-90 (Ind. Ct. App. 1995)

(emphasis added).  As explained above, Orlik found comparable employment with Brightpoint

*before* she was terminated from Delphi and therefore she cannot recover any damages under

Indiana law.  The short time between her termination from Delphi and her employment starting

at Brightpoint was a result of Orlik voluntarily taking an oversees trip therefore Orlik is not

entitled to compensation for that period.

37.     Orlik's claim for compensatory damages also arises from the same facts

and circumstances as her Title VII damages claim, and the law does not permit her to recover her

pecuniary losses *twice*.  She also incorrectly claims pecuniary losses twice – once based on the

state law public policy claim and again based on her Title VII claim – but the law does not

permit a person to be made more than whole.  See Gentile v. County of Suffolk, 962 F.2d 142,

153 (2d Cir. 1991) (internal citations omitted) (emphasis added) ("[W]hen a plaintiff seeks

compensation for the same damages under different legal theories of wrongdoing, the plaintiff

16

should receive compensation for an item of damages only once."). In addition, the infirmities in

Orlik's Title VII damage assumption apply equally here, and thus her damages calculation should

be reduced accordingly and she is not entitled to more than $34,765.82. Myers Dec. ¶ 48. Orlik

is not entitled to any damages for her state law retaliatory discharge claim. Nor is she entitled to

any prejudgment interest because she did not make a written offer to settle this matter. See

Indiana Code § 34-51-4-6; Gregory & Appel Ins. Agency v. Philadelphia Indemnity Ins. Co, 835

N.E.2d 1053, 1065 (Ind. Ct. App. 2005) (plaintiff denied prejudgment interest because he never

made a written offer to settle).

> *Orlik Cannot Recover Punitive Damages For Her State Law Retaliatory
> Discharge Claim.*

38.    Orlik has not, and cannot demonstrate that she would be entitled to any

punitive damages for the Indiana retaliatory discharge claim – let alone the excessive

$579,768.09 punitive damage award to which she claims she is entitled.[10] Under Indiana law,

"[p]unitive damages may be recovered only if there is clear and convincing evidence that the

defendant's conduct was 'inconsistent with the hypothesis that the tortious conduct was the result

of a mistake of fact or law, honest error of judgment, over-zealousness, mere negligence, or other

such noniniquitous human failing." Hass Carriage, Inc., 651 N.E.2d at 290; see also Ind. Code §

34-51-3-2. Orlik has not provided evidence to support her state law punitive damage claim. In

contrast, Delphi has demonstrated that Orlik never complained to her supervisor that she was

asked to do anything illegal – or even that others' activities were illegal. Mills Dec. ¶ 20. Delphi

also has demonstrated that Orlik's supervisor was not aware of Orlik raising any particular issues

regarding "inappropriate and potentially actionable conflict of interest problems and accounting

---

[10]Orlik claims punitive damages to the *maximum* extent allowed under Indiana law. See Ind. Code § 34-51-3-4 ("A
punitive damage award *may not be more than the greater* of: (1) three (3) times the amount of compensatory
damages awarded in the action; or (2) fifty thousand dollars ($50,000).").

practices" outside the scope of Orlik's general internal audit duties.  Id.  Mills dealt with the

concerns that Orlik mentioned in the ordinary course of business just as she dealt with concerns

raised by other employees.  Id.  Accordingly, Orlik cannot recover punitive damages for her state

law retaliatory discharge claim.

Conclusion

39.    Orlik's failure to comply with this Court's order should not be excused and

she should be barred from providing any testimony at the hearing on this matter.  To the extent

she can introduce evidence of damages, her alleged damages are excessive, unsubstantiated and

duplicative.  In any event, she flatly has not established grounds for any punitive damages here.

Therefore, the Proof of Claim should be disallowed and expunged.

Memorandum of Law

40.    Because the legal points and authorities upon which this Supplemental

Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the

service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local

Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York

be deemed satisfied.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim and (b) granting the Debtors such other and further relief

as is just.

18

Dated: New York, New York
      February 21, 2007

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By:    /s/ John Wm. Butler, Jr.
        John Wm. Butler, Jr. (JB 4711)
        John K. Lyons (JL 4951)
        Albert L. Hogan III (AH 8807)
        Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

– and –

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By:  /s/ Kayalyn A. Marafioti
        Kayalyn A. Marafioti (KM 9632)
        Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,

Debtors and Debtors-in-Possession

# **EXHIBIT A**

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

       - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -   x
                                                              :
        In re                                                 :      Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :      Case No. 05-44481 (RDD)
                                                              :
                                                              :      (Jointly Administered)
              Debtors.                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DECLARATION OF NANCY MILLS IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM  NO. 12163 (EVA ORLIK)

("MILLS DECLARATION ")

Nancy Mills declares as follows:

            1.      I submit this declaration in support of the Debtors' Supplemental Reply

With Respect To Proof Of Claim 12163 (Eva Orlik) (the "Supplemental Reply").  Capitalized

terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.     I received a B.S. in accounting from Indiana University.  I worked for General Motors ("GM") starting in 1979, and I have been employed at all times by Delphi since it commenced its existence as a separate entity in 1999.  Between May 1998 and June 2001, I was the Divisional Internal Control Manager for Delphi Automotive Systems Corporation, Delphi Delco Electronics in Kokomo, Indiana.  My current title is Finance Manager.

3.     Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Eva Orlik's ("Orlik") employment at Delphi.  If I were called upon to testify, I could and would testify to the facts set forth herein.

4.     Orlik began working as an analyst in Delphi's finance area on or about October 11, 1994.  In late 1997, Delphi assigned Orlik to an Internal Auditor position.  I became Orlik's supervisor in May 1998.  When I entered the department, I had the opportunity to sit in on Orlik's performance evaluation with my predecessor, Max McNeal.  Orlik had specifically requested this off-cycle review because she had not received a merit increase to her salary, and she wanted to know why.  During the evaluation, McNeal explained Orlik's deficiencies during the previous evaluation period, which included poor communication skills.  Orlik made no mention of any harassment or disparate treatment based on her national origin during this review.

5.     From the beginning of my time as Orlik's supervisor, she was repeatedly late in turning in assignments to me.  I also noted that on many occasions she had trouble communicating concisely and effectively with co-workers and with me.  These were ongoing problems throughout the second half of 1998 and the beginning of 1999.

6.     In May 1998, when I arrived in the internal audit department, the department members occupied two adjoining offices.  As our staff fluctuated between three and four people, Orlik was sometimes working in an office by herself.  My decisions on where to place people were based on an effort to place the most junior people in an office with the most senior person so that the senior person could answer questions and guide the junior person.

7.     On or about February 5, 1999, I completed the final phase of Orlik's 1999 performance evaluation ("PDP").  A true and accurate copy of the PDP is attached as <u>Exhibit A</u>. The PDP rated Orlik's performance as unsatisfactory, particularly in the areas of oral and written communication skills and her ability to prioritize and balance multiple tasks.

8.     I presented the PDP to Orlik sometime between February 5, 1999, and February 22, 1999.  On or about February 22, 1999, Orlik submitted a detailed written response to her final performance review.  The response did not address communication skills or the ability to prioritize and balance multiple tasks, except to state in the final paragraph:

> I accept the remaining criticism expressed in my performance review although I was not aware of the seriousness of the problem or the scrutiny of my areas for improvement until the conversation with Nancy Mills on February 11 [1999].  I will maintain a positive attitude and strive to improve my performance.  If despite my continuous efforts my performance will still be deemed unsatisfactory, I am asking to be allowed to continue my employment with Delphi-D until October 10, 1999, when I will become vested in the employee retirement benefit program.

9.     Orlik's response to her 1998 PDP did not mention national origin discrimination.  I never heard any employee make ethnic jokes or inappropriate ethnically-oriented comments to Orlik.  Orlik never complained to me about such jokes or comments. Indeed, Orlik never raised the issue of national origin discrimination or national origin harassment with me or, to the best of my knowledge, with any member of Delphi's human

resources staff or Delphi management at any time between 1994 and the time that she filed her charge of discrimination with the EEOC on or about August 24, 1999.

10.    In late February 1999, I worked with Greg Morgan, a human resources representative, to develop a Performance Improvement Plan ("PIP") for Orlik because of her performance deficiencies.  A true and accurate copy of Orlik's PIP is attached as <u>Exhibit B</u>.

11.    Placement on a PIP is Delphi's normal response to an unsatisfactory performance review.  The purposes of a PIP are (1) to ensure that the employee is fully aware of her performance deficiencies and the specific required performance levels she needs to reach, and (2) to create a timetable for the employee to improve her performance.

12.    Normally, if an employee fails to meet the goals set forth in a PIP, Delphi will terminate his or her employment.  Morgan and I communicated this fact to Orlik when we originally presented the PIP to her on February 24, 1999.  Orlik's PIP was scheduled to conclude on July 1, 1999.

13.    Orlik's PIP identified four areas of performance deficiency:  (1) ineffective written and oral communication; (2) inability to prioritize and balance multiple tasks; (3) misses assignment deadlines frequently; and (4) ineffective interpersonal relationships.  The plan included the behavior or results desired with regard to each problem, and the steps that management and Orlik would take to solve each problem.  During the PIP process, I met regularly with Orlik and Morgan to discuss Orlik's progress.

14.    As part of the PIP, I required Orlik to maintain a task prioritization list of the daily tasks she performed.  I had used such lists myself in the past, and I hoped they would allow both Orlik and me to become better aware of how Orlik was spending her time.  The goal was to help Orlik spend her time more efficiently and prioritize more effectively.  Orlik

4

maintained the lists in Excel.  The lists included information such as dates, tasks performed, time

spent performing the tasks, and other task progress information.  A true and accurate copy of a

representative task prioritization list that Orlik prepared is attached as <u>Exhibit C</u>.  Orlik

periodically turned the lists into me.  I reviewed them and made suggestions for improvement to

Orlik.

15.     We also encouraged Orlik to attend professional development courses

offered at Delphi.  Delphi prepares a curriculum of coursework to address various skills and

areas in which employees often need training or improvement.  Orlik attended a time

management course called "Getting Organized:  How To Accomplish More With Less."  This

course was intended to provide her additional skills and tactics to address her need to effectively

prioritize and complete her assignments.

16.     One of the action steps we, as management, agreed to take to help Orlik

correct the performance deficiency of ineffective oral and written communication was to enroll

her in a class that taught effective communication skills.  My primary concerns in this area were

that Orlik's oral and written communications were often neither concise nor conveyed in an

appropriate tone.  When speaking, Orlik tended to be very loud; she frequently repeated herself;

and her tone tended to be curt.  I wanted Orlik to attend a class that focused on these types of

communication problems.

17.     Because Orlik was studying for the CPA exam, I understood that she was

unavailable at the times that in-house communication training classes were offered.

Accordingly, in order to accommodate Orlik's tight schedule, Morgan and I referred Orlik to

classes offered by a professor at Indiana University-Kokomo, which Orlik could attend during

her lunch hour.  Before the classes started, I talked with a member of the IU Kokomo staff about

5

the nature of my specific concerns with Orlik's communications.  I understood that the textbook used in the class was, "How to Win Friends and Influence People."

18.     I did not know until sometime after the communication class started that the name of the class was English as a Second Language.  I was surprised to learn the name of the class because I was concerned with the manner in which Orlik communicated, not with Orlik's ability to understand or speak English.

19.     Orlik, Morgan, and I discussed the communication classes in PIP review sessions in late May and June 1999.  Orlik did not complain during any PIP review session or at any other time that she saw the classes as a form of national origin harassment.

20.     From time to time, Orlik expressed concerns to me as a normal part of her internal audit job about the way that Delphi handled certain accounting entries or conflict of interest issues.  I vaguely recall comments in the summer of 1999 about whether there should be reserves for potential physical inventory losses or potential fixed asset losses and whether there should be a larger or different bad debt reserve.  None of Orlik's comments gave me particular concern.  Orlik never suggested that any practice she was observing was illegal.  Orlik never suggested that she personally was being asked to do anything illegal.  I responded to Orlik's concerns in the ordinary course of business just as I would the concerns of any other employee in internal audit.  Raising such concerns is a primary part of an employee's job in internal audit.  One example of a concern Orlik expressed and my response is reflected in the e-mail exchange attached as Exhibit D.

21.     By June 25, 1999, I believed that although Orlik's performance deficient, she showed a slight improvement in the two weeks prior to the end of her PIP.  Accordingly, I

recommended that Orlik's PIP be extended through August 31, 1999.  Delphi approved my

request.

   22. During 1999, I took the lead in engaging with internal corporate auditors

in a financial audit.  Orlik assisted me by serving as an additional liaison for the auditors.  I was

scheduled to take vacation in early August 1999 when the audit was about to come to a close.  At

the urging of my supervisor, General Director of Finance and Ventures, Jim Humphrey, I placed

my most senior auditor, Laura Denny, into the lead liaison role that I had held.  This was done in

order to assure that the most experienced person would be available to address any concerns that

the auditors had as they finished their work.  I intended for Orlik also to continue to be available

to interact with auditors until the conclusion of the audit by assisting Denny as she did me.

   23. Sometime in mid-August, after completion of the corporate audit, while

attempting to highlight continuing problems with Orlik's communication skills, I pointed out to

Orlik that Humphrey had expressed concern that she had spent too much time talking to the

auditors rather than simply listening to them and being sure that she addressed the concerns that

they raised.  This was another example of Orlik's struggle with concise and appropriate

communication issues.

   24. As the end of August neared, I had to determine whether Orlik had

completed the PIP or should be terminated upon the August 31, 1999, deadline for completion.

Despite a two-week period of improvement before the end of the first PIP deadline, Orlik's

overall performance had not significantly improved.  By August 24, 1999, it was apparent that

Orlik was not going to complete the PIP successfully by the end of August.  Accordingly, on

August 24, 1999, I recommended to Delphi management that Orlik be terminated for poor job

performance.  When I made the decision that Orlik had to be terminated, I did not know that

Orlik had filed a charge with the EEOC alleging national origin discrimination.

25.    Sometime between August 25, 1999, and September 1, 1999, Delphi

personnel in Kokomo learned that Orlik had filed a charge of discrimination with the EEOC.  I

was surprised by the charge because this was the first time I had heard an allegation of national

origin discrimination.  Humphrey, Morgan, Richard Moser, a higher level human resources

representative, and I discussed the charge, reviewed the grounds for the discharge, and consulted

with Delphi legal staff.  We ultimately decided that, because Orlik had failed to complete the PIP

and her performance issues were unrelated to the EEOC allegations, we should proceed with

Orlik's termination.  Orlik was terminated solely due to her poor performance.  I did not

recommend termination because of her national origin.  I also was not retaliating for Orlik

having filed an EEOC complaint.  Finally, I was not retaliating against any of Orlik's concerns

about accounting practices.  Those concerns did not make any particular impression on me

because expressing such concerns was a part of Orlik's job in internal audit.

26.    Delphi has an anti-harassment policy that prohibits national origin

harassment.  Delphi passed this policy out in its new Salaried Employee Handbook in or around

May 1999.  I received a copy.  True and accurate copies of the policy and another section of the

handbook that restates the policy are attached as Exhibit E.  All persons who were involved in

Orlik's PIP process and the decision to terminate Orlik were aware of this policy.  Orlik would

have received this policy as well.  Under this policy, Delphi prohibits the discriminatory

behavior that Orlik alleges and provides a protocol for dealing with discrimination if it occurred.

I have reviewed Orlik's personnel file and saw no evidence of her having filed any complaints in

accordance with the policy.  My records also contain a letter from Marion McDonald, manager

over Orlik's department from 1994 to 1997, to the Delphi Human Resources Department, which

was prompted by Orlik's EEOC Complaint.  Ms. McDonald's letter indicated that in the four

years she oversaw Orlik's department, McDonald was not aware of any harassment against Orlik

or any other employees.  She also stated that Orlik never approached her to complain about

inappropriate comments relating to Orlik's national origin.   Orlik never reported any

discrimination to Delphi; and to my knowledge, no discrimination occurred.


     I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing
statements are true and correct.

     Executed on February 21, 2007, in Kokomo, Indiana

                         */s/ Nancy Mills*
                         Nancy Mills

# EXHIBIT A



## Classified Salaried Employee
## Performance Development Plan

**DELCO**
ELECTRONICS

| Name: | Eva Orlik | | | | |
|---|---|---|---|---|---|
| Supervisor: | Nancy Mills/Max McNeal | SSN: | 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 | Department: | 5125 |
| Review Period: | 1/98-12/98 | Position Title: | Internal Auditor | Position Code: | 6F32 |

**MAJOR JOB QUALIFICATIONS**
(Specific to the position, not the employee)

Bachelor's Degree in Accounting or Finance
MBA and/or professional certification preferred
Knowledge of accounting principles and procedures
Knowledge of data processing systems
Strong communication skills
Strong analytical skills
Ability to work independently and with teams
Ability to formulate alternative strategies or courses of action
Ability to understand and interpret procedures and evaluate alternate controls
Ability to handle non-recurring special assignments

**MAJOR JOB RESPONSIBILITIES**
(Specific to the position, not the employee)

Perform audit tests and special ICRQ reviews.
Perform special studies.
Consult on policy and procedure matters.
Perform investigations.
Identify high risk areas within Delphi DE and develop corrective action plans.

**CAREER PLANNING DISCUSSION:** ☐ YES ☐ NO

**EXISTING SKILLS:**
Extensive cost/budgets experience, knowledge of Delco financial reporting and accounts payable related systems (receiving, purchasing), analytical skills

**CAREER OBJECTIVE**

Short Term: Continue assignment in Audit

Long Term: 7th level senior financial analyst position in one of the areas supporting financial decission making

**SKILL REQUIREMENTS/ EXPERIENCES**

Short Term: Increased knolwledge of AP&P and corporate policies
IC conferences

Long Term: Cost Etimating experience
Capital Management experience

**SKILL DEVELOPMENT AND TRAINING PLAN:** (Includes formal training, projects, tasks, assignments, seminars, professional affiliations)

| DEVELOPMENT GOALS: (Phase I) | DEVELOPMENT GOALS PROGRESS: (Phase II & III) | Scheduled | Completed |
|---|---|---|---|
| Team Delphi II | | 4/23/98 | 4/23/98 |
| RONA training | | 2/27/98 | 2/27/98 |
| NAO IC Conference, Detroit | | 10/98 | — |
| Emergeney procedure/fire extinguisher training | | 4/98 | 4/98 |
| Advanced Financial Aecounting/IUPUI | | 8/98 | 1/99 |

Effectiveness/Value of Training: *Team Delphi's training was better organized than Team Delphi. RONA training was very informative*

*Rev. 12/96 DE 701.02A*

Page 1

## PERFORMANCE GOALS (Phase I):

1. Fuba Integration into Delco systems - by 12/31/98
2. Theft and Defalcations reporting
3. Quarterly reconciliations status
4. Testing of high risk and non-compliance items - by 11/30/98
5. Conflict of Interest Questionaire - by early 10/98
6. Testing of high risk Payables/Receiving processes
7. TSO 9000 account reconciliations procedure
8. Substitute in cashier function - as required
9. Reconciliation of U.S cash accounts - monthly
10. Balance Sheet review for cash accounts -quarterly

## PERFORMANCE GOALS PROGRESS (Phase II):

1. Inventory successfully moved to DA books. Follow-up still req'd on Balance Sheet accounts such as cash, FA and A/P. Some follow-up req'd on Income Statement items.
2. Completed for '97. Presentation draft in process.
3. Ongoing. Implemented several improvements. Need to coordinate implementation of standard reporting by Delphi-D locations by 3rd quarter submission (mid-November)
5. In process
6. Action plan developed. Developing a source of A/P information
7. Completed - needs supervisor's review
8. Have substituted as required
9 & 10. Completed through Q2, 1998

Phase I Initials: _EuS_ _NM_ Date: 8-25-98     Phase II Initials: _EuS_ _KM_ Date: 8-25-98

**PEOPLE ATTRIBUTES REVIEW (Phase III):** Place an X on the continuum for each people attribute which best represents the employee's performance.

Communication, Customer Focus, Diversity, Global Perspective, Leadership, Multi-Skilled, Personal & Professional Integrity, Professional/Technical Competence, Responsibility & Accountability, Risk Taking, Systems Thinking, Teamwork

## OVERALL PERFORMANCE SUMMARY (Phase III):

Place an X on the continuum where it best represents the employee's performance and check the appropriate box indicating growth during the review period. Be sure to consider performance goals, development goals, and people attributes in this evaluation.

Needs Improvement --- X --- Consistent, Sustained Performance --- Outstanding Performance

[X] Unsatisfactory; [ ] Performance Diminishing; [ ] Unchanged since previous evaluation; [ ] Growing in the role; performance improving

**Phase III:**

Supervisor Comments (goal attainment, people attributes, performance summary):

See Attachment A

Employee Comments:
Noteworthy initiatives and achievements: successful coordination of the Fuba project, initiative to help transition Fuba's A/P, improved account reconciliation procedure: quarterly updates of account ownership on Finance Web, designed and implemented new account reconciliation forms in compliance with AP&P, initiative to develop a source of information for A/P process verification project.

* Eva Ozuie 2/22/99   Nancy A. Mile 2-5-99   R Humphrey 2/17/99

Employee Signature* / Date   Supervisor/Competency Leader / Date   Second Level Supervisor / Date

*Your signature in each phase does not necessarily signify agreement with the performance review. It means that each phase and the Overall Performance Summary have been discussed with you.

Rev. 12/96 DE 701.02A   * please see attachment B.

**Goal Attainment:**

Eva has completed several of her goals, but the outstanding items are as follows:

| | |
|---|---|
| Fnba LLC integration into Delphi-D | Activities have been outlined but the site is not fully integrated into Delphi-D's books. Should be completed by March 31, 1999. |
| Theft and Defalcation reporting | A presentation outlining reporting reqnirements bas been prepared and will be communicated during February, 1999. |
| Testing of high risk /non-compliance items | This activity was distributed to other coworkers due to her workload. |
| Testing of Payables/Receiving process | This activity was postponed due to current staffing issues. |
| TQS procedure for account reconciliations | This activity was completed, but due to a process change, it will require an update. |
| Conflict of Interest questionnaire | Eva completed the Delphi-A requirements but still needs to summarize supplier conflicts for the Purchasing staffs' use. This should be completed during February, 1999. |

**People Attributes:**

Eva's strongest attribute is focusing on meeting customer requirements and providing prompt follow-up. She also shows a sense of responsibility for tasks given, but she does not seek out additional assignments. When given an assignment, at times, her tone of communication comes across that the assignment is an imposition. She needs to be more proactive and accepting of responsibility. Eva accepts feedback and does try to act upon it. An area which could be strengthened is her communication skills. Her oral communicatious tend to he longer than necessary. Also, the same thought or point gets repeated multiple times in conversations. She also tends to try and solve problems during meetings. While this is beneficial at times, it is more often disruptive. She also should keep supervision better informed on the status of tasks. She needs to make oral communications more clear and concise. Her written communications are not always consistent. Comments have been received as to the curtness of her memos as well as the clarity of her memos. She needs to insure that information is always proofread for accuracy and she also needs to insure that confidential information is never inappropriately shared (e.g. conflict of interest responses from employees sent to all HR representatives). Eva should also show improvement in her listening skills. She has a tendency to interrupt others without listening to the full statement or idea. This sometimes results in the communicator having to repeat what was missed earlier. Eva's analytical ability is good at times, but is not consistent. Eva will analyze a project in much greater detail than is required to complete the task. She needs to learn the appropriate amount of analysis required in order to complete tasks in the time allotted. This results in the fact that it takes Eva longer to complete assignments than others in the department. Eva also has difficulty balancing multiple tasks well. She does better when she focuses ou only one specific projeet. However, there are very few jobs, and none at the sixth level, that focus on single projects. She also has difficulty prioritizing which item should receive the highest priority. During my time in the department, I have not been able to give Eva additional/special assignments because of some of the items noted. Eva needs to be appreciative of her teammates. Criticism of another department member who assisted her with a project did not benefit the team. She also needs to respect other individuals' time. Eva will interrupt for a quick question and this ean be disruptive to others if they are currently meeting with someone else. If time is required to meet on topics, appointments should be made.

**Performauce Summary:**

Eva has several areas in which she needs to make improvements. During 1999, I recommend that she be sent to additional communication training and time management courses. I also recommend that Eva be placed on a Performance Improvement Plan.

February 22, 1999
Eva Orlik
Attachment B, 1998 Performance Review

Below are the facts describing my professional attributes and other issues related to my 1998 performance review:

- I have continued my professional growth by taking the courses such as Advanced Accounting at IUPUI and the CPA Review.

- My performance goals were adjusted during 1998 due to the staffing shortage. I have completed all the revised tasks.

- I have completed a substantial number of 1998 department goals. I have consistently worked overtime to keep up with the workload while taking continuous education classes at night. For these reasons I was unable to take on an additional workload.

- The CPA Review course I am currently taking requires a significant time commitment. Due to the staffing problem in the department my request for a part time assignment was denied.

- My technical skills were transparent in the finance related tasks such as Fuba, LLC integration project and account reconciliation status reporting.

  - In December of 1998 I reconciled the discrepancies between Fuba, LLC and Delphi-D books and passed the project on to George Caston, Fuba LLC business manager, for preparation of adjusting journal entries. Completion of the project was passed back to me in January of 1999.

  - With regard to the account reconciliation status project, I have shown both professional and negotiation skills to expose many unreconciled accounts. I took an initiative to improve the quality of reconciliations. I coordinated a new reconciliation process for the accounts transferred to Delphi Accounting Center in Juarez, designed and implemented the new account reconciliation forms and distributed training materials worldwide to increase awareness of the importance of this task. Account reconciliations were mentioned by Jim Humphrey in the December 1998 Fianance employee meeting as one of the most notable Finance achievements in 1998.

- On multiple occasions I have shown an initiative and demonstrated high technical skills.

  - I have exposed potential conflict of interest situations through utilization of Dacor system.
  - I have learned on my own the Powerpoint application to alleviate the workload of others. I used these skills to prepare several presentations.
  - I have designed a report for testing of payables using previously acquired programming skills. The project was postponed due to the staffing problems.

- My substantial workload and the fact that I was assigned a desk away from the remaining department employees did not contribute in a positive way to the sense of teamwork. I have expressed on multiple occasions a need to be better integrated with the group.

- On several instances I received a positive feedback related to the quality and teamwork aspect of my work. I have enclosed a hard copy of one of them.

- I had to address with Nancy Mills an issue of insufficient cooperation on the part of the team member due to my concern related to the fast approaching important deadline. The situation arouse because the responsibilities were not clearly defined. I made sure to maintain a friendly relationship with that employee.

- I accept the remaining criticism expressed in my performance review although I was not aware of the seriousness of the problem or the scrutiny of my areas for improvement until the conversation with Nancy Mills on February 11. I will maintain a positive attitude and strive to improve my performance. If despite my continuous efforts my performance will still be deemed unsatisfactory, I am asking to be allowed to continue my employment with Delphi-D until October 10, 1999, when I will become vested in the employee retirement benefit program.

**DELPHI**
Automotive Systems

Nancy A Mills

11/03/98 10:08:32 PM

To:  Eva M Orlik
Subject:  Re: Delnosa Reconciliations Status Q3.

Eva,

I thought that I would share John Rotko's very positive comments with you!

Nancy

———————— Forwarded by Nancy A Mills/DELCO on 11/03/98 10:05 PM ——————

**DELPHI**
Automotive Systems

John F Rotko

11/03/98 03:50:32 PM

To:  Nancy A Mills
Subject:  Re: Delnosa Reconciliations Status Q3.

Nancy :  It is very refreshing to receive these types of notes; obviously  Eva has a lot to do with these accolades. Good work on her part, and I can positively feel that we are over the "hump" on getting a handle on account reconciliations.

Regards,   John R.

### Delphi Automotive Systems

| | |
|---|---|
| **From:** | Eva M Orlik/DELCO |
| **Date:** | 11/03/98 02:21:15 PM EST |
| **Subject:** | Re: Delnosa Reconciliations Status Q3. |

Lulu,

Your summary file is almost exactly what I was looking for. I added some minor details like the count of reconciled and unreconciled accounts. I think it will help us turn the information around faster, especially that we always have last minute changes to the Juarez count.

I have also compared your report with the Q3 download of Delnosa GMGL accounts in US$, and found only 4 accounts that did not make it to your list. I marked them in red in column A and B. Can you look into this?

Good job, Lulu! It will help me a great deal.

Thank you,

Eva



delnosa Q3 SUMMAR

10/30/98 01:48:18 PM
Patricia Palacios



# DELPHI
## Automotive Systems

To:     Eva M Orlik/DELCO@DELCO
cc:     John F Rolko/MX/DELCO@DELCO
        Norma Alejandra Garcia/MX/DELCO@DELCO

Subject:  Delnosa Reconciliations Status Q3.

Eva,
I am attaching two files,
The first one(SUMMARY XLS) is listed by General Ledger Account & Sub account and without the Local
suffix. And the second is the old format that I used to send you, the wich includes the local
suffix(COMPLETE XLS). Please review the information and let me know if I need to make changes.

Also, I talked with Sandra Ruesga (from Juarez) she agreed to submit the Delnosa's Reconcilement Report
by November 13th.

          

SUMMARY.X          COMPLETE.

Thank you. Have a nice weekend.

## Lourdes Sánchez C.
Internal Control
Ext. 8.953.2612

Eva Orlik, Internal Control
Delphi Delco Electronics Systems
Location: Plt 1 - 2nd Floor East - Kokomo  IN
gm phn:  8-322-2764   fax:  8-322-4817   m/s:  A239
phn:  765-451-2764   fax:  765-451-4817
net:  emorlik@mail.delcoelect.com

To:

Patricia Palacios/MX/DELCO

**cc:**
John F Rotko/MX/DELCO
Norma Alejandra Garcia/MX/DELCO
Adriana M Valdez/MX/DELCO
Oscar Quintanilla/MX/DELCO

**Category:**

# EXHIBIT B

**General Motors Corporation**
**PERFORMANCE IMPROVEMENT PLAN**

*Reviewed 3-9-99*
*w/ Eva & Greg*

NAME: Eva Orlik

DATE: 2-24-1999

| | 1. Performance Deficiencies | 2. Behavior or Results Desired by Management | 3. Action Management Will Take to Help Employee Correct Deficiencies | 4. Action Employee Will Take to Correct Deficiencies | Completion Date |
|---|---|---|---|---|---|
| 1. | Ineffective oral and writtten communications | 1. Concise oral communications; improved tone of oral & written comm.; improved listening; improved accuracy and clarity of written communications. | 1. Enroll Eva in a class on effective communications; provide regular feedback on communications skills | 1. Conscious of the length of communication and the tone of voice, plus concentrate on listening better. Will seek feedback from Nancy Mills on all the above plus critique written communications in advance of sending out. | 7/1/99 |
| 2. | Inability to prioritize and balance multiple tasks | 2. Effectively prioritize and balance tasks without supervision | 2. Enroll Eva in a time management class; require Eva to maintain a task prioritization list with deadlines | 2. Maintain a task prioritization list in Excel or some other tool and update it regularly | 7/1/99 |
| 3. | Misses assignment deadlines frequently | 3. All assignments completed within deadlines | 3. Clearly communicate assignment deadlines and expectations to Eva | 3. Same as above | 7/1/99 |
| 4. | Ineffective interpersonal relationships | 4. Perform roles within team effectively; a team player who aids co-workers | 4. Provide regular feedback on Eva's interpersonal effectiveness with peers, customers, team members, etc. | 4. Attempt to maintain and develop friendly relationships with peers, customers, etc., plus perform required roles within teams | 7/1/99 |

SIGNATURES: Upon successful completion of the PIP, should any deficiencies recur in the future, immediate disciplinary action may take place in lieu of a PIP.

Appraiser _____  3-8-99   Employee _____  3/9/99
                              Date                                     Date

Appraiser's Supv. _____  3-8-99   Personnel _____  3/1/93
                                     Date                                     Date

Other _____                        Other _____
        Date                                           Date

-0046101.doc

APPRAISAL OF PROGRESS

Evaluate the employee's progress to date on the plan for improvement detailed on the reverse side.

**3/9/99**    Eva should continue to work on making communications more concise and to the point. Written communications need to present thoughts and ideas clearly. Too much rework occurred during this evaluation period. Also, notes should continue to be proofread to insure that all corrections have been made. Attention should be made to the "To" and "cc" individuals on E-Mails. Always insure that the "To" addressees are the people that you expect to take some action with the note. Eva has developed a task list to monitor when assignments will be due. This appears to be helping Eva keep track of all assignments. Assignments should be completed as close to the original completion date as possible in order to keep things from "piling up" at a future date. The only assignment that was not completed during this review period was the completion of a template that the Financial Reporting Department had requested. Also, the escheatable property plan outlined for the balance sheet review needs to have owners for the activities identified and dates for when the activity will be completed. Eva and I were unable to review this together before the assignment due date. The theft & defalcations assignment was completed by Eva on-time, however, I was unable to review the document until 3/7/99. People were surveyed regarding Eva's teamwork abilities. The major comments that were returned all centered around keeping communications brief and to the point.    Eva, 3/9/99    NMM 3-9-99    Eva Ruiz 3/9/99

SIGNATURES:

orikcip.doc

APPRAISAL OF PROGRESS

Evaluate the employee's progress to date on the plan for improvement detailed on the reverse side.

**3/9/99**    Eva should continue to work on making communications more concise and to the point. Written communications need to present thoughts and ideas clearly. Too much rework occurred during this evaluation period. Also, notes should continue to be proofread to insure that all corrections have been made. Attention should be made to the "To" and "cc" individuals on E-Mails. Always insure that the "To" addressees are the people that you expect to take some action with the note. Eva has developed a task list to monitor when assignments will be due. This appears to be helping Eva keep track of all assignments. Assignments should be completed as close to the original completion date as possible in order to keep things from "piling up" at a future date. The only assignment that was not completed during this review period was the completion of a template that the Financial Reporting Department had requested. Also, the escheatable property plan outlined for the balance sheet review needs to have owners for the activities identified and dates for when the activity will be completed. Eva and I were unable to review this together before the assignment due date. The theft & defalcations assignment was completed by Eva on-time, however, I was unable to review the document until 3/7/99. People were surveyed regarding Eva's teamwork abilities. The major comments that were returned all centered around keeping communications brief and to the point.

**4/1/99**    Communication skills continue to be an area which Eva needs to improve. Her voice continues to be boisterous and individuals have commented regarding their ability to hear her conversations. She also needs to be respectful of other individuals' time. Even though individuals may be in the middle of a conversation or have indicated no time is available, Eva proceeds with her questions. An example of this would be requesting account reconciliations on the first workday when the primary focus of that day is to insure all entries are booked correctly and on-time to the ledger. Eva needs to improve her listening skills. At times, she appears to be thinking of her next question rather than focusing on the conversation at hand. Some individuals have commented that topics need to be explained multiple times. At times I feel that I have to negotiate with Eva on due dates. Examples would include not being able to attend a department meeting and working out timing for the escheatable property assignment. Things must be completed in a timely manner because it will cause work to pile up to an even greater extent in the future. Also, written communications still tend to require more review and rework than expected. Since I have been out of the office for the majority of this week, I have not received an update on the cash account reconciliation, the plan for completion of the escheatable property activity or a training plan to address performance deficiencies. Also, the theft and defalcation training package and the associated Delphi CFO letter have not been issued to date even though all comments were provided on Friday, March 26.

**4/27/99**    Eva is making some progress in completing assignments on time. She is maintaining a task list and is advising me of the status of all items. This is helping her to keep aware of all assignments that have been given. Eva needs to insure that she is enrolled in some communication classes and a time management course. These classes need to be completed and practiced in order to successfully complete this process. It would have been more advantageous to have taken these classes earlier in the process. Eva needs to be more cognizant of people's time. On April 14, 1999, a review of the status of assignments was scheduled for one hour but actually lasted two and a half hours. Communications must become more concise. Care should also be taken with information in the area. I, another supervisor and an hourly employee, all noticed where the combination to the petty cash drawer was located.

*Bram 4-27-99*    *NM 4-27-99*    *[signature] 4/27/99*

onlkplp.doc

## APPRAISAL OF PROGRESS

5/25/99   There has been a longer than normal gap in the appraisal of Eva's progress due to Eva being out of the office in preparation for the CPA examination coupled with travelling. Communication skills still need to be improved. When Eva and I discuss the content of a note for an E-Mail, I notice that she tries to write every word that is said during our discussion. She needs to learn to pen these memos independently. I have also received feedback that her communications are at times, repetitive in nature. Also, I have received feedback from other supervisors that she could display more diplomacy in her dealings with other employees. Recently, Eva gave our summer student a portion of her assignment. I believe that this was inappropriate for her to pass along her responsibilities without consulting me beforehand. Eva has taken the Time Management Training and is scheduled to take some additional communication classes.

_____ 5-25-99      JAM 5-25-99      Eva Olive  5/25/99

SIGNATURES:

Appraiser _____ Date _____

Appraiser's Supv. _____ Date _____

Other _____ Date _____

Employee _____ Date _____

Personnel _____ Date _____

Other _____ Date _____

orfkpjp.doc

APPRAISAL OF PROGRESS

**5/25/99**   There has been a longer than normal gap in the appraisal of Eva's progress due to Eva being out of the office in preparation for the CPA examination coupled with travelling. Communication skills still need to be improved. When Eva and I discuss the content of a note for an E-Mail, I notice that she tries to write every word that is said during our discussion. She needs to learn to pen these memos independently. I have also received feedback that her communications are at times, repetitive in nature. Also, I have received feedback from other supervisors that she could display more diplomacy in her dealings with other employees. Recently, Eva gave our summer student a portion of her assignment. I believe that this was inappropriate for her to pass along her responsibilities without consulting me beforehand. Eva has taken the Time Management Training and is scheduled to take some additional communication classes.

**6/10/99**   Eva should continue to focus on time management. She still needs to improve her productivity. Assignments appear to take longer than average to complete. I sometimes sense that tasks that are not as substantial are not getting a high priority. Eva needs to be timely with requests. Information was late for a response to EAG as to what accounts they reconciled on our behalf. Phone responses are not always answered in a timely manner. Eva needs to communicate the status of how her communication classes are progressing.

Notation | acknowledgment of receipt of Eva's responses to 4-1-99 comments
plus completed work schedule.

BAM  6-10-99        Eva Obler  6/10/99

R. Mink  6-10-99

SIGNATURES:

_____        Employee
Appraiser                Date

_____        Personnel
Appraiser's Supv.        Date

_____        Other
Other

oriikplp.doc

# APPRAISAL OF PROGRESS

**5/25/99** There has been a longer than normal gap in the appraisal of Eva's progress due to Eva being out of the office in preparation for the CPA examination coupled with travelling. Communication skills still need to be improved. When Eva and I discuss the content of a note for an E-Mail, I notice that she tries to write every word that is said during our discussion. She needs to learn to pen these memos independently. I have also received feedback that her communications are at times, repetitive in nature. Also, I have received feedback from other supervisors that she could display more diplomacy in her dealings with other employees. Recently, Eva gave our summer student a portion of her assignment. I believe that this was inappropriate for her to pass along her responsibilities without consulting me beforehand. Eva has taken the Time Management Training and is scheduled to take some additional communication classes.

**6/10/99** Eva should continue to focus on time management. She still needs to improve her productivity. Assignments appear to take longer than average to complete. I sometimes sense that tasks that are not as substantial are not getting a high priority. Eva needs to be timely with requests. Information was late for a response to EAG as to what accounts they reconciled on our behalf. Phone responses are not always answered in a timely manner. Eva needs to communicate the status of how her communication classes are progressing.

**6/25/99** During the past two week period, Eva has begun to show some performance improvements. When we reviewed the FUBA project status, the summary analysis was clearly put together and the associated workpapers were well documented to tie in with the summary page. This helped facilitate our review of the information. Also, there have been some improvements in Eva's communication skills. Messages tend to be delivered with better tone and are more concise. The Delphi Audit Services staff has been complimentary of Eva's support during the last two weeks. Also, I have received complimentary feedback from our Systems Information Manager regarding an analysis that Eva completed on the financial staff's phone activity. Based upon the items observed during the last two weeks, I would like to extend Eva's evaluation period through August 31, 1999. This is being done to insure that the improved performance is sustainable. *Sam 6/25/99* *Eva 6/25/99* *NAM 6-25-99*

SIGNATURES:

orliksp.doc

## APPRAISAL OF PROGRESS

**8/17/99** No significant change in Eva's performance has occurred since the last evaluation date. During the last two week period, Eva has spent her time in the following manner: 36% miscellaneous tasks, 35% account reconciliations, 22% assisting with the audit of the Financial staff by Delphi Audit Services and 5.2% on getting surveys modified for the upcoming ICRQ. A significant time was spent on miscellaneous tasks. Eva should prioritize her work efforts more effectively so as to allow for more opportunities to work on true internal control assignments. Also reconciliations took a fair amount of time to complete. Efforts should continue to reduce the amount of time spent in this particular area. Eva should continue to work on her listening and comprehension skills. I received feedback from one of her peers that it took longer to explain the operation of a new system to Eva than it did for others in the group. Now that the Corporate audit has been completed, Eva should continue working on the escheatable property project.

SIGNATURES:

| | | |
|---|---|---|
| Appraiser | | Employee |
| | Date | |
| Appraiser's Supv. | | Personnel |
| | Date | |
| Other | | Other |
| | Date | |

Evaluate the employee's progress to date on the plan for improvement detailed on the reverse side.

oflkpip.doc

## APPRAISAL OF PROGRESS

**8/17/99** No significant change in Eva's performance has occurred since the last evaluation date. During the last two week period, Eva has spent her time in the following manner: 36% miscellaneous tasks, 35% account reconciliations, 22% assisting with the audit of the Financial staff by Delphi Audit Services and 5.2% on getting surveys modified for the upcoming ICRQ. A significant time was spent on miscellaneous tasks. Eva should prioritize her work efforts more effectively so as to allow for more opportunities to work on true internal control assignments. Also reconciliations took a fair amount of time to complete. Efforts should continue to reduce the amount of time spent in this particular area. Eva should continue to work on her listening and comprehension skills. I received feedback from one of her peers that it took longer to explain the operation of a new system to Eva than it did for others in the group. Now that the Corporate audit has been completed, Eva should continue working on the escheatable property project.

**9/01/99** Since the last review period, Eva has completed the quarterly account reconciliation report for submission to Delphi headquarters. She performed independent analysis on the Internal Control Review Questionnaires in preparation for the 1999 calendar year survey. Given the amount of time that Eva spent on her own preparing for our review (approximately 29 hours), I would have expected the review with me to be much more effective. The review with me took approximately 5 hours and this included a review of all questions on all of the questionnaires. Some questions should have been added to comprehend prior audit comments at Delphi-D and were not included at the time of the review. A meeting that I requested on 8/19/99 to be set-up with Jeff Hicks, Eva, and myself to discuss some of Eva's concerns regarding fixed assets has not been completed. Also, some of the open items from prior reviews have yet to be completed.

Based upon the continuous assessment during this evaluation process, I still notice that Eva has difficulty with balancing and prioritizing multiple tasks as well as completing all assignments within defined deadlines. While her communications skills have improved some over the last two months, she still needs to work on clarity and conciseness. I do not believe that Eva has effectively and successfully completed this Performance Improvement Plan.

SIGNATURES:

Appraiser _____  Date 9/1/99

Appraiser's Supv. _____  Date 9/1/99

Other _____  Date

Employee _Eva Ojik refused to sign_  Date 9-1-99

Personnel _____  Date 9/1/99

Other _____  Date

orikojip.doc

# EXHIBIT C

Rec'd 7-19-99

Deadlines

| Open items | Due date | Weekday | Time | Task | Progress information |
|---|---|---|---|---|---|
| | 28-Jun | Monday | | Feedback on Adrian Luzuriaga recon worksheets | .6 hr reviewed memo asking mgrs for feedback |
| | 28-Jun | | 12:00 PM | B.J. Gilzean - class, travel, reading assignment | 1.75 hr |
| | | | | phone, VM, e-mail,deadlines update, assist auditors | 1.5 hr |
| | | | | Return Mike Pezzetti's call, answer q. after his review of adtnl backup and explanations, make at his request minor chgs to the adjustments wksht, write a memo summarizing Fuba LLC adjustments on DE books, inform/review w/Mary, research 97 BS discrepancy betw. books and tax return | 4.75 hrs |
| | 28-Jun | | | Call Mike Emerson, Key Bank,868-6004 to make sure he rec'd my 6/25 fax. | 0.4 hr |
| | 28-Jun | | 11:00 AM | Claude - prm frt mtg w/ Bill Barnett, Chris Perry, Roger Sherman, Bill's office. Is Skip coming to this mtg? Respond Mon AM.- roger x4226 | left msg |
| | 29-Jun | . | | Reconciliation of cash accounts | 5.5 hrs, worked on prior recon items |
| | 29-Jun | | | phone, VM, e-mail,deadlines update, assist auditors, follow up on prmt frt mtg | 2 hrs - selection of air carriers for spot buys - done at Delphi-A - Kitty Hawk |
| | 29-Jun | | | handle a request for a copy of travel policy, figure out a download from Netscape | 1 hr |
| | 29-Jun | | | changes to memos per Nancy's instructions | 0.5 hr |
| | 30-Jun | 8.30 AM | | Dept mtg | 2.4 hrs |
| | 30-Jun | 10.30 AM | | Key Bank refresher w/ Nancy | cancelled |
| | 30-Jun | | | follow up on frt claims billing recon to PCL records | 1.5 hrs |
| | 30-Jun | 1:00 PM | 4.30 PM | Customs seminar CTC, 2nd floor above CTC1, report in dept mtg, contact - Brenda Catron | 3 hrs |
| | 30-Jun | | | call Brian Reynolds 8-444-6405 re 1st Chicago 5/2 and 6/8 trans - dr and cr each day for $2186, check 467673 ( not paid by bank). NY Treasurer's Office processed as a pmt on JV 0003, part of a dr to a/c da 1001 for 4336.80. DA 1001 needs to be credited for 2186. | msg 7/1 |
| | 1-Jul | Thursday | 12:00 PM | B.J. Gilzean | 1.75 hr |
| | 1-Jul | | | phone, VM, e-mail,deadlines update, assist auditors | 1 hr |
| | 1-Jul | | | Follow up on auditors' findings | 1.2 hr |
| | 1-Jul | | | Follow up w/ Key Bank | .75 hr |
| | 1-Jul | | | Follow up with Mike Pezzetti, respond to request | .5 hr $35K delta betw BS and tax return written off to expense based on the info I provided. |
| | 1-Jul | | | Follow up on closing Fuba's account, locate requested documents, find out how to process wire transfer, write an acknowledgment, send to Gary Bertolini | 1.5 hr |
| | 1-Jul | | | Reconciliation of cash accounts, follow up w/ Brian Reynolds | 2.5 hrs |

Deadlines

| Open items | Due date | Weekday | Time | Task | Progress information |
|---|---|---|---|---|---|
| | | | | follow up w/Mark Monreal | 0.25 hr, mgrs fill out 2 sets of ICRQs - 1 for Delphi-D and 1 for Delphi-E - different dates, different q. Mark rec'd the ICRQs for distribution to all Mke mgrs from Clyde Fabricio (replaced by Gay Terry). Only one engineering mgr rec'd duplicate forms. |
| | 2-Jul | | | Send follow-up to all sites' IC asking for copies of theft reports | 3 hrs figure out distr. List, change presentation, write memo, resch - a/c recons and mtgs 6/30, 7/1 |
| | 2-Jul | | | figure out how to transfer PDF files to Word | 1 hr |
| | 2-Jul | | | follow up on cash mgmt issue, e-mail to Jeff Janos' mgr @ NYTO | 0.5 hr |
| | 2-Jul | | | phone, VM, e-mail,deadlines update, assist auditors, clean up overhead files | 2.5 hrs |
| | 2-Jul | | | get organized for tasks during shutdown - ICRQ files, have passwords reset for Easytrev | 1 hr |
| | 6-Jul | | | Clean Sharon Terrini's desk | 1.3 h |
| | 6-Jul | | | phone, VM, e-mail,deadlines update | .75 hr |
| | 6-Jul | | | Send follow-up to all sites' IC asking for copies of theft reports | 2 hrs, make more changes for clarity, finish, send for Nancy's review |
| | 6-Jul | | | Easytrev database/access problem | 3.5 hrs, run sample reports, meet w/Brenda, request database access |
| | 6-Jul | | | Clarify with H. Rosenberg that one of Fuba LLC invoices for dissolution fees has been paid, request pmt processing for the remaining legal fees | 1 hr |
| | 7-Jul | | | 30 storage tags for Mary | .8 hr |
| | 7-Jul | | | Escheatable property - search for all vendor codes since checks issued | 1.7 hr |
| | 7-Jul | | | phone, VM, prior e-mail,deadlines update | 1.5 hr |

Deadlines

| Open items | Due date | Weekday | Time | Task | Progress information |
|---|---|---|---|---|---|
| | 7-Jul | | | Research 1st Chicago reconciling item from6/98 w/Jeff Janos, NYTO, Joyce Decarlo, 1st Chicago, Xiaowei and Michelle Davis-Forbes. | 3.5 hrs Reviewed transaction flow with Xiaowei since till 6/98 the reconciliation of DA1001 was tied to DJ1001. In 6/98 the cash management function transferred to NYTO. Talked to Michelle Davis-Forbes, GM Cash Mgmt(313-667-7562). Determined that an offset to a reconciling item of DR 2189 booked to DA 1001on JV 3 in 6/98 was a CR to GM Corp. Cash A/ C booked through DA 6350 open a/c.  Joyce and Jeff are researching the transactions to determine whether the bank failed to issue a cr to a/c 945285 tied to DA 1001 or a part of 6/98 jv3 was incorrect. If a problem is on DE books talk to Rebecca Donahue, Delphi Cash Mgmt 248-813-3307. Established w/Joyce that check 467670has been aid.Faxed documents showing that bank statement does not reflect it. |
| | 8-Jul | | | Sick | |
| | 9-Jul | | | phone, VM, e-mail,deadlines update | .5 hr |
| | 9-Jul | | | Keybank reconciling items - resolved the 1997 $10K payment discrepancy issue, worked on 1998 discrepancy to prepare for meeting at Keybank. | 2 hrs |
| | 9-Jul | | | Escheatable property - search for all vendor codes since checks issued | 8.5 hrs |
| | 12-Jul | | | Escheatable property - search for all vendor codes since checks issued, run/trouble shoot a report in PLIPC4B | 8 hrs |
| | 12-Jul | | | phone, VM,e-mail,deadlines update, help Sandy locate document retention info | .75 hr |
| | 13-Jul | | | Issue 60 storage labels for Sandy Comerford | .8 hr |
| | 13-Jul | | | Trouble shoot the Easytrev report in PLIPC4B AND clipc1B with Shabira/EDS, Brenda and on my own | 8 HRS CLIPC1B fixed, no access to TAPE92, submitted security request, Brenda to approve, PLIPC4B problem remains |
| | 13-Jul | | | Follow up w/Keybank and EAG on '98 Keybank reconciling items | .75 hr |
| | 14-Jul | | | Phone, VM, Misc - issue adtnl storage tags for G/L group, update deadlines, follow up w/EAG on 2/98 payments | 1.5 hr |

| | Deadlines | | | | |
|---|---|---|---|---|---|
| Open items | Due date | Weekday | Time | Task | Progress information |
| | 14-Jul | | | Trouble shoot the Easytrev reports in PLIPC4B with Shabira/EDS, Brenda and on my own, run the report in clipc1B | 11 hrs identified problem: 94 file - different format than 93, TAPE92- name unknown, no active module found - tape not retrieved in Plano. Run 95-1/98, 93, 94, 2/98-6/98. Problem w/500 page report in queue - EDS could not stop print job. Other reports 300-400 pages - printer problem. Some reports - missing data in document and PO field - run w/ Brenda, fixed on my own, reports stuck in print queue. Got final version of 94, 93 needs to be rerun based on 94 logic, 95-1/98 needs to be rerun, got the logic. Run final version of 2/98-6/99. |
| | 15-Jul | | | Run remaining reports. Changed HDE printer orientation, report spooled but did not print, called helpdesk. Rerun the reports on KODSN089. Run adtl reports by amt to identify pmt w/possible wrg check #, date. Identified course of action for several pmts. | 9.5 hrs |
| | 15-Jul | | | Misc | .5 hr |
| | 16-Jul | | | Run individual reports, research pmts for which no record can be found, detail in escheatable property file | 8.5 hrs |

# EXHIBIT D

*Add'l Request*
*Made w/ June*
*Reconciliation*
*Report*

# DELPHI
### Automotive Systems

Nancy A Mills

08/19/99 01:34:04 AM

Addressee List
Subject: Re: June reconciliation status report

Eva,

Please add the two accounts that were noted as unreconciled during the audit 1810/1845 as mentioned in my voice mail.

I have some concerns regarding the action plans—They don't look "active". There is no definitive corrective action plan with any date committed. Also, for your first two accounts, are the comments in all caps related to the first account and the regular type related to the second account? Also, in Liverpool, what does "Wtg." stand for?

While we did discuss that some of the accounts would not be resolved immediately, by showing that accounts will not be reconciled until September, Q3 or 12/31/99, this will be a red flag that we are not clearing our resolving items in a timely manner. If we stay with these dates, we need to insure that Jim has approved a deviation for not having them resolved/reconciled within 30 days.

I would eliminate your comments regarding the 3270 "opportunity" in your note to the staff. I would like to discuss this again in greater depth when I return to the office. Some of the explanation is still unclear. I would also like for Jeff Hicks to help explain this. If your concerns are still valid, there will still be time to keep the entry from being booked in August accounting.

Nancy
Eva M Orlik



**Eva M Orlik**
08/18/99 03:53 PM

To: Nancy A Mills
Subject:   June reconciliation status report

Nancy,

Attached is the file containing comprehensive worldwide account reconciliation status information as of June 30, 99. I have followed up on several leads in my reconciliation audits. My findings are included on page "June Audit".

I am concerned that we may take the imbalance in account 3270 to income in 1999 just to write it off in the year 2000 as a result of Fixed Asset physical inventory.

Please note the following excerpt from the Accounting Policy Manual:

> "To assure accuracy and aid in control, periodic physical inventories should be taken of all fixed assets at intervals deemed appropriate by the unit but at least once every five years. Once started, the inventory must be completed within one year. Assets not found must be written-off if they are not located within one year

after completion of the inventory. Nominal value assets are not subject to
periodic physical inventories but each unit should continue to exercise adequate
physical controls.

Occurrences such as major or substantial expansion programs, plant
rearrangements, replacement or modernization programs, etc., may indicate the
need for a more frequent physical verification than otherwise would be necessary.
During programs of this nature, the plant is often exposed to extensive change
involving the movement or disposal of many types of assets. All physical activity
in the assets should be promptly recorded in the property records and a physical
verification may be the only assurance that the property
records represent the assets actually in existence. This is particularly applicable to
assets such as booths, conveyors, certain types of machines, air, gas and water
lines, electrical systems, etc., where the change is difficult to discern except by
close physical inspection.

The results of the inventory experience should be used in appraising the adequacy
of internal controls related to reporting and recording acquisitions, disposals,
transfers and departmental movement of assets."

As you know, only the page called "Unreconciled" is submitted to Delphi-A. Please let me know if it will require any cha

Thank you,



Jun_99 recons.

Eva Orlik, Internal Control
Delphi Delco Electronics Systems
Location:  Plt 1 - 2nd Floor East - Kokomo  IN
gm phn:  8-322-2764   fax: 8-322-4817  m/s: A239
phn:  765-451-2764   fax:  765-451-4817
net:  eva.m.orlik@delphiauto.com

Diagnostics


Diagnostics

DETAIL OF JUNE '99 UNRECONCILED ACCOUNTS:

Business Unit:    Delphi Delco Electronics Worldwide Operations

| Unit | T/B code | 4 digit general ledger account | 5 digit subaccount | Acct Balance on 6/30/99 | Date last reconciled | Unreconciled Balance | When recon will be complete | Individual Responsible | Corrective Action Plan |
|---|---|---|---|---|---|---|---|---|---|
| Kokomo, IN | DA-00280 | 5030 | 14110 | (258,422.96) | Dec-98 | (258,422.96) | Q3 | Sanders | 00957 JV 13/98; PETE LUNDER - BEG BAL PER GM RECLASS OF ITEMES FROM 5278 WHICH HAVEN'T BEEN RELIEVED YET; Sheryl Campbell says no Pension expert as yet at Delphi A, thus, no relief has bee been booked to Pension for 1999. Packard statement issues do not match trial balance submission |
| | DA-00280 | 6681 | 00000 | (941,866.67) | Dec-98 | (941,665.67) | Dec-99 | Sanders | |
| | DA-00280 | 4201 | 00129 | (2,017,603.74) | Mar-99 | ??? | Jul-99 | Bridenthal | Corrective action planned for Sept 99 for remaining allied A/P issues |
| | DA-00280 | 4201 | 00SA2 | (16,269,717.05) | not to summt | (141,374.11) | Sept | Bridenthal | Corrective action planned for Sept 99 for remaining allied A/P issues |
| | DA-00280 | 4201 | 00SC3 | (285,430.32) | not to stmnt | (27,777.00) | Sept | Bridenthal | Corrective action planned for Sept 99 for remaining allied A/P issues |
| | DA-00280 | 4201 | 00SD1 | (37,785.18) | not to stmnt | ??? | Sept | Bridenthal | Corrective action planned for Sept 99 for remaining allied A/P issues |
| | DA-00280 | 4201 | 00719 | (6,227,577.59) | not to stmnt | 452,648.89 | Sept | Bridenthal | Corrective action planned for Sept 99 for remaining allied A/P issues |
| | DA-00280 | 4201 | 00723 | | not to stmnt | 250,000.00 | Sept | Bridenthal | Corrective action planned for Sept 99 for remaining allied A/P issues |
| | DA-00280 | 4411 | 00000 | (301,827,492.05) | Jan-99 | 70,538.85 | Jul-99 | Stouder | A/P ISSUES TO BE RESOLVED |
| | DA-D2280 | 1890 | 00000 | 2,439,393.84 | May-99 | 2,315,753.08 | Sep-99 | McCoy | In process of researching GMTOPS bookings with EAG and Capital Mgmt. |
| Liverpool, U.K. | 00509 | 2001 | 00231 | 49,897.72 | 2/28/99 | 49,897.72 | 7/31/99 | Chris Young | Wtg Delphi Treasury (Brussels) |
| | 00509 | 2001 | 00554 | 41,597.57 | 2/28/99 | 41,597.57 | 7/31/99 | Chris Young | Wtg Delphi Treasury (Brussels) |
| | 00509 | 2557 | | 4,844.57 | 2/28/99 | 4,844.57 | 7/31/99 | Chris Young | Wtg Delphi Treasury (Brussels) |
| | 00509 | 2556 | | 400,906.35 | 2/28/99 | 400,906.35 | 7/31/99 | Chris Young | Wtg Delphi Treasury (Brussels) |
| | 00509 | 4601 | 00231 | (242,831.35) | 2/28/99 | (242,831.35) | 7/31/99 | Chris Young | Wtg Delphi Treasury (Brussels) |
| | 00509 | 4601 | 00554 | (41,437.21) | 2/28/99 | (41,437.21) | 7/31/99 | Chris Young | Wtg Delphi Treasury (Brussels) |
| Fuba, Germany | 2660 | 1601 | 00150 | 1,238.15 | ongoing | 1,238.15 | July 99 | M. Brinkhaus | Remittance advices received, reconciliation almost complete |
| | 2660 | 1601 | 00280 | (1,140.94) | ongoing | (1,140.94) | July 99 | M. Brinkhaus | Remittance advices received, reconciliation almost complete |
| Megamos, Germany | 00568 | 1601 | 00260 | 3,662,739.87 | | 526,074.65 | 12/31/99 | Irene Kuetz | DELCO Kokomo to provide further details |
| | 00568 | 1601 | 00568 | 1,097,206.15 | 5/31/99 | 295,607.84 | 12/31/99 | Irene Kuetz | |

Delphi-D Account Reconcilement Status:

| | Total # Of Accts | # of Accts Not Reconciled | % | | $ Balance of Unreconciled Accounts |
|---|---|---|---|---|---|
| U.S. Operations | 962 | 9 | 0.94% | | (325,428,311.82) |
| Foreign Subsidiaries: | | | | | |
| Mexico | 295 | 0 | 0.00% | | |
| Argalana | 410 | 0 | 0.00% | | |
| Singapore | 195 | 0 | 0.00% | | |
| China | 67 | 0 | 0.00% | | |
| Germany | 385 | 4 | 1.04% | | 4,760,043.22 |
| England | 177 | 6 | 3.39% | | 212,970.85 |
| France | 43 | 0 | 0.00% | | |
| Sweden | 91 | 0 | 0.00% | | |
| Subtotal | | | | | |
| Total Division | 2,636 | 19 | 0.72% | | (320,455,297.45) |

# EXHIBIT E

**DELPHI**

Automotive Systems



U.S. SALARIED EMPLOYEE HANDBOOK

performance starts to decline. However, no special privileges or exemptions apply. If you do not cooperate in obtaining help and in improving job performance, then a decision will be made as to your suitability for continued employment.

## Workplace Violence

Delphi is committed to protecting the health and safety of each employee by providing a work environment that is free of harassment, threats and acts of violence.

In support of this policy and consistent with health and safety priorities, Delphi will not tolerate any threat, direct or implied, or physical conduct by any person which results in harm to people or property, or which harasses, disrupts or interferes with another's work performances, or which creates an intimidating, offensive or hostile environment.

Management recognizes that preventing workplace violence is a fundamental responsibility. In the event individuals or situations at risk for violence are identified, management will respond promptly to ensure a thorough and timely evaluation. Key resources to assist in this process include senior management, security, human resources, medical and EAP personnel, legal and communications organizations and law enforcement officials.

Employees share in the responsibility for maintaining a safe work environment. Your responsibilities include communicating safety concerns and cooperating in efforts to resolve concerns. Making threatening statements or gestures, possessing weapons or dangerous devices or possessing or selling drugs or alcohol while on company property are prohibited.

Violation of this policy will not be tolerated and will result in disciplinary action up to and including discharge.

## Safety Belt Usage

As part of the Corporation's commitment to the health and safety of employees and their families, Delphi urges all employees and their families always to use safety belts and child restraints. Further, employees who operate Corporate-owned or leased vehicles, and all occupants of those vehicles, are required to use safety belts and, when appropriate, child restraints. This also applies to instances when a personal vehicle is used for Corporate business. The objective is to reduce injuries and deaths due to vehicle crashes and to attain 100% restraint usage. The key message is safety belt use is the most effective way to reduce the risk of injuries and fatalities in vehicle crashes.

## RELATIONSHIPS AND RESPONSIBILITIES REGARDING DIVERSITY, EQUAL OPPORTUNITY, AFFIRMATIVE ACTION AND NON-DISCRIMINATION

Diversity is a source of the innovation and creativity which are essential to our success. We support and must integrate the many voices of diversity and increase our understanding of differences in life experiences, cultures and beliefs. Consistent with our values of teamwork and integrity, the Corporation has a long-standing commitment to diversity, equal opportunity, affirmative action and non-discrimination. The Corporation extends opportunities to qualified applicants and employees on a non-discriminatory basis. Reasonable accommodation is made to the limitations of qualified individuals with disabilities, qualified disabled veterans and veterans of the Vietnam Era, taking into account the needs of the business and financial costs.

We have an ongoing commitment to cultivate our diversity by creating and maintaining a workplace environment that naturally enables everyone to make the greatest contribution. This requires a workplace environment which is free of discrimination, hostility and physical or verbal harassment with respect to

1

YOUR WORKPLACE ENVIRONMENT

**1**

**YOUR WORKPLACE ENVIRONMENT**

race, gender, color, national origin, religion, age, disability, sexual orientation, being a special disabled veteran or a veteran of the Vietnam Era or any other protected status.

Harassment based on sex, age, race, national origin, religion, disability or any other protected status is prohibited and is a violation of Corporate policy. Harassment may encompass a wide variety of behaviors including without limitation unwelcome conduct, whether verbal, physical or visual, that is based upon or relates to a person's protected status and has the purpose or effect of creating a hostile, offensive or intimidating workplace environment.

Sexual harassment, in particular, should be understood to mean unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when: 1) submission to such conduct by an individual is made explicitly or implicitly a term or condition of employment, 2) submission to or rejection of such conduct by an individual is used as the basis for an employment decision or 3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance, or of creating a hostile, intimidating or offensive working environment. Examples of sexual harassment may include but are not limit

ed to unwelcome sexual propositions, unwelcome jokes or comments of a sexual nature, sexually oriented cartoons, pictures or photographs, or any other potentially offensive materials of a sexual nature in the workplace, including distribution or posting of such materials through the use of company computer networks.

It is important for you to promptly report any incident in which you feel you have experienced or witnessed harassment or discrimination in, or connected to, the workplace and to promptly report any complaints or concerns you may have about equal opportunity, affirmative action or discrimination. Complaints and concerns can be brought to the attention of your supervisor, manager or your local Human Resources representative. If you feel uncomfortable bringing the matter to your supervisor or manager or if your supervisor or manager is thought to be involved in the harassment, it is important that you bring the matter to the attention of your Human Resource representative. In addition, other existing complaint procedures, such as the Open Door policy, may be used to raise concerns about harassment, discrimination, equal employment opportunity or affirmative action.

It is every employee's responsibility to act in a manner that will create

and maintain a workplace environment that supports diversity and is free from all discrimination and harassment. Supervisors, in particular, are expected to support the Corporation's policy of diversity and equal opportunity. Supervisors are expected to take reasonable and appropriate action to prevent discrimination and harassment and, in conjunction with Human Resource representatives, to investigate and respond to complaints of discrimination or harassment. The Corporation will not tolerate behavior which is inconsistent with this policy and will take action to prevent and respond to any such behavior up to and including discharge.

It is not the intent of the Corporation to interfere unnecessarily in the lives of employees; nevertheless, it is important to advise employees of the potential problems inherent in consensual relationships between supervisors and subordinates. Supervisors and subordinates involved in a consensual relationship must advise senior management or your local Human Resources representative of your relationship. Upon review of the circumstances, steps may be taken to see that the reporting relationship is changed, if necessary, or to take similar steps to protect both parties and the workplace environment.

## DELPHI AUTOMOTIVE SYSTEMS POLICY AGAINST SEXUAL HARASSMENT

Delphi has a written and widely distributed policy on equal opportunity employment. Sexual harassment, as in the case of harassment based on age, race, color, sex, religion, national origin, sexual orientation or other protected status, is a violation of this policy.

All employees are expected to deal fairly and honestly with one another to ensure a work environment free of intimidation and harassment. Abuse of the dignity of anyone, through ethnic, racist or sexist slurs or through other derogatory or objectionable conduct, is offensive employee behavior. Sexual harassment also includes unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature.

All Delphi employees are entitled to a work environment in which words and actions do not have even the appearance of disrespect. Sexually oriented jokes, cartoons, pictures, language, certain gestures and touching may be offensive to people and, therefore, may result in a hostile work environment. This type of conduct will not be tolerated in the workplace. Delphi facilities must be free of hostility resulting from sexually oriented behavior. It is the responsibility of management and each employee to maintain an environment free of hostility. As in the case of other unfair employment practices, if you believe you have been subjected to sexual harassment, you should promptly bring your concerns to the attention of either your immediate supervisor, manager, local Human Resources representative, or you may utilize appropriate and existing internal complaint procedures.

## DELPHI AUTOMOTIVE SYSTEMS POLICY COVERING WORKPLACE RELATIONSHIPS

Decisions related to all matters of employment are to be made on the basis of Company policy/practices and sound management principles. Although it is not the intent of Delphi to interfere unnecessarily with the private lives of employees, private lives and personal relationships can impact upon the work environment and employee morale.

The Corporation neither prohibits nor encourages the employment of relatives; the decision to hire or promote an individual should not be influenced by the candidate's relationship to an employee. When relatives are hired, there must not be a reporting relationship, either direct or indirect, to the related employee. Other than these limitations, there is no prohibition against other Corporate employing units hiring such relatives who are otherwise fully qualified. The term "relative" generally describes close family members such as spouse, father, mother, brother, sister, son or daughter and such relatives who are related by marriage. Situations where other significant personal relationships (including romantic or sexual relationships) exist between non-relatives must be treated the same as for relatives. All decisions on matters related to employment must be clearly defensible and, as in any potential conflict of interest situation, must stand the test of the perception of a third party.

Supervisors and subordinates involved in a consensual relationship must advise senior management or your local Human Resources representative of your relationship. Upon review of the circumstances, steps may be taken to see that the reporting relationship is changed, if necessary, or to take similar steps to protect both parties and the workplace environment.

APPENDIX OF POSTED POLICIES

10

43



USSDAS
5/99

# **<u>EXHIBIT B</u>**

August 13, 1999

Ms. Eva Orlik
14102 Warbler Way North
Carmel, IN 46033

Dear Ms. Orlik:

Brightpoint, Inc. is pleased to offer you the position of **Business Manager** with our North American division reporting to Larry Davies, Manager of Finance and Administration. Should you accept our offer of employment, your salary will be $2,192.31 bi-weekly, equivalent to $57,000.00 annually. You will also be eligible to receive a bonus of up to 5% of your annual salary. This bonus is based on the completion of quantified department goals that are to be determined and is payable at the sole discretion of the Manager, Finance and Administration.

Please be advised that prior to performing any duties for the company, every applicant shall submit to a pre-employment controlled substance testing within 48 hours of receiving our conditional offer of employment. The testing site is Methodist Occupational Health Center, 7301 Georgetown Road. The test site hours are 8am – 11pm Monday through Friday. In the event that the test results are positive, the offer will be automatically and immediately withdrawn by Brightpoint, Inc.

Should you have any questions please feel free to contact me at (317) 297-6100 ex. 5087. I would appreciate your considering our offer and advising me of your decision by Wednesday, August 18, 1999. Thank you for your interest in Brightpoint, Inc. I look forward to hearing from you.

Sincerely,

*Pamela A. Elliott*

Pamela A. Elliott

Human Resource Representative

Cc: Larry Davies, Manager, Finance and Administration

# **EXHIBIT C**

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                          :
        In re                                             :    Chapter 11
                                                          :
DELPHI CORPORATION, et al.,                               :    Case No. 05-44481 (RDD)
                                                          :
                                                          :    (Jointly Administered)
        Debtors.                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

DECLARATION OF STEVE W. MYERS IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM  NO. 12163 (EVA ORLIK)

("STEVE W. MYERS – EVA ORLIK")

Steve W. Myers declares as follows:

1.      Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases ("Delphi" or the "Debtors").  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proof Of Claim 12163 (Eva Orlik) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      I received a B.S. degree in business management from Indiana University and a Masters in Business Administration from Indiana Wesleyan University.  I worked for General Motors ("GM") starting in 1976.  I have been employed at all times by Delphi since it commenced its existence as a separate entity in 1999.  Between March 2004 and the present, I have been Manager HR Policy and Administration for Delphi Electronics and Safety.

3.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my knowledge of the records of Eva Orlik's employment at Delphi.  If I were called upon to testify, I could and would testify to the facts set forth herein.

4.      I have reviewed Eva Orlik's Employment/Compensation History from Delphi ("History").  A true and accurate copy of the History is attached as Exhibit A.

5.      I have confirmed that Eva Orlik never elected health insurance while working at Delphi.  Therefore, I have not calculated any loss in value for that alleged benefit.

6.      I have reviewed Exhibit C that was attached to Orlik's Proof of Claim (the "Orlik Damages Calculation").  I have also reviewed the documents attached as Exhibit 2 to Orlik's Supplemental Response filed on February 19, 2007.  Using information from the Orlik Damages Calculation, the History, Delphi's policies and procedures, and a limited amount of information from the document attached as Exhibit 2 to Orlik's Supplemental Response, and making certain assumptions described below, I have calculated what certain aspects of Orlik's compensation could have been if she had remained employed with Delphi between September 1,

2

1999, and February 1, 2007,[1] and compared them to what she could have earned from her new employment with Brightpoint during the same time period.

## I.    BASE SALARY

7.      Schedule 3 of the Orlik Damages Calculation says that Orlik's base salary at Brightpoint was $57,000.00 per year ($4,750.00/month) beginning in October 1999.  The History shows that her final salary at Delphi was $48,720.00 per year ($4,060.00/month).  In the Orlik Damages Calculation, Orlik omits information that reflects the significant difference in base salary between Delphi and Brightpoint.  I have considered the significant difference in base salary when making my calculations because the higher base salary at Brightpoint offsets a large portion of the higher benefits Orlik received while at Delphi.  With the assumptions explained in the following paragraphs, my calculations show that Orlik's compensation at Brightpoint would have *exceeded* her compensation at Delphi between September 1, 1999, and February 1, 2007, by $67,671.00.

8.      To recognize individual and team performance, in most years, Delphi establishes a base salary increase fund or "merit fund."  The amount of funding is determined by Delphi after consideration of economic conditions, competitive salary movement, inflation, and overall business conditions.  The fund is always described as a percentage of the total of all existing salaries in an employee's unit.  Once the fund percentage is determined, each individual supervisor applies the percentage to the total of all salaries of all persons under his or her supervision.  This calculation gives the total amount of money available to be used for base salary increases for the employees who work for that supervisor.  Individual increases are based on (1) performance and (2) current salary level in comparison to the established midpoint and maximum for the position in question.

---

[1]    I chose the date February 1, 2007, because this is the most recent date for which I have all relevant information to make all calculations.  Because of the current and continuously changing financial condition of Delphi, it would be unduly speculative to attempt to make calculations today to the date of the March 21, 2007, hearing.

3

9.      In any given year, approximately 85% of Delphi employees who receive a base increase receive the merit fund percentage or less.  Approximately 15% of employees receiving a base increase are designated as "high potential employees."  Some poor performing employees and some employees whose salaries are already at or near the established maximum for their positions may receive a lump sum increase rather than an increase to base salary.  These lump sums are called "recognition awards."

10.      The timing of base salary increases varies from year to year.  The months of increases and the merit fund percentages for the relevant time period were:

| Effective Month | Percentage |
| --- | --- |
| June 2000 | 4.5% |
| June 2001 | 3.5% |
| October 2002 | 3.0% |
| October 2003 | 3.0% |
| October 2004 | 2.5% |
| July 2005 | No merit plan |
| July 2006 | 3.0% |

11.      Orlik's base salary at the time of her termination from Delphi was $48,720.00 per year ($4,060.00/month).  In making my calculations, I have assumed that Orlik's base salary would have increased by the merit fund percentages on the date that each such percentage became effective.  For example, I have assumed that Orlik's base salary would have increased by 4.5% effective June 1, 2000, to $4,243.00/month.  I believe that this is a generous assumption based on my review of the merit fund percentages from 1994 - 1999 and Orlik's History.  Orlik did not receive a base salary increase every year.  The base salary increases that she did receive were all below the merit fund percentage except the 1995 increase, which exceeded the merit fund percentage for that year.

12.      Schedule 3 of the Orlik Damages Calculation says that Orlik's base salary at Brightpoint was $57,000.00 per year ($4,750.00/month) beginning in October 1999.  I have no

4

information about what, if any, base salary increases Orlik has received at Brightpoint.  In

making my calculations, I have assumed that Orlik's base salary at Brightpoint would have

increased by the Delphi merit fund percentages on the date that each such percentage became

effective.  For example, I have assumed that Orlik's base salary at Brightpoint would have

increased by 4.5 % effective June 1, 2000, to $4,964.00/month.  I believe this is a conservative

estimate of potential increases at Brightpoint because, due to Delphi's poor financial condition,

merit fund increases at Delphi have been low.

        13.    Exhibit B to this Declaration is a true and accurate copy of a document

that I prepared that compares the base salary increases Orlik would have received at Delphi to

the base salary increases she would have received at Brightpoint based on the assumptions

outlined above.

## II.    INCENTIVE COMPENSATION

        14.    In the Orlik Damages Calculation, Orlik claims that she is entitled to

$19,195.00 in lost incentive compensation.  My calculations reflect that her maximum total loss,

calculated as if she had been employed with Delphi until February 1, 2007, would have been

$10,606.74.

        15.    Delphi pays incentive compensation to its salaried employees in addition

to base salary and other benefits.  Each year, the company sets certain performance targets.  If

the company as a whole meets or exceeds those targets, then salaried employees receive

incentive compensation based on their employment level [2] and a percentage of their annual

salary.  If the company as a whole does not hit the targets, no one gets incentive compensation.

---

[2]    Below the executive (unclassified) level, salaried employees at Delphi are classified by levels from 2 to 9 depending on the positions they hold.  Higher level positions generally carry greater responsibilities, more supervisory responsibilities, and/or require greater technical skill.  Normally, higher levels carry higher salary ranges. The History shows that Orlik was a 6th level employee the entire time she worked for Delphi.

16.     Delphi achieved business results sufficient to make incentive compensation payments for the years of 1999, 2000, 2002, and 2006.  For the years of 1999, 2000, and 2002, business metrics were measured on a calendar year basis and payment to employees occurred soon after the close of the calendar year.  For 1999 and 2000, the plan included a partial cash payment and partial stock option payment methodology.  The Delphi Strategy Board determined the cash payment portion for 1999 and 2000.  The total stock options awarded were based on the balance of the incentive compensation payment not paid in cash divided by the Black-Scholes Value.  As defined in company communications, the Black-Scholes value is "the most widely known valuation model developed by Fischer Black, Myron Scholes and Robert Merton (and) is used by Delphi to value stock options.  The model allows companies to develop an estimate of the present market value of a stock option."  Delphi eliminated the stock option portion of the plan beginning in 2002.

17.     For 2006, business metrics were measured on a half-year basis (January - June and July - December) and payment to employees occurred soon after the close of these six-month measurement periods.  For 2006 and after, one-half of an employee's target incentive compensation payment was based on the business performance results for the division he or she works in, and one-half was based on the overall business performance results of the corporation.

18.     Exhibit C to this Declaration is a true and accurate copy of my calculations of Orlik's possible lost incentive compensation from September 1, 1999, to February 1, 2007.

### III.    HOLIDAYS/VACATION/SICK TIME ALLOWANCE

19.     In the Orlik Damages Calculation, Orlik claims a loss of $42,424.00 in combined holiday/vacation/sick time allowance.  For purposes of my calculations, I have broken this component down into two pieces: holiday pay and vacation/sick pay.  My calculations show that Orlik's maximum total loss of combined holiday, vacation, and sick time between September

6

1, 1999, and February 1, 2007, was $15,406.99.  As explained in detail below, this number represents $12,998.48 in holiday pay and $2,418.51 in combined vacation/sick pay.

20.    A true and accurate copy of the pages of Delphi Automotive Systems U.S. Salaried Employee Handbook that cover vacations, holidays, and disability leaves of absence are attached to this Declaration as Exhibit D.

### A.    Delphi & Brightpoint Holiday Comparison Information

21.    Delphi allowed its salaried employees 16 paid holidays in each year from 1999 through 2006.  Delphi has not yet issued a holiday list for 2007, but the company has had two paid holidays in January 2007: New Year's Day and Martin Luther King Jr. Memorial Day.

22.    According to Schedule 3 of the Orlik Damages Calculation, Brightpoint offers 7 paid holidays per year.

23.    Exhibit E is a true and accurate copy of my calculations comparing the holiday pay Orlik would have received at Delphi to the holiday pay that Orlik would have received at Brightpoint between September 1, 1999, and February 1, 2007.  My calculations in Exhibit E demonstrate that Orlik's maximum total loss with respect to holidays would have been $12,998.48.

### B.    Delphi Vacation and Sick Day Background Information

24.    Under Delphi's vacation policy (Exhibit D), had Orlik remained at Delphi until February 1, 2007, she would have been entitled to the vacation days as explained on Exhibit E.

25.    Contrary to Orlik's assertion in Schedule 3 of the Orlik Damages Calculation, Delphi does not provide sick days to salaried employees.  Under Delphi's Disability Leaves of Absence Policy (Exhibit D), an employee who qualifies for short-term disability benefits has a seven-day waiting period of absence before the benefits begin.  The employee

7

continues to receive his or her regular salary during that time period.  These waiting period days are not awarded or accrued under a policy like a vacation day or a PTO day; they are completely contingent upon an employee becoming ill.  They are not payable when an employee leaves Delphi's employment, regardless of the reason for departure.  Nevertheless, I have included "sick days" – using this seven (7) day waiting period – in my calculations on Exhibit F.

> **C.    Delphi & Brightpoint Vacation/Sick Day Comparison Information**

26.    According to Schedule 3 of the Orlik Damages Calculation, Brightpoint allows employees to have 20 PTO (paid time off) days per year.

27.    Exhibit F is a true and accurate copy of my calculations comparing (1) a combination of the vacation pay Orlik would have received at Delphi and the sick pay she claims she would have received to (2) the PTO pay that Orlik would have received at Brightpoint during the relevant time period.  My calculations in Exhibit F demonstrate that Orlik's maximum total loss with respect to vacation and sick days would have been $2,418.51.

## IV.    RETIREMENT PLAN

28.    In the Orlik Damages Calculation, Orlik claims a loss of $43,283.00 in "retirement plan" contributions.  As explained in detail below, my calculations show that Orlik's maximum total loss of "retirement plan" contributions between September 1, 1999, and February 1, 2007, was $9,681.09.

29.    Schedule 2 of the Orlik Damages Calculation refers to a "retirement plan." I assume that Orlik is referring to Delphi's Savings-Stock Purchase Program ("S-SSP").  The S-SSP is a defined contribution retirement plan.  Employees may elect to contribute, through payroll deductions, up to 20% of their eligible salary into the S-SSP.  During certain time periods, Delphi contributes an additional "matching" amount to the S-SSP.  Delphi has changed the percentage of salary eligible for the match and the match level percentage from time to time

8

depending upon the financial condition of the company.  If an employee has contributed at least the percentage of salary eligible for the match, Delphi's contribution is calculated by multiplying the base salary by the percentage eligible for the match and match level percentage.  For example: assume that an employee's monthly base salary was $1,000.00, she made a 10% of base salary contribution to the S-SSP, the eligible percentage of base salary was 6%, and the match percentage was 70%.  Delphi's contribution would be $1,000.00 x .06 x .70 = $42.00.

30.    The S-SSP percentages of eligible base salary and match levels for the period from September 1, 1999, to February 1, 2007, were:

|  | Date | Match Level | Percent of Eligible Base Salary |
|---|---|---|---|
| January 1, 1998 | May 31, 2000 | 70 | 6 |
| June 1, 2000 | December 31, 2000 | 70 | 7 |
| January 1, 2001 | February 28, 2001 | 70 | 8 |
| March 1, 2001 | March 31, 2001 | 0 | |
| April 1, 2001 | April 30, 2001 | 50 | 7 |
| May 1, 2001 | January 31, 2003 | 0 | |
| February 1, 2003 | October 15, 2004 | 30 | 7 |
| October 16, 2004 | Present | 0 | |

31.    Delphi also makes a Flexible Compensation Payment ("FCP") for each salaried employee.  Employees may choose to place this in the S-SSP.  Schedule 2 of the Orlik Damages Calculation assumes that Orlik would have made this choice.  I make the same assumption in my calculations.  In 1999, 2000, and 2001, the FCP was $1,800.00.  From 2002 to the present, the FCP has been $1,200.00.  In order to offset this reduction in the FCP, Delphi has provided salaried employees with four additional vacation days per year for 2002 - 2006.  I

9

included these days in my vacation pay calculation on Exhibit F. In addition employees hired after 1993, such as Orlik, received a 1% Delphi benefit contribution to their S-SSP account.

32. Schedule 2 of the Orlik Damages Calculation states that Brightpoint contributed 25% of the first 6% of Orlik's salary to a 401K – another form of defined contribution plan – each year from 2000 – 2001; and Exhibit 2 to Orlik's Supplemental Response, specifically Exhibit B to the Gomez Affidavit, indicates that Brightpoint contributed 50% of the first 6% from 2002 through the present. In making her calculations on the Orlik Damages Calculation, Orlik uses her last salary at Delphi rather than her actual salary at Brightpoint. In making my calculations, I have used the Brightpoint salary figures that I calculated for Exhibit B.

33. Exhibit G is a true and accurate copy of my calculations comparing the retirement plan contributions Orlik would have received at Delphi to the retirement plan contributions that Orlik would have received at Brightpoint between September 1, 1999, and February 1, 2007. I assumed that Orlik would have contributed at least the percentage of salary eligible for the match in each year.

## V.    PENSION BENEFITS

34. On the Lead Schedule of the Orlik Damages Calculation, Orlik claims that she is entitled to $60,203.61 in lost pension benefits on a net present value basis. In Exhibit 2 to Orlik's Supplemental Response, Orlik's expert concludes that if (1) Orlik's termination date had been September 1, 2007, and (2) she had received 4% annual merit increases at Delphi, then she would be entitled to $69,906.17 in lost pension benefits on a net present value basis. I have calculated Orlik's total lost pension benefits on a net present value basis based on a February 1, 2007, termination date. I have used the salary figures that I calculated for Exhibit B. My calculations reflect that her maximum total lost pension benefits on a net present value basis would have been $66,742.00.

10

35.    The Delphi Retirement Program for Salaried Employees ("SRP"), a defined benefit pension plan, is made up of two parts.  Part A is contributed entirely by Delphi.  It provides monthly pension benefits for all employees who have five or more years of vesting service.  Each employee's Part B is based on his or her individual contributions to the plan.  To receive Part B benefits, an employee must contribute at all times while eligible and leave contributions in the plan.  Part B has two components:  a Primary benefit and a Supplementary benefit.

36.    I calculated the total (combined Part A and Part B) benefits that would be available for Orlik to draw starting at age 65.  I first made this calculation as of her actual termination date, September 1, 1999.  I then made the same calculation assuming that her employment would have terminated February 1, 2007.  Finally, in order to determine the amount of Orlik's purported loss, I calculated (1) the difference between these two sets of benefits and (2) the present value of this difference.  I explain my calculations step by step below.

37.    My first step was to determine Orlik's years of credited service.  According to the History, Orlik's credited service as of September 1, 1999, was 4 years and 11 months, which is 4.9167 years.  If Orlik would have terminated on February 1, 2007, she would have had 12 years and 4 months, which is 12.3333 years.

38.    Attached as <u>Exhibit H</u> is a true and accurate copy of a spreadsheet that I prepared to show my calculations of the average base monthly salary and employee contributions necessary for the calculation of Part B benefits.  I explain these calculations in the next three paragraphs.

39.    In order to calculate Part B benefits, the SRP requires the calculation of average base salary over the last 60 months of employment prior to the valuation date.  Accordingly, I calculated Orlik's average base monthly salary for the 60 months preceding the September 1, 1999, valuation date.  In making this calculation, I used the Delphi monthly base

11

salary figures calculated on Exhibit B.  My average base monthly salary calculation was as follows:

- 9/94 monthly base salary          = $ 3545.00 x  1 month  = $ 3,545.00
- 10/94 thru 9/95 monthly base salary = $ 3585.00 x 12 months = $43,020.00
- 10/95 thru 9/96 monthly base salary = $ 3760.00 x 12 months = $45,120.00
- 10/96 thru 12/98 monthly base salary = $ 3910.00 x  27 months =$105,570.00
- 1/99 thru 8/99 monthly base salary = $ 4060.00 x  8 months  =$ 32,480.00
                                                                    $ 229,735.00

$ 229,735.00 ÷ 60 = $ 3,828.92 (average base monthly salary for this period).

40.    I next calculated the average base salary that Orlik would have made over the last 60 months of employment prior to February 1, 2007.  In making this calculation, I used the Delphi monthly base salary figures calculated on Exhibit B.  My average base monthly salary calculation was as follows:

- 2/02 thru 9/02 monthly base salary = $4,392.00 x 8 months   = $ 35,136.00
- 10/02 thru 9/03 monthly base salary = $4,524.00 x 12 months = $ 54,288.00
- 10/03 thru 9/04 monthly base salary = $4,660.00 x 12 months = $ 55,920.00
- 10/04 thru 6/06 monthly base salary = $4,777.00 x 21 months = $100,317.00
- 7/06 thru 1/07 monthly base salary =  $4,920.00 x 7 months   = $ 34,440.00
                                                                    $280,101.00

$280,101.00 ÷ 60 = $4,668.35 (average base monthly salary for this period).

41.    Next, I determined Orlik's monthly contributions to Part B.  Employee monthly contributions equal 1.25% of the amount that the employee's actual monthly base salary exceeds a "bend point."  Delphi Corporation determines the "bend point" periodically in coordination with increases in the Social Security taxable wage base.  The spreadsheet attached as Exhibit H shows the results of these calculations under the column "Part B Contributions"  For example, for November 1999, the calculation would have been $4,060.00 - $2,700.00 (bend point) = $1,360.00 x .0125 = $17.00.  An employee first becomes eligible to participate in Part B on the first day of the month after completion of six (6) months of employment with Delphi.  I determined that Orlik's total Part B contributions as of September 1, 1999, were $834.99.  Applying the salary assumptions from Exhibit B, and assuming that Orlik would have continued

12

to contribute to Part B, her total Part B contributions as of February 1, 2007, would have been $2,082.40.

42.     Next, I calculated the actual Part A, Part B contributory, and Part B supplementary benefits as of September 1, 1999.  Part A benefits are calculated by multiplying the employee's years of credited service by a "basic benefit rate."  Delphi establishes the basic benefit rate from time to time.  As of September 1, 1999, the basic benefit rate was $40.00.  Accordingly, the Part A calculation for September 1, 1999, was 4.9167 (years of credited service) x $40.00 (basic benefit rate) = $196.67 Part A Benefit.

43.     Part B Primary benefits are calculated by multiplying total employee contributions to the date of valuation by an established interest rate of 8.33%.  Delphi obtained this established interest rate from GM.  GM used this established interest rate from at least October 1979 to the start of Delphi in January 1999.  Delphi has used it consistently since that time.  The calculation for Orlik's 1999 Part B Primary Benefit was $834.99 (total employee contribution) x 8.33% (interest rate) = $69.55 Part B Primary Benefit.

44.     Part B Supplementary benefits are calculated by subtracting an "exclusion factor" from the average monthly base salary (as calculated in paragraphs 38 & 39) and multiplying the remainder by 1% and by the employee's years of credited service.  Delphi establishes the exclusion factor from time to time.  The calculation for September 1, 1999, was $3,828.92 (average base salary) - $4,000 (exclusion factor) x .01 x 4.9167 (years of credited service) = $0.00 Part B Supplementary Benefit.

45.    To summarize my calculations, Orlik's total monthly pension benefit as of September 1, 1999, which she may draw at age 65 is:

| | |
|---|---|
| Part A Primary | $196.67 |
| Part B Primary | $ 69.55 |
| Part B Supplementary | $   0.00 |
| | $266.22[3] |

46.    I also calculated Orlik's total monthly pension benefit assuming a February 1, 2007, termination date.  My calculations, using the methods set out in paragraphs 41-43, were as follows:

12.3333 (years of credited service) x $49.55 (basic benefit rate) = $611.12 Part A Benefit

$2,075.65 (total employee contribution) x 8.33% =             $173.46 Part B Primary

$4,668.35 (average base salary) - $4,955(exclusion factor)
x .01 x 12.3333 (years of credited service) =             $ 0.00 Part B Supplementary
                                                                        $784.58

47.    Finally, I calculated a present value figure in order to evaluate Orlik's alleged pension losses.  First, I subtracted from the projected monthly benefit described in paragraph 45 (i.e., $784.58) the actual monthly benefit which Orlik is eligible to receive as described in paragraph 44 (i.e., $266.22).  This resulted in a difference of $518.36.  Then, I plugged the $517.80 into a pension calculator relied upon by Delphi's employee benefits staff to

---

[3]    In calculating Orlik's total available pension benefits as of September 1, 1999, I discovered that the pension value, which Delphi's third party pension administrator calculated as of July 1, 2001, and upon which Orlik relies in Schedule 1 of the Orlik Damages Calculation was incorrect.  Specifically, the calculation of the Part B supplementary benefit was incorrect.  It appears that the third party pension administrator miscalculated Orlik's average base salary, which caused the person doing the calculations to calculate her Part B supplementary benefit as too high.  The July 1, 2001, pension center figures also include a present value calculation of $9,288.65.  Because the basic pension benefit calculation is slightly different, this number must also be slightly different.  The $9,288.65 present value figure is the number that Orlik appears to have been attempting to validate on the first page of her Schedule 1 of the Orlik Damages Calculation.  I do not understand the "present value" calculations that Orlik performed when attempting this validation.  I also do not understand the calculations that Orlik performs at the top of page 2 of Schedule 1 of the Orlik Damages Calculation.

determine the net present value of monthly pension benefits.[4]  The calculator resulted in a net

present value of Orlik's purported pension loss of $66,742.00.

**VI.    CONCLUSION**

        48.    Overall, the Orlik Damages Calculation alleged $193,256.03 in monetary

losses.  My calculation, even given the generous assumptions in Orlik's favor, has determined

that Orlik's damages could not be more than $34,765.82.  This is summarized as follows:

| | |
|---|---|
| Incentive Pay Loss | $ 10,606.74 |
| Holiday/Vacation/Sick Loss | $ 15,406.99 |
| Retirement Plan Loss | $   9,681.09 |
| Pension Plan Loss | $ 66,742.00 |
| | $102,436.82 |
| | |
| Salary Gain at Brightpoint | $   67,671.00 |
| Total Alleged Damages | **$   34,765.82** |

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing

statements are true and correct.


Executed on February 21, 2007, in Kokomo, Indiana


                             */s/ Steve W. Meyers*
                             Steve W. Myers

---

[4]    The calculator applies a discount rate of 5.9% and uses standard actuarial mortality tables.

# EXHIBIT A

Employment History
CONFIDENTIAL

| | |
|---|---|
| Employee No | : 01016939    Eva M Orlik |
| Continuous Service Date | : 10/11/1994 |
| Residence Status | : |
| Exempt Status | : Exempt |
| SSN | : 571611356 |
| Gender | : Female |
| Birth Date | : 12/03/1957 |
| Ethnic Origin | : White/Not Hispanic origin |
| Veteran Status | : Non-veteran |
| Disability | : No |
| Telephone | : 3175819744 |
| Address | : 14102 WARBLER WAY N |
| | CARMEL, IN 46033 |
| | USA |

Education

| Certificate | Year | School | Brn of Study 1 | Brn of Study 2 | GPA |
|---|---|---|---|---|---|
| Bachelor | 1981 | Educ-Poland | Economics | | 3.6 |

Language

| Language | Skill | Proficiency |
|---|---|---|

Appraisal

| Date | App | Crit | Appraiser |
|---|---|---|---|
| 12/31/1998 U | | | |
| 12/31/1996 S | | | |

Employment

| Date | Position | PY GD | PY LV | Div/Stf | Pers. Area | Sub Area | Org Unit | EE SG | Reason for Action |
|---|---|---|---|---|---|---|---|---|---|
| 09/01/1999 | ACCOUNTING ANALYST | 6 | 6C | DPH-DELCO | KOKOMO | IN | FINANC D8050/5102 | SE | RELEASE-FINAL |
| 02/01/1999 | ACCOUNTING ANALYST | 6 | 6C | DPH-DELCO | KOKOMO | IN | FINANC D8050/5102 | RA | CHG-REORG/ORG NAME |
| 01/01/1999 | FINANCIAL ANALYST | 6 | 6C | DPH-DELCO | KOKOMO | IN | FINANC D8050/5102 | RA | HIRE-SUCCESSOR ENTERPRISE |

| Date | Job | GD | LV | | | | Org | Number | Reason |
|---|---|---|---|---|---|---|---|---|---|
| 12/31/1998 | FINANCIAL ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11070/5102 | SE | SEP-SUCCESSOR ENTERPRISE |
| 04/16/1997 | FINANCIAL ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11070/5102 | RA | CHG-REORG/ORG NAME |
| 02/04/1997 | FINANCIAL ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11600/5102 | RA | CHG-LOCAL TITLE |
| 03/15/1996 | STATISTICIAN 6/OR ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11600/5102 | RA | CHG-REORG/ORG NAME |
| 01/01/1995 | STATISTICIAN 6/OR ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11180/5102 | RA | CHG-REORG/ORG NAME |
| 10/11/1994 | STATISTICIAN 6/OR ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11180/5116 | RA | HIRE-REGULAR |
| 10/11/1994 | STATISTICIAN 6/OR ANALYST | 6 | 6C | GM DELCO ELECTR KOKOMO | IN | FINANC | 11180/5116 | RA | ADD RECORD |

Delphi
User: WZJ462
Employee : 01016939

Compensation History
CONFIDENTIAL

Date: 02/19/2007
Time: 08:57:31

Employee                    : 01016939    Eva M Orlik
Continuous Service Date     : 10/11/1994
Residence Status            :
Exempt Status               : Exempt

Salary Minimum   : 43,260.00
Salary Midpoint  : 58,200.00
Salary Maximum   : 77,700.00

Compensation

| Date | Reason For Action | Job | PY GD | PY LV | Base Rate | Change Amount | PCT CHG | Annual Salary |
|---|---|---|---|---|---|---|---|---|
| 01/01/1999 | Hire | STATISTICIAN 6/OR ANALYST | 6 | 6C | 4060.00 | 150.00 | 3.8 | 48720.00 |
| 06/01/1998 | RECOGNITION AWARD | STATISTICIAN 6/OR ANALYST | 6 | 6C | | 1000.00 | 2.1 | |
| 10/01/1996 | BASE SALARY INCREASE | STATISTICIAN 6/OR ANALYST | 6 | 6C | 3910.00 | 150.00 | 4.0 | 46920.00 |
| 10/01/1995 | BASE SALARY INCREASE | STATISTICIAN 6/OR ANALYST | 6 | 6C | 3760.00 | 175.00 | 4.9 | 45120.00 |
| 10/11/1994 | HIRE-REGULAR | STATISTICIAN 6/OR ANALYST | 6 | 6C | 3585.00 | 0.00 | 0.0 | 43020.00 |

# EXHIBIT B

## EXHIBIT B - SALARY

### Salary Calculation (1999 - 2006)

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| October 1999 thru May 2000 | $4750 per month | $4060 per month | |
| (8 Months) | 8 months | 8 months | |
| | $38,000.00 | $32,480.00 | $5,520.00 |

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| June 2000 thru May 2001 | $4,964 | $4,243 | |
| (12 months) | 12 months | 12 months | |
| (Salaries increased by 4.5% Merit Fund) | $59,568.00 | $50,916.00 | $8,652.00 |

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| June 2001 thru Sep 2002 | $5,138 | $4,392 | |
| (16 months) | 16 months | 16 months | |
| (Salaries increased by 3.5% Merit Fund) | $82,208.00 | $70,272.00 | $11,936.00 |

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| October 2002 thru Sep 2003 | $5,292 | $4,524 | |
| (12 months) | 12 months | 12 months | |
| (Salaries increased by 3.0% Merit Fund) | $63,504.00 | $54,288.00 | $9,216.00 |

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| October 2003 thru Sep 2004 | $5,451 | $4,660 | |
| (12 months) | 12 months | 12 months | |
| (Salaries increased by 3.0% Merit Fund) | $65,412.00 | $55,920.00 | $9,492.00 |

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| October 2004 thru June 2006 | $5,587 | $4,777 | |
| (21 months) | 21 months | 21 months | |
| (Salaries increased by 2.5% Merit Fund) | $117,327.00 | $100,317.00 | $17,010.00 |

| Salary Period | Brightpoint Income | Delphi Income | Salary Gain at Brightpoint |
|---|---|---|---|
| July 2006 thru January 2007 | $5,755 | $4,920 | |
| (7 months) | 7 months | 7 months | |
| (Salaries increased by 3.0% Merit Fund) | $40,285.00 | $34,440.00 | $5,845.00 |

**Total Brightpoint Salary Gain**     **$67,671.00**

**Assumptions:**
1. Orlik would have received the merit fund % salary increases at Delphi.
2. Orlik's ending salary at Delphi was $48,720 ($4060 per month).
3. Orlik's starting salary at Brightpoint was $57,000 ($4750 per month).
4. Orlik would have received the same % salary increases at the same time at Brightpoint as at Delphi.

# **<u>EXHIBIT C</u>**

**EXHIBIT C - INCENTIVE COMPENSATION**

## Incentive Compensation Calculation (1999 - 2005)

| | CALCULATION FOR TOTAL VALUE OF INCENTIVE COMPENSATION PAYOUT | | | | | | | | STOCK OPTION CALCULATION | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PLAN YEAR | MONTHLY BASE SALARY | ANNUALIZED SALARY | TARGET PAYOUT (SIXTH LEVEL EMPLOYEES) | TARGET PAYOUT AMOUNT | BUSINESS RESULTS (% OF FORECASTED OBJECTIVES) | TOTAL VALUE OF PAYOUT | CASH PAYMENT | BALANCE | DIVIDED BY BLACK SCHOLES VALUE | TOTAL STOCK OPTIONS |
| 1999 | $4,060 | $48,720 | 3.50% | $1,705.20 | 167% | $2,847.68 | $2,200 | $647.68 | 5.95 | 108 |
| 2000 | $4,243 | $50,916 | 3.50% | $1,782.06 | 157% | $2,797.83 | $2,325 | $472.83 | 5.92 | 79 |
| 2001 | Business performance not sufficient to produce payment | | | | | | | | | |
| 2002 | $4,392 | $52,704 | 4.00% | $2,108.16 | 86.50% | $1,824 | $1,824 | Stock Option element of Incentive Compensation Program eliminated. | | |
| 2003 | Business performance not sufficient to produce payment | | | | | | | | | |
| 2004 | Business performance not sufficient to produce payment | | | | | | | | | |
| 2005 | Business performance not sufficient to produce payment | | | | | | | | | |

## Incentive Compensation Calculation (2006)

Progam changed to make separate payments based on divisional results and overall corporate results. 50% ot Target Award based on divisional results and 5[0]% of target award based on corporate results.

| PLAN YEAR | MONTHLY BASE SALARY | 1/2 YEAR SALARY | TARGET PAYOUT (SIXTH LEVEL EMPLOYEES) | TARGET PAYOUT AMOUNT | 50% OF TARGET AMOUNT | DELPHI-E&S RESULTS | DELPHI-E&S PAYMENT | CORPORATE RESULTS | CORPORATE PAYMENT | TOTAL PAYMENT |
|---|---|---|---|---|---|---|---|---|---|---|
| 1st Half 2006 | $4,777 | $28,662 | 4.00% | $1,146.48 | 573.24 | 200% | $1,146.48 | 200% | $1,146.48 | $2,292.96 |
| 2nd Half 2006 | $4,920 | $29,520 | 4.00% | $1,180.80 | 590.4 | 0% | $0.00 | 143% | $844.27 | $844.27 |

**Total Incentive Compensation Loss    $10,606.74**

**Assumptions:**
1. Total incentive compensation loss was calculated using "total value of the payment" for 1999, 2000 and 2002 and the "total payment" for 2006.

# EXHIBIT D

# DELPHI
Automotive Systems



U.S. SALARIED EMPLOYEE HANDBOOK



VACATIONS
HOLIDAYS
AND LEAVES

7

## VACATION POLICY AND ELIGIBILITY

The Corporation provides vacation with pay so you can enjoy regular periods of rest and relaxation. You are encouraged to take all vacation to which you are entitled each year. Vacation time may not be carried over into the next year. Pay is not given in place of vacation, except in certain circumstances with prior approval when your employment ends and you have unused vacation days remaining.

Vacation eligibility is based on length of service. Vacation entitlements are vested on a current calendar year basis at the rate of 25% of such entitlements per completed calendar quarter (ie, 25% through March 31, 50% through June 30, 75% through September 30 and 100% through December 31). The following table provides more detailed information.

### VACATIONS FOR EMPLOYEES HIRED PRIOR TO OCTOBER 2 OF THE PREVIOUS YEAR

| Length of Service as of Oct. 1 of Current Year | Vacation with Pay |
|---|---|
| 1 year but less than 3 | 2 weeks |
| 3 years but less than 5 | 2 1/2 weeks |
| 5 years but less than 10 | 3 weeks |
| 10 years but less than 15 | 3 1/2 weeks |
| 15 years but less than 20 | 4 weeks |
| 20 or more years | 5 weeks |

The table below shows the amount of vacation to which you are entitled if you are recently employed in a Regular Employee or Flexible Service Employee classified position.

### VACATIONS FOR EMPLOYEES HIRED AFTER OCTOBER 1 OF THE PREVIOUS YEAR

| Employment Date | Vacation with Pay |
|---|---|
| after April 1 (current year) | none until following year |
| January 1 to March 31 (current year) | 1 week |
| October 2 to December 31 (previous year) | 1 1/2 weeks |

Employees in executive level or professional/technical positions on December 31 of the preceding year will be granted four weeks of vacation unless they qualify for five weeks based on length of service of at least 20 years as of October 1 of the current year.

You may have an opportunity to purchase additional paid days off through the Flexible Compensation Payment option during the annual Flex Enrollment process. Purchased additional days off must be used during the current calendar year after you have used all your regular vacation entitlement.

28

## OTHER CONSIDERATIONS WILL AFFECT YOUR VACATION ENTITLEMENT

### Transfer from an Hourly Rate Job

If you transfer from an hourly rate job, the length of your vacation will be adjusted to take into account vacation pay received and/or time off taken as an hourly rated employee.

### Return from Layoff to a Regular Employee-Temporary Assignment Or Layoff-Training Assignment

If you accept a Regular Employee-Temporary Assignment or Layoff-Training Assignment which is six months or more in duration, you are eligible for vacation. Your Human Resources representative can advise you of your exact eligibility.

### Return from Layoff Or Leave of Absence

Your Human Resources representative will inform you of any vacation entitlement when you return to work following any layoff or leave of absence.

### Employment Ends

When your employment ends, your vacation entitlement may be settled by time off or pay in lieu of vacation, or a combination of the two. Any pay in lieu of vacation will be reduced to account for vacation already taken in the calendar year.

The following schedule will apply to employees separating from active service:

- You will receive 100% of vacation entitlement regardless of separation date if you:

  -separate as a result of layoff or a mutually satisfactory release

  -retire (except as a result of discharge or final release)

  -receive a management-initiated "special separation"

  -die (cash payments will be paid immediately to the surviving spouse, children, member of the employee's family or other individual who is responsible for payment of funeral expenses, etc.)

- You will receive 0%-100% vacation entitlement based on the calendar year quarter of separation if you:

  -quit

  -take an employee-initiated "special separation"

- You will receive no vacation entitlement if you are separated involuntarily because of unsatisfactory employer/employee relationship (i.e., you are discharged or final released).

Corporate salaried policy would be administered in accordance with applicable state laws in those instances where the provisions of such laws exceed the limits of the salaried policy.

Furthermore, there may be occasion for Corporate or local management to declare a vacation shutdown period. In such an event, you will have part or all of your vacation entitlement and/or purchased days off applied to the shutdown period. Sufficient advance notice of the shutdown will be given so you may plan for this time off.

## HOLIDAYS

As a salaried employee you will be entitled to paid holidays which may vary slightly in number from year to year. Following is a holiday schedule for a typical year, based on experience:

- New Year's Day
- Martin Luther King Jr. Memorial Day
- Good Friday
- Monday after Easter
- Memorial Day
- Independence Day
- Labor Day
- Veterans Day
- Thanksgiving Day and the day following
- Christmas Eve Day, Christmas Day and the weekdays which fall between Christmas and New Year's Day

The Memorial Day holiday may be replaced by another day of greater local importance in certain communities. Also, if your job involves marketing of Corporate products,

VACATIONS, HOLIDAYS AND LEAVES

7

29

VACATIONS, HOLIDAYS AND LEAVES

**7**

your holidays may vary from the above schedule but will be equal in number.

If one or more holidays fall within a scheduled vacation period, you will not be required to take a vacation day. Similarly, should a recognized holiday fall on a Saturday or Sunday and your normal work week is Monday through Friday, you will receive a day off during your work week.

## LEAVES OF ABSENCE

There may be occasions when you must be absent for reasons other than vacation or holidays. The extent to which you may be paid for absent time during the first seven consecutive calendar days of absence, while not on leave of absence or vacation, will be determined on the basis of each individual case, except where such absence is due to a compensable occupational accident or a compensable occupational disease. Generally, if you must be absent for longer than seven calendar days, Corporate salaried policy provides disability, military and special leaves of absence for eligible salaried employees.

In cases of personal illness and/or your need to provide care for a covered family member who has a

serious health condition, Corporate policies providing for leaves of absence comply with the Family and Medical Leave Act (FMLA).

## DISABILITY LEAVES OF ABSENCE

If you are absent for more than seven calendar days as a result of sickness or accident, you will be placed on a disability leave of absence upon medical verification of the disability.

As a general rule, your length of service will accrue for up to 12 months while you are on a Corporate-approved disability leave. However, if you are on a Corporate-approved disability leave and your absence is due to an accident or disease covered by a workers compensation law, your length of service will accrue for the entire disability leave.

If you are a classified employee on a disability leave, your base salary will continue as shown in the following table. Any Sickness and Accident benefits you may receive from the Life and Disability Benefits Program will be subtracted from your base salary.*

*The subtraction will include any workers compensation or state disability benefits and certain Social Security benefits.*

## SALARY CONTINUATION SCHEDULE FOR DISABILITY LEAVES OF ABSENCE

| Years of Length of Service | Period of Combined Salary & S&A Benefits |
|---|---|
| less than 1 | 1 week |
| 1 but less than 5 | 8 weeks |
| 5 but less than 10 | 13 weeks |
| 10 or more | 26 weeks |

After receiving the above payments, S&A benefits at 75% of base salary continue as provided by the Life and Disability Benefits Program.

If you are in an executive position, your regular compensation will continue for up to 12 months while on disability leave. Your regular compensation will be reduced by the amount of any lost-time benefits received in accordance with federal or state legislation for the same period of disability.

If you are still disabled after receiving salary continuation and S&A benefits for the maximum period, you may be eligible for monthly Extended Disability benefits under the Life and Disability Benefits Program. For further information about these and other benefits available in the event you are disabled, refer to the salaried employee handbook regarding salaried benefits.

30



USSDAS
5/99

# EXHIBIT E

# EXHIBIT E – HOLIDAYS

| Time Period | Delphi | | Brightpoint | | |
| --- | --- | --- | --- | --- | --- |
| | Calculation | Value | Calculation | Value | Variance |
| Sept. 1999 – May 2000 | 15 days x 8 hrs/day x $23.42 | $2810.40 | 6 days x 8 hrs/day x $27.40 | $1315.20 | $1495.20 |
| June 2000 – May 2001 | 16 days x 8hrs/day x $24.48 | $3133.44 | 7 days x 8 hrs/day x $28.64 | $1603.84 | $1529.60 |
| June 2001 – September 2002 | 18 days x 8 hrs/day x $25.34 | $3648.96 | 9 days x 8 hrs/day x $29.64 | $2134.08 | $1514.88 |
| October 2002- September 2003 | 16 days x 8 hrs/day x $26.10 | $3340.80 | 7 days x 8 hrs/day x $30.53 | $1709.68 | $1631.12 |
| October 2003 – September 2004 | 16 days x 8 hrs/day x $26.88 | $3440.64 | 7 days x 8 hrs/day x $31.45 | $1761.20 | $1679.44 |
| October 2004 – June 2006 | 30 days x 8 hrs/day x $27.56 | $6614.40 | 12 days x 8hrs/day x $32.23 | $3094.08 | $3520.32 |
| July 2006 – present | 13 days x 8 hrs/day x $28.38 | $2951.52 | 5 days x 8 hrs/day x $33.34 | $1333.60 | $1617.92 |
| | | | **Total Holiday Time Loss** | | **$12,988.48** |

**Assumptions:**

1.  Delphi allowed 16 paid days of holiday each year from September 1999 through January 2007 under its holiday policy. These holidays include: New Year's Day; Martin Luther King, Jr. Memorial Day; Good Friday; Monday after Easter; Memorial Day; Independence Day; Labor Day; Veterans Day; Thanksgiving Day and the day following; Christmas Eve Day, Christmas Day, and the weekdays which fall between Christmas and New Year's Day.

2.  Per Orlik, Brightpoint allowed 7 paid holidays. I assume these 7 holidays were: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving, and Christmas Day.

**Calculations:** These amounts are based on average Delphi merit increases for each year.

Delphi: monthly salary x 12 ÷ 2080                    Brightpoint: monthly salary x 12 ÷ 2080

Delphi Hourly Rate for:                               Brightpoint Hourly Rate[1] for:

| | | | |
| --- | --- | --- | --- |
| September 1999 – May 2000 | $23.42 | September 1999 – May 2000 | $27.40 |
| June 2000 – May 2001 | $24.48 | June 2000 – May 2001 | $28.64 |
| June 2001 – September 2002 | $25.34 | June 2001 – September 2002 | $29.64 |
| October 2002– September 2003 | $26.10 | October 2002 – September 2003 | $30.53 |
| October 2003 – September 2004 | $26.88 | October 2003 – September 2004 | $31.45 |
| October 2004 – June 2006 | $27.56 | October 2004 – June 2006 | $32.23 |
| July 2006 – January 2007 | $28.38 | July 2006 – January 2007 | $33.34 |

---

[1]  Because the Debtors have no information as to raises Orlik received at Brightpoint, the Debtors assume, for the sake of consistency, that Orlik received the same percent rate increase at Brightpoint that the Debtors assume she would have received at Delphi. This is a conservative assumption because Delphi rate increases were relatively low during the years in question due to poor performance.

# EXHIBIT F

## EXHIBIT F – VACATION AND SICK

| Time Period | Delphi | | Brightpoint | | Variance |
|---|---|---|---|---|---|
| | Calculation | Value | Calculation | Value | |
| January - May 2000 | 5/12 of 156 hours at $23.42/hour | $1522.30 | 5/12 of 20 days (160 hours) at $27.40 | $1826.67 | $304.37 |
| June 2000 – May 2001 | 7/12 of 156 hours (for 2000) and 5/12 of 176 hours (for 2001) at $24.48 | $4022.88 | 160 hours at $28.64 | $4582.40 | $559.52 |
| June 2001 – September 2002 | 7/12 of 176 hours (for 2001) and 9/12 of 208 (for 2002) hours at $25.34 | $6554.61 | 213.3 hours at $29.64 | $6322.21 | -$232.40 |
| October 2002– September 2003 | 208 hours at $26.10 | $5428.80 | 160 hours at $30.53 | $4884.80 | -$544.00 |
| October 2003 – September 2004 | 208 hours at $26.88 | $5591.04 | 160 hours at $31.45 | $5032.00 | -$559.04 |
| October 2004 – June 2006 | 15/12 of 208 hours (for 2004 and 2005) and 6/12 of 228 hours (for 2006) at $27.56 | $10,307.44 | 280 hours at $32.23 | $9024.40 | -$1283.04 |
| July 2006 – February 1, 2007 | 7/12 of 228 hours at $28.38 | $3774.54 | 93.3 hours at $33.34 | $3110.62 | -$663.92 |
| | | | **Total Vacation and Sick Time Loss** | | **$2,418.51** |

**Assumptions:**

1. Delphi does not offer a set number of sick days, however Orlik alleges that the seven day waiting period before short term disability becomes available are sick days, and, for argument sake, the Debtors will work within that assumption.
2. At Delphi, Orlik would have received:
   - 2.5 weeks (100 hours) of vacation in 2000, plus the 7 sick days (56 hours) she claims
   - 3 weeks (120 hours) of vacation in 2001, plus the 7 sick days (56 hours) she claims
   - 3 weeks (120 hours) of vacation in 2002, 4 days (32 hours) to offset reduction in flexible compensation payment, plus the 7 sick days (56 hours) she claims
   - 3 weeks (120 hours) of vacation in 2003, (32 hours) to offset reduction in flexible compensation payment, plus the 7 sick days (56 hours) she claims
   - 3 weeks (120 hours) of vacation in 2004, (32 hours) to offset reduction in flexible compensation payment, plus the 7 sick days (56 hours) she claims
   - 3 weeks (120 hours) of vacation in 2005, (32 hours) to offset reduction in flexible compensation payment, plus the 7 sick days (56 hours) she claims
   - 3.5 weeks (140 hours) of vacation in 2006, (32 hours) to offset reduction in flexible compensation payment, plus the 7 sick days (56 hours) she claims
3. Because pay rates changed mid-year, the value of vacation days is calculated assuming Orlik would spread her use of the vacation days proportionally throughout the year.
4. Orlik used all her vacation time for 1999.
5. See Exhibit E for calculation of hourly rates.

# EXHIBIT G

**EXHIBIT G – RETIREMENT**

**Calculations:**

1. Calculate Delphi S-SSP Matching Contributions if Orlik had worked to 2/1/2007

| | |
|---|---|
| September 1999 – May 2000 ($4060 x 9 x .06 x .70) | $1534.68 |
| June 2000 - December 2000 ($4243 x 7 x .07 x .70) | $1455.35 |
| January 2001 - February 2001 ($4243 x 2 x .08 x .70) | $ 475.22 |
| April 2001 ($4243 x 1 x .07 x .50) | $ 148.51 |
| February 2003 – September 2003 ($4524 x 8 x .07 x .30) | $ 760.03 |
| October 2003 – September 2004 ($4660 x 12 x .07 x .30) | $1174.32 |
| October 1 – October 15, 2004 ($4777 x .5 x .07 x .30) | $  50.16 |
| | $5598.27 |

2. Calculate Delphi flexible compensation payment ($1800 1999- 2001; $1200 for 2002-2006)

| | |
|---|---|
| $1800 x 3 | $ 5400.00 |
| $1200 x 5 | $ 6000.00 |
| | $11,400.00 |

3. Calculate Delphi 1% contribution for retiree health care

| | |
|---|---|
| **1999** | |
| 4060 x 12 x .01 | $467.20 |
| **2000** | |
| 4060 x 5 x .01 | $203.00 |
| 4243 x 7 x .01 | $297.01 |
| **2001** | |
| 4243 x 5 x .01 | $212.15 |
| 4392 x 7 x .01 | $307.44 |
| **2002** | |
| 4392 x 9 x .01 | $395.28 |
| 4524 x 3 x .01 | $135.72 |
| **2003** | |
| 4524 x 9 x .01 | $407.16 |
| 4660 x 3 x .01 | $139.80 |
| **2004** | |
| 4660 x 9 x .01 | $419.40 |
| 4777 x 3 x .01 | $143.31 |
| **2005** | |
| 4777 x 12 x .01 | $573.24 |
| **2006** | |
| 4777 x 6 x .01 | $286.62 |
| 4920 x 6 x .01 | $295.20 |
| | $4282.53 |

| Total: | | |
|---|---|---|
| | **(1) S-SSP Matching Contributions:** | **$5598.27** |
| | **(2) Flexible Compensation Payment:** | **$11,400.00** |
| | **(3) 1% Contribution:** | **$4282.53** |
| | | **$21,280.80** |

4. Calculate Brightpoint contributions. Per Orlik's Schedule 2, Brightpoint contributed 25% of the first 6% of her salary in 2000 and 2001 and 50% of the first 6% of her salary from 2002 - 2006[1]

| | |
|---|---|
| **2000** | |
| 4750 x 5 x .06 x .25 | $356.25 |
| 4964 x 7 x .06 x .25 | $521.22 |
| **2001** | |
| 4964 x 5 x .06 x .25 | $372.30 |
| 5138 x 7 x .06 x .25 | $539.49 |
| **2002** | |
| 5138 x 9 x .06 x .50 | $1387.26 |
| 5292 x 3 x .06 x .50 | $476.28 |
| **2003** | |
| 5292 x 9 x .06 x .50 | $1428.84 |
| 5451 x 3 x .06 x .50 | $490.59 |
| **2004** | |
| 5451 x 9 x .06 x .505 | $1471.77 |
| 5587 x 3 x .06 x .50 | $502.83 |
| **2005** | |
| 5587 x 12 x .06 x .50 | $2011.32 |
| **2006** | |
| 5587 x 6 x .06 x .50 | $1005.66 |
| 5755 x 6 x .06 x .50 | $1035.90 |
| | $11,599.71 |

| VARIANCE: | Delphi Retirement Benefits | $21,280.80 |
|---|---|---|
| | Brightpoint Retirement Benefits | - 11,599.71 |
| | **Total Retirement Loss** | **$9,681.09** |

---

[1] This assumes that Orlik would have contributed at least 6% of her salary to her savings plan.

# EXHIBIT H

**EXHIBIT H - PENSION**
Page 1 of 3

| Monthly Base Salary | | Part B Contributions | Total Contributions | Part B Primary Benefit |
|---|---|---|---|---|
| Sep-94 | 3545 | | | |
| Oct-94 | 3585 | | | |
| Nov-94 | 3585 | | | |
| Dec-94 | 3585 | | | |
| Jan-95 | 3585 | | | |
| Feb-95 | 3585 | | | |
| Mar-95 | 3585 | | | |
| Apr-95 | 3585 | | | |
| | | | | |
| May-95 | 3585 | | | |
| Jun-95 | 3585 | | | |
| Jul-95 | 3585 | | | |
| Aug-95 | 3585 | | | |
| Sep-95 | 3585 | | | |
| **Oct-95** | 3760 | | | |
| Nov-95 | 3760 | | | |
| Dec-95 | 3760 | | | |
| Jan-96 | 3760 | | | |
| Feb-96 | 3760 | | | |
| Mar-96 | 3760 | | | |
| Apr-96 | 3760 | | | |
| May-96 | 3760 | | | |
| Jun-96 | 3760 | | | |
| Jul-96 | 3760 | | | |
| Aug-96 | 3760 | | | |
| Sep-96 | 3760 | | | |
| **Oct-96** | 3910 | | | |
| Nov-96 | 3910 | | | |
| Dec-96 | 3910 | | | |
| Jan-97 | 3910 | | | |
| Feb-97 | 3910 | | | |
| Mar-97 | 3910 | | | |
| Apr-97 | 3910 | | | |
| May-97 | 3910 | | | |
| Jun-97 | 3910 | | | |
| Jul-97 | 3910 | | | |
| Aug-97 | 3910 | | | |
| Sep-97 | 3910 | | | |
| Oct-97 | 3910 | | | |
| Nov-97 | 3910 | | | |
| Dec-97 | 3910 | | | |
| Jan-98 | 3910 | | | |
| Feb-98 | 3910 | | | |
| Mar-98 | 3910 | | | |
| Apr-98 | 3910 | | | |
| May-98 | 3910 | | | |
| Jun-98 | 3910 | | | |
| Jul-98 | 3910 | | | |
| Aug-98 | 3910 | | | |
| Sep-98 | 3910 | | | |
| Oct-98 | 3910 | | | |
| Nov-98 | 3910 | | | |

**Vested Retirement Estimate with separation 9/1/99**

| | |
|---|---|
| Basic Benefit | 196.67 |
| Part B Supplement | 0.00 |
| Part B Primary | 69.55 |
| | **266.22** |

**Vested Retirement Estimate with separation 2/1/07**

| | |
|---|---|
| Basic Benefit | 611.12 |
| Part B Supplementary | 0.00 |
| Part B Primary | 173.46 |
| | **784.58** |

**EXHIBIT H - PENSION**
Page 2 of 3

| | | | | |
|---|---|---|---|---|
| Dec-98 | 3910 | | | |
| **Jan-99** | 4060 | | | |
| | | | | |
| Feb-99 | 4060 | | | |
| Mar-99 | 4060 | | | |
| Apr-99 | 4060 | | | |
| May-99 | 4060 | | | |
| Jun-99 | 4060 | | | |
| Jul-99 | 4060 | | | |
| Aug-99 | 4060 | **229,735.00** | **834.99** | **69.55** |
| | | | | |
| | | | | |
| Sep-99 | 4060 | | 17.00 | |
| Oct-99 | 4060 | | 17.00 | |
| Nov-99 | 4060 | | 17.00 | |
| Dec-99 | 4060 | | 17.00 | |
| Jan-00 | 4060 | | 13.25 | |
| Feb-00 | 4060 | | 13.25 | |
| Mar-00 | 4060 | | 13.25 | |
| Apr-00 | 4060 | | 13.25 | |
| May-00 | 4060 | | 13.25 | |
| | | 4.5% merit | | |
| Jun-00 | 4243 | fund | 15.54 | |
| Jul-00 | 4243 | | 15.54 | |
| Aug-00 | 4243 | | 15.54 | |
| Sep-00 | 4243 | | 15.54 | |
| Oct-00 | 4243 | | 15.54 | |
| Nov-00 | 4243 | | 15.54 | |
| Dec-00 | 4243 | | 15.54 | |
| Jan-01 | 4243 | | 15.54 | |
| Feb-01 | 4243 | | 15.54 | |
| Mar-01 | 4243 | | 15.54 | |
| Apr-01 | 4243 | | 15.54 | |
| May-01 | 4243 | | 15.54 | |
| | | 3.5% merit | | |
| Jun-01 | 4392 | fund | 17.40 | |
| Jul-01 | 4392 | | 17.40 | |
| Aug-01 | 4392 | | 17.40 | |
| Sep-01 | 4392 | | 17.40 | |
| Oct-01 | 4392 | | 17.40 | |
| Nov-01 | 4392 | | 17.40 | |
| Dec-01 | 4392 | | 17.40 | |
| Jan-02 | 4392 | | 17.40 | |
| Feb-02 | 4392 | | 17.40 | |
| Mar-02 | 4392 | | 17.40 | |
| Apr-02 | 4392 | | 17.40 | |
| May-02 | 4392 | | 17.40 | |
| Jun-02 | 4392 | | 17.40 | |
| Jul-02 | 4392 | | 17.40 | |
| Aug-02 | 4392 | | 17.40 | |
| Sep-02 | 4392 | | 17.40 | |
| | | 3.0% merit | | |
| Oct-02 | 4524 | fund | 19.05 | |
| Nov-02 | 4524 | | 19.05 | |
| Dec-02 | 4524 | | 19.05 | |
| Jan-03 | 4524 | | 12.80 | |
| Feb-03 | 4524 | | 12.80 | |
| Mar-03 | 4524 | | 12.80 | |
| Apr-03 | 4524 | | 12.80 | |
| May-03 | 4524 | | 12.80 | |

**Note: $834.99 determined by review of actual contribution records**

**EXHIBIT H - PENSION**

Page 3 of 3

| | | | | | |
|---|---|---|---|---|---|
| Jun-03 | 4524 | | 12.80 | | |
| Jul-03 | 4524 | | 12.80 | | |
| Aug-03 | 4524 | | 12.80 | | |
| Sep-03 | 4524 | | 12.80 | | |
| | | 3.0% merit | | | |
| Oct-03 | 4660 | fund | 14.50 | | |
| Nov-03 | 4660 | | 14.50 | | |
| Dec-03 | 4660 | | 14.50 | | |
| Jan-04 | 4660 | | 12.00 | | |
| Feb-04 | 4660 | | 12.00 | | |
| Mar-04 | 4660 | | 12.00 | | |
| Apr-04 | 4660 | | 12.00 | | |
| May-04 | 4660 | | 12.00 | | |
| Jun-04 | 4660 | | 12.00 | | |
| Jul-04 | 4660 | | 12.00 | | |
| Aug-04 | 4660 | | 12.00 | | |
| Sep-04 | 4660 | | 12.00 | | |
| | | 2.5% merit | | | |
| Oct-04 | 4777 | fund | 13.46 | | |
| Nov-04 | 4777 | | 13.46 | | |
| Dec-04 | 4777 | | 13.46 | | |
| Jan-05 | 4777 | | 10.96 | | |
| Feb-05 | 4777 | | 10.96 | | |
| Mar-05 | 4777 | | 10.96 | | |
| Apr-05 | 4777 | | 10.96 | | |
| May-05 | 4777 | | 10.96 | | |
| Jun-05 | 4777 | | 10.96 | | |
| | | **Note: No 2005** | | | |
| Jul-05 | 4777 | **Comp Plan** | 10.96 | | |
| Aug-05 | 4777 | | 10.96 | | |
| Sep-05 | 4777 | | 10.96 | | |
| Oct-05 | 4777 | | 10.96 | | |
| Nov-05 | 4777 | | 10.96 | | |
| Dec-05 | 4777 | | 10.96 | | |
| Jan-06 | 4777 | | 10.96 | | |
| Feb-06 | 4777 | | 10.96 | | |
| Mar-06 | 4777 | | 10.96 | | |
| Apr-06 | 4777 | | 10.96 | | |
| May-06 | 4777 | | 10.96 | | |
| Jun-06 | 4777 | | 10.96 | | |
| | | 3.0% merit | | | |
| Jul-06 | 4920 | fund | 12.75 | | |
| Aug-06 | 4920 | | 12.75 | | |
| Sep-06 | 4920 | | 12.75 | | |
| Oct-06 | 4920 | | 12.75 | | |
| Nov-06 | 4920 | **60-** | 12.75 | | |
| Dec-06 | 4920 | **Month** | 12.75 | | |
| Jan-07 | 4920 | **280101  4668.35** | **10.25** | 2082.40 | 173.46 |

# EXHIBIT G

Delphi Corporation
Special Parties

| Company | Contact | Address1 | Address2 | City | State | Zip | Phone | Party/Function |
|---------|---------|----------|----------|------|-------|-----|-------|----------------|
| McDermott Will & Emery LLP | Peter A Clark Jason J DeJonker | 227 W Monroe St | 227 W Monroe St | Chicago | IL | 60606 | 312-372-2000 | Counsel for Cherry GmbH |
| McDermott Will & Emery LLP | Nava Hazan Abigail M Beal | 340 Madison Ave | 340 Madison Ave | New York | NY | 10017-4613 | 212-547-5400 | Counsel for Cherry GmbH |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

2/22/2007 10:55 AM
Cherry special parties

# EXHIBIT H

Delphi Corporation
Special Party

| Claimant | Contact | Address1 | Address2 | City | State | Zip |
|----------|---------|----------|----------|------|-------|-----|
| Joseph Reno | Brad A. Chalker | Law Offices of Brad A. Chalker | 848-C E Franklin St | Centerville | OH | 45459 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

2/22/2007 11:39 AM
Joseph Reno special party

# EXHIBIT I

Delphi Corporation
Special Parties

| Claimant | Contact | Address1 | Address2 | Address3 | City | State | Zip |
|----------|---------|----------|----------|----------|------|-------|-----|
| Eva Orlik | Eva Orlik | 14102 Warbler Way N. | | | Carmel | IN | 46033 |
| Eva Orlik | Gerrard DiConza | DiConza Law, P.C. | 630 Third Ave. | Seventh Floor | New York | NY | 10017 |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)                    Page 1 of 1                    2/22/2007 11:38 AM
Eva Orlik special parties