UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | CASE NO. 05-44481 (RDD) |
| | : | (Claim No. 9956) |
| Debtors. | : | Jointly Administered |

MOTION FOR LEAVE TO FILE
CLAIMANT JOSEPH RENO'S
TRIAL BRIEF AND DECLARATION

Now comes the Claimant, Joseph Reno, and moves the Court for leave to file the attached Trial Brief and Declaration of Claimant Joseph Reno. The Debtor is neither surprised nor prejudiced by this filing as all referenced documents, evidence, and legal arguments are well-known to the Debtor by virtue of prior discovery and proceedings in Joseph Reno v. Delphi Corporation, Case No. 3:04CV-0321, U.S. District Court, So. Dist. of Ohio. Furthermore, the Trial of this matter has been delayed until March 21, 2007. Justice is served by addressing the merits of this matter and a full and fair Hearing on the merits cannot be had without this input from the Claimant Joseph Reno.

Alternatively, the Claimant, Joseph Reno, requests that the Court allow him to make this Declaration via his own live testimony at the Hearing now set for March 21, 2007.

Respectfully submitted,

*[signature: Brad Chalker]*

Brad A. Chalker
Law Offices of Brad A. Chalker LLC
P.O. Box 750726
Dayton, OH 45475
(937) 436-1893 telephone
(937) 436-1894 fax
Email:  BAC@chalkerlaw.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | CASE NO. 05-44481 (RDD) |
| | : | (Claim No. 9956) |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | |

---

## CLAIMANT JOSEPH RENO'S TRIAL BRIEF AND DECLARATION

---

Skadden, Arps, Slate, Meagher & Flom LLP
333 W. Wacker Dr., Suite 2100
Chicago, IL 60606
(312) 407-0700
John Wm. Hogan III
Albert L. Hogan III
John K. Lyons
Rone E. Meisler

    -and-

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Law Offices of Brad A. Chalker LLC
P.O. Box 750726
Dayton, OH 45475
(937) 436-1893
Brad A. Chalker

Attorney for Claimant,
Joseph Reno

I.  FACTS.

This claim arises from the Delphi Corporation's wrongful discharge and denial of employment benefits to Claimant Joseph Reno. This wrongful discharge from employment occurred as a direct result of a leak of hazardous chromium wastewater (at the Delphi Corporation's Kettering, Ohio, manufacturing plant) and of Claimant Joseph Reno's frustrated attempts to address this environmental emergency. A more detailed description of the background of this dispute, as well as the resulting violations of law by the Debtor Delphi Corporation is attached hereto as Declaration Exhibit #1. (The Amended Complaint filed in Case No. 3:04-CV-0321 U.S. District Court, Southern District of Ohio, now stayed as a result of the Delphi Corporation's bankruptcy filing). See also the Declaration of Joseph Reno infra.

As an affirmative defense, the Delphi Corporation has claimed employee misconduct as an alleged nondiscriminatory reason for Claimant Reno's discharge. See attached Declaration Exhibit #2 (March 30, 2004, letter from Delphi's Attorney to OSHA). According to Delphi's March 30, 2004, letter, the event which triggered Claimant Reno's discharge from employment was the completion of its "misconduct" investigation by its investigator ("Complainant's suspension was essentially converted into a termination when Brown [third party investigator retained by Delphi] completed his investigation"). This is and was a totally false material statement made by the Delphi Corporation to OSHA. It is directly contradicted by the sworn statement of Investigator Brown, i.e., he told the Delphi Corporation "[o]n February 20th . . . that my investigation was not complete". Claimant Reno's employment was terminated shortly thereafter by the Delphi Corporation, without further input from its Investigator. See attached Declaration Exhibit #3. It is further evidenced that "as of March 17th, 2004, the date that Mr.

-1-

Reno was terminated by Delphi, [Investigator Brown] had yet to do the interviews [sic] of David Atchison and the second interview with Joe Reno". Id. at 37. Thus, the sworn testimony of Delphi Corporation's own Investigator belies any claim to a causal connection between the "completion" of his investigation and the termination of Claimant Reno's employment. Further evidence of pretext is contained throughout the sworn deposition testimony of witness Troy Calton, attached as Declaration Exhibit #4. See e.g., Calton testimony at p. 95 of Declaration Exhibit #4:

> Q. Did anybody tell you --- anybody at Onyx, Joe Reno, anybody in the entire world tell you that they intended . . . that this box was ultimately going to get billed to Delphi?
>
> A. Nobody told me that, no.

Witness Calton also provides evidence of the real reason why Claimant Reno's employment was terminated by the Delphi Corporation as follows at p. 88 of Exhibit #4.

> A. Joe Reno wanted to do – fix the whole [leaking hazardous waste] tank and Mark Gooding [Delphi Supervisor] wanted to fix just part of it.

See also the "whistleblower" letter of Claimant Reno dated March 2, 2004, copy attached hereto as Declaration Exhibit #5.

-2-

II.    LAW.

To establish a prima facie case for a whistleblower claim, a party must show: (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action. See generally, Fennell v. First Step Designs, Ltd. (1st Cir. 1996), 83 F.3d 526, 535. "Once a prima facie showing has been made, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its employment decision." Id. (Citation omitted). "If the defendant does so, the ultimate burden falls on the plaintiff to show that the proffered legitimate reason is in fact a pretext and that the job action was the result of the defendant's retaliatory animus." Id. (Citations omitted). "On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Id. (Citation omitted).

A plaintiff who establishes a prima facie case need not introduce additional evidence of discrimination or retaliation to show pretext." Eperesi v. Northernenvirotest Systems, Inc. (6th Cir. 1999), 1999 WL 825034, unreported. (Citation omitted). "Rather, a prima facie case, coupled with disbelief of the employer's proffered reason, will suffice to support a finding of discrimination or retaliation." Id. (Citation omitted). The trial court "should not blindly accept the proffered reason as honest." Id. (Citation omitted).

In deciding these cases, courts must determine whether or not causation exists. Demonstrating a link between the protected activity and the timing of the challenged employment decision significantly helps a showing of causation. The closer the temporal proximity, the more likely a court will infer causation.

FAIR CREDIT REPORTING ACT (FCRA), 15 U.S.C. 1681-1681y
SPECIAL PROCEDURES FOR EMPLOYEE INVESTIGATIONS

Section 603(x) provides special procedures for investigations of suspected misconduct by an employee or for compliance with Federal, state or local laws and regulations or the rules of a self-regulatory organization, and compliance with written policies of the employer. These investigations are not treated as consumer reports so long as the employer or its agent complies with the procedures set forth in Section 603(x), and a summary describing the nature and scope of the inquiry is made to the employee if an adverse action is taken based on the investigation.

OHIO REVISED CODE

## § 4113.52 Right of employee to report violation of law by employer or fellow employee.

(A)(1)(a) If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the employee may file a written report that provides sufficient detail to identify and describe the violation with the prosecuting authority of the county or municipal corporation where the violation occurred, with a peace officer, with the inspector general if the violation is within the inspector general's jurisdiction, or with any other appropriate public official or agency that has regulatory authority over the employer and the industry, trade, or business in which the employer is engaged.

(b) If an employee makes a report under division (A)(1)(a) of this section, the employer, within twenty-four hours after the oral notification was made or the report was received or by the close of business on the next regular business day following the day on which the oral notification was made or the report was received, whichever is later, shall notify the employee, in writing, of any effort of the employer to correct the alleged violation or hazard or of the absence of the alleged violation or hazard.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0041p.06

# UNITED STATES COURTS OF APPEALS

FOR THE SIXTH CIRCUIT

---

JON JERMER,

        *Plaintiff-Appellant,*

v.

SIEMENS ENERGY & AUTOMATION, INC.,

        *Defendant-Appellee.*

No. 03-4191

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00448—Sandra S. Beckwith, District Judge.

Argued: December 10, 2004

Decided and Filed: January 25, 2005

Before: MERRITT, GIBBONS, and ROGERS, Circuit Judges.

---

COUNSEL

**ARGUED:** David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellant. Keith P. Spiller, THOMPSON HINE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** David G. Torchia, TOBIAS, KRAUS & TORCHIA, Cincinnati, Ohio, for Appellant. Keith P. Spiller, THOMPSON HINE, Cincinnati, Ohio, for Appellee.

---

OPINION

---

    MERRITT, Circuit Judge. This Ohio diversity case arises from the plaintiff-employee's so-called "*Greeley*" claim against his former employer for wrongful discharge. The specific claim is that he was dismissed in retaliation for raising complaints about the air quality at the employer's facility in Ohio. The district court rejected the claim.



    In Ohio, common law claims of wrongful discharge in violation of "public policy" were created by the case of *Greeley v. Miami Valley Maint. Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990). Relevant "public policy" may arise from a number of sources including the federal and Ohio Constitutions, statutory law, administrative rules or the common law, according to *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 320-21 (Ohio 1997). Five years after *Greeley*, the Ohio Supreme Court in *Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995), set out the following four necessary elements of this new "public policy" claim, the second of which (the "jeopardy element") is at issue in this appeal:

-6-

No. 03-4191         *Jermer v. Siemens Energy & Automation, Inc.*                    Page 2



>  1. That [a] clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element).
>  2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element).
>  3. The plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element).
>  4. The employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element).

*Id.* (emphasis in original). The Court held that the first two elements are questions of law while the latter two are questions of fact. *Id.* at 658. This language from *Collins* is very general and leaves a lot of room for interpretation. The meaning of these four elements for this new Ohio tort has not yet gained the level of clarity or certainty that allows predictive outcomes.

The question before us is the meaning of the second element, the so-called "jeopardy element." Our interpretation of this gateway element is as follows: although complaining employees do not have to be certain that the employer's conduct is illegal or cite a particular law that the employer has broken, the employee must at least give the employer clear notice that the employee's complaint is connected to a governmental policy. It must be sufficiently clear from the employee's statements that he is invoking governmental policy that a reasonable employer would understand that the employee relies on the policy as the basis for his complaint. Because the employee here never connected his statements about air quality to governmental policy or mentioned or in any way invoked governmental policy as the basis of his complaint, we agree with the district court that his case must be dismissed for the failure to show that his dismissal would "jeopardize" Ohio's public policy.

III.   PRETEXT.

A plaintiff may establish pretext by showing "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the] discharge, or (3) that they were insufficient to motivate discharge." Manzer v. Diamond Shamrock Chem. Co. (6th Cir. 1994), 29 F.3d 1078, 1084.

Pretext is evidenced in the instant case by three "i's" with regard to the "Dumpster Investigation" relied upon by the Delphi Corporation and conducted by third-party Securitas, Inc. Investigator Brown:  (1) incomplete, (2) incompetent, and (3) illegal.

Incomplete

It is Employee Investigations 101 (and simple, common-sense fairness) that an investigator must interview <u>all</u> of the material witnesses during the course of an employee investigation . . . and then provide the accused employee an opportunity to respond to the "charges". By failing to interview all of the defense witnesses identified by Joe Reno, and by further failing to give Joe Reno an opportunity to respond, the "Dumpster Investigation" was incomplete, biased and lacking in any sense of fairness or due process.  It cannot be over-emphasized that Delphi made a material misrepresentation of fact to an investigating government agency (OSHA) when it reported to OSHA that the <u>completion</u> of the Securitas, Inc. investigation was the trigger for its firing of Joe Reno on March 17, 2004.  The Securitas, Inc. Investigator <u>never completed</u> his investigation . . . and the <u>only</u> event of consequence between the date of Joe Reno's suspension from employment (February 20, 2004), and the date of his firing (March 17, 2004) . . . was Joe Reno's "whistleblower letter" dated March 2, 2004.

-8-

Incompetent

First, Securitas, Inc. Investigator Brown had no "training in conducting employee investigations". Brown Deposition p. 17, Declaration Exhibit #15. Second, he conducted "group interviews" of material witnesses in the presence of non-Delphi employees (for example, the "group interview" of Troy Calton on February 18, 2004). If he had received the proper training, he might have known that "group interviews" are a terrible way to conduct an employee investigation because of peer pressure issues and because of the liability exposure for publication of defamatory statements to non-employee participants. Third, he claims to have relied upon the oral uncorroborated statement of a witness who had given prior inconsistent oral statements, and he persisted in doing so even after the witness repeatedly refused to reduce his statement to writing. (Investigator Brown was so incredibly incompetent that he was later unable to recognize the witness' refusal to provide him with a written statement as a "red flag" with regard to the witness' credibility. Brown deposition pp. 49-50, Declaration Exhibit #15). And fourth, he ignored and failed to interview material witnesses and document material facts which were exculpatory with regard to Joe Reno. See, e.g., Brown deposition pp. 30-32, Declaration Exhibit #15.

<u>Illegal</u>

Investigator Brown was an employee of third-party Securitas, Inc. when he conducted his incomplete and incompetent "Dumpster Investigation". <u>See</u> Brown deposition p. 17, Declaration Exhibit #15. Accordingly, it was twice illegal (and unfair) for Securitas, Inc./Delphi not to disclose to Joe Reno "a summary containing the nature and substance of the communication upon which the adverse action [first, upon the suspension on February 20 and second, upon the termination of Joe Reno's employment on March 17, 2004] is based." <u>Fair Credit Reporting Act</u>, 15 U.S.C. § 1681a(x)(2).

Because Delphi relies upon third-party Securitas, Inc.'s investigation as a legitimate, non-retaliatory reason for its firing of Joe Reno . . . and because the evidence described above proves that this investigation was incomplete, incompetent, and illegal, Claimant Joseph Reno has met his burden of showing "pretext" and judgment should be entered in his favor in this case.

IV.    DAMAGES.

1.) COBRA penalty (as of Sept. 2, 2004, when Case #3:04-CV-00321 was first filed)..$18,590.00

2.) Lost wages and benefits.................................................................................$1,580,074.00

3.) ERISA (pension) loss ...........................................................................................$6,099.59

4.) Punitive damages...........................................................................................$14,220,666.00

5.) Court costs and expenses.................................................................................$19,670.30

6.) Attorney's fees (as of Feb. 2007)......................................................................$76,385.72

7.) + pre and post-judgment interest ............................................................. (to be determined)

   Total ...........................................................................................................$15,921,485.61

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELPHI CORPORATION, et al., | : | CASE NO. 05-44481 (RDD) |
| | : | (Claim No. 9956) |
| Debtors. | : | Jointly Administered |

DECLARATION OF JOSEPH RENO
WITH REGARD TO PROOF OF CLAIM NO. 9956

STATE OF OHIO          )
                       ) ss
COUNTY OF MONTGOMERY   )

Joseph Reno, being first duly sworn, deposes and says as follows:

1. I am the Claimant in this Claim No. 9956 and I was wrongfully discharged from my employment by the Debtor Delphi Corporation, as is more fully set forth in attached Exhibit #1, the Amended Complaint I filed in federal district court in Dayton, Ohio, Case No. 3:04-CV-0321, U.S. District Court (S.D. Ohio).

2. I have personal knowledge and am otherwise competent to testify regarding the matters stated in this Affidavit.

3. The following is a "time-line" of all dates and events material to my "whistleblower" claim against my former employer, the Debtor Delphi Corporation.

> October 2003 . . . Joe Reno gives a $100 deposit to Onyx employee Troy Calton, in order for Reno to rent an Onyx-owned dumpster for Joe Reno's newly-purchased residence in Waynesville, Ohio. Joe Reno tells Calton he will pay the additional "tipping charge" (which cannot be calculated until the actual disposal of the contents of the dumpster). This conversation is witnessed by Delphi employee

David Atchison and by independent contractor David Low, both of whom subsequently provide written statements. See Declaration Exhibit #6.

Christmas Holiday 2003 . . . Without Joe Reno's knowledge or consent, Onyx employee Troy Calton relocates the involved Onyx dumpster from Joe Reno's Waynesville residence to a parking lot on Delphi's premises.

January 29, 2004 . . . Independent Contractor Mike Wittman informs Delphi employee JoAnne Rau (1) of the presence of the subject Onyx-owned dumpster on Delphi's premises, (2) that the contents of the Onyx-owned dumpster came from Joe Reno's residence, and (3) that Onyx employee Troy Calton has stated that he "would take care of it". See Declaration Exhibit #7.

January 30, 2004 . . . Joe Reno's supervisor, Mark Gooding, begins an "investigation" using a third-party investigator (Mike Brown of Securitas, Inc.) to allegedly determine facts already known to Delphi (i.e. that the contents of the involved Onyx-owned dumpster came from Joe Reno's residence and that Onyx employee Troy Calton "would take care of it").

February 2, 2004 . . . Joe Reno meets with Troy Calton. Calton takes full responsibility for leaving Reno's trash in the Onyx-owned dumpster that he (Calton) had forgotten about on Delhi's property. Joe Reno asked for and obtained a receipt from Calton for his $100 deposit for his use of the Onyx dumpster, "tipping charge" to be determined later.

February 5, 2004 . . . Securitas, Inc. Investigator Brown meets with Onyx employee Troy Calton and two Onyx Supervisors (Tim Delph and Mike Webb). Calton says (1) that it was his fault that the involved Onyx dumpster was left on Delphi's property as he had "forgotten" about it, and (2) that Joe Reno had never "asked or insinuated that the box removal and disposal costs be paid by Delphi".

February 13, 2004 . . . Delphi employees discover a leak at the base of one of Delphi's two 75,000 gallon chrome wastewater treatment tanks located in Kettering, Ohio. These tanks hold an average daily accumulation of 100,000 gallons of chromium wastewater, containing highly toxic hexavalent chrome between 150 ppm and 5000 ppm. Joe Reno (Delphi's Senior Environmental Engineer) makes the decision to immediately address this environmental and safety hazard by utilizing a sludge storage tank as a temporary, replacement chrome treatment tank.

Feb. 14-16, 2004 . . . Through a combination of a plumbing bypass, temporary hosing and pumps and additional man-hours by independent contractors (Crown, Frebco and Onyx), Joe Reno was able to avoid idling most of Delphi's Kettering, Ohio operations (i.e. the jobs of approximately 1,200 employees).

February 16, 2004 . . . Joe Reno meets with Securitas, Inc. Investigator Brown (Reno was previously informed as to the purpose of this interview by both Troy Calton and Mark Gooding). Reno answers all of Investigator Brown's questions and provides Brown with two witness statements evidencing the fact that he (Reno) did pay a $100 deposit for his rental of the Onyx-owned dumpster in question.

February 18, 2004 . . . Securitas, Inc. Investigator Brown "re-interviews" Onyx employee Troy Calton for an hour, this time with Mark Gooding present (as well as Onyx Supervisors Mike Webb and Tim Delph). For the first hour of this "re-interview", Calton continues to state (1) that Joe Reno did nothing wrong, and (2) the subject dumpster was left on Delphi's property solely due to Calton's own mistake. After this second "re-interview" was over, Securitas, Inc. Investigator Brown claims that Onyx employee Troy Calton recanted what he said during the course of his first and second interviews and in this third interview decided to incriminate Joe Reno. It is noteworthy that there is no record of Calton's own words during the course of this third interview and that on multiple subsequent occasions, Calton refused to provide Securitas, Inc. Supervisor Brown with any written statement incriminating Joe Reno. Furthermore, when later deposed under oath, Calton testified that neither Joe Reno nor anybody else told him that it was "intended . . . that this box was ultimately going to get billed to Delphi."

(prior to) February 19, 2004 . . . Without Joe Reno's approval, Delphi contracted for ultrasonic testing as to the integrity of its leaking hazardous waste tank only "on the wall 3 feet up". See Declaration Exhibit #8.

Feb. 19-20, 2004 . . . Visual inspection of the leaking hazardous waste tank showed that the epoxy coating on the bottom third of the tank had been eaten away by corrosion. There were also six blisters (pinhole coating failures) in the upper portion of the tank. It was Joe Reno's stated position that the entire tank not just "3 feet up" of the involved tank needed to be blasted down to white metal to repair both the evident and the non-evident corrosion. Due to its same age and construction, it was further Joe Reno's stated position that Delphi's companion 75,000 gallon hazardous waste tank was in need of the same inspection and repair. Repairs were scheduled to begin on February 23, 2004.

Friday A.M., Feb. 20, 2004 . . . At the chemical treatment plant, Joe Reno and Mark Gooding argued about the way Joe Reno was addressing this safety hazard. Gooding criticized Reno's use of around-the-clock staffing. Gooding also objected to testing/repairs above the bottom third of the leaking tank. Gooding further argued with Reno about doing anything to address the hazard posed by the second, companion hazardous waste tank.

Friday P.M., Feb. 20, 2004 . . . After arguing with Gooding earlier that same day about the extent of costly repairs for the leaking hazardous waste tank, Gooding calls

-14-

Joe Reno into Gooding's office and suspends Joe Reno's employment at Delphi. The pretext stated by Gooding for this suspension is "the dumpster investigation".

(approx.) Feb. 20, 2004) . . . Securitas, Inc. Investigator Brown informs Delphi that "my investigation was not complete". . . as inter alia he had yet to interview witness David Atchison or have a second interview with Joe Reno. See Declaration Exhibit #9.

February 20, 2004 . . . Pyramid Riggers, the outside contractor hired by Delphi, makes its post-inspection report . . . "This tank is rejected" due to a "15" long crack". The tank does not comply with Code Section "ASWD1.1". See Declaration Exhibit #10.

March 2, 2004 . . . Joe Reno sends a "whistleblower letter" to Delphi Attorney James Walle on Delphi's Legal-Environmental Staff in Troy, Michigan . . . advising Delphi through Walle that (1) there was a serious environmental and safety hazard at Delphi's chemical treatment plant in Kettering, Ohio, (2) that Delphi employee Gooding was not qualified to address the hazard and was disregarding necessary repairs to address this environmental and safety hazard, and (3) that Gooding's suspension of Joe Reno's employment was a pretext to facilitate Gooding's plans. See Exhibit #2.

March 3, 2004 . . . Securitas, Inc. Investigator Brown interviews contractor David Low. Low corroborates what he said in his prior, written statement. Investigator Brown obtains no evidence from Low incriminating Joe Reno.

March 4, 2004 . . . Delphi attorney Walle writes Delphi's only "response" to Joe Reno's whistleblower letter. This "response" is a per se violation of Ohio Revised Code 4113.52 as it fails to notify Reno of either (1) Delphi's actions taken "to correct the alleged violation or hazard" or (2) "the absence of the alleged violation or hazard". See Declaration Exhibit #12.

March 17, 2004 . . . Joe Reno is fired by Delphi for alleged "cause". The involved Delphi representative (Jim Money) refuses to divulge the "cause" to Reno. [According to his subsequent sworn deposition testimony, it was Delphi executive Glenn Howarth (together with Beth Patrick) who made the ultimate decision to terminate Joe Reno's Delphi employment . . . and he did so with full knowledge of Joe Reno's March 2, 2004 "whistleblower letter".] See Declaration Exhibit #13.

March 17, 2004 . . . Securitas, Inc. Investigator Brown is informed by Gooding of Delphi's termination of Reno's employment. According to Investigator Brown's own sworn statement to OSHA: "I did not have any other meetings or contacts with corporate individuals to discuss the investigation since February 20[th]" [i.e. between February 20th, the date of Reno's suspension and March 17th, when

Reno's employment was terminated by Delphi].

April 5, 2004 . . . Delphi denies Joe Reno any COBRA benefit.

April 26, 2004 . . . Joe Reno pays Onyx for the remaining "tipping" charges for his rental of the subject dumpster ($393.32) per Onyx invoice dated April 22, 2004. See Declaration Exhibit #14.

February 16, 2006 . . . After repeatedly refusing to pay out Joe Reno's vested Delphi pension, Delphi finally does so only after suit is filed in federal district court in Dayton, Ohio. ERISA loss to Joe Reno is $6,099.59.

4. The following is a list of Exhibits relevant to my "whistleblower" claim against the Debtor Delphi Corporation. All of these Exhibits were previously identified and produced during the proceedings in federal court Case No. 3:04-CV-0321, U.S. District Court (S.D. Ohio).

#1 . . .   Amended Complaint, Case No. 3:04-CV-0321, U.S. District Court, So. Dist. of Ohio

#2 . . .   March 30, 2004 letter from Delphi's Attorney to OSHA

#3 . . .   OSHA Statement of Securitas, Inc. Investigator Brown

#4 . . .   Sworn deposition testimony of witness Troy Calton

#5 . . .   "Whistleblower" letter by Joseph Reno dated March 2, 2004

#6 . . .   Witness Statements of David Low and David Atchison

#7 . . .   OSHA Statement of Delphi employee JoAnne Rau

#8 . . .   American Testing Services, Ltd. quote to Delphi for ultrasonic testing

#9 . . .   Interim Report of Securitas, Inc. Investigator Brown

#10 . . .  Inspection Report of American Testing Services, Ltd.

#11 . . .  Affidavit of witness David Atchison

#12 . . .  Delphi "response" to Reno "whistleblower" letter

#13 . . .  Sworn deposition testimony of Delphi executive Glenn Howarth

#14 . . .  Onyx invoice dated April 22, 2004 for "tipping" of Onyx-owned dumpster rented to Joseph Reno

#15 . . .  Sworn deposition testimony of Securitas, Inc. Inspector Brown

#16 . . .  Sworn deposition testimony of witness Terry Mitchell Brown

#17 . . .  Economic Analysis of expert witness Ralph Frasca, Ph.D.

All of the above-cited Exhibits are attached and expressly made a part of this Declaration of Joseph Reno with regard to Proof of Claim No. 9956.

Further, the Declarant sayeth naught.

_____
Joseph Reno

SWORN AND SUBSCRIBED before me this 28th day of February, 2007.

_____
Notary Public

BRAD A. CHALKER, Attorney at Law
Notary Public, State of Ohio
My Commission has no expiration date
Section 147.03 O. R. C.