EXHIBIT #1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH RENO, | * | CASE NO. 3:04-CV-00321 |
| Plaintiff, | * | Judge Walter Herbert Rice |
| v. | * | |
| DELPHI CORPORATION, | * | |
| Defendant. | * | **FIRST AMENDED COMPLAINT** |

## PLAINTIFF'S FIRST AMENDED COMPLAINT WITH JURY DEMAND

Plaintiff, Joseph Reno ("Reno"), for his First Amended Complaint against Defendant, Delphi Corporation ("Delphi") alleges as follows:

### JURISDICTION AND VENUE

1.    This is an action for wrongful discharge and denial of employment benefits arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 et seq. and the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. In addition, this action is based upon a violation of the Ohio whistleblower statute, O.R.C. § 4113.52, the Ohio wage payment statue, O.R.C. §4113.15, discharge in violation of Ohio's public policy and the common law for defamation. This action presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2.    Venue is proper in this district under 28 U.S.C. §1391(b) and (c).

EXHIBIT

#1

## THE PARTIES

3.      Plaintiff Joseph Reno is a citizen of the State of Ohio residing at 5012 Lytle Road, Waynesville, Ohio 45068.  At all times relevant hereto, Reno was employed by Defendant Delphi as a Senior Environmental Engineer with responsibilities as both chemical treatment supervisor for Delphi's Kettering, Ohio, operations and environmental site coordinator for Delphi's plant on Kettering Boulevard.

4.      Defendant Delphi Corporation is a Delaware corporation doing business in Ohio at 2000 Forrer Boulevard, Kettering, OH 45420.  At all times relevant hereto, Delphi was Reno's employer.

## BACKGROUND

5.      On February 13, 2004, Delphi employees discovered a leak at the base of one of Delphi's two 75,000 gallon chromium wastewater treatment tanks located at Delphi's Chemical Treatment Plant (the "CTP") in Kettering, Ohio.  These tanks hold an average daily accumulation of 100,000 gallons of chromium wastewater containing hexavalent chromium, a highly toxic substance subject to the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act, and its implementing Environmental Protection Agency regulations.

6.      In response to this environmental and safety hazard, Delphi's Senior Environmental Engineer (Joseph Reno) made the decision to immediately modify and utilize a sludge storage tank as a temporary replacement chrome treatment tank.

7.      From February 14 to February 16, 2004, Reno employed a combination of a plumbing bypass, temporary hosing, pumps, and additional man-hours by outside contractors to avoid idling the work of approximately one thousand two hundred (1200) Delphi employees at

2

Delphi's Kettering, Ohio facilities.

8.     On February 16, 2004, Reno was asked to meet with an Investigator employed by Delphi to investigate the facts and circumstances surrounding Reno's personal hiring of Onyx, a waste disposal contractor, to set a solid waste collection bin at Reno's newly-purchased residence in Waynesville, Ohio.  Reno answered all of the Investigator's questions and provided the Investigator with two signed witness statements and a paid deposit receipt evidencing the fact that Reno was paying in full for Onyx's services.

9.     During the period of time from February 19 to February 20, 2004, the leaking 75,000 gallon chromium tank was drained and an inspection revealed that the original epoxy coating on the bottom third of the tank had been eaten away by corrosion.  Two obvious leaks to the outside environment had occurred where the wall of the tank joined its bottom, on the southwest and northeast sides of the tank.  Due to its identical age and construction and its twenty-five (25) years of uninterrupted service, it was Reno's belief that the companion 75,000 gallon tank was also in an advanced state of corrosion.

10.    Over the last several years, there have been at least three (3) leaks of hazardous chromium wastewater to the outside environment at the CTP.  In spite of these continuing problems, for over two (2) years, Delphi has stopped funding any preventive maintenance at its CTP, despite repeated requests by Reno to do so.

11.    The only repairs done by Delphi for more than two (2) years at its CTP have been "band-aid" fixes, in response to emergency situations.

12.    On Friday morning, February 20, 2004, Reno's supervisor, Mark Gooding ("Gooding"), made one of his rare visits to Delphi's CTP in Kettering, Ohio.  During this Friday morning visit Gooding repeatedly questioned, criticized, and argued with Reno's decision to

3

address the on-going environmental emergency with around-the-clock staffing.  Gooding also insisted that Reno cut back on the repairs which Reno had already scheduled to begin on Monday, February 23, 2004.  Gooding told Reno (in the face of Reno's express objections) that only the bottom third and the visibly damaged areas of the leaking chromium treatment tank should be recoated, that only a patch should be welded on the leaking manway of the chromium clarifier tank, and that nothing at all should be done to inspect or maintain the second chromium treatment tank.

13.    Later on that same Friday, February 20, 2004, Reno was summoned to Gooding's office and suspended "with full pay and benefits" from his employment at Delphi.  The pretext given for this action was the on-going Investigation into Reno's personal hiring of a solid waste disposal contractor, but the true motivation was expressed by Gooding several hours earlier when he argued with Reno about the expense of repairs Reno had planned in order to comply with Environmental Protection Agency ("EPA") regulations.

14.    Following Reno's suspension, Gooding cancelled the repairs scheduled by Reno, and proceeded to complete the cheapest possible "band-aid" repairs.  At that time, the second chrominum treatment tank was neither drained nor inspected.

15.    Following Reno's suspension, Gooding (and other, as yet unidentified Delphi agents and/or employees) proceeded to defame Reno by stating that Reno had misappropriated Company assets, been dishonest in dealing with a supplier, and engaged in obstruction of justice. The malicious purpose of these falsehoods was to further create a pretext for the wrongful termination of Reno's employment.

16.    On March 2, 2004, Reno sent an internal "whistleblower" letter to Delphi attorney James Walle in Delphi's Legal-Environmental department at Delphi's headquarters in Troy,

4

Michigan. Inter alia this "whistleblower" letter advised Delphi (1) that there existed a serious hazard to public health and safety at the CTP in Kettering, Ohio; (2) that Reno reasonably believed that Gooding was "not qualified to deal with this environmental hazard, has intentionally cut the necessary staffing, and has disregarded the repairs necessary for full compliance with applicable health, safety, and environmental rules and regulations"; and (3) that Reno's "suspension from Delphi employment was initiated by Delphi employee Mark Gooding to facilitate his plan to circumvent and ignore applicable health, safety, and environmental rules and regulations." A copy of this "whistleblower" letter is attached as Exhibit "A" to Plaintiff's Complaint filed 9/2/04 and is expressly incorporated herein.

17.    To date, Delphi has failed to respond to Reno's March 2, 2004, "whistleblower" letter by either notifying Reno, in writing, of any corrective measures actually taken or of the absence of his reported hazards to public health and safety.

18.    On March 17, 2004, after more than twenty-two (22) years of employment at Delphi by Reno, and only fifteen (15) days after Reno mailed his "whistleblower" letter, Delphi wrongfully terminated Reno's employment for "cause". At no time to date has Delphi had the simple decency to tell Reno what this "cause" was, in spite of his repeated requests to Delphi to do so.

19.    By letters dated April 5, 2004, and May 24, 2004, Delphi ignored Reno's objections and refused to offer him and his family continuing group health insurance coverage pursuant to the Consolidated Omnibus Reconciliation Act (i.e. "COBRA").

20.    By letter dated March 31, 2004, Delphi refused to pay Reno for his unused vacation days which had accrued prior to his wrongful termination of employment on March 17, 2004. Also to date, Delphi has not paid Reno all of the salary and vested pension monies that he

was entitled to receive through and after the date of his wrongful termination of employment.

## COUNT ONE – COBRA VIOLATION

21.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 20.

22.    The Consolidated Omnibus Reconciliation Act, 29 U.S.C. Section 1161-1168, commonly referred to as "COBRA", generally mandates that a group health plan offer separated employees the opportunity to elect continuation coverage, *i.e.* an extension of their previous group health insurance coverage.

23.    Before March 17, 2004, Reno was covered by Delphi's group health insurance.

24.    After its wrongful termination of Reno's employment on March 17, 2004, Delphi violated COBRA law by refusing to offer him continuing group health insurance coverage.

25.    As a result of Delphi's violation of COBRA law, Joseph Reno has been damaged.

## COUNT TWO – ERISA VIOLATIONS

26.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 25.

27.    The Employee Retirement Income Security Act of 1974, 29 U.S.C. Sections 1001 et seq. ("ERISA") requires that Delphi honor the commitments it has made to Reno in its Summary Plan Description (the "SPD") for salaried employees' benefits.

28.    Delphi has breached its SPD commitment to Reno that "[s]eparated employees will receive a lump-sum payment for unused, vested vacation days per completed calendar year quarter". SPD page #123.

29.    Delphi has further breached its SPD commitment to Reno that "the exit interview will be the occasion for informing the employee of the reason for separation". SPD page #123.

30.    In addition, in spite of Reno's repeated demands, Delphi has breached its

fiduciary and ERISA responsibilities by failing to pay Reno his vested pension funds (approximately $150,000).

31.    As a result of Delphi's violations of ERISA law, Joseph Reno has been damaged.

COUNT THREE – O.R.C. 4113.52 (WHISTLEBLOWER) VIOLATION

32.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 31.

33.    During the course of Reno's employment with Delphi, he became aware of certain violations of environmental rules and regulations (as further described in the attached Exhibit).

34.    Reno reasonably believed that these environmental law violations constituted hazards to public health and safety.

35.    On March 2, 2004, Reno made a written report to James P. Walle on the Legal-Environmental Staff of Delphi World Headquarters; this report identified and described to Delphi these hazards to public health and safety.

36.    In violation of Ohio Revised Code Section 4113.52(A)(1)(b), Delphi has failed to notify Reno, in writing, of any actual corrective measures it has taken, or of the absence of his reported hazards to public health and safety.

37.    In retaliation for Reno's report of environmental law violations, and in violation of Ohio Revised Code Section 4113.52(B)(1), Delphi terminated Reno's employment on March 17, 2004.

38.    The accuracy of Reno's report of hazards to public health and safety is confirmed by the actual leak on and about February 13, 2004, of highly toxic hexavalent chromium waste to the outside environment.

39.    Suit has hereby been filed for Delphi's violations of Ohio Revised Code Section 4113.52 within one hundred eighty days of Delphi's wrongful discharge of Reno from its

employment.

40.    As a result of Delphi's violations of Section 4113.52 of the Ohio Revised Code,

Joseph Reno has been damaged.

<u>COUNT FOUR – DISCHARGE IN VIOLATION OF PUBLIC POLICY</u>

41.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 40.

42.    A clear public policy exists as manifested in a state or federal constitution, statute

or administrative regulation, or in the common law.  Section 6971, Title 42, U.S. Code,

specifically prohibits employers from retaliating against employees who allege violations of the

Resource Conservation and Recovery Act (and its implementing regulations), as amended by the

Hazardous and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act

(Section 6971, Title 42, U.S. Code).  Further, in the case of <u>Kulch v. Structural Fibers, Inc.</u>

(1997), 78 Ohio St.3d 134, 677 N.E. 2d 308, Ohio recognized a clear public policy in favor of

workplace safety.  <u>See also</u> <u>Pytlinski v. Brocar Prods., Inc.</u> (2002), 94 Ohio St.3d 77, 760 N.E.2d

385.

43.    This clear public policy in favor of workplace safety would be jeopardized if

employers such as Delphi were allowed to discharge employees such as Reno for reporting safety

concerns.

44.    Delphi's termination of Reno's employment was motivated by Reno's express

workplace and public safety concerns (as further described above).

45.    Delphi lacked any overriding legitimate business justification for its termination

of Joseph Reno's employment.

46.    As a result of Delphi's discharge of his employment in violation of public policy,

Joseph Reno has been damaged.

8

<u>COUNT FIVE - O.R.C. 4113.15 (WAGE PAYMENT) VIOLATION</u>

47.     Plaintiff restates and incorporates the allegations of paragraphs 1 through 46.

48.     Section 4113.15 of the Ohio Revised Code requires corporations doing business in the State of Ohio "on or before the fifteenth day of each month, pay such employees the wages earned by them during the last half of the proceeding calendar month."

49.     From February 20, 2004, to March 17, 2004, Delphi suspended Joseph Reno expressly "with full pay and benefits".

50.     From March 17, 2004, to (approx.) April 14, 2004, Reno was entitled to receive his accrued and unused vacation pay.

51.     Delphi has wrongfully refused to pay Reno any wages or benefits subsequent to March 15, 2004.

52.     As a result of Delphi's violation of Section 4113.15 of the Ohio Revised Code, Joseph Reno has been damaged.

<u>COUNT SIX – DEFAMATION</u>

53.     Plaintiff restates and incorporates the allegations of paragraphs 1 through 52.

54.     Delphi has defamed Reno by stating through its representative(s) that Reno has misappropriated Company assets, that Reno has been dishonest in dealing with a Delphi supplier, and that Reno is guilty of obstruction of justice.

55.     These defamatory statements by Delphi are both false and malicious.

56.     These defamatory statements have been published to both Delphi employees and non-employees.

57.     As a result of Delphi's acts of defamation, Joseph Reno has been damaged.

9

## COUNT SEVEN – FAIR CREDIT
## REPORTING ACT VIOLATION

58.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 57.

59.    The Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") requires inter alia that employer(s) (who take an adverse action against an employee based on information received from an outside investigator) provide a summary thereof to the involved employee.

60.    Delphi has violated the Fair Credit Reporting Act by failing to provide Reno with so much as a summary of its outside investigation of Reno.

61.    Delphi's violation of the Fair Credit Reporting Act has damaged Joseph Reno and constitutes evidence of pretext in this case.

WHEREFORE, Plaintiff Joseph Reno prays for the following relief:

A.    Judgment that Defendant Delphi has violated federal and Ohio law as set forth above;

B.    An award of benefits due Reno as a result of Delphi's wrongful actions, in an amount in excess of Ten Thousand Dollars ($10,000), the exact amount to be determined at trial;

C.    An award of wages due Reno on March 17, 2004, in an amount in excess of Five Thousand ($5,000), the exact amount to be determined at trial;

D.    An award of liquidated damages pursuant to Ohio Revised Code § 4113.15 in the amount of 6% of "B" and "C" above, the exact amount to be determined at trial;

E.    An award of One Hundred Ten Dollars ($110) per day, for each day of Delphi's COBRA violation as set forth above, the exact amount to be determined at trial;

F.    An award of back wages and benefits due Reno, from March 17, 2004, to the date

of trial, in an amount in excess of Fifty-Five Thousand Dollars ($55,000), the

exact amount to be determined at trial;

G.    An award of future wages and benefits due Reno, in an amount in excess of One

Million Five Hundred and Twenty-Four Thousand Dollars ($1,524,000), the exact

amount to be determined at trial;

H.    Monetary relief and/or damages for Delphi's ERISA violations in excess of One

Hundred and Fifty Thousand Dollars ($150,000), the exact amount to determined

at trial;

I.    An award of punitive damages, in the amount of nine (9) times the compensatory

damages award per State Farm v. Campbell, 123 S. Ct. 1513 (2003);

J.    An award of costs and attorney's fees in this action;

K.    An award of prejudgment and post-judgment interest; and

L.    Such other relief as the Court may deem just and necessary.

Respectfully submitted,


s/Brad A. Chalker
Brad A. Chalker (#0011992)
Law Offices of Brad A. Chalker, LLC
7953 Washington Woods Drive
P.O. Box 750726
Dayton, Ohio 45475-0726
(937) 436-1893 (phone)
(937) 436-1894 (fax)
BAC@chalkerlaw.com (email)
Trial Attorney for Plaintiff, Joseph Reno

JURY DEMAND

Plaintiff Joseph Reno hereby demands a trial by jury.


s/Brad A. Chalker
Brad A. Chalker

11

# EXHIBIT #2

# DELPHI

March 30, 2004

<u>Via Facsimile and U.S. Mail</u>

Ms. Susan Schlemann
Investigator
Occupational Safety & Health Administration
36 Triangle Park Drive
Cincinnati, OH 46246-3411

RE:    Joseph M. Reno v. Delphi Chassis Systems
       Case Number 5-1610-04-034

Dear Ms. Schlemann:

This letter constitutes Respondent Delphi Corporation's ("Delphi") formal position statement in response to the above-referenced complaint filed by Complainant Joseph Reno.

In his complaint, Complainant alleges that he believes he was terminated because of his March 2, 2004 letter alleging environmental and safety concerns to Delphi's attention. What Complainant fails to mention, however, is that he sent that letter only after he had been suspended pending the outcome of an ongoing, and wholly unrelated, investigation into alleged inappropriate conduct. That investigation ultimately established that Complainant had misappropriated company funds, had taken personal advantage of his business relationship with a Delphi supplier, and had intentionally (though unsuccessfully) tried to obstruct Delphi's subsequent investigation. Complainant was terminated solely for those reasons, not because he brought any alleged safety concerns to Delphi's attention.

Accordingly, Complainant's complaint against Delphi is without merit, and should be dismissed.

<u>Background</u>

Complainant was hired by Delphi in August 1981. At all relevant times he was employed as a Senior Environmental Engineer, with responsibility for waste removal and wastewater treatment at Respondent's Kettering and Moraine, Ohio manufacturing facilities.

•   <u>The Investigation Into Improper Waste Disposal Begins</u>

On January 29, 2004, Environmental Coordinator JoAnne Rau was contacted by an employee of Crown Solutions, Inc.[1] regarding a waste dumpster[2] that was located on the Kettering property. The Crown employee wanted to know how he should record the contents of the dumpster for disposal. Rau learned that the dumpster contained fencing and aquarium salt bags – neither of which could have come from the Delphi facility. Accordingly, on January 30, she brought the

---

[1] Crown is a water management and engineering company that provides Delphi with services and personnel.
[2] The container is formally known as a "waste roll-off box" – a mobile container that can be attached to a semi truck, as opposed to a stationary dumpster one might find at an apartment complex, for example. However, for ease of reference, this statement will refer to the container as a dumpster.

Delphi Legal Staff  MC: 480-410-144  5825 Delphi Drive  Troy, MI 48098  Tel: [1] 248.813.1460  Fax: [1] 248.813.1466  E-mail: jeffery.m.peterson@delphi.com

DC 453



EXHIBIT
#2

matter to the attention of her supervisor, Facilities & Services Site Manager Mark Gooding. Rau informed Gooding that the dumpster belonged to Onyx Industrial Services, a company that provides waste disposal services for Delphi. Gooding contacted Onyx, but Onyx was unable to explain the contents of the dumpster, or why it was located on Delphi property.

Gooding found this to be sufficiently unusual that it warranted further investigation. Accordingly, on January 30, he contacted Mike Brown, an Investigator for Securitas, which provides security services for Delphi. Gooding informed Brown that, after speaking with other individuals, he believed the contents of the dumpster may have come from Complainant's home or business.

Brown began by inspecting the dumpster, and found that it contained boxes of aquarium sea salt, old wire fencing, broken pieces of concrete, and other construction scrap. He also learned that Complainant had an aquarium business, and had recently purchased a small farm, all of which was consistent with the dumpster's contents. (A copy of Brown's Investigation Report is attached as Exhibit A).

On February 3, Brown met with Onyx representatives to discuss the dumpster. Onyx informed Brown that they had located a receipt for $100 cash dated December 22, 2003, that showed Joe Reno had privately arranged for the dumpster. (A copy of the receipt is attached as Exhibit B). They also noted that the individual who had transported the dumpster was an Onyx employee named Troy Carlton.

Brown met with Carlton on February 5. Carlton told Brown that in the fall of 2003 Complainant had asked him to deliver an empty dumpster to Complainant's residence. Carlton indicated that a few months later Complainant asked him to come back and pick up the dumpster. According to Carlton, when he picked up the dumpster there was an emergency at the Kettering facility, so rather than taking the dumpster to a landfill, he had driven straight to the facility, dropped the dumpster off, and subsequently forgot to retrieve it. Carlton denied that Complainant had asked him to bill the dumpster's disposal costs to Delphi. (See Exhibit A).

- A Small Leak Is Discovered In A Treatment Tank

On Friday, February 13, 2004, Complainant and his crew discovered a small leak emanating from the bottom of one of Delphi's hexavalent chromium wastewater treatment tanks. The Kettering facility has two parallel, 75,000 gallon, epoxy coated, carbon steel batch treatment tanks that are used to adjust the pH of the wastewater and to reduce the hexavalent chrome to its trivalent state.

Complainant decided to install temporary plumbing to enable a sludge storage tank to be used as a temporary chrome treatment tank so the actual tank could be drained, inspected, and repaired. This was accomplished between February 14 and 16, 2004. Complainant also arranged for extra manpower to be brought in to monitor the plumbing and tanks during this time.

- The Waste Disposal Investigation Continues

On Monday, February 16, Mike Brown interviewed Complainant in connection with his investigation into the Onyx dumpster. Brown asked Complainant to explain the sequence of events regarding the dumpster. Complainant told Brown that he asked Carlton to deliver the dumpster to his house in "late November or early December, 2003." Complainant claimed that he filled the dumpster with debris, and had Carlton pick it up on December 22. He stated that he assumed Carlton had taken

DC 454

March 30, 2004
Page 3 of 8

the dumpster to a landfill, until he learned in late January that "someone was taking pictures" of the dumpster, and that an investigation was being conducted.

Complainant then presented Brown with two written statements – one from David Atchison, an hourly employee, and another from Dave Low, a Crown employee. (Copies of these statements are attached as Exhibit C). Both individuals claimed that they overheard a conversation between Complainant and Troy Carlton in which Complainant told Carlton he would pay the fee for the dumpster.[3] Complainant told Brown that he paid Carlton $100 on December 22, and received a receipt.

- Troy Carlton Recants His Story

On Wednesday, February 18, Brown conducted another interview with Carlton (Gooding and Onyx managers Mike Webb and Tim Delph were also present). Initially, Carlton repeated his story that he had picked up the dumpster on December 22, 2003, and that Complainant had paid Onyx $100 for its services. However, as the interview was wrapping up, Carlton asked Brown what he thought would happen to him (Carlton), and Brown told him that as long as he was telling the truth there was nothing to worry about. After speaking to Webb and Delphi privately for a few minutes, Carlton located Brown and indicated he wanted to resume the interview.

Carlton then informed Brown that he needed to "make some changes" to his story. He indicated that in August or September 2003 Complainant asked him to deliver a dumpster to Complainant's house. Around the end of September or early October (not December 22), Complainant asked Carlton to pick up the dumpster. According to Carlton, he and Complainant drove in an Onyx truck to Complainant's home to retrieve the dumpster, and returned to the facility together, dropping the dumpster at the location where it was eventually discovered. Carlton admitted to Brown that he knew the final disposal fee would be billed to Delphi. Complainant gave Carlton $100 cash the day the dumpster was returned to Delphi (not December 22), which was intended for Carlton personally in exchange for doing "a favor" for Complainant. Carlton also admitted that he never gave the $100 to Onyx. (See Exhibit A).

Carlton further stated that on either February 2 or 3, 2004 (i.e., shortly after the investigation began), Complainant approached Carlton and asked for a receipt for the $100. According to Carlton, he filled the receipt out that day, and randomly picked December 22, 2003 as the date on the receipt.

At the conclusion of the interview Brown asked Carlton to submit a complete statement of events as he had described, and asked that it be completed by February 19. Carlton indicated that he would do so. (See Exhibit A).

- Complainant Informs His Supervisor Of The Leak

During a staff meeting on Wednesday, February 18[4] – five days after the leak was discovered – Complainant informed Mark Gooding of the leak, and his efforts to re-route the wastewater to the

---

[3] Brown found it odd that Complainant had come to the meeting with these two statements in his possession, since Brown had not yet spoken to Complainant, and no issue had been raised about Complainant's communications with Carlton.

[4] This meeting did not take place on Tuesday, February 17, as Complainant alleged in his March 2, 2004 letter to James P. Walle (discussed below).

DC 455

sludge tank.  Complainant and Gooding went to view the tank, and Gooding assigned Plant Engineer Jerry Lee to assist Complainant with the task of having the tank cleaned, inspected, and repaired.

After the tank was cleaned, Delphi retained American Testing Services, Ltd. (ATS) to perform an inspection of the tank on Friday, February 20.  ATS reported that all of the welds were inspected and that the tank's thickness was approximately equal to the original design thickness of .25 inches.  However, a 15-inch-long crack was discovered in the bottom of the tank weld, which was the source of the small leak.

Mark Gooding and JoAnne Rau visited the treatment plant early Friday afternoon, February 20 to speak with ATS about the inspection and test results.  Gooding and Complainant discussed ATS's findings and made arrangements for the tank to be repaired and recoated the following week.

- Delphi Suspends Complainant Based On The Waste Disposal Investigation

At around noon on February 20, Mike Brown – who was completely unaware of the chrome tank issue – advised Mark Gooding and Human Resources representatives of his findings to date. He indicated that, although his investigation couldn't be considered completely closed because Carlton had not yet provided a written statement, there was already ample evidence that Complainant had committed several acts of misconduct in connection with the dumpster.

Based on Brown's findings to date, Divisional Salaried Personnel Director Elizabeth Meyer decided that Reno should be suspended pending the final outcome of the investigation (like Brown, Meyer had no knowledge of the chrome tank issue at that time).  Accordingly, based on Meyer's decision, late in the afternoon of February 20, Human Resources Representative Debbie Field and Mark Gooding informed Complainant that he was being suspended, with pay.  Gooding subsequently placed Jerry Lee in charge of the waste treatment area.

- The Tank Is Repaired

Between February 23 and March 1, 2004, the surface crack and another small area of the tank were repaired with welded patches, and the bottom three feet of the tank, along with any blisters, were re-coated with an epoxy material superior to the original coating.  The tank was then readied for a return to service.

- Complainant's March 2 Letter To Delphi's Legal Staff And Delphi's Response

On March 2, 2004, Complainant sent a letter to James Walle, an environmental attorney on the Delphi Legal Staff, which Walle received late in the afternoon of March 3.  (A copy of the letter is attached as Exhibit D).  In the letter, Complainant – for the first time – raised a series of alleged concerns about the safety of the chrome treatment tanks, and the risk of "catastrophic failure."  He also referred to his suspension on February 20, which Complainant characterized as relating to Troy Carlton's "inadvertent return of the box containing [Complainant's] trash" to the Kettering facility.  He claimed that Carlton had been interviewed "and took full responsibility for returning the box to Delphi" (obviously Complainant was not aware that Carlton had recanted his original story). He also repeated the lie (which he ironically characterized in his letter as "undisputed fact") that he had "paid in full for the disposal of this waste."  After professing his innocence, Complainant speculated that his suspension had been "initiated by ..... Gooding to facilitate his plan to

circumvent and ignore applicable health, safety, and environmental rules and regulations." Of course, Complainant had no way of knowing that Gooding played no role in the decision to suspend him, or that the decision was, in fact, made hundreds of miles away by a human resources executive with no knowledge whatsoever about the chrome treatment tank issue.

In a letter dated March 4, 2004 (copy attached as Exhibit E), Walle thanked Complainant for his letter and promised to look into the situation. Walle and Delphi's Facilities Services Group arranged to bring two Delphi environmental managers (Marty Cristo and Roy Knapp) and an independent consulting engineering firm, Hubbel, Roth & Clark, Inc. (HRC), to determine whether the two chrome wastewater tanks were, in fact, safe for continued use. Accordingly, the tank was again emptied, and the Delphi personnel inspected the site on Friday, March 5. HRC Engineer Ed Cote arrived on Saturday, March 6, and conducted his own independent investigation. Importantly, neither Cote nor the environmental managers had been made aware of Complainant's March 2 letter.

Following his inspection, Cote, Cristo, and Knapp concluded that the plant had taken timely, appropriate action concerning the leaking tank, and believed that the plant's original plan to inspect the non-leaking tank during Delphi's July shutdown period was appropriate. Indeed, the parties agreed that the emptied tank should be put back into service as soon as possible, since risks posed by re-routing the wastewater were believed to be greater than the risk of tank failure.

Delphi subsequently retained ATS to conduct additional ultrasonic inspections of the other chrome treatment tank.[5] The results of that inspection showed that the thickness of that tank was approximately .25 inches, measured at four random locations along the sidewall. This suggested that the structure of the other tank was sound as well (since the original design thickness of the tank was .25 inches).

On March 26, 2004, HRC provided Delphi with its final report. (A copy is attached as Exhibit F). The report concluded that Delphi had responded to the leak immediately and appropriately. It noted that Delphi emptied and inspected the tanks, and repaired two isolated areas with steel plates. Furthermore, the lower portion of the tank was covered with a coating superior to the original. According to HRC, "**the new patched areas and the original coatings effectively protect the steel tank.**" The report went on to find that the condition of Delphi's tanks was similar to other tanks in use throughout the automotive industry. HRC also recommended that Delphi inspect and, if necessary, repair all of its tanks as soon as possible – possibly during Delphi's annual July shutdown, when wastewater flows are significantly reduced.

• <u>The Waste Disposal Investigation Concludes: Complainant Is Terminated</u>

Mike Brown continued his investigation into early March. On March 5, 2004, he interviewed Troy Carlton for a third time. Carlton reaffirmed his earlier statement, but refused to provide a written statement unless Delphi agreed not to "take action against" him for his role in the dumpster scam.

Brown considered his investigation completed, and he notified Meyer. Meyer discussed the matter with Glenn Howarth, the Director of Delphi's Environmental Services Group.[6] Meyer and Howarth agreed that Brown's investigation had established the following:

---

[5] The ultrasound enabled ATS to determine the thickness of the tank walls without actually emptying the tank.

[6] Howarth is Mark Gooding's supervisor, and was thus two levels above Complainant.

DC 457

March 30, 2004
Page 6 of 8

- Complainant's arrangement with Troy Carlton to deliver an Onyx dumpster to his house, and to return the dumpster to Delphi, in exchange for $100 paid directly to Carlton, constituted a conflict of interest, a misappropriation of Delphi resources, and an abuse of Delphi's business relationship with Onyx.
- Complainant had willfully obstructed Delphi's investigation into the incident by conduct including: (1) lying about the facts, (2) persuading Carlton to produce a bogus receipt, and (3) compelling David Atchison and Dave Low to submit false statements on his behalf.[7]

These facts were beyond dispute, and constituted a clear violation of Delphi's guiding policies and principles. By this point, of course, Meyer and Howarth were aware of the chrome treatment tank issue, and of Complainant's letter to Walle. However, they agreed that they had no choice but to terminate Complainant's employment. The fact that Complainant had raised concerns about the chrome tanks did not in any way lessen or excuse his unacceptable conduct on a completely unrelated issue – particularly in light of the fact that the waste disposal investigation began well before the chrome tank leak even occurred, and Complainant didn't send his letter until well after he had been suspended.

For the reasons stated above, Complainant was terminated on March 17, 2004.

<u>Discussion of Complainant's Claims</u>

Complainant claims that he was terminated because he raised safety concerns in his March 2, 2004 letter to Jim Walle. His complaint is being investigated under the provisions of 29 C.F.R. Part 24 and 29 U.S.C. §660(c).

The analysis for a claim under either provision is essentially the same: Was Complainant discharged because he engaged in "protected activity"? Complainant must establish that he did, in fact, engage in protected activity, and that his termination was causally connected to that protected activity. *See, e.g., Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361 (8th Cir. 1994).

- <u>Complainant Did Not Engage In A Protected Activity</u>

Complainant must first show that his March 2, 2004 letter to Delphi legal staff constituted "protected activity." Under 29 C.F.R. §24.2 Complainant would have to show that he either had (or was about to): commenced proceedings under any of the listed statutes; testified in such proceedings; assisted or participated in such proceedings; notified Delphi of an alleged violation of a relevant federal statute; refused to engage in any practice made unlawful; or testified before congress or other governmental proceeding. Complainant's letter does not fall within any of those categories.

Likewise, Complainant's letter does not appear to fit the criteria of 29 U.S.C. §660(c) or 29 C.F.R. Part 1977. While Delphi acknowledges that it is the Department of Labor's policy that internal complaints can constitute protected activity *if made in good faith* (29 C.F.R. §1977.9(c)), there is no evidence that Complainant's letter was made in good faith, as opposed to a deliberate effort to make exaggerated allegations in order to protect himself against possible discipline for his malfeasance. In this respect, it's very significant that Complainant waited several weeks to raise

---

[7] Atchison retired shortly after the investigation began, so Delphi was unable to take action against him for filing a false statement. Low is not a Delphi employee.

March 30, 2004
Page 7 of 8

these allegations. If Complainant genuinely believed Delphi's response posed an unreasonable risk, one would expect him to have brought the issue forward immediately.

- ## There Is No Evidence Of A Causal Connection

Moreover, regardless of whether Complainant's letter constituted "protected activity," there is no evidence whatsoever to suggest that there was a causal connection between the letter and the decision to terminate his employment. The following facts establish that the decision to terminate was made for a reason that preceded, and was wholly unrelated to, any issue regarding the chrome treatment tanks:

- Complainant was terminated based on the results of an investigation that began on February 2, 2004 – 11 days before the leak was discovered, and a month before Complainant wrote his March 2 letter to Jim Walle.
- Complainant was suspended 11 days before he wrote his March 2 letter, and he was never permitted to return to work. As he himself acknowledges, his suspension was specifically connected to the investigation into the dumpster disposal issue.
- The decision to suspend Complainant was made by Delphi's Salaried Personnel Director, who at the time had no knowledge of any issue regarding the chrome treatment tanks. Her decision was based on the preliminary findings of an investigator who likewise had no knowledge of the issue regarding the tanks.
- Complainant's suspension was essentially converted into a termination when Brown completed his investigation and confirmed that Complainant had engaged in inappropriate and unethical conduct.
- Complainant's March 2 letter did not change the fact that he had misappropriated Delphi assets, entered into an arrangement with Delphi's supplier that was a clear conflict of interest, and deliberately obstructed and misled Delphi's investigation into his conduct.

The only fact that is at all suggestive of a causal connection is the short amount of time between Complainant's letter and his termination. However, the unique facts of this case rebut any inference caused by the temporal proximity. In this case, at the same time as the tank issue, there was a parallel investigation being conducted by individuals who had no direct involvement with the tank issue. The waste disposal investigation was therefore also temporally related to Complainant's termination. Accordingly, there is no basis on which to conclude that the mere closeness of time, without more, establishes that *either* issue (the Onyx dumpster or Complainant's letter) was, in fact, causally connected to Complainant's termination. However, when this temporal proximity is coupled with the other facts showing that the termination was connected to the waste disposal issue, there is only one reasonable conclusion that can be drawn.

Finally, it is nonsensical to claim that Respondent would discharge Complainant for raising a safety issue. To the contrary, Delphi considered it Complainant's **responsibility** to monitor the tanks, and to report any perceived safety issues. Indeed, Gooding appreciated that Complainant had informed him of the leak, and of the steps that had been taken to bypass the tank. Gooding also approved and monitored the subsequent inspection and repair of the tank – all of which occurred before Delphi received Complainant's March 2 letter. And an independent consultant subsequently verified that Delphi's efforts were appropriate.

DC 439

March 30, 2004
Page 8 of 8

In sum, there is no evidence to suggest that Delphi terminated Complainant because of his March 2 letter.  In contrast, there is extensive evidence suggesting that Complainant was terminated solely for his actions in connection with the Onyx dumpster.

<u>Conclusion</u>

Based on the above, it is clear that Complainant's complaint lacks factual or legal merit. Complainant was terminated solely because he entered into a private arrangement that resulted in a conflict of interest, misappropriation of Delphi resources, and intentionally interfered with Delphi's subsequent investigation.  His termination had nothing to do with his alleged and belated concerns about the safety of the chrome treatment tanks – to the contrary, Delphi plant management and corporate personnel appropriately addressed chrome wastewater tank matter.   Accordingly, Complainant's complaint should be dismissed.

If you have any questions or need additional information, please do not hesitate to contact me.

Very truly yours,

Jeffery M. Peterson
Attorney

Attachments

DC 460

EXHIBIT #3

U.S. Department of Labor
**WITNESS STATEMENT**        Occupational Safety and Health Administration
Page 1

*Final*

Case #5-1610-04-034

I, Mike Brown, am employed at Securitas Security Services USA, Inc., MC 2-06, 2000 Forrer Blvd, Kettering, Ohio 45420 for 6+ years.  Office telephone number, 937-455-7008.  My job classification is Investigator.

I understand that this statement will be held in confidence until such time as I may be called to testify in a court or administrative proceeding, at which time it may be produced upon demand of opposing counsel.  Additionally, this statement may be made available to other agencies if it will assist them in the performance of their statutory functions.  Upon closing of the case, this statement may be subject to disclosure only in accordance with applicable statute(s) and agency policy.

Please initial here if you wish this statement to be held in confidence _____

On February 2, 2004, Mark Gooding arrived in my office to inform me that there was a roll-off box at the east side of the plant, near the coal storage bin and he informed me that material inside this box was believed to belong to Joe Reno. I went out to inspect the box and noticed that the box contained empty bags, boxes of aquarium sea salt, old wire fencing, broken pieces of concrete and other items similar to construction scrap.

On February 3, 2004, I contacted Tim Delph, Onyx Corporation to have a meeting to discuss the circumstances of the box.  I went to the Onyx' office and met with Tim Delph and Mike Webb. (On a previous telephone call I was notified from Onyx that they had a receipt confirming that Joe Reno rented the box).

On February 4, 2003, I was contacted by Tim Delph who related that the driver involved with the box, rented by Joe Reno, was Troy Carlton an employee with Onyx.

I interviewed Troy Carlton on 3 different occasions, the first time was on February 5, second time was February 18th, and the third time was March 5th. Troy Carlton admitted to being involved with the circumstances on the box that Joe Reno rented. On the February 18th interview, Troy did mention that Joe Reno approached him on either February 2, or February 3rd wanting a receipt for $100.00 cash. Troy gave Joe Reno a receipt and picked December 22, 2003 at random.

On February 12th, I attended a meeting in Troy, Michigan with Mary Ann Polvinen, Glenn Howarth, Dennis DeLong, and Jerry Koplan, on teleconference was Mark Gooding and Marti Cristo. This was the first meeting to brief corporate and supervisors



EXHIBIT
#3

WITNESS STATEMENT

on status of the investigation involving Joe Reno. Part of my purpose on talking to these individuals, was to inform them that my next step was to interview Joe Reno. There was a decision made that Debbie Field, Human Resources Salaried for E&C in Dayton, Ohio, would be a witness in my interview with Joe Reno.

On February 16th, I conducted an interview involving Joe Reno, with Debbie Field present. Joe Reno seemed somewhat defensive in this interview. Joe Reno handed me signed statements from two employees at Delphi. I was somewhat surprised with Joe handing statements to support his position on how the box was going to be paid for. The reason I was somewhat surprised is If salary employees were made aware of an ongoing investigation they normally would confront their supervisor or someone in management to find out what is going on, and not to my knowledge Joe Reno did not attempt to do this prior to his interview.

On February 20th, I contacted Beth Sax and Mary Ann Polvinan, Corporate Headquarters to inform them that my investigation was not complete. And due to the fact that I was on vacation the following week, I pose the question on what they wanted to do with the case in the meantime. One of the options could be put Joe Reno on paid leave or leave Joe in place until I return from vacation.

On March 1st, I returned from vacation and was notified I believe from Mark Gooding who informed me that Joe Reno had been suspended pending the outcome of the investigation.

On March 17th, I came down to Mark Gooding's office and asked him the status of Joe Reno's employment at Delphi. Mark Gooding informed me that Jim Money was trying to contact Joe Reno to come in to talk to him. I then contacted Jim Money and asked if there was any assistance he needed from me. Jim Money then contacted me later, stated he met with Joe Reno and discharged him from his employment from Delphi. I did not have any other meetings or contacts with Corporate individuals to discuss the investigation since February 20th. I was not informed of any decision in regards to Joe Reno's employment.

I finished my investigation on March 9th, I did send a preliminary report to Jerry Koplin, Dennis DeLong, and Beth Sax.

U.S. Department of Labor
Occupational Safety and Health Administration
Page 3

WITNESS STATEMENT

I did send a final report to Mark Gooding, Debbie Fields, Marti Cristo(?), Dennis
DeLong, Jerry Koplin, Beth Sax, Mary Ann Polvinan, and possibly Beth Meyers.

I have conducted fraud cases against salary employees in the past which have resulted
in termination.

Attached is a final investigative report completed on March 9, 2004.

I have read and had the opportunity to correct this statement consisting of __3__ typed pages,
and these facts are true and correct to the best of my knowledge and belief. Public Law 91-596,
Paragraph 17(g) and 18 U.S.C. § 1001 make it a criminal offense to knowingly make a false
statement or misrepresentation in this statement. I understand that a violation of paragraph
17(g) of the Occupational Safety and Health Act is a criminal offense punishable by six (6)
months in a Federal Penitentiary, a $10,000. fine and/or a combination of both.  I understand
further that a violation of 18 U.S.C. 1001 is a criminal offense punishable by 5 years in a Federal
Penitentiary, a $10,000. fine and/or a combination of both.

Signature: _____   Date: _____

WITNESS:
Susan A. Schlemann, Investigator    SIGNATURE: _____

# EXHIBIT #4

1

1       IN THE UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF OHIO

3               WESTERN DIVISION

4                 *   *   *

5   JOSEPH RENO,

6               Plaintiff,

7       vs.                    CASE NO. 3:04CV321

8   DELPHI CORPORATION,

9               Defendant.

10                *   *   *

11      Deposition of TROY CALTON, Witness

12  herein, called by the Plaintiff for

13  cross-examination pursuant to the Rules of Civil

14  Procedure, taken before me, Alice F. Bush, a

15  Notary Public in and for the State of Ohio, at the

16  offices of Brad A. Chalker, 848C East Franklin

17  Street, Centerville, Ohio, on Tuesday, August 23,

18  2005, at 9:43 a.m.

19                *   *   *

20

21

22

23

24

25

**EXHIBIT**

4

88

| | | |
|---|---|---|
| 11:39:00 | 1 | want to spend the money on fixes? |
| 11:39:02 | 2 | MR. LEWIS:  Object to form. |
| 11:39:06 | 3 | MR. KNAPP:  Go ahead. |
| 11:39:07 | 4 | THE WITNESS:  He wanted to fix it and |
| 11:39:08 | 5 | they didn't, or -- |
| 11:39:10 | 6 | BY MR. CHALKER: |
| 11:39:10 | 7 | Q.   He and they? |
| 11:39:11 | 8 | A.   Joe Reno wanted to do -- fix the |
| 11:39:14 | 9 | whole tank and Mark Gooding wanted to fix just |
| 11:39:18 | 10 | part of it. |
| 11:39:19 | 11 | Q.   And when did you come to know |
| 11:39:23 | 12 | this? |
| 11:39:23 | 13 | A.   During that process of doing that |
| 11:39:31 | 14 | job. |
| 11:39:31 | 15 | Q.   While Joe was still there? |
| 11:39:33 | 16 | A.   Um-hum. |
| 11:39:33 | 17 | Q.   Yes? |
| 11:39:34 | 18 | A.   Yes.  I'm sorry. |
| 11:39:36 | 19 | Q.   Back to Exhibit 22, just a couple |
| 11:39:48 | 20 | of questions.  In several of these paragraphs |
| 11:39:52 | 21 | that Mr. Lewis asked you to adopt, there's an |
| 11:39:59 | 22 | indication in here that -- I'll read one of |
| 11:40:01 | 23 | them.  Troy stated that he was given the |
| 11:40:04 | 24 | receipt but still had not given the cash to |
| 11:40:07 | 25 | Onyx.  K |

95

11:46:14  1          A.    How do I know?  Just contractors

11:46:17  2   do things for people.

11:46:18  3          Q.    My question is did anybody tell

11:46:22  4   you -- anybody at Onyx, Joe Reno, anybody in

11:46:27  5   the entire world tell you that they intended --

11:46:31  6          A.    No.

11:46:31  7          Q.    Let me finish my question, okay?

11:46:33  8          A.    Oh, I'm sorry.

11:46:34  9          Q.    Did anybody ever tell you or

11:46:37  10  provide you any evidence, any reason, okay, to

11:46:40  11  believe that this box was ultimately going to

11:46:44  12  get billed to Delphi?

11:46:45  13         A.    Nobody told me that, no.

11:46:56  14              MR. CHALKER:  Let me just have a

11:46:57  15  quick question with Joe.

11:47:01  16              (Thereupon, a break was taken.)

11:47:15  17              MR. CHALKER:  That's all the

11:47:16  18  questions I have.  Thank you, sir.

11:47:17  19              FURTHER CROSS-EXAMINATION

11:47:20  20  BY MR. LEWIS:

11:47:20  21         Q.    I just have one quick question.

11:47:24  22  Mr. Chalker just asked you about discussions

11:47:27  23  about environmental issues or work that was

11:47:30  24  going to be done at the waste treatment plant.

11:47:33  25              Mr. Calton, you weren't present for

EXHIBIT #5

3/2/04

James P. Walle
Delphi World Headquarters
Legal-Environmental Staff
5725 Delphi Drive
Troy, MI 48098-2815

Dear Jim,

I am writing to inform you of a situation which currently exists at Kettering Operations.

Friday afternoon, 2/13/04, at the Chemical Treatment Plant (CTP) we discovered a leak at the base of one of our two 75,000g, steel construction, chrome treatment tanks. These two tanks are used to collect chromium wastewater from the platers in the plant. I've been the supervisor at this facility for over 20 years. These tanks receive chromium continually and there is no backup. Consequently, while many of our other tanks have been drained, cleaned, sandblasted, and recoated several times during the last 25 years, these tanks have been in continual service. Consequently, Friday afternoon we were faced with a decision, shutdown this tank, in turn idling most of Kettering Operations, our customers plants, send up to 1200 employees home, or find a way around this problem. After discussions with my 1st and 2nd shift Crown operators, Frebco plumbers, and Onyx personnel, I made the decision to have Frebco install temporary plumbing in order to empty and utilize a sludge storage tank as a replacement chrome treatment tank. This involved a plumbing bypass, temporary hosing and pumps, and additional man-hours for Crown, Onyx, and Frebco. The work was completed on Saturday thru Monday and we began using the bypass on Tuesday morning. Additional staffing during this period was required and should be maintained until repairs are completed. It was entirely my decision. My supervisor, Mark Gooding, does not involve himself in the day to day operations of the CTP, and has in fact visited the CTP once in the last 18 months prior to this tank failure. Mark has no background in environmental management, is not a CHMM, nor does he have any experience in wastewater treatment.

I informed Mark what was happening on Tuesday morning. My 1st and 2nd shift Crown operators have collectively 7 months experience between them. Being contract personnel, they could not take the responsibility to make this decision and implement this bypass. I believe the temporary bypass I designed, which is working successfully, has literally saved Delphi millions of dollars in lost revenue and wages, and that no one else had the experience and knowledge of the CTP to devise this bypass. We receive an average 100,000g of chromium wastewater per day containing a range of hexavalent chrome between 150 parts per million (ppm) to 5000 ppm. Since tanker trailers only hold 3000g, trucking 33 tankers per day to an offsite treatment facility, even if we could find one that could handle the volume (I don't believe one exists) was not an option. This bypass was our only option. We had riggers and tank inspection personnel in on Thursday and Friday to clean, grind and test the tank bottom where the failure occurred. The tank was originally coated with epoxy, and the coating on the bottom third of the tank is gone.



EXHIBIT
# 5

The failure occurred in two locations, at the radius where the wall and bottom join, on the southwest and northwest sides. The failure was due to tank corrosion since the original coating has failed. The second tank is most likely in the same condition. Mark visited with Jo Anne Rau at the treatment plant on Friday, 2/20/04. Repairs were scheduled to begin on Monday, 2/23/04, the first day of my suspension, which I will discuss later. I believe this suspension was a direct response to my insistence upon around the clock staffing during repairs, and more complete repairs, not a Band-Aid. Mark repeatedly questioned me this week as to why I needed 2 Onyx personnel to man the pumps, and additional Crown staffing. Mark was deliberately pressuring me to cheapen repairs below what was necessary and safe. He also insisted that we not recoat the entire inside of the tank but only the bottom third and those spots which were visibly damaged. Whether or not the second tank will be drained and inspected is an open question. Kettering Operations is losing money, and plans to exit the chrome plating business in approximately three years so there is a great deal of pressure to minimize repairs.

I need to emphasize again that these tanks have in operation for over 25 years, and there is likely coating failure and corrosion higher up the walls. There is every reason to believe that the second tank is in the exact same condition as the tank which failed since they have both been in uninterrupted, identical service for 25 years. These tanks contain hexavalent chromium. They are located approximately 150 feet west of Woodman Drive north of Dorothy Lane. Should we experience a catastrophic failure when the tank is full (the most likely time since that's when the bottom is subject to the most pressure) there would be no way to stop this liquid from rolling downhill towards Woodman Drive. There is a six foot high retaining wall around the tanks, but the tanks are 22 feet tall, and the retaining wall has construction joints in it, so it won't hold water anyway. Standing on top of the tanks, it is easy to see how the water would roll southeast and down to Woodman Drive and to the creek that borders Delphi on the south. A release of 75000g of untreated hexavalent chromium waste would cause significant soil and groundwater contamination. This is a significant risk to the corporation, to the neighborhoods of east Kettering, and to the area groundwater.

On Friday afternoon, 2/20/04, I was suspended with pay and benefits for the stated reason of an ongoing investigation concerning Onyx corporation, involving my rental of a trash gondola for yard waste from a recently purchased residence I was remodeling, and the inadvertent return of the box containing my trash to Kettering Operations by the driver. The Onyx driver was interviewed by the investigator and took full responsibility for returning the box to Delphi instead of the landfill. I had previously met with the investigator, on Monday 2/16/04, answered his questions truthfully, and supplied him signed statements from two witnesses regarding my conversation with the Onyx driver and the undisputed fact that I was paying in full for the disposal of this waste. Even though I had done nothing wrong, on the afternoon of 2/20/04, I was called to Mark's office and told that I was being suspended. Earlier that same day, Mark and I had disagreed on the course of the repairs to the damaged tank. He repeatedly questioned me as to why it was necessary to staff the treatment plant around the clock with Crown and Onyx personnel. My position was that this was an unprecedented situation, with pumps and hoses transferring hexavalent chromium to a tank not designed for this purpose with hoses running along the catwalks outside of any containment. Furthermore, we had not at that time completed any thickness testing on the tank walls and bottom to determine the overall condition of the tank

apart from the two known failures. Mark was insistent that we only repair the visible failures, and only recoat the portions of the tank where the coating was completely gone. I was in complete disagreement since this coating was 25 years old, and we had every reason to believe that additional coating failure and corrosion existed higher up on the tank wall, due to the presence of wall blisters and rust flaking on the tank mixing vanes. Mark stated that since Kettering Operations was going to exit the plating business in three to five years, we needed to reduce repair costs. The repairs were scheduled to begin on Monday morning, 2/23/04, simultaneous with the first day of my suspension. I have been informed that a co-workers, Jerry Lee, on Monday, 2/23/04, told the CTP plant personnel that he was now in charge, that Joe would not be returning, and that he was immediately reducing the staffing for this environmental hazard. Jerry's background is in facilities and he has no training or experience with wastewater treatment. Additionally, I am informed that the "quick fix" repairs ordered by Mark Gooding will be completed this week, and both tanks returned to normal service without any scheduled inspection or repairs to the second tank. This is a dangerous situation, and represents a significant ongoing liability to the corporation, our residential neighbors, and the soil and groundwater of the community.

The purpose of this correspondence is to advise Delphi (through your office) that:

1.  The subject chemical treatment plant tanks constitute a serious environmental threat and hazard to the environment, to the involved Delphi employees, and to the nearby residents;

2.  Delphi employee Mark Gooding is not qualified to deal with this environmental hazard, has intentionally cut the necessary staffing, and has disregarded the repairs necessary for full compliance with applicable health, safety, and environmental rules and regulations;

and,

3.  My own suspension from Delphi employment was initiated by Delphi employee Mark Gooding to facilitate his plan to circumvent and ignore applicable health, safety, and environmental rules and regulations.

Very truly yours,

Joseph Reno

EXHIBIT #6

Date: 2/4/04

To: Joe Reno

From : David Low

Joe , I have recollection of conversation between you and Troy Calton. Where Troy asked, "How do I bill this?" and you replied "I can pay for it." I do not know what the conversation was about. I also do not remember the date of this conservation. This conversation was in the WTP control room and I think Dave Atchison was also present.

Dave Low

EXHIBIT
# 6

February 4, 2004

In the lab, I heard a conversation between Joe Reno and Troy Calton. Joe talked to Troy about setting a box out at his new house for yard debris.

Troy said he didn't know how he'd bill for that. Joe said he would pay the tipping charge, whatever it was.

David K. Atchison

EXHIBIT #7

U.S. Department of Labor
Occupational Safety and Health Administration

WITNESS STATEMENT

Page 1

Case #5-1610-04-034

I, JoAnne C. Rau, am employed at Delphi Corporation, 2000 Forrer Blvd, Kettering, Ohio 45420 for 5 years.  Office telephone number, 937-455-7954.  My job classification is Environmental Site Coordinator.

I understand that this statement will be held in confidence until such time as I may be called to testify in a court or administrative proceeding, at which time it may be produced upon demand of opposing counsel.  Additionally, this statement may be made available to other agencies if it will assist them in the performance of their statutory functions.  Upon closing of the case, this statement may be subject to disclosure only in accordance with applicable statute(s) and agency policy.

Please initial here if you wish this statement to be held in confidence

*I hereby depose and say: (If appropriate) This interview is being conducted in the presence of Jeffery M. Peterson, Attorney , and I have no objections to his/her presence.*          (Initials)

I have known Joe Reno for approximately 10 years. I was a contractor working at Delphi before I was hired as a salaried employee with Delphi. I worked with Joe in the same office, but I didn't work directly with Joe.  My responsibilities are to oversee the environmental compliance on the Kettering Delphi facility.

On January 29th, Mike Wittman, Crown Solutions, approached me and stated that he had gone over to the wastewater treatment plant to manifest waste shipments, when he located a red roll-off box that belonged to Onyx. Mike had asked Troy Carlton, of Onyx if he (Mike) needed to fill out the paperwork for this box. Troy told him that the box was from Joe Reno's place, don't worry about it, he would take care of it. I asked Mike if he looked inside the box, and he had not. I sent Mike out to look in the box and see what was inside. Mike looked in the box, came back and stated that there was fencing, some yellow salt bags, and other debris inside the box. We approached Jerry Lee to look inside the box to verify whether or not the items could be Delphi waste. The contents didn't seem consistent with Delphi construction debris. I asked Jerry to take pictures of the contents of the box.  Jerry couldn't take pictures at that time, and took the pictures the following week. I never reviewed or received the pictures. The following week Mark Gooding talked to the Delphi investigator and then it was out of my hands (on the issue with the dumpster).



EXHIBIT
#7

DC 501

EXHIBIT #8

9-2004  02:58P FROM:





American Testing
Services, Ltd.

February 19, 2004

Delphi
M/C F-40
2000 Forrer Blvd.
P.O. Box 1042
Dayton, Ohio  45401-1042

We are pleased to quote the following inspection on Chromic Acid Tank at your facility.
Magnetic Particle Inspection of Ring and Lap Welds.  Digital Ultrasonic thickness of a
three foot grid on floor of tank and on the wall 3 feet up.

Not to exceed $ 3995.00

Thank you for giving American Testing Services, Ltd. the opportunity to provide these
services.  We look forward to working with you.

Respectfully Submitted.



EXHIBIT

#8

EXHIBIT #9

Field, Deborah J

| | |
|---|---|
| From: | Brown, Mike F |
| Sent: | Friday, February 20, 2004 11:42 AM |
| To: | Koplin, Jarriel A |
| Cc: | 'dennis.delong@securitasinc.com'; Gooding, Mark A; Polvinen, Mary Ann ; Field, Deborah J |
| Subject: | ONYX case |

Jerry,

The following new information will be added to my report. Attached is my original report for reference. At the end of this email please take note of the questions that I have.

Investigation:

On 2/16/04 I interviewed Joe Reno. Debbie Field was also present. I asked Joe to tell me the complete chronological order of events pertaining to the drop box. Joe stated that he asked Troy in late November or early December of 2003 to drop off a box at his new residence. He stated that he told Troy he would pay for it. Troy delivered the box shortly after the request. Joe stated that he filled the box with debris from renovations at his residence and had it filled before Dec 22nd. He states that he was present at his house on the 22nd since it was during Christmas shut down (Christmas shut down did not start until Dec.23rd) and that Troy picked up the box in the afternoon. He states that he did not know where the box went at that point and assumed it went to a landfill. Joe stated that he was not aware that the box was on Delphi property until late January when he says he was told that someone was taking pictures of it and understood an investigation was being conducted. At that point Joe produced two witness statements. One is from an hourly worker, David Atchison, and the other is from a contract worker from Crown, Dave Low. Both statements were written at the request of Joe and briefly state that they were present in the waste treatment control room during a conversation with Joe and Troy where Joe stated he would pay for the tipping fee for the box. Joe stated to me that he obtained these as evidence he was doing things right concerning the box. Joe states that he gave Troy $100 cash on Dec. 22nd and got the receipt from Troy on that date.

When asked if Joe has ever received any favors, gratuities, kickbacks or any other improper transactions from any contractors he stated that he has not. When asked to explain inconsistencies and gaps in his turnstile records, Joe stated that he visits different facilities and walks through the Gate #4 truck entrance at the Kettering facility and just flashes his badge to the guard to enter the plant. When asked how he exits the plant without swiping he stated that he asks for rides to his car from ONYX only on bad weather days. Joe was not asked any further questions regarding time records and did not volunteer any further explanation. The interview with Joe was terminated at that time.

On Wednesday 2/18/04 I re-interviewed ONYX employee Troy Calton. Mark Gooding was present during the interview along with Mike Webb and Tim Delph of ONYX. Calton stated that the information he gave me at the first interview was true. An hour later I concluded the interview. As we were leaving Troy asked me what would happen to him and I stated that as long as his story was true he had nothing to worry about. Mark Gooding and I were still down the hall talking when Webb, Delph and Calton approached us a second time and stated that Troy needed to talk to us again. We went back into a meeting room and resumed the interview. At this time Troy stated that I needed to hear some changes to his story. He stated the following additions/revisions to his original statement.

Troy stated that he was asked by Joe sometime in Aug or Sept 03 to deliver a drop box to Joe's house. Troy scheduled another driver to deliver the box and it was delivered. Troy stated that around the end of Sept or Oct Joe asked that the box be picked up since the box was digging into Joe's asphalt driveway from the heat. Troy does not remember the exact date but states that he and Joe left the Delphi site together in an ONYX truck to retrieve the box. They picked it up and returned it to the Kettering facility together and dropped it in the spot that it remains to this date. Troy stated that he knew the final disposal fee would be billed to Delphi. Troy stated that he did not record the date of the delivery since he assumed Joe would not be billed the usual $75/week storage fees due to Joe being a Delphi contact. He had scheduled the box to be picked up by an ONYX driver on a couple of different occasions but due to work loads it was not picked up prior this investigation and could not be picked up at that point. Troy states that Joe gave him the $100 cash the day they dropped the box at Delphi and that it was intended to be for Troy in return for doing Joe a favor. Troy never forwarded the money to ONYX. Troy was aware that this issue was being investigated on 1/30/04. He states that Joe came to him on either 2/2 or 2/3/04 and asked for a receipt for the $100 cash. Troy gave him one and picked 12/22/03 as the date on the receipt at random. Troy was aware of the statements Joe obtained from the two waste treatment plant employees. He states he had conversation with David Atchison who stated he lied in the statement to Joe and that Davis was not present

EXHIBIT
#9

DC 387

for the conversation as he stated. Troy also stated that another Crown employee, Terry Ruble, had told Troy he was asked by Joe to write a statement but would not do so since it would be untrue.

Troy still states that he drove Joe out of gate 4 in an ONYX truck daily and took Joe around to Joe's personal vehicle. Troy also states that he nor any other of the treatment plant workers see or talk to Joe in the afternoon. Troy states he does not know where Joe is or what he is doing. When asked about any gratuities given to Joe or anyone else at Delphi, Troy stated that he buys chicken every Wednesday for the treatment plant employees which amounts to approx. $30-$40.00. Joe is present for those lunches. He states that no other money, gifts or services are or have been paid.

At this point Troy stated that this is the complete and truthful account of the incident. I asked Troy, with assistance of Mike Webb, to write a complete statement of the events. I asked that it be completed by 1 pm on 2/19. Troy and Mike Webb agreed and we concluded the meeting.

On 2/19 I received a call from Troy stating he had not completed the statement as he had been very busy at work. I contacted Mike Webb and asked if there were any other reasons that the statement was not completed and he told me that there were not and that he and Troy would complete by Friday. I received a call on 2/20 from Mike Webb who stated that Troy was concerned that Delphi would take action against him and had contacted an attorney. Mike stated that Troy wanted a letter from Delphi stating that Delphi would not take action against him. I advised Mike Webb that I would get back to him.

No further action at this time.


Further investigation activity:

Interviews with David Atchison, Dave Low and Terry Ruble.

Second interview with Joe Reno.


Recommendations/Questions/Observations:

From my perspective we can go forward with the investigation without providing the letter requested by Troy Calton. With Mark Gooding, Mike Webb and Tim Delph as witnesses let the oral statements stand as is. We could also ask for Mike Webb and Tim Delph to provide statements as to what Troy said in the last interview.

If every one agrees we could do one of two things. Delphi could suspend Joe pending further investigation *or* do so after a second interview. It should be clear to everyone that Joe has violated several rules. I had hoped to conclude this investigation by this time. However due to the additional information and need for further interviews it will not be done today. I will be on a vacation next week that I cannot postpone. Please advise what the consensus is to go forward. I would like to a part of the pending action but if necessary Mark Gooding and Debbie Field know what I know and could go forward without my presence.

Mike brown



KettONYX0204.doc

DC 388

EXHIBIT #10

MHR-5-2004  08:57H FROM:                          TO:4559179          P:2/4



American Testing Services, Ltd.
3060 East River Road
Dayton, OH  45439

## On-Site Inspection Report

---

**Customer Information**

Pyramid Riggers                          Date:          2-20-04
2076 North Broad Street                  PO Number:
Fairborn,          Ohio    45324         Job Number:  ATS-MPF-471

**Item(s) to be Inspected:**
100% of welds on floor of chromic acid waste tank

**Inspection Method(s) to be Utilized:**
hand yoke S/N 1018 and 10517 dry red powder batch #038707-014

**Specification or Code:**
ASW D1.1 / no cracks allowed

**Results of Inspection:**
100% of welds on floor were inspected and were accepted at time of inspection.  There was one crack
located on the floor at the south end approx. 1.5" from outside wall and 2" west of the center weld.
Crack is approx. 15" long.  This tank is rejected.

Technician:  Jeff Adams Level III
Signature on File

---

EXHIBIT
#10

DC 417

# EXHIBIT #11

<u>AFFIDAVIT</u>

STATE OF OHIO                           )
                                        ) SS:
COUNTY OF MONTGOMERY                     )

DAVID K. ATCHISON, being first duly sworn, deposes and says as follows:

1.    I was employed by Delphi for thirty-five (35) years, and, as such, I have personal knowledge and I am otherwise competent to testify regarding the matters stated in this Affidavit.

2.    At all relevant times hereto, I was classified as a "728" employee, water treatment plant attendant, at Delphi's Chemical Treatment Plant (the "CTP") in Kettering, Ohio.

3.    In 2003, I witnessed and heard a conversation between Joe Reno and Troy Carlton, an Onyx Corp. employee. During this conversation, Joe Reno asked Troy Carlton to set an ONYX box at his new house in order to collect yard debris. Joe Reno agreed to pay ONYX the "tipping charge" for this box, which is determined upon the actual dumping of the box.

Further, the Affidavit sayeth naught.

_____
David K. Atchison

Sworn and subscribed before me this 1st day of September 2004.


_____
Rosemary Shannon
Notary Public

ROSEMARY SHANNON, Notary Public
In and for the State of Ohio
My Commission Expires Nov. 1, 2004

**EXHIBIT**
# 11

EXHIBIT #12

# DELPHI

March 4, 2004

Mr. Joseph Reno                                    *via FedEx*
7777 Cliffview Ct.
Centerville, OH 45459

Dear Joe,

This is to acknowledge that I received your March 2nd letter late yesterday afternoon. Thank you for bringing this matter to my attention, as I was unaware of the situation.

Be assured that Delphi is investigating this matter to determine the facts and to evaluate what course of action Delphi should take to ensure that the chrome treatment tanks maintain their structural integrity. As you know, Delphi is committed to complying with the law and protecting human health and the environment.

I understand that your employment status is under review and that you will be contacted as soon as possible in that regard.

Sincerely,

James P. Walle
James P. Walle
Delphi Legal Staff
Environmental Section

JPW/bb

EXHIBIT
#12

Delphi Legal Staff
World Headquarters and Customer Center
5725 Delphi Drive   Troy, Michigan   48098-2815   USA

# EXHIBIT #13

GLENN HOWARTH                                                    Page 1
September 28, 2005

1                      UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF OHIO

3                           WESTERN DIVISION

4

5    JOSEPH RENO,

6              Plaintiff,

7         vs.                        Case No. 3:04-CV-0321

8                                    Hon. Walter Herbert Rice

9    DELPHI CORPORATION,

10             Defendant.

11   _____            ORIGINAL

12

13

14        The Deposition of GLENN HOWARTH,

15        Taken at 30800 Telegraph Road, Suite 2925,

16        Bingham Farms, Michigan,

17        Commencing at 9:02 a.m.,

18        Wednesday, September 28, 2005,

19        Before Susan L. Law, CSR-3597.

20

21

22

23

24

25



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888



EXHIBIT
# 13

GLENN HOWARTH                                          Page 34
September 28, 2005

1        operation at its plant in Nodia, N-O-D-I-A, India?

2                    MR. LEWIS:  Object to form, foundation.

3    A.   I guess I'm not -- I do not know specifically, no.

4    BY MR. CHALKER:

5    Q.   Okay.  Do you know when Mr. Reno's employment with

6         Delphi Corporation was terminated?

7    A.   Yes, I do.

8    Q.   When was that?

9    A.   Based on Jeff Peterson's report to OSHA, I believe it

10        was March 17th.

11   Q.   2004?

12   A.   2004, yes.

13   Q.   Who made the ultimate decision to terminate Mr. Reno's

14        Delphi employment on March 17th, 2004?

15                   MR. LEWIS:  Object to form.  Go ahead.

16   A.   From what I recall, it was Beth Patrick and myself

17        and, I believe, Maryann Polvinen was probably also

18        involved with the discussion.

19   BY MR. CHALKER:

20   Q.   This was a joint decision between these folks you've

21        just said?

22   A.   I think it was a -- we had a -- we had a meeting to

23        discuss the situation, and Beth Patrick and myself

24        made the ultimate decision.

25   Q.   Okay.  At the time you participated in this decision



GLENN HOWARTH
September 28, 2005

1          to terminate Joe Reno's employment, were you aware --

2          well, based on your prior testimony I guess you were,

3          but let me just get this on the record.  Were you

4          aware of the letter that Joe Reno had sent to Attorney

5          Walle dated March 2nd of 2004?

6                    MR. LEWIS:  Object to form.

7     A.   Yes, I was aware of the letter.

8     BY MR. CHALKER:

9     Q.   You've referred on several occasions to Jeff

10         Peterson's letter.  Let me -- we're almost done.  Let

11         me show you what's been previously marked as

12         Plaintiff's Exhibit 23, and ask if this is the letter

13         without the attachments that you have been referring

14         to throughout your -- course of your deposition?

15    A.   Yes.

16    Q.   Okay.  Would you look at the last page of what's been

17         previously marked as Plaintiff's Exhibit 23 and note

18         the highlighted portion thereon.  I will represent to

19         you that the highlighting is mine, it was not on the

20         original document.  Do you see that?

21    A.   Yes, I do.

22    Q.   I'm going to read it and ask you so it's in the

23         record.

24                   "Complainant was terminated solely because

25              he entered into a private arrangement that



BIENENSTOCK
COURT REPORTING & VIDEO
248-644-8888

# EXHIBIT #14

ONYX INDUSTRIAL SERVICES INC.          Remit to    :   ONYX INDUSTRIAL SERVICES INC.
6151 EXECUTIVE BLVD                                     PO BOX 70610
HUBER HEIGHTS, OH 45424                                CHICAGO IL 60673-0610
                                                       ****PAYMENTS ONLY****


Invoice to:   RENO                    Invoice #   :   178121
JOE RENO                              Invoice Date:   Apr22/2004
7777                                  Onyx W.O. #  :   233860
CLIFTVIEW CT                          CONTRACT     :
CENTERVILLE OH                        RELEASE #    :
45459                                 LOCATION-    :
Ordered By:   JOE RENO                VENDOR       :
P.O. #   :                            PAY NET 30   :   TERMS
Work Desc :   TRANSPORT TO STONEY HOLLOW
-------------------------------------------------------------------------------------
  Date      Item #   Work Tkt Description        Qty      Unit Pr         Amount
-------------------------------------------------------------------------------------

Mar23/2004 0000330   008937  OPERATOR W/TRUCK    2.00        22.50          45.00
Mar23/2004 4000020   008937  DISPOSAL            1.00       348.32         348.32
                                                                        ----------
                             Sub-total (Work Ticket: 008937)               393.32

                                                                        ----------
                             Invoice Total                                 393.32

EXHIBIT
#14

# EXHIBIT #15

1

```
1           IN THE UNITED STATES DISTRICT COURT

2              FOR THE SOUTHERN DISTRICT OF OHIO

3                      WESTERN DIVISION

4                        *    *    *

5    JOSEPH RENO,

6                   Plaintiff,

7         vs.                    CASE NO. 3:04-CV-0321

8    DELPHI CORPORATION,

9                   Defendant.

10                       *    *    *

11           Deposition of MICHAEL F. BROWN, Witness

12   herein, called by the Plaintiff for

13   cross-examination pursuant to the Rules of Civil

14   Procedure, taken before me, Mary Jo Stevens, a

15   Notary Public in and for the State of Ohio, at the

16   offices of Brad A. Chalker, 953 Washington Woods

17   Drive, Centerville, Ohio, on Friday, the 8th day

18   of July, 2005, at 1:24 p.m.

19                       *    *    *

20

21

22

23

24

25
```

EXHIBIT

#15

17

13:45:11  1   and theft to workplace violence, just any kind

13:45:19  2   of assistance I can provide there.

13:45:21  3          Q.   How many Securitas employees are

13:45:27  4   at the same location as you are?

13:45:31  5          A.   I'm the only one with

13:45:32  6   investigations in this area.  There are

13:45:41  7   Securitas plant security at each Delphi

13:45:46  8   location, but I am not directly related to

13:45:50  9   plant security.

13:45:50  10         Q.   Do you have your own office?

13:45:52  11         A.   Yes.

13:45:53  12         Q.   And I take it that's on the

13:45:56  13  grounds of the Delphi plant there on Forrer?

13:45:59  14         A.   Yes, on Forrer Boulevard.  Yes.

13:46:01  15         Q.   Securitas is a separate standalone

13:46:06  16  company aside from Delphi, is it not?

13:46:08  17         A.   Yes.

13:46:09  18         Q.   And you are not employed directly

13:46:12  19  by Delphi, is that correct?

13:46:14  20         A.   That's correct.

13:46:14  21         Q.   Have you had any training in

13:46:27  22  conducting employee investigations?

13:46:33  23         A.   Nothing directly with employee

13:46:35  24  investigations, just investigations in general.

13:46:38  25         Q.   Not been to any of those seminars

30

14:02:51  1   it.  Would you read that out loud to us?

14:02:54  2           A.    On January 29th Mike Wittman,

14:02:58  3   Crown Solutions, approached me and stated that

14:02:59  4   he had gone over to the wastewater treatment

14:03:02  5   plant to manifest waste shipments when he

14:03:06  6   located a red roll off box that belonged to

14:03:11  7   Onyx.  Mike had asked Troy Carlton of Onyx if

14:03:16  8   he, Mike, needed to fill out the paperwork for

14:03:18  9   this box.  Troy told him that the box was from

14:03:21  10  Joe Reno's place, don't worry about it, he

14:03:25  11  would take care of it.

14:03:25  12          Q.    Sir, I've been through your file

14:03:28  13  very carefully and I just don't see anywhere in

14:03:31  14  your file reports these facts recorded by

14:03:36  15  JoAnne Rau in her OSHA statement, number one,

14:03:41  16  that before your investigation began that Troy

14:03:45  17  Carlton freely admitted that the contents of

14:03:49  18  the box came from Joe Reno, and, two, that Troy

14:03:53  19  Carlton acted to prevent Joe Reno's box from

14:03:55  20  being manifested as belonging to Delphi.

14:03:56  21  Here's my question.  Is it because these

14:04:00  22  reported facts by JoAnne Rau are favorable to

14:04:05  23  my client Joe Reno that they were left out of

14:04:08  24  your report?

14:04:09  25          MR. LEWIS:  Object to form.

31

14:04:11  1          THE WITNESS:  I wasn't aware of this

14:04:12  2   statement.  I wasn't aware of this information.

14:04:14  3          Q.   During the entire course of your

14:04:21  4   investigation these facts reported by JoAnne

14:04:26  5   Rau never came out?

14:04:27  6          A.   I never talked to JoAnne Rau.  I

14:04:29  7   did talk to Mike Wittman, but those facts were

14:04:33  8   not revealed to me.

14:04:33  9          Q.   That's a good point.  You did meet

14:04:36 10   with Mike Wittman on March 3rd of '04, correct?

14:04:41 11          A.   Probably in my investigative

14:04:43 12   report.

14:04:43 13          Q.   Feel free to --

14:04:45 14          A.   I'm sorry, what was the date that

14:04:47 15   you mentioned?

14:04:48 16          Q.   March 3rd, '04.

14:04:58 17          A.   Yes.

14:05:00 18          Q.   Okay.  And the reason you met with

14:05:03 19   Mike Wittman was an investigation of this box

14:05:06 20   that was found on Delphi property, right?

14:05:08 21          A.   Yes.

14:05:11 22          Q.   Now, are you saying here that

14:05:14 23   during the entire course of your interview with

14:05:16 24   Mike Wittman on March 3rd of '04, the fact that

14:05:20 25   he was the one who first discovered the box

32

14:05:23  1  never came up?

14:05:24  2              MR. LEWIS:  Object to form.

14:05:27  3              THE WITNESS:  You're correct, it did

14:05:28  4  not come up.

14:05:29  5         Q.  And it never came up that Troy

14:05:35  6  Carlton freely acknowledged that this box came

14:05:40  7  from Joe Reno's, that never came up, correct?

14:05:44  8         A.  It did in the interview with Troy.

14:05:46  9         Q.  I'm talking about the interview

14:05:48 10  with Mike Wittman?

14:05:50 11         A.  No, it did not.

14:05:52 12         Q.  And the fact that Troy Carlton

14:05:54 13  right from the get go took steps to keep Delphi

14:05:58 14  paperwork from being manifested on the Reno

14:06:01 15  box, did that fact come up during your

14:06:04 16  interview with Mike Wittman on March 3rd of

14:06:08 17  '04?

14:06:09 18              MR. LEWIS:  Object to form.

14:06:10 19              THE WITNESS:  That's correct.  It did

14:06:12 20  not.

14:06:26 21         Q.  Let's look at the second page of

14:06:29 22  your OSHA statement.

14:06:37 23         A.  On 26 or 21?

14:06:40 24         Q.  I think we'll just go with 26

14:06:43 25  because you have identified that as your final

37

| | | |
|---|---|---|
| 14:11:54 | 1 | Ruble and a second interview with Joe Reno? |
| 14:11:58 | 2 | A.   That's fair.   That's correct. |
| 14:12:03 | 3 | Q.   Was there anything else undone as |
| 14:12:08 | 4 | far as you know on February 20th, 2004 in |
| 14:12:11 | 5 | regard to your investigation? |
| 14:12:17 | 6 | A.   Not that I can recall. |
| 14:12:24 | 7 | Q.   Okay.   Now, according to your |
| 14:12:30 | 8 | notes, and feel free to refer to them, after |
| 14:12:37 | 9 | February 20th, 2004, you did interview Dave Low |
| 14:12:46 | 10 | and Terry Ruble, correct? |
| 14:12:51 | 11 | A.   Yes. |
| 14:12:52 | 12 | Q.   But as of March 17th, 2004, the |
| 14:12:57 | 13 | date that Mr. Reno was terminated by Delphi, |
| 14:13:02 | 14 | you had yet to do the interviews of David |
| 14:13:05 | 15 | Atchison and the second interview with Joe |
| 14:13:08 | 16 | Reno, correct? |
| 14:13:09 | 17 | A.   That's correct. |
| 14:13:09 | 18 | Q.   So it's fair to say that your |
| 14:13:11 | 19 | investigation was still incomplete as of |
| 14:13:14 | 20 | February 17th, 2004 due to the lack of |
| 14:13:19 | 21 | interviews that you had planned with David |
| 14:13:22 | 22 | Atchison and second interview with Joe Reno, |
| 14:13:26 | 23 | correct? |
| 14:13:26 | 24 | MR. LEWIS:   Object to form. |
| 14:13:28 | 25 | THE WITNESS:   Yes. |

40

14:16:54  1    Jerry Koplan.   There could have been people

14:16:57  2    that I had contact with.   So --

14:17:03  3           Q.    All right.   Let's assume that you

14:17:05  4    had contacts but didn't put them in your

14:17:09  5    report.

14:17:09  6           A.    That's very possible.

14:17:10  7           Q.    You didn't tell them between

14:17:14  8    February 20th and March 17th that you had

14:17:17  9    completed your investigation, did you?

14:17:21  10          A.    My report would have been

14:17:22  11   forwarded probably on March 9th to finalize it.

14:17:26  12          Q.    My question, sir --

14:17:31  13          A.    I'm sorry.

14:17:32  14          MR. LEWIS:   I think he should be able

14:17:34  15   to answer the question.

14:17:34  16          Q.    Are you done?

14:17:35  17          A.    Well, my report would have been

14:17:38  18   forwarded probably on the 9th to everybody that

14:17:41  19   got a copy of the report.

14:17:44  20          Q.    But my question was between

14:17:47  21   February 20th and March 17th, did you tell

14:17:53  22   anybody that you had completed your

14:17:56  23   investigation of Mr. Reno?

14:18:03  24          A.    No.

14:18:13  25          Q.    And the reason you hadn't

41

14:18:15  1   completed it is because you hadn't done the

14:18:18  2   second Joe Reno interview and you hadn't done

14:18:21  3   the Dave Atchison interview before Mr. Reno was

14:18:25  4   terminated on March 17th, correct?

14:18:28  5            MR. LEWIS:  Object to form.

14:18:29  6            THE WITNESS:  That's correct.

14:18:39  7        Q.   Why was Joe Reno's employment with

14:18:42  8   Delphi terminated?

14:18:44  9            MR. LEWIS:  Object to foundation.

14:18:47  10           THE WITNESS:  I really can't answer

14:18:49  11  that.  I wasn't part of that decision or

14:18:51  12  communication.

14:19:06  13       Q.   I need you to see if you can

14:19:18  14  identify what's been marked as Plaintiff's

14:19:20  15  Exhibit 22.

14:19:30  16       A.   This looks like my report up

14:19:34  17  until -- up through 3-5.

14:19:42  18       Q.   Is it an accurate copy?  I will

14:19:45  19  represent to you that I obtained this through

14:19:52  20  formal discovery through your attorney Mr.

14:19:55  21  Lewis and based on my representation do you

14:19:58  22  recognize this as a true and accurate copy of

14:20:00  23  your preliminary report, that evolving document

14:20:04  24  that ultimately ended up in the file and report

14:20:10  25  that you contained in your file?

49

14:33:49  1    You're saying that Mr. Reno's interview with

14:33:53  2    you where he gave facts different from what

14:33:57  3    Troy Carlton gave you, that's the sum total of

14:34:02  4    the evidence that you found that would show

14:34:07  5    that he interfered with the investigation?

14:34:09  6              MR. LEWIS:  Object to form.  Asked

14:34:12  7    and answered.

14:34:13  8              THE WITNESS:  Yes.

14:34:14  9        Q.    Now, Mr. Carlton, let's talk about

14:34:19  10   him for a second.  During the course of your

14:34:48  11   investigation you met with Troy Carlton three

14:34:53  12   times, correct?

14:34:54  13       A.    Yes.

14:34:54  14       Q.    And on multiple occasions you

14:34:58  15   asked him to provide you with a written

14:35:03  16   statement?

14:35:03  17       A.    At least one occasion, yes.

14:35:05  18       Q.    And he never did, is that correct?

14:35:08  19       A.    That's correct.

14:35:09  20       Q.    Now, as a trained investigator,

14:35:12  21   did his failure to provide you with the

14:35:19  22   statement you requested, did that raise any red

14:35:21  23   flag for you as a trained investigator as to

14:35:25  24   his credibility with respect to the statement

14:35:29  25   you received?

50

| | | |
|---|---|---|
| 14:35:30 | 1 | A.    No. |
| 14:35:30 | 2 | Q.    Now, he was a proven liar, |
| 14:35:36 | 3 | correct? |
| 14:35:36 | 4 | MR. LEWIS:  Object to form. |
| 14:35:38 | 5 | THE WITNESS:  You will have to be |
| 14:35:42 | 6 | specific on what you're referring to.  I don't |
| 14:35:46 | 7 | know -- |
| 14:35:46 | 8 | Q.    Well, he lied to you because the |
| 14:35:48 | 9 | first time you met with him he told one story |
| 14:35:50 | 10 | and then the second time he met with you he |
| 14:35:54 | 11 | told a different story, very different, |
| 14:35:57 | 12 | correct? |
| 14:35:57 | 13 | MR. LEWIS:  Object to form. |
| 14:36:01 | 14 | THE WITNESS:  I won't say it's a |
| 14:36:02 | 15 | different story.  He wasn't complete the first |
| 14:36:05 | 16 | time. |
| 14:36:05 | 17 | Q.    You won't say that the first story |
| 14:36:10 | 18 | was different from the second story, Mr. Brown? |
| 14:36:17 | 19 | A.    Well -- |
| 14:36:18 | 20 | Q.    Go ahead and refer to your notes. |
| 14:36:40 | 21 | A.    It wasn't the same facts as the |
| 14:36:42 | 22 | second interview. |
| 14:36:43 | 23 | Q.    Well, in the first interview he |
| 14:36:48 | 24 | exonerated Mr. Reno of any wrongdoing and in |
| 14:36:51 | 25 | the second interview he implicated Mr. Reno. |

EXHIBIT  #16

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF OHIO

3    WESTERN DIVISION

4    *    *    *

5    JOSEPH RENO,

6    Plaintiff,

7    vs.    CASE NO. 3:04CV321

8    DELPHI CORPORATION,

9    Defendant.

10    *.    *    *

11    Deposition of TERRY MITCHELL BROWN,

12    Witness herein, called by the Plaintiff for

13    cross-examination pursuant to the Rules of Civil

14    Procedure, taken before me, Alice F. Bush, a

15    Notary Public in and for the State of Ohio, at the

16    offices of Brad A. Chalker, 848C East Franklin

17    Street, Centerville, Ohio, on Tuesday, August 23,

18    2005, at 1:01 p.m.

19    *    *    *

20

21

22

23

24

25

EXHIBIT
#16

49

| | | |
|---|---|---|
| 14:08:10 | 1 | and it appears to have been there for months, |
| 14:08:13 | 2 | the hazardous waste is leaking through the |
| 14:08:15 | 3 | crack, gravity takes it down.  You don't have |
| 14:08:21 | 4 | any way of knowing how much hazardous waste |
| 14:08:25 | 5 | leaked through that crack and went down, do |
| 14:08:28 | 6 | you, sir? |
| 14:08:29 | 7 | MR. LEWIS:  Object to foundation. |
| 14:08:32 | 8 | MR. KNOTH:  Go ahead. |
| 14:08:33 | 9 | THE WITNESS:  That is correct. |
| 14:08:34 | 10 | BY MR. CHALKER: |
| 14:08:37 | 11 | Q.  And you don't think that a tank |
| 14:08:42 | 12 | that is rejected as this one was is an |
| 14:08:45 | 13 | insignificant problem, do you? |
| 14:08:46 | 14 | MR. LEWIS:  Object to foundation. |
| 14:08:48 | 15 | THE WITNESS:  I would not say it's |
| 14:08:56 | 16 | insignificant, the crack, after it was discovered. |
| 14:08:59 | 17 | BY MR. CHALKER: |
| 14:09:07 | 18 | Q.  Are you aware of any arguments, |
| 14:09:10 | 19 | dissension between Mark Gooding and Joe Reno |
| 14:09:14 | 20 | about repairs to the tank that had the fifteen |
| 14:09:19 | 21 | inch crack in it? |
| 14:09:20 | 22 | MR. LEWIS:  Object to form. |
| 14:09:22 | 23 | THE WITNESS:  I'm aware that Joe and |
| 14:09:27 | 24 | Mark disagreed on how to repair it. |
| 14:09:30 | 25 | BY MR. CHALKER: |

50

14:09:30  1          Q.   Okay.  Can you tell me what you

14:09:32  2  know about that?

14:09:36  3              MR. LEWIS:  Object to foundation.

14:09:37  4              THE WITNESS:  Joe wanted to repair

14:09:43  5  the entire tank, thinking that if this fifteen

14:09:46  6  inch crack or any crack was found in the tank,

14:09:51  7  likely there was other cracks that were bound to

14:09:56  8  develop or already underway of developing.

14:10:01  9  BY MR. CHALKER:

14:10:02 10          Q.   And what did Mr. Gooding want to

14:10:05 11  do?

14:10:05 12              MR. LEWIS:  Same objection.

14:10:13 13              THE WITNESS:  Mr. Gooding wanted to

14:10:15 14  repair the section of the tank that was determined

14:10:17 15  to be in need of repair.

14:10:19 16  BY MR. CHALKER:

14:10:19 17          Q.   And how was Mr. Gooding to

14:10:21 18  determine what section of the tank was in need

14:10:23 19  of repair?

14:10:25 20              MR. LEWIS:  Object to foundation.

14:10:27 21              THE WITNESS:  I would assume from the

14:10:28 22  on site inspection report.

14:10:30 23  BY MR. CHALKER:

14:10:31 24          Q.   Okay.  Were you aware that before

14:10:35 25  the inspectors got there to do their testing,

52

| | | |
|---|---|---|
| 14:12:00 | 1 | Q.    I guess then how do you know there |
| 14:12:02 | 2 | was actually any dispute between Gooding and |
| 14:12:05 | 3 | Reno? |
| 14:12:05 | 4 | A.    After the fact Joe and I discussed |
| 14:12:07 | 5 | the repair, and he told me that he disagreed |
| 14:12:10 | 6 | with the idea of only doing a portion of the |
| 14:12:13 | 7 | tank, felt like that it's only a matter of time |
| 14:12:17 | 8 | before the whole tank was developing, you know, |
| 14:12:22 | 9 | further leaks. |
| 14:12:25 | 10 | Q.    And this discussion with Joe Reno, |
| 14:12:27 | 11 | did that take place while he was still there at |
| 14:12:31 | 12 | Delphi as an active employee? |
| 14:12:35 | 13 | A.    Yes. |
| 14:12:36 | 14 | MR. CHALKER:  That's all the |
| 14:12:37 | 15 | questions I have.  Thank you, sir. |
| 14:12:39 | 16 | MR. LEWIS:  Thank you. |
| 14:12:44 | 17 | MR. KNOTH:  Mitch, do you want to |
| 14:12:46 | 18 | review the transcript and see if there's anything |
| 14:12:48 | 19 | you need to correct or you want to waive that? |
| 14:12:51 | 20 | It's up to you. |
| 14:12:52 | 21 | THE WITNESS:  I'll waive that. |
| 14:12:55 | 22 | (Thereupon, the deposition was |
| 14:12:57 | 23 | concluded at 2:12 p.m.) |
| | 24 | |
| | 25 | |

EXHIBIT  #17

# Economic Analysis in the Matter of Joseph Reno

Prepared by Ralph R. Frasca, Ph.D.
At the request of Brad A. Chalker, Esq.
August 5, 2004



EXHIBIT

17

I.    Personal Data on Mr. Joseph Reno

| | |
|---|---|
| Assumed Current Date | 9/1/2004 |
| Date of Birth | 9/8/1954 |
| Age at Assumed Current Date | 49.98 |
| Date of Termination | 3/17/2004 |
| Age at Date of Termination | 49.52 |
| Worklife Expectancy (WLE) at Date of Termination (years) | 15.21 |
| Remaining WLE at Assumed Current Date | 14.75 |
| Life Expectancy at Date of Injury | 28.80 |

Source for data on worklife expectancy: Gary Skoog & James Ciecka, "The Markov (Increment-Decrement) Model of Labor Force Activity," Journal of Legal Economics, vol. 11, no. 1, 2001.

Source for data on life expectancy:  Life Table Males & Females: United States, 2000, National Vital Statistics Reports, Vol. 51, No. 3, December 19, 2002.

II.    Historical Wage Loss

Mr. Reno was employed as a Senior Environmental Engineer at General Motors, Delphi Chassis Division from August 1981 to May 1998. He continued employment as Senior Environmental Engineer at Delphi Corporation from May 1998 to the date of his termination, March 17, 2004. Table I contains an estimate of lost back compensation from the date of termination to the assumed current date.

Table I
Lost Back Compensation

| Year | Historic Wages (1) | Projected Wage (2) | Wage Loss (3) |
|------|------|------|------|
| 2004 | $19,946 | $63,637 | $ 43,691 |
| 2003 | 93,980 | | |
| 2002 | 92,780 | | |
| 2001 | 90,576 | | |
| | | Fringe benefits (4) | 11,493 |
| | | Total lost compensation (5) | $ 55,184 |

Notes to Table I
(1)    Annual salary based on Delphi Compensation Statements 2001-2003. Wages for 2004 based upon estimated pro-rata share of annual compensation of $94,980 through date of termination.
(2)    Pro-rata share of annual salary from beginning of calendar year to assumed current date.
(3)    Projected wage less historic wage.
(4)    Fringe benefits are 26.3% of wages based upon "2001 Personal Compensation Summary" prepared for Mr. Reno by Delphi Automotive Systems.
(5)    Lost wages plus lost fringe benefits.

*Prepared by Ralph R. Frasca, Ph.D.*

2

III.    Lost Front Compensation

Lost front compensation includes lost compensation from the assumed current data to the date when the loss is completely mitigated or through the end of Mr. Reno's worklife. Table II presents the present value of the cumulative annual loss through the end of the expected worklife.

Table II
Cumulative Lost Front Compensation

| Year (1) | Annual Loss (2) | Cumulative Front Loss (3) | Cumulative Front plus Back Loss (4) |
|---|---|---|---|
| 2004 | $ 39,588 | $ 39,588 | $ 94,772 |
| 2005 | 117,612 | 157,201 | 212,384 |
| 2006 | 115,306 | 272,507 | 327,691 |
| 2007 | 113,045 | 385,552 | 440,736 |
| 2008 | 110,829 | 496,381 | 551,565 |
| 2009 | 108,656 | 605,037 | 660,221 |
| 2010 | 106,525 | 711,562 | 766,746 |
| 2011 | 104,436 | 815,998 | 871,182 |
| 2012 | 102,389 | 918,387 | 973,571 |
| 2013 | 100,381 | 1,018,768 | 1,073,952 |
| 2014 | 98,413 | 1,117,181 | 1,172,365 |
| 2015 | 96,483 | 1,213,664 | 1,268,848 |
| 2016 | 94,591 | 1,308,255 | 1,363,439 |
| 2017 | 92,737 | 1,400,992 | 1,456,176 |
| 2018 | 90,918 | 1,491,910 | 1,547,094 |
| 2019 | 32,980 | 1,524,890 | 1,580,074 |

Notes to Table II
(1) 2004 and 2019 are partial years.
(2) Annual base compensation equal to $94,980 in lost wages and $24,985 in lost fringe benefits. Annual loss is discounted to present value at net real discount rate of 2 percent per annum. Historical support for a net real discount rate of 2 percent is contained in the appendix.
(3) Loss from the assumed current date through the end of the indicated year.
(4) Loss in the column to the left plus back loss of $55,184

*Prepared by Ralph R. Frasca, Ph.D.*

3

The U.S. Bureau of Labor Statistics in the Occupational Outlook Handbook indicates that the, "Median annual earnings of environmental engineers were $61,410 in 2002. The middle 50 percent earned between $47,650 and $77,360. The lowest 10 percent earned less than $38,640, and the highest 10 percent earned more than $91,510." In 1992 Mr. Reno's wages were $92,780. This placed him in the top 10 percent of all environmental engineers. Table III indicates Mr. Reno's lost compensation given a reduction in future earnings to the indicated percentile for all environmental engineers.

Table III

Reduction in Wages as a Percentage of
Cumulative Future Compensation

| Historic wages 2002 | $92,780 | Cumulative compensation over remaining worklife (1) | $1,524,890 |
|---|---|---|---|
| Percentile of Environmental Engineers | Wages (2) | Percent reduction (3) | Relative lost front compensation (4) |
| 10% | $91,510 | 1.37% | $20,873 |
| 25% | 77,360 | 16.62% | 253,436 |
| 75% | 47,650 | 48.64% | 741,736 |
| 90% | 38,640 | 58.35% | 889,821 |

Notes to Table III
(1) See Table II
(2) Source for wages, Occupational Outlook Handbook, 2004-05 Edition.
(3) Percent reduction from $92,790.
(4) Percent reduction multiplied by cumulative compensation over worklife

Mr. Reno's position after termination is similar to that of a displaced worker. Numerous economic studies have documented the fact that displaced workers suffer significant and persistent wage loss. Furthermore, the losses rise with pre-displacement seniority. This has been explained by a loss of firm specific earnings potential and a scarlet letter effect. With a discretionary layoff the market infers that the laid-off worker is of low quality.

*Prepared by Ralph R. Frasca, Ph.D.*

A comprehensive review of labor market studies on displaced workers can be found in "Job Displacement" by Lori G. Kletzer, *The Journal of Economic Perspectives,* Vol. 12, No. 1 (Winter, 1998), 115-136. Among the many findings noted in the article are the following:

- Even after five or six years, quarterly earnings remain between $1,000 and $2,000 below expected levels. These losses equal approximately 25 percent of predisplacement earnings.
- ... earnings losses on the order of 17 to 25 percent for a sample of workers from durable goods manufacturing, relative to what displaced workers would have earned if they had not been displaced.
- The hourly earnings declines are also persistent: seven years after job loss, average hourly earnings are approximately 9 percent below expected levels, and similar sized losses are found at ten years after displacement.
- College educated young workers experience the largest relative earnings losses: about 25 percent in the fifth year following job loss.
- The evidence shows that displaced workers typically earned more in their previous job than they could have earned from other employers.
- ... each year of job tenure is associated with an additional earnings loss...

Given these empirical results, Table IV contains estimates of Mr. Reno's potential loss that range from a 9 percent reduction in earnings over approximately five years, which is the minimal documented loss, to a 25 percent reduction over approximately 10 years, which is as far as these studies reach. In Table V, back loss is combined with potential front compensation loss for estimates of total compensation loss.

Table IV
Range of Potential Front Compensation Loss

| Term (years) | 4.67 | 6.67 | 9.67 |
|---|---|---|---|
| Cumulative compensation (1) | $496,381 | $711,562 | $1,018,768 |
| Percentage loss | | | |
| 9% | $44,674 | $64,041 | $91,689 |
| 17% | 84,385 | 120,966 | 173,191 |
| 25% | 124,095 | 177,890 | 254,692 |

*Prepared by Ralph R. Frasca, Ph.D.*

5

Table V
Range of Total Compensation Loss
Back Compensation plus Front Compensation

| Term (years) | 4.67 | 6.67 | 9.67 |
|---|---|---|---|
| Cumulative compensation (1) | $551,565 | $766,746 | $1,073,952 |
| Percentage loss | | | |
| 9% | 99,858 | 119,224 | 146,873 |
| 17% | 139,569 | 176,149 | 228,374 |
| 25% | 179,279 | 233,074 | 309,876 |

Notes to Tables IV and V
(1) See Table II
(2) Combined value from Table II and Table I

Respectfully submitted by,

Ralph R. Frasca, Ph.D.

## Appendix on the Real Interest Rate and Real Discount Rate

The Supreme Court has determined that a real discount rate may be used to reduce future earnings to present value. See Jones & Laughlin Steel Corp. V. Pfeifer, 462 U.S. 523 (1983), 462 U.S. 523.

## Historic Data

| YEAR | T-BILLS 3-MONTH (1) | CPI PERCENT CHANGE (2) | ECI PERCENT CHANGE (3) |
|------|------|------|------|
| 1981 | 14.03 | 9.35 | 6.18 |
| 1982 | 10.69 | 5.80 | 5.23 |
| 1983 | 8.63 | 3.11 | 4.52 |
| 1984 | 9.58 | 4.14 | 3.89 |
| 1985 | 7.48 | 3.44 | 2.99 |
| 1986 | 5.98 | 1.82 | 3.32 |
| 1987 | 5.77 | 3.52 | 4.60 |
| 1988 | 6.67 | 3.97 | 4.49 |
| 1989 | 8.12 | 4.60 | 4.48 |
| 1990 | 7.51 | 5.13 | 4.20 |
| 1991 | 5.42 | 4.04 | 3.28 |
| 1992 | 3.45 | 2.92 | 3.28 |
| 1993 | 3.02 | 2.91 | 3.50 |
| 1994 | 4.29 | 2.50 | 3.07 |
| 1995 | 5.51 | 2.76 | 2.60 |
| 1996 | 5.02 | 2.87 | 2.83 |
| 1997 | 5.07 | 2.24 | 3.33 |
| 1998 | 4.81 | 1.53 | 3.29 |
| 1999 | 4.66 | 2.16 | 3.39 |
| 2000 | 5.66 | 3.25 | 4.24 |

Notes to above Table

1.  Federal Reserve Bank, Series H.15 Selected Interest Rates, Yields Per Annum, Auction Average on 3-Month Treasury Bills.
2.  U.S. Bureau of the Census, Consumer Price Indexes, All Items
3.  U.S. Bureau of Labor Statistics, Employment Cost Index for Private Industry Workers.

*Prepared by Ralph R. Frasca, Ph.D.*

### The Real Interest Rate and Real Discount Rate

| Period Years | Real Interest Rate (1) | Real Discount Rate (2) |
|---|---|---|
| 81-00 | 2.85 | 2.34 |
| 86-00 | 2.24 | 1.75 |
| 91-00 | 1.92 | 1.27 |

(1) $\left[\dfrac{1+\left(\text{Nominal Interest Rate}\right)}{1+\left(\text{Inflation Rate}\right)}\right]-1$

(2) $\left[\dfrac{1+\left(\text{Nominal Interest Rate}\right)}{1+\left(\text{ECI}\right)}\right]-1$

Graph of Annual Treasury Bill Rate and Annual Rate of Change in the CPI and the ECI



*Prepared by Ralph R. Frasca, Ph.D.*

8

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by DHL overnight delivery, postage prepaid, on this **28**ᵗʰ day of February to the following:

Skadden, Arps, Slate, Meagher & Flom LLP
333 W. Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 407-0700
John Wm. Hogan III
Albert L. Hogan III
John K. Lyons
Rone E. Meisler

      and

Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY 10036
(212) 735-3000
Kayalyn A. Marafioti
Thomas J. Matz

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession


_____
Brad A. Chalker