**Hearing Date And Time: March 22, 2007 at 10:00 a.m.**
**Objection Deadline: March 15, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

In re                      :      Chapter 11
                               :
DELPHI CORPORATION, et al.,    :      Case No. 05-44481 (RDD)
                               :
                               :      (Jointly Administered)
                               :
          Debtors.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. §§ 363(b), 365(a), AND 365(d) AND FED. R. BANKR. P. 6004 AND 6006 AUTHORIZING DEBTORS TO (A) ENTER INTO AND ASSIGN PURCHASE AGREEMENT, (B) ENTER INTO LEASE AGREEMENT, AND (C) REJECT CERTAIN UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY

("LEASE TRANSACTION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for an order under 11 U.S.C. §§ 363(b), 365(a), and

365(d) and Fed. R. Bankr. P. 6004 and 6006 authorizing, but not directing, Delphi Automotive

Systems LLC  ("DAS LLC") to (a) enter into and assign a purchase agreement, (b) enter into a

lease agreement and other necessary agreements to effectuate a lease transaction (the "Lease

Transaction"), and (c) reject two leases of nonresidential real property, all under the terms set

forth more fully below, and respectfully represent as follows:

Background

A.     The Chapter 11 Filings

              1.      On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered

orders directing the joint administration of the Debtors' chapter 11 cases.

              2.      No trustee or examiner has been appointed in the Debtors' cases.  On

October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an

official committee of equity holders.

              3.      This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are sections 363(b),

365(a), and 365(d) of the Bankruptcy Code and rules 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company") as

of December 31, 2006 had global net sales of approximately $26.4 billion and global assets of

approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from the

Bankruptcy Court.

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
       and its worldwide subsidiaries and affiliates.

3

based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which were charges related to the U.S. employee special attrition programs.

9.    The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[3]  Finally, the Debtors must devise a workable solution to their current pension situation.

12.    On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements.  The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment

---

[3]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

5

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred

and common equity in the reorganized Delphi to support the Debtors' transformation plan.  (The

Equity Purchase and Commitment Agreement is subject to the completion of due diligence,

satisfaction or waiver of numerous other conditions (including Delphi's achievement of

consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by

either Delphi or the Plan Investors of certain termination rights.)  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with the Plan

Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of

the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors

and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues,

and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements

with their U.S. labor unions and GM.

13.    On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  Although much remains to be accomplished

in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a

course that should lead to a consensual resolution with their U.S. labor unions and GM while

providing an acceptable financial recovery framework for the Debtors' stakeholders.

6

14.     Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

Relief Requested

15.     By this Motion, the Debtors seek entry of an order under sections 363(b),

365(a), and 365(d) of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006 authorizing,

but not directing, DAS LLC to (a) enter into agreements necessary to effectuate the Lease

Transaction and (b) reject two leases of nonresidential real property, all under the terms set forth

more fully below.  To effectuate the Lease Transaction, by this Motion the Debtors seek

authority to enter into and assign a purchase and sale agreement (the "Purchase Agreement"), a

lease (the "Lease"), an assignment agreement with respect to the Purchase Agreement (the

"Assignment Agreement"), a sublease (the "Sublease"), and an escrow agreement (the "Escrow

Agreement").[4]

Basis For Relief

16.     The Debtors are in the process of implementing their transformation plan.

As part of the plan, the Debtors are streamlining their operations to capitalize on their world-

class technology and market strengths.  Consistent with this plan, the Debtors have determined

that it would be strategically advantageous to consolidate multiple office and technical sites in

Michigan and Illinois into one new location in Michigan.  The goals behind this consolidation

---

[4]    Forms of the Purchase Agreement, Lease, Assignment Agreement, Sublease, and Escrow Agreement are
attached hereto as Exhibits A, B, C, D, and E, respectively.

7

are to reduce operating costs and create a single technical center in close proximity to the

Debtors' major customers, thus promoting the Debtors' image of technical capability.  The

Debtors further believe that such a consolidated facility will stimulate discussion and dialogue

among diverse groups and teams at Delphi, and that this dialogue will spark new innovation that

will enable the Debtors to gain an edge on competitors in the industry.  To that end, in the latter

part of 2006 the Debtors began searching for an appropriate facility that would allow the Debtors

to meet this objective.

> 17.    In October 2006, the Debtors located a site in Auburn Hills, Michigan (the

"Property") that would satisfy their needs.  The Property comprises approximately 347,000

square feet of office space and 90,000 square feet of lab space situated on approximately 35

acres.  Moreover, the Property will allow the Debtors to locate a single state-of-the-art technical

center closer to their major customers such as General Motors, Ford, DaimlerChrysler, and

Hyundai.

A.    The Terms Of The Purchase And The Lease

> 18.    Having located the Property that would meet their needs, the Debtors

proceeded simultaneously to negotiate a multiparty transaction pursuant to which the Property

would be acquired by a third-party investor and leased to DAS LLC.  Accordingly, DAS LLC

negotiated with the Property's current owner, Valeo Electrical Systems, Inc. ("Valeo"), to acquire

the Property, subject to this Court's approval, among other things, for the sum of $33 million (the

"Purchase Price").

> 19.    To test the market for investment in the Lease Transaction, over a period

of several months, the Debtors solicited offers from numerous parties requesting proposals to

purchase the Property and lease it to DAS LLC on an initial lease term of ten years.  The Debtors

then analyzed those offers based on a number of factors, including total rent per square foot, total

rent over the lease term, costs under the lease, effective base rent upon execution and in year ten

of the lease, and applicable broker fees.  After reviewing more than ten offers, the Debtors

determined that the best offer was presented by the Metcalf Family Trust ("Metcalf").

> 20.    The agreements that make up the Lease Transaction include the Purchase

Agreement, the Lease, the Assignment Agreement, the Sublease, and the Escrow Agreement.  To

effectuate the transaction, prior to filing this Motion DAS LLC executed the Purchase

Agreement and immediately assigned the Purchase Agreement to Metcalf under the Assignment

Agreement.  If Metcalf closes the transactions contemplated by the Purchase Agreement and

attains possession of the Property, the Lease from Metcalf to DAS LLC will commence.  For a

period of approximately five months following closing, Valeo will in turn sublease a portion of

the Property from DAS LLC while Valeo prepares to leave the building.  As security for

payment of the rent due under the Sublease, which could total $780,250, Valeo will deposit

$880,250 into escrow under the terms of the Escrow Agreement.  The Sublease rent payments

will then be periodically disbursed from the escrow account.

> 21.    The salient terms of the Purchase Agreement are as follows:[5]

> > (a)    <u>Property</u>.  Approximately 437,800 square feet of office and laboratory space located at 3000 University Drive, Auburn Hills, Michigan.
>
> > (b)    <u>Purchase Price</u>.  $33 million.
>
> > (c)    <u>Due Diligence Period</u>.  DAS LLC and Metcalf will have until April 6, 2007 to complete their due diligence of the Property and title (the "Due Diligence Period").  Prior to the expiration of the Due Diligence Period, and following Court approval, Metcalf is required to give written notice of its approval (the "Approval

---

[5]    To the extent this summary differs from the Purchase Agreement in any way, the provisions of the Purchase Agreement control.

9

Notice") of the Property to Valeo.  Under the terms of the Purchase Agreement and the Assignment Agreement, submission of the Approval Notice will be at Delphi's sole direction.

(d)     Deposit.  As the purchaser, within three business days of execution of the Purchase Agreement, Metcalf will deposit $825,000 with a title company (the "Initial Deposit").  Once Metcalf gives the Approval Notice, Metcalf will deposit an additional $825,000 with a title company (collectively with the "Initial Deposit," the "Deposit").  Once the Approval Notice is sent to Valeo, the Deposit will be non-refundable.

(e)     Condition To Closing.  The effectiveness of the Purchase Agreement is expressly conditioned upon Court approval.  Absent such relief, the Purchase Agreement will be null, void, and of no effect whatsoever and the Deposit will be refunded by Valeo.

(f)     Closing Date. April 30, 2007.

22.     The Assignment Agreement provides that Metcalf must accept the Property in its current condition and further provides that Metcalf affirms its acceptance of the terms of the Purchase Agreement.   The Assignment Agreement also provides that, if the Lease Transaction is terminated through DAS LLC's direction and through no fault of Metcalf, DAS LLC will compensate Metcalf for its actual and reasonable expenses, with such expenses not to exceed $50,000.[6]  Finally, Metcalf must also assign to DAS LLC its interest, if any, in any rents collected under the Sublease between DAS LLC and Valeo, as described below.

23.     The Lease provides for an initial term of ten years, with two optional additional terms of five years each.  The monthly base rental for the initial ten-year term is $268,125.00, or $7.35 per square foot, per annum.  After performing an extensive market analysis, DAS LLC believes that this rental rate is within market rates for similar property in similar locations.  Under the terms of the Lease, DAS LLC will also be responsible for all

---

[6]     For example, if DAS LLC determines to terminate the Lease Transaction based on its due diligence, then Metcalf would be entitled to its actual and reasonable expenses under the Assignment Agreement.

10

operating expenses and real estate taxes.  Accordingly, the effective cost per square foot,

including base rent and operating costs, is approximately $19.98 for the first year.

        24.     Under the Sublease, Valeo will sublet a portion of the Property from DAS

LLC while Valeo transitions out of the Property.  For the first 120 days following the effective

date of the Lease, Valeo will sublet 141,800 square feet from DAS LLC.  Prior to the end of the

succeeding 30 days, during which Valeo will sublet 57,000 square feet, Valeo will completely

depart from the Property and the Sublease will terminate by its terms.  The total rent for the

Sublease term amounts to $780,250.00, provided that Valeo does not elect to exit the Property

prior to the end of the Sublease.  The Sublease will thus enable DAS LLC to earn revenue from a

portion of the Property while DAS LLC is itself transitioning certain operations to the Property.

As mentioned above, as security for the rent due under the Sublease, and to protect DAS LLC

from any potential damages related to Valeo's subtenancy, Valeo will deposit the sum of

$880,250.00 into escrow under the terms of the Escrow Agreement.  The Purchase Agreement,

Lease, Assignment Agreement, Sublease, and Escrow Agreement were negotiated at arms length

and in good faith, and entry into these agreements as part of the Lease Transaction is in the best

interests of the Debtors' estates.

B.     The Consolidated Facilities

        25.     The size of the Property would enable the Debtors to consolidate in the

near-term six of their leased office and technical centers located in Michigan and Illinois and a

portion of one owned site located in Flint, Michigan. The facilities that would be moved to the

Property (or other Delphi facilities) and their current lease end dates (if applicable) are as

follows:

| City | State | Address | Current Lease End Date | Short Description |
|------|-------|---------|------------------------|------------------|
| Brighton | Michigan | 12501 East Grand River | June 30, 2008 | "Brighton" |
| Troy | Michigan | 1322 Rankin | Apr. 30, 2007 | "Rankin" |
| Troy | Michigan | 1441 Long Lake Road | Apr. 30, 2007[7] | "Long Lake" |
| Troy | Michigan | 1401 Crooks Road | Mar. 31, 2010 | "Crooks Road" |
| Shelby Township | Michigan | 51786 Shelby Parkway | July 31, 2010 | "Shelby" |
| Downers Grove | Illinois | 3110 Woodcreek Drive | Aug. 14, 2010 | "Downers Grove" |
| Flint | Michigan | 1601 North Averill Avenue | N/A | "Flint Technical Center" |

With respect to the Brighton, Rankin, and Long Lake facilities, the Debtors would vacate those facilities and complete the transition of the functions performed in those facilities to the Property by the end of the current lease terms for each of the facilities. With respect to the Crooks Road property, the Debtors would terminate the lease under its terms by exercising a negotiated termination provision in the lease. Upon six months' written notice, the Debtors would be required to pay one year of base rent under the lease. Some of the employees in the Flint Technical Center would move to the Property and the Flint Technical Center would await further disposition. The leases for the Shelby and Downers Grove facilities would be rejected as set forth more fully below.

---

[7] On February 27, 2007, the Debtors issued a notice of lease renewal for a nine-month extension or renewal of the Long Lake lease to January 31, 2008 under this Court's Order Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew Real Property Leases Without Further Court Approval entered on January 6, 2006 (the "Lease Procedures Order") (Docket No. 1777). Under the Lease Procedures Order, this renewal will be final and effective barring objections as of March 13, 2007.

C.        Rejection Of Certain Of The Leases

26.        As set forth above, to effectuate the Lease Transaction the Debtors will

reject their leases for the Shelby facility and the Downers Grove facility.[8]  As the Debtors sell or

wind-down their non-core businesses, they will only be using approximately 76 percent of their

office capacity at the Shelby facility and 33 percent of their office capacity at the Downers Grove

facility.  In conjunction with their financial and real estate advisors, the Debtors have also

determined that the Shelby Lease and the Downers Grove Lease cannot be profitably assumed

and assigned to a third party.  With both leases set to expire in 2010, the Debtors need to reject

the leases to avoid paying for excess capacity for the remainder of the lease terms.

27.        To transition out of these facilities seamlessly, the Debtors expect that

they will need until approximately September 30, 2007 to vacate the Shelby facility and

transition operations to the Property.  Similarly, the Debtors expect that they will need until

approximately November 30, 2007 to vacate the Downers Grove facility.  Accordingly, the

Debtors seek authority to reject the Shelby Lease effective as of September 30, 2007 and to

reject the Downers Grove Lease effective as of November 30, 2007.  Notwithstanding the

Debtors' belief that they will need the allotted time to vacate the Shelby and Downers Grove

premises, the Debtors will nonetheless endeavor to vacate the two premises more quickly.  To

avoid the cost and expense of seeking additional relief from this Court if the Debtors succeed in

this effort, the Debtors now also seek authority to reject the Shelby and Downers Grove Leases

effective as of August 31, 2007 and October 31, respectively, upon ten days' prior written notice

to the respective lessors of those premises.

---

[8]    The Shelby lease was originally dated May 9, 2000, as amended and assigned, between Shelby Industrial
Investors II LLC and Delphi (the "Shelby Lease").  The Downers Grove lease was originally dated January 31,
1991, as amended and assigned, between LaSalle National Bank, as Trustee Under Trust Agreement Dated
October 1, 1990, and Known as Trust Number 115987 and Delphi Mechatronic Systems, Inc. (the "Downers
Grove Lease").

D.        The Benefits Of The Lease Transaction

28.        The joinder of the seven facilities outlined above into one facility will

enable the Debtors to create a consolidated footprint in Southeast Michigan that is closer to key

customers.  The consolidation will also enable the Debtors to achieve efficiencies that will

reduce headcount by approximately 57 employees in the aggregate in the engineering,

information technology, and human resources departments.  Having a central and state-of-the-art

facility will help attract top talent as the Debtors emerge from bankruptcy.  The Debtors also

anticipate that a central facility will foster better communications among their employees, which

will lead to improved quality and increased innovation.  Having one central technology center

will thus facilitate the Debtors' efforts to focus on their world-class technology as outlined in the

transformation plan.

29.        Further, entry into the Lease Transaction will generate net savings of

approximately $123 million over ten years,[9] with one-time capital spending and expenses of

approximately $41 million over two years.  These savings will be largely achieved through

elimination of excess capacity at the consolidated facilities.  As the Debtors sell or wind-down

their non-core operations, many of the consolidated facilities will have underutilized capacity

that results in excess costs.  Entry into the Lease Transaction will enable the Debtors to

minimize and ultimately eliminate these costs while providing the site-specific benefits outlined

above.

---

[9]    This savings figure assumes approximately $9 million in state and local tax incentives that the Debtors expect to
receive in connection with the Lease Transaction.

14

Applicable Authority

A.    The Debtors Have Soundly Exercised Their Business Judgment

30.    Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

31.    The Second Circuit has held that, although the Bankruptcy Court sits as an

"overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . .

debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors

and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's

consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a

means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift

administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a

lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

32.    Once the debtor articulates a valid business justification, a presumption

arises that "in making a business decision the directors of a corporation acted on an informed

basis, in good faith and in the honest belief that the action was in the best interests of the

company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter,

"[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of

rebutting the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector

simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

33.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

34.    As set forth above, the Debtors have sound business justification for entering into the Lease Transaction at this time.   The consolidation of seven facilities into one site would provide efficiencies that will result in net savings of $123 million over 10 years,[10] against one-time capital spending and expenses of only $41 million over a two-year period. Having one consolidated state-of-the-art facility in Southeast Michigan will allow the Debtors to improve their image of technical capability, while increasing their proximity to their key customers.   Finally, the agreements underlying the Lease Transaction were negotiated at arms length and in good faith.

35.    The Debtors have also exercised sound business judgment in deciding to reject the Shelby Lease and the Downers Grove Lease.  Under the Debtors' consolidation plan, these facilities carry and will continue to carry excess capacity that creates an unnecessary burden on the Debtors' estates.  These two leases cannot be profitably assumed and assigned. Furthermore, this Court has already approved the Debtors' exercise of their business judgment in determining whether to reject leases by approving the lease rejection procedures outlined in its Order Under 11 U.S.C. §§ 365(a) and 554 and Fed. R. Bankr. P. 6006 Approving Procedures For

---

[10]    See Supra n. 9.

Rejecting Unexpired Real Property Leases and Authorizing Debtors to Abandon Certain

Furniture, Fixture, and Equipment (the "Lease Rejection Procedures Order"), entered January 6,

2006 (Docket No. 1776).  Under the Lease Rejection Procedures Order, upon service of a

Rejection Notice (as defined in the Lease Rejection Procedures Order), such a rejection will

become effective absent objection after ten calendar days.

           1.       The Debtors Have Shown Good Cause For Delayed Rejection Effective
                   Dates For The Shelby and Downers Grove Leases

      36.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to

the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor."  11 U.S.C. § 365(a).  The assumption or rejection of an executory contract or unexpired

lease by a debtor is subject to review under the business judgment standard.  See Orion Pictures

Corp. v. Showtime Network, Inc., 4 F.3d 1095, 1099 (2d Cir. 1993); In re The Penn Traffic Co.,

322 B.R. 63, 68 (Bankr. S.D.N.Y. 2005) (stating "[i]t is well established that the decision

whether to assume or reject an executory contract under section 365(a) is a matter of business

judgment to be exercised in the best interests of the debtor in possession and its creditors").

      37.     The business judgment standard is satisfied when a debtor determines that

rejection will benefit the estate.  See In re Child World, Inc., 142 B.R. 87, 89 (Bankr. S.D.N.Y.

1992); In re Ionosphere Clubs, Inc., 100 B.R. 670, 673 (Bankr. S.D.N.Y. 1989).  In applying this

standard, courts show great deference to a debtor's decision to reject an unexpired lease or

executory contract.  See In re G Survivor Corp., 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

      38.     The Debtors have satisfied the requirements described above.  This

Motion constitutes an application to reject the Shelby Lease and the Downers Grove Lease, and

the Debtors have shown that such rejection is necessary to allow the Debtors to transition out of

these facilities in an orderly manner.  On the other hand, the proposed delayed effective dates for

the rejection of these leases will not prejudice the lessors under these two leases, because the

lessors are now aware, months in advance, of a specific effective date for rejection.  To the

extent that the Debtors are able to accelerate the rejection effective dates, the affected lessors are

now aware of those accelerated dates as well, and the lessors will receive additional written

notice of accelerated rejection, if it is to occur, a full ten days in advance of such accelerated

dates.  Further, the Debtors will abide by the provisions of the Lease Rejection Procedures Order

that provide protection to lessors under rejected leases, including the lessor's ability to dispose of

abandoned property and the Debtors' obligation to pay rent until the effective date of the

rejection.   For these reasons, the Debtors request that the Court approve the rejection of the

Shelby Lease with an effective date of September 30, 2007 and the rejection of the Downers

Grove Lease with an effective date of November 30, 2007.  In the event the Debtors are able to

vacate these facilities earlier than anticipated, the Debtors further request the authority to reject

the Shelby Lease effective as of August 31, 2007 and the Downers Grove Lease effective as of

October 31, 2007, upon ten days' written notice to the respective lessors of those premises.  The

Debtors propose that the form of such earlier rejection notice be in the form required under the

Lease Rejection Procedures Order.

Conclusion

39.    The Debtors submit that the approval of the Lease Transaction, including

the approval of the Purchase Agreement, the Lease, the Assignment Agreement, the Sublease,

the Escrow Agreement, and the rejection of the Shelby Lease and the Downers Grove Lease are

in the best interests of the Debtors' estates and will maximize value for all creditors as described

above.

18

## Notice Of Motion

40.    Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

41.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order  (a)

authorizing, but not directing, Delphi to (i) enter into the agreements necessary to effectuate the

Lease Transaction, including the Purchase Agreement, the Lease, the Assignment Agreement,

the Sublease, and the Escrow Agreement, and (ii) reject the Shelby Lease and the Downers

Grove Lease upon the effective dates described herein, and (b) granting the Debtors such other

and further relief as is just.

Dated:        New York, New York
              March 2, 2007

                                    SKADDEN, ARPS, SLATE, MEAGHER
                                     & FLOM LLP


                                    By:    /s/ John Wm. Butler, Jr.
                                           John Wm. Butler, Jr. (JB 4711)
                                           John K. Lyons (JL 4951)
                                           Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700


                                                - and -


                                    By:    /s/ Kayalyn A. Marafioti
                                           Kayalyn A. Marafioti (KM 9632)
                                           Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                      Debtors and Debtors-in-Possession