# Exhibit A

## PURCHASE AND SALE AGREEMENT

### 3000 University Drive, Auburn Hills, Michigan

This Purchase and Sale Agreement (this "**Agreement**") dated as of March 2, 2007 (the "**Effective Date**"), is made by Valeo Electrical Systems, Inc. ("**Seller**") and Delphi Automotive Systems LLC ("**Buyer**").

### RECITALS

A.     Seller is the owner of certain real property consisting of approximately 437,800 square feet of building improvements located at 3000 University Drive, Auburn Hills, Michigan, such building being more particularly described below (the "**Property**").

B.     Seller and Buyer entered into that certain Expression of Interest Letter dated January 12, 2007 (the "**Letter**") by which Seller and Buyer agreed to negotiate the terms of a purchase and sale agreement for the sale of the Property to Buyer.

C.     On October 8, 2005, Delphi Corporation and certain of its U.S. affiliates, including Buyer, filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions for reorganization under the Bankruptcy Code (collectively, the "**Debtors**").  The Debtors continue to operate their business as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.

D.     Buyer desires to purchase the Property, subject to the terms and conditions set forth herein.

IN CONSIDERATION of the respective agreements hereinafter set forth, Seller and Buyer agree as follows:

1.     <u>Sale and Purchase of Property</u>.  Seller agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, subject to the terms and conditions set forth herein, the following:

(a)     that certain real property consisting of approximately 437,800 square feet of building improvements located at 3000 University Drive, Auburn Hills, Michigan (the "Property"), more particularly described in <u>Exhibit A</u> attached hereto (the "**Real Property**");

(b)     Seller's right, title and interest in any rights, privileges and easements appurtenant to the Real Property, including, without limitation, minerals, oil, gas and other hydrocarbon substances on and under the Real Property, development rights, air rights, water, water rights, riparian rights and water stock relating to the Real Property and rights-of-way or other appurtenances used in connection with the beneficial use and enjoyment of the Real Property (collectively, the "**Appurtenances**");

(c)    Seller's right, title and interest in the improvements and fixtures located on the Real Property, including, without limitation, all affixed equipment used in connection with the operation of the Real Property, and all on-site parking (collectively, the "**Improvements**"); and

(d)    Seller's right, title and interest, the personal property located in such building and described in <u>Exhibit B</u> attached hereto (the "**Personal Property**").

All of the items referred to in subparagraphs (a), (b), (c) and (d) above are collectively referred to as the "**Property**"; provided, however, that the Property shall not include Seller's signs upon the Real Property or the personal property listed on <u>Exhibit B</u>-1, attached hereto.

2.    Purchase Price.

(a)    The purchase price for the Property is Thirty Three Million Dollars ($33,000,000.00) (the "**Purchase Price**") and shall be paid as follows:

(i)    Within three (3) business days after execution of this Agreement by all parties hereto, Buyer will deposit with Lawyers Title Insurance Corporation (the "**Title Company**"), Eight Hundred Twenty Five Thousand Dollars ($825,000.00) which will be refundable to Buyer only if (a) Buyer does not timely approve in writing the Property (as defined below under "Due Diligence Period"), (b) any express condition of Seller's obligations under this Agreement failing to timely occur, (c) Seller defaults under this Agreement, or (d) the Bankruptcy Court does not approve the sale by April 6, 2007.  All interest earned on the Deposit shall become part of the Deposit.

(ii)    If prior to the end of the Due Diligence Period, Buyer gives written notice to Seller of its approval of the Property, Buyer will deposit an additional Eight Hundred Twenty Five Thousand Dollars ($825,000.00) into Escrow with Title Company.  Thereafter, the Initial Deposit, the Additional Deposit and interest thereon (collectively the "**Deposit**") will be non-refundable to Buyer except in the case of (a) a default by Seller under this Agreement, (b) any express condition of Seller's obligations under this Agreement failing to timely occur, or (c) the Bankruptcy Court does not approve the sale by April 6, 2007.

(iii)    The Title Company shall invest the Deposit in investments selected by Buyer and reasonably approved by Seller, which may include, without limitation, any certificates of deposit, savings or other accounts of any federally insured savings and loan association or bank, provided that no investment may have a maturity date later than the Closing or involve the risk of loss of principal. In the event the sale of the Property as contemplated hereunder is consummated, the Deposit shall be credited against the Purchase Price.

The balance of the Purchase Price, i.e., the Purchase Price, less the Deposit shall be paid to Seller through escrow in immediately available funds at the closing of the purchase and sale

contemplated hereunder (the "**Closing**").  The Closing shall be deemed to occur upon the delivery and recording of the Deed (as defined in Section 3(a) below).

(b)   (i)   Upon receipt of each of the Initial Deposit and the Additional Deposit, Title Company shall execute the Receipt of Escrow Agent in the form of <u>Exhibit C</u> hereto and deliver a copy thereof to each of Seller and Buyer.  The Deposit is to be held in escrow by Title Company until completion of the transaction described herein or as otherwise set forth herein.  Upon Title Company's receipt of each portion of the Deposit, Title Company shall promptly notify Seller in writing thereof.

(ii)   (A)   By executing this Agreement, Title Company shall be deemed to have accepted the terms of this Agreement and agreed to receive, hold and disburse the Deposit as herein provided.

(B)   Title Company shall not be liable for any action taken or omitted by it in good faith and believed by Title Company to be authorized or within the rights or powers conferred upon it by this Agreement, except for damages caused by gross negligence or willful misconduct of the Escrow Agent.

(C)   In the event that a dispute shall arise in connection with the Deposit, or as to the rights of any of the parties in and to, or the disposition of, the Deposit, Title Company shall have the right to (1) hold and retain all or any part of the Deposit until such dispute is settled or finally determined by litigation, arbitration or otherwise, or (2) deposit the Deposit in an appropriate court of law, following which Title Company shall thereby and thereafter be relieved from any liability or obligation under this Section 2(b), or (3) institute an action in interpleader or other similar action permitted by stakeholders in the State of Michigan or (4) interplead any of the parties in any action or proceeding which may be brought to determine the rights of the parties to the Deposit.

(D)   Title Company shall not have any liability or obligation for loss of all or any portion of the Deposit by reason of the insolvency or failure of the institution of depository with whom the Deposit is maintained.

3.   <u>Transfer of Title to the Property</u>.

(a)   At the Closing, Seller shall convey to Buyer title to the Real Property, the Appurtenances and the Improvements, by duly executed and acknowledged limited warranty or covenant deed in the form attached hereto as <u>Exhibit D</u> (the "**Deed**").  At the Closing, Seller shall convey title to the Property, subject to no liens, encumbrances, claims, demands, security interests, options, purchase agreements, mortgages, pledges, leases, conditional sales or other title retention agreements, exceptions, or restrictions of any kind or nature whatsoever (collective, "**Encumbrances**") other than the Permitted Encumbrances, as hereinafter defined. "Permitted Encumbrances" means any Encumbrances identified on the Title Commitment attached hereto as <u>Exhibit E</u> (the "Title Commitment") and shown on the Survey, and matters which arise subsequent to the date of the Title Commitment that are disclosed in writing to Buyer are not objected to by Buyer at least five (5) business days prior to the expiration of the Due

Diligence Period (in each case meeting all of the requirements of this Agreement applicable thereto). Evidence of delivery of title shall be the issuance by Title Company to Buyer of an ALTA owners title insurance policy for the Purchase Price on Title Company's current form insuring fee ownership of the Real Property in Buyer subject to the Permitted Exceptions and such exceptions as are approved or waived by Buyer pursuant to Section 4(c) herein, with the standard exceptions deleted and including the following endorsements: zoning, access, survey, flood plain certification and comprehensive (ALTA 9.2) (collectively, the "**Title Policy**").

(b)    At the Closing, Seller will execute a bill of sale in the form attached hereto as Exhibit F (the "**Bill of Sale**").

4.    Due Diligence Period.

(a)    Due Diligence Period.  Buyer shall have until 5:00 p.m. (Eastern Time) on April 6, 2007 (the "**Due Diligence Period**") to conduct its due diligence review with respect to the Property.

(b)    Due Diligence Deliveries.  Seller has delivered to Buyer copies of the following documents to the extent in Seller's possession ("**Due Diligence Documents**"):

(i)    An ALTA survey of the Property (the "**Survey**"),

(ii)    Environmental, engineering, soils and other physical reports pertaining to the Real Property and Improvements, if any.

(iii)    Any other agreements; contracts, documents; correspondence; tests; surveys; maps and any conditions to such maps; plans or other materials; right of way and easement agreements; bonds; permits; and entitlements.

(c)    Title Matters; Buyer's Objections; Seller's Right to Cure.  Seller has delivered to Buyer the Title Commitment and the Survey.  At least five (5) business days prior to the expiration of the Due Diligence Period, Buyer shall notify Seller in writing of any title matters which have arisen subsequent to the date of the Title Commitment that have been disclosed in writing to Buyer and to which Buyer objects (the "Title Exceptions"). If Buyer does not provide any such notification, Buyer shall be deemed to have approved all Title Exceptions. If Buyer timely provides notice of objections, Seller then shall have three (3) business days in which to notify Buyer whether Seller will remove any such Title Exceptions to which Buyer has objected. If Seller does not agree to remove such Title Exceptions to Buyer's satisfaction, Buyer shall have the option during the Due Diligence Period to waive such Title Exceptions to which Buyer has objected and proceed to Closing, or to terminate this Agreement on or before the end of the Due Diligence Period.

(d)    Buyer's Inspections.  After the date of this Agreement, Buyer and its authorized agents, consultants and contractors may enter upon the Property during reasonable business hours to make and perform evaluations, inspections and investigations of the condition of the Property upon reasonable notice to Seller.  Notwithstanding the foregoing, any environmental investigation shall be conducted only by an environmental consulting or engineering firm

4

approved by Seller in writing, which approval shall not be unreasonably withheld.  Buyer and its authorized agents, consultants and contractors shall provide evidence of commercial general liability insurance in amounts not less than Two Million Dollars ($2,000,000) per occurrence and shall name Seller as an additional insured.  In addition, any such environmental consultant or engineering firm shall provide evidence of environmental liability insurance and errors and omissions coverage in amounts not less than Two Million Dollars ($2,000,000) per occurrence and shall name Seller as an additional insured.  To the extent Buyer desires to conduct any invasive tests of the Property, Buyer shall do so only after providing to Seller written notice detailing the scope of work and describing the tests, procedures and proposed sampling locations and only upon receipt of Seller's consent thereto.  Buyer shall pay the costs of all inspections and shall repair any damage to the Property caused thereby.  Buyer shall indemnify, defend, protect and hold Seller harmless from any claims, liabilities, damages or expenses, including without limitation, reasonable attorneys' fees and costs, arising from or in connection with any and all construction liens and any and all damage to property or persons arising out of the inspections, other than any damages due to Seller's negligence or misconduct, which obligations of Buyer shall survive the termination of this Agreement, any provision of this Agreement to the contrary notwithstanding.  The provisions of this Section 4(d) shall only apply to any inspections by Buyer conducted after the date of this Agreement.  Any inspections by Buyer pursuant to this Section 4(d) shall be conducted in such a manner as to minimize inconvenience caused to Seller and interference with Seller's business operations in the Real Property.

(e)    Bankruptcy Court Approval.  In order for Buyer to consummate the transactions contemplated by this Agreement, Buyer must first obtain approval of such transactions and this Agreement as well as the contemplated assignment of this Agreement to the Metcalf Family Living Trust, or its affiliate ("Metcalf"), the Lease between Metcalf, as landlord, and Buyer or its affiliate, as tenant, and the sublease between Buyer, as sublessor, and Seller as sublessee, from the Bankruptcy Court.  Buyer shall use commercially reasonable efforts to file a motion with the Bankruptcy Court (the "Motion") in order to obtain a final and non-appealable order of the Bankruptcy Court approving this Agreement (the "Order") and will take all appropriate actions in Buyer's discretion to obtain the Order.  The proposed Order must be reasonably acceptable to Buyer and Seller.  It is a condition precedent to this Agreement that Buyer obtain the Order prior to the expiration of the Due Diligence Period.  If the Motion is not approved by the Bankruptcy Court, this Agreement shall be null, void and of no effect whatsoever and the Deposit shall be refunded to the Buyer.

(f)    Expiration of Due Diligence Period.  Buyer shall have until expiration of the Due Diligence Period to deliver notice to Seller and Title Company that Buyer has approved its due diligence evaluation of the Property (the "Approval Notice"), which Buyer may approve or disapprove in its sole and absolute discretion.  During the Due Diligence Period, Buyer may send a notice terminating this Agreement because, based on the results of its due diligence evaluation of the Property, Buyer elects not to purchase the Property ("Termination Notice").  Notwithstanding anything herein contained to the contrary, Buyer shall not give the Approval Notice unless it has obtained the Order prior to such Approval Notice.  However, Buyer may send the Termination Notice at any time during the Due Diligence Period.  If Buyer does not deliver the Approval Notice to Seller before the end of the Due Diligence Period, Buyer shall be deemed to have elected to terminate this Agreement.  If Buyer elects, or is deemed to have

elected, to terminate this Agreement in accordance with this Section 4(f), Seller shall cause the Title Company to return the Deposit plus interest accrued thereon to Buyer, and neither party shall have any rights or obligations hereunder (except to the extent otherwise provided herein). If Buyer timely gives the Approval Notice (and has theretofore obtained the Order), this Agreement shall continue in effect and the Deposit shall be deemed nonrefundable to Buyer.

5.    Conditions to Closing.

(a)    The following conditions are precedent to Buyer's obligation to purchase the Property (the "**Buyer's Conditions**"):

(i)    Title Insurance.  Title Company shall have issued or shall have unconditionally and irrevocably committed to issue the Title Policy.

(ii)    Representations, Warranties and Covenants.  Seller shall have performed each covenant required to be performed by Seller under this Agreement and Seller's representations and warranties set forth in this Agreement shall be materially true and correct as of the Closing.

(iii)    Sublease.  Seller shall have executed the Sublease in the form of Exhibit G hereto (the "**Sublease"**).

(iv)    Bankruptcy Court Approval.  The Bankruptcy Court shall have entered a final, nonappealable order approving this Agreement, the Assignment Agreement, the Lease and the Sublease (collectively the "**Transaction"**).

(v)    Seller's Work.  Seller has completed the Seller's Work, including delivery of the Remediation Certification required under Section 12(c).

Buyer's Conditions are intended solely for the benefit of Buyer.  If any of Buyer's Conditions is not timely satisfied for any reason other than Buyer's default hereunder, Buyer shall have the right in its sole discretion to either (i) waive in writing such Buyer's Condition (other than the condition in Section 5(a)(iv)) and proceed with the Closing, or (ii) terminate this Agreement, in which event the Deposit shall be returned to Buyer and neither party shall have further obligations under this Agreement (other than obligations which by their terms survive such a termination); provided however that if Seller is in default, Buyer shall retain its remedies against Seller as provided in Section 6(b) below.  Buyer cannot waive the Condition in Section 5(a)(iv).

(b)    The following conditions are precedent to Seller's obligation to sell the Property (the "**Seller's Conditions**"):

(i)    Deposit of Funds.  Buyer shall have deposited the Purchase Price into escrow, and such other funds as may be required pursuant to Section 7(f) and any other provisions of this Agreement.

(ii)     <u>Deliveries Complete</u>.  Buyer shall have delivered to Title Company the documents listed in Section 7(d) of this Agreement.

(iii)     <u>Representations, Warranties and Covenants</u>.  Buyer shall have performed each and every covenant required to be performed by Buyer under this Agreement and all of Buyer's representations and warranties set forth in this Agreement shall be true and correct as of the Closing.

(iv)     <u>Sublease</u>.  Buyer shall have executed and delivered and caused Metcalf to execute and deliver the Sublease.

Seller's Conditions are intended solely for the benefit of Seller. If any of Seller's Conditions is not satisfied, Seller shall have the right in its sole discretion either to (i) waive in writing the Seller's Condition and proceed with the sale, or (ii) terminate this Agreement; in which event the Deposit shall be returned to Buyer and neither party shall have further obligations under this Agreement (other than obligations which by their terms survive such a termination); provided however that if Buyer is in default, Seller shall retain the Deposit as liquidated damages, as provided in Section 6(a) below.

6.     <u>Remedies</u>.

(a)     If the sale of the Property is not consummated because of a breach or default under this agreement by Buyer, the Deposit and interest accrued thereon shall be paid to and retained by Seller as liquidated damages and as Seller's sole remedy for such breach or default. By initialing below, the parties have agreed that Seller's actual damages in the event of a failure to consummate this sale due to Buyer's default would be extremely difficult or impracticable to determine.  After negotiation, the parties have agreed that, considering all the circumstances existing on the date of this Agreement, the amount of the deposit is a reasonable estimate of the damages that Seller would incur in such event.  The payment and retention of such amount as liquidated damages is not intended as a forfeiture or penalty, but is intended to constitute liquidated damages to Seller.  Seller waives all right to seek other rights or remedies against buyer, including without limitation, specific performance.  However, nothing in this Section shall preclude the recovery of attorneys' fees or other costs incurred by Seller in enforcing this agreement or limit the effectiveness of the indemnification obligations of Buyer under this agreement.

(b)     If the sale of the Property is not consummated because of a breach or default under this Agreement by Seller, Buyer may, as Buyer's sole and exclusive remedy exercise one, and only one, of the following: (i) terminate this Agreement by delivery of notice of termination to Seller, whereupon the Deposit shall be returned to Buyer and Seller shall reimburse Buyer and Metcalf for actual out-of-pocket expenses incurred in connection with the transaction contemplated hereunder, but in no event shall such reimbursement exceed Seventy-Five Thousand Dollars ($75,000) and all parties hereto shall be relieved of all further obligations hereunder (other than obligations which by their terms survive such a termination); or (ii) close and waive the default; or (iii) commence an action for specific performance.

7.      <u>Closing and Escrow</u>.

(a)      Upon mutual execution of this Agreement, the parties shall deposit an executed counterpart of this Agreement with Title Company as instructions to Title Company as the escrow holder for consummation of the purchase and sale contemplated hereby.  Seller and Buyer each agrees to execute such additional escrow instructions as may be reasonably appropriate, or reasonably required by Title Company, to enable Title Company, as escrow holder to comply with this Agreement; provided that in the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions, the terms of this Agreement shall control.

(b)      The Closing hereunder shall be held and delivery of all items to be made at the Closing shall be made at the offices of Title Company at 10 a.m. (Eastern Time) on April 30, 2007.  The date so established for Closing is referred to herein as the "**Closing Date**".

(c)      At the Closing, subject only to the Sublease, Seller shall deliver to Buyer exclusive possession of the Property, and the Property in good broom clean condition, with all of Seller's personal property removed.

(d)      At or before the Closing, Seller shall deliver to Buyer, or to Title Company as escrow holder, the following:

(i)      a duly executed and acknowledged Deed in the form of <u>Exhibit D</u> hereto;

(ii)      a duly executed Bill of Sale in the form of <u>Exhibit F</u> hereto;

(iii)      three (3) duly executed copies of the Sublease in the form of <u>Exhibit G</u> hereto;

(iv)      three (3) duly executed copies of the Escrow Agreement in the form of <u>Exhibit H</u> hereto (the "Escrow Agreement");

(v)      any other instruments or records called for hereunder which have not previously been delivered, and keys to all doors to the Improvements which are in Seller's or its agents' possession; and

(vi)      an affidavit pursuant to Section 1445(b)(2) of the United States Internal Revenue Code (the "**Code**") and on which Buyer is entitled to rely, that Seller is not a "foreign person" within the meaning of Section 1445(f)(3) of the Code, substantially in the form of <u>Exhibit I</u> attached hereto.

Buyer may waive compliance on Seller's part under any of the foregoing items by an instrument in writing.

(e)      At or before Closing, Buyer shall deliver to Seller, or to Title Company as escrow holder, the following:

(i)        three (3) duly executed copies of the Sublease duly executed by Metcalf in the form of <u>Exhibit F</u> hereto;

(ii)        three (3) duly executed copies of the Escrow Agreement; and

(iii)        the Purchase Price as adjusted for prorations and costs as provided herein.

(f)        Seller and Buyer shall each deposit such other instruments as are reasonably required by the escrow holder or otherwise required to close the escrow and consummate the purchase and sale of the Property in accordance with the terms hereof.

(g)        The following are to be apportioned as of the Closing Date:

(i)        <u>Utility Charges</u>.  Seller shall pay all such charges for utilities used through the date prior to the Closing Date. Buyer will pay to Seller at Closing the amount of any utility deposit(s) made by Seller, and Seller will assign to Buyer all of its right, title and interest in and to the applicable deposit(s) relating thereto. Buyer will be responsible for the cost of all utilities used on or after the Closing Date.  Seller will pay all utility bills Seller has received prior to the Closing and will provide proof of payment of such utility bills prior to the Closing.

(ii)        <u>Other Apportionments; Closing Costs</u>.  Seller shall pay the premium for the Title Policy and any real estate transfer taxes.  Seller and Buyer shall equally split the escrow fees and all other costs incurred in connection with the transaction contemplated by this Agreement, as reasonably determined by Title Company.

(iii)        <u>Real Estate Taxes and Assessments</u>.  General real estate taxes and installment payments on assessments payable for all tax years ending prior to the Closing Date, and any supplemental or special tax assessments which are specific to the Seller and other real estate assessments which are relating to the period of time prior to the Closing, or due and payable as a result of the sale of the Property will be paid by Seller; provided however, Seller will not pay any increase in the real estate taxes as a result of the sale of the Property (uncapping).  General real estate taxes and the current installment payments on all assessments payable for the tax year in which the Closing Date occurs will be prorated by Title Company on a due date basis and allocated between Seller and Buyer as of the Closing Date.

(iv)        <u>Closing Statement</u>.  Title Company shall prepare a preliminary Closing settlement statement and shall deliver such statement to Buyer and Seller for approval no less than three (3) days prior to the Closing Date.

(v)        <u>Post-Closing Reconciliation</u>.  Seller and Buyer agree that if any of the foregoing prorations cannot be calculated accurately as of the Closing Date, then the same shall be estimated (based on current information then known) for

9

the purposes of Closing and within ninety (90) days after the Closing Date, or sooner if sufficient information is available to permit the parties to effectively calculate such prorations, either party owing the other party a sum of money based on such subsequent prorations shall pay such sum to the other party within ten (10) days after such calculations.

(vi)    <u>Survival</u>.  The provisions of this Section 7(f) shall survive the Closing.

8.    <u>Representations and Warranties and Limited Indemnity of Seller</u>.    Seller represents and warrants to Buyer as follows, which representations and warranties shall be true as of the date of this Agreement and as of the Closing:

(a)    Seller has full power and authority to enter into and perform the terms of this Agreement;

(b)    This Agreement is duly authorized and executed by Seller, and this Agreement and all documents required to be executed by Seller in connection herewith, are and shall be valid, legally binding obligations of Seller, enforceable in accordance with their terms;

(c)    Seller has no Knowledge and has not received written notice from any city, county, state or federal authority with jurisdiction ("Governmental Entity") of any order or directive that any work of repair, maintenance, or improvement be performed on the Property, which has not been performed;

(d)    Subject to the approval of the Transaction by the Bankruptcy Court, Seller has received no written notice and has no Knowledge that any action, proceeding or investigation is pending or threatened against Seller relating to the Property, before any court or governmental department, commission, board, agency or instrumentality that would affect its ability to carry out its obligations under this Agreement;

(e)    Seller is not a "foreign person" as that term is defined in Section 1445(f) of the Code and any similar provisions of applicable state law, and the regulations issued thereunder;

(f)    There are no management, service, maintenance, utility or other contracts or agreements affecting the Property, oral or written, which extend beyond the Closing Date and which would bind Buyer or encumber the Property after Closing;

(g)    Seller has received no writing from a Governmental Entity that there may be or are contemplated any condemnation proceedings against the whole or any part of the Property;

(h)    On the date hereof and as of the Closing Date, the Property is not encumbered by any mortgage or deed of trust.  Any existing encumbrances upon the Property which Seller is required to remove under this Agreement shall be paid and discharged prior to the Closing Date;

(i)       There is no litigation pending, or to Seller's Knowledge threatened, which affects title to, or possession of, the Property.  Seller will inform Buyer immediately upon the notice of the institution of any such litigation;

(j)       There are no written or oral leases or license agreements in effect with respect to the Property that will be in effect on the Closing Date and no person other than Seller will be in possession, entitled to or claims entitlement to possession of the Property on the Closing Date and Seller shall deliver exclusive possession of the Property to Buyer on the Closing Date, subject to the Sublease;

(k)       Seller has received no notice from any Governmental Entity and has no Knowledge of any violations concerning the condition and/or use of the Property which have not heretofore been corrected by Seller.  Seller shall correct, at its own cost and expense, any violations of law, ordinances, order or requirements of any Governmental Entities affecting the Property of which it has been notified or Ronald Floyd, Facilities Manager of Seller has actual knowledge without inquiry as of the Closing Date, which assumption of cost and liability shall survive the Closing Date;

(l)       Except for the existing underground water tank, Seller has received no written or official notice and has no Knowledge that any tanks, drums, toxic or hazardous materials (which are regulated by a state or federal environmental law ("Hazardous Material") are located on, in or under the Property or that Seller is in violation or alleged to be in violation of any state or federal environmental laws with respect to the Property;

(m)       With respect to the Property, Seller has received Buyer's phase I environmental site assessment dated March 2007, which identified two certain recognized environmental conditions as defined under the ASTM Standard E1527-05:  the existence of (i) an oil/water separator, and (ii) below grade hydraulic lifts; Seller has received no written or official notice of and has no Knowledge that there has been a release of a Hazardous Material into the soils or water or groundwater of the Property in connection with (i) or (ii) above.

(n)       (i)       Seller has received the report prepared for Buyer by Enviroair Consultants, Inc., dated February 20, 2007 for Project No. 070219-DCM1 (the "Enviroair Report").

(ii)       With respect to the identification, evaluation and remediation of damage to the Property from entry of water, fungus, mold or mold spores ("Water Damage"), Seller has provided to Buyer third party consultant and contractor reports in Seller's possession or in the possession of Seller's consultants, advisors, agents or attorneys (save attorney-client privileged documents) relating to Water Damage, and has granted Buyer access to all documents in Seller's possession related to Water Damage to Seller's Knowledge, and has given Buyer the opportunity to make copies of such documents.

(iii)       (A) Seller has received no written or official notice from a Governmental Entity other than as disclosed to Buyer and (B) other than information given by Seller to Buyer or access to which was granted by Seller to Buyer and as provided in the

Enviroair Report, Seller has no Knowledge of any such Water Damage to the Property which has not been repaired or which will not be repaired as "Seller's Slab Work" in accordance with the recommendations set forth in the consultants' reports set forth on Exhibit J hereto.  Except for the Seller's Slab Work, Seller has completed all of the recommendations set forth in the consultants' reports set forth on <u>Exhibit J</u> hereto.

(o)     Seller will promptly inform Buyer in writing of any material event adversely affecting the ownership, use, occupancy, operation or maintenance of the Property of which Seller has Knowledge.

For the purposes of this Agreement, Seller's Knowledge means the actual knowledge or knowledge a person would reasonably be expected to have based on reasonable investigation of Ronald Floyd, Facilities Manager of Seller.  If Buyer makes any claim for a breach of the foregoing representations and warranties based upon a breach of Seller's Knowledge then the Buyer bears the burden of proof to demonstrate Seller's Knowledge.

In the event any of the foregoing representations or warranties of the Seller are not true on the date hereof or on the Closing Date, Seller shall be considered in default and Purchaser, in addition to its other rights herein, shall have the right to waive the same and proceed to consummate the transaction contemplated herein, or to declare this Agreement null and void and thereby be entitled to an immediate refund of the Deposit.  The representations, warranties, and covenants set forth herein, as applicable, shall survive the Closing Date for a period of eighteen (18) months subsequent to which the same shall be null and void.

9.     <u>Representations and Warranties of Buyer</u>.  Buyer represents and warrants to Seller as follows:

(a)     Other than approval of the Transaction by the Bankruptcy Court, Buyer has full power and authority to enter into and perform the terms of this Agreement.

(b)     This Agreement is duly authorized and executed by Buyer, and this Agreement and all documents required to be executed by Buyer in connection herewith, are and shall be valid, legally binding obligations of Buyer, enforceable in accordance with their terms.

(c)     To Buyer's knowledge, no action, proceeding or investigation is pending or threatened against Buyer, before any court or governmental department, commission, board, agency or instrumentality that would affect its ability to carry out its obligations under this Agreement.

The representations, warranties, and covenants set forth herein, as applicable shall survive the Closing Date for a period of eighteen (18) months subsequent to which the same shall be null and void.

10.     <u>Risk of Loss</u>.  In the event any of the Property is damaged or destroyed prior to the Closing Date, and such damage or (i) would cost less than One Hundred Thousand Dollars ($100,000) to repair and is fully covered by Seller's insurance, except for the deductible amounts

thereunder, or (ii) is uninsured and would cost less than One Hundred Thousand Dollars ($100,000) to repair or restore, then this Agreement shall remain in full force and effect and Buyer shall acquire the Property upon the terms and conditions set forth herein ("**Minor Casualty**"). In such event, Buyer shall receive a credit against the Purchase Price equal to such (a) deductible amount (except the portion applied to repairs), and Seller shall assign to Buyer all of Seller's right, title and interest in and to all proceeds of insurance on account of such damage or destruction or (b) if clause (ii) above is applicable, the remaining cost to repair and restore. In the event of a casualty other than a Minor Casualty or the Property becomes the subject of any condemnation proceeding involving a portion of the Property greater than One Hundred Thousand Dollars ($100,000), then each of Buyer and Seller shall have the right, at its election, to terminate this Agreement by delivery of notice of termination to other on or before the scheduled Closing Date, whereupon Buyer and Seller shall instruct Title Company to return the Deposit to Buyer, and each shall be released from all obligations hereunder pertaining to the Property (other than the indemnification obligations under Section 4(d) and 13 (b)). If this Agreement is not terminated, Seller shall assign to Buyer any proceeds of insurance or condemnation awards and the Purchase Price shall be reduced by the amount of Seller's deductible (except the portion applied to repairs). Unless this Agreement shall be terminated pursuant to this Section 10, Buyer shall be responsible for all repairs which have not been completed by the Closing Date and the Closing Date shall not be delayed.

11.    <u>Operation Pending Closing</u>.  Prior to the Closing, Seller shall operate and maintain the Property substantially in accordance with Seller's past practices for the previous 12 months. Seller shall not enter into any new lease with respect to the Property prior to the Closing. Seller shall not enter into any contract with respect to the Property prior to the Closing if such contract would bind Buyer after the Closing, unless Buyer consents to such contract. Without the prior written consent of Buyer, which will not be unreasonably withheld or delayed, Seller will not subject the Property to any additional liens, encumbrances, covenants, conditions, easements, rights of way or similar matters after the Effective Date which could affect the Property following the Closing.

12.    <u>Seller's Work</u>.

(a)    Prior to the Closing Date, Seller at its sole cost and expense shall (i) remediate the water and fungal damage identified in the Enviroair Report and restore the portions of the Real Property affected by such remediation ("Seller's Enviroair Work") and (ii) seal the A Wing and G Wing concrete slab as recommended in the January 9, 2003 NTH Project NO:16-021141-00 report ("Seller's Slab Work"). Seller's Enviroair Work and Seller's Slab Work are collectively referred to as "Seller's Work".

(b)    Seller's Enviroair Work shall be conducted to remediate the Real Property with respect to the damage identified in the Enviroair Report to the extent required under the following standards of practice in the mold remediation industry:  (i) the New York City Department of Health and Mental Hygiene Guidelines on Assessment and Remediation of Fungi in Indoor Environments, and (ii) the Institute of Inspection, Cleaning and Restoration Certification, Standard S-520, Standard and Reference Guide for Professional Mold Remediation. Seller's Work will be done in a good and workmanlike manner.

(c)    Upon the completion of Seller's Work, Seller shall cause its remediation contractor, who is reasonably acceptable to Buyer, to certify to Seller and Buyer ("**Remediation Certification**") that such remediation and sealing has been completed in accordance with this Section 12.

13.    <u>Miscellaneous</u>.

(a)    Notices.  Except as otherwise specifically provided in this Agreement, any notice, consent, request or approval required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given upon (i) hand delivery, (ii) one business day after being deposited with Federal Express or another reliable overnight courier service, (iii) transmission by facsimile telecopy during regular business hours at the receiver's location, with facsimile transmittal confirmation and with a confirming copy sent the same business day by United States mail, or (iv) upon receipt after being deposited in the United States mail, registered or certified mail, postage prepaid, return receipt required and addressed as follows:

| | |
|---|---|
| If to Buyer: | Delphi Automotive Systems LLC<br>5825 Delphi Drive,<br>Troy, Michigan 48098<br>Attn:  Executive Director, Operations Support Group |
| With a copy to: | Delphi Automotive Systems LLC<br>5725 Delphi Drive<br>Troy, Michigan 48098<br>Attn:  Deputy General Counsel – Transactional and<br>        Restructuring |
| With a copy to: | The Metcalf Family Living Trust<br>2920 Rohrer Drive<br>Lafayette, California  94549<br>Attention:  David Metcalf<br>Facsimile: 925-283-2263 |
| With a copy to: | Morgan Miller Blair<br>Suite 200<br>1331 N. California Blvd.<br>Walnut Creek, California 94596<br>Attention:  Chris Hunter, Esq.<br>Facsimile: 925-943-1106 |
| If to Seller: | Valeo Electrical Systems, Inc.<br>3000 University<br>Auburn Hills, Michigan  48326-2356<br>Attention:  Francoise Colpron<br>Facsimile: 248-340-8455 |

|                        |                                                 |
|------------------------|-------------------------------------------------|
| With a copy to:        | Honigman Miller Schwartz and Cohn LLP           |
|                        | 2290 First National Building                    |
|                        | 660 Woodward Avenue                             |
|                        | Detroit, Michigan  48226-3506                   |
|                        | Attn:  E. Todd Sable, Esq.                      |
|                        | Facsimile: 313-465-7549                         |
|                        |                                                 |
| If to Title            | LandAmerica                                     |
| Company:               | 1050 Wilshire Dr. Suite 310                     |
|                        | Troy, Michigan                                  |
|                        | Attention: Steve Nadolski                       |
|                        | Facsimile: 248-649-1626                         |

or such other address as any of the foregoing may from time to time specify in writing to the other.

(b)    Brokers/Intermediaries.    Seller represents that Seller has not had any conversations or dealings with any broker, finder or other intermediary in connection with the Property other than Binswanger America, LLC and L. Mason Capitani Incorporated ("**Seller's Brokers**").  Buyer represents that Buyer has not had any conversations or dealings with any broker, finder or other intermediary in connection with the Property other than DREAL INC., Grubb & Ellis, Collier's International Partnership and Jones Lang LaSalle Americas, Inc. (**"Buyer's Brokers"**).  If and only if the Closing occurs hereunder at Closing Seller shall pay real estate commissions to Seller's Brokers equal to: (i) $660,000; and (ii) any additional commissions owing to Seller's Brokers.  Seller's Brokers shall pay the commissions due Buyer's Brokers as directed by DREAL INC. in accordance with a separate agreement between Seller's Brokers and DREAL INC.    Seller hereby authorizes the Title Company to deduct the commissions from the Purchase Price.  Seller agrees to defend, indemnify and hold harmless Buyer from and against any and all liabilities, claims, demands, damages, or costs of any kind (including attorneys' fees, costs and expenses) arising from or connected with any broker's or finder's fee or commission or charge ("**Broker Claims**") claimed to be due by Seller's Brokers or any other person other than Buyer's Brokers arising from or by reason of Seller's conduct with respect to this transaction.  Subject to Seller's payment of Seller's Brokers as provided above, Buyer agrees to defend, indemnify and hold harmless Seller from and against any and all Broker Claims claimed to be due Buyer's Broker or any other person arising from or by reason of Buyer's conduct with respect to this transaction other than claims of Seller's Brokers.  This Section 13(b) shall survive the close of Escrow or termination of this Agreement.

(c)    Counterparts.  This Agreement may be executed in any number of counterparts and each counterpart shall be deemed to be an original document.  Delivery of the executed Agreement may be accomplished by facsimile transmission, and if so, the facsimile copy shall be deemed an executed original counterpart of this Agreement.  All executed counterparts together shall constitute one and the same document, and any signature pages, including facsimile copies thereof, may be assembled to form a single original document.

(d)    <u>Successors and Assigns</u>.  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors, heirs, administrators and assigns. Buyer may assign this Agreement and its rights hereunder upon written notice to Seller, and any such assignment will release Buyer from all liability under this Agreement.

(e)    <u>Amendments</u>.  Except as otherwise provided herein, this Agreement may be amended or modified only by an instrument executed by both parties.

(f)    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

(g)    <u>Integration of Prior Agreements</u>.  This Agreement and the exhibits hereto constitute the entire agreement between the parties and supersede all prior negotiations, correspondence, agreements and understandings between the parties relating to the subject matter hereof.

(h)    <u>Enforcement</u>.  In the event a dispute arises concerning the performance, meaning or interpretation of any provision of this Agreement, the defaulting party or the party not prevailing in such dispute (as the court shall determine) shall pay any and all reasonable costs and expenses incurred by the other party in enforcing or establishing its rights hereunder, including, without limitation, arbitration and court costs and attorneys' and experts' fees.  Any such attorneys' fees and other expenses incurred by either party in enforcing a judgment in its favor under this Agreement shall be recoverable separately from and in addition to any other amount included in such judgment, and such attorneys' fees obligation is intended to be severable from the other provisions of this Agreement and to survive and not be merged into any such judgment.

(i)    <u>Time of the Essence; Dates</u>.  Time is of the essence of this Agreement.  If any of the dates specified in this Agreement shall fall on a Saturday, a Sunday, or a holiday, such date shall be deemed to have expired at 3:00 p.m. (Pacific Time) on the next business day, notwithstanding anything to the contrary herein.

(j)    <u>Severability</u>.  If any provision of this Agreement, or the application thereof to any person, place or circumstance, shall be held by a court of competent jurisdiction to be invalid, unenforceable or void, the remainder of this Agreement and such provisions as applied to other persons, places and circumstances shall remain in full force and effect.

(k)    <u>1031 Exchange</u>.  Buyer and Seller shall each, upon request of the other party, cooperate in effecting one or more tax-deferred like kind exchanges under Section 1031 of the Internal Revenue Code in connection with the transaction contemplated by this Agreement, including the execution of escrow instructions and other documents therefor; provided that the requesting party will pay any and all additional costs or expenses connected with such exchange and provided that the requested party shall not be required to take title to other real property in connection with the exchange and the Closing shall not be delayed as a result thereof.  Buyer and/or Seller may assign its rights in, and delegate its duties under this Agreement (in part or in whole), as well as transfer its interest in the Property, to an exchange intermediary, and Buyer

16

and/or Seller may add such intermediary as an additional party to the escrow, provided that Buyer and/or Seller, as applicable, shall remain primarily liable under this Agreement.

(l)     <u>Third Party Beneficiary</u>.   After any assignment of this Agreement by Delphi, Delphi shall remain a third party beneficiary to this Agreement.

(m)     <u>Bankruptcy Court Approval</u>.   Buyer's obligations under this Agreement are contingent upon Bankruptcy Court Approval.

(n)     Except as expressly provided in Section 8 hereof, Buyer expressly acknowledges that Seller has made no warranties or representations as to the condition of the Property, including but not limited to title conditions, soil conditions, environmental conditions, compliance with zoning laws or ordinances or building code provisions or set back lines, if any, or building, construction, use or occupancy restrictions or any federal, state or local government laws or regulations which may be applicable to the Property or its use, or availability of utilities. Purchaser further acknowledges that as of the Closing Date it will have inspected, analyzed, reviewed and evaluated the Property, that it and its representatives will have conducted such investigations of the Property as deemed necessary by Purchaser and that it will be thoroughly aware of the condition of the Property.   Except as expressly provided in Section 8 hereof, the property and any other property or right furnished or to be furnished under or in connection with this Agreement by Seller to Buyer are sold or furnished "AS IS, WHERE IS" AND WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY NATURE WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; AND EXCEPT AS EXPRESSLY PROVIDED IN SECTION 8 HEREOF, AND/OR IN THE DEED TO BE DELIVERED BY SELLER TO BUYER.   SELLER DISCLAIMS AND BUYER HEREBY WAIVES AND RELEASES SELLER FROM ANY OBLIGATION, LIABILITY, CLAIM OR DEMAND, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND PATENT INFRINGEMENT), STRICT LIABILITY OR OTHERWISE, WITH RESPECT TO THE PROPERTY, AND PURCHASER ASSUMES ALL LIABILITY FOR ANY CONDITION(S) ON THE PROPERTY, INCLUDING WITHOUT LIMITATION ENVIRONMENTAL AND SOIL CONDITIONS.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**<u>BUYER</u>**:

DELPHI AUTOMOTIVE SYSTEMS LLC

By:_____

Print Name:_____

Its:  Authorized Signatory

**SELLER**:

VALEO ELECTRICAL SYSTEMS, INC.

By:_____

Print Name:_____

Its:_____


Lawyers Title Insurance Corporation hereby executes this Agreement in order to evidence the acceptance and agreement to perform its undertakings as Title Company hereunder and to execute and deliver the Escrow Agreement at Closing.

**LAWYERS TITLE INSURANCE CORPORATION**

By:        _____

Dated:        _____, 2007

LIST OF EXHIBITS

Exhibit A              Description of Real Property

Exhibit B              List of Personal Property

Exhibit B-1            Excluded Personal Property

Exhibit C              Receipt of Escrow Agent

Exhibit D              Covenant Deed

Exhibit E              Title Commitment

Exhibit F              Bill of Sale

Exhibit G              Sublease

Exhibit H              Escrow Agreement

Exhibit I              Certificate of Transferor (FIRPTA Affidavit)

Exhibit J              Water Damage Consultants' Recommendations

# EXHIBIT A

## REAL PROPERTY
## LEGAL DESCRIPTION

A part of the West 1/2 of Section 13 and East 1/2 of Section 14, Town 3 North, Range 10 East, City of Auburn Hills, Oakland County, Michigan, being described as:  Commencing at the West 1/4 corner of Section 13; thence South 03 degrees 12 minutes 11 seconds East, 83.78 feet along the line between Sections 13 and 14, to a point on the Southerly line of University Drive, as proposed, thence along said line the following two courses:  (1) Along a curve to the right 156.21 feet, said curve having a radius of 3,153.84 feet, central angle of 02 degrees 50 minutes 16 seconds and a long chord bearing of South 61 degrees 47 minutes 48 seconds West 156.19 feet, and (2) South 63 degrees 12 minutes 55 seconds West, 606.47 feet to the point of beginning on the West line of the proposed parkway; thence along said line along the following five courses:  (1) South 26 degrees 47 minutes 05 seconds East, 44.69 feet, and (2) Along a curve to the left 328.13 feet, said curve having a radius of 350.00 feet, central angle of 53 degrees 42 minutes 55 seconds and a long chord bearing of South 53 degrees 38 minutes 32 seconds East, 316.24 feet, and (3) South 80 degrees 30 minutes 00 seconds East, 126.29 feet, and (4) Along a curve to the right 501.78 feet, said curve having a radius of 460.00 feet, central angle of 62 degrees 30 minutes 00 seconds and a long chord bearing of South 49 degrees 15 minutes 00 seconds East, 477.27 feet, and (5) South 18 degrees 00 minutes 00 seconds  East, 380.06 feet; thence South 72 degrees 00 minutes 00 seconds West, 146.77 feet; thence South 15 degrees 00 minutes 00 seconds West, 155.13 feet; thence South 61 degrees 00 minutes 00 seconds West, 394.00 feet; thence South 77 degrees 45 minutes 54 seconds West, 205.62 feet; thence South 69 degrees 30 minutes 00 seconds West, 105.00 feet; thence South 84 degrees 30 minutes 00 seconds West, 173.00 feet; thence North 82 degrees 00 minutes 00 seconds West, 124.00 feet; thence North 64 degrees 30 minutes 00 seconds West, 285.00 feet; thence North 47 degrees 00 minutes 00 seconds West, 124.00 feet; thence North 20 degrees 55 minutes 47 seconds West, 175.78 feet to a point on the Easterly line of proposed road; thence along said line along the following two courses:  (1) Along a curve to the left 664.23 feet, said curve having a radius of 770.00 feet, central angle of 49 degrees 25 minutes 32 seconds and a long chord bearing North 02 degrees 04 minutes 19 seconds West, 643.83 feet and (2) North 26 degrees 47 minutes 05 seconds West, 28.47 feet to a point on the Southerly line of University Drive, as proposed; thence North 63 degrees 12 minutes 55 minutes East, 769.65 feet to the point of beginning.

**EXHIBIT B**

**LIST OF PERSONAL PROPERTY**

A. **Office Area:**
   1. Auditorium AV Equipment
   2. Modular Furniture
   3. PBX and Handsets
   4. Sound System (Lobby / Cafeteria)

B. **Lab Area:**
   1. Air Compressor #1
   2. Air Compressor #2
   3. Air Compressor #3
   4. Material Lift
   5. Overhead Crane

C. **Kitchen Equipment:**
   1. All kitchen equipment excepting that which is listed in Exhibit B-1

D. **Building Systems:**
   1. Fire Extinguishers
   2. Building System Specific Spare Parts and Supplies (e.g. Heat Pump Filters)

**EXHIBIT B-1**

**EXCLUDED PERSONAL PROPERTY**

A. **Office Area:**
1. Art Work
2. Coat Racks (Portable)
3. Coffee Making Machines
4. Defibrillators
5. Display Cases
6. Electronic White Boards
7. Employee Badge System
8. First Aid Kits (Fire Blankets)
9. Flags
10. Ladders
11. Mail Room Equipment / Furniture
12. Microwave Ovens and Refrigerators
13. Office Equipment (Copiers, Fax Machines, Printers, Plotters, Binding Machines)
14. Office Furniture other than Modular Type
15. Paper Supplies
16. Picnic Tables
17. Plants
18. Podium (Portable)
19. Portable AV Equipment (TVs, DVD players, Projectors, Carts, Screens, Etc.)
20. Print Files
21. Recycle Bins
22. Visitor Badge ID System

B. **Lab Area:**
1. Eye Wash Stations
2. Fork Lifts and Chargers
3. Hazardous Material Cabinets
4. Laboratory Storage Racks
5. Laboratory Test Equipment (Chambers, Ovens, Fixtures, Instrumentation, Etc.)
6. Laboratory Work Benches
7. Maintenance Tools and General Supplies
8. Man Lifts
9. Pallet Jacks
10. Shipping Dock Equipment / Supplies
11. Sound Chamber Controls, Panels, Associated HVAC
12. Spill Kits
13. Vehicle Hoist

C. **Kitchen Equipment:**
   1. Sharp Microwave (Property of Valeo)
   2. Tropicana Display Cooler (Property of Aramark)
   3. Coca Cola Display Cooler (Property of Aramark)
   4. Snapple Display Cooler (Property of Aramark)
   5. Amana Microwave (Property of Valeo)
   6. Savor Toaster (Property of Valeo)
   7. 5 Scotsman Ice Maker (Property of Valeo)
   8. Pepsi Display Cooler (Property of Aramark)
   9. Scotsman Flaker Ice Maker (3B Vending Area)

**EXHIBIT C**

**RECEIPT OF ESCROW AGENT**

Lawyers Title Insurance Corporation hereby acknowledges receipt of the sum of Eight Hundred Twenty Five Thousand Dollars ($825,000) which it agrees to hold in escrow, together with all interest thereon and any prior and/or future deposits, as the Deposit in accordance with the terms of the Purchase and Sale Agreement between Valeo Electrical systems Inc., as Seller, and Delphi Automotive Services LLC, as Purchaser, dated March 2, 2007 covering property at 3000 University Drive, Auburn Hills, Michigan.

**TITLE COMPANY:**

**LAWYERS TITLE INSURANCE CORPORATION**

By: _____

Name: _____

Its: _____

Date: _____, 2007

**EXHIBIT D**

**COVENANT DEED**

THIS INDENTURE, made this _____ day of _____, 2007, between **VALEO ELECTRICAL SYSTEMS, INC.**, a Delaware corporation, with its principal place of business at 3000 University, Auburn Hills, Michigan 48326-2356 (hereinafter referred to as "Grantor"), and **DAVID R. METCALF**, as Trustee of the Metcalf Family Living Trust, dated June 11, 1993, whose address is 2920 Rohrer Drive, Lafayette, California 94549 (hereinafter referred to as "Grantee").

<u>WITNESSETH</u>:

The Grantor for and in consideration of the sum of One Dollar ($1.00) in hand paid by Grantee, the receipt of which is hereby acknowledged, has granted, bargained, sold, remised, released, aliened and confirmed, and by these presents does grant, bargain, sell, remise, alien and confirm unto Grantee and Grantee's successors and assigns, forever, all of that certain parcel of land, situate, lying and being in the City of Auburn Hills, Oakland County, State of Michigan, described on Exhibit A hereto (hereinafter referred to as the "Real Property"); TOGETHER with all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining, and the reversion or reversions, remainder or remainders, rents, issues and profits thereof; and all the estate, right, title, interest, claim or demand whatsoever, of Grantor, either in law or equity, of, in and to the above bargained Real Property, with the said hereditaments and appurtenances; TO HAVE AND TO HOLD the Real Property as before described, with the appurtenances, unto Grantee, its successors and assigns, FOREVER, subject to the matters set forth on Exhibit B hereto.  And Grantor, for itself, its successors and assigns, does covenant, grant, bargain, and agree to and with Grantee, its successors and assigns, that Grantor has not heretofore done, committed or wittingly or unwittingly suffered to be done or committed any act, matter or thing whatsoever, whereby the Real Property hereby granted, or any part thereof, is, or shall or may be charged or encumbered in title, estate or otherwise howsoever, except as may be hereinabove stated.

The Grantor grants to the Grantee the right to make all divisions under Section 108 of the Land Division Act, Act No. 288 of the Public Acts of 1967.

This property may be located within the vicinity of farmland or a farm operation. Generally accepted agricultural and management practices which may generate noise, dust,

odors, and other associated conditions may be used and are protected by the Michigan Right to Farm Act.

**IN WITNESS WHEREOF**, Grantor has hereunto set its hand and seal on the day and year first above written.

Signed, seal and delivered:                 **VALEO ELECTRICAL SYSTEMS, INC.,**
                                            a Delaware corporation
_____            By:_____

Print Name:_____            Print Name:_____

_____            Its:_____

Print Name:_____


STATE OF MICHIGAN          )
                           )  ss:
COUNTY OF                  )

         The foregoing instrument was acknowledged before me this _____ day of _____, 2007, by _____, the _____ of Valeo Electrical Systems, Inc., a _____ corporation, on behalf of said corporation.

         [SEAL)

                                            _____
                                            Notary Public
                                            _____ County, MI
                                            My Commission expires:_____

Prepared by:
William J. Zousmer, Esq.
Honigman Miller Schwartz and Cohn
2290 First National Building
Detroit, Michigan 48226
313/465-7616

When recorded return to:
Ciara M. Comerford, Esq.
Delphi Automotive Systems LLC
5825 Delphi Drive; MC 480-410-268
Troy, MI  48098

# EXHIBIT A

## LEGAL DESCRIPTION

A part of the West 1/2 of Section 13 and East 1/2 of Section 14, Town 3 North, Range 10 East, City of Auburn Hills, Oakland County, Michigan, being described as:  Commencing at the West 1/4 corner of Section 13; thence South 03 degrees 12 minutes 11 seconds East, 83.78 feet along the line between Sections 13 and 14, to a point on the Southerly line of University Drive, as proposed, thence along said line the following two courses:  (1) Along a curve to the right 156.21 feet, said curve having a radius of 3,153.84 feet, central angle of 02 degrees 50 minutes 16 seconds and a long chord bearing of South 61 degrees 47 minutes 48 seconds West 156.19 feet, and (2) South 63 degrees 12 minutes 55 seconds West, 606.47 feet to the point of beginning on the West line of the proposed parkway; thence along said line along the following five courses:  (1) South 26 degrees 47 minutes 05 seconds East, 44.69 feet, and (2) Along a curve to the left 328.13 feet, said curve having a radius of 350.00 feet, central angle of 53 degrees 42 minutes 55 seconds and a long chord bearing of South 53 degrees 38 minutes 32 seconds East, 316.24 feet, and (3) South 80 degrees 30 minutes 00 seconds East, 126.29 feet, and (4) Along a curve to the right 501.78 feet, said curve having a radius of 460.00 feet, central angle of 62 degrees 30 minutes 00 seconds and a long chord bearing of South 49 degrees 15 minutes 00 seconds East, 477.27 feet, and (5) South 18 degrees 00 minutes 00 seconds  East, 380.06 feet; thence South 72 degrees 00 minutes 00 seconds West, 146.77 feet; thence South 15 degrees 00 minutes 00 seconds West, 155.13 feet; thence South 61 degrees 00 minutes 00 seconds West, 394.00 feet; thence South 77 degrees 45 minutes 54 seconds West, 205.62 feet; thence South 69 degrees 30 minutes 00 seconds West, 105.00 feet; thence South 84 degrees 30 minutes 00 seconds West, 173.00 feet; thence North 82 degrees 00 minutes 00 seconds West, 124.00 feet; thence North 64 degrees 30 minutes 00 seconds West, 285.00 feet; thence North 47 degrees 00 minutes 00 seconds West, 124.00 feet; thence North 20 degrees 55 minutes 47 seconds West, 175.78 feet to a point on the Easterly line of proposed road; thence along said line along the following two courses:  (1) Along a curve to the left 664.23 feet, said curve having a radius of 770.00 feet, central angle of 49 degrees 25 minutes 32 seconds and a long chord bearing North 02 degrees 04 minutes 19 seconds West, 643.83 feet and (2) North 26 degrees 47 minutes 05 seconds West, 28.47 feet to a point on the Southerly line of University Drive, as proposed; thence North 63 degrees 12 minutes 55 minutes East, 769.65 feet to the point of beginning.

**EXHIBIT B**

**PERMITTED EXCEPTIONS**

1. Covenants and conditions set forth in a certain Deed recorded in Liber 10257, Page 184.

2. Maintenance Agreement and Easements, and the terms, conditions and provisions thereof, contained in Grant of Easement recorded in Liber 10257, Page 188.

3. Declaration of Covenants, Conditions and Restrictions recorded in Liber 10257, Page 157.  Assignment of Covenant Rights to Chrysler Corporation, as contained in Liber 14122, Page 535.

4. Easement to Consumers Power Company for gas pipeline, as contained in Liber 14536, Page 565.

5. Agreements with Kasper Drain Drainage District, and the terms, conditions and provisions thereof, as contained in Liber 12488, Page 666, and Liber 12488, Page 671.

6. Grant of Easement to the Detroit Edison Company for electrical facilities, as contained in Liber 10856, Page 144.

7. Grant of Temporary Easements, as contained in Liber 10257, Page 204.

8. Grant of Easements to the City of Auburn Hills for underground sanitary, storm and sewer lines, and the terms, conditions and provisions thereof, as contained in Liber 14076, Page 686.

**EXHIBIT E**

**TITLE COMMITMENT**

[INSERT]

**EXHIBIT F**

**BILL OF SALE**

For good and valuable consideration the receipt of which is hereby acknowledged, Valeo Electrical Systems, Inc. ("**Seller**"), does sell, transfer, assign and convey to David R. Metcalf, Trustee of the Metcalf Family Living Trust dated June 11, 1993 ("Buyer"), all of Seller's right, title and interest in the personal property owned by Seller that is listed on Schedule 1 attached hereto and located in or on the real property at 3000 University, Auburn Hills, Michigan (the "Personal Property").

Seller sells and delivers the Personal Property "as is" to Buyer, and Seller has not made, nor shall Seller be deemed to have made, any representation or warranty, express or implied, as to the value, merchantability, quality or fitness for use or purpose of the Personal Property. Seller warrants only that it has good and marketable title to the Personal Property and the Personal Property is not subject to any liens, claims, or encumbrances whatsoever.

Seller and Buyer agree as follows:

A.    The Personal Property is furnished "AS IS", "WHERE IS", AND WITH ALL FAULTS AND WITHOUT ANY REPRESENTATION OR WARRANTY OF ANY NATURE WHATSOEVER, EXPRESS OR IMPLIED, ORAL OR WRITTEN, AND IN PARTICULAR, WITHOUT ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; AND EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS BILL OF SALE, SELLER DISCLAIMS AND BUYER HEREBY WAIVES ANY OBLIGATION, LIABILITY, RIGHT, CLAIM OR DEMAND IN CONTRACT, TORT (INCLUDING NEGLIGENCE AND PATENT INFRINGEMENT), STRICT LIABILITY OR OTHERWISE WITH RESPECT TO THE PERSONAL PROPERTY.    Without limiting the generality of the foregoing, Buyer acknowledges and agrees: (i) that Seller neither represents nor warrants that the Personal Property conveyed under this Bill of Sale will operate satisfactorily, (ii) that Seller shall have no liability or responsibility for the condition and/or operation of the Personal Property after transfer to Buyer, its agents, representatives and/or contractors, and (iii) that Buyer is purchasing the Personal Property based solely upon its own inspection, evaluation, review and analysis and Buyer assumes the entire risk associated with such inspection, evaluation, review and analysis being incomplete or inaccurate.

B.    In no event, whether occasioned by breach of contract, breach of warranty, tort (including negligence), strict liability or otherwise, shall Seller be liable to Buyer for incidental, indirect, special or consequential damages.

This sale is made without warranty of title or other warranty of any kind.

DATED this _____ day of _____, 2007.

**<u>SELLER</u>**:

**VALEO ELECTRICAL SYSTEMS, INC.,**
a Delaware corporation

By:_____

Print Name:_____

Its:_____

**Schedule 1**
**to**
**Bill of Sale**

**List of Personal Property**

A. **Office Area:**
   1.   Auditorium AV Equipment
   2.   Modular Furniture
   3.   PBX and Handsets
   4.   Sound System (Lobby / Cafeteria)

B. **Lab Area:**
   1.   Air Compressor #1
   2.   Air Compressor #2
   3.   Air Compressor #3
   4.   Material Lift
   5.   Overhead Crane

C. **Kitchen Equipment:**
   1.   All kitchen equipment excepting that which is listed in Exhibit B-1 to the Purchase
        and Sale Agreement

D. **Building Systems:**
   1.   Fire Extinguishers
   2.   Building System Specific Spare Parts and Supplies (e.g. Heat Pump Filters)

## EXHIBIT G

## SUBLEASE AGREEMENT

This **SUBLEASE AGREEMENT** dated as of April _____, 2007 by and between Delphi Automotive Systems LLC, with offices at 5725 Delphi Drive, Troy, Michigan 48098 ("SUBLESSOR"), and Valeo Electrical Systems, Inc., with offices at 4100 N. Atlantic Boulevard, Auburn Hills, Michigan 48326 ("SUBLESSEE"), is based upon the following:

A.      Sublessor has leased, as Tenant, from The Metcalf Family Living Trust dated June 11, 1993, as Landlord ("PRIME LANDLORD"), premises located at 3000 University Drive, in the City of Auburn Hills, County of Oakland, State of Michigan (the "DEMISED PREMISES"), pursuant to a certain lease dated March 2, 2007(the "PRIME LEASE"); and

B.      Sublessor desires to sublet to Sublessee and Sublessee desires to hire from Sublessor a portion of the Demised Premises as described on Exhibit A attached hereto; and

NOW THEREFORE, the parties agree as follows:

1.      **SUBLEASE.**  Sublessor hereby sublets to Sublessee a portion of the Demised Premises, for use as general office, research laboratory and for no other purpose, as follows:

(a)      The "Sublet Premises," as described on Exhibit A hereto, consists of one hundred forty-one thousand eight hundred (141,800) square feet as shown on Exhibits A-1, A-2, A-3 and A-5 attached hereto and made a part hereof.

(b)      On or prior to one hundred twenty (120) days after the Commencement Date, the portion of the Sublet Premises as shown of Exhibits A-2, A-3 and A-5, shall be excluded from the Sublet Premises and the Sublet Premises shall be reduced to fifty-seven thousand (57,000) square feet.

(c)      On or prior to one hundred fifty (150) days after the Commencement Date, the portion of the Sublet Premises as shown of Exhibits A-1 and A-5, shall be excluded from the Sublet Premises and the Sublet Premises shall be vacated in its entirety.

(d)      During the term, Sublessor shall provide Sublessee with access to those portions of the IT Areas that are then portions of the Sublet Premises and Sublessee shall provide Sublessor access to those portions of the IT Areas which are not then portions of the Sublet Premises.

(e)      During the term, Sublessee shall provide Sublessor with access to the portions of the laboratory space not part of the Sublet Premises and the restroom area in the laboratory area.

(f)     Sublessee shall also have the right to utilize portions of the common areas of the Demised Premises as well as the parking areas in order to reasonably utilize the Sublet Premises during the term.

(g)     Notwithstanding anything herein contained to the contrary, Sublessee may vacate and surrender portions of the Sublet Premises to Sublessor at any time and from time to time and upon such surrender in good broom clean condition, good order and repair, reasonable wear and tear excepted, such surrendered portion of the Sublet Premises shall no longer be part of the Sublet Premises and Rent under Paragraph 3 shall be adjusted accordingly.

2.     **TERM.**     The term of this sublease ("SUBLEASE TERM") shall commence on the Commencement Date and shall expire One Hundred Fifty (150) days after the Commencement Date, or such earlier date upon which the Sublease Term expires or terminates pursuant to the provisions of this Sublease or pursuant to law.

3.     **RENT.**

(a)     The rent for the Sublease Term shall be Seven Hundred Eighty Thousand Two Hundred Fifty and 00/100 Dollars ($780,250.00) ("Rent").   The foregoing amount has been determined based on Sublessee occupying the entire Sublet Premises for the full Sublease Term of each respective portion of the Sublet Premises.  Such Rent shall be paid to Sublessor in accordance with the terms of the "Escrow Agreement," as defined in Paragraph 4 hereof.

(b)     The Rent paid pursuant to this Paragraph 3 is paid on a gross basis and Sublessor shall pay all costs and expenses of operating and maintaining the Demised Premises, except that Sublessee shall provide janitorial service to the Sublet Premises at its sole cost and expense.

4.     **ESCROW AGREEMENT.**     Sublessee shall deposit with Lawyers Title Insurance Corporation (the "Escrow Agent") pursuant to an Escrow Agreement executed by Sublessee, Sublessor and the Escrow Agent, the sum of Eight Hundred Eighty Thousand Two Hundred Fifty and 00/100 Dollars ($880,250.00) (the "Sublease Escrow Funds") to be utilized to satisfy Sublessee's obligations under this Sublease.  Escrow Agent will disburse the Sublease Escrow Funds pursuant to the terms of the Escrow Agreement.

5.     **MAINTENANCE AND REPAIR.**

(a)     Except as provided in Paragraph 5(b) hereof, Sublessor covenants and agrees that Sublessor will, at Sublessor's expense, during the continuation of this Sublease, keep the said Sublet Premises and the Demised Premises in good repair.

(b)     Sublessee shall repair any damage caused to the Demises Premises resulting from the negligence or wrongful acts of Sublessee, Nidec, and Sublessee's and Nidec's agents, contractors or employees.   Sublessee shall not be required to make any other repairs or replacements to the Demised Premises.

(c)    Sublessee shall not perform any acts or carry on any practices which may injure the Demised Premises or be a nuisance or menace to Sublessor.  Sublessee shall not conduct its business in a manner which would cause an increase in Sublessor's insurance premiums for the Demised Premises other than Sublessee's current operations.

(d)    The Sublessee shall at Sublessee's own expense under penalty of forfeiture and damages promptly comply with all lawful laws, orders, regulations or ordinances of all municipal, County and State authorities affecting the cleanliness, safety, occupation and use of same, except that Sublessee shall not be required to make any alterations to the Sublet Premises to so comply.

6.    **UTILITIES AND TAXES.**  Sublessor shall pay for all gas, water, heat and electricity charges for the Demised Premises during the term of this Sublease.  Sublessor shall pay the real estate taxes and installments of special assessments relating to the Demised Premises during the term of this Sublease.

7.    **DAMAGE OR INJURY.**  Neither Prime Landlord nor Sublessor shall be responsible or liable to the Sublessee for any loss or damage (a) to Property or injury to persons sustained by Sublessee or others, caused by conditions or activities on the Sublet Premises (other than due to Sublessor's failure to repair), (b) that may be caused by the acts or omissions of persons occupying adjoining premises (other than Sublessor) or any part of the Demised Premises or (c) for any loss or damage resulting to Sublessee or Sublessee's property from bursting, stoppage or leaking of water, gas, sewer or steam pipes.

8.    **INSURANCE.**

(a)    (i)    Sublessee shall procure and keep in effect commercial general liability insurance, including contractual liability, with minimum limits of liability of Two Million Dollars ($2,000,000) combined single limit (per occurrence and annual aggregate) for bodily injury or death, and property damage.  Such insurance shall name Sublessor and the Prime Landlord, as "additional insureds," shall specifically include the liability assumed hereunder by Sublessee, and shall provide that it is primary insurance and not excess over or contributory with any other valid, existing and applicable insurance in force for or on behalf of Sublessor and the Prime Landlord.

(ii)    Sublessee shall procure and keep in effect "all risks" (also known as "special cause of loss," including theft, and leakage from fire protective devices) property insurance for the full replacement cost of Sublessee's trade fixtures, equipment, and personal property.

(iii)    On Sublessor's or Prime Landlord's reasonable request, Sublessee shall provide evidence of the insurance required pursuant to Paragraph 8(a)(i) and (ii) hereof.

(b)    (i)    Sublessor shall procure and keep in effect commercial general liability insurance, including contractual liability, with minimum limits of liability of Two Million Dollars ($2,000,000) combined single limit (per occurrence and annual aggregate) for bodily injury or

death, and property damage.  Such insurance shall name Sublessee and the Prime Landlord as "additional insureds" and shall specifically include the liability assumed hereunder by Sublessor.

(ii)    Sublessor shall procure and keep in effect "all risks" (also known as "special cause of loss", including theft, and leakage from fire protective devices) property insurance for the full replacement value of the Demised Premises.

(iii)    On Sublessee's reasonable request, Sublessor shall provide evidence of the insurance required pursuant to Paragraph 8(a)(i) and (ii) hereof.

(c)    Sublessor, Sublessee and the Prime Landlord shall each be released from any liability (by way of subrogation or otherwise) for loss or damage to any building, structure or other tangible property, or any resulting loss of income, or losses under workers' compensation laws and benefits, resulting from damage by fire or casualty, irrespective of the cause of such fire or casualty to the extent that such loss or damage is insured or required to be insured under this Sublease.

9.    **SERVICES BY PRIME LANDLORD.**  Sublessee shall look only to Sublessor for any services to be furnished to Sublessee in accordance with this Sublease.

10.    **ALTERATIONS.**  Sublessee shall not make any alterations, additions or improvements upon or to the Sublet Premises without the prior written consent of Sublessor and Prime Landlord. Any permitted alterations, additions and improvements shall be made at the sole cost of Sublessee and shall become the property of Sublessor and shall remain on and be surrendered with the Sublet Premises at the termination of this Sublease; however, Sublessor, at the time of Sublessor's approval, may designate by written notice to Sublessee those alterations, additions, and improvements which shall be removed by Sublessee at the expiration or termination of this Sublease and Sublessee shall promptly remove the same and repair any damage to the Sublet Premises caused by such removal.  Notwithstanding anything herein contained to the contrary, the movable office furniture, trade fixtures, business equipment and other personal property of Sublessee  (other than any items included in the definition of Property under the Purchase and Sale Agreement dated March 2, 2007 between Sublessor and Sublessee) shall remain its property and may be removed from the Sublet Premises at the end of the Subleased Term.  Sublessee shall deliver up the Sublet Premises, at the expiration or sooner termination of the term of this Sublease, in as good condition as they are now in and in a broom clean condition, ordinary wear, damage resulting from Sublessor's failure to repair, fire and other casualties excepted.

11.    **ACCESS.** At all reasonable hours, the Sublet Premises shall be open to Prime Landlord and Sublessor, their agents and representatives for inspecting or for repairs, additions or alterations by either party.

12.    **SUBLESSEE'S COVENANTS.**  Sublessee covenants with Sublessor to hire the Sublet Premises and to pay the Rent therefor as aforesaid, that it will commit no waste, nor suffer the same to be committed thereon, nor injure nor misuse the same; and also that it shall not make alterations therein, nor use the same for any purposes but that hereinbefore authorized.  Sublessee has inspected the Sublet Premises and accepts same in their present condition, without any warranties or

representations (expressed or implied) being relied upon and is relying upon its own inspection. Sublessee further covenants that this Sublease shall not be assigned, encumbered or otherwise transferred, and the Sublet Premises shall not be further sublet by Sublessee, in whole or in part, and Sublessee shall neither suffer nor permit any of the Sublet Premise to be used or occupied by others without the prior consent of Prime Landlord in each instance; provided however, that notwithstanding the foregoing, Sublessee has the right to sublet to or otherwise permit Nidec Motors and Actuators USA, Inc. ("Nidec") to occupy portions of the Sublet Premises during the Term of this Sublease.

13.    **PRIME LEASE.**

(a)    Notwithstanding that this Sublease is a sublease, Prime Landlord, Sublessor and Sublessee acknowledge that the terms and provisions of this Sublease shall not be subordinate to the Prime Lease but that this Sublease contains all of the terms and conditions which have been agreed to by the parties without reference to the Prime Lease.

(b)    Notwithstanding anything contained to the contrary in the Prime Lease or in this Sublease, the parties agree that in the event of cancellation of the Prime Lease for any reason whatsoever, including the default of Sublessor, as tenant thereunder, or the surrender thereof, whether voluntary, involuntary or by operation of law, this Sublease shall not thereby be cancelled or terminated, but Sublessee shall make full and complete attornment to the Prime Landlord and the Prime Landlord shall recognize all of Sublessee's rights hereunder for the balance of the Sublease Term with the same force and effect as thought this Sublease were originally made from the Prime Landlord to Sublessee hereunder.

(c)    The Prime Landlord has executed his consent to this Sublease in order to evidence his acceptance and agreement to the foregoing provisions of this Paragraph 13.

14.    **FIRE.**  It is understood and agreed that if the Sublet Premises are damaged or destroyed in whole or in part by fire or other casualty during the term, Sublessor will repair and restore the same to good tenantable condition with reasonable dispatch, and the Rent herein provided for shall abate entirely in case the entire Sublet Premises are untenantable and pro rata for the portion rendered untenantable, in case a part only is untenantable, until the Sublet Premises are restored to a tenantable condition. If the Sublessee shall fail to adjust Sublessee's own insurance or to remove damaged goods, wares, equipment or property within a reasonable time, and as a result thereof the repairing and restoration is delayed, there shall be no abatement of rental during the period of such delay.  If Sublessee shall use any part of the Sublet Premises for storage during the period of repair a reasonable charge shall be made therefor against Sublessee.  In case the Sublet Premises, or the Demised Premises shall be destroyed to the extent of more than one-half of the value thereof, Sublessor shall have the option to terminate this Sublease by written notice to Sublessee.  In no event shall Sublessor be required to repair or replace Sublessee's merchandise, trade fixtures, leasehold improvements, business machines, equipment, freight or materials stored at the Sublet Premises.

15.   **INDEMNITY.**  Each of Sublessor and Sublessee (the "Indemnitor") shall hold the other and the Prime Landlord (the "Indemnitees") harmless from any damage to any property or injury to or death of any person arising in, on or upon the Demised Premises arising from the negligence or wrongful acts of the Indemnitor, its agents, contractors and/or employees (including in the case of, Sublessee, the negligence or wrongful acts of Nidec).  The foregoing indemnity obligations shall include reasonable attorneys' fees, investigation costs and other reasonable costs and expenses incurred by the Indemnitees from the first notice that any claim or demand is to be made or may be made.   The provisions of this Paragraph 15 shall survive the termination of this Sublease with respect to any damage, injury or death occurring prior to such termination.

16.   **DEFAULT AND REENTRY.**

(a)   If Sublessee shall be in default in performing any of the terms of this Sublease, Sublessor shall give Sublessee written notice of such default, and if Sublessee shall fail to cure such default within thirty (30) days after the receipt of such notice, or if the default is of such a character as to reasonably require more than thirty (30) days to cure, then if Sublessee shall fail, within said thirty (30) day period, to commence and thereafter proceed diligently to cure such default, then and in either of such events, Sublessor may (at its option and in addition to its other legal remedies) cure such default for the account of Sublessee, and any sum so expended by Sublessor plus interest shall be Rent for all purposes hereunder, and shall be paid by Sublessee with the next installment of Rent.

(b)   If any Rent referred to in Paragraph 16(a) hereof shall be due and unpaid or Sublessee shall be in default upon any of the other terms of this Sublease, and such default has not been cured after notice and within the time provided in Paragraph 16(a) hereof, then Sublessor, in addition to its other remedies, shall have the immediate right of re-entry.  Should Sublessor re-enter or take possession pursuant to legal proceedings or any notice provided for by law, Sublessor may terminate this Sublease and recover from Sublessee (or from the Escrow Funds) all amounts due Sublessor hereunder

17.   **QUIET ENJOYMENT.**  Sublessor covenants that Sublessee, on payment of all Rent due and performing all the covenants herein, shall and may peacefully and quietly have, hold and enjoy the Sublet Premises for the Term.

18.   **EXPENSES.**  The prevailing party in any lawsuit between Sublessor and Sublessee shall be reimbursed by the non-prevailing party for its reasonable attorneys' fees and costs.

19.   **REMEDIES NOT EXCLUSIVE.**  It is agreed that each and every of the rights, remedies and benefits provided by this Sublease shall be cumulative, and shall not be exclusive of any other of said rights, remedies and benefits, or of any other rights, remedies and benefits allowed by law.

20.   **WAIVER.**  One or more waivers of any covenant or condition by Sublessor or Sublessee shall not be construed as a waiver of a further breach of the same covenant or condition.

21.   **NOTICES.**  Any notice which either party may or is required to give, shall be given by mailing the same, postage prepaid, to Sublessee at 4100 N. Atlantic Boulevard, Auburn Hills,

Michigan 48326 or to Sublessor, at the Demised Premises with a copy to the Manager, Real Estate Services, 5825 Delphi Drive, MC 480-410-174, Troy, Michigan 48098 or at such other place as may be designated by the parties from time to time.

22.    **HAZARDOUS SUBSTANCES.**    Sublessee shall not use, store, or dispose of any hazardous substances upon the Demised Premises, except use and storage of such substances if they are customarily used in Sublessee's business, and such use and storage complies with all environmental laws and regulations. Hazardous substances means any hazardous waste, substance or toxic materials regulated under any federal or state environmental laws or local regulations or ordinances applicable to the property.  Notwithstanding anything herein contained to the contrary, Sublessor acknowledges that Sublessee's operation of the Sublet Premises in accordance with its prior practices shall not violate the provisions of this Paragraph 22.

23.    **HOLDING OVER.**  It is hereby agreed that if Sublessee holds over after the termination of this Sublease or the date to exclude the respective portion from the Sublet Premises as described in Paragraph 1 (including any holdover occupancy by Nidec), with respect to any portion of the Sublet Premises, thereafter the tenancy shall be from month to month in the absence of a written agreement to the contrary and Sublessee shall pay as Rent for such portion of the Sublet Premises at the rate of $.0417 per square foot per day plus $3,800 per day for each day until the date such portion of the Sublet Premises are delivered to Sublessor

24.    **SURRENDER.**  Upon surrender, Sublessee shall promptly deliver all keys for the Sublet Premises to Sublessor at the place then fixed for notice.  No surrender of the Sublet Premises by Sublessee, nor delivery of the keys therefor to Sublessor, nor acceptance by Sublessor of such surrender of keys, shall operate or be construed as relieving Sublessee of any of its obligations hereunder.  This Sublease and the tenancy hereby created shall cease and terminate at the end of the original term hereof, and Sublessee hereby waives notice to move and agrees that Sublessor shall be entitled to the benefit of all provisions of law respecting the summary recovery of possession of the Sublet Premises from a tenant holding over to the same extent as if statutory notice were given.

All property, equipment, fixtures, and inventory including without limitation, all personal property, goods, improvements, fixtures and merchandise or any property owned or controlled by Sublessee left on the Demised Premises when Sublessee vacates shall be deemed to have been abandoned by Sublessee, and by such abandonment, Sublessee and any other person or corporation claiming through or under Sublessee, automatically relinquishes any right or interest therein and authorizes Sublessor to sell, dispose of, or destroy same. Sublessor shall have the exclusive right to retain all proceeds from any sale.  Sublessee shall be liable to Sublessor for any reasonable costs of removal of Sublessee's property.

**IN WITNESS WHEREOF,** the parties hereto have executed this Sublease as of the date set forth above.

Witness

_____

Print Name:_____

**SUBLESSOR**:

Delphi Automotive Systems LLC

By:_____

Print Name:_____

Its:_____

Witness

_____

Print Name:_____

**SUBLESSEE**:

Valeo Electrical Systems, Inc.

By:_____

Print Name:_____

Its:_____

The Prime Landlord hereby consents to the foregoing Sublease and specifically to the provisions of Paragraphs 13(a) and (b) of such Sublease.

Witness

         The Metcalf Family Living Trust,
         dated June 11, 1993

Print Name:_____

         By:_____
         Print Name:_____
         Its:_____

**EXHIBIT H**

**ESCROW AGREEMENT**

THIS ESCROW AGREEMENT (this "Escrow Agreement") made and entered into on April ___, 2007, among LAWYERS TITLE INSURANCE CORPORATION (the "Escrow Agent"), DELPHI AUTOMOTIVE SYSTEMS LLC, a Delaware limited liability company ("Sublessor"), and VALEO ELECTRICAL SYSTEMS, INC., a Delaware corporation ("Sublessee"), is based upon the following:

A.      Sublessor and Sublessee entered into a Real Property Purchase Agreement, dated March 2, 2007 (the "Purchase Agreement"), with respect to the sale of real property that is located in the City of Auburn Hills, Oakland County, State of Michigan (the "State") (the "Property").

B.      Sublessor assigned its rights under the Purchase Agreement to Metcalf Family Trust ("Prime Landlord") pursuant to an Assignment and Assumption Agreement dated March 2, 2007. Sublessor and Prime Landlord executed a Lease Agreement for the Property dated March 2, 2007.

C.      Sublessor and Sublessee entered into a Sublease Agreement (the "Sublease") for Sublessee's post-closing occupancy of a portion of the Property (the "Premises").

D.      Pursuant to Paragraph 4 of the Sublease, Sublessor and Sublessee agreed to enter into an escrow agreement with Escrow Agent pursuant to which Sublessee will deposit with Escrow Agent an amount equal to Eight Hundred Eighty Thousand Two Hundred Fifty and 00/100 Dollars ($880,250.00) representing the total rent payable by Sublessee during the term of the Sublease (as calculated based on a 360-day year) plus One Hundred Thousand Dollars ($100,000) (the "Sublease Escrow Funds").

E.      The Sublease Escrow Funds are to be disbursed for the payment of the Rent under the Sublease in accordance with this Escrow Agreement.

F.    Escrow Agent has agreed to receive, hold and return or release the Sublease Escrow Funds in the manner set forth in this Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants, terms, and conditions contained in this Escrow Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Escrow Agreement agree as follows:

1.    Defined Terms.

(a)    Terms used in this Escrow Agreement with initial capital letters and not otherwise defined in this Escrow Agreement have the meaning ascribed to them in the Sublease.

(b)    Seller and Purchaser agree that the Sublease Escrow Funds are equal to Eight Hundred Eighty Thousand Two Hundred Fifty and 00/100 Dollars ($880,250.00). Such amount has been computed as if Tenant occupied the entire Premises for the full term for each respective portion thereof as provided in the Sublease; however, Sublessor and Sublessee acknowledge that Sublessee may vacate portions of the Premises prior to the expiration of the full term of the Sublease with respect thereto, in which event the portion of the Sublease Escrowed Funds applicable to the unused term will be returned to Sublessee as herein provided.

2.    Appointment of Escrow Agent.  Sublessor and Sublessee appoint Escrow Agent as their escrow agent for the purposes set forth in this Escrow Agreement, and Escrow Agent accepts such appointment.

3.    Delivery of Post Closing Escrowed Funds.  On the date of this Agreement, Sublessee has delivered to Escrow Agent the Sublease Escrow Funds.

4.    Acceptance of Appointment by Escrow Agent.  Escrow Agent confirms receipt of the Sublease Escrow Funds.  Escrow Agent agrees to hold the Sublease Escrow Funds in a

federally-insured and interest-bearing account pursuant to the terms of this Escrow Agreement, with the interest earned thereon to be added to and become a part of the Sublease Escrow Funds. Escrow Agent agrees to hold and disburse the Sublease Escrow Funds and all accrued interest on the Sublease Escrow Funds in accordance with the terms and conditions of this Escrow Agreement.

5.    <u>Disposition of Sublease Escrow Funds</u>.  The Sublease Escrow Funds will be held and disbursed by Escrow Agent as follows:

(a)    The Escrow Agent will disburse the Escrow Funds to the Sublessor pursuant to the following schedule ("Disbursement Schedule"):

(i)    On the thirtieth (30th) day following the Commencement Date defined in the Sublease, the Escrow Agent shall disburse to Sublessor from the Sublease Escrow Funds, One Hundred Seventy-seven Thousand Two Hundred Fifty and 00/100 ($177,250.00).

(ii)    On the sixtieth (60th) day following the Commencement Date defined in the Sublease, the Escrow Agent shall disburse to Sublessor from the Sublease Escrow Funds, One Hundred Seventy-seven Thousand Two Hundred Fifty and 00/100 ($177,250.00).

(iii)    On the ninetieth (90th) day following the Commencement Date defined in the Sublease, the Escrow Agent shall disburse to Sublessor from the Sublease Escrow Funds, One Hundred Seventy-seven Thousand Two Hundred Fifty and 00/100 ($177,250.00).

(iv)    On the one hundred and twentieth (120th) day following the Commencement Date defined in the Sublease, the Escrow Agent shall disburse to Sublessor from the Sublease Escrow Funds, One Hundred Seventy-seven Thousand Two Hundred Fifty and 00/100 ($177,250.00).

(v)    On the one hundred and fiftieth (150th) day following the Commencement Date defined in the Sublease, the Escrow Agent shall disburse to Sublessor from the Sublease Escrow Funds, Seventy-one Thousand Two Hundred Fifty and 00/100 ($71,250.00).

All payments called for under the Sublease shall be made without setoff or deduction, at Sublessor's office or at such other address as Sublessor may designate subject to Sublessee's right to vacate portions of the Premises prior to the expiration of the term for that portion of the Premises as set forth in the Sublease.

(b)     If Sublessee vacates portions of the Premises prior to expiration of the term for that portion of the Premises as set forth in the Sublease, then at any time prior to the end of each respective period described above, Sublessee may provide Sublessor and the Escrow Agent a written notice ("Early Exit Notice") detailing (1) the reduction in the number of rentable square feet of the Premises, (2) the date of the number of rentable square feet of the Premises occupied on a daily basis during the preceding rental period, (3) the rent payable therefor (at the rate of $.0417 per square feet per day) ("Revised Rental Amount") and (4) the adjusted "Disbursement Schedule" for the remainder of the Term of the Sublease.

(c)     Within ten (10) days after receipt of such Early Exit Notice, the Escrow Agent shall pay the Revised Rental Amount due pursuant to such notice to Sublessor.  If Sublessee fails to so provide such notice prior to the end of each period described above, the Escrow Agent shall pay the amount due Sublessor pursuant to the above disbursement of Sublease Escrow Funds.

(d)     If Sublessee holds over after the termination of the term of the Sublease or the date to exclude the respective portion from the Sublet Premises as described in Paragraph 1 of the Sublease with respect to any portion of the Sublet Premises, thereafter the tenancy shall be from month-to-month in the absence of a written agreement to the contrary, and then at any time prior to the end of each respective period described above or within ten (10) days after the end of a month of holdover tenancy, Sublessor may provide Sublessee and the Escrow Agent a written notice ("Holdover Notice") detailing (1) the number of rentable square feet of the Premises in which Sublessee held over on a daily basis during either the preceding rental period or preceding month, and (2) the rent payable therefor (a the rate of $0.0417 per square foot per day plus $3,800 per day) ("Holdover Amount").

(e)     Within ten (10) days after receipt of such Holdover Notice, the Escrow Agent shall pay the Holdover Amount (plus any amount owed pursuant to the Disbursement Schedule in Paragraph 5(a)).

(f)     Upon Sublessee's vacation of the entire Premises, Sublessee shall deliver a written notice to the Escrow Agent and Sublessor notifying them of Sublessee's vacation of the Premises.  Escrow Agent shall pay the rent due Sublessor for such period and the balance of the Sublease Escrow Funds, if any, shall be paid to Sublessee.

(g)     Notwithstanding the provisions of Paragraph 5(a), (b) and (c) hereof:

(i)     If the Escrow Agent has not received an Early Exit Notice from Sublessee or Holdover Notice from Sublessor with respect to any period, the Escrow Agent shall pay to Sublessor the amount for such period payable with respect to the period described in the Disbursement Schedule above.

(ii)     Notwithstanding such Early Exit Notice from Sublessee and payment of such Revised Rental Amount by the Escrow Agent or Holdover Notice for Sublessor and payment of such Holdover Amount by Escrow Agent, Sublessor shall have the right to contest Sublessee's Early Exit Notice and Sublessee shall have the right to contest Sublessor's Holdover Notice for any respective period (or month during a holdover period) by written notice to the other party and the Escrow Agent within ten (10) days after receipt of Sublessee's Early Exit Notice or Sublessor's Holdover Notice with respect to such period.  If Sublessor or Sublessee fail to so provide such notice within such ten (10) day period, the other party's notice shall be conclusive.  If Sublessor or Sublessee provides such notice in a timely manner, Sublessor and Sublessee shall use good faith efforts to resolve such matter and the Escrow Agent shall continue to hold the disputed amount as provided in Paragraph 6 hereof.  Any undisputed amount shall be released to Sublessor and Sublessee as provided in Paragraphs 5(a)-(f) hereof.

6.     <u>Limitation on Escrow Agent's Liability</u>.  Except for Escrow Agent's willful default or misconduct or negligence, Escrow Agent will have no liability under this Escrow Agreement as long as it performs its obligations under this Escrow Agreement in good faith.  In the event of a dispute as to the disposition of the Sublease Escrow Funds, Escrow Agent is authorized and directed to do either of the following (the determination of which will be made by Escrow Agent in

its sole discretion):  (i) file an interpleader action as provided by law, in which event Escrow Agent will be released from any further liability under this Escrow Agreement, or (ii) hold the Sublease Escrow Funds until Escrow Agent receives an order of a court of competent jurisdiction or written instructions from both Sublessor and Sublessee directing the disposition of the Sublease Escrow Funds.  Sublessor and Sublessee, jointly and severally, agree to reimburse Escrow Agent for any and all expenses, including reasonable attorneys' fees, which Escrow Agent may incur as a result of any legal proceedings affecting this Escrow Agreement or the performance of Escrow Agent's duties, provided that as between Sublessor and Sublessee, the non-prevailing party in any dispute between Sublessor and Sublessee that results in expenses being incurred by Escrow Agent under this Escrow Agreement will be responsible for such expenses.  Upon the performance of the services described above, Escrow Agent will be released and acquitted from any further liabilities concerning this Escrow Agreement, it being expressly understood that such liability in any event is limited by the terms and conditions set forth in this Escrow Agreement.

7.    Notices.    All notices or other communications provided for under this Escrow Agreement must be in writing and signed on behalf of the party that sends the notice or other communication.  Notices and other communications must be personally delivered, sent by certified or registered mail, return receipt requested, or sent by a reputable national overnight delivery service, and will be effective upon the earlier of receipt or refusal or failure to accept receipt if sent to the following addresses:

| | |
|---|---|
| If to Escrow Agent: | Land America/Lawyers Title Corporation<br>1050 Wilshire Drive<br>Troy, Michigan  48084<br>Attention:    Steve Nadolski |
| If to Sublessor: | Delphi Automotive Systems LLC<br>5825 Delphi Drive<br>MC:  480-410-174<br>Troy, Michigan  48098<br>Attention:    Jeffrey Beaudoen, Manager,<br>            Real Estate Services |

|                    |                                                      |
|--------------------|------------------------------------------------------|
| With a Copy to:    | Delphi Automotive Systems                            |
|                    | 5725 Delphi Drive                                    |
|                    | MC:  483-400-603                                     |
|                    | Troy, Michigan  48098                                |
|                    | Attention:      Deputy General Counsel               |
|                    |                 Transactional & Restructuring        |
|                    |                                                      |
|                    |                                                      |
| If to Sublessee:   | Valeo Electrical Systems, Inc.                       |
|                    | 4100 North Atlantic Boulevard                        |
|                    | Auburn Hills, Michigan  48326                        |
|                    | Attention:      Francoise Colpron                    |
|                    | email:  francoise.colpron@valeo.com                  |
| With a Copy to:    | Honigman Miller Schwartz and Cohn LLP                |
|                    | 2290 First National Building                         |
|                    | Detroit, Michigan  48226                             |
|                    | Attention:      E. Todd Sable, Esq.                  |
|                    | (313) 465-7549 (Fax)                                 |
|                    | (313) 465-7548 (Voice)                               |
|                    | email: tsable@honigman.com                           |

Each party may change its address from time to time by delivering notice to each of the other parties in any manner described above.

8.    <u>Applicable Law</u>.  This Agreement will be interpreted and enforced according to the laws of the State of Michigan.

9.    <u>Counterparts</u>.  This Escrow Agreement may be executed in counterparts, each of which will constitute an original although not fully executed, but all of which when taken together, will constitute but one agreement.  Delivery by facsimile of this Escrow Agreement or an executed counterpart of this Escrow Agreement will be deemed a good and valid execution and delivery of this Escrow Agreement.

10.    <u>Entire Agreement</u>.  This Escrow Agreement and the Sublease represent the entire understanding between the parties with respect to the subject matter of this Escrow Agreement, and all prior agreements and understandings between the parties with respect to the subject matter of this Escrow Agreement are merged in this Escrow Agreement.  Any amendment, modification, or

waiver of any obligation under this Escrow Agreement must be in writing and signed by the parties that are to be bound by the applicable amendment, modification or waiver.

11.    <u>Successors and Assigns</u>.  This Escrow Agreement will be binding upon and inure to the benefit of the parties to this Escrow Agreement and their respective heirs, representatives, successors, and assigns.

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the day and year first above written.

DELPHI AUTOMOTIVE SYSTEMS LLC,
a Delaware limited liability company

By:_____

Its:      Authorized Signatory


VALEO ELECTRICAL SYSTEMS, INC.,
a Delaware corporation

By:_____

Its:_____


LAWYERS TITLE INSURANCE
CORPORATION

By:_____

Its:_____

**EXHIBIT I**

**CERTIFICATE OF TRANSFEROR**

**(FIRPTA Affidavit)**

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person.   To inform _____, the transferee of certain real property located 3000 University Drive, Auburn Hills, Michigan that withholding of tax is not required upon the disposition of such U.S. real property interest by the undersigned ("**Transferor**"), the undersigned certifies the following on behalf of Transferor:

I.        Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

II.       Transferor's U.S. tax identification number is _____; and

III.      Transferor's office address is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by the transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury, I declare that I have examined this certificate and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated: _____, 2007.

**Transferor**:

_____

By:_____

Print Name:_____

Its:_____

**EXHIBIT J**

**WATER DAMAGE CONSULTANTS' RECOMMENDATIONS**

| | | |
|---|---|---|
| 1. | 09-28-2001 | Air Analysis & Consulting Report No. 012009-D |
| 2. | 10-02-2001 | Air Analysis & Consulting Report No. B-05969 |
| 3. | 10-02-2001 | Air Analysis & Consulting Report No. CR-010110-E |
| 4. | 10-19-2001 | Air Analysis & Consulting Report No. 011510-E |
| 5. | 10-19-2001 | MEA Project No. 2451 |
| 6. | 12-04-2001 | MEA Project No. 2451 (b) |
| 7. | 02-26-2002 | MEA Air Sample Data (no report) |
| 8. | 07-19-2002 | SME Project No. PG41597 |
| 9. | 10-04-2002 | BDN Air Sample Data and Analysis |
| 10. | 01-09-2003 | NTH Project No.: 16-021141-00 |
| 11. | 07-31-2003 | NTH Project No.: 16-021141-01 |
| 12. | 12-10-2003 | NTH Project No.: 16-021141-03 |
| 13. | 04-12-2004 | NTH Project No.: 16-040238-00 |
| 14. | 11-05-2004 | NTH Project No.: 16-041067-00 |