Exhibit B

**EXECUTION COPY 03/02/2007**

# LEASE AGREEMENT

Between

The Metcalf Family Living Trust dated June 11, 1993

as Lessor

and

Delphi Automotive Systems LLC

as Lessee

# TABLE OF CONTENTS

## ARTICLE I

SECTION 1.01.        LEASE OF PREMISES; TITLE AND CONDITION .............................. 1

Section 1.02.        Use ........................................................................................................... 1

Section 1.03.        Term ......................................................................................................... 1

Section 1.04.        Options To Extend the Term .................................................................... 2

Section 1.05.        Rent .......................................................................................................... 2

Section 1.06.        Right of First Refusal ............................................................................... 4

## ARTICLE II

SECTION 2.01.        MAINTENANCE AND REPAIR ............................................................. 4

Section 2.02.        Alterations, Replacements and Additions ................................................. 5

## ARTICLE III

SECTION 3.01.        SEVERABLE PROPERTY ..................................................................... 5

Section 3.02.        Removal .................................................................................................... 6

## ARTICLE IV

SECTION 4.01.        LESSEE'S ASSIGNMENT AND SUBLETTING .................................... 6

Section 4.02.        Transfer or Pledge by Lessor .................................................................... 7

Section 4.03.        Sublessee SNDA's ..................................................................................... 7

## ARTICLE V

SECTION 5.01.        NET LEASE ............................................................................................ 8

Section 5.02.        Taxes and Assessments; Compliance With Law ....................................... 9

Section 5.03.        Liens ....................................................................................................... 10

Section 5.04.        Indemnification ...................................................................................... 10

Section 5.05.        Permitted Contests ................................................................................. 11

Section 5.06.        Environmental Compliance .................................................................... 11

## ARTICLE VI

SECTION 6.01.           PROCEDURE UPON PURCHASE .......................................................13

Section 6.02.           Condemnation and Casualty .................................................................. 14

Section 6.03.           Insurance. ........................................................................................... 17

## ARTICLE VII

SECTION 7.01.           CONDITIONAL LIMITATIONS; DEFAULT PROVISIONS...............19

Section 7.02.           Bankruptcy or Insolvency ..................................................................... 22

Section 7.03.           Additional Rights of Lessor .................................................................. 22

## ARTICLE VIII

SECTION 8.01.           NOTICES AND OTHER INSTRUMENTS ...........................................23

Section 8.02.           Estoppel Certificates; Financial Information ........................................... 24

## ARTICLE IX

SECTION 9.01.           NO MERGER ....................................................................................26

Section 9.02.           Surrender............................................................................................... 26

Section 9.03.           Assumption ........................................................................................... 26

Section 9.04.           Separability; Binding Effect; Governing Law ......................................... 26

Section 9.05.           Table of Contents and Headings; Internal References............................ 26

Section 9.06.           Counterparts .......................................................................................... 27

Section 9.07.           Lessor's Liability .................................................................................. 27

Section 9.08.           Amendments and Modifications .............................................................. 27

Section 9.09.           Additional Rent...................................................................................... 27

Section 9.10.           Consent of Lessor .................................................................................. 27

Section 9.11.           Options................................................................................................... 28

Section 9.12.           Schedules ............................................................................................... 28

Section 9.13.           Currency................................................................................................. 28

Section 9.14.           Waiver of Jury Trial............................................................................... 28

## SCHEDULES

Schedule A        The Land and Permitted Exceptions ................................................................\

Schedule B        Term and Basic Rent....................................................................................\

Schedule C        Commencement and Memorandum of Lease Agreement ................................\

Schedule D        Lessee's Work................................................................................................\

**THIS LEASE AGREEMENT**, dated as of [_____] (this "Lease"), is made between The Metcalf Family Living Trust dated June 11, 1993 ("Lessor"), and Delphi Automotive Systems LLC, a Delaware limited liability company (herein, together with any entity succeeding thereto by consolidation, merger or acquisition of its assets substantially as an entirety, called the "Lessee").

## BACKGROUND

On _____, 2007, Lessee and Valeo Electrical Systems, Inc. (the "Seller") executed a Purchase and Sale Agreement (the "PSA") regarding the purchase by Lessee of the Premises (as defined below).  Lessee and Lessor executed an Assignment Agreement whereby Lessee assigned its interest as Buyer, in and to the PSA and Assignee has agreed to accept such assignment and assume the obligations of Buyer under the PSA.

## ARTICLE I

**Section 1.01. Lease of Premises; Title and Condition**.  In consideration of the rents and covenants herein stipulated to be paid and performed by Lessee and upon the terms and conditions herein specified, Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the premises (the "Premises") consisting of:

(a)    that parcel of land located in Auburn Hills, Michigan and more particularly described in Schedule A attached hereto and made a part hereof (the "Land");

(b)    all of the buildings, structures, fixtures, facilities, installations and other improvements of every kind and description now or hereafter in, on, over and under the Land and all plumbing, gas, electrical, ventilating, lighting and other utility systems, ducts, hot water heaters, oil burners, domestic water systems, elevators, escalators, canopies, air conditioning systems and all other building systems and fixtures attached to or comprising a part of the buildings but excluding all personal property now or hereafter belonging to Lessee and Severable Property (as defined in Section 3.01 hereof) (collectively, the "Improvements"); and

(c)    all of Lessor's right, title and interest, if any, in and to all easements, rights-of-way, appurtenances and other rights and benefits associated with the Land and to all public or private streets, roads, avenues, alleys or passways, open or proposed, on or abutting the Land (the "Agreements") (all of the foregoing being included within the term "Land").

The Premises are leased to Lessee subject to Permitted Exceptions listed in <u>Schedule A</u>.

**Section 1.02.  Use**.  Lessee may use the Premises for any lawful purpose, provided such use shall not diminish the value of the Premises or constitute a nuisance.  Lessor acknowledges that Lessee's current use of the Premises does not diminish the value of the Premises or constitute a nuisance.

**Section 1.03.  Term**.  This Lease shall be for an initial term of ten (10) years beginning on the later of (a) the date hereof (b) the date on which possession of the Premises is delivered to Lessee pursuant to this Lease, or (c) the "Closing Date" of the sale of the Premises from the Seller to Lessor as defined in the PSA (the "Commencement Date") and ending at midnight on the tenth anniversary of the Commencement Date (the "Primary Term").  The time period during which this Lease shall be in effect, including the Primary Term and any Extended Term (as defined in Section 1.04) for which the right to extend is exercised, as any of the same may be terminated prior to their scheduled expiration pursuant to the provisions hereof, is sometimes referred to herein as the "Lease Term."

**Section 1.04.  Options To Extend the Term**.  Unless an Event of Default (as defined herein) has occurred and is continuing at the time any option is exercised, Lessee shall have the right and option to extend the Lease Term for two (2) additional periods of five (5) years each, each commencing at midnight on the day on which the then existing term of this Lease expires (an "Extended Term"), unless this Lease shall have expired or been terminated pursuant to any provision hereof.  The Primary Term and any Extended Term shall commence and expire on the dates set forth in Schedule B.  Prior to exercising its option to extend the Lease Term for each of the Extended Terms, Lessee shall first give Lessor written notice (the "Rental Determination Notice") at any time not more than fifteen (15) or less than nine (9) months prior to the expiration of the then existing Term or Extended Term of Lessee's intent to determine the Adjusted Fair Market Rental (as defined in Section 1.05).  Thereafter, the parties shall begin the determination of the Adjusted Fair Market Rental for the Premises for such Extended Term pursuant to subsection 1.05(d).  After the Adjusted Fair Market Rental for the immediately succeeding Extended Term is determined pursuant to the terms of subsection 1.05(d), Lessee may exercise its option to extend the Lease Term by delivering to Lessor a written instrument of exercise of option no later than six (6) months prior to the expiration of the then existing Lease Term; provided that, if such Adjusted Fair Market Rental value has not been so determined at least 30 days prior to the date by which Lessee must deliver such extension notice, Lessee shall have an additional 45 days after determination thereof within which to make such delivery.  Upon the delivery of the written instrument of exercise referred to in the immediately preceding sentence, as applicable, the Lease Term shall be automatically extended for the next succeeding Extended Term on the terms and conditions provided herein.  Upon the request of Lessor or Lessee, the parties hereto will, at the expense of Lessee, execute and exchange an instrument in recordable form setting forth the extension of the Lease Term in accordance with this Section 1.04.

**Section 1.05.  Rent**.

(a)    During the Primary Term, Lessee shall pay the amounts set forth in Schedule B and during any Extended Term the amount determined in accordance with subsection 1.05(b) and also set forth on Schedule B, as basic rent for the Premises ("Basic Rent").  Notwithstanding anything to the contrary herein, Lessee shall have no obligation to pay Basic Rent for the first full month following the Commencement Date.  Lessee shall pay Basic Rent to Lessor, at Lessor's address as set forth herein, at such other address or to such other person as Lessor from time to time may designate in writing or, if Lessor and Lessee mutually elect, Lessee shall pay Basic Rent via wire transfer to an account specified by Lessor.  Lessor shall give Lessee not less than

15 days' prior written notice of any change in the address to which such payments are to be made. If the party entitled to receive Basic Rent or such party's address shall change, Lessee may, until receipt of notice of such change from the party entitled to receive Basic Rent immediately preceding such change, continue to pay Basic Rent and additional charges to the party to which, and in the manner in which, the preceding installment of Basic Rent or additional charges, as the case may be, was paid. Such annual rentals shall be payable in equal monthly installments in advance on the first day of each month. Any rental payment made with respect to a period which is less than one month shall be prorated by multiplying the then applicable monthly rental by a fraction the numerator of which is the number of days in such month with respect to which rent is being paid and the denominator of which is the total number of days in such month. Lessee shall perform all its obligations under this Lease at its sole cost and expense, and shall pay all Basic Rent, additional charges and any other sum due hereunder when due and payable, without notice or demand. Under the terms of this Lease, Lessee is not required to pay any separate management or administration fee to Lessor.

(b)     . During the Extended Terms hereof, Lessee shall pay to Lessor as Basic Rent for the Premises, without any prior demand therefor, an amount per annum equal to the Adjusted Fair Market Rental (as hereinafter defined). Such amounts shall be payable in equal monthly installments in advance on the first day of each month during the applicable Extended Term.

(c)     Intentionally Omitted.

(d)     The term "Adjusted Fair Market Rental" as used herein shall mean an amount equivalent to ninety-five percent (95%) of the then current fair market rate of rentals received for a triple net lease structure in the general market area in which the Premises are located for similar buildings of comparable characteristics, including, but not limited to, age, condition and classification. Following delivery of the Rental Determination Notice, the Adjusted Fair Market Rental shall be determined mutually by Lessor and Lessee within 30 days after Lessor's receipt of the Rental Determination Notice or, if no mutual determination is made, by the following procedure: not more than 40 days after Lessor's receipt of the Rental Determination Notice, the parties shall attempt to agree upon an appraiser. If the parties agree upon an appraiser, the appraiser so selected shall appraise the Adjusted Fair Market Rental value of the Premises within 30 days after selection. If the parties fail to so agree upon the selection of one such appraiser within 40 days after Lessor's receipt of Lessee's Rental Determination Notice, Lessee and Lessor shall each designate, within 10 days from the end of such 40-day period, one appraiser to determine such Adjusted Fair Market Rental value. In the event either party fails to so select its own appraiser, the other party may obtain court appointment of an appraiser. The two appraisers so selected shall attempt to agree upon such Adjusted Fair Market Rental value of the Premises as at the date of said appraisal. In the event the two appraisers fail to agree upon the Adjusted Fair Market Rental value of the Premises within 90 days after Lessor's receipt of Lessee's Rental Determination Notice, the two appraisers shall meet and select a third appraiser within 20 days after the expiration of such 90-day period. In the event the two appraisers fail to so select a third appraiser, either party may obtain court appointment of such third appraiser. Within

3

30 days after the third appraiser is selected, the three appraisers so selected shall meet and attempt to agree upon such Adjusted Fair Market Rental value of the Premises as at the date of said appraisal.  In the event the three appraisers fail to agree upon the Adjusted Fair Market Rental value of the Premises within 140 days after Lessor's receipt of Lessee's Rental Determination Notice, the third appraiser shall independently appraise the Adjusted Fair Market Rental value of the Premises within 10 days after such failure to agree, and the arithmetic mean of the three appraisals will be the Adjusted Fair Market Rental.  All appraisers shall be members in good standing of the American Institute of Real Estate Appraisers or any organization succeeding thereto and have had not less than 10 years' experience with commercial real estate of the type of the Premises in the general market area where the Premises are located.  Lessee and Lessor shall split the cost of all appraisals equally.

**Section 1.06.  Right of First Refusal.**  Lessor grants to Lessee the right of first refusal to purchase the Premises on the same terms and conditions as are stated in any offer for the sale of the Premises made by Lessor or submitted by a prospective purchaser and acceptable to Lessor (an "Offer").  Within five (5) business days after making or receiving any Offer, Lessor shall deliver to Lessee a true, correct and complete copy of the Offer.  Lessee shall have thirty (30) days after Lessee receives the Offer to elect to purchase the Premises on the terms and conditions that are stated in the Offer.  If Lessee does not exercise this right, Lessor may sell the Premises in accordance with the terms and provisions of the Offer during the six (6) month period after Lessee receives the Offer.  If a sale in accordance with an Offer does not close within six (6) months after submission of the Offer, Lessee's right of first refusal herein shall be reinstated.  The right of first refusal contained in this Section 1.06 shall not apply to a foreclosure or similar sale of the Premises by any holder of a mortgage on the Premises or to the granting of a deed in lieu of foreclosure by Lessor to such holder.

**Section 1.07.   Commencement and Memorandum of Lease Agreement:**

The parties agree to execute a Commencement and Memorandum of Lease Agreement, in substantially the form attached hereto as Schedule C, setting forth the commencement, expiration, and anniversary dates of the Initial Term of the Lease and the commencement, expiration, and renewal notification dates of any renewal option(s).  Lessee may record the Commencement and Memorandum of Lease Agreement at Lessee's expense.  Neither party shall record the Lease or any portion thereof.

## ARTICLE II

**Section 2.01.  Maintenance and Repair**.

(a)     Lessee acknowledges that it has received the Premises in good order and repair.  Subject to Lessor's reimbursement obligations set forth in Section 2.01(b) below, Lessee, at its own expense, will maintain all parts of the Premises in good repair and condition and will take all action and will make all structural and nonstructural, changes and repairs which may be required to keep all parts of the Premises in good repair and condition (including, but not limited to, all painting, glass, utilities, conduits, fixtures and

MMB:4000-016:736803.2

equipment, foundation, roof, exterior walls, heating and air conditioning systems, wiring, plumbing, sprinkler systems and other utilities, and all paving, sidewalks, roads, parking areas, curbs and gutters and fences), except to the extent any of the foregoing are caused by the Lessor's gross negligence or intentional conduct.  Other than due to Lessor's gross negligence or intentional conduct, Lessor shall not be required to maintain, repair or rebuild all or any part of the Premises.  Subject to the foregoing, Lessee waives the right to require Lessor to maintain, repair or rebuild all or any part of the Premises or make repairs at the expense of Lessor pursuant to any Legal Requirement, Agreement, contract, covenant, condition or restrictions at any time.

(b)    During any Extended Term, it is understood that capital repairs and replacements to the Premises made by Lessee during such Extended Term will be amortized in accordance with generally accepted accounting principles at the time such capital costs are incurred consistently applied over the useful life of the item so capitalized.  The amount of capital costs to be paid by Lessee shall be limited to the portion of the amortized capital costs incurred during the remaining Lease Term in respect to useful life of the item so capitalized.  If the useful life of item so capitalized exceeds the remaining Lease Term, Lessor shall pay the excess to Lessee by paying the entire amount of such excess to Lessee within thirty (30) days after presentation of an invoice.  If Lessee exercises the second Extended Term and for any extended term of the Lease beyond the second Extended Term (whether pursuant to the extension rights in this Lease or pursuant to any additional extension agreed upon by Lessor and Lessee) and Lessor previously paid for a portion of the costs provided for in this Section, then Lessee shall pay to Lessor prior to the commencement of the new extended Term an amount equal to the amortized portion of the capital repairs and replacements paid by Lessor in the prior Extended Term, which are applicable to the following extended Term.

**Section 2.02.  Alterations, Replacements and Additions**.  Lessee may, at its expense, make additions to and alterations of the Improvements, and construct additional Improvements, including performing the work set forth in Schedule D, provided that (i) the fair market value, the square footage (other than, in each case, a *de minimis* amount) or the useful life of the Premises shall not be lessened thereby, (ii) such work shall be expeditiously completed in a good and workmanlike manner and in compliance with all applicable Legal Requirements and the requirements of all insurance policies required to be maintained by Lessee hereunder, and (iii) Lessee shall have obtained Lessor's consent, provided that Lessor's consent shall not be required with respect to the work set forth on Exhibit D, although Lessor has the right to review the plans.  In the event Lessee desires Lessor's determination that a proposed alteration, if completed in accordance with detailed plans and specifications submitted to Lessor, which are prepared by a licensed architect, shall not lessen the fair market value of the  Premises or is not a structural alteration, Lessor shall advise Lessee of its determination within fifteen (15) days after Lessor receives such detailed plans and specifications for the alteration.  Cosmetic, interior or nonstructural alterations that cost $500,000 or less in any one project shall not require Lessor's prior written consent.  All additions and alterations of the Premises, without consideration by Lessor, shall be and remain part of the Premises and the property of Lessor and shall be subject to this Lease.

MMB:4000-016:736803.2

## ARTICLE III

**Section 3.01. Severable Property**.  Lessee may, at its expense, install, assemble or place on the Premises and remove and substitute any items of machinery, equipment, furniture, furnishings or other personal property used or useful in Lessee's business and trade fixtures (collectively, the "Severable Property"), and title to same shall remain in Lessee.  Lessor, on behalf of itself and any parties claiming through it, hereby (i) waives any right of distraint, landlord's lien, or any other interest, lien or claim Lessor may now have or hereafter obtain in such Severable Property whether by operation of law, contract or otherwise and (ii) agrees that Lessee may lease or enter into financing arrangements with respect to the Severable Property, and any lessor or lender of Severable Property may remove such Severable Property from the Premises within the time period provided for in Section 3.02 below, and may enter upon the Premises for such purpose, without hindrance or disturbance on the part of the Lessor.  Lessor agrees, at the request of Lessee, to execute a waiver agreement, reasonably satisfactory to Lessee and Lessor, for the benefit of any present or future holder of a security interest in or lessor of any Severable Property.

**Section 3.02.  Removal**.  Lessee may remove the Severable Property at any time during the Lease Term.  Any of Lessee's Severable Property not removed by Lessee prior to the expiration of the Lease or 30 days after an earlier termination shall be considered abandoned by Lessee and may be appropriated, sold, destroyed or otherwise disposed of by Lessor without obligation to account therefor.  Lessee will repair at its expense all damage to the Premises necessarily caused by the removal of Lessee's Severable Property, whether effected by Lessee or by Lessor (unless this Lease has been terminated as a result of casualty or condemnation).  The foregoing notwithstanding, Lessee's Severable Property shall not be considered abandoned unless and until Lessor shall have given to Lessee written notice and Lessee shall have failed to remove Lessee's Severable Property within five (5) days.

## ARTICLE IV

**Section 4.01. Lessee's Assignment and Subletting**.  Unless an Event of Default shall have occurred hereunder and be continuing, Lessee may, for its own account, assign this Lease or sublet or license the use of all or any part of the Premises for the Primary Term or any Extended Term (with respect to which such extension has previously been exercised) of this Lease.  Each such assignment or sublease shall expressly be made subject to the provisions hereof.  No such assignment or sublease shall modify or limit any right or power of Lessor hereunder or affect or reduce any obligation of Lessee hereunder, and all such obligations shall be those of Lessee and shall continue in full effect as obligations of a principal and not of a guarantor or surety, as though no subletting or assignment had been made, such liability of the Lessee named herein to continue notwithstanding any subsequent modifications or amendments of this Lease; provided, however, that (other than with respect to any modifications required by law or on account of bankruptcy or insolvency) if any modification or amendment is made without the consent of Lessee named herein (which consent shall not be unreasonably withheld or delayed), such modification or amendment shall be ineffective as against Lessee named herein to the extent, and only to the extent, that the same shall increase the obligations of Lessee, it being expressly agreed that (even if any such modification or amendment shall materially

6

increase the likelihood of a default by Lessee under this Lease) Lessee named herein shall remain liable to the full extent of this Lease as if such modification had not been made.  Neither this Lease nor the Lease Term hereby demised shall be mortgaged by Lessee, nor shall Lessee mortgage or pledge its interest in any sublease of the Premises or the rentals payable thereunder. Any sublease made other than as expressly permitted by this Section 4.01 and any assignment of Lessee's interest hereunder made otherwise than as expressly permitted by this Section 4.01 shall be void.  Lessee shall, within 20 days after the execution of any assignment or sublease, deliver a conformed copy thereof to Lessor.  Notwithstanding anything herein to the contrary, Lessee shall be entitled to assign this lease in accordance with a confirmation plan approved by the Bankruptcy Court (as defined in Section 7.02 (a)).

      **Section 4.02.  Transfer or Pledge by Lessor**.  Lessor shall be free to transfer its fee interest in the Premises or any part thereof or interest therein; subject, however, to the terms of this Lease.  Any such transfer shall relieve the transferor of all liability and obligation hereunder (to the extent of the interest transferred) accruing after the date of the transfer and any assignee shall be bound by the terms and provisions of this Lease.  Lessor shall be free to pledge or mortgage its interest in the Premises and this Lease on the condition that either (i) this Lease shall be superior to such pledge or mortgage or (ii) if Lessor elects to have this Lease be subordinate to the mortgage of any lender of Lessor, Lessee receives a subordination, nondisturbance agreement and attornment reasonably acceptable to Lessee from the holder of such pledge or mortgage.

Such subordination, non-disturbance and attornment agreement shall be executed by Lessor, the mortgagee, and any other persons claiming benefits under such Agreement, and shall provide (i) that the Lease is subordinate to the lien of any mortgage or mortgages upon the Premises, (ii) that the Lessee's right of possession will not be disturbed by the mortgagee in connection with any mortgage foreclosure proceedings so long as Lessee performs its obligations set forth in the Lease, (iii) that the Lessee shall attorn to the foreclosing mortgagee or purchaser at the foreclosure sale, and (iv) such other provisions which are acceptable to Lessee.

Lessor agrees that, in the event a mortgage is placed on the Land or the Premises and a collateral assignment of rents or leases is given as security for the loan, Lessee will be furnished with a copy of such collateral assignment.

## ARTICLE V

**Section 5.01.  Net Lease**.

      (a)      It is expressly understood and agreed by and between the parties that this Lease is a triple net lease, and the Basic Rent and all other sums payable hereunder to or on behalf of Lessor shall be paid without notice or demand and without setoff, counterclaim, abatement, suspension, deduction or defense.

7

(b)    Except as otherwise expressly provided in the Lease, this Lease shall not terminate, nor shall Lessee have any right to terminate this Lease or be entitled to the abatement of any rent or any reduction thereof, nor shall the obligations hereunder of Lessee be otherwise affected, by reason of any damage to or destruction of all or any part of the Premises from whatever cause, the taking of the Premises or any portion thereof by condemnation or otherwise, the prohibition, limitation or restriction of Lessee's use of the Premises, or interference with such use by any private person or corporation, or by reason of any eviction by paramount title or otherwise, or Lessee's acquisition of ownership of the Premises otherwise than pursuant to an express provision of this Lease, or for any other cause whether similar or dissimilar to the foregoing, any present or future law to the contrary notwithstanding, it being the intention of the parties hereto that the rent and all other charges payable hereunder to or on behalf of Lessor shall continue to be payable in all events and the obligations of Lessee hereunder shall continue unaffected, unless the requirement to pay or perform the same shall be terminated pursuant to an express provision of this Lease.  Nothing contained in this Section 5.01 shall be deemed a waiver by Lessee of any rights that it may have to bring a separate action with respect to any default by Lessor hereunder or under any other agreement.

(c)    Lessee covenants and agrees that it will remain obligated under this Lease in accordance with its terms, and that Lessee will not take any action to terminate, rescind or avoid this Lease, notwithstanding the bankruptcy, insolvency, reorganization, composition, readjustment, liquidation, dissolution, winding-up or other proceeding affecting Lessor or any assignee of Lessor in any such proceeding and notwithstanding any action with respect to this Lease which may be taken by any trustee or receiver of Lessor or of any assignee of Lessor in any such proceeding or by any court in any such proceeding.

(d)    Except as otherwise expressly provided in this Lease, Lessee waives all rights now or hereafter conferred by law (i) to quit, terminate or surrender this Lease or the Premises or any part thereof or (ii) to any abatement, suspension, deferment or reduction of the rent, or any other sums payable hereunder to or on behalf of Lessor, regardless of whether such rights shall arise from any present or future constitution, statute or rule of law.

(e)    Lessor covenants that during the Lease Term and provided that Lessee has performed and observed all of the covenants and conditions on its part to be performed and observed under this Lease, Lessee's quiet and peaceful enjoyment of possession of the Premises shall not be disturbed by Lessor or persons claiming by, through or under Lessor.

**Section 5.02.  Taxes and Assessments; Compliance With Law**.

(a)    Lessee shall pay, prior to delinquency: (i) all taxes, assessments, levies, fees, water and sewer rents and charges and all other governmental charges, general and special, ordinary and extraordinary, foreseen and unforeseen, which are, at any time prior to or during the Primary Term or any Extended Term hereof imposed or levied upon or assessed against or which arise with respect to (A) the Premises, (B) any Basic Rent,

additional rent or other sums payable hereunder, (C) this Lease or the leasehold estate hereby created or (D) the operation, possession or use of the Premises; (ii) all gross receipts or similar taxes (i.e., taxes based upon gross income which fail to take into account deductions with respect to depreciation, interest, taxes or ordinary and necessary business expenses, in each case relating to the Premises) imposed or levied upon, assessed against or measured by any Basic Rent, additional rent or other sums payable hereunder; (iii) all sales, value added, ad valorem, use and similar taxes at any time levied, assessed or payable on account of the acquisition, ownership, leasing, operation, possession or use of the Premises; and (iv) all charges of utilities, communications and similar services serving the Premises.  Lessee shall be entitled to any abatement, refund or rebate made for any taxes, assessments, levies, fees or other amounts that are the responsibility of Lessee under this subsection 5.02(a).  Lessee shall not be required to pay any tax resulting from the negligence or fraud of Lessor, any excess profits, franchise, estate, inheritance, transfer, income, capital gains or similar tax of Lessor; provided, however, that if, at any time during the Lease Term, the method of taxation shall be such that there shall be assessed, levied, charged or imposed on Lessor a capital levy or other tax directly on the rents received therefrom, or upon the value of the Premises or any present or future improvement or improvements on the Premises, then all such levies and taxes or the part thereof so measured or based shall be payable by Lessee, and Lessee shall pay and discharge the same as herein provided.  Lessee will furnish to Lessor, promptly after demand therefor, proof of payment of all items referred to above which are payable by Lessee.  If any such assessment may legally be paid in installments, Lessee may pay such assessment in installments; in such event, Lessee shall be liable only for installments which become due and payable with respect to any tax period occurring in whole or in part during the Lease Term hereof; provided, however, that all amounts referred to in this Section 5.02(a) for the fiscal or tax year in which the Lease Term shall expire shall be apportioned so that Lessee shall pay those portions thereof which correspond with the portion of such year as are within the Lease Term hereby demised.

(b)     Lessee shall comply with and cause the Premises to comply with and shall assume all obligations and liabilities with respect to (i) all laws, ordinances and regulations and other governmental rules, orders and determinations presently in effect or hereafter enacted, made or issued, whether or not presently contemplated (collectively, "Legal Requirements"), applicable to the Premises or the ownership, operation, use or possession thereof and (ii) all agreements, contracts, insurance policies (including, without limitation, to the extent necessary to prevent cancellation thereof and to insure full payment of any claims made under such policies), agreements, covenants, conditions and restrictions now or hereafter applicable to the Premises or the ownership, operation, use or possession thereof, including, but not limited to, all such Legal Requirements, contracts, agreements, covenants, conditions and restrictions which require structural, unforeseen or extraordinary changes; provided, however, that, with respect to any of the obligations of Lessee in clause (ii) above, Lessee shall not be required to so comply unless Lessee is either a party thereto or has given its written consent thereto, or unless the same is occasioned by Legal Requirements or Lessee's default (including any failure or omission by Lessee) under this Lease.  Further, any such structural unforeseen or extraordinary changes will be amortized in accordance with generally accepted

9

accounting principles and the amount of the cost of such structural, unforeseen or extraordinary changes that Lessee is responsible for is limited to the remaining current lease term.   At Lessor's option, Lessor will pay the cost of the entire structural, unforeseen or extraordinary changes and bill Lessee for the Lessee's portion in equal monthly installments, or Lessee shall pay the entire cost and Lessor shall reimburse Lessee for Lessor's portion within 30 days after presentation of an invoice from Lessee. Nothing in clause (ii) of the immediately preceding sentence or the following sentence shall modify the obligations of Lessee under Section 5.04 of this Lease.   If Lessee exercises the second Extended Term and for any extended term of the Lease beyond the second Extended Term (whether pursuant to the extension rights in this Lease or pursuant to any additional extension agreed upon by Lessor and Lessee) and Lessor previously paid for a portion of the costs for structural, unforeseen or extraordinary changes provided for in this Section, then Lessee shall pay to Lessor prior to the commencement of the new extended Term an amount equal to the amortized portion of the costs for structural, unforeseen or extraordinary changes provided for in this Section paid by Lessor in the prior Extended Term, which are applicable to the following extended Term.

(c)     After the occurrence and during the continuance of an Event of Default by Lessee under this Lease, and upon the request of Lessor, Lessee shall, in addition to and concurrently with the payment of Basic Rent as required in subsection 1.05(a) hereof, pay one-twelfth of the amount (as estimated by Lessor) of the annual taxes and assessments described in subsection 5.02(a) hereof and the annual premiums for insurance required in Section 6.03 hereof next becoming due and payable with respect to the Premises, and Lessee shall also pay to Lessor on demand therefor the amount by which the actual taxes and assessments and insurance premiums exceed the payment by Lessee required in this subsection.

**Section 5.03.  Liens**.  Lessee will remove and discharge any charge, lien, security interest or encumbrance upon the Premises or upon any Basic Rent, additional rent or other sums payable hereunder which arise from the acts of Lessee, including, without limitation, all liens which arise out of the possession, use, occupancy, construction, repair or rebuilding of the Premises or by reason of labor or materials furnished to Lessee or for the Premises, but not including (i) the liens and encumbrances set forth in <u>Schedule A</u>, (ii) this Lease and any assignment hereof or any sublease permitted hereunder and (iii) any mortgage, charge, lien, security interest or encumbrance created or caused by Lessor or its agents, employees or representatives without the consent of Lessee.  Lessee may provide a bond or other security reasonably acceptable to Lessor to remove or pay all costs associated with the removal of any such lien, provided the conditions of Section 5.05 shall be satisfied.   Nothing contained in this Lease shall be construed as constituting the consent or request of Lessor, express or implied, to or for the performance (on behalf of or for the benefit of Lessor) by any contractor, laborer, materialman or vendor, of any labor or services or for the furnishing of any materials for any construction, alteration, addition, repair or demolition of or to the Premises or any part thereof.  Notice is hereby given that Lessor will not be liable for any labor, services or materials furnished or to be furnished to Lessee, or to anyone holding an interest in the Premises or any part thereof through or under Lessee, and that no mechanic's or other liens for any such labor, services or materials shall attach to or affect the interest of Lessor in and to the Premises.

10

**Section 5.04. Indemnification**.  Except for the negligence, gross negligence or willful misconduct of the Lessor, Lessee shall defend all actions against Lessor with respect to, and shall pay, protect, indemnify and save harmless the Lessor from and against, any and all liabilities, losses, damages, costs, expenses (including, without limitation, reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature arising from (i) injury to or death of any person, or damage to or loss of property, on the Premises, (ii) violation by Lessee of this Lease, (iii) use, act or omission of Lessee or its agents, contractors, licensees, sublessees or invitees and (iv) any contest referred to in Section 5.05 of this Lease.  Lessor shall indemnify Lessee against all damages arising from Lessor's negligence, gross negligence and willful misconduct.

**Section 5.05. Permitted Contests**.  Lessee, at its expense, may contest, by appropriate legal proceedings conducted in good faith and with due diligence, any Legal Requirement with which Lessee is required to comply pursuant to Section 5.02(b), or the amount or validity or application, in whole or in part, of any tax, assessment or charge which Lessee is obligated to pay or any lien, encumbrance or charge not permitted by Sections 2.01, 2.02, 5.02(a), 5.03 and 6.01, provided that (i) the commencement of such proceedings shall suspend the enforcement or collection thereof against or from Lessor and against or from the Premises, (ii) neither the Premises nor any rent therefrom nor any part thereof or interest therein would be in any danger of being sold, forfeited, attached or lost, (iii) Lessee shall have furnished such security, if any, as may be reasonably required in the proceedings and as may be required by Lessor, and (iv) if such contest be finally resolved against Lessee, Lessee shall promptly pay the amount required to be paid, together with all interest and penalties accrued thereon.  Lessor, at Lessee's expense, shall execute and deliver to Lessee such authorizations and other documents as reasonably may be required in any such contest.  Lessee shall indemnify and save Lessor harmless against any cost or expense of any kind that may be imposed upon Lessor in connection with any such contest and any loss resulting therefrom.  Lessee shall not be in default hereunder in respect to the compliance with any Legal Requirement with which Lessee is obligated to comply pursuant to Section 5.02(b) or in respect to the payment of any tax, assessment or charge which Lessee is obligated to pay or any lien, encumbrance or charge not permitted by Section 2.01, 2.02, 5.02(a), 5.03 and 6.02 which Lessee is in good faith contesting pursuant to the terms of this Section 5.05.

**Section 5.06. Environmental Compliance.**

(a)    For purposes of this Lease:

(i)    the term "*Environmental Laws*" shall mean and include the Federal Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Hazardous Materials Transportation Act, the Toxic Substances Control Act, the Federal Insecticide, Fungicide and Rodenticide Act and all applicable federal, state and local environmental laws, ordinances, rules, requirements, regulations and publications, as any of the foregoing may have been or may be from time to time amended, supplemented or supplanted and any and all other federal, state or local laws, ordinances, rules, requirements, regulations and publications, now or hereafter existing, relating to the preservation or regulation of the public health, welfare or

11

environment or the regulation or control of toxic or hazardous substances or materials; and

(ii)     the term "*Regulated Substance*" shall mean and include any, each and all substances or materials now or hereafter regulated pursuant to any Environmental Laws, including, but not limited to, any such substance or material now or hereafter defined as or deemed to be a "regulated substance," "pesticide," "hazardous substance" or "hazardous waste" or included in any similar or like classification or categorization thereunder.

(b)     Lessee shall:

(i)     not cause or permit any Regulated Substance to be placed, held, located, released, transported or disposed of on, under, at or from the Premises in violation of Environmental Laws;

(ii)     provide Lessor with written notice (and a copy as may be applicable) of any of the following within 10 days of receipt thereof: (A) any actual or threatened release by Lessee of any Regulated Substance in any way adversely affecting the Premises, which is in violation of Environmental Laws; (B) Lessee's receipt or submission, or Lessee's obtaining knowledge or notice of any kind, of any report, citation, notice or other communication from or to any federal, state or local governmental or quasi-governmental authority regarding any Regulated Substance in any way adversely affecting the Premises; or (C) Lessee's obtaining knowledge or notice of any kind of the incurrence of any cost or expense by any federal, state or local governmental or quasi-governmental authority or any private party in connection with the assessment, monitoring, containment, removal or remediation of any kind of any Regulated Substance in any way adversely affecting the Premises, or of the filing or recording of any lien on the Premises or any portion thereof in connection with any such action or Regulated Substance in any way adversely affecting the Premises; and

(iii)     in addition to the requirements of Section 5.04 hereof, except related to the gross negligence or willful misconduct of Lessor, defend all actions against Lessor and pay, protect, indemnify and save harmless Lessor from and against any and all liabilities, losses, damages, costs, expenses (including, without limitation, reasonable attorneys' fees and expenses), causes of action, suits, claims, demands or judgments of any nature relating to any matters involving Environmental Laws, Regulated Substances or other environmental issues, but only to the extent relating to Lessee's operation of the Premises during the Term.

(c)     The indemnities contained in this Section 5.06 shall survive the expiration or earlier termination of this Lease.

(d)     In connection with any potential sale or financing of the Premises by Lessor during the term of this Lease, Lessor may, at its sole cost and expense, arrange for phase I environmental audits (as such term is defined now or hereafter by the

12

environmental remediation industry), to be conducted at the Premises, provided that any such audits are conducted in a manner so as not to unreasonably interfere with the conduct of Lessee's business on the Premises.

## ARTICLE VI

**Section 6.01.**  Condemnation and Casualty.

(a)    ***General Provisions***.  Except as provided in Section 6.01(b), Lessee hereby irrevocably assigns to Lessor any award, compensation or insurance payment to which Lessee may become entitled by reason of Lessee's interest in the Premises (i) if the use, occupancy or title of the Premises or any part thereof is taken, requisitioned or sold in, by or on account of any actual or threatened eminent domain proceeding or other action by any person having the power of eminent domain (collectively, a "Condemnation") or (ii) if the Premises or any part thereof is damaged or destroyed by fire, flood or other casualty ("Casualty").  All awards, compensations and insurance payments (or, in the event Lessee elects or is permitted to self insure pursuant to Section 6.02(c), any and all amounts to be paid by Lessee in lieu of such insurance payment) on account of any Condemnation or Casualty are herein collectively called "Compensation."  Lessor may appear in any such proceeding or action to negotiate, prosecute and adjust any claim for any Compensation, and Lessor shall collect any such Compensation.  Other than with respect to a Condemnation which results in the termination of this Lease pursuant to the terms hereof, Lessee shall pay all of Lessor's reasonable costs and expenses in connection with each such proceeding, action, negotiation, prosecution and adjustment.  Lessee shall be entitled to participate in any such proceeding, action, negotiation, prosecution, appeal or adjustment as contemplated herein.  Notwithstanding anything to the contrary contained in this Article VI, if permissible under applicable law, any separate Compensation made to Lessee, including any payments made pursuant to insurance policies, for Lessee's moving and relocation expenses, business interruption, anticipated loss of business profits, loss of goodwill or fixtures and equipment which the Lessee is responsible to insure and which are not part of the Premises (including, without limitation, the Severable Property) shall be paid directly to and shall be retained by Lessee (and shall not be deemed to be "Compensation").  All Compensation shall be applied pursuant to this Section 6.01, and all such Compensation (less the expense of collecting such Compensation) is herein called the "Net Proceeds."

(b)    ***Substantial Condemnation***.  If a Condemnation shall, in Lessee's good faith judgment, affect all or a substantial portion of the Premises and shall render the Premises unsuitable for restoration for continued use and occupancy in Lessee's business, then Lessee may, not later than 60 days after a determination has been made as to when possession of the Premises must be delivered with respect to such Condemnation, deliver to Lessor (i) notice of its intention ("Notice of Intention") to terminate this Lease on the next rental payment date which occurs not less than 90 days after the delivery of such notice (the "Condemnation Termination Date"), (ii) a certificate of an authorized officer of Lessee describing the event giving rise to such termination and stating that Lessee has determined that such Condemnation has rendered the Premises unsuitable for restoration for continued use and occupancy in Lessee's business, and (iii) documentation or a

13

certificate to the effect that termination of this Lease will not be in violation of any agreement in effect as of the Condemnation Termination Date with which Lessee is obligated to comply pursuant to this Lease. This Lease shall terminate on the Condemnation Termination Date, except with respect to obligations and liabilities of Lessee hereunder, actual or contingent, which have arisen on or prior to the Condemnation Termination Date, upon payment by Lessee of all Basic Rent, additional rent and other sums due and payable hereunder up to and including the Condemnation Termination Date, and the Net Proceeds shall belong to Lessor. In the event Lessee does not deliver the Notice of Intention to Lessor, Lessor shall permit so much of the Net Proceeds as may be necessary to be utilized by Lessee to repair or restore the Premises.

(c)     ***Substantial Casualty During Extended Term***. If a Casualty shall, in Lessee's good-faith judgment, affect all or a substantial portion of the Premises during an Extended Term, if any, and shall render the Premises unsuitable for restoration for continued use and occupancy in Lessee's business, then Lessee may, not later than 150 days after such Casualty, deliver to Lessor (i) notice of its intention to terminate this Lease on the next rental payment date which occurs not less than 60 days after the delivery of such notice (the "Casualty Termination Date"), (ii) a certificate of an authorized officer of Lessee describing the event giving rise to such termination and stating that Lessee has determined that such Casualty has rendered the Premises unsuitable for restoration for continued use and occupancy in Lessee's business, and (iii) documentation or a certificate to the effect that termination of this Lease will not be in violation of any agreement then in effect with which Lessee is obligated to comply pursuant to this Lease. Upon payment by Lessee of all Basic Rent, additional rent and other sums then due and payable hereunder to and including the Casualty Termination Date, this Lease shall terminate on the Casualty Termination Date except with respect to obligations and liabilities of Lessee hereunder, actual or contingent, which have arisen on or prior to the Casualty Termination Date, and the Net Proceeds shall be paid to and shall belong to Lessor.

(d)     ***Less Than Substantial Condemnation or Any Casualty During the Primary Term***. If, after a Condemnation or Casualty, Lessee does not give or does not have the right to give notice of its intention to terminate this Lease as provided in subsection 6.01(b) or (c), then this Lease shall continue in full force and effect and Lessee shall, at its expense, rebuild, replace or repair the Premises in conformity with the requirements of Sections 2.01, 2.02 and 5.03 so as to restore the Premises (in the case of Condemnation, as nearly as practicable) to the condition and character thereof immediately prior to such Casualty or Condemnation. To the extent the Net Proceeds with respect to any Casualty or Condemnation are less than $500,000, such amount shall be paid to Lessee to be used to rebuild, replace or repair the Premises in a lien-free and good and workmanlike manner. To the extent the Net Proceeds from any Casualty or Condemnation are $500,000 or greater, prior to any such rebuilding, replacement or repair, Lessee shall determine the maximum cost thereof (the "Restoration Cost"), which amount shall be acceptable to Lessor. The Restoration Cost shall be paid first out of Lessee's own funds to the extent that the Restoration Cost exceeds the Net Proceeds payable in connection with such occurrence, after which expenditure Lessee shall be entitled to receive the Net Proceeds, but only against (i) certificates of Lessee delivered to

14

Lessor from time to time as such work of rebuilding, replacement and repair progresses, each such certificate describing the work for which Lessee is requesting payment and the cost incurred by Lessee in connection therewith and stating that Lessee has not theretofore received payment for such work and (ii) such additional documentation as Lessor may reasonably require, including, but not limited to, copies of all contracts and subcontracts relating to restoration, architects' certifications, title policy updates and lien waivers or releases.  Any Net Proceeds remaining after final payment has been made for such work and after Lessee has been reimbursed for any portions it contributed to the Restoration Cost shall be paid to Lessee.  In the event of any temporary Condemnation, this Lease shall remain in full effect and Lessee shall be entitled to receive the Net Proceeds allocable to such temporary Condemnation, except that any portion of the Net Proceeds allocable to the period after the expiration or termination of the Lease Term shall be paid to Lessor.  If the cost of any rebuilding, replacement or repair required to be made by Lessee pursuant to this subsection 6.01(d) shall exceed the amount of such Net Proceeds, the deficiency shall be paid by Lessee.

(e)    ***Disbursement of Insurance Proceeds***.  Notwithstanding anything to the contrary contained in this Section 6.01, in case of any Casualty which does not result in a termination of this Lease and with respect to which the Net Proceeds are not to be paid directly to Lessee to rebuild, replace or repair the Premises, such Net Proceeds (excluding, however, proceeds payable or on account of Severable Property) shall be paid directly to a third party depository which shall be a title insurance company, bank, trust company, or other institution reasonably acceptable to Lessor and Lessee, and such Net Proceeds shall be, upon Lessee's request, remitted by such depository to Lessee or to the persons designated by Lessee for the costs of labor and materials as the work of repair, replacement and/or restoration progresses.   The provisions set forth in Section 6.01(d) above shall be applicable with respect to the conditions governing disbursement of the Net Proceeds to Lessee.  The depository shall be instructed to invest the deposited funds in an interest bearing account in a national bank or in short-term securities of the United States of America and all interest earned shall be deemed a part of the deposit.

**Section 6.02.  Insurance**.

(a)    Lessee may self-insure the insurance coverage referred to in this Section 6.02, provided that such self insurance program does not violate any applicable laws.

(b)    The following terms and provisions shall apply:

(i)    Lessee will maintain insurance on the Premises of the following character:

(A)    Property insurance against all risks of direct physical loss, including loss by fire, lightning and other risks which at the time are included under "extended coverage" endorsements, which shall include flood insurance (if the Premises are located in a flood zone), in amounts sufficient to prevent Lessor and Lessee from becoming a coinsurer of any loss but in any event in amounts not less than 100% of the actual

replacement value of the Improvements, exclusive of foundations and excavations;

(B)    General public liability insurance and/or umbrella liability insurance against claims for bodily injury, death or property damage occurring on, in or about the Premises, which insurance shall be written on an "occurrence basis," in the minimum amounts of $5,000,000 for bodily injury or death to any one person, $5,000,000 for any one accident and $5,000,000 for property damage to others;

(C)    Worker's compensation insurance (including employers' liability insurance, if requested by Lessor) to the extent required by the law of the state in which the Premises are located;

(D)    Boiler and machinery insurance in respect of any boilers and similar apparatus located on the Premises in the minimum amount of $500,000;

(E)    During any period of construction on the Premises, builder's risk insurance on a completed value, non-reporting basis for the total cost of such alterations or improvements, and workers' compensation insurance as required by applicable law.  This coverage may be provided by Lessee's all risk property insurance pursuant to Section 6.02(i) herein.

Such insurance shall be written by companies reasonably acceptable to Lessor and carrying an A.M. Best rating of "A-" or better, and with the exception of workers' compensation insurance, shall name Lessor as an additional insured as its interest may appear.  Insurance required to be carried hereunder may be provided under blanket or global policies .

(ii)    Every such property insurance policy (other than any workers' compensation policy) shall bear a mortgagee endorsement in favor of any mortgagee or beneficiary previously disclosed to Lessee in writing (whether one or more, the "Mortgagee") under each mortgage, deed of trust or similar security instrument creating a lien on the interest of Lessor in the Premises (whether one or more, the "Mortgage"), and any loss under any such policy shall be payable to the Mortgagee which has a first lien on such interest (if there is more than one first Mortgagee, then to the trustee for such Mortgagees) to be held and applied by Mortgagee toward restoration pursuant to Section 6.01.

(iii)    Lessee shall deliver to Lessor and Mortgagee upon request, copies of original or duplicate certificates of insurance, reasonably satisfactory to Lessor and Mortgagee evidencing the existence of all insurance which is required to be maintained by Lessee hereunder.  Any insurance required hereunder may be provided under blanket policies.

16

(iv)    Lessee hereby agrees to waive its insurer's rights of recovery against Lessor for loss of or damage to property or the property of others under its control.

(c)    The requirements of this Section 6.02 shall not be construed to negate or modify Lessee's obligations under Section 5.04.

## ARTICLE VII

**Section 7.01.** Conditional Limitations; Default Provisions.

(a)    Any of the following occurrences or acts shall constitute an Event of Default under this Lease:

(i)    If Lessee shall (A) fail to pay any Basic Rent as and when required to be paid by Lessee hereunder and such failure shall continue for five (5) business days after receipt of written notice thereof from Lessor (provided that Lessor shall not be obligated to give such notice more than two (2) times in any calendar year), (B) fail to pay any additional rent or other sum as and when required to be paid by Lessee hereunder and such failure shall continue for three (3) business days after receipt of written notice thereof from Lessor, or (C) fail to observe or perform any other provision hereof and such nonmonetary failure shall continue for 30 days after written notice to Lessee of such failure (provided that, in the case of any such failure which cannot be cured by the payment of money and cannot with diligence be cured within such 30-day period, if Lessee shall commence promptly to cure the same and thereafter prosecute the curing thereof with diligence, the time within which such failure may be cured shall be extended for such period not to exceed 180 days as is necessary to complete the curing thereof with diligence);

(ii)    If any representation or warranty of Lessee set forth in any certificate provided by Lessee pursuant to this Lease, shall prove to be incorrect in any material adverse respect as of the time when the same shall have been made in a way adverse to Lessor and Lessor shall suffer a loss or detriment as a result thereof, including, without limitation, the taking of any action (including, without limitation, the demise of the Premises to Lessee herein) in reliance upon such representation or warranty and, in each case, the facts shall not be conformed to the representation and warranty as soon as practicable in the circumstances (but in no event to exceed 30 days) after written notice to Lessee from Lessor of such inaccuracy and Lessor restored to the position it would have enjoyed had such representation or warranty been accurate at the time it was made; or

(iii)    If the Premises shall have been abandoned and not maintained or secured in the manner required hereunder for a period of 30 consecutive days after written notice of such from Lessor to Lessee.

(b)    If an Event of Default shall have happened and be continuing, Lessor shall have the right to give Lessee notice of Lessor's termination of the Lease Term.  Upon the

17

giving of such notice, the Lease Term and the estate hereby granted shall expire and terminate on such date as fully and completely and with the same effect as if such date were the date herein fixed for the expiration of the Lease Term, and all rights of Lessee hereunder shall expire and terminate, but Lessee shall remain liable as hereinafter provided.

(c)    If an Event of Default shall have happened and be continuing, Lessor shall have the immediate right, whether or not the Lease Term shall have been terminated pursuant to subsection 7.01(b), to reenter and repossess the Premises and the right to remove all persons and property (subject to Section 3.02) therefrom by summary proceedings, ejectment or any other legal action or in any lawful manner Lessor determines to be necessary or desirable.  Lessor shall be under no liability by reason of any such reentry, repossession or removal.  No such reentry, repossession or removal shall be construed as an election by Lessor to terminate the Lease Term unless a notice of such termination is given to Lessee pursuant to subsection 7.01(b) or unless such termination is decreed by a court.

(d)    At any time or from time to time after a reentry, repossession or removal pursuant to subsection 7.01(c), whether or not the Lease Term shall have been terminated pursuant to subsection 7.01(b), Lessor may (but shall be under no obligation to) relet the Premises for the account of Lessee, in the name of Lessee or Lessor or otherwise, without notice to Lessee, for such term or terms and on such conditions and for such uses as Lessor, in its absolute discretion, may determine.  Lessor may collect any rents payable by reason of such reletting.  Lessor shall not be liable for any failure to relet the Premises or for any failure to collect any rent due upon any such reletting.

(e)    No expiration or termination of the Lease Term pursuant to subsection 7.01(b), by operation of law or otherwise, and no reentry, repossession or removal pursuant to subsection 7.01(c) or otherwise, and no reletting of the Premises pursuant to subsection 7.01(d) or otherwise, shall relieve Lessee of its liabilities and obligations hereunder, all of which shall survive such expiration, termination, reentry, repossession, removal or reletting.

(f)    In the event of any expiration or termination of the Lease Term or reentry or repossession of the Premises or removal of persons or property therefrom by reason of the occurrence of an Event of Default, Lessee shall pay to Lessor all Basic Rent, additional rent and other sums required to be paid by Lessee, in each case to and including the date of such expiration, termination, reentry, repossession or removal, and, thereafter, Lessee shall, until the end of what would have been the Lease Term in the absence of such expiration, termination, reentry, repossession or removal and whether or not the Premises shall have been relet, be liable to Lessor for, and shall pay to Lessor, as liquidated and agreed current damages: (i) all Basic Rent, all additional rent and other sums which would be payable under this Lease by Lessee in the absence of any such expiration, termination, reentry, repossession or removal, together with all expenses of Lessor in connection with such reletting (including, without limitation, all repossession costs, brokerage commissions, reasonable attorneys' fees and expenses (including, without limitation, fees and expenses of appellate proceedings), employee's expenses,

18

alteration costs and expenses of necessary preparation for such reletting), less (ii) the net proceeds, if any, of any reletting effected for the account of Lessee pursuant to subsection 7.01(d).  Lessee shall pay such liquidated and agreed current damages on the dates on which rent would be payable under this Lease in the absence of such expiration, termination, reentry, repossession or removal, and Lessor shall be entitled to recover the same from Lessee on each such date.

(g)     At any time after any such expiration or termination of the Lease Term or reentry or repossession of the Premises or removal of persons or property therefrom by reason of the occurrence of an Event of Default, whether or not Lessor shall have collected any liquidated and agreed current damages pursuant to subsection 7.01(f), Lessor shall be entitled to recover from Lessee, and Lessee shall pay to Lessor on demand, as and for liquidated and agreed final damages for Lessee's default and in lieu of all liquidated and agreed current damages beyond the date of such demand (it being agreed that it would be impracticable or extremely difficult to fix the actual damages), an amount equal to the excess, if any, of (a) the aggregate of all Basic Rent for what would be the then unexpired Lease Term in the absence of such expiration, termination, reentry, repossession or removal, discounted at the rate of 5% per annum, over (b) the then fair rental value of the Premises, discounted at the rate of 5% per annum for the same period. If any law shall limit the amount of liquidated final damages to less than the amount above agreed upon, Lessor shall be entitled to the maximum amount allowable under such law.

**Section 7.02.**  Bankruptcy or Insolvency.

(a)     On October 8, 2005 Delphi Corporation ("Delphi") and certain of its U.S. affiliates filed voluntary petitions for reorganization under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and on October 14, 2005, three additional U.S. subsidiaries of Delphi filed voluntary petitions for reorganization under the Bankruptcy Code (collectively, the "Debtors").  The Debtors continue to operate their business as "debtors-in-possession" under the jurisdiction of the Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Court.  This Lease and Lessor's and Lessee's respective obligations under this Lease are contingent upon approval by the Bankruptcy Court.

**Section 7.03.**  Additional Rights of Lessor.

(a)     No right or remedy hereunder shall be exclusive of any other right or remedy, but shall be cumulative and in addition to any other right or remedy hereunder or now or hereafter existing.  Failure to insist upon the strict performance of any provision hereof or to exercise any option, right, power or remedy contained herein shall not constitute a waiver or relinquishment thereof for the future.  Receipt by Lessor of any Basic Rent, additional rent or other sums payable hereunder with knowledge of the breach of any provision hereof shall not constitute waiver of such breach, and no waiver by Lessor of any provision hereof shall be deemed to have been made unless made in writing.  Lessor shall be entitled to injunctive relief in case of the violation, or attempted

19

or threatened violation, of any of the provisions hereof, or to a decree compelling performance of any of the provisions hereof, or to any other remedy allowed to Lessor by law or equity.

(b)    Lessee hereby waives and surrenders for itself and all those claiming under it, including creditors of all kinds, (i) any right and privilege which it or any of them may have to redeem the Premises or to have a continuance of this Lease after termination of Lessee's right of occupancy by order or judgment of any court or by any legal process or writ, or under the terms of this Lease, or after the termination of the Lease Term as herein provided, (ii) the benefits of any law which exempts property from liability for debt and (iii) Lessee specifically waives any rights of redemption or reinstatement available by law or any successor law.

(c)    If an Event of Default on the part of Lessee shall have occurred hereunder and be continuing, then, without thereby waiving such default, Lessor may, but shall be under no obligation to, take all action, including, without limitation, entry upon the Premises, to perform the obligation of Lessee hereunder immediately and without notice in the case of any emergency as may be reasonably determined by Lessor and upon five business days' notice to Lessee in other cases.  All reasonable expenses incurred by Lessor in connection therewith, including, without limitation, reasonable attorneys' fees and expenses (including, without limitation, those incurred in connection with any appellate proceedings), shall constitute additional rent under this Lease and shall be paid by Lessee to Lessor upon demand.

(d)    If Lessee shall be in default in the performance of any of its obligations under this Lease beyond any applicable grace or cure period hereunder, Lessee shall pay to Lessor, on demand, all expenses actually incurred by Lessor as a result thereof, including, without limitation, reasonable attorneys' fees and expenses (including, without limitation, those incurred in connection with any appellate proceedings).  If Lessor shall be made a party to any litigation commenced against Lessee and Lessee shall fail to provide Lessor with counsel approved by Lessor and pay the expenses thereof, Lessee shall pay all costs and reasonable attorneys' fees and expenses in connection with such litigation (including, without limitation, fees and expenses incurred in connection with any appellate proceedings).

(e)    If Lessee shall fail to pay when due any Basic Rent, additional rent or other sum required to be paid by Lessee hereunder, Lessor shall be entitled to collect from Lessee as additional rent and Lessee shall pay to Lessor, in addition to such Basic Rent, additional rent or other sum, a late payment charge on the delinquency equal to the Late Rate.  The Late Rate shall be the lesser of (i) that per annum rate of interest which exceeds by two percentage points the prime rate most recently published in the Wall Street Journal (or a comparable publication if the Wall Street Journal ever ceases publication) as the prime rate or (ii) the maximum rate permitted by applicable law, not to exceed 18%.  In addition to all other remedies Lessor has hereunder, if Lessee shall fail to pay any Basic Rent, additional rent or other sum, as and when required to be paid by Lessee hereunder prior to the expiration for the period of payment pursuant to subsection 7.01(a)(i)(A), Lessor shall be entitled to collect from Lessee, and Lessee shall

20

pay to Lessor, as additional rent, an amount equal to 1% of the amount shown in the notice as unpaid.  Lessor shall not exercise any late payment charge or interest penalty unless and until Lessor shall have given to Lessee written notice and Lessee shall have failed to remedy such non-payment within five (5) days, provided, however, Lessor shall not be obligated to give written notice of non-payment more than three (3) times in any 12-month period.

Nothing in this Lease will be construed to give Lessor the right to possession of any of Lessee's records, files, business records or customer names or records.  Lessee shall have the right to vacate the Premises without being in default of this Lease, provided Lessee continues to otherwise comply with the terms of the Lease.

## ARTICLE VIII

**Section 8.01. Notices and Other Instruments**.  All notices, offers, consents and other instruments given pursuant to this Lease shall be in writing and shall be validly given when hand delivered or sent by a courier or express service guaranteeing overnight delivery or by telecopy, with original being promptly sent as otherwise provided above, addressed as follows:

| | |
|---|---|
| If to Lessor: | The Metcalf Family Living Trust dated June 11, 1993<br>2920 Rohrer Drive<br>Lafayette, CA 94549<br>Attn: David Metcalf<br>Facsimile:  [_____] |
| With a copy to: | Chris Hunter, Esq.<br>Morgan Miller Blair<br>1331 N. California Blvd., Suite 200<br>Walnut Creek, CA 94596<br><br>Facsimile:  (925) 943-1106 |
| If to Lessee: | Delphi Automotive Systems LLC<br>5825 Delphi Drive, Troy, MI  48098<br>Attention:  Operations Support Group - Director<br>Facsimile:  248.813.1422 |
| With a copy to: | Delphi Automotive Systems LLC<br>5725 Delphi Drive, Troy, MI  48098<br>Attention:  Deputy General Counsel - Transactional & Restructuring<br>Facsimile:  248.813.2491 |

Lessor and Lessee each may from time to time specify, by giving 15 days notice to each other party, (i) any other address in the United States as its address for purposes of this Lease and (ii) any other person or entity in the United States that is to receive copies of notices, offers,

consents and other instruments hereunder.  Notices given in accordance with this Section 8.01 shall be deemed delivered on the day after they are sent.

**Section 8.02.  Estoppel Certificates.**

Lessee shall, within thirty (30) days of receipt of written notice from Lessor, execute and deliver an estoppel certificate certifying, if true, that:  (a) the Lease is in full force and effect and has not been modified or amended (or if modified or amended, describing the same); (b) the date Lessee accepted occupancy of the Premises; (c) the date to which Base Rent and additional rent has been paid; (d) to the best of Lessee's knowledge and belief and without due diligence investigation, the defenses or offsets thereto or defaults of Lessor under the Lease (or if none be claimed, stating that fact); and (e) such other matters as Lessor may reasonably request.

**ARTICLE IX**

**Section 9.01.  No Merger**.  There shall be no merger of this Lease or of the leasehold estate hereby created with the fee estate in the Premises by reason of the fact that the same person acquires or holds, directly or indirectly, this Lease or the leasehold estate hereby created or any interest herein or in such leasehold estate, as well as the fee estate in the Premises or any interest in such fee estate.

**Section 9.02.  Surrender**.  Upon the expiration or termination of this Lease, Lessee shall surrender the Premises to Lessor in good repair and condition except for any damage resulting from Condemnation or Casualty or normal wear and tear not required to be repaired by Lessee.  The provisions of this Section and Article III shall survive the expiration or other termination of this Lease.  All alterations, additions and improvements (other than the Severable Property) which shall have been made or installed by Lessee upon the Premises shall remain upon and be surrendered with the Premises as a part thereof, and Lessee shall have no obligation to restore the Premises to any previous condition.

**Section 9.03.  Assumption**.  In the event of a consolidation of Lessee with one or more entities where Lessee is not the surviving entity, the surviving entity shall deliver to Lessor, and any assignee of any interest of Lessor, an acknowledged instrument assuming all obligations, covenants and responsibilities of Lessee hereunder.

**Section 9.04.  Separability; Binding Effect; Governing Law**.  Each provision hereof shall be separate and independent, and the breach of any provision by Lessor shall not discharge or relieve Lessee from any of its obligations hereunder.  Each provision hereof shall be valid and shall be enforceable to the extent not prohibited by law.  If any provision hereof or the application thereof to any person or circumstance shall to any extent be invalid or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby.  All provisions contained in this Lease shall be binding upon, inure to the benefit of and be enforceable by the successors and assigns of Lessor to the same extent as if each such successor and assign were named as a party hereto.  All provisions contained in this Lease shall be binding upon the successors and assigns of Lessee and shall inure to the benefit of and be enforceable by the permitted successors and assigns of Lessee in each case to the same extent as if each

22

successor and assign were named as a party hereto.  This Lease shall be governed by and interpreted in accordance with the laws of the state in which the Premises are located.

**Section 9.05.  Table of Contents and Headings; Internal References**.  The table of contents and the headings of the various paragraphs and schedules of this Lease have been inserted for reference only and shall not to any extent have the effect of modifying the express terms and provisions of this Lease.  Unless stated to the contrary, any references to any Section, subsection, Schedule and the like contained herein are to the respective Section, subsection, Schedule and the like of this Lease.

**Section 9.06.  Counterparts**.  This Lease may be executed in two or more counterparts and shall be deemed to have become effective when and only when one or more of such counterparts shall have been executed by or on behalf of each of the parties hereto (although it shall not be necessary that any single counterpart be executed by or on behalf of each of the parties hereto, and all such counterparts shall be deemed to constitute but one and the same instrument) and shall have been delivered by each of the parties to the other.

**Section 9.07.  Lessor's Liability**.  Notwithstanding anything to the contrary provided in this Lease, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Lease by Lessor, that there shall be absolutely no personal liability on the part of any partner, director, member, officer, trustee or shareholder of Lessor, its successors or assigns with respect to any of the terms, covenants and conditions of this Lease, and any liability on the part of Lessor shall be limited solely to the Premises, such exculpation of liability to be absolute and without any exception whatsoever.

**Section 9.08.  Amendments and Modifications**.  Except as expressly provided herein, this Lease may not be modified or terminated except by a writing signed by Lessor and Lessee.

**Section 9.09.  Additional Rent**.  All amounts other than Basic Rent which Lessee is required to pay or discharge pursuant to this Lease, including the charge provided for by Section 7.03(e) hereof, shall constitute additional rent.

**Section 9.10.  Consent of Lessor**.  Except as specifically set forth in this Lease, all consents and approvals to be granted by Lessor shall not be unreasonably withheld or delayed.  Any disputes regarding Lessor's refusal to grant any consent shall be subject to resolution, at Lessee's option, under the Expedited Procedures provisions of the Commercial Arbitration Rules of the American Arbitration Association (presently Rules 53 through 57); provided, however, that with respect to any such arbitration, (i) the list of arbitrators referred to in Rule 54 shall be returned within five (5) business days from the date of mailing, (ii) the parties shall notify the American Arbitration Association, by telephone, within four (4) days of any objections to the arbitrator appointed and will have no right to object if the arbitrator so appointed was on the list submitted by the American Arbitration Association and was not objected to in accordance with the second sentence of Rule 54, (iii) the Notice of Hearing referred to in Rule 55 shall be four (4) days in advance of the hearing, (iv) the hearing shall be held within seven (7) days after the appointment of the arbitrator, and (v) the arbitrator shall have no right to award damages.  Judgment upon any decision rendered in any arbitration held pursuant to this Article shall be final and binding upon Lessor and Lessee, whether or not a judgment shall be entered in any

MMB:4000-016:736803.2

Court.  Each party shall pay its own counsel fees and expenses, if any, in connection with any arbitration under this Article, including the expenses and fees of any arbitrator selected by it in accordance with the provisions of this Article, and the parties shall share all other expenses and fees of any such arbitration.  The arbitrators shall be bound by the provisions of this Lease, and shall not add to, subtract from or otherwise modify such provisions.  Under no circumstances will Lessee be entitled to damages with respect to the failure to grant any consent or approval.

     **Section 9.11.  Options**.  The options to extend the Primary Term or any existing Extended Term created in this Lease are personal to the original Lessee and any entity with which it may be merged or consolidated or shall succeed to a substantial portion of its assets and are exercisable only as long as this Lease is in effect and has not expired or been terminated.

     **Section 9.12.  Schedules**.  Attached hereto are <u>Schedule A,</u> <u>Schedule B, Schedule C and Schedule D</u> referred to in this Lease, which Schedules are hereby incorporated by reference herein.

     **Section 9.13.  Currency**.  All references in this Lease to money shall be to the currency of the United States of America.

     **Section 9.14.    Waiver of Jury Trial.**  LESSOR AND LESSEE HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS LEASE, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS AMONG LESSEE OR LESSOR RELATING TO THE SUBJECT MATTER OF THE TRANSACTIONS CONTEMPLATED BY THIS LEASE OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED AMONG LESSOR AND LESSEE.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS).    THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS LEASE, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTIONS CONTEMPLATED BY THIS LEASE OR ANY RELATED TRANSACTIONS.  IN THE EVENT OF LITIGATION, THIS LEASE MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

     **Section 9.15.  Hold-Over.**    If Lessee occupies the Premises after the expiration of the Term, this Lease shall continue on a month-to-month basis; provided that, for the first three (3) months after the expiration of the Term, Lessee shall only remain liable for the payment of Base Rent and other charges under this Lease through the date Lessee vacates the Premises.  If Lessee occupies the Premises for a period after the first three (3) months, the rental rate shall be increased to a rate not to exceed one hundred twenty-five percent (125%) of the Base Rent. Either party may cancel such tenancy upon thirty (30) days written notice to the other.

**Section 9.16.  Post-Closing Occupancy Rent.**  Lessor hereby assigns to Lessee any post-closing occupancy rent ("Valeo Rent") Lessor received from Valeo Electrical Systems, Inc. in connection with the Real Property Purchase and Sale Agreement between Valeo and Lessee, dated _____, as assigned by Lessee to Lessor, and will either (a) deliver any Valeo Rent received by Lessor to Lessee within five (5) business days of receipt by Lessor, or (b) will direct any third party escrow agent holding funds for the post-closing occupancy rent to deliver such Valeo Rent to Lessee.

**Section 9.17.   Signs.**  Lessee shall have exclusive sign rights for the Premises, exterior and interior, and shall have the right to erect and display signs on the Premises and on such other areas of the Premises as Lessor approves in Lessor's reasonable discretion.  Lessee's signage shall comply with all Legal Requirements.

[Signature Page Follows]

25

**IN WITNESS WHEREOF**, the parties hereto have caused this Lease to be executed as of the date first above written.

**LESSOR:**

The Metcalf Family Living Trust dated June 11, 1993

By _____

Printed Name     David Metcalf

Title                   Trustee

**LESSEE:**

Delphi Automotive Systems LLC, a Delaware limited liability company

By _____

Printed Name _____

Title _____

## SCHEDULE A

## PART I

## LEGAL DESCRIPTION

A part of the West 1/2 of Section 13 and East 1/2 of Section 14, Town 3 North, Range 10 East, City of Auburn Hills, Oakland County, Michigan, being described as: Commencing at the West 1/4 corner of Section 13; thence South 03 degrees 12 minutes 11 seconds East, 83.78 feet along the line between Sections 13 and 14, to a point on the Southerly line of University Drive, as proposed, thence along said line the following two courses: (1) Along a curve to the right 156.21 feet, said curve having a radius of 3,153.84 feet, central angle of 02 degrees 50 minutes 16 seconds and a long chord bearing of South 61 degrees 47 minutes 48 seconds West 156.19 feet, and (2) South 63 degrees 12 minutes 55 seconds West, 606.47 feet to the point of beginning on the West line of the proposed parkway; thence along said line along the following five courses: (1) South 26 degrees 47 minutes 05 seconds East, 44.69 feet, and (2) Along a curve to the left 328.13 feet, said curve having a radius of 350.00 feet, central angle of 53 degrees 42 minutes 55 seconds and a long chord bearing of South 53 degrees 38 minutes 32 seconds East, 316.24 feet, and (3) South 80 degrees 30 minutes 00 seconds East, 126.29 feet, and (4) Along a curve to the right 501.78 feet, said curve having a radius of 460.00 feet, central angle of 62 degrees 30 minutes 00 seconds and a long chord bearing of South 49 degrees 15 minutes 00 seconds East, 477.27 feet, and (5) South 18 degrees 00 minutes 00 seconds East, 380.06 feet; thence South 72 degrees 00 minutes 00 seconds West, 146.77 feet; thence South 15 degrees 00 minutes 00 seconds West, 155.13 feet; thence South 61 degrees 00 minutes 00 seconds West, 394.00 feet; thence South 77 degrees 45 minutes 54 seconds West, 205.62 feet; thence South 69 degrees 30 minutes 00 seconds West, 105.00 feet; thence South 84 degrees 30 minutes 00 seconds West, 173.00 feet; thence North 82 degrees 00 minutes 00 seconds West, 124.00 feet; thence North 64 degrees 30 minutes 00 seconds West, 285.00 feet; thence North 47 degrees 00 minutes 00 seconds West, 124.00 feet; thence North 20 degrees 55 minutes 47 seconds West, 175.78 feet to a point on the Easterly line of proposed road; thence along said line along the following two courses: (1) Along a curve to the left 664.23 feet, said curve having a radius of 770.00 feet, central angle of 49 degrees 25 minutes 32 seconds and a long chord bearing North 02 degrees 04 minutes 19 seconds West, 643.83 feet and (2) North 26 degrees 47 minutes 05 seconds West, 28.47 feet to a point on the Southerly line of University Drive, as proposed; thence North 63 degrees 12 minutes 55 minutes East, 769.65 feet to the point of beginning.

MMB:4000-016:736803.2

## SCHEDULE A

## PART II

## PERMITTED EXCEPTIONS

1. Covenants and conditions set forth in a certain Deed recorded in Liber 10257, Page 184.

2. Maintenance Agreement and Easements, and the terms, conditions and provisions thereof, contained in Grant of Easement recorded in Liber 10257, Page 188.

3. Declaration of Covenants, Conditions and Restrictions recorded in Liber 10257, Page 157. Assignment of Covenant Rights to Chrysler Corporation, as contained in Liber 14122, Page 535.

4. Easement to Consumers Power Company for gas pipeline, as contained in Liber 14536, Page 565.

5. Agreements with Kasper Drain Drainage District, and the terms, conditions and provisions thereof, as contained in Liber 12488, Page 666, and Liber 12488, Page 671.

6. Grant of Easement to the Detroit Edison Company for electrical facilities, as contained in Liber 10856, Page 144.

7. Declaration of Restrictions of Use recorded in Liber 10257, Page 177.

8. Grant of Easements to the City of Auburn Hills for underground sanitary, storm and sewer lines, and the terms, conditions and provisions thereof, as contained in Liber 14076, Page 686.

# SCHEDULE A

## PART III

## SEVERABLE PROPERTY

All apparatus, personal property, trade fixtures, inventory, equipment, machinery, fittings, furniture, furnishings, chattel, materials and supplies located on and used in, or related to Lessee's business or any entity claiming by, through or under Lessee, including, but not limited to, mainframe computers, kitchen equipment and telephone and similar systems and articles of personal property of every kind and nature whatsoever, and any additions, replacements, accessions and substitutions thereto or therefor, and all proceeds of all of the foregoing, or any part of the foregoing used or usable in connection with any present or future operation or letting (or subletting) of such leasehold interest or the activities at any time conducted thereon and now or hereafter owned by Lessee or by any sublessor or other person or entity using all or any part of the Premises by, through, or under (or with the express or implied consent of) Lessee.

## SCHEDULE B

### PART I

### THE PRIMARY TERM AND EXTENDED TERMS

|  | Term | Commencement | Expiration |
|---|---|---|---|
| Primary Term: | 10 Years | [April 30, 2007] | [April 29, 2017] |
| Extended Term: |  |  |  |
| 1st Extended Term: | 5 Years | [_____] | [_____] |
| 2nd Extended Term: | 5 Years | [_____] | [_____] |

## <u>SCHEDULE B</u>

## PART II

## BASIC RENT

### PRIMARY TERM

| Dates | Total Monthly Rental |
|---|---|
| Month 1 | $ 0.00 |
| Months 2 - 120 | $ 268,125.00 |

### EXTENDED TERMS

| Dates | Total Annual Rental |
|---|---|
| Years 11 - 15 | Adjusted Fair Market Rental |
| Years 16 - 20 | Adjusted Fair Market Rental |

Lessee shall have no obligation to pay Basic Rent for the first full month following the Commencement Date.

## <u>SCHEDULE C</u>

## COMMENCEMENT AND MEMORANDUM OF LEASE AGREEMENT

**AGREEMENT** made as of the _____ day of _____, 200__, between The Metcalf Family Living Trust dated June 11, 1993 , with its principal address at , hereinafter referred to as Lessor, and Delphi Automotive Systems LLC, a Delaware limited liability company, with its principal address at 5725 Delphi Drive, Troy, Michigan 48098, hereinafter referred to as Lessee,

### W I T N E S S E T H:

That the Lease Agreement dated as of _____, 2007, between the parties hereto covering a 437,800 square foot building and the approximate 35-acres parcel on which the building is located, with an address of 3000 University Drive, Auburn Hills, Michigan, and on the real property described in Exhibit "A" attached hereto, for a Primary Term of ten (10) years is hereby amended as follows:

The Primary Term of the Lease shall be Ten (10)  (10) years with the Commencement Date beginning _____, 200_____, and the Primary Term expiring on _____, 200____.

The area of the Premises is amended to be defined as _____ square feet of rentable area of the Building.

It is understood and agreed that the Commencement, expiration, and notice dates for the renewal option(s) are as follows:

| Renewal Period(s) | Notice Date | Commencement Date | Expiration Date |
|---|---|---|---|
| Five (5) years | _____ | | _____ |
| Five (5) years | _____ | _____ | _____ |

All capitalized terms used herein shall have the same definition as in the Lease.

As hereby amended, the Lease Agreement dated _____, 2007, is in all respects ratified and confirmed.

In the event this document is recorded, its recording is intended solely to give notice of the Lease and is not a complete summary of the terms and conditions thereof.  Any successor in interest to the Lessor shall take the Lease subject to all the terms and conditions of same, as amended herein. Except as to the amendment made herein, this document shall not be used in interpreting provisions of the Lease.

**IN WITNESS WHEREOF,** the Lessor has signed and sealed this instrument this _____ day of , 200____, and the Lessee has signed and sealed this instrument this _____ day of , 200___.

In the presence of:

X X X X X X X X X X X X X X X X X X X                    BY X X X X X X X X X X X X X X X X X X

President

X X X X X X X X X X X X X X X X X X X                    ATTEST X X X X X X X X X X X X X X X X

Secretary

iii

In the presence of:

X X X X X X X X X X X X X X X X X X X X        BY X X X X X X X X X X X X X X X X X X

X X X

X X X X X X X X X X X X X X X X X X X X        ATTEST X X X X X X X X X X X X X X X X

X X X

iv

## SCHEDULE D
## INITIAL IMPROVEMENTS

**GENERAL SITE**

Signage: Change signage to tenant specific.

Parking:    Expand as required by local municipality, surface parking to accommodate additional tenants (approx 1400 total).

Security Systems:  Replace security access system.  Add exit door card readers.

**OFFICE BUILDING (All Floors)**

Enclosed Space:  All floors to be laid out to maximize density Necessitating the elimination/modification of existing enclosed space and/or the addition of enclosed office and conference space.

Finishes:  All finishes will be similar to existing.

Interior Walls: Painted drywall with doors and trim to match existing.

Voice/Data Cabling:  Remove existing cable and pull new.

**LAB BUILDING**

Enclosed Space:  To be laid out to facilitate various light laboratory   functions. Bench top analysis and fume hoods.  Painted drywall construction or reconfigurable partitions will be utilized.  Additional air handling equipment will be required for air exchanges.

Engine Dynamometers:  Dynamometers will be anchored to the floor in a room consisting of masonry wall construction, safety glass for viewing, explosion proof fixtures and explosion relief panels on exterior walls.  Fuel is delivered from a fuel farm external to the building by way of floor trenches.   Dyno cells will be controlled through one central control room.  9 dyno cells will be installed.  A floor mounted poured concrete mezzanine over the cells will house mechanical and electrical equipment.

Vehicle Dynamometers:  2 Vehicle dynamometers will be installed in  floor pits approximately 8'x12' in a VEL (vehicle emission lab) room constructed of double block with a vapor barrier in between for humidity control.  This facility will require the addition of significant air handling and humidity control equipment.  2 vehicle dynamometers will be installed in floor pits in a garage environment surrounded by reconfigurable metal skin partitions.

<u>Garage</u>:  8 garage access doors will be installed and a 10 bay garage space created with reconfigurable partitions.  8 floor mounted vehicle hoists will be installed.  A vehicle exhaust system will be installed and makeup air as needed.

<u>Piping</u>:   Test equipment throughout the lab space will be supplied from central gas, water, air and vacuum systems.

<u>Electrical</u>:  Additional transformers as required to support lab functions.