1

1

2  UNITED STATES BANKRUPTCY COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 05-44481

5  - - - - - - - - - - - - - - - - - - - -x

6  In the Matter of:

7

8  DELPHI CORPORATION,

9

10         Debtor.

11

12  - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              One Bowling Green

16              New York, New York

17

18              January 12, 2007

19              10:05 AM

20

21  B E F O R E:

22  HON. ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25

2

1    HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

2    Respect To Debtors' Objection To Proofs Of Claim Nos. 257, 264,

3    288, 297, 1271, 1272, And 1334 filed by John Wm. Butler Jr. on

4    behalf of Delphi Corporation. with hearing to be held on

5    1/12/2007 at 10:00 AM at Courtroom 610 (RDD.

6

7    HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

8    Respect To Debtors' Objection To Proofs Of Claim Nos. 12129 And

9    14370 filed by John Wm. Butler Jr. on behalf of Delphi

10   Corporation.  With hearing to be held on 1/12/2007 at 10:00 AM

11   at Courtroom 610 (RDD.

12

13   HEARING re  Notice of Hearing Notice Of Sufficiency Hearing

14   With Respect To Debtors' Objection To Proof Of Claim No. 2856

15   filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

16   with hearing to be held on 1/12/2007 at 10:00 AM at Courtroom

17   610 (RDD).

18

19   HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

20   Respect To Debtors' Objection To Proof Of Claim No. 11911 filed

21   by John Wm. Butler Jr. on behalf of Delphi Corporation.  With

22   hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

23   (RDD).

24

25

3

1   HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

2   Respect To Debtors' Objection To Proof Of Claim No. 7075 filed

3   by John Wm. Butler Jr. on behalf of Delphi Corporation.  With

4   hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

5   (RDD).

6

7   HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

8   Respect To Debtors' Objection To Proof Of Claim No. 11892 filed

9   by John Wm. Butler Jr. on behalf of Delphi Corporation. with

10  hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

11  (RDD).

12

13  HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

14  Respect To Debtors' Objection To Proof Of Claim No. 13411 filed

15  by John Wm. Butler Jr. on behalf of Delphi Corporation. with

16  hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

17  (RDD).

18

19  HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

20  Respect To Debtors' Objection To Proof Of Claim No. 9674 filed

21  by John Wm. Butler Jr. on behalf of Delphi Corporation. with

22  hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

23  (RDD) (Attachments: # (1) Claims Procedure Order).

24

25

4

1    HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

2    Respect To Debtors' Objection To Proof Of Claim No. 3886 filed

3    by John Wm. Butler Jr. on behalf of Delphi Corporation.  With

4    hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

5    (RDD) (Attachments: # (1) Claims Procedure Order).

6

7    HEARING re Notice of Hearing Notice Of Sufficiency Hearing With

8    Respect To Debtors' Objection To Proof Of Claim No. 4321 filed

9    by John Wm. Butler Jr. on behalf of Delphi Corporation.  With

10   hearing to be held on 1/12/2007 at 10:00 AM at Courtroom 610

11   (RDD) (Attachments: # (1) Claims Procedure Order).

12

13   HEARING re Notice of Hearing Notice Of Claims Objection Hearing

14   With Respect To Debtors' Objection To Proof Of Claim No. 16322

15   filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

16   with hearing to be held on 2/14/2007 at 10:00 AM at Courtroom

17   610 (RDD) (Attachments: # (1) Claims Procedure Order)(Butler,

18   John) Docket Text Modified on 12/12/2006 (Bush, Brent).

19

20   HEARING re Notice of Hearing Notice Of Claims Objection Hearing

21   With Respect To Debtors' Objection To Proof Of Claim No. 2479

22   filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

23   With hearing to be held on 2/14/2007 at 10:00 AM at Courtroom

24   610 (RDD).

25

5

1    HEARING re Notice of Hearing Notice Of Claims Objection Hearing

2    With Respect To Debtors' Objection To Proof Of Claim No. 13409

3    filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

4    with hearing to be held on 2/14/2007 at 10:00 AM at Courtroom

5    610 (RDD).

6

7    HEARING re Notice of Hearing Notice Of Claims Objection Hearing

8    With Respect To Debtors' Objection To Proof Of Claim No. 2558

9    filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

10   With hearing to be held on 2/14/2007 at 10:00 AM at Courtroom

11   610 (RDD).

12

13   HEARING re Notice of Hearing Notice Of Claims Objection Hearing

14   With Respect To Debtors' Objection To Proof Of Claim No. 14245

15   filed by John Wm. Butler Jr. on behalf of Delphi Corporation.

16   With hearing to be held on 2/14/2007 at 10:00 AM at Courtroom

17   610 (RDD).

18

19   HEARING re Notice of Hearing Notice Of Change Of Omnibus

20   Hearing Date filed by John Wm. Butler Jr. on behalf of Delphi

21   Corporation. With hearing to be held on 1/12/2007 at 10:00 AM

22   at Courtroom 610 (RDD).

23

24

25

6

1    HEARING re Motion to Extend Time Motion For Order Under 11

2    U.S.C. Section 1121(d) Extending Debtors' Exclusive Periods

3    Within Which To File And Solicit Acceptances Of Reorganization

4    Plan filed by John Wm. Butler Jr. on behalf of Delphi

5    Corporation.  With hearing to be held on 1/12/2007 at 10:00 AM

6    at Courtroom 610 (RDD) Responses due by 1/4/2007.

7

8    HEARING re Third Omnibus Objection to Claims with hearing to be

9    held on 11/30/2006 at 10:00 AM at Courtroom 610 (RDD)

10   Objections due by 11/24/2006, filed by John Wm. Butler Jr. on

11   behalf of Delphi Corporation.

12

13   HEARING re Motion to Extend Time Motion For Order Under 11

14   U.S.C. Section 1121(d) Extending Debtors' Exclusive Periods

15   Within Which To File And Solicit Acceptances Of Reorganization

16   Plan filed by John Wm. Butler Jr. on behalf of Delphi

17   Corporation. With hearing to be held on 1/12/2007 at 10:00 AM

18   at Courtroom 610 (RDD) Responses due by 1/4/2007.

19

20   HEARING re Motion to Allow Claims Motion of Cadence Innovation,

21   LLC to Allow and Pay Administrative Priority Claim filed by

22   Dennis J. Connolly on behalf of Cadence Innovation, LLC. With

23   hearing to be held on 1/11/2007 (check with court for location)

24   Responses due by 1/4/2007.

25

7

1    HEARING re Debtors' Fifth Omnibus Objection to Claims with

2    hearing to be held on 1/11/2007 at 10:00 AM at Courtroom 610

3    (RDD) Objections due by 1/4/2007, filed by John Wm. Butler Jr.

4    on behalf of Delphi Corporation.

5

6    HEARING re Objection to Motion Limited Objection to Motion for

7    Order Under 11 U.S.C. s. 1121(d) Extending Debtors' Exclusive

8    Period Within Which to File and Solicit Acceptances of

9    Reorganization Plan (related document(s)[6285]) filed by Judith

10   Elkin on behalf of Highland Capital Management L.P.

11

12   HEARING re Response Debtors' Omnibus Reply In Support Of

13   Debtors' Fourth Omnibus Objection Pursuant To 11 U.S.C. Section

14   502(b) And Fed. R. Bankr. P. 3007 To Certain Duplicate And

15   Amended Claims filed by John Wm. Butler Jr. on behalf of Delphi

16   Corporation.  With hearing to be held on 1/12/2007 at 10:00 AM

17   at Courtroom 610 (RDD).

18

19   HEARING re Notice of Hearing Proposed Fourteenth Omnibus

20   Hearing Agenda filed by John Wm. Butler Jr. on behalf of Delphi

21   Corporation. With hearing to be held on 1/12/2007 at 10:00 AM

22   at Courtroom 610 (RDD).

23

24

25   Transcribed by:  Pnina Eilberg

8

1

2  A P P E A R A N C E S :

3  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4       Attorneys for Delphi Corporation

5       333 West Wacker Drive

6       Chicago, IL 60606

7

8  BY:   JOHN W. BUTLER, ESQ.

9        AL HOGAN, ESQ.

10       JOHN K. LYONS, ESQ.

11       RON E. MEISLER, ESQ.

12

13  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

14       Attorneys for Delphi Corporation

15       Four Times Square

16       New York, NY 10036

17

18  BY:   KAYALYN A. MARAFIOTI, ESQ.

19        THOMAS J. MATZ, ESQ.

20

21

22

23

24

25

9

```
 1   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
 2         Attorneys for the Equity Committee
 3         One New York Plaza
 4         New York, New York 10004
 5
 6   BY:   BONNIE STEINGART, ESQ.
 7
 8   UNITED STATES TRUSTEE
 9         33 Whitehall Street
10         New York, New York 10004
11
12   BY:   ALICIA M. LEONHARD, ESQ.
13
14   HAYNES AND BOONE, LLP
15         Attorneys for Highland
16         153 East 53rd Street
17         Suite 4900
18         New York, NY 10022
19   BY:   LENARD M. PARKINS, ESQ.
20         JUDITH ELKIN, ESQ.
21         BRIAN D. HAIL
22
23
24
25
```

10

1  | LATHAM & WATKINS, LLP

2  |      Attorneys for Creditors Committee

3  |      885 Third Avenue

4  |      New York, NY 10022

5  |

6  | BY:   MARK A. BROUDE, ESQ.

7  |

8  | MILBANK, TWEED, HADLEY & MCGLOY, LLP

9  |      601 South Figueroa Street

10 |      Los Angeles, CA 90017

11 |

12 | BY:   THOMAS R. KRELLER, ESQ.

13 |      GREGORY A. BRAY, ESQ.

14 |

15 | PREVIANT, GOLDBERG, UELMAN, GRATZ, MILLER & BRUEGGEMAN, S.C.

16 |      Attorneys for IBEW and IAM

17 |      1555 North River Center Drive

18 |      Suite 202

19 |      Milwaukee, WI 53212

20 |

21 | BY:   MARIANNE GOLDSTEIN ROBBINS, ESQ.

22 |

23 |

24 |

25 |

11

1    WEIL, GOTSHAL & MANGES, LLP

2         Attorneys for General Motors

3         767 Fifth Avenue

4         New York, NY 10153

5

6    BY:   JEFFREY L. TANENBAUM, ESQ.

7         MICHAEL KESSLER, ESQ.

8

9    KASOWITZ, BENSON, TOREES & FREIDMAN, LLP

10        Attorneys for Ad Hoc Trade Committee

11        633 Broadway

12        New York, NY 10019

13

14   BY:   JEFFREY R. GLEIT, ESQ.

15

16   WHITE AND CASE, LLP

17        Attorneys for Appaloosa Management &

18        Harbinger Capital, LLC

19        1155 Avenue of the Americas

20        New York, NY 10036

21

22   BY:   DOUGLAS P. BAUMSTEIN, ESQ.

23        GLENN M. KURTZ, ESQ.

24        THOMAS E. LAURIA, ESQ (Telephonically)

25

12

1    CHADBOURNE & PARKE, LLP

2          Attorneys for Eagle Capital

3          30 Rockefeller Plaza

4          New York, NY 10112

5

6    BY:   HOWARD SEIFE, ESQ.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

13

1          P R O C E E D I N G S

2          THE COURT:  Please be seated.  Okay.  Delphi

3  Corporation and this is the continuation of the hearing on the

4  debtor's motion for approval of the equity commitment agreement

5  and the PSA.

6      MR. BUTLER:  Good morning, Your Honor, Jack Butler along

7  with my colleagues Kaylayn Marfioti and Al Hogan here again on

8  behalf of the debtors for the hearing.

9      Your Honor, before proceeding with the debtor's closing

10  argument, two items.  One, we have circulated to counsel for

11  the remaining objectors and we have provided to the Court a

12  black lined version of some change pages to the EPCA.  The

13  import of which would be to eliminate in 12(C) of the EPCA any

14  opportunity of the plan investors to terminate the EPCA if they

15  terminate the PSA.  So that there's no longer a cross

16  termination right in favor of the investors and I would like to

17  have that added to the record as Exhibit 123 and admitted into

18  evidence with Your Honor's permission.

19  (Black Lined Version of EPCA was hereby received as Debtor's

20  Exhibit 123 for identification, as of this date.)

21          THE COURT:  Okay.  That's fine.

22          MR. BUTLER:  The other item I have, Your Honor, for

23  the Court is marked as Exhibit 124, which has been circulated.

24  It is an updated objection chart to show the status of where we

25  are with all objectors having settled except the equity

14

1  committee, Highland and the US Trustee.

2           THE COURT:  Thank you, Your Honor.

3           MR. PARKINS:  Your Honor, we object to that

4  admission.  We don't agree with it.  This is their

5  representation --

6           THE COURT:  Well actually, the chart -- as far as the

7  chart is concerned, I don't think you need to submit that.  I

8  mean I -- the statements by the objecting unions and the

9  debtors were, sort of, carefully worked out yesterday and

10 stated on the record.  And I don't want them to feel that

11 they're going to have to --

12          MR. BUTLER:  That's fine, Your Honor.  That's all.

13 We just prepared the updated chart.

14          THE COURT:  Okay.

15          MR. BUTLER:  The objections have -- are all

16 withdrawn.  We didn't, otherwise, change it from our reply.

17          THE COURT:  Okay.  I think the record's clear on

18 that.

19          MR. BUTLER:  Thanks.

20          MR. PARKINS:  Thank you, Your Honor.

21          THE COURT:  And the change to the commitment

22 agreement, obviously, deletes the provision for the refund of

23 any commitment fees as moot under -- under the --

24          MR. BUTLER:  That's correct, Your Honor.

25          THE COURT:  -- what had been 12(c) II, because now

15

1    they don't have the right to terminate in the first place.

2          MR. BUTLER:  Correct, Your Honor.

3          THE COURT:  Okay.  All right.  So why don't I hear,

4    then, brief oral argument in respect of the motion.

5          MR. BUTLER:  Your Honor, thank you.  Your Honor, on

6    behalf of the debtors, we're here today to seek now an order

7    authorizing and approving the debtor's entry into the

8    agreements that have been referred to in these hearings as

9    framework agreements, or more specifically the equity purchase

10   and commitment agreement and the plan framework support

11   agreement, as those agreements have been amended as entered

12   into evidence in this hearing.

13         These agreements are the product of more than five

14   months of an intense effort and arms length process that has

15   involved, among others, the debtors, various potential plan

16   investors, General Motors Corporation and representatives of

17   the debtor's statutory and ad hoc committees.  And I think its

18   important, just briefly, to talk about the process that got us

19   to this point.  Because, as the document, Exhibit 45, that's

20   been admitted into evidence, there was, in fact, in the end of

21   July, days before the STN motion was filed.  And this is set

22   forth in Exhibits 11 through 13 of the evidence.  There was a

23   discussion and an exchange between the company's lead

24   independent director, the company's -- some of the company's

25   officers, the chair of the official committee of unsecured

16

1    creditors that on the eve of filing the STN motion by the

2    creditors committee, which has -- in which they would -- had

3    that matter actually been heard they would have sought to have

4    control over the claims against General Motors Corporation.

5    There was a discussion about the importance of trying to find a

6    path that would lead towards a resolution of, not only General

7    Motors issues but ultimately of the transformation issues in

8    this case.

9         It was really the chair of the creditors committee

10   acting on behalf of the committee who had urged the company to

11   set up a process that would, hopefully, lead to that result.

12   And based on that encouragement and on, what was really the

13   leadership that the chair of the creditors committee

14   demonstrated reaching out to our lead director and our senior

15   officers, there were discussions over the weekend of the -- at

16   the end of July, July 28th, 29th, between counsel to the

17   creditors committee, the equity committee and the debtors, all

18   of which are contained -- or summarized in those exhibits,

19   which lead to the establishment of framework meetings that

20   began on August 1st.

21        And on August 1st, at that meeting, page 31 of that

22   presentation, the company got up and said to its stakeholders,

23   and General Motors wasn't a part of this particular meeting and

24   said, look, we have a choice to make.  As near as the company

25   can tell, there are six paths that we are capable of pursuing

17

1     here.  And let us describe the paths to you and give you the

2     company's thought.  And one path was -- three of the paths were

3     related to reaching a near term labor and General Motors

4     consensual resolution and three paths said, look that's not

5     going to be possible, what should we do.

6          And as we went through and explained the paths, the

7     debtor's expressed a preference for path one.  The debtor's

8     said, we think the best thing that could happen to the estate

9     is let's figure out a labor deal now, but that will require for

10    you sorting out a bifurcated arrangement with General Motors.

11    In order for them to do their labor transformations they're

12    going to want a release from us.  The company's prepared to

13    consider that but we have to deal with the claims that they

14    have against the estate later in a plan process, which would

15    occur after we suspended the litigation and negotiated a claims

16    resolution process.

17         One of the things, I think Your Honor; our

18    stakeholders can uniformly agree is that none of them liked

19    that path.  Our creditors committee, our equity committee,

20    General Motors, all of our major stakeholders said to us, in

21    that -- on the financial side of the house, in terms of these

22    things.  They basically said look, we really need you to think

23    about going along path three.  And path three was a path that

24    said, what you need to try to do is reach a comprehensive deal.

25    And a comprehensive deal involving labor and General Motors

18

1    means that from the standpoint of General Motors they said, we

2    are only interested in a net recovery.  We want to understand

3    what our next exposure -- or exposure because they're not -- at

4    the end of the day, their exposure is far more than their

5    recovery.  They said we want to know what our net number is in

6    order to do a deal.  And our committee said we're not prepared

7    to tell General Motors what we think their net number is unless

8    we have a framework of understanding of what our recoveries

9    will be.

10          And faced with that, the company moved forward with a

11   framework set of discussions that began late -- two days later

12   with General Motors in the room.  And there were -- and the

13   record is clear and Your Honor has many exhibits that point to

14   the process that occurred over the following five months

15   leading up from August 1 through -- up to December 18th, as the

16   steps that were taken and the process that occurred as the

17   company proceeded along that line trying to understand that

18   General Motors wanted to understand that exposure.  The

19   committees wanted to understand net recoveries.  Essentially,

20   in this case, our major stakeholders wanted to understand how

21   the pie was going to be served before we had finished baking

22   it.  In fact, before it was even in the oven.

23          But the complexity of this particular case, at the

24   end of the day, the debtor's conceded required that approach.

25   This case as I -- as Mr. Miller said in his testimony and his

19

1   experience over the many years he served as the chief executive

2   officer of different companies is among the most complex -- he

3   testified was the most complex he's ever dealt with and

4   certainly is, I think, the most complex I've dealt with in my

5   career, trying to make sure that we allow the largest

6   manufacturing company ever to be in bankruptcy with global

7   operations across the planet and 185,000 employees to actually

8   continue to operate, continue to supply the automotive

9   industry.  Remembering that if we falter, in Mr. Miller's

10  words, if we do it badly it's not just a problem for General

11  Motors; Delphi shuts down the global automotive industry.  And

12  how do we figure out how to work through these processes in a

13  way that will allow the company to proceed.

14          So we followed path three.  Our stakeholders said,

15  follow path three, that's the path we followed.  That leads to

16  a series of framework discussions in which things became

17  clearer as we moved forward.  Which is, we had a framework

18  document, and there's been testimony and the record talks about

19  different sections of it.  The section that got the most

20  developed and finally -- essentially agreed upon was the

21  distribution element of the framework.  The transformation of

22  contributions from General Motors in their view, as we

23  understood it, and in the debtor's view, ultimately, couldn't

24  be finally resolved until ultimately we had labor done.  And so

25  without being able to have a line of sight to labor, from

20

1   General Motors perspective, so they could understand what their

2   contributions would be for that, they couldn't ultimately

3   finish the transaction with us.  And so we moved towards

4   December and we came up with the practical, which is how do we

5   communicate to the global community, continue to have the

6   support of our customers, other than General Motors.  Keep in

7   mind that as Mr. Miller testified yesterday, two thirds of our

8   new business comes from customers other than General Motors for

9   periods in 2008 and 9 and 10, and 11.  And if we disrupt that

10  supply chain, that's a fundamental value destruction

11  proposition for this company.

12          How do we be able to, sort of, move forward in this.

13  And ultimately, after the thirty-seven some odd meetings that

14  Mr. Miller testified the board held and following this process

15  each step along the way.  The board authorized the company to

16  file the framework motions that are before the Court.  But I

17  think it's really important to understand the process that was

18  here.  And I'll go through the exhibits in a few minutes.  This

19  wasn't something that was dreamt up by one -- one constituency

20  here on a Saturday afternoon and motions were filed on Monday.

21  This has been a process that has been collaborative, difficult,

22  complex, controversial at times, but a process that has moved

23  forward very, very carefully since the middle of last year.

24  And Your Honor has had some glimpse into that because at the

25  same time, the company has done something that in my experience

21

1   has not been done in any other large complex case, where 1113

2   and 1114 motions, which congress assumes will be disposed of

3   within thirty days thereof or thirty to forty-five days their

4   filing, have in fact been moved from one hiatus to the next

5   hiatus to the next.  Tracking this process along with the

6   companion 365 litigation against General Motors and we've had

7   more than a dozen chambers conferences with Your Honor as that

8   has been trying to match the balancing, as Mr. Miller always

9   calls it, the balancing of what's the appropriate thing to do

10  here from the debtor's perspective to maximize value for our

11  stakeholders.

12          As the company then presented this, I think the next

13  item I wanted to address, Your Honor, is certainly what is the

14  standard here?  What are we seeking?  This is not, and we

15  disagree respectfully with the U.S. Trustee, a confirmation

16  hearing.  If one thing the record made very clear in the case

17  and the evidence is uncontroverted on is, that there is no plan

18  here.  There is the -- even the objectors have testified in

19  their view -- their testimony and their part of the record said

20  that there is no value here unless there are consensual labor

21  and General Motors transactions and those aren't here.

22          And so what we've done -- or tried to do is find that

23  rock Mr. Miller talked about in his testimony.  That rock that

24  we can stand on to try to move this company forward and this

25  reorganization forward.  And in doing so, we're asking Your

22

1    Honor to authorize us to enter into and perform the

2    transactions contemplated and the conditions contemplated under

3    the EPCA and the PSA and ask you to authorize it under sections

4    363 of the Bankruptcy Code.  Which, as everyone knows in this

5    room, allows the debtors to use property of the estate, other

6    than in the ordinary course of business after notice in the

7    hearing, if the debtors demonstrate sound business

8    justification for the proposed usage?

9            And during the course of this case we've had a lot of

10   colloquy, Your Honor, with the debtors over Your Honor's

11   formulation of the Orion Pictures Corporation and other

12   controlling precedent in this circuit.  And we have come to

13   know and respect this Court's view that this is a summary

14   proceeding.  And that once the debtor's articulate a valid

15   business justification for the proposal, there's a presumption

16   that arises that the board's decision was undertaken on an

17   informed basis in good faith.  And the honest belief that its

18   actions were made in the best interest of the company.

19           But if the board's judgment is challenged, and

20   objectors come forward with specific evidence to support the

21   challenge.  Then, Your Honor, in some respects becomes a

22   thirteenth direct.  And Your Honor looks at the evidence and is

23   faced, frankly, with the very same challenge Mr. Miller talked

24   about in his testimony.  Not the ability to decide whether any

25   particular provision is objectionable because the debtor's

23

1    concede there are objectionable provisions in this document.

2    There are things we tried to get.  The evidence is replete with

3    things we tried to achieve and were unable to.  The question

4    is, Your Honor is faced with, is the same question our

5    directors debated and ultimately that Mr. Miller testified to

6    and what I thought was one of the most cogent and compelling

7    recitations of corporate governance that I've had the privilege

8    of hearing in a courtroom.  Where he went through and explained

9    the very careful balancing that the Board had to do, mindful

10   that their decision was to say yes or no.  They weren't given

11   the opportunity -- have the opportunity to say, yeah, I like

12   article three but I don't like article five.  And gee, wouldn't

13   it be nice if article 7.B -- 3 B was different.  We all feel

14   that way.  I feel that way.  That's not, in fact, what's

15   available to us.

16          And clearly, we -- at least our view of Orion and

17   it's progeny is that the evidence is properly debatable and

18   where reasonable minds may differ about the prudence of the

19   proposed court of action, we believe that the precedent in this

20   district -- in this circuit, would guide the Court to approve

21   the debtor's judgments as they were made.  And we believe

22   that's the -- we believe that's the appropriate standard.  We

23   point out that the only thing we're asking Your Honor to do

24   today is to permit us to -- to authorize us to enter into and

25   perform under the EPCA and the PSA.  There is much more wood to

24

1   be chopped in this case.  Many more hurdles for the debtors

2   with their stakeholders to overcome.  But I think there are a

3   few things in the record that are, I thought, extraordinary in

4   that they were completed uncontroverted and not only

5   uncontroverted but in fact in the testimony of Mr. Daugherty,

6   many of these items were reconfirmed.  And Mr. Daugherty not

7   only didn't quibble with the debtor's views regarding the value

8   proposition that there was little or no value, you know, there

9   was reduced value.  I think he said little or no value.  If

10  there weren't consensual GM and labor deals.  But he also made

11  a point of not quibbling with our timetable.  That we need to

12  emerge before -- if we possibly can, prior to the third quarter

13  of this year and not get ourselves immersed in the very complex

14  quadrennial labor contract negotiations between the unions and

15  the UAW leading those negotiations with GM and Daimler Chrysler

16  and Ford.

17          When you look at the evidence here, in light of the

18  standard, we believe that the evidence is overwhelming.  We're

19  mindful that Your Honor only has to find that we have carried

20  our burden by preponderance.  Because you balanced, if you

21  ultimately believe this judgment is a 50.1, 49.9 balance, the

22  company still prevails.  But we actually believe that the

23  uncontroverted nature of the evidence is overwhelming.

24          I'd ask you, when you think about this, Your Honor,

25  reflect on it, to reflect back on the black lines that are in

25

1    exhibits 6 through 9 of the evidence which show the first

2    documents the plan investors gave the company and the documents

3    we filed with this court.  And then add the black lines that

4    have been put into evidence during the course of this hearing

5    as further adjustments have been made, settling with the

6    creditors committee, the ad hoc committee and other

7    stakeholders including the black line that was announced this

8    morning.  I don't think there can be any conclusion other than

9    this is a fully negotiated commercial contract and that it

10   represents a compromise on all parties and ultimately the

11   question is, is this fully negotiated, comprehensive,

12   integrated set of agreements something that is in the best

13   interest of the estate from the point of, did the Board

14   exercise reasonable business judgment saying, I need that rock

15   to stand on.  I need to be able to move forward in this

16   reorganization.

17            Lest there be any question about process, the

18   evidence, I think, is also uncontroverted.  If Your Honor looks

19   at, not just the Board presentations, which would be Exhibits

20   14 through 34, but also the later exhibits that occurred in the

21   meetings in early January, which would be exhibits -- I believe

22   it is 114 through 118.  I think the -- that process,

23   particularly when you marry to it the weekly and certainly

24   monthly involvement and consultation with statutory committees

25   that's in evidence, looking at Exhibits 45 through 54 which

26

1    talk -- which indicate that from the beginning, when these six

2    paths were presented to our statutory committees and they gave

3    us guidance of where to pursue.  Throughout this process we

4    have considered their views.

5            Even with the equity committee and the company were

6    unable to agree, the company took the extraordinary measure of

7    actually putting together a chart of the equity committees

8    objections and presenting it to the Board.  In my experience,

9    that is an extraordinary circumstance.  Typically, you don't

10   bring that into the board room.  It was brought into the board

11   room here to make very sure that, as Mr. Miller testified, that

12   a contrary -- a contrarian view was presented to the Board so

13   that they could fully consider it.

14           I also want to point, in this record, to what was a

15   fairly extraordinary process that Your Honor crafted with the

16   parties in the discovery process.  And that is what's reflected

17   in Exhibits 55 through 58 that have been admitted into

18   evidence.  Which is an opportunity for the company's statutory

19   and official -- and ad hoc committees to be able to go through

20   and outline anything they thought was an ambiguity.  And I

21   think our committees, from the debtor's perspective, took some

22   license with that exercise but nonetheless presented a whole

23   series of issues.  And then that resulted and culminated in

24   Exhibit 58, which was a response to those items.  A statement

25   of clarifications and other statements, a twenty-three page

27

1   document that was signed by the plan investors and General

2   Motors and the company, that I thought went a long way to

3   making sure that there couldn't be arguments later about

4   anything.  Not only that the debtor's had thought needed to b

5   clarified but certainly that the -- our stakeholders believed

6   in that process needed to be clarified.

7         So I think, Your Honor, when one looks at the

8   evidence and weighs it, the uncontroverted evidence is

9   overwhelming.  But I do focus on items like the value

10  proposition and the very real risk in this case for value

11  destruction or the lack of value creation, however one wants to

12  look at it, if we're not able to go forward here.  I emphasize

13  the timetable issues that we talked about.  I emphasize the --

14  also the corporate governance process that Mr. Miller testified

15  to when he was called as a hostile witness by the opposition to

16  this.

17        I also think, Your Honor, when one looks at the

18  objections, and I'm not going to go through each one of them

19  unless Your Honor has specific questions, we did summarize our

20  positions in our papers and I'll stand on the exhibits that was

21  filed.  But I do think it is important to note, on this record,

22  that as we sit here before -- today in closing arguments that

23  there's not a single creditor of this estate, save Highland,

24  who is opposing the relief requested here by the debtors.  And

25  it's important that we understand, as we all do, that the

28

1    debtor's have an obligation to maximize the enterprise value of

2    this business for all of our stakeholders, taken as a whole.

3    But it is a duty owed to everyone collectively and it is also,

4    I think, not only a truism but a reality that when one measures

5    those responsibilities against the issue of taking risk and

6    risk proposition, that the lower someone is in the absolute

7    priority chain, the more risk that party or that constituency

8    wants the debtors to take in order to be able to obtain what

9    that constituency believes is appropriate value for them.

10           I wish it were so easy for a board to do that.  In

11   fact, that's not what the Board is obligated to do as a matter

12   of law.  A board's obligation, a company's obligation is to

13   look at the whole picture, the totality of the circumstances

14   and to understand that, as Mr. Miller and Mr. Sheehan testified

15   to, the importance of not only having a rock to stand on but to

16   have a transaction to move forward with.  Understanding, all

17   along, that Delphi has and will -- has exercised and will

18   continue to exercise its fiduciary responsibilities to consider

19   superior alternatives to the plan investors' transaction

20   subject to the EPCA and the PSA.

21           So that really relates -- brings down a question

22   here.  One way to crystallize this question, particularly in

23   light of the limitations of liability that are set forth in the

24   EPCA is, is the debtor's view, as Mr. Miller said because he

25   sort of boiled it down, you know, he didn't get into the, you

29

1    know, are there seventeen ways to terminate this thing or not,

2    but he said to you in his testimony, very clearly, that the

3    Board understood, considered, evaluated and believed it was

4    appropriate to subject this estate to the potential of losing

5    or expending a significant amount of resources on a transaction

6    that might not ultimately close.  Because in weighing that

7    against the other alternatives and balance -- and when one

8    balances it, the Board of Directors thought that the potential

9    for value destruction or lack of value creation and the

10   alternative was far, far more than moving forward in this

11   process.  As they weighed it, the decision to move forward in

12   this process was, in fact, the decision that they thought was

13   in the best interest of their stakeholders and fulfilled their

14   responsibilities to maximize enterprise value.

15           I would also note, Your Honor, and because I think it

16   is significant, I want to say a word about General Motors

17   Corporation.  General Motors Corporation is a very significant

18   factor in this Chapter 11 case.  And they have had, over the

19   years, a controversial relationship with this company.  And the

20   debtor's themselves have acknowledged that the company has

21   colorable claims against General Motors for some of that

22   conduct over the years.  On the other hand, there -- I think

23   that any prudent, responsible evaluation of General Motors

24   conduct during this Chapter 11 case has been one that concludes

25   that they are searching, as the debtor's are and I believe most

30

1    of our stakeholders are, to a solution here that allows

2    everybody to move forward and allows this company to emerge as

3    continuing to be GMs largest single supplier anywhere on the

4    face of the planet.  And that isn't going to be easy.  It's

5    complex.  Trying to get a piece of paper that General Motors

6    would sign its name to, in the form of the PSA, was an

7    extraordinarily difficult process.  But the fact is, Your

8    Honor, I think its important for the Court to know, as you

9    presided over these hearings since October of 2005, there is a

10   document that General Motors signed.  And when people raise

11   questions about ambiguities, within a week or ten days there

12   was another document General Motors signed.  And the process of

13   working with the plan investors and the company, making sure

14   those clarifications were accurate, making sure -- that was a -

15   - that was a process where General Motors reacted in real time,

16   worked constructively and worked in good faith.  And the --

17   what we need to have the ability to do now is to move forward

18   and to get this motion approved by Your Honor and to get these

19   documents implemented and get about the business of trying to

20   move this transaction to completion.  And if there is a

21   superior transaction that is executable and feasible that can

22   be implemented and that brings more value, taken as a whole to

23   our stakeholders, the debtors will, of course, exercise their

24   fiduciary responsibilities in connection with that.  Which is

25   why we insisted in the PSA, for example, in article 2.4, the

31

1    debtor's have the opportunity to have discussions with General

2    Motors and bring with them third parties in the event that the

3    debtors in the exercise of their fiduciary duties thought that

4    was appropriate.  We would not accept, for example, a lock up

5    that the plan investors wanted that did not have the fiduciary

6    out that permitted -- I'm talking now about the lock up between

7    General Motors and the plan investors.  We would not accept a

8    lockup that would not allow General Motors to talk to people

9    that we brought to them in the exercise of our fiduciary

10   duties.  And so, we have tried to make sure there's a path here

11   to do the responsible thing.

12           But I also think its importance, the guidance that

13   Mr. Miller gave and Mr. Sheehan gave in their testimony.  Which

14   is, this is not just about capital?  The truth of the matter

15   is, Your Honor, you know, there are many, many, many, many

16   sources of capital who have come to the debtors.  And there's

17   more than enough capitol.  One of the good pieces of news of

18   this whole reorganization is there is an oversupply of capital

19   that wants to finance, invest, be a part of this transformation

20   assuming that we can reach consensual transactions with labor

21   and General Motors.  Capital is not the issue.  The issue is,

22   how does one actually get there.  How does one actually execute

23   that transaction.  And the judgments this Board of Directors

24   has had to make and this management team has had to make is a

25   judgment of how do you execute.  Because if we can't find an

32

1   executable transaction and execute it before the fall, then

2   even as Highland concedes there is a very material risk of

3   value destruction.  And we won't be talking, at that point in

4   time, about what stakeholders at the bottom of the absolute

5   priority chain will be receiving.  We'll be talking about, you

6   know, what the creditors will receive other than par plus

7   accrued if we can, you know, as we rejigger how we will try to

8   sort this out.  And that is something that we all want to try

9   to avoid.  And the uncertainty of having the benefit guarantee

10   expire and the covenant guarantee expire and have the -- throw

11   that kind of wrench into our labor relations so that the whole

12   prospect for our organized labor in this country working for

13   Delphi that they have no idea what's going to happen to their

14   benefits -- their health benefits and pension and so forth, are

15   risks that will, at a minimum, be highly disruptive and greatly

16   uncertain.

17         And those are risks that the company believes need

18   and must be avoided if it can be.  No promises with this, Your

19   Honor.  There's no guarantees here.  I don't stand before you

20   representing a company that says, sign me -- approve these

21   pieces of paper and we'll be -- no worries, we'll be back in

22   March or April with a disclosure statement of plan.  A lot of

23   work to be done.  But if we can't get out of the starting block

24   today, Your Honor, then everyone is going to have to think hard

25   and wonder -- and our customers globally are going to have to

33

1   sort through what it is Delphi can do to get -- to go forward.

2   And it will put the company, we think, into great uncertainty

3   and great risk.  Thank you.

4           THE COURT:  Okay.  Thank you.

5           MS. STEINGART:  Good morning, Your Honor, Bonnie

6   Steingart from Fried, Frank --

7           THE COURT:  Good morning.

8           MS. STEINGART:  On behalf of the equity committee.

9   Among the objectors this afternoon the order will be, as we

10  have discussed it, if it's acceptable to the Court, that I will

11  go first and Ms. Leonhard from the U.S. Trustee's office will

12  go second and Highland third.

13          THE COURT:  Okay.

14          MS. STEINGART:  Is that acceptable?

15          THE COURT:  That's fine.

16          MS. STEINGART:  Just to start with, Your Honor.  You

17  know the debtors have allies in wanting this transformation to

18  work.  Mr. Butler acts as if when someone objects, they're

19  trying to put a stake in the heart of this company.  We have,

20  as great or greater interest then Mr. Butler does in seeing

21  that there is a transformation, in seeing that there is a sale

22  or some other transaction of Delphi to these plan investors or

23  others, that creates an environment where there will be a

24  successful manufacturing company for labor and for Delphi

25  stakeholders.  He does not have a monopoly on that market.

34

1    That is something that is very important to us.  So the fact

2    that we're objecting does not mean we're trying to get the

3    debtor to a point where it's going to collapse.

4         There is also a tendency here, Your Honor, to every

5    time there is a question raised there are the swords of GM that

6    come out and are run into the heart of this company.  If we

7    don't do this, this will happen with GM.  If we don't do this,

8    this create of horrible will happen.  There is here, and as I

9    go through the testimony of the witnesses, Mr. Resnick

10   admitted, I'll emphasize this later, that there's still a sixty

11   day window -- a forty-five to sixty day window where people may

12   come in and have a meaningful talk with this debtor and we'll

13   get to that.

14        So, the issues that arise when these various

15   horrible, terrorist tactics of all those who are objecting or

16   what might happen if the debtors don't get precisely what they

17   want, I think that this Court should ignore that.

18        The motions before the Court today seek approvals of

19   agreement that will lead to the sale of Delphi to these plan

20   investors.  While the Court will need to review and approve

21   other agreements, and eventually a disclosure statement and

22   plan, these agreements set the stage for the structure of all

23   other matters that will follow.  So sometimes, even though we

24   say that we're just talking about fees here, Your Honor, we're

25   talking about more.

35

1            In our third supplemental objection we laid out the

2    concerns of the equity committee that remained after the

3    various, and Mr. Butler uses the word clarifications, but you

4    and I know that they were changes and they were changes because

5    there were things that were incorrect in those agreements.  So

6    there have been clarifications which are changes and there have

7    been changes which are changes.  And then there have been

8    changes again.  And at just five minutes before Your Honor came

9    into this room, we got the last change, okay.  Which was the

10   elimination of the April 1st to disclosure statement walk away

11   date.  But I tell you, even though we are heartened by the

12   change and we think that it's a good thing, it's not enough.

13   And indeed it -- it demonstrates a pattern of dealing and

14   pattern of bring solution that has made all of these issues

15   more litigious and more lengthy then they need to be.

16           Issues that remain.  First and foremost I think its

17   important for the Court to recognize that the UCC and trade are

18   now receiving par plus accrued.  I am not at the bottom of the

19   food chain.  Delphi's public shareholders are on the top of

20   that food chain.  We are the only significant watch dog that

21   remains in this case.  And the value that's being talked about,

22   that's being diverted, that's being diminished belongs to us.

23   And while we might be tussling with GM, it exists.  So Jack,

24   excuse me -- I shouldn't say that Your Honor, Mr. Butler's

25   characterization of somehow someone being at the bottom of the

36

1    food chain and throwing bombs because they don't care about

2    what happens, that's just wrong.  It's wrong on every level.

3         So what's left.  Well the agreements may be less

4    illusory, but there are significant issues because GM still has

5    an absolute right to walk away.  And having just gotten this

6    fix five minutes ago, it's hard to figure out what the other

7    implications of that would be but I will try.

8         Second, the alternate transaction fee is still

9    inappropriate in the face of a lack of procedure for highering

10   better offers.  And when there's no alternative to just having

11   whatever period remains elapse.  Here we have Mr. Butler

12   saying, well, you know, these agreements say that debtors can

13   exercise their absolute minimum fiduciary duties and if someone

14   comes pounding, knocking, breaking down our door maybe talk to

15   them.  When you give an alternate transaction fee, you have to

16   have more than a begrudging attitude towards people who may

17   come knocking at the door.

18        The value transfer to the plan investors is massive

19   and unconscionable.  And indeed in this little -- in this

20   little summary that Mr. Butler tried to give you earlier today

21   and that was properly objected to, the bidders have the

22   temerity to refer to that value transfer as a return on

23   investment.  That's not a return on investment.  That's a gift

24   of 500 million dollars.  The only way -- the only way that

25   should remain in place is if there is a meaningful market test

37

1    so that this Court can come to the conclusion that the only way

2    the debtor gets transformed is by giving away this value.  I'm

3    not saying you need to take it away necessarily.  If there's no

4    market test it should be gone.  But if there's a real market

5    test and no one can come to the table who will do this

6    transaction without diverting so much value, then that's where

7    the chips may fall.

8           Fourth, regardless of who the successful bidder is,

9    the rights offering must be commenced at the later of the

10   registration statement or confirmation of this plan.  The

11   ability to waive the rights offering must be eliminated from

12   the agreements because even statements that people don't intend

13   to enforce such agreements are cold comfort and certainly

14   inadequate to protect Delphi's public shareholders.

15          I would just like to talk, very briefly, about what

16   we learned from the witnesses and documents and how those facts

17   apply to the legal issues.

18          THE COURT:  Well, before we do that.  I noted this

19   during the trial.  I have a very hard time seeing how, under

20   this structure, which contemplates the investors getting their

21   equity through a rights offering and under the PSA contemplates

22   a rights offering and says that they won't go out and confirm a

23   plan until the rights offering is complete, how -- how, as a

24   practical matter, you could waive it?  The only way you could

25   waive it, I guess, is if the SEC says you can't do it.  I mean,

38

```
 1   I could see why they wouldn't take it out for that reason --
 2   that very reason.  But I don't see how they could just
 3   voluntarily choose to waive it given all the other elements of
 4   this transaction.
 5            MS. STEINGART:  Well, Your Honor, they can waive it
 6   because the agreements specifically say they could waive it.
 7            THE COURT:  But --
 8            MS. STEINGART:  You know --
 9            THE COURT:  -- there are other provisions of the
10   agreement that would limit how they could waive it, I would
11   think.  Because it doesn't -- none of it works as a mechanical
12   matter.  They don't get their stock except through a rights
13   offering.
14            MS. STEINGART:  No, the investors, Your Honor, get
15   their stock through a direct subscription.  The investors do
16   not get their stock through the rights offering.
17            THE COURT:  But they're backstopping a rights
18   offering.
19            MS. STEINGART:  The direct subscription and the
20   issuance of the shares take place regardless -- the issuance --
21   the existence of the shares is provided for in the agreement.
22   And then once the shares exist some of them are provided to the
23   public shareholders through the rights offering and the rest
24   are taken up through direct subscription by the plan investors.
25   And that's why the plan investors have a different registration
```

39

1   statement for their purchase then the public shareholders.  So

2   there is -- so in that -- in that process there is the ability

3   for the company and --

4            THE COURT:  Well, I'm sorry --

5            MS. STEINGART:  -- the plan investors --

6            THE COURT:  -- could we go over that point?

7            MS. STEINGART:  Yeah.

8            THE COURT:  Where is it described that there are

9   going to be two different registration statements?

10           MS. STEINGART:  The plan investors have a separate

11  registration statement, Your Honor.

12           THE COURT:  Well --

13           MR. BUTLER:  Your Honor, there's a resale

14  registration statement that they have -- that eventually --

15  that will have to go on in order for them to resale their

16  security --

17           MS. STEINGART:  Right.

18           THE COURT:  But under 1144 they're underwriters.  And

19  you're going to have the registration statement coming -- I

20  mean, you'd have to do it at confirmation.  So I don't see why

21  there wouldn't be just one registration statement which would

22  cover both.  And again, I mean, I raised this during argument.

23  And I do want to hear the parties on this.  There is this pro -

24  - it's an unusual provision given the other provisions of the

25  agreement, that talk about sole discretion and the like, but

40

```
 1    6(d) of the investment agreement, again, says each investor

 2    shall use its reasonable best efforts to take all actions and

 3    do all things reasonably necessary, proper or advisable on its

 4    part under this agreement and applicable laws to cooperate with

 5    the company and to consummate and make effective the

 6    transactions contemplated, not only by this agreement (which

 7    has its various walk rights) and the PSA (which has its various

 8    walk rights), but also the GM settlement and the plan.  The

 9    plan is a plan that -- I mean, you're going to negotiate a plan

10    that has a registration rights feature to it.  They've

11    committed not to confirm the plan, seek confirmation of the

12    plan until they have the registration rights complete.  I don't

13    see how this imposes some -- some duty -- I mean, this -- this

14    appears to me to impose a duty to use reasonable best efforts,

15    more than sort of a general good faith duty that people

16    arguably have whenever they're dealing with each other, but a

17    reasonable best efforts duty to cause the effectiveness of the

18    plan.

19            MS. STEINGART:  Well, Your Honor, several -- several

20    points.  First is, the equity committee is not a party to any

21    of these agreements, that's number one.

22            THE COURT:  I don't -- okay.

23            MS. STEINGART:  And that matters.  And that matters.

24    Because conditions and other things can be adjusted and waived

25    as suits the parties to those agreements at the proper time.
```

41

1    Secondly --

2              THE COURT:  Well, but you're saying parties, plural

3    which includes the debtor as a fiduciary, so --

4              MS. STEINGART:  I do -- I do include the debtors.

5    But the debtors have shown -- the debtors have shown that every

6    time the plan investors say I want the stock at thirty-five, I

7    want to make the rights offering through confirmation.  I want

8    to --

9              THE COURT:  Well, let's go to the next point because

10   you have 363 in any event.

11             MS. STEINGART:  Let me just say this.  Lastly, Your

12   Honor, you know the plan investors have duties too.  The plan

13   investors have investors.  And as we get to the point where the

14   plan and disclosure statement have been put together, and Your

15   Honor, they're not put together yet.  And as the plan investors

16   may believe that somehow that their recovery will be diminished

17   they can begin to pressure for these kinds of changes to

18   protect the constituencies they must protect.

19             THE COURT:  But aren't they under a reasonable best

20   efforts obligation under this provision.  I mean, they can't

21   just jerk the company around at that point, can they?

22             MS. STEINGART:  They -- they will do whatever it is

23   necessary for them to do to protect their constituencies.

24   They're not going to be sitting here and wondering about --

25             THE COURT:  That's fine.  Companies do whatever is

42

```
1    necessary all the time, but it's subject to their contractual

2    obligations.

3            MS. STEINGART:  This is not a contractual obligation

4    that means that they cannot seek waiver because the agreement

5    contemplates waiver.  If there was not a waiver provision, if

6    they introduced it at the eleventh hour --

7            THE COURT:  No, I agree.  There's definitely a waiver

8    provision, but it just seems to me it's - it's limited not

9    only, sort of, by the general good faith obligations that

10   people have to the extent they have them, but by this

11   provision.  So I -- I just -- that one I didn't -- I mean, I --

12   I -- the whole purpose of this -- of this document, as far as

13   the equity is concerned, is to enable the registration rights.

14   I understand why it's important to the equity, but I also

15   understand that there's a reason to have general waiver rights

16   in documents.  There are things that can come up.  The SEC may,

17   although it's hard for me to imagine why, given the importance

18   of this matter and given the company's cooperation with the SEC

19   as evidenced by the agreement the company entered into, that

20   the SEC would put obstacles in the way of a registration rights

21   agreement, but conceivably that would happen and you might have

22   to take some other route to get people the value that they're

23   entitled to.  But it's a -- other than that, I don't think it

24   could be used as a mechanism to jerk the company around.  I

25   just don't see that as a legitimate tactic.
```

43

1          MS. STEINGART:  Well, Your Honor, to the extent that

2    you read the agreements that way, we are certainly want to have

3    this kind of value brought to -- home to our equity holders and

4    to the extent situations arise that mean we have to try to work

5    with the company and the plan investors to deliver it in some

6    other way, we're certainly open to do that.  We just want to

7    make sure that it doesn't go away.  That's our concern.

8          And to the extent that the Court believes that it

9    won't go away, we will -- you know, certainly will accept that.

10   But --

11         THE COURT:  Well, I don't believe it will go away for

12   a bad reason.  Let's put it that way.

13         MS. STEINGART:  It's an option and I guess, to the

14   extent that the Court's not inclined to do anything about it,

15   then we'll see what develops and deal with those issues when

16   they arise.  But there are still important other issues that

17   exist here.  And I think that we can begin to talk about it by

18   looking at Mr. Sheehan.

19         Mr. Sheehan testified that, in a sense, the alternate

20   transaction fee and commitment fees here represent double

21   dipping.  He said, in his view, that the alternative

22   transaction fee was not put in place to get this bidder to come

23   in and act as a stocking horse.  That was in his testimony.  He

24   testified that the other amounts or the other purposes of this

25   was to compensate the investors for the use of their money and

44

1    their expenses.  But we certainly have commitment fees that are

2    doing that and expense of reimbursements that are doing that.

3           He said he really didn't anticipate the cumulative

4    effect of the plan support agreement and the EPCA in --

5           THE COURT:  Could I stop you, though, on the prior

6    point?

7           MS. STEINGART:  Yes.

8           THE COURT:  You said earlier that there's a sixty-

9    day, perhaps even ninety-day window for other transactions, so

10   lets see who comes to the table.  But isn't -- isn't the risk

11   that if I go that route as the equity committee wants it, which

12   is not to approve this motion, that the table will be empty?

13   There's no one sitting there.  If I don't approve this motion

14   isn't it really a game of chicken with Appaloosa and Cerberus

15   and the other investors as to whether they leave the table?

16   And -- and -- so isn't that the real rationale for these

17   various fees?  Certainly the alternative transaction fee?

18          MS. STEINGART:  Well, the alternative transaction fee

19   only matters if someone else can be at the table.  And --

20          THE COURT:  Well, no.  But -- but -- is the point

21   you're making that all that the investors have is an option or

22   is it that they'll be there anyway?  Because I don't have any

23   assurance that they will be there at this level.  And I

24   appreciate that you say this level isn't sufficient.  But this

25   level has created a fairly high class problem for the

45

1   shareholders, who, before this transaction was announced, you

2   know, were maybe gasping up in fairly thin air.

3       MS. STEINGART:  Well, I think that -- that part and

4   parcel of this transaction being put together, Your Honor, were

5   representations that there really would be a market test here.

6   So -- so that's -- that's part -- that was part of these

7   framework meetings, hours and hours together and we'll get to

8   that.

9       THE COURT:  But see -- I -- I -- but, but --

10      MS. STEINGART:  The courts have --

11      THE COURT:  Now let me -- let me -- because I want to

12  -- when you say there would be a market test, you can have a

13  market test with a stalking horse.  In fact that's generally

14  how it's done.  So I guess I don't -- I understand your

15  argument that -- and it was certainly a powerful argument the

16  way the document first read, that it wasn't a real stalking

17  horse.  But at the same time, what is precluding the market

18  test now, other than the position the company is in separate

19  and apart from, you know, as a matter of its business?

20      MS. STEINGART:  Well, there are several things that

21  are -- that are precluding that from occurring, Your Honor.  I

22  think that -- that it makes it very difficult for people to

23  approach the company and to deal with the complexity of the

24  issues here without there being some limited process for that

25  to occur.  Everyone keeps talking about how this is the

46

```
 1   biggest, the most complex, the most difficult, that, you know,

 2   GM has to find bidders acceptable.  Unions have to find bidders

 3   acceptable.  And I can -- I can understand all of that.  And to

 4   the extent that that is the case and you want to award someone

 5   this kind of a package, okay, because the thing that

 6   necessitates the market test is not only the fee, Your Honor.

 7   It's the package, okay.  And if you're going to award that kind

 8   of a package to someone for being at the table, then I think

 9   that you have to put yourself in the position to satisfy

10   yourself that it's the only deal available.  And unless there

11   is some way that people can get into the process and people can

12   have a pathway, the company should be facilitated, not just

13   minimally causing conversations with GM and at the appropriate

14   time the union, for those who come forward who are properly

15   screened and who the debtor determines can or should engage in

16   these discussions.  Its not a free for all, but the package is

17   one that would justify it.  And you say, well, you know,

18   they've given me, you know, they've given me, like, the company

19   a take it or leave it package.  And they've tweaked it here and

20   they've tweaked it there.  And if I -- you know, and somehow

21   they're going to walk away.  The courts have often, Your Honor,

22   said look, this is good but you need to change your process

23   this way for me to approve it.  You know, Mr. Butler said you

24   were the thirteenth director.  For you, the thirteenth director

25   in a different situation.  You're the thirteenth director who
```

47

1    has now been fully informed because Mr. Miller said he never

2    saw the 500 million dollar --

3            THE COURT:  No, but I -- I -- I don't understand.

4    It's kind of loose -- loose terminology here.  What do you mean

5    by "process and package"?  I'm just not --

6            MS. STEINGART:  Well, I think that that can very

7    easily -- you know, we have sophisticated financial advisors

8    and lawyers who can say that during a forty-five day window

9    this is the screening procedure.  This is what you need to be a

10   qualified bidder.  This is who it goes to.

11           THE COURT:  But you know, when you -- I mean, I

12   drafted the Southern District Rules on selling assets, all

13   right.  When you go to the prescreening procedures, do you know

14   what it says?  You pre-qualify in terms "satisfactory to show

15   that you have the financial wherewithal to consummate the

16   transaction."  And here --

17           MS. STEINGART:  Right.

18           THE COURT:  -- you have -- beyond that point, which

19   is ultimately the same thing that anyone will do here anyway,

20   is try to show Rothschild and the company that they have the

21   financial wherewithal, I mean, that's not really a "procedure;"

22   everyone knows that.  And then the other -- the other point is,

23   you know, fairly unusual here, which is that -- and it's a

24   point that anyone who's looking to buy into this company knows

25   or has to know, if they do just minimal due diligence, is that

48

 1    they have to be able to relate to the unions and their key

 2    customers.  So I -- I don't' think it's a particular mystery.

 3    It wasn't a mystery to Mr. Daugherty.  On November 1st he knew

 4    something was up and he called Mr. Tepper and said, "I want to

 5    be involved."  And I'm assuming, given all the money awash in

 6    the hedge fund distress fund world, that, you know, there were

 7    probably a lot of other people between then and December 18th

 8    that also had the same idea, and certainly since then.  It's

 9    not really a mystery is it?

10            MS. STEINGART:  Your Honor, I don't think that it's a

11    mystery but I do think that given the posture of GM in issuing

12    statements and sending communications that it's not a loss to

13    anybody.

14            THE COURT:  But GM, I -- well actually --

15            MS. STEINGART:  I understand --

16            THE COURT:  Well, actually, that's -- I wanted to

17    raise that point.

18            MS. STEINGART:  Uh-huh.

19            THE COURT:  It's a question I had for the debtor.  GM

20    is obviously a third party.  It can agree not to talk to

21    someone or to talk to someone.

22            MS. STEINGART:  Exactly.

23            THE COURT:  There is relief sought, in the form of

24    order submitted, that I want to make sure I understand.  Which

25    is -- it appears in both the findings as well as the -- the --

49

1    one of the decretal paragraphs.  It's in both paragraph O of

2    the findings but I'll read from the decretal paragraph,

3    paragraph 4.  It says, "The entry into the plan framework

4    support agreement by the parties thereto and the performance

5    and fulfillment of their obligations there under does not

6    violate any law, including the Bankruptcy Code, and may not

7    give rise to any claim or remedy against any of the parties

8    thereto, including without limitation the designation of the

9    vote of GM or any plan investor or any affiliate of any plan

10   investor under section 1125(e) of the Bankruptcy Code, on

11   account of entering into the PSA and performing there -- and

12   fulfilling their obligations thereunder."

13          And then there's a following statement - a statement

14   that says, "notwithstanding anything contained herein, except

15   with respect to those types of claims, all other rights and

16   claims are fully preserved."

17          And so my -- my question is, the way I read this, I

18   don't see anything wrong or improper, you could -- could

19   persuade me otherwise, I guess, in GM simply entering into an

20   agreement that says it will talk to third parties only under

21   certain conditions.  Those being a fiduciary condition as well

22   as the condition that Mr. Butler alluded to, which is the

23   debtor can -- in conjunction with the debtor's discussions with

24   third parties.

25          How -- however, a creditor like GM might then

50

1    subsequently engage or use its -- use its discussions, it seems

2    to me, could conceivably, under certain circumstances, which I

3    trust GM wouldn't do, but conceivably as part of that process,

4    could engage in behavior that might lead to the designation of

5    its vote.  You know, it could say I will only talk to you if

6    you agree to, you know, pay us a fee or something like that.

7    Or, you know, we'll only talk if you agree that we get the

8    following distribution under a plan or something like that.  I

9    trust that this -- this language doesn't protect GM or the

10   other parties other than from the literal wording of the

11   language which says that it agrees not to talk unless these

12   conditions are met.  Is that right?

13            MR. BUTLER:  Your Honor, from the debtor's

14   perspective that's correct.  And General Motors is here and

15   they can -- they can respond to it.  Paragraph 4 of the

16   proposed order in the 1125(e) writes there, simply there was a

17   great concern that -- being very clear here, that having GM

18   sign a piece of paper saying it supported this approach was not

19   going to then give someone who didn't like GM down the line,

20   the opportunity to sort of say, okay, now you can't vote in the

21   plan.  And that was the issue.  Because it wasn't -- them

22   entering into the plan was not supposed to give other parties

23   leverage in this case.

24            THE COURT:  All right.

25            MR. BUTLER:  That is why this was written.

51

1          THE COURT:  All right.  Well, at the same time I

2    didn't want to protect any party.  I mean, you conceivably --

3    other -- you know, other parties to these agreements could do

4    things in connection with negotiating the plan or the GM

5    settlement that might give rise to a designation of vote.  And

6    I -- I read it as not protecting them under those

7    circumstances.

8          But why isn't -- why isn't GM's agreement -- why

9    isn't GM free to agree not to talk to anyone in return for

10   getting the agreement with Appaloosa and Cerberus?

11         MS. STEINGART:  Because, in restricting GM it means

12   that -- in having an agreement that's Court approved

13   restricting GM as opposed to GM conducting its own volitional

14   conduct in terms of talking or not talking, it puts the Court

15   in crematoria on a restriction of people being able to come

16   into this process.

17         THE COURT:  But doesn't it -- doesn't it just say

18   something that I wouldn't have power over anyway?

19         MS. STEINGART:  Yes, but to the extent that someone

20   is asking you to approve this behavior, you shouldn't.  GM --

21         THE COURT:  Well, that's why I just went through the

22   earlier language.  Because if it -- if they're asking me to

23   approve behavior that would violate the Bankruptcy Code, I have

24   a problem with that.  But it doesn't sound to me that that's

25   what's being done.

52

1          MS. STEINGART:  But Your Honor, you know -- you do

2     know as well as I do, that when -- that first of all, that's

3     very hard to identify and prosecute.  And secondly -- secondly,

4     there would be such an aura of uncertainty around behavior that

5     one would be uncomfortable -- that why would you want to create

6     an environment for that to occur.  Why -- why shouldn't GM have

7     to -- why should GM have -- have this chill or umbrella to hind

8     behind when it behaves in certain ways in connection with the

9     conduct of these negotiations going forward.  The agreement --

10          THE COURT:  But even if -- even if --

11          MS. STEINGART:  -- Your Honor, is the most illusory.

12     It can want -- first of all, it's not a party to the EPCA.

13          THE COURT:  But let me -- let me just interrupt you

14     for a second.  To the extent it is a chill they have it anyway.

15     They don't need.  Why wouldn't they?

16          MS. STEINGART:  Your Honor -- I disagree Your Honor,

17     they have it differently.  They have it differently.  To the

18     extent that this Court approves the agreement, then there is a

19     wider range -- then there is a wider swamp of conduct that they

20     can attribute to a court approved agreement to not making

21     themselves available, to not having meaningful conversations.

22     All of this -- all of the -- what it does is, it makes the plan

23     investors lock -- it sort of is an exponential increase in the

24     alternate transaction fee but not monetarily.  Not monetarily.

25     Because it's a restriction on conversations that would help if

53

1    a bidder is serious and meaningful that would help that

2    transaction along.  Its one thing for the investors to get a no

3    shot from the company in a limited way and that would result in

4    an alternate transaction fee.  Its another thing for a layer to

5    be on top of that that would embolden GM to create more of a --

6    more of a protected court-approved behaviors that --

7              THE COURT:  But in the end only --

8              MS. STEINGART:  -- to take that out of the process --

9              THE COURT:  But I'm sorry.  The only --

10             MS. STEINGART:  -- that could lead to another --

11             THE COURT:  The only behavior is one that's arguably

12   more limited as far as -- in that it restricts GM's rights than

13   it would have normally without an order, i.e., they could

14   always say I'm not talking to anyone.  That's one of the -- you

15   know, that's one of the basic -- that's a basic right.  "I

16   don't want to talk to you."

17             MS. STEINGART:  Well, Your Honor, right.  And that's

18   a right that they can exercise.  But Your Honor, the only

19   reason this is in here is so that GM can protect the favored

20   bidder.  And I think that that's a reason why the Court should

21   not approve it.

22             And secondly, while we talk about agreements being

23   illusory, who in this process is at more illusory with respect

24   to, then GM.  Their April 1st walk away has not been changed.

25   Their ability to not make labor agreements or other agreements

54

1    for no reason or any reason has not been changed.

2              THE COURT:  But what are they getting?

3              MS. STEINGART:  Why do they care? They care for two

4    reasons.

5              THE COURT:  No, no.  What is -- what is the debtor

6    giving them?

7              MS. STEINGART:  The debtor -- the debtor is giving

8    them, in a sense, and they are getting a situation where they

9    can obstruct more effectively the debtor's discussions with

10   third parties.  And it's not that the debtor is getting it --

11             THE COURT:  Well, what right does -- what right does

12   GM have to -- under these agreements, to preclude the debtor

13   talking to anybody?

14             MS. STEINGART:  The problem is that --

15             THE COURT:  In fact, hasn't GM agreed that --

16   implicitly that if the debtor brings someone to them they'll --

17   they'll listen and talk?

18             MS. STEINGART:  Why should there have to be a process

19   to bring someone to them?  Why shouldn't they just be available

20   for anyone to contact?  Why shouldn't that exist?  And then

21   they can say, we don't want to talk to you.  The debtor's can

22   find someone that they feel is worthwhile and say, GM, we'd

23   really like you to talk to them.  That's not changed one way or

24   the other.  But why shouldn't somebody be able to go to GM?

25   Why shouldn't GM be able to talk to them?  What possible

55

1    benefit can anyone --

2              THE COURT:  But that's a --

3         MS. STEINGART:  -- but the plan investors is that --

4              THE COURT:  Again I -- I guess I don't see what the

5    debtors -- couldn't -- couldn't GM and the --

6              MS. STEINGART:  It chills the debtor's ability to get

7    their bid.

8              THE COURT:  -- and the plan investors -- no, but

9    couldn't GM and the investors have separately agreed anyway?

10             MS. STEINGART:  But they didn't.  Your Honor, but

11   they didn't.

12             MR. BUTLER:  We are -- actually, they did.  And

13   that's the whole point of the lockup.  That was the whole point

14   of the fiduciary out provision, because the debtor said we

15   won't sign this agreement and we won't bring it to court unless

16   the debtors have the right to bring you people, who we're

17   talking to in the performance of our fiduciary duties.

18             THE COURT:  So in essence -- doesn't this limit GM's

19   rights as opposed to give them more power?

20             MS. STEINGART:  Well, Your Honor, the response to

21   that is, all the more need for a process.  If the plan

22   investors and GM want to make agreements that chill the ability

23   of serious people to go and talk to GM directly, so much more

24   the Court should see the need for more than the debtors

25   exercising some minimal fiduciary duty, reception to people who

56

1    may come and knock on their door.  All of these things, Your

2    Honor, are of a piece.  And each one -- each one operates --

3           THE COURT:  Well, let me -- is there any -- is there

4    any restriction under this motion or anything else out in the

5    case precluding any party from knocking on Fried Frank's door,

6    Houlihan Lokey's door, the chairman of the equity committee's

7    door and saying "the debtor's not listening to me"?  I mean,

8    aren't there layers on layers of fiduciary duties here that

9    protect a sale -- a bonafide person that wants to buy from --

10          MS. STEINGART:  None of the -- Your Honor, not if the

11   process is chilled, no.  No, it doesn't.  And I think that the

12   combination of events here and if I could just proceed to talk

13   about it slightly?

14          THE COURT:  Okay.

15          MS. STEINGART:  I think that you can appreciate that

16   the process is chilled.  And I think that you can appreciate,

17   in other settings such as this, this court and others have

18   encouraged minimal changes to these kinds of agreements.

19          THE COURT:  But I -- I still don't -- but what are

20   they?

21          MS. STEINGART:  The message is sent --

22          THE COURT:  I still don't -- I still haven't heard

23   what they are, the minimal changes that you're talking about.

24   I don't -- I don't --

25          MS. STEINGART:  All right.  Well, a minimal change --

57

1   would you?

2

3         MR. SCHELER:  Your Honor -- Your Honor, Brad Scheler.

4         THE COURT:  You ought to come near a microphone

5   because that's what gets picked up on the transcript.  But you

6   better put your blackberry off because that will make the

7   microphone make strange noises.

8         MR. SCHELER:  Your Honor, just a couple of things.

9   First I want to go back a little bit to the point that you had

10  about the rights offering.

11        THE COURT:  No, I don't want to have two arguers.  I

12  just want to hear the "minimal changes."

13        MR. SCHELER:  It's all related.  It's all related.

14  Changes that we need are the rights offering, okay?

15        THE COURT:  No, no.  That's not -- I'm talking --

16  this is a very limited point, which is the "process" -- Ms.

17  Steingart is --

18        MR. SCHELER:  Your Honor -- Your Honor, basically the

19  "process" is as follows.  Okay.  There is a major undertaking

20  that has to be done between GM and the unions and Delphi.  And

21  we support that effort and support that endeavor.  Cerberaloosa

22  has wisely said, what we want is we want to be a part and

23  parcel of that deal and they are a part and parcel of that

24  deal.  But it has also been said on the record, okay, publicly

25  is that GM has a -- currently has a preference.  Now I can't,

58

1    in any way shape or form, read into the mind of GM and I don't

2    think today's hearing should or needs to be about GM.  But what

3    we want is, we want during the next sixty day period for the

4    debtors to be directed by this Court, because they're awarding

5    this huge fee, to encourage, cajole, the debtors and unions to

6    talk to any qualified bidder.  Okay.  Not just to Cerebaloosa.

7    This is not a done deal.  Now you can't put a gun to GM's head,

8    as you say, and do this.  But if in fact what's happening here

9    is that GM has decided, in their own discretion, that the only

10   deal they want is the Cerebaloosa deal, then you've given

11   them -- you've given to Cerebaloosa ironclad protection and

12   we're on a fool's errand to think there's going to be

13   competitive bidding.  So the burden that we want, is we want

14   the debtors to be directed by this Court that if you're giving

15   a third party, Cerebaloosa, huge breakup fee protection, use

16   the next sixty day and if you have a problem getting General

17   Motors, the unions or anybody else to entertain higher and

18   better offers, come back to this Court and explain to my why

19   that is.  Now, it may be that GM says, we just don't like those

20   guys, and that's their entitlement.  But then the tension is,

21   is the allocation of value between General Motors and the

22   equity holders.  We're very clear about this, Your Honor.

23   General Motors can have whoever it wants as the successful

24   bidder here provided that the equity holders get the value

25   they're entitled to.  Right now, what you have is the potential

59

1    circumstance where Cerebeloosa gets paid a lot of dough and the

2    company believes that its gone as far as it needs to go unless

3    -- unless it decides it can get General Motors and the unions

4    to do a little bit more than they've done to date.  Right now

5    this circumstance presents itself to us as though we're done.

6    And unfortunately, the parties with an economic stake in the

7    upside of this aren't done and the only way for us to be done

8    is if the company treats third parties in a more embracing way.

9    And not just in a show way.  Your Honor --

10                THE COURT:  All right.  No I -- okay.

11                MR. SCHELER:  Okay?

12                THE COURT:  Yeah, I heard you.

13                MR. SCHELER:  Thank you.

14                MS. STEINGART:  If, just to proceed a little bit,

15   Your Honor, because the provisions here that -- that the Court

16   is approving are provisions that were not considered by the

17   Board in a fully informed way.  They didn't understand the

18   operation of the two agreements.  Both Mr. Sheehan and Mr.

19   Miller testified about that.  They did not receive information

20   that showed how the two agreements operated in tandem and how

21   each one operated to enhance the detriments of the other to the

22   debtor.

23                Let's -- you know, what we heard from Mr. Resnick.

24   We heard from Mr. Resnick that he never provided the Board with

25   a synthesis of the fee and value transfer provisions of the

1    EPCA.  He never fully apprised the Board of the inherent value

2    of the convertible preferred to AHC.  What he did was tell the

3    Board that the seventy-six million in fees were market.  And

4    that this was the only advice he gave to the Board on the

5    package of fees and discounts that AHC was receiving.  And that

6    he didn't give the Board any analysis of the terms and

7    structure.  What else did Mr. Resnick do?  Mr. Resnick had

8    Rothschild compile the chart that is JT Exhibit 96.  And this

9    chart is a chart of convertible preferred stock provisions call

10   comparison.  He said it showed him what he already knew.  And

11   what it showed him is that convertible prefers, in public

12   companies such as Delphi, are never sold at a discount.  Are

13   always sold at a premium.  He knew this already.  But he didn't

14   tell Mr. Sheehan that.  And he didn't tell the Board that.  But

15   if you look at this chart, Your Honor, what he did with it, was

16   he sent it to the plan investors.  And he sent it to the plan

17   investors in November.

18          What else did Mr. Resnick do?  He said that the

19   backup, to his opinion, that the seventy-six million, without

20   taking account of the -- any other fees, was plan value which

21   he charts.  And one of the charts, which is JT Exhibit 66, plan

22   of reorganization rights offerings, has a chart of fifteen to

23   eighteen companies.  And he argues that the fees are market but

24   he doesn't tell the Board that only one company on that list

25   also got discounted stock in addition to the fee for acting as

61

1    the backstop.

2              Your Honor, what he failed to tell the Board, when

3    the Board approved this agreement, was one of the most -- also

4    one of the most important points.  He never advised the Board

5    on the basic value of the option, that the company was giving

6    to AHC to have the right to walk away from this agreement the

7    day before the effective date.

8              I know, Your Honor, it's been changed.  But the issue

9    is, what was the Board -- what was the Board told and what did

10   the Board understand?  Our position is not that the Board did

11   not try.  It's not that the Board did not work hard.  We agree

12   that the Board did.  But it did not have the kind of

13   information that one would have hoped and expected, given the

14   advisors it had, that it could -- that it should have.  Here

15   Mr. Resnick testified that he told them it was market.  At the

16   same time, in a separate document, and we've seen these.  We've

17   gone through these documents.  At the same time, in a separate

18   document, in the smallest print possible, there's information

19   about how this 400 million dollars in fees in addition to the

20   seventy-six.  So the seventy-six million is in big print and

21   the 400 million is, like, tiny.

22             Okay.  He further testified, Your Honor, when asked

23   why didn't you put it in one document was that it was his

24   professional judgment.  This is his professional judgment and

25   operation to advise the Board in this manner.  Okay.  So much

62

1    for professional judgment.

2                    THE COURT:  Well, it's not a fee.

3                    MS. STEINGART:  It's a transfer of value --

4                    THE COURT:  I'm not approving -- I'm not approving --

5    I'm not approving the preferred stock today.  That -- that's

6    contingent on there being a plan.  And even then its not a fee.

7    It's --

8                    MS. STEINGART:  Well, the plan that's proposed will

9    have this attribute, Your Honor.

10                    THE COURT:  I mean, I think you -- I mean, the way I

11   view your argument is, that in essence the -- well, it's a

12   little incorrect to refer to this as a stalking horse

13   transaction because it's a -- it's not your typical sale

14   transaction.  But your argument is that we should -- we should

15   start all over again because this one isn't good enough.

16                    MS. STEINGART:  No, my argument is not that I should

17   start all over again, Your Honor.  My argument is that the

18   confluence of these attributes of the agreement make the entire

19   situation where this company is not testing the market

20   unacceptable.

21                    THE COURT:  Well, that's what -

22                    MS. STEINGART:  And I --

23                    THE COURT:  But I guess that's what you're saying, is

24   that this isn't -- this isn't a good initial test.  Or this

25   isn't a good basis to move forward on because the price is too

63

1   low.  Because again, I'm not approving this discount, as you

2   characterize it, today.  It's not -- it's not one of the fees

3   under the investment agreement.

4           MS. STEINGART:  But Your Honor, you heard the

5   testimony here.  You heard the testimony time and time again

6   about how time is running out, the situation is complex.  It's

7   really hard to talk to other people.  You can change that.

8   That's the aspect of this agreement that makes all other

9   aspects more egregious.  Okay.  It was -- Mr. Miller sat here

10  and when he looked at that chart he said he had no idea about

11  that.  He had no idea about that 500 million dollars was

12  involved -- was involved in the combination of discounts and

13  fees.

14          THE COURT:  Well, no.  But he had the equity's -- the

15  Board considered the equity's itemization of the -- the

16  problems with the motion.

17          MS. STEINGART:  He testified -- Your Honor, he did

18  testify in words that he didn't realize that those amounts were

19  implicated in plan value.  If you looked at those numbers in

20  plan value with the stock.  He said that, Your Honor.

21          THE COURT:  For December 11th?

22          MS. STEINGART:  He sat -- as he sat here yesterday,

23  he said that.

24          THE COURT:  But it -- he also testified that in

25  connection with the Board meeting on the 9th and the 10th, they

64

1   literally went through Houlihan Lokey's points item by item.

2          MS. STEINGART:  They did.

3          THE COURT:  That included this point.

4          MS. STEINGART:  They went through Houlihan Lokey's

5   points but they're here -- but they -- where were they were.

6   Did you want them to withdraw from the agreement?

7          THE COURT:  That was under consider --

8          MS. STEINGART:  That's not -- that's not --

9          THE COURT:  -- that was under consideration.

10         MS. STEINGART:  That was under consideration, Your

11  Honor.  And I don't think that the company felt that that would

12  be the wisest thing to do, nor do I.

13         THE COURT:  But then --

14         MS. STEINGART:  Unless -- unless these agreements --

15         THE COURT:  But then wait a minute.  What are we

16  talking about then?

17         MS. STEINGART:  Your Honor, if what we're talking

18  about here is whether there are certain provisions of the

19  agreement that are unacceptable.  And to the extent --

20         THE COURT:  No, I understand.  You --

21         MS. STEINGART: -- that the Court communicates that

22  and, you know, first of all --

23         THE COURT:  Well, all right.  But that's a little

24  different.  That's basically -- you've been saying you don't

25  like the -- these two agreements because they're too much like

65

1    an option.  But in essence, aren't you saying you want to flip

2    it over and give the estate the option in -- you know, that's

3    basically --

4              MS. STEINGART:  The estate's paying for the option,

5    Your Honor.

6              THE COURT:  No, no, no.  I'm saying, you want to flip

7    it and say the estate can have, you know, the parts that you

8    like and cut out the more egregious parts that you don't like.

9    And there's some merit to that.  I understand that issue.  But

10   isn't that all we're talking about?

11             MS. STEINGART:  I don't think so, Your Honor.

12   Because I think that without the estate being in a position to

13   have the option period, because -- what Mr. Resnick told you

14   when he said that there's a sixty-day window is that this is

15   the option period that is the payment that is the quid pro quo

16   for the alternate transaction fee.  And unless -- and unless

17   there's a better way for people to get to this company, and GM

18   is not locked up in more ways than just its attitudinal

19   preference, that the period will be valueless.  Mr. Miller sat

20   there and said, the time is running out.  So if the time is

21   running out and if there's no opportunity to shop this company,

22   yes, the Court should not approve this agreement.  If there is,

23   and there are ways to make it structured so that the estate is

24   not harmed, because the estate is harmed by the value transfer.

25   And certainly, you know, I think with a prospect of bringing

66

1    other meaningful people in that the estate is not going to be

2    in a position where it can't move forward.

3              Getting back to Mr. Resnick.  There was a certain

4    point in time where, I think it was important for him, like all

5    professionals, to give his client bad news.  Whether his client

6    asked for it or not.  His job was to say, I've looked at this

7    and they're getting 500 million.  His job was to say, I've

8    looked at this and they have an option to walk away instead of

9    hiding the ball in separate documents and small print.  And I

10   think that's what you had happening here.

11             Mr. Sheehan testified that he didn't realize what the

12   optionality was in the agreements.  He had advisors who should

13   have told him.  We don't, in any way shape or form, question

14   the good intentions, the tireless efforts of Board and

15   management at Delphi, Your Honor.  But they did not receive an

16   understanding of these agreements when they approved them.  And

17   that matters.  That matters very much.  It's not a hollow

18   responsibility and it's not something that there should be

19   precedent in this court or any other court, that agreements

20   that are considered that have these kinds of things that people

21   who are negotiating them and approving them admit they don't

22   know about, can be sustained.  That's not what integrated

23   resources says, Your Honor.

24             Mr. Miller said he tried very hard to understand the

25   agreements and we agree.  But he also admitted that in

67

1    narrowing the process to just AHC as a bidder, and it wasn't a

2    really big narrowing because there are only three to begin

3    with.   There was -- from the time they entered bankruptcy, the

4    only three companies that this debtor ever talked to were

5    Cerberus, Ripple Wood and Appaloosa.   Mr. Resnick said as much.

6    So they narrowed the three to one.   And the Board narrowed the

7    three to one because during these framework discussions, that

8    Mr. Butler is so enamored of talking to us about, the

9    committees were told that that process would lead to a stocking

10   horse bid.   And Mr. Miller acknowledged that when he was on the

11   stand.

12             So the Board put itself in a position with AHC --

13             THE COURT:   I'm not -- I'm not so sure he said it the

14   way you said it.

15             MS. STEINGART:   I thought he acknowledged it.   Okay.

16   But the Court certainly has its views and this is --

17             THE COURT:   I'm assuming you were there, though.   So

18   in this sense I'm --

19             MS. STEINGART:   I was.

20             THE COURT:   -- I'm letting you testify, in a sense.

21             MS. STEINGART:   But wasn't --

22             THE COURT:   But a lot is in the mind of the beholder

23   of what a "market test" is, obviously.

24             MS. STEINGART:   It does.   It does.   But when AHC

25   narrowed it to one bidder, Your Honor -- when it narrowed it to

68

```
 1    one bidder, they compromised their negotiating position to the
 2    extent that both Mr. Miller and Mr. Sheehan testified time and
 3    time again that every disagreement on their part, with the plan
 4    investors, became a take it or leave it situation as to
 5    discounted stock, as to timing of rights offering, as to
 6    optionality.  Every time there was a pushback, the plan
 7    investors would say take it or leave it and the company was
 8    there.
 9              THE COURT:  But if you look at the exhibits that
10    talk, that the Board had about resolution of open points, I
11    mean, it shows that -- that there were agreements by the
12    investors where they backed off of their original positions.
13    Now some of them may have been overreaching original positions,
14    but in my view not all of them.  I mean, it doesn't seem to me
15    it was just that they had them completely over a barrel.
16              MS. STEINGART:  Well, just about, Your Honor.
17    Because on any matter of any substance or value that was --
18    there was a one-way street there.  In essence, Mr. Miller
19    testified that he now finds himself in a situation where GM and
20    the plan investors are making it impossible, for whatever small
21    window Mr. Resnick testified and Mr. Miller agrees exists for
22    that market test to take place.  What was the equity committee
23    doing in all this?  Because Mr. Butler has been -- has been
24    fond of saying, from time to time during this case, well the
25    equity committee was there, they knew what the fees were, they
```

69

1    knew what this was, they knew what that was.  We wanted to

2    cooperate.  We wanted to help facilitate the debtor making a

3    deal that would enable this transformation.  Because we too

4    want the debtor to succeed.  And we, joined with the creditors

5    committee in helping the AHC proposal emerge because we thought

6    it would be a stocking horse, because we thought that we would

7    have the ability to work with debtors to use such a process to

8    maximize value.  Because a rights offering was proposed for our

9    share -- for shareholders -- public shareholders of Delphi that

10   gave them the full value of the discount.  And a process for

11   exercising those rights that were meaningful.  And meaningful

12   for unsophisticated investors.

13          Instead, what the equity committee got was, we're

14   working very hard.  It's too late.  GM won't talk to anybody.

15   It's very hard for us to make a process to invite bidders in

16   because they should be inviting people in.  Giving this package

17   away, they shouldn't just be sitting back. There should be four

18   or five or six serious contenders for this -- for this estate,

19   that are identified and that are approached and whose review of

20   the transaction is facilitated.

21          Instead of a rights offering that gives public

22   shareholders the full value of that ten dollar discount, we

23   have a rights offering that makes it complicated for the moms

24   and pops to really understand and exercise those rights based

25   on the insistence of the plan investors for even more value.

70

1    They insisted on having the rights offering in a way that

2    diminished the ten dollar value that the shareholders who had

3    paltry amounts of shares would have so that they would have

4    fewer fees to pay.  It was economically profitable to them to

5    do that.  That was what Mr. Sheehan testified.  The company

6    didn't want these things to happen.  Mr. Miller wanted the

7    process to proceed so that there was a meaningful market test.

8    But something went terribly wrong.  And the only one, the

9    thirteenth director that Mr. Butler referred to is the only one

10   who can correct it.

11          The only rationale for leaving this agreement in

12   place is to have a process where they do have to go out and

13   find people.  Not an open option, but a process that invites

14   the people who have the capacity in and lets them have a look.

15   Without that, these agreements should not be approved.

16          And I can talk about the legal basis for that, but

17   Your Honor has my briefs.  Thank you very much.

18          THE COURT:  Okay.  Thank you.

19          MS. LEONHARD:  Good morning, You Honor.

20          THE COURT:  Good morning.

21          MS. LEONHARD:  Alicia Leonhard for the United States

22   Trustee.  I'll be very brief.  I have, actually, three points

23   to make.

24          First, I'll start very specific -- make two specific

25   points.  The debtors -- neither the debtors nor the investors

71

1  made any salient response to the U.S. Trustee's objection

2  regarding fee applications under Section 503(b).  They simply

3  reiterated their argument that it was their business judgment

4  and they could pay the fees under the Business Judgment Rule.

5  However, I don't think that the Business Judgment Rule trumps

6  the requirement to file fee applications under 503(b).  And but

7  for this -- this motion and these agreements, none of those

8  people except perhaps Appaloosa, would be entitled to fees.

9  And Appaloosa certainly would be in here seeking fees under

10  503(b) by application.

11         THE COURT:  Well -- can -- let's go through that.

12         MS. LEONHARD:  Yes.

13         THE COURT:  It's the case - isn't it -- under

14  numerous instances where an estate will pay fees of a DIP

15  lender and its counsel or someone who is doing due diligence to

16  provide exit financing without a full 503(b) application?  I

17  agree with you that it is also the case, normally, since those

18  fees are always at least limited by a standard of

19  reasonableness and also contractually tied to a particular

20  activity that there's a process in place for the Court to

21  resolve any disputes about those issues.  And normally, in

22  addition to the debtor getting the bills, the U.S. Trustee will

23  and/or, you know, a committee will.

24         MS. LEONHARD:  Certainly.

25         THE COURT:  But I -- and that's not the case here

72

1    either, and I want to address that.  But I don't -- I guess as

2    far as a fee structure is concerned, in connection with a

3    transaction, it's certainly not my experience to say that a

4    503(b) application is required.  I want to bifurcate this as

5    between the fees in connection with the transaction and going

6    forward if approved and the specific Appaloosa fees, because

7    that's a separate issue that you've raised.  But just on the

8    first point it seems to me that, as long as a debtor can show,

9    under 503(b)(i), that these are actual and necessary and

10   beneficial, that you don't -- you don't get into (b)(iii) and

11   (b)(iv).

12           MS. LEONHARD:  That's correct, Your Honor.  You

13   don't -- in that circumstance you don't get into (b) -- you

14   don't get into the substantial contribution issue.

15           THE COURT:  Right.

16           MS. LEONHARD:  Absolutely.  However, there is, you

17   know, that the -- the reason, I think, that the DIP lender

18   situation is distinguishable is that there is an underlying

19   contractual obligation for the DIP lender.  And also for pre-

20   petition lenders and also for indentured trustees, there's an

21   underlying contractual obligation that exists -- very often

22   existed pre-petition.

23           THE COURT:  But again, I -- there -- there are at

24   least two other scenarios I can think of where this is done

25   fairly routinely.  One is in connection with a stalking horse

73

1   transaction where one element of the upset fee or the break fee

2   is payment of the fees, reasonable fees, in connection with the

3   transaction.  That's different from the O'Brien Energy case

4   where there was no agreement.

5           MS. LEONHARD:  Uh-huh.

6           THE COURT:  Where the court was looking at it, in

7   essence, as a substantial contribution.

8           MS. LEONHARD:  Uh-huh.  Uh-huh.

9           THE COURT:  And then there are the cases where, as

10  just happened in this -- in this case, the debtor either does a

11  refinancing during the case or is looking for exit financing.

12          MS. LEONHARD:  Uh-huh.

13          THE COURT:  And agrees -- on notice of course, agrees

14  to pay the fees of the party providing the refinancing or the

15  exit.  I mean, the people who provided the fee -- who did the

16  refinancing recently, they -- they had fees paid.

17          MS. LEONHARD:  Your Honor, I would agree.  The U.S.

18  Trustee would agree that if there's an underlying contract the

19  fees would be payable.  You know, I -- I suppose, I mean, can

20  one look at this and say this is an underlying contract, I

21  don't know.  But that is the reason, if there's no underlying

22  contract.  But I also think that based on this agreement, which

23  is very lopsided, the balance of power is, sort of, in the

24  investor's side.  I think that the parties in interest in this

25  case have a right to see the fees and also see whether they're

74

```
 1   reasonable.
 2            THE COURT:  Well, I -- on that point it did seem to
 3   me that the U.S. Trustee should be entitled to get the fees --
 4   the bills.  The same type of mechanism that the creditors
 5   committee has in the order without -- you know, without going
 6   further than that.  And so that they would have the opportunity
 7   to -- the U.S. Trustee would have the opportunity to review
 8   them.  You're on the fee committee anyway?
 9            MS. LEONHARD:  Yes, Your Honor.
10            THE COURT: I think there is an issue as to widening
11   it because it strikes me that, conceivably, there will be
12   issues down the road where people will be showing legal bills
13   and other statements to parties who may be in litigation
14   against them.  The U.S. Trustee's not really going to be in
15   that position.  I believe that there is a problem with this
16   agreement unless there is that type of mechanism, in addition
17   to the committee, which I see you've already put into the
18   order.
19            MS. LEONHARD:  Okay well, that's fine, Your Honor.
20   But I think there is -- I think Appaloosa presents a different
21   issue.
22            THE COURT:  This is the five million?
23            MS. LEONHARD: That's correct.  And I do believe that
24   the debtor's have -- in some sense are -- the parties have, in
25   some sense, acknowledged that by not making the payment until a
```

75

```
1    plan is confirmed.  Appaloosa clearly, in the beginning, was a
2    very active in the case as the Court remembers.  They were here
3    every day from the very beginning.  And they actually filed the
4    motion to -- for appointment of the equity committee, and is
5    seeking, I'm sure, the only basis on which the Court could
6    approve fees would be under the substantial contribution
7    provision at 503(b)IV.  And I think it's the only way that
8    Appaloosa -- I think Appaloosa must file a fee application
9    under 503(b) to get those fees.
10              And I would request that the Court modify -- if the
11   Court does approve the order, to modify the -- approve the
12   agreements to modify the agreement to require Appaloosa to file
13   a fee application.
14              THE COURT:  All right.
15              MS. LEONHARD:  The second argument I'd like to make
16   is with respect to the plan framework agreement.  The issue the
17   U.S. Trustee has with the plan framework agreement is that
18   it -- it specifies, almost many of the terms of the plan, which
19   appear to be written in stone.  And the Court -- and the
20   party -- and the debtor says, well, we're not here to confirm
21   the plan.  And of course I understand that.  But our concern is
22   that they're -- the parties are asking the Court to approve
23   terms of the plan.
24              Now, when we come to plan confirmation, these terms
25   will be in the plan and are the parties going to come back --
```

76

1    and some of these actually appear to violate 1129.  For

2    example, I noticed that GM is treated differently then the

3    other unsecured creditors.  Are they going to come back and

4    say, but Your Honor, these terms were approved already?

5            THE COURT:  No, they -- they can't.  It's like --

6    it's like, again, it seems to me, at least, when a debtor comes

7    to the Court and says I would like you to approve a breakup fee

8    and expense reimbursement in connection with a particular

9    transaction.  The only thing that's before the Court is the

10   expense reimbursement and the breakup fee.  The transaction is

11   reviewed to see whether it was reasonable for the debtor to

12   agree to a breakup fee or transaction.  But -- I'm sorry, to a

13   breakup fee or an expense reimbursement.  And that's, I think,

14   the inquiry I was going through with Mr. Steingart.

15           MS. LEONHARD:  Uh-huh.

16           THE COURT:  But the terms of the deal itself, just as

17   the terms of the plan structure upon which the PSA is premised,

18   are not up for approval at that time.

19           MS. LEONHARD:  Well, I think so long as that's clear.

20   I mean, I think that our view is that this is a term sheet in

21   agreement by the parties.  And I -- we're not exactly sure why

22   it really need approval by the Court.  Because parties can have

23   this agreement without Court approval.

24           THE COURT:  Well, I think the debtors, out of an

25   excess of caution, are looking for direction.  And part of this

77

```
1    is, that it's a public process and the direction is being shown
2    to everyone, including third parties out in the marketplace,
3    such as Highland, that, you know, this is the path we're going
4    down.  Not that this is approved now, but this is how we're
5    going to be spending our time over the next, you know, few
6    months, or weeks at least.
7             MS. LEONHARD:  Yes.  Okay.  Well, actually, Your
8    Honor, you segued me right into my last brief comment.  You
9    know, I think we've heard a whole lot, today -- in the past few
10   days, it's been a very interesting trial about uncertainty and
11   how the Court has to approve this agreement today or the debtor
12   will have to start all over.  And I have to say that, you know,
13   from the standpoint of this is a public company and a U.S.
14   Trustee, in many ways, is here to protect the public interest.
15   And I'm the only person here, the U.S. Trustee, the only person
16   here without a financial interest, so I have a really pure
17   public interest.  And it was interesting, today, that, you
18   know, that Mr. Butler walked in and said, oh, we have a
19   concession from the investors.  Wow, they're -- they took away
20   the escape hatch.  This is great.  But what it showed to the
21   U.S. Trustee was, this is the value of transparency and
22   openness, public disclosure.  And those are the core of
23   bankruptcy.
24            And you look at this agreement and, there is a real
25   imbalance of power.  And I understand that debtors never have
```

78

```
 1    much leverage.  But many of the terms, and I'm speaking mostly
 2    of the rights offering and the governance provisions, are
 3    really detrimental to the small shareholders.  And we all know
 4    that the debtor has 300,000 shareholders.  And many of them
 5    have one or two shares.  Very small shareholders, but they're
 6    very loyal to the company.  And in fact, the Court ordered the
 7    United States Trustee to form the equity committee in
 8    recognition of that fact.  And so this case, in the truest
 9    sense, implicates the public interest.  And so that is why the
10    United States Trustee concurs with the equity committee that
11    the Court should either deny approval of these agreements or
12    modify the agreements so that there's a thirty to sixty day
13    window for the debtor to actively seek higher and better
14    offers.
15            Thank you very much, Your Honor.
16            THE COURT:  Okay.  Before you -- before you sit
17    down --
18            MS. LEONHARD:  Yes.
19            THE COURT:  Obviously I'm mindful that there are not
20    just large shareholders here.
21            MS. LEONHARD:  Yes.
22            THE COURT:  And frankly I've had an ongoing concern
23    from the beginning of the case that people who are or might
24    become large shareholders might use the process to take
25    advantage of those who aren't.  It seems to me that, whether or
```

79

1    not ultimately the rights offering is structured the way it is

2    in the PSA, that there should be every effort by the debtor and

3    the equity committee to make the rights offering transparent.

4    And I guess, to the extent that the U.S. Trustee could

5    recognize that as well it would be helpful.  Obviously

6    resources need to be expended on that process if it's to be

7    done.  So that it's not just those who hear through the

8    grapevine or sense the shifting sands, as Mr. Daugherty said,

9    but those who aren't as well tuned in.  And I'm not faulting

10   him for that.  He has a perfect right to be tuned in.  But it

11   seems to me that there is a -- a cost to making a rights

12   offering transparent but it strikes me that the cost is

13   probably well spent here where you have a lot of public

14   shareholders.

15          MS. LEONHARD:  Thank you, Your Honor.

16          THE COURT:  But, the one thing I haven't addressed is

17   the U.S. Trustee's point about the five million dollar fee that

18   is contingent upon confirmation and a distribution to the

19   equity holders.  And I think that's largely Appaloosa's issue.

20   Now, I know, because we carried over, the gentlemen from White

21   and Case are maybe traveling now and I apologize to them for

22   that.  I see one of their colleagues back here.  But are you on

23   the phone still, Mr. Lauria?  No.  Well, I -- is anyone here

24   for Appaloosa.

25          UNKOWN ATTORNEY: You know, I'm here but probably

80

1    without authority.

2              THE COURT:  Is your client here?

3              UNKNOWN ATTORNEY:  No, they're not.

4              THE COURT:  Well, I could tell you that you can look

5    at this provision two ways, obviously.  I'll make their

6    argument for you because I've thought about it.  You can look

7    at this two ways.  You can say it's really just part of the

8    consideration.  That it really isn't a 3.4 billion dollar deal.

9    That's obviously net all of the things that Ms. Steingart has

10   pointed out.  And one of the things it's net of is this five

11   million dollar fee.  And so you can look at it, leaving aside

12   the other discounts, other fees, this is a 3.3995 deal.

13             On the other hand, it is structured as a fee, in

14   respect of professionals' fees.  And that really does clearly

15   fit within the language of 503(b)(3) or (4).  I think that

16   that's probably what Congress had in mind here.  Particularly

17   given Congress' concern about professional fees in bankruptcy

18   and the need to have extra review of them.  And the fact that

19   this isn't really tied to -- the work done itself isn't tied to

20   this transaction, unlike the other work that we were talking

21   about.

22             So it seems to me that there's a real serious issue

23   as to whether this should not be subject to the requirements of

24   an application under 503(b)(3) or (4).  Having said that, it --

25   without actually seeing the time entries, but those would be

81

1   reviewed for reasonableness in any event -- it strikes me that

2   it is the type of work that would normally be covered by

3   503(b)(3) and (4).  And I think Ms. Leonhard would agree with

4   that.

5        I could also tell you that just two or three weeks

6   ago I approved a similar application in the Refco case for an

7   ad hoc shareholder committee that basically met the same

8   requirements.  What would be excluded would be work done, not

9   in connection with the case, not in connection with seeking an

10  equity committees appointment and doing the due diligence that

11  contributed to the proposal that's in front of the Court now,

12  which I assume and I think Mr. Resnick confirms this, started

13  very early in the case.  What would be excluded is matters that

14  really would relate to the types of things that normally

15  wouldn't be covered by a 503(b) application.  And those, in

16  this context, would be pretty minor.

17       So, as in the Refco case there are -- certainly

18  parties in interest can agree not to object to such an

19  application except under limited circumstances, i.e., it was

20  only related to the following work and its capped in a certain

21  amount.  But I think it presents an issue as to the -- as to

22  the transaction.  On that score, I note that there is a

23  provision of this agreement that says, that it's a condition of

24  the agreement that there be a final order.  And I understand

25  why that's in there.  And normally it's waived unless there's a

82

1    really valid basis for appeal that the parties can judge on

2    their own.  But I'm telling you that even if I approve this,

3    and I in all likelihood wouldn't, I think it raises substantial

4    issues on an appeal.  So I -- I -- I strongly urge that you two

5    go call the Appaloosa's and see if this would be revised.

6              MS. LAURIA:  Your Honor, can you hear me.

7              THE COURT:  Oh, you're there after all.  I thought

8    you weren't there.

9              MR. LAURIA:  Yes, I apologize, Your Honor.  We

10   thought we had a live line but we didn't.

11             THE COURT:  Oh, okay.

12             MR. LAURIA:  We got the operator who, I guess, has

13   now put us in.

14             THE COURT:  All right.  Just at the -- just at the

15   key moment.  Did you hear what I was saying?

16             MR. LAURIA:  I heard about seventy-five percent of

17   it.

18             THE COURT:  Okay.

19             MR. LAURIA:  During the time when the operator was

20   figuring out how to put us in live we were disconnected.

21             THE COURT:  All right.  Well, was that the last

22   seventy-five percent?

23             MR. LAURIA:  That was -- it was the first seventy-

24   five percent.  I probably missed some --

25             THE COURT:  the last twenty-five percent was

83

```
 1    basically that I -- I just have serious problems with this and

 2    I think that an appellate court probably would too.  And given

 3    all the requirements of this transaction, it seems to me that

 4    Appaloosa has reasonable comfort that it will get paid all or

 5    substantially all of what's covered by this.  But I think that

 6    the proper procedures ought to be gone through.

 7              MR. LAURIA:  All right, Your Honor.  We certainly

 8    understand the guidance and we'll -- we'll try to get this

 9    dealt with appropriately.

10              THE COURT:  Okay.

11              MR. LAURIA:  The thinking on our end was that the

12    benefit provided by the -- to work in connection with the

13    appointment of an equity committee is, at this point, in the

14    case manifest.  And we were trying really to streamline --

15              THE COURT:  Well, I think it is manifest but that's -

16    - but that still doesn't get around the requirement of filing

17    an application.  I guess that's the distinction I'm making.  I

18    think, just like the firm in Refco that got the substantial

19    contribution award, it's likely your firm and the other firms

20    that Appaloosa hired for this period would.  But you still have

21    to go through the process.

22              MR. LAURIA:  Understood, Your Honor.

23              THE COURT:  Okay.  All right.  Thank you.

24              MS. LEONHARD:  Thank you, Your Honor.

25              MR. BUTLER:  Mr. Lauria, can I just ask a qualifying
```

84

1   question, Your Honor?

2          THE COURT:  Mr. Lauria, does understood mean that

3   it's agreed so that if the 503(b)(4) language is put in here,

4   if the Judge chooses to approve the transaction an order can be

5   entered today?

6          MR. LAURIA:  Well what's -- what I mean by understood

7   is, that I understand what the Court has said.  And I will

8   recommend it to my client but without getting an official

9   authorization, I can't make the changes.  I will certainly, as

10  soon as we get an opportunity, talk to my client.  And I -- I

11  am confident that the client will agree to accept the Court's

12  guidance and to make an appropriate change here.

13         THE COURT:  Okay.  Thank you.  And again, I apologize

14  that your -- that this carried over, but that's the way it

15  goes.

16         MR. LAURIA:  Your Honor, we understand and we're very

17  appreciative that the Court was able to make this accommodation

18  for us to be able to -- to be live by phone.

19         THE COURT:  Okay.  All right.  So is it Mr. Parkins

20  or your colleague?

21         MS. STEINGART:  Just one minute, Your Honor.  One

22  thing that I overlooked to cover and it is quite, quite

23  important to us and I'll be brief.  Is the request in the

24  debtor's order for a waiver of the ten day stay.

25         THE COURT:  Oh, we'll deal with that at the end of

85

1      the hearing.

2              MS. STEINGART:  Oh, okay.  Thank you.

3              THE COURT:  I -- I haven't ruled yet.  So I'll deal

4      with that at -- but I understand your point on that.

5              MS. STEINGART:  You do, okay.

6              MR. PARKINS:  Your Honor, my name is Lenard Parkins,

7      Haynes and Boone for Highland Capital.  I'll try not to be

8      redundant to what has already been covered --

9              THE COURT:  Okay.

10             MR. PARKINS:  -- with respect to the various points

11     raised.  I think where Highland Capital is coming from, having

12     heard the evidence and heard the arguments today, is that

13     Highland believes that the approval of this motion is really

14     premature by thirty days.  And the reason its premature by

15     thirty days, Your Honor is, number one, we know the timeframe

16     that the company has in order to get out by the end of the

17     second, or the beginning of the third quarter.  And number two,

18     its premature because since Highland has made its proposal on

19     December 21, the company has looked at that proposal and has

20     responded in the evidence, in exhibits number 117 and Exhibit

21     34, and in a way that reflects that they acknowledge that

22     there's a better deal on the table.  And we're suggesting, let

23     thirty days run to see if we can flush that out before 100

24     million dollar hurdle is put up.

25             For example the Rothschild work has shown, both on

86

1    December 22nd and two days ago, that the cash recovery for

2    unsecured creditors is more certain than the treatment proposed

3    for other creditors.

4            Number two, recoveries for the common shareholders

5    are higher, under the Highland proposal.  And as counsel for

6    the equity committee has stated, this is likely the return for

7    the equity is a preeminent -- we are the holders, we are the

8    stakeholders here because all the other creditors under the

9    proposed framework anticipated plan are going to get paid in

10   full.

11           Number three, that with respect to the governance

12   that -- the governance issues that the Court ought to let the

13   process play out without a 100 million dollar threshold to see

14   if the corporate governance issues can't be straightened out

15   and are not approving what Rothschild called, not the best

16   practices.

17           And fourth, most importantly, Your Honor, with

18   respect to the registration rights offering.  The company

19   believes that the Highland proposal of doing a registration

20   rights offering, either as part of a plan or after a plan, is a

21   material benefit that eliminates transaction risk.  And they've

22   acknowledged that.

23           So -- so our suggestion is, since -- since December

24   21, and you had Christmas and you had New Years, so much

25   acknowledgment by the company has taken place of a better deal,

87

1    that before Your Honor approves a 100 million dollar threshold

2    to continue talks on that better deal.  And we have thirty days

3    to talk about it and let the company further investigate or let

4    anyone else come in.

5         Now, I don't have an answer to your question you

6    asked counsel for the equity committee, who's going to be at

7    the table tomorrow if you don't approve it.  I don't have that

8    answer.  Now, it's a -- you said it's a game of chicken but a

9    lot of money's been expended by Cerberus and Appaloosa.  But

10   irrespective of that, it seems to me that what's going to be

11   approved today as a 100 million dollar hurdle with respect to a

12   transaction, the company's already found there's a better one

13   out there.

14        And I think, what we're saying is, let that play out.

15   I think the equity committee suggests that, the U.S. Trustee

16   suggests that.  What we suggest is, let that play out for a

17   limited timeframe.  Come back and if there's nothing there,

18   approve this transaction.  But before you approve that

19   transaction, let it play out because the company has already

20   acknowledged that the Highland proposal, or possibly others

21   that might come in would be better.  It's been a very short

22   timeframe since December 18, and it has that two holiday days,

23   and yet the company's made great strides in looking at the

24   transaction and say many, many parts of it are better.

25        What they have also said is that execution risk.

88

1    There hasn't been time to sit down and talk with the company or

2    the other parties in interest to eliminate that execution in

3    the fifteen or sixteen business days that have happened, when

4    probably for ten of them no one was around during the holiday

5    season.  But a lot of strides have been made.  And we suggest

6    that before you shut the door and put a 100 million dollar

7    price tag on opening that door you let this play out a bit.

8              That's what I have to say.  Thank you.

9              THE COURT:  Why do you pick thirty days?

10             MR. PARKINS:  Well I picked thirty days, Your Honor,

11   because it is -- we are cognizant of the sensitive nature of

12   getting due diligence done -- due diligence started and due

13   diligence done.  As you heard in the evidence yesterday,

14   Cerberus and Appaloosa and Ripple Wood had three to four months

15   of due diligence.  We don't want to prejudice the end game for

16   Delphi of not being able to get somebody else in, do the due

17   diligence and get it done in a timeframe that doesn't prejudice

18   Delphi's desire to exit in the right time.  This is a big deal.

19   This is a big transaction.  These people that have signed up --

20   these documents have had three or four months to do due

21   diligence.  We suggest that we would do it in six weeks to two

22   months.  But it seems to me that we need to play out, a little

23   bit, whether or not that can happen in the next thirty days

24   before you put a 100 million dollar price tag.

25             I'm not arguing that 100 million dollar price tag, if

89

1    you look at M and A deals or breakup fees doesn't fall within

2    the parameters that courts have approved.  I'm not going to

3    argue that.  It's 100 million dollars.  And we've just had this

4    deal on the table since December 18.  And the company has

5    acknowledged that the Highland deal is a better economic for

6    the company, subject to execution risk.  Let there time -- let

7    there be time, Judge, to close that execution risk question yay

8    or nay before you approve a 100 million dollar hurdle.  That's

9    why.  We're sensitive in getting this done, we wanted it

10   quickly.  We're sensitive to them wanting to get out of

11   bankruptcy, that's why we suggest this timeframe.

12          Thank you.

13          THE COURT:  I'm sorry.  Still thinking.  The -- the

14   debtor has the right, as do other parties, to terminate the

15   investment agreement, which has the alternative transaction fee

16   in it, at the end of August.  I take it your client believes

17   that's too late, from his testimony.

18          MR. PARKINS:  The end of April -- I mean, you said

19   the end of August.

20          THE COURT:  The end of August.

21          MR. PARKINS:  Yeah.

22          THE COURT:  Right.

23          MR. PARKINS:  Yes.

24          THE COURT:  That -- that's your -- okay.  I just

25   wanted to make sure I understood that correctly.  Is that --

90

1    that's his view, that its too late?

2           MR. PARKINS:  Yes.  We think -- we -- we believe

3    that -- we take to heart what we've heard from the debtor, that

4    they need to get this transaction done.  We take to heart,

5    also, the debtor's own analysis that, in many respects, our

6    deal is a better transaction.  That's in the evidence not

7    disputed, subject to risk of execution.  We haven't had time to

8    even talk to the debtor very much because it's been Christmas

9    holidays and we've been getting ready for hearings and taking

10   depositions, or any other parties to try to see if we can close

11   the gap on this risk of execution.

12          A 100 million dollar hurdle is a big hurdle to put on

13   there without giving sufficient time -- a little time to let

14   those discussions happen, Judge.  Thank you.

15          THE COURT:  Okay.  Thank you.

16          MR. SEIFE:  Good morning, Your Honor.  Howard Seife

17   from Chadborne and Parke.  We're counsel for Eagle Rock

18   Capital, a significant shareholder from this case.  We have not

19   filed a position or objection to the pending motion, but we

20   would ask leave of the Court to address one or two questions

21   which the Court posed.

22          This Court asked, specifically, what process -- what

23   procedures could be put in place, perhaps, to facilitate other

24   parties coming forward.  And our concern as a significant

25   shareholder is just that, to maximize value.  And we're not

91

1    taking a position today either for or against the transaction

2    or the motion, but we do feel that there are specific steps the

3    debtor could take to facilitate a more open process and to

4    facilitate the ability of people like Highland to make a bid

5    and perhaps create greater value for the estate.

6              In particular, what we're looking for is the debtor,

7    not just to go through the motions here, but let's have

8    Rothschild conduct an active process of qualifying bidders, of

9    keeping the data room open so if there are qualified bidders,

10   they have access to it on an expedited basis.  And perhaps,

11   most importantly, we were disturbed to hear the testimony from

12   Mr. Daugherty of his difficulty in obtaining a non-disclosure

13   agreement which would permit him access to the confidential

14   information and the data room.  There should be a standardized

15   form of agreement that parties could enter into that will

16   facilitate a real open process here.  And I think the debtor as

17   well, should be cognizant to their fiduciary duties to

18   facilitate communications with General Motors, because

19   obviously that's a big gate keeper here in the process going

20   forward.  So --

21             THE COURT:  Well -- okay, no, go ahead.

22             MR. SEIFE:  And the final point is, we need real

23   timelines because we are very sensitive to the exigencies of

24   the case, of the looming deadlines in the union negotiation.

25   But parties need to know what the timelines are so they could

92

```
 1    enter into the process.  So we're not suggesting that this not

 2    go forward, but by the same time there has to be the ability

 3    for other parties to -- to play on a fair and level playing

 4    field.

 5              THE COURT:  But isn't it -- isn't it clear, from this

 6    hearing, that as far as the timeline is concerned, if you're a

 7    bidder, you know, get going right now?  I mean, I don't see

 8    that there's any -- any doubt about that.

 9              MS. SEIFE:  Absolutely.  There is -- it is clear to

10    everyone they have to move quickly.  But if they don't have

11    access to the data room and there isn't an NDA that's in --

12              THE COURT:  Well, I want to -- I want to turn to the

13    non-disclosure.  My impression, and there wasn't a lot of

14    testimony about this, is that -- except I believe what was

15    stated was that the form of NDA offered up was essentially the

16    form that the other parties had signed in the case.  That makes

17    sense because they would have -- they -- the key parties in the

18    case have been privy to material non-public information and --

19    and to talk about that with each other they would need to be

20    bound by the agreement.  The only other testimony was Mr.

21    Daugherty's testimony about, you know, the debtor acting like

22    his mother.  And on that one, I don't know whether that's in

23    the other NDAs or not -- Mr. Butler's nodding yes.  But I

24    understand it, in this context, given the difficulty of

25    negotiating agreements with GM and the unions.  In some
```

93

1   measure, also, the -- the legal requirements of the debtor

2   negotiating with the unions -- and it strikes me that if the

3   debtor is to act as a proper fiduciary, it does have to keep

4   some control over that process.  It has to balance the function

5   of getting a higher alternative proposal with the function of

6   not letting that process disrupt these key negotiations.  I

7   mean, if -- if -- if those negotiations are not conducted

8   sensitively, you could certainly lose this window.  So, I

9   guess, other than saying to the debtor something that I believe

10  came through pretty clearly in Mr. Miller's testimony already,

11  that they already understand, which is that they are

12  fiduciaries for all constituencies.  And in this case that

13  includes, clearly, making an opportunity for a real bid.  I'm

14  not -- lifting that restriction, to me, on having the debtor

15  available, at least having the right to be available if it

16  chooses to, is one that's -- that's a risky proposition to lift

17  that completely.

18          Now, if someone feels that the debtor is stonewalling

19  them or is not giving them the opportunity for a key meeting or

20  meetings, it seems to me that they're -- that bidder is going

21  to find a very receptive audience in the equity committee and

22  its professionals and they're going to come to me immediately.

23  I mean, they don't hesitate to call up chambers on a lot less

24  important things.  And we hear about them, you know, and

25  they're dealt with very quickly.  And so I don't know, other

94

1    than giving -- reiterating, sort of a general sense of

2    direction, I think it's hard to -- to say that, you know, the

3    debtor is wrong for not insisting on that type of provision.

4              MR. SEIFE: I agree, Your Honor, these are very

5    sensitive issues and the debtor has, obviously, valid concerns.

6    But I found Mr. Daugherty's testimony particularly concerning.

7    If he can't even get started in the process because of the

8    inability to negotiate the terms of the NDA.

9              THE COURT: He could get --

10             MR. SEIFE: And, you know, perhaps --

11             THE COURT: -- he could get -- I mean, what I took

12   away from his testimony is that he wasn't going to get started

13   in the process because he wanted that one term out. And I'm

14   basically saying, I'm not sympathetic with that. I think the

15   term should be in there. I'm assuming he's not going to go --

16   I'm assuming they wouldn't -- sure they'd listen to him. Of

17   course -- anyone would listen to him, but I doubt that the

18   union and GM would pay a lot of attention to him until he's

19   actually spent more time going through the data room.

20             MR. SEIFE: Right. But this is a gate keeping issue

21   to get in the data room.

22             THE COURT: I understand but I'm still --

23             MR. STEIFE: And this is going to come up with each

24   potential qualified --

25             THE COURT: And maybe by saying what I'm saying, what

95

```
 1    I'm making clear is that they shouldn't assume, in fact they

 2    should assume the contrary, that they're going to win that gate

 3    keeping issue.  I think the point they'll win on is if the

 4    debtor is using that power in a way that's -- that's not in

 5    keeping with its fiduciary duties.  They'll win on that point.

 6    But I think that it's -- given where we are in the process, and

 7    given the fact that -- where it comes up, in particular, is in

 8    discussions with third parties, namely GM and the unions -- I

 9    think the debtor needs to keep some right, at least, to have

10    control over that process so it doesn't go haywire.

11            MR. SIEFE:  Thank you, Your Honor.  As long as its

12    clear, which I think Your Honor has made clear, that if the

13    debtor isn't playing fair --

14            THE COURT:  Yeah, then it's clear.

15            MR. SIEFE:  -- that you're available --

16            THE COURT:  I agree with that.

17            MR. SIEFE:  -- for immediate application.

18            THE COURT:  On very short notice.  As far as the data

19    room is concerned, I took Mr. Resnick's testimony to mean that

20    it's there and it's going to say there.  I mean, I -- they'd be

21    crazy not to leave it there.  They've paid a lot of money to

22    have it there and it should be there.  And I'm assuming that

23    they're going to be updating it.  They're going to -- in

24    essence that's going to be the basis for any discovery in

25    connection with confirmation.  So -- right, Mr. Butler, I mean,
```

96

```
 1    you're going to keep the data room in place?

 2              MR. BUTLER:  It's not one data room, it's a multiple,

 3    I think.

 4              THE COURT:  Right.

 5              MR. BUTLER:  Your Honor, we actually have a very

 6    elaborate process of providing information in electronic data

 7    rooms and other rooms.  And that is being maintained.  We're

 8    tracking all the information we're giving to people and we will

 9    be able to work with individuals to provide information on a

10    timely basis under the appropriate conditions.

11              THE COURT:  Okay.  And then, I guess, the other point

12    that Mr. Daugherty raised, I haven't addressed this -- I really

13    focused on dealing with GM and the unions, is he mentioned that

14    he needs to talk to potential financing sources.  Well, in

15    today's world a potential financing sources is also a potential

16    trader or an actual trader.  And then I'm even less sympathetic

17    there.  There's got to be a way for information to be shared.

18    And I mentioned this earlier.  I am, in this case in

19    particular, sensitive to the issue of there being two types of

20    shareholders, the moms and pops, and the former employees who

21    hold a fairly small amount of stock, and people who can amass a

22    large amount.  And I think that it is appropriate in those

23    circumstances for the debtor to keep some reasonable rein over

24    the process of sharing information about itself and it's plan

25    process with people who are potentially in the marketplace,
```

97

1    over and above just having them sign a confidentiality

2    agreement.  Because the potential for mischief there is pretty

3    high.

4              MR. SEIFE:  Thank you, Your Honor.

5              MR. BUTLER:  Brief response, Your Honor, or do you

6    want to hear from --

7              THE COURT:  Okay.

8              MR. BUTLER:  Your Honor, just a couple of points.

9    Just for the comfort of the Court on the NDA issue, the -- one

10   of the things that's in Exhibit 117, that the Board of

11   Directors considered in connection with the Highland deal was

12   actually a black line of the Highland Capital NDA against the

13   Appaloosa NDA.  Because one of the things that the directors

14   wanted to look at was -- were the differences, and looking at

15   the issues, and these issues that were communicated to Highland

16   on January 10th, after the conclusion of the board meeting by

17   Mr. Miller, were testified to, was based, in part, on the

18   Board's itself review of what Highland was demanding and the

19   Board's determination that it was unacceptable.

20             I also, and I want to say this gently and gingerly

21   because we do view Highland, our second largest shareholder, as

22   a legitimate source of potential interest in the company,

23   however I would not agree with what Mr. Parkins said three or

24   four times in the record, that the debtors acknowledge that the

25   -- that in testimony or otherwise, that Highland is the better

98

1    bid.  That is not the case.  And in fact, that is contrary to

2    the guidance that Mr. Daugherty was given by Mr. Miller and

3    that Mr. Miller testified to.  And for obvious reasons on this

4    record, I'm not going to go through the guidance that Mr.

5    Daugherty was given, and we didn't do it in the hearing

6    yesterday, but Mr. Daugherty was given very specific guidance

7    on three things that Highland needed to do for the Board's

8    determination that it was premature to work with Highland to

9    have that issue revisited.  And there was a very explicit

10   statement communicated to Mr. Highland -- rather, excuse me, to

11   Mr. Daugherty on behalf of Highland from the Board of Directors

12   of the company.

13          I also think that Highland's objection here,

14   generally, Your Honor, you know, ought to be given some

15   discounted consideration.  In fact, there's nothing in this

16   record -- in fact, there's no information the company has that

17   the December 21st proposal was anything other than an

18   expression of interest, which has been amended twice.  First on

19   December 29th in a pretty immaterial way and then on January

20   9th, in the company's view, a number of material ways.  The

21   complexity of this transaction is also highlighted by the fact

22   that given GM's very public statements that if, in fact,

23   Highland's view of value is correct and there's a couple

24   billion dollars more here, General Motor's view is that that --

25   that value or some fair share of it, belongs to them and they

99

1    would no longer be supportive of the PSA because they're not

2    prepared to put six to seven and a half billion dollars into

3    the company under those circumstances.

4            And I'm mindful of Mr. Scheler's comments on this

5    record, that the equity committee would have a different view

6    as to what their fair share is.  But what that tells me is,

7    that the Highland offer is not an apples to apples offer.  If,

8    in fact, Highland's view of value is correct there will be

9    another round of discussion among the stakeholders about how

10   that incremental value will be shared.  And it would be

11   incorrect, and the Board determined it would be incorrect, to

12   assume that simply -- that incremental value, if it existed,

13   belonged exclusively to one stakeholder in this company.

14           The -- I also think that Mr. Daugherty's testimony,

15   when one strips away the public advertisement of his offer,

16   which is what a good deal of the testimony was about, in fact

17   needs to be evaluated from a credibility perspective on the

18   fact that Mr. Daugherty, one of the twelve partners of the firm

19   and the person who runs their distress practice, couldn't even

20   remember how Highland accumulated its holdings or that it

21   passed the five percent threshold within the last sixty days on

22   its way to moving from below five percent to above 8.8 percent

23   of the stock.  I think Mr. Daugherty, you know, probably has a

24   very good recollection of those issues and -- and I also was

25   struck by the fact that they conceded that they had been

100

1    calling Mr. Tepper and others since November 1st, but also

2    acknowledged they didn't contact the company at all, ever,

3    since December -- until December 21st, some six weeks later.

4    And I would say again here, and Mr. Scheler and I have had

5    these discussions.  If there are, in fact, people out there in

6    the world that have superior transactions they should contact

7    the company.  The plan investors know that we have a fiduciary

8    duty to deal with those matters and that we will exercise that

9    duty along -- along the lines that Mr. Miller testified to

10   yesterday.

11           Having said that, the company couldn't be more -- in

12   more disagreement then with Mr. Parkins' view that we should

13   just take a delay.  Take a timeout here and wait.  Nor are we,

14   and it's not a surprise, I think, either to Ms. Steingart or

15   Mr. Scheler or to their principals, that the company is not --

16   does not believe that an auction of the kind they describe,

17   which is what their process -- their word process is code for,

18   auction.  Now, I think Ms. Stiengart said we should have four,

19   five or six real bidders out there and move into an auction

20   process.  Our view, and Mr. Sheehan and Mr. Miller both

21   testified to it, I thought, eloquently, is that we are not

22   going to be able to move forward, in the company's judgment, in

23   a material and meaningful way with our unions, all of whom have

24   lawyers sitting in this room taking down -- through this entire

25   hearing, or General Motors who is similarly situated.  If they

101

1    don't have an understanding of who the plan investors are,

2    knowing full well that if we -- that we have to operate in

3    connection with our fiduciary duties.  I think -- I think I'm -

4    - I expect, I believe that our unions and General Motors will

5    negotiate with us and the plan investors in a meaningful way

6    even though they understand the possibility of something else

7    happening with respect to us fulfilling our fiduciary

8    responsibilities because we've had those discussions.

9            But it is a time, here, to move forward.  And the

10   debtors believe, and in the timelines we have in place, Your

11   Honor has seen those timelines, Exhibit 54, carries forth the

12   timeline which is even up on the chart here, which makes it

13   very clear what the timetable is in order to be able to have a

14   meaningful opportunity to emerge from Chapter 11 before the

15   summer is out and the quadrennial labor contract negotiations

16   in the auto industry begin.  And it's a very ambitious

17   timeline.  And ultimately we need to get about it.  And the

18   timeline calls for having agreements with our unions and

19   General Motors by the end of this month, which is going to be

20   very difficult to do given the delay of these hearings which

21   were necessary, and we're not debating them.  But -- and then

22   it gives us a recovery period during February to try and finish

23   any of those things off.  But we have to get about the business

24   of doing those things.

25           With respect to Ms. Steingart's argument, I simply

1    think I need to say for the record to be complete here, that

2    the company does not -- the debtors don't agree with her

3    characterization of the evidence, nor do I view that the

4    evidence actually would support many of the things she said

5    that it would support.  And nor does the company agree with the

6    characterization, nor could she point to anything in the

7    documents that would say that the debtors are going to simply

8    exercise their minimum duties.  That characterization, I have

9    to tell you, is entirely offensive to the debtors and its

10   retained professionals who believe that they have worked night

11   and day to exercise their fiduciary duties in a responsible

12   manner as this Court would expect us to and we'll continue to

13   do that.

14         The last comment I would simply make, Your Honor, is

15   something that I guess the objectors would have the Court

16   ignore.  And that is, that we've had a process here.  This

17   process has been going on, now, for half a year.  And it's a

18   process that the parties participated in, as I said before, I'm

19   not saying people agreed with every part of it -- part of the

20   process, but there was a process.  And it took an enormous

21   amount of work to try to find a combination of qualified plan

22   investors that we could get General Motors, who has to agree

23   with us, and has to provide six to seven and a half billion

24   dollars, that's the public estimate, of value in -- with labor,

25   to get labor on board, that it took half a year for us to be

103

1   able to find the combination of people that General Motors

2   would indicate that they thought would be an acceptable group

3   of plan investors to negotiate the final deal with.  And that

4   process had enormous transparency to our stakeholders.  So

5   there's been a process here.  The debtors will, if you approve

6   these agreements as we hope you will, the debtors will, in

7   fact, continue to exercise their fiduciary duties in the

8   fullest sense of that meaning if there are superior offers that

9   are presented to it.

10          THE COURT:  Okay.  Can we spend a minute on the

11   request for the 6004 waiver -- the waiver of the ten day --

12          MR. BUTLER:  Sure.

13          THE COURT:  -- statutory stay?  It seems to me, given

14   the final order condition anyway, and the fact, obviously, that

15   there's been an actively prosecuted objection, that that's a

16   pretty heavy burden to overcome.  What's the basis for waiving

17   it?

18          MR. BUTLER:  Well, Your Honor, the requirement -- the

19   requirement of our investment agreement is that we have a final

20   order by the 20 --

21          THE COURT:  Second, right.

22          MR. BUTLER:  -- of this -- of this month.  And the --

23   and that's the -- that's the only requirement that we have in

24   connection with the order.

25          THE COURT:  Okay.

104

1            MR. BUTLER:  There was -- there was -- the -- the --

2    I think the reason for it, and the testimony you had, is the

3    importance of trying to communicate to our unions and General

4    Motors who we are already weeks behind in trying to move these

5    negotiations forward, that in fact there's finality with this

6    particular piece of the puzzle.  I mean that's the fundamental

7    issue --

8            THE COURT:  All right.

9            MR. BUTLER:  -- which is, you know, the every day

10   that -- our belief is and I'm -- Mr. Miller and Mr. Sheehan

11   testified to this, every day that the -- we think -- that labor

12   and General Motors do not believe that we have a path here,

13   subject to a fiduciary duty, but a path, is a day that we will

14   not make progress on those issues.  And people are going to

15   say, well, gee, that -- it should be different but the fact of

16   the matter is people who are making billions of dollars of

17   concessions and labor unions who are being asked to transform

18   the way in which they do business with us, have made it very

19   clear over the first fifteen months of this case what their

20   expectations are.  The stakeholders know it, the committees

21   know it, the debtors know it.  And we can, you know, there's a

22   lot of -- I've heard a lot of people say a lot of things here

23   and I wish I could waive a wand and make things different.  But

24   there's a reality to this case that we all better face if we're

25   going to create value.  And that's the issue, Your Honor.  And

105

```
 1    that's why it's in there.  It's because there's a --

 2              THE COURT:  But it's not in the agreement its in the

 3    motion.

 4              MR. BUTLER:  Correct.

 5              THE COURT:  All right.  Well, I think you -- I think

 6    you've -- well, not only you but I will make the point clear

 7    that the -- the need to move quickly is absolutely clear.  But

 8    on this point, I think that -- particularly given the final

 9    order provision, which of course can be waived as well as the

10    objection -- that I would not waive the statutory ten day

11    period.  The short answer is that I think you can do what you

12    need to do during that period in any event.

13              MR. BUTLER:  Thank you, Your Honor.

14              THE COURT:  So you won on that one.

15              MS. STEINGART:  Thank you.

16              THE COURT:  Okay.

17              MS. STEINGART:  Nice to have won.  Briefly, Your

18    Honor?

19              THE COURT:  Real briefly.

20              MS. STEINGART:  Very, very briefly, Your Honor.

21              THE COURT:  All right.  When I say you, I was

22    addressing Ms. Steingart, for the record.

23              MS. STEINGART:  Right.  Now the debtors have just

24    acknowledged, or acknowledged in the papers they've filed, that

25    GM has been a serious wrongdoer with respect to the debtors for
```

106

1    a substantial period of time.  That there are --

2              THE COURT:  Is that what Mr. Butler said?

3              MS. STEINGART:  There are colorable claims and there

4    are colorable claims -- that's what they said in their papers

5    here.

6              THE COURT:  Well, there's a lot -- there's a lot

7    between the word colorable and saying that they're a serious

8    wrongdoer so --

9              MS. STEINGART:  Well, there are serious claims here,

10   Your Honor.

11             THE COURT:  That I -- I understand that.

12             MS. STEINGART:  And the committees -- both committees

13   agree --

14             THE COURT:  I understand that point.

15             MS. STEINGART:  Both committees agree, in their view,

16   that GM is a net obligor to this company.  So now Mr. Butler's

17   telling you that shareholders take subject to GM deciding which

18   bidder is appropriate for this debtor to talk to.  Your Honor,

19   that's outrageous.  Okay.  Mr. Butler said he wants --

20             THE COURT:  But -- wait -- wait a minute.  Didn't Mr.

21   Daugherty say, and hasn't this whole process been designed to

22   arrive at a consensual resolution of those thorny issues?

23   That's all Mr. Butler is saying, is, he's looking -- he puts a

24   premium on consensus, as I'm sure GM does too.  And that

25   ultimately there's more value for the estate out of consensus,

107

1    including from GM, then in litigating over the next several

2    months.

3           MS. STEINGART:  Well, Your Honor, we too want

4    consensus, but we don't want GM to be in a position where its

5    dictating the investors that this company may talk to.  And

6    that's what -- that's the description, I think, that I had just

7    heard.  That GM was willing to talk to these three, to deal

8    with these three to get to the point we are today.  And, Your

9    Honor, the committee likes the point we're at today.  We like

10   very much that there's this deal that's been developed.  And

11   indeed that these investors had invested so much time and so

12   much effort and stand so much to gain, they're not going to

13   walk away from it.

14          Mr. Butler said he wants finality.  Finality means

15   he's not talking to anybody else.  That's the problem.  That's

16   why we need the process.  The unions are not going to reject a

17   serious bonafide person.  Mr. Butler's not in a situation where

18   talks can't proceed because at this point, given the process,

19   this Court's concern, constituency concerns, the unions have

20   proceeded responsibly.  And don't think that any of us are here

21   to create a situation where they can't negotiate their concerns

22   in good faith.

23          THE COURT:  Okay.  But I -- I'm going to cut you off

24   because I think you're going over ground that we've already

25   gone over.

108

1        MS. STEINGART:  So that, you know, so I think that

2   unless this Court imposes a process that this value will be

3   given away without any real market test, since this debtor went

4   to bankruptcy it's only spoken to three people, Your Honor.  It

5   should be required to speak to more than that.

6        THE COURT:  Okay.  All right.

7        MR. LAURIA:  Your Honor, this is Tom Lauria.

8        THE COURT:  Yes.

9        MR. LAURIA:  I wanted to come back and respond to the

10  point that we talked about earlier.  And actually there was one

11  clarification I also wanted to make, to the extent it wasn't

12  clear on the record.

13       THE COURT:  Okay.

14       MR. LAURIA:  I've been able to communicate, with my

15  client, and they have confirmed that they will agree to changes

16  in the order to provide that they will file a 503(b)

17  application with respect to the pre-May 17 fees and expenses

18  that they have incurred.

19       THE COURT:  Okay.

20       MR. LAURIA:  And the second issue I wanted to

21  mention, in literally just thirty seconds.  Much has been said

22  about the value for the ten dollar discount on the conversion

23  of the preferred stock under the deal.  And I just wanted to

24  make sure that the Court was connecting the dots in the fact

25  pattern here.  That the rights offering deal which was on the

109

```
1    table before the preferred was built into the structure

2    contemplated that exact ten dollar discount to all the

3    shareholders.  Indeed the rights offering is still a rights

4    offering at thirty-five dollars per share, to all of the

5    shareholders.  So to the extent that there is value there, its

6    going to all of the shareholders.  When the preferred was

7    layered into the deal, every party in this discussion agreed

8    and nobody ever questioned that the preferred can convert at

9    the same price that the stock is being offered to the

10   shareholders by the rights offering.  And I just wanted to make

11   sure that that fact was known.

12            THE COURT:  Well, when you say every party, does that

13   include the equity committee?

14            MR. LAURIA:  Yes, it does, Your Honor.

15            THE COURT:  Well, all right.  In any event, I'm

16   not -- I'm not ruling, as I said before -- as I said to Ms.

17   Leonhard, I'm not ruling today on the -- to the U.S. Trustee.

18   I'm not ruling today on the underlying plan or any elements of

19   it.  So --

20            MR. LAURIA:  Your Honor, I just wanted to --

21            THE COURT:  No, but I -- I -- that's fine.  I --

22   you're certainly entitled to say that.  And some of the

23   witnesses brought out some of the points you've raised as well.

24   All right.  Okay.  Anyone else? Not that I'm inviting anyone,

25   but -- okay.
```

110

1          I have in front of me a motion by these debtors for

2   approval of their entry into two agreements that are related.

3   The first being an equity purchase and commitment agreement

4   that I'll sometimes refer to as the investment agreement,

5   between them and several investors, including as the primary

6   ones Appaloosa and Cerberus, at least that's how I'll refer to

7   them.

8          Secondly, a plan framework support agreement, or a

9   PSA or support agreement, between those same entities and also

10  with General Motors Corporation.  Specifically in addition to

11  approval of the debtors' entry into those agreements, I'm being

12  asked to consider approval of various fees that are provided

13  for under various circumstances to be paid to the investors

14  under the investment agreement.  These include professional

15  fees in connection with the proposed investment transaction

16  that have already been incurred as well as similar fees going

17  forward; secondly, commitment fees, which are staged to occur

18  during various milestones -- or to be incurred during various

19  milestones over the coming weeks and months; and finally, under

20  two circumstances set forth in section 12(h) of the investment

21  agreement, an alternative transaction fee.  That is because

22  these investors have agreed, under certain conditions, to make

23  a substantial investment of cash in the debtors in return for

24  equity, preferred and common, and to backstop further a rights

25  offering to the existing common shareholders to the extent that

111

1    that rights offering is not fully subscribed.

2              The agreements, and in particular the investment

3    agreement, have been modified from time to time since December

4    18th when they were initially entered into by the company.  The

5    plan framework support agreement lays out, as it is titled, a

6    framework, pursuant to which the investors, the debtors and GM

7    will resolve certain key issues in connection with the

8    development and eventual confirmation of a Chapter 11 plan for

9    these debtors.  The Court has not been asked to approve the

10   framework for the plan and the debtors are not bound to obtain

11   confirmation of such a plan and certainly no party is bound to

12   vote in support of such a plan.  But the parties have committed

13   themselves to work in good faith to implement the terms set

14   forth in the framework agreement.

15             In some respects, then, the relief that the debtors

16   are seeking -- the debtors seek today -- is not particularly

17   momentous in these cases.  And that's not to belittle the

18   amount of the fees that I'm being asked to approve; this is, in

19   terms of dollar value, an enormous transaction and on a market

20   assessment, both the professional fees required to implement

21   such a transaction as well as commitment fees and a breakup fee

22   or alternative transaction fee are all large because of that

23   fact.  However, it's also clear to me that the approval of this

24   motion and the transactions that it contemplates is, in fact,

25   if not legally in terms of the direction and conduct of these

112

1   cases, highly significant.  And I believe it is hoped by all

2   parties, perhaps with some exception on behalf of the equity

3   committee (although even the equity committee acknowledges that

4   its very pleased with the where this case stands at this

5   point), a watershed event in the case.  That is because of the

6   unusual nature of this case.  This is not a simple case (and

7   sometimes very large cases can be simple, in which the main

8   issue is the determination of total enterprise value): this is

9   a case with the potential for truly endlessly moving parts.

10  Because here, total enterprise value is less the issue then net

11  recovery to the parties.  And that -- that recovery -- and to

12  some extent total enterprise value as well, depends upon the

13  resolution of the debtors' labor and retiree and pension

14  related issues, as well as the resolution of the debtors'

15  issues both businesswise, as well as in terms of potential

16  avoidance actions and other contract rights and claims, with

17  General Motors, its largest customer.

18        But, as I noted before, there's real circularity in

19  that process, because it is difficult to resolve those two

20  issues without understanding the debtors' enterprise value and

21  future sources of financing.

22        Consequently the debtors, several months ago, at the

23  beginning of August, after consultation with both their

24  official committees, entered on a process that would not, in

25  the short term, attempt to resolve the labor and GM related

113

1    issues, but would, instead, try to resolve issues pertaining to

2    the net recovery to all parties in the case.  That, very

3    quickly, although it took several months to implement, became a

4    process that involved discussions with the potential plan

5    investors or plan funders.  It also involved discussions with

6    GM to the extent that they're memorialized in the PSA.  It is

7    the evidence before me today, but it's also simply a matter of

8    logic, that knowing the willingness of third parties to commit

9    to fund a substantial amount of new money both helps to confirm

10   the debtors' total enterprise value as well as greatly

11   facilitates the ability of the debtors, GM and the unions to

12   negotiate the remaining issues between them and among them by

13   knowing that the path to ultimate exit from those negotiations

14   is relatively clear.

15           The standard for the Court's consideration of a

16   motion like this is also a relatively clear.  The Court needs

17   to consider whether an action out of the ordinary course of

18   business under section 363(b) (which the debtor's entry into

19   these two agreements is) is a decision that is supported by

20   good business judgment.  That is the case, assuming, as I find

21   here, that the debtor has acted on an arms-length basis without

22   any taint of insider dealing or the like.  And as I say, I find

23   that specifically here based upon, among other things, Mr.

24   Sheehan's testimony and Mr. Miller's testimony.  Indeed it

25   appears to me that the debtors have extensively consulted with,

1   not only -- and acted through -- not only their Board, which is

2   an independent board, but also with the two official committees

3   and other key constituents in the case.

4            So, consequently, I review this matter as a matter of

5   business judgment.  The second circuit in In re Orion Pictures

6   Corp. 4 F.3d, 1095, (2d Cir. 1993), albeit in the context of a

7   decision under 365 of the Code, but I believe it's equally

8   applicable to one under Section 363(b), states that such

9   decisions are made by the Bankruptcy Court in the exercise of

10  its business judgment, stating it is important to keep in mind

11  that the Bankruptcy Court's business judgment in deciding a

12  motion to assume (in this case to take an action out of the

13  ordinary course) is just that, a judgment of the sort of a

14  businessman would make.  This business judgment could turn out

15  to be wrong but hopefully it won't.  That view, I think, is

16  also supported by the Second Circuit's decision in In Re

17  Financial News Network, Inc., 980 F.2d, 165, in which -- I'm

18  sorry (2d Cir. 1992), in which the Second Circuit stated that

19  "this appeal concerns the difficult balancing act the

20  Bankruptcy Court must perform when it conducts an auction of a

21  debtor's assets.  It walks a tightrope between, on the one

22  hand, providing for an orderly bidding process, recognizing the

23  danger that absent such a fixed and fair process bidders may

24  decline to participate, and on the other hand, retaining the

25  liberty to respond to differing circumstances so as to obtain

115

1    the greatest return for the bankrupt estate." Obviously there

2    the Second Circuit was talking about a formal auction. But I

3    believe its logic translates also to other requests for

4    approval of actions out of the ordinary course in which the

5    Court has to balance various concerns pertaining to the merits

6    of the transaction that's brought before the Court, which may

7    go beyond dollars and cents but also relate to issues such as

8    time and the effect that it may have on the case generally.

9           Now that being said, the courts are also quite clear

10   that, under normal circumstances, if a board that is not

11   affected by a conflict of interest or other self dealing

12   properly considers or has properly considered such an action,

13   that the Bankruptcy Court will, absent evidence to the

14   contrary, defer to the board's business judgment.

15          That is set forth at length by Judge Mukasey in

16   Integrated Resources Inc, 147 BR 650, SDNY 1992 and in numerous

17   other cases from this district applying a business judgment

18   standard to actions out of the ordinary course. I have to say,

19   however, though, and particularly in light of Orion and FNN and

20   even Judge Mukasey's decision (where notwithstanding his view

21   that the board acted properly for purposes of the business

22   judgment rule, he himself analyzed a proposed breakup fee

23   transaction closely and carefully), that particularly where

24   there are objections by official committees or other key

25   constituents in a case, I will go beyond mere deference to a

1    board's business judgment and review the agreements themselves

2    closely and consider the issues raised by the objectors, again,

3    particularly those who are fiduciaries for constituencies in

4    the case, like official committees.

5            I think this is also appropriate given what

6    frequently if not always occurs in these situations,

7    particularly where they are contested (and which certainly

8    occurred here), which is that proposed transactions frequently

9    are amended before final approval.  So that the focus does,

10   ultimately, become a fairly objective one within the Court's

11   own review.

12           So, while I find that this Board -- the debtor's

13   board -- is not only independent and without conflict but also

14   one that acted with due care and responsibly and with a welcome

15   degree of responsiveness to the views of their constituents,

16   I've also reviewed the transaction, separate and apart from the

17   Board's consideration, in light of the objections raised and my

18   own concerns.  And I'll note further that I have not hesitated

19   in the past to disapprove transactions that called for breakup

20   fees and expense reimbursements, as the objectors pointed out

21   both in the WestPoint Stevens case and in the Refco case.

22           Here, however, I will approve the motion as modified

23   (as late as this hearing, at least in connection with the

24   change made by Appaloosa at my urging).  I do so because I

25   believe, first and foremost, that these two transactions, the

117

1    debtors' entry into them, are a proper exercise of the debtors'

2    business judgment.  I further conclude that the fees that I

3    described earlier are each appropriate under the case law and

4    practice as well as a proper exercise of the debtors' business

5    judgment.

6           As the Integrated Resources decision makes clear,

7    there are at least three purposes for approving, in advance,

8    the payment of professional fees and a breakup or alternative

9    transaction fee to a third party making an investment in or

10   purchasing an asset of a debtor's estate.  To my mind, the key

11   reason to do that here is so that the debtors, having attracted

12   a potentially successful bid and one that will facilitate the

13   resolution of the remaining open issues in the case, do not

14   want - the debtor does not want, legitimately, that bidder to

15   retract its bid, which it has the right to do under its

16   agreement.

17          Further, although I believe that the record is clear

18   that the window for other bidders to make a higher and better

19   offer to the debtors is a narrow one, I believe, as a secondary

20   matter, that the investment agreement will establish a basis

21   for other bids to be made and will attract additional bidding.

22   Indeed I think the evidence is clear that it was the filing of

23   this bid -- and I'm using the term bid as shorthand -- that

24   attracted the Highland bid.  As Mr. Daugherty testified, he

25   read the bid, believed that his firm could do better, marked up

118

1    the bid as he thought was appropriate for his company, and sent

2    it to the debtor.

3          The objectors here, particularly the equity

4    committee, take the view that because the debtor is not

5    engaging in a formal auction process or a process with at least

6    a greater formal structure around it with more active shopping

7    or more of a direction to the debtor than has already been

8    expressed by the Court, that this approach is insufficient and

9    that it unduly restricts the sale process.  As I said before,

10   there have been times when I've disapproved alternative

11   transactions fees and the like based on such considerations.

12   Either, as in the case of Refco, because I believed that the

13   proposed stalking horse bid was so unclear and so full of outs

14   and options that in effect no one would know what to bid

15   against.  Or, as in the case of WestPoint Stevens, because I

16   believed that the stalking horse bidders were so imbedded in

17   the capital structure already that they did not need further

18   incentive to make their proposal.  Now it might be argued that

19   since Appaloosa and perhaps other investors are creditors and

20   shareholders already of the debtors that the same consideration

21   should apply here as well.  However, in WestPoint Stevens the

22   proposed stalking horse bidders were, with a small dollar

23   exception relatively speaking, making a credit bid of their

24   debt, not putting in new cash.  More importantly, unlike here,

25   those proposed stalking horse bidders had over fifty-one

119

1    percent of the claims that would be paid, ultimately, in the

2    bid.  And that's clearly not the case here.  In other words

3    here, in a large measure, a more than preponderant measure,

4    this is new money coming into the debtors with a real risk.

5            In both of those cases also, there were third parties

6    who stated, like Highland, that they were ready, willing and

7    able to bid already and that they did not need a -- the debtor

8    could take the risk that it would lose the transaction in hand

9    because they were there to step right in.

10           I accept that Highland is bona fide.  It has retained

11   capable counsel and has spent a fair amount of money in

12   pursuing its proposal.  But in this case I'm not prepared to

13   take the risk of clearing the table in the hope that others

14   will come to it.  I say that not only because the Highland

15   proposal at this point is, in my view just in terms of timing,

16   significantly behind the other proposal of Appaloosa and

17   Cerberus (and as an aside, that difference is something that

18   can at least, in some measure, be ascribed to Highland itself

19   given Mr. Daugherty's testimony that he was aware that there

20   was a potential for alternative transactions, at least pointing

21   back to November 1st), but also because this case has important

22   timing considerations.

23           So before turning to those considerations let me

24   summarize by saying simply as a matter of reviewing a breakup

25   fee on a standalone basis here under the criteria laid out by

120

1     Integrated Resources and the other courts, I believe that the

2     deal is now structured -- commits the investors sufficiently

3     that it is within the debtors' business judgment to keep them

4     committed.

5            In addition, as I noted earlier, because of the

6     dynamics of this case, I believe that it is of critical

7     importance for the debtors to have the ability to show GM and

8     the unions that this path exists.  The record is clear, and I

9     believe undisputed, that all the parties in this case, and in

10    particular the debtor, the unions and GM, face an opportunity

11    over the next weeks to resolve their issues in a way that's

12    beneficial to all.  And if that opportunity is not taken, given

13    the fact that the national labor agreements expire this fall

14    and the GM benefit guarantee would consequently apparently

15    expire as well, the case could -- and all parties' recoveries

16    and the business could -- be adversely affected in a way that I

17    believe no one wants to contemplate.  With this agreement in

18    place, the unions and GM, as well as the other parties in

19    interest, can see a structure that they can complete.

20           You all are probably tired of this metaphor but since

21    you used the term "framework", I'll go back to the view that

22    the debtor with what it has negotiated thusfar with the

23    investors and GM and the creditors committee, has set up a

24    framework for a building or house.  GM and the unions now have

25    the opportunity to complete that framework with the debtors and

121

1   the investors.  I'm assuming the house and the framework are

2   roomy enough so that they can do that even though it may not be

3   the exact architecture they like, because the alternative could

4   be an unfinished building or a shack, alternatively.  In other

5   words, the existence of these agreements with both the

6   investors and the debtors committed to the extent they are, and

7   I believe with the amendments to the agreements those

8   commitments are real and worthwhile, the parties know what they

9   can achieve.  And knowing what they can achieve, I believe,

10  makes them accountable for not achieving it: not to me but to

11  their constituents, to their own shareholders and to the

12  unions' members.

13          The debtor, very properly, said that it not only

14  intends to bargain but has bound itself to bargain.  So

15  obviously, as I said to the U.S. Trustee, these agreements do

16  not represent a done deal as far as the plan is concerned or as

17  far as the labor negotiations are concerned.  But they do, in

18  my view, materially facilitate the resolution of those issues.

19          Mr. Miller testified to the fact that the Board,

20  quite rightly, considered at the meeting that took place on the

21  9th and 10th of this month, whether in light of the benefits

22  that I just described it should even bother considering

23  alternative transactions as prompted by the Highland proposal.

24  One could make the case for saying "no," but the Board quite

25  rightly decided, I think, that that's not the right answer and

122

1    that it should and must consider them.  I believe it can

2    balance that consideration with the need to move ahead quickly,

3    because I believe that all parties in the case, including the

4    unions and GM, understand the need to do that, to move ahead

5    quickly and not to wait and see.  That means it is incumbent

6    upon any bidder, including Highland, to move quickly and it is

7    incumbent upon the debtor, while not disrupting the

8    negotiations it has and will undertake with the unions and GM,

9    to facilitate Highland and, if other bidders appear, other

10   bidders' proposals of higher and better transactions.

11           However, I do not believe that it is in the debtors'

12   interest to take the parties' focus off of the negotiations

13   with GM and the unions.  And I believe that conducting a formal

14   auction process or letting prospective bidders, without a

15   measure of coordination and supervision by the debtors, state

16   their case to third parties here - well, the risks of such an

17   approach outweigh their benefits.  Under different

18   circumstances I might have pressured the company and the

19   investors to put off the process for thirty to forty-five days.

20   But I don't believe that that can be done here given the need

21   to resolve labor and GM issues promptly.  Frankly, I don't

22   believe it's in labor's and GM's interest to do that either, as

23   a matter of fiduciary duty, until they see something far more

24   real, and they will have to decide, ultimately, how to

25   structure their negotiations.  But I believe putting them off

123

1     to see what comes out is detrimental to all.  Given that

2     benefit to the estate, I consider an approval today of the

3     alternative transaction fee to be appropriate.

4              As stated in my discussion with the U.S. Trustee, I

5     also conclude that the other fees, as provided for in the

6     agreement, are appropriate, as that agreement has been revised

7     on the record.

8              I also believe, as clarified on the record, that the

9     agreement by GM to limit the circumstances in which it would

10    talk to third parties is something that GM can do on its own.

11    And in fact the way it's doing it here is of benefit to the

12    estate given its acknowledgement that the debtor can bring the

13    third parties to GM for consultation.

14             And I believe that, as far as the order is concerned,

15    the order is not blessing any sort of misconduct should GM --

16    or any of the other parties involved in these transactions --

17    engage in some misconduct.  Something I clearly don't expect to

18    occur in any event.

19             I think I've dealt with this already but,

20    specifically, as far as the remaining objection is concerned,

21    by the equity committee, that the proposed transaction is

22    simply not good enough in various respects to merit tying the

23    estate to these types of fees in connection with its pursuit, I

24    will note that the equity committee has pointed out elements of

25    the transaction -- the ultimate transaction -- that are

124

1    objectionable.  But I am not approving those elements today nor

2    any -- any elements of a plan as set forth in the PSA. That's

3    for another day.  I have concluded, however, in my review of

4    the transaction as a whole, that it is a transaction that is

5    worth pursuing as a basis for concluding the case.  There is an

6    opportunity, although limited, for it to be improved on, not

7    only by third parties but also in light of potential

8    impediments to confirmation of a plan.  And that's something

9    that will -- that I will have to deal with down the road.  On

10   the other hand, as I said before, the debtors have very

11   properly used the term "framework" here as laying out a clear

12   basis by which the other crucial elements of this case can be

13   resolved.

14            I do not believe, consequently, that these

15   transactions, to the extent I'm being asked to approve them

16   today, would constitute a sub-rosa or a de-facto plan.  I do

17   not believe I'm approving a de-facto plan today.  I think that

18   the distinction is set forth very clearly by Judge Gropper in

19   Tower Automotive, 342 BR 158, Bankruptcy SDNY 2006, and the

20   circumstances here are even more clear than there, I believe.

21   Nothing from this estate is being distributed as part of what

22   I'm approving today, other than the fees, which are being dealt

23   with on a standalone basis.  As I've already explained they're

24   being separately justified.

25            Let me say one final word about the debtor's

125

1    fiduciary duties here.  Judge Mukasey in Integrated Resources

2    makes it clear that a debtor in bankruptcy's fiduciary duties

3    are different then a debtor's duties outside of bankruptcy.

4    And, in particular, that those duties are owed to all the

5    constituents.  They include a duty to get the creditors paid in

6    full.  Based on the record here, while I conclude that if all

7    goes well creditors will be paid in full and that the ultimate

8    result in this case will be one in which various parties are

9    debating how much the shareholders should receive or will

10   receive, that there is a risk to the estate if the debtors do

11   not proceed along the path that this motion enables them to go

12   down that the creditors will not be paid in full.  And

13   consequently, I think that based on today's state of facts, the

14   debtors have properly exercised their fiduciary duties

15   considering all the interests of all their constituents.

16         As I said before, if it appears, as matters proceed,

17   that the debtors are not doing that and that they are

18   improperly shutting out those who legitimately appear to offer

19   a higher and better transaction, then I'm sure I'll hear about

20   it and I'll rule very quickly on that point.  But I do not see,

21   here, a debtor who is acting in any other way then one would

22   expect, which is that it's acting fully consistent with its

23   fiduciary duties.

24         So, I've reviewed the order and with the exception of

25   deleting the paragraph waiving Rule 6004, I'm prepared to enter

126

```
 1   that order as it was submitted to me.  I don't believe I need
 2   to change it in terms of the fee review, because I think that's
 3   clear on the record both in respect of the five million
 4   Appaloosa issue as well as providing the fee statements to the
 5   U.S. Trustee.
 6              MR. BUTLER:  Thank you, Your Honor.
 7              THE COURT:  Okay.  So you can submit that order at
 8   the end of the hearing.
 9              MR. BUTLER:  We will, Your Honor.  Thank you very
10   much.
11              THE COURT:  Okay.
12              MR. BUTLER:  Your Honor, on a related matter, we had
13   scheduled, at 3 o'clock today, the -- a chambers conference on
14   the 365 litigation on 1113 and 1114 litigation.  I believe all
15   those parties are in the courtroom.  And I wanted to indicate
16   to Your Honor that in light of Your Honor's ruling now the
17   debtors will circulate a proposed order to those parties.
18   First we ask to vacate the conference today.  Second, we will
19   circulate to those parties and submit to Your Honor an order
20   that would suspend the 1113, 1114 and 365 litigations for a
21   period of time, probably consistent with the duration of the
22   EPCA so that ultimately -- on that path we won't continue with
23   the chambers conferences and we'll have a proposal in there
24   about how to deal with the tolling of the January 31st date,
25   which I have to review with counsel to the unions.  We'll
```

127

```
 1    submit that.  We'll circulate that and assuming we have a

 2    consent order we'll submit it to Your Honor promptly.

 3              MR. KENNEDY:  I'm confident that's acceptable to the

 4    unions.

 5              THE COURT:  Okay.  All right.  Okay.  All right.

 6    I'll do that.  I think the key is that it's coterminous with

 7    these two agreements.  Obviously if they fall apart, I expect

 8    you'll be back to me.  Although at that point you may be back

 9    with a totally different motion.

10              MR. BUTLER:  Right.

11              THE COURT:  Under totally different economics.  So --

12    I'm happy to suspend.

13              MR. BUTLER:  Thank you, Your Honor.  Your Honor, our

14    next -- just to get some guidance from the Court, we were

15    supposed to start the omnibus about ninety minutes ago.  Do you

16    want to take a break?

17              THE COURT:  Well, I expect there are a number of

18    people here that don't -- don't need to hear about a patent

19    case.  Although Mr. Connelly does.  And so, why don't I give

20    people five minutes or so, who want to leave to leave.  And

21    then we can pick up again.

22              MR. BUTLER:  Do you want lunch?

23              THE COURT:  I was going to have it after -- I don't

24    think there's a lot on, at this point.

25              MR. BUTLER:  Well, there's the -- the omnibus and
```

128

1    then there's a claims hearing after that.

2              THE COURT:  Well, I was going to take a break before

3    the claims hearing.

4              MR. BUTLER:  Got it.  Okay.

5              MR. PARKINS:  Your Honor, if I may, do you have the

6    exclusivity --

7              MR. BUTLER:  Highland has withdrawn its objection to

8    exclusivity.

9              THE COURT:  Okay.  I had -- I had heard that.

10   Obviously, as with any exclusivity matter, that's without

11   prejudice to any party coming back and saying exclusivity

12   should be terminated.  But as far as the extension, I'll grant

13   that extension.  I think it's supported by the record.

14             MR. PARKINS:  thank you, Your Honor.

15             THE COURT:  All right.  So I'll be back at twenty

16   five of 2.

17             MR. BUTLER:  Thank you, Your Honor.

18             MR. LAURIA:  Thank you, Your Honor.

19        (Proceedings concluded at 1:27 PM)

20

21

22

23

24

25

129

I N D E X

E X H I B I T S

| DEBTOR'S | DESCRIPTION | PAGE |
|----------|-------------|------|
| 123 | Black Lined | 13 |
| | Version of EPCA | |

RULINGS

| | Page | Line |
|--|------|------|
| Approval of motion | 116 | 19 |

130

1

2                          C E R T I F I C A T I O N

3

4       I (we), court approved transcriber(s), certify that the

5       foregoing is a correct transcript from the official electronic

6       sound recording of the proceedings in the above-entitled

7       matter, except where, as indicated, the Court has modified the

8       transcript.

9

10      _____  January 15, 2007

11      Signature of Transcriber              Date

12

13      Pnina Eilberg

14      typed or printed name

15

16

17

18

19

20

21

22

23

24

25

**A**

**ability** 22:24 30:17
37:11 39:2 53:25
55:6,22 69:7 91:4
92:2 113:11 120:7
**able** 19:25 20:12
25:15 26:19 27:12
28:8 48:1 51:15
54:24,25 84:17,18
88:16 96:9 100:22
101:13 103:1
108:14 119:7
**above-entitled**
130:6
**absent** 114:23
115:13
**absolute** 28:6 32:4
36:5,13
**absolutely** 72:16
92:9 105:7
**accept** 31:4,7 43:9
84:11 119:10
**acceptable** 33:10,14
46:2,3 103:2 127:3
**Acceptances** 6:3,15
7:8
**access** 91:10,13
92:11
**accommodation**
84:17
**account** 49:11 60:20
**accountable** 121:10
**accrued** 32:7 35:18
**accumulated** 99:20
**accurate** 30:14
**achieve** 23:3 121:9,9
**achieving** 121:10
**acknowledge** 85:21
97:24
**acknowledged** 29:20
67:10,15 74:25
86:22 87:20 89:5
100:2 105:24,24
**acknowledgement**
123:12
**acknowledges** 112:3

**acknowledgment**
86:25
**act** 43:23 93:3
114:19
**acted** 113:21 114:1
115:21 116:14
**acting** 16:10 60:25
92:21 125:21,22
**action** 23:19 113:17
114:12 115:12
**actions** 22:18 40:2
112:16 115:4,18
**active** 75:2 91:8
118:6
**actively** 78:13
103:15
**activity** 71:20
**acts** 33:18
**actual** 72:9 96:16
**ad** 11:10 15:17 25:6
26:19 81:7
**add** 25:3
**added** 13:17
**addition** 60:25
61:19 71:22 74:16
110:10 120:5
**additional** 117:21
**address** 21:13 72:1
90:20
**addressed** 79:16
96:12
**addressing** 105:22
**adjusted** 40:24
**adjustments** 25:5
**Administrative** 6:21
**admission** 14:4
**admit** 66:21
**admitted** 13:17
15:20 26:17 34:10
66:25
**advance** 117:7
**advantage** 78:25
**adversely** 120:16
**advertisement**
99:15
**advice** 60:4

**advisable** 40:3
**advise** 61:25
**advised** 61:4
**advisors** 47:7 61:14
66:12
**affiliate** 49:9
**afternoon** 20:20
33:9
**Agenda** 7:20
**ago** 36:6 81:6 86:1
112:22 127:15
**agree** 14:4 17:18
26:6 42:7 48:20
50:6,7 51:9 61:11
66:25 71:17 73:17
73:18 76:12 81:3
81:18 84:11 94:4
95:16 97:23 102:2
102:5,22 106:13
106:15 108:15
**agreed** 19:20 54:15
55:9 84:3 102:19
109:7 110:22
**agreement** 13:4
14:22 15:10,11
34:19 38:10,21
39:25 40:1,4,6
42:4,19,21 44:4
49:4,20 51:8,10,12
52:9,18,20 55:15
61:3,6 62:18 63:3
63:8 64:6,19 65:22
70:1 73:4,22
74:16 75:12,16,17
76:21,23 77:11,24
81:23,24 89:15
91:13,15 92:20
97:2 103:19 105:2
110:3,4,8,9,14,21
111:3,5,14 117:16
117:20 120:17
123:6,6,9
**agreements** 15:8,9
15:11,13 25:12
34:21,22 35:5 36:3
36:12 37:12,13

**38**:6 40:21,25 43:2
51:3 53:22,25,25
54:12 55:22 56:18
59:18,20 64:14,25
66:12,16,19,25
68:11 70:15 71:7
75:12 78:11,12
92:25 101:18
103:6 110:2,11
111:2 113:19
116:1 120:13
121:5,7,15 127:7
**agrees** 50:11 68:21
73:13,13
**AHC** 60:2,5 61:6
67:1,12,24 69:5
**ahead** 91:21 122:2,4
**air** 45:2
**AI** 8:9 13:7
**albeit** 114:6
**Alicia** 9:12 70:21
**allies** 33:17
**allocation** 58:21
**allow** 6:20,21 19:5
19:13 31:8
**allows** 22:5 30:1,2
**alluded** 49:22
**alternate** 36:8,15
43:19 52:24 53:4
65:16
**alternative** 29:10
36:10 43:21 44:17
44:18 89:15 93:5
110:21 111:22
117:8 118:10
119:20 121:3,23
123:3
**alternatively** 121:4
**alternatives** 28:19
29:7
**amass** 96:21
**ambiguities** 30:11
**ambiguity** 26:20
**ambitious** 101:16
**amended** 7:15 15:11
98:18 116:9

**amendments** 121:7
**Americas** 11:19
**amount** 29:5 81:21
 96:21,22 102:21
 111:18 113:9
 119:11
**amounts** 43:24
 63:18 70:3
**analysis** 60:6 90:5
**analyzed** 115:22
**and/or** 71:23
**Angeles** 10:10
**announced** 25:7
 45:1
**answer** 87:5,8
 105:11 121:25
**anticipate** 44:3
**anticipated** 86:9
**anybody** 48:13
 54:13 58:17 69:14
 107:15
**anyway** 44:22 47:19
 51:18 52:14 55:9
 74:8 103:14
**apart** 45:19 116:16
 127:7
**apologize** 79:21 82:9
 84:13
**Appaloosa** 11:17
 44:14 51:10 67:5
 71:8,9 72:6 74:20
 75:1,8,8,12 79:24
 83:4,20 87:9 88:14
 97:13 110:6
 116:24 118:19
 119:16 126:4
**Appaloosa's** 79:19
 82:5
**apparently** 120:14
**appeal** 82:1,4
 114:19
**appear** 75:19 76:1
 122:9 125:18
**appears** 40:14 48:25
 113:25 125:16
**appellate** 83:2

**apples** 99:7,7
**applicable** 40:4
 114:8
**application** 71:10,16
 72:4 75:8,13 80:24
 81:6,15,19 83:17
 95:17 108:17
**applications** 71:2,6
**apply** 37:17 118:21
**applying** 115:17
**appointment** 75:4
 81:10 83:13
**appreciate** 44:24
 56:15,16
**appreciative** 84:17
**apprised** 60:1
**approach** 18:24
 45:23 50:18 118:8
 122:17
**approached** 69:19
**appropriate** 21:9
 23:22 28:9 29:4
 31:4 46:13 84:12
 96:10,22 106:18
 116:5 117:3 118:1
 123:3,6
**appropriately** 83:9
**approval** 13:4 76:18
 76:22,23 78:11
 85:13 110:2,11,12
 111:23 115:4
 116:9 123:2
 129:11
**approvals** 34:18
**approve** 23:20 32:20
 34:20 44:12,13
 46:23 51:20,23
 53:21 65:22 75:6
 75:11,11,22 76:7
 77:11 82:2 84:4
 87:7,18,18 89:8
 103:5 111:9,18
 116:22 124:15
**approved** 30:18
 51:12 52:20 61:3
 66:16 70:15 72:6

76:4 77:4 81:6
 87:11 89:2 130:4
**approves** 52:18 87:1
**approving** 15:7
 59:16 62:4,4,5
 63:1 66:21 86:15
 117:7 124:1,17,22
**April** 32:22 35:10
 53:24 89:18
**architecture** 121:3
**arguably** 40:16
 53:11
**argue** 89:3
**argued** 118:18
**arguers** 57:11
**argues** 60:23
**arguing** 88:25
**argument** 13:10
 15:4 39:22 45:15
 45:15 62:11,14,16
 62:17 71:3 75:15
 80:6 101:25
**arguments** 27:3,22
 85:12
**arises** 22:16
**arms** 15:14
**arms-length** 113:21
**ARPS** 8:3,13
**arrangement** 17:10
**arrive** 106:22
**article** 23:12,12,13
 30:25
**articulate** 22:14
**ascribed** 119:18
**aside** 80:11 119:17
**asked** 61:22 66:6
 87:6 90:22 104:17
 110:12 111:9,18
 124:15
**asking** 21:25 23:23
 51:20,22 75:22
**aspect** 63:8
**aspects** 63:9
**assessment** 111:20
**asset** 117:10
**assets** 47:12 114:21

**assume** 81:12 95:1,2
 99:12 114:12
**assumes** 21:2
**assuming** 31:20 48:5
 67:17 94:15,16
 95:22 113:20
 121:1 127:1
**assurance** 44:23
**Attachments** 3:23
 4:5,11,17
**attempt** 112:25
**attention** 94:18
**attitude** 36:16
**attitudinal** 65:18
**ATTORNEY** 79:25
 80:3
**Attorneys** 8:4,14 9:2
 9:15 10:2,16 11:2
 11:10,17 12:2
**attract** 117:21
**attracted** 117:11,24
**attribute** 52:20 62:9
**attributes** 62:18
**auction** 100:16,18
 100:19 114:20
 115:2 118:5
 122:14
**audience** 93:21
**August** 16:20,21
 18:15 89:16,19,20
 112:23
**aura** 52:4
**authority** 80:1
**authorization** 84:9
**authorize** 22:1,3
 23:24
**authorized** 20:15
**authorizing** 15:7
**auto** 101:16
**automotive** 19:8,11
 124:19
**available** 23:15
 46:10 52:21 54:19
 93:15,15 95:15
**Avenue** 10:3 11:3,19
**avoid** 32:9

**avoidance** 112:16
**avoided** 32:18
**award** 46:4,7 83:19
**awarding** 58:4
**aware** 119:19
**awash** 48:5

_____

### B

**b** 1:21 23:13 27:4
  72:10,11,13 129:4
**back** 24:25 32:21
  57:9 58:18 66:3
  69:17 75:25 76:3
  79:22 87:17 108:9
  119:21 120:21
  127:8,8 128:11,15
**backed** 68:12
**backstop** 61:1
  110:24
**backstopping** 38:17
**backup** 60:19
**bad** 43:12 66:5
**badly** 19:10
**baking** 18:21
**balance** 24:21 29:7
  73:23 93:4 115:5
  122:2
**balanced** 24:20
**balances** 29:8
**balancing** 21:8,9
  23:9 114:19
**ball** 66:9
**Bankr** 7:14
**bankrupt** 115:1
**bankruptcy** 1:2,14
  1:23 19:6 22:4
  49:6,10 51:23 67:3
  77:23 80:17 89:11
  108:4 114:9,11,20
  115:13 124:19
  125:3
**bankruptcy's** 125:2
**bargain** 121:14,14
**barrel** 68:15
**based** 16:12 69:24
  73:22 97:17

113:23 118:11
  125:6,13
**basic** 53:15,15 61:5
**basically** 17:22
  57:18 64:24 65:3
  81:7 83:1 94:14
**basis** 22:17 62:25
  70:16 75:5 82:1
  91:10 95:24 96:10
  103:16 113:21
  117:20 119:25
  124:5,12,23
**BAUMSTEIN** 11:22
**began** 16:20 18:11
**beginning** 26:1 75:1
  75:3 78:23 85:17
  112:23
**begrudging** 36:16
**behalf** 2:4,9,15,21
  3:3,9,15,21 4:3,9
  4:15,22 5:3,9,15
  5:20 6:4,11,16,22
  7:4,10,15,20 13:8
  15:6 16:10 33:8
  98:11 112:2
**behaves** 52:8
**behavior** 50:4 51:20
  51:23 52:4 53:11
**behaviors** 53:6
**beholder** 67:22
**belief** 22:17 104:10
**believe** 23:19,21,22
  24:18,21,22 25:21
  29:25 41:16 43:11
  74:15,23 90:2
  92:14 93:9 100:16
  101:4,10 102:10
  104:12 112:1
  114:7 115:3
  116:25 117:17,19
  120:1,6,9,17 121:7
  121:9 122:1,3,11
  122:13,20,22,25
  123:8,14 124:14
  124:17,20 126:1
  126:14

**believed** 27:5 29:3
  117:25 118:12,16
**believes** 28:9 32:17
  43:8 59:2 85:13
  86:19 89:16
**belittle** 111:17
**belonged** 99:13
**belongs** 35:22 98:25
**beneficial** 72:10
  120:12
**benefit** 32:9 55:1
  83:12 86:21
  120:14 123:2,11
**benefits** 32:14,14
  121:21 122:17
**BENSON** 11:9
**best** 17:8 22:18
  25:12 29:13 40:2
  40:14,17 41:19
  86:15
**better** 36:10 57:6
  58:18 65:17 78:13
  85:22 86:25 87:2
  87:12,21,24 89:5
  90:6 97:25 104:24
  117:18,25 122:10
  125:19
**beyond** 47:18 115:7
  115:25
**bid** 55:7 67:10 91:4
  93:13 98:1 117:12
  117:15,23,23,24
  117:25 118:1,13
  118:14,23 119:2,7
**bidder** 37:8 43:22
  47:10 53:1,20 58:6
  58:24 67:1,25 68:1
  92:7 93:20 106:18
  117:14 122:6
**bidders** 36:21 46:2,2
  69:15 91:8,9
  100:19 114:23
  117:18 118:16,22
  118:25 122:9,10
  122:14
**bidding** 58:13

**believed** 114:22 117:21
**bids** 117:21
**bifurcate** 72:4
**bifurcated** 17:10
**big** 61:20 67:2 88:18
  88:19 90:12 91:19
**biggest** 46:1
**billion** 80:8 98:24
  99:2 102:23
**billions** 104:16
**bills** 71:22 74:4,12
**bit** 57:9 59:4,14 88:7
  88:23
**black** 13:12,19
  24:25 25:3,7 97:12
  129:6
**blackberry** 57:6
**blessing** 123:15
**block** 32:23
**board** 20:14,15 23:9
  25:13,19 26:8,10
  26:10,12 28:10,11
  29:3,8 31:23 59:17
  59:24 60:1,3,4,6
  60:14,24 61:2,3,4
  61:9,9,10,10,11,12
  61:25 63:15,25
  66:14 67:6,12
  68:10 97:10,16
  98:11 99:11
  102:25 114:1,2
  115:10,21 116:12
  116:13 121:19,24
**board's** 22:16,19
  28:12 97:18,19
  98:7 115:14 116:1
  116:17
**boiled** 28:25
**bombs** 36:1
**bona** 119:10
**bonafide** 56:9
  107:17
**Bonnie** 9:6 33:5
**Boone** 9:14 85:7
**bother** 121:22
**bottom** 32:4 35:18

35:25
**bound** 92:20 111:10
 111:11 121:14
**Bowling** 1:15
**BR** 115:16 124:19
**Brad** 57:3
**BRAY** 10:13
**break** 73:1 127:16
 128:2
**breaking** 36:14
**breakup** 58:15 76:7
 76:10,12,13 89:1
 111:21 115:22
 116:19 117:8
 119:24
**Brent** 4:18
**BRIAN** 9:21
**brief** 15:4 70:22
 77:8 84:23 97:5
**briefly** 15:18 37:15
 105:17,19,20
**briefs** 70:17
**bring** 26:10 31:2
 35:14 54:19 55:15
 55:16 123:12
**bringing** 65:25
**brings** 28:21 30:22
 54:16
**Broadway** 11:11
**BROUDE** 10:6
**brought** 26:10 31:9
 43:3 109:23 115:6
**BRUEGGEMAN**
 10:15
**building** 120:24
 121:4
**built** 109:1
**burden** 24:20 58:13
 103:16
**Bush** 4:18
**business** 20:8 22:6,7
 22:15 25:14 28:2
 30:19 45:19 71:3,4
 71:5 88:3 101:23
 104:18 113:18,20
 114:5,10,11,14

115:14,17,21
116:1 117:2,4
120:3,16
**businessman** 114:14
**businesswise** 112:15
**Butler** 2:3,9,15,21
 3:3,9,15,21 4:3,9
 4:15,17,22 5:3,9
 5:15,20 6:4,10,16
 7:3,15,20 8:8 13:6
 13:6,22 14:12,15
 14:19,24 15:2,5
 33:18,20 35:3
 36:11,20 39:13
 46:23 49:22 50:13
 50:25 55:12 67:8
 68:23 70:9 77:18
 83:25 95:25 96:2,5
 97:5,8 103:12,18
 103:22 104:1,9
 105:4,13 106:2,19
 106:23 107:14
 126:6,9,12 127:10
 127:13,22,25
 128:4,7,17
**Butler's** 35:24 92:23
 106:16 107:17
**buy** 47:24 56:9

---

### C

**C** 8:2 13:1 130:2,2
**CA** 10:10
**Cadence** 6:20,22
**cajole** 58:5
**call** 60:9 82:5 93:23
**called** 27:15 48:4
 86:15 116:19
**calling** 100:1
**calls** 21:9 101:18
**capable** 16:25
 119:11
**capacity** 70:14
**capital** 7:10 11:18
 12:2 31:14,16,18
 31:21 85:7,11
 90:18 97:12

118:17
**capitol** 31:17
**capped** 81:20
**care** 36:1 54:3,3
 116:14
**career** 19:5
**careful** 23:9
**carefully** 14:9 20:23
 115:23
**carried** 24:19 79:20
 84:14
**carries** 101:11
**case** 1:4 11:16 16:8
 18:20,23,25 21:1
 21:16 22:9 24:1
 27:10 29:18,24
 35:21 46:4 50:23
 56:5 68:24 71:13
 71:17,25 73:3,10
 73:11,25 75:2 78:8
 78:23 79:21 81:6,9
 81:13,17 83:14
 90:18 91:24 92:16
 92:18 93:12 96:18
 98:1 104:19,24
 112:4,5,6,6,9
 113:2,20 114:3,12
 115:8,25 116:4,21
 116:21 117:3,13
 118:12,15 119:2
 119:12,21 120:6,9
 120:15 121:24
 122:3,16 124:5,12
 125:8 127:19
**cases** 73:9 111:17
 112:1,7 115:17
 119:5
**cash** 86:1 110:23
 118:24
**cause** 40:17
**causing** 46:13
**caution** 76:25
**Center** 10:17
**cents** 115:7
**Cerberaloosa** 57:21
**Cerberus** 44:14

51:10 67:5 87:9
88:14 110:6
119:17
**Cerebaloosa** 58:6,10
 58:11,15
**Cerebeloosa** 59:1
**certain** 7:14 49:21
 50:2 52:8 64:18
 66:3 81:20 86:2
 110:22 111:7
**certainly** 19:4 21:13
 25:23 27:5 37:13
 43:2,6,9 44:1,17
 45:15 48:8 65:25
 67:16 71:9,24 72:3
 81:17 83:7 84:9
 93:8 109:22
 111:11 116:7
**certify** 130:4
**Chadborne** 90:17
**CHADBOURNE**
 12:1
**chain** 20:10 28:7
 32:5 35:19,20 36:1
**chair** 15:25 16:9,13
**chairman** 56:6
**challenge** 22:21,23
**challenged** 22:19
**chambers** 21:7
 93:23 126:13,23
**change** 5:19 13:12
 14:16,21 35:9,12
 46:22 56:25 63:7
 84:12 116:24
 126:2
**changed** 53:24 54:1
 54:23 61:8
**changes** 35:4,4,6,7,7
 35:8 41:17 56:18
 56:23 57:12,14
 84:9 108:15
**Chapter** 29:18,24
 101:14 111:8
**characterization**
 35:25 102:3,6,8
**characterize** 63:2

**chart** 13:24 14:6,7
14:13 26:7 60:8,9
60:9,15,22 63:10
101:12
**charts** 60:21,21
**check** 6:23
**Chicago** 8:6
**chicken** 44:14 87:8
**chief** 19:1
**chill** 52:7,14 55:22
**chilled** 56:11,16
**chills** 55:6
**chips** 37:7
**choice** 16:24
**choose** 38:3
**chooses** 84:4 93:16
**chopped** 24:1
**Christmas** 86:24
90:8
**Chrysler** 24:15
**Cir** 114:6,18
**circuit** 22:12 23:20
114:5,18 115:2
**Circuit's** 114:16
**circularity** 112:18
**circulate** 126:17,19
127:1
**circulated** 13:10,23
**circumstance** 26:9
59:1,5 72:13
**circumstances**
28:13 50:2 51:7
81:19 96:23 99:3
110:13,20 114:25
115:10 122:18
123:9 124:20
**claim** 2:2,8,14,20
3:2,8,14,20 4:2,8
4:14,21 5:2,8,14
6:21 49:7
**claims** 3:23 4:5,11
4:13,17,20 5:1,7
5:13 6:8,20 7:1,15
16:4 17:13,15
29:21 49:15,16
106:3,4,9 112:16

119:1 128:1,3
**clarification** 108:11
**clarifications** 26:25
30:14 35:3,6
**clarified** 27:5,6
123:8
**class** 44:25
**clear** 14:17 18:13
21:16 50:17 58:22
76:19 92:5,9 95:1
95:12,12,14
101:13 104:19
105:6,7 108:12
111:23 113:14,16
115:9 117:6,17,22
120:8 124:11,20
125:2 126:3
**clearer** 19:17
**clearing** 119:13
**clearly** 23:16 29:2
75:1 80:14 93:10
93:13 119:2
123:17 124:18
**client** 66:5,5 80:2
84:8,10,11 89:16
108:15
**close** 29:6 89:7
90:10
**closely** 115:23 116:2
**closing** 13:9 27:22
**code** 22:4 49:6,10
51:23 100:17
114:7
**cogent** 23:6
**cognizant** 88:11
91:17
**cold** 37:13
**collaborative** 20:21
**collapse** 34:3
**colleague** 84:20
**colleagues** 13:7
79:22
**collectively** 28:3
**colloquy** 22:10
**colorable** 29:21
106:3,4,7

**combination** 56:12
63:12 102:21
103:1
**come** 22:12,20 31:16
34:6,12 36:17 37:1
37:5 42:16 43:22
46:14 51:15 56:1
57:4 58:18 75:24
75:25 76:3 87:4,17
87:21 93:22 94:23
108:9 119:14
**comes** 20:8 36:14
44:10 76:6 95:7
123:1
**comfort** 37:13 83:4
97:9
**coming** 39:19 85:11
90:24 110:19
119:4 128:11
**commenced** 37:9
**comment** 77:8
102:14
**comments** 99:4
**commercial** 25:9
**commit** 113:8
**commitment** 13:4
14:21,23 15:10
43:20 44:1 110:3
110:17 111:21
**commitments** 121:8
**commits** 120:2
**committed** 40:11
111:12 120:4
121:6
**committee** 9:2 10:2
11:10 14:1 15:25
16:2,9,10,13,17,17
17:19,19 18:6 25:6
25:6 26:5 33:8
35:2 40:20 44:11
68:22,25 69:5,13
71:23 74:5,8,17
75:4 78:7,10 79:3
81:7 83:13 86:6
87:6,15 93:21 99:5
107:9 109:13

112:3,3 118:4
120:23 123:21,24
**committees** 15:17
18:19 25:24 26:2,7
26:19,21 67:9
81:10 104:20
106:12,12,15
112:24 114:2
115:24 116:4
**committee's** 56:6
**common** 86:4
110:24,25
**communicate** 20:5
104:3 108:14
**communicated**
97:15 98:10
**communicates**
64:21
**communications**
48:12 91:18
**community** 20:5
**companies** 19:2
41:25 60:12,23
67:4
**companion** 21:6
**company** 16:10,22
16:24 18:10,17
19:6,13 20:11,15
20:25 21:12,24
22:18 24:22 25:2
26:5,6 27:2 29:19
29:20 30:2,13
32:17,20 33:2,19
33:24 34:6 39:3
40:5 41:21 42:19
42:24 43:5 45:18
45:23 46:12,18
47:20,24 53:3 59:2
59:8 60:24 61:5
62:19 64:11 65:17
65:21 68:7 70:5
77:13 78:6 85:16
85:19 86:18,25
87:3,19 88:1 89:4
89:6 97:22 98:12
98:16 99:3,13

100:2,7,11,15
102:2,5 106:16
107:5 111:4 118:1
122:18
**company's** 15:23,24
15:24 17:2,12
26:18 28:12 42:18
87:12,23 98:20
100:22
**comparison** 60:10
**compelling** 23:6
**compensate** 43:25
**competitive** 58:13
**compile** 60:8
**complete** 37:23
40:12 102:1
120:19,25
**completed** 24:4
**completely** 68:15
93:17
**completion** 30:20
**complex** 19:2,3,4
20:22 21:1 24:13
30:5 46:1 63:6
**complexity** 18:23
45:23 98:21
**complicated** 69:23
**comprehensive**
17:24,25 25:11
**compromise** 25:10
**compromised** 68:1
**concede** 23:1
**conceded** 18:24
99:25
**concedes** 32:2
**conceivably** 42:21
50:2,3 51:2 74:11
**concern** 43:7 50:17
75:21 78:22 80:17
90:24 107:19
**concerned** 14:7
42:13 72:2 92:6
95:19 121:16,17
123:14,20
**concerning** 94:6
**concerns** 35:2 94:5

107:19,21 114:19
115:5 116:18
**concession** 77:19
**concessions** 104:17
**conclude** 117:2
123:5 125:6
**concluded** 124:3
128:19
**concludes** 29:24
**concluding** 124:5
**conclusion** 25:8 37:1
97:16
**concurs** 78:10
**condition** 49:21,22
81:23 103:14
**conditions** 22:2
40:24 49:21 50:12
96:10 110:22
**conduct** 29:22,24
51:14 52:9,19 91:8
111:25
**conducted** 93:7
**conducting** 51:13
122:13
**conducts** 114:20
**conference** 126:13
126:18
**conferences** 21:7
126:23
**confident** 84:11
127:3
**confidential** 91:13
**confidentiality** 97:1
**confirm** 37:22 40:11
75:20 113:9
**confirmation** 21:15
37:10 39:20 40:11
41:7 75:24 79:18
95:25 111:8,11
124:8
**confirmed** 75:1
108:15
**confirms** 81:12
**conflict** 115:11
116:13
**confluence** 62:18

**congress** 21:2 80:16
80:17
**conjunction** 49:23
**connecting** 108:24
**connection** 30:24
51:4 52:8 63:25
72:2,5,25 73:2
76:8 81:9,9 83:12
95:25 97:11 101:3
103:24 110:15
111:7 116:23
123:23
**Connelly** 127:19
**Connolly** 6:22
**consensual** 17:4
21:20 24:10 31:20
106:22
**consensus** 106:24,25
107:4
**consent** 127:2
**consequently** 112:22
114:4 120:14
124:14 125:13
**consider** 17:13
26:13 28:18 64:7
110:12 113:17
116:2 122:1 123:2
**consideration** 64:9
64:10 80:8 98:15
113:15 116:17
118:20 122:2
**considerations**
118:11 119:22,23
**considered** 26:4
29:3 59:16 63:15
66:20 97:11
115:12 121:20
**considering** 121:22
125:15
**considers** 115:12
**consistent** 125:22
126:21
**constituencies** 41:18
41:23 93:12 116:3
**constituency** 20:19
28:7,9 107:19

**constituents** 114:3
115:25 116:15
121:11 125:5,15
**constitute** 124:16
**constructively** 30:16
**consultation** 25:24
112:23 123:13
**consulted** 113:25
**consummate** 40:5
47:15
**contact** 54:20 100:2
100:6
**contained** 16:18
49:14
**contemplate** 120:17
**contemplated** 22:2,2
40:6 109:2
**contemplates** 37:20
37:21 42:5 111:24
**contenders** 69:18
**contested** 116:7
**context** 81:16 92:24
114:6
**contingent** 62:6
79:18
**continuation** 13:3
**continue** 19:8,8 20:5
28:18 87:2 102:12
103:7 126:22
**continuing** 30:3
**contract** 24:14 25:9
73:18,20,22
101:15 112:16
**contractual** 42:1,3
72:19,21
**contractually** 71:19
**contrarian** 26:12
**contrary** 26:12 95:2
98:1 115:14
**contributed** 81:11
**contribution** 72:14
73:7 75:6 83:19
**contributions** 19:22
20:2
**control** 16:4 93:4
95:10

**controlling** 22:12
**controversial** 20:22
  29:19
**conversations** 46:13
  52:21,25
**conversion** 108:22
**convert** 109:8
**convertible** 60:2,9
  60:11
**cooperate** 40:4 69:2
**cooperation** 42:18
**coordination** 122:15
**core** 77:22
**Corp** 114:6
**corporate** 23:7
  27:14 86:14
**Corporation** 1:8 2:4
  2:10,15,21 3:3,9
  3:15,21 4:3,9,15
  4:22 5:3,9,15,21
  6:5,11,17 7:4,16
  7:21 8:4,14 13:3
  15:16 16:4 22:11
  29:17,17 110:10
**correct** 14:24 15:2
  50:14 70:10 72:12
  74:23 98:23 99:8
  105:4 130:5
**correctly** 89:25
**cost** 79:11,12
**coterminous** 127:6
**counsel** 13:10 16:16
  71:15 86:5 87:6
  90:17 119:11
  126:25
**country** 32:12
**couple** 57:8 97:8
  98:23
**course** 22:6,9 25:4
  30:23 73:13 75:21
  94:17 105:9
  113:17 114:13
  115:4,18
**court** 1:2,14 6:23
  13:2,11,21,23 14:2
  14:6,14,17,21,25

15:3 20:16 23:19
23:20 25:3 30:8
33:4,7,10,13,15
34:17,18,20 35:17
37:1,18 38:7,9,17
39:4,6,8,12,18
40:22 41:2,9,19,25
42:7 43:8,11 44:5
44:8,20 45:9,11
47:3,11,18 48:14
48:16,19,23 50:24
51:1,12,14,17,21
52:10,13,18,20
53:7,9,11,20 54:2
54:5,11,15 55:2,4
55:8,15,18,24 56:3
56:14,17,19,22
57:4,11,15 58:4,14
58:18 59:10,12,15
62:2,4,10,21,23
63:14,21,24 64:3,7
64:9,13,15,20,21
64:23 65:6,22
66:19,19 67:13,16
67:17,20,22 68:9
70:18,20 71:11,13
71:20,25 72:15,23
73:6,6,9,13 74:2
74:10,22 75:2,5,10
75:11,14,19,22
76:5,7,9,16,22,23
76:24 77:11 78:6
78:11,16,19,22
79:16 80:2,4 81:11
82:7,11,14,18,21
82:25 83:2,10,15
83:23 84:2,7,13,17
84:19,25 85:3,9
86:12 88:9 89:13
89:20,22,24 90:15
90:20,21,22 91:21
92:5,12 94:9,11,22
94:25 95:14,16,18
96:4,11 97:7,9
102:12,15 103:10
103:13,21,25

104:8 105:2,5,14
105:16,19,21
106:2,6,11,14,20
107:23 108:2,6,8
108:13,19,24
109:12,15,21
111:9 113:16
114:9,20 115:5,6
115:13 118:8
126:7,11 127:5,11
127:14,17,23
128:2,9,15 130:4,7
**courtroom** 2:5,11,16
  2:22 3:4,10,16,22
  4:4,10,16,23 5:4
  5:10,16,22 6:6,9
  6:18 7:2,17,22
  23:8 126:15
**courts** 45:10 46:21
  89:2 115:9 120:1
**Court's** 22:13 43:14
  84:11 107:19
  113:15 114:11
  116:10
**court-approved**
  53:6
**covenant** 32:10
**cover** 39:22 84:22
**covered** 81:2,15
  83:5 85:8
**crafted** 26:15
**crazy** 95:21
**create** 34:8 52:5
  53:5 91:5 104:25
  107:21
**created** 44:25
**creates** 33:23
**creation** 27:11 29:9
**credibility** 99:17
**credit** 118:23
**creditor** 27:23 49:25
**creditors** 10:2 16:1
  16:2,9,13,17 17:19
  25:6 32:6 69:4
  74:4 76:3 86:2,3,8
  118:19 120:23

125:5,7,12
**crematoria** 51:15
**criteria** 119:25
**critical** 120:6
**cross** 13:15
**crucial** 124:12
**crystallize** 28:22
**culminated** 26:23
**cumulative** 44:3
**currently** 57:25
**customer** 112:17
**customers** 20:6,8
  32:25 48:2
**cut** 65:8 107:23

---

## D

**D** 1:22 9:21 13:1
  129:2
**Daimler** 24:15
**danger** 114:23
**data** 91:9,14 92:11
  94:19,21 95:18
  96:1,2,6
**date** 5:20 13:20
  35:11 59:4 61:7
  126:24 130:11
**Daugherty** 24:5,6
  48:3 79:8 91:12
  96:12 98:2,5,6,11
  99:18,23 106:21
  117:24
**Daugherty's** 92:21
  94:6 99:14 119:19
**day** 18:4,24 34:11
  34:11 44:9 47:8
  58:3,16 61:7 75:3
  78:12 84:24
  102:11 103:11
  104:9,11,13
  105:10 124:3
**days** 15:21 18:11
  21:3,3 30:11 77:10
  85:14,15,23 86:1
  87:2,22 88:3,9,10
  88:23 99:21
  122:19

**deadlines** 91:24
**deal** 17:9,13,24,25
  18:6 43:15 45:23
  46:10 57:23,24
  58:7,10,10 69:3
  76:16 80:8,12
  84:25 85:3,22
  86:25 87:2 88:18
  89:4,5 90:6 97:11
  99:16 100:8 103:3
  107:7,10 108:23
  108:25 109:7
  120:2 121:16
  124:9 126:24
**dealing** 35:13 40:16
  96:13 113:22
  115:11
**deals** 24:10 89:1
**dealt** 19:3,4 83:9
  93:25 123:19
  124:22
**debatable** 23:17
**debated** 23:5
**debating** 101:21
  125:9
**debt** 118:24
**debtor** 1:10 34:3,12
  37:2 41:3 46:15
  48:19 49:23 54:5,7
  54:7,10,12,16
  55:14 59:22 67:4
  69:2,4 71:22 72:8
  73:10 75:20 76:6
  76:11 77:11 78:4
  78:13 79:2 89:14
  90:3,8 91:3,6,16
  92:21 93:1,3,9,14
  93:18 94:3,5 95:4
  95:9,13 96:23
  106:18 108:3
  113:21 117:14
  118:2,4,7 119:7
  120:10,22 121:13
  122:7 123:12
  125:2,21
**debtors** 2:2,8,14,20

3:2,8,14,20 4:2,8
  4:14,21 5:2,8,14
  6:2,14 7:1,7,12,13
  13:8 14:9 15:6,15
  16:17 22:5,7,10
  24:1 27:24 28:8
  30:23 31:3,16
  33:17 34:16 36:12
  41:4,5,5 55:5,16
  55:24 58:4,5,14
  69:7 70:25,25
  76:24 77:25 97:24
  101:10 102:2,7,9
  103:5,6 104:21
  105:23,25 110:1
  110:11,23 111:6,9
  111:10,15,16
  112:13,14,20,22
  113:10,11,25
  117:1,1,4,11,19
  118:20 119:4
  120:3,7,25 121:6
  122:11,15 124:10
  125:10,14,17
  126:17
**debtor's** 13:4,9,19
  15:7,17 17:7,7
  18:24 19:23 21:10
  22:14,25 23:21
  24:7 26:21 27:4
  28:1,24 29:20,25
  31:1 49:23 50:13
  54:9,21 55:6 56:7
  74:24 84:24 90:5
  113:18 114:21
  116:12 117:10
  124:25 125:3
  129:5
**December** 18:15
  20:4 48:7 63:21
  85:19 86:1,23
  87:22 89:4 98:17
  98:19 100:3,3
  111:3
**decide** 22:24 122:24
**decided** 58:9 121:25

**decides** 59:3
**deciding** 106:17
  114:11
**decision** 22:16 23:10
  29:11,12 113:19
  114:7,16 115:20
  117:6
**decisions** 114:9
**decline** 114:24
**decretal** 49:1,2
**defer** 115:14
**deference** 115:25
**definitely** 42:7
**degree** 116:15
**delay** 100:13 101:20
**deletes** 14:22
**deleting** 125:25
**deliver** 43:5
**Delphi** 1:8 2:4,9,15
  2:21 3:3,9,15,21
  4:3,9,15,22 5:3,9
  5:15,20 6:4,11,16
  7:4,15,20 8:4,14
  13:2 19:11 28:17
  32:13 33:1,22,24
  34:19 57:20 60:12
  66:15 69:9 88:16
**Delphi's** 35:19 37:14
  88:18
**demanding** 97:18
**demonstrate** 22:7
**demonstrated** 16:14
**demonstrates** 35:13
**Dennis** 6:22
**deny** 78:11
**depends** 112:12
**depositions** 90:10
**describe** 17:1
  100:16
**described** 39:8
  117:3 121:22
**description** 107:6
  129:5
**designation** 49:8
  50:4 51:5
**designed** 106:21

**desire** 88:18
**destruction** 20:10
  27:11 29:9 32:3
**determination**
  97:19 98:8 112:8
**determined** 99:11
**determines** 46:15
**detrimental** 78:3
  123:1
**detriments** 59:21
**developed** 19:20
  107:10
**development** 111:8
**develops** 43:15
**de-facto** 124:16,17
**dictating** 107:5
**differ** 23:18
**difference** 119:17
**differences** 97:14
**different** 19:2,19
  23:13 38:25 39:9
  46:25 64:24 73:3
  74:20 99:5 104:15
  104:23 122:17
  125:3 127:9,11
**differently** 52:17,17
  76:2
**differing** 114:25
**difficult** 20:21 30:7
  45:22 46:1 101:20
  112:19 114:19
**difficulty** 91:12
  92:24
**diligence** 47:25
  71:15 81:10 88:12
  88:12,13,15,17,21
**diminished** 35:22
  41:16 70:2
**DIP** 71:14 72:17,19
**dipping** 43:21
**direct** 22:22 38:15
  38:19,24
**directed** 58:4,14
**direction** 76:25 77:1
  94:2 111:25 118:7
**directly** 55:23

**director** 15:24 16:14
  46:24,24,25 70:9
**directors** 23:5 29:8
  31:23 97:11,13
  98:11
**disagree** 21:15
  52:16
**disagreement** 68:3
  100:12
**disapprove** 116:19
**disapproved** 118:10
**disclosure** 32:22
  34:21 35:10 41:14
  77:22
**disconnected** 82:20
**discount** 60:12 63:1
  69:10,22 108:22
  109:2
**discounted** 60:25
  68:5 98:15
**discounts** 60:5 63:12
  80:12
**discovery** 26:16
  95:24
**discretion** 39:25
  58:9
**discussed** 33:10
**discussion** 15:23
  16:5 99:9 109:7
  123:4
**discussions** 16:15
  18:11 19:16 31:1
  46:16 49:23 50:1
  54:9 67:7 90:14
  95:8 100:5 101:8
  113:4,5
**disposed** 21:2
**disputed** 90:7
**disputes** 71:21
**disrupt** 20:9 93:6
**disrupting** 122:7
**disruptive** 32:15
**distinction** 83:17
  124:18
**distinguishable**
  72:18

**distress** 48:6 99:19
**distributed** 124:21
**distribution** 19:21
  50:8 79:18
**district** 1:3 23:20
  47:12 115:17
**disturbed** 91:11
**diverted** 35:22
**diverting** 37:6
**Docket** 4:18
**document** 15:19
  19:18 23:1 27:1
  30:10,12 42:12
  45:16 61:16,18,23
**documents** 25:2,2
  30:19 37:16 42:16
  61:17 66:9 88:20
  102:7
**document(s)[6285**
  7:9
**dog** 35:20
**doing** 21:25 44:2,2
  68:23 71:15 81:10
  86:19 101:24
  123:11 125:17
**dollar** 47:2 69:22
  70:2 79:17 80:8,11
  85:24 86:13 87:1
  87:11 88:6,24,25
  89:8 90:12 108:22
  109:2 111:19
  118:22
**dollars** 36:24 61:19
  63:11 89:3 98:24
  99:2 102:24
  104:16 109:4
  115:7
**door** 36:14,17 56:1,5
  56:6,7 88:6,7
**dots** 108:24
**double** 43:20
**doubt** 92:8 94:17
**dough** 59:1
**DOUGLAS** 11:22
**dozen** 21:7
**drafted** 47:12

**DRAIN** 1:22
**dreamt** 20:19
**Drive** 8:5 10:17
**due** 6:6,10,18,24 7:3
  47:25 71:15 81:10
  88:12,12,12,15,16
  88:20 116:14
**Duplicate** 7:14
**duration** 126:21
**duties** 31:3,10 36:13
  41:12 55:17 56:8
  91:17 95:5 101:3
  102:8,11 103:7
  125:1,2,3,4,14,23
**duty** 28:3 40:13,14
  40:15,17 55:25
  100:8,9 104:13
  122:23 125:5
**dynamics** 120:6

---

**E**

**E** 1:21,21 8:2,2,11
  11:24 13:1,1 129:2
  129:4 130:2
**Eagle** 12:2 90:17
**earlier** 36:20 44:8
  51:22 96:18
  108:10 117:3
  120:5
**early** 25:21 81:13
**easily** 47:7
**East** 9:16
**easy** 28:10 30:4
**economic** 59:6 89:5
**economically** 70:4
**economics** 127:11
**effect** 44:4 115:8
  118:14
**effective** 40:5 61:7
**effectively** 54:9
**effectiveness** 40:17
**effort** 15:14 57:21
  79:2 107:12
**efforts** 40:2,14,17
  41:20 66:14
**egregious** 63:9 65:8

**eighteen** 60:23
**Eilberg** 7:25 130:13
**either** 72:1 73:10
  78:11 86:20 91:1
  100:14 118:12
  122:22
**elaborate** 96:6
**elapse** 36:11
**electronic** 96:6
  130:5
**element** 19:21 73:1
**elements** 38:3
  109:18 123:24
  124:1,2,12
**eleventh** 42:6
**eliminate** 13:13 88:2
**eliminated** 37:11
**eliminates** 86:21
**elimination** 35:10
**Elkin** 7:10 9:20
**eloquently** 100:21
**embolden** 53:5
**embracing** 59:8
**emerge** 24:12 30:2
  69:5 101:14
**emphasize** 27:12,13
  34:10
**employees** 19:7
  96:20
**empty** 44:12
**enable** 42:13 69:3
**enables** 125:11
**enamored** 67:8
**encourage** 58:5
**encouraged** 56:18
**encouragement**
  16:12
**endeavor** 57:21
**endlessly** 112:9
**Energy** 73:3
**enforce** 37:13
**engage** 46:15 50:1,4
  123:17
**engaging** 118:5
**enhance** 59:21
**enormous** 102:20

103:4 111:19
**enter** 22:1 23:24
  91:15 92:1 125:25
**entered** 15:11 42:19
  67:3 84:5 111:4
  112:24
**entering** 49:11,19
  50:22
**enterprise** 28:1
  29:14 112:8,10,12
  112:20 113:10
**entertain** 58:17
**entire** 62:18 100:24
**entirely** 102:9
**entities** 110:9
**entitled** 42:23 58:25
  71:8 74:3 109:22
**entitlement** 58:20
**entries** 80:25
**entry** 15:7 49:3
  110:2,11 113:18
  117:1
**environment** 33:23
  52:6
**EPCA** 13:12,13,14
  13:19 22:3 23:25
  28:20,24 44:4
  52:12 60:1 126:22
  129:7
**equally** 114:7
**equity** 9:2 13:4,25
  15:9 16:17 17:19
  26:5,7 33:8 35:2
  37:21 40:20 42:13
  42:14 43:3 44:11
  56:6 58:22,24
  68:22,25 69:13
  75:4 78:7,10 79:3
  79:19 81:10 83:13
  86:6,7 87:6,15
  93:21 99:5 109:13
  110:3,24 112:2,3
  118:3 123:21,24
**equity's** 63:14,15
**errand** 58:12
**escape** 77:20

**ESQ** 8:8,9,10,11,18
  8:19 9:6,12,19,20
  10:6,12,13,21 11:6
  11:7,14,22,23,24
  12:6
**essence** 55:18 62:11
  65:1 68:18 73:7
  95:24
**essentially** 18:19
  19:20 92:15
**establish** 117:20
**establishment** 16:19
**estate** 17:8,14 22:5
  25:13 27:23 29:4
  65:2,7,12,23,24
  66:1 69:18 71:14
  91:5 106:25 115:1
  117:10 123:2,12
  123:23 124:21
  125:10
**estate's** 65:4
**estimate** 102:24
**evaluated** 29:3
  99:17
**evaluation** 29:23
**eve** 16:1
**event** 31:2 41:10
  81:1 105:12
  109:15 112:5
  123:18
**events** 56:12
**eventual** 111:8
**eventually** 34:21
  39:14
**everybody** 30:2
**evidence** 13:18
  15:12,20,22 21:17
  22:20,22 23:2,17
  24:17,18,23 25:1,4
  25:18,25 26:18
  27:8,8 85:12,20
  88:13 90:6 102:3,4
  113:7 115:13
  117:22
**evidenced** 42:19
**exact** 109:2 121:3

**exactly** 48:22 76:21
**example** 30:25 31:4
  76:2 85:25
**exception** 112:2
  118:23 125:24
**excess** 76:25
**exchange** 15:23
**excluded** 81:8,13
**Exclusive** 6:2,14 7:7
**exclusively** 99:13
**exclusivity** 128:6,8
  128:10,11
**excuse** 35:24 98:10
**executable** 30:21
  32:1
**execute** 31:22,25
  32:1
**execution** 87:25
  88:2 89:6,7 90:7
  90:11
**executive** 19:1
**exercise** 25:14 26:22
  28:18 30:23 31:3,9
  36:13 53:18 69:24
  100:8 102:8,11
  103:7 114:9 117:1
  117:4
**exercised** 28:17
  125:14
**exercising** 55:25
  69:11
**Exhibit** 13:17,20,23
  15:19 26:24 60:8
  60:21 85:20 97:10
  101:11
**exhibits** 15:22 16:18
  18:13 20:18 25:1
  25:19,20,21,25
  26:17 27:20 68:9
  85:20
**exigencies** 91:23
**exist** 38:22 43:17
  54:20
**existed** 72:22 99:12
**existence** 38:21
  121:5

**existing** 110:25
**exists** 35:23 68:21
  72:21 120:8
**exit** 71:16 73:11,15
  88:18 113:13
**expect** 101:4 102:12
  123:17 125:22
  127:7,17
**expectations** 104:20
**expected** 61:13
**expedited** 91:10
**expended** 79:6 87:9
**expending** 29:5
**expense** 44:2 76:8
  76:10,13 116:20
**expenses** 44:1
  108:17
**experience** 19:1
  20:25 26:8 72:3
**expire** 32:10,10
  120:13,15
**explain** 58:18
**explained** 17:6 23:8
  124:23
**explicit** 98:9
**exponential** 52:23
**exposure** 18:3,3,4
  18:18
**expressed** 17:7
  118:8
**expression** 98:18
**Extend** 6:1,13
**Extending** 6:2,14
  7:7
**extension** 128:12,13
**extensively** 113:25
**extent** 42:10 43:1,4
  43:8,14 46:4 51:19
  52:14,18 64:19
  68:2 79:4 108:11
  109:5 110:25
  112:12 113:6
  121:6 124:15
**extra** 80:18
**extraordinarily**
  30:7

**extraordinary** 24:3
26:6,9,15

---

**F**

**F** 1:21 130:2
**face** 30:4 36:9
104:24 120:10
**faced** 18:10 22:23
23:4
**facilitate** 69:2 90:23
91:3,4,16,18
117:12 121:18
122:9
**facilitated** 46:12
69:20
**facilitates** 113:11
**fact** 15:20 18:22
21:4 23:14 24:5
28:11 29:12 30:7
34:1 45:13 54:15
58:8 78:6,8 80:18
95:1,7 98:1,15,16
98:21,22 99:8,16
99:18,25 100:5
103:7,14 104:5,15
108:24 109:11
111:23,24 120:13
121:19 123:11
**factor** 29:18
**facts** 37:16 125:13
**failed** 61:2
**fair** 92:3 95:13
98:25 99:6 114:23
119:11
**fairly** 26:15 44:25
45:2 47:23 72:25
96:21 116:10
**faith** 22:17 30:16
40:15 42:9 107:22
111:13
**fall** 32:1 37:7 89:1
120:13 127:7
**falter** 19:9
**far** 14:6 18:4 29:10
29:10 42:12 53:12
59:2 72:2 92:6

95:18 121:16,17
122:23 123:14,20
128:12
**faulting** 79:9
**favor** 13:16
**favored** 53:19
**feasible** 30:21
**feature** 40:10
**February** 101:22
**Fed** 7:14
**fee** 36:8,15 43:20,22
44:17,18 46:6 50:6
52:24 53:4 58:5,15
59:25 60:25 62:2,6
65:16 71:2,6 72:2
73:1,1,15 74:8
75:8,13 76:7,10,12
76:13 79:17 80:11
80:13 89:15
110:21 111:21,22
115:22 117:9
119:25 123:3
126:2,4
**feel** 14:10 23:13,14
54:22 91:2
**feels** 93:18
**fees** 14:23 34:24
43:20 44:1,17 60:3
60:5,20,23 61:19
63:2,13 68:25 70:4
71:4,8,9,14,18
72:5,6 73:2,2,14
73:16,19,25 74:3
75:6,9 80:12,14,17
89:1 108:17
110:12,15,16,17
111:18,20,21
116:20 117:2,8
118:11 123:5,23
124:22
**felt** 64:11
**fewer** 70:4
**fide** 119:10
**fiduciaries** 93:12
116:3
**fiduciary** 28:18

30:24 31:3,5,9
36:13 41:3 49:21
55:14,17,25 56:8
91:17 93:3 95:5
100:7 101:3,7
102:11 103:7
104:13 122:23
125:1,2,14,23
**field** 92:4
**fifteen** 60:22 88:3
104:19
**Fifth** 7:1 11:3
**fifty-one** 118:25
**Figueroa** 10:9
**figure** 17:9 19:12
36:6
**figuring** 82:20
**file** 6:3,15 7:8 20:16
71:6 75:8,12
108:16
**filed** 2:3,9,15,20 3:2
3:8,14,20 4:2,8,15
4:22 5:3,9,15,20
6:4,10,16,21 7:3,9
7:15,20 15:21
20:20 25:3 27:21
75:3 90:19 105:24
**filing** 16:1 21:4
83:16 117:22
**final** 81:24 91:22
103:3,14,19 105:8
116:9 124:25
**finality** 104:5
107:14,14
**finally** 19:20,24
110:19
**finance** 31:19
**financial** 17:21 47:7
47:15,21 77:16
114:17
**financing** 71:16
73:11 96:14,15
112:21
**find** 16:5 21:22
24:19 31:25 46:2,2
54:22 70:13 93:21

102:21 103:1
113:20,22 116:12
**findings** 48:25 49:2
**finds** 68:19
**fine** 13:21 14:12
33:15 41:25 74:19
109:21
**finish** 20:3 101:22
**finished** 18:21
**firm** 83:18,19 99:18
117:25
**firms** 83:19
**first** 15:1 25:1 33:11
35:16 40:20 45:16
52:2,12 57:9 64:22
70:24 72:8 82:23
98:18 104:19
110:3 116:25
126:18
**fit** 80:15
**five** 15:13 18:14
23:12 35:8 36:6
69:18 74:22 79:17
80:10 82:24 99:21
99:22 100:19
126:3 127:20
128:16
**fix** 36:6
**fixed** 114:23
**flip** 65:1,6
**FLOM** 8:3,13
**flush** 85:23
**FNN** 115:19
**focus** 27:9 116:9
122:12
**focused** 96:13
**follow** 19:15 34:23
**followed** 19:14,15
**following** 18:14
20:14 49:13 50:8
81:20
**follows** 57:19
**fond** 68:24
**food** 35:19,20 36:1
**fool's** 58:12
**Ford** 24:16

foregoing 130:5
foremost 35:16
  116:25
form 30:6 48:23
  58:1 66:13 78:7
  91:15 92:15,16
formal 115:2 118:5
  118:6 122:13
former 96:20
formulation 22:11
forth 15:22 28:23
  32:14 101:11
  110:20 111:14
  115:15 124:2,18
forty-five 21:3 34:11
  47:8 122:19
forward 18:10 19:17
  20:12,23 21:24,25
  22:20 25:15 27:12
  28:16 29:10,11
  30:2,17 33:1 46:14
  52:9 62:25 66:2
  72:6 90:24 91:20
  92:2 100:22 101:9
  104:5 110:17
found 87:12 94:6
four 8:15 69:17
  88:14,20 97:24
  100:18
Fourteenth 7:19
fourth 7:13 37:8
  86:17
framework 15:9,10
  16:19 18:8,11
  19:16,17,21 20:16
  45:7 49:3 67:7
  75:16,17 86:9
  110:8 111:5,6,10
  111:14 120:21,24
  120:25 121:1
  124:11
Frank 9:1 33:6
frankly 22:23 78:22
  122:21
Frank's 56:5
free 46:16 51:9

FREIDMAN 11:9
frequently 116:6,8
Fried 9:1 33:6 56:5
front 81:11 110:1
fulfilled 29:13
fulfilling 49:12
  101:7
fulfillment 49:5
full 69:10,22 71:16
  86:10 101:2
  118:13 125:6,7,12
fullest 103:8
fully 25:9,11 26:13
  47:1 49:16 59:17
  60:1 111:1 125:22
function 93:4,5
fund 48:6,6 113:9
fundamental 20:10
  104:6
funders 113:5
further 25:5 61:22
  74:6 87:3 110:24
  116:18 117:2,17
  118:17
future 112:21
F.2d 114:17
F.3d 114:6

———
G
———

G 13:1
gain 107:12
game 44:14 87:8
  88:15
gap 90:11
gasping 45:2
gate 91:19 94:20
  95:2
gee 23:12 104:15
general 11:2 15:16
  16:4,6,23 17:3,10
  17:20,25 18:1,7,12
  18:18 19:10,22
  20:1,6,8 21:6,21
  27:1 29:16,17,21
  29:23 30:5,10,12
  30:15 31:1,7,8,21

40:15 42:9,15
50:14 58:16,21,23
59:3 91:18 94:1
98:24 100:25
101:4,19 102:22
103:1 104:3,12
110:10 112:17
generally 45:13
98:14 115:8
gentlemen 79:20
gently 97:20
getting 37:20 51:10
54:2,8,10 58:16
66:3,7 71:22 84:8
88:12 89:9 90:9
93:5
gift 36:23
gingerly 97:20
give 17:1 36:15,20
49:7 50:19,22 51:5
55:19 60:6 65:2
66:5 127:19
given 23:10 38:3
39:24 42:17,18
46:18,18 48:5,11
58:10,11 61:13
80:17 83:2 92:24
95:6,7 98:2,5,6,14
98:22 101:20
103:13 105:8
107:18 108:3
116:5 119:19
120:12 122:20
123:1,12
gives 69:21 101:22
giving 37:2 54:6,7
58:14 61:5 69:16
90:13 93:19 94:1
96:8
GLEIT 11:14
GLENN 11:23
glimpse 20:24
global 19:6,11 20:5
globally 32:25
GM 24:10,15 34:5,7
35:23 36:4 40:8

46:2,13 48:11,14
48:19 49:9,19,25
50:3,9,17,19 51:4
51:9,11,13,13,20
52:6,7 53:5,19,24
54:12,15,22,24,25
55:5,9,22,23 57:20
57:25 58:1,2,9,19
65:17 68:19 69:14
76:2 92:25 94:18
95:8 96:13 105:25
106:16,17,24
107:1,4,7 111:6
112:25 113:6,11
120:7,10,14,18,23
120:24 122:4,8,13
122:21 123:9,10
123:13,15
GMs 30:3
GM's 51:8 53:12
55:18 58:7 98:22
122:22
go 20:18 26:19 27:12
27:18 33:1,11,12
34:9 37:22 39:6,15
41:9 43:7,9,11
44:11 47:13 54:24
55:23 57:9 59:2
70:12 71:11 82:5
83:21 91:7,21 92:2
94:15 95:10 98:4
115:7,25 120:21
125:11
goes 47:10 84:15
125:7
going 14:11 17:5,12
17:23 18:21 27:18
30:4 32:13,24,25
34:3 39:9,19 40:9
41:24 46:7,21
50:19 52:9 58:12
66:1 72:5 74:5,14
75:25 76:3,14 77:3
77:5 86:9 87:6,10
89:2 91:19 92:7
93:20,22 94:12,15

94:19,23 95:2,20
95:23,23,24 96:1
98:4 100:22
101:19 102:7,17
104:14,25 107:12
107:16,23,24
109:6 110:16
127:23 128:2
**GOLDBERG** 10:15
**GOLDSTEIN** 10:21
**good** 13:6 22:17
30:16 31:17 33:5,7
35:12 40:15 42:9
46:22 62:15,24,25
66:14 70:19,20
90:16 99:16,24
107:22 111:13
113:20 123:22
**GOTSHAL** 11:1
**gotten** 36:5
**governance** 23:7
27:14 78:2 86:11
86:12,14
**grant** 128:12
**grapevine** 79:8
**GRATZ** 10:15
**great** 33:2,3,20
50:17 77:20 87:23
**greater** 33:20 91:5
118:6
**greatest** 115:1
**greatly** 32:15 113:10
**Green** 1:15
**GREGORY** 10:13
**Gropper** 124:18
**ground** 107:24
**group** 103:2
**guarantee** 32:9,10
120:14
**guarantees** 32:19
**guess** 37:25 43:13
45:14 49:19 55:4
62:23 72:1 79:4
82:12 83:17 93:9
96:11 102:15
**guidance** 26:3 31:12

83:8 84:12 98:2,4
98:6 127:14
**guide** 23:20
**gun** 58:7
**guys** 58:20

___

### H

**H** 129:4
**HADLEY** 10:8
**HAIL** 9:21
**half** 99:2 102:17,23
102:25
**hand** 29:22 80:13
114:22,24 119:8
124:10
**happen** 17:8 32:13
34:7,8,16 42:21
70:6 88:23 90:14
**happened** 73:10
88:3
**happening** 58:8
66:10 101:7
**happens** 36:2
**happy** 127:12
**Harbinger** 11:18
**hard** 32:24 36:6
37:19 42:17 52:3
61:11 63:7 66:24
69:14,15 94:2
**harmed** 65:24,24
**HARRIS** 9:1
**hatch** 77:20
**Haynes** 9:14 85:7
**haywire** 95:10
**head** 58:7
**health** 32:14
**hear** 15:3 39:23
57:12 79:7 82:6,15
91:11 93:24 97:6
125:19 127:18
**heard** 16:3 56:22
59:12,23,24 63:4,5
77:9 82:16 85:12
85:12 88:13 90:3
104:22 107:7
128:9

**hearing** 2:1,1,1,4,7,7
2:7,10,13,13,13,16
2:19,19,19,22 3:1
3:1,1,4,7,7,7,10,13
3:13,13,16,19,19
3:19,22 4:1,1,1,4,7
4:7,7,10,13,13,13
4:16,20,20,20,23
5:1,1,1,4,7,7,7,10
5:13,13,13,16,19
5:19,20,21 6:1,5,8
6:8,13,17,20,23
7:1,2,6,12,16,19
7:19,20,21 13:3,8
15:12 21:16 22:7
23:8 25:4 58:2
85:1 92:6 98:5
100:25 116:23
126:8 128:1,3
**hearings** 15:8 30:9
90:9 101:20
**heart** 33:19 34:6
90:3,4
**heartened** 35:11
**heavy** 103:16
**hedge** 48:6
**held** 2:4,10,16,22
3:4,10,16,22 4:4
4:10,16,23 5:4,10
5:16,21 6:5,9,17
6:23 7:2,16,21
20:14
**help** 52:25 53:1 69:2
**helpful** 79:5
**helping** 69:5
**helps** 113:9
**hesitate** 93:23
**hesitated** 116:18
**hiatus** 21:4,5
**hiding** 66:9
**high** 44:25 97:3
**higher** 58:17 78:13
86:5 93:5 117:18
122:10 125:19
**highering** 36:9
**Highland** 7:10 9:15

14:1 27:23 32:2
33:12 77:3 85:7,11
85:13,18 86:5,19
87:20 89:5 91:4
97:11,12,15,18,21
97:25 98:7,8,10,11
99:7,20 117:24
119:6,10,14,18
121:23 122:6,9
128:7
**Highland's** 98:13,23
99:8
**highlighted** 98:21
**highly** 32:15 112:1
**hind** 52:7
**hired** 83:20
**hoc** 11:10 15:17 25:6
26:19 81:7
**Hogan** 8:9 13:7
**hold** 96:21
**holders** 43:3 58:22
58:24 79:19 86:7
**holdings** 99:20
**holiday** 87:22 88:4
**holidays** 90:9
**hollow** 66:17
**home** 43:3
**HON** 1:22
**honest** 22:17
**Honor** 13:6,9,22
14:2,3,12,20,24
15:2,5,5 17:17
18:13 20:24 21:7
21:13 22:1,10,21
22:22 23:4,23
24:19,24 25:18
26:15 27:7,17,19
29:15 30:8,18
31:15 32:19,24
33:5,16 34:4,24
35:8,24 38:5,14
39:11,13 40:19
41:12,15 43:1 45:4
45:21 46:6,21
48:10 50:13 52:1
52:11,16,16 53:17

53:18 55:10,20
56:2,10 57:3,3,8
57:18,18 58:22
59:9,15 60:15 61:2
61:8,22 62:9,17
63:4,17,20 64:11
64:17 65:5,11
66:15,23 67:25
68:16 70:17,19
72:12 73:17 74:9
74:19 76:4 77:8
78:15 79:15 82:6,9
83:7,22,24 84:1,16
84:21 85:6,15
86:17 87:1 88:10
90:16 94:4 95:11
95:12 96:5 97:4,5
97:8 98:14 101:11
102:14 103:18
104:25 105:13,18
105:20 106:10,18
107:3,9 108:4,7
109:14,20 126:6,9
126:12,16,19
127:2,13,13 128:5
128:14,17,18
**Honor's** 13:18 22:10
  126:16
**hope** 103:6 119:13
**hoped** 61:13 112:1
**hopefully** 16:11
  114:15
**horrible** 34:8,15
**horse** 43:23 45:13
  45:17 62:12 67:10
  69:6 72:25 118:13
  118:16,22,25
**hostile** 27:15
**Houlihan** 56:6 64:1
  64:4
**hour** 42:6
**hours** 45:7,7
**house** 17:21 120:24
  121:1
**Howard** 12:6 90:16
**huge** 58:5,15

**hurdle** 85:24 87:11
  89:8 90:12,12
**hurdles** 24:1

**I**

**IAM** 10:16
**IBEW** 10:16
**idea** 32:13 48:8
  63:10,11
**identification** 13:20
**identified** 69:19
**identify** 52:3
**ignore** 34:17 102:16
**II** 14:25
**iii** 72:10
**IL** 8:6
**illusory** 36:4 52:11
  53:23,23
**imagine** 42:17
**imbalance** 77:25
**imbedded** 118:16
**immaterial** 98:19
**immediate** 95:17
**immediately** 93:22
**immersed** 24:13
**impediments** 124:8
**implement** 111:13
  111:20 113:3
**implemented** 30:19
  30:22
**implicated** 63:19
**implicates** 78:9
**implications** 36:7
**implicitly** 54:16
**import** 13:13
**importance** 16:5
  28:15 31:12 42:17
  104:3 120:7
**important** 15:18
  20:17 27:21,25
  30:8 34:1 35:17
  42:14 43:16 61:4
  66:4 84:23 93:24
  114:10 119:21
**importantly** 86:17
  91:11 118:24

**impose** 40:14
**imposes** 40:13 108:2
**impossible** 68:20
**impression** 92:13
**improper** 49:18
**improperly** 125:18
**improved** 124:6
**inability** 94:8
**inadequate** 37:14
**inappropriate** 36:9
**incentive** 118:18
**inclined** 43:14
**include** 41:4 109:13
  110:14 125:5
**included** 64:3
**includes** 41:3 93:13
**including** 25:7 49:6
  49:8 77:2 107:1
  110:5 122:3,6
**incorrect** 35:5 62:12
  99:11,11
**increase** 52:23
**incremental** 99:10
  99:12
**incumbent** 122:5,7
**incurred** 108:18
  110:16,18
**indentured** 72:20
**independent** 15:24
  114:2 116:13
**indicate** 26:1 103:2
  126:15
**indicated** 130:7
**individuals** 96:9
**industry** 19:9,11
  101:16
**information** 59:19
  61:13,18 91:14
  92:18 96:6,8,9,17
  96:24 98:16
**informed** 22:17 47:1
  59:17
**inherent** 60:1
**initial** 62:24
**initially** 111:4
**Innovation** 6:20,22

**inquiry** 76:14
**insider** 113:22
**insisted** 30:25 70:1
**insistence** 69:25
**insisting** 94:3
**instances** 71:14
**insufficient** 118:8
**integrated** 25:12
  66:22 115:16
  117:6 120:1 125:1
**intend** 37:12
**intends** 121:14
**intense** 15:14
**intentions** 66:14
**interest** 22:18 25:13
  29:13 33:20 73:24
  77:14,16,17 78:9
  81:18 88:2 97:22
  98:18 115:11
  120:19 122:12,22
**interested** 18:2
**interesting** 77:10,17
**interests** 125:15
**interrupt** 52:13
**introduced** 42:6
**invest** 31:19
**invested** 107:11
**investigate** 87:3
**investment** 36:23,23
  40:1 63:3 89:15
  103:19 110:4,14
  110:15,20,23
  111:2 117:9,20
**investor** 40:1 49:9
  49:10
**investors** 13:14,16
  15:16 25:2 27:1
  28:19 30:13 31:5,7
  33:22 34:20 36:18
  37:20 38:14,15,24
  38:25 39:5,10 41:6
  41:12,13,13,15
  43:5,25 44:15,21
  52:23 53:2 55:3,8
  55:9,22 60:16,17
  68:4,7,12,20 69:12

69:25 70:25 77:19
100:7 101:1,5
102:22 103:3
107:5,11 110:5,13
110:22 111:6
113:5 118:19
120:2,23 121:1,6
122:19
**investor's** 73:24
**invite** 69:15
**invites** 70:13
**inviting** 69:16
109:24
**involved** 15:15 48:5
63:12,12 113:4,5
123:16
**involvement** 25:24
**involving** 17:25
**ironclad** 58:11
**irrespective** 87:10
**issuance** 38:20,20
**issue** 28:5 31:21,21
50:21 61:8 65:9
72:7,14 74:10,21
75:16 79:19 80:22
81:21 94:20 95:3
96:19 97:9 98:9
104:7,25 108:20
112:8,10 126:4
**issues** 16:7,7 26:23
27:13 34:14 35:14
35:16 36:4 37:17
43:15,16 45:24
71:21 74:12 82:4
86:12,14 94:5
97:15,15 99:24
104:14 106:22
111:7 112:14,15
112:20 113:1,1,12
115:7 116:2
117:13 120:11
121:18 122:21
**issuing** 48:11
**item** 13:22 21:13
64:1,1
**itemization** 63:15

**items** 13:10 24:6
26:24 27:9
**iv** 72:11
**i.e** 53:13 81:19

_____

**J**

**J** 6:22 8:19
**Jack** 13:6 35:23
**JACOBSON** 9:1
**January** 1:18 25:21
97:16 98:19
126:24 130:10
**JEFFREY** 11:6,14
**jerk** 41:21 42:24
**job** 66:6,7
**John** 2:3,9,15,21 3:3
3:9,15,21 4:3,9,15
4:18,22 5:3,9,15
5:20 6:4,10,16 7:3
7:15,20 8:8,10
**joined** 69:4
**Jr** 2:3,9,15,21 3:3,9
3:15,21 4:3,9,15
4:22 5:3,9,15,20
6:4,10,16 7:3,15
7:20
**JT** 60:8,21
**judge** 1:23 82:1 84:4
89:7 90:14 115:15
115:20 124:18
125:1
**judgment** 22:19
24:21 25:14 31:25
61:24,24 62:1 71:3
71:4,5 100:22
113:20 114:5,10
114:11,13,14
115:14,17,22
116:1 117:2,5
120:3
**judgments** 23:21
31:23
**Judith** 7:9 9:20
**July** 15:21 16:16,16
**justification** 22:8,15
**justified** 124:24

**justify** 46:17

_____

**K**

**K** 8:10
**KASOWITZ** 11:9
**KAYALYN** 8:18
**Kaylayn** 13:7
**keep** 20:6 93:3 95:9
96:1,23 114:10
120:3
**keeper** 91:19
**keeping** 91:9 94:20
95:3,5
**keeps** 45:25
**KENNEDY** 127:3
**KESSLER** 11:7
**key** 48:1 82:15
92:17 93:6,19
111:7 114:3
115:24 117:10
127:6
**kind** 32:11 43:3 46:5
46:7 47:4 61:12
100:16
**kinds** 41:17 56:18
66:20
**knew** 48:3 60:10,13
68:25 69:1,1
**knock** 56:1
**knocking** 36:14,17
56:5
**know** 18:5 22:13
24:8 28:25 29:1
30:8 31:15 32:6,7
33:17 35:4 36:12
38:8 41:12 43:9
45:2,19 46:1,17,18
46:20,23 47:7,11
47:13,23,25 48:6
50:5,6,7 51:3 52:1
52:2 53:15 59:23
61:8 64:22 65:2,7
65:25 66:22 71:23
72:17 73:19,21
74:5 77:3,5,9,12
77:18 78:3 79:20

79:25 85:15 91:25
92:7,21,22 93:24
93:25 94:2,10
98:14 99:23 100:7
104:9,20,21,21,21
108:1 118:14
121:8
**knowing** 101:2
113:8,13 121:9
**known** 109:11
**knows** 22:4 47:22,24
**KRELLER** 10:12
**KURTZ** 11:23

_____

**L**

**L** 11:6
**labor** 17:3,9,11,25
19:24,25 21:20
24:10,14 31:20
32:11,12 33:24
53:25 101:15
102:24,25 104:11
104:17 112:13,25
120:13 121:17
122:21
**labor's** 122:22
**lack** 27:11 29:9 36:9
**laid** 35:1 119:25
**language** 50:9,11
51:22 80:15 84:3
**large** 21:1 78:20,24
96:22 111:22
112:7 119:3
**largely** 79:19
**largest** 19:5 30:3
97:21 112:17
**Lastly** 41:11
**late** 18:11 69:14
89:17 90:1 116:23
**LATHAM** 10:1
**Lauria** 11:24 79:23
82:6,9,12,16,19,23
83:7,11,22,25 84:2
84:6,16 108:7,7,9
108:14,20 109:14
109:20 128:18

**law** 28:12 49:6 117:3
**laws** 40:4
**lawyers** 47:8 100:24
**layer** 53:4
**layered** 109:7
**layers** 56:8,8
**laying** 124:11
**lays** 111:5
**lead** 15:23 16:6,11
  16:14,19 34:19
  50:4 53:10 67:9
**leadership** 16:13
**leading** 18:15 24:15
**leads** 19:15
**learned** 37:16
**leave** 44:15 46:19
  68:4,7 90:20 95:21
  127:20,20
**leaving** 70:11 80:11
**left** 36:3
**legal** 37:17 70:16
  74:12 93:1
**legally** 111:25
**legitimate** 42:25
  97:22
**legitimately** 117:14
  125:18
**Lenard** 9:19 85:6
**lender** 71:15 72:17
  72:19
**lenders** 72:20
**length** 15:14 115:15
**lengthy** 35:15
**Leonhard** 9:12
  33:11 70:19,21,21
  71:12,24 72:12,16
  73:5,8,12,17 74:9
  74:19,23 75:15
  76:15,19 77:7
  78:18,21 79:15
  81:3 83:24 109:17
**Lest** 25:17
**letting** 67:20 93:6
  122:14
**let's** 17:9 41:9 43:12
  59:23 71:11 91:7

**level** 36:2 44:23,24
  44:25 92:3
**leverage** 50:23 78:1
**liability** 28:23
**liberty** 114:25
**license** 26:22
**lift** 93:16
**lifting** 93:14
**light** 24:17 28:23
  115:19 116:17
  121:21 124:7
  126:16
**liked** 17:18
**likelihood** 82:3
**likes** 107:9
**limit** 38:10 55:18
  123:9
**limitation** 49:8
**limitations** 28:23
**limited** 7:6 42:8
  45:24 53:3,12
  57:16 71:18 81:19
  87:17 124:6
**line** 18:17 19:25
  25:7 50:19 82:10
  97:12 129:10
**lined** 13:12,19 129:6
**lines** 24:25 25:3
  100:9
**list** 60:24
**listen** 54:17 94:16
  94:17
**listening** 56:7
**literal** 50:10
**literally** 64:1 108:21
**litigating** 107:1
**litigation** 17:15 21:6
  74:13 126:14,14
**litigations** 126:20
**litigious** 35:15
**little** 24:8,9 36:19,20
  57:9 59:4,14 62:12
  64:23 88:22 90:13
**live** 82:10,20 84:18
**LLC** 6:21,22 11:18
**LLP** 8:3,13 9:1,14

**10**:1,8 11:1,9,16
  12:1
**location** 6:23
**lock** 31:4,6 52:23
**locked** 65:18
**lockup** 31:8 55:13
**logic** 113:8 115:3
**Lokey's** 56:6 64:1,4
**long** 27:2 72:8 76:19
  95:11
**longer** 13:15 99:1
**look** 16:24 17:4,22
  24:17 27:12 28:13
  46:22 60:15 68:9
  70:14 73:20 77:24
  80:4,6,11 89:1
  97:14
**looked** 63:10,19
  66:6,8 85:19
**looking** 25:25 43:18
  47:24 73:6,11
  76:25 87:23 91:6
  97:14 106:23
**looks** 22:22 25:18
  27:7,17
**looming** 91:24
**loose** 47:4,4
**lopsided** 73:23
**Los** 10:10
**lose** 93:8 119:8
**losing** 29:4
**loss** 48:12
**lot** 22:9 32:22 48:7
  59:1 67:22 77:9
  79:13 87:9 88:5
  92:13 93:23 94:18
  95:21 104:22,22
  104:22 106:6,6
  127:24
**low** 63:1
**lower** 28:6
**loyal** 78:6
**lunch** 127:22
**LYONS** 8:10
**L.P** 7:10

**M**

**M** 9:12,19 11:23
  89:1
**main** 112:7
**maintained** 96:7
**major** 17:20 18:20
  57:19
**making** 27:3 30:13
  30:14 44:21 52:20
  68:20 69:2 74:25
  79:11 83:17 93:13
  95:1 104:16 117:9
  118:23
**management** 7:10
  11:17 31:24 66:15
**MANGES** 11:1
**manifest** 83:14,15
**manner** 61:25
  102:12
**manufacturing** 19:6
  33:24
**MARAFIOTI** 8:18
**March** 32:22
**Marfioti** 13:7
**MARIANNE** 10:21
**MARK** 10:6
**marked** 13:23
  117:25
**market** 33:25 36:25
  37:4,4 45:5,12,13
  45:17 46:6 60:3,23
  61:15 62:19 67:23
  68:22 70:7 108:3
  111:19
**marketplace** 77:2
  96:25
**marry** 25:23
**massive** 36:18
**match** 21:8
**material** 32:2 86:21
  92:18 98:20
  100:23
**materially** 121:18
**matter** 1:6 16:3
  28:11 31:14 37:24
  38:12 42:18 45:19

68:17 104:16
113:7 114:4,4
117:20 119:24
122:23 126:12
128:10 130:7
**matters** 34:23 40:23
40:23 44:19 66:17
66:17 81:13 100:8
125:16
**MATZ** 8:19
**maximize** 21:10
28:1 29:14 69:8
90:25
**MCGLOY** 10:8
**MEAGHER** 8:3,13
**mean** 14:8 34:2
37:25 39:20,22
40:9,13 41:20
42:11 43:4 47:4,11
47:21 51:2 56:7
62:10,10 68:11,14
73:15,19 76:20
84:2,6 89:18 92:7
93:7,23 94:11
95:19,20,25 104:6
**meaning** 103:8
**meaningful** 34:12
36:25 52:21 53:1
66:1 69:11,11 70:7
100:23 101:5,14
**means** 18:1 42:4
51:11 107:14
122:5
**measure** 26:6 93:1
119:3,3,18 122:15
**measures** 28:4
**mechanical** 38:11
**mechanism** 42:24
74:4,16
**meeting** 16:21,23
63:25 93:19 97:16
121:20
**meetings** 16:19
20:13 25:21 45:7
93:20
**MEISLER** 8:11

**members** 121:12
**memorialized** 113:6
**mention** 108:21
**mentioned** 96:13,18
**mere** 115:25
**merit** 65:9 123:22
**merits** 115:5
**message** 56:21
**met** 50:12 81:7
**metaphor** 120:20
**MICHAEL** 11:7
**microphone** 57:4,7
**middle** 20:23
**MILBANK** 10:8
**milestones** 110:18
110:19
**Miller** 10:15 18:25
20:7,14 21:8,23
22:23 23:5 26:11
27:14 28:14,24
31:13 47:1 59:19
63:9 65:19 66:24
67:10 68:2,18,21
70:6 97:17 98:2,3
100:9,20 104:10
121:19
**Miller's** 19:9 93:10
113:24
**million** 36:24 47:2
60:3,19 61:19,20
61:21 63:11 66:7
74:22 79:17 80:11
85:24 86:13 87:1
87:11 88:6,24,25
89:3,8 90:12 126:3
**Milwaukee** 10:19
**mind** 20:7 58:1
67:22 80:16
114:10 117:10
**mindful** 23:9 24:19
78:19 99:4
**minds** 23:18
**minimal** 47:25
55:25 56:18,23,25
57:12
**minimally** 46:13

**minimum** 32:15
36:13 102:8
**minor** 81:16
**minute** 64:15 84:21
103:10 106:20
**minutes** 20:18 35:8
36:6 127:15,20
**mischief** 97:2
**misconduct** 123:15
123:17
**missed** 82:24
**modified** 4:18 111:3
116:22 130:7
**modify** 75:10,11,12
78:12
**moment** 82:15
**momentous** 111:17
**moms** 69:23 96:20
**Monday** 20:20
**monetarily** 52:24,24
**money** 43:25 48:5
95:21 113:9 119:4
119:11
**money's** 87:9
**monopoly** 33:25
**month** 101:19
103:22 121:21
**monthly** 25:24
**months** 15:14 18:14
77:6 88:14,20,22
104:19 107:2
110:19 112:22
113:3
**moot** 14:23
**morning** 13:6 25:8
33:5,7 70:19,20
90:16
**mother** 92:22
**motion** 6:1,1,13,13
6:20,20 7:6,6 13:4
15:4,21 16:1 30:18
44:12,13 56:4
63:16 71:7 75:4
85:13 90:19 91:2
105:3 110:1
111:24 113:16

114:12 116:22
125:11 127:9
129:11
**motions** 20:16,20
21:2 34:18 91:7
**Motors** 11:2 15:16
16:4,7,23 17:3,10
17:20,25 18:1,7,12
18:18 19:11,22
20:1,6,8 21:6,21
27:2 29:16,17,21
29:23 30:5,10,12
30:15 31:2,7,8,21
50:14 58:17,21,23
59:3 91:18 100:25
101:4,19 102:22
103:1 104:4,12
110:10 112:17
**Motor's** 98:24
**move** 20:12 21:24
25:15 28:16 29:11
30:2,17,20 62:25
66:2 92:10 100:19
100:22 101:9
104:4 105:7 122:2
122:4,6
**moved** 18:10 19:17
20:3,22 21:4
**moving** 29:10 99:22
112:9
**Mukasey** 115:15
125:1
**Mukasey's** 115:20
**multiple** 96:2
**mystery** 48:2,3,9,11

———————

**N**
**N** 8:2 13:1 129:2
130:2
**name** 30:6 85:6
130:14
**narrow** 117:19
**narrowed** 67:6,6,25
67:25
**narrowing** 67:1,2
**national** 120:13

**nature** 24:23 88:11
  112:6
**nay** 89:8
**NDA** 92:11,15 94:8
  97:9,12,13
**NDAs** 92:23
**near** 16:24 17:3 57:4
**necessarily** 37:3
**necessary** 40:3
  41:23 42:1 72:9
  101:21
**necessitates** 46:6
**need** 14:7 17:22,24
  24:11 25:14,15
  30:17 32:17 34:20
  35:15 37:3 46:22
  47:9 52:15 55:21
  55:24 57:14 76:22
  79:6 80:18 88:22
  90:4 91:22,25
  92:19 101:17
  102:1 105:7,12
  107:16 118:17
  119:7 122:2,4,20
  126:1 127:18
**needed** 27:4,6 98:7
**needs** 58:2 59:2 95:9
  96:14 99:17
  113:16
**negotiate** 40:9 94:8
  101:5 103:3
  107:21 113:12
**negotiated** 17:15
  25:9,11 120:22
**negotiating** 51:4
  66:21 68:1 92:25
  93:2
**negotiation** 91:24
**negotiations** 24:14
  24:15 52:9 93:6,7
  101:15 104:5
  113:13 121:17
  122:8,12,25
**neither** 70:25
**net** 18:2,5,7,19 80:9
  80:10 106:16

112:10 113:2
**Network** 114:17
**never** 47:1 59:24
  60:1,12 61:4 77:25
**new** 1:3,16,16 8:16
  9:3,4,4,10,10,18
  10:4 11:4,12,20
  12:4 20:8 86:24
  113:9 118:24
  119:4
**news** 31:17 66:5
  114:17
**nice** 23:13 105:17
**night** 102:10
**ninety** 127:15
**ninety-day** 44:9
**nodding** 92:23
**noises** 57:7
**non-disclosure**
  91:12 92:13
**non-public** 92:18
**normal** 115:10
**normally** 53:13
  71:17,21 81:2,14
  81:25
**North** 10:17
**Nos** 2:2,8
**note** 27:21 29:15
  81:22 116:18
  123:24
**noted** 37:18 112:18
  120:5
**notice** 2:1,1,7,7,13
  2:13,19,19 3:1,1,7
  3:7,13,13,19,19
  4:1,1,7,7,13,13,20
  4:20 5:1,1,7,7,13
  5:13,19,19 7:19
  22:6 73:13 95:18
**noticed** 76:2
**notwithstanding**
  49:14 115:20
**November** 48:3
  60:17 100:1
  119:21
**number** 18:5,7

40:21 85:15,17,20
  86:4,11 98:20
  127:17
**numbers** 63:19
**numerous** 71:14
  115:16
**NY** 8:16 9:18 10:4
  11:4,12,20 12:4

**O**

**O** 1:21 13:1 49:1
  130:2
**object** 14:3 81:18
**objected** 36:21
**objecting** 14:8 34:2
  34:15
**objection** 2:2,8,14
  2:20 3:2,8,14,20
  4:2,8,13,14,20,21
  5:1,2,7,8,13,14 6:8
  7:1,6,6,13 13:24
  35:1 71:1 90:19
  98:13 103:15
  105:10 123:20
  128:7
**objectionable** 22:25
  23:1 124:1
**objections** 6:10 7:3
  14:15 26:8 27:18
  115:24 116:17
**objective** 116:10
**objectors** 13:11,25
  21:18 22:20 33:9
  102:15 116:2,20
  118:3
**objects** 33:18
**obligated** 28:11
**obligation** 28:1,12
  28:12 41:20 42:3
  72:19,21
**obligations** 42:2,9
  49:5,12
**obligor** 106:16
**obstacles** 42:20
**obstruct** 54:9
**obtain** 28:8 111:10

114:25
**obtaining** 91:12
**obvious** 98:3
**obviously** 14:22
  48:20 67:23 78:19
  79:5 80:5,9 91:19
  94:5 103:14 115:1
  121:15 127:7
  128:10
**occur** 17:15 45:25
  52:6 110:17
  123:18
**occurred** 18:14,16
  25:20 116:8
**occurring** 45:21
**occurs** 116:6
**October** 30:9
**odd** 20:13
**offensive** 102:9
**offer** 99:7,7,15
  117:19 125:18
**offered** 92:15 109:9
**offering** 37:9,11,21
  37:22,23 38:13,16
  38:18,23 41:7
  57:10,14 68:5 69:8
  69:21,23 70:1 78:2
  79:1,3,12 86:18,20
  108:25 109:3,4,10
  110:25 111:1
**offerings** 60:22
**offers** 36:10 58:18
  78:14 103:8
**office** 33:11
**officer** 19:2
**officers** 15:25 16:15
**official** 15:25 26:19
  84:8 112:24 114:2
  115:24 116:4
  130:5
**oh** 77:18 82:7,11
  84:25 85:2
**okay** 13:2,21 14:14
  14:17 15:3 33:4,13
  35:9 40:22 46:5,7
  50:20 56:14 57:14

57:19,24 58:6
59:10,11 61:22,25
63:9 67:15 70:18
74:19 77:7 78:16
82:11,18 83:10,23
84:13,19 85:2,5,9
89:24 90:15 91:21
96:11 97:7 103:10
103:25 105:16
106:19 107:23
108:6,13,19
109:24,25 126:7
126:11 127:5,5
128:4,9
**omnibus** 5:19 6:8
7:1,12,13,19
127:15,25
**once** 22:14 38:22
**ones** 110:6
**one-way** 68:18
**ongoing** 78:22
**open** 43:6 68:10
70:13 91:3,9,16
117:13
**opening** 88:7
**openness** 77:22
**operate** 19:8 101:2
**operated** 59:20,21
**operates** 56:2
**operation** 59:18
61:25
**operations** 19:7
**operator** 82:12,19
**opinion** 60:19
**opportunity** 13:14
23:11,11 26:18
31:1 50:20 65:21
74:6,7 84:10 93:13
93:19 101:14
120:10,12,25
124:6
**opposed** 51:13 55:19
**opposing** 27:24
**opposition** 27:15
**option** 43:13 44:21
61:5 65:1,2,4,13

65:15 66:8 70:13
**optionality** 66:12
68:6
**options** 118:14
**oral** 15:4
**order** 3:23 4:5,11,17
6:1,13 7:7 15:6
17:11 18:6 28:8
33:9 39:15 48:24
50:16 53:13 74:5
74:18 75:11 81:24
84:4,24 85:16
101:13 103:14,20
103:24 105:9
108:16 123:14,15
125:24 126:1,7,17
126:19 127:2
**ordered** 78:6
**orderly** 114:22
**ordinary** 22:6
113:17 114:13
115:4,18
**organized** 32:12
**original** 68:12,13
**Orion** 22:11 23:16
114:5 115:19
**ought** 57:4 83:6
86:12 98:14
**outline** 26:20
**outrageous** 106:19
**outs** 118:13
**outside** 125:3
**outweigh** 122:17
**oven** 18:22
**overcome** 24:2
103:16
**overlooked** 84:22
**overreaching** 68:13
**oversupply** 31:18
**overwhelming** 24:18
24:23 27:9
**owed** 28:3 125:4
**O'Brien** 73:3
**o'clock** 126:13

──────────────
**P**

**P** 7:14 8:2,2 11:22
13:1
**package** 46:5,7,8,16
46:19 47:5 60:5
69:16
**page** 16:21 26:25
129:5,10
**pages** 13:12
**paid** 59:1 73:16 83:4
86:9 95:21 110:13
119:1 125:5,7,12
**paltry** 70:3
**paper** 30:5 32:21
50:18
**papers** 27:20 105:24
106:4
**par** 32:6 35:18
**paragraph** 49:1,2,3
50:15 125:25
**paragraphs** 49:1
**parameters** 89:2
**parcel** 45:4 57:23,23
**Parke** 12:1 90:17
**Parkins** 9:19 14:3
14:20 84:19 85:6,6
85:10 88:10 89:18
89:21,23 90:2
97:23 100:12
128:5,14
**part** 16:23 21:19
31:19 40:4 45:3,6
45:6 50:3 57:22,23
68:3 76:25 80:7
86:20 97:17
102:19,19 124:21
**participate** 114:24
**participated** 102:18
**particular** 16:23
18:23 22:25 48:2
71:19 76:8 91:6
95:7 96:19 104:6
111:2 120:10
125:4
**particularly** 25:23
28:22 80:16 94:6
105:8 111:16

115:19,23 116:3,7
118:3
**parties** 25:10 26:16
31:2 39:23 40:25
41:2 49:4,7,20,24
50:10,22 51:3
54:10 59:6,8 73:24
74:13,24 75:22,25
76:21,22 77:2
81:18 82:1 88:2
89:14 90:10,24
91:15,25 92:3,16
92:17 95:8 102:18
111:12 112:2,11
113:2,8 119:5
120:9,15,18 121:8
122:3,12,16
123:10,13,16
124:7 125:8
126:15,17,19
**partners** 99:18
**parts** 65:7,8 87:24
112:9
**party** 28:7 40:20
48:20 51:2 52:12
56:5 58:15 73:14
75:20 109:7,12
111:11 117:9
128:11
**passed** 99:21
**patent** 127:18
**path** 16:6 17:2,7,19
17:23,23,23 19:14
19:15,15 31:10
77:3 104:12,13
113:13 120:8
125:11 126:22
**paths** 16:25 17:1,2,4
17:6 26:2
**pathway** 46:12
**pattern** 35:13,14
108:25
**pay** 6:21 50:6 70:4
71:4,14 73:14
94:18
**payable** 73:19

paying 65:4
payment 65:15 73:2
  74:25 117:8
pending 90:19
pension 32:14
  112:13
people 30:10 31:8
  34:11 36:16 37:12
  40:15 42:10,22
  45:22 46:11,11
  48:7 51:15 55:16
  55:23,25 63:7
  65:17 66:1,20
  69:16 70:13,14
  71:8 73:15 74:12
  78:23 88:19 91:4
  96:8,21,25 100:5
  102:19 103:1
  104:14,16,22
  108:4 127:18,20
percent 82:16,22,24
  82:25 99:21,22,22
  119:1
perfect 79:10
perform 22:1 23:25
  114:20
performance 49:4
  55:17
performing 49:11
period 7:8 36:11
  58:3 65:13,15,19
  83:20 101:22
  105:11,12 106:1
  126:21
periods 6:2,14 20:9
permission 13:18
permit 23:24 91:13
permitted 31:6
person 56:9 77:15
  77:15 99:19
  107:17
perspective 20:1
  21:10 26:21 50:14
  99:17
persuade 49:19
pertaining 113:1

115:5
petition 72:20
phone 79:23 84:18
pick 88:9 127:21
picked 57:5 88:10
picture 28:13
Pictures 22:11 114:5
pie 18:21
piece 30:5 50:18
  56:2 104:6
pieces 31:17 32:21
place 15:1 36:25
  38:20 43:22 68:22
  70:12 71:20 86:25
  90:23 96:1 101:10
  120:18 121:20
plan 6:4,16 7:9
  13:14 15:10,15
  17:14 21:17 25:2
  27:1 28:19 30:13
  31:5,7 32:22 33:22
  34:19,22 36:18
  37:10,23 38:24,25
  39:5,10 40:8,9,9,9
  40:11,12,18 41:6
  41:12,12,14,15
  43:5 44:4 49:3,9,9
  50:8,21,22 51:4
  52:22 55:3,8,21
  60:16,16,20,21
  62:6,8 63:19,20
  68:3,6,20 69:25
  75:1,16,17,18,21
  75:23,24,25 76:17
  86:9,20,20 96:24
  100:7 101:1,5
  102:21 103:3
  109:18 110:8
  111:5,8,10,11,12
  113:4,5 121:16
  124:2,8,16,17
planet 19:7 30:4
play 86:13 87:14,16
  87:19 88:7,22 92:3
playing 92:3 95:13
Plaza 9:3 12:3

Please 13:2
pleased 112:4
plural 41:2
plus 32:6 35:18
PM 128:19
Pnina 7:25 130:13
point 15:19 18:13
  23:23 24:11 25:13
  26:14 32:3 34:3
  39:6 41:9,13,21
  44:6,20 47:18,22
  47:24 48:17 55:13
  55:13 57:9,16 64:3
  66:4 72:8 74:2
  79:17 83:13 85:4
  91:22 95:3,5 96:11
  102:6 105:6,8
  106:14 107:8,9,18
  108:10 112:5
  119:15 125:20
  127:8,24
pointed 80:10
  116:20 123:24
pointing 119:20
points 40:20 61:4
  64:1,5 68:10 70:22
  70:25 85:10 97:8
  109:23
pops 69:24 96:20
posed 90:21
position 45:18 46:9
  61:10 65:12 66:2
  67:12 68:1 74:15
  90:19 91:1 107:4
positions 27:20
  68:12,13
possibility 101:6
possible 17:5 54:25
  61:18
possibly 24:12 87:20
posture 48:11
potential 15:15 29:4
  29:8 58:25 94:24
  96:14,15,15 97:2
  97:22 112:9,15
  113:4 119:20

124:7
potentially 96:25
  117:12
pounding 36:14
power 51:18 55:19
  73:23 77:25 95:4
powerful 45:15
practical 20:4 37:24
practice 99:19 117:4
practices 86:16
pre 72:19
precedent 22:12
  23:19 66:19
precisely 34:16
preclude 54:12
precluding 45:17,21
  56:5
preeminent 86:7
preference 17:7
  57:25 65:19
preferred 60:2,9
  62:5 108:23 109:1
  109:6,8 110:24
prefers 60:11
prejudice 88:15,17
  128:11
premature 85:14,14
  85:18 98:8
premised 76:17
premium 60:13
  106:24
prepared 14:13
  17:12 18:6 99:2
  119:12 125:25
preponderance
  24:20
preponderant 119:3
prescreening 47:13
presentation 16:22
presentations 25:19
presented 21:12
  26:2,12,22 103:9
presenting 26:8
presents 59:5 74:20
  81:21
preserved 49:16

**presided** 30:9
**pressure** 41:17
**pressured** 122:18
**presumption** 22:15
**pretty** 81:16 93:10
    97:2 98:19 103:16
**prevails** 24:22
**PREVIANT** 10:15
**pre-May** 108:17
**pre-petition** 72:22
**pre-qualify** 47:14
**price** 62:25 88:7,24
    88:25 109:9
**primary** 110:5
**principals** 100:15
**print** 61:18,20 66:9
**printed** 130:14
**prior** 24:12 44:5
**priority** 6:21 28:7
    32:5
**privilege** 23:7
**privy** 92:18
**pro** 39:23 65:15
**probably** 48:7 79:13
    79:25 80:16 82:24
    83:2 88:4 99:23
    120:20 126:21
**problem** 19:10
    44:25 51:24 54:14
    58:16 74:15
    107:15
**problems** 63:16 83:1
**procedure** 3:23 4:5
    4:11,17 36:9 47:9
    47:21
**procedures** 47:13
    83:6 90:23
**proceed** 19:13 56:12
    59:14 70:7 107:18
    125:11,16
**proceeded** 18:17
    107:20
**proceeding** 13:9
    22:14
**proceedings** 128:19
    130:6

**process** 15:14,18
    16:11 17:14,16
    18:14,16 20:14,17
    20:21,22 21:5
    25:17,22 26:3,15
    26:16 27:6,14
    29:11,12 30:7,12
    30:15 39:2 45:24
    46:11,22 47:5 50:3
    51:16 53:8,23
    54:18 55:21 56:11
    56:16 57:16,19
    67:1,9 69:7,10,15
    70:7,12,13 71:20
    77:1 78:24 79:6
    83:21 86:13 90:22
    91:3,8,16,19 92:1
    93:4,6 94:7,13
    95:6,10 96:6,24,25
    100:17,17,20
    102:16,17,18,20
    102:20 103:4,5
    106:21 107:16,18
    108:2 112:19,24
    113:4 114:22,23
    118:5,5,9 122:14
    122:19
**processes** 19:12
**product** 15:13
**professional** 61:24
    61:24 62:1 80:17
    110:14 111:20
    117:8
**professionals** 66:5
    80:14 93:22
    102:10
**profitable** 70:4
**progeny** 23:17
**progress** 104:14
**promises** 32:18
**prompted** 121:23
**promptly** 122:21
    127:2
**Proof** 2:14,20 3:2,8
    3:14,20 4:2,8,14
    4:21 5:2,8,14

**Proofs** 2:2,8
**proper** 40:3,25 83:6
    93:3 117:1,4
**properly** 23:17
    36:21 46:14
    115:12,12,21
    121:13 124:11
    125:14
**property** 22:5
**proposal** 22:15 69:5
    81:11 85:18,19
    86:5,19 87:20 93:5
    98:17 118:18
    119:12,15,16
    121:23 126:23
**proposals** 122:10
**proposed** 7:19 22:8
    23:19 50:16 62:8
    69:8 86:2,9 110:15
    115:22 116:8
    118:13,22,25
    123:21 126:17
**proposition** 20:11
    24:8 27:10 28:6
    93:16
**prosecute** 52:3
**prosecuted** 103:15
**prospect** 32:12
    65:25
**prospective** 122:14
**protect** 37:14 41:18
    41:18,23 50:9 51:2
    53:19 56:9 77:14
**protected** 53:6
**protecting** 51:6
**protection** 58:11,15
**provide** 71:16 96:9
    102:23 108:16
**provided** 13:11
    38:21,22 58:24
    59:24 73:15 83:12
    110:12 123:5
**providing** 73:14
    96:6 114:22 126:4
**provision** 14:22
    22:25 39:24 41:20

42:5,8,11 55:14
    75:7 80:5 81:23
    94:3 105:9
**provisions** 23:1 38:9
    39:24 59:15,16,25
    60:9 64:18 78:2
**prudence** 23:18
**prudent** 29:23
**PSA** 13:5,15 22:3
    23:25 28:20 30:6
    30:25 37:21 40:7
    49:11 76:17 79:2
    99:1 110:9 113:6
    124:2
**public** 35:19 37:14
    38:23 39:1 60:11
    69:9,21 77:1,13,14
    77:17,22 78:9
    79:13 98:22 99:15
    102:24
**publicly** 57:24
**purchase** 15:9 39:1
    110:3
**purchasing** 117:10
**pure** 77:16
**purpose** 42:12
**purposes** 43:24
    115:21 117:7
**pursuant** 7:13 111:6
**pursue** 26:3
**pursuing** 16:25
    119:12 124:5
**pursuit** 123:23
**pushback** 68:6
**put** 25:4 33:2,19
    41:14,15 42:20
    43:12,22 45:4 46:9
    57:6 58:7 61:23
    67:12 74:17 82:13
    82:20 84:3 85:24
    88:6,24 90:12,23
    99:2 122:19
**puts** 51:14 106:23
**putting** 26:7 118:24
    122:25
**puzzle** 104:6

## Q

**quadrennial** 24:14
    101:15
**qualified** 47:10 58:6
    91:9 94:24 102:21
**qualifying** 83:25
    91:8
**quarter** 24:12 85:17
**question** 23:3,4
    25:11,17 28:21,22
    34:5 48:19 49:17
    66:13 84:1 87:5
    89:7
**questioned** 109:8
**questions** 27:19
    30:11 90:20
**quibble** 24:7
**quibbling** 24:11
**quickly** 89:10 92:10
    93:25 105:7 113:3
    122:2,5,6 125:20
**quid** 65:15
**quite** 84:22,22 115:9
    121:20,24
**quo** 65:15

## R

**R** 1:21 7:14 8:2
    10:12 11:14 13:1
    130:2
**raise** 30:10 48:17
**raised** 34:5 39:22
    72:7 85:11 96:12
    109:23 116:2,17
**raises** 82:3
**range** 52:19
**rationale** 44:16
    70:11
**RDD** 2:5,11,17,23
    3:5,11,17,23 4:5
    4:11,17,24 5:5,11
    5:17,22 6:6,9,18
    7:3,17,22
**reach** 17:24 31:20
**reaching** 16:14 17:3
**reacted** 30:15

**read** 43:2 45:16 49:2
    49:17 51:6 58:1
    117:25
**ready** 90:9 119:6
**real** 27:10 30:15
    37:4 44:16 45:16
    77:24 80:22 91:16
    91:22 93:13
    100:19 105:19
    108:3 112:18
    119:4 121:8
    122:24
**reality** 28:4 104:24
**realize** 63:18 66:11
**really** 16:9,12 17:22
    20:17 28:21 44:3
    44:14 45:5 47:21
    48:9 54:23 63:7
    67:2 69:24 74:14
    76:22 77:16 78:3
    80:7,8,14,19 81:14
    82:1 83:14 85:13
    96:12
**reason** 38:1,2 42:15
    43:12 53:19,20
    54:1,1 72:17 73:21
    85:14 104:2
    117:11
**reasonable** 23:18
    25:14 40:2,14,17
    41:19 73:2 74:1
    76:11 83:4 96:23
**reasonableness**
    71:19 81:1
**reasonably** 40:3
**reasons** 54:4 98:3
**receive** 32:6 59:19
    66:15 125:9,10
**received** 13:19
**receiving** 32:5 35:18
    60:5
**reception** 55:25
**receptive** 93:21
**recitations** 23:7
**recognition** 78:8
**recognize** 35:17

79:5
**recognizing** 114:22
**recollection** 99:24
**recommend** 84:8
**reconfirmed** 24:6
**record** 13:17 14:10
    18:13 19:18 21:16
    21:19 24:3 26:14
    27:21 57:24 97:24
    98:4,16 99:5 102:1
    105:22 108:12
    117:17 120:8
    123:7,8 125:6
    126:3 128:13
**recording** 130:6
**record's** 14:17
**recoveries** 18:8,19
    86:4 120:15
**recovery** 18:2,5
    41:16 86:1 101:22
    112:11,11 113:2
**reduced** 24:9
**redundant** 85:8
**Refco** 81:6,17 83:18
    116:21 118:12
**refer** 36:22 62:12
    110:4,6
**referred** 15:8 70:9
**refinancing** 73:11
    73:14,16
**reflect** 24:25,25
**reflected** 26:16
**reflects** 85:21
**refund** 14:22
**regarding** 24:7 71:2
**regardless** 37:8
    38:20
**registration** 37:10
    38:25 39:9,11,14
    39:19,21 40:10,12
    42:13,20 86:18,19
**reimbursement**
    76:8,10,13
**reimbursements**
    44:2 116:20
**rein** 96:23

**reiterated** 71:3
**reiterating** 94:1
**reject** 107:16
**rejigger** 32:7
**relate** 48:1 81:14
    115:7
**related** 7:9 17:3
    57:13,13 81:20
    110:2 112:14,25
    126:12
**relates** 28:21
**relations** 32:11
**relationship** 29:19
**relatively** 113:14,16
    118:23
**release** 17:12
**relief** 27:24 48:23
    111:15
**remain** 35:16 36:25
**remained** 35:2
**remaining** 13:11
    113:12 117:13
    123:20
**remains** 35:21 36:11
**remedy** 49:7
**remember** 99:20
**Remembering** 19:9
**remembers** 75:2
**reorganization** 6:3
    6:15 7:9 21:25
    25:16 31:18 60:22
**replete** 23:2
**reply** 7:12 14:16
**represent** 43:20
    121:16
**representation** 14:5
**representations**
    45:5
**representatives**
    15:16
**representing** 32:20
**represents** 25:10
**request** 75:10 84:23
    103:11
**requested** 27:24
**requests** 115:3

require 17:9 75:12
required 18:24 72:4
  108:5 111:20
requirement 71:6
  83:16 103:18,19
  103:23
requirements 80:23
  81:8 83:3 93:1
resale 39:13,15
Resnick 34:9 59:23
  59:24 60:7,7,18
  61:15 65:13 66:3
  67:5 68:21 81:12
Resnick's 95:19
resolution 16:6 17:4
  17:16 68:10
  106:22 112:13,14
  117:13 121:18
resolve 71:21 111:7
  112:19,25 113:1
  120:11 122:21
resolved 19:24
  124:13
resources 29:5
  66:23 79:6 115:16
  117:6 120:1 125:1
respect 2:2,8,14,20
  3:2,8,14,20 4:2,8
  4:14,21 5:2,8,14
  15:4 22:13 49:15
  53:23 75:16 80:14
  85:10 86:11,18
  87:11 101:7,25
  105:25 108:17
  126:3
respectfully 21:15
respects 22:21 90:5
  111:15 123:22
respond 50:15 108:9
  114:25
responded 85:20
response 7:12 26:24
  55:20 71:1 97:5
Responses 6:6,18,24
responsibilities 28:5
  28:18 29:14 30:24

101:8
responsibility 66:18
responsible 29:23
  31:11 102:11
responsibly 107:20
  116:14
responsiveness
  116:15
rest 38:23
restricting 51:11,13
restriction 51:15
  52:25 56:4 93:14
restricts 53:12 118:9
result 16:11 53:3
  125:8
resulted 26:23
retained 102:10
  119:10
retaining 114:24
retiree 112:13
retract 117:15
return 36:22,23 51:9
  86:6 110:23 115:1
review 34:20 69:19
  74:7 80:18 97:18
  114:4 116:1,11
  124:3 126:2,25
reviewed 76:11 81:1
  116:16 125:24
reviewing 119:24
revised 82:5 123:6
revisited 98:9
right 13:16 15:1,3
  36:5 39:17 47:13
  47:17 50:12,24
  51:1 53:15,17,18
  54:11,11 55:16
  56:25 58:25 59:4
  59:10 61:6 64:23
  72:15 73:25 75:14
  77:8 79:10 82:14
  82:21 83:7,23
  84:19 88:18 89:14
  89:22 92:7 93:15
  94:20 95:9,25 96:4
  103:21 104:8

105:5,21,23 108:6
  109:15,24 117:15
  119:9 121:25
  127:5,5,10 128:15
rightly 121:20,25
rights 37:9,11,21,22
  37:23 38:12,16,17
  38:23 40:7,8,10,12
  41:7 42:13,15,20
  49:15 53:12 55:19
  57:10,14 60:22
  68:5 69:8,11,21,23
  69:24 70:1 78:2
  79:1,3,11 86:18,20
  108:25 109:3,3,10
  110:24 111:1
  112:16
Ripple 67:5 88:14
rise 49:7 51:5
risk 27:10 28:5,6,7
  32:2 33:3 44:10
  86:21 87:25 89:6,7
  90:7,11 119:4,8,13
  125:10
risks 32:15,17
  122:16
risky 93:16
River 10:17
road 74:12 124:9
ROBBINS 10:21
ROBERT 1:22
rock 21:23,23 25:14
  28:15 90:17
Rockefeller 12:3
RON 8:11
room 18:12 22:5
  26:10,11 35:9 91:9
  91:14 92:11 94:19
  94:21 95:19 96:1,2
  100:24
rooms 96:7,7
roomy 121:2
Rothschild 47:20
  60:8 85:25 86:15
  91:8
round 99:9

route 42:22 44:11
routinely 72:25
rule 71:4,5 115:22
  125:20,25
ruled 85:3
Rules 47:12
ruling 109:16,17,18
  126:16
RULINGS 129:9
run 34:6 85:23
running 63:6 65:20
  65:21
runs 99:19

_____

S

s 7:7 8:2 13:1 129:4
sale 33:21 34:19
  56:9 62:13 118:9
salient 71:1
sands 79:8
sat 63:9,22,22 65:19
satisfactory 47:14
satisfy 46:9
Saturday 20:20
save 27:23
saw 47:2
saying 25:14 36:12
  37:3 41:2 50:18
  56:7 62:23 64:24
  65:1,6 68:24 82:15
  87:14 93:9 94:14
  94:25,25 102:19
  106:7,23 119:24
  121:24 128:11
says 32:20 37:22,25
  40:1 47:14 49:3,14
  49:20 50:11 58:19
  66:23 75:20 76:7
  81:23
scenarios 72:24
scheduled 126:13
Scheler 57:3,3,8,13
  57:18 59:11,13
  100:4,15
Scheler's 99:4
score 81:22

| | | | |
|---|---|---|---|
| **screened** 46:15 | **self** 115:11 | **shareholder** 81:7 | **Signature** 130:11 |
| **screening** 47:9 | **selling** 47:12 | 90:18,25 97:21 | **signed** 27:1 30:10,12 |
| **SDNY** 115:16 | **sending** 48:12 | **shareholders** 35:19 | 88:19 92:16 |
| 124:19 | **senior** 16:14 | 37:14 38:23 39:1 | **significant** 29:5,16 |
| **searching** 29:25 | **sense** 43:19 54:8 | 45:1 69:9,9,22 | 29:17 35:20 36:4 |
| **season** 88:5 | 67:18,20 74:24,25 | 70:2 78:3,4,5,20 | 90:18,24 112:1 |
| **seated** 13:2 | 78:9 79:8 92:17 | 78:24 79:14 86:4 | **significantly** 119:16 |
| **SEC** 37:25 42:16,18 | 94:1 103:8 | 96:20 106:17 | **similar** 81:6 110:16 |
| 42:20 | **sensitive** 88:11 89:9 | 109:3,5,6,10 | **similarly** 100:25 |
| **second** 33:12 36:8 | 89:10 91:23 94:5 | 110:25 118:20 | **simple** 112:6,7 |
| 52:14 75:15 85:17 | 96:19 | 121:11 125:9 | **simply** 49:19 50:16 |
| 97:21 103:21 | **sensitively** 93:8 | **shares** 38:20,21,22 | 71:2 99:12 101:25 |
| 108:20 114:5,16 | **sent** 56:21 60:16,16 | 70:3 78:5 | 102:7,14 113:7 |
| 114:18 115:2 | 118:1 | **sharing** 96:24 | 119:24 123:22 |
| 126:18 | **separate** 39:10 | **Sheehan** 28:14 | **single** 27:23 30:3 |
| **secondary** 117:19 | 45:18 61:16,17 | 31:13 43:18,19 | **sit** 27:22 78:16 88:1 |
| **secondly** 41:1 52:3,3 | 66:9 72:7 116:16 | 59:18 60:14 66:11 | **sitting** 41:24 44:13 |
| 53:22 110:8,17 | **separately** 55:9 | 68:2 70:5 100:20 | 69:17 100:24 |
| **seconds** 108:21 | 124:24 | 104:10 | **situated** 100:25 |
| **section** 6:2,14 7:13 | **series** 19:16 26:23 | **Sheehan's** 113:24 | **situation** 46:25 54:8 |
| 19:19 49:10 71:2 | **serious** 53:1 55:23 | **sheet** 76:20 | 62:19 63:6 68:4,19 |
| 110:20 113:18 | 69:18 80:22 83:1 | **shifting** 79:8 | 72:18 107:17,21 |
| 114:8 | 105:25 106:7,9 | **shop** 65:21 | **situations** 43:4 |
| **sections** 19:19 22:3 | 107:17 | **shopping** 118:6 | 116:6 |
| **security** 39:16 | **served** 18:21 19:1 | **short** 87:21 95:18 | **six** 16:25 26:1 69:18 |
| **see** 38:1,2 39:20 | **set** 15:21 16:11 | 105:11 112:25 | 88:21 99:2 100:3 |
| 40:13 42:25 43:15 | 18:11 25:12 28:23 | **shorthand** 117:23 | 100:19 102:23 |
| 44:10 45:9 49:18 | 34:22 110:20 | **shot** 53:3 | **sixteen** 88:3 |
| 55:4,24 73:25,25 | 111:13 115:15 | **show** 13:24 25:1 | **sixty** 34:10,11 44:8 |
| 74:17 76:11 79:22 | 120:23 124:2,18 | 47:14,20 59:9 72:8 | 58:3,16 78:12 |
| 82:5 85:23 86:13 | **settings** 56:17 | 120:7 | 99:21 |
| 90:10 92:7 120:19 | **settled** 13:25 | **showed** 59:20 60:10 | **sixty-day** 65:14 |
| 122:5,23 123:1 | **settlement** 40:8 51:5 | 60:11 77:20 | **SKADDEN** 8:3,13 |
| 125:20 | **settling** 25:5 | **showing** 74:12 | **SLATE** 8:3,13 |
| **seeing** 33:20,21 | **seven** 99:2 102:23 | **shown** 41:5,5 77:1 | **slightly** 56:13 |
| 37:19 80:25 | **seventeen** 29:1 | 85:25 | **small** 66:9 68:20 |
| **seek** 15:6 34:18 | **seventy** 82:23 | **shows** 68:11 | 78:3,5 96:21 |
| 40:11 42:4 78:13 | **seventy-five** 82:16 | **SHRIVER** 9:1 | 118:22 |
| 111:16 | 82:22 | **shut** 88:6 | **smallest** 61:18 |
| **seeking** 21:14 71:9 | **seventy-six** 60:3,19 | **shuts** 19:11 | **sold** 60:12,13 |
| 75:5 81:9 111:16 | 61:20,20 | **shutting** 125:18 | **sole** 39:25 |
| **seen** 61:16 101:11 | **shack** 121:4 | **side** 17:21 73:24 | **Solicit** 6:3,15 7:8 |
| **segued** 77:8 | **shape** 58:1 66:13 | **SIEFE** 95:11,15,17 | **solution** 30:1 35:14 |
| **Seife** 12:6 90:16,16 | **share** 69:9 98:25 | **sight** 19:25 | **somebody** 54:24 |
| 91:22 92:9 94:4,10 | 99:6 109:4 | **sign** 30:6 32:20 | 88:16 |
| 94:20 97:4 | **shared** 96:17 99:10 | 50:18 55:15 97:1 | **soon** 84:10 |

**sophisticated** 47:7
**sorry** 39:4 53:9
  76:12 89:13
  114:18
**sort** 14:9 20:12
  28:25 32:8 33:1
  40:15 42:9 50:20
  52:23 73:23 94:1
  114:13 123:15
**sorting** 17:10
**sought** 16:3 48:23
**sound** 22:7 51:24
  130:6
**source** 97:22
**sources** 31:16 96:14
  96:15 112:21
**South** 10:9
**Southern** 1:3 47:12
**speak** 108:5
**speaking** 78:1
  118:23
**specific** 22:20 27:19
  70:24,24 72:6 91:2
  98:6
**specifically** 15:9
  38:6 90:22 110:10
  113:23 123:20
**specifies** 75:18
**spend** 103:10
**spending** 77:5
**spent** 79:13 94:19
  119:11
**spoken** 108:4
**Square** 8:15
**stage** 34:22
**staged** 110:17
**stake** 33:19 59:6
**stakeholder** 99:13
**stakeholders** 16:22
  17:18,20 18:20
  19:14 21:11 24:2
  25:7 27:5 28:2
  29:13 30:1,23 32:4
  33:25 86:8 99:9
  103:4 104:20
**stalking** 45:13,16

62:12 72:25
  118:13,16,22,25
**stand** 21:24 25:15
  27:20 28:15 32:19
  67:11 107:12
**standalone** 119:25
  124:23
**standard** 21:14
  23:22 24:18 71:18
  113:15 115:18
**standardized** 91:14
**standpoint** 18:1
  77:13
**stands** 112:4
**start** 33:16 62:15,17
  70:24 77:12
  127:15
**started** 81:12 88:12
  94:7,12
**starting** 32:23
**state** 122:15 125:13
**stated** 14:10 86:6
  92:15 114:18
  119:6 123:4
**statement** 26:24
  32:22 34:21 35:10
  37:10 39:1,11,14
  39:19,21 41:14
  49:13,13 98:10
**statements** 14:8
  26:25 37:12 39:9
  48:12 74:13 98:22
  126:4
**states** 1:2,14 9:8
  70:21 78:7,10
  114:8
**stating** 114:10
**status** 13:24
**statutory** 15:17
  25:24 26:2,18
  103:13 105:10
**stay** 84:24 103:13
**STEIFE** 94:23
**Steingart** 9:6 33:5,6
  33:8,14,16 38:5,8
  38:14,19 39:5,7,10

39:17 40:19,23
  41:4,11,22 42:3
  43:1,13 44:7,18
  45:3,10,20 47:6,17
  48:10,15,18,22
  51:11,19 52:1,11
  52:16 53:8,10,17
  54:3,7,14,18 55:3
  55:6,10,20 56:10
  56:15,21,25 57:17
  59:14 62:3,8,16,22
  63:4,17,22 64:2,4
  64:8,10,14,17,21
  65:4,11 67:15,19
  67:21,24 68:16
  76:14 80:9 84:21
  85:2,5 100:14
  105:15,17,20,22
  105:23 106:3,9,12
  106:15 107:3
  108:1
**Steingart's** 101:25
**step** 20:15 119:9
**steps** 18:16 91:2
**Stevens** 116:21
  118:15,21
**Stiengart** 100:18
**STN** 15:21 16:1
**stock** 38:12,15,16
  41:6 60:9,25 62:5
  63:20 68:5 96:21
  99:23 108:23
  109:9
**stocking** 43:23 67:9
  69:6
**stone** 75:19
**stonewalling** 93:18
**stop** 44:5
**straightened** 86:14
**strange** 57:7
**streamline** 83:14
**street** 9:9,16 10:9
  68:18
**strides** 87:23 88:5
**strikes** 74:11 79:12
  81:1 93:2

**strips** 99:15
**strongly** 82:4
**struck** 99:25
**structure** 34:22
  37:20 60:7 72:2
  76:17 109:1 118:6
  118:17 120:19
  122:25
**structured** 65:23
  79:1 80:13 120:2
**subject** 28:20 29:4
  42:1 80:23 89:6
  90:7 104:13
  106:17
**submit** 14:7 126:7
  126:19 127:1,2
**submitted** 48:24
  126:1
**subscribed** 111:1
**subscription** 38:15
  38:19,24
**subsequently** 50:1
**substance** 68:17
**substantial** 72:14
  73:7 75:6 82:3
  83:18 106:1
  110:23 113:9
**substantially** 83:5
**sub-rosa** 124:16
**succeed** 69:4
**successful** 33:24
  37:8 58:23 117:12
**Sufficiency** 2:1,7,13
  2:19 3:1,7,13,19
  4:1,7
**sufficient** 44:24
  90:13
**sufficiently** 120:2
**suggest** 87:16 88:5
  88:21 89:11
**suggesting** 85:22
  92:1
**suggestion** 86:23
**suggests** 87:15,16
**Suite** 9:17 10:18
**suits** 40:25

**summarize** 27:19
119:24
**summarized** 16:18
**summary** 22:13
36:20
**summer** 101:15
**superior** 28:19
30:21 100:6 103:8
**supervision** 122:15
**supplemental** 35:1
**supplier** 30:3
**supply** 19:8 20:10
**support** 7:12 15:10
20:6 22:20 44:4
49:4 57:21,21
102:4,5 110:8,9
111:5,12
**supported** 50:18
113:19 114:16
128:13
**supportive** 99:1
**suppose** 73:19
**supposed** 50:22
127:15
**sure** 19:5 26:11 27:3
30:13,14 31:10
43:7 48:24 67:13
75:5 76:21 89:25
94:16 103:12
106:24 108:24
109:11 125:19
**surprise** 100:14
**suspend** 126:20
127:12
**suspended** 17:15
**sustained** 66:22
**swamp** 52:19
**swords** 34:5
**sympathetic** 94:14
96:16
**synthesis** 59:25
**S.C** 10:15

**T**

**T** 129:4 130:2,2
**table** 37:5 44:10,12

44:15,19 46:8
85:22 87:7 89:4
109:1 119:13
**tactic** 42:25
**tactics** 34:15
**tag** 88:7,24,25
**taint** 113:22
**take** 28:8 37:3 38:1
38:20 40:2 42:22
46:19 53:8 68:4,7
68:22 78:24 89:16
90:3,4 91:3 100:13
100:13 106:17
114:12 118:4
119:8,13 122:12
127:16 128:2
**taken** 18:16 28:2
30:22 38:24 86:25
120:12
**talk** 15:18 26:1 31:8
34:12 36:14 37:15
39:25 43:17 48:20
48:21 49:20 50:5,7
50:11 51:9 53:16
53:22 54:17,21,23
54:25 55:23 56:12
58:6 63:7 68:10
69:14 70:16 84:10
87:3 88:1 90:8
92:19 96:14
106:18 107:5,7
123:10
**talked** 21:23 22:23
27:13 35:21 67:4
108:10
**talking** 31:6 32:3,5
34:24,25 45:25
51:14,14 53:14
54:13 55:17 56:23
57:15 64:16,17
65:10 67:8 80:20
107:15 115:2
**talks** 19:18 87:2
107:18
**tandem** 59:20
**TANENBAUM** 11:6

**team** 31:24
**Telephonically**
11:24
**tell** 16:25 18:7 35:11
60:2,14,14,24 61:2
80:4 81:5 102:9
**telling** 82:2 106:17
**tells** 99:6
**temerity** 36:22
**ten** 30:11 69:22 70:2
84:24 88:4 103:11
105:10 108:22
109:2
**tendency** 34:4
**tension** 58:20
**Tepper** 48:4 100:1
**term** 17:3 76:20
94:13,15 112:25
117:23 120:21
124:11
**terminate** 13:14,15
15:1 29:1 89:14
**terminated** 128:12
**termination** 13:16
**terminology** 47:4
**terms** 17:21 47:14
51:14 60:6 75:18
75:23,24 76:4,16
76:17 78:1 94:8
111:13,19,25
112:15 119:15
126:2
**terribly** 70:8
**terrorist** 34:15
**test** 36:25 37:4,5
45:5,12,13,18 46:6
62:24 67:23 68:22
70:7 108:3
**testified** 19:3 20:7
20:14 21:18 23:5
26:11 27:14 28:14
43:19,24 59:19
61:15,22 63:17,24
66:11 68:2,19,21
70:5 97:17 98:3
100:9,21 104:11

117:24 121:19
**testify** 63:18 67:20
**testimony** 18:25
19:18 21:19,23
22:24 24:5 29:2
31:13 34:9 43:23
63:5,5 89:17 91:11
92:14,20,21 93:10
94:6,12 95:19
97:25 99:14,16
104:2 113:24,24
119:19
**testing** 62:19
**Text** 4:18
**thank** 14:2,20 15:5
33:3,4 59:13 70:17
70:18 78:15 79:15
83:23,24 84:13
85:2 88:8 89:12
90:14,15 95:11
97:4 105:13,15
126:6,9 127:13
128:14,17,18
**Thanks** 14:19
**thereof** 21:3
**thereto** 49:4,8
**thereunder** 49:12
**they'd** 94:16 95:20
**thin** 45:2
**thing** 17:8 21:9,16
23:23 29:1 31:11
35:12 46:5 47:19
53:2,4 64:12 76:9
79:16 84:22
**things** 17:17,22
19:16 23:2,3 24:3
35:5 40:3,24 42:16
45:20 51:4 56:1
57:8 66:20 70:6
80:9,10 81:14
93:24 97:10,13
98:7 101:23,24
102:4 104:22,23
113:23
**think** 14:7,17 15:17
17:8,17,22 18:7

19:4 20:17 21:12
24:2,9,24 25:8,18
25:22 26:21 27:7
27:17,21 28:4
29:15,22 30:8
31:12 32:24 33:2
34:17 35:12,16
38:11 42:23 43:17
45:3,22 46:8 47:6
48:2,10,11 53:20
56:11,15,16 58:2
58:12 62:10 64:11
65:11,12,25 66:4
66:10 71:5 72:17
72:24 73:22,24
74:10,20,20 75:7,8
76:13,19,20,24
77:9 79:19 80:15
81:3,12,21 82:3
83:2,5,15,18 85:11
87:14,15 90:2
91:16 94:2,14 95:3
95:6,9,12 96:3,22
98:13 99:14,23
100:14,18 101:3,3
102:1 104:2,11
105:5,5,8,11 107:6
107:20,24 108:1
114:15 116:5
117:22 121:25
123:19 124:17
125:13 126:2
127:6,24 128:13
**thinking** 83:11
89:13
**third** 6:8 10:3 24:12
31:2 33:12 35:1
48:20 49:20,24
54:10 58:15 59:8
77:2 85:17 95:8
113:8 117:9 119:5
122:16 123:10,13
124:7
**thirds** 20:7
**thirteenth** 22:22
46:24,24,25 70:9

**thirty** 21:3,3 78:12
85:14,15,23 87:2
88:9,10,23 108:21
122:19
**thirty-five** 41:6
109:4
**thirty-seven** 20:13
**THOMAS** 8:19
10:12 11:24
**thorny** 106:22
**thought** 17:2 23:6
24:3 26:20 27:2,4
29:8,12 31:3 67:15
69:5,6 80:6 82:7
82:10 100:21
103:2 118:1
**three** 17:2,4,23,23
19:14,15 23:12
67:2,4,6,7 70:22
81:5 86:11 88:14
88:20 97:23 98:7
107:7,8 108:4
117:7
**threshold** 86:13
87:1 99:21
**throw** 32:10
**throwing** 36:1
**thusfar** 120:22
**tied** 71:19 80:19,19
**tightrope** 114:21
**time** 6:1,13 20:25
30:15 32:4 34:5
37:19 40:25 41:6
42:1 45:17 46:14
51:1 61:16,17 63:5
63:5,6 65:20,20
66:4 67:3 68:2,3,6
68:24,24 76:18
77:5 80:25 82:19
88:1,18 89:6,7
90:7,13,13 92:2
94:19 101:9 106:1
107:11 111:3,3
115:8 126:21
**timeframe** 85:15
87:17,22 88:17

89:11
**timeline** 92:6 101:12
101:17,18
**timelines** 91:23,25
101:10,11
**timely** 96:10
**timeout** 100:13
**times** 8:15 20:22
97:24 118:10
**timetable** 24:11
27:13 101:13
**timing** 68:5 119:15
119:22
**tiny** 61:21
**tired** 120:20
**tireless** 66:14
**titled** 111:5
**today** 15:6 23:24
27:22 32:24 34:18
36:20 62:5 63:2
77:9,11,17 84:5
85:12 87:11 91:1
107:8,9 109:17,18
111:16 113:7
123:2 124:1,16,17
124:22 126:13,18
**today's** 58:2 96:15
125:13
**told** 61:9,15 65:13
66:13 67:9
**tolling** 126:24
**Tom** 108:7
**tomorrow** 87:7
**top** 35:19 53:5
**TOREES** 11:9
**total** 112:8,10,12
113:10
**totality** 28:13
**totally** 127:9,11
**Tower** 124:19
**tracking** 21:5 96:8
**trade** 11:10 35:17
**trader** 96:16,16
**transaction** 20:3
28:16,19 29:5
30:20,21 31:23

32:1 33:22 36:8,15
37:6 38:4 43:20,22
44:17,18 45:1,4
47:16 52:24 53:2,4
62:13,14 65:16
69:20 72:3,5 73:1
73:3 76:9,10,12
80:20 81:22 83:3
84:4 86:21 87:12
87:18,19,24 88:19
89:15 90:4,6 91:1
98:21 110:15,21
111:19,21,22
115:6,23 116:16
117:9 119:8 123:3
123:21,25,25
124:4,4 125:19
**transactions** 21:21
22:2 31:20 40:6
44:9 100:6 111:24
116:8,19,25
118:11 119:20
121:23 122:10
123:16 124:15
**Transcribed** 7:25
**Transcriber** 130:11
**transcriber(s)** 130:4
**transcript** 57:5
130:5,8
**transfer** 36:18,22
59:25 62:3 65:24
**transform** 104:17
**transformation** 16:7
19:21 31:19 33:17
33:21 69:3
**transformations**
17:11
**transformed** 37:2
**translates** 115:3
**transparency** 77:21
103:4
**transparent** 79:3,12
**traveling** 79:21
**treated** 76:2
**treatment** 86:2
**treats** 59:8

**trial** 37:19 77:10
**tried** 21:22 23:2,3
  31:10 36:20 66:24
**truest** 78:8
**truism** 28:4
**truly** 112:9
**trumps** 71:5
**trust** 50:3,9
**Trustee** 9:8 14:1
  21:15 70:22 71:22
  73:18 74:3,7 75:17
  77:14,15,21 78:7
  78:10 79:4 87:15
  109:17 121:15
  123:4 126:5
**trustees** 72:20
**Trustee's** 33:11 71:1
  74:14 79:17
**truth** 31:14
**try** 17:24 21:24 32:7
  32:8 36:7 43:4
  47:20 61:11 83:8
  85:7 90:10 101:22
  102:21 113:1
**trying** 16:5 18:17
  19:5 21:8 30:5,19
  33:19 34:2 83:14
  104:3,4
**tuned** 79:9,10
**turn** 92:12 114:14
**turning** 119:23
**tussling** 35:23
**tweaked** 46:19,20
**TWEED** 10:8
**twelve** 99:18
**twenty** 128:15
**twenty-five** 82:25
**twenty-three** 26:25
**twice** 98:18
**two** 13:10 18:11
  20:7 39:9 54:3
  57:11 59:18,20
  64:25 70:24 72:24
  78:5 80:5,7 81:5
  82:4 85:17 86:1,4
  87:22 88:21 90:20

96:19 110:2,20
  112:19 113:19
  114:2 116:25
  127:7
**tying** 123:22
**type** 74:4,16 81:2
  94:3
**typed** 130:14
**types** 49:15 81:14
  96:19 123:23
**typical** 62:13
**Typically** 26:9

---

### U

**UAW** 24:15
**UCC** 35:17
**UELMAN** 10:15
**Uh-huh** 48:18 73:5,8
  73:8,12 76:15
**ultimate** 113:13
  123:25 125:7
**ultimately** 16:7
  19:23,24 20:2,13
  23:5 24:21 25:10
  29:6 47:19 79:1
  101:17 106:25
  116:10 119:1
  122:24 126:22
**umbrella** 52:7
**unable** 23:3 26:6
**unacceptable** 62:20
  64:19 97:19
**uncertain** 32:16
**uncertainty** 32:9
  33:2 52:4 77:10
**unclear** 118:13
**uncomfortable** 52:5
**unconscionable**
  36:19
**uncontroverted**
  21:17 24:4,5,23
  25:18 27:8
**underlying** 72:18,21
  73:18,20,21
  109:18
**understand** 18:2,17

18:18,19,20 20:1
  20:17 27:25 28:14
  42:14,15 45:14
  46:3 47:3 48:15,24
  59:17 61:10 64:20
  65:9 66:24 69:24
  75:21 77:25 81:24
  83:8 84:7,16 85:4
  92:24 93:11 94:22
  101:6 106:11,14
  122:4
**understanding** 18:8
  28:16 66:16 101:1
  112:20
**understood** 19:23
  29:3 83:22 84:2,6
  89:25
**undertake** 122:8
**undertaken** 22:16
**undertaking** 57:19
**underwriters** 39:18
**undisputed** 120:9
**unduly** 118:9
**unfinished** 121:4
**unfortunately** 59:6
**uniformly** 17:18
**union** 46:14 91:24
  94:18
**unions** 14:8 24:14
  46:2 48:1 57:20
  58:5,17 59:3 92:25
  93:2 95:8 96:13
  100:23 101:4,18
  104:3,17 107:16
  107:19 113:11
  120:8,10,18,24
  121:12 122:4,8,13
  126:25 127:4
**United** 1:2,14 9:8
  70:21 78:7,10
**UNKNOWN** 80:3
**UNKOWN** 79:25
**unsecured** 15:25
  76:3 86:2
**unsophisticated**
  69:12

**unusual** 39:24 47:23
  112:6
**updated** 13:24 14:13
**updating** 95:23
**upset** 73:1
**upside** 59:7
**urge** 82:4
**urged** 16:10
**urging** 116:24
**usage** 22:8
**use** 22:5 40:2,14
  43:25 50:1,1 58:15
  69:7 78:24
**uses** 35:3
**U.S** 1:23 21:15
  33:11 71:1,22
  73:17 74:3,7,14
  75:17 77:13,15,21
  79:4,17 87:15
  109:17 121:15
  123:4 126:5
**U.S.C** 6:2,14 7:7,13

---

### V

**vacate** 126:18
**valid** 22:14 82:1
  94:5
**value** 20:10 21:10,20
  24:7,8,9,9 27:9,10
  27:11 28:1,9 29:9
  29:9,14 30:22 32:3
  35:21 36:18,22
  37:2,6 42:22 43:3
  58:21,24 59:25
  60:1,20 61:5 62:3
  63:19,20 65:24
  68:17 69:8,10,22
  69:25 70:2 77:21
  90:25 91:5 98:23
  98:25 99:8,10,12
  102:24 104:25
  106:25 108:2,22
  109:5 111:19
  112:8,10,12,20
  113:10
**valueless** 65:19

**various** 15:15 34:14 35:3 40:7,7 44:17 85:10 110:12,13 110:18,18 115:5 123:22 125:8
**version** 13:12,19 129:7
**view** 19:22,23 21:19 22:13 23:16 26:12 28:24 43:21 62:11 68:14 76:20 90:1 97:21 98:20,23,24 99:5,8 100:12,20 102:3 106:15 114:15 115:20 118:4 119:15 120:21 121:18
**views** 24:7 26:4 67:16 116:15
**violate** 49:6 51:23 76:1
**volitional** 51:13
**voluntarily** 38:3
**vote** 49:9 50:5,20 51:5 111:12

---

### W

**W** 8:8
**Wacker** 8:5
**wait** 64:15 100:13 106:20,20 122:5
**waive** 37:11,24,25 38:3,5,6,10 104:23 105:10
**waived** 40:24 81:25 105:9
**waiver** 42:4,5,5,7,15 84:24 103:11,11
**waiving** 103:16 125:25
**walk** 35:10 36:5 40:7,8 46:21 53:24 61:6 66:8 107:13
**walked** 77:18
**walks** 114:21
**wand** 104:23

**want** 14:10 17:12 18:2,5 26:14 29:16 32:8 34:17 39:23 41:6,7,7 43:2,6 45:11 46:4 48:4,24 51:2 52:5,12 53:16 54:21 55:22 57:9 57:11,12,22,22 58:3,3,10,13,13 64:6 65:1,6 69:4 70:6 72:1,4 88:15 92:12,12 97:6,20 107:3,4 117:14,14 127:16,20,22
**wanted** 18:18,19,20 21:13 31:5 48:16 69:1,2 70:6 89:9 89:25 94:13 97:14 108:9,11,20,23 109:10,20 126:15
**wanting** 33:17 89:10
**wants** 27:11 28:8 31:19 44:11 56:9 58:23 106:19 107:14 120:17
**wasn't** 16:23 20:19 45:16 48:3 50:21 67:1,21 92:13 94:12 108:11
**watch** 35:20
**watershed** 112:5
**WATKINS** 10:1
**way** 19:13 20:15 23:14,14 27:2 28:22 36:24,24 37:1,24 42:20 43:2 43:6,12 45:16 46:11,23 49:17 53:3 54:23 58:1 59:7,8,9,17 62:10 65:17 66:13 67:14 70:1 75:7 79:1 84:14 85:21 95:4 96:17 98:19 99:22 100:23 101:5 104:18 120:11,16

123:11 125:21
**ways** 29:1 52:8 65:18,23 77:14 80:5,7 98:20
**week** 30:11
**weekend** 16:15
**weekly** 25:23
**weeks** 77:6 81:5 88:21 100:3 104:4 110:19 120:11
**weighed** 29:11
**weighing** 29:6
**weighs** 27:8
**WEIL** 11:1
**welcome** 116:14
**went** 17:6 23:8 27:2 51:21 64:1,4 70:8 108:3
**weren't** 23:10 24:10 82:8
**West** 8:5
**WestPoint** 116:21 118:15,21
**we'll** 32:5,21,21 34:12 43:15 45:7 50:7 83:8,8 84:25 102:12 126:23,25 127:1,2
**we're** 15:6 18:6 21:25 23:23 24:18 27:12 34:2,2,24,24 43:6 55:16 58:12 58:22 59:5 64:17 65:10 69:13 75:20 76:21 77:3,4 84:16 85:22 87:14 89:9 89:10 90:17,25 91:6 92:1 96:7,8 101:21 104:24 107:9
**we've** 21:6,22 22:9 61:16,16 77:9 89:3 90:3,9 101:8 102:16 107:24
**wherewithal** 47:15 47:21

**White** 11:16 79:20
**Whitehall** 9:9
**WI** 10:19
**widening** 74:10
**wider** 52:19,19
**willing** 107:7 119:6
**willingness** 113:8
**win** 95:2,3,5
**window** 34:11,11 44:9 47:8 65:14 68:21 78:13 93:8 117:18
**wisely** 57:22
**wisest** 64:12
**wish** 28:10 104:23
**withdraw** 64:6
**withdrawn** 14:16 128:7
**witness** 27:15
**witnesses** 34:9 37:16 109:23
**Wm** 2:3,9,15,21 3:3 3:9,15,21 4:3,9,15 4:22 5:3,9,15,20 6:4,10,16 7:3,15 7:20
**won** 105:14,17
**wonder** 32:25
**wondering** 41:24
**wood** 23:25 67:5 88:14
**word** 29:16 35:3 100:17 106:7 124:25
**wording** 50:10
**words** 19:10 63:18 119:2 121:5
**work** 19:12 32:23 33:18 43:4 61:11 69:7 80:19,20 81:2 81:8,20 83:12 85:25 96:9 98:8 102:21 111:13
**worked** 14:9 30:16 30:16 102:10
**working** 30:13

32:12 69:14
**works** 38:11
**world** 48:6 96:15
    100:6
**worries** 32:21
**worth** 124:5
**worthwhile** 54:22
    121:8
**wouldn't** 23:12 38:1
    39:21 50:3 51:18
    52:15 81:15 82:3
    94:16
**Wow** 77:19
**wrench** 32:11
**writes** 50:16
**written** 50:25 75:19
**wrong** 36:2,2 49:18
    70:8 94:3 114:15
**wrongdoer** 105:25
    106:8

---

**X**

**x** 1:5,12 129:2,4

---

**Y**

**yay** 89:7
**yeah** 23:11 39:7
    59:12 89:21 95:14
**year** 20:23 24:13
    102:17,25
**years** 19:1 29:19,22
    86:24
**yesterday** 14:9 20:7
    63:22 88:13 98:6
    100:10
**York** 1:3,16,16 8:16
    9:3,4,4,10,10,18
    10:4 11:4,12,20
    12:4

---

**0**

**05-44481** 1:4

---

**1**

**1** 3:23 4:5,11,17
    18:15
**1st** 16:20,21 35:10

48:3 53:24 100:1
    119:21
**1/11/2007** 6:23 7:2
**1/12/2007** 2:5,10,16
    2:22 3:4,10,16,22
    4:4,10 5:21 6:5,17
    7:16,21
**1/4/2007** 6:6,18,24
    7:3
**1:27** 128:19
**10** 20:9
**10th** 63:25 97:16
    121:21
**10:00** 2:5,10,16,22
    3:4,10,16,22 4:4
    4:10,16,23 5:4,10
    5:16,21 6:5,9,17
    7:2,16,21
**10:05** 1:19
**100** 85:23 86:13 87:1
    87:11 88:6,24,25
    89:3,8 90:12
**10004** 9:4,10
**10019** 11:12
**10022** 9:18 10:4
**10036** 8:16 11:20
**10112** 12:4
**10153** 11:4
**1095** 114:6
**11** 6:1,13 7:7,13
    15:22 20:9 29:18
    29:24 101:14
    111:8
**11th** 63:21
**11/24/2006** 6:10
**11/30/2006** 6:9
**1113** 21:1 126:14,20
**1114** 21:2 126:14,20
**1121(d)** 6:2,14 7:7
**1125(e)** 49:10 50:16
**1129** 76:1
**114** 25:22
**1144** 39:18
**1155** 11:19
**116** 129:11
**117** 85:20 97:10

**118** 25:22
**11892** 3:8
**11911** 2:20
**12** 1:18
**12(c)** 13:13 14:25
**12(h)** 110:20
**12/12/2006** 4:18
**12129** 2:8
**123** 13:17,20 129:6
**124** 13:23
**1271** 2:3
**1272** 2:3
**13** 15:22 129:6
**1334** 2:3
**13409** 5:2
**13411** 3:14
**14** 25:20
**14245** 5:14
**14370** 2:9
**147** 115:16
**15** 130:10
**153** 9:16
**1555** 10:17
**158** 124:19
**16322** 4:14
**165** 114:17
**17** 108:17
**18** 87:22 89:4
**18th** 18:15 48:7
    111:4
**185,000** 19:7
**19** 129:11
**1992** 114:18 115:16
**1993** 114:6

---

**2**

**2** 128:16
**2d** 114:6,18
**2.4** 30:25
**2/14/2007** 4:16,23
    5:4,10,16
**20** 103:20
**2005** 30:9
**2006** 124:19
**2007** 1:18 130:10
**2008** 20:9

**202** 10:18
**21** 85:19 86:24
**21st** 98:17 100:3
**22nd** 86:1
**2479** 4:21
**2558** 5:8
**257** 2:2
**264** 2:2
**28th** 16:16
**2856** 2:14
**288** 2:3
**29th** 16:16 98:19
**297** 2:3

---

**3**

**3** 23:13 126:13
**3.3995** 80:12
**3.4** 80:8
**30** 12:3
**300,000** 78:4
**3007** 7:14
**31** 16:21
**31st** 126:24
**33** 9:9
**333** 8:5
**34** 25:20 85:21
**342** 124:19
**363** 22:4 41:10
**363(b)** 113:18 114:8
**365** 21:6 114:7
    126:14,20
**3886** 4:2

---

**4**

**4** 49:3 50:15 80:15
    80:24 81:3 114:6
**400** 61:19,21
**4321** 4:8
**45** 15:19 25:25
**49.9** 24:21
**4900** 9:17

---

**5**

**50.1** 24:21
**500** 36:24 47:2 63:11
    66:7
**502(b)** 7:14

**503(b)** 71:2,6,10,16
72:4 75:9 81:15
108:16
**503(b)IV** 75:7
**503(b)(i)** 72:9
**503(b)(3)** 80:15,24
81:3
**503(b)(4)** 84:3
**53rd** 9:16
**53212** 10:19
**54** 25:25 101:11
**55** 26:17
**58** 26:17,24

---
**6**

**6** 25:1
**6(d)** 40:1
**6004** 103:11 125:25
**601** 10:9
**60606** 8:6
**610** 2:5,11,17,22 3:4
3:10,16,22 4:4,10
4:17,24 5:5,11,17
5:22 6:6,9,18 7:2
7:17,22
**633** 11:11
**650** 115:16
**66** 60:21

---
**7**

**7.B** 23:13
**7075** 3:2
**767** 11:3

---
**8**

**8.8** 99:22
**885** 10:3

---
**9**

**9** 20:9 25:1
**9th** 63:25 98:20
121:21
**90017** 10:10
**96** 60:8
**9674** 3:20
**980** 114:17

**VERITEXT/NEW YORK REPORTING COMPANY**