Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                        :

In re                      :      Chapter 11
                        :

DELPHI CORPORATION, et al.,     :      Case No. 05-44481 (RDD)
                        :

               Debtors.   :      (Jointly Administered)
                        :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THIRD SUPPLEMENTAL APPLICATION FOR ORDER UNDER 11 U.S.C.
§§ 327(a), 328(a), 1107(b) AND FED. R. BANKR. P. 2014 AUTHORIZING
EMPLOYMENT AND RETENTION OF KPMG LLP TO (I) ENTER INTO
MASTER PROFESSIONAL SERVICES AGREEMENT WITH DEBTORS, (II)
CONTINUE TO PROVIDE DEBTORS WITH GLOBAL MOBILITY ADVISORY
SERVICES RELATED TO INTERNATIONAL ASSIGNEES EFFECTIVE
NUNC PRO TUNC TO FEBRUARY 9, 2007, (III) CONTINUE TO PROVIDE DEBTORS
WITH TAX CONSULTING SERVICES EFFECTIVE NUNC PRO TUNC
TO FEBRUARY 9, 2007, (IV) CONTINUE TO PROVIDE DEBTORS WITH
INTERNATIONAL ASSIGNMENT SERVICES RELATED TO DEBTORS'
INTERNATIONAL ASSIGNEES EFFECTIVE NUNC PRO TUNC
TO JANUARY 31, 2007, (V) PROVIDE DEBTORS WITH CERTAIN FRESH START
SERVICES EFFECTIVE NUNC PRO TUNC TO NOVEMBER 16, 2006,
AND (VI) PROVIDE DEBTORS WITH CERTAIN ADDITIONAL SERVICES

("KPMG Third Supplemental Retention Application")

          Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this application (the "Third Supplemental Application") for an order pursuant to

11 U.S.C. §§ 327(a), 328(a), and 1107(b) and Rule 2014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") authorizing the employment and retention of KPMG LLP

("KPMG") to (i) enter into the Master Professional Services Agreement (the "Master Agreement") with the Debtors, effective <u>nunc pro tunc</u> to February 9, 2007, (ii) continue to provide the Debtors with certain global mobility services related to international assignees ("Global Mobility Services"), effective <u>nunc pro tunc</u> to February 9, 2007, (iii) continue to provide the Debtors with certain tax consulting services ("Tax Consulting Services"), effective <u>nunc pro tunc</u> to February 9, 2007, (iv) continue to provide the Debtors with certain international assignment services related to the Debtors' international assignees ("International Assignment Services"), effective <u>nunc pro tunc</u> to January 31, 2007, (v) provide the Debtors with certain fresh start services ("Fresh Start Services"), effective <u>nunc pro tunc</u> to November 16, 2006, and (vi) provide the Debtors with certain additional services (including the renewal and extension of existing services, additional phase services under existing engagements, and additional services under future statements of work between the Debtors and KPMG in accordance with the Master Agreement) (the "Additional Services").  In support of this Third Supplemental Application, the Debtors submit the declaration of Gary A. Silberg, executed March 14, 2007 (the "Silberg Declaration"), a copy of which is attached hereto as <u>Exhibit 1</u>.

This Third Supplemental Application supplements (a) the Application For Order Under 11 U.S.C §§ 327(a), 328(a), And 1107(b) Authorizing Employment And Retention Of KPMG LLP As Tax And Transaction Services Advisors To Debtors, Effective <u>Nunc Pro Tunc</u> To October 8, 2005 (the "Original Application"), dated February 14, 2006 (Docket No. 2366), (b) the Supplemental Application For Order Under 11 U.S.C. §§ 327(a), 328(a), And 1107(b) Authorizing (i) Employment And Retention Of KPMG LLP As Advisory And Valuation Advisors To Debtors, Effective <u>Nunc Pro Tunc</u> To February 16, 2006, (ii) Continued Retention Of KPMG LLP As Tax Advisors To The Debtors, Effective <u>Nunc Pro Tunc</u> To January 1, 2006,

And (iii) Additional International Executive Tax Services To Be Rendered By KPMG LLP To Debtors Effective <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To January 18, 2006 (the "First Supplemental Application"), dated April 20, 2006 (Docket No. 3307), and (c) the Second Supplemental Application For Order Under 11 U.S.C. §§ 327(a), 328(a), 1107(b) And Fed. R. Bankr. P. 2014 Authorizing Employment And Retention Of KPMG LLP To Assist Debtors In (i) Certain Improvements To International Tax Reporting Package And Processes Effective <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To August 1, 2006, (ii) Certain Internal Reporting Initiatives Effective <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To May 9, 2006, (iii) A Special Investigation Effective <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To July 10, 2006, (iv) Certain Transfer Pricing Services Effective <u>Nunc</u> <u>Pro</u> <u>Tunc</u> To May 19, 2006, (v) Certain Improvements To Financial Close, Consolidation And Management Reporting Processes, And (vi) Certain Additional Services (the "Second Supplemental Application," and collectively with the Original Application and the First Supplemental Application, the "Prior Applications"), dated November 10, 2006 (Docket No. 5522).  In further support of this Third Supplemental Application, the Debtors respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases.  On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official

committee of unsecured creditors (the "Creditors' Committee").  On April 28, 2006, the U.S.

Trustee appointed an official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and

1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are sections 327(a),

328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules.

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company") as of

December 31, 2006 had global net sales of approximately $26.4 billion and global assets of

approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth

largest public company business reorganization in terms of revenues and the thirteenth largest

public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are

not chapter 11 debtors and continue their business operations without supervision from this

Court.

6.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's

---

[1]    The aggregated financial data used in this Application generally consists of consolidated information from
Delphi and its worldwide subsidiaries and affiliates.

business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to the Company in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[2]  Reflective of a

continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4

billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred a net loss of $5.5

billion, $3.0 billion of which were charges related to the U.S. employee special attrition

programs.

9.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

---

[2]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording
of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net
operating loss in calendar year 2004 was $482 million.

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product portfolio, operational issues, and forward-looking revenue requirements.  Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[3]  Finally, the Debtors must devise a workable solution to their current pension situation.

---

[3]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

12.    On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements.  The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  (The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's achievement of consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights.)  The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

13.    On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course

7

that should lead to a consensual resolution with their U.S. labor unions and GM while providing

an acceptable financial recovery framework for the Debtors' stakeholders.

14.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are well-

positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of

its resources to continue to deliver high-quality products to its customers globally.  Additionally,

the Company will preserve and continue the strategic growth of its non-U.S. operations and

maintain its prominence as the world's premier auto supplier.

The Prior Applications

15.    On February 15, 2006, the Debtors filed the Original Application pursuant

to the terms of certain engagement letters, by and between the Debtors and KPMG, each as

described and defined therein (the "Original Engagement Letters").

16.    On March 3, 2006, this Court entered an order approving the Original

Application pursuant to the terms of the Original Engagement Letters, effective nunc pro tunc to

October 8, 2005 (the "Original Retention Order").  Pursuant to the Original Retention Order the

Debtors were authorized to retain KPMG to provide (i) international tax process improvement

assistance, (ii) certain tax consulting services, (iii) international executive services provided to

the Debtors and their expatriates, and (iv) acquisition and due diligence services.

17.    On April 20, 2006, the Debtors filed the First Supplemental Application

pursuant to the terms of certain engagement letters, by and between the Debtors and KPMG,

each as described and defined therein (the "First Supplemental Engagement Letters").

18.    On May 2, 2006, this Court entered an order approving the First

Supplemental Application pursuant to the terms of the First Supplemental Engagement Letters

(the "First Supplemental Retention Order").  Pursuant to the First Supplemental Retention Order

8

the Debtors were authorized to retain KPMG to (i) provide advisory and valuation services, (ii) continue to provide tax advisory services, and (iii) provide additional international executive tax services to the Debtors and their expatriates.

19.    On November 10, 2006, the Debtors filed the Second Supplemental Application pursuant to the terms of certain engagement letters, by and between the Debtors and KPMG, each as described and defined therein (the "Second Supplemental Engagement Letters").

20.    On December 6, 2006, this Court entered an order approving the Second Supplemental Application pursuant to the terms of the Second Supplemental Engagement Letters (the "Second Supplemental Retention Order").  In accordance with the Second Supplemental Retention Order the Debtors were authorized to retain KPMG to provide the Debtors with (i) certain improvements to the international tax reporting package and processes, (ii) certain internal reporting initiatives, (iii) a certain special investigation, (iv) certain transfer pricing services, (v) certain improvements to the financial close, consolidation, and management reporting processes, and (vi) certain additional services.

<u>Relief Requested</u>

21.    By this Third Supplemental Application, the Debtors respectfully request entry of an order under sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Bankruptcy Rule 2014, authorizing employment and retention of KPMG to (i) enter into the Master Agreement, a copy of which is attached as <u>Exhibit A</u> to the Silberg Declaration, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to February 9, 2007, (ii) continue to provide the Debtors with the Global Mobility Services, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to February 9, 2007, pursuant to the terms and conditions set forth in (a) the Master Agreement and (b) the applicable Statement of Work for the Global Mobility Advisory Services (the "Global Mobility SOW"), a copy of which is attached to the

Silberg Declaration as <u>Exhibit B</u>, (iii) continue to provide the Debtors with the Tax Consulting

Services, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to February 9, 2007, pursuant to the terms and conditions set

forth in (a) the Master Agreement and (b) the applicable Statement of Work for the Tax

Consulting Services (the "Tax Consulting SOW"), a copy of which is attached to the Silberg

Declaration as <u>Exhibit C</u>, (iv) continue to provide the Debtors with International Assignment

Services, effective <u>nunc</u> <u>pro</u> <u>tunc</u> to January 31, 2007, pursuant to the terms and conditions set

forth in (a) the Master Agreement and (b) the applicable Statement of Work for the International

Assignment Services (the "International Assignment SOW"), a copy of which is attached to the

Silberg Declaration as <u>Exhibit D</u>, (v) provide the Debtors with Fresh Start Services, effective

<u>nunc</u> <u>pro</u> <u>tunc</u> to November 16, 2006, pursuant to the terms and conditions set forth in (a) the

Master Agreement and (b) the applicable Statement of Work for the Fresh Start Services, a copy

of which is attached to the Silberg Declaration as <u>Exhibit E</u> (the "Fresh Start SOW," and

collectively with the International Assignment SOW, the Tax Consulting SOW, and the Global

Mobility SOW, the "SOWs"), and (vi) provide the Debtors with certain Additional Services.

   22. The Debtors believe that they will continue to require the services provided

by KPMG and request for KPMG to render Professional Services to the Debtors which will

include the renewal and extension of existing services, additional phase services under existing

engagements, and additional services under future statements of work between the Debtors and

KPMG in accordance with the Master Agreement.  Accordingly, the Debtors are hereby seeking

authority to retain KPMG to complete the projects described in the SOWs filed herewith and to

execute additional statements of work without further Court approval.  The additional statements

of work will contain indemnity and limitations on liability provisions on terms that will be no

less favorable to the Debtors than those set forth in the Master Agreement.  The Debtors submit

that this arrangement is far more beneficial to and conservative of estate resources than would be

the case if each engagement between the Debtors and KPMG required a lengthy and expensive

retention application.  Moreover, no bankruptcy policies should be offended because such

arrangement does nothing to effect the administration of these chapter 11 cases.

23.    The Second Supplemental Retention Order provides that no Court approval

is required for any "Additional Services."  According to the Second Supplemental Application,

"Additional Services" constitute those that are (i) a renewal and extension of services approved

to be provided by KPMG under the Prior Applications or (ii) services of a nature consistent with

the services covered in Prior Applications.  The Debtors believe that all of the services described

in the SOWs are "Additional Services" under the Second Supplemental Retention Order because

they constitute either renewal and extension of services approved to be provided by KPMG

under the Prior Applications or services of a nature consistent with the services covered in Prior

Applications.  Out of abundance of caution, however, and because the SOWs were executed

pursuant to the Master Agreement, the Debtors hereby request authorization for KPMG to

provide such services.

<u>Scope Of Services</u>

A.    <u>The Master Agreement</u>

24.    The Master Agreement establishes the standard terms and conditions

pursuant to which KPMG may provide the Debtors with certain professional services (the

"Professional Services").  The specific scope of work and other conditions will be described in

each applicable statement of work.

25.    The Global Mobility Services, the Tax Consulting Services, the

International Assignment Services, and the Fresh Start Services are evidenced by the Master

11

Agreement as supplemented by the applicable statement of work. The respective scopes of such services are described in the SOWs:

1.    <u>Global Mobility SOW</u>

26.    In accordance with the Global Mobility SOW, KPMG will provide certain international assignment administration and consulting services to the Debtors in addition to those set forth in the Original Engagement Letters and First Supplemental Engagement Letters, including, but not limited to the following:

a.    <u>Pre-Assignment Services</u>

    i.    Prepare cost projection, including revisions;

    ii.    Prepare draft international assignment agreement;

    iii.    Prepare draft pay calculation;

    iv.    Finalize International Assignment Agreement and pay calculation and participate in consultation session;

    v.    Calculate Relocation Allowance and Mobility Premium to be paid in month prior to assignment and provide to payroll;

    vi.    Calculate first year spending account to be paid in first month of assignment and provide to payroll; and

    vii.    Obtain Social Security Certificates of Coverage.

b.    <u>During Assignment Services</u>

    i.    Calculate annual spending account on assignment anniversary date and provide to payroll;

    ii.    Answer international assignee's policy-related inquiries including policy interpretation based on Delphi-provided assumptions;

    iii.    Serve as focal point for international assignee's general questions and issues;

    iv.    Prepare periodic adjustments to compensation items according to Delphi's policy and/or changes to international assignee's pay or family status;

v.       Prepare payroll changes per pay period and forward to Delphi for approval and processing;

vi.      Prepare annual year-end compensation summaries;

vii.     Monitor data provider subscriptions and invoices, as needed;

viii.    Track key dates and notify International assignees and/or management of required actions;

ix.      Track tax equalization settlements, forward to Delphi for approval and processing; and

x.       Conduct annual customer satisfaction survey and report results to Delphi.

c.    <u>Repatriation Services</u>

i.       Calculate Relocation Allowance less outstanding tax and pro-rata spending account due from employee.

d.    <u>Other Services</u>

i.       Perform other services requested by Delphi related to international assignments.

2.    <u>Tax Consulting SOW</u>

27.   In accordance with the Tax Consulting SOW, KPMG will continue to provide tax consulting services with respect to such matters as may arise for Delphi for which Delphi seeks KPMG's advice and consultation.

3.    <u>International Assignment SOW</u>

28.   In accordance with the International Assignment SOW, KPMG will provide certain international assignment tax preparation and consulting services to the Debtors in addition to those set forth in the Original Engagement Letters and First Supplemental Engagement Letters, including, but not limited to the following:

a.    <u>Expatriates Assigned From The U.S. And Expatriates Assigned To The U.S.</u>

i.       Collect tax data;

  ii.  Calculate annual hypothetical tax withholding;

  iii.  Prepare required home and host country individual income tax returns during, and one year after, assignment;

  iv.  Prepare requests for extension of time to file tax returns(s), where required;

  v.  Prepare U.S. estimated tax vouchers, if required;

  vi.  Prepare year-end U.S. withholding calculations, where applicable;

  vii.  Prepare tax equalization calculations;

  viii.  Determine and arrange for timely payment of local taxes in the host country, where applicable;

  ix.  Conduct pre-departure and/or post-arrival consultation sessions; and

  x.  Handle routine correspondence with IRS and foreign tax authorities, including review of assessments.

b.  <u>Expatriates Assigned To And From Non-U.S. Countries</u>

  i.  Collect tax data;

  ii.  Calculate annual hypothetical tax withholding;

  iii.  Prepare required home and host country individual income tax returns during, and one year after, assignment;

  iv.  Prepare requests for extension of time to file tax returns(s), where required;

  v.  Determine and arrange for timely payment of local taxes in the host country, where applicable;

  vi.  Prepare tax equalization calculations;

  vii.  Conduct pre-departure and/or post-arrival consultation sessions; and

  viii.  Handle routine correspondence with foreign tax authorities, including review of assessments.

c.  <u>Employee Assigned To The Mexican Border</u>

  i.  Collect tax data;

14

      ii.        Prepare U.S. income tax return(s);

      iii.        Prepare requests for extension of time to file tax return(s), where required;

      iv.        Prepare tax equalization calculations;

      v.        Prepare monthly non-resident Mexican tax calculations;

      vi.        Conduct post-arrival consultation session; and

      vii.        Handle routine correspondence with the IRS.

d.      <u>J-1 Visa Trainees</u>

      i.        Collect tax data;

      ii.        Prepare U.S. income tax return(s);

      iii.        Prepare requests for extension of time to file tax return(s), where required;

      iv.        Conduct post-arrival consultation session; and

      v.        Handle routine correspondence with the IRS.

e.      <u>Cost Estimates</u>

      i.        Prepare cost projection, including revisions;

      ii.        Prepare draft international assignment agreement;

      iii.        Prepare draft pay calculation;

      iv.        Finalize international assignment agreement and pay calculation and participate in consultation session;

      v.        Calculate Relocation Allowance and Mobility Premium to be paid in month prior to assignment and provide to payroll;

      vi.        Calculate first year spending account to be paid in first month of assignment and provide to payroll;

      vii.        Calculate annual spending account on assignment anniversary date and provide to payroll; and

      viii.        Calculate Relocation Allowance less outstanding tax and pro-rata spending account due from employee.

     f.     <u>Global Coordination</u>

        i.     Coordinate centralized hypothetical tax calculation process;

        ii.     Coordinate tax planning review;

        iii.     Coordinate on-going benchmarking of Delphi's current tax equalization policy;

        iv.     Coordinate dedicated website for Delphi;

        v.     Coordinate dedicated website for Delphi employees;

        vi.     Coordinate unlimited access to all KPMG publications;

        vii.     Coordinate status reports and client service reports; and

        viii.     Coordinate KPMG International Executive Services Flash Alert Newsletters.

     g.     <u>Other Services</u>

        i.     Perform other services requested by Delphi related to international assignments.

     4.     <u>Fresh Start SOW</u>

     29.    Pursuant to the Fresh Start SOW, KPMG will provide the Debtors with services related to addressing various valuation, accounting, financial reporting, and tax needs arising from the Debtors' anticipated adoption of a confirmed plan of reorganization and emergence from chapter 11.  Specifically, KPMG will assist the Debtors in the recognition, measurement, and financial reporting requirements of Statement of Position 90-7, Financial Reporting by Entities in Reorganization under the Bankruptcy Code ("SOP 90-7").

     30.    In accordance with the Fresh Start SOW, KPMG will provide Fresh Start Services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including, but not limited to:

     a.     <u>Accounting And Tax</u>

    i.    <u>Fresh Start Approach And Work Steps</u>:  Considering the alternatives in approach, timing, order, and adoption dates for fresh start reporting, the alternatives for on-going efficient processing of detailed accounting records, and the potential approaches for updating detailed records to reflect changes in values and the new accounting requirements following emergence;

    ii.    <u>Change Of Ownership</u>:  Evaluating whether the conditions in SOP 90-7 are met to justify adoption of a new, fresh start basis by determining whether there is a change in ownership before confirmation and after emergence;

    iii.    <u>Issues And Documentation</u>:  Researching and documenting (memoranda, discussions with Ernst & Young as required, etc.) to support the accounting and reporting conclusions reached in accordance with SOP 90-7;

    iv.    <u>Segregation Of Liabilities</u>:  Identifying and segregating liabilities that arose before and after filing to reflect the liabilities subject to the bankruptcy process;

    v.    <u>Claims</u>:  Monitoring the bankruptcy cases to (a) compare the claims filed, allowed, and existing debtor balances (particularly to trade vendors), (b) adjust the existing payables to the allowed claims, and (c) estimate claims to be settled upon emergence;

    vi.    <u>Reporting Classifications</u>:  Identifying and segregating pre-emergence expenses, restructuring costs, and losses for classification in a special category called "reorganization items" to properly portray amounts from activities to restructure the operations prior to emergence;

    vii.    <u>Guarantees</u>:  Considering issues related to recognizing the fair value of obligations from Guarantees (FIN 45) (from units subject to spin-off or sale as a result of the restructuring process);

    viii.    <u>Asset Retirement Obligations (SFAS 143)</u>:  Considering issues related to the recognition of obligations from the retirement of tangible long-lived assets (from units subject to spin-off or sale as a result of the restructuring process);

    ix.    <u>Top Level Reporting</u>:  Assessing the degree to which top side adjustments and disclosures are utilized to report on a fresh start basis from the date of emergence until such amounts are recorded to the Debtors' detailed accounting records;

    x.    <u>Detailed Accounting Records</u>:  Developing an approach to repopulating the Debtors' detailed records with new fair values and asset lives; providing electronic files and assisting with updating fixed asset and other detailed accounting records with the concluded fair values;

xi.  Training Delphi Employees:  Assisting with training the Debtors' employees on the impact of adopting fresh start accounting;

xii.  Book vs. Tax Balances:  Identifying differences between book and tax balances that arise from the plan of emergence and fresh start accounting;

xiii.  Tax Attributes:  Determining the current position of federal and state tax attributes (including usage limitations) and net asset basis (including basis in stock of subsidiaries) for federal and state tax purposes;

xiv.  Insolvent Subsidiaries:  Considering the deferred tax impact on the outside basis of investments in insolvent subsidiaries;

xv.  Cancelled Debt Income:  Computing the amount and allocation of canceled debt income for federal and state tax purposes;

xvi.  NOL Carryforwards:  Identifying limitations in the ability to utilize net operating loss carry forwards as a result of the approved plan of reorganization;

xvii.  Tax Elections:  Assessing the impact of available federal and state tax elections; and

xviii.  Bankruptcy-Related Expenses:  Assessing the deductibility of bankruptcy-related expenses.

b.  Valuation

i.  Reorganization Value:  Reading and identifying potential issues with the reorganization value (the "Reorganization Value") as determined by the Debtors' financial advisors and identifying differences in assumptions or methodologies used to determine reorganization value and the Business Enterprise Value of the Debtors' reporting units and plants;

ii.  Identification Of Assets And Liabilities:  Obtaining and reading the Debtors' historical financial statements and detailed financial records, and conducting site visits as necessary, to identify assets and liabilities, regardless of whether those assets and liabilities are currently recorded;

iii.  Fair Values:  Preparing Fair Value Estimates for each identified asset and liability including In-Process Research and Development;

iv.  Goodwill:  Determining the difference, if any, between Reorganization Value and the fair value of the subject assets and liabilities identified and valued ("goodwill" or "negative goodwill");

v.  Reporting Units:  Determining the Business Enterprise Value for each reporting unit and allocating the fair value of subject assets and liabilities, including goodwill, to the SFAS 142 Reporting Units

18

identified by the Debtors, taking into consideration the Reorganization Value;

vi.  <u>Joint Ventures</u>:  Preparing fair value estimates for the joint venture interests and allocations to identified intangibles in acquisitions accounted for under the equity method;

vii.  <u>Remaining Useful Lives</u>:  Estimating remaining useful lives and providing amortization schedules for the tangible and identified intangible assets; and

viii.  <u>Valuation Report</u>:  Issuing a valuation report covering the fair value estimates of the subject assets and liabilities and Business Enterprise Values for each reporting unit of the Debtors;

c.  <u>Systems</u>

i.  Assessing the impact of fresh start accounting on the Debtors' existing systems and reporting requirements and providing recommendations for improvement;

ii.  Providing the Debtors with example model journal entries that may be required to adjust the accounting records in connection with initial or subsequent conversion to the new accounting bases;

iii.  Working with the Debtors to identify methods to record the adjustments required in the consolidation systems and accounting records;

iv.  Assisting with identifying the impact on other reporting requirements and methods to efficiently report on the new bases of accounting (<u>i.e.</u>, tax and management reporting);

v.  Advising the Debtors on the roll-out of the "component evaluation" methodology to each impacted entity.  This methodology organizes the work effort around components to identify where adjustments are needed and how to incorporate these into the various systems.  Key aspects include:

- Understanding the local accounting policies or requirements;

- Identifying the impact of the new accounting policies or requirements;

- Identifying of the accounts which must be restated;

- Documenting the systems which require change and possible new systems;

- Identifying interdependence with other components;

- Developing a preliminary plan to produce new data requirements (design);

- Obtaining approvals or sign off on key decisions; and

- Identifying factor to consider as you begin to implement (build and test); and

    vi. Advising the Debtors on additional improvements which could be made to the financial reporting processes and systems in both the short term and long term.

    d.    <u>Project Management</u>

        i. KPMG will provide project management services to the Debtors' senior management and its fresh start project manager that will assist in coordinating the Fresh Start Services.

31. The services to be provided by KPMG to the Debtors under the SOWs will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals and KPMG will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors, accountants, and counsel, as appropriate, to avoid duplication of efforts.

32. Subject to this Court's approval of the Third Supplemental Application, KPMG is willing to provide the Debtors with the services described in the Master Agreement and the SOWs on the terms set forth therein.

<u>Qualifications Of Professionals</u>

33. As was the case with the Prior Applications, the Debtors have selected KPMG to provide the services described in the Engagement Letters because of KPMG's diverse experience and extensive knowledge in the fields of accounting and taxation.

34. The Debtors have employed KPMG as financial and tax advisors since 1999. In addition, since the Petition Date, the Debtors have engaged KPMG for a number of matters. By virtue of its prior engagements, KPMG has developed a significant amount of institutional knowledge regarding the Debtors' books, records, financial information, and other data maintained by the Debtors. Further, KPMG is well-qualified and able to represent the

Debtors in a cost-effective, efficient, and timely manner.  Accordingly, the Debtors wish to continue to retain KPMG to provide further assistance during these chapter 11 cases.

Disinterestedness Of Professionals

35.    The affidavit of Patrick N. Karpen, sworn to February 9, 2006 (the "Original Affidavit") in support of the Original Application, the affidavit of Gary A. Silberg, sworn to April 20, 2006 (the "First Supplemental Affidavit") in support of the First Supplemental Application, the affidavit of Ann Marie Goddard, sworn to July 10, 2006 (the "Goddard Affidavit"), and the declaration of Gary A. Silberg executed on November 10, 2006 (the "Original Silberg Declaration," and collectively with the Original Affidavit, the First Supplemental Affidavit, and the Goddard Affidavit, the "Prior Affidavits and Declaration") filed in support of the Second Supplemental Application, and the Silberg Declaration, contain information available as of the date hereof with respect to KPMG's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  Based on the information set forth in the Prior Affidavits and Declaration and the Silberg Declaration, the Debtors submit that KPMG and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

Professional Compensation

36.    Subject to this Court's approval and pursuant to the terms and conditions of the Engagement Letters, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the rates described therein.

37.    The rates included in this Third Supplemental Application (exclusive of discounts) are KPMG's normal and customary rates for matters of this sort.  In the normal course

21

of business, KPMG revises its hourly rates on October 1st of each year.  Subject to this Court's

approval, KPMG requests that the rates listed below be revised to the hourly rates that will be in

effect at such time.

A.    <u>The Master Agreement</u>

38.    The professional fees will be determined by each statement of work, as

applicable.

39.    KPMG will seek expense reimbursements in accordance with the terms and

conditions of the Travel And Per Diem Expense Reimbursement Policy made part of the Master

Agreement, and in accordance with guidelines established by the U.S. Trustee (the "U.S. Trustee

Guidelines").

1.    <u>The Global Mobility SOW</u>

40.    The rates for services to be rendered by KPMG under the Global Mobility

SOW are as follows:

|  | **Fees** |
|---|---|
| Annual Fee for International Assignees Assigned from the U.S. | $3,000 |
| Annual Fee for International Assignees Assigned to the U.S. | $1,320 |
| Annual Fee for International Assignees Assigned to and from Non-U.S. Countries | $840 |
| Preparation of Cost Estimates, International Assignment Agreement, and Pay Calculation and for cancelled assignments | $850 |

2.    <u>The Tax Consulting SOW</u>

41.    Pursuant to the terms and conditions of the Tax Consulting SOW, KPMG's

requested compensation for professional services rendered to the Debtors will be based upon the

hours actually expended by each assigned staff member at each staff member's hourly billing rate. The hourly rates for the Tax Consulting Services are as follows:

| Professional Level: | Net Hourly Rate After Application Of Discount: |
|---|---|
| Partner | $480 |
| Senior Manager | $395 |
| Manager | $315 |
| Senior Associate | $225 |
| Associate | $150 |

42. In accordance with the Tax Consulting SOW, fees for KPMG International Member Firms will be billed at 60% of their standard hourly rates. KPMG estimates that the total fees to be incurred under the Tax Consulting SOW will range from $50,000 to $75,000.

3. The International Assignment SOW

43. The rates for services to be rendered by KPMG under the International Assignment SOW are as follows:

| | Fees |
|---|---|
| Expatriates Assigned to the U.S. | $1,750 |
| Expatriates Assigned from the U.S. | $2,700 |
| Expatriates Assigned to and from Non-U.S. Countries | $2,100 |
| Employees Assigned to the Mexican Border | $750 |
| J-1 Visa Trainees | $375 |
| Preparation of monthly Mexican non-resident tax withholding calculation for Employees Assigned to the Mexico Border | $40 |
| Preparation of Amended U.S. tax returns for Expatriates Assigned to the U.S. and Expatriates Assigned from the U.S. | $800 |

Preparation of Amended U.S. tax returns for Employees Assigned to the Mexico Border                                    $375

                                                                                                                                              $850
Preparation of Cost Estimates, Expatriate Agreement, Pay Calculation and update of annual Spending Account at onset of assignment

Preparation and compilation of payments at host information                    $375


4.      The Fresh Start SOW

        44.     Subject to this Court's approval and pursuant to the terms and conditions of the Fresh Start SOW, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate. KPMG has agreed to apply a voluntary discount to its hourly rates as set forth in the Fresh Start Engagement Letter. The discounted hourly rates for such services to be rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate After Application Of Discount: |
| --- | --- |
| Partner | $500 |
| Director | $440 |
| Manager | $360 |
| Senior | $250 |
| Associate | $165 |

        45.     KPMG estimates that the total fees to be incurred under the Fresh Start SOW will amount to approximately $10 million.

        46.     KPMG intends to apply to this Court for allowance of compensation and reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy

Code, the Bankruptcy Rules, corresponding Local Bankruptcy Rules for the Southern District of

New York (the "Local Rules"), orders of this Court, and U.S. Trustee Guidelines.  KPMG

acknowledges that all compensation will be subject to this Court's review and approval after

notice and hearing.  KPMG has agreed to accept as compensation such sums as may be allowed

by this Court.

47.    The Debtors believe that KPMG's fees are fair and reasonable in light of

industry practice, market rates both in and out of chapter 11 proceedings, KPMG's experience in

reorganizations, and KPMG's importance in these cases.

<u>Other Terms And Conditions Of The Master Agreement And SOWs</u>

A.    <u>Subcontracting Services To KPMG Member Firms</u>

48.    The KPMG global network encompasses independent professional services

practices conducted by separate legal entities throughout the world.  KPMG International, a

Swiss cooperative, serves as a coordinating entity for a network of member firms operating

under the KPMG name.  KPMG International is a member-based entity with no shareholders and

no permanent capital.  Each of the member firms of KPMG International ("KPMG Member

Firms") is separate and legally distinct.  KPMG is the United States member firm of KPMG

International.

49.    Without the Debtors' prior written approval, KPMG may subcontract with

certain other KPMG Member Firms to provide services to the Debtors under the Master

Agreement and the SOWs, <u>provided</u>, <u>however</u>, that KPMG will remain fully and solely

responsible for all of its liabilities and obligations under the Master Agreement and the SOWs

whether or not performed, in whole or in part, by KPMG, any affiliate of KPMG, any KPMG

Member Firm, or any of their respective affiliates.  The Debtors will have no recourse, and will

bring no claim, against any KPMG Member Firm other than KPMG, or against any

subcontractors, members, shareholders, directors, officers, managers, partners, agents,

representatives, or employees of any KPMG Member Firm (or any of their respective successors

or permitted assigns), or any of their respective assets, with respect to the services or otherwise

under the Master Agreement and the SOWs.

B.    Dispute Resolution

50.    With respect to dispute resolution, KPMG acknowledges that any dispute or

claim relating to their engagement under the Master Agreement and the SOWs may be brought

before this Court.

C.    Indemnification And Limitation On Liability

51.    With respect to indemnification and limitation on liability, KPMG

acknowledges that under the Master Agreement and the SOWs, KPMG will not be indemnified

and KPMG's limitation of liability will not apply to claims arising out of KPMG's gross

negligence or willful misconduct.

52.    Pursuant to the International Assignment SOW and the Global Mobility

SOW, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of

contract, negligence, or other tort committed by KPMG, regardless of the theory of liability

asserted, is limited to no more than two times the total amount of fees paid to KPMG for services

rendered under the International Assignment SOW and the Global Mobility SOW.  Pursuant to

the Tax Consulting SOW, KPMG's liability to pay damages for any losses incurred by Delphi as

a result of breach of contract, negligence, or other tort committed by KPMG, regardless of the

theory of liability asserted, is limited to no more than five times the total amount of fees paid to

KPMG for services rendered under the Tax Consulting SOW.

53.    Pursuant to the Fresh Start SOW, KPMG's liability to pay damages for any losses incurred by the Debtors as a result of breach of contract, negligence, or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for services rendered under the Fresh Start SOW.

D.    Termination

54.    The Master Agreement will expire on December 31, 2007, whereupon KPMG and the Debtors may extend the Master Agreement for successive one year periods. Each SOW will become effective as of the date of the commencement of services to be rendered under such SOW, or, if earlier, the date of execution of such SOW. Each SOW will remain effective until the completion of the services to be rendered under the applicable SOW.

55.    KPMG and the Debtors may terminate the Master Agreement or any SOW in the event of a material breach of the Master Agreement that is not cured within 30 days after receipt of written notice of such breach.

56.    Additionally, under the Master Agreement, the Debtors may terminate any SOW for convenience at any time upon 30 days' prior written notice. KPMG may terminate any SOW at any time upon 30 days' notice to the Debtors in the event of any change in law, rule, regulation, or professional standards that would cause the continued provision of the services under such SOW by KPMG to violate such law, rule, regulation, or professional standard or in the event of a sale by KPMG of the practice providing the services under such SOW if the Debtors elect not to consent to an assignment to the party acquiring such practice from KPMG. The terminating party shall provide the Court, the U.S. Trustee, the Creditors' Committee, and the Fee Committee with ten business days' notice of termination.

## Conclusion

57.     For the foregoing reasons, the Debtors submit that the relief requested

herein is in the best interests of the Debtors and their estates and creditors and should be

approved.

## Notice

58.     Notice of this Third Supplemental Application has been provided in

accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105

And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates

And Certain Notice, Case Management, And Administrative Procedures, entered by this Court

on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the

Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

59.     Because the legal points and authorities upon which this Third Supplemental

Application relies are incorporated herein, the Debtors respectfully request that the requirement

of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be

deemed satisfied.

WHEREFORE, the Debtors respectfully request that this Court enter an order authorizing the employment and retention of KPMG to (i) enter into the Master Agreement with the Debtors, effective nunc pro tunc to February 9, 2007, (ii) continue to provide the Debtors with Global Mobility Services, effective nunc pro tunc to February 9, 2007, (iii) continue to provide the Debtors with Tax Consulting Services, effective nunc pro tunc to February 9, 2007, (iv) continue to provide the Debtors with International Assignment Services, effective nunc pro tunc to January 31, 2007, (v) provide the Debtors with the Fresh Start Services, effective nunc pro tunc to November 16, 2006, (vi) provide the Debtors with certain Additional Services, and (vii) granting the Debtors such other and further relief as is just.

Dated:    New York, New York
          March 16, 2007

                                    DELPHI CORPORATION, on behalf of itself and
                                    certain of its subsidiaries and affiliates, as Debtors
                                    and Debtors-in-Possession

                                    By:   /s/ John D. Sheehan
                                          Name: John D. Sheehan
                                          Title:   Vice President and Chief Restructuring
                                                   Officer