UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
     In re                          :      Chapter 11
                                          :
DELPHI CORPORATION, et al.,               :      Case No. 05-44481 (RDD)
                                          :
             Debtors.     :      (Jointly Administered)
                                          :
- - - - - - - - - - - - - - - - - - - - - - - -x

DECLARATION OF GARY A. SILBERG IN SUPPORT OF THIRD SUPPLEMENTAL
APPLICATION FOR ORDER UNDER 11 U.S.C. §§ 327(a), 328(a), 1107(b) AND FED. R.
BANKR. P. 2014 AUTHORIZING EMPLOYMENT AND RETENTION OF KPMG LLP TO (I)
ENTER INTO MASTER PROFESSIONAL SERVICES AGREEMENT WITH DEBTORS, (II)
CONTINUE TO PROVIDE DEBTORS WITH GLOBAL MOBILITY ADVISORY SERVICES
RELATED TO INTERNATIONAL ASSIGNEES EFFECTIVE NUNC PRO TUNC TO
FEBRUARY 9, 2007, (III) CONTINUE TO PROVIDE DEBTORS WITH TAX CONSULTING
SERVICES EFFECTIVE NUNC PRO TUNC TO FEBRUARY 9, 2007, (IV) CONTINUE TO
PROVIDE DEBTORS WITH INTERNATIONAL ASSIGNMENT SERVICES RELATED TO
DEBTORS' INTERNATIONAL ASSIGNEES EFFECTIVE NUNC PRO TUNC TO JANUARY
31, 2007, (V) PROVIDE DEBTORS WITH CERTAIN FRESH START SERVICES
EFFECTIVE NUNC PRO TUNC TO NOVEMBER 16, 2006, AND (VI) PROVIDE DEBTORS
WITH CERTAIN ADDITIONAL SERVICES

State of Illinois       )
                        ) ss:
City of Chicago         )

Gary A. Silberg, hereby declares as follows:

         1.     I am a Certified Public Accountant and a partner of KPMG LLP ("KPMG"),

a professional services firm. I submit this declaration (the "Silberg Declaration") on behalf of

KPMG in support of the third supplemental application (the "Third Supplemental Application")[1]

of Delphi Corporation, and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), for

---

[1]     Capitalized terms used herein but not otherwise defined will have those meanings set forth in the Third
Supplemental Application, Original Affidavit or the First Supplemental Affidavit (each as defined below).

entry of an order, pursuant to §§ 327(a), 328(a), and 1107(b) of title 11 of the United States Code, as amended (the "Bankruptcy Code"), and Rule 2014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing the employment and retention of KPMG to (i) enter into the Master Professional Services Agreement (the "Master Agreement") with the Debtors, effective <u>nunc pro tunc</u> to February 9, 2007, annexed hereto as <u>Exhibit A</u>, (ii) continue to provide the Debtors with certain global mobility advisory services related to the Debtors' international assignees ("Global Mobility Advisory Services"), effective <u>nunc pro tunc</u> to February 9, 2007, pursuant to the terms and conditions set forth in (a) the Master Agreement and (b) applicable Statement of Work for the project Global Mobility Advisory Services dated February 9, 2007 (the "Global Mobility SOW"), annexed hereto as <u>Exhibit B</u>, (iii) continue to provide the Debtors with certain tax consulting services ("Tax Consulting Services"), effective <u>nunc pro tunc</u> to February 9, 2007, pursuant to the terms and conditions set forth in (a) the Master Agreement and (b) applicable Statement of Work for the project Tax Consulting Services dated February 9, 2007 (the "Tax Consulting SOW"), annexed hereto as <u>Exhibit C</u>, (iv) continue to provide the Debtors with certain international assignment services ("International Assignment Services") related to the Debtors' international assignees, effective <u>nunc pro tunc</u> to January 31, 2007, pursuant to the terms and conditions set forth in (a)  the Master Agreement and (b) the applicable Statement of Work for the project International Assignment Services dated February 9, 2007 (the "International Assignment SOW"), annexed hereto as <u>Exhibit D</u>, (v) provide the Debtors with certain fresh start services ("Fresh Start Services"), effective <u>nunc pro tunc</u> to November 16, 2006, pursuant to the terms and conditions set forth in (a) the Master Agreement and (b) applicable Statement of Work for the project Fresh Start Services dated February 9, 2007 (the "Fresh Start SOW", and collectively with the Global Mobility SOW, the Tax Consulting SOW, and the International Assignment SOW, the

"SOWs"), annexed hereto as <u>Exhibit E</u>, and (vi) provide the Debtors with certain additional services (which services include (i) the renewal and extension of existing services and additional phase services under existing engagements approved by this Court, and (ii) additional services under future statements of work between the Debtors and KPMG for services of a nature consistent with the services covered in Prior Applications or in accordance with the Master Agreement) (the "Additional Services").

2.    This Silberg Declaration hereby incorporates by reference (a) the Affidavit of Patrick N. Karpen, sworn to on February 9, 2006 (the "Original Affidavit"), filed in support of the application dated February 14, 2006, pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules for authorization to retain KPMG as tax and transaction services advisors to the Debtors, effective <u>nunc pro tunc</u> to October 8, 2005 (the "Original Application"), pursuant to the terms of the engagement letters as described and defined therein (the "Original Engagement Letters"), (b) the Affidavit of Gary A. Silberg, sworn to on April 20, 2006 (the "First Supplemental Affidavit"), filed in support of the first supplemental application dated April 20, 2006 (the "First Supplemental Application"), pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy Code and Rule 2014 of the Bankruptcy Rules authorizing (i) the employment and retention of KPMG as advisory and valuation services advisors to the Debtors effective <u>nunc pro tunc</u> to February 16, 2006, (ii) the continued retention of KPMG as tax advisors to the Debtors effective <u>nunc pro tunc</u> to January 1, 2006, and (iii) additional international executive tax services to be rendered by KPMG to the Debtors effective <u>nunc pro tunc</u> to January 18, 2006 (the "First Supplemental Engagement Letters"), (c) the Affidavit of Ann Marie Goddard, sworn to on July 10, 2006, (the "Goddard Affidavit" and together with the Original Affidavit and the First Supplemental Affidavit, the "Prior Affidavits")

and (d) the declaration of Gary A. Silberg declared on November 10, 2006, (the "Declaration")

filed in support of the second supplemental application dated November 10, 2006 (the "Second

Supplemental Application"), pursuant to sections 327(a), 328(a), and 1107(b) of the Bankruptcy

Code and Rule 2014 of the Bankruptcy Rules for authorization to retain KPMG to assist the

Debtors with (i) certain improvements to the international tax reporting package and processes

effective nunc pro tunc to August 1, 2006, (ii) certain internal reporting initiatives effective nunc

pro tunc to May 9, 2006, (iii) a special investigation effective nunc pro tunc to July 10, 2006, (iv)

certain transfer pricing services effective nunc pro tunc to May 19, 2006, (v) certain improvements

to the financial close, consolidation and management reporting processes, and (vi) certain

additional services (including the renewal and extension of existing services and additional phase

services under existing engagements by and between the Debtors and KPMG) of a nature

consistent with the services covered in retention applications previously approved by the Court

("Additional Services").  On March 3, 2006, this Court entered an order approving the Original

Application effective nunc pro tunc to October 8, 2005 (the "Original Retention Order"), on May 2,

2006, this Court entered an order approving the First Supplemental Application (the "First

Supplemental Retention Order"), and on December 6, 2006, this Court entered an order approving

the Second Supplemental Application (the "Second Supplemental Retention Order").  I have

personal knowledge of the matters set forth herein, and, if called as a witness, would testify

competently thereto.[2]

Services To Be Rendered

A.    The Master Agreement

      3.    The Master Agreement establishes the standard terms and conditions

pursuant to which KPMG may provide the Debtors with certain professional services

---

[2]    Certain of the disclosures herein relate to matters within the knowledge of other professionals at KPMG.

("Professional Services'). The specific scope of work and other conditions will be described in each applicable statement of work.

    4.    The Global Mobility Services, the Tax Consulting Services, the International Assignment Services, and the Fresh Start Services are evidenced by the Master Agreement as supplemented by the applicable statement of work. The respective scopes of such services are described in the SOWs:

B.    <u>Global Mobility SOW</u>

    5.    In accordance with the Global Mobility SOW, KPMG will provide certain international assignment administration and consulting services to the Debtors in addition to those set forth in the Original Engagement Letters and First Supplemental Engagement Letters, including, but not limited to the following:

    a.    <u>Pre-Assignment Services</u>

        i.    Prepare cost projection including revisions;

        ii.    Prepare draft international assignment agreement;

        iii.    Prepare draft pay calculation;

        iv.    Finalize International Assignment Agreement and pay calculation and participate in consultation session;

        v.    Calculate Relocation Allowance and Mobility Premium to be paid in month prior to assignment and provide to payroll;

        vi.    Calculate first year spending account to be paid in first month of assignment and provide to payroll; and,

        vii.    Obtain Social Security Certificates of Coverage.

    b.    <u>During Assignment Services</u>

        i.    Calculate annual spending account on assignment anniversary date and provide to payroll;

        ii.    Answer international assignee's policy-related inquiries including policy interpretation based on Delphi-provided assumptions;

    iii.     Serve as focal point for international assignee's general questions and issues;

    iv.     Prepare periodic adjustments to compensation items according to Delphi's policy and/or changes to international assignee's pay or family status;

    v.     Prepare payroll changes per pay period and forward to Delphi for approval and processing;

    vi.     Prepare annual year-end compensation summaries;

    vii.     Monitor data provider subscriptions and invoices, as needed;

    viii.     Track key dates and notify International assignees and/or management of required actions;

    ix.     Track tax equalization settlements, forward to Delphi for approval and processing; and,

    x.     Conduct annual customer satisfaction survey and report results to Delphi.

c.    <u>Repatriation Services</u>

    i.     Calculate Relocation Allowance less outstanding tax and pro-rata spending account due from employee.

d.    <u>Other Services</u>

    i.     Other services requested by Delphi related to international assignments.

C.    <u>Tax Consulting SOW</u>

    6.    In accordance with the Tax Consulting SOW, KPMG will continue to provide tax consulting services with respect to such matters as may arise for Delphi for which Delphi seeks KPMG's advice and consultation.

D.    <u>International Assignment SOW</u>

    7.    In accordance with the International Assignment SOW, KPMG will provide certain international assignment tax preparation and consulting services to the Debtors in addition

to those set forth in the Original Engagement Letters and First Supplemental Engagement Letters,

including, but not limited to the following:

a.    <u>Expatriates Assigned From The U.S. And Expatriates Assigned To The U.S.</u>

       i.    Collect tax data;

       ii.    Calculate annual hypothetical tax withholding;

       iii.    Prepare required home and host country individual income tax returns during, and one year after assignment;

       iv.    Prepare requests for extension of time to file tax returns(s), where require;

       v.    Prepare U.S. estimated tax vouchers, if required;

       vi.    Prepare year-end U.S. withholding calculations, where applicable;

       vii.    Prepare tax equalization calculations;

       viii.    Determine and arrange for timely payment of local taxes in the host country, where applicable;

       ix.    Conduct pre-departure and/or post-arrival consultation sessions; and,

       x.    Handle routine correspondence with IRS and foreign tax authorities, including review of assessments.

b.    <u>Expatriates Assigned To And From Non-U.S. Countries</u>

       i.    Collect tax data;

       ii.    Calculate annual hypothetical tax withholding;

       iii.    Prepare required home and host country individual income tax returns during, and one year after assignment;

       iv.    Prepare requests for extension of time to file tax returns(s), where required;

       v.    Determine and arrange for timely payment of local taxes in the host country, where applicable;

       vi.    Prepare tax equalization calculations;

vii.    Conduct pre-departure and/or post-arrival consultation sessions; and,

viii.    Handle routine correspondence with foreign tax authorities, including review of assessments.

c.    <u>Employee Assigned To The Mexican Border</u>

i.    Collect tax data;

ii.    Prepare U.S. income tax return(s);

iii.    Prepare requests for extension of time to file tax return(s), where required;

iv.    Prepare tax equalization calculations;

v.    Prepare monthly non-resident Mexican tax calculations;

vi.    Conduct post-arrival consultation session; and,

vii.    Handle routine correspondence with the IRS.

d.    <u>J-1 Visa Trainees</u>

i.    Collect tax data;

ii.    Prepare U.S. income tax return(s);

iii.    Prepare requests for extension of time to file tax return(s), where required;

iv.    Conduct post-arrival consultation session; and,

v.    Handle routine correspondence with the IRS.

e.    <u>Cost Estimates</u>

i.    Prepare cost projection including revisions;

ii.    Prepare draft international assignment agreement;

iii.    Prepare draft pay calculation;

iv.    Finalize international assignment agreement and pay calculation and participate in consultation session;

v.    Calculate Relocation Allowance and Mobility Premium to be paid in month prior to assignment and provide to payroll;

    vi.    Calculate first year spending account to be paid in first month of assignment and provide to payroll;

    vii.    Calculate annual spending account on assignment anniversary date and provide to payroll; and,

    viii.    Calculate Relocation Allowance less outstanding tax and pro-rata spending account due from employee.

f.    <u>Global Coordination</u>

    i.    Centralized hypothetical tax calculation process;

    ii.    Tax planning review;

    iii.    On-going benchmarking of Delphi's current tax equalization policy;

    iv.    Dedicated website for Delphi;

    v.    Dedicated website for Delphi employees;

    vi.    Unlimited access to all KPMG publications;

    vii.    Status reports and client service reports; and,

    viii.    KPMG International Executive Services Flash Alert Newsletters.

g.    <u>Other Services</u>

    i.    Other services requested by Delphi related to international assignments.

E.    <u>Fresh Start SOW</u>

    8.    Pursuant to the Fresh Start SOW, KPMG will provide the Debtors with services related to addressing various valuation, accounting, financial reporting and tax needs arising from the Debtors' anticipated adoption of a confirmed plan of reorganization and emergence from chapter 11.  Specifically, KPMG will assist the Debtors in the recognition, measurement and financial reporting requirements of Statement of Position 90-7, *Financial Reporting by Entities in Reorganization under the Bankruptcy Code* ("SOP 90-7").

9.    In accordance with the Fresh Start SOW, KPMG will provide Fresh Start

Services to the Debtors as KPMG and the Debtors deem appropriate and feasible, including but not

limited to:

a.    <u>Accounting And Tax</u>

i.    <u>Fresh Start Approach And Work Steps</u>:  Considering the alternatives in approach, timing, order, and adoption dates for fresh start reporting, the alternatives for on-going efficient processing of detailed accounting records, and the potential approaches for updating detailed records to reflect changes in values and the new accounting requirements following emergence;

ii.    <u>Change Of Ownership</u>:  Evaluating whether the conditions in SOP 90-7 are met to justify adoption of a new, fresh start basis by determining whether there is a change in ownership before confirmation and after emergence;

iii.    <u>Issues And Documentation</u>:  Researching and documenting (memoranda, discussions with Ernst & Young as required, etc.) to support the accounting and reporting conclusions reached in accordance with SOP 90-7;

iv.    <u>Segregation Liabilities</u>:  Identifying and segregating of liabilities that arose before and after filing to reflect the liabilities subject to the bankruptcy process;

v.    <u>Claims</u>:  Monitoring the bankruptcy proceedings to (a) compare the claims filed, allowed, and existing debtor balances (particularly to trade vendors), (b) adjust the existing payables to the allowed claims, and (c) estimate claims to be settled upon emergence;

vi.    <u>Reporting Classifications</u>:  Identifying and segregating pre-emergence expenses, restructuring costs, and losses for classification in a special category called "reorganization items" to properly portray amounts from activities to restructure the operations prior to emergence;

vii.    <u>Guarantees</u>:  Considering issues related to recognizing the fair value of obligations from Guarantees (FIN 45) (from units subject to spin-off or sale as a result of the restructuring process);

viii.    <u>Asset Retirement Obligations(SFAS 143)</u>:  Considering issues related to the recognition of obligations from the retirement of tangible long-lived assets (from units subject to spin-off or sale as a result of the restructuring process);

ix.    <u>Top Level Reporting</u>:  Assessing the degree to which top side adjustments and disclosures are utilized to report on a fresh start basis

from the date of emergence until such amounts are recorded to the Debtors' detailed accounting records;

x.    Detailed Accounting Records: Developing an approach to repopulating the Debtors' detailed records with new fair values and asset lives - providing electronic files and assistance with updating fixed asset and other detailed accounting records with the concluded fair values;

xi.    Training Delphi Employees: Assisting with training the Debtors' employees on the impact of adopting fresh start accounting;

xii.    Book vs. Tax Balances: Identifying differences between book and tax balances that arise from the plan of emergence and fresh start accounting;

xiii.    Tax Attributes: Determining the current position of federal and state tax attributes (including usage limitations) and net asset basis (including basis in stock of subsidiaries) for federal and state tax purposes;

xiv.    Insolvent Subsidiaries: Considering the deferred tax impact on the outside basis of investments in insolvent subsidiaries;

xv.    Cancelled Debt Income: Computing the amount and allocation of canceled debt income for federal and state tax purposes;

xvi.    NOL Carryforwards: Identifying limitations in the ability to utilize net operating loss carry forwards as a result of the approved plan of reorganization;

xvii.    Tax Elections: Assessing the impact of available federal and state tax elections; and

xviii.    Bankruptcy-Related Expenses: Assessing the deductibility of bankruptcy-related expenses.

b.    Valuation

i.    Reorganization Value: Reading and identifying potential issues with the reorganization value (the "Reorganization Value") as determined by the Debtors' financial advisors and identifying differences in assumptions or methodologies used to determine reorganization value and the Business Enterprise Value of the Debtors' reporting units and plants;

ii.    Identification Of Assets And Liabilities: Obtaining and reading the Debtors' historical financial statements and detailed financial records, and conducting site visits as necessary, to identify assets and liabilities, regardless of whether those assets and liabilities are currently recorded;

iii.    <u>Fair Values</u>:  Preparing Fair Value Estimates for each identified asset and liability including In-Process Research and Development;

iv.    <u>Goodwill</u>:  Determining the difference, if any, between Reorganization Value and the fair value of the subject assets and liabilities identified and valued ("goodwill" or "negative goodwill");

v.    <u>Reporting Units</u>:  Determining the Business Enterprise Value for each reporting unit and allocating the fair value of subject assets and liabilities, including goodwill, to the SFAS 142 Reporting Units identified by the Debtors, taking into consideration the Reorganization Value;

vi.    <u>Joint Ventures</u>:  Preparing fair value estimates for the joint venture interests and allocations to identified intangibles in acquisitions accounted for under the equity method;

vii.    <u>Remaining Useful Lives</u>:  Estimating remaining useful lives and providing amortization schedules for the tangible and identified intangible assets; and

viii.    <u>Valuation Report</u>:  Issuing a valuation report covering the fair value estimates of the subject assets and liabilities and Business Enterprise Values for each reporting unit of the Debtors;

c.    <u>Systems</u>

i.    Assessing the impact of fresh start accounting on the Debtors' existing systems and reporting requirements and providing recommendations for improvement;

ii.    Providing the Debtors with example model journal entries that may be required to adjust the accounting records in connection with initial or subsequent conversion to the new accounting bases;

iii.    Working with the Debtors to identify methods to record the adjustments required in the consolidation systems and accounting records;

iv.    Assisting with identifying the impact on other reporting requirements and methods to efficiently report on the new bases of accounting (i.e. tax and management reporting);

v.    Advising the Debtors on the roll-out of the "component evaluation" methodology to each impacted entity.  This methodology organizes the work effort around components to identify where adjustments are needed and how to incorporate these into the various systems.  Key aspects include:

- Understanding the local accounting policies or requirements;

- Identifying the impact of the new accounting policies or requirements;

- Identifying of the accounts which must be restated;
- Documenting the systems which require change and possible new systems;
- Identifying interdependence with other components;
- Developing a preliminary plan to produce new data requirements (design);
- Obtaining approvals or sign off on key decisions; and
- Identifying factor to consider as you begin to implement (build and test); and

    vi.    Advising the Debtors on additional improvements which could be made to the financial reporting processes and systems in both the short term and long term.

    d.    <u>Project Management</u>

    i.    KPMG will provide project management services to the Debtors' senior management and its fresh start project manager that will assist in coordinating the Fresh Start Services.

10.    The services to be provided by KPMG to the Debtors under the Master Agreement, and the SOWs will not be unnecessarily duplicative of those provided by any other of the Debtors' professionals and KPMG will coordinate any services performed at the Debtors' request with the Debtors' other professionals, including financial advisors, accountants, and counsel, as appropriate, to avoid duplication of efforts.

11.    Subject to this Court's approval of the Third Supplemental Application, KPMG is willing to provide the Debtors with the services described in the Master Agreement and the SOWs on the terms set forth therein.

<u>Professional Compensation</u>

12.    Subject to this Court's approval of the Third Supplemental Application and pursuant to the terms and conditions of the Master Agreement and the SOWs, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours

actually expended by each assigned staff member at each staff member's hourly billing rate, subject to the discounts and other terms set forth herein.

13.      The rates included in this Silberg Declaration (exclusive of discounts) are KPMG's normal and customary rates for matters of this sort.  In the normal course of business, KPMG revises its hourly rates on October 1st of each year.  Subject to this Court's approval, KPMG requests that the rates listed below be revised to the hourly rates that will be in effect at such time.

A.     The Global Mobility SOW

14.      Subject to this Court's approval and pursuant to the terms and conditions of the Global Mobility SOW, KPMG's requested compensation for professional services rendered to the Debtors under the Global Mobility SOW are as follows:

|  | Fees |
|---|---|
| Annual Fee for International Assignees Assigned from the U.S. | $3,000 |
| Annual Fee for International Assignees Assigned to the U.S. | $1,320 |
| Annual Fee for International Assignees Assigned to and from Non-U.S. Countries | $840 |
| Preparation of Cost Estimates, International Assignment Agreement, and Pay Calculation and for cancelled assignments | $850 |

B.     The Tax Consulting SOW

15.      Subject to this Court's approval and pursuant to the terms and conditions of the Tax Consulting SOW, KPMG's requested compensation for professional services rendered to the Debtors will be based upon the hours actually expended by each assigned staff member at each staff member's hourly billing rate.  The hourly rates for the Tax Consulting Services are as follows:

| Professional Level: | Net Hourly Rate After Application Of Discount: |
|---|---|
| Partner | $480 |
| Senior Manager | $395 |
| Manager | $315 |
| Senior Associate | $225 |
| Associate | $150 |

16.    In accordance with the Tax Consulting SOW, fees for KPMG International Member Firms will be billed at 60% of their standard hourly rates.  KPMG estimates that the total fees to be incurred under the Tax Consulting SOW will be $50,000 to $75,000.

C.    The International Assignment SOW

17.    Subject to this Court's approval and pursuant to the terms and conditions of the International Assignment SOW, KPMG's requested compensation for professional services rendered to the Debtors under the International Assignment SOW are as follows:

|  | Fees |
|---|---|
| Expatriates Assigned to the U.S. | $1,750 |
| Expatriates Assigned from the U.S. | $2,700 |
| Expatriates Assigned to and from Non-U.S. Countries | $2,100 |
| Employees Assigned to the Mexican Border | $750 |
| J-1 Visa Trainees | $375 |
| Preparation of monthly Mexican non-resident tax withholding calculation for Employees Assigned to the Mexico Border | $40 |
| Preparation of Amended U.S. tax returns for Expatriates Assigned to the U.S. and Expatriates Assigned from the U.S. | $800 |
| Preparation of Amended U.S. tax returns for Employees Assigned to the Mexico Border | $375 |
| Preparation of Cost Estimates, Expatriate Agreement, Pay Calculation and update of annual Spending Account at onset of | $850 |

assignment

Preparation and compilation of payments at host information          $375

D.     The Fresh Start SOW

18.     Subject to this Court's approval and pursuant to the terms and conditions of

the Fresh Start SOW, KPMG's requested compensation for professional services rendered to the

Debtors will be based upon the hours actually expended by each assigned staff member at each

staff member's hourly billing rate.  KPMG has agreed to apply a voluntary discount to its hourly

rates as set forth in the Fresh Start SOW.  The discounted hourly rates for such services to be

rendered by KPMG are as follows:

| Professional Level: | Net Hourly Rate After Application Of Discount: |
|---|---|
| Partner | $500 |
| Director | $440 |
| Manager | $360 |
| Senior | $250 |
| Associate | $165 |

E.     Expenses

19.     KPMG will seek such reimbursements in accordance with the terms and

conditions of the Travel And Per Diem Expense Reimbursement Policy made part of the Master

Agreement and the SOWs, and in accordance with guidelines established by the U.S. Trustee (the

"U.S. Trustee Guidelines").

20.     KPMG intends to apply to this Court for allowance of compensation and

reimbursement of expenses in accordance with the applicable provisions of the Bankruptcy Code,

the Bankruptcy Rules, corresponding Local Bankruptcy Rules for the Southern District of New

York (the "Local Rules"), orders of this Court, and U.S. Trustee Guidelines.   KPMG

acknowledges that all compensation will be subject to this Court's review and approval after notice and hearing. KPMG has agreed to accept as compensation such sums as may be allowed by this Court.

Other Terms And Conditions Of The Master Agreement and SOWs

A.    Subcontracting Services To KPMG Member Firms

21.    The KPMG global network encompasses independent professional services practices conducted by separate legal entities throughout the world. KPMG International, a Swiss cooperative, serves as a coordinating entity for a network of member firms operating under the KPMG name. KPMG International is a member-based entity with no shareholders and no permanent capital. Each of the member firms of KPMG International ("KPMG Member Firms") is separate and legally distinct. KPMG is the United States member firm of KPMG International.

22.    Without the Debtors' prior written approval, KPMG may subcontract with certain other KPMG Member Firms to provide services to the Debtors under the Master Agreement and the SOWs, provided, however, that KPMG will remain fully and solely responsible for all of its liabilities and obligations under the Master Agreement and the SOWs whether or not performed, in whole or in part, by KPMG, any affiliate of KPMG, any KPMG Member Firm, or any of their respective affiliates. The Debtors will have no recourse, and will bring no claim, against any KPMG Member Firm other than KPMG, or against any subcontractors, members, shareholders, directors, officers, managers, partners, agents, representatives, or employees of any KPMG Member Firm (or any of their respective successors or permitted assigns), or any of their respective assets, with respect to the services or otherwise under the Master Agreement and the SOWs.

23.        KPMG will pay such Engagement Member Firms directly for their services, and will apply to the Court for reimbursement by the Debtors of any such payments made by KPMG to the Engagement Member Firms.   The KPMG Member Firms (other than KPMG) providing services to the Debtors under the Master Agreement and the SOWs will use category codes to describe the services rendered, rather than more detailed descriptions usually required for fee applications.

B.      Dispute Resolution

24.        With respect to dispute resolution, KPMG acknowledges that any dispute or claim relating to their engagement under the Master Agreement and the SOWs may also be brought before this Court.

C.      Indemnification And Limitation On Liability

25.        With respect to indemnification and   limitation on liability, KPMG acknowledges that under the Master Agreement and the SOWs, KPMG will not be indemnified and KPMG's limitation of liability will not apply to claims arising out of KPMG's own bad-faith, self-dealing, breach of fiduciary duty, gross negligence, or willful misconduct, if any.

26.        Pursuant to the International Assignment SOW and the Global Mobility SOW, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence, or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than two times the total amount of fees paid to KPMG for services rendered under the International Assignment SOW and the Global Mobility SOW. Pursuant to the Tax Consulting SOW, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence, or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than five times the total amount of fees paid to KPMG for

services rendered under the Tax Consulting SOW.  Pursuant to the Fresh Start SOW, KPMG's liability to pay damages for any losses incurred by the Debtors as a result of breach of contract, negligence, or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for services rendered under the Fresh Start SOW.

D.      Termination

27.      The Master Agreement will expire on December 31, 2007, whereupon KPMG and the Debtors may extend the Master Agreement for successive one year periods.  Each SOW will become effective as of the date of the commencement of services to be rendered under such SOW, or, if earlier, the date of execution of such SOW.   Each SOW will remain effective until the completion of the services to be rendered under the applicable SOW.

28.      KPMG and the Debtors may terminate the Master Agreement or any SOW in the event of a material breach of the Master Agreement that is not cured within 30 days after receipt of written notice of such breach.

29.      Additionally, under the Master Agreement, the Debtors may terminate any SOW for convenience at any time upon 30 days' prior written notice.  KPMG may terminate any SOW at any time upon 30 days' notice to the Debtors in the event of any change in law, rule, regulation, or professional standards that would cause the continued provision of the services under such SOW by KPMG to violate such law, rule, regulation, or professional standard or in the event of a sale by KPMG of the practice providing the services under such SOW if the Debtors elect not to consent to an assignment to the party acquiring such practice from KPMG.  The terminating party shall provide the Court, the U.S. Trustee, the Official Committee of Unsecured Creditors, and the Joint Fee Review Committee with ten business days' notice of termination.

## Disinterestedness Of Professionals

30.     The Prior Affidavits, the Declaration and this Silberg Declaration contain information on KPMG's connections with other parties-in-interest, as required by Bankruptcy Rule 2014(a).  KPMG maintains procedures on an ongoing basis to evaluate its connections with parties-in-interest in the Debtors' chapter 11 cases (the "Conflicts Procedures").  Based on the information in the Prior Affidavits, the Declaration, this Silberg Declaration and the Conflicts Procedures, KPMG and the professionals in the firm are "disinterested persons," as that term is used in section 101(14) of the Bankruptcy Code, and are otherwise eligible to be retained under section 327(a) of the Bankruptcy Code.

31.     KPMG's identification of material relationships is ongoing.  If and when additional information becomes available with respect to any other relationships which may exist between KPMG, KPMG Member Firms (as defined in the Original Affidavit), or their partners and professionals and the Debtors, creditors, or any other parties-in-interest which may affect these chapter 11 cases, supplemental affidavits describing such information will be filed with this Court.

32.     In accordance with section 504 of the Bankruptcy Code, I hereby state that there is no agreement or understanding between KPMG and any other entity, other than a member, partner, or regular associate of KPMG for the sharing of compensation received or to be received for services rendered under the Master Agreement and the SOWs.

33.    I declare under penalty of perjury under the laws of the United States of

America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on March 14, 2007, at Chicago, Illinois

Gary A. Silberg
Partner

EXHIBIT A

# MASTER PROFESSIONAL SERVICES AGREEMENT

This is a MASTER PROFESSIONAL SERVICES AGREEMENT, dated as of February 9, 2007 (this "Agreement"), between KPMG LLP, a Delaware registered limited liability partnership ("KPMG"), and Delphi Corporation, a Delaware corporation ("Delphi"), each a Party, and together Parties, to this Agreement.

## Background

KPMG and Delphi desire to establish a contract pursuant to which Delphi may, from time to time, obtain from KPMG, and KPMG may provide to Delphi, certain professional Services (as defined in Section 1(a)), all on the terms and subject to the conditions set forth in this Agreement and in the applicable statement of work ("SOW").

## Terms and Conditions

In consideration of the premises and of the mutual covenants and agreements contained herein, and intending to be legally bound, the Parties hereby agree as follows:

1.    Services.

(a)    This Agreement establishes the standard terms and conditions pursuant to which KPMG may provide to Delphi certain professional services (the "Services"), as may be performed or agreed upon from time to time in writing in an SOW. Notwithstanding anything herein to the contrary, the Services shall not include (i) the provision of expert testimony on behalf of Delphi (which would be subject to a separate engagement) or (ii) any service that would require KPMG to maintain independence from Delphi in accordance with then current applicable law, rule or regulation of any governmental entity or professional organization. Unless expressly set forth in a Statement of Work with respect to tax services, the Services do not include representing Delphi in the event of a challenge by the United States Internal Revenue Service (the "IRS") or other tax or revenue authorities. An executed SOW, attached and incorporated into a Delphi purchase order, may expressly identify and amend terms and conditions in this Agreement, or list special terms and conditions, effective for that SOW only. Unless modified by provisions contained in an SOW, the terms and conditions in this Agreement are incorporated into and made part of each SOW. To the extent of any express conflict or inconsistency between the terms and conditions of an SOW and the terms and conditions of this Agreement, the terms and conditions of the SOW will control.

(b)    An SOW shall contain the following, as applicable: (i) the term or period of time during which KPMG will perform the Services, provide resources or otherwise perform its obligations as specified in the SOW; (ii) a description of the obligations of, and Services to be performed by, KPMG; (iii) a description of Delphi's responsibilities related to the SOW,

1

including any facilities, equipment, personnel and tasks or other support to be provided or performed by Delphi; (iv) KPMG's fees and expenses under the SOW, or, if applicable, the basis on which such fees and expenses will be computed; (v) any provision limiting the liability of either Party other than, or in addition to, those provision set forth herein, and (vi) any other terms and conditions appropriate to the Services to be performed and the obligations of the Parties under that SOW. Forms of Statements of Work are attached hereto as Attachment A.

(c)     Subsequent to the completion of the Services under an SOW, KPMG will not update its advice, recommendations or work product for changes or modification to the law and regulations, or to the judicial and administrative interpretations thereof, or for subsequent events or transactions, unless Delphi separately engages KPMG to do so in writing after such changes or modifications, interpretations, events or transactions.

2.     Term.

The term of this Agreement shall commence as of February 9, 2007, and shall continue until December 31, 2007, whereupon Delphi and KPMG may agree to extend the Agreement for successive one (1) year periods. Each SOW shall become effective as of the date of the commencement of the Services or, if earlier, the date of execution of such SOW. Each SOW executed by the Parties prior to the effective date of a termination (as provided for in Section 7) shall remain in full force and effect in accordance with its terms, including the terms and conditions of this Agreement until completion of the Services to be provided thereunder or termination of the applicable SOW. If KPMG commenced the performance of the Services prior to the execution of this Agreement, this Agreement shall be effective as of the commencement of such Services and shall cover such Services unless the performance of such Services are governed by an existing executed agreement. The Parties agree that any such existing executed agreements shall be converted to SOWs within ninety (90) days of the execution of this Agreement, unless the services under such existing executed agreements have been completed by such date.

3.     Fees, Expenses and Taxes.

(a)     In addition to professional fees outlined in the applicable SOW, KPMG will also bill Delphi for pre-approved reasonable and necessary out-of-pocket and travel expenses according to the guidelines set forth in Exhibit A: Delphi Travel and Expense Reimbursement Policy for Contractors; provided, however, that instead of submitting all expenses on Delphi expense vouchers, KPMG shall account for such expenses within KPMG's normal expense reimbursement system. An SOW may set forth certain expenses or an amount applicable to certain expenses or exceptions to the Delphi travel policy referred to above, which shall serve a Delphi's pre-approval for KPMG to incur such expenses. Delphi may elect to have KPMG book travel through Delphi. Delphi acknowledges that where KPMG is reimbursed for expenses, it is KPMG's policy to bill clients the amount incurred at the time the good or service is purchased and that if KPMG subsequently receives a volume rebate or other incentive payment from a vendor relating to such expenses, KPMG does not credit such payment to Client and that KPMG instead applies such payments to reduce its overhead costs, which costs

2

are taken into account in determining KPMG's standard billing rates and certain transaction charges that may be charged to clients.

(b)    Delphi shall pay for all taxes, other than withholding taxes and taxes based on or measured by KPMG's or KPMG's personnel's net income, including any interest and penalties from any related deficiency if due to an act by Delphi and not that of KPMG, in connection with this Agreement, including any sales, use, excise, value-added, services, consumption, and other taxes and duties assessed on the provision of Services by KPMG to Delphi or on KPMG's charges to Delphi under this Agreement including the reimbursement of expenses, so long as such taxes are listed in the applicable invoice  The parties shall cooperate in good faith to minimize such tax liabilities to the extent legally permissible.

4.    Invoices.

Unless otherwise provided in an SOW, KPMG will submit an invoice to Delphi at the end of every month for all hours of service provided to Delphi by KPMG, together with all expenses incurred by KPMG, during the preceding month period.  The invoices shall be in the form and contain all information required by the rules and procedures of the United States Bankruptcy Court for the Southern District of New York.  Each such invoice shall be due and payable pursuant to Delphi's Multilateral Netting System ("MNS-2"), which provides, on average, that payment shall be on the second day of the second month following the date of the invoice, recognizing that the rules and procedures of the United States Bankruptcy Court for the Southern District of New York will apply.  In no event shall Delphi pay KPMG interest or other late charges on any fees due under this Agreement.

5.    Client Responsibilities.

(a)    Delphi shall provide or arrange to provide KPMG with all information relevant to the Services and any reasonable assistance as may be required to properly perform the Services, including without limitation timely access to and use of Delphi's personnel, facilities, equipment, data and information to the extent necessary for KPMG to perform the Services. Unless otherwise indicated, Delphi represents and warrants to KPMG that all such information will be accurate and complete in all material respects, to the best of Delphi's knowledge.  Delphi acknowledges and agrees that KPMG may, in performing certain aspects of the Services, base its conclusions on the facts and assumptions that Delphi furnishes and that KPMG may use data, material, and other information furnished by or at the request or direction of Delphi without any independent investigation or verification and that KPMG shall be entitled to rely upon the accuracy and completeness of such data, material and other information.  Inaccuracy or incompleteness of such data, material and other information furnished to KPMG could have a material effect on KPMG's conclusions.  The overall definition and scope of the work to be performed, and the adequacy of such definition and scope in addressing Delphi's needs, is Delphi's responsibility.    Delphi shall perform all management functions and make all management decisions in connection with the Services, and shall assign competent individuals to oversee the Services.  Delphi is also responsible for the implementation of actions identified in the course of this engagement and results achieved from using any Services or Deliverables as defined in Section 6(a) below.

3

(b)      Each Party shall use commercially reasonable procedures to check for the then most commonly known viruses and to check the integrity of data before sending information to the other electronically, but each Party recognizes that such procedures cannot be a guarantee that transmissions will be virus free.  It remains the responsibility of the Party receiving an electronic communication from the other to carry out a virus check on any attachments before launching any documents whether received on disk or otherwise.

(c)      Neither Party shall be responsible for any delay, cost increase or other consequences due to the other Party's failure to perform any of its obligations under this Agreement or an SOW or otherwise due to factors beyond its reasonable control.  Each Party will use commercially reasonable efforts to mitigate such costs or expenses.  Any deadline that is affected by the other party's default shall be extended by a reasonable amount of time provided that the non-defaulting party has provided timely communication to the defaulting party.

6.      <u>Deliverables.</u>

(a)      <u>Ownership.</u> KPMG shall own any general skills, know-how, expertise, ideas, concepts, methods, techniques, processes, software, materials or other intellectual property or information which may have been discovered, created, developed or derived by KPMG either prior to or as a result of its provision of Services under this Agreement ("KPMG Materials"). Subject to the restrictions in this Agreement, Delphi will own all tangible written material originally prepared expressly for Delphi and delivered to Delphi under this Agreement (the "Deliverables"), excluding any KPMG Materials contained or embodied therein.  KPMG's working papers and KPMG's Confidential Information (as defined in Section 9(a)) belong exclusively to KPMG; provided, however, KPMG shall provide a copy of such working papers to Delphi after consultation and agreement with Delphi.  Delphi will have a non-exclusive, non-transferable license to use KPMG Materials for Delphi's own internal use and only for the purposes for which they are delivered to the extent that they form part of the Deliverables.

(b)      <u>Use of Deliverables.</u> Except as otherwise expressly stated in the applicable SOW, all Deliverables are solely for Delphi's internal use and benefit.  Delphi shall not authorize any third party ("Third Party") to rely upon any of the Deliverables except as set forth in an SOW or, if not set forth in an SOW, without KPMG's prior written consent.  Except that Deliverables may be disclosed to (i) taxing authorities, (ii) an accounting firm providing attest services to Delphi (solely to the extent necessary for the performance of such attest services), and (iii) as set forth in this Section 9(b) or (iv) as set forth in an SOW; Delphi shall not distribute to, discuss with, or otherwise disclose the Deliverables to any Third Party without KPMG's prior written consent.  Oral or preliminary information, drafts or advice given by KPMG may not be relied upon or attributed to KPMG unless KPMG specifically confirms such information or advice or otherwise reduces such draft to a final writing.

7.      <u>Termination.</u>

(a) Either Party may terminate this Agreement or any SOW under this Agreement in the event of a material breach of this Agreement that is not cured within thirty (30) days after

4

receipt of written notice of such breach. Unless otherwise provided in the applicable SOW, Delphi may terminate this Agreement or any SOW for convenience at any time upon thirty (30) days prior written notice. KPMG may terminate any SOW for convenience at any time upon thirty (30) days notice to Delphi in the event of any change in law, rule, regulation or professional standards that would cause the continued provision of the services under such SOW by KPMG to violate such law, rule, regulation or professional standards or in the event of a sale by KPMG of the practice providing the services under such SOW if Delphi elects not to consent to an assignment to the party acquiring such practice from KPMG. In the event of Delphi termination for breach by KPMG, Delphi shall be responsible for fees earned and expenses incurred only up to the date of written notice to KPMG of the breach. In the event of other termination by Delphi or termination by KPMG for breach by Delphi, Delphi will be responsible for fees earned and expenses incurred through the actual date of termination. In the event of termination by mutual agreement, the Parties shall jointly determine the fees due or to be refunded.

(b) KPMG may also resign from performing all or any portion of the Services and terminating this Agreement and/or any SOW immediately upon written notice in the event that circumstances arise that would make continuation of all or any portion of the Services by KPMG in conflict with any independence or other professional regulations, standards or guidelines to which KPMG conforms. If Delphi is or becomes an SEC registrant audit client of KPMG and the Services performed and/or Deliverables provided under a particular SOW will be relied upon by the KPMG audit team, the limitation of liability and Delphi's obligation to indemnify under this Agreement will not apply to such Services and/or Deliverables.

8.    <u>Warranty.</u>

KPMG warrants that it has the requisite power and authority to enter into and perform its obligations under this Agreement and each SOW. KPMG further warrants that the Services will be performed by qualified personnel. KPMG warrants that it will provide its non-tax-related Services in a manner consistent with the terms and conditions of this Agreement and in accordance with the applicable Standards for Consulting Services established by the American Institute of Certified Public Accountants ("AICPA") as well as any applicable standards (as agreed to between the Parties) of the Public Company Accounting Oversight Board ("PCAOB"). KPMG warrants that it will provide its tax services in a manner consistent with the terms and conditions of this Agreement and in accordance with the AICPA Statements on Standards for Tax Services and any applicable standards (as agreed to between the Parties) of the PCAOB. THE WARRANTIES IN THIS SECTION 8 AS WELL AS ANY EXPRESS WARRANTY IN ANY APPLICABLE SOW (BUT ONLY IF EXPRESSLY IDENTIFIED AS A "WARRANTY" IN SUCH SOW) ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, OR WHETHER ARISING BY COURSE OF DEALING OR PERFORMANCE, CUSTOM, USAGE IN THE TRADE OR PROFESSION OR OTHERWISE, INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

9.      Confidentiality.

(a)     All data relating specifically to a Party's business and any other information
which reasonably should be understood to be confidential in nature are confidential
information of such Party.  KPMG's proprietary software, tools, methodologies, techniques,
ideas, discoveries, inventions, know-how and any other information which reasonably should
be understood to be confidential to KPMG are confidential information of KPMG.  Delphi
confidential information and KPMG confidential information are collectively referred to as
"Confidential Information."  Each Party shall use Confidential Information of the other Party
only in furtherance of the purposes of this Agreement and shall not disclose such Confidential
Information to any third party without the other Party's prior written consent.  Each Party
agrees to take reasonable measures to protect the confidentiality of the other Party's
Confidential Information and to advise its employees of the confidential nature of the
Confidential Information and of the confidentiality provisions and use prohibitions herein.

(b)     Notwithstanding any terms or conditions in this Agreement to the contrary, no
conditions of confidentiality within the meaning of Internal Revenue Code §6111(d) or U.S.
Treasury Regulations §1.6011-4 are intended, and Delphi (and each employee, representative,
or other agent of Delphi) may disclose to any and all persons, without limitation of any kind,
the tax treatment and tax structure of any transaction and all materials of any kind (including
opinions or other tax analysis) that are provided to Delphi relating to such tax treatment and tax
structure, subject to the limitations set forth in the following sentence.  In the event that a
Deliverable includes discussion of such tax treatment or tax structure, disclosure of the
Deliverable will be limited solely to the section or sections discussing the tax treatment or tax
structure; all other information in the Deliverable unrelated to the tax treatment or tax structure
remains subject to the restrictions set forth in Section 9(a) and all references to "KPMG" and
all branding and other identifiers of KPMG shall be redacted from the tax treatment and tax
structure portions of such Deliverable, and/or shall otherwise not be distributed to any other
third party, except as may be expressly provided for in this Agreement.  This Section 9(b)) is
effective as of the commencement of any discussions the Parties may have had regarding any
transaction related to any Services.

(c)     Notwithstanding anything to the contrary contained in this Agreement, neither
Party shall be obligated to treat as confidential any information disclosed by the other Party (the
"Disclosing Party") which: (i) is rightfully known to the recipient prior to its disclosure by the
Disclosing Party except that which was disclosed under a prior confidentiality agreement
between the Parties; (ii) is released by the Disclosing Party to any other person or entity
(including governmental agencies) without restriction; (iii) is independently developed by the
recipient without any use of or reliance on Confidential Information; or (iv) is or later becomes
publicly available without violation of this Agreement or may be lawfully obtained by a Party
from any nonparty.  Notwithstanding the foregoing, either Party may disclose Confidential
Information of the other to a third party as may be required by law, statute, rule or regulation,
including any subpoena or other similar form of process, or by the standards of the AICPA or
other professional self-regulatory authority, provided that (and without breaching any legal or

6

regulatory requirement) the Party to which the request is made provides the other Party with prompt written notice thereof and, if practicable under the circumstances, allows the other Party to seek a restraining order or other appropriate relief. Subject to KPMG's confidentiality obligations in this Agreement, nothing herein shall preclude or limit KPMG from providing services similar to the Services to other KPMG clients.

      (d)    The provisions of this Section 9 shall survive the termination or expiration of this Agreement.

10.    <u>Indemnification.</u>

      (a)    Subject to the provisions hereof, each Party shall indemnify, defend and hold harmless the other from and against any and all amounts payable under any judgment, verdict, court order or settlement for death or bodily injury or the damage to or loss or destruction of any real or tangible personal property, but only to the extent the foregoing arise out of the indemnitor's gross negligence or intentional misconduct in the performance of this Agreement.

      (b)    KPMG agrees to indemnify, defend and hold harmless Delphi from and against any and all amounts payable under any judgment, verdict, court order or settlement for Third Party claims of infringement or misappropriation of any trade secrets, copyrights, trademarks, trade names or other intellectual property rights alleged to have occurred and arising from the Deliverables. Should Delphi's use of such Deliverables be determined to have infringed, or if, in KPMG's judgment, such use is likely to be infringing, KPMG may, at its option: (i) procure for Delphi the right to continue using such Deliverables provided, or (ii) replace or modify them to make their use non-infringing while yielding substantially equivalent results. If neither of the above options are or would be available on a basis that KPMG finds commercially reasonable, then, KPMG may terminate this Agreement, Delphi shall return such Deliverables provided to KPMG and KPMG will refund to Delphi the fees paid for the Deliverables provided. This infringement indemnity does not cover claims to the extent arising from: (1) the combination of such Deliverables with products or services not provided by KPMG; (2) the modification of such Deliverables by any person, other than KPMG; (3) Deliverables complying with or based upon: (A) designs provided by or at the direction of Delphi or (B) specifications or other information provided by or at the direction of Delphi; or (4) use of systems, materials or work performed in a manner not permitted or contemplated hereunder or by another obligation of Delphi to KPMG.

11.    <u>Limitation of Liability.</u>

      (a)    KPMG is the US member firm of the global network of KPMG International (exclusive of KPMG, the "KPMG Member Firms"). In the course of providing the Services and/or Deliverables hereunder, KPMG, may, in its discretion, draw on the resources of and subcontract to other KPMG Member Firms. Delphi agrees that KPMG may provide any information KPMG receives in connection with this engagement to other KPMG Member Firms for the purpose of providing the Services and/or for internal administrative and regulatory compliance purposes. The provision of Services and/or Deliverables will remain the

7

responsibility of KPMG. Delphi agrees that in relation to the Services and this Agreement, its relationship is solely with KPMG. Delphi further agrees that no KPMG Member Firms, nor the partners, principals or employees of KPMG or the KPMG Member Firms (together the "Beneficiaries"), who perform work in connection with the Services and/or Deliverables will have any liability to Delphi in connection with the Services or this Agreement. Delphi therefore agrees to bring any claim under this Agreement against KPMG and not to bring a claim of any nature against any such KPMG Member Firm relating to the Services, Deliverables or this Agreement except where such a claim cannot be excluded by law.

(b)     The provisions of this Agreement and any SOWs relating to the Beneficiaries have been stipulated by KPMG expressly for their benefit. Delphi agrees that each of the Beneficiaries shall have the right to rely on said provisions as if they were Parties to this Agreement. Delphi likewise agrees on behalf of all of its business operations in which Delphi has a direct or indirect controlling interest and that are receiving Services or Benefits of Services under this Agreement ("Service Recipients"), that they are bound by these provisions as if they were Parties to this Agreement. Without limiting any other indemnification provision set forth in this Agreement, Delphi agrees to indemnify and hold harmless KPMG and the Beneficiaries from and against any claim that is asserted by any Service Recipient other than Delphi arising out of or relating to the Services and/or Deliverables provided under this Agreement, and all liabilities, costs, damages and expenses imposed or incurred in connection therewith, including reasonable attorneys' fees.

(c)     Each SOW shall include a provision setting forth any applicable limitation of liability. The parties acknowledge and agree that no SOW shall be valid unless it contains such a provision. In addition, neither party will be liable in any event for lost profits or any consequential, indirect, punitive, exemplary or special damages. Further, KPMG shall have no liability to Delphi arising from or relating to any third party hardware, software, information or materials supplied by Delphi

(d)     KPMG accepts no liability to third parties other than Service Recipients with respect to the Services and Deliverables. Delphi agrees (without limiting any other indemnification provision set forth in this Agreement) to indemnify and hold KPMG and the Beneficiaries (as defined in Section 11(a)) harmless from and against any and all Third Party claims, suits and actions, and all associated damages, settlements, losses, liabilities, costs, and expenses, including without limitation reasonable attorneys fees, arising from or relating to the Services and/or Deliverables under this Agreement, except to the extent finally determined to have resulted from KPMG's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful or intentional misconduct relating to such Services and/or Deliverables.

12.     Changes; Additional Services.

KPMG will not be responsible for work that is beyond the scope of Services set forth in this Agreement or the applicable SOW. Either Party may request changes to the Services. Changes must be agreed between the Parties and may be subject to reasonable adjustments to fees and schedules. Changes to an SOW that amount to the provision of additional Services,

rather than adjustments to the Services already agreed, must be in writing and signed by both Parties.

13.    Subcontracts.

KPMG may subcontract any of the Services hereunder, with written approval of Delphi, provided that KPMG shall be responsible for the fulfillment of its obligations hereunder.  For purposes of this section, KPMG Member Firms outside of the US are not considered subcontractors.  Notwithstanding anything to the contrary in this Agreement, KPMG may disclose Delphi's Confidential Information to such approved subcontractors involved in the provision of the Services.

14.    Engagement Limitations Applicable to All Services.

(a)    The Services do not include the provision of legal advice and KPMG makes no representations regarding questions of legal interpretation.  Delphi should consult with its attorneys with respect to any legal matters or items that require legal interpretation, under federal, state or other type of law or regulation.  Changes in the law and/or its interpretation may take place before KPMG's advice is acted upon, or may be retrospective in effect; KPMG accepts no responsibility for changes in the law or its interpretation which may occur after the provision of the Services.  Without limiting the generality of the foregoing, Delphi acknowledges that tax laws and regulations are subject to change at any time, and such changes may be retroactive in effect and may be applicable to advice given or other Services rendered before their effective dates.  KPMG does not assume responsibility (and will have no liability) for such changes occurring after the date it has completed its Services under a particular SOW.

(b)    KPMG will provide no opinion, attestation or other form of assurance with respect to its work or the information upon which its work is based.  The procedures KPMG will be performing under this Agreement will not constitute an examination or a review in accordance with generally accepted auditing standards or attestation standards.  KPMG will not audit or otherwise verify the information supplied to it in connection with any engagement under this Agreement, from whatever source, except as may be specified in the applicable SOW.

(c)    KPMG has not been engaged to, nor will KPMG provide any management functions or make management decisions for Delphi under this Agreement.  It is Delphi's responsibility to establish and maintain its internal controls.  In addition, it is Delphi's responsibility to determine the procedures deemed necessary in connection with its compliance with the provisions of the Sarbanes-Oxley Act of 2002 (the "Act") and related SEC rules, to execute those procedures and to assess the results of its procedures and the adequacy thereof.  KPMG provides no opinion or other form of assurance with respect to Delphi's compliance with the Act, related SEC rules, or Delphi's procedures.  KPMG makes no representation as to the sufficiency of Delphi's procedures for its own purposes.  The Services should not be taken to supplant inquiries and procedures that Delphi should undertake for purposes of obtaining and using the information necessary in connection with Delphi's compliance with the provisions of the Act and related SEC rules.

9

(d)     Except as otherwise set forth in the applicable SOW, Delphi acknowledges that completion of the Services under an SOW or acceptance of the Deliverables thereunder will not constitute a basis for Delphi's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act"). The Services under an SOW shall not be construed to support Delphi's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(e)     KPMG may communicate with Delphi by electronic mail or otherwise transmit documents in electronic form during the course of providing Services under this Agreement. Delphi accepts the inherent risks of these forms of communication (including the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices) and agrees that it may rely only upon a final hardcopy version of a document or other communication that KPMG transmits to Delphi unless no such hardcopy is submitted by KPMG to Delphi.

(f)     Delphi acknowledges that certain of KPMG's personnel who may be considered "owners" under the California Accountancy Act and implementing regulations (California Business and Professions Code section 5079(a); 16 Cal. Code Regs. sections 51 and 51.1) and who may provide Services under an SOW may not be licensed as certified public accountants under the laws of any of the various states.

15.   General.

(a)     KPMG, in furnishing Services to Delphi, is acting only as an independent contractor and is not acting as a fiduciary of Delphi. KPMG does not undertake to perform any obligation of Delphi, whether regulatory or contractual, or to assume any responsibility for Delphi's business or operations. KPMG has the sole right and obligation to supervise, manage, contract, direct, procure, perform or cause to be performed all work to be performed by KPMG, except as otherwise provided in this Agreement or any SOW. KPMG accepts full and exclusive liability for the payment of all employer contributions and taxes measured by the remuneration paid to KPMG employees as required by all applicable United States federal, state and local laws, rules and regulations.

(b)     This Agreement may only be amended by written agreement signed by a duly authorized representative of each Party.

(c)     THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT GIVING EFFECT TO THE PROVISIONS RELATING TO CONFLICT OF LAWS.

(d)     In the unlikely event that differences concerning our services or fees should arise that are not resolved by mutual agreement, to facilitate judicial resolution and save time and expense of both parties, Delphi and KPMG agree not to demand a trial by jury in any action,

proceeding or counterclaim arising out of or relating to our services and fees for this engagement.

(e)    Any controversy or claim with respect to, in connection with, arising out of, or in any way related to, this Agreement or the Services provided hereunder (including any such matter involving any parent, subsidiary, affiliate, successor in interest or agent of Delphi or KPMG) shall be brought in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), or the District Court if such District Court withdraws the reference, and the parties to this Agreement, and any and all successors and assigns thereof, consent to the jurisdiction and venue of such court as the sole exclusive forum (unless such court does not have jurisdiction and venue of such claims or controversies) for the resolution of such claims, causes of action or lawsuits.  If the Bankruptcy Court, or the District Court upon withdrawal of the reference, does not have or retain jurisdiction over the foregoing claims or controversies, the parties to this Agreement and any and all successors and assigns thereof agree that the forum and venue for any legal or equitable action or proceeding arising out of, or in connection with, this Agreement will lie in the appropriate federal or state courts in the State of Michigan and specifically waives any and all objections to such jurisdiction and venue.  The foregoing is binding upon Delphi, KPMG and any and all successors and assigns thereof. Notwithstanding the agreement to such procedures, either party may seek injunctive relief to enforce its rights with respect to the use or protection of (i) its confidential or proprietary information or material, (ii) its names, trademarks, service marks or logos and (iii) the enforcement of the notice provisions set forth in this Agreement.

(f)    No delay or omission by either Party in exercising any right or power shall impair such right or power or be construed to be a waiver.  A waiver by either Party of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach or of any other covenant.  No waiver or discharge shall be valid unless in writing and signed by an authorized representative of the Party against whom such waiver or discharge is sought to be enforced.

(g)    This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their permitted successors and assigns, and, except as expressly provided herein, nothing in this Agreement shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Neither Party may, nor shall have the power to, assign or transfer this Agreement or any rights or obligations hereunder or claims arising hereunder, without the prior written consent of the other Party.  Any attempt to assign or transfer this Agreement in violation of this subsection shall be void and of no force and effect.

(h)    This Agreement and the applicable SOWs constitute the entire agreement between the Parties with respect to the Services and the rights and responsibilities of the Parties with respect to such applicable SOWs.  Except as permitted by an SOW, neither Party shall publicize their relationship or the terms of this Agreement or any SOW or use the other Party's name or other trademarks or service marks in any advertisement or publication without the other Party's prior written approval except that KPMG may include Delphi's name on a client list; provided that such list does not specify the specific services provided by KPMG to Delphi.

11

(i)     The provisions of this Agreement, which expressly or by implication are intended to survive its termination or expiration, will survive and continue to bind both Parties.

(j)     If any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both Parties shall be relieved of all obligations arising under such provision, but if the remainder of this Agreement shall not be affected by such declaration or finding and is capable of substantial performance, then each provision not so affected shall be enforced to the extent permitted by law.

(k)     Except as expressly provided herein, all remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise.

(l)     Where agreement, approval, acceptance, consent or similar action by Delphi or KPMG is required, such action shall not be unreasonably delayed or withheld.

(m)     (1)     Headings in this Agreement are for convenience only.  The headings shall not be used in interpreting this Agreement or any provision of it.

(n)     Neither Party shall be liable to the other for any delay or failure to perform any of the Services or obligations set forth in this Agreement due to causes beyond its reasonable control.

(o)     The engagement limitations set forth on Addendum A are incorporated by reference herein.

(p)     All of KPMG's agents, employees, subcontractors and/or independent contractors furnished by KPMG to perform the Services (collectively, "Personnel") are and will remain KPMG's employees and/or independent contractors and, under no circumstances, will any Personnel furnished by KPMG be deemed to be Delphi's employees or agents.  KPMG is solely responsible, at KPMG's sole cost and expense, for (i) the fulfillment of all obligations to Personnel, and (ii) the compliance by KPMG and personnel with Agreement and all laws, regulations, orders and other governmental requirements applicable to performance of the Services.

9(BALANCE OF THIS PAGE INTENTIONALLY BLANK)

12

(q)     KPMG will assure that all Personnel who are performing Services on behalf of KPMG are competent to perform the Services.  KPMG will require all Personnel who are performing any work on Delphi's premises to comply with all of Delphi's reasonable instructions, regulations and policies that have been provided to KPMG in writing in a timely manner.  Delphi, in its sole discretion, has the right to: (i) bar any of Personnel from Delphi's premises for failure to observe Delphi's regulations or policies, (ii) require that KPMG promptly remove from Delphi's premises any Personnel who violate any of Delphi's regulations or policies, and (iii) require that KPMG cease using any Personnel to perform the Services who are reasonably unacceptable to Delphi.  Delphi will confer with KPMG to discuss Delphi's concerns prior to requiring removal of any Personnel.  KPMG will replace any barred or removed Personnel with Personnel reasonably acceptable to Delphi.

In witness whereof, each of the Parties has caused this Agreement to be executed on its behalf by its duly authorized representative as of the date first above written.

Delphi Corporation                                    KPMG LLP

By:                                                   By:
Name: John D. Sheehan                                 Name: Gary Silberg
Title: VP + Chief Restructuring Officer               Title: Partner

13

**Exhibit A**

**Delphi Travel and Per Diem Expense Reimbursement Policy for
Contractors**

A.    If Contractor is required by Delphi to travel as an incidental requirement in performing services for Delphi, then such travel and per diem expenses, subject to prior written approval of Delphi, will be reimbursable as follows:

| | | |
|---|---|---|
| 1. | Air Travel | Economy/Coach class only. Business class is permitted only upon prior written consent by Delphi. |
| 2. | Hotel | Contractor will exercise good, sound business judgment and discretion in choosing hotels, such as moderately priced chain hotels or hotels that offer discounted corporate rates. Where extended travel is involved, reduced rates may be available and should be requested. |
| 3. | Rental Cars | Compact or intermediate class only. The cost of collision damage waiver and personal accident insurance is the responsibility of Contractor. |
| 4. | Mileage Allowance | Reimbursement will be at the then current IRS rate (currently $0.44 per mile) for the miles which are in excess of his or her normal commute from home to work and back. When permanently assigned to another location, even if the new location is temporary, Contractor will not be reimbursed for excess miles, additional driving time, etc. |
| 5. | Expense Reports | If requested, Contractor will provide receipts for all reimbursable expenses, including meals and other expenditures, in excess of $25.00 or more. |
| 6. | Meals | Meals will not be reimbursed for non-overnight trips, except in the case of late return occasioned by travel outside normal working hours. Reimbursement for meals will be the actual and reasonable expenses paid by Contractor. |

14

7. Extended Travel    Contractor should review the home visit policy prior to a trip. Generally, the following provisions apply:

If the travel expense is less than the living expense in the temporary location, Contractor will be reimbursed for travel to the permanent location every week.

If the travel expense is more than the living expense in the temporary location, Contractor will be reimbursed for travel to the permanent location every two weeks.

Excess expenses due to frequent travel or stays will not be reimbursed by Delphi without its prior written approval.

7. Miscellaneous    When Contractor chooses an alternative method of transportation, e.g., to drive instead of fly, reimbursement, including meals and lodging, will not exceed the lesser of the two costs. Documentation to support the lesser cost must be attached to expense report. Travel time must also be limited if on working hours.

The employee, his or her immediate supervisor, and an authorized Delphi representative must sign the expense report form.

Contractor is responsible for travel reservations, hotel/motel accommodations and rental cars. If directed by Delphi, Contractor will make all travel arrangements through Global Experts in Travel, using a special account set up for such purposes.

Any cash advance by Contractor to its employee is the responsibility of Contractor.

8. Per Diem    In certain instances, a per diem will be paid to Contractor in accordance with Delphi's standard per diem policy.

B.    All travel and per diem for which Contractor seeks reimbursement will be submitted to Delphi on standard vouchers, with substantiating documentation, and will accompany the monthly invoices.

15

## ADDENDUM A

1.      **Engagement Limitations Applicable to Tax Services.**

(a)      With regard to any tax Services provided pursuant to this Agreement, Delphi shall bring to KPMG's attention any matters that may reasonably be expected to require further consideration to determine the proper treatment of any relevant item and any changes in the information as originally presented as soon as such information becomes available. KPMG is not responsible (and shall not be liable) for any penalties assessed against Delphi as a result of Delphi's failure to provide KPMG with all the relevant information relative to the issue under consultation and Delphi agrees to reimburse KPMG for any penalties imposed on KPMG, its partners or staff, as the result of Delphi's failure to provide such information.

(b)      Some of the tax matters on which KPMG may be asked to advise Delphi may have implications to other persons or entities. However, KPMG shall have no responsibility or liability to these persons or entities unless KPMG specifically is engaged to address these issues to such persons or entities, and KPMG expressly agrees to do so in an SOW.

(c)      Tax jurisdictions may impose penalties for certain failures. Relative to the Services provided under the terms of this Agreement, KPMG will discuss with Delphi any tax positions of which KPMG is aware that KPMG believes may subject Delphi to penalties. KPMG will also discuss with Delphi possible courses of action related to the Delphi's tax return, where applicable, to avoid the imposition of any penalty (e.g., disclosure). KPMG will use its judgment in resolving questions where the tax law may be unclear, or where there are conflicts between taxing authorities' interpretations of the law and other supportable positions, and discuss them with Delphi. KPMG is not responsible for any penalties imposed for positions that have been discussed with Delphi where KPMG recommended a course of action to avoid penalties and Delphi elected not to pursue such course.

(d)      US Treasury Regulation §1.6011-4 requires that taxpayers disclose to the IRS their participation in certain "reportable transactions." Delphi shall advise KPMG if it determines that any matter covered by this Agreement is a reportable transaction that is required to be disclosed under §1.6011-4. Similar Treasury regulations issued under Internal Revenue Code §6112 require that KPMG maintain lists of certain client engagements where it is a material advisor to clients that have participated in either a reportable transaction or a transaction that is required to be registered with the IRS as a tax shelter. If KPMG determines, after consultation with Delphi, that Delphi has participated in either a reportable transaction or one required to be registered under Internal Revenue Code §6111, KPMG will place Delphi's name and other required information on a list and will so advise Delphi. Sometime in the future the IRS may request KPMG's lists of reportable or §6011 transactions, and KPMG may be compelled to provide the IRS with the contents of its lists, including Delphi's name. KPMG will advise Delphi if it is ultimately required to provide Delphi's name to the IRS in connection with any matter covered by this Agreement.

16

2.    **Engagement Limitations Applicable to Transaction Services/Due Diligence Services.**

(a)    Where KPMG's work expressly includes consideration of prospective financial information, KPMG will comment on the bases and assumptions underlying the prospective financial information adopted as the case may be by Delphi or by the management of the company who is the subject of a due diligence investigation (the "Target Company"), but KPMG's work will not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the AICPA, and KPMG will not express any opinion or provide any assurance (in the sense in which "opinion" and "assurance" are used in the AICPA standards). Where KPMG comments on bases and assumptions underlying the prospective financial information, KPMG reports may include tables aggregating quantified vulnerabilities and sensitivities in order to illustrate effects of possible alternative assumptions. Those tables should not be regarded as a restatement of the Target's and/or management's prospective financial information, or preparation of revised prospective financial information; they are provided as a means of summarizing KPMG comments to assist Delphi in considering Delphi's implications for the transaction. It is Delphi's responsibility to consider KPMG comments and make Delphi's own decision based on the information available to the Delphi. Delphi must make its own decision about likely future profitability and the cash flows likely to be generated by the Target and Delphi understands that, with regard to illustrations of sensitivities that may be included in our Deliverables, there may be other, equally valid ways of assessing the sensitivities and possible outcomes. Delphi understands that our Deliverables are not prepared for the purposes of managing the Target's business and because events and circumstances frequently do not occur as expected, there will usually be differences between predicted and actual results, and those differences may be material. KPMG LLP is not responsible for developing the underlying assumptions of the prospective financial information and we take no responsibility and accept no liability for the achievement of predicted results.

(b)    Except to the extent expressly agreed to the contrary in writing, where KPMG comments on use of Internet technologies in key business processes, KPMG does so as business advisors rather than as information technology specialists.

(c)    Where the work expressly includes consideration of potential operational improvements, KPMG will comment on the Delphi and/or Target Company's view of such improvements. KPMG's comments will be provided solely in the light of our business experience of operational matters but will not be based on direct experience of Delphi's operations or the Target Company's operations, specific industry or commercial sector. KPMG's comments may not represent the optimal operational solution and there may be other, equally valid, views. Further, the results which can be achieved will depend upon the detailed circumstances at the time and on the way in which planned operational improvements are implemented. KPMG takes no responsibility for the achievement of potential operational improvements.

(d)    KPMG assumes no responsibility and makes no representations with respect to the accuracy or completeness of information provided by any Target Company. KPMG will not provide assurance that matters of significance to the financial information or to Delphi's due diligence investigation will be disclosed. We have not been engaged to,

17

nor will we provide any management functions or make management decisions for Delphi. Further, KPMG's work is not designed to and is not likely to reveal fraud or misrepresentation by the management of a Target Company.

    (e)    Advice and comments that KPMG may provide in the course of a due diligence engagement regarding the accounting and tax treatment of a proposed transaction should not be viewed as a formal accounting or tax opinion of KPMG. If such opinions are desired and KPMG determines that such an opinion can be issued, the terms of an engagement to provide such an opinion will be subject to a separate SOW.

    (f)    Delphi acknowledges that KPMG may be asked to provide services to other Clients who may be in competition with Delphi or whose interests may conflict with Delphi's interests, or regarding the possible purchase or sale of a Target Company that may be in competition with Delphi or whose interests may conflict with Delphi's interests. Except as otherwise set forth in individual SOWs, KPMG will not be prevented or restricted by virtue of its relationship with Delphi under this Contract from providing services to other clients. Except as required by law or professional regulations, KPMG will maintain the information obtained during the course of each engagement it performs for Delphi confidentially in accordance with Section 9 of the Agreement.

**3.    Circular 230: Limitations.**

    (a)    <u>For Tax Services:</u>

        i.    *Other Written Advice.*  It is anticipated that the written advice KPMG provides during the course of this engagement will be Other Written Advice as defined by Treasury Circular 230. Accordingly, unless otherwise prohibited or KPMG agrees to issue a Covered Opinion as defined by Circular 230, KPMG written advice may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed. KPMG advice will contain any other disclosures required by Circular 230.

        ii.    *Covered Opinion.*  If expressly set forth in the applicable Statement of Work, or in the deliverable itself, KPMG's final written deliverable will be a Covered Opinion as defined by Circular 230. All other written advice provided prior to KPMG's final deliverable may include a disclosure stating that the advice was not intended or written to be used, and it cannot be used, for the purpose of avoiding tax penalties that may be imposed on the taxpayer. In the event Delphi does not proceed with the transaction that is the subject of KPMG's advice or proceeds with the transaction but choose not to receive a final deliverable from KPMG, Delphi may not rely on any of the advice provided by KPMG for the purpose of avoiding any penalties that the IRS may impose. To the extent Delphi is entitled to rely on KPMG's written advice for purposes of penalty protection, Delphi understands that such reliance will be limited to the issues expressly addressed, therein. KPMG's final deliverable may contain certain disclosures required by Circular 230.

(b)      For Transaction Services/Due Diligence:

The Tax advice provided in KPMG reports or other forms of written communication relative to KPMG's due diligence work may be considered written tax advice subject to the rules of Treasury Circular 230.    Accordingly, unless otherwise prohibited or agreed to with Delphi in advance to the contrary, such tax advice in any written form will constitute "Other Written Advice" as defined by Circular 230. Accordingly, tax information and/or advice provided in the report or other forms of written communication is not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties that may be imposed on the taxpayer.    In accordance with these regulations, KPMG's written communications will include a disclosure to this effect. Further, KPMG reports or other forms of written communication relating to the provision of due diligence services will not be written to support the promotion or marketing of this or any transaction or matters addressed in the report or other forms of written communication and should not be considered a Marketed Opinion under Circular 230.

**4.      Engagement Limitations Applicable to Dispute Analysis/Expert Witness Services.**

(a)      Delphi acknowledges that KPMG is a large firm who is engaged by new Clients every day throughout the United States.    KPMG will undertake a reasonable review of its records to determine its professional relationships with any persons or entities Delphi identifies in connection with any dispute analysis and related expert witness engagement that KPMG undertakes for Delphi.    KPMG will advise Delphi of any conflicts of interest of which KPMG becomes aware that would preclude KPMG from performing such work.

(b)      KPMG may be engaged by parties adverse to Delphi to perform dispute analysis/expert witness services in litigation matters that are unrelated to any dispute analysis/expert witness services that KPMG may perform for Delphi under this Agreement. Delphi agrees not to use the fact of any current or previous KPMG engagement for expert witness services by opposing parties in other matters as a means of enhancing or diminishing KPMG's credibility in conjunction with any appearance before a trier of fact.

19

**ATTACHMENT A SAMPLE FORM**

**Statement of Work ("SOW")**
**Between Delphi Corporation and KPMG LLP**


**Project Name:**

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated November [XX], 2007 between Delphi Corporation ("Delphi") and KPMG LLP, ("KPMG") and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

**I.      PURPOSE AND SCOPE OF THIS SOW:**

This SOW covers[describe project generally_____].
This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project/effort.

**II.     PARTIES' RESPONSIBILITIES UNDER THIS SOW**

   **2.1      Services to be provided by KPMG:**

   2.2      **Deliverables:**

   **2.3      Delphi's Responsibilities:**

   **2.4      Timing**

   The timing of the services to be provided hereunder is as follows:

| Project Start Date: | |
|---|---|
| Estimated Project Completion Date: | |

20

III.    **RESOURCES ASSIGNED TO THIS SOW**

The KPMG personnel assigned to provide services and deliverables under this SOW are as
follows:

IV.    **PAYMENT; EXPENSES; AND INVOICES**

    **4.1    Payment Terms**

    **4.2    Professional Fees and Expenses [list any taxes applicable]**

V.    **OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW**

    **5.1    Limitation of Liability:** Except to the extent finally determined to have resulted
from the gross negligence or intentional misconduct of KPMG, KPMG's liability
to pay damages for any losses incurred by Delphi as a result of breach of
contract, negligence or other tort committed by KPMG, regardless of the theory
of liability asserted, is limited to no more than [_____( _ _ ) times] the total
amount of fees paid to KPMG for the Services provided under this SOW.
Except to the extent finally determined to have resulted from the gross
negligence or intentional misconduct of Delphi or in connection with Delphi's
violation of its obligations under Section 6(b) of the Agreement, Delphi's
liability to pay damages for any losses incurred by KPMG as a result of breach
of contract, negligence or other tort committed by Delphi, regardless of the
theory of liability asserted, is limited to no more than the total amount of fees
paid to KPMG for the services provided under this SOW.

    **5.2    [Insert terms specific to Project - *[consult sample SOWs for practice group]]***

    **5.3    For engagements that will take over a year:** Because adverse income tax
consequences may result from assignment of personnel at project sites for an
engagement for a year or more, such personnel may annually be required by KPMG to
break from providing services to Delphi.  KPMG will monitor its staff on the long-
term expense reimbursement policy and will inform Delphi prior to such break.  If
Delphi does not want to release personnel from performing Services for the
aforementioned period, Delphi shall pay to KPMG the amount of compensation
provided by KPMG to its personnel to cover the tax consequences thereof.

    **5.4** If applicable: Delphi shall provide reasonable workspace, administrative support,
computer facilities and other support, which are necessary to perform the Services.
Delphi shall perform the tasks and provide the assistance described in this SOW.
Delphi shall ensure that it has appropriate back up, security and virus-checking
procedures for any computer facilities, information or materials it provides.  Subject to
such rules and regulations that Delphi reasonably imposes, Delphi will consent to the

21

use, by staff visiting or working from the Delphi site, of Delphi's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources. Delphi agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| KPMG LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| | | | |

| DELPHI CORPORATION | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| | | | |
| Signature | Printed Name | Title | Date |
| | | | |

22

EXHIBIT B

**Statement of Work ("SOW")**
**Between Delphi Corporation and KPMG LLP**

**Project Name:  Global Mobility Advisory Services**

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated as of February 9, 2007 between Delphi Corporation ("Delphi") and KPMG LLP ("KPMG") and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

## I.    PURPOSE AND SCOPE OF THIS SOW:

This SOW covers international assignment administration and consulting services related to Delphi's international assignees. This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project and effort.

## II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW

### 2.1    Services to be provided by KPMG:

- Pre-Assignment Services
  - Prepare cost projection including revisions;
  - Prepare draft international assignment agreement;
  - Prepare draft pay calculation;
  - Finalize International Assignment Agreement and pay calculation and participate in consultation session;
  - Calculate Relocation Allowance and Mobility Premium to be paid in month prior to assignment and provide to payroll;
  - Calculate first year spending account to be paid in first month of assignment and provide to payroll; and,
  - Obtain Social Security Certificates of Coverage.

- During Assignment Services
  - Calculate annual spending account on assignment anniversary date and provide to payroll;
  - Answer international assignee's policy –related inquiries including policy interpretation based on Delphi-provided assumptions;
  - Serve as focal point for international assignee's general questions and issues;
  - Prepare periodic adjustments to compensation items according to Delphi's policy and/or changes to international assignee's pay or family status;

1

- Prepare payroll changes per pay period and forward to Delphi for approval and processing;
- Prepare annual year-end compensation summaries;
- Monitor data provider subscriptions and invoices, as needed;
- Track key dates and notify International assignees and/or management of required actions;
- Track tax equalization settlements, forward to Delphi for approval and processing; and,
- Conduct annual customer satisfaction survey and report results to Delphi.

- Repatriation Services
  - Calculate Relocation Allowance less outstanding tax and pro-rata spending account due from employee.

- Other Services
  - Other services requested by Delphi related to international assignments.

## 2.2    Deliverables:

Completed documents as indicated in Section 2.1.

## 2.3    Delphi's Responsibilities:

- Notify KPMG of new international assignees;
- Arrange for provision of data to be delivered to KPMG on a timely basis;
- Additional responsibilities to be determined by Delphi ISG.

## 2.4    Timing

The timing of the services to be provided hereunder is as follows:

| Parallel Testing Start Date: | May 1, 2007 |
| Go Live Start Date: | July 1, 2007 |
| Estimated Project Completion Date: | December 31, 2009 |

## III.   RESOURCES ASSIGNED TO THIS SOW

The KPMG personnel initially assigned to provide services and deliverables under this SOW are as follows:

| | |
|---|---|
| Goddard, Ann Marie: | Global Engagement Partner |
| Yong, Doyoung: | Global Engagement Senior Manager |
| Meyer, Therese: | Transition Senior Manager |
| Murray, Jennifer: | Senior Associate |
| Woods, Tonya: | Associate |
| Petrov, Petar: | Associate |
| Burton, Safaya: | Team Coordinator |
| KPMG IES Technology | |

## IV.   PAYMENT; EXPENSES; AND INVOICES

**4.1   Payment Terms:** Half of the total projected annual fee will be billed in advance on May 1 and October 1 of each year. Payment is due upon receipt of the invoice. Billing and payment procedures are subject to the terms of the Agreement to the extent applicable.

**4.2   Professional Fees and Expenses**

| | |
|---|---|
| Annual Fee for International Assignees Assigned from the U.S. ($250 per month) | $3,000 |
| Annual Fee for International Assignees Assigned to the U.S. ($110 per month) | $1,320 |
| Annual Fee for International Assignees Assigned to and from Non-U.S. Countries ($70 per month) | $840 |
| Preparation of Cost Estimates, International Assignment Agreement, and Pay Calculation and for cancelled assignments | $850 |

## V.   OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

**5.1   Limitation of Liability:** Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of KPMG, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than two times the total amount of fees paid to KPMG for the Services provided under this SOW. Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Delphi or in connection with Delphi's violation of its obligations under Section 6(b) of the Agreement, Delphi's liability to pay damages for any

3

losses incurred by KPMG as a result of breach of contract, negligence or other tort committed by Delphi, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for the services provided under this SOW.

**5.2**    **Not Applicable**

**5.3**    **For engagements that will take over a year:** Because adverse income tax consequences may result from assignment of personnel at project sites for an engagement for a year or more, such personnel may annually be required by KPMG to break from providing services to Delphi. KPMG will monitor its staff on the long-term expense reimbursement policy and will inform Delphi prior to such break. If Delphi does not want to release personnel from performing Services for the aforementioned period, Delphi shall pay to KPMG the amount of compensation provided by KPMG to its personnel to cover the tax consequences thereof.

(Balance of this page is intentionally blank)

4

5.4   **If applicable:** Delphi shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform the Services. Delphi shall perform the tasks and provide the assistance described in this SOW. Delphi shall ensure that it has appropriate back up, security and virus-checking procedures for any computer facilities, information or materials it provides. Delphi consents to the use, by staff visiting or working from the Delphi site, of the Delphi's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources. Delphi agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| KPMG LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| *[signature: Ann Marie Goddard]* | Ann Marie Goddard | Midwest Lead Partner, International Executive Services | Date |

| DELPHI CORPORATION | | | |
|---|---|---|---|
| Authorized Signature *[signature: Kevin Smith]* | Printed Name *Kevin Smith* | Title *Director, GSM* | Date *26th Feb '07* |
| Authorized Signature | Printed Name | Title | Date |

5

## EXHIBIT C

Statement of Work ("SOW")
Between Delphi Corporation and KPMG LLP

Project Name:  Tax Consulting Services

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated as of February 9, 2007 between Delphi Corporation ("Delphi") and KPMG LLP, ("KPMG") and is fully incorporated therein.  All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

## I.    PURPOSE AND SCOPE OF THIS SOW:

This SOW covers tax consulting services. This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project/effort.

## II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW

### 2.1    Services to be provided by KPMG:

We will provide tax consulting services with respect to such matters as may arise for which you seek our advice and consultation.  However, we will not render any advice with respect to a "listed transaction" or any transaction that is substantially similar to a "listed transaction" within the meaning of Treasury Regulation §1.6011-4.  KPMG will not defend any transaction that is or becomes a transaction designated by the IRS as a "listed transaction".

We do not anticipate that the written tax advice provided under this engagement letter will be a Covered Opinion as defined in §10.35 of Circular 230 ("Covered Opinion").  However, if our services will rise to the level of a Covered Opinion, we will issue a separate SOW for the issuance of a Covered Opinion.

### Tax Advice Standards

If KPMG is considered a tax return preparer under Treasury Regulation §301.7701-15 or routine assistance in connection with examinations by the taxing authorities is being provided, we will apply elevated standards.  Under these standards, we must be able to determine that any return position on which we advise has a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by the IRS) if the position does not involve a transaction designated by the IRS as a "listed transaction" or a transaction with the principal purpose of avoiding or evading any tax imposed by the Internal

1

Revenue Code (a "principal purpose transaction"). If the advice relates to a "principal purpose transaction", we must arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood of success if challenged by the IRS) with respect to the position. In determining whether a position satisfies the "realistic possibility" and "should" standards, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. We will inform you as soon as possible if, during our analysis, we determine circumstances exist that prevent us from advising you under these standards.

### Coordination with KPMG International Member Firms

Our services covered by this engagement letter may also necessitate the assistance of a member firm of KPMG International. To the extent that our services under this engagement letter require such assistance, the services will be provided under the direction of KPMG LLP, the U.S. member firm of KPMG International, and will include the participation of one or more other member firms of KPMG International ("KPMG member firms"). KPMG LLP is a separate legal entity from other member firms of KPMG International. Advice relative to tax matters outside the United States will be based on tax advice provided by the KPMG member firm in the particular country and on the relevant tax authorities in that country. In rendering such advice, we may also consider U.S. tax treaties, their technical explanations, and judicial and administrative interpretations thereof.

In certain countries, a KPMG member firm is authorized to provide legal services within its jurisdiction. This engagement letter encompasses only tax services provided by KPMG member firms and does not encompass any legal services a KPMG member firm may be authorized to provide. Should the provision of such legal services not be proscribed by applicable independence rules and should you choose to retain a KPMG member firm to provide legal services, including drafting of documents, in a particular country, you and the KPMG member firm will enter into a separate fee arrangement and engagement letter for the provision of such legal services.

## III.   RESOURCES ASSIGNED TO THIS SOW

The KPMG personnel assigned to provide services and deliverables under this SOW will be mutually agreed by Delphi and KPMG when such services are requested by Delphi, on a service-by-service basis.

## IV.   PAYMENT; EXPENSES; AND INVOICES

### 4.1   Payment Terms

KPMG will invoice Delphi on a monthly basis.

2

### 4.2 Professional Fees and Expenses

Our fees for tax consulting services will be based on the actual time incurred to complete the project at the following hourly rates, plus out-of-pocket expenses.

| | |
|---|---|
| Partner | $480 |
| Senior Manager | $395 |
| Manager | $315 |
| Senior Associate | $225 |
| Associate | $150 |

Fees for KPMG International Member Firm will be billed at 60% of their standard hourly rates.

We estimate that the fees under this SOW will be $50,000 to $75,000.

## V.    OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

**5.1    Limitation of Liability:** Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of KPMG, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than <u>five</u> times the total amount of fees paid to KPMG for the Services provided under this SOW. Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Delphi or in connection with Delphi's violation of its obligations under Section 6(b) of the Agreement, Delphi's liability to pay damages for any losses incurred by KPMG as a result of breach of contract, negligence or other tort committed by Delphi, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for the services provided under this SOW.

**5.2    Not Applicable**

**5.3    Not Applicable**

**5.4** If applicable: Delphi shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform the Services. Delphi shall perform the tasks and provide the assistance described in this SOW. Delphi shall ensure that it has appropriate back up, security and virus-checking

3

procedures for any computer facilities, information or materials it provides. Delphi consents to the use, by staff visiting or working from the Delphi site, of the Delphi's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources. Delphi agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF**, the Parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

### KPMG LLP

| Signature | Printed Name | Title | Date |
|---|---|---|---|
| *Duncan Forsythe* | Duncan Forsythe | Partner | 23 February 2007 |
| Signature | Printed Name | Title | Date |
| | | | |

### DELPHI CORPORATION

| Authorized Signature | Printed Name | Title | Date |
|---|---|---|---|
| *J.P. Whitson* | James P. Whitson | Chief Tax Officer | 23 February 2007 |
| Authorized Signature | Printed Name | Title | Date |
| *Kevin Smith* | Kevin Smith | Director, GSM | 26th Feb 07 |

## EXHIBIT D

Statement of Work ("SOW")
Between Delphi Corporation and KPMG LLP

Project Name: International Assignment Services

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated as of February 9, 2007 between Delphi Corporation ("Delphi") and KPMG LLP ("KPMG") and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

## I.    PURPOSE AND SCOPE OF THIS SOW:

This SOW covers international assignment tax preparation and consulting services related to Delphi's international assignees, employees at the Mexico Border, and J-1 visa trainees. This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project and effort.

## II.    PARTIES' RESPONSIBILITIES UNDER THIS SOW

### 2.1    Services to be provided by KPMG:
- Expatriates Assigned from the U.S. and Expatriates Assigned to the U.S.
  - Collect tax data;
  - Calculate annual hypothetical tax withholding;
  - Prepare required home and host country individual income tax returns during, and one year after assignment;
  - Prepare requests for extension of time to file tax returns(s), where required;
  - Prepare U.S. estimated tax vouchers, if required;
  - Prepare year-end U.S. withholding calculations, where applicable;
  - Prepare tax equalization calculations;
  - Determine and arrange for timely payment of local taxes in the host country, where applicable;
  - Conduct pre-departure and/or post-arrival consultation sessions; and,
  - Handle routine correspondence with the IRS and foreign tax authorities, including review of assessments.

1

- Expatriates Assigned to and from non-U.S. Countries
  - Collect tax data;
  - Calculate annual hypothetical tax withholding;
  - Prepare required home and host country individual income tax returns during, and one year after assignment;
  - Prepare requests for extension of time to file tax returns(s), where required;
  - Determine and arrange for timely payment of local taxes in the host country, where applicable;
  - Prepare tax equalization calculations;
  - Conduct pre-departure and/or post-arrival consultation sessions; and,
  - Handle routine correspondence with foreign tax authorities, including review of assessments.

- Employees Assigned to the Mexican Border
  - Collect tax data;
  - Prepare U.S. income tax return(s);
  - Prepare requests for extension of time to file tax returns(s), where required;
  - Prepare tax equalization calculations;
  - Prepare monthly non-resident Mexican tax calculations;
  - Conduct post-arrival consultation session; and,
  - Handle routine correspondence with the IRS.

- J-1 Visa Trainees
  - Collect tax data;
  - Prepare U.S. income tax return(s);
  - Prepare requests for extension of time to file tax returns(s), where required;
  - Conduct post-arrival consultation session; and,
  - Handle routine correspondence with the IRS.

- Cost Estimates
  - Prepare cost projection including revisions;
  - Prepare draft international assignment agreement;
  - Prepare draft pay calculation;
  - Finalize international assignment agreement and pay calculation and participate in consultation session;
  - Calculate Relocation Allowance and Mobility Premium to be paid in month prior to assignment and provide to payroll;
  - Calculate first year spending account to be paid in first month of assignment and provide to payroll;
  - Calculate annual spending account on assignment anniversary date and provide to payroll; and,
  - Calculate Relocation Allowance less outstanding tax and pro-rata spending account due from employee.

2

- Global Coordination
  - Centralized hypothetical tax calculation process;
  - Tax planning review;
  - On-going benchmarking of Delphi's current tax equalization policy;
  - Dedicated website for Delphi;
  - Dedicated website for Delphi employees;
  - Unlimited access to all KPMG publications;
  - Status reports and client service reports; and,
  - KPMG International Executive Services Flash Alert Newsletters.

- Other Services
  - Other services requested by Delphi related to international assignments.

## 2.2   Deliverables:

Completed documents as indicated in Section 2.1.

## 2.3   Delphi's Responsibilities:

- Arrange for provision of data to be delivered to KPMG on a timely basis;
- Review and timely approve annual authorization list;
- Follow-up with international assignees with outstanding organizers on August 15th of each applicable year;
- Arrange for timely tax payments to authorities through the AFC process;
- Provide monthly cash receipt report for tax equalization payments and tax refunds;

## 2.4   Timing

The timing of the services to be provided hereunder is as follows:

| Project Start Date: | January 31, 2007 |
|---|---|
| Estimated Project Completion Date: | December 31, 2009 |

3

## III.    RESOURCES ASSIGNED TO THIS SOW

The KPMG personnel initially assigned to provide services and deliverables under this SOW are as follows:

| | |
|---|---|
| Goddard, Ann Marie: | Global Engagement Partner |
| Yong, Doyoung: | Global Engagement Senior Manager |
| Froylan, Sandra: | Manager |
| Murray, Jennifer: | Senior Associate |
| Beaudry, Dave: | Senior Associate |
| Parikh, Nihar: | Associate |
| Bogdanets, Alex: | Associate |
| Petrov, Petar: | Associate |
| Burton, Safaya: | Team Coordinator |
| KPMG Member Firms | |

## IV.    PAYMENT; EXPENSES; AND INVOICES

**4.1    Payment Terms:** Half of the total projected annual fee will be billed in January. The remainder will be billed upon completion of tax returns or completion of project. Non-U.S. tax return fees and services will be billed directly to the Delphi local entities as applicable by country.  Payment is due upon receipt of the invoice.  Billing and payment procedures are subject to the terms of the Agreement to the extent applicable.

**4.2    Professional Fees and Expenses**

| | |
|---|---|
| Expatriates Assigned to the U.S. | $1,750 |
| Expatriates Assigned from the U.S. | $2,700 |
| Expatriates Assigned to and from Non-U.S. Countries | $2,100 |
| Employees Assigned to the Mexican Border | $750 |
| J-1 Visa Trainees | $375 |
| Preparation of monthly Mexican non-resident tax withholding calculation for Employees Assigned to the Mexico Border | $40 |
| Preparation of Amended U.S. tax returns for Expatriates Assigned to the U.S. and Expatriates Assigned from the U.S. | $800 |
| Preparation of Amended U.S. tax returns for Employees Assigned to the Mexico Border | $375 |
| Preparation of Cost Estimates, Expatriate Agreement, Pay Calc and update of annual Spending Account at onset of assignment | $850 |
| Preparation of compilation of payments at host information | $375 |

4

## V.    OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW

5.1    **Limitation of Liability:** Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of KPMG, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than two times the total amount of fees paid to KPMG for the Services provided under this SOW. Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Delphi or in connection with Delphi's violation of its obligations under Section 6(b) of the Agreement, Delphi's liability to pay damages for any losses incurred by KPMG as a result of breach of contract, negligence or other tort committed by Delphi, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for the services provided under this SOW.

5.2    **Not Applicable**

5.3    **For engagements that will take over a year:** Because adverse income tax consequences may result from assignment of personnel at project sites for an engagement for a year or more, such personnel may annually be required by KPMG to break from providing services to Delphi. KPMG will monitor its staff on the long-term expense reimbursement policy and will inform Delphi prior to such break. If Delphi does not want to release personnel from performing Services for the aforementioned period, Delphi shall pay to KPMG the amount of compensation provided by KPMG to its personnel to cover the tax consequences thereof.

(Balance of this page is intentionally blank)

5

5.4 **If applicable:** Delphi shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform the Services. Delphi shall perform the tasks and provide the assistance described in this SOW. Delphi shall ensure that it has appropriate back up, security and virus-checking procedures for any computer facilities, information or materials it provides. Delphi consents to the use, by staff visiting or working from the Delphi site, of the Delphi's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources. Delphi agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the Parties and set forth herein.

**IN WITNESS WHEREOF,** the Parties to the above referenced Agreement have caused this SOW to be executed by their authorized representatives.

| KPMG LLP | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |
| | Ann Marie Goddard | Midwest Lead Partner, International Executive Services | Date |
| **DELPHI CORPORATION** | | | |
| Authorized Signature | Printed Name | Title | Date |
| Kevin Smith | Kevin Smith | Director, GSM | 26th Feb '07 |
| Authorized Signature | Printed Name | Title | Date |
| | | | |

## EXHIBIT E



KPMG LLP
303 East Wacker Drive
Chicago, IL 60601

Telephone 312 665 1000
Fax        312 665 6038
Internet   www.us.kpmg.com

**Statement of Work ("SOW") - Number ___**
**Between Delphi Corporation and KPMG LLP**

**Project Name:** Fresh Start Services
Project Date: February 9, 2007

This SOW is governed under the Master Professional Services Agreement (the "Agreement") dated February 9, 2007 between Delphi Corporation ("Delphi") and KPMG LLP, ("KPMG") and is fully incorporated therein. All terms used in this SOW and not otherwise defined will have the same meaning as in the Agreement.

## I.    PURPOSE AND SCOPE OF THIS SOW:

This SOW covers the provision of advisory services to Delphi, including: accounting and tax, valuation, systems, and project management services for the period beginning February 9, 2007. This SOW confirms the understanding of the objectives, deliverables, timing, staffing and fees for this project/effort. This SOW covers work for addressing various valuation, accounting, financial reporting and tax needs arising from your anticipated adoption of a confirmed plan of reorganization and emergence from Chapter 11.

## II.   PARTIES' RESPONSIBILITIES UNDER THIS SOW

### 2.1    Services to be provided by KPMG:

In connection with Delphi's emergence from Chapter 11, it will apply fresh start accounting in accordance with AICPA Statement of Position 90-7, *Financial Reporting by Entities in Reorganization Under the Bankruptcy Code* ("SOP 90-7").

At Delphi's request, KPMG will provide advisory services related to Delphi's fresh start accounting under the day-to-day direction of Brian Murray, Director of Fresh Start Accounting, including accounting and tax, valuation, systems, and project management services ("Fresh Start Services"). Delphi agrees to identify those individuals authorized to request Services from KPMG under the terms of this SOW. Individuals authorized to request Services agree to identify the purpose of the Services, and identify for whom the Services are to be performed at the time the Services are requested.

Our work will be based primarily on information supplied by management of Delphi and will be carried out on the basis that such information is accurate and complete. Delphi is responsible for and should consult with its external auditor on matters of how existing



accounting principles have been applied, and the effect, if any, on any financial information resulting from our services.

We will assume no responsibility and make no representations with respect to the accuracy or completeness of information provided to us by management of Delphi or any other person. Moreover, our work cannot provide assurance that matters of significance to you will be disclosed. We have not been engaged to, nor will we, provide any management functions or make management decisions for Delphi. Further, our work is not designed to and is not likely to reveal fraud or misrepresentation by the management of Delphi or any other person.

We do not anticipate that the written tax advice provided under this engagement letter will be a Covered Opinion as defined in §10.35 of Circular 230 ("Covered Opinion"). Therefore, all the written tax advice provided under this engagement letter will contain the following legend:

> ANY TAX ADVICE IN THIS COMMUNICATION IS NOT INTENDED OR WRITTEN BY KPMG TO BE USED, AND CANNOT BE USED, BY A CLIENT OR ANY OTHER PERSON OR ENTITY FOR THE PURPOSE OF (i) AVOIDING PENALTIES THAT MAY BE IMPOSED ON ANY TAXPAYER OR (ii) PROMOTING, MARKETING OR RECOMMENDING TO ANOTHER PARTY ANY MATTERS ADDRESSED HEREIN.

However, if our services will rise to the level of a Covered Opinion, we will issue a separate engagement letter for the issuance of a Covered Opinion.

If KPMG is considered to be a tax return preparer under Treasury Regulation §301.7701-15, we will apply elevated standards in providing tax advice. Under these standards, we must be able to determine that any return position on which we advise has a "realistic possibility" of being sustained on its merits (i.e., approximately a one-in-three or greater likelihood of success if challenged by the IRS) if the position does not involve a transaction designated by the IRS as a "listed transaction" or a transaction with the principal purpose of avoiding or evading any tax imposed by the Internal Revenue Code (a "principal purpose transaction"). If the advice relates to a "principal purpose transaction", we must arrive at a "should" confidence level (i.e., approximately a 70 percent or greater likelihood of success if challenged by the IRS) with respect to the position. In determining whether a position satisfies the "realistic possibility" and "should" standards, we will not take into account the possibility that a tax return will not be audited, that an issue will not be raised on audit, or that an issue will be settled. We will inform you as soon as possible if, during our analysis, we determine circumstances exist that prevent us from advising you under these standards.

A detailed description of our scope of services by area is included as follows:



### Scope of Our Services: Accounting and Tax

We will assist management with planning an approach, consideration of alternatives, research, analysis, implementation assistance and assistance with preparing documentation related to your accounting and reporting the emergence from Bankruptcy and adopting Fresh Start reporting. In providing this assistance, we will provide assistance and support to management in its consideration or evaluation of the following:

- *Fresh Start Approach and Work Steps:* Consideration of the alternatives in approach, timing, order, and adoption dates for Fresh Start Reporting, the alternatives for on-going efficient processing of detailed accounting records, and the potential approaches for updating detailed records to reflect changes in values and the new accounting requirements following emergence;

- *Change in ownership.* Evaluation of whether the conditions in SOP 90-7 are met to justify adoption of a new, fresh start basis by determining whether there is a change in ownership before confirmation and after emergence;

- *Issues & documentation.* Research and documention (memoranda, discussions with Ernst & Young as required, etc.) to support the accounting and reporting conclusions reached in accordance with SOP 90-7;

- *Segregation of liabilities.* Identification and segregation of liabilities that arose before and after filing to reflect the liabilities subject to the bankruptcy process;

- *Claims.* Monitoring the bankruptcy proceedings to (i) compare the claims filed, allowed, and existing debtor balances (particularly for trade vendors) to (ii) adjust the existing payables to the allowed claims and (iii) estimate claims to be settled upon emergence (failure to properly estimate the claims to be settled at emergence will impact post-emergence earnings);

- *Reporting classifications.* Identification and segregation of pre-emergence expenses, restructuring costs, and losses for classification in a special category called "reorganization items" to properly portray amounts from activities to restructure the operations prior to emergence;

- *Guarantees (FIN 45).* Consideration of issues related to recognizing the fair value of obligations from guarantees (from units subject to spin-off or sale as a result of the restructuring process);

- *Asset Retirement Obligations (SFAS 143).* Consideration of issues related to recognizing obligations from the retirement of tangible long-lived assets (from units subject to spin-off or sale as a result of the restructuring process);

(3)

*KPMG*

- *Top level reporting.* Assessment of the degree to which top side adjustments and disclosures are utilized to report on a fresh start basis from the date of emergence until such amounts are recorded to your detailed accounting records;

- *Detailed accounting records.* Developing an approach to repopulating your detailed records with new fair values and asset lives, providing electronic files and assisting with updating fixed asset and other detailed accounting records with the concluded fair values;

- *Training Delphi employees.* At your direction, assisting with training your employees on the impact of adopting fresh start accounting;

- *Book vs. tax balances.* Identification of differences between book and tax balances that arise from the plan of emergence and fresh start accounting;

- *Tax attributes.* Determination of the current position of federal and state tax attributes (including usage limitations) and net asset basis (including basis in stock of subsidiaries) for federal and state tax purposes;

- *Insolvent subsidiaries.* Consideration of the deferred tax impact on the outside basis of investments in any insolvent subsidiaries;

- *Cancelled debt income.* Computation of the amount and allocation of cancelled debt income for federal and state tax purposes;

- *NOL carryforwards.* Identification of limitations in the ability to utilize net operating loss carry forwards as a result of the approved plan;

- *Tax elections.* Assessment of the impact of available federal and state tax elections; and

- *Bankruptcy-related expenses.* Assessment of the deductibility of bankruptcy-related expenses.

The work that we will perform will consist of the following: (a) holding discussions with certain Delphi officers, employees and outside consultants, (b) reading relevant documentation provided by you (c) assisting with gathering additional data, (d) analyzing data and (e) providing advice related to your analyses as required.

The observations we will make will often be in the form of issues identified and alternative views that Delphi may consider when determining its particular accounting. The goal of our work is to help Delphi develop accounting and financial reporting and tax planning and reporting. We may also provide observations as to what may be the views of Delphi's independent accountant, the staff of the Securities and Exchange Commission, or various tax authorities. Such observations may be made without any discussion with Delphi's independent accountant, the staff of the Securities and Exchange Commission, or the tax

(4)



authorities and as such may not reflect those parties' actual views on a particular topic or issue.

Our observations should not be taken as any form of concurrence, conclusion or opinion that we agree with or support Delphi's proposed accounting or tax treatment for a particular transaction or its proposed accounting under a new accounting pronouncement. Our role is one of facilitating Delphi management's analysis as it reaches its own conclusions.

We will perform our tax services on the basis of the information you have provided and in consideration of the applicable federal, foreign, state or local tax laws, regulations and associated interpretations relative to the appropriate jurisdiction as of the date the services are provided. Tax laws and regulations and/or their interpretation are subject to change at any time, and such changes may be retroactive in effect and may be applicable to advice given or other services rendered before their effective dates. We do not assume responsibility (and will have no liability) for such changes occurring after the date we have completed our services.

As you are aware, tax returns and other filings are subject to examination by taxing and other regulatory authorities. If KPMG and Delphi agree, we can assist Delphi in the event of an audit of any issue for which we have provided services under this Agreement. Such services will be subject to a separate Statement of Work. Our fees for tax audit services that we may agree to provide at a later date are not included in our fee for the Fresh Start Services covered by this SOW.

**Scope of Our Services: <u>Valuation</u>**

Under SOP 90-7 fresh start accounting, the reorganization value of Delphi, which will be provided to us by Delphi or its advisors, will be allocated to Delphi's assets and liabilities in accordance with the procedures specified in Statement of Financial Accounting Standards No. 141, *Business Combinations* ("FAS 141"). Under FAS 141, the reorganization value of Delphi will be allocated to Delphi's assets and liabilities based on their estimated fair values upon emergence from Chapter 11. According to FAS 141, fair value is defined as: *"The amount at which the asset could be bought (or incurred) or sold (or settled) in a current transaction between willing parties, that is, other than in a forced or liquidation sale."* After January 1, 2007, Statement of Financial Accounting Standards No. 157, *Fair Value Measurement* ("FAS 157") will amend that definition to read as follows: *the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.*

To assist you with the allocation of assets and liabilities based on their estimated fair values upon emergence from Chapter 11, you have requested that we perform the following:

- *Reorganization value.* Read and identify potential issues with the reorganization value ("Reorganization Value") as determined by the Company's financial advisors and identify differences in assumptions or methodologies used to determine reorganization value and the business enterprise values ("BEV") of your reporting units and plants;



- *Identify assets & liabilities.* Obtain and read the Company's historical financial statements and detailed financial records, and conduct site visits as necessary, to identify assets and liabilities, regardless of whether those assets and liabilities are currently recorded. Where applicable and acceptable by you and your auditors, we will apply sampling techniques to support an extrapolation of values to the subject population. In other instances, we will assist you in identifying subject assets. In either event, we are not responsible for assuring that all assets have been identified, rather we will rely upon your representation of the population of your assets and liabilities;

- *Fair values.* Prepare fair value estimates for each identified asset and liability (the "Subject Assets and Liabilities"), including in-process research and development ("IPR&D");

- *Goodwill.* Determine the difference, if any, between Reorganization Value and the fair value of the Subject Assets and Liabilities identified and valued ("goodwill" or "negative goodwill");

- *Reporting units.* Determine the BEV for each reporting unit and allocate the fair value of Subject Assets and Liabilities, including goodwill, to the SFAS 142 Reporting Units identified by the Company taking into consideration the Reorganization Value;

- *Joint Ventures.* Prepare fair value estimates for the joint venture interests and allocations to identified intangibles in acquisitions accounted for under the equity method;

- *Remaining useful lives.* Estimate remaining useful lives and provide amortization schedules for the tangible and identified intangible assets;

- *Valuation report.* Issue a valuation report covering the fair value estimates of the Subject Assets and Liabilities and BEVs for each reporting unit of the Company.

To properly apply these fair value definitions, we will assume the use (and incurrence) of the subject assets (and liabilities) in an ongoing business, unless otherwise indicated by management. To the extent that the information can be obtained without undue cost and effort, our analysis will also reflect assumptions that would be made by market participants if they were to buy or sell each identified asset on an individual asset basis or other appropriate unit of account.

Our work will include discussions with directors, officers, and employees regarding the historic, current, and future operations of Delphi. Our financial analysis will be based on available historical and projected financial statements and operating data provided by management. We will also review industry and comparative public company financial data obtained from published or other available sources.

Our valuation analysis and recommendation of values are based on information and financial



data provided by management of Delphi and from third party sources. Information obtained from third party sources will be obtained from sources considered reliable and believed to be true and correct. However, no representation, liability or warranty for the accuracy of such items is assumed by or imposed on us, and is subject to corrections, errors, omissions and withdrawal without notice. With respect to the prospective financial information used by us as part of our analysis we will not examine, compile or apply agreed upon procedures to such information in accordance with standards established by the AICPA, and will not express assurance of any kind on such information. Because events and circumstances frequently do not occur as expected, there will usually be differences between predicted and actual results, and those differences may be material. We take no responsibility for the achievement of predicted results included in the prospective financial information.

In the performance of our valuation work, good and marketable title is assumed. No investigation of legal title or liens will be made, and we render no opinion or any form of assurance as to ownership or condition.

In the performance of our work, the existence of potentially hazardous materials (i) used in the construction, maintenance or servicing of buildings and machinery and equipment of the business, such as the presence of urea-formaldehyde foam insulation, asbestos, lead paint, toxic waste, underground tanks, radon and/or any other prohibited material or chemical which may or may not be present on or in the subject real and/or tangible personal property or (ii) of which the business may be held accountable, is not expected to be, unless specifically indicated in the Deliverables, disclosed to us during the course of this engagement. We, however, are not qualified to detect such substances. The existence of these potentially hazardous materials could have a significant effect on our value recommendations. You are urged to retain an expert in this field, if desired. The recommendation of value assumes the items being value is "'clean" and free of any of these adverse conditions unless we have been notified to the contrary in writing.

Unless otherwise stated in our scope of work our recommendation of value will not consider the possible effect, if any, of (i) future federal, state or local legislation, (ii) environmental or ecological matters or (iii) potential economic gain or loss resulting from contingent assets, liabilities, or events existing as of the Valuation Date. We have no responsibility for any events, conditions or circumstances that take place subsequent to the date of our Deliverable. We reserve the right, without any obligation on our part, to make revisions to our report and conclusion reached herein should we be made aware of facts existing at the Valuation Date, which were not known by us at the date of this report.

Our recommendation of value should not be used as the basis of any decision to purchase, sell or transfer any interest in any assets. Such decisions are your sole responsibility alone, as is the structure to be utilized and the price to be accepted. The selection of the price to be accepted in any transaction requires consideration of factors beyond the information we will provide or have provided. An actual transaction might be concluded at a significantly higher value or at a significantly lower value, depending upon the circumstances of the transaction and the knowledge and motivations of the buyers and sellers at that time. Neither our



recommendation of value nor our Valuation Deliverables are to be construed as a fairness opinion as to the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation.

## Scope of Our Services: <u>Systems</u>

We will provide systems services to embed the "fresh start" adjustments into the financial reporting processes of Delphi, considering all of its various reporting requirements. In providing our systems services we will:

- Assess the impact of fresh start accounting on Delphi's existing systems and reporting requirements and provide recommendations for improvement
- Provide you with example model journal entries that may be required to adjust the accounting records in connection with initial or subsequent conversion to the new accounting bases
- Work with you to identify methods to record the adjustments required in the consolidation systems and accounting records
- Assist with identifying the impact on other reporting requirements and methods to efficiently report on the new bases of accounting (i.e. tax and management reporting)
- Advise you on the roll-out of the "component evaluation" methodology to each impacted entity. This methodology organizes the work effort around components to identify where adjustments are needed and how to incorporate these into the various systems. Key aspects include:
  - o Understanding the local accounting policies or requirements
  - o Identifying the impact of the new accounting policies or requirements
  - o Identifying of the accounts which must be restated
  - o Documenting the systems which require change and possible new systems
  - o Identifying interdependence with other components
  - o Developing a preliminary plan to produce new data requirements (design)
  - o Obtaining approvals or sign off on key decisions
  - o Identifying factors to consider as you begin to implement (build and test)
- Advise you on additional improvements which could be made to the financial reporting processes and systems in both the short term and long term

As noted above, our systems services include identifying factors to consider as you begin to implement (build and test) adjustments to be made to the system. Delphi is responsible for building and testing adjustments to be made to systems. We will be able to assist Delphi in building and testing the adjustments on the basis of a scope assessment at that time. However, unless otherwise indicated, our fees for these additional services are not included in our fee for the Fresh Start Services covered by this SOW.



**Scope of Our Services:  <u>Project Management</u>**

We will provide project management services to Delphi senior management and its fresh start project manager that will assist in coordinating Fresh Start Services.  Project management services will be designed to advise Delphi regarding project timelines, milestones, deliverables, interdependencies, risks and resources.  In providing the project management services, we expect to comment upon Delphi's proposed:

1.  Project structure, scope, governance, and detailed planning;
2.  Approach and prioritization with respect to issue resolution and change management processes; and
3.  Approach to status reporting and the related communication process.

We also expect to facilitate KPMG's compliance with Delphi's chosen approaches to project management.

**Professional Standards**

KPMG will perform their services under the Statements on Standards for Consulting Services issued by the American Institute of Certified Public Accountants.  The sufficiency of the procedures is solely the responsibility of the specified users of our advice and/or discussion documents.  Consequently, KPMG makes no representation regarding the sufficiency of the procedures either for the purpose for which our advice and/or discussion documents is being prepared or for any other purpose.

**No Audit or Independent Verification**

In this engagement, KPMG assumes no responsibility for auditing information provided by Delphi or for expressing an opinion or any other form of assurance (including an audit or review) on any part of Delphi's financial statements.  Those responsibilities belong to Delphi and their independent auditor.  Further, KPMG will not be compiling or otherwise associated with Delphi's financial statements as that term is defined in the Statements on Auditing Standards issued by the AICPA and you cannot refer to us or our report with third parties or in any regulatory filings without our express written consent.

Except as otherwise set forth in the SOW, in accepting this engagement, Delphi acknowledges that completion of this engagement or acceptance of deliverables resulting from this engagement will not constitute a basis for Delphi's assessment or evaluation of internal control over financial reporting and disclosure controls and procedures, or its compliance with its principal officer certification requirements under Section 302 of the Sarbanes-Oxley Act of 2002 (the "Act").  This engagement shall not be construed to support Delphi's responsibilities under Section 404 of the Act requiring each annual report filed under Section 13(a) or 15(d) of the Securities Exchange Act of 1934 to contain an internal control report from management.

(9)



To the extent that KPMG provides accounting advisory services to Delphi, we will base our conclusions on the facts and assumptions that Delphi submits; we will not independently verify such information but will inform Delphi's management of any such information that may appear questionable to KPMG. Inaccuracy or incompleteness of the information provided to us could have a material effect on our advice and services provided. In rendering accounting advice, whether written or oral, we will consider the applicable technical literature, laws and regulations. Financial reporting authoritative guidance is subject to change or modification, retroactively or prospectively, by varying interpretation and by subsequently issued pronouncements, legislation, and regulatory, administrative, or judicial decisions. Any such change or modification could affect the validity of our advice. Following the termination of this engagement, we will not update our advice for subsequent changes, in circumstances, events, or modifications of rules.

Accounting advice provided by KPMG to Delphi may not be provided to any third party without the express written permission of KPMG. Additionally, Delphi agrees that we have no obligation to update any information provided to you for events and circumstances occurring after termination of this engagement, unless a request is agreed to in writing.

**Advice on the Application of Accounting Principles (SAS 50)**

KPMG's valuation services are intended to be a primarily straightforward application of generally accepted valuation methodologies to Delphi's facts. KPMG does not have responsibility for management analysis or decision-making with respect to Delphi's positions taken on tax returns, the application of any accounting principles, related financial statement disclosures and balance sheet accounts. Delphi is to consult with their independent auditor on the application of accounting principles.

To the extent that our engagement scope contemplates KPMG providing Delphi with other accounting advisory services, we will assist you with performing research and identifying important factors to consider when applying the guidance to your circumstances. We will assist Delphi with preparation of analyses and supporting documentation to enable you to consider the possible accounting decisions and draw conclusions on your interpretations of the application of accounting. In doing so, we limit our advice to the extent within accepted practice with the intention that you will not encounter issues or disagreements with your auditor, necessitating communication with your audit committee or require disclosure of significant consultations with accountants other than your auditor, but rather will work with you and your auditor in a collaborative approach to arrive at common agreement on the appropriate interpretations for the circumstances.

Should you request more formal views by KPMG on a particular matter involving the application of generally accepted accounting principles, either verbally or in writing, such advice falls within the provisions of Statement of Auditing Standards No. 50 *Reports on the Application of Accounting Principles* as amended by Statement of Auditing Standards No. 97, *Amendment to SAS 50, 'Reports on the Application of Accounting Principles'* (SAS 97). Because of the requirements of SAS 50, and KPMG internal policies, on those occasions when



we provide such accounting advice to the principal of proposed accounting policies who is not a KPMG audit client, such professional requirements include communicating with the independent auditors' of the Company to discuss such matters as:

- the economic substance of the transactions in scope versus the form of the transaction;

- whether there is a dispute between the Company and the continuing accountants; or

- whether the continuing accountants have reached a conclusion that differs from ours.

We anticipate providing advice under SAS 50 related to the application of SOP 90-7 and SFAS 144 with respect to your emergence from bankruptcy and impairment analysis and agree to undertake such advice pursuant to this SOW.

### 2.2  KPMG Deliverables:

**Documentation of Deliverables**
KPMG and Delphi agree to establish and agree upon the level and content of oral and written material to be provided to Delphi in connection with Fresh Start Services (the "Deliverables").

**Accounting and Tax, Systems, Impairment and Project Management Deliverables**

During various stages of our work, we will provide you with oral advice, verbal reports, various outlines, executive summaries, presentations, letters, issues analysis, schedules, etc., prepared to assist us in advising you.  No formal written report will be issued by KPMG as part of this advice.

**Valuation Deliverables**

Our goal is to present all deliverables in a format that is most effective for you. We typically provide our deliverables in two phases:

- Phase one's deliverable will be a summary report with accompanying financial schedules detailing preliminary valuation or impairment charge conclusions; and

- Phase two's deliverable will be a full report, with accompanying financial schedules, that provides an overview of our valuation process, fair values of the subject assets, (where appropriate) remaining useful lives, a description of valuation methodologies, and assumptions utilized.

This report will include, but will not be limited to, the following:

- An executive summary of our conclusions;

(11)



- A summary of the relevant accounting considerations related to fresh start accounting;

- A reconciliation of allocated enterprise value to the reorganization value determined by Delphi's financial advisers;

- Detailed descriptions of Delphi and each reporting unit;

- Analysis of the economic environment and prospects for future economic growth as of the report date;

- Detailed analysis of the industry in which Delphi and each of its reporting units compete;

- Detailed analysis of the financial condition of the Company and each reporting unit;

- Extensive description and rationale behind the valuation approaches used in our analysis;

- A conclusion on the value of all assets and liabilities as well as an allocation of those values to the reporting units determined by Delphi; and

- Detailed financial exhibits supporting our conclusions.

To enable Delphi to support its valuation conclusions included in its regulatory filings, our Valuation Deliverables may be shared with your auditor and applicable regulatory authorities having jurisdiction over Delphi and the subject matter of our Valuation Deliverables. Delphi agrees that it will provide KPMG with prompt notice prior to any such distribution.

The Valuation Deliverables may not be used in conjunction with any other appraisal or study. Our recommendation of value stated in our Valuation Deliverables will be based on the program of utilization described in the Valuation Deliverables, and may not be separated into parts. No change of any item in the Valuation Deliverables is authorized by anyone other than KPMG and we shall have no responsibility for any such unauthorized change.

Prior to issuing our Valuation Deliverables in final form, we will require a representation letter from you stating that we have been provided all relevant information of which you are aware and that there is no reason to believe that KPMG's assumptions based on these representations are unreasonable.

### Limitations Covering All Deliverables

You agree not to use our Deliverables for any purpose other than as set forth in this SOW. Any other use, except where express authorization is provide in writing, is unauthorized and may be misleading.

Except as stated elsewhere in this SOW, our Deliverables in either draft or final form or portions thereof including our oral comments, should not be communicated or distributed to



any party who is not a member of Delphi management nor should they be referred to or quoted, in whole or in part, in any prospectus, registration statement, public filing, loan, other agreement or document, and KPMG should not be named as an expert without our express written consent.

In the event that our Deliverables are to be distributed to another party or if you request that we participate in oral discussions with another party, other than your audit firm, a release letter (similar to that set forth in Exhibit B) to hold KPMG, and any subcontractor we may use, harmless relative to their use of the Deliverable must be received from that party prior to the distribution or discussion. It is agreed that the terms of such release letter are to be determined exclusively by KPMG. The foregoing consent and release shall not apply to circumstances where Delphi has first carefully considered the contents of such Deliverables and has adopted them as its own. Where Delphi has adopted KPMG Deliverable content as its own, Delphi shall redact any and all reference to KPMG or KPMG's name from the Deliverable prior to any such disclosure, distribution or discussion and shall present such Deliverable as its own work product with no attribution or references in any form to KPMG or KPMG's name.

During the engagement we may develop electronic work products, including spreadsheets, documents, databases and other electronic tools to assist us with our engagement. In some cases these electronic work products may be provided to Delphi upon request. As these electronic work products were developed specifically for our purposes and without consideration of any purpose for which you might use them, they are made available on an 'as is' basis for Delphi's use only. Further, we make no representations or warranties as to the sufficiency or appropriateness of the spreadsheets for any purpose for which you may use them, or that the operation thereof will be uninterrupted or error-free.

The report provided under this SOW is not intended to be used, nor should be used, in connection with any tax matter. Although our engagement will include tax accounting support, our valuation report is not intended to be used for tax purposes. Therefore, our valuation report will contain the following legend:

> *This report is not intended to be used, nor should be used, in connection with any tax matter. In the event Client uses this report for or in relation to any tax matter, the report is not intended or written by KPMG to be used, and cannot be used, by a client or any other person or entity for the purpose of (i) avoiding penalties that may be imposed on any taxpayer or (ii) promoting, marketing or recommending to any other party any matters addressed herein.*

We have attached as Exhibit A to this letter the Valuation Limiting Terms and Conditions for your information. We also have attached as Exhibit C to this letter, an example representation letter that we would tailor to your specific facts and assumptions and will request that you sign at the end of our engagement.



### 2.3  Use of Subcontractors:

Our services covered by this engagement letter may also necessitate the assistance of a member firm of KPMG International. To the extent that our services under this engagement letter require such assistance, the services will be provided under the direction of KPMG LLP, the U.S. member firm of KPMG International, and will include the participation of other member firms of KPMG International ("KPMG member firms"). KPMG LLP is a separate legal entity from other member firms of KPMG International. KPMG LLP, without the Company's prior written approval, may subcontract a portion of its responsibilities under this engagement letter to any of the KPMG member firms, provided, however, that KPMG LLP shall remain fully and solely responsible for all of KPMG's liabilities and obligations under the engagement letter.

### 2.4  Delphi's Responsibilities:

Delphi's financial statements and regulatory filings are the sole responsibility of Delphi. Delphi management is responsible for properly recording transactions in the accounting records. Management is also responsible for identifying and ensuring that Delphi complies with the laws and regulations applicable to its activities. KPMG has not been engaged to, and will not, perform management functions, make management decisions, or act or appear to act in a capacity equivalent to that of an employee or otherwise engage in any activity that in the judgment of KPMG would be inappropriate in the capacity for performing the services as set forth in this SOW.

It is your responsibility to determine the adequacy of the scope of our work to be performed for your purposes. We make no representations as to whether our procedures are sufficient for your purposes. Also it is understood that it is your responsibility to (1) designate a management-level individual or individuals to be responsible for overseeing the services being provided, (2) evaluate the adequacy of the services performed and any findings that result, and (3) make all management decisions and perform all management functions, including accepting responsibility for the implementation of actions identified in the course of this engagement and results achieved from using the services and/or Deliverables. Delphi agrees that it will notify KPMG in writing if management does not have sufficient information or advice from KPMG to enable management to make and accept responsibility for all decisions related to our advice.

Delphi is responsible for making available to KPMG, upon request, all of the necessary information and company personnel to whom KPMG can direct inquiries to perform its services as set forth in this SOW. Delphi agrees to perform the tasks and provide the assistance agreed to by the parties. Any timing or fee estimate we have provided for this engagement takes into account the agreed-upon level of assistance from Delphi and commitment of Delphi resources. KPMG shall not be responsible for any delay or other consequences resulting from Delphi's failure to perform any of its obligations under this Agreement. Delphi's failure to satisfy its responsibilities under this SOW may lead to an

(14)



increase in KPMG fees, depending on the extent to which KPMG has to perform more services or reschedule its commitments to deliver the Services, or KPMG's inability to provide the Services.

KPMG will make specific inquiries of Delphi management when performing the services as set forth in this SOW. KPMG intends to rely upon the results of its procedures and the responses to its inquiries in forming its findings.

## 2.5 Limitation of Liability and Indemnification

Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of KPMG, KPMG's liability to pay damages for any losses incurred by Delphi as a result of breach of contract, negligence or other tort committed by KPMG, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for the Services provided under this SOW. Except to the extent finally determined to have resulted from the gross negligence or intentional misconduct of Delphi or in connection with Delphi's violation of its obligations under Section 6(b) of the Agreement, Delphi's liability to pay damages for any losses incurred by KPMG as a result of breach of contract, negligence or other tort committed by Delphi, regardless of the theory of liability asserted, is limited to no more than the total amount of fees paid to KPMG for the services provided under this SOW.

## 2.6 In addition to the engagement limitations set forth in Section 14 in the Agreement:

KPMG is responsible for performing the services set forth in this SOW in accordance with the terms of the Agreement and this SOW and reporting its findings thereon. The day-to-day performance of the services as set forth in this SOW will be directed, reviewed, and supervised by KPMG.

Delphi agrees that KPMG may use the Delphi's name in experience citations with respect to Fresh Start Services.

## 2.7 Timing

The timing of the services to be provided hereunder is as follows:

| Project Start Date: | November 16, 2006 |
|---|---|
| Estimated Project Completion Date: | March 31, 2008 |



## III.   RESOURCES ASSIGNED TO THIS SOW

The KPMG leadership team assigned to provide Fresh Start Services and Deliverables under this SOW are as follows:

| Resource Name | Title |
|---|---|
| Brian Heckler | Partner |
| Dan Gary | Partner |
| Robert Musur | Partner |
| Duncan Forsythe | Partner |
| Kevin Voigt | Managing Director |

KPMG will assign additional personnel as necessary throughout the course of the project.

## IV.   PAYMENT; EXPENSES; AND INVOICES

### 4.1   Payment Terms

Payment terms are consistent with the terms in Section 4 of the Agreement.

### 4.2   Professional Fees and Expenses

KPMG's fees are based on the time required by the individuals assigned to the engagement, based on the rates set forth below. Based on our experience with similar engagements we estimate that the fees will amount to approximately $10 million for Fresh Start Services, excluding expenses. Individual hourly rates vary according to the degree of responsibility involved and experience and skill required. The agreed upon billing rates are detailed below. Expenses will be billed in accordance with the terms in Sections 3 and 4 of the Agreement. In addition, any costs incurred by KPMG with respect to the purchase of valuation data from third party sources will be billed as an out of pocket expense.

| Level | Standard rate | Discount | Net rate |
|---|---|---|---|
| Partner | $835 | ($335) | $500 |
| Director | $800 | ($360) | $440 |
| Manager | $650 | ($290) | $360 |
| Senior | $500 | ($250) | $250 |
| Associate | $400 | ($235) | $165 |



## V.   *OTHER TERMS AND CONDITIONS THAT SHALL APPLY TO THIS SOW*

**5.1**  In the event KPMG is requested or authorized by Delphi or required by government regulation, subpoena, or other legal process to produce its working papers or its personnel as witnesses with respect to its engagement for Delphi, Delphi will, so long as KPMG is not a party to the proceeding in which the information is sought, reimburse KPMG for our professional time and expenses, as well as the reasonable fees and expenses of its counsel, incurred in responding to such a request.

**5.2**  Delphi shall provide reasonable workspace, administrative support, computer facilities and other support, which are necessary to perform the Services.  Delphi shall perform the tasks and provide the assistance described in this SOW.  Delphi consents to the use, by staff visiting or working from the Delphi site, of the Delphi's resources, including, but not limited to network, Internet and extranet access, for the purpose of accessing similar resources. Delphi agrees to perform in a timely fashion those tasks and provide the personnel agreed to by the parties and set forth herein.

**5.3**  In providing KPMG with access to Delphi's network, the Internet and Delphi's extranet, KPMG will comply with all of the following:

(a) KPMG will comply as appropriate with the Delphi's Information Security Policy which will be made available to KPMG.

(b) KPMG is responsible and accountable for ensuring that all KPMG devices attaching to Delphi's network are compliant with KPMG's virus policy which include periodic automatic updates.

(c) KPMG is responsible and accountable for ensuring that all KPMG devices attaching to Delphi's network use KPMG standard configurations and are current with respect to automatic update distributions.

(d) Communications shall be secure (e.g., SSL/VPN, secret/confidential files exchanged encrypted, or password protected) as appropriate.  KPMG and Delphi to agree on which KPMG personnel should be issued and utilize Delphi e-mail accounts (KPMGConsultant@delphi.com).

(e) KPMG shall not store Delphi information on an unsecured device for any longer than is necessary to fulfill a specific business need and must delete or transfer unsecured data to a secure device as soon as practicable.  Any data stored on a laptop shall be encrypted.

(f) For information identified as sensitive by Delphi Corp., KPMG shall report any data spills or loss of an unsecured device to Delphi IT Security as soon as practical.

(g) KPMG shall maintain an updated listing of all KPMG employees who perform services under this SOW which can be reviewed with Delphi upon reasonable request.



**IN WITNESS WHEREOF,** the parties to the above referenced Agreement have caused this
SOW to be executed by their authorized representatives.

| KPMG LLP | | | |
|---|---|---|---|
| Signature *Brian L. Heckler* | Printed Name<br>Brian Heckler | Title<br>Partner | Date<br>3/14/07 |
| **Delphi Corporation** | | | |
| Authorized Signature | Printed Name<br>JOHN D. SHEEHAN | Title VP & Chief<br>Restructuring Officer | Date<br>3/16/07 |
| Authorized Signature | Printed Name<br>Kevin . Smith | Title<br>Director, GSM | Date<br>3/16/07 |

(18)

EXHIBIT A

**KPMG LLP**
**Valuation Services Limiting Assumptions Addendum to Standard Terms and Conditions**

This Valuation Services Limiting Assumptions Addendum to the Standard Terms and Conditions is an integral part of the accompanying Standard Terms and Conditions for Advisory and Tax Services.

18. **Nature of Opinion.** Neither our opinion nor our report are to be construed as a fairness opinion as to the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation, but, instead, are the expression of our determination of the fair [market] value of the Subject Assets between a hypothetical willing buyer and a hypothetical willing seller in an assumed transaction on an assumed valuation date. For various reasons, the price at which the Subject Assets might be sold in a specific transaction between specific parties on a specific date might be significantly different from the fair [market] value expressed in our report.

19. **Going Concern Assumption, No Undisclosed Contingencies** - Our analysis (i) assumes that as of the Valuation Date the Company and its assets will continue to operate as configured as a going concern; (ii) is based on the past and present financial condition of the Company and its assets as of the Valuation Date; and (iii) assumes that the Company had no undisclosed real or contingent assets or liabilities, no unusual obligations or substantial commitments, other than in the ordinary course of business, nor had any litigation pending or threatened that would have a material effect on our analysis.

20. **Reliance on Forecasted Data.** Any use of management's projections or forecasts in our analysis does not constitute an examination or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA"). We do not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines. Further, there will usually be differences between prospective and actual results because events and circumstances frequently do not occur as expected and those differences may be material.

21. **USPAP.** Unless otherwise stated in our report, out report is in substantial compliance with USPAP ("Uniform Standards of Professional Appraisal Practice").

22. **Verification of Legal Description or Title.** We have made no investigation of legal description or title and have assumed that owner(s) claims to property are valid. No consideration will be given to liens or encumbrances which may be against the property except as specifically stated as part of the financial statements you provide to us as part of this engagement. Full compliance with all applicable federal, state and local zoning, environmental, and similar laws and regulations is assumed, unless otherwise stated, and responsible ownership and competent management are assumed.

23. **Verification of Hazardous Conditions.** We will not investigate the extent of any hazardous substances that may exist as we are not qualified to test for such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation or other hazardous substances or environmental conditions may effect the value of the property, the value will be estimated predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility will be assumed for any such conditions, or for any expertise or engineering knowledge required to discover them.

24. **Condition of Property.** We assume no liability whatsoever with respect to the condition of the subject property for hidden or unapparent conditions, if any, of the subject property, subsoil or structures, and further assume no liability or responsibility whatsoever with respect to the correction of any defects which may now exist or which may develop in the future. Equipment components considered, if any, were assumed to be adequate for the needs of the property's improvements, and in good working condition, unless otherwise reported.

25. **Zoning.** It is assumed that all public and private zoning and use restrictions and regulations had been complied with, unless non-conformity was stated, defined and considered in the report.

26. **The Americans with Disabilities Act ("ADA").** The ADA became effective January 26, 1992. The valuation profession will not make a specific compliance survey and analysis of this property to determine whether or not it is in conformity with the various detailed requirements of the ADA. It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the ADA, could reveal that the property is not in compliance with one or more requirements of the ADA. If so, this fact could have a negative effect upon the value of the property. Since the valuation professional has not direct evidence relating to this issue, he will not consider possible non-compliance with the requirements of the ASA in estimating the value of the property.

Revised 10/16/06



**Exhibit B**

Releasing Party

[Date]

KPMG LLP

Dear _____:

Delphi has informed Releasing Party that KPMG LLP has performed certain procedures to assist Delphi in connection with its application of fresh start accounting in connection with its emergence from Chapter 11 bankruptcy proceedings ("Fresh Start Services"). We understand that the work performed by KPMG LLP was performed in accordance with instructions provided by Delphi and was performed exclusively for Delphi's sole benefit and use.

Delphi has requested that KPMG LLP provide Releasing Party access to certain reports and documentation produced in accordance with Delphi's instruction ("Work Product"). Releasing Party acknowledges that this Work Product was prepared at the direction of Delphi and may not include all procedures deemed necessary for the purposes of Releasing Party and that certain findings and information may have been communicated to Delphi that are not reflected in the Work Product.

In consideration of KPMG LLP allowing Releasing Party access to the Work Product and, if requested by Releasing Party, discussing the Work Product, Releasing Party agrees that it does not acquire any rights as a result of such access that it would not otherwise have had and acknowledges that neither KPMG LLP nor any other KPMG Firm or subcontractor involved in performing the Fresh Start Services or related Work Product ("Released Firms") assumes any duties or obligations to Releasing Party in connection with such access.

Releasing Party agrees to release KPMG LLP, each Released Firm and their personnel from any claim by Releasing Party that arises as a result of KPMG LLP permitting Releasing Party access to the Fresh Start Services Work. Further, Releasing Party agrees not to disclose or distribute the Work Product, or information received, orally or in writing from KPMG LLP or a Released Firm to any other parties without KPMG LLP's prior written consent, except as required by law, regulation, or legal process, provided that, except in the case of routine supervisory examinations by bank regulatory authorities, Releasing Party provides KPMG LLP with prompt notice of any request that Releasing Party disclose such information (so long as such notice is not prohibited by law), so that KPMG LLP may at its option object to the

(19)



request and/or seek an appropriate protective order.  It is understood and agreed that any objection of KPMG LLP to such a request shall not affect Releasing Party's obligations to produce materials called for by appropriate legal or regulatory process.


Acknowledged by Releasing Party representative:


By:    _____
        (Name of company official)


        _____
        (Title)


        _____
        (Date)

*Exhibit C*

### Sample Representation Letter (for Delphi)

[Date]

**KPMG LLP**
303 E, Wacker
Chicago, IL 60601
Attn: Robert Musur

Dear Mr. Musur:

This letter will confirm our understanding regarding certain elements of KPMG LLP's engagement to assist Delphi ("Delphi" or the "Company") in valuing certain assets and liabilities in connection with our application of Statement of Position 90-7, *Financial Reporting for Entities in Reorganization Under the Bankruptcy Code*. The valuation was performed as of _____ (the "Valuation Date").

We have reviewed your valuation report and the related data that was used in this report. In connection with your valuation study, we have supplied you with all significant and relevant information of which we are aware. The information supplied to you includes:

- list to be provided near project completion;

We understand you have relied on the aforementioned information and upon discussions with employees of Delphi during your engagement and that you have not undertaken any procedures to verify the reasonableness of this information. We understand that you express no opinion as to the fairness of the presentation of the aforementioned information and that any alterations or modifications to this information could materially affect your findings.

We have no reason to dispute the underlying financial information upon which you relied in your analysis. We understand that your findings are to be relied upon solely in connection with the circumstances set forth in your proposal letter.

Sincerely,

Thomas S. Timko

Corporate Controller