**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
| | : | (Jointly Administered) |
| Debtors. | : | |

DEBTORS' AMENDED SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

("AMENDED SUPPLEMENTAL REPLY – JOSEPH RENO")[1]

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively the "Debtors"),

[1] The Debtors' Amended Supplemental Reply supersedes the Debtors' Supplemental Reply (Docket No. 7006).

hereby submit their Amended Supplemental Reply With Respect To Proof Of Claim No. 9956 (Joseph Reno) (the "Amended Supplemental Reply") and respectfully represent as follows:

Introduction

1. Joseph Reno ("Reno"), a former full-time salaried at-will employee of Delphi's Kettering, Ohio, manufacturing plant (the "Plant"), alleges that his supervisor at Delphi, Mark Gooding ("Gooding"), suspended and terminated him because of their disagreement over whether a leaking wastewater tank should be totally resurfaced or only patched where appropriate (the "Wastewater Incident"). Contrary to his allegations, however, Reno was suspended and later terminated by Elizabeth Patrick ("Patrick"), Delphi's Divisional Salaried Personnel Director based in Troy, Michigan, after an internal investigation (the "Investigation") revealed, among other things, that Reno abused his position with respect to a Delphi vendor for personal benefit and obstructed Delphi's subsequent Investigation into the matter.

2. The Investigation—which began weeks before the Wastewater Incident—revealed that (i) Reno misused his relationship with Delphi's waste contractor, Onyx Industrial Services Inc. ("Onyx"), to get an Onyx employee to haul a dumpster to and from his house; (ii) the dumpster, filled with Reno's discarded waste, was hauled to Delphi property; and (iii) Reno attempted to conceal his actions during the Investigation. Based on these facts, Patrick decided to suspend and later terminate Reno.

3. Reno's claim that Delphi terminated him because he and Gooding disagreed over how to remedy a wastewater leak is untenable. Patrick—not Gooding—made the decision to suspend Reno and without knowledge of the Wastewater Incident. Although Patrick later became aware of the Wastewater Incident, Patrick was not involved in the Wastewater Incident and was not influenced by any differences of opinion between Reno and Gooding as to how best to fix the tank. Patrick decided, after being apprised of the results of the Investigation,

to suspend and later fire Reno due to his unacceptable misconduct and subsequent attempts to obstruct the Investigation. Accordingly, Reno's retaliatory discharge claim against the Debtors has no merit and must fail.

4. Reno argues that Delphi's stated reason for terminating his employment was a pretext because the Investigation was not complete when he was fired and thus could not have served as the basis for the termination. Contrary to Reno's assertion, Patrick had more than sufficient information to terminate Reno's employment when Michael Brown ("Brown"), a licensed investigator, informed her that Reno paid the Onyx driver $100 in cash to provide him with a dumpster for personal use and then to return that dumpster to Delphi property, and that Reno was attempting to obstruct the Investigation. Reno cannot show that Delphi's stated reason for terminating his employment was a pretext or that Delphi did not have an independent reason to terminate him as a result of the misconduct uncovered as part of the Investigation.

5. Reno's other claims similarly fail. Reno's claim based on Ohio's whistleblower statute fails because Reno did not comply with the statutory requirements. Reno's claim under the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-69 ("COBRA"), fails because the Debtors terminated Reno for gross misconduct and were therefore not required to continue his group health insurance. Reno's claim under the Fair Credit Reporting Act (the "FCRA") fails because the Investigation, and Brown's report that results from it, are outside the reach of the act. Reno has not articulated the legal or factual basis for any of his other claims. This Court should disallow and expunge Reno's claim in its entirety.

## Background

6. Many key facts are not in dispute. In late 2003, Reno approached Troy Calton ("Calton"), the primary Onyx contact for the Plant's waste disposal, and asked him to deliver an Onyx dumpster to his home so that he could dispose of yard debris, concrete, wire,

wire fencing, general construction debris, empty bags, and sea salt boxes from his wife's aquarium business. (Reno Dep. 16:6-8.)[2] The two never discussed an exact fee, a rough estimate, or a unit price for the dumpster rental and waste disposal. (Id. 158:15 – 159:10; Calton Dep. 35:24 – 36:2.) Instead, Reno paid Calton $100 in cash for delivering a red Onyx dumpster to Reno's home and did not sign a rental agreement or even request a receipt. (Reno Dep. 18:4-10.) In lieu of signing a rental agreement or getting a written receipt at the time, Reno claims to have "purposely attempted to rent [the] dumpster and pay for it in . . . front of witnesses" to avoid apparently any potential "misunderstanding" that might later develop as to whether he "intended to pay for [the] service in full." (Id. 11:7-22, 142:14 – 143:9, 146:10-19.) The dumpster arrangement was not recorded in Onyx's books and records because, as Calton understood the arrangement, the $100 cash "was for me for the trouble"—a "personal payment" not intended for Onyx. (Calton Dep. 35:15-21; 58:1-22.)

7. Reno admits that, at the time, he understood Delphi's conflict-of-interest policy, which prohibits employees from using their position at Delphi to seek favors or more favorable terms from Delphi vendors. (Reno Dep. 54:9 – 55:16; Declaration Of Beth Patrick In Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 9956 (Joseph Reno) (the "Patrick Decl.") ¶ 13, attached hereto as Exhibit A.)[3] Yet Reno never sought or received approval from Gooding, Human Resources, or anyone else at Delphi for this unusual off-the-books transaction involving a $100 cash payment to the Onyx driver.

8. On January 29, 2004, Delphi's Environmental Site Coordinator for the Plant, JoAnne Rau ("Rau"), was notified that a red dumpster located on the property of the Plant contained fencing and aquarium salt bags, not waste that would have normally come from the

[2] Copies of deposition transcripts cited herein will be included in parties' joint exhibit binder to be filed prior to hearing.

[3] Elizabeth Patrick's name at the time of these events was Elizabeth Meyer.

Plant. (Rau Dep. 13:13-21.) Calton notified Reno that he had spotted Delphi employees taking pictures of the dumpster and its contents and that an investigation into the red dumpster containing Reno's debris had begun. (Reno Dep. 142:14 – 143:9.) Calton and Reno discussed that "it was going to be a problem." (Calton Dep. 33:4-5.) Reno admits his "first thought was to protect [himself]." (Reno Dep. 143:23 – 144:8.) Thus, Reno immediately asked Calton to create a backdated receipt for the $100 in cash that he gave to Calton earlier. (Id. 18:7-10; 33:24 – 34:11; Calton Dep. 19:21 – 20:5.) And, instead of approaching Gooding or anyone else in Delphi management or Human Resources, Reno immediately solicited statements from two subordinate employees at Delphi (David Atchison and Terry Ruble) and an employee of a Delphi contractor (David Low) to confirm a passing conversation between Reno and Calton that had purportedly occurred roughly four months earlier when Reno allegedly agreed to pay for the dumpster costs. (Id. 22:6-9, 25:19 – 27:3.)

9. On February 2, 2004, Gooding contacted Brown and asked Brown to determine the origin of the debris and the reason for its presence on Delphi property. (See Amended Declaration Of Michael Brown In Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 9956 (Joseph Reno) (the "Brown Decl.") ¶ 7, a true and correct copy of which is attached hereto as Exhibit B.) Brown discovered that the dumpster belonged to Onyx. (Id. ¶ 8(a).) As the key Onyx contact for the Plant, Calton worked closely with Reno. (Id. ¶ 8(b).) Brown also discovered that Plant employees believed that Reno might have been the source of the debris in the dumpster. (Id. ¶ 7.)

10. Meanwhile, on February 4, 2004, Reno received witness statements from Atchison and Low. (Reno Dep. 25:19 – 27:3.) Ruble refused to sign such a statement. (Id. 26:21 – 27:3; Ex. B, Brown Decl. ¶ 21.) Although Reno contends that he believed the

Investigation was based on "a big misunderstanding," he nevertheless kept the two witness statements dated February 4, 2004, from anyone in Delphi management, Human Resources, or otherwise until a couple of weeks later when Reno was summoned to be questioned about his role in the dumpster matter. (Reno Dep. 143:15 – 146:19.)

11. On February 5, 2004, Brown met with Calton. (Ex. B, Brown Decl. ¶ 9.) Calton initially told Brown that, in early fall 2003, Reno asked him to deliver an empty dumpster to Reno's residence and that a few months later Reno asked him to return to pick up the dumpster. (Id. ¶¶ 9-10.) Calton said that he was supposed to take the dumpster from Reno's residence to a landfill. (Id. ¶ 11.) However, due to an emergency at the Plant, he drove with the dumpster straight to the Plant. (Id.) Calton then left the dumpster on Delphi property and forgot to retrieve it later to take it to a landfill. (Id.)

12. Coincidentally, on February 13, 2004, about two weeks after the Investigation had been initiated, Reno supposedly discovered a leak from a chromium wastewater treatment tank at the Plant and temporarily solved the leakage problem by creating a bypass to a different holding tank. (See March 30, 2004, letter from Delphi to the Occupational Safety and Health Administration (the "Delphi OSHA Letter") at 2, attached hereto as Exhibit C; Reno's First Amended Complaint (the "Am. Compl.") ¶¶ 5-6, attached hereto as Exhibit D.) Reno failed to mention that he was notified of this problem months earlier. (T. Brown Dep. 36:21 - 43:19.) Although Reno claims that he believed a release of toxic chromium had occurred, he chose not to inform Gooding or Rau at that time. (Reno Dep. 86:12-20, 110:16-111:6.)

13. On February 16, 2004, Brown interviewed Reno regarding the dumpster. (Ex. B, Brown Decl. ¶ 12.) Reno told Brown that he had asked Calton to deliver the dumpster to his house in late November 2003 or early December 2003—not early fall 2003 as Calton stated

during his February 5 interview with Brown. (Id.) Reno also said that he filled the dumpster and asked Calton to pick it up on December 22, 2003. (Id.) Reno explained that December 22, 2003, had been the first day of Delphi's holiday shutdown for the year, so he was at home that day and thus able to coordinate Calton's removal of the dumpster. (Id.) Brown later learned that the 2003 holiday shutdown began on December 23—not December 22 as Reno had said. (Id.) Reno told Brown that, until he learned of the Investigation in late January 2004, he thought the dumpster had been taken to the landfill. (Id. ¶ 13.)

14. Then, without Brown asking him to do so, Reno produced the two prepared written statements from Atchison and Low, who purported to have overheard a conversation between Reno and Calton in which Reno allegedly told Calton that Reno would personally pay the fee for the dumpster. (Id. ¶ 14.) Brown found it odd that Reno came to the interview with prepared statements, especially because prior to the interview, Brown had not raised any issues related to the use of the dumpster, its presence on Delphi property, or whether any such conversations between Reno and Calton actually occurred. (Id.) Brown later learned from Ruble, that Reno also had asked Ruble to give a statement, but Ruble refused to do so because such a statement would have been false. (Id. ¶ 21.)

15. Two days after his interview with Brown, Reno decided to inform Gooding and Rau for the first time at a February 18, 2004 staff meeting of a leak that occurred five days earlier. (See March 2, 2004, Letter from Reno to James Walle (the "March 2 Letter"), attached hereto as Exhibit E; Reno Dep. 80:1-23, 81:16-25, 82:2-16, 86:12-20, 110:16 – 111:6.) Delphi retained American Testing Services Ltd. ("ATS") to inspect the tank on February 20, 2004. (See ATS Onsite Inspection Report dated February 20, 2004 (the "ATS Report"), attached hereto as Exhibit F.) Reno claims that he wanted to recoat the entire tank that had leaked, while

Gooding concluded that only the bottom third of the tank and any other visibly cracked areas noted in the ATS Report needed to be recoated. (See Ex. D, Am. Compl. ¶ 12.) Between February 23, 2004, and March 1, 2004, the tank was repaired by patching any cracks and resurfacing the bottom three feet of the tank and any other damaged areas. (See Ex. C, Delphi OSHA Letter at 4; HRC Investigation Report at 2, attached hereto as Exhibit G.)

16. Meanwhile, because there were significant discrepancies in the chronologies that Reno and Calton offered concerning the dumpster incident, Brown decided to interview Calton for a second time on February 18, 2004. (Ex. B, Brown Decl. ¶ 15.) After Calton repeated the same story he had told Brown in his February 5 interview, Calton asked what would happen to him as a result of his involvement in the dumpster incident. (Id.) Brown explained to Calton that, as long as he was telling the truth, nothing would happen to him. (Id.) After the interview had ended, while still in the hallway, Calton asked whether he could resume the interview because he needed to make some changes in his statement. (Id. ¶ 16.) Calton explained that he delivered the dumpster to Reno's home in August 2003 or September 2003—not November or December 2003 as Reno had told Brown—and that he picked up the dumpster in late September 2003 or October 2003—not on December 22, 2003, as Reno had told Brown. (Id. ¶ 16(a) & (b).) Calton then explained that he and Reno drove together in the Onyx truck from the Plant to Reno's residence to retrieve the dumpster and then they both brought it back to the Plant. (Id. ¶ 16(b).) Calton admitted that Reno gave him $100 in cash in exchange for the favor of allowing Reno to use the dumpster at his home and for picking up and dropping the dumpster off at the Plant. (Id. ¶ 16(c).) Calton admitted that he did not give the $100 to Onyx. (Id.) He also explained that, in February 2004, shortly after the Investigation began, Reno approached Calton and asked him to create a receipt for the $100 cash payment. (Id. ¶ 16(d).)

Calton said he arbitrarily chose December 22, 2003, as the date for the receipt. (Id.) Calton testified that, contrary to Reno's solicited statements, there were no other people present when Reno gave him the $100 cash (Calton Dep. 63:19-23, 79:19 – 80:18.)

17. On February 20, 2004, after learning of the status and findings of the Investigation, Patrick decided to suspend Reno. (Ex. A, Patrick Decl. ¶ 9.) Both Brown and Patrick were unaware of the Wastewater Incident. (Id. ¶ 10; Ex. B, Brown Decl. ¶ 24.)

18. On March 2, 2004, Reno sent a letter to James Walle, a Delphi Legal Department attorney who dealt with environmental issues. (See Ex. D, March 2 Letter.) In the letter, Reno expressed general concerns about the safety of the chrome treatment tanks at the Plant. He also referred to the dumpster Investigation, although he inaccurately reported that Calton had taken full responsibility for returning the dumpster to Delphi. (Id.) In response to the letter, Delphi arranged for both internal Delphi environmental managers and an independent consulting engineering firm, Hubbel, Roth & Clark Inc., to investigate and determine if the wastewater tanks at the Plant were in fact safe for continued use. Both investigations concluded that Delphi had taken appropriate action concerning the tanks. (See Ex. G, HRC Investigation Report at 3.)

19. On March 5, 2004, Brown conducted a third interview with Calton. (Ex. B, Brown Decl. ¶ 22.) Calton reaffirmed his statement that Reno personally had paid him $100 and only later requested a receipt. (Id.) Although Calton had agreed after the February 18 interview to give a written statement, he refused to give a written statement unless Delphi agreed not to take action against him. (Id. ¶ 17.) After reading Brown's findings from March 5, 2004, Patrick decided that the information that Brown had uncovered established that Reno abused Delphi's business relationship with Onyx and obstructed the Investigation by lying about the

facts and persuading Calton to produce a fraudulent receipt. (Ex. A, Patrick Decl. ¶ 13.) Therefore, on March 17, 2004, Patrick decided to terminate Reno. (Id.) The leak had nothing to do with her decision.

20. On May 20, 2004, the Occupational Safety & Health Administration ("OSHA"), concluded, in response to a complaint filed by Reno, "that [Delphi] terminated [Reno] for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest and trying to obstruct and mislead Delphi's subsequent investigation." (See OSHA Finding, attached hereto as Exhibit H.)

## Argument

21. Reno cannot establish a retaliatory discharge claim because Delphi's suspension and later termination of Reno were not in retaliation for the Wastewater Incident. Delphi's decision to terminate Reno was based on Patrick's assessment that Reno misappropriated Delphi assets, took advantage of his business relationship with Onyx—a conflict of interest—and tried to obstruct and mislead Delphi's Investigation. Accordingly, Reno's public policy retaliatory discharge claim fails. So, too, do Reno's other claims. Because Reno failed to comply with the requirements of Ohio's whistleblower statute, his claim under that statute must fail. Because Delphi terminated Reno for cause, Reno's COBRA claim must fail.

### A. Reno Cannot Show He Was Suspended Or Terminated Contrary To Ohio Public Policy.

22. As an initial matter, Reno's Trial Brief[4] overlooks the elements that he must prove to establish his claim that he was discharged in violation of Ohio public policy:

> In order to support a claim for discharge in violation of public policy, a plaintiff must show (1) the existence of a clear public policy, (2) dismissal under circumstances that would jeopardize that policy, (3) dismissal related to the public

[4] Reno's Trial Brief was attached to his Motion For Leave To File Claimant Joseph Reno's Trial Brief And Declaration (Docket No. 7103), filed March 2, 2007.

policy, and (4) lack of an overriding business justification for the employer's action.

Urban v. Osborn Mfg., Inc., 847 N.E.2d 1272, 1276 (Ohio Ct. App. 2006).[5] Since Reno cannot meet these elements, his claim should be disallowed and expunged.

i. Reno Cannot Show That His Termination Was Related To Workplace Or Public Safety, Or Any Other Public Policy

23. Reno cannot show that Delphi's suspension or termination of him jeopardizes Ohio public policy because Delphi suspended and terminated him for his misconduct related to the dumpster incident and the related Investigation—not his concerns about how best to repair a leak in the south chrome tank at the Plant.

24. As an initial matter, Brown began investigating Reno's misconduct almost two weeks *before* the wastewater leak and interviewed both Reno and Calton *before* Reno decided to disclose the wastewater leak on February 18, 2004. (Ex. B, Brown Decl. ¶¶ 9, 12, 15.) Reno was suspended with pay on February 20, 2004, the same day that ATS submitted the initial inspection report on the wastewater tank, and nearly two weeks before Reno submitted the March 2 Letter. By February 20, 2004, Brown's Investigation into Reno's conduct concerning the Onyx dumpster already had revealed that (1) Calton contradicted Reno's story ; (2) Reno gave Calton $100 in cash, and Calton had not turned the money over to Onyx; (3) Reno requested a backdated receipt from Calton only after Brown began his investigation into the matter; and (4) Reno asked subordinate employees to give exculpatory statements regarding Reno's transaction with Calton. (See generally Ex. B, Brown Decl.) These revelations

[5] The two cases that Reno cites in his section entitled the "Law" do not even articulate to the elements of an Ohio public policy claim. (See Trial Br. at 3 (citing Fennell v. First Step Designs Ltd., 83 F.3d 526 (1st Cir. 1996) (interpreting Maine's whistleblower statute) and Eperesi v. Northernenvirotest Sys. Inc., No. 98-3452, 1999 WL 825034, at *5 (6th Cir. Oct. 6, 1999) (unpublished) (finding that plaintiff's Ohio public policy claim survived summary judgment because "[b]oth parties seem to agree that [plaintiff's] common law public policy claim is dependent on the success of her claims of discrimination and retaliation").)

convinced Patrick to suspend Reno on February 20, 2004. (See Ex. A, Patrick Decl. ¶ 9.) Patrick then terminated Reno on March 17, 2004, for the same reasons. (Id. ¶ 13 & Exhibit 1.) The Wastewater Incident had absolutely no bearing on Patrick's decision. (Id. ¶ 11.)

25. Moreover, the decision to suspend and subsequently terminate Reno was made by Patrick, who was uninvolved in the wastewater leak. Reno inaccurately attributes to Gooding the decisions to suspend and to terminate him. Contrary to Reno's assertions, however, Gooding did not make the decision to terminate Reno. Patrick did. (Id. ¶ 13.)

26. Notably, Delphi did take Reno's environmental concerns seriously. From the time they became aware of the wastewater leak, Reno's superiors, including Gooding, handled the environmental concerns appropriately. Delphi commissioned ATS to conduct an investigation on February 20, 2004, allowing Delphi to develop a course of action to repair the problem. (See Ex. F, ATS Report.) After the March 2 Letter, Delphi commissioned two additional inspections to ensure that the repairs were sufficient. (See Ex. C, Delphi OSHA Letter at 5; Ex. G, HRC Investigation Report at 3.) Both investigations revealed that Delphi took appropriate steps to repair the wastewater tank and create a plan for inspecting other tanks. (Id.)

27. Despite taking Reno's concerns seriously, Delphi could not excuse Reno's misconduct. On April 3, 2001, Reno acknowledged that he received and understood Delphi's booklet, Foundations of Excellence. (Reno Dep. 54:9 – 55:16; Ex. A, Patrick Decl. ¶ 13(a) & Exhibit 1 thereto.) Page 6 of the booklet states: "[W]e must avoid actions or relationships that might conflict or even appear to conflict with our job responsibilities or Delphi's interests." The policy continues:

> A conflict of interest is an obligation to or relationship with any person or organization that competes or does business with Delphi, that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation *and without regard to*

> *personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement. The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest*.
>
> Examples of potential conflict of interests include: . . . *Accepting services or receiving payment from a supplier* . . . .

(Ex. A, Patrick Decl. at Exhibit 1 (emphasis added).) The policy concludes with the expectation that all employees will disclose promptly any situation that could result in a conflict and to seek out superiors to assist in resolving any questions an employee might have regarding a potential conflict.

28. Reno sought no advice or counsel from any superior when he arranged with Calton to deliver a dumpster at his personal residence, filled it up with his personal debris, and then drove with Calton to deliver it to Delphi property. Patrick could not ignore Reno's breach of Delphi's conflict-of-interest policy and other misconduct simply because Reno raised environmental concerns two weeks *after* Delphi already had begun investigating his misconduct. Excusing Reno's misconduct and not terminating him simply because he subsequently raised environmental concerns would undermine—not promote—Ohio public policy under these circumstances.

ii. Reno Cannot Show That Delphi Lacked An Overriding Business Justification To Suspend and Terminate Him.

29. Nor can Reno show that Delphi lacked an overriding business justification for suspending and terminating him. See Urban, 2006-Ohio-1080, 847 N.E.2d at 1276. In addition to showing that an improper motive somehow infected Delphi's decision to terminate, Reno also must show that Delphi did not otherwise have a legitimate reason for terminating him. See id.; Thompson v. Gynecologic Oncology & Pelvic Surgery Assocs., No. 06AP-340, 2006 WL 3491738, at *9 (Ohio Ct. App. Dec. 5, 2006) (dismissing public policy claim because "[plaintiff] failed to raise a genuine issue of material fact as to . . . whether [employer] lacked an

overriding legitimate business justification for the discharge"). Reno fails to show that Delphi lacked a legitimate business justification for terminating him.

30. Without question, Brown, the individual conducting the investigation and reporting his findings to Patrick, had absolutely *no* knowledge of the Wastewater Incident until *afte*r Reno was suspended and terminated. Thus, although Reno cites various perceived flaws with Brown's investigation, the undisputed evidence is that Brown conducted an investigation revealing that, among other things, Reno had taken personal advantage of his business relationship with Onyx and tried to obstruct and mislead the Investigation. Faced with such revelations, Patrick determined that Reno should be suspended and terminated. Because Reno's evidence does not prove that Delphi lacked an overriding business justification for suspending and terminating him, his retaliatory discharge claims must fail.

iii. Reno's Evidence Does Not Undermine the Debtors' Legitimate Nonretaliatory Reason for Terminating His Employment.

31. Reno suggests that a "misrepresentation of fact" by Delphi to OSHA on March 30, 2004, regarding the completion status of Brown's investigation at the time of the termination shows that Patrick's articulated reason for firing Reno was a pretext (Trial Br. at 1-2, 8.) Not so. That Brown thought his investigation was not yet "complete" but Patrick thought it was "complete" for purposes of concluding that Reno was involved in misconduct does nothing to contradict Patrick's articulated reasons for terminating Reno on March 17, 2004.

32. Reno's other argument—i.e., that Patrick must have lied about suspending and terminating him because the Investigation was incomplete, incompetent, and illegal—makes no sense. (Trial Br. at 8.) Regarding completeness, Reno suggests that Patrick could rely on the information uncovered by Brown *only if*, as part of his investigation, Brown had "interview[ed] all defense witnesses identified by Joe Reno" and "give[n] Joe Reno an opportunity to respond."

Not so. Reno cites no case law supporting this novel proposition. There is nothing wrong with a decision maker making an employment decision where, as here, she had had more than enough information to conclude that an employee engaged in misconduct.

33. Regarding competence, Reno attacks Brown's qualifications and investigative techniques (e.g., conducting group interviews, crediting Calton's revised version of events, etc.). That Brown did not conduct the investigation according to Reno's suggested investigative protocol does not show that Patrick is lying about the real reason for suspending and later terminating Reno. In fact, the *only* reason why Patrick even could have suspended Reno in the first instance would was the results of the Investigation, the undisputed evidence in this case being that she and Brown were both unaware of the Wastewater Incident at that time. Reno's misconduct—already determined to be the basis for suspending him—did not simply vanish because Reno quickly developed environmental concerns days after Brown had interrogated him about why his personal debris was in a dumpster on Delphi property.[6]

34. Regarding illegality, Reno argues that Patrick must have lied about her reasons for terminating Reno because Brown or Delphi or both were required by law to give Reno a "summary" of Brown's report "*after* taking any adverse action" against him. (Trial Br. at 10 (citing 15 U.S.C. § 1681a(x)(2)).) The Debtors did not, however, violate the FRCA provision because Delphi's investigation and subsequent termination of Reno is an employee misconduct investigation that (i) was not intended to be covered under the purview of the FCRA's reach; (ii)

[6] Reno also suggests that the Investigation was not competently performed for other reasons. For example, Reno cites Calton's deposition transcript for the proposition that Calton said that (i) he did not expressly tell Reno he thought Delphi would be billed for the dumpster removal and (ii) he was aware that Gooding and Reno disagreed on whether the entire tank needed resurfacing. (Trial Br. at 2.) In fact, Calton's testimony actually confirms Patrick's grounds for termination in that Calton stated, "I would assume that my boss would just bill [the dumpster fees] to Delphi, once the bill came in." (Calton Dep. 94:4-6.) Moreover, Calton's knowledge that Reno and Gooding disagreed about how to handle the wastewater leak does not establish that Patrick is untruthful regarding her reasons for terminating Reno.

did not involve a consumer reporting agency; (iii) did not generate a consumer report or investigative consumer report; and (iv) did not involve a third party because Brown was acting as an agent of Delphi. See Hartman v. Lisle Park Dist., 158 F. Supp. 2d 869 (N.D. Ill. 2001) (finding attorney is agent for purposes of conducting investigations and therefore no violation of preamended FCRA); Johnson v. Fed. Express Corp., 147 F. Supp. 2d 1268, 1272 (M.D. Ala. 2001) (1272 ("[e]mployer investigations of specific workplace acts by their employees . . . simply are of no import to Congress.").[7]

35. Reno cites no case law that would require Delphi to give Reno a copy of Brown's report *before* it took adverse action against him in order for Reno to have a chance to rebut the findings therein. Indeed, even if a violation of the FCRA in fact occurred—which Debtors dispute—an employer may still rely on information in a report in deciding to terminate an employee. See Baker v. Bank of Nova Scotia, No. 1:04-CV-0660-RLV, 2006 WL 618413, at *16 (N.D. Ga. Mar. 8, 2006) ("even if the [employer's] actions violated the FCRA, such a violation does not demonstrate that the [employer's] reliance on the information provided in the report when it decided to terminate Plaintiff's employment is a pretext for discrimination").

36. In sum, Reno fails to meet his burden of proving both (i) that he was terminated in violation of Ohio public policy for raising environmental concerns and (ii) that

---

[7] Delphi's investigation and subsequent termination of Reno on March 17, 2004, occurred prior to the effective date of the amendment to the FCRA that Reno relies on as authority for his proposition that Delphi violated the requirements of the FCRA. See 15 U.S.C. § 1681a(x); 12 C.F.R. § 222.1(c)(2)(v) (effective date Mar. 31, 2004). That, even under Section 1681a(x), Delphi's investigation of Reno would have implicated the requirements of the FCRA is far from clear. Nonetheless, the Debtors did not violate the provision requiring that the employee receive a "summary" of the report because (i) there is no requirement that a summary be written; (ii) Reno was well aware of the misconduct investigation; and (iii) in any event, Reno was in fact given a copy of Delphi's March 30, 2004, letter to OSHA as well as all copies of Brown's report during discovery in the underlying case, both of which detailed the reasons for Reno's termination. Moreover, because Reno had extensive knowledge of the investigation, he cannot prove that he was damaged *as a result* of any alleged failure by Delphi to give him a summary. See Lewis v. Ohio Prof'l Elec. Network LLC, 248 F. Supp. 2d 693, 701 (S.D. Ohio 2003).

Delphi lacked an overriding business justification for terminating him. Accordingly, Reno's public policy claim should be disallowed and expunged.

B. Reno Cannot Maintain A Claim Under Ohio's Whistleblower Statute.

37. Reno's statutory whistleblower claim suffers not only from the same deficiencies articulated above but also from an independent flaw: the Wastewater Incident and his March 2 Letter do not meet the requirements of Ohio's whistleblower statute. Reno, therefore, has no legal basis to assert a claim for retaliatory discharge under the Ohio statute, and his claims based thereon should accordingly be disallowed and expunged.

38. Ohio's whistleblower statute imposes specific requirements on employees who become aware "of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct" and who then attempt to seek protection under the statute. OHIO REV. CODE ANN. § 4113.52(A)(1)(a). First, "the employee orally shall notify (his) supervisor or other responsible officer . . . of the violation" the employer is committing. Id. Second, the "employee shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation." Id. Then, if the violation is not corrected within 24 hours of either report or the employer does not undertake reasonable efforts to commence corrections, an employee may file a report with the prosecuting attorney or relevant agency responsible for regulating the conduct at issue. Id.

39. Reno failed to comply with any of these requirements and therefore cannot rely on the statute for any remedy. The leak first appeared on February 13, 2004, but Reno did not orally report the leak to Gooding or Delphi's environmental liaison, JoAnne Rau, until February 18, 2004, during a marketing meeting. Even then, he did not give sufficient detail to identify any statutory violation. Reno never filed a written report of the incident with Gooding.

Furthermore, Reno and Gooding did not disagree over the need to fix the tank and comply with all applicable laws. In fact, Delphi hired a consulting firm, ATS, to run tests on the tanks in order to assess compliance with applicable statutes. The tests were completed on February 20, 2004. (See Ex. F, ATS Report.) Although Reno disagreed on the course of action taken to repair the tank, he did not state that it violated any specific statute or regulation. (See Ex. E, March 2 Letter.) The March 2 Letter, while in writing, also fails to meet the requirements of the statute in two important ways: (1) the letter merely describes the disagreement between Reno and Gooding on the extent of repairs and criticizes Gooding's expertise in making appropriate decisions; and (2) the letter ignores the fact that repairs began on February 23, 2004. (See id.) Reno never cited any specific regulation that Delphi was violating.

40. The Ohio Supreme Court has repeatedly stated that employees must *strictly* comply with the statute's specific requirements to invoke any protection under the statute. Kulch v. Structural Fibers, Inc., 677 N.E.2d 308, 322-23 (Ohio 1997); Contreras v. Ferro Corp., 652 N.E.2d 940 (Ohio 1995); accord Haney v. Chrysler Corp., 699 N.E.2d 121 (Ohio Ct. App. 1997). In Contreras, the court denied protection because the employee failed to file oral or written complaints before engaging outside investigators to investigate illegal activity. In Haney the court denied protection because, like Reno, Haney's written report was delivered to a person other than his direct supervisor and lacked the specificity required by the statute to describe an unlawful violation. See Haney, 699 N.E.2d at 122. Because Reno did not meet the statutory requirements of maintaining a claim for damages under the Ohio whistleblower statute, this claim should be disallowed and expunged.[8]

[8] In his Trial Brief, Reno attached an excerpt from the case Jermer v. Siemens Energy & Automation, Inc., 395 F.3d 655 (6th Cir. 2005), apparently for the proposition he need not cite a particular law that Delphi was violating to assert a *common-law* wrongful public policy claim. This case does nothing to obviate the Ohio

C. Reno's COBRA Claim Fails.

41. Reno's claim under COBRA fails because Delphi terminated him for gross misconduct. Reno willfully violated Delphi's conflict-of-interest policy by taking personal advantage of his business relationship with Onyx; this is a conflict-of-interest according to Delphi's policies. He also attempted to have Delphi pay to have his personal debris disposed. Reno also actively attempted to obstruct and mislead Delphi's subsequent Investigation in the dumpster matter. Delphi was not required under COBRA to continue Reno's group health insurance coverage because he was terminated for gross misconduct. See 29 U.S.C. § 1163(2); Karby v. Standard Prods. Co., No. 3:90-2918-17, 1992 WL 333931, at *6 (D.S.C. June 22, 1992) ("gross misconduct" where an employee stole company property and deviated from employer's business ethics policy by making false statements on his conflict-of-interest disclosures).

D. Reno's Other Claims Fail

42. Reno's other claims also fail. As discussed supra at 16-17, Reno cannot maintain a claim under the FCRA. Reno also has not articulated the legal or factual basis for any other claim. This Court should disallow and expunge Reno's Claim in its entirety.

Conclusion

43. Reno fails to establish any claim against Debtors. Delphi management terminated Reno for legitimate reasons. The Debtors are not liable to Reno for his retaliatory discharge claim or any other claim, and his Proof of Claim should be disallowed and expunged.

---

Supreme Court's requirement that plaintiffs strictly comply with the statutory requirements if asserting a *statutory* claim under Ohio Revised Code § 4113.52.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
March 16, 2007

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

– and –

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
Debtors and Debtors-in-Possession