# EXHIBIT A

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                              :
       In re                          :     Chapter 11
                                                :
DELPHI CORPORATION, et al.,       :     Case No. 05-44481 (RDD)
                                                :
                                                :     (Jointly Administered)
                     Debtors.     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### DECLARATION OF BETH PATRICK IN SUPPORT OF DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

State of North Carolina       )
                                ) ss:
New Hanover County        )

      Pursuant to 28 U.S.C Section 1746, I, Elizabeth Patrick, declare the following:

1.      My name is Elizabeth Patrick.  I am over age 18 and have personal knowledge of the facts contained in this declaration.  I am competent to testify to the facts contained herein.  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno.  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      At all times relevant to my involvement with the suspension and termination of Joseph Reno, my last name was Meyer.  I have since married and my last name is now Patrick.

4.      In 2004, I was employed by Delphi Corporation with responsibilities in the field of human resources.  My title was Director of Salaried Personnel for the Energy & Chassis Division of Delphi.  My office was located in Troy, Michigan.  In my position, I had two areas of responsibility: (a) all of the salaried personnel functions which were based out of Delphi's worldwide headquarters located in Troy, Michigan and (b) all salaried personnel and salaried human resource operations located throughout Delphi's Energy & Chassis manufacturing facilities worldwide.

5.      During the referenced time period, my staff was comprised of approximately 20 direct reports who were responsible for assisting and coordinating human resource activities.  This included responsibility over the specific site where Joseph Reno worked.

6.      At the time, I did not know Joseph Reno personally, but came to know of

him starting in mid-February of 2004 when I was informed by one of my staff, Mary Ann

Polvinen, that she had an investigative report indicating that Mr. Reno was engaged in conduct

that violated Delphi's conflict of interest policies set forth in Delphi's *Foundation For Excellence*

handbook, a true and correct copy of which is attached hereto as <u>Exhibit 1</u>.  I asked to see the

report.

7.      I reviewed the report prepared by Mike Brown.  I learned that Mr. Reno

had engaged a Delphi vendor, Onyx Industrial Systems, Inc. ("Onyx"), to deliver a dumpster to

his home and later to retrieve it.  The dumpster was found on Delphi property, and Onyx had no

record of any arrangements for Mr. Reno to pay for the services.  I had worked previously with

Mr. Brown so I called him to discuss his investigation.  At that time it was clear to me from Mr.

Brown's investigation that Reno had engaged in conduct that violated Delphi policies relating to

conflicts of interest, in particular, and the misappropriation of Delphi resources. It also appeared

as if Reno was interfering with Mr. Brown's investigation.  It appeared that Mr. Reno was

soliciting fraudulent statements from subordinate employees to corroborate his story, and had

made false statements to Mr. Brown.

8.      In addition to Mr. Brown, I also conferred with Ms. Polvinen and Glenn

Howarth, the Director over Delphi's environmental operations in the area where Mr. Reno was

employed.  As a result of these discussions, Mr. Brown was authorized to complete his

investigation by conducting additional interviews he thought would be helpful before I finalized

any action involving Mr. Reno.

9.      Within this same time frame, from February 18 to February 20, 2004, I

made the decision to suspend Mr. Reno with pay pending the outcome of the investigation.  I

considered the suspension to be in the best interests of Delphi because it was apparent from Mr.

Brown's report that Mr. Reno was interfering with the investigation by providing false

information and imposing on subordinates and others to provide false information to Mr. Brown.

I also recall that Mr. Brown was going to be on vacation the following week.  Accordingly, I

gave instructions that Mr. Reno was to be suspended with pay until Mr. Brown returned from

vacation and was able to gather additional information.  Delphi's records show that the

suspension was effective as of February 20, 2004.

**Leaking Waste Water Treatment Tank at Delphi.**

10.     Following Mr. Reno's suspension, but before his termination, I became

aware of and saw a copy of a letter that Reno wrote to attorney James Walle of Delphi's Legal

Staff, which complained about the manner in which Delphi-Kettering Plant was repairing a

leaking waste water treatment tank.  The letter was shown to me because Mr. Reno mentioned

his suspension in the letter, and I needed to be aware of the fact that in his letter Mr. Reno had

linked the water tank issues to his suspension from Delphi.  This was the first I had heard of any

waste water leak.

11.     In my mind, and with my responsibilities, Reno's environmental complaint

and letter had no bearing on the investigation into Reno's conflict of interest with a Delphi

vendor that was uncovered by Mr. Brown's investigation. The water tank issue was not involved

in the matter Mr. Brown was investigating and the substantive handling of environmental issues

was not an area for which I had any responsibility.  Consequently, Mr. Reno's involvement with

the water tank had no bearing on my decisions regarding Mr. Reno's employment and no one

asked for my counsel or guidance on the manner in which that issue, the water tank, should be

handled.  Moreover, no one at Delphi, either subordinate to, equal to, or superior to me instructed

me, hinted at, or even suggested that Mr. Reno be terminated because of his complaint about the water tank. The water tank matter was a separate and distinct matter to be handled by persons responsible for environmental operations.

**Suspension with Pay Turns to Termination.**

12.     At some point in March following Mr. Brown's return from vacation, I received and update on Mr. Brown's investigation.  The substance of this latest report was substantially the same as the report I had reviewed in February and the information I had received over the telephone from Mr. Brown.  I recall that Mr. Brown was conducting additional interviews but those additional interviews only corroborated the existing information, and did not provide anything new.

13.     Thus, based on the Brown report, I made the decision to terminate Mr. Reno's employment on March 17, 2004.  My reasons for terminating Reno include the following:

(a)     Reno used his position at Delphi to leverage the use of a Delphi vendor's dumpster for his own personal use on financial terms that were far more favorable to him than the terms would have been had he contracted with the vendor at arms length. Such conduct is directly contrary to Delphi's conflict of interest policies which prohibit employees from using their position at Delphi to seek favors or more favorable terms from our vendors.  In *Foundations For Excellence*, Delphi's policy describes a conflict of interest as

> . . . an obligation to or a relationship with any person or organization that competes or does business with Delphi that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation *and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement.*

See page 6 and 7 of Mr. Reno's acknowledged copy of *Foundations For Excellence*, attached hereto.

Examples of conflicts of interest are set forth in the *Foundations* booklet and include

" * Accepting services . . . from a supplier, . . ."  See page 7.

       (b)    Reno paid $100 in cash to our vendor's driver for the "favor" of delivering the Onyx dumpster to Reno's home, retrieving the dumpster after Reno had filled it with debris, and returning the dumpster to an area at the Delphi Plant where it sat for several months.

       (c)    After Mr. Brown commenced his investigation, Reno imposed on several subordinate employees to provide statements for Mr. Brown's investigation so that it would appear as if Reno intended to pay for the services.  I was informed by Mr. Brown that one of Reno's subordinates was asked to provide a false statement corroborating Reno's story that he had agreed with the Onyx driver to take full responsibility for the costs of the dumpster.  That subordinate refused to make such a false statement.  As far as I was concerned, such impositions on subordinates is an intolerable abuse of one's supervisory authority.

       (d)    After Mr. Brown commenced his investigation, Reno approached the Onyx driver and asked him to obtain an Onyx receipt for the $100 cash payment Reno had given to the driver for the favor of allowing Reno to use the dumpster.

       (e)    Reno lied during the investigation.  I consider the Onyx driver's recanted statement to be truthful because he specifically asked what would happen to him after Mr. Brown completed his investigation.  When Mr. Brown assured him that nothing would happen as long as he was telling the truth, the Onyx driver asked to change his statement.  To me, the fear of bad consequences if one knows he can get in trouble for not telling the truth is powerful motivation to tell the truth and avoid consequences.  Thus, in reviewing Mr. Brown's reports I gave more weight to the recanted statement by the Onyx driver than to Mr. Reno's

version of what happened.  Moreover, because there was no credible evidence to validate an

arms length transaction between Mr. Reno and Delphi's vendor, Onyx, the Reno version - "I will

pay for it" - was not at all reliable.  The Onyx driver's second story was substantiated by the fact

that Onyx had no independent record of Mr. Reno's order for the dumpster, no any record of the

$100 payment.

        (f)       Reno's efforts to take advantage of a relationship with a Delphi

vendor also resulted in a misappropriation of Delphi assets.

        i.       Delphi human resources were diverted to this investigation.  Mr.

Brown's investigation required numerous, time consuming interviews in order to clarify

inconsistent information supplied by witnesses, including the lies from Reno.

        ii.       When witnesses are interviewed or management is required to deal

with the results of this kind of investigation, human resources are diverted from Delphi's mission

to resolving matters that distract from, take time away from and do not advance Delphi's purpose

as a world class producer of automotive parts.  Moreover, significant financial resources are

expended when an outside investigator is required to devote time to conduct such an

investigation.

        (g)       Finally, the fact  that Reno lied about the facts in an effort to

misdirect the investigation is equally intolerable and, in my opinion, the lies coupled with the

other infractions constituted gross misconduct warranting a termination for cause.

        14.      I was the final decision maker in this matter.  Although I got input from

Mr. Brown and others regarding his investigation, the final decision was mine.

        15.      Based on all of the foregoing, it was my decision, to terminate Mr. Reno

effective March 17, 2004.

16.     Reno was terminated for gross misconduct, so he was not eligible to receive COBRA benefits.

Dated this 21 day of February, 2007.

_____*/s/ Elizabeth Patrick*_____
Elizabeth Patrick

# **EXHIBIT 1**

## Employee Acknowledgement

I acknowledge that I have received a
copy of the booklet, "Foundation for
Excellence."

JOSEPH M. RENO
_____
Name

*Joseph M Reno*
_____
Signature

4/3/01
_____
Date

*Please return this signed form to your
local Human Resources Department.*

**DELPHI**
Automotive Systems



DEFENDANT'S
EXHIBIT
3
RENO

PENGAD 800-631-6989

DC 180

DC 181

# TABLE OF CONTENTS

## Foundation for Excellence

A MESSAGE FROM J.T. BATTENBERG III _____ 2

PERSONAL INTEGRITY _____ 3
  Complying with the Law

EXCELLENCE IN THE WORKPLACE _____ 5
  Managing Diversity
  Health & Safety Policy
  Conflicts of Interest
  Protecting Corporate Property
  Accurate Information, Records & Communications
  Responding to Legal Investigations
  Information Requests
  Communicating with the Media
  Internet/Intranet Usage
  Internet Chat Rooms

EXCELLENCE IN THE MARKETPLACE _____ 11
  Product & Service Quality
  Fair Competition
  Suppliers & Fair Treatment
  Honest Communications
  Gifts, Entertainment & Gratuities
  Soliciting Gifts or Favors
  Accepting Gifts or Favors
  Accepting Invitation of Entertainment
  Customer/Supplier Entertainment Policies
  Others

EXCELLENCE IN SOCIETY & OUR COMMUNITIES _____ 16
  Avoiding Improper Payments
  Import/Export Controls
  Delphi Insider Trading Policy
  Corporate Citizenship
  Environmental Principles

THE DELPHI PRINCIPLES _____ 21

# DELPHI
Automotive Systems

# FOUNDATION FOR EXCELLENCE

## A GUIDE TO REPRESENTING DELPHI WITH INTEGRITY

DC 182

# Personal Integrity

**INTEGRITY** – *We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.*

Integrity begins with each of us – the judgments and decisions that we make as individuals.

How do we define personal integrity? First, it means exemplifying the Principles and Absolutes of Excellence in our own conduct and complying with Delphi policies, even when we may not agree with them. In a global enterprise, legitimate differences of opinion may arise as to the appropriateness of the corporate policies across worldwide operations.

While such differences are understandable, and can lead to a healthy discussion of choices, they do not excuse us from observing the existing policies. We are always welcome to voice our concerns and to request exceptions for special circumstances through appropriate leadership when warranted. It is important that we use our judgment not only to consider the precise meaning of our stated values or policies, but also the spirit and intended purpose of them as we make these choices.

Second, it means we have a responsibility to voice concerns when we believe Delphi or fellow employees are acting contrary to existing policies. Collectively, we are the corporation, and the actions of one individual can damage the reputation of all. When someone compromises the Principles of Excellence or policies, we should either inform them directly, or use other available channels to voice our concerns. The best option is usually to discuss the situation with a manager. Alternatively, we can bring our concerns to functional experts such as the

---



Dear Colleagues,

*Delphi is establishing a culture based on the Principles and Absolutes of Excellence, a culture encompassing passion, creativity and common business processes. It is a culture that brings us together as a team, and makes each of us responsible for examining our own actions, to ensure that we represent Delphi with excellence.*

*Achieving our vision – to be recognized by our customers as their best supplier – can only be achieved through consideration, fairness and dignity in all that we do. Each of us represents the entire Delphi organization. As we conduct our business, we need to respect the people and environments in which we work.*

Foundation for Excellence is our guide for employee conduct. I encourage you to read this document thoroughly, while keeping in mind that the guidelines cover a wide range of Delphi's business processes. It is important that we all understand them in order to support our fellow colleagues and our corporate vision. Following these policies and guidelines will help make Delphi an excellent company to work with, both for our customers and our employees.

Regards,

*J. T. Battenberg III*
Chairman, CEO and President
Delphi Automotive Systems

DC 183

*Excellence in the Workplace*

**TRUST IN RELATIONSHIPS** – *We expect our people to build and maintain a foundation of trust and respect in everything we do.*

Delphi values its diverse, dedicated global workforce that is committed to Excellence and a culture where individual strengths, combined with teamwork, are a recognized source of our mutual success. As a leader in automotive components, systems and modules, we draw on the unique background of each employee to offer new perspectives and solutions as we strive to be our customers' best supplier.

## MANAGING DIVERSITY

We believe that attracting and retaining qualified talent is vital to Delphi's continued success. Delphi has an ongoing commitment to diversity, equal opportunity, and non-discrimination. Opportunities are extended to qualified applicants and employees on a non-discriminatory basis. The organization is enriched through the representation of diverse experiences, backgrounds, ethnicity, lifestyles, cultural orientation and beliefs. Reasonable accommodations are made for the physically challenged and persons with disabilities.

Consistent with the above philosophy, Delphi is dedicated to creating a workplace environment that enables every team member to contribute fully. It is our policy to comply with applicable employment laws wherever we conduct business. It is every employee's responsibility to act in a manner that supports this policy and to maintain the workplace environment free from all discrimination, hostility and harassment, including sexual harassment.

Legal Staff, Audit Staff, Security or Human Resources. We also have available the EthicsLine (888.679.8848) in many countries for employees who are uncomfortable discussing their concerns with their leadership.

## COMPLYING WITH THE LAW

In order to comply with the law, we must know the law. For many of us, this means we will need advice or training from experts to understand our responsibilities. Common sense, our conscience and good intentions are not always enough. At a minimum, we must learn enough about the laws that affect what we do to spot potential issues and then follow through to get answers about the right way to proceed.

Complying with the law requires more than knowledge, it requires action. This takes a high degree of cooperation and communication – the essential elements of teamwork. As a member of the team, if someone thinks some aspect of Delphi's business may be in violation of the law they should raise the issue with management or the Legal Staff.

The worst thing we can do is to ignore or try to cover up a potential problem and allow it to grow more severe over time.

4

DC 184

Supervisors and managers are held accountable to prevent discrimination and to support equity in addressing employee concerns and/or complaints. Delphi will not tolerate behavior that is inconsistent with this policy and will take appropriate action to prevent such behavior from occurring.

Full support of the corporation's policy on diversity and equal opportunity along with the necessary efforts to ensure that all recruitment, employment, training, promotions and other personnel actions comply with these principles is essential. This policy reflects our belief that a capable and committed workforce perpetuates Delphi's creativity, innovation, growth and success.

## HEALTH & SAFETY POLICY

Delphi is committed to protecting the health and safety of each employee as our overriding priority. We believe that all occupational injuries and illnesses are preventable. There will be no compromise of an individual's well-being in anything we do. The implementation of actions to help our employees realize a healthy, injury-free environment is a leadership responsibility. Continuing support of this effort is the responsibility of everyone. We will lead the Delphi team to ensure that we protect the well-being of every member.

## CONFLICTS OF INTEREST

For us to help Delphi earn and maintain its reputation as a company that conducts business with the utmost integrity, we must avoid actions or relationships that might conflict or even appear to conflict with our job responsibilities or Delphi's interests.

A conflict of interest is an obligation to or relationship with any person or organization that competes or does

business with Delphi, that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement. The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest.

Examples of potential conflicts of interest include:

- Investing in a supplier, customer or competitor

- Accepting services or receiving payment from a supplier, customer or competitor

- Having close family members who work for suppliers, customers or competitors

- Working outside Delphi without department director approval

Occasionally conflicts of interest may arise through involvement in public service or charitable activities, such as holding public office or involvement in charitable organizations. Before accepting such responsibilities, we need to familiarize ourselves with the extent to which Delphi has interests or business affected by our involvement, and ensure that no corporate assets, including the Delphi name, are used or referred to in connection with such activities.

Outside employment can also create conflicts of interest. We are expected to devote our full time and attention to our work during regular business hours and for whatever additional time may be required.

Delphi expects all employees to disclose promptly any situation that could result in an actual or potential conflict of interest. If we are not sure the situation creates a

DC 185

interpretation. Litigation is a fact of life in societies governed by many laws that give a variety of authorities broad investigative powers.

Legal papers and investigations normally flow through established channels, but there may be occasions where inquiries and legal papers are received by other employees. If you should receive these types of papers in your capacity as a representative of Delphi, consult the Legal Staff immediately, before submitting to an interview, answering questions about Delphi business, producing any documents or even responding to any requests made in connection with litigation or an investigation.

## INFORMATION REQUESTS

Information is one of Delphi's most valuable assets in the competitive global marketplace for our products and services. We all share a responsibility to protect valuable Delphi information for our mutual benefit.

Delphi information includes all information related to our business, created or acquired using Delphi resources, regardless of the specific nature or form of the information. We will maintain confidentiality of customer information.

## COMMUNICATING WITH THE MEDIA

We strive to maintain integrity in our relationships with the media and general public by providing clear and accurate communication. All Delphi divisions and regions have a designated Public Affairs or Communications function, which is responsible for communicating the Corporation's position on a range of issues.

If you are contacted by a member of the press, you should notify your manager and your division or regional

9

conflict, we should seek the help of our supervisor or Human Resources contact person.

## PROTECTING CORPORATE PROPERTY

We have an obligation to safeguard corporate assets by ensuring they are properly maintained and used to further Delphi business interests. We should always consider whether our decision to use or commit a resource is in the best business interest of the corporation.

Business assets should not be used for personal reasons. However, situations may arise where infrequent and limited personal use is acceptable. When such situations arise, use sound judgment, common sense and discuss the issue with your manager if there are doubts about the appropriateness of the use.

## ACCURATE INFORMATION, RECORDS & COMMUNICATIONS

Decisions are made based on the accuracy of information recorded at all levels of the organization. Inaccurate information can lead to poor decision making. Additionally, our customers, suppliers and government officials rely on us to be honest and provide accurate information on subjects ranging from our products and services to Delphi's financial performance and our environmental practices.

It is our responsibility to ensure that all information and records are maintained honestly and accurately, and that any errors are promptly recognized, communicated to appropriate management and corrected.

## RESPONDING TO LEGAL INVESTIGATIONS

Despite our best efforts to comply with all applicable laws and regulations, there will always be matters of

8

DC 186

**Please Note:**
*Amendment to paragraph 2 on preceding page.*

## INTERNET/INTRANET USAGE

The Delphi provided internet connection is intended to be used primarily for business purposes. Any personal use must not interfere with normal business activities, involve solicitation, be associated with any for-profit outside business activity or potentially embarrass Delphi. Users are expected to act responsibly and in Delphi's best interests whenever they use the Delphi provided internet connection.

---

Communications department to ensure that the most appropriate person or team responds. Employees are generally not authorized to immediately respond to journalists. Responsible members of the media do not expect impromptu answers. As a general rule, even if a Delphi employee is the subject matter expert, media questions should be referred to the Delphi Communications or Corporate Affairs Staff.

## INTERNET/INTRANET USAGE

Use of the intranet, as with other Delphi assets, should be limited to situations related to our work assignments. It is never acceptable to use Delphi equipment to access or create material that is illegal or inappropriate. If in doubt, ask your supervisor or the Information Systems & Services group.

## INTERNET CHAT ROOMS

It is Delphi's policy not to respond to chat room rumor or speculation.

To maintain confidentiality of Delphi information, employees are not to respond to any inquiries or post any information on the Internet relative to Delphi unless specifically asked to do so by their supervisor and the response is cleared through Corporate Affairs and/or Legal.

10

DC 187

# Excellence in the Marketplace

**CUSTOMER ENTHUSIASM** – *Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.*

## PRODUCT & SERVICE QUALITY

It is our goal to be our customers' best supplier. We must be mindful of that goal at every phase of our relationship with customers – from the design of our products to the discussions we may have with them about service issues. We must passionately pursue customer satisfaction by being entrepreneurial, fast, less bureaucratic, customer focused, innovative and excellent in everything we do.

## FAIR COMPETITION

We believe in competing fairly because we all benefit from fair, free and open markets. We compete strictly on the merits of our products and services and make no attempts to restrain or limit trade.

Specifically:

- We never discuss such matters as prices, pricing strategies, product or marketing plans or terms of sale with competitors. Should a prohibited subject come up during a discussion or meeting, leave and inform leadership or the Legal Staff.

- We do not enter into agreements with our competitors concerning prices, production volumes, customers or sales territories.

11

DC 188

- We do not link purchase of one product to another or compel suppliers to buy from us to retain their Delphi business.

- We do not disparage the products or services of a competitor.

- We collect competitive information through proper public or other lawful channels and do not use information that was obtained illegally or improperly by others, including through misrepresentation, invasion of property or privacy or coercion.

Not only is fair competition a matter of our own values, it is also a matter of law in most every country Delphi conducts business. Competition law requirements may exist in specific countries. Contact the Legal Staff for more information.

## SUPPLIERS & FAIR TREATMENT

Our suppliers are valued partners in the success of our business. Our relationships with suppliers must be characterized by honesty and fairness. They are selected on the basis of quality, service, technology and price. Terms and conditions defining our relationship with suppliers are communicated during the request for quote process and agreements to such terms and conditions, or any acceptable modifications, are reached before work begins. Included in the standard terms and conditions are Delphi's policies regarding payment terms, confidentiality, the use of intellectual property and labor practice expectations.

## HONEST COMMUNICATIONS

Customers, suppliers, government agencies and communities depend on the honesty and accuracy of our communications. We are each responsible to communicate in a forthright and honest way, free of any misleading or inaccurate information. This includes not overcommitting on what we can deliver, and promptly informing affected parties when changes occur. When we make a mistake in what we have told someone, we must take prompt action to correct it.

## GIFTS, ENTERTAINMENT & GRATUITIES

Our policy on gifts, entertainment and gratuities is designed to reflect our values. We are charged with the responsibility to make decisions, based upon business considerations. The terms "suppliers" and "customers" in the policy below are used in the broadest possible sense. A supplier is any person or organization, inside or outside the Corporation, who furnishes goods or services to the Corporation. A customer is an individual or organization, inside or outside the Corporation, who receives goods and services.

## SOLICITING GIFTS OR FAVORS

Employees may not solicit, for personal reasons, any gifts or favors from an individual or an organization that does business with Delphi – or one which seeks to do so. The size of the gift or favor is immaterial. Soliciting gifts or favors – either directly or indirectly – from customers, suppliers, potential customers or suppliers, is strictly prohibited. All conduct in this regard that creates even the appearance of impropriety must be avoided.

DC 189

## ACCEPTING GIFTS OR FAVORS

*It is permissible to accept gifts or gratuities from a customer, supplier and/or a potential customer or supplier where they are freely offered, it's legal and a business-related purpose exists. Acceptance from that particular supplier or customer should be infrequent, and generally the value, not the cost, is less than $50.00 (US$). As a general guideline you should not accept anything that:*

1. Compromises, or appears to compromise the integrity of the business relationship

2. Places you or others in an unsafe environment (e.g., alcohol-related activities)

3. Potentially embarrasses or damages your reputation or the reputation of the company

Specific questions should be discussed with your supervisor, the local Human Resources representative or the Legal Staff.

## ACCEPTING INVITATION OF ENTERTAINMENT

Accepting an invitation of entertainment from customers, suppliers and potential customers or suppliers is permissible where the invitations are freely offered, and a business-related purpose exists. Acceptance from that particular supplier or customer should be infrequent and entertainment and meals should not be lavish. Employees are to be accompanied by the person or organization providing the entertainment. As a general guideline you should not accept an invitation of entertainment that: 1) compromises the integrity of the business relationship, or 2) places you or others in an unsafe or inappropriate environment (e.g., alcohol-related activities, adult entertainment clubs).

Specific questions should be discussed with your supervisor, the Human Resources representative or the Legal Staff.

## CUSTOMER/SUPPLIER ENTERTAINMENT POLICIES

To the extent our customers and suppliers discourage or forbid the receiving of gifts, entertainment or other gratuities by their employees, Delphi employees are expected to know and respect those customer and supplier policies and practices.

## OTHERS

Other important relationships that Delphi maintains can impact our business. Examples of this are our relationships with governmental officials, unions and union representatives.

Gifts, entertainment, or other gratuities should never be provided to a governmental official without first getting approval from a senior officer responsible for Delphi operations in the particular country or region involved. Due to the complexity of relevant laws and regulations, and varying cultural and ethical norms, any decision to provide a gift, entertainment or gratuity, including meals, to a government official should be discussed with the Legal Staff.

Similarly, it may be illegal to provide a gift, entertainment, or other gratuity to a union or union official in the United States or other countries. Do not hesitate to obtain advice from the Human Resource or Legal Staffs before providing a gift, entertainment or other gratuity to a union or union official.

14

15

*Excellence in Society*
*& Our Communities*

**RESPONSIBILITY TO SOCIETY** – *We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.*

## AVOIDING IMPROPER PAYMENTS

We believe in promoting good governance and the fair and impartial administration of laws. It is, therefore, strictly prohibited to give anything of value directly or indirectly to a government official in order to influence his or her judgment in the performance of official duties.

In addition, as a United States-incorporated company, bribery payments by any Delphi employee or agent to foreign officials are illegal under the U.S. Foreign Corrupt Practices Act (FCPA). Under FCPA, Delphi is accountable for the actions of its employees, including non-United States citizens and employees of non-U.S. based subsidiaries and agents throughout the world. Similar legislation is being enacted in many countries, including France, Germany and Japan as part of a global effort to combat corruption and bribery. There are circumstances where facilitating payments may be appropriate, but those situations must be discussed with the Legal Staff prior to any action being taken. Any questions as to whether a gift or payment would be considered improper under our guidelines or national laws must be discussed with the Legal Staff.

## IMPORT/EXPORT CONTROLS

We must abide by special laws and regulations that apply to the export of products and technical data. All employees who are involved with exports have an obligation to become familiar with the regulations and procedures that apply in their location. We must also comply with anti-boycott and international embargo regulations in all locations where we do business.

## DELPHI INSIDER TRADING POLICY

As employees of Delphi, it is illegal to trade Delphi securities on the basis of material inside information. Inside information is information that is known inside Delphi but is not known to the general investing public. It is sometimes called "non-public information." "Material" information is that which a reasonable investor would consider important in a decision to buy, hold or sell Delphi's stock. If the information could change the price of Delphi's stock, it is material.

Some examples of information, whether positive or negative, that are material include:

- Earnings and dividend amounts

- Projections of future earnings or losses

- Pending labor negotiations or disputes, including possible strikes

- Pending or proposed mergers, acquisitions or tender offers

- Significant sales of assets or the disposition of a subsidiary

- Changes in dividend policies, the offering of additional securities or a stock split

- Changes in top management

DC 191

- Significant new products or technological advances

- Significant changes in production schedules or product planning

- The gain or loss of a substantial customer or contract; or extraordinary borrowing, changes in debt ratings or impending bankruptcy or liquidity problems

Every manager is responsible to see that any employee who could learn of material inside information is aware of the complete Delphi Insider Trading Policy and implications of the policy.

The complete Delphi Insider Trading Policy is posted on Delphi's Intranet, Apollo. For questions about Insider Trading, please contact the Delphi Legal Staff, in particular, the Assistant General Counsel – Corporate and Securities.

## CORPORATE CITIZENSHIP

Delphi Automotive Systems strives to achieve an effective global philanthropic program that supports our business objectives while helping society, particularly in the communities in which we reside. Delphi's three-pronged approach to corporate citizenship includes:

**The Delphi Foundation** – The umbrella for our philanthropy effort is our self-funding Foundation. Its priority is education, primarily in the areas of science and technology.

**Delphi Community Relations** – As a corporate citizen in numerous communities around the world, this effort seeks to ensure the presence of the Delphi brand in our local communities in such a way that our company is viewed as a "neighbor of choice." The priority also is largely educational in focus, but contributions are tailored to local needs and priorities as well.

**Delphi Volunteers** – A philosophy aimed at enabling and inspiring our employees to give to the community in the way they tell us is most meaningful: through the provision of personal time and talent.

Overall, Delphi targets educational opportunities and support systems aimed at helping young people reach their full potential. Special – though not exclusive – consideration is given to educational programs focused on science and technology. Primary consideration is given to requests that:

- Link to Delphi's business vision and mission

- Are innovative in approach

- Demonstrate an ability to measure effectiveness

- Are customer-driven

- Are global programs that encourage international reach and involvement

- Clearly articulate the benefits to Delphi and its local communities

## ENVIRONMENTAL PRINCIPLES

As a responsible corporate citizen, Delphi Automotive Systems is dedicated to protecting human health, natural resources and the global environment. This dedication reaches further than compliance with the law to encompass the integration of sound environmental practices in our business decisions.

The following environmental principles provide guidance to Delphi Automotive Systems personnel worldwide in the conduct of their daily business practices.

- We are committed to actions to restore and preserve the environment

18

DC 192

# The Delphi Principles

**Customer Enthusiasm** – Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.

**Trust in Relationships** – We expect our people to build and maintain a foundation of trust and respect in everything they do.

**Integrity** – We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.

**Responsibility to Society** – We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.

**Dedication to EXCELLENCE** –
We are determined to achieve EXCELLENCE in everything we do. Our future success depends on uncompromising adherence to our vision and the absolutes of EXCELLENCE.

For more information about Excellence visit Apollo, Delphi's employee home page, at http://apollo.delphiauto.com/excellence/.

- We are committed to reducing waste and pollutants, conserving resources and recycling materials at every stage of the product life cycle.

- We will continue to participate actively in educating the public regarding environmental conservation.

- We will continue to pursue vigorously the development and implementation of technologies for minimizing pollutant emissions.

- We will continue to work with all governmental entities for the development of technically sound and financially responsible environmental laws and regulations.

- We will continually assess the impact of our plants and products on the environment and the communities in which we live and operate, with a goal of continuous improvement.

20

DC 193

*"We are what we repeatedly do. Excellence then, is not an act, but a habit."*

—Aristotle

# DELPHI

Automotive Systems

Driving
Tomorrow's
Technology

DC 194