# **EXHIBIT B**

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

- and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------ x
                                :
   In re                        :   Chapter 11
                                :
DELPHI CORPORATION, et al.,     :   Case No. 05-44481 (RDD)
                                :
                                :   (Jointly Administered)
           Debtors.             :
------------------------------- x

**AMENDED DECLARATION OF MICHAEL BROWN IN SUPPORT OF DEBTORS'
SUPPLEMENTAL REPLY CONCERNING PROOF OF CLAIM NO. 9956 (JOSEPH RENO)**

State of Ohio        )
                     ) ss:
Montgomery County    )

Pursuant to 28 U.S.C Section 1746, I, Michael Brown, declare the following:

1. My name is Michael Brown. I am over age 18 and have personal knowledge of the facts contained in this declaration. I am competent to testify to the facts contained herein. Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno. If I were called upon to testify, I could and would testify to the facts set forth herein.

3. For more than six years preceding the events described in this declaration, I was employed by Securitas Investigative Services USA, Inc., as an Investigator. Throughout that entire period, my base of operation was located at Delphi Corporation's manufacturing facilities in Kettering, Montgomery County, Ohio. However, both then and now, it was not uncommon for me to conduct Delphi investigations all over the continental United States, and Mexico.

4. I receive authorization for my assignments from Delphi's Corporate Security group in Troy, Michigan, not Securitas. Moreover, it was not uncommon for me to be asked by Delphi managers and executives located in the Dayton area to investigate matters of concern to them. In turn, I would report such requests to Delphi's Corporate Security group and receive clearance to proceed.

**My Investigation Methods and Reporting.**

5. It has long been my custom and practice to prepare a written record of significant findings that arise during the course of my investigations. As witnesses are interviewed, as information is gathered, or as facts are learned, I record these events, findings and facts in a progressive narrative. Stated another way, with the use of a computer, I record new information on the original or initial document in the chronological order in which it is received by me. It is not my practice to prepare "preliminary reports," "interim reports," or "final reports."

6. It is also my custom and practice to report significant new findings to those who are using my services via telephone or email. There is no set pattern to this practice. If, in the course of such verbal reporting, someone asks for a copy of my written report to date, I will provide it to them as updated. I do not keep any records that would identify when I provided someone with a copy of my ongoing written report. Attached hereto as Exhibit 1 is a true and correct copy of my report with respect to the investigation into Mr. Reno's involvement with the dumpster. As explained, this report was a work in progress in which I added information as my investigation progressed. Each entry was made on or around the date referenced at the beginning of each paragraph.

**The Dumpster Investigation.**

7. On February 2, 2004, Delphi's Facilities Manager, Mark Gooding, asked me to investigate a dumpster on Delphi's property that contained waste materials, i.e., empty marine sea salt bags, discarded wire fencing, broken concrete and construction debris, that were not waste products from any Delphi manufacturing operations. Mr. Gooding informed me that within the Environmental Group at Delphi's Kettering Operations people had pointed to the

possibility that the material belonged to Joseph Reno, a Senior Environmental Manager for Delphi, who reported to Gooding. I relayed Mr. Gooding's request to Delphi's Corporate Security in Troy and was authorized to proceed with the investigation.

        8.       Through a series of interviews, spelled out in detail in my attached report, my investigation uncovered the following:

        (a)       The dumpster belonged to Onyx, a Delphi vendor which supplied liquid or fluid waste containers to Delphi for the collection and eventual disposal of fluid manufacturing waste that involved environmental concerns. Onyx managed the filling and removal of the containers from Delphi and transport for appropriate disposal. In the ordinary course, Delphi is charged for Onyx's services. For solid waste containers and disposal, Delphi contracted with another vendor, not Onyx.

        (b)       Delphi's direct contact person with Onyx was its driver/representative, Troy Calton. Mr. Calton's primary responsibility for Onyx, if not his sole responsibility, was to manage Onyx' liquid waste account with Delphi. In this capacity, Calton had direct contact with and worked on an almost daily basis with Delphi's Joseph Reno.

        (c)       I learned from Mr. Calton that the Onyx dumpster had been delivered to Joseph Reno's personal residence in late August or early September so that Reno could collect and eventually dispose of solid trash, rubble and other debris collected from the Reno residence.

        (d)       My investigation also included a search of corporate records filed with the Secretary of State in Columbus, Ohio. This search produced records indicating that

either Mr. Reno or his wife, or both, operated an aquarium business out of their home thus explaining the empty marine sea salt bags found in the dumpster.

**February 5, 2004, Initial Interview With Onyx Driver, Troy Calton.**

9.  On February 5, 2004, I conducted my first interview with Troy Calton who had delivered the Onyx dumpster to Reno's residence. In his initial interview, Calton stated that he had delivered the dumpster to Reno's residence sometime in the early fall of 2003. A more precise date could not be determined because, according to Calton, Onyx had no placement/disposal/tipping records for this particular dumpster.

10. Approximately two months after placing the dumpster at Reno's residence, the precise date being unknown, Calton stated that he was summoned by Reno to retrieve the dumpster because it was digging holes in his driveway. (At a later date in my investigation, Onyx managers produced a receipt for $100 received from Reno and dated December 22, 2003.)

11. Calton further explained that while en route to a landfill to dispose of the contents of the Reno dumpster, he received a call from an unknown source at Delphi asking him to come to the plant to attend to another matter. Thus, according to Calton, he took the Reno dumpster to the Delphi plant, off-loaded it, attended to the other pressing matter and forgot about retrieving the Reno dumpster for disposal.

**February 16, 2004, Initial Interview With Joseph Reno.**

12. On February 16, 2003, Debbie Field of Delphi's Human Resources in the Dayton area accompanied me during my interview with Mr. Reno. I asked Mr. Reno to provide a complete chronology of events relating to the Onyx dumpster. Contrary to Mr. Calton's chronology, Mr. Reno stated that he asked Mr. Calton to deliver the dumpster to his residence in

late November or early December and that he, Reno, would pay for the service. Mr. Reno stated that he filled the dumpster and, while at home during the year-end Delphi Christmas shutdown, he telephoned Onyx and asked Mr. Calton to pick it up on December 22, 2003, a Monday. My investigation determined that the Christmas shutdown did not start until the following day, December 23.

13.     Mr. Reno stated that he assumed that Mr. Calton had taken the dumpster to a landfill and thought nothing further about it until a couple weeks before our interview when he became aware that someone was taking pictures of the dumpster on Delphi's property and that an investigation was underway.

14.     Even though I had not asked Mr. Reno to bring anything to the interview, Reno produced two brief, written statements from other employees, which stated that each had been present and overheard a conversation between Reno and Calton wherein Reno said he would pay the "tipping fee" (disposal fee) for the dumpster. I found it abnormal that Reno had come prepared with statements to corroborate his story before I ever questioned its validity. I have never had anyone else come prepared to an interview with outside statements. One of the employees, David Atchison, was subordinate to Reno, but had retired from Delphi before my investigation commenced. The other statement was from a contract employee, Dave Low, who was employed by Crown Solutions, Inc, an environmental company. Reno ended the interview by stating that he had given Calton $100 on December 22 and obtained an Onyx receipt from Calton on that date.

**February 18, 2004, Second Interview With Troy Calton Along With Onyx Managers And Mark Gooding.**

15. Two days after the Reno interview, I asked Mr. Calton and his managers to visit with me at Delphi for further interviews. I needed to clarify the inconsistencies in the chronologies provided earlier by Calton and Reno. I asked Mark Gooding to accompany me at this second interview with Mr. Calton. Mr. Gooding was there as a resource to me to answer questions that arose during the interview regarding the relationships with the various disposal contractors. He was also a there as a witness to the interview. At the outset, and in the presence of his Onyx managers, Calton stuck with his original version of events. As Mark Gooding and I were leaving the interview room, Calton asked what would happen to him as a result of his involvement with the dumpster. I replied that he had nothing to worry about as long as his statement was true.

16. While Gooding and I were in the hallway, we were approached by the Onyx managers who stated that Calton wanted to speak further with us. I resumed the interview with Mr. Calton during which he recanted his earlier statement and provided the following information:

(a) The original request from Reno to deliver the dumpster to his home was in August or September of 2003, not the fall of the year.

(b) Sometime near the end of September or early October, both Calton and Mr. Reno left Delphi in an Onyx truck, traveled to Reno's home to retrieve the dumpster and both drove it back to Delphi for drop off at the location where I found it when I commenced my investigation almost four months later. Calton also stated that no record was kept of the delivery

because Calton assumed that Reno, as a Delphi contact for Onyx, would not be charged for the storage, use and disposal fees associated with this particular dumpster.

(c) Reno gave Calton $100 cash in return for the favor and the services. No receipt was given to Reno on that date and Calton did not deliver the $100 in cash to Onyx.

(d) Mr. Calton also stated that on February 2nd or 3rd, 2004, which was during the early stages of my investigation, Reno approached Calton and asked for a receipt for the $100. Calton obliged and stated that he picked December 22, 2003 at random as the date for the receipt. Calton obtained the receipt from an employee in Onyx's office named Jerri Dirks and gave it to Reno.

17. I then asked Mr. Calton to provide me with a written account of his factual statement. Mr. Calton and the Onyx managers promised that I would receive the statement the next day, February 19, 2004. No written statement was delivered as promised. On Friday, February 20, I received a telephone call from one of the Onyx managers, Mike Webb, who informed me that Mr. Calton had consulted an attorney and would not provide a written statement unless he had written assurance from Delphi that the company would not take action against him for his involvement in the dumpster incident.

**February 20, 2004, Report Of Findings To Corporate Headquarters In Troy Michigan.**

18. Since Mr. Calton refused to provide a written statement and I was preparing to leave on vacation, I reported my findings to corporate headquarters in Troy, Michigan. My present recollection is that I spoke with Beth Polvinen, as well as counsel for Delphi. I also recall that I spoke with Elizabeth Meyer, the head of Corporate Salaried Personnel for all of Delphi and informed her of my findings and answered her questions. If any one of

these persons asked me for a report, I would have sent them what had been prepared to that point in time.

19. There were other aspects of my investigation that I considered incomplete at that time and I recall explaining to personnel in Troy that I would need to conduct other interviews when I returned from vacation. I was encouraged to do so. In addition, I recall discussion about how the corporation should deal with Reno until I returned. I noted that Reno had interfered with the investigation by obtaining statements from employees and had lied to me about the chronology of events, disposal of the trash, the payment for the services and the $100 receipt. While suspension was discussed, it was not my responsibility to make any decisions as to Reno's employment status with Delphi so I left the conversations and then went on vacation.

**Return From Vacation.**

20. On March 1, 2004, I returned from vacation and learned from Mark Gooding that Reno had been suspended while I was on vacation.

21. On March 3 and 4, I conducted additional interviews set forth in my attached report. Of particular note was an interview with Terry Ruble who was retired at the time of the interview. He stated that Reno had approached him near the start of my investigation and asked for a statement covering conversations Ruble overheard between Reno and Calton regarding the dumpster. Ruble refused Reno's request to provide a statement because he could not recall any such conversations.

22. On March 5, 2004, I met again with Mr. Calton, the Onyx managers and Mark Gooding. Since Calton had refused to give me a written statement, I was seeking verification of the facts Calton had related during the second interview on February 18, 2004.

- 9 -

Calton only changed one fact: he stated that he had received the $100 in cash about two weeks before he and Reno retrieved the dumpster from Reno's home and dropped it at Delphi. Thus, the cash transaction occurred sometime in September, not December 22, 2003.

23. At some point following my post-vacation interviews, I telephoned my findings to Beth Meyer in Troy Michigan. I am aware of a witness statement that OSHA Investigator Susan Schlemann drafted during my interview, in which Ms. Schlemann wrote that "I did not have any other meetings or contacts with Corporate individuals to discuss the investigation since February 18th, 19th, or 20th." As I explained during my deposition of on July 8, 2005, this statement is inaccurate. I did not have any formal meetings with corporate individuals after that time, but I do remember updating Ms. Meyer after February 20th. I remember that I had contact with her after February 20th because it was after I returned from my vacation on March 1st. Subsequently, I learned that Reno's suspension had been changed to a termination.

**Leaking Waste Water Treatment Tank**

24. Since closing my investigation on March 24, 2004 by arranging for the removal of the Reno dumpster from Delphi's premises, I have learned that Reno had complained about a leaking waste water treatment tank on Delphi's premises and that he had filed a complaint with federal authorities claiming that his termination was in retribution for his environmental complaint. Throughout the course of my investigation into the dumpster, no one at Delphi mentioned the leaking water tank. Reno did not mention it when I interviewed him. No other employees that I interviewed mentioned the tank. Nor did Reno's boss, Mark Gooding, or any of the executives that I spoke with in Troy Michigan at Delphi corporate headquarters mention the water tank during my investigation. I did not learn about the water tank leak until

after Mr. Reno was terminated. Even then I did not learn the details of that issue. The water tank had no bearing on my investigation, my interviews, my findings, or my conclusions about Joseph Reno's complicity in a scheme to take advantage of Delphi's relationship with a vendor, Onyx, in order to acquire personal services for himself and then to lie about the facts during the course of my investigation.

Dated this 16th day of March, 2007 at Kettering, Ohio.

/s/ *Michael Brown*
Michael Brown

# **EXHIBIT 1**

## CONFIDENTIAL INVESTIGATIVE REPORT

Date:       2/5/04

To:         Investigations File

From:       Mike Brown - Investigator

Subject:    Possible waste removal fraud

c:          Dennis DeLong; Jerry Koplin

---

### Investigative Summary

On 2/2/04 this Investigator was advised that a roll-off drop box (portable dumpster) belonging to ONYX had been placed on the ground within the perimeter fence at the Kettering facility. The box contained items that likely did not belong to Delphi and may have been the personal property of a Delphi employee. The Investigation has revealed that the property did originate from a Delphi employee's home. The Investigation has shown that the Delphi salaried employee, Joe Reno, has attempted to have his waste disposed of at Delphi's expense. There was evidence revealed in this investigation that Mr. Reno has on numerous occasions left the facility earlier than his standard workday permits.

### Incident Location

Delphi – Kettering E&C Facility
2000 Forrer Blvd.
Dayton, OH

### Date / Time Occurred

Drop box delivered to Delphi property sometime in the fall of 2003.

### Persons Interviewed

Tim Delph – ONYX Account Mgr.
Mike Webb – ONYX Division Mgr
Troy Calton – Onyx Industrial Services Inc. employee
Mitch Brown – Crown Solutions Inc. Mgr.
Mike Wittman – Crown Environmental Specialist
Terry Ruble – Crown employee in Waste Treatment plant
Dave Low – Crown employee in Waste Treatment plant
Nesby Brown – Crown employee in Waste Treatment plant

### Investigation Activity

On 2/2/04 this Investigator initiated an investigation into the circumstances surrounding the presence of a roll-off drop box located on the property at the Kettering facility. The box was located on the north side of the coal storage bin, which is inside the perimeter fence. It appeared that the box contained items that did not come from Delphi. I spoke with Mark Gooding, Site Manager for FSG who stated that as a result of numerous employees questioning the contents, and feedback he received from those employees, that the contents may have come from the home and or business of one of his reports, Joe Reno.

Reno is a Sr. Environmental Engineer with responsibility for waste removal for the Kettering E&C and the Moraine Harrison (KBP) facilities. I examined the box and its contents and observed the box is a ONYX container and that it contained empty bags and boxes of aquarium sea salt, old wire fencing, broken pieces of concrete and other items similar to construction scrap. Subsequent investigation revealed that Mr. Reno has or had an aquarium business and recently bought a small farm. All consistent with the contents of the box.

I retrieved gate records for ONYX, ring reports for Mr. Reno, both at Kettering and KBP. I observed that the ring reports for Mr. Reno showed drastic inconsistencies with no pattern common for employees. I found that Troy Calton was the primary contact for ONYX and entered the Kettering facility on a daily basis.

On 2/3/04 I contacted Tim Delphi and arranged for a meeting at ONYX to discuss the circumstances. I met with Tim and Mike Webb and asked why the box was at Delphi and if they knew how and when it arrived there. They advised that they had not yet contacted the driver responsible for the delivery but did have a receipt for $100.00 cash dated 12/22/03 showing Joe Reno as the customer. At that time they assumed that it was a deposit for disposal from Mr. Reno's personal account. ONYX stated that they would further look into the situation and report back to me. On 2/4/04 I received a call from Tim Delph who advised that the driver was Troy Calton and that he was willing to talk to me about the issue. We arranged to meet at ONYX on 2/5/04.

On 2/5/04 I met with Troy, Tim and Mike at ONYX. Troy explained that he had been asked by Mr. Reno, sometime in early fall, to deliver an empty box to Reno's residence near Waynesville, OH for the purpose of using it to remove various debris. Sometime later, approximately two months since ONYX does not show records as to when, Troy stated that Reno asked him to pick up the box as soon as possible as it was digging into his driveway. Troy recalls that on the morning he picked it up, he received a call from an unknown person at the Kettering plant requesting service right away. Troy states that he drove straight to the plant with the box and dropped it where it remains at this time. He stated that he has forgot to retrieve the box during this time.

I asked Troy if Reno has ever asked or insinuated that the box removal and disposal costs be paid by Delphi. Troy stated that Reno has never asked for that to happen, but has never questioned him as to the invoice above the deposit Reno initially paid. When asked if Mr. Reno and Troy were ever together outside of Delphi, he stated that only to give Reno a ride to his car. Troy added that on a daily basis Reno would contact him while Troy was on site and ask him to meet at the ONYX truck and give him a ride around to Reno's car. It should be noted that ONYX vehicles enter through gate 4 (east side) and park near the coal bin. The parking lot that Mr. Reno parks in daily is outside gate 1 which is on the west side of the plant. Troy stated that he does not know where Reno travels to at that point. When exiting through Gate 4 security does not log occupants or passengers of vehicles. It would therefore be my assumption that this activity would only be to avoid turnstile rings. The interview with Troy was terminated.

I reviewed Reno's 2001 and 2002 Conflict of Interest Questionnaire's and read that Reno had disclosed that he assisted his wife in her home based business. The questionnaire does not state what that business is. I researched registered businesses in Ohio through Lexis-Nexis and found records that show Joe Reno as the registered agent for Marine Solutions at his home address in Centerville, OH. Records also show that Joe, his wife and an unknown additional female are the Incorporators/Applicants for Medical Laboratory Services also located at his home address.

On 2/16/04 I interviewed Joe Reno. Debbie Field was also present. I asked Joe to tell me the complete chronological order of events pertaining to the drop box. Joe stated that he had asked Troy in late November or early December of 2003 to drop off a box at his new residence. He stated that he told Troy he would pay for it. Troy delivered the box shortly after the request.

Joe stated that he filled the box with debris from renovations at his residence and had it filled before Dec 22nd. He states that he was present at his house on the 22nd since it was during Christmas shut down (Christmas shut down did not start until Dec 23rd) and that Troy picked up the box in the afternoon. He states that he did not know where the box went at that point and assumed it went to a landfill. Joe stated that he was not aware that the box was on Delphi property until late January when he says he was told that someone was taking pictures of it and understood an investigation was being conducted. At that point Joe produced two witness statements. One is from an hourly worker, David Atchison, and the other is from a contract worker from Crown, Dave Low. Both statements were written at the request of Joe and briefly state that they were present in the waste treatment control room during a conversation with Joe and Troy where Joe stated he would pay for the tipping fee for the box. Joe stated to me that he obtained these as evidence he was doing things right concerning the box. Joe states that he gave Troy $100 cash on Dec. 22nd and got the receipt from Troy on that date. When asked if Joe has ever received any favors, gratuities, kickbacks or any other improper transactions from any contractors he stated that he has not.

I asked Joe about his personal businesses outside of Delphi. Joe stated that he assists his wife in her aquarium service business but only helps part time on nights and weekends. He also stated that she operates a medical laboratory consulting business that he does not participate in. I did not ask Joe to explain the inconsistencies in his Conflict of Interest Questionnaire statement and his answers in this interview at this time.

When asked to explain inconsistencies and gaps in his turnstile records, Joe stated that he visits different facilities and walks through the Gate #4 truck entrance at the Kettering facility and just flashes his badge to the guard to enter the plant. When asked how he exits the plant without swiping he stated that he asks for rides to his car from ONYX only on bad weather days. Joe was not asked any further questions regarding time records and did not volunteer any further explanation. The interview with Joe was terminated at that time.

On Wednesday 2/18/04 I re-interviewed ONYX employee Troy Calton. Mark Gooding was present during the interview along with Mike Webb and Tim Delph of ONYX. Calton stated that the information he gave me at the first interview was true. An hour later I concluded the interview. As we were leaving Troy asked me what would happen to him and I stated that as long as his story was true he had nothing to worry about. Mark Gooding and I were still down the hall talking when Webb, Delph and Calton approached us a second time and stated that Troy needed to talk to us again. We went back into a meeting room and resumed the interview. At this time Troy stated that I needed to hear some changes to his story. He stated the following additions/revisions to his original statement.

Troy stated that he was asked by Joe sometime in Aug or Sept 03 to deliver a drop box to Joe's house. Troy scheduled another driver to deliver the box and it was delivered. Troy stated that around the end of Sept or Oct Joe asked that the box be picked up since the box was digging into Joe's asphalt driveway from the heat. Troy does not remember the exact date but states that he and Joe left the Delphi site together in an ONYX truck to retrieve the box. They picked it up and returned it to the Kettering facility together and dropped it in the spot that it remains to this date. Troy stated that he knew the final disposal fee would be billed to Delphi. Troy stated that he did not record the date of the delivery since he assumed Joe would not be billed the usual $75/week storage fees due to Joe being a Delphi contact. He had scheduled the box to be picked up by an ONYX driver on a couple of different occasions but due to work loads it was not picked up prior this investigation and could not be picked up at that point. Troy states that Joe gave him the $100 cash the day they dropped the box at Delphi and that it was intended to be for Troy in return for doing Joe a favor. Troy never forwarded the money to ONYX. Troy was aware that this issue was being investigated on 1/30/04. He states that Joe came to him on either 2/2 or 2/3/04 and asked for a receipt for the $100 cash. Troy gave him one and picked 12/22/03 as the date on the receipt at random.

Troy was aware of the statements Joe obtained from the two waste treatment plant employees. He states he had conversation with David Atchison who stated he lied in the statement to Joe and that Davis was not present for the conversation as he stated. Troy also stated that another Crown employee, Terry Ruble, had told Troy he was asked by Joe to write a statement but would not do so since it would be untrue.

Troy still states that he drove Joe out of gate 4 in an ONYX truck daily and took Joe around to Joe's personal vehicle. Troy also states that he nor any other of the treatment plant workers see or talk to Joe in the afternoon. Troy states he does not know where Joe is or what he is doing. When asked about any gratuities given to Joe or anyone else at Delphi, Troy stated that he buys chicken every Wednesday for the treatment plant employees which amounts to approx. $30-$40.00. Joe is present for those lunches. He states that no other money, gifts or services are or have been paid.

At this point Troy stated that this is the complete and truthful account of the incident. I asked Troy, with assistance of Mike Webb, to write a complete statement of the events. I asked that it be completed by 1 pm on 2/19. Troy and Mike Webb agreed and we concluded the meeting. On 2/19 I received a call from Troy stating he had not completed the statement, as he had been very busy at work. I contacted Mike Webb and asked if there were any other reasons that the statement was not completed and he told me that there were not and that he and Troy would complete by Friday.

I received a call on 2/20 from Mike Webb who stated that Troy was concerned that Delphi would take action against him and had contacted an attorney. Mike stated that Troy wanted a letter from Delphi stating that Delphi would not take action against him. I advised Mike Webb that I would get back to him.

On 03/03/04 I met with Mitch Brown, Mgr for Crown Solutions Inc, in reference to this investigation. Mitch has responsibility for supervising Crown employees who work in the Kettering facility waste treatment plant. Another supervisor for Crown, Mike Wittman, also sat in on the meeting. I asked Mitch and Mike if they had any information pertaining to waste removal and any fraud, gratuities or any other improper activity. They were both aware of the focus of this investigation prior to this meeting and stated that they did not have any knowledge of such activity. Mike Wittman did state that his desk is adjacent to Joe Reno's and that he does not see Joe at his desk very often. He stated that he is aware of "Chicken Wednesdays" (lunch bought by ONYX for employees assigned at the treatment plant every Wednesday) but has not participated. Mitch explained that most of his employees dealt with Heritage Waste Systems and not directly with ONYX. I informed Mitch and Mike that I would like to interview their employees that were assigned to waste removal and control and that I would like for Mitch to sit in on those interviews. Mitch agreed and we proceeded to meet and interview the following Crown employees.

On 03/03/04 at approximately 1130hrs I conducted an interview with Crown employee Terry Ruble with Mitch Brown present. Terry is a retired Delphi hourly employee from the Kettering facility waste treatment plant and works part time where needed in waste treatment. Terry stated that Joe Reno had approached him on or about 02/02/04 for a statement regarding a conversation between Joe and Troy Calton concerning the drop box. Terry stated that Reno had asked him for a statement but Terry stated that he did not recall the conversation and could not furnish a written statement to Joe. I asked Terry numerous questions about his knowledge of any improper activity between contractors and any Delphi employees he consistently stated he was not aware of any. Terry stated that approximately 3-4 years ago he worked for Reno cleaning fish tanks for Reno's aquarium business but had only cleaned a few at that time and it was always done on his own time during evening or weekend hours. The interview was terminated.

On 03/03/04 at approximately 1230hrs I conducted an interview with Crown employee David Low with Mitch Brown present. Low is assigned every day to the control room at the waste treatment plant at Kettering. David volunteered that he was aware of the current investigation and that Reno was out on suspension regarding the drop box. Low stated that he had been asked by Reno to furnish a statement regarding the conversation between Reno and Calton. David stated that he did write the statement that I showed him and that the conversation was the only involvement he had in the investigation. When asked if he saw Reno on a daily basis he stated that he did not and further stated that he seldom remembered seeing Reno during the afternoons. Low had no further information and the interview was terminated.

On 03/04/04 at approximately 1030hrs I initiated an interview with Nesby Brown, a Crown employee. Present during the interview was Mitch Brown and Securitas Investigator Brent Faust. Nesby is a retired Delphi employee and is now employed full time by Crown. He is assigned part time at the waste treatment control room and part time at the hazardous waste drum pad. Nesby's normal hours are 3am to 11am. When asked about any personal or non-Delphi business he does with Joe Reno he stated that approximately six years ago he helped Reno build a garage at Reno's residence on evenings and weekends. He also stated that approximately 4-5 years ago he would pick up aquarium supplies for Reno in Columbus after work and deliver them to Joe's house the next morning before going to work. Brown had no other pertinent information and the interview was terminated.

On 03/05/04 at approximately 0900hrs I conducted a follow up interview with Troy Calton of ONYX. Present was Tim Delph, Mike Webb of ONYX and Mark Gooding, Delphi. I reviewed the statements made by Troy in my interview with him on 2/18/04. Troy's responses remained the same except that he remembered that he had been given the $100 cash from Reno approximately 1-2 weeks prior to returning the drop box to Delphi. I asked for clarification regarding the written receipt for the $100 and Troy stated that on either 2/2 or 2/3/04 Joe had approached Troy and asked for a written receipt for the cash. Troy stated that he would get one from ONYX. He stated that he went to ONYX the next morning and asked an office employee named Jerri Dirks to give him a receipt for $100 cash to Joe Reno for disposal of a roll off box. He states that he picked the date of 12/22/03 at random and not at the direction of Reno or anyone else. Troy stated that he was given the receipt but had still not given the cash to ONYX. He still states that he understood that the money was from Joe to him and not to ONYX. Troy then gave the receipt to Reno the following day. Troy continued to confirm his statements given to me in the previous interview and the interview was terminated.

On 03/05/04 Investigator Brent Faust, at my request, removed the hard drive from Joe Reno's Delphi issued computer. Investigator Faust took the hard drive to his office in Indianapolis, IN for a search for evidence that Reno may have spent time conducting his personal business on the computer. Investigator Faust informed me on 3/9/04 that he found no evidence of improper activity on the computer.

On 3/23/04 I contacted ONYX to have the drop box in question picked up from the Kettering facility. Troy Calton responded from ONYX at approximately 1030hrs. and after he and inspected the container to ensure that no other items or waste had been added to it, he left the facility.

<u>Conclusion</u>

Delphi HR personnel discharged employee Reno the week of 3/15/04 with no further investigation activity.

### Evidence Retained

Ring reports for Joseph Reno for the past six months to present for Kettering and KBP. (In possession of Mark Gooding)

Receipt for cash deposit for roll-off box for Joe Reno from ONYX.

Conflict of Interests for Joe Reno for 2002 and 2003.

Copies of statements given to me by Joe Reno from Dave Low and David Atchison.

Ohio Secretary of State public business records for Marine Solutions and Medical Laboratory

### Personal Data

Joseph M. Reno
Sr. Environmental Engineer
Level 7
SSN: 277522266

### End of Report