# **EXHIBIT C**

# DELPHI

March 30, 2004

<u>Via Facsimile and U.S. Mail</u>

Ms. Susan Schlemann
Investigator
Occupational Safety & Health Administration
36 Triangle Park Drive
Cincinnati, OH 46246-3411

    RE:    Joseph M. Reno v. Delphi Chassis Systems
            Case Number 5-1610-04-034

Dear Ms. Schlemann:

This letter constitutes Respondent Delphi Corporation's ("Delphi") formal position statement in response to the above-referenced complaint filed by Complainant Joseph Reno.

In his complaint, Complainant alleges that he believes he was terminated because of his March 2, 2004 letter alleging environmental and safety concerns to Delphi's attention. What Complainant fails to mention, however, is that he sent that letter only **after** he had been suspended pending the outcome of an ongoing, and wholly unrelated, investigation into alleged inappropriate conduct. That investigation ultimately established that Complainant had misappropriated company funds, had taken personal advantage of his business relationship with a Delphi supplier, and had intentionally (though unsuccessfully) tried to obstruct Delphi's subsequent investigation. Complainant was terminated **solely** for those reasons, not because he brought any alleged safety concerns to Delphi's attention.

Accordingly, Complainant's complaint against Delphi is without merit, and should be dismissed.

## Background

Complainant was hired by Delphi in August 1981. At all relevant times he was employed as a Senior Environmental Engineer, with responsibility for waste removal and wastewater treatment at Respondent's Kettering and Moraine, Ohio manufacturing facilities.

- ### The Investigation Into Improper Waste Disposal Begins

On January 29, 2004, Environmental Coordinator JoAnne Rau was contacted by an employee of Crown Solutions, Inc.[1] regarding a waste dumpster[2] that was located on the Kettering property. The Crown employee wanted to know how he should record the contents of the dumpster for disposal. Rau learned that the dumpster contained fencing and aquarium salt bags – neither of which could have come from the Delphi facility. Accordingly, on January 30, she brought the

---

[1] Crown is a water management and engineering company that provides Delphi with services and personnel.
[2] The container is formally known as a "waste roll-off box" – a mobile container that can be attached to a semi truck, as opposed to a stationary dumpster one might find at an apartment complex, for example. However, for ease of reference, this statement will refer to the container as a dumpster.

DC 453

Delphi Legal Staff  MC: 480-410-144  5825 Delphi Drive  Troy, MI 48098  Tel: [1] 248.813.1460  Fax: [1] 248.813.1466  E-mail: jeffery.m.peterson@delphi.com

EXHIBIT
#3

March 30, 2004
Page 2 of 8

matter to the attention of her supervisor, Facilities & Services Site Manager Mark Gooding. Rau informed Gooding that the dumpster belonged to Onyx Industrial Services, a company that provides waste disposal services for Delphi. Gooding contacted Onyx, but Onyx was unable to explain the contents of the dumpster, or why it was located on Delphi property.

Gooding found this to be sufficiently unusual that it warranted further investigation. Accordingly, on January 30, he contacted Mike Brown, an Investigator for Securitas, which provides security services for Delphi. Gooding informed Brown that, after speaking with other individuals, he believed the contents of the dumpster may have come from Complainant's home or business.

Brown began by inspecting the dumpster, and found that it contained boxes of aquarium sea salt, old wire fencing, broken pieces of concrete, and other construction scrap. He also learned that Complainant had an aquarium business, and had recently purchased a small farm, all of which was consistent with the dumpster's contents. (A copy of Brown's Investigation Report is attached as Exhibit A).

On February 3, Brown met with Onyx representatives to discuss the dumpster. Onyx informed Brown that they had located a receipt for $100 cash dated December 22, 2003, that showed Joe Reno had privately arranged for the dumpster. (A copy of the receipt is attached as Exhibit B). They also noted that the individual who had transported the dumpster was an Onyx employee named Troy Carlton.

Brown met with Carlton on February 5. Carlton told Brown that in the fall of 2003 Complainant had asked him to deliver an empty dumpster to Complainant's residence. Carlton indicated that a few months later Complainant asked him to come back and pick up the dumpster. According to Carlton, when he picked up the dumpster there was an emergency at the Kettering facility, so rather than taking the dumpster to a landfill, he had driven straight to the facility, dropped the dumpster off, and subsequently forgot to retrieve it. Carlton denied that Complainant had asked him to bill the dumpster's disposal costs to Delphi. (See Exhibit A).

- A Small Leak Is Discovered In A Treatment Tank

On Friday, February 13, 2004, Complainant and his crew discovered a small leak emanating from the bottom of one of Delphi's hexavalent chromium wastewater treatment tanks. The Kettering facility has two parallel, 75,000 gallon, epoxy coated, carbon steel batch treatment tanks that are used to adjust the pH of the wastewater and to reduce the hexavalent chrome to its trivalent state.

Complainant decided to install temporary plumbing to enable a sludge storage tank to be used as a temporary chrome treatment tank so the actual tank could be drained, inspected, and repaired. This was accomplished between February 14 and 16, 2004. Complainant also arranged for extra manpower to be brought in to monitor the plumbing and tanks during this time.

- The Waste Disposal Investigation Continues

On Monday, February 16, Mike Brown interviewed Complainant in connection with his investigation into the Onyx dumpster. Brown asked Complainant to explain the sequence of events regarding the dumpster. Complainant told Brown that he asked Carlton to deliver the dumpster to his house in "late November or early December, 2003." Complainant claimed that he filled the dumpster with debris, and had Carlton pick it up on December 22. He stated that he assumed Carlton had taken

DC 454

March 30, 2004
Page 3 of 8

the dumpster to a landfill, until he learned in late January that "someone was taking pictures" of the dumpster, and that an investigation was being conducted.

Complainant then presented Brown with two written statements – one from David Atchison, an hourly employee, and another from Dave Low, a Crown employee. (Copies of these statements are attached as Exhibit C). Both individuals claimed that they overheard a conversation between Complainant and Troy Carlton in which Complainant told Carlton he would pay the fee for the dumpster.[3] Complainant told Brown that he paid Carlton $100 on December 22, and received a receipt.

- Troy Carlton Recants His Story

On Wednesday, February 18, Brown conducted another interview with Carlton (Gooding and Onyx managers Mike Webb and Tim Delph were also present). Initially, Carlton repeated his story that he had picked up the dumpster on December 22, 2003, and that Complainant had paid Onyx $100 for its services. However, as the interview was wrapping up, Carlton asked Brown what he thought would happen to him (Carlton), and Brown told him that as long as he was telling the truth there was nothing to worry about. After speaking to Webb and Delphi privately for a few minutes, Carlton located Brown and indicated he wanted to resume the interview.

Carlton then informed Brown that he needed to "make some changes" to his story. He indicated that in August or September 2003 Complainant asked him to deliver a dumpster to Complainant's house. Around the end of September or early October (not December 22), Complainant asked Carlton to pick up the dumpster. According to Carlton, he and Complainant drove in an Onyx truck to Complainant's home to retrieve the dumpster, and returned to the facility together, dropping the dumpster at the location where it was eventually discovered. Carlton admitted to Brown that **he knew the final disposal fee would be billed to Delphi**. Complainant gave Carlton $100 cash the day the dumpster was returned to Delphi (not December 22), which was intended for Carlton personally in exchange for doing "a favor" for Complainant. Carlton also admitted that he never gave the $100 to Onyx. (See Exhibit A).

Carlton further stated that on either February 2 or 3, 2004 (i.e., shortly after the investigation began), Complainant approached Carlton and asked for a receipt for the $100. According to Carlton, he filled the receipt out that day, and randomly picked December 22, 2003 as the date on the receipt.

At the conclusion of the interview Brown asked Carlton to submit a complete statement of events as he had described, and asked that it be completed by February 19. Carlton indicated that he would do so. (See Exhibit A).

- Complainant Informs His Supervisor Of The Leak

During a staff meeting on Wednesday, February 18[4] – five days after the leak was discovered – Complainant informed Mark Gooding of the leak, and his efforts to re-route the wastewater to the

---

[3] Brown found it odd that Complainant had come to the meeting with these two statements in his possession, since Brown had not yet spoken to Complainant, and no issue had been raised about Complainant's communications with Carlton.
[4] This meeting did not take place on Tuesday, February 17, as Complainant alleged in his March 2, 2004 letter to James P. Walle (discussed below).

DC 455

March 30, 2004
Page 4 of 8

sludge tank. Complainant and Gooding went to view the tank, and Gooding assigned Plant Engineer Jerry Lee to assist Complainant with the task of having the tank cleaned, inspected, and repaired.

After the tank was cleaned, Delphi retained American Testing Services, Ltd. (ATS) to perform an inspection of the tank on Friday, February 20. ATS reported that all of the welds were inspected and that the tank's thickness was approximately equal to the original design thickness of .25 inches. However, a 15-inch-long crack was discovered in the bottom of the tank weld, which was the source of the small leak.

Mark Gooding and JoAnne Rau visited the treatment plant early Friday afternoon, February 20 to speak with ATS about the inspection and test results. Gooding and Complainant discussed ATS's findings and made arrangements for the tank to be repaired and recoated the following week.

- Delphi Suspends Complainant Based On The Waste Disposal Investigation

At around noon on February 20, Mike Brown – who was completely unaware of the chrome tank issue – advised Mark Gooding and Human Resources representatives of his findings to date. He indicated that, although his investigation couldn't be considered completely closed because Carlton had not yet provided a written statement, there was already ample evidence that Complainant had committed several acts of misconduct in connection with the dumpster.

Based on Brown's findings to date, Divisional Salaried Personnel Director Elizabeth Meyer decided that Reno should be suspended pending the final outcome of the investigation (like Brown, Meyer had no knowledge of the chrome tank issue at that time). Accordingly, based on Meyer's decision, late in the afternoon of February 20, Human Resources Representative Debbie Field and Mark Gooding informed Complainant that he was being suspended, with pay. Gooding subsequently placed Jerry Lee in charge of the waste treatment area.

- The Tank Is Repaired

Between February 23 and March 1, 2004, the surface crack and another small area of the tank were repaired with welded patches, and the bottom three feet of the tank, along with any blisters, were re-coated with an epoxy material superior to the original coating. The tank was then readied for a return to service.

- Complainant's March 2 Letter To Delphi's Legal Staff And Delphi's Response

On March 2, 2004, Complainant sent a letter to James Walle, an environmental attorney on the Delphi Legal Staff, which Walle received late in the afternoon of March 3. (A copy of the letter is attached as Exhibit D). In the letter, Complainant – for the first time – raised a series of alleged concerns about the safety of the chrome treatment tanks, and the risk of "catastrophic failure." He also referred to his suspension on February 20, which Complainant characterized as relating to Troy Carlton's "inadvertent return of the box containing [Complainant's] trash" to the Kettering facility. He claimed that Carlton had been interviewed "and took full responsibility for returning the box to Delphi" (obviously Complainant was not aware that Carlton had recanted his original story). He also repeated the lie (which he ironically characterized in his letter as "undisputed fact") that he had "paid in full for the disposal of this waste." After professing his innocence, Complainant speculated that his suspension had been "initiated by . . . Gooding to facilitate his plan to

DC 456

March 30, 2004
Page 5 of 8

circumvent and ignore applicable health, safety, and environmental rules and regulations." Of course, Complainant had no way of knowing that Gooding played no role in the decision to suspend him, or that the decision was, in fact, made hundreds of miles away by a human resources executive with no knowledge whatsoever about the chrome treatment tank issue.

In a letter dated March 4, 2004 (copy attached as Exhibit E), Walle thanked Complainant for his letter and promised to look into the situation. Walle and Delphi's Facilities Services Group arranged to bring two Delphi environmental managers (Marty Cristo and Roy Knapp) and an independent consulting engineering firm, Hubbel, Roth & Clark, Inc. (HRC), to determine whether the two chrome wastewater tanks were, in fact, safe for continued use. Accordingly, the tank was again emptied, and the Delphi personnel inspected the site on Friday, March 5. HRC Engineer Ed Cote arrived on Saturday, March 6, and conducted his own independent investigation. Importantly, neither Cote nor the environmental managers had been made aware of Complainant's March 2 letter.

Following his inspection, Cote, Cristo, and Knapp concluded that the plant had taken timely, appropriate action concerning the leaking tank, and believed that the plant's original plan to inspect the non-leaking tank during Delphi's July shutdown period was appropriate. Indeed, the parties agreed that the emptied tank should be put back into service as soon as possible, since risks posed by re-routing the wastewater were believed to be greater than the risk of tank failure.

Delphi subsequently retained ATS to conduct additional ultrasonic inspections of the other chrome treatment tank.[5] The results of that inspection showed that the thickness of that tank was approximately .25 inches, measured at four random locations along the sidewall. This suggested that the structure of the other tank was sound as well (since the original design thickness of the tank was .25 inches).

On March 26, 2004, HRC provided Delphi with its final report. (A copy is attached as Exhibit F). The report concluded that Delphi had responded to the leak immediately and appropriately. It noted that Delphi emptied and inspected the tanks, and repaired two isolated areas with steel plates. Furthermore, the lower portion of the tank was covered with a coating superior to the original. According to HRC, "the new patched areas and the original coatings effectively protect the steel tank." The report went on to find that the condition of Delphi's tanks was similar to other tanks in use throughout the automotive industry. HRC also recommended that Delphi inspect and, if necessary, repair all of its tanks as soon as possible -- possibly during Delphi's annual July shutdown, when wastewater flows are significantly reduced.

- The Waste Disposal Investigation Concludes; Complainant Is Terminated

Mike Brown continued his investigation into early March. On March 5, 2004, he interviewed Troy Carlton for a third time. Carlton reaffirmed his earlier statement, but refused to provide a written statement unless Delphi agreed not to "take action against" him for his role in the dumpster scam.

Brown considered his investigation completed, and he notified Meyer. Meyer discussed the matter with Glenn Howarth, the Director of Delphi's Environmental Services Group.[6] Meyer and Howarth agreed that Brown's investigation had established the following:

---

[5] The ultrasound enabled ATS to determine the thickness of the tank walls without actually emptying the tank.

[6] Howarth is Mark Gooding's supervisor, and was thus two levels above Complainant.

DC 457

March 30, 2004
Page 6 of 8

- Complainant's arrangement with Troy Carlton to deliver an Onyx dumpster to his house, and to return the dumpster to Delphi, in exchange for $100 paid directly to Carlton, constituted a conflict of interest, a misappropriation of Delphi resources, and an abuse of Delphi's business relationship with Onyx.
- Complainant had willfully obstructed Delphi's investigation into the incident by conduct including: (1) lying about the facts, (2) persuading Carlton to produce a bogus receipt, and (3) compelling David Atchison and Dave Low to submit false statements on his behalf.[7]

These facts were beyond dispute, and constituted a clear violation of Delphi's guiding policies and principles. By this point, of course, Meyer and Howarth were aware of the chrome treatment tank issue, and of Complainant's letter to Walle. However, they agreed that they had no choice but to terminate Complainant's employment. The fact that Complainant had raised concerns about the chrome tanks did not in any way lessen or excuse his unacceptable conduct on a completely unrelated issue – particularly in light of the fact that the waste disposal investigation began well before the chrome tank leak even occurred, and Complainant didn't send his letter until well after he had been suspended.

For the reasons stated above, Complainant was terminated on March 17, 2004.

### Discussion of Complainant's Claims

Complainant claims that he was terminated because he raised safety concerns in his March 2, 2004 letter to Jim Walle. His complaint is being investigated under the provisions of 29 C.F.R. Part 24 and 29 U.S.C. §660(c).

The analysis for a claim under either provision is essentially the same: Was Complainant discharged because he engaged in "protected activity"? Complainant must establish that he did, in fact, engage in protected activity, and that his termination was causally connected to that protected activity. See, e.g., Reich v. Hoy Shoe Co., Inc., 32 F.3d 361 (8th Cir. 1994).

- Complainant Did Not Engage In A Protected Activity

Complainant must first show that his March 2, 2004 letter to Delphi legal staff constituted "protected activity." Under 29 C.F.R. §24.2 Complainant would have to show that he either had (or was about to): commenced proceedings under any of the listed statutes; testified in such proceedings; assisted or participated in such proceedings; notified Delphi of an alleged violation of a relevant federal statute; refused to engage in any practice made unlawful; or testified before congress or other governmental proceeding. Complainant's letter does not fall within any of those categories.

Likewise, Complainant's letter does not appear to fit the criteria of 29 U.S.C. §660(c) or 29 C.F.R. Part 1977. While Delphi acknowledges that it is the Department of Labor's policy that internal complaints can constitute protected activity *if made in good faith* (29 C.F.R. §1977.9(c)), there is no evidence that Complainant's letter was made in good faith, as opposed to a deliberate effort to make exaggerated allegations in order to protect himself against possible discipline for his malfeasance. In this respect, it's very significant that Complainant waited several weeks to raise

---

[7] Atchison retired shortly after the investigation began, so Delphi was unable to take action against him for filing a false statement. Low is not a Delphi employee.

DC 458

March 30, 2004
Page 7 of 8

these allegations. If Complainant genuinely believed Delphi's response posed an unreasonable risk, one would expect him to have brought the issue forward immediately.

- **There Is No Evidence Of A Causal Connection**

Moreover, regardless of whether Complainant's letter constituted "protected activity," there is no evidence whatsoever to suggest that there was a causal connection between the letter and the decision to terminate his employment. The following facts establish that the decision to terminate was made for a reason that preceded, and was wholly unrelated to, any issue regarding the chrome treatment tanks:

- Complainant was terminated based on the results of an investigation that began on February 2, 2004 – 11 days before the leak was discovered, and a month before Complainant wrote his March 2 letter to Jim Walle.
- Complainant was suspended 11 days before he wrote his March 2 letter, and he was never permitted to return to work. As he himself acknowledges, his suspension was specifically connected to the investigation into the dumpster disposal issue.
- The decision to suspend Complainant was made by Delphi's Salaried Personnel Director, who at the time had no knowledge of any issue regarding the chrome treatment tanks. Her decision was based on the preliminary findings of an investigator who likewise had no knowledge of the issue regarding the tanks.
- Complainant's suspension was essentially converted into a termination when Brown completed his investigation and confirmed that Complainant had engaged in inappropriate and unethical conduct.
- Complainant's March 2 letter did not change the fact that he had misappropriated Delphi assets, entered into an arrangement with Delphi's supplier that was a clear conflict of interest, and deliberately obstructed and misled Delphi's investigation into his conduct.

The only fact that is at all suggestive of a causal connection is the short amount of time between Complainant's letter and his termination. However, the unique facts of this case rebut any inference caused by the temporal proximity. In this case, at the same time as the tank issue, there was a parallel investigation being conducted by individuals who had no direct involvement with the tank issue. The waste disposal investigation was therefore also temporally related to Complainant's termination. Accordingly, there is no basis on which to conclude that the mere closeness of time, without more, establishes that *either* issue (the Onyx dumpster or Complainant's letter) was, in fact, causally connected to Complainant's termination. However, when this temporal proximity is coupled with the other facts showing that the termination was connected to the waste disposal issue, there is only one reasonable conclusion that can be drawn.

Finally, it is nonsensical to claim that Respondent would discharge Complainant for raising a safety issue. To the contrary, Delphi considered it Complainant's responsibility to monitor the tanks, and to report any perceived safety issues. Indeed, Gooding appreciated that Complainant had informed him of the leak, and of the steps that had been taken to bypass the tank. Gooding also approved and monitored the subsequent inspection and repair of the tank – all of which occurred before Delphi received Complainant's March 2 letter. And an independent consultant subsequently verified that Delphi's efforts were appropriate.

DC 459

March 30, 2004
Page 8 of 8

In sum, there is no evidence to suggest that Delphi terminated Complainant because of his March 2 letter. In contrast, there is extensive evidence suggesting that Complainant was terminated solely for his actions in connection with the Onyx dumpster.

Conclusion

Based on the above, it is clear that Complainant's complaint lacks factual or legal merit. Complainant was terminated solely because he entered into a private arrangement that resulted in a conflict of interest, misappropriation of Delphi resources, and intentionally interfered with Delphi's subsequent investigation. His termination had nothing to do with his alleged and belated concerns about the safety of the chrome treatment tanks -- to the contrary, Delphi plant management and corporate personnel appropriately addressed chrome wastewater tank matter. Accordingly, Complainant's complaint should be dismissed.

If you have any questions or need additional information, please do not hesitate to contact me.

Very truly yours,

Jeffery M. Peterson
Attorney

Attachments

DC 460