# **EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOSEPH RENO, | * | CASE NO. 3:04-CV-00321 |
| Plaintiff, | * | Judge Walter Herbert Rice |
| v. | * | |
| DELPHI CORPORATION, | * | |
| Defendant. | * | **FIRST AMENDED COMPLAINT** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT WITH JURY DEMAND**

Plaintiff, Joseph Reno ("Reno"), for his First Amended Complaint against Defendant, Delphi Corporation ("Delphi") alleges as follows:

JURISDICTION AND VENUE

1. This is an action for wrongful discharge and denial of employment benefits arising under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq., the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 et seq. and the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. In addition, this action is based upon a violation of the Ohio whistleblower statute, O.R.C. § 4113.52, the Ohio wage payment statue, O.R.C. §4113.15, discharge in violation of Ohio's public policy and the common law for defamation. This action presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

2. Venue is proper in this district under 28 U.S.C. §1391(b) and (c).

EXHIBIT #1

## THE PARTIES

3. Plaintiff Joseph Reno is a citizen of the State of Ohio residing at 5012 Lytle Road, Waynesville, Ohio 45068. At all times relevant hereto, Reno was employed by Defendant Delphi as a Senior Environmental Engineer with responsibilities as both chemical treatment supervisor for Delphi's Kettering, Ohio, operations and environmental site coordinator for Delphi's plant on Kettering Boulevard.

4. Defendant Delphi Corporation is a Delaware corporation doing business in Ohio at 2000 Forrer Boulevard, Kettering, OH 45420. At all times relevant hereto, Delphi was Reno's employer.

## BACKGROUND

5. On February 13, 2004, Delphi employees discovered a leak at the base of one of Delphi's two 75,000 gallon chromium wastewater treatment tanks located at Delphi's Chemical Treatment Plant (the "CTP") in Kettering, Ohio. These tanks hold an average daily accumulation of 100,000 gallons of chromium wastewater containing hexavalent chromium, a highly toxic substance subject to the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act, and its implementing Environmental Protection Agency regulations.

6. In response to this environmental and safety hazard, Delphi's Senior Environmental Engineer (Joseph Reno) made the decision to immediately modify and utilize a sludge storage tank as a temporary replacement chrome treatment tank.

7. From February 14 to February 16, 2004, Reno employed a combination of a plumbing bypass, temporary hosing, pumps, and additional man-hours by outside contractors to avoid idling the work of approximately one thousand two hundred (1200) Delphi employees at

Delphi's Kettering, Ohio facilities.

8. On February 16, 2004, Reno was asked to meet with an Investigator employed by Delphi to investigate the facts and circumstances surrounding Reno's personal hiring of Onyx, a waste disposal contractor, to set a solid waste collection bin at Reno's newly-purchased residence in Waynesville, Ohio. Reno answered all of the Investigator's questions and provided the Investigator with two signed witness statements and a paid deposit receipt evidencing the fact that Reno was paying in full for Onyx's services.

9. During the period of time from February 19 to February 20, 2004, the leaking 75,000 gallon chromium tank was drained and an inspection revealed that the original epoxy coating on the bottom third of the tank had been eaten away by corrosion. Two obvious leaks to the outside environment had occurred where the wall of the tank joined its bottom, on the southwest and northeast sides of the tank. Due to its identical age and construction and its twenty-five (25) years of uninterrupted service, it was Reno's belief that the companion 75,000 gallon tank was also in an advanced state of corrosion.

10. Over the last several years, there have been at least three (3) leaks of hazardous chromium wastewater to the outside environment at the CTP. In spite of these continuing problems, for over two (2) years, Delphi has stopped funding any preventive maintenance at its CTP, despite repeated requests by Reno to do so.

11. The only repairs done by Delphi for more than two (2) years at its CTP have been "band-aid" fixes, in response to emergency situations.

12. On Friday morning, February 20, 2004, Reno's supervisor, Mark Gooding ("Gooding"), made one of his rare visits to Delphi's CTP in Kettering, Ohio. During this Friday morning visit Gooding repeatedly questioned, criticized, and argued with Reno's decision to

3

address the on-going environmental emergency with around-the-clock staffing. Gooding also insisted that Reno cut back on the repairs which Reno had already scheduled to begin on Monday, February 23, 2004. Gooding told Reno (in the face of Reno's express objections) that only the bottom third and the visibly damaged areas of the leaking chromium treatment tank should be recoated, that only a patch should be welded on the leaking manway of the chromium clarifier tank, and that nothing at all should be done to inspect or maintain the second chromium treatment tank.

13. Later on that same Friday, February 20, 2004, Reno was summoned to Gooding's office and suspended "with full pay and benefits" from his employment at Delphi. The pretext given for this action was the on-going Investigation into Reno's personal hiring of a solid waste disposal contractor, but the true motivation was expressed by Gooding several hours earlier when he argued with Reno about the expense of repairs Reno had planned in order to comply with Environmental Protection Agency ("EPA") regulations.

14. Following Reno's suspension, Gooding cancelled the repairs scheduled by Reno, and proceeded to complete the cheapest possible "band-aid" repairs. At that time, the second chrominum treatment tank was neither drained nor inspected.

15. Following Reno's suspension, Gooding (and other, as yet unidentified Delphi agents and/or employees) proceeded to defame Reno by stating that Reno had misappropriated Company assets, been dishonest in dealing with a supplier, and engaged in obstruction of justice. The malicious purpose of these falsehoods was to further create a pretext for the wrongful termination of Reno's employment.

16. On March 2, 2004, Reno sent an internal "whistleblower" letter to Delphi attorney James Walle in Delphi's Legal-Environmental department at Delphi's headquarters in Troy,

4

Michigan. <u>Inter alia</u> this "whistleblower" letter advised Delphi (1) that there existed a serious hazard to public health and safety at the CTP in Kettering, Ohio; (2) that Reno reasonably believed that Gooding was "not qualified to deal with this environmental hazard, has intentionally cut the necessary staffing, and has disregarded the repairs necessary for full compliance with applicable health, safety, and environmental rules and regulations"; and (3) that Reno's "suspension from Delphi employment was initiated by Delphi employee Mark Gooding to facilitate his plan to circumvent and ignore applicable health, safety, and environmental rules and regulations." A copy of this "whistleblower" letter is attached as Exhibit "A" to Plaintiff's Complaint filed 9/2/04 and is expressly incorporated herein.

17. To date, Delphi has failed to respond to Reno's March 2, 2004, "whistleblower" letter by either notifying Reno, in writing, of any corrective measures actually taken or of the absence of his reported hazards to public health and safety.

18. On March 17, 2004, after more than twenty-two (22) years of employment at Delphi by Reno, and only fifteen (15) days after Reno mailed his "whistleblower" letter, Delphi wrongfully terminated Reno's employment for "cause". At no time to date has Delphi had the simple decency to tell Reno what this "cause" was, in spite of his repeated requests to Delphi to do so.

19. By letters dated April 5, 2004, and May 24, 2004, Delphi ignored Reno's objections and refused to offer him and his family continuing group health insurance coverage pursuant to the Consolidated Omnibus Reconciliation Act (<u>i.e.</u> "COBRA").

20. By letter dated March 31, 2004, Delphi refused to pay Reno for his unused vacation days which had accrued prior to his wrongful termination of employment on March 17, 2004. Also to date, Delphi has not paid Reno all of the salary and vested pension monies that he

was entitled to receive through and after the date of his wrongful termination of employment.

### COUNT ONE – COBRA VIOLATION

21. Plaintiff restates and incorporates the allegations of paragraphs 1 through 20.

22. The Consolidated Omnibus Reconciliation Act, 29 U.S.C. Section 1161-1168, commonly referred to as "COBRA", generally mandates that a group health plan offer separated employees the opportunity to elect continuation coverage, i.e. an extension of their previous group health insurance coverage.

23. Before March 17, 2004, Reno was covered by Delphi's group health insurance.

24. After its wrongful termination of Reno's employment on March 17, 2004, Delphi violated COBRA law by refusing to offer him continuing group health insurance coverage.

25. As a result of Delphi's violation of COBRA law, Joseph Reno has been damaged.

### COUNT TWO – ERISA VIOLATIONS

26. Plaintiff restates and incorporates the allegations of paragraphs 1 through 25.

27. The Employee Retirement Income Security Act of 1974, 29 U.S.C. Sections 1001 et seq. ("ERISA") requires that Delphi honor the commitments it has made to Reno in its Summary Plan Description (the "SPD") for salaried employees' benefits.

28. Delphi has breached its SPD commitment to Reno that "[s]eparated employees will receive a lump-sum payment for unused, vested vacation days per completed calendar year quarter". SPD page #123.

29. Delphi has further breached its SPD commitment to Reno that "the exit interview will be the occasion for informing the employee of the reason for separation". SPD page #123.

30. In addition, in spite of Reno's repeated demands, Delphi has breached its

6

fiduciary and ERISA responsibilities by failing to pay Reno his vested pension funds (approximately $150,000).

31. As a result of Delphi's violations of ERISA law, Joseph Reno has been damaged.

## COUNT THREE – O.R.C. 4113.52 (WHISTLEBLOWER) VIOLATION

32. Plaintiff restates and incorporates the allegations of paragraphs 1 through 31.

33. During the course of Reno's employment with Delphi, he became aware of certain violations of environmental rules and regulations (as further described in the attached Exhibit).

34. Reno reasonably believed that these environmental law violations constituted hazards to public health and safety.

35. On March 2, 2004, Reno made a written report to James P. Walle on the Legal-Environmental Staff of Delphi World Headquarters; this report identified and described to Delphi these hazards to public health and safety.

36. In violation of Ohio Revised Code Section 4113.52(A)(1)(b), Delphi has failed to notify Reno, in writing, of any actual corrective measures it has taken, or of the absence of his reported hazards to public health and safety.

37. In retaliation for Reno's report of environmental law violations, and in violation of Ohio Revised Code Section 4113.52(B)(1), Delphi terminated Reno's employment on March 17, 2004.

38. The accuracy of Reno's report of hazards to public health and safety is confirmed by the actual leak on and about February 13, 2004, of highly toxic hexavalent chromium waste to the outside environment.

39. Suit has hereby been filed for Delphi's violations of Ohio Revised Code Section 4113.52 within one hundred eighty days of Delphi's wrongful discharge of Reno from its

7

40. As a result of Delphi's violations of Section 4113.52 of the Ohio Revised Code, Joseph Reno has been damaged.

## COUNT FOUR – DISCHARGE IN VIOLATION OF PUBLIC POLICY

41. Plaintiff restates and incorporates the allegations of paragraphs 1 through 40.

42. A clear public policy exists as manifested in a state or federal constitution, statute or administrative regulation, or in the common law. Section 6971, Title 42, U.S. Code, specifically prohibits employers from retaliating against employees who allege violations of the Resource Conservation and Recovery Act (and its implementing regulations), as amended by the Hazardous and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act (Section 6971, Title 42, U.S. Code). Further, in the case of Kulch v. Structural Fibers, Inc. (1997), 78 Ohio St.3d 134, 677 N.E. 2d 308, Ohio recognized a clear public policy in favor of workplace safety. See also Pytlinski v. Brocar Prods., Inc. (2002), 94 Ohio St.3d 77, 760 N.E.2d 385.

43. This clear public policy in favor of workplace safety would be jeopardized if employers such as Delphi were allowed to discharge employees such as Reno for reporting safety concerns.

44. Delphi's termination of Reno's employment was motivated by Reno's express workplace and public safety concerns (as further described above).

45. Delphi lacked any overriding legitimate business justification for its termination of Joseph Reno's employment.

46. As a result of Delphi's discharge of his employment in violation of public policy, Joseph Reno has been damaged.

8

### COUNT FIVE - O.R.C. 4113.15 (WAGE PAYMENT) VIOLATION

47. Plaintiff restates and incorporates the allegations of paragraphs 1 through 46.

48. Section 4113.15 of the Ohio Revised Code requires corporations doing business in the State of Ohio "on or before the fifteenth day of each month, pay such employees the wages earned by them during the last half of the proceeding calendar month."

49. From February 20, 2004, to March 17, 2004, Delphi suspended Joseph Reno expressly "with full pay and benefits".

50. From March 17, 2004, to (approx.) April 14, 2004, Reno was entitled to receive his accrued and unused vacation pay.

51. Delphi has wrongfully refused to pay Reno any wages or benefits subsequent to March 15, 2004.

52. As a result of Delphi's violation of Section 4113.15 of the Ohio Revised Code, Joseph Reno has been damaged.

### COUNT SIX – DEFAMATION

53. Plaintiff restates and incorporates the allegations of paragraphs 1 through 52.

54. Delphi has defamed Reno by stating through its representative(s) that Reno has misappropriated Company assets, that Reno has been dishonest in dealing with a Delphi supplier, and that Reno is guilty of obstruction of justice.

55. These defamatory statements by Delphi are both false and malicious.

56. These defamatory statements have been published to both Delphi employees and non-employees.

57. As a result of Delphi's acts of defamation, Joseph Reno has been damaged.

9

## COUNT SEVEN – FAIR CREDIT REPORTING ACT VIOLATION

58. Plaintiff restates and incorporates the allegations of paragraphs 1 through 57.

59. The Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") requires inter alia that employer(s) (who take an adverse action against an employee based on information received from an outside investigator) provide a summary thereof to the involved employee.

60. Delphi has violated the Fair Credit Reporting Act by failing to provide Reno with so much as a summary of its outside investigation of Reno.

61. Delphi's violation of the Fair Credit Reporting Act has damaged Joseph Reno and constitutes evidence of pretext in this case.

WHEREFORE, Plaintiff Joseph Reno prays for the following relief:

A. Judgment that Defendant Delphi has violated federal and Ohio law as set forth above;

B. An award of benefits due Reno as a result of Delphi's wrongful actions, in an amount in excess of Ten Thousand Dollars ($10,000), the exact amount to be determined at trial;

C. An award of wages due Reno on March 17, 2004, in an amount in excess of Five Thousand ($5,000), the exact amount to be determined at trial;

D. An award of liquidated damages pursuant to Ohio Revised Code § 4113.15 in the amount of 6% of "B" and "C" above, the exact amount to be determined at trial;

E. An award of One Hundred Ten Dollars ($110) per day, for each day of Delphi's COBRA violation as set forth above, the exact amount to be determined at trial;

F. An award of back wages and benefits due Reno, from March 17, 2004, to the date

of trial, in an amount in excess of Fifty-Five Thousand Dollars ($55,000), the exact amount to be determined at trial;

G. An award of future wages and benefits due Reno, in an amount in excess of One Million Five Hundred and Twenty-Four Thousand Dollars ($1,524,000), the exact amount to be determined at trial;

H. Monetary relief and/or damages for Delphi's ERISA violations in excess of One Hundred and Fifty Thousand Dollars ($150,000), the exact amount to determined at trial;

I. An award of punitive damages, in the amount of nine (9) times the compensatory damages award per State Farm v. Campbell, 123 S. Ct. 1513 (2003);

J. An award of costs and attorney's fees in this action;

K. An award of prejudgment and post-judgment interest; and

L. Such other relief as the Court may deem just and necessary.

Respectfully submitted,

s/Brad A. Chalker
Brad A. Chalker (#0011992)
Law Offices of Brad A. Chalker, LLC
7953 Washington Woods Drive
P.O. Box 750726
Dayton, Ohio 45475-0726
(937) 436-1893 (phone)
(937) 436-1894 (fax)
BAC@chalkerlaw.com (email)
Trial Attorney for Plaintiff, Joseph Reno

### JURY DEMAND

Plaintiff Joseph Reno hereby demands a trial by jury.

s/Brad A. Chalker
Brad A. Chalker

11

## CERTIFICATE OF SERVICE

The foregoing First Amended Complaint was filed electronically with the Court on June 7, 2005.* Notice of this filing was sent to all parties by operation of the Court's electronic filing system.

s/Brad A. Chalker
Brad A. Chalker

(* Note... This case was commenced with the filing of the initial Complaint on Sept. 2, 2004.)

12