**Hearing Date: March 22, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

     - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
     Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                            :
          In re                                             :     Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :     Case No. 05-44481 (RDD)
                                                            :
                                                            :     (Jointly Administered)
                              Debtors.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' SUPPLEMENTAL OBJECTION TO LEAD PLAINTIFFS'
SUPPLEMENTAL PLEADING IN FURTHER SUPPORT OF MOTION FOR
<u>LIMITED MODIFICATION OF AUTOMATIC STAY</u>

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby respectfully submit this supplemental objection (the "Supplemental Objection") to the Lead Plaintiffs' Motion For A Limited Modification Of The Automatic Stay filed on November 15, 2005 (Docket No. 1063) (the "Motion"). The Debtors filed an objection to the Motion on December 29, 2005 (Docket No. 1667) (the "Initial Objection"). On January 25, 2006, the Bankruptcy Court entered an order modifying the automatic stay (Docket No. 1883) (the "Stay Modification Order") solely to allow the Lead Plaintiffs to seek modification of the PSLRA stay. On February 15, 2007, the United States District Court for the Eastern District of Michigan (the "Michigan District Court") entered an order partially modifying the PSLRA stay (the "Partial Modification Order"). On March 2, 2007, Delphi and certain defendants filed a motion for reconsideration and clarification of the Partial Modification Order (the "Reconsideration Motion"). On March 6, 2007, the Lead Plaintiffs filed the Supplemental Pleading in Further Support of the Motion for a Limited Modification of the Automatic Stay, dated March 6, 2007 (the "Motion Supplement") (Docket No. 7128). In support of this Supplemental Objection, Delphi respectfully represents as follows:

<u>Preliminary Statement</u>

1.      The Lead Plaintiffs' Motion should be denied. Modifying the automatic stay to allow the Lead Plaintiffs to take discovery of the Debtor is inappropriate because, among other reasons, consideration of the relief requested in their Motion remains premature, the Lead Plaintiffs have not demonstrated cause for modifying the automatic stay, and modification of the automatic stay to comply with the Lead Plaintiffs' discovery

2

requests would place a heavy burden on the Debtors.[1]  In their Motion Supplement, the

Lead Plaintiffs contend that the undue prejudice demonstrated for relief from the PSLRA

stay should be viewed as sufficient cause to lift the automatic stay.  "Cause" to modify the

automatic stay, however, requires a different showing than that required to modify the

PSLRA stay.  As this Court noted at the hearing on the Motion in January 5, 2006, even if

the Michigan District Court lifted the PSLRA stay, this Court would still need to conduct a

consideration of the factors relevant under Sonnax.  (Transcript of Omnibus Hearing, Jan.

5, 2006, p. 75, lines 11-14.)  Consequently, the Lead Plaintiffs' contention that the limited

modification of the PSLRA is sufficient cause to modify the automatic stay is inadequate.

       2.     At the outset, however, this Court's consideration of the Motion and

the Motion Supplement at this time would be premature.  Although the Michigan District

Court entered the Partial Modification Order partially modifying the automatic stay,

Delphi and certain other defendants in the securities litigation consolidated in the Michigan

District Court (the "Securities Litigation") on March 2, 2007 timely filed the

Reconsideration Motion, a copy of which is attached hereto as Exhibit A.[2]  The Michigan

District Court has not yet ruled on the Reconsideration Motion, and until it does so, the

---

[1]    As described in this Supplemental Objection, the Debtors believe that complying with the terms of
discovery requested by the Lead Plaintiffs (and as outlined in the Michigan District Court's Partial
Modification Order) would be extremely burdensome; if this Court decides to modify the automatic stay
to any extent, the scope of the relief should be narrowly tailored.  To protect the estates from the undue
burden imposed by the Lead Plaintiffs' requests, the stay should be lifted at most only as to the estates'
hard copy documents already produced to the Securities and Exchange Commission (other than those
that are privileged or constitute work product).

[2]    Deloitte & Touche LLP, another named defendant in the Securities Litigation, also filed its Motion For
Reconsideration Of The Opinion And Order Regarding Lead Plaintiffs' Motion For Partial Modification
Of PSLRA Discovery Stay in the Michigan District Court on March 2, 2007.

Lead Plaintiffs' Motion is not ripe. This Court should defer ruling on the Motion for the same reasons it did last time.

       3.      In any event, the Lead Plaintiffs are entitled to no relief from the automatic stay. They argued in their pleadings before the Michigan District Court and in their Motion Supplement that they are concerned about "falling behind" the Official Committee of Unsecured Creditors (the "Creditors' Committee") in the negotiations taking place in the Debtors' chapter 11 reorganization cases. The Lead Plaintiffs contend that unless the automatic stay is lifted and they are provided access to documents shared with the Creditors' Committee, the Official Committee of Equity Security Holders (the "Equity Committee" and, together with the Creditors' Committee, the "Statutory Committees"), and the Securities and Exchange Commission (the "SEC"), they will be severely prejudiced and potentially "left with nothing."[3] The Lead Plaintiffs' concerns are unfounded and their contentions are without merit.

       4.      Quite simply, the Statutory Committees are not competing with the Lead Plaintiffs for a distribution from the Debtors' estates. The Statutory Committees are,

---

[3]    The Lead Plaintiffs co-opt this quoted language from the opinion of Judge Cote in In re Worldcom, Inc. Securities Litigation, 234 F. Supp. 2d 301, 306 (S.D.N.Y. 2002), to demonstrate the "undue prejudice" they will suffer if unable to proceed with discovery. If undue prejudice does indeed result from the imposition of the PSLRA stay (and for that matter, the Bankruptcy Code's automatic stay), it is congressionally mandated. As recently discussed in In re Refco Inc. Sec. Litig., No. 05 Civ. 8626 (GEL), 2006 WL 2337212 (S.D.N.Y. Aug. 8, 2006), "[i]f the stay of discovery mandated by the PSLRA were lifted every time a third party, not subject to the stay, was engaged in settlement discussions with the defendant, then the 'undue prejudice' provision would essentially eviscerate the stay requirement. That is not what Congress intended. The Court in WorldCom recognized this fact, in holding that 'unique circumstances' present in that case necessitated the lifting of the stay. Those unique circumstances were the court-ordered coordinated settlement discussions, and the 'very real risk' that the defendants [Worldcom's Directors], after settling with other parties, would 'no longer have anything or at least as much to offer' plaintiffs." Id. at *3. Similarly, the fact that the Bankruptcy Code's automatic stay may hinder the Lead Plaintiffs' efforts to pursue certain defendants named in the Securities Litigation should not be construed as "undue prejudice," but as legislative intent. Congress did not elect to extend the automatic stay or the PSLRA stay to the SEC or the Department of Justice.

however, fulfilling their fiduciary and statutory duties by engaging in negotiations with the Debtors and GM regarding a settlement of the various transformation, operational, and restructuring issues that are at the core of the Debtors' chapter 11 reorganization cases. The Lead Plaintiffs do not explain how they are severely prejudiced by the Statutory Committees fulfilling their statutory and fiduciary duties.  Instead, the Lead Plaintiffs attempt to show that they are unduly prejudiced by these negotiations, and that the automatic stay should be lifted to remedy this purported hardship.  Again, the Lead Plaintiffs confuse the standards for modifying the PSLRA stay with the cause necessary to modify the automatic stay.  The automatic stay was intended to allow debtors to formulate restructuring plans without responding to ancillary litigation.

   5. Cutting through all of the Lead Plaintiffs' rhetoric regarding undue prejudice, the only new supposed "cause" for lifting the stay that the Lead Plaintiffs have been able to show is that they want some documents that might help them survive pending motions to dismiss, amend their complaint, and formulate a litigation and settlement strategy.  The Lead Plaintiffs have represented to this Court in their Motion Supplement that they "never did, nor do they now, possess such a motive."  (Mot. Supp. ¶ 13).  In pleadings filed in the Michigan District Court, however, the Lead Plaintiffs have taken a contrary position, stating that they should be allowed to amend their complaint after reviewing the documents.  <u>See</u> Motion For Leave To Amend The Consolidated Class Action Complaint ("Leave to Amend Mot.") at 12, a copy of which is attached hereto as <u>Exhibit B</u>.  The "cause" that the Lead Plaintiffs now claim to show is really no different

than the Lead Plaintiffs' true purpose for the discovery articulated by the Debtors in their

Initial Objection—to "get smart" on the Securities Litigation.  (Initial Obj. ¶ 10).

6.      Aside from the Lead Plaintiffs' inability to show cause, the scope of

discovery they request is overly broad and burdensome to the Debtors.  The Partial

Modification Order appears to allow the Lead Plaintiffs, notwithstanding the relevancy and

other limitations of Federal Rule of Civil Procedure 26, to obtain discovery of materials

produced by any defendant to the Securities Litigation (including Delphi Corporation) in

conjunction with the Audit Committee's internal investigation.  This would include a huge

but as yet un-quantified collection of materials never produced to any third party, including

the SEC or Statutory Committees.

7.      The Debtors have collected hundreds of gigabytes of electronic

materials and hundreds of thousands of hard copy pages in connection with subpoenas

from the SEC and an investigation by Delphi's Audit Committee.  Because the totality of

these materials has been only summarily reviewed, the Debtors know only that an

unknown percentage of the materials have been produced to the federal government (under

confidentiality agreements).  And only a very small percentage of this latter production has

been shared with the Statutory Committees (under joint interest agreements).  The

remaining materials, which might number millions of pages of documents, have received

only a limited review for relevance, and essentially no review for privilege, privacy, or

other similar concerns.  And because of the confidentiality and joint interest agreements,

many of the materials produced to the SEC and Statutory Committees have also yet to be

reviewed thoroughly for relevance, privilege, privacy, and the like.  If the Debtors were

forced to conduct a massive review of all of these materials for responsiveness, relevancy, privilege, and other similar concerns, it could occupy thousands of hours of attorney time at a very substantial cost.  The relief requested by the Lead Plaintiffs would be extremely prejudicial to the estates.

Procedural Background

8.      On July 22, 2004, Delphi received its first subpoena from the SEC. Over the course of several months thereafter the Debtors gathered documents that may have been responsive to the SEC's document requests.  Delphi entered into confidentiality agreements with the SEC on November 2, 2004 and January 7, 2005 and a confidentiality agreement with the Department of Justice on April 5, 2005.  The Debtors subsequently produced to the SEC the documents described in the Declaration of Joseph E. Papelian, executed on March 2, 2007, in support of the Reconsideration Motion (the "Papelian Declaration"), a copy of which is attached hereto as Exhibit C.

9.      On April 19, 2006, the Debtors entered into a Joint Interest Agreement with the Creditors' Committee, after which the Debtors shared with the Creditors' Committee a subset of the documents produced to the SEC.  On approximately July 29, 2006, the Debtors entered into a Joint Interest Agreement with the Equity Committee.  The Debtors later shared with the Equity Committee a much more limited set of the documents that had previously been provided to the Creditors' Committee, as directed by this Court in the Equity Committee Joint Interest Agreement Order (Docket No. 4960).

10.    On February 15, 2007, the Michigan District Court entered the Partial Modification Order modifying the PSLRA stay.  On March 2, 2007, Delphi and certain of the defendants in the Securities Litigation filed the Reconsideration Motion.

11.    On March 6, 2007, the Lead Plaintiffs filed in this Court their Motion Supplement, renewing their demand that Delphi produce "a copy of all documents and materials Delphi has produced or provided, in connection with any inquiries or investigations relating to Delphi's accounting practices or business affairs, to any of the following:  (a) the Executive branch of the United States Government (including but not limited to the Department of Justice ('DOJ') and the SEC) or (b) Wilmer, Cutler, Pickering, Hale & Dorr ('Wilmer, Cutler') in connection with its representations of the Special Investigative Committee of Delphi's Board of Directors."  (Mot. Supp. ¶ 2.)

Argument

I.    Consideration Of The Motion Remains Premature

12.    On January 5, 2006, this Court allowed the Lead Plaintiffs a limited modification of the Bankruptcy Code's automatic stay to seek relief from the PSLRA stay in the Michigan District Court.  As this Court noted at the hearing on the Motion, the Michigan District Court is the logical gatekeeper of issues related to the PSLRA stay, and this Court should not decide automatic stay issues until the Michigan District Court has ruled on the PSLRA stay.  Accordingly, until the Michigan District Court rules on the Reconsideration Motion, this Court's consideration of the Motion is not ripe for the same reasons described in the Initial Objection and this Court's bench ruling on January 5, 2006.

13.     The Reconsideration Motion is based, in part, on the recent decision

in In re Refco Inc. Sec. Litig., No. 05 Civ. 8626 (GEL), 2006 WL 2337212 (S.D.N.Y.

Aug. 8, 2006), in which the district court denied a motion brought by plaintiffs represented

by the same lead counsel as here, and who made the same arguments in both courts.

14.     As discussed in the Reconsideration Motion, the Refco decision was

entered after the Debtors had completed their briefing on the modification of the PSLRA

stay.  The Refco decision distinguishes the Worldcom decision that was heavily relied on

by the Lead Plaintiffs.  The Refco court decided not to modify the PSLRA stay (despite the

lead plaintiffs' contention that they were unable to make informed decisions about

litigation strategy) and noted that PSLRA actions should be treated differently than other

actions:

> Plaintiffs state that the question for the Court is whether it is
> appropriate to force the Class to wait months while motions to
> dismiss are briefed and decided, while other interested parties . . .
> are reviewing these materials now.  That, however, is not the
> question for the Court.  Whether PSLRA plaintiffs should be
> subjected to a discovery stay while other parties, who are bringing
> claims under other causes of action, are not subjected to a stay is a
> question for Congress, and one that Congress has answered.  Under
> the PSLRA, discovery in this action has been stayed.  That stay
> does not apply to government investigations, bankruptcy
> proceedings, internal investigations, or non-PSLRA actions.  The
> discrepancy between PSLRA actions and other actions is not
> evidence of undue prejudice, but rather is evidence of Congress's
> judgment that PSLRA actions should be treated differently than
> other actions.  This Court may not second-guess that judgment.

Refco, 2006 WL 2337212, at *2.

15.     Under the Michigan District Court local rules, unless the court so

orders, no response to and no oral argument on the Reconsideration Motion are permitted.

Nevertheless, the Debtors believe that the factual similarities between the Refco decision

and the facts before the Michigan District Court are compelling and that this Court's ruling

on the merits of the Lead Plaintiffs' Motion is premature until the Michigan District Court

rules on the Reconsideration Motion.

II.    The Lead Plaintiffs Have Failed To Demonstrate Cause

16.    If the Court decides that it is appropriate to consider the Motion

before the Michigan District Court rules on the Reconsideration Motion, the Lead

Plaintiffs' request to lift the automatic stay should be denied.[4]  The automatic stay imposed

by section 362 of the Bankruptcy Code is one of the most fundamental and significant

protections that the Bankruptcy Code affords a debtor.  Midlantic Nat'l Bank. v. N.J. Dep't

of Envt'l Prot., 474 U.S. 494, 503 (1986); see also In re Drexel Burnham Lambert Group

Inc., 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("automatic stay is key to the collective

and preservative nature of a bankruptcy proceeding").  The automatic stay is designed to,

among other things, give the debtor a "breathing spell" after the commencement of a

chapter 11 case, shielding debtors from creditor harassment and a multitude of litigation in

a variety of forums at a time when the debtor's personnel should be focusing on

restructuring.  See Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S.

1079 (2000).

17.    The automatic stay broadly extends to all matters which may have

an effect on a debtor's estate, enabling bankruptcy courts to ensure that debtors have the

opportunity to rehabilitate and reorganize their operation.  See Manville Corp. v. Equity

---

[4]    The automatic stay does not prevent the Lead Plaintiffs from conducting discovery as to all defendants
(and non-parties) to the Securities Litigation.  The Lead Plaintiffs note in their Motion Supplement that
they have served document requests on named defendants and non-parties. (Mot. Supp. ¶ 10).

10

Sec. holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62-64 (2d Cir. 1986); see also Fid. Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir. 1976) ("Such jurisdiction is 'necessary to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted); AP Indus. Inc. v. SN Phelps & Co. (In re AP Indus. Inc.), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.").

18.    Section 362(d)(1) of the Bankruptcy Code provides that a court may grant relief from the automatic stay "for cause."  The lifting of the stay for cause is committed to the sound discretion of the court.  In re Sonnax Indus., 907 F.2d 1280, 1288 (2d Cir. 1990).  In Sonnax, the Court of Appeals explained the burden-shifting regime that applies to a motion to modify the automatic say:

> The burden of proof on a motion to lift or modify the automatic stay is a shifting one.  Section 362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the burden of proof on the debtor for all issues other than the "debtor's equity in property," 11 U.S.C. § 362(g)(1).  See 2 Collier on Bankruptcy para. 362.10, at 362-76.  If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.

Id. at 1285.

19.    The Lead Plaintiffs conflate the cause necessary for lifting the PSLRA stay with the cause necessary for lifting the automatic stay.  (See Mot. Supp. ¶ 13 ("District Court Order leaves no doubt that Lead Plaintiffs have indeed shown 'cause' for

the requested relief."); ¶ 20 (stating that Judge Rosen found that balance of harms weighs in favor of modifying automatic stay).)  The Lead Plaintiffs essentially argue that the Michigan District Court's finding of "undue prejudice," a standard for lifting the PSLRA stay, is also cause to modify the automatic stay.  The Lead Plaintiffs' ability to obtain relief from the PSLRA stay in the Michigan District Court is not a substitute for showing cause in this Court; Judge Rosen did not evaluate or apply the Second Circuit's standards for automatic stay relief.  Moreover, the <u>Refco</u> decision calls into question whether the Lead Plaintiffs will in fact suffer any undue prejudice.  The <u>Refco</u> court stated, on facts nearly identical to those in this case, that "plaintiffs' inability to make informed decisions due to lack of access to documents does not rise to the level of undue prejudice." <u>Refco</u>, 2006 WL 2337217, at *2.  Because the Lead Plaintiffs have failed to make the required threshold showing of cause in this Court to modify the automatic stay, their motion should be denied, without requiring further showing by the Debtors.

20.    Moreover, the Lead Plaintiffs are contingent, unliquidated, unsecured creditors of the Debtors, no more and likely much less (due to the mandatory subordination provision of Bankruptcy Code section 510(b)).  Their prepetition action does not grant them any special status as unsecured creditors, nor does it entitle them to any special rights under the Bankruptcy Code.  But based on a reading of the Motion Supplement, one would assume that the Bankruptcy Code's automatic stay provisions do not apply to class action plaintiffs if the PSLRA Stay has been modified.  Potential prejudice to prepetition litigants is not sufficient cause to lift the Bankruptcy Code's automatic stay.  <u>See</u> <u>In re Pioneer Commercial Funding Corp.</u>, 114 B.R. 45, 48 (Bankr.

S.D.N.Y. 1990) ("an unsecured, unliquidated claim holder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown").

21.    A fundamental purpose of the automatic stay is to allow a debtor and its management to avoid responding to time-consuming, ancillary prepetition litigation matters.  Enforcement of the automatic stay allows the debtor and its management to focus on issues central to the successful restructuring of the debtor.  The standards for modification of the PSLRA stay should not necessarily serve as a bankruptcy court's lens for finding cause to lift the automatic stay.  The PSLRA stay and the automatic stay serve two different purposes.  Modifying the automatic stay requires an examination and weighing of different factors and, at a minimum, a showing of cause by the party requesting relief from the automatic stay.  Because the Lead Plaintiffs have failed to make the required threshold showing of a valid "cause" to modify the automatic stay, their Motion should be denied.

22.    The automatic stay is more than a mere formality:  it is a cornerstone of the Bankruptcy Code, a chapter 11 debtor's shield from litigants and creditor demands.  As demonstrated below, the Lead Plaintiffs have not, and indeed can not, carry the burden of establishing that sufficient cause exists to lift the automatic stay.  Accordingly, the Motion should be denied.

A.    The Competing Interests Of The Debtors Outweigh The Lead Plaintiffs' Interest

23.    Even assuming that the Lead Plaintiffs had advanced a valid cause to modify the automatic stay, the relevant considerations still weigh in favor of keeping the stay intact to preclude discovery of the Debtors in the Securities Litigation.

13

24.    Because of the unstructured nature of the issues that are often contemplated in lift-stay proceedings, certain courts have used a list of twelve factors when determining whether cause exists to modify or lift the automatic stay.  See, e.g., In re Curtis, 40 B.R. 795, 799-800 (Bankr. D. Utah 1984).  In Sonnax, the Second Circuit set forth the list of twelve factors that may be considered when deciding whether the stay should be lifted to allow litigation against a Debtor to continue in another forum:

> (1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

In re Sonnax Indus., 907 F.2d  at 1286.  All twelve factors may not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each of the twelve factors.  Burger Boys, Inc. v. South St. Seaport Ltd. Partnership (In re Burger Boys, Inc.), 183 B.R. 682, 688 (S.D.N.Y. 1994).

1.    The Balance Of Harms Weighs In The Favor Of The Debtors

25.    The Debtors and their estates would be greatly prejudiced if the automatic stay were modified to permit the Lead Plaintiff's requested discovery to proceed.  At this stage of these chapter 11 cases, Debtors are faced with numerous critical issues in connection with their transformation and reorganization plans.  Distractions in responding

14

to Lead Plaintiffs' discovery requests will force the Debtors to divert their attention from these critical tasks.

      (a)    <u>The Lead Plaintiffs Will Not Be Harmed If The Automatic Stay Is Not Modified</u>

26.    As discussed above, the Lead Plaintiffs contend that the "undue prejudice" found in the Michigan District Court shifts the balance of harm in their favor, and constitutes cause for lifting the stay.  The "unique circumstances" that led to the finding of "undue prejudice" in <u>Worldcom</u> were not present in the <u>Refco</u> case and are not present in this case.  <u>See Refco</u>, 2006 WL 2337217, at *3.  Neither the Michigan District Court nor this Court has ordered the Lead Plaintiffs to engage in coordinated settlement discussions with other plaintiffs in other proceedings not bound by the PSLRA stay.  As the <u>Refco</u> court noted, "Mere speculation about highly contingent possibilities of future prejudice does not demonstrate that lifting the stay is 'necessary . . . to prevent undue prejudice' that would otherwise result."  <u>Id.</u> at *3 (citation omitted).  Consequently, unlike the <u>Worldcom</u> case where settlement discussions were ordered, the Lead Plaintiffs will suffer no harm from "not keeping pace with the bankruptcy and the SEC action" (Mot. Supp. ¶ 20) if the automatic stay is not lifted to accommodate their discovery demands.

27.    Moreover, the Lead Plaintiffs' claim that they will be "left with nothing" is a red herring.  The Lead Plaintiffs are claimants in the Debtors' chapter 11 cases and will be entitled to a distribution from the Debtors' estates commensurate with their interests in these chapter 11 cases.  The Lead Plaintiffs do not need to liquidate their claim against the Debtors now.  The Lead Plaintiffs only risk "being left with nothing" if their prepetition claim lacks merit.  Again, the circumstances here are quite different than

Worldcom. The fact that Delphi has settled the SEC's claims poses no risk to the Lead

Plaintiffs because the SEC imposed no monetary fine or penalty on Delphi. The ability of

Delphi (and certain other defendants) to settle claims is not sufficient cause to lift the

automatic stay and does not cause undue prejudice to the Lead Plaintiffs. See Refco, 2006

WL 2337217, at *2. ("Under the PSLRA, discovery in this action has been stayed. That

stay does not apply to government investigations, bankruptcy proceedings, internal

investigations, or non-PSLRA actions. The discrepancy between PSLRA actions and other

actions is not evidence of undue prejudice, but rather is evidence of Congress's judgment

that PSLRA actions should be treated differently than other actions.").

> (b)    Responding To Discovery Requests Will Inequitably Harm The
>        Debtors

28.    Responding to the Lead Plaintiffs' requests will be more burdensome

than making some copies and printing some shipping labels. As discussed in the Papelian

Declaration and outlined below, the scope of the Lead Plaintiffs' discovery is exceedingly

broad and would seek production of documents that have not been specifically reviewed by

counsel to Delphi's Audit Committee, WilmerHale,[5] or produced to the SEC.

29.    Delphi's internal investigation collected an immense volume of

documents from numerous sources, including a vast amount of hard copy documents and

electronic information. When the SEC first contacted the Debtors, Mr. Papelian had the

computer back-up tapes for Delphi's headquarters delivered to his office. He later

---

[5]    On August 24, 2004, Delphi formally retained the outside law firm of WilmerHale to assist, among other
things, in the collection of documents and with Delphi's internal investigation. WilmerHale engaged
forensic accountants PricewaterhouseCoopers ("PwC") to assist in the collection of electronic files. On
October 5, 2004, the Audit Committee of Delphi's Board of Directors assumed responsibility for the
internal investigation.

16

provided these tapes to the Audit Committee's agents in connection with its internal investigation.

30.    The Debtors eventually issued more than a dozen internal document search memos in response to several SEC subpoenas.  After collecting more than 700,000 pages of documents and identifying those that were responsive, the Debtors produced, under the agreements between Delphi and the SEC, approximately 576,000 pages (some of which were privileged).

31.    The Audit Committee's agents also imaged the hard drives of computers belonging to 89 Delphi employees, e-mail files for 84 employees, and a subset of the back-up tapes mentioned above.  From these sources, the Audit Committee's agents created a database consisting of more than one million unique email items and more than 400,000 unique user files totaling more than 130 gigabytes of data.  General keyword searches identified 107,881 unique e-mails and attachments and specific keyword searches identified 37,492 unique e-mails and attachments.  The Debtors then produced to the SEC, under the terms of Delphi's agreement with the SEC, the responsive documents (which as mentioned above included certain privileged documents).

32.    As a separate and independent task, WilmerHale electronically culled documents from the complete database (i.e., the original database with more than 130 gigabytes of data) that were addressed to or from or copied an attorney, and the Debtors produced the remainder to the SEC (which accordingly included nonresponsive and irrelevant documents, as well as additional potentially privileged documents).

33.     An immense amount of information collected in connection with Delphi's internal investigation was nonresponsive and therefore never specifically reviewed by WilmerHale (or anyone else).  Similarly, WilmerHale personnel did not personally review the electronically-culled database given to the SEC and the vast majority of that database likely contains documents that are not relevant to the claims in the Michigan District Court action and some documents may raise issues of employee privacy or other confidentiality or privilege concerns.  The Lead Plaintiffs, however, seek discovery with respect to all of these items.

34.     The Lead Plaintiffs will undoubtedly assert that they are entitled to the same documents that the Debtors shared with the Statutory Committees.  The Lead Plaintiffs appear to be under the mistaken impression that the Statutory Committees and the SEC received identical sets of documents from the Debtors.  Not true.  A very limited set of documents was shared with the Statutory Committees.  Regardless of the volume of documents shared with the Statutory Committees, as the <u>Refco</u> court noted in the context of the PSLRA stay, "the mere fact that documents have been provided to a third party does not entitle plaintiffs to a modification of the stay to obtain those documents."  <u>Refco</u>, 2006 WL 2337217, at *2.

35.     As discussed above, the documents that Delphi collected and shared with the SEC were voluminous.  Moreover, many of the documents produced to the SEC were not reviewed for relevance, privilege, or privacy issues.  Needless to say, the review of the documents produced to the SEC and the documents collected for Delphi's internal investigation would be time consuming, expensive, and disruptive to the administration of

these cases.  In addition, members of Delphi's legal staff (with assistance from

WilmerHale) would necessarily need to be involved in the review of these documents.

These same Delphi personnel are also involved in administering the Debtors' estates and

formulating and negotiating the Debtors' transformation and reorganization plans. [6]

36.     In their Motion, the Lead Plaintiffs imply that that if discovery is

sought from a debtor, the automatic stay is modified as a matter of course.  (Mot. ¶ 9).  The

Lead Plaintiffs rely on Teledyne Indus., Inc. v. Eon Corp., 373 F. Supp. 191, 203

(S.D.N.Y. 1974), for the proposition that so long as the purpose of the stay is observed,

modification of the stay is warranted.  (Mot. ¶ 12).  The Teledyne ruling was later

distinguished in In re Johns-Manville Corp., 40 B.R. 219 (S.D.N.Y. 1984), which reasoned

that "Teledyne should not be read as indicating that discovery requests against the

bankrupt will invariably be granted . . . .  [Instead], requests should be upheld *only* when

such discovery will not interfere significantly with the Debtor's reorganization efforts."  Id.

at 223.   The Debtors would suffer prejudice if the Motion were granted because of the

distraction and interference to the Debtors' reorganization efforts that would flow from

allowing the litigation and discovery requests to proceed at these critical stages of these

chapter 11 cases.  In re U.S. Brass Corp., 173 B.R. 1000, 1006 (Bankr. E.D. Tex. 1994)

("When balancing the hardships in lifting the stay, the most important factor is the effect of

such litigation on the administration of the estate; even slight interference with the

---

[6]    The Debtors acknowledge that although a privilege and work product review of hard copy documents
produced to the SEC would also involve a substantial amount of work on the part of Delphi's internal
counsel, management, and external counsel, such a review would be less burdensome than the review of
all documents collected in Delphi's internal investigation.  For this reason, the production of the estates'
hard copy documents already produced to the SEC (other than those that are privileged or work product)
would limit the burden imposed on the Debtors by the Lead Plaintiffs' requests.

19

administration may be enough to preclude relief.") (citing <u>In re Curtis</u>, 40 B.R. 795, 806

(Bankr. D. Utah 1984)).

      2.    <u>Lifting The Stay Will Likely Protract The Securities Litigation</u>

      37.    Modification of the stay as requested by the Lead Plaintiffs will not

result in even a partial resolution of the Securities Litigation.  In fact, modification of the

stay ordering the Debtors to produce documents in accordance with the Partial

Modification Order entered by the Michigan District Court will likely produce a number of

disputes surrounding the scope of the documents to be produced to the Lead Plaintiffs.

Subject to the Reconsideration Motion, the Michigan District Court's Partial Modification

Order would allow the Lead Plaintiffs to obtain discovery, subject only to any claim of

privilege or attorney work product, of "materials produced by any of the Defendants in

conjunction with the internal investigation conducted by the Delphi Audit Committee of its

Board of Directors, represented by Wilmer Cutler, outside counsel, and

PriceWaterhouseCooper, forensic accountants."  (Partial Modification Order at 19.)  The

breadth of the Michigan District Court's order facially appears to permit discovery of the

vast category of documents collected in connection with Delphi's internal investigation, but

not produced to any third parties (because they were determined not to be relevant).

      38.    If the scope of discovery ordered by the Michigan District Court is

not clarified, the Partial Modification Order may inadvertently grant the Lead Plaintiffs

access to documents that have never been "produced" in any fashion to anyone beyond the

Company and its outside counsel.  Indeed, a large portion of the materials gathered in the

course of Delphi's internal investigations was deemed nonresponsive and therefore was

never specifically reviewed by WilmerHale (or PwC), let alone shared with the SEC or the Statutory Committees.

39.    Moreover, as the Debtors stated in their Initial Objection, lifting the stay may actually protract the litigation as the Lead Plaintiffs use the Debtors' documents to redraft a complaint that should otherwise be dismissed.  In their Motion Supplement, the Lead Plaintiffs contend that their reason for lifting the automatic stay is not fueled by a desire to reshape their complaint.  (See Mot. Supp. ¶ 16.)  That is simply not true.  Notwithstanding their assertions in their Motion Supplement, in the Leave to Amend Motion (Exhibit B), the Lead Plaintiffs argue that the PSLRA stay should be lifted, that they should be allowed access to documents provided to the Creditors' Committee and the SEC, and that they should be allowed "to amend the Complaint after an opportunity to review these documents."  (Leave to Amend Mot. at 12.)  The Lead Plaintiffs further allege that these documents (although not having been reviewed by the Lead Plaintiffs) will "reinforce" some of the Lead Plaintiffs' allegations.  (Id.)  The Lead Plaintiffs' true motivation for lifting the automatic stay—obtaining discovery to further amend their complaint—has been evident since the filing of their Motion in November 2005.

40.    The Lead Plaintiffs' desire to review all the documents produced to the Creditors' Committee and the SEC to bolster their complaint is not sufficient cause to lift the automatic stay.  As discussed above, the Debtors will suffer a significant prejudice if they are forced to produce the documents shared with the SEC and the Statutory Committees, many of which have not yet been reviewed for relevance or privilege and thus require review before any production to the Lead Plaintiffs.  The Lead Plaintiffs, on the

other hand, will be delayed in conducting discovery (as was intended by the automatic

stay) but will suffer no prejudice if the automatic stay remains in place.

3.    Relief From The Stay Will Not Resolve The Securities Litigation

41.    Bankruptcy courts have modified the stay to allow litigation to

proceed in another forum if that litigation was at a very advanced stage and trial was

imminent.  See In re Fernstrom Storage & Van Co., 938 F.2d at 737 (finding that "where

the stayed non-bankruptcy litigation has reached an advanced stage, courts have shown a

willingness to lift the stay to allow the litigation to proceed").  The theory behind cases

such as Fernstrom Storage is that the non-debtor would be prejudiced—whereas the debtor

would not be prejudiced—by proceeding with the non-bankruptcy litigation if the parties

were on the eve of trial when the debtor commenced its bankruptcy case.  See id. at 737

(finding that "the further along the litigation, the more unfair it is to force the plaintiff

suing the debtor-defendant 'to duplicate all of its efforts in the bankruptcy court.'").

42.    In stark contrast to the substantial prejudice that the Debtors would

suffer, the Lead Plaintiffs can not show that they would be prejudiced if the Motion were

denied.  The Lead Plaintiffs will face only the ordinary delay that all creditors face in

complex chapter 11 cases (and no more delay than is statutorily mandated in class action

litigation cases).  Creditor delay is inherent in the bankruptcy process, and is an

unavoidable—and intended—consequence of the automatic stay.

43.    The Lead Plaintiffs argue that the actions in the Michigan District

Court are no longer "nascent."  Although time has passed since the Securities Litigation

was commenced, the actions have not even progressed beyond the pleadings stage since

the Lead Plaintiffs filed the Motion in November 2005.  Delphi and the defendants have

filed motions to dismiss, but those motions remain pending in the Michigan District Court.

The parties in the Securities Litigation still remain nowhere close to being ready for trial.

It is obvious that the Securities Litigation remains in its infancy and there will be no

prejudice in continuing the automatic stay.[7]

    4. <u>Judicial Economy Will Not Be Served By Lifting The Stay</u>

    44. Relief from the stay does not guarantee an expeditious and

economical resolution of the Lead Plaintiffs' action.  In fact, the opposite will most likely

occur if the stay is lifted—with the Debtors litigating multiple issues in both this Court and

the Michigan District Court.  As noted above, without clarification of the Partial

Modification Order, the Debtors will likely be involved in significant disputes regarding

the scope of the discovery allowed in the Securities Litigation.  This outcome of

uncoordinated litigation on several fronts in different courts is what the automatic stay was

designed to avoid.  <u>See</u>, <u>e.g.</u>, <u>In re Chateaugay Corp.</u>, 93 B.R. 26, 30 (S.D.N.Y. 1988)

(noting that the automatic stay is intended to prevent "chaotic and uncontrolled scramble

for the debtor's assets in a variety of uncoordinated proceedings in different courts").

Consequently, the relief requested in the Motion should be denied.

III. The Fundamental Purpose Of The Automatic Stay
   <u>Would Be Violated If The Stay Were Modified</u>

    45. The fundamental purpose of the stay imposed by section 362(a)(i) of

the Bankruptcy Code is to provide a debtor with a breathing spell, by giving the debtor the

time and an opportunity "to attempt a repayment or reorganization plan."  <u>Borman v.</u>

---

[7] The Lead Plaintiffs state that the Securities Litigation is "now poised to proceed with particularized discovery, unhindered by the PSLRA stay." (Supp. Mot. ¶ 19.)  Judge Rosen limited the modification of the PSLRA stay, as described on pages 18 and 19 of the Partial Modification Order.

Raymark Indus., 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting H.R. Rep. No. 95-595, 95th

Cong., 1st Sess. 340 (1977)).  Section 362(a)(i), therefore, stays pending prepetition

litigation to "forestall the depletion of the debtor's assets due to legal costs in defending

proceedings against it," and "avoid interference with the. . . rehabilitation of the debtor."

Borman, 946 F.2d at 1036 (quoting Association of St. Croix Condominium Owners v. St.

Croix Hotel Corp., 682 F.2d 446, 448 (3d Cir. 1982)).

      46.     The Motion is clearly inconsistent with the fundamental purpose of

the automatic stay.  The Debtors' management and in-house legal team, in particular, are

already taxed with the responsibility of negotiating and formulating the Debtors'

transformation and reorganization plans.  As this Court is aware, the Debtors have made

significant progress in formulating a potential reorganization plan framework, but much

work remains to be done.  Modification of the automatic stay at this stage would force the

Debtors and several critical members of management to divert their attention from the

critical issues that require all of their time and energy in these stages of the Debtors'

chapter 11 cases.

Conclusion

      47.     For the reasons set forth above, the Motion should be denied.  The

Lead Plaintiffs have not demonstrated cause for lifting the automatic stay.  A balancing of

the competing interests of the Debtors and the Lead Plaintiffs demonstrates that the

automatic stay should not be modified to permit the Lead Plaintiffs to proceed with

discovery as requested in their Motion.  To the extent that this Court modifies the

automatic stay, to protect the estates from the undue burden imposed by the Lead Plaintiffs'

24

requests, the stay should be lifted at most only as to the estates' hard copy documents already produced to the SEC (other than those that are privileged or constitute work product).

<u>Memorandum Of Law</u>

48.      Because the legal points and authorities upon which this Supplemental Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an

order (i) denying the Motion and (ii) granting them such other and further relief as is just.

Dated:    New York, New York
          March 19, 2007

                              SKADDEN, ARPS, SLATE, MEAGHER
                              & FLOM LLP

                              By:    /s/ John Wm. Butler, Jr.
                                     John Wm. Butler, Jr. (JB 4711)
                                     John K. Lyons (JL 4951)
                                     Ron E. Meisler (RM 3026)
                              333 West Wacker Drive, Suite 2100
                              Chicago, Illinois 60606
                              (312) 407-0700

                                       - and -

                              By:    /s/ Kayalyn A. Marafioti
                                     Kayalyn A. Marafioti (KM 9632)
                                     Thomas J. Matz (TM 5986)
                              Four Times Square
                              New York, New York 10036
                              (212) 735-3000

                              Attorneys for Delphi Corporation, et al.,
                               Debtors and Debtors-in-Possession