# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN RE DELPHI SECURITIES, DERIVATIVE, § <br> AND ERISA LITIGATION § <br> § <br> This Document Relates to: In re Delphi § <br> Corporation Securities Litigation, § <br> No. 06-10026 § | MDL No. 1725 <br> Case No. 05-md-1725 <br> <br> Hon. Gerald E. Rosen |

**LEAD PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR LEAVE TO AMEND
THE CONSOLIDATED CLASS ACTION COMPLAINT AND FOR RELIEF FROM
<u>LOCAL RULE 15.1</u>**

**SULLIVAN, WARD, ASHER & PATTON, P.C.**
Debra Beth Pevos (P36196)
25800 Northwestern Highway Suite 1000
P.O. Box 222
Southfield, MI 48037
(248) 746-2800

*Liaison Counsel for Lead Plaintiffs*

| | |
|---|---|
| **NIX, PATTERSON & ROACH, L.L.P.** <br> Jeffrey J. Angelovich <br> Bradley E. Beckworth <br> Susan Whatley <br> 205 Linda Drive <br> Daingerfield, Texas 75638 <br> (903) 645-7333 | **SCHIFFRIN & BARROWAY, L.L.P.** <br> Michael K. Yarnoff <br> Sean M. Handler <br> Benjamin J. Hinerfeld <br> 280 King of Prussia Road <br> Radnor, Pennsylvania 19087 <br> (610) 667-7706 |
| **GRANT & EISENHOFER P.A.** <br> Stuart M. Grant <br> James J. Sabella <br> Sharan Nirmul <br> 45 Rockefeller Center <br> New York, New York 10111 <br> (212) 755-6501 | **BERNSTEIN LITOWITZ BERGER & GROSSMANN, LLP** <br> John P. Coffey <br> Hannah E. Greenwald <br> Matthew C. Moehlman <br> Elliott Weiss <br> 1285 Avenue of the Americas <br> New York, New York 10019 <br> (212) 554-1400 |

*Co-Lead Counsel for Lead Plaintiffs and the Prospective Class*

Lead Plaintiffs, the Oklahoma Teachers' Retirement System, the Public Employees' Retirement System of Mississippi, Stichting Pensioenfonds ABP and Raiffeisen Kapitalanlage-Gesellschaft m.b.H., respectfully submit this Brief in Support of Motion for Leave to Amend the Consolidated Class Action Complaint (the "Complaint") and for Relief from Local Rule 15.1.

## I. CONCISE STATEMENT OF ISSUES PRESENTED

1. Should Lead Plaintiffs be permitted to amend the Complaint (1) to remedy any pleading deficiencies in the Complaint, assuming *arguendo* that the Court concludes, in considering Defendants' motions to dismiss the Complaint, that there are such deficiencies in the Complaint; and (2) to address significant events that have occurred and new facts that have been uncovered since the Complaint was filed; where (3) amendment would not be futile and would be for good cause and without undue delay, improper motive, or undue prejudice to Defendants?

    Lead Plaintiffs respectfully submit that this question must be answered affirmatively.

2. Should Lead Plaintiffs be granted relief from Local Rule 15.1, which requires a party who moves to amend a pleading to attach the proposed amended pleading to the motion, except by leave of court, in an effort to avoid unnecessary amendments and where additional facts have been uncovered and significant events have occurred since the filing of the Complaint?

    Lead Plaintiffs respectfully submit that this question must be answered affirmatively.

## II. MOST APPROPRIATE AUTHORITY FOR THE RELIEF SOUGHT

The guiding law on this issue can be drawn from: Rule 15(a) of the Federal Rules of Civil Procedure; Rule 15.1 of the Local Rules; *Morse v. McWhorter*, 290 F.3d 795 (6th Cir. 2002); and *Foman v. Davis*, 371 U.S. 178 (1962).

## III. FACTUAL AND PROCEDURAL BACKGROUND

The factual basis underlying the instant action is contained in the Complaint, Lead Plaintiffs' Motion for Partial Modification of the PSRLA Discovery Stay that was filed on March 10, 2006, and in Lead Plaintiffs' letter to the Court of August 2, 2006.

### IV. NATURE OF RELIEF REQUESTED

Lead Plaintiffs filed their Complaint on September 30, 2005. Defendants moved to dismiss Lead Plaintiffs' allegations on March 10, 2006. For the reasons stated in Lead Plaintiffs' Omnibus Memorandum in Opposition to Defendants' Motions to Dismiss filed on May 12, 2006, Lead Plaintiffs believe Defendants' motions should be denied in their entirety. As such, it is uncertain at this time whether any amendment will be necessary. Thus, this is not a case where the plaintiffs realize, after several unsuccessful attempts, that their allegations are insufficient and are now desperately seeking to salvage the case. Rather, this is a situation where Lead Plaintiffs have filed one and only one complaint—a complaint that, as currently pleaded, they believe is sufficient and adequate. In the event that the Court denies Defendants' motions, there may be no need for Lead Plaintiffs to amend the Complaint.

However, Lead Plaintiffs are mindful of the fact that this Court has, in at least one prior securities fraud action, required the plaintiff to file a formal request for leave to amend prior to the time the Court ruled on a pending motion to dismiss. Accordingly, in an abundance of caution, Lead Plaintiffs respectfully request that if the Court concludes that any aspect of the Complaint is insufficient, Lead Plaintiffs be given leave to amend their complaint to cure any perceived deficiencies. Pursuant to Local Rule 15.1, however, Lead Plaintiffs respectfully request leave to postpone until after the Court's ruling on the pending motions the filing of any proposed amended complaint.

### V. LEAD PLAINTIFFS SATISFY THE LIBERAL STANDARD FOR AMENDMENT OF PLEADINGS UNDER RULE 15(A)

Federal Rule of Civil Procedure 15(a) provides that, after a responsive pleading has been served, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and **leave shall be freely given when justice so requires.**" Fed. R. Civ. P.

15(a) (emphasis added). The Federal Rules generally favor a liberal amendment policy, and a party's motion to amend its complaint should be denied only in situations where the amendment is futile or where there is undue delay, bad faith, dilatory motive, repeated failures to cure deficiencies by previous amendments, and undue prejudice to the non-moving party. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). Leave to amend is particularly appropriate in securities fraud cases should the complaint be found not to have alleged fraud with particularity. *Morse*, 290 F.3d at 800; *see also Miller v. Champion Enter., Inc.*, 346 F.3d 660, 689-90 (6th Cir. 2003); *In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.*, 271 F. Supp. 2d 1007, 1019, n.9 (E.D. Mich. 2003).

Here, amendment of the Complaint would not be futile; instead, amendment would be for good cause and without undue delay, improper motive or undue prejudice to Defendants. First, Lead Plaintiffs make this motion at an early procedural point in the case. Defendants' motions to dismiss remain *sub judice*. In addition to the fact that there has not been any judgment on the pleadings, discovery at the present time is stayed under the PSLRA. Accordingly, given the early procedural posture of the case, Lead Plaintiffs' motion cannot be considered dilatory.

Second, Lead Plaintiffs' request is not the product of bad faith; rather, as set forth below, this request is a direct response to numerous facts that have been revealed and significant events that have occurred since Lead Plaintiffs filed their Complaint. Nor is Lead Plaintiffs' proposed amendment futile. This is the first request to amend the Complaint (the first pleading filed by the court-appointed Lead Plaintiffs), and is made to incorporate the significant events that have occurred and the additional facts that have come (and continue to come) to light since the Complaint was filed. Significantly, this is not – as is often the case – a request to amend a

3

complaint after multiple, unsuccessful attempts to cure identified deficiencies.[1] Indeed, Lead Plaintiffs assert that the Complaint is sufficiently and adequately pled, and request amendment to capture post-Complaint facts and events and to address any potential pleading deficiencies identified by the Court.

Lastly, granting Lead Plaintiffs' motion to amend will not prejudice any Defendant. The parties have taken no discovery, nor have they undertaken any efforts or incurred expenses that the proposed amendment would likely moot. Indeed, Defendants will not be able to point to a single reason why amendment of the Complaint will cause them prejudice, nor can they demonstrate that Lead Plaintiffs possess a wasteful motive in seeking this relief. Moreover, and most importantly, Lead Plaintiffs may suffer extreme prejudice if the relief is not granted.

**A.   Should The Complaint Be Determined To Be Deficient, Amendment Would Permit Lead Plaintiffs To Address New Facts That Have Been Uncovered And Significant Events That Have Occurred Since The Complaint Was Filed**

  **1.   *The SEC's Complaint***

On October 30, 2006, the Securities and Exchange Commission ("SEC") filed civil fraud charges against Delphi and nine of its former executives, as well as four employees of outside firms for their alleged involvement in Delphi's massive accounting fraud. A true and correct copy of the SEC's Complaint is attached hereto as Exhibit A. Simultaneously, Delphi and six charged individuals settled with the SEC. Among those settling were former Chief Financial Officer (and Individual Defendant named in Lead Plaintiffs' Complaint) Alan Dawes, who reportedly agreed to pay $687,000 in fines and restitution. Delphi's agreement to settle the

---

[1] While the Sixth Circuit has noted that **repeated** amendments may frustrate the purpose of the PSLRA, allowing an amendment in the instant case would not have that effect because, among other things: this is Lead Plaintiffs' **first** request for leave to amend the Complaint; Lead Plaintiffs are making this request prior to any ruling on the pleadings; and, as set forth in detail above, Lead Plaintiffs are seeking the amendment to address the significant events that have occurred and the numerous new facts that have been (and continue to be) revealed since the Complaint was filed, and to address any pleading deficiencies, if dismissed.

charges against it will bar the Company from future violations of securities laws, but will not subject it to any financial penalties.

Significantly, though not surprisingly, the SEC's Complaint largely mirrors the allegations set forth in Lead Plaintiffs' Complaint. Relying upon some of the same confidential sources that Lead Plaintiffs had previously interviewed in formulating their Complaint, the SEC's Complaint spells out in great detail four primary fraudulent accounting transactions that are also detailed in Lead Plaintiffs' Complaint.[2] The evidence set forth in the SEC's Complaint further corroborates Lead Plaintiffs' specific allegations against the officers and directors named therein as well as BBK, Ltd. and Bank One. *Id.* Moreover, the SEC's Complaint reveals new information regarding the role of General Motors ("GM") and Electronic Data Systems ("EDS") in committing the accounting fraud that led to Delphi's Restatement. Any amended complaint filed by Lead Plaintiffs would reflect the specific facts alleged by the SEC in its Complaint.

### 2. *The Department of Justice's Investigation Continues*

In addition to the SEC's formal charges described above, the Department of Justice ("DOJ") continues its investigation into Delphi and its former officers and directors. *The Detroit News* reported on November 24, 2006 that federal prosecutors expect to decide by January whether to seek criminal charges against former Delphi executives involved in the fraud.

### 3. *Additional New Evidence Discovered by Lead Plaintiffs*

Even though Lead Plaintiffs assert that their Complaint is adequately and sufficiently pled, should the Court disagree, leave to amend would be appropriate to permit Lead Plaintiffs to

---

[2] Those transactions are: (1) the May 2000 warranty reserve increase and mislabeled warranty payment to General Motors (Delphi's former parent company); (2) the December 2000 sham transaction of precious metals to Bank One; (3) the December 2000 sham transaction of automotive batteries and generator cores to BBK (a financial consulting firm run by B.N. Bahadur); and (4) the fourth quarter 2001 mislabeled loan from EDS Corporation. All of these fraudulent transactions served to materially misstate Delphi's financial condition and mislead investors throughout the Class Period.

address the numerous facts that have been uncovered since the Complaint was filed. These new facts, discussed more fully below, both confirm and buttress Lead Plaintiffs' existing allegations, and further illuminate Delphi's fraudulent accounting practices and how Defendants directly participated in, knew about or recklessly disregarded Delphi's widespread fraud. For example, in the course of their continuing investigation, Lead Plaintiffs have conducted several interviews of individuals with relevant information regarding this matter, who have revealed such details as:

- Additional information regarding the Delphi/Bank One transaction, including that a high-ranking executive in Delphi's accounting department knew of and talked openly to other Delphi employees regarding Delphi's "selling and buying back inventory relating to the precious metals" transaction with Bank One and that, after Delphi closed its books for the year ended December 31, 2000, a Delphi executive reopened the books and made late journal entries relating to the sale of precious metals to Bank One following the closing;

- According to a former employee who worked in Delphi's accounting group, among other departments, the journal entries relating to the precious metals transactions are easily identifiable and recognizable as they were made after the close of Delphi's books. Specifically, this former employee stated: "If I were looking for anything wrong, I would look for the last entries that were recorded. I would go through what gets recorded first, what got recorded last. If you are looking for anything wrong I'd say it would be some of the last entries. There would have been one close and then everything was reviewed and additional entries were recorded;"

- Statements from Delphi employees confirming Lead Plaintiffs' allegations that Delphi was obligated to repurchase the precious metals inventory from Bank One at the year-end close or shortly thereafter; identification of Delphi executives who made the accounting determination of this transaction; and that Delphi's tax department struggled with the transactions as they related to the tax return; including one employee who questioned the way it was being booked;

- Statements from a former Delphi employee in a position to know that Delphi's auditor, Deloitte & Touche, LLP ("Deloitte"), should have flagged Delphi's late journal entries as they related to the sales of inventory and the re-purchase of this inventory in subsequent periods. In particular, this former Delphi employee explained that Deloitte in the first instance should have observed these late journal entries at or near in time to their entry, and in any event, should have noticed these entries in the next audit period;

- Additional information regarding Delphi's improper accounting of warranty payments to GM, including information from a former Delphi employee that the spin-

6

off agreement between GM and Delphi contained terms regarding warranty payment adjustments, and that "if you followed the terms, it came out that Delphi did not owe GM any money." This former employee stated that it was his understanding that Delphi ignored the terms of the agreement and used data from a different baseline year which then created "a huge amount that Delphi owed to GM." He explained that "you have to *not* follow the agreement to create the need for a pension adjustment and then you sort of mask the payment as an adjustment. The only way you owed money is if you used the wrong base year." (emphasis added). According to Lead Plaintiffs' continuing investigation, Defendants Free and Blahnik were involved in Delphi's accounting treatment for these warranty payments;

- Additional information regarding the Delphi/Setech transactions, including that the terms and conditions of these transactions were specifically authorized by Defendants Blahnik, Dawes and Free;

- Additional support for allegations regarding the fraudulent transactions between Delphi and EDS, including a statement by a former Delphi employee that he "was aware of some negotiations that were going on, something that smelled a little rotten from the standpoint of taking future discounts and giving some kind of an incentive from EDS;"

- Additional support for allegations regarding Delphi's fraudulent recording of a $20 million rebate as income at the time it was received from EDS in the fourth quarter of 2001, including a statement by a former Delphi employee that: "It got a little bit funny because they already took the $20 million as revenue and then how do you charge back against that? The accounting got a little bit funny and they started to squirm a little bit; Delphi then struggled to find a way to justify/explain the accounting activity as it related to the $20 million check;"

- Specific information regarding the $26 million "upfront money" Delphi received from EDS and the recording of the money as income at the time it was received despite the fact that the contract was a multi-year contract for services;

- Statements from Delphi employees confirming Lead Plaintiffs' allegations that the Delphi/BBK transaction was "clearly done for the purpose of increasing pretax income" and the identification of Delphi executives involved in the transaction;

- The identification of specific Deloitte employees responsible for auditing services provided to Delphi; and

- The identification of additional Delphi executives working in the financial reporting division.

These additional facts both corroborate and bolster Lead Plaintiffs' allegations against Defendants as set forth in the Complaint. Lead Plaintiffs intend to present these facts in

7

substantially greater detail in their amended complaint, if so allowed.

### 4. *Other Post-Complaint Events Have Altered the Landscape of This Case*

In October 2005, Delphi and substantially all of its active U.S. subsidiaries filed for relief pursuant to Chapter 11, marking the largest bankruptcy in U.S. automotive history.[3] Delphi's bankruptcy filing has necessarily changed the landscape of this case. Most significantly, the litigation has been stayed against the Company pursuant to the automatic stay, 11 U.S.C. § 362(a), while it is proceeding against all other non-debtor Defendants. At the time of filing the Complaint, Delphi was a primary focus of the Complaint's allegations regarding the scienter of Delphi as a company and its officers and directors. While Lead Plaintiffs maintain that the Complaint as presently pled sufficiently alleges claims against all Defendants, Delphi's bankruptcy filing has affected the manner in which Lead Plaintiffs would present their scienter allegations against the Officer and Director Defendants.[4]

Furthermore, additional relevant facts continue to come to light through the Bankruptcy Proceedings. For example, on November 22, 2006, Delphi filed a motion in the Bankruptcy Proceedings requesting the court to authorize its decision to <u>not</u> advance legal fees and costs to certain former Delphi officers, including John Blahnik and Paul Free, named defendants in this action. This motion was filed after Delphi's Compensation Committee determined that "it could

---

[3] Lead Plaintiffs have been actively involved in the Bankruptcy Proceedings. In addition to filing their Motion for a Limited Modification of the Automatic Stay and litigating that issue, Lead Plaintiffs objected to and litigated Delphi's Motion to Implement a Key Employee Compensation Program ("KECP") and Delphi's Application to Retain Deloitte & Touche, LLP as their Independent Auditors and Accountants. In conjunction with the KECP Objection, Delphi requested documents from Lead Plaintiffs going to Lead Plaintiffs' securities claims, and Lead Plaintiffs complied by producing all non-privileged documents sought by Delphi's requests. When Lead Plaintiffs in turn put the identical requests to Delphi, the Company invoked the PSLRA discovery stay.

[4] The Officer Defendants are Defendants Battenberg, Dawes, Free, Blahnik, Donald Runkle and John D. Sheehan. The Director Defendants are Defendants Susan A. McLaughlin, Roger S. Penske, Patricia Sueltz, Virgis W. Colbert, David N. Farr, Shoichiro Irimajiri, Dr. Bernd Gottschalk, Robert H. Brust, Oscar De Paula Bernardes Neto, John D. Opie and Cynthia A. Niekamp.

8

not in good faith pay advancements to former employees whose actions the Audit Committee found were linked to the restatement and all related negative consequences."

In addition, Lead Plaintiffs filed their Complaint in the Southern District of New York and thus pled their claims under prevailing Second Circuit law. On December 12, 2005, the MDL transferred this case to this Court for coordinated or consolidated pretrial proceedings with the actions already pending in this district. While Lead Plaintiffs maintain that the Complaint satisfies the pleading requirements of the Sixth Circuit, there are significant distinctions between Second Circuit and Sixth Circuit law in PSLRA cases, particularly regarding scienter pleading requirements.[5] An amendment would provide Lead Plaintiffs with an opportunity to plead this case specifically under Sixth Circuit law and also to account for Delphi's bankruptcy filing.[6]

---

[5] *Compare Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001) with *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 251 n.2 (S.D.N.Y. 2005) (expressly rejecting the "most plausible inference" doctrine set forth in *Helwig* in favor of continued application of the Second Circuit's "all reasonable inferences" standard). Defendant JP Morgan is well aware of this distinction in the circuit law, as it argued in favor of the most plausible inference doctrine in its motion to dismiss Lead Plaintiffs' Complaint in this case (*see* Docket No. 66 at 6-7), yet was faced with the same unsuccessful argument from the defendants in *Winnick*.

[6] Lead Plaintiffs should also be granted leave to file an amended complaint to the extent there has been further refinement of the standard for pleading scheme liability under Rule 10b-5(a) and (c), as articulated in recent decisions by the Eighth and Ninth Circuits in *In re Charter Communications, Inc. Sec. Litig.*, 443 F.3d 987 (8th Cir. 2006) and *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006), respectively, as well as by various district courts including the United States District Court for the Southern District of New York in *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428 (S.D.N.Y. 2006), the United States District Court for the Northern District of Texas in *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, __ F. Supp. 2d__, 2006 WL 2034461 (S.D. Tex. July 20, 2006) ("*Enron IV*") and the United States District Court for the Eastern District of Missouri in *Dutton v. D&K Healthcare Res.*, No. 4:04CV147SNL, 2006 WL 1778863 (E.D. Mo. June 23, 2006). While Lead Plaintiffs maintain that their present allegations against Bank One, BBK and Setech are sufficient and adequate, and satisfy the tests articulated in these recent decisions and, in particular, in *Charter* and *Simpson*, leave to amend is appropriately granted where there is an evolution in the law after plaintiffs have filed their complaint. *See Lundy v. Morgan Stanley & Co., Inc.*, No. C-90-2796 TEH, 1991 WL 23829, at *2 (N.D. Cal. July 18, 1991) (granting plaintiff's motion to amend); *Issen v. GSC Enters. Inc.*, 522 F. Supp. 390, 394 (N.D. Ill. 1981) (granting plaintiffs' motion to amend); *see also Gregory v. Harris-Teeter Supermarkets, Inc.*, 728 F. Supp. 1259, 1260 (W.D.N.C. 1990) (granting plaintiff's motion to amend). Moreover, although Defendant JPMorgan has argued that *Simpson* and *Enron* further limit liability under Rule 10b-5(a) and (c), Lead Plaintiffs believe, as set forth in their prior submissions, that the courts in both cases actually adopted a lower threshold for liability.

**B.    Lead Plaintiffs Should Be Allowed Access To Documents Produced
To Governmental Agencies, And Allowed Leave To Amend After Review,
But Prior To Ultimate Resolution Of The Motions To Dismiss**

As the Court is aware, Delphi, Delphi employees, GM, EDS, Bank One, Deloitte and BBK have all produced documents to the SEC and the Federal Bureau of Investigation ("FBI") pursuant to the federal investigations against them regarding Delphi's accounting practices. The SEC relied on these documents, which necessarily relate to these parties' relationship to Delphi, in its Complaint against Delphi and multiple former Delphi executives and several employees of outside firms. Lead Plaintiffs have made diligent efforts to obtain these previously produced documents. As discussed above, on November 15, 2005, Lead Plaintiffs filed a Motion for a Limited Modification of the Automatic Stay in the Bankruptcy Proceeding, seeking a narrow modification of the automatic stay to obtain from Delphi a copy of all documents and materials that Delphi has produced or provided in connection with the SEC and DOJ investigations or Delphi's internal investigation. Judge Drain granted Lead Plaintiffs' motion in part and entered an order permitting Lead Plaintiffs to seek relief in this Court from the discovery stay under the PSLRA. Judge Drain further ordered that upon entry of an order by this Court granting Lead Plaintiffs relief from the PSLRA stay, the remaining portion of Lead Plaintiffs' Motion shall be heard promptly thereafter by the Bankruptcy Court. *Id.*

Accordingly, on March 10, 2006, Lead Plaintiffs filed their Motion and Brief in Support of the Motion for Partial Modification of the PSLRA Discovery Stay. In that Motion, Lead Plaintiffs specifically requested entry of an order: (1) permitting Lead Plaintiffs to serve Defendants (other than Delphi) and certain third parties with discovery requests to produce evidence; and (2) permitting Lead Plaintiffs to return to Judge Drain in the Bankruptcy

10

Proceeding, seeking permission to serve Delphi, the debtor, with discovery requests to produce evidence that has already been produced to authorities.

Significantly, on July 27, 2006, as a result of its review of Delphi's confidential information, Delphi's Unsecured Creditors' Committee ("UCC") filed a motion in the bankruptcy court entitled, "Ex Parte Motion for an Order Authorizing the Official Committee of Unsecured Creditors to File Under Seal Exhibits to the Committee's Motion for an Order Authorizing it to Prosecute the Debtor's Claims and the Defenses Against General Motors Corporation and the Certain Former Officers of the Debtors."[7] In its motion, the UCC requested leave to file under seal a demand letter against GM and a complaint against certain of Delphi's officers and directors to recover damages that Delphi suffered due to their actions. The UCC stated that both the demand letter and the complaint were based upon its review of the documents previously produced to the SEC pursuant to its investigation of Delphi. Specifically, the UCC stated:

> In researching and preparing the Complaint, the Committee used, and the Complaint and Demand Letter contain, information produced by Debtors relating to ongoing investigations of the Debtors, including investigations by the Securities and Exchange Commission.

UCC's Motion at ¶ 5.

Thus, based on the UCC's assessment, the information and documents produced by Delphi to the SEC contain sufficient evidence to file a meritorious claim for relief against certain of Delphi's officers and directors.[8] Furthermore, these same documents served as the basis for the SEC's 79-page Complaint against Delphi and a host of former executives and outside

---

[7] A copy of the UCC's Motion and an Affidavit filed in support thereof are attached to Lead Plaintiffs' August 2, 2006 letter to this Court.

[8] Additionally, on September 5, 2006, Delphi's Equity Committee filed an objection to the UCC's Motion. In its objection, Delphi's Equity Committee stated that it has received access to the same documents that Delphi previously provided to the UCC.

11

employees involved in the fraud. Although Lead Plaintiffs have not obtained or reviewed these documents produced to the governmental entities and the UCC, at a minimum, these documents will undoubtedly reinforce Lead Plaintiffs' allegations of scienter regarding the Individual Defendants, the Audit Committee Defendants, Deloitte, Setech, BBK and Bank One. These documents most certainly will provide additional information regarding each of these Defendants' involvement in the fraudulent transactions identified in the Complaint. Thus, to avoid repeated amendments of the Complaint and to prevent Lead Plaintiffs from suffering severe prejudice, Lead Plaintiffs should be (1) provided access to the documents produced to the governmental agencies and the UCC, and (2) allowed leave to amend the Complaint after an opportunity to review these documents.

### C.  Lead Plaintiffs Will Suffer Extreme Prejudice If Leave To Amend Is Not Allowed

Lead Plaintiffs are likely to suffer extreme prejudice if the relief requested herein is denied. As the Court itself has noted, no party to this litigation stands to gain by precluding Lead Plaintiffs from fully fleshing out the factual issues and prematurely ending the case at a time when there is an abundance of documentary evidence supporting Lead Plaintiffs' claims to which they have not yet been allowed access. February 8, 2006 Transcript, Exhibit A to Lead Plaintiffs' Lift Stay Reply Brief at 29. Indeed, while remaining mindful of the purposes of the PSLRA, courts should be cautious not to terminate cases on a premature record, particularly in light of the formal criminal investigation being conducted in regard to Delphi's widespread fraud. *Id.* Lead Plaintiffs share this Court's view that the PSLRA contemplates "full opportunities...for plaintiffs to develop at least their pleadings to the point where they get a fair shot at making their best arguments." *Id.* at 30.

This is especially true in the event that the Court grants Defendants' motions to dismiss in part. Should the Court sustain part of the Complaint, the purposes of the PSLRA will not be

12

frustrated, and an amendment would be for good cause and not futile. "[T]he goal of the PSLRA was to prevent strike suits and costly discovery. Here, however, after surviving dismissal as to some [d]efendants, there is no fear that this is merely a baseless strike suit." *See Hayes v. Lemmerz Int'l*, 271 F. Supp. 2d 1007, 1019 n.9 (E.D. Mich. 2003) (citing *Champion*, 145 F.Supp.2d at 873). Further, to the extent that the Court sustains the allegations in the Complaint against certain Defendants, discovery will take place and may uncover specific facts implicating others. Should this occur, Lead Plaintiffs would seek to amend the Complaint to include the facts developed in discovery. *See id.* (finding that discovery would inevitably take place because the court sustained the complaint as to three defendants and that "[i]f discovery uncovers specific facts implicating KPMG acted with scienter, only then will KPMG be brought back into the suit."). For these reasons, Lead Plaintiffs will likely suffer extreme prejudice if they are not granted an opportunity to amend the Complaint.

### VI. PURSUANT TO LOCAL RULE 15.1, LEAD PLAINTIFFS REQUEST LEAVE OF COURT NOT TO FILE A PROPOSED AMENDED COMPLAINT WITH THE INSTANT MOTION

Local Rule 15.1 states that:

A party who moves to amend a pleading shall attach the proposed amendment to the motion. Any amendment to a pleading, whether filed as a matter of course or upon a motion to amend, must, except by leave of court, reproduce the entire pleading as amended, and may not incorporate any prior pleading by reference. Failure to comply with this Rule is not grounds for denial of the motion.

E.D. MICH. LOCAL RULE 15.1. Lead Plaintiffs respectfully request leave of Court not to file a proposed amendment with the instant motion as provided by Local Rule 15.1. Lead Plaintiffs request this exception for several reasons.

First, Local Rule 15.1 expressly authorizes a plaintiff to seek leave of court not to file a proposed amendment concurrently with a motion for leave to amend. The Rule also states that the failure to attach a copy of the proposed amended complaint is not grounds for denial of the

13

motion for leave to amend. Thus, Local Rule 15.1 clearly contemplates the relief requested by Lead Plaintiffs.

Also, as demonstrated in greater detail above, additional facts continue to be revealed and discovered since the time Lead Plaintiffs filed their Complaint. Indeed, in the fourteen months since Lead Plaintiffs filed their Complaint, Delphi filed for bankruptcy protection, almost all of the current defendants produced documents to and/or were interviewed by the SEC and/or DOJ, the SEC has filed an enforcement action against numerous defendants in this case, and several of those same defendants have now settled with the SEC. Moreover, in the last week at least one newspaper has reported that criminal indictments are likely forthcoming. Given these factual developments and the rapidly changing landscape of this case, it would be a waste of judicial resources if Lead Plaintiffs were required to file an incomplete amendment now only to have to request further amendments as additional facts and information come to light through Lead Plaintiffs' and the federal regulators' continued investigations.

Last, in the event the Court grants Lead Plaintiffs' Motion for Partial Modification of the PSLRA discovery stay, Lead Plaintiffs would need sufficient time to obtain and review the documents previously produced to the governmental agencies. Allowing Lead Plaintiffs time to complete their review of such documents will further eliminate the need for repeated, unnecessary amendments.

Accordingly, Lead Plaintiffs respectfully request relief from Local Rule 15.1's requirement that a copy of the proposed amended complaint be attached to this motion.

### V. CONCLUSION

For the reasons set forth above, Lead Plaintiffs respectfully request that the Court grant their Motion for Leave to Amend the Consolidated Class Action Complaint and for Relief from Local Rule 15.1.

Dated: 11/28/06

Respectfully Submitted,

SULLIVAN, WARD, ASHER & PATTON, P.C.

By: /s/ Debra Beth Pevos
Debra Beth Pevos (P36196)
25800 Northwestern Highway, Suite 1000
P.O. Box 222
Southfield, MI 48037
(248) 746-2800
dpevos@swappc.com

*Liaison Counsel for Lead Plaintiffs*