**Hearing Date: March 22, 2007, 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                   :
    In re                           :         Chapter 11
                                   :
DELPHI CORPORATION, et al.,     :         Case No. 05-44481 (RDD)
                                   :
                 Debtors.      :         (Jointly Administered)
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO SECOND
SUPPLEMENT TO KECP MOTION (DOCKET NO. 213) SEEKING
AUTHORITY TO CONTINUE AIP FOR FIRST HALF OF 2007

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this omnibus reply to the objections to the Second Supplement To KECP Motion (Docket No. 213) Seeking Authority To Continue AIP For First Half Of 2007, dated March 12, 2007 (Docket No. 7200) (the "Second Supplement") filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") (Docket No. 7325), the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America ("IUE-CWA") (Docket No. 7335), the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers, International Union, AFL-CIO ("USW") (Docket No. 7326), and the International Brotherhood of Electrical Workers Local Union No. 663 ("IBEW"), the International Association of Machinists and Aerospace Workers, Tool and Die Makers Local Lodge 78, District 10 ("IAM"), and the International Union of Operating Engineers Locals 18S and 832S ("IUOE") (Docket No. 7324), all dated March 19, 2007.[1]

Preliminary Statement

1.  The Debtors filed the Second Supplement on March 12, 2007, ten days before the omnibus hearing scheduled for March 22, 2007, with the consent of the Official Committee of Unsecured Creditors (the "Creditors' Committee"). The Debtors received four objections before the objection deadline on March 19, 2007—one each from the UAW, the IUE-CWA, and the USW, and one covering the IBEW, the IAM, and the IUOE.[2] With the exception

---

[1] Capitalized terms not separately defined here have the meanings ascribed to them in the Second Supplement.

[2] A chart summarizing the unions' objections and the Debtors' responses is attached to this omnibus reply as Exhibit A.

2

of these labor unions, and in contrast with the Debtors' proposals to implement the short-term annual incentive plan (the "AIP") in the first and second halves of 2006, no other party has filed an objection to the Second Supplement.

    2.  Most of the allegations raised by the unions are replays of arguments that were considered and rejected by this Court in connection with the Debtors' previous AIP programs. These include the contention that the Debtors should not be permitted to continue the AIP because they did not consult with the unions before filing the Second Supplement,[3] that continuing the AIP is inappropriate in light of the Debtors' labor-transformation objectives and will make it more difficult to reach a consensual agreement with the unions,[4] that the AIP constitutes an improper retention program,[5] that continuing the AIP now is inappropriate because a portion of the performance period has already elapsed,[6] and that the Debtors should defer

---

[3] While not subjected to the individual review of every Delphi stakeholder (including each of the objecting unions), the Second Supplement was vetted with and approved by two independent groups: the Compensation Committee of Delphi Corporation's Board of Directors (the "Compensation Committee") (which has such authority and responsibility under applicable Delaware law) and the Official Committee of Unsecured Creditors (the "Creditors' Committee") (as an independent statutory committee charged with representing the interests of all general unsecured creditors and on which two of the objecting unions serve).

[4] The unions would have the Bankruptcy Court conclude that it is not possible to negotiate appropriate and competitive hourly collective bargaining agreements unless the Bankruptcy Court first takes away from salaried employees their reasonable and competitive incentive programs which are indisputably an integral element of their direct compensation programs. That cannot be a result which constitutes a reasonable business judgment on the part of the Debtors and is inconsistent with earlier findings of this Court.

[5] Unlike "pay for stay" retention programs, the AIP program outlined in the Second Supplement provides incentive compensation only upon the achievement of performance targets vetted with and approved by the Compensation Committee and the Creditors' Committee.

[6] Like each of the two prior semi-annual AIP programs, the Second Supplement reaches the Bankruptcy Court for approval during the performance period because of the time and effort devoted to reviewing the Debtors' 2007 business plan and the corresponding AIP performance targets with the Compensation Committee and the Creditors' Committee. As this Court might expect, the AIP performance targets were established by the Debtors without the benefit of actual performance period results and then the AIP payout curves were negotiated with the Creditors' Committee. In that context, visibility into actual performance during the first quarter of 2007, while positive to the 2007 Business Plan, is irrelevant: just as no one would countenance the Debtors relaxing the AIP performance targets in the face of actual performance below targeted 2007 expectations neither should the Debtors' salaried employees be penalized because their contributions appear to be trending towards actual performance positive to those expectations. Moreover,

*(cont'd)*

3

implementation of the AIP until the conclusion of these chapter 11 cases.[7] As this Court has explained in its prior rulings, these arguments do not detract from the Debtors' reasonable business judgment that continuing the AIP is a necessary step toward achieving competitive compensation opportunities for the Covered Employees, and that the AIP offers appropriate incentives to Covered Employees to achieve the corporate- and division-level performance targets derived from the Debtors' Preliminary Business Plan.

3.  The remainder of the unions' arguments are directed toward alleged deficiencies in the Preliminary Business Plan or the AIP's terms and conditions—namely, that the Preliminary Business Plan includes inaccurate assumptions regarding a labor transformation and support from General Motors Corporation ("GM"), that the Debtors have provided insufficient detail with respect to adjustments based on the outcome of negotiations with the unions and GM, and that the financial targets proposed by the Debtors are inappropriate because they are subject to adjustments by the Debtors. In fact, however, in implementing the AIP for the first half of 2007, as was the practice for the prior AIP periods, the Debtors will calculate AIP performance such that performance improvements solely related to union and GM transformation contributions will be eliminated. As for the performance targets, any adjustments

---

*(cont'd from previous page)*
in order to achieve the support of the Creditors' Committee for the Second Supplement, the Creditors' Committee required that the AIP payout curves be adjusted to increase the amount of performance in excess of plan to achieve various levels of increased incentive performance payouts. (The Second Supplemental AIP Order attached to this omnibus response as <u>Exhibit B</u> includes payout curves and corrected tables to the payout curves which were revised to eliminate typographical errors not material to the actual payout curves.)

[7]   As previously announced on the record at the January 2007 omnibus hearing, the Debtors have already taken the KECP-EIP (emergence program) off the calendar and intend to incorporate that program as part of an overall competitive executive compensation program design into the Debtors' joint plan of reorganization. As a result, both this Court and the Debtors' stakeholders will be able to evaluate the emergence cash and equity incentive programs in the context of the overall plan of reorganization in the chapter 11 cases. However, not only would it not make any rationale business sense to defer the establishment of the Debtors' semi-annual KECP-AIP incentive performance programs until some point following the performance periods, it would also deprive the Debtors' salaried employees of an integral element of their compensation program design.

will be limited to the division-level targets based on the Debtors' allocation of income and expense among divisions as part of their normal budgeting process.[8]

Responses To Objections

A.    The Debtors Have Vetted The AIP With Independent Constituencies And Are Not Obligated To Consult With The Unions Before Seeking To Continue The AIP.

    4.    Several unions argue that it would be improper to grant the Debtors' request for authority to continue the AIP for the first half of 2007 because the Debtors did not consult them about the AIP before filing the Second Supplement.[9] As explained in the Second Supplement, however, the Debtors did vet the AIP's terms and conditions with independent entities that do not include a single person eligible for incentive compensation under the AIP, including Delphi's compensation consultant, Watson Wyatt Worldwide, the Compensation Committee of Delphi's Board of Directors (the "Board"), and the Creditors' Committee, together with its financial advisors and compensation consultant. (See Second Supplement ¶¶ 9-12.) This vetting process, which is the same as the vetting process used by the Debtors in connection with the AIP as implemented in the first and second halves of 2006, is more than adequate to overcome any suggestion that the AIP is tainted by any improper self-dealing.[10] In light of the

---

[8]    The Creditors' Committee was notified of these potential mechanical adjustments before the Debtors filed the Second Supplement. Furthermore, the Debtors have agreed to review the AIP payout calculations with the Creditors' Committee at least ten business days prior to making any AIP payments to the Covered Employees.

[9]    The IBEW, IAM, and IUOE also take issue with the fact that the Debtors did not share the Preliminary Business Plan with them before the filing. On March 20, 2007, the Debtors distributed to all of the unions a presentation to the Creditors' Committee that details the Preliminary Business Plan's forecasts for the first half of 2007.

[10]    At the hearing on the AIP for the first half of 2006, this Court noted in particular the important role played by the Creditors' Committee in reviewing the AIP, stating:

> The official creditors' committee, which . . . is properly representative of the various constituencies in this very large case, spent a great deal of time reviewing the originally proposed annual incentive plan and negotiating its terms, and it has done so not only with

*(cont'd)*

vetting performed by these independent entities, there is no basis for the unions' argument that the Debtors must perform the additional step of consulting the unions before seeking to continue the AIP.

B.  The Unions' Concerns Regarding Shared Sacrifice And Collective Bargaining Do Not Defeat The Debtors' Reasonable Business Judgment To Continue The AIP.

5.  All of the unions contend that it is inappropriate for the Debtors to continue the AIP while at the same time it seeks to reduce its labor costs and achieve a labor transformation, and that granting the Debtors the relief they seek will make it more difficult to achieve a consensual resolution of labor issues. This Court has addressed both arguments before. With respect to the notion of shared sacrifice, for example, this Court has long recognized that the AIP and the Debtors' efforts to reduce labor costs are logically consistent in that both are essential to the Debtors' broader objective of instituting competitive compensation practices across their entire workforce. As for the notion that continuing the AIP will impede a consensual resolution of labor issues, it is the Debtors' view that the prospects for an agreement depend on the terms and conditions of the labor proposals presented to the unions, and not ancillary matters

---

*(cont'd from previous page)*

> the expertise of its counsel and its members, but also its own human resources/executive compensation consultant, and it has concluded that it agrees with the debtors that, as far as the level of compensation and the targets and the measures for awarding an annual incentive for this period, that is the six month period, the plan is reasonable and satisfies its own business judgment.

(Docket No. 3414 at 242-43.) The Creditors' Committee has reached the same conclusion with respect to the AIP for the first half of 2007.

6

such as the AIP. This Court summarized these points in its ruling at the hearing on February 10, 2006, when it explained:

> It is very hard to ask someone to make a substantial give-up, when you yourself have just received the right to obtain a bonus. And it, at a minimum, takes at least in practical terms, I would think, at least 10 minutes of explaining in any meeting where that issue's raised, if someone's willing to listen, why the fate of one, the bonus, should not really be tied to the other, and, in fact, that the request for the concession is thematically, actually related to the other, in the sense, that they're both intended to make the debtor more competitive. Nevertheless, I believe that anyone negotiating in good faith with the debtors, would ultimately have to accept that explanation. And, I think that the debtors' unions, their advisors, and the rank and file, are, first, smart enough to make the argument, the inevitable argument, and, second, smart enough also to understand the debtors' and my response.

(Docket No. 3414 at 249-50; accord id. at 102-03, 158-59; Docket No. 4996 at 100.)

      6.     The competitiveness rationale is particularly compelling here because none of the unions have disputed the fact that, without the incentive-compensation opportunities available under the AIP, the Debtors' executive-compensation structure ranks in the bottom 25% when compared to the compensation opportunities offered by Delphi's peers. (See Second Supplement ¶ 13.) It is also important to remember that the AIP was part of the Covered Employees compensation structure before the Debtors filed their voluntary petitions. As such, authorizing the Debtors to continue the AIP will merely restore an element of executive compensation that was available to the Covered Employees prepetition and move the Debtors' toward a market-competitive compensation structure. (See Exhibit C to this omnibus reply.)

      7.     With respect to the impact of the AIP on labor negotiations, the unions have objected each time the Debtors have sought authority to implement competitive semi-annual incentive programs. However, since this Court issued its Order Under 11 U.S.C. §§ 105 And 363 Authorizing The Debtors To Implement A Short-Term Annual Incentive Program (Docket No. 2441) (the "AIP Order") on February 17, 2006, there has been substantial progress toward a consensual resolution of the Debtors' labor transformation issues, including the

agreement among the Debtors, the UAW, and GM on a special attrition program in March 2006 and a supplement to that program in June 2006, and the agreement among the Debtors, the IUE-CWA, and GM on a similar special attrition program in June 2006.  The Debtors also voluntarily suspended their Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements And Under 11 U.S.C. § 1114(g) Authorizing Modification Of Retiree Welfare Benefits (Docket No. 3035) (the "Section 1113 And 1114 Motion") in January, 2007 in connection with this Court's approval of the Debtors' Expedited Motion For Order Authorizing And Approving The Equity Purchase And Commitment Agreement Pursuant To Sections 105(a), 363(b), 503(b) And 507(a) Of The Bankruptcy Code And The Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), And 1125(e) Of The Bankruptcy Code (Docket No. 6179).

    8.  The fact that there has been significant movement toward a consensual resolution since this Court issued the AIP Order undercuts the unions' argument that continuing the AIP for an additional six-month period will stall negotiations.  As this Court noted at the hearing on February 10, 2006, it is hard to accept that "the mere fact that an executive is getting more money is going to . . . be the deciding factor here."  (Docket No. 3414 at 103.)

C.  The AIP Is Not Subject To The Bankruptcy Abuse Prevention And Consumer Protection Act Of 2005 And, In Any Event, Does Not Constitute A Retention Program.

    9.  Several of the unions characterize the AIP as a retention program, and go on to argue that it would be inappropriate to implement a retention program here, either because of alleged defects with retention programs in general, the particular facts and circumstances of this case, or the new restrictions on retention programs established by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (the "BAPCPA").  As a threshold matter, because the Debtors commenced these chapter 11 cases before the BAPCPA's general effective

8

date of October 17, 2005, the BAPCPA's restrictions on retention programs do not apply here. More importantly, as this Court expressly found at the AIP hearing in July 2006, the AIP "is not a [r]etention o[r] severance program." (Docket No. 4996 at 102.)

10. Although all elements of compensation induce employees to remain employees to some degree, the AIP does not constitute the kind of pay-to-stay program that one typically associates with a retention program. The AIP does not offer Covered Employees any compensation opportunities whatsoever for merely remaining in the Debtors' employ. Instead, the AIP provides opportunities for incentive compensation, but only when the Debtors achieve or exceed their corporate- or division-level performance targets. And even if the Debtors do reach or exceed those targets, each Covered Employee who is eligible to receive incentive compensation must undergo a review of his or her individual performance, with the potential for downward adjustments of incentive compensation to zero if the Covered Employee is designated a poor performer or otherwise fails to meet expectations.

11. Given that the incentive-compensation opportunities provided under the AIP are contingent upon the Debtors' financial performance and each Covered Employee's individual performance, the AIP is not a retention program. Accordingly, the unions' criticisms of retention programs and their assertions that such a program is unnecessary in light of the facts and circumstances of this case do nothing to advance their objections to continuing the AIP for the first half of 2007.

D.  The AIP Provides Covered Employees With Appropriate Incentives Despite The Fact That A Portion Of The Performance Period Has Already Elapsed.

12. In its objection, the IUE-CWA points out that the hearing on the Second Supplement will occur some twelve weeks into the six-month performance period at issue here. Based on this timing, the IUE-CWA asserts that it is all but certain that the Debtors will achieve

9

their performance targets for the first half of 2007, and that the AIP cannot have any incentive effect with respect to the weeks that have already past. The timing of the Debtors' filing of the Second Supplement (and the contested hearing) was driven largely by the Debtors' strong desire to complete their AIP discussions with the Creditors' Committee and obtain the Creditors' Committee's support before filing the Second Supplement, which happened in early March 2007. The Debtors filed the Second Supplement as soon as practicable thereafter, on March 12, 2007.

13. There is no evidentiary basis for the IUE-CWA's contention that the timing of the Second Supplement makes the AIP's performance targets easy to achieve. This Court should reject the IUE-CWA's argument for that reason alone. See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (explaining that, under section 363(b) of the Bankruptcy Code, an objector "is required to produce some evidence respecting its objections"); In re Enron Corp., 335 B.R. 22, 28 (S.D.N.Y. 2005) (same). Moreover, the IUE-CWA's unsupported position that the performance targets are too low is inconsistent with the considered conclusions of the Compensation Committee and the Creditors' Committee (of which the IUE-CWA is a member), both of which determined that the performance targets were set at an appropriate level.

14. With respect to the incentive effect of the AIP, the hearing on the Debtors' previous AIP proposals also took place when the performance periods were underway. The contested hearing on the Debtors' request to implement the AIP for the first half of 2006 was held on February 10, 2006, approximately six weeks into the performance period, and the hearing on continuing the AIP for the second half of 2006 was on July 19, 2006, approximately three weeks into the performance period. Not only does the IUE-CWA's assertion that the timing of the Second Supplement prevents the AIP from having any meaningful incentive effect conflict with the judgments reached by the Compensation Committee and the Creditors'

10

Committee, but the position also ignores the practical reality that the Covered Employees have been managing the Debtors continuously during the performance period with the objective of maximizing business enterprise value for all of the Debtors' stakeholders. The implication of the IUE-CWA's argument—that the Covered Employees would wait until after the Court's approval of the Second Supplement to seek to perform in the best interests of the Debtors' estates—should be soundly rejected by this Court.

E.      There Is No Legitimate Reason To Defer The AIP Until The Conclusion Of These Cases.

15.     Some of the unions propose that the Debtors defer implementation of the AIP until the conclusion of these chapter 11 cases. While this position might have some logic and rationale with respect to the KECP-EIP emergence programs (which have already been taken off calendar and incorporated into the plan of reorganization process), the unions have not offered any legitimate reason for such a delay with respect to the Second Supplement. The unions sought to defer the Debtors' implementation of the AIP on February 10, 2006, arguing that granting the Debtors' request on the eve of a then-existing deadline to file a motion under sections 1113 and 1114 would derail labor negotiations. The unions also sought to defer the AIP at the hearing on July 19, 2006, when the Debtors and the unions were still litigating the Section 1113 And 1114 Motion. The fact that some unions are urging deferral now, when litigation regarding the Section 1113 And 1114 Motion has been suspended indefinitely, suggests that the unions will always favor deferring the AIP, without regard to the facts and circumstances as they exist at that time.

16.     This Court identified this very problem at the hearing in February 2006, when it rejected the argument that the hearing on the Debtors' request for authority to implement the AIP for the first half of 2006 should be adjourned in light of the impending deadline to file a motion under sections 1113 and 1114. The Court explained:

11

> it appears to me that if I did not approve this AIP today, I would be approving it at some point, because it is reasonable. I don't really see a logical reason to defer that beyond the inevitable push back that the debtors would receive. [T]hey would receive that push back inevitably, I believe, at any time.

(Docket No. 3414 at 250; accord id. at 162 (stating, "I hope that a request for an adjournment is not just putting off the day when people have to do explaining").)

F.     The Unions' Objections To The AIP's Terms And Conditions Are Not Well-Founded.

17.    In addition to the procedural and general objections discussed above, a number of the unions also raise two specific arguments regarding the terms and conditions of the AIP. The first, presented by the UAW, the IBEW, the IAM, and the IUOE, challenges the Preliminary Business Plan's assumptions regarding a labor transformation and support from GM and the nature of any adjustments under the AIP if the actual outcome of the negotiations with the unions and GM differ from those assumptions. The Preliminary Business Plan does assume that the Debtors will achieve a labor transformation and benefit from support obligations undertaken by GM effective January 1, 2007, and it is obvious that those events have yet to occur. This does not mean, however, that the Preliminary Business Plan is inadequate for purposes of establishing AIP performance targets, or that the Covered Employees will be eligible for incentive compensation based on assumed or actual savings resulting from the Debtors negotiations with the unions and GM.

18.    The assumed costs and savings associated with the labor transformation and GM support are built into the Preliminary Business Plan and the AIP performance targets. To the extent that the costs and savings actually achieved by the Debtors differ from those assumptions, the Debtors will adjust EBITDAR (at the corporate level) and OIBITDAR (at the division level) to negate the impact of any such difference under the AIP. The critical point is that this adjustment leads to the same outcome that would arise if the net savings were not

12

included in the AIP target or the Debtors' results in the first instance. Thus, there is no functional difference between using EBITDAR-UG and OIBITDAR-UG in setting the AIP targets and measuring the Debtors' financial performance (as the Debtors did in prior periods), on the one hand, and making the adjustment described above, on the other. Both methods ensure that Covered Employees do not receive incentive compensation under the AIP because of savings achieved as a result of the Debtors' ongoing negotiations with the unions and GM.

19. The second objection directed at the terms and conditions relates to the Debtors' performance targets. In the Second Supplement, the Debtors explained that the division-level AIP targets are subject to adjustments based on the Debtors' allocation of income and expense among the divisions in the ordinary course of business. (See Second Supplement ¶ 7 n.6.) Seizing on this disclosure, the IBEW, the IAM, and the IUOE assert that the Debtors are seeking the "authority to institute an AIP . . . based on targets which will be set at Debtors' discretion, without further court review." (Docket No. 7324 ¶ 24.)

20. Contrary to the unions' argument, the adjustments referenced in the Second Supplement are not matters of discretion, but instead are mechanical alterations that flow from the Debtors' normal business practice of allocating income and expense items to the appropriate division. Those items are not included in the division-level performance targets submitted to this Court because the allocation process will not be completed until later in the performance period (the corporate-level target will not change). The only alternative to this approach would be to strip out the allocated income and expense items at the end of the first half of 2007, a process that is far more burdensome than adjusting the targets and yet would achieve no additional benefit to the Debtors, their estates, their creditors, or the parties here. In addition, the Debtors notified the Creditors' Committee and its professional advisors of this issue during

13

their AIP discussions, and have committed to reviewing any adjustment with the Creditors'

Committee as soon as they become available.

Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter a Second Supplemental AIP Order in substantially the form of that attached to this omnibus response as Exhibit B and grant the Debtors such other and further relief as is just.

Dated: New York, New York
March 21 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP

By: /s/ John Wm. Butler, Jr.
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan, III (AH 8807)
Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By: /s/ Kayalyn A. Marafioti
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession