IN THE UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

In re                      :    Chapter 11
                                 :

DELPHI CORPORATION, et al.,   :    Case No. 05-44481 (RDD)
                               :

                 Debtors.   :    (Jointly Administered)
                               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AFFIDAVIT OF SERVICE

I, Evan Gershbein, being duly sworn according to law, depose and say that I am employed by Kurtzman Carson Consultants, LLC, the Court appointed claims and noticing agent for the Debtors in the above-captioned cases.

On March 16, 2007, I caused to be served the document listed below upon the parties listed on Exhibit A hereto via overnight delivery:

    1)  Debtors' Supplemental Reply With Respect to Proof of Claim No. 7907 (Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.) ("Supplemental Reply - Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.) (Docket No. 7299) [a copy of which is attached hereto as Exhibit B]

On March 16, 2007, I caused to be served the document listed below upon the parties listed on Exhibit C hereto via overnight delivery:

    2)  Debtors' Amended Supplemental Reply With Respect to Proof of Claim No. 9956 (Joseph Reno) ("Amended Supplemental Reply - Joseph Reno") (Docket No. 7302) [a copy of which is attached hereto as Exhibit D]

Dated: March 22, 2007

                                  */s/ Evan Gershbein*
                                  Evan Gershbein

Subscribed and sworn to (or affirmed) before me on this 22nd day of March, 2007, by Evan Gershbein, personally known to me or proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature:   */s/ Sarah Frankel*

Commission Expires:   *12/23/08*

# EXHIBIT A

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|
| Davis, Polk & Wardwell | Donald Bernstein Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | Debtors |
| Don Erickson | | 7668 El Camino Real Suite 104 | No 627 | La Costa | CA | 92009 | Counsel for Yilmaz |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler Bonnie Steingart Vivek Melwani Jennifer L Rodburg Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | Counsel to Equity Security Holders Committee |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher Richard Duker Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | Counsel to Official Committee of Unsecured Creditors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | Counsel to the Debtor |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | Counsel to United States Trustee |
| Yilmaz Sahinkaya Structural Mechanics Analysis Inc. | Yilmaz Sahinkaya | P.O. Box 700910 | | San Jose | CA | 95170 | Company |

# EXHIBIT B

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.Delphidocket.com


UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
            In re                             :        Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :        Case No. 05-44481 (RDD)
                                              :
                                              :        (Jointly Administered)
                                              :
                        Debtors               :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOF OF CLAIM NO. 7907
(Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.)

("SUPPLEMENTAL REPLY – Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.")

Delphi Corporation and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submits their Supplemental Reply With Respect To Proof Of Claim No. 7907 (Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.) (this "Supplemental Reply"), and respectfully represent as follows:

<u>Introduction</u>

1.      Yilmaz Sahinkaya Structural Mechanics Analysis, Inc. ("Yilmaz SMA") filed Proof of Claim No. 7907 (the "Proof of Claim") on or about June 13, 2006.  The Proof of Claim asserts an unsecured nonpriority claim in the amount of $42,000 (the "Claim").

2.      The Debtors objected to the Claim pursuant to the Debtors' (i) Fifth Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007 To Certain (a) Claims With Insufficient Documentation and (b) Claims Not Reflected on Debtors' Books and Records (Docket No. 6100) (the "Fifth Omnibus Claims Objection"), which was filed on December 8, 2006.

3.      On January 3, 2007, Yilmaz SMA filed a Response to Debtors' Fifth Omnibus Objection To Its Claim No. 7907 (Docket No. 6421) (the "Response").

4.      On February 14, 2007, the Debtors filed their Statement of Disputed Issues With Respect to Proof of Claim 7907 (Yilmaz SMA) (Docket No. 6954).

5.      On February 21, 2007, the Debtors and Yilmaz SMA, with their legal counsel, conducted a telephonic meet and confer pursuant to the Order Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 2002(m), 3007, 7016, 7026, 9006, 9007, and 9014 Establishing (i) Dates for Hearings Regarding Objections to Claims and (ii) Certain Notices and Procedures Governing Objections to Claims (Docket No. 6089) (the "Procedures Order").

2

<u>Argument</u>

A.    <u>Yilmaz SMA Should Be Precluded From Introducing Evidence At The Hearing.</u>

1.    On February 7, 2007, the Debtors filed a Notice of Claims Objection

Hearing with Respect to Debtors' Objection to Proof of Claim No. 7907 (Yilmaz SMA) (Docket

No. 6881), and set the date for the hearing as April 13, 2007.  A copy of this Court's Procedures

Order was attached to and served with the notice to Yilmaz SMA.

2.    On February 21, 2007, the Debtors and Yilmaz SMA, with their legal

counsel, conducted a telephonic meet and confer pursuant to the Procedures Order.  Prior to the

meet and confer the Debtors e-mailed another copy of the Procedures Order to Yilmaz SMA's

counsel.  The Procedures Order was discussed on the meet and confer and Yilmaz SMA's

counsel acknowledged that he had received the Procedures Order.

3.    The Procedures Order provides: "The Claimant may file and serve its

Supplemental Response no later than 30 business days prior to commencement of the Claims

Objection Hearing. . . .  The Supplemental Response may include affidavits or declarations from

no more than two witnesses setting forth the basis of the Contested Claim and evidence

supporting the Contested Claim. . . . The Claimant shall not be permitted to elicit any direct

testimony at the Claims Objection Hearing. . . ."  <u>See</u> Procedures Order,  ¶ 9(e).

6.    Here, this Court's Procedures Order required Yilmaz SMA to file its

Supplemental Response along with any witness affidavits or declarations it intended to use at

trial on or before March 2, 2007.  Yet, without excuse, Yilmaz failed to file any Supplemental

Response.  Indeed, Yilmaz SMA's counsel was provided a copy of the Claim Procedures Order

on many occasions prior to that deadline.  Because Yilmaz SMA failed to file its Supplemental

Response and affidavits or declarations by the court-ordered deadline, and has not articulated any

3

reason that would excuse such a failure, it should be barred from eliciting any testimony at the hearing.

B.    <u>Yilmaz SMA Is Not Entitled To The Alleged Amount In Its Proof of Claim.</u>

7.    The Debtors expressly incorporate their entire Statement of Disputed Issues With Respect to Proof of Claim 7907 (Yilmaz SMA) (Docket No. 6954) into this Supplemental Reply.  <u>See</u> <u>also</u> Declaration of John MacBain In Support Of Debtors' Supplemental Reply With Respect To Proof of Claim No. 7907, a true and accurate copy is attached hereto as <u>Exhibit A</u>.  For the reasons discussed in the Statement of Disputed Issues and supported in MacBain's declaration, the Proof of Claim should be disallowed and expunged.

<u>Memorandum of Law</u>

8.    Because the legal points and authorities upon which this Supplemental Reply relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

4

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claim and (b) granting the Debtors such other and further relief as is just.

Dated: New York, New York
       March 16, 2007

                                    SKADDEN, ARPS, SLATE,
                                    MEAGHER & FLOM LLP

                                    By: /s/ John Wm. Butler, Jr.
                                         John Wm. Butler, Jr. (JB 4711)
                                         John K. Lyons (JL 4951)
                                         Albert L. Hogan III (AH 8807)
                                         Ron E. Meisler (RM 3026)
                                    333 West Wacker Drive, Suite 2100
                                    Chicago, Illinois 60606
                                    (312) 407-0700

                                    – and –

                                    SKADDEN, ARPS, SLATE,
                                    MEAGHER & FLOM LLP
                                    By: /s/ Kayalyn A. Marafioti
                                         Kayalyn A. Marafioti (KM 9632)
                                         Thomas J. Matz (TM 5986)
                                    Four Times Square
                                    New York, New York 10036
                                    (212) 735-3000

                                    Attorneys for Delphi Corporation, et al.,
                                    Debtors and Debtors-in-Possession

**Hearing Date:  April 13, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                           :
     In re                          :  Chapter 11
                                                           :
DELPHI CORPORATION, et al.,                                :  Case No. 05-44481 (RDD)
                                                           :
                                                           :  (Jointly Administered)
        Debtors.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DECLARATION OF JOHN MACBAIN IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOF OF CLAIM NUMBER 7907
(Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.)

("MACBAIN DECLARATION – Yilmaz Sahinkaya Structural Mechanics Analysis, Inc.")

John MacBain declares as follows:

1.      Delphi Corporation and certain of its subsidiaries and affiliates are debtors

and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the

Debtors' Supplemental Reply With Respect To Proof Of Claim 7907 (Yilmaz Sahinkaya

Structural Mechanics Analysis, Inc.) (the "Supplemental Reply").  Capitalized terms not

otherwise defined in this declaration have the meanings ascribed to them in the Supplemental

Reply and the Statement of Disputed Issues.

2.      Except as otherwise indicated, all facts set forth in this declaration are

based upon my personal knowledge, my review of relevant documents, my opinion, and my

experience with and knowledge of Delphi Automotive Systems LLC's ("DAS LLC") relationship

with Yilmaz Sahinkaya Structural Mechanics Analysis, Inc ("Yilmaz SMA").  If I were called

upon to testify, I could and would testify to the facts set forth herein.

3.      I am currently an engineer at DAS LLC (which, with certain of its

subsidiaries and affiliates, the debtors and debtors-in-possession in the above-captioned cases,

are referred to collectively and variously herein as "Delphi" or the "Debtors").  I have worked for

General Motors Corporation and/or DAS LLC for over twenty years.  In my capacity as an

engineer at DAS LLC, I oversaw the technical work related to a certain project (the "Project")

whereby Yilmaz SMA agreed to provide DAS LLC certain services and am familiar with the

documents kept in the ordinary course of business related to the Project.  Yilmaz SMA agreed to

provide technical services required by DAS LLC in conjunction with the Project to develop an

accurate and reliable computer modeling and simulation program to be used as a system design

and analysis tool to test and analyze electrical systems in automotive vehicles.

2

4.      On May 18, 1999, Yilmaz SMA sent a Proposal/Statement of Work to DAS LLC to outline the services it would provide related to the Project.  A true and accurate copy of the Proposal/Statement of Work ("SOW") is attached hereto as <u>Exhibit 1</u>.

5.      The terms and conditions upon which DAS LLC agreed to purchase services related to the Project from Yilmaz SMA, were further memorialized in a certain purchase order AES93504 dated July 2, 1999 (the "Purchase Order"), a true and accurate copy of the Purchase Order is attached hereto as <u>Exhibit 2</u>.  I am not aware of any other agreement between Yilmaz SMA and DAS LLC at that time, outside of the SOW, the Purchase Order, the general terms and conditions incorporated therein ("Terms and Conditions"), and the information systems and services terms ("IS&S Terms") incorporated therein, a true and accurate copy of the Terms and Conditions is attached hereto as <u>Exhibit 3</u> and a true and accurate copy of the IS&S Terms is attached hereto as <u>Exhibit 4</u>.  Nor do I know of any other DAS LLC employee who made a representation or promise to Yilmaz SMA that would add to or modify the terms of the SOW, the Purchase Order, the Terms and Conditions, or the IS&S Terms.

6.      The goal of the Project was for Yilmaz SMA to provide DAS LLC a user friendly computer modeling and simulation program (the "Program") that would allow DAS LLC engineers to experiment through simulation with various electrical architectures, i.e., electrical components and their interconnections, under a wide range of load demands and vehicle operating conditions.  Ultimately, the Program's business purpose was to help DAS LLC achieve its goal of reaching an appropriate margin between high fuel efficiency and price point for a particular vehicle.  Although DAS LLC employs its own engineers, DAS LLC hired Yilmaz SMA as an outside consultant because Yilmaz SMA represented it had expertise with

3

this type of Project and it could focus exclusively on the Project while DAS LLC engineers could focus on other matters.

7.    The Purchase Order sets forth the four interrelated tasks and associated costs that Yilmaz SMA agreed to provide DAS LLC related to the Project:

| | | |
|---|---|---|
| Task 1: | Power Source Sub System Analysis and Program Development | $32,000 |
| Task 2: | Electrical Power Demand Loads Sub System Analysis and Program Development | $48,000 |
| Task 3: | Integrated System Analysis and Program Development | $24,000 |
| Task 4: | Documentation/Training | $16,000 |

See Purchase Order, Ex. 2.  DAS LLC agreed to pay Yilmaz SMA the amount associated with each task upon the timely and satisfactory completion of such task.

8.    Task 1 required Yilmaz SMA to provide analysis and models related to the various components that represent the power system, i.e., *sources* of power and their distributors, in automobiles.  Task 2, on the other hand, required Yilmaz SMA to provide analysis and models for various components that are *users* of power in automobiles.  Task 3 required Yilmaz SMA to provide a Program that allows DAS LLC engineers to combine the component models from Tasks 1 and 2 into any desired electrical architecture they needed for a particular vehicle.  Task 4 required Yilmaz SMA to prepare and timely deliver a final report describing the analysis and results from Task 1 through Task 3 and to conduct onsite training regarding the Program and CSSL-V language code/compiler and Saber or Simulink conversions of the entire Program.

9.    With respect to Task 1, Yilmaz SMA agreed to create component models for all aspects of the electrical power system of a vehicle that would ultimately provide building

4

blocks for a larger simulation program.  The work product Yilmaz SMA delivered to DAS LLC

failed to meet the requirements of the Purchase Order.

10.    As an initial matter, Yilmaz SMA's work was untimely and incomplete.

Yilmaz SMA agreed to complete all tasks within 6 months of the commencement of the Project

on August 16, 1999, i.e., by February 2000.  See Kickoff Memorandum, a true and accurate copy

is attached hereto as Exhibit 5.

11.    By the time DAS LLC received Invoice 1 from Yilmaz SMA on or about

April 28, 2000, Yilmaz SMA had not completed Task 1.  Before DAS LLC paid the invoice, the

invoice was reduced from $32,000 to $24,000 in recognition of the fact that at best only 75% of

the work on Task 1 was completed by April 28, 2000 and that there was an error in at least one

component model Yilmaz SMA provided to DAS LLC.  See Response, p. 4; see also Invoice 1, a

true and accurate copy is attached hereto as Exhibit 6.  On June 14, 2000, DAS LLC paid Yilmaz

SMA $24,000 for services related to the Project rendered through April 28, 2000.  See Payment,

a true and accurate copy is attached hereto as Exhibit 7.  Yilmaz SMA had not timely and

satisfactorily completed Task 1 by the date DAS LLC paid Invoice 1 either.

12.    Moreover, it was only with extensive assistance from DAS LLC's own in

house resources that Yilmaz SMA even completed any work of Task 1.  During the Project, DAS

LLC expended a considerable amount of in house resources to educate Yilmaz SMA about basic

technologies related to the Project that Yilmaz SMA had represented to DAS LLC it had

expertise in prior to commencement of the Project.  For example, DAS LLC provided Yilmaz

SMA all information it needed to develop analyses and models as contemplated for the Project.

Nevertheless, DAS LLC engineers had to create and run shadow models in Saber to explain

various aspects of the process to Yilmaz SMA.  Yilmaz SMA was providing to DAS LLC

5

engineers only what they had already modeled and provided to Yilmaz SMA. A prime example is the voltage/current behavior in a three-phase rectifier bridge being fed by a three-phase Lundell generator. In fact, DAS LLC's engineers working with the same information as Yilmaz SMA were able to develop just such models for the Project. Yilmaz SMA's work therefore was of no value or use to DAS LLC.

13.    Furthermore, the models and analyses Yilmaz SMA provided were of no use to DAS LLC because they were in hard copy format and in a software language with which DAS LLC engineers were unfamiliar. Yilmaz SMA only provided materials to DAS LLC in hard copy format despite an agreement to the contrary and repeated requests for electronic models. As a result of Yilmaz SMA's failure to provide models in electronic format, DAS LLC engineers could not use or test any of the work that Yilmaz SMA submitted.

14.    Yilmaz SMA also insisted at the onset of the Project that it should develop the Program in CSSL-V, a software system not generally used by DAS LLC or the industry. DAS LLC only agreed to the use of CSSL-V on the condition that Yilmaz SMA convert the component models (and later the Program) into DAS LLC's preferred software programs of Saber or Matlab/Simulink and also provide DAS LLC with the CSSL-V codes that it used for the Project. To my knowledge, Yilmaz SMA never complied with those obligations.

15.    With respect to Task 2, Yilmaz SMA agreed to create component models for all aspects of a vehicle that demand/utilize power and would ultimately provide the building blocks for a larger simulation Program. I am not aware of any work that was submitted by Yilmaz SMA for Task 2 by September 14, 2000 when DAS LLC exercised its option to terminate the contract due to the failure of Yilmaz SMA to meet its obligations under the contract. See Termination Letter, a true and accurate copy is attached hereto as Exhibit 8. In

6

fact, Task 1 was not even completed by September 14, 2000.  See Termination Letter, Ex. 8.

Upon termination, DAS LLC informed Yilmaz SMA to stop work on the Project.  See

Termination Letter, Ex. 8.  Despite that instruction, years later, DAS LLC received numerous

letters and faxes from Yilmaz SMA attempting to provide additional work related to the Project.

      16.     I am not aware of any work for Task 2 that Delphi received within the

active period of the contract or shortly thereafter.  Even if Yilmaz SMA provided DAS LLC

some component models within Task 2, any alleged work product it provided failed to meet the

requirements of the Purchase Order.  Any alleged work submitted by Yilmaz SMA related to

Task 2 had the same issues as those submitted with respect to Task 1, including that they were

submitted untimely, Yilmaz SMA required excessive assistance from DAS LLC engineers,

provided models to DAS LLC only in hard copy format, and used a software language unfamiliar

to DAS LLC.

      17.     With respect to Tasks 3 and 4, Yilmaz SMA agreed to provide DAS LLC

the ability to integrate all the component models into a user friendly computer simulation

Program and conduct training related to the Program.  The Program was to be user friendly to

permit easy construction of any automotive electrical architecture desired.  As of September 14,

2000, Yilmaz SMA had not even completed Tasks 1 or 2, i.e., the building blocks for the

Program, let alone development of the Program itself or providing any related documentation or

training to DAS LLC.

      18.     DAS LLC terminated Yilmaz SMA's services with respect to the Project

on September 14, 2000 because Yilmaz SMA did not meet its obligations under the Purchase

Order.  At that time, Yilmaz SMA had not completed Task 1 or any of the remaining tasks by the

date of the Termination Letter – almost 13 months after the Project started on August 16, 1999 –

7

notwithstanding that Yilmaz SMA had agreed all tasks would be finished within 6 months of the commencement of the Project. See Kickoff Memorandum, Ex. 5.

19.     Yilmaz SMA's work related to Tasks 1 and 2 should have been building blocks for Task 3 and part of a comprehensive Program that gave DAS LLC engineers the ability in a user friendly manner to manipulate the electrical components (e.g., building blocks) and/or external conditions to simulate a range of results in vehicles.  Instead, Yilmaz SMA provided only a limited number of stand-alone components in hard copy format (that DAS LLC had already developed in house) with no process for integration and with no ability to conduct user friendly computer simulation.

20.     After reviewing Invoice 2, dated July 20, 2004, I do not believe DAS LLC owes Yilmaz SMA the additional $42,400 it billed to the Project through September 14, 2000 for all of the reasons discussed above. See Invoice 2, a true and accurate copy is attached hereto as Exhibit 9.  In addition, the total projected cost for Task 1 was $32,000. See Purchase Order, Ex. 2.  I did not authorize additional work beyond the project cost for Task 1 and I am not aware of any other DAS LLC employee authorizing any additional work beyond that projected cost.  DAS LLC paid Yilmaz SMA $24,000 with respect to Task 1, which represented 75% of the total cost for Task 1. See Invoice 1, Ex. 6; see also Payment, Ex. 7.  Even assuming Yilmaz SMA provided all the bargained for services in Task 1, which it did not, the remaining amount due for any alleged work on Task 1 completed prior to the Termination Letter would be the difference between the total cost of Task 1 and the payment already made, $8,000 in total – not $23,700 as listed on Invoice 2. See Invoice 2, Ex. 9.  Moreover, I am unaware of any timely and satisfactory work completed on Tasks 2 through 4.  In particular, Task 3 and 4 required a comprehensive

Program that was never completed.  The payment DAS LLC already paid to Yilmaz SMA far

exceeds the value of the work it provided DAS LLC.

 

 

      I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the

foregoing statements are true and correct.

Executed on March 16, 2007 in Kokomo, Indiana.

 

 

            /s/ John MacBain

            John MacBain

# **EXHIBIT 1**

**To: Dr Iftikhar Khan**

**From: Yilmaz Sahinkaya**

**Re:** ADEM Proposal Changes

**Fax:**(317) 579-3402
/(5)451 3879

**Date:** May 18, 1999

**Pages: 5**

Dear Iftikhar:

I have made the necessary changes on pages 1 and 3 of the **proposal as you**

requested.

Regards

Yilmaz Sahinkaya

(0)(650)574-0254
2264

Structural Mechanics Analysis. Inc.
P.O. Box 700910, San Jose, CA 95110

## Automotive Dynamic Energy Management Proposal

### INTRODUCTION

Energy management system of an automotive vehicle is designed to control flow of electric power to and from the battery in response to power load demands. Recent studies indicate that changing vehicle's electric power source to 42 volt battery will improve performance and fuel efficiency, lower cost, and reduce emission levels of pollutants and toxic gases flowing from automobile tailpipes into the atmosphere. However, this likely transformation will require substantial design changes in the physical and operational characteristics of most components in the system. Hence, this is a challenging and expensive task which can be best achieved by means of an accurate and reliable computer modeling and simulation program used for system design and analysis.

The proposal describes briefly, technical approach, project cost and scheduling for developing the automotive dynamic energy management (ADEM) program which is designed to provide Delphi engineers with an accurate, reliable, flexible, and user friendly modeling and simulation program. The ADEM program can be used as a system design and analysis tool to shorten the transition period for the change over from present 12 volt battery to 42 volt battery in automotive vehicles.

The ADEM program will be developed by using a commercial simulation program such as CSSL-V from Simulation Services, ACSL from Mitchell&Gautier, Saber from Analogy, and Matlab / Simulink from Math Works. The ADEM program uses the Microsoft Windows operating system. This proposal includes only the work for the development of CSSL-V and Saber or Matlab/Simulink versions of the ADEM program as required by the needs of Delphi.

All technical and proprietary design information provided by Delphi to SMA, Inc., during this project will be kept in high confidence and will not be given to a third party without the prior written permission of Delphi. Delphi will have ownership and rights of using and modifying the ADEM program as required by its business objectives. However, the SMA, Inc. will retain all rights for its proprietary modeling, programming, simulation, validation, and animation techniques, control algorithms, and application-specific routines implemented during the development of the ADEM program.

### TECHNICAL APPROACH

The objective of this proposal is to develop an accurate and flexible design software enabling engineers to make design changes resulting in performance enhancement, cost reduction, fuel efficiency improvement, and reduction in emissions. This will be accomplished by performing the following tasks:

1

Task 1. Power source sub-system analysis and program development. The power source sub system includes the following components:

- Engine driven three-phase ac generator
- Three-phase ac/dc converter, high-voltage battery set, and high voltage loads
- The dc/dc converter, low voltage battery, and low voltage loads

Each component model includes control logic, algorithms, and feedback sensor response characteristics, electric power flow paths and schedules, and simplified power demand load dynamics. Model will yield the following results:

- Performance data including transient and steady-state current, voltage, and electric power wave forms with engine rpm and load demand changes.
- Data summary text on the magnitude of current peaks, current rms values, voltage overshoots, predicted temperature rises, and their times of occurrences.
- Graphical display of all required wave forms and data summary text.
- 3-Dimensional graphical display of associated wiring including size, weight, and cost data.

Task 2. Electrical power demand loads sub-system analysis and program development. The electrical power demand sub system includes the following components:

1) Safety & Security: airbag/seat belt safety, adaptive cruise control, collision avoidance, and security.
2) Basic Vehicle Controls:
- Chassis controls: electric power steering, ABS and/or TCS, and suspension.
- Energy management:
  - Powertrain: engine, transmission emissions, thermostat.
  - Accessories: lights, air conditioner/heater, doors, windows, and seats, and wind shield wiper controls.
3) Entertainment & Information:
  - Navigation and guidance.
  - Real time information.
  - Entertainment.

Each component model includes control logic, algorithms, and feedback sensor response characteristics, electric power flow paths and schedules, and simplified load dynamics. Model will yield the following results:

- Performance data including transient and steady-state actuator drive current, voltage, and power wave forms and load response characteristics such as speed, position, force, torque, temperature and pressure.
- Data summary text on the magnitude of current peaks, current rms values, voltage overshoots, predicted temperature rises, and their times of occurrences.
- graphical display of all required wave forms and data summary text.
- 3-Dimensional graphical display of associated wiring including size, weight, and cost data.

Task 3. Integrated system analysis and program development including the power source sub system and electrical power demand loads sub system. The integrated system model will yield all the results described in Task 1 and Task 2.

Task 4. Documentation and training including:
- Final report describing theoretical concepts used in the development of component, sub system, and system models, programming techniques, simulation, validation, and animation rules for the CSSL-V version of the ADEM program.
- One day training on the CSSL-V version of the ADEM program at a designated Delphi facility.
- Three days on the job training with the Saber or Matlab/Simulink version of the ADEM program at the same Delphi facility mentioned above.

## PROJECT COST

| Task | Labor-hours | Cost ( $ ) |
|---|---|---|
| 1. Power source sub system analysis and program development | 400 | 32,000 |
| 2. Electrical power demand loads sub system analysis and program development | 600 | 48,000 |
| 3. Integrated system analysis and program development | 300 | 24,000 |
| 4. Documentation/Training | 200 | 16,000 |
| | | Total Cost: $120,000 |

Total cost includes all necessary computer PC hardware, software and expenses for four trips to designated Delphi facilities, and delivery of the following design software programs:

- ADEM CSSL-V version.
- ADEM Saber or Mathlab / Simulink version.

ADEM Saber or Matlab/Simulink or ACSL versions will be developed by working with Delphi experts during the project. Efforts for such conversions are estimated not to exceed four weeks for ADEM Saber or Mathlab/Simulink and four days for ADEM ACSL respectively.

# PROJECT SCHEDULE

|  | Months | | | | | | |
|---|---|---|---|---|---|---|---|
| **Tasks** | 0 | 1 | 2 | 3 | 4 | 5 | 6 |

1. Power source sub system analysis and program development

2. Electrical power demand loads sub system analysis and program development

3. Integrated system analysis and program development

4. Documentation / Training

# PROJECT TEAM

The manager of the project team is Dr. Yilmaz Sahinkaya. The team members and their responsibilities include:

Dr. Yilmaz Sahinkaya   : ADEM program design, development, and validation.

Mr. Altan Eris   : Modeling for generator, power circuits, motor drives, and wiring.

Mr. Terrence Mc Ginnis : Modeling of control system logic and algorithms, sensors, and wiring.

Dr. Harold Durlofsky   : Modeling of the 3-D reference frame, suspension system, and design of wiring display program.

Dr. Ragnar Nilsen   : Design and development of Windows front-end program.

The resumes of project team members are included in APPENDIX-A.

4

# EXHIBIT 2

# DELPHI
Automotive Systems

**PURCHASE** PAGE

**ORDER:** AES93504

DELPHI AUTOMOTIVE SYSTEMS
DELPHI GLOBAL PURCHASING
4800 S. SAGINAW ST.
P.O. BOX 1360
FLINT MI
48501-1360                          US

VENDOR NUMBER 09-853-4027
STRUCTURAL MECHANICS ANALYSIS
1073 REGENCY KNOLL DR
TO: PO BOX 700910
SAN JOSE CA
95170-0910

SHIP T:
DELPHI L & E WORLD HDQTRS
DELPHI AUTOMOTIVE SYSTEMS
4800 S. SAGINAW STREET
FLINT MI
48507                          US

INVOICE TO:
DELPHI-E IS ON PAY ON RECEIPT.
FORWARD ANY "WORK COMPLETED
INVOICE" PAPERWORK TO YOUR
DELPHI CONTACT FOR "RECEIPT
ENTRY FOR PAYMENT" PROCESS. ..
US

This Number Must Appear On All Invoices, Packing Slips,
Packages and Bills of Lading.
(2) copies of your packing slip must accompany each shipment.
Item Identification Number(s) must be shown on Packing Slips
Invoices.
Invoice Attn Accounts Payable
Do not Declare Valuation of Express Shipments or Insure Parcel
Post.

| ORDER DATE | PHONE: 810-257-87 |
|---|---|
| 07/02/99 | C  NICHOLS |
| AUTHORIZATION ISSUE DATE | AN          Buyer |
| ALTERNATION EXPIRE DATE | |

| PAYMENT TERMS | | F.O.B.  DESTINATION UNLESS OTHERWISE INDICATED | SHIP VIA |
|---|---|---|---|
| NET   2ND DAY OF 2ND MONTH | | FOB ORGIN, CONSIGNEE BILLING | UNITED PARCEL SERVICE |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO | NOUN NAME  DESCRIPTION | RFQ NUMBER | DATE SECURED  TAX CODE | BASE UNIT PRICE | PRICE MULTIPLE |
|---|---|---|---|---|---|---|---|
| | | | THIS ORDER IS LISTED IN THE FOLLOWING CURRENCY<br>USD   DOLLAR (UNITED STATES)<br><br>++THIS IS A CONFIRMING ORDER DO NOT DUPLICATE +<br>CONFIRMED WITH: YILMAZ SAHINKAYA<br><br>PRICING AND DELIVERABLES PER SUPPLIER PROPOSAL.<br><br>PURCHASE ORDER TERMS FOR INFORMATION SYSTEMS AND<br>SERVICES (SHORT FORM IS&S TERMS) APPLIES TO THIS<br>ORDER. | | | | |
| 0001 | 1 | PRG06345 001 | DEVELOPMENT OF A TOOL FOR THE SIMULATION OF AN<br>AUTOMOTIVE ELECTRICAL SYSTEM AS DESCRIBED<br>IN THE STATEMENT - OF - WORK IN EXHIBIT A.<br>PAYMENT SHALL BE MADE IN FOUR (4) INSTALLMENTS<br>ACCORDING TO THE COMPETION OF TASKS AS INDICATED<br>IN THE PROJECT SCHEDULE IN EXHIBIT A 6/30/99 - 7/1/00<br>TASK 1 - POWER SOURCE SUB SYSTEM ANALYSIS AND PROGRAM<br>                    DEVELOPMENT<br>WHO ORDERED: IFTIKHAR KHAN | | 07/10/99   F   0.00% | 32000.0000 | |
| 0002 | 1 | PRG06345 002 | TASK #2 - ELECTRICAL POWER DEMAND LOADS SUB SYSTEM<br>             ANALYSIS AND PROGRAM DEVELOPMENT<br>WHO ORDERED: IFTIKHAR KHAN | | 07/10/99   F   0.00% | 48000.0000 | |

CONTINUE PAGE    2

004611   USER CLYDE NICHOLS                    ORIGINAL



**DELPHI**
Automotive Systems

DELPHI AUTOMOTIVE SYSTEMS
DELPHI GLOBAL PURCHASING
4800 S. SAGINAW ST.
P.O. BOX 1360
FLINT MI
48501-1360                    US

VENDOR NUMBER 09-853 4027
TO: STRUCTURAL MECHANICS ANALYSIS
1073 REGENCY KNOLL DR
PO BOX 700910
SAN JOSE CA
95170-0910

SHIP TO: DELPHI E & E WORLD HDQTRS
DELPHI AUTOMOTIVE SYSTEMS
4800 S. SAGINAW STREET
FLINT MI
48507                    US

INVOICE TO: DELPHI-E IS ON PAY ON RECEIPT.
FORWARD ANY "WORK COMPLETED
INVOICE" PAPERWORK TO YOUR
DELPHI CONTACT FOR "RECEIPT
ENTRY FOR PAYMENT" PROCESS. ..
US

**PURCHASE** PAGE
**ORDER:** AES93504

ORDER DATE 07/02/99
PHONE: 810-257-87
C. NICHOLS
AN    Buyer

| PAYMENT TERMS | | | | | | | | F.O.B. DESTINATION UNLESS OTHERWISE INDICATED | SHIP VIA | |
| NET 2ND DAY OF 2ND MONTH | | | | | | | | FOB ORGIN, CONSIGNEE BILLING | UNITED PARCEL SERVICE | |

| ITEM SEQUENCE | QUANTITY ORDERED | ITEM IDENTIFICATION NO. | NOUN NAME | DESCRIPTION | REQ NUMBER | DATE REQUIRED | TAX CODE | BASE UNIT PRICE | PRICE MULTIPLE |
|---|---|---|---|---|---|---|---|---|---|
| 0003 | 1 | PRG06345 003 | | TASK #3 - INTEGRATED SYSTEM ANALYSIS AND PROGRAM DEVELOPMENT. WHO ORDERED: IFTIKHAR KHAN | | 07/10/99 | F 0.00% | 24000.0000 | |
| 0004 | 1 | PRG06345 004 | | TASK #4 - DOCUMENTATION / TRAINING WHO ORDERED: IFTIKHAR KHAN | | 07/10/99 | F 0.00% | 16000.0000 | |

TERMS AND CONDITIONS SEPTEMBER 30, 1998, APPLY,
OF WHICH SUPPLIER HAS RECEIVED A COPY.

# EXHIBIT 3

**1. ACCEPTANCE:**
Seller has read and understands this contract and agrees that Seller's written acceptance or commencement of any work or services under this contract shall constitute Seller's acceptance of these terms and conditions only.

**2. SHIPPING AND BILLING:**
Seller agrees: (a) to properly pack, mark and ship goods in accordance with the requirements of Buyer, the involved carriers, and, if applicable, the country of destination; (b) to route shipments in accordance with Buyer's instructions; (c) to make no charge for handling, packaging, storage or transportation of goods, unless otherwise stated as set forth on the contract; (d) to provide with each shipment packing slips with Buyer's contract and/or release a number and date of shipment marked thereon; (e) to properly mark each package with a label/tag according to Buyer's instructions; (f) to promptly forward the original bill of lading or other shipping receipt for each shipment in accordance with Buyer's instructions. Seller will include on bills of lading or other shipping receipts correct classification identification of the goods shipped in accordance with Buyer's instructions and the carrier's requirements. The marks on each package and identification of the goods on packing slips, bills of lading and invoices (when required) shall be sufficient to enable Buyer to easily identify the goods purchased. Seller further agrees: (a) to accept payment based upon Buyer's Evaluated Receipt Record/Self Billed invoice, unless an invoice is requested by Buyer; and (b) to accept payment by electronic funds transfer. The payment date is set forth in the Line Item Detail of this contract, or if not stated, shall be the date established by Buyer's Multilateral Netting System (MLB-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American facilities. Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods or date of services. Buyer may withhold payment pending receipt of evidence, in such form and detail as Buyer may direct, of the absence of any liens, encumbrances and claims on the goods or services under the contract.

**3. DELIVERY SCHEDULES:**
Time is of the essence, and deliveries shall be made both in quantities and at times specified in Buyer's schedules. Buyer shall not be required to make payment for goods delivered to Buyer that are in excess of quantities specified in Buyer's delivery schedules. Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments, neither of which shall entitle Seller to a modification of the price for goods or services covered by this contract. Where quantities and/or delivery schedules are not specified, Seller shall deliver goods in such quantities and times as Buyer may direct in subsequent releases.

**4. PREMIUM SHIPMENTS:**
If Seller's acts or omissions result in Seller's failure to meet Buyer's delivery requirements and Buyer requires a more expeditious method of transportation for the goods than the transportation method originally specified by Buyer, Seller shall ship the goods as expeditiously as possible at Seller's sole expense.

**5. CHANGES:**
Buyer reserves the right at any time to direct changes, or cause Seller to make changes, to drawings and specifications of the goods or to otherwise change the scope of the work covered by this contract including work with respect to such matters as inspection, testing or quality control, and Seller agrees to promptly make such changes. Any difference in price or time for performance resulting from such changes shall be equitably adjusted by Buyer after receipt of documentation in such form and detail as Buyer may direct. Any changes to this contract shall be made in accordance with Paragraph 31.

**6. SUPPLIER QUALITY AND DEVELOPMENT; INSPECTION:**
Seller agrees to participate in Buyer's supplier quality and development program(s) and to comply with all quality requirements and procedures specified by Buyer, as revised from time to time, including those applicable to Seller as set forth in Quality System Requirements QS-9000, as applicable. Buyer shall have the right to enter Seller's facility at reasonable times to inspect the facility, goods, materials and any property of Buyer covered by this contract. Buyer's inspection of the goods, whether during manufacture, prior to delivery or within a reasonable time after delivery, shall not constitute acceptance of any work-in-process or finished goods.

**7. NONCONFORMING GOODS:**
Seller acknowledges that Buyer will not perform incoming inspections of the goods, and waives any rights to require Buyer to conduct such inspections. To the extent Buyer rejects goods as nonconforming, the quantities under this contract will automatically be reduced unless Buyer will receive notifies Seller. Seller will not replace quantities so reduced without a new contract or schedule from Buyer. Nonconforming goods will be held by Buyer, in accordance with Seller's instructions at Seller's risk. Seller's failure to provide written instructions within 10 days, or such shorter period as may be commercially reasonable under the circumstances, after notice of nonconformity shall entitle Buyer, at Buyer's option, to charge Seller for storage and handling or to dispose of the goods without liability to Seller. Payment for nonconforming goods shall not constitute an acceptance of them, limit or impair Buyer's right to assert any legal or equitable remedy, or relieve Seller's responsibility for latent defects.

**8. FORCE MAJEURE:**
Any delay or failure of either party to perform its obligations shall be excused if Seller is unable to produce, sell or deliver, or Buyer is unable to accept delivery, buy or use, the goods or services covered by this contract, as the result of an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order, provided that written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter). During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract. In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s). If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days. If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

**9. WARRANTY:**
Seller warrants/guarantees that the goods covered by this contract will conform to the specifications, drawings, samples, or descriptions furnished to or by Buyer, and will be merchantable, of good material and workmanship and free from defect. In addition, Seller acknowledges that Seller knows of Buyer's intended use and warrants/guarantees that all goods covered by this contract that have been selected, designed, manufactured or assembled by Seller based upon Buyer's stated use will be fit and sufficient for the particular purpose intended by Buyer. The warranty period shall be that provided by applicable law, except that if Buyer offers a longer warranty to its customers for goods installed on vehicles, such longer period shall apply.

**10. INGREDIENTS DISCLOSURE; SPECIAL WARNINGS AND INSTRUCTIONS:**
If requested by Buyer, Seller shall promptly furnish to Buyer in such form and detail as Buyer may direct: (a) a list of all ingredients in the goods; (b) the amount of all ingredients; and (c) information concerning any changes in or additions to such ingredients. Prior to and with the shipment of the goods, Seller agrees to furnish to Buyer sufficient warning and notice in writing (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with such special handling instructions as may be necessary to advise carriers, Buyer, and their respective employees of how to exercise that measure of care and precaution that will best prevent bodily injury or property damage in the handling,

transportation, processing, storage, use, exposure, maintenance and packing shipped to Buyer.

**11. INSOLVENCY:**
Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller; (b) filing of a voluntary petition in bankruptcy by Seller; (c) filing of any involuntary petition in bankruptcy against Seller; (d) appointment of a receiver or trustee for Seller, or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.

**12. TERMINATION FOR BREACH OR NONPERFORMANCE:**
Buyer reserves the right to terminate all or any part of this contract, without liability to Seller, if Seller: (a) repudiates or breaches any of the terms of this contract, including Seller's warranties; (b) fails to perform services or deliver goods as specified by Buyer; (c) fails to make progress so as to endanger timely and proper completion of services or delivery of goods; and does not correct such failure or breach within 10 days (or such shorter period of time if commercially reasonable under the circumstances) after receipt of written notice from Buyer specifying such failure or breach.

**13. TERMINATION FOR CONVENIENCE:**
In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller the following amounts without duplication: (a) the contract price for all goods or services that have been completed in accordance with this contract and not previously paid for; and (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this contract; less, however, the sum of the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent, and the cost of any damaged or destroyed goods or material. Buyer will make no payments for finished goods, work-in-process or raw materials fabricated or procured by Seller in amounts in excess of those authorized in delivery releases nor for any undelivered goods that are in Seller's standard stock or that are readily marketable. Payments made under this Paragraph shall not exceed the aggregate price payable by Buyer for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller.

**14. INTELLECTUAL PROPERTY:**
Seller agrees: (a) to defend, hold harmless and indemnify Buyer, its successors and customers against any claims of infringement (including patent, trademark, copyright, industrial design right, or other proprietary right, or misuse or misappropriation of trade secret) and resulting damages and expenses (including attorney's and other professional fees) arising in any way in relation to the goods or services contracted, including such claims where Seller has provided only part of the goods or services; Seller expressly waives any claim against Buyer that such infringement arose out of compliance with Buyer's specification; (b) that Buyer or Buyer's subcontractor has the right to repair, reconstruct, or rebuild the specific goods delivered under this contract without payment of any royalty to Seller; (c) that parts manufactured based on Buyer's drawings and/or specifications may not be used for its own use or sold to third parties without Buyer's express written authorization; and (d) to the extent that this contract is issued for the creation of copyrightable works, the works shall be considered "works made for hire" to the extent that the works do not qualify as "works made for hire," Seller hereby assigns to Buyer all right, title and interest in all copyrights and moral rights therein.

**15. TECHNICAL INFORMATION DISCLOSED TO BUYER:**
Seller agrees not to assert any claim (other than a claim for patent infringement) with respect to any technical information that Seller shall have disclosed or may hereafter disclose to Buyer in connection with the goods or services covered by this contract.

**16. INDEMNIFICATION:**
If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, the employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

**17. INSURANCE:**
Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth in the Special Terms. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request. The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

**18. SELLER'S PROPERTY:**
Unless otherwise agreed to by Buyer, Seller, at its expense, shall furnish, keep in good condition, and replace when necessary all machinery, equipment, tools, jigs, dies, gauges, fixtures, molds, patterns and other items ("Seller's Property") necessary for the production of the goods. The cost of changes to Seller's Property necessary to make design and specification changes authorized by Buyer shall be paid for by Buyer. Seller shall insure Seller's Property with full fire and extended coverage insurance for its replacement value. Seller grants Buyer an irrevocable option to take possession of and title to Seller's Property that is special for the production of the goods upon payment to Seller of its net book value less any amounts that Buyer has previously paid to Seller for the cost of such items; provided, however, that this option shall not apply if Seller's Property is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.

**19. BUYER'S PROPERTY:**
All supplies, materials, tools, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items furnished by Buyer, either directly or indirectly, to Seller to perform this contract, or for which Seller has been reimbursed by Buyer, shall be and remain the property of Buyer and held by Seller on a bailment basis ("Buyer's Property"). Seller shall bear the risk of loss of and damage to Buyer's Property. Buyer's Property shall at all times be properly housed and maintained by Seller, at its expense, shall not be used by Seller for any purpose other than the performance of this contract; shall be deemed to be personalty; shall be conspicuously marked by Seller as the property of Buyer; shall not be commingled with the property of Seller or with that of a third person; and shall not be moved from Seller's premises without Buyer's prior written approval. Buyer shall have the right to enter Seller's premises at all reasonable times to inspect such property and Seller's records with respect thereto. Upon the request of Buyer, Buyer's Property shall be immediately released to Buyer or delivered to Buyer by Seller, either (i) F.O.B. transport equipment at Seller's plant, properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such property, or (ii) to any location designated by Buyer, in which event Buyer shall pay to Seller the reasonable costs of delivering such property to such location. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on any of Buyer's Property for work performed on such property or otherwise.

**20. SERVICE AND REPLACEMENT PARTS:**
Seller will sell to Buyer goods necessary for it to fulfill its current model service and replacement parts requirements at the price(s) set forth in this contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that shall not, in the aggregate, exceed the price of the system or module less assembly costs. During the 15 year period after Buyer completes current model purchases, Seller will sell goods to Buyer to fulfill Buyer's past model service and replacement parts requirements. Unless otherwise agreed to by Buyer, the price(s) during the first 3 years of this period shall be those in effect at the conclusion of current model purchases. For the remainder of this period, the price(s) for goods shall be as agreed to by the parties. When requested by Buyer, Seller shall make service literature and other materials available at no additional charge to support Buyer's service part sales activities.

**21. REMEDIES:**
The rights and remedies reserved to Buyer in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity. Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Paragraph 9, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods; (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

**22. CUSTOMS; EXPORT CONTROLS:**
Credits or benefits resulting or arising from this contract, including trade credits, export credits or the refund of duties, taxes or fees, shall belong to Buyer. Seller shall provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive such benefits or credits, as well as to fulfill its customs related obligations, origin marking or labeling requirements and local content origin requirements, if any. Export licenses or authorizations necessary for the export of the goods shall be the responsibility of Seller unless otherwise indicated in this contract, in which event Seller shall provide such information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller shall undertake such arrangements as necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

**23. SETOFF/RECOUPMENT:**
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries; and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

**24. NO ADVERTISING:**
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

**25. COMPLIANCE WITH LAWS; FORCED LABOR:**
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

**26. NO IMPLIED WAIVER:**
The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect its right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

**27. NON-ASSIGNMENT:**
Seller may not assign or delegate its obligations under this contract without Buyer's prior written consent.

**28. RELATIONSHIP OF PARTIES:**
Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

**29. GOVERNING LAW; JURISDICTION:**
This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

**30. SEVERABILITY:**
If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or law, and the remaining provisions of this contract shall remain in full force and effect.

**31. ENTIRE AGREEMENT:**
This contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this contract and supersedes all prior oral or written representations and agreements. This contract may only be modified by a contract amendment issued by Buyer.

Revised: September 30, 1999

# **<u>EXHIBIT 4</u>**

**Purchase Order Terms**
**For Information Systems and Services**
**(Short Form IS&S Terms)**

**1.   SPECIFICATIONS; STANDARD OF WORKMANSHIP**

Seller agrees to provide information technology and services (the "Services") to Buyer in accordance with the terms of this Purchase Order and the specifications on the front of this Purchase Order (the "Specifications") as modified by this Purchase Order.  The Specifications contains a detailed description of Services Seller will perform.  In addition, the Specifications also contains the description of the computer programs, written work product and other materials that Seller will deliver to Buyer (the "Deliverables"), the time when the Deliverables will be provided, the identity of Seller's employees who will perform work, and the estimated time and charges for each segment of the work.

Limited Warranty.  Seller warrants that its Services will be performed in a professional and workmanlike manner consistent with the highest industry standards for the performance of such Services.

EXCEPT AS SET FORTH IN SECTIONS 18 AND 20, THE PRECEDING IS SELLER'S ONLY WARRANTY CONCERNING THE SERVICES AND ANY DELIVERABLES, AND IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES AND REPRESENTATIONS, EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY OR OTHERWISE.

All changes to the Specifications must be requested in writing and require mutual agreement. Evaluation and/or implementation of requested changes may result in modification to the estimated number of hours or other terms of this Purchase Order.  Changes to the Specifications will be incorporated through written amendment.

**2.   COMPENSATION FOR SERVICES; EXPENSES**

Seller will be compensated for Services as set forth on the face of this Purchase Order, but not to exceed the price estimate approved by Buyer in the Specifications, without Buyer's written approval. In addition, Buyer will reimburse reasonable and necessary out-of-pocket costs (including travel costs in accordance with Buyer's Travel Guidelines) and subcontracted costs associated with the Services, provided such costs have been previously approved by Buyer in writing and are not included as part of any fixed-price arrangement. All out-of-pocket and subcontracted costs will be billed net, without mark-up.

**3.   INVOICES AND PAYMENTS**

Invoices will be submitted by Seller at the times and in the detail as set forth on the face of this Purchase Order.  The payment date is set forth on the face of this Purchase Order, or if not stated, shall be the date established by Buyer's Multilateral Netting System (MNS-2), which provides, on average, that payment shall be made on the second day of the second month following, in the case of the Buyer's North American facilities, Seller's shipment date of goods or date of services, and, for all of Buyer's other locations, Buyer's receipt date of the goods or date of services.

**4.   OWNERSHIP OF DELIVERABLES**

To the extent that any preexisting materials of Seller or any subcontractor of Seller are contained in the Deliverables, Seller hereby grants to Buyer an irrevocable, worldwide, royalty-free license to such preexisting materials. Such license includes the right to use, reproduce, display, and prepare derivative works based upon such preexisting materials and derivative works thereof solely for Buyer's internal use, including, but not limited to, use in connection with the project or projects for which this Purchase Order has been issued.

1

041999 IS&S

Upon payment, the Deliverables become the exclusive property of Buyer. Seller agrees to do all lawful acts and sign all assignments and other papers Buyer may reasonably request relating to the assignment of the Deliverables, or applications for patents, mask works, registrations, trademarks, and copyrights, both United States and foreign, or relating to the conduct of any opposition, litigation or other controversy in connection therewith, provided that all expenses incident to the filing of such applications, the prosecution thereof and the conduct of any opposition, litigation or other controversy will be borne by Buyer.

To the extent that Seller utilizes any of its or a subcontractor's property and derivatives thereof, (including any hardware or software of Seller or a subcontractor or any proprietary or confidential information of Seller or a subcontractor or any trade secrets of Seller or a subcontractor, "Seller Intellectual Property") in performing services hereunder, such property remains the property of Seller or such subcontractor and, except for the license set forth in the immediately preceding paragraph, Buyer will acquire no right or interest in such property.

Seller owns and has copyright ownership of, and has all rights to use, disclose, license to Buyer and otherwise employ its ideas, concepts, know-how, methods, techniques, processes, and skills, and adaptations thereof (including generalized features of the sequence, structure, and organization of any works of authorship) in conducting its business (including providing services or creating programming or materials for other clients), and Buyer will not assert against Seller or its personnel any prohibition or restraint from so doing, except as otherwise provided in Section 18 below.

When Deliverables include computer programs, including, where applicable, object code (including microcode) and source code, and any enhancements, modifications, updates or releases relating thereto ("Developed Software"), Seller agrees that all writings, discoveries, designs, mask works, inventions and improvements whether copyrightable, patentable or not which are written, conceived, created, discovered or made by Seller's employees or subcontractors in the course of performing Services, excluding Seller Intellectual Property, are considered by the parties as "works made for hire," and that they will be promptly disclosed to Buyer and become Buyer's sole property. Seller further agrees to provide Buyer with all Documentation related to Developed Software without restriction of any kind. "Documentation" includes user manuals, training materials, product descriptions and applicable specifications, technical manuals and supporting materials, developed documents, and other printed information, whether distributed in print, electronic, or video format.

5.   CONFIDENTIALITY OF BUYER'S INFORMATION

Seller understands the need for confidentiality of the information furnished to it by Buyer and agrees that Buyer's information will be treated as confidential, trade secret information of Buyer. Seller will protect the Buyer's information from disclosure, using the same degree of care that Seller uses in protecting its own similar information, but at least a reasonable degree of care. Seller agrees further to limit access to the Buyer's information to only those employees, agents, representatives or subcontractors who have a need to know, and only so much of such Buyer's information will be disclosed as is necessary for that employee, agent, representative or subcontractor to perform his or her function. Seller shall be responsible for any breach of this Purchase Order by its employees, agents, representatives or subcontractors. Seller's obligations under this paragraph will continue for two (2) years after disclosure and will survive any termination or cancellation of this Purchase Order.

The provisions of this Section 5 do not apply to any information, or any portion thereof, which (a) now is or hereafter becomes publicly available by other than a breach hereof (including any information filed with any governmental agency and available to the public), (b) is generally known or readily ascertainable in the data processing or manufacturing industries, (c) is disclosed to Seller by a third party that Seller reasonably believes is legally entitled to disclose such information, (d) was known by Seller prior to its receipt from Buyer, (e) is developed by Seller independently of any disclosures previously made by Buyer to Seller of such information, (f) is disclosed with Buyer's prior written consent, (g) is required to be disclosed by order of a court of competent jurisdiction, administrative

2

agency or governmental body, or by subpoena, summons or other legal process, or by law, rule or regulation, or by applicable regulatory or professional standards, provided that prior to such disclosure by Seller Buyer is given reasonable advance notice of such order and an opportunity to object to such disclosure, or (h) is disclosed by Seller in connection with any judicial or other proceeding involving Buyer and Seller (or any partners, principals or employees of Seller) (whether or not such proceeding involves any third parties) relating to Services.

In addition, Seller recognizes that its close association with Buyer's personnel and access to Buyer's confidential information in the course of performing this Purchase Order may enable Seller to evaluate publicly available information about Buyer from an insider's perspective and that Buyer's confidence would be revealed if such evaluations were published. Therefore, Seller agrees not to publish, or help anyone publish, anything whatsoever about Buyer concerning the subject matter of this Purchase Order, except with the prior written consent of Buyer, during the term of this Purchase Order and for one (1) year thereafter.

6.   AGREEMENTS WITH EMPLOYEES AND OTHERS
Seller represents that it has agreements in place with its partners, principals and employees sufficient to permit Seller to grant to Buyer the ownership and license rights specified in Section 4 and to protect Buyer's information as set forth in Section 5.   In the event of the use of representatives or subcontractors, Seller will enter into agreements with such representatives or subcontractors that are sufficient to permit Seller to grant to Buyer the ownership and license rights specified in Section 4 and to protect Buyer's information as set forth in Section 5.

7.   KNOW-HOW LICENSE GRANT.
Seller agrees not to sue Buyer over the use of any algorithm, process, method or technique of doing business ("Method of Doing Business") that Buyer adopts in connection with Seller's performance under this Purchase Order including, but not limited to, any Method of Doing Business first conceived, wholly or in part, by an employee or agent of Buyer that Seller later embodies in the Developed Software, and any Method of Doing Business that Buyer embodies in a related application.  This covenant not to sue expressly excludes use of Seller Intellectual Property itself outside the scope of the license rights granted herein.

8.   FORCE MAJEURE
Any delay or failure of either party to perform its obligations shall be excused if Seller is unable to produce, sell or deliver, or Buyer is unable to accept delivery, buy or use, the goods or services covered by this contract, as the result of an event or occurrence beyond the reasonable control of the party and without its fault or negligence, including, but not limited to, acts of God, actions by any governmental authority (whether valid or invalid), fires, floods, windstorms, explosions, riots, natural disasters, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), inability to obtain power, material, labor equipment or transportation, or court injunction or order; provided that the written notice of such delay (including the anticipated duration of the delay) shall be given by the affected party to the other party as soon as possible after the event or occurrence (but in no event more than 10 days thereafter).  During the period of such delay or failure to perform by Seller, Buyer, at its option, may purchase goods from other sources and reduce its schedules to Seller by such quantities, without liability to Seller, or have Seller provide the goods from other sources in quantities and at times requested by Buyer, and at the price set forth in this contract.  In addition, Seller at its expense shall take such actions as are necessary to ensure the supply of goods to Buyer for a period of at least 30 days during any anticipated labor disruption or resulting from the expiration of Seller's labor contract(s).  If requested by Buyer, Seller shall, within 10 days, provide adequate assurances that the delay shall not exceed 30 days.  If the delay lasts more than 30 days or Seller does not provide adequate assurance that the delay will cease within 30 days, Buyer may immediately terminate this contract without liability.

3

## 9. MAINTENANCE.

Seller will provide Buyer with maintenance services in accordance with this Purchase Order, but in any event, Seller will provide at no additional charge for a period of twelve (12) months from the date of Buyer's acceptance of the Developed Software: (i) any known solution to any problem relating to the Developed Software as such solution becomes known to Seller; (ii) correction for any problem that Seller or Buyer diagnoses as a defect in a currently supported version of the Developed Software; (iii) reasonable telephone support in the form of counsel and advise on use and maintenance of the Developed Software during Seller's normal business hours (Monday through Friday 8:00 a.m. to 8:00 p.m., EST; (iv) all modifications and enhancements that Seller elects to incorporate into the Developed Software and does not separately price; (v) any new release of the Developed Software that Seller elects to make available to any of its customers; (vi) any Updates; and (vii) if requested by Buyer, on-site assistance in installation of the Developed Software. Seller will have no liability under this paragraph if Buyer modifies the Developed Software without Seller's written consent, or fails to incorporate into the Developed Software an Update that Seller has provided to Buyer related to a maintenance problem for which Buyer is seeking support, or if Buyer is not using the then current version of the Developed Software in which the problem for which Buyer is seeking support has been resolved. Notwithstanding the foregoing, Buyer may delay implementing an Update or a version of the Developed Software for up to six (6) months without any loss of its rights to maintenance and support. Updates means any error corrections or changes in the Developed Software developed by Seller so as to conform to revised standards as announced from time to time by a generally recognized standard committee in the applicable industry.

## 10. THIRD-PARTY AGREEMENTS

Seller has provided a complete list of all third-party agreements to which Seller is a party as of the date hereof relating to Seller's performance of this Purchase Order, including all agreements for materials, software, equipment, labor, and consulting. Seller agrees that it will not enter into any other third-party agreements, or otherwise delegate any of its duties under this Purchase Order, without first obtaining the prior written consent of Buyer.

## 11. INSOLVENCY

Buyer may immediately terminate this contract without liability to Seller in any of the following or any other comparable events: (a) insolvency of Seller; (b) filing of a voluntary petition in bankruptcy by Seller; (c) filing of any involuntary petition in bankruptcy against Seller; (d) appointment of a receiver or trustee for Seller; or (e) execution of an assignment for the benefit of creditors by Seller, provided that such petition, appointment or assignment is not vacated or nullified within 15 days of such event. Seller shall reimburse Buyer for all costs incurred by Buyer in connection with any of the foregoing, including, but not limited to, all attorney's or other professional fees.

## 12. EFFECTIVE DATE; TERMINATION FOR BREACH

This Purchase Order is effective as of the date issued. Either party may, upon giving thirty (30) days' written notice identifying specifically the basis for such notice, terminate this Purchase Order for breach of a material term or condition of this Purchase Order, provided the breaching party shall not have cured such breach within the thirty (30) day period.

## 13. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this contract, Buyer may, at its option, immediately terminate all or any part of this contract, at any time and for any reason, by giving written notice to Seller. Upon such termination, Buyer shall pay to Seller without duplication for all Services rendered and expenses incurred and committed to by Seller in accordance with this order prior to the date of termination and not previously paid for. Except as provided in this Paragraph, Buyer shall not be liable for and shall not be required to make payments to Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, unabsorbed overhead, interest on claims, product development and engineering costs, facilities and equipment rearrangement costs or rental, unamortized depreciation costs, or general and administrative burden charges from termination of this

4

contract. Within 60 days from the effective date of termination, Seller shall submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit Buyer's audit, and shall thereafter promptly furnish such supplemental and supporting information as Buyer shall request. Buyer or its agents shall have the right to audit and examine all books, records, facilities, work, material, inventories and other items relating to any termination claim of Seller. Upon any termination of this Purchase Order, Seller, at Buyer's request and expense, will assist Buyer in effecting a seamless transition for replacing the Services.

## 14. BUYER'S RULES AND POLICIES

Seller will require its employees when on Buyer's premises to comply with all Buyer rules and policies which Buyer communicates to Seller or its employees. Buyer reserves the right to bar employees, representatives or agents of Seller from Buyer's premises for failure to observe such rules and policies.

## 15. INFORMATION GATHERING PRACTICES

Seller agrees that its acquisition of information on behalf of Buyer will be in compliance with all applicable laws and in addition will be in compliance with the ethical principles set forth in the Buyer's Guidelines For Employee Conduct, which state in pertinent part as follows:

> "There are, however, important limitations on how and what competitive information may be obtained. No improper means may be used to acquire confidential or proprietary information from any competitor, supplier or customer. Improper means would include any form of industrial espionage, the payment of money or giving of any favor or consideration, or the hiring of a competitor's employees to obtain confidential information. Information which may not be sought would include data on a competitor's unannounced new products or confidential data relating to costs, prices or profits."

## 16. INDEMNIFICATION:

If Seller performs any work on Buyer's premises or utilizes the property of Buyer, whether on or off Buyer's premises, Seller shall indemnify and hold Buyer harmless from and against any liability, claims, demands or expenses (including attorney's and other professional fees) for damages to the property of or injuries (including death) to Buyer, its employees or any other person arising from or in connection with Seller's performance of work or use of Buyer's property, except for such liability, claim, or demand arising out of the sole negligence of Buyer.

## 17. INSURANCE:

Seller shall maintain insurance coverage with carriers acceptable to Buyer and in the amounts set forth on the face of this Purchase Order. Seller shall furnish to Buyer either a certificate showing compliance with these insurance requirements or certified copies of all insurance policies within 10 days of Buyer's written request. The certificate will provide that Buyer will receive 30 days' prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. Seller's furnishing of certificates of insurance or purchase of insurance shall not release Seller of its obligations or liabilities under this contract.

## 18. PROPRIETARY RIGHTS

(a)  Seller hereby represents and warrants that:
    i.   Seller has the right to confer to Buyer the rights granted to Buyer herein; and
    ii.  The Deliverables shall be free and clear of all liens and encumbrances, and Buyer shall be entitled to use the Deliverables without disturbance.

(b)  If notified promptly in writing of any judicial action brought against Buyer based on an allegation that Buyer's use of the Seller's Intellectual Property or the Deliverables infringes a United States patent, copyright, trademark, mask work or any rights of a third party or constitutes misuse or

5

misappropriation of a trade secret ("**Infringement**"), Seller will defend such action at its expense and will pay the costs and damages awarded in any such action or the cost of settling such action. Seller shall have sole control of the defense of any such action and all negotiations for its settlement or compromise. If notified promptly in writing of any informal claim (other than a judicial action) brought against Buyer based on an allegation that Buyer's use of the Seller's Intellectual Property or the Deliverables constitutes Infringement, Seller will pay the costs associated with resolving such claim and will pay the settlement amount (if any), provided that Seller shall have sole control of the resolution of any such claim and all negotiations for its settlement. If a final injunction shall be obtained against Buyer's use of Seller's Intellectual Property or the Deliverables by reason of Infringement, or if in Seller's opinion Buyer's use of Seller's Intellectual Property of the Deliverables is likely to become the subject of a claim of Infringement, Seller may at its option and expense either:

    i.    procure for Buyer the right to continue to use Seller's Intellectual Property or the Deliverables as contemplated hereunder, or

    ii.    replace or modify Seller's Intellectual Property or the Deliverables to make its use hereunder non-infringing while being capable of performing the same function. If neither option is reasonably available to Seller, then the applicable Purchase Order or relevant part of such Purchase Order may be terminated at the option of either party hereto without further obligation or liability other than as provided in Section 5 (Confidentiality) hereof, except that Seller shall promptly refund to Buyer a sum equal to the amount Buyer paid to Seller for the infringing Seller's Intellectual Property or the Deliverables.

In the event the infringing Seller's Intellectual Property or the Deliverables are integral to the operations of hardware also purchased from Seller, or its agent, Seller shall arrange for the removal of the hardware and refund to Buyer all monies paid for the hardware less an amount equal to one-sixtieth (1/60) of the contract price of the system per month that the system has been in operation.
Buyer shall have the right to participate in the defense of any such claim at its own expense through counsel of its choice.

## 19.  MALICIOUS SOFTWARE
Malicious software is defined as a self-propagating program that performs a series of harmful actions within a computer system, for example, file deletion, file corruption, and data theft or that halts operation of the Software, for example, keys. Buyer shall use reasonable efforts to maintain on its equipment, data bases, and networks reasonably current protection programs against the introduction of malicious software. Seller will not introduce malicious software into Buyer's equipment, data base(s), or network(s). In the event that Seller does introduce malicious software, Seller will use its best efforts to immediately remove such malicious software from all infected equipment, database(s), and network(s) and to restore such equipment, database(s), and network(s) to their original state.

## 20.  YEAR 2000 WARRANTY
Any software or equipment developed and provided by Seller under this Purchase Order must be fully Year 2000 Compliant except as specified herein.

With respect to any third-party software and equipment procured by Seller for delivery to Buyer under the terms of this Purchase Order ("**Third-Party Software or Equipment**"), if any, Seller shall use all reasonable efforts: (i) to obtain on Buyer's behalf the warranty set forth in the preceding sentence; and (ii) to determine whether the Third-Party Software or Equipment is Year 2000 Compliant before using the Third-Party Software and Equipment hereunder. If Seller is unable to obtain such warranty for Third-Party Software or Equipment, Seller shall promptly notify Buyer and shall promptly undertake to test the Third-Party Software or Equipment using Buyer's Year 2000 Compliance Test Procedure, or a comparable procedure approved by Buyer. If the Third-Party Software or Equipment fails the Year 2000 Compliance Test Procedure, Buyer shall have the option to do one of the following: (i) reject the Third-Party Software or Equipment and pursue other alternatives; or (ii) require Seller to upgrade the Third-Party Software or Equipment to render it Year 2000 Compliant.

To be "Year 2000 Compliant" the software or equipment must at all times before, during, and after January 1, 2000, accurately process and handle date and time data (including, but not limited to, calculating, comparing and sequencing) from, into, and between the twentieth and twenty-first centuries, and the years 1999 and 2000, including leap year calculations, to the extent that other information technology (e.g., hardware, software and firmware) used in combination with such software or equipment properly exchange date/time data with it. To the extent any software or equipment provided by Seller under this Purchase Order (if any) must perform as a system, such software or equipment used in combination must properly exchange date/time data among themselves in accordance with the foregoing warranty.

## 21. REMEDIES
Except as expressly provided herein to the contrary, the rights and remedies reserved to Buyer and Seller in this contract shall be cumulative with, and additional to, all other or further remedies provided in law or equity. Without limiting the foregoing, should any goods fail to conform to the warranties set forth in Section 1, Buyer shall notify Seller and Seller shall, if requested by Buyer, reimburse Buyer for any incidental and consequential damages caused by such nonconforming goods, including, but not limited to, costs, expenses and losses incurred by Buyer (a) in inspecting, sorting, repairing or replacing such nonconforming goods; (b) resulting from production interruptions, (c) conducting recall campaigns or other corrective service actions, and (d) claims for personal injury (including death) or property damage caused by such nonconforming goods. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

## 22. LIMITATION OF LIABILITY
In no event shall either party be liable for consequential, incidental or punitive loss, damage or expenses (including lost profits or savings) even if it has been advised of their possible existence.

In no event shall either party be liable for consequential, incidental or punitive loss, damage or expenses (including lost profits or savings) even if it has been advised of their possible existence

The limitations or exculpations of liability set forth above shall not apply to (1) either party's liability (a) for claims, demands, loss, damage or expense relating to bodily injury or death of any person or damage to real and/or personal property, or (b) resulting from its gross negligence or willful, wanton, or reckless misconduct; and (2) Seller's Liability under Sections 18 (Proprietary Rights) and Section 19 (Malicious Software) hereof.

## 23. SETOFF/RECOUPMENT
In addition to any right of setoff or recoupment provided by law, all amounts due to Seller shall be considered net of indebtedness of Seller and its affiliates/subsidiaries to Buyer and its affiliates/subsidiaries; and Buyer shall have the right to setoff against or to recoup from any amounts due to Seller and its affiliates/subsidiaries from Buyer and its affiliates/subsidiaries.

## 24. NO ADVERTISING
Seller shall not, without first obtaining the written consent of Buyer, in any manner advertise or publish the fact that Seller has contracted to furnish Buyer the goods or services covered by this contract, or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials.

## 25. COMPLIANCE WITH LAWS; FORCED LABOR
Seller, and any goods or services supplied by Seller, shall comply with all applicable laws, rules, regulations, orders, conventions, ordinances or standards of the country(ies) of destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Seller further represents that neither it nor any of

its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or provision of services under this contract. At Buyer's request, Seller shall certify in writing its compliance with the foregoing. Seller shall indemnify and hold Buyer harmless from and against any liability claims, demands or expenses (including attorney's or other professional fees) arising from or relating to Seller's noncompliance.

## 26. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this contract shall in no way affect the right to require such performance at any time thereafter, nor shall the waiver of either party of a breach of any provision of this contract constitute a waiver of any succeeding breach of the same or any other provision.

## 27. NON-ASSIGNMENT

Neither party may assign or delegate its obligations under this contract without the other party's prior written consent.

## 28. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties and nothing in this contract shall make either party the agent or legal representative of the other for any purpose whatsoever, nor does it grant either party any authority to assume or to create any obligation on behalf of or in the name of the other.

## 29. GOVERNING LAW; JURISDICTION

This contract is to be construed according to the laws of the country (and state/province, if applicable) from which this contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any conflict of law provisions that would require application of another choice of law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this contract is issued.

## 30. SEVERABILITY

If any term(s) of this contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such term(s) shall be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this contract shall remain in full force and effect.

## 31. RIGHT TO AUDIT

Buyer, at its expense, has the right to review and/or audit the all relevant books and records, including the administrative and accounting policies, guidelines, practices and procedures of Seller, to substantiate the charges invoiced under this Purchase Order. Seller will preserve all such documents for a period of four (4) years after final payment. Seller further agrees to cooperate fully with Buyer with all reasonable requests of Buyer for such review(s) or audit(s) and agrees that such audit may be used as a basis for settlement of disputes which might arise regarding payments under this Purchase Order.

## 32. EXCLUSIVE SERVICES

Seller agrees that it will not, for a period of twelve (12) months following completion of the Services, assign those persons who directly and substantively performed services for Buyer under this Purchase Order and had access to Buyer's information (Section 5), to perform similar services for a competitor in the same line of business as Buyer.

### 33. ENTIRE AGREEMENT

This Purchase Order, together with all attachments and exhibits hereto, constitutes the entire agreement between Seller and Buyer with respect to the subject matter hereof and shall supersede all prior oral or written representations and agreements. The printed terms and conditions appearing on the reverse side of Buyer's purchase order form shall be deemed to be deleted in their entirety, shall apply to neither party and replaced by the terms and conditions contained herein. In the event of any conflict between the terms on the face of this Purchase Order (including Specifications and other attachments and exhibits hereto) and these short form IS&S terms, such conflict will be resolved in favor of terms set forth on the face of this Purchase Order.

# **EXHIBIT 5**

**Second Note to the Technical Teams**
**SMA Contract with Dr. Yilmaz Sahinkaya**
August 11, 1999

This note will serve as a reminder of the upcoming meetings during the week of August 16 with Dr. Yilmaz Sahinkaya and will also give some additional direction as the project comes into focus.

The primary focus of this SOW relates to analysis of electrical systems for 42/14 volt vehicles. Thus, this work will not comprehend certain components and architectures related to hybrid vehicles. Rather, the assumption is a relatively traditional vehicle with a single or dual voltage electrical architecture. The only exception at this point is the discussion and modeling of IC engines with electric valve control.

There has been discussion on how to focus the work of this contract to maximize the impact here at Energenix. It will be useful to validate the analyses against a real vehicle. In the present environment, the only choice is the Renault Scenic. Thus, the power generation / modification / storage components and any 42 volt components will be focused on the components already in the Scenic (or planned for implementation as the list of 42 volt loads increases). This should not be limiting, as the models will be both generic and also characterized to a specific component.

The meeting schedules are as follows:

| | |
|---|---|
| Kickoff Meeting | Monday, August 16, 8:30 AM, Conf Room 3D |
| Overall Computational Chassis | Monday, August 16, 10:30 AM, Conf Room 3D |

Trip to Anderson to see Gebamo in action and talk with generator team
Monday, August 16 afternoon, Jim Moore's work area and room 18-313

| | |
|---|---|
| 3 Phase AC generator | Tuesday, August 17, 8 AM , Conf. Room 3E |
| AC to DC Rectifier | Tuesday, August 17, 10 AM, Conf. Room 3E |
| DC to DC Converters | Tuesday, August 17, 1 PM, Conf. Room 3E |
| Rechargeable battery | Tuesday, August 17, 3 PM, Conf. Roon 3E |

| | |
|---|---|
| IC Engine with Electric Valve Control | Wednesday, August 18, 8 AM, Conf Room 2E |
| DC to AC Inverters | Wednesday, August 18, 10 AM., Conf. Room 2E |
| Wrap-up Meeting | Wednesday, August 18, 1 PM, Conf. Room 2E |

Late Wednesday afternoon as well as potentially some time on Thursday will be available for further meetings with Yilmaz.

As a reminder, the composition of the teams is:

Overall Computational Chassis/GUI
                            Conover, Husted, Simopoulos, Wood, Moore, MacBain
Rechargeable battery        Waters, Kruger, Barnhardt, Hanauer, and Kwok
3 Phase AC generator        Raja, Krefta, Khan, Fattic, and Moore
AC to DC Rectifier          Ely, Barrett, and Sriram
DC to DC Converters         Barrett, Sriram, Maple, and Kurnia
DC to AC Inverters          Raja, Sriram, Kurnia, and Hayes
IC Engine with Electric Valve Cont.  Ely and further team to be selected

John MacBain

# **EXHIBIT 6**

# INVOICE

**Structural Mechanics Analysis, Inc.**
P.O. Box 700910
San Jose, CA 95170-910

**Phone: (408) 255-1630**

Invoice No    :  042700

Invoice Date  : April 28, 2000

Client        : **Delphi Automotive Systems**
           **4800 S. Saginaw Street**
           **Flint, MI  48507**

P.O. No.     :  **AES93504**

| Item No. | Description | Price |
|---|---|---|
| PRG06345 001 | **Dr. Y.E. Sahinkaya Lead Research Engineer Developed a user friendly computer simulation program for the design and analysis of an automotive electrical system including generator, electric power devices with associated controllers, battery system, and simplified load models.** | $24,000 ~~$32,000~~ |

*Autom. Electrical System.*

Period :  August 15 - April 28, 2000  *1999*

Total    ~~$32,000~~
$24,000

Received by : _____      Date : _____

# **EXHIBIT 7**

ATTACHMENT- 6

**Delphi Automotive Systems**
Disbursement  Services
18  E  Judson
Pontiac,  MI    48342-2205

DETACH BEFORE DEPOSITING CHECK

CHECK NO.    900154464

PAYMENT DATE    06/14/00

ANALYSIS

| DOC. REFERENCE NUMBER | % DISC. | INVOICE AMOUNT | DISC. AMOUNT | NET AMOUNT |
|---|---|---|---|---|
| EA 008852330001 | 00.0000 | 24,000.00 | .00 | 24,000.00 |
| 0.750    UOM: EA    U/P: | | 32,000.00000 | EXT: | 24,000.00 |

CONTACT BUYER\QTY VAR OR NO PHT CALL PLANT\FOR
CALL CUST SERVICE 248 874-4636                NB

| **TOTAL** | | 24,000.00 | .00 | 24,000.00 |

# **EXHIBIT 8**



Dear  Dr. Yilmaz Sahinkaya,                                      September 14, 2000

At this time the purchase order AES-93504 will be closed.  The deliverables of this
purchase order have not been met, therefore putting Delphi in a poor position.  Deadlines
are being missed and the success of this project is in jeopardy.  Project #1 should have
been completed by October 1999, but yet it is still open.

At this time I must instruct Structural Mechanics Analysis not to proceed any further with
this project.  Please forward to James Wood the software source codes and
documentation that is completed to date.

Regards,

Michele Peek
Senior Buyer
Delphi Energy & Chasis Systems
810) 257-6013

3

# EXHIBIT 9

ATTACHMENT 7

INVOICE

Structural Mechanics Analysis, Inc.
P.O. Box  700910
San Jose, CA 95170-910
Phone: (408) 255-1630

Invoice No   :  072004

Invoice Date :  July 20, 2004

Client :  c/o  Mr. James A. Wood
         Delphi Corporation
         Plant 12 ERC Bldg.
         2705 South Goyer Road
         Kokoma, IN 46904-9005

P.O. No.  :  AES-93504

| Item  No. | Description | Price |
|-----------|-------------|-------|
| PRG06345 001 | Power Source Sub- System Analysis and Program Development | $ 23,700 |
| PRG 06345 002 | Electrical Power Demand Loads Sub-System Analysis and Program Development | $ 2,500 |
| PRG06345 003 | Integrated System Analysis and Program Development | $ 12,500 |
| PRG06345 004 | Documentation/ Training | $ 3,700 |
| Period :  April 28, 2000 – September 14, 2000 | Total | $ 42,400 |

Received by:                                    Date:

# EXHIBIT C

Delphi Corporation
Special Parties

| COMPANY | CONTACT | ADDRESS1 | ADDRESS2 | CITY | STATE | ZIP | PARTY / FUNCTION |
|---|---|---|---|---|---|---|---|
| Davis, Polk & Wardwell | Donald Bernstein<br>Brian Resnick | 450 Lexington Avenue | | New York | NY | 10017 | Counsel to Debtor's Postpetition Administrative Agent |
| Delphi Corporation | Sean Corcoran, Karen Craft | 5725 Delphi Drive | | Troy | MI | 48098 | Debtors |
| Fried, Frank, Harris, Shriver & Jacobson | Brad Eric Sheler<br>Bonnie Steingart<br>Vivek Melwani<br>Jennifer L Rodburg<br>Richard J Slivinski | One New York Plaza | | New York | NY | 10004 | Counsel to Equity Security Holders Committee |
| Joseph Reno | Brad A. Chalker | Law Offices of Brad A. Chalker | P.O. Box 750726 | Dayton | OH | 45475 | Counsel for Joseph Reno |
| JPMorgan Chase Bank, N.A. | Thomas F. Maher, Richard Duker, Gianni Russello | 270 Park Avenue | | New York | NY | 10017 | Postpetition Administrative Agent |
| Latham & Watkins LLP | Robert J. Rosenberg | 885 Third Avenue | | New York | NY | 10022 | Counsel to Official Committee of Unsecured Creditors |
| Simpson Thatcher & Bartlett LLP | Kenneth S. Ziman, Robert H. Trust, William T. Russell, Jr. | 425 Lexington Avenue | | New York | NY | 10017 | Counsel to Debtor's Prepetition Administrative Agent, JPMorgan Chase Bank, N.A. |
| Skadden, Arps, Slate, Meagher & Flom LLP | John Wm. Butler, John K. Lyons, Ron E. Meisler | 333 W. Wacker Dr. | Suite 2100 | Chicago | IL | 60606 | Counsel to the Debtor |
| Skadden, Arps, Slate, Meagher & Flom LLP | Kayalyn A. Marafioti, Thomas J. Matz | 4 Times Square | P.O. Box 300 | New York | NY | 10036 | Counsel to the Debtor |
| United States Trustee | Alicia M. Leonhard | 33 Whitehall Street | 21st Floor | New York | NY | 10004-2112 | Counsel to United States Trustee |

In re. Delphi Corporation, et al.
Case No. 05-44481 (RDD)

Page 1 of 1

3/21/2007 10:43 AM
Reno Response Service List

# EXHIBIT D

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                            :
        In re                               :    Chapter 11
                                            :
DELPHI CORPORATION, et al.,                 :    Case No. 05-44481 (RDD)
                                            :
                                            :    (Jointly Administered)
              Debtors.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

DEBTORS' AMENDED SUPPLEMENTAL REPLY WITH RESPECT TO
PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

("AMENDED SUPPLEMENTAL REPLY – JOSEPH RENO")[1]

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively the "Debtors"),

---

[1]    The Debtors' Amended Supplemental Reply supersedes the Debtors' Supplemental Reply (Docket No. 7006).

1

hereby submit their Amended Supplemental Reply With Respect To Proof Of Claim No. 9956

(Joseph Reno) (the "Amended Supplemental Reply") and respectfully represent as follows:

Introduction

1.      Joseph Reno ("Reno"), a former full-time salaried at-will employee of

Delphi's Kettering, Ohio, manufacturing plant (the "Plant"), alleges that his supervisor at Delphi,

Mark Gooding ("Gooding"), suspended and terminated him because of their disagreement over

whether a leaking wastewater tank should be totally resurfaced or only patched where

appropriate (the "Wastewater Incident").  Contrary to his allegations, however, Reno was

suspended and later terminated by Elizabeth Patrick ("Patrick"), Delphi's Divisional Salaried

Personnel Director based in Troy, Michigan, after an internal investigation (the "Investigation")

revealed, among other things, that Reno abused his position with respect to a Delphi vendor for

personal benefit and obstructed Delphi's subsequent Investigation into the matter.

2.      The Investigation—which began weeks before the Wastewater Incident—

revealed that (i) Reno misused his relationship with Delphi's waste contractor, Onyx Industrial

Services Inc. ("Onyx"), to get an Onyx employee to haul a dumpster to and from his house; (ii)

the dumpster, filled with Reno's discarded waste, was hauled to Delphi property; and (iii) Reno

attempted to conceal his actions during the Investigation.  Based on these facts, Patrick decided

to suspend and later terminate Reno.

3.      Reno's claim that Delphi terminated him because he and Gooding

disagreed over how to remedy a wastewater leak is untenable.  Patrick—not Gooding—made the

decision to suspend Reno and without knowledge of the Wastewater Incident. Although Patrick

later became aware of the Wastewater Incident, Patrick was not involved in the Wastewater

Incident and was not influenced by any differences of opinion between Reno and Gooding as to

how best to fix the tank.  Patrick decided, after being apprised of the results of the Investigation,

2

to suspend and later fire Reno due to his unacceptable misconduct and subsequent attempts to

obstruct the Investigation.  Accordingly, Reno's retaliatory discharge claim against the Debtors

has no merit and must fail.

4.    Reno argues that Delphi's stated reason for terminating his employment

was a pretext because the Investigation was not complete when he was fired and thus could not

have served as the basis for the termination.  Contrary to Reno's assertion, Patrick had more than

sufficient information to terminate Reno's employment when Michael Brown ("Brown"), a

licensed investigator, informed her that Reno paid the Onyx driver $100 in cash to provide him

with a dumpster for personal use and then to return that dumpster to Delphi property, and that

Reno was attempting to obstruct the Investigation.  Reno cannot show that Delphi's stated reason

for terminating his employment was a pretext or that Delphi did not have an independent reason

to terminate him as a result of the misconduct uncovered as part of the Investigation.

5.    Reno's other claims similarly fail.  Reno's claim based on Ohio's

whistleblower statute fails because Reno did not comply with the statutory requirements.  Reno's

claim under the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. §§ 1161-69

("COBRA"), fails because the Debtors terminated Reno for gross misconduct and were therefore

not required to continue his group health insurance.  Reno's claim under the Fair Credit

Reporting Act (the "FCRA") fails because the Investigation, and Brown's report that results from

it, are outside the reach of the act.  Reno has not articulated the legal or factual basis for any of

his other claims.  This Court should disallow and expunge Reno's claim in its entirety.

<u>Background</u>

6.    Many key facts are not in dispute.  In late 2003, Reno approached Troy

Calton ("Calton"), the primary Onyx contact for the Plant's waste disposal, and asked him to

deliver an Onyx dumpster to his home so that he could dispose of yard debris, concrete, wire,

3

wire fencing, general construction debris, empty bags, and sea salt boxes from his wife's

aquarium business. (Reno Dep. 16:6-8.)[2] The two never discussed an exact fee, a rough

estimate, or a unit price for the dumpster rental and waste disposal. (Id. 158:15 – 159:10; Calton

Dep. 35:24 – 36:2.) Instead, Reno paid Calton $100 in cash for delivering a red Onyx dumpster

to Reno's home and did not sign a rental agreement or even request a receipt. (Reno Dep. 18:4-

10.) In lieu of signing a rental agreement or getting a written receipt at the time, Reno claims to

have "purposely attempted to rent [the] dumpster and pay for it in . . . front of witnesses" to

avoid apparently any potential "misunderstanding" that might later develop as to whether he

"intended to pay for [the] service in full." (Id. 11:7-22, 142:14 – 143:9, 146:10-19.) The

dumpster arrangement was not recorded in Onyx's books and records because, as Calton

understood the arrangement, the $100 cash "was for me for the trouble"—a "personal payment"

not intended for Onyx. (Calton Dep. 35:15-21; 58:1-22.)

           7.      Reno admits that, at the time, he understood Delphi's conflict-of-interest

policy, which prohibits employees from using their position at Delphi to seek favors or more

favorable terms from Delphi vendors. (Reno Dep. 54:9 – 55:16; Declaration Of Beth Patrick In

Support Of Debtors' Supplemental Reply With Respect To Proof Of Claim 9956 (Joseph Reno)

(the "Patrick Decl.") ¶ 13, attached hereto as Exhibit A.)[3] Yet Reno never sought or received

approval from Gooding, Human Resources, or anyone else at Delphi for this unusual off-the-

books transaction involving a $100 cash payment to the Onyx driver.

           8.      On January 29, 2004, Delphi's Environmental Site Coordinator for the

Plant, JoAnne Rau ("Rau"), was notified that a red dumpster located on the property of the Plant

contained fencing and aquarium salt bags, not waste that would have normally come from the

_____

[2]    Copies of deposition transcripts cited herein will be included in parties' joint exhibit binder to be filed prior to
       hearing.
[3]    Elizabeth Patrick's name at the time of these events was Elizabeth Meyer.

Plant.  (Rau Dep. 13:13-21.)  Calton notified Reno that he had spotted Delphi employees taking

pictures of the dumpster and its contents and that an investigation into the red dumpster

containing Reno's debris had begun.  (Reno Dep. 142:14 – 143:9.)  Calton and Reno discussed

that "it was going to be a problem." (Calton Dep. 33:4-5.) Reno admits his "first thought was to

protect [himself]." (Reno Dep. 143:23 – 144:8.) Thus, Reno immediately asked Calton to create

a backdated receipt for the $100 in cash that he gave to Calton earlier.  (Id. 18:7-10; 33:24 –

34:11; Calton Dep. 19:21 – 20:5.) And, instead of approaching Gooding or anyone else in Delphi

management or Human Resources, Reno immediately solicited statements from two subordinate

employees at Delphi (David Atchison and Terry Ruble) and an employee of a Delphi contractor

(David Low) to confirm a passing conversation between Reno and Calton that had purportedly

occurred roughly four months earlier when Reno allegedly agreed to pay for the dumpster costs.

(Id. 22:6-9, 25:19 – 27:3.)

   9. On February 2, 2004, Gooding contacted Brown and asked Brown to

determine the origin of the debris and the reason for its presence on Delphi property.  (See

Amended Declaration Of Michael Brown In Support Of Debtors' Supplemental Reply With

Respect To Proof Of Claim 9956 (Joseph Reno) (the "Brown Decl.") ¶ 7, a true and correct copy

of which is attached hereto as Exhibit B.)  Brown discovered that the dumpster belonged to

Onyx.  (Id. ¶ 8(a).)  As the key Onyx contact for the Plant, Calton worked closely with Reno.

(Id. ¶ 8(b).)  Brown also discovered that Plant employees believed that Reno might have been the

source of the debris in the dumpster.  (Id. ¶ 7.)

   10. Meanwhile, on February 4, 2004, Reno received witness statements from

Atchison and Low.  (Reno Dep. 25:19 – 27:3.)  Ruble refused to sign such a statement.  (Id.

26:21 – 27:3; Ex. B, Brown Decl. ¶ 21.)  Although Reno contends that he believed the

5

Investigation was based on "a big misunderstanding," he nevertheless kept the two witness statements dated February 4, 2004, from anyone in Delphi management, Human Resources, or otherwise until a couple of weeks later when Reno was summoned to be questioned about his role in the dumpster matter.  (Reno Dep. 143:15 – 146:19.)

11.     On February 5, 2004, Brown met with Calton.  (Ex. B, Brown Decl. ¶ 9.) Calton initially told Brown that, in early fall 2003, Reno asked him to deliver an empty dumpster to Reno's residence and that a few months later Reno asked him to return to pick up the dumpster.  (Id. ¶¶ 9-10.)  Calton said that he was supposed to take the dumpster from Reno's residence to a landfill.  (Id. ¶ 11.)  However, due to an emergency at the Plant, he drove with the dumpster straight to the Plant.  (Id.)  Calton then left the dumpster on Delphi property and forgot to retrieve it later to take it to a landfill.  (Id.)

12.     Coincidentally, on February 13, 2004, about two weeks after the Investigation had been initiated, Reno supposedly discovered a leak from a chromium wastewater treatment tank at the Plant and temporarily solved the leakage problem by creating a bypass to a different holding tank.  (See March 30, 2004, letter from Delphi to the Occupational Safety and Health Administration (the "Delphi OSHA Letter") at 2, attached hereto as Exhibit C; Reno's First Amended Complaint (the "Am. Compl.") ¶¶ 5-6, attached hereto as Exhibit D.) Reno failed to mention that he was notified of this problem months earlier. (T. Brown Dep. 36:21 - 43:19.) Although Reno claims that he believed a release of toxic chromium had occurred, he chose not to inform Gooding or Rau at that time.  (Reno Dep. 86:12-20, 110:16-111:6.)

13.     On February 16, 2004, Brown interviewed Reno regarding the dumpster. (Ex. B, Brown Decl. ¶ 12.)  Reno told Brown that he had asked Calton to deliver the dumpster to his house in late November 2003 or early December 2003—not early fall 2003 as Calton stated

6

during his February 5 interview with Brown.  (Id.)  Reno also said that he filled the dumpster and

asked Calton to pick it up on December 22, 2003.  (Id.)  Reno explained that December 22, 2003,

had been the first day of Delphi's holiday shutdown for the year, so he was at home that day and

thus able to coordinate Calton's removal of the dumpster.  (Id.)  Brown later learned that the

2003 holiday shutdown began on December 23—not December 22 as Reno had said.  (Id.)  Reno

told Brown that, until he learned of the Investigation in late January 2004, he thought the

dumpster had been taken to the landfill.  (Id. ¶ 13.)

        14.    Then, without Brown asking him to do so, Reno produced the two

prepared written statements from Atchison and Low, who purported to have overheard a

conversation between Reno and Calton in which Reno allegedly told Calton that Reno would

personally pay the fee for the dumpster.  (Id. ¶ 14.)  Brown found it odd that Reno came to the

interview with prepared statements, especially because prior to the interview, Brown had not

raised any issues related to the use of the dumpster, its presence on Delphi property, or whether

any such conversations between Reno and Calton actually occurred.  (Id.)  Brown later learned

from Ruble, that Reno also had asked Ruble to give a statement, but Ruble refused to do so

because such a statement would have been false.  (Id. ¶ 21 )

        15.    Two days after his interview with Brown, Reno decided to inform

Gooding and Rau for the first time at a February 18, 2004 staff meeting of a leak that occurred

five days earlier.  (See March 2, 2004, Letter from Reno to James Walle (the "March 2 Letter"),

attached hereto as Exhibit E; Reno Dep. 80:1-23, 81:16-25, 82:2-16, 86:12-20, 110:16 – 111:6.)

Delphi retained American Testing Services Ltd. ("ATS") to inspect the tank on February 20,

2004.  (See ATS Onsite Inspection Report dated February 20, 2004 (the "ATS Report"), attached

hereto as Exhibit F.)  Reno claims that he wanted to recoat the entire tank that had leaked, while

7

Gooding concluded that only the bottom third of the tank and any other visibly cracked areas noted in the ATS Report needed to be recoated. (See Ex. D, Am. Compl. ¶ 12.) Between February 23, 2004, and March 1, 2004, the tank was repaired by patching any cracks and resurfacing the bottom three feet of the tank and any other damaged areas. (See Ex. C, Delphi OSHA Letter at 4; HRC Investigation Report at 2, attached hereto as Exhibit G.)

16.    Meanwhile, because there were significant discrepancies in the chronologies that Reno and Calton offered concerning the dumpster incident, Brown decided to interview Calton for a second time on February 18, 2004. (Ex. B, Brown Decl. ¶ 15.) After Calton repeated the same story he had told Brown in his February 5 interview, Calton asked what would happen to him as a result of his involvement in the dumpster incident. (Id.) Brown explained to Calton that, as long as he was telling the truth, nothing would happen to him. (Id.) After the interview had ended, while still in the hallway, Calton asked whether he could resume the interview because he needed to make some changes in his statement. (Id. ¶ 16.) Calton explained that he delivered the dumpster to Reno's home in August 2003 or September 2003—not November or December 2003 as Reno had told Brown—and that he picked up the dumpster in late September 2003 or October 2003—not on December 22, 2003, as Reno had told Brown. (Id. ¶ 16(a) & (b).) Calton then explained that he and Reno drove together in the Onyx truck from the Plant to Reno's residence to retrieve the dumpster and then they both brought it back to the Plant. (Id. ¶ 16(b).) Calton admitted that Reno gave him $100 in cash in exchange for the favor of allowing Reno to use the dumpster at his home and for picking up and dropping the dumpster off at the Plant. (Id. ¶ 16(c).) Calton admitted that he did not give the $100 to Onyx. (Id.) He also explained that, in February 2004, shortly after the Investigation began, Reno approached Calton and asked him to create a receipt for the $100 cash payment. (Id. ¶ 16(d).)

Calton said he arbitrarily chose December 22, 2003, as the date for the receipt.  (Id.)  Calton

testified that, contrary to Reno's solicited statements, there were no other people present when

Reno gave him the $100 cash (Calton Dep. 63:19-23, 79:19 – 80:18.)

        17.     On February 20, 2004, after learning of the status and findings of the

Investigation, Patrick decided to suspend Reno.  (Ex. A, Patrick Decl. ¶ 9.) Both Brown and

Patrick were unaware of the Wastewater Incident.  (Id. ¶ 10; Ex. B, Brown Decl. ¶ 24.)

        18.     On March 2, 2004, Reno sent a letter to James Walle, a Delphi Legal

Department attorney who dealt with environmental issues.  (See Ex. D, March 2 Letter.)  In the

letter, Reno expressed general concerns about the safety of the chrome treatment tanks at the

Plant. He also referred to the dumpster Investigation, although he inaccurately reported that

Calton had taken full responsibility for returning the dumpster to Delphi.  (Id.)  In response to the

letter, Delphi arranged for both internal Delphi environmental managers and an independent

consulting engineering firm, Hubbel, Roth & Clark Inc., to investigate and determine if the

wastewater tanks at the Plant were in fact safe for continued use.  Both investigations concluded

that Delphi had taken appropriate action concerning the tanks.  (See Ex. G, HRC Investigation

Report at 3.)

        19.     On March 5, 2004, Brown conducted a third interview with Calton.  (Ex.

B, Brown Decl. ¶ 22.)  Calton reaffirmed his statement that Reno personally had paid him $100

and only later requested a receipt.  (Id.)  Although Calton had agreed after the February 18

interview to give a written statement, he refused to give a written statement unless Delphi agreed

not to take action against him.  (Id. ¶ 17.)  After reading Brown's findings from March 5, 2004,

Patrick decided that the information that Brown had uncovered established that Reno abused

Delphi's business relationship with Onyx and obstructed the Investigation by lying about the

9

facts and persuading Calton to produce a fraudulent receipt.  (Ex. A, Patrick Decl. ¶ 13.)

Therefore, on March 17, 2004, Patrick decided to terminate Reno.  (Id.)  The leak had nothing to

do with her decision.

20.    On May 20, 2004, the Occupational Safety & Health Administration

("OSHA"), concluded, in response to a complaint filed by Reno, "that [Delphi] terminated

[Reno] for misappropriating company assets, taking personal advantage of his business

relationship with a Delphi supplier, which is a conflict of interest and trying to obstruct and

mislead Delphi's subsequent investigation."  (See OSHA Finding, attached hereto as Exhibit H.)

Argument

21.    Reno cannot establish a retaliatory discharge claim because Delphi's

suspension and later termination of Reno were not in retaliation for the Wastewater Incident.

Delphi's decision to terminate Reno was based on Patrick's assessment that Reno

misappropriated Delphi assets, took advantage of his business relationship with Onyx—a conflict

of interest—and tried to obstruct and mislead Delphi's Investigation.  Accordingly, Reno's public

policy retaliatory discharge claim fails. So, too, do Reno's other claims.  Because Reno failed to

comply with the requirements of Ohio's whistleblower statute, his claim under that statute must

fail.  Because Delphi terminated Reno for cause, Reno's COBRA claim must fail.

A.    Reno Cannot Show He Was Suspended Or Terminated Contrary To Ohio Public Policy.

22.    As an initial matter, Reno's Trial Brief[4] overlooks the elements that he

must prove to establish his claim that he was discharged in violation of Ohio public policy:

> In order to support a claim for discharge in violation of public policy, a plaintiff
> must show (1) the existence of a clear public policy, (2) dismissal under
> circumstances that would jeopardize that policy, (3) dismissal related to the public

---

[4]    Reno's Trial Brief was attached to his Motion For Leave To File Claimant Joseph Reno's Trial Brief And
Declaration (Docket No. 7103), filed March 2, 2007.

policy, and (4) lack of an overriding business justification for the employer's
action.

Urban v. Osborn Mfg., Inc., 847 N.E.2d 1272, 1276 (Ohio Ct. App. 2006).[5]  Since Reno cannot

meet these elements, his claim should be disallowed and expunged.

      i.      Reno Cannot Show That His Termination Was Related To Workplace Or
           Public Safety, Or Any Other Public Policy

     23.    Reno cannot show that Delphi's suspension or termination of him

jeopardizes Ohio public policy because Delphi suspended and terminated him for his misconduct

related to the dumpster incident and the related Investigation—not his concerns about how best

to repair a leak in the south chrome tank at the Plant.

     24.    As an initial matter, Brown began investigating Reno's misconduct almost

two weeks *before* the wastewater leak and interviewed both Reno and Calton *before* Reno

decided to disclose the wastewater leak on February 18, 2004.  (Ex. B, Brown Decl. ¶¶ 9, 12,

15.)  Reno was suspended with pay on February 20, 2004, the same day that ATS submitted the

initial inspection report on the wastewater tank, and nearly two weeks before Reno submitted the

March 2 Letter.  By February 20, 2004, Brown's Investigation into Reno's conduct concerning

the Onyx dumpster already had revealed that (1)  Calton contradicted Reno's story ; (2) Reno

gave Calton $100 in cash, and Calton had not turned the money over to Onyx; (3) Reno

requested a backdated receipt from Calton only after Brown began his investigation into the

matter; and (4) Reno asked subordinate employees to give exculpatory statements regarding

Reno's transaction with Calton.  (See generally Ex. B, Brown Decl.)  These revelations

---

[5]    The two cases that Reno cites in his section entitled the "Law" do not even articulate to the elements of an Ohio
public policy claim. (See Trial Br. at 3 (citing Fennell v. First Step Designs Ltd., 83 F.3d 526 (1st Cir. 1996)
(interpreting Maine's whistleblower statute) and Eperesi v. Northernenvirotest Sys. Inc., No. 98-3452, 1999 WL
825034, at *5 (6th Cir. Oct. 6, 1999) (unpublished) (finding that plaintiff's Ohio public policy claim survived
summary judgment because "[b]oth parties seem to agree that [plaintiff's] common law public policy claim is
dependent on the success of her claims of discrimination and retaliation").)

convinced Patrick to suspend Reno on February 20, 2004.  (See Ex. A, Patrick Decl. ¶ 9.)

Patrick then terminated Reno on March 17, 2004, for the same reasons.  (Id. ¶ 13 & Exhibit 1.)

The Wastewater Incident had absolutely no bearing on Patrick's decision.  (Id. ¶ 11.)

25.    Moreover, the decision to suspend and subsequently terminate Reno was

made by Patrick, who was uninvolved in the wastewater leak.  Reno inaccurately attributes to

Gooding the decisions to suspend and to terminate him.  Contrary to Reno's assertions, however,

Gooding did not make the decision to terminate Reno.  Patrick did.  (Id. ¶ 13.)

26.    Notably, Delphi did take Reno's environmental concerns seriously.  From

the time they became aware of the wastewater leak, Reno's superiors, including Gooding,

handled the environmental concerns appropriately.  Delphi commissioned ATS to conduct an

investigation on February 20, 2004, allowing Delphi to develop a course of action to repair the

problem.  (See Ex. F, ATS Report.)  After the March 2 Letter, Delphi commissioned two

additional inspections to ensure that the repairs were sufficient.  (See Ex. C, Delphi OSHA Letter

at 5; Ex. G, HRC Investigation Report at 3.)  Both investigations revealed that Delphi took

appropriate steps to repair the wastewater tank and create a plan for inspecting other tanks.  (Id.)

27.    Despite taking Reno's concerns seriously, Delphi could not excuse Reno's

misconduct.  On April 3, 2001, Reno acknowledged that he received and understood Delphi's

booklet, Foundations of Excellence.  (Reno Dep. 54:9 – 55:16; Ex. A, Patrick Decl. ¶ 13(a) &

Exhibit 1 thereto.)  Page 6 of the booklet states: "[W]e must avoid actions or relationships that

might conflict or even appear to conflict  with our job responsibilities or Delphi's interests."  The

policy continues:

> A conflict of interest is an obligation to or relationship with any person or
> organization that competes or does business with Delphi, that could affect an
> employee's judgment in fulfilling our responsibilities to Delphi to make business
> decisions solely in the best interests of the corporation *and without regard to*

*personal gain.  A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement.  The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest.*

*Examples of potential conflict of interests include:  . . .  Accepting services or receiving payment from a supplier . . . .*

(Ex. A, Patrick Decl. at Exhibit 1 (emphasis added).)  The policy concludes with the expectation that all employees will disclose promptly any situation that could result in a conflict and to seek out superiors to assist in resolving any questions an employee might have regarding a potential conflict.

28.    Reno sought no advice or counsel from any superior when he arranged with Calton to deliver a dumpster at his personal residence, filled it up with his personal debris, and then drove with Calton to deliver it to Delphi property.  Patrick could not ignore Reno's breach of Delphi's conflict-of-interest policy and other misconduct simply because Reno raised environmental concerns two weeks *after* Delphi already had begun investigating his misconduct. Excusing Reno's misconduct and not terminating him simply because he subsequently raised environmental concerns would undermine—not promote—Ohio public policy under these circumstances.

ii.    Reno Cannot Show That Delphi Lacked An Overriding Business
       Justification To Suspend and Terminate Him.

29.    Nor can Reno show that Delphi lacked an overriding business justification for suspending and terminating him.  See Urban, 2006-Ohio-1080, 847 N.E.2d at 1276.  In addition to showing that an improper motive somehow infected Delphi's decision to terminate, Reno also must show that Delphi did not otherwise have a legitimate reason for terminating him. See id.; Thompson v. Gynecologic Oncology & Pelvic Surgery Assocs., No. 06AP-340, 2006 WL 3491738, at *9 (Ohio Ct. App. Dec. 5, 2006) (dismissing public policy claim because "[plaintiff] failed to raise a genuine issue of material fact as to . . . whether [employer] lacked an

13

overriding legitimate business justification for the discharge").  Reno fails to show that Delphi
lacked a legitimate business justification for terminating him.

30.     Without question, Brown, the individual conducting the investigation and
reporting his findings to Patrick, had absolutely *no* knowledge of the Wastewater Incident until
*after* Reno was suspended and terminated.  Thus, although Reno cites various perceived flaws
with Brown's investigation, the undisputed evidence is that Brown conducted an investigation
revealing that, among other things, Reno had taken personal advantage of his business
relationship with Onyx and tried to obstruct and mislead the Investigation.  Faced with such
revelations, Patrick determined that Reno should be suspended and terminated.  Because Reno's
evidence does not prove that Delphi lacked an overriding business justification for suspending
and terminating him, his retaliatory discharge claims must fail.

iii.     Reno's Evidence Does Not Undermine the Debtors' Legitimate
         Nonretaliatory Reason for Terminating His Employment.

31.     Reno suggests that a "misrepresentation of fact" by Delphi to OSHA on
March 30, 2004, regarding the completion status of Brown's investigation at the time of the
termination shows that Patrick's articulated reason for firing Reno was a pretext (Trial Br. at 1-2,
8.)  Not so.  That Brown thought his investigation was not yet "complete" but Patrick thought it
was "complete" for purposes of concluding that Reno was involved in misconduct does nothing
to contradict Patrick's articulated reasons for terminating Reno on March 17, 2004.

32.     Reno's other argument—i.e., that Patrick must have lied about suspending
and terminating him because the Investigation was incomplete, incompetent, and illegal—makes
no sense. (Trial Br. at 8.)  Regarding completeness, Reno suggests that Patrick could rely on the
information uncovered by Brown *only if*, as part of his investigation, Brown had "interview[ed]
all defense witnesses identified by Joe Reno" and "give[n] Joe Reno an opportunity to respond."

14

Not so.  Reno cites no case law supporting this novel proposition.  There is nothing wrong with a decision maker making an employment decision where, as here, she had had more than enough information to conclude that an employee engaged in misconduct.

33.    Regarding competence, Reno attacks Brown's qualifications and investigative techniques (e.g., conducting group interviews, crediting Calton's revised version of events, etc.).  That Brown did not conduct the investigation according to Reno's suggested investigative protocol does not show that Patrick is lying about the real reason for suspending and later terminating Reno.  In fact, the *only* reason why Patrick even could have suspended Reno in the first instance would was the results of the Investigation, the undisputed evidence in this case being that she and Brown were both unaware of the Wastewater Incident at that time.  Reno's misconduct—already determined to be the basis for suspending him—did not simply vanish because Reno quickly developed environmental concerns days after Brown had interrogated him about why his personal debris was in a dumpster on Delphi property.[6]

34.    Regarding illegality, Reno argues that Patrick must have lied about her reasons for terminating Reno because Brown or Delphi or both were required by law to give Reno a "summary" of Brown's report "*after* taking any adverse action" against him.  (Trial Br. at 10 (citing 15 U.S.C. § 1681a(x)(2)).)  The Debtors did not, however, violate the FRCA provision because Delphi's investigation and subsequent termination of Reno is an employee misconduct investigation that (i) was not intended to be covered under the purview of the FCRA's reach; (ii)

---

[6]    Reno also suggests that the Investigation was not competently performed for other reasons. For example, Reno cites Calton's deposition transcript for the proposition that Calton said that (i) he did not expressly tell Reno he thought Delphi would be billed for the dumpster removal and (ii) he was aware that Gooding and Reno disagreed on whether the entire tank needed resurfacing. (Trial Br. at 2.) In fact, Calton's testimony actually confirms Patrick's grounds for termination in that Calton stated, "I would assume that my boss would just bill [the dumpster fees] to Delphi, once the bill came in."  (Calton Dep. 94:4-6.)  Moreover, Calton's knowledge that Reno and Gooding disagreed about how to handle the wastewater leak does not establish that Patrick is untruthful regarding her reasons for terminating Reno.

did not involve a consumer reporting agency; (iii) did not generate a consumer report or

investigative consumer report; and (iv) did not involve a third party because Brown was acting as

an agent of Delphi.  See Hartman v. Lisle Park Dist., 158 F. Supp. 2d 869 (N.D. Ill. 2001)

(finding attorney is agent for purposes of conducting investigations and therefore no violation of

preamended FCRA); Johnson v. Fed. Express Corp., 147 F. Supp. 2d 1268, 1272 (M.D. Ala.

2001) (1272 ("[e]mployer investigations of specific workplace acts by their employees . . .

simply are of no import to Congress.").[7]

35.    Reno cites no case law that would require Delphi to give Reno a copy of

Brown's report *before* it took adverse action against him in order for Reno to have a chance to

rebut the findings therein.  Indeed, even if a violation of the FCRA in fact occurred—which

Debtors dispute—an employer may still rely on information in a report in deciding to terminate

an employee.  See Baker v. Bank of Nova Scotia, No. 1:04-CV-0660-RLV, 2006 WL 618413, at

*16 (N.D. Ga. Mar. 8, 2006) ("even if the [employer's] actions violated the FCRA, such a

violation does not demonstrate that the [employer's] reliance on the information provided in the

report when it decided to terminate Plaintiff's employment is a pretext for discrimination").

36.    In sum, Reno fails to meet his burden of proving both (i) that he was

terminated in violation of Ohio public policy for raising environmental concerns and (ii) that

---

[7]    Delphi's investigation and subsequent termination of Reno on March 17, 2004, occurred prior to the effective
date of the amendment to the FCRA that Reno relies on as authority for his proposition that Delphi violated the
requirements of the FCRA.  See 15 U.S.C. § 1681a(x); 12 C.F.R. § 222.1(c)(2)(v) (effective date Mar. 31,
2004).  That, even under Section 1681a(x), Delphi's investigation of Reno would have implicated the
requirements of the FCRA is far from clear. Nonetheless, the Debtors did not violate the provision requiring
that the employee receive a "summary" of the report because (i) there is no requirement that a summary be
written; (ii) Reno was well aware of the misconduct investigation; and (iii) in any event, Reno was in fact given
a copy of Delphi's March 30, 2004, letter to OSHA as well as all copies of Brown's report during discovery in
the underlying case, both of which detailed the reasons for Reno's termination.  Moreover, because Reno had
extensive knowledge of the investigation, he cannot prove that he was damaged *as a result* of any alleged
failure by Delphi to give him a summary. See Lewis v. Ohio Prof'l Elec. Network LLC, 248 F. Supp. 2d 693,
701 (S.D. Ohio 2003).

Delphi lacked an overriding business justification for terminating him.  Accordingly, Reno's

public policy claim should be disallowed and expunged.

B.    <u>Reno Cannot Maintain A Claim Under Ohio's Whistleblower Statute</u>.

        37.    Reno's statutory whistleblower claim suffers not only from the same

deficiencies articulated above but also from an independent flaw: the Wastewater Incident and

his March 2 Letter do not meet the requirements of Ohio's whistleblower statute.  Reno,

therefore, has no legal basis to assert a claim for retaliatory discharge under the Ohio statute, and

his claims based thereon should accordingly be disallowed and expunged.

        38.    Ohio's whistleblower statute imposes specific requirements on employees

who become aware "of a violation of any state or federal statute or any ordinance or regulation of

a political subdivision that the employee's employer has authority to correct" and who then

attempt to seek protection under the statute.  OHIO REV. CODE ANN. § 4113.52(A)(1)(a).  First,

"the employee orally shall notify (his) supervisor or other responsible officer . . . of the

violation" the employer is committing.  <u>Id.</u>  Second, the "employee shall file with that supervisor

or officer a written report that provides sufficient detail to identify and describe the violation."

<u>Id.</u>  Then, if the violation is not corrected within 24 hours of either report or the employer does

not undertake reasonable efforts to commence corrections, an employee may file a report with

the prosecuting attorney or relevant agency responsible for regulating the conduct at issue.  <u>Id.</u>

        39.    Reno failed to comply with any of these requirements and therefore cannot

rely on the statute for any remedy.  The leak first appeared on February 13, 2004, but Reno did

not orally report the leak to Gooding or Delphi's environmental liaison, JoAnne Rau, until

February 18, 2004, during a marketing meeting.  Even then, he did not give sufficient detail to

identify any statutory violation.  Reno never filed a written report of the incident with Gooding.

Furthermore, Reno and Gooding did not disagree over the need to fix the tank and comply with

all applicable laws.  In fact, Delphi hired a consulting firm, ATS, to run tests on the tanks in

order to assess compliance with applicable statutes.  The tests were completed on February 20,

2004.  (See Ex. F, ATS Report.)  Although Reno disagreed on the course of action taken to repair

the tank, he did not state that it violated any specific statute or regulation.  (See Ex. E, March 2

Letter.)  The March 2 Letter, while in writing, also fails to meet the requirements of the statute in

two important ways: (1) the letter merely describes the disagreement between Reno and Gooding

on the extent of repairs and criticizes Gooding's expertise in making appropriate decisions; and

(2) the letter ignores the fact that repairs began on February 23, 2004.  (See id.)  Reno never cited

any specific regulation that Delphi was violating.

        40.     The Ohio Supreme Court has repeatedly stated that employees must

*strictly* comply with the statute's specific requirements to invoke any protection under the statute.

Kulch v. Structural Fibers, Inc., 677 N.E.2d 308, 322-23 (Ohio 1997); Contreras v. Ferro Corp.,

652 N.E.2d 940 (Ohio 1995); accord Haney v. Chrysler Corp., 699 N.E.2d 121 (Ohio Ct. App.

1997).  In Contreras, the court denied protection because the employee failed to file oral or

written complaints before engaging outside investigators to investigate illegal activity.  In Haney

the court denied protection because, like Reno, Haney's written report was delivered to a person

other than his direct supervisor and lacked the specificity required by the statute to describe an

unlawful violation.  See Haney, 699 N.E.2d at 122.  Because Reno did not meet the statutory

requirements of maintaining a claim for damages under the Ohio whistleblower statute, this

claim should be disallowed and expunged.[8]

---

[8]    In his Trial Brief, Reno attached an excerpt from the case Jermer v. Siemens Energy & Automation, Inc., 395
F.3d 655 (6th Cir. 2005), apparently for the proposition he need not cite a particular law that Delphi was
violating to assert a *common-law* wrongful public policy claim. This case does nothing to obviate the Ohio

C.      Reno's COBRA Claim Fails.

41.      Reno's claim under COBRA fails because Delphi terminated him for gross misconduct.  Reno willfully violated Delphi's conflict-of-interest policy by taking personal advantage of his business relationship with Onyx; this is a conflict-of-interest according to Delphi's policies.  He also attempted to have Delphi pay to have his personal debris disposed. Reno also actively attempted to obstruct and mislead Delphi's subsequent Investigation in the dumpster matter.  Delphi was not required under COBRA to continue Reno's group health insurance coverage because he was terminated for gross misconduct.  See 29 U.S.C. § 1163(2); Karby v. Standard Prods. Co., No. 3:90-2918-17, 1992 WL 333931, at *6 (D.S.C. June 22, 1992) ("gross misconduct" where an employee stole company property and deviated from employer's business ethics policy by making false statements on his conflict-of-interest disclosures).

D.      Reno's Other Claims Fail

42.      Reno's other claims also fail. As discussed supra at 16-17, Reno cannot maintain a claim under the FCRA.  Reno also has not articulated the legal or factual basis for any other claim.  This Court should disallow and expunge Reno's Claim in its entirety.

### Conclusion

43.      Reno fails to establish any claim against Debtors.  Delphi management terminated Reno for legitimate reasons.  The Debtors are not liable to Reno for his retaliatory discharge claim or any other claim, and his Proof of Claim should be disallowed and expunged.

---

Supreme Court's requirement that plaintiffs strictly comply with the statutory requirements if asserting a statutory claim under Ohio Revised Code § 4113.52.

WHEREFORE the Debtors respectfully request that this Court enter an order (a)

disallowing and expunging the Claim and (b) granting the Debtors such other and further relief

as is just.

Dated: New York, New York
        March 16, 2007

                                        SKADDEN, ARPS, SLATE,
                                        MEAGHER & FLOM LLP


                                        By:    /s/ John Wm. Butler, Jr.
                                            John Wm. Butler, Jr. (JB 4711)
                                            John K. Lyons (JL 4951)
                                            Albert L. Hogan III (AH 8807)
                                            Ron E. Meisler
                                            333 West Wacker Drive, Suite 2100
                                            Chicago, Illinois 60606
                                            (312) 407-0700


                                        – and –


                                        SKADDEN, ARPS, SLATE,
                                        MEAGHER & FLOM LLP


                                        By:    /s/ Kayalyn A. Marafioti
                                            Kayalyn A. Marafioti (KM 9632)
                                            Thomas J. Matz (TM 5986)
                                            Four Times Square
                                            New York, New York 10036
                                            (212) 735-3000


                                        Attorneys for Delphi Corporation, et al.,
                                        Debtors and Debtors-in-Possession

20

# **<u>EXHIBIT A</u>**

**Hearing Date and Time: March 21, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                            :
            In re                                           :        Chapter 11
                                                            :
DELPHI CORPORATION, et al.,                                 :        Case No. 05-44481 (RDD)
                                                            :
                                                            :        (Jointly Administered)
                          Debtors.                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## DECLARATION OF BETH PATRICK IN SUPPORT OF DEBTORS' SUPPLEMENTAL REPLY WITH RESPECT TO PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

State of North Carolina      )
                             )  ss:
New Hanover County           )

Pursuant to 28 U.S.C Section 1746, I, Elizabeth Patrick, declare the following:

1

1.      My name is Elizabeth Patrick.  I am over age 18 and have personal knowledge of the facts contained in this declaration.  I am competent to testify to the facts contained herein.  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno.  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      At all times relevant to my involvement with the suspension and termination of Joseph Reno, my last name was Meyer.  I have since married and my last name is now Patrick.

4.      In 2004, I was employed by Delphi Corporation with responsibilities in the field of human resources.  My title was Director of Salaried Personnel for the Energy & Chassis Division of Delphi.  My office was located in Troy, Michigan.  In my position, I had two areas of responsibility: (a) all of the salaried personnel functions which were based out of Delphi's worldwide headquarters located in Troy, Michigan and (b) all salaried personnel and salaried human resource operations located throughout Delphi's Energy & Chassis manufacturing facilities worldwide.

5.      During the referenced time period, my staff was comprised of approximately 20 direct reports who were responsible for assisting and coordinating human resource activities.  This included responsibility over the specific site where Joseph Reno worked.

6.      At the time, I did not know Joseph Reno personally, but came to know of him starting in mid-February of 2004 when I was informed by one of my staff, Mary Ann Polvinen, that she had an investigative report indicating that Mr. Reno was engaged in conduct that violated Delphi's conflict of interest policies set forth in Delphi's *Foundation For Excellence* handbook, a true and correct copy of which is attached hereto as <u>Exhibit 1</u>.  I asked to see the report.

7.      I reviewed the report prepared by Mike Brown.  I learned that Mr. Reno had engaged a Delphi vendor, Onyx Industrial Systems, Inc. ("Onyx"), to deliver a dumpster to his home and later to retrieve it.  The dumpster was found on Delphi property, and Onyx had no record of any arrangements for Mr. Reno to pay for the services.  I had worked previously with Mr. Brown so I called him to discuss his investigation.  At that time it was clear to me from Mr. Brown's investigation that Reno had engaged in conduct that violated Delphi policies relating to conflicts of interest, in particular, and the misappropriation of Delphi resources. It also appeared as if Reno was interfering with Mr. Brown's investigation.  It appeared that Mr. Reno was soliciting fraudulent statements from subordinate employees to corroborate his story, and had made false statements to Mr. Brown.

8.      In addition to Mr. Brown, I also conferred with Ms. Polvinen and Glenn Howarth, the Director over Delphi's environmental operations in the area where Mr. Reno was employed.  As a result of these discussions, Mr. Brown was authorized to complete his investigation by conducting additional interviews he thought would be helpful before I finalized any action involving Mr. Reno.

9.      Within this same time frame, from February 18 to February 20, 2004, I made the decision to suspend Mr. Reno with pay pending the outcome of the investigation.  I

3

considered the suspension to be in the best interests of Delphi because it was apparent from Mr.

Brown's report that Mr. Reno was interfering with the investigation by providing false

information and imposing on subordinates and others to provide false information to Mr. Brown.

I also recall that Mr. Brown was going to be on vacation the following week.  Accordingly, I

gave instructions that Mr. Reno was to be suspended with pay until Mr. Brown returned from

vacation and was able to gather additional information.  Delphi's records show that the

suspension was effective as of February 20, 2004.

**Leaking Waste Water Treatment Tank at Delphi.**

    10.  Following Mr. Reno's suspension, but before his termination, I became

aware of and saw a copy of a letter that Reno wrote to attorney James Walle of Delphi's Legal

Staff, which complained about the manner in which Delphi-Kettering Plant was repairing a

leaking waste water treatment tank.  The letter was shown to me because Mr. Reno mentioned

his suspension in the letter, and I needed to be aware of the fact that in his letter Mr. Reno had

linked the water tank issues to his suspension from Delphi.  This was the first I had heard of any

waste water leak.

    11.  In my mind, and with my responsibilities, Reno's environmental complaint

and letter had no bearing on the investigation into Reno's conflict of interest with a Delphi

vendor that was uncovered by Mr. Brown's investigation. The water tank issue was not involved

in the matter Mr. Brown was investigating and the substantive handling of environmental issues

was not an area for which I had any responsibility.  Consequently, Mr. Reno's involvement with

the water tank had no bearing on my decisions regarding Mr. Reno's employment and no one

asked for my counsel or guidance on the manner in which that issue, the water tank, should be

handled.  Moreover, no one at Delphi, either subordinate to, equal to, or superior to me instructed

me, hinted at, or even suggested that Mr. Reno be terminated because of his complaint about the water tank. The water tank matter was a separate and distinct matter to be handled by persons responsible for environmental operations.

**Suspension with Pay Turns to Termination.**

12.    At some point in March following Mr. Brown's return from vacation, I received and update on Mr. Brown's investigation.  The substance of this latest report was substantially the same as the report I had reviewed in February and the information I had received over the telephone from Mr. Brown.  I recall that Mr. Brown was conducting additional interviews but those additional interviews only corroborated the existing information, and did not provide anything new.

13.    Thus, based on the Brown report, I made the decision to terminate Mr. Reno's employment on March 17, 2004.  My reasons for terminating Reno include the following:

(a)    Reno used his position at Delphi to leverage the use of a Delphi vendor's dumpster for his own personal use on financial terms that were far more favorable to him than the terms would have been had he contracted with the vendor at arms length. Such conduct is directly contrary to Delphi's conflict of interest policies which prohibit employees from using their position at Delphi to seek favors or more favorable terms from our vendors.  In *Foundations For Excellence*, Delphi's policy describes a conflict of interest as

> . . . an obligation to or a relationship with any person or organization that competes or does business with Delphi that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation *and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement.*

See page 6 and 7 of Mr. Reno's acknowledged copy of *Foundations For Excellence*, attached hereto.

5

Examples of conflicts of interest are set forth in the *Foundations* booklet and include

" * Accepting services . . . from a supplier, . . ."  See page 7.

        (b)      Reno paid $100 in cash to our vendor's driver for the "favor" of delivering the Onyx dumpster to Reno's home, retrieving the dumpster after Reno had filled it with debris, and returning the dumpster to an area at the Delphi Plant where it sat for several months.

        (c)      After Mr. Brown commenced his investigation, Reno imposed on several subordinate employees to provide statements for Mr. Brown's investigation so that it would appear as if Reno intended to pay for the services.  I was informed by Mr. Brown that one of Reno's subordinates was asked to provide a false statement corroborating Reno's story that he had agreed with the Onyx driver to take full responsibility for the costs of the dumpster.  That subordinate refused to make such a false statement.  As far as I was concerned, such impositions on subordinates is an intolerable abuse of one's supervisory authority.

        (d)      After Mr. Brown commenced his investigation, Reno approached the Onyx driver and asked him to obtain an Onyx receipt for the $100 cash payment Reno had given to the driver for the favor of allowing Reno to use the dumpster.

        (e)      Reno lied during the investigation.  I consider the Onyx driver's recanted statement to be truthful because he specifically asked what would happen to him after Mr. Brown completed his investigation.  When Mr. Brown assured him that nothing would happen as long as he was telling the truth, the Onyx driver asked to change his statement.  To me, the fear of bad consequences if one knows he can get in trouble for not telling the truth is powerful motivation to tell the truth and avoid consequences.  Thus, in reviewing Mr. Brown's reports I gave more weight to the recanted statement by the Onyx driver than to Mr. Reno's

6

version of what happened.  Moreover, because there was no credible evidence to validate an

arms length transaction between Mr. Reno and Delphi's vendor, Onyx, the Reno version - "I will

pay for it" - was not at all reliable.  The Onyx driver's second story was substantiated by the fact

that Onyx had no independent record of Mr. Reno's order for the dumpster, no any record of the

$100 payment.

(f)       Reno's efforts to take advantage of a relationship with a Delphi

vendor also resulted in a misappropriation of Delphi assets.

i.       Delphi human resources were diverted to this investigation.  Mr.

Brown's investigation required numerous, time consuming interviews in order to clarify

inconsistent information supplied by witnesses, including the lies from Reno.

ii.       When witnesses are interviewed or management is required to deal

with the results of this kind of investigation, human resources are diverted from Delphi's mission

to resolving matters that distract from, take time away from and do not advance Delphi's purpose

as a world class producer of automotive parts.  Moreover, significant financial resources are

expended when an outside investigator is required to devote time to conduct such an

investigation.

(g)       Finally, the fact  that Reno lied about the facts in an effort to

misdirect the investigation is equally intolerable and, in my opinion, the lies coupled with the

other infractions constituted gross misconduct warranting a termination for cause.

14.       I was the final decision maker in this matter.  Although I got input from

Mr. Brown and others regarding his investigation, the final decision was mine.

15.       Based on all of the foregoing, it was my decision, to terminate Mr. Reno

effective March 17, 2004.

7

16.    Reno was terminated for gross misconduct, so he was not eligible to

receive COBRA benefits.


Dated this 21 day of February, 2007.


_____*/s/ Elizabeth Patrick*_____
Elizabeth Patrick

# EXHIBIT 1

## Employee Acknowledgement

I acknowledge that I have received a
copy of the booklet, "Foundation for
Excellence."

JOSEPH M. RENO
_____
Name

*[signature]*
_____
Signature

4/3/01
_____
Date

*Please return this signed form to your
local Human Resources Department.*

**DELPHI**
Automotive Systems



DEFENDANT'S
EXHIBIT
3
RENO

PENGAD 800-631-6989

DC 180

DC 181

# TABLE OF CONTENTS

## Foundation for Excellence

A MESSAGE FROM J.T. BATTENBERG III _____ 2

PERSONAL INTEGRITY _____ 3
  Complying with the Law

EXCELLENCE IN THE WORKPLACE _____ 5
  Managing Diversity
  Health & Safety Policy
  Conflicts of Interest
  Protecting Corporate Property
  Accurate Information, Records & Communications
  Responding to Legal Investigations
  Information Requests
  Communicating with the Media
  Internet/Intranet Usage
  Internet Chat Rooms

EXCELLENCE IN THE MARKETPLACE _____ 11
  Product & Service Quality
  Fair Competition
  Suppliers & Fair Treatment
  Honest Communications
  Gifts, Entertainment & Gratuities
  Soliciting Gifts or Favors
  Accepting Gifts or Favors
  Accepting Invitation of Entertainment
  Customer/Supplier Entertainment Policies
  Others

EXCELLENCE IN SOCIETY & OUR COMMUNITIES _____ 16
  Avoiding Improper Payments
  Import/Export Controls
  Delphi Insider Trading Policy
  Corporate Citizenship
  Environmental Principles

THE DELPHI PRINCIPLES _____ 21

# DELPHI
## Automotive Systems

# FOUNDATION FOR EXCELLENCE

## A GUIDE TO REPRESENTING DELPHI WITH INTEGRITY

DC 182

# Personal Integrity

**INTEGRITY** – We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.

Integrity begins with each of us – the judgments and decisions that we make as individuals.

How do we define personal integrity? First, it means exemplifying the Principles and Absolutes of Excellence in our own conduct and complying with Delphi policies, even when we may not agree with them. In a global enterprise, legitimate differences of opinion may arise as to the appropriateness of the corporate policies across worldwide operations.

While such differences are understandable, and can lead to a healthy discussion of choices, they do not excuse us from observing the existing policies. We are always welcome to voice our concerns and to request exceptions for special circumstances through appropriate leadership when warranted. It is important that we use our judgment not only to consider the precise meaning of our stated values or policies, but also the spirit and intended purpose of them as we make these choices.

Second, it means we have a responsibility to voice concerns when we believe Delphi or fellow employees are acting contrary to existing policies. Collectively, we are the corporation, and the actions of one individual can damage the reputation of all. When someone compromises the Principles of Excellence or policies, we should either inform them directly, or use other available channels to voice our concerns. The best option is usually to discuss the situation with a manager. Alternatively, we can bring our concerns to functional experts such as the

3

---

Dear Colleagues,

*Delphi is establishing a culture based on the Principles and Absolutes of Excellence, a culture encompassing passion, creativity and common business processes. It is a culture that brings us together as a team, and makes each of us responsible for examining our own actions, to ensure that we represent Delphi with excellence.*

*Achieving our vision – to be recognized by our customers as their best supplier – can only be achieved through consideration, fairness and dignity in all that we do. Each of us represents the entire Delphi organization. As we conduct our business, we need to respect the people and environments in which we work.*

*Foundation for Excellence is our guide for employee conduct. I encourage you to read this document thoroughly, while keeping in mind that the guidelines cover a wide range of Delphi's business processes. It is important that we all understand them in order to support our fellow colleagues and our corporate vision. Following these policies and guidelines will help make Delphi an excellent company to work with, both for our customers and our employees.*

Regards,



J.T. Battenberg III
Chairman, CEO and President
Delphi Automotive Systems

2

DC 183

# Excellence in the Workplace

**TRUST IN RELATIONSHIPS** – *We expect our people to build and maintain a foundation of trust and respect in everything we do.*

## MANAGING DIVERSITY

Delphi values its diverse, dedicated global workforce that is committed to Excellence and a culture where individual strengths, combined with teamwork, are a recognized source of our mutual success. As a leader in automotive components, systems and modules, we draw on the unique background of each employee to offer new perspectives and solutions as we strive to be our customers' best supplier.

We believe that attracting and retaining qualified talent is vital to Delphi's continued success. Delphi has an ongoing commitment to diversity, equal opportunity, and non-discrimination. Opportunities are extended to qualified applicants and employees on a non-discriminatory basis. The organization is enriched through the representation of diverse experiences, backgrounds, ethnicity, lifestyles, cultural orientation and beliefs. Reasonable accommodations are made for the physically challenged and persons with disabilities.

Consistent with the above philosophy, Delphi is dedicated to creating a workplace environment that enables every team member to contribute fully. It is our policy to comply with applicable employment laws wherever we conduct business. It is every employee's responsibility to act in a manner that supports this policy and to maintain the workplace environment free from all discrimination, hostility and harassment, including sexual harassment.

Legal Staff, Audit Staff, Security or Human Resources. We also have available the EthicsLine (888.679.8848) in many countries for employees who are uncomfortable discussing their concerns with their leadership.

## COMPLYING WITH THE LAW

In order to comply with the law, we must know the law. For many of us, this means we will need advice or training from experts to understand our responsibilities. Common sense, our conscience and good intentions are not always enough. At a minimum, we must learn enough about the laws that affect what we do to spot potential issues and then follow through to get answers about the right way to proceed.

Complying with the law requires more than knowledge, it requires action. This takes a high degree of cooperation and communication – the essential elements of teamwork. As a member of the team, if someone thinks some aspect of Delphi's business may be in violation of the law they should raise the issue with management or the Legal Staff.

The worst thing we can do is to ignore or try to cover up a potential problem and allow it to grow more severe over time.

4

DC 184

business with Delphi, that could affect an employee's judgment in fulfilling our responsibilities to Delphi to make business decisions solely in the best interests of the corporation and without regard to personal gain. A conflict of interest can arise when an employee benefits, or even appears to benefit, from a Delphi business arrangement. The appearance of a conflict can be just as damaging to reputations as an actual conflict of interest.

Examples of potential conflicts of interest include:

*   Investing in a supplier, customer or competitor
*   Accepting services or receiving payment from a supplier, customer or competitor
*   Having close family members who work for suppliers, customers or competitors
*   Working outside Delphi without department director approval

Occasionally conflicts of interest may arise through involvement in public service or charitable activities, such as holding public office or involvement in charitable organizations. Before accepting such responsibilities, we need to familiarize ourselves with the extent to which Delphi has interests or business affected by our involvement, and ensure that no corporate assets, including the Delphi name, are used or referred to in connection with such activities.

Outside employment can also create conflicts of interest. We are expected to devote our full time and attention to our work during regular business hours and for whatever additional time may be required.

Delphi expects all employees to disclose promptly any situation that could result in an actual or potential conflict of interest. If we are not sure the situation creates a

Supervisors and managers are held accountable to prevent discrimination and to support equity in addressing employee concerns and/or complaints. Delphi will not tolerate behavior that is inconsistent with this policy and will take appropriate action to prevent such behavior from occurring.

Full support of the corporation's policy on diversity and equal opportunity along with the necessary efforts to ensure that all recruitment, employment, training, promotions and other personnel actions comply with these principles is essential. This policy reflects our belief that a capable and committed workforce perpetuates Delphi's creativity, innovation, growth and success.

## HEALTH & SAFETY POLICY

Delphi is committed to protecting the health and safety of each employee as our overriding priority. We believe that all occupational injuries and illnesses are preventable. There will be no compromise of an individual's well-being in anything we do. The implementation of actions to help our employees realize a healthy, injury-free environment is a leadership responsibility. Continuing support of this effort is the responsibility of everyone. We will lead the Delphi team to ensure that we protect the well-being of every member.

## CONFLICTS OF INTEREST

For us to help Delphi earn and maintain its reputation as a company that conducts business with the utmost integrity, we must avoid actions or relationships that might conflict or even appear to conflict with our job responsibilities or Delphi's interests.

A conflict of interest is an obligation to or relationship with any person or organization that competes or does

DC 185

interpretation. Litigation is a fact of life in societies governed by many laws that give a variety of authorities broad investigative powers.

Legal papers and investigations normally flow through established channels, but there may be occasions where inquiries and legal papers are received by other employees. If you should receive these types of papers in your capacity as a representative of Delphi, consult the Legal Staff immediately, before submitting to an interview, answering questions about Delphi business, producing any documents or even responding to any requests made in connection with litigation or an investigation.

## INFORMATION REQUESTS

Information is one of Delphi's most valuable assets in the competitive global marketplace for our products and services. We all share a responsibility to protect valuable Delphi information for our mutual benefit.

Delphi information includes all information related to our business, created or acquired using Delphi resources, regardless of the specific nature or form of the information. We will maintain confidentiality of customer information.

## COMMUNICATING WITH THE MEDIA

We strive to maintain integrity in our relationships with the media and general public by providing clear and accurate communication. All Delphi divisions and regions have a designated Public Affairs or Communications function, which is responsible for communicating the Corporation's position on a range of issues.

If you are contacted by a member of the press, you should notify your manager and your division or regional

9

---

conflict, we should seek the help of our supervisor or Human Resources contact person.

## PROTECTING CORPORATE PROPERTY

We have an obligation to safeguard corporate assets by ensuring they are properly maintained and used to further Delphi business interests. We should always consider whether our decision to use or commit a resource is in the best business interest of the corporation.

Business assets should not be used for personal reasons. However, situations may arise where infrequent and limited personal use is acceptable. When such situations arise, use sound judgment, common sense and discuss the issue with your manager if there are doubts about the appropriateness of the use.

## ACCURATE INFORMATION, RECORDS & COMMUNICATIONS

Decisions are made based on the accuracy of information recorded at all levels of the organization. Inaccurate information can lead to poor decision making. Additionally, our customers, suppliers and government officials rely on us to be honest and provide accurate information on subjects ranging from our products and services to Delphi's financial performance and our environmental practices.

It is our responsibility to ensure that all information and records are maintained honestly and accurately, and that any errors are promptly recognized, communicated to appropriate management and corrected.

## RESPONDING TO LEGAL INVESTIGATIONS

Despite our best efforts to comply with all applicable laws and regulations, there will always be matters of

8

**Please Note:**
**Amendment to paragraph 2 on preceding page.**

## INTERNET/INTRANET USAGE

The Delphi provided internet connection is intended to be used primarily for business purposes. Any personal use must not interfere with normal business activities, involve solicitation, be associated with any for-profit outside business activity or potentially embarrass Delphi. Users are expected to act responsibly and in Delphi's best interests whenever they use the Delphi provided internet connection.

Communications department to ensure that the most appropriate person or team responds. Employees are generally not authorized to immediately respond to journalists. Responsible members of the media do not expect impromptu answers. As a general rule, even if a Delphi employee is the subject matter expert, media questions should be referred to the Delphi Communications or Corporate Affairs Staff.

### INTERNET/INTRANET USAGE

Use of the intranet, as with other Delphi assets, should be limited to situations related to our work assignments. It is never acceptable to use Delphi equipment to access or create material that is illegal or inappropriate. If in doubt, ask your supervisor or the Information Systems & Services group.

### INTERNET CHAT ROOMS

It is Delphi's policy not to respond to chat room rumor or speculation.

To maintain confidentiality of Delphi information, employees are not to respond to any inquiries or post any information on the Internet relative to Delphi unless specifically asked to do so by their supervisor and the response is cleared through Corporate Affairs and/or Legal.

10

DC 187

# Excellence in the Marketplace

**CUSTOMER ENTHUSIASM** – *Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.*

## PRODUCT & SERVICE QUALITY

It is our goal to be our customers' best supplier. We must be mindful of that goal at every phase of our relationship with customers – from the design of our products to the discussions we may have with them about service issues. We must passionately pursue customer satisfaction by being entrepreneurial, fast, less bureaucratic, customer focused, innovative and excellent in everything we do.

## FAIR COMPETITION

We believe in competing fairly because we all benefit from fair, free and open markets. We compete strictly on the merits of our products and services and make no attempts to restrain or limit trade.

Specifically:

- We never discuss such matters as prices, pricing strategies, product or marketing plans or terms of sale with competitors. Should a prohibited subject come up during a discussion or meeting, leave and inform leadership or the Legal Staff.

- We do not enter into agreements with our competitors concerning prices, production volumes, customers or sales territories.

11

- We do not link purchase of one product to another or compel suppliers to buy from us to retain their Delphi business.

- We do not disparage the products or services of a competitor.

- We collect competitive information through proper public or other lawful channels and do not use information that was obtained illegally or improperly by others, including through misrepresentation, invasion of property or privacy or coercion.

Not only is fair competition a matter of our own values, it is also a matter of law in most every country Delphi conducts business. Competition law requirements may exist in specific countries. Contact the Legal Staff for more information.

## SUPPLIERS & FAIR TREATMENT

Our suppliers are valued partners in the success of our business. Our relationships with suppliers must be characterized by honesty and fairness. They are selected on the basis of quality, service, technology and price. Terms and conditions defining our relationship with suppliers are communicated during the request for quote process and agreements to such terms and conditions, or any acceptable modifications, are reached before work begins. Included in the standard terms and conditions are Delphi's policies regarding payment terms, confidentiality, the use of intellectual property and labor practice expectations.

## HONEST COMMUNICATIONS

Customers, suppliers, government agencies and communities depend on the honesty and accuracy of our communications. We are each responsible to communicate in a forthright and honest way, free of any misleading or inaccurate information. This includes not overcommitting on what we can deliver, and promptly informing affected parties when changes occur. When we make a mistake in what we have told someone, we must take prompt action to correct it.

## GIFTS, ENTERTAINMENT & GRATUITIES

Our policy on gifts, entertainment and gratuities is designed to reflect our values. We are charged with the responsibility to make decisions, based upon business considerations. The terms "suppliers" and "customers" in the policy below are used in the broadest possible sense. A supplier is any person or organization, inside or outside the Corporation, who furnishes goods or services to the Corporation. A customer is an individual or organization, inside or outside the Corporation, who receives goods and services.

## SOLICITING GIFTS OR FAVORS

Employees may not solicit, for personal reasons, any gifts or favors from an individual or an organization that does business with Delphi – or one which seeks to do so. The size of the gift or favor is immaterial. Soliciting gifts or favors – either directly or indirectly – from customers, suppliers, potential customers or suppliers, is strictly prohibited. All conduct in this regard that creates even the appearance of impropriety must be avoided.

DC 189

## ACCEPTING GIFTS OR FAVORS

*It is permissible to accept gifts or gratuities from a customer, supplier and/or a potential customer or supplier where they are freely offered, it's legal and a business-related purpose exists.* Acceptance from that particular supplier or customer should be infrequent, and generally the value, nor the cost, is less than $50.00 (US$). As a general guideline you should not accept anything that:

1. Compromises, or appears to compromise the integrity of the business relationship

2. Places you or others in an unsafe environment (e.g., alcohol-related activities)

3. Potentially embarrasses or damages your reputation or the reputation of the company

Specific questions should be discussed with your supervisor, the local Human Resources representative or the Legal Staff.

## ACCEPTING INVITATION OF ENTERTAINMENT

Accepting an invitation of entertainment from customers, suppliers and potential customers or suppliers is permissible where the invitations are freely offered, and a business-related purpose exists. Acceptance from that particular supplier or customer should be infrequent and entertainment and meals should not be lavish. Employees are to be accompanied by the person or organization providing the entertainment. As a general guideline you should not accept an invitation of entertainment that: 1) compromises the integrity of the business relationship, or 2) places you or others in an unsafe or inappropriate environment (e.g., alcohol-related activities, adult entertainment clubs).

Specific questions should be discussed with your supervisor, the Human Resources representative or the Legal Staff.

## CUSTOMER/SUPPLIER ENTERTAINMENT POLICIES

To the extent our customers and suppliers discourage or forbid the receiving of gifts, entertainment or other gratuities by their employees, Delphi employees are expected to know and respect those customer and supplier policies and practices.

## OTHERS

Other important relationships that Delphi maintains can impact our business. Examples of this are our relationships with governmental officials, unions and union representatives.

Gifts, entertainment, or other gratuities should never be provided to a governmental official without first getting approval from a senior officer responsible for Delphi operations in the particular country or region involved. Due to the complexity of relevant laws and regulations, and varying cultural and ethical norms, any decision to provide a gift, entertainment or gratuity, including meals, to a government official should be discussed with the Legal Staff.

Similarly, it may be illegal to provide a gift, entertainment, or other gratuity to a union or union official in the United States or other countries. Do not hesitate to obtain advice from the Human Resource or Legal Staffs before providing a gift, entertainment or other gratuity to a union or union official.

14

15

DC 190

## IMPORT/EXPORT CONTROLS

We must abide by special laws and regulations that apply to the export of products and technical data. All employees who are involved with exports have an obligation to become familiar with the regulations and procedures that apply in their location. We must also comply with anti-boycott and international embargo regulations in all locations where we do business.

## DELPHI INSIDER TRADING POLICY

As employees of Delphi, it is illegal to trade Delphi securities on the basis of material inside information. Inside information is information that is known inside Delphi but is not known to the general investing public. It is sometimes called "non-public information." "Material" information is that which a reasonable investor would consider important in a decision to buy, hold or sell Delphi's stock. If the information could change the price of Delphi's stock, it is material.

Some examples of information, whether positive or negative, that are material include:

- Earnings and dividend amounts

- Projections of future earnings or losses

- Pending labor negotiations or disputes, including possible strikes

- Pending or proposed mergers, acquisitions or tender offers

- Significant sales of assets or the disposition of a subsidiary

- Changes in dividend policies, the offering of additional securities or a stock split

- Changes in top management

17

---

*Excellence in Society & Our Communities*

**RESPONSIBILITY TO SOCIETY** – *We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.*

## AVOIDING IMPROPER PAYMENTS

We believe in promoting good governance and the fair and impartial administration of laws. It is, therefore, strictly prohibited to give anything of value directly or indirectly to a government official in order to influence his or her judgment in the performance of official duties.

In addition, as a United States-incorporated company, bribery payments by any Delphi employee or agent to foreign officials are illegal under the U.S. Foreign Corrupt Practices Act (FCPA). Under FCPA, Delphi is accountable for the actions of its employees, including non-United States citizens and employees of non-U.S. based subsidiaries and agents throughout the world. Similar legislation is being enacted in many countries, including France, Germany and Japan as part of a global effort to combat corruption and bribery. There are circumstances where facilitating payments may be appropriate, but those situations must be discussed with the Legal Staff prior to any action being taken. Any questions as to whether a gift or payment would be considered improper under our guidelines or national laws must be discussed with the Legal Staff.

16

DC 191

- Significant new products or technological advances
- Significant changes in production schedules or product planning
- The gain or loss of a substantial customer or contract; or extraordinary borrowing, changes in debt ratings or impending bankruptcy or liquidity problems

Every manager is responsible to see that any employee who could learn of material inside information is aware of the complete Delphi Insider Trading Policy and implications of the policy.

The complete Delphi Insider Trading Policy is posted on Delphi's Intranet, Apollo. For questions about Insider Trading, please contact the Delphi Legal Staff, in particular, the Assistant General Counsel – Corporate and Securities.

## CORPORATE CITIZENSHIP

Delphi Automotive Systems strives to achieve an effective global philanthropic program that supports our business objectives while helping society, particularly in the communities in which we reside. Delphi's three-pronged approach to corporate citizenship includes:

**The Delphi Foundation** – The umbrella for our philanthropy effort is our self-funding Foundation. Its priority is education, primarily in the areas of science and technology.

**Delphi Community Relations** – As a corporate citizen in numerous communities around the world, this effort seeks to ensure the presence of the Delphi brand in our local communities in such a way that our company is viewed as a "neighbor of choice." The priority also is largely educational in focus, but contributions are tailored to local needs and priorities as well.

**Delphi Volunteers** – A philosophy aimed at enabling and inspiring our employees to give to the community in the way they tell us is most meaningful: through the provision of personal time and talent.

Overall, Delphi targets educational opportunities and support systems aimed at helping young people reach their full potential. Special – though not exclusive – consideration is given to educational programs focused on science and technology. Primary consideration is given to requests that:

- Link to Delphi's business vision and mission
- Are innovative in approach
- Demonstrate an ability to measure effectiveness
- Are customer-driven
- Are global programs that encourage international reach and involvement
- Clearly articulate the benefits to Delphi and its local communities

## ENVIRONMENTAL PRINCIPLES

As a responsible corporate citizen, Delphi Automotive Systems is dedicated to protecting human health, natural resources and the global environment. This dedication reaches further than compliance with the law to encompass the integration of sound environmental practices in our business decisions.

The following environmental principles provide guidance to Delphi Automotive Systems personnel worldwide in the conduct of their daily business practices.

- We are committed to actions to restore and preserve the environment

18

DC 192

# The Delphi Principles

**Customer Enthusiasm** – Our customers' interests always come first. We are committed to products, services, business practices and an attitude that creates customer enthusiasm. This is the foundation of our security.

**Trust in Relationships** – We expect our people to build and maintain a foundation of trust and respect in everything they do.

**Integrity** – We are dedicated to complying fully with the letter and spirit of the laws, regulations and ethical principles that govern us. We will protect all confidential information we receive from our customers or business partners.

**Responsibility to Society** – We hold ourselves accountable to the highest standards of conduct relative to our broadest corporate responsibilities to society as a whole. We will strive to build and maintain effective relationships with the communities and institutions with which we interact.

**Dedication to EXCELLENCE** – We are determined to achieve EXCELLENCE in everything we do. Our future success depends on uncompromising adherence to our vision and the absolutes of EXCELLENCE.

For more information about Excellence visit Apollo, Delphi's employee home page, at http:/apollo.delphiauto.com/excellence/.

- We are committed to reducing waste and pollutants, conserving resources and recycling materials at every stage of the product life cycle.

- We will continue to participate actively in educating the public regarding environmental conservation.

- We will continue to pursue vigorously the development and implementation of technologies for minimizing pollutant emissions.

- We will continue to work with all governmental entities for the development of technically sound and financially responsible environmental laws and regulations.

- We will continually assess the impact of our plants and products on the environment and the communities in which we live and operate, with a goal of continuous improvement.

20

DC 193

*"We are what we repeatedly do. Excellence then, is not an act, but a habit."*

—Aristotle

# DELPHI
Automotive Systems

Driving
Tomorrow's
Technology

DC 194

## **EXHIBIT B**

Hearing Date and Time: March 21, 2007 at 10:00 a.m.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - -  - x
                                         :
          In re                           :    Chapter 11
                                           :
DELPHI CORPORATION, et al.,        :    Case No. 05-44481 (RDD)
                                           :
                                           :    (Jointly Administered)
          Debtors.                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## AMENDED DECLARATION OF MICHAEL BROWN IN SUPPORT OF DEBTORS' SUPPLEMENTAL REPLY CONCERNING PROOF OF CLAIM NO. 9956 (JOSEPH RENO)

State of Ohio         )
                      )   ss:
Montgomery County )

Pursuant to 28 U.S.C Section 1746, I, Michael Brown, declare the following:

1.      My name is Michael Brown. I am over age 18 and have personal knowledge of the facts contained in this declaration. I am competent to testify to the facts contained herein. Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply.

2.      Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi's relationship with Joseph Reno. If I were called upon to testify, I could and would testify to the facts set forth herein.

3.      For more than six years preceding the events described in this declaration, I was employed by Securitas Investigative Services USA, Inc., as an Investigator. Throughout that entire period, my base of operation was located at Delphi Corporation's manufacturing facilities in Kettering, Montgomery County, Ohio. However, both then and now, it was not uncommon for me to conduct Delphi investigations all over the continental United States, and Mexico.

4.      I receive authorization for my assignments from Delphi's Corporate Security group in Troy, Michigan, not Securitas. Moreover, it was not uncommon for me to be asked by Delphi managers and executives located in the Dayton area to investigate matters of concern to them. In turn, I would report such requests to Delphi's Corporate Security group and receive clearance to proceed.

- 2 -

**My Investigation Methods and Reporting.**

5.        It has long been my custom and practice to prepare a written record of
significant findings that arise during the course of my investigations.  As witnesses are
interviewed, as information is gathered, or as facts are learned, I record these events, findings
and facts in a progressive narrative.  Stated another way, with the use of a computer, I record
new information on the original or initial document in the chronological order in which it is
received by me.  It is not my practice to prepare "preliminary reports," "interim reports," or "final
reports."

6.        It is also my custom and practice to report significant new findings to
those who are using my services via telephone or email.  There is no set pattern to this practice.
If, in the course of such verbal reporting, someone asks for a copy of my written report to date, I
will provide it to them as updated.  I do not keep any records that would identify when I provided
someone with a copy of my ongoing written report.  Attached hereto as <u>Exhibit 1</u> is a true and
correct copy of my report with respect to the investigation into Mr. Reno's involvement with the
dumpster.  As explained, this report was a work in progress in which I added information as my
investigation progressed.  Each entry was made on or around the date referenced at the beginning
of each paragraph.

**The Dumpster Investigation.**

7.        On February 2, 2004, Delphi's Facilities Manager, Mark Gooding, asked
me to investigate a dumpster on Delphi's property that contained waste materials, i.e., empty
marine sea salt bags, discarded wire fencing, broken concrete and construction debris, that were
not waste products from any Delphi manufacturing operations.  Mr. Gooding informed me that
within the Environmental Group at Delphi's Kettering Operations people had pointed to the

- 3 -

possibility that the material belonged to Joseph Reno, a Senior Environmental Manager for Delphi, who reported to Gooding. I relayed Mr. Gooding's request to Delphi's Corporate Security in Troy and was authorized to proceed with the investigation.

      8.     Through a series of interviews, spelled out in detail in my attached report, my investigation uncovered the following:

      (a)     The dumpster belonged to Onyx, a Delphi vendor which supplied liquid or fluid waste containers to Delphi for the collection and eventual disposal of fluid manufacturing waste that involved environmental concerns. Onyx managed the filling and removal of the containers from Delphi and transport for appropriate disposal. In the ordinary course, Delphi is charged for Onyx's services. For solid waste containers and disposal, Delphi contracted with another vendor, not Onyx.

      (b)     Delphi's direct contact person with Onyx was its driver/representative, Troy Calton. Mr. Calton's primary responsibility for Onyx, if not his sole responsibility, was to manage Onyx' liquid waste account with Delphi. In this capacity, Calton had direct contact with and worked on an almost daily basis with Delphi's Joseph Reno.

      (c)     I learned from Mr. Calton that the Onyx dumpster had been delivered to Joseph Reno's personal residence in late August or early September so that Reno could collect and eventually dispose of solid trash, rubble and other debris collected from the Reno residence.

      (d)     My investigation also included a search of corporate records filed with the Secretary of State in Columbus, Ohio. This search produced records indicating that

- 4 -

either Mr. Reno or his wife, or both, operated an aquarium business out of their home thus explaining the empty marine sea salt bags found in the dumpster.

**February 5, 2004, Initial Interview With Onyx Driver, Troy Calton.**

9.      On February 5, 2004, I conducted my first interview with Troy Calton who had delivered the Onyx dumpster to Reno's residence.  In his initial interview, Calton stated that he had delivered the dumpster to Reno's residence sometime in the early fall of 2003.  A more precise date could not be determined because, according to Calton, Onyx had no placement/disposal/tipping records for this particular dumpster.

10.      Approximately two months after placing the dumpster at Reno's residence, the precise date being unknown, Calton stated that he was summoned by Reno to retrieve the dumpster because it was digging holes in his driveway. (At a later date in my investigation, Onyx managers produced  a receipt for $100 received from Reno and dated December 22, 2003.)

11.      Calton further explained that while en route to a landfill to dispose of the contents of the  Reno dumpster, he received a call from an unknown source at Delphi asking him to come to the plant to attend to another matter.  Thus, according to Calton, he took the Reno dumpster to the Delphi plant, off-loaded it, attended to the other pressing matter and forgot about retrieving the Reno dumpster for disposal.

**February 16, 2004, Initial Interview With Joseph Reno.**

12.      On February 16, 2003, Debbie Field of Delphi's Human Resources in the Dayton area accompanied me during my interview with Mr. Reno.  I asked Mr. Reno to provide a complete chronology of events relating to the Onyx dumpster. Contrary to Mr. Calton's chronology, Mr. Reno stated that he asked Mr. Calton to deliver the dumpster to his residence in

- 5 -

late November or early December and that he, Reno, would pay for the service. Mr. Reno stated

that he filled the dumpster and, while at home during the year-end Delphi Christmas shutdown,

he telephoned Onyx and asked Mr. Calton to pick it up on December 22, 2003, a Monday. My

investigation determined that the Christmas shutdown did not start until the following day,

December 23.

13.    Mr. Reno stated that he assumed that Mr. Calton had taken the dumpster

to a landfill and thought nothing further about it until a couple weeks before our interview when

he became aware that someone was taking pictures of the dumpster on Delphi's property and that

an investigation was underway.

14.    Even though I had not asked Mr. Reno to bring anything to the interview,

Reno produced two brief, written statements from other employees, which stated that each had

been present and overheard a conversation between Reno and Calton wherein Reno said he

would pay the "tipping fee" (disposal fee) for the dumpster. I found it abnormal that Reno had

come prepared with statements to corroborate his story before I ever questioned its validity. I

have never had anyone else come prepared to an interview with outside statements. One of the

employees, David Atchison, was subordinate to Reno, but had retired from Delphi before my

investigation commenced. The other statement was from a contract employee, Dave Low, who

was employed by Crown Solutions, Inc, an environmental company. Reno ended the interview

by stating that he had given Calton $100 on December 22 and obtained an Onyx receipt from

Calton on that date.

- 6 -

**February 18, 2004, Second Interview With Troy Calton Along With Onyx Managers And
Mark Gooding.**

        15.      Two days after the Reno interview, I asked Mr. Calton and his managers
to visit with me at Delphi for further interviews. I needed to clarify the inconsistencies in the
chronologies provided earlier by Calton and Reno. I asked Mark Gooding to accompany me at
this second interview with Mr. Calton. Mr. Gooding was there as a resource to me to answer
questions that arose during the interview regarding the relationships with the various disposal
contractors. He was also a there as a witness to the interview. At the outset, and in the presence
of his Onyx managers, Calton stuck with his original version of events. As Mark Gooding and I
were leaving the interview room, Calton asked what would happen to him as a result of his
involvement with the dumpster. I replied that he had nothing to worry about as long as his
statement was true.

        16.      While Gooding and I were in the hallway, we were approached by the
Onyx managers who stated that Calton wanted to speak further with us. I resumed the interview
with Mr. Calton during which he recanted his earlier statement and provided the following
information:

        (a)      The original request from Reno to deliver the dumpster to his
home was in August or September of 2003, not the fall of the year.

        (b)      Sometime near the end of September or early October, both Calton
and Mr. Reno left Delphi in an Onyx truck, traveled to Reno's home to retrieve the dumpster and
both drove it back to Delphi for drop off at the location where I found it when I commenced my
investigation almost four months later. Calton also stated that no record was kept of the delivery

- 7 -

because Calton assumed that Reno, as a Delphi contact for Onyx, would not be charged for the storage, use and disposal fees associated with this particular dumpster.

(c)    Reno gave Calton $100 cash in return for the favor and the services. No receipt was given to Reno on that date and Calton did not deliver the $100 in cash to Onyx.

(d)    Mr. Calton also stated that on February 2nd or 3rd, 2004, which was during the early stages of my investigation, Reno approached Calton and asked for a receipt for the $100. Calton obliged and stated that he picked December 22, 2003 at random as the date for the receipt. Calton obtained the receipt from an employee in Onyx's office named Jerri Dirks and gave it to Reno.

17.    I then asked Mr. Calton to provide me with a written account of his factual statement. Mr. Calton and the Onyx managers promised that I would receive the statement the next day, February 19, 2004. No written statement was delivered as promised. On Friday, February 20, I received a telephone call from one of the Onyx managers, Mike Webb, who informed me that Mr. Calton had consulted an attorney and would not provide a written statement unless he had written assurance from Delphi that the company would not take action against him for his involvement in the dumpster incident.

**February 20, 2004, Report Of Findings To Corporate Headquarters In Troy Michigan.**

18.    Since Mr. Calton refused to provide a written statement and I was preparing to leave on vacation, I reported my findings to corporate headquarters in Troy, Michigan. My present recollection is that I spoke with Beth Polvinen, as well as counsel for Delphi. I also recall that I spoke with Elizabeth Meyer, the head of Corporate Salaried Personnel for all of Delphi and informed her of my findings and answered her questions. If any one of

- 8 -

these persons asked me for a report, I would have sent them what had been prepared to that point in time.

19.      There were other aspects of my investigation that I considered incomplete at that time and I recall explaining to personnel in Troy that I would need to conduct other interviews when I returned from vacation. I was encouraged to do so. In addition, I recall discussion about how the corporation should deal with Reno until I returned. I noted that Reno had interfered with the investigation by obtaining statements from employees and had lied to me about the chronology of events, disposal of the trash, the payment for the services and the $100 receipt. While suspension was discussed, it was not my responsibility to make any decisions as to Reno's employment status with Delphi so I left the conversations and then went on vacation.

**Return From Vacation.**

20.      On March 1, 2004, I returned from vacation and learned from Mark Gooding that Reno had been suspended while I was on vacation.

21.      On March 3 and 4, I conducted additional interviews set forth in my attached report. Of particular note was an interview with Terry Ruble who was retired at the time of the interview. He stated that Reno had approached him near the start of my investigation and asked for a statement covering conversations Ruble overheard between Reno and Calton regarding the dumpster. Ruble refused Reno's request to provide a statement because he could not recall any such conversations.

22.      On March 5, 2004, I met again with Mr. Calton, the Onyx managers and Mark Gooding. Since Calton had refused to give me a written statement, I was seeking verification of the facts Calton had related during the second interview on February 18, 2004.

- 9 -

Calton only changed one fact: he stated that he had received the $100 in cash about two weeks

before he and Reno retrieved the dumpster from Reno's home and dropped it at Delphi. Thus,

the cash transaction occurred sometime in September, not December 22, 2003.

        23.     At some point following my post-vacation interviews, I telephoned my

findings to Beth Meyer in Troy Michigan. I am aware of a witness statement that OSHA

Investigator Susan Schlemann drafted during my interview, in which Ms. Schlemann wrote that

"I did not have any other meetings or contacts with Corporate individuals to discuss the

investigation since February 18th, 19th, or 20th." As I explained during my deposition of on July

8, 2005, this statement is inaccurate. I did not have any formal meetings with corporate

individuals after that time, but I do remember updating Ms. Meyer after February 20th. I

remember that I had contact with her after February 20th because it was after I returned from my

vacation on March 1st. Subsequently, I learned that Reno's suspension had been changed to a

termination.

**Leaking Waste Water Treatment Tank**

        24.     Since closing my investigation on March 24, 2004 by arranging for the

removal of the Reno dumpster from Delphi's premises, I have learned that Reno had complained

about a leaking waste water treatment tank on Delphi's premises and that he had filed a

complaint with federal authorities claiming that his termination was in retribution for his

environmental complaint. Throughout the course of my investigation into the dumpster, no one

at Delphi mentioned the leaking water tank. Reno did not mention it when I interviewed him.

No other employees that I interviewed mentioned the tank. Nor did Reno's boss, Mark Gooding,

or any of the executives that I spoke with in Troy Michigan at Delphi corporate headquarters

mention the water tank during my investigation. I did not learn about the water tank leak until

- 10 -

after Mr. Reno was terminated. Even then I did not learn the details of that issue. The water

tank had no bearing on my investigation, my interviews, my findings, or my conclusions about

Joseph Reno's complicity in a scheme to take advantage of Delphi's relationship with a vendor,

Onyx, in order to acquire personal services for himself and then to lie about the facts during the

course of my investigation.

Dated this 16th day of March, 2007 at Kettering, Ohio.

_____ /s/ Michael Brown _____
Michael Brown

# EXHIBIT 1

1

## CONFIDENTIAL INVESTIGATIVE REPORT

Date:           2/5/04

To:             Investigations File

From:           Mike Brown – Investigator

Subject:        Possible waste removal fraud

c:              Dennis DeLong; Jerry Koplin

### Investigative Summary

On 2/2/04 this investigator was advised that a roll-off drop box (portable dumpster) belonging to ONYX had been placed on the ground within the perimeter fence at the Kettering facility. The box contained items that likely did not belong to Delphi and may have been the personal property of a Delphi employee's home. The investigation has revealed that the property did originate from a Delphi employee's home. The investigation has shown that the Delphi salaried employee, Joe Reno, has attempted to have his waste disposed of at Delphi's expense. There was evidence revealed in this investigation that Mr. Reno has on numerous occasions left the facility earlier than his standard workday permits.

### Incident Location

Delphi – Kettering E&C Facility
2000 Forrer Blvd.
Dayton, OH

### Date / Time Occurred

Drop box delivered to Delphi property sometime in the fall of 2003.

### Persons Interviewed

Tim Delph – ONYX Account Mgr.
Mike Webb – ONYX Division Mgr
Troy Calton – Onyx Industrial Services Inc. employee
Mitch Brown – Crown Solutions Inc. Mgr.
Mike Wittman – Crown Environmental Specialist
Terry Ruble – Crown employee in Waste Treatment plant
Dave Low – Crown employee in Waste Treatment plant
Nesby Brown – Crown employee in Waste Treatment plant

### Investigation Activity

On 2/2/04 this investigator initiated an investigation into the circumstances surrounding the presence of a roll-off drop box located on the property at the Kettering facility. The box was located on the north side of the coal storage bin, which is inside the perimeter fence. It appeared that the box contained items that did not come from Delphi. I spoke with Mark Gooding, Site Manager for FSG who stated that as a result of numerous employees questioning the contents, and feedback he received from those employees, that the contents may have come from the home and or business of one of his reports, Joe Reno.

Reno is a Sr. Environmental Engineer with responsibility for waste removal for the Kettering E&C and the Moraine Harrison (KBP) facilities. I examined the box and its contents and observed the box is a ONYX container and that it contained empty bags and boxes of aquarium sea salt, old wire fencing, broken pieces of concrete and other items similar to construction scrap. Subsequent investigation revealed that Mr. Reno has or had an aquarium business and recently bought a small farm. All consistent with the contents of the box.

I retrieved gate records for ONYX, ring reports for Mr. Reno, both at Kettering and KBP. I observed that the ring reports for Mr. Reno showed drastic inconsistencies with no pattern common for employees. I found that Troy Calton was the primary contact for ONYX and entered the Kettering facility on a daily basis.

On 2/3/04 I contacted Tim Delphi and arranged for a meeting at ONYX to discuss the circumstances. I met with Tim and Mike Webb and asked why the box was at Delphi and if they knew how and when it arrived there. They advised that they had not yet contacted the driver responsible for the delivery but did have a receipt for $100.00 cash dated 12/22/03 showing Joe Reno as the customer. At that time they assumed that it was a deposit for disposal from Mr. Reno's personal account. ONYX stated that they would further look into the situation and report back to me. On 2/4/04 I received a call from Tim Delph who advised that the driver was Troy Calton and that he was willing to talk to me about the issue. We arranged to meet at ONYX on 2/5/04.

On 2/5/04 I met with Troy, Tim and Mike at ONYX. Troy explained that he had been asked by Mr. Reno, sometime in early fall, to deliver an empty box to Reno's residence near Waynesville, OH for the purpose of using it to remove various debris. Sometime later, approximately two months since ONYX does not show records as to when, Troy stated that Reno asked him to pick up the box as soon as possible as it was digging into his driveway. Troy recalls that on the morning he picked it up, he received a call from an unknown person at the Kettering plant requesting service right away. Troy states that he drove straight to the plant with the box and dropped it where it remains at this time. He stated that he has forgot to retrieve the box during this time.

I asked Troy if Reno has ever asked or insinuated that the box removal and disposal costs be paid by Delphi. Troy stated that Reno has never asked for that to happen, but has never questioned him as to the invoice above the deposit Reno initially paid. When asked if Mr. Reno and Troy were ever together outside of Delphi, he stated that only to give Reno a ride to his car. Troy added that on a daily basis Reno would contact him while Troy was on site and ask him to meet at the ONYX truck and give him a ride around to Reno's car. It should be noted that ONYX vehicles enter through gate 4 (east side) and park near the coal bin. The parking lot that Mr. Reno parks in daily is outside gate 1 which is on the west side of the plant. Troy stated that he does not know where Reno travels to at that point. When exiting through Gate 4 security does not log occupants or passengers of vehicles. It would therefore be my assumption that this activity would only be to avoid turnstile rings. The interview with Troy was terminated.

I reviewed Reno's 2001 and 2002 Conflict of Interest Questionnaire's and read that Reno had disclosed that he assisted his wife in her home based business. The questionnaire does not state what that business is. I researched registered businesses in Ohio through Lexis-Nexis and found records that show Joe Reno as the registered agent for Marine Solutions at his home address in Centerville, OH. Records also show that Joe, his wife and an unknown additional female are the Incorporators/Applicants for Medical Laboratory Services also located at his home address.

On 2/16/04 I interviewed Joe Reno. Debbie Field was also present. I asked Joe to tell me the complete chronological order of events pertaining to the drop box. Joe stated that he had asked Troy in late November or early December of 2003 to drop off a box at his new residence. He stated that he told Troy he would pay for it. Troy delivered the box shortly after the request.

Joe stated that he filled the box with debris from renovations at his residence and had it filled before Dec 22nd. He states that he was present at his house on the 22nd since it was during Christmas shut down (Christmas shut down did not start until Dec.23rd) and that Troy picked up the box in the afternoon. He states that he did not know where the box went at that point and assumed it went to a landfill. Joe stated that he was not aware that the box was on Delphi property until late January when he says he was told that someone was taking pictures of it and understood an investigation was being conducted. At that point Joe produced two witness statements. One is from an hourly worker, David Atchison, and the other is from a contract worker from Crown, Dave Low. Both statements were written at the request of Joe and briefly state that they were present in the waste treatment control room during a conversation with Joe and Troy where Joe stated he would pay for the tipping fee for the box. Joe stated to me that he obtained these as evidence he was doing things right concerning the box. Joe states that he gave Troy $100 cash on Dec. 22nd and got the receipt from Troy on that date. When asked if Joe has ever received any favors, gratuities, kickbacks or any other improper transactions from any contractors he stated that he has not.

I asked Joe about his personal businesses outside of Delphi. Joe stated that he assists his wife in her aquarium service business but only helps part time on nights and weekends. He also stated that she operates a medical laboratory consulting business that he does not participate in. I did not ask Joe to explain the inconsistencies in his Conflict of Interest Questionnaire statement and his answers in this interview at this time.

When asked to explain inconsistencies and gaps in his turnstile records, Joe stated that he visits different facilities and walks through the Gate #4 truck entrance at the Kettering facility and just flashes his badge to the guard to enter the plant. When asked how he exits the plant without swiping he stated that he asks for rides to his car from ONYX only on bad weather days. Joe was not asked any further questions regarding time records and did not volunteer any further explanation. The interview with Joe was terminated at that time.

On Wednesday 2/18/04 I re-interviewed ONYX employee Troy Calton. Mark Gooding was present during the interview along with Mike Webb and Tim Delph of ONYX. Calton stated that the information he gave me at the first interview was true. An hour later I concluded the interview. As we were leaving Troy asked me what would happen to him and I stated that as long as his story was true he had nothing to worry about. Mark Gooding and I were still down the hall talking when Webb, Delph and Calton approached us a second time and stated that Troy needed to talk to us again. We went back into a meeting room and resumed the interview. At this time Troy stated that I needed to hear some changes to his story. He stated the following additions/revisions to his original statement.

Troy stated that he was asked by Joe sometime in Aug or Sept 03 to deliver a drop box to Joe's house. Troy scheduled another driver to deliver the box and it was delivered. Troy stated that around the end of Sept or Oct Joe asked that the box be picked up since the box was digging into Joe's asphalt driveway from the heat. Troy does not remember the exact date but states that he and Joe left the Delphi site together in an ONYX truck to retrieve the box. They picked it up and returned it to the Kettering facility together and dropped it in the spot that it remains to this date. Troy stated that he knew the final disposal fee would be billed to Delphi. Troy stated that he did not record the date of the delivery since he assumed Joe would not be billed the usual $75/week storage fees due to Joe being a Delphi contact. He had scheduled the box to be picked up by an ONYX driver on a couple of different occasions but due to work loads it was not picked up prior this investigation and could not be picked up at that point. Troy states that Joe gave him the $100 cash the day they dropped the box at Delphi and that it was intended to be for Troy in return for doing Joe a favor. Troy never forwarded the money to ONYX. Troy was aware that this issue was being investigated on 1/30/04. He states that Joe came to him on either 2/2 or 2/3/04 and asked for a receipt for the $100 cash. Troy gave him one and picked 12/22/03 as the date on the receipt at random.

Troy was aware of the statements Joe obtained from the two waste treatment plant employees. He states he had conversation with David Atchison who stated he lied in the statement to Joe and that Davis was not present for the conversation as he stated. Troy also stated that another Crown employee, Terry Ruble, had told Troy he was asked by Joe to write a statement but would not do so since it would be untrue.

Troy still states that he drove Joe out of gate 4 in an ONYX truck daily and took Joe around to Joe's personal vehicle. Troy also states that he nor any other of the treatment plant workers see or talk to Joe in the afternoon. Troy states he does not know where Joe is or what he is doing. When asked about any gratuities given to Joe or anyone else at Delphi, Troy stated that he buys chicken every Wednesday for the treatment plant employees which amounts to approx. $30-$40.00. Joe is present for those lunches. He states that no other money, gifts or services are or have been paid.

At this point Troy stated that this is the complete and truthful account of the incident. I asked Troy, with assistance of Mike Webb, to write a complete statement of the events. I asked that it be completed by 1 pm on 2/19. Troy and Mike Webb agreed and we concluded the meeting. On 2/19 I received a call from Troy stating he had not completed the statement, as he had been very busy at work. I contacted Mike Webb and asked if there were any other reasons that the statement was not completed and he told me that there were not and that he and Troy would complete by Friday.

I received a call on 2/20 from Mike Webb who stated that Troy was concerned that Delphi would take action against him and had contacted an attorney. Mike stated that Troy wanted a letter from Delphi stating that Delphi would not take action against him. I advised Mike Webb that I would get back to him.

On 03/03/04 I met with Mitch Brown, Mgr for Crown Solutions Inc, in reference to this investigation. Mitch has responsibility for supervising Crown employees who work in the Kettering facility waste treatment plant. Another supervisor for Crown, Mike Wittman, also sat in on the meeting. I asked Mitch and Mike if they had any information pertaining to waste removal and any fraud, gratuities or any other improper activity. They were both aware of the focus of this investigation prior to this meeting and stated that they did not have any knowledge of such activity. Mike Wittman did state that his desk is adjacent to Joe Reno's and that he does not see Joe at his desk very often. He stated that he is aware of "Chicken Wednesdays" (lunch bought by ONYX for employees assigned at the treatment plant every Wednesday) but has not participated. Mitch explained that most of his employees dealt with Heritage Waste Systems and not directly with ONYX. I informed Mitch and Mike that I would like to interview their employees that were assigned to waste removal and control and that I would like for Mitch to sit in on those interviews. Mitch agreed and we proceeded to meet and interview the following Crown employees.

On 03/03/04 at approximately 1130hrs I conducted an interview with Crown employee Terry Ruble with Mitch Brown present. Terry is a retired Delphi hourly employee from the Kettering facility waste treatment plant and works part time where needed in waste treatment. Terry stated that Joe Reno had approached him on or about 02/02/04 for a statement regarding a conversation between Joe and Troy Calton concerning the drop box. Terry stated that Reno had asked him for a statement but Terry stated that he did not recall the conversation and could not furnish a written statement to Joe. I asked Terry numerous questions about his knowledge of any improper activity between contractors and any Delphi employees he consistently stated he was not aware of any. Terry stated that approximately 3-4 years ago he worked for Reno cleaning fish tanks for Reno's aquarium business but had only cleaned a few at that time and it was always done on his own time during evening or weekend hours. The interview was terminated.

On 03/03/04 at approximately 1230hrs I conducted an interview with Crown employee David Low
with Mitch Brown present.  Low is assigned every day to the control room at the waste treatment
plant at Kettering.  David volunteered that he was aware of the current investigation and that
Low was out on suspension regarding the drop box.  Low stated that he had been asked by
Reno to furnish a statement regarding the conversation between Reno and Calton.  David stated
that he did write the statement that I showed him and that the conversation was the only
involvement he had in the investigation.  When asked if he saw Reno on a daily basis he stated
that he did not and further stated that he seldom remembered seeing Reno during the afternoons.
Low had no further information and the interview was terminated.

On 03/04/04 at approximately 1030hrs I initiated an interview with Nesby Brown, a Crown
employee.  Present during the interview was Mitch Brown and Securities investigator Brent Faust.
Nesby is a retired Delphi employee and is now employed full time by Crown.  He is assigned part
time at the waste treatment control room and part time at the hazardous waste drum pad.
Nesby's normal hours are 3am to 11am.  When asked about any personal or non-Delphi business
he does with Joe Reno he stated that approximately six years ago he helped Reno build a garage
at Reno's residence on evenings and weekends.  He also stated that approximately 4-5 years
ago he would pick up aquarium supplies for Reno in Columbus after work and deliver them to
Joe's house the next morning before going to work.  Brown had no other pertinent information
and the interview was terminated.

On 03/05/04 at approximately 0900hrs I conducted a follow up interview with Troy Calton of
ONYX.  Present was Tim Delph, Mike Webb of ONYX and Mark Gooding, Delphi.  I reviewed the
statements made by Troy in my interview with him on 2/18/04.  Troy's responses remained the
same except that he remembered that he had been given the $100 cash from Reno
approximately 1-2 weeks prior to returning the drop box to Delphi.  I asked for clarification
regarding the written receipt for the $100 and Troy stated that on either 2/2 or 2/3/04 Joe had
approached Troy and asked for a written receipt for the cash.  Troy stated that he would get one
from ONYX.  He stated that he went to ONYX the next morning and asked an office employee
named Jerri Dirks to give him a receipt for $100 cash to Joe Reno for disposal of a roll off box.
He states that he picked the date of 12/22/03 at random and not at the direction of Reno or
anyone else.  Troy stated that he was given the receipt but had still not given the cash to ONYX.
He still states that he understood that the money was from Joe to him and not to ONYX.  Troy
then gave the receipt to Reno the following day.  Troy continued to confirm his statements given
to me in the previous interview and the interview was terminated.

On 03/05/04 Investigator Brent Faust, at my request, removed the hard drive from Joe Reno's
Delphi issued computer.  Investigator Faust took the hard drive to his office in Indianapolis, IN for
a search for evidence that Reno may have spent time conducting his personal business on the
computer.  Investigator Faust informed me on 3/9/04 that he found no evidence of improper
activity on the computer.

On 3/23/04 I contacted ONYX to have the drop box in question picked up from the Kettering
facility.  Troy Calton responded from ONYX at approximately 1030hrs. and after he and inspected
the container to ensure that no other items or waste had been added to it, he left the facility.

### Conclusion

Delphi HR personnel discharged employee Reno the week of 3/15/04 with no further investigation
activity.

**Evidence Retained**

Ring reports for Joseph Reno for the past six months to present for Kettering and KBP. (In possession of Mark Gooding)

Receipt for cash deposit for roll-off box for Joe Reno from ONYX.

Conflict of Interests for Joe Reno for 2002 and 2003.

Copies of statements given to me by Joe Reno from Dave Low and David Atchison.

Ohio Secretary of State public business records for Marine Solutions and Medical Laboratory

**Personal Data**

Joseph M. Reno
Sr. Environmental Engineer
Level 7
SSN: 277522266

**End of Report**

**EXHIBIT C**

# DELPHI

March 30, 2004

<u>Via Facsimile and U.S. Mail</u>

Ms. Susan Schlemann
Investigator
Occupational Safety & Health Administration
36 Triangle Park Drive
Cincinnati, OH  46246-3411

RE:   Joseph M. Reno v. Delphi Chassis Systems
      Case Number 5-1610-04-034

Dear Ms. Schlemann:

This letter constitutes Respondent Delphi Corporation's ("Delphi") formal position statement in response to the above-referenced complaint filed by Complainant Joseph Reno.

In his complaint, Complainant alleges that he believes he was terminated because of his March 2, 2004 letter alleging environmental and safety concerns to Delphi's attention. What Complainant fails to mention, however, is that he sent that letter only **after** he had been suspended pending the outcome of an ongoing, and wholly unrelated, investigation into alleged inappropriate conduct. That investigation ultimately established that Complainant had misappropriated company funds, had taken personal advantage of his business relationship with a Delphi supplier, and had intentionally (though unsuccessfully) tried to obstruct Delphi's subsequent investigation. Complainant was terminated **solely** for those reasons, not because he brought any alleged safety concerns to Delphi's attention.

Accordingly, Complainant's complaint against Delphi is without merit, and should be dismissed.

<u>Background</u>

Complainant was hired by Delphi in August 1981. At all relevant times he was employed as a Senior Environmental Engineer, with responsibility for waste removal and wastewater treatment at Respondent's Kettering and Moraine, Ohio manufacturing facilities.

- <u>The Investigation Into Improper Waste Disposal Begins</u>

On January 29, 2004, Environmental Coordinator JoAnne Rau was contacted by an employee of Crown Solutions, Inc.[1] regarding a waste dumpster[2] that was located on the Kettering property. The Crown employee wanted to know how he should record the contents of the dumpster for disposal. Rau learned that the dumpster contained fencing and aquarium salt bags – neither of which could have come from the Delphi facility. Accordingly, on January 30, she brought the

---

[1] Crown is a water management and engineering company that provides Delphi with services and personnel.
[2] The container is formally known as a "waste roll-off box" – a mobile container that can be attached to a semi truck, as opposed to a stationary dumpster one might find at an apartment complex, for example. However, for ease of reference, this statement will refer to the container as a dumpster.

DC 453

Delphi Legal Staff  MC: 480-410-144   5825 Delphi Drive  Troy, MI 49098   Tel: [1] 248.813.1460   Fax: [1] 248.813.1466   E-mail: jeffery.m.peterson@delphi.com

EXHIBIT
#3

March 30, 2004
Page 2 of 8

matter to the attention of her supervisor, Facilities & Services Site Manager Mark Gooding. Rau informed Gooding that the dumpster belonged to Onyx Industrial Services, a company that provides waste disposal services for Delphi. Gooding contacted Onyx, but Onyx was unable to explain the contents of the dumpster, or why it was located on Delphi property.

Gooding found this to be sufficiently unusual that it warranted further investigation. Accordingly, on January 30, he contacted Mike Brown, an investigator for Securitas, which provides security services for Delphi. Gooding informed Brown that, after speaking with other individuals, he believed the contents of the dumpster may have come from Complainant's home or business.

Brown began by inspecting the dumpster, and found that it contained boxes of aquarium sea salt, old wire fencing, broken pieces of concrete, and other construction scrap. He also learned that Complainant had an aquarium business, and had recently purchased a small farm, all of which was consistent with the dumpster's contents. (A copy of Brown's Investigation Report is attached as Exhibit A).

On February 3, Brown met with Onyx representatives to discuss the dumpster. Onyx informed Brown that they had located a receipt for $100 cash dated December 22, 2003, that showed Joe Reno had privately arranged for the dumpster. (A copy of the receipt is attached as Exhibit B). They also noted that the individual who had transported the dumpster was an Onyx employee named Troy Carlton.

Brown met with Carlton on February 5. Carlton told Brown that in the fall of 2003 Complainant had asked him to deliver an empty dumpster to Complainant's residence. Carlton indicated that a few months later Complainant asked him to come back and pick up the dumpster. According to Carlton, when he picked up the dumpster there was an emergency at the Kettering facility, so rather than taking the dumpster to a landfill, he had driven straight to the facility, dropped the dumpster off, and subsequently forgot to retrieve it. Carlton denied that Complainant had asked him to bill the dumpster's disposal costs to Delphi. (See Exhibit A).

- A Small Leak Is Discovered In A Treatment Tank

On Friday, February 13, 2004, Complainant and his crew discovered a small leak emanating from the bottom of one of Delphi's hexavalent chromium wastewater treatment tanks. The Kettering facility has two parallel, 75,000 gallon, epoxy coated, carbon steel batch treatment tanks that are used to adjust the pH of the wastewater and to reduce the hexavalent chrome to its trivalent state.

Complainant decided to install temporary plumbing to enable a sludge storage tank to be used as a temporary chrome treatment tank so the actual tank could be drained, inspected, and repaired. This was accomplished between February 14 and 16, 2004. Complainant also arranged for extra manpower to be brought in to monitor the plumbing and tanks during this time.

- The Waste Disposal Investigation Continues

On Monday, February 16, Mike Brown interviewed Complainant in connection with his investigation into the Onyx dumpster. Brown asked Complainant to explain the sequence of events regarding the dumpster. Complainant told Brown that he asked Carlton to deliver the dumpster to his house in "late November or early December, 2003." Complainant claimed that he filled the dumpster with debris, and had Carlton pick it up on December 22. He stated that he assumed Carlton had taken

DC 454

March 30, 2004
Page 3 of 8

the dumpster to a landfill, until he learned in late January that "someone was taking pictures" of the dumpster, and that an investigation was being conducted.

Complainant then presented Brown with two written statements – one from David Atchison, an hourly employee, and another from Dave Low, a Crown employee. (Copies of these statements are attached as Exhibit C). Both individuals claimed that they overheard a conversation between Complainant and Troy Carlton in which Complainant told Carlton he would pay the fee for the dumpster.[3] Complainant told Brown that he paid Carlton $100 on December 22, and received a receipt.

- Troy Carlton Recants His Story

On Wednesday, February 18, Brown conducted another interview with Carlton (Gooding and Onyx managers Mike Webb and Tim Delph were also present). Initially, Carlton repeated his story that he had picked up the dumpster on December 22, 2003, and that Complainant had paid Onyx $100 for its services. However, as the interview was wrapping up, Carlton asked Brown what he thought would happen to him (Carlton), and Brown told him that as long as he was telling the truth there was nothing to worry about. After speaking to Webb and Delph privately for a few minutes, Carlton located Brown and indicated he wanted to resume the interview.

Carlton then informed Brown that he needed to "make some changes" to his story. He indicated that in August or September 2003 Complainant asked him to deliver a dumpster to Complainant's house. Around the end of September or early October (not December 22), Complainant asked Carlton to pick up the dumpster. According to Carlton, he and Complainant drove in an Onyx truck to Complainant's home to retrieve the dumpster, and returned to the facility together, dropping the dumpster at the location where it was eventually discovered. Carlton admitted to Brown that he knew the final disposal fee would be billed to Delphi. Complainant gave Carlton $100 cash the day the dumpster was returned to Delphi (not December 22), which was intended for Carlton personally in exchange for doing "a favor" for Complainant. Carlton also admitted that he never gave the $100 to Onyx. (See Exhibit A).

Carlton further stated that on either February 2 or 3, 2004 (i.e., shortly after the investigation began), Complainant approached Carlton and asked for a receipt for the $100. According to Carlton, he filled the receipt out that day, and randomly picked December 22, 2003 as the date on the receipt.

At the conclusion of the interview Brown asked Carlton to submit a complete statement of events as he had described, and asked that it be completed by February 19. Carlton indicated that he would do so. (See Exhibit A).

- Complainant Informs His Supervisor Of The Leak

During a staff meeting on Wednesday, February 18[4] – five days after the leak was discovered -- Complainant informed Mark Gooding of the leak, and his efforts to re-route the wastewater to the

---

[3] Brown found it odd that Complainant had come to the meeting with these two statements in his possession, since Brown had not yet spoken to Complainant, and no issue had been raised about Complainant's communications with Carlton.

[4] This meeting did not take place on Tuesday, February 17, as Complainant alleged in his March 2, 2004 letter to James P. Walle (discussed below).

DC 455

March 30, 2004
Page 4 of 8

sludge tank. Complainant and Gooding went to view the tank, and Gooding assigned Plant Engineer Jerry Lee to assist Complainant with the task of having the tank cleaned, inspected, and repaired.

After the tank was cleaned, Delphi retained American Testing Services, Ltd. (ATS) to perform an inspection of the tank on Friday, February 20. ATS reported that all of the welds were inspected and that the tank's thickness was approximately equal to the original design thickness of .25 inches. However, a 15-inch-long crack was discovered in the bottom of the tank weld, which was the source of the small leak.

Mark Gooding and JoAnne Rau visited the treatment plant early Friday afternoon, February 20 to speak with ATS about the inspection and test results. Gooding and Complainant discussed ATS's findings and made arrangements for the tank to be repaired and recoated the following week.

- Delphi Suspends Complainant Based On The Waste Disposal Investigation

At around noon on February 20, Mike Brown – who was completely unaware of the chrome tank issue – advised Mark Gooding and Human Resources representatives of his findings to date. He indicated that, although his investigation couldn't be considered completely closed because Carlton had not yet provided a written statement, there was already ample evidence that Complainant had committed several acts of misconduct in connection with the dumpster.

Based on Brown's findings to date, Divisional Salaried Personnel Director Elizabeth Meyer decided that Reno should be suspended pending the final outcome of the investigation (like Brown, Meyer had no knowledge of the chrome tank issue at that time). Accordingly, based on Meyer's decision, late in the afternoon of February 20, Human Resources Representative Debbie Field and Mark Gooding informed Complainant that he was being suspended, with pay. Gooding subsequently placed Jerry Lee in charge of the waste treatment area.

- The Tank Is Repaired

Between February 23 and March 1, 2004, the surface crack and another small area of the tank were repaired with welded patches, and the bottom three feet of the tank, along with any blisters, were re-coated with an epoxy material superior to the original coating. The tank was then readied for a return to service.

- Complainant's March 2 Letter To Delphi's Legal Staff And Delphi's Response

On March 2, 2004, Complainant sent a letter to James Walle, an environmental attorney on the Delphi Legal Staff, which Walle received late in the afternoon of March 3. (A copy of the letter is attached as Exhibit D). In the letter, Complainant – for the first time – raised a series of alleged concerns about the safety of the chrome treatment tanks, and the risk of "catastrophic failure." He also referred to his suspension on February 20, which Complainant characterized as relating to Troy Carlton's "inadvertent return of the box containing [Complainant's] trash" to the Kettering facility. He claimed that Carlton had been interviewed "and took full responsibility for returning the box to Delphi" (obviously Complainant was not aware that Carlton had recanted his original story). He also repeated the lie (which he ironically characterized in his letter as "undisputed fact") that he had "paid in full for the disposal of this waste." After professing his innocence, Complainant speculated that his suspension had been initiated by Gooding to facilitate his plan to

DC 456

March 30, 2004
Page 5 of 8

circumvent and ignore applicable health, safety, and environmental rules and regulations." Of course, Complainant had no way of knowing that Gooding played no role in the decision to suspend him, or that the decision was, in fact, made hundreds of miles away by a human resources executive with no knowledge whatsoever about the chrome treatment tank issue.

In a letter dated March 4, 2004 (copy attached as Exhibit E), Walle thanked Complainant for his letter and promised to look into the situation. Walle and Delphi's Facilities Services Group arranged to bring two Delphi environmental managers (Marty Cristo and Roy Knapp) and an independent consulting engineering firm, Hubbel, Roth & Clark, Inc. (HRC), to determine whether the two chrome wastewater tanks were, in fact, safe for continued use. Accordingly, the tank was again emptied, and the Delphi personnel inspected the site on Friday, March 5. HRC Engineer Ed Cote arrived on Saturday, March 6, and conducted his own independent investigation. Importantly, neither Cote nor the environmental managers had been made aware of Complainant's March 2 letter.

Following his inspection, Cote, Cristo, and Knapp concluded that the plant had taken timely, appropriate action concerning the leaking tank, and believed that the plant's original plan to inspect the non-leaking tank during Delphi's July shutdown period was appropriate. Indeed, the parties agreed that the emptied tank should be put back into service as soon as possible, since risks posed by re-routing the wastewater were believed to be greater than the risk of tank failure.

Delphi subsequently retained ATS to conduct additional ultrasonic inspections of the other chrome treatment tank.[5]   The results of that inspection showed that the thickness of that tank was approximately .25 inches, measured at four random locations along the sidewall. This suggested that the structure of the other tank was sound as well (since the original design thickness of the tank was .25 inches).

On March 26, 2004, HRC provided Delphi with its final report. (A copy is attached as Exhibit F). The report concluded that Delphi had responded to the leak immediately and appropriately. It noted that Delphi emptied and inspected the tanks, and repaired two isolated areas with steel plates. Furthermore, the lower portion of the tank was covered with a coating superior to the original. According to HRC, "the new patched areas and the original coatings effectively protect the steel tank." The report went on to find that the condition of Delphi's tanks was similar to other tanks in use throughout the automotive industry.  HRC also recommended that Delphi inspect and, if necessary, repair all of its tanks as soon as possible -- possibly during Delphi's annual July shutdown, when wastewater flows are significantly reduced.

- The Waste Disposal Investigation Concludes; Complainant Is Terminated

Mike Brown continued his investigation into early March.  On March 5, 2004, he interviewed Troy Carlton for a third time.  Carlton reaffirmed his earlier statement, but refused to provide a written statement unless Delphi agreed not to "take action against" him for his role in the dumpster scam.

Brown considered his investigation completed, and he notified Meyer. Meyer discussed the matter with Glenn Howarth, the Director of Delphi's Environmental Services Group.[6] Meyer and Howarth agreed that Brown's investigation had established the following:

---

[5] The ultrasound enabled ATS to determine the thickness of the tank walls without actually emptying the tank.
[6] Howarth is Mark Gooding's supervisor, and was thus two levels above Complainant.

DC 457

March 30, 2004
Page 6 of 8

- Complainant's arrangement with Troy Carlton to deliver an Onyx dumpster to his house, and to return the dumpster to Delphi, in exchange for $100 paid directly to Carlton, constituted a conflict of interest, a misappropriation of Delphi resources, and an abuse of Delphi's business relationship with Onyx.
- Complainant had willfully obstructed Delphi's investigation into the incident by conduct including: (1) lying about the facts, (2) persuading Carlton to produce a bogus receipt, and (3) compelling David Atchison and Dave Low to submit false statements on his behalf.[7]

These facts were beyond dispute, and constituted a clear violation of Delphi's guiding policies and principles. By this point, of course, Meyer and Howarth were aware of the chrome treatment tank issue, and of Complainant's letter to Walle. However, they agreed that they had no choice but to terminate Complainant's employment. The fact that Complainant had raised concerns about the chrome tanks did not in any way lessen or excuse his unacceptable conduct on a completely unrelated issue – particularly in light of the fact that the waste disposal investigation began well before the chrome tank leak even occurred, and Complainant didn't send his letter until well after he had been suspended.

For the reasons stated above, Complainant was terminated on March 17, 2004.

<u>Discussion of Complainant's Claims</u>

Complainant claims that he was terminated because he raised safety concerns in his March 2, 2004 letter to Jim Walle. His complaint is being investigated under the provisions of 29 C.F.R. Part 24 and 29 U.S.C. §660(c).

The analysis for a claim under either provision is essentially the same: Was Complainant discharged because he engaged in "protected activity"? Complainant must establish that he did, in fact, engage in protected activity, and that his termination was causally connected to that protected activity. *See, e.g., Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361 (8th Cir. 1994).

- <u>Complainant Did Not Engage In A Protected Activity</u>

Complainant must first show that his March 2, 2004 letter to Delphi legal staff constituted "protected activity." Under 29 C.F.R. §24.2 Complainant would have to show that he either had (or was about to): commenced proceedings under any of the listed statutes; testified in such proceedings; assisted or participated in such proceedings; notified Delphi of an alleged violation of a relevant federal statute; refused to engage in any practice made unlawful; or testified before congress or other governmental proceeding. Complainant's letter does not fall within any of those categories.

Likewise, Complainant's letter does not appear to fit the criteria of 29 U.S.C. §660(c) or 29 C.F.R. Part 1977. While Delphi acknowledges that it is the Department of Labor's policy that internal complaints can constitute protected activity *if made in good faith* (29 C.F.R. §1977.9(c)), there is no evidence that Complainant's letter was made in good faith, as opposed to a deliberate effort to make exaggerated allegations in order to protect himself against possible discipline for his malfeasance. In this respect, it's very significant that Complainant waited several weeks to raise

---

[7] Atchison retired shortly after the investigation began, so Delphi was unable to take action against him for filing a false statement. Low is not a Delphi employee.

DC 458

March 30, 2004
Page 7 of 8

these allegations. If Complainant genuinely believed Delphi's response posed an unreasonable
risk, one would expect him to have brought the issue forward immediately.

- <u>There Is No Evidence Of A Causal Connection</u>

Moreover, regardless of whether Complainant's letter constituted "protected activity," there is no
evidence whatsoever to suggest that there was a causal connection between the letter and the
decision to terminate his employment. The following facts establish that the decision to terminate
was made for a reason that preceded, and was wholly unrelated to, any issue regarding the
chrome treatment tanks:

- Complainant was terminated based on the results of an investigation that began on
  February 2, 2004 -- 11 days before the leak was discovered, and a month before
  Complainant wrote his March 2 letter to Jim Walle.
- Complainant was suspended 11 days before he wrote his March 2 letter, and he was never
  permitted to return to work. As he himself acknowledges, his suspension was specifically
  connected to the investigation into the dumpster disposal issue.
- The decision to suspend Complainant was made by Delphi's Salaried Personnel Director,
  who at the time had no knowledge of any issue regarding the chrome treatment tanks. Her
  decision was based on the preliminary findings of an investigator who likewise had no
  knowledge of the issue regarding the tanks.
- Complainant's suspension was essentially converted into a termination when Brown
  completed his investigation and confirmed that Complainant had engaged in inappropriate
  and unethical conduct.
- Complainant's March 2 letter did not change the fact that he had misappropriated Delphi
  assets, entered into an arrangement with Delphi's supplier that was a clear conflict of
  interest, and deliberately obstructed and misled Delphi's investigation into his conduct.

The only fact that is at all suggestive of a causal connection is the short amount of time between
Complainant's letter and his termination. However, the unique facts of this case rebut any
inference caused by the temporal proximity. In this case, at the same time as the tank issue, there
was a parallel investigation being conducted by individuals who had no direct involvement with the
tank issue. The waste disposal investigation was therefore also temporally related to
Complainant's termination. Accordingly, there is no basis on which to conclude that the mere
closeness of time, without more, establishes that *either* issue (the Onyx dumpster or Complainant's
letter) was, in fact, causally connected to Complainant's termination. However, when this temporal
proximity is coupled with the other facts showing that the termination was connected to the waste
disposal issue, there is only one reasonable conclusion that can be drawn.

Finally, it is nonsensical to claim that Respondent would discharge Complainant for raising a safety
issue. To the contrary, Delphi considered it Complainant's responsibility to monitor the tanks,
and to report any perceived safety issues. Indeed, Gooding appreciated that Complainant had
informed him of the leak, and of the steps that had been taken to bypass the tank. Gooding also
approved and monitored the subsequent inspection and repair of the tank – all of which occurred
before Delphi received Complainant's March 2 letter. And an independent consultant
subsequently verified that Delphi's efforts were appropriate.

DC 459

March 30, 2004
Page 8 of 8

In sum, there is no evidence to suggest that Delphi terminated Complainant because of his March 2 letter. In contrast, there is extensive evidence suggesting that Complainant was terminated solely for his actions in connection with the Onyx dumpster.

Conclusion

Based on the above, it is clear that Complainant's complaint lacks factual or legal merit. Complainant was terminated solely because he entered into a private arrangement that resulted in a conflict of interest, misappropriation of Delphi resources, and intentionally interfered with Delphi's subsequent investigation. His termination had nothing to do with his alleged and belated concerns about the safety of the chrome treatment tanks – to the contrary, Delphi plant management and corporate personnel appropriately addressed chrome wastewater tank matter. Accordingly, Complainant's complaint should be dismissed.

If you have any questions or need additional information, please do not hesitate to contact me.

Very truly yours,

Jeffery M. Peterson
Attorney

Attachments

DC 460

# **EXHIBIT D**

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOSEPH RENO,                          *       CASE NO. 3:04-CV-00321

        Plaintiff,                 *       Judge Walter Herbert Rice

v.                                    *

DELPHI CORPORATION,                   *

        Defendant.                 *       **FIRST AMENDED
                                              COMPLAINT**

---

**PLAINTIFF'S FIRST AMENDED COMPLAINT WITH JURY DEMAND**

---

      Plaintiff, Joseph Reno ("Reno"), for his First Amended Complaint against Defendant,

Delphi Corporation ("Delphi") alleges as follows:

<u>JURISDICTION AND VENUE</u>

    1.    This is an action for wrongful discharge and denial of employment benefits arising

under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 <u>et seq.</u>, the Consolidated

Omnibus Budget Reconciliation Act, 29 U.S.C. § 1161 <u>et seq</u>. and the Fair Credit Reporting Act,

15 U.S.C. § 1681 <u>et seq</u>.  In addition, this action is based upon a violation of the Ohio

whistleblower statute, O.R.C. § 4113.52, the Ohio wage payment statue, O.R.C. §4113.15,

discharge in violation of Ohio's public policy and the common law for defamation.  This action

presents a federal question within this Court's jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C.

§ 1343.

    2.    Venue is proper in this district under 28 U.S.C. §1391(b) and (c).

EXHIBIT
#1

## THE PARTIES

3.    Plaintiff Joseph Reno is a citizen of the State of Ohio residing at 5012 Lytle Road,

Waynesville, Ohio 45068.  At all times relevant hereto, Reno was employed by Defendant

Delphi as a Senior Environmental Engineer with responsibilities as both chemical treatment

supervisor for Delphi's Kettering, Ohio, operations and environmental site coordinator for

Delphi's plant on Kettering Boulevard.

4.    Defendant Delphi Corporation is a Delaware corporation doing business in Ohio

at 2000 Forrer Boulevard, Kettering, OH 45420.  At all times relevant hereto, Delphi was Reno's

employer.

## BACKGROUND

5.    On February 13, 2004, Delphi employees discovered a leak at the base of one of

Delphi's two 75,000 gallon chromium wastewater treatment tanks located at Delphi's Chemical

Treatment Plant (the "CTP") in Kettering, Ohio.  These tanks hold an average daily accumulation

of 100,000 gallons of chromium wastewater containing hexavalent chromium, a highly toxic

substance subject to the Resource Conservation and Recovery Act, as amended by the Hazardous

and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act, and its

implementing Environmental Protection Agency regulations.

6.    In response to this environmental and safety hazard, Delphi's Senior

Environmental Engineer (Joseph Reno) made the decision to immediately modify and utilize a

sludge storage tank as a temporary replacement chrome treatment tank.

7.    From February 14 to February 16, 2004, Reno employed a combination of a

plumbing bypass, temporary hosing, pumps, and additional man-hours by outside contractors to

avoid idling the work of approximately one thousand two hundred (1200) Delphi employees at

2

Delphi's Kettering, Ohio facilities.

     8.    On February 16, 2004, Reno was asked to meet with an Investigator employed by Delphi to investigate the facts and circumstances surrounding Reno's personal hiring of Onyx, a waste disposal contractor, to set a solid waste collection bin at Reno's newly-purchased residence in Waynesville, Ohio. Reno answered all of the Investigator's questions and provided the Investigator with two signed witness statements and a paid deposit receipt evidencing the fact that Reno was paying in full for Onyx's services.

     9.    During the period of time from February 19 to February 20, 2004, the leaking 75,000 gallon chromium tank was drained and an inspection revealed that the original epoxy coating on the bottom third of the tank had been eaten away by corrosion. Two obvious leaks to the outside environment had occurred where the wall of the tank joined its bottom, on the southwest and northeast sides of the tank. Due to its identical age and construction and its twenty-five (25) years of uninterrupted service, it was Reno's belief that the companion 75,000 gallon tank was also in an advanced state of corrosion.

     10.    Over the last several years, there have been at least three (3) leaks of hazardous chromium wastewater to the outside environment at the CTP. In spite of these continuing problems, for over two (2) years, Delphi has stopped funding any preventive maintenance at its CTP, despite repeated requests by Reno to do so.

     11.    The only repairs done by Delphi for more than two (2) years at its CTP have been "band-aid" fixes, in response to emergency situations.

     12.    On Friday morning, February 20, 2004, Reno's supervisor, Mark Gooding ("Gooding"), made one of his rare visits to Delphi's CTP in Kettering, Ohio. During this Friday morning visit Gooding repeatedly questioned, criticized, and argued with Reno's decision to

3

address the on-going environmental emergency with around-the-clock staffing. Gooding also

insisted that Reno cut back on the repairs which Reno had already scheduled to begin on

Monday, February 23, 2004. Gooding told Reno (in the face of Reno's express objections) that

only the bottom third and the visibly damaged areas of the leaking chromium treatment tank

should be recoated, that only a patch should be welded on the leaking manway of the chromium

clarifier tank, and that nothing at all should be done to inspect or maintain the second chromium

treatment tank.

13.    Later on that same Friday, February 20, 2004, Reno was summoned to Gooding's

office and suspended "with full pay and benefits" from his employment at Delphi. The pretext

given for this action was the on-going Investigation into Reno's personal hiring of a solid waste

disposal contractor, but the true motivation was expressed by Gooding several hours earlier when

he argued with Reno about the expense of repairs Reno had planned in order to comply with

Environmental Protection Agency ("EPA") regulations.

14.    Following Reno's suspension, Gooding cancelled the repairs scheduled by Reno,

and proceeded to complete the cheapest possible "band-aid" repairs. At that time, the second

chrominum treatment tank was neither drained nor inspected.

15.    Following Reno's suspension, Gooding (and other, as yet unidentified Delphi

agents and/or employees) proceeded to defame Reno by stating that Reno had misappropriated

Company assets, been dishonest in dealing with a supplier, and engaged in obstruction of justice.

The malicious purpose of these falsehoods was to further create a pretext for the wrongful

termination of Reno's employment.

16.    On March 2, 2004, Reno sent an internal "whistleblower" letter to Delphi attorney

James Walle in Delphi's Legal-Environmental department at Delphi's headquarters in Troy,

4

Michigan. <u>Inter alia</u> this "whistleblower" letter advised Delphi (1) that there existed a serious

hazard to public health and safety at the CTP in Kettering, Ohio; (2) that Reno reasonably

believed that Gooding was "not qualified to deal with this environmental hazard, has

intentionally cut the necessary staffing, and has disregarded the repairs necessary for full

compliance with applicable health, safety, and environmental rules and regulations"; and (3) that

Reno's "suspension from Delphi employment was initiated by Delphi employee Mark Gooding

to facilitate his plan to circumvent and ignore applicable health, safety, and environmental rules

and regulations." A copy of this "whistleblower" letter is attached as Exhibit "A" to Plaintiff's

Complaint filed 9/2/04 and is expressly incorporated herein.

17.    To date, Delphi has failed to respond to Reno's March 2, 2004, "whistleblower"

letter by either notifying Reno, in writing, of any corrective measures actually taken or of the

absence of his reported hazards to public health and safety.

18.    On March 17, 2004, after more than twenty-two (22) years of employment at

Delphi by Reno, and only fifteen (15) days after Reno mailed his "whistleblower" letter, Delphi

wrongfully terminated Reno's employment for "cause". At no time to date has Delphi had the

simple decency to tell Reno what this "cause" was, in spite of his repeated requests to Delphi to

do so.

19.    By letters dated April 5, 2004, and May 24, 2004, Delphi ignored Reno's

objections and refused to offer him and his family continuing group health insurance coverage

pursuant to the Consolidated Omnibus Reconciliation Act (<u>i.e.</u> "COBRA").

20.    By letter dated March 31, 2004, Delphi refused to pay Reno for his unused

vacation days which had accrued prior to his wrongful termination of employment on March 17,

2004. Also to date, Delphi has not paid Reno all of the salary and vested pension monies that he

was entitled to receive through and after the date of his wrongful termination of employment.

## COUNT ONE – COBRA VIOLATION

21.     Plaintiff restates and incorporates the allegations of paragraphs 1 through 20.

22.     The Consolidated Omnibus Reconciliation Act, 29 U.S.C. Section 1161-1168, commonly referred to as "COBRA", generally mandates that a group health plan offer separated employees the opportunity to elect continuation coverage, i.e. an extension of their previous group health insurance coverage.

23.     Before March 17, 2004, Reno was covered by Delphi's group health insurance.

24.     After its wrongful termination of Reno's employment on March 17, 2004, Delphi violated COBRA law by refusing to offer him continuing group health insurance coverage.

25.     As a result of Delphi's violation of COBRA law, Joseph Reno has been damaged.

## COUNT TWO – ERISA VIOLATIONS

26.     Plaintiff restates and incorporates the allegations of paragraphs 1 through 25.

27.     The Employee Retirement Income Security Act of 1974, 29 U.S.C. Sections 1001 et seq. ("ERISA") requires that Delphi honor the commitments it has made to Reno in its Summary Plan Description (the "SPD") for salaried employees' benefits.

28.     Delphi has breached its SPD commitment to Reno that "[s]eparated employees will receive a lump-sum payment for unused, vested vacation days per completed calendar year quarter".  SPD page #123.

29.     Delphi has further breached its SPD commitment to Reno that "the exit interview will be the occasion for informing the employee of the reason for separation".  SPD page #123.

30.     In addition, in spite of Reno's repeated demands, Delphi has breached its

6

fiduciary and ERISA responsibilities by failing to pay Reno his vested pension funds
(approximately $150,000).

    31.    As a result of Delphi's violations of ERISA law, Joseph Reno has been damaged.

<u>COUNT THREE – O.R.C. 4113.52 (WHISTLEBLOWER) VIOLATION</u>

    32.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 31.

    33.    During the course of Reno's employment with Delphi, he became aware of certain
violations of environmental rules and regulations (as further described in the attached Exhibit).

    34.    Reno reasonably believed that these environmental law violations constituted
hazards to public health and safety.

    35.    On March 2, 2004, Reno made a written report to James P. Walle on the Legal-
Environmental Staff of Delphi World Headquarters; this report identified and described to Delphi
these hazards to public health and safety.

    36.    In violation of Ohio Revised Code Section 4113.52(A)(1)(b), Delphi has failed to
notify Reno, in writing, of any actual corrective measures it has taken, or of the absence of his
reported hazards to public health and safety.

    37.    In retaliation for Reno's report of environmental law violations, and in violation
of Ohio Revised Code Section 4113.52(B)(1), Delphi terminated Reno's employment on March
17, 2004.

    38.    The accuracy of Reno's report of hazards to public health and safety is confirmed
by the actual leak on and about February 13, 2004, of highly toxic hexavalent chromium waste to
the outside environment.

    39.    Suit has hereby been filed for Delphi's violations of Ohio Revised Code Section
4113.52 within one hundred eighty days of Delphi's wrongful discharge of Reno from its

employment.

40. As a result of Delphi's violations of Section 4113.52 of the Ohio Revised Code,

Joseph Reno has been damaged.

### COUNT FOUR – DISCHARGE IN VIOLATION OF PUBLIC POLICY

41. Plaintiff restates and incorporates the allegations of paragraphs 1 through 40.

42. A clear public policy exists as manifested in a state or federal constitution, statute

or administrative regulation, or in the common law. Section 6971, Title 42, U.S. Code,

specifically prohibits employers from retaliating against employees who allege violations of the

Resource Conservation and Recovery Act (and its implementing regulations), as amended by the

Hazardous and Solid Waste Amendments of 1984, also known as the Solid Waste Disposal Act

(Section 6971, Title 42, U.S. Code). Further, in the case of Kulch v. Structural Fibers, Inc.

(1997), 78 Ohio St.3d 134, 677 N.E. 2d 308, Ohio recognized a clear public policy in favor of

workplace safety. See also Pytlinski v. Brocar Prods., Inc. (2002), 94 Ohio St.3d 77, 760 N.E.2d

385.

43. This clear public policy in favor of workplace safety would be jeopardized if

employers such as Delphi were allowed to discharge employees such as Reno for reporting safety

concerns.

44. Delphi's termination of Reno's employment was motivated by Reno's express

workplace and public safety concerns (as further described above).

45. Delphi lacked any overriding legitimate business justification for its termination

of Joseph Reno's employment.

46. As a result of Delphi's discharge of his employment in violation of public policy,

Joseph Reno has been damaged.

8

## COUNT FIVE - O.R.C. 4113.15 (WAGE PAYMENT) VIOLATION

47.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 46.

48.    Section 4113.15 of the Ohio Revised Code requires corporations doing business in the State of Ohio "on or before the fifteenth day of each month, pay such employees the wages earned by them during the last half of the proceeding calendar month."

49.    From February 20, 2004, to March 17, 2004, Delphi suspended Joseph Reno expressly "with full pay and benefits".

50.    From March 17, 2004, to (approx.) April 14, 2004, Reno was entitled to receive his accrued and unused vacation pay.

51.    Delphi has wrongfully refused to pay Reno any wages or benefits subsequent to March 15, 2004.

52.    As a result of Delphi's violation of Section 4113.15 of the Ohio Revised Code, Joseph Reno has been damaged.

## COUNT SIX – DEFAMATION

53.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 52.

54.    Delphi has defamed Reno by stating through its representative(s) that Reno has misappropriated Company assets, that Reno has been dishonest in dealing with a Delphi supplier, and that Reno is guilty of obstruction of justice.

55.    These defamatory statements by Delphi are both false and malicious.

56.    These defamatory statements have been published to both Delphi employees and non-employees.

57.    As a result of Delphi's acts of defamation, Joseph Reno has been damaged.

9

## COUNT SEVEN – FAIR CREDIT
## REPORTING ACT VIOLATION

58.    Plaintiff restates and incorporates the allegations of paragraphs 1 through 57.

59.    The Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") requires inter alia that employer(s) (who take an adverse action against an employee based on information received from an outside investigator) provide a summary thereof to the involved employee.

60.    Delphi has violated the Fair Credit Reporting Act by failing to provide Reno with so much as a summary of its outside investigation of Reno.

61.    Delphi's violation of the Fair Credit Reporting Act has damaged Joseph Reno and constitutes evidence of pretext in this case.

WHEREFORE, Plaintiff Joseph Reno prays for the following relief:

A.    Judgment that Defendant Delphi has violated federal and Ohio law as set forth above;

B.    An award of benefits due Reno as a result of Delphi's wrongful actions, in an amount in excess of Ten Thousand Dollars ($10,000), the exact amount to be determined at trial;

C.    An award of wages due Reno on March 17, 2004, in an amount in excess of Five Thousand ($5,000), the exact amount to be determined at trial;

D.    An award of liquidated damages pursuant to Ohio Revised Code § 4113.15 in the amount of 6% of "B" and "C" above, the exact amount to be determined at trial;

E.    An award of One Hundred Ten Dollars ($110) per day, for each day of Delphi's COBRA violation as set forth above, the exact amount to be determined at trial;

F.    An award of back wages and benefits due Reno, from March 17, 2004, to the date

10

of trial, in an amount in excess of Fifty-Five Thousand Dollars ($55,000), the

exact amount to be determined at trial;

G.    An award of future wages and benefits due Reno, in an amount in excess of One

Million Five Hundred and Twenty-Four Thousand Dollars ($1,524,000), the exact

amount to be determined at trial;

H.    Monetary relief and/or damages for Delphi's ERISA violations in excess of One

Hundred and Fifty Thousand Dollars ($150,000), the exact amount to determined

at trial;

I.    An award of punitive damages, in the amount of nine (9) times the compensatory

damages award per State Farm v. Campbell, 123 S. Ct. 1513 (2003);

J.    An award of costs and attorney's fees in this action;

K.    An award of prejudgment and post-judgment interest; and

L.    Such other relief as the Court may deem just and necessary.

Respectfully submitted,

s/Brad A. Chalker
Brad A. Chalker (#0011992)
Law Offices of Brad A. Chalker, LLC
7953 Washington Woods Drive
P.O. Box 750726
Dayton, Ohio 45475-0726
(937) 436-1893 (phone)
(937) 436-1894 (fax)
BAC@chalkerlaw.com (email)
Trial Attorney for Plaintiff, Joseph Reno

JURY DEMAND

Plaintiff Joseph Reno hereby demands a trial by jury.

s/Brad A. Chalker
Brad A. Chalker

11

## CERTIFICATE OF SERVICE

The foregoing First Amended Complaint was filed electronically with the Court on June 7, 2005.  Notice of this filing was sent to all parties by operation of the Court's electronic filing system.

s/Brad A. Chalker
Brad A. Chalker

(✳ Note... This case was commenced with The filing of The initial complaint on Sept. 2, 2004.)

12

# **EXHIBIT E**

3/2/04

James P. Walle
Delphi World Headquarters
Legal-Environmental Staff
5725 Delphi Drive
Troy, MI 48098-2815

Dear Jim,

I am writing to inform you of a situation which currently exists at Kettering Operations.

Friday afternoon, 2/13/04, at the Chemical Treatment Plant (CTP) we discovered a leak at the base of one of our two 75,000g, steel construction, chrome treatment tanks. These two tanks are used to collect chromium wastewater from the platers in the plant. I've been the supervisor at this facility for over 20 years. These tanks receive chromium continually and there is no backup. Consequently, while many of our other tanks have been drained, cleaned, sandblasted, and recoated several times during the last 25 years, these tanks have been in continual service. Consequently, Friday afternoon we were faced with a decision, shutdown this tank, in turn idling most of Kettering Operations, our customers plants, send up to 1200 employees home, or find a way around this problem. After discussions with my 1st and 2nd shift Crown operators, Frebco plumbers, and Onyx personnel, I made the decision to have Frebco install temporary plumbing in order to empty and utilize a sludge storage tank as a replacement chrome treatment tank. This involved a plumbing bypass, temporary hosing and pumps, and additional man-hours for Crown, Onyx, and Frebco. The work was completed on Saturday thru Monday and we began using the bypass on Tuesday morning. Additional staffing during this period was required and should be maintained until repairs are completed. It was entirely my decision. My supervisor, Mark Gooding, does not involve himself in the day to day operations of the CTP, and has in fact visited the CTP once in the last 18 months prior to this tank failure. Mark has no background in environmental management, is not a CHMM, nor does he have any experience in wastewater treatment.

I informed Mark what was happening on Tuesday morning. My 1st and 2nd shift Crown operators have collectively 7 months experience between them. Being contract personnel, they could not take the responsibility to make this decision and implement this bypass. I believe the temporary bypass I designed, which is working successfully, has literally saved Delphi millions of dollars in lost revenue and wages, and that no one else had the experience and knowledge of the CTP to devise this bypass. We receive an average 100,000g of chromium wastewater per day containing a range of hexavalent chrome between 150 parts per million (ppm) to 5000 ppm. Since tanker trailers only hold 3000g, trucking 33 tankers per day to an offsite treatment facility, even if we could find one that could handle the volume (I don't believe one exists) was not an option. This bypass was our only option. We had riggers and tank inspection personnel in on Thursday and Friday to clean, grind and test the tank bottom where the failure occurred. The tank was originally coated with epoxy, and the coating on the bottom third of the tank is gone.



EXHIBIT
#6

The failure occurred in two locations, at the radius where the wall and bottom join, on the southwest and northwest sides. The failure was due to tank corrosion since the original coating has failed. The second tank is most likely in the same condition. Mark visited with Jo Anne Rau at the treatment plant on Friday, 2/20/04. Repairs were scheduled to begin on Monday, 2/23/04, the first day of my suspension, which I will discuss later. I believe this suspension was a direct response to my insistence upon around the clock staffing during repairs, and more complete repairs, not a Band-Aid. Mark repeatedly questioned me this week as to why I needed 2 Onyx personnel to man the pumps, and additional Crown staffing. Mark was deliberately pressuring me to cheapen repairs below what was necessary and safe. He also insisted that we not recoat the entire inside of the tank but only the bottom third and those spots which were visibly damaged. Whether or not the second tank will be drained and inspected is an open question. Kettering Operations is losing money, and plans to exit the chrome plating business in approximately three years so there is a great deal of pressure to minimize repairs.

I need to emphasize again that these tanks have been in operation for over 25 years, and there is likely coating failure and corrosion higher up the walls. There is every reason to believe that the second tank is in the exact same condition as the tank which failed since they have both been in uninterrupted, identical service for 25 years. These tanks contain hexavalent chromium. They are located approximately 150 feet west of Woodman Drive north of Dorothy Lane. Should we experience a catastrophic failure when the tank is full (the most likely time since that's when the bottom is subject to the most pressure) there would be no way to stop this liquid from rolling downhill towards Woodman Drive. There is a six foot high retaining wall around the tanks, but the tanks are 22 feet tall, and the retaining wall has construction joints in it, so it won't hold water anyway. Standing on top of the tanks, it is easy to see how the water would roll southeast and down to Woodman Drive and to the creek that borders Delphi on the south. A release of 75000g of untreated hexavalent chromium waste would cause significant soil and groundwater contamination. This is a significant risk to the corporation, to the neighborhoods of east Kettering, and to the area groundwater.

On Friday afternoon, 2/20/04, I was suspended with pay and benefits for the stated reason of an ongoing investigation concerning Onyx corporation, involving my rental of a trash gondola for yard waste from a recently purchased residence I was remodeling, and the inadvertent return of the box containing my trash to Kettering Operations by the driver. The Onyx driver was interviewed by the investigator and took full responsibility for returning the box to Delphi instead of the landfill. I had previously met with the investigator, on Monday 2/16/04, answered his questions truthfully, and supplied him signed statements from two witnesses regarding my conversation with the Onyx driver and the undisputed fact that I was paying in full for the disposal of this waste. Even though I had done nothing wrong, on the afternoon of 2/20/04, I was called to Mark's office and told that I was being suspended. Earlier that same day, Mark and I had disagreed on the course of the repairs to the damaged tank. He repeatedly questioned me as to why it was necessary to staff the treatment plant around the clock with Crown and Onyx personnel. My position was that this was an unprecedented situation, with pumps and hoses transferring hexavalent chromium to a tank not designed for this purpose with hoses running along the catwalks outside of any containment. Furthermore, we had not at that time completed any thickness testing on the tank walls and bottom to determine the overall condition of the tank

apart from the two known failures. Mark was insistent that we only repair the visible failures, and only recoat the portions of the tank where the coating was completely gone. I was in complete disagreement since this coating was 25 years old, and we had every reason to believe that additional coating failure and corrosion existed higher up on the tank wall, due to the presence of wall blisters and rust flaking on the tank mixing vanes. Mark stated that since Kettering Operations was going to exit the plating business in three to five years, we needed to reduce repair costs. The repairs were scheduled to begin on Monday morning, 2/23/04, simultaneous with the first day of my suspension. I have been informed that a co-workers, Jerry Lee, on Monday, 2/23/04, told the CTP plant personnel that he was now in charge, that Joe would not be returning, and that he was immediately reducing the staffing for this environmental hazard. Jerry's background is in facilities and he has no training or experience with wastewater treatment. Additionally, I am informed that the "quick fix" repairs ordered by Mark Gooding will be completed this week, and both tanks returned to normal service without any scheduled inspection or repairs to the second tank. This is a dangerous situation, and represents a significant ongoing liability to the corporation, our residential neighbors, and the soil and groundwater of the community.

The purpose of this correspondence is to advise Delphi (through your office) that:

1. The subject chemical treatment plant tanks constitute a serious environmental threat and hazard to the environment, to the involved Delphi employees, and to the nearby residents;

2. Delphi employee Mark Gooding is not qualified to deal with this environmental hazard, has intentionally cut the necessary staffing, and has disregarded the repairs necessary for full compliance with applicable health, safety, and environmental rules and regulations;

and,

3. My own suspension from Delphi employment was initiated by Delphi employee Mark Gooding to facilitate his plan to circumvent and ignore applicable health, safety, and environmental rules and regulations.

Very truly yours,

Joseph Reno

# **EXHIBIT F**

MHK-5-2004  08:57H FROM:                                    TO:4559179           P:2/4



American Testing Services, Ltd.
3060 East River Road
Dayton, OH  45439

## On-Site Inspection Report

---

**Customer Information**

Pyramid Riggers                                    **Date:**        2-20-04
2076 North Broad Street                            **PO Number:**
Fairborn,        Ohio    45324                     **Job Number:**  ATS-MPF-471


**Item(s) to be Inspected:**
100% of welds on floor of chromic acid waste tank


**Inspection Method(s) to be Utilized:**
hand yoke S/N 1018 and 10517 dry red powder batch #038707-014


**Specification or Code:**
ASW D1.1 / no cracks allowed


**Results of Inspection:**
100% of welds on floor were inspected and were accepted at time of inspection.  There was one crack located on the floor at the south end approx. 1.5" from outside wall and 2" west of the center weld. Crack is approx. 15" long.  This tank is rejected.


**Technician:**  Jeff Adams Level III
**Signature on File**


DC 417

## READINGS AND LOCATIONS SIDE WALL



*Wall thickness
Readings.
Orig. 0.25 in*

| | | | | |
|---|---|---|---|---|
| 58. | .253 | | 69. | .255 |
| 59. | .254 | | 70. | .267 |
| 60. | .252 | | 71. | .264 |
| 61. | .248 | | 72. | .266 |
| 62. | .246 | | 73. | .268 |
| 63. | .249 | | 74. | .264 |
| 64. | .252 | | 75. | .262 |
| 65. | .255 | | 76. | .259 |
| 66. | .260 | | 77. | .248 |
| 67. | .260 | | 78. | 255 |
| 68. | .256 | | 79. | .253 |

DC 418

MAR-5-2004  08:57A FROM:                                    TO:4559179              P:3/4

## READINGS AND LOCATIONS OF FLOOR



Floor reading.
Orig - 0.25 in

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1. | .266 | 16. | .272 | 31. | .264 | 46. | .268 |
| 2. | .287 | 17. | .280 | 32. | .263 | 47. | .260 |
| 3. | .283 | 18. | .270 | 33. | .262 | 48. | .270 |
| 4. | .245 | 19. | .221 | 34. | .244 | 49. | .276 |
| 5. | .254 | 20. | .243 | 35. | .268 | 50. | .257 |
| 6. | .246 | 21. | .251 | 36. | .250 | 51. | .256 |
| 7. | .246 | 22. | .246 | 37. | .258 | 52. | .256 |
| 8. | .262 | 23. | .239 | 38. | .246 | 53. | .259 |
| 9. | .257 | 24. | .263 | 39. | .268 | 54. | .258 |
| 10. | .268 | 25. | .230 | 40. | .253 | 55. | .246 |
| 11. | .249 | 26. | .264 | 41. | .248 | 56. | .268 |
| 12. | .239 | 27. | .265 | 42. | .266 | 57. | .263 |
| 13. | .254 | 28. | .247 | 43. | .257 | | |
| 14. | .239 | 29. | .255 | 44. | .253 | | |
| 15. | .265 | 30. | .255 | 45. | .257 | | |

DC 419

# EXHIBIT G

# HRC

## HUBBELL, ROTH & CLARK, INC.
### CONSULTING ENGINEERS

Walter H. Alix
George E. Hubbell
Peter T. Roth
Michael D. Waring
Keith D. McCormack
Curt A. Christenson

CHIEF FINANCIAL OFFICER
J. Bruce McFarland

SENIOR ASSOCIATES
Frederick C. Nevarre
Gary J. Tressel
Lawrence R. Anayas
Kenneth A. Melchior
Dennis M. Morname
Randal L. Ford
David P. Wican

Nancy M.D. Faught
Jonathan E. Booth
Michael C. MacDonald
Marvin A. Olane
James C. Hanson
Richard F. Beaudian
Margaret Synk Kuhn
William R. Davis
James J. Abela
Daniel W. Mitchell
Joel E. Bowden
Jesse B. VanDeCreek
Robert F. DeFrain
Marshall J. Grazioli

March 26, 2004

Delphi
M/C 480-410-166
5825 Delphi Drive
Troy, MI 48098

Attention: Mr. Mark Hester, Asst. General Counsel

Re: Summary of Site Visit        HRC Job No. 20040218.02
    Kettering, Ohio WWTP Tank Evaluation

Dear Mr. Hester:

Thank you for the opportunity to assist Delphi with evaluating the wastewater treatment tanks at your Kettering, Ohio facility. Mr. Ed Cote, P.E. of HRC visited the site on March 6, 2004 and the following is a report of the visit as well as follow-up tasks.

## Background

Mr. Cote visited the site and met with the following Delphi employees:

- Marty Cristo
- Mark Gooding
- Jerald Lee
- Roy Knapp

Wastewater containing hexavalent chromium (chrome) is treated in two parallel, 75,000 gallon coated, carbon steel batch treatment tanks. The process consists of filling one tank while the other is in the treatment mode. The first step is to adjust the pH to between 2.0 and 2.5 with sulfuric acid while adding sodium bisulfite to reduce the hexavalent chrome to its trivalent state.

The tanks were constructed in 1977 from carbon steel with an epoxy coating. The foundation consists of a concrete ringwall with the welded steel floor installed over oiled sand. The area around the tank consists of gravel and is reportedly built on backfill. The wastewater tank farm is surrounded by a concrete retaining wall which extends approximately 4 feet above grade.

## Tank Inspection and Repairs                    DC 480

Crown Environmental's second shift personnel noticed a very small leak emanating from the bottom of one of the two batch chrome treatment tanks, Tank 2, and immediately took action. A 50,000 gallon sludge

Corporate Office: 555 Hulet Drive • P.O. Box 824 • Bloomfield Hills, MI 48303-0824 (Mailing – P.O. Box) – 48302-0360 (UPS Zip)
Telephone: (248) 454-6300 • FAX: (248) 338-2592 or (248) 454-6312 • www.hrc-engr.com

Y:\200402\2006402.5\Proposal\Comm\Summary.doc

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 2

holding tank was put into service with heavy duty hose connections (camlock fittings) to provide storage for incoming wastewater while the suspect batch tank was taken out of service.

Delphi drained Tank 2 and cleaned the inside with a high pressure water spray. It was immediately evident that the coating had failed in a number of small areas where the coating was blistered or missing. It was also evident that the wastewater formed a tenacious coating on top of the epoxy coating because the sludge layer was very difficult to remove with high pressure water blasting.

Delphi retained American Testing Services, Ltd. (ATS), a local testing service, to perform a tank inspection per the American Society of Welding D1.1 code. They reported that 100% of the welds on the floor were inspected and they found that the thickness was approximately equal to the original design of 0.25 inch thickness. ATS also reported a 15 inch long crack in the weld on the tank bottom, which was the source of the leak. ATS' report also showed that the metal thickness on the blistered paint areas was approximately equal to the original design.

Delphi personnel also found a small area of corrosion on the bottom of the sidewall. This area and the 15 inch crack were repaired with welded patches (steel plates). The welding was performed by a local industrial welding service.

The tank coating was found to be in poor condition on the bottom and along the sides up to almost three feet. The entire tank bottom plus 3 feet up the side of the tank from the bottom was recoated. The individual blisters were also recoated. Coating was accomplished by sandblasting to white metal and coating with an epoxy novolac material. Delphi reported that this coating is used in the chrome plating areas with very good success. This coating is considered superior to the original coatings which were believed to be epoxy.

The tank was put back into service and it was found that the repair of the small leak was successful. The tank was then drained prior to HRC's visit to allow a visual inspection. Mr. Cote inspected the coating from the opened manway and the overhead walkway. The repaired surfaces appeared to be professionally applied similar to a new tank.

The Delphi team and Mr. Cote met after the inspection and reasoned that Tank 2 was not in danger of structural failure. The thickness testing showed that the tank was of similar thickness to a new tank, so there was no reason to suspect additional concerns. Based upon a review of the tank thickness testing and Mr. Cote's visual inspection, the team saw no immediate threat of a catastrophic tank collapse. The Delphi team and Mr. Cote decided to put the tank back into service as soon as practical since we deemed the risk of utilizing hoses with camlock fittings greater than the likelihood of a catastrophic tank failure.

The team discussed the need to drain and inspect all of the facility's wastewater tanks as soon as possible or instead wait for the July shutdown when the incoming wastewater flow is very small. We discussed the fact that these tanks are of similar construction and age as hundreds of others in the U.S. Automotive industry. HRC shared some information about another large manufacturing client's program to repair tanks and HRC was asked to learn more (see HRC's Findings and Recommendations section below). In particular, the Delphi team was interested in the qualifications of those that repaired the tanks.

## Secondary Containment

The team agreed that wastewater treatment tanks are exempt from the federal SPCC regulations. Mr. Cote noted that many corporations have a mixture of sites with and without secondary containment of

DC 481

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 3

wastewater treatment tanks.  The tank farm is surrounded by a poured concrete retaining wall which has several relatively small cracks or expansion joints which would allow an escape of spilled liquid.  The team agreed that most of the contents of a spill would be contained by the walls surrounding the porous stone over the large area, however, so the urgency of repairing cracks is minimal.

There is one area of the retaining wall which was damaged by a truck and the team recommended that it be repaired.

A storm sewer runs through the containment area with two manholes with solid covers.  The team agreed that covers should be inspected and the gaskets replaced, if necessary, to prevent a possible migration offsite in the event of a spill.  The team noted that a large spill could leave the site if it found its way through the soil into joints in the storm sewer.

## HRC's Findings and Recommendations

HRC contacted several tank companies and our other contacts in the automotive industry with the following to report:

1. Delphi responded to the suspected leak on the sidewall immediately and appropriately.  The tank was emptied and inspected both visually and with thickness testing.  Two isolated areas were repaired with steel plates.  The coatings were repaired with an epoxy novolac coating which is superior to the original coating.  The new patched areas and the original coatings effectively protect the steel tank.

2. The Delphi team stated that they would prefer to repair Tank 1 during the July 2004 shutdown when flows are very low.  Delphi further stated that they would perform thickness testing of Tank 1 immediately to substantiate their belief that there is no immediate threat of tank failure. HRC received a faxed report from Delphi on March 17 which showed that the thickness was approximately 0.25 inches at four points taken on the sidewall.  This testing indicates that the tank wall thickness is approximately equal to the original.  HRC recommends that Tank 1 be taken out of service during the July shutdown, cleaned, inspected, and repaired as was done with Tank 2. This statement is based upon the fact that Tank 2 operated since 1977 under similar conditions and did not pose an imminent risk of catastrophic failure as demonstrated by a thorough tank inspection.

3. In general, the automotive industry's tanks were constructed per the American Petroleum Institute (API) Specification No. 650.  API's standard for inspection and repair is covered under API 653. In general, the automotive industry uses certified API tank inspectors to inspect the tanks after they are drained and cleaned with water blasting.

4. The automotive industry generally uses experienced tank repair crews who are familiar with API's repair requirements.  There are instances when a certified inspector has been used to oversee the repair work of local welders.  Delphi's tank repairs were performed by a local industrial welding service, but it should be noted that the bottom is fully supported by a sand cushion and is subject to less stress than the sidewalls.  Therefore, these welded patches are not as significant as on the sidewall.

5. The condition of tanks within the automotive industry varies depending upon the service, but in general, the situation is similar to Delphi's chrome tanks; the coatings have failed on the bottom, along the sidewall up to the baffles, and the baffles themselves.  This is probably due to the fact that heavy abrasive materials tend to reside in the bottom of a batch tank.

DC 482

Mr. Mark Hester
March 26, 2004
Job No. 20030218.02
Page 4

6. Automotive tanks appear to last longer than those in the municipal water and wastewater industry, for example. HRC suspects that a protective coating of sludge is formed over the original tank lining which protects the carbon steel. This coating is probably composed of precipitated metals combined with oils.

We appreciate the opportunity to provide Delphi with engineering services. Please contact us with any questions you may have.

Very truly yours,

HUBBELL, ROTH & CLARK, INC.

Curt A. Christeson, P.E.
Principal/Vice President

Edward L. Cote, P.E. DEE
Department Head, Industrial Facilities

CAC/jjb/scb

DC 483

Y:\30042\3000-0218\Proposal\CurtSummary.doc

TOTAL P.05

# EXHIBIT H

**U.S. Department of Labor**

Occupational Safety & Health Administration
Cincinnati Area Office
36 Triangle Park Dr.
Cincinnati, OH 45246
(513) 841-4132
Fax: (513) 841-4114



MAY 2 0 2004

Joseph M. Reno
5012 Lytle Road
Waynesville, Ohio 45068

Re:    Delphi Corporation/Reno/5-1610-04-034
       Secretary's Findings

Dear Mr. Reno:

This is to advise you that we have completed our investigation of the above-referenced complaint which you filed against Delphi Corporation ("Respondent") under the employee protection provisions of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c). Complainant, Joseph M. Reno, claimed that Respondent terminated him for writing a letter to corporate about the safety and environmental issues surrounding the wastewater treatment plant

Following an investigation of this matter by a duly authorized investigator, the Secretary of Labor, acting through her agent, the Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region V, finds no reasonable cause to believe that Respondent violated the complainant's rights under Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c).

Respondent is a manufacturing facility that has a waste removal and wastewater treatment plant with wastewater containing hexavalent chromium. Respondent's principal place of business is located in Kettering Ohio. Therefore, Respondent is a company within the meaning of EPA.

Respondent hired Complainant in August 1981, and at all relevant times he was employed as a Senior Environmental Engineer with responsibility for waste removal and wastewater treatment at Respondent's Kettering and Moraine, Ohio manufacturing facilities. Complainant was an employee within the meaning of the EPA.

Complainant was discharged on or about March 17, 2004. On or about March 17, 2004, Complainant filed a complaint with the Occupational Safety and Health Administration alleging that Respondent discriminated against him in violation of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c). This complaint was timely filed.

The findings show that Respondent terminated Complainant for misappropriating company assets, taking personal advantage of his business relationship with a Delphi supplier, which is a conflict of interest, and trying to obstruct and mislead Delphi's subsequent investigation.

For the reasons noted above, this investigation finds no reasonable cause to believe that Complainant was terminated in violation of Section 211 and 42 USC 5851 and Section 11(c) and 29 CFR 1977.9 (a) and (c) and the complaint is therefore dismissed.

Complainant and Respondent have 30 days from receipt of these Findings to file objections and request a hearing on the record, or they will become final and not subject to court review. Objections must be filed with the Chief Administrative Law Judge, U.S. Department of Labor, 800 K Street NW Suite 400, Washington, D.C. 20001, with this office and with the Regional Administrator, U.S. Department of Labor – OSHA, 230 S. Dearborn St. 32nd Floor, Chicago, IL  60604. The Respondent and any named party must also be provided notice of objections and requests for a hearing on the record.

If you have any questions, please do not hesitate to call me at (513) 841-4132.

Sincerely,


Richard T. Gilgrist, CIH
Area Director

cc:    Chief Administrative Law Judge
       Respondent
       EPA