**Hearing Date:  May 10, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

KADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

        - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                              :
          In re                                               :        Chapter 11
                                                              :
DELPHI CORPORATION, et al.,                                   :        Case No. 05-44481 (RDD)
                                                              :
                                    Debtors.                  :        (Jointly Administered)
                                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

DEBTORS' STATEMENT OF DISPUTED ISSUES WITH RESPECT TO PROOF OF CLAIM
NUMBER 12347 (FURUKAWA ELECTRIC NORTH AMERICA ADP, INC. AND
FURUKAWA ELECTRIC COMPANY)

("STATEMENT OF DISPUTED ISSUES – FURUKAWA")

Delphi Corporation and certain of its subsidiaries and affiliates, debtors and

debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit

this Statement Of Disputed Issues With Respect To Proof Of Claim Number 12347 (Furukawa

Electric North America ADP, Inc. and Furukawa Electric Company) (the "Statement Of

Disputed Issues") and respectfully represent as follows:

<u>Background</u>

1.      Furukawa Electric North America ADP, Inc. ("Furukawa North America")

and Furukawa Electric Company ("Furukawa Company," and together with Furukawa North

America, "Furukawa," or the "Claimant") filed proof of claim number 12347 (the "Proof of

Claim") against Delphi Automotive Systems, LLC ("DAS LLC") on or about July 28, 2006.  The

Proof of Claim asserts an unsecured nonpriority claim in the amount of $2,589,684.56 (the

"Claim") for alleged breach of contract damages.  The Claim includes alleged damages for legal

fees, "inventory," "investment," and other miscellaneous charges.  <u>See</u> attachments to the Proof

of Claim.

2.      The Debtors objected to the Claim pursuant to the Debtors' (I) Third

Omnibus Objection (Substantive) Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 3007

To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By

Debtors' Books And Records, And (C) Claims Subject To Modification And (II) Motion To

Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No.

5452) (the "Third Omnibus Claims Objection"), which was filed on October 31, 2006.

3.      The Claimant filed the Objection Of Furukawa Electric North America

ADP, Inc. And Furukawa Electric Company To Debtors' Third Omnibus Claims Objection

(Docket No. 5788) (the "Response") on November 22, 2006.

2

Disputed Issues

A.      Furukawa Breached Its Agreements With DAS LLC

        4.      Furukawa, not DAS LLC, breached the agreements between the parties.
Pursuant to a Long Term Contract, dated as of September 7, 2000, between Furukawa Company
and DAS LLC (the "Long Term Contract"), and purchase order number SAG90I4710 issued
September 12, 2001 by DAS LLC to Furukawa North America (the "Purchase Order," and
together with the Long Term Contract, the "Agreements"), Furukawa agreed to sell DAS LLC
approximately 100% of DAS LLC's requirements for torque and position sensors (the "Sensors").
True and correct copies of the Long Term Contract and the Purchase Order are attached as
Exhibit A and Exhibit B, respectively.  The Sensors, manufactured and sold by Furukawa, were
shipped to DAS LLC's manufacturing facility in Saginaw, Michigan, and were assembled by
DAS LLC into Power Steering Assist Mechanisms that were then assembled into steering
columns.  The steering columns manufactured by DAS LLC were sold to General Motors
Corporation ("GM") for assembly into GM vehicles.

        5.      Furukawa offered a design for the Sensors that would meet the
manufacturing and electrical steering use requirements of DAS LLC in its manufacture of
steering columns for sale to GM.  DAS LLC's specific requirements were communicated to
Furukawa to accomplish this purpose.  A pre-production part of the Sensors was provided by
Furukawa to DAS LLC, and was subjected to the tests and evaluations required for production
approval.  DAS LLC ordered the Sensors from Furukawa on the well-founded belief that
Furukawa would ship Sensors having the same design, integrity, metallurgical quality, and
electrical quality as the approved parts.

6.    Furukawa, without the knowledge and consent of DAS LLC, and with intentional disregard of DAS LLC's instructions, changed certain material used as plating in the Sensors.  Indeed, Furukawa twice requested that material revisions be made to the Sensors' specification, and DAS LLC twice refused such requests for sound metallurgical and engineering reasons.  Furukawa's material and unauthorized change in the plating of the Sensors resulted in the failure of the Sensors, which led to failures in the steering columns sold by DAS LLC to GM.

7.    Delphi Automotive Systems General Terms and Conditions (the "Terms and Conditions"), which were incorporated into the terms of both the Long Term Contract and the Purchase Order, provide, in relevant part:

> Seller [Furukawa] warrants and guarantees to Buyer [DAS LLC], its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

See Terms and Conditions ¶ 7.1, attached to the Long Term Contract.  Furukawa's material alteration of the Sensors breached certain of these express warranties, and thus constituted a material breach of the terms of the Agreements.

8.    In addition, Furukawa knew of, or should have known of, DAS LLC's expectation that the Sensors meet certain design requirements.  Thus, in addition to the express warranties provided by the terms of the Agreements, Furukawa's material alterations of the Sensors breached certain implied warranties created by law.

9.    Accordingly, as a result of its breach of both express and implied warranties, Furukawa breached the terms of the Agreements.

4

B.     DAS LLC Is Not Liable For Alleged Breach Of Contract Damages

10.     The Response simply states that the Claim "is a claim for breach of

contract damages ('cancellation damages')."  See Response at 3.  The Proof of Claim simply

attaches charts that itemize the alleged damages constituting the Claim.  See attachments to the

Proof of Claim.[1]  However, DAS LLC is not liable for these alleged damages because DAS LLC

did not breach the Agreements.  Instead, DAS LLC properly terminated the Agreements as a

result of Furukawa's breach.

11.     The Terms and Conditions provide DAS LLC the right to terminate the

Agreements "at any time after execution if Seller [Furukawa] (a) repudiates, breaches, or

threatens to breach any of the terms of [the Agreements], including Seller's warranties, (b) fails

to perform or threatens not to perform services or deliver goods in accordance with [the

Agreements]; or (c) fails to assure timely and proper completion of services or delivery of

goods."  See Terms and Conditions ¶ 10, attached to the Long Term Contract.

12.     Because of Furukawa's breach of the express and implied warranties in the

Agreements, DAS LLC terminated the Agreements pursuant to a letter dated April 8, 2004 (the

"Termination Letter").  A true and correct copy of the Termination Letter is attached hereto as

Exhibit C.  Therefore, DAS LLC properly terminated the Agreements.

13.     Furukawa's characterization of its Claim as "cancellation damages," and

its inclusion of "inventory" and "investment" as part of these alleged damages suggest that

---

[1]     Also, Furukawa's Response fails to comply with the requirements set forth in paragraph 3
of this Court Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m), 3007,
7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding
Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To
Claims (Docket No. 6089) because it does not, among other things, set forth the specific
factual and legal reasons why the claim should be allowed.

Furukawa alleges that DAS LLC is liable both for inventory not purchased by DAS LLC and certain investment and other costs allegedly incurred by Furukawa.[2]  Accordingly, because DAS LLC properly terminated the Agreements and did not breach the Agreements, DAS LLC is not liable for alleged "cancellation damages," and the Claim should be disallowed and expunged.

C.      Not Only Should The Claim Be Disallowed And Expunged, But The Debtors Should Recover On Its Claim For Damages Against The Claimant

14.      Not only is DAS LLC not liable to Furukawa, but Furukawa is liable to DAS LLC for, among other things, Furukawa's breach of the Agreements.

15.      On or about October 14, 2004, DAS LLC filed a complaint (the "Complaint") in the Circuit Court for Saginaw County, Michigan captioned Delphi Automotive Systems, LLC v. Furukawa Electric North America APD, Inc., et al, Case No. 04-54245-CK.  A true and correct copy of the Complaint is attached as Exhibit D.  The Complaint includes four counts, including breach of contract, breach of UCC warranties, tortious interference, and fraud and misrepresentation, each of which the Debtors fully incorporate as though set forth herein.

16.      For the reasons set forth in the Complaint, the Debtors are entitled to, and request an order granting, an award of damages resulting from Furukawa's breach of contract, breach of UCC warranties, tortious interference, and fraud and misrepresentation.

---

[2]      The Debtors have no specific knowledge of the line items contained in the damage calculation attached to Furukawa's Proof of Claim, and thus do not concede that the costs alleged were actually incurred by Furukawa. Moreover, DAS LLC cannot be held liable for Furukawa's alleged "investment" in a product line that failed because of Furukawa's wrongful alteration of the Sensors.  Nor was DAS LLC obligated to purchase "inventory" that caused its steering columns to fail.  Likewise, DAS LLC is not liable for any other alleged costs incurred by Furukawa, including the "miscellaneous costs" itemized with the Proof of Claim.  Finally, neither the Agreements nor applicable law entitles Furukawa to recover its legal fees from DAS LLC.  DAS LLC is not liable for any of these alleged costs or damages

Reservation Of Rights

17.    This Statement Of Disputed Issues is submitted by the Debtors pursuant to

paragraph 9(d) of the Order Pursuant To 11 U.S.C. § 502(b) And Fed. R. Bankr. P. 2002(m),

3007, 7016, 7026, 9006, 9007, And 9014 Establishing (i) Dates For Hearings Regarding

Objections To Claims And (ii) Certain Notices And Procedures Governing Objections To Claims

(Docket No. 6089) (the "Claims Objection Procedures Order").  Consistent with the provisions

of the Claims Objection Procedures Order, the Debtors' submission of this Statement Of

Disputed Issues is without prejudice to (a) the Debtors' right to later identify and assert additional

legal and factual bases for disallowance, expungement, reduction, or reclassification of the Claim

and (b) the Debtors' right to later identify additional documentation supporting the disallowance,

expungement, reduction, or reclassification of the Claim.

WHEREFORE the Debtors respectfully request that this Court enter an order (a) disallowing and expunging the Claims, (b) awarding the Debtors damages in an amount in excess of $25 million, and (c) granting the Debtors such other and further relief as is just.

Dated: New York, New York
      March 13, 2007

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ John Wm. Butler
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Albert L. Hogan III (AH 8807)
      Ron E. Meisler (RM 3026
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

– and –

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

# EXHIBIT A

**LONG TERM CONTRACT**

1.    **Purchase of Product**

**The Furukawa Electric Co.,Ltd.** ("Seller") agrees to sell, and **Delphi Automotive Systems LLC acting through its Saginaw Steering Division** ("Buyer") agrees to purchase, approximately one hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Daily Tool Capacity |
|---|---|---|---|
| 26085186-000 Specification; 26079879-043 | Gamma and Epsilon program; Sensor Assembly Torque & Position | $13.00 USD | Production tooling capacity is 167pcs/hour/tool. Assembly line capacity is 300 pcs/hour. |
| 26089247-000 Specification; 26079879-043 | Fiat 169 (600); Sensor Assembly Torque & Position | $13.00 USD | Above capacity references 8/18/2000 quotation and includes Gamma,Epsilon,Fiat 169, fiat y843 programs. Tooling limiter is plastic injection molds, 2 tools or 334 pcs/hour total. Tooling cost for Gamma, Epsilon, and Fiat 169 programs shown on this contract is $1,125,667.00 . (Tooling will be paid in a lump sum upon PPAP approval.) |

2.    **Term**

With respect to each Product, the term of this Contract is from Calendar Year 2002 through 7/1/2007.

3.    **Prices**

The per unit price of each Product for Calendar Year 2002 is F.O.B. Plymouth Michigan for Epsilon Requirements, Cadiz, Spain for Gamma & Fiat 169(600) Requirements. (1990 IncoTerms). Pricing for each subsequent calendar year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Calendar Year 2003 | 3.5 | percent |
| Calendar Year 2004 | 3 | percent |
| Calendar Year 2005 | 3 | percent |
| Calendar Year 2006 | 3 | percent |
| Calendar Year 2007 | 3 | percent |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

## 4.    Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

## 5.    Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping

instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until 7/1/2007.  Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt.    The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

**EXECUTED** by Buyer and Seller as of  9/7/00.

**Buyer:**                                                     **Seller:**

**Delphi Automotive Systems LLC**              **The Furukawa Electric Co.,Ltd.**
**acting through its Saginaw Steering Division**

By: _Duane D. Bolinger_                            By: _M. Shimizu_
Name: _Duane A. Bolinger_                        Name:  Makoto Shimizu
Title: _Director of Purchasing_                    Title: Director, Automotive
                                                                        Products Division

**DELPHI AUTOMOTIVE SYSTEMS**

**GENERAL TERMS AND CONDITIONS**

> *Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not

otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

2.4 Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

- Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5. NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to

perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1   General.   Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2   Date and Time Processing.   Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3   Warranty Period.   The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such

termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, <u>plus</u> (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract <u>less</u> (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12.  TECHNICAL INFORMATION

12.1  <u>Exchange of Information</u>.  Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to any use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2  <u>Waiver of Claims</u>.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

12.3  <u>Repair and Rebuild</u>.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  <u>Computer Programs and Written Works</u>.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to

assign and assigns to Buyer all right, title and interest in any intellectual property rights in
such works of authorship.

## 13. INDEMNIFICATION

13.1    Infringement. Seller will defend, hold harmless and indemnify Buyer and its
customers, and their respective successors and assigns, against any claims of
infringement (including patent, trademark, copyright, moral, industrial design or other
proprietary rights, or misuse or misappropriation of trade secret) and resulting damages
and expenses (including, without limitation, attorney and other professional fees and
disbursements) relating to the goods or services covered by this Contract, including any
claims in circumstances where Seller has provided only part of the goods or services.
Seller waives any claim against Buyer that any such infringement arose out of
compliance with Buyer's specifications.

13.2    Activities on Buyer's Premises. Seller will defend, hold harmless, and indemnify
Buyer from and against any liability, claims, demands, damages, costs or expenses
(including, without limitation, reasonable attorney and other professional fees and
disbursements) arising from or in connection with the performance of any service or work
by Seller or its employees, agents, representatives and subcontractors on Buyer's or
Buyer's customer's premises or the use of the property of Buyer or any customer of
Buyer, except to the extent such liability arises out of the negligence or willful
misconduct of Buyer or Buyer's customer.

13.3    Product Liability . Seller will defend, hold harmless, and indemnify Buyer from and
against any liability and expenses (including, without limitation, attorney and other
professional fees and disbursements) arising from or in connection with any third party
claims or demands to recover for personal injury or death, property damage or economic
loss caused by any of the goods or services supplied by Seller (regardless of whether such
claim or demand arises under tort, negligence, contract, warranty, strict liability or other
legal theories), except to the extent such injury, damage or loss results from Buyer's
specifications as to design or materials or from alteration or improper repair, maintenance or
installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws,
rules, regulations, orders, conventions, ordinances and standards of the country(ies) of
origin and destination or that relate to the manufacture, labeling, transportation,
importation, exportation, licensing, approval or certification of the goods or services,
including, but not limited to, those relating to environmental matters, wages, hours and
conditions of employment, subcontractor selection, discrimination, occupational
health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will
utilize slave, prisoner or any other form of forced or involuntary labor in the supply of
goods or services under this Contract.    Upon Buyer's request, Seller will certify in
writing its compliance with the foregoing.    Seller will defend, hold harmless and

indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.  With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests.  The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.  The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment").  Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value.  Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis.  To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be

held by Seller pursuant to this Article.  Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property.  Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property.  Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise.  Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  <u>Seller's Duties with Respect to Buyer's Property</u>.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3  <u>Return of Buyer's Property</u>.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.  Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.  If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4 <u>Disclaimer of Warranties</u>. Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5 <u>Development, Engineering And Consulting Services</u>. Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties. If requested by Buyer, Seller will

also make service literature and other materials available at no additional charge
to support Buyer's service activities.

## 19. REMEDIES

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in
addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export
credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all
information necessary (including written documentation and electronic transaction
records) to permit Buyer to receive these benefits or credits, and to fulfill any customs
related obligations, origin marking or labeling requirements and local content origin
requirements. Seller will obtain all export licenses or authorizations necessary for the
export of the goods unless otherwise indicated in this Contract, in which event Seller will
provide all information as may be necessary to enable Buyer to obtain such licensees or
authorization(s). Seller will make all arrangements that are necessary for the goods to be
covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or
Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller
or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller
or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish
Buyer the goods or services covered by this Contract or use any trademarks or trade
names of Buyer in Seller's advertising or promotional materials unless Buyer consents in
writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any
provision of this Contract will not affect the right to require such performance at any later
time, nor will the waiver by either party of a breach of any provision of this Contract
constitute a waiver of any succeeding breach of the same or any other provision. No
course of dealing or course of performance may be used to evidence a waiver or
limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

**29. ENTIRE AGREEMENT**

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT B

**DELPHI**
Automotive Systems

| PURCHASING LOCATION | PURCHASE ORDER | SAG90I4710 |

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180   DUNS 966877987

SHIP TO

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
-----------------------------------

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS, PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS. ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | REC. DEPT. NOTIFY | CODE |
|---|---|---|---|---|
| AS RELEASED | | NET   MNS-2 | | SA |
| F.O.B.  SHIPPING POINT | | | VIA   SEE INSTRUCTIONS BELOW | |

STATE & LOCAL SALES, USE TAX CODES    4B-NOT TAXABLE - FOR INDUSTRIAL PROCESSING.
PERMIT NO 3800440

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS |
|---|---|---|---|---|

THIS ORDER IS EFFECTIVE  9/12/01
AND EXPIRES  9/10/07.

ATTENTION*** THE PAYMENT DATE IS SET FORTH IN THE LINE ITEM DETAIL OF THIS
CONTRACT, OR IF NOT STATED, SHALL BE THE DATE ESTABLISHED BY THE BUYER'S
MULTILATERAL NETTING SYSTEM (MNS-2), WHICH PROVIDES, ON AVERAGE, THAT PAYMENT
SHALL BE MADE ON THE SECOND DAY OF THE SECOND MONTH FOLLOWING, IN THE CASE OF THE
BUYER'S NORTH AMERICAN FACILITIES, SELLER'S SHIPMENT DATE OF GOODS OR DATE OF
SERVICES, AND, FOR ALL OF THE BUYER'S OTHER LOCATIONS, BUYER'S RECEIPT DATE OF
THE GOODS OR DATE OF SERVICES. BUYER MAY WITHOLD PAYMENT PENDING RECEIPT OF
EVIDENCE, IN SUCH FORM AND DETAIL AS BUYER MAY DIRECT, OF THE ABSENCE OF ANY
LIENS, ENCUMBRANCES AND CLAIMS ON THE GOODS OR SERVICES UNDER THIS CONTRACT.

THE SUPPLIER AGREES TO SELL AND THE BUYER AGREES TO PURCHASE, AT THE PRICE AND
UPON AND SUBJECT TO THE TERMS AND CONDITIONS IN THE FACE AND REVERSE SIDE HEREOF,
AND BY REFERENCE AS THOUGH TYPED HEREON, THE SUPPLEMENTAL TERMS AND CONDITIONS
ATTACHED TO THE REQUEST FOR QUOTATION, THE FOLLOWING PERCENT OF OF THE
ARTICLE(S) DESCRIBED BELOW FOR THE ABOVE TIME PERIOD.

THIS PURCHASE ORDER IS AN INVOICELESS PURCHASE ORDER, THE INDICATOR FOR YOU THE
SUPPLIER IS THE "I" IN THE THIRD POSITION OF THE PURCHASE ORDER NUMBER. (EXAMPLE:
SAGXX"I"XXXX) UNDER THE INVOICELESS PAYMENT PROGRAM, YOUR COMPANY IS NO LONGER
REQUIRED TO SEND INVOICES TO RECEIVE PAYMENT. THE AUTOMOTIVE COMPONENTS GROUP
WILL GENERATE PAYMENTS TO YOUR COMPANY BASED UPON RECEIPT OF MATERIAL AT THE
CURRENT PRICE AND PAYMENT TERMS. TO EXPEDITE PAYMENT UNDER THE INVOICELESS
PAYMENT PROGRAM, YOU WILL NEED TO ADHERE TO THE FOLLOWING GUIDELINES: 1- ADVISE
THE BUYER OF ANY DISCREPANCIES ON THE PURCHASE ORDER PRIOR TO THE SHIPMENT OF THE
MATERIAL. 2- DELPHI PART/ITEM CODE NO. MUST BE INCLUDED ON ALL PACKING SLIPS AND

CONTINUED ON PAGE   2

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE

DELPHI
Automotive Systems

| PURCHASE ORDER | SAG9014710

**PURCHASING LOCATION**

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI 48601-9494

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180   DUNS 966877987

SHIP TO

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                     4817D

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
-----------------------------------

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,
PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.
ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | CODES |
|---|---|---|---|---|---|
| F.O.B. | | | | VIA | |

STATE & LOCAL SALES,
USE TAX CODES

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|

MAILED TO THE "RECEIVING NOTIFY" PERSON ON PO. 3- THE UNIT OF MEASURE ON THE
PACKING SLIP MUST BE THE SAME AS THE PURCHASE ORDER UNIT OF MEASURE. 4- DO NOT
SEND AN INVOICE. PAYMENT WILL BE BASED ON RECEIPT RECORDS. 5- A MONTHLY STATEMENT
IS REQUIRED BY THE 10TH OF EACH MONTH. 6- CONTAINER CHARGES, SET-UP CHARGES, AND
OTHER MISCELLANEOUS CHARGES MUST BE BILLED MONTHLY IN A SUMMARY BILLING WHICH
CONTAINS THE FOLLOWING INFORMATION: A- COMPLETE PURCHASE ORDER NUMBER. B- BILL OF
LADING OR PACKING SLIP NUMBER. C- RELEASE NUMBERS. D- SHIPMENT DATE FOR EACH
ITEM. WHEN THE ABOVE IS NECESSARY, BILL TO "NAO DISBURSEMENT ANALYSIS", PO BOX
436040, PONTIAC, MI 48343-6040. PLEASE NOTE THAT SALES TAX SHOULD NOT BE BILLED
IN A MONTHLY SUMMARY SINCE DELPHI SAGINAW HAS A DIRECT PAY PERMIT WITH THE
FOLLOWING STATES: ALABAMA PAY PERMIT NO. 224 MICHIGAN PAY PERMIT NO. ME3800440
NEW YORK PAY PERMIT NO. DP000036 COMPLIANCE WITH THESE GUIDELINES WILL PROMOTE
PROMPT PAYMENT.

26085186   SENSOR ASM, COMP TORQ & POSN                        12.56   PC
          PURCHASED COMPLETE
          TO BLUEPRINT   DATED  4/06/99
          PER CHART 26092738 DTD  4/06/99
          UNRELEASED
          ACT 2400   75000          TAX 4B
          WEEKLY CAP     12500    MIN LOT SIZE

SUPPLIER TO SHIP PRODUCTION SAMPLES TO "PPAP". LEAD TIMES TO REFLECT THESE
REQUIREMENTS. IDENTIFIED IN AIAG PPAP MANUAL "PPAP" SECTION.

SELLER ACKNOWLEDGES AND AGREES THAT BUYER'S GENERAL TERMS AND CONDITIONS ARE
INCORPORATED IN, AND A PART OF, THIS CONTRACT AND EACH PURCHASE ORDER, RELEASE,
REQUISITION. WORK ORDER, SHIP- PING INSTRUCTION, SPECIFICATION AND OTHER
DOCUMENTS ISSUED BY BUYER OR ACCEPTED IN WRITING BY BUYER, WHETHER EXPRESSED IN
WRITTEN FORM OR BY ELEC- TRONIC DATA INTERCHANGE, RELATING TO THE GOODS AND/OR

CONTINUED ON PAGE   3

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE   2

DELPHI
Automotive Systems

PURCHASING LOCATION

| PURCHASE ORDER | SAG90I4710 |

BELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

SHIP TO

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                48170

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
--------------------------------

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,
PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.
ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | CODES IAR |
|---|---|---|---|---|---|
| F.O.B. | | | | VIA | |
| STATE & LOCAL SALES, USE TAX CODES | | | | | |

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | |
|---|---|---|---|---|

SERVICES TO BE PROVIDED BY SELLER PURSUANT TO THIS CONTRACT (SUCH DOCUMENTS ARE
COLLECTIVELY REFERRED TO AS THIS "CONTRACT"). A COPY OF BUYER'S GENERAL TERMS AND
CONDITIONS IS AVAILABLE UPON WRITTEN REQUEST TO BUYER OR VIA THE INTERNET AT
DELPHI'S WEBSITE, DELPHIAUTO.COM (BY CLICKING ON "SUPPLIERS" IN THE HEADER AND
THEN "SUPPLIER STANDARDS" ON THE SUPPLIER PAGE AND THEN "ATTACHMENTS, FORMS, AND
ADDITIONAL INFORMATION", AND THEN "DGP SUPPLIER GUIDELINES ATTACHMENT C GENERAL
TERMS AND CONDITIONS"). SELLER ACKNOWLEDGES AND AGREES THAT IT HAS READ AND
UNDERSTANDS BUYER'S GENERAL TERMS AND CONDITIONS. IF SELLER ACCEPTS THIS CONTRACT
IN WRITING OR COMMENCES ANY OF THE WORK OR SERVICES WHICH ARE THE SUBJECT OF THIS
CONTRACT, SELLER WILL BE DEEMED TO HAVE ACCEPTED THIS CONTRACT AND BUYER'S
GENERAL TERMS AND CONDITIONS IN THEIR ENTIRETY WITHOUT MODIFICATION. ANY
ADDITIONS TO, CHANGES IN, MODIFICATIONS OF, OR REVISIONS OF THIS CONTRACT
(INCLUDING BUYER'S GENERAL TERMS AND CONDITIONS) WHICH SELLER PROPOSES WILL BE
DEEMED TO BE REJECTED BY BUYER EXCEPT TO THE EXTENT THAT BUYER EXPRESS- LY AGREES
TO ACCEPT ANY SUCH PROPOSALS IN WRITING.

THIS IS NOTIFICATION FOR AWARD OF BUSINESS FOR PART NUMBERS NOT SHOWN AS
(ACTIVE). SHIPMENT OF THOSE PARTS AGAINST THIS ORDER IS PROHIBITED UNTIL AN
ALTERATION WITH CURRENT BLUE PRINT DATE AND REVISION IS ISSUED, UNLESS OTHERWISE
STATED IN THIS ORDER.

ALL PARTS OR MATERIAL MUST BE PRODUCED IN ACCORDANCE W/GENERAL MOTORS' GENERAL
QUALITY STANDARDS FOR PURCHASED MATERIAL

WE WELCOME YOUR SUGGESTIONS ON ANY COST SAVINGS IDEAS. SPECIAL CONSIDERATION ON
FUTURE BUSINESS WILL BE GIVEN TO THOSE WHO HELP US REDUCE OUR COST.

MATERIAL SAFETY DATA SHEETS (MSDS) AND CORRESPONDING PURCHASE ORDER NUMBER,
APPLYING TO CHEMICALS AND/OR ARTICLES SUPPLIED TO DELPHI, SAGINAW, MI, MUST BE

CONTINUED ON PAGE    4

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE

DELPHI
Automotive Systems

| PURCHASE ORDER | SAG9014710 |

PURCHASING LOCATION

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP TO

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
- - - - - - - - - - - - - - - - - - - - - - - - - -

**P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,
PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.
ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).**

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | | CODES TAX |
|---|---|---|---|---|---|---|
| F.O.B. | | | | VIA | | |
| STATE & LOCAL SALES, USE TAX CODES | | | | | | |

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|
| | | INCLUDED WITH THE SHIPMENT AND A COPY SENT CERTIFIED MAIL TO THE DELPHI CHEMISTRY DEPARTMENT - WASTE WATER TREATMENT PLANT, SAGINAW, MICHIGAN. MSDS ONLY REQUIRED WITH FIRST SHIPMENT AND, THEREAFTER EVERY FIRST SHIPMENT AFTER CHANGES TO MSDS. | | |
| | | IN ACCEPTING THIS ORDER, IN ADDITION TO THESE TERMS AND CONDITIONS DESCRIBED ON THIS DOCUMENT, THE SELLER AGREES TO PAYMENT IN ACCORDANCE WITH ITS CURRENT EFT PAYMENT AGREEMENT, OR WHERE EFT IS NOT IN PLACE, THAT GM MAY DEFER MAKING PAYMENT BY PAPER CHECK DURING ANY RECOGNIZED GM HOLIDAY UNTIL THE NEXT GM BUSINESS DAY WITHOUT BEING IN DEFAULT OR LOSING ANY CASH DISCOUNT PRIVILEGES. FOR EXAMPLE, DURING CHRISTMAS, A DELAY OF ONE WEEK FROM THE NORMAL PAYMENT DATE WILL OCCUR. IN CONTRACT, EFT PAYMENTS WILL BE MADE THE FIRST BANKING DAY FOLLOWING THE EFT DUE DATE, AND GOOD FUNDS WILL BE AVAILABLE ON THAT DATE. | | |

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222        LAST

PAGE

DELPHI
Automotive Systems

| | | PURCHASE ORDER | SAG90I4710 |

PURCHASING LOCATION

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

ALTERATION 75284

ORDER ISSUE DATE: 09/12/01
SEPTEMBER 13, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP TO

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,
PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.
ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | CODES TAX SA |
| F.O.B. | | | | VIA | |

STATE & LOCAL SALES USE TAX CODES  4B-NOT TAXABLE - FOR INDUSTRIAL PROCESSING.
PERMIT NO 3800440

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|
| PC | ******** 26085186 | THIS ORDER IS EFFECTIVE  9/12/01 AND EXPIRES  9/10/07. THE FOLLOWING HAS BEEN CHANGED TO READ: THE FOLLOWING PRICE EFFECTIVE  1/01/04 SENSOR ASM, COMP TORQ & POSN PURCHASED COMPLETE TO BLUEPRINT  DATED  4/06/99 PER CHART 26092738 DTD  4/06/99 UNRELEASED ACT 2400  75000          TAX 4B WEEKLY CAP      12500    MIN LOT SIZE PRICE CHG THIS IS NOTIFICATION FOR AWARD OF BUSINESS FOR PART NUMBERS NOT SHOWN AS (ACTIVE).  SHIPMENT OF THOSE PARTS AGAINST THIS ORDER IS PROHIBITED UNTIL AN ALTERATION WITH CURRENT BLUE PRINT DATE AND REVISION IS ISSUED, UNLESS OTHERWISE STATED IN THIS ORDER. | ******** 12.12 | PC |

THIS IS NOT AN ORDER BUT CHANGES OR AMENDS
PURCHASE ORDER NOW IN YOUR POSSESSION.

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

DELPHI
Automotive Systems

PURCHASING LOCATION

**PURCHASE ORDER**    SAG90I4710
ALTERATION 75285

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

ORDER ISSUE DATE: 09/12/01
SEPTEMBER 13, 2001

**INVOICE TO**

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI              48170

**SHIP TO**

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,
PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.
ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | REC. DEPT. NOTIFY | CODES TAN SA |
|---|---|---|---|---|
| F.O.B. | | | VIA | |

STATE & LOCAL SALES, USE TAX CODES  4B—NOT TAXABLE - FOR INDUSTRIAL PROCESSING.
PERMIT NO 3800440

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|
| | | THIS ORDER IS EFFECTIVE 9/12/01 AND EXPIRES 9/10/07. | | |
| | | THE FOLLOWING HAS BEEN CHANGED TO READ: | | |
| | ********* | THE FOLLOWING PRICE EFFECTIVE 1/01/05 | ********* | |
| PC | 26085186 | SENSOR ASM, COMP TORQ & POSN PURCHASED COMPLETE TO BLUEPRINT DATED 4/06/99 PER CHART 26092738 DTD 4/06/99 UNRELEASED | 10.70 | PC |
| | | ACT 2400  75000          TAX 4B WEEKLY CAP    12500    MIN LOT SIZE | | |
| | | PRICE CHG THIS IS NOTIFICATION FOR AWARD OF BUSINESS FOR PART NUMBERS NOT SHOWN AS (ACTIVE).  SHIPMENT OF THOSE PARTS AGAINST THIS ORDER IS PROHIBITED UNTIL AN ALTERATION WITH CURRENT BLUE PRINT DATE AND REVISION IS ISSUED, UNLESS OTHERWISE STATED IN THIS ORDER. | | |

THIS IS NOT AN ORDER BUT CHANGES OR AMENDS
PURCHASE ORDER NOW IN YOUR POSSESSION.

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE    1

# EXHIBIT C

# DELPHI

April 8, 2004

Furukawa Electric Co., Ltd.
**Attn: Mr. Hironori Suzuki, General Manager**
20-16 Nobono-Cho
Kameyama-Shi, Mie 519-0292
JAPAN

Re:   Furukawa Breach of Contract

Dear Mr. Suzuki:

In accordance with the terms and conditions of Delphi's Purchase Order 90I4710 and Long Term Contract dated 7 September 2000, copies of which are attached for your reference, please consider this letter notice of contract cancellation for breach of warranty, effective immediately.

Delphi has documented that Furukawa deliberately made and withheld relevant information pertaining to unauthorized changes to the slip ring plating. This change  in turn, led to unprecedented Electric Power Steering ("EPS") failures and vehicle warranty returns to Delphi's largest customer, General Motors. This change was not only implemented without notification to Delphi, but was made despite the fact that Delphi specifically instructed Furukawa not to make such change.

The unprecedented warranty returns have put Delphi and GM at risk in the marketplace during the launch of not only GM's new Malibu vehicles, but also the leading-edge replacement technology to Delphi's hydraulic power steering systems. In addition, the National Highway Traffic Safety Administration ("NHTSA") has opened an investigation into alleged EPS failures involving 2004 Malibu vehicles.

Delphi reserves any and all rights and remedies it may have against Furukawa, specifically including the right to recover from Furukawa any and all costs related to warranty returns, recall expenses, liability and expenses from the ensuing use of  Furukawa's sensors.

Delphi expects immediate reimbursement for the production tool monies paid to Furukawa for this business in the amount of US$591,365.

Sincerely,

Delphi Saginaw Steering

By: _Ted Seeger_____
Ted Seeger
Its: Engineering Director EPS

Delphi Saginaw Steering

By: _Beverly Gaskin_____
Beverly Gaskin
Its: Purchasing Director

# EXHIBIT D

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF SAGINAW

DELPHI AUTOMOTIVE SYSTEMS, LLC,
A Delaware Corporation,

                    Plaintiff,                Case No. 04-5 4 2 4 5 -CK

v.

FURUKAWA ELECTRIC NORTH AMERICA APD, INC.
A Foreign Profit Corporation, and THE FURUKAWA
ELECTRIC CO. LIMITED, A Foreign Profit Corporation,

                    Defendants.

---

| | |
|---|---|
| LIPPERT, HUMPHREYS, CAMPBELL, DUST & HUMPHREYS, P.C. By: A.T. Lippert, Jr. (P16714) Attorneys for Plaintiff 4800 Fashion Square Blvd., Ste. 410 Saginaw, MI 48604-2604 (989) 792-2552 | DONALD R. PARSHALL, JR. (P30267) Co-Counsel for Plaintiff Delphi Corporation 5825 Delphi Drive Troy, MI 48098-2815 (248) 813-3367 |

---

**There is no other pending or resolved civil
action arising out of the transaction or
occurrence alleged in this complaint.**

### COMPLAINT AND DEMAND FOR JURY

      Plaintiff, Delphi Automotive Systems, LLC, (Delphi) alleges the following for its Complaint

against defendants, Furukawa Electric North America APD, Inc., a Foreign Profit Corporation,

and The Furukawa Electric Co. Limited, a Foreign Profit Corporation:

### PARTIES, JURISDICTION, AND VENUE

      1.    Delphi is incorporated under the laws of the State of Delaware and has its

principal place of business at 5825 Delphi Drive, Troy, Michigan 48089-2015. Delphi

manufactures a wide variety of products for the automotive industry, including steering columns for General Motors.

2.      Defendant Furukawa Electric North America APD, Inc is a foreign profit corporation authorized to do business in the State of Michigan.  Its registered office is 601 Abbott Road, East Lansing, Michigan 48823.  Its resident agent is CSC - Lawyers Incorporating Service, 601 Abbott Road, East Lansing, Michigan 48823.

3.      The Furukawa Electric Co. Limited is a foreign profit corporation having its principal place of business in Marunouchi, Chiyoda-KU Tokyo, Japan.    Defendant Furukawa Electric North America APD, Inc. is its agent, representative, and sales representative within the State of Michigan.

4.      The defendants maintain a business office at 47677 Galleon Drive, Plymouth, Michigan 48170.

5.      A torque and position sensor, Delphi part number 26085186, is manufactured by the defendants and sold by the defendants to Delphi in accordance with the terms of a Delphi purchase order issued to Furukawa Electric North American APD, Inc. on September 12, 2001, (attached Exhibit A) and in accordance with the terms of a Long Term Contract between Delphi and Furukawa Electric Co. Limited on September 7, 2000 (attached Exhibit B).

6.      The torque and position sensor manufactured and sold by the defendants are shipped to Delphi's manufacturing facility in Saginaw, Michigan.

7.      The torque and position sensors are assembled by Delphi into Power Steering Assist Mechanisms that are then assembled into steering columns.  The steering columns manufactured by Delphi in its Saginaw manufacturing facility, and are sold by Delphi to General Motors Corporation for assembly into General Motors vehicles.

-2-

LIPPERT, HUMPHREYS, CAMPBELL, DUST & HUMPHREYS, P.C.

8.   Jurisdiction is proper in the Saginaw County Circuit Court pursuant to MCL 600.605 because the amount in controversy exceeds $25,000.00, exclusive of costs, interest and attorney fees.

9.   Venue is proper in this court pursuant to MCL 600.1629.   The contracts of the parties were made in Saginaw County.

## COUNT I – BREACH OF CONTRACT

10.   Delphi re-alleges each of the preceding paragraphs in paragraphs 1 through 9.

11.   Delphi issued its Purchase Order SAG90I4710 to Furukawa Electric North America APD, Inc. on September 12, 2001.   The purchase order provided for the sale by Furukawa Electric North America APD, Inc. of torque and position sensors, Delphi part number 26085186, at an agreed price.   (Exhibit A)

12.   A Long Term Contract was issued by Delphi acting through its Saginaw steering division as "Buyer" to the Furukawa Electric Co. Limited as "Seller."   (Exhibit B)   The Long Term Contract provided for the sale by Furukawa Electric Co. Limited of part number 26085186 to Delphi.

13.   All parts sold by the defendants were to be manufactured in accordance with specifications provided by Delphi to the defendants.

14.   The defendants agreed to manufacture the torque and position sensor in accordance with Delphi specifications and had actual knowledge that failure to conform to Delphi specifications would result in product failure and resultant losses and damages.

15.   The torque and position sensors sold by the defendants to Delphi for assembly into its Power Steering Assist Mechanism and its steering columns were subject to warranties that provide:

-3-

"7.1  General.    Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer.  If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

* * *

7.3    Warranty Period.    The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract."

16.    The defendants requested twice that material revisions be made to the part specifications in order that the defendants could change the physical characteristics of the torque and position sensor.  Delphi considered this request for the change in specifications and the requests were not granted for sound metallurgical and engineering reasons.

17.    The defendants, acting without the required knowledge and consent of Delphi, materially altered the specifications of the torque and position sensor.  This material and unauthorized change was made by the defendants prior to their first request to Delphi to alter the specifications of the part, while knowing that approval of Delphi of the part specification was required.  This material and unauthorized change resulted in the failure of the torque and position sensor.  The failure of the torque and position sensor led to failures in the Power Steering Assist Mechanism sold by Delphi to General Motors and installed in General Motors vehicles.

18.    The defendants acknowledge and admit that they made material changes to the specifications for the torque and position sensor without Delphi's consent.

-4-

LIPPERT, HUMPHREYS, CAMPBELL, DUST & HUMPHREYS, P.C.

19.    The defendants breached the contracts made between them and Delphi and breached the warranties made by them to Delphi.

20.    It is essential that at all times Delphi maintain its reputation with General Motors and with its other customers as a competent skillful manufacturer of automotive parts. The actions of the defendants constituting a breach of contract were intentional, and it was reasonably foreseeable that such intentional acts would cause injury and damage to the reputation of Delphi as a competent and skillful manufacturer of automotive parts.

21.    As a direct consequence of the breach of contract, and breach of warranties, and the intentional violation of the terms of the contract, Delphi has sustained losses and damages.

WHEREFORE Delphi claims damages and exemplary damages from the defendants, and each of them, in an amount in excess of $25,000.00, together with interest, costs, and attorneys fees.

## COUNT II – VIOLATION OF UCC WARRANTIES

22.    Delphi re-alleges each of the preceding paragraphs made in paragraphs 1 through 21.

23.    The contracts made between Delphi and the defendants are subject to the provisions of the Michigan Uniform Commercial Code.

24.    At the time that the contracts were made between Delphi and the defendants, the defendants had reason to know that the torque and position sensors would be used for a particular purpose and that Delphi was relying upon the skill and judgment of the defendants to furnish suitable goods meeting the specifications of Delphi.

25.    The defendants expressly warranted that the torque and position sensors would be manufactured in strict accordance with Delphi's engineering and quality specifications.

-5-

26.    The defendants breached the express and implied warranties created by the contracts and by the provisions of Michigan Uniform Commercial Code.  MCLA 440.2315, MCLA 440.2313.

27.    As a direct consequence of the breach of express and implied warranties and the intentional violations of the terms of the contracts and the Michigan Uniform Commercial Code, Delphi has sustained losses and damages.

WHEREFORE Delphi claims damages and exemplary damages from the defendants, and each of them, in an amount in excess of $25,000.00, together with interest, costs, and attorneys fees.

## COUNT III – TORTIOUS INTERFERENCE

28.    Delphi re-alleges each of the preceding paragraphs made in paragraphs 1 through 27.

29.    At all times pertinent to this complaint Delphi had a business relationship with General Motors Corporation and the expectancy of future business with General Motors Corporation.

30.    The business relationship and the expectancy of a continuing business relationship had a reasonable likelihood of future economic benefit for Delphi.

31.    The defendants, and each of them, knew of Delphi's business relationship with General Motors and its expectation that the economically beneficial business relationship would continue.

32.    Defendants manufactured and sold to Delphi torque and position sensors that did not meet the manufacturing specifications of Delphi and were unsuitable for installation into electric steering columns.

-6-

LIPPERT, HUMPHREYS, CAMPBELL, DUST & HUMPHREYS, P.C.

33.     The intentional sale of a known defective parts interfered with Delphi's business relationship with General Motors and Delphi's expectancy of a continuing business relationship.

34.     The actions of the defendants were improper and the improper conduct interfered with Delphi's business relationship with General Motors and the expectancy of continuing business relationship.

35.     The defendants' conduct has caused a disruption in the business relationship existing between Delphi and General Motors.  The Delphi steering columns sold to General Motors and installed by General Motors in its vehicles have been subject to warranty issues because they do not meet Delphi and General Motors specifications.

36.     There is a reasonable likelihood that the intentional conduct of the defendants will further disrupt and damage the business relationship existing between Delphi and General Motors and the expectancy of a continuing business relationship between Delphi and General Motors.

37.     Delphi has been financially damaged as a direct result of defendant's intentional and tortious conduct.

WHEREFORE Delphi claims damages and exemplary damages from the defendants, and each of them, in an amount in excess of $25,000.00, together with interest, costs, and attorneys fees.

## COUNT III – FRAUD AND MISREPRESENTATION

38.     Delphi re-alleges each of the allegations made in paragraphs 1 through 37 inclusive.

-7-

39.   At all times pertinent to this complaint the defendants, and each of them, represented to Delphi that the torque and position sensor manufactured by them met the manufacturing specifications of Delphi and General Motors.

40.   The representations made by the defendants were false.

41.   The defendants knew that the representations were false.

42.   The defendants recklessly represented that the torque and position sensor met the specifications of Delphi and General Motors without knowing whether the representation was true.

43.   Defendants made the representations with the intent that Delphi rely upon their representations.

44.   Delphi relied upon the representations made by the defendants.

45.   Delphi was damaged as a result of its reliance upon the representations made by the defendants and each of them.

WHEREFORE Delphi claims damages and exemplary damages from the defendants, and each of them, in an amount in excess of $25,000.00, together with interest, costs, and attorneys fees.

LIPPERT, HUMPHREYS, CAMPBELL, DUST
& HUMPHREYS, P.C.

By: _____
A. T. Lippert, Jr. (P16714)
Attorneys for Plaintiff
4800 Fashion Square Blvd., Ste. 410
Saginaw, MI 48604-2604
(989) 792-2552

Dated:  October 14, 2004

Donald R. Parshall, Jr. (P30267)
Co-Counsel for Plaintiff
Delphi Corporation
5825 Delphi Drive
Troy, MI 48098-2815
(248) 813-3367

-8-

## JURY TRIAL DEMAND

Plaintiff, Delphi Automotive Systems, LLC, by its attorneys Lippert, Humphreys,

Campbell, Dust & Humphreys, P.C., hereby demands a trial by jury in this case.


LIPPERT, HUMPHREYS, CAMPBELL, DUST
& HUMPHREYS, P.C.

By: _____
A. T. Lippert, Jr. (P16714)
Attorneys for Plaintiff
4800 Fashion Square Blvd., Ste. 410
Saginaw, MI 48604-2604
(989) 792-2552

Dated: October 14, 2004

Donald R. Parshall, Jr. (P30267)
Co-Counsel for Plaintiff
Delphi Corporation
5825 Delphi Drive
Troy, MI 48098-2815
(248) 813-3367


-9-

DELPHI
Automotive Systems

PURCHASING LOCATION

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

| PURCHASE ORDER | SAG90I4710 |

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                          48170

SHIP TO
SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
--------------------------------

**P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS, PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS. ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).**

| DATE REQUIRED | DATE PROMISED | TERMS | REC. DEPT. NOTIFY | CODE TAX |
|---|---|---|---|---|
| AS RELEASED | | NET   MNS-2 | | SA |

F.O.B.  SHIPPING POINT                                    VIA   SEE INSTRUCTIONS BELOW

STATE & LOCAL SALES, USE TAX CODES    48-NOT TAXABLE - FOR INDUSTRIAL PROCESSING.
PERMIT NO 3800440

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|
| | | THIS ORDER IS EFFECTIVE  9/12/01 AND EXPIRES  9/10/07. | | |

ATTENTION*** THE PAYMENT DATE IS SET FORTH IN THE LINE ITEM DETAIL OF THIS
CONTRACT, OR IF NOT STATED, SHALL BE THE DATE ESTABLISHED BY THE BUYER'S
MULTILATERAL NETTING SYSTEM (MNS-2), WHICH PROVIDES, ON AVERAGE, THAT PAYMENT
SHALL BE MADE ON THE SECOND DAY OF THE SECOND MONTH FOLLOWING, IN THE CASE OF THE
BUYER'S NORTH AMERICAN FACILITIES, SELLER'S SHIPMENT DATE OF GOODS OR DATE OF
SERVICES, AND, FOR ALL OF THE BUYER'S OTHER LOCATIONS, BUYER'S RECEIPT DATE OF
THE GOODS OR DATE OF SERVICES. BUYER MAY WITHOLD PAYMENT PENDING RECEIPT OF
EVIDENCE, IN SUCH FORM AND DETAIL AS BUYER MAY DIRECT, OF THE ABSENCE OF ANY
LIENS, ENCUMBRANCES AND CLAIMS ON THE GOODS OR SERVICES UNDER THIS CONTRACT.

THE SUPPLIER AGREES TO SELL AND THE BUYER AGREES TO PURCHASE, AT THE PRICE AND
UPON AND SUBJECT TO THE TERMS AND CONDITIONS IN THE FACE AND REVERSE SIDE HEREOF,
AND BY REFERENCE AS THOUGH TYPED HEREON, THE SUPPLEMENTAL TERMS AND CONDITIONS
ATTACHED TO THE REQUEST FOR QUOTATION, THE FOLLOWING PERCENT OF OF THE
ARTICLE(S) DESCRIBED BELOW FOR THE ABOVE TIME PERIOD.

THIS PURCHASE ORDER IS AN INVOICELESS PURCHASE ORDER, THE INDICATOR FOR YOU THE
SUPPLIER IS THE "I" IN THE THIRD POSITION OF THE PURCHASE ORDER NUMBER. (EXAMPLE:
SAGXX"I"XXXX) UNDER THE INVOICELESS PAYMENT PROGRAM, YOUR COMPANY IS NO LONGER
REQUIRED TO SEND INVOICES TO RECEIVE PAYMENT. THE AUTOMOTIVE COMPONENTS GROUP
WILL GENERATE PAYMENTS TO YOUR COMPANY BASED UPON RECEIPT OF MATERIAL AT THE
CURRENT PRICE AND PAYMENT TERMS. TO EXPEDITE PAYMENT UNDER THE INVOICELESS
PAYMENT PROGRAM, YOU WILL NEED TO ADHERE TO THE FOLLOWING GUIDELINES: 1- ADVISE
THE BUYER OF ANY DISCREPANCIES ON THE PURCHASE ORDER PRIOR TO THE SHIPMENT OF THE
MATERIAL. 2- DELPHI PART/ITEM CODE NO. MUST BE INCLUDED ON ALL PACKING SLIPS AND

CONTINUED ON PAGE   2

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE  1

**DELPHI** Automotive Systems

LEGAL COPY

| PURCHASE ORDER | SAG90I4710

PURCHASING LOCATION

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP TO

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
--------------------------------

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS, PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS. ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | TAX CODES |
|---|---|---|---|---|---|
| F.O.B. | | | VIA | | |

STATE & LOCAL SALES, USE TAX CODES

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|

MAILED TO THE "RECEIVING NOTIFY" PERSON ON PO. 3- THE UNIT OF MEASURE ON THE PACKING SLIP MUST BE THE SAME AS THE PURCHASE ORDER UNIT OF MEASURE. 4- DO NOT SEND AN INVOICE. PAYMENT WILL BE BASED ON RECEIPT RECORDS. 5- A MONTHLY STATEMENT IS REQUIRED BY THE 10TH OF EACH MONTH. 6- CONTAINER CHARGES, SET-UP CHARGES, AND OTHER MISCELLANEOUS CHARGES MUST BE BILLED MONTHLY IN A SUMMARY BILLING WHICH CONTAINS THE FOLLOWING INFORMATION: A- COMPLETE PURCHASE ORDER NUMBER. B- BILL OF LADING OR PACKING SLIP NUMBER: C- RELEASE NUMBERS. D- SHIPMENT DATE FOR EACH ITEM. WHEN THE ABOVE IS NECESSARY, BILL TO "NAO DISBURSEMENT ANALYSIS", PO BOX 436040, PONTIAC, MI 48343-6040. PLEASE NOTE THAT SALES TAX SHOULD NOT BE BILLED IN A MONTHLY SUMMARY SINCE DELPHI SAGINAW HAS A DIRECT PAY PERMIT WITH THE FOLLOWING STATES: ALABAMA PAY PERMIT NO. 224 MICHIGAN PAY PERMIT NO. ME3800440 NEW YORK PAY PERMIT NO. DP000036 COMPLIANCE WITH THESE GUIDELINES WILL PROMOTE PROMPT PAYMENT.

| 26085186 | SENSOR ASM, COMP TORQ & POSN | 12.56 | PC |
| | PURCHASED COMPLETE | | |
| | TO BLUEPRINT  DATED 4/06/99 | | |
| | PER CHART 26092738 DTD 4/06/99 | | |
| | UNRELEASED | | |
| | ACT 2400 75000      TAX 4B | | |
| | WEEKLY CAP    12500    MIN LOT SIZE | | |

SUPPLIER TO SHIP PRODUCTION SAMPLES TO "PPAP". LEAD TIMES TO REFLECT THESE REQUIREMENTS. IDENTIFIED IN AIAG PPAP MANUAL "PPAP" SECTION.

SELLER ACKNOWLEDGES AND AGREES THAT BUYER'S GENERAL TERMS AND CONDITIONS ARE INCORPORATED IN, AND A PART OF, THIS CONTRACT AND EACH PURCHASE ORDER, RELEASE, REQUISITION, WORK ORDER, SHIP- PING INSTRUCTION, SPECIFICATION AND OTHER DOCUMENTS ISSUED BY BUYER OR ACCEPTED IN WRITING BY BUYER, WHETHER EXPRESSED IN WRITTEN FORM OR BY ELEC- TRONIC DATA INTERCHANGE, RELATING TO THE GOODS AND/OR

CONTINUED ON PAGE    3

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE    2

DELPHI
*Automotive Systems*

PURCHASING LOCATION

**BELPHI SAGINAW STEERING SYSTEMS**
**DELPHI AUTOMOTIVE SYSTEMS**
**3900 E HOLLAND RD.**
**SAGINAW, MI   48601-9494**

| PURCHASE ORDER | SAG90I4710 |

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP TO

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
- - - - - - - - - - - - - - - - - - - - - - -

**P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,**
**PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.**
**ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).**

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | CODES LAR |
|---|---|---|---|---|---|
| F.O.B. | | | | VIA | |
| STATE & LOCAL EXCISE, USE TAX CODES | | | | | |

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS |
|---|---|---|---|---|

SERVICES TO BE PROVIDED BY SELLER PURSUANT TO THIS CONTRACT (SUCH DOCUMENTS ARE
COLLECTIVELY REFERRED TO AS THIS "CONTRACT"). A COPY OF BUYER'S GENERAL TERMS AND
CONDITIONS IS AVAILABLE UPON WRITTEN REQUEST TO BUYER OR VIA THE INTERNET AT
DELPHI'S WEBSITE, DELPHIAUTO.COM (BY CLICKING ON "SUPPLIERS" IN THE HEADER AND
THEN "SUPPLIER STANDARDS" ON THE SUPPLIER PAGE AND THEN "ATTACHMENTS, FORMS, AND
ADDITIONAL INFORMATION", AND THEN "DGP SUPPLIER GUIDELINES ATTACHMENT C GENERAL
TERMS AND CONDITIONS"). SELLER ACKNOWLEDGES AND AGREES THAT IT HAS READ AND
UNDERSTANDS BUYER'S GENERAL TERMS AND CONDITIONS. IF SELLER ACCEPTS THIS CONTRACT
IN WRITING OR COMMENCES ANY OF THE WORK OR SERVICES WHICH ARE THE SUBJECT OF THIS
CONTRACT, SELLER WILL BE DEEMED TO HAVE ACCEPTED THIS CONTRACT AND BUYER'S
GENERAL TERMS AND CONDITIONS IN THEIR ENTIRETY WITHOUT MODIFICATION. ANY
ADDITIONS TO, CHANGES IN, MODIFICATIONS OF, OR REVISIONS OF THIS CONTRACT
(INCLUDING BUYER'S GENERAL TERMS AND CONDITIONS) WHICH SELLER PROPOSES WILL BE
DEEMED TO BE REJECTED BY BUYER EXCEPT TO THE EXTENT THAT BUYER EXPRESS- LY AGREES
TO ACCEPT ANY SUCH PROPOSALS IN WRITING.

THIS IS NOTIFICATION FOR AWARD OF BUSINESS FOR PART NUMBERS NOT SHOWN AS
(ACTIVE). SHIPMENT OF THOSE PARTS AGAINST THIS ORDER IS PROHIBITED UNTIL AN
ALTERATION WITH CURRENT BLUE PRINT DATE AND REVISION IS ISSUED, UNLESS OTHERWISE
STATED IN THIS ORDER.

ALL PARTS OR MATERIAL MUST BE PRODUCED IN ACCORDANCE W/GENERAL MOTORS' GENERAL
QUALITY STANDARDS FOR PURCHASED MATERIAL

WE WELCOME YOUR SUGGESTIONS ON ANY COST SAVINGS IDEAS. SPECIAL CONSIDERATION ON
FUTURE BUSINESS WILL BE GIVEN TO THOSE WHO HELP US REDUCE OUR COST.

MATERIAL SAFETY DATA SHEETS (MSDS) AND CORRESPONDING PURCHASE ORDER NUMBER,
APPLYING TO CHEMICALS AND/OR ARTICLES SUPPLIED TO DELPHI, SAGINAW, MI. MUST BE

CONTINUED ON PAGE    4

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE

DELPHI
Automotive Systems

PURCHASING LOCATION

**DELPHI SAGINAW STEERING SYSTEMS**
**DELPHI AUTOMOTIVE SYSTEMS**
**3900 E HOLLAND RD.**
**SAGINAW, MI  48601-9494**

| PURCHASE ORDER | SAG9014710 |

SEPTEMBER 12, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP TO

SHIP ACCORDING TO RELEASE AND
SHIPPING SCHEDULES
--------------------------------------

**P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,**
**PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.**
**ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).**

| DATE REQUIRED | DATE PROMISED | TERMS | | REC. DEPT. NOTIFY | CODES TAX |
|---|---|---|---|---|---|
| F.O.B. | | | | VIA | |

STATE & LOCAL SALES,
USE TAX CODES

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS |
|---|---|---|---|---|

INCLUDED WITH THE SHIPMENT AND A COPY SENT CERTIFIED MAIL TO THE DELPHI CHEMISTRY
DEPARTMENT - WASTE WATER TREATMENT PLANT, SAGINAW, MICHIGAN. MSDS ONLY REQUIRED
WITH FIRST SHIPMENT AND, THEREAFTER EVERY FIRST SHIPMENT AFTER CHANGES TO MSDS.

IN ACCEPTING THIS ORDER, IN ADDITION TO THESE TERMS AND CONDITIONS DESCRIBED ON
THIS DOCUMENT, THE SELLER AGREES TO PAYMENT IN ACCORDANCE WITH ITS CURRENT EFT
PAYMENT AGREEMENT, OR WHERE EFT IS NOT IN PLACE, THAT GM MAY DEFER MAKING PAYMENT
BY PAPER CHECK DURING ANY RECOGNIZED GM HOLIDAY UNTIL THE NEXT GM BUSINESS DAY
WITHOUT BEING IN DEFAULT OR LOSING ANY CASH DISCOUNT PRIVILEGES. FOR EXAMPLE,
DURING CHRISTMAS, A DELAY OF ONE WEEK FROM THE NORMAL PAYMENT DATE WILL OCCUR. IN
CONTRACT, EFT PAYMENTS WILL BE MADE THE FIRST BANKING DAY FOLLOWING THE EFT DUE
DATE, AND GOOD FUNDS WILL BE AVAILABLE ON THAT DATE.

B. VANHOVE,
SENIOR BUYER
PHONE (517) 757-4035
FAX (989) 757-9222        LAST

PAGE

DELPHI
Automotive Systems

PURCHASING LOCATION

**DELPHI SAGINAW STEERING SYSTEMS**
**DELPHI AUTOMOTIVE SYSTEMS**
**3900 E HOLLAND RD.**
**SAGINAW, MI  48601-9494**

| PURCHASE ORDER | SAG90I4710 |
| --- | --- |
| | ALTERATION 75284 |

ORDER ISSUE DATE: 09/12/01
SEPTEMBER 13, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                    48170

SHIP TO

P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS,
PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS.
ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).

| DATE REQUIRED | DATE PROMISED | TERMS | REC. DEPT. NOTIFY | CODES |
| --- | --- | --- | --- | --- |
| | | | | UM |
| | | | | SA |
| F.O.B. | | | VIA | |

STATE & LOCAL SALES/USE TAX CODES: 4B-NOT TAXABLE - FOR INDUSTRIAL PROCESSING.
PERMIT NO 3800440

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
| --- | --- | --- | --- | --- |
| | | THIS ORDER IS EFFECTIVE  9/12/01 | | |
| | | AND EXPIRES  9/10/07. | | |
| | | THE FOLLOWING HAS BEEN CHANGED TO READ: | | |
| | ********* | THE FOLLOWING PRICE EFFECTIVE  1/01/04 | ********* | |
| PC | 26085186 | SENSOR ASM, COMP TORQ & POSN | 12.12 | PC |
| | | PURCHASED COMPLETE | | |
| | | TO BLUEPRINT   DATED  4/06/99 | | |
| | | PER CHART 26092738 DTD  4/06/99 | | |
| | | UNRELEASED | | |
| | | | | |
| | | ACT 2400  75000            TAX 4B | | |
| | | WEEKLY CAP     12500    MIN LOT SIZE | | |
| | | | | |
| | | PRICE CHG | | |
| | | THIS IS NOTIFICATION FOR AWARD OF | | |
| | | BUSINESS FOR PART NUMBERS NOT SHOWN AS | | |
| | | (ACTIVE).  SHIPMENT OF THOSE PARTS | | |
| | | AGAINST THIS ORDER IS PROHIBITED UNTIL | | |
| | | AN ALTERATION WITH CURRENT BLUE PRINT | | |
| | | DATE AND REVISION IS ISSUED, UNLESS | | |
| | | OTHERWISE STATED IN THIS ORDER. | | |

THIS IS NOT AN ORDER BUT CHANGES OR AMENDS
PURCHASE ORDER NOW IN YOUR POSSESSION.

B. VANHOVE,
SENIOR BUYER
PHONE: (517) 757-4035
FAX (989) 757-9222

PAGE

DELPHI
Automotive Systems

PURCHASING LOCATION

DELPHI SAGINAW STEERING SYSTEMS
DELPHI AUTOMOTIVE SYSTEMS
3900 E HOLLAND RD.
SAGINAW, MI  48601-9494

| PURCHASE ORDER | SAG90I4710 |

ALTERATION 75285

ORDER ISSUE DATE: 09/12/01
SEPTEMBER 13, 2001

INVOICE TO

VENDOR 328180    DUNS 966877987

FURUKAWA ELECTRIC NORTH AMERICA APD INC
47677 GALLEON DR
PLYMOUTH MI                48170

SHIP TO

**P.O. NUMBER (AND RELEASE NUMBER, IF APPLICABLE) MUST APPEAR ON ALL INVOICES, PACKING SLIPS, PACKAGES AND BILLS OF LADING. ITEM CODE NUMBERS MUST APPEAR ON ALL INVOICES AND PACKING SLIPS. ADDRESS ALL INQUIRIES AND CORRESPONDENCE TO THE NAME SHOWN AT BOTTOM OF P.O. (OR RELEASE).**

| DATE REQUIRED | DATE PROMISED | TERMS | REC. DEPT. NOTIFY | CODES |
|---|---|---|---|---|
| | | | | WB SA |
| F.O.B. | | | VIA | |

STATE & LOCAL SALES, USE TAX CODES  4B-NOT TAXABLE - FOR INDUSTRIAL PROCESSING.
PERMIT NO 3800440

| QUANTITY | ITEM CODE NO. | DESCRIPTION | UNIT PRICE | UNIT MEAS. |
|---|---|---|---|---|
| | | THIS ORDER IS EFFECTIVE  9/12/01 AND EXPIRES  9/10/07. | | |
| | | THE FOLLOWING HAS BEEN CHANGED TO READ: | | |
| | ******** | THE FOLLOWING PRICE EFFECTIVE  1/01/05 | ******** | |
| PC | 26085186 | SENSOR ASM, COMP TORQ & POSN PURCHASED COMPLETE TO BLUEPRINT  DATED  4/06/99 PER CHART 26092738 DTD  4/06/99 UNRELEASED | 10.70 | PC |
| | | ACT 2400  75000            TAX 4B WEEKLY CAP    12500    MIN LOT SIZE | | |
| | | PRICE CHG THIS IS NOTIFICATION FOR AWARD OF BUSINESS FOR PART NUMBERS NOT SHOWN AS (ACTIVE).  SHIPMENT OF THOSE PARTS AGAINST THIS ORDER IS PROHIBITED UNTIL AN ALTERATION WITH CURRENT BLUE PRINT DATE AND REVISION IS ISSUED, UNLESS OTHERWISE STATED IN THIS ORDER. | | |

THIS IS NOT AN ORDER BUT CHANGES OR AMENDS
PURCHASE ORDER NOW IN YOUR POSSESSION.

B. VANHOVE,
SENIOR BUYER
PHONE (517) 757-4035
FAX (989) 757-9222

PAGE    1

## LONG TERM CONTRACT

1.  **Purchase of Product**

    The Furukawa Electric Co.,Ltd. ("Seller") agrees to sell, and Delphi
    Automotive Systems LLC acting through its Saginaw Steering
    Division ("Buyer") agrees to purchase, approximately one hundred
    percent (100%) of Buyer's production and service requirements for the
    following products (each referred to as a "Product" and collectively
    referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Daily Tool Capacity |
|---|---|---|---|
| 26085188-000 Specification; 26079879-043 | Gamma and Epsilon program; Sensor Assembly Torque & Position | $13.00 USD | Production tooling capacity is 167pcs/hour/tool. Assembly line capacity is 300 pcs/hour. |
| 26089247-000 Specification; 26079879-043 | Fiat 169 (600); Sensor Assembly Torque & Position | $13.00 USD | Above capacity references 8/18/2000 quotation and includes Gamma,Epsilon,Fiat 169, fiat y843 programs. Tooling limiter is plastic injection molds, 2 tools or 334 pcs/hour total. Tooling cost for Gamma, Epsilon, and Fiat 169 programs shown on this contract is $1,125,667.00 . (Tooling will be paid in a lump sum upon PPAP approval.) |

2.  **Term**

    With respect to each Product, the term of this Contract is from Calendar Year
    2002 through 7/1/2007.

3.  **Prices**

    The per unit price of each Product for Calendar Year 2002 is F.O.B. Plymouth
    Michigan for Epsilon Requirements, Cadiz, Spain for Gamma & Fiat 169(600)
    Requirements. (1990 IncoTerms). Pricing for each subsequent calendar year is
    subject to the following minimum annual percentage reductions from the prior
    Calendar Year's pricing:

| Calendar Year 2003 | 3.5 | percent |
| Calendar Year 2004 | 3 | percent |
| Calendar Year 2005 | 3 | percent |
| Calendar Year 2006 | 3 | percent |
| Calendar Year 2007 | 3 | percent |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping



furukawa+gen+il.doc
09/14/00

Uncontrolled Copy

Instructions) issued by Buyer from time to time during the term of this Contract.
Buyer's General Terms and Conditions, a copy of which is attached, are hereby
incorporated into this Contract by reference, provided, however, that Buyer's
right to "terminate for convenience" under the General Terms and Conditions will
be inapplicable to this Contract until 7/1/2007. Any amendment to, or revision of,
such General Terms and Conditions shall also become a part of this Contract,
provided that (i) Buyer provides Seller with a copy of such revised Terms and
Conditions and (ii) Seller does not object to such revised Terms and Conditions
in writing within thirty (30) days after receipt.   The Terms and Conditions
(together with any revision made a part of this Contract) shall be construed, to
the extent possible, as consistent with the terms and conditions set forth in this
Contract and as cumulative, provided, however, that if such construction is
unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of  9/7/00.

**Buyer:**                                              **Seller:**

**Delphi Automotive Systems LLC**                       **The Furukawa Electric Co.,Ltd.**
**acting through its Saginaw Steering Division**

By: _Duan D. Blmgr_                                     By: _M. Shimizu_
Name: _Duane D. Bulgra_                                 Name: _Makoto Shimizu_
Title: _Director of Purchasing_                         Title: _Director, Automotive_
                                                               _Products Division_

furukawa+gen+ii.doc                  Uncontrolled Copy                      - 3 -
09/14/00