Victor J. Mastromarco, Jr. (Mich Bar No P34564)
THE MASTROMARCO FIRM
Counsel to H.E. Services Company &
Robert Backie
1024 North Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

Hearing Date: April 27, 2007
Time:  10:00 a.m. (Eastern Standard)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

DELPHI CORPORATION, et al.,

Debtors.

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

---

**H.E. SERVICES COMPANY AND ROBERT BACKIE'S SUPPLEMENTAL RESPONSE TO DEBTORS' (I) THIRD OMNIBUS OBJECTION (SUBSTANTIVE) PURSUANT TO 11 U.S.C. § 502(b) AND FED. R. BANKR. P. 3007 TO CERTAIN (A) CLAIMS WITH INSUFFICENT DOCUMENTATION, (B) CLAIMS UNSUBSTANTIATED BY DEBTORS' BOOKS AND RECORDS, AND (C) CLAIMS SUBJECT TO MODIFICATION AND (II) MOTION TO ESTIMATE CONTINGENT AND UNLIQUIDATED CLAIMS PURSUANT TO 11 U.S.C. § 502 (c)**

**REQUEST FOR TELEPHONE CONFERENCE ON MODIFICATION OF PROCEDURES**

1.    The Creditors hereby seek a conference call with regards to the discovery procedures as well as the hearing procedures. As illustrated below, a modification of the procedures are necessary so as to conduct meaningful discovery and a meaningful hearing

1

## SUPPLEMENTAL RESPONSE

2.    The Creditor, H.E. Services Company [hereinafter referred to as H.E. Services Company and jointly as Creditors] is a Michigan Corporation.[1] (See Backie Affidavit – **Exhibit 1**). The Creditor, Robert Backie [hereinafter referred to as Mr. Backie and jointly as Creditors] is a Native American and is the majority shareholder and Chief Executive Officer of H.E. Services Company.[2] (See Backie Affidavit – **Exhibit 1**). H.E. Services Company consists of several divisions including an H.E. Services Engineering and Testing Division, a Universal Tool Division, Universal Inspection Division, Universal Manufacturing Division, and an Ancon Prototype & Machine Division. (Backie Affidavit – **Exhibit 1**). H.E. Services Company's facilities included a facility in Flint, Michigan. (Backie Affidavit – **Exhibit 1**).

3.    The Creditors have filed their claims against Delphi Corporation et. seq.[3] [hereinafter referred to collectively as Debtor]. This supplemental response is divided into three parts. The first part set forth the services and goods which were performed by the Creditors for the Debtor and which have not been paid as promised. The second part sets forth the business dealings which the Creditors initiated in reliance upon Debtor's words and actions and the damages which

---

[1] H.E. Services Company was incorporated in 1982. (See Backie Affidavit – **Exhibit 1**).

[2] The Creditors were encouraged by Debtor to obtain minority status with the promise from Debtor that Creditors would be given favorable status by Debtor pursuant to its internal policies. (See Backie Affidavit – **Exhibit 1**). In fact, the Creditors did obtain minority status for H.E. Services Company, and is in fact certified by the United States Small Business Administration as a firm owned and operated by socially and economically disadvantaged individuals eligible to receive federal contracts under the Small Business Administration's business development program. See 42 USC § 637. (See also Backie Affidavit – **Exhibit 1**). Debtor is not a minority corporation. (See Backie Affidavit – **Exhibit 1**).

[3] The Debtor in is statement of disputed issues, claims that the Creditors did not file a proof of claim against Delphi Automotive Systems, LLC. Debtor is mistaken. The proofs of claims filed by Creditors names <u>all</u> of the Delphi corporate entities including Delphi Automotive Systems, LLC. The Court should note that the debtor is identified as "Delphi Corporation **et. seq.**". The Court should also note that exhibit to the proof of claims is an amended complaint which identifies the defendant as Delphi Automotive Systems, LLC which further evidences the fact that the proof of claim was not limited to the Delphi Corporation.

2

have resulted from Debtors' wrongful actions. The third part sets forth a legal discussion for each

of Creditors claims against the Debtor.

4.      For the reasons as set forth below, the Debtors' defenses are unavailing and, accordingly,

this Court should deny the Third Omnibus Objection and allow the Proofs of Claim in full.

### PART ONE

**I.      SERVICES AND GOODS PROVIDED TO DEBTOR IN RELIANCE UPON DEBTORS' REPRESENTATIONS – PAYMENT NOT MADE BY DEBTOR.**

5.      With regards to the Creditors' Universal Inspection Division, the invoices, purchase

orders and other paperwork establishes that Debtor, at a minimum, owes Creditors at least

**$247,746.58**. (See Backie Affidavit – **Exhibit 1**, See also Universal Inspection supporting

documentation – **Exhibit 2**).[4] With regards to the Ancon Prototype & Machine Division, the

invoices, purchase orders and other paperwork establishes that Debtor, at a minimum, owes

Creditors **$133,291.20**. (See Backie Affidavit – **Exhibit 1**, See also Ancon supporting

documentation – **Exhibit 3**). With regards to the H.E. Services Company Engineering and

Testing Division, the invoices, purchase orders and other paperwork establishes that Debtor, at a

minimum, owes Creditors **$598,201.24**. (See Backie Affidavit – **Exhibit 1**, See also Additional

Invoices and Purchase Orders for H.E. Services Company Engineering and Testing Division –

**Exhibit 4**).

### PART TWO

**II.      EXPENDITURES     MADE     IN     RELIANCE     UPON     DEBTOR'S REPRESENTATIONS – JUAREZ, MEXICO.**

---

[4] Within the invoices are those that were initially sent to Prince Manufacturing but which should have been submitted to Debtor for services which were performed by Creditors for Debtor. Those invoices were submitted to Debtor and have not been paid. (Backie Affidavit – Exhibit 1, See also Universal Inspection supporting documentation – **Exhibit 2**).

3

6.      Debtor asked H.E. Services' Ancon Division to attend a series of meetings in Juarez, Mexico, through Debtor's agent Greg A. Novak along with other representatives from Debtor, to entice Creditors to open a facility to support Delphi-Juarez.[5] (Backie Affidavit – **Exhibit 1**).  At that time H.E. Services was Debtors' major source of prototypes. (Backie Affidavit – **Exhibit 1**).

7.      At the urging of Debtor, H.E. Services Company organized a team of corporate executives to concentrate their efforts on the Delphi-Juarez program, including sending a representative to live in neighboring El Paso, Texas, for purposes of meeting Delphi-Juarez's demands. (Backie Affidavit – Exhibit 1). Furthermore, and at Debtor's request, H.E. Services personnel made multiple trips to the El Paso, Texas area, including Tim Fortier (President of H.E. Services), Joe Stearns (V.P. of Manufacturing for H.E. Services), Eric Jacob (V.P. of Sales for H.E. Services), Joel Karwat (Director of Quality Control for H.E. Services), Patrick Harmon (Director of Manufacturing and Facilities for H.E. Services) and John Chisa (Manager of the Ancon Division for H.E. Services). (Backie Affidavit – **Exhibit 1**).

8.      At the same time, Mr. Backie and Mr. Richard Bolt (Senior Vice President of Republic Bank), scheduled a meeting with Mr. Jerry Haller and Debtor's purchasing staff to determine the validity of Delphi-Juarez's needs as well as the timing and financial responsibilities involved. (Backie Affidavit – **Exhibit 1**). This occurred in approximately early 1999. (Backie Affidavit – **Exhibit 1**).  After having made their due diligence efforts to examine the Delphi-Juarez Facility, and also on the urging of Debtor's personnel, including Jerry Haller, the engineer in charge of the prototype area for Debtor, H.E. Services did construct a state of the art facility in El Paso, Texas, a few miles from the border, and the Delphi-Juarez facility, for the purposes of achieving the Delphi-Juarez requested assistance.  (Backie Affidavit – **Exhibit 1**).

---

[5] The Creditors were told that the facility should be modeled after Creditors' Ancon prototype facility which was an approved minority source for Debtor. (Backie Affidavit – **Exhibit 1**).

4

9.     H.E. Services was assured by a number of Debtor's representatives that if in fact they were to make the financial commitment, and establish the plant in El Paso, that they would be given the contracts to serve the needs of Debtor's new Tech Center. (Backie Affidavit – **Exhibit 1**). Furthermore, specific information was given in the form of intended orders, purchases, etc., which further confirmed the promises made by Debtor concerning the Delphi-Juarez relationship with H.E. Services.[6] (Backie Affidavit – **Exhibit 1**).    As a result of these confirmations, assurances and promises, Mr. Bolt of Republic Bank, gave the go-ahead to finance the project. (Backie Affidavit – **Exhibit 1**).

10.    Soon thereafter, H.E. Services installed a "state of the art" machining and inspection facility in a leased site in El Paso, Texas. (Backie Affidavit – **Exhibit 1**). The grand opening was attended by Debtor's personnel amid fanfare with local dignitaries. (Backie Affidavit – **Exhibit 1**).    At that point in time and based on the promises of Debtor and their principals, with regard to the Delphi-Juarez project, H.E. Services Company had an investment of over $1,350,000.00. (Backie Affidavit – **Exhibit 1**).    All this investment was subsequently lost due to the failure on the part of Debtor to meet the projected and promised revenues. (Backie Affidavit – **Exhibit 1**). This includes the expense of the A2 LA laboratory certification and inspection equipment which was never used, or if used, to a minimal extent. (Backie Affidavit – **Exhibit 1**).    All such certification was <u>required</u> by Debtor. (Backie Affidavit – **Exhibit 1**).    Due to the lack of work and the failure of promises, the site was closed down in July of 2000. (Backie Affidavit – **Exhibit 1**).    Furthermore, Debtor refused to pay in a timely manner the delinquent invoices for

---

[6] Debtor also promised the Creditors that if they built the facility that they would be Debtors' exclusive supplier of prototype parts, assembly, inspection and related services. (Backie Affidavit – **Exhibit 1**). Ultimately the Debtor breached its promise when it failed to recognize the exclusive nature of the services provided by Creditors and failed to utilize the Creditors as its exclusive source of the goods and services for that local. (Backie Affidavit – **Exhibit 1**).

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI  48605-3197   (989) 752-1414

this site which are contained within the Ancon invoices. (Backie Affidavit – **Exhibit 1**, See also **Exhibit 3**).

### III.  EXPENDITURES    MADE    IN    RELIANCE    UPON    DEBTOR'S REPRESENTATIONS - H.E. SERVICES FLINT MANUFACTURING DIVISION.

11.    Prior to opening the operation of the H.E. Services Flint Manufacturing Division, H.E. Services had been awarded by Debtor a number of production and assembly jobs at plant locations in Saginaw, Michigan. (Backie Affidavit – **Exhibit 1**).  These programs were presented to H.E. Services through the years 1997 through 1999. (Backie Affidavit – **Exhibit 1**).  Included in these commodities requested and purchased, were tie rods, flanges and lock modules. (Backie Affidavit – **Exhibit 1**).   The equipment and machinery was supplied by Debtor's Saginaw facility for this project and the quality control rating was always "excellent." (Backie Affidavit – **Exhibit 1**).

12.     In approximately October and November of 1999, Debtor made additional requests of H.E. Services. (Backie Affidavit – **Exhibit 1**).  Specifically, H.E. Services was asked by Debtor to provide several new parts and services namely "lower column bracket assemblies", "diamond size and assembly pump housings", "machine shift tubes", "machine PLT 2 aluminum side covers", "press pins to support housing", machine sides 600 gear side covers", and "assembly lock modules". (Backie Affidavit – **Exhibit 1**).  H.E. Services was also asked to produce the following with a high probability rating: "assembly of tilt housings" and "attainment of lock modules". (Backie Affidavit – **Exhibit 1**).

13.    Along with these programs were several additional projects with high volume production. (Backie Affidavit – **Exhibit 1**). Specifically, H.E. Services was required to give a "piece price" per given yearly volumes and Debtor's Saginaw facility was to supply all the machinery and tooling. (Backie Affidavit – **Exhibit 1**).  The next step was to establish a plant in the "Flint

6

area".[7] (Backie Affidavit – **Exhibit 1**). H.E. Services was also required as part of this promise and agreement, that they were to lease a building, provide a plant layout and to receive approval from Debtor's Management for the property which they were to lease. (Backie Affidavit – **Exhibit 1**). As a result, H.E. Services obtained Cooper Real Estate in Flint, Michigan, to find a suitable accommodation which would satisfy Debtor. (Backie Affidavit – **Exhibit 1**). Several buildings were looked at but were not approved by Debtor. (Backie Affidavit – **Exhibit 1**). When Debtor was requested to explain <u>why</u> these particular buildings were not suitable, Debtor's management's reply was, "we don't want this facility being too close to any union activity." (Backie Affidavit – **Exhibit 1**). Eventually, H.E. Services did get approval from Debtor on a building located at 5117 South Dort Highway, Flint, Michigan. (Backie Affidavit – **Exhibit 1**). The building, both office and manufacturing facilities, consisted of over 60,000 square feet of office and warehouse space, with additional parking and easements for driveways. (Backie Affidavit – **Exhibit 1**).

14.     Leasing terms for the building was for five years with an annual base rent of $227,950.00. (Backie Affidavit – **Exhibit 1**). This also required a security deposit of $25,000 triple net. (Backie Affidavit – **Exhibit 1**). H.E. Services took possession of the building on March 27, 2000. (Backie Affidavit – **Exhibit 1**).

15.     Next, H.E. Services was required to provide Debtor a plant layout, for purposes of installation of electrical buss-work, air compressors, air and water lines, warehouse space, quality and inspection areas, ample lighting and to relocate H.E. Services' personnel of higher

---

[7] The Debtor in enticing the establishment of a Flint Plant, explained its preferential treatment of minority corporations. (Backie Affidavit – **Exhibit 1**). Ultimately, Debtors provided the promised orders to non-minority competitors and paid the non-minority company for money per piece then the Debtor was paying the Creditors for the same piece. (Backie Affidavit – **Exhibit 1**). In fact, at the end of year one of the agreement the Creditors had only received thirty-three percent of the promised orders. (Backie Affidavit – **Exhibit 1**).

7

caliber into the building so as to supervise, facilitate and coordinate the operation. (Backie Affidavit – **Exhibit 1**). Many of H.E. Services' personnel were asked to drive an extra 100 miles per day to facilitate the Debtor's requirements. (Backie Affidavit – **Exhibit 1**).

16.     When Debtor's Saginaw facility was ready to ship equipment from Saginaw to Flint, H.E. Services obtained manufactured parts for the purpose of inspection. (Backie Affidavit – **Exhibit 1**). This request was made by H.E. Services as part of their due diligence and to ensure that the machines and tooling equipment being supplied by Debtor could indeed make the parts within specification (i.e. it appeared that the machines and tooling that Delphi was supplying to H.E. Services were very old and antiquated). (Backie Affidavit – **Exhibit 1**). This fact was later confirmed. (Backie Affidavit – **Exhibit 1**).

17.     Checking some of the units on H.E. Services Inspections Division's Zeiss Co-ordinate Measuring Machines, H.E. Services had found several dimensions to be out of specifications. (Backie Affidavit – **Exhibit 1**). Specifically, H.E. Services' engineers noted that these parts would be rejected (as being out of spec) and sent to a "containment level" as unusable parts, and H.E. Services specifically informed Debtor they did not want to take on these programs until it was decided who would repair the tooling and who would pay for it. (Backie Affidavit – **Exhibit 1**).

18.     When Steve Dawe of Debtor's Saginaw Purchasing group became aware of H.E. Services' concerns, and the fact that H.E. Services believed Debtor had previously misrepresented what they intended H.E. Services to do, Mr. Dawe began to immediately threaten H.E. Services' operations in Saginaw. (Backie Affidavit – **Exhibit 1**). He stated that regardless of any agreements on various purchase orders that he would remove all work, regardless of agreements, if Creditors did not comply with his demands. (Backie Affidavit – **Exhibit 1**). When

8

H.E. Services explained to Steve Dawe that they would be unable to run this facility based on the amount of volume that they were being provided, as opposed to promised, and that they needed more work or higher prices per unit, Mr. Dawe again threatened to pull all work from H.E. Services. (Backie Affidavit – **Exhibit 1**). After multiple meetings to try to establish a "win/win" solution, Mr. Dawe stated that his instructions were to, "pull the jobs if price increases were asked for." (Backie Affidavit – **Exhibit 1**). Making good on his threat, in July of 2003, Mr. Dawe had the equipment pulled from both H.E. Services' Saginaw and Flint plants and sent the business to non-minority companies including Prince Manufacturing, Alma Contech Manufacturing and Mariah Manufacturing Company. (Backie Affidavit – **Exhibit 1**). Like the problems pointed out by H.E. Services, the parts made by Prince and Mariah Manufacturing immediately fell into "Level II Containment." (Backie Affidavit – **Exhibit 1**). Interestingly, Mr. Dawe then hired H.E. Services to sort the parts from Prince Manufacturing. (Backie Affidavit – **Exhibit 1**). H.E. Services in line with their attempts to help facilitate Debtor's business relationships, sent a bill to Debtor as requested but they have still not been paid for this service as reflected in the Universal Inspection Invoices. (Backie Affidavit – **Exhibit 1**, See also **Exhibit 2**).

19.    H.E. Services' losses in sales because of the failure of Debtor to make good in its promises in the Flint location alone has caused losses to exceed $10,600,000.00 and amortized tooling repairs and accommodations exceeded $1,850,000.00. (Backie Affidavit – **Exhibit 1**).

**V.    EXPENDITURES MADE IN RELIANCE UPON DEBTOR'S REPRESENTATIONS - EX-CELL-O GRIDING MACHINE XJ690.**

20.    In early 1999 H.E. Services was approached by Mr. Bruce Waslusky, who was with Debtor's Purchasing Department in Saginaw. (Backie Affidavit – **Exhibit 1**). At the time he approached H.E. Services, he asked about a collaboration with Debtor on the purchase of a

9

grinding machine to produce spindle shafts. (Backie Affidavit – **Exhibit 1**). Essentially, the way
that the purchase was to work, is that Debtor would promise to purchase a certain number of
spindle shafts over a period of several years, and a portion of the purchases would be delegated
or designated towards the purchase of the machine. (Backie Affidavit – **Exhibit 1**). The machine
in question was a universal single spindle CNC (computer numerical control) ball track grinder,
which was to be built in Germany by EX-CELL-O. (Backie Affidavit – **Exhibit 1**). Based on
Debtor's assurances, Debtor would be issuing a purchase order for a set number of units. A
purchase order, number PO53B0028 to H.E. Services, was issued on December 14, 1999.
(Backie Affidavit – **Exhibit 1**). In return and in reliance thereon, H.E. Services issued its
purchase order to EX-CELL-O, PO53510057 on the same date, for the purchase of the machine.
(Backie Affidavit – **Exhibit 1**). The machine was to be delivered to Saginaw, Michigan, on
September 15, 2000, at a price of $621,696.00 to H.E. Services. (Backie Affidavit – **Exhibit 1**).

21.     The reason for the purchase was based not only on Debtor's promises to pay H.E.
Services Company back for its costs and servicing in the purchase of this product through
amortizing the cost of this machine over piece price, but also for the promised future economic
benefits to H.E. Services. (Backie Affidavit – **Exhibit 1**). Debtor assumed orders for this
machine at 7000 pieces per year. (Backie Affidavit – **Exhibit 1**). Debtor also set the conditions
and specifications for the machine with James Sundeck, a consultant to Debtor. (Backie
Affidavit – **Exhibit 1**). Also extraordinary, was Debtor's requirement of EX-CELL-O that the
machine be equipped with "Fanuc" controls as opposed to the "Siemen" controls that normally
came with such a machine. (Backie Affidavit – **Exhibit 1**). Debtor's interference and control
over EX-CELL-O on the actual design of this machine, precipitated many of the problems which
later occurred with the machine. (Backie Affidavit – **Exhibit 1**. Because of the problems

10

precipitated by Debtor on the EX-CELL-O project, a letter which was dated January 23, 2001, was sent to EX-CELL-O asking them for the following credits:

| | | |
|---|---|---|
| ▪ | Lost Business- | $ 80,010.00 |
| ▪ | Wasted trips to Germany | $ 18,500.00 |
| ▪ | Financial Commitments to Bank | $ 66,110.00 |
| ▪ | Employee Labor Costs | $ 43,200.00 |
| | **Losses at of 1-23-04** | **$207,820.00**[8] |

22. EX-CELL-O Corporation refused to reimburse the Creditors for the extra $207,820.00. (Backie Affidavit – **Exhibit 1**). Subsequently, it was learned that EX-CELL-O was contacted by Bruce Waslusky of Debtor's Saginaw Division. (Backie Affidavit – **Exhibit 1**). Mr. Waslusky indicated that EX-CELL-O should sue to get the machine back and that "he and Delphi" would "make a deal" with another vendor to facilitate obtaining the machine. (Backie Affidavit – **Exhibit 1**).

23. Even though this EX-CELL-O machine was in H.E. Services' possession, Mr. Waslusky took it upon himself to encourage EX-CELL-O Corporation to sue H.E. Services so that they could obtain and provide the machine to a hand-picked third party vendor for purposes of doing work for Delphi in Saginaw. (Backie Affidavit – **Exhibit 1**).

24. That instead of submitting orders for the above-mentioned parts to the Creditors, the Debtor instead submitted orders for those parts to a non-minority corporation, and paid the non-minority corporation more money per piece then Debtor was paying the Creditors for the same piece. (Backie Affidavit – **Exhibit 1**).

**PART THREE**

25. Prior to the Voluntary Petition for Bankruptcy, the Creditors had initiated a lawsuit against the Debtor seeking recovery for damages arising from Debtor's wrongful actions. A copy

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197  (989) 752-1414

of the Amended Complaint has been attached for the Court's convenience. (See Amended Complaint – **Exhibit 5**).

## I.    COUNT ONE – CREDITORS' 42 U.S.C. § 1981 CLAIM.

26.    The Creditors have alleged that the Debtor seek damages arising from contractual breaches on the basis of race discrimination. As the Court is aware, 42 U.S.C. § 1981 states in relevant part:

> [a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.[9] The Sixth Circuit has noted that Section 1981 exists as a federal remedy for unlawful discrimination:

> Section 1981 has been held to afford a federal remedy against discrimination on the basis of race in private employment contracts. Johnson v. Railway Express Agency, 421 U.S. 454, 459-460, 95 S.Ct. 1716, 44 L.Ed.2d 295.

Winston v. Lear-Siegler, Inc., 558 F.2d 1266, 1268 (6th Cir. 1977).

27.    As illustrated in the evidentiary statement as set forth above, evidence exists that the Debtor breached contractual obligations with the Creditors and, in at least some cases, in favor of non-minority competitors. Accordingly, the Creditors seek a recovery of all money damages permitted by statute. Specifically, the Creditors seek the following damages as set forth in their Amended Complaint:

---

[8] Essentially, Creditors were being improperly burdened with costs directly related to Debtor's improper modifications of the machine. (Backie Affidavit – **Exhibit 1**).
[9] Section 1981 has been extended to Corporate Plaintiffs with a racial identity. See Thinket Ink. Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053 (9th Cir. 2004).

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI  48605-3197  (989) 752-1414

93.

That as a result of Defendant's violations of section 1981, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

94.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

(Amended Complaint – **Exhibit 5**).[10]

## II.    COUNT TWO – CREDITORS' INNOCENT AND/OR NEGLIGENT MISREPRESENTATIONS.

28.    The Creditors also allege that the Debtor seeks to enforce the contracts which existed

between themselves and Debtor. The elements for innocent misrepresentation under Michigan

law includes the following:

> Claims for fraudulent misrepresentation require proof that (1) the defendant made a material representation, (2) it was false, (3) the defendant knew it was false when made, or made it recklessly, without knowledge of its truth and as a positive assertion, (4) it was made with the intention to induce reliance by the plaintiff, (5) the plaintiff acted in reliance upon it, and (6) the plaintiff thereby suffered injury. Temborius v. Slatkin, 157 Mich App 587, 597, 403 NW2d 821 (1986). A claim for "innocent" misrepresentation requires proof of the same elements except that the misrepresentation need not be made knowingly or recklessly. Innocent misrepresentation also requires proof of the additional element that the plaintiff's injury actually benefited the defendant. Id.

State-Williams Partnership vs. Gale, 169 Mich App 170, 178, 425 NW2d 756 (1988).

29.    As illustrated in the evidentiary statement as set forth above, evidence exists that the

Debtor innocently and/or negligently misrepresented its intentions with the Creditors.

Accordingly, the Creditors seek a recovery of all money damages permitted by Michigan law.

Specifically, the Creditors seek the following damages as set forth in their Amended Complaint:

102.

That as a result of Defendant's misrepresentation, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

---

[10] See 42 USC § 1981a.

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI 48605-3197 (989) 752-1414

103.

That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

(Amended Complaint – **Exhibit 5**).

III.    **COUNT    THREE    &    FIVE    –    CREDITORS'    FRAUDULENT MISREPRESENTATIONS.**

30.    The Michigan Court of Appeals in the case of <u>Phinney v. Perlmutter</u>, 222 Mich App 513,

525; 564 NW2d 532 (1997), has reiterated the elements for fraud:

> In order to prove fraud or misrepresentation, plaintiff had to show: (1) that Perlmutter made a material misrepresentation, (2) that it was false, (3) that Perlmutter knew it was false or made the promise recklessly without knowledge of its truth or falsity, (4) that Perlmutter made the promise with the intent that plaintiff would act on it, (5) that plaintiff acted in reliance, and (6) that plaintiff suffered damage. <u>Arim v. General Motors Corp.</u>, 206 Mich App 178, 195, 520 NW2d 695 (1994). A fraudulent misrepresentation may be based on a promise made in bad faith without intention of performance. <u>Hi-Way Motor Co. v. Int'l Harvester Co.</u>, 398 Mich 330, 337-338, 247 NW2d 813 (1976).

31.    The Court should note that unfulfilled promise to perform in the future is actionable under Michigan law where there is evidence that it was made with a present undisclosed intent not to perform. <u>Foreman v. Foreman</u>, 266 Mich App 132, 143, 701 NW2d 167 (2005), citing <u>Rutan v. Straehly</u>, 289 Mich 341, 348-349; 286 NW 639 (1930). Additionally, liability for fraud may be predicated on statements that relate to future events when the statements were intended to be and accepted as representations of fact that involved matters peculiarly within the knowledge of the speaker. <u>Foreman v. Foreman</u>, 266 Mich App 132, 143, 701 NW2d 167 (2005), quoting <u>Crook v. Ford</u>, 249 Mich 500, 504-505; 229 NW 587 (1930).

32.    As illustrated in the evidentiary statement as set forth above, evidence exists that the Debtor fraudulently misrepresented its intentions with the Creditors. Accordingly, the Creditors

14

seek a recovery of all money damages permitted by Michigan law. Specifically, the Creditors

seek the following damages as set forth in their Amended Complaint:

> 111.
> That as a result of Defendant's misrepresentation, Plaintiffs have suffered
> economic damages in excess of 20 Million dollars, exclusive of attorney fees,
> costs, and interest which the Plaintiffs further seek.
> 112.
> That Plaintiffs have also suffered non-economic loss including emotional distress,
> anguish, mortification, humiliation, and loss of pleasures of life.

(Amended Complaint – **Exhibit 5**).

## IV.    COUNT FOUR – CREDITORS' SILENT FRAUD.

33.    With regards to silent fraud, the Michigan Court of Appeals has described the nature of

silent fraud:

> A legal duty to disclose commonly arises from a circumstance in which the
> plaintiff inquires regarding something, to which the defendant makes a false or
> misleading representation by replying incompletely with answers that are truthful
> but omit material information. Id.

The Marble Cleary Trust vs. The Edward-Marlah Muzyl Trust, 262 Mich App 485, 500, 686

NW2d 770 (2004).

34.    As illustrated in the evidentiary statement as set forth above, evidence exists that the

Debtor withheld information when it owed a duty with the Creditors. Accordingly, the Creditors

seek a recovery of all money damages permitted by Michigan law. Specifically, the Creditors

seek the following damages as set forth in their Amended Complaint:

> 128.
> That as a result of Defendant's fraud based on a bad-faith promise, Plaintiffs have
> suffered economic damages in excess of 20 Million dollars, exclusive of attorney
> fees, costs, and interest which the Plaintiffs further seek.
> 129.
> That Plaintiffs have also suffered non-economic loss including emotional distress,
> anguish, mortification, humiliation, and loss of pleasures of life.

(Amended Complaint – **Exhibit 5**).

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI  48605-3197  (989) 752-1414

## VI.    COUNT SIX – CREDITORS' CLAIM OF PROMISSORY ESTOPPEL.

35.    The Michigan Supreme Court has explained the cause of action for Promissory Estoppel:

> "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

State Bank of Standish v. Curry, 442 Mich 76, 83; 500 NW2d 104 (1993), citing to Restatement

Contracts 2d §90 pg. 242, see also Ardt v. Titan Ins. Co., 233 Mich App 685, 692, 593 NW2d

215 (1999), and Mt. Carmel Mercy Hosp. v. Allstate Ins. Co., 194 Mich App 580, 589, 487

NW2d 849 (1992).

36.    The rational for enforcing promises has also been explained by the Supreme Court:

> Promissory estoppel developed to protect the ability of individuals to trust promises in circumstances where trust is essential. It is the value of trust that forms the basis of the entitlement to rely. (internal citation omitted).

State Bank of Standish v. Curry, 442 Mich 76, 83-84; 500 NW2d 104 (1993). In other words, not

every element to an agreement must be spelled out in the promise in order for that promise to be

enforceable under a theory of promissory estoppel as explained by the Michigan Supreme Court:

> This approach is consistent with the general rule of contract that, where the parties have left open some matters to be determined in the future, enforcement is not precluded if there exists a method of determining the terms of the contract either by examining the agreement itself or by other usage or custom that is independent of a party's mere "wish, will and desire." An enforceable agreement may be found "even though the determination is left to one of the contracting parties [as long as] he is required to make it 'in good faith' in accordance with [an] existing standard or with facts capable of objective proof." 1 Corbin, Contracts, § 95, p. 402.

State Bank of Standish v. Curry, 442 Mich 76, 89-90; 500 NW2d 104 (1993). The Michigan

Supreme Court has explained that a Court should also consider the following when considering

the promises:

16

Variables such as the nature of the relationship between the parties, the clarity of the representation, as well as the circumstances surrounding the making of the representation, are important to the determination of whether the manifestation rises to the level of a promise.

State Bank of Standish v. Curry, 442 Mich 76, 86; 500 NW2d 104 (1993).

37.     As illustrated in the evidentiary statement as set forth above, evidence exists that the

Debtor made certain promises which the Creditors relied upon to their detriment. Accordingly,

the Creditors seek a recovery of all money damages permitted by Michigan law. Specifically, the

Creditors seek the following damages as set forth in their Amended Complaint:

> 135.
> That as a result of Defendant's conduct, Plaintiffs have suffered economic damages in excess of 20 Million dollars, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.
> 136.
> That Plaintiffs have also suffered non-economic loss including emotional distress, anguish, mortification, humiliation, and loss of pleasures of life.

(Amended Complaint – **Exhibit 5**).

## VII.  COUNT SEVEN – CREDITORS' BREACH OF CONTRACT (UCC) CLAIM AGAINST DEBTOR.

38.     The Creditors also seek damages arising from contractual breaches in the context of the

sale of goods.[11] A contract for the sale of goods exists when a buyer offers to buy goods and a

seller accepts that offer. MCL § 440.2206, see also MCL § 440.2207. Acceptance occurs when

the seller through words or actions indicates in any reasonable manner that it intends to enter into

a contract under the terms proposed by the buyer. MCL § 440.2206, see also MCL § 440.2207.

Upon nonpayment of the goods, the Plaintiffs are entitled to seek damages arising from the

nonpayment. MCL § 440.2209.

---

[11] The Court should note that the Debtor has attached as Exhibit A to its statement of disputed issues a document which is not signed by either party (or anyone for that matter) and which was purportedly generated by Debtor on October 17, 2006. Clearly, this document is not a contract as asserted by the Debtor.

17

39.    As illustrated in the evidentiary statement as set forth above, evidence exists that the Debtor made certain agreements with the Creditors with regards to the sale of goods which the Debtor has subsequently breached. Accordingly, the Creditors seek a recovery of all money damages permitted by statute. Specifically, the Creditors seek the following damages as set forth in their Amended Complaint:

146.
That Plaintiffs are entitled to the price due under the contract together with any commercially reasonable charges, expenses the Plaintiffs incurred as a result of Defendant's breach.

147.
That as a result of Defendant's breach of contract, Plaintiffs have suffered economic damages in excess of $400,000, exclusive of attorney fees, costs, and interest.

(Amended Complaint – **Exhibit 5**).[12]

## VIII.    COUNT EIGHT – CREDITORS' BREACH OF CONTRACT CLAIM AGAINST DEBTOR.

40.    The Michigan Court of Appeals has explained the elements for a breach of contract cause of action:

The essential elements of a valid contract are the following: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." Thomas v. Leja, 187 Mich App 418, 422, 468 NW2d 58 (1991).

Hess v. Cannon Township, 265 Mich App 582, 592, 696 NW2d 742 (2005).

41.    As illustrated in the evidentiary statement as set forth above, evidence exists that the Debtor made certain agreements with the Creditors with regards to services which the Debtor has subsequently breached. Accordingly, the Creditors seek a recovery of all money damages

---

[12] See MCL § 440.2709 & MCL § 440.2710, See also Haken v. Scheffler, 24 Mich App 196; 180 NW2d 206 (1970).

18

permitted by Michigan law. Specifically, the Creditors seek the following damages as set forth in

their Amended Complaint:

### 157.

That Plaintiffs are entitled to the price due under the contract together with any commercially reasonable charges, expenses the Plaintiffs incurred as a result of Defendant's breach.

### 158.

That as a result of Defendant's breach of contract, Plaintiffs have suffered economic damages in excess of $400,000, exclusive of attorney fees, costs, and interest which the Plaintiffs further seek.

(Amended Complaint – **Exhibit 5**).[13]

## MEMORANDUM OF LAW

42.   Since the legal authorities relied on by Creditors are set forth herein, Creditors have not

filed a separate memorandum of law. Creditors reserve the right to file a separate memorandum

of law in reply to any response filed by Debtor.

## RESERVATION OF RIGHTS

43.   Claimants reserve the right to amend or supplement (i.) their filed Proof of Claims, (ii)

the documentary evidence filed in support of the Proof of Claims, (iii) this Supplemental

Response, and (iv) the evidentiary record in support of the Proof of Claims at a later date.

## WITNESSES THAT ARE UNAVAILABLE

44.   H.E. Services no longer employs any individuals, and, as such, no longer has any control

over said individuals. Due to the multifaceted nature of Creditors claims the Creditors anticipate

---

[13] See Jim Bob, Inc. v. Mehling, 178 Mich App 71, 443 NW2d 451 (1989), Lawrence v. Will Darrah & Assoc., 445 Mich 1, 516 NW2d 43 (1994); Earl Dubey & Sons, Inc. v. Macomb Concrete Corp., 81 Mich App 662, 266 NW2d 152 (1978); Tross v. HE Clark Co., 274 Mich 263, 264 NW 365 (1936); Dierickx v. Vulcan Indus., 10 Mich App 67, 158 NW2d 778 (1968), Kolton v. Nassar, 358 Mich 154, 99 NW2d 362 (1959); The Vogue v. Shopping Centers, Inc., 402 Mich 546, 266 NW2d 148 (1978); Joerger v. Gordon Food Serv., 224 Mich App 167, 568 NW2d 365 (1997); Fera v. Village Plaza, 396 Mich 639, 242 NW2d 372 (1976); Getman v. Mathews, 125 Mich App 245, 335 NW2d 671 (1983); Holton v. Monarch Motor Car Co., 202

THE MASTROMARCO FIRM, 1024 N. Michigan Avenue, P.O. Box 3197, Saginaw, MI  48605-3197  (989) 752-1414

seeking permission to call at the time of the hearing its former employees as identified in the accompanying affidavit as well as the attached invoices and supporting documentations along with Debtors agents as referenced in those same documents. All of the individuals will claim to have knowledge regarding the various transactions in which they are referenced.

## REPLIES

45.      Replies to this Supplemental Response should be made to (The Mastromarco Firm, 1024 North Michigan Avenue, Post Office Box 3197, Saginaw, Michigan 48605-3197, Attn: Victor J. Mastromarco, Jr.

## RELIEF SOUGHT

46.      Wherefore, the Creditors again request that this Honorable Court award the monies owed which have been requested in the Amended Complaint which has been previously submitted to this Court as an attachment to Creditors' Proofs of Claims.

Dated:   March 26, 2007

Respectfully submitted,

THE MASTROMARCO FIRM

s/ Victor J. Mastromarco, Jr.
Victor J. Mastromarco, Jr. (P34564)
Attorney for Creditors
1024 N. Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414
vmastromar@aol.com

---

Mich 271, 168 NW 539 (1918); Earl Dubey & Sons, Inc. v. Macomb Concrete Corp., 81 Mich App 662, 266 NW2d 152 (1978); Huler v. Nassar, 322 Mich 1, 33 NW2d 637 (1948).

Victor J. Mastromarco, Jr. (Mich Bar No P34564)          Hearing Date: April 27, 2007
THE MASTROMARCO FIRM                                     Time:  10:00 a.m. (Eastern Standard)
Counsel to H.E. Services Company &
Robert Backie
1024 North Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re:

DELPHI CORPORATION, et al.,

                    Chapter 11
                    Case No. 05-44481 (RDD)
                    (Jointly Administered)

Debtors.

---

## CERTIFICATE OF SERVICE

Victor J. Mastromarco, Jr. being duly admitted to practice before the Southern District of

New York, certifies that on the 26th day of March 2007, I caused service of the Supplemental

Response to the above-captioned Debtors' Third Omnibus Claims Objections by overnight

courier on the parties listed below:

Skadden, Arps, Slate, Meagher & Flom
Four Times Square
New York, New York 10036
Attn:   Kayalyn A. Marafioti, Esq.

Skadden, Arps, Slate, Meagher & Flom
333 West Wacker Drive
Suite 2100
Chicago, Illinois 60606
Attn:   John Wm. Butler, Jr., Esq.
        John K. Lyons, Esq.
        Sarah J. Platt, Esq.
        Courtney E. VanLonkHuyzen, Esq.

1

Dated:  March 26, 2007

s/ Victor J. Mastromarco, Jr.
Victor J. Mastromarco, Jr. (P34564)

2