# BACKIE AFFIDAVIT

# EXHIBIT 1

Victor J. Mastromarco, Jr. (Mich Bar No P34564)
THE MASTROMARCO FIRM
Counsel to H.E. Services Company &
Robert Backie
1024 North Michigan Avenue
Post Office Box 3197
Saginaw, Michigan 48605-3197
(989) 752-1414

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:

DELPHI CORPORATION, et al.,

Debtors.

Chapter 11
Case No. 05-44481 (RDD)
(Jointly Administered)

### AFFIDAVIT OF ROBERT BACKIE

STATE OF MICHIGAN      )
                       ) ss
COUNTY OF SAGINAW      )

I, Robert Backie, being first duly sworn, state as follows based upon my personal knowledge:

1. I am over the age of 18.

2. I am the CEO for H.E. Services Company.

3. I am a Native American Chippewa Indian, and I am the majority shareholder of H.E. Services Company.

4. H.E. Services Company is a Michigan Corporation in good standing.

5. H.E. Services Company was incorporated in 1982.

1

6. H.E. Services Company consists of several divisions including a H.E. Services Engineering and Testing Division, a Universal Tool Division, Universal Inspection Division, Universal Manufacturing Division, H.E. Services Engineering Division and an Ancon Prototype & Machine Division.

7. H.E. Services Company's facilities included a facility in Flint, Michigan.

8. I was encouraged by Debtor to obtain minority status for my company with the promise from Debtor that my company would be given favorable status by Debtor pursuant to its internal policies.

9. In fact, I did obtain minority status for H.E. Services Company, and it is in fact certified by the United States Small Business Administration as a firm owned and operated by socially and economically disadvantaged individuals eligible to receive federal contracts under the Small Business Administration's business development program.

10. Debtor is not a minority corporation.

## UNPAID INVOICES

11. With regards to my company's Universal Inspection Division, the invoices and supporting documentation from H.E. Services Company shows moneys owed by Debtor on services and goods which were performed and provided to Debtor and has been attached to the supplemental response as **Exhibit 2**.

    A. A small portion of the invoices contained within **Exhibit 2** are invoices that were initially sent to Prince Manufacturing

2

but which should have been submitted to Debtor for services which were performed by my company for Debtor. Those invoices were submitted to Debtor and have not been paid.

12. With regards to my company's Ancon Division, the invoices and supporting documentation from H.E. Services Company shows moneys owed by Debtor on services and goods which were performed and provided to Debtor and has been attached to the supplemental response as **Exhibit 3**.

13. With regards to my company's Engineering Division, the invoices and supporting documentation from H.E. Services Company shows moneys owed by Debtor on services and goods which were performed and provided to Debtor and has been attached to the supplemental response as **Exhibit 4**.

### JUAREZ, MEXICO

14. Debtor asked H.E. Services' Ancon Division to attend a series of meetings in Juarez, Mexico, through Debtor's agent Greg A. Novak along with other representatives from Debtor, to entice me and H.E. Services to open a facility to support Debtor's Delphi-Juarez facility.

15. At that time H.E. Services was Debtors' major source for prototypes.

16. H.E. Services was told by Debtor that the El Paso facility should be modeled after our Ancon prototype facility which was an approved minority source for Debtor.

17. Debtor also promised H.E. Services that if they built the facility in El Paso that they would be Debtors' exclusive supplier of prototype parts,

3

assembly, inspection and related services in that local.

18. At the urging of Debtor, H.E. Services Company organized a team of corporate executives to concentrate their efforts on the Delphi-Juarez program, including sending a H.E. Services representative to live in neighboring El Paso, Texas, for purposes of meeting Delphi-Juarez's demands.

19. Furthermore, and at Debtor's request, H.E. Services personnel made multiple trips to the El Paso, Texas area, including Tim Fortier (President of H.E. Services), Joe Stearns (V.P. of Manufacturing for H.E. Services), Eric Jacob (V.P. of Sales for H.E. Services), Joel Karwat (Director of Quality Control for H.E. Services), Patrick Harmon (Director of Manufacturing and Facilities for H.E. Services) and John Chisa (Manager of the Ancon Division for H.E. Services).

20. At the same time, I along with Mr. Richard Bolt (Senior Vice President of Republic Bank), scheduled a meeting with Mr. Jerry Haller and Debtor's purchasing staff to determine the validity of Delphi-Juarez's needs as well as the timing and financial responsibilities involved. This occurred in approximately in early 1999.

21. After having made our due diligence efforts to examine the Delphi-Juarez Facility, and also on the urging of Debtor's personnel, including Jerry Haller, the engineer in charge of the prototype area for Debtor, H.E. Services did construct a state of the art facility in El Paso, Texas, a few

4

miles from the border, and the Delphi-Juarez facility, for the purposes of achieving the Delphi-Juarez requested assistance.

22. H.E. Services was assured by a number of Debtor's representatives that if in fact H.E. Services were to make the financial commitment and establish the plant in El Paso, that they would be given the contracts to serve the needs of Debtor's new Tech Center.

23. Furthermore, specific information was given in the form of intended orders, purchases, etc., which further confirmed the promises made by Debtor concerning the Delphi-Juarez relationship with H.E. Services.

24. As a result of these confirmations, assurances and promises, Mr. Bolt of Republic Bank, gave the go-ahead to finance the project.

25. Soon thereafter, H.E. Services, in reliance upon Debtors' promises, built a "state of the art" machining and inspection facility in a leased site in El Paso, Texas.

26. The grand opening was attended by Debtors' personnel amid fanfare with local dignitaries.

27. At that point in time and based on the promises of Debtor and their principals, with regard to the Delphi-Juarez project, H.E. Services Company had an investment of over $1,350,000.00.

28. Ultimately the Debtor breached its promise when it failed to recognize the exclusive nature of the services provided by my company and failed to utilize my company as its exclusive source of the goods and services.

5

29. All this investment was subsequently lost due to the failure on the part of Debtor to meet the projected and promised revenues.

   A. This includes the expense of the A2 LA laboratory certification and inspection equipment which was never used, or if used, to a minimal extent.

   B. All such certification which was <u>required</u> by Debtor.

   C. Due to the lack of work and the failure of promises, the El Paso site was closed down in July of 2000.

30. Furthermore, Debtor refused to pay in a timely manner the delinquent invoices for this site. Unpaid invoices from project performed by my company at El Paso appear as part of the outstanding invoices in **Exhibit 3**.

### H.E.S. FLINT MANUFACTURING DIVISION

31. Prior to opening the operation of the H.E. Services Flint Manufacturing Division, H.E. Services had been awarded by Debtor a number of production and assembly jobs at plant locations in Saginaw, Michigan.

   A. These programs were presented to H.E. Services through the years 1997 through 1999.

   B. Included in these commodities requested and purchased, were tie rods, flanges and lock modules.

   C. The equipment and machinery was supplied by Debtor's Saginaw facility for this project and the quality control rating was always "excellent."

32. In approximately October and November of 1999, Debtor made additional requests of H.E. Services.

    A. Specifically, H.E. Services was asked by Debtor to provide several new parts and services namely "lower column bracket assemblies", "diamond size and assembly pump housings", "machine shift tubes", "machine PLT 2 aluminum side covers", "press pins to support housing", machine sides 600 gear side covers", and "assembly lock modules".

    B. H.E. Services was also asked to produce the following with a high probability rating: "assembly of tilt housings" and "attainment of lock modules".

    C. Along with these programs were several additional projects with high volume production. Specifically, H.E. Services was required to give a "piece price" per given yearly volumes and Debtor's Saginaw facility was to supply all the machinery and tooling.

33. As part of these requests, I along with my company was also asked to establish a plant in the Flint Michigan area. As part of this promise and agreement, I along with my company was told that we were to lease a building, provide a plant layout and to receive approval from Debtor's Management for the property which we were to lease.

34. The Debtor, in enticing my establishment of a Flint Plant, explained its

7

preferential treatment of minority corporations.

35. As a result, H.E. Services obtained Cooper Real Estate in Flint, Michigan, to find a suitable accommodation which would satisfy Debtor.

36. Several buildings were looked at but were not approved by Debtor. When Debtor was requested to explain <u>why</u> these particular buildings were not suitable, Debtor's management's reply was, "we don't want this facility being too close to any union activity."

37. H.E. Services was also required to provide Debtor a plant layout, for purposes of installation of electrical buss-work, air compressors, air and water lines, warehouse space, quality and inspection areas, ample lighting and to relocate H.E. Services' personnel of higher caliber into the building so as to supervise, facilitate and coordinate the operation.

38. Many of H.E. Services' personnel were asked to drive an extra 100 miles per day to facilitate the Debtor's requirements.

39. Eventually, H.E. Services did get approval from Debtor on a building located at 5117 South Dort Highway, Flint, Michigan.

   A. The building, both office and manufacturing facilities, consisted of over 60,000 square feet of office and warehouse space, with additional parking and easements for driveways.

   B. Leasing terms for the building was for five years with an annual base rent of $227,950.00. This also required a security deposit of $25,000 triple net.

40. H.E. Services took possession of the building on March 27, 2000.

41. It quickly became apparent (after my company had already committed to the Flint facility) that the Debtor had failed to provide my company with suitable equipment necessary to make the parts in the quantities promised by Debtor.

    A. When Debtor's Saginaw facility was ready to ship equipment from Saginaw to Flint, H.E. Services obtained manufactured parts for the purpose of inspection.

    B. This request was made by H.E. Services as part of their due diligence and to ensure that the machines and tooling equipment being supplied by Debtor could indeed make the parts within specification (i.e. it appeared that the machines and tooling that Debtor was supplying to H.E. Services were very old and antiquated).

    C. This fact was later confirmed when the equipment was utilized.

    D. Specifically, a checking some of the units on H.E. Services Inspections Division's Zeiss Co-ordinate Measuring Machines showed that several dimensions to be out of specifications.

    E. Specifically, H.E. Services' engineers noted that these parts would be rejected (as being out of spec) and sent to a

9

"containment level" as unusable parts, and H.E. Services specifically informed Debtor they did not want to take on these programs until it was decided who would repair the tooling and who would pay for it.

F. Debtor had previously promised, as part of the agreement to building the Flint facility, that the equipment they were providing would be suitable for the parts which were going to be made there at the prices my company was authorized to charge.

42. When Steve Dawe of Debtor's Saginaw Purchasing group became aware of H.E. Services' concerns, and the fact that H.E. Services believed Debtor had previously misrepresented what they intended H.E. Services to do, Mr. Dawe began to immediately threaten H.E. Services' operations in Saginaw.

43. Mr. Dawe stated that regardless of any agreements on various purchase orders that he would remove all work, regardless of agreements, if my company did not comply with his demands.

44. When H.E. Services explained to Steve Dawe that they would be unable to run this facility based on the amount of volume that they were being provided, as opposed to promised, and that they needed more work or higher prices per unit, Mr. Dawe again threatened to pull all work from H.E. Services.

45. After multiple meetings to try to establish a "win/win" solution, Mr. Dawe

10

stated that his instructions were to, "pull the jobs if price increases were asked for."

46. Making good on his threat, in July of 2003, Mr. Dawe had the equipment pulled from both H.E. Services' Saginaw and Flint plants and sent the business to non-minority companies including Prince Manufacturing, Alma Contech Manufacturing and Mariah Manufacturing Company.

47. Like the problems pointed out by H.E. Services, the parts made by Prince and Mariah Manufacturing immediately fell into "Level II Containment."

   A.  Mr. Dawe then hired H.E. Services to sort the parts from Prince Manufacturing. H.E. Services in line with their attempts to help rebuild its business relationship with Debtor agreed to sort the parts.

   B.  When my company sent a bill to Debtor as requested, Debtor has refused to pay those bills and those outstanding bills appear as part of **Exhibit 2** to the Supplemental Response.

48. Ultimately, Debtors provided the promised orders to non-minority competitors and paid the non-minority companies more money per piece then the Debtor was paying my company for the same piece and Debtor refused to pay my company the same amount.

49. It should be noted that at the end of year one of the agreement my company had only received thirty-three percent of the promised orders.

50. H.E. Services' losses in sales because of the failure of Debtor to make good in its promises in the Flint location alone has caused losses to exceed

11

$10,600,000.00 and tooling repairs and accommodations exceeded $1,850,000.00.

## EX-CELL-O GRINDING MACHINE

51. In early 1999 H.E. Services was approached by Mr. Bruce Waslusky, who was with Debtor's Purchasing Department in Saginaw. At the time he approached H.E. Services, he asked about a collaboration with Debtor on the purchase of a grinding machine to produce spindle shafts.

52  Essentially, the way that the purchase was to work, is that Debtor would promise to purchase a certain number of spindle shafts over a period of several years, and a portion of the purchases would be delegated or designated towards the purchase of the machine.

53. The machine in question was a universal single spindle CNC (computer numerical control) ball track grinder, which was to be built in Germany by EX-CELL-O.

54. Based on Debtor's assurances, Debtor would be issuing a purchase order for a set number of units. A purchase order, number PO53B0028 to H.E. Services, was issued on December 14, 1999.

55. In return and in reliance thereon, H.E. Services issued its purchase order to EX-CELL-O, PO53510057 on the same date, for the purchase of the machine.

56. The machine was to be delivered to Saginaw, Michigan, on September 15, 2000, at a price of $621,696.00 to H.E. Services.

57. The reason for the purchase was based not only on Debtor's promises to pay H.E. Services Company back for its costs and servicing in the purchase of this product through amortizing the cost of this machine over piece price, but also for the promised future economic benefits to H.E. Services.

58. Debtor assumed orders for this machine at 7000 pieces per year.

59. Debtor also set the conditions and specifications for the machine with James Sundeck, a consultant to Debtor.

60. Debtor also required of EX-CELL-O that the machine be equipped with "Fanuc" controls as opposed to the "Seimen" controls that normally came with such a machine. Fanuc is a General Motors affiliated company and Fanuc is a trade name.

61. Debtor's interference and control over EX-CELL-O on the actual design of this machine, precipitated many of the problems which later occurred with the machine.

62. Because of the problems precipitated by Debtor on the EX-CELL-O project, a letter which was dated January 23, 2001, was sent to EX-CELL-O asking them for the following credits:

     - Lost Business-                $ 80,010.00
     - Wasted trips to Germany       $ 18,500.00
     - Financial Commitments         $ 66,110.00
       to Bank
     - Employee Labor Costs          $ 43,200.00
       **Losses at of 1-23-04**      **$207,820.00**

13

63. Essentially, Creditors were being improperly burdened with costs directly related to Debtor's improper modifications of the machine.

64. EX-CELL-O Corporation refused to reimburse the Creditors for the extra $207,820.00.

65. Subsequently, it was learned that EX-CELL-O was contacted by Bruce Waslusky of Debtor's Saginaw Division.

66. Mr. Waslusky indicated that EX-CELL-O should sue to get the machine back and that "he and Delphi" would "make a deal" with another vendor to facilitate obtaining the machine.

67. Even though this EX-CELL-O machine was in H.E. Services' possession, Mr. Waslusky took it upon himself to encourage EX-CELL-O Corporation to sue H.E. Services so that they could obtain and provide the machine to a hand-picked third party vendor for purposes of doing work for Debtor in Saginaw.

68. It should be noted that the Debtor, instead of submitting orders for the above-mentioned parts to my company, sent those parts to a non-minority corporation and paid the non-minority corporation more money per piece then Debtor was paying my company for the same piece.

## DEMISE OF H.E. SERVICES COMPANY

69. In approximately May of 2004, H.E. Services closed its doors and ceased providing services and goods.

70. The reason for its closure was Debtors failure to follow through with its

14

agreements and promises as set forth in this affidavit as well as the invoices.

## ADDITIONAL DAMAGES SOUGHT

71. In addition to the economic losses set forth in the invoices and as set forth in this affidavit, I have also suffered non-economic damages in the form of extreme humiliation, emotion distress, mental anguish and destruction of my life style as a result of Debtors' discriminatory and unlawful actions.

72. I along with my company have also suffered attorney fees and costs for pursuing my claims in Federal District Court as well as this Court.

73. To the extent permitted by law, I believe the Court should award punitive damages for Debtors' outrageous conduct.

FURTHER, AFFIANT SAYETH NOT.

_____
ROBERT BACKIE

Subscribed and sworn to before me
on this 25th day of March, 2007.

_____
SHARON E. NAVARRE, Notary Public
Bay County acting in Saginaw County, MI
My Commission Expires 6-6-07

15