TOGUT, SEGAL & SEGAL LLP,       **HEARING DATE:**      **June 26, 2007**
Conflicts Counsel for       **HEARING TIME:**      **10:00 a.m.**
 Debtors and Debtors in Possession       **OBJECTION DEADLINE:**      **June 19, 2007 at 4:00 PM**
One Penn Plaza, Suite 3335
New York, NY  10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                         :
In re                        :          Chapter 11
                         :
     DELPHI CORPORATION, et al.,      :          Case No. 05-44481 (RDD)
                         :
                Debtors.      :          (Jointly Administered)
                         :
------------------------------------------------------------X

**FOURTH APPLICATION OF TOGUT, SEGAL & SEGAL LLP FOR AN
ALLOWANCE OF INTERIM COMPENSATION FOR SERVICES RENDERED AS
CONFLICTS COUNSEL FOR THE DEBTORS FOR THE PERIOD OCTOBER 1, 2006
THROUGH JANUARY 31, 2007 AND FOR REIMBURSEMENT OF EXPENSES**

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

       Togut, Segal & Segal LLP ("TS&S" or "Applicant"), as conflicts counsel for

Delphi Corporation ("Delphi") and the other above-captioned debtors and debtors in

possession (collectively, the "Debtors"), respectfully makes this application (the "Fourth

Application") for an allowance of interim compensation for professional services

rendered during the period of October 1, 2006 through and including January 31, 2007

(the "Fourth Interim Period"), and for reimbursement of expenses incurred in

connection with such services.  In support of this Application, TS&S states:

<u>**PRELIMINARY STATEMENT**</u>

       During the Fourth Interim Period, TS&S continued to provide legal

services to assist the Debtors including, without limitation, the settlement of setoff

claims which were asserted by customers and vendors who sought to withhold

payment of an aggregate of $13.5 million.  As part of Applicant's efforts to resolve these

claims during the Fourth Interim Period, Applicant helped the Debtors to identify and

collect more than $1.7 million of trade accounts receivable that were being withheld by

setoff claimants above the amount of their allowable setoff claims.  Since the Initial

Filing Date (defined below), Applicant has helped the Debtors collect more than $32

million of excess trade accounts receivable from setoff claimants and to settle more than

$121 million of setoff claims.  During the Fourth Interim Period, Applicant also helped

the Debtors to reach an agreement for the recovery of more than $9 million from a

master swap agreement counterparty which asserted setoff rights.  In addition, and as

more fully described below, TS&S continued to assist the Debtors with:  (i) the

enforcement of pre-petition supply agreements to ensure continued deliveries of

product for the Debtors' "just in time" inventory system;  (ii) the resolution of disputes

with certain vendors which demanded post-petition payment on account of pre-petition

obligations;  and (iii) the enforcement of rights pursuant to the Debtors D&O policy

(defined below).

## I.    FEES AND EXPENSES FOR WHICH ALLOWANCE IS SOUGHT

1.    This Application is made pursuant to section 331 of title 11 of the

United States Code (the "Bankruptcy Code"), Rule 2016(a) of the Federal Rules of

Bankruptcy Procedure, and the November 4, 2005 Order of the Court establishing

procedures for compensation and reimbursement of professionals, as amended (the

"Administrative Fee Order"), for an allowance of interim compensation for services

rendered to the Debtors during the Fourth Interim Period in the amount of $593,308,

and for reimbursement of expenses in the amount of $5,790.70.

2.      TS&S attorneys and paraprofessionals expended a total of 1,201.2[1]

hours during the Fourth Interim Period.  A schedule setting forth the number of hours

expended by the firm's partners, counsel, associates and paraprofessionals, their

respective hourly rates, and the year in which each attorney was admitted to practice is

attached as Exhibit "1."  A schedule specifying the type of expenses for which TS&S is

seeking reimbursement and the total amount of each category is attached as Exhibit "2."

To the extent that time or disbursement charges for services rendered or disbursements

incurred relate to the Fourth Interim Period, but are not processed until after the date of

this Application, TS&S reserves the right to request additional compensation and

reimbursement in a future application.

3.      TS&S maintains computerized records of the daily time slips

completed by all attorneys and paraprofessionals.  Preceding the time entries is a chart

listing the names, billing rates and time spent by each of the attorneys and

paraprofessionals rendering services on behalf of the Debtors.  In support of this

Application, copies of these computerized records, together with a computer generated

detailed itemization of the expenses incurred, have been filed electronically with the

Bankruptcy Court for the Southern District of New York (the "Court") as a supplement

to this Application and furnished to the service parties who are identified in the

Administrative Order.

4.      On April 26, 2006, TS&S filed its first application (the "First

Application") for an award of interim compensation in the amount of $789,874 and

---

[1]      Consistent with this Court's General Order M-151, Section E, Applicant has reviewed its monthly
invoices for the Fourth Interim Period and has deemed it appropriate to delete and/or correct
time entries by certain timekeepers, resulting in a reduction of Applicant's request for
compensation for the Fourth Interim Period by $631.50.  See Exhibit "3" annexed hereto.

reimbursement of expenses of $14,531.15 for the period of October 8, 2005 through and including January 31, 2006 (the "First Interim Period").

5.    On July 27, 2006, TS&S filed its second application (the "Second Application") for an award of interim compensation in the amount of $1,045,443.50 and reimbursement of expenses of $13,940.08 for the period of February 1, 2006 through and including May 31, 2006 (the "Second Interim Period").

6.    On December 5, 2006, TS&S filed its third application (the "Third Application," together with the First Application and the Second Application, the "Prior Applications") for an award of interim compensation in the amount of $776,175.50 and reimbursement of expenses of $4,879.63 for the period of June 1, 2006 through and including September 30, 2006 (the "Third Interim Period," together with the First Interim Period and the Second Interim Period, the "Prior Interim Periods").  Pursuant to an Order of the Court dated December 11, 2006, the hearing to consider the Prior Applications was scheduled for February 15, 2007.

7.    Pursuant to Orders dated February 15, 2007, TS&S was awarded: (i) $781,058 for legal fees and $14,531.15 for reimbursement of expenses requested in the First Application;  (ii) $1,036,627.50 for legal fees and $13,940.08 for reimbursement of expenses requested in the Second Application;  and (iii) $767,359.50 for legal fees and $4,879.63 for reimbursement of expenses requested in the Third Application.

8.    Pursuant to an Order of the Court dated December 11, 2006, the Debtors were authorized to pay all amounts held back during the Prior Interim Periods to applicants once they resolved objections and/or comments that were made to their respective fee applications by the Joint Fee Review Committee (the "Fee Committee") in this case.

9.      During the Fourth Interim Period, TS&S met with the Fee Committee and resolved all of the issues identified by the Fee Committee regarding the fee applications filed by TS&S for the Prior Interim Periods.  TS&S voluntarily reduced its requests for compensation and reimbursement of expenses for the Prior Interim Periods and will be paid all of the amounts previously held back during the Prior Interim Periods.

10.      Other than the payments made by the Debtors to TS&S for fees and expenses incurred during the Prior Interim Periods pursuant to the Administrative Fee Order, as amended, and disclosed in the Prior Applications, and those payments described below made during the Fourth Interim Period in accordance with the terms of the Administrative Fee Order, TS&S has not received payment of compensation or reimbursement of expenses in this chapter 11 case.

11.      Pursuant to the Administrative Fee Order, TS&S submitted four monthly invoices during the Fourth Interim Period:  (i) for October 1, 2006 through October 30, 2006 in the amounts of $121,887.50 for fees and $486.19 for expenses;  (ii) for November 1, 2006 through November 30, 2006 in the amounts of $145,779 for fees and $2,117.52 for expenses;  (iii) for December 1, 2006 through December 31, 2006 in the amounts of $118,579 for fees and $2,578.89 for expenses;  and (iv) for January 1, 2007 through January 31, 2007 in the amounts of $207,442 for fees and $608.10 for expenses.

12.      As of the date hereof and in accordance with the Administrative Fee Order, TS&S has received payment from the Debtors representing 80% of its fees and 100% of its expenses through and including the period of November, 2006.  TS&S has not yet received any payments from the Debtors for fees and expenses for services rendered during December 2006 and January 2007.

13.     As confirmed by the Certification of Neil Berger, a member of

TS&S, attached as Exhibit "4," all of the services rendered by TS&S during the case for

which interim compensation is sought herein were rendered for and on behalf of the

Debtors in connection with their chapter 11 cases.

## II.    RETENTION OF TS&S[2]

14.     TS&S was retained by the Debtors just prior to the Initial Filing

Date in October 2005 to serve as conflicts counsel and to work with the Debtors' lead

bankruptcy counsel, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden").  TS&S is

responsible for handling all bankruptcy-related matters where Skadden has an actual or

perceived conflict, and discrete tasks assigned by Skadden that can be more efficiently

handled by TS&S.  TS&S has not received a retainer.

15.     By Order dated November 4, 2005, the Debtors were authorized to

retain TS&S on a final basis (Docket No. 1034).

16.     Since its retention and through the Fourth Interim Period, TS&S

and Skadden have continued to carefully coordinate their efforts and their work is

complementary.[3]

17.     All of the work summarized in this Fourth Application for which

TS&S seeks interim compensation was performed efficiently, at the lowest cost to the

Debtors' estates, and with minimal duplication of services in an effort to keep the

administration expenses to a minimum.  TS&S staffed its projects in a manner that

would permit it to bill fewer hours than would have otherwise been possible.

---

[2]     A description of the Debtors' business operations and the commencement of the Debtors' chapter
11 cases is contained in the First Application and other pleadings filed in this Court.

[3]     A description of TS&S' qualifications to provide services to the Debtors is set forth at length in
the First Application, and that description is incorporated herein by reference.

### III.    SERVICES RENDERED BY TS&S
### DURING THE FOURTH INTERIM PERIOD

18.    All of the professional services provided by TS&S are set forth in TS&S' computerized time records, and the Court is respectfully referred to those records for the details of all of the work performed.

19.    Prior to the filing of the Debtors' chapter 11 cases, the Debtors and Skadden determined that a clear division of litigation-related duties was necessary to avoid potential conflicts that might have arisen had Skadden had been responsible for the resolution of all such matters.

20.    During the Fourth Interim Period, TS&S continued to take primary responsibility for representing the Debtors in the various matters, among others, that would not be addressed by Skadden including:

(a)    motions and demands made by creditors asserting setoff and/or recoupment rights pursuant to section 553 of the Bankruptcy Code and Paragraph "18" of this Court's Final DIP Financing Order, dated October 28, 2005 (the "DIP Order");

(b)    motions and demands by parties-in-interest for relief from the automatic stay pursuant to section 362 of the Bankruptcy Code (the "Automatic Stay");

(c)    issues related to the Essential Supplier Motion (as defined below), including the resolution of Orders to Show Cause addressing payments made to non-conforming suppliers;

(d)    issues concerning potential injunction litigation with various suppliers to prevent cessation of shipment of products necessary for uninterrupted manufacturing activities of the Debtors;

(e)    efforts to collect amounts due to the Debtors;  and

(f)    the commencement of an adversary proceeding on behalf of the Debtors to enforce coverage rights under one of their D&O Policies.

7

A.    **Setoff Issues**:

21.    As part of their negotiations regarding post-petition financing, the Debtors included a detailed mechanism in the DIP Order to enable the Debtors' suppliers to exercise setoff claims and/or recoupment rights regarding their pre-petition payables, subject to certain conditions.  Following the procedures contained in paragraph 18 of the DIP Order, a supplier may seek to exercise a setoff right that arose during the Debtors' ordinary course of business without such assertion being subject to section 362 of the Bankruptcy Code.[4]  Setoffs that are subject to paragraph 18 of the DIP Order may include claims arising out of, for example, pre-petition warranty and/or product recall, customer adjustments, customer rebates and allowances, overpricing, short shipments and credits for damaged goods.

22.    On January 5, 2006, this Court entered an Order authorizing the Debtors to, among other things, refinance their post-petition financing and pre-petition secured debt (the "Refinancing Order", together with the DIP Order, the "DIP Orders"). The procedures for the resolution of setoffs that were contained in paragraph 18 of the DIP Order are continued in Paragraph 16 of the Refinancing Order.

23.    Any claimant that seeks to exercise setoff rights must submit a written request with supporting documentation to the Debtors and the Official Committee of Unsecured Creditors (the "Committee") (with a copy to JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as Administrative Agent for the Debtors).  If within 10 business days after sending such request, unless the parties extend that time, the Debtors and any particular claimant have failed to agree on the allowed amount of a

---

[4]    Nothing contained herein is meant to modify the provisions of the DIP Order or any right or obligation of any party thereunder.

requested setoff, they may seek resolution of the matter through an agreed-upon mediator or the Court.  If the mediator cannot resolve the dispute within thirty days, the parties may submit the matter to binding arbitration.

24.     At the end of the Fourth Interim Period, 110 non-General Motors claimants had asserted one or more setoff claims aggregating approximately $150 million.  The Debtors received 10 new setoff demands seeking approximately $2 million during the Fourth Interim Period, and TS&S devoted substantial time assisting the Debtors with the continued resolution of the setoff and/or recoupment requests.

25.     During the Fourth Interim Period, Applicant worked with the Debtors and FTI Consultants, Inc. ("FTI"), the Debtors' financial advisors, to resolve 18 setoff demands which sought an aggregate of approximately $13.5 million.  None of the resolutions that TS&S negotiated during the Fourth Interim Period required Court intervention, mediation or arbitration.

26.     Moreover, Applicant assisted the Debtors in identifying setoff claimants who had been holding accounts payable for amounts exceeding their setoff demands.  Applicant obtained agreements with those setoff claimants and collected approximately $1.7 million of accounts receivable[5], while preserving all of the Debtors' rights to challenge such claimants' setoff rights and to pursue additional accounts receivable claims.  As described below, Applicant's efforts to resolve setoff disputes also helped the Debtors to collect more than $9 million from a master swap counterparty that sought to withhold payment while asserting setoff rights.

---

[5]     Since the Initial Filing Date, TS&S has assisted in the collection of more than $32 million of accounts receivable from setoff claimants.

27.     To effectively resolve these setoff demands, TS&S continued to (i) regularly communicate with the Debtors' personnel to facilitate their ability to obtain and analyze data needed to reconcile the amounts of the receivables against the payables owed to the setoff claimants;  (ii) assist in the claim objection/reconciliation process;  (iii) develop strategies for responding to setoff motions and prepare for possible litigation if settlement negotiations failed;  (iv) engage in negotiations with counsel for the setoff claimants;  and (v) conduct necessary legal and factual research regarding issues raised in the motions and letter demands.

28.     TS&S also continued to work with the Debtors to ensure that mutuality existed to prevent setoffs.  In instances where the amounts to be setoff have involved a pre-petition overpayment by the Debtors, TS&S has conducted necessary forensic/factual and legal research.

29.     During the Fourth Interim Period, TS&S continued to have primary responsibility for all of the unresolved setoff claims that have been asserted pursuant to the DIP Orders, except those made by General Motors.  Recognizing the number and size of setoff demands made by vendors and the relationship that setoff claims have to other areas of the Debtors' cases (such as claims reconciliation), it has been necessary for the Debtors, TS&S, Skadden and FTI to continue to communicate with each other regularly to know the status of the setoff demands.  TS&S provides periodic status reports to the Debtors, FTI and Skadden concerning progress made in the resolution of setoff claims.

30.     Throughout the Fourth Interim Period, the Debtors, TS&S and FTI participated in weekly status calls with the Debtors to review pending setoff demands and to help coordinate the participants' efforts.  During these calls, among other things, the parties:  (i) discussed new demands that the Debtors received (including an analysis

of the merits of each new demand);  (ii) monitored the status of the Debtors' and setoff

claimant's exchange of information to reconcile the accounts;  (iii) analyzed the factual

and legal issues implicated by the demands;  and (iv) developed uniform strategies on

behalf of the Debtors regarding each of the demands.  These calls have proven essential

in safeguarding the Debtors' interests because they have permitted TS&S to efficiently

address the setoff demands without duplicating the efforts of Skadden or the Debtors.

31.    TS&S' efforts to assist in the resolution of the setoff claims by

Barclays Bank, PLC ("Barclays Bank") is illustrative of TS&S' efforts in this area during

the Fourth Interim Period.

32.    On November 23, 2001, Delphi entered into a master swap

agreement (the "Master Agreement") with Barclays Bank.  On October 10, 2005,

Barclays Bank sent Delphi a Notice of Termination of the Master Agreement, which

constituted early termination thereof.  Section 6 of the Master Agreement requires

Barclays Bank to make a termination payment to Delphi upon the early termination of

the Master Agreement.

33.    On October 26, 2005, Barclays Bank sent Delphi a Statement of

Payment on Early Termination, pursuant to which Barclays Bank represented that it

owed Delphi $10,178,261.40 as the termination payment provided for by the Master

Agreement.  Barclays Bank later recalculated the amount due to Delphi as a result of the

early termination of the Master Agreement, and on November 14, 2005, Barclays Bank

sent Delphi an Amended Statement of Payment on Early Termination, revising the

amount that it owed Delphi to $9,044,399.41 (the "Termination Payment").

34.    Delphi made demand upon Barclays Bank for payment and

delivery of the Termination Payment.  In response, Barclays Bank asserted that it had a

right to withhold payment of all or part of the Termination Payment to protect its

alleged setoff rights on account of any indemnification payment obligations that may be owed to it by Delphi pursuant to, and in connection with: (i) the indemnity provisions of the Master Agreement; (ii) the pre-petition issuance of certain Delphi bonds (the "Bonds") by Barclays Capital Inc. ("Barclays Capital"), an affiliate of Barclays Bank; and (iii) claims that have been asserted against Barclays Capital in a class action filed in the Southern District of New York, styled *In re Delphi Corp. Securities Litigation, 1:05-cv-2637* (the "Litigation")[6].

35.    Applicant obtained, reviewed and analyzed the Master Agreement, correspondence and pleadings in the Litigation to determine whether the setoff right asserted by Barclays Bank was valid. Applicant also counseled the Debtors regarding these matters.

36.    Based upon Applicant's legal analysis and counsel, the Debtors asserted that they did not owe any indemnification obligation to Barclays Bank because, *inter alia*, Barclays Bank was neither an issuer of the Bonds nor was it named as a defendant in the Litigation, and the issuance of the Bonds by Barclays Capital was wholly unrelated to the Master Agreement and the parties' rights and obligations thereunder.

37.    Applicant engaged in extensive negotiations with Barclays Bank on behalf of Delphi and obtained an agreement from Barclays Bank for the return of the entire amount of the Termination Payment; Barclays Bank retained only the right to asset setoff rights, if any, as a non-exercising setoff claimant pursuant to the DIP Orders,

---

[6]    On February 6, 2006, the Litigation was consolidated with several other actions pending against Delphi and related entities and transferred to the United States District Court for the Eastern District of Michigan as part of the consolidated proceeding known as *In re Delphi Corporation Securities, Derivative and ERISA Litigation* (MDL No. 1725).

and the Debtors and the Committee retained all of their rights to contest any such claims.

38.     Applicant drafted and negotiated the terms of a settlement agreement with Barclays Bank and the Committee.  Moreover, Applicant prepared, filed and served a Motion for an Order pursuant to Bankruptcy Rule 9019 for approval of the settlement agreement with Barclays Bank.  The parties' settlement agreement was "So Ordered" by the Court on February 15, 2007, and Barclays paid the $9,044,399.41 Termination Payment to Delphi.

39.     The services provided by TS&S to assist the Debtors in the resolution of setoff claims has been highly beneficial and efficient:  during the Fourth Interim Period, 18 claims seeking to setoff approximately $13.5 million against trade receivables were resolved and concluded, and the Debtors collected more than $1.7 million of trade accounts receivable that were withheld by setoff claimants.  Moreover, Applicant assisted the Debtors to collect more than $9 million from Barclays Bank.  All of these results were achieved without litigation.

40.     Setoff demands continue to be asserted against the Debtors, and TS&S continues to assist the Debtors as they review, analyze and resolve demands.

**B.    Automatic Stay Issues:**

41.     During the Fourth Interim Period, TS&S continued to share responsibility in addressing contested motions filed by parties-in-interest for relief from the Automatic Stay.  To resolve these requests, TS&S:  (i) had telephone conferences with the Debtors' in-house attorneys and business representatives to discuss strategy for settlement and/or potential responses to the motions;  (ii) communicated with counsel for movants to discuss legal issues that were implicated by their clients' motions and attempted to negotiate consensual resolutions;  (iii) reviewed documents

13

provided by the Debtors and counsel to the movants (e.g., term sheets, contracts, related pleadings, etc.);  and (iv) performed legal research, when necessary.

**C.**   **Essential Supplier Issues/Orders to Show Cause**

42.   During the Fourth Interim Period, TS&S resolved the remaining Order to Show Cause against a vendor which received a post-petition payment on account of a pre-petition obligation.  During the Prior Interim Periods, TS&S filed eight Notices of Waiver and obtained corresponding Orders to Show Cause for the Debtors against Non-Conforming Suppliers for aggregate conditional payments of $3,512,006.76. TS&S has now achieved settlements in all of those matters on terms favorable to the Debtors.

43.   The Debtors' manufacturing facilities use a "just-in-time" supply method for components.  Consequently, the Debtors do not maintain a significant inventory (and in many cases, less than 24 hours worth) of parts supplied by their most important suppliers (the "Essential Suppliers").  Moreover, the Debtors rely on the "sole source" supply method, i.e., they purchase all of their requirements for a particular (and necessary) part from one supplier.  Accordingly, the Debtors depend upon frequent and, in many cases, daily shipments of components from the Essential Suppliers to keep their manufacturing facilities operating.

44.   The Debtors were concerned that the Essential Suppliers would exploit the Debtors' need for shipments by, among other things, demanding post-petition payment of pre-petition invoices.  Consequently, on the Initial Filing Date, the Debtors filed their Motion for an Order Authorizing Continuation of Vendor Rescue Program and Payment of Pre-petition Claims of Financially-Distressed Sole Source Suppliers and Vendors Without Contracts (the "Essential Supplier Motion").  Pursuant

to the Essential Supplier Motion, the Debtors sought permission to conditionally pay[7] pre-petition claims (the "Essential Supplier Claims") owing to certain of its suppliers that were "essential" to the uninterrupted function of the Debtors' business operations.

45.     In the Essential Supplier Motion, the Debtors demonstrated that the relief sought was immediate and critically necessary because the failure to pay the Essential Supplier Claims would cause the Essential Suppliers to withhold goods and/or services from the Debtors.  Without "sole source" supplies, the Debtors would suffer substantial delays and disruptions, and be unable to conduct business.  On October 13, 2005, the Court entered an Order approving the Essential Supplier Motion (the "Essential Supplier Order").

46.     Pursuant to the Essential Supplier Order, the Debtors were also authorized, but not directed, to waive (the "Waiver") the conditions outlined in the Essential Supplier Motion (e.g., the execution of a Trade Agreement) to conditionally pay the claim of a threatening supplier (the "Non-Conforming Supplier") subject to the procedures that are contained in the Essential Supplier Order.

47.     During the Fourth Interim Period, Applicant concluded negotiations to resolve the remaining Order to Show Cause, which was filed against Deutsch Dagan Ltd. ("Deutsch Dagan"), a Non-Conforming Supplier, for a conditional payment in the amount of $207,078.  As part of its efforts to settle this matter, TS&S: (i) conducted negotiations with counsel to Deutsch Dagan regarding the merits of the payment made to Deutsch Dagan and the legal issues implicated by its demand for payment;  (ii) participated in telephone conferences with the Debtors' personnel to

---

[7]     The Debtors explain in the Essential Supplier Motion that they would cause parties to enter into letter agreements (the "Trade Agreements") as a condition for payment of an Essential Supplier Claim.

discuss background and strategy; (iii) reviewed and analyzed documents provided by the Debtors regarding Deutsch Dagan's corporate structure and historical relationship with the Debtors; and (iv) performed legal and non-legal research to ensure that service of the Notice of Waiver and Order to Show Cause upon Deutsch Dagan, a German corporation located in Israel, was in compliance with the Hague Convention, and whether Deutsch Dagan had the necessary "minimum contacts" with the United States to be subject to the jurisdiction of the Court.

48.    Applicant and Deutsch Dagan reached a settlement and the parties negotiated the terms of a letter agreement to memorialize this settlement. Applicant prepared and submitted a Consent Order withdrawing the Order to Show Cause, which was entered by the Court on January 10, 2007. Applicant's efforts helped prevent the cessation of shipping by Deutsch Dagan, an important supplier of the Debtors, and also enabled the Debtors to achieve a benefit for their estates.

49.    Applicant filed eight Notices of Waiver and obtained corresponding Orders to Show Cause for the Debtors against Non-Conforming Suppliers for aggregate conditional payments of $3,512,006.76. Applicant achieved settlements in all of those matters on terms favorable to the Debtors, and without any contested hearings before this Court. The Debtors recovered approximately $3.3 million of cash and post-petition credit from Non-Conforming Suppliers with the assistance of Applicant and without the need for any active litigation before the Court.

**D.    Injunction Issues:**

50.    During the Fourth Interim Period, Applicant continued to prepare pleadings at the request of the Debtors and Skadden to enjoin suppliers who threatened to stop shipping parts, despite enforceable "sole source" contracts with the Debtors.

51.     Generally, the Debtors contracted with their suppliers to purchase parts at a specific time, which is often tied directly to the production run of a particular Original Equipment Manufacturer ("OEM") vehicle.  These requirements contracts generally take the form of purchase orders, which constitute the Debtors' requirements for a particular product over a specified period of time.  The Debtors' standard General Terms and Conditions (the "Terms and Conditions") are incorporated into these contracts.  The Terms and Conditions provide that if a supplier "commences any of the work or services which are the subject of this Contract, [supplier] will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification."  The Terms and Conditions also contain the supplier's acknowledgment that in the event of an actual, anticipatory or threatened breach of the contract, the Debtors are entitled to specific performance and injunctive or other equitable relief.

52.     During the Fourth Interim Period, certain suppliers threatened to stop shipping parts to the Debtors.  These suppliers asserted, among other things, that the price increases in raw materials made it unprofitable for them to continue to meet the Debtors' requirements.  The consequences of a supplier unilaterally stopping shipment of parts would have been catastrophic.  The Debtors' manufacturing facilities would be forced to shut down within a matter of days after the missed shipment.  Within one to two days after a shutdown of one of the Debtors' facilities, the Debtors' OEM customers would likely be forced to halt production of their products on one or more of their assembly lines.  A shutdown of even one assembly line of an OEM could cause the manufacturer millions of dollars of damages which would be asserted against the Debtors.

53.     Consequently, when it was required, Applicant prepared comprehensive pleadings against several suppliers that had threatened to stop shipments.  These pleadings sought temporary, preliminary and permanent relief to:  (i) enjoin the suppliers from breaching, terminating, or attempting to terminate the pre-petition requirements contracts between the suppliers and the Debtors;  and (ii) direct the suppliers to continue to perform under those contracts.  For each supplier, Applicant drafted a complaint, motion for a temporary restraining order, a memorandum of law, and a proposed Order.  Applicant was prepared to file those documents with the Court in the event that the Debtors were not able to negotiate acceptable business solutions with their suppliers and in that regard, litigation support was unavoidable.

54.     To date, the Debtors' negotiations with suppliers who threatened to stop shipments, with assistance from Applicant, have been successful.  No injunction pleadings have had to be filed, in part because the suppliers' knew that the Debtors and TS&S were prepared to seek expedited relief from this Court.

**E.     Accounts Receivable**

55.     Throughout the Fourth Interim Period, Applicant continued to assist the Debtors in their efforst to collect account receivable.

**i.     Askys Adversary Proceeding:**

56.     On or about March 11, 2003, Aksys Ltd. ("Aksys") and Delphi Medical Systems Colorado Corporation ("DMSCC") entered into a Contract Manufacturing Agreement (the "CMA") pursuant to which DMSCC sold and delivered certain medical machinery and provided certain manufacturing services to Aksys with an agreed upon price and value of $2,420,487 (the "Invoiced Amount").

18

57.    DMSCC mailed and/or transmitted one or more invoices to Aksys for the Invoiced Amount (the "Invoices").  Aksys did not dispute the Invoices.  By a letter dated March 16, 2006, DMSCC formally notified Aksys that Aksys was in violation of its contractual obligations to DMSCC based upon its failure to pay the Invoices.  On June 5, 2006, DMSCC made written demand upon Aksys for payment on the Invoices (the "June 5 Letter").

58.    Pursuant to the CMA, DMSCC also purchased and stored certain goods for Aksys (the "Stored Materials").  In 2004, Aksys deposited $3,408,813.23 with DMSCC to secure payment for the Stored Materials (the "Materials Deposit").  Applicant counseled DMSCC regarding its setoff and other rights to the Materials Deposit, and by a letter dated July 5, 2006 (the "July 5 Letter" and, together with the June 5 Letter, the "Letters"), DMSCC notified Aksys that the Materials Deposit had been fully setoff and depleted and that the CMA had been terminated based on Aksys' violation of its terms.

59.    Following the full depletion and application of the Material Deposit to the benefit of DMSCC in accordance with the CMA, Aksys continued to be liable to DMSCC for the Stored Materials in the amount of $1,588,089.38 (the "Stored Materials Balance").  Applicant assisted DMSCC to make written demand upon Aksys for payment on account of the Stored Materials Balance in the June 5 Letter.

60.    Aksys neither responded to the Letters nor made any payments to DMSCC on account of the Invoices or the Stored Materials Balance, which are past due and payable by Aksys to DMSCC in the aggregate amount of $4,008,576.38 (the "Receivable").  In the July 5 Letter, DMSCC demanded full payment of the Receivable.

61.    Settlement negotiations between the parties failed.  With Applicant's assistance, DMSCC analyzed its legal recourse against Akysys regarding

the Receivable. Consistent with instructions from DMSCC, Applicant prepared a Complaint against Aksys and on August 1, 2006, DMSCC commenced an adversary proceeding against Aksys (the "Aksys Proceeding") to: (a) compel the turnover and payment of the Receivable plus all interest accrued thereon from June 5, 2006 pursuant to section 542(b) of the Bankruptcy Code; and (b) disallow any claims in favor of Aksys in the Debtors' chapter 11 cases pursuant to Bankruptcy Code section 502(d).

62. On August 28, 2006, Aksys demanded that, in accordance with section 27 of the CMA, the issues raised in the Aksys Proceeding be decided pursuant to binding arbitration at the American Arbitration Association in Chicago, Illinois. Aksys also demanded that DMSCC voluntarily dismiss the Aksys Proceeding.

63. DMSCC agreed to the Aksys arbitration demand, but it did not agree to dismiss the Aksys Proceeding. The parties entered into a stipulation, which was "So Ordered" by the Court on October 24, 2006, and agreed to continue negotiations.

64. In a series of conversations between the parties in late November and early December 2006, Aksys indicated to DMSCC that it was financially distressed and not able to pay the entire amount of the Receivable. Applicant sought and obtained financial disclosure from Aksys following the negotiation and execution of a confidentiality agreement governing the review and use of such documents. Negotiations with Askys are ongoing.

**ii.      NYCH LLC d/b/a RCS Computer Experience Adversary Proceeding:**

65. In or about February, 2005, the Debtors began to supply satellite radios to NYCH LLC d/b/a RCS Computer Experience ("RCS") for resale. Prior to the Initial Filing Date, the Debtor sold satellite radios to RCS with a total invoice value of $349,615.31, but RCS paid only $95,508.83 in exchange for the radios.

66.     In the fall of 2005, the Debtors sent a demand letter to RCS demanding the immediate payment of all remaining amounts due and owing to Delphi. RCS failed to remit the requested payment to the Debtors.

67.     On November 6, 2006, Applicant commenced an adversary proceeding on behalf of the Debtors against RCS to recover $257,106.48, representing unpaid invoices for retail products that the Debtors sold to RCS.  RCS answered the complaint on January 8, 2007.

68.     During the Fourth Interim Period, Applicant conducted settlement negotiations with RCS, exchanged settlement offers and conducted informal discovery. Applicant continues to work with the Debtors and RCS to recover funds due and owing to the Debtors from RCS and to attempt to settle the adversary proceeding against RCS.

### iii.     Miscellaneous Accounts Receivable

69.     During the Fourth Interim Period, the Debtors asked TS&S to assist them in the collection of accounts receivable from various customers and shippers. TS&S worked with the Debtors to review and analyze foundation documents and information in support of these accounts receivable claims, and prepared and sent demand letters to account debtors.

70.     TS&S engaged in telephone conferences with numerous parties from whom the Debtors sought payment, and participated in status calls and conferences with the Debtors regarding those negotiations.

**F.     Insurance Issues:**

### i.     National Union Adversary Proceeding:

71.     On or about February 5, 2004, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") issued to the Debtors the Delphi Executive and Organization Liability Insurance policy number 931-88-56 (the "D&O

21

Policy") and the Delphi Employee Benefit Plan Fiduciary Liability Insurance, policy

number 931-88-61 (the "Fiduciary Policy). A dispute arose between the Debtors and

National Union regarding National Union's obligation to provide coverage for certain

fees and expenses that the Debtors incurred in connection with certain investigations by

the Securities and Exchange Commission ("SEC"). After settlement negotiations failed,

Applicant prepared and filed a Complaint on behalf of the Debtors for Declaratory

Judgment against National Union on January 31, 2007 (the "National Union

Complaint").[8]

　　　　72.    Pursuant to its obligations to its current and former officers,

directors and employees, and for its own defense, Delphi paid the reasonable fees, costs

and expenses charged by professionals that were retained in connection with the SEC

investigation. In addition, pursuant to the Debtors' obligations pursuant to their by-

laws, the Debtors advanced the reasonable costs and expenses charged by counsel for

certain of its current and former directors, officers and employees in connection with

the SEC investigation.

　　　　73.    In March of 2005, the Debtors announced that they intended to

restate certain of its filed financial disclosures (the "Restatement Announcement"). The

Restatement Announcement triggered the filing of numerous lawsuits against the

Debtors and certain of their current and former directors, officers and employees,

including securities fraud actions and derivative litigation (collectively, the "Securities

and Derivative Litigation") and Employee Retirement Income Security Act actions (the

"ERISA Actions").

---

[8]　　　　Nothing contained here is intended to constitute or may be construed to constitute a waiver of
any of the Debtors' rights, claims or defenses, all of which are expressly preserved.

74.    The Debtors retained and paid counsel to defend the Debtors and certain of its current and former directors, officers and employees in response to the Securities and Derivate Litigation and the ERISA Actions.  In addition, pursuant to the Debtors' obligations to its current and former directors, officers and employees, and subject to the Bankruptcy Court's Order dated October 8, 2005, the Debtors advanced the fees, costs and expenses of certain of their current and former directors, officers and employees in response to the Securities and Derivative Litigation and the ERISA Actions.

75.    Between October 14, 2005, when the SEC issued its first subpoena to a former officer of the Debtors concerning the allegations asserted in the SEC's formal order of investigation, and January 31, 2007, when the National Union Complaint was filed, the Debtors expended approximately $19 million to jointly defend itself and, pursuant to its obligations, certain of its current and former directors, officers, and employees, in response to the SEC investigation, the Securities and Derivate Litigation and the ERISA Actions.

76.    National Union has refused to reimburse the Debtors in full, or to pay on behalf of the Debtors and their directors, officers and employees, costs paid by the Debtors in excess of the retention under the D&O Policy.

77.    Accordingly, in late December 2006, after negotiations regarding the scope of National Union's obligations to the Debtors were unsuccessful, the Debtors asked Applicant to commence an adversary proceeding in the Bankruptcy Court for declaratory relief regarding National Union's obligations under the D&O Policy. Applicant coordinated with Delphi and Delphi's insurance counsel Neal, Gerber & Eisenberg LLP ("Neal Gerber") and prepared the National Union Complaint.

78.     During the Fourth Interim Period, Applicant reviewed documents and analyzed correspondence and conferred with Neal Gerber to frame and limit the issues for which declaratory relief was needed.  Additionally, Applicant reviewed the terms of the D&O Policy and the Fiduciary Policy in light of the allegations made by the SEC, and in the various complaints filed in the Securities and Derivate Litigation and the ERISA Actions, to ascertain that coverage was available to the Debtors in excess of the National Union coverage that had been provided to date.

**G.      Miscellaneous Matters Addressed by TS&S:**

79.     In addition to the matters discussed above, TS&S rendered services for, or on behalf of, the Debtors in connection with other miscellaneous matters during the Fourth Interim Period, such as:

<div style="margin-left:2em;">

(a)     reviewing various motions and other pleadings filed with the Court regarding case and project strategy;

(b)     participating in numerous (i) "task" and senior strategy calls;  and (ii) status and strategy meetings with the Debtors, the Debtors' professionals, and the Committee;

(c)     attending omnibus hearings and addressing various matters at such hearings;

(d)     attending meetings with the Debtors and the statutory committees in these cases;

(e)     preparing and regularly updating status charts for Debtors regarding assorted matters;

(f)     conferring with Skadden regarding the delegation of responsibilities of certain matters to TS&S to ensure no duplication of effort between the two firms;  and

(g)     frequently communicating with various third parties, including the Court, the United States Trustee, the Committee and individual creditors and other parties-in-interest concerning the status, conduct and administration of the Debtors' chapter 11 cases.

</div>

## IV.    THE COMPENSATION REQUESTED

80.    There are numerous factors to be considered by the Court in determining allowances of compensation.  *See, e.g.*, *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.), *cert. denied*, 431 U.S. 904 (1977);  *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991).  *See also In re Nine Associates, Inc.*, 76 B.R. 943 (S.D.N.Y. 1987);  *In re Cuisine Magazine, Inc.*, 61 B.R. 210 (Bankr. S.D.N.Y. 1986).

81.    The perspective from which an application for an allowance of compensation should be viewed in a reorganization case was aptly stated by Congressman Edwards on the floor of the House of Representatives on September 28, 1978, when he made the following statement in relation to section 330 of the Bankruptcy Code:

> [B]ankruptcy legal services are entitled to command the same competency of counsel as other cases.  In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11.    Contrary language in the Senate report accompanying S.2266 is rejected, and *Massachusetts Mutual Life Insurance Company v. Brock*, 405 F.2d 429, 432 (5th Cir. 1968) is overruled.    Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

124 Cong. Rec. H11,092 (daily ed. Sept. 28, 1978) (emphasis added).  *See also In re McCombs*, 751 F.2d 286 (8th Cir. 1984);  *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13 (Bankr. S.D.N.Y. 1991);  *In re Carter*, 101 B.R. 170 (Bankr. D.S.D. 1989);  *In re Public Service Co. of New Hampshire*, 93 B.R. 823, 830 (Bankr. D.N.H. 1988);  *In re White Motor Credit Corp.*, 50 B.R. 885 (Bankr. N.D. Ohio 1985).

82.    In awarding compensation pursuant to section 330 of the

Bankruptcy Code to professional persons employed under section 327, the Court must

take into account, among other factors, the cost of comparable non-bankruptcy services.

Section 330 of the Bankruptcy Code provides, in pertinent part, for payment of:

- reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional persons employed by such person; and

- reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1).

83.    As the court in *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13

(Bankr. S.D.N.Y. 1991), stated:

> With due recognition of the historical position of Bankruptcy Courts in compensation matters, we recognize that creditors have agreed to pay rates for retained counsel of their choice because of the needs of the particular case. One could posit other situations or cases where a presumption of prior informed judgment might not be as strong. Here, however, we have a multi-debtor, multi-committee case involving sophisticated creditors who have determined that the rates charged and tasks undertaken by attorneys are appropriate. We should not, and will not, second guess the determination of those parties, who are directed by Congress, under the Bankruptcy Code, to shape and resolve the case, and who are in fact bearing the cost. To do so, of course, would be to continue what Congress specifically intended to stop in 1978: Courts, instead of markets, setting rates, with the inevitable consequence that all the legal specialists required by the debtor or official committees would demur to participate.

*Drexel*, 133 B.R. at 20-21.

84.    The professional services rendered by TS&S have required

expenditure of substantial time and effort. During the Fourth Interim Period, TS&S

professionals and paraprofessionals recorded 1,201.2 hours in providing the required professional services for which TS&S seeks compensation.

85.     Time and labor devoted is only one of many factors to be considered in awarding attorney compensation.  The number of hours expended must be considered in light of (i) the amount involved and the results achieved to date, (ii) the novelty and difficulty of the questions presented, (iii) the skill requisite to perform properly the legal services, (iv) the preclusion of other employment on behalf of other clients, (v) the customary fee charged to a private client for the services rendered, (vi) awards in similar cases, (vii) time constraints required by the exigencies of the case, including the frequency and amount of time required to be devoted other than during regular business hours, (viii) the experience, reputation and ability of the attorneys rendering services, and (ix) the nature and length of the professional relationship with the client (the "Johnson Factors").  *See Johnson v. Georgia Highway Express*, 488 F.2d at 717-19 (enumerating factors to be considered in awarding attorneys' fees in equal employment opportunities cases under Title VII);  *In re First Colonial Corp. of America*, 544 F.2d at 1294 (applying the Johnson Factors in bankruptcy cases).

86.     The majority of the Johnson Factors are codified in section 330(a) of the Bankruptcy Code, and have been applied by various courts in making determinations that requested attorneys' fees constitute reasonable compensation.  It is well settled that the "lodestar method,"[9] as opposed to an application solely of the

---

[9]     Application of the "lodestar method" involves multiplying the number of hours reasonably expended on the case by the reasonable hourly rate of compensation for each attorney.  *See Shaw v. Travelers Indemnity Co. (In re Grant Assocs.)*, 154 B.R. 836, 843 (S.D.N.Y. 1993).  This method of calculating attorney fees is appropriate in light of section 330(a) of the Bankruptcy Code, which serves as a starting point, permitting bankruptcy courts, in their own discretion, to consider other factors, such as the novelty and difficulty of the issues, the special skills of counsel, and their results obtained.  *See In re Copeland*, 154 B.R. 693, 698 (Bankr. W.D. Mich. 1993).

Johnson Factors, is the best means of determining attorney fees in bankruptcy cases.[10] The Supreme Court, however, has clearly articulated that the "lodestar method" is presumed to subsume the Johnson Factors, as does section 330(a) of the Bankruptcy Code. *Delaware Valley I*, 478 U.S. at 563; *Cena's Fine Furniture*, 109 B.R. at 581.

87.    TS&S respectfully submits that application of the foregoing criteria more than justifies the compensation requested in this Fourth Application. The professional services rendered in these chapter 11 cases have been performed by attorneys with broad expertise and high levels of skill in their practice areas or specialty.

88.    At all times throughout the Fourth Interim Period, TS&S successfully avoided expensive litigation by brokering reasonable settlements among the parties. TS&S' efforts have therefore been of significant value to the Debtors and the creditors of these estates.

89.    TS&S has not sought to burden this Court by setting forth all of the services rendered to the Debtors and for the benefit of creditors. TS&S has reviewed all of its office files which indicate numerous legal situations and problems resolved over and above those detailed in this Fourth Application, and which are more fully summarized in the time sheet entries annexed hereto and made a part hereof which were contemporaneously prepared when the services were rendered.

---

[10]    *See, e.g., Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 483 U.S. 711 ("*Delaware Valley II*"), on remand, 826 F.2d 238 (3rd Cir. 1987); *Pennsylvania v. Delaware Valley Citizens Counsel for Clean Air*, 478 U.S. 546 (1986) ("*Delaware Valley I*"); *United States Football League v. National Football League*, 887 F.2d 408, 413 (2nd Cir. 1989), *cert. denied*, 493 U.S. 1071 (1990); *Lindy Bros. Builders Inc. v. American Radiator and Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973), *vacated on other grounds*, 540 F.2d 102 (3rd Cir. 1976); *In re Cena's Fine Furniture, Inc.*, 109 B.R. 575 (E.D.N.Y. 1990); *In re Drexel Burnham Lambert Group Inc.*, 133 B.R. 13, 21 (Bankr. S.D.N.Y. 1991).

90.    TS&S has devoted 1,201.2 hours of actual recorded time during the Fourth Interim Period resulting in time charges of $593,939.50 as reflected in Exhibits "1."

91.    This Interim Application reflects (a) a voluntary reduction by Applicant in connection with each monthly statement to (a) reflect the elimination of all fees related to any timekeeper who billed fewer than two total hours during the Fourth Application Period and (b) to correct a discreet billing error.  See Exhibit "3." Consequently, Applicant's request for compensation for the Fourth Interim Period equals $593,308.

92.    Throughout the Fourth Interim Period, TS&S sought to assign projects in this case to associates, law clerks, and paraprofessionals who could most efficiently and expeditiously handle them.  TS&S respectfully submits that the legal services reflected in the annexed time slip entries are fair and reasonable and are commensurate with the quality of services provided herein.

93.    In addition to the fees sought for legal services, TS&S has incurred $5,790.70 in out-of-pocket expenses during the Fourth Interim Period directly attributable to the representation of the Debtors.

94.    No part of the compensation to be received pursuant to this Application will be shared with any other person or firm, and no other agreements, either express or implied, to share any compensation received as attorneys for the Debtors has been, or will be, made by TS&S.

95.    Copies of this Application have been given to:  (i) the Debtors; (ii) counsel for the Debtors;  (iii) counsel for the Committee;  (iv) the United States Trustee;  (v) counsel for the agent under the Debtors' pre-petition credit facility;

(vi) counsel for the agent under the Debtors' post-petition credit facility;  and (vii) the Fee Committee.

## V.     CONCLUSION

**WHEREFORE**, TS&S respectfully requests that this Fourth Application be granted and that it be awarded an allowance of $593,308 for legal services rendered to the Debtors during the Fourth Interim Period, and $5,790.70 for reimbursement of expenses, and that the Debtors be authorized and directed to pay such amounts as may be just and proper.

Dated:    New York, New York
          March 28, 2007

                              TOGUT, SEGAL & SEGAL LLP,
                              Conflicts Counsel for the Debtors
                              and Debtors in Possession
                              By:

                              /s/ Albert Togut
                              ALBERT TOGUT (AT-9759)
                              NEIL BERGER (NB-3599)
                              Members of the Firm
                              One Penn Plaza, Suite 3335
                              New York, New York 10119
                              (212) 594-5000