1   THE COURT:  Please be seated.  Okay.  We're back on the record

2   in Delphi Corporation and in particular I'm going to give a

3
4   bench ruling on the debtors' objection to the proof of claim

5
6   filed by Mr. Joseph Reno.  As I generally do with fairly

7
8   lengthy bench decisions, I'll give it orally because I think

9
10  it's important for the parties to know the result right away,

11
    but I will review the transcript.  And I'll review it not only

12
13  for accuracy but also reserve the right to edit it if what came

14  out of my mouth, remarkably, didn't make sense and to correct

15  it, and that will be my final ruling.  But I will not change

16  the gist of my ruling.

17          The claim by Mr. Reno sets forth a number of theories

18  of recovery, but I should note first that today's hearing, by

19  agreement of the parties, was limited to the merits of those

20  theories, with the parties reserving to a subsequent hearing,

21  if necessary, a determination of damages in connection with any

22  claims that I find to be meritorious.

23          The theories all stem from the same common facts,

24  except the last one, which is a claim under ERISA for damages

25  resulting from delayed payment of pension benefits.  The

    claimant also makes a claim under COBRA, and obviously that

    claim itself does not derive from the facts that I'm going to

    go  through in a moment, but the debtors' defense does.

    Essentially, as both parties have stated, those facts pertain

    to Mr. Reno's termination as an employee of Delphi in March of

1   2004.  Mr. Reno contends that that termination was a wrongful

2   discharge in retaliation for his view expressed to his

3

4   supervisor, and ultimately to an in-house lawyer at Delphi,

5

6   that Delphi needed to take certain steps to correct a condition

7

8   in a waste water container tank, and that might exist in

9

10  another waste water container, and that, consequently, he has a

11

12  wrongful discharge claim and/or a claim under Ohio's

13  whistleblower statute because he was terminated in light of

14  Delphi's receipt of the letter informing Delphi of the waste

15  water container issue.

16        He also contends that Delphi did not comply with the

17  Fair Credit Reporting Act in the conduct of, and the provision

18  of information in connection with, Delphi's investigation of

19  him.  This is not only a claim but is also offered as evidence

20  to show the real motivation rather than the pretextual basis,

21  for Delphi's termination of Mr. Reno.

22        Delphi, on the other hand, contends that Mr. Reno was

23  fired not because of his environmental warning or the point of

24  view that he raised with his supervisor, and ultimately with

25  in-house legal staff, but rather because of information that

    Delphi learned pertaining to Mr. Reno's conduct on the job and

    in connection with an investigation of that conduct.

    Consequently, Delphi argues that his termination was not

    wrongful, but proper, and certainly was not retaliatory.  It

    contends that because Mr. Reno was properly terminated for such

1    reasons, it did not have a responsibility, under COBRA, to him

2    and that it also is not liable for the remaining cause of

3
4    action, which I have not yet described, which is a defamation

5
6    claim.

7
8            Finally, Delphi contends that the investigation that

9
10   it commissioned and the use of that investigation were not

11
     covered within the ambit of the Fair Credit Reporting Act and,

12
13   consequently, that there was nothing improper or actionable in

14   connection with the investigation, and, further, that no

15   inference can be drawn from any alleged impropriety under the

16   Fair Credit Reporting Act as to Delphi's motivation in

17   terminating Mr. Reno's employment.

18           As with most claims of this nature, the parties have

19   very different views as to the underlying facts.  They have

20   presented those facts in a written record before the Court in a

21   joint exhibit binder that includes witness declarations, as

22   well as the prior testimony of witnesses, and letters and e-

23   mails, which I've reviewed.

24           In light of the differences in the underlying

25   testimony and the nature of the claims here, it's important to

     delineate the burden of proof, which I think the parties

     generally agree upon.  As the claimant, Mr. Reno, has the

     ultimate burden of proof.  However his claim, in large measure,

     comes down to an assertion that the reason proffered for his

     termination by Delphi was and is merely a pretext.  Under those

1    circumstances the courts have developed a burden-shifting

2    regime which provides that, under the proper circumstances, by

3

4    showing a prima facie case of retaliation the claimant may

5

6    shift the burden to the defendant to articulate a legitimate

7

8    non-retaliatory reason for its employment decision.  That is,

9

10   the employer meets that burden by showing an alternative reason

11

     than the discriminatory one stated by the claimant, which the

12

13   claimant then may show was only a pretext.

14            In my view -- although, and I'll get to this in a

15   moment, at oral argument claimant may have been setting forth a

16   somewhat different burden-shifting argument -- once the

17   employer has come forward with a non-discriminatory reason for

18   firing the claimant, the claimant again has the ultimate burden

19   of proof.  The area of potential doubt is whether he meets that

20   burden by showing that it is more likely the case that the

21   claimant was fired for the discriminatory reason, or

22   alternatively, that he need show only that the non-

23   discriminatory reason articulated was not the only basis for

24   the termination, but, rather, there was a mixed motive,

25   including an improper one.  In the "pretext" cases, I believe

     that the burden is on the claimant to show that it is more

     likely that he or she was terminated for a discriminatory or an

     improper reason or a retaliatory reason.  See Manzer v. Diamond

     Shamrock Chemicals, 29 F.3d 1078 (6th Cir. 1994).  In a prior

     Title VII context, the latter view, however, was adopted by a

1    plurality opinion of the Supreme Court in <u>Price Waterhouse v.</u>

2    <u>Hopkins</u>, 490 U.S. 228 (1989), although, again, that was in a
3
4    Title VII context, not focusing on the pretextual argument that
5
6    the claimant is making here.
7
8            In any event, I find that Delphi's articulated reason
9
10   was not a mere pretext and that Mr. Reno has not proven an
11
     improper or retaliatory reason for Delphi's firing him.
12
13           Let me proceed through the factual record and address

14   first the wrongful discharge claims, since I believe that

15   consideration of the other claims, with the exception of the

16   ERISA claim, all flow from that analysis.

17           First, it should be noted that Mr. Reno asserts

18   claims under both Ohio's whistleblower statute and then,

19   second, or alternatively, under Ohio common law that his

20   termination violated Ohio public policy as arising from his

21   having rasied a legitimate workplace concern regulated by

22   federal and state environmental laws dealing with hazardous

23   wastes.

24           The Ohio whistleblower statute should be addressed

25   first, because, at least based on my reading of it, as well as

     the cases interpreting it, it contains procedural requirements

     that obviously do not exist under the Ohio common law wrongful

     termination cases, and I find that Mr. Reno did not comply with

     those procedural requirements, and, under the case law

     interpreting Ohio Rev. Code Ann. § 4113.52(A)(1)(a), he would,

1  therefore, not have a claim.  The statute requires that an

2  employee (a) orally notify his or her supervisor, or other

3
4  responsible officer of the employer, of the alleged violation,

5
6  and (b) subsequently file with that person a written report

7
8  that provides sufficient detail to identify and describe the

9
10  violation.  And then it provides for a mechanism, if those

11
   requirements have been satisfied, for the employer to correct

12
13  the violation or make a reasonable and good faith effort to

14  correct it within twenty-four hours after the oral notification

15  or the receipt of the written report, whichever is earlier.

16  And then it provides an opportunity for the employee to seek

17  appropriate redress.

18       The debtors contend that Mr. Reno did not comply with

19  this provision in two respects.  One I don't accept.  Although

20  it's somewhat of a close call, I believe he did set forth in

21  sufficient detail the environmental concerns or hazardous

22  substance concerns that he claims, legitimately, existed with

23  respect to the container tanks.  However, procedurally he did

24  not provide oral notification of those conditions to the person

25  to whom he then sent the written report.  That is, he informed

   Mr. Gooding, his supervisor, orally of the conditions and

   subsequently mailed his letter to Mr. Walle, the in-house

   counsel at Delphi.

        Given the timing constraints and specific language of

   this statute, that means that he has not complied with it and

1    he doesn't have a cause of action under it.   See Haney v.

2    Chrysler Corp., 699 N.E.2d 121, 122 (Ohio Ct. App. 1997).

3
4              There are other potential defenses to this cause of
5
6    action, but I believe that they are best dealt with in the
7
8    context of the other wrongful discharge claim raised by Mr.
9
10   Reno, which is that he was suspended or terminated contrary to
11
     Ohio public policy.   That public policy claim doctrine was
12
13   adopted by the Ohio Supreme Court in Greeley v. Miami Valley

14   Maintenance Contractors, Inc., 551 N.E.2d 981 (Ohio 1989).

15   It's an exception to Ohio's general at-will employment

16   standard, which permits an employer to terminate an employee at

17   will for any cause at any time whatsoever.

18             In order to have a claim for discharge in violation

19   of public policy under Ohio law, the claimant must show (1) the

20   existence of a clear public policy (that is, the "clarity"

21   element);  (2) dismissal under the circumstances would

22   jeopardize that policy (the "jeopardy" element); (3) dismissal

23   related to a public policy (the "causation" element); and (4)

24   lack of an overriding business justification for the employer's

25   action.   The debtors do not dispute the "clarity" or "jeopardy"

     elements laid out in the Ohio cases, including Painter v.

     Graley, 639 N.E.2d 51 (Ohio 1994) and Urban vs. Osborne Mfg.,

     Inc., 847 N.E.2d 1272 (Ohio Ct. App. 2006).   They do, however,

     dispute causation, arguing strenuously that Mr. Reno was not

     dismissed because of his championing the public policy of the

1   State of Ohio and the United States to have an environmentally

2   clean and safe workplace, but, rather, for a wholly separate

3
4   reason.

5
6          They also contend, relatedly, that the overriding

7
8   business justification for his termination was, again, that his

9
10  personal conduct was in violation of Delphi's policies, as

11
    opposed to his disagreement with Mr. Gooding over the proper

12
13  maintenance and protection of the container tanks and the

14  surrounding environment or his making that concern known to Mr.

15  Walle in his letter.

16          I've been through the factual record, and, as is

17  often the case with claims of this kind, there is no smoking

18  gun and the claimant relies upon the Court's drawing inferences

19  from circumstantial evidence.  On its face, that circumstantial

20  evidence, to my mind, does set forth a prima facie case, in

21  that on the very day that Mr. Reno had his dispute with Mr.

22  Gooding about the container tanks he was put on administrative

23  suspension, albeit with full pay and benefits.

24          Moreover, he was terminated just short of a month

25  thereafter, after he had notified Mr. Walle on March 2, 2004 of

    his concern about the container tank's condition as well as his

    concern about being put on suspension.  Between February 20th,

    when he was suspended, and the date of his termination, that

    letter on its face is one of only two significant factual

    developments.  The other is some additional investigatory work

1   done by the third party investigator, Mr. Brown, that the

2   debtors had hired to investigate a situation that I will talk

3
4   about in a moment.  But those facts alone, in my mind, raise

5
6   enough of a concern to shift the burden to Delphi.

7
8       I find, however, based on my review of the factual

9
10  record, including not only the declarations of Ms. Patrick and

11
    Mr. Brown but also the depositions and prior testimony and

12
13  witness statements, that Delphi has met its burden to show that

14  it was not motivated by the hazardous waste or environmental

15  issues that Mr. Reno raised with his supervisor and then

16  disclosed to Mr. Walle, or by Mr. Reno's having raised those

17  issues.  And, having shifted the burden back to Mr. Reno, I do

18  not believe that Mr. Reno has overcome the evidence that

19  supports my conclusion that Delphi terminated him for separate

20  reasons that were legitimate and unrelated to retaliation over

21  Mr. Reno's having aired his views as to the container tanks.

22      Specifically, it became known to Delphi that a

23  dumpster owned by one of its contractors had been placed on the

24  Dayton property, or the Dayton site, containing garbage and

25  debris that was not Delphi's.  In and of itself that was a

    fairly innocuous event; however, it was of enough concern,

    apparently, to cause Mr. Reno's boss, Mr. Gooding, to arrange

    for a third party investigator, Mr. Brown, to determine the

    circumstances under which the dumpster came to the site.  The

    reason for that concern appears to be that it was very quickly

1   assumed, and assumed correctly, that the debris in the dumpster

2   originated with Mr. Reno.  Delphi has a clear policy against

3
4   conflicts of interest and, separately and distinctly,

5
6   soliciting gifts or favors from suppliers or vendors or

7
8   customers.  And there was an appearance that that may have

9
10  occurred here.  All of this occurred well before the date that

11
    Mr. Reno says he first learned of the waste water treatment

12
13  container issue, which he says was February 13, 2004.

14          The investigation started two weeks before then.  And

15  the investigator interviewed Mr. Reno on February 16th, as well

16  as other parties involved.  As a result of that investigation

17  process Mr. Brown concluded that Mr. Reno had obtained a favor

18  from Troy Calton, an employee of a company called Onyx that

19  works directly for, as a contractor, Mr. Reno, to remove

20  material from his yard and/or house.  Brown also learned that

21  this arrangement may well have been a secret one, and that it

22  was, at least, not cleared in advance with Mr. Reno's

23  superiors, and, perhaps as importantly, that in the process of

24  the investigation Mr. Reno was not forthcoming as to the facts

25  of the relationship and had sought out from his subordinates

    witness statements in connection with the relationship, which

    he held in reserve.  All of this led Mr. Brown and also

    Delphi's personnel officers to conclude that Mr. Reno had

    violated both Delphi's no-favors policy and the conflict of

    interest policy, as well as potentially put undue pressure on

1   subordinates and perhaps asked them to remember facts that they

2   could not remember or that were not, in fact, the truth.

3
4        The record, I should be clear, is not one where I can
5
6   ultimately decide whether Mr. Brown's conclusions were right or
7
8   wrong.  But, beyond that, the claimant contends that they were
9
10  so clearly incorrect that Delphi could not credibly be said to
11
    have relied on them as a basis for his termination, which is a
12
13  proper inquiry for me to make.

14       I'll note first in considering the conclusions that

15  Mr. Brown made that I do credit his conclusions with regard to

16  the underlying arrangements between Calton and Mr. Reno.  Mr.

17  Calton changed his story in a second interview with Mr. Brown,

18  in a way that I believe indicated that the second version is

19  the correct version.  It is, moreover, one that Mr. Calton's

20  subsequent deposition in key respects corroborates, namely that

21  the dumpster was filled and taken under an arrangement with Mr.

22  Reno, with Mr. Reno's knowledge and, in fact, at least as

23  Calton stated in his deposition, Calton's implied assumption

24  that ultimately the cost would be run through Delphi's

25  accounting system.  To my mind, having reviewed Delphi's

    Foundation of Excellence Policy, at Exhibit 17, whether

    ultimately Mr. Reno felt he was going to pay, in full, for this

    dumpster arrangement is less important than the fact that he

    engaged in it at all with Mr. Calton without disclosing it to

    his supervisors.

1          I also believe that Mr. Reno's not being forthcoming

2     about the facts of this relationship was fairly well

3
4     established through Mr. Brown's investigation.  And that, in

5
6     turn, lays some doubt on the witness statements that Mr. Reno

7
8     got out of his subordinates, particularly in light of the facts

9
10    that one of them did not provide a witness statement although

11
12    Mr. Reno asked him to do so -- that individual being the one

13    who was apparently no longer working for Delphi -- as well as

14    Mr. Calton's testimony that neither of the individuals who did

15    provide statements was present when he had the discussion with

16    Mr. Reno about the dumpster.

17          Ms. Patrick states in her affidavit, and I believe

18    that the record corroborates this, that Mr. Reno was put on

19    suspension before she, or anyone making that decision,

20    understood his contention about the container tanks, and that

21    it was a coincidence that Gooding gave him this news on the

22    very day that they had their argument about the tanks.

23          That moves the analysis, therefore, to the subsequent

24    period.  And I think that this is where Mr. Reno and his

25    counsel properly turned their attention.  Their argument is

      that, in essence, the work that Brown did and that led Delphi

      to suspend Mr. Reno was not sufficient to lead to his

      termination and could not be viewed to be sufficient to lead to

      his termination, but, rather, that it was the subsequent

      development of Reno's sending his letter to Mr. Walle, and his

1   insistence on a different approach to the container tank

2   problem than Mr. Gooding wanted to take, that led to the

3
4   termination.

5
6        There is no direct evidence of this in the record.

7
8   The claimant relies, therefore, on two things.  First, he

9
10   contends that the "dumpster incident," as the parties have

11
    referred to it, is simply too insignificant to lead to his

12
13   termination.  (And I should note that he has spent his career

14   at Delphi).

15        Second, he contends that Mr. Brown's investigation,

16   by Mr. Brown's own admission, was not complete at the time that

17   Mr. Reno was terminated in March of 2004.  Why not wait, Mr.

18   Reno contends, until the investigation was complete -- for the

19   record to be done --before making that decision? And the answer

20   to that question, he says, is that it was simply a facade or a

21   pretense -- or a pretext -- for the decision.

22        I've carefully considered those two points and I'll

23   deal with them in order.  It seems to me that it is regrettable

24   that an individual would be fired over something as foolish and

25   petty as this dumpster incident.  However, Mr. Reno is a person

    charged with important duties that involve integrity,

    credibility and adherence to proper procedures.  And I

    understand why Delphi could legitimately conclude that not only

    the relationship with the contractor but also the way that it

    appears Mr. Reno reacted to the investigation in terms of

1   arguably not telling the truth and arguably inducing

2   subordinates to take positions on his behalf, arguably

3
4   improperly, all support important and legitimate concerns as to

5
6   his credibility, reliability and adherence Delphi's policies.

7
8           I have the impression, which I believe is

9
10  corroborated to some extent by some updating of the initial

11
    investigation by Mr. Brown, that Delphi was concerned that this

12
13  was not an isolated matter but that Mr. Reno had involved other

14  people, both employees and contractors, in doing favors for

15  him: for example, the statement by Mr. Ruble that he helped

16  with an aquarium business owned by Mr. Reno's wife, even though

17  Mr. Ruble testified that he did that work for Mr. Reno and his

18  wife after hours.

19          So, it does not appear to me that the dumpster

20  incident is, in fact, comparable to Captain Queeg's ice cream

21  incident in the Caine Mutiny but, rather, it had substance to

22  it, particularly given Mr. Reno's position of responsibility.

23          As far as the issue of what I should take away from

24  Mr. Brown's acknowledgement that his investigation was

25  incomplete, I have also considered that point, and I believe

    that in the absence of anything in the record to show how much

    more Mr. Brown felt he needed to make it complete, and in what

    sense he felt it was incomplete, I turn to the e-mail from him

    to Delphi on the day that Mr. Reno was suspended, in which

    Brown said that "it should be clear to everyone that Joe has

1    violated several rules" -- Joe meaning Mr. Reno.  Brown said

2    that in the same paragraph in which he acknowledged that he
3
4    would like to do more work on the investigation.  I don't
5
6    believe therefore that, based on this record, the fact that Mr.
7
8    Brown believed the investigation was incomplete is something
9
10   that, in and of itself, shows that Delphi was using his work as
11
     a pretext, given what had already been disclosed.
12
13        Mr. Reno contends that I should look askance on

14   Brown's investigation also because it was incompetent and

15   illegal.  And I've considered that argument as well.  As far as

16   the incompetency point, I'll note that Brown had been an

17   investigator for six years, and I do not see in his

18   investigation or in the subsequent testimony or record any

19   attempt to do anything other than a good job.  He does not

20   appear to me to have been negligent, or, alternatively,

21   motivated to reach a certain result.  And I do not believe that

22   the law requires him to conduct an investigation beyond what he

23   did.

24        The contention of illegality dovetails back to Mr.

25   Reno's claim that the investigation and the debtors' failure to

     provide a copy of it to Mr. Reno violated the Fair Credit

     Reporting Act.  There may be instances where the failure to

     comply with a law such as the Fair Credit Reporting Act may

     lead a court to draw an inference that something very serious

     was motivating a party to act contrary to law, an ulterior

1   purpose.  For example, here it is argued, at least between the

2   lines, why would the debtor violate the FCRA but for the fact

3

4   that it wanted to cover up that it was engaging in the whole

5

6   exercise as a facade to hide a retaliatory purpose?  I,

7

8   however, do not accept that argument here.  I will determine

9

10  shortly whether the FCRA was violated or not.  But I think, at

11

    a minimum, it is clear that it was not clearly violated.  That

12

13  is, someone in Ms. Patrick's position or Mr. Gooding's

14  position, or other people involved in this process, would not

15  have known with any degree of clarity that what they were doing

16  was in violation of the FCRA -- which undercuts the whole

17  inferential argument about an improper motivation.

18          Mr. Reno's contention that the FCRA applies here is a

19  plain meaning argument that has been criticized by a number of

20  courts, particularly in respect of the version of the statute

21  that would be applicable here, which is that in addition to

22  applying to the provision of reports with regard to a

23  consumer's creditworthiness, credit standing and credit

24  capacity, the statute provides that it applies to such reports

25  going to a consumer's character, general reputation, personal

    characteristics or mode of living with regard to employment

    purposes.

            I agree with Johnson v. Federal Express Corp., 147

    F.Supp. 2d. 1268 (M.D. Ala. 2001), Hartman v. Lyle Park Dist.,

    158 F.Supp. 2d 869 (N.D. Ill. 2001) and Rugg v. Hanac, Inc.,

1   2002 U.S. Dist. LEXIS 18101 (S.D.N.Y. 2001), as to their

2   skepticism that the FCRA applies to this type of investigatory
3
4   report dealing with a consumer's particular workplace conduct
5
6   (that is, in contrast to reports going to decisions to hire or
7
8   to fire based on general non-workplace conduct, such as set
9
10  forth in <u>Comeaux v. Brown & Williamson Tobacco Co.</u>, 915 F.2d
11
    1264 (9th Cir. 1990) and <u>Hodge v. Texaco, Inc.</u>, 975 F.2d 1093
12
13  (5th Cir. 1992)).

14          In addition, I believe that the record, as it is,

15  does not enable me to find that Mr. Brown's company, Securitas,

16  which is not described other than as simply being a large

17  investigatory company, would be a "credit reporting agency,"

18  which is necessary to fit his investigation within the FCRA's

19  definition of an "investigative consumer report" which, in

20  turn, triggers the applicability of the statute under 15 U.S.C.

21  § 1681a(f).  That term is defined as "any person which, for

22  monetary fees, dues or on a cooperative non-profit basis,

23  regularly engages in whole or in part in the practice of

24  assembling or evaluating consumer credit information or other

25  information on consumers for the purpose of furnishing consumer

    reports to third parties, and which uses any means or facility

    of interstate commerce for the purpose of preparing or

    furnishing consumer reports."  See again <u>Rugg v. Hanac, Inc.</u>,

    2002 U.S. Dist. LEXIS 18101 (S.D.N.Y. 2002).

            So, not only on the merits, but also, as importantly

1   -- since, as was pointed out in oral argument, even if Mr. Reno

2   were to prevail on the merits of the FCRA claim he would get a

3

4   very small amount of money -- in connection with evaluating

5

6   whether Delphi was engaging in a pretext when it said that it

7

8   relied upon Mr. Brown's investigation, I conclude that the FCRA

9

10   has no bearing.

11

        Therefore, in considering the circumstantial evidence

12

13   in the record before me, where Delphi has come forward with a

14   non-retaliatory or a non-discriminatory reason for firing Mr.

15   Reno that I find credible, I do not believe that Mr. Reno has

16   carried his burden of proof to show that this was not the only

17   reason for his termination, or that, to the contrary, it was

18   more likely that he was terminated in retaliation for having

19   taken his views on the container tank issue over Mr. Gooding's

20   head.  The proof offered by Mr. Reno is too slim and his

21   assertions of a bad motive too strongly contradicted by the

22   record.

23        I'll note further, although ultimately this is a

24   lesser reason for my holding, that Delphi in response to Mr.

25   Reno's letter, at least shortly after the letter was received,

     commissioned a third-party environmental consultant to look at

     the tanks.  That was done on March 6th, and that consultant's

     report appears in the record at Exhibit 19.  So there does

     appear to be a prompt response by Delphi, and certainly no

     attempt to keep Mr. Reno's complaint under wraps, but, to the

1  contrary, to open it up to a third party.  And I think the

2  report not only has to speak for itself, because there's been

3

4  no further testimony about its bona fides, but I think it does

5

6  speak for itself as a legitimate third party corroboration of

7

8  the bona fides of Delphi's actions.  Moreover, Delphi later

9

10  that summer, in May, apparently involved the local authorities

11

12  in looking at the tanks, who also were satisfied.

13       So while I acknowledge that the sunshine aspect of

14  what Delphi did doesn't necessarily obviate Mr. Reno's claim,

15  because, after all, one could still infer, if the

16  circumstantial evidence was sufficient, that Delphi terminated

17  him because Delphi was mad that he raised the environmental

18  concerns in the first place, it does further support Delphi's

19  contention that as far as that aspect of his performance was

20  concerned, as opposed to his dealings with Mr. Calton and

21  subordinates, they considered Mr. Reno's advice and took it

22  seriously.

23       Based on those findings, the defamation claim, I

24  believe, will not lie under Ohio law.  To state a claim under

25  Ohio law for defamation, the plaintiff must show that there was

   a false statement defamatory to the plaintiff, published to a

   third party by a defendant who was, at least, negligent, that

   was damaging to the plaintiff's reputation.  A plaintiff must

   prove a defendant's negligence by clear and convincing

   evidence, but need only prove the other elements by a

1   preponderance of the evidence.  In a defamation action,

2   therefore, falsity is an essential element.  Furthermore, in
3
4   defending against a defamation action, it is sufficient for the
5
6   defendant to show that the imputation is substantially true, or
7
8   as it is often put, to justify the gist, the sting or the
9
10  substantial truth of the defamation.  See Parry v. Mohawk
11
    Motors of Mich., 236 F.3d 299, 312 (6th Cir. 2001) (citations
12
13  omitted).  Here, the alleged defamation was the statement that

14  Mr. Reno was being terminated because of the dumpster incident

15  and his conduct in connection with the investigation thereof.

16  And for the reasons I've stated, there was, under the Ohio law,

17  no basis for a defamation claim based on that statement.

18        The COBRA claim is, for me, somewhat more difficult

19  to decide, given the posture of this action.  The statute

20  provides, in 29 U.S.C. § 1163(2) that continuing coverage is

21  not required to be provided to an employee after termination

22  for "gross misconduct."  That term is not defined.  The courts

23  have grappled with the definition in various ways.  One, at

24  least, has said that "gross misconduct" constitutes a deviation

25  from the employer's business ethics policy for, among other

    reasons, failing to disclose a financial interest in a

    supplier, accepting favors and gifts from a vendor and claiming

    reimbursement from the company for non-official travel.  See

    Karby v. Standard Prods. Co., Civ. A. No. 3:90-2918-17, 1992 WL

    333931 (D.S.C. 1992).  A case out of Texas has defined the term

1   to mean a substantial deviation from the high standards and

2   obligations of a managerial employee that would indicate that
3
4   such an employee cannot be entrusted with his management duties
5
6   without danger to the employer.  See Avina v. Texas Pig Stands,
7
8   Inc., 1991 U.S. Dist. LEXIS 13957 (W.D. Tex. 1991).
9
10          As I said, I have not determined here, because I
11
    cannot on this record, whether Mr. Brown was right or not.  I
12
13  have determined that there was enough of a basis in his

14  investigation for a proper termination of Mr. Reno.  But I do

15  not know from his investigation whether he had established

16  "gross misconduct."  And I don't believe the debtors have

17  established it here, either, as a matter of fact, for purposes

18  of this statute.  They have, again, established that they had a

19  valid basis for terminating Mr. Reno, based on the

20  investigation.  They did not have to conduct a trial.  But I

21  think that proving gross misconduct, as opposed to proving that

22  they had enough basis to terminate him, requires more in the

23  factual record.  And so I believe that they have not met what I

24  think is their burden here to show gross misconduct.

25  Therefore, I believe that Mr. Reno's COBRA claim is

    established.

            Finally, as to the ERISA claim, I think it was made

    clear at oral argument that this claim really devolves into a

    damages issue.  I did not see any opposition on the merits as

    to, for example, an alleged defense that it was proper to delay

1    distribution of Mr. Reno's pension money.  And so the issue as

2    to whether that distribution included an element of interest

3
4    and/or if it didn't, what the proper damages would be for Mr.

5
6    Reno's not having received it from the date -- which has also

7
8    not been established -- that the pension money should have been

9
10   distributed and the date it was, which has been established,

11
     should await further trial if the parties choose to do so,

12
13   although my hope is, given the amount claimed, that there can

14   be a resolution of that matter.

15           All right.  As I said, I'm going to go over the

16   transcript, because obviously this has gone on, probably far

17   too long for all of you, and I want to make sure it's accurate

18   and properly reflects my thinking on the issues.  But again,

19   the conclusions won't change.  So, Mr. Hogan, you should submit

20   an order, consistent with my ruling, which disallows all of the

21   claims except for the COBRA and ERISA claims, reserves the

22   ERISA issue for further trial on damages calculation and allows

23   the COBRA claim.

24

25