**Hearing Date: June 26, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                         :
           In re                             :      Chapter 11
                                           :
DELPHI CORPORATION, et al.,        :      Case No. 05-44481 (RDD)
                                           :
                                           :      (Jointly Administered)
                   Debtors.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FOURTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("FOURTH SKADDEN INTERIM FEE APPLICATION")

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | Delphi Corporation and the Affiliate Debtors |
| Date of Retention Order: | November 4, 2005 |
| Period for Which Compensation and Reimbursement are Sought: | October 1, 2006 through January 31, 2007 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary: | **$12,820,504** |
| Amount of Expense Reimbursement Sought as Actual, Reasonable, and Necessary: | **$708,096** |
| Voluntary Reductions: | |
| Monthly Fee Statements: | **$1,170,978** |
| Fourth Fee Application: | **$106,834** |
| Total Voluntary Reductions: | **$1,277,812** |

This is an/(a):  _____X_____ Interim  _____ Final Application.

Aggregate Amounts Paid to Date: $**43,843,162**

## PRIOR FEE APPLICATIONS

| Prior Fee Application | Date Filed | Period Covered | Interim Fees Requested (Awarded) | Interim Expense Reimbursement Requested (Awarded) |
|---|---|---|---|---|
| First | 05/31/06 | 10/08/05 – 01/31/06 | $9,200,920 ($9,187,586.67) | $622,420 ($622,420) |
| Second | 07/31/06 | 02/01/06 – 05/31/06 | $11,310,231 ($11,296,897.67) | $825,854 ($825,854) |
| Third | 11/30/06 | 06/01/06 – 09/30/06 | $10,025,538 ($10,012,204.66) | $848,232 ($848,232) |

TIME SUMMARY TO FOURTH INTERIM FEE APPLICATION OF
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
OCTOBER 1, 2006 – JANUARY 31, 2007

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| **PARTNERS** | | | | |
| Butler, Jr., John Wm. | 1980 | $791 | 1,108.8 | $877,466 |
| Lyons, John K. | 1989 | $704 | 829.5 | $583,969 |
| Marafioti, Kayalyn A. | 1980 | $830 | 618.2 | $513,106 |
| Cochran, Eric L. | 1987 | $845 | 514.9 | $435,093 |
| Panagakis, George N. | 1990 | $751 | 554.6 | $416,381 |
| Hogan, III, Albert L. | 1997 | $682 | 543.9 | $370,823 |
| Berlin, Kenneth | 1974 | $782 | 186.6 | $145,922 |
| Gibson, Marie L. | 1997 | $670 | 150.4 | $100,768 |
| Krakaur, Keith D. | 1986 | $775 | 110.9 | $85,901 |
| Gross, Cliff | 1989 | $830 | 82.7 | $68,641 |
| Saggese, Nick P. | 1980 | $875 | 77.3 | $67,638 |
| Brewster, Jody J. | 1986 | $775 | 70.0 | $54,251 |
| Leff, Neil M. | 1981 | $711 | 59.5 | $42,330 |
| Wexler, Marian P. | 1977 | $810 | 50.7 | $41,067 |
| Frishman, Lawrence D. | 1989 | $810 | 46.2 | $37,422 |
| Frost, Jr., Don. J. | 1989 | $790 | 40.5 | $31,995 |
| Berke, Jay S. | 1972 | $810 | 36.0 | $29,160 |
| Furfaro, John P. | 1981 | $810 | 33.3 | $26,973 |
| Stoll, Neal. R. | 1974 | $865 | 14.3 | $12,370 |
| Noel, Gregg A. | 1982 | $845 | 12.5 | $10,563 |
| Huser, Henry L. | 1984 | $810 | 10.8 | $8,748 |
| **Partner Total** | | | **5,151.6** | **$3,960,587** |
| **COUNSEL** | | | | |
| Matz, Thomas J. | 1976 | $625 | 761.6 | $476,009 |
| Garner, Lee P. | 1995 | $619 | 515.9 | $319,472 |
| Ramlo, Kurt | 1993 | $609 | 287.3 | $174,850 |
| Shivakumar, Dhananjai | 1998 | $612 | 259.1 | $158,658 |
| Schneider, David A. | 1988 | $595 | 191.8 | $114,122 |
| Sensenbrenner, Eric B. | 1996 | $625 | 144.0 | $90,001 |
| Gasaway, Michelle | 1998 | $564 | 129.6 | $73,032 |
| Bergmann, Michael R. | 1993 | $625 | 11.1 | $6,938 |
| **Counsel Total** | | | **2,300.4** | **$1,413,082** |

---

[1]    The blended rates set forth for certain professionals reflect the average billing rate for the entire Application Period and incorporate a reduced billing rate for nonworking travel time.  On September 1, 2006, Skadden changed its standard bundled hourly rates in accordance with firm policies for periodic rate adjustments as disclosed on Skadden's Retention Application (as defined below) and the supporting declaration attached thereto. Prior to this Application Period, Skadden notified the Delphi Fee Review Committee (as defined below) of the pending change in the standard bundled hourly rate schedule and as an accommodation to the Debtors, those rate changes were made effective as of October 1, 2006.  Skadden's current hourly rates under the bundled rate structure during this Fourth Application Period were as follows: $630 to $875 for partners and of counsel, $595 to $665 for counsel and special counsel, $315 to $585 for associates, and $160 to $250 for legal assistants.

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| **ASSOCIATES** | | | | |
| Meisler, Ron E. | 1999 | $554 | 927.7 | $513,562 |
| Stuart, Nathan L. | 2002 | $490 | 960.8 | $471,246 |
| Reese, Randall G. | 2001 | $490 | 879.3 | $431,054 |
| Hardin, Adlai S. | 1998 | $585 | 691.8 | $404,707 |
| Grant, T. Kellan | 2000 | $464 | 761.4 | $353,385 |
| Fern, Brian M. | 1996 | $561 | 592.7 | $332,487 |
| Perl, Michael W. | 2004 | $421 | 787.2 | $331,503 |
| Diaz, Lisa B.* | 2006 | $337 | 924.4 | $311,174 |
| Wharton, Joseph N. | 1998 | $550 | 529.8 | $291,406 |
| Jjingo, M. Janine | 2006 | $390 | 679.3 | $264,927 |
| Herriott, Allison Verderber | 2004 | $418 | 626.7 | $262,268 |
| Bolton, Ian S.* | 2005 | $384 | 662.3 | $254,525 |
| Howe, Eric J. | 2005 | $381 | 655.4 | $249,542 |
| Guzzardo, John | 2004 | $429 | 461.2 | $198,079 |
| Houston, Brent M. | 2003 | $435 | 447.1 | $194,492 |
| Campanario, Nick D. | 2002 | $527 | 340.8 | $179,763 |
| Platt, Sarah J.* | 2006 | $340 | 527.9 | $179,506 |
| Furman, Eric C. | 2000 | $570 | 250.8 | $142,857 |
| MacDonald, F. Neil | 1997 | $576 | 237.5 | $136,891 |
| Willenken, Karen E. | 2000 | $557 | 198.2 | $110,420 |
| Carter, P. Gifford | 2002 | $513 | 189.8 | $97,371 |
| Lederer, J.R.* | 2007 | $315 | 292.8 | $92,235 |
| Shih, Jonathan L.* | Not Admitted | $315 | 270.8 | $85,302 |
| Ganitsky, Daniel I. | 2001 | $585 | 135.6 | $79,327 |
| Connors, Christopher P. | 1999 | $585 | 133.1 | $77,865 |
| VanLonkhuyzen, Courtney E. | 2004 | $419 | 161.7 | $67,774 |
| Feinberg, Aaron S. | 2002 | $535 | 121.8 | $65,164 |
| La Pergola, Antonio | 2001 | $565 | 109.4 | $61,812 |
| Wilson, Louis D. | 2000 | $585 | 101.6 | $59,438 |
| Lazarova, Natalia F. | 2002 | $470 | 101.8 | $47,846 |
| Danz, Catherine E. | 2001 | $535 | 79.4 | $42,481 |
| Rohner, William M. | 2002 | $495 | 74.2 | $36,732 |
| Schockett, Paul | 2006 | $390 | 90.3 | $35,217 |
| Ogunsanya, Gregory O. | 2004 | $495 | 70.4 | $34,849 |
| Olasky, Peter | 2005 | $435 | 71.1 | $30,931 |
| McLeod, John M. | 1999 | $585 | 51.3 | $30,011 |
| Malone, Elizabeth A. | 2002 | $495 | 60.5 | $29,948 |
| De Elizalde, Dolores | 2003 | $495 | 57.9 | $28,661 |
| Schohn, Erica | 2004 | $401 | 70.8 | $28,412 |
| Stenger, Allen | 2004 | $470 | 51.8 | $24,346 |
| Katz, Micah G. | 2006 | $390 | 51.4 | $20,046 |
| Halper, Adam | 2005 | $390 | 45.9 | $17,901 |
| Fitzgerald, James E. | 2002 | $535 | 29.8 | $15,943 |
| Turman III, Rossie E. | 1999 | $585 | 22.3 | $13,046 |
| Vujic, Ivana | 2002 | $535 | 19.8 | $10,593 |

| Name | Year Of Admission | Rate[1] | Hours | Amount |
|---|---|---|---|---|
| Phillips, Daniel P. | 1998 | $585 | 17.1 | $10,004 |
| Louko, Tero | 2000 | $585 | 14.1 | $8,249 |
| Pehlke, David R. | 2005 | $390 | 12.0 | $4,680 |
| **Associate Total** | | | **14,650.8** | **$6,769,978** |
| **PARAPROFESSIONALS** | | | | |
| Rosen, Ruth | N/A | $248 | 667.8 | $165,438 |
| Demma, Jeffrey | N/A | $250 | 629.2 | $157,300 |
| Zsoldos, Andrew F. | N/A | $190 | 620.8 | $117,952 |
| Chavali, Aruna | N/A | $160 | 548.2 | $87,712 |
| Klimek, Marsha V. | N/A | $250 | 136.0 | $34,000 |
| Worscheck, Toby M. | N/A | $80 | 256.7 | $20,536 |
| Salazar, Adriana | N/A | $225 | 67.7 | $15,233 |
| Nowicki, John A. | N/A | $250 | 54.6 | $13,650 |
| Millican, Ian S. | N/A | $160 | 68.3 | $10,928 |
| Terry, William C. | N/A | $280 | 38.5 | $10,780 |
| Gilchrist, Julie M. | N/A | $250 | 42.9 | $10,725 |
| Rivera, Maira | N/A | $80 | 125.2 | $10,016 |
| Donnelly, Neal P. | N/A | $225 | 31.2 | $7,020 |
| Woodfield, Joseph | N/A | $160 | 34.5 | $5,520 |
| Chow, Pauline P. | N/A | $250 | 19.8 | $4,950 |
| Malik, Faizah | N/A | $160 | 16.3 | $2,608 |
| Landon, Kara D. | N/A | $190 | 13.1 | $2,489 |
| **Paraprofessional Total** | | | **3,370.8** | **$676,857** |
| **TOTAL ALL PROFESSIONALS** | | | **25,473.6** | **$12,820,504** |
| This summary excludes voluntary fee reductions of $1,155,711, of which $1,048,877 was reduced on the monthly statements and $106,834[2] is an additional accommodation on this Interim Application. | | | | |

\* These timekeepers are "Law Clerks."  Law Clerks are law school graduates who have not yet been admitted to practice.  For purposes of billing statistics, law clerks are included with associates.  However, several Law Clerks were admitted to practice during the Application Period and thus were promoted to associates.

---

[2]    In accordance with Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995, Skadden has identified those entries within Exhibits D-1 through D-38 for which accommodations are being provided pursuant to this Interim Application.

SUMMARY OF SERVICES RENDERED BY
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
OCTOBER 1, 2006 – JANUARY 31, 2007

| Activities | Hours | Fees |
|---|---|---|
| Reorganization Plan / Plan Sponsors | 7,454.6 | $4,147,192 (32.3%) |
| Claims Administration (General) | 4,374.4 | $2,081,005 (16.2%) |
| Customer Matters (Reviews/Investigations) | 1,284.9 | $661,440 (5.2%) |
| Case Administration | 2,087.7 | $613,369 (4.8%) |
| Asset Dispositions (General) | 869.6 | $492,762 (3.8%) |
| Rights Offering | 745.8 | $444,341 (3.5%) |
| Tax Matters | 687.8 | $417,360 (3.3%) |
| Nonworking Travel Time | 1,249.9 | $393,436 (3.1%) |
| Retention / Fee Matters / Objections (Others) | 891.4 | $384,393 (3.0%) |
| Retention / Fee Matters (SASM&F) | 639.3 | $284,463 (2.2%) |
| Litigation (Insurance Recovery) | 468.5 | $280,759 (2.2%) |
| Financing (DIP and Emergence) | 532.2 | $267,852 (2.1%) |
| General Corporate Advice | 382.6 | $253,853 (2.0%) |
| Automatic Stay (Relief Actions) | 520.6 | $248,725 (1.9%) |
| Creditor Meetings / Statutory Committees | 420.7 | $215,231 (1.7%) |
| Environmental Matters | 297.9 | $211,507 (1.6%) |
| Business Operations / Strategic Planning | 286.6 | $188,290 (1.5%) |
| Supplier Matters | 442.3 | $182,296 (1.4%) |
| Employee Matters (Labor Unions) | 280.7 | $180,964 (1.4%) |
| Leases (Real Property) | 261.9 | $145,356 (1.1%) |
| Employee Matters (General) | 212.2 | $127,626 (1.0%) |
| Customer Matters (GM) | 115.2 | $80,818 (0.6%) |
| Employee Matters (Pension) | 129.8 | $77,033 (0.6%) |
| Regulatory and SEC Matters | 132.8 | $73,424 (0.6%) |
| Disclosure Statement / Voting Issues | 129.9 | $62,694 (0.5%) |
| Executory Contracts (Personalty) | 97.4 | $50,562 (0.4%) |
| Intellectual Property | 101.1 | $47,649 (0.4%) |
| Global Subsidiaries (Non-U.S.) | 76.6 | $46,676 (0.4%) |
| Secured Claims | 95.7 | $44,488 (0.3%) |
| Real Estate (Owned) | 64.2 | $42,465 (0.3%) |

| Activities | Hours | Fees |
|---|---|---|
| Litigation (General) | 74.4 | $37,702 (0.3%) |
| Utilities | 34.2 | $16,604 (0.1%) |
| Claims Administration (Reclamation / Trust Funds) | 18.8 | $10,623 (0.1%) |
| Reports and Schedules | 11.9 | $7,546 (0.1%) |
| **Total** | **25,473.6** | **$12,820,504** |

**Hearing Date: June 26, 2007**
**Hearing Time: 10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                :
         In re                    :     Chapter 11
                                :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                :
                                :     (Jointly Administered)
         Debtors.         :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

FOURTH INTERIM APPLICATION OF SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP, COUNSEL TO DEBTORS-IN-POSSESSION, SEEKING
ALLOWANCE AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT
OF EXPENSES UNDER 11 U.S.C. §§ 330 AND 331

("FOURTH SKADDEN INTERIM FEE APPLICATION")

Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), counsel for Delphi

Corporation ("Delphi") and certain of its subsidiaries and affiliates (the "Affiliate Debtors"),

debtors and debtors-in-possession in the above-captioned cases (the "Reorganization Cases"),

submits this fourth interim application (the "Interim Application") seeking interim allowance and

payment of compensation and reimbursement of expenses under 11 U.S.C. §§ 330 and 331 for the

period from October 1, 2006 through January 31, 2007 (the "Application Period").  Skadden

submits this Interim Application for (a) allowance of compensation for professional services

rendered by Skadden to the Debtors and (b) reimbursement of actual and necessary charges and

disbursements incurred by Skadden in the rendition of required professional services on behalf of

the Debtors.  In support of this Interim Application, Skadden represents as follows:

Background

A.    The Chapter 11 Filings

1.    On October 8 and 14, 2005 (the "Petition Dates"), Delphi and certain of its

U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended

(the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their

properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

Code.  This Court entered orders directing the joint administration of the Debtors' chapter 11

cases.

2.    On October 17, 2005, the Office of the United States Trustee (the "U.S.

Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee").

On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders (the

"Equity Committee").  No trustee or examiner has been appointed in the Debtors' cases.

3.    On May 5, 2006, this Court authorized the establishment of a joint fee review committee (the "Fee Review Committee") and approved a protocol regarding the committee, its composition, mandate, and procedures (Docket No. 3630) (the "Fee Review Protocol"). The Fee Review Committee is comprised of representatives of each of: (a) the U.S. Trustee for this District, (b) the Debtors, and (c) the Creditors' Committee.

4.    This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for the relief requested herein are sections 330 and 331 of the Bankruptcy Code, Rule 2016 of the Federal Rules of Bankruptcy Procedure, and Rule 2016-1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York (the "Local Rules"). This Interim Application has been prepared in accordance with the Amended Guidelines for Fees and Disbursements for Professionals in Southern District of New York Bankruptcy Cases, adopted by the Court on April 19, 1995 (the "Local Guidelines"), and the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 (Appendix A to 28 C.F.R. § 58), dated May 17, 1996 (the "UST Guidelines" and, together with the Local Guidelines, the "Guidelines"). Pursuant to the Local Guidelines, a certification regarding compliance with the Guidelines is attached hereto as Exhibit A.

Retention Of Skadden

6.    Upon the commencement of the Reorganization Cases, the Debtors applied to this Court for an order approving the retention of Skadden as their principal restructuring and bankruptcy counsel (the "Retention Application") to perform legal services under a general

3

retainer that was necessary to enable the Debtors to faithfully execute their duties as

debtors-in-possession.  On November 4, 2005, this Court entered an order (the "Retention

Order")[3] authorizing the Debtors to employ Skadden as their counsel under the terms set forth in

the Retention Application.[4]

       7.     In the Retention Application, the Debtors disclosed that Skadden's fees for

professional services are based on its guideline hourly rates, which are periodically adjusted.  The

Debtors also disclosed in the Retention Application that Skadden's charges and disbursements are

invoiced pursuant to Skadden's Policy Statement Concerning Charges and Disbursements, a copy

of which is attached to the Engagement Agreement.  Certain charges and disbursements are not

charged separately under the bundled rate structure as described in the Retention Application.

Other than an arrangement between Skadden and its members, there is no agreement or

understanding between Skadden and any person for the sharing of compensation to be received

for services rendered in this case.

<u>Fee Procedures And Monthly Fee Statements</u>

       8.     On November 4, 2005, this Court entered the Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals (Docket No. 869) (the "Initial Interim Compensation Order").  This order was

subsequently amended on March 8, 2006 (Docket No. 2747), March 28, 2006 (Docket No. 2986),

May 5, 2006 (Docket No. 3630), July 12, 2006 (Docket No. 4545), October 13, 2006 (Docket No.

---

[3]    A copy of the Retention Application, the supporting declaration, and the Retention Order are attached collectively hereto as <u>Exhibit B</u>.  These materials include factual information regarding the experience and standing at the bar of certain of Skadden's senior attorneys.

[4]    The Retention Order incorporates the terms of an engagement agreement dated as of July 12, 2005 (the "Engagement Agreement"), between Skadden and the Debtors, a copy of which is attached as Exhibit A to the declaration supporting the Retention Application.

4

5310), and December 11, 2006 (Docket No. 6145) (collectively and together with the Initial

Interim Compensation Order, the "Interim Compensation Order").

9.    To monitor costs to the Debtors' estates and avoid duplicative efforts in the

review of fee applications filed in these Reorganization Cases, the Debtors, the Creditors'

Committee, and the U.S. Trustee negotiated the formation of the Fee Review Committee to

review, comment on, and, if necessary, object to the various fee applications filed in these

Reorganization Cases.  As stated above, on May 5, 2006, this Court authorized the establishment

of the Fee Review Committee and approved the Fee Review Protocol.  On August 17, 2006, this

Court entered an order authorizing the Fee Review Committee to retain Legal Cost Control, Inc.

("LCC") as fee analyst to assist the Fee Review Committee (Docket No. 4959).

10.    Pursuant to paragraphs 2(a), 2(j), and 7 of the Interim Compensation Order,

as supplemented, and the Fee Review Protocol, Skadden is submitting this Interim Application to

the Debtors, the U.S. Trustee, counsel to the Creditors' Committee, counsel to the agent under the

Debtors' former prepetition credit facility, counsel to the agent under the Debtors' postpetition

credit facility, and the members of the Fee Review Committee and its fee auditors.

<u>Overview Of Delphi Corporation</u>

11.    Delphi and its subsidiaries and affiliates (collectively, the "Company"), as

of December 31, 2006 had global net sales of $26.4 billion, and global assets of approximately

$15.4 billion.[5]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues, and the thirteenth largest public company

---

[5]    The aggregated financial data used in this Interim Application generally consists of consolidated information
from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on
February 27, 2007.

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court.[6]

12.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every major

global automotive original equipment manufacturer (each an "OEM").

13.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary

of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's

business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and

liabilities of these divisions and subsidiaries were transferred to the Company in accordance with

the terms of a Master Separation Agreement between Delphi and GM.  In connection with these

transactions, Delphi accelerated its evolution from a North American-based, captive automotive

supplier to a global supplier of components, integrated systems, and modules for a wide range of

customers and applications.  Although GM is still the Company's single largest customer, today

more than half of Delphi's revenue is generated from non-GM sources.

<u>Events Leading To Chapter 11 Filing</u>

14.    In the first two years following Delphi's separation from GM, the Company

generated approximately $2 billion in net income.  Every year thereafter, however, with the

exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company

---

[6]    On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive
component plant in Cadiz, Spain, filed its "Concurso" application for a Spanish insolvency proceeding.  The
Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that
is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost
structure.

reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[7]  Reflective of a

continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4

billion on net sales of $26.9 billion.  In 2006, the Debtors incurred a net loss of approximately

$5.5 billion, approximately $3.0 billion of which were charges related to U.S. employee special

attrition programs implemented in furtherance of Delphi's transformation plan described below.

15.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

original equipment manufacturers resulting in the reduced number of motor vehicles that GM

produces annually in the United States and related pricing pressures, and (c) increasing

commodity prices.

16.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

---

[7]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on U.S. deferred tax assets as of December 31, 2004.  The Company's net operating loss in
calendar year 2004 was approximately $482 million.

## The Debtors' Transformation Plan

17.    On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena

in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to

finalize GM's financial support for Delphi's legacy and labor costs and to ascertain GM's business

commitment to the Company.  Third, the Debtors must streamline their product portfolio to

capitalize on their world-class technology and market strengths and make the necessary

manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried

workforce to ensure that the Company's organizational and cost structure is competitive and

aligned with its product portfolio and manufacturing footprint.[8]  Finally, the Debtors must devise

a workable solution to their current pension situation.

18.    Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that are

well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all

of its resources to continue to deliver high-quality products to its customers globally.

Additionally, the Company will preserve and continue the strategic growth of its non-U.S.

operations and maintain its prominence as the world's premier auto supplier.

---

[8]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which are planned to be transitioned as
part of the Company's transformation plan.

Significant Events During The Application Period

A.      Framework Discussions

            19.      During the Application Period, the Debtors reached significant milestones

in their reorganization.  On December 18, 2006, Delphi announced that it had accepted a proposal

for an equity purchase and commitment agreement (the "EPCA") with affiliates of Appaloosa

Management L.P. ("Appaloosa"), Cerberus Capital Management, L.P. ("Cerberus"), and

Harbinger Capital Partners Master Fund I, Ltd. ("Harbinger"), as well as Merrill Lynch & Co.

("Merrill Lynch") and UBS Securities ("UBS" and, collectively with Appaloosa, Harbinger,

Cerberus, and Merrill, the "Plan Investors") to invest up to $3.4 billion in preferred and common

equity in the reorganized Delphi to support the company's transformation plan and the

reorganization plan framework agreement signed by Delphi, the Plan Investors, and GM on

December 18, 2006 (the "Plan Framework Support Agreement" or "PSA"), which should facilitate

the Debtors' emergence from chapter 11.  On the same date, Delphi accepted a proposal from

JPMorgan Chase Bank, N.A. and a group of lenders to refinance in full the Debtors' existing $2.0

billion debtor-in-possession financing facility and approximately $2.5 billion prepetition revolver

and term loan facilities.

            20.      The EPCA, the PSA, and several ancillary instruments (together, the

"Framework Agreements") are the result of months of intense negotiation among the Debtors, the

statutory committees, GM, and the Plan Investors.  The negotiation among the parties did not end

after the motion seeking approval of the Framework Agreements was filed on December 18, 2006.

Instead, over the course of the twenty-four days between the filing of the motion seeking approval

of the Framework Agreements and the two-day hearing on the Framework Agreements that

commenced on January 11, 2007, the Debtors received multiple objections to the relief requested,

9

conducted numerous "meet-and-confer" conferences with objecting parties, responded to the

discovery and deposition requests of the objecting parties, received and evaluated an unsolicited,

competing multi-billion dollar investment proposal, and resolved certain alleged ambiguities in

the Framework Agreements.  Ultimately, on January 12, 2007, after two days of testimony and

arguments, the Court entered an order (the "Framework Approval Order") authorizing the Debtors

to enter into the Framework Agreements.  Nearly one-third of the professional fees for which the

Debtors seek approval pursuant to this Interim Application relate to the negotiation and drafting of

the Framework Agreements, the prosecution of the Debtors' motion for authorization to enter into

such agreements, and other matters relating to the Debtors' implementation efforts.

B.    Claims Administration

            21.    One of the requirements of the Framework Agreements is that certain

prepetition trade and other unsecured claims be reduced to $1.7 billion or less.  With $37 billion in

liquidated amounts plus certain unliquidated amounts asserted against the Debtors as of January

31, 2007 on account of more than 16,500 proofs of claim and certain scheduled liabilities for

which no proof of claim was filed, the Debtors face a challenging task.  To satisfy this

requirement, during the Application Period, the Debtors and their advisors devoted a significant

amount of time to the claims resolution process.  During the Application Period, in just four

months, the Debtors, with the assistance of their advisors, filed six omnibus claims objections

which ultimately led to court orders that disallowed, expunged, or reduced approximately 4,800

claims in the approximate amount of $6.4 billion, or approximately 17% of the aggregate face

amount of liquidated claims asserted.  In addition, the Debtors gained court approval of certain

claims objection procedures applicable to claims that become contested when claimants respond

to an omnibus objection.  Pursuant to these procedures, the Debtors have scheduled nearly three

dozen claims for adjudication in a hearing before this Court, held multiple "meet-and-confer" discussions and mediations, and ultimately resolved thirteen contested claims during the Application Period before they were scheduled for hearing.  Finally, with respect to contested claims that proceeded to hearing, the Debtors obtained orders disallowing and expunging 94% of such claims, thus reducing the prepetition unsecured claims pool by another $212 million.

C.    GM And Labor Negotiations

22.    Another requirement of the Framework Agreements is the conclusion of comprehensive agreements with Delphi's U.S. labor unions and GM that are consistent with the Debtors' transformation plan.  As a result of the progress achieved in connection with the Framework Agreements, the Debtors sought, and this Court approved, an order suspending the Debtors' section 1113/1114 motion to reject their collective bargaining agreements and their motion to reject certain unprofitable GM supply contracts.  During the Application Period Delphi, together with the Plan Investors and GM, developed several joint labor proposals adjusted for the circumstances of Delphi's principal unions.  These proposals addressed a broad range of issues, including changes to compensation and benefits, the future of the Debtors' product portfolio and manufacturing footprint, and the triggering of the GM benefit guarantee.

23.    In addition, the Debtors and GM have also continued to engage in negotiations (which have included the Plan Investors) to establish and memorialize GM's future commitments to the Debtors as a supplier.  Included in these negotiations were discussions about, among other things, GM's commitment to the Framework Agreements and the Debtors' emergence from chapter 11, reconciling claims related to certain legacy agreements, and alleged warranty liability.  These agreements, once reached, should pave the way for the Debtors to emerge from chapter 11.

11

D.    <u>DIP Refinancing</u>

24.    During the Application Period, due to the robust conditions in the capital markets and the positive momentum in the Reorganization Cases, the Debtors determined that they could replace their existing prepetition and postpetition financing facilities with more favorable terms. Accordingly, with the assistance of their professional advisors, the Debtors negotiated a $4.5 billion refinancing to replace their existing secured prepetition and postpetition secured debt, which saves the estates approximately $9 million per month and provides a platform from which to secure and negotiate an exit facility. The refinanced loan consists of a $1.75 billion first priority revolving credit facility, a $250 million first priority term loan, and an approximate $2.5 billion second priority term loan. Under the refinanced facility, the maturity date for the Debtors' DIP facility was also extended from October 8, 2007 to December 31, 2007.

E.    <u>GM Investigations</u>

25.    Another key matter that the Debtors continued to address during this Application Period was the investigation of legacy and other claims against GM. Early in these cases, the Debtors listed unliquidated claims against GM in their Statement of Financial Affairs and Schedules of Assets and Liabilities. Thereafter, pursuant to a motion filed by the Creditors' Committee that was unopposed by the Debtors, this Court entered an order requiring GM to produce certain documents to the Creditor's Committee regarding certain claims that the Debtors hold against GM and that GM allegedly holds against the Debtors. Additionally, the Debtors and the Creditors' Committee entered into a joint interest agreement whereby the Debtors agreed to share certain confidential information with the Creditors' Committee. Based in part on the documents provided by the Debtors to the Creditors' Committee, prior to the Application Period the Creditors' Committee filed a motion seeking court authority to prosecute the Debtors' claims

and defenses against GM and certain former officers of Delphi on the Debtors' behalf (also known as the STN Motion) (Docket No. 4718), to which the Debtors filed a preliminary objection on August 4, 2006 (Docket No. 4859). The STN motion remains pending and was most recently adjourned to the April 20, 2007 omnibus hearing. The Equity Committee, which has also been provided information by the Debtors pursuant to a joint interest agreement, has also articulated its views regarding the Debtors' claims and defenses against GM in submissions to the Debtors and court filings. During the application period, Skadden continued its work in assisting with the Debtors' evaluation of potential claims and defenses against GM, which will either be resolved as part of a consensual plan of reorganization process or litigated if a consensual resolution of the GM legacy issues cannot be reached.

<u>Requested Fees And Reimbursement Of Expenses</u>

26.     Skadden has played an important role in advising the Debtors with respect to implementing their restructuring strategy and developing and negotiating a framework agreement that may provide the foundation for a plan of reorganization. As a result of its efforts during the Application Period, Skadden now seeks interim allowance of $12,820,504 in fees calculated at the applicable guideline hourly billing rates of the firm's personnel who have worked on the Reorganization Cases, and $708,096 in charges and disbursements actually and necessarily incurred by Skadden while providing services to the Debtors during the Application Period.

27.     This Interim Application reflects (a) a voluntary reduction by Skadden in connection with each monthly statement in the aggregate amount of $1,048,877 with respect to fees (generally including the elimination from any matter of any timekeeper who recorded less than one hour and the elimination of any timekeeper who recorded less than $2,500 in the aggregate on all Delphi matters) and $122,101 with respect to charges and disbursements

13

(including, among other things, certain reductions to in-firm food services to comply with the Fee
Review Committee's guidelines) and (b) an additional voluntary reduction in the amount of
$106,834 in connection with this Interim Application to reflect, among other things, the
elimination of all fees related to (i) any timekeeper who billed fewer than ten total hours during
the Application Period, (ii) any timekeeper who billed less than $1,000 during the Application
Period, (iii) any instance in which a timekeeper billed less than $1,000 to a particular matter
during the Application Period, and (iv) the elimination of any matter to which fewer than ten
hours were billed during the Application Period. Accordingly, including the voluntary client
accommodations in connection with each monthly statement, Skadden is voluntarily reducing its
fees by $1,155,711, or approximately 8.3%, and its charges and disbursements by $122,101, or
approximately 14.7%, for a total reduction of $1,277,812 for items that Skadden normally would
bill its clients.[9]

       28.     In staffing this case, in budgeting and incurring charges and disbursements,
and in preparing and submitting this Interim Application, Skadden has been mindful of the need
to be efficient while providing appropriate and vigorous representation of the Debtors. As
described in detail herein, Skadden believes that the requests made in this Interim Application
comply with this Court's standards in the context of the unique circumstances surrounding these
unusually large and complex cases.

---

[9]    Skadden believes that the amounts requested in this Interim Application are reasonable in relation to the services
rendered. The amounts requested are already reduced to reflect the client accommodations described herein. To
the extent that a party objects to this Interim Application, Skadden reserves the right to recapture such client
accommodations and seek up to the full amount of fees and expenses actually incurred in connection with this
engagement. Furthermore, Skadden reserves its right to recapture and seek allowance of all client
accommodations as part of its final fee application.

Summary Of Services Rendered By
Skadden During The Application Period

29.     Throughout the Application Period, Skadden has worked closely with the

Debtors and their advisors to administer these estates and maximize the return for

parties-in-interest.  These services have been directed toward a myriad of tasks necessary to

achieve this result.  To meet the Debtors' needs, Skadden has provided multi-disciplinary services

on a daily basis, often working nights, weekends, and holidays.  Throughout this process, certain

of the principal Skadden attorneys working on the Reorganization Cases were required to devote

the vast majority of their time to this matter, often to the exclusion of other clients.  As a result of

the efforts of the Debtors and their professionals, the Debtors continued to make substantial

progress in evaluating their businesses and pursuing their transformation plan; negotiated and

received court approval of the Framework Agreements with GM, the statutory committees, and

other key parties-in-interest; and continued to reconcile claims asserted against the Debtors at an

intense pace, all of which is meant to facilitate the Debtors' goal of emerging from chapter 11

during 2007.

30.     At the commencement of the Reorganization Cases, Skadden created 45

different matter numbers or subject-matter categories (the "Matter Categories") to which its

professionals assigned the time billed by them, all of which are related to the tasks performed by

Skadden on behalf of the Debtors.[10]  Skadden has kept a contemporaneous record of the time

spent rendering such services and, consistent with the Guidelines, separated tasks in billing

---

[10]    There are now 47 Matter Categories because Skadden added two additional matter categories since the Petition
Date: Customer Matters (Review and Investigations) and Rights Offering.  Exhibit C contains a table of all matter
numbers used by Skadden in these Reorganization Cases, as well as a description of certain business statistics of
Skadden in these Reorganization Cases.

15

increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and necessary for the proper administration of the Reorganization Cases.

31.    Skadden devoted approximately <u>68.7%</u> of its time to the following seven matters, each of which was responsible for fees <u>in excess of $400,000</u> during the Application Period: Reorganization Plan/Plan Sponsors, Claims Administration (General), Customer Matters (Reviews/Investigations), Case Administration, Asset Dispositions (General), Rights Offering, and Tax Matters.

32.    Skadden devoted approximately <u>27.0%</u> of its time in the aggregate to the following 14 matters, billings for each of which were <u>between $100,000 and $400,000</u> during the Application Period: Nonworking Travel Time, Retention/Fee Matters/Objections (Others), Retention / Fee Matters (SASM&F), Litigation (Insurance Recovery), Financing (DIP and Emergence), General Corporate Advice, Automatic Stay (Relief Actions), Creditor Meetings/Statutory Committees, Environmental Matters, Business Operations/Strategic Planning, Supplier Matters, Employee Matters (Labor Unions), Leases (Real Property), and Employee Matters (General).

33.    The remainder of time billed by Skadden (approximately <u>4.2%</u>) was devoted to the following 13 matters, each of which accounted for <u>less than $100,000</u> during the Application Period:  Customer Matters (GM), Employee Matters (Pension), Regulatory and SEC Matters, Disclosure Statement/Voting Issues, Executory Contracts (Personalty), Intellectual Property, Global Subsidiaries (Non-U.S.), Secured Claims, Real Estate (Owned), Litigation (General), Utilities, Claims Administration (Reclamation/Trust Funds), and Reports and Schedules.

<u>Matters Greater Than $400,000</u>

A.    <u>Reorganization Plan/Plan Sponsors</u>

34.    As previously discussed, the primary advancement of the Reorganization

Cases during the Application Period relates to the Debtors' entry into the Framework Agreements

with the Plan Investors and GM.  During the Application Period, Skadden devoted a significant

amount of time to assisting the Debtors with the negotiation and documentation of the Framework

Agreements, and ultimately, the eventual prosecution of the Plan Investor and Framework

Support Approval Motion.

35.    <u>The Framework Discussions</u>.  The framework discussions, which

commenced on August 1, 2006, progressed significantly in the two months prior to the

Application Period.  Prior to the Application Period, the Debtors and Skadden believed that the

framework discussions had yielded significant progress because the discussions had produced

multiple proposals and drew the interest of several unaffiliated potential plan investors, which

stirred a competitive process.

36.    During the Application Period, framework discussions led to the

Framework Agreements.  In October 2006, the Debtors, with the assistance of Skadden, entered

into non-disclosure agreements with Cerberus and other potential plan investors, and then

expanded the framework discussions being conducted with the statutory committees and GM to

include these potential plan investors, as well as Appaloosa, which had been in discussion with

stakeholders for some time.  The framework discussions involved many implementation ideas for

a transformed Delphi, and Skadden professionals assisted the Debtors in reviewing and

evaluating carefully all of these suggestions.  These discussions were intended to provide a basis

for developing the framework for an eventual reorganization plan.  The discussions addressed

17

various matters, including allocation of legacy liabilities, wind- down or divestiture of non-core North American facilities, GM's contribution and recovery, potential plan treatment for various stakeholders, the anticipated scope of, and potential limitations on, general unsecured claims, future capital structure, and corporate governance upon emergence.

37.    By November 2006 the Debtors, with the assistance of their advisors, including Skadden, narrowed the potential investment proposals to two investor groups.  The Debtors and their advisors met with both investor groups multiple times at Skadden's offices, and held discussions with them in smaller groups continuously through mid-November.

38.    On the morning of November 16, 2006, the Debtors convened a meeting at Skadden's New York offices among principals and advisors from the Debtors, the statutory committees, the potential plan investors, and GM.  During a day of intense negotiations and discussions, the participants worked through significant issues concerning the framework.  The Debtors, with the assistance of Skadden, negotiated with the potential investors over numerous deal points favored by the statutory committees, and ultimately obtained positive results on many issues that were believed to be significant to the statutory committees.  At the conclusion of the full-day session on November 16, the Debtors believed they had achieved significant progress such that the framework structure under consideration would be supported ultimately by the committees.

39.    The all-day framework session was followed by an evening meeting of the Board, at which the Debtors selected Appaloosa/Harbinger and Cerberus (together with Merrill Lynch and UBS) as potential plan investors. The Debtors, at the direction of the Board, were instructed to pursue earnest negotiation of definitive documents with the Plan Investors to determine if there was a viable transaction that could be accomplished.

18

40.    By late November 2006, the Debtors, with the assistance of Skadden, and the Plan Investors began working on documenting their agreements through a series of drafting sessions held at Skadden's New York offices.  Prior to that time period, various groups had circulated and commented on draft "term sheets" outlining potential Framework Agreements and discussion points related to the Framework Agreements.  The drafting sessions between the Plan Investors and the Debtors produced early drafts of the EPCA and the PSA.

41.    On December 11, 2006, Delphi's management presented drafts of the EPCA and the PSA to the Board.  These agreements were fully negotiated and were the most favorable agreements that management believed it could reasonably achieve under the circumstances through arms-length bargaining.  After a full discussion with the management team and the Debtors' advisors, the Board approved and authorized the Debtors to enter into the Framework Agreements.  On December 18, 2006, Delphi announced that it had entered into the PSA with the Plan Investors and GM, which outlined a framework plan of reorganization, including an outline of the proposed financial recovery of the Company's stakeholders and the treatment of certain claims asserted by GM, the resolution of certain pension funding issues, and the corporate governance of reorganized Delphi.  The PSA, as well as the economics and structure of the plan framework itself, was expressly conditioned on reaching consensual agreements with the Unions (as defined below) and GM.  On the same date, the Debtors filed the Framework Approval Motion[11] with the Bankruptcy Court seeking approval of the PSA and the EPCA.  The hearing on the Framework Approval Motion was initially scheduled for January 5, 2007.

---

[11]    See Expedited Motion for Order Authorizing and Approving The Equity Purchase and Commitment Agreement Pursuant to Sections 105(a), 363(b), 503(b), and 507(a) of the Bankruptcy Code and the Plan Framework Support Agreement Pursuant To Sections 105(a), 363(b), and 1125(e) of the Bankruptcy Code (Docket No. 6179) (the "Framework Approval Motion").

42.    <u>The Framework Hearing</u>.  Despite the months of negotiations, the Framework Approval Motion immediately drew objections from the Debtors' statutory committees.  The Debtors also received objections from the Ad Hoc Committee of Delphi Trade Claim Holders, the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers-Communications Workers of America (the "IUE-CWA"), the International Union of Operating Engineers (the "IUOE"), the International Brotherhood of Electrical Workers (the "IBEW"), and the U.S. Trustee.  In addition, on December 21, 2006, the Debtors received an unsolicited investment proposal from Highland Capital Management, L.P. ("Highland").  Highland also issued a press release stating that it was prepared to offer a competing investment proposal to the Debtors as an alternative to that embodied in the Framework Agreements and that it had submitted a letter to the Board outlining the proposal's principal terms.  The text of the letter was appended to the press release.  Highland also objected to the Framework Approval Motion and attached its alternative proposal as an exhibit to its objection.

43.    Highland had made no prior contact with the Debtors regarding participation in the Debtors' reorganization.  Nevertheless, Delphi acknowledged publicly on December 21, 2006, that it would carefully analyze and consider Highland's proposal and discuss its merit with the Board.  That same day, the Debtors' Chief Restructuring Officer and General Counsel commenced discussions with Highland.  The Debtors and their advisors immediately engaged in discussions with Highland to better understand and explore Highland's proposal and the Board was kept apprised of the key terms, similarities, and differences between the Framework Agreements and Highland's proposal.

44.    Simultaneously, the Debtors and their advisors were working to resolve the objections received to the Framework Approval Motion.  On December 29, 2006, the Debtors

submitted a response, acknowledged by GM, Appaloosa, and Cerberus, to various statements propounded by the Creditors' Committee, the Equity Committee, and the Trade Committee in which the committees purported to set forth ambiguities in the Framework Agreements. The Debtors' response stated that the parties agreed to make certain clarifications to the Framework Agreements in response to the committee's objections and statements of purported ambiguities.

45.    While attempting to resolve the objections to the Framework Approval Motion, the Debtors' discussions with Highland continued, including attempts to negotiate the terms and conditions of a proposed confidentiality agreement. These discussions included a lengthy meeting on January 2, 2007 at the Debtors' headquarters in Troy, Michigan in which principals for the Debtors and Highland as well as legal and financial advisors for both the Debtors and Highland participated. As a result of these meetings and discussions, Highland agreed to provide additional information to the Debtors later in the week of January 2, 2007, including proposed markups of the existing Framework Agreements, its due diligence requests and timetable, and its vision statement regarding execution of the transaction and the value Highland would bring to the Debtors as a plan investor.

46.    On January 3, 2007, the Board met and continued its evaluation of the Highland proposal. During that same time, the Debtors solicited input from their key constituents including GM, the statutory committees, the Unions, and other stakeholders regarding the Highland proposal. On January 10, after consulting with the Board, the Debtors advised Highland that they decided to proceed with the Framework Hearing on January 11, 2007 and seek approval of the Framework Motion. The Debtors concluded that it was in the best interests of the Company and its stakeholders, taken as a whole, to enter into the PSA and EPCA and ultimately carry out the terms of those agreements. Accordingly, the Debtors advised Highland that, among other things,

21

based on the information then available, the Debtors could not conclude that the Highland

proposal, as a matter of fact, would deliver superior value to the Debtors' stakeholders and that,

like the Framework Agreements, there were significant conditionality and execution risks in the

Highland proposal.[12]

      47.     Despite the best efforts of the Debtors and their advisors, the hearing on the

Framework Approval Motion was contested.  Consequently, preparation for this hearing required

significant time and attention from the Debtors and their advisors.  The discovery process

preceding the hearing required roughly half a dozen formal "meet-and confer" discussions,

multiple telephonic chambers conferences, and the review and production of a significant volume

of documents generated during the course of the framework discussions since August 2006.  The

process also resulted in a number of amendments to the EPCA and the PSA, some of which were

intended to address concerns raised by the objecting parties.

      48.     The hearing on the Plan Investment and Framework Approval Motion took

place on January 11 and 12, 2007.  Four witnesses testified at the hearing, including the Executive

Chairman of the Board, the Debtors' Chief Restructuring Officer, and the Debtors' lead financial

advisor.  After closing arguments, on January 12, 2007, this Court read its opinion adjudicating the

matter and entered the Framework Approval Order, which reflected, among other things, that entry

into the Framework Agreements was a proper exercise of the Debtors' business judgment.  The

Court also noted in its bench ruling that the approval of the Framework Agreements was a

"watershed event in the case" (Transcript from Hearing held on January 12, 2007, 112: 5) and

remarked that Delphi's Board "is not only independent and without conflict but also one that acted

with due care and responsibly and with a welcome degree of responsiveness to the views of their

---

[12]    There have been no communications between the Debtors and Highland since the EPCA and the PSA were
approved by the Bankruptcy Court on January 12, 2007.

constituents." Id. at 116: 13-15.  On January 18, 2007, the Framework Agreements were fully

executed.

49.    Implementation Of EPCA And PSA.  Following the entry of the

Framework Approval Order, the Debtors turned their attention to implementing the terms of the

Framework Agreements and developing a plan of reorganization based on the terms of the

agreements.  Two of the Debtors' most significant obligations under the Framework Agreements

are to negotiate comprehensive settlement agreements with GM and the Debtors' U.S. unions.  As

a result of the progress achieved in connection with the Framework Agreements, the Debtors

determined that the adjourned 1113 and 1114 Motion[13] and the GM Contract Rejection Motion[14]

should be suspended to permit negotiations to continue.  Therefore, following entry of the

Framework Approval Order, the Debtors sought, and this Court approved, an order suspending

prosecution of the motions indefinitely, effective January 31, 2007 (Docket No. 6779).[15]

50.    By mid-January, 2007 the Debtors, after having obtained approval of the

Framework Agreements, continued discussions with GM at various levels of their respective

organizations concerning a broad spectrum of commercial matters.  At the same time, the

Debtors, GM, and the Plan Investors began work on a joint, consensual labor proposal.  Although

productive discussions have continued, as of the date of filing of this Interim Application, the

Debtors have yet to conclude agreements with either GM or its U.S. labor unions.

---

[13]    See Motion For Order Under 11 U.S.C. § 1113(c) Authorizing Rejection Of Collective Bargaining Agreements
And Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket No. 3035) (the
"1113/1114 Motion").

[14]    See Motion For Order Under 11 U.S.C. § 365 And Fed. R. Bankr. P. 6006 Authorizing Rejection Of Certain
Executory Contracts With General Motors Corporation (Docket No. 3033) (the "GM Contract Rejection
Motion").

[15]    The Debtors have reserved their right to seek a hearing on these motions should circumstances so require.

23

51.    In addition, in connection with the EPCA, the Debtors agreed to provide due diligence materials to the Plan Investors.  On December 22, 2006, the Debtors received an expansive legal due diligence request from counsel to Appaloosa/Harbinger and Cerberus.  In response to this diligence request, Skadden professionals worked with the Debtors to identify responsive documents.  Specifically, Skadden professionals conducted numerous in-person meetings and teleconferences with the various employees of the Debtors to gather documents to be made available for the Plan Investors' review.  Skadden professionals reviewed and indexed each document that was provided and created a data room in Troy, Michigan for the Plan Investors' attorneys to review.  This data room was in addition to the other data rooms that were established prior to the Application Period by the Debtors with the assistance of Skadden in response to legal due diligence requests.

52.    Additionally, during the Application Period, seven different attorneys for Appaloosa/Harbinger and Cerberus visited the data room in Troy, Michigan on various occasions to review documents.  To facilitate this process, Skadden attorneys were on site in Troy to prepare and update the data room and to coordinate with counsel to the Plan Investors to ensure an appropriate setting and schedule for their review of documents.  Throughout this process, Skadden professionals participated in numerous conference calls and in-person meetings between the Debtors' and counsel for the Plan Investors to ensure a timely and efficient flow of information between the parties.  Following the on-site visits, Skadden also assisted the Debtors in responding to requests submitted by the Plan Investors for copies of documents that were reviewed in the data room in Troy.

53.    In addition to the ongoing legal due diligence, the Plan Investors are also conducting financial and other business-related due diligence.  In connection with these due

24

diligence efforts, the Debtors, with the assistance of their advisors, provide documents and presentations to the Plan Investors to assist the Plan Investors in the due diligence efforts. To maintain coordination between the legal and business due diligence, Skadden attorneys maintained constant communication with PricewaterhouseCoopers, the Debtors' retained professional to assist with due diligence, and the Debtors' business personnel leading the business side diligence. This has been particularly helpful because many follow up legal diligence requests are a result of the business diligence. As of the end of the Application Period and the filing of this Interim Application, the due diligence efforts remain a work in progress, and Skadden continues to work with the Debtors and counsel to the Plan Investors to provide responsive documents and information.

54.    Finally, on December 22, 2006, shortly after the Debtors filed the Framework Approval Motion, the Debtors filed their third motion to extend the exclusivity period to file and solicit acceptances of a plan of reorganization (Docket No. 6285). To allow the Debtors time to implement the EPCA and the PSA (and to pursue alternative courses of action if the EPCA and the PSA were not consummated), Skadden assisted the Debtors in seeking an extension of the exclusive periods to file and solicit acceptances of a plan of reorganization through and including July 31, 2007 and September 30, 2007, respectively. The Creditors' Committee, the Equity Committee, and Highland objected to the motion. The Creditors' Committee withdrew its objection prior to the hearing. This Court overruled the objections filed by the Equity Committee and Highland and entered an order approving the motion on January 23, 2007 (Docket No. 6700).

55.    In connection with the foregoing services, Skadden expended 7,454.6 hours during the Application Period for which Skadden seeks compensation of $4,147,192, or 32.3% of

the total compensation sought in this Interim Application.[16]  Detailed time entries of each

Skadden professional related to these services are attached hereto as <u>Exhibit D-1</u>.  A summary of

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm. Butler, Jr. | $875 | 426.8 | $373,451 |
| Eric L. Cochran | $845 | 426.2 | $360,140 |
| Adlai S. Hardin | $585 | 576.5 | $337,254 |
| George N. Panagakis | $810 | 370.7 | $300,267 |
| Nathan L. Stuart | $495 | 598.8 | $296,408 |
| Thomas J. Matz | $625 | 440.7 | $275,439 |
| Kayalyn A. Marafioti | $830 | 315.0 | $261,450 |
| Albert L. Hogan III | $695 | 286.1 | $198,840 |
| Lee P. Garner | $625 | 218.6 | $136,626 |
| Ron E. Meisler | $585 | 218.5 | $127,824 |
| Michael W. Perl | $435 | 279.5 | $121,584 |
| Nick D. Campanario | $535 | 220.3 | $117,861 |
| Ian S. Bolton | $390 | 295.6 | $115,284 |
| John Guzzardo | $435 | 236.6 | $102,921 |
| Kurt Ramlo | $625 | 152.7 | $95,438 |
| Kellan Grant | $470 | 183.3 | $86,151 |
| Lisa B. Diaz | $384 | 214.9 | $82,544 |
| Marie L. Gibson | $670 | 93.2 | $62,444 |
| Antonio La Pergola | $565 | 109.4 | $61,812 |
| J.R. Lederer | $315 | 192.0 | $60,481 |
| Neil MacDonald | $585 | 83.6 | $48,906 |
| Natalia F. Lazarova | $470 | 101.8 | $47,846 |
| Sarah J. Platt | $333 | 127.2 | $42,405 |
| Daniel I. Ganitsky | $585 | 70.8 | $41,418 |
| Courtney E. VanLonkhuyzen | $435 | 86.7 | $37,715 |

---

[16]  This compares to $14,195, or 0.2%, $20,728, or 0.2%, and $820,818, or 8.2% of the total fees requested for this matter in Skadden's First, Second and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| M. Janine Jjingo | $390 | 83.3 | $32,487 |
| John M.McLeod | $585 | 51.3 | $30,011 |
| Gregory O. Ogunsanya | $495 | 55.6 | $27,523 |
| Brian M. Fern | $565 | 40.3 | $22,770 |
| Peter Olasky | $435 | 46.2 | $20,098 |
| Neal R. Stoll | $865 | 14.3 | $12,370 |
| Henry L. Huser | $810 | 10.8 | $8,748 |
| Tero Louko | $585 | 14.1 | $8,249 |
| Allison V. Herriott | $435 | 7.0 | $3,046 |
| Adam Halper | $390 | 6.8 | $2,652 |
| Randall G. Reese | $535 | 4.5 | $2,408 |
| Eric J. Howe | $390 | 4.9 | $1,911 |
| William M. Rohner | $495 | 3.5 | $1,733 |
| Brent M. Houston | $435 | 2.9 | $1,262 |
| Paraprofessional Total | | 783.6 | $179,415 |
| **Total** | | **7,454.6** | **$4,147,192 (32.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$158,689** |

B.    Claims Administration (General)

        56.    As of January 31, 2007, more than 16,500 proofs of claim were filed against

the Debtors, a portion of which assert, in whole or in part, unliquidated claims.  As part of the

Debtors' reconciliation efforts, the Debtors compared the proofs of claim received to scheduled

liabilities and determined that there are certain scheduled liabilities for which no proof of claim

was filed.  In the aggregate, these proofs of claim and scheduled liabilities assert more than $37

billion in liquidated amounts plus certain unliquidated amounts.  Because of the magnitude of

asserted claims, parties involved in the framework discussions have required a clear

understanding of the scope of the allowed claims against the Debtors in these cases.  Accordingly,

during the Application Period, the Debtors, with the assistance of Skadden and other members of

the Debtors' claims reconciliation team, completed a preliminary evaluation and estimation of the

amount and types of claims asserted against the Debtors.  This preliminary evaluation and

estimation contributed to the Debtors' ability to consummate the Framework Agreements.

57.    The Debtors, with the assistance of Skadden, spent considerable time

preparing for and presenting a claims administration update to their key constituents.  At a

presentation to the key stakeholders on November 8, 2006, the Debtors provided a comprehensive

update of the then-current state of their claims administration process, including the results of

their preliminary claims estimations.  As a result of information provided during that

presentation, among other things, one of the requirements of the Framework Agreements is that

certain prepetition trade and other unsecured claims be reduced to $1.7 billion or less.

Accordingly, during the Application Period, the Debtors, with the assistance of Skadden and

other members of the claims reconciliation team, devoted a significant amount of time (i)

identifying proofs of claim subject to objection, (ii) objecting to these proofs of claim pursuant to

omnibus claims objections, (iii) prosecuting omnibus objections at omnibus hearings, (iv)

implementing (after negotiations with the Creditors' Committee and other parties, and ultimate

approval by this Court) streamlined procedures, as described more fully below, to resolve

contested claim objections, and (v) prosecuting and/or resolving contested claim objections both

with and without the assistance of the Court.

58.    Prior to the Application Period, the Debtors filed their first omnibus claims

objection, which resulted in this Court's entering an Order, during the Application Period,

expunging approximately 3,500 proofs of claims in the amount of approximately $1.7 billion.

During the Application Period, the Debtors, with the assistance of Skadden and other members of

the claims reconciliation team, continued to identify thousands of proofs of claim subject to

objection on both procedural and substantive grounds, and filed six additional omnibus claims

28

objections. These six omnibus claims objections ultimately resulted in the entry of orders

disallowing, expunging, or reducing approximately 4,800 additional proofs of claims in the

approximate amount of $6.4 billion.

59.    In addition, due to the volume of filed claims and the need for an expedited

resolution of contested claims matters, the Debtors anticipated the need for a streamlined claims

resolution process. Accordingly, Skadden worked with the Debtors' claims reconciliation team to

design procedures to streamline the resolution of such claims. Skadden assisted the Debtors by

drafting a motion (the "Claim Objection Procedures Motion") seeking authority to implement

claim objection procedures (the "Claim Objection Procedures") that would streamline the

resolution of contested claims matters by, among other things, (i) establishing procedures to

facilitate the resolution of contested claims without resort to evidentiary hearings, including

"meet-and-confer" discussions and mediations, (ii) limiting, when litigation is necessary, the

scope of discovery, the number of witnesses called at hearing, and the time allocated for hearing,

(iii) providing flexibility for parties to alter the procedures to address the needs of particular

claims to enhance the likelihood of consensual resolution, and (iv) establishing a mechanism to

adjudicate the legal sufficiency of a claim through abbreviated procedures culminating in a

"sufficiency hearing" in which no evidence is presented to the court. The Debtors received a

number of both formal and informal objections to the Claim Objection Procedures Motion,

including an informal objection by the Creditors' Committee. Skadden engaged in extensive

negotiations with the objecting parties, the Creditors' Committee in particular, and made certain

modifications to the Claim Objection Procedures to resolve many of the objecting parties'

concerns. Skadden, on behalf of the Debtors, prosecuted the Claim Objection Procedures Motion

at the November 30, 2006 omnibus hearing, and ultimately obtained an order from this Court

approving the procedures as modified pursuant to negotiation (the "Claim Objection Procedures

Order") (Docket No. 6089).  The procedures established pursuant to the Claim Objection

Procedures Order have been instrumental in the Debtors' success in expeditiously reconciling

claims filed in these cases.

   60. With the Claim Objection Procedures Order in place, Skadden, during the

Application Period, assisted the Debtors in identifying 15 contested claims in the approximate

amount of $210 million to be noticed for sufficiency hearing and 20 contested claims in the

approximate amount of $83 million to be noticed for claims objection hearing.  Skadden

prosecuted the 15 contested claims noticed for sufficiency hearing at the January 12, 2007

sufficiency hearing, and this Court entered an order (Docket No. 6701) disallowing and

expunging fourteen of those claims in the aggregate amount of approximately $210 million.

   61. In addition, during the Application Period, Skadden prosecuted the twenty

contested claims noticed for claims objection hearing by (i) participating in multiple "meet and

confer" discussions and mediations, (ii) engaging in extensive negotiations leading to the ultimate

resolution of a large number of the claims, and (iii) litigating all aspects of the claims in the

different stages of the Claim Objection Procedures, including drafting and responding to

discovery, preparing witnesses, and drafting trial briefs.  As a result of these services provided by

Skadden during the Application Period, the Debtors were able to negotiate, both during and after

the Application Period, the consensual resolution of 13 of the contested claims noticed for claims

objection hearings during the Application Period.

   In connection with the foregoing services, Skadden expended 4,374.4 hours

during the Application Period for which Skadden seeks compensation of $2,081,005, or 16.2% of

the total compensation sought in this Interim Application.[17]  Detailed time entries of each

Skadden professional related to these services are attached hereto as <u>Exhibit D-2</u>.  A summary of

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John K. Lyons | $775 | 471.9 | $365,724 |
| Randall G. Reese | $535 | 598.8 | $320,359 |
| Eric J. Howe | $390 | 545.5 | $212,745 |
| Allison V. Herriott | $435 | 411.7 | $179,091 |
| Lisa B. Diaz | $341 | 439.6 | $149,837 |
| Ian S. Bolton | $389 | 325.6 | $126,819 |
| Sarah J. Platt | $343 | 342.5 | $117,317 |
| Albert L. Hogan III | $695 | 138.6 | $96,327 |
| Kayalyn A. Marafioti | $830 | 77.7 | $64,491 |
| Christopher P. Connors | $585 | 104.8 | $61,309 |
| Joseph N. Wharton | $565 | 102.4 | $57,857 |
| John (Jack) Wm. Butler, Jr. | $875 | 45.8 | $40,076 |
| Courtney E. VanLonkhuyzen | $435 | 63.2 | $27,492 |
| Brian M. Fern | $565 | 47.1 | $26,612 |
| Thomas J. Matz | $625 | 30.8 | $19,251 |
| George N. Panagakis | $810 | 23.4 | $18,954 |
| Michael W. Perl | $435 | 41.5 | $18,054 |
| Ron E. Meisler | $585 | 30.7 | $17,960 |
| Kenneth Berlin | $810 | 18.0 | $14,580 |
| Louis D. Wilson | $585 | 20.5 | $11,993 |
| Lee P. Garner | $625 | 13.7 | $8,563 |
| John P. Furfaro | $810 | 7.9 | $6,399 |
| William M. Rohner | $495 | 12.0 | $5,941 |
| J.R. Lederer | $315 | 14.1 | $4,442 |
| M. Janine Jjingo | $390 | 10.2 | $3,978 |

---

[17]  This compares to $31,974, or 0.3%, $151,245, or 1.3%, or $467,214 or 4.7% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kurt Ramlo | $625 | 5.3 | $3,313 |
| Dhananjai Shivakumar | $625 | 4.6 | $2,875 |
| Jay S. Berke | $810 | 3.0 | $2,430 |
| Kellan Grant | $470 | 4.1 | $1,927 |
| Paraprofessional Total | | 419.4 | $94,289 |
| **Total** | | **4,374.4** | **$2,081,005 (16.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$25,016** |

C.    Customer Matters (Reviews/Investigations)

62.    On January 20, 2006, the Debtors filed their Schedules of Assets and Liabilities (Docket No. 1854) and their Statement of Financial Affairs (Docket No. 1855) listing certain unliquidated claims that the Debtors held against GM.  On March 24, 2006, the Creditors' Committee filed a Motion For An Order Compelling The Production Of Documents By General Motors Corporation Pursuant To Rule 2004 Of The Federal Rules Of Civil Procedure (Docket No. 2961) requesting this Court's direction for GM to turn over certain documents to the Creditors' Committee so that the Creditors' Committee could evaluate certain claims that the Debtors hold against GM and that GM allegedly holds against the Debtors.  The Debtors did not object to the Creditors' Committee's motion, which resulted in the Creditors' Committee and GM entering into a stipulation and agreed order on April 11, 2006 whereby the Creditors' Committee and GM agreed that the Creditors' Committee was authorized to seek document production from GM and that GM would produce certain documents.

63.    On March 28, 2006, the Debtors filed their Motion For Approval Of Joint Interest Agreement Between the Debtors And The Official Committee Of Unsecured Creditors, Implementation Of Protective Order, And Approval Of Procedures To Protect Information In Fee Statements (Docket No. 3000) seeking this Court's authority to share certain confidential

32

information with the Creditors' Committee to facilitate the Creditors' Committee's ability to
investigate various on-going investigations.

64.    On May 11, 2006, the Creditors' Committee sent a letter (the "Demand
Letter") and subsequently a draft complaint (the "Draft Complaint") to the Board demanding that
the Debtors promptly pursue certain claims and defenses that the Debtors may have against GM.
The Draft Complaint was based in part on documents provided to the Creditors' Committee under
a joint interest agreement previously approved by this Court.

65.    On July 28, 2006, the Creditors' Committee filed its motion seeking court
authority to prosecute the Debtors' claims and defenses against GM and certain former officers of
the Debtors on Delphi's behalf (also known as the STN Motion) (Docket No. 4718),[18] to which
the Debtors filed a preliminary objection on August 4, 2006 (Docket No. 4859).  The STN Motion
remains pending.  As of the end of the Application Period, the STN Motion was adjourned to the
February 15, 2007 omnibus hearing and has subsequently been adjourned to the April 20, 2007
omnibus hearing.

66.    In light of the various filings and demand letters, beginning prior to the
Application Period and continuing during the Application Period, Skadden assisted the Debtors in
conducting a further factual inquiry regarding the evaluation of the Debtors' potential claims and
defenses against GM.  In conducting the factual inquiry, Skadden reviewed thousands of
documents, conducted thirty-two interviews, and kept detailed records of the inquiry.  Skadden
also continued throughout the Application Period to research and assist the Debtors and the Board
in evaluating the legal merits of potential claims and defenses against GM.  Finally, in December

---

[18]    Shortly after the formation of the Equity Committee, the Debtors solicited the Equity Committee's views
regarding potential estate claims against GM.  On August 24, 2006, the Equity Committee delivered a letter to the
Debtors stating that the Equity Committee's view of the Debtors' claims and defenses against GM, and on
September 5, 2006, the Equity Committee filed its objection to the STN Motion (Docket No. 5070).

and January, and continuing beyond the Application Period, Skadden assisted the Debtors and

their financial advisors in analyzing and evaluating potential damages recoveries in various

potential litigation scenarios.

       67.    In connection with the foregoing services, Skadden professionals expended

1,284.9 hours during the Application Period for which Skadden seeks compensation of $661,440,

or 5.2% of the total compensation sought in this Interim Application.[19]  Detailed time entries of

each Skadden professional related to these services are attached hereto as Exhibit D-3.  A

summary of the hours expended and the corresponding dollar amount of the services performed

by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Lee P. Garner | $625 | 274.1 | $171,314 |
| Karen E. Willinken | $585 | 179.3 | $104,891 |
| Jonathan L. Shih | $315 | 270.8 | $85,302 |
| John Guzzardo | $435 | 195.9 | $85,217 |
| Keith D. Krakaur | $810 | 101.2 | $81,972 |
| George N. Panagakis | $810 | 50.7 | $41,067 |
| Albert L. Hogan III | $695 | 49.2 | $34,195 |
| Nick D. Campanario | $535 | 31.8 | $17,013 |
| John (Jack) Wm. Butler, Jr. | $875 | 13.8 | $12,076 |
| David R. Pehlke | $390 | 12.0 | $4,680 |
| Allison V. Herriott | $435 | 10.6 | $4,611 |
| Nathan L. Stuart | $495 | 4.2 | $2,079 |
| J.R. Lederer | $315 | 5.3 | $1,670 |
| Paraprofessional Total | | 86.0 | $15,353 |
| **Total** | | **1,284.9** | **$661,440 (5.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$56,963** |

---

[19]   This compares to $743,110, or 7.4%, of the total fees requested for this matter in Skadden's Third Interim Fee
Application.  Skadden did not request compensation for this matter in its First or Second Interim Fee
Applications.

D.    Case Administration

68.    This category is comprised of matters relating to, among other things, (a) general preparation for, and attendance at, court hearings, (b) general communications with creditors and other parties-in-interest, (c) general case administration, including duties pertaining to service of process, (d) general advice with respect to the prosecution of the Reorganization Cases, and (e) general advice with respect to the rights and duties of debtors-in-possession in the administration of the Reorganization Cases.

69.    Skadden devoted significant time preparing for and attending the omnibus and special hearings that this Court established.  The omnibus hearings have streamlined the administration of these Reorganization Cases by establishing a schedule known to all parties-in-interest for Court hearings and consolidating multiple matters in a single hearing, thus eliminating unnecessary time and expense spent appearing before the Court on numerous occasions each month regarding disparate matters.  Indeed, despite the fact that the Debtors are the largest manufacturing company ever to have sought reorganization relief, the Debtors have held only 15 omnibus hearings to date, including three omnibus hearings during the Application Period.[20]  At these three omnibus hearings, 25 discrete matters were heard.  This omnibus hearing schedule requires a carefully coordinated, but limited, team of Skadden attorneys to attend the hearings, to meet with numerous parties-in-interest who appear, and to resolve as many issues as possible without court intervention.  In fact, it is not unusual for differences to be bridged at the courthouse just prior to the applicable hearing.  Indeed, the Debtors, with the assistance of Skadden and the Debtors' other professionals, have succeeded in presenting the great majority of

---

[20]    During the Application Period there were also several additional off-omnibus hearings.  Specifically, there were two claims hearings, a hearing regarding the refinancing of the DIP facility, and a hearing on the Framework Agreement that spanned two days.

these matters as uncontested or resolved.  To date, there have been relatively few contested

matters in these cases, and even fewer matters that actually required contested evidentiary

hearings.  Following the hearings, Skadden must occasionally modify proposed orders to comply

with the Court's rulings and subsequently submit those orders to this Court for entry and

docketing.  But for the coordinated efforts of Skadden (as well as the Debtors' other retained

professionals) in connection with these hearings, this simply would not be possible.

70.     The internal coordination of motions, responses, objections, witnesses, and

other related matters requires close and careful attention by the entire Skadden team.  The

omnibus hearing schedule established in these Reorganization Cases is designed to efficiently

address nearly all matters arising in these cases but requires that multiple professionals and

paraprofessionals assist with various functions with respect to each omnibus hearing.  For

example, the monthly omnibus hearing agendas that Skadden prepares require significant

attention by Skadden paraprofessionals.  Skadden attorneys are then requested to review and

approve the particular matter(s) on the agenda for which they have principal responsibility to

ensure that all relevant filings are properly reflected.

71.     Moreover, given the size and complexity of these Reorganization Cases, the

Debtors and Skadden are presented with a unique set of challenges in administering the cases,

tracking motions filed by others, responding to inquiries from parties-in-interest, and maintaining

organization and control over a case that could quickly become disorganized if attention were not

provided to case administration matters on a continual basis.  Thus, for instance, Skadden worked

closely with the Debtors, this Court's Clerk's Office, representatives of this Court's Chambers, the

U.S. Trustee's Office, the Debtors' notice and claims agent (Kurtzman Carson Consultants LLC

("KCC")), the Debtors' public relations advisors, and the Debtors' other advisors in coordinating

the various procedures and processes to aid in the administration of the Reorganization Cases,

including a dedicated website (which required periodic updates to communicate significant

events during these cases), telephone hotlines, and e-mail information sites to assist in responding

to the numerous inquiries that this case has generated.  At the commencement of the

Reorganization Cases, for example, the Debtors and Skadden established a telephone hotline that

provides basic information to callers and allows them to leave voicemail messages to be returned

by an appropriate Skadden attorney.  During the Application Period, approximately 292 messages

were submitted to the hotline.  In addition, numerous parties contacted Skadden directly with

their inquires.  When necessary, Skadden researched responses to more complicated voicemail

messages and otherwise responded to inquiries tendered directly on the hotline.  A considerable

amount of time was devoted to these efforts.

72.     Skadden also estimates that it received hundreds of pieces of written

correspondence during the Application Period, all of which were routed to appropriate

professionals within Skadden and answered either orally or in writing.  Skadden necessarily

devoted significant resources responding to these matters.  These efforts assured responsive

answers to parties, ensured that the Debtors continued to conduct their affairs in accordance with

the Bankruptcy Code and applicable nonbankruptcy law, and also assisted the Debtors and their

estates by resolving numerous matters that might otherwise have resulted in pleadings filed with

this Court.

73.     In addition to communications matters, various files were maintained by

paraprofessionals that were critical to the ability of Skadden and others to promptly address issues

that arose during the Application Period.  Skadden reviewed all pleadings and orders filed in the

Reorganization Cases and worked with KCC to ensure that entities entitled to notice were kept

37

informed of significant events in the Reorganization Cases.  The efficient management of

administrative matters in a paper-intensive case of this size is a significant task.  Each week, the

Debtors and Skadden are inundated with correspondence, documents, requests, pleadings, and

other papers.  During the Application Period, nearly 1,939 items were docketed.  On average, at

least 15 pleadings were filed and docketed each day (including weekends and holidays) during

the 123 days in the Application Period.  As of January 31, 2007, approximately 7,181 items had

been docketed.

74.    Given this volume of activity, Skadden maintained various procedures to

create efficiencies in the management of the Reorganization Cases and to avoid unnecessary

duplication of effort between its own professionals and its advisors.  For instance, during the

Application Period, Skadden kept detailed calendars of future events in the Reorganization Cases

and maintained other planning tools to ensure that critical deadlines were met in this large and

highly complex case and that an individual professional was assigned principal responsibility for

nearly each discrete task to be completed.

75.    Skadden is also required to devote substantial attention and resources to

notice and related matters in these cases.  As of the end of the Application Period, there were

approximately 473 parties on the core service lists, including approximately 61 parties on the

Master Service List,[21] and an additional 412 parties who had filed a notice of appearance or

request for notice in these cases (the "2002 List Parties").  Skadden, through its paraprofessionals,

updates and maintains these lists to ensure proper notice by reviewing each pleading filed and

updating the entities that firms represent as well as recording relevant addresses, reviewing all

---

[21]    The Master Service List is comprised of (a) the Debtors and their counsel, (b) the Office of the United States
Trustee, (c) the members of and counsel for the Creditors' Committee and the Equity Committee, (d) counsel for
the agent under the Debtors' former prepetition credit facility, (e) counsel for the agent under the Debtors'
postpetition credit facility, and (f) those parties which may be added to the Master Service List upon written
request to the Debtors or as may be otherwise ordered by the Court for good and sufficient cause.

electronic and written correspondence to ensure that all lists are accurate, and reviewing all

notices of appearance to minimize the chance that a party-in-interest is inadvertently excluded

from a mailing.

      76.    In connection with the foregoing services, Skadden expended 2,087.7 hours

during the Application Period for which Skadden seeks compensation of $613,369, or 4.8% of the

total compensation sought in this Interim Application.[22]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-4</u>.  A summary of the hours

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| M. Janine Jjingo | $390 | 190.3 | $74,217 |
| Ron E. Meisler | $585 | 104.5 | $61,134 |
| Thomas J. Matz | $625 | 68.9 | $43,063 |
| Kayalyn A. Marafioti | $830 | 47.9 | $39,757 |
| Brian M. Fern | $565 | 28.8 | $16,273 |
| John K. Lyons | $775 | 20.7 | $16,044 |
| Kurt Ramlo | $625 | 21.3 | $13,314 |
| Allison V. Herriott | $435 | 29.1 | $12,659 |
| Lisa B. Diaz | $339 | 31.9 | $10,829 |
| Kellan Grant | $470 | 19.5 | $9,165 |
| Michael W. Perl | $435 | 14.6 | $6,352 |
| Nathan L. Stuart | $495 | 12.8 | $6,337 |
| John (Jack) Wm. Butler, Jr. | $875 | 6.8 | $5,951 |
| Joseph N. Wharton | $565 | 10.0 | $5,652 |
| Adlai S. Hardin | $585 | 7.4 | $4,330 |
| Brent M. Houston | $435 | 8.3 | $3,611 |
| Sarah J. Platt | $336 | 8.1 | $2,720 |
| J.R. Lederer | $315 | 7.2 | $2,268 |

---

[22]   This compares to $1,136,809, or 12.4%, $603,278, or 5.3%, and $604,443, or 6.0% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Randall G. Reese | $535 | 4.2 | $2,248 |
| George N. Panagakis | $810 | 2.7 | $2,187 |
| Eric L. Cochran | $845 | 2.1 | $1,775 |
| Ian S. Bolton | $390 | 3.9 | $1,521 |
| Eric J. Howe | $390 | 3.8 | $1,482 |
| Dhananjai Shivakumar | $625 | 2.3 | $1,438 |
| Paraprofessional Total | | 1,430.6 | $269,042 |
| **Total** | | **2,087.7** | **$613,369 (4.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$82,040** |

E.    Asset Dispositions (General)

        77.    The Debtors have stated that to achieve the necessary cost savings and

operational effectiveness envisioned in their transformation plan, they must streamline their

product portfolio to capitalize on their world-class technology and market strengths and make the

necessary manufacturing alignment with their new focus.  As part of this effort, the Debtors

identified non-core product lines that do not fit into the company's future strategic framework and

planned to sell or wind-down these product lines.  These non-core product lines include Brake

and Chassis Systems, Catalysts, Cockpits and Instrument Panels, Door Modules and Latches,

Ride Dynamics, Steering, and Wheel Bearings.  During the Application Period, Skadden

allocated significant resources in advising the Debtors with respect to various contemplated

divestitures of significant assets and began drafting and reviewing various pleadings and purchase

agreements in connection with the contemplated divestitures.

        78.    As part of this process, during the Application Period, Skadden advised the

Debtors with respect to the sale of the Company's brake hose manufacturing business in Dayton,

Ohio to Harco Manufacturing Group, LLC ("Harco").  The Debtors believe that the brake hose

product line is fundamentally strong, but the business does not fit within the Debtors' anticipated

40

product portfolio under their transformation plan.  Accordingly, just prior to the end of the

Application Period, Skadden worked with the Debtors to facilitate that transaction.  In that regard,

among other things, Skadden drafted and filed a motion (the "Brake Hose Business Sale Motion")

(Docket No. 6742) seeking approval of bidding procedures and certain bid protections for Harco

as the stalking horse bidder.  The Brake Hose Business Sale Motion also sought approval at a later

date of (a) the sale of the brake hose business to Harco for $9.75 million, (b) the assumption and

assignment of certain executory contracts and unexpired leases to Harco or a subsequent

successful bidder, and (c) the assumption of certain liabilities.  Following the Application Period,

this Court approved the bidding procedures and bid protections.

79.    Similarly, during the Application Period, Skadden assisted the Debtors with

preparation for potential divestures of several other lines of the Debtors' business, including,

among other things, the sale of Delphi's Steering, Interior, and Closures businesses.  Skadden

worked with the Debtors to assess various bids and term sheets, reviewed and drafted asset

purchase agreements, and began preparing pleadings, notices, and drafting proposed orders

customary for such transactions to be submitted for Court approval.  By the end of the Application

Period, the Debtors were continuing to negotiate the terms of those transactions.

80.    In connection with the foregoing services, Skadden expended 869.6 hours

during the Application Period for which Skadden seeks compensation of $492,762, or 3.8% of the

total compensation sought in this Interim Application.[23]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-5.  A summary of the hours

---

[23]    This compares to $117,199, or 1.3%, $375,042, or 3.3%, and $554,644 or 5.5% of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brian M. Fern | $565 | 187.8 | $106,108 |
| P. Gifford Carter | $535 | 174.2 | $93,198 |
| Joseph N. Wharton | $565 | 147.6 | $83,395 |
| John K. Lyons | $775 | 95.0 | $73,626 |
| Ron E. Meisler | $585 | 39.9 | $23,343 |
| Eric J. Howe | $390 | 54.1 | $21,099 |
| Marie L. Gibson | $670 | 29.3 | $19,631 |
| Randall G. Reese | $535 | 33.8 | $18,084 |
| James E. Fitzgerald | $535 | 29.8 | $15,943 |
| Ivana Vujic | $535 | 19.8 | $10,593 |
| Kayalyn A. Marafioti | $830 | 11.5 | $9,545 |
| Brent M. Houston | $435 | 10.1 | $4,394 |
| Sarah J. Platt | $355 | 11.6 | $4,119 |
| Kellan Grant | $470 | 4.9 | $2,303 |
| Eric L. Cochran | $845 | 2.2 | $1,859 |
| J.R. Lederer | $315 | 5.9 | $1,859 |
| Kurt Ramlo | $625 | 1.7 | $1,063 |
| Paraprofessional Total | | 10.4 | $2,600 |
| **Total** | | **869.6** | **$492,762 (3.8%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$12,803** |

F.    Rights Offering

        81.    In connection with the EPCA, and in contemplation of a rights offering in connection with the Debtors' reorganization plan as outlined in the EPCA and the PSA, during the Application Period, the Debtors, with the assistance of Skadden, devoted a significant amount of time to the development of the rights offering procedures and the drafting of an S-1 Registration Statement (the "Registration Statement") that was ultimately filed with the Securities and Exchange Commission on March 7, 2007, after the Application Period.  The Debtors, with the

assistance of Skadden, devoted a significant amount of time discussing and negotiating the

Registration Statement with the Plan Investors and the Statutory Committees.  Skadden also

undertook a diligence review of the Debtors and dedicated time during the Application Period to

researching certain issues related to the unique aspects of the rights offering as contemplated by

the Registration Statement.

82.    In connection with the foregoing services, Skadden expended 745.8 hours

during the Application Period for which Skadden seeks compensation of $444,341, or 3.5% of the

total compensation sought in this Interim Application.[24]  Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-6</u>.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Erin C. Furman | $585 | 237.6 | $138,996 |
| Nick P. Saggese | $875 | 77.3 | $67,638 |
| Michelle Gasaway | $625 | 104.1 | $65,063 |
| Nathan L. Stuart | $495 | 126.7 | $62,717 |
| Micah G. Katz | $390 | 51.4 | $20,046 |
| Paul Schockett | $390 | 40.7 | $15,873 |
| Eric B. Sensenbrenner | $625 | 22.7 | $14,188 |
| Gregg A. Noell | $845 | 12.5 | $10,563 |
| George N. Panagakis | $810 | 11.2 | $9,072 |
| Kayalyn A. Marafioti | $830 | 10.2 | $8,466 |
| Daniel I. Ganitsky | $585 | 11.7 | $6,845 |
| Eric L. Cochran | $845 | 6.0 | $5,070 |
| Aaron S. Feinberg | $535 | 8.2 | $4,387 |
| John (Jack) Wm. Butler, Jr. | $875 | 4.6 | $4,025 |
| Adlai S. Hardin | $585 | 5.0 | $2,925 |

---

[24]    Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee Applications.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 5.9 | $2,773 |
| Marie L. Gibson | $670 | 3.7 | $2,479 |
| Thomas J. Matz | $625 | 1.8 | $1,125 |
| Gregory O. Ogunsanya | $495 | 2.2 | $1,089 |
| Michael W. Perl | $435 | 2.3 | $1,001 |
| **Total** | | **745.8** | **$444,341 (3.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$19,428** |

G.    Tax Matters

83.    In connection with the development and negotiation of the Framework
Agreements and to lay the groundwork for a potential plan of reorganization and emergence from
chapter 11, during the Application Period, Skadden continued analyzing certain complex tax
ramifications of various framework agreement proposals, including the Framework Agreements
with the Plan Investors.  In particular, Skadden professionals researched and analyzed the
Debtors' ability to utilize certain favorable tax rules available under section 382 of the Internal
Revenue Code as they relate to various scenarios proposed in the framework discussions.  These
issues include, among other things, matters related to change-in-control and potential limitations
on the uses of net operating losses and other tax assets after emerging from chapter 11.  In
addition, Skadden continued to analyze certain income tax ramifications resulting from the
various framework agreement proposals, including the agreed-upon Framework Agreements with
the Plan Investors.  Skadden assisted in preparing the tax disclosure for the Form S-1 relating to
the issuance of rights to certain holders of the Debtors' common stock, as contemplated under the
EPCA.  Finally, Skadden assisted the Debtors in reviewing and analyzing various issues in
connection with reconciling proofs of claim filed by various federal, state, and local taxing
authorities.

44

84.    In connection with the foregoing services, Skadden expended 687.8 hours during the Application Period for which Skadden seeks compensation of $417,360, or 3.3% of the total compensation sought in this Interim Application.[25]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-7.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| David A. Schneider | $595 | 138.2 | $82,230 |
| Eric B. Sensenbrenner | $625 | 121.3 | $75,813 |
| Cliff Gross | $830 | 82.7 | $68,641 |
| Aaron S. Feinberg | $535 | 113.6 | $60,777 |
| Jody J. Brewster | $775 | 61.8 | $47,896 |
| Michael W. Perl | $435 | 47.9 | $20,837 |
| Paul Schockett | $390 | 49.6 | $19,344 |
| Allen Stenger | $470 | 37.5 | $17,625 |
| Kayalyn A. Marafioti | $830 | 12.5 | $10,375 |
| Daniel P. Phillips | $585 | 17.1 | $10,004 |
| John (Jack) Wm. Butler, Jr. | $875 | 1.7 | $1,488 |
| Kurt Ramlo | $625 | 2.1 | $1,313 |
| Joseph N. Wharton | $565 | 1.8 | $1,017 |
| **Total** | | **687.8** | **$417,360 (3.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$20,252** |

### Matters Between $100,000 And $400,000

H.    Nonworking Travel Time

85.    Because of the extensive breadth of services that Skadden is providing to the Debtors in these Reorganization Cases, Skadden draws upon the experience and talent of a number of professionals from its worldwide organization including offices located primarily in

---

[25]    This compares to $932,086, or 10.1%, $82,775, or 0.7%, and $319,866, or 3.2% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

Chicago, London, Los Angeles, New York, and Washington, D.C.  As this Court is aware, the

Debtors are headquartered in Troy, Michigan, members of the Creditors' Committee are based in

several states across the United States, the Debtors' postpetition lenders are based in New York,

and many of the Debtors' other primary constituencies, including its Unions and GM, are based in

Michigan.  As a consequence of these disparate locations and the Debtors' expectation and

determined need that certain Skadden partners and associates be on site in Michigan on a regular

basis as well as in other locations, including New York, for specific events, Skadden

professionals frequently must travel among these and other locations.  Among other things,

Skadden professionals travel to meet with the Board and senior management, creditor and equity

constituencies, and to attend Court hearings.  Skadden's professionals who spend time traveling,

but not otherwise working, allocate their time to this billing category.

86.     Skadden expended 1,249.9 hours during the Application Period devoted to

nonworking travel time for which Skadden seeks compensation of $393,436, or 3.1% of the total

compensation sought in the Interim Application.[26]  This amount reflects an approximate

fifty-three percent (53%)[27] reduction from Skadden's guideline hourly rates.  Detailed time

entries of each Skadden professional are attached hereto as Exhibit D-8.  A summary of the hours

expended and the corresponding dollar amount of the travel time for each professional is provided

in the following table:

---

[26]    This compares to $290,270, or 3.2%, $376,303, or 3.3%, and $351,261, or 3.5% of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications.

[27]    This reduction is comprised of the following:  the elimination of approximately 96 hours of billed time during the
Application Period as an additional accommodation to the Debtor, and thereafter, a fifty-percent (50%) reduction
to the guideline hourly rates.  The eliminated time charges primarily related to extended travel time occasioned by
weather and air traffic control delays.

| Name | Rate | Time | Amount |
|---|---|---|---|
| John (Jack) Wm. Butler, Jr. | $438 | 212.0 | $92,751 |
| John K. Lyons | $388 | 152.0 | $58,900 |
| Randall G. Reese | $268 | 147.2 | $39,376 |
| George N. Panagakis | $405 | 81.1 | $32,846 |
| Ron E. Meisler | $293 | 99.7 | $29,163 |
| Lisa B. Diaz | $188 | 94.6 | $17,751 |
| Michael W. Perl | $218 | 50.3 | $10,941 |
| Allison V. Herriott | $218 | 47.6 | $10,354 |
| Michelle Gasaway | $313 | 25.5 | $7,969 |
| Joseph N. Wharton | $282 | 28.1 | $7,938 |
| Albert L. Hogan III | $348 | 20.7 | $7,194 |
| Neil M. Leff | $415 | 17.0 | $7,055 |
| Eric J. Howe | $195 | 31.1 | $6,065 |
| Karen E. Willenken | $293 | 18.9 | $5,529 |
| Kenneth Berlin | $405 | 12.9 | $5,225 |
| Kellan Grant | $247 | 20.1 | $4,974 |
| Erica Schohn | $235 | 20.7 | $4,865 |
| Kurt Ramlo | $248 | 15.1 | $4,719 |
| Nathan L. Stuart | $248 | 17.6 | $4,356 |
| P. Gifford Carter | $268 | 15.6 | $4,173 |
| Keith D. Krakur | $405 | 9.7 | $3,929 |
| Erin C. Furman | $293 | 13.2 | $3,861 |
| Ian S. Bolton | $195 | 18.5 | $3,608 |
| Dhananjai Shivakumar | $313 | 10.5 | $3,282 |
| Lee P. Garner | $313 | 9.5 | $2,969 |
| Nick D. Campanario | $268 | 9.6 | $2,568 |
| Courtney E. VanLonkhuyzen | $218 | 11.8 | $2,567 |
| John Guzzardo | $218 | 11.7 | $2,545 |
| Brian M. Fern | $283 | 8.5 | $2,402 |
| Neil MacDonald | $293 | 7.0 | $2,048 |
| Paraprofessional Total | | 12.1 | $1,513 |
| **Total** | | **1,249.9** | **$393,436 (3.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$451,021** |

I.      Retention/Fee Matters/Objections (Others)

87.     Reorganization cases as large and complex as these require the coordinated efforts of a number of restructuring advisors and professionals.  To this end, during the Application Period, Skadden assisted an Affiliate Debtor, MobileAria, Inc., in retaining DLA Piper LLP to advise and represent MobileAria with respect to general business, corporate, employment, and intellectual property matters.  Skadden also assisted the Debtors in retaining the investment banking firm, W.Y. Campbell & Company, to provide services in connection with the formulation, analysis, negotiation, and implementation of the divestiture or other strategic alternatives relating to certain of the Debtors' non-core business lines.  Skadden, on behalf of the Debtors, also worked with Rothschild Inc., KPMG LLP, PricewaterhouseCoopers LLP, Wilmer Cutler Pickering Hale and Dorr LLP, and Mayer, Brown, Rowe and Maw to expand the scope of each firm's respective engagements.  In addition, during the Application Period, the Debtors, with the assistance of Skadden, began the process of preparing additional retention and supplemental retention applications for various other professional firms, which applications the Debtors anticipate will be filed during subsequent applications periods.  When necessary, Skadden conferred with the Debtors and the professionals to be retained and provided assistance with evaluating discrete issues affecting the Debtors' retention of these professionals.

88.     Furthermore, during the Application Period, Skadden advised the Debtors regarding the retention, pursuant to the Order Under 11 U.S.C. §§ 327, 330, and 331 Authorizing Retention Of Professionals Utilized By Debtors In Ordinary Course Of Business (the "Ordinary Course Professionals Order") (Docket No. 883), of approximately six ordinary course professionals who provide the Debtors with various non-restructuring legal, accounting, and other professional services.  Because the Ordinary Course Professional Order requires any

48

ordinary course professional to file an affidavit prior to being retained and compensated by the
Debtors, Skadden assisted the Debtors in tracking which professionals had filed such affidavits
and when the expiration of the individual objection period had occurred, permitting the Debtors
then to pay such ordinary course professionals.

89.    In accordance with the requests of the U.S. Trustee, the Ordinary Course
Professionals Order requires that any ordinary course professional whose fees exceed $50,000 per
month or $500,000 in the aggregate during the pendency of these Reorganization Cases must be
retained pursuant to a formal retention application to receive future compensation from the
Debtors.  Accordingly, during the Application Period, Skadden, on behalf of the Debtors, assisted
Ivins, Phillips & Barker, one of the Debtors' ordinary course professionals, in preparing its formal
retention application, which was ultimately filed on January 31, 2007 (Docket No. 6784).

90.    Finally, at the end of the Application Period, the Fee Review Committee
reviewed the fee applications filed by various professionals for the first, second, and third interim
fee periods.  To facilitate and centralize the review by the Fee Review Committee, Skadden, at the
Fee Review Committee's request and direction, coordinated with various professionals and
arranged in-person or telephonic meetings with the Fee Review Committee to review, and as
necessary to negotiate, certain additional fee accommodations.  Lastly, Skadden drafted and filed
a notice of hearing for all the professionals' fee applications and provided relevant information to
the Court, as requested.

91.    In connection with the foregoing services, Skadden expended 891.4 hours
during the Application Period for which Skadden seeks compensation of $384,393, or 3.0% of the

total compensation sought in this Interim Application.[28]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-9.  A summary of the hours

expended and the corresponding dollar amount of the services performed by each professional is

provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| M. Janine Jjingo | $390 | 371.5 | $144,885 |
| Thomas J. Matz | $625 | 103.8 | $64,876 |
| Dolores De Elizalde | $495 | 57.9 | $28,661 |
| Ron E. Meisler | $585 | 46.9 | $27,438 |
| Joseph N. Wharton | $565 | 43.2 | $24,408 |
| Brian M. Fern | $565 | 37.8 | $21,358 |
| John K. Lyons | $775 | 18.7 | $14,493 |
| Kayalyn A. Marafioti | $830 | 17.3 | $14,359 |
| John (Jack) Wm. Butler, Jr. | $875 | 8.6 | $7,526 |
| Sarah J. Platt | $355 | 6.9 | $2,450 |
| Paraprofessional Total | | 178.8 | 33,939 |
| **Total** | | **891.4** | **$384,393 (3.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$25,793** |

J.    Retention/Fee Matters (SASM&F)

92.    Skadden is one of the largest law firms in the world, with more than 1,700

attorneys located in 22 offices in 11 countries.  Because of the number of the Debtors' business

relationships and the number of Skadden's business clients, Skadden has been required to spend

significant time since the commencement of the Reorganization Cases with respect to retention

and fee issues.  In particular, Skadden conducted an extensive relationship and disclosure search

in connection with being retained as Debtors' counsel.  In addition, as new parties have become

---

[28]    This compares to  $377,176, 4.1%, $431,545, or 3.8%, and $241,482, or 2.4% of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

involved in aspects of these cases, Skadden has conducted supplementary disclosure searches and also periodically refreshes its searches to ensure the disclosure of new clients when warranted. When appropriate, Skadden prepares and files supplemental declarations disclosing certain significant relationships that Skadden may have with a party-in-interest.  Finally, pursuant to the requirements of the Interim Compensation Order, Skadden prepares detailed monthly compensation packages for distribution and is required to prepare and file interim fee applications in accordance with the established procedures.

93.    In addition, as discussed above, prior to the Application Period, the Fee Review Committee retained LCC to serve as its fee analyst.  During the Application Period, LCC issued three separate summary reports and recommendations to the Fee Review Committee on each of Skadden's first three interim fee applications.  With respect to LCC's reports on Skadden's interim fee applications, Skadden professionals were required to review, analyze, and reconcile the fee data and recommendations proposed by LCC to effectively respond to the Fee Review Committee.  After reviewing and reconciling LCC's reports, during the Application Period, Skadden drafted responses to the Fee Committee in response to the reports prepared by LCC.

94.    In connection with the foregoing services, Skadden expended 639.3 hours during the Application Period for which Skadden seeks compensation of $284,463, or 2.2% of the total compensation sought in this Interim Application.[29]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-10.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

---

[29]    This compares to $58,023, or 0.6%, $191,088, or 1.7%, and $134,152, or 1.3% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

51

| Name | Rate | Time | Amount |
|---|---|---|---|
| Michael W. Perl | $435 | 234.2 | $101,878 |
| John (Jack) Wm. Butler, Jr. | $875 | 43.3 | $37,888 |
| Joseph N. Wharton | $565 | 60.4 | $34,127 |
| Ron E. Meisler | $585 | 40.2 | $23,518 |
| Lisa B. Diaz | $336 | 41.3 | $13,888 |
| Kayalyn A. Marafioti | $830 | 16.5 | $13,695 |
| Allison V. Herriott | $435 | 20.7 | $9,005 |
| Nathan L. Stuart | $495 | 17.0 | $8,415 |
| Thomas J. Matz | $625 | 7.0 | $4,375 |
| M. Janine Jjingo | $390 | 8.6 | $3,354 |
| Adlai S. Hardin | $585 | 3.3 | $1,931 |
| Brian M. Fern | $565 | 3.1 | $1,752 |
| J.R. Lederer | $315 | 5.0 | $1,575 |
| Paraprofessional Total | | 138.7 | $29,062 |
| **Total** | | **639.3** | **$284,463 (2.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$44,047** |

K.    Litigation (Insurance Recovery)

95.    During the Application Period, certain former officers and senior employees of the Debtors (the "Movants") filed a motion seeking advancement of attorneys' fees and costs incurred for litigation, through access to insurance proceeds, related to the Debtors' restatement of certain prior period financial statements, prior-period accounting practices, and the adequacy of their financial disclosures for the affected periods (Docket No. 5360).  At the same time, the Movants filed a motion seeking modification of the first day Human Capital Obligations Order to require the Debtors to advance defense costs related to this litigation (Docket No. 5354). In these two motions, the Movants asserted a variety of constitutional and statutory objections to force the advancements of the legal fees and costs.

96.    Skadden assisted the Debtors in drafting objections to the Movants' motions.  Skadden professionals also consulted with other objectors and negotiated with all

52

parties to narrow the litigable issues.  The parties ultimately arrived at an efficient and timely

interim resolution of the dispute, not only providing the Movants with the advancements of

insurance proceeds they sought, but also protecting the Debtors' estates and defending the

integrity of the first day Human Capital Obligations Order during the course of the subject

litigation.  Skadden subsequently assisted the Debtors in drafting, presenting, and revising the

proposed orders entered by the Court on December 21, 2006, as the Order Denying Motion to

Modify October 13, 2005 Order and to Compel Delphi Corporation to Advance Legal Fees and

Costs (Docket No. 6263), and the Order Under 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 2016(a)

Authorizing Advancement of Defense Costs Under Debtors' Insurance Policies (Docket No.

6264).

> 97.    In connection with the foregoing services, Skadden professionals expended

468.5 hours during the Application Period for which Skadden seeks compensation of $280,759,

or 2.2% of the total compensation sought in this Interim Application.[30]  Detailed time entries of

each Skadden professional related to these services are attached hereto as Exhibit D-11.  A

summary of the hours expended and the corresponding dollar amount of the services performed

by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Dhananjai Shivakumar | $625 | 234.0 | $146,250 |
| Neil McDonald | $585 | 134.8 | $78,858 |
| Albert L. Hogan III | $695 | 19.1 | $13,275 |
| Nathan L. Stuart | $495 | 23.5 | $11,633 |
| Ron E. Meisler | $585 | 18.3 | $10,706 |
| Kellan Grant | $470 | 11.1 | $5,217 |

---

[30]    This compares to $83,523, or 0.9%, of the total fees requested for this matter in Skadden's First Interim Fee
Application for this matter.  Skadden did not request compensation for this matter in Skadden's Second and Third
Interim Fee Applications.

| Name | Rate | Time | Amount |
|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $875 | 5.7 | $4,988 |
| Kayalyn A. Marafioti | $830 | 5.4 | $4,482 |
| Sarah J. Platt | $325 | 8.0 | $2,600 |
| Thomas J. Matz | $625 | 1.6 | $1,000 |
| Paraprofessional Total | | 7.0 | $1,750 |
| **Total** | | **468.5** | **$280,759 (2.2%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,371** |

L.    Financing (DIP and Emergence)

98.    In late December 2006, after reviewing the current robust conditions in the capital markets and assessing the positive momentum of the Reorganization Cases, the Debtors concluded that they could replace their existing prepetition and postpetition financing on more favorable terms.  During the Application Period, the Debtors conducted a search for replacement financing and determined that it was in their best interests to refinance their existing DIP credit facility of $2 billion and their approximately $2.5 billion existing prepetition credit facility. Skadden, working with the Debtors' special counsel Shearman & Sterling LLP ("Shearman") (being mindful not to duplicate efforts), assisted the Debtors in negotiating and documenting the terms of a replacement financing facility (the "Replacement Financing Facility") submitted by a syndicate of lenders led by JPMorgan Chase Bank, N.A.[31]  The Replacement Financing Facility provided interest rate reductions on the Debtors' secured financing that ultimately resulted in financing savings of approximately $9 million per month.  Skadden drafted and on December 18, 2006 filed the Expedited Motion for an Order Under 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), and 364(e) and Fed. R. Bankr. P. 2002, 4001 and 6004(g) (I) Authorizing Debtors To Obtain Post-Petition Financing And (II) Authorizing Debtors To

---

[31]    To avoid duplication of effort, Shearman was primarily responsible for documenting the transaction and Skadden took primary responsibility for obtaining court approval.

54

Refinance Secured Post-Petition Financing And Prepetition Secured Debt (the "DIP Refinancing
Motion") (Docket No. 6180).

99.    During the Application Period, Howard County, Indiana ("Howard
County") filed a limited objection to the DIP Refinancing Motion, based on concerns that its tax
liens would be negatively impacted by the relief requested therein.  This was the only objection
filed to the DIP Refinancing Motion.  Howard County's objection was resolved through
discussions between Skadden and counsel to Howard County regarding the impact of the DIP
Refinancing Motion, and this Court entered an order approving that motion on January 5, 2007
(Docket No. 6461).

100.    On January 9, 2007 the Debtors, with the assistance of Skadden and
Shearman, finalized the Replacement Financing Facility, which consists of a $1.75 billion first
priority revolving credit facility, a $250 million first priority term loan, and an approximate $2.5
billion second priority term loan.  Under the Replacement Financing Facility, the interest rate for
the revolving facility was reduced by 25 basis points, and the interest rate for the first priority
term loan was reduced by 50 basis points.  By refinancing the prepetition secured debt with the
second priority term loan, the interest rate was reduced by 125 to 275 basis points.  Under the
Replacement Financing Facility, the maturity date for the Debtors' DIP facility was also extended
from October 8, 2007 to December 31, 2007.

101.    In connection with the foregoing services, Skadden expended 532.2 hours
during the Application Period for which Skadden seeks compensation of $267,852, or 2.1% of the
total compensation sought in this Interim Application.[32]  Detailed time entries of each Skadden

---

[32]    This compares to, $296,608, or 3.2% and $20,973, or 0.2% of the total fees requested for this matter in Skadden's
First and Second Interim Fee Applications, respectively.  Skadden did not request compensation for this matter in
its Third Interim Fee Application.

professional related to these services are attached hereto as <u>Exhibit D-12</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 169.6 | $79,712 |
| Ron E. Meisler | $585 | 99.9 | $58,442 |
| Lawrence D. Frishman | $810 | 41.2 | $33,372 |
| John (Jack) Wm Butler, Jr. | $875 | 24.2 | $21,176 |
| J.R. Lederer | $315 | 59.8 | $18,837 |
| Christopher P. Connors | $585 | 28.3 | $16,556 |
| Rossie E. Turman III | $585 | 22.3 | $13,046 |
| Ian S. Bolton | $390 | 18.7 | $7,293 |
| Kayalyn A. Marafioti | $830 | 4.3 | $3,569 |
| Sarah J. Platt | $355 | 4.8 | $1,704 |
| George N. Panagakis | $810 | 1.8 | $1,458 |
| Thomas J. Matz | $625 | 2.0 | $1,250 |
| Paraprofessional Total | | 55.3 | $11,437 |
| **Total** | | **532.2** | **$267,852 (2.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$10,432** |

M.      <u>General Corporate Advice</u>

102.    During the Application Period, Skadden attended meetings of the Board

and certain of the Board's standing committees.  Skadden assisted the Board and Delphi senior

management in part by preparing detailed analyses and other materials for distribution and

discussion.  Skadden also advised the Board and the Debtors' management (during these

meetings, throughout the framework negotiations, and in the course of the Debtors' daily

operations) on corporate governance matters related to the framework discussions and the

reorganization generally.

103.    Also during the Application Period, Skadden advised the Debtors in connection with the preparation of the Debtors' regulatory filings with the Securities and Exchange Commission, including the Debtors' Form 8-Ks, which are issued in connection with disclosure issues on matters such as material agreements (such as the EPCA and the PSA), financial matters (such as the refinancing of the Debtors' DIP facility), and the Debtors' monthly operating reports, as well as in connection with internal and external communication matters.  In addition, during the Application Period, Skadden assisted the Debtors in preparing the Form 10-Q for the quarterly period ended September 30, 2006, which was filed after the Application Period on February 13, 2007, and the Form 10-K for the year ended December 31, 2006, which was ultimately filed on February 27, 2007, nearly one month after the end of the Application Period.

104.    In addition, during the Application Period, Skadden assisted the Debtors on various matters relating to the trust preferred securities.  Delphi is a party to two declarations of trust pursuant to which two series of trust preferred securities, the 8.25% Cumulative Trust Preferred Securities and the Adjustable Rate Trust Preferred Securities, were issued in 2003.  Pursuant to the declarations of trust, the trusts that issued these preferred securities were liquidated during the Application Period as a result of the filing of these chapter 11 cases.  In exchange for their book-entry interests in the global certificates issued pursuant to the declarations of trust, holders of the preferred securities received pro rata interests in two global notes issued by Delphi.  Skadden assisted in connection with the liquidation of the trusts and the exchange of the preferred securities for interests in the global notes.  During the Application Period, the Debtors, with the assistance of Skadden, negotiated the arrangements with the indenture trustee, and Skadden reviewed and commented on relevant documentation.

105.    In connection with the foregoing services, Skadden expended 382.6 hours during the Application Period for which Skadden seeks compensation of $253,853, or 2.0% of the total compensation sought in this Interim Application.[33]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-13.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $875 | 80.3 | $70,264 |
| Eric L. Cochran | $845 | 39.8 | $33,631 |
| Daniel I. Ganitsky | $585 | 53.1 | $31,064 |
| Kayalyn A. Marafioti | $830 | 24.6 | $20,418 |
| Adlai S. Hardin | $585 | 31.2 | $18,252 |
| Adam Halper | $390 | 39.1 | $15,249 |
| Marie L. Gibson | $670 | 22.5 | $15,075 |
| Peter Olasky | $435 | 24.9 | $10,833 |
| Gregory O. Ogunsanya | $495 | 12.6 | $6,237 |
| Ron E. Meisler | $585 | 10.6 | $6,201 |
| Thomas J. Matz | $625 | 9.5 | $5,938 |
| Nathan L. Stuart | $495 | 9.6 | $4,753 |
| Louis D. Wilson | $585 | 5.5 | $3,218 |
| John K. Lyons | $775 | 3.4 | $2,635 |
| George N. Panagakis | $810 | 3.0 | $2,430 |
| Lawrence D. Frishman | $810 | 2.4 | $1,944 |
| Kenneth Berlin | $810 | 2.1 | $1,701 |
| Albert L. Hogan III | $695 | 2.2 | $1,529 |
| Randall G. Reese | $535 | 2.4 | $1,284 |
| Lisa B. Diaz | $315 | 3.8 | $1,197 |
| **Total** | | **382.6** | **$253,853 (2.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$27,117** |

---

[33]    This compares to $340,687, or 3.7%, $249,312, or 2.2%, and $161,208, or 1.6 %, of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

N.    Automatic Stay (Relief Actions)

106.    As of the Petition Dates, the Debtors were parties to more than 200 active

and threatened lawsuits.  Although section 362 of the Bankruptcy Code generally prohibits parties

from pursuing actions against the Debtors on account of prepetition claims, a limited number of

complaints were filed postpetition on account of prepetition liabilities.  The Debtors, with the

assistance of Skadden, communicated effectively with opposing counsel to have such complaints

withdrawn.  Moreover, the Debtors have received numerous requests since the Petition Dates,

including approximately 50 motions, five of which were filed during the Application Period,

seeking modification of the stay to allow the claimants to proceed against the Debtors in

non-bankruptcy courts.  Skadden worked with the Debtors' legal department and other employees

of the Debtors to reach a consensual resolution in response to many of the requests for

modification or relief from the stay.  In certain cases, however, the Debtors and the movant were

unable to resolve their differences, and on those occasions, Skadden (and in certain instances

Togut, Segal & Segal LLP ("Togut")) drafted objections to these lift stay motions.  One of these

motions was litigated by Skadden during the Application Period.

107.    In addition, prior to the Application Period, Skadden professionals worked

with the Debtors' legal department, other employees of the Debtors, and the Debtors' insurers to

develop procedures for consensually modifying the automatic stay to permit cost-effective and

timely liquidation and settlement of certain prepetition litigation claims that are covered under the

Debtors' general, product, and automobile liability insurance policies.  This Court approved the

implementation of such procedures on June 26, 2006 (the "Lift Stay Procedures") (Docket No.

4366).  Following entry of that order, Skadden attorneys have continued to work closely with the

Debtors and the Debtors' local, non-bankruptcy litigation counsel to reconcile claims under the

59

Lift Stay Procedures.  In certain instances, in accordance with the Lift Stay Procedures, mediation has begun or mediation dates have been set to resolve many of these claims.

108.    In addition, Skadden created guidelines to aid the Debtors' legal department and other employees of the Debtors in determining whether a particular claim would qualify for reconciliation and settlement under the Lift Stay Procedures.  During the Application Period, Skadden continued to assist the Debtors' legal department almost daily regarding the application of these Lift Stay Procedures to various claims and to advise the Debtors regarding strategies for facilitating and ultimately implementing strategies with respect to settlements.  Skadden also continues to respond to the Debtors' questions about the information that is to be included in certain reports, which the Debtors are required to provide to the Creditors' Committee and its financial advisors under this Court's order approving the Lift Stay Procedures.  Finally, Skadden has assisted the Debtors in their documentation of the resolutions of claims.

109.    In connection with the foregoing services, Skadden expended 520.6 hours during the Application Period for which Skadden seeks compensation of $248,725, or 1.9% of the total compensation sought in this Interim Application.[34]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-14.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Brent M. Houston | $435 | 351.5 | $152,903 |
| Kurt Ramlo | $625 | 71.6 | $44,751 |
| Michael W. Perl | $435 | 30.1 | $13,094 |
| Kellan Grant | $470 | 18.5 | $8,695 |

[34]    This compares to $64,079, or 0.7%, $140,233, or 1.2%, and $356,684, or 3.6%, of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John K. Lyons | $775 | 10.7 | $8,293 |
| Brian M. Fern | $565 | 13.4 | $7,572 |
| Ron E. Meisler | $585 | 12.0 | $7,020 |
| Kayalyn A. Marafioti | $830 | 3.9 | $3,237 |
| Albert L. Hogan III | $695 | 2.1 | $1,460 |
| Paraprofessional Total | | 6.8 | $1,700 |
| **Total** | | **520.6** | **$248,725 (1.9%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$27,429** |

O.    Creditor Meetings/Statutory Committees

110.    This category of time relates to meetings with various creditor and equity constituencies, and, in particular, with the Creditors' Committee and the Equity Committee (the "Statutory Committees") and their respective legal and financial advisors. Throughout the Application Period, Skadden regularly communicated with the Statutory Committees and their respective advisors regarding the progress and status of the Reorganization Cases.

111.    In addition to day-to-day communication, during the Application Period, Skadden represented the Debtors at four formal meetings with the Statutory Committees and their professional advisors. Two of these meetings were joint meetings among the Debtors, the Creditors' Committee, and the Equity Committee and their respective professional advisors. The formal monthly meetings have provided a forum for the Statutory Committees (including their members) to address general and specific concerns. In addition to the formal meetings with the Statutory Committees, during the Application Period, the Debtors also held smaller sessions with the professionals for the Statutory Committees. These meetings have allowed the Debtors to keep the Statutory Committee members and professionals informed as to upcoming issues, such as motions to be heard at the monthly omnibus hearings, the status of the Debtors' transformation plan, development and negotiations concerning the framework agreement, and actions to be

61

undertaken in furtherance of the transformation plan and the framework agreement.  The Debtors

believe that these efforts have likely eliminated potential objections that the Statutory

Committees might have filed to some of the Debtors' motions by communicating and consulting

with the Statutory Committees in advance of filings and anticipated transactions, thus avoiding

some unnecessary litigation expenses.  Skadden assisted the Debtors in preparing for these

meetings, including assisting with the coordination of information provision and status reports.

   112. In connection with the foregoing services, Skadden expended 420.7 hours

during the Application Period for which Skadden seeks compensation of $215,231, or 1.7% of the

total compensation sought in this Interim Application.[35]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-15.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Allison V. Herriott | $435 | 93.5 | $40,674 |
| Adlai S. Hardin | $585 | 60.5 | $35,393 |
| Lisa B. Diaz | $368 | 78.4 | $28,859 |
| John (Jack) Wm Butler, Jr. | $875 | 32.5 | $28,439 |
| Kayalyn A. Marafioti | $830 | 29.0 | $24,070 |
| Thomas J. Matz | $625 | 33.1 | $20,688 |
| Ron E. Meisler | $585 | 24.0 | $14,041 |
| John Guzzardo | $435 | 14.5 | $6,308 |
| M. Janine Jjingo | $390 | 7.1 | $2,769 |
| Brian M. Fern | $565 | 3.6 | $2,035 |
| Kellan Grant | $470 | 3.8 | $1,786 |
| Eric L. Cochran | $845 | 1.8 | $1,521 |

---

[35] This compares to $415,954, or 4.5%, $1,527,032, or 13.5%, and $341,135, or 3.4% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Michael W. Perl | $435 | 2.9 | $1,262 |
| Paraprofessional Total | | 36.0 | $7,386 |
| **Total** | | **420.7** | **$215,231 (1.7%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$15,207** |

P.    Environmental Matters

113.    Skadden assisted the Debtors in their efforts to comply with environmental law while also complying with the requirements of the Bankruptcy Code.  Analysis of the Debtors' potential environmental liabilities raises particularly complex factual issues because, among other reasons, a large portion of those liabilities arises from actions or operations that took place before the Debtors' separation from GM.  As a result, Skadden was required to research and analyze many legal issues in connection with this matter.

114.    In addition, many of the U.S. plants that Delphi intends to wind down may present environmental concerns.  Therefore, Skadden assisted the Debtors in developing a strategy regarding potential alternatives for addressing these potential environmental liabilities in connection with emergence from chapter 11 and analyzing the legal issues that may arise from implementation of such strategies.

115.    Furthermore, in connection with the ongoing claims review, Skadden has assisted the Debtors in analyzing various environmental claims that have been filed in these cases.  In addition, Skadden assisted the Debtors with analysis and review of environmental conditions associated with the Debtors' properties in certain states, and developed provisions for resolving potential environmental liabilities in connection with possible property sales, lease rejections, or other transactional agreements.  Finally, Skadden advised the Debtors regarding a settlement with certain affiliates of TRW Automotive Inc. ("TRW") resolving, among other things, certain disputes concerning the respective obligations of each of TRW and certain Affiliate Debtors

63

under an environmental deed providing primarily for remediation of environmental contamination at certain facilities that were transferred by TRW to Delphi with Delphi's purchase of the global diesel business from TRW in 1999. In addition, Skadden assisted the Debtors in preparing a notice of that settlement and serving that notice on certain stakeholders as required under the court-approved procedures for settling non-ordinary course claims.

116. In connection with the foregoing services, Skadden expended 297.9 hours during the Application Period for which Skadden seeks compensation of $211,507, or 1.6% of the total compensation sought in this Interim Application.[36] Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-16</u>. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Kenneth Berlin | $810 | 153.6 | $124,416 |
| Don J. Frost, Jr. | $790 | 40.5 | $31,995 |
| Elizabeth A. Malone | $495 | 60.5 | $29,948 |
| Joseph N. Wharton | $565 | 26.6 | $15,030 |
| Ron E. Meisler | $585 | 15.5 | $9,068 |
| John (Jack) Wm Butler, Jr. | $875 | 1.2 | $1,050 |
| **Total** | | **297.9** | **$211,507 (1.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$10,235** |

Q.    <u>Business Operations/Strategic Planning</u>

117. This matter covers Skadden's work with the Debtors' senior management, investment bankers, financial advisors, and other business and legal advisors in considering restructuring strategies and initiatives. Among other matters, senior Skadden lawyers

---

[36]    This compares to $163,396, or 1.8%, $140,142, or 1.2%, and $129,158, or 1.3% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

participated in weekly meetings at the Company's headquarters, including Delphi Transformation

Committee meetings.  Skadden also participated in numerous strategy sessions, meetings, and

calls to consider such major case issues as the Debtors' development of (a) their transformation

plan, (b) 2007-2011 preliminary restructuring business plan, (c) the framework discussions, and

(d) various scenarios, considerations, and ramifications regarding the Reorganization Cases.

Furthermore, Skadden assisted the Debtors with respect to operational issues as they relate to

these Reorganization Cases, including, without limitation, conducting negotiations with the

Creditors' Committee and the Equity Committee as well as analyzing certain proposed strategic

intercompany transactions.

       118.   In addition, Skadden advises the Debtors' management of the Debtors'

rights and duties as debtors-in-possession, noting proscribed, permitted, and required conduct.

Skadden frequently advises the Debtors' management with respect to specific business questions

posed by management that arise from events occurring in the Reorganization Cases.  Part of

Skadden's advice in this regard involves the participation of Skadden professionals in periodic

planning and strategy conferences with the Debtors' senior management team.

       119.   To assist the Debtors in continuing to perform their fiduciary duties,

Skadden works with the Debtors in implementing procedures for the Debtors to operate their

businesses in accordance with the requirements of the Bankruptcy Code.  Skadden reviews

certain of the Debtors' proposed expenditures, contractual relationships, dispositions of property,

and other transactions to aid the Debtors in evaluating whether the contemplated transactions are

within the ordinary course of business or are outside the ordinary course of business and require

Court approval.

120.    Moreover, in furtherance of the Debtors' transformation plan, prior to the

Application Period the Debtors, with the assistance of Skadden and other outside counsel, entered

into two agreements for the outsourcing of certain information technology infrastructure services.

One agreement was with Electronic Data Systems Corporation and EDS Information Services,

LLC, which provides for the outsourcing of global desktops, service desks, and mainframe

systems hosting (the "EDS Agreement").  The second agreement was between Delphi and

Hewlett Packard Company to allow the Debtors to outsource server systems hosting (and,

together with the EDS Agreement, the "IT Infrastructure Outsourcing Agreements").  The

aggregate projected cost of the IT Infrastructure Outsourcing Agreements is approximately

$700-$800 million over the seven-year term of the agreements, and after one-time transition costs

of $80 million, the Debtors expect that the IT Infrastructure Outsourcing Agreements will result

in a net operating savings of $155 million over the term of the agreements.

121.    Both prior and during the Application Period, Skadden took the lead role in

drafting and preparing the necessary motions to obtain this Court's approval of the IT

Infrastructure Outsourcing Agreements and assisted the Debtors throughout the process to

apprise the Debtors' key constituents to minimize litigation risk in the Debtors' pursuit of Court

approval.  To this end, Skadden assisted the Debtors in preparing material for and holding

working group sessions with the Creditors' Committee to communicate the substance of the

Debtors' request and apprise the Creditors' Committee of the rationale behind the Debtors'

business judgment.  Due to proprietary and confidential information contained in the IT

Infrastructure Outsourcing Agreements, prior to the Application Period, the Debtors, with the

assistance of Skadden, filed an ex parte motion for authority to file the IT Infrastructure

Outsourcing Agreements under seal (Docket No. 5198), which was granted on September 28,

66

2006 (Docket No. 5231). Just prior to the Application Period, the Debtors also filed a motion

seeking authority to enter into the IT Infrastructure Outsourcing Agreements (Docket No. 5237).

During the Application Period, Skadden worked with the Debtors' business team, their financial

advisors, and in-house counsel in preparing for the hearing related to the IT Infrastructure

Outsourcing Agreements.  On October 23, 2006 the Court entered an order approving the IT

Infrastructure Outsourcing Agreements (Docket No. 5378).

        122.   Finally, during the Application Period, Skadden assisted the Debtors in

negotiating and obtaining approval of Debtor Delphi Medical Systems Texas Corporation's

("DMS Texas") negotiated cessation of production for its sole customer.  DMS Texas had

incurred operating losses of approximately $2.5 million per year, and the agreement with its sole

customer allowed DMS Texas to cease operations at its Houston facility in an orderly and

cost-effective manner.  Under the agreement, DMS Texas also received compensation from its

sole customer that significantly helped to defray the wind-down expenses.  This Court approved

the agreement on December 18, 2006 (Docket No. 6197).

        123.   In connection with the foregoing services, Skadden expended 286.6 hours

during the Application Period for which Skadden seeks compensation of $188,290, or 1.5% of the

total compensation sought in this Interim Application.[37]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-17.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

---

[37]   This compares to $258,753, or 2.8%, $192,132, or 1.7%, and $304,824, or 3.0% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| John (Jack) Wm Butler, Jr. | $875 | 80.9 | $70,788 |
| Kellan Grant | $470 | 65.9 | $30,973 |
| Eric L. Cochran | $845 | 33.0 | $27,886 |
| Brian M. Fern | $565 | 22.9 | $12,939 |
| Ron E. Meisler | $585 | 18.5 | $10,824 |
| Kayalyn A. Marafioti | $830 | 8.1 | $6,723 |
| John K. Lyons | $775 | 6.3 | $4,883 |
| Lisa B. Diaz | $315 | 13.3 | $4,190 |
| Thomas J. Matz | $625 | 5.9 | $3,688 |
| Kurt Ramlo | $625 | 5.2 | $3,251 |
| Jay S. Berke | $810 | 3.0 | $2,430 |
| Albert L. Hogan III | $695 | 2.2 | $1,530 |
| George N. Panagakis | $810 | 1.6 | $1,296 |
| Nathan L. Stuart | $495 | 2.4 | $1,188 |
| Marie L. Gibson | $670 | 1.7 | $1,139 |
| Adlai S. Hardin | $585 | 1.9 | $1,112 |
| Paraprofessional Total | | 13.8 | $3,450 |
| **Total** | | **286.6** | **$188,290 (1.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$15,318** |

R.    Supplier Matters

124.    As previously stated, Delphi is the largest industrial company ever to seek

chapter 11 relief.  The Debtors' manufacturing operations depend upon the timely delivery of

goods and services from thousands of separate suppliers that are party to more than 96,000

distinct supply agreements.  Management of the Debtors' supply chain issues was further

complicated by the Debtors' reliance, consistent with normal automotive industry practice, on

"just-in-time" inventory management systems and "sole source" supply methods.  As discussed in

68

detail in motions filed earlier in these cases,[38] use of the just-in-time supply method means that

the Debtors do not maintain a significant inventory of the components supplied by many of their

suppliers.  Pursuant to the sole source supply method, the Debtors frequently purchase all their

requirements for a particular part from one supplier, each of which must meet demanding

specifications imposed by both the Debtors and their OEM customers before they can be used in

manufacturing the Debtors' products.

125.    The Debtors' use of just-in-time inventory management and sole-source

supply methods results in, among other things, the following unique risks to the Debtors'

businesses:  (a) a failure by a supplier to timely ship goods may force the Debtors' manufacturing

facilities using those parts to shut down less than 24 hours after the missed shipment and the

Debtors' OEM customer's manufacturing facilities to shut down less than 48 hours after the

missed shipment and (b) the Debtors are unable to re-source parts to another supplier in the short-

term.  The Debtors' post-filing supply chain management has been further complicated by the fact

that many of the Debtors' suppliers are facing similar financial pressures to those faced by the

Debtors.  The financial instability of some of such suppliers was significantly exacerbated by the

Debtors' chapter 11 filings and the large prepetition amounts owed to suppliers at the time of the

Debtors' filings.

126.    During the Application Period, Skadden continued to assist the Debtors in

managing numerous supply chain issues to avoid any interruptions in the supply of goods and

services to the Debtors' manufacturing operations.  In particular, the Debtors continued to address

---

[38]    See, e.g., Motion for Order Under 11 U.S.C. §§ 105(a), 363, 364, 1107, and 1108 and Fed. R. Bankr. P. 6004 and
9019 Authorizing Continuation of Vendor Rescue Program and Payment of Prepetition Claims of
Financially-Distressed Sole Source Suppliers and Vendors Without Contracts, dated October 13, 2005 (Docket
No. 17); Motion for Order Under 11 U.S.C. §§ 363(b) and 365(a) and Fed. R. Bankr. P. 9019 Approving
Procedures to Assume Certain Amended and Restated Sole Source Supplier Agreements, dated November 18,
2005 (Docket No. 1098).

supplier issues pursuant to the various supplier-related "first day" orders that were approved by

the Court early in these cases, as well as this Court's order dated December 12, 2005 (Docket No.

1494) (the "SAAP Order"), granting the Debtors authority to assume agreements covering the

supply of goods that the Debtors determine are critical to their on-going business operations. This

required the Debtors, with the assistance of Skadden, to negotiate a significant number of

agreements with multiple suppliers pursuant to such orders. During the Application Period,

Skadden also devoted time to negotiations with suppliers regarding the extension or replacement

of expiring supply agreements, including pursuant to the procedures approved by the Court in the

SAAP Order.

127.    In addition, during the Application Period, Skadden assisted the Debtors in

responding to a complaint filed in state court by Clarion Corporation ("Clarion") related to a

contract dispute with that supplier. With Skadden's assistance, the Debtors were successful at

staying the state court case, and following the Application Period the Debtors began litigating

Clarion's claims in the Bankruptcy Court. Separately, Skadden also assisted the Debtors with a

proposed settlement of a prepetition lawsuit filed by the Debtors against one of its suppliers by,

reviewing and commenting on the proposed settlement agreement, among other things, and

focusing on whether Court approval was required for the settlement.

128.    In connection with the foregoing services, Skadden expended 442.3 hours

during the Application Period for which Skadden seeks compensation of $182,296, or 1.4% of the

total compensation sought in this Interim Application.[39]    Detailed time entries of each Skadden

professional related to these services are attached hereto as <u>Exhibit D-18</u>. A summary of the

---

[39]    This compares to $1,032,388, or 11.2%, $539,862, or 4.8%, and $331,877, or 3.3% and of the total fees requested
for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Randall G. Reese | $535 | 88.4 | $47,295 |
| John K. Lyons | $775 | 50.8 | $39,371 |
| Kellan Grant | $470 | 65.8 | $30,926 |
| Nick D. Campanario | $535 | 32.2 | $17,228 |
| Michael W. Perl | $435 | 30.7 | $13,355 |
| Ron E. Meisler | $585 | 12.2 | $7,138 |
| Kurt Ramlo | $625 | 8.2 | $5,125 |
| Eric J. Howe | $390 | 10.6 | $4,134 |
| Allison V. Herriott | $435 | 6.5 | $2,828 |
| Sarah J. Platt | $355 | 6.7 | $2,379 |
| Joseph N. Wharton | $565 | 2.5 | $1,413 |
| John Guzzardo | $435 | 2.5 | $1,088 |
| Paraprofessional Total | | 125.2 | $10,016 |
| **Total** | | **442.3** | **$$182,296 (1.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$9,976** |

S.    Employee Matters (Labor Unions)

129.    As of the Petition Dates, substantially all of the Debtors' approximately

34,750 hourly employees in the United States were represented by three principal unions – the

United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"),

the IUE-CWA, and the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied

Industrial and Service Workers, International Union, AFL-CIO (the "USW").  The Debtors have

master collective bargaining agreements with each of these three unions as well as "local

agreements" with affiliated local unions covering primarily local issues that are worksite or

business specific.  The Debtors also have collective bargaining agreements with three other

unions – the International Association of Machinists and Aerospace Workers (the "IAM"), the

71

IBEW, and the IUOE covering approximately 135 employees (the six foregoing unions (the

UAW, IUE-CWA, USW, IAM, IBEW, and IUOE) being referred to herein collectively as the

"Unions").

130.    As this Court is aware, on March 31, 2006, the Debtors filed a Motion for

Order Under 11 U.S.C. § 1113(c) Authorizing Rejection of Collective Bargaining Agreements

and Under 11 U.S.C. § 1114(g) Authorizing Modification of Retiree Welfare Benefits (Docket

No. 3035)(the "1113/1114 Motion") and the Court held a contested hearing on the 1113/1114

Motion in the prior application period.  During the Application Period, Skadden worked with the

Debtors and other professionals to further the negotiations between the Debtors and their Unions.

Throughout the Application Period, Skadden worked closely (being mindful not to duplicate

efforts) with O'Melveny & Myers, LLP ("O'Melveny"), special labor counsel retained by the

Debtors to advise with respect to the prosecution, continuance, and ultimate suspension of the

Debtors' 1113/1114 Motion.

131.    Throughout the Application Period, the Debtors, with the assistance of

Skadden, have continued to provide information to, and engage in discussions and negotiations

with, the Unions and the Debtors' stakeholders in an effort to resolve the labor matters forming

the basis of the 1113/1114 Motion.  To apprise the Court of the progress of the framework

discussions and other matters, the Court held five in camera status conferences during the

Application Period.  Skadden advised and represented the Debtors at each of these conferences.

132.    During the Application Period, the Debtors, with Skadden's assistance,

continued to negotiate with the USW, as well as their other unions, regarding programs similar to

the UAW and IUE-CWA attrition programs previously approved by this Court.  In this regard,

Skadden assisted the Debtors with evaluating and responding to issues related to the ineligibility

72

of certain employees to participate in an IUE-CWA attrition plan at the New Brunswick facility.

Skadden also assisted in evaluating and responding to claims alleged during the Application

Period related to the status and arbitration of an employee's medical condition for purposes of

being considered an employee able to participate in a potential USW voluntary retirement

program.

133.    In connection with the foregoing services, Skadden expended 280.7 hours

during the Application Period for which Skadden seeks compensation of $180,964, or 1.4% of the

total compensation sought in this Interim Application.[40]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-19.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Louis D. Wilson | $585 | 71.3 | $41,711 |
| John (Jack) Wm Butler, Jr. | $875 | 35.0 | $30,626 |
| Thomas J. Matz | $625 | 41.1 | $25,688 |
| Jay S. Berke | $810 | 30.0 | $24,300 |
| John P. Furfaro | $810 | 25.4 | $20,574 |
| Kayalyn A. Marafioti | $830 | 9.7 | $8,051 |
| Kellan Grant | $470 | 15.1 | $7,097 |
| Joseph N. Wharton | $565 | 12.0 | $6,780 |
| Nathan L. Stuart | $495 | 9.4 | $4,653 |
| Brian M. Fern | $565 | 4.1 | $2,317 |
| Ron E. Meisler | $585 | 3.8 | $2,223 |
| M. Janine Jjingo | $390 | 5.6 | $2,184 |

---

[40]    This compares to $414,991, or 4.5%, $2,590,790, or 22.9%, and $1,387,983, or 13.8% of the total fees requested
for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

73

| Name | Rate | Time | Amount |
|------|------|------|--------|
| William M. Rohner | $495 | 2.3 | $1,139 |
| Paraprofessional Total | | 15.9 | $3,621 |
| **Total** | | **280.7** | **$180,964 (1.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$21,004** |

T.  Leases (Real Property)

134.  The Debtors are currently lessors or lessees with respect to approximately
80 leases of real property.  During the Application Period, Skadden worked closely with the
Debtors on matters related to such real property leases including (a) advising the Debtors'
regarding negotiating the renewal or amendments of certain leases, (b) reviewing proposed new
leases and negotiating entry into certain new leases, (c) preparing and servicing notices under the
Order Under 11 U.S.C. §§ 363, 1107, and 1108 Approving Procedures to Enter Into or Renew
Real Property Leases Without Further Court Approval, entered on January 6, 2006 (Docket No.
1777) for new or renewed leases, (d) assisting the Debtors with their decision-making process
regarding the rejection of leases including advising the Debtors regarding lease rejection claims
and lease rejection strategies, (e) researching and advising the Debtors relating to the effect of
leasehold assignor's liability in a rejection scenario, (f) reviewing and advising the Debtors with
respect to environmental issues concerning the Debtors' nonresidential real property leases, and
(g) researching, advising, and resolving various mechanics' lien claims with respect to the
Debtors' leased real property.

135.  In addition, during the Application Period, the Debtors, with the assistance
of Skadden, proceeded to negotiate the sale-leaseback of a property in Auburn Hills, Michigan to
obtain significant economic advantages from the consolidation of six leased and owned facilities
in Michigan and Illinois, create a single, state-of-the-art technical center located in close
proximity to the Debtors' major customers, accelerate the development of new products and

74

innovations, foster better communications among employees, and properly project Delphi's

image of technical and technological capability.  Skadden continued to assist the Debtors with the

development of a strategic plan to accomplish the proposed consolidation and implementation of

that plan by negotiating with brokers, sellers, investors, and other related parties regarding the

numerous issues which arose with respect to the proposals to consolidate these sites.

       136.    Furthermore, on September 21, 2006, Orix Warren, LLC ("Orix"), a lessor

which was the sole objector to the Debtors' October 2005 motion to extend the deadline to assume

or reject leases under section 365(d)(4) of the Bankruptcy Code (the "Section 365(d)(4) Extension

Motion"), filed a notice of a supplemental objection to the extension of the Debtors' deadline to

assume or reject their unexpired lease of nonresidential real property in Warren, Ohio with Orix

(the "Orix Lease") (Docket No. 5178).  By way of background, pursuant to the Debtors'

settlement of Orix's objection to the Section 365(d)(4) Extension Motion, as memorialized in the

Order Pursuant to 11 U.S.C. § 365(d)(4) Extending Deadline to Assume or Reject Unexpired

Leases of Nonresidential Real Property entered by the Court on November 29, 2005 (Docket No.

1345), the notice of a supplemental objection triggered litigation under which the Debtors had the

burden to show cause for the last six months of the 18-month extension granted by the order

granting the Section  365(d)(4) Extension Motion.  During the Application Period, Skadden

prepared and filed the Debtors' reply to Orix's objection on November 20, 2006 (Docket No.

5590), and the Declaration of John D. Sheehan, their Chief Restructuring Officer, in support of

their reply (Docket No. 5590).  Skadden then assisted the Debtors in commencing discovery in

anticipation of a contested hearing and then negotiating with Orix to consensually resolve the

objection. As a result of these efforts, Orix agreed to withdraw its objection (Docket No. 5940)

and the Debtors' six-month extension (to June 2007) to assume or reject the Orix Lease became

effective.

137.    In connection with the foregoing services, Skadden expended 261.9 hours

during the Application Period for which Skadden seeks compensation of $145,356, or 1.1% of the

total compensation sought in this Interim Application.[41]    Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-20.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Joseph N. Wharton | $565 | 74.6 | $42,149 |
| Catherine E. Danz | $535 | 75.5 | $40,394 |
| Kellan Grant | $470 | 51.2 | $24,064 |
| Marian P. Wexler | $810 | 17.7 | $14,337 |
| Ron E. Meisler | $585 | 19.2 | $11,233 |
| Michael W. Perl | $435 | 14.3 | $6,221 |
| Albert L. Hogan III | $695 | 3.3 | $2,294 |
| Kayalyn A. Marafioti | $830 | 2.2 | $1,826 |
| Thomas J. Matz | $625 | 2.3 | $1,438 |
| John (Jack) Wm Butler, Jr. | $875 | 1.6 | $1,400 |
| **Total** | | **261.9** | **$145,356 (1.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$5,970** |

U.    Employee Matters (General)

138.    As of the Petition Dates, the Company employed approximately 180,000

employees worldwide, of which 50,600 were employees in the United States at approximately 44

manufacturing sites, 13 technical centers, and Delphi's Troy, Michigan headquarters.

---

[41]    This compares to $143,190, or 1.6%,  $290,834, or 2.6%, and $81,111, or 0.8% of the total fees requested for this
matter in Skadden's First, Second, and Third  Interim Fee Applications, respectively.

76

Approximately 34,750 of the Debtors' U.S. employees were hourly employees as of the Petition

Dates, and 96% of these are union-represented.  Outside the United States, the Company's foreign

entities employed more than 134,000 people on the Petition Dates, supporting 120 manufacturing

sites and 20 technical centers in nearly 40 countries around the globe.

139.    During the Reorganization Cases, the Debtors have been attempting to

restructure the compensation programs of all of their employees to market-competitive levels.

Among other human capital programs, Skadden, along with the Debtors' other advisors, continue

to advise the Debtors in connection with the Debtors' reassessment of the employment

proposition that the Company could offer its executive workforce in light of current U.S. and

marketplace economic realities.  The result of this evaluation led to Skadden's drafting, prior to

the Application Period, of a motion (the "KECP Motion") to implement a key employee

compensation program ("KECP") based on recommendations made by the Debtors' outside

compensation consultant as adopted by the Compensation and Executive Development

Committee of the Board.

140.    During the Application Period, Skadden continued discussions with the

Creditors' Committee on issues related to both the KECP emergence incentive program and a

short-term annual incentive program for the first half of 2007 that would be substantially

consistent with the program designed for calendar year 2006.  In addition, Skadden assisted the

Debtors in their own review and analysis of the programs.  At the Omnibus Hearing on January

12, 2007, the KECP emergence incentive program was removed from the Court's calendar in

order to incorporate such program into the Debtors' plan of reorganization process.  The hearing

on the AIP for the first half of 2007 was also further adjourned, first to the February 2007

omnibus hearing, and then to the omnibus hearing scheduled for March 22, 2007.

141.    In connection with the foregoing services, Skadden expended 212.2 hours during the Application Period for which Skadden seeks compensation of $127,626, or 1.0% of the total compensation sought in this Interim Application.[42]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-21.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Neil M. Leff | $830 | 42.5 | $35,275 |
| John (Jack) Wm Butler, Jr. | $875 | 27.1 | $23,713 |
| Erica Schohn | $470 | 50.1 | $23,547 |
| Brian M. Fern | $565 | 32.7 | $18,477 |
| Nick D. Campanario | $535 | 33.4 | $17,870 |
| Albert L. Hogan III | $695 | 2.6 | $1,807 |
| Eric L. Cochran | $845 | 1.4 | $1,183 |
| Ron E. Meisler | $585 | 2.0 | $1,170 |
| Paraprofessional Total | | 20.4 | $4,584 |
| **Total** | | **212.2** | **$127,626 (1.0%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$10,477** |

Matters Under $100,000

V.    Customer Matters (GM)

142.    During the Application Period, Skadden assisted the Debtors with many matters related to GM, the Debtors' largest customer and former parent.  The principal activity during the Application Period was assisting the Debtors with direct negotiations with GM concerning GM legacy issues and the overall supplier/customer relationship between Delphi and GM.  While the Debtors had earlier filed a motion to reject certain unprofitable GM supply

---

[42]    This compares to $879,786, or 9.6%, $359,097, or 3.2%, and $308,544, or 3.1% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

contracts (Docket No. 3033) (the "GM Contract Rejection Motion") in March 2006, as a result of

the progress achieved in connection with the Framework Agreements, the Debtors sought, and

this Court approved, an order suspending prosecution of the GM Contract Rejection Motion

indefinitely, effective January 31, 2007 (Docket No. 6778). Throughout the Application Period,

the Debtors, with the assistance of Skadden, also continued to focus on negotiations concerning

certain ordinary course negotiations related to GM.  Additionally, during the Application Period,

Skadden reviewed the GM legacy agreements, researched issues regarding treatment of such

agreements under the Bankruptcy Code, and drafted summaries ad charts of issues arising under

these agreements.

143.    In connection with the foregoing services, Skadden expended 115.2 hours

during the Application Period for which Skadden seeks compensation of $80,818, or 0.6% of the

total compensation sought in this Interim Application.[43]   Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-22.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| John (Jack) Wm Butler, Jr. | $875 | 39.6 | $34,651 |
| Brian M. Fern | $565 | 39.5 | $22,318 |
| George N. Panagakis | $810 | 8.4 | $6,804 |
| Thomas J. Matz | $625 | 4.6 | $2,876 |
| Louis D. Wilson | $585 | 4.3 | $2,516 |
| Adlai S. Hardin | $585 | 4.0 | $2,340 |
| Dhananjai Shivakumar | $625 | 3.5 | $2,188 |
| Nathan L. Stuart | $495 | 4.4 | $2,178 |
| Eric L. Cochran | $845 | 2.4 | $2,028 |

[43]    This compares to $458,182, or 5.0%, $1,789,803, or 15.8%, and $1,699,180, or 16.9% of the total fees requested
for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Albert L. Hogan III | $695 | 2.6 | $1,807 |
| Ron E. Meisler | $585 | 1.9 | $1,112 |
| **Total** | | **115.2** | **$80,818 (0.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$8,301** |

W.  <u>Employee Matters (Pension)</u>

144.   Skadden assisted the Debtors during the Application Period in connection with bankruptcy and restructuring advice related to the Debtors' seven defined benefit pension plans covered by termination insurance programs administered by the PBGC.  During the Application Period, Skadden assisted the Debtors by researching and analyzing various issues in connection with the contemplated treatment of the pension plans.  Additionally, Skadden also assisted the Debtors by analyzing various tax-related issues in connection with the pension funding obligations.

145.   In connection with the foregoing services, Skadden expended 129.8 hours during the Application Period for which Skadden seeks compensation of $77,033, or 0.6% of the total compensation sought in this Interim Application.[44]  Detailed time entries of each Skadden professional related to these services are attached hereto as <u>Exhibit D-23</u>.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| David A. Schneider | $595 | 53.6 | $31,892 |
| Kayalyn A. Marafioti | $830 | 13.0 | $10,790 |
| Brian M. Fern | $565 | 14.9 | $8,419 |
| Michael R. Bergmann | $625 | 11.1 | $6,938 |

---

[44]   This compares to $58,190, or 0.5%, and $28,202, or 0.3%, of the total fees requested for this matter in Skadden's Second and Third Interim Fee Applications, respectively.  Skadden did not request any compensation for this matter in its First Interim Fee Application.

80

| Name | Rate | Time | Amount |
|---|---|---|---|
| Allen Stenger | $470 | 14.3 | $6,721 |
| Jody J. Brewster | $775 | 8.2 | $6,355 |
| Sarah J. Platt | $315 | 12.1 | $3,812 |
| Lawrence D. Frishman | $810 | 2.6 | $2,106 |
| **Total** | | **129.8** | **$77,033 (0.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,576** |

X.    Regulatory And SEC Matters

146.    Delphi had been the subject of an ongoing investigation by the SEC
involving Delphi's accounting and the adequacy of disclosures for a number of transactions dating
from Delphi's separation from GM.  On October 30, 2006, the SEC commenced and
simultaneously settled with Delphi a lawsuit alleging violations of federal securities laws, which
concluded the SEC's investigation of Delphi.  Under the agreement approved by the SEC, Delphi
agreed, without admitting or denying any wrongdoing, to be enjoined from future violations of
the securities laws.  No civil monetary penalties were imposed against Delphi.  During the
Application Period, Skadden assisted the Debtors in seeking the Court's approval of the
settlement.  On November 10, 2006, the Debtors, with the assistance of Skadden, filed their
Motion for Order Authorizing Entry Into Settlement With the Securities and Exchange
Commission (Docket No. 5520).  The Court entered an order approving the Debtors' settlement
with the SEC on December 11, 2006 (Docket No. 6140).

147.    In connection with the foregoing services, Skadden expended 132.8 hours
during the Application Period for which Skadden seeks compensation of $73,424, or 0.6% of the
total compensation sought in this Interim Application.[45]  Detailed time entries of each Skadden

---

[45]    This compares to $12,245, or 0.1%, and $8,624, or 0.1% of the total fees requested for this matter in Skadden's
First and Second Interim Fee Applications.  Skadden did not request any compensation for this matter in its Third
Interim Fee Application.

81

professional related to these services are attached hereto as <u>Exhibit D-24</u>. A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Nathan L. Stuart | $495 | 56.3 | $27,869 |
| Ron E. Meisler | $585 | 25.7 | $15,035 |
| John (Jack) Wm Butler, Jr. | $875 | 9.1 | $7,963 |
| Albert L. Hogan III | $695 | 8.5 | $5,908 |
| Kayalyn A. Marafioti | $830 | 5.6 | $4,648 |
| Neil MacDonald | $585 | 5.8 | $3,393 |
| Dhananjai Shivakumar | $625 | 4.2 | $2,625 |
| Michael W. Perl | $435 | 4.7 | $2,045 |
| Thomas J. Matz | $625 | 1.9 | $1,188 |
| Paraprofessional Total | | 11.0 | $2,750 |
| **Total** | | **132.8** | **$73,424 (0.6%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,900** |

Y.    <u>Disclosure Statement / Voting Issues</u>

148.    In connection with the development of the Framework Agreement and the preparation of the plan of reorganization, during the Application Period, Skadden assisted the Debtors in the early conceptual development of a disclosure statement that will ultimately be prepared and filed together with a plan of reorganization. Additionally, Skadden professionals began, developing solicitation procedures that may ultimately be the basis for soliciting votes on the plan of reorganization.

149.    In connection with the foregoing services, Skadden expended 129.9 hours during the Application Period for which Skadden seeks compensation of $62,694, or 0.5% of the total compensation sought in this Interim Application.[46]    Detailed time entries of each Skadden

---

[46]    Skadden did not request compensation for this matter in its First, Second, or Third Interim Fee Applications.

82

professional related to these services are attached hereto as <u>Exhibit D-25</u>.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Nathan L. Stuart | $495 | 78.1 | $38,660 |
| Kellan Grant | $470 | 46.3 | $21,761 |
| Adlai S. Hardin | $585 | 2.0 | $1,170 |
| J.R. Lederer | $315 | 3.5 | $1,103 |
| **Total** | | **129.9** | **$62,694 (0.5%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$4,929** |

Z.    <u>Executory Contracts (Personalty)</u>

150.    The Debtors estimate that, as of the Petition Dates, they were parties to

347,000 scheduled executory contracts and unexpired leases, which collectively involve billions

of dollars of liabilities.  During the Application Period, Skadden worked closely with numerous

internal and external representatives and employees of the Debtors to coordinate the review of

various executory contracts and, together with the Debtors' senior management and business

advisors, to evaluate contracts and leases for assumption or rejection.  To conduct the analysis,

Skadden participated in meetings with the Debtors' business personnel regarding appropriate

proration of invoices between prepetition and postpetition periods to calculate the Debtors'

postpetition payment obligations.  Moreover, Skadden participated in numerous meetings and

teleconferences with contract counterparties regarding contractual matters, termination notices,

and other related issues.

151.    In connection with the foregoing services, Skadden expended 97.4 hours

during the Application Period for which Skadden seeks compensation of $50,562, or 0.4% of the

total compensation sought in this Interim Application.[47]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-26.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brian M. Fern | $565 | 34.2 | $19,324 |
| Kellan Grant | $470 | 25.4 | $11,938 |
| Ron E. Meisler | $585 | 19.1 | $11,174 |
| Michael W. Perl | $435 | 11.5 | $5,003 |
| Eric J. Howe | $390 | 5.4 | $2,106 |
| Joseph N. Wharton | $565 | 1.8 | $1,017 |
| **Total** | | **97.4** | **$50,562 (0.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$3,537** |

AA.    Intellectual Property

            152.    Throughout the Application Period, Skadden provided legal advice

regarding bankruptcy-related issues affecting the Debtors' intellectual property, particularly

patents and licenses.  Skadden devoted time to research, track, and analyze legal issues related to

the potential intellectual property claims that could be asserted against the Debtors, including, but

not limited to, the possible priority status of such potential claims in the Reorganization Cases.  In

particular, in connection with a patent infringement case, Skadden professionals devoted time to

researching and analyzing the nature of claims that could be asserted against the Debtors should

they not prevail at trial.  Finally, during the Application Period, Skadden assisted the Debtors in

reviewing and assessing the legal implications of entering into several intellectual property

licensing agreements.

---

[47]    This compares to $153,055, or 1.7%, $38,078, or 0.3%, and $69,027, or 0.7% of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

153.    In connection with the foregoing services, Skadden expended 101.1 hours during the Application Period for which Skadden seeks compensation of $47,649, or 0.4% of the total compensation sought in this Interim Application.[48]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-27.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brent M. Houston | $435 | 74.3 | $32,322 |
| Brian M. Fern | $565 | 17.6 | $9,944 |
| Ron E. Meisler | $585 | 9.2 | $5,383 |
| **Total** | | **101.1** | **$47,649 (0.4%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$7,750** |

BB.    Global Subsidiaries (Non-U.S.)

154.    During the Application Period, Skadden devoted time advising the Company on matters relating to its non-U.S. global subsidiaries including intercompany transactions with foreign entities.  Specifically, during the Application Period, among other things, Skadden assisted the Debtors in analyzing the costs and benefits of an intercompany transaction to contribute equity to a European subsidiary and worked with the Debtors in developing proper mechanics to consummate the transaction in compliance with the Debtors' first day orders and non-U.S. law.  Skadden also initiated discussions with the Creditors' Committee on related issues.

155.    In connection with the foregoing services, Skadden expended 76.6 hours during the Application Period for which Skadden seeks compensation of $46,676, or 0.4% of the

---

[48]    This compares to $22,186, or 0.2%, $65,656, or 0.6%, and $32,050, or 0.3% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

total compensation sought in this Interim Application.[49]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-28.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Brian M. Fern | $565 | 56.4 | $31,867 |
| John (Jack) Wm Butler, Jr. | $875 | 8.2 | $7,176 |
| Ron E. Meisler | $585 | 9.5 | $5,558 |
| Kayalyn A. Marafioti | $830 | 2.5 | $2,075 |
| Total | | 76.6 | $46,676 (0.4%) |
| Voluntary fee accommodation excluded from total: | | | $17,536 |

CC.    Secured Claims

156.    Throughout the Application Period until January 9, 2007, when the

prepetition lenders were paid in full, the Debtors, with Skadden's assistance, continued to work

with and meet with their prepetition lenders to keep them reasonably informed with respect to

these Reorganization Cases.  Skadden also devoted time to reconciling requests for setoff under

the DIP Financing Order.[50]  In seeking to resolve these setoff claims, Skadden tracked certain

setoff claims, researched their validity, and ultimately negotiated resolutions of the claims.

Skadden also dealt with a number of issues regarding assertion of liens against the Debtors

including with respect to lien litigation filed by L&W Engineering, Co. and Southtec, LLC.  With

respect to L&W Engineering, Co., Skadden advised the Debtors about potential settlement of the

pending adversary proceeding, and Skadden participated in negotiations with L&W Engineering,

---

[49]    This compares to $330,534, or 3.6%, $205,234, or 1.8%, and $32,906, or 0.3% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

[50]    Skadden and Togut, the Debtors' conflicts counsel, work cooperatively to handle the dozens of setoff requests received to date with careful attention to ensure no duplication of efforts.

Co.'s counsel in an effort to settle consensually this matter as well as reconcile the prepetition

claim filed by that creditor.

157.    In connection with the foregoing services, Skadden expended 95.7 hours

during the Application Period for which Skadden seeks compensation of $44,488, or 0.3% of the

total compensation sought in this Interim Application.[51]   Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-29.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| William M. Rohner | $495 | 56.4 | $27,919 |
| Ron E. Meisler | $585 | 10.1 | $5,909 |
| Albert L. Hogan III | $695 | 6.7 | $4,657 |
| M. Janine Jjingo | $390 | 2.7 | $1,053 |
| Paraprofessional Total | | 19.8 | $4,950 |
| **Total** | | **95.7** | **$44,488 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$1,174** |

DD.    Real Estate (Owned)

158.    Skadden assisted the Debtors in reviewing the Debtors' owned real estate

and the potential purchase of property related to the Debtors' contemplated consolidation of

certain office and research facilities.  Specifically, Skadden: (a) participated on numerous

conference calls with the sellers of the property and (b) reviewed and commented on numerous

acquisition specific documents including the letter of intent and the purchase agreement.  These

issues required numerous communications with the Debtors' real estate and facilities personnel.

---

[51]    This compares to $236,983, or 2.6%,  $266,437, or 2.4%, and $153,028, or 1.5% of the total fees requested for this
       matter in Skadden's First, Second, and Third  Interim Fee Applications, respectively.

In addition, Skadden worked together with the Debtors in coordinating various matters related to the Debtors' owned real estate, including resolving claims related to statutory real property lien issues.

159.    In connection with the foregoing services, Skadden expended 64.2 hours during the Application Period for which Skadden seeks compensation of $42,465, or 0.3% of the total compensation sought in this Interim Application.[52]    Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-30.    A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Marian P. Wexler | $810 | 33.0 | $26,730 |
| Ron E. Meisler | $585 | 16.0 | $9,360 |
| Kellan Grant | $470 | 4.7 | $2,209 |
| Catherine E. Danz | $535 | 3.9 | $2,087 |
| Lisa B. Diaz | $315 | 6.6 | $2,079 |
| **Total** | | **64.2** | **$42,465 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$2,803** |

EE.    Litigation (General)

160.    During the Application Period, Skadden was required to devote resources to various litigation matters not within the purview of other billing categories.  Skadden assisted the Debtors in negotiations relating to some of the non-bankruptcy litigation matters.  Additionally, Skadden conducted legal research and advised the Debtors about removing certain actions from the state courts.

---

[52]    This compares to $63,413, or 0.7%, $44,502, or 0.4%, and $31,005, or 0.3% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

161.    In connection with the foregoing services, Skadden expended 74.4 hours during the Application Period for which Skadden seeks compensation of $37,702, or 0.3% of the total compensation sought in this Interim Application.[53]  Detailed time entries of each Skadden professional related to these services are attached hereto as Exhibit D-31.  A summary of the hours expended and the corresponding dollar amount of the services performed by each professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Kellan Grant | $470 | 46.2 | $21,714 |
| Nick D. Campanario | $535 | 13.5 | $7,223 |
| Neil MacDonald | $585 | 6.3 | $3,686 |
| Kurt Ramlo | $625 | 4.1 | $2,563 |
| Ron E. Meisler | $585 | 4.3 | $2,516 |
| **Total** | | **74.4** | **$37,702 (0.3%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$12,691** |

FF.    Utilities

162.    During the Application Period, Skadden occasionally received correspondence related to utility issues and Skadden reviewed such correspondence and provided guidance to Debtors on these matters.  In addition, during the Application Period, Skadden assisted the Debtors in reviewing and negotiating the terms of an energy contract for one of the Debtor entities.  Skadden professionals reviewed various drafts of the contract and participated in numerous conference calls to work out the terms of the contract.

163.    In connection with the foregoing services, Skadden expended 34.2 hours during the Application Period for which Skadden seeks compensation of $16,604, or 0.1% of the

---

[53]    This compares to $21,112, or 0.2%, $33,598, or 0.3%, and $11,076, or 0.1% of the total fees requested for this matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

total compensation sought in this Interim Application.[54]   Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-32.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|------|------|------|--------|
| Michael W. Perl | $435 | 22.7 | $9,876 |
| Ron E. Meisler | $585 | 11.5 | $6,728 |
| **Total** | | **34.2** | **$$16,604 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$148** |

GG.    Claims Administration (Reclamation/Trust Funds)

164.    As previously disclosed to this Court, the Debtors received roughly 855

unique reclamation demands with a total face amount of more than $285 million.  During the

Application Period, Skadden continued to work with the Debtors and their business advisors in

negotiating the merit and amount of outstanding reclamation claims with the holders of such

claims.  As a result of negotiations with reclamation claimants since the Petition Dates, 737 of the

original 855 non-duplicate claims were resolved (either consensually or by default) as of January

31, 2007, subject to the reservation of certain further defenses.

165.    In connection with the foregoing services, Skadden expended 18.8 hours

during the Application Period for which Skadden seeks compensation of $10,641.80, or 0.1% of

the total compensation sought in this Interim Application.[55]   Detailed time entries of each

Skadden professional related to these services are attached hereto as Exhibit D-33.  A summary of

---

[54]    This compares to $295,549, or 3.2%, $192,060, or 1.7%, and $13,398, or 0.1% ,of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

[55]    This compares to $134,926, or 1.5%, $142,265, or 1.3%, and $217,669, or 2.2% of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

the hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Joseph N. Wharton | $565 | 18.8 | $10,623 |
| **Total** | | **18.8** | **$10,623 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$3,355** |

HH.    Reports And Schedules

166.    The Debtors are required to submit Monthly Operating Reports, which

provide detailed information regarding the Debtors' assets, liabilities, and operations on a

monthly basis. During the Application Period, Skadden worked with the Debtors' finance and

accounting personnel, as well as the Debtors' financial advisors and the U.S. Trustee, to review

and file Monthly Operating Reports for the months of September, October, November, and

December 2006.

167.    In connection with the foregoing services, Skadden expended 11.9 hours

during the Application Period for which Skadden seeks compensation of $7,546, or 0.1% of the

total compensation sought in this Interim Application.[56]  Detailed time entries of each Skadden

professional related to these services are attached hereto as Exhibit D-34.  A summary of the

hours expended and the corresponding dollar amount of the services performed by each

professional is provided in the following table:

| Name | Rate | Time | Amount |
|---|---|---|---|
| Thomas J. Matz | $625 | 6.6 | $4,126 |
| Ron E. Meisler | $585 | 4.0 | $2,341 |

---

[56]    This compares to $187,152, or 2.0%, $22,844, or 0.2%, and $8,325, or 0.1% of the total fees requested for this
matter in Skadden's First, Second, and Third Interim Fee Applications, respectively.

91

| Name | Rate | Time | Amount |
|---|---|---|---|
| Kayalyn A. Marafioti | $830 | 1.3 | $1,079 |
| **Total** | | **11.9** | **$7,546 (0.1%)** |
| **Voluntary fee accommodation excluded from total:** | | | **$5,336** |

<u>Relief Requested</u>

168.    Skadden has submitted monthly fee statements for the period from October 1, 2006 through January 31, 2007, and, in accordance with the Interim Compensation Order, now submits this Interim Application covering the Application Period.  Based on the firm's customary billing practices, the Debtors ordinarily would be billed a total of $13,976,215 for fees and $830,197 for charges and disbursements.  In keeping with Skadden's commitment to self-policing its fees, charges, and disbursements, and based on various accommodations to the Debtors, Skadden voluntarily reduced, as part of its monthly fee statements, its fees by $1,048,877, or approximately 7.5%, and its charges and disbursements by $122,101, or approximately 14.7%. As a result, the actual amount billed to the Debtors was $12,927,338 for fees and $708,096 for charges and disbursements.

169.    Moreover, as an additional accommodation, Skadden has voluntarily reduced the amount sought in this Interim Application by $106,834 to reflect, among other accommodations, the elimination of (i) fees related to any timekeeper who billed fewer than ten total hours during the Application, (ii) fees related to any timekeeper who billed less than $1,000 during the Application Period, (iii) fees related to any instance in which a timekeeper billed less than $1,000 to a particular matter during the Application Period, and (iv) fees related to any matter to which fewer than ten hours were billed during the Application Period.  As a result, the actual amount sought herein is $12,820,504 for fees.  This represents a total reduction with

respect to fees, charges, and disbursements of $1,277,812, or approximately 8.6%, from those amounts that Skadden would customarily charge.

170.    The Interim Compensation Order provides that, when seeking interim compensation, professionals must submit monthly fee statements to the Debtors, counsel to the Debtors, the U.S. Trustee, counsel for the Creditors' Committee, counsel for the agent under the Debtors' prepetition credit facility, counsel for the agent under the Debtors' postpetition credit facility, and members of the Fee Review Committee.  Each person receiving a statement has at least 15 days after its receipt to review it.  If no objection to a monthly fee statement is made within 45 days after the end of the applicable billing period, the Debtors are authorized to pay 80% of the fees requested (with the remaining 20% of the fees requested referred to herein as the "Holdback") and 100% of the charges and disbursements requested.  Skadden has submitted monthly fee statements as described above for each of the months covered by the Application Period.

171.    Skadden has received $10,341,871 on account of billed fees and $708,096 on account of billed charges and disbursements and has accrued a Holdback in the amount of $2,585,467.  After application of an additional client accommodation of $106,834, Skadden is requesting payment of 50% of the Holdback, or $1,292,733, leaving $1,292,734 of the Holdback for this Application Period outstanding, for which Skadden will later seek payment.  Skadden submits that payment of one half of the Holdback amount for this Application Period upon approval of this Interim Application is an appropriate balance between the interest of professionals in receiving prompt payment and the interest of the estates in ensuring reasonable professional compensation and reimbursement for actual or necessary expenses.

A.    Allowance Of Professional Fees

172.    During the Application Period, professionals at Skadden billed an aggregate of 25,473.6 hours reflected in this Interim Application working on matters concerning the Debtors' Reorganization Cases.[57]  Of such time spent, 5,151.6 hours were spent by partners, 2,300.4 hours were spent by counsel, 14,650.8 hours were spent by associates, and 3,370.8 hours were spent by legal assistants.  A summary showing the name and position of each such partner, counsel, associate, and legal assistant, together with that person's date of admission to the bar (as applicable), net hours during the Application Period, and blended hourly billing rate, is provided in the Summary of Services found at the beginning of this Interim Application.[58]

B.    Reimbursement Of Charges And Disbursements

173.    As disclosed in the Retention Application that this Court approved, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases.  The charges and disbursements charged to clients include, among others, charges for messenger services, photocopying, court fees, travel expenses, postage, long distance telephone charges, computerized legal research, investigative searches, and other charges customarily billed by law firms.  Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

174.    Skadden has attempted to minimize the charges and disbursements associated with the Debtors' Reorganization Cases, particularly for items such as reproduction and delivery, which have been lowered as a result of the restricted service list and the ability to

---

[57]    Skadden maintains records of the time it expended in the rendition of all professional services, which time records are made concurrently with the rendition of professional services.

[58]    In addition to the matter list, Exhibit C also sets forth the blended hourly rate and certain other business statistics associated with the Reorganization Cases.

94

serve the 2002 List Parties electronically, which Skadden proposed and this Court approved.

During the Application Period, Skadden disbursed the following sums for actual and necessary

charges and disbursements in the rendition of professional services in the Reorganization Cases,

and requests that it be reimbursed therefor:

<u>Charges And Disbursements Incurred</u>[59]

| | |
|---|---|
| Travel Expenses | $304,429 |
| Reproduction And Document Preparation | $229,790 |
| Computer Legal Research | $107,933 |
| Outside Research | $15,877 |
| Electronic Document Management | $15,795 |
| Courier, Express Delivery, And Postage | $15,592 |
| Court Reporting | $10,685 |
| Telecommunications | $7,565 |
| Filing/Court Fees | $430 |
| **TOTAL** | **$708,096** |

175.    The above charges and disbursements are reasonable and are consistent

with those incurred by other bankruptcy practitioners in other large, complex chapter 11

reorganization cases in this and other districts.  Moreover, Skadden believes that the unique size

and complexity of these cases, including the terms of this Court's case management order, as

amended, which require, among other things, overnight delivery of most pleadings, warrant

reimbursement of the foregoing charges and disbursements.

<u>Reasonableness Of Fees, Charges, And Disbursements</u>

176.    Under section 330 of the Bankruptcy Code, a Bankruptcy Court may award

to a professional employed by the estates "reasonable compensation for actual, necessary

services" rendered by the professional, plus "reimbursement for actual, necessary expenses."  <u>See</u>

---

[59]    The details relating to the charges and disbursements can be found in <u>Exhibits D-1</u> through <u>D-38</u> on a matter by matter basis.

11 U.S.C. § 330(a)(1).  See generally In re Cenargo Int'l, 294 B.R. 571 (Bankr. S.D.N.Y. 2003);

In re Child World, Inc., 185 B.R. 14 (Bankr. S.D.N.Y. 1995).

177.    In determining the amount of "reasonable compensation," the Court must

consider the nature, extent, and value of the services, taking into account all the relevant factors,

including the time spent on such services, the rates charged for such services, whether the services

were necessary and beneficial, whether the services were performed in a reasonable amount of

time commensurate with the complexity, importance, and nature of the problem, issue, or task

addressed, and whether the compensation is reasonable based on the customary compensation

charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code.

See 11 U.S.C. § 330(a)(3).

178.    In assessing attorneys' fees, courts use several different approaches.  The

Second Circuit and bankruptcy courts in this district frequently utilize the "lodestar" method,

which is a determination as to the number of hours of service reasonably devoted to the case

multiplied by the attorney's reasonable rates.  See Savoie v. Merchants Bank, 166 F.3d 456, 460

(2d Cir. 1999) (applying lodestar approach to non-bankruptcy case); In re Masterwear Corp., 233

B.R. 266, 277 (Bankr. S.D.N.Y. 1999).  When applying the lodestar approach, courts in this

district incorporate the familiar factors set forth in Johnson v. Georgia Highway Express, Inc.,

488 F.2d 714 (5th Cir. 1974).[60]  See, e.g., Betancourt v. Giuliani, 325 F. Supp. 2d 330, 332 n.3

(S.D.N.Y. 2004) ("In adjusting the lodestar, courts generally consider the . . . factors set forth in

Johnson v. Georgia Highway Express, Inc."); Sucre v. MIC Leasing Corp. (In re Sucre), 226 B.R.

---

[60]    The twelve Johnson factors are (1) the time and labor required, (2) the novelty and difficulty of the questions, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) the time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.  Johnson, 488 F.2d at 717-19.

340, 351-52 (Bankr. S.D.N.Y. 1998) ("To determine the 'lodestar fee' the Court must make an

initial objective determination as to the number of hours reasonably expended and the reasonable

hourly rate . . . . After multiplying the two, the Court may adjust the product by a consideration of

[the Johnson] factors." (citation omitted)).

179.   In awarding attorneys' fees, courts will also consider whether the services

rendered were reasonably likely to benefit the debtor's estate.  See, e.g., In re Ames Dep't Stores,

Inc., 76 F.3d 66, 71 (2d Cir. 1996), rev'd on other grounds, Lamie v. United States Trustee, 540

U.S. 526 (2004); In re Granite Partners, L.P., 213 B.R. 440, 447 (Bankr. S.D.N.Y. 1997); In re

Drexel Burnham Lambert Group, Inc., 133 B.R. 13, 22 (Bankr. S.D.N.Y. 1991).  Thus, the Court

should focus on what a reasonable lawyer would have done at the time and not invoke a hindsight

analysis.

> [I]t is important for a court to maintain a "sense of overall proportion" and not
> "become enmeshed in meticulous analysis of every detailed facet of the
> professional representation."  It is easy to speculate in retrospect that the work
> could have been done in less time or with fewer attorneys or with an associate
> rather than a partner.  On the other hand, it is also possible that [the debtor] would
> not have enjoyed the success it did had its counsel managed matters differently.

Boston & Maine Corp. Moore, (In re Boston & Maine Corp.), 776 F.2d 2, 10 (1st Cir. 1985)

(citations omitted).

180.   In accordance with the factors enumerated in 11 U.S.C. § 330 and

applicable case law, the amount requested herein by Skadden is fair and reasonable, in light of (a)

the nature of the Reorganization Cases, (b) the novelty and complexity of the Reorganization

Cases, (c) the time and labor required to represent the Debtors effectively, (d) the time limitations

imposed by the Reorganization Cases, (e) the nature and extent of the services rendered,

(f) Skadden's experience, reputation, and ability, (g) the value of Skadden's services, and (h) the

cost of comparable services other than in a case under the Bankruptcy Code.

C.    Nature, Complexity, And Duration Of Cases

181.    As should be evident from the summary of Skadden's services as described above in this Interim Application, the Debtors' chapter 11 reorganization presents a particularly unique set of circumstances, and unquestionably is a large and complex case.  The nature and complexity of the Reorganization Cases has required Skadden to develop case management and staffing solutions at every stage of the proceedings.  These tasks have been particularly daunting in light of the Debtors' widespread operations and the relative sophistication of other parties-in-interest in these Reorganization Cases.  Skadden nonetheless has assisted the Debtors by employing a streamlined case management structure that generally consists of relatively small, core teams, and has assigned various attorneys to other discrete tasks to avoid the performance of duplicative or unnecessary work.

182.    Given the size of these Reorganization Cases and the number of matters that continually need to be addressed simultaneously, there have been occasions when a number of Skadden attorneys must be present and participate in the discussions and negotiations.  This is particularly true of meetings with the Creditors' Committee, and the Equity Committee, and also with respect to the monthly omnibus hearings.  Skadden believes that, as evident by the summaries contained in this Interim Application and the time entries attached hereto, it has articulated specific reasons for attendance by multiple attorneys on such occasions.

D.    Experience Of Skadden

183.    The experience of Skadden also has benefited the estates.  Skadden is among the largest firms and has one of the largest restructuring groups in the world.  As more fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude and

98

fast-paced issues that arise in similar chapter 11 cases.  Accordingly, Skadden's depth of

experience in chapter 11 matters has ensured that a number of pressing matters could be

addressed promptly.  In addition, Skadden's commitment to monitoring the administrative

expenses of the estates, including its own legal fees, has been a constant element of its

representation of the Debtors.  Indeed, this emphasis has been manifested in Skadden's careful

review of its fees, charges, and disbursements and a voluntary client accommodation of

$1,277,812, including a voluntary aggregate accommodation of $1,170,978 on Skadden's

monthly fee statements and an additional $106,834 voluntary reduction on this Interim

Application.

E.    Comparable Services

184.    An award of compensation also must be based on the cost of comparable

services other than in a bankruptcy case.  Skadden's rates are consistent with rate structures

charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed

clearly in its Retention Application, which this Court approved and as to which none of the major

constituencies objected.  The amounts sought by Skadden are consistent with the fees, charges,

and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and

duration.  Accordingly, the cost of comparable services supports the Interim Application, and the

services performed during the Application Period more than warrant the allowance of

compensation, particularly in view of the results achieved.

F.    Compliance With Guidelines

185.    Skadden believes that this Interim Application, together with the

attachments hereto, substantially complies in all material respects with the Guidelines and the

Debtors have paid all quarterly fees currently due and payable to the U.S. Trustee.  To the extent

99

this Application does not comply in every respect with the requirements of such guidelines,

Skadden respectfully requests a waiver for any such technical non-compliance.

<u>Notice</u>

186.    In compliance with the Sixth Supplemental Order Under 11 U.S.C. § 331

Establishing Procedures For Interim Compensation And Reimbursement Of Expenses Of

Professionals, entered by this Court on December 11, 2006 (Docket No. 6145), notice of the filing

of this Interim Application will be provided to all parties who have filed a notice of appearance

with the Clerk of this Court and requested notice of pleadings in these chapter 11 cases.  In

addition, the Interim Application in its entirety will be served on the following parties: (i) Delphi

Corporation, 5725 Delphi Drive, Troy, Michigan 48098, Att'n: David M. Sherbin, Esq., (ii) the

Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street,

Suite 2100, New York, New York 10004, Att'n: Alicia M. Leonhard, Esq., (iii) counsel for the

Creditors' Committee, Latham & Watkins LLP, 885 Third Avenue, New York, New York

10022-4802, Att'n: Robert J. Rosenberg, Esq., (iv) counsel for the Equity Committee, Fried,

Frank, Harris, Shriver & Jacobson, LLP, One New York Plaza, New York, New York 10004,

Att'n: Bonnie Steingart, Esq., (v) counsel for the agent under the Debtors' former prepetition

credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York

10017, Att'n: Kenneth S. Ziman, Esq. and Robert H. Trust, Esq., (vi) counsel for the agent under

the Debtors' postpetition credit facility, Davis Polk & Wardell, 450 Lexington Avenue, New

York, New York 10017, Att'n: Donald S. Bernstein, Esq. and Brian M. Resnick, Esq., and (vii)

the members of the Fee Review Committee and its advisor, Legal Cost Control, Inc., 255 Kings

Highway East, Haddonfield, New Jersey 08033, Att'n: John J. Marquess.  In light of the nature of

the relief requested, the Debtors submit that no other or further notice is necessary.

100

<u>Memorandum Of Law</u>

187.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order allowing interim compensation of $12,820,504 to Skadden for professional services rendered as attorneys for the Debtors during the Application Period, plus reimbursement of actual and necessary charges and disbursements incurred in the amount of $708,096, (b) authorize and direct the Debtors to pay to Skadden the amount of $1,292,733 to reduce the Holdback accrued during the Application Period, with the remaining Holdback amount of $1,292,734 to be held by the Debtors until further order of this Court, and (c) grant it such other and further relief as is just.

Dated: New York, New York
      March 30, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


By:  /s/ John Wm. Butler, Jr.
    John Wm. Butler, Jr. (JB 4711)
    John K. Lyons (JL 4951)
    Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

     - and -


By:  /s/ Kayalyn A. Marafioti
    Kayalyn A. Marafioti (KM 9632)
    Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
 Debtors and Debtors-in-Possession

102