**Hearing Date And Time: April 20, 2007 at 10:00 a.m.**
**Objection Deadline: April 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :
      In re                    :     Chapter 11
                                :
DELPHI CORPORATION, et al.,    :     Case No. 05-44481 (RDD)
                                :
                                :     (Jointly Administered)
            Debtors.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R.
BANKR. P. 6004 AUTHORIZING DEBTORS TO ENTER INTO
APPLICATION MAINTENANCE AND SUPPORT AGREEMENTS

("APPLICATION MAINTENANCE MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed.

R. Bankr. P. 6004 authorizing, but not directing, the Debtors to enter into various information

technology ("IT") agreements related to application maintenance and support services, and

respectfully represent as follows:

<u>Background</u>

A.    <u>The Chapter 11 Filings</u>

1.    On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered

orders directing the joint administration of the Debtors' chapter 11 cases.

2.    No trustee or examiner has been appointed in the Debtors' cases.  On

October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an

official committee of equity holders.

3.    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are section 363(b)

of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.    Current Business Operations Of The Debtors

5.    Delphi and its subsidiaries and affiliates (collectively, the "Company"), as

of December 31, 2006 had global net sales of $26.4 billion, and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues, and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.    The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.    Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[1]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[2]   On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive
component plant in Cadiz, Spain, filed its "Concurso" application for a Spanish insolvency proceeding.  The
Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event
that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its
overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.    Events Leading To The Chapter 11 Filing

8.    In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which were charges related to the U.S. employee special

attrition programs.

9.    The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

---

[3]    Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
loss in calendar year 2004 was $482 million.

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the
United States and related pricing pressures, and (c) increasing commodity prices.

10.    In light of these factors, the Company determined that it would be
imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product
portfolio, operational issues, and forward-looking revenue requirements.  Because discussions
with its major unions and GM had not progressed sufficiently by the end of the third quarter of
2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the
Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its
transformation plan.  First, Delphi must modify its labor agreements to create a competitive
arena in which to conduct business.  Second, the Debtors must conclude their negotiations with
GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain
GM's business commitment to the Company.  Third, the Debtors must streamline their product
portfolio to capitalize on their world-class technology and market strengths and make the
necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform
their salaried workforce to ensure that the Company's organizational and cost structure is
competitive and aligned with its product portfolio and manufacturing footprint.[4]  Finally, the
Debtors must devise a workable solution to their current pension situation.

---

[4]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.

12.     On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was an

equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred

and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The

Equity Purchase and Commitment Agreement is subject to the completion of due diligence,

satisfaction or waiver of numerous other conditions (including Delphi's achievement of

consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by

either Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with the Plan

Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of

the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors

and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues,

and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements

with their U.S. labor unions and GM.

13.     On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into

an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

14.    Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

## Relief Requested

15.    By this Motion, the Debtors seek entry of an order under section 363(b) of the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, the Debtors to enter into and perform under (a) an agreement with Computer Sciences Corporation ("CSC"),

which provides for the system support for SAP,[5] commercial, supply chain, and manufacturing

services (the "CSC Agreement"), and (b) an amendment to the September 20, 2006 Master

Service Agreement with Electronic Data Systems Corporation and EDS Information Services,

L.L.C. (collectively with Electronic Data Systems Corporation, "EDS"),[6] which provides for

engineering systems support (the "EDS Agreement," and, together with the CSC Agreement, the

"Application Maintenance Agreements").

Basis For Relief

16.    The Debtors' decision to enter into the Application Maintenance

Agreements is another step in the implementation of their transformation plan.  Specifically,

under the Debtors' transformation plan, the Debtors intend to transform their salaried workforce

to ensure a competitive structure aligned with their product portfolio and manufacturing

footprint, which would in turn lower the Debtors' selling, general, and administrative ("SG&A")

expenses.  To achieve this goal, the Debtors are designing and implementing a shared service

delivery model that will contribute to the reduction of their global SG&A expense by $450

million annually.  One aspect of this effort is Delphi's accelerated consolidation and outsourcing

of IT functions and its transition to common processes and systems.  Benchmarking analysis

conducted with independent consultants examining the detailed cost of IT services of Delphi and

its key IT competitors led to the conclusion that Delphi's 2005 IT operating budget of $588

million could be reduced by $256 million (included in the $450 million objective) through three

transformation actions:  outsourcing IT services, reducing the number and type of unique, non-

---

[5]    SAP software is used to integrate accounting, distributions, human resources, and manufacturing, among other functions.  A platform using SAP software provides management with near real time data and better controls to assist in a company's centralization efforts.

[6]    Pursuant to the IT Infrastructure Outsourcing Order (defined below), the Debtors received authority from this Court to enter into and perform under the September 20, 2006 Master Service Agreement by and between Delphi and EDS (the "EDS MSA").

common systems and moving such systems to common operating platforms, and running a

streamlined IT shared service organization.

17.     Outsourcing of IT services, which is expected to result in a portion of the

$256 million in savings, will be completed in three phases.  The Debtors' shared service model

calls for the outsourcing of the following IT services:  (a) global infrastructure services,

including desktops, service desk, and mainframe and server systems hosting; (b) application

maintenance and support; and (c) network services such as data networks and voice services.  On

October 19, 2006, this Court entered an order authorizing the Debtors to enter into and perform

under the first phase of their planned IT outsourcing (Docket No. 5378) (the "IT Infrastructure

Outsourcing Order").  This Motion addresses the outsourcing of application maintenance and

support services, which is the second phase of the IT outsourcing plan.

18.     Prior to the implementation of their IT transformation plan, the Debtors

purchased IT services from more than 100 regional-based suppliers.  The completion of all three

outsourcing phases would enable rationalization of the supplier-provider base to fewer than ten

direct suppliers.  Because many of the Debtors' major existing IT contracts are due to expire by

the end of 2007, it is appropriate for the Debtors to take this initiative at this time.  Alternatively,

the Debtors could begin negotiations to extend their existing agreements.  Doing so, however,

would not only hinder the Debtors' long-term efforts to transition to a more efficient delivery

model through outsourcing, but could also restrict the Debtors in completing other

transformation objectives due to ongoing minimum revenue commitments in existing contracts.

19.     Outsourcing IT services to a few strategic suppliers will enable the

Debtors to significantly reduce the number of internal employees providing such services.  The

second phase, outsourcing of applications maintenance and support, will result in significant

operating savings over current operating costs. After one-time transition costs of approximately

$25 million, the Debtors expect net operating savings to approximate $13 million over the five-

year term of the Application Maintenance Agreements.

20.     As part of the competitive bidding process for the outsourcing of

application maintenance and support services, the Debtors used external industry experts in

global outsourcing and contract negotiations to objectively and competitively select service

providers that have proven technical capability and global breadth. The Debtors followed a

structured bidding process methodology to ensure that an objective and comprehensive

assessment was conducted according to established standards. The Debtors established a

selection steering committee (the "Selection Steering Committee") to assess the market for

qualified service providers. The Selection Steering Committee identified five target service

providers. Subsequently, the Selection Steering Committee conducted a formal review of each

service provider's standard market offering, and ultimately the Debtors sought requests for

proposals from three service providers. The Debtors provided a detailed service requirement

document to the three service providers and also conducted due diligence on the global service

delivery capabilities of such providers. All three service providers submitted formal proposals to

the Debtors. Based on the submitted proposals, the Debtors selected two service providers to

take to final contract. Subsequently, the parties negotiated master service agreements, statements

of work, service levels, pricing, and supporting schedules.

21.     Based on arms-length negotiations between the Debtors and each of CSC

and EDS, the Debtors have recommended to Delphi's Board of Directors (the "Board"), and

subsequently received approval from the Board, to award aspects of the project to each of CSC

and EDS.[7]  Apportioning the scope of the project between CSC and EDS allowed the Debtors to

select the most competitive terms offered by each of CSC and EDS.  Moreover, by moving to a

model that provides for the outsourcing of application maintenance and support services to two

vendors, the Debtors believe that they will (a) achieve and sustain a competitive environment in

which their service providers will provide service at competitive prices throughout the term of

the agreement, (b) be able to develop stronger relationships with their fewer service providers,

(c) reduce their costs through common processes, common systems, and economies of scale, and

(d) find providers with innovation and progressive technology.  The key terms of each proposal

are described below.

The Application Maintenance Agreements

22.    The Debtors have entered into the Application Maintenance Agreements

with CSC and EDS, the effectiveness of which is conditioned on this Court's approval.  The

Debtors are filing the Application Maintenance Agreements under seal as Exhibit A and Exhibit

B attached hereto, respectively.[8]  The CSC Agreement and EDS Agreement are being filed under

seal because they contain competitively sensitive business information which, if publicly

disclosed, would release proprietary and confidential information and could detrimentally affect

the Debtors' (and CSC's and EDS's) ability to negotiate the terms of future agreements with other

parties.  Generally, each agreement is a global services contract under which Delphi will contract

for global application maintenance and support services on behalf of itself and each of its

---

[7]    The Debtors are also in the process of competitively bidding outsourcing contracts for network services, the
final phase of the Debtors' IT outsourcing plan.  The Debtors expect to award for the final phase by the end of
the first half of 2007.

[8]    The Debtors filed the Application Maintenance Agreements under seal in accordance with the Order Under 11
U.S.C. § 107(b) And Fed. R. Bankr. P. 9018 Authorizing Debtors To File The Application Maintenance And
Support Agreements Under Seal (Docket No. 7453).  The Debtors previously filed the EDS MSA under seal in
accordance with the September 28, 2006 Order Under 11 U.S.C. § 107(b) And Fed. R. Bankr. P. 9018
Authorizing Debtors To File The Information Technology Infrastructure Outsourcing Agreements Under Seal
(Docket No. 5231).

subsidiaries and affiliates for a five-year term.[9]  The aggregate cost of both contracts is between

$150 and $200 million over the five-year term.  Monthly operating expenses and one-time

transition costs will be charged directly or allocated to the Delphi affiliates which use the

services, with approximately 50% of operating and transition costs being borne by the Debtors

and the remaining costs by non-Debtor affiliates of Delphi.[10]

23.    The scope of services to be provided under the Application Maintenance

Agreements includes transition services both at inception and at termination to ensure a smooth

transition from existing service providers to CSC and EDS and also to ensure that there is no

disruption to Delphi's business at the end of the term.  The agreements include a variable (both

additions and reductions) resource model that eliminates the need for re-pricing, thereby

providing Delphi with substantially more flexibility and scalability than it has under its existing

application maintenance and support contracts.  As explained in more detail below, this

provision will be particularly helpful when Delphi seeks to sell or wind-down non-core product

lines and manufacturing sites as part of its transformation plan.  The Application Maintenance

Agreements also include benchmarking clauses to ensure that the contracts continue to be

competitive as to service, price, and technology over their respective terms.

24.    <u>Termination Rights</u>.  Delphi may terminate either of the Application

Maintenance Agreements (a) for cause, (b) for convenience, (c) upon change in control of

applicable service provider or Delphi, or (d) for insolvency of the applicable service provider.

---

[9]    In the event of any inconsistency between the Motion and the Application Maintenance Agreements, the
Application Maintenance Agreements each governs.

[10]    As previously disclosed in other filings before this Court, the Intercompany Agreement, dated May 17, 1999, is
an intercompany cash pooling agreement permitting Delphi and its subsidiaries to engage in intercompany
transactions, track intercompany transfers of funds, and obtain reimbursement for services provided to each
other.  The Intercompany Agreement covers the flow of expenses and liabilities arising from the CSC
Agreement and the EDS Agreement.

No termination charges apply in the case of a termination for cause or upon insolvency of the

applicable service provider.  The amounts of any termination charges under a termination for

convenience or upon change in control are calculated in accordance with the schedule attached to

the terminated agreement and, in each case, reflect the service provider's investment to provide

the services.  There are no termination charges payable after five years (with limited charges

after three years) under either of the Application Maintenance Agreements.

       25.     CSC and EDS each has certain termination rights under its respective

Agreements.  If either CSC or EDS becomes entitled to terminate its respective agreement, each

must nonetheless provide termination assistance services at previously negotiated prices and

payment terms for an additional period of time.

       26.     <u>Divestitures</u>.  As part of its transformation plan, Delphi identified non-core

product lines and manufacturing sites that do not fit into its future strategic framework and that

Delphi is seeking to sell or wind-down.  Delphi also continually evaluates its product portfolio

and could retain or exit certain businesses depending on market forces or cost structure changes.

Delphi intends to sell or wind-down non-core product lines and manufacturing sites during the

term of the Application Maintenance Agreements.  Thus, Delphi required that the Application

Maintenance Agreements provide Delphi flexibility with respect to the effect that a divestiture

would have upon its rights and obligations under these agreements.  The following table

summarizes Delphi's options under the Application Maintenance Agreements subsequent to a

divestiture:

| | Partial Termination For Convenience | Reduce Service Consumption (Reduced Resource Credit Mechanism) | Requirement Of Divested Entity To Enter Into Separate Agreement With Service Provider By Separating Application Maintenance Agreements |
|---|---|---|---|
| Termination Charges | • Termination charges would apply | • No termination charges apply | • No termination charges apply |
| Rights | • Right to hire people, buy equipment, and assign contracts | • No right to hire people, buy assets, or assign contracts | • No need to hire people, buy assets, or transfer contracts |
| Base Charges | • Apportioned to scale for remaining services | • Charges for application maintenance and support services are adjusted for changes in volume as a percentage of the resource unit cost and based on the variance above or below the applicable resource baseline | • Apportioned, based on services to be provided to divested entity<br>• Per unit pricing based on aggregate of services |
| Other | • Most likely incur separate project costs for services related to due diligence | • "Extraordinary Events" clause (which may result in more favorable pricing for Delphi) may be invoked if reduction is significant | • Base charges may be increased to reflect higher fixed costs (service provider would be required to prove that separating caused higher fixed costs)<br>• May incur separate project costs for services related to due diligence |

27.    <u>Treatment Of Prepetition Agreements And Claims Of CSC And EDS</u>.

Prior to the Petition Date, Delphi had an existing agreement with EDS (the "EDS Prepetition

Agreement") under which EDS provided to Delphi certain application maintenance and support

services.  Under the EDS Agreement, certain prepetition services provided by EDS in

accordance with the EDS Prepetition Agreement will be terminated while other prepetition

services, which are beyond the scope of the Application Maintenance Agreements, will continue

to be provided under the Debtors' existing agreements with EDS.  In addition, under the EDS

Agreement, EDS amended and restated the release it signed in connection with the EDS MSA,

which included the release and/or waiver of certain claims and termination charges, so as to now

include a release and/or waiver of additional termination charges against Delphi and its affiliates

that arise as a result of the termination of portions of the EDS Prepetition Agreement and/or

consummation of the Application Maintenance Agreements.[11]  Although CSC and Delphi were

parties to two prepetition agreements, the services provided under those agreements were not

within the scope of the Application Maintenance Agreements.  Therefore, the CSC Agreement

does not include a release in respect of any claims under those prepetition agreements.

28.    Services To Affiliates.  CSC and EDS have entered or will enter into

companion agreements with certain of Delphi's affiliates (the "Companion Agreements") to

provide such affiliates with the services contemplated under the Application Maintenance

Agreements.  Pursuant to the Companion Agreements and the Application Maintenance

Agreements, Delphi's affiliates will be directly invoiced for the services they receive from CSC

or EDS under the Application Maintenance Agreements and will be obligated to pay those

invoices.  To induce CSC and EDS' performance to Delphi's affiliates, Delphi has agreed to be

fully responsible and liable for all obligations and performance of its affiliates, including

payment obligations for certain charges directly invoiced to the non-Debtor affiliates.

Contemporaneously with entering into the Companion Agreements, Delphi will enter into

indemnity agreements with its foreign, non-Debtor affiliates receiving services under the

Application Maintenance Agreements.  Under these indemnity agreements, in consideration for

Delphi's directing CSC and EDS to provide the services contemplated under the Application

Maintenance Agreements to the foreign affiliates, the foreign affiliates will indemnify Delphi for

any payments made by Delphi on their behalf under the Application Maintenance Agreements.

In the event that Delphi is required to make payment under the Application Maintenance

Agreements on behalf of an affiliate Debtor, Delphi hereby requests that it would have an

---

[11]    The specific terms of this release are included as an exhibit to the EDS Agreement which forms a part of
Exhibit A and which was filed under seal.

allowed claim under section 503 of the Bankruptcy Code against the affiliate Debtor for the amount of such payment.

29.     The Debtors and CSC have bargained in good faith to arrive at the terms and conditions of the CSC Agreement.  Moreover, CSC has significant and proven experience with delivering the services as described herein.  Thus, the Debtors submit that CSC has the expertise, skills, and tools to help Delphi efficiently transform its application maintenance and support services.

30.     The Debtors and EDS have also bargained in good faith to arrive at the terms and conditions of the EDS Agreement.  Moreover, EDS has significant experience with delivering the services as described herein.  Thus, the Debtors submit that EDS has the expertise, skills, and tools to help Delphi efficiently transform its application maintenance and support services.

31.     In the exercise of their business judgment, the Debtors believe that the savings and organizational efficiency that can be achieved through implementation of the Application Maintenance Agreements will maximize the recovery for all stakeholders and that therefore the proposed agreements with CSC and EDS are in the best interests of the Debtors' estates and the relief sought herein should be approved.

Applicable Authority

32.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

16

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

33.    The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate."  In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues."  Orion Pictures, 4 F.3d at 1098-99.

34.    Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity."  Id.   To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

35.    As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

17

36.     The Debtors submit that entering into Application Maintenance
Agreements in accordance with the terms described above reflects a sound use of the Debtors'
business judgment.  By entering into the Application Maintenance Agreements, the Debtors
estimate total net operating savings as compared to current spending for global application
maintenance and support services of approximately $13 million over the five-year term of the
agreements.  The Application Maintenance Agreements allow for significant changes in the
Debtors' organizational size and scope commensurate with business portfolio divestitures, wind-
downs, or acquisitions (a significant benefit to Delphi) without triggering a repricing of the
Agreements.  Also, by reducing the number of service providers, the Debtors should reduce their
IT costs through common processes, common systems, and economies of scale.

<u>Notice Of Motion</u>

37.     Notice of this Motion has been provided in accordance with the Amended
Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m),
9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case
Management, And Administrative Procedures, entered by this Court on October 26, 2006
(Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other
or further notice is necessary.

<u>Memorandum Of Law</u>

38.     Because the legal points and authorities upon which this Motion relies are
incorporated herein, the Debtors respectfully request that the requirement of the service and
filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy
Rules for the United States Bankruptcy Court for the Southern District of New York be deemed
satisfied.

18

WHEREFORE the Debtors respectfully request that the Court enter an order (a) authorizing, but not directing, the Debtors to enter into and perform under the Application Maintenance Agreements with CSC and EDS and (b) granting the Debtors such other and further relief as is just.

Dated:      New York, New York
            March 30, 2007

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700

- and -

By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession

**Exhibit A**
**CSC Agreement**

(Filed Under Seal)

**Exhibit B**
**EDS Agreement**

(Filed Under Seal)