**Hearing Date And Time: April 20, 2007 at 10:00 a.m.**
**Objection Deadline: April 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

   - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
        In re                                 :    Chapter 11
                                              :
DELPHI CORPORATION, et al.,                   :    Case No. 05-44481 (RDD)
                                              :
                                              :    (Jointly Administered)
                                              :
              Debtors.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 363(b) AND FED. R.
BANKR. P. 6004 AUTHORIZING DEBTORS TO ENTER INTO
FINANCE OUTSOURCING AGREEMENT

("FINANCE OUTSOURCING MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates,

debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"),

hereby submit this motion (the "Motion") for an order pursuant to 11 U.S.C. § 363(b) and Fed.

R. Bankr. P. 6004 authorizing, but not directing, the Debtors to enter into an agreement with

Genpact International, LLC ("Genpact") to provide certain finance outsourcing services to the

Debtors, and respectfully represent as follows:

Background

A.     The Chapter 11 Filings

         1.     On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and

affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title

11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered

orders directing the joint administration of the Debtors' chapter 11 cases.

         2.     No trustee or examiner has been appointed in the Debtors' cases.  On

October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an

official committee of unsecured creditors.  On April 28, 2006, the U.S. Trustee appointed an

official committee of equity holders.

         3.     This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core

proceeding under 28 U.S.C. § 157(b)(2).

4.      The statutory predicates for the relief requested herein are section 363(b)

of the Bankruptcy Code and rule 6004 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules").

B.      Current Business Operations Of The Debtors

5.      Delphi and its subsidiaries and affiliates (collectively, the "Company"), as

of December 31, 2006 had global net sales of $26.4 billion, and global assets of approximately

$15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public

company business reorganization in terms of revenues, and the thirteenth largest public company

business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11

debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.      The Company is a leading global technology innovator with significant

engineering resources and technical competencies in a variety of disciplines, and is one of the

largest global suppliers of vehicle electronics, transportation components, integrated systems and

modules, and other electronic technology.  The Company supplies products to nearly every

major global automotive original equipment manufacturer.

7.      Delphi was incorporated in Delaware in 1998 as a wholly-owned

subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the

Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the

assets and liabilities of these divisions and subsidiaries were transferred to the Company in

---

[1]    The aggregated financial data used in this Motion generally consists of consolidated information from Delphi
and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27,
2007.

[2]    On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive
component plant in Cadiz, Spain, filed its "Concurso" application for a Spanish insolvency proceeding.  The
Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event
that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its
overall cost structure.

accordance with the terms of a Master Separation Agreement between Delphi and GM.  In

connection with these transactions, Delphi accelerated its evolution from a North American-

based, captive automotive supplier to a global supplier of components, integrated systems, and

modules for a wide range of customers and applications.  Although GM is still the Company's

single largest customer, today more than half of Delphi's revenue is generated from non-GM

sources.

C.      Events Leading To The Chapter 11 Filing

8.      In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter, however,

with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the

Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3]

Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of

approximately $2.4 billion on net sales of $26.9 billion.  Moreover, in 2006, the Debtors incurred

a net loss of $5.5 billion, $3.0 billion of which were charges related to the U.S. employee special

attrition programs.

9.      The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational

restrictions driven by collectively bargained agreements, including restrictions preventing the

Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating

largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a
      valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The Company's net operating
      loss in calendar year 2004 was $482 million.

OEMs resulting in the reduced number of motor vehicles that GM produces annually in the

United States and related pricing pressures, and (c) increasing commodity prices.

    10.    In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

portfolio, operational issues, and forward-looking revenue requirements.  Because discussions

with its major unions and GM had not progressed sufficiently by the end of the third quarter of

2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the

Debtors' transformation plan and preserve value for its stakeholders.

D.    The Debtors' Transformation Plan

    11.    On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a competitive

arena in which to conduct business.  Second, the Debtors must conclude their negotiations with

GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain

GM's business commitment to the Company.  Third, the Debtors must streamline their product

portfolio to capitalize on their world-class technology and market strengths and make the

necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform

their salaried workforce to ensure that the Company's organizational and cost structure is

competitive and aligned with its product portfolio and manufacturing footprint.[4]  Finally, the

Debtors must devise a workable solution to their current pension situation.

---

[4]    As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product
portfolio on core technologies for which the Company believes it has significant competitive and technological
advantages.  The Company's revised operating structure consists of its four core business segments:  Electronics
and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture.  The Company also
has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the
Company's transformation plan.

12.     On December 18, 2006, the Debtors marked another milestone in their

chapter 11 cases with the announcement of two significant agreements.  The first of these was an

equity purchase and commitment agreement (the "Equity Purchase and Commitment

Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management,

L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and

Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred

and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The

Equity Purchase and Commitment Agreement is subject to the completion of due diligence,

satisfaction or waiver of numerous other conditions (including Delphi's achievement of

consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by

either Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with the Plan

Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of

the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors

and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues,

and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework

Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements

with their U.S. labor unions and GM.

13.     On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into

an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to

extend the date by which the company, the Cerberus Capital Management, L.P. affiliate, or the

Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not

yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a

consensual settlement of legacy issues with GM.  The amendment extended the termination right

pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make

certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase

and Commitment Agreement and the Plan Framework Support Agreement.

        14.     Although much remains to be accomplished in the Debtors' reorganization

cases, the Debtors and their stakeholders are together navigating a course that should lead to a

consensual resolution with their U.S. labor unions and GM while providing an acceptable

financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the

reorganization process, the Debtors expect to emerge as a stronger, more financially sound

business with viable U.S. operations that are well-positioned to advance global enterprise

objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-

quality products to its customers globally.  Additionally, the Company will preserve and

continue the strategic growth of its non-U.S. operations and maintain its prominence as the

world's premier auto supplier.

Relief Requested

        15.     By this Motion, the Debtors seek entry of an order under section 363(b) of

the Bankruptcy Code and Bankruptcy Rule 6004 authorizing, but not directing, the Debtors to

enter into and perform under an agreement with Genpact (the "Finance Outsourcing

Agreement"), which provides for the outsourcing of certain of the Debtors' accounts receivable,

accounts payable, fixed assets, travel and expense reporting, general ledger, and contract

administration processes (the "Processes").

Basis For Relief

16.    The Debtors' decision to enter into the Finance Outsourcing Agreement is

another step in the implementation of their transformation plan.  Specifically, under the Debtors'

transformation plan, the Debtors intend to transform their salaried workforce to ensure a

competitive structure aligned with their product portfolio and manufacturing footprint, which

would in turn lower the Debtors' selling, general, and administrative ("SG&A") expenses.  In

furtherance of this goal, the Debtors in the exercise of their business judgment have decided to

consolidate many staff administrative functions into a global business service group.

17.    The Debtors seek to reduce the costs associated with the Processes by

outsourcing the Processes to a qualified service provider.  Outsourcing the Processes to one

service provider will enable the Debtors to reduce significantly the number of internal employees

performing the Processes.  Additionally, the Debtors expect to improve productivity over time by

reducing the number and type of unique, non-common systems, moving to common operating

platforms, and running a streamlined shared service organization.  After one-time transition costs

of approximately $78 million, net operating savings are expected to approximate $150 million in

the aggregate over the 88-month term of the Finance Outsourcing Agreement.

18.    As part of the competitive bidding process for the outsourcing of the

Processes, the Debtors hired external industry experts in global outsourcing and contract

negotiations to objectively and competitively select finance service providers that have proven

technical capability and global breadth.  The Debtors followed a structured bidding method that

was designed to produce an objective and comprehensive assessment according to established

standards.  Contemporaneously, the Debtors also visited several other companies that have

implemented a shared service model for finance services to better understand the costs and

benefits of such a model.

19.     The Debtors also established a selection steering committee (the

"Selection Steering Committee") to assess the market for qualified finance service providers.

This assessment resulted in the identification of four target finance service providers.

Subsequently, the Selection Steering Committee conducted a formal review of each of these

service providers, and ultimately the Debtors sought requests for proposals from these four

finance service providers.  The Debtors provided detailed service requirements to the four

service providers and also conducted due diligence on the global service delivery capabilities of

each of the four proposed providers.  All four service providers submitted formal proposals to the

Debtors.  Subsequently, the Debtors selected two finalists from the group of four and negotiated

master service agreements, statements of work, service levels, pricing, and supporting schedules

with each of the two finalists.

20.     Based on arms-length negotiations between the Debtors and Genpact, the

Debtors recommended to Delphi's Board of Directors (the "Board"), and subsequently received

approval from the Board, to enter into the Finance Outsourcing Agreement with Genpact.

Subsequently, the Debtors entered into the Finance Outsourcing Agreement with Genpact, the

effectiveness of which is conditioned on this Court's approval.  The Debtors are filing a redacted

version of the Finance Outsourcing Agreement as <u>Exhibit A</u> attached hereto.[5]

21.     By outsourcing the Processes to one service provider, the Debtors believe

that they will be able to develop a strong relationship with that service provider and reduce their

finance costs through common processes, common systems, and economies of scale.  The key

terms of the Finance Outsourcing Agreement are described below.

---

[5]    The Debtors filed a redacted version of the Finance Outsourcing Agreement in accordance with the Order
Under 11 U.S.C. § 107(b) And Fed. R. Bankr. P. 9018 Authorizing Debtors To File Redacted Version Of
Finance Outsourcing Agreement (Docket No. 7476).

The Finance Outsourcing Agreement

22.     Generally, the Finance Outsourcing Agreement is a global services

contract under which Genpact agrees to perform the Processes for Delphi and its designated

subsidiaries and affiliates for an 88-month term.[6]  Delphi's aggregate costs to Genpact over the

life of the Finance Outsourcing Agreement (including transition costs to Genpact of $31 million)

will be approximately $180 to $220 million.  Monthly operating expenses and one-time

transition costs will be charged directly or allocated to either Delphi or the Delphi affiliate which

use the services.   It is estimated that approximately 38% of operating expenses and one-time

transition costs will be borne by the Debtors with the remainder being borne by non-Debtor

affiliates of Delphi.[7]

23.     The scope of services to be provided under the Finance Outsourcing

Agreement includes transition services at its inception to facilitate a smooth transition from

Delphi's existing internal structure and termination assistance services at its termination to

mitigate the risk of disruption to Delphi's business at the end of the term.  As explained in more

detail below, this provision will be particularly helpful when Delphi seeks to sell or wind-down

non-core product lines and manufacturing sites as part of its transformation plan.  The Finance

Outsourcing Agreement also includes benchmarking clauses, cost-saving clauses, and continuous

improvement clauses designed to allow Delphi to keep the Finance Outsourcing Agreement

competitive as to service, price, and technology over the term of the agreement.

---

[6]   In the event of any inconsistency between the Motion and the Finance Outsourcing Agreement, the provisions
of the Finance Outsourcing Agreement govern.

[7]   As previously disclosed in other filings before this Court, the Intercompany Agreement, dated May 17, 1999, is
an intercompany cash pooling agreement that permits Delphi and its subsidiaries to engage in intercompany
transactions, track intercompany transfers of funds, and obtain reimbursement for services provided to each
other.  The Intercompany Agreement covers the flow of expenses and liabilities arising from the Finance
Outsourcing Agreement.

24.     Termination Rights.  Delphi may terminate the Finance Outsourcing

Agreement (a) for cause, (b) for convenience, (c) upon a change in control of either Genpact or

Delphi, (d) upon certain changes in laws, (e) for Genpact's failure to timely recover from a force

majeure event, (f) for Genpact's refusal to maintain the liability cap, (g) based upon significant

degradation in Genpact's financial condition, or (h) in the event of the insolvency of Genpact.

No termination charges apply in the case of a termination for cause or upon Genpact's

insolvency.  The amounts of any termination charges under a termination for convenience or

upon change in control are calculated in accordance with the schedule attached to the Finance

Outsourcing Agreement and reflect Genpact's investment in providing the services.  There are no

termination charges payable after 81 months under the Finance Outsourcing Agreement.

25.     Genpact has the right to terminate the Finance Outsourcing Agreement

after the expiration of the applicable notice period in the event that Delphi has failed to pay

undisputed fees above a specified amount.  If Genpact becomes entitled to terminate the Finance

Outsourcing Agreement, it must nonetheless provide termination assistance services at

previously negotiated prices and payment terms for an additional period of time.

26.     Divestitures.  As part of its transformation plan, Delphi identified non-core

product lines and manufacturing sites that do not fit into its future strategic framework, and that

it is seeking to sell or wind-down.  Delphi also continually evaluates its product portfolio and

could retain or exit certain businesses depending on market forces or cost structure changes.

Delphi intends to sell or wind-down non-core product lines and manufacturing sites during the

term of the Finance Outsourcing Agreement.  Thus, Delphi negotiated provisions in the Finance

Outsourcing Agreement that give Delphi flexibility with respect to the effect that a divestiture

would have upon Delphi's rights and obligations under the agreement.  The following table

summarizes Delphi's options under the Finance Outsourcing Agreement subsequent to a

divestiture:

| | Partial Termination For Convenience | Reduce Service Consumption (Reduced Use of Full-Time Equivalent ("FTE") Resource Units) | Requirement Of Divested Entity To Enter Into Separate Agreement With Service Provider By Separating Finance Outsourcing Agreement |
|---|---|---|---|
| Termination Charges | • Termination charges would apply | • No termination charges would apply | • No termination charges would apply |
| Rights | • Right to buy equipment and assign contracts | • No right to hire people, buy assets, or assign contracts | • No need to hire people, buy assets, or transfer contracts |
| Base Charges | • Apportioned to scale for remaining services | • Charges for finance and accounting services are adjusted based upon use of FTE resource units | • Apportioned, based on services to be provided to divested entity<br>• Pricing based on aggregate service consumption<br>• Separate agreement would include same terms and conditions used as the Finance Outsourcing Agreement |
| Other | • Most likely incur separate project costs for services related to due diligence | • N/A | • May incur separate project costs for services related to due diligence |

27.    Treatment Of Prepetition Agreements And Claims Of Genpact.  Delphi

and Genpact did not enter into any agreements prior to the date when Delphi sought

reorganization relief.  Thus, Genpact does not hold any prepetition claims against the Debtors.

28.    Companion Agreements.  Genpact will enter into companion agreements

with certain of Delphi's affiliates (the "Companion Agreements") to provide such affiliates the

services contemplated under the Finance Outsourcing Agreement.  Pursuant to the Companion

Agreements and the Finance Outsourcing Agreement, Delphi's affiliates will be directly invoiced

for the services they receive from Genpact under the Finance Outsourcing Agreement and will be

obligated to pay those invoices.  To induce Genpact's performance to Delphi's affiliates, Delphi

has agreed to be secondarily liable for the obligations of the applicable affiliates under the

Finance Outsourcing Agreement.  In the event that Delphi is required to make payment under the

Finance Outsourcing Agreement on behalf of an affiliate Debtor, Delphi hereby requests that it

would have an allowed claim under section 503 of the Bankruptcy Code against the affiliate

Debtor for the amount of such payment.[8]

29.     The Debtors and Genpact have bargained in good faith to arrive at the

terms and conditions of the Finance Outsourcing Agreement.  Moreover, Genpact has significant

and proven experience with delivering the services described herein.  Thus, the Debtors submit

that Genpact has the expertise, skills, and tools to perform the Processes.

30.     In the exercise of their business judgment, the Debtors believe that the

savings and organizational efficiency to be achieved through the work of Genpact and Delphi

will maximize the recovery for all stakeholders and that therefore the proposed agreement with

Genpact is in the best interests of the Debtors' estates and the relief sought herein should be

approved.

Applicable Authority

31.     Bankruptcy Code section 363(b)(1) permits a debtor-in-possession to use

property of the estate "other than in the ordinary course of business" after notice and a hearing.

11 U.S.C. § 363(b)(1).  Uses of estate property outside the ordinary course of business may be

authorized if the debtor demonstrates a sound business justification for it.  See In re Lionel

Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (business judgment rule requires finding that good

business reason exists to grant debtor's application under section 363(b)); In re Delaware Hudson

Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

---

[8]     Contemporaneously with entering into the Companion Agreements, Delphi will enter into indemnity
agreements with its foreign, non-Debtor affiliates receiving services under the Finance Outsourcing Agreement.
Under these indemnity agreements, in consideration for Delphi's directing Genpact to provide the services
contemplated under the Finance Outsourcing Agreement to the foreign affiliates, the foreign affiliates will
indemnify Delphi for any payments made by Delphi on their behalf under the Finance Outsourcing Agreement.

32.     The Second Circuit has held that, although the Bankruptcy Court sits as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the . . . debtor-in-possession," it must nevertheless resist becoming "arbiter of disputes between creditors and the estate." In re Orion Pictures Corp., 4 F.3d 1095, 1098-99 (2d Cir. 1993).  The Court's consideration of a debtor's section 363(b) motion is a summary proceeding, intended merely as a means to "efficiently review the . . . debtor's decision[s] . . . in the course of the swift administration of the bankruptcy estate.  It is not the time or place for prolonged discovery or a lengthy trial with disputed issues." Orion Pictures, 4 F.3d at 1098-99.

33.     Once the debtor articulates a valid business justification, a presumption arises that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992).  Thereafter, "[p]arties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." Id.   To satisfy its burden, it is not enough for an objector simply to raise and argue an objection. Rather, an objector "is required to produce some evidence respecting its objections." Lionel, 722 F.2d at 1071.

34.     As a rule, the debtor's business judgment "should be approved by the court unless it is shown to be 'so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.'" In re Aerovox, Inc., 269 B.R. 74, 81 (Bankr. D. Del. 2001) (quoting In re Interco, Inc., 128 B.R. 229, 234 (Bankr. E.D. Mo. 1991)).

35.     The Debtors submit that entering into the Finance Outsourcing Agreement in accordance with the terms described above reflects a sound use of the Debtors' business

judgment.  By entering into the Finance Outsourcing Agreement, the Debtors estimate total net operating savings as compared to current spending for the Processes of approximately $150 million over the 88-month term of the agreement.  The Finance Outsourcing Agreement allows for significant changes in the Debtors' organizational size and scope commensurate with business portfolio divestitures, wind-downs, or acquisitions (a significant benefit to Delphi).  Also, by outsourcing these Processes to one service provider with transition expertise and process knowledge, the Debtors should reduce their SG&A costs through common processes, common systems, and economies of scale.

## Notice Of Motion

36.    Notice of this Motion has been provided in accordance with the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) And 105 And Fed. R. Bankr. P. 2002(m), 9006, 9007, And 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, And Administrative Procedures, entered by this Court on October 26, 2006 (Docket No. 5418).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

37.    Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a)

authorizing, but not directing, the Debtors to enter into and perform under the Finance

Outsourcing Agreement with Genpact and (b) granting the Debtors such other and further relief

as is just.

 Dated:        New York, New York
                March 30, 2007

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM LLP


By:   /s/ John Wm. Butler, Jr.
      John Wm. Butler, Jr. (JB 4711)
      John K. Lyons (JL 4951)
      Ron E. Meisler (RM 3026)
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700


- and -


By:   /s/ Kayalyn A. Marafioti
      Kayalyn A. Marafioti (KM 9632)
      Thomas J. Matz (TM 5986)
Four Times Square
New York, New York 10036
(212) 735-3000

Attorneys for Delphi Corporation, et al.,
  Debtors and Debtors-in-Possession