**Master Services Agreement**

**March 28, 2007**

**by and between**

**Delphi Corporation**

**and**

**Genpact International, LLC**

**Table of Contents**

Page

1.  BACKGROUND AND OBJECTIVES ...........................................................1
    1.1  Performance and Management by Service Provider. ....................1
    1.2  Goals and Objectives. ...................................................................1
    1.3  Interpretation. ...............................................................................2
2.  DEFINITIONS AND DOCUMENTS ........................................................2
    2.1  Definitions. ...................................................................................2
    2.2  Other Terms. .................................................................................2
    2.3  Companion Agreements. ...............................................................2
    2.4  Associated Contract Documents. ..................................................3
3.  TERM .......................................................................................................4
    3.1  Initial Term. ..................................................................................4
    3.2  Reserved. .......................................................................................5
4.  SERVICES ...............................................................................................5
    4.1  Overview. .......................................................................................5
    4.2  Transition Services. .......................................................................6
    4.3  Reserved. .......................................................................................8
    4.4  Termination Assistance Services. .................................................8
    4.5  Use of Third Parties. ...................................................................13
    4.6  Projects. .......................................................................................14
    4.7  Acquisition and Divestiture Services. .........................................15
    4.8  Acceptance. ..................................................................................16
5.  REQUIRED CONSENTS .........................................................................17
    5.1  Service Provider Responsibility. .................................................17
    5.2  Financial Responsibility. .............................................................18
    5.3  Contingent Arrangements. ...........................................................18
6.  FACILITIES, SOFTWARE, EQUIPMENT, CONTRACTS AND ASSETS
    ASSOCIATED WITH THE PROVISION OF SERVICES ...........................19
    6.1  Service Facilities. ........................................................................19
    6.2  Use of Service Provider Facilities. .............................................22
    6.3  Delphi Rules/Employee Safety. ..................................................22
    6.4  Software, Equipment and Third Party Contracts. ........................23
    6.5  Managed Third Parties. ...............................................................24

Table of Contents

Page

6.6     Acquired Assets. ...................................................................................25

7.    SERVICE LEVELS. ........................................................................................26

7.1     General. ....................................................................................................26

7.2     Service Level Credits; Deliverable Credits. .........................................27

7.3     Problem Analysis. ...................................................................................27

7.4     Continuous Improvement Reviews. ......................................................28

7.5     Measurement and Monitoring. ..............................................................28

7.6     Satisfaction Surveys. ..............................................................................28

7.7     Notice of Adverse Impact. ......................................................................29

8.    PROJECT PERSONNEL. ..............................................................................29

8.1     Key Service Provider Personnel and Critical Support Personnel. ....29

8.2     Service Provider Account Executive. ....................................................31

8.3     Compensation of Service Provider Account Executive and Key
        Service Provider Personnel. ...................................................................31

8.4     Service Provider Personnel Are Not Delphi Employees. .....................31

8.5     Replacement, Qualifications, and Retention of Service Provider
        Personnel. ................................................................................................32

8.6     Transitioned Personnel – EU Employees. .............................................33

8.7     Conduct of Service Provider Personnel. ...............................................35

8.8     Substance Abuse. ....................................................................................35

8.9     Union Agreements. ..................................................................................36

9.    SERVICE PROVIDER RESPONSIBILITIES ..............................................36

9.1     Policy and Procedures Manual. .............................................................36

9.2     Reports. ...................................................................................................38

9.3     Governance; Meetings. ...........................................................................38

9.4     Quality Assurance and Internal Controls. ...........................................39

9.5     Processes, Procedures, Architecture, Standards and Planning. ..........40

9.6     Change Control. ......................................................................................41

9.7     Access to Specialized Service Provider Skills and Resources;
        Disagreements Regarding New Services. ..............................................43

9.8     Audit Rights. ...........................................................................................43

9.9     Agency and Disbursements. ...................................................................47

9.10    Subcontractors. .......................................................................................48

Table of Contents

Page

9.11    Technology and Business Process Evolution.................................................49

9.12    Retained Systems and Processes.................................................50

9.13    Annual Reviews.................................................50

9.14    Reserved.................................................50

10.    DELPHI RESPONSIBILITIES.................................................50

10.1    Responsibilities.................................................50

10.2    Savings Clause.................................................51

11.    CHARGES.................................................52

11.1    General.................................................52

11.2    Pass-Through Expenses.................................................53

11.3    Reserved.................................................54

11.4    Taxes.................................................54

11.5    New Services.................................................56

11.6    Proration.................................................58

11.7    Refundable Items.................................................58

11.8    Delphi Benchmarking Reviews.................................................59

12.    INVOICING AND PAYMENT.................................................60

12.1    Invoicing.................................................60

12.2    Payment Due.................................................60

12.3    Set Off.................................................61

12.4    Disputed Charges.................................................61

12.5    Administrative Claims.................................................61

13.    DELPHI DATA AND OTHER PROPRIETARY INFORMATION.................................................61

13.1    Delphi Ownership of Delphi Data.................................................61

13.2    Safeguarding Delphi Data.................................................62

13.3    Delphi Personal Data.................................................64

13.4    Confidentiality.................................................66

13.5    File Access.................................................69

14.    OWNERSHIP OF MATERIALS.................................................69

14.1    Delphi Owned Materials.................................................69

14.2    Developed Materials.................................................71

14.3    Service Provider Owned Materials.................................................72

DELPHI CONFIDENTIAL

**Table of Contents**

| | | Page |
|---|---|---|

14.4    Other Materials.....................................................................73

14.5    General Rights.......................................................................74

14.6    Delphi's Rights Upon Expiration or Termination of Agreement.................74

15.    REPRESENTATIONS, WARRANTIES AND COVENANTS........................77

15.1    Work Standards.....................................................................77

15.2    Efficiency and Cost Effectiveness. .................................................77

15.3    Software and other Materials. ......................................................77

15.4    Non-Infringement. ..................................................................78

15.5    Authorization. ......................................................................78

15.6    Inducements; Delphi Code of Ethics. ..............................................79

15.7    Malicious Code. .....................................................................79

15.8    Disabling Code. .....................................................................79

15.9    Compliance with Laws. .............................................................80

15.10    Interoperability .....................................................................82

15.11    Disclaimer. .........................................................................82

16.    INSURANCE AND RISK OF LOSS.........................................................82

16.1    Insurance. ..........................................................................82

16.2    Risk of Loss. ........................................................................84

17.    INDEMNITIES ...........................................................................84

17.1    Indemnity by Service Provider.....................................................84

17.2    Indemnity by Delphi. ...............................................................86

17.3    Additional Indemnities. ............................................................86

17.4    Infringement. .......................................................................86

17.5    Indemnification Procedures.........................................................87

17.6    Indemnification Procedures – Governmental Claims...............................88

17.7    Subrogation. ........................................................................88

18.    LIABILITY ...............................................................................88

18.1    General Intent. ......................................................................88

18.2    Force Majeure. ......................................................................88

18.3    Limitation of Liability...............................................................89

19.    DISPUTE RESOLUTION..................................................................91

19.1    Informal Dispute Resolution........................................................91

Table of Contents

Page

19.2    Reserved. ....................................................................................92

19.3    Arbitration. .................................................................................92

19.4    Jurisdiction. ...............................................................................94

19.5    Continued Performance. ..........................................................94

19.6    Governing Law ..........................................................................94

20.    TERMINATION ..................................................................................94

20.1    Termination for Cause. ............................................................94

20.2    Termination for Convenience. .................................................95

20.3    Termination Upon Service Provider Change of Control. ...............95

20.4    Termination Upon Delphi Change of Control. ........................96

20.5    Termination for Insolvency. ....................................................96

20.6    Delphi Rights Upon Service Provider's Bankruptcy. .............96

20.7    Termination for Service Provider Degraded Financial Condition ...........97

20.8    Critical Services. ......................................................................97

21.    GENERAL ..........................................................................................98

21.1    Binding Nature and Assignment. .............................................98

21.2    Entire Agreement; Amendment. ..............................................98

21.3    Notices. .....................................................................................98

21.4    Counterparts. ..........................................................................101

21.5    Headings. .................................................................................101

21.6    Relationship of Parties. ..........................................................101

21.7    Severability. ............................................................................101

21.8    Consents and Approval. ..........................................................101

21.9    Waiver of Default; Cumulative Remedies. .............................102

21.10    Survival. .................................................................................102

21.11    Publicity. ...............................................................................102

21.12    Service Marks. .......................................................................102

21.13    Export. ...................................................................................102

21.14    Enforcement and Third Party Beneficiaries. ........................102

21.15    Covenant Against Pledging. ..................................................103

21.16    Order of Precedence. .............................................................103

21.17    Hiring of Employees. .............................................................103

**Table of Contents**

                                                                                    **Page**

**21.18  Further Assurances.** ...................................................................................103

**21.19  Liens.** 104

**21.20  Covenant of Good Faith.** ...........................................................................104

**21.21  Acknowledgment.** ......................................................................................104

**21.22  References.** ...............................................................................................104

## MASTER SERVICES AGREEMENT

This Master Services Agreement (this "**Master Services Agreement**", together with the Companion Agreements, this "**Agreement**") is entered into by and between Delphi Corporation, a Delaware corporation ("**Delphi**"), and Genpact International, LLC, a Delaware limited liability company ("**Service Provider**") acting through its Hungarian Branch having its principal places of business at Duna Plaza Offices, 4th Floor, H-1138, Budapest Vaci ut 178, Hungary and is dated March 28, 2007.

WHEREAS, Delphi and Service Provider have engaged in extensive negotiations, discussions and due diligence that have culminated in the formation of the contractual relationship described in this Agreement;

WHEREAS, Delphi desires to procure from Service Provider, and Service Provider desires to provide to Delphi and other Eligible Recipients, finance and accounting, sales contract management and other products and services described in this Agreement, on the terms and conditions specified herein;

NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, and of other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, Delphi and Service Provider (collectively, the "**Parties**" and each, a "**Party**") hereby agree as follows:

1.  **BACKGROUND AND OBJECTIVES**

1.1  **Performance and Management by Service Provider**.

Delphi desires that certain finance and accounting, sales contract management and other functions and services presently provided, performed and managed by or for Delphi and the other Eligible Recipients be provided, performed and managed by Service Provider as described in this Agreement. Service Provider has carefully reviewed Delphi's requirements, has performed the due diligence it deems necessary to enter into this Agreement, and desires to perform and manage such functions and services for Delphi and the other Eligible Recipients.

1.2  **Goals and Objectives**.

The Parties acknowledge and agree that the specific goals and objectives of the Parties in entering into this Agreement are to:

(1)  Reduce Delphi's transaction processing costs;

(2)  Ensure guaranteed levels of service quality;

(3)  Provide end-to-end service delivery accountability;

(4)  Utilize enabling technologies to add value to Delphi's business processes;

(5)  Transform Delphi's current processes to standard processes globally, recognizing legally required differences;

(6)  Attain world-class efficiency;

(7)  Provide access to better technology and skilled resources;

(8)  Maintain highly controlled business environment;

(9)  Gain access to world class capabilities by contracting with a first tier service provider;

(10)  Eliminate duplication across Delphi; and

(11)    Provide Delphi with the flexibility to adapt rapidly to Delphi changing requirements and changes in the Delphi business environment, especially those where demand fluctuates.

**1.3    Interpretation.**

The provisions of this **Article 1** are intended to be a general introduction to this Agreement and are not intended to expand or limit the scope of the Parties' obligations or alter the plain meaning of this Agreement's terms and conditions, as set forth hereinafter.  However, to the extent the terms and conditions of this Agreement are unclear or ambiguous, such terms and conditions are to be construed so as to be consistent with the background and objectives set forth in this **Article 1**.

**2.    DEFINITIONS AND DOCUMENTS**

**2.1    Definitions.**

The terms used with initial capital letters in this Agreement shall have the meanings ascribed to them in **Schedule 1**.

**2.2    Other Terms.**

The terms defined in **Schedule 1** and elsewhere in this Agreement include the plural as well as the singular and the derivatives of such terms. Unless otherwise expressly stated, the words "herein," "hereof," and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, Subsection or other subdivision.  Article, Section, Subsection, Schedule and Exhibit references in this Master Services Agreement refer to articles, sections and subsections of, schedules and exhibits to, this Agreement.  The words "include" and "including" shall not be construed as terms of limitation.  Unless otherwise modified, the words "day," "month," and "year" mean, respectively, calendar day, calendar month and calendar year.  As stated in **Section 21.3**, the word "notice" and "notification" and their derivatives means notice or notification in writing.  Other terms used in this Agreement are defined in the context in which they are used and shall have the meanings there indicated.

**2.3    Companion Agreements.**

(a)    **Operation**.  At Delphi's option, Delphi may require Service Provider to enter into, or to cause Service Provider Affiliates to enter into, one or more companion agreements to this Master Services Agreement with Eligible Recipients for the purpose of memorializing the implementation of this Agreement with respect to such Eligible Recipients, compliance with Laws applicable to such Eligible Recipients or otherwise to effect the intent of the Parties under this Agreement with respect to such Eligible Recipients (each, a "**Companion Agreement**").  All references to this Agreement include all Companion Agreements, and all rights to extend or terminate the Term of this Agreement include the right to extend or terminate any or all of the Companion Agreements.  Each Companion Agreement will be substantially in the form of **Exhibit 1**, unless otherwise agreed by the Parties.  Except where expressly agreed upon by the Parties in an amendment to this Agreement, Delphi and Service Provider agree that the execution of Companion Agreements shall in no way limit or reduce the obligations of either Party under this Agreement, including with respect to the provision of Services to any Eligible Recipient.

(b)    **Enforcement**.  Delphi and Service Provider acknowledge and agree that with respect to each Companion Agreement, Delphi shall be fully responsible and liable for all obligations of the applicable Eligible Recipient, and Service Provider shall be fully responsible and liable for all obligations of Service Provider or any Service Provider Affiliate or Subcontractor, as may be applicable.  Until the date of Emergence, the applicable Eligible Recipient under a Companion Agreement shall have the right to enforce this Agreement with respect to such Companion Agreement, and to assert all rights and exercise and receive the benefits of all remedies (including money damages) under such Companion Agreement, to the same extent as if such Eligible

Recipient (in relation to such Companion Agreement) were Delphi Corporation, subject to the limitations of liability applicable under this Agreement. In addition, Delphi Corporation shall have the right, as the agent of the applicable Eligible Recipient, to enforce this Agreement (including the terms of all Companion Agreements) on behalf of each Eligible Recipient that enters into a Companion Agreement, and to assert all rights and exercise and receive the benefits of all remedies (including monetary damages) of each such Eligible Recipient in relation to each such Companion Agreement, to the same extent as if Delphi Corporation were such Eligible Recipient, subject to the limitations of liability applicable under this Agreement. Genpact International, LLC shall have the right to enforce this Agreement (including the terms of all Companion Agreements) on behalf of each Affiliate or Subcontractor that enters into a Companion Agreement, and to assert all rights and exercise and receive the benefits of all remedies (including monetary damages) of each such Affiliate or Subcontractor hereunder, to the same extent as if Genpact International, LLC were such Affiliate or Subcontractor, subject to the limitations of liability applicable under this Agreement. Except to the extent specifically provided otherwise in a Companion Agreement, any and all disputes arising under or relating to any Companion Agreement shall be subject to the provisions of **Article 19**, and under no circumstances shall Delphi Corporation or any other Eligible Recipient, on the one hand, or Genpact International, LLC or any Service Provider Affiliate or Subcontractor, on the other hand, bring or attempt to bring any claim or other action arising under or relating to any Companion Agreement or this Agreement in any jurisdiction except as provided in **Article 19** (it being understood that Eligible Recipients that enter into separate agreements with Service Provider (or its designees), as contemplated by **Section 11.1(f)(iii)**, shall be entitled to enforce those agreements directly against Service Provider (or its designees)).

**2.4**     **Associated Contract Documents**.

This Agreement includes each of the following Schedules and Exhibits, all of which are attached to this Agreement and incorporated into this Agreement by this reference. Unless otherwise expressly stated, references to specific Schedules include all numbered subsidiary Schedules (e.g., references to **Schedule 2** include not only **Schedule 2**, but also **Schedules 2.1**, **2.2** and **2.3**).

| Schedule Number | Schedule Name | First Section Reference |
|---|---|---|
| 1 | Definitions | 2.1 |
| 2 | Statement of Work | 4.1(a)(i)(1) |
| 2.1 | Cross Functional | – |
| 2.2 | Finance and Accounting | – |
| 2.2-A | Accounts Receivable | – |
| 2.2-B | Accounts Payable | – |
| 2.2-C | Reserved | – |
| 2.2-D | Reserved | – |
| 2.2-E | Travel and Expense | – |
| 2.3 | Contract Administration | – |
| 3 | Service Levels | 4.2(b) |
| 3-A | Service Levels Matrix | – |
| 3-B | Service Level Definitions | – |
| 3-C | Critical Deliverables | Schedule 1 |
| 3-D | Reserved | – |
| 3-E | Measuring Tools and Methodologies | – |
| 4 | Pricing Methodology | 4.1(a)(iv) |
| 4-A | Rates | 4.1(a)(iv) |
| 4-B | Financial Responsibility/Asset Ownership Matrix | 6.4(a) |
| 4-C | Initial Taxes | – |
| 4-D | Transition Charges | – |
| 4-E | Termination Charges | 20.2 |
| 4-F | Expense Reimbursement Policy | 11.1(c) |
| 4-G | Pass-Through Expenses | 11.2(a) |

-3-

| | | |
|---|---|---|
| 4-H | Initial Delphi FTEs | – |
| 4-I | Productivity Improvement Factors | – |
| 4-J | Foreign Currency Exchange Rates | – |
| 4-K | Charges for Certain Transition Delays | – |
| 4-L | Invoicing of Eligible Recipients | 12.1(b) |
| 5 | Personnel | – |
| 5-A | Reserved | – |
| 5-B | Reserved | – |
| 5-C | Critical Support Personnel | 8.1(a)(ii) |
| 5-D | Key Service Provider Personnel | 8.1(a)(ii) |
| 6 | Governance Model | 4.2(g)(iii) |
| 6-A | Committee Relationships and Memberships | 9.3(a) |
| 6-B | Policy and Procedures Manual Content | 9.1(a) |
| 7 | Delphi Sites | – |
| 7-A | Delphi Facilities | 6.1(a) |
| 7-B | Service Provider Facilities | 6.1(a) |
| 8 | Transition Plan | 4.2(a) |
| 8-A | Transition Plan Details | – |
| 9 | Projects | 4.6(a)(i) |
| 10 | Potential Scope Expansion | – |
| 10-A | Fixed Assets | – |
| 10-B | General Accounting | – |
| 11 | Direct Delphi Competitors | Schedule 1 |
| 12 | Direct Service Provider Competitors | Schedule 1 |
| 13 | Reports | 4.6(b)(iii) |
| 14 | Customer Satisfaction Surveys | 7.6(a) |
| 14-A | Sample Point of Service Survey | – |
| 15 | Business Continuity Plan | 18.2(d) |
| 16 | IT Disaster Recovery Plan | 18.2(d) |
| 17 | Delphi Rules | 6.3(a) |
| 17-A | Data Security | – |
| 17-B | Delphi Information Security Policy | 6.3(a) |
| 17-C | Delphi Foundations for Excellence | 15.6(a) |
| 17-D | Delphi Internal Controls | 9.4(a)(vi) |
| 17-E | Delphi Forced Labor Policy | – |
| 18 | Network Services Demarcation | – |
| 19 | Subcontractors and Managed Third Parties | Schedule 1 |
| 19-A | Subcontractors | – |
| 19-B | Managed Third Parties | Schedule 1 |
| 20 | Approved Benchmarkers | 11.8(a) |
| Exhibit 1 | Form of Companion Agreement | 2.3(a) |
| | **REDACTED** | |
| Exhibit 3 | Form of Non-Disclosure Agreement | 4.4(a) |
| Exhibit 4 | Form of Invoice | 12.1(b) |
| Exhibit 5 | Form of Work Order | 4.6(b)(i) |

**3.    TERM**

**3.1    Initial Term**.

The initial Term of this Agreement shall commence as of 12:00:01 a.m., United States Eastern Time on the Effective Date and continue until 11:59:59 p.m., United States Eastern Time, on July 31, 2014, unless this Agreement is terminated as provided herein or extended as provided in **4.4(a)(2)**, in which case the Term shall end at 11:59:59 p.m., United States Eastern Time, on the effective date of such termination or the date

to which this Agreement is extended.

**3.2**    **Reserved.**

**4.**    **SERVICES**

**4.1**    **Overview**.

(a)    **Services**.    Service Provider shall provide the Services to Delphi, and, upon Delphi's request, to other Eligible Recipients and Authorized Users designated by Delphi, including for any or all Delphi Sites.    The Services shall consist of the following:

    (i)    The services, functions, processes and responsibilities described in this Agreement and its Schedules, including:

        (1)    the Services described in **Schedule 2**;

        (2)    the Transition Services described in **Section 4.2** and **Schedule 8**; and

        (3)    the Termination Assistance Services described in **Section 4.4**.

    (ii)    The following additional services, functions, processes and responsibilities, even if not specifically described in this Agreement, to the extent requested by Delphi:

    (iii)    the services, functions, processes and responsibilities that were performed in the last twelve (12) months before the relevant transition by Delphi Personnel who are transferred to or displaced by Service Provider, or whose functions were displaced by or transferred to Service Provider, as a result of this Agreement, and are reasonably related to the services, functions, processes and responsibilities described in **Schedule 2**.

    (iv)    Such other services, functions, processes and responsibilities as Delphi may include in the Services from time to time by notice to Service Provider that are (A) reasonably related to the Services described in this **Section 4.1** and (B) can reasonably be performed by Service Provider Personnel in the rate categories listed on **Schedule 4-A**.

(b)    **Included Services**.    If any services, functions or responsibilities not specifically described in this Agreement are an inherent, necessary or customary part of the Services or are required for proper performance or provision of the Services in accordance with this Agreement, they shall be deemed to be included within the scope of the Services to be delivered for the Charges, as if such services, functions or responsibilities were specifically described in this Agreement.

(c)    **Commencement of Services**.    Service Provider shall commence providing the Services as follows:

    (i)    in the case of the Transition Services, on the date stated in the Transition Plan;

    (ii)    in the case of the Services described in **Schedule 2**, at 12:00:01 a.m., United States Eastern Time on the applicable Production Date unless otherwise specified in the Transition Plan (or at such later time as Delphi may specify, subject to Delphi's right to delay the Transition Services pursuant to the terms of this Agreement); and

    (iii)    in the case of Services that are Projects, New Services and Termination Assistance Services, on the date determined in accordance with this Agreement.

(d)    **Required Resources**.    Except as otherwise expressly provided in this Agreement, Service

Provider shall be responsible for providing the facilities, personnel, Equipment, Software, technical knowledge, expertise and other resources necessary to provide the Services.

(e)    **Service Provider Responsibility.**    Subject to **Section 10.2**, Service Provider shall be responsible for the provision of the Services in accordance with this Agreement even if, by agreement of the Parties, such Services are actually performed or dependent upon services performed by (i) Subcontractors, (ii) non-Service Provider Personnel or (iii) Managed Third Parties.

(f)    **Electronic Delivery.**    To the maximum extent possible, and except as otherwise directed by Delphi or expressly provided in this Agreement, Service Provider shall deliver all Materials, documentation, reports and other contract deliverables to Delphi and the other Eligible Recipients at the designated Delphi Site by electronic transmission or by load and leave (where no tangible storage media is physically transferred to Delphi or the other Eligible Recipients).

**REDACTED**

**REDACTED**

**REDACTED**

**4.3**    **Reserved**.

**4.4**    **Termination Assistance Services**.

       (a)    **Availability**.    As part of the Services, to the extent requested by Delphi and for the Charges set forth in **Section 4.4(b)(8)** and **Schedule 4-E**, Service Provider shall provide to Delphi, the other Eligible Recipients and/or their designee(s) that have entered into a Confidentiality Agreement in the form of **Exhibit 3** the termination/expiration assistance requested by Delphi to allow the Services to continue without interruption or adverse effect and to facilitate the orderly transfer of the Services to Delphi or its designee, including the assistance described in this **Section 4.4** (the

"**Termination Assistance Services**").

(1)    **Period of Provision**.  Service Provider shall provide the Termination Assistance Services to Delphi and the other Eligible Recipients, and/or their designee(s) (i) commencing upon notice from Delphi up to six (6) months prior to the expiration of the Term, or on such earlier date as Delphi may request, and continuing for up to eighteen (18) months following the effective date of the expiration of the Term, (ii) commencing upon any notice of termination (including notice based upon breach or default by Delphi (subject to **Section 4.4(a)(4)** below), breach or default by Service Provider or termination in whole or in part for convenience by Delphi) of the Term with respect to all or any part of the Services, and continuing for up to eighteen (18) months following the effective date of such termination with respect to the terminated Services, and/or (iii) commencing upon notice of termination of all or part of the Services to an Eligible Recipient, including in connection with any divestiture of an Eligible Recipient (or any business unit or other portion thereof) and continuing for up to eighteen (18) months following the effective date of such termination.

(2)    **Extension of Termination Assistance Services**.  Delphi may elect, upon thirty (30) days' prior notice, to extend the effective date of any expiration or termination of all or part of the Termination Assistance Services, in Delphi's sole discretion, _provided_ that the total of all such extensions for such Termination Assistance Services will not exceed one hundred and eighty (180) days following the originally specified effective expiration or termination date, without Service Provider's prior written consent.  If Delphi provides less than thirty (30) days' prior notice of an extension, Service Provider shall nonetheless use commercially reasonable efforts to comply with Delphi's request and provide the requested Services and/or Termination Assistance Services.

(3)    **Extension of Other Services**.  As part of the Termination Assistance Services, for a period of eighteen (18) months following any expiration or termination date, Service Provider shall provide to the Eligible Recipient(s), under the terms and conditions of this Agreement, at Delphi's request, any or all of the Services being performed by Service Provider prior to such expiration or termination date, including those Services described in **Article 4** and **Schedule 2**, _provided_ that Delphi may extend the period for the provision of such Services for up to an additional one hundred and eighty (180) days in accordance with **Section 4.4(a)(2)**.

(4)    **Firm Commitment**.  Service Provider shall provide Termination Assistance Services to Delphi and the other Eligible Recipients, or their designee(s), regardless of the reason for the expiration or termination of the Term, _provided_ that if this Agreement is terminated by Service Provider under **Section 20.1(b)** for Delphi's failure to pay undisputed amounts, Service Provider may require payment by Delphi in advance of the month in which such Termination Assistance Services will be provided or performed under this **Section 4.4**.  At Delphi's request, Service Provider shall provide Termination Assistance Services directly to an Eligible Recipient or an Entity acquiring Control of an Eligible Recipient.

(5)    **Performance**.  All Termination Assistance Services shall be provided subject to and in accordance with the terms and conditions of this Agreement.  Service Provider shall perform the Termination Assistance Services with at least the same degree of accuracy, quality, completeness, timeliness, responsiveness and resource efficiency as Service Provider was required to provide with respect to the same or similar Services during the Term, except as approved by Delphi under **Section 4.4(b)(8)(ii)**.  The quality and level of performance of the Termination Assistance Services provided by Service Provider following the expiration or termination of the Term, as to all or part of the Services, or Service Provider's receipt of a notice of termination or non-renewal, shall continue to meet or exceed the Service Levels and shall not be degraded or deficient in any respect,

-9-

except as approved by Delphi under **Section 4.4(b)(8)(ii)**.    Accordingly, Service Level Credits may still be assessed for failure to meet Service Levels during the period that Service Provider provides Termination Assistance Services.    Service Provider Personnel (including Key Service Provider Personnel) reasonably considered by Delphi to be critical to the performance of the Services and Termination Assistance Services shall be retained on the Delphi account through the completion of all relevant Termination Assistance Services.

(b)    **Scope of Termination Assistance Service**.    As part of the Termination Assistance Services and except as otherwise requested by Delphi, Service Provider shall timely transfer the control and responsibility for all Services previously performed by or for Service Provider to Delphi, the other Eligible Recipients and/or their designee(s), and shall execute any documents reasonably necessary to effect such transfers.    In addition, in connection with each termination or expiration of the Term with respect to the Services (or any portion thereof), Service Provider will provide the following assistance and Services at Delphi's direction:

(1)    **General Support**.    Service Provider shall (i) assist Delphi, the other Eligible Recipients and/or their designee(s) in developing a written transition plan for the transition of the Services to Delphi, such other Eligible Recipients, or their designee(s), which plan shall include (as requested by Delphi) capacity planning, process planning, facilities planning, human resources planning, technology planning, telecommunications planning and other planning necessary to effect the transition, (ii) perform consulting services as requested to assist in implementing the transition plan, (iii) train personnel designated by Delphi, other Eligible Recipients and/or their designee(s) in the use of any processes or associated Equipment, Systems, Materials or tools used in connection with the provision of the Services, (iv) provide Delphi a catalog of all processes, Software, Delphi Data, Equipment, Materials, Third Party Contracts and tools used to provide the Services, (v) provide machine readable and printed listings and associated documentation for source code for Software owned by Delphi and source code to which Delphi is entitled under this Agreement and assist in its re-configuration, (vi) assist in the execution of a parallel operation and testing process until the successful completion of the transition to Delphi, other Eligible Recipients and/or their designee(s), (vii) create and provide copies of the Delphi Data in the format and on the media reasonably requested by Delphi, other Eligible Recipients and/or their designee(s), (viii) provide a complete and up-to-date, electronic copy of the Policy and Procedures Manual in the format and on the media reasonably requested by Delphi, other Eligible Recipients and/or their designee(s), and (ix) provide other technical and process assistance as requested by Delphi, other Eligible Recipients and/or their designee(s).

**REDACTED**

-10-

**REDACTED**

      (ii)     With respect to Subcontractors, Service Provider shall use all commercially reasonable efforts to (A) obtain for Delphi and the other Eligible Recipients the rights specified in **Section 4.4(b)(2)(i)**, and (B) ensure that the such rights are not subject to subsequent Subcontractor approval or the payment of any fees by Delphi and another Eligible Recipient. If Service Provider is unable to obtain any such rights with respect to a Subcontractor, it shall notify Delphi in advance and shall not use such Subcontractor without Delphi's approval (and absent such approval, Service Provider's use of any such Subcontractor shall obligate Service Provider to obtain or arrange, at no additional cost to Delphi, the rights specified in **Section 4.4(b)(2)(i)**, for Delphi and the other Eligible Recipients upon any expiration or termination).

      (iii)    Promptly upon Delphi providing notice for provision of Termination Assistance Services pursuant to **Section 4.4(a)(1)**, to the extent possible under applicable Privacy Laws. Service Provider shall provide to Delphi a list, organized by country and skill sets, of the Service Provider Personnel who are eligible for solicitation for employment pursuant to this **Section 4.4(b)(2)**. Subject to applicable Laws and Service Provider policy, such list shall specify each such Service Provider Personnel's job title, annual rate of pay, a summary of applicable employment benefit policies and other information reasonably requested by Delphi.

(3)    **Materials.** As provided in **Section 14.6**, and subject to **Section 6.4(c)**, Service Provider shall provide, and hereby grants to Delphi (with a right to sublicense to the other Eligible Recipients and/or their designee(s)) or, at Delphi's election, to the Eligible Recipients and/or their designees, license, sublicense and/or other rights to certain Materials used by Service Provider, Service Provider Affiliates or Subcontractors in performing the Services.

(4)    **Equipment.** Subject to **Section 6.4(c)**, Delphi, the Eligible Recipients and/or their designee(s) shall have the right (but not the obligation) to purchase, or assume the lease for, any Equipment (including the Acquired Assets), owned or leased by Service Provider, or Service Provider Subcontractors (including Service Provider Affiliates) that is primarily used by Service Provider, Service Provider Subcontractors or Service Provider Affiliates to perform the Services. Such Equipment shall be transferred in good working condition, reasonable wear and tear excepted, as of the expiration or termination date or the completion of any Services requiring such Equipment, whichever is later. Service Provider shall maintain such Equipment through the date of transfer so as to be eligible for the applicable manufacturer's maintenance program at no additional charge to Delphi. In the case of Service Provider-owned Equipment, Service Provider shall grant to Delphi, the other Eligible Recipients and/or their designee(s) a warranty of title and a warranty that such Equipment is free and clear of all liens and encumbrances. Such conveyance by Service Provider to Delphi, the other Eligible Recipients and/or their designee(s) shall be the lesser of fair market value or net book value, <u>provided</u> that for such purpose net book value shall be calculated in accordance with GAAP, using a form of accelerated depreciation consistently applied, and Delphi shall pay all other costs, expenses, sales, use and other similar taxes arising out of or in connection with the purchase or delivery of such Equipment from Service Provider to Delphi. At Delphi's

request, the Parties shall negotiate in good faith and agree upon the form and structure of the purchase. In the case of leased Equipment, Service Provider shall (i) represent and warrant that the lease is not in default, (ii) represent and warrant that all payments thereunder have been made through the date of transfer, and (iii) notify Delphi of any lessor defaults of which it is aware at the time.

(5) **Delphi Facilities, Equipment and Software.** Service Provider shall vacate the Delphi Facilities and return to Delphi, if not previously returned, any Delphi owned or leased Equipment, Delphi Owned Materials and Delphi licensed Software, in condition at least as good as the condition when made available to Service Provider, ordinary wear and tear excepted. Such Delphi Facilities, Equipment and Materials shall be vacated and returned at the expiration or termination date of the Term or the completion of any Services requiring such Delphi Facilities, Equipment and Materials, whichever is later.

(6) **Service Provider Subcontracts and Third Party Contracts.** Service Provider shall inform Delphi of all subcontracts or Third Party Contracts primarily used by Service Provider, Service Provider Subcontractors or Service Provider Affiliates to perform the Services. Except as otherwise approved by Delphi pursuant to **Section 6.4(c)**, (i) Service Provider shall, at Delphi's request, cause any such Subcontractors, Service Provider Affiliates or third party contractors to permit Delphi, the other Eligible Recipients and/or their designee(s) to assume prospectively any or all such contracts or to enter into new contracts with Delphi, the other Eligible Recipients and/or their designees on substantially the same terms and conditions, including price, as of the expiration or termination date or the completion of any Termination Assistance Services requiring such subcontracts or Third Party Contracts, whichever is later and (ii) there shall be no charge or fee imposed on Delphi, the other Eligible Recipients and/or their designee(s) by Service Provider or its Subcontractors, Affiliates or third party contractors for such assignment, license or sublicense. Service Provider shall (i) represent and warrant that it is not in default under such subcontracts and Third Party Contracts, and all payments thereunder through the date of assignment are current, and (ii) notify Delphi of any Subcontractor's or third party contractor's default with respect to such subcontracts and Third Party Contracts of which it is aware at the time.

(7) **Other Subcontracts and Third Party Contracts.** In addition to its obligations under **Section 4.4(b)(6)**, Service Provider shall make commercially reasonable efforts to make available to Delphi, the other Eligible Recipients and/or their designee(s), pursuant to reasonable terms and conditions, any Subcontractor or third party services then being utilized by Service Provider in the performance of the Services. Service Provider shall retain the right to utilize any such Subcontractor or third party services in connection with the performance of services for any other Service Provider customer. Delphi and the other Eligible Recipients shall retain the right (A) to contract directly with any Subcontractor or third party previously utilized by Service Provider to perform any Services or (B) to the extent provided in **Section 4.4(b)(6)**, to assume Service Provider's contract with such Subcontractor or third party. Nothing contained in **Sections 4.4(b)(6)** or this **Section 4.4(b)(7)** above shall be applicable to any subcontract between Service Provider and a subsidiary (directly or indirectly) of Service Provider, provided Service Provider shall inform Delphi from time to time of the identity of such subsidiaries.

(8) **Rates and Charges.**

(i) To the extent Delphi requests Services pursuant to **Section 4.4(a)(3)**, Delphi will pay Service Provider the Charges specified in **Schedule 4** that Delphi would have been obligated to pay Service Provider for such Services if the Term had not yet expired or been terminated. To the extent Delphi requests a portion (but not all) of the Services included in a particular Charge, the amount to be

paid by Delphi will be equitably adjusted in proportion to the portion of the Services included in the applicable Charge that Service Provider will not be providing or performing.

(ii)    Except as otherwise provided in this **Section 4.4(b)(8)**, if Delphi requests that Service Provider perform or provide the Termination Assistance Services in accordance with this Agreement, Delphi shall pay Service Provider the rates (including rates for Transition Services) and charges specified in **Schedule 4-A** for the additional Service Provider Personnel or resources required to perform such Termination Assistance Services.  To the extent that the Termination Assistance Services requested by Delphi can be provided by Service Provider using personnel and resources already assigned to Delphi without adversely affecting Service Provider's ability to perform in accordance with the Agreement including the Service Levels, there will be no additional charge to Delphi for such Termination Assistance Services.  If the Termination Assistance Services requested by Delphi cannot be provided by Service Provider using personnel and resources then assigned to Delphi without adversely affecting Service Provider's ability to perform in accordance with the Agreement, including the Service Levels, Delphi, in its sole discretion, may forego or delay any work activities or temporarily or permanently adjust the work to be performed by Service Provider, the schedules associated therewith or the Service Levels to permit the performance of such Termination Assistance Services using such personnel or resources already assigned to perform the Services.

(c)    **Resources**.  Service Provider shall deploy all necessary resources to perform Termination Assistance Services in accordance with this **Section 4.4** as soon as possible after notice by Delphi, but in no case more than ninety (90) days following notice of termination or the expiration of a right to extend the Term.

(d)    **Survival of Terms**.  This **Section 4.4** shall survive expiration or termination of the Term.

**4.5    Use of Third Parties.**

(a)    **Right of Use**.  Nothing in this Agreement shall be construed as a requirements contract, and notwithstanding anything to the contrary contained herein, this Agreement shall not be interpreted to prevent Delphi or any other Eligible Recipient from obtaining from third parties (each, a "**Delphi Third Party Contractor**"), or providing to itself, any or all of the Services or any other services. Nor shall anything in this Agreement be construed or interpreted as limiting Delphi's right or ability during the Term to change the requirements of Delphi or the other Eligible Recipients, move parts of Towers in and out of scope, add or delete Eligible Recipients or to increase or decrease its demand for Services, subject to any agreed payments in relation to such changes as specified in **Schedule 4**.

(b)    **Service Provider Cooperation**.  Service Provider shall fully cooperate with and work in good faith with Delphi, other Eligible Recipients and Delphi Third Party Contractors as described in **Schedule 2** or requested by Delphi.  Such cooperation shall include, to the extent requested by Delphi, the following:  (i) providing timely access to any facilities being used to provide the Services, as necessary for Delphi personnel or Delphi Third Party Contractors that have entered into Confidentiality Agreements in the form of **Exhibit 3** to perform the work assigned to them; (ii) providing timely reasonable electronic and physical access to the processes and associated Equipment, Software and other Systems to the extent necessary and appropriate for Delphi personnel or Delphi Third Party Contractors that have entered into Confidentiality Agreements in the form of **Exhibit 3** to perform the work assigned to them; (iii) providing timely written requirements, standards, policies or other documentation for the processes and associated Equipment, Software or

-13-

Systems procured, operated, supported or used by Service Provider in connection with the Services and interfacing with Delphi Systems; (iv) ensuring that there is no degradation in the provision of the Services caused by the adjustments made by Service Provider in transferring Services to a third party, Delphi or another Eligible Recipient, except as expressly specified in a written plan approved by Delphi for the transfer of such Services; or (v) any other cooperation or assistance reasonably necessary for Delphi personnel or Delphi Third Party Contractors to perform the work in question. Delphi personnel and Delphi Third Party Contractors shall comply with Service Provider's reasonable security and confidentiality requirements, and shall, to the extent performing work on Software, Equipment or Systems for which Service Provider has operational responsibility, comply with Service Provider's reasonable standards, methodologies, and procedures.

(c)    **Notice by Service Provider**.  Service Provider shall immediately notify Delphi when it becomes aware that an act or omission of a Delphi Third Party Contractor will cause, or has caused, a problem or delay in providing the Services, and shall use all commercially reasonable efforts to work with Delphi, the other Eligible Recipients and the Delphi Third Party Contractor to prevent or circumvent such problem or delay.  Service Provider shall cooperate with Delphi, the other Eligible Recipients and Delphi Third Party Contractors to resolve differences and conflicts arising between the Services and other activities undertaken by Delphi, the other Eligible Recipients or Delphi Third Party Contractors.   Any notification provided by Service Provider in accordance with this **Section 4.5(c)** shall not excuse Service Provider from the performance of any of its obligations under this Agreement.

**4.6**    **Projects**.

(a)    **Procedures and Performance**.

(i)    Service Provider shall perform Projects requested and approved by Delphi as part of the Services, which shall be at charges which are either included in the rates specified for the Services or as separate charges, as mutually agreed between the Parties.   The Projects underway and planned as of the Effective Date are specified in **Schedule 9**.  If Service Provider desires to make any change to a Project that is underway as of the Effective Date or those that are planned and listed in **Schedule 9**, then Service Provider shall submit to Delphi a written proposal describing such change and the potential impact of such change, and Delphi may, in its sole discretion approve or reject such proposal.

(ii)    A "**Project**" is a discrete unit of non-recurring work that is (A) not described or provided for in this Agreement to be performed as Services (unless expressly identified as a Project), (B) not an inherent, necessary or customary part of the day–to-day Services, and (C) not otherwise required to be performed by Service Provider to meet its obligations under this Agreement, including the Transition Services and Service Levels (other than Service Levels related to Project performance).   A Project may consist of or include work that would otherwise be treated as New Services.

(iii)    The Service Provider Personnel assigned to perform such Projects shall possess the training, education, experience, competence and skill to perform such work.   The Delphi Contract Executive or his or her designee shall request, define, and set the priority for such Projects.   Service Provider shall maintain appropriate continuity of personnel assigned to perform Projects.

(b)    **Project Proposals, Requirements, and Prioritization**.   Projects shall be requested, proposed, priced, approved or disapproved, and performed in accordance with this Agreement and the following:

(i)    Service Provider shall prepare a Project proposal that conforms with the requirements for New Services proposals in accordance with **Section 11.5(a)** prior to beginning such

-14-

Project.  Such Project proposal shall be set forth in the form of **Exhibit 5** ("**Work Order**").  The efforts expended by Service Provider in preparing proposals or plans or reporting on the status of such Projects shall be included in the Monthly Base Charges.

(ii)    Delphi may accept or reject such Project proposal in its sole discretion.  Delphi shall prioritize Projects in its discretion.  As reasonably requested by Delphi, Service Provider shall assist Delphi in prioritizing Projects.

(iii)   Service Provider shall report on Projects in accordance with **Schedule 13** and as reasonably requested by Delphi.

(c)    **Additional Work or Reprioritization.**  The Delphi Contract Executive or his or her designee may identify new or additional work activities to be performed by Service Provider Personnel (including work activities that would otherwise be treated as New Services) or reprioritize or reset the schedule for existing work activities to be performed by such Service Provider Personnel. Service Provider shall use commercially reasonable efforts to perform such work activities without impacting the established schedule for other tasks or the performance of the Services in accordance with the Service Levels.  If it is not possible to avoid such an impact, Service Provider shall notify Delphi of the anticipated impact and obtain its consent prior to proceeding with such work activities. Delphi, in its sole discretion, may forego or delay such work activities or temporarily adjust the work to be performed by Service Provider, the schedules associated therewith or the Service Levels to permit the performance by Service Provider of such work activities.  If Delphi elects not to forego or delay such work activities or temporarily adjust the work to be performed by Service Provider, then any such changes shall be made through the Change Control Procedures, including mutual agreement in relation to treatment of increased costs, if any, due to such changes.

**4.7    Acquisition and Divestiture Services.**

Service Provider shall provide the following Services related to Entities acquired or divested, or planned to be acquired or divested, by Delphi or any other Eligible Recipient,

(a)    **Acquisition and New Entity Support.**  With respect to a potential acquisition or formation, by Delphi or any other Eligible Recipient, of a new Affiliate, partnership, joint venture or other Entity that may become an Eligible Recipient, upon Delphi's request, Service Provider will provide support (including assessments of the current business processes to be acquired, potential integration approaches, and the potential net economic impact of the acquisition in connection with the Services) as reasonably necessary to assist Delphi's assessment of the portion of the acquisition or new Entity to which the Services will relate and subsequently provide the Services as they apply to such Entity on the terms and conditions of this Agreement.  Such support will be provided within the timeframe reasonably requested by Delphi or as required by the timing of the acquisition or formation of such Entity.  Delphi shall reimburse Service Provider's Out-of-Pocket Expenses related to such support.

(b)    **Migration of Business Processes.**  As requested by Delphi and as related to the Services, Service Provider will migrate the functions of such Entity similar to the Service to the Delphi environment on the terms and conditions of this Agreement.

(c)    **Personnel Support.**  As requested by Delphi, Service Provider will provide personnel to staff vacancies and to provide management for the functions needed to support such Entity and similar to the Services, including on-site support at the location of such Entity at the rates for FTEs set forth in **Schedule 4**, as well as any incremental Out-of-Pocket Expenses, but only to the extent Service Provider notifies Delphi in advance of such expenses, obtains Delphi's approval prior to incurring such expenses (which approval shall not be unreasonably delayed or withheld), and uses commercially reasonable efforts to minimize such expenses.

-15-

(d)    **Divestitures.** From time to time and at any time, Delphi and/or other Eligible Recipients may divest business units or Affiliates (or portions thereof). In connection with such divestitures, as requested by Delphi, Service Provider will provide transition support services to Delphi, the divested Entity or the acquiring Entity, subject to **Section 4.4(b)(8)**. Service Provider shall provide the services described in **Sections 4.7(a)** through **4.7(c)** and **Section 11.1(f)** to the divested Entity or the acquiring Entity with respect to such divestitures. As provided in **Section 11.1(f)**, any and all revenues, resources or other similar usage measures in connection with services that are the same as, or similar to, the Services and that are obtained by any divested Entity under a separate agreement between such Entity and Service Provider, shall count toward the satisfaction of any revenue, resource or other similar usage requirements under this Agreement.

**4.8**    **Acceptance.**

(a)    **Non-Critical Testing Deliverables.** All Software, Equipment, Systems and/or other deliverables that are not Critical Testing Deliverables shall only be "Accepted" as determined by Delphi's reasonable discretion in accordance with **Schedule 6**, following the implementation, installation, testing, and execution in the production environment for an agreed upon number of business cycles if such Software, Equipment, Systems, projects and/or other contract deliverables and milestones are in Compliance.

(b)    **Critical Testing Deliverables.** The deliverables from Projects (unless otherwise agreed prior to the execution of such Project) and any other deliverables as mutually agreed from time to time shall be Critical Testing Deliverables. Other Software, Equipment, Systems, projects, and/or other deliverables may also be classified as Critical Testing Deliverables by the Parties. Each Critical Testing Deliverable shall subject to "Acceptance" as described below in **Section 4.8(b)(i)** through **(v)**, unless expressly agreed otherwise.

    (i)    **Acceptance Review Period.** For each deliverable agreed by the Parties to be a critical deliverable (each a "**Critical Testing Deliverable**"), Delphi will have either (1) the period of time set forth in the applicable plan, if any, or (2) thirty (30) days if no such period is set forth in a Delphi approved plan, to determine whether the Critical Testing Deliverable Complies to its Acceptance Criteria (such period of time the "**Acceptance Review Period**"). The Acceptance Review Period will begin on the date that Service Provider provides written notification to Delphi that the Critical Testing Deliverable is ready to be reviewed by Delphi. Unless otherwise agreed, Service Provider will perform comprehensive testing (e.g., unit, string, integration, stress, volume, system testing) on each such Critical Testing Deliverable prior to submitting such item to Delphi for Acceptance.

    (ii)    **Acceptance Review.** During the Acceptance Review Period, Delphi and other Eligible Recipients will be entitled to review and may further test each Critical Testing Deliverable, individually and collectively, to determine whether such item(s) contain any type of Noncompliance. Service Provider will cooperate with such review and testing efforts, provide a technical environment to facilitate such review, and provide all applicable documentation that will assist in such review and testing.

    (iii)    **Acceptance and Deemed Acceptance.** If Delphi does not identify any Noncompliance relating to a Critical Testing Deliverable during its Acceptance Review Period, Delphi will inform Service Provider in writing that the Critical Testing Deliverable is Accepted, subject to the other provisions of this Agreement. If Delphi does not Accept a Critical Testing Deliverable, Delphi will provide Service Provider a notice of Noncompliance as described below. If Delphi does not Accept or deliver a notice of Noncompliance to Service Provider by the end of the Acceptance Review Period, Service Provider will so inform Delphi and provide Delphi an additional Acceptance Review Period of at least fourteen (14) days (unless otherwise set forth in an appropriate Delphi approved plan).

-16-

If Delphi does not Accept such Critical Testing Deliverable or deliver a notice of Noncompliance within such period of time, such Critical Testing Deliverable shall be deemed Accepted. Neither Delphi's nor any other Eligible Recipient's use in a live production environment shall constitute Acceptance, affect any rights and remedies that may be available to Delphi or any other Eligible Recipient, and/or constitute or result in "Acceptance."

(iv)    **Noncompliance**.  If a Noncompliance is detected, Delphi will so notify Service Provider and reasonably specify the nature of the failure or deficiency giving rise to such Noncompliance.  Promptly after receiving such notice from Delphi and at no charge to Delphi, Service Provider will correct such Noncompliance, satisfy the Acceptance Criteria, and ensure the integration of the correction (including among other deliverables and previously Accepted items).  Beginning upon receipt of notice from Service Provider that a Critical Testing Deliverable is again ready to be Accepted, the applicable Acceptance Review Period will begin again and the Parties will re-perform their obligations under **Sections 4.8(b)(i)** through **(iii)**.

(v)    **Failure to Cure a Noncompliance**.  If Service Provider (1) requires more than two (2) attempts to cure a particular Noncompliance, (2) does not correct a Noncompliance in a reasonable period of time (not to exceed fourteen (14) days, unless otherwise mutually agreed), or (3) cures a particular Noncompliance and such cure results in another Noncompliance and Service Provider is not able to collectively cure such Noncompliance(s) within two (2) attempts, then Delphi may:  (A) provide Service Provider an additional cure period; (B) conditionally Accept the Critical Testing Deliverable and develop a remediation plan with Service Provider whereby Service Provider will fix the Noncompliance under a mutually agreed plan; (C) correct the Noncompliance itself or hire a third party to correct the Noncompliance at Service Provider's expense; (D) implement and use the Critical Testing Deliverable despite the Noncompliance and equitably reduce the charges until the Noncompliance is corrected based on the impact of the Noncompliance; or (E) exercise any of its other rights and remedies under this Agreement.  If Delphi elects options (A) or (B) above and Service Provider fails to cure the Noncompliance in accordance with the foregoing, Delphi may thereafter elect any of the foregoing options (A) through (E).  These remedies above are in addition to and will not limit Delphi's other remedies, whether at law, in equity, or under this Agreement.

(c)    **Previously Accepted Items**.  In the event any modification or rework of a previously Accepted Critical Testing Deliverable or other deliverable is required for the Acceptance of a subsequent deliverable, then Service Provider shall perform such modification or rework at no charge and each Party's obligations, rights, and remedies described herein shall continue to apply.

## 5.    REQUIRED CONSENTS

### 5.1    Service Provider Responsibility.

At no additional cost to Delphi, Service Provider shall undertake all administrative activities necessary to obtain all Service Provider Required Consents (other than Bankruptcy Court Consents).  At Service Provider's request, Delphi will cooperate with Service Provider in obtaining the Service Provider Required Consents (other than Bankruptcy Court Consents) by executing appropriate Delphi approved written communications and other documents prepared or provided by Service Provider.  At Delphi's cost, Delphi shall undertake all administrative activities necessary to obtain all Delphi Required Consents.  Service Provider will cooperate with Delphi and make commercially reasonable efforts to enable Delphi to obtain the Delphi Required Consents by executing appropriate Service Provider approved written communications and other documents prepared or provided by Delphi.  With Delphi's approval, Service Provider shall exercise for the benefit of Delphi and the other Eligible Recipients any rights Service Provider has to utilize

or transfer license rights or other applicable rights under Service Provider's existing third party licenses, leases or contracts, and the Parties shall cooperate in minimizing or eliminating any costs associated therewith. To the extent any Bankruptcy Court Consent is required to be obtained by Delphi or any other Eligible Recipient to assign, transfer or assume any license or other applicable rights under any third party licenses, leases or contracts, Delphi shall determine, in its sole discretion, whether and when to seek such consent, provided that, at Delphi's request, Service Provider shall, at no additional cost to any Eligible Recipient, cooperate (and shall cause each of its Affiliates and Service Provider Personnel to cooperate) with Delphi in obtaining the required Bankruptcy Court Consents.

**5.2    Financial Responsibility.**

Service Provider shall pay all transfer, re-licensing or termination fees or expenses associated with obtaining any Service Provider Required Consents, or terminating any licenses or agreements as to which Service Provider is unable to obtain such Service Provider Required Consents. Delphi shall pay all transfer, re-licensing or termination fees or expenses associated with obtaining any Delphi Required Consents, or terminating any licenses or agreements as to which Delphi is unable to obtain such Delphi Required Consents.

**5.3    Contingent Arrangements.**

If, despite using all commercially reasonable efforts, Service Provider is unable to obtain a Service Provider Required Consent, Service Provider shall, at Delphi's option and with Delphi's consent, replace such Third Party Materials with other Materials offering equivalent features and functionality. If, despite using all commercially reasonable efforts, Delphi is unable to obtain a Delphi Required Consent, Service Provider shall, at Delphi's option and with Delphi's consent, make commercially reasonable efforts to replace such Third Party Materials with other Materials offering equivalent features and functionality. If, despite using all commercially reasonable efforts, Delphi is unable to obtain a Delphi Required Consent with respect to any other Delphi (or other Eligible Recipient) Third Party Contract or a Bankruptcy Court Consent has not been obtained, then, unless and until all Delphi Required Consents (including any Bankruptcy Court Consents) have been obtained, Service Provider shall manage such other Third Party Contract on Delphi's behalf and perform all obligations and enforce all rights under such other Third Party Contract as if Service Provider were a party to the agreement in Delphi's (or the applicable Eligible Recipient's) place. If, despite using all commercially reasonable efforts, management of such other Third Party Contract is not legally or contractually possible or Delphi is unable to obtain any other Delphi Required Consent, Service Provider shall use all commercially reasonable efforts to determine and adopt, subject to Delphi's prior approval, such alternative approaches as are necessary and sufficient to provide the Services without such Required Consent and any expenses for the same shall be incurred by Delphi, but only to the extent that Service Provider notifies Delphi in advance of such costs, obtains Delphi's approval prior to incurring such costs, and uses commercially reasonable efforts to minimize such costs. If, despite using all commercially reasonable efforts, Service Provider is unable to obtain a Service Provider Required Consent, Service Provider shall use all commercially reasonable efforts to determine and adopt, subject to Delphi's prior approval, such alternative approaches as are necessary and sufficient to provide the Services without such Service Provider Required Consent and any expenses for the same shall be incurred by Service Provider. If such alternative approaches are required for a period longer than thirty (30) days following the applicable Production Date, the Parties will equitably adjust the terms and reduce the prices specified in this Agreement to reflect any additional costs being incurred by Delphi or Service Provider and any Services not being received by Delphi and the other Eligible Recipients. In addition, if Service Provider fails to obtain any Service Provider Required Consent (other than Bankruptcy Court Consents) within ninety (90) days of the applicable Production Date and such failure has a material adverse impact on the use or enjoyment of the Services by Delphi or the other Eligible Recipients, Delphi may terminate this Agreement or any affected portions thereof without payment of any Termination Charges. Except as otherwise expressly provided herein, the failure to obtain any Service Provider Required Consent shall not relieve Service Provider of its obligations under this Agreement. Further, if Delphi fails to obtain any Delphi Required Consent within ninety (90) days of the applicable Production Date and such failure has a material adverse impact on the use or enjoyment of the Services by Delphi or the other Eligible Recipients, Delphi may terminate this Agreement or any affected portions upon payment of the required

Termination Charges. Except as otherwise expressly provided herein, the failure to obtain any Delphi Required Consent shall not relieve Delphi of its obligations under this Agreement.

6.    **FACILITIES, SOFTWARE, EQUIPMENT, CONTRACTS AND ASSETS ASSOCIATED WITH THE PROVISION OF SERVICES**

6.1    **Service Facilities**.

(a)    **Service Facilities**.    Service Provider (and its Affiliates and Subcontractors) shall provide the Services at or from (i) the Delphi Facilities described on **Schedule 7-A**, (ii) the Service Provider Facilities described on **Schedule 7-B**, or (iii) any other service location approved by Service Provider and Delphi.    Service Provider shall obtain Delphi's prior approval for any proposed relocation by Service Provider, its Affiliates or Subcontractors of the provision of a Service to a new or different Service Provider Facility.    Delphi acknowledges and hereby approves the Service Provider Facilities set forth on **Schedule 7-B** as of the Effective Date for the provision of the Services and scope thereof described herein.    Without limiting Delphi's rights of approval, Service Provider shall be financially responsible for all additional costs, taxes or expenses related to or resulting from any Service Provider-initiated relocation to a new or different Service Provider Facility, including any costs or expenses incurred or experienced by Delphi or any other Eligible Recipient as a result of such relocation.

(b)    **Delphi Facilities**.    Delphi shall provide Service Provider with the use of and access to the Delphi Facilities (or equivalent space) described in **Schedule 7-A** for the periods specified therein solely as necessary for Service Provider to perform its obligations under this Agreement.    All Delphi owned or leased assets provided for the use of Service Provider under this Agreement shall remain in Delphi Facilities unless Delphi otherwise agrees.    In addition, all improvements or modifications to Delphi Facilities requested by Service Provider shall be (i) subject to review and approval in advance by Delphi, (ii) in strict compliance with Delphi's then-current policies, standards, rules and procedures, and (iii) performed by and through Delphi at Service Provider's expense.    Service Provider acknowledges and agrees that the facilities to be provided by Delphi are sufficient for performing the Services and for satisfying Service Provider's responsibilities under this Agreement. THE DELPHI FACILITIES ARE PROVIDED BY DELPHI TO SERVICE PROVIDER ON AN AS-IS, WHERE-IS, WITH ALL FAULTS BASIS.    DELPHI EXPRESSLY DISCLAIMS ANY WARRANTIES, EXPRESS OR IMPLIED, AS TO THE DELPHI FACILITIES, OR THEIR CONDITION OR SUITABILITY FOR USE BY SERVICE PROVIDER.

(c)    **Furniture, Fixtures and Equipment**.    At the Delphi Facilities described in **Schedule 7-A**, Delphi shall provide office space and office furniture for the number of Service Provider Personnel and for such periods specified in **Schedule 7-A**.    The office space and office furniture provided by Delphi for the use of Service Provider Personnel will be generally comparable in quality to the office space and office furniture provided to the then-standard office space and office furniture provided to similarly situated Delphi employees.    Service Provider shall be financially responsible for providing all other office space, office furniture and fixtures needed by Service Provider or Service Provider Personnel (including Transitioned Employees) to provide the Services, and for all upgrades, replacements and additions to such office space, furniture or fixtures, provided that such office furniture and fixtures must be approved in advance by Delphi and meet Delphi's then-current standards, and provided further that Service Provider shall use commercially reasonable efforts to purchase and use surplus Delphi furniture and fixtures to the extent available.    Service Provider Personnel using the office facilities provided by Delphi will be accorded reasonable access to the communications wiring in such facilities (including fiber, copper and wall jacks, subject to **Section 6.1(d)**) and the use of certain shared office equipment and services, such as photocopiers, local and long distance telephone service for Delphi-related calls, telephone handsets, mail service, office support service (e.g., janitorial), heat, light, and air conditioning, provided that such access and usage shall be solely for and in connection with the provision of Services by such Service Provider Personnel, and provided further that Service Provider shall reimburse Delphi for the additional incremental costs incurred by Delphi or the other Eligible Recipients if and to the extent Service

-19-

Provider's service delivery model and/or inefficiency cause its usage or consumption of such resources to exceed historical levels (with appropriate adjustments to account for Delphi's reduced consumption of such resources due to its downsizing or other decreases in Eligible Recipient personnel, facilities, business, etc.). Service Provider shall be responsible for providing all other office related equipment (including desktop and laptop personal computers and all related peripherals) and services needed by Service Provider or Service Provider Personnel at such Delphi Facilities to provide the Services, and for upgrades, improvements, replacements and additions to such equipment or services.

(d)    **Service Provider's Responsibilities Regarding Delphi's Network.**  To the extent any Equipment provided or used by Service Provider or Service Provider Personnel is connected directly to the network(s) of Delphi or any other Eligible Recipient, such Equipment (and all Software installed thereon) shall be (i) subject to review and approval in advance by Delphi (and Service Provider shall cooperate with Delphi in the testing, evaluation and approval of such Equipment); (ii) in strict compliance with Delphi's then-current security policies, architectures, standards, rules and procedures and other Delphi Rules; and (iii) in strict compliance with Delphi's then-current hardware and software specifications. Service Provider shall not install or permit the installation of any other software on such Equipment without Delphi's prior approval. Service Provider shall promptly investigate any security breach of Delphi's networks or Systems associated with Service Provider Personnel or the performance of the Services. Service Provider shall notify Delphi and permit Delphi to participate in any audit or investigation of any such security breach. Service Provider shall promptly report the findings of any such audit or investigation to Delphi and shall provide Delphi with a copy of any written report prepared in connection therewith within sixty (60) days after completion. Service Provider shall ensure that all e-mail addresses and listings of any Service Provider Personnel in Delphi's network clearly and unambiguously indicate the employment affiliation of such personnel.

(e)    **Service Provider's Responsibilities.**  Except as provided in **Sections 6.1(a)**, **(b)** and **(c)** and **Section 6.4**, Service Provider shall be responsible for providing all furniture, fixtures, Software, Equipment, space and other facilities required to perform the Services and all upgrades, improvements, replacements and additions to such furniture, fixtures, Software, Equipment, space and facilities. Without limiting the foregoing, Service Provider shall provide (i) all maintenance, site management, site administration and similar services for the Service Provider Facilities, (ii) uninterrupted power supply services for the Service Provider Facilities and for the Software, Equipment and Systems in Delphi Facilities as designated in **Schedule 7-A**, and (iii) telecommunications transport (voice and data) between and among Service Provider Facilities, Delphi Sites and Delphi Facilities.

(f)    **Physical Security.**  Service Provider shall be responsible for the safety and physical access and control of the areas that Service Provider controls or that are dedicated solely for use by Service Provider in performing the Services and Service Provider shall not permit any person to have access to, or control of, any such area unless such access or control is permitted in accordance with control procedures approved by Delphi or any higher standard agreed to by Delphi and Service Provider. Service Provider shall be solely responsible for compliance by Service Provider Personnel with such control procedures, including obtaining advance approval to the extent required thereby.

(g)    **Standards, Requirements and Procedures at Delphi Facilities.**  Except as provided in **Section 6.1(f)**, Service Provider shall, and shall cause the Service Provider Personnel to, adhere to and enforce the Delphi Rules, as well as the operational, safety and security standards, requirements and procedures described in the applicable lease and/or then in effect at the Delphi Facilities, as such standards, requirements and procedures may be modified by Delphi from time to time. Service Provider shall regularly advise Delphi of other operational, safety and security practices, procedures and safeguards in effect at the facilities of other Service Provider customers, where those practices, procedures and safeguards are of a higher standard than those contemplated in this Agreement without breaching Service Provider's confidentiality obligations to other Service Provider customers.

-20-

(h)     **Employee Services.**  Subject to applicable security requirements, Delphi shall permit Service Provider Personnel to use certain employee facilities (e.g., designated parking facilities, cafeteria, and common facilities) at the Delphi Facilities that are generally made available to the employees and contractors of Delphi or the other Eligible Recipients.  The employee facilities in question and the extent of Service Provider Personnel's permitted use shall be specified in writing by Delphi and shall be subject to modification without advance notice in Delphi's sole discretion.  Service Provider Personnel will not be permitted to use employee facilities designated by Delphi for the exclusive use of certain Delphi or other Eligible Recipient employees and will not be entitled to the provision or reimbursement of paid parking.

(i)     **Use of Delphi Facilities.**

    (i)     Unless Service Provider obtains Delphi's prior written agreement, which Delphi may withhold in its sole discretion, Service Provider shall use the Delphi Facilities, and the Equipment and Software located therein, only to provide the Services to Delphi and the other Eligible Recipients.

    (ii)    Delphi reserves the right to relocate any Delphi Facility from which the Services are then being provided by Service Provider to another geographic location, provided that in such event, Delphi will provide Service Provider with comparable office space in the new geographic location.  In such event, Delphi shall pay the applicable labor rate(s) for additional personnel reasonably required by Service Provider plus the incremental Out-of-Pocket Expenses reasonably incurred by Service Provider in physically relocating to such new geographic location, including any incremental expenses incurred in relation to the shifting of or any changes to Systems or the telecommunication plan devised between Service Provider Facility and Delphi Facility, provided that such relocation is not expressly contemplated in this Agreement, and that Service Provider notifies Delphi of such additional required personnel and incremental Out-of-Pocket Expenses, obtains Delphi's approval prior to using such personnel or incurring such expenses, and uses commercially reasonable efforts to minimize such personnel and expenses.

    (iii)   Delphi also reserves the right to direct Service Provider to cease using all or any part of the space in any Delphi Facility from which the Services are then-being provided by Service Provider and to thereafter use such space for its own purposes, provided that in the event that Service Provider brings to the attention of Delphi any disruption of or adverse effect on the Services due to such change, the Parties shall mutually devise a method to minimize such disruption or adverse effect.  In such event, Delphi shall reimburse Service Provider for any reasonable incremental Out-of-Pocket Expenses incurred by Service Provider in leasing substitute space and physically relocating to such space, provided that (A) such relocation by Service Provider at Delphi's direction is not expressly contemplated in this Agreement, (B) Service Provider notifies Delphi of such incremental Out-of-Pocket Expenses, (C) Service Provider obtains Delphi's approval prior to incurring such expenses, and (D) Service Provider uses commercially reasonable efforts to minimize such expenses.

(j)     **Conditions for Return.**  When the Delphi Facilities are no longer to be used by Service Provider as contemplated by **Section 6.1** or are otherwise no longer required for performance of the Services, Service Provider shall notify Delphi as soon as practicable and shall vacate and return such Delphi Facilities (including any improvements to such facilities made by or at the request of Service Provider) to Delphi in substantially the same condition as when such facilities were first provided to Service Provider, subject to reasonable wear and tear.

(k)     **No Violation of Laws.**  Service Provider shall (i) treat, use and maintain the Delphi Facilities in a reasonable manner, and (ii) ensure that neither Service Provider nor any of its Subcontractors or other Service Provider Personnel commits, and use all reasonable efforts to ensure that no business

-21-

visitor or invitee commits, any act in violation of any Laws in a Delphi Facility or any act in violation of Delphi's insurance policies or in breach of Delphi's obligations under the applicable real estate leases in such Delphi Facilities (in each case, to the extent Service Provider has received notice of such insurance policies or real estate leases or should reasonably be expected to know of such obligations or limitations).

**6.2**    **Use of Service Provider Facilities**.

During the Term and thereafter during the Audit Period, subject to Service Provider's reasonable security restrictions generally applicable to Service Provider's other customers and subject to Delphi's confidentiality obligations under this Agreement, Service Provider shall provide to Delphi at no charge, (i) reasonable access to and use of Service Provider Facilities from which the Services are being performed, and (ii) access to reasonable work/conference space at such Service Provider Facilities for the conduct of Delphi's business pertaining to the Services for a reasonable duration of time.    At Delphi's request, subject to Service Provider's reasonable security restrictions generally applicable to other customers and Delphi's confidentiality obligations under this Agreement, Service Provider shall provide reasonable access to and use of such Service Provider Facilities by Delphi or Delphi Third Party Contractors (not being competitors of Service Provider) to install third party software and equipment, which are required as part of the Services and which will thereafter be managed by Service Provider.

**6.3**    Delphi Rules/Employee Safety.

(a)    **Delphi Rules and Compliance**.    In performing the Services and using the Delphi Facilities, Service Provider shall observe and comply with all Delphi policies, rules, and regulations applicable to Delphi Facilities or the provision of the Services which have been communicated to Service Provider or Service Provider Personnel in advance by such means as are generally used by Delphi to disseminate such information to its employees or contractors, including those set forth on **Schedule 17**, those applicable to specific Delphi Sites, and Delphi's Information Security Policy (collectively, "**Delphi Rules**").    Delphi's current Information Security Policy is set forth in **Schedule 17-B**, and may be amended by Delphi from time to time, upon notice to Service Provider. Service Provider acknowledges and agrees that, as of the Production Date for each Service, Service Provider will be fully informed as to the Delphi Rules for such Service.    Service Provider shall be responsible for the promulgation and distribution of Delphi Rules to Service Provider Personnel as and to the extent necessary and appropriate.    Additions or modifications to the Delphi Rules may be (i) communicated orally by Delphi or another Eligible Recipient directly to Service Provider or designated Service Provider Personnel, (ii) disclosed to Service Provider and Service Provider Personnel in writing, (iii) conspicuously posted at a Delphi Facility, (iv) electronically posted, or (v) communicated to Service Provider or designated Service Provider Personnel by means generally used by Delphi to disseminate such information to its employees or contractors at the applicable site.    Service Provider and Service Provider Personnel shall observe and comply with such additional or modified Delphi Rules and, if the additional or modified Delphi Rules constitute New Services, the Parties shall mutually agree upon the treatment of additional costs to Service Provider, if any, to implement such additional or modified Delphi Rules in accordance with **Section 11.5**.

(b)    **Safety and Health Compliance**.    Service Provider and Service Provider Personnel shall familiarize themselves with the premises and operations at each Delphi Site or Delphi Facility at, to or from which Services are rendered and the Delphi Rules applicable to each such Delphi Site or Delphi Facility.    Service Provider and Service Provider Personnel shall observe and comply with all Laws applicable to the use of each Delphi Facility or Delphi Site or the provision of the Services, including environmental Laws and Laws regarding occupational health and safety.    Service Provider shall be responsible for the compliance of Equipment, Software, Systems and Services for which it is operationally responsible with such Laws and shall be responsible for any acts or omissions of Service Provider Personnel in contravention of such Laws.    Service Provider and Service Provider Personnel also shall observe and comply with all Delphi Rules with respect to safety, health, security and the environment and shall take all commercially reasonable precautions

-22-

to avoid injury, property damage, spills or emissions of hazardous substances, materials or waste, and other dangers to persons, property or the environment. To the extent required by Delphi, Service Provider Personnel shall receive prescribed training prior to entering certain Delphi Sites or Delphi Facilities.

6.4    **Software, Equipment and Third Party Contracts.**

(a)    **Financial Responsibility.** Service Provider shall be responsible for any third party fees or expenses on and after the applicable Production Date that are associated with Software, Equipment, Equipment Leases and Third Party Contracts for which Service Provider is financially responsible under **Schedule 2** or **4-B** and any other Third Party Contracts (excluding Third Party Contracts administered by Service Provider on a pass-through basis, which are addressed in **Section 11.2**) used by or on behalf of Service Provider to provide the Services. Delphi shall be responsible for third party fees or expenses incurred on and after the applicable Production Date that are associated with Software, Equipment, Equipment Leases and Third Party Contracts for which Delphi is financially responsible under **Schedule 2** or **4-B** in connection with Service Provider's provision of the Services. Unless otherwise expressly provided, each Party also shall be responsible for any third party fees or expenses on and after the applicable Production Date associated with new, substitute or replacement Software, Equipment, Equipment Leases or Third Party Contracts (including Upgrades, enhancements, new versions or new releases of such Software or Equipment) for which such Party is financially responsible under **Schedule 2** or **4-B**, in connection with Service Provider's provision of the Services. With respect to Third Party Software licenses, Equipment Leases and Third Party Contracts that are transferred to Service Provider by Delphi or for which Service Provider otherwise has or assumes financial responsibility under this Agreement except as provided in **Article 5** as to the responsibilities of Delphi and the Eligible Recipients as to the Required Consents, Service Provider shall:   (i) pay all amounts becoming due under such licenses, leases or contracts, and all related expenses, for periods on or after the applicable Production Date for the Services for which such Third Party Software licenses, Equipment Leases and Third Party Contracts are used ; (ii) rebate to Delphi any prepayment of such amounts in accordance with **Section 11.7(a)**; (iii) pay all modification, termination, cancellation, late payment, renewal or other fees, penalties, charges, interest or other expenses relating to periods on or after the applicable Production Date; and (iv) be responsible for curing any defaults in Service Provider's performance under such licenses, leases and contracts on or after the applicable Production Date, provided that this clause (iv) is not intended to make Service Provider responsible for obtaining Bankruptcy Court Consents or Delphi Required Consents.

(b)    **Operational Responsibility.** With respect to Software, Equipment, Equipment Leases and Third Party Contracts for which Service Provider is operationally responsible under **Schedule 2** or **4-B** and any other Third Party Contracts (excluding Third Party Contracts administered by Service Provider on a pass-through basis, which are addressed in **Section 11.2**) used by or on behalf of Service Provider to provide the Services, Service Provider shall be responsible for:  (i) the evaluation, procurement, testing, installation, rollout, use, support, management, administration, operation and maintenance of such Software, Equipment, Equipment Leases and Third Party Contracts; (ii) the evaluation, procurement, testing, installation, rollout, use, support, management, administration, operation and maintenance of new, substitute or replacement Software, Equipment, Equipment Leases and Third Party Contracts (including Upgrades, enhancements, new versions or new releases of such Software or Equipment); (iii) the performance, availability, reliability, compatibility and interoperability of such Software, Equipment and Third Party Contracts each in accordance with this Agreement, including the Service Levels and Change Control Procedures; (iv) the compliance with and performance of all operational, administrative and contractual obligations specified in the applicable licenses, leases and contracts; (v) the administration and exercise, for the benefit of Delphi, as appropriate, of all rights available under such licenses, leases and contracts; and (vi) the payment of any discounts, credits or other amounts lost or not recovered, or fees, penalties, charges, interest or other expenses due and owing, under or with respect to such licenses, leases and contracts that are incurred, caused by or result from Service Provider's failure to comply with or perform its obligations under this **Section 6.4(b)** (except to the extent that such failure

-23-

directly results from the acts or omissions of Delphi under those licenses, leases or contracts in contravention of its obligations under this Agreement).

(c) **Rights Upon Expiration/Termination.** With respect to all Third Party Software licenses, Equipment Leases and Third Party Contracts for which Service Provider is financially or operationally responsible under this Agreement, Service Provider shall use all commercially reasonable efforts to: (i) obtain for Delphi, the other Eligible Recipients and/or their designee(s) the license, sublicense, assignment and other rights specified in **Sections 4.4(b)** and **14.6**; (ii) ensure that the granting of such license, sublicense, assignment and other rights is not subject to subsequent third party approval or the payment by Delphi, the other Eligible Recipients or their designee(s) of license, assignment or transfer fees; (iii) ensure that the terms, conditions and prices applicable to Delphi, the other Eligible Recipients and/or their designee(s) following expiration or termination of this Agreement (or any portion thereof) are no less favorable than those otherwise applicable to Service Provider, and at least sufficient for the continuation of the activities comprising the Services; (iv) ensure that neither the expiration or termination of this Agreement (or any portion thereof) nor the assignment of the license, lease or contract will trigger less favorable terms, conditions or pricing; and (v) not replace any perpetual licenses with subscription term licenses or use subscription term licenses for any new Software or other Materials not currently licensed by Delphi (it being understood, that the foregoing obligations of Service Provider shall apply with respect to all Eligible Recipients, whether now or hereafter receiving Services under this Agreement or under a separate agreement with Service Provider (or its designee) as contemplated by **Section 11.1(f)(iii)**). If Service Provider is unable to obtain any such rights and assurances, it shall notify Delphi in advance and shall not use such Third Party Software license, Equipment Lease or Third Party Contract without Delphi's approval (and absent such approval, Service Provider's use of any such Third Party Software license, Equipment Lease or Third Party Contract shall obligate Service Provider to obtain or arrange, at no additional cost to Delphi, for such license, sublicense, assignment or other right for Delphi, the other Eligible Recipients and their designee(s) upon expiration or termination). If Delphi consents to Service Provider's use of specific Third Party Software licenses, Equipment Leases or Third Party Contracts under these circumstances, such consent shall be deemed to be conditioned on Service Provider's commitment to use all commercially reasonable efforts to cause such third party to agree at expiration or termination of this Agreement or the completion of Termination Assistance Services that Delphi, the other Eligible Recipients and/or their designee(s) will be permitted to assume prospectively the license, lease or contract in question or to enter into a new license, lease or contract with Delphi, the other Eligible Recipients and/or their designee(s) on substantially the same terms and conditions, including price.

(d) **Benefits Pass-Through.** With respect to any products and services procured by Service Provider for Delphi on a cost-plus, cost-reimbursement or Pass-Through Expense basis during the course of performing the Services, Service Provider shall use all commercially reasonable efforts to pass through to Delphi all benefits offered by the manufacturers and/or suppliers of such products and services (including all warranties, refunds, credits, rebates, discounts, training, technical support and other consideration offered by such manufacturers and suppliers) except to the extent otherwise agreed by Delphi. If Service Provider is unable to pass through any such benefit to Delphi, it shall notify Delphi in advance and shall not purchase such product or service without Delphi's prior written approval. Prior to procuring any products or services for an Eligible Recipient, Service Provider will disclose to Delphi whether Service Provider (or any of its Affiliates or Subcontractors) has any interest in, or affiliation, referral or marketing agreement or similar relationship with, the manufacturer or vendor of such products or services and the nature of such relationship and the manner, if any, in which such relationship varies from an "arms-length" relationship.

**6.5 Managed Third Parties.**

(a) **Responsibility.** Service Provider shall manage the Managed Third Parties such that each Managed Third Party performs in accordance with this Agreement, including achievement of the Service Levels, and complies with all applicable duties and obligations imposed on Service

Provider under this Agreement.  Unless otherwise agreed in writing by the Parties, Service Provider shall be responsible for performing Services, complying with Service Levels and providing reports and other deliverables, even where doing so relies upon Managed Third Parties.  Service Provider shall be responsible for managing each Managed Third Party or its personnel to perform in accordance with the applicable Third Party Contract, and in a manner such that Service Provider complies with duties and obligations of Service Provider under this Agreement.  Service Provider shall be Delphi's and the other Eligible Recipients' sole point of contact regarding the services provided by such Managed Third Parties, provided that the foregoing will not prohibit Delphi from communicating directly with any Managed Third Parties.  Financial responsibility for all charges associated with any Managed Third Party shall be as **Schedule 4-B**.  Amounts payable with respect to Managed Third Parties may be (i) payable to the Managed Third Party directly by Delphi as a Pass-Through Expense or (ii) payable to the Managed Third Party by Service Provider (and Service Provider shall be deemed to have included such payments in the Charges).   To the extent Delphi retains financial responsibility for any Third Party Contract with a Managed Third Party for which Service Provider otherwise would be responsible under **Schedule 4-B**, Delphi may cease paying the charges and costs to such Managed Third Party, and Service Provider shall assume financial responsibility (and retain operational responsibility) for the services previously performed by such Managed Third Party.

(b)    **Modification.**  If a Managed Third Party's Third Party Contract is terminated (other than by Delphi for convenience) or a Managed Third Party ceases to perform or fails to perform in accordance with this Agreement, Service Provider shall be responsible for the continued performance of the Services in accordance with this Agreement and shall either provide the services under the applicable Third Party Contract itself or enter into an agreement for such services with a replacement Managed Third Party.   Delphi reserves all rights to modify, amend, renew, terminate, extend or otherwise replace any Managed Third Party and/or the applicable Third Party Contract, and to negotiate any Pass-Through Expenses associated therewith.   If a modification, amendment or replacement of a Managed Third Party materially impairs Service Provider's ability to meet its obligations under this **Section 6.5**, then, within thirty (30) days after Service Provider receives notice of such modification, amendment or replacement, Service Provider shall notify Delphi in writing in sufficient detail to explain Service Provider's concerns, and thereafter the Parties shall meet and agree to any appropriate modifications or relief to Service Provider's obligations that are directly affected by such change.   Delphi shall agree to reimburse Service Provider for reasonable, actual and demonstrable increases in costs and expenses incurred by Service Provider as a direct result of Delphi's modification, amendment or replacement of such a Third Party Contract or Managed Third Party, provided that Service Provider (i) notifies Delphi in writing of all such costs and expense within thirty (30) days after Service Provider's receipt of a copy of the modification, amendment or replacement to the applicable Third Party Contract, (ii) obtains Delphi's prior approval of such costs and expenses, and (iii) uses commercially reasonable efforts to minimize such costs and expenses.

**6.6    Acquired Assets.**

(a)    **Acquisition and Conveyance.**  Delphi shall convey (or shall cause the applicable Eligible Recipient to convey) to Service Provider, and Service Provider shall (or shall cause an Affiliate to) accept, all of Delphi's (or the applicable Eligible Recipient's) right, title and interest in and to the Acquired Assets.   In consideration for such conveyance, Service Provider shall pay Delphi (or the applicable Eligible Recipient designated by Delphi) the Acquired Assets Credit specified in this Agreement.    Delphi represents and warrants to Service Provider that Service Provider (or its Affiliates) shall take good and clear title to the Acquired Assets, free and clear of all liens.   The conveyance of the Acquired Assets shall be effected by the delivery of each Acquired Asset to Service Provider where possible or, where this is not possible, by the delivery of a general assignment and bill of sale.   Each of the transactions described in this Section 6.6(a) shall occur, for each of the Acquired Assets, on the Production Date for the Services that such Acquired Asset will be used to provide.   Except as otherwise expressly provided in this **Section 6.6**, DELPHI CONVEYS THE ACQUIRED ASSETS TO SERVICE PROVIDER ON AN "AS IS," "WHERE IS" AND "WITH ALL

-25-

FAULTS" BASIS.  DELPHI HEREBY DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS, OR THE CONDITION OR SUITABILITY OF SUCH ACQUIRED ASSETS FOR USE BY SERVICE PROVIDER TO PROVIDE THE SERVICES, INCLUDING WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(b)     **Taxes on Acquired Assets.**  Service Provider shall be responsible for, and shall pay, or provide evidence of exemption from, all sales, use, goods and services and other similar taxes arising out of the conveyance of the Acquired Assets.  The Acquired Assets Credit is exclusive of all taxes, including VAT, other applicable value added taxes, and Recoverable Taxes.  Delphi and Service Provider intend that Article 5 of the Sixth EC Directive, as implemented in the relevant jurisdiction, will apply to the conveyance of the Acquired Assets pursuant to this Agreement in those jurisdictions in which it applies and agree to use all reasonable endeavors to secure that the conveyance is treated neither as a supply of goods nor a supply of services.  If, nevertheless, any VAT is chargeable in respect of any supply in connection with the conveyance of the Acquired Assets pursuant to this Agreement, then Service Provider shall forthwith pay or procure the payment to Delphi of an amount equal to any such VAT in respect of the conveyance of the Acquired Assets (in addition to the consideration or any other sum payable to Delphi) subject to the production of a valid VAT invoice in respect of such conveyance, and shall indemnify Delphi for any fines, penalties or interest imposed by any Tax Authority arising out of the treatment by Delphi and Service Provider of such conveyance.  Service Provider warrants to Delphi that Service Provider is registered for VAT or will be registered for VAT with effect from a date not later than such Production Date and shall on or before that date provide Delphi with proof of such registration reasonably satisfactory to Delphi.  Service Provider warrants to Delphi that the Acquired Assets are to be used by Service Provider in carrying on the same kind of business as that carried on by Delphi and Service Provider will after the Production Date continue to carry on such business.  In relation to VAT or other value added tax records:  (i) Delphi shall on the Production Date deliver to Service Provider all records required to be so delivered under the applicable legislation; and (ii) Service Provider shall preserve or shall procure to be preserved those records for such period as may be required by Law and during that period permit Delphi reasonable access to them to inspect or make copies of them.  All sums payable in connection with the transfer of the Acquired Assets are exclusive of VAT and other value added taxes and Service Provider shall, in addition to such sums, pay any VAT and other value added taxes properly chargeable thereon, on receipt of a valid VAT or other value added tax invoice.

(c)     **Removal and Operation**.  Service Provider shall be responsible for any and all costs associated with moving (including packaging) of the Acquired Assets from its location at the time of the acquisition by Service Provider contemplated hereunder, together with any and all costs of operation, use and re-configuring (including resulting third party charges) the Acquired Assets, except as otherwise expressly provided under this Agreement.

7.     **SERVICE LEVELS**


# REDACTED

**REDACTED**

7.2      **Service Level Credits; Deliverable Credits**.

(a)      **Service Level Credits**.  Service Provider recognizes that Delphi is paying Service Provider to deliver the Services in a manner that meets or exceeds the Service Levels.  If Service Provider fails to meet the Service Levels, then, in addition to other remedies available to Delphi, Service Provider shall pay to Delphi the performance credits specified in **Schedule 3** (the "**Service Level Credits**") in recognition of the diminished value of the Services resulting from Service Provider's failure to meet the agreed upon level of performance, and not as a penalty or liquidated damages.  Under no circumstances shall the imposition of Service Level Credits be construed as Delphi's sole or exclusive remedy for any failure to meet the Service Levels.  However, if Delphi recovers monetary damages from Service Provider as a result of Service Provider's failure to meet a Service Level, Service Provider shall be entitled to set-off against such damages any Service Level Credits actually paid to Delphi for the failure giving rise to such recovery (as such Service Level Credits may be reduced by any applicable earnback pursuant to **Schedule 3**).

(b)      **Deliverable Credits**.  Service Provider recognizes that Delphi is paying Service Provider to provide certain Critical Deliverables by the time and in the manner agreed by the Parties.  If Service Provider fails to meet its obligations with respect to such Critical Deliverables, then, in addition to other remedies available to Delphi, Service Provider shall pay to Delphi the amounts specified in **Schedules 3** or **8**, as applicable, or established by Delphi as part of the Project approval process ("**Deliverable Credits**") on a case-by-case basis in recognition of the diminished value of the Services resulting from Service Provider's failure to meet the agreed upon level of performance, and not as a penalty or liquidated damages.  If Delphi recovers monetary damages from Service Provider as a result of Service Provider's failure to meet its obligations with respect to one (1) or more Critical Deliverables, Service Provider shall be entitled to set-off against such damages any Deliverable Credits actually paid to Delphi for the failures giving rise to such recovery.

7.3      **Problem Analysis**.

If Service Provider fails to provide Services in accordance with the Service Levels, and/or this Agreement, Service Provider shall at no cost to Delphi (after restoring service or otherwise resolving any immediate problem):  (i) promptly investigate and report on the causes of the problem; (ii) provide a Root Cause Analysis of such failure as soon as practicable after such failure or at Delphi's request; (iii) correct the problem as soon as practicable (regardless of cause or fault) or coordinate the correction of the problem if Service Provider does not have responsibility for the particular service at issue; (iv) advise Delphi of the status of remedial efforts being undertaken with respect to such problem; (v) demonstrate to Delphi's reasonable satisfaction that the causes of such problem have been or will be corrected on a permanent basis; and (vi) take all commercially reasonable actions to prevent any recurrence of such problem.  Service Provider shall use all commercially reasonable efforts to complete the Root Cause Analysis within fifteen (15) days of a failure, provided that, if it is not capable of being completed within fifteen (15) days using reasonable diligence, Service Provider shall complete such Root Cause Analysis as quickly as possible and shall notify Delphi prior to the end of the initial fifteen (15) day period as to the status of the Root Cause Analysis and the estimated completion date.

**REDACTED**

**7.5     Measurement and Monitoring.**

Service Provider shall, on or before the Production Date associated with each Service, at no additional cost to Delphi, implement measurement and monitoring tools and metrics as well as standard reporting procedures, all acceptable to Delphi, to measure and report Service Provider's performance of such Service at a level of detail sufficient, as determined by Delphi, to verify Service Provider's compliance with the applicable Service Levels.  Delphi or its designee will have the right to audit all such measurement and reporting tools, performance metrics and reporting procedures.  Service Provider shall provide Delphi with on-line access to up-to-date problem management data and other data regarding the status of service problems, service requests and user inquiries.  Service Provider also shall provide Delphi with access to the data used by Service Provider to calculate its performance against the Service Levels and the measurement and monitoring tools and procedures utilized by Service Provider to generate such data for purposes of audit and verification.  Delphi shall not be required to pay any amount in addition to the Charges for such measurement and monitoring tools or the resource utilization associated with their use.

**7.6     Satisfaction Surveys.**

(a)     **General.**   In accordance with the initial survey dates, and at regular intervals, each as specified in **Schedule 14** or by Delphi thereafter, Service Provider and/or independent third parties engaged by Service Provider shall conduct the satisfaction surveys of Delphi's management and Authorized Users in accordance with the survey protocols and procedures specified in **Schedule 14** in order to determine their satisfaction with Service Provider's provision of the Services.   To the extent Service Provider engages an independent third party to perform all or any part of any satisfaction survey, such third party shall be approved in advance by Delphi. These surveys shall be conducted at no additional cost to Delphi.

(b)     **Delphi Conducted Surveys.**   In addition to the satisfaction surveys to be conducted pursuant to

**Section 7.6(a)**, Delphi may survey Authorized User satisfaction with Service Provider's performance in connection with and as part of broader satisfaction surveys periodically conducted by Delphi. At Delphi's request, Service Provider shall cooperate and assist Delphi with the formulation of the survey questions, protocols and procedures and the execution and review of such surveys.

(c)    **Survey Follow-up.** If the results of any satisfaction survey conducted pursuant to **Section 7.6(a)** or **(b)** indicate that the level of satisfaction with Service Provider's performance is less than the target level specified in **Schedule 3** or **14**, Service Provider shall promptly and at no additional cost to Delphi: (i) conduct a Root Cause Analysis as to the cause of such dissatisfaction; (ii) develop an action plan to address and improve the level of satisfaction; (iii) present such plan to Delphi for its review, comment and approval; and (iv) take action in accordance with the approved plan and as necessary to improve the level of satisfaction. Delphi and Service Provider shall establish a schedule for completion of a Root Cause Analysis and the preparation and approval of the action plan which shall be reasonable and consistent with the severity and materiality of the problem, provided that the time for completion of such tasks shall not exceed thirty (30) days from the date such user survey results are finalized and reported. Service Provider's action plan developed hereunder shall specify the specific measures to be taken by Service Provider and the dates by which each such action shall be completed. Promptly after completion of the measures described in such action plan, Service Provider shall conduct follow-up surveys with the affected Authorized User and management to confirm that the cause of any dissatisfaction has been addressed and that the level of satisfaction has improved.

7.7    **Notice of Adverse Impact**.

If Service Provider becomes aware of any failure by Service Provider to comply with its obligations under this Agreement or any other situation (i) that has impacted or reasonably could impact the maintenance of Delphi's or any other Eligible Recipient's financial integrity or internal controls, the accuracy of Delphi's or any other Eligible Recipient's financial, accounting, quality, procurement, inventory, marketing, supply chain, human resources, or other records and reports, or compliance with Delphi Rules, Delphi Standards or applicable Laws, or (ii) that has had or reasonably could have any other material adverse impact on the Services in question or the impacted business operations of Delphi or the other Eligible Recipients, then Service Provider shall immediately notify Delphi of such situation and the impact or expected impact and Service Provider shall meet with Delphi to formulate an action plan to minimize or eliminate the impact of such situation.

8.    **PROJECT PERSONNEL**

**REDACTED**

**REDACTED**

**8.2    Service Provider Account Executive.**

Service Provider shall designate a "**Service Provider Account Executive**" for this Delphi engagement who, unless otherwise agreed by Delphi, shall maintain his or her office in or near Troy, Michigan.  The Service Provider Account Executive shall:   (i) be one of the Key Service Provider Personnel; (ii) be a full time employee of Service Provider; (iii) devote his or her full time and effort to managing and addressing Delphi concerns in relation to the Services; (iv) remain in this position for a minimum period of two (2) years from the initial assignment (except as a result of an Exception Transfer); (v) serve as the single point of contact in relation to the Services; (vi) be the single point of contact to whom all Delphi communications concerning this Agreement may be addressed; (vii) have authority to act on behalf of Service Provider in all day-to-day matters pertaining to this Agreement, including the administration of this Agreement and the individual Companion Agreements on a day-to-day basis on behalf of Service Provider (including decisions, consents, notices, acceptances and approvals) and only the Service Provider Account Executive (and his or her designees(s)) shall be authorized to act on behalf of Service Provider or to amend, modify, change, waive or discharge their rights and obligations under this Agreement or such Companion Agreements; (viii) have day-to-day responsibility for billing and relationship management; and (ix) have day-to-day responsibility for ensuring customer satisfaction and addressing any concerns in relation to attainment of all Service Levels.

**REDACTED**

**8.4    Service Provider Personnel Are Not Delphi Employees.**

The Parties intend to create an independent contractor relationship.  Nothing in this Agreement shall operate or be construed as making Delphi (or any other Eligible Recipient) and Service Provider either partners, joint venturers, principals, joint employers, agents or employer and employees of or with the other.   Service Provider Personnel are neither employees nor agents of any Eligible Recipient and are not eligible to participate in any employment benefit plans or other conditions of employment available to any Eligible Recipient's employees.   No officer, director, employee, agent, Affiliate, contractor or subcontractor or other Service Provider Personnel retained by Service Provider to perform work hereunder shall be deemed to be an officer, director, employee, agent, Affiliate, contractor or subcontractor of any Eligible Recipient for any purpose.   Service Provider (or its Subcontractors) shall be solely responsible for making, or causing to be made, all deductions and withholdings from the Service Provider Personnel's salaries and other compensation.   Service Provider (or its Subcontractors) shall have exclusive control over the Service Provider Personnel and over the labor and employee relations, and the policies relating to wages, hours, working conditions or other conditions of such personnel.   Service Provider (or its

Subcontractors), and not Delphi or any other Eligible Recipient, shall have the right, power, authority and duty to supervise and direct the activities of the Service Provider Personnel and to pay salary to and otherwise compensate such Service Provider Personnel for any work performed by them on the behalf of Delphi or the other Eligible Recipients pursuant to this Agreement.    Service Provider (or its Subcontractors) shall have the exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, discharge and adjust grievances with the Service Provider Personnel.    However, at any time Delphi shall, without any additional charge to any Eligible Recipient, have the right to require Service Provider to immediately remove from involvement in any of the Services any Service Provider Personnel objectionable to Delphi as provided in **Section 8.5(b)**.    Service Provider, and not Delphi or the other Eligible Recipients, shall be responsible and therefore solely liable for all acts and omissions of Service Provider Personnel, including acts and omissions constituting negligence, gross negligence, willful misconduct and/or fraud.

**REDACTED**

REDACTED

**8.6**    **Transitioned Personnel – EU Employees**.

    (a)    It is not intended that any person shall transfer employment from Delphi to the Service Provider pursuant to the Transfer Legislation in connection with the provision of the Services. However, if any person transfers by operation of the Transfer Legislation or such person alleges that he or she transfers to the Service Provider or any Subcontractor in connection with the provision of the Services, the Parties will co-operate with each other and use all reasonable efforts to resolve the situation.    In the absence of any agreement or if Service Provider does not wish to productively use such person, Service Provider or relevant Subcontractor may dismiss any such person.

    (b)    Delphi shall indemnify and keep indemnified Service Provider and any relevant sub-contractor from all Employment Liabilities which the Service Provider or a relevant sub-contractor may incur as a result of the Transfer Legislation applying or being alleged to apply including any Employment Liabilities arising out of or in connection with any dismissal pursuant to **Section 8.6(a)** save in respect of any such liabilities which arise out of any unlawful acts of discrimination by Service Provider or in respect of any acts or omissions by Service Provider in relation to any such staff who are not dismissed by Service Provider no later than one hundred and twenty (120) days after the transfer or the alleged transfer.

    (c)    If any staff of Service Provider transfers or alleges that they transfer to Delphi or a successor service provider as a result of the cessation of all or part of the Services for whatever reason, the Parties will co-operate with each other and use all reasonable efforts to resolve the situation. In the absence of any agreement or if Delphi (or the relevant successor service provider) does not wish to productively use such person, Delphi or the relevant successor service provider may dismiss any such person.

    (d)    Service Provider shall indemnify and keep indemnified Delphi and any relevant successor service

provider from all Employment Liabilities which Delphi or the relevant successor service provider may incur as a result of the Transfer Legislation applying or being alleged to apply including any Employment Liabilities arising out of or in connection with any dismissal pursuant to **Section 8.6(c)** save in respect of any such liabilities which arise out of any unlawful acts of discrimination by Delphi (or a relevant successor service provider) or in respect of any acts or omissions by Delphi (or a relevant successor service provider) in relation to any such staff who are not dismissed by Delphi (or the successor service provider) no later than one hundred and twenty (120) days after the transfer or the alleged transfer.

(e)     For the purposes of this **Section 8.6**, (i) **"Employment Liabilities"** means all liabilities, compensation, awards, penalties, costs (including legal costs), or other payments connected with or arising from all and any laws, including, without limitation, directives, statutes, secondary legislation, orders, codes of practice and common law, whether of the European Community or the United Kingdom, relating to or connected with the employment of employees or the engagement of other workers, including in each case their health and safety at work but excluding any contractual dismissal indemnities paid in addition to the dismissal indemnities provided for applicable law or any applicable collective bargaining agreement; and (ii) **"Transfer Legislation"** means the Transfer of Undertakings (Protection of Employment) Regulations 2006 or any other law implementing in any jurisdiction the European Council Directive 2001/23/EC on the approximation of laws of European member states relating to the safeguarding of employees' rights in the event of transfers of undertakings, businesses or parts of undertakings or businesses, in each case as amended or replaced from time to time

(f)     With respect to Service Provider Personnel employed in European Union countries in which the EC Acquired Rights Directive is applicable, Service Provider shall not, other than in the ordinary course of business, itself do or allow any of its agents, Affiliate or Subcontractor to, do any of the following without the prior consent of Delphi, such consent shall not be unreasonably withheld:

    (i)     vary or purport or promise to vary the terms or conditions (as amended from time to time) of employment or engagement or services of any such Service Provider Personnel (including promises to make any additional payment or provide any additional benefit);

    (ii)    reduce or vary the involvement of any such Service Provider Personnel in the provision of Services;

    (iii)   terminate (or give notice to terminate) the employment of any such Service Provider Personnel, except for gross misconduct or as a result of a disciplinary procedure such as to make termination permissible at law;

    (iv)    solicit any employee, subcontractor or consultant to provide the Services or assign any additional individuals to the provision of the Services (other than as reasonably required to ensure Supplier's ability to comply with its obligations under this Agreement); or

    (v)     transfer any such Service Provider Personnel away from the provision of the Services;

only where such variation, reduction, termination, recruitment or transfer is instituted  (A) specifically with the intention of disadvantaging Delphi, (B) after any notice of termination or non-renewal of this Agreement (or any portion thereof) or applicable Service, or (C) within six (6) months of the expiration of this Agreement (or any portion thereof) or applicable Service, or is designed to take effect, in whole or part, after any termination or expiration of this Agreement (or any portion thereof) or applicable Service.

(g)     In addition, with respect to Service Provider Personnel employed in European Union countries in which the EC Acquired Rights Directive is applicable, Service Provider shall not, and will not allow any of its agents, Affiliates or Subcontractors to, do anything or make any change that:

-34-

(i)      results in having specific provisions in indefinite term employment contracts with the contract of such Service Provider Personnel that would prevent Delphi from terminating such employment contracts not being terminable within six (6) months of the expiration or termination of this Agreement or applicable Service or the end of the Termination Assistance Services period;

(ii)     relates to the provision of a benefit triggered by termination of employment or termination or non-renewal of this Agreement or any Service; or

(iii)    relates to the provision of a benefit (other than base salary) which such individual will or may have a contractual right to receive after the expiration or termination of this Agreement or applicable Service, other than benefits attaching automatically to a promotion awarded in the ordinary course of business or a discretionary payment made by Service Provider (or the applicable Service Provider Affiliate).

## 8.7    Conduct of Service Provider Personnel.

(a)    **Conduct and Compliance.**  While at Delphi Sites or Delphi Facilities, the Service Provider Personnel shall (i) comply with the Delphi Rules and other rules and regulations regarding personal and professional conduct generally applicable to personnel at such Delphi Sites (and communicated to Service Provider or Service Provider Personnel in writing or by any other means generally used by Delphi to disseminate such information to its employees or contractors), (ii) comply with reasonable requests of Delphi or other Eligible Recipients personnel pertaining to personal and professional conduct, (iii) attend workplace training offered by Delphi and/or the other Eligible Recipients at Delphi's request, and (iv) otherwise conduct themselves in a businesslike and professional manner.

(b)    **Identification of Service Provider Personnel.**  All Service Provider Personnel shall clearly identify themselves as Service Provider Personnel and not as employees of Delphi and/or the other Eligible Recipients.  This shall include any and all communications, whether oral, written or electronic, as appropriate.  Each Service Provider Personnel shall wear a badge indicating that he or she is employed by Service Provider or its Subcontractors when at a Delphi Site or Delphi Facility.  Service Provider Personnel will be required to display a Delphi badge while at a Delphi Facility or Delphi Site, such badge will be clearly marked with the words "Contractor," on the front of the badge in an offsetting color to the badge background, to indicate that the Service Provider Personnel are not an employee of Delphi or another Eligible Recipient.  In addition, Service Provider shall, and shall cause its Affiliates and Subcontractors to, take all reasonable measures to avoid any confusion as to the employment status of their personnel located at any Delphi Facility or Delphi Site, including by placing appropriate placards or legends at a visible location in their workspace indicating employment affiliation, verifying that business cards clearly indicate employment affiliation, and other measures that are or become appropriate from time to time. Delphi may review such measures and Service Provider shall take any reasonable additional measures that Delphi may request for purposes of avoiding confusion as to employment affiliation.

(c)    **Restriction on Marketing Activity.**  Except for marketing representatives designated in writing by Service Provider to Delphi, none of the Service Provider Personnel shall conduct any marketing activities to Delphi or other Eligible Recipient employees at Delphi Facilities or Sites (including marketing of any New Services), other than, subject to **Section 13.3**, reporting potential marketing opportunities to Service Provider's designated marketing representatives.

## 8.8    Substance Abuse.

(a)    **Employee Removal.**  To the extent permitted by applicable Laws, Service Provider shall immediately remove (or cause to be removed) any Service Provider Personnel who is known to be or reasonably suspected of engaging in substance abuse while at Delphi Facility or Site, in a Delphi

-35-

vehicle or while performing Services.    In the case of reasonable suspicion, such removal shall be pending completion of the applicable investigation.    Substance abuse includes the sale, attempted sale, possession or use of illegal drugs, drug paraphernalia, or, to the extent not permitted on at Delphi Facilities or Delphi Sites, alcohol, or the misuse of prescription or non-prescription drugs.

(b)     **Substance Abuse Policy**.    Service Provider represents, warrants and covenants that it has and will maintain substance abuse policies, in each case in conformance with applicable Laws, and Service Provider Personnel will be subject to such policies.    Service Provider represents and warrants that it shall require its Subcontractors and Affiliates providing Services to have and maintain such policy in conformance with applicable Law and to adhere to this provision.

**8.9     Union Agreements**.

Service Provider shall provide Delphi not less than ninety (90) days' notice of the expiration of any collective bargaining agreement with unionized Service Provider Personnel if the expiration of such agreement or any resulting labor dispute could potentially interfere with or disrupt the business or operations of Delphi or another Eligible Recipient or impact Service Provider's ability to timely perform its duties and obligations under this Agreement.

**9.     SERVICE PROVIDER RESPONSIBILITIES**

**9.1     Policy and Procedures Manual**.

(a)     **Delivery and Contents**.    As part of the Services, and at no additional cost, Service Provider shall provide to Delphi and the other Eligible Recipients a manual describing the policies and procedures that will govern the provision of the Services, including the content required by **Schedule 6-B** and those policies and procedures of Delphi and the other Eligible Recipients that Delphi may designate from time to time (the "**Policy and Procedures Manual**").

(b)     **Delivery**.    Service Provider shall deliver the Policy and Procedures Manual to Delphi for its review, comment and approval in accordance with the following deadlines:

(i)     **Initial Outline**.    Service Provider shall deliver a detailed outline of the content to be included in the Policy and Procedures Manual within thirty (30) days after the Effective Date.

(ii)     **Content Required Prior to the Production Date**.    Service Provider shall deliver in the portions of the Policy and Procedures Manual that are required to be completed prior to each Production Date (including content identified as such in **Schedule 6-B**) at least thirty (30) days prior to such Production Date.

(iii)     **Content Required Following the Production Date**.    Service Provider shall deliver the remaining portions of the Policy and Procedures Manual with respect to any Services no later than 120 days after the Production Date for such Services.

(iv)     **Delphi Review and Comments**.    Service Provider shall make any changes requested by Delphi with respect to the Materials delivered pursuant to this **Section 9.1(b)** within fifteen (15) business days after receipt from Delphi, and shall resubmit such Materials for Delphi's further review and approval.

(c)     **Contents**.    At a minimum, the Policy and Procedures Manual shall include the following:

(i)     a detailed description of the Services and the manner in which each will be performed by Service Provider, including (A) the Equipment, Software, and Systems to be procured, operated, supported or used; (B) documentation (including operations manuals, user

-36-

guides, specifications, policies/procedures and disaster recovery plans) providing further details regarding such Services;   (C) the specific activities to be undertaken by Service Provider in connection with each Service, including, where appropriate, the direction, supervision, monitoring, staffing, reporting, planning and oversight activities to be performed by Service Provider under this Agreement; (D) the checkpoint reviews, testing, acceptance, controls and other procedures to be implemented and used to assure service quality; and (E) the processes, methodologies and controls to be implemented and used by Service Provider to ensure compliance with applicable Laws;

(ii)     the procedures for Delphi/Service Provider interaction and communication, including (A) call lists; (B) procedures for and limits on direct communication by Service Provider with Delphi personnel; (C) problem management and escalation procedures; (D) Change Control Procedures; (E) priority and project procedures; (F) Acceptance related procedures (subject to **Section 4.8**); (G) quality assurance procedures and checkpoint reviews; (H) the project formation process and implementation methodology; and (I) annual and quarterly financial objectives, budgets, and performance goals; and

(iii)    practices and procedures addressing such other issues and matters as Delphi shall reasonably request.

Service Provider shall incorporate Delphi's then-current policies and procedures in the Policy and Procedures Manual to the extent it is directed to do so by Delphi.

(d)     **Revision and Maintenance**.   Following approval of the complete Policy and Procedures Manual, Service Provider shall incorporate any additional comments or suggestions of Delphi into the Policy and Procedures Manual and shall deliver a final revised version to Delphi for Delphi's approval within fifteen (15) days after Service Provider's receipt of such comments and suggestions.   The Policy and Procedures Manual will be delivered and maintained by Service Provider in hard copy and electronic formats and will be accessible electronically to Delphi management and Authorized Users in a manner consistent with Delphi's security policies.

(e)     **Compliance**.   Until the Policy and Procedures Manual is finalized and agreed upon by the Parties ,Service Provider shall perform the Services in accordance with (i) GAAP; (ii) the directions of Delphi as to its compliance plan for the Sarbanes-Oxley Act of 2002 (including as provided in **Section 9.4**) and in a manner such that a SAS 70 Type II letter, surrounding the internal controls of Service Provider, in accordance with GAAS, could be rendered;(iii) any and all applicable Laws and (iv) Delphi's then-current policies and procedures.   Thereafter, Service Provider shall perform the Services in accordance with the Policy and Procedures Manual.   In the event of a conflict between the provisions of this Agreement and the Policy and Procedures Manual, the provisions of this Agreement shall control unless the Parties expressly agree otherwise and such agreement is set forth in the relevant portion of the Policy and Procedures Manual.

(f)     **Modification and Updating**.   Service Provider shall promptly modify and update the Policy and Procedures Manual monthly to reflect changes in the operations or procedures described therein and to comply with Delphi Standards and the Strategic Plans.   Service Provider shall provide the proposed changes in the manual to Delphi for review, comment and approval.   To the extent such change could (i) increase Delphi's total costs of receiving the Services, (ii) require changes to the facilities, systems, software or equipment of Delphi and/or the Eligible Recipients, (iii) have an adverse impact on the functionality, interoperability, performance, accuracy, speed, responsiveness, quality or resource efficiency of the Services, or (iv) violate or be inconsistent with the Delphi Standards or the Strategic Plans, Service Provider shall not implement such change without first obtaining Delphi's approval, which Delphi may withhold in its sole discretion.

(g)     **Annual Review**.   The Parties shall meet to perform a formal annual review of the Policy and Procedures Manual on each anniversary of the Effective Date (or such other date as may be agreed

to by the Parties)..

**9.2**    **Reports**.

(a)    **Reports**.    Service Provider shall provide Delphi with the reports pertaining to the performance of the Services and Service Provider's other obligations under this Agreement sufficient to permit Delphi to monitor and manage Service Provider's performance ("**Reports**").    The Reports to be provided by Service Provider shall include those described in **Schedule 13** in the format and at the frequencies provided therein, as well as those provided by Delphi prior to the Production Date for the related Services.    In addition, from time to time, Delphi may identify additional Reports to be generated by Service Provider and delivered to Delphi on an *ad hoc* or periodic basis.    The Reports described in **Schedule 13** and, to the extent reasonably possible, all other Reports shall be provided to Delphi by secure on-line connection in an electronic format capable of being accessed by Microsoft Office components and downloadable by Delphi, with the information contained therein capable of being displayed graphically and accessible from a web browser and traditional printed form.

(b)    **Back-Up Documentation**.    As part of the Services, Service Provider shall provide Delphi with such documentation and other information available to Service Provider as may be reasonably requested by Delphi from time to time in order to verify the accuracy of the Reports provided by Service Provider.    In addition, Service Provider shall provide Delphi with all documentation and other information reasonably requested by Delphi from time to time to verify that Service Provider's performance of the Services is in compliance with the Service Levels and this Agreement.

(c)    **Correction of Errors**.    As part of the Services and at no additional charge to Delphi, Service Provider shall promptly correct any errors or inaccuracies in or with respect to the Reports, the information or data contained in such Reports, or other contract deliverables provided by Service Provider or its agents, Subcontractors, Managed Third Parties or third party product or service providers.

(d)    **Budget Reports**.    Within ninety (90) days after the Effective Date and annually or as requested thereafter, Service Provider shall provide information requested by Delphi so that Delphi can develop its annual and quarterly financial objectives and budgets and performance goals.    Such Report shall be subject to review and approval by Delphi before incorporation into Service Provider's working plans.

**9.3**    **Governance; Meetings**.

(a)    **Governance Model**.    The Parties shall manage their relationship under this Agreement using the governance model in **Schedule 6**.

(b)    **Meetings**.    During the Term, representatives of the Parties shall meet periodically or as requested by Delphi to discuss matters arising under this Agreement, including any such meetings provided for under the Transition Plan, the Policy and Procedures Manual or **Schedule 6**.    Each Party shall bear its own costs in connection with the attendance and participation of such Party's representatives in such meetings.

(c)    **Agenda and Minutes**.    For each such meeting, upon Delphi request, Service Provider shall prepare and distribute an agenda, which will incorporate the topics designated by Delphi.    Service Provider shall distribute such agenda in advance of each meeting so that the meeting participants may prepare for the meeting.    In addition, upon Delphi request, Service Provider shall record and promptly distribute minutes for every meeting for review and approval by Delphi.

(d)    **Authorized User and Eligible Recipient Meetings**.    Service Provider shall notify the Delphi

-38-

Contract Executive in advance of scheduled meetings with Authorized Users or Eligible Recipients (other than meetings pertaining to the provision of specific Services on a day-to-day basis) and shall invite the Delphi Contract Executive to attend such meetings or to designate a representative to do so.

**9.4    Quality Assurance and Internal Controls.**

(a)    **General**.  At no cost to Delphi, Service Provider shall develop and implement Quality Assurance and internal control (including financial and accounting controls, organizational controls, input/output controls, system modification controls, processing controls, system design controls, and access controls) processes and procedures, including implementing tools and methodologies, to perform the Services in an accurate and timely manner, in accordance with (A) the Service Levels and other requirements of this Agreement, (B) GAAP (applied in accordance with GAAS such that a SAS 70 Type II letter could be issued relative to the operations in the delivery of the Services by Service Provider in relation to testing for the control environment),    (C) the interpretation provided by Delphi in relation to its compliance with the Sarbanes-Oxley Act of 2002, and (E) industry standards (e.g., QS 9000, ISO 9001/2000, ISO 14000, ISO 17799 and BS 7799) applicable to Delphi and the Eligible Recipients and the performance of the Services.    Such processes, procedures and controls shall include verification, checkpoint reviews, testing, and acceptance relative to the quality and timeliness of Service Provider's performance.    Without limiting the generality of the foregoing, Service Provider shall at no cost to Delphi:

(i)    Maintain a strong control environment in day-to-day operations, to meet the following fundamental control objectives: (1) financial and operational information is valid, complete and accurate; (2) operations are performed efficiently and achieve effective results, consistent with the requirements of this Agreement; (3) assets are safeguarded; and (4) actions and decisions of the organization are in compliance with Laws;

(ii)    Build the following basic control activities into work processes: (1) accountability clearly defined and understood; (2) access properly controlled; (3) adequate supervision; (4) transactions properly authorized; (5) transactions properly recorded; (6) transactions recorded in proper accounting period; (7) policies, procedures; and responsibilities documented; (8) adequate training and education; (9) adequate separation of duties; and (10) recorded assets compared with existing assets;

(iii)    Develop and execute a process to ensure periodic control self-assessments are performed with respect to all Services (such self-assessments to be performed at least annually unless and until Delphi approves less frequent self-assessments);

(iv)    Maintain an internal audit function to sufficiently monitor the processes and Systems used to provide the Services (i.e., perform audits, track control measures, communicate status to management, drive corrective action, etc.).    As part of such internal audit function, Service Provider shall:

(1)    Develop and execute an annual risk assessment process to evaluate risk in the Services.  This assessment shall become the basis to create an annual risk-based audit plan of Services.  The plan shall be provided to Delphi for its review and approval in sufficient time to permit Delphi to comply with its obligations and requirements;

(2)    Promptly provide audit reports resulting from subsequent audit activity to Delphi, and make related work papers available to Delphi upon request;

(3)    Adopt a qualitative methodology (e.g., high, medium, low effectiveness) of reporting the level of controls and internal audit results; and

-39-

(4) Provide to Delphi a summary of planned audit activity, audit activity performed, associated significant findings, and status of follow-up activity, and a summary of control incidents (e.g., frauds, conflict of interest situations, etc.) and related corrective action, at least quarterly;

(v) Conduct investigations of suspected fraudulent activities within Service Provider's organization that impact or could impact Delphi or the other Eligible Recipients. Service Provider shall promptly notify Delphi of any such suspected fraudulent activity and the results of any such investigation as they relate to Delphi or the other Eligible Recipients. At Service Provider's request, Delphi shall provide reasonable assistance to Service Provider in connection with any such investigation;

(vi) Comply with all applicable requirements and guidelines established by Delphi in order to assist Delphi to meet the requirements of the Sarbanes-Oxley Act of 2002 and implementing regulations promulgated by the United States Securities and Exchange Commission and Public Company Accounting Oversight Board, as further described in **Schedule 17-D**, and similar Laws in other jurisdictions;

(vii) Recommend and, with Delphi's prior approval, implement compliance measures to satisfy Sarbanes-Oxley requirements, and similar requirements in other jurisdictions, including, certification as to internal controls as requested by Delphi.

(b) **Approval by Delphi**. Service Provider shall submit such processes, procedures and controls to Delphi for its review, comment and approval within thirty (30) days after the Effective Date and shall use commercially reasonable efforts to finalize such processes, procedures, and controls and obtain Delphi's final approval on or before the applicable Production Date. Upon Delphi's approval, such processes and procedures shall be included in the Policy and Procedures Manual. Prior to the approval of such processes and procedures by Delphi, Service Provider shall adhere strictly to Delphi's then current policies, procedures, and controls. No failure or inability of the quality assurance procedures to disclose any errors or problems with the Services shall excuse Service Provider's failure to comply with the Service Levels and other terms of this Agreement.

**9.5    Processes, Procedures, Architecture, Standards and Planning**.

(a) **Service Provider Support**. As requested by Delphi, Service Provider shall assist Delphi on an on-going basis in defining (i) standards, policies, practices, processes, procedures, interfaces, protocols, controls and other standards to be adhered to and enforced by Service Provider in the performance of the Services (collectively, the "**Delphi Standards**"), (ii) Strategic Plans and (iii) short-term implementation plans. If so requested, the assistance to be provided by Service Provider shall include: (A) active participation with Delphi representatives on permanent and ad-hoc committees and working groups addressing such issues; (B) assessments of the then-current Delphi Standards at a level of detail sufficient to permit Delphi to make informed business decisions; (C) analyses of the appropriate direction for such Delphi Standards in light of business priorities, business strategies, competitive market forces, and changes in technology, Laws and industry practices; (D) recommendations regarding standards, processes, procedures and controls and associated technology architectures, standards, products and systems; and (E) the provision of current, historical, and forecasted system capacity, performance, and utilization metrics at reasonable requested levels of detail. With respect to each recommendation, Service Provider shall provide the following at a level of detail sufficient to permit Delphi to make an informed business decision: (1) the projected cost to Delphi and the Eligible Recipients and cost/benefit analyses; (2) the changes, if any, in the personnel and other resources Service Provider, Delphi and/or the Eligible Recipients will require to operate and support the changed standards; (3) the resulting impact on the total costs of Delphi and the Eligible Recipients; (4) the expected performance, quality, responsiveness, efficiency, reliability, security risks and other service levels; and (5) general plans and projected time schedules for development and implementation.

-40-

(b)    **Service Provider Familiarity with Delphi Standards**.  Service Provider acknowledges that Service Provider will be fully informed as to the Delphi Standards as of the applicable Production Date, both through due diligence and information from, and interaction with, Delphi.  Service Provider shall be responsible for documenting the Delphi Standards in the applicable Policy and Procedures Manual in accordance with <u>**Section 9.1**</u>.  Additions, deletions or modifications to the Delphi Standards shall be communicated in writing by Delphi to Service Provider.

(c)    **Delphi Authority and Service Provider Compliance**.  Delphi shall have final authority to promulgate Delphi Standards and Strategic Plans and to modify or grant waivers from such Delphi Standards and Strategic Plans; provided that if any new or modified Delphi Standard constitutes a New Service, the Parties shall mutually agree upon the treatment of additional costs to Service Provider, if any, to implement such additional or modified Delphi Standard in accordance with <u>**Section 11.5**</u>.  Service Provider shall (i) comply with and implement the Delphi Standards and Strategic Plans in providing the Services, (ii) work with Delphi to enforce the Delphi Standards and Strategic Plans, (iii) modify the Services as and to the extent necessary and on a schedule to conform to such Delphi Standards and Strategic Plans, and (iv) obtain Delphi's prior written approval for any deviations from such Delphi Standards and Strategic Plans.

(d)    **Financial, Forecasting and Budgeting Support**.  To support Delphi's forecasting and budgeting processes, Service Provider shall to the extent requested by Delphi provide Delphi the information regarding the costs to be incurred by Delphi and/or the other Eligible Recipients in connection with the Services and the cost/benefit to Delphi and/or the other Eligible Recipients associated therewith, including:  (i) actual and forecasted utilization of Resource Units; (ii) actual and forecasted changes in the total cost or utilization of resources of the Eligible Recipients associated with changes to the environment; (iii) opportunities to modify or improve the Services, to reduce the Charges, Pass-Through Expenses, taxes, or retained expenses incurred by Delphi or any other Eligible Recipients; and (iv) estimated taxes for which Delphi is responsible in relation to the Services.  Such information shall be provided at Delphi's request and in accordance with the schedule established by Delphi.

**9.6    Change Control**.

(a)    **Compliance with Change Control Procedures**.  In making any change in the information technology and other standards, processes, procedures and controls or associated technologies, architectures, standards, products, Software, Equipment, Systems, Services, or Materials provided, operated, managed, supported or used in connection with the Services (a "**Change**"), Service Provider shall comply with the change control procedures specified in the Policy and Procedures Manual ("**Change Control Procedures**").  The Policy and Procedures Manual shall contain a procedure that allows Delphi to exercise the approval rights in this Section and complies with the following requirements:

(i)    **Impact Assessment**.  If Service Provider desires to make any Change that may have an adverse impact or require changes as described in <u>**Section 9.6(c)**</u> or increase the risk of Service Provider not being able to provide the Services in accordance with this Agreement or violate or be inconsistent with Delphi Standards or Strategic Plans, then Service Provider shall at no cost to Delphi prepare a written risk assessment and mitigation plan: (1) describing in detail the nature and extent of such adverse impact or risk; (2) describing any benefits, savings or risks to Delphi or the Eligible Recipients associated with such Change; and (3) proposing strategies to mitigate any adverse risks or impacts associated with such change and, after consultation and agreement with Delphi, implement the plan.

(ii)    **Comparison Testing**.  Each time that Service Provider makes a material Change, shall perform a comparison test at a reasonable and mutually agreed level of detail to ensure the Change will not have an adverse impact on the costs, business, or environment of

Delphi or an Eligible Recipient or on the functionality interoperability, performance, accuracy, speed, legality, responsiveness, quality or resource efficiency of, the Services. In addition, at Delphi's request for any Change, Service Provider shall perform a comparison at a reasonable and mutually agreed level of detail, between the number of FTEs required to perform a representative sample of the Services being performed for Delphi and the Eligible Recipients immediately prior to the Change and immediately after the Change. Delphi shall not be required to pay for increased FTEs due to a Change except to the extent that such Change is requested or approved by Delphi after notice from Service Provider of such increased FTEs.

(iii) **Testing.** Prior to making any Change, (A) Service Provider shall verify by appropriate testing that the Change or item is properly implemented, operating in accordance with its specifications, performing its intended functions in a reliable manner and compatible with and capable of operating as part of the Delphi environment, and (B) to the extent that any interfaces need to be developed or modified in order for such Change to integrate successfully, and be compatible, with the Delphi environment, Service Provider shall develop or modify such interfaces as part of the Services subject to the Change Control Procedures.

(b) **Financial Responsibility For Changes.** Without limiting Delphi's right of approval under **Section 9.6(c)**, unless otherwise set forth in this Agreement or otherwise expressly approved by Delphi, Service Provider shall bear all charges, fees and costs associated with any change desired by Service Provider, including all charges, fees and costs associated with (i) the design, implementation, testing and rollout of such Change, (ii) any modification or enhancement to, or substitution for, any impacted process or associated Software, Equipment, System, Services or Materials, (iii) any increase in the cost to Delphi or the other Eligible Recipients of operating, maintaining or supporting any impacted process or associated Software, Equipment, System, Services or Materials, and (iv) subject to **Section 9.6(h)**, any increase in Resource Unit usage resulting from such Change.

(c) **Delphi Approval – Cost; Adverse Impact.** Service Provider shall make no Change which may: (i) increase Delphi's total cost of receiving the Services; (ii) require material changes to, or have an adverse impact on, Delphi's or another Eligible Recipient's business, operations, facilities, processes, systems, software, utilities, tools or equipment (including those provided, managed, operated, supported and/or used on their behalf by Delphi Third Party Contractors); (iii) require Delphi, the other Eligible Recipients or Service Provider to install a new version, release, upgrade of, or replacement for, any Software or Equipment or to modify any Software or Equipment; (iv) have an adverse impact on the security, functionality, interoperability, performance, accuracy, speed, responsiveness, quality or resource efficiency of the Services; (v) have an adverse impact on any Applications run by Delphi or the other Eligible Recipients, (vi) have an adverse impact on Service Provider's ability to adequately deliver the Services, (vii) have an adverse impact on the cost, either actual or planned, to Delphi of terminating all or any part of the Services or exercising its right under this Agreement to in-source or use third parties; (viii) have an adverse impact on Delphi's or another Eligible Recipient's environment (including its flexibility to deal with future changes, interoperability and its stability), (ix) introduce new technology to (A) Delphi's or an Eligible Recipient's environment or business or (B) Service Provider's environment, to the extent that such introduction has or may have an impact on Delphi's or another Eligible Recipient's environment; (x) have an adverse impact on the functionality, interoperability, performance, accuracy, speed, responsiveness, quality, cost or resource efficiency of Delphi's Retained Systems and Processes or (xi) violate or be inconsistent with Delphi Standards or Strategic Plans as specified in **Section 9.5**, without first obtaining Delphi's approval, which approval Delphi may withhold in its sole discretion. If Service Provider desires to make such a Change, it shall provide to Delphi a written proposal describing in detail the extent to which the desired change may affect the functionality, performance, price or resource efficiency of the Services and any benefits, savings or risks to Delphi or the other Eligible Recipients associated with such Change.

-42-

(d)     **Delphi Legal and Regulatory Approval.** Without first obtaining the approval of Delphi in accordance with the approval procedures specified by Delphi, Service Provider shall not, and shall not permit any Service Provider Personnel to:   (i) use Open Source Code/Shareware in performing the Services or incorporate Open Source Code/Shareware into any Software or other Materials, Equipment, System, or deliverable, or (ii) implement or use in performing the Services an IVR or VRU solution having one or more of the following characteristics:   (1) the entry by callers of distinct customer verification data that is compared to information stored in a database to determine if the caller is qualified to continue using the system; (2) the IVR system provides the caller with computer generated confirmation numbers; (3) the use by callers of temporary PINs with the ability to change the PIN; or (4) the generation of automatic screen pops at the operator terminal based on caller-specific information entered by the caller.

(e)     **Information for Exercise of Strategic Authority.**   In order to facilitate Delphi's strategic control pursuant to **Section 9.5**, Service Provider shall provide Delphi with such information as Delphi shall reasonably require prior to making any proposed Change.   Such information shall include, at a minimum, a description of the proposed rights of Delphi and the other Eligible Recipients with respect to ownership and licensing (including any related restrictions) relating to the applicable Software, Equipment or other technology or Materials.   Such description shall include the license fees, maintenance fees and/or purchase or lease terms (if any) for use of such Software, Equipment or other technology or Materials by Delphi, the other Eligible Recipients and their respective third party contractors upon termination or expiration of the Term and any limitations or conditions on such use.

(f)     **Temporary Emergency Changes.**   Notwithstanding the foregoing, Service Provider may make temporary Changes required by an emergency if it has been unable to contact the Delphi Contract Executive or his or her designee to obtain approval after making reasonable efforts.   Service Provider shall document and report such emergency Changes to Delphi not later than the next business day after the Change is made.   Such Changes shall not be implemented on a permanent basis unless and until approved by Delphi.

(g)     **Implementation of Changes.**   Service Provider shall schedule and implement all Changes to the extent possible so as not to (i) disrupt or adversely impact the business or operations of Delphi or the Eligible Recipients, (ii) degrade the Services then being received by them, or (iii) interfere with their ability to obtain the full benefit of the Services.

(h)     **Planning and Tracking.**   On a monthly basis, Service Provider shall prepare a rolling quarterly "look ahead" schedule for ongoing and planned Changes for the next three (3) months.   The status of Changes will be monitored and tracked by Service Provider against the applicable schedule.

**9.7     Access to Specialized Service Provider Skills and Resources; Disagreements Regarding New Services.**

(a)     **Specialized Services.**   Upon Delphi's request, Service Provider shall provide Delphi and the Eligible Recipients with prompt access to Service Provider's specialized services, personnel and resources pertaining to information technology or other standards, processes and procedures and associated software, equipment and systems on an expedited basis taking into account the relevant circumstances (the "**Specialized Services**").   The Parties acknowledge that the provision of such Specialized Services may, in some cases, constitute New Services.

(b)     **Disagreements Regarding New Services.**   If Delphi authorizes Service Provider to proceed but the Parties disagree as to whether the authorized work constitutes New Services, Service Provider shall proceed with such work and the disagreement shall be submitted to dispute resolution pursuant to **Article 19**.

**REDACTED**

-43-

REDACTED

**REDACTED**

**REDACTED**

**REDACTED**

9.9    **Agency and Disbursements**.

(a)    **Disbursements**.  Beginning on the applicable Production Date, Service Provider shall make payments to certain lessors, licensors and vendors as paying agent of Delphi or the Eligible Recipients, or shall reimburse Delphi for payments made by Delphi or the Eligible Recipients to such lessors, licensors and vendors, if and to the extent such payments relate to Third Party Contracts, Equipment Leases or Third Party Software licenses as to which Service Provider is financially responsible, but which have not been formally transferred to Service Provider.

(b)    **Limited Agency**.  Delphi hereby appoints Service Provider as its limited agent during the Term solely for the purposes of and to the extent required for the administration of and payment of Pass-Through Expenses and amounts under Managed Third Party agreements.  Delphi shall provide, on a timely basis, such affirmation of Service Provider's authority to such lessors, licensors, suppliers, and other third parties as Service Provider may reasonably request.

(c)    **Reimbursement for Substitute Payment**.  If either Party in error pays to a third party an amount for which the other Party is responsible under this Agreement, the Party that is responsible for such payment shall promptly reimburse the paying Party for such amount.

(d)    **Notice of Decommissioning**.  Service Provider will notify Delphi promptly if and to the extent any Delphi or other Eligible Recipient owned Equipment or Delphi or other Eligible Recipient leased Equipment will no longer be used to provide the Services.  The notification will include the identification of the Equipment, and the date it will no longer be needed by Service Provider, along with the reason for decommissioning.  Upon receipt of any such notice, Delphi may (or may cause the applicable Eligible Recipient to), in its sole discretion, terminate the Equipment Lease for such

-47-

leased Equipment as of the date specified in such notice and sell or otherwise dispose of or redeploy such Delphi or other Eligible Recipient owned Equipment that is the subject of such a notice as of the date specified in such notice. Upon Service Provider ceasing to use any Equipment (or, in the case of leased Equipment, upon the last day Delphi or any other Eligible Recipient is obligated to make such leased Equipment available to Service Provider, if earlier), Service Provider shall return the same to Delphi, the other Eligible Recipients and/or their designee(s) in condition at least as good as the condition thereof on the date Service Provider took possession or control thereof, ordinary wear and tear excepted. Service Provider shall, at Service Provider's expense, deliver such Equipment to the location designated by Delphi, the other Eligible Recipients and/or their designee(s).

**9.10     Subcontractors.**

(a)     **Use of Subcontractors.** Prior to entering into a subcontract with a third party (that does not qualify as a Shared Subcontractor in accordance with **Section 9.10(c)**) for any portion of the Services, Service Provider shall (i) at Delphi's request, deliver to Delphi a copy of the proposed subcontract (other than any details in relation to pricing or information in relation to use of such Subcontractors for other customers of Service Provider), or (in Delphi's reasonable discretion) a detailed description of the scope and material terms (other than pricing terms) of the proposed subcontract, (ii) give Delphi reasonable prior notice of the subcontract, specifying the components of the Services affected, the scope of the proposed subcontract, the identity and qualifications of the proposed Subcontractor, and the reasons for subcontracting the work in question, the location of the Subcontractor facilities from which the Services will be provided, the extent to which the subcontract will be dedicated, and the Subcontractor's willingness to grant the rights described in **Section 6.4(c)** upon expiration or termination, and (iii) obtain Delphi's prior written approval of such Subcontractor, which may be withheld in Delphi's sole discretion.

(b)     **Right to Revoke Approval.** Delphi shall also have the right during the Term to revoke its prior approval of a Subcontractor and direct Service Provider to replace such Subcontractor as soon as possible at no additional cost to Delphi, if the Subcontractor's performance is materially deficient or if there are other reasonable grounds for removal. Service Provider shall have a reasonable opportunity to investigate Delphi's concerns, correct the Subcontractor's deficient performance and provide Delphi with a written action plan to assure that such deficient performance will not recur. If Delphi is not reasonably satisfied with Service Provider's efforts to correct the Subcontractor's deficient performance and/or to ensure its non-recurrence, Service Provider shall, as soon as possible, remove and replace such Subcontractor. Service Provider shall continue to perform its obligations under this Agreement, notwithstanding the removal of the Subcontractor. Delphi shall not be responsible for any termination charges or cancellation fees that Service Provider may be obligated to pay to a Subcontractor as a result of the removal of such Subcontractor at Delphi's request or the withdrawal or cancellation of the Services then performed by such Subcontractor as permitted under this Agreement.

(c)     **Shared Subcontractors.** Service Provider may, in the ordinary course of business, enter into subcontracts with a total estimated annual value of less than $250,000 (i) for third party services or products that are not a material portion of the Services, that are not exclusively dedicated to Delphi and that do not include regular direct contact with Delphi or Eligible Recipient personnel or the performance of services at Delphi Sites, or (ii) with temporary personnel firms for the provision of temporary contract labor (collectively, "**Shared Subcontractors**"), provided that such Shared Subcontractors possess the training and experience, competence and skill to perform the work in a skilled and professional manner. Service Provider shall not be required to obtain Delphi's prior approval of Shared Subcontractors. If, however, Delphi expresses dissatisfaction with the services or products of a Shared Subcontractor, Service Provider shall work in good faith to resolve Delphi's concerns on a mutually acceptable basis and, at Delphi request, replace such Shared Subcontractor at no additional cost to Delphi.

(d)     **Service Provider Responsibility.** Unless otherwise expressly approved by Delphi, the terms of

-48-

any subcontract must be consistent with this Agreement, including: (i) confidentiality and intellectual property obligations; (ii) Delphi's approval rights (which must apply directly to the Subcontractor); (iii) compliance with Delphi Standards, Strategic Plans and applicable Laws; (iv) compliance with Delphi's policies and directions; (v) audit rights as described in **Section 9.8**; (vi) Key Service Provider Personnel where a Subcontractor employee is one of the Key Service Provider Personnel; and (vii) insurance coverage, as described in **Section 16.1(a)**, but with coverage limits and types of coverage consistent with the scope of the work to be performed by such Subcontractor. Service Provider shall use a common methodology and tool set to ensure all of the Subcontractors are managed effectively and efficiently.   Notwithstanding the terms of the applicable subcontract, the approval of such Subcontractor by Delphi or the availability or unavailability of Subcontractor insurance, Service Provider shall be and remain responsible and liable for the proper performance, in accordance with this Agreement, of all Projects, New Services and other Services, even if performed by Service Provider Affiliates, Subcontractors or other Service Provider Personnel.   Service Provider shall be responsible for any failure by any Subcontractor, or Subcontractor personnel, to perform in accordance with this Agreement or to comply with any duties or obligations imposed on Service Provider under this Agreement to the same extent as if such failure to perform or comply was committed by Service Provider or Service Provider employees.   Service Provider shall be responsible for the performance of all such Subcontractors and Subcontractor personnel providing any of the Services hereunder.   Service Provider shall be Delphi's sole point of contact regarding the Services, including with respect to payment, _provided_ that the foregoing will not prohibit Delphi from communicating directly with any Subcontractors.   The Parties will endeavor to manage communications with Subcontractors through governance process described in **Schedule 6**.

(e)     **Service Provider Subsidiaries.**   The Service Provider shall perform its obligations under this Agreement solely through (i) subcontractors approved by Delphi pursuant to this **Section 9.10**, (ii) Shared Subcontractors and (iii) direct or indirect subsidiaries of Service Provider.   It is clarified that nothing contained in this **Section 9.10** shall be applicable to any subcontract between Service Provider and a subsidiary (directly or indirectly) of Service Provider, provided Service Provider shall inform Delphi from time to time of the identity of such subsidiaries.

**REDACTED**

-49-

REDACTED

9.12    **Retained Systems and Processes.**

    (a)    **No Adverse Effect**.   Service Provider shall not, by any act or omission, (i) adversely affect or alter the functionality, interoperability, performance, accuracy, speed, responsiveness, quality, cost or resource efficiency of Retained Systems and Processes without the prior consent of Delphi, or (ii) require changes to Retained Systems and Processes, including associated processes, applications, systems, software, utilities, tools or equipment, without the prior consent of Delphi.

    (b)    **Assistance**.   As part of the Services, Service Provider shall provide Delphi (upon Delphi's request) with Services in relation to Retained Systems and Processes, including:   (i) liaising with Delphi or third parties regarding the impact of any alterations to the Retained Systems and Processes and vice versa; and (ii) identifying favorable vendors, and acting as Delphi's agent, in relation to the acquisition, support and development of Retained Systems and Processes.

9.13    **Annual Reviews**.

Annually, or more frequently if Delphi requires, the Parties shall conduct a detailed review of the Services then-being performed by Service Provider.   As part of this review, the Parties shall perform the activities described in **Section 6(d)(i)** of **Schedule 4**.   In addition, the Parties shall examine:   (i) whether the Charges are consistent with Delphi's forecasts and the actual service volumes, industry norms and Service Provider's representations; (ii) the quality of the performance and delivery of the Services; (iii) whether Service Provider has delivered cost saving or efficiency enhancing proposals; (iv) the level and currency of the technologies and processes employed; (v) the business and technology strategy and direction; and (vi) such other things as Delphi may require.

9.14    **Reserved**.

10.    **DELPHI RESPONSIBILITIES**

10.1    **Responsibilities**.

In addition to Delphi's responsibilities as expressly set forth elsewhere in this Agreement, Delphi shall be responsible for the following:

(a)  **Delphi Contract Executive**.  Delphi shall designate one (1) individual to whom all Service Provider communications concerning this Agreement may be addressed (the **"Delphi Contract Executive"**), who shall have the authority to act on behalf of Delphi and the other Eligible Recipients in all day-to-day matters pertaining to this Agreement, including the administration of this Agreement and the individual Companion Agreements on a day-to-day basis on behalf of Delphi and the other Eligible Recipients (including decisions, consents, notices, acceptances and approvals) and only the Delphi Contract Executive (and his or her designees(s)) shall be authorized to act on behalf of Delphi and the other Eligible Recipients or to amend, modify, change, waive or discharge their rights and obligations under this Agreement or such Companion Agreements. Delphi may change the designated Delphi Contract Executive from time to time by providing notice to Service Provider.  Additionally, Delphi will have the option, but will not be obligated, to designate additional representatives who will be authorized to make certain decisions (e.g., regarding emergency maintenance) if the Delphi Contract Executive is not available.

(b)  **Cooperation**.  Delphi shall cooperate with Service Provider by, among other things, making available, as reasonably requested by Service Provider, management decisions, information, approvals and acceptances so that Service Provider may accomplish its obligations and responsibilities hereunder.

(c)  **Requirement of Writing**.  To the extent Service Provider is required under this Agreement to obtain Delphi's approval, consent or agreement, such approval, consent or agreement must be in writing and must be signed by or directly transmitted by electronic mail from the Delphi Contract Executive or an authorized Delphi representative.  Notwithstanding the preceding sentence, the Delphi Contract Executive may agree in advance in writing that as to certain specific matters oral approval, consent or agreement will be sufficient.

**10.2**    **Savings Clause**.

(a)  **Requirements**.  Service Provider's failure to perform its responsibilities under this Agreement or to meet the Service Levels shall be excused if and to the extent such Service Provider non-performance is directly caused by (i) the wrongful or tortious actions of Delphi, another Eligible Recipient or a Delphi Third Party Contractor performing obligations on behalf of Delphi under this Agreement (unless and to the extent, Service Provider has operational or management responsibility with respect to such Delphi Third Party Contractor), or (ii) the failure of Delphi or another Eligible Recipient to perform (either directly or through a third party engaged by Delphi or another Eligible Recipient to do so) Delphi's expressly specified obligations under this Agreement (which are reflected as affirmative obligations), but only if Service Provider, upon actual or constructive knowledge of such an occurrence, expeditiously:

    (i)  notifies Delphi of such wrongful or tortious action or failure to perform and its inability to perform under such circumstances;

    (ii)  provides Delphi with reasonable opportunity to correct such wrongful or tortious action or failure to perform and thereby avoid such Service Provider non-performance;

    (iii)  identifies and pursues all commercially reasonable means to avoid or mitigate the impact of such wrongful or tortious action or failure to perform;

    (iv)  uses commercially reasonable efforts to perform notwithstanding such wrongful or tortious action or failure to perform; and

    (v)  conducts a Root Cause Analysis at no cost to Delphi and thereby demonstrates that such wrongful or tortious action or failure to perform is the cause of Service Provider's non-performance (*it being understood*, that the time required to complete such Root Cause

-51-

Analysis shall not delay or extend any excuse of nonperformance to which Service Provider is entitled pursuant to this **Section 10.2**).

(b)    **No Other Circumstances**.   Service Provider acknowledges and agrees that the circumstances described in this **Section 10.2**, together with force majeure, are the only circumstances in which its failure to perform its responsibilities under this Agreement or to meet the Service Levels will be excused and that Service Provider will not assert any other act or omission of Delphi or the other Eligible Recipients as excusing any such failure on Service Provider's part.

(c)    **Authorized User Actions**.   For the avoidance of doubt with respect to **clause (ii)** of **Section 10.2(a)**, Service Provider will not be excused of any of its responsibilities, including its failure to meet any Service Levels, with respect to an operational area due an Authorized User's negligent actions in such operational area, except to the extent Delphi has failed to perform an expressly specified obligation on which Service Provider's performance was dependent.

## 11.   CHARGES

### 11.1   General.

(a)    **Payment of Charges**.   In consideration of Service Provider's performance of the Services, Delphi agrees to pay Service Provider the applicable Charges that are set forth in **Schedule 4** beginning as of the applicable Production Date.   Service Provider shall continually seek to identify methods of reducing such Charges and will notify Delphi of such methods and the estimated potential savings associated with each such method.

(b)    **No Additional Charges**.   Delphi shall not pay any Charges for the Services other than those set forth in this Agreement.   Any costs incurred by Service Provider prior to the Effective Date are included in the Charges as set forth in **Schedule 4** and are not to be separately paid or reimbursed by Delphi.

(c)    **Incidental Expenses**.   Service Provider acknowledges that, except as expressly provided otherwise in this Agreement, expenses that Service Provider incurs in performing the Services are included in Service Provider's charges and rates set forth in this Agreement.   Accordingly, such Service Provider expenses are not separately reimbursable by Delphi unless Delphi, in its sole discretion, has agreed in advance and in writing to reimburse Service Provider for the expense, and those expenses comply with Service Provider's then-current expense policy, provided that (i) Service Provider shall work with Delphi to ensure that such expenses are minimized to the extent possible and (ii) Service Provider shall submit expense reports as part of its invoices presented to Delphi.   Service Provider's expense policy as of the Effective Date is set forth in **Schedule 4-F**.

(d)    **No Charge for Reperformance**.   At no additional expense to Delphi, Service Provider shall reperform (including any required backup or restoration of data from scheduled backups or, if not available on such backups, restoration by other means with Delphi's reasonable cooperation) any Services that result in incorrect outputs due to an error or breach by Service Provider, and the resources required for such performance shall not be counted in calculating the Charges payable or resources utilized by Delphi hereunder.

(e)    **Charges for Contract Changes**.   Unless otherwise agreed, changes in the Services (including changes in Delphi Standards, Strategic Plans, processes, Software, Equipment and Systems) and changes in the rights or obligations of the Parties under this Agreement (collectively, "**Contract Changes**") shall result in changes in the applicable Charges only if and to the extent:   (i) this Agreement expressly provides for a change in the Charges in such circumstances; (ii) the agreed upon Charges or pricing methodology in **Schedule 4** expressly provides for a price change in such circumstances (for example, **Schedule 4** specifies an Hourly Rate that is applicable to a Service); or

-52-

(iii) the Contract Change meets the definition of New Services for purposes of **Section 11.5** and additional Charges are applicable in accordance therewith.

(f)     **Eligible Recipient Services.**

    (i)     **Eligible Recipients**.   Service Provider shall provide the Services to Eligible Recipients designated by Delphi.   To the extent a designated Eligible Recipient will receive less than all of the Services, Delphi shall identify the categories of Services to be provided by Service Provider to such Eligible Recipient.

    (ii)     **New Eligible Recipients**.   From time to time Delphi may request that Service Provider provide Services to Eligible Recipients not previously receiving such Services.   Except as provided in **Section 11.5** or otherwise agreed by the Parties, such Services shall be performed in accordance with the terms, conditions and prices (excluding any non-recurring transition or start-up activities specific to such Eligible Recipients) then-applicable to the provisions of the same Services to existing Eligible Recipients.

    (iii)     **Election Procedure**.   In the event of a transaction described in **clause (c)** or **(d)** within the definition of Eligible Recipient in **Schedule 1**, Delphi may elect, on behalf of the Eligible Recipient in question, that either (i) such Eligible Recipient shall continue to obtain Services in some or all of the Services or Towers subject to and in accordance with the terms and conditions of this Agreement for the remainder of the Term, (ii) such Entity shall obtain some or all of the Services under a separate agreement between Service Provider and such Entity containing the same terms and conditions as this Agreement (and, at Delphi's direction, Service Provider will enter into such a separate agreement with the Entity with which Delphi plans to conduct such transaction, provided that such Entity meets the general creditworthiness requirements of Service Provider at such time for its customers), or (iii) the Term shall be terminated as to such Eligible Recipient with respect to some or all Services as of a specified date, subject to the payment of any applicable Termination Charges and its receipt of Termination Assistance Services pursuant to **Section 4.4**.   If the Services are provided under a separate agreement, Delphi shall have no obligation to pay or any liability whatsoever for any fees or other amounts in relation to the Services provided to such Entity and/or such separate agreement, and Delphi shall not be required to act as the agent of such Entity.   However, Services provided to such Entity shall be included in the calculation of Service volumes, pricing and other volume sensitive measures, if any, under this Agreement, but shall be excluded when determining any Termination Charges payable as a result of termination for convenience.

**11.2     Pass-Through Expenses.**

(a)     **Procedures and Payment**.   Service Provider shall administer and invoice Delphi for Pass-Through Expenses identified in **Schedule 4-G** as follows.   Unless otherwise agreed by the Parties, Delphi and/or another Eligible Recipient shall pay all Pass-Through Expenses directly to the applicable vendors following review, validation and approval of such Pass-Through Expenses by Service Provider.   No new Pass-Through Expenses may be added without Delphi's prior consent, which it may withhold in its sole discretion.   Before submitting an invoice to Delphi and/or another Eligible Recipient for any Pass-Through Expense, Service Provider shall (i) review and validate the invoiced charges, (ii) identify any errors or omissions, (iii) determine and notify Delphi if any Recoverable Taxes are included in the invoiced charges (as indicated on the applicable invoice), and (iv) communicate with the applicable vendor to correct any errors or omissions, resolve any questions or issues and obtain any applicable credits, rebates, discounts or other incentives for Delphi.   Service Provider shall deliver to Delphi the original supplier invoice, together with any documentation supporting such invoice and a statement that Service Provider has reviewed and validated the invoiced charges, within ten (10) days after Service Provider's receipt

-53-

thereof, provided that, if earlier, Service Provider shall use commercially reasonable efforts to deliver such invoice, documentation and statement at least five (5) business days prior to the date on which payment is due, and provided further that, if it is not possible to deliver such invoice, documentation and statement at least five (5) business days prior to the due date, Service Provider shall promptly notify Delphi and, at Delphi's option, either request additional time for review and validation or submit the invoice for payment subject to subsequent review and validation. In addition, if the vendor offers a discount for payment prior to a specified date, Service Provider shall use commercially reasonable efforts to deliver such invoice and associated documentation to Delphi at least thirty-five (35) days prior to such date, provided that the Service Provider has at least the ten (10) day period referred to above for processing such invoice. To the extent Service Provider fails to comply with its obligations hereunder, it shall be financially responsible for any discounts lost or any late fees or interest charges incurred by Delphi and/or the other Eligible Recipients. In addition, to the extent Service Provider fails to process any invoice in accordance with this provision within sixty (60) days after Service Provider's receipt of such invoice, it shall be financially responsible for the payment of all such invoiced amounts.

(b)     **Efforts to Minimize**.   Service Provider shall continually seek to identify methods of reducing and minimizing Delphi's retained and Pass-Through Expenses and will notify Delphi of such methods and the estimated potential savings associated with each such method.

(c)     **Cost Savings**.   If Service Provider proposes an innovative, value-adding, and cost-saving solution not previously identified by Delphi or the other Eligible Recipients, and not otherwise required under this Agreement, that Delphi or another Eligible Recipient elects to implement, then the Parties may agree on a case-by-case basis to share a percentage of the net cost savings directly attributable to the proposed solution for a specified period.

**11.3     Reserved**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

**11.6    Proration**.

Periodic charges under this Agreement are to be computed on a calendar month basis, and shall be prorated for any partial month on a calendar day basis.

**11.7    Refundable Items**.

(a)    **Prepaid Amounts**.    Where Delphi and/or the other Eligible Recipients have prepaid for a service or function for which Service Provider is assuming financial responsibility under this Agreement, Service Provider shall promptly refund to Delphi or such other Eligible Recipient, upon either Party identifying the prepayment, that portion of such prepaid expense which is attributable to periods on and after the applicable Production Date.

(b)    **Refunds and Credits**.    If Service Provider should receive a refund, credit, discount or other rebate for goods or services paid for by Delphi and/or the other Eligible Recipients on a Pass-Through Expense, retained expense, cost-plus or cost-reimbursement basis, then Service Provider shall (i) notify Delphi of such refund, credit, discount or rebate, and (ii) pay the full amount of such refund, credit, discount or rebate to Delphi or such other Eligible Recipient.

(c)    **Allocation of Balloon, Roll-Over and Similar Payments**.    With respect to contracts assigned to Delphi, another Eligible Recipient (or its designee) in connection with any Termination Assistance Services, where the costs under any such contracts entered into by Service Provider, a Service Provider Affiliate or Subcontractor are to be apportioned between the Parties, Service Provider shall be responsible for the payment of any costs required to be paid by Delphi (or the applicable assignee) after the assignment of such contracts to Delphi (or the applicable assignee), to the extent such costs are attributable to periods during the Term and the provision of any Termination Assistance Services and not attributable solely to the assignment.    Additionally, if lease, license, maintenance, service charges or other periodic payments under any such contract increase after assignment to Delphi (or the applicable assignee) (other than to account for cost of living or similar increases) (e.g., balloon or similar payments), all such payments shall be recalculated so that, as between the Parties, the entire cost shall be amortized evenly over the entire term of such contract. In the case of licenses, such allocation of costs shall not apply to the initial one-time license fees

paid or payable by Service Provider.   Service Provider shall be responsible for those roll-over and recalculated costs that are attributable to periods during the Term and the provision of any Termination Assistance Services, and, upon assignment to Delphi (or the applicable assignee), Delphi shall, as between the Parties, be responsible for all other payments.   Service Provider shall provide a credit to Delphi for any such roll-over costs and recalculated costs against any amounts then-due and owing by Delphi (or the applicable assignee) or, if there are no amounts then-owed by Delphi, pay such roll-over or recalculated amounts to Delphi within thirty (30) days after the assignment of the applicable contract to Delphi (or the applicable assignee).

**REDACTED**

**REDACTED**

12. **INVOICING AND PAYMENT**

12.1    **Invoicing.**

(a)    **Invoice.**    Within ten (10) business days of the end of each month, Service Provider shall present Delphi with an invoice for any Charges due and owing for the immediately preceding month (the "**Monthly Invoice**"). Each invoice, and the data underlying each invoice, shall be delivered to Delphi, at its request, at the address(es) listed in **Section 21.3**, in a format that is compliant with the local regulations of the country that governs the Service Provider. Service Provider shall not invoice Delphi for any advance or concurrent charges or other amounts. In addition, Service Provider shall provide a report that lists the legal entities invoiced and the amounts invoiced, provides a summary total of the invoiced amounts by invoice category, and provides other similar information as reasonably requested by Delphi.

(b)    **Form and Data.**    At the same time as Service Provider presents Delphi with each Monthly Invoice called for in **Section 12.1(a)**, Service Provider shall provide separate Monthly Invoices for each Delphi Affiliate or Eligible Recipient then-receiving Services, allocated among such Affiliates or Eligible Recipients based on the chargeback data generated by Service Provider and/or the allocation formula provided by Delphi. Unless otherwise agreed by the Parties, any Entity that is an Eligible Recipient as of the Effective Date shall be invoiced in accordance with **Schedule 4-L**. Each invoice shall be in the form specified in **Exhibit 4** and shall be modified as necessary to (i) comply with all applicable legal, tax, regulatory and accounting requirements, (ii) allow Delphi to validate volumes, fees and taxes, (iii) permit Delphi to chargeback internally to an organizational level specified by Delphi, and (iv) meet Delphi's and the other Eligible Recipient's business accounting and billing requirements. Each invoice shall include the pricing calculations and related data utilized to establish the Charges and sufficient information to validate the service volumes and associated Charges and taxes. The data underlying each invoice shall be delivered to Delphi electronically (if requested by Delphi) in a form and format compatible with Delphi's accounting systems.

(c)    **Credits.**    To the extent a credit may be due to Delphi pursuant to this Agreement, Service Provider shall provide Delphi with an appropriate credit against amounts then due and owing; if no further payments are due to Service Provider, Service Provider shall pay such amounts to Delphi within fifteen (15) days.

(d)    **Time Limitation.**    If Service Provider fails to provide an invoice to Delphi for any amount (including taxes and Pass-Through Expenses) within one hundred and eighty (180) days after the month in which the Services in question are rendered or the expense incurred, Service Provider shall waive any right it may otherwise have to invoice for and collect such amount.

**REDACTED**

-60-

# REDACTED

**12.3    Set Off.**

With respect to any amount to be paid or reimbursed by Delphi hereunder, Delphi may set off against such amount any amount that Service Provider is obligated to pay Delphi hereunder.

**12.4    Disputed Charges.**

Delphi may withhold payment of particular Charges that Delphi reasonably disputes in good faith subject to the following:

(a)    **Notice of Dispute.**    If Service Provider's invoice includes sufficient detail and supporting documentation to enable Delphi to reasonably determine whether Service Provider's Charges are in accordance with this Agreement, Delphi shall notify Service Provider on or before the payment due date of such invoice if it disputes any of the Charges in such invoice.

(b)    **Notice of Insufficient Detail, Documentation and Dispute.**    If Service Provider's invoice does not include sufficient detail and supporting documentation to enable Delphi to reasonably determine whether Service Provider's Charges are in accordance with this Agreement, Delphi shall so notify Service Provider on or before the payment due date.    Service Provider shall promptly provide such reasonable detail and supporting documentation, and Delphi shall notify Service Provider within ten (10) business days after receipt thereof by the Delphi Contract Executive whether it disputes any of the Charges in Service Provider's invoice.

(c)    **Description and Explanation.**    If Delphi disputes any Service Provider Charges, Delphi shall so notify Service Provider and provide a description of the particular Charges in dispute and an explanation of the reason why Delphi disputes such Charges.

(d)    **Continued Performance.**    Each Party agrees to continue performing its obligations under this Agreement while any dispute is being resolved unless and until such obligations are terminated by the termination or expiration of this Agreement.

(e)    **No Waiver.**    Neither the failure to dispute any Charges or amounts prior to payment nor the failure to withhold any amount shall constitute, operate or be construed as a waiver of any right Delphi may otherwise have to dispute any Charge or amount or recover any amount previously paid.

**12.5    Administrative Claims.**

Claims of Service Provider arising under this Master Services Agreement prior to Emergence shall constitute administrative expenses of the Debtors of the kind specified in Sections 503(b) and 507(a) of the Bankruptcy Code in the cases filed by the Debtors under such Code, subject to **Section 18.3**.

**13.    DELPHI DATA AND OTHER PROPRIETARY INFORMATION**

**13.1    Delphi Ownership of Delphi Data.**

Delphi Data are and shall remain the property of Delphi (and/or the applicable Eligible Recipients). Service Provider shall promptly deliver, to Delphi, Delphi Data (or the portion of such Delphi Data specified by Delphi) in the format and on the media prescribed by Delphi (i) at any time at Delphi's request, (ii) at the end of the Term and the completion of all requested Termination Assistance Services (except Contract Records, which shall be retained by Service Provider for the Audit Period unless and to

the extent Service Provider is directed by Delphi to deliver to Delphi such Contract Records prior to the expiration of the Audit Period), or (iii) with respect to particular Delphi Data, at such earlier date that such data are no longer required by Service Provider to perform the Services.    Thereafter, Service Provider shall return or destroy, as directed by Delphi, all copies of the Delphi Data in Service Provider's possession or under Service Provider's control as soon as possible, but in any event within ten (10) business days, and deliver to Delphi written certification of such return or destruction signed by an authorized representative of Service Provider, provided that, in the event of a third party lawsuit against Service Provider, Delphi shall reasonably cooperate with Service Provider to provide relevant Delphi Data to Service Provider solely for Service Provider to defend itself in such third party lawsuit.    Service Provider shall not withhold any Delphi Data as a means of resolving any dispute.    Delphi Data shall not be utilized by Service Provider for any purpose other than the performance of Services under this Agreement and Service Provider shall at all times comply with Delphi's privacy policy, as modified by Delphi from time to time.    Delphi Data shall not be sold, assigned, leased, encumbered, commercially exploited or otherwise provided to third parties by or on behalf of Service Provider or any Service Provider Personnel.    Service Provider shall promptly notify Delphi if it believes that any use of Delphi Data by Service Provider contemplated under this Agreement or to be undertaken as part of the Services is inconsistent with the foregoing.

**13.2    Safeguarding Delphi Data.**

(a)    **Restrictions on Access and Use.**    Except as expressly provided in this Agreement, (i) all Delphi Data shall be stored only on Delphi Systems; (ii) Service Provider shall ensure that all Service Provider Personnel performing Services access Delphi Data solely via Delphi Systems; and (iii) Service Provider shall not print, transmit outside of Delphi Systems, or store any Delphi Data on any media without Delphi's prior written consent.    Delphi Data shall not be accessed, disclosed, transmitted or otherwise utilized by Service Provider or its Subcontractors for any purpose other than the performance of Services in accordance with Delphi's instructions and shall not be sold, assigned, leased or otherwise transferred, disposed of or provided to third parties by Service Provider or commercially exploited by or on behalf of Service Provider or any Service Provider Personnel.    Notwithstanding the foregoing, Service Provider shall have the right to print Delphi Data as may be required to perform Services if (i) such printing is done in a secure area dedicated to the provision of Services, (ii) all such printed copies remain in such secure area, and (iii) all such printed copies are securely destroyed when they are no longer needed for Service Provider to perform Services.    Service Provider shall limit its access to and use of Delphi Systems or Delphi Data solely to perform Services and shall employ reasonable safeguards to prevent and detect unauthorized attempts to access or otherwise compromise any Delphi System or Delphi Data, electronic file, software or other electronic services used by Delphi or any Service Recipient other than as specifically required to perform the Services.

(b)    **Safeguarding Procedures.**    Service Provider shall at no cost to Delphi establish and maintain environmental, safety and facility procedures, data security procedures and other safeguards against the destruction, loss, unauthorized access or alteration of Delphi Data in the possession or under the control of Service Provider that are (i) no less rigorous than those maintained by Delphi as of the Effective Date (or implemented by Delphi in the future to the extent deemed necessary by Delphi), including the security and control requirements under this Agreement, (ii) no less rigorous than those maintained by Service Provider for its own information of a similar nature, (iii) no less rigorous than accepted security standards in the industry (such as ISO 17799 and/or BS 7799), and (iv) adequate to meet the requirements of Delphi's privacy, security and records retention policies and applicable Laws.    After the first Production Date and as requested by Delphi, Service Provider shall evaluate the then-current Delphi security policy and shall prepare and submit for Delphi review and approval recommendations with respect to changes or modifications to such policy.    Service Provider shall maintain and enforce the then-current Delphi security policy until any changes or modifications are approved in writing by Delphi for implementation.    Delphi shall have the right to establish backup security for Delphi Data and to keep backup copies of the Delphi Data in Delphi's possession at Delphi's expense if Delphi so chooses.    Service Provider shall provide Delphi with downloads of Delphi Data, as requested by Delphi, to enable Delphi to maintain such backup security or backup copies of Delphi Data.    Service Provider shall remove all Delphi Data

from any media taken out of service and shall destroy or securely erase such media in accordance with the Policy and Procedures Manual. No media on which Delphi Data is stored may be used or re-used to store data of any other customer of Service Provider or to deliver data to a third party, including another Service Provider customer, unless securely erased in accordance with the Policy and Procedures Manual. In the event Service Provider discovers or is notified of a breach or potential breach of security relating to Delphi Data, Service Provider shall, in addition to its obligations pursuant to **Sections 6.1(d)** and **13.2(d)**, expeditiously (A) notify Delphi of such breach or potential breach, (B) investigate (with Delphi's participation if so desired by Delphi) such breach or potential breach and perform a risk assessment, Root Cause Analysis and corrective action plan thereon, (C) provide a written report to Delphi of such risk assessment, Root Cause Analysis and action plan (D) remediate the effects of such breach or potential breach of security, (E) provide Delphi with such assurances as Delphi shall request that such breach or potential breach will not recur, and (F) provide periodic updates during the investigation to Delphi and provide Delphi the Root Cause Analysis reports. Nothing in this Agreement will be construed as a limitation on Delphi's right to use Delphi Data for its own purposes.

(c)    **Corrections**. Service Provider shall at no cost to Delphi restore all Delphi Data that is destroyed, lost or improperly altered by Service Provider using generally accepted data restoration techniques. In addition, if Service Provider, its Affiliates, Subcontractors or other Service Provider Personnel has caused the destruction, loss or alteration of any Delphi Data, Service Provider shall be responsible for the cost of restoring such data. Service Provider shall at all times adhere to the procedures and safeguards specified in **Sections 13.2(a)** and **(b)** and shall correct (including any required back-up or restoration of data from scheduled backups, or if not available on such backups, restoration by other means with Delphi's reasonable cooperation), at no charge to Delphi, any destruction, loss or alteration of any Delphi Data attributable to any error or breach of this Agreement due to Service Provider or Service Provider Personnel.

(d)    **Electronic Incident Reporting**. For purposes of this provision, "**Electronic Incident**" means any unauthorized action by a known or unknown person which, if successfully completed, attempted, or threatened, could reasonably be considered one of the following: an attack, penetration, denial of service, disclosure of Proprietary Information, misuse of system access, unauthorized access or intrusion (hacking), virus intrusion, scan of the Systems, networks, technology, content or websites of Delphi (or another Eligible Recipient) or Service Provider (or its Affiliates or Subcontractors), or any other activity that could adversely affect Proprietary Information. Service Provider shall report to Delphi all known or suspected Electronic Incidents. If an Electronic Incident occurs, Service Provider shall as soon as possible notify Delphi as specified in the Policy and Procedures Manual, and provide the following information, to the extent known to or ascertainable by Service Provider: the nature and impact of the Electronic Incident; actions already taken by Service Provider; Service Provider's assessment of immediate risk; and corrective measures to be taken, evaluation of alternatives, and next steps. Service Provider shall continue providing appropriate status reports to Delphi regarding the resolution of the Electronic Incident and prevention of future such Electronic Incidents. In consultation with Service Provider, Delphi may, in its reasonable discretion, require that Service Provider's ability to access, process, or store Delphi Proprietary Information be suspended, connectivity with Service Provider be terminated, or other appropriate action be taken pending such resolution, provided that upon any such action by Delphi, Service Provider shall be relieved of its obligations under this Agreement to the extent it is unable to perform under such circumstances and so notifies Delphi at the time of such suspension by Delphi.

(e)    **Information Security Review**. During the Term, and upon reasonable notice to the Service Provider, Delphi and/or the other Eligible Recipients may perform information security reviews on any Systems, Equipment, Software, network(s) or facilities used by Service Provider to provide the Services hereunder ("**Reviews**"). The Reviews may include physical inspection, external scan, internal scan, code review, process reviews and reviews of system configurations. The Reviews may be conducted, at Delphi's discretion and at Delphi's or the other Eligible Recipient's expense, by Delphi, another Eligible Recipient or their designee(s). The Parties shall mutually agree upon the scope and methodology of such Reviews, provided that Service Provider shall not unreasonably

-63-

withhold or delay its agreement to such scope and methodology. Service Provider hereby grants permission to Delphi and the other Eligible Recipients to perform the Reviews per the agreed upon scope and methodology; provided, however, that any such Review shall be conducted by Delphi, another Eligible Recipient or their designee(s), as applicable, in compliance with the provisions of **Sections 9.8(e)(ii)–(iv)** as if such Review were an audit subject to such Sections. Service Provider will not bring any claim against Delphi or the other Eligible Recipients based upon Reviews permitted under this Section and conducted pursuant to the agreed upon scope and methodology. Should any Review result in the discovery of material security risks to the Systems, Equipment, Software, network(s) or facilities used by Service Provider to provide the Services, Delphi shall promptly notify Service Provider of such risks, and Service Provider shall respond to Delphi in writing within three (3) days with Service Provider's plan to take reasonable measures to promptly correct, repair, or modify the applicable System, Equipment, Software, network or facility to effectively eliminate such risks at no cost to Delphi or the other Eligible Recipients to the extent required for Service Provider to be in compliance with **Section 13.2(b)** and otherwise Service Provider shall, if directed by Delphi, so correct, repair or modify at Delphi's expense. Upon approval by Delphi, Service Provider shall implement such plan as quickly as practicable. Should Service Provider fail to take reasonable measures to remedy the identified risk, Delphi may terminate this Agreement for cause effective immediately.

**13.3    Delphi Personal Data.**

(a)    **Compliance with Privacy Laws.** Service Provider shall comply with the provisions of and the obligations imposed on Service Provider under applicable Privacy Laws (and Delphi shall inform and update Service Provider on the various jurisdictions from which data is transmitted by Delphi such that such jurisdiction's Privacy Laws become applicable). In addition, Service Provider shall provide Delphi with such assistance as Delphi may reasonably request to fulfill the responsibilities of Delphi and the other Eligible Recipients under such Privacy Laws. Service Provider also shall comply with the other data privacy policies of Delphi, as well as the data privacy policies of any self-regulatory organizations to which Delphi or the other Eligible Recipients belong which are applicable to Service Provider in its role as a data processor and third party service provider to Delphi and the other Eligible Recipients in relation to Delphi Personal Data.

(b)    **Return of Personal Data.** All Delphi Personal Data acquired by Service Provider shall be returned or destroyed (at the option of Delphi) by Service Provider on request in accordance with **Section 13.1**, unless and to the extent such Delphi Personal Data is required by Service Provider to discharge its obligations hereunder or under applicable Privacy Laws.

(c)    **Service Provider Responsible for Third Parties.** Service Provider shall be responsible for the acts and omissions of any Subcontractor or other third party that processes (within the meaning of the applicable Privacy Laws) Delphi Personal Data on Service Provider's behalf in the same manner and to the same extent as it is responsible for its own acts and omissions with respect to such Delphi Personal Data.

(d)    **Data Controller.** The Parties acknowledge and agree that each Eligible Recipient located in the European Economic Area is the data controller of all Delphi Personal Data processed by Service Provider for such Eligible Recipient in providing the Services. Service Provider shall merely act in relation to such Delphi Personal Data as the data processor on behalf of such data controller and shall act only in accordance with the reasonable instructions of the relevant Eligible Recipient in relation to such Delphi Personal Data.

(e)    **Personal Data Security.** Without limiting Service Provider's obligations under **Section 13.2** or otherwise with respect to data security, Service Provider shall:

    (i)    having regard to the state of technological development and the cost of implementing any measures, provide a level of security (including appropriate technical and organizational

measures (e.g., encryption)) appropriate to:

  (A)    the harm that might result from unauthorized or unlawful processing of such Delphi Personal Data, or accidental loss, destruction or damage of such Delphi Personal Data; and

  (B)    the nature of the Delphi Personal Data;

 (ii)    take commercially reasonable steps to ensure the reliability of Service Provider Personnel who have access to the Delphi Personal Data;

 (iii)    provide Delphi or the relevant Eligible Recipient with such information, assistance and cooperation, and execute such documents and additional terms, as Delphi or such other Eligible Recipient may reasonably require from time to time to establish Service Provider's and/or Delphi's and the other Eligible Recipients' compliance with the obligations relating to security contained in the Privacy Laws; and

 (iv)    inform Delphi or the relevant Eligible Recipient as soon as reasonably practicable of any particular risk to the security of any of their computer networks of which it becomes aware and of the categories of Delphi Personal Data and individuals that may be affected.

(f)    **Transfers of Personal Data outside the European Economic Area.**

 (i)    In the event it is necessary to transfer Delphi Personal Data from a country within the European Economic Area (EEA) to a country outside the EEA for Service Provider processing, Service Provider shall enter into an agreement with Delphi and/or the relevant Eligible Recipient obligating Service Provider to adhere to the requirements imposed by the standard contractual clauses for the transfer of Delphi Personal Data to processors established in third countries issued by the European Commission pursuant to Article 26(2) and (4) of EU Directive 95/46/EC, unless the country of transfer is a country the European Commission has determined ensures an adequate level of privacy protection by reason of its domestic law, in accordance with Article 25(6) of EU Directive 95/46/EC.

 (ii)    In the event it is necessary for Delphi to transfer Delphi Personal Data from within the EEA to a country outside the EEA for Service Provider processing, and Service Provider is located in the EEA or a country the European Commission has determined ensures an adequate level of privacy protection under Article 25(6) of EU Directive 95/46/EC, Service Provider shall ensure that any Subcontractors and other third parties with whom it contracts to process Delphi Personal Data comply with data security requirements of the applicable Privacy Laws and any relevant data protection contractual terms entered into between Delphi and Service Provider.

 (iii)    Service Provider shall not, and shall ensure that Subcontractors and other third parties with whom it contracts to process Delphi Personal Data on its behalf shall not, (A) transfer Delphi Personal Data from within the EEA to a territory outside the EEA, except on terms substantially in accordance with the standard contractual clauses issued by the European Commission pursuant to EU Directive 95/46/EC, and (B) operate in relation to such Delphi Personal Data in any way that could put Delphi or any other Eligible Recipient in breach of its obligations under the Privacy Laws.

(g)    **Further Data Processor Obligations**.    Service Provider shall promptly, and in any event not later than reasonably required in order to enable Delphi or the relevant Eligible Recipient to fulfill its duties under any Privacy Law:

(i)      pass on to Delphi or the relevant Eligible Recipient any inquiries or communication (including subject access requests) from Authorized Users relating to their Delphi Personal Data or its processing; and

(ii)      provide such information as may be required for the purpose of responding to any such Authorized Users or otherwise necessary for Delphi to comply with duties under Privacy Laws.

Service Provider shall at all times act in a manner consistent with the requirements of any and all codes relating to personal data processing which are generally accepted within the outsourcing sectors in so far as they are relevant to the Services performed by Service Provider and in so far as they are applicable to Service Provider in its role as a data processor in relation to Delphi Personal Data.

**13.4 Confidentiality**.

(a)      **General**. Service Provider and Delphi each acknowledge that the other possesses and will continue to possess information that has been developed or received by it, has commercial value in its or its customers' business and is not generally available to the public.

(b)      **Proprietary Information of Delphi**. Except as otherwise specifically agreed in writing by the Parties, **"Proprietary Information"** of Delphi means (i) this Agreement and the terms hereof, (ii) all information and Materials marked confidential, restricted or proprietary by Delphi, and (iii) any other information that is treated as confidential by Delphi and would reasonably be understood to be confidential, whether or not so marked. In the case of Delphi and the other Eligible Recipients, Proprietary Information also shall include Software provided to Service Provider by or through Delphi or the other Eligible Recipients, Developed Materials, Delphi Data, attorney-client privileged materials, attorney work product, customer lists, customer contracts, customer information, rates and pricing, information with respect to competitors, strategic plans, account information, rate case strategies, research information, chemical formulae, product formulations, plant and equipment design information, catalyst information, information that contains trade secrets, financial/accounting information (including assets, expenditures, mergers, acquisitions, divestitures, billings collections, revenues and finances), human resources and personnel information, marketing/sales information, information regarding businesses, plans, operations, third party contracts, licenses, internal or external audits, law suits, regulatory compliance or other information or data obtained, received, transmitted, processed, stored, archived, or maintained by Service Provider under this Agreement. By way of example, Delphi Proprietary Information shall include plans for changes in Delphi's or another Eligible Recipient's facilities, business units and product lines, plans for business restructuring, mergers, acquisitions or divestitures, rate information, plans for the development and marketing of new products, financial forecasts and budgets, technical proprietary information, employee lists and company telephone or e-mail directories.

(c)      **Proprietary Information of Service Provider**. Except as otherwise specifically agreed in writing by the Parties, **"Proprietary Information"** of Service Provider means (i) this Agreement and the terms hereof, (ii) all information and Materials marked confidential, restricted or proprietary by Service Provider, and (iii) any other information that is treated as confidential by Service Provider and would reasonably be understood to be confidential in the circumstances under which such information was disclosed, whether or not so marked.

(d)      **Obligations**.

(i)      During the Term and at all times thereafter as specified in **Section 13.4(i)**, Service Provider and Delphi shall not disclose to any third party, except as allowable herein, and shall maintain the confidentiality of, all Proprietary Information of the other Party (and,

-66-

in the case of Service Provider, of the other Eligible Recipients). Delphi and Service Provider shall each use at least the same degree of care to safeguard and to prevent disclosing to third parties, except as allowable herein, the Proprietary Information of the other Party as it employs to avoid unauthorized disclosure, publication, dissemination, destruction, loss, or alteration of its own information (or information of its customers) of a similar nature, but not less than reasonable care.   At Delphi's request, Service Provider shall require all Service Provider Personnel having access to Delphi Proprietary Information to execute a written agreement provided or approved by Delphi incorporating the pertinent terms and conditions of this **Article 13** (and that expressly permits Delphi, in Delphi's reasonable discretion, to independently enforce such confidentiality or non-disclosure agreement at Service Provider's expense).   Service Provider Personnel shall not have access to Delphi Proprietary Information without proper authorization from the Delphi Contract Executive (or his or her designee) in accordance with the Policy and Procedures Manual and the governance process agreed upon by the Parties.   Upon receiving such authorization, authorized Service Provider Personnel shall have access to Delphi Proprietary Information only to the extent necessary for such person to perform his or her obligations under or with respect to this Agreement or as otherwise naturally occurs in such person's scope of responsibility, provided that such access is not in violation of Law.

(ii)     The Parties may disclose Proprietary Information of the other Party to their respective Affiliates, auditors, attorneys, accountants, consultants, contractors and subcontractors, where (A) such disclosure is necessary for the performance of such person's or entity's obligations under (or, in the case of Delphi, for the full enjoyment of the Services and the rights granted to the Eligible Recipients hereunder) or with respect to this Agreement or otherwise naturally occurs in such person's or entity's scope of responsibility, and (B) the person or entity (and its applicable officers and employees) agree in writing to assume the obligations described in this **Section 13.4**.   In addition, Delphi may disclose Service Provider's Proprietary Information to other third parties in connection with a due diligence review for a potential acquisition or divestiture of an Eligible Recipient, provided that such disclosure is only to individuals having a need to know such information to complete such review and the third parties performing such review agree in writing to keep such information confidential and use it only for such review.   In each instance, the Party making such disclosures shall assume full responsibility for the acts or omissions of such person or entity and take all reasonable measures to ensure that the Proprietary Information of the other Party is not disclosed or used in contravention of this Agreement.   Any disclosure to such person or entity shall be under the terms and conditions as provided herein.   Each Party's Proprietary Information shall remain the property of such Party.

(iii)    Neither Party shall (A) make any use or copies of the Proprietary Information of the other Party except as contemplated by this Agreement, (B) acquire any right in or assert any lien against the Proprietary Information of the other Party, (C) sell, assign, transfer, lease, or otherwise dispose of Proprietary Information of the other Party to third parties, except as allowable herein, or commercially exploit such information, including through Derivative Works, or (D) refuse for any reason (including a default or material breach of this Agreement by the other Party) to promptly provide the other Party's Proprietary Information (including copies thereof) to the other Party if requested to do so. Notwithstanding the foregoing, and for the avoidance of doubt, Delphi may disclose Proprietary Information of Service Provider relating to the terms of this Agreement and/or Service Provider's performance hereunder (e.g., Delphi's operations, the Services, the applicable Service Levels and measurements of Service Provider's performance with respect to such Service Levels, Delphi's aggregate costs for the total Services (but not the country- or Tower-specific Charges)), including in connection with a benchmarking under **Section 11.8** or the solicitation of proposals for or the procurement of the same or similar services from Delphi Third Party Contractors.   Upon expiration or any

-67-

termination of this Agreement and completion of each Party's obligations under this Agreement, each Party shall return or destroy, as the other Party may direct, all documentation in any medium that contains, refers to, or relates to the other Party's Proprietary Information within thirty (30) days (except Contract Records, which shall be retained by Service Provider for the Audit Period, unless and to the extent Service Provider is directed by Delphi to deliver such Contract Records to Delphi prior to the expiration of the Audit Period). Each Party shall deliver to the other Party written certification of its compliance with the preceding sentence signed by an authorized representative of such Party. In addition, each Party shall take all necessary steps to ensure that its employees comply with these confidentiality and non-use provisions.

(e)     **Exclusions**.  Section 13.4(d) shall not apply to any particular information which the receiving Party can demonstrate: (i) is, at the time of disclosure to it, generally available to the public other than through a breach of the receiving Party's or a third party's confidentiality obligations; (ii) after disclosure to it, is published by the disclosing Party or otherwise becomes generally available to the public other than through a breach of the receiving Party's or a third party's confidentiality obligations; (iii) is lawfully in the possession of the receiving Party without restriction at the time of disclosure to it; (iv) is received without restriction from a third party having a lawful right to disclose such information; or (v) is independently developed by the receiving Party without reference to Proprietary Information of the furnishing Party; provided however, that the exclusions in the foregoing subsections (i) and (ii) shall not be applicable to the extent that the disclosure or sharing of such information by one or both Parties is subject to any limitation, restriction, consent or notification requirement under any applicable federal or state information privacy law or regulation then in effect. The Parties acknowledge and agree that Proprietary Information of the other Party that is not generally available to the public shall not be deemed public or subject to this exclusion merely because it is combined with information that is generally available to the public. In addition, the receiving Party shall not be considered to have breached its obligations under this Section 13.4 for disclosing Proprietary Information of the other Party as required, in the opinion of its legal counsel, to satisfy any legal requirement of a competent government body or to comply with any required judicial or administrative process, including, in the case of Delphi, disclosure requests from (i) any statutory committee appointed in the bankruptcy cases in which Delphi is the debtor or (ii) any potential sponsor of a plan of reorganization (on an as-needed basis and pursuant to a written confidentiality agreement), provided that, promptly upon receiving any such request, such Party, to the extent it may legally do so, advises the other Party of the other Party's Proprietary Information to be disclosed and the identity of the third party requiring such disclosure prior to making such disclosure in order that the other Party may interpose an objection to such disclosure, take action to assure confidential handling of its Proprietary Information, or take such other action as it deems appropriate to protect the Proprietary Information. The receiving Party shall use commercially reasonable efforts to cooperate with the disclosing Party in its efforts to seek a protective order or other appropriate remedy or in the event such protective order or other remedy is not obtained, to obtain assurance that confidential treatment will be accorded such Proprietary Information.

(f)     **Loss of Proprietary Information**.  Each Party shall upon the knowledge or belief of a loss of the other Party's Proprietary Information (i) immediately notify the other Party of any possession, use, knowledge, disclosure, or loss of such other Party's Proprietary Information in contravention of this Agreement, (ii) promptly furnish to the other Party all known details and assist such other Party in investigating and/or preventing the reoccurrence of such possession, use, knowledge, disclosure, or loss, (iii) cooperate with the other Party in any investigation or litigation deemed necessary by such other Party to protect its rights, and (iv) promptly use all commercially reasonable efforts to prevent further possession, use, knowledge, disclosure, or loss of the other Party's Proprietary Information in contravention of this Agreement. Each Party shall bear any costs it incurs in complying with this Section 13.4(f).

(g)     **No Implied Rights**.  Nothing contained in this Section 13.4 shall be construed as obligating a Party to disclose its Proprietary Information to the other Party, or as granting to or conferring on a

Party, expressly or impliedly, any rights or license to any Proprietary Information of the other Party.

(h)    **Filing Redacted Agreement or Agreement Under Seal.**    Delphi and Service Provider agree that this Agreement contains highly sensitive and confidential competitive information, business terms and detailed proprietary information which, if publicly disclosed, would detrimentally affect Delphi's and Service Provider's businesses.    To protect this confidential and proprietary information, before filing its motion seeking approval to enter into this Agreement, Delphi will use its reasonable best efforts to obtain permission from the Bankruptcy Court to file this Agreement in a redacted state or under seal, pursuant to Section 107(b) of the Bankruptcy Code, Bankruptcy Rule 9018, and General Order M-242 of the United States Bankruptcy Court for the Southern District of New York.

(i)    **Survival.**    Service Provider's obligations with respect to Delphi Personal Data and Delphi's human resources and personnel information shall survive the expiration or termination of this Agreement and shall be perpetual.    To the extent disclosed to Delphi in accordance with the Process, Delphi's non-disclosure and confidentiality obligations with respect to Service Provider's human resources and personnel information shall survive the expiration or termination of this Agreement and shall be perpetual.    The Parties' obligations of non-disclosure and confidentiality with respect to all of the other Party's Proprietary Information shall survive the expiration or termination of this Agreement for a period of five (5) years from the later of (i) the expiration or termination of this Agreement (including all periods of Termination Assistance Services), or (ii) the return or destruction of the other Party's Proprietary Information in accordance with **Sections 13.1** and **13.4(d)(iii)** (but not including accounting information pertaining to this Agreement that Service Provider is required to maintain pursuant to applicable Laws); provided, that the passage of this five (5) year period shall not absolve either Party of responsibility for any breach of this **Article 13** occurring prior to the expiration of such five (5) year period.

**13.5    File Access.**

Delphi shall have unrestricted access to, and the right to review and retain the entirety of, all computer or other files containing Delphi Data, as well as all systems and network logs, system parameters and documentation.    At no time shall any of such files or other materials or information be stored or held in a form or manner not readily accessible to Delphi.    Service Provider shall provide to the Delphi Contract Executive all passwords, codes, comments, keys, documentation and the locations of any such files and other materials promptly upon the request of Delphi, including Equipment and Software keys and such information as to format, encryption (if any) and any other specification or information necessary for Delphi to retrieve, read, revise and/or maintain such files and information.    Upon the request of the Delphi Contract Executive, Service Provider shall confirm that, to the best of its knowledge, all files and other information provided to Delphi are complete and that no material element, amount, or other fraction of such files or other information to which Delphi may request access or review has been deleted, withheld, disguised or encoded in a manner inconsistent with the purpose and intent of providing full and complete access to Delphi as contemplated by this Agreement.

**14.    OWNERSHIP OF MATERIALS**

**14.1    Delphi Owned Materials.**

(a)    **Ownership of Delphi Owned Materials.**    Delphi shall be the sole and exclusive owner of (i) all intellectual property, including Software and other Materials, owned or acquired by Delphi, Delphi Affiliates or the other Eligible Recipients, including Delphi Owned Software and other Materials owned, acquired or created by or for Delphi and the other Eligible Recipients before, on or after the Effective Date, (ii) all enhancements and Derivative Works of such intellectual property, Software and other Materials, including all United States and foreign patent, copyright and other intellectual property rights in such Materials, and (iii) certain Developed Materials, as provided in **Section 14.2** (collectively, "**Delphi Owned Materials**").    As between Delphi and Service Provider, Delphi

Owned Materials shall include (A) all intellectual property, including Software and other Materials, pertaining to Delphi products or services created by or obtained from sellers, distributors, purchasers or users of such products or services, and (ii) all enhancements or Derivative Works of such intellectual property, including Software and other Materials.

(b)     **License to Delphi Owned Materials**.     As of the Production Date for each of the Services, Delphi hereby grants Service Provider and, to the extent necessary for Service Provider to provide such Services, to Subcontractors designated by Service Provider that sign a written agreement to be bound by all of the terms contained herein applicable to such Materials (such agreement shall be agreed to by the Parties and shall include the terms specified in this Section as well as those pertaining to the ownership of such Materials and any Derivative Works developed by the Parties, the scope and term of the license, the restrictions on the use of such Materials, the obligations of confidentiality, etc.) a non-exclusive, non-transferable, royalty-free limited right and license during the Term (and thereafter to the extent necessary to perform any Termination Assistance Services requested by Delphi) to access, use, execute, reproduce, display, perform, modify and distribute the Delphi Owned Materials approved by Delphi, for the express and sole purpose of providing the Services.     Service Provider and its Subcontractors have no right or license to the source code to such Delphi Owned Materials unless and to the extent approved in advance by Delphi.     Delphi Owned Materials shall remain the property of Delphi (or, if applicable, its Affiliates or other Eligible Recipients).     Service Provider and its Subcontractors shall not (i) use any Delphi Owned Materials for the benefit of any person or Entity other than Delphi or the other Eligible Recipients, (ii) separate or uncouple any portions of the Delphi Owned Materials, in whole or in part, from any other portions thereof, or (iii) reverse assemble, reverse engineer, translate, disassemble, decompile or otherwise attempt to create or discover any source or human readable code, underlying algorithms, ideas, file formats or programming interfaces of the Delphi Owned Materials by any means whatsoever, without the prior approval of Delphi, which may be withheld at Delphi's sole discretion.     Except as otherwise requested or approved by Delphi, Service Provider and its Subcontractors shall cease all use of Delphi Owned Materials upon the end of the Term and the completion of any Termination Assistance Services and shall certify such cessation to Delphi in a notice signed by an officer of Service Provider and each applicable Subcontractor.     THE DELPHI OWNED MATERIALS ARE PROVIDED BY DELPHI TO SERVICE PROVIDER AND ITS SUBCONTRACTORS ON AN AS-IS, WHERE-IS BASIS.     DELPHI EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AS TO SUCH DELPHI OWNED MATERIALS, OR THE CONDITION OR SUITABILITY OF SUCH MATERIALS FOR USE BY SERVICE PROVIDER OR ITS SUBCONTRACTORS TO PROVIDE THE SERVICES, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(c)     **License to Delphi Licensed Third Party Materials**.     Subject to Delphi having obtained any Delphi Required Consents, Delphi hereby grants to Service Provider, for the sole purpose of performing the Services and solely to the extent of Delphi's underlying rights, the same rights of access and use as Delphi possesses under the applicable software licenses with respect to Delphi Licensed Third Party Materials.     Delphi also shall grant such rights to Subcontractors designated by Service Provider if and to the extent necessary for Service Provider to provide the Services, provided that Service Provider shall pay all fees, costs and expenses associated with the granting of such rights to such Subcontractors.     Service Provider and its Subcontractors shall comply with the duties, including use restrictions and nondisclosure obligations, imposed on Delphi by such licenses.     In addition, each Subcontractor shall sign a written agreement to be bound by all of the terms contained herein applicable to such Third Party Materials (such agreement shall be agreed to by the Parties and shall include the terms specified in this Section as well as those pertaining to the ownership of such Materials and any derivative materials developed by the Parties, the scope and term of the license, the restrictions on the use of such Materials, the obligations of confidentiality, etc.).     Except as otherwise requested or approved by Delphi (or the relevant licensor), Service Provider and its Subcontractors shall cease all use of such Third Party Materials upon the end of the Term and the completion of any Termination Assistance Services requested by Delphi.     THE DELPHI LICENSED THIRD PARTY MATERIALS ARE PROVIDED BY DELPHI TO

-70-

SERVICE PROVIDER AND ITS SUBCONTRACTORS ON AN AS-IS, WHERE-IS BASIS. DELPHI EXPRESSLY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES, EXPRESSED OR IMPLIED, AS TO SUCH DELPHI LICENSED THIRD PARTY MATERIALS, OR THE CONDITION OR SUITABILITY OF SUCH MATERIALS FOR USE BY SERVICE PROVIDER OR ITS SUBCONTRACTORS TO PROVIDE THE SERVICES, INCLUDING WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**REDACTED**

**REDACTED**

**REDACTED**

**14.4    Other Materials**.

This Agreement shall not confer upon either Party intellectual property rights in Materials of the other Party (to the extent not covered by this **Article 14**) unless otherwise so provided elsewhere in this Agreement.

**14.5    General Rights**.

(a)    **Copyright Legends**.  Each Party agrees to reproduce copyright legends which appear on any portion of the Materials which may be owned by the other Party or third parties.

(b)    **Residuals**.  Nothing in this Agreement (including **Article 9**) shall restrict any employee or representative of a Party from using general ideas, concepts, practices, learning or know-how relating to the Services provided hereunder that are retained in the unaided memory of such employee or representative after performing the obligations of such Party under this Agreement, except to the extent that such use infringes upon any patent, copyright or other intellectual property right of a Party or its Affiliates (or, in the case of Service Provider, of any other Eligible Recipient); provided, that this **Section 14.5(b)** shall not (i) be deemed to limit either Party's obligations under this Agreement with respect to the disclosure or use of Proprietary Information, or (ii) operate or be construed as permitting an employee or representative of Service Provider to disclose, publish, disseminate or use (A) the source of any Proprietary Information of Delphi or another Eligible Recipient, (B) any financial, statistical or personnel information of Delphi or another Eligible Recipient, or (C) the business plans of Delphi or the other Eligible Recipients.  An individual's memory is unaided if the individual has not intentionally memorized the other Party's Proprietary Information for the purpose of retaining and subsequently using or disclosing it and does not identify the information as the other Party's Proprietary Information upon recollection.  For avoidance of doubt, the foregoing would not permit Service Provider Personnel to use Proprietary Information of Delphi or another Eligible Recipient for any purpose other than the provision of Services under this Agreement.

(c)    **No Implied Licenses**.  Except as expressly specified in this Agreement, nothing in this Agreement shall be deemed to grant to one Party, by implication, estoppel or otherwise, license rights, ownership rights or any other intellectual property rights in any Materials owned by the other Party or any Affiliate of the other Party (or, in the case of Service Provider, of any other Eligible Recipient).

(d)    **Incorporated Materials**.  Subject to **Section 14.3(c)**, should either Party incorporate into Developed Materials any intellectual property subject to third party patent, copyright or license rights, then any ownership or license rights granted herein with respect to such Materials shall be limited by and subject to any such patents, copyrights or license rights, provided that prior to incorporating any such intellectual property in any Materials, the Party incorporating such intellectual property in the Materials has disclosed this fact and obtained the prior approval of the other Party.

**REDACTED**

-74-

**REDACTED**

**REDACTED**

**REDACTED**

15.    **REPRESENTATIONS, WARRANTIES AND COVENANTS**

15.1    **Work Standards.**

Service Provider represents, warrants and covenants that: (i) the Services shall be rendered with promptness, due care, skill and diligence; (ii) the Services shall be executed in a workmanlike manner, in accordance with the Service Levels and the best practices of leading providers of services that are the same as or similar to the Services; (iii) Service Provider shall use adequate numbers of qualified individuals with suitable training, education, experience, know-how, competence and skill to perform the Services; (iv) Service Provider shall provide such individuals with training as to new products and services prior to the implementation of such products and services in the Delphi and/or other Eligible Recipients environment(s); and (v) Service Provider shall have the resources, capacity, expertise and ability in terms of Equipment, Software, know-how and personnel to provide the Services.

15.2    **Efficiency and Cost Effectiveness.**

Service Provider represents, warrants and covenants that it shall use commercially reasonable efforts to provide the Services in the most cost-effective and efficient manner consistent with the required level of quality and performance.    Without limiting the generality of the foregoing, such efforts shall include:

(a)    **Timing of Actions.**    Making adjustments in the timing of actions (consistent with Delphi priorities and schedules for the Services and Service Provider's obligation to meet the Service Levels).

(b)    **Timing of Functions.**    Delaying or accelerating, as appropriate, the performance of non-critical functions within limits acceptable to Delphi.

(c)    **Alternative Technologies.**    Subject to **Section 9.5**, using alternative technologies to perform the Services.

(d)    **Efficiency.**    Efficiently using resources for which Delphi is charged hereunder and compiling data concerning such efficient use in segregated and auditable form whenever possible.

15.3    **Software and other Materials.**

(a)    **Ownership and Use.**    Service Provider represents, warrants and covenants that it is either the owner of, or authorized to use, any and all Software and other Materials provided and used by or on behalf of Service Provider in providing the Services.    As to any such Software or other Materials that Service Provider does not own but is authorized to use, Service Provider shall advise Delphi as to the ownership and extent of Service Provider's rights with regard to such Software and other Materials to the extent any limitation in such rights would impair Service Provider's performance of

-77-

its obligations under this Agreement.

(b)     **Performance**.  Service Provider represents, warrants and covenants that any Service Provider Owned Software will perform in conformance with its Specifications and will provide the functions and features and operate in the manner described therein.

(c)     **Developed Materials**.  Service Provider warrants and covenants that Developed Materials will be free from material errors in operation and performance, will Comply with the applicable documentation and other Specifications will conform to applicable criteria set forth in this Agreement, and will provide the functions and features and operate in the manner described in **Schedules 2** and **8** or otherwise agreed by the Parties for the applicable period after Acceptance as follows:  (i) six (6) months for Developed Materials that execute on a daily, weekly or monthly cycle; (ii) twelve (12) months for Developed Materials that execute on a quarterly cycle; and (iii) two (2) years for Developed Materials that execute on an annual cycle.  During such warranty period, Service Provider shall (A) correct such failure at no charge to Delphi, (B) use commercially reasonable efforts to make such correction as expeditiously as possible, and (C) to the extent that such failure is not promptly corrected, implement appropriate work-arounds at no charge and without increasing Delphi's or any other Eligible Recipients' retained work efforts or costs.  If Service Provider fails or is unable to repair or replace such nonconforming Developed Material, Delphi shall, in addition to any and all other remedies available to it hereunder, be entitled to obtain from Service Provider a copy of the source code and/or object code and/or other applicable documentation to such Developed Material.

(d)     **Nonconformity of Service Provider Owned Software**.  In addition to the foregoing, if the Service Provider Owned Software (excluding Service Provider owned Developed Materials which are addressed in **Section 15.3(c)**) does not conform to the Specifications and criteria set forth in this Agreement, and/or materially adversely affects the Services provided hereunder, Service Provider shall expeditiously repair such Software or replace such Software with conforming Software.

**15.4     Non-Infringement.**

Except as otherwise provided in this Agreement, each Party represents, warrants and covenants that it shall perform its responsibilities under this Agreement in a manner that does not infringe, or constitute an infringement or misappropriation of, any patent, copyright, trademark, trade secret or other proprietary or privacy rights of any third party; _provided_ that such Party shall not have any obligation or liability to the extent any infringement or misappropriation is caused by (i) modifications made by the other Party or its contractors or subcontractors, without the knowledge or approval of such Party, (ii) the other Party's combination of such Party's work product or Materials with items not furnished, specified or reasonably anticipated by such Party or contemplated by this Agreement, (iii) a breach of this Agreement by the other Party, (iv) the failure of the other Party to use corrections or modifications provided by such Party offering equivalent features and functionality, or (v) Delphi Licensed Third Party Software or Service Provider Licensed Third Party Software, except to the extent that such infringement or misappropriation arises from the failure of such Party to obtain the necessary licenses or Required Consents or to abide by the limitations of the applicable Third Party Software licenses.  Each Party further represents, warrants and covenants that it will not use or create materials in connection with the Services which are libelous, defamatory or obscene.

**15.5     Authorization.**

Each Party represents, warrants and covenants to the other that:

(a)     **Corporate Existence**.  It is a corporation duly incorporated (where such party is Delphi) and or a limited liability company properly formed (where such party is Service Provider), and it is validly existing and in good standing under the Laws of the State of Delaware;

-78-

(b)    **Corporate Power and Authority**. It has the requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement and it has and will maintain through itself and its subsidiaries the resources required to perform its obligations under this Agreement throughout the Term;

(c)    **Legal Authority**. It has obtained all licenses, authorizations, approvals, consents or permits required to perform its obligations under this Agreement under all applicable federal, state or local laws and under all applicable rules and regulations of all authorities having jurisdiction over the Services, except to the extent the failure to obtain any such license, authorizations, approvals, consents or permits is, in the aggregate, immaterial;

(d)    **Due Authorization**. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement have been duly authorized by the requisite corporate action on the part of such Party; and

(e)    **No Violation or Conflict**. The execution, delivery, and performance of this Agreement shall not constitute a violation of any judgment, order, or decree; a material default under any material contract by which it or any of its material assets are bound; or an event that would, with notice or lapse of time, or both, constitute such a default.

**15.6    Inducements; Delphi Code of Ethics.**

(a)    **Inducements**. Service Provider represents and warrants that neither it, nor any of its Affiliates nor any of its or their respective officers, directors, employees, agents or representatives, will give, or, to the best of Service Provider's knowledge, has given, any commissions, payments, kickbacks, lavish or extensive entertainment, or other inducements of more than minimal value to any employee or agent of Delphi in connection with this Agreement, consistent with the Delphi Foundations for Excellence. Service Provider also acknowledges that the giving of any such payments, gifts, entertainment, or other thing of value is strictly in violation of Delphi policy on conflicts of interest, and may result in the cancellation for cause of this Agreement and other existing and future contracts between the Parties.

(b)    **Delphi Foundations for Excellence**. Service Provider represents, warrants and covenants that, in the performance of the Services and its other contractual obligations hereunder, it shall comply with the Delphi Foundations for Excellence, as such code of ethics may be reasonably modified from time to time.

**15.7    Malicious Code.**

Each Party shall cooperate with the other Party and shall take commercially reasonable actions and precautions consistent with **Schedule 2** to prevent the introduction and proliferation of Malicious Code into Delphi's or another Eligible Recipient's environment or any System used by Service Provider to provide the Services. Without limiting Service Provider's other obligations under this Agreement, in the event Malicious Code is found in Equipment, Software or Systems managed or supported by Service Provider or used by Service Provider to provide the Services, Service Provider shall, at no additional charge to Delphi, eliminate and reduce the effects of such Malicious Code and, if the Malicious Code causes a loss of operational efficiency or loss of data, to mitigate such losses and restore such data with generally accepted data restoration techniques.

**15.8    Disabling Code.**

Service Provider represents, warrants and covenants that (a) without the prior written consent of Delphi, Service Provider shall not insert into the Software any code that Service Provider knows or should have known could be invoked to disable or otherwise shut down all or any portion of the Software, Equipment and/or Systems, (b) with respect to any disabling code that may be part of the Software, Service Provider

shall not invoke or cause to be invoked such disabling code at any time, including upon expiration or termination of this Agreement for any reason, without Delphi's prior written consent, and (c) it shall use only Third Party Software (i) without disabling code or (ii) with respect to which the Third Party Software licensor and any other entity controlling invocation of such disabling code has agreed to refrain from invoking such disabling code, without the prior approval of Delphi.   For purposes of this provision, code that serves the function of ensuring software license compliance (including passwords) shall not be deemed disabling code, provided Service Provider notifies Delphi in advance of such code and obtains Delphi's approval prior to installing such code in any Software, Equipment or System.

15.9    **Compliance with Laws**.

(a)    **Compliance by Service Provider**.   Subject to __Section 15.9(c)__ and __Section 15.9(e)__, Service Provider represents, warrants and covenants that, with respect to the provision of the Services and the performance of any of its other legal and contractual obligations hereunder, it is and shall be in compliance with all applicable Laws and shall remain in compliance with such Laws for the Term and any Termination Assistance Services period, including identifying and procuring applicable permits, certificates, approvals and inspections required under such Laws.   Without limitation to the generality of the foregoing, Service Provider specifically represents, warrants and covenants as follows:

(i)    Service Provider and all Subcontractors (including shared Subcontractors and other Service Provider Personnel) shall comply with all applicable Laws regarding minimum wage, living conditions, overtime, working conditions, and the applicable labor and environmental Laws.

(ii)    Service Provider shall not use, and shall ensure that no Subcontractors (including shared Subcontractors or other Service Provider Personnel) use, any child labor, prison inmates, convicted felons or criminals, nor shall they contract with any prison system, to perform any Services.

(iii)    All products supplied by Service Provider pursuant to this Agreement shall conform to and satisfy the requirements of The Occupational Safety and Health Act of 1970 (or any state or local Laws passed in lieu thereof) and all standards and regulations issued thereunder.

(b)    **Compliance Data and Reports**.   At no additional charge, Service Provider shall provide Delphi with data and reports in Service Provider's possession and requested by Delphi for Delphi to comply with, all Laws applicable to the Services.

(c)    **Notice of Laws**.   Service Provider shall at no cost to Delphi notify Delphi of any Laws and changes in Laws applicable to Service Provider's performance of the Services, including those applicable to the employment of Service Provider Personnel and the provision of Services from the countries in which Service Provider Facilities are located (collectively, **"Service Provider Laws"**). Delphi shall be responsible for notifying Service Provider of any other Laws and any changes in such other Laws to the extent they impose an obligation on Delphi including Laws (i) regulating Delphi's and/or the other Eligible Recipients' principal businesses (other than Service Provider Laws) and (ii) apply to Delphi's and/or the other Eligible Recipient's receipt and use of the Services in the countries in which Delphi Facilities are located to the extent relevant to Service Provider's performance obligations under this Agreement (collectively, **"Delphi Laws"**).   Service Provider's obligation to comply with Delphi Laws shall be subject to Service Provider being made aware of the Delphi Laws by Delphi.   Service Provider shall, through the Service Provider Personnel, maintain general familiarity with Delphi Laws, and shall bring additional or changed requirements, of which it becomes reasonably aware, to Delphi's attention.   Subject to its non-disclosure obligation under other customer contracts, Service Provider also shall make commercially reasonable efforts to obtain information regarding such requirements from other

-80-

outsourcing customer engagements and to communicate such information to Delphi in a timely manner. In addition, Service Provider shall use commercially reasonable efforts to advise Delphi of Laws and changes in Laws about which Service Provider or Service Provider Personnel become aware that apply to an Eligible Recipient's principal businesses, but without assuming an affirmative obligation of inquiry, except as otherwise provided herein, and without relieving Service Provider of its obligations hereunder. At Delphi's request, Service Provider Personnel shall participate in Delphi provided compliance training programs.

(d)    **Interpretation of Laws or Changes in Laws**. Delphi shall be responsible, with Service Provider's cooperation and assistance, for interpreting Delphi Laws or changes in Delphi Laws and for identifying the impact of such Delphi Laws or changes in Delphi Laws on Service Provider's performance and Delphi's and/or the other Eligible Recipients' receipt and use of the Services. Service Provider shall be responsible, with Delphi's cooperation and assistance, for interpreting Service Provider Laws or changes in Service Provider Laws and for identifying the impact of such Service Provider Laws or changes in Service Provider Laws on Service Provider's performance and Delphi's and/or the other Eligible Recipients' receipt and use of the Services. To the extent the impact of any Service Provider Law or change in Service Provider Law cannot be readily identified by Service Provider, the Parties shall cooperate in interpreting such Law or change in Law and shall seek in good faith to identify and agree upon the impact on Service Provider's performance and Delphi's and/or the other Eligible Recipients' receipt and use of the Services. If the Parties are unable to agree upon such impact, Delphi shall retain the right, in its sole discretion, to interpret such Service Provider Law or change in Service Provider Law and determine its impact. In addition, if Service Provider reasonably concludes, after due inquiry, that the compliance obligations associated with any Service Provider Law or change in Service Provider Law are unclear or that there is more than one reasonable approach to achieving compliance, Service Provider may escalate the issue to Delphi for a final decision. If Delphi makes a final decision as to the interpretation of a Service Provider Law or a change in Service Provider Law despite Service Provider's written objection to such interpretation as being incorrect, and Service Provider complies with such decision, Service Provider shall be relieved of responsibility for any resulting non-compliance with such Service Provider Law if and to the extent such decision is ultimately determined to be in error. Service Provider shall notify Delphi expeditiously of such non-compliance upon learning thereof and shall work expeditiously to remedy such non-compliance upon receipt of Delphi's approval.

(e)    **Implementation of Changes in Laws**. In the event of any changes in Laws (including Delphi Laws to the extent Service Provider receives notice of such Delphi Laws from Delphi or as otherwise provided in **Section 15.10(e)**), Service Provider shall implement any necessary modifications to the Services prior to the deadline imposed by the regulatory or governmental body having jurisdiction for such requirement or change. Service Provider shall bear the costs associated with compliance with such Laws, including changes in Laws applicable to the Services unless and to the extent such changes (i) are to Delphi Laws and (ii) meet the definition of New Service, in which case it shall be treated and charged as a Project and/or New Service, as applicable. At Delphi's request, Service Provider Personnel shall participate in Delphi provided regulatory compliance training programs.

(f)    **Responsibility**. If a charge of non-compliance by Service Provider with any such Laws occurs, Service Provider shall promptly notify Delphi of such charge. Subject to **Section 15.10(e)**, Service Provider shall be responsible for any Losses imposed on Service Provider, Delphi or the other Eligible Recipients resulting from any failure of Service Provider or its Subcontractors or third party product or service providers to comply with applicable Laws, unless and to the extent such failure directly results from the sole acts or omissions of Delphi, another Eligible Recipient or a Delphi Third Party Contractor in contravention of Delphi's obligations under this Agreement, including its obligation to inform Service Provider in relation to Delphi Laws.

(g)    **Assistance to Delphi**. As part of the Services and on an ongoing basis, Service Provider shall assist Delphi and the other Eligible Recipients as they may reasonably require in their efforts to

comply with applicable Laws (including any changes to Laws) not applicable to Service Provider or related to the Services.

(h)    **Termination**.    If any change in Laws results in an increase of twenty percent (20%) or more in the estimated average monthly Charges, or otherwise has a material adverse impact on Service Provider's ability to perform the Services, and Delphi would not have incurred such additional cost or impact if it had not outsourced the Services in question to Service Provider, then Delphi may, at its option, terminate this Agreement or the impacted Services by giving Service Provider at least ninety (90) days' prior notice and designating a date upon which such termination shall be effective. If Delphi so terminates, Delphi shall pay Service Provider an amount equal to one-half of the Termination Charges that would be applicable if Delphi were terminating this Agreement or the impacted Services under **Section 20.2**.

**15.10    Interoperability**.

Service Provider represents, warrants and covenants that the Software, Equipment and Systems provided by Service Provider, and/or used to provide the Services, will be fully interoperable with the software, equipment and systems used by Delphi or the other Eligible Recipients to provide the same or similar services and/or to deliver records to, receive records from, or otherwise interact with the software, equipment and systems to receive the Services, provided that Delphi or the other Eligible Recipients inform Service Provider of such software, equipment and systems and any change to such software, equipment and systems.

**15.11    Disclaimer**.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS, CONDITIONS OR WARRANTIES TO THE OTHER PARTY, WHETHER EXPRESS OR IMPLIED, INCLUDING IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED WARRANTY OR CONDITION OTHERWISE ARISING FROM COURSE OF DEALING OR USAGE OF TRADE.

**16.    INSURANCE AND RISK OF LOSS**

**16 1    Insurance**.

(a)    **Requirements**.    Service Provider agrees to keep in full force and effect and maintain at its sole cost and expense the following policies of insurance with the specified minimum limits of liability during the term of this Agreement:

**REDACTED**

**REDACTED**

**REDACTED**

**17.    INDEMNITIES**

**17.1    Indemnity by Service Provider.**

Service Provider shall indemnify, defend and hold harmless Delphi and its Affiliates and the other Eligible Recipients and their respective officers, directors, employees, agents, representatives, successors, and assigns from any and all Losses and threatened Losses due to third party claims (which shall not include claims by Delphi Affiliates and/or Eligible Recipients) arising from or in connection with any of the following:

(a)    **Representations, Warranties and Covenants.**    Service Provider's breach of any of the representations, warranties and covenants set forth in **Sections 14.2(d)**, **15.5**, **15.6**, **15.7**, **15.8**, **15.9**,

**16.1(f)** and **16.2(b)**.

(b)     **Licenses, Leases and Contracts.**  Service Provider's failure to observe or perform any duties or obligations to be observed or performed by Service Provider under Third Party Software licenses, Equipment Leases or Third Party Contracts used by or on behalf of Service Provider to provide the Services.

(c)     **Delphi Data or Proprietary Information.**  Service Provider's breach of its obligations with respect to Delphi Data or Delphi Proprietary Information.

(d)     **Infringement.**    Infringement or misappropriation or alleged infringement or alleged misappropriation of a patent, trade secret, copyright or other proprietary rights of a third party not affiliated with Service Provider in contravention of Service Provider's representations, warranties and covenants in **Sections 15.3** and **15.4**.

(e)     **Government Claims.**  Claims by government regulators of agencies for fines, penalties, sanctions, interest or other monetary remedies imposed by a governmental body, regulatory agency or standards organization resulting from Service Provider's failure to perform its responsibilities under this Agreement.

(f)     **Taxes**.  Taxes, together with interest and penalties, that are the responsibility of Service Provider under **Section 11.4**.

(g)     **Claims Arising in Shared Facility Services.**  Systems, services or products provided by Service Provider to a third party from any shared Service Provider facility or using any shared Service Provider resources (excluding Services provided to an Eligible Recipient pursuant to this Agreement).

(h)     **Affiliate, Subcontractor or Assignee Claims**.  Any claim, other than an indemnification claim under **Section 17.2** of this Agreement, initiated by a Service Provider Affiliate or Subcontractor or other Service Provider Personnel asserting rights under this Agreement, or any claim initiated by any entity to which Service Provider assigned, transferred, pledged, hypothecated or otherwise encumbered its rights to receive payments under this Agreement.

(i)     **Service Provider Personnel Injury Claims**.  Any claim by Service Provider Personnel for death or bodily injury suffered on a Delphi Site or at a Delphi Facility, except to the extent caused by Delphi's gross negligence or willful misconduct.

(j)     **Employment Claims**.  Any claim (including claims by Transitioned Employees) relating to any: (i) employment, co-employment or joint employment of Service Provider Personnel by Delphi, or any other Eligible Recipients (including their respective personnel), (ii) violation by Service Provider, Service Provider Affiliates or Subcontractors, or their respective officers, directors, employees, representatives or agents, of any Laws or any common law protecting persons or members of protected classes or categories, including Laws prohibiting discrimination or harassment on the basis of a protected characteristic; (iii) liability arising or resulting from the employment of Service Provider Personnel (including Transitioned Employees) by Service Provider, Service Provider Affiliates or Subcontractors (including liability for any social security or other employment taxes, workers' compensation claims and premium payments, and contributions applicable to the wages and salaries of such Service Provider Personnel); (iv) payment or failure to pay any salary, wages or other cash compensation due and owing to any Service Provider Personnel (including Transitioned Employees from and after their Employment Effective Dates); (v) employee pension or other benefits of any Service Provider Personnel (including Transitioned Employees) accruing from and after their Employment Effective Date; and/or (vi) other aspects of the employment relationship of Service Provider Personnel (including Transitioned Employees) with Service Provider, Service Provider Affiliates or Subcontractors or the termination of such

-85-

relationship, including claims for wrongful discharge, claims for breach of express or implied employment contract and increases in unemployment insurance premiums.

(k)    **EC Acquired Rights Directive**. The indemnities by Service Provider to Delphi detailed in **Section 8.6**.

**17.2**    **Indemnity by Delphi.**

Delphi shall indemnify, defend and hold harmless Service Provider and its officers, directors, employees, agents, representatives, successors, and assigns, from any Losses and threatened Losses due to third party claims (excluding Service Provider Affiliate and Subcontractor claims) arising from or in connection with any of the following:

(a)    **Representations, Warranties and Covenants**. Delphi breach of any of the representations, warranties and covenants set forth in **Sections 15.5**, **15.7** and **15.9**.

(b)    **Licenses, Leases or Contracts**. Delphi's failure to observe or perform any duties or obligations to be observed or performed by Delphi under any of the applicable Third Party Software licenses, Equipment Leases or Third Party Contracts to the extent Delphi is financially or operationally responsible under this Agreement.

(c)    **Service Provider's Proprietary Information**. Delphi's breach of its obligations with respect to Service Provider's Proprietary Information.

(d)    **Taxes**. Taxes, together with interest and penalties, that are the responsibility of Delphi under **Section 11.4**.

(e)    **Acquired Assets**. Any claim relating to the Acquired Assets accruing prior to the transfer of such Acquired Assets to Service Provider, including liens or encumbrances.

(f)    **EC Acquired Rights Directive**. The indemnities by Delphi to Service Provider detailed in **Section 8.6**.

(g)    **Infringement**. Infringement or misappropriation or alleged infringement or alleged misappropriation of a patent, trade secret, copyright or other proprietary rights of a third party resulting from any Materials, Data or information provided by Delphi in contravention of Delphi's representations, warranties and covenants in **Section 15.4**.

**17.3**    **Additional Indemnities**.

Service Provider and Delphi each shall indemnify, defend and hold harmless the other, and the Eligible Recipients and their respective Affiliates, officers, directors, employees, agents, representatives, successors, and assigns, from any and all Losses and threatened Losses to the extent they arise from or in connection with any of the following:   (a) except as otherwise provided in **Section 17.1(i)**, the death or bodily injury of any agent, employee, customer, business invitee, business visitor or other person caused by the negligence or other tortious conduct of the indemnitor or the failure of the indemnitor to comply with its obligations under this Agreement; and (b) the damage, loss or destruction of any real or tangible personal property of a third party (excluding Affiliates of Delphi or Service Provider, Subcontractors or other Service Provider Personnel, or Eligible Recipients) caused by the negligence or other tortious conduct of the indemnitor or the failure of the indemnitor to comply with its obligations under this Agreement.

**17.4**    **Infringement**.

In the event that (a) any Equipment, Software or other Materials or Services provided or made available by Service Provider or its Affiliates or Subcontractors or other Service Provider Personnel pursuant to this

-86-

Agreement or used by them in the performance or delivery of the Services are found, or in Delphi's reasonable opinion are likely to be found, to infringe upon the patent, copyright, trademark, trade secrets, intellectual property or proprietary rights of any third party in any country in which Services are to be performed or received under this Agreement, or (b) the continued use of such items is enjoined, Service Provider shall, in addition to defending, indemnifying and holding harmless Delphi as provided in **Section 17.1(d)** and to the other rights Delphi may have under this Agreement, promptly and at its own cost and expense and in such a manner as to minimize the disturbance to Delphi's and the other Eligible Recipients' business activities do one of the following:

(a)     **Obtain Rights**.    Obtain for Delphi and the other Eligible Recipients the right to continue using and receiving the benefits of such Equipment, Software or other Materials, or Services.

(b)     **Modification**.    Modify the item(s) in question so that it is no longer infringing, _provided_ that such modification does not degrade the performance or quality of the Services or adversely affect Delphi's and the other Eligible Recipients' intended use as contemplated by this Agreement.

(c)     **Replacement**.    Replace such item(s) with a non-infringing functional equivalent acceptable to Delphi.

**17.5     Indemnification Procedures**.

With respect to third party claims that are subject to indemnification under this Agreement (other than as provided in **Section 17.6** with respect to claims covered by **Section 17.1(e)**), the following procedures shall apply:

(a)     **Notice**.    Promptly after receipt by any entity entitled to indemnification under this Agreement of notice of the commencement or threatened commencement of any civil, criminal, administrative, or investigative action or proceeding involving a claim in respect of which the indemnitee will seek indemnification hereunder, the indemnitee shall notify the indemnitor of such claim.    No delay or failure to so notify an indemnitor shall relieve it of its obligations under this Agreement except to the extent that such indemnitor has suffered actual prejudice by such delay or failure.    Within fifteen (15) days following receipt of notice from the indemnitee relating to any claim, but no later than five (5) days before the date on which any response to a complaint or summons is due, the indemnitor shall notify the indemnitee that the indemnitor elects to assume control of the defense and settlement of that claim (a "**Notice of Election**").

(b)     **Procedure Following Notice of Election**.    If the indemnitor delivers a Notice of Election within the required notice period, the indemnitor shall assume sole control over the defense and settlement of the claim; _provided_ that (i) the indemnitor shall keep the indemnitee fully apprised at all times as to the status of the defense, and (ii) the indemnitor shall obtain the prior written approval of the indemnitee before entering into any settlement of such claim asserting any liability against the indemnitee or imposing any obligations or restrictions on the indemnitee or ceasing to defend against such claim.    The indemnitor shall not be liable for any legal fees or expenses incurred by the indemnitee following the delivery of a Notice of Election; _provided_ that (A) the indemnitee shall be entitled to employ counsel at its own expense to participate in the handling of the claim, and (B) the indemnitor shall pay the fees and expenses associated with such counsel if there is a conflict of interest with respect to such claim which is not otherwise resolved or if the indemnitor has requested the assistance of the indemnitee in the defense of the claim or the indemnitor has failed to defend the claim diligently and the indemnitee is prejudiced or likely to be prejudiced by such failure.    The indemnitor shall not be obligated to indemnify the indemnitee for any amount paid or payable by such indemnitee in the settlement of any claim if (1) the indemnitor has delivered a timely Notice of Election and such amount was agreed to without the written consent of the indemnitor, (2) the indemnitee has not provided the indemnitor with notice of such claim and a reasonable opportunity to respond thereto, or (3) the time period within which to deliver a Notice of Election has not yet expired.

(c)    **Procedure Where No Notice of Election Is Delivered**. If the indemnitor does not deliver a Notice of Election relating to any claim within the required notice period, the indemnitee shall have the right to defend the claim in such manner as it may deem appropriate. The indemnitor shall promptly reimburse the indemnitee for all such reasonable costs and expenses incurred by the indemnitee, including reasonable attorneys' fees.

**17.6**    **Indemnification Procedures – Governmental Claims**.

With respect to claims covered by **Section 17.1(e)**, the following procedures shall apply:

(a)    **Notice**. Promptly after receipt by Delphi of notice of the commencement or threatened commencement of any action or proceeding involving a claim in respect of which the indemnitee will seek indemnification pursuant to **Section 17.1(e)**, Delphi shall notify Service Provider of such claim. No delay or failure to so notify Service Provider shall relieve Service Provider of its obligations under this Agreement except to the extent that Service Provider has suffered actual prejudice by such delay or failure.

(b)    **Procedure for Defense**. Delphi shall be entitled, at its option, to have the claim handled pursuant to **Section 17.5** or to retain sole control over the defense and settlement of such claim, <u>provided</u> that, in the latter case, Delphi shall (i) consult with Service Provider on a regular basis regarding claim processing (including actual and anticipated costs and expenses) and litigation strategy, (ii) reasonably consider any Service Provider settlement proposals or suggestions, and (iii) use commercially reasonable efforts to minimize any amounts payable or reimbursable by Service Provider.

**17.7**    **Subrogation**.

Except as otherwise provided in **Sections 16.1** or **16.2**, in the event that an indemnitor shall be obligated to indemnify an indemnitee pursuant to any provision of this Agreement, the indemnitor shall, upon payment of such indemnity in full, be subrogated to all rights of the indemnitee with respect to the claims to which such indemnification relates.

**18.**    **LIABILITY**

**18.1**    **General Intent**.

Subject to the specific provisions and limitations of this Article 18, it is the intent of the Parties that each Party shall be liable to the other Party for any actual damages incurred by the non-breaching Party as a result of the breaching Party's failure to perform its obligations in the manner required by this Agreement.

**18.2**    **Force Majeure**.

(a)    **General**. Subject to **Section 18.2(d)**, no Party shall be liable for any default or delay in the performance of its obligations under this Agreement if and to the extent such default or delay is caused, directly or indirectly, by fire, flood, earthquake, elements of nature or acts of God, wars, riots, civil disorders, rebellions or revolutions, acts of terrorism, strikes, lockouts or labor disputes or any other similar cause beyond the reasonable control of such Party, except to the extent that the non-performing Party is at fault in failing to prevent or causing such default or delay. The failure of any Equipment, Software or System for which Service Provider is operationally responsible to be year 2000 compliant shall not be considered a force majeure event and shall not relieve Service Provider of any of its obligations under this Agreement, including its obligations to perform the Services in accordance with the Service Levels. A strike, lockout or labor dispute involving Service Provider Personnel shall not excuse Service Provider from its obligations hereunder. In addition, the refusal of Service Provider Personnel to enter a facility that is the subject of a labor dispute shall excuse Service Provider from its obligations hereunder only if and to the extent such

refusal is based upon a clear and present danger of physical harm.

(b)    **Duration and Notification.**    In the event of a force majeure event, the non-performing Party shall be excused from further performance or observance of the obligation(s) so affected for as long as such circumstances prevail and such Party continues to use all commercially reasonable efforts to recommence performance or observance whenever and to whatever extent possible without delay. Any Party so prevented, hindered or delayed in its performance shall, as quickly as practicable under the circumstances, notify the Party to whom performance is due by telephone (to be confirmed in writing within one (1) day of the inception of such delay) and describe at a reasonable level of detail the circumstances of the force majeure event, the steps being taken to address such force majeure event, and the expected duration of such force majeure event.

**REDACTED**

(d)    **Disaster Recovery.**    Within ninety (90) days after the Effective Date or by the Production Date for each of the Services, whichever occurs first for such Service, Service Provider shall document its disaster-recovery plan for such Services and ensure that it is consistent with and will operate in conjunction with **Schedules 15** and **16** and the pricing for the said disaster-recovery plan is included in **Schedule 4**.    Service Provider shall execute its disaster-recovery plan upon the occurrence of a disaster and cooperate with Delphi in the execution of Delphi's and/or the other Eligible Recipients' business-continuity and disaster-recovery plans.

(e)    **Payment Obligation.**    If Service Provider fails to provide Services in accordance with this Agreement due to the occurrence of a force majeure event, all amounts payable to Service Provider hereunder shall be equitably adjusted in a manner such that Delphi is not required to pay any amounts for Services that it is not receiving from Service Provider.

(f)    **Allocation of Resources.**    Without limiting Service Provider's obligations under this Agreement, whenever a force majeure event or disaster causes Service Provider to allocate limited resources between or among Service Provider's customers and Affiliates, Delphi and the other Eligible Recipients shall receive at least as favorable treatment as comparable Service Provider customers. In no event will Service Provider re-deploy or re-assign any Key Service Provider Personnel to another customer or account in the event of the occurrence of a force majeure event.

**REDACTED**

**REDACTED**

**REDACTED**

19.    **DISPUTE RESOLUTION**

19.1    **Informal Dispute Resolution.**

Prior to the initiation of formal dispute resolution procedures with respect to any dispute, other than as provided in **Sections 19.3(j)** or **20.8**, the Parties shall first attempt to resolve such dispute informally, as follows:

(a)    **Initial Effort**.    The Parties agree that the Delphi Contract Executive and the Service Provider

-91-

Account Executive shall attempt in good faith to resolve all disputes (other than those described in **Section 19.3(j)** or **20.8**). In the event the Delphi Contract Executive and the Service Provider Account Executive are unable to resolve a dispute in an amount of time that either Party deems reasonable under the circumstances, such Party may refer the dispute for resolution to the senior corporate executives specified in **Section 19.1(b)** upon written notice to the other Party.

(b)    **Escalation.** Within five (5) business days of a notice under **Section 19.1(a)** referring a dispute for resolution by senior corporate executives, the Delphi Contract Executive and the Service Provider Account Executive will each prepare and provide to Service Provider's Executive Vice President – Business Development and Delphi's Executive Vice President, Global Business Services, respectively, summaries of the non-privileged relevant information and background of the dispute, along with any appropriate non-privileged supporting documentation, for their review. The designated senior corporate executives will confer as often as they deem reasonably necessary in order to gather and furnish to the other all non-privileged information with respect to the matter in issue which the Parties believe to be appropriate and germane in connection with its resolution. The designated senior corporate executives shall discuss the problem and negotiate in good faith in an effort to resolve the dispute without the necessity of any formal proceeding. The specific format for the discussions will be left to the discretion of the designated senior corporate executives, but may include the preparation of agreed-upon statements of fact or written statements of position.

(c)    **Provision of Information.** During the course of negotiations under **Section 19.1(a)** or **(b)**, all reasonable requests made by one Party to another for non-privileged information, reasonably related to the dispute, will be honored in order that each of the parties may be fully advised of the other's position. All negotiation shall be strictly confidential and used solely for the purposes of settlement. Any materials prepared by one Party for these proceedings shall not be used as evidence by the other Party in any subsequent arbitration or litigation; provided that the underlying facts supporting such materials may be subject to discovery.

(d)    **Prerequisite to Formal Proceedings.** Formal proceedings for the resolution of a dispute may not be commenced until the earlier of:

(i)    the senior corporate executives designated under **Section 19.1(b)** concluding in good faith that amicable resolution through continued negotiation of the matter does not appear likely; or

(ii)    thirty (30) days after the notice under **Section 19.1(a)** referring the dispute to senior corporate executives.

**19.2    Reserved.**

**19.3    Arbitration.**

(a)    **Rules.** Any and all disputes arising out of or relating to this Agreement that have not been resolved pursuant to **Section 19.1** shall be resolved by final and binding arbitration ("**Arbitration**") under the then-in-force International Arbitration Rules of the ICDR.

(b)    **Arbitral Panel.** The Arbitration shall be conducted by three arbitrators. The Parties shall each nominate one arbitrator and shall inform the other Party and the ICDR of the identity of its Party-nominated arbitrator within fifteen (15) days of the filing of the demand for Arbitration. The two Party-nominated arbitrators shall then have fifteen (15) days in which to together appoint a third arbitrator to serve as chair of the arbitral panel.

(c)    **Seat.** The location of the Arbitration shall be Oakland County in the State of Michigan. The Arbitration shall be conducted in English unless the Parties mutually agree otherwise.

(d)    **Limitations Period**. An Arbitration claim shall be rejected as untimely if the Request for Arbitration was filed after the date that such claim would be barred by the applicable statute of limitations.

(e)    **Evidence.** The arbitrators shall be guided by the Rules of Evidence of the International Bar Association in providing for document exchanges and evidentiary submissions.

(f)    **Limitation on Damages Awards**. Subject to applicable law, the arbitrators shall have no authority to award punitive, exemplary, or any other damages other than compensatory damages.

(g)    **Costs and Fees**. Arbitration costs, including attorneys' fees, expert fees, and expenses, shall be borne in the manner determined by the arbitrators.

(h)    **Award**. An award issued in Arbitration may be entered by any court having jurisdiction thereof.

(i)    **Confidentiality.** Unless otherwise agreed by the Parties and subject to applicable law, the Parties (including their Affiliates, employees, agents, experts and consultants), the arbitrators, and the ICDR shall maintain the confidentiality of all documents, communications, proceedings and awards provided, produced, or exchanged in an Arbitration.

(j)    **Interim Measures and Injunctive Relief**. Nothing in this Agreement shall prevent the Parties, prior to the formation of the arbitral panel, from applying to a court of competent jurisdiction for provisional or interim measures or injunctive relief as may be necessary to safeguard the property or rights that are the subject matter of the Arbitration. Once the arbitral panel is in place, it shall have exclusive jurisdiction to hear applications for interim measures or injunctive relief, except that any interim measures or injunctive relief ordered by the arbitral panel may be immediately and specifically enforced by a court of competent jurisdiction.

    (i)    If injunctive relief is required for any of the five reasons set forth immediately below, either Party may file for Arbitration immediately (and, if necessary, apply to a court of competent jurisdiction pending constitution of the arbitral panel) and shall not be required to follow the procedures set forth in **Section 19.1** of this Agreement:

        (i)    to avoid the expiration of any applicable limitations period;

        (ii)    to preserve a superior position with respect to other creditors;

        (iii)    to address a claim arising out of the breach of a Party's obligations under **Article 13**;

        (iv)    to address a claim arising out of the breach or attempted or threatened breach of the obligations described in **Section 19.3(j)(ii)**; or

        (v)    to prevent other damages that are so immediate, so large or severe, and so incapable of adequate redress after the fact that a temporary restraining order or other immediate injunctive relief is the only adequate remedy.

    (ii)    **Irreparable Harm**. Service Provider acknowledges that, in the event it breaches (or attempts or threatens to breach) its obligation to provide Services or Termination Assistance Services in accordance with this Agreement, its obligation respecting continued performance in accordance with **Section 19.5**, or its obligation to provide access to Delphi Data in accordance with **Section 13.5**, Delphi and/or the other Eligible Recipients will be irreparably harmed. In such a circumstance, Delphi may proceed directly to arbitration. If the arbitral tribunal should find that Service Provider has breached (or attempted or threatened to breach) any such obligations, Service Provider

agrees that, without any additional findings of irreparable injury or other conditions to injunctive relief, it shall not oppose the entry of an appropriate order compelling performance by Service Provider and restraining it from any further breaches (or attempted or threatened breaches).

**19.4    Jurisdiction**.

Each Party irrevocably agrees that, unless otherwise mutually agreed by the Parties, any legal action, suit or proceeding brought by it in any way arising out of this Agreement must be brought solely and exclusively (a) on or before Emergence, in the case of any legal action, suit or proceeding brought by Delphi on behalf of itself or any Eligible Recipient which is a Debtor, in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and (b) in all other instances in Oakland County, Michigan, and each Party irrevocably submits to the sole and exclusive jurisdiction of the Bankruptcy Court and the federal and state courts in Oakland County, Michigan, as applicable in personam, generally and unconditionally with respect to any action, suit or proceeding brought by it or against it by the other Party.

**19.5    Continued Performance**.

(a)    **General**.    Each Party agrees that it shall, unless otherwise directed by the other Party, continue performing its obligations under this Agreement while any dispute is being resolved, <u>provided</u> that this **Section 19.5** shall not operate or be construed as extending the Term or prohibiting or delaying a Party's exercise of any right it may have to terminate the Term as to all or any part of the Services.    For purposes of clarification, Delphi Data may not be withheld by Service Provider pending the resolution of any dispute.

(b)    **Non-Interruption of Service**.    Service Provider acknowledges and agrees that any interruption to the Service will cause irreparable harm to Delphi and/or the other Eligible Recipients, in which case an adequate remedy at law would not be available.    Service Provider expressly acknowledges and agrees that, pending resolution of any dispute or controversy, it shall not deny, withdraw, or restrict Service Provider's provision of the Services to Delphi and/or the other Eligible Recipients under this Agreement, except as specifically and expressly agreed in writing by Delphi and Service Provider.

**19.6    Governing Law**.

This Agreement and performance under it shall be governed by and construed in accordance with the applicable laws of the State of New York, without giving effect to the principles thereof relating to conflicts of laws, and the Bankruptcy Code, where applicable.    The application of the United Nations Convention on Contracts for the International Sale of Goods is expressly excluded.

**REDACTED**

**REDACTED**

**REDACTED**

**REDACTED**

21.    **GENERAL**

21.1    **Binding Nature and Assignment**.

    (a)    **Binding Nature**.  This Agreement will be binding on the Parties and their respective successors and permitted assigns.

    (b)    **Assignment**.  Neither Party may, or will have the power to, assign this Agreement without the prior written consent of the other, except in the following circumstances:

        (i)    Delphi may assign its rights or obligations under this Agreement, without approval of Service Provider, to an Affiliate which expressly assumes Delphi's obligations and responsibilities hereunder, <u>provided</u> that Delphi remains fully liable for and is not relieved from the full performance of its obligations under this Agreement;

        (ii)    Delphi may assign its rights and obligations under this Agreement without the approval of Service Provider to an Entity acquiring Control of Delphi, an Entity into which Delphi is merged, or an Entity acquiring all or substantially all of Delphi's assets, or one or more Entities who upon Emergence become successors to Delphi's assets as part of a Bankruptcy Court approved plan of reorganization, <u>provided</u> that the acquirer or surviving Entity(ies) agrees in writing to be bound by the terms and conditions of this Agreement; and

        (iii)    Service Provider may assign its rights or obligations under this Agreement, without approval of Delphi, to an Affiliate which expressly assumes Service Provider's obligations and responsibilities hereunder, <u>provided</u> that Service Provider remains fully liable for and is not relieved from the full performance of its obligations under this Agreement.

    (c)    **Impermissible Assignment**.  Any attempted assignment that does not comply with the terms of this Section shall be null and void.

21.2    **Entire Agreement; Amendment**.

This Agreement, including any Schedules and Exhibits referred to herein and attached hereto, each of which is incorporated herein for all purposes, constitutes the entire agreement between the Parties with respect to the subject matter hereof.  There are no agreements, representations, warranties, promises, covenants, commitments or undertakings other than those expressly set forth herein.  This Agreement supersedes all prior agreements, representations, warranties, promises, covenants, commitments or undertaking, whether written or oral, with respect to the subject matter contained in this Agreement.  No amendment, modification, change, waiver, or discharge hereof shall be valid unless in writing and signed by an authorized representative of the Party against which such amendment, modification, change, waiver, or discharge is sought to be enforced.

21.3    **Notices**.

    (a)    **Primary Notices**.  Any notice, notification, request, demand or determination provided by a Party pursuant to the following:

        (i)    <u>**Section 4.4**</u> (Termination Assistance Services);

        (ii)    <u>**Section 4.5(a)**</u> (Use of Third Parties – Right of Use);

        (iii)    <u>**Section 7.7**</u> (Notice of Adverse Impact);

-98-

(iv)    **Section 10.2** (Savings Clause);

(v)     **Section 13.4(f)** (Loss of Proprietary Information);

(vi)    **Sections 17.5** (Indemnification Procedures);

(vii)   **Section 17.6** (Indemnification Procedures – Government Claims);

(viii)  **Section 18.2** (Force Majeure);

(ix)    **Section 18.3(e)** (Waiver of Liability Cap);

(x)     **Section 19.1** (Informal Dispute Resolution);

(xi)    **Article 20** (Termination); and

(xii)   **Section 21.1** (Binding Nature and Assignment);

shall be in writing and shall be delivered in hard copy using one of the following methods and shall be deemed delivered upon receipt:    (A) by hand; (B) by an express courier with a reliable system for tracking delivery; or (C) by registered or certified mail, return receipt requested, postage prepaid.    Unless otherwise notified, the foregoing notices shall be delivered as follows:

In the case of Delphi:

> Delphi Corporation
> 5725 Delphi Drive
> Mail-code:    480-900-001
> Troy, Michigan 48098
> Attention: Dana Fidler, Director - Financial Processes and Services
> E-mail Address:   dana.f.fidler@delphi.com
> Facsimile Number:   248 267 4277

With a copy to:

> Delphi Corporation
> 5725 Delphi Drive
> Mail-code:    483-400-603
> Troy, Michigan 48098
> Attention: David Sherbin, Vice President and General Counsel
> E-mail Address:   David.Sherbin@delphi.com
> Facsimile Number:   (248) 813-2491

and

In the case of Service Provider:

> Genpact International, LLC
> 1251 Avenue of the Americas, 41st Floor
> New York, NY 10020
> Attention: Senior Vice-President & General Counsel
> Fax: 646 823 0467

With a copy by email or facsimile to:

-99-

Attention: Selva M. Vaidiyanathan, Vice-President, Automotive CoE
E-mail Address: selva.vaidiyanathan@genpact.com
Facsimile Number: 91-4066657070

(b)    **Other Notices**.    All notices, notifications, requests, demands or determinations required or provided pursuant to this Agreement, other than those specified in **Section 21.3(a)**, may be sent in hard copy in the manner specified in **Section 21.3(a)**, or by e-mail transmission (where receipt is acknowledged by the recipient) or facsimile transmission (with acknowledgment of receipt from the recipient's facsimile machine) to the addresses set forth below:

In the case of Delphi:

Delphi Corporation
5725 Delphi Drive
Mail-code:    480-900-001
Troy, Michigan 48098
Attention: Dana Fidler, Director - Financial Processes and Services
E-mail Address:    dana.f.fidler@delphi.com
Facsimile Number:    248 267 4277

and

In the case of Service Provider:

Attention: Selva M. Vaidiyanathan, Vice-President, Automotive CoE
E-mail Address: selva.vaidiyanathan@genpact.com
Facsimile Number: 91-4066657070

(c)    **Notice of Change**.    A Party may from time to time change its address or designee for notification purposes by giving the other prior notice of the new address or designee and the date upon which it shall become effective.

(d)    **Service of Process**.    Notwithstanding the above, for the purpose of service of legal process and receipt of notice or pleadings in judicial proceedings before the federal or state courts of Oakland County, Michigan, as selected by the Parties under **Section 19.4**, both Parties to this Agreement irrevocably agrees and consents to the following address for service of process:

In the case of Delphi:

Delphi Corporation
5725 Delphi Drive
Mail-code:    48-400-603
Troy, Michigan 48098
Attention: David Sherbin, Vice President and General Counsel
E-mail Address:    David.Sherbin@delphi.com
Facsimile Number:    (248) 813-2491

With a copy to:

Delphi Corporation
5725 Delphi Drive
Mail-code:    480-900-001
Troy, Michigan 48098
Attention: Dana Fidler, Director - Financial Processes and Services

-100-

E-mail Address:   dana.f.fidler@delphi.com
Facsimile Number:   248 267 4277

And

In the case of Service Provider:

Genpact International, LLC
1251 Avenue of the Americas, 41st Floor
New York, NY 10020
Attention: Senior Vice-President & General Counsel
Fax: 646 823 0467_____

With a copy by email or facsimile to:

Attention: Selva M. Vaidiyanathan, Vice-President, Automotive CoE
E-mail Address: selva.vaidiyanathan@genpact.com
Facsimile Number: 91-4066657070

**21.4    Counterparts.**

This Agreement may be executed in several counterparts, all of which taken together shall constitute one single agreement between the Parties hereto.

**21.5    Headings.**

The article and section headings and the table of contents used herein are for reference and convenience only and shall not be considered in the interpretation of this Agreement.

**21.6    Relationship of Parties.**

Service Provider, in furnishing services to Delphi and the other Eligible Recipients hereunder, is acting as an independent contractor, and Service Provider has the sole obligation to supervise, manage, contract, direct, procure, perform or cause to be performed, all work to be performed by Service Provider under this Agreement.   The relationship of the Parties under this Agreement shall not constitute a partnership or joint venture for any purpose.   Except as expressly provided in this Agreement, Service Provider is not an agent of Delphi or the other Eligible Recipients and has no right, power or authority, expressly or impliedly, to represent or bind Delphi or the other Eligible Recipients as to any matters, except as expressly authorized in this Agreement.

**21.7    Severability.**

In the event that any provision of this Agreement conflicts with the law under which this Agreement is to be construed or if any such provision is held invalid or unenforceable by a court with jurisdiction over the Parties, such provision shall be deemed to be restated to reflect as nearly as possible the original intentions of the Parties in accordance with applicable Law.   The remaining provisions of this Agreement and the application of the challenged provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each such provision shall be valid and enforceable to the full extent permitted by Law.

**21.8    Consents and Approval.**

Except where expressly provided as being in the sole discretion of a Party, where agreement, approval,

acceptance, consent, confirmation, notice or similar action by either Party is required under this Agreement, such action shall not be unreasonably delayed or withheld. An approval or consent given by a Party under this Agreement shall not relieve the other Party from responsibility for complying with the requirements of this Agreement, nor shall it be construed as a waiver of any rights under this Agreement, except as and to the extent otherwise expressly provided in such approval or consent.

**21.9    Waiver of Default; Cumulative Remedies.**

(a)    **Waiver of Default.** A delay or omission by either Party hereto to exercise any right or power under this Agreement shall not be construed to be a waiver thereof. A waiver by either of the Parties hereto of any of the covenants to be performed by the other or any breach thereof shall not be construed to be a waiver of any succeeding breach thereof or of any other covenant herein contained. All waivers must be in writing and signed by the Party waiving its rights.

(b)    **Cumulative Remedies.** All remedies provided for in this Agreement shall be cumulative and in addition to and not in lieu of any other remedies available to either Party at law, in equity or otherwise. The election by a Party of any remedy provided for in this Agreement or otherwise available to such Party shall not preclude such Party from pursuing any other remedies available to such Party at law, in equity, by contract or otherwise.

**21.10    Survival.**

Any provision of this Agreement which contemplates performance or observance subsequent to any termination or expiration of this Agreement shall survive any termination or expiration of this Agreement and continue in full force and effect. Additionally, all provisions of this Agreement will survive the expiration or termination of this Agreement to the fullest extent necessary to give the Parties the full benefit of the bargain expressed herein.

**21.11    Publicity.**

Except with respect to Delphi's statements to the Bankruptcy Court in a public filing or at a hearing related to this Agreement, neither Party shall use the other Party's name or mark or refer to the other Party directly or indirectly in any media release, public announcement, or public disclosure relating to this Agreement, including in any promotional or marketing materials, customer lists or business presentations without the prior written consent of the other Party prior to each such use or release. Service Provider shall not make any public statements about this Agreement, the Services or its relationship with Delphi and/or the Eligible Recipients without Delphi's prior approval.

**21.12    Service Marks.**

Neither Party shall, without the other Party's prior consent, use any of the names, service marks or trademarks of that Party or the other Eligible Recipients of Delphi in any of its advertising or marketing materials.

**21.13    Export.**

The Parties acknowledge that certain Equipment, Software and technical data to be provided hereunder and certain transactions hereunder may be subject to export controls under the laws and regulations of the United States, the European Union, the United Nations and other jurisdictions. No Party shall export or re-export any such items or any direct product thereof or undertake any transaction or service in violation of any such laws or regulations. To the extent within Service Provider's control, Service Provider shall be responsible for, and shall coordinate and oversee, compliance with such export laws in respect of such items exported or imported hereunder.

**21.14    Enforcement and Third Party Beneficiaries.**

Delphi shall have the right to enforce this Agreement and to assert all rights and exercise and receive the benefits of all remedies, including monetary damages, on behalf of each Eligible Recipient to the same extent as if such Eligible Recipient were Delphi under this Agreement. Except as expressly provided herein, this Agreement is entered into solely between, and may be enforced only by, Delphi (on behalf of itself and the other Eligible Recipients) and Service Provider (on behalf of itself and the Service Provider Affiliates). Except as expressly provided herein, this Agreement shall not be deemed to create any rights or causes of action in or on behalf of any third parties, including employees, suppliers and customers of a Party, or to create any obligations of a Party to any such third parties.

**21.15    Covenant Against Pledging**.

Service Provider agrees that, without the prior written consent of Delphi, it shall not assign, transfer, pledge, hypothecate or otherwise encumber its rights to receive payments from Delphi under this Agreement for any reason whatsoever. To the extent Delphi permits Service Provider to assign, transfer, pledge, hypothecate or otherwise encumber its rights to receive payments from Delphi under this Agreement, Service Provider shall continue to be Delphi's sole point of contact with respect to this Agreement, including with respect to payment, provided that the foregoing will not prohibit Delphi from communicating directly with any third party. The person or Entity to which such rights are assigned, transferred, pledged, hypothecated or otherwise encumbered shall not be considered a third party beneficiary under this Agreement and shall not have any rights or causes of action against Delphi.

**21.16    Order of Precedence**.

Unless specifically provided otherwise in any Companion Agreement, in the event of a conflict, this Agreement shall take precedence over the Schedules attached hereto, and the Schedules shall take precedence over any attached Exhibits.

**21.17    Hiring of Employees**.

(a)    **Solicitation and Hiring**. Except as expressly set forth herein, during the Term and for a period of twelve (12) months thereafter, Service Provider will not solicit for employment directly or indirectly, nor employ, any employees of Delphi or another Eligible Recipient or individual Delphi Third Party Contractors without the prior approval of Delphi. Except as expressly set forth herein in connection with the expiration or termination of this Agreement (or any portion thereof) or any Service, during the Term and for a period of twelve (12) months thereafter, Delphi will not solicit for employment directly or indirectly, nor employ, any employee of Service Provider involved in the performance of Service Provider's obligations under this Agreement without the prior consent of Service Provider. In each case, the prohibition on solicitation and hiring shall extend ninety (90) days after the termination of the employee's employment or, in the case of Service Provider employees, the cessation of his or her involvement in the performance of Services under this Agreement. This provision shall not operate or be construed to prevent or limit any employee's right to practice his or her profession or to utilize his or her skills for another employer or to restrict any employee's freedom of movement or association.

(b)    **Publications**. Neither the publication of classified advertisements in newspapers, periodicals, Internet bulletin boards, or other publications of general availability or circulation nor the consideration and hiring of persons responding to such advertisements shall be deemed a breach of this **Section 21.17**, unless the advertisement and solicitation is undertaken as a means to circumvent or conceal a violation of this provision and/or the hiring party acts with knowledge of this hiring prohibition.

**21.18    Further Assurances**.

Each Party covenants and agrees that, subsequent to the execution and delivery of this Agreement and without any additional consideration, each Party shall execute and deliver any further legal instruments and

-103-

perform any acts that are or may become necessary to effectuate the purposes of this Agreement.

**21.19    Liens.**

Service Provider shall not file, or by its action or inaction permit, any liens to be filed on or against property or realty of Delphi or any Eligible Recipient.   In the event that any such liens arise as a result of Service Provider's action or inaction, Service Provider shall obtain a bond to fully satisfy such liens or otherwise remove such liens at its sole cost and expense within ten (10) business days.   If Service Provider fails to do so, Delphi may, in its sole discretion, pay the amount of such lien, and/or deduct such amounts from payments due to Service Provider.

**21.20    Covenant of Good Faith.**

Each Party agrees that, in its respective dealings with the other Party under or in connection with this Agreement, it shall act in good faith.

**21.21    Acknowledgment.**

The Parties each acknowledge that the terms and conditions of this Agreement have been the subject of active and complete negotiations, and that such terms and conditions should not be construed in favor of or against any Party   by reason of the extent to which any Party or its professional advisors participated in the preparation of this Agreement.

**21.22    References.**

Without first obtaining Delphi's consent, Service Provider shall not use Delphi as a reference for all prospective Service Provider customers interested in purchasing services that include the same or substantially similar services to the Services.   If Delphi provides such consent, then in conjunction with the foregoing, Delphi's Vice President of Corporate Communication (or equivalent level of Delphi management), shall serve as the contact point for such prospective Service Provider customers and shall respond to all inquiries in a timely manner.   Notwithstanding **Section 13.4**, Service Provider acknowledges and agrees that Delphi's Director Indirect/Machinery & Equipment (or equivalent level of Delphi management) may freely discuss all aspects of Service Provider's performance and Delphi's satisfaction with such performance with prospective Service Provider customers.   Service Provider shall provide such prospective Service Provider customers with appropriate Delphi contact information.   The identity of such prospective Service Provider customers and all information related thereto shall be considered Service Provider Proprietary Information.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective duly authorized representatives as of the Effective Date.

**Delphi Corporation**                                   **Genpact International, LLC**

By:    Robert J. Dellinger                               By:    Harpreet Duggal

Title:  Executive Vice President and Chief Financial Officer   Title:  Senior Vice President

Date: March 28, 2007                                     Date: March 28, 2007

# Schedule 1

# Definitions

This **Schedule 1** is a part of and incorporated within the Master Services Agreement between Delphi and Genpact International, LLC. References to the preamble, articles, sections, schedules and exhibits in this **Schedule 1** are to the preamble, Articles and Sections of, and Schedules and Exhibits to, the Agreement unless otherwise specified.  As used in this Agreement:

"**Acceptance Criteria**" means the criteria used to determine whether Critical Testing Deliverables are ready to be evaluated for Acceptance by Delphi in whole or in part.  Acceptance Criteria include:  (i) any mutually agreed written criteria identified as Acceptance Criteria; (ii) Compliance; and (iii) for all Software and System deliverables that process data, such item successfully integrates with all other Services, Software, Equipment, Systems, and other resources and is fully documented such that the anticipated end user can utilize the functionality of such Deliverable and that reasonable knowledgeable professionals can understand, maintain, support, and modify such item.

"**Acceptance**" or "**Accept**" means the determination, in Delphi's reasonable discretion in accordance with **Schedule 6**, following implementation, installation, testing and execution in the production environment for an agreed upon number of business cycles that Software, Equipment, Systems and/or other contract deliverables are in Compliance.

"**Acceptance Review Period**" has the meaning given in **Section 4.8(b)(i)**. "**Accounts Payable**" has the meaning given in **Section 2** of **Schedule 2.2-B**.

"**Acquired Assets**" means the Equipment, Software and other assets listed on **Schedule 21** that Service Provider will acquire pursuant to the terms of this Agreement.

"**Acquired Assets Credit**" means the amount set forth on **Schedule 4** that Service Provider will pay to Delphi as consideration for the Acquired Assets.

"**Active Delphi Customer**" has the meaning given in **Section 2(a)** of **Schedule 2.2-A**.

"**Actual FTE Charges**" has the meaning given in **Section 3** of **Schedule 4.**

"**Actual FTE Resource Units**" has the meaning given in **Section 3** of **Schedule 4.**

"**Actual RU-based FTEs**" has the meaning given in **Section 3** of **Schedule 4.**

"**Adequate Data**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**AFCs**" means "**Authorizations for Checks**," as defined in **Section 2(a)** of **Schedule 2.2-A**.

"**Affiliate**" means with respect to any Entity, any other Entity that is directly or indirectly Controls, is Controlled by or under common Control with such Entity at the time in question.

"**Agreement**" has the meaning given in the preamble to this Agreement.

"**Allocation of Pool Percentage**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**AP**" means Accounts Payable.

"**AP Time Zone**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**AR**" means "**Accounts Receivable**," as defined in **Section 2** of **Schedule 2.2-A.**

"**Arbitration**" has the meaning given in **Section 19.3(a)**.

"**At Risk Amount**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Audit Period**" means the longer of (a) the period for retention of Contract Records required by Delphi's record retention policy (as such policy may be modified from time to time and provided to Service Provider in writing), (b) seven (7) years after the provision of the applicable Service to Delphi or any other Eligible Recipient, or (c) the period required by applicable Law.

"**Authorized User(s)**" means, unless otherwise indicated, officers, directors, employees, contractors, and agents of Delphi and the other Eligible Recipients and any other person(s) designated by Delphi or another Eligible Recipient to receive or use the Systems or Services provided by Service Provider. "**Bankruptcy Code**" has the meaning given in **Section 20.6(b)**.

"**Bankruptcy Court**" has the meaning given in **Section 19.4**, or such other court as shall have jurisdiction over the Debtors with respect to the cases filed by them under Chapter 11 of the Bankruptcy Code.

"**Bankruptcy Court Consent**" means a consent (if any) to the extent required to be obtained from the Bankruptcy Court until Emergence pursuant to Section 365 of the Bankruptcy Code: (i) to assign or transfer to Service Provider Delphi Licensed Third Party Software, Third Party Contracts, Equipment Leases or Acquired Assets (including related warranties); (ii) to grant Service Provider the right to use and/or access the Delphi Licensed Third Party Software in connection with providing the Services; (iii) to grant Delphi and the other Eligible Recipients the right to use and/or access the Service Provider Owned Software, Third Party Software and Equipment acquired, operated, supported, used, or required to be used by Service Provider in connection with providing the Services; (iv) to assign or transfer to Delphi, the other Eligible Recipients or their designee(s) any Developed Materials; and (v) to assign or transfer to Delphi, the other Eligible Recipients or their designee(s) Service Provider Owned Software, Third Party Software, Third Party Contracts, Equipment Leases or other rights following the Term to the extent provided in this Agreement.

"**Bankruptcy Rejection**" has the meaning given in **Section 20.6(b)**.

"**Benchmark Standard**" has the meaning given in **Section 11.8(d)**.

"**Benchmarker**" has the meaning given in **Section 11.8(a)**.

"**Benchmarking**" has the meaning given in **Section 11.8(a)**.

"**BS 7799**" means the standard of such name published by the British Standards Institute (BSI).

"**Business Unit**" has the meaning given in **Section 3** of **Schedule 4.**

"**Call Center**" has the meaning given in **Section 10.1** of **Schedule 2.1**.

"**Change**" has the meaning given in **Section 9.6(a)**.

"**Change Control Procedures**" has the meaning given in **Section 9.6(a)**.

"**Chargeable Projects**" has the meaning given in **Section 3** of **Schedule 4.**

"**Charges**" means the amounts set forth in **Article 11** and **Schedule 4** (or otherwise set forth in the Agreement) as charges due to Service Provider in return for providing the Services.

"**Companion Agreement**" has the meaning given in **Section 2.3(a)**.

"**Compliance**" and "**Comply**" means, with respect to process(es), Software, Equipment, Systems or other contract deliverables to be implemented, designed, developed, delivered, integrated, installed and/or tested by Service Provider, in compliance in all material respects with the applicable Acceptance Criteria and other Specifications and this Agreement.

"**Continuous Improvement Adjustment Date**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Contract Administration**" has the meaning given in **Section 2.3** of **Schedule 2.1**.

"**Contract Changes**" has the meaning given in **Section 11.1(e)**.

"**Contract Records**" has the meaning given in **Section 9.8(a)**.

"**Contract Year**" means, for the first Contract Year, a period commencing on the Effective Date and ending on December 31, 2007 and, for each ensuing Contract Year, a twelve (12) month period commencing on January 1 and ending on December 31.  If any Contract Year is less than twelve (12) months, the rights and obligations under this Agreement that are calculated on a Contract Year basis will be proportionately adjusted for such shorter period.

"**Control**" and its derivatives means:  (a) the legal, beneficial, or equitable ownership, directly or indirectly, of (i) at least fifty percent (50%) of the aggregate of all voting equity interests in an Entity, or (ii) equity interests having the right to at least fifty percent (50%) of the profits of an Entity or, in the event of dissolution, to at least fifty percent (50%) of the assets of an Entity; (b) the right to appoint, directly or indirectly, a majority of the board of directors; (c) the right to control, directly or indirectly, the management or direction of the Entity by contract or corporate governance document; or (d) in the case of a partnership, the holding by an Entity (or one of its Affiliates) of the position of sole general partner.

"**Critical Deliverables**" means those milestone activities and deliverables identified in **Schedule 3-C**, the Transition Plan (including Transition Milestones), or established as part of a New Service that have associated Deliverable Credits payable to Delphi in the event Service Provider fails to complete such milestone activities or deliver such deliverables in accordance with the foregoing, as applicable.

"**Critical Service Level**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Critical Support Personnel**" means those individuals identified in **Schedule 5-C** as critical to the ongoing success of Service Provider's delivery of the Services to Delphi and the other Eligible Recipients.

"**Critical Testing Deliverable**" has the meaning given in **Section 4.8(b)(i)**.

"**Critical Transition Milestone**" means a Transition Milestone identified as a Critical Transition Milestone in the Transition Plan.

"**Cumulative PIF**" has the meaning given in **Section 3** of **Schedule 4.**

"**Customer Charge-Back**" has the meaning given in **Section 2(a)** of **Schedule 2.2-A**.

"**Debtor**" means Delphi and each other Eligible Recipient that filed a voluntary petition of reorganization under Chapter 11 of the Bankruptcy Code.

"**Deliverable Credits**" has the meaning given in **Section 7.2(b)**.

"**Delivery Services**" has the meaning given in **Section 3** of **Schedule 4.**

"**Delphi**" has the meaning given in the Preamble.

"**Delphi Contract Executive**" has the meaning given in **Section 10.1(a)**.

"**Delphi Customer**" has the meaning given in **Section 2(a)** of **Schedule 2.2-A**.

"**Delphi Data**" means any data or information of Delphi or any other Eligible Recipient that is provided to or obtained by Service Provider in connection with the negotiation and execution of this Agreement or the performance of Service Provider's obligations under this Agreement, including data and information with respect to the businesses, customers, revenues, expenses, contracts, operations, facilities, products, regulatory compliance, competitors, assets, liabilities, expenditures, mergers, acquisitions, divestitures, billings, collections, and finances of Delphi or any other Eligible Recipient.  Delphi Data also means any data or information (i) created, generated, collected or processed by Service Provider in the performance of its obligations under this Agreement, including data processing input and output, service level measurements, asset information, Reports, third party service and product agreements, contract charges, and retained expense and Pass-Through Expenses, or (ii) that resides in or is accessed through Software, Equipment or Systems provided, operated, supported, or used by Service Provider in connection with the Services, as well as information derived from this data and information.

"**Delphi Facilities**" means the facilities listed in **Schedule 7-A** that are provided by Delphi or the other Eligible Recipients for the use of Service Provider to the extent necessary to provide the Services.

"**Delphi Foundations for Excellence**" means the policy set forth in **Section 17-C**, as it may be amended from time to time.

"**Delphi Holiday**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**Delphi Laws**" has the meaning given in **Section 15.9(c)**.

"**Delphi Licensed Third Party Materials**" means Materials provided under licensed or lease (other than by Service Provider, its Affiliates or Subcontractors) to Delphi or other Eligible Recipients and used to provide the Services.

"**Delphi Licensed Third Party Software**" means Delphi Licensed Third Party Materials consisting of Software.

"**Delphi Owned Materials**" has the meaning given in **Section 14.1(a)**.

"**Delphi Owned Software**" means Software owned by Delphi (or a Delphi Affiliate or another Eligible Recipient) and used, operated, maintained or supported by or on behalf of Service Provider under or in connection with this Agreement.

"**Delphi Personal Data**" means that portion of Delphi Data that is subject to any Privacy Laws.

"**Delphi Personnel**" means the employees, agents, contractors or representatives of Delphi or its Affiliates or other Eligible Recipients who performed any of the Services to be provided by Service Provider during the twelve (12) months preceding the Production Date for such Services.

"**Delphi Reporting Entity**" has the meaning given in **Section 2(d)** of **Schedule 2.2-A**.

"**Delphi Required Consents**" means the approvals, consent and authorizations required from third parties or governmental entities in connection with Delphi's receipt of the Services or performance of its obligations hereunder, including each of the foregoing required to be obtained:  (i) to grant Service Provider the right to use and/or access the Delphi Systems in connection with providing the Services; and (ii) to grant Service Provider and any Subcontractors the right to use and/or access the Delphi Owned Software or Delphi Licensed Third Party Materials to the extent required to permit Service Provider to exercise the licenses granted to Delphi to perform the Services as they may change from time to time (both in scope and location).

"**Delphi Rules**" has the meaning given in **Section 6.3(a)**.

"**Delphi Sites**" or "**Sites**" means the offices or other facilities, including those listed on **Schedule 7-A**, at or to which Service Provider is to provide the Services.

"**Delphi Standards**" has the meaning given in **Section 9.5(a)**.

"**Delphi Third Party Contractors**" has the meaning given in **Section 4.5(a)**.

"**Delphi Time Zone**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**Delphi Vendor**" has the meaning given in **Section 2(a)** of **Schedule 2.2-A**.

"**Derivative Work**" shall mean a work based on one or more preexisting works, including a condensation, transformation, translation, modification, expansion, or adaptation, that, if prepared without authorization of the owner of the copyright of such preexisting work, would constitute a copyright infringement under applicable Law, but excluding the preexisting work.

"**Developed Materials**" shall mean any Materials (including Software), or any modifications, enhancements or Derivative Works thereof, developed by or on behalf of Service Provider for Delphi or the other Eligible Recipients or as specially identified in this Agreement or a Work Order .

"**Direct Delphi Competitor**" means the Entities identified in **Schedule 11**, as well as their Affiliates, successors and assigns, as such list of Entities may be modified by Delphi from time to time.

"**Direct Service Provider Competitor**" means the Entities identification on **Schedule 12**, as well as their Affiliates, successors and assigns, as such list of Entities may be modified from time to time.

"**Disaster Recovery Plan**" has the meaning set forth in **Schedule 16**.

"**EC Acquired Rights Directive**" means legislation, regulation, enactment, agreement or other instrument relating to the transfer of any employee in the relevant EU jurisdiction, including those regulations implementing the provisions of EC Directives No. 77/187 dated 14 February 1977, 2001/23 dated 12 March 2001 or equivalent, as such legislation, regulation, enactment, agreement, or other instrument may be amended or replaced from time to time.

"**EDI**" means electronic data interchange.

"**Effective Date**" means the date, if any, that the Bankruptcy Count issues a final order approving the Agreement.    However, if the Effective Date does not occur by May 31, 2007, the Parties will discuss whether to extend the end date of the initial Term to approximately 88 months from the Effective Date.  If the Effective Date does not occur by September 30, 2007, then either Party by providing written notice to the other may declare the Agreement null and void and neither Party will have any further rights or obligations hereunder.

"**Efficiency**" has the meaning given in **Section 3** of **Schedule 4.**

"**Efficiency-Based Monthly Process & Region Baseline FTEs**" has the meaning given in **Section 3** of **Schedule 4.**

"**EFT**" has the meaning given in **Section 2.5** of **Schedule 2.2-B**.

"**Electronic Incident**" has the meaning given in **Section 13.2(d)**.

"**Eligible Recipients**" means, collectively, and to the extent such Entity is receiving Services under this Agreement, the following:

    (a)     Delphi;

    (b)     any Entity that is an Affiliate of Delphi on the Effective Date, or thereafter becomes an Affiliate of Delphi;

    (c)     any Entity that purchases after the Effective Date from Delphi or any Affiliate of Delphi, all or substantially all of the assets of Delphi or such Affiliate, or of any division, marketing unit, business unit, administrative unit, or manufacturing, research or

development facility thereof, provided that, if Delphi wishes such Entity to receive Services under this Agreement, such Entity agrees in writing to be bound by the terms and conditions of this Agreement;

(d)    any Entity that after the Effective Date is created using assets of Delphi or any Affiliate of Delphi, provided that, if Delphi wishes such Entity to receive Services under this Agreement, such Entity agrees in writing to be bound by the terms and conditions of this Agreement;

(e)    any Entity into which Delphi or any Affiliate of Delphi merges or consolidates, provided that such Entity has assumed Delphi's obligations under this Agreement, and provided further that, if Delphi wishes such Entity to receive Services under this Agreement, such Entity agrees in writing to be bound by the terms and conditions of this Agreement;

(f)    any Entity which merges into or consolidates with Delphi or any Affiliate of Delphi;

(g)    any Entity, including any corporation, joint venture, partnership, or research or development division, in which on or after the Effective Date, Delphi or any Affiliate of Delphi has an ownership interest and/or as to which Delphi or such Affiliate has management or operational responsibility by law or contract;

(h)    any Entity in which Delphi or any of its Affiliates hold significant stock, warrants or debt;

(i)    any franchisee or other customer of an Eligible Recipient identified in **clauses (a)** through **(g)** above, but only in connection with the provision of products or services by such Eligible Recipient to such customer or franchisee (other than solely by the resale of the Services under this Agreement);

(j)    any person or Entity engaged in the provision of products or services to Delphi or an Eligible Recipient identified in **clauses (a)** through **(g)** above, but only in connection with the provision of such products or services to Delphi or such Eligible Recipient (other than solely by the resale of the Services under this Agreement); and

(k)    other entities to which the Parties agree.

Except as used in **Sections 17.1**, **17.3**, **17.4**, **17.5** and **17.6**, Eligible Recipients shall include the employees, contractors, subcontractors, agents and representatives of the Entities identified as Eligible Recipients in clauses **(a)** through **(j)** above.

"**EMEA**" means the Region comprised of Europe, the Middle East and Africa.

"**Emergence**" means the date a confirmed plan of reorganization has been approved by the Bankruptcy Court under Chapter 11 of the Bankruptcy Code with respect to the Debtors.

"**Employment Effective Date**" means, with respect to each Transitioned Employee, the date that such Transitioned Employee begins employment with Service Provider.

"**Employment Liabilities**" has the meaning given in **Section 8.6(e)**.

"**Entity**" means a corporation, partnership, joint venture, trust, limited liability company, limited liability partnership, association or other organization or entity.

"**Equipment**" means all computing, networking, communications and related computing equipment (hardware and firmware) procured, provided, operated, supported, or used by or on behalf of Delphi or the other Eligible Recipients, Service Provider or Authorized Users in connection with the Services, including (i) mainframe, midrange, server and distributed computing equipment and associated attachments, features, accessories, peripheral devices, and cabling, (ii) personal computers, laptop computers, terminals, workstations and associated attachments, features, accessories, printers, multi-functional printers, peripheral

devices, and cabling, and (iii) voice, data, video and wireless telecommunications and network and monitoring equipment and associated attachments, features, accessories, cell phones, peripheral devices, and cabling.

"**Equipment Leases**" means all leasing arrangements whereby Delphi, the Eligible Recipients or a Delphi Third Party Contractor leases Equipment as of the Commencement Date which will be used by Service Provider to perform the Services after the Commencement Date.

"**ERP**" means enterprise resource planning.

"**ERS**" has the meaning given in **Section 2.1** of **Schedule 2.2-B**.

"**Estimated Delivery Services Charges**" has the meaning given in **Section 3** of **Schedule 4.**

"**ETBR**" means electronic trial balance reporting, as defined in **Section 8.1** of **Schedule 2.1**.

"**EU Time Zone**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**Exception Transfer**" has the meaning given in **Section 8.1(b)**.

"**Expected Service Level**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Expected Service Level Default**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**F&A**" means finance and accounting.

"**Full Time Equivalent**" or "**FTE**" means a level of effort, excluding vacation, holidays, training, administrative and other non-productive time (but including a reasonable amount of additional work outside normal business hours), equivalent to that which would be provided by one person working full time for one year.  Unless otherwise agreed, one FTE is assumed to be at least 1,850 productive hours per Contract Year. Without Delphi's prior written approval, one (1) dedicated individual's total work effort cannot amount to more than one FTE.

"**GAAP**" means generally accepted accounting principles of the United States, applied in accordance with SAS-69, as such principles may be modified during the Term by the Public Accounting Oversight Board or other applicable authorities.

"**GAAS**" means generally accepted accounting standards, as such standards may be modified during the Term by the Public Accounting Oversight Board or other applicable authorities.

"**Gain Share Uplift**" has the meaning given in **Section 3** of **Schedule 4.**

"**GST**" means Goods and Services Tax.

"**High Priority Demand**" has the meaning given in **Section 2.2** of **Schedule 2.3**.

"**High Priority Part Number Order**" has the meaning given in **Schedule 3-B**.

"**Hourly Rate**" has the meaning given in **Section 3** of **Schedule 4.**

"**Hours**" has the meaning given in **Section 3** of **Schedule 4.**

"**ICDR**" means International Center for Dispute Resolution.

"**Income Tax**" means any:  (a) applicable federal, state and local, and foreign taxes measured based on net income or profits, net worth, gross receipts or gross profits, including the Ohio commercial Activity Tax; (b) taxes which are of the nature of excess profits tax, minimum tax on tax preferences, alternative minimum tax, accumulated earnings tax, personal holding company tax, capital gains tax or franchise tax for the privilege

of doing business, including the New Jersey Alternative Minimum Assessment Tax and the Michigan Single Business Tax; and (c) interest, penalties and other additions thereto assessed by a Tax Authority.

"**INCOTERM**" means INternational COmmerce TERMS, a set of uniform rules for the interpretation of international commercial terms defining the costs, risks, and obligations of buyers and sellers in international transactions.

"**India Time Zone**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**Initial Data Set**" has the meaning given in **Section 10.1** of **Schedule 3**.

"**Interest Rate**" has the meaning given in **Section 9.8(c)**.

"**ISO 17799**" is an information security standard published by the International Organization for Standardization (ISO).

"**ISP**" means information security policy, as defined in **Section 2.6** of **Schedule 2.**

"**IVR**" means interactive voice response.

"**Key Performance Indicators**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Key Service Provider Personnel**" means the Service Provider Personnel filling the positions designated in **Schedule 5-D** as Key Service Provider Personnel.

"**Laws**" shall mean all federal, state, provincial, regional, territorial and local laws, statutes, ordinances, regulations, rules, executive orders, supervisory requirements, directives, circulars, opinions, interpretive letters and other official releases of or by any government, or any authority, department or agency thereof, including the United States Securities and Exchange Commission and the Public Accounting Oversight Board.  For purposes of this Agreement, Laws also shall include the Bankruptcy Code (including any related rules and regulations and orders of the Bankruptcy Court as applicable to any Debtor), Privacy Laws, GAAP and GAAS.  In addition, any other laws in force in any jurisdiction (regulatory or otherwise) in which the Services are being provided.

"**Losses**" means all losses, liabilities, damages (including punitive and exemplary damages), fines, penalties, interest and claims (including taxes), and all related costs and expenses (including reasonable legal fees and disbursements and costs of investigation, litigation, experts, settlement, judgment, interest and penalties).

"**Malicious Code**" means (i) any code, program, or sub-program whose knowing or intended purpose is to damage or interfere with the operation of the computer system containing the code, program or sub-program, or to halt, disable or interfere with the operation of the Software, code, program, or sub-program, itself, (ii) any device, method, or token that permits any person to circumvent the normal security of the Software or the system containing the code, or (iii) any adware, spyware, Internet bots, malware, bugs, web bugs or other surreptitious code.

"**Managed Contract**" means a license, lease, services agreement or other contract with a Delphi Third Party Contractor (a) that is or has been entered into by Delphi, its Affiliates or other Eligible Recipients, (b) that is not assigned or to be assigned to Service Provider pursuant to this Agreement, and (c) for which Service Provider has operational responsibility or financial and operational responsibility pursuant to this Agreement.

"**Managed Third Parties**" means the Delphi Third Party Contractors that are party to Managed Contracts, including those listed on **Schedule 19-B** and any substitute or replacement third party contractors reasonably designated by Delphi.

"**Master Services Agreement**" has the meaning given in the Preamble.

"**Materials**" means, collectively, Software, literary works, other works of authorship, specifications, designs, analyses, processes, methodologies, concepts, inventions (whether patentable or reduced to practice), know-

how, programs, program listings, programming tools, documentation, user materials, reports, drawings, databases, spreadsheets, machine-readable data, text and files, financial models and work product, whether tangible or intangible.

"**Measurement Period**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**Minimum Service Level**" means the minimum requirement for a Service Level, as designated in **Schedule 3-A**.

"**Minimum Service Level Default**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**MNS-2**" has the meaning given in **Section 12.2**.

"**Monthly Invoice**" has the meaning given in **Section 12.1(a)**.

"**Monthly Process & Region Forecast FTEs**" has the meaning given in **Section 3** of **Schedule 4.**

"**NA Time Zone**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**New Advances**" has the meaning given in **Section 9.11(c)**.

"**New Services**" means services (i) that are materially different from the Services, (ii) that require materially different levels of effort, resources or expense from Service Provider, and (iii) for which there is no current charging methodology (including Resource Units or Project Services pricing as described in **Schedule 4**).

"**Noncompliance**" means each instance that the Software, Equipment, Systems, or other deliverable or milestone fails to meet its Acceptance Criteria or is otherwise deficient in Delphi's reasonable discretion.

"**Notice of Election**" has the meaning given in **Section 17.5(a)**.

"**Open Source Code/Shareware**" means any software that contains or is derived, in any form, from, in whole or in part, any software distributed as free software, shareware, or known as "open source code" in the software industry (e.g., Linux, Openadapter, etc.) or that requires as a condition of use, modification, and/or distribution of such software that such software or other software incorporated into such software, derived from or distributed with such software be (i) disclosed or distributed in source code form, (ii) licensed for the purpose of making derivative works, and (iii) re-distributed at no charge. Open Source Code/Shareware also includes software distributed under any license or distribution model recognized by the Open Source Initiative as "Open Source Software" including: (a) GNU's General Public License (GPL) or Lesser/Library GPL (LGPL); (b) the Artistic License (e.g., PERL); (c) the Mozilla Public License(s); (d) the Netscape Public License; (e) the Berkeley software design (BSD) license including Free BSD or BSD-style license; (f) the Sun Public License (SPL); (g) an Open Source Foundation License (e.g., CDE and Motif Unix user interfaces); and (h) the Apache Server License.

"**Out-of-Pocket Expenses**" means reasonable, incremental, demonstrable and actual out-of-pocket expenses due and payable to a third party by Service Provider that are approved in advance by Delphi and for which Service Provider is entitled to be reimbursed by Delphi under this Agreement. Out-of-Pocket Expenses shall not include Service Provider's overhead costs (or allocations thereof), general and/or administrative expenses or other mark-ups. Out-of-Pocket Expenses shall be calculated at Service Provider's actual incremental expense and shall be net of all rebates and allowances.

"**Party**" and "**Parties**" have the meaning given in the Recitals.

"**Pass-Through Expenses**" means the expenses, if any, listed in **Schedule 4-I**, as such list may be amended by Delphi from time to time, for which Delphi has agreed in advance to be financially responsible, in accordance with **Article 11**, following processing and review of the third party invoice by Service Provider. Service Provider shall not charge any handling or administrative charge in connection with its processing or review of such invoices.

"**Performance Category**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Policy and Procedures Manual**" has the meaning given in **Section 9.1(a)**.

"**Pool Percentage Available for Allocation**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**PPAP**" means Production Part Approval Process.

"**Privacy Laws**" means Laws that relate to the security and protection of personally-identifiable information, data privacy, trans-border data flow or data protection, including the Health Insurance Portability and Accountability Act (HIPAA), the Gramm-Leach-Bliley Act and the implementing legislation and regulations of the European Union member states under the European Union Directive 95/46/EC.

"**Process**" has the meaning given in **Section 3** of **Schedule 4**.

"**Production Date**" means, for any Service, the date specified in the Transition Plan for such Service, or such other date as the Parties may agree upon in writing as the date on which Service Provider will assume full responsibility for such Service. The "applicable Production Date" means the Production Date applicable to the relevant Services.

"**Project**" has the meaning given in **Section 4.6(a)(ii)**.

"**Project FTE Charges**" means Charges for Project Services.

"**Proprietary Information**" has the meaning given in **Sections 13.4(b)** and **(c)**.

"**Quality Assurance**" means the actions, planned and performed, to provide confidence that all processes, Systems, Equipment, Software and components that influence the quality of the Services are working as expected individually and collectively.

"**Recoverable Taxes**" means any tax on goods or services where the payer of the tax is able to claim a credit for that tax from a Tax Authority, and includes Goods and Services Taxes, Harmonized Sales Taxes, Value Added Taxes and other similar taxes.

"**Region**" has the meaning given in **Section 3** of **Schedule 4.**

"**Reports**" has the meaning given in **Section 9.2(a)**.

"**RFB**" means "**Request for Billing**," as defined in **Section 2(a)** of **Schedule 2.2-A**.

"**RFC**" means "**Request for Credit**," as defined in **Section 2(a)** of **Schedule 2.2-A**.

"**Resource Units**" has the meaning given in **Section 3** of **Schedule 4**."**Resource Unit Forecast**" has the meaning given in **Section 6(d)(i)** of **Schedule 4**.

"**Retained Systems and Processes**" means those systems and processes of Delphi or another Eligible Recipient for which Service Provider has not assumed responsibility under this Agreement (including those provided, managed, operated, supported and/or used on their behalf by Delphi Third Party Contractors). Retained Systems and Processes include equipment and software associated with such systems and processes.

"**Reviews**" has the meaning given in **Section 13.2(e)**.

"**Root Cause Analysis**" means the formal process, specified in the Policy and Procedures Manual, to be used by Service Provider to diagnose the underlying cause of problems at the lowest reasonable level so that corrective action can be taken that will eliminate repeat failures. Service Provider shall implement a Root Cause Analysis as specified in **Section 7.3** or as requested by Delphi.

"**SAP PIF**" means the SAP productivity improvement factors set forth in **Table 3** in **Schedule 4-I**.

"**SAS**" has the meaning given in **Section 9.8(i)(i)**.

"**SAS 70**" means Statement of Auditing Standards No. 70, as defined in **Section 2.4** of **Schedule 2.1**.

"**Service Level Credits**" has the meaning given in **Section 7.2(a)** and **Schedule 3**.

"**Service Level(s)**" means, individually and collectively, the quantitative performance standards for the Services set forth in **Schedule 3**.

"**Service Level Credit Allocation Percentage**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Service Level Default**" has the meaning given in **Section 1.3** of **Schedule 3**.

"**Service Provider**" has the meaning given in the Preamble.

"**Service Provider Account Executive**" has the meaning given in **Section 8.2** and shall describe the Service Provider representative responsible for both the day-to-day relationship with Delphi as well as the delivery of all Services to Delphi.

"**Service Provider Facilities**" means, individually and collectively, the facilities owned or leased by Service Provider (or its Affiliates or Subcontractors) from which Service Provider (or its Affiliates or Subcontractors) provides any Services.  Service Provider Facilities are listed on **Schedule 7-B**.

"**Service Provider Laws**" has the meaning given in **Section 15.9(c)**.

"**Service Provider Licensed Third Party Materials**" means Materials that are provided under licensed or lease to Service Provider, its Affiliates or Subcontractors and used in connection with the Services or to which Service Provider provides any Eligible Recipient with access in connection with the Services, as well as such other Materials for which Service Provider is financially responsible under this Agreement.

"**Service Provider Owned Materials**" has the meaning given in **Section 14.3(a)**.

"**Service Provider Owned Software**" means any Software owned by Service Provider (or its Affiliates or Subcontractors) and used to provide the Services.

"**Service Provider Personnel**" means Service Provider, its Affiliates and Subcontractors, and their respective employees, representatives, contractors, subcontractors and agents who perform any Services under this Agreement.

"**Service Provider Required Consents**" means the approvals, consent and authorizations required from third parties or governmental entities in connection with Service Provider's provision of the Services or performance of its obligations hereunder, including each of the foregoing required to be obtained:  (i) to grant Delphi and the other Eligible Recipients the right to use and/or access the Service Provider Owned Software, Service Provider Licensed Third Party Materials and Equipment; (ii) to change location of the installation or use of any software or equipment referred to in clause (i) above, or System (including consents to offshore use) or change the permitted use thereof by Service Provider; (iii) to assign or transfer to Delphi, the other Eligible Recipients or their designee(s) any Developed Materials; and (iv) to assign or transfer to Delphi, the other Eligible Recipients or their designee(s) Service Provider Owned Software, Service Provider Licensed Third Party Materials, Third Party Contracts, Equipment Leases or other rights following the Term to the extent provided in this Agreement.

"**Service Taxes**" means all sales, service, GST, value-added, use, excise and other similar transaction taxes that apply to the delivery of goods and services to Delphi or an Eligible Recipient under this Agreement that are assessed against either Party on the provision of the Services as a whole, or on any particular Service received by Delphi or an Eligible Recipient from Service Provider, excluding Recoverable Taxes and Income Taxes.

"**Services**" means, collectively:  (i) the services, functions and responsibilities described in **Article 4** and elsewhere in this Agreement (including Transition Services and Termination Assistance Services) as they may be supplemented, enhanced, modified or replaced during the Term in accordance with this Agreement; and (ii) any ongoing Projects and any new Projects upon Delphi's acceptance of Service Provider's proposals for such Projects in accordance with **Section 4.6** and the other provisions of this Agreement; and (iii) any New Services, upon Delphi's acceptance of Service Provider's proposal for such New Services in accordance with **Section 11.5** and the other provisions of this Agreement.

"**Shared Subcontractor**" has the meaning given in **Section 9.10(c)**.

"**SL Business Day**" has the meaning given in **Section 1.8** of **Schedule 3-B.**

"**Software**" means all software programs and programming (and all modifications, replacements, Upgrades, enhancements, documentation, materials and media related thereto), to the extent a Party has financial or operational responsibility for such programs or programming in connection with the Services, including under **Schedule 2** or **4-B.**  Software shall include all such programs or programming in use or required to be used as of the applicable Production Date and those as to which Service Provider received reasonable notice and/or access prior to the applicable Production Date.  Software also shall include all such programs or programming developed and/or introduced by or for Delphi or the other Eligible Recipients on or after the applicable Production Date to the extent a Party has financial or operational responsibility for such programs or programming under **Schedule 2** or **4-B.**

"**Specialized Services**" has the meaning given in **Section 9.7(a)**.

"**Specifications**" means, with respect to processes, Software, Equipment, Systems or other contract deliverables to be designed, developed, delivered, integrated, installed and/or tested by Service Provider, the technical, design and/or functional specifications set forth in **Schedule 2** or **8** or elsewhere in this Agreement, in third party vendor documentation, in a New Services or Project description requested and/or approved by Delphi, or otherwise agreed upon in writing by the Parties.

"**Strategic Plan**" means the plans that may be periodically developed by Delphi that set forth Delphi's key business objectives and requirements and outline its strategies for achieving such objectives and requirements. Delphi may revise the Strategic Plan from time to time.  The Strategic Plan will include both annual and multi-year strategies, objectives and requirements.

"**Subcontractors**" means subcontractors (of any tier) of Service Provider, including Shared Subcontractors. The initial list of Subcontractors is set forth on **Schedule 19**, each of which has been approved by Delphi to the extent such approval is required and described thereon.  **Schedule 19** may be amended during the Term in accordance with **Section 9.12**.

"**System**" means an interconnected grouping of manual or electronic processes, including Equipment, Software and associated attachments, features, accessories, peripherals and cabling, and all additions, modifications, substitutions, Upgrades or enhancements to such System, to the extent a Party has financial or operational responsibility for such System or System components under **Schedule 2**.  System shall include all Systems in use or required to be used as of the applicable Production Date, all additions, modifications, substitutions, Upgrades or enhancements to such Systems and all Systems installed or developed by or for Delphi, the other Eligible Recipients or Service Provider following the applicable Production Date.

"**T&E**" means travel and expense, as defined in **Section 2** of **Schedule 2.2-E.**

"**Tax Authority**" means any government authority or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or other imposition of any type of tax.

"**Technology and Business Process Evolution**" means any improvement, upgrade, addition, modification, replacement, or enhancement to the standards, policies, practices, processes, procedures, methods, controls, scripts, product information, technologies, architectures, standards, Applications, Equipment, Software, Systems, tools, products, transport systems, interfaces and personnel skills associated with the performance

of finance, accounting, and/or sales contract management business processes and related functions in line with the best practices of leading providers of such services, as determined by Delphi. Service Provider's obligations with respect to Technology and Business Process Evolution apply not only to the Services performed by Service Provider, but also to its support of the finance, accounting, and/or sales contract management business processes and related functions performed by or for Delphi and the Eligible Recipients at or from Delphi Facilities. Technology and Business Process Evolution includes: (i) higher capacity, further scaling and commercializing of business processes, more efficient and scalable business processes, new versions and types of applications and systems/network software, new business or IT processes, and new types of equipment that will enable Service Provider to perform the Services more efficiently and effectively as well as enable Delphi and the Eligible Recipients to meet and support their business requirements and strategies and (ii) any change to the Equipment, Software or methodologies used to provide the Services that is necessary to bring that function, Equipment or Software or those methodologies into line with the Delphi Standards and/or current industry standards. For the avoidance of doubt, Technology and Business Process Evolution shall not constitute New Services or Projects.

"**Term**" has the meaning given in **Article 3**.

"**Termination Assistance Services**" has the meaning given in **Section 4.4(a)**.

"**Termination Charge**" means the termination charges payable by Delphi upon termination pursuant to **Section 20.2** as set forth in **Schedule 4-F**. The Termination Charge shall be calculated as of the later of (i) the end of the Term (or the date of termination of the applicable Services under the Agreement), and (ii) the satisfactory completion of all Termination Assistance Services requested by Delphi under **Section 4.4**.

"**Third Party Contracts**" means all agreements between third parties and Delphi, an Eligible Recipient or Service Provider (or Service Provider's Subcontractors or Affiliates) that have been or will be used to provide the Services to the extent a Party has financial or operational responsibility for such contracts under **Schedule 2** or **4-B.** Third Party Contracts include all such agreements in effect as of the applicable Production Date and those as to which Service Provider received reasonable notice and/or reasonable access prior to the applicable Production Date. Third Party Contracts also shall include those third party agreements entered into by or for Delphi, another Eligible Recipient or Service Provider (or Service Provider's Subcontractors or Affiliates) after the applicable Production Date to the extent a Party has financial or operational responsibility for such Third Party Contracts under **Schedule 4-B**.

"**Third Party Materials**" means, collectively, Delphi Licensed Third Party Materials and Service Provider Licensed Third Party Materials.

"**Third Party Software**" means all Third Party Materials consisting of Software. Third Party Software also shall include all such Software that is licensed and/or leased after the applicable Production Date.

"**Tollgate**" has the meaning given in **Schedule 8**.

"**Tower**" means any of the following components of the Services: Finance and Administration Services and Sales Contract Management Services.

"**Transfer Legislation**" has the meaning given in **Section 8.6(e)**.

"**Transition Milestone**" has the meaning give in **Section 4.2(c)**.

"**Transition Period**" means the period that commences on the Effective Date and expires 11:59:59 p.m., United States Eastern Time, on the date specified for the completion of the Transition Services as specified in the Transition Plan, unless expressly extended in writing by Delphi.

"**Transition Plan**" means the plan set forth in **Schedule 8** and developed pursuant to **Section 4.2**, which identifies all material transition tasks, Projects and deliverables to be completed by Service Provider in connection with the transition of all Services to Service Provider, and the dates by which each is to be completed by Service Provider.

"**Transition Services**" means the services, functions and responsibilities described in **Section 4.2** and the Transition Plan to be performed by Service Provider during the Transition Period.

"**Transitioned Employees**" means the employees of Delphi or its Affiliates who accept offer of employment from and become employed by Service Provider in connection with this Agreement.  Upon being employed by Service Provider, such Transitioned Employees shall be deemed to be Service Provider Personnel as defined herein.

"**Upgrade**" and its derivatives means the updates, renovations, enhancements, additions and/or new versions or releases of Software or Equipment by Service Provider.  Unless otherwise agreed, financial responsibility for the costs, fees and expenses associated with an Upgrade of Software or Equipment shall be allocated between the Parties in accordance with **Section 6.4** and **Schedule 4**.

"**VAT**" means value added tax.

"**VRU**" means voice response unit.

"**Work Order**" has the meaning given in **Section 4.6(b)(i)**.

"**Yearly Performance Average**" has the meaning given in **Section 1.3** of **Schedule 3**.