**Hearing Date And Time: April 20, 2007 at 10:00 a.m.**
**Objection Deadline: April 13, 2007 at 4:00 p.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
(312) 407-0700
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free: (800) 718-5305
International: (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|   |   |   |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELPHI CORPORATION, et al., | : | Case No. 05-44481 (RDD) |
|  | : |  |
|  | : | (Jointly Administered) |
| Debtors. | : |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MOTION FOR ORDER UNDER 11 U.S.C. § 365(d)(4)
FURTHER EXTENDING DEADLINE TO ASSUME OR
REJECT LEASES OF NONRESIDENTIAL REAL PROPERTY

("SECOND 365(d)(4) DEADLINE EXTENSION MOTION")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit this motion (the "Motion") for an order under 11 U.S.C. § 365(d)(4) further extending the deadline to assume or reject unexpired leases of nonresidential real property, and respectfully represent as follows:

Background

A.   The Chapter 11 Filings

1.   On October 8 and 14, 2005, Delphi and certain of its U.S. subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330, as then amended (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. This Court entered orders directing the joint administration of the Debtors' chapter 11 cases.

2.   No trustee or examiner has been appointed in the Debtors' cases. On October 17, 2005, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors. On April 28, 2006, the U.S. Trustee appointed an official committee of equity holders.

3.   This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding under 28 U.S.C. § 157(b)(2).

4.   The statutory predicate for the relief requested herein is section 365(d)(4) of the Bankruptcy Code.

2

B.   Current Business Operations Of The Debtors

5.   Delphi and its subsidiaries and affiliates (collectively, the "Company"), as of December 31, 2006 had global net sales of $26.4 billion, and global assets of approximately $15.4 billion.[1]  At the time of its chapter 11 filing, Delphi ranked as the fifth largest public company business reorganization in terms of revenues, and the thirteenth largest public company business reorganization in terms of assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.[2]

6.   The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

7.   Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and

---

[1]   The aggregated financial data used in this Motion generally consists of consolidated information from Delphi and its worldwide subsidiaries and affiliates as disclosed in the Company's Form 10-K filed on February 27, 2007.

[2]   On March 20 2007, Delphi Automotive Systems Espana S.L., whose sole operation is a non-core automotive component plant in Cadiz, Spain, filed its "Concurso" application for a Spanish insolvency proceeding.  The Concurso proceeding does not affect other Delphi legal entities in Spain or elsewhere and is an isolated event that is consistent with Delphi's transformation plan to optimize its manufacturing footprint and to lower its overall cost structure.

3

modules for a wide range of customers and applications. Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

C.   Events Leading To The Chapter 11 Filing

8.   In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income. Every year thereafter, however, with the exception of 2002, the Company has suffered losses. In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in net sales.[3] Reflective of a continued downturn in the marketplace, in 2005 Delphi incurred net losses of approximately $2.4 billion on net sales of $26.9 billion. Moreover, in 2006, the Debtors incurred a net loss of $5.5 billion, $3.0 billion of which were charges related to the U.S. employee special attrition programs.

9.   The Debtors believe that the Company's financial performance has deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and operational restrictions driven by collectively bargained agreements, including restrictions preventing the Debtors from exiting non-profitable, non-core operations, all of which have the effect of creating largely fixed labor costs, (b) a competitive U.S. vehicle production environment for domestic OEMs resulting in the reduced number of motor vehicles that GM produces annually in the United States and related pricing pressures, and (c) increasing commodity prices.

10.   In light of these factors, the Company determined that it would be imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities, product

---

[3]   Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004. The Company's net operating loss in calendar year 2004 was $482 million.

4

portfolio, operational issues, and forward-looking revenue requirements. Because discussions with its major unions and GM had not progressed sufficiently by the end of the third quarter of 2005, the Company commenced these chapter 11 cases for its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

D.     The Debtors' Transformation Plan

11.    On March 31, 2006, the Company outlined five key tenets of its transformation plan. First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business. Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company. Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus. Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.[4] Finally, the Debtors must devise a workable solution to their current pension situation.

12.    On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements. The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and

---

[4] As part of this effort, effective July 1, 2006, the Company realigned its business operations to focus its product portfolio on core technologies for which the Company believes it has significant competitive and technological advantages. The Company's revised operating structure consists of its four core business segments: Electronics and Safety, Thermal Systems, Powertrain Systems, and Electrical/Electronic Architecture. The Company also has two additional segments, Steering and Automotive Holdings Group, which will be transitioned as part of the Company's transformation plan.

5

UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's achievement of consensual agreements with its principal U.S. labor unions and GM), and the non-exercise by either Delphi or the Plan Investors of certain termination rights.  The second agreement was a plan framework support agreement (the "Plan Framework Support Agreement") with the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain proposed terms of the Debtors' anticipated plan of reorganization, including the distributions to be made to creditors and shareholders, the treatment of GM's claims, the resolution of certain pension funding issues, and the corporate governance of the reorganized Debtors.  The terms of the Plan Framework Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

13.     On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make

6

certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

    14.  Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders. Upon the conclusion of the reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives. In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally. Additionally, the Company will preserve and continue the strategic growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

Relief Requested

    15.  The Debtors request entry of an order, under section 365(d)(4) of the Bankruptcy Code, further extending the date on or before which the Debtors may assume or reject unexpired leases of nonresidential real property to and including the earlier of the date when a plan of reorganization in Delphi's chapter 11 cases is confirmed and September 30, 2007, a date which is approximately four months from the current deadline and 22 months from the original deadline arising at the commencement of these cases under section 365(d)(4) of the Bankruptcy Code. The relief requested is without prejudice to the Debtors' right to seek a further extension of such deadline and without prejudice to a lessor's right to seek a shortening of the deadline.

Basis For Relief

16. The Debtors are lessors or lessees with respect to approximately 80 unexpired leases of nonresidential real property (the "Real Property Leases"). Pursuant to this Court's Order Pursuant To 11 U.S.C. § 365(d)(4) Extending Deadline To Assume Or Reject Unexpired Leases Of Nonresidential Real Property, entered November 29, 2005 (Docket No. 1345), the current deadline ("Current Deadline") for the Debtors to assume or reject unexpired leases of nonresidential real property is June 7, 2007.

17. The Debtors are in the process of implementing their transformation plan. To facilitate the Debtors' transformation plan, as stated above, the Debtors recently entered into the Equity Purchase Commitment Agreement and the Plan Framework Support Agreement (together, the "Framework Agreements"), which provide a platform for the resolution of transformation issues and the formulation of a consensual plan of reorganization. Until the outcome of the Framework Agreements is known, the Debtors cannot determine which leases should be assumed and which should be rejected. Indeed, the underlying transactions have a particularly acute impact on the Debtors' portfolio of leaseholds. Among other things, the required consensual resolution with the Debtors' U.S. labor unions is critical to the Debtors' ability to determine which leases to assume or reject because of restrictions in certain of the Debtors' collective bargaining agreements on the closure of certain of the Debtors' facilities. Moreover, the transformation plan, as supported by the Framework Agreements, contemplates a realignment of the Debtors' product portfolio and manufacturing footprint. In accordance therewith, the Debtors must determine which leased properties fit within this realignment when they emerge from bankruptcy. Accordingly, the Current Deadline is premature.

18. The proposed deadline coincides with the Debtors' current deadline to solicit acceptances of a plan of reorganization.[5] The Debtors requested the September 30, 2007 solicitation extension because of the possibility that emergence from reorganization might be delayed because of the size and complexity of the Debtors' cases, the possibility that the actions required to be taken under the Framework Agreements might not be completed by the end of the second quarter of 2007, and the possibility that the transactions contemplated by the Framework Agreements might not be consummated. These same factors can delay the Debtors' ability to acquire all information necessary to decide whether to assume or reject a lease. Accordingly, the Debtors require more time than the Current Deadline allows to complete their evaluation of the Real Property Leases.

19. Thus, by this Motion, the Debtors request an extension of the section 365(d)(4) deadline to allow them to fully and prudently determine whether to assume or reject particular Real Property Leases. If the Current Deadline is not extended beyond June 7, 2007, the Debtors may be compelled, prematurely, to assume substantial, long-term liabilities under the Real Property Leases or forfeit benefits associated with some Real Property Leases to the detriment of the Debtors' ability to operate and preserve the going-concern value of their business for the benefit of all creditors and other parties-in-interest. The extension proposed by this Motion is modest at slightly less than four months, or even less if the Debtors confirm a plan of reorganization before September 30, 2007. The non-debtor parties under the Real Property Leases will not be prejudiced by the proposed extension because the Debtors are making payments under the Real Property Leases as they come due.

---

[5] The September 30, 2007 deadline for the Debtors to solicit acceptances for a plan of reorganization was set under this Court's Order Under 11 U.S.C. § 1121(d) Extending Debtors' Exclusive Periods Within Which To File And Solicit Acceptances Of Reorganization Plan, entered on January 23, 2007 (Docket No. 6700).

9

Applicable Authority

20.     Section 365(d)(4) of the Bankruptcy Code provides:

> Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

1 1 U.S.C. § 365(d)(4).

21.     The term "cause" as used in section 365(d)(4) is not defined in the Bankruptcy Code. In South Street Seaport L.P. v. Burger Boys, Inc., 94 F.3d 755 (2d Cir. 1996), the United States Court of Appeals for the Second Circuit held that the following factors would establish whether "cause" existed to extend the statutory period under section 365(d)(4) of the Bankruptcy Code:

(a)     whether the debtor was paying for the use of the property;

(b)     whether the debtor's continued occupation could damage the lessor beyond the compensation available under the Bankruptcy Code;

(c)     whether the lease is the debtor's primary asset; and

(d)     whether the debtor has had sufficient time to formulate a plan of reorganization.

Id. at 761. The court enumerated additional factors that may merit consideration, including the complexity of the case and the number of leases that the debtor must evaluate. Id. See also 130 Cong. Rec. S8891, 58,894-95 (daily ed. June 29, 1984) ("cause" includes large number of leases) (statement of Sen. Hatch), reprinted in 1984 U.S.C.C.A.N. 590, 597; In re Enron Corp., 279 B.R. 695, 703 (Bankr. S.D.N.Y. 2002).

22.     The Debtors satisfy all of these requirements. First, in compliance with section 365(d)(3) of the Bankruptcy Code, the Debtors have remained and fully intend to remain

10

current with respect to all outstanding postpetition rental obligations under the Real Property Leases.

23. Second, the relief requested herein will not affect any lessor's rights in a manner inconsistent with the provisions of the Bankruptcy Code. See <u>Edward J. Debartolo Corp. v. Child World, Inc.</u>, 146 B.R. 89, 92 (S.D.N.Y. 1992) (holding that extension of debtors' time to assume or reject its unexpired leases of nonresidential real property is appropriate when leaseholders are not "irreparably injured in the interim"). The Debtors have the financial ability to and intend to continue to perform all of their obligations under the Real Property Leases as required by section 365(d)(3) of the Bankruptcy Code. The significant cash revenues from the Debtors' operations, plus the final Court approval of a $4.5 billion financing package for the Debtors on January 6, 2007, afford the Debtors this financial ability.

24. Third, certain of the Real Property Leases are among the Debtors' primary assets and are vital to their reorganization efforts. The Debtors' manufacturing sites, technical centers, and sales offices are fundamental to their reorganization efforts. These premises consequently comprise an integral component of the Debtors' strategic business plans.

25. Fourth, given the complexity of theses cases, the Debtors may require additional time to formulate a plan of reorganization. As set forth above, the Debtors have made significant progress in their reorganization efforts, including obtaining Court approval of the Framework Agreements. This progress is particularly significant considering that these complex cases are currently among the largest pending before any bankruptcy court in the United States. As noted above:

    (a)    Forty-two affiliated entities sought chapter 11 relief.

    (b)    As of December 31, 2006, the Debtors employed approximately 171,400 people worldwide and maintained 300 sites in 36

11

      countries, including manufacturing facilities, technical centers, customer centers, and sales offices.

  (c)  The Debtors' global 2006 revenues were approximately $26.4 billion, and global assets were approximately $15.4 billion.

  (d)  The Debtors supply products to nearly every major global automotive original equipment manufacturer, including its former parent, GM, with approximately $11.6 billion in sales annually to GM alone.

  26.  Additionally, as stated above, if the Current Deadline is not extended, the Debtors may be compelled to assume liabilities prematurely under the Real Property Leases or risk forfeiting benefits associated with certain Real Property Leases. To prevent this difficult choice with insufficient information, this Court should exercise its discretion to extend the Current Deadline to the earlier of confirmation of a plan of reorganization or September 30, 2007, a date consistent with the Debtors' outside projection regarding the timing of plan confirmation.

  27.  Courts in this circuit and others have granted similar relief to the relief requested herein in other large, complex chapter 11 cases. See, eg., In re WorldCom, Inc., Case No. 02-13533 (AJG) (Bankr. S.D.N.Y. Sept. 19, 2002, Sept. 24, 2003) (extended through plan confirmation); In re Enron Corp., Ch. 11 Case No. 01-16034 (AJG) (Bankr. S.D.N.Y. Jan. 31, 2002, Dec. 19, 2002) (initially extended for approximately 11 months; later extended for additional year); In re Ames Dep't Stores, Inc., Case No. 01-4227 (REG) (Bankr. S.D.N.Y. Oct. 3, 2001, Dec. 5, 2001) (extended through confirmation); In re Nextwave Personal Commc'ns Inc., Case No. 98 B 21529 (ASH) (Bankr. S.D.N.Y. July 10, 1998) (extended through confirmation); In re Maidenform Worldwide, Inc., Case No. 97 B 44869 (CB) (Bankr. S.D.N.Y. Sept. 12, 1997) (extended through confirmation); In re UAL Corp., Case No. 02-B-48191 (ERW)

(Bankr. N.D. Ill. Feb. 6, 2003, July 21, 2003, Sept. 21, 2005) (extended through plan confirmation).

28. Accordingly, this Court should extend the time within which the Debtors may assume or reject any Real Property Lease to and including the earlier of the date when a plan of reorganization in these cases is confirmed and September 30, 2007, without prejudice to the Debtors' right to seek a further extension of such deadline or a lessor's right to seek a shortening of the deadline.

## Notice Of Motion

29. Notice of this Motion has been provided in accordance with the Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates And Certain Notice, Case Management, and Administrative Procedures, entered March 20, 2006 (Docket No. 2883), and the Amended Eighth Supplemental Order Under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing Omnibus Hearing Dates and Certain Notice, Case Management, and Administrative Procedures, entered October 26, 2006 (Docket No. 5418). In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum Of Law

30. Because the legal points and authorities upon which this Motion relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York be deemed satisfied.

WHEREFORE the Debtors respectfully request that the Court enter an order (a) extending the deadline to assume or reject unexpired leases of nonresidential real property to and including the earlier of the date when a plan of reorganization is confirmed in these cases and September 30, 2007, without prejudice to the Debtors' right to seek a further extension of such deadline or a lessor's right to seek a shortening of the deadline, and (b) granting the Debtors such other and further relief as is just.

Dated:   New York, New York
         March 30, 2007

        SKADDEN, ARPS, SLATE, MEAGHER
         & FLOM LLP

        By:   /s/ John Wm. Butler, Jr.
            John Wm. Butler, Jr. (JB 4711)
            John K. Lyons (JL 4951)
            Ron E. Meisler (RM 3026)
        333 West Wacker Drive, Suite 2100
        Chicago, Illinois 60606
        (312) 407-0700

                - and -

        By:   /s/ Kayalyn A. Marafioti
            Kayalyn A. Marafioti (KM 9632)
            Thomas J. Matz (TM 5986)
        Four Times Square
        New York, New York 10036
        (212) 735-3000

        Attorneys for Delphi Corporation, et al.,
          Debtors and Debtors-in-Possession