1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 05-44481

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   DELPHI CORPORATION,

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13                 U.S. Bankruptcy Court

14                 One Bowling Green

15                 New York, New York

16

17                 March 22, 2007

18                 10:15 AM

19

20

21   B E F O R E:

22   HON. ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2  Motion to Approve Motion For Orders Under 11 U.S.C. Sections

3  363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014

4  (A) Approving (I) Bidding Procedures, (II) Certain Bid

5  Protections, (III) Form And Manner Of Sale Notices, And (IV)

6  Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of

7  Certain Of Debtors' Assets Comprising Assets Exclusively Used

8  In Debtors' Brake Hose Business Free And Clear Of Liens,

9  Claims, And Encumbrances, (II) Assumption And Assignment Of

10  Certain Executory Contracts And Unexpired Leases, And (III)

11  Assumption Of Certain Liabilities.

12

13  Motion for Omnibus Objection to Claim(s) Debtors' Eighth

14  Omnibus Objection (Procedural) Pursuant To 11 U.S.C. Section

15  502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate And

16  Amended Claims, (B) Claims Duplicative Of Consolidated Trustee

17  Claim, (C) Equity Claims, And (D) Protective Claims.

18

19  Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus

20  Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)

21  And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently

22  Documented Claims, (B) Claims Not Reflected On Debtors' Books

23  And Records, (C) Untimely Claims, And (D) Claims Subject To

24  Modification.

25

3

1

2   Motion to Approve Motion For Orders Under 11 U.S.C. Sections

3   363 And 365 And Fed. R. Bankr. P. 2002, 6004, 6006, And 9014

4   (A) Approving (I) Bidding Procedures, (II) Certain Bid

5   Protections, (III) Form And Manner Of Sale Notices, And (IV)

6   Sale Hearing Date And (B) Authorizing And Approving (I) Sale Of

7   Certain Of Debtors' Assets Comprising Assets Exclusively Used

8   In Debtors' Brake Hose Business Free And Clear Of Liens,

9   Claims, And Encumbrances, (II) Assumption And Assignment Of

10  Certain Executory Contracts And Unexpired Leases, And (III)

11  Assumption Of Certain Liabilities.

12

13  Motion to Approve Motion For Order Under 11 U.S.C. Sections

14  363(b), 365(a), And 365(d) And Fed. R. Bankr. P. 6004 And 6006

15  Authorizing Debtors To (A) Enter Into And Assign Purchase

16  Agreement, (B) Enter Into Lease Agreement, And (C) Reject

17  Certain Unexpired Leases Of Nonresidential Real Property.

18

19  Motion for Relief from Stay : Lead Plaintiffs' Motion for a

20  Limited Modification of the Automatic Stay

21

22  Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus

23  Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)

24  And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently

25  Documented Claims, (B) Claims Not Reflected On Debtors' Books

4

1

2    And Records, (C) Untimely Claims, And (D) Claims Subject To

3    Modification.

4

5    Motion to Authorize Motion For Order Under Sections 105 And 363

6    Authorizing The Debtors To Implement A Key Employee

7    Compensation Program

8

9    Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus

10   Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)

11   And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently

12   Documented Claims, (B) Claims Not Reflected On Debtors' Books

13   And Records, (C) Untimely Claims, And (D) Claims Subject To

14   Modification.

15

16   Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus

17   Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)

18   And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently

19   Documented Claims, (B) Claims Not Reflected On Debtors' Books

20   And Records, (C) Untimely Claims, And (D) Claims Subject To

21   Modification.

22

23   Motion for Omnibus Objection to Claim(s) Debtors' Eighth

24   Omnibus Objection (Procedural) Pursuant To 11 U.S.C. Section

25   502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate And

5

1

2    Amended Claims, (B) Claims Duplicative Of Consolidated Trustee

3    Claim, (C) Equity Claims, And (D) Protective Claims.

4

5    Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus

6    Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)

7    And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently

8    Documented Claims, (B) Claims Not Reflected On Debtors' Books

9    And Records, (C) Untimely Claims, And (D) Claims Subject To

10   Modification.

11

12   Motion to Approve Motion for Orders Under 11 U.S.C. Sections

13   363 and 365 And Fed. R. Bankr. P.2002, 6004, 6006, And 9014 (A)

14   Approving (I) Bidding Procedures, (II) Certain Bid Protections,

15   (III) Form And Manner Of Sale Notices, And (IV) Sale Hearing

16   Date and (B) Authorizing and Approving (I) Sale Of Certain Of

17   Debtors' Assets Comprising Assets Exclusively Used In Debtors'

18   Brake Hose Business Free And Clear Of Liens, Claims, And

19   Encumbrances, (II) Assumption And Assignment Of Certain

20   Executory Contracts And Unexpired Leases, And (III) Assumption

21   Of Certain Liabilities

22

23   Motion to Approve Motion For Order Under 11 U.S.C. Sections

24   363(b), 365(a), And 365(d) And Fed. R. Bankr. P. 6004 And 6006

25   Authorizing Debtors To (A) Enter Into And Assign Purchase

```
                                                          6
 1

 2     Agreement, (B) Enter Into Lease Agreement, And (C) Reject

 3     Certain Unexpired Leases of Nonresidential Real Property

 4

 5     Objection to Motion (Objection by IUE-CWA to Second

 6     Supplemental KECP Motion (Docket #7200)).

 7

 8     Motion for Relief from Stay : Lead Plaintiffs' Motion for a

 9     Limited Modification of the Automatic Stay

10

11     Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus

12     Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)

13     And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently

14     Documented Claims, (B) Claims Not Reflected On Debtors' Books

15     And Records, (C) Untimely Claims, And (D) Claims Subject To

16     Modification.

17

18     Motion to Authorize Motion For Order Under Sections 105 and 363

19     Authorizing the Debtors To Implement A Key Employee

20     Compensation Program

21

22     Motion for Relief from Stay : Lead Plaintiffs' Motion for a

23     Limited Modification of the Automatic Stay

24     Motion for Omnibus Objection to Claim(s) Debtors' Eighth

25     Omnibus Objection (Procedural) Pursuant To 11 U.S.C. Section
```

7

502(b) And Fed. R. Bankr. P. 3007 To Certain (A) Duplicate And
Amended Claims, (B) Claims Duplicative Of Consolidated Trustee
Claim, (C) Equity Claims, And (D) Protective Claims.

Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus
Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)
And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently
Documented Claims, (B) Claims Not Reflected On Debtors' Books
And Records, (C) Untimely Claims, And (D) Claims Subject To
Modification.

Motion for Omnibus Objection to Claim(s) Debtors' Ninth Omnibus
Objection (Substantive) Pursuant To 11 U.S.C. Section 502(b)
And Fed. R. Bankr. P. 3007 To Certain (A) Insufficiently
Documented Claims, (B) Claims Not Reflected On Debtors' Books
And Records, (C) Untimely Claims, And (D) Claims Subject To
Modification.

Transcribed By:  Sharona Shapiro

8

```
 1
 2   A P P E A R A N C E S :
 3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
 4        Attorneys for Delphi Corporation
 5        Four Times Square
 6        New York, New York 10036
 7
 8   BY:   JOHN (JACK) WM. BUTLER, JR., ESQ.
 9        KAYALYN A. MARAFIOTI, ESQ.
10        ALBERT L. HOGAN III, ESQ.
11
12   MEYER, SUOZZI, ENGLISH & KLEIN
13        Attorneys for United Steel Workers
14        1350 Broadway
15        New York, New York 10018
16
17   BY:   LOWELL PETERSON, ESQ.
18
19   SHELDON S. TOLL PLLC
20        Attorney for Milwaukee Investment Co.
21        2000 Town Center
22        Southfield, MI 48075
23
24   BY:   SHELDON S. TOLL, ESQ.
25
```

9

1

2    COHEN, WEISS AND SIMON LLP

3          Attorneys for UAW

4          330 West 42nd Street

5          New York, New York 10036

6

7    BY:   BABETTE A. CECCOTTI, ESQ.

8

9    GORLICK, KRAVITZ & LISTHAUS, P.C.

10         Attorneys for Operating Engineers

11         Locals 18-S, 832-S,

12         IBEW Local 663 and IAM District 10

13         17 State Street, 4th Floor

14         New York, New York 10004

15

16   BY:   BARBARA S. MEHLSACK, ESQ.

17

18   TOGUT, SEGAL & SEGAL, LLP

19         One Penn Plaza

20         New York, NY 10119

21

22   BY:   NEIL BERGER, ESQ.

23

24

25

10

1

2  BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP

3       Attorneys for Securities Lead Plaintiffs

4       1285 Avenue of the Americas

5       New York, New York 10019

6

7  BY:   JOHN P. (SEAN) COFFEY, ESQ.

8

9  KENNEDY, JENNIK & MURRAY, P.C.

10       Attorneys for IUE-CWA

11       113 University Place

12       New York, NY 10003

13

14  BY:   LARRY MAGARIK, ESQ.

15

16

17

18

19

20

21

22

23

24

25

11

1                       P R O C E E D I N G S

2               THE COURT:  Are the people in Delphi ready?  I know

3    you --

4               MR. BUTLER:  We are, Your Honor.

5               THE COURT:  Okay.

6               MR. BUTLER:  Your Honor, good morning, Jack Butler,

7    Kayalyn Marafioti and Al Hogan on behalf of Delphi Corporation

8    with other colleagues from Skadden, Arps, Slate, Meagher & Flom

9    here for the sixteenth omnibus hearing.  Your Honor, we have

10   filed an omnibus hearing agenda and we'll, with rough justice,

11   at least try to take things in that order, if it's okay with

12   Your Honor.

13              THE COURT:  Okay.

14              MR. BUTLER:  Your Honor, let me initially address --

15   let's why I sort of said rough justice -- let me initially

16   address matters 1, 5, and 6.  These are the interim fee

17   applications of Thompson Hine LLP at docket number 3467.

18   Agenda item number 5 is the interim fee application of Houlihan

19   Lokey at docket number 5987.  And item number 6 is the DLA

20   Piper interim fee application at docket number 6030.  These

21   applications were not in a position, in terms of their filing

22   dates and other matters related, to be considered by the fee

23   committee when it went through its process to deal with all the

24   other first, second, and third fee applications.  As a result,

25   the fee committee has requested, and these parties have agreed,

12

1    to adjourn this matter to the June 26th omnibus hearing.

2    That's when we're scheduled to hear the fourth fee applications

3    and it's the fee committee's intention then to roll these into

4    that process that they have -- that they intend to have in

5    place for that review.

6            THE COURT:  Okay.

7            MR. BUTLER:  Matters 2 and 3 on the agenda, matter 2

8    is the creditors committee GM claims and defenses motion at

9    docket number 4718.  And matter number 3 is the companion ex

10   parte motion of the equity committee at docket number 5229.

11   The parties have agreed to adjourn these matters, again, as

12   rolling adjournment to the April 20th omnibus hearing.

13           THE COURT:  Okay.

14           MR. BUTLER:  Your Honor, matter number 4 is the

15   Wachovia Bank's relief from stay.  I think Mr. Berger is here

16   to report on that matter to the Court.

17           MR. BERGER:  Good morning, Judge.

18           THE COURT:  Good morning.

19           MR. BERGER:  Neil Berger, Togut, Segal & Segal.  Your

20   Honor may recall that Wachovia asserted a claim against the

21   debtors of in excess of 6.8 million dollars.  When the

22   automatic stay brought to halt their state court action against

23   Delphi in the Mississippi State Court, they sought relief from

24   the automatic stay to assert that claim against one of our

25   employees.

13

1          We agreed with Wachovia to try to mediate this

2     matter.  I attended the mediation in Jackson, Mississippi last

3     week.  Retired bankruptcy Judge Frank Conrad is our mediator.

4     Our client was in attendance, as was Wachovia.  We didn't reach

5     a settlement on Friday, but we are much closer than we were

6     before we started.  This is a good mediation, Your Honor.

7     We're settling not only the 6.8 million dollar claim asserted

8     by Wachovia against the estate but we've also agreed to

9     settle -- tried to settle -- an 800,000 dollar claim asserted

10    by Lextron, which was Wachovia's borrower.  Again, we are much

11    closer than we were before we started the mediation.  Judge

12    Conrad has continued the mediation by way of e-mail and phone

13    and we were in contact with him last night.  The parties have

14    agreed, subject to Your Honor's agreement, that we'd adjourn

15    the hearing to consider this stay motion until the next omnibus

16    hearing.

17          THE COURT:  Okay.  That's fine.

18          MR. BERGER:  Thank you, Judge.

19          THE COURT:  Thank you.

20          MR. BUTLER:  Your Honor, the next matter on the

21    agenda is matter number 7.  This is the ATEL Leasing

22    Corporation motion, docket number 6990.  This is a motion in

23    which they're seeking allowance in payment of what they assert

24    are outstanding post-petition amounts in the administrative

25    expense claim to compel assumption or rejection of an unexpired

14

1   lease and for turnover of equipment.  The allegations here are

2   being examined.  We're trying to reconcile the accounts and

3   reach a consensual resolution in this matter.  The debtors

4   believe we have in fact paid all the post-petition amounts that

5   are due and owing in connection with this.  But in order to

6   complete the reconciliation and, frankly, to persuade ATEL to

7   take this matter off the calendar, we are continuing.  And at

8   least for the moment, the parties have agreed to adjourn it to

9   the April 20th omnibus hearing.

10          THE COURT:  Okay.

11          MR. BUTLER:  We now turn, Your Honor, to the

12   uncontested, agreed or settled matters.  The first matter is

13   the lease transaction motion subscribed at agenda item number

14   8, docket number 7111.  There was an objection filed at docket

15   number 7207 by a landlord Milwaukee investment company to the

16   debtor's motion to reject the Shelby lease.  The debtors filed

17   a response in connection with that.  We attached a settlement

18   of that objection.  Attached to our omnibus reply, which was

19   above docket number 7371, is a second lease amendment

20   agreement.

21          For the record, Your Honor, I would indicate to you

22   that the last sentence of paragraph 6 of that agreement has

23   been amended by the parties this morning in Court, even though

24   that was signed, such that that sentence will now say -- the

25   word any has been added prior to the word liability.  So that

15

1    sentence will now read, "In the event of any such assignment,

2    tenant shall be released from any liability under the lease in

3    whole or in part."  And that matter resolves the objection. I

4    think Mr. Toll is present in court today to confirm the

5    withdrawal of the objection based on the settlement.

6         MR. TOLL:  Good morning, Your Honor, Sheldon Toll for

7    Milwaukee Investment Company.  The objection is withdrawn in

8    the matter.

9         MR. BUTLER:  Your Honor, discussing now -- just

10   presenting this a little more broadly in terms of this

11   transaction.  This is a motion pursuant to which Delphi

12   Automotive Systems, LLC, will enter into a lease transaction to

13   essentially effect the consolidation of six leased facilities

14   and part of one owned facility, the property located in Auburn

15   Hills, Michigan.  This motion originally requested the

16   authority to reject the two leases.  But because of the

17   resolution of the loan objection filed, we're now seeking to

18   reject only one lease, as described in the motion.

19        The agreements that underlie this transaction include

20   a purchase agreement and an assignment agreement, a lease, a

21   sublease, and an escrow agreement.  And those agreements are

22   all attached to the motion.  In the absence of any objection

23   from any party, Your Honor, I'm not going to describe each of

24   those in detail.  But I do want to point out to the Court that

25   this is not the everyday sort of singular lease motion.  This

16

1    is actually part of the company's transformation plan strategy

2    to streamline their operations and capitalize on their market

3    strengths.  And the company has gone through its real estate

4    facilities, an extensive review of its facilities, as it begins

5    to prepare for emergence from Chapter 11 and has concluded that

6    it would be strategically advantageous to consolidate multiple

7    offices and technical sites in Michigan and in Illinois into

8    one location in Michigan.  So the principal goal for this is to

9    reduce operation costs and create a single technical center

10   that's in closer proximity to Delphi's world headquarters as

11   well as their major customers and therefore in the company's

12   view continue to project and amplify Delphi's technical and

13   technological capabilities.

14          This process began in 2006.  There has been a lot of

15   work done over the last six to eight months.  The property that

16   has been selected comprises roughly 347,000 square feet of

17   office space and 90,000 square feet of lab space situated in

18   approximately thirty-eight to thirty-five acres and will allow

19   the debtors to locate a single state-of-the-art technical

20   center closer to the major OEMs that are situated in the larger

21   Detroit metropolitan area.

22          Your Honor, I'm not going to describe all of the

23   transactions that are fairly intricate.  They are laid out, I

24   think, in detail in the motion.  We have reviewed this

25   transaction with our statutory committees.  No objection's been

17

1    filed.  We'd ask Your Honor to grant the relief requested.

2              THE COURT:  Okay.  I will grant the relief for the

3    reasons stated in the motion and because it's unopposed.  I had

4    two questions.  First, do the parties want approval of the

5    Shelby stipulation or is it -- it's not mentioned in the

6    proposed order which I got, except for the fact that the

7    objection was withdrawn.

8              MR. BUTLER:  Your Honor --

9              THE COURT:  Do you want to insert that in the order?

10   I mean, it's certainly reasonable.

11             MR. BUTLER:  We certainly can do that, Your Honor,

12   because it's intended to have the Court be in agreement with

13   our authority to enter into that assignment.

14             THE COURT:  Okay.  And then secondly, there was -- I

15   think in the motion on the Downers Grove lease there was a

16   little confusion about the date that it would run through.  In

17   one place I think it says November 30th and then another place

18   it says October 31.  Do you -- is it the later or the earlier

19   date?

20             MR. BUTLER:  Your Honor, Mr. Meisler, who's been

21   working on this, advises me that both dates are considered

22   appropriate because one is an outside date and the other one is

23   one that we submitted the ten-day notice provisions of some of

24   the prior orders.

25             THE COURT:  Oh, okay.  All right.  Then there's no

18

1    confusion.  Okay.  Very well.  So I'll look for -- I guess it's

2    just a slightly revised order to deal with the Shelby

3    stipulation.

4              MR. BUTLER:  Thank you, Your Honor.  The next matter

5    on the agenda, matter number 9, is the brake hose business sale

6    motion at docket number 6742.  There were some objections filed

7    in connection with this.  Maricopa County filed an objection at

8    7016 and withdrew it at docket number 7170.  Pima County filed

9    an objection at docket number 7197 and withdrew the objection

10   at docket number 7249.  There is -- the purchaser is here, as

11   we indicated in our papers, and I'll describe in a little more

12   detail, there were no competing bids with respect to this

13   property so there was no option conducted by the company.

14   There were no other objections received.

15             I will note for the record -- and comment on this a

16   little bit later.  And I think counsel for the USW will also

17   comment on it in a few minutes -- but the order provides that

18   this does remain subject to the provisions of the collective

19   bargaining agreement with the USW, the United Steel Workers,

20   and the rights they have pursuant to those collective

21   bargaining agreements.  And we'll both comment on that in a few

22   minutes but this is subject to order.

23             I also, Your Honor, would like to introduce to the

24   Court Mr. Ronald Pretekin from the Coolidge Wall law firm who

25   represents the purchaser, the Harco purchaser, and Mr. Rick

19

1    Garber, who is the general manager of Harco, who are both

2    present in the courtroom today.

3           THE COURT:  Okay.  Thank you.

4           MR. BUTLER:  Your Honor, the motion that we have

5    filed covers the use -- the sale of the debtor's assets used

6    exclusively in the debtor's brake hose business, free and clear

7    of liens, claims, and encumbrances, the assumption and

8    assignment of certain executory contracts and unexpired leases,

9    and the assumption of certain other liabilities.

10          We're here today in the two-step process we've used

11   for this transaction to ask for approval of the sale of the

12   brake hose business to Harco.  We were before you last month

13   for approval of the bidding procedures and obtained an order

14   from you at docket number 6988 which approved bidding

15   procedures, bid protections, the manner and form of notice of

16   sale, and the setting of the sale hearing.  While the debtors

17   have complied in all respects with the bidding procedure's

18   order and also endeavor to engage other bidders, there were no

19   other qualified bids submitted for business and there was no

20   option conducted.

21          Today, the debtors seek to have Your Honor enter an

22   order substantiating the form of the sale order that's attached

23   as Exhibit C to the motion.  That order has been modified to

24   reflect the withdrawal of the two objections.  We ask that Your

25   Honor authorize and approve the sale described in the motion,

20

1    the assumption and assignment of the assumed contracts and the

2    assumption and the assignment of the assumed liabilities.

3              Your Honor, in connection with the process -- the

4    sale process here.  This is a process that has been -- and it's

5    described in the motion in detail -- it was an extensive

6    process used by the company in order to try to sell these

7    assets and ultimately to enter into the transaction with Harco

8    Manufacturing, LLC and Harco Brake Systems, Inc.  And that led

9    to the proposed sale that's before Your Honor, which is for 9.8

10   million and other considerations.

11             This transaction is subject to the USW waiving the

12   no-sale clause in its collective bargaining agreement with

13   Delphi Corporation.  Delphi continues to negotiate with the USW

14   to achieve this result.  Those efforts will continue, you know,

15   beyond the entry of this proposed sale order if Your Honor's

16   inclined to grant the order.  This issue is specifically

17   contemplated in the Harco purchase agreement and is a condition

18   for proceeding the closing.  We hope to resolve this matter

19   with the USW and we have ninety days following entry of the

20   sale order before either party has a right to terminate. If a

21   waiver is not obtained, the parties may terminate and Harco

22   would be entitled to the expense reimbursement which is capped

23   at 100,000 dollars, which is set forth in the bidding

24   procedures order.

25             Your Honor, we've also requested that the ten-day

21

1   stay of Bankruptcy Rule 6004 and 6006 be waived because that

2   waiver's required under the terms of the sale and purchase

3   agreement.  In light of the potential delay in reaching a

4   resolution -- I pointed out that was requested, Your Honor --

5   in light of the potential delay in reaching a resolution with

6   the USW because I don't think we believe we'll obtain that in

7   the interim ten-day period, we did ask Harco and they have

8   agreed that that is no longer a requirement -- they waived that

9   requirement under the sale agreement and we have therefore

10  deleted that from the modified order we had submitted.  We take

11  seriously Your Honor's comments in the past about the use of

12  Rule 6004 and 6006 and concluded under the facts and

13  circumstances, as I sit here today, that that was an

14  appropriate course of action.  I think counsel for USW wants to

15  address the issue of the USW's position on this motion.

16          MR. PETERSON:  Good morning, Your Honor, Lowell

17  Peterson from Meyer, Suozzi, English & Klein for the steel

18  workers.

19          THE COURT:  Good morning.

20          MR. PETERSON:  As Mr. Butler sets forth, this order

21  does provide that the sale is subject to the terms of the

22  agreement.  The agreement expressly provides that the sale is

23  contingent or conditioned upon a waiver by the steel workers of

24  the sale, no close provision in the collective bargaining

25  agreement.  We have commenced negotiations.

22

1      THE COURT:  I'm sorry, does the order itself -- I was

2  looking for that provision.  I just want to make sure I --

3      MR. PETERSON:  I think the provision that Mr.

4  Butler's talking about is on page 9.

5      THE COURT:  Do you know what paragraph?

6      MR. PETERSON:  Paragraph 3.  At least this is what I

7  hope he's referring to, where it says, "subject to the terms

8  and conditions of the agreement."  If it needs to be clarified,

9  presumably we can do so.

10      THE COURT:  All right.

11      MR. PETERSON:  Because I think --

12      THE COURT:  So, I mean, it's the agreement that's

13  expressly subject to the steel workers, as opposed to the

14  order.  The order just refers to the agreement?

15      MR. PETERSON:  Yes, Your Honor.

16      THE COURT:  Okay.  All right.

17      MR. PETERSON:  And the agreement itself specifically

18  has as a condition preceding the closing, as I described on the

19  record.

20      THE COURT:  Fine.  Okay.  All right.

21      MR. PETERSON:  We've had some discussions with the

22  debtors.  It's thankfully not presumably a matter of there

23  being a lot of moving parts.  It's just that we haven't nailed

24  down the -- essentially, the labor terms -- going forward.  We

25  think that we probably will -- in fact, the steel workers think

23

1   that the outlines of the agreement have been in place for quite

2   some time.  But we haven't got there yet.  We hope to do so, we

3   certainly hope to do so within ninety days, and if so we would

4   be willing to let the sale go forward.  It's unfortunate from

5   our perspective that this business, which we think is a

6   moneymaker, will be leaving Delphi, but that is a business

7   decision the debtors have made and so be it.  And we just want

8   to make sure that our folks are protected going forward.

9          THE COURT:  Okay.  I think the record's clear then on

10  this point.

11         MR. PETERSON:  Thank you, Your Honor.

12         THE COURT:  All right.  Anyone else want to address

13  this motion?  Obviously there are no objections, so in light of

14  that fact and the motion itself, I'll approve it.  I've been

15  through the order and I had a couple of minor comments but they

16  were truly minor so that will get entered today.

17         MR. BUTLER:  Thank you, Your Honor.  Your Honor, we

18  turn now to the contested portion of documents, certain of

19  these matters have been resolved and as you know, with respect

20  to the way in which we do a claims objection, which I'll

21  address in a moment, the unresolved nature of these objections

22  we move over to the claims track in any respect.

23         The next matter is matter number 10.  This is the

24  eighth omnibus claims objection filed at docket number 6962.

25  In this objection we have objected to 236 claims that are

24

1   duplicative of other claims that have been filed or have been

2   amended or superseded by later filed claims or duplicative of

3   the aggregate liability asserted by two different claims or

4   have been amended or superseded by two different claims and are

5   survived by other claims, or claims were filed by individual

6   note holders and are duplicative of the consolidated claim

7   filed by Wilmington Trust.  We've also objected to claims filed

8   by holders of Delphi common stocks, solely on account of their

9   stock filings, as well as claims filed by holders of common

10  stocks, solely on account of their holdings that were untimely,

11  and also claims merely protective in nature.

12          In summary, of the 236 claim objections filed, 110

13  proofs of claim asserted liquidated claims of approximately

14  40.2 million, which we believe are duplicative.  One proof of

15  claim asserted a liquidated claim of approximately 9,300

16  dollars.  It was filed -- it was duplicative of the master

17  proof of claim filed by Wilmington Trust.  Eight proofs of

18  claim assert liquidated damages of approximately 17,900

19  relating to the Delphi common stock.  And there were 117 proofs

20  of claim that asserted liquidated claims of approximately 1.2

21  million that were merely protective in nature.  By protective

22  in nature, I mean claims that asserted liabilities that are

23  contingent in nature.  For example, a lessor filing a proof of

24  claim for rejection damages in the event that the lease is

25  somehow rejected in the future.

25

1          As of March 21, 2007, in preparing for this hearing,

2     there were six timely filed formal responses.  Those six

3     responses covered fifteen claims that asserted, in the

4     aggregate, approximately 8.2 million dollars.  And we have

5     provided, in our omnibus reply, a chart to that extent that

6     summarizes those.  As a result of those claims objections and

7     where we stand today, Your Honor, starting out with 236 claims,

8     and moving fifteen claims over to the claims track for further

9     resolution, today we're seeking relief from Your Honor with

10    respect to 221 uncontested claims that assert liquidated claim

11    damages of approximately 33.2 million dollars.  And as I

12    indicated, we will follow the claims procedure order with

13    respect to the fifteen claims included in the six responses

14    that go now over into the claims track.  We have an order we

15    submitted in that respect.

16          THE COURT:  Okay.  All right, in light of there being

17    no objections with regard to the claims that you seek to

18    disallow today and the objection itself, and obviously the

19    notice of the objection, I'll approve that relief.

20          MR. BUTLER:  Thank you, Your Honor.  Your Honor, I'd

21    like now to turn to matter number 11.  This is our ninth

22    omnibus claims objection dealing with substantive objections

23    filed at docket number 6968.  In this objection, we dealt with

24    1824 claims in six categories, as I'll describe in a moment.

25    Twenty proofs of claim -- the first category was twenty proofs

26

1    of claim aggregating approximately 26.9 million which

2    contained, in the debtor's view, insufficient documentation to

3    support the claim asserted.  Sixty-eight proofs of claim in the

4    amount of approximately 6.5 million which contain liabilities

5    or dollar amounts that don't match the debtor's books and

6    records.  Thirty-one proofs of claim in the aggregate amount of

7    approximately 10.4 million dollars which were not timely filed

8    pursuant to the bar date order.  And 1,705 proofs of claim in

9    the aggregate amount of approximately 61.7 million that the

10   debtors seek to modify, still subject to further objection

11   dealing with claims in the aggregate amount of 55.1 million of

12   which the debtors seek to change the asserted debtor entity.

13   And as we have done in this last category, Your Honor, we seek

14   a modification, not a disallowance of the entire claim, but a

15   modification down to a particular amount or a particular

16   debtor.

17        As of March 21st, in preparing for this hearing, we

18   have received eighty-seven formal responses to the omnibus

19   objection, seventy-three of which were entered on the docket

20   and fourteen of which we received separately and kept track of,

21   but we've not yet hit the court's docket.  Of those eighty-

22   seven responses, seventy were docketed and timely filed, three

23   were docketed and not timely filed, and fourteen were

24   undocketed.  We have attached a chart and summarized that in

25   our reply.  While we would normally move the objections or

27

1    claims dealing with the eighty-seven formal responses that we

2    received off to the claims track and we'd simply reserve on

3    issues like timeliness and so forth, I wanted the Court to note

4    the fact that in a proposed order we've submitted to you we do

5    not seek to adjourn the hearing with respect to seventeen

6    claims covered by fourteen responses because we believe we

7    resolved those responses with the respondents.

8            Eleven of the resolved responses pertain to claims

9    for which the debtors seek only to change the identity of the

10   alleged debtor.  They don't seek to modify the dollar claim or

11   classification.  And as we discussed that with the respondents,

12   we didn't believe -- they didn't, I think, understand the

13   relief that was being sought.  The counsel for the debtor -- we

14   contacted each of those, we clarified the scope of the relief,

15   explained the debtor's not seeking to modify the amount or the

16   class of their claims at this time, although we'd reserve that

17   for future objection, but rather change the identity of that

18   entity.  As a result of that clarification, eleven of the

19   respondents agreed to the relief requested and we think those

20   should be resolved, notwithstanding the objection, and we've

21   noted those in the proposed order.

22           One respondent asserted the claimant agrees with the

23   relief requested by the debtor in the ninth omnibus objection

24   so it was a response that was filed but it said they agreed

25   with us and therefore we believe that relief is appropriate.

28

1    An additional respondent asserts the claimant withdrew its

2    three claims prior to the filing of the ninth omnibus claims

3    objection.   And we took that pleading for its face value and

4    if they're saying it's withdrawn, then we believe, for the sake

5    of clarity, we can get the relief that we're seeking dealing

6    with that matter.   And, finally, we agreed to withdraw our

7    objection with respect to a claim covered by other response.

8    And so in that, one of the fourteen claims was resolved in the

9    claimant's favor, if you will, upon further review of their

10   merits of their position.

11          Therefore, because the fourteen responses I've just

12   summarized for you, covering seventeen proofs of claim

13   resolved, we don't seek to adjourn the hearings or put those

14   particular matters on the separate claims track.   Putting aside

15   those responses, then, the unresolved responses cover 122

16   proofs of claim, asserting liquidated claims of approximately

17   37.8 million dollars.   And those would go to the claims, as is

18   our custom.

19          THE COURT:   And those, again, include the undocketed

20   ones but the ones that were served on you?

21          MR. BUTLER:   Both for the undocketed ones that we

22   received and for the ones that were not timely, we moved those

23   over to the claims track, reserved our rights to address those

24   issues at a later date.

25          THE COURT:   Okay.

29

1          MR. BUTLER:  So that means, Your Honor, that the

2    order we have submitted to you in connection with our omnibus

3    reply, we're now seeking to deal with the uncontested portion

4    of the ninth omnibus claims objection.  It covers approximately

5    1,702 claims, asserting liquidated damages of approximately

6    67.7 million.  We're seeking to expunge 97 of these claims with

7    an asserted amount of approximately 23.1 million.  And with

8    respect to the balance, I think it's about 1605 claims that

9    assert 44.6 million that were seeking to modify the indemnity

10   of the debtor, the class and/or the amount of the claim.  If

11   Your Honor enters that relief, it will result in a reduction of

12   the asserted amount of those claims to about 40.2 million,

13   dollars which will then go back into the claims hopper for

14   further review on other grounds.

15          THE COURT:  Okay.  All right.  Again, in light of the

16   unopposed nature of the relief that you're seeking today and

17   the notice and the basis for that relief set forth in the

18   objection, I'll grant it.

19          MR. BUTLER:  Thank you, Your Honor.  Your Honor, we

20   now move to matter number 12.  This is the lead plaintiff's

21   motion for modification of the automatic stay.  It's filed

22   originally at docket number 1063.  In modifying the stay

23   originally, for the purposes of going to the MDL litigation

24   before Judge Rosen to address matters relating to the PSLRA

25   stay, you invited the lead plaintiffs to come back to this

30

1    court on an expedited basis when it was appropriate to do so.

2    They received the relief, or at least part of the relief they

3    were seeking.  There was a partial modification of the PSLRA

4    stay entered by Judge Rosen.  That led to the lead plaintiff's

5    filing a request for an expedited consideration which we agreed

6    was timely and appropriately filed under the case management

7    order of docket number 7128.  We have filed our supplemental

8    objection at docket number 7344 as well as a supplement last

9    evening to advise the Court that Judge Rosen had denied the

10   motions for reconsideration of his earlier opinion modifying,

11   in part, the PSLRA stay.

12        Your Honor, as we advised chambers very late in the

13   evening last evening, counsel for the lead plaintiffs and

14   counsel for the debtors spent a good deal of time talking

15   through these issues yesterday.  And Mr. Sherman, the general

16   counsel of the company, who is present in the courtroom today,

17   led those discussions on behalf of the debtors in terms of

18   being directly involved.  It is the company's view that as we

19   move in towards and prepare for emergence from Chapter 11, that

20   we need to find a mechanism to deal with these issues.

21   Obviously, the litigation is in the district court in Michigan

22   but it does have -- there is an important involvement and

23   interplay between that litigation and the company's plan of

24   reorganization and our eventual emergence here.  And we wanted

25   to begin to create a channel for trying to sort these matters

31

1   out.  They're complex, the positions that the lead plaintiffs

2   have on certain matters are not consistent with the views, for

3   example, of our statutory committees on some of the same

4   subjects.  We have to deal with a variety of those issues.  We

5   certainly have to deal with and respect all the carriers in

6   that and there will obviously, at some point, if we're

7   successful in working this out, there are a bunch of other

8   individual plaintiffs involved and there is a coordination

9   between Judge Rosen's courtroom and this courtroom that we've

10  already had to --

11              THE COURT:  And you said the litigation is in

12  Michigan but the stay hasn't been lifted in respect to the

13  underlying claim against Delphi?

14              MR. BUTLER:  Correct, Your Honor.

15              THE COURT:  All right.

16              MR. BUTLER:  And so there is that interplay, and as

17  we made the point in our papers, and without belaboring the

18  point or arguing it today, we believe that the case law and the

19  statutory predicates of the PSLRA stay, which is only an

20  interim stay through the pleadings process in the MDL

21  litigation, and the automatic stay here are very different.

22  But the good news is that Mr. Coffey, who is present right

23  behind me --

24              MR. COFFEY:  Good morning, Your Honor.

25              MR. BUTLER:  -- who's leading the -- who is one of

32

1    lead counsel for the MDL plaintiffs, and the company were able

2    to sort out an interim resolution of this, which I'd like to

3    describe to the Court.  We will prepare an order that would

4    modify the automatic stay consistent with the statements I'm

5    about to make but Mr. Coffey -- we would like to work through

6    that order and submit it to chambers in the next week or so.

7              THE COURT:  Okay.

8              MR. BUTLER:  We'll try to go through it.

9              THE COURT:  Okay.

10             MR. BUTLER:  Essentially, Your Honor, what we have

11   agreed to do is to produce certain documents on a voluntary

12   basis to the lead plaintiffs, and I'll describe those in a

13   minute, subject to the removal of documents that we contend are

14   privileged or subject to work product, and we would provide a

15   privileged law to them in that respect, and they've agreed, as

16   I'll describe in a minute, to not fight the privilege issues

17   until a later point in time.  So the idea here is to get a

18   significant amount of documents in the hands of the lead

19   plaintiffs so they can begin their work in educating themselves

20   about some of the underlying issues.

21             My personal hope is that that will lead to a

22   settlement track in terms of being able to work with all of the

23   parties that have an interest in this, over the next number of

24   months, towards a settlement track.  The company has hoops it

25   has to jump through.  We have to deal with our statutory

33

1    committees; we have to deal with the carriers and others before

2    we're in a position to initiate those discussions.  But we

3    intend to jump through each of those hoops in a prompt manner

4    to the extent that we are able to do so, that's certainly our

5    view of this.

6            So we start today with agreeing with the lead

7    plaintiffs that we will produce to them some 576,000 pages of

8    responsive documents previously produced to the Securities and

9    Exchange Commission, subject to reviewing and removing from

10   that production any documents that are privileged or constitute

11   a work product.  In addition, Your Honor, there is a key word

12   database of documents that is described in paragraph 10 of the

13   declaration of Joseph E. Papalion and it was filed in support

14   of our objection to the motion.  And that paragraph 10

15   described documents that were identified as responsive after

16   key word searches were conducted on a database that had been

17   constructed based on electronic searches of computers and

18   e-mail files and other matters.  And we've agreed to produce

19   the documents that are in that key word database -- or I should

20   more properly say that were the subject of those key word

21   subjects as described in paragraph 10 of Mr. Papalion's

22   declaration, again, removing from that production any documents

23   that are privileged or constitute work product.  And I've told

24   Mr. Coffey that I believe that those documents are included

25   within the 576,000 pages, but for the sake of clarity on this

34

1      record, to the extent that they're not, we will still produce

2      them.

3              Other aspects of this agreement, Your Honor, are as

4      follows.  As I said, we'll provide a privileged log to the lead

5      plaintiffs.  We have agreed to go through a voluntary process

6      with the lead plaintiffs to demonstrate to them that the

7      production we're making contains sufficient information to

8      allow them to formulate and consider the pursuit of a possible

9      settlement strategy of this matter.  And in doing that, we will

10     produce to them the key word search terms that created the key

11     search documents that are being turned over to them.  And we

12     will also provide them with information regarding the

13     collection and selection of the data that was included in the

14     master database against which this key word search database was

15     derived, which is a smaller subset of those documents.

16             We have agreed that we will produce these documents

17     on a rolling basis as we review them.  We had not reviewed them

18     for privilege before in other matters, but we'll produce them

19     on a rolling basis.  We expect to be able to begin producing

20     those documents next week.  We're going to use reasonable

21     efforts to produce those documents over the next month.  We

22     intend to coordinate closely with Mr. Coffey as colleagues on a

23     cooperative basis and I don't expect there to be issues

24     surrounding that production.

25             THE COURT:  So there's not an outside date, it's more

35

1   governed by good faith?

2           MR. BUTLER:  It's governed by good faith.  I had said

3   to Mr. Coffey that I would say on this record our goal is to do

4   it in the next month, and that's what we're going to work on

5   doing very seriously.  We've reviewed that.  It is, you know,

6   big cases have big numbers with them and translating into

7   actual work that has to be done looking at 576,000 pages takes

8   some amount of time.

9           THE COURT:  But this process seems consistent with

10  Judge Rosen's remarks about the parties discussing ways to

11  streamline those issues.

12          MR. BUTLER:  Yes, I believe it is, Your Honor.

13          THE COURT:  Okay.

14          MR. BUTLER:  This settlement would be an interim

15  settlement of the motion.  The motion would be adjourned

16  without a date, subject to being placed back on this Court's

17  calendar on short notice after the Michigan district ruled on

18  the motions to dismiss pending in that court.  So there would

19  be a period of time.  Similarly, we've agreed that we reserve

20  all our rights on the privilege issues and to fight those

21  issues and selective waiver issues and all that which would be

22  argued not earlier than the time that that motion was brought

23  before this Court, either have Mr. Coffey included in that

24  motion or file a separate motion with respect to it.  But that

25  issue is reserved.  The idea is to get documents in their hands

36

1   now and not fight about the privilege issue at the moment.

2                THE COURT:  Okay.

3                MR. BUTLER:  Your Honor, we also have agreed that

4   they may use the documents we're going to produce to them for

5   any purpose except that they may not be used to amend their

6   complaint in the court or to be used in the pleadings process

7   leading up to the determination of the pending motions to

8   dismiss.  That's not the purpose of making this production to

9   them.  There is an issue that we have agreed with them we need

10  to address and that is they have filed a current motion to

11  amend their complaint and if it turns out that Judge Rosen

12  decides that he'll grant that motion and put off in abeyance

13  the motions to dismiss until the amended complaint is filed and

14  those motions were updated vis-a-vis an amended complaint,

15  we've agreed that we would modify the stay here so that Judge

16  Rosen could determine whether or not these documents that are

17  being produced could be used for purposes of that amended

18  complaint.  We reserve our rights, but that argument would not

19  take place in this courtroom.  That argument on that narrow

20  issue in that narrow circumstance would take place in the

21  district court with both parties having reserved their rights.

22                THE COURT:  Okay.

23                MR. BUTLER:  What we didn't want to do, either of us,

24  is end up in a situation where Judge Rosen makes some

25  determinations about the complaint pending in front of him and

37

1    then on that narrow issue we say, well, that's fine, Judge,

2    but, you know, these documents or the stay hasn't been lifted.

3    And we just thought it was better to have that argument in

4    front of Judge Rosen.

5              THE COURT:  Right.  All right.

6              MR. BUTLER:  Your Honor, we, as I indicated, each of

7    us, each of the lead plaintiffs and the debtors reserve our

8    rights regarding our assertion of the attorney/client privilege

9    and work product production with the documents that we're

10   producing.  And I've indicated that this would not be

11   determined by this Court prior to any renewal of this motion by

12   the lead plaintiffs, in accordance with my earlier remarks.

13             Finally, we've agreed to enter in, with the lead

14   plaintiffs, a protective order in the bankruptcy court here

15   similar to protective orders you've previously entered to

16   protect the use of personal information involving the privacy

17   of third parties.  And we'll work out the scope with Mr.

18   Coffey, but this is really intended to cover things like Social

19   Security numbers and other personal information that might be

20   in the databases that would be protected under, and should be

21   protected under, various privacy laws.

22             It is not intended, in the example that Mr. Coffey

23   used to me earlier, that if there's a codefendant that's a

24   corporation and, you know, they wanted us to keep something

25   private, that this protective order would keep that private,

38

```
 1    that wasn't the intention of it.  It's more for what I would

 2    call the customer privacy issues that are a concern to debtor

 3    corporations with respect to employees and other similar

 4    examples.

 5           Your Honor, that constitutes the general principles

 6    of our settlement today which Mr. Coffey is going to address in

 7    just a moment.  The debtor appreciates the constructive nature

 8    in which the lead plaintiffs have entered into these

 9    discussions.  There is, obviously, in any major Chapter 11 case

10    as large and complex as this that involves this kind of

11    litigation, there does need to be, with all respect to the

12    adjudication of the complaints and the process that occurs in

13    the MDL process, there is a process that has to occur in this

14    Court as part of the reorganization process.  And we are, I

15    think, pleased and appreciative of the fact that that process

16    now has the opportunity, I think, to begin on a constructive

17    tone.

18           THE COURT:  Okay.  Well, I saw you nodding along with

19    Mr. Etkin in the background, but is there something you want to

20    add to that summary?

21           MR. COFFEY:  Your Honor, Sean Coffey of Bernstein

22    Litowitz, cocounsel for the securities lead plaintiffs.  Mr.

23    Butler has faithfully described our agreement today.

24           THE COURT:  Okay.  All right.  So I'll look for that

25    order -- I guess you gave a copy to the two committees -- just
```

39

1    to see if it actually says what you said it says.

2              MR. COFFEY:  Yes, we described this in general terms

3    to the committees earlier this morning before we came in here.

4              THE COURT:  Okay.  Fine, thank you.

5              MR. COFFEY:  Thank you, Your Honor.

6              MR. BUTLER:  Your Honor, if we could briefly move to

7    matter 14 on the agenda, this is the National Union Fire

8    Insurance Company of Pittsburgh's declaratory judgment

9    involving a complaint relating to a matter not unrelated to the

10   MDL litigation, involving whether or not the fees that the

11   company has incurred are appropriately dealt with under our

12   insurance policies.  Mr. Berger's handling this matter and we

13   need to address the Court on this subject.

14             THE COURT:  Okay.

15             MR. BERGER:  Judge, Mr. Butler gave you the sum and

16   substance of the adversary proceeding.  Your Honor so ordered a

17   stipulation extending the defendant's time to answer until

18   April 9th.  This adversary proceeding was commenced after

19   ongoing settlement negotiations broke down.  We're hopeful

20   they'll be restarted.  We're waiting for either a phone call or

21   an answer.  There is an ADR provision in the policy but so far

22   the parties have been focusing more on how to get from A to B

23   than addressing that point.  With Your Honor's consent, we'll

24   adjourn this to the next omni hearing?

25             THE COURT:  Okay.  That's fine, although the last

40

1    thing you said -- and I don't remember this, maybe we've gone

2    over this before -- does the ADR cover the subject matter of

3    this particular matter?

4              MR. BERGER:  Sorry?  Does --

5              THE COURT:  Does the ADR provision cover the issues

6    in this matter?

7              MR. BERGER:  In this adversary proceeding, I believe

8    that they will.

9              THE COURT:  All right, so --

10             MR. BERGER:  If it's triggered, we may have to come

11   back to Your Honor and say we're headed in that direction.

12             THE COURT:  Okay.  All right.  But hopefully the

13   parties will focus on trying to resolve it since coverage

14   litigation presents its risk to the insurer always.

15             MR. BERGER:  We appreciate that and we'll be sure to

16   tell the defendant about today's conference.

17             THE COURT:  Okay.

18             MR. BUTLER:  Your Honor, that leaves on the omnibus

19   agenda for March only one other matter, matter 13, which is the

20   first half of 2007 KECP.  This will be a contested hearing.

21   We'd like a few minutes to consult with the objectors and

22   prepare for that.  And we were wondering if we could have a

23   fifteen-minute recess at this time.

24             THE COURT:  All right.  So I'll come back at 11:15.

25   Is there going to be a portion of this that you expect to be

41

1    under seal, or not?

2              MR. BUTLER:  I don't think so, Your Honor.

3              THE COURT:  Okay.  Fine.

4              MR. BUTLER:  I mean, the mechanics we've used in the

5    past is, you know, has been to refer to the confidential

6    information and not summarize it openly in court --

7              THE COURT:  Right.

8              MR. BUTLER:  -- as Your Honor has it.

9              THE COURT:  Right.  And I did receive the joined

10   exhibit binder.  So I'll be back at 11:15.

11             MR. BUTLER:  Thank you, Your Honor.

12        (Recess from 10:58 until 11:29)

13             THE COURT:  Please be seated.  Okay, we're back on

14   the record on Delphi.

15             MR. BUTLER:  Thank you, Your Honor, Jack Butler again

16   for the debtors.  We are here on the last matter on the March

17   omnibus agenda, it's matter number 13, this is the second

18   supplement to the KECP involving the AIP program for the first

19   half of 2007.  The supplement was filed at docket number 7200

20   and we're here today to review this first half supplement

21   because of objections raised last summer to the debtor's

22   proposal.  We'd simply reviewed these with the committee as

23   going forward but instead the objectors, including some of the

24   objectors who are here today, wanted us to come back publicly

25   on the record to deal with this matter, and we are here to do

42

1    that.

2            This is a supplement to the motion originally filed

3    at docket number 213 at the beginning of the case.  And the

4    only objections filed to this are filed by our unions that --

5    our U.S. labor unions -- that would include the IBEW and the

6    IAM and the IUOE who filed joint objections at docket number

7    7324.  The UAW's objection is at docket number 7325.  The USW's

8    objection at docket number 7327 and the IUECWA's objection at

9    docket number 7335.

10           Your Honor, we filed an omnibus reply last evening

11   that addresses those objections and provides a summary of the

12   objections, which is also Exhibit 14 in the joint exhibit book,

13   as well as the payout curves with the corrected tables.  The

14   tables had typographical errors in them that we needed to

15   confirm with the creditors committee.  We've had to correct

16   tables.  We've done that.  Those are now attached to our

17   omnibus reply.  And also the Exhibit C to the reply are some of

18   the structural compensation charts that are also Exhibit 14 to

19   the joint index of exhibits.

20           Your Honor, we have reviewed the joint index of

21   exhibits -- these are Exhibits 1 through 21 -- with the

22   objectors.  My understanding is there is not objection to

23   admitting these matters into evidence.  The declarations would

24   be subject to cross-examination, which we'll address in a

25   moment.  But subject to cross-examination on Joint Exhibits 6,

43

1  7, and 8, Your Honor, I'd move the admission of Exhibits 1

2  through 21 into evidence.

3          THE COURT:  Okay.  Hearing no objections, those will

4  be admitted.

5  (Joint Exhibits 1 through 21 were hereby received for

6  identification, as of this date.)

7          MR. BUTLER:  Thank you, Your Honor.  Your Honor, to

8  try to do this in an efficient matter -- and Your Honor has

9  dealt with this issue in the past -- we're going to try to get

10 the evidence in and then we'll all address these positions in

11 closing arguments, if that's acceptable to Your Honor.

12         THE COURT:  Okay.

13         MR. BUTLER:  The testimony that needs to come in

14 evidence are the three debtor declarations.  The first

15 declaration, as I would offer into evidence, is Joint Exhibit

16 6.  This is the declaration of expert report of Nick Bubnovich

17 in support of the second supplement to the KECP.  And I would

18 offer that into evidence, subject to any cross-examination.

19         MS. MEHLSACK:  Mr. Butler, I'd like to cross Mr.

20 Bubnovich, please.

21         THE COURT:  Okay.  Mr. Bubnovich, you can come up to

22 the stand, please.  But I'll accept his declaration as direct.

23         MR. BUTLER:  Thank you, Your Honor.

24         THE COURT:  Just have a seat.

25     (Witness duly sworn.)

44

1      THE COURT:  For the record would you spell your name,

2   please?

3      THE WITNESS:  Bubnovich, B-U-B-N-O-V-I-C-H.

4   CROSS-EXAMINATION

5   BY MS. MEHLSACK:

6   Q.    Good morning, Mr. Bubnovich.  I'm Barbara Mehlsack and

7   I'm here today representing the operating engineers

8   Locals 18-S, and 832-S and the IBEW Local 663 and IAM District

9   10.  And I understand, Mr. Bubnovich, that you had the primary

10  responsibility for designing the payout program that's the

11  subject of the hearing today, is that correct?

12  A.    I am the debtor's compensation consultant.  The design and

13  the payout curve was a joint undertaking involving not just

14  myself but also the company as well as the compensation

15  consultant from the unsecured creditors committee as well as

16  members of that committee also.

17  Q.    What I'm hoping you can do is help me out in understanding

18  how you arrive at how in this particular case and how generally

19  you would arrive at a ratio between a performance level and a

20  payout that would satisfy the Court and anybody else that it's

21  a fair relationship in the sense that it is actually working as

22  an incentive program.  And by that I mean there is the, I

23  believe there's the first half of 2006, the program ended up

24  with a fair number of individuals receiving a 200 percent

25  payout.  There is a number that is in Mr. Sheehan's

45

1    confidential declaration estimating what the average payout

2    will be for the non-DSB members, the non-board members for the

3    second half of 2006.  Is there some kind of formula, and I'm

4    really asking you to help me out in this, is there some -- is

5    it intuitive, is there a mathematical formula, is there a way

6    that you as an expert can say I'm satisfied that what we've

7    arrived at in this particular instance is a relationship, a

8    payout curve, that means this is a meaningful incentive

9    program.  It's not, to use the words that the Court used the

10   last time around, it's not a layout, it will have an effect on

11   people's performance.

12   A.    That's a complex question and a complex set of

13   assumptions.  Let me start by saying that the performance

14   target, and if we might let's just talk about EBITDA

15   performance target at the corporate level, which is

16   approximately 124 million dollars, was based on the company's

17   business plan.  That number was derived from -- or was first

18   established at the beginning of this year in January.  It was

19   company's best estimate, based on the facts and circumstances

20   at the time, of the performance that it expected to achieve

21   under its business plan.  The board of directors approved at

22   target.  Now, if that target is achieved, then target bonuses

23   totaling, I believe approximately, twenty some million dollars

24   would be paid to the executives, and by the executives I mean

25   the DSB, Delphi Strategy Board, as well as the non-DSB

46

1    executives.  Now, is that helpful or is there something more

2    that you would like?

3    Q.    No, well, maybe if I pose it to you in terms of a

4    hypothetical.  If you turn to Exhibit 1, to the second

5    supplemental order, it's got -- are you there?

6    A.    Yes, I am.

7    Q.    Okay.  For example, it says, a pad of 150 percent will be

8    made for non-DSB members for an EBITDA of 387 million, 387.4.

9    A.    Okay.

10   Q.    Is that correct?

11   A.    Yes.

12   Q.    If we were to end up at the end of the first half of 2007

13   with a hundred percent, let's say, of the non-DSB members

14   getting 150 percent payout, that would mean that the EBITDA was

15   more than three times -- the EBITDA achieved would be more than

16   three times the EBITDA that was projected.  Would that tell

17   you, as an expert in this area, aha, maybe we should have set a

18   target higher than that and people would have worked harder,

19   whatever it is that this so-called incentive plan because the

20   debtor has been very clear that this is supposedly an incentive

21   plan and not a retention plan so presumably it works to incent

22   people to do something they would not otherwise do.  Is there

23   some magic formula number that says if X number of people

24   achieve X percentage above a hundred percent, then our targets

25   were -- we undertargeted, or is there not?  Is this a magic --

47

1    is there some kind of intuition, magic, what is it that leads,

2    I believe you and I guess the committee and everyone else, to

3    conclude that 150 percent payout for 387 million dollars EBITDA

4    is reasonable?  And is there a judgment, a correction, that you

5    make afterwards on the basis, because it's my understanding

6    that indeed everybody realized that a correction had to be made

7    when the last time around there were a significant number of --

8            MR. BUTLER:  Objection, Your Honor, this is more

9    testimony or something, it's not a question.

10           THE COURT:  Well, it's hard to follow the question --

11   I think you're going to have to break it down.

12   Q.   Is there some way of the rest of us saying, well, this is

13   a reasonable payout ratio?

14   A.   Again, the curve -- the two curves on this page were the

15   product of negotiation between the company and the unsecured

16   creditors committee.  I don't believe that the committee, and I

17   don't speak for the committee, would have allowed a curve of

18   any sort, or a payout that it thought was unreasonable.  Now,

19   it is also fair to observe that, you know, this isn't a hundred

20   percent science.  You know, there is some art.  It's a judgment

21   as to what is fair, appropriate, or reasonable.  Certainly I

22   would say that if the company's performance is 375 million

23   dollars of EBITDA, which is as you point out three times the

24   target performance, if that increase -- that increase would

25   result in an additional several million dollar payout to the

48

1    non-DSB participants, and that's a pretty fair ratio.  Most

2    people would say for what amounts to about 250 million dollars

3    more of EBITDA to pay out, I think it would be an additional

4    fifteen to twenty million dollars, that that's a pretty good

5    ratio, common sense.

6    Q.    And if everybody got, let's say, 150 percent payout, there

7    would not be a question that maybe we should have set the 100

8    percent target higher than we set it and therefore we would

9    have achieved an even greater EBITDA?

10   A.    Well, I don't think you can look at a particular payout

11   for a particular period.  The payout might be high because of a

12   number of factors, primarily performance was excellent or

13   outstanding.  You know, I will concede the point that if the

14   payout is always at maximum over an extended period of time for

15   four, five, six, seven, eight years, that would tell a

16   reasonable person, well, the goal setting here maybe isn't what

17   it should be.  But that hasn't been the case here.

18            MS. MEHLSACK:  I have no further questions, Your

19   Honor.

20            THE COURT:  Okay.  Does anyone else have any

21   questions of Mr. Bubnovich?  I have a question.  The expert

22   report that you submitted says that in looking at comparable

23   companies, without the continuation of the AIP, Delphi would be

24   in the lower twenty-five percent, is that correct?

25            THE WITNESS:  Correct.

49

1          THE COURT:  When you look at the other companies to

2     make that determination, do you go into the level of detail

3     where you look at the -- or project the likelihood that the

4     triggers that those other companies set for the bonus levels

5     will be met?

6          THE WITNESS:  No.  The data that's used is from two

7     sources.  In the case of the DSB, we benchmark them against

8     them peer companies.  And in the case of the non-DSB, because

9     there's 400 plus people, we use survey data.  Now, in using

10    both sources, really, you have a wide variety and number of

11    companies and the assumption is, well, some of them may have

12    paid out at maximum, some of them at target, and some of them

13    below target.  So that's the way that's taken into account,

14    because you've got so many data points.

15         THE COURT:  Is it your experience that comparable

16    firms generally set their targets in the way that Delphi has --

17    obviously not after consultation with a creditors committee,

18    except for a couple of them, but generally with the same

19    methodology?

20         THE WITNESS:  Yes, absolutely.

21         THE COURT:  Okay.  Thank you.  Any re-direct?

22         MR. BUTLER:  No re-direct, Your Honor.

23         THE COURT:  Okay.  You can step down, Mr. Bubnovich.

24         MR. BUTLER:  Your Honor, I'd now like to offer into

25    evidence, and for cross-examination, Joint Exhibit 7 which is a

50

1   declaration of John D. Sheehan in support of the second

2   supplement.  This has been marked highly confidential and I'd

3   offer it into evidence at this time.

4           THE COURT:  Okay.  Does anyone want to cross-examine

5   Mr. Sheehan?  Okay.  Then I will, again, accept his declaration

6   into evidence.

7           MR. BUTLER:  Thank you, Your Honor.  Finally, Your

8   Honor, and I'd actually like Mr. Naylor to stand so that I can

9   introduce him to the Court.  We have in the courtroom today

10  Craig G. Naylor, who is chairman of the company's compensation

11  committee, a member of the board of directors who's an

12  independent director of the company.  Mr. Naylor assumed the

13  role of compensation committee chairman this year and this is

14  the --

15          THE COURT:  Is that because the other gentleman had

16  to testify last time?

17          MR. BUTLER:  Well, I don't want to connect those

18  dots, but he did retire from the board, Your Honor.

19          THE COURT:  Okay.

20          MR. BUTLER:  No, actually, he'd been appointed to

21  another board and a couple of boards and needed to limit the

22  number of boards he was on.  But Mr. Naylor is an independent

23  director of the company and chairman of the compensation

24  committee.  He has submitted his declaration in support of the

25  second supplement and that's Joint Exhibit 8 and we'd like to

51

1      move that into admission, subject to cross-examination.

2                 THE COURT:  Okay.  Does anyone wish to cross-examine

3      Mr. Naylor?  All right.  I'll admit his declaration -- his

4      testimony.

5

6                 MR. BUTLER:  Thank you, Your Honor.  What I'd like to

7      then do is move into the closing argument, present the

8      company's case, Your Honor, and then I'll come back up after

9      with Your Honor's permission.  Reserve some time and come back

10     up after the objectors have presented their objections.

11                THE COURT:  Okay.

12                MR. BUTLER:  Your Honor, as I've mentioned at the two

13     prior hearings back in February and July of 2006, there are

14     essentially four components to the executive compensation

15     structure at Delphi.  And those are illustrated in the Exhibit,

16     Joint Exhibit 2, that's been admitted into evidence, and I have

17     one of those pages here on the easel, which is the page that

18     talks about the executive compensation structure of the first

19     half if AIP were approved.  And you can see that the first

20     component is salary or base wages.  Twenty percent of the DSB's

21     total compensation or total direction compensation comes from

22     that program.  The benefits that they receive, health care and

23     other benefits, comprise about six percent of the total piece

24     of the pie that they would get.  If Your Honor were to approve

25     this KECP as you have in the past, the Rangel incentive

52

1   opportunity would comprise twenty-one percent of the pie.  And

2   the remaining fifty-three percent, in the case of the Delphi

3   strategy board, really is the long-term incentive program

4   piece, which the company has agreed to address in connection

5   with the plan of reorganization.  It's intended to be addressed

6   through the emergence program, which has two components.  The

7   cash emergence program and the equity emergence program.  The

8   cash program is backward looking, trying to address this

9   competitive shortfall, that's defined on Exhibit 2 here in some

10  way with respect to the Chapter 11 case, and then the emergence

11  equity program is designed to look forward eighteen months into

12  the future in connection with the reorganized company.  Your

13  Honor is aware of the fact that after consultation with the

14  committees and trying to sense the best way to address those

15  issues, we did take the emergence program off the calendar and

16  we've incorporated it in the plan of reorganization process.

17  And that's also addressed in the EPCA that has been approved by

18  Your Honor, and we're involved in the process, in the equity

19  investment process, with the plan investors and with the

20  creditors committee, moving forward in evaluating what a

21  competitive executive program design would be.  And Your Honor

22  will have an opportunity to -- and stakeholders will have an

23  opportunity to examine that in connection with the plan process

24  and understanding the context of the entire plan.  The company

25  was persuaded that was the appropriate way to address that,

53

1    even though it left the executives, some 500 executives,

2    running a global twenty-six billion dollar business on five

3    continents, in a position where they were -- during this case,

4    even if you approve the AIP, more than half of their direct

5    compensation opportunities are being held in limbo.  And that

6    is the only stakeholder in this case, in terms of employees,

7    where that's the case.  We've taken half of someone's

8    compensation and said, you know, we'll address that later.

9    And, ultimately, the company believed that the tradeoffs in

10   trying to address what is, admittedly always a controversial

11   subject, that that was the appropriate way to deal with that.

12            The company has a very different view, as Your Honor

13   knows, with respect to the annual incentive program.  That

14   component in the case, the DSB, represents roughly a fifth of

15   their direct payment opportunities in their program design.  It

16   is the company's belief that we need to continue this program.

17   The evidence you now have points out about how the program has

18   been developed.  It is, you know, when I was here for the

19   second or the first supplement, the second half 2006 KECP, I

20   was here in the face of a couple of issues that were somewhat

21   challenging with respect to the objections, because we're

22   coming off a first half performance where people were paid, for

23   the most part, at the 200 percent end of the spectrum.  So

24   there had been -- the company had considerably exceeded its

25   plan and most of the divisions that exceeded their plans, and

54

1    it was a robust performance vis-a-vis plan.

2              I also had the challenge at the time, Your Honor, of

3    relating from just a common sense perspective, relating the

4    steady state plan that had been developed in 2005 and into the

5    early part of 2006, into a plan that Your Honor could have

6    confidence in.  It wasn't just sort of imagined and a number

7    picked out of the air.  And that's always a challenge in the

8    beginning of a Chapter 11 case, because when you present to

9    stakeholders and to the Court a steady state plan of this is

10   what we think will happen if we don't do things.  To a certain

11   extent that is a, as Mr. Bubnovich said, it's not a science,

12   it's an art.  You are imagining what will happen to you, and in

13   this case we were imagining in the fall of 2005 and in 2006

14   what would happen to this company when we filed the largest

15   manufacturing Chapter 11 in history.  And how does a company

16   like this, in a just in time supply chain, in this sort of

17   intricate complex place we are, how do we operate?  And what

18   will happen to us?  And, fortunately for stakeholders, because

19   the fact is business enterprise value has gone up as a result

20   of the performance in the Chapter 11, fortunately, some of the

21   concerns we had that might happen to us in the first half of

22   2006 did not materialize.  And we, in fact, hit, as Your Honor

23   heard in testimony in connection with the first supplement, we

24   had some of the best operating metrics performance in the

25   history of the company during the first part of 2006.  That

55

1   resulted in performance in excess of plan, and it resulted in

2   sort of 200 percent payouts.  But it raised the question in the

3   minds of our stakeholders about, well, gee, are these layups?

4   How easy are these plans to accomplish?  And we explained the

5   process to Your Honor in connection with the first supplement

6   that Your Honor approved, the second half 2006 KECP, and as

7   Your Honor is aware from the testimony and the record now, that

8   KECP performance turned out differently.  There was a

9   performance that was achieved, but the average achieved

10  performance was 108 percent, or thereabouts, for DSB members,

11  120 percent, on average, for non-DSB members.  And several of

12  our divisions did not receive their divisional payment at all,

13  because they didn't make their plan.  So there wasn't a matter

14  of getting 200 percent.  They got zero percent.

15          And, you know, I'm not quibbling with Your Honor,

16  because we respect Your Honor's decisions in this case, but we

17  have, you know, we continue to be of the view, as a company,

18  that having a cliff, a tight program on the downside where you

19  have to make the target or you get nothing, which is what we're

20  using in this Chapter 11 case, is not customary compensation

21  policy, but it's the policy we're dealing with here.  And, as a

22  result, we had divisions that got nothing on account of

23  performance in very difficult times.  I said difficult times

24  because this is a challenging environment.  You only need to

25  read the newspaper to understand that OEM productions and their

56

1    production forecasts are going down and not up.  We're very

2    volume driven as probably the largest supplier on the face of

3    the planet, and, you know, we're very sensitive to that.  We're

4    extremely sensitive to commodity costs.  And there are all

5    kinds of external factors that are not within the ability of

6    this management team to be able to manipulate for a performance

7    result.  And, in fact, dealing with commodities, dealing with

8    OEM volumes, and dealing with the complexities of the chain

9    that we have been involved in, and, by the way, as a result of

10   consensual bargaining for agreements with the IUE and the UAW,

11   our two major unions.

12            This company, in 2006, also did the extraordinary

13   thing of having more than 20,000 people leave our U.S.

14   operations and have to then operate -- which was the

15   substantial amount of the hourly work force in our plants --

16   and then have to replace those -- what needed to be replaced,

17   on a need to run basis with temporary employees.  And still

18   have our plants run on time.  And while people can say, well,

19   gee, that's, you know, we understand it has to happen, well,

20   management has to make that happen.  And, ultimately, that

21   happened.  Tremendous cooperation from our unions.  And

22   ultimately we were able to continue to run without any material

23   disruptions to our OEMs through that entire process.

24            But the second half performance was challenged.  The

25   second half performance didn't end up where people would have

57

1    liked it to have been.  And the kinds of, you know, payouts

2    that occurred in the first half would not occur.  Now, I've

3    heard the argument made by -- and the objections that, gee,

4    there's something bad about paying 200 percent.  I have quite

5    the contrary view.  If, in fact, we could pay 200 percent on

6    these payout curves, and if you look at Exhibit 2, and if we

7    could actually pay 200 percent and achieve a result of north of

8    545 million dollars in EBITDA after, you know, taking out the

9    adjustments for transformation costs, which I'll talk about in

10   a moment, I suspect, even though we have difficulties with our

11   committees from time to time, I suspect they would be

12   celebrating with us, because what that would ultimately mean is

13   that the value of the company and the value of the enterprise

14   is enhanced.  And ultimately paying twenty to thirty-seven

15   million dollars to 500 executives across the globe to make that

16   happen, as Mr. Bubnovich just testified, the ratio that Ms.

17   Mehlsack's looking for, that ratio is achieved under anyone's

18   business judgment.  Because ultimately that increase in value

19   would be enormously positive to this company.

20           And I will tell you, from the company's perspective,

21   Your Honor, the performance in 2006, which exceeded the

22   expectations of the company, and, I will say, frankly, the

23   expectations of our stakeholders, at least those stakeholders

24   who are in close negotiations with us on issues, has resulted

25   in the company being able to think about a framework and think

58

1    about an approach that will, we hope, at the end of the day

2    involve a consensual arrangement with General Motors and with

3    our other stakeholders and with our unions that will allow the

4    company to emerge.  And being able to negotiate that with

5    enhanced value, as opposed to having a melting ice cube in

6    deteriorating value, is enormously important to this

7    reorganization.  Now, when you look at what's in the evidence,

8    Your Honor, and I just think it's important to understand that

9    we're -- you know, why things happened as they happened in

10   2006.  What we have put into evidence, in addition to Mr.

11   Bubnovich's testimony about how this design was put in place,

12   and his view and the view of his firm, that this is an

13   appropriate and reasonable program.  You have Mr. Sheehan's

14   declaration and his testimony in which he has walked through

15   the company's performance, how the business plan was developed,

16   and -- let me just say a word about that.  I said last year,

17   but I was a little concerned about the fact I was coming in

18   with a steady state plan that people could take a shot at and

19   say, hey, Mr. Butler, you know, you just picked a number,

20   because you can't tie it to anything.  There's no particular

21   business judgment because we're just trying to stabilize this

22   business.

23          That's not where we are today, Judge.  Today I come

24   in front of you and tell you that we have targets that are

25   derived from a preliminary business plan, which is a five year

59

1    plan, which has been prepared, and is being vetted under our

2    framework agreements by investors who are considering putting

3    in 3.4 billion dollars in equity and by creditors' statutory

4    committees who are looking to sign on to the framework that has

5    been proposed.  With the modifications, they may want to

6    negotiate with us, but that framework.  And so the plan that's

7    been developed is a plan that's intended to generate equity

8    investment of a very substantial amount, seven or eight billion

9    dollars worth or more of debt financing, emergence financing.

10   And so the program that's been put together is, in the

11   company's perspective, a robust program that is intended to be

12   what the company's best estimates are.  And Your Honor, I

13   think, has or should have the confidence this time around of

14   being able to say this plan and the targets derived from this

15   plan, the hundred percent target, are based on, or derived

16   from, something I can understand has independent purposes.

17   It's not just an imagination of what the stabilization of the

18   company may do.  This is actually the plan.  We're trying to

19   vet with stakeholders to emerge.  And those targets, the

20   hundred percent targets, are derived from that.  And the

21   argument that anyone might make that somehow this plan was

22   manipulated to be low so people could get thirty million bucks

23   or twenty-five million bucks given the underlying purposes of

24   this plan, I think, frankly, that is just a ludicrous argument.

25   Not only is it not true, it's just -- it defies any kind of a

60

1    smell test or creditability to it.

2            And so we start with the number which has been

3    publicly disclosed for the first half of 124.1 million.  One of

4    the issues I want to clarify on the record today, and we talked

5    about in our caucus prior to -- we had a meet and confer caucus

6    during the adjournment recess, rather, this morning, with the

7    objectors, was -- several of the objectors pointed out

8    something I agreed with, which was that there's, I think, some

9    confusion about how we will take this business plan and

10   continue to apply, if you will, the UG concept.  The minus U

11   minus G, they don't give the executives any kind of special

12   credit for General Motors contributions or savings from union

13   concessions in the collective bargaining process -- how that

14   process is going to work.  And there was, I think, confused

15   about the fact that people were talking about what will --

16   adjusted for variances and people say, well, what do you mean

17   adjusted for variances, there's already a transformation

18   assumed in the plan.  And that's correct.  And I think it's

19   important to understand that one of the complexities this time

20   around is that our 2007 to 2011 business plan, from which the

21   first half 2007 targets are derived, does assume

22   transformation.  It assumes we actually are going to be

23   successful.  And, therefore, one of the things we're going to

24   have to do here is we're going to have to adjust out at the end

25   of the performance period the actual performance, good and bad,

61

1    pluses and minuses, that are related to the UG concept, the U

2    and the G concept we've talked about.  And that is our

3    intention, and that is our commitment, and that is our

4    agreement with the creditors committee.  And we've also

5    committed, as indicated in the papers and in our reply, we've

6    committed to sit down with the creditors committee ten business

7    days -- at least ten business days before we make any payments

8    under this program, and review all those calculations with the

9    committee.  And I will also say, by way of disclosure, Your

10   Honor, that we're trying to sort that out even now in terms of

11   what's actually in the plan.  Which has, of course, nothing to

12   do with what the actual performance might be.  We'll have to

13   figure that out later.  But there is some transformation in the

14   first half in the plan.  We're sorting through that now with

15   our bank group, because on an independent track we are

16   renegotiating our covenants and other aspects of our 4.5

17   billion dollar DIP agreement in a -- we have a very positive

18   discussion going on right now with our banks.  It was a bank

19   group meeting yesterday, and we expect to close the first

20   amendment at the end of this month.  And working through that

21   our banks, of course, set their covenants not based on our

22   transformation.  You would expect as a DIP lender, Your Honor

23   would understand this in particular.  The banks want to

24   understand what's your non-transformed world look like, and how

25   are you going to perform there.  And also, banks don't

62

1    necessarily accept the way in which a business plan is

2    calculated.  They actually have their own definitions on what

3    they want you to count and not count in EBITDA and so forth.

4         And so we've been in the process of translating for

5    our banks in the last few days.  The business plan EBITDA and

6    moving mechanically from the business plan EBITDA to the

7    adjusted steady state business plan that they want to set the

8    covenants on.  And I will tell you that while that EBITDA

9    number is larger, is higher than 124 million, because they have

10   us add back things into EBITDA for their purposes, there was

11   actually a subtraction from that number for the effects of

12   transformation.  That is to say the U and the G are not

13   positive in the first half of '07.  They're, in fact, negative.

14   And that has to do with assumptions we had involving the

15   pricing deals we would enter into with General Motors, that are

16   not yet -- that won't have taken full effect, among other

17   matters.

18        I will also tell you, by way of disclosure, Your

19   Honor, we indicated in our reply, it is true that we're halfway

20   or almost halfway through the performance period.  As Mr.

21   Bubnovich testified, the targets were set at the beginning of

22   the performance period, but it's taken us time to review our

23   business plan in detail, whether it's statutory committees,

24   it's taken us time to negotiate consensual payout curves with

25   the creditors committee.  The committee spent a great deal of

63

1    time discussing that with us and wanting to go through and be

2    comfortable with the curves.  And so we're in the middle of the

3    period.  And it is true, although we can't quantify it for you

4    in terms of actual performance, because our books aren't

5    closed, but from an estimative perspective, it is true that we

6    are performing in the first quarter ahead of our business plan.

7            Again, I think that's a good news thing and a bad

8    news thing.  From a restructuring perspective, from where I

9    sit, it's a great thing for the things I need to be working on

10   over the next few months.  But I do want Your Honor to note

11   that we are tracking ahead.  And, again, some people have

12   argued in the objections, gee, that's a bad thing.  I don't

13   think it's a bad thing.  And ultimately they say, well, we

14   shouldn't -- maybe we should change -- not do the program or we

15   should change the targets.  I just point out it was -- as we

16   did in our reply, Your Honor, I think if I was standing in

17   front of you and telling you, gee, commodity prices went up by,

18   you know, thirty percent, and we're not going to make any of

19   our numbers, and therefore, Judge, we'd like to change all the

20   targets.  I don't think they're -- you know, and adjust them

21   downward.  I don't think we'd have any support in this

22   courtroom from anybody.  They would say, hey, you set your

23   target; you're going to live by it.  And that's what we intend

24   to do here.  But I did want Your Honor to be aware of those

25   facts.  And I do want you to be aware that our commitment, and

64

1    we've made this commitment to the union objectors, is that we

2    will adjust the performance in 2007 to take out the effects of

3    U and G consistent with the practices over the last year.  And

4    after -- with an opportunity for review by the statutory

5    creditors committee and their financial advisors.  So, Your

6    Honor, when you -- just in closing, from my perspective, when

7    you look at -- just a couple of other items I wanted to touch

8    on that are in the evidence.  I talked about positive

9    performance and I would point out to Your Honor that there is

10   in the confidential book -- Exhibit 21 does have the

11   presentation made to the statutory committees earlier this

12   month, that was made -- put together by our chief executive

13   officer, by Mr. O'Neil, and his team.  Just outlining the

14   performance during 2006 on a variety of metrics that the

15   company considers to be material.  This presentation was also

16   made to General Motors and to our plan investors.  And it is an

17   important plan of the performance evaluation of the company.

18   And I think it is important to note that from the company's

19   perspective, as the evidence and the declarations from Mr.

20   Naylor and others indicate, the company believes that these

21   incentive programs are working.  We do believe that the

22   management team is working 24/7 to achieve maximizing business

23   enterprise value for all of our stakeholders.  And we believe

24   that the program that we're proposing here is, in every

25   respect, reasonable and appropriate consistent with our past

65

1    practices since entering into Chapter 11 that Your Honor has

2    approved on two prior occasions.  And ought to be approved

3    going forward.  Your Honor, that's the sum and substance of our

4    presentation and I'm prepared to answer any questions from you,

5    and I'll come back after the objectors are done.

6              THE COURT:  Okay.  I had one question on Exhibit 2.

7    You had one of the pie charts up there.  But I had a question

8    just on the first one, the first pie chart which is historic

9    Delphi executive compensation structure.

10             MR. BUTLER:  All of theirs?

11             THE COURT:  Right, that one.  Historic, how far back

12   does that go?

13             MR. BUTLER:  This was put together by -- with the

14   help of Watson Wyatt, with Mr. Bubnovich's team and the

15   company.  And I think this is intended, and I'll look back to

16   them to help me on this, I think this measured the performance

17   over since the time of emergence for spinoff from General

18   Motors.  Is that right?  Is it the period -- this period -- the

19   historic structure?  This is the --

20             MR. BUBNOVICH:  Yeah, that's correct, Jack.  It's the

21   structure since the time of the spinoff.

22             THE COURT:  Okay.  All right.  Okay.  I don't have

23   any questions right now.  I may after hearing the objectors.

24             MR. BUTLER:  Okay.  Thank you, Your Honor.

25             THE COURT:  Okay.

66

1           MS. CECCOTTI:  Good morning.  Babette Ceccotti,

2    Cohen, Weiss and Simon, for the UAW.  Once again addressing the

3    subject of the AIP.  Debtors reply, of course, notes the

4    Court's prior rulings on similar motions in the past in this

5    case.  And I do want to assure the Court that it's not as

6    though the UAW is not mindful of the Court's prior rulings.  We

7    don't have short memories.  We felt that it was important

8    however to lodge an objection to, I guess, the re-upping or

9    reauthorization of the AIP.  Again, at this time, because

10   frankly, the observation that we made in our objection, we

11   believe, really does bear restating.  Given the fact that

12   although I think we acknowledge and agree that the case has

13   certainly advanced from the last time that we were all before

14   the Court on this issue, with respect to the unions and, from

15   my perspective, the UAW represented membership, of course,

16   matters are still in flux and still uncertain.  I did note, of

17   course, Mr. Butler's presentation regarding the percentage of

18   salary that the AIP represents, and that this, as he framed it,

19   represents an instance where some portion of the salaries of

20   this particular group remain in limbo, I think were his words,

21   with respect to the deferral of the emergence -- the emergence

22   program, until later in the case.  But I think it's important

23   for us to again remember that here we are talking about line

24   workers.  The perception, as I know I've described to the Court

25   in the past, that the perception of the line workers in this

67

1    case, of course, right now is still uncertainty as to them and

2    their working conditions going forward.  The emergence, of

3    course, will look towards the emergence of everybody going

4    forward, including this executive group and the group that will

5    be covered by what will be the forthcoming program that will

6    affect those folks.  But right now there are efforts, as the

7    Court is aware, to resolve the labor issues and we think that

8    from the standpoint of the Court's articulation of the way the

9    Court views these programs, does it make good business sense

10   now to consider, once again, dealing with an AIP program for --

11   although it does affect several hundred people, is still

12   considered a select group when compared to the Delphi workforce

13   as a whole.  And the viewpoint of my constituents, which is

14   that matters like this are really geared towards providing that

15   group with some certainty, even if their compensation is not

16   going to be totally adjusted here.  It still reflects an

17   endeavor to provide some certitude for that group in terms of

18   that group's compensation for 2007.  The debtors have also

19   asked, I noted in the order, that the Court actually schedule

20   the next time we all will be together to discuss the AIP in

21   July, whereas the membership represented by the UAW still faces

22   uncertainty.  And the perception there is important, we submit

23   for the Court, in engaging right now the efforts of the unions

24   and the debtors to continue to address the labor matters, and

25   in determining whether it makes good business sense to approve

68

1   the motion this morning.  We submit that it is critical for the

2   Court to consider the UAW's perspective, which is that this

3   program does constitute a distraction as they continue with

4   their efforts with the company.  The trickle down effect to the

5   workforce, you know, which deals really in headlines from the

6   case, will simply be managers get bonuses.  Not curve, not

7   necessarily focusing at all on the efforts of the creditors

8   committee to deal with the curve and to devise a program that,

9   in a negotiated way, makes sense to that particular

10  stakeholder.  All of these details are simply not details that

11  get to the level of the shop floor.  What gets to the level of

12  the shop floor are questions of -- sort of the general --

13  what's happening in the case generally.  What's happening with

14  my wages and benefits when the company emerges from bankruptcy?

15  What will that look like?  When will I get to know what that

16  looks like?  What efforts is my union undertaking now to

17  protect my wages and benefits?  And I see over here that

18  somehow there's a headline that says managers get bonuses.  So

19  that's simply a reality that the union faces, not only in this

20  case, but in many other cases where in bankruptcy courtrooms

21  across the country, programs like this are brought to the

22  attention of the Court, for which approval is sought, and it's

23  a double standard that, frankly, even somebody like me who's in

24  courtrooms every day, unfortunately, on these matters, still

25  finds difficult to address, let alone the perception of the

69

1    line worker.  So we believed that it was important, once again,

2    to bring to the Court and restate the union's view that while

3    the labor issues continue to be pending and unresolved, that it

4    does not make good business sense to proceed now to approve the

5    program and that these matters are best left deferred, as we

6    said the last time, until a time when there is greater clarity

7    for the wages and benefits affecting the UAW membership.

8            THE COURT:  Okay.

9            MR. PETERSON:  Good afternoon, Your Honor.  Lowell

10   Peterson for the steelworkers.  We rest principally on the

11   statements we made in our written objections.  I do want to

12   underscore the frustration level felt by the steelworkers, both

13   the rank and file and the leadership.  That here we are,

14   towards the end of March, and we haven't advanced past where we

15   were six to eight months ago.  The unions really did step up to

16   the plate in a very forthright manner at that time, as it has

17   throughout Delphi's history, and addressed the company's needs,

18   and we are still not in a position to have our programs

19   finalized and brought to the Court for approval.  If nothing

20   else, this KECP proves that when the company wants to get

21   things done, it can.  And we just hope that the company wants

22   to get done our piece of this puzzle and hope that it will do

23   so very shortly.  In terms of compensation being in abeyance or

24   in limbo, one of the problems that the steelworkers face is

25   that at least with respect to most of our members, and

70

1    certainly all the people who've been around for a while,

2    there's no question about what's going to happen.  We're all

3    going to lose jobs.  That's what's going to happen to the

4    steelworkers.  The question is in what manner?  What's going to

5    happen in the meantime and what happens when they finally close

6    the door on their pickup trucks and cars for the last time and

7    leave Delphi forever?  We thought we had that stuff addressed,

8    and here we are, and it's still not done.  And this simply

9    underscores our frustration with the process at this point.

10            THE COURT:  Okay.

11            MR. PETERSON:  Thank you, Your Honor.

12            MS. MEHLSACK:  Good afternoon, Your Honor.  Barbara

13   Mehlsack, and I'm here speaking for the IBEW and the IAM, as

14   well as the operating engineers.  And, Your Honor, the last

15   time, if you don't mind, Your Honor, I'll --

16            THE COURT:  That's okay.  It's kind of a recalcitrant

17   microphone there.

18            MS. MEHLSACK:  You know, the last time around, Your

19   Honor, Your Honor addressed this issue of our -- the union's

20   explaining to their members that there really is a connection

21   between paying bonuses to managers and the request for

22   concessions, because it's all about making the company more

23   competitive.  The problem for the 135 IBEW, IAM and operating

24   engineer represented employees is, Your Honor, that there has

25   been no connection, because there's been absolutely zero

71

1    movement in connection with those bargaining units.  We haven't

2    even reached the point, Your Honor, where we can say we

3    thought, as the steelworkers could say, we thought we had the

4    issue of what was going to happen to people when doors closed,

5    that -- what would happen to them.  How much money would they

6    get?  What would be the status of their health insurance?  What

7    would be the status of their pensions?  And the inconvenient

8    truth is, Your Honor, that we are both in limbo, and, to use

9    Mr. Butler's term, and -- on the one hand.  On the other hand,

10   we've got people who know, as the steelworkers members know,

11   that they are going to be out the door, but they just don't

12   know then what's -- you know, what's going to be the status of

13   their being out the door.  So that it is difficult, if not

14   impossible, to say to people -- again, as Mr. Peterson points

15   out, when the company wants to get something done, they can get

16   it done.  The fact is the company has made it very clear to us

17   and to -- by us I mean to the IBEW, the IAM and the operating

18   engineers, that there will be no negotiations.  Not even will

19   there be no deal, but at this point, they've told us, at a

20   corporate level, we can't even negotiate with you until we make

21   a deal with the UAW.  And so when Ms. Ceccotti says on behalf

22   of her clients that paying this money now is -- she used the

23   word distraction, and I take that to mean that that constitutes

24   a distraction, an interference, an impediment, a slowing down,

25   whatever else you want to call it, of the ability of the

72

1    company and the UAW to reach a deal.  What that then says to my

2    clients, and -- is you're going to continue in this state of

3    uncertainty for a long time to come.  And so, Your Honor, the

4    company is prepared to pay between twenty and thirty-seven

5    million dollars out over the next several months to its

6    management, but it cannot commit to paying you, the IBEW, the

7    IAM, and the operating engineers, attrition money.  And we

8    understand, Your Honor, that the company has an issue about

9    leave-takings, and that people not be encouraged to leave.  In

10   our case, it's not incenting people to stay, it's making sure

11   that people don't leave before they're ready to leave.  And my

12   clients have made it very clear that they're prepared to

13   make -- come to understandings with the company about how

14   people are going to leave and under what timing.  And once

15   again, we've been met with a stone wall.  So that from the

16   point of view of equity, Your Honor, I think it -- once again,

17   it's the inconvenient truth that the IBEW, IAM and the

18   operating engineers are the only group of individuals who have

19   achieved no resolution of any of the issues with which we

20   started this whole process.  And we would ask again, Your

21   Honor, that serious consideration be given to deferring these

22   payments to such time as there is a resolution, a full

23   resolution, of the labor transformation issues.

24            THE COURT:  Okay.  Ms. Ceccotti, if I could do

25   something to break what I gather is still an impasse with the

73

1    UAW, I would surely do it.  But if I conclude that this short-

2    term incentive program annual -- actually it's a semiannual

3    incentive program, makes sense as a stand-alone matter, I don't

4    see how that breaks a logjam.  To suggest to the union that I

5    wouldn't approve it until after the negotiations were done

6    would either be just deferring something just for the sake of

7    deferring it or giving them the misimpression that it wouldn't

8    be approved.  I mean, there have been instances where companies

9    in Chapter 11 have negotiated very meaningful and painful cuts

10   with their unions.  And then, subsequently, and often only like

11   a month or two later, requested significant compensation

12   changes, usually in the form of -- not this type of

13   compensation change but the long-term incentives.  And there, I

14   think understandably, the unions go nuts.  Because, you know,

15   they say, well, what were we talking about for the last six

16   months?  It just seems to me that when you focus on the

17   negotiating dynamic, I understand that it's easy because

18   it's -- and not to denigrate that too much, but it's easy to

19   say, you know, how can you talk, union leadership, when they're

20   getting bonuses?  And I understand that that's a serious

21   political issue because there's appeal to the phrase for the

22   union.  But wouldn't it be worse to give the union the wrong

23   impression?  And to suggest that this wouldn't get approved?

24            MS. CECCOTTI:  Well, Your Honor, let me try to

25   respond in this way.  I think that -- and I think actually the

74

1    point was probably brought up more -- most clearly in the USW's

2    papers.  The leadership, of course, has been involved in many

3    more of these cases, unfortunately, than the rank and file

4    workers are.  This is, you know, with any luck their only

5    bankruptcy experience.  And, obviously, if there is -- in any

6    negotiated situation the union needs the support of the

7    membership.  And so the union has to operate on any number of

8    levels in any given situation, and programs like this resonate

9    very strongly with the membership, and the leadership is

10   acutely aware of that.  And that is just something that needs

11   to be taken into account when -- again, speaking generically,

12   any union leadership goes to its members and says, okay,

13   we're -- you know, we had to make some tough decisions here,

14   and we're bringing this to you to vote on.  And inevitably the

15   questions come back well, you know, what kind of a system is

16   this that, you know, we have to take cuts and, you know, the

17   Court just approved bonuses.  Or, and you're quite right,

18   frankly, that if this were done after a negotiated agreement,

19   there would be the inevitable question about where's the shared

20   sacrifice?  And we'd be facing that challenge.  But these are

21   sort of inherent in the system that we have, or the system that

22   we've come to have, where a company can make use of the

23   bankruptcy court to address labor agreements and retiree health

24   and the like, while at the same time coming into court for a

25   host of other activities, including addressing its compensation

75

```
1    issues, or for management executives.  So it's a challenge that
2    the union faces constantly in these cases, and it may not seem
3    to be logical in the way that it unfolds.  But it does unfold,
4    and this is the way it unfolds, unfortunately.  So that where
5    we have, right now, a situation where we don't yet have
6    anything to bring to the membership, there will -- as I said,
7    there will be this headline, management gets bonuses.  And what
8    about us?  And what does the future lie in terms of our own
9    sense of uncertainty?  So, yes, I will concede to you that it
10   may very well be that at the end of the day, whatever program
11   it is that the company wants to roll out at emergence will be
12   met with a hue and cry of a different form, and that will be
13   something that will simply have to be addressed then.  So I
14   don't know if it's a case of something being better now or
15   worse -- better or worse now versus better or worse later, but
16   the membership, as I say, these issues resonate very strongly
17   with the membership.  Mr. Butler alluded to the challenges in
18   his own remarks.  And it's just something that is a reality
19   that just, frankly, needs to be dealt with. You know, Congress
20   attempted to address it in the law with some mixed success, I
21   suppose.  But it is a reality, and if companies are going to be
22   permitted to further these programs in bankruptcy, it is just
23   simply a reality that has to be dealt with, and I'm afraid I
24   can't give you a better, or perhaps from the Court's
25   perspective, more logical answer, but -- except to underscore
```

76

1    that is a reality that simply needs to be addressed.

2              THE COURT:  Okay.  Thank you.  Okay.

3              MR. MAGARIK:  Larry Magarik from Kennedy, Jennik and

4    Murray representing IUE-CWA.  We'll rest in our submission.

5              THE COURT:  Which I've -- I've read it.

6              MR. BUTLER:  Your Honor, just a couple of

7    observations.  When we started these cases, one of the things

8    we talked about was the necessary -- the need for the company

9    to be competitive in everything they did, and Your Honor has

10   addressed that need for competition in earlier rulings, the

11   need to be competitive.  And one of the challenges we have is

12   that the facts in this case, and they're indisputable at this

13   point, but the facts in this case is that through testimony

14   over eighteen months, or almost sixteen months, I guess, is

15   that our executive compensation has not been competitive.  It

16   has been competitively low.  And that is in an inconvenient

17   truth for people, to use the phrase.  It is a controversial

18   issue.  But it is a fact.  It is also a fact that our

19   compensation for our hourly workers is, on the main, not across

20   the board, but on the main is un-competitively high.  And

21   trying to address bringing those two worlds into a competitive

22   state is a complex, controversial and difficult thing to do.

23   And we are in the midst of all of those issues.  And I think

24   Ms. Ceccotti and I agree on more than we disagree on, as it

25   relates to the complexity of these issues.  That is why,

77

1    notwithstanding the huge amount of heat we took for it, that

2    the company early in this case, in the first week of the case,

3    filed the KECP motion that had both the annual incentive plan,

4    which we did then and believe now, and respect Your Honor's

5    ruling that you don't agree with it, but believe is an ordinary

6    course type of program.  And the emergence program, which we

7    concede is not ordinary course.  It's why we put it out then.

8    Because the other inconvenient truth about executive

9    compensation is there is no good time, you know, in a Chapter

10   11 case to bring that subject up.  Because the only people who

11   think it's important, in a positive sense, to reward managers,

12   tends to be the company and then sometimes the committees who

13   are looking for the return on improved business enterprise

14   value.  But it is -- on the labor side, it is controversial.

15   Because while the headline may be that managers get bonuses,

16   that's really not the accurate headline.  These are not bonuses

17   in the sense that bonuses are incremental to someone's

18   compensation.  This is incentive compensation which is an

19   integral element of their direct compensation.  You could not

20   have this program and increase salaries by the same amount of

21   the pie, I suppose.  But it's the pie that's competitive.  Not

22   the individual program.  But it's only in Chapter 11, and only

23   with executives that we find ourselves coming to court and

24   having to deal with each element of the pie in front of the

25   Court.  If I were sitting here doing that same thing with

78

```
1    labor, as opposed to honoring, as 1113 requires us to do, and

2    1114 requires us to do, each element of their contract during

3    the Chapter 11 case until we either collectively bargain

4    something or otherwise deal with the 1113, 1114, process, which

5    we've now suspended in this case to facilitate those consensual

6    negotiations.  There would be a firestorm.  And the fact of the

7    matter is while I share and empathize with the comments Ms.

8    Mehlsack made, for example, with respect to some of the

9    frustrations, Mr. Peterson's frustrations, they know as well as

10   I do that the reason we're not done with the smaller unions,

11   and not done with the USW, has everything to do with how one,

12   in the case of the USW, deals with the GM benefit guarantee and

13   the comprehensive settlement with General Motors, which is not

14   going to be completed until we have line of sight to General

15   Motor's satisfaction.  With respect to the negotiations with

16   the UAW and the IUE.  And the case of the smaller unions that

17   Ms. Mehlsack's speaking for today, they don't have a GM benefit

18   guarantee.  But they want something to be -- they want to be

19   treated, you know, I won't say to get the guarantee, but they

20   want it recognized that they're treated in a way that is, from

21   their perspective, commensurate with that.  And it is also, I

22   suppose, an inconvenient truth that -- I agree with Ms.

23   Mehlsack, we're not going to get that resolved until we resolve

24   the broader issues of the GM benefit guarantee, which are going

25   to be principally negotiated with the UAW and with the IUE-CWA.
```

79

1   And once those are resolved, we need to resolve some particular

2   issues on the interpretation of the benefit guarantee involving

3   the USW, which, I think, Mr. Peterson would acknowledge is not

4   a debtor issue.  Although we're trying to facilitate it.  It is

5   a difference of view between the GM and USW about what the

6   benefit guarantee means.  And we have to resolve those issues.

7   So it's not as though this is something within our control that

8   the company is just not getting done.  I think Your Honor has a

9   very deep understanding of the complexity of the issues and

10  what we are doing to try to accomplish it.  I also regret that

11  bringing something controversial to the Court -- we need to do

12  this every six months, on this particular program.  As Your

13  Honor knows, it was the debtor's desire to receive final

14  approval of the AIP structure, in connection with the first

15  supplement, after we got into the case, and we thought that

16  would be constructive, and that we would deal with the AIP in

17  court only if the creditors committee did not, in their

18  separate fiduciary analysis, believe it was an appropriate --

19  exercise the debtor's business judgment.  And it was these

20  objectors together, I think, with the lead plaintiffs, who had

21  objected at the time.  Who said no, come back every six months.

22  And we're largely here, in this public spectacle, dealing with

23  an AIP because the labor unions wanted us here.  Because of the

24  objections they filed at the last objection.  But we would have

25  preferred that this be dealt with in an order or course manner,

80

1   and vetted with, and supervised by the creditors committee.

2   And we've been able to do that successfully and meet their

3   challenges to this program on each of the occasions.  And

4   that's not been, you know, speaking of layups, it's been hardly

5   a layup.  The fact is there've been intense negotiations

6   between the committees.  If you look at the payout curves that

7   are attached to the order and are Exhibit 1, the curves are

8   much more aggressive this time around.  In terms of where

9   they're -- they're far more aggressive than the company wanted

10  them to be, but, the aggressive nature of the curves was

11  insisted on by the committee as they evaluated all the facts

12  and circumstances relating to the business plan.  So, Your

13  Honor, I would ask, Your Honor, as you consider these issues,

14  to consider them in the context of the case, and to rule on the

15  evidence that's before you.  I think the evidence is

16  uncontroverted that this is a reasonable exercise of the

17  debtor's business judgment.  It has been vetted and approved by

18  our statutory creditors committee, and the net of this is that

19  if we are so fortunate as to be able to make payments on these

20  performance curves, and certainly at the higher end of the

21  performance curves as they've been adjusted by the creditors

22  committee, the net result of that is that there will be

23  geometrically more value going into the estate, and

24  contributing to the total enterprise value, than will be used

25  to pay the executives who, by anyone's, I think, definition,

81

1    will have had a role in making that happen.  Thank you, Your

2    Honor.

3              THE COURT:  Okay.  Thank you.  Okay, I have before me

4    the debtor's so-called second supplement to the KECP motion.

5    In reality, it is a motion seeking approval of the continuation

6    of their short-term annual incentive compensation plan for the

7    first six months of 2007.  The issue came up at the last

8    hearing, and I should address it today as well, as to whether

9    such as motion needs to be made in the first place.  One of

10   the -- in positions that the bankruptcy code puts upon a

11   debtor, which he would not otherwise have, is that actions out

12   of the ordinary course need to be subject to notice to parties

13   of interest and approval, if there's an objection.  Whereas

14   under 363(c) of the bankruptcy code, actions in the ordinary

15   course do not need to be noticed and creditors don't need to be

16   given the opportunity to object to them.  In some respects,

17   this annual incentive plan could be viewed as an ordinary

18   course activity.  As the first page of Exhibit 2 shows, when

19   compared with the page of the exhibit that shows the effect of

20   this motion, is that it's in line, almost exactly on the

21   numbers, with Delphi's historic compensation structure, in

22   fact, going back to the beginning of Delphi's existence.  In

23   terms of percentages allocable to salary, benefits, annual

24   short-term incentive and long-term incentive.  On the other

25   hand, notwithstanding that treating this motion as one under

82

1    363(b) imposes stress on all of the parties, including, most

2    importantly, on Delphi's business.  In respect of -- at least

3    its relations with its unions.  It seems to me that unless the

4    key parties of interest are prepared to accept that this aspect

5    of Delphi's compensation structure is ordinary course, we need

6    to go through this exercise.  And when I say exercise, I don't

7    mean it as one where the conclusions is foregone, but one where

8    the companies process, and ultimately its judgment, are tested

9    first by the parties in interest and ultimately by the Court.

10   The reasons here for treating it as an out of the ordinary

11   course transaction, I think, are twofold.  One was perhaps more

12   significant early in the case than now.  Which is that a key

13   element of any plan like this is the targets that the company

14   sets based upon its projections.  And, particularly early in a

15   Chapter 11 case, as Mr. Butler discussed, those targets are

16   open to a lot of review, consideration, discussion and vetting.

17   Because they're uncertain further along in the process, and I

18   believe we are further along today, those targets do become

19   easier to understand and test and approach, perhaps, a degree

20   of clarity that's greater than many, if not most, companies

21   have out of bankruptcy because of the vetting process that they

22   go through.  But it is still a process that involves some

23   uncertainty and, for that reason, it's one of the reasons that

24   a motion like this could be treated out of the ordinary course.

25   In addition, as the unions have noted, the effect of a

83

```
 1    resetting of the targets, which is an element of this type of
 2    proposal because it is a short-term compensation incentive, has
 3    an impact, for better or worse, on the labor negotiations.  It
 4    can be, if one wants to, and I think one would have to, given
 5    the evidence here, look at it with blinders on characterized as
 6    a handout or a bonus for either political purposes or for
 7    simply kvetching purposes.  That happens.  And I don't want to
 8    downplay it, because I respect Ms. Ceccotti and her colleague's
 9    views that it happens.  On the other hand, at least those who
10    want to look at this type of program with a willingness to look
11    at it objectively and in detail, have the opportunity to do
12    that in the light of day, in a courtroom with full opportunity
13    to test it.  And I would hope that those who really care about
14    these sorts of things in the union membership, and I think the
15    union is made up of people who are very serious and intelligent
16    people, will appreciate the process that Congress provided to
17    go through requests like this, to see whether they bona fide
18    and appropriate or not.  And realize that if the process has
19    been fair, it is not necessarily the case that every dollar
20    that goes into an executive's pocket is a dollar out of my
21    pocket, but rather one that will improve the company as a
22    whole.  Now, here I've reviewed the evidence and the
23    objections.  And as with the prior hearings, I conclude, as I
24    think I have to procedurally, that first the triggers and the
25    targets were established in a fair manner that's not tainted by
```

84

1    self-dealing.  That is, they were set independently of the

2    individuals who would benefit from this element of the

3    executive compensation package, first through the action of the

4    board, and in particular the compensation committee of the

5    board, as advised by outside professionals.  And second, by the

6    official creditors committee, which has its own professionals

7    and which has as its members a representative group of Delphi's

8    creditors, including a union.  And which, moreover, I'm sure is

9    very well aware of its fiduciary duties to all unsecured

10   creditors.  The process has shown, to my mind, that first the

11   company and second the committee have looked at the targets

12   carefully, and looked at the underlying business plan carefully

13   in setting the triggers for the incentive payments.  Then,

14   secondly, having reached that conclusion, I need to decide

15   whether under Section 363(b) of the code these target proposals

16   and the overall request is a valid exercise of the debtor's

17   business judgment standing alone without consideration of the

18   ongoing negotiations with the unions, and that is, primarily,

19   when I say ongoing, a reference to negotiations with the UAW

20   and the IUE, because, as an aside, I accept the proposition

21   that those are the critical negotiations here given their tie-

22   in to the GM relationship that Delphi has.  Separate and apart

23   from those negotiations, this package for the next six months

24   clearly meets the business judgment tests.  In his second

25   opinion in the Dana case, Judge Lifland helpfully listed some

85

1    of the factors that a court might consider under the 363(b)

2    test when it comes to an aspect of the compensation package

3    like this.  Those are, as he lists them, is there a reasonable

4    relationship between the plan proposed and the results to be

5    obtained?  Is the cost of the plan reasonable in the context of

6    the debtor's assets, liabilities and earnings?  Is the scope of

7    the plan fair and reasonable?  That is, does it discriminate

8    unfairly?  Or, on the other hand, is it properly tailored to

9    the constituency it's supposed to cover.  Is the plan or

10   proposal consistent with the industry standards?  What were the

11   due diligence efforts of the debtor in investigating the need

12   for the plan?  And general industry practice.  And did the

13   debtor receive independent counsel in performing due diligence

14   and in creating and authorizing the insider compensation.  I

15   have considered those questions and conclude that here this

16   plan, or this six month aspect of the debtor's compensation,

17   satisfies the business judgment standard in light of those

18   questions.  I think it is fair to say that one should look at

19   the executive compensation here as a total package,

20   particularly given the historical backdrop.  And in that

21   regard, it is obvious to me that a significant element of that

22   compensation package has been lacking throughout the case, and

23   will continue to be lacking until a plan is confirmed, and that

24   is the long-term incentive opportunity which, depending on

25   whether you're a junior or a senior executive, can run from

86

1    about thirty-three percent to over fifty percent of your

2    compensation.  They're good reasons why the debtor is deferring

3    that question.  They go both to what I think is a more close

4    tie-in to the labor negotiations.  They also go to bankruptcy

5    concerns.  In that, as the Court and the U.S. Airways opinion

6    that a couple of objectors have cited found, those types of

7    long-term incentive programs are so tied to the actual plan

8    structure, including stock allocation and capitalization, that

9    they're very hard to set in advance.  And perhaps raise more

10   issues than the benefit of giving executives that third to

11   fifty percent of their compensation would benefit the company.

12   But this aspect that's before me today does not raise those

13   issues.  It's raised colloquially as a bonus.  But, to my mind,

14   is more clearly an element of the salary package than a

15   handout.  Indeed, I think that Watson, Wyatt or Skadden or

16   anyone else out there would be well served to give some thought

17   to an alternative to the term bonus other than an AIP.  And I

18   think there is -- there really is a distinction, particularly

19   as one looks in a colloquial term bonus.  What I take away from

20   the evidence, not only from this hearing but other hearings, is

21   that the short-term annual incentive compensation here,

22   assuming that the triggers are correct, and I'll get back to

23   that in a moment.  But assuming they're correct is something

24   that executives truly have a reasonable expectation of getting

25   if the incentive's from that.  However, unlike the rank and

87

```
 1    file, they also can be deprived of it, not only because of the

 2    performance of the company, but also because of their own

 3    individual performance.  In that sense, it's not like salary.

 4    It's worse, because if their supervisors believe that they have

 5    not individually performed up to expectations, it can be

 6    reduced.  So assuming that the triggers are fair and correct

 7    based on the debtor's projections, I do not view this as a

 8    handout, but rather as something that's necessary so that the

 9    debtor's executive team will be compensated at least somewhat

10    comparably to their competitors.  As far as whether the

11    triggers themselves are appropriate, there's really not been a

12    contest on that, and I think that reflects the work done not

13    only by the company but by the creditors committee.  And taking

14    away prior testimony and past hearings not only on these types

15    of motions, but also in connection with the planned support

16    agreement, it seems to me that if, in fact, as Mr. Bubnovich

17    testified, the debtors exceed the targets in ways that will

18    truly enhance the executives' recovery under this compensation

19    portion, they won't be the only ones happy.  In fact, all of

20    the debtor's constituents looking to the continuation of this

21    company and its continued going concern value will be happy.

22    That would include not only those who are continuing to work

23    for the company, as well as those who've supplied it credit,

24    but also those who hope and expect that the company will

25    continue to honor its pension obligations and/or deal with
```

88

```
1    other aspects of buyout or termination packages.  So, in short,

2    I will approve this motion.  I don't believe that this was in

3    any way the type of compensation arrangement that Congress

4    dealt with under BAPCPA, but is, as I said before, very closely

5    tied to ordinary course compensation.  So I did have a question

6    about the order, however.  And I just want to make sure I don't

7    screw up negotiations that you had amongst yourselves with it.

8    So let me turn to that.  As I understand it, yeah, and Mr.

9    Butler's been very clear about it this afternoon, the AIP

10   contemplates two adjustments and each of which is going to be

11   shared with the committee before it's implemented.  The first

12   is an adjustment to a dollar for dollar reflect of a variance

13   between the assumptions in the business plan for labor unions

14   and/or General Motors savings.  And the second is an adjustment

15   for division level performance targets based on allocation of

16   income and expense among divisions in the ordinary course of

17   business.

18            MR. BUTLER:  Yes, Your Honor.

19            THE COURT:  Okay.  I have actually put that into the

20   order just to make it a little clearer.  And what I'm going to

21   do is leave my markup with you and you can look it over with

22   Mr. Rosenberg and the others who want to look at it, which I

23   assume includes the unions' counsel, and you can let me know if

24   I got it wrong or not.  But that's what I wanted to make clear.

25   And other than that, I didn't have any comments on the order.
```

89

1          MR. BUTLER:  Thank you, Your Honor.  We'll review

2     that and submit an order consistent with what you marked upon

3     or come back to chambers.

4          THE COURT:  Okay.  I do want to see one other thing.

5     I hope and I trust that there is a lot going on behind the

6     scenes with respect to labor and GM negotiations.

7          MR. BUTLER:  There are a -- the --

8          THE COURT:  You don't have to report to me.

9          MR. BUTLER:  I'm not going to because I think in my

10     agreement with Mr. --

11          THE COURT:  You're not supposed to.

12          MR. BUTLER:  -- we would not report.

13          THE COURT:  Right.

14          MR. BUTLER:  Other than -- but I think your

15     assumption is correct.

16          THE COURT:  Okay.  Obviously you're going to come

17     back in April and give me a report, unless there's some further

18     development, but -- I was going to say this anyway, but the

19     comments of Mr. Peterson and others have prompted me to say it

20     even more.  I strongly urge all the parties to put every effort

21     into those negotiations.  And it's easy for me to do that

22     because I don't know whether anyone is not putting any effort

23     into it or not.  And if you are then just pat yourself on the

24     back and finish.  If you aren't, though, I'm going to reiterate

25     something I said at the hearing on the plan support agreement,

90

```
 1   which is that because of a number of factors, which I don't
 2   view necessarily as factors that will always pertain, this
 3   debtor is in a position where the parties involved in those
 4   negotiations, including GM, can achieve something if they act
 5   promptly that they may well not be able to achieve later.  It's
 6   a confluence of -- as I said, a lot of factors including the
 7   market, financial market, and what the debtor and all of its
 8   workers have been able to achieve.  And it seems to me that
 9   because that is clear if someone isn't putting all of his or
10   her or its institutions efforts into resolving these open
11   issues, it's clear to me that they can be held accountable.
12   Not necessarily in this court.  But, more importantly, to their
13   own investors and constituents.  I would urge you to keep
14   working and, again, if you are, great.  And pat yourselves on
15   the back and please come back to me and report a deal.  Okay.
16            MR. BUTLER:  Thank you, Your Honor.  That completes
17   the matters on the March 2007 omnibus hearing.
18            (Whereupon this hearing was concluded at 2:18 PM)
19
20
21
22
23
24
25
```

91

1

2                              I N D E X

3

4    WITNESS                 EXAMINATION BY        PAGE

5    Mr. Bubnovich         Ms. Mehlsack          44

6

7

8                              E X H I B I T S

9    JOINT                 DESCRIPTION           PAGE

10   1-21                  Joint exhibits        43

11

12

13                                RULINGS

14                          Page    Line

15   Relief granted        19      2

16   Approved motion to sell  25      14

17   brake hose business to

18   Harco.

19   Relief granted        27      19

20   Relief granted        31      16

21   Motion approved       88       2

22

23

24

25

92

1

2                        C E R T I F I C A T I O N

3

4       I, Sharona Shapiro, court approved transcriber, certify that

5       the foregoing is a correct transcript from the official

6       electronic sound recording of the proceedings in the above-

7       entitled matter.

8

9       _____ March 27, 2007

10      Signature of Transcriber                 Date

11

12      Sharona Shapiro

13      typed or printed name

14

15

16

17

18

19

20

21

22

23

24

25

## A

abeyance 36:12 69:23
ability 56:5 71:25
able 32:1,22 33:4 34:19 56:6,22 57:25 58:4 59:14 80:2,19 90:5,8
absence 15:22
absolutely 49:20 70:25
accept 43:22 50:5 62:1 82:4 84:20
acceptable 43:11
accomplish 55:4 79:10
account 24:8,10 49:13 55:22 74:11
accountable 90:11
accounts 14:2
accurate 77:16
achieve 20:14 45:20 46:24 57:7 64:22 90:4,5,8
achieved 45:22 46:15 48:9 55:9,9 57:17 72:19
acknowledge 66:12 79:3
acres 16:18
act 90:4
action 12:22 21:14 84:3
actions 81:11,14
activities 74:25
activity 81:18
actual 35:7 60:25 61:12 63:4 86:7
acutely 74:10
add 38:20 62:10
added 14:25
addition 33:11 58:10 82:25
additional 28:1 47:25 48:3
address 11:14,16

21:15 23:12,21 28:23 29:24 36:10 38:6 39:13 42:24 43:10 52:4,8,14,25 53:8,10 67:24 68:25 74:23 75:20 76:21 81:8
addressed 52:5,17 69:17 70:7,19 75:13 76:1,10
addresses 42:11
addressing 39:23 66:2 74:25
adjourn 12:1,11 13:14 14:8 27:5 28:13 39:24
adjourned 35:15
adjournment 12:12 60:6
adjudication 38:12
adjust 60:24 63:20 64:2
adjusted 60:16,17 62:7 67:16 80:21
adjustment 88:12 88:14
adjustments 57:9 88:10
administrative 13:24
admission 43:1 51:1
admit 51:3
admitted 43:4 51:16
admittedly 53:10
admitting 42:23
ADR 39:21 40:2,5
advance 86:9
advanced 66:13 69:14
advantageous 16:6
adversary 39:16,18 40:7
advise 30:9
advised 30:12 84:5
advises 17:21
advisors 64:5

affect 67:6,11
afraid 75:23
afternoon 69:9 70:12 88:9
agenda 11:10,18 12:7 13:21 14:13 18:5 39:7 40:19 41:17
aggregate 24:3 25:4 26:6,9,11
aggregating 26:1
aggressive 80:8,9,10
ago 69:15
agree 66:12 76:24 77:5 78:22
agreed 11:25 12:11 13:1,8,14 14:8,12 21:8 27:19,24 28:6 30:5 32:11,15 33:18 34:5,16 35:19 36:3,9,15 37:13 52:4 60:8
agreeing 33:6
agreement 3:16,16 6:2,2 13:14 14:20 14:22 15:20,20,21 17:12 18:19 20:12 20:17 21:3,9,22,22 21:25 22:8,12,14 22:17 23:1 34:3 38:23 61:4,17 74:18 87:16 89:10 89:25
agreements 15:19 15:21 18:21 56:10 59:2 74:23
agrees 27:22
aha 46:17
ahead 63:6,11
AIP 41:18 48:23 51:19 53:4 66:3,9 66:18 67:10,20 79:14,16,23 86:17 88:9
air 54:7
Airways 86:5

AI 11:7
ALBERT 8:10
allegations 14:1
alleged 27:10
allocable 81:23
allocation 86:8 88:15
allow 16:18 34:8 58:3
allowance 13:23
allowed 47:17
alluded 75:17
alternative 86:17
amend 36:5,11
amended 2:16 5:2 7:3 14:23 24:2,4 36:13,14,17
amendment 14:19 61:20
Americas 10:4
amount 26:4,6,9,11 26:15 27:15 29:7 29:10,12 32:18 35:8 56:15 59:8 77:1,20
amounts 13:24 14:4 26:5 48:2
amplify 16:12
analysis 79:18
and/or 29:10 87:25 88:14
annual 53:13 73:2 77:3 81:6,17,23 86:21
answer 39:17,21 65:4 75:25
anybody 44:20 63:22
anyone's 57:17 80:25
anyway 89:18
apart 84:22
appeal 73:21
application 11:18,20
applications 11:17 11:21,24 12:2

**apply** 60:10
**appointed** 50:20
**appreciate** 40:15
  83:16
**appreciates** 38:7
**appreciative** 38:15
**approach** 58:1
  82:19
**appropriate** 17:22
  21:14 27:25 30:1
  47:21 52:25 53:11
  58:13 64:25 79:18
  83:18 87:11
**appropriately** 30:6
  39:11
**approval** 17:4 19:11
  19:13 68:22 69:19
  79:14 81:5,13
**approve** 2:2 3:2,13
  5:12,23 19:25
  23:14 25:19 51:24
  53:4 67:25 69:4
  73:5 88:2
**approved** 19:14
  45:21 51:19 52:17
  55:6 65:2,2 73:8
  73:23 74:17 80:17
  91:16,21 92:4
**Approving** 2:4,6 3:4
  3:6 5:14,16
**approximately**
  16:18 24:13,15,18
  24:20 25:4,11 26:1
  26:4,7,9 28:16
  29:4,5,7 45:16,23
**April** 12:12 14:9
  39:18 89:17
**area** 16:21 46:17
**argued** 35:22 63:12
**arguing** 31:18
**argument** 36:18,19
  37:3 51:7 57:3
  59:21,24
**arguments** 43:11
**Arps** 8:3 11:8
**arrangement** 58:2

88:3
**arrive** 44:18,19
**arrived** 45:7
**art** 47:20 54:12
**articulation** 67:8
**aside** 28:14 84:20
**asked** 67:19
**asking** 45:4
**aspect** 82:4 85:2,16
  86:12
**aspects** 34:3 61:16
  88:1
**assert** 12:24 13:23
  24:18 25:10 29:9
**asserted** 12:20 13:7
  13:9 24:3,13,15,20
  24:22 25:3 26:3,12
  27:22 29:7,12
**asserting** 28:16 29:5
**assertion** 37:8
**asserts** 28:1
**assets** 2:7,7 3:7,7
  5:17,17 19:5 20:7
  85:6
**Assign** 3:15 5:25
**assignment** 2:9 3:9
  5:19 15:1,20 17:13
  19:8 20:1,2
**assume** 60:21 88:23
**assumed** 20:1,2
  50:12 60:18
**assumes** 60:22
**assuming** 86:22,23
  87:6
**assumption** 2:9,11
  3:9,11 5:19,20
  13:25 19:7,9 20:1
  20:2 49:11 89:15
**assumptions** 45:13
  62:14 88:13
**assure** 66:5
**ATEL** 13:21 14:6
**attached** 14:17,18
  15:22 19:22 26:24
  42:16 80:7
**attempted** 75:20

**attendance** 13:4
**attended** 13:2
**attention** 68:22
**Attorney** 8:20
**Attorneys** 8:4,13 9:3
  9:10 10:3,10
**attorney/client** 37:8
**attrition** 72:7
**Auburn** 15:14
**authority** 15:16
  17:13
**authorize** 4:5 6:18
  19:25
**authorizing** 2:6 3:6
  3:15 4:6 5:16,25
  6:19 85:14
**automatic** 3:20 6:9
  6:23 12:22,24
  29:21 31:21 32:4
**Automotive** 15:12
**Avenue** 10:4
**average** 45:1 55:9
  55:11
**aware** 52:13 55:7
  63:24,25 67:7
  74:10 84:9

---

**B**

**B** 1:21 2:6,16,22 3:6
  3:16,25 4:12,19
  5:2,8,16 6:2,14 7:3
  7:9,16 39:22 91:8
**Babette** 9:7 66:1
**back** 29:13,25 35:16
  40:11,24 41:10,13
  41:24 51:8,9,13
  62:10 65:5,11,15
  74:15 79:21 81:22
  86:22 89:3,17,24
  90:15,15
**backdrop** 85:20
**background** 38:19
**backward** 52:8
**bad** 57:4 60:25 63:7
  63:12,13
**balance** 29:8

**bank** 61:15,18
**Bankr** 2:3,15,21 3:3
  3:14,24 4:11,18,25
  5:7,13,24 6:13 7:2
  7:8,15
**bankruptcy** 1:2,13
  1:23 13:3 21:1
  37:14 68:14,20
  74:5,23 75:22
  81:10,14 82:21
  86:4
**banks** 61:18,21,23
  61:25 62:5
**Bank's** 12:15
**BAPCPA** 88:4
**bar** 26:8
**Barbara** 9:16 44:6
  70:12
**bargain** 78:3
**bargaining** 18:19,21
  20:12 21:24 56:10
  60:13 71:1
**base** 51:20
**based** 15:5 33:17
  45:16,19 59:15
  61:21 82:14 87:7
  88:15
**basis** 29:17 30:1
  32:12 34:17,19,23
  47:5 56:17
**bear** 66:11
**began** 16:14
**beginning** 42:3
  45:18 54:8 62:21
  81:22
**begins** 16:4
**behalf** 11:7 30:17
  71:21
**belaboring** 31:17
**belief** 53:16
**believe** 14:4 21:6
  24:14 27:6,12,25
  28:4 31:18 33:24
  35:12 40:7 44:23
  45:23 47:2,16
  64:21,23 66:11

77:4,5 79:18 82:18
87:4 88:2
**believed** 53:9 69:1
**believes** 64:20
**benchmark** 49:7
**benefit** 78:12,17,24
79:2,6 84:2 86:10
86:11
**benefits** 51:22,23
68:14,17 69:7
81:23
**Berger** 9:22 10:2
12:15,17,19,19
13:18 39:15 40:4,7
40:10,15
**Berger's** 39:12
**Bernstein** 10:2
38:21
**best** 45:19 52:14
54:24 59:12 69:5
**better** 37:3 75:14,15
75:15,24 83:3
**beyond** 20:15
**bid** 2:4 3:4 5:14
19:15
**bidders** 19:18
**bidding** 2:4 3:4 5:14
19:13,14,17 20:23
**bids** 18:12 19:19
**big** 35:6,6
**billion** 53:2 59:3,8
61:17
**binder** 41:10
**bit** 18:16
**blinders** 83:5
**board** 45:21,25
50:11,18,21 52:3
76:20 84:4,5
**boards** 50:21,22
**bona** 83:17
**bonus** 49:4 83:6
86:13,17,19
**bonuses** 45:22 68:6
68:18 70:21 73:20
74:17 75:7 77:15
77:16,17

**book** 42:12 64:10
**books** 2:22 3:25
4:12,19 5:8 6:14
7:9,16 26:5 63:4
**borrower** 13:10
**Bowling** 1:14
**brake** 2:8 3:8 5:18
18:5 19:6,12 20:8
91:17
**break** 47:11 72:25
**breaks** 73:4
**briefly** 39:6
**bring** 69:2 75:6
77:10
**bringing** 74:14
76:21 79:11
**broader** 78:24
**broadly** 15:10
**Broadway** 8:14
**broke** 39:19
**brought** 12:22 35:22
68:21 69:19 74:1
**Bubnovich** 43:16,20
43:21 44:3,6,9
48:21 49:23 54:11
57:16 62:21 65:20
87:16 91:5
**Bubnovich's** 58:11
65:14
**bucks** 59:22,23
**bunch** 31:7
**business** 2:8 3:8
5:18 18:5 19:6,12
19:19 23:5,6 45:17
45:21 53:2 54:19
57:18 58:15,21,22
58:25 60:9,20 61:6
61:7 62:1,5,6,7,23
63:6 64:22 67:9,25
69:4 77:13 79:19
80:12,17 82:2
84:12,17,24 85:17
88:13,17 91:17
**Butler** 8:8 11:4,6,6
11:14 12:7,14
13:20 14:11 15:9

17:8,11,20 18:4
19:4 21:20 23:17
25:20 28:21 29:1
29:19 31:14,16,25
32:8,10 35:2,12,14
36:3,23 37:6 38:23
39:6,15 40:18 41:2
41:4,8,11,15,15
43:7,13,19,23 47:8
49:22,24 50:7,17
50:20 51:6,12
58:19 65:10,13,24
75:17 76:6 82:15
88:18 89:1,7,9,12
89:14 90:16
**Butler's** 22:4 66:17
71:9 88:9
**buyout** 88:1
**B-U-B-N-O-V-I-C...**
44:3

### C

**C** 2:17,23 3:16 4:2
4:13,20 5:3,9 6:2
6:15 7:4,10,17 8:2
11:1 19:23 42:17
92:2,2
**calculated** 62:2
**calculations** 61:8
**calendar** 14:7 35:17
52:15
**call** 38:2 39:20
71:25
**capabilities** 16:13
**capitalization** 86:8
**capitalize** 16:2
**capped** 20:22
**care** 51:22 83:13
**carefully** 84:12,12
**carriers** 31:5 33:1
**cars** 70:6
**case** 1:4 30:6 31:18
38:9 42:3 44:18
48:17 49:7,8 51:8
52:2,10 53:3,6,7
53:14 54:8,13

55:16,20 66:5,12
66:22 67:1 68:6,13
68:20 72:10 75:14
76:12,13 77:2,2,10
78:3,5,12,16 79:15
80:14 82:12,15
83:19 84:25 85:22
**cases** 35:6 68:20
74:3 75:2 76:7
**cash** 52:7,8
**categories** 25:24
**category** 25:25
26:13
**caucus** 60:5,5
**Ceccotti** 9:7 66:1,1
71:21 72:24 73:24
76:24 83:8
**celebrating** 57:12
**center** 8:21 16:9,20
**certain** 2:4,7,10,11
2:15,21 3:4,7,10
3:11,17,24 4:11,18
4:25 5:7,14,16,19
5:21 6:3,13 7:2,8
7:15 19:8,9 23:18
31:2 32:11 54:10
**certainly** 17:10,11
23:3 31:5 33:4
47:21 66:13 70:1
80:20
**certainty** 67:15
**certify** 92:4
**certitude** 67:17
**chain** 54:16 56:8
**chairman** 50:10,13
50:23
**challenge** 54:2,7
74:20 75:1
**challenged** 56:24
**challenges** 75:17
76:11 80:3
**challenging** 53:21
55:24
**chambers** 30:12
32:6 89:3
**change** 26:12 27:9

27:17 63:14,15,19
73:13
**changes** 73:12
**channel** 30:25
**Chapter** 16:5 30:19
38:9 52:10 54:8,15
54:20 55:20 65:1
73:9 77:9,22 78:3
82:15
**characterized** 83:5
**chart** 25:5 26:24
65:8
**charts** 42:18 65:7
**chief** 64:12
**circumstance** 36:20
**circumstances**
21:13 45:19 80:12
**cited** 86:6
**claim** 2:17 5:3 7:4
12:20,24 13:7,9,25
24:6,12,13,15,15
24:17,18,20,24
25:10,25 26:1,3,3
26:6,8,14 27:10
28:7,12,16 29:10
31:13
**claimant** 27:22 28:1
**claimant's** 28:9
**claims** 2:9,16,16,17
2:17,22,22,23,23
3:9,25,25 4:2,2,12
4:12,13,13,19,19
4:20,20 5:2,2,3,3,8
5:8,9,9,18 6:14,14
6:15,15 7:3,3,4,4,9
7:9,10,10,16,16,17
7:17 12:8 19:7
23:20,22,24,25
24:1,2,3,4,5,5,7,9
24:11,13,20,22
25:3,6,7,8,8,10,12
25:13,14,17,22,24
26:11 27:1,2,6,8
27:16 28:2,2,8,14
28:16,17,23 29:4,5
29:6,8,12,13

**Claim(s)** 2:13,19
3:22 4:9,16,23 5:5
6:11,24 7:6,13
**clarification** 27:18
**clarified** 22:8 27:14
**clarify** 60:4
**clarity** 28:5 33:25
69:6 82:20
**class** 27:16 29:10
**classification** 27:11
**clause** 20:12
**clear** 2:8 3:8 5:18
19:6 23:9 46:20
71:16 72:12 88:9
88:24 90:9,11
**clearer** 88:20
**clearly** 74:1 84:24
86:14
**client** 13:4
**clients** 71:22 72:2,12
**cliff** 55:18
**close** 21:24 57:24
61:19 70:5 86:3
**closed** 63:5 71:4
**closely** 34:22 88:4
**closer** 13:5,11 16:10
16:20
**closing** 20:18 22:18
43:11 51:7 64:6
**cocounsel** 38:22
**code** 81:10,14 84:15
**codefendant** 37:23
**Coffey** 10:7 31:22
31:24 32:5 33:24
34:22 35:3,23
37:18,22 38:6,21
38:21 39:2,5
**Cohen** 9:2 66:2
**colleagues** 11:8
34:22
**colleague's** 83:8
**collection** 34:13
**collective** 18:18,20
20:12 21:24 60:13
**collectively** 78:3
**colloquial** 86:19

**colloquially** 86:13
**come** 29:25 40:10,24
41:24 43:13,21
51:8,9 58:23 65:5
72:3,13 74:15,22
79:21 89:3,16
90:15
**comes** 51:21 85:2
**comfortable** 63:2
**coming** 53:22 58:17
74:24 77:23
**commenced** 21:25
39:18
**commensurate**
78:21
**comment** 18:15,17
18:21
**comments** 21:11
23:15 78:7 88:25
89:19
**Commission** 33:9
**commit** 72:6
**commitment** 61:3
63:25 64:1
**committed** 61:5,6
**committee** 11:23,25
12:8,10 41:22
42:15 44:15,16
47:2,16,16,17
49:17 50:11,13,24
52:20 61:4,6,9
62:25,25 64:5 68:8
79:17 80:1,11,18
80:22 84:4,6,11
87:13 88:11
**committees** 16:25
31:3 33:1 38:25
39:3 52:14 57:11
59:4 62:23 64:11
77:12 80:6
**committee's** 12:3
**commodities** 56:7
**commodity** 56:4
63:17
**common** 24:8,9,19
48:5 54:3

**companies** 48:23
49:1,4,8,11 73:8
75:21 82:8,20
**companion** 12:9
**company** 14:15 15:7
16:3 18:13 20:6
30:16 32:1,24 39:8
39:11 44:14 47:15
50:12,23 52:4,12
52:24 53:9,12,24
54:14,15,25 55:17
56:12 57:13,19,22
57:25 58:4 59:18
64:15,17,20 65:15
68:4,14 69:20,21
70:22 71:15,16
72:1,4,8,13 74:22
75:11 76:8 77:2,12
79:8 80:9 82:13
83:21 84:11 86:11
87:2,13,21,23,24
**company's** 16:1,11
30:18,23 45:16,19
47:22 50:10 51:8
53:16 57:20 58:15
59:11,12 64:18
69:17
**comparable** 48:22
49:15
**comparably** 87:10
**compared** 67:12
81:19
**compel** 13:25
**compensated** 87:9
**compensation** 4:7
6:20 42:18 44:12
44:14 50:10,13,23
51:14,18,21,21
53:5,8 55:20 65:9
67:15,18 69:23
73:11,13 74:25
76:15,19 77:9,18
77:18,19 81:6,21
82:5 83:2 84:3,4
85:2,14,16,19,22
86:2,11,21 87:18

88:3,5
**competing** 18:12
**competition** 76:10
**competitive** 52:9,21
70:23 76:9,11,15
76:21 77:21
**competitively** 76:16
**competitors** 87:10
**complaint** 36:6,11
36:13,14,18,25
39:9
**complaints** 38:12
**complete** 14:6
**completed** 78:14
**completes** 90:16
**complex** 31:1 38:10
45:12,12 54:17
76:22
**complexities** 56:8
60:19
**complexity** 76:25
79:9
**complied** 19:17
**component** 51:20
53:14
**components** 51:14
52:6
**comprehensive**
78:13
**comprise** 51:23 52:1
**comprises** 16:16
**Comprising** 2:7 3:7
5:17
**computers** 33:17
**concede** 48:13 75:9
77:7
**concept** 60:10 61:1,2
**concern** 38:2 87:21
**concerned** 58:17
**concerns** 54:21 86:5
**concessions** 60:13
70:22
**conclude** 47:3 73:1
83:23 85:15
**concluded** 16:5
21:12 90:18

**conclusion** 84:14
**conclusions** 82:7
**condition** 20:17
22:18
**conditioned** 21:23
**conditions** 22:8 67:2
**conducted** 18:13
19:20 33:16
**confer** 60:5
**conference** 40:16
**confidence** 54:6
59:13
**confidential** 41:5
45:1 50:2 64:10
**confirm** 15:4 42:15
**confirmed** 85:23
**confluence** 90:6
**confused** 60:14
**confusion** 17:16
18:1 60:9
**Congress** 75:19
83:16 88:3
**connect** 50:17
**connection** 14:5,17
18:7 20:3 29:2
52:4,12,23 54:23
55:5 70:20,25 71:1
79:14 87:15
**Conrad** 13:3,12
**consensual** 14:3
56:10 58:2 62:24
78:5
**consent** 39:23
**consider** 13:15 34:8
67:10 68:2 80:13
80:14 85:1
**considerably** 53:24
**consideration** 30:5
72:21 82:16 84:17
**considerations**
20:10
**considered** 11:22
17:21 67:12 85:15
**considering** 59:2
**considers** 64:15
**consistent** 31:2 32:4

35:9 64:3,25 85:10
89:2
**consolidate** 16:6
**consolidated** 2:16
5:2 7:3 24:6
**consolidation** 15:13
**constantly** 75:2
**constituency** 85:9
**constituents** 67:13
87:20 90:13
**constitute** 33:10,23
68:3
**constitutes** 38:5
71:23
**constructed** 33:17
**constructive** 38:7,16
79:16
**consult** 40:21
**consultant** 44:12,15
**consultation** 49:17
52:13
**contact** 13:13
**contacted** 27:14
**contain** 26:4
**contained** 26:2
**contains** 34:7
**contemplated** 20:17
**contemplates** 88:10
**contend** 32:13
**contest** 87:12
**contested** 23:18
40:20
**context** 52:24 80:14
85:5
**continents** 53:3
**contingent** 21:23
24:23
**continuation** 48:23
81:5 87:20
**continue** 16:12
20:14 53:16 55:17
56:22 60:10 67:24
68:3 69:3 72:2
85:23 87:25
**continued** 13:12
87:21

**continues** 20:13
**continuing** 14:7
87:22
**contract** 78:2
**contracts** 2:10 3:10
5:20 19:8 20:1
**contrary** 57:5
**contributing** 80:24
**contributions** 60:12
**control** 79:7
**controversial** 53:10
76:17,22 77:14
79:11
**Coolidge** 18:24
**cooperation** 56:21
**cooperative** 34:23
**coordinate** 34:22
**coordination** 31:8
**copy** 38:25
**corporate** 45:15
71:20
**corporation** 1:8 8:4
11:7 13:22 20:13
37:24
**corporations** 38:3
**correct** 31:14 42:15
44:11 46:10 48:24
48:25 60:18 65:20
86:22,23 87:6
89:15 92:5
**corrected** 42:13
**correction** 47:4,6
**cost** 85:5
**costs** 16:9 56:4 57:9
**counsel** 18:16 21:14
27:13 30:13,14,16
32:1 85:13 88:23
**count** 62:3,3
**country** 68:21
**County** 18:7,8
**couple** 23:15 49:18
50:21 53:20 64:7
76:6 86:6
**course** 21:14 61:11
61:21 66:3,15,17
67:1,3 74:2 77:6,7

79:25 81:12,15,18
82:5,11,24 88:5,16
**court** 1:2,13 11:2,5
11:13 12:6,13,16
12:18,22,23 13:17
13:19 14:10,23
15:4,24 17:2,9,12
17:14,25 18:24
19:3 21:19 22:1,5
22:10,12,16,20
23:9,12 25:16 27:3
28:19,25 29:15
30:1,9,21 31:11,15
32:3,7,9 34:25
35:9,13,18,23 36:2
36:6,21,22 37:5,11
37:14 38:14,18,24
39:4,13,14,25 40:5
40:9,12,17,24 41:3
41:6,7,9,13 43:3
43:12,21,24 44:1
44:20 45:9 47:10
48:20 49:1,15,21
49:23 50:4,9,15,19
51:2,11 54:9 65:6
65:11,22,25 66:5
66:14,24 67:7,9,19
67:23 68:2,22 69:2
69:8,19 70:10,16
72:24 74:17,23,24
76:2,5 77:23,25
79:11,17 81:3 82:9
85:1 86:5 88:19
89:4,8,11,13,16
90:12 92:4
**courtroom** 19:2
30:16 31:9,9 36:19
50:9 63:22 83:12
**courtrooms** 68:20
68:24
**court's** 26:21 35:16
66:4,6 67:8 75:24
**covenants** 61:16,21
62:8
**cover** 28:15 37:18
40:2,5 85:9

**coverage** 40:13
**covered** 25:3 27:6
28:7 67:5
**covering** 28:12
**covers** 19:5 29:4
**Craig** 50:10
**create** 16:9 30:25
**created** 34:10
**creating** 85:14
**credit** 60:12 87:23
**creditability** 60:1
**creditors** 12:8 42:15
44:15 47:16 49:17
52:20 59:3 61:4,6
62:25 64:5 68:7
79:17 80:1,18,21
81:15 84:6,8,10
87:13
**critical** 68:1 84:21
**cross** 43:19
**cross-examination**
42:24,25 43:18
44:4 49:25 51:1
**cross-examine** 50:4
51:2
**cry** 75:12
**cube** 58:5
**current** 36:10
**curve** 44:13 45:8
47:14,17 68:6,8
**curves** 42:13 47:14
57:6 62:24 63:2
80:6,7,10,20,21
**custom** 28:18
**customary** 55:20
**customer** 38:2
**customers** 16:11
**cuts** 73:9 74:16

---

**D**

**D** 1:22 2:17,23 4:2
4:13,20 5:3,9 6:15
7:4,10,17 11:1
50:1 91:2
**damages** 24:18,24
25:11 29:5

**Dana** 84:25
**data** 34:13 49:6,9,14
**database** 33:12,16
33:19 34:14,14
**databases** 37:20
**date** 2:6 3:6 5:16
17:16,19,22 26:8
28:24 34:25 35:16
43:6 92:10
**dates** 11:22 17:21
**day** 58:1 68:24
75:10 83:12
**days** 20:19 23:3 61:7
61:7 62:5
**deal** 11:23 18:2 29:3
30:14,20 31:4,5
32:25 33:1 41:25
53:11 62:25 68:8
71:19,21 72:1
77:24 78:4 79:16
87:25 90:15
**dealing** 25:22 26:11
27:1 28:5 55:21
56:7,7,8 67:10
79:22
**deals** 62:15 68:5
78:12
**dealt** 25:23 39:11
43:9 75:19,23
79:25 88:4
**debt** 59:9
**debtor** 1:10 26:12
26:16 27:10,13,23
29:10 38:2,7 43:14
46:20 79:4 81:11
85:11,13 86:2 90:3
90:7
**debtors** 2:7,8,13,19
2:22 3:7,8,15,22
3:25 4:6,9,12,16
4:19,23 5:5,8,17
5:17,25 6:11,14,19
6:24 7:6,9,13,16
12:21 14:3,16
16:19 19:16,21
22:22 23:7 26:10

26:12 27:9 30:14
30:17 37:7 41:16
66:3 67:18,24
87:17
**debtor's** 14:16 19:5
19:6 26:2,5 27:15
41:21 44:12 79:13
79:19 80:17 81:4
84:16 85:6,16 87:7
87:9,20
**decide** 84:14
**decides** 36:12
**decision** 23:7
**decisions** 55:16
74:13
**declaration** 33:13
33:22 43:15,16,22
45:1 50:1,5,24
51:3 58:14
**declarations** 42:23
43:14 64:19
**declaratory** 39:8
**deep** 79:9
**defendant** 40:16
**defendant's** 39:17
**defenses** 12:8
**deferral** 66:21
**deferred** 69:5
**deferring** 72:21 73:6
73:7 86:2
**defies** 59:25
**defined** 52:9
**definition** 80:25
**definitions** 62:2
**degree** 82:19
**delay** 21:3,5
**deleted** 21:10
**Delphi** 1:8 8:4 11:2
11:7 12:23 15:11
20:13,13 23:6 24:8
24:19 31:13 41:14
45:25 48:23 49:16
51:15 52:2 65:9
67:12 70:7 84:22
**Delphi's** 16:10,12
69:17 81:21,22

82:2,5 84:7
**demonstrate** 34:6
**denied** 30:9
**denigrate** 73:18
**depending** 85:24
**deprived** 87:1
**derived** 34:15 45:17
    58:25 59:14,15,20
    60:21
**describe** 15:23
    16:22 18:11 25:24
    32:3,12,16
**described** 15:18
    19:25 20:5 22:18
    33:12,15,21 38:23
    39:2 66:24
**DESCRIPTION**
    91:9
**design** 44:12 52:21
    53:15 58:11
**designed** 52:11
**designing** 44:10
**desire** 79:13
**detail** 15:24 16:24
    18:12 20:5 49:2
    62:23 83:11
**details** 68:10,10
**deteriorating** 58:6
**determination** 36:7
    49:2
**determinations**
    36:25
**determine** 36:16
**determined** 37:11
**determining** 67:25
**Detroit** 16:21
**developed** 53:18
    54:4 58:15 59:7
**development** 89:18
**devise** 68:8
**difference** 79:5
**different** 24:3,4
    31:21 53:12 75:12
**differently** 55:8
**difficult** 55:23,23
    68:25 71:13 76:22

**difficulties** 57:10
**diligence** 85:11,13
**DIP** 61:17,22
**direct** 43:22 53:4,15
    77:19
**direction** 40:11
    51:21
**directly** 30:18
**director** 50:12,23
**directors** 45:21
    50:11
**disagree** 76:24
**disallow** 25:18
**disallowance** 26:14
**disclosed** 60:3
**disclosure** 61:9
    62:18
**discriminate** 85:7
**discuss** 67:20
**discussed** 27:11
    82:15
**discussing** 15:9
    35:10 63:1
**discussion** 61:18
    82:16
**discussions** 22:21
    30:17 33:2 38:9
**dismiss** 35:18 36:8
    36:13
**disruptions** 56:23
**distinction** 86:18
**distraction** 68:3
    71:23,24
**district** 1:3 9:12
    30:21 35:17 36:21
    44:8
**division** 88:15
**divisional** 55:12
**divisions** 53:25
    55:12,22 88:16
**DLA** 11:19
**docket** 6:6 11:17,19
    11:20 12:9,10
    13:22 14:14,14,19
    18:6,8,9,10 19:14
    23:24 25:23 26:19

26:21 29:22 30:7,8
    41:19 42:3,6,7,8,9
**docketed** 26:22,23
**documentation** 26:2
**Documented** 2:22
    3:25 4:12,19 5:8
    6:14 7:9,16
**documents** 23:18
    32:11,13,18 33:8
    33:10,12,15,19,22
    33:24 34:11,15,16
    34:20,21 35:25
    36:4,16 37:2,9
**doing** 34:9 35:5
    77:25 79:10
**dollar** 13:7,9 26:5
    27:10 47:25 53:2
    61:17 83:19,20
    88:12,12
**dollars** 12:21 20:23
    24:16 25:4,11 26:7
    28:17 29:13 45:16
    45:23 47:3,23 48:2
    48:4 57:8,15 59:3
    59:9 72:5
**door** 70:6 71:11,13
**doors** 71:4
**dots** 50:18
**double** 68:23
**Downers** 17:15
**downplay** 83:8
**downside** 55:18
**downward** 63:21
**DRAIN** 1:22
**driven** 56:2
**DSB** 45:25 49:7
    53:14 55:10
**DSB's** 51:20
**due** 14:5 85:11,13
**duly** 43:25
**Duplicate** 2:15 4:25
    7:2
**duplicative** 2:16 5:2
    7:3 24:1,2,6,14,16
**duties** 84:9
**dynamic** 73:17

| **E** |
| --- |

**E** 1:21,21 8:2,2 11:1
    11:1 33:13 91:2,8
    92:2
**earlier** 17:18 30:10
    35:22 37:12,23
    39:3 64:11 76:10
**early** 54:5 77:2
    82:12,14
**earnings** 85:6
**easel** 51:17
**easier** 82:19
**easy** 55:4 73:17,18
    89:21
**EBITDA** 45:14 46:8
    46:14,15,16 47:3
    47:23 48:3,9 57:8
    62:3,5,6,8,10
**educating** 32:19
**effect** 15:13 45:10
    62:16 68:4 81:19
    82:25
**effects** 62:11 64:2
**efficient** 43:8
**effort** 89:20,22
**efforts** 20:14 34:21
    67:6,23 68:4,7,16
    85:11 90:10
**eight** 16:15 24:17
    48:15 59:8 69:15
**eighteen** 52:11
    76:14
**eighth** 2:13 4:23
    6:24 23:24
**eighty** 26:21
**eighty-seven** 26:18
    27:1
**either** 20:20 35:23
    36:23 39:20 73:6
    78:3 83:6
**electronic** 33:17
    92:6
**element** 77:19,24
    78:2 82:13 83:1
    84:2 85:21 86:14
**eleven** 27:8,18

**emerge** 58:4 59:19
**emergence** 16:5
    30:19,24 52:6,7,7
    52:10,15 59:9
    65:17 66:21,21
    67:2,3 75:11 77:6
**emerges** 68:14
**empathize** 78:7
**Employee** 4:6 6:19
**employees** 12:25
    38:3 53:6 56:17
    70:24
**encouraged** 72:9
**encumbrances** 2:9
    3:9 5:19 19:7
**endeavor** 19:18
    67:17
**ended** 44:23
**engage** 19:18
**engaging** 67:23
**engineer** 70:24
**engineers** 9:10 44:7
    70:14 71:18 72:7
    72:18
**English** 8:12 21:17
**enhance** 87:18
**enhanced** 57:14
    58:5
**enormously** 57:19
    58:6
**enter** 3:15,16 5:25
    6:2 15:12 17:13
    19:21 20:7 37:13
    62:15
**entered** 23:16 26:19
    30:4 37:15 38:8
**entering** 65:1
**enterprise** 54:19
    57:13 64:23 77:13
    80:24
**enters** 29:11
**entire** 26:14 52:24
    56:23
**entitled** 20:22 92:7
**entity** 26:12 27:18
**entry** 20:15,19

**environment** 55:24
**EPCA** 52:17
**equipment** 14:1
**equity** 2:17 5:3 7:4
    12:10 52:7,11,18
    59:3,7 72:16
**errors** 42:14
**escrow** 15:21
**ESQ** 8:8,9,10,17,24
    9:7,16,22 10:7,14
**essentially** 15:13
    22:24 32:10 51:14
**established** 45:18
    83:25
**estate** 13:8 16:3
    80:23
**estimate** 45:19
**estimates** 59:12
**estimating** 45:1
**estimative** 63:5
**Etkin** 38:19
**evaluated** 80:11
**evaluating** 52:20
**evaluation** 64:17
**evening** 30:9,13,13
    42:10
**event** 15:1 24:24
**eventual** 30:24
**everybody** 47:6 48:6
    67:3
**everyday** 15:25
**evidence** 42:23 43:2
    43:10,14,15,18
    49:25 50:3,6 51:16
    53:17 58:7,10 64:8
    64:19 80:15,15
    83:5,22 86:20
**ex** 12:9
**exactly** 81:20
**EXAMINATION**
    91:4
**examine** 52:23
**examined** 14:2
**example** 24:23 31:3
    37:22 46:7 78:8
**examples** 38:4

**exceed** 87:17
**exceeded** 53:24,25
    57:21
**excellent** 48:12
**excess** 12:21 55:1
**Exchange** 33:9
**exclusively** 2:7 3:7
    5:17 19:6
**executive** 51:14,18
    52:21 64:12 65:9
    67:4 76:15 77:8
    84:3 85:19,25 87:9
**executives** 45:24,24
    46:1 53:1,1 57:15
    60:11 75:1 77:23
    80:25 86:10,24
    87:18
**executive's** 83:20
**executory** 2:10 3:10
    5:20 19:8
**exercise** 79:19 80:16
    82:6,6 84:16
**exhibit** 19:23 41:10
    42:12,12,17,18
    43:15 46:4 49:25
    50:25 51:15,16
    52:9 57:6 64:10
    65:6 80:7 81:18,19
**exhibits** 42:19,21,21
    42:25 43:1,5 91:10
**existence** 81:22
**expect** 34:19,23
    40:25 61:19,22
    87:24
**expectation** 86:24
**expectations** 57:22
    57:23 87:5
**expected** 45:20
**expedited** 30:1,5
**expense** 13:25 20:22
    88:16
**experience** 49:15
    74:5
**expert** 43:16 45:6
    46:17 48:21
**explained** 27:15

55:4
**explaining** 70:20
**expressly** 21:22
    22:13
**expunge** 29:6
**extended** 48:14
**extending** 39:17
**extensive** 16:4 20:5
**extent** 25:5 33:4
    34:1 54:11
**external** 56:5
**extraordinary** 56:12
**extremely** 56:4
**e-mail** 13:12 33:18

---

**F**

**F** 1:21 92:2
**face** 28:3 53:20 56:2
    69:24
**faces** 67:21 68:19
    75:2
**facilitate** 78:5 79:4
**facilities** 15:13 16:4
    16:4
**facility** 15:14
**facing** 74:20
**fact** 14:4 17:6 22:25
    23:14 27:4 38:15
    52:13 54:19,22
    56:7 57:5 58:17
    60:15 62:13 66:11
    71:16 76:18,18
    78:6 80:5 81:22
    87:16,19
**factors** 48:12 56:5
    85:1 90:1,2,6
**facts** 21:12 45:19
    63:25 76:12,13
    80:11
**fair** 44:21,24 47:19
    47:21 48:1 83:19
    83:25 85:7,18 87:6
**fairly** 16:23
**faith** 35:1,2
**faithfully** 38:23
**fall** 54:13

**far** 39:21 65:11 80:9
  87:10
**favor** 28:9
**February** 51:13
**Fed** 2:3,15,21 3:3,14
  3:24 4:11,18,25
  5:7,13,24 6:13 7:2
  7:8,15
**fee** 11:16,18,20,22
  11:24,25 12:2,3
**fees** 39:10
**feet** 16:16,17
**felt** 66:7 69:12
**fide** 83:17
**fiduciary** 79:18 84:9
**fifteen** 25:3,8,13
  48:4
**fifteen-minute**
  40:23
**fifth** 53:14
**fifty** 86:1,11
**fifty-three** 52:2
**fight** 32:16 35:20
  36:1
**figure** 61:13
**file** 35:24 69:13 74:3
  87:1
**filed** 11:10 14:14,16
  15:17 17:1 18:6,7
  18:8 19:5 23:24
  24:1,2,5,7,9,12
  24:16,17 25:2,23
  26:7,22,23 27:24
  29:21 30:6,7 33:13
  36:10,13 41:19
  42:2,4,4,6,10
  54:14 77:3 79:24
**files** 33:18
**filing** 11:21 24:23
  28:2 30:5
**filings** 24:9
**final** 79:13
**finalized** 69:19
**finally** 28:6 37:13
  50:7 70:5
**financial** 64:5 90:7

**financing** 59:9,9
**find** 30:20 77:23
**finds** 68:25
**fine** 13:17 22:20
  37:1 39:4,25 41:3
**finish** 89:24
**Fire** 39:7
**firestorm** 78:6
**firm** 18:24 58:12
**firms** 49:16
**first** 11:24 14:12
  17:4 25:25 40:20
  41:18,20 43:14
  44:23 45:17 46:12
  51:18,19 53:19,22
  54:21,23,25 55:5
  57:2 60:3,21 61:14
  61:19 62:13 63:6
  65:8,8 77:2 79:14
  81:7,9,18 82:9
  83:24 84:3,10
  88:11
**five** 48:15 53:2
  58:25
**Flom** 8:3 11:8
**floor** 9:13 68:11,12
**flux** 66:16
**focus** 40:13 73:16
**focusing** 39:22 68:7
**folks** 23:8 67:6
**follow** 25:12 47:10
**following** 20:19
**follows** 34:4
**force** 56:15
**forecasts** 56:1
**foregoing** 92:5
**foregone** 82:7
**forever** 70:7
**form** 2:5 3:5 5:15
  19:15,22 73:12
  75:12
**formal** 25:2 26:18
  27:1
**formula** 45:3,5
  46:23
**formulate** 34:8

**forth** 20:23 21:20
  27:3 29:17 62:3
**forthcoming** 67:5
**forthright** 69:16
**fortunate** 80:19
**fortunately** 54:18,20
**forward** 22:24 23:4
  23:8 41:23 52:11
  52:20 65:3 67:2,4
**found** 86:6
**four** 8:5 48:15 51:14
**fourteen** 26:20,23
  27:6 28:8,11
**fourth** 12:2
**framed** 66:18
**framework** 57:25
  59:2,4,6
**Frank** 13:3
**frankly** 14:6 57:22
  59:24 66:10 68:23
  74:18 75:19
**free** 2:8 3:8 5:18
  19:6
**Friday** 13:5
**front** 36:25 37:4
  58:24 63:17 77:24
**frustration** 69:12
  70:9
**frustrations** 78:9,9
**full** 62:16 72:22
  83:12
**further** 25:8 26:10
  28:9 29:14 48:18
  75:22 82:17,18
  89:17
**future** 24:25 27:17
  52:12 75:8

---

**G**

**G** 11:1 50:10 60:11
  61:2 62:12 64:3
**Garber** 19:1
**gather** 72:25
**geared** 67:14
**gee** 55:3 56:19 57:3
  63:12,17

**general** 19:1 30:15
  38:5 39:2 58:2
  60:12 62:15 64:16
  65:17 68:12 78:13
  78:14 85:12 88:14
**generally** 44:18
  49:16,18 68:13
**generate** 59:7
**generically** 74:11
**gentleman** 50:15
**geometrically** 80:23
**getting** 46:14 55:14
  73:20 79:8 86:24
**give** 60:11 73:22
  75:24 86:16 89:17
**given** 59:23 66:11
  72:21 74:8 81:16
  83:4 84:21 85:20
**giving** 73:7 86:10
**global** 53:2
**globe** 57:15
**GM** 12:8 78:12,17
  78:24 79:5 84:22
  89:6 90:4
**go** 23:4 25:14 28:17
  29:13 32:8 34:5
  49:2 63:1 65:12
  73:14 82:6,22
  83:17 86:3,4
**goal** 16:8 35:3 48:16
**goes** 74:12 83:20
**going** 15:23 16:22
  22:24 23:8 29:23
  34:20 35:4 36:4
  38:6 40:25 41:23
  43:9 47:11 56:1
  60:14,22,23,24
  61:18,25 63:18,23
  65:3 67:2,3,16
  70:2,3,3,4 71:4,11
  71:12 72:2,14
  75:21 78:14,23,24
  80:23 81:22 87:21
  88:10,20 89:5,9,16
  89:18,24
**good** 11:6 12:17,18

13:6 15:6 21:16,19
30:14 31:22,24
35:1,2 44:6 48:4
60:25 63:7 66:1
67:9,25 69:4,9
70:12 77:9 86:2
**GORLICK** 9:9
**governed** 35:1,2
**grant** 17:1,2 20:16
29:18 36:12
**granted** 91:15,19,20
**great** 62:25 63:9
90:14
**greater** 48:9 69:6
82:20
**Green** 1:14
**GROSSMANN** 10:2
**grounds** 29:14
**group** 61:15,19
66:20 67:4,4,12,15
67:17 72:18 84:7
**group's** 67:18
**Grove** 17:15
**guarantee** 78:12,18
78:19,24 79:2,6
**guess** 18:1 38:25
47:2 66:8 76:14

---

**H**

**H** 91:8
**half** 40:20 41:19,20
44:23 45:3 46:12
51:19 53:4,7,19,22
54:21 55:6 56:24
56:25 57:2 60:3,21
61:14 62:13
**halfway** 62:19,20
**halt** 12:22
**hand** 71:9,9 81:25
83:9 85:8
**handling** 39:12
**handout** 83:6 86:15
87:8
**hands** 32:18 35:25
**happen** 54:10,12,14
54:18,21 56:19,20

57:16 70:2,3,5
71:4,5 81:1
**happened** 56:21
58:9,9
**happening** 68:13,13
**happens** 70:5 83:7,9
**happy** 87:19,21
**Harco** 18:25 19:1,12
20:7,8,17,21 21:7
91:18
**hard** 47:10 86:9
**harder** 46:18
**headed** 40:11
**headline** 68:18 75:7
77:15,16
**headlines** 68:5
**headquarters** 16:10
**health** 51:22 71:6
74:23
**hear** 12:2
**heard** 54:23 57:3
**hearing** 2:6 3:6 5:15
11:9,10 12:1,12
13:15,16 14:9
19:16 25:1 26:17
27:5 39:24 40:20
43:3 44:11 65:23
81:8 86:20 89:25
90:17,18
**hearings** 28:13
51:13 83:23 86:20
87:14
**heat** 77:1
**held** 53:5 90:11
**help** 44:17 45:4
65:14,16
**helpful** 46:1
**helpfully** 84:25
**hey** 58:19 63:22
**he'll** 36:12
**high** 48:11 76:20
**higher** 46:18 48:8
62:9 80:20
**highly** 50:2
**Hills** 15:15
**Hine** 11:17

**historic** 65:8,11,19
81:21
**historical** 85:20
**history** 54:15,25
69:17
**hit** 26:21 54:22
**Hogan** 8:10 11:7
**holders** 24:6,8,9
**holdings** 24:10
**HON** 1:22
**honor** 11:4,6,9,12,14
12:14,20 13:6,20
14:11,21 15:6,9,23
16:22 17:1,8,11,20
18:4,23 19:4,21,25
20:3,9,25 21:4,16
22:15 23:11,17,17
25:7,9,20,20 26:13
29:1,11,19,19
30:12 31:14,24
32:10 33:11 34:3
35:12 36:3 37:6
38:5,21 39:5,6,16
40:11,18 41:2,8,11
41:15 42:10,20
43:1,7,7,8,11,23
47:8 48:19 49:22
49:24 50:7,8,18
51:6,8,12,24 52:13
52:18,21 53:12
54:2,5,22 55:5,6,7
55:15 57:21 58:8
59:12 61:10,22
62:19 63:10,16,24
64:6,9 65:1,3,24
69:9 70:11,12,14
70:15,19,19,24
71:2,8 72:3,8,16
72:21 73:24 76:6,9
79:8,13 80:13,13
81:2 87:25 88:18
89:1 90:16
**honoring** 78:1
**Honor's** 13:14 20:15
21:11 39:23 51:9
55:16 77:4

**hoops** 32:24 33:3
**hope** 20:18 22:7
23:2,3 32:21 58:1
69:21,22 83:13
87:24 89:5
**hopeful** 39:19
**hopefully** 40:12
**hoping** 44:17
**hopper** 29:13
**hose** 2:8 3:8 5:18
18:5 19:6,12 91:17
**host** 74:25
**Houlihan** 11:18
**hourly** 56:15 76:19
**hue** 75:12
**huge** 77:1
**hundred** 46:13,24
47:19 59:15,20
67:11
**hypothetical** 46:4

---

**I**

**IAM** 9:12 42:6 44:8
70:13,23 71:17
72:7,17
**IBEW** 9:12 42:5
44:8 70:13,23
71:17 72:6,17
**ice** 58:5
**idea** 32:17 35:25
**identification** 43:6
**identified** 33:15
**identity** 27:9,17
**II** 2:4,9 3:4,9 5:14
5:19
**III** 2:5,10 3:5,10
5:15,20 8:10
**Illinois** 16:7
**illustrated** 51:15
**imagination** 59:17
**imagined** 54:6
**imagining** 54:12,13
**impact** 83:3
**impasse** 72:25
**impediment** 71:24
**Implement** 4:6 6:19

**implemented** 88:11
**important** 30:22
  58:6,8 60:19 64:17
  64:18 66:7,22
  67:22 69:1 77:11
**importantly** 82:2
  90:12
**imposes** 82:1
**impossible** 71:14
**impression** 73:23
**improve** 83:21
**improved** 77:13
**incent** 46:21
**incenting** 72:10
**incentive** 44:22 45:8
  46:19,20 51:25
  52:3 53:13 64:21
  73:2,3 77:3,18
  81:6,17,24,24 83:2
  84:13 85:24 86:7
  86:21
**incentives** 73:13
**incentive's** 86:25
**inclined** 20:16
**include** 15:19 28:19
  42:5 87:22
**included** 25:13
  33:24 34:13 35:23
**includes** 88:23
**including** 41:23 67:4
  74:25 82:1 84:8
  86:8 90:4,6
**income** 88:16
**inconvenient** 71:7
  72:17 76:16 77:8
  78:22
**incorporated** 52:16
**increase** 47:24,24
  57:18 77:20
**incremental** 77:17
**incurred** 39:11
**indemnity** 29:9
**independent** 50:12
  50:22 59:16 61:15
  85:13
**independently** 84:1

**index** 42:19,20
**indicate** 14:21 64:20
**indicated** 18:11
  25:12 37:6,10 61:5
  62:19
**indisputable** 76:12
**individual** 24:5 31:8
  77:22 87:3
**individually** 87:5
**individuals** 44:24
  72:18 84:2
**industry** 85:10,12
**inevitable** 74:19
**inevitably** 74:14
**information** 34:7,12
  37:16,19 41:6
**inherent** 74:21
**initially** 11:14,15
**initiate** 33:2
**insert** 17:9
**insider** 85:14
**insisted** 80:11
**instance** 45:7 66:19
**instances** 73:8
**institutions** 90:10
**insufficient** 26:2
**Insufficiently** 2:21
  3:24 4:11,18 5:7
  6:13 7:8,15
**insurance** 39:8,12
  71:6
**insurer** 40:14
**integral** 77:19
**intelligent** 83:15
**intend** 12:4 33:3
  34:22 63:23
**intended** 17:12
  37:18,22 52:5 59:7
  59:11 65:15
**intense** 80:5
**intention** 12:3 38:1
  61:3
**interest** 32:23 81:13
  82:4,9
**interference** 71:24
**interim** 11:16,18,20

  21:7 31:20 32:2
  35:14
**interplay** 30:23
  31:16
**interpretation** 79:2
**intricate** 16:23
  54:17
**introduce** 18:23
  50:9
**intuition** 47:1
**intuitive** 45:5
**investigating** 85:11
**investment** 8:20
  14:15 15:7 52:19
  59:8
**investors** 52:19 59:2
  64:16 90:13
**invited** 29:25
**involve** 58:2
**involved** 30:18 31:8
  52:18 56:9 74:2
  90:3
**involvement** 30:22
**involves** 38:10 82:22
**involving** 37:16 39:9
  39:10 41:18 44:13
  62:14 79:2
**issue** 20:16 21:15
  35:25 36:1,9,20
  37:1 43:9 66:14
  70:19 71:4 72:8
  73:21 76:18 79:4
  81:7
**issues** 27:3 28:24
  30:15,20 31:4
  32:16,20 34:23
  35:11,20,21,21
  38:2 40:5 52:15
  53:20 57:24 60:4
  67:7 69:3 72:19,23
  75:1,16 76:23,25
  78:24 79:2,6,9
  80:13 86:10,13
  90:11
**item** 11:18,19 14:13
**items** 64:7

**IUE** 56:10 78:16
  84:20
**IUECWA's** 42:8
**IUE-CWA** 6:5
  10:10 76:4 78:25
**IUOE** 42:6
**IV** 2:5 3:5 5:15

_____
J
_____
**Jack** 8:8 11:6 41:15
  65:20
**Jackson** 13:2
**January** 45:18
**Jennik** 10:9 76:3
**jobs** 70:3
**John** 8:8 10:7 50:1
**joined** 41:9
**joint** 42:6,12,19,20
  42:25 43:5,15
  44:13 49:25 50:25
  51:16 91:9,10
**Joseph** 33:13
**JR** 8:8
**Judge** 1:23 12:17
  13:3,11,18 29:24
  30:4,9 31:9 35:10
  36:11,15,24 37:1,4
  39:15 58:23 63:19
  84:25
**judgment** 39:8 47:4
  47:20 57:18 58:21
  79:19 80:17 82:8
  84:17,24 85:17
**July** 51:13 67:21
**jump** 32:25 33:3
**June** 12:1
**junior** 85:25
**justice** 11:10,15

_____
K
_____
**Kayalyn** 8:9 11:7
**KECP** 6:6 40:20
  41:18 43:17 51:25
  53:19 55:6,8 69:20
  77:3 81:4
**keep** 37:24,25 90:13
**Kennedy** 10:9 76:3

**kept** 26:20
**key** 4:6 6:19 33:11
  33:16,19,20 34:10
  34:10,14 82:4,12
**kind** 38:10 45:3 47:1
  59:25 60:11 70:16
  74:15
**kinds** 56:5 57:1
**Klein** 8:12 21:17
**know** 11:2 20:14
  22:5 23:19 35:5
  37:2,24 41:5 47:19
  47:20 48:13 53:8
  53:18 55:15,17
  56:3,19 57:1,8
  58:9,19 63:18,20
  66:24 68:5,15
  70:18 71:10,10,12
  71:12 73:14,19
  74:4,13,15,16,16
  75:14,19 77:9 78:9
  78:19 80:4 88:23
  89:22
**knows** 53:13 79:13
**KRAVITZ** 9:9
**kvetching** 83:7

**L**

**L** 8:10
**lab** 16:17
**labor** 22:24 42:5
  67:7,24 69:3 72:23
  74:23 77:14 78:1
  79:23 83:3 86:4
  88:13 89:6
**lacking** 85:22,23
**laid** 16:23
**landlord** 14:15
**large** 38:10
**largely** 79:22
**larger** 16:20 62:9
**largest** 54:14 56:2
**Larry** 10:14 76:3
**late** 30:12
**law** 18:24 31:18
  32:15 75:20

**laws** 37:21
**layout** 45:10
**layup** 80:5
**layups** 55:3 80:4
**lead** 3:19 6:8,22
  10:3 29:20,25 30:4
  30:13 31:1 32:1,12
  32:18,21 33:6 34:4
  34:6 37:7,12,13
  38:8,22 79:20
**leadership** 69:13
  73:19 74:2,9,12
**leading** 31:25 36:7
**leads** 47:1
**lease** 3:16 6:2 14:1
  14:13,16,19 15:2
  15:12,18,20,25
  17:15 24:24
**leased** 15:13
**leases** 2:10 3:10,17
  5:20 6:3 15:16
  19:8
**Leasing** 13:21
**leave** 56:13 70:7
  72:9,11,11,14
  88:21
**leaves** 40:18
**leave-takings** 72:9
**leaving** 23:6
**led** 20:8 30:4,17
**left** 53:1 69:5
**lender** 61:22
**lessor** 24:23
**let's** 11:15 45:14
  46:13 48:6
**level** 44:19 45:15
  49:2 68:11,11
  69:12 71:20 88:15
**levels** 49:4 74:8
**Lextron** 13:10
**liabilities** 2:11 3:11
  5:21 19:9 20:2
  24:22 26:4 85:6
**liability** 14:25 15:2
  24:3
**lie** 75:8

**liens** 2:8 3:8 5:18
  19:7
**Lifland** 84:25
**lifted** 31:12 37:2
**light** 21:3,5 23:13
  25:16 29:15 83:12
  85:17
**liked** 57:1
**likelihood** 49:3
**limbo** 53:5 66:20
  69:24 71:8
**limit** 50:21
**Limited** 3:20 6:9,23
**line** 66:23,25 69:1
  78:14 81:20 91:14
**liquidated** 24:13,15
  24:18,20 25:10
  28:16 29:5
**listed** 84:25
**LISTHAUS** 9:9
**lists** 85:3
**litigation** 29:23
  30:21,23 31:11,21
  38:11 39:10 40:14
**Litowitz** 10:2 38:22
**little** 15:10 17:16
  18:11,16 58:17
  88:20
**live** 63:23
**LLC** 15:12 20:8
**LLP** 8:3 9:2,18 10:2
  11:17
**loan** 15:17
**Local** 9:12 44:8
**Locals** 9:11 44:8
**locate** 16:19
**located** 15:14
**location** 16:8
**lodge** 66:8
**log** 34:4
**logical** 75:3,25
**logjam** 73:4
**Lokey** 11:19
**long** 72:3
**longer** 21:8
**long-term** 52:3

73:13 81:24 85:24
  86:7
**look** 18:1 38:24
  48:10 49:1,3 52:11
  57:6 58:7 61:24
  64:7 65:15 67:3
  68:15 80:6 83:5,10
  83:10 85:18 88:21
  88:22
**looked** 84:11,12
**looking** 22:2 35:7
  48:22 52:8 57:17
  59:4 77:13 87:20
**looks** 68:16 86:19
**lose** 70:3
**lot** 16:14 22:23
  82:16 89:5 90:6
**low** 59:22 76:16
**Lowell** 8:17 21:16
  69:9
**lower** 48:24
**luck** 74:4
**ludicrous** 59:24

**M**

**Magarik** 10:14 76:3
  76:3
**magic** 46:23,25 47:1
**main** 76:19,20
**major** 16:11,20 38:9
  56:11
**making** 34:7 36:8
  70:22 72:10 81:11
**management** 30:6
  56:6,20 64:22 72:6
  75:1,7
**manager** 19:1
**managers** 68:6,18
  70:21 77:11,15
**manipulate** 56:6
**manipulated** 59:22
**manner** 2:5 3:5 5:15
  19:15 33:3 69:16
  70:4 79:25 83:25
**manufacturing** 20:8
  54:15

**Marafioti** 8:9 11:7
**March** 1:17 25:1
  26:17 40:19 41:16
  69:14 90:17 92:9
**Maricopa** 18:7
**marked** 50:2 89:2
**market** 16:2 90:7,7
**markup** 88:21
**master** 24:16 34:14
**match** 26:5
**material** 56:22
  64:15
**materialize** 54:22
**mathematical** 45:5
**matter** 1:6 12:1,7,9
  12:14,16 13:2,20
  13:21 14:3,7,12
  15:3,8 18:4,5
  20:18 22:22 23:23
  23:23 25:21 28:6
  29:20 34:9 39:7,9
  39:12 40:2,3,6,19
  40:19 41:16,17,25
  43:8 55:13 73:3
  78:7 92:7
**matters** 11:16,22
  12:7,11 14:12
  23:19 28:14 29:24
  30:25 31:2 33:18
  34:18 42:23 62:17
  66:16 67:14,24
  68:24 69:5 90:17
**maximizing** 64:22
**maximum** 48:14
  49:12
**MDL** 29:23 31:20
  32:1 38:13 39:10
**Meagher** 8:3 11:8
**mean** 17:10 22:12
  24:22 41:4 44:22
  45:24 46:14 57:12
  60:16 71:17,23
  73:8 82:7
**meaningful** 45:8
  73:9
**means** 29:1 45:8

79:6
**measured** 65:16
**mechanically** 62:6
**mechanics** 41:4
**mechanism** 30:20
**mediate** 13:1
**mediation** 13:2,6,11
  13:12
**mediator** 13:3
**meet** 60:5 80:2
**meeting** 61:19
**meets** 84:24
**Mehlsack** 9:16
  43:19 44:5,6 48:18
  70:12,13,18 78:8
  78:23 91:5
**Mehlsack's** 57:17
  78:17
**Meisler** 17:20
**melting** 58:5
**member** 50:11
**members** 44:16 45:2
  45:2 46:8,13 55:10
  55:11 69:25 70:20
  71:10 74:12 84:7
**membership** 66:15
  67:21 69:7 74:7,9
  75:6,16,17 83:14
**memories** 66:7
**mentioned** 17:5
  51:12
**merely** 24:11,21
**merits** 28:10
**met** 49:5 72:15
  75:12
**methodology** 49:19
**metrics** 54:24 64:14
**metropolitan** 16:21
**Meyer** 8:12 21:17
**MI** 8:22
**Michigan** 15:15
  16:7,8 30:21 31:12
  35:17
**microphone** 70:17
**middle** 63:2
**midst** 76:23

**million** 12:21 13:7
  20:10 24:14,21
  25:4,11 26:1,4,7,9
  26:11 28:17 29:6,7
  29:9,12 45:16,23
  46:8 47:3,22,25
  48:2,4 57:8,15
  59:22,23 60:3 62:9
  72:5
**Milwaukee** 8:20
  14:15 15:7
**mind** 70:15 84:10
  86:13
**mindful** 66:6
**minds** 55:3
**minor** 23:15,16
**minus** 60:10,11
**minuses** 61:1
**minute** 32:13,16
**minutes** 18:17,22
  40:21
**misimpression** 73:7
**Mississippi** 12:23
  13:2
**mixed** 75:20
**modification** 2:24
  3:20 4:3,14,21
  5:10 6:9,16,23
  7:11,18 26:14,15
  29:21 30:3
**modifications** 59:5
**modified** 19:23
  21:10
**modify** 26:10 27:10
  27:15 29:9 32:4
  36:15
**modifying** 29:22
  30:10
**moment** 14:8 23:21
  25:24 36:1 38:7
  42:25 57:10 86:23
**money** 71:5,22 72:7
**moneymaker** 23:6
**month** 19:12 34:21
  35:4 61:20 64:12
  73:11 85:16

**months** 16:15 32:24
  52:11 63:10 69:15
  72:5 73:16 76:14
  76:14 79:12,21
  81:7 84:23
**morning** 11:6 12:17
  12:18 14:23 15:6
  21:16,19 31:24
  39:3 44:6 60:6
  66:1 68:1
**motion** 2:2,2,13,19
  3:2,2,13,13,19,19
  3:22 4:5,5,9,16,23
  5:5,12,12,23,23
  6:5,6,8,8,11,18,18
  6:22,22,24 7:6,13
  12:8,10 13:15,22
  13:22 14:13,16
  15:11,15,18,22,25
  16:24 17:3,15 18:6
  19:4,23,25 20:5
  21:15 23:13,14
  29:21 33:14 35:15
  35:15,22,24,24
  36:10,12 37:11
  42:2 68:1 77:3
  81:4,5,9,20,25
  82:24 88:2 91:16
  91:21
**motions** 30:10 35:18
  36:7,13,14 66:4
  87:15
**Motors** 58:2 60:12
  62:15 64:16 65:18
  78:13 88:14
**Motor's** 78:15
**move** 23:22 26:25
  29:20 30:19 39:6
  43:1 51:1,7
**moved** 28:22
**movement** 71:1
**moving** 22:23 25:8
  52:20 62:6
**multiple** 16:6
**Murray** 10:9 76:4

**N**

N 8:2 11:1 91:2 92:2
nailed 22:23
name 44:1 92:13
narrow 36:19,20
  37:1
National 39:7
nature 23:21 24:11
  24:21,22,23 29:16
  38:7 80:10
Naylor 50:8,10,12
  50:22 51:3 64:20
necessarily 62:1
  68:7 83:19 90:2,12
necessary 76:8 87:8
need 30:20 36:9
  38:11 39:13 53:16
  55:24 56:17 63:9
  76:8,10,11 79:1,11
  81:12,15,15 82:5
  84:14 85:11
needed 42:14 50:21
  56:16
needs 22:8 43:13
  69:17 74:6,10
  75:19 76:1 81:9
negative 62:13
negotiate 20:13 58:4
  59:6 62:24 71:20
negotiated 68:9 73:9
  74:6,18 78:25
negotiating 73:17
negotiation 47:15
negotiations 21:25
  39:19 57:24 71:18
  73:5 78:6,15 80:5
  83:3 84:18,19,21
  84:23 86:4 88:7
  89:6,21 90:4
Neil 9:22 12:19
net 80:18,22
New 1:3,15,15 8:6,6
  8:15,15 9:5,5,14
  9:14,20 10:5,5,12
news 31:22 63:7,8
newspaper 55:25

Nick 43:16
night 13:13
ninety 20:19 23:3
ninth 2:19 3:22 4:9
  4:16 5:5 6:11 7:6
  7:13 25:21 27:23
  28:2 29:4
nodding 38:18
Nonresidential 3:17
  6:3
non-board 45:2
non-DSB 45:2,25
  46:8,13 48:1 49:8
  55:11
non-transformed
  61:24
normally 26:25
north 57:7
note 18:15 24:6 27:3
  63:10 64:18 66:16
noted 27:21 67:19
  82:25
notes 66:3
notice 17:23 19:15
  25:19 29:17 35:17
  81:12
noticed 81:15
Notices 2:5 3:5 5:15
notwithstanding
  27:20 77:1 81:25
November 17:17
no-sale 20:12
number 11:17,18,19
  11:19,20 12:9,9,10
  12:14 13:21,22
  14:13,14,15,19
  18:5,6,8,9,10
  19:14 23:23,24
  25:21,23 29:20,22
  30:7,8 32:23 41:17
  41:19 42:3,6,7,8,9
  44:24,25 45:17
  46:23,23 47:7
  48:12 49:10 50:22
  54:6 58:19 60:2
  62:9,11 74:7 90:1

numbers 35:6 37:19
  63:19 81:21
nuts 73:14
NY 9:20 10:12

**O**

O 1:21 11:1 92:2
object 81:16
objected 23:25 24:7
  79:21
objection 2:13,14,19
  2:20 3:22,23 4:9
  4:10,16,17,23,24
  5:5,6 6:5,5,11,12
  6:24,25 7:6,7,13
  7:14 14:14,18 15:3
  15:5,7,17,22 17:7
  18:7,9,9 23:20,24
  23:25 25:18,19,22
  25:23 26:10,19
  27:17,20,23 28:3,7
  29:4,18 30:8 33:14
  42:7,8,8,22 47:8
  66:8,10 79:24
  81:13
objections 18:6,14
  19:24 23:13,21
  24:12 25:6,17,22
  26:25 41:21 42:4,6
  42:11,12 43:3
  51:10 53:21 57:3
  63:12 69:11 79:24
  83:23
objection's 16:25
objectively 83:11
objectors 40:21
  41:23,24 42:22
  51:10 60:7,7 64:1
  65:5,23 79:20 86:6
obligations 87:25
observation 66:10
observations 76:7
observe 47:19
obtain 21:6
obtained 19:13
  20:21 85:5

obvious 85:21
obviously 23:13
  25:18 30:21 31:6
  38:9 49:17 74:5
  89:16
occasions 65:2 80:3
occur 38:13 57:2
occurred 57:2
occurs 38:12
October 17:18
OEM 55:25 56:8
OEMs 16:20 56:23
offer 43:15,18 49:24
  50:3
office 16:17
officer 64:13
offices 16:7
official 84:6 92:5
Oh 17:25
okay 11:5,11,13
  12:6,13 13:17
  14:10 17:2,14,25
  18:1 19:3 22:16,20
  23:9 25:16 28:25
  29:15 32:7,9 35:13
  36:2,22 38:18,24
  39:4,14,25 40:12
  40:17 41:3,13 43:3
  43:12,21 46:7,9
  48:20 49:21,23
  50:4,5,19 51:2,11
  65:6,22,22,24,25
  69:8 70:10,16
  72:24 74:12 76:2,2
  81:3,3 88:19 89:4
  89:16 90:15
omni 39:24
omnibus 2:13,14,19
  2:19 3:22,22 4:9,9
  4:16,16,23,24 5:5
  5:5 6:11,11,24,25
  7:6,6,13,13 11:9
  11:10 12:1,12
  13:15 14:9,18
  23:24 25:5,22
  26:18 27:23 28:2

29:2,4 40:18 41:17
42:10,17 90:17
**once** 66:2 67:10 69:1
72:14,16 79:1
**ones** 28:20,20,21,22
87:19
**ongoing** 39:19 84:18
84:19
**open** 82:16 90:10
**openly** 41:6
**operate** 54:17 56:14
74:7
**operating** 9:10 44:7
54:24 70:14,23
71:17 72:7,18
**operation** 16:9
**operations** 16:2
56:14
**opinion** 30:10 84:25
86:5
**opportunities** 53:5
53:15
**opportunity** 38:16
52:1,22,23 64:4
81:16 83:11,12
85:24
**opposed** 22:13 58:5
78:1
**option** 18:13 19:20
**order** 3:13 4:5 5:23
6:18 11:11 14:5
17:6,9 18:2,17,22
19:13,18,22,22,23
20:6,15,16,20,24
21:10,20 22:1,14
22:14 23:15 25:12
25:14 26:8 27:4,21
29:2 30:7 32:3,6
37:14,25 38:25
46:5 67:19 79:25
80:7 88:6,20,25
89:2
**ordered** 39:16
**orders** 2:2 3:2 5:12
17:24 37:15
**ordinary** 77:5,7

81:12,14,17 82:5
82:10,24 88:5,16
**originally** 15:15
29:22,23 42:2
**ought** 65:2
**outlines** 23:1
**outlining** 64:13
**outside** 17:22 34:25
84:5
**outstanding** 13:24
48:13
**overall** 84:16
**owing** 14:5
**owned** 15:14
**O'Neil** 64:13

———————
## P

**P** 2:3,15,21 3:3,14
3:24 4:11,18,25
5:7,24 6:13 7:2,8
7:15 8:2,2 10:7
11:1
**package** 84:3,23
85:2,19,22 86:14
**packages** 88:1
**pad** 46:7
**page** 22:4 47:14
51:17 81:18,19
91:4,9,14
**pages** 33:7,25 35:7
51:17
**paid** 14:4 45:24
49:12 53:22
**painful** 73:9
**Papalion** 33:13
**Papalion's** 33:21
**papers** 18:11 31:17
61:5 74:2
**paragraph** 14:22
22:5,6 33:12,14,21
**part** 15:3,14 16:1
30:2,11 38:14
53:23 54:5,25
**parte** 12:10
**partial** 30:3
**participants** 48:1

**particular** 26:15,15
28:14 40:3 44:18
45:7 48:10,11
58:20 61:23 66:20
68:9 79:1,12 84:4
**particularly** 82:14
85:20 86:18
**parties** 11:25 12:11
13:13 14:8,23 17:4
20:21 32:23 35:10
36:21 37:17 39:22
40:13 81:12 82:1,4
82:9 89:20 90:3
**parts** 22:23
**party** 15:23 20:20
**pat** 89:23 90:14
**pay** 48:3 57:5,7 72:4
80:25
**paying** 57:4,14
70:21 71:22 72:6
**payment** 13:23
53:15 55:12
**payments** 61:7
72:22 80:19 84:13
**payout** 42:13 44:10
44:13,20,25 45:1,8
46:14 47:3,13,18
47:25 48:6,10,11
48:14 57:6 62:24
80:6
**payouts** 55:2 57:1
**peer** 49:8
**pending** 35:18 36:7
36:25 69:3
**Penn** 9:19
**pension** 87:25
**pensions** 71:7
**people** 11:2 46:18,22
46:23 48:2 49:9
53:22 56:13,18,25
58:18 59:22 60:15
60:16 63:11 67:11
70:1 71:4,10,14
72:9,10,11,14
76:17 77:10 83:15
83:16

**people's** 45:11
**percent** 44:24 46:7
46:13,14,24 47:3
47:20 48:6,8,24
51:20,23 52:1,2
53:23 55:2,10,11
55:14,14 57:4,5,7
59:15,20 63:18
86:1,1,11
**percentage** 46:24
66:17
**percentages** 81:23
**perception** 66:24,25
67:22 68:25
**perform** 61:25
**performance** 44:19
45:11,13,15,20
47:22,24 48:12
53:22 54:1,20,24
55:1,8,9,10,23
56:6,24,25 57:21
58:15 60:25,25
61:12 62:20,22
63:4 64:2,9,14,17
65:16 80:20,21
87:2,3 88:15
**performed** 87:5
**performing** 63:6
85:13
**period** 21:7 35:19
48:11,14 60:25
62:20,22 63:3
65:18,18
**permission** 51:9
**permitted** 75:22
**person** 48:16
**personal** 32:21
37:16,19
**perspective** 23:5
54:3 57:20 59:11
63:5,8 64:6,19
66:15 68:2 75:25
78:21
**persuade** 14:6
**persuaded** 52:25
**pertain** 27:8 90:2

**Peterson** 8:17 21:16
    21:17,20 22:3,6,11
    22:15,17,21 23:11
    69:9,10 70:11
    71:14 79:3 89:19
**Peterson's** 78:9
**phone** 13:12 39:20
**phrase** 73:21 76:17
**picked** 54:7 58:19
**pickup** 70:6
**pie** 51:24 52:1 65:7
    65:8 77:21,21,24
**piece** 51:23 52:4
    69:22
**Pima** 18:8
**Piper** 11:20
**Pittsburgh's** 39:8
**place** 10:11 12:5
    17:17,17 23:1
    36:19,20 54:17
    58:11 81:9
**placed** 35:16
**plaintiffs** 3:19 6:8
    6:22 10:3 29:25
    30:13 31:1,8 32:1
    32:12,19 33:7 34:5
    34:6 37:7,12,14
    38:8,22 79:20
**plaintiff's** 29:20
    30:4
**plan** 16:1 30:23
    45:17,21 46:19,21
    46:21 52:5,16,19
    52:23,24 53:25
    54:1,4,5,9 55:1,13
    58:15,18,25 59:1,6
    59:7,14,15,18,21
    59:24 60:9,18,20
    61:11,14 62:1,5,6
    62:7,23 63:6 64:16
    64:17 77:3 80:12
    81:6,17 82:13
    84:12 85:4,5,7,9
    85:12,16,23 86:7
    88:13 89:25
**planet** 56:3

**planned** 87:15
**plans** 53:25 55:4
**plants** 56:15,18
**plate** 69:16
**Plaza** 9:19
**pleading** 28:3
**pleadings** 31:20
    36:6
**please** 41:13 43:20
    43:22 44:2 90:15
**pleased** 38:15
**PLLC** 8:19
**plus** 49:9
**pluses** 61:1
**PM** 90:18
**pocket** 83:20,21
**point** 15:24 23:10
    31:6,17,18 32:17
    39:23 47:23 48:13
    63:15 64:9 70:9
    71:2,19 72:16 74:1
    76:13
**pointed** 21:4 60:7
**points** 49:14 53:17
    71:14
**policies** 39:12
**policy** 39:21 55:21
    55:21
**political** 73:21 83:6
**portion** 23:18 29:3
    40:25 66:19 87:19
**pose** 46:3
**position** 11:21 21:15
    28:10 33:2 53:3
    69:18 90:3
**positions** 31:1 43:10
    81:10
**positive** 57:19 61:17
    62:13 64:8 77:11
**possible** 34:8
**post-petition** 13:24
    14:4
**potential** 21:3,5
**practice** 85:12
**practices** 64:3 65:1
**preceding** 22:18

**predicates** 31:19
**preferred** 79:25
**preliminary** 58:25
**prepare** 16:5 30:19
    32:3 40:22
**prepared** 59:1 65:4
    72:4,12 82:4
**preparing** 25:1
    26:17
**present** 15:4 19:2
    30:16 31:22 51:7
    54:8
**presentation** 64:11
    64:15 65:4 66:17
**presented** 51:10
**presenting** 15:10
**presents** 40:14
**presumably** 22:9,22
    46:21
**Pretekin** 18:24
**pretty** 48:1,4
**previously** 33:8
    37:15
**prices** 63:17
**pricing** 62:15
**primarily** 48:12
    84:18
**primary** 44:9
**principal** 16:8
**principally** 69:10
    78:25
**principles** 38:5
**printed** 92:13
**prior** 14:25 17:24
    28:2 37:11 51:13
    60:5 65:2 66:4,6
    83:23 87:14
**privacy** 37:16,21
    38:2
**private** 37:25,25
**privilege** 32:16
    34:18 35:20 36:1
    37:8
**privileged** 32:14,15
    33:10,23 34:4
**probably** 22:25 56:2

74:1
**problem** 70:23
**problems** 69:24
**Procedural** 2:14
    4:24 6:25
**procedurally** 83:24
**procedure** 25:12
**procedures** 2:4 3:4
    5:14 19:13,15
    20:24
**procedure's** 19:17
**proceed** 69:4
**proceeding** 20:18
    39:16,18 40:7
**proceedings** 92:6
**process** 11:23 12:4
    16:14 19:10 20:3,4
    20:4,6 31:20 34:5
    35:9 36:6 38:12,13
    38:13,14,15 52:16
    52:18,19,23 55:5
    56:23 60:13,14
    62:4 70:9 72:20
    78:4 82:8,17,21,22
    83:16,18 84:10
**produce** 32:11 33:7
    33:18 34:1,10,16
    34:18,21 36:4
**produced** 33:8
    36:17
**producing** 34:19
    37:10
**product** 32:14 33:11
    33:23 37:9 47:15
**production** 33:10,22
    34:7,24 36:8 37:9
    56:1
**productions** 55:25
**professionals** 84:5,6
**program** 4:7 6:20
    41:18 44:10,22,23
    45:9 51:22 52:3,6
    52:7,7,8,11,15,21
    53:13,15,16,17
    55:18 58:13 59:10
    59:11 61:8 63:14

64:24 66:22 67:5
67:10 68:3,8 69:5
73:2,3 75:10 77:6
77:6,20,22 79:12
80:3 83:10
**programs** 64:21
67:9 68:21 69:18
74:8 75:22 86:7
**project** 16:12 49:3
**projected** 46:16
**projections** 82:14
87:7
**prompt** 33:3
**prompted** 89:19
**promptly** 90:5
**proof** 24:14,17,23
**proofs** 24:13,17,19
25:25,25 26:3,6,8
28:12,16
**properly** 33:20 85:8
**property** 3:17 6:3
15:14 16:15 18:13
**proposal** 41:22 83:2
85:10
**proposals** 84:15
**proposed** 17:6 20:9
20:15 27:4,21 59:5
85:4
**proposing** 64:24
**proposition** 84:20
**protect** 37:16 68:17
**protected** 23:8
37:20,21
**protections** 2:5 3:5
5:14 19:15
**protective** 2:17 5:3
7:4 24:11,21,21
37:14,15,25
**proves** 69:20
**provide** 21:21 32:14
34:4,12 67:17
**provided** 25:5 83:16
**provides** 18:17
21:22 42:11
**providing** 67:14
**provision** 21:24 22:2

22:3 39:21 40:5
**provisions** 17:23
18:18
**proximity** 16:10
**PSLRA** 29:24 30:3
30:11 31:19
**public** 79:22
**publicly** 41:24 60:3
**purchase** 3:15 5:25
15:20 20:17 21:2
**purchaser** 18:10,25
18:25
**purpose** 36:5,8
**purposes** 29:23
36:17 59:16,23
62:10 83:6,7
**pursuant** 2:14,20
3:23 4:10,17,24
5:6 6:12,25 7:7,14
15:11 18:20 26:8
**pursuit** 34:8
**put** 28:13 36:12
58:10,11 59:10
64:12 65:13 77:7
88:19 89:20
**puts** 81:10
**putting** 28:14 59:2
89:22 90:9
**puzzle** 69:22
**P.C** 9:9 10:9
**P.2002** 5:13

___

**Q**

**qualified** 19:19
**quantify** 63:3
**quarter** 63:6
**question** 45:12 47:9
47:10 48:7,21 55:2
65:6,7 70:2,4
74:19 86:3 88:5
**questions** 17:4 48:18
48:21 65:4,23
68:12 74:15 85:15
85:18
**quibbling** 55:15
**quite** 23:1 57:4

74:17

___

**R**

**R** 1:21 2:3,15,21 3:3
3:14,24 4:11,18,25
5:7,13,24 6:13 7:2
7:8,15 8:2 11:1
92:2
**raise** 86:9,12
**raised** 41:21 55:2
86:13
**Rangel** 51:25
**rank** 69:13 74:3
86:25
**ratio** 44:19 47:13
48:1,5 57:16,17
**reach** 13:4 14:3 72:1
**reached** 71:2 84:14
**reaching** 21:3,5
**read** 15:1 55:25 76:5
**ready** 11:2 72:11
**real** 3:17 6:3 16:3
**reality** 68:19 75:18
75:21,23 76:1 81:5
**realize** 83:18
**realized** 47:6
**really** 37:18 45:4
49:10 52:3 66:11
67:14 68:5 69:15
70:20 77:16 83:13
86:18 87:11
**reason** 78:10 82:23
**reasonable** 17:10
34:20 47:4,13,21
48:16 58:13 64:25
80:16 85:3,5,7
86:24
**reasons** 17:3 82:10
82:23 86:2
**reauthorization**
66:9
**recalcitrant** 70:16
**recall** 12:20
**receive** 41:9 51:22
55:12 79:13 85:13
**received** 18:14

26:18,20 27:2
28:22 30:2 43:5
**receiving** 44:24
**recess** 40:23 41:12
60:6
**recognized** 78:20
**reconcile** 14:2
**reconciliation** 14:6
**reconsideration**
30:10
**record** 14:21 18:15
22:19 34:1 35:3
41:14,25 44:1 55:7
60:4
**recording** 92:6
**records** 2:23 4:2,13
4:20 5:9 6:15 7:10
7:17 26:6
**record's** 23:9
**recovery** 87:18
**reduce** 16:9
**reduced** 87:6
**reduction** 29:11
**refer** 41:5
**reference** 84:19
**referring** 22:7
**refers** 22:14
**reflect** 19:24 88:12
**Reflected** 2:22 3:25
4:12,19 5:8 6:14
7:9,16
**reflects** 67:16 87:12
**regard** 25:17 85:21
**regarding** 34:12
37:8 66:17
**regret** 79:10
**reimbursement**
20:22
**reiterate** 89:24
**reject** 3:16 6:2 14:16
15:16,18
**rejected** 24:25
**rejection** 13:25
24:24
**related** 11:22 61:1
**relates** 76:25

**relating** 24:19 29:24
39:9 54:3,3 80:12
**relations** 82:3
**relationship** 44:21
45:7 84:22 85:4
**released** 15:2
**relief** 3:19 6:8,22
12:15,23 17:1,2
25:9,19 27:13,14
27:19,23,25 28:5
29:11,16,17 30:2,2
91:15,19,20
**remain** 18:18 66:20
**remaining** 52:2
**remarks** 35:10
37:12 75:18
**remember** 40:1
66:23
**removal** 32:13
**removing** 33:9,22
**renegotiating** 61:16
**renewal** 37:11
**reorganization**
30:24 38:14 52:5
52:16 58:7
**reorganized** 52:12
**replace** 56:16
**replaced** 56:16
**reply** 14:18 25:5
26:25 29:3 42:10
42:17,17 61:5
62:19 63:16 66:3
**report** 12:16 43:16
48:22 89:8,12,17
90:15
**representative** 84:7
**represented** 66:15
67:21 70:24
**representing** 44:7
76:4
**represents** 18:25
53:14 66:18,19
**request** 30:5 70:21
84:16
**requested** 11:25
15:15 17:1 20:25

21:4 27:19,23
73:11
**requests** 83:17
**required** 21:2
**requirement** 21:8,9
**requires** 78:1,2
**reserve** 27:2,16
35:19 36:18 37:7
51:9
**reserved** 28:23
35:25 36:21
**resetting** 83:1
**resolution** 14:3
15:17 21:4,5 25:9
32:2 72:19,22,23
**resolve** 20:18 40:13
67:7 78:23 79:1,6
**resolved** 23:19 27:7
27:8,20 28:8,13
78:23 79:1
**resolves** 15:3
**resolving** 90:10
**resonate** 74:8 75:16
**respect** 18:12 23:19
23:22 25:10,13,15
27:5 28:7 29:8
31:5,12 32:15
35:24 38:3,11
52:10 53:13,21
55:16 64:25 66:14
66:21 69:25 77:4
78:8,15 82:2 83:8
89:6
**respects** 19:17 81:16
**respond** 73:25
**respondent** 27:22
28:1
**respondents** 27:7,11
27:19
**response** 14:17
27:24 28:7
**responses** 25:2,3,13
26:18,22 27:1,6,7
27:8 28:11,15,15
**responsibility** 44:10
**responsive** 33:8,15

**rest** 47:12 69:10
76:4
**restarted** 39:20
**restate** 69:2
**restating** 66:11
**restructuring** 63:8
**result** 11:24 20:14
25:6 27:18 29:11
47:25 54:19 55:22
56:7,9 57:7 80:22
**resulted** 55:1,1
57:24
**results** 85:4
**retention** 46:21
**retire** 50:18
**Retired** 13:3
**retiree** 74:23
**return** 77:13
**review** 12:5 16:4
28:9 29:14 34:17
41:20 61:8 62:22
64:4 82:16 89:1
**reviewed** 16:24
34:17 35:5 41:22
42:20 83:22
**reviewing** 33:9
**revised** 18:2
**reward** 77:11
**re-direct** 49:21,22
**re-upping** 66:8
**Rick** 18:25
**right** 17:25 20:20
22:10,16,20 23:12
25:16 29:15 31:15
31:22 37:5,5 38:24
40:9,12,24 41:7,9
51:3 61:18 65:11
65:18,22,23 67:1,6
67:23 74:17 75:5
89:13
**rights** 18:20 28:23
35:20 36:18,21
37:8
**risk** 40:14
**ROBERT** 1:22
**robust** 54:1 59:11

**role** 50:13 81:1
**roll** 12:3 75:11
**rolling** 12:12 34:17
34:19
**Ronald** 18:24
**Rosen** 29:24 30:4,9
36:11,16,24 37:4
**Rosenberg** 88:22
**Rosen's** 31:9 35:10
**rough** 11:10,15
**roughly** 16:16 53:14
**rule** 21:1,12 80:14
**ruled** 35:17
**ruling** 77:5
**rulings** 66:4,6 76:10
91:13
**run** 17:16 56:17,18
56:22 85:25
**running** 53:2

---

**S**

**S** 8:2,19,24 9:16
11:1 91:8
**sacrifice** 74:20
**sake** 28:4 33:25 73:6
**salaries** 66:19 77:20
**salary** 51:20 66:18
81:23 86:14 87:3
**sale** 2:5,6,6 3:5,6,6
5:15,15,16 18:5
19:5,11,16,16,22
19:25 20:4,9,15,20
21:2,9,21,22,24
23:4
**satisfaction** 78:15
**satisfied** 45:6
**satisfies** 85:17
**satisfy** 44:20
**savings** 60:12 88:14
**saw** 38:18
**saying** 28:4 45:13
47:12
**says** 17:17,18 22:7
39:1,1 46:7,23
48:22 68:18 71:21
72:1 74:12

scenes 89:6
schedule 67:19
scheduled 12:2
science 47:20 54:11
scope 27:14 37:17
    85:6
screw 88:7
seal 41:1
Sean 10:7 38:21
search 34:10,11,14
searches 33:16,17
seat 43:24
seated 41:13
second 6:5 11:24
    14:19 41:17 43:17
    45:3 46:4 50:1,25
    53:19,19 55:6
    56:24,25 81:4 84:5
    84:11,24 88:14
secondly 17:14
    84:14
Section 2:14,20 3:23
    4:10,17,24 5:6
    6:12,25 7:7,14
    84:15
Sections 2:2 3:2,13
    4:5 5:12,23 6:18
securities 10:3 33:8
    38:22
Security 37:19
see 39:1 51:19 68:17
    73:4 83:17 89:4
seek 19:21 25:17
    26:10,12,13 27:5,9
    27:10 28:13
seeking 13:23 15:17
    25:9 27:15 28:5
    29:3,6,9,16 30:3
    81:5
Segal 9:18,18 12:19
    12:19
select 67:12
selected 16:16
selection 34:13
selective 35:21
self-dealing 84:1

sell 20:6 91:16
semiannual 73:2
senior 85:25
sense 44:21 48:5
    52:14 54:3 67:9,25
    68:9 69:4 73:3
    75:9 77:11,17 87:3
sensitive 56:3,4
sentence 14:22,24
    15:1
separate 28:14
    35:24 79:18 84:22
separately 26:20
serious 72:21 73:20
    83:15
seriously 21:11 35:5
served 28:20 86:16
set 20:23 29:17
    45:12 46:17 48:7,8
    49:4,16 61:21 62:7
    62:21 63:22 84:1
    86:9
sets 21:20 82:14
setting 19:16 48:16
    84:13
settle 13:9,9
settled 14:12
settlement 13:5
    14:17 15:5 32:22
    32:24 34:9 35:14
    35:15 38:6 39:19
    78:13
settling 13:7
seven 26:22 48:15
    59:8
seventeen 27:5
    28:12
seventy 26:22
seventy-three 26:19
Shapiro 7:24 92:4
    92:12
share 78:7
shared 74:19 88:11
Sharona 7:24 92:4
    92:12
Sheehan 50:1,5

Sheehan's 44:25
    58:13
Shelby 14:16 17:5
    18:2
Sheldon 8:19,24
    15:6
Sherman 30:15
shop 68:11,12
short 35:17 66:7
    73:1 88:1
shortfall 52:9
shortly 69:23
short-term 81:6,24
    83:2 86:21
shot 58:18
shown 84:10
shows 81:18,19
side 77:14
sight 78:14
sign 59:4
Signature 92:10
signed 14:24
significant 32:18
    47:7 73:11 82:12
    85:21
similar 37:15 38:3
    66:4
Similarly 35:19
Simon 9:2 66:2
simply 27:2 41:22
    68:6,10,19 70:8
    75:13,23 76:1 83:7
single 16:9,19
singular 15:25
sit 21:13 61:6 63:9
sites 16:7
sitting 77:25
situated 16:17,20
situation 36:24 74:6
    74:8 75:5
six 15:13 16:15 25:2
    25:2,13,24 48:15
    51:23 69:15 73:15
    79:12,21 81:7
    84:23 85:16
sixteen 76:14

sixteenth 11:9
Sixty-eight 26:3
Skadden 8:3 11:8
    86:15
Slate 8:3 11:8
slightly 18:2
slowing 71:24
smaller 34:15 78:10
    78:16
smell 60:1
Social 37:18
solely 24:8,10
somebody 68:23
someone's 53:7
    77:17
somewhat 53:20
    87:9
sorry 22:1 40:4
sort 11:15 15:25
    30:25 32:2 47:18
    54:6,16 55:2 61:10
    68:12 74:21
sorting 61:14
sorts 83:14
sought 12:23 27:13
    68:22
sound 92:6
sources 49:7,10
SOUTHERN 1:3
Southfield 8:22
so-called 46:19 81:4
space 16:17,17
speak 47:17
speaking 70:13
    74:11 78:17 80:4
special 60:11
specifically 20:16
    22:17
spectacle 79:22
spectrum 53:23
spell 44:1
spent 30:14 62:25
spinoff 65:17,21
square 8:5 16:16,17
stabilization 59:17
stabilize 58:21

**stakeholder** 53:6
68:10
**stakeholders** 52:22
54:9,18 55:3 57:23
57:23 58:3 59:19
64:23
**stand** 25:7 43:22
50:8
**standard** 68:23
85:17
**standards** 85:10
**standing** 63:16
84:17
**standpoint** 67:8
**stand-alone** 73:3
**start** 33:6 45:13
60:2
**started** 13:6,11
72:20 76:7
**starting** 25:7
**state** 9:13 12:22,23
54:4,9 58:18 62:7
72:2 76:22
**stated** 17:3
**statements** 32:4
69:11
**STATES** 1:2
**state-of-the-art**
16:19
**status** 71:6,7,12
**statutory** 16:25 31:3
31:19 32:25 59:3
62:23 64:4,11
80:18
**stay** 3:19,20 6:8,9,22
6:23 12:15,22,24
13:15 21:1 29:21
29:22,25 30:4,11
31:12,19,20,21
32:4 36:15 37:2
72:10
**steady** 54:4,9 58:18
62:7
**steel** 8:13 18:19
21:17,23 22:13,25
**steelworkers** 69:10

69:12,24 70:4 71:3
71:10
**step** 49:23 69:15
**stipulation** 17:5
18:3 39:17
**stock** 24:9,19 86:8
**stocks** 24:8,10
**stone** 72:15
**strategically** 16:6
**strategy** 16:1 34:9
45:25 52:3
**streamline** 16:2
35:11
**Street** 9:4,13
**strengths** 16:3
**stress** 82:1
**strongly** 74:9 75:16
89:20
**structural** 42:18
**structure** 51:15,18
65:9,19,21 79:14
81:21 82:5 86:8
**stuff** 70:7
**subject** 2:23 4:2,13
4:20 5:9 6:15 7:10
7:17 13:14 18:18
18:22 20:11 21:21
22:7,13 26:10
32:13,14 33:9,20
35:16 39:13 40:2
42:24,25 43:18
44:11 51:1 53:11
66:3 77:10 81:12
**subjects** 31:4 33:21
**sublease** 15:21
**submission** 76:4
**submit** 32:6 67:22
68:1 89:2
**submitted** 17:23
19:19 21:10 25:15
27:4 29:2 48:22
50:24
**subscribed** 14:13
**subsequently** 73:10
**subset** 34:15
**substance** 39:16

65:3
**substantial** 56:15
59:8
**substantiating**
19:22
**substantive** 2:20
3:23 4:10,17 5:6
6:12 7:7,14 25:22
**subtraction** 62:11
**success** 75:20
**successful** 31:7
60:23
**successfully** 80:2
**sufficient** 34:7
**suggest** 73:4,23
**sum** 39:15 65:3
**summarize** 41:6
**summarized** 26:24
28:12
**summarizes** 25:6
**summary** 24:12
38:20 42:11
**summer** 41:21
**Suozzi** 8:12 21:17
**superseded** 24:2,4
**supervised** 80:1
**supervisors** 87:4
**supplement** 30:8
41:18,19,20 42:2
43:17 50:2,25
53:19 54:23 55:5
79:15 81:4
**supplemental** 6:6
30:7 46:5
**supplied** 87:23
**supplier** 56:2
**supply** 54:16
**support** 26:3 33:13
43:17 50:1,24
63:21 74:6 87:15
89:25
**suppose** 75:21 77:21
78:22
**supposed** 85:9 89:11
**supposedly** 46:20
**sure** 22:2 23:8 40:15

72:10 84:8 88:6
**surely** 73:1
**surrounding** 34:24
**survey** 49:9
**survived** 24:5
**suspect** 57:10,11
**suspended** 78:5
**sworn** 43:25
**system** 74:15,21,21
**Systems** 15:12 20:8

---

**T**

**T** 91:8 92:2,2
**tables** 42:13,14,16
**tailored** 85:8
**tainted** 83:25
**take** 11:11 14:7
21:10 36:19,20
52:15 58:18 60:9
64:2 71:23 74:16
86:19
**taken** 49:13 53:7
62:16,22,24 74:11
**takes** 35:7
**talk** 45:14 57:9
73:19
**talked** 60:4 61:2
64:8 76:8
**talking** 22:4 30:14
60:15 66:23 73:15
**talks** 51:18
**target** 45:14,15,22
45:22,22 46:18
47:24 48:8 49:12
49:13 55:19 59:15
63:23 84:15
**targets** 46:24 49:16
58:24 59:14,19,20
60:21 62:21 63:15
63:20 82:13,15,18
83:1,25 84:11
87:17 88:15
**team** 56:6 64:13,22
65:14 87:9
**technical** 16:7,9,12
16:19

technological 16:13
tell 40:16 46:16
    48:15 57:20 58:24
    62:8,18
telling 63:17
temporary 56:17
ten 61:6,7
tenant 15:2
tends 77:12
ten-day 17:23 20:25
    21:7
term 71:9 73:2
    86:17,19
terminate 20:20,21
termination 88:1
terms 11:21 15:10
    21:2,21 22:7,24
    30:17 32:22 34:10
    39:2 46:3 53:6
    61:10 63:4 67:17
    69:23 75:8 80:8
    81:23
test 60:1 82:19
    83:13 85:2
tested 82:8
testified 57:16 62:21
    87:17
testify 50:16
testimony 43:13
    47:9 51:4 54:23
    55:7 58:11,14
    76:13 87:14
tests 84:24
thank 13:18,19 18:4
    19:3 23:11,17
    25:20 29:19 39:4,5
    41:11,15 43:7,23
    49:21 50:7 51:6
    65:24 70:11 76:2
    81:1,3 89:1 90:16
thankfully 22:22
theirs 65:10
thereabouts 55:10
thing 40:1 56:13
    63:7,8,9,12,13
    76:22 77:25 89:4

things 11:11 37:18
    54:10 58:9 60:23
    62:10 63:9 69:21
    76:7 83:14
think 12:15 15:4
    16:24 17:15,17
    18:16 21:6,14 22:3
    22:11,25,25 23:5,9
    27:12,19 29:8
    38:15,16 41:2
    47:11 48:3,10
    54:10 57:25,25
    58:8 59:13,24 60:8
    60:14,18 63:7,13
    63:16,20,21 64:18
    65:15,16 66:12,20
    66:22 67:7 72:16
    73:14,25,25 76:23
    77:11 79:3,8,20
    80:15,25 82:11
    83:4,14,24 85:18
    86:3,15,18 87:12
    89:9,14
third 11:24 37:17
    86:10
thirty 59:22 63:18
thirty-eight 16:18
thirty-five 16:18
Thirty-one 26:6
thirty-seven 57:14
    72:4
thirty-three 86:1
Thompson 11:17
thought 37:3 47:18
    70:7 71:3,3 79:15
    86:16
three 26:22 28:2
    43:14 46:15,16
    47:23
tie 58:20 84:21
tied 86:7 88:5
tie-in 86:4
tight 55:18
time 23:2 27:16
    30:14 32:17 35:8
    35:19,22 39:17

40:23 45:10,20
    47:7 48:14 50:3,16
    51:9 54:2,16 56:18
    57:11,11 59:13
    60:19 62:22,24
    63:1 65:17,21 66:9
    66:13 67:20 69:6,6
    69:16 70:6,15,18
    72:3,22 74:24 77:9
    79:21 80:8
timeliness 27:3
timely 25:2 26:7,22
    26:23 28:22 30:6
times 8:5 46:15,16
    47:23 55:23,23
timing 72:14
today 15:4 19:2,10
    19:21 21:13 23:16
    25:7,9,18 29:16
    30:16 31:18 33:6
    38:6,23 41:20,24
    44:7,11 50:9 58:23
    58:23 60:4 78:17
    81:8 82:18 86:12
today's 40:16
Togut 9:18 12:19
told 33:23 71:19
Toll 8:19,24 15:4,6,6
tone 38:17
total 51:21,21,23
    80:24 85:19
totaling 45:23
totally 67:16
touch 64:7
tough 74:13
Town 8:21
track 23:22 25:8,14
    26:20 27:2 28:14
    28:23 32:22,24
    61:15
tracking 63:11
tradeoffs 53:9
transaction 14:13
    15:11,12,19 16:25
    19:11 20:7,11
    82:11

transactions 16:23
Transcribed 7:24
transcriber 92:4,10
transcript 92:5
transformation 16:1
    57:9 60:17,22
    61:13,22 62:12
    72:23
translating 35:6
    62:4
treated 78:19,20
    82:24
treating 81:25 82:10
Tremendous 56:21
trickle 68:4
tried 13:9
triggered 40:10
triggers 49:4 83:24
    84:13 86:22 87:6
    87:11
trucks 70:6
true 59:25 62:19
    63:3,5
truly 23:16 86:24
    87:18
trust 24:7,17 89:5
Trustee 2:16 5:2 7:3
truth 71:8 72:17
    76:17 77:8 78:22
try 11:11 13:1 20:6
    32:8 43:8,9 73:24
    79:10
trying 14:2 30:25
    40:13 52:8,14
    53:10 58:21 59:18
    61:10 76:21 79:4
turn 14:11 23:18
    25:21 46:4 88:8
turned 34:11 55:8
turnover 14:1
turns 36:11
twenty 25:25,25
    45:23 48:4 51:20
    57:14 72:4
twenty-five 48:24
    59:23

**twenty-one** 52:1
**twenty-six** 53:2
**two** 15:16 17:4
19:24 24:3,4 38:25
47:14 49:6 51:12
52:6 56:11 65:2
73:11 76:21 88:10
**twofold** 82:11
**two-step** 19:10
**type** 73:12 77:6 83:1
83:10 88:3
**typed** 92:13
**types** 86:6 87:14
**typographical** 42:14

_____
**U**
**U** 60:1 61:1 62:12
64:3
**UAW** 9:3 56:10 66:2
66:6,15 67:21 69:7
71:21 72:1 73:1
78:16,25 84:19
**UAW's** 42:7 68:2
**UG** 60:10 61:1
**ultimately** 20:7 53:9
56:20,22 57:12,14
57:18 63:13 82:8,9
**uncertain** 66:16
82:17
**uncertainty** 67:1,22
72:3 75:9 82:23
**uncontested** 14:12
25:10 29:3
**uncontroverted**
80:16
**underlie** 15:19
**underlying** 31:13
32:20 59:23 84:12
**underscore** 69:12
75:25
**underscores** 70:9
**understand** 27:12
44:9 55:25 56:19
58:8 59:16 60:19
61:23,24 72:8
73:17,20 82:19

**88:8**
**understandably**
73:14
**understanding**
42:22 44:17 47:5
52:24 79:9
**understandings**
72:13
**undertaking** 44:13
68:16
**undertargeted**
46:25
**undocketed** 26:24
28:19,21
**unexpired** 2:10 3:10
3:17 5:20 6:3
13:25 19:8
**unfairly** 85:8
**unfold** 75:3
**unfolds** 75:3,4
**unfortunate** 23:4
**unfortunately** 68:24
74:3 75:4
**union** 39:7 60:12
64:1 68:16,19 73:4
73:19,22,22 74:6,7
74:12 75:2 83:14
83:15 84:8
**unions** 42:4,5 56:11
56:21 58:3 66:14
67:23 69:15 73:10
73:14 78:10,16
79:23 82:3,25
84:18 88:13,23
**union's** 69:2 70:19
**United** 1:2 8:13
18:19
**units** 71:1
**University** 10:11
**unopposed** 17:3
29:16
**unreasonable** 47:18
**unrelated** 39:9
**unresolved** 23:21
28:15 69:3
**unsecured** 44:15

47:15 84:9
**untimely** 2:23 4:2
4:13,20 5:9 6:15
7:10,17 24:10
**un-competitively**
76:20
**updated** 36:14
**urge** 89:20 90:13
**use** 19:5 21:11 34:20
36:4 37:16 45:9
49:9 71:8 74:22
76:17
**usually** 73:12
**USW** 18:16,19 20:11
20:13,19 21:6,14
78:11,12 79:3,5
**USW's** 21:15 42:7
74:1
**U.S** 1:13,23 42:5
56:13 86:5
**U.S.C** 2:2,14,20 3:2
3:13,23 4:10,17,24
5:6,12,23 6:12,25
7:7,14

_____
**V**
**valid** 84:16
**value** 28:3 54:19
57:13,13,18 58:5,6
64:23 77:14 80:23
80:24 87:21
**variance** 88:12
**variances** 60:16,17
**variety** 31:4 49:10
64:14
**various** 37:21
**versus** 75:15
**vet** 59:19
**vetted** 59:1 80:1,17
**vetting** 82:16,21
**view** 16:12 26:2
30:18 33:5 53:12
55:17 57:5 58:12
58:12 69:2 72:16
79:5 87:7 90:2
**viewed** 81:17

**viewpoint** 67:13
**views** 31:2 67:9 83:9
**vis-a-vis** 36:14 54:1
**volume** 56:2
**volumes** 56:8
**voluntary** 32:11
34:5
**vote** 74:14

_____
**W**
**Wachovia** 12:15,20
13:1,4,8
**Wachovia's** 13:10
**wages** 51:20 68:14
68:17 69:7
**waiting** 39:20
**waived** 21:1,8
**waiver** 20:21 21:23
35:21
**waiver's** 21:2
**waiving** 20:11
**walked** 58:14
**wall** 18:24 72:15
**want** 15:24 17:4,9
22:2 23:7,12 36:23
38:19 50:4,17 59:5
60:4 61:23 62:3,7
63:10,24,25 66:5
69:11 71:25 78:18
78:18,20 83:7,10
88:6,22 89:4
**wanted** 27:3 30:24
37:24 41:24 64:7
79:23 80:9 88:24
**wanting** 63:1
**wants** 21:14 69:20
69:21 71:15 75:11
83:4
**wasn't** 38:1 54:6
55:13
**Watson** 65:14 86:15
**way** 13:12 23:20
45:5 47:12 49:13
49:16 52:10,14,25
53:11 56:9 61:9
62:1,18 67:8 68:9

73:25 75:3,4 78:20 88:3
**ways** 35:10 87:17
**week** 13:3 32:6 34:20 77:2
**Weiss** 9:2 66:2
**went** 11:23 63:17
**West** 9:4
**we'll** 11:10 18:21 21:6 32:8 34:4,18 37:17 39:23 40:15 42:24 43:10 53:8 61:12 76:4 89:1
**we're** 12:2 13:7 14:2 15:17 19:10 25:9 28:5 29:3,6 31:6 33:2 34:7,20 35:4 36:4 37:9 39:19,20 40:11 41:13,20 43:9 52:18 53:21 55:19,21 56:1,3,3 58:9,21 59:18 60:23,24 61:10,14 62:19 63:2,18 64:24 70:2 74:13 74:14 78:10,23 79:4,22
**we've** 13:8 19:10 20:25 22:21 24:7 26:21 27:4,20 31:9 33:18 35:5,19 36:15 37:13 40:1 41:4 42:15,16 45:6 52:16 53:7 61:2,4 61:5 62:4 64:1 71:10 72:15 74:22 78:5 80:2
**who've** 70:1 87:23
**wide** 49:10
**willing** 23:4
**willingness** 83:10
**Wilmington** 24:7,17
**wish** 51:2
**withdraw** 28:6
**withdrawal** 15:5 19:24

**withdrawn** 15:7 17:7 28:4
**withdrew** 18:8,9 28:1
**Witness** 43:25 44:3 48:25 49:6,20 91:4
**WM** 8:8
**wondering** 40:22
**word** 14:25,25 33:11 33:16,19,20 34:10 34:14 58:16 71:23
**words** 45:9 66:20
**work** 16:15 32:5,14 32:19,22 33:11,23 35:4,7 37:9,17 56:15 60:14 87:12 87:22
**worked** 46:18
**worker** 69:1
**workers** 8:13 18:19 21:18,23 22:13,25 66:24,25 74:4 76:19 90:8
**workforce** 67:12 68:5
**working** 17:21 31:7 44:21 61:20 63:9 64:21,22 67:2 90:14
**works** 46:21
**world** 16:10 61:24
**worlds** 76:21
**worse** 73:22 75:15 75:15,15 83:3 87:4
**worth** 59:9
**wouldn't** 73:5,7,22 73:23
**written** 69:11
**wrong** 73:22 88:24
**Wyatt** 65:14 86:15

**X**

**x** 1:5,12 46:23,24 91:2,8

**Y**

**yeah** 65:20 88:8

**year** 45:18 50:13 58:16,25 64:3
**years** 48:15
**yesterday** 30:15 61:19
**York** 1:3,15,15 8:6,6 8:15,15 9:5,5,14 9:14,20 10:5,5,12

**Z**

**zero** 55:14 70:25

**#**

**#7200** 6:6

**0**

**05-44481** 1:4
**07** 62:13

**1**

**1** 11:16 42:21 43:1,5 46:4 80:7
**1,702** 29:5
**1,705** 26:8
**1-21** 91:10
**1.2** 24:20
**10** 9:12 23:23 33:12 33:14,21 44:9
**10.4** 26:7
**10:15** 1:18
**10:58** 41:12
**100** 48:7
**100,000** 20:23
**10003** 10:12
**10004** 9:14
**10018** 8:15
**10019** 10:5
**10036** 8:6 9:5
**10119** 9:20
**105** 4:5 6:18
**1063** 29:22
**108** 55:10
**11** 2:2,14,20 3:2,13 3:23 4:10,17,24 5:6,12,23 6:12,25 7:7,14 16:5 25:21 30:19 38:9 52:10

54:8,15,20 55:20 65:1 73:9 77:10,22 78:3 82:15
**11:15** 40:24 41:10
**11:29** 41:12
**110** 24:12
**1113** 78:1,4
**1114** 78:2,4
**113** 10:11
**117** 24:19
**12** 29:20
**120** 55:11
**122** 28:15
**124** 45:16 62:9
**124.1** 60:3
**1285** 10:4
**13** 40:19 41:17
**135** 70:23
**1350** 8:14
**14** 39:7 42:12,18 91:16
**150** 46:7,14 47:3 48:6
**16** 91:20
**1605** 29:8
**17** 9:13
**17,900** 24:18
**18-S** 9:11 44:8
**1824** 25:24
**19** 91:15,19

**2**

**2** 12:7,7 51:16 52:9 57:6 65:6 81:18 91:15,21
**2:18** 90:18
**20th** 12:12 14:9
**20,000** 56:13
**200** 44:24 53:23 55:2 55:14 57:4,5,7
**2000** 8:21
**2002** 2:3 3:3
**2005** 54:4,13
**2006** 16:14 44:23 45:3 51:13 53:19 54:5,13,22,25 55:6

56:12 57:21 58:10
64:14
**2007** 1:17 25:1 40:20
41:19 46:12 60:20
60:21 64:2 67:18
81:7 90:17 92:9
**2011** 60:20
**21** 25:1 42:21 43:2,5
64:10
**21st** 26:17
**213** 42:3
**22** 1:17
**221** 25:10
**23.1** 29:7
**236** 23:25 24:12 25:7
**24/7** 64:22
**25** 91:16
**250** 48:2
**26th** 12:1
**26.9** 26:1
**27** 91:19 92:9

**3**
**3** 12:7,9 22:6
**3.4** 59:3
**30th** 17:17
**3007** 2:15,21 3:24
4:11,18,25 5:7
6:13 7:2,8,15
**31** 17:18 91:20
**33.2** 25:11
**330** 9:4
**3467** 11:17
**347,000** 16:16
**363** 2:3 3:3 4:5 5:13
6:18
**363(b)** 3:14 5:24
82:1 84:15 85:1
**363(c)** 81:14
**365** 2:3 3:3 5:13
**365(a)** 3:14 5:24
**365(d)** 3:14 5:24
**37.8** 28:17
**375** 47:22
**387** 46:8 47:3
**387.4** 46:8

**4**
**4** 12:14
**4th** 9:13
**4.5** 61:16
**40.2** 24:14 29:12
**400** 49:9
**42nd** 9:4
**43** 91:10
**44** 91:5
**44.6** 29:9
**4718** 12:9
**48075** 8:22

**5**
**5** 11:16,18
**500** 53:1 57:15
**502(b)** 2:15,20 3:23
4:10,17,25 5:6
6:12 7:2,7,14
**5229** 12:10
**545** 57:8
**55.1** 26:11
**576,000** 33:7,25 35:7
**5987** 11:19

**6**
**6** 11:16,19 14:22
42:25 43:16
**6.5** 26:4
**6.8** 12:21 13:7
**6004** 2:3 3:3,14 5:13
5:24 21:1,12
**6006** 2:3 3:3,14 5:13
5:24 21:1,12
**6030** 11:20
**61.7** 26:9
**663** 9:12 44:8
**67.7** 29:6
**6742** 18:6
**6962** 23:24
**6968** 25:23
**6988** 19:14
**6990** 13:22

**7**
**7** 13:21 43:1 49:25

**7016** 18:8
**7111** 14:14
**7128** 30:7
**7170** 18:8
**7197** 18:9
**7200** 41:19
**7207** 14:15
**7249** 18:10
**7324** 42:7
**7325** 42:7
**7327** 42:8
**7335** 42:9
**7344** 30:8
**7371** 14:19

**8**
**8** 14:14 43:1 50:25
**8.2** 25:4
**800,000** 13:9
**832-S** 9:11 44:8
**88** 91:21

**9**
**9** 18:5 22:4
**9th** 39:18
**9,300** 24:15
**9.8** 20:9
**90,000** 16:17
**9014** 2:3 3:3 5:13
**97** 29:6