## EXECUTIVE SUMMARY
### Regarding Delphi Idle Floor Space Inventory Accounting Fraud
### & Azimuth/Mothershead Whistleblower Complaint

This matter stems from 2001, when Delphi disclosed to me that it suffered from material weaknesses in its internal controls and governance processes related to the management and reporting of its divisional real estate and facility assets. My information is derived from my personal observations of Delphi and independent research; from disclosures by the SEC and FBI; from Delphi's own multiple admissions of misconduct made in 2006; and from Delphi's retaliation against us in 2002.

I have prepared an extensive 57-page Personal Statement that details the information and events that, in summary, give me reasonable basis to believe:

A) Delphi Corporation and certain of its officers and executives continuously and fraudulently manipulated Delphi's idle facility floor space inventory accounting processes, and intentionally and materially misrepresented its related facility financial and floor space vacancy data.

B) On a monthly basis, Delphi executives took, and directed others to take, a series of actions to artificially maintain and report a false "normal level" of factory floor space utilization, actions that were intended to help reduce the financial impact of Delphi's facility overcapacity problems, and conceal evidence of Delphi's deteriorating financial condition.

C) During this period, Delphi executives and others were publishing management reports indicating that Delphi was experiencing "normal" facility floor space utilization levels that included a "normal" 10% floor space vacancy rate. In fact, Delphi's Facility Services Group (FSG) disclosed that these reports were the result of fraudulent misrepresentation of Delphi's internal data, and that Delphi Corporate officers and/or Divisional executives:

   1. Made explicit statements that they expected Delphi FSG to report an aggregate divisional floor space vacancy rate not to exceed 10% of total floor space, on a month to month basis;

   2. Directed and/or made explicit statements that they expected Delphi-FSG to take all steps necessary to maintain that 10% vacancy rate;

   3. Established a tone, environment, expectations and/or explicit directives that compelled Delphi-FSG to directly manipulate and misrepresent divisional floor space and vacancy inventories, in order to report an artificially maintained vacancy rate of 10%, on a continual monthly basis.

D) Delphi-FSG further disclosed that many Delphi Officers and executives believed Delphi was "40% heavy" with excess and idle facility floor space, a facility overcapacity problem far exceeding the 10% facility floor space vacancy Delphi was currently and fraudulently publishing. Delphi-FSG disclosed that the "40% heavy" phrase originated with CEO J.T.

1

Battenberg, and that this phrase and number quantified a problem that was a topic of discussion and written reports between EVP-HR Weber, VP-Facilities Healy, Director-FSG Jaffurs, and Manager-FSG Schwab and others.

E) In manufacturing accounting, it is a GAAP-approved practice to temporarily book overhead expenses directly related to the manufacture of a product as a component cost of an inventoriable asset, rather than as an expense. Direct overhead expense attributable to production does not appear on the company's income statement until the finished-goods inventory is sold, under GAAP's revenue-expense matching principle.

F) Thus, a portion of direct overhead costs such as facility floor space is not reflected as an expense on the income statement during the period in which they are incurred. Rather, these expenses are accounted for as a product cost and captured in the cost/value of inventory and carried on the asset side of the balance sheet until sold, and the company receives revenue.

G) U.S. GAAP, ARB 43 and SFAS 151 do place limits over this feature of manufacturing accounting. These regulations and advisories state that only facility costs associated with "normal levels" of production may be suspended as an expense and held as an inventoriable asset, with overhead expense recognized on the income statement only when the revenues associated with those costs and products are received.

H) ARB 43 and SFAS 151 specify that when idle facility expense reaches "abnormal" levels — such as Delphi's 300% difference between reported and actual idle facility vacancy rates — GAAP, ARB 43 and SFAS 151 dictate that the expense associated with those idle facilities must be recognized as an non-direct and/or G&A expense in the period in which the costs were incurred, and not calculated as part of "normal" expenses absorbed into the inventoriable goods.

I) Thus, Delphi leadership believed that up to 40% of Delphi's floor space was idle, vacant, unutilized or excess — an amount that represents an "abnormal level" of production and facility overcapacity up to four times greater than the "normal" 10% rate Delphi was then disclosing to shareholders and financial analysts.

J) Delphi's disclosures indicate Delphi was actively misrepresenting facility floor space inventory data in order to "game" regulations concerning normal and abnormal levels of production capacity, in violation of GAAP, ARB 43, its successor SFAS 151, and many other fraud and securities laws.

K) Delphi's fraud is material. Delphi's "40% heavy" idle facility overcapacity represents some 40million square feet of idle floor space, a shareholder capital asset Delphi itself values between $400million to $800million, and which generates facility expenses of $440million annually, by Delphi's internal estimates.

L) By manipulating and misrepresenting Delphi's facility floor space vacancy rate, Delphi was able to continue to report a "normal level" of facility utilization, and thus avoid triggering an "abnormal level" event, a continuing current-period expense item or one-time Unscheduled

Material Event with negative impact of up to $440million. Instead, Delphi was able to report reduced expenses, increased inventoriable assets — and increased profits — with up to $440million in benefit to each area.

M) During a time when Delphi was struggling to post a $300million profit (2002), perpetrating this fraud allowed Delphi to materially overstate its profits, overstate its assets, understate its expenses, and hide its untenable cost structure by up to $440million — for a fraudster, the very best of all possible worlds.

N) Delphi's fraudulent accounting allowed the company to delay reporting to its shareholders and financial analysts news of its rapidly deteriorating financial condition and support its stock price. Importantly, this fraud also allowed Delphi to avoid financial disclosures that could have negatively affected the pricing premiums it commands under fixed-price or cost-plus contracts with customers like General Motors. If Delphi's costs were suddenly lower because a large portion of its facility overhead could no longer be charged to ("absorbed" into) the product, Delphi would not be able to charge as much for its products, it would recover fewer of its expenses, and its profits would be reduced.

O) Delphi's actions date back to 2001, and may have begun as early as 1999 when Delphi was still owned by General Motors. In fact, the many of the processes and practices ongoing inside Delphi today were first GM processes and practices. Since Delphi went public in 1999, GM and Delphi, and GM's Worldwide Facilities Group and Delphi's Facility Services Group, have maintained a close ongoing relationship. We thus believe GM may face liability in this matter.

P) Mothershead later learned that Delphi's 2002 conduct was perpetrated by the same Delphi executives who have admitted to the SEC to having committed accounting fraud, and this conduct occurred during the same time period Delphi admitted to the SEC it had perpetrated the precious-metals and computer-purchase frauds with BBK and EDS.

Q) At the time, Mothershead only knew and understood Delphi was misrepresenting its floor space data. He did not know about or understand the technical issues of full-absorption accounting, over-absorption of fixed overhead, or GAAP or ARB 43 regulations.

R) When Mothershead brought to the attention of Delphi's officers and executives in 2002 the information that he did know – that data was being manipulated -- Delphi did have full knowledge of the implications of Mothershead's disclosures, even if Mothershead did not. In response, Delphi swiftly began to illegally conspire to cover-up, contain, conceal and suppress further disclosures of Delphi's fraudulent accounting practices by Mothershead, in violation of The Exchange Act of 1934.

S) Mothershead brought his recommendations and concerns in detail to one Delphi Officer in particular, including Mothershead's belief that Delphi was possibly violating Sarbanes-Oxley and The Exchange Act of 1934. The Delphi Officer responded that Delphi did not have any of the problems that Mothershead raised; that Delphi was at no risk of violations; that there were no problems related to Delphi's facility overcapacity; that Azimuth and Mothershead's

work was not valuable and not helpful to Delphi; that there was no way Delphi Corporate was prepared to take any action to limit Delphi Divisions' authority related to its facilities and real estate; and that under no circumstances was Delphi prepared to act on or even acknowledge Mothershead's observations, recommendation and concerns. "We're Delphi," this officer stated. "We can do whatever we want to do. We don't have to listen to you or any other consultant for any reason."

T) Delphi and its employees subsequently committed intimidations, harassment and illegal retaliations against Mothershead as an individual engaged in protected activities in 2002, in violation of Sarbanes-Oxley Act of 2002. Mothershead was the subject of intimidating personal threats by Delphi FSG leaders; Delphi Purchasing threatened Mothershead and his business with lawsuits, back-billing and harassment by law enforcement agencies, and threatened and instigated an extensive contract audit of Azimuth's work; Delphi Legal threatened legal retaliation and stated that Mothershead was effectively blackballed from further work from Delphi, subsequently removing Azimuth and Mothershead from Delphi's approved vendor list only a few months after the Delphi-Azimuth Agreement was signed.

U) During this time, Delphi-FSG made false promises to fraudulently extract additional work from Mothershead. Ultimately, using its undue economic influence over Mothershead by stringing him along for 10 months for fees due him – his sole source of income -- for work Delphi had commissioned him to undertake, Delphi was able to defraud Mothershead and coerce him to sign the Delphi-Azimuth Agreement, a contract created for the explicitly illegal purpose of furthering and concealing Delphi's idle facility accounting fraud. Mothershead signed the Agreement, under extreme financial and emotional duress, in October 2002.

V) During this period, Mothershead learned that certain Delphi-FSG staff had been demoted and had lost their business authority as a result of their involvement with Mothershead.

W) Today, Delphi continues to illegally and fraudulently misrepresent its idle facility floor space today, in 2007, despite its prior agreement with the SEC to cease and desist from such activity in October 2006. As a result:

1. Delphi's present management and Delphi's Board of Directors have failed to establish "a tone at the top" with actions and formal policies that have forced Delphi and its management employees to abandon their fraudulent activities and comply with the law, securities regulations and overall good business ethics.

2. Only an independent outside objective investigator will be able to determine the full nature and extent of Delphi's fraudulent activities. Delphi's present management and Board of Directors have been ineffective in eradicating fraudulent accounting practices after years of Delphi's admitted abuse and illegal conduct, so new honesty and effectiveness cannot be expected.

3. If the allegations detailed in this Settlement Proposal and the Personal Statement Affidavit of Robert Mothershead are confirmed by internal or independent investigation,

the Bankruptcy Court's presumption of the Debtor's continuing possession of the corporate estate will be severely challenged. Confirmation of even some of these allegations will likely indicate that appointment of a trustee is required to displace current management because the Debtor In Possession is unable and unwilling to manage the corporate estate according to the dictates of the Bankruptcy Code, and within the terms of the SEC injunction Delphi settled in October 2006.

X) Mothershead readily admits that he signed the Delphi-Azimuth Agreement, and that this Agreement purports to be a settlement of Mothershead's claims against Delphi. However, there are multiple theories of law Mothershead will depend on in his belief that the Delphi-Azimuth Agreement is void, non-enforceable, or cancelable, including:

1. The Delphi-Azimuth Agreement is void from the beginning. In Michigan, a contract created for illegal purposes or for purposes contrary to public policy is void ab initio. The preponderance of evidence will show that Delphi had ample reason and motivation to defraud, lie to and coerce Mothershead into silence and to contain and suppress Mothershead from making further disclosures about Delphi's securities fraud. Delphi created its untruthful contract for the specific and illegal purpose of furthering its accounting and securities frauds, by suppressing and containing further disclosures by Mothershead that would have revealed Delphi's misconduct.

2. The Delphi-Azimuth Agreement is void from the beginning. Under an alternative legal theory, Delphi not only coerced Mothershead into signing the Agreement through the weight of its undue economic influence over him, but also fraudulently misrepresented itself during the negotiations in order to extract additional unpaid work from Mothershead and convince him that there was no basis to Mothershead's 2002 suspicions and allegations, and there was no basis for Delphi to pay Mothershead the fees he was owed. A contract created by one party to defraud the other is by definition illegal and void ab initio.

3. Delphi has already breached the Delphi-Azimuth Agreement. By committing and then admitting its illegal fraudulent actions, and refusing to renegotiate the Delphi-Azimuth Agreement, Delphi has now made it impossible for Mothershead to continue to remain silent in the face of Delphi's illegal conduct, as required by the Confidentiality Clause of the Agreement. No contract can require another party to undertake illegal conduct. Delphi has breached the Agreement and Mothershead is damaged by that breach. Delphi has already breached the Delphi-Azimuth Agreement. By committing the illegal fraudulent actions I was suspicious of, and then, by admitting to other illegal fraudulent actions of the very same type, Delphi has now made it impossible for me to continue to remain silent in the face of Delphi's illegal conduct, as required by the Confidentiality provisions of the Agreement. No contract can require another party to undertake illegal conduct. Delphi has breached the Agreement and I am damaged by that breach.

4. The Delphi-Azimuth Agreement is cancelable or unenforceable. The written record will show that Mothershead literally begged Delphi to fulfill its promises to him and to pay the fees it owed him. Ten months after he began work, Delphi offered 11 cents on the

dollar and Mothershead was on the verge of defaulting on his mortgage. To the extent that Mothershead signed Delphi's illegal contract, Mothershead did so only as a result of Delphi's fraudulent conduct, and under extreme emotional and financial duress. Delphi's undue economic influence had left him no practical alternative, and he had no practical choice to do otherwise.

The basis for my beliefs is outlined in the 57-page Personal Statement of Robert A. Mothershead, and the ample paper and digital evidence I accumulated in my two-year relationship with Delphi and the four subsequent years since that relationship ended. For purposes of a Whistleblower Claim, I am only required to establish that I have a reasonable basis to believe Delphi has committed the acts of fraud detailed in my Personal Statement and my personal Delphi archive. A read of my Personal Statement Affidavit will answer why the information Delphi disclosed to me allows me to meet that hurdle.

Sincerely,

**Robert Mothershead**
Azimuth North America LLC & Related Entities (ANA+RE)