# MASTER INVOICE #DPH053102R: NOVEMBER 16, 2001—APRIL 30, 2002

|  |  |  |
|---|---|---|
| CLIENT: | Delphi Automotive Systems<br>WW Facilities Attn C. Sumling<br>1450 W. Long Lake Road<br>Mail Code 482-414-230<br>Troy MI 48098 | SHIP TO: Delphi Facilities Svcs Grp<br>Delphi Headquarters<br>Attn: Robert Bator<br>5725 Delphi Drive<br>Troy MI 48098 |

**Azimuth**
Decision Support

Azimuth North America
18530 Mack Avenue, Suite 364
Grosse Pointe Farms MI
48236-3254 USA

Robert Mothershead, CEO

ram@azimuth-na.com T
www.azimuth-na.com F
313 884 5300
313 884 7154
313 475 1682 C

| PURCHASE ORDER | LPS49835 |
|---|---|
| WHO ORDERED | SCHWAB 248-2675688 |
| VENDOR: | Azimuth North America |
| VENDOR #: | 02-710-7130 |
| Date: | May 31, 2002 |

**Description of Services**
Mgmt services of Robert Mothershead
Rate: $3000 per day
Period: 11/16/01-5/31/02

**PERIOD 1:** Nov 16-Dec 6, 2001

| service unit | #units | multiplier | calc days | rate | totals |
|---|---|---|---|---|---|
| Quarter day | 0 | 0.25 | 0.00 | 3,000 | $ - |
| Half day | 1 | 0.50 | 0.50 | 3,000 | $ 1,500 |
| Full day | 5 | 1.00 | 5.00 | 3,000 | $ 15,000 |
| subtotals | 6 | | 5.50 | 3000 | $ 16,500 |
| | | | Services this period | | $ 16,500 |

**PERIOD 2:** January 7-31, 2002

| service unit | #units | multiplier | calc days | rate | totals |
|---|---|---|---|---|---|
| Quarter day | 3 | 0.25 | 0.75 | 3,000 | $ 2,250 |
| Half day | 2 | 0.50 | 1.00 | 3,000 | $ 3,000 |
| Full day | 12 | 1.00 | 12.00 | 3,000 | $ 36,000 |
| subtotals | 17 | | 13.75 | 3000 | $ 41,250 |
| | | | Services this period | | $ 41,250 |

**PERIOD 3:** February 4-28, 2002

| service unit | #units | multiplier | calc days | rate | totals |
|---|---|---|---|---|---|
| Quarter day | 2 | 0.25 | 0.50 | 3,000 | $ 1,500 |
| Half day | 6 | 0.50 | 3.00 | 3,000 | $ 9,000 |
| Full day | 12 | 1.00 | 12.00 | 3,000 | $ 36,000 |
| subtotals | 20 | | 15.50 | 3000 | $ 46,500 |
| | | | Services this period | | $ 46,500 |

**PERIOD 4:** March 1-29, 2002

| service unit | #units | multiplier | calc days | rate | totals |
|---|---|---|---|---|---|
| Quarter day | 10 | 0.25 | 2.50 | 3,000 | $ 7,500 |
| Half day | 5 | 0.50 | 2.50 | 3,000 | $ 7,500 |
| Full day | 5 | 1.00 | 5.00 | 3,000 | $ 15,000 |
| subtotals | 20 | | 10.00 | 3000 | $ 30,000 |
| | | | Services this period | | $ 30,000 |

**PERIOD 5:** April 1-30, 2002

| service unit | #units | multiplier | calc days | rate | totals |
|---|---|---|---|---|---|
| Quarter day | 8 | 0.25 | 2.00 | 3,000 | $ 6,000 |
| Half day | 10 | 0.50 | 5.00 | 3,000 | $ 15,000 |
| Full day | 0 | 1.00 | 0.00 | 3,000 | $ - |
| subtotals | 18 | | 7.00 | 3000 | $ 21,000 |
| | | | Services this period | | $ 21,000 |

**SUMMARY: AZIMUTH SERVICES**  November 16, 2001-April 30, 2002

| service unit | #units | multiplier | calc days | rate | totals |
|---|---|---|---|---|---|
| Quarter day | 23 | 0.25 | 5.75 | 3,000 | $ 17,250 |
| Half day | 24 | 0.50 | 12.00 | 3,000 | $ 36,000 |
| Full day | 34 | 1.00 | 34.00 | 3,000 | $ 102,000 |
| subtotals | 81 | | 51.75 | 3000 | $ 155,250 |
| | | | Total Services | | $ 155,250 |

SUBTOTAL: Services, unadjusted, actual, 11/16/01-4/   $ 155,250
SUBTOTAL: Credit: Additional Fee Write-off           $ (5,250)

**NET DUE THIS INVOICE**                              $ 150,000

*Realized Fee Analysis*

| Actual Days | Full | Half | Quarter |
|---|---|---|---|
| 51.75 | $ 2,899 | $ 1,449 | $ 725 |

Please remit payment to:
Azimuth North America LLC
18530 Mack Avenue, Suite 364
Grosse Pointe Farms MI 48236-3254

THANK YOU!

# ATTENTION: JOHN JAFFURS, EXEC DIRECTOR, DELPHI FSG
# DELINQUENT ACCOUNT—PAY NOW—STMT #DPH-FSG-091201

Azimuth North America
18530 Mack Avenue, Suite 364
Grosse Pointe Farms MI
48236-3254 USA

**CLIENT:** Delphi Automotive Systems
WW Facilities Attn C. Sumling
Building C
Mail Code 482-414-230
Troy MI 48098

**Azimuth** — Decision Support

Robert Mothershead  CEO
ram@azimuth-na.com
www.azimuth-na.com

313 884 5300  T
313 884 7154  F
313 475 1682  C

| | | |
|---|---|---|
| PURCHASE ORDER | LPS49835 | **Description of Services** |
| WHO ORDERED | SCHWAB 248-2675688 | Mgmt services of Robert Mothershead |
| VENDOR: | Azimuth North America | Rate: $3000 per day |
| VENDOR #: | 02-710-7130 | |
| Date: | September 30, 2002 | Period: 11/16/01-4/30/02 |

RE: INVOICE #DPH053102R    INVOICE DETAIL: AZIMUTH SERVICES    November 16, 2001-April 30, 2002
DATED:    31-May-02

| service unit | #units | multiplier | calc days | rate | | totals |
|---|---|---|---|---|---|---|
| Quarter da | 23 | 0.25 | 5.75 | 3,000 | $ | 17,250 |
| Half day | 24 | 0.50 | 12.00 | 3,000 | $ | 36,000 |
| Full day | 34 | 1.00 | 34.00 | 3,000 | $ | 102,000 |
| subtotals | 81 | | 51.75 | 3000 | $ | 155,250 |

| | | |
|---|---|---|
| Total Services | $ | 155,250 |
| SUBTOTAL: Credit: Additional Fee Write-off | $ | (5,250) |
| SUBTOTAL: INV#DPH053102R | $ | 150,000.00 |
| Interest on unpaid balance: June 30, 2002 | $ | 2,937.50 |
| Subtotal | $ | 152,937.50 |
| Interest on unpaid balance: July 31, 2002 | $ | 2,995.03 |
| Subtotal | $ | 155,932.53 |
| Interest on unpaid balance: August 31, 2002 | $ | 3,053.68 |
| Subtotal | $ | 158,986.21 |
| Interest on unpaid balance: September 30, 2002 | $ | 3,113.48 |
| Subtotal | $ | 162,099.69 |

Interest on unpaid balances accrues at 1.958% monthly / 23.5% annually from date of invoice.
Interest accrues per DPH Interest Schedule #DPH-FSG-INT-093002 until balance paid in full.
This is the only PAST DUE statement you will receive. Refer to interest schedule for future payments.

| CURRENT | 30 DAYS | 60 DAYS | 90 + DAYS | | |
|---|---|---|---|---|---|
| $  3,113 | $  3,054 | $ 2,995 | $  152,937 | **PAY THIS NOW** | $  162,099.69 |

See DPH Interest Schedule #DPH-FSG-INT-093002

Remit payment to:    Azimuth North America LLC
18530 Mack Avenue, Suite 364
Grosse Pointe Farms MI 48236-3254

**CONFIDENTIAL**

Azimuth North America
18530 Mack Avenue, Suite 364
Grosse Pointe Farms MI
48236-3254 USA

**Azimuth** Decision Support

TO: Cary Schwab — Delphi FSG
Bill Mazzola, Bob Stenger — Delphi Purchasing
FROM: Robert Mothershead — Azimuth
RE: FSG-Azimuth business relationship
Azimuth costs incurred under oral authorization of John Jaffurs
DATE: September 3, 2002

Robert Mothershead  CEO
ram@azimuth-na.com
www.azimuth-na.com
313 884 5300  T
313 884 7154  F
313 475 1682  C

In November and December of 2001, John Jaffurs of Delphi's Facility Services Group orally authorized Cary Schwab and I to work together to support Cary Schwab in the development of a plan that addressed critical operational and strategic challenges faced by his group. From 11/01 to 8/02, my small company provided the following services to Mr. Jaffurs and FSG in collaboration with and under the coordination of Cary Schwab:

- Identified potential facility spend savings of up to $500million
- Developed strategies to optimize up to $2billion in real estate assets
- Outlined opportunities to reorganize Delphi's real estate asset management practices to enable global manufacturing agility and drive shareholder value
- Diagnosed FSG operations capabilities and defined the steps FSG must take to operate more effectively
- Defined a real value proposition and business purpose for FSG's future, and the future of its people—one with more strategic value to Delphi than its current role, and better able to withstand current and future assaults caused by internal budgetary distress and outsourcing by executive fiat.

However, circumstances beyond my control have eroded my confidence in Azimuth's ability to maintain an effective business relationship with this group. Detailed documentation on these and other relevant circumstances, actions and issues can be provided at a later date, to appropriate audiences and in the proper forums, as required.

Thus, this is notice of my intent to immediately disengage Azimuth from further involvement with FSG. To bring current and clarify the status of Azimuth's relationship with FSG, please be advised of the following, effective August 29, 2002:

- Azimuth rescinds the May 29, 2002 proposal and offer of services as a result of FSG's non-performance under the proposal's June 7, 2002 acceptance date. No further services to FSG are contemplated.

- Azimuth rescinds its previously tendered invoice, dated 5/29/02. This invoice totaled $150,000 gross, less an $85,000 fee write-off credit, for a "kill fee" net due amount of $65,000. The credit was offered as a good-faith incentive with our time-limited 5/29/02 proposal. The proposal, the offer, the invoice and the credit were not acted on by the June 7, 2002 and are now retracted.

- We submit Azimuth Master Invoice #DPH053102R in the net amount of $150,000. This invoice formalizes the estimated cost to date report provided to FSG five months ago, on April 4, 2002, and replaces the 5/29/02 invoice. These net fees are due Azimuth for work undertaken and completed on oral authorization of John Jaffurs.

- $150,000 is now 90 days past due and payable to Azimuth. Please pay this past due amount immediately.

- Documentation provided for Azimuth's Stage 1 work includes: a proposal memorializing Mr. Jaffurs' oral authorization to Mr. Schwab, Azimuth and me; actual deliverables provided to FSG, substantial portions of which have been purposefully obscured to protect Azimuth's intellectual property rights and proprietary trade secrets pending satisfactory resolution of this matter; Azimuth rate structure; and time billing and other supporting documentation.

Please be assured that within certain parameters I am able and willing to provide FSG the benefit of an orderly and professional wind-down of our relationship. This memo constitutes my offer to Delphi or FSG of a final closing process, which includes a ten-day transition period, a summary deliverables presentation or transfer, followed by full disengagement no later than 5pm Friday, September 13, 2002. My offer must be accepted by an authorized representative of Delphi and forwarded to Azimuth no later than 10am, Friday, September 6, 2002 or it will expire. A faxed writing to Azimuth at (313) 884-7154 is acceptable.

**Azimuth** Decision Support

RE:     FSG-Azimuth business relationship
DATE:   September 3, 2002
PAGE:   two

Should Delphi accept this offer, my goals for this period are as follows:

- Achieve immediate and final resolution of the continuing issues between our firms
- Help both parties realize and maximize the value of our work
- Be paid immediately and fairly for the amounts that are owed me for work that FSG leadership requested I perform
- Present/provide/transfer to FSG any final deliverables
- Close our accounts with FSG
- Move Azimuth on to further opportunities outside of Delphi

Based on my last phone conversation with Mr. Schwab in late August 2002, I assume our common interests are to resolve our issues and provide value for Delphi shareholders, Delphi internal clients and FSG. In that conversation Mr. Schwab told me he intended to meet with Mr. Mazzola, review Azimuth documentation, reach agreement with Mr. Mazzola on the amounts owed to Azimuth, and then submit a recommendation to John Jaffurs for his immediate and final approval. To facilitate this process, this package contains three document sets, which are arranged in reverse chronology:

- A set containing current invoices, complete activity documents, correspondence and other information; this set also contains the most recent work and proposals requested by and completed by Azimuth at FSG's request between May 1, 2002 and August 31, 2002. This includes the now-expired 5/29 proposal and invoice. The transition plan and final deliverables are summarized in the attached Closing Process Proposal.
- Proposal, documentation and correspondence for Azimuth's Stage 1 work for FSG, completed in good faith on John Jaffurs' oral authorization between November 16, 2001 and April 30, 2002, as an extension to Delphi Purchase Order #LPS49835.
- Proposal and documentation Azimuth's initial Alpha Phase work for FSG, from July 25, 2001 to November 15, 2001, and covered under Delphi Purchase Order #LPS49835.

As you know, the Alpha Phase documents have been requested by Delphi Purchasing as they audit Purchase Order #LPS49835. In order to help Delphi Purchasing put this contract into compliance I have personally pledged my full cooperation to Mr. Mazzola and to provide full documentation about the Alpha Phase (and all other stages) of our work for FSG as contracted for in July 2001. These documents include:

- Proposal for Alpha Phase work for Delphi FSG
- Actual deliverables provided to FSG
- Azimuth rate sheet (see Alpha Phase proposal)
- Time billing documentation

A last request from Mr. Mazzola was clarification on Azimuth billing terminology and structure. Specifically, Azimuth submitted an Alpha Phase retainer invoice and referenced it on other Alpha Phase documentation. We intended that this retainer act as an advance payment on account, which would be offset by future Azimuth services. We recently learned Delphi policy prohibits such advance payments. Thus, this was an error on Azimuth's part, of which we, FSG and Purchasing only recently became aware. To the best of our knowledge, this retainer/advance payment was never formally approved by either Delphi FSG or Delphi Purchasing, nor acknowledged by either party. More importantly, no such retainer/advance invoice was ever paid by Delphi. The total amount billed of $60,500 is substantiated by enclosed documentation and deliverables FSG received, and has been correctly invoiced and properly paid. No credits or debits are due either party in this matter (other than the open issue of the contract extension for Stage 1 work.) The total amount of $60,500 was billed as a reduction to actual time, and paid in December, long after any advanced payment would have had an effect, and after work was begun and completed. No other payments were received prior to or after this December payment. We submit Azimuth Master Invoice #DPH113001R as a final reconciliation of this matter; it summarizes—and at your discretion can replace—all other invoices submitted by Azimuth and paid by Delphi in calendar year 2001.

Please contact me with questions. Cell (313) 475-1682. Fax (313) 884-7154. ram@azimuth-na.com
Thank you.
**Robert Mothershead, Azimuth LLC**
/end/

This is confidential information.                                   TiG4/Alpha:Users:ram:Desktop:DPHfinal090302.doc



Azimuth North America
18530 Mack Avenue, Suite 364
Grosse Pointe Farms MI
48236-3254 USA

Decision Support

Robert Mothershead  CEO   ram@azimuth-na.com
www.azimuth-na.com
313 884 5300  T
313 884 7154  F
313 475 1682  C

September 26, 2002                **CONFIDENTIAL**

Ms. Karen L. Healy
VP, Corporate Affairs & Facilities
Delphi Automotive Systems
Auburn Hills, MI

via email: karen.l.healy@delphiauto.com

Dear Ms. Healy:

This is to alert you to a business situation that falls within your span of responsibility, provide you a top-level view of the issues, identify related opportunities, and request immediate assistance in resolving these matters.

Since August 2001 I have been providing communications, analytical and strategic planning support focused on Delphi's real estate assets and facility management operations. I have also provided thought leadership and communications support to the sponsor of this work, Mr. John Jaffurs, and the staff of Delphi's Facility Services Group.

During the fall of 2001, Mr. Jaffurs and his staff faced turbulent times. FSG needed to build bridges with Delphi's Asia-Pacific Strategy Board. While in Asia, FSG leadership learned about the events of 9/11 along with the rest of the world. Shortly afterward, FSG learned its operating budget had been effectively cut by 20%. Later, Delphi executive leadership informed Mr. Jaffurs that he should begin to consider and explore wholesale outsourcing of FSG. Against this complex and volatile backdrop, Mr. Jaffurs and his staff, through our mutual relationship with Sun Microsystems, solicited and invited me into Delphi, and engaged me to provide the following services to FSG:

- Develop an FSG communications platform to:
    o enhance FSG's perceived value to its DPH internal clients
    o support FSG's presentation to the Asia-Pacific Strategy Board
    o help counter the effects of Delphi's executive-led budget cuts
- Develop a strategic and operations plan that helps FSG:
    o Generate and understand defensive options FSG can pose to DPH executive management as viable alternatives to partial or complete outsourcing of FSG
    o Gather information for a structured diagnostic to understand the dynamics of FSG's role within DPH, its options to reduce current volatility, and to assess FSG's current state of operational effectiveness
    o Develop a toolkit of individual strategies and tactics that FSG can use to improve its operations effectiveness
    o Develop a comprehensive vision, framework and roadmap to help FSG transform itself into an aligned strategic asset for Delphi (and thus mitigate the threat of outsourcing by executive fiat)
- Provide a decision support process to accommodate the needs of FSG's diverse stakeholders
- Address measurability, accountability and delivery in FSG's IT solutions
- Provide core content that could be used by FSG in the GE WorkOut or Change Acceleration Process

(continued on page two)

CONFIDENTIAL. Unpublished work © 1993-2002 Azimuth LLC. Authorized use only. No part of this document may be quoted, forwarded, reproduced, displayed on a video or computer system, transmitted, transcribed, stored in a retrieval system, or translated into any language or computer language, in any form or by any means, without prior written consent of Azimuth LLC. The information herein is the protected property of Azimuth LLC, GPF, MI. All rights reserved. Macintosh HD:Users:marthamothershead:Desktop:DPH-FSG-Healy092502[1].doc

Azimuth. Decision Support

**Ms. Karen L. Healy**, page two

To date, I have substantially completed the deliverables in all of these areas, and others. I have been partially paid for my work. I have provided FSG with a series of communications outlining my findings and work products, which include:

- Optimized governance of Delphi's facilities and real estate decisions is a global strategic lever that can encourage and accelerate positive changes, drive greater supply chain agility, and increase RONA and Delphi shareholder value.
- Total-factor cost savings opportunities in Delphi's facilities spend may exceed $500 million annually.
- FSG's aggregate services may cost Delphi up to 40% more than similar services provided by its best-in-class peers and some third-party providers.
- The absence of known, specific, critical business processes, practices, and management and financial systems, are fundamental contributors to FSG's cost-performance imbalance.
- Other root causes of FSG's overburdened cost structure include inefficient Delphi corporate governance and organizational processes, and a Delphi facility portfolio that may also as much as 40% over capacity.
- Diagnosed FSG operations capabilities and developed a Shared Facilities Services roadmap to enhance FSG's operational effectiveness, and reduce fixed costs in a controlled and measured manner over the next three to five years.
- Defined a Strategic Real Estate Asset Management process and governance structure as a core value proposition for FSG's future, and the future of its people—one that achieves complete alignment with Delphi's corporate strategic goals. (My work in this area was the impetus for Mr. Jaffurs' meeting with you in June, in which you reportedly agreed to support further confidential research on this subject.)
- Identified critical shortfalls within FSG: lack of requisite native strategic skills, systems, incentives, culture, structure, authority, with a surplus of territoriality and resistance to change. Without supportive assistance, FSG will likely be unable to lead its own transformation with the speed and magnitude required to achieve baseline cost reductions of 40% over the next five years. Thus, FSG's ability to become a core strategic asset for Delphi may be in jeopardy.

Despite the opportunities presented, our neutral and objective findings have not been welcomed by Mr. Jaffurs. It is also possible he has chosen to exert control over our work for his own purposes. Either way, on or about May 14, 2002, one of Mr. Jaffurs' subordinates quoted him to me as saying that sharing this information with you or others at Delphi, or with others outside Delphi, would "seriously damage our relationship." It was also made clear to me—first by Mr. Jaffur's subordinate and recently by a senior Delphi Purchasing Manager—that my ability to receive final payment for the six months of work I expended on this project would be predicated on my agreement to not share this information with you or any other Delphi executive leaders.

Today, I have yet to receive final payment for my work, and I must take action. After months of broken promises and delays by Mr. Jaffurs, I can only conclude now that my relationship with FSG has ended, and that it appears Mr. Jaffurs has not dealt with me in good faith. I hope I am wrong in this conclusion.

Thus, my recourse is to disobey Mr. Jaffur's veiled warnings and bring this matter to your attention as his direct supervisor.

(continued on page three)

CONFIDENTIAL. Unpublished work © 1993-2002 Azimuth LLC. Authorized use only. No part of this document may be quoted, forwarded, reproduced, displayed on a video or computer system, transmitted, transcribed, stored in a retrieval system, or translated into any language or computer language, in any form or by any means, without prior written consent of Azimuth LLC. The information herein is the protected property of Azimuth LLC, GPF, MI. All rights reserved. Macintosh HD:Users:marthamothershead:Desktop:DPH-FSG-Healy092502[1].doc



**Ms. Karen L. Healy,** page three

Ms. Healy, I would be happy to meet with you immediately in order to provide you more detail on our work, the importance of which should not be overshadowed by payment issues. I would like to show you how our work for FSG could be applied to other overhead activities inside Delphi. I believe your background and current area of responsibility make you particularly well-suited to champion an enterprise-wide shared services strategy which could reduce Delphi's total SG&A costs by as much as 25% annually over the next four to five years, and do so in a controlled and humane manner. Our work for FSG would provide an effective case study and template to assess feasibility and define a business case.

Finally, I am seeking your support to help me be immediately and fairly compensated for the commitments your subordinate made to me. I believe he may disavow responsibility, but am not sure because he has not returned a single phone call I've made to him in over six months, preferring to communicate through his subordinates. The past due amount is $150,000, and the current amount is $19,500, for a total of $169,500.

Ms. Healy, I am an independent consultant and depended on Mr. Jaffurs' authorization and the continued encouragement and promises of Mr. Jaffurs' and his subordinates, to do this work. Based on Mr. Jaffurs' apparent authority, and FSG's assertions that our existing Delphi Purchase Order # LPS49835 would be amended to cover our work, I funded John Jaffur's work out of my own personal capital while waiting for paperwork that never came.

Now, after exhausting six months in negotiations and further provision of information and services, it has become clear that Mr. Jaffurs' actions have effectively deprived me both of the funds I used to finance the work he requested I perform, and the income he promised me.

My consulting work with Azimuth is the sole source of income for my family. I have children aged 4 and 8 to support. I am looking at the prospect of losing much of what I own and watching my children Annie and Ben lose their home, schools and a secure future. John Jaffurs' actions are threatening to shatter my family needlessly and for pitiably little money.

I hope you are willing to help us resolve this issue forthrightly and immediately.

Sincerely yours,
**Robert Mothershead**


### About Azimuth
*Through its principal, Robert Mothershead, Azimuth helps leaders at Global 1000 companies develop stronger connections between their corporate strategies and the daily operations that create customer and shareholder value. In practice, we support our clients' decision processes, help define actionable business strategies, and help implement those strategies by improving operations effectiveness and accountability. In some instances, we recommend and help implement optimized internal shared service centers, or develop external business process outsourcing solutions. In all cases, we act as an architect and facilitator of strategy, process and solutions. We also insist on maintaining a neutral third-party stance, providing rigorously analytical and objective recommendations, free of conflicts of interest inherent to solutions operators. We are a small firm with blue-chip client credentials and experience.*

CONFIDENTIAL. Unpublished work © 1993-2002 Azimuth LLC. Authorized use only. No part of this document may be quoted, forwarded, reproduced, displayed on a video or computer system, transmitted, transcribed, stored in a retrieval system, or translated into any language or computer language, in any form or by any means, without prior written consent of Azimuth LLC. The information herein is the protected property of Azimuth LLC, GPF, MI. All rights reserved. Macintosh HD:Users:marthamothershead:Desktop:DPH-FSG-Healy092502[1].doc

# DELPHI

*By E-Mail, Telecopier, and First Class Mail*

October 8, 2002

**FOR PURPOSE OF
EXPLORATION OF
SETTLEMENT ONLY**

Mr. Robert Mothershead
Azimuth North America LLC
18530 Mack Avenue
Suite 364
Grosse Pointe Farms, Michigan 48236
Fax: (313) 884-7154

Dear Mr. Mothershead:

As discussed in our phone call yesterday afternoon, Azimuth North America LLC ("Azimuth") has requested payment from Delphi Automotive Systems LLC ("Delphi") in the amount of $169,500, $19,500 of which you claim to be due pursuant to Delphi Purchase Order No. LPS 49835 (the "Purchase Order"), and the remaining $150,000 of which you claim to be due for services rendered pursuant to Delphi's request but without the issuance of any purchase order or other supporting documentation.

As a preliminary matter, I must reiterate my statement to you of yesterday afternoon that any further communications that you have with Delphi must be directed to me and only to me. Your contact with other individuals at Delphi will only slow down the settlement process, and each person with which you have made, or attempted to make, contact has been directed not to respond to any further inquiries from you.

The Delphi Legal Staff has spoken to representatives of the Delphi Facilities Services Group and Delphi Global Purchasing and has reviewed the documentation relevant to this matter, including your numerous correspondence and the Purchase Order. Based on those discussions and that review, we have been unable to establish a basis for any obligation of Delphi to pay Azimuth any amount in excess of the payments which were previously made under the Purchase Order.

Notwithstanding the foregoing, in an effort to finally resolve this issue, Delphi is willing to make a payment to Azimuth in the amount of $19,500 (the unspent amount under the Purchase Order). The payment of such funds will be contingent upon the execution by Azimuth and by you personally of a Settlement and Release Agreement (in form and content acceptable to Delphi, in its sole discretion) pursuant to which Azimuth and you will waive all claims Azimuth or you may now or hereafter have against Delphi arising out of the Purchase Order or any services you have performed, or claim to have performed, prior to the date of the Settlement and Release Agreement.

Delphi Legal Staff
World Headquarters and Customer Center
5725 Delphi Drive   Troy, Michigan   48098-2815   USA

If you are willing to settle this matter on the basis set forth above, you should confirm your agreement with the foregoing by signing and returning one copy of this letter to me by fax at (248) 813-2491. If we do not receive a copy of this letter which has been executed by you no later than 2:00 p.m. on Friday, October 11, 2002, this offer shall be retracted.

This letter is being sent to you for the sole and exclusive purpose of facilitating settlement discussions, without prejudice to any of Delphi's rights and without evidencing any admissions by Delphi, and may not be used in any manner in any administrative, judicial or other proceedings.

Very truly yours,


Sean P. Corcoran
Assistant General Counsel
Delphi Legal Staff


ACCEPTED AND AGREED:

AZIMUTH NORTH AMERICA LLC


By: _____                    _____
        Robert Mothershead                              ROBERT MOTHERSHEAD,
                                                        IN HIS INDIVIDUAL CAPACITY
Its: _____
Date: _____

# SETTLEMENT AND RELEASE AGREEMENT

This Settlement and Release Agreement (this "Agreement") is entered into as of October __, 2002 (the "Effective Date"), by and among Delphi Automotive Systems LLC ("Delphi"), Azimuth North America LLC ("Azimuth"), and Robert Mothershead ("Mothershead").

## RECITALS

A. Pursuant to Purchase Order No. LPS 49835 dated July 20, 2001 issued by Delphi in favor of Azimuth and accepted by Azimuth (the "Purchase Order"), Azimuth and Mothershead, on Azimuth's behalf, provided certain consulting services to Delphi.

B. Azimuth and Mothershead have requested payment from Delphi in the amount of $169,500, $19,500 of which those parties claim are due under the Purchase Order and the remaining $150,000 of which those parties claim are due in connection with additional consulting services rendered without the issuance of a Delphi purchase order.

C. Delphi has been unable to establish a basis for any obligation of Delphi to pay Azimuth such requested amounts.

D. Delphi, Azimuth and Mothershead believe it to be in their mutual best interests to resolve their disagreement with respect to the amounts due, if any, from Delphi to Azimuth.

WHEREFORE, based upon the foregoing recitals and for good and valuable consideration, the receipt and adequacy of which is acknowledged, the parties agree as follows:

1. Azimuth and Mothershead shall each, by their execution of this Agreement, grant the release set forth in Section 3 below (the "Release").

2. In consideration of the Release, Delphi agrees to pay Azimuth Nineteen Thousand Five Hundred Dollars ($19,500) (the "Settlement Amount"). Azimuth and Mothershead each agree to accept the Settlement Amount as full payment and satisfaction of any obligations of Delphi to Azimuth or Mothershead of any kind arising out of or in connection with any facts, circumstances or transactions in existence or occurring at any time prior to the Effective Date, including, without limitation, any obligations arising out of or in connection with the Purchase Order or any services Azimuth or Mothershead have performed, or allege to have performed, prior to the Effective Date.

3. In consideration of the Settlement Amount, Azimuth and Mothershead, on behalf of themselves and their respective affiliates, subsidiaries, divisions, partners, members, shareholders, representatives, attorneys, officers, directors, employees, successors, assigns and any and all other persons or entities acting or purporting to act on any of their behalf, do hereby fully and forever release, acquit and discharge Delphi, together with its affiliates, subsidiaries, divisions, partners, members, shareholders, representatives, attorneys, officers, directors, employees, successors, assigns and all other persons or entities acting or purporting to act on any of their behalf (collectively, the "Delphi Parties"), from any and all claims, damages, expenses, liabilities, costs, actions, demands, allegations, obligations and lawsuits (collectively, "Claims") relating in any way to any facts, circumstances or transactions in existence or occurring at any time prior to the

1

Effective Date, including, without limitation, any Claims arising out of or in connection with the Purchase Order or any services Azimuth or Mothershead have performed, or allege to have performed, prior to the Effective Date. Azimuth and Mothershead each covenant that he or it will not commence any action or suit, or prosecute any pending action or suit, in law or in equity, against Delphi or any of the other Delphi Parties on account of any action or cause of action relating to those Claims released by Azimuth and Mothershead under this Agreement.

4. Each party represents that it has full power and authority to enter into and perform this Agreement and that the person signing this Agreement on behalf of such party has been properly authorized and empowered to enter into this Agreement. Azimuth and Mothershead each represent and warrant that they have never assigned or transferred to any person or entity any right or interest arising in their favor pursuant to the Purchase Order or in connection with any services Azimuth or Mothershead have performed, or allege to have performed, at the request of Delphi or any of the other Delphi Parties.

5. Each party affirms that: (i) it has fully read this entire Agreement, (ii) it has had the opportunity to consult with its attorneys regarding the terms of this Agreement, (iii) it signs this Agreement as its own free and voluntary act, and (iv) this Agreement constitutes the full and complete understanding among the parties, and merges and integrates any and all previous negotiations, representations, covenants, promises, conditions and understandings, concerning the settlement and release of any Claims Azimuth or Mothershead may have against any of the Delphi Parties. The parties further acknowledge that in entering into this Agreement, they are not relying, nor have they relied upon, any covenants, promises, conditions or understandings, either oral or written, other than those contained and set forth in the terms of this Agreement.

6. The parties acknowledge that they have read this Agreement, and that they are equally responsible for the wording of the terms of this Agreement as a result of drafting specific terms, negotiating specific terms or approving the wording selected by others to state specific terms. Consequently, the parties agree and acknowledge that in interpreting this Agreement, the rule of contractual interpretation and construction under which ambiguities in the provisions of an agreement are construed against the party drafting such provisions does not apply to the interpretation or construction of the terms of this Agreement. The parties further represent that they understand the contents of this Agreement and that they are signing this Agreement as their free act and deed, without any persuasion or coercion on the part of anyone.

7. This Agreement shall be binding upon the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns, as the case may be.

8. Each party agrees to fully cooperate with the other parties and to take all additional actions that may be necessary to give full force and effect to this Agreement.

9. No term or provision of this Agreement may be waived, altered, modified or amended except by a written instrument, duly executed by the parties to this Agreement.

2

10. This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument. For purposes of this Agreement, facsimile signatures shall also constitute originals.

11. This Agreement is made in the State of Michigan and shall be governed by, and construed and enforced in accordance with, the laws of the State of Michigan, without regard to conflicts of law principles.

12. Azimuth and Mothershead agree that they shall keep confidential and shall not disclose to any person or entity other than their attorneys who agree to be bound by the confidentiality provisions of this Agreement (i) the existence of this Agreement and all of its terms and (ii) any information regarding Delphi or any of the other Delphi Parties that was disclosed to or discovered by Azimuth or Mothershead in connection with the services under the Purchase Order or any other work or activity that Azimuth or Mothershead performed concerning Delphi or any of the other Delphi Parties prior to the Effective Date.. Notwithstanding the foregoing, Azimuth and Mothershead shall have the right to disclose the terms of this Agreement (a) with Delphi's permission (which may be granted or withheld in Delphi's sole discretion) and (b) in any action to enforce the terms of this Agreement against Delphi or where compelled to do so by the order of a court of competent jurisdiction

**DELPHI AUTOMOTIVE SYSTEMS LLC**

BY: _____
NAME: _____
ITS: _____


**AZIMUTH NORTH AMERICA LLC**

BY: _____                         _____
      Robert Mothershead                                            **ROBERT MOTHERSHEAD,**
ITS:   Chief Executive Officer                                  In His Individual Capacity

3

FORM B10 (Official Form 10) (04/05)

| UNITED STATES BANKRUPTCY COURT __Southern__ DISTRICT OF __New York__ | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**DELPHI AUTOMOTIVE SYSTEMS LLC** | Case Number<br>**05-44640** | |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property: **"Azimuth North America LLC & Related Entities"**, Including Azimuth North America LLC; Addison Group, Inc.; Addison GroupShares PSP; and/or any member, officer, shareholder, beneficiary and trustee of such entities; and/or any former Independent contractor employee who provided services to Delphi Automotive Systems LLC through such entities | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | |
|---|---|---|
| Name and address where notices should be sent:<br>**Azimuth North America LLC & Related Entities**<br>**Delphi Vendor # 02-710-7130**<br>**18530 Mack Avenue, Grosse Pointe Farms MI 48236-3254**<br>email: azimuthllc@earthlink.net<br>Telephone number:   TEL 313 475 1682   FAX 313 731 0404 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |
| Account or other number by which creditor identifies debtor:<br>**Vendor #02-710-7130 - and - Delphi PO# LPS-49835 dated July 20, 2001, and revised December 2001, and October 2002** | Check here ☐ replaces<br>if this claim ☐ amends  a previously filed claim, dated:_____ | |

**1. Basis for Claim**

| | | |
|---|---|---|
| ☒ Goods Sold / Services Performed | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) | |
| ☐ Customer Claim | ☒ Wages, salaries, and compensation (fill out below)<br>Last four digits of SS #: **9789** | |
| ☐ Taxes | Unpaid compensation for services performed | |
| ☐ Money Loaned | from **June 1, 2001** to **October 19, 2002** | |
| ☐ Personal Injury | (date) (date) | |
| ☐ Other _____ | | |

| 2. Date debt was incurred:<br>approximate dates: **July 21, 2001 to October 19, 2002** | 3. If court judgment, date obtained: |
|---|---|

**4. Total Amount of Claim at Time Case Filed:** $150,000 unsecured princ bal + $134,487 unsecured interest @14.9% = TOTAL $ 284,487.00
(unsecured)   (secured)   (priority)   (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

| **5. Secured Claim.**<br>☐ Check this box if your claim is secured by collateral (including a right of setoff).<br>Brief Description of Collateral:<br>☐ Real Estate ☐ Motor Vehicle<br>☐ Other_____<br>Value of Collateral: $_____<br>Amount of arrearage and other charges *at time case filed* included in secured claim, if any: $_____<br>**6. Unsecured Nonpriority Claim** $ **$284,487.00**<br>☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority. | **7. Unsecured Priority Claim.**<br>☐ Check this box if you have an unsecured priority claim<br>Amount entitled to priority $_____<br>Specify the priority of the claim:<br>☐ Wages, salaries, or commissions (up to $10,000),* earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).<br>☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).<br>☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).<br>☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).<br>☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).<br>☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).<br>*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. $10,000 and 180-day limits apply to cases filed on or after 4/20/05. Pub. L. 109-8.* |
|---|---|

| 8. **Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.<br>9. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.<br>10. **Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| Date<br>**July 28, 2006** | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Robert A. Mothershead - Member, Officer, Shareholder, Beneficiary and Trustee of "Azimuth North America LLC & Related Entities" | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

CONFIDENTIAL. Unpublished work © 2000-2006, "Azimuth North America LLC & Related Entities", Grosse Pointe Farms, MI. All rights reserved.

SUMMARY OF CLAIM & DOCUMENTATION:                                    date: July 29, 2006
Creditor: Azimuth North America LLC & Related Entities (Vendor #02-710-7130)
Debtor: Delphi Automotive Systems LLC
Delphi Case # 05-44640; Delphi Purchase Order #LPS49835.

1. CLAIM FOR PAYMENT FOR SERVICES RENDERED
This is a Claim for payment for services delivered by:

> "Azimuth North America LLC & Related Entities", which includes Azimuth North America LLC; Addison Group, Inc.; Addison GroupShares PSP; and/or any member, officer, shareholder & beneficiary of such entities; and/or any former independent contractor employees who provided services to Delphi Automotive Systems LLC through such entities; all of Grosse Pointe Farms, Michigan;

...said services having been delivered to:

> Delphi Automotive Systems, LLC, and its internal Facilities Services Group (together, "Delphi-FSG"), all of Auburn Hills, Michigan;

...said services having been delivered during the period from July 20, 2001 and October 19, 2002.

2. VALUE OF CLAIM
The value of the unpaid services provided by and claimed by Azimuth on final delivery to Delphi-FSG on October 19, 2002 is **$150,000.00**. Azimuth has assessed an interest rate of 14.9% since that time, which totals **$134,487.00** as of July 31, 2006. The total value of Azimuth's Claim against Delphi is **$284,487.00** at July 31, 2006. A line-item statement detailing these charges is attached as Attachment A.

3. BACKGROUND: AZIMUTH, AND DELPHI-FSG'S INITIAL SERVICES CONTRACT WITH AZIMUTH
Azimuth North America LLC is a corporate strategy, research, technology, communications and services firm solely-owned and operated by consultant Robert A. Mothershead, and is legally, operationally and financially related to Addison Group, Inc., and Addison GroupShares PSP, entities controlled by or which benefit Mothershead. Together these entities and Mothershead comprise "Azimuth North America LLC and Related Entities" (hereafter, "Azimuth").

Azimuth's activities are broad in scope; however, Azimuth does not itself provide management services related to its clients' legal, accounting or financial issues, and Mothershead himself has no formal training, certification, or licenses to practice in those areas.

In late 2000, Delphi-FSG leadership contacted Azimuth, a new start-up firm, to discuss how Azimuth could deliver research, management consulting, technology, communications and business analysis services to Delphi-FSG. On July 21, 2001, Delphi-FSG's corporate parent, Delphi Automotive Systems LLC issued Azimuth a **Delphi Purchase Order #LPS49835; Vendor #02-710-7130.**

Delphi-FSG informed Azimuth that executives from Delphi-FSG's corporate parent had decided to explore the idea of outsourcing the entire internal Delphi-FSG operation to an external third-party vendor. Delphi-FSG leadership hired Azimuth to develop a business case and communications that would act as counter-offensive measures to help Delphi-FSG leadership defeat this proposal. Azimuth provided these services and proof of delivery of same to Delphi-FSG on multiple occasions between August 2001 and December 2001. Delphi-FSG paid for initial services provided by Azimuth through late 2001.

In December 2001, after delivery of the initial services, Delphi-FSG leadership directed Azimuth to continue work under PO#LPS49835 and to deliver additional services and requirements defined by Delphi-FSG. Delphi-FSG promised to amend Azimuth's Purchase Order to account for these additional services.

Azimuth met these additional requirements and delivered services through April 2002. During this time,

CONFIDENTIAL. Unpublished work © 2000-2006, "Azimuth North America LLC & Related Entities", Grosse Pointe Farms, MI. All rights reserved.

Azimuth generated findings and information that Azimuth relayed to Delphi-FSG, and which became highly distressing to the leadership of Delphi-FSG and its corporate parent, outlined below, and became the subject of a dispute, contentious discussions and negotiations between Azimuth and Delphi-FSG. Beginning in May 2002, Delphi-FSG disavowed its responsibility for payment for these additional services by Azimuth, and Delphi-FSG refused to pay Azimuth. That dispute is the subject of Azimuth's current claim.

## 4. ADDITIONAL SERVICES REQUESTED BY DELPHI-FSG AND DELIVERED BY AZIMUTH

During the provision of the additional services Delphi-FSG had requested of Azimuth, specific Delphi-FSG leadership individuals gave Azimuth confidential information about its operations. Azimuth also learned about Delphi-FSG's operations as it conducted its own research. Together, this information was multi-faceted, complex and difficult for Azimuth to understand and interpret, and its implications for Azimuth's client Delphi-FSG extended beyond the limits of Azimuth's knowledge of legal and financial matters, which Azimuth admitted to Delphi-FSG.

However, at various times early as January 2002 and continuing through October 2002, Azimuth informed Delphi-FSG leadership and officers of its corporate parent that Azimuth had uncovered the following information or had reasonable grounds to believe that the following conditions might be true:

- That Delphi-FSG leadership had told Azimuth that Delphi-FSG leadership were concerned about Delphi's internal accounting controls, methods, and technologies used to manage and report of its shareholders' $2billion+ facilities and real estate assets, and that these internal controls were woefully inadequate;

- That, to the best of Azimuth's limited knowledge, upon Azimuth's review it did appear to Azimuth that Delphi's internal accounting controls, methods, and technologies used to manage and report of its shareholders' $2billion+ facilities and real estate assets could indeed be inadequate;

- That, to the best of Azimuth's limited knowledge, Azimuth could not determine whether Delphi's possible internal controls inadequacies were the result of incompetence or purposeful fraud;

- That, to the best of Azimuth's limited knowledge, the information generated by and presented within Delphi-FSG's internal controls and reports, and which became the basis for some of the financial and accounting claims made in Delphi's public media announcements, statements to shareholders and/or reports to the SEC, possibly contained errors, or untrue statements, or unverifiable facts, that Azimuth roughly estimated could lead to up to $500million in overstatement or understatement of shareholder assets, if proven to be true;

- That, to the best of Azimuth's limited knowledge, Delphi-FSG's inadequate internal controls could possibly violate the Securities and Exchange Act of 1934; and, further, could possibly violate the proposed Sarbanes-Oxley regulations that were scheduled to become law on July 30, 2002;

- That, to the best of Azimuth's limited knowledge, if Delphi's internal controls were indeed inadequate and in violation of law, that civil and criminal charges could possibly be brought against Delphi and Delphi-FSG, on both a corporate basis and against Delphi's individual executives and staff.

This information was highly distressing to Delphi-FSG leadership and certain officers of its parent corporation. A financial dispute followed. Mothershead was personally threatened.

## 5. DELPHI'S RESPONSE TO AZIMUTH'S ADDITIONAL SERVICES & INFORMATION

At this time, Azimuth was a startup with few clients and little funding, and its business position was precarious. Azimuth had financed its work for Delphi beginning in December 2001 and still had not received payment as of April 2002. As a result, the financial positions of its sole contract employee, Robert A. Mothershead, were also precarious: Mothershead had no source of income other than Azimuth and its work for Delphi-FSG. Also at this time, Mothershead was beginning to experience severe health

2

CONFIDENTIAL Unpublished work © 2000-2006, "Azimuth North America LLC & Related Entities", Grosse Pointe Farms, MI. All rights reserved.

and medical problems, much of it stress-induced due to Delphi-FSG's actions against him, that reduced his ability to effectively negotiate with Delphi-FSG. At about this time, Delphi-FSG became aware of Azimuth's and Mothershead's precarious position and difficulties as a result of its non-payment of Azimuth's fees. Delphi used this information to its advantage and disavowed responsibility for Azimuth's fees for additional services rendered.

### 6. PREVIOUS SETTLEMENT, RELEASE & NON-DISCLOSURE AGREEMENT BETWEEN DELPHI AUTOMOTIVE SYSTEMS LLC AND AZIMUTH

When Delphi-FSG became aware of Azimuth's and Mothershead's financial condition, and Mothershead's health problems, Delphi-FSG used this information and its undue economic influence to its advantage in negotiating a restrictive financial settlement and non-disclosure agreement with Azimuth and Mothershead.

Many individuals and leaders from Delphi-FSG and its corporate parent became involved in negotiating with Azimuth. As a result, Azimuth, which had no other choice, entered into a Settlement, Release & Non Disclosure Agreement with Delphi-FSG and its parent Delphi Automotive Systems LLC, dated October 19, 2002.

### 7. DELPHI'S SETTLEMENT AND CONFIDENTIALITY AGREEMENT WITH AZIMUTH WAS ILLEGAL AT THE TIME IT WAS MADE, AND IS THUS VOID.

It has recently come to Azimuth's attention that the Settlement, Release & Non-Disclosure Agreement ("SRNDA") between Delphi-FSG and Azimuth was created for illegal purposes, and thus violates public policy and provisions of the Securities and Exchange Act of 1934 ("SEC34") and Sarbanes-Oxley Act of 2002 ("SOX02"). Violations of other laws are also possible. Specifically, Delphi's SRNDA had the effect of, and/or Delphi created the SRNDA specifically in order to:

- Contain and suppress information possessed by Azimuth and Mothershead related to Delphi's possible violations of SEC34 and SOX02.

- Retaliate against Azimuth and Mothershead, who in effect were acting as whistleblowers, in violation of provisions of SOX02.

### 8. AZIMUTH'S BASIS FOR THE CLAIM BEFORE THIS COURT

Azimuth believes it has a rightful claim in this matter because of it believes the Settlement, Release & Confidentiality Agreement it signed with Delphi on October 19, 2002 is null and void because it was illegal when it was drafted. Thus, no legal Settlement, Release and Non-Disclosure Agreement has ever existed or has ever been executed between Delphi-FSG and Azimuth, and no legal agreement exists at this time.

### 9. DOCUMENTATION OF AZIMUTH'S CLAIM

Azimuth possesses voluminous documentation (500+ pages and many megabytes of digital data) supporting the claims made in this document, too much to attach to this document, and is willing and able to provide this information to Delphi, the Court, the SEC, the Department of Justice, and any other authority in this matter.

The undersigned states that this information is truthful to the best of his knowledge, and is the Authorized Representative to present this information to this Court.

---

Robert A. Mothershead                                                                date
Authorized Representative for
**"Azimuth North America LLC & Related Entities"** which includes Azimuth North America LLC; Addison Group, Inc.; Addison GroupShares PSP; and/or any member, officer, shareholder & beneficiary of such entities; and/or any former independent contractor employees who provided services to Delphi Automotive Systems LLC through such entities.

18530 Mack Avenue                                        Tel 133 475 1682 Fax 313 731 0404
Grosse Pointe Farms MI 48236                             Azimuthllc@earthlink.net

3