TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Sean McGrath (SM-4676)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT                    **HEARING DATE: April 20, 2007**
SOUTHERN DISTRICT OF NEW YORK                              **AT:  10:00 a.m.**

------------------------------------------------------------x
                                                            :
In re:                                                      :
                                                            :          Chapter 11
DELPHI CORPORATION, *et al.*,                               :          Case No. 05-44481 [RDD]
                                                            :
                            Debtors.                        :          Jointly Administered
                                                            :
------------------------------------------------------------x

## DEBTORS' OBJECTION TO MOTION BY FURUKAWA ELECTRIC NORTH AMERICA APD AND FURUKAWA ELECTRIC CO., LTD., FOR (A) ABSTENTION PURSUANT TO 28 U.S.C. § 1334(c);  (B) RELIEF FROM AUTOMATIC STAY PURSUANT TO 11 U.S.C. 362(d);  AND (C) AN ORDER LIMITING THE SCOPE OF THE THIRD OMNIBUS CLAIM OBJECTION HEARING

**TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:**

Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates, debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned cases (the "Cases"), by their undersigned counsel, as and for their objection to

the motion dated March 23, 2007 (the "Motion") of Furukawa Electric North America

APD ("Furukawa North America") and Furukawa Electric Co., Ltd. (jointly,

"Furukawa" or the "Claimant") for an Order for (a) abstention pursuant to 28 U.S.C.

1334(c);  (b) relief from the automatic stay pursuant to 362(d) of title 11 of the United

States Code (the "Bankruptcy Code");  and (c) for an order limiting the scope of the

claim objection hearing scheduled for May 10, 2007, respectfully state:

## PRELIMINARY STATEMENT

1.    The Motion should be denied in all respects because Furukawa has

not shown adequate cause for the relief that it seeks.

2.    Furukawa submitted to the jurisdiction of this Court when it filed

its proof of claim and the Debtors have objected to Furukawa's Proof of Claim.  The

parties' dispute is a claim objection which is proceeding in this Court and which is a

"core proceeding" pursuant to 28 U.S.C. § 157.

3.    "Abstention is only mandated with respect to non-core matters.

Therefore where a matter constitutes a core proceeding, the mandatory abstention

provisions of section 1334(C)(2) are inapplicable."  Luan Investment S.E. v. Franklin 145

Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 232 (2d Cir. 2002).

4.    Furukawa has failed to satisfy its burden to establish either

mandatory or discretionary abstention.  It has also failed to satisfy its burden to

establish cause to modify the automatic stay.

5.    Consequently, the Furukawa claim objection is properly litigated in

this Court and not in the State Court (defined below).  See Langenkamp v. Culp, 498

U.S. 42, 44 (1990) ("by filing a claim against a bankruptcy estate the creditor triggers the

process of 'allowance and disallowance of claims,' thereby subjecting himself to the

bankruptcy court's equitable power").

2

## Current Business Operations of the Debtors

6.        As of December 31, 2005, Delphi and its subsidiaries and affiliates
(collectively, the "Company") had global 2005 net sales of approximately $26.9 billion
and global assets of approximately $17.0 billion.[1]  At the time of its chapter 11 filing,
Delphi ranked as the fifth largest public company business reorganization in terms of
revenues, and the thirteenth largest public company business reorganization in terms of
assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their
business operations without supervision from the Bankruptcy Court.

7.        The Company is a leading global technology innovator with
significant engineering resources and technical competencies in a variety of disciplines,
and is one of the largest global suppliers of vehicle electronics, transportation
components, integrated systems and modules, and other electronic technology.  The
Company supplies products to nearly every major global automotive original
equipment manufacturer.

8.        Delphi was incorporated in Delaware in 1998 as a wholly-owned
subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM
conducted the Company's business through various divisions and subsidiaries.
Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries
were transferred to the Company in accordance with the terms of a Master Separation
Agreement between Delphi and GM.  In connection with these transactions, Delphi
accelerated its evolution from a North American-based, captive automotive supplier to
a global supplier of components, integrated systems, and modules for a wide range of

---

[1]        The aggregated financial data used in this objection generally consists of consolidated
information from Delphi and its worldwide subsidiaries and affiliates.

3

customers and applications.  Although GM is still the Company's single largest

customer, today more than half of Delphi's revenue is generated from non-GM sources.

### Events Leading To The Chapter 11 Filing

9.     In the first two years following Delphi's separation from GM, the

Company generated approximately $2 billion in net income.  Every year thereafter,

however, with the exception of 2002, the Company has suffered losses.  In calendar year

2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in

net sales.[2]  Reflective of a continued downturn in the marketplace, in 2005 Delphi

incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

10.     The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and

operational restrictions driven by collectively bargained agreements, including

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all

of which have the effect of creating largely fixed labor costs, (b) a competitive U.S.

vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing

pressures, and (c) increasing commodity prices.

11.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.

Because discussions with its major unions and GM had not progressed sufficiently by

the end of the third quarter of 2005, the Company commenced these chapter 11 cases for

---

[2]     Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the
recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The
Company's net operating loss in calendar year 2004 was $482 million.

its U.S. businesses to complete the Debtors' transformation plan and preserve value for its stakeholders.

### The Debtors' Transformation Plan

12.      On March 31, 2006, the Company outlined five key tenets of its transformation plan.  First, Delphi must modify its labor agreements to create a competitive arena in which to conduct business.  Second, the Debtors must conclude their negotiations with GM to finalize GM's financial support for the Debtors' legacy and labor costs and to ascertain GM's business commitment to the Company.  Third, the Debtors must streamline their product portfolio to capitalize on their world-class technology and market strengths and make the necessary manufacturing alignment with their new focus.  Fourth, the Debtors must transform their salaried workforce to ensure that the Company's organizational and cost structure is competitive and aligned with its product portfolio and manufacturing footprint.  Finally, the Debtors must devise a workable solution to their current pension situation.

13.      On December 18, 2006, the Debtors marked another milestone in their chapter 11 cases with the announcement of two significant agreements.  The first of these was an equity purchase and commitment agreement (the "Equity Purchase and Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors").  Under the Equity Purchase and  Commitment Agreement, the Plan Investors have agreed to invest up to $3.4 billion in preferred and common equity in the reorganized Delphi to support the Debtors' transformation plan.  The Equity Purchase and Commitment Agreement is subject to the completion of due diligence, satisfaction or waiver of numerous other conditions (including Delphi's achievement of consensual

agreements with its principal U.S. labor unions and GM), and the non-exercise by either

Delphi or the Plan Investors of certain termination rights.  The second agreement was a

plan framework support agreement (the "Plan Framework Support Agreement") with

the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain

proposed terms of the Debtors' anticipated plan of reorganization, including the

distributions to be made to creditors and shareholders, the treatment of GM's claims,

the resolution of certain pension funding issues, and the corporate governance of the

reorganized Debtors.  The terms of the Plan Framework Support Agreement are

expressly conditioned on the Debtors' reaching consensual agreements with their U.S.

labor unions and GM.

            14.     On January 12, 2007, this Court authorized the Debtors to execute,

deliver, and implement the Equity Purchase and Commitment Agreement and the Plan

Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi

entered into an amendment to the Equity Purchase and Commitment Agreement with

the Plan Investors to extend the date by which the Company, the Cerberus Capital

Management, L.P. affiliate, or the Appaloosa Management L.P. affiliate have the right to

terminate the agreement on account of not yet having completed tentative labor

agreements with Delphi's principal U.S. labor unions and a consensual settlement of

legacy issues with GM.  The amendment extended the termination right pursuant to a

14-day notice mechanism.  The amendment also extended the deadline to make certain

regulatory filings under the federal antitrust laws in connection with the Equity

Purchase and Commitment Agreement and the Plan Framework Support Agreement.

            15.     Although much remains to be accomplished in the Debtors'

reorganization cases, the Debtors and their stakeholders are together navigating a

course that should lead to a consensual resolution with their U.S. labor unions and GM

while providing an acceptable financial recovery framework for the Debtors'

stakeholders.  Upon the conclusion of the reorganization process, the Debtors expect to

emerge as a stronger, more financially sound business with viable U.S. operations that

are well-positioned to advance global enterprise objectives.  In the meantime, Delphi

will marshal all of its resources to continue to deliver high-quality products to its

customers globally.  Additionally, the Company will preserve and continue the strategic

growth of its non-U.S. operations and maintain its prominence as the world's premier

auto supplier.

## BACKGROUND

A.    **The Parties' Disputed Claims**

16.    Pursuant to:  (a) a Long Term Contract dated September 7, 2000

between Furukawa Electric Co., Ltd. and Delphi Automotive Systems, LLC ("DAS

LLC") (the "Long Term Contract") and (b) a purchase order number SAG90I4710 issued

September 12, 2001 by DAS LLC to Furukawa North America (the "Purchase Order,"

together with the Long Term Contract, the "Agreements"), Furukawa agreed to sell

DAS LLC approximately 100% of DAS LLC's requirements for torque and position

sensors (the "Sensors").  Copies of the Agreements are annexed to Exhibit 2 of the

Motion.

17.    The Sensors that were manufactured and sold by Furukawa, were

shipped to DAS LLC's manufacturing facility in Saginaw, Michigan, and were

assembled by DAS LLC into Power Steering Assist Mechanisms that were then

assembled into steering columns.  The steering columns manufactured by DAS LLC

were sold to General Motors Corporation ("GM") for assembly into GM vehicles.

18.    Furukawa offered a design for the Sensors that would meet the

manufacturing and electrical steering use requirements of DAS LLC in its manufacture

of steering columns for sale to GM.  DAS LLC's specific requirements were
communicated to Furukawa to accomplish this purpose.  A pre-production part of the
Sensors was provided by Furukawa to DAS LLC, and was subjected to the tests and
evaluations required for production approval.  DAS LLC ordered the Sensors from
Furukawa on the well-founded belief that Furukawa would ship Sensors having the
same design, integrity, metallurgical quality, and electrical quality as the approved
parts.

19.     Subsequent to providing Delphi with the pre-production part,
which was approved by the Debtors, and validated by GM and the Debtors, Furukawa
twice requested that material revisions be made to the Sensors' specification, and DAS
LLC twice refused such requests for sound metallurgical and engineering reasons.
Furukawa, without the knowledge and consent of DAS LLC, and with intentional
disregard of DAS LLC's instructions, changed certain material used as plating in the
Sensors.  Furukawa's material and unauthorized change in the plating of the Sensors
resulted in the failure of the Sensors, which led to failures in the steering columns sold
by DAS LLC to GM.  GM issued a recall as a result of the failure of the Sensor, and, in
turn, deducted approximately $24 million from payments to DAS LLC  -- amounts
representing GM's losses that were caused by Furukawa's unauthorized changes to the
Sensors.

20.     In addition, Furukawa knew of, or should have known of, DAS
LLC's expectation that the Sensors meet certain design requirements.  Thus, in addition
to the express warranties provided by the terms of the Agreements, Furukawa's
material alterations of the Sensors breached certain implied warranties created by law.

21.     As a result of its breach of both express and implied warranties,
Furukawa breached the terms of the Agreements.  When the parties could not resolve

8

the issues through negotiation, DAS LLC filed a complaint against Furukawa (the "State Court Complaint") in the Circuit Court for the County of Saginaw Michigan (the "State Court") on October 14, 2004 (the "State Court Action").

22.     Significantly, Furukawa never asserted a counterclaim in the State Court Action.  Instead, it asserted its Proof of Claim in this Court.

23.     There has been no deposition discovery in the State Court Action, a mediation mandated by Michigan law has not yet been scheduled and no trial date has been set.[3]

**B.     The Proof of Claim**

24.     On October 8, 2005, the Debtors commenced these Cases.

25.     Furukawa filed proof of claim number 12347 (the "Proof of Claim") against DAS LLC on or about July 28, 2006.  The Proof of Claim asserts an unsecured nonpriority claim in the amount of $2,589,684.56 for alleged breach of contract damages (the "Furukawa Claim").  The Furukawa Claim includes alleged damages for legal fees, "inventory," "investment," and other miscellaneous charges.  See attachments to the Proof of Claim which is annexed to the Motion as Exhibit 3.

26.     The Debtors objected to the Furukawa Claim pursuant to the Debtors' (I) Third Omnibus Objection (Substantive) Pursuant to 11 U.S.C. § 502(b) and Fed. R. Bankr. P. 3007 To Certain (A) Claims With Insufficient Documentation, (B) Claims Unsubstantiated By Debtors' Books And Records, and (C) Claims Subject To Modification and (II) Motion to Estimate Contingent And Unliquidated Claims Pursuant To 11 U.S.C. § 502(c) (Docket No. 5452) (the "Third Omnibus Claims Objection"), which was filed on October 31, 2006.

---

[3] The time within which the Debtors may remove the State Court Action has been extended by this Court.

27.    Furukawa responded and objected to the Debtors' Third Omnibus Claims Objection (Docket No. 5788) (the "Response") on November 22, 2006.

28.    The Debtors' objections to the Furukawa Claim requires consideration and adjudication of the Debtors' affirmative claims against Furukawa, absent which, adjudication of the claim objection will result in an incomplete resolution.

## ARGUMENT

### A.    The Motion for Mandatory Abstention Should Be Denied

29.    Furukawa submitted to the jurisdiction of this Court when it filed its proof of claim.  The Debtors have objected to Furukawa's Proof of Claim and Furukawa responded and joined issue with the Debtors' objection.

30.    This dispute involves a claim objection which is a "core proceeding" pursuant to 28 U.S.C. § 157.

31.    "Abstention is only mandated with respect to non-core matters. Therefore where a matter constitutes a core proceeding, the mandatory abstention provisions of section 1334(c)(2) are inapplicable."   Luan Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.), 304 F.3d 223, 232 (2d Cir. 2002)

32.    Furukawa explicitly concedes this point when it states that mandatory abstention is required only when the matter at issue is a non-core proceeding.  Motion at 10.

33.    Accordingly, the Furukawa claim objection is properly litigated in this Court and not in the State Court Action.  See Langenkamp v. Culp, 498 U.S. 42, 44 (1990) ("by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power ").

34.    Based upon the foregoing, its request for mandatory abstention must be denied.

## B.  The Motion for Discretionary Abstention Should Be Denied

35.    Furukawa alternatively seeks relief under the doctrine of discretionary abstention pursuant to 28 U.S.C §1334(c)(1).  However, as demonstrated below, Furukawa has failed to establish any of the exceptional circumstances required for permissive abstention.

This Court recently held:

> In determining whether to exercise permissive abstention under section 1334 (c), courts have considered one or more (not necessarily all) of twelve factors (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention;  (2) the extent to which state law issues predominate over bankruptcy issues;  (3) the difficulty or unsettled nature of the applicable state law;  (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court;  (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334;  (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;  (7) the substance rather than the form of an asserted 'core' proceeding;  (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;  (9) the burden of the bankruptcy court's docket;  (10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;  (11) the existence of a right to a jury trial;  (12) the presence in the proceeding of nondebtor parties."

In re:  Calpine Corp. 2007 WL 39124 at *3 (S.D.N.Y. Jan. 3, 2007).  After reviewing these factors, the Court held that "abstention is appropriate only in certain narrowly tailored exceptional circumstances" (citing Colorado River Water Conservation vs. U.S., 424 U.S. 800, 817-18 (1946) and that "[f]ederal courts have a 'virtually unflagging obligation' to exercise the jurisdiction given them."  2007 WL 39124 at *3 (citing In re Joint Eastern and Southern District Asbestos Litigation 78 F.3d 764, 775 (2d. Cir. 1996);  accord Luan

<u>Investment S.E. v. Franklin 145 Corp. (In re Petrie Retail, Inc.)</u>, 2001 WL 826122
(S.D.N.Y. July 19, 2001), <u>aff'd</u>, 304 F.3d 223, 232 (2d Cir. 2002).

36.    Here the relevant factors identified in <u>Calpine</u> militate against
discretionary abstention.  With respect to the efficient administration of justice,
Furukawa filed the proof of claim in this Court based on the same contract out of which
the State Court Action arose.  The parties are all before this Court[4] and the issues of
liability, damages and recovery regarding the Debtors' Agreements with Furukawa
may and should all be adjudicated in this Court, as opposed to the piecemeal
adjudication that Furukawa advocates.

37.    While the parties' dispute may implicate some state law issues, this
claim dispute can be resolved by applying Michigan law.  <u>See</u> <u>Luan Investment S.E.</u>,
2001 WL 826122 at *8, <u>aff'd</u>, 304 F.3d 223 (2d. Cir. 2002) ("Principles of comity were
satisfied because the bankruptcy court applied the law of the Commonwealth of Puerto
Rico in interpreting the Lease.").  This Court has previously adjudicated liability claim
disputes that were governed by Michigan state law.  <u>See</u> Order Disallowing Claim of
Laborsource 2000 Inc., dated March 8, 2007 [Docket No. 7173].

38.    Moreover, while Furukawa baldly describes the matter as
"complex", Motion at 12, it points to no specific difficult or unsettled issue of state law
that would govern the parties' dispute, and it showed its faith in this Court's ability to
interpret whatever state law issues might be implicated by filing its Proof of Claim in
this Court.  Accordingly, a consideration of those factors militates against abstention.

---

[4] Indeed, Furukawa has previously been before this Court, having sought relief from the automatic stay
to effect a setoff against a pre-petition overpayment it received.  [Docket No. 1537].  That request was
denied.  [Docket No. 2652].

39.     The Debtors and Furukawa are "diverse" within the meaning of 28 U.S.C. § 1332, consequently, an independent basis for jurisdiction exists for this contested matter in this Court.  This factor favors rejection of discretionary abstention.

40.     Resolution of Furukawa's proof of claim and Delphi's related claim against it could provide approximately $24 million to the for the benefit of the Debtors and their stakeholders.  Clearly, this dispute is closely related to the main bankruptcy case and involves a "core proceeding" in substance as well as name.

41.     Severing these matters is the least feasible option.  The State Court Action is not ready for trial and abstention at this point might mean a delay of years in the State Court before a judgment could benefit the Debtors' estates and their stakeholders.  This matter will not unduly strain the Court's docket because, following resolution of the Motion, the dispute between the parties can be resolved within the already well-defined terms of the claims objections procedures that were established by the Court's December 6, 2006 Order (the "Claims Procedures Order").  [Docket No. 6089].  This Court has already ruled on numerous claim objections in these cases.

42.     Furukawa has presented no allegation or evidence that forum shopping has occurred.  Indeed, Furukawa never asserted a counterclaim in the State Court Action.  Instead, it asserted its Proof of Claim in this Court.

43.     For all of these reasons, Furukawa's request for discretionary abstention should be denied.

## C.    The Motion for Relief from the Automatic Stay Should Be Denied

44.     Furukawa also contends that it should be granted relief from the automatic stay to pursue the State Court Action.  This request must also be rejected because Furukawa has failed to satisfy its burden to establish cause to modify the stay.

45.     The automatic stay imposed by section 362 of the Bankruptcy Code is one of the most fundamental and significant protections that the Bankruptcy Code affords a debtor.  Midatlantic Nat'l Bank v. N.J. Dep't of Envt'l. Prot., 474 U.S. 494, 503 (1986);  see also In re Drexel Burnham Lambert Group Inc., 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("[A]utomatic stay is key to the collective and preservative nature of a Bankruptcy proceeding.").  The automatic stay is designed to, among other purposes, give the debtor a "breathing spell" after the commencement of a chapter 11 case and shield the debtor from creditor harassment and a multitude of litigation in a variety of forums at a time when the debtor's personnel should be focusing on restructuring.  See Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S. 1079 (2000);  In re Enron Corp., 300 B.R. 201, 211 (Bankr. S.D.N.Y. 2003).

46.     The automatic stay broadly extends to all matters that may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that a debtor has the opportunity to rehabilitate and reorganize its operations.  See Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.), 801 F.2d 60, 62-64 (2d Cir. 1986);  see also Fidelity Mortgage Investors v. Camelia Builders, Inc., 550 F.2d 47, 53 (2d Cir. 1976), cert. denied, 429 U.S. 1093 (1977) ("Such jurisdiction is necessary 'to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted);  AP Indus. Inc. v. SN Phelps & Co. (In re AP Indus. Inc. v. SN Phelps & Co. (In re AP Indus., Inc.) 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.").

14

47.    Section 362(d)(1) of the Bankruptcy Code provides that the Court may grant relief from the automatic stay "for cause." In Sonnax Indus. v. Tri Component Prods. Corp. (In re Sonnax Indus.), 907 F.2d 1280, 1285 (2d Cir. 1990), the Court of Appeals explained the burden-shifting regime on a motion to modify the automatic stay:

> The burden of proof on a motion to lift or modify the automatic stay is a shifting one. Section 362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the burden of proof on the debtor for all issues other than "the debtor's equity in property," 11 U.S.C. § 362(g)(1). See 2 Collier on Bankruptcy ¶ 362.10, at 362-76. If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection.

48.    "If the movants fail to make an initial showing of cause . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." Id.; see also In re Metro Transp. Co., 82 B.R. 351, 353 (Bankr. E.D. Pa. 1988) (unsecured creditors face difficult task of producing evidence to establish balance of hardships tips in their favor to obtain stay relief). Moreover, during the period when debtors still retain the exclusive right to formulate a plan of reorganization, "an unsecured, unliquidated claim holder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown." See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

49.    As demonstrated herein, Furukawa has failed to establish any cause, let alone extraordinary cause, sufficient to obtain relief from the automatic stay to proceed with the State Court Action. The failure of Furukawa to satisfy its burden to show cause is sufficient grounds to deny its Motion.

50.    Even if Furukawa had provided some evidence to satisfy its burden to establish cause – which it has not – this Court may exercise its discretion to determine whether a modification of the automatic stay would be appropriate under the circumstances.  In re Sonnax Indus., 907 F.2d at 1288.  Courts have traditionally used multifactor tests to determine whether cause exists to modify or lift the automatic stay. The Second Circuit has used a twelve-factor test articulated in the Sonnax decision.  In re Sonnax sets forth the following list of twelve factors that should be considered when deciding whether the stay should be modified to allow litigation against a debtor to continue in another forum:

> (1) whether relief would result in a partial or complete resolution of the issues;  (2) lack of any connection with or interference with the bankruptcy case;  (3) whether the other proceeding involves the debtor as a fiduciary;  (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it;  (6) whether the action primarily involves third parties;  (7) whether litigation in another forum would prejudice the interests of other creditors;  (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;  (10) the interests of judicial economy and the expeditious and economical resolution of litigation;  (11) whether the parties are ready for trial in the other proceeding;  and (12) impact of the stay on the parties and the balance of harms.

Id. at 1286.  See also In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984).  All twelve factors will not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167 F.3d 139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each of the twelve factors.  See Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship (In re Burger Boys, Inc.), 183 B.R. 682, 688 (Bankr. S.D.N.Y. 1994).

51.    The factors relevant to the Motion are:  (i) whether relief would result in a partial or complete resolution of the issues;  (ii) lack of any connection with

or interference with the bankruptcy case;  (iii) whether the action primarily involves third parties;  (iv) whether litigation in another forum would prejudice the interests of other creditors;  (v) the interests of judicial economy and the expeditious and economical resolution of litigation;  (vi) whether the parties are ready for trial in the other proceeding;  and (vii) the impact of the stay on the parties and the balance of harms.  As demonstrated below, Furukawa has not, and indeed cannot, carry the burden of establishing that sufficient cause exists to modify the automatic stay. Accordingly, the Motion should be denied.

1.    Relief from Stay Would (i) Result in an Incomplete
      Resolution of the Issues;  (ii) Interfere With the Bankruptcy Case;
      and (iii) Not Serve the Interests of Judicial Economy

52.    As described above, the State Court Action and the Furukawa Claim Objection in this Court are inextricably intertwined because they are based on identical facts, circumstances and injuries.  Furukawa's pursuit of the State Court Action would interfere with these Cases because the Debtors would need to focus their resources of time, people and money to oversee the State Court Action while pursuing their objection to the Furukawa Claim in this Court, all at a time when they need to devote their resources to maintain enterprise value and advance their reorganization efforts.  The relief sought by Furukawa would not only result in an incomplete or inconsistent resolution of the issues but would also be contrary to the interests of judicial and case administration economy.

2.    The Conflict Involves the Same Parties, the State Court
      Action Is Not Ready For Trial, and Pursuit of the State
      Court Lawsuit Would Prejudice the Rights of Other Creditors

53.    The Debtors' objection to Furukawa's Proof of Claim in this Court and the State Court Action involve the identical parties.

17

54.     In addition, the State Court Action has not meaningfully progressed.  In fact, the case is in such a preliminary phase that there has yet to be any deposition discovery and neither a state mandated mediation nor a trial date has been scheduled.  The total amount at issue, approximately $24 million, is significant to these estates.  Modifying the automatic stay to allow Furukawa to proceed against the Debtors in the State Court Action would require the Debtors and their counsel to invest in time-consuming and costly litigation to the detriment of other efforts that are more central to the Debtors' efforts to reorganize.

55.     The case of <u>Bohack Corp. v. Borden, Inc.( In re Bohack Corp.)</u>, 599 F.2d 1160, 1168 (2d Cir. 1979), cited by Furukawa as support for the proposition that relief from the automatic stay should be granted, is inapposite on the facts and the law.  Contrary to Furukawa's assertion, the antitrust complaint filed by the debtor in <u>Bohack</u> was filed two years *after* the debtor sought bankruptcy relief.  When the creditor subsequently made a counterclaim in the antitrust litigation, the Court, citing equity, ruled it would be unfair to preclude it from doing so.  Here, by contrast, Furukawa submitted to and invoked this Court's jurisdiction by filing its Proof of Claim -- having never asserted that claim in the State Court Action.  Furukawa thereafter joined issue in the Debtors' objection to Furukawa's Proof of Claim in this Court.[5]  Equity requires that Furukawa be held to its choice of forum and litigate here.

3.      The Balance Of The Harms Weighs In Favor Of
        <u>Denying Furukama Relief from the Stay</u>

56.     In stark contrast to the substantial prejudice that the Debtors would suffer, Furukawa cannot show that it would be prejudiced if the Motion were denied.

---

[5] In compliance with this Court's Claims Procedures Order, Furukawa and the Debtors participated at a meet and confer session and are scheduled to meet again.

Furukawa will participate in the Debtors' cases in the same way that all other creditors will participate in complex chapter 11 cases, and this Court has limited the delay associated with claim adjudication by implementing the procedures contained in the Claims Procedures Order. See In re Comdisco, 271 B.R. 273 at 277-80 (Bankr. N.D. Ill. 2002) (finding that "the automatic stay almost always delays litigants … [t]hat, after all, is its purpose, and the reason they call it a 'stay'").

57.     Finally, Furukawa submitted to the jurisdiction of this Court when it filed its proof of claim. The Debtors have objected to Furukawa's Proof of Claim. The allowance or disallowance of a claim is a core proceeding and the Furukawa claim objection is properly litigated in this Court and not in the State Court Action. See Langenkamp v. Culp, 498 U.S. 42, 44 (1990) ("by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims, thereby subjecting himself to the bankruptcy court's equitable power").

**D.     This Matter Should Be Fully Resolved at a Claims Hearing**

58.     Furukawa's request that the claims hearing for the Debtors' claim objection hearing be "limited" must also be rejected. This dispute is a breach of contract matter and can be resolved within the parameters of the Orders of this Court. Furukawa and the Debtors each assert claims for damages in connection with the Agreements. This Court cannot adjudicate one claim without considering the other, and this Court is well equipped to adjudicate all of the parties' claims. Furukawa will not suffer any hardship as a result of this Court's resolving the parties' claims. The interests of judicial economy strongly favor such a resolution and granting Furukawa's requests could lead to inconsistent adjudications.

## CONCLUSION

59.     Based on the foregoing, Furukawa has failed to establish any basis for abstention or relief from the automatic stay, and its Motion should be denied in its entirety.

## NOTICE

60.     Notice of this Objection has been provided in accordance with the Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (i) Omnibus Hearing Dates, (ii) Certain Notice, Case Management, and Administrative Procedures, and (iii) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), which was entered by this Court on December 7, 2006 (Docket No. 6089).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## MEMORANDUM OF LAW

61.     Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

**WHEREFORE**, the Debtors respectfully request that the Court enter an

Order denying the Motion, together with such other and further relief as may be just

and proper.

Dated:   New York, New York
       April 13, 2007

                  DELPHI CORPORATION, *et al.*
                  By their attorneys,
                  TOGUT, SEGAL & SEGAL LLP
                  By:

                  /s/ Neil Berger
                  ALBERT TOGUT (AT-9759)
                  NEIL BERGER (NB-3599)
                  Members of the Firm
                  One Penn Plaza
                  New York, New York 10119
                  (212) 594-5000