TOGUT, SEGAL & SEGAL LLP
Co-Counsel for Delphi Corporation, *et al.*,
Debtors and Debtors in Possession
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Albert Togut (AT-9759)
Neil Berger (NB-3599)
Lara Sheikh (LS-0879)

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

**HEARING DATE: April 20, 2007
AT:  10:00 a.m.**

-------------------------------------------------------------x
                                                             :
In re:                                                       :
                                                             :     Chapter 11
DELPHI CORPORATION, *et al.*,                                :     Case No. 05-44481 [RDD]
                                                             :
                        Debtors.                             :     Jointly Administered
                                                             :
-------------------------------------------------------------x

## DEBTORS' OBJECTION TO MOTION BY WACHOVIA BANK, NATIONAL ASSOCIATION, FOR RELIEF FROM AUTOMATIC STAY TO PROCEED WITH LITIGATION AGAINST LARRY GRAVES, A DELPHI EMPLOYEE, IN THE CIRCUIT COURT OF THE SECOND JUDICIAL DISTRICT OF HINDS COUNTY MISSISSIPPI

**TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:**

Delphi Corporation ("Delphi") and certain of its subsidiaries and

affiliates, debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned cases (the "Cases"), by their undersigned counsel, as and for their objection to

the Motion (the "Motion") by Wachovia Bank, National Association, as successor by

merger to SouthTrust Bank, ("Wachovia" or "SouthTrust") for an Order for relief from

the automatic stay to proceed with a Mississippi state court lawsuit (the "State Court

Action") against Larry Graves ("Mr. Graves"), one of the Debtors' current managers,
respectfully state:

## PRELIMINARY STATEMENT

1.    Mr. Graves is a current management employee of the Debtors to
whom the Debtors have indemnity obligations.  Those indemnity obligations arise from
the Debtors' By-Laws and pursuant to an Order of this Court.  The Debtors are bound
to advance Mr. Graves' costs and expenses incurred and to indemnify him in
accordance with the Debtors' Bylaws in the State Court Action, which Wachovia
commenced against the Debtors prior to the Filing Date (defined below)[1].

2.    Wachovia asserts a claim of more than $6.8 million against Delphi.
Now that its direct claims against Delphi are stayed, Wachovia seeks to collect upon its
claims by pursuing litigation against Mr. Graves in the Mississippi State Court Action
with full knowledge of the Debtors' indemnification obligations.

3.    Wachovia improperly seeks relief from the automatic stay to
pursue Mr. Graves even though the Mississippi State Court has held that:  (i) claims
which Wachovia sought to assert against other Delphi employees, including Mr.
Graves' superior, based upon conduct and allegations that are precisely the same as
those asserted against Graves, are "based solely on alleged acts they performed in their
representative capacity and in the course and scope of their employment with
Delphi . . . " and "do not indicates [sic] any basis for liability . . .";  and (ii)  the

---

[1]    Wachovia added Mr. Graves as a defendant in the Mississippi State Court Action before the
Filing Date (defined below).

automatic stay pursuant by Title 11 U.S.C. (the "Bankruptcy Code") section 362 bars

Wachovia's efforts to assert its claim against the other Delphi Employees.[2]

4.    On August 13, 2006, the Mississippi State Court entered an order

advising that if the continuation of any litigation against Mr. Graves was also found to

be a violation of the automatic stay, it would entertain Mr. Graves' request for payment

of reasonable fees and expenses.  Wachovia filed its Motion in this Court three days

before those sanctions were to be considered by the Mississippi State Court.

5.    It is abundantly clear that having been told by the Mississippi State

Court that its claims against Delphi employees violate the automatic stay in the

Debtors' cases, Wachovia's present Motion is an impermissible request that this Court

exercise appellate review of the Mississippi State Court ruling.

6.    The facts, which are uncontested by Wachovia, demonstrate an

identity of interest between Mr. Graves and the Debtors, such that "unusual

circumstances" warrant extending the automatic stay to stay the Mississippi State Court

Action against Mr. Graves.  Wachovia has failed to demonstrate any cause to justify

modification of the automatic stay, and no basis exists for this Court to exercise its

discretion to permit the State Court Action to continue against one of the Debtors'

current employees on account of duties that he took within the course and scope of his

employment.  Consequently, the Motion should be denied.

## THE DEBTORS' BANKRUPTCY CASES

7.    On October 8 and 14, 2005, Delphi and certain of its U.S.

subsidiaries and affiliates filed voluntary petitions in this Court for reorganization relief

---

[2]    The Mississippi State Court denied Wachovia's second request to amend its Complaint in the
Mississippi State Court Action to sue additional Delphi employees, including Mr. Graves'
superiors. See Exhibit "5," ¶ 2.

under Chapter 11 of Title 11 of the Bankruptcy Code.  The Debtors continue to operate

their businesses and manage their properties as debtors in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  This Court entered Orders directing

the joint administration of the Debtors' Chapter 11 cases.

8.    On October 13, 2005, this Court entered an Order which, among

other things, authorized the Debtors to continue maintenance with their Human Capital

Benefits Programs [the "Human Capital Order," Docket No. 198].  Those Human

Capital Benefits Programs include, among other things, the Debtors' obligation to

advance fees and expenses for the benefit of employees for costs and liability that they

incur in connection with their actions relating to their employment with the Debtors.

See Exhibit "1."

9.    On October 17, 2005, the United States Trustee (the "U.S. Trustee")

appointed an official committee of unsecured creditors.  No trustee or examiner has

been appointed in the Debtors' cases.  On April 28, 2006 the U.S. Trustee appointed an

official committee of equity holders (the "Equity Committee").

10.    This Court has jurisdiction over this contested matter pursuant to

28 U.S.C. §§ 157 and 1334.

<u>**Current Business Operations of the Debtors**</u>

11.    As of December 31, 2005, Delphi and its subsidiaries and affiliates

(collectively, the "Company") had global 2005 net sales of approximately $26.9 billion

and global assets of approximately $17.0 billion.[3]  At the time of its chapter 11 filing,

Delphi ranked as the fifth largest public company business reorganization in terms of

revenues, and the thirteenth largest public company business reorganization in terms of

4

assets.  Delphi's non-U.S. subsidiaries are not chapter 11 debtors and continue their business operations without supervision from the Bankruptcy Court.

12.    The Company is a leading global technology innovator with significant engineering resources and technical competencies in a variety of disciplines, and is one of the largest global suppliers of vehicle electronics, transportation components, integrated systems and modules, and other electronic technology.  The Company supplies products to nearly every major global automotive original equipment manufacturer.

13.    Delphi was incorporated in Delaware in 1998 as a wholly-owned subsidiary of General Motors Corporation ("GM").  Prior to January 1, 1999, GM conducted the Company's business through various divisions and subsidiaries.  Effective January 1, 1999, the assets and liabilities of these divisions and subsidiaries were transferred to the Company in accordance with the terms of a Master Separation Agreement between Delphi and GM.  In connection with these transactions, Delphi accelerated its evolution from a North American-based, captive automotive supplier to a global supplier of components, integrated systems, and modules for a wide range of customers and applications.  Although GM is still the Company's single largest customer, today more than half of Delphi's revenue is generated from non-GM sources.

<u>Events Leading To The Chapter 11 Filing</u>

14.    In the first two years following Delphi's separation from GM, the Company generated approximately $2 billion in net income.  Every year thereafter, however, with the exception of 2002, the Company has suffered losses.  In calendar year 2004, the Company reported a net loss of approximately $4.8 billion on $28.6 billion in

---

[3]    The aggregated financial data used in this objection generally consists of consolidated

*(footnote continued on the following page)*

net sales.[4]  Reflective of a continued downturn in the marketplace, in 2005 Delphi

incurred net losses of approximately $2.4 billion on net sales of $26.9 billion.

15.     The Debtors believe that the Company's financial performance has

deteriorated because of (a) increasingly unsustainable U.S. legacy liabilities and

operational restrictions driven by collectively bargained agreements, including

restrictions preventing the Debtors from exiting non-profitable, non-core operations, all

of which have the effect of creating largely fixed labor costs, (b) a competitive U.S.

vehicle production environment for domestic OEMs resulting in the reduced number of

motor vehicles that GM produces annually in the United States and related pricing

pressures, and (c) increasing commodity prices.

16.     In light of these factors, the Company determined that it would be

imprudent and irresponsible to defer addressing and resolving its U.S. legacy liabilities,

product portfolio, operational issues, and forward-looking revenue requirements.

Because discussions with its major unions and GM had not progressed sufficiently by

the end of the third quarter of 2005, the Company commenced these chapter 11 cases for

its U.S. businesses to complete the Debtors' transformation plan and preserve value for

its stakeholders.

### The Debtors' Transformation Plan

17.     On March 31, 2006, the Company outlined five key tenets of its

transformation plan.  First, Delphi must modify its labor agreements to create a

competitive arena in which to conduct business.  Second, the Debtors must conclude

their negotiations with GM to finalize GM's financial support for the Debtors' legacy

---

[4]     information from Delphi and its worldwide subsidiaries and affiliates.
        Reported net losses in calendar year 2004 reflect a $4.1 billion tax charge, primarily related to the
        recording of a valuation allowance on the U.S. deferred tax assets as of December 31, 2004.  The
        Company's net operating loss in calendar year 2004 was $482 million.

and labor costs and to ascertain GM's business commitment to the Company.  Third, the
Debtors must streamline their product portfolio to capitalize on their world-class
technology and market strengths and make the necessary manufacturing alignment
with their new focus.  Fourth, the Debtors must transform their salaried workforce to
ensure that the Company's organizational and cost structure is competitive and aligned
with its product portfolio and manufacturing footprint.  Finally, the  Debtors must
devise a workable solution to their current pension situation.

    18.    On December 18, 2006, the Debtors marked another milestone in
their chapter 11 cases with the announcement of two significant agreements.  The first
of these was an equity purchase and commitment agreement (the "Equity Purchase and
Commitment Agreement") with affiliates of Appaloosa Management L.P., Cerberus
Capital Management, L.P., and Harbinger Capital Partners Master Fund I, Ltd., as well
as Merrill Lynch & Co. and UBS Securities LLC (collectively, the "Plan Investors").
Under the Equity Purchase and  Commitment Agreement, the Plan Investors have
agreed to invest up to $3.4 billion in preferred and common equity in the reorganized
Delphi to support the Debtors' transformation plan.  The Equity Purchase and
Commitment Agreement is subject to the completion of due diligence, satisfaction or
waiver of numerous other conditions (including Delphi's achievement of consensual
agreements with its principal U.S. labor unions and GM), and the non-exercise by either
Delphi or the Plan Investors of certain termination rights.  The second agreement was a
plan framework support agreement (the "Plan Framework Support Agreement") with
the Plan Investors and GM.  The Plan Framework Support Agreement outlines certain
proposed terms of  the Debtors' anticipated plan of reorganization, including the
distributions to be made to creditors and shareholders, the treatment of GM's claims,
the resolution of certain pension funding issues, and the corporate governance of the

reorganized Debtors.  The terms of the Plan Framework  Support Agreement are expressly conditioned on the Debtors' reaching consensual agreements with their U.S. labor unions and GM.

19.     On January 12, 2007, this Court authorized the Debtors to execute, deliver, and implement the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement (Docket No. 6589).  On February 28, 2007, Delphi entered into an amendment to the Equity Purchase and Commitment Agreement with the Plan Investors to extend the date by which the Company, the Cerberus Capital Management, L.P. affiliate, or the  Appaloosa Management L.P. affiliate have the right to terminate the agreement on account of not yet having completed tentative labor agreements with Delphi's principal U.S. labor unions and a consensual settlement of legacy issues with GM.  The amendment extended the termination right  pursuant to a 14-day notice mechanism.  The amendment also extended the deadline to make certain regulatory filings under the federal antitrust laws in connection with the Equity Purchase and Commitment Agreement and the Plan Framework Support Agreement.

20.     Although much remains to be accomplished in the Debtors' reorganization cases, the Debtors and their stakeholders are together navigating a course that should lead to a consensual resolution with their U.S. labor unions and GM while providing an acceptable financial recovery framework for the Debtors' stakeholders.  Upon the conclusion of the  reorganization process, the Debtors expect to emerge as a stronger, more financially sound business with viable U.S. operations that are well-positioned to advance global enterprise objectives.  In the meantime, Delphi will marshal all of its resources to continue to deliver high-quality products to its customers globally.  Additionally, the Company will preserve and continue the strategic

growth of its non-U.S. operations and maintain its prominence as the world's premier auto supplier.

**Wachovia's Claim and State Court Action**

21.     Lextron Corporation ("Lextron") was a manufacturer of automotive and telecommunications parts in Jackson, Mississippi.  The Debtors purchased finished automotive parts from Lextron.  The Debtors provided equipment to Lextron to make the automotive parts, and was a major supplier of raw materials to Lextron.  Many of the parts made by Lextron for Delphi were original parts for new vehicles.  Lextron was Delphi's sole supplier of many of those original parts, and those original parts were part of Delphi's "just in time" inventory system.  Lextron supplied parts to the Debtors pursuant to a requirements contract.  See Exhibit "2."

22.     Discovery in the Mississippi State Court Action has disclosed that in 2002, SouthTrust, now Wachovia, provided real estate loans, an operating line of credit and other loans to Lextron.  By mid-2002, Lextron's total debt to SouthTrust had reached approximately $6.2 million.  In the first half of 2002, SouthTrust increased Lextron's line of credit from $2.5 million to $3.2 million.  Inventory and receivables secured the line of credit.

23.     In late 2002, SouthTrust sent an independent collateral auditor to inspect Lextron.  The collateral auditor reported to SouthTrust that Lextron's financial records were in poor condition, that employee trust funds had been diverted,[5] that Lextron was slow paying its vendors, and that its inventory and receivable records were unreliable.  The collateral auditor concluded that SouthTrust lacked adequate collateral

---

[5]     The Internal Revenue Service has asserted tax liens against Lextron's assets, including the Lextron POC (defined below) against the Debtors.

to secure its claims against Lextron.  Lextron's loans were then transferred to
SouthTrust's Special Assets Division, with the account to be administered by Andy
Raine, a SouthTrust vice president.

24.    By late 2002, SouthTrust declared Lextron's loans in default, and
directed Lextron to hire Alvarez & Marsal ("A&M"), a consultant for financially
distressed companies.  In late December, A&M prepared a five-week cash flow
projection that revealed significant negative cash flow at Lextron.  A&M also prepared a
liquidation analysis that projected a low, medium and high recovery if Lextron was
liquidated.  Under all of those scenarios, A&M projected that SouthTrust was in a loss
position.

25.    SouthTrust and Lextron entered into a Forbearance Agreement
with an effective date of December 31, 2002.  In the Forbearance Agreement, SouthTrust
took assignment of Lextron's claims against its outside CPA firm (which produced
audited financial statements).  Subsequently, in its own lawsuit against the CPA firm,
SouthTrust described Lextron as a "financial house of cards."

26.    Although SouthTrust knew that Lextron was not viable, in
December 2002, SouthTrust asked the Debtors to provide it with a written
representation that the Debtors would continue to use Lextron as a supplier.  On
January 9, 2003, the Debtors sent a letter (the "January 9 Letter") to SouthTrust, signed
by Mr. Graves[6] in his capacity as representative of the Debtors, in which the Debtors
stated that their "focus [was] to maintain Lextron as a supplier."  Significantly, the letter

---

[6]    Mr. Graves did not participate in the communications between SouthTrust and the Debtors
which culminated in the January 9 Letter.  Discovery in Wachovia's action against the Debtors
confirms that Mr. Graves signed the January 9 Letter only because the employees who did
participate in those communications were unavailable on January 9.

also retained the Debtors' right of setoff, i.e., the use of bookkeeping contra entries to net out payments. The letter was emailed to Mr. Raine on January 9, 2003.

27.    In January 2003, SouthTrust increased Lextron's line of credit by $800,000. Wachovia now asserts that SouthTrust relied upon the January 9 Letter when it increased Lextron's line of credit even though:  (a) Lextron supplied parts to the Debtors pursuant to a requirements contract pursuant to which monthly shipments and billings were subject to fluctuation;  and (b) A&M told Lextron's officers in a January 3, 2003 email, *before* Delphi's letter was sent to Wachovia and before Wachovia's conversations with the Debtors' representatives concluded, that SouthTrust was committed to increase the line of credit by $800,000. Moreover, Delphi's letter was sent after Wachovia had seen A&M's five-week cash flow projection which showed a substantial shortfall. SouthTrust's loan record approving the increase in Lextron's line of credit bears a typed date of January 8, 2003 – one day before the January 9 Letter to SouthTrust. The loan record further reflects that the purpose of the loan was to stop a free fall liquidation, and made no mention of the January 9 Letter. See Exhibit "3" annexed hereto.

28.    Reports issued by each A&M and the Debtors' professionals separately concluded that Lextron could not continue as a viable business enterprise and a supplier to the Debtors. The Debtors terminated Lextron as a supplier during February 2003 after Lextron failed to present a credible plan to assure the Debtors that Lextron had the ability to continue as a going concern.

**Mississippi State Court Action**

29.    On April 3, 2003, SouthTrust commenced the Mississippi State Court Action against the Debtors and Lextron. SouthTrust asserted that the Debtors made material misrepresentations that induced SouthTrust to increase its line of credit

to Lextron, and that the Debtors were responsible for the repayment of that $800,000 line of credit. Lextron cross-claimed against the Debtors and asserted similar facts against the Debtors, and also sought consequential and incidental damages.[7]

30.    Wachovia asserted that the Debtors are liable to Wachovia: $966,750.68 in compensatory damages, representing the increased line of credit to Lextron, plus interest, costs and expenses; $856,120.84, representing attorneys' fees and expenses; and $4,833,753.40, representing punitive damages. Wachovia has filed duplicative Proofs of Claim Nos. 14912 and 14913 in the Debtors' case. See Exhibit "4" annexed hereto (together, the "Wachovia POC").

31.    Lextron filed its own petition for relief under Chapter 11 of the Bankruptcy Code in the United State Bankruptcy Court for the Southern District of Mississippi in February 2004. Lextron was unable to reorganize and, upon a motion by the United States Trustee, Lextron's bankruptcy case was dismissed.

32.    At a hearing during September 2005, prior to the Filing Date, SouthTrust sought leave to file an amended complaint to add Mr. Graves as a defendant in the Mississippi State Court Action and it was orally granted permission to do so. Consistent with their By-Laws, the Debtors have agreed to advance fees and expenses to Mr. Graves in the Mississippi State Court Action.

33.    Later in September 2005, Wachovia filed a motion for authority to file a second amended complaint (the "Second Amended Complaint") to add certain other Delphi employees as defendants, including Mr. Graves' superior at the time, Sidney Johnson (the "Other Delphi Employees"). Wachovia asserted that the Other

---

[7]    Lextron's cross-claims against the Debtors were dismissed. Lextron asserted similar claims in a response to the Debtors' separate replevin action that they had to commence against Lextron to recover possession of the Debtors' tooling.

Delphi Employees participated in the preparation of the January 9 Letter and, based

upon allegations precisely the same as those asserted by Wachovia against Graves,

Wachovia asserted that the Other Delphi Employees were liable to Wachovia, even

though their actions were within the scope of their employment with the Debtors.

34.    On April 11, 2006, the Mississippi State Court entered an order (the

"April 11 Order") and denied Wachovia's motion for leave to file the Second Amended

Complaint against the Other Delphi Employees, and held that:

> "SouthTrust seeks individual liability against the [Other]
> Delphi Employees based solely on alleged acts they
> performed in their representative capacity and in the course
> and scope of their employment with Delphi.  No allegations
> in the proposed Second Amended Complaint indicates [sic]
> any basis for liability against the [Other] Delphi Employees
> in their individual capacity. . . .  SouthTrust's claims against
> Delphi are subject to the automatic stay afforded Delphi as a
> result of its Chapter 11 bankruptcy filing on October 8, 2005.
> The bankruptcy automatic stay afforded Delphi also applies
> to the Delphi Employees."

April 11 Order, ¶¶ 1-2, annexed hereto as Exhibit "5."

35.    Wachovia's allegations of liability against the Other Delphi

Employees, which were rejected by the Mississippi State Court, are identical to the

allegations against Mr. Graves in the First Amended Complaint.  See Second Amended

Complaint ¶¶ 7-9, and First Amendment Complaint ¶¶ 3-5, each annexed hereto as

Exhibit "6."

36.    On August 23, 2006, the Mississippi Court entered an order

(the "August 23  Order," a copy of which is annexed hereto as Exhibit "7") which

decreed that in the event the Mississippi State Court was asked to determine and

concluded that any litigation against Mr. Graves is stayed – as are the claims against the

Other Delphi Employees – it would consider a motion by Mr. Graves to assess expenses

13

against Wachovia, including attorneys' fees incurred by Mr. Graves to defend in the Mississippi State Court Action.

37.    On September 25, 2006, Mr. Graves filed a motion to dismiss the First Amended Complaint and he sought costs against Wachovia.  Mr. Graves' motion was scheduled to be heard by the Mississippi State Court on December 1, 2006. Apparently, Wachovia concluded that the Mississippi State Court would follow its prior ruling and hold that Wachovia's claims against Mr. Graves – which are the same as the proposed causes of action against the Other Delphi Employees –  are stayed and award costs to Mr. Graves.  Wachovia filed its present Motion in this Court on November 28, 2006 – three days before the Mississippi State Court was scheduled to consider Mr. Graves' motion for dismissal and sanctions.  Wachovia then asked the Mississippi State Court to refrain from ruling on Mr. Graves' motion until this Court rules on the Motion.

38.    Lextron has filed duplicative Proofs of Claim Nos. 10385460 and 10385461 in the Debtors' cases seeking payment of $800,000, plus incidental and punitive actual consensual damages . . . ."  See Exhibit "8" annexed hereto (together, the "Lextron POC").

39.    Pursuant to an Agreement to Release Account Proceeds and Collateral Assignment of Claims between SouthTrust and Lextron dated March 14, 2003, Lextron collaterally assigned to SouthTrust all of Lextron's claims against the Debtors, and gave Wachovia "the right to release, waive, compromise or settle any of the [Lextron] Claims" against the Debtors.  See Exhibit "9."

40.    The Debtors advised Wachovia that they object to the Wachovia and Lextron POC's.  The Debtors and Wachovia agreed to mediate the Debtors' claim objections.  The parties' mediation began on March 16, 2007 in Jackson, Mississippi and

14

continued until the negotiations reached an impasse.  The Debtors' formal objections to Wachovia's and Lextron's POCs will be adjudicated in this Court pursuant to this Court's December 6, 2006 Order (the "Claim Procedure Order") which, among other things, approved procedures governing objections to claims [Docket No. 6089].[8]

**Delphi's Obligations**

41.    Article V of the Amended and Restated By-Laws of Delphi Corporation (the "By-Laws") provides for the indemnification of managerial employees of the Debtors, such as Mr. Graves.  A copy of the By-Laws is annexed hereto as Exhibit "10."  Section 5.1 of the By-Laws provides, in relevant part, that Delphi shall indemnify any person who was or is made a party to any action, suit or proceeding by reason of the fact that such person is or was a managerial employee of Delphi against expenses (including attorneys' fees and disbursements), costs, judgments, fines, penalties and amounts paid in settlement actually and reasonably incurred by such person in connection with such action.  Delphi is also obligated under its By-Laws to advance Mr. Graves' expenses pursuant to section 5.5 of the By-Laws.

42.    The Human Capital Order authorized the Debtors to honor their obligations to Mr. Graves.

43.    A verified copy of the By-Laws were provided to Wachovia in the Mississippi State Court Action.

---

[8]    Disallowance of the Wachovia POC and the Lextron POC will render moot Wachovia's claims against Mr. Graves in the Mississippi State Court Action.

## ARGUMENT

**I.    The Automatic Stay Should Bar the Continuation of the Mississippi State Court Action Against Mr. Graves[9]**

44.    Pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, a Bankruptcy Court may properly conclude that proceedings against non-debtor co-defendants are stayed in the presence of "unusual circumstances," such as where there is such an identity between the debtor and the third party defendant, that the debtor may be said to be the real party defendant and that the judgment against the third party defendant will in effect be a judgment or finding against the debtor. A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999, cert. denied, 479 U.S. 876 (4th Cir. 1986); In re Lomas Financial Corp. v. Northern Trust Company, 117 B.R. 64, 68 (S.D.N.Y. 1990). Polytop Corp. v. Globe Plastics, Inc., 31 B.R. 226 (D.R.I. 1983) (concluding that state court action against employee of debtor violated the automatic stay). "An illustration of such a situation would be a suit against a third party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." A.H. Robins, 788 F.2d at 999; In re Lomas, 117 B.R. at 68.

---

[9]    The extension of the automatic stay to Mr. Graves does not require the commencement of an adversary proceeding because both parties have briefed the issue of the applicability of the automatic stay to Mr. Graves in the Mississippi State Court Action, and the failure to proceed by adversary proceeding will not prejudice either party. See In re Zale Corporation, 62 F.3d 746,763-64 (5th Cir.1995)(requirements of adversary proceeding may be waived where each party is aware of all the issues and has had a chance to address them)(citing In re Haber Oil Co., 12 F.3d 426, 440 (5th Cir. 1994)); In re Copper Kind Inn, 918 F.2d 1404, 1407 (9th Cir. 1990)(same); In re E-Z Serve Convenience Stores, Inc., 318 B.R. 631, 636 (Bankr. M.D.N.C. 2004)(the lack of adversary proceeding is "harmless error" if the failure to provide an adversary proceeding "does not result in demonstrable prejudice")(citing In re Lewis, 142 B.R. 952, 955 (Bankr. D. Colo. 1992)); In re Wlodarski, 115 B.R. 53, 56 (Bankr. S.D.N.Y. 1990)(although action should have been brought as an adversary proceeding, the failure of the opposing party to object to the form of the proceeding, and the interests of an expeditious resolution to the case, allowed the court to resolve the matter).

45.      A debtor corporation's financial responsibility for claims against its principals creates an identity of interest sufficient to justify extension of the automatic stay.  In re North Star Contracting Corp., 125 B.R. 368, 370 (S.D.N.Y. 1991);  In re Lomas, 117 B.R. at 68.  See also, Queenie Ltd. v. Nygard Int'l, 321 F.3d 282, 287 (2d Cir. 2003) (recognizing that it is appropriate to apply the stay to a non-debtor where the adjudication of a lawsuit will have an immediate adverse economic impact on the debtor's estate).

46.      Courts also extend the automatic stay to non-debtors when an adverse judgment in that litigation will collaterally estop the debtor in subsequent litigation.  In re Calpine Corp., 354 B.R. 45, 47 (Bankr. S.D.N.Y. 2006) (citing cases). Polytop, supra 31 B.R. at 229 ("the allegations against Globe necessarily concern actions by Lindley in his capacity as an employee of Polytop").

47.      In this case, Delphi's By-Law's expressly provide for the indemnification of managerial employees, such as Mr. Graves.  By its Human Capital Order, this Court authorized Delphi to honor its indemnity obligations to its managerial employees, and the Debtors have agreed to advance the costs and expenses that Mr. Graves has been incurring to defend himself in the Mississippi State Court Action.  This alone creates a basis to conclude that the automatic stay prevents the continuation of Wachovia's claims against Mr. Graves.  A.H. Robins, supra.

48.      The Mississippi State Court has already ruled that Wachovia's allegations in the proposed Second Amended Complaint against the Other Delphi Employees, including Mr. Graves' superiors who prepared the January 9 Letter, do not provide any basis to hold those employees liable in their individual capacities because their alleged actions in connection with the January 9 Letter were all taken in the scope and capacity as representatives of the Debtors.  See Exhibit "5," ¶ 2.  The allegations

against Mr. Graves are identical to Wachovia's allegations against the Other Delphi
Employees.  As a result, Wachovia's allegations against Mr. Graves fail to provide a
basis for any individual liability.  Indeed, Wachovia's allegations seek to impose
liability for actions taken by Mr. Graves in his capacity as an employee of the Debtors.
Consequently, any findings or judgment in an action against Mr. Graves would be
findings and a judgment against the Debtors.

49.    Furthermore, Wachovia's claims against Mr. Graves are based
upon the identical facts that give rise to the Wachovia Claim against the Debtors and
are inextricably tied to the Wachovia POC.  Wachovia filed the Wachovia POC in this
Court and submitted itself to this Court's jurisdiction.  The Debtors' objection to the
Wachovia POC has been asserted and gone to mediation as contemplated by the Claims
Procedure Order.  If the mediation fails, the allowance of the Wachovia POC will be
adjudicated by this Court as a "core" proceeding pursuant to the Claims Procedures
Order.  28 U.S.C. § 157(b)(2)(B).

50.    If the State Court Lawsuit is permitted to proceed against Mr.
Graves, issues regarding the Debtors' liability, their defenses and any damages that
may be fixed, will be determined in the Debtors' absence, thereby exposing the Debtors
to a significant risk of inconsistent rulings, collateral estoppel, *stare decisis* and
evidentiary prejudice.  This result also supports a continuation of the complete stay of
the Mississippi State Court Lawsuit.  See In re Calpine Corp., 354 B.R. at 47.

51.    All of these facts satisfy the "unusual circumstances" standard set
forth in A.H. Robins and adopted by Courts in this Circuit.  A judgment against Mr.
Graves will in effect be a judgment against Delphi as a result of its immediate adverse
economic impact to the Debtors' estates and its potential collateral estoppel effect.  The

stay articulated by the Mississippi State Court is sound and should apply to Mr. Graves – and the Debtors' interests pursuant to Bankruptcy Code sections 105(a) and 362(a).

## II.     <u>Wachovia Has Failed to Establish Cause to Modify the Automatic Stay</u>

52.    The automatic stay imposed by section 362 of the Bankruptcy Code is one of the most fundamental and significant protections that the Bankruptcy Code affords a debtor.  <u>Midlantic Nat'l Bank v. N.J. Dep't of Envt'l. Prot.</u>, 474 U.S. 494, 503 (1986); <u>see also</u> <u>In re Drexel Burnham Lambert Group, Inc.</u>, 113 B.R. 830, 837 (Bankr. S.D.N.Y. 1990) ("[A]utomatic stay is key to the collective and preservative nature of a bankruptcy proceeding.").  The automatic stay is designed to, among other purposes, give the debtor a "breathing spell" after the commencement of a chapter 11 case and shield the debtor from creditor harassment and a multitude of litigation in a variety of forums at a time when the debtor's personnel should be focusing on restructuring.  <u>See</u> <u>Taylor v. Slick</u>, 178 F.3d 698, 702 (3d Cir. 1999), cert. denied, 528 U.S. 1079 (2000); <u>In re Enron Corp.</u>, 300 B.R. 201 (Bankr. S.D.N.Y. 2003).

53.    The automatic stay broadly extends to all matters that may have an effect on a debtor's estate, enabling bankruptcy courts to ensure that the debtor has the opportunity to rehabilitate and reorganize its operations.  <u>See</u> <u>Manville Corp. v. Equity Sec. Holders Comm.</u> (<u>In re Johns-Manville Corp.</u>), 801 F.2d 60, 62–64 (2d Cir. 1986); <u>see also</u> <u>Fid. Mortgage Investors v. Camelia Builders, Inc.</u>, 550 F.2d 47, 53 (2d Cir. 1976) ("Such jurisdiction is necessary 'to exclude any interference by the acts of others or by proceedings in other courts where such activities or proceedings tend to hinder the process of reorganization.'") (citation omitted); <u>AP Indus. Inc. v. SN Phelps & Co.</u> (<u>In re AP Indus., Inc.</u>), 117 B.R. 789, 798 (Bankr. S.D.N.Y. 1990) ("The automatic stay prevents creditors from reaching the assets of the debtor's estate piecemeal and preserves the

debtor's estate so that all creditors and their claims can be assembled in the bankruptcy court for a single organized proceeding.").

54.    The Second Circuit has described the automatic stay as a "crucial provision of bankruptcy law" intended to "prevent[ ] disparate actions against debtors . . . [and] ensur[e] that no creditor receives more than an equitable share of the bankrupt's estate." Lincoln Savings Bank, FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Assoc., Inc., 880 F.2d 1540, 1545 (2d Cir. 1989) (internal citations omitted).

55.    Section 362(d)(1) of the Bankruptcy Code provides that the Court may grant relief from the automatic stay "for cause." The Bankruptcy Code does not define the term "cause" and the determination of whether sufficient cause exists to modify the stay is determined on a case by case analysis. See In re Balco Equities Ltd., Inc., 312 B.R. 734, 748-49 (Bankr. S.D.N.Y. 2004). While the debtors still retain the exclusive right to formulate a plan of reorganization, "an unsecured, unliquidated claim holder should not be permitted to pursue litigation against the debtor in another court unless extraordinary circumstances are shown." See In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990).

56.    As more fully described below, Wachovia has failed to show any cause, let alone extraordinary cause, sufficient to obtain relief from the automatic stay to proceed with its litigation against Mr. Graves, which is, in essence, a prosecution of its allegations of actions taken by the Debtors. The failure of Wachovia to satisfy its burden to show cause is sufficient grounds to deny its Motion.

57.    Even if Wachovia had provided evidence to show cause, the determination to modify the automatic stay is committed to the sound discretion of the Court. In re Sonnax Indus., 907 F.2d 1280, 1288 (2d Cir. 1990). Courts have traditionally

used multifactor tests to determine whether cause exists to modify or lift the automatic

stay.  In re Sonnax sets forth the following list of twelve factors that should be

considered when deciding whether the stay should be lifted to allow litigation against a

debtor to continue in another forum:

> (1) whether relief would result in a partial or complete resolution of the  issues;
> (2) lack of any connection with or interference with the bankruptcy  case; (3)
> whether the other proceeding involves the debtor as a fiduciary;  (4) whether a
> specialized tribunal with the necessary expertise has been  established to hear the
> cause of action; (5) whether the debtor's insurer has  assumed full responsibility
> for defending it; (6) whether the action  primarily involves third parties; (7)
> whether litigation in another forum  would prejudice the interests of other
> creditors; (8) whether the judgment  claim arising from the other action is subject
> to equitable subordination;  (9) whether movant's success in the other proceeding
> would result in a  judicial lien avoidable by the debtor; (10) the interests of
> judicial economy  and the expeditious and economical resolution of litigation;
> (11) whether  the parties are ready for trial in the other proceeding; and (12)
> impact of  the stay on the parties and the balance of harms.

Id. at 1286.  See also In re Curtis, 40 B.R. 795, 799–800 (Bankr. D. Utah 1984).  All twelve

factors will not be relevant in every case, Mazzeo v. Lenhart (In re Mazzeo), 167  F.3d

139, 143 (2d Cir. 1999), nor must the Court afford equal weight to each of the  twelve

factors.  See Burger Boys, Inc. v. S. St. Seaport Ltd. P'ship (In re Burger Boys, Inc.), 183

B.R. 682, 688 (S.D.N.Y. 1994).

        58.    Consideration of the Sonnax factors relevant here:  (i) whether relief

would result in a partial or complete resolution of the issues; (ii) lack of any connection

with or interference with the bankruptcy case; (iii) whether litigation in another forum

would prejudice the interests of other creditors; (iv) the interests of judicial economy

and the expeditious and economical resolution of litigation; (v) whether the parties are

ready for trial in the other proceeding; and (vi) the impact of the stay on the parties and

the balance of harms, all dictate denial of the Motion.  As demonstrated below,

Wachovia has not, and cannot, carry its burden of establishing that cause exists to modify the automatic stay.

A.    Relief from Stay Would (i) Result in an Incomplete
      Resolution of the Issues; (ii) Interfere With the
      Bankruptcy Case; and (iii) Not Serve the Interests of
      Judicial Economy

59.    As described above, the Mississippi State Court Action, the Lextron Claim and the Wachovia Claim are inextricably intertwined because they are based on identical facts and circumstances and they allege similar damages.  Wachovia's pursuit of the Mississippi State Court Action against Mr. Graves in the Mississippi State Court will interfere with these Cases because the Debtors would be required to devote time and resources to oversee and participate in the State Court Action while at the same pursue their objections to the Wachovia and Lextron POC's in this Court.

60.    Moreover, permitting claimants such as Wachovia to pursue collection of their claims against the Debtors by asserting claims against the Debtors' employees in foreign forums would present distracting and unreasonable burdens that would impair the Debtors' reorganization efforts at a time when maintaining enterprise value is paramount.  Relief from the automatic stay could not only result in an incomplete or inconsistent resolution of the issues, but it would be contrary to the interests of judicial economy.  Wachovia's litigation tactics should not be condoned.

B.    The Debtors And Their Creditors Will Be Prejudiced
      Because There Is No Insurance To Cover The Costs And
      Potential Liability of Mr. Graves

61.    The Debtors do not have insurance to cover the costs and liability associated with the Mississippi State Court Action against Mr. Graves.  All of the costs associated with defending the action and any liability that may ultimately arise on account of Wachovia's claims against Mr. Graves would be borne directly by the

Debtors to the detriment of their stakeholders.  As a result, the Debtors and their estates would be prejudiced if the automatic stay was modified to permit the State Court Action to proceed.

C.    The Mississippi State Court Action As Against Mr. Graves is Not Prepared For Trial and Pursuit of the State Court Lawsuit Would Prejudice the Rights of Other Creditors

62.    The State Court Action against Mr. Graves is in its infancy.  The amended Complaint against Mr. Graves was filed in December 2005, shortly after the Debtors' Filing Date.  This factor mitigates in favor of denial of the Motion.  See In re Comdisco, 271 B.R. 273, 277–80 (Bankr. N.D. Ill. 2002) (denying motion to lift stay regarding securities class action in its early stages).  In fact, no scheduling order has been entered regarding the claims against Mr. Graves.

63.    The assertion of claims of more than $7 million is significant to these estates.  Modifying the automatic stay to allow Wachovia to proceed against the Mr. Graves in the Mississippi State Court Action would require the Debtors and their counsel to invest in time and resources to costly litigation to the detriment of other efforts that are more central to the Debtors' efforts to reorganize.

64.    Finally, Wachovia has not articulated any credible reason why the continuation of the stay of the Mississippi State Court Action would cause Wachovia harm.

65.    Consequently, the 'balance of harms' dictate denial of the Motion.

## CONCLUSION

66.    Based upon the foregoing, "unusual circumstances" exist to conclude that the automatic stay applies to the claims against Mr. Graves in the

Mississippi State Court Action.  Wachovia has failed to establish any basis for relief from the automatic stay, and its Motion should be denied in its entirety.

## Notice

67.    Notice of this Objection has been provided in accordance with the Order under 11 U.S.C. §§ 102(1) and 105 and Fed. R. Bankr. P. 2002(m), 9006, 9007, and 9014 Establishing (i) Omnibus Hearing Dates, (ii) Certain Notice, Case Management, and Administrative Procedures, and (iii) Scheduling an Initial Case Conference in Accordance with Local Bankr. R. 1007-2(e), which was entered by this Court on October 14, 2005 (Docket No. 245).  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

## Memorandum of Law

68.    Because the legal points and authorities upon which this Objection relies are incorporated herein, the Debtors respectfully request that the requirement of the service and filing of a separate memorandum of law under Local Rule 9013-1(b) be deemed satisfied.

*(Concluded on Following Page)*

**WHEREFORE**, the Debtors respectfully request that the Court enter an

Order denying the Motion, together with such other and further relief as may be just

and proper.

Dated:   New York, New York
         April 13, 2007

                              DELPHI CORPORATION, *et al.*
                              By their attorneys,
                              TOGUT, SEGAL & SEGAL LLP
                              By:


                              /s/ Neil Berger
                              ALBERT TOGUT (AT-9759)
                              NEIL BERGER (NB-3599)
                              Members of the Firm
                              One Penn Plaza
                              New York, New York 10119
                              (212) 594-5000