# EXHIBIT "8"

# 9522

☑ Date Stamped Copy Returned
☐ No self addressed stamped envelope
☐ No copy to return

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT __SOUTHERN__ DISTRICT OF __NEW YORK__ | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>Delphi Automotive System, LLC | Case Number<br>05-44640 | MASTER CODE:<br>10385461 |
|---|---|---|

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

**Lextron Corporation**

Name and address where notices should be sent:

Craig M. Geno, Esq.
Melanie Vardaman, Esq.
Harris & Geno, PLLC
PO Box 3380, Ridgeland, MS  39158-33
Telephone number: 661-427-0048

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☑ Check box if the address differs from the address on the envelope sent to you by the court.

Claim #09522
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

**Received**

JUL 1 8 2006

Kurtzman Carson
THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor: | Check here ☐replaces<br>if this claim ☐amends   a previously filed claim, dated:_____ |
|---|---|

**1. Basis for Claim**

☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other   **Contract Dispute**

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)
Last four digits of SS #: _____
Unpaid compensation for services performed
from _____ to _____
(date)          (date)

| **2.** Date debt was incurred:<br>October 2002 | **3.** If court judgment, date obtained:<br>N/A |
|---|---|

**4.** Total Amount of Claim at Time Case Filed: $800,000.00, plus incidental and punitive actual, compensatory damages (damages to be determined)
☐ (secured)   (priority)   (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other_____

Value of Collateral:  $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6.** Unsecured Nonpriority Claim $ 800,000.00

☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8.** Credits: The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9.** Supporting Documents: *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10.** Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
2006
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date<br>7/13/06 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Melanie T. Vardaman, Esq., Attorney for Lextron Corporation |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

0544640060714000000000001

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

SEP - 7 2004

J. T. NOBLIN, CLERK
BY_____ DEPUTY

DELPHI AUTOMOTIVE SYSTEMS, LLC,

        **Plaintiff**

v.

        CIVIL ACTION NO. 3:03CV335WS

LEXTRON CORPORATION,

        **Defendant**

RECEIVED

APR 0 8 2006

BY:_____

## ANSWER AND COUNTERCLAIM OF LEXTRON CORPORATION

Lextron Corporation ("Lextron") files this Answer and Counterclaim in response to the

Complaint filed by Delphi Automotive Systems, LLC ("Plaintiff") as follows:

### AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

This action is or should be stayed by operation of 11 U.S.C. § 362, due to Lextron's

Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Southern District of

Mississippi ("the Bankruptcy Court") on February 12, 2004. Delphi has never sought relief from

the automatic stay; nor has it ever been a party to any motion seeking relief from the automatic

stay; nor has this action ever been the subject of an order granting any form of relief from the

automatic stay. Lextron is reserved of its right to seek relief from the Bankruptcy Court to

impose the stay as to this proceeding, and to seek any damages that may be warranted under the

circumstances.

### Affirmative Defense No. 2

Plaintiff's request for relief is barred or diminished by operation of one or more of the following doctrines: waiver, estoppel, ratification, and/or laches.

### Affirmative Defense No. 3

Plaintiff's request for relief is barred by principles of equity, including but not limited to, unclean hands and unjust enrichment.

### Affirmative Defense No. 4

Plaintiff's request for relief is barred or diminished as a result of its failure to abide by the covenant of good faith and fair dealing inherent in every contract to be performed in Mississippi.

### Affirmative Defense No. 5

Plaintiff's putative claims should be barred or diminished due to its failure to mitigate.

### Affirmative Defense No. 6

Plaintiff's putative claims are subject to setoff and/or recoupment, which are specifically reserved and asserted.

### Affirmative Defense No. 7

Plaintiff's putative claims are subject to treatment in a plan of reorganization to be confirmed by the Bankruptcy Court in Lextron's Chapter 11 case, and the terms of such plan will control and supersede any judgment that might be obtained by Plaintiff, without regard to any judgment obtained by Lextron in it counterclaim.

### Affirmative Defense No. 8

Plaintiff has failed to join a necessary or indispensable party, or necessary or indispensable parties, or a party or parties needed for just adjudication, and should be required to join such party or parties pursuant to Rules 17 and 19 of the Federal Rules of Civil Procedure.

### Affirmative Defense No. 9

Plaintiff's claim for replevin of bailed property is moot, as is its request for damages for wrongful detention, due to Lextron's agreement to relinquish the equipment made the subject of the replevin count, and the Agreed Order Granting Motion for Writ of Replevin ("the Replevin Order") entered by this Court on March 5, 2003. Lextron is reserved of its right to seek damages from Plaintiff for wrongful removal of equipment belonging to Lextron.

### Affirmative Defense No. 10

Plaintiff cannot recover on its putative claims because it is not the real party in interest for purposes of this action, and/or because it lacks standing to pursue putative causes of action belonging to other legally distinct entities. In addition, any attempt by Plaintiff to assign its putative claims to other entities, or to add other entities as Plaintiffs at this stage of the litigation is barred by operation of 11 U.S.C. § 362.

### Affirmative Defense No. 11

Plaintiff's contract claims are barred by one or more of the following: lack of mutuality of obligation; lack of consideration; failure of consideration; duress; impossibility; and failure of conditions precedent and/or conditions subsequent.

### ANSWERS TO NUMBERED PARAGRAPHS OF COMPLAINT

And now, addressing Plaintiff's Complaint, paragraph by numbered paragraph, Lextron answers as follows:

1.    Lextron is without knowledge or information sufficient to form a belief as to the truth of paragraph 1.

2.    Admitted.

3.    Denied.

4.      Admitted as to venue, without admitting jurisdiction. Denied as to allegations regarding Delphi's replevin claim, due to entry of the Replevin Order.

5.      Admitted.

6.      Admitted that Plaintiff and Lextron entered into various Contracts, and admitted that the Contracts speak for themselves. Denied as to any contrary interpretation. Further admitted that Lextron entered into contracts with other legally distinct Delphi entities. All other allegations not admitted herein are denied.

7.      Admitted that Lextron performed work for Delphi Packard Electric Systems Division pursuant to the General Terms and Conditions, which speak for themselves. Denied as to any contrary interpretation or legal effect.

8.      Admitted that Lextron performed work for Delphi Safety & Interior Division pursuant to the General Terms and Conditions, as amended from time to time, which speak for themselves. Denied as to any contrary interpretation or legal effect.

9.      Admitted.

10.     Admitted that the Contracts speak for themselves. Denied as to any contrary interpretation or legal effect.

11.     Admitted that the contractual language speaks for itself. Denied as to any contrary interpretations or legal effect.

12.     Admitted that the contractual language speaks for itself. Denied as to any contrary interpretations or legal effect.

13.     Admitted that Plaintiff transmitted letters terminating the relationship between Plaintiff and Lextron, without admitting to the validity or legal effect of the letters, and admitted

that copies are attached to the Complaint. Admitted that the letters speak for themselves, and denied as to any contrary interpretation or legal effect.

14.    Admitted that Charles Doty ("Mr. Doty") and Sidney Johnson ("Mr. Johnson") engaged in a telephone conversation on February 28, 2003. Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

15.    Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

16.    Denied that Lextron owed a balance to Plaintiff, denied that Lextron had failed to meet its contract obligations to Plaintiff in January, 2003, and denied that Lextron was in breach of its contract with Plaintiff. Admitted that Plaintiff extended certain accommodations to Lextron as an inducement for Lextron to continue working for Plaintiff. Admitted that Lextron was out of formula on a loan from SouthTrust, and admitted that the loan documents speak for themselves. Denied as to any contrary interpretation. Admitted that Lextron was in arrears with respect to certain payroll taxes assessed for 2002, but denied as to the amount asserted by Delphi. Denied that Lextron failed to maintain adequate accounting controls. All other allegations not admitted herein are denied.

17.    Denied to Delphi's claim as to the purpose of the document attached as Exhibit 3A to the Complaint. Denied that Plaintiff had no obligation to pay Lextron in connection with

terminating the contract. Otherwise, admitted, subject to resolution of the replevin counts, as contained in the Replevin Order.

18. The allegations of paragraph 18 are moot based on the Replevin Order, and therefore denied.

19. Denied.

20. Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

21. The allegations of paragraph 21 are moot based on the Replevin Order, and therefore denied.

22. The allegations of paragraph 22 are moot based on the Replevin Order, and therefore denied.

23. The allegations of paragraph 23 are moot based on the Replevin Order, and therefore denied.

24. Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

25. The allegations of paragraph 25 are moot based on the Replevin Order, and therefore denied.

26. The allegations of paragraph 26 are moot based on the Replevin Order, and therefore denied.

27. Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

28. Admitted that the Court has the power to issue a declaratory judgment. Denied as to any contrary interpretation.

29.     Admitted that Plaintiff is requesting a declaratory judgment. Denied that it is entitled to the judgment requested.

30.     Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

31.     Denied.

32.     Denied.

33.     Denied. Lextron further denies that Delphi is entitled to any of the relief in the unnumbered *ad damnum* paragraph beginning "WHEREFORE. . . ." All other allegations of the Complaint not specifically admitted herein are denied.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation requests that a judgment of dismissal be entered in its favor as to all counts of Plaintiff's Complaint not previously adjudicated. Lextron requests all other relief appropriate in the premises.

## COUNTERCLAIM

Lextron files this Counterclaim pursuant to F.R.C.P. 13, as follows:

### I. Parties

1.     Counterclaimant Lextron Corporation ("Lextron") is a Mississippi Corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi.

2.     Counterdefendant Delphi Automotive Systems, LLC ("Delphi") is a Delaware limited liability company doing business in the state of Mississippi.

### II. Facts

3.     At the inception of their joint venture, Delphi advised Lextron ("Lextron") and certain of its affiliates that it wanted to work with Lextron to manufacture significant amounts of auto components for use by Delphi. Delphi advised Lextron and Doty that the volume of business Delphi would make available to Lextron as part of the joint venture was such that

Lextron would have to significantly expand its physical plant. Delphi further promised Lextron and Doty that it would use its "best efforts" to cause the venture to be a success, as Delphi represented to Lextron that it would cause Lextron's cost of producing products for Delphi to be as low as possible and its production facilities to be as efficient as possible.

4.      In reliance on Delphi's representations and promises, Lextron acquired at considerable expense a manufacturing facility, and after consultation, inspection and direction by Delphi, renovated that facility at even greater expense so as to accommodate Delphi's manufacturing requirements, all in compliance with Delphi's demand that the facility be dedicated to manufacturing for Delphi alone (hereinafter sometimes "the Delphi dedicated facility").

5.      Delphi, at all times relevant herein, represented to Lextron and Doty that Delphi would provide necessary economic and technical support, guidance and assistance to Lextron, and, through their combined efforts, Lextron would be a major Delphi supply partner.

6.      Subsequently, Delphi failed to, and intentionally refused to increase the volume of Delphi manufacturing business as promised, failed to grant modest and reasonable price increases despite repeated requests from Lextron, and otherwise failed to use its "best efforts" to cause the joint venture to be a success. In fact, Delphi refused to implement Lextron requested cost reductions and production efficiencies. As a consequence of Delphi's acts, omissions and misrepresentations, by late 2002, Lextron had serious financial difficulties.

.7.      Despite Lextron's financial difficulties, Delphi continued to assure Lextron that it was and would continue to work in Lextron's best interest to cause Lextron to be profitable, specifically and expressly agreeing by written Contract to use its, Delphi's, "best efforts" to cause Lextron's costs to be as low as possible and its production facilities and efficiencies to

be as high as possible *(see* Contracts dated October 31, 2002, October 8, 2002 and September 5, 2002 attached hereto as Exhibits A, B and C).

    8.    Shortly thereafter, Delphi reassured Lextron's lender, Southtrust Bank, and Doty, that Delphi had an interest in the Lextron venture and was committed to support of it. Delphi reaffirmed its commitment to support Lextron in a letter to Southtrust Bank dated January 9, 2003, a copy of which is attached as Exhibit D. In reliance on Delphi's promises as aforesaid, Lextron committed to incur additional indebtedness from Southtrust Bank in the amount of $800,000.00, and Charles Doty was induced, in reliance on Delphi's promises, to execute a personal guaranty of that debt.

    9.    Lextron had earlier incurred substantial indebtedness from Southtrust Bank (guaranteed by Lextron CEO Charles Doty) in reliance on Delphi's promises to support and grow Lextron economically and technologically.

    10.    In late February 2003, shortly after Delphi's written assurances of its commitment to the Lextron venture's success (by assuring Lextron that whatever means were necessary to reduce Lextron's costs and increase its efficiencies would be undertaken by Delphi), and just after Delphi confirmed its interest in and obligation to support Lextron, Delphi abruptly and unilaterally breached its agreements and duties by reneging on its commitment to the Lextron venture and by terminating all Contracts between Delphi and Lextron then in existence, including three (3) new contracts (hereinafter referred to as the "Three New Contracts") which had recently (within the last few months) been awarded.

    11.    Delphi represented to Doty and Lextron that the basis for termination of its commitments was a provision in a document entitled "General Terms and Conditions" which reads as follows:

Buyer [Delphi] may immediately terminate this contract without liability to Seller [Lextron] in any of the following or any similar events:... (f) any accommodation by Buyer, financial or otherwise, not <u>contemplated</u> <u>by</u> <u>this</u> <u>contract,</u> that are necessary for Seller to meet its obligations under this contract [emphasis added].

*See* Letter dated February 27, 2003, from Delphi to Lextron attached as Exhibit E.

12.    Delphi's termination of the joint venture and of the three then existing production agreements was knowingly without any lawful basis since, among other things, (a) the provision referenced above on which the termination was purportedly based has no application to Delphi's commitment to the success of the Lextron joint venture, and (b) with respect to the "Three New Contracts" in particular, because they <u>specifically require</u> Delphi to assist and work with Lextron by using its "best efforts." Because the accommodation provision in subsection (f) of the General Terms and Conditions document has no application, it therefore could not be relied upon as a basis for termination.

13.    Delphi schemed throughout the Lextron venture to make Lextron dependent on it under the guise that Delphi would use its massive know-how and resources to insure the success of Lextron's Delphi manufacturing business. Yet, Delphi actually acted to drive Lextron into debt and then unilaterally and wrongfully terminated their relationship and its obligations to support Lextron. Among the wrongful conduct in which Delphi engaged, in addition to the aforedescribed, was Delphi's refusal to honor its commitment which it stated repeatedly, to significantly increase Lextron's volume of business so as to utilize all, or substantially all, of the Delphi dedicated facility; Delphi's refusal to adjust Lextron's pricing model so as to enable Lextron to make a profit from the joint venture; Delphi's refusal to pay Lextron for commodities at the same higher price paid by Delphi to Lextron's competitors within the State of Mississippi; Delphi's refusal to allow Lextron to reduce its costs, including

10

lead wire cost; Delphi's misrepresentation of its intent with regard to the retention of

consultants who were represented to be working for the benefit of Lextron while, in reality,

they were used by Delphi to obtain information regarding Lextron and its prospective non-

Delphi related business ventures and to otherwise sabotage the Lextron-Delphi joint

venture; and Delphi's assurances to Lextron and Doty that in the event Lextron incurred

indebtedness in pursuit of the Delphi venture, Delphi would support Lextron

economically and technologically to ensure its success. As a part of Lextron's effort to

restructure its business, Delphi urged, through BBK, Ltd., that Lextron shut down all non-

Delphi business activity.

14.    As set forth more fully below, the foregoing acts, omissions and

misrepresentations were intentional and reckless and have severely damaged Lextron and Doty.

### COUNT ONE

### BREACH OF JOINT VENTURE AGREEMENT

15.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual

allegations.

16.    Delphi's acts, omissions and misrepresentations as set forth herein constitute a

breach of the Delphi agreements to act jointly with Lextron (and Charles Doty) to create a

profitable Delphi dedicated manufacturing facility.

17.    Lextron is therefore entitled to damages as a consequence of the aforesaid acts,

omissions and misrepresentations as more fully set forth below.

### COUNT TWO

### BREACH OF CONTRACTS

18.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual

allegations.

19.    Such acts, omissions and misrepresentations constitute a breach of the Lextron-Delphi contracts, including the "Three New Contracts."

20.    Defendant Lextron is entitled to damages as a consequence of the aforesaid contractual breaches as more fully set forth below.

21.    In addition, Lextron is entitled to contractual and damages from Delphi as a result of improperly applied credits, and the failure of Delphi to either pay Lextron or credit it for products assembled and shipped to Delphi.

22.    Specifically, and in contrast to Delphi's claim that Lextron owes certain sums for allegedly breaching the supply contract, Delphi in fact owes Lextron the net amount of $461,197.16 for products assembled and shipped to Delphi, and for which Delphi never paid or properly credited Lextron.

**COUNT THREE**

<u>INTENTIONAL MISREPRESENTATION</u>

23.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

24.    Such misrepresentations were intentional and were relied upon by Lextron in acquiring and renovating a dedicated Delphi facility; incurring substantial indebtedness (including the $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's attention from other business opportunities.

25.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FOUR

### NEGLIGENT MISREPRESENTATION

26.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

27.    Such misrepresentations were relied by Lextron in acquiring and renovating the Delphi dedicated facility; incurring indebtedness (including the additional $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's and Doty's attention from other business opportunities.

28.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH CONTRACT

29.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

30.    Delphi's conduct in unilaterally, intentionally, wrongfully and recklessly terminating the joint venture and aforementioned contracts and in breaching those agreements tortiously interfered with (and was intended to interfere with) Lextron's contracts with Southtrust Bank, other creditors, and with other existing and potential business pursuits.

31. Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SIX

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

32. Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

33. Such acts, omissions and misrepresentations, as set forth herein were willful, malicious and undertaken in bad faith, and thus constituted a breach of the duty of good faith and fair dealing implied in all contracts.

34. Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SEVEN

### UNFAIR TRADE PRACTICES

35. Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

36. The foregoing acts, omissions and misrepresentations constitute unfair trade practices, including, but not limited to, Delphi's practice of paying more for commodities purchased from Lextron competitors than for those same products purchased from Lextron, in violation of Miss. Code Ann. 75-21-3, and other applicable state statutes.

37. Defendant Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT EIGHT

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

38.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

39.    Such acts, omissions and misrepresentations interfered with Lextron's prospective business relations with other parties. Delphi intentionally committed such acts, including the wrongful termination of the joint venture and the aforementioned contracts to cause Lextron to be unable to consummate such other prospective business.

40.    Defendants are entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

### COUNT NINE

### BREACH OF FIDUCIARY DUTY

41.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

42.    As a consequence of the long-standing course of dealing, representations and promises of Delphi and the joint venture arrangement of the parties, Delphi owed Lextron a fiduciary duty, which Delphi breached by the foregoing acts, omissions and misrepresentations.

43.    The foregoing breach of fiduciary duties entitles Defendants to damages as set forth below.

### COUNT TEN

### FRAUD

44.    Lextron and Doty incorporate herein, as if fully set forth, all of the foregoing factual allegations.

45.    Delphi knowingly made the foregoing representations and promises with the knowledge that they were false or with reckless disregard for their truth and intending for and inducing Lextron to rely thereon all to Lextron's extreme detriment. Under the circumstances of the parties' unique, fiduciary, and special relationship, Lextron at all times pertinent hereto, was entitled to rely on the Delphi representations.

46.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT ELEVEN

## SUPPRESSION OF MATERIAL FACTS

47.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

48.    Delphi suppressed its true intentions while misrepresenting to Lextron its interest in and support of Lextron, all to the extreme detriment of Lextron.

49.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT TWELVE

## CONVERSION

50.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

51.    Despite specific concerns raised by Lextron with respect to the property by Delphi in its count for replevin, and despite assurances by Delphi that it would remove only equipment owned by it, on March 10, 2003, Delphi removed items of equipment belonging to Lextron, and in which Delphi had no interest.

52.   The equipment wrongfully converted by Delphi is listed as follows:

| | |
|---|---|
| Front Door Harness: | Serial # 16643688 |
| Front Door Harness: | Serial # 16643690 |
| Backdoor Harness: | Serial # 1544-7743 |
| Backdoor Harness: | Serial # 1544-7744 |
| Steering Column Harness: | Serial # 16870022 |

53.   Delphi's removal of these items of equipment was in direct violation of the Agreed Order entered into by and between Delphi and Lextron, and filed of record in this Court, which authorized Delphi to remove only those items of equipment belonging to it.

54.   Delphi's removal and continued detention of these items was deliberate and intentional, and was performed in furtherance of its calculated business decision to ruin Lextron.

55.   In the alternative, Delphi's removal and continued detention of these items was the product of gross negligence, mismanagement, and lack of oversight as to amount to an intentional tort.

56.   Delphi is therefore liable to Lextron for actual, compensatory, incidental, and punitive damages as a result of its willful or grossly negligent acts of conversion of Lextron's property, all in violation of an Order of this Court.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation demands judgment against Delphi Automotive Systems, LLC, including all of its divisions and affiliates named or referred to in the Complaint filed by Delphi herein, or who may otherwise be liable to Lextron, for all actual, compensatory, incidental, and punitive damages in an amount to be determined by the jury at trial, plus all accruing pre- and post-judgment interest and costs of this action, and such other and further relief as the jury and Court deem appropriate.

Dated, this the 7th day of September, 2004.

LEXTRON CORPORATION

By: _____
    Chad J. Hammons

Alveno N. Castilla, Esq. (MS Bar 5924)
Chad J. Hammons, Esq. (MS Bar #10419)
Watkins Ludlam Winter & Stennis, P.A.
633 North State Street (39202)
Post Office Box 427
Jackson, MS 39205-0427

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has this

day been placed in the United States Mail, postage prepaid, to the following:

Debra Brown, Esq.
Frank Trapp, Esq.
Phelps Dunbar
P. O. Box 23066
Jackson, MS 39225-3066

This 7th day of September, 2004.

_____
Chad J. Hammons

18

# EXHIBIT "A"

# DELPHI



RECEIVED
NOV 1 2002
BY:

**DELPHI CORPORATION
LONG TERM CONTRACT**

### 1.   Purchase of Product

**Lextron Automotive ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):**

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| GX203842<br>15447743 | 2004 DCX HB RRAB Leadwire Asm (LH) | $▓▓ USD | ▓▓ annually (based on maximum of 235 working days and 100 hours per week) |
| GX203843<br>15447744 | 2004 DCX HB RRAB Leadwire Asm (RH) | $▓▓ USD | ▓▓ annually (based on maximum of 235 working days and 100 hours per week) |

### 2.   Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2006.

### 3.   Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms). Pricing for each subsequent Calendar Year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Part Number | % Red. | Calendar Year 2004 Pricing | % Red. | Calendar Year 2005 Pricing | % Red. | Calendar Year 2006 Pricing |
|---|---|---|---|---|---|---|
| GX203842 | 5% | ▓▓ | 5% | ▓▓ | 5% | ▓▓ |
| GX203843 | 5% | ▓▓ | 5% | ▓▓ | 5% | ▓▓ |

15447743
15447744

WLS 12/21/02

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to ~~fifty~~ percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price

reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.   **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.   **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this 31ˢᵀ day of Oᴄᴛᴏʙᴇʀ, 2002.

Buyer:                                    Seller:

**Delphi Corporation LLC**                **Lextron Automotive**
acting through its Safety & Interior
Systems Division

By: _____          By: _____
Name:  Michelle E. Joseph                Name:  Ray C. Irby
Title: Senior Electrical Buyer           Title: Chief Operating Officer

## DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1  Shipping.  Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2  Billing.  Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3  Delivery Schedules.  Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

-1-

Revised June 24, 1999

.. .remium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules
sing the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods
sing a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible.
eller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to
il to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## SPECIFICATION, DESIGN AND SCOPE CHANGES

uyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of
iy services or work covered by this Contract, including work related to inspection, testing or quality control. While
uyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such
\anges. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes,
cluding Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article
) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or
livery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's .
st of production and the time to implement such changes. In the event of any disagreement arising out of such changes,
yer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue
rforming under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller
olve any disagreement arising out of such changes.

## QUALITY AND INSPECTION

ler will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements
l procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i)
·  :  Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial
c....on and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and
perty that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-
:ess or finished goods.

## NON-CONFORMING GOODS

·er is not required to perform incoming inspections of any goods, and Seller waives any right to require
·er to conduct any such inspections. Seller will not substitute any goods for the goods covered by this
itract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its
>n, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods,
require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or
edies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of
·conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or
l shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the
conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to
ige for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all
of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by
ir to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods
iot constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or
/e Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

## FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## WARRANTY

1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

3 Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

- 3 -

Revised June 24, 1999

le ·  requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, tra.. portation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER /

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

n addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under hi  ntract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which eller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required ) pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, eller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by uyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 2. TECHNICAL INFORMATION

2.1  Exchange of Information. Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to ny use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

2.2  Waiver of Claims. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, ry  customers or respective suppliers with respect to any technical information that Seller shall have disclosed n... hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -

Revised June 24, 1999

I.    Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  Computer Programs and Written Works.  All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 3.  INDEMNIFICATION

3.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.   Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

3.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other p‾ ‾ional fees and disbursements) arising from or in connection with the performance of any service or work by Seller its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

3.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, handling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

1    INSURANCE

-5-

r will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property or work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer

Revised June 24, 1999

v  ave the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with
e..ct thereto.

7.3  Return of Buyer's Property. Seller agrees that Buyer has the right, at any time and from time to time, with or
vithout reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.
Vithout further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the
ight to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in
ccordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by
leller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the
equirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates,
ι which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.
f Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an
nmediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or
ithout legal process, and take immediate possession of Buyer's Property.

7.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's
roperty nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's
enefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT
IADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS
R IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF
UYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for
y loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including,
ithout limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of
rvice or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory
mages, profits or any other indirect, special or consequential damages.

.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services
Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of
thorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole
)perty of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services
)eveloped IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every
sonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional
:uments reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse
ler for reasonable costs incurred by Seller in providing such assistance.

SERVICE AND REPLACEMENT PARTS

ring the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and
lacement parts requirements to Buyer's customers at the then current production price(s) under this
ntract. If the goods are systems or modules, Seller will sell the components or parts that comprise the
tem or module at price(s) that will not, in the aggregate, exceed the price of the system or module less
embly costs. If this Contract is in effect at the end of the vehicle production program into which the goods
ered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its
tomers' service and replacement parts requirements during the fifteen (15) year period following the end of
h vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in
:ct during the entire Post-Production Period. During the first three (3) years of the Post-Production Period,
price(s) for such goods will be the production price(s) which were in effect at the commencement of the
it-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods
be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature
l other materials available at no additional charge to support Buyer's service activities.

.᠆᠆MEDIES

-7-

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services ...red by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials ...ess Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

...'s Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this ...tract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT "B"

# DELPHI



### DELPHI CORPORATION
### LONG TERM CONTRACT

## FILE

## 1.  Purchase of Product

Lextron Corporation ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16870022 | 2003 ½ GMT 315 Steering Wheel Wire Harness | $▇▇ | ▇▇▇(based on a maximum of 235 working days and 100 hours per week) |

## 2.  Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2007.

## 3.  Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms).  Pricing for each subsequent Calendar Year. is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| | | |
|---|---|---|
| Calendar Year 2004 | ▇▇% or Piece Price $▇▇ ea. |
| Calendar Year 2005 | ▇▇% or Piece Price $▇▇ ea. |
| Calendar Year 2006 | ▇▇% or Piece Price $▇▇ ea. |
| Calendar Year 2007 | ▇▇% or Piece Price $▇▇ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect

to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer.  If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive.  If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract.  Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003.  Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt.  The Terms and Conditions (together with any revision made a part of this Contract) shall be

construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this _8th_ day of _October_, 2002.

Buyer:                                      Seller:

Delphi Corporation LLC                       Lextron Corporation
acting through its Safety & Interior
Systems Division

By: _____            By: _____
Name:  Michelle E. Joseph                   Name:  Ray C. Irby
Title:  Senior Electrical Buyer             Title:  Chief Operating Officer

Page 2 of 2

# EXHIBIT "C"

# DELPHI

### DELPHI CORPORATION
### LONG TERM CONTRACT

1.    **Purchase of Product**

Lextron Automotive Technologies Corporation ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately <u>one hundred</u> percent (<u>100%</u>) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16643688 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $███ | ███,███/yr |
| 16643690 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $███ | ███,███/yr |

2.    **Term**

With respect to each Product, the term of this Contract is from **Model Year 2004** through **Model Year 2005**.

3.    **Prices**

The per unit price of each Product for **Model Year 2004 is F.O.B. Buyer's Plant, Freight Collect (2000 IncoTerms).** Pricing for each subsequent **Model Year** is subject to the following minimum annual percentage reductions from the prior **Model Year's** pricing:

**Part Number 16643688**

| | | |
|---|---|---|
| Model Year 2005 | Three percent ( 3%) | Piece Price $███ ea. |
| Model Year 2006 | Three percent ( 3%) | Piece Price $███ ea. |
| Model Year 2007 | Three percent ( 3%) | Piece Price $███ ea. |
| Model Year 2008 | Three percent ( 3%) | Piece Price $███ ea. |

**Part Number 16643690**

| | | |
|---|---|---|
| Model Year 2005 | Three percent ( 3%) | Piece Price $███ ea. |
| Model Year 2006 | Three percent ( 3%) | Piece Price $███ ea. |
| Model Year 2007 | Three percent ( 3%) | Piece Price $███ ea. |
| Model Year 2008 | Three percent ( 3%) | Piece Price $███ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to **fifty percent (50%)** of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Model Year 2004 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Model Year 2004. Any amendment to, or revision of, such General

Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this 5ᵀᴴ day of SEPTEMBER, 2002.

Buyer:                                            Seller:

Delphi Corporation LLC                   Lextron Automotive
acting through its Safety & Interior    Technologies Corporation
Systems Division

By: _____       By: _____
Name:  Michelle E. Joseph              Name:  Ray C. Irby
Title:  Senior Electrical Buyer          Title:  Chief Operating Officer

## DELPHI AUTOMOTIVE SYSTEMS

### GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## SHIPPING AND BILLING

1. Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2. Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines the requirements of Buyer's customers or market, economic or other conditions require changes in its schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

Revised June 24, 1999

Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing, or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

## ORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by he quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any uch disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least irity (30) days after such disruption commences.

## WARRANTY

.1 General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services d by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and anuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from fect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nconforming goods.

2 Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including mputer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately ocess, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st ntries, including leap year calculations.

Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by s Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all redients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers ficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous erial that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

-3-

Revised June 24, 1999

legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1  Exchange of Information.  Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to any use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2  Waiver of Claims.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or shall hereafter disclose in connection with the goods or services covered by this Contract.

-4-

Revised June 24, 1999

3   Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and
subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment
of any royalty or other compensation to Seller.

12.4  Computer Programs and Written Works.  All works of authorship, including without limitation, software, computer
programs, and databases (including object code, micro code, source code and data structures), and all enhancements,
modifications and updates thereof and all other written work products or materials, which are created in the course of
performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole
property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for
hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such
works of authorship.

## 13.  INDEMNIFICATION

13.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective
successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial
design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses
(including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services
covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or
services.    Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's
specifications.

13.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any
liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other
professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller
or  employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the
property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful
misconduct of Buyer or Buyer's customer.

3.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and
expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in
connection with any third party claims or demands to recover for personal injury or death, property damage or economic
loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under
ort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss
results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation
y any party other than Seller.

## 4.  COMPLIANCE WITH LAWS

eller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders,
conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture,
labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including,
not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor
election, discrimination, occupational health/safety and motor vehicle safety.  Neither Seller nor any of its subcontractors
ill utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this
contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing.  Seller will defend, hold
armless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including
easonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with
is Article.

## i.  SURANCE

- 5 -

Revised June 24, 1999

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1 <u>Bailment of Property</u>. All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. T     extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property or work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2 <u>Seller's Duties with Respect to Buyer's Property</u>. While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer

- 6 -

Revised June 24, 1999

ᵥᵢₗₗ have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with
ᵣᵣect thereto.

17.3  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or
without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property.
Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the
right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in
accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by
Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the
requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates,
in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates.
If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an
immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or
without legal process, and take immediate possession of Buyer's Property.

17.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's
Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's
benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT
MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS
OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF
BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE.  Buyer will not be liable to Seller for
any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including,
without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of
service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory
damages, profits or any other indirect, special or consequential damages.

17.   Development, Engineering And Consulting Services.   Engineering, consulting or development services
("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of
authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole
property of Buyer.  Seller agrees to assign all right, title and interest in and to IP that results from Development Services
("Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every
reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional
documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse
Seller for reasonable costs incurred by Seller in providing such assistance.

8. SERVICE AND REPLACEMENT PARTS

During the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and
replacement parts requirements to Buyer's customers at the then current production price(s) under this
Contract. If the goods are systems or modules, Seller will sell the components or parts that comprise the
system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less
assembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods
covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its
customers' service and replacement parts requirements during the fifteen (15) year period following the end of
such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in
effect during the entire Post-Production Period.. During the first three (3) years of the Post-Production Period,
the price(s) for such goods will be the production price(s) which were in effect at the commencement of the
Post-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods
will be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature
and other materials available at no additional charge to support Buyer's service activities.

9. REMEDIES

-7-

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. . Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over er or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this C ict, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written ontract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly eserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or elating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of ny previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the ame or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without rejudice to Buyer's claims, rights, or remedies.

# EXHIBIT "D"

# DELPHI

memo

Date:     February 26, 2003   ~~JAN 9~~

To:       Andy Raines              SouthTrust Bank

From:     Larry Graves

Subject:  Delphi-P Support of Lextron

c:        Sidney Johnson
          Greg Naylor
          Martha Everett

As a follow up your conversation with Greg Naylor and Martha Everett, I am writing you this memo to re-iterate Delphi Packard's (Delphi-P) focus to maintain Lextron Corporation as a supplier. We have resources to assist Lextron, including a reduction in our payment terms to Net 15, during its cash flow shortfall.

Delphi-P is currently extending the equivalent of MNS2 credit terms (very favorable credit terms) for the material that Lextron purchases from Delphi-P. We take our payment via a contra rather than receiving a check from Lextron. Lextron and your bank have asked Delphi-P to stop the contra method and change to accepting check payments from Lextron. Delphi-P will continue to send invoices and will allow Lextron to reconcile the contra amount prior to the contra being taken. Delphi-P understands that need for accurate fiscal review and accountability at Lextron, and will support their desire to achieve that relative to this business situation. Delphi-P is not considering limiting its right to set offs.

Additionally, because of Delphi-P's support and interest in Lextron, Delphi-P is requesting SouthTrust Bank to continue its support of Lextron. If you have any questions please contact Greg Naylor or me.

Regards,

Larry W. Graves
North America Purchasing Director
Delphi Packard Electric Systems

# EXHIBIT "E"

# DELPHI

February 27, 2003

Mr. Charles Doty
President and CEO
Lextron Corporation
P.O. Box 23971
Jackson, Mississippi 39225-3971

Dear Mr. Doty,

As you are aware, Delphi Automotive Systems LLC, by and through its Delphi Safety & Interior Systems Division, ("Delphi") has issued three (3) Long Term Contracts (the "Contracts") to Lextron Corporation ("Lextron") for the manufacture and supply of a variety of wire harness and other component assemblies for use in the automotive industry (the "Products").

Each of those Contracts incorporates Delphi's General Terms and Conditions and provides that those General Terms and Conditions are cumulative with the terms and conditions contained in the Contracts. Section 9 of Delphi's General Terms and Conditions states as follows:

> Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events ... (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.

As you know, in recent months, Lextron has required a number of financial and contract accommodations from Delphi in order to continue operations. Regrettably, the necessity of accommodations from Delphi forces us to terminate the Contracts and exit Lextron. This is a difficult but necessary decision to ensure the continued and uninterrupted supply of Products. As I am sure you appreciate, the consequences of not delivering the Products to our customers are enormous and a situation we must avoid.

Sincerely,

DELPHI AUTOMOTIVE SYSTEMS LLC
Delphi Safety & Interior Systems Division

*Ann Macrino*

Ann Macrino
Electrical Commodity Manager, Delphi Safety & Interiors

cc:    Karen Craft, Delphi Legal Staff
       Joseph Papelian, Delphi Legal Staff
       Martha Everett, Delphi Supplier Risk Management
       Michelle E. Joseph, Buyer, Delphi Safety & Interiors
       Karen McClain, Purchasing Director, Delphi Safety & Interiors
       Albeno Castilla, Counsel to Lextron Corporation

World Headquarters and Customer Center

FORM B10 (Official Form 10) (04/04)

| UNITED STATES BANKRUPTCY COURT __SOUTHERN__ DISTRICT OF __NEW YORK__ | PROOF OF CLAIM |

| Name of Debtor | Case Number | Master Code: |
| Delphi Corporation | 05-44481 | 10385460 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor (The person or other entity to whom the debtor owes money or property):

Lextron Corporation

Name and address where notices should be sent:
Craig M. Geno, Esq.
Melanie T. Vardaman, Esq.
Harris & Geno, PLLC
PO Box 3380, Ridgeland, MS  39158-338
Telephone number: 601-427-0048

Claim #09524
USBC SDNY
Delphi Corporation, et al.
05-44481 (RDD)

**Received**
*JUL 1 8 2006*
THIS SPACE IS FOR COURT USE ONLY
Kurtzman Carson

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.
☐ Check box if you have never received any notices from the bankruptcy court in this case.
☒ Check box if the address differs from the address on the envelope sent to you by the court.

Account or other number by which creditor identifies debtor:

Check here ☐ replaces
if this claim ☐ amends   a previously filed claim, dated:_____

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☒ Taxes
- ☐ Other    Contract Dispute

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Last four digits of SS #: _____
  Unpaid compensation for services performed
  from _____ to _____
       (date)        (date)

**2. Date debt was incurred:**
October 2002

**3. If court judgment, date obtained:**
N/A

**4. Total Amount of Claim at Time Case Filed:** $ 800,000.00 actual, compensatory damages plus incidental and punitive damages be determined. (secured) (priority) (Total)
(unsecured)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Nonpriority Claim** $ 800,000.00
☒ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $_____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,925),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,225* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units-11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/07 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JUL 1 8 2006
CLAIMS PROCESSING CENTER
USBC, SDNY

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
| 7/13/06 | Melanie T. Vardaman, Esq.   attorney for Lextron Corporation |

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment

0544481060714000000000025

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

DELPHI AUTOMOTIVE SYSTEMS, LLC,

        **Plaintiff**

v.

        **CIVIL ACTION NO. 3:03CV335WS**

LEXTRON CORPORATION,

        **Defendant**

## ANSWER AND COUNTERCLAIM OF LEXTRON CORPORATION

Lextron Corporation ("Lextron") files this Answer and Counterclaim in response to the

Complaint filed by Delphi Automotive Systems, LLC ("Plaintiff") as follows:

### AFFIRMATIVE DEFENSES

### Affirmative Defense No. 1

This action is or should be stayed by operation of 11 U.S.C. § 362, due to Lextron's

Chapter 11 bankruptcy filing in the United States Bankruptcy Court for the Southern District of

Mississippi ("the Bankruptcy Court") on February 12, 2004.  Delphi has never sought relief from

the automatic stay; nor has it ever been a party to any motion seeking relief from the automatic

stay; nor has this action ever been the subject of an order granting any form of relief from the

automatic stay.  Lextron is reserved of its right to seek relief from the Bankruptcy Court to

impose the stay as to this proceeding, and to seek any damages that may be warranted under the

circumstances.

L558851.1/08173.15318

### Affirmative Defense No. 2

Plaintiff's request for relief is barred or diminished by operation of one or more of the following doctrines: waiver, estoppel, ratification, and/or laches.

### Affirmative Defense No. 3

Plaintiff's request for relief is barred by principles of equity, including but not limited to, unclean hands and unjust enrichment.

### Affirmative Defense No. 4

Plaintiff's request for relief is barred or diminished as a result of its failure to abide by the covenant of good faith and fair dealing inherent in every contract to be performed in Mississippi.

### Affirmative Defense No. 5

Plaintiff's putative claims should be barred or diminished due to its failure to mitigate.

### Affirmative Defense No. 6

Plaintiff's putative claims are subject to setoff and/or recoupment, which are specifically reserved and asserted.

### Affirmative Defense No. 7

Plaintiff's putative claims are subject to treatment in a plan of reorganization to be confirmed by the Bankruptcy Court in Lextron's Chapter 11 case, and the terms of such plan will control and supersede any judgment that might be obtained by Plaintiff, without regard to any judgment obtained by Lextron in it counterclaim.

### Affirmative Defense No. 8

Plaintiff has failed to join a necessary or indispensable party, or necessary or indispensable parties, or a party or parties needed for just adjudication, and should be required to join such party or parties pursuant to Rules 17 and 19 of the Federal Rules of Civil Procedure.

### Affirmative Defense No. 9

Plaintiff's claim for replevin of bailed property is moot, as is its request for damages for wrongful detention, due to Lextron's agreement to relinquish the equipment made the subject of the replevin count, and the Agreed Order Granting Motion for Writ of Replevin ("the Replevin Order") entered by this Court on March 5, 2003. Lextron is reserved of its right to seek damages from Plaintiff for wrongful removal of equipment belonging to Lextron.

### Affirmative Defense No. 10

Plaintiff cannot recover on its putative claims because it is not the real party in interest for purposes of this action, and/or because it lacks standing to pursue putative causes of action belonging to other legally distinct entities. In addition, any attempt by Plaintiff to assign its putative claims to other entities, or to add other entities as Plaintiffs at this stage of the litigation is barred by operation of 11 U.S.C. § 362.

### Affirmative Defense No. 11

Plaintiff's contract claims are barred by one or more of the following: lack of mutuality of obligation; lack of consideration; failure of consideration; duress; impossibility; and failure of conditions precedent and/or conditions subsequent.

## ANSWERS TO NUMBERED PARAGRAPHS OF COMPLAINT

And now, addressing Plaintiff's Complaint, paragraph by numbered paragraph, Lextron answers as follows:

1. Lextron is without knowledge or information sufficient to form a belief as to the truth of paragraph 1.

2. Admitted.

3. Denied.

4.    Admitted as to venue, without admitting jurisdiction. Denied as to allegations regarding Delphi's replevin claim, due to entry of the Replevin Order.

5.    Admitted.

6.    Admitted that Plaintiff and Lextron entered into various Contracts, and admitted that the Contracts speak for themselves. Denied as to any contrary interpretation. Further admitted that Lextron entered into contracts with other legally distinct Delphi entities. All other allegations not admitted herein are denied.

7.    Admitted that Lextron performed work for Delphi Packard Electric Systems Division pursuant to the General Terms and Conditions, which speak for themselves. Denied as to any contrary interpretation or legal effect.

8.    Admitted that Lextron performed work for Delphi Safety & Interior Division pursuant to the General Terms and Conditions, as amended from time to time, which speak for themselves. Denied as to any contrary interpretation or legal effect.

9.    Admitted.

10.    Admitted that the Contracts speak for themselves. Denied as to any contrary interpretation or legal effect.

11.    Admitted that the contractual language speaks for itself. Denied as to any contrary interpretations or legal effect.

12.    Admitted that the contractual language speaks for itself. Denied as to any contrary interpretations or legal effect.

13.    Admitted that Plaintiff transmitted letters terminating the relationship between Plaintiff and Lextron, without admitting to the validity or legal effect of the letters, and admitted

that copies are attached to the Complaint. Admitted that the letters speak for themselves, and denied as to any contrary interpretation or legal effect.

14.    Admitted that Charles Doty ("Mr. Doty") and Sidney Johnson ("Mr. Johnson") engaged in a telephone conversation on February 28, 2003. Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

15.    Admitted that Mr. Doty conditionally agreed to give Delphi access to the Lextron premises, subject to certain terms and conditions to be met by Delphi, and subject to further consideration of the rights and obligations of the parties. All other allegations not admitted herein are denied.

16.    Denied that Lextron owed a balance to Plaintiff, denied that Lextron had failed to meet its contract obligations to Plaintiff in January, 2003, and denied that Lextron was in breach of its contract with Plaintiff. Admitted that Plaintiff extended certain accommodations to Lextron as an inducement for Lextron to continue working for Plaintiff. Admitted that Lextron was out of formula on a loan from SouthTrust, and admitted that the loan documents speak for themselves. Denied as to any contrary interpretation. Admitted that Lextron was in arrears with respect to certain payroll taxes assessed for 2002, but denied as to the amount asserted by Delphi. Denied that Lextron failed to maintain adequate accounting controls. All other allegations not admitted herein are denied.

17.    Denied to Delphi's claim as to the purpose of the document attached as Exhibit 3A to the Complaint. Denied that Plaintiff had no obligation to pay Lextron in connection with

terminating the contract. Otherwise, admitted, subject to resolution of the replevin counts, as contained in the Replevin Order.

18.    The allegations of paragraph 18 are moot based on the Replevin Order, and therefore denied.

19.    Denied.

20.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

21.    The allegations of paragraph 21 are moot based on the Replevin Order, and therefore denied.

22.    The allegations of paragraph 22 are moot based on the Replevin Order, and therefore denied.

23.    The allegations of paragraph 23 are moot based on the Replevin Order, and therefore denied.

24.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

25.    The allegations of paragraph 25 are moot based on the Replevin Order, and therefore denied.

26.    The allegations of paragraph 26 are moot based on the Replevin Order, and therefore denied.

27.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

28.    Admitted that the Court has the power to issue a declaratory judgment. Denied as to any contrary interpretation.

29.    Admitted that Plaintiff is requesting a declaratory judgment. Denied that it is entitled to the judgment requested.

30.    Admitted that Plaintiff incorporates all prior allegations of the Complaint. Lextron incorporates all prior enumerated answers. Denied as to content and legal effect.

31.    Denied.

32.    Denied.

33.    Denied. Lextron further denies that Delphi is entitled to any of the relief in the unnumbered *ad damnum* paragraph beginning "WHEREFORE. . . ." All other allegations of the Complaint not specifically admitted herein are denied.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation requests that a judgment of dismissal be entered in its favor as to all counts of Plaintiff's Complaint not previously adjudicated. Lextron requests all other relief appropriate in the premises.

## COUNTERCLAIM

Lextron files this Counterclaim pursuant to F.R.C.P. 13, as follows:

### I. Parties

1.    Counterclaimant Lextron Corporation ("Lextron") is a Mississippi Corporation with its principal place of business located in the City of Jackson, Hinds County, Mississippi.

2.    Counterdefendant Delphi Automotive Systems, LLC ("Delphi") is a Delaware limited liability company doing business in the state of Mississippi.

### II. Facts

3.    At the inception of their joint venture, Delphi advised Lextron ("Lextron") and certain of its affiliates that it wanted to work with Lextron to manufacture significant amounts of auto components for use by Delphi. Delphi advised Lextron and Doty that the volume of business Delphi would make available to Lextron as part of the joint venture was such that

Lextron would have to significantly expand its physical plant. Delphi further promised Lextron and Doty that it would use its "best efforts" to cause the venture to be a success, as Delphi represented to Lextron that it would cause Lextron's cost of producing products for Delphi to be as low as possible and its production facilities to be as efficient as possible.

4.    In reliance on Delphi's representations and promises, Lextron acquired at considerable expense a manufacturing facility, and after consultation, inspection and direction by Delphi, renovated that facility at even greater expense so as to accommodate Delphi's manufacturing requirements, all in compliance with Delphi's demand that the facility be dedicated to manufacturing for Delphi alone (hereinafter sometimes "the Delphi dedicated facility").

5.    Delphi, at all times relevant herein, represented to Lextron and Doty that Delphi would provide necessary economic and technical support, guidance and assistance to Lextron, and, through their combined efforts, Lextron would be a major Delphi supply partner.

6.    Subsequently, Delphi failed to, and intentionally refused to increase the volume of Delphi manufacturing business as promised, failed to grant modest and reasonable price increases despite repeated requests from Lextron, and otherwise failed to use its "best efforts" to cause the joint venture to be a success. In fact, Delphi refused to implement Lextron requested cost reductions and production efficiencies. As a consequence of Delphi's acts, omissions and misrepresentations, by late 2002, Lextron had serious financial difficulties.

7.    Despite Lextron's financial difficulties, Delphi continued to assure Lextron that it was and would continue to work in Lextron's best interest to cause Lextron to be profitable, specifically and expressly agreeing by written Contract to use its, Delphi's, "best efforts" to cause Lextron's costs to be as low as possible and its production facilities and efficiencies to

be as high as possible *(see* Contracts dated October 31, 2002, October 8, 2002 and September 5, 2002 attached hereto as Exhibits A, B and C).

8.    Shortly thereafter, Delphi reassured Lextron's lender, Southtrust Bank, and Doty, that Delphi had an interest in the Lextron venture and was committed to support of it. Delphi reaffirmed its commitment to support Lextron in a letter to Southtrust Bank dated January 9, 2003, a copy of which is attached as Exhibit D. In reliance on Delphi's promises as aforesaid, Lextron committed to incur additional indebtedness from Southtrust Bank in the amount of $800,000.00, and Charles Doty was induced, in reliance on Delphi's promises, to execute a personal guaranty of that debt.

9.    Lextron had earlier incurred substantial indebtedness from Southtrust Bank (guaranteed by Lextron CEO Charles Doty) in reliance on Delphi's promises to support and grow Lextron economically and technologically.

10.    In late February 2003, shortly after Delphi's written assurances of its commitment to the Lextron venture's success (by assuring Lextron that whatever means were necessary to reduce Lextron's costs and increase its efficiencies would be undertaken by Delphi), and just after Delphi confirmed its interest in and obligation to support Lextron, Delphi abruptly and unilaterally breached its agreements and duties by reneging on its commitment to the Lextron venture and by terminating all Contracts between Delphi and Lextron then in existence, including three (3) new contracts (hereinafter referred to as the "Three New Contracts") which had recently (within the last few months) been awarded.

11.    Delphi represented to Doty and Lextron that the basis for termination of its commitments was a provision in a document entitled "General Terms and Conditions" which reads as follows:

> Buyer [Delphi] may immediately terminate this contract without liability to Seller [Lextron] in any of the following or any similar events:... (f) any accommodation by Buyer, financial or otherwise, not contemplated by this contract, that are necessary for Seller to meet its obligations under this contract [emphasis added].

*See* Letter dated February 27, 2003, from Delphi to Lextron attached as Exhibit E.

12.     Delphi's termination of the joint venture and of the three then existing production agreements was knowingly without any lawful basis since, among other things, (a) the provision referenced above on which the termination was purportedly based has no application to Delphi's commitment to the success of the Lextron joint venture, and (b) with respect to the "Three New Contracts" in particular, because they specifically require Delphi to assist and work with Lextron by using its "best efforts." Because the accommodation provision in subsection (f) of the General Terms and Conditions document has no application, it therefore could not be relied upon as a basis for termination.

13.     Delphi schemed throughout the Lextron venture to make Lextron dependent on it under the guise that Delphi would use its massive know-how and resources to insure the success of Lextron's Delphi manufacturing business. Yet, Delphi actually acted to drive Lextron into debt and then unilaterally and wrongfully terminated their relationship and its obligations to support Lextron. Among the wrongful conduct in which Delphi engaged, in addition to the aforedescribed, was Delphi's refusal to honor its commitment which it stated repeatedly, to significantly increase Lextron's volume of business so as to utilize all, or substantially all, of the Delphi dedicated facility; Delphi's refusal to adjust Lextron's pricing model so as to enable Lextron to make a profit from the joint venture; Delphi's refusal to pay Lextron for commodities at the same higher price paid by Delphi to Lextron's competitors within the State of Mississippi; Delphi's refusal to allow Lextron to reduce its costs, including

10

lead wire cost; Delphi's misrepresentation of its intent with regard to the retention of consultants who were represented to be working for the benefit of Lextron while, in reality, they were used by Delphi to obtain information regarding Lextron and its prospective non-Delphi related business ventures and to otherwise sabotage the Lextron-Delphi joint venture; and Delphi's assurances to Lextron and Doty that in the event Lextron incurred indebtedness in pursuit of the Delphi venture, Delphi would support Lextron economically and technologically to ensure its success. As a part of Lextron's effort to restructure its business, Delphi urged, through BBK, Ltd., that Lextron shut down all non-Delphi business activity.

14.  As set forth more fully below, the foregoing acts, omissions and misrepresentations were intentional and reckless and have severely damaged Lextron and Doty.

### COUNT ONE

### BREACH OF JOINT VENTURE AGREEMENT

15.  Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

16.  Delphi's acts, omissions and misrepresentations as set forth herein constitute a breach of the Delphi agreements to act jointly with Lextron (and Charles Doty) to create a profitable Delphi dedicated manufacturing facility.

17.  Lextron is therefore entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

### COUNT TWO

### BREACH OF CONTRACTS

18.  Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

19.    Such acts, omissions and misrepresentations constitute a breach of the Lextron-Delphi contracts, including the "Three New Contracts."

20.    Defendant Lextron is entitled to damages as a consequence of the aforesaid contractual breaches as more fully set forth below.

21.    In addition, Lextron is entitled to contractual and damages from Delphi as a result of improperly applied credits, and the failure of Delphi to either pay Lextron or credit it for products assembled and shipped to Delphi.

22.    Specifically, and in contrast to Delphi's claim that Lextron owes certain sums for allegedly breaching the supply contract, Delphi in fact owes Lextron the net amount of $461,197.16 for products assembled and shipped to Delphi, and for which Delphi never paid or properly credited Lextron.

## COUNT THREE

## INTENTIONAL MISREPRESENTATION

23.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

24.    Such misrepresentations were intentional and were relied upon by Lextron in acquiring and renovating a dedicated Delphi facility; incurring substantial indebtedness (including the $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's attention from other business opportunities.

12

25.   Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FOUR

### NEGLIGENT MISREPRESENTATION

26.   Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

27.   Such misrepresentations were relied by Lextron in acquiring and renovating the Delphi dedicated facility; incurring indebtedness (including the additional $800,000.00 Southtrust indebtedness noted in Paragraph No. 8 of this Counterclaim); expending funds to travel to Michigan to meet with Delphi when Delphi had already decided to break its contract with Lextron; making significant investments in capital equipment which had functional and economic usefulness only in the production of Delphi products; devoting scarce and valuable resources to working with Delphi's consultants and agents; and diverting Lextron's and Doty's attention from other business opportunities.

28.   Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT FIVE

### TORTIOUS INTERFERENCE WITH CONTRACT

29.   Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

30.   Delphi's conduct in unilaterally, intentionally, wrongfully and recklessly terminating the joint venture and aforementioned contracts and in breaching those agreements tortiously interfered with (and was intended to interfere with) Lextron's contracts with Southtrust Bank, other creditors, and with other existing and potential business pursuits.

31.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SIX

### BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

32.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

33.    Such acts, omissions and misrepresentations, as set forth herein were willful, malicious and undertaken in bad faith, and thus constituted a breach of the duty of good faith and fair dealing implied in all contracts.

34.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT SEVEN

### UNFAIR TRADE PRACTICES

35.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

36.    The foregoing acts, omissions and misrepresentations constitute unfair trade practices, including, but not limited to, Delphi's practice of paying more for commodities purchased from Lextron competitors than for those same products purchased from Lextron, in violation of Miss. Code Ann. 75-21-3, and other applicable state statutes.

37.    Defendant Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT EIGHT

### INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

38.     Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

39.     Such acts, omissions and misrepresentations interfered with Lextron's prospective business relations with other parties. Delphi intentionally committed such acts, including the wrongful termination of the joint venture and the aforementioned contracts to cause Lextron to be unable to consummate such other prospective business.

40.     Defendants are entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT NINE

### BREACH OF FIDUCIARY DUTY

41.     Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

42.     As a consequence of the long-standing course of dealing, representations and promises of Delphi and the joint venture arrangement of the parties, Delphi owed Lextron a fiduciary duty, which Delphi breached by the foregoing acts, omissions and misrepresentations.

43.     The foregoing breach of fiduciary duties entitles Defendants to damages as set forth below.

## COUNT TEN

### FRAUD

44.     Lextron and Doty incorporate herein, as if fully set forth, all of the foregoing factual allegations.

45.    Delphi knowingly made the foregoing representations and promises with the knowledge that they were false or with reckless disregard for their truth and intending for and inducing Lextron to rely thereon all to Lextron's extreme detriment. Under the circumstances of the parties' unique, fiduciary, and special relationship, Lextron at all times pertinent hereto, was entitled to rely on the Delphi representations.

46.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## 'COUNT ELEVEN

### SUPPRESSION OF MATERIAL FACTS

47.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

48.    Delphi suppressed its true intentions while misrepresenting to Lextron its interest in and support of Lextron, all to the extreme detriment of Lextron.

49.    Lextron is entitled to damages as a consequence of the aforesaid acts, omissions and misrepresentations as more fully set forth below.

## COUNT TWELVE

### CONVERSION

50.    Lextron incorporates herein, as if fully set forth, all of the foregoing factual allegations.

51.    Despite specific concerns raised by Lextron with respect to the property by Delphi in its count for replevin, and despite assurances by Delphi that it would remove only equipment owned by it, on March 10, 2003, Delphi removed items of equipment belonging to Lextron, and in which Delphi had no interest.

1558651.008173.15318

16

52.    The equipment wrongfully converted by Delphi is listed as follows:

Front Door Harness:          Serial # 16643688
Front Door Harness:          Serial # 16643690
Backdoor Harness:            Serial # 1544-7743
Backdoor Harness:            Serial # 1544-7744
Steering Column Harness:     Serial # 16870022

53.    Delphi's removal of these items of equipment was in direct violation of the

Agreed Order entered into by and between Delphi and Lextron, and filed of record in this Court,

which authorized Delphi to remove only those items of equipment belonging to it.

54.    Delphi's removal and continued detention of these items was deliberate and

intentional, and was performed in furtherance of its calculated business decision to ruin Lextron.

55.    In the alternative, Delphi's removal and continued detention of these items was

the product of gross negligence, mismanagement, and lack of oversight as to amount to an

intentional tort.

56.    Delphi is therefore liable to Lextron for actual, compensatory, incidental, and

punitive damages as a result of its willful or grossly negligent acts of conversion of Lextron's

property, all in violation of an Order of this Court.

WHEREFORE, PREMISES CONSIDERED, Lextron Corporation demands judgment

against Delphi Automotive Systems, LLC, including all of its divisions and affiliates named or

referred to in the Complaint filed by Delphi herein, or who may otherwise be liable to Lextron,

for all actual, compensatory, incidental, and punitive damages in an amount to be determined by

the jury at trial, plus all accruing pre- and post-judgment interest and costs of this action, and

such other and further relief as the jury and Court deem appropriate.

Dated, this the 7th day of September, 2004.

LEXTRON CORPORATION

By: _____
       Chad J. Hammons

Alveno N. Castilla, Esq. (MS Bar 5924)
Chad J. Hammons, Esq. (MS Bar #10419)
Watkins Ludlam Winter & Stennis, P.A.
633 North State Street (39202)
Post Office Box 427
Jackson, MS 39205-0427

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document has this

day been placed in the United States Mail, postage prepaid, to the following:

Debra Brown, Esq.
Frank Trapp, Esq.
Phelps Dunbar
P. O. Box 23066
Jackson, MS 39225-3066

This 7th day of September, 2004.

_____
Chad J. Hammons

# EXHIBIT "A"

# DELPHI



RECEIVED
NOV 1 2002
BY:

DELPHI CORPORATION
LONG TERM CONTRACT

### 1.  Purchase of Product

Lextron Automotive ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| GX203842 *1544 7743* | 2004 DCX HB RRAB Leadwire Asm (LH) | $▇ USD | ▇ annually (based on maximum of 235 working days and 100 hours per week) |
| GX203843 *1544 7744* | 2004 DCX HB RRAB Leadwire Asm (RH) | $▇ USD | ▇ annually (based on maximum of 235 working days and 100 hours per week) |

### 2.  Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2006.

### 3.  Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms).  Pricing for each subsequent Calendar Year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Part Number | % Red. | Calendar Year 2004 Pricing | % Red. | Calendar Year 2005 Pricing | % Red. | Calendar Year 2006 Pricing |
|---|---|---|---|---|---|---|
| GX203842 *15447743* | 5% | $▇ | 5% | $▇ | 5% | $▇ |
| GX203843 *15447744* | 5% | $▇ | 5% | $▇ | 5% | $▇ |

*ME$
10/21/02*

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product.  Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price

reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this __31ST__ day of __OCTOBER__, 2002.

Buyer:

Seller:

**Delphi Corporation LLC**
**acting through its Safety & Interior**
**Systems Division**

**Lextron Automotive**

By: _____

By: _____

Name: Michelle E. Joseph

Name: Ray C. Irby

Title: Senior Electrical Buyer

Title: Chief Operating Officer

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2  SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

-1-

Revised June 24, 1999

2. Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 5) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) [review] Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or a shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

-2-

Revised June 24, 1999

## ORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## . WARRANTY

.1  General. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services [covered] by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from [d]efect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested [b]y Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

.2  Date and Time Processing. Seller warrants and guarantees to Buyer and its customers that any products (including [c]omputer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately [p]rocess, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st [c]enturies, including leap year calculations.

.3  Warranty Period. The period for each of the foregoing warranties will be that provided by applicable law, except that [if] Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by [th]is Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

[If] Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all [in]gredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to [th]e ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers [s]ufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous [ma]terial that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures [an]d precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

- 3 -

Revised June 24, 1999

le ˙ requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, tra.. portation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER /

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1  Exchange of Information.  Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards.  Such technical information will not be subject to any use or disclosure restrictions.  Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2  Waiver of Claims.  Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, its ˙ customers or their respective suppliers with respect to any technical information that Seller shall have disclosed now or hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -

Revised June 24, 1999

1.   Repair and Rebuild.  Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4  Computer Programs and Written Works.  All works of authorship, including without limitation, software, computer programs, and databases. (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

3.  INDEMNIFICATION

3.1  Infringement.  Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.   Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

3.2  Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

3.3  Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

1  INSURANCE

- 5 -

Revised June 24, 1999

will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.  With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten/(10) days after Buyer requests.  The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment").  Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in w    or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article.  Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property.  Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property.  Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property.  Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property.  When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property or work performed on such property or otherwise.  Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property.  Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault.  Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from    s premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations.  Buyer

- 6 -

Revised June 24, 1999

w⁻ ˙ave the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with re⌐ ⌐ct thereto.

17.3  Return of Buyer's Property. / Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the :ight to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, n which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. f Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

7.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's enefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT IADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS IR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF UYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for ry loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, ithout limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of rvice or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory images, profits or any other indirect, special or consequential damages.

7.5  Development, Engineering And Consulting Services.  Engineering, consulting or development services Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of thorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole operty of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services Developed IP") to Buyer. Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every asonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional cuments reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse ller for reasonable costs incurred by Seller in providing such assistance.

. SERVICE AND REPLACEMENT PARTS

iring the term of this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and placement parts requirements to Buyer's customers at the then current production price(s) under this intract. If the goods are systems or modules, Seller will sell the components or parts that comprise the stem or module at price(s) that will not, in the aggregate, exceed the price of the system or module less sembly costs. If this Contract is in effect at the end of the vehicle production program into which the goods vered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its stomers' service and replacement parts requirements during the fifteen (15) year period following the end of :h vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in ect during the entire Post-Production Period. During the first three (3) years of the Post-Production Period, price(s) for such goods will be the production price(s) which were in effect at the commencement of the st-Production Period. For the remainder of the Post-Production Period, the price(s) for such service goods be as reasonably agreed to by the parties. If requested by Buyer, Seller will also make service literature i other materials available at no additional charge to support Buyer's service activities.

... MEDIES

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services ~red by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials ..ess Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

~ ~is Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this .ntract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

~ 8 ~

Revised June 24, 1999

action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

-9-

# EXHIBIT "B"



**DELPHI**

RECEIVED
OCT 9 2002
BY:

DELPHI CORPORATION
LONG TERM CONTRACT

FILE

## 1. Purchase of Product

Lextron Corporation ("Seller") agrees to sell, and Delphi Corporation LLC acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately One Hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16870022 | 2003 ½ GMT 315 Steering Wheel Wire Harness | $▮▮▮ | ▮▮▮▮(based on a maximum of 235 working days and 100 hours per week) |

## 2. Term

With respect to each Product, the term of this Contract is from Calendar Year 2003 through Calendar Year 2007.

## 3. Prices

The per unit price of each Product for Calendar Year 2003 is F.O.B. Seller's Plant, Freight Collect (2000 IncoTerms). Pricing for each subsequent Calendar Year is subject to the following minimum annual percentage reductions from the prior Calendar Year's pricing:

| Calendar Year 2004 | ▮▮% or Piece Price $▮▮▮ ea. |
|---|---|
| Calendar Year 2005 | 3.5% or Piece Price $▮▮▮ ea. |
| Calendar Year 2006 | ▮▮% or Piece Price ▮▮▮ ea. |
| Calendar Year 2007 | ▮▮% or Piece Price $1.2▮ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect

to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

### 4.  Right to Purchase from Others

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Calendar Year 2003 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

### 5.  Purchase Orders

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Calendar Year 2003. Any amendment to, or revision of, such General Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be

construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this __8ᵀᴴ__ day of __October__ , 2002.

Buyer:                                          Seller:

Delphi Corporation LLC                          Lextron Corporation
acting through its Safety & Interior
Systems Division

By: _____            By: _____
Name:   Michelle E. Joseph               Name:    Ray C. Irby
Title:  Senior Electrical Buyer          Title:   Chief Operating Officer

# EXHIBIT "C"

# DELPHI

### DELPHI CORPORATION
### LONG TERM CONTRACT

1.    **Purchase of Product**

Lextron Automotive Technologies Corporation ("Seller") agrees to sell, and **Delphi Corporation LLC** acting through its Safety & Interior Systems Division ("Buyer") agrees to purchase, approximately one hundred percent (100%) of Buyer's production and service requirements for the following products (each referred to as a "Product" and collectively referred to as the "Products"):

| Part Number | Description | Per Unit Price | Annual Tool Capacity |
|---|---|---|---|
| 16643688 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $▮▮▮▮ | ▮▮▮,▮▮▮/yr |
| 16643690 | 2004 Cami YT1 Door Hardware Module Wire Harness (Front) | $▮▮▮ | ▮▮▮,▮▮▮/yr |

2.    **Term**

With respect to each Product, the term of this Contract is from **Model Year 2004** through **Model Year 2005**.

3.    **Prices**

The per unit price of each Product for **Model Year 2004** is F.O.B. Buyer's Plant, Freight Collect (2000 IncoTerms). Pricing for each subsequent Model Year is subject to the following minimum annual percentage reductions from the prior Model Year's pricing:

**Part Number 16643688**
| | | |
|---|---|---|
| Model Year 2005 | Three percent (▮%) | Piece Price ▮▮▮▮ ea. |
| Model Year 2006 | Three percent (▮%) | Piece Price ▮▮▮▮ ea. |
| Model Year 2007 | Three percent (▮%) | Piece Price ▮▮▮▮ ea. |
| Model Year 2008 | Three percent (▮%) | Piece Price $▮▮▮ ea. |

**Part Number 16643690**
| | | |
|---|---|---|
| Model Year 2005 | Three percent (▮%) | Piece Price $▮▮▮ ea. |
| Model Year 2006 | Three percent (▮%) | Piece Price $▮▮▮ ea. |
| Model Year 2007 | Three percent (▮%) | Piece Price $▮▮▮ ea. |
| Model Year 2008 | Three percent (▮%) | Piece Price $▮▮▮ ea. |

Buyer and Seller will use their best efforts to implement cost savings and productivity improvements in order to reduce Seller's costs of supplying each Product. Buyer and Seller agree that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to fifty percent (50%) of any net cost savings achieved by Seller with respect to such Product (i.e., savings after recovery by Seller of a pro rata portion, based on the remaining term of this Contract, of the reasonable and documented costs to achieve such cost savings), provided, however, that the pricing of each Product will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any savings resulting from reduction on the content of the such Product.

No price increases (including any decrease of the scheduled price reductions) will be made on account of (i) Seller's failure to achieve any expected cost savings or productivity improvements or (ii) any increases in Seller's labor, materials, overhead and other costs. In the event that Buyer agrees to any price increases (or a decrease of any scheduled price reductions) with respect to any Product, then, notwithstanding anything to the contrary set forth in this Contract, the pricing of each Products will be reduced (in addition to any scheduled price reductions) by an amount equal to one hundred percent (100%) of any subsequent net cost savings achieved by Seller with respect to such Product until aggregate price reductions on account of Seller's cost savings equal any price increases previously agreed to by Buyer.

4.    **Right to Purchase from Others**

During the entire term of this Contract, Seller will assure that each Product remains competitive in terms of technology, design, service and quality with any similar product available to Buyer. Following Model Year 2004 Seller will also assure that each Product remains competitive in terms of price with any similar product available to Buyer. If, in the reasonable opinion of Buyer, a Product does not remain competitive, Buyer, to the extent it is free to do so, will advise Seller in writing of the area(s) in which a similar product is more competitive. If, within ninety (90) days, Seller does not agree to immediately sell any Product with comparable technology, design, quality, or, if applicable, price, Buyer may elect to purchase any similar products available to Buyer without any liability to Seller under this Contract.

5.    **Purchase Orders**

All Products will be ordered by Buyer, and delivered by Seller, in accordance with written purchase orders (including related delivery releases and shipping instructions) issued by Buyer from time to time during the term of this Contract. Buyer's General Terms and Conditions, a copy of which is attached, are hereby incorporated into this Contract by reference, provided, however, that Buyer's right to "terminate for convenience" under the General Terms and Conditions will be inapplicable to this Contract until the end Model Year 2004. Any amendment to, or revision of, such General

Terms and Conditions shall also become a part of this Contract, provided that (i) Buyer provides Seller with a copy of such revised Terms and Conditions and (ii) Seller does not object to such revised Terms and Conditions in writing within thirty (30) days after receipt. The Terms and Conditions (together with any revision made a part of this Contract) shall be construed, to the extent possible, as consistent with the terms and conditions set forth in this Contract and as cumulative, provided, however, that if such construction is unreasonable, the terms and conditions set forth in this Contract shall control.

EXECUTED by Buyer and Seller as of this 5th day of September, 2002.

Buyer:                                    Seller:

Delphi Corporation LLC                    Lextron Automotive
acting through its Safety & Interior      Technologies Corporation
Systems Division

By: _____              By: _____
Name: ___Michelle E. Joseph___           Name: ___Ray C. Irby___
Title: ___Senior Electrical Buyer___      Title: ___Chief Operating Officer___

Page 2 of 2

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

*Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## . SHIPPING AND BILLING

.1    Shipping.    Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

. Billing.    Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

. Delivery Schedules.    Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

Revised June 24, 1999

Premium Shipments. If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules u...g the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3. SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 1. QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial o..  ..on and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## . NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

- 2 -

Revised June 24, 1999

## FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## WARRANTY

.1  General.  Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

.2  Date and Time Processing.  Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

.3  Warranty Period.  The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

## INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable

-3-

Revised June 24, 1999

legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under his Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1 Exchange of Information. Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards. Such technical information will not be subject to any use or disclosure restrictions. Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2 Waiver of Claims. Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

- 4 -

Revised June 24, 1999

~~3 Repair and Rebuild. Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and ~~ r subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4 Computer Programs and Written Works. All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer. To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1 Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services. Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2 Activities on Buyer's Premises. Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3 Product Liability . Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic oss caused by any of the goods or services supplied by Seller (regardless of whether such claim or demand arises under ort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss esults from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation ry any party other than Seller.

## 4. COMPLIANCE WITH LAWS

:eller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, onventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, ibeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, ut not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor :lection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors rill utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this 'ontract. Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold armless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including :asonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with ris Article.

## 5. ˙SURANCE

-5-

Revised June 24, 1999

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers sonably acceptable to Buyer. With respect to any such insurance coverage, Seller will furnish to Buyer either a ...dificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage. The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment. This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others. Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1 Bailment of Property. All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis. T    's extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer. To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller, Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller las an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and laims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, ease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When ermitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property or work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications lay not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

7.2 Seller's Duties with Respect to Buyer's Property. While Buyer's Property is in Seller's possession and until Seller elivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be sponsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or ault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's wn expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be ersonal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not ommingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from ller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the a    cturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer

- 6 -

Revised June 24, 1999

will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with ect thereto.

17.3  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property.  Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.  Development, Engineering And Consulting Services.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer. Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer. Seller will notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

18. SERVICE AND REPLACEMENT PARTS

During the term of  this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs.  If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

9.  REMEDIES

-7-

Revised June 24, 1999

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer. Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements. Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licenses or authorization(s). Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law.

- 8 -

Revised June 24, 1999

Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over ar or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this C     ict, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

-9-

# EXHIBIT "D"

# DELPHI

**memo**

Date:       ~~February 26~~, 2003    Jan 9

To:        Andy Raines                SouthTrust Bank

From:    Larry Graves

Subject:  Delphi-P Support of Lextron

c:          Sidney Johnson
            Greg Naylor
            Martha Everett

As a follow up your conversation with Greg Naylor and Martha Everett, I am writing you this memo to re-iterate Delphi Packard's (Delphi-P) focus to maintain Lextron Corporation as a supplier. We have resources to assist Lextron, including a reduction in our payment terms to Net 15, during its cash flow shortfall.

Delphi-P is currently extending the equivalent of MNS2 credit terms (very favorable credit terms) for the material that Lextron purchases from Delphi-P. We take our payment via a contra rather than receiving a check from Lextron. Lextron and your bank have asked Delphi-P to stop the contra method and change to accepting check payments from Lextron. Delphi-P will continue to send invoices and will allow Lextron to reconcile the contra amount prior to the contra being taken. Delphi-P understands that need for accurate fiscal review and accountability at Lextron, and will support their desire to achieve that relative to this business situation. Delphi-P is not considering limiting its right to set offs.

Additionally, because of Delphi-P's support and interest in Lextron, Delphi-P is requesting SouthTrust Bank to continue its support of Lextron. If you have any questions please contact Greg Naylor or me.

Regards,

Larry W. Graves
North America Purchasing Director
Delphi Packard Electric Systems

# EXHIBIT "E"

# DELPHI

February 27, 2003

Mr. Charles Doty
President and CEO
Lextron Corporation
P.O. Box 23971
Jackson, Mississippi 39225-3971

Dear Mr. Doty,

As you are aware, Delphi Automotive Systems LLC, by and through its Delphi Safety & Interior Systems Division, ("Delphi") has issued three (3) Long Term Contracts (the "Contracts") to Lextron Corporation ("Lextron") for the manufacture and supply of a variety of wire harness and other component assemblies for use in the automotive industry (the "Products").

Each of those Contracts incorporates Delphi's General Terms and Conditions and provides that those General Terms and Conditions are cumulative with the terms and conditions contained in the Contracts. Section 9 of Delphi's General Terms and Conditions states as follows:

> Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events ... (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract.

As you know, in recent months, Lextron has required a number of financial and contract accommodations from Delphi in order to continue operations. Regrettably, the necessity of accommodations from Delphi forces us to terminate the Contracts and exit Lextron. This is a difficult but necessary decision to ensure the continued and uninterrupted supply of Products. As I am sure you appreciate, the consequences of not delivering the Products to our customers are enormous and a situation we must avoid.

Sincerely,

DELPHI AUTOMOTIVE SYSTEMS LLC
Delphi Safety & Interior Systems Division

*Ann Macrino*

Ann Macrino
Electrical Commodity Manager, Delphi Safety & Interiors

cc:    Karen Craft, Delphi Legal Staff
       Joseph Papelian, Delphi Legal Staff
       Martha Everett, Delphi Supplier Risk Management
       Michelle E. Joseph, Buyer, Delphi Safety & Interiors
       Karen McClain, Purchasing Director, Delphi Safety & Interiors
       Albeno Castilla, Counsel to Lextron Corporation

World Headquarters and Customer Center

Delphi has redacted certain exhibits to the Lextron proofs of claim to the extent that they
include competitive edge pricing information.