**Hearing Date and Time: June 22, 2007 at 10:00 a.m.**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
Albert L. Hogan III (AH 8807)
John K. Lyons (JL 4951)
Ron E. Meisler (RM 3026)

    - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
   Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

|  |  |
|---|---|
| In re | Chapter 11 |
| DELPHI CORPORATION, et al., | Case No. 05-44481 (RDD) |
|  | (Jointly Administered) |
| Debtors. |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

DEBTORS' OMNIBUS SUPPLEMENTAL REPLY WITH RESPECT TO
PROOFS OF CLAIM NUMBERS 837, 838 & 14762
<u>(H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES.)</u>

("SUPPLEMENTAL REPLY – H.E. SERVICES, ET AL")

Delphi Corporation ("Delphi") and certain of its subsidiaries and affiliates, debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), hereby submit their Supplemental Reply With Respect To Proofs Of Claim Nos. 837, 838, and 14762 (H.E. Services Company, Robert Backie, and Richard Janes) (this "Supplemental Reply"), and respectfully represent as follows:

Introduction

1.  H.E. Services Company ("HES"), a long-time former supplier of goods and services to Delphi Automotive Systems, LLC ("DAS LLC") and its predecessor the GM Corporation ("GM")[1] since the 1990s, made a number of business decisions that were not as lucrative as HES hoped and that eventually led to HES's demise in 2004. Instead of accepting that its decisions to invest in new facilities or new equipment did not yield desirable results, HES seeks to recoup the money it invested over the years (as well as any lost profits and other damages) by alleging that various individuals from DAS LLC – most of whom are unnamed in HES's papers – *guaranteed* HES a stream of future purchase orders if it made the investments. However, HES, as a long-time and sophisticated supplier of DAS LLC, knew full well that DAS LLC (i) does not promise future business outside its request for quotation (or "RFQ") process, (ii) highlights that its projections are not guaranteed, and (iii) does not guarantee the success of supplier investments in new facilities or equipment. Simply put, HES took a number of business risks that did not pan out; it was not guaranteed an endless stream of business regardless of whether, as happened here, the cost and quality of HES's goods and services made it noncompetitive.

---

[1] Prior to Delphi's January 1, 1999 divestiture from GM, HES supplied parts and services to GM. For convenience "DAS LLC" is used throughout this Reply regardless of the time frame at issue.

2

2. HES's underlying complaint articulates three discrete investments that HES allegedly made based on some apparently verbal agreement or guarantee of future business from DAS LLC: (i) construction of a facility in El Paso, Texas to service DAS LLC's technology center in Juarez, Mexico (the "Juarez Relationship"); (ii) establishment of a manufacturing facility in Flint, Michigan to service DAS LLC's Saginaw Steering Division's needs (the "Flint Relationship"); and (iii) the purchase of an EX-CELL-O grinding machine to manufacture prototype parts for DAS LLC's Saginaw Steering Division (the "EX-CELL-O Relationship") (collectively, the "Relationships"). Based on these statements, HES has asserted a variety of claims, including fraud, misrepresentation, promissory estoppel, and breach of contact – all allegedly done because HES is a minority-owned firm. These claims must fail, however, because in fact DAS LLC never promised future business on the condition that HES make these investments; DAS LLC represented then to suppliers, as it continues to represent to suppliers today, that purchase orders are issued as a result of its RFQ process and the supplier with the most competitive quote, in terms of price and quality, will be awarded the business. HES made its investments so that it could *compete* for DAS LLC's business – not be guaranteed such business *ad infinitum.*

3. The claims asserted by HES's shareholders – Robert Backie and Richard Janes – also fail for independent reasons.[2] As shareholders, Backie and Janes have no standing to raise claims belonging to HES. Moreover, Janes was not a party to the underlying lawsuit filed in 2005 and has not alleged any discrimination against him individually.

---

[2] Backie and Janes are former HES officers and shareholders. Backie was the majority shareholder.

4. The claims also fail for a variety of other reasons, including Claimants' failure to: (i) file claims by the deadline set forth in the applicable statute of limitations; (ii) set forth any specific facts indicating discrimination; (iii) set forth facts that support its fraud and misrepresentation claims; (iv) set forth facts of a clear and definite promise upon which HES reasonably relied; and (v) explain how alleged oral agreements or promises would be enforceable in light of DAS LLC's standard terms and conditions that contain an integration clause and written amendment requirement. Accordingly, the claims asserted by HES, Backie, and Janes should be disallowed and expunged in their entirety.

Background

5. HES's relationship with DAS LLC, and its predecessor GM, began in the mid-1990s and lasted until spring 2004 when HES permanently went out of business. Since the inception of the relationship, DAS LLC purchased automotive components that HES engineered pursuant to various purchase orders, each incorporating DAS LLC's General Terms and Conditions. Additionally, DAS LLC hired HES to perform inspection and assembly services, also pursuant to purchase orders incorporating the same General Terms and Conditions.

6. Experienced and sophisticated DAS LLC suppliers, including HES, understand that DAS LLC issues written RFQs to multiple potential suppliers in connection with all products or services DAS LLC desires to purchase. (See Declaration Of John Taylor In Support Of Debtors' Supplemental Reply (the "Taylor Decl.") ¶ 7, a true and correct copy of which is attached hereto as Exhibit 1; Declaration Of Stephen Dawe In Support Of Debtors' Supplemental Reply (the "Dawe Decl.") ¶ 7, a true and correct copy of which is attached hereto

as Exhibit 2.)[3]  Once an RFQ is issued, suppliers have the opportunity to bid on the prospective business; after a series of negotiations (the "RFQ Process"), DAS LLC chooses the most competitive supplier, both in terms of value and quality, to fulfill its needs.  (See id.)  Suppliers never receive business – or the promise of business – from DAS LLC without first going through the RFQ Process.  (See Dawe Decl. ¶ 7.)

7.      Through its policies, DAS LLC encourages business with minority suppliers.  (Taylor Decl. ¶ 4.)  Primarily, DAS LLC helps minority suppliers gain access to business opportunities with DAS LLC, i.e., access to the RFQ Process.  (Id. ¶ 6.)  Once a minority supplier is issued an RFQ, there is no guarantee that such supplier ultimately will win the business.  (Id.)  During the RFQ Process, minority suppliers' bids are considered without regard to their minority status.  (Id. ¶¶ 6-7)  If, at the end of the RFQ Process, two or more suppliers are *equally* competitive in terms of value and quality, then DAS LLC will normally choose to give the business to the minority supplier.[4]  (Id. ¶¶ 6-7.)  DAS LLC conveyed its policy to Mr. Backie on numerous occasions.

8.      Over the years, while HES remained operational, it received numerous RFQs from DAS LLC.  In all cases, DAS LLC's decisions not to award business to HES after the RFQ Process were based solely on HES's relative lack of competitiveness in terms of value or quality.  DAS LLC's decisions to terminate contracts with HES, from time to time, were

---

[3]  The Debtors have redacted certain confidential pricing information from certain declaration exhibits pursuant to paragraph 9(f)(ii) of the Claim Objection Procedures Order, and agree to make such information available to Claimants' counsel upon request.

[4]  Exceptions may be made in certain cases where, for example, the Buyer overseeing the RFQ process has an excellent and long-standing relationship with the non-minority supplier.

similarly premised on HES's relative lack of competitiveness. They were never based on the fact that HES was a minority-owned firm or that Backie was a minority. (See, e.g., Dawe Decl. ¶ 8.)

    A.    <u>HES's Decision To Open Up A Facility In El Paso, Texas To Service DAS LLC's Tech Center Located in Juarez, Mexico</u>

9. In the 1995-1996 timeframe, six divisions of DAS LLC – itself then a division of GM – established a "Tech Center" in Juarez, Mexico. The Tech Center produces, among other things, automotive prototype parts and automotive assemblies for DAS LLC's customers. Because DAS LLC lacked a local supplier base in Juarez, it approached many of its current suppliers and notified them of the business opportunities available in Juarez.

10. In particular, DAS LLC notified suppliers, including HES, of its plans for the Tech Center and the type of work the Tech Center would require. DAS LLC encouraged its suppliers to grow with DAS LLC, but cautioned that suppliers should not expand to Juarez without developing other business opportunities in the area. DAS LLC provided no promise or guarantee of business to HES or any other prospective supplier; indeed, all prospective suppliers, including HES, were well-aware of DAS LLC's standard RFQ Process.

11. DAS LLC's Juarez Tech Center issued multiple RFQs to HES's El Paso facility during its operation. Moreover, once DAS LLC's Saginaw Steering Division learned that Mr. Backie intended to close HES El Paso, even DAS LLC's Saginaw facility issued RFQs to HES El Paso. (Declaration Of Bruce Waslusky In Support Of Debtors' Supplemental Reply (the "Waslusky Decl.") ¶ 5, a true and correct copy of which is attached hereto as <u>Exhibit 3</u>.) HES's failure to obtain business from these RFQs was due solely to HES's relative lack of competitiveness in terms of value or quality. (<u>Id.</u>) DAS LLC's decisions not to award business to HES El Paso were not premised on race.

6

12. DAS LLC made no promise to HES that it would secure any – much less exclusive – business with DAS LLC's Tech Center; indeed, the only valid evidence of DAS LLC's promise to do business with HES in any respect is a properly issued purchase order. Setting this fact aside, it was inherently unreasonable for HES to rely on the prospect of future business where DAS LLC's RFQ Process was common knowledge.

B.  HES's Decision To Open Up A Facility In Flint, Michigan

13. DAS LLC made no promise of future business to HES in connection with the Flint Relationship. In particular, DAS LLC did not require or "entice" HES to establish its Flint Manufacturing division. (See Dawe Decl. ¶ 4.) Nor did DAS LLC promise future business to HES's Flint Manufacturing and Universal Manufacturing[5] divisions. (See id. ¶ 7.) All business offered to the HES Flint Manufacturing and Universal Manufacturing divisions was subject to DAS LLC's standard RFQ Process. (Id.)

14. DAS LLC awarded certain business to HES's Flint Manufacturing and Universal Manufacturing divisions after HES submitted the most competitive bids in response to RFQs. (Id.) Subsequently, DAS LLC issued purchase orders to HES, each of which incorporated DAS LLC's standard Terms and Conditions. (Id.)

15. In or around early 2002, DAS LLC began learning of serious quality issues with respect to products produced at HES's Flint and Saginaw facilities. (Id. ¶¶ 9-14.) Indeed, in response to customer complaints, DAS LLC audited Universal Manufacturing on or about March 22 and March 26, 2002. (Id. ¶ 11.) The DAS LLC auditor, Sybil Chernek, documented the major quality control issues at HES's Universal Manufacturing division,

---

[5] Universal Manufacturing was the name of HES's Saginaw facility. (Dawe Decl. ¶ 5.)

7

including the "absence or total breakdown of [quality systems]," which resulted HES's Universal Manufacturing division being placed on "major nonconformity status." (Id.)

16. Around that same time that the quality of HES's products began deteriorating, HES proposed that DAS LLC pay increased prices for the parts HES manufactured and assembled because HES was not turning a profit on the business. (Id. ¶ 15.) DAS LLC first refused the requested increases in February of 2002. (Id.) Nevertheless, HES persisted in requesting price increases, going so far as refusing to correct its quality problems before being awarded a price increase. (Id. ¶ 16.) HES's persistent requests for price increases culminated in meetings between HES and DAS LLC personnel on or about October 8, 2002 and December 4, 2002. (Id. ¶¶ 17-18.) During the meetings, HES indicated that it would not honor its contractual obligations at the previously agreed upon prices. (Id.) DAS LLC reiterated that it would not agree to the increased prices. (Id.) As a result, HES and DAS LLC mutually agreed that DAS LLC would begin resourcing the HES business to more competitive suppliers.[6] (Id. ¶ 18.) Accordingly, on December 6, 2002, DAS LLC provided notice of its decision to terminate its contracts with HES's Flint Manufacturing and Universal Manufacturing divisions for convenience pursuant to DAS LLC's General Terms & Conditions. (Id. ¶ 19.)

17. DAS LLC's decision to terminate contracts with HES's Flint Manufacturing and Universal Manufacturing divisions was based solely on the value and quality of products HES provided, not on race. Indeed, DAS LLC continued to contract with other divisions of HES until HES went out of business in the spring of 2004. (See id. ¶ 21.)

---

[6] Delphi eventually did resource this business to three suppliers, including one minority-owed supplier. These suppliers offered prices lower than HES's prices. (Dawe Decl. ¶ 20.)

8

18.     DAS LLC's terminations of its contracts with HES's Flint Manufacturing and Universal Manufacturing divisions were proper under the terms of the relevant purchase orders.  DAS LLC fully performed under the purchase orders prior to the terminations and therefore did not breach any contractual obligation to HES.  Moreover, during the performance of the contracts, HES expressly assumed the risk of variations in DAS LLC's requirements.  As such, HES cannot complain that DAS LLC ultimately ordered fewer parts than anticipated.

C.      HES's Purchase Of An EX-CELL-O Machine

19.     In approximately mid-1999, DAS LLC issued RFQ number S30000009 to HES, among other suppliers, to solicit production of prototype C/V joint components, specifically inner and outer races.  (Waslusky Decl. ¶ 7.)  Production of the prototype inner and outer races required that the supplier purchase an EX-CELL-O Model XG-690 grinding machine to facilitate DAS LLC's requirements.  (Id.)  After the RFQ Process, DAS LLC awarded HES's Ancon division the business because it offered DAS LLC the most competitive per part prices.[7]  (Id. ¶ 8.)

20.     Upon being awarded the business, HES was responsible for contracting with EX-CELL-O GmbH for the purchase of the EX-CELL-O machine.  (Id. ¶ 9.)  Moreover, HES was responsible for providing all maintenance and repair to the EX-CELL-O machine.  (Id.)  HES acknowledged these responsibilities in its various quotes on the EX-CELL-O business.  (Id.)  Moreover, DAS LLC consistently conveyed to HES personnel that DAS LLC did not

---

[7]  The per part price HES quoted Delphi was based both the cost of necessary materials and the cost of the EX-CELL-O machine.  (Waslusky Decl. ¶ 8.)

intend to become involved with the purchase of the EX-CELL-O machine or any related commercial issues between HES and EX-CELL-O GmbH.  (Id. ¶ 10.)

21. DAS LLC desired the incorporation of Fanuc controls into the EX-CELL-O machine; because Fanuc controls are the industry standard in the United States, DAS LLC routinely requires the use of Fanuc controls to meet its requirements.[8]  (Id. ¶ 11.)  HES was aware of the requirement that the EX-CELL-O machine incorporate Fanuc controls prior to bidding on and being awarded the EX-CELL-O business.  (Id.)

22. On or about October 29, 1999, DAS LLC issued a blanket requirements contract in the form of a purchase request ("MBO S3B00028") to HES in connection with the EX-CELL-O Relationship.  (Id. ¶ 12.)  MBO S3B00028 specified that although DAS LLC projected that it would require 7,000 parts annually in connection with the EX-CELL-O Relationship, the actual volume may vary according to DAS LLC's requirements.  (Id.)  MBO S3B00028 also acknowledged that the per part price "will go up or down based on actual[] volume."  (Id.)

23. In approximately late 2001, HES requested, and DAS LLC agreed to make, a consistent monthly payment to HES to help offset the cost of the EX-CELL-O machine – irrespective of the number of parts ordered.  (Id. ¶ 14.)  This was in lieu of a volume driven variable monthly payment to HES based on the number of parts ordered, as was originally anticipated.  (Id.)  If DAS LLC required parts in any given month it would pay an additional amount above and beyond the guaranteed payment.  (Id.)  To effect the revised terms of the EX-CELL-O Relationship, on April 30, 2002, DAS LLC issued purchase order number S3S18278 to

---

[8] By contrast, Siemens controls are the industry standard in Europe and are thus generally incompatible with Delphi's American operations.  (Waslusky Decl. ¶ 11.)

HES. (Id. ¶ 15.) This purchase order was governed by DAS LLC's General Terms and Conditions. (Id.) Purchase order S3S18278 authorized DAS LLC to disburse to HES a monthly payment of $22,926.00 toward HES's costs associated with acquiring the EX-CELL-O machine (which were originally included in the quoted per part price). (Id.) These payments were scheduled to continue for 36 months; however, DAS LLC made only twenty of the scheduled payments because HES permanently closed its business prior to invoicing DAS LLC for the remaining payments. (Id.)

24.     Simultaneous to the issuance of purchase order S3S18278 on April 30, 2002, DAS LLC also re-issued the blanket requirements contract associated with the EX-CELL-O Relationship under a new purchase request ("MBO S3B00059"). (Id. ¶ 16.) This re-issued purchase request reflected lowered per part prices because DAS LLC was separately making monthly payments to HES under purchase order S3S18278. (Id.) All purchase orders issued under MBO S3B00059 explicitly incorporated and were made subject to DAS LLC's General Terms and Conditions.

25.     Problems arose between EX-CELL-O GmbH and HES that resulted in delayed delivery of the EX-CELL-O machine.[9] (Id. ¶ 13.) Following the late delivery of the EX-CELL-O machine, problems persisted that prevented HES from efficiently meeting DAS LLC's requirements. (Id. ¶ 17.) For instance, HES experienced problems with the programming of the machine, which it struggled with for many months. (Id. ¶ 18.) Additionally, the

---

[9]   Indeed, contrary to Mr. Backie's representation that the EX-CELL-O machine was delivered on September 15, 2000 (Backie Aff. ¶ 56), the EX-CELL-O machine was not actually delivered to HES until December 15, 2001. (Waslusky Decl. ¶ 13.)

11

permanent tooling for the machine presented continuous problems where HES was unable to alter the EX-CELL-O machine efficiently to meet DAS LLC's requirements.  (Id.)

26.     As a result of these problems, HES sometimes failed to meet DAS LLC's requirements.  (Id. ¶ 21.)  On such occasions, where the alternative was defaulting on obligations to customers, DAS LLC resourced production of some inner and outer race prototypes to Ranger Tool & Die ("Ranger") at a substantially higher cost to DAS LLC.  (Id. ¶¶ 21-22.)  DAS LLC's determination to resource certain business to Ranger was not based on race.

27.     Despite Ranger's involvement, DAS LLC remained committed to the EX-CELL-O Relationship and continued to make monthly payments to HES under purchase order S3S18278 until the time that HES permanently closed its business.  (Id. ¶ 22.)  As such, DAS LLC fully performed on the contracts related to the EX-CELL-O Relationship and did not breach any obligations to HES.  Moreover, HES assumed the risk in good faith variations in DAS LLC's requirements.  See supra ¶ 22.  As such it was inherently unreasonable for HES to rely on DAS LLC's requirements forecasts, especially where the original blanket purchase order (MBO00028) explicitly stated that such forecasts were subject to change.

   D.   HES's Alleged Unpaid Invoices

28.     HES attached over 700 pages of allegedly unpaid invoices to its Supplemental Response.  (See Supp. Resp. Exs. 2, 3, 4.)  Although Debtors' investigation into these invoices is on-going, Debtors have identified certain invoices that have been previously paid. (Declaration Of William Locricchio In Support Of Debtors' Supplemental Reply (the "Locricchio Decl.") ¶ 8, a true and correct copy of which is attached hereto as Exhibit 4.) Additionally, Debtors have identified inconsistencies and duplicate invoices, which cast doubt on

HES's claims. (Id. ¶¶ 4-7.) Thus far, Debtors have not identified any invoices that it was required to pay, yet failed to do so. [10] (Id. ¶ 9.)

Argument

29.  As an initial matter, the claims asserted by HES, Backie, and Janes fail because of several legal defects. With respect to the claims in general, HES's shareholders cannot, as they attempt to do here, prosecute claims owned by HES; accordingly, their claims fail for, among other reasons, lack of standing. Moreover, many of the claims (as they relate to various investments) fail because they were filed after the applicable statutes of limitation had run.

30.  Their claims also fail as a matter of law because the facts, as articulated in the HES's Supplemental Response and Backie's Affidavit, do not establish their claims. The claim under 42 U.S.C. § 1981 fails because no facts suggest that DAS LLC intended to discriminate on the basis of race. The fraud and misrepresentation claims fail because HES's allegations amount to nothing more than a promise to purchase a certain amount of goods or services from HES in the future, and a breach of a future promise is not actionable under a fraud or misrepresentation theory. The bad-faith promise claim fails because no facts suggest a fraudulent intent contemporaneous with the alleged promise. Indeed, in most cases, HES does not even identify the individual who allegedly made the false promise. The promissory estoppel claim fails because HES does not allege either a clear and definite promise or reasonable reliance. And the breach of contract claim fails to the extent that HES relies on alleged oral

---

[10] Debtors are continuing to reconcile the over-700 pages of invoices and other documentation submitted by HES with its Supplemental Response and determine whether any of HES's claims for nonpayment falls outside the applicable statute of limitation period or is barred by the claim bar date.

promises because each relationship was governed by a purchase order, which contained an integration clause and written amendment requirement.

31.    The claims fail on the merits as well. As the facts above demonstrate, HES simply made a number of investments that were not as profitable as HES had hoped. DAS LLC did not guarantee future business in the event that HES made such investments or otherwise deceive HES. Rather, DAS LLC communicated that such investment simply permitted HES to compete for the business – not be guaranteed it regardless of whether HES remained competitive.

A.    <u>Backie and Janes Lack Standing to Bring the Claims of HES</u>.

32.    As an initial matter, all of the claims in the Amended Complaint belong solely to HES. Backie and Janes lack standing to assert HES's claims in their individual capacities as former officers or shareholders of the company. <u>See</u> <u>Belle Isle Grill Corp. v. Detroit</u>, 666 N.W.2d 271, 474 (Mich. Ct. App. 2003). The Amended Complaint alleges economic losses sustained by HES in connection with HES's Relationships with DAS LLC. (<u>See</u> Am. Cmplt. ¶¶ 93, 100, 111, 120, 128, 135, 147, 158.) Any loss that Backie and Janes sustained in connection with these Relationships are derivative to the losses of HES. Because Backie and Janes lack fail to state any actionable individual injuries, the Court must disallow all Counts as to Backie and Janes.

  B. <u>All Claims Based On the Juarez Relationship and the Section 1981 Claim With Respect to the Other Relationships Are Barred By The Statute of Limitations</u>.

  33. HES and Backie filed their original complaint in the underlying case on February 16, 2005.[11] The statute of limitations is four years for the following claims: the claim under 42 U.S.C. § 1981 and the breach of contract claim arising under the Uniform Commercial Code ("UCC"). <u>See</u> 28 U.S.C. § 1658(a) (Section 1981 claim); MCLA § 440.2725(1) (UCC claim). The statute of limitations is six years for claims of misrepresentation, fraud, common law breach of contract, and promissory estoppel. <u>See</u> MCLA § 600.5813 (all personal actions, including fraud and misrepresentation); <u>Kawsny v. Driessen</u>, 202 N.W.2d 443, 446 (Mich. Ct. App. 1972) (fraud claim); MCLA § 600.5807(8) (common law breach of contract claim); <u>Huhtala v. Travelers Ins. Co.</u>, 257 N.W.2d 640, 643 (Mich. 1977) (promissory estoppel claim).

  34. Many of Claimants' claims are barred by the statute of limitations. For example, with respect to the Juarez Relationship, all of the claims are barred because no facts suggest that any cause of action based on that Relationship accrued after February 15, 1999 (six years before the lawsuit was filed) and certainly not after February 15, 2001 (four years before the lawsuit was filed). Moreover, the Section 1981 claim must fail as it relates to the other Relationships as well (<u>i.e.</u>, the Flint and EX-CELL-O Relationships) because no facts suggest that a discriminatory act occurred after February 15, 2001. Discovery may reveal that other claims of HES are similarly barred.

---

[11]  Janes was not a party to the underlying lawsuit and has not separately sued Delphi based on the conduct alleged in the Amended Complaint.

    C.    <u>Claimants Fail to State a Claim Under 42 U.S.C. § 1981</u>.

35.    Even assuming Claimants' Section 1981 claim is not barred by the statute of limitations – which the Debtors dispute – Claimants still fail to state a claim of discrimination under 42 U.S.C. § 1981. To establish a claim under Section 1981 a plaintiff must allege and ultimately prove, among other things, intent to discriminate on the basis of race by the defendant. <u>See</u> <u>Burton v. Plastics Research Corp.</u>, 134 F. Supp.2d 881, 885-86 (E.D. Mich. 2001). Here, Claimants fail to allege, and cannot prove, any facts suggesting an intent on the part of DAS LLC to discriminate against Claimants *on the basis of race*. To the contrary, Claimants explicitly state that DAS LLC's alleged conduct was motivated by its desire to drive down the prices offered by HES's competitors – not to drive HES out of business because it was a minority-owned business. (<u>See</u> Am. Cmplt. ¶¶ 18-19.) Indeed, Claimants' minority status is merely incidental to the scheme they allege. Because Claimants fail to state a claim under Section 1981, their Section 1981 claim must be disallowed and expunged in its entirety.

    D.    <u>Claimants Fail to State Claims for Misrepresentation or Fraud</u>.

36.    Claimants fail to state claims for which relief may be granted with respect to the fraud and misrepresentation claims (the "Fraud Claims," which are Counts II through IV of the Amended Complaint). Misrepresentation and fraud claims must be predicated on a false statement of past or existing fact. <u>E.g.</u>, <u>Hi-Way Motor Co. v. Int'l Harvester Co.</u>, 247 N.W.2d 813, 816 (Mich. 1976). "Future promises are contractual and do not constitute fraud." <u>Id.</u>

37.    Here, in connection with each Relationship, Claimants allege that DAS LLC misrepresented its "present need for services and parts." (<u>E.g.</u>, Am. Cmplt. ¶ 37; <u>see also</u> <u>id.</u> ¶¶ 29, 48, 51, 54, 61, 65, 82.) These allegations amount to nothing more than breach of

16

contract claims. In other words, Claimants complain that DAS LLC allegedly breached "promises" to purchase a certain amount of products or services from HES. Thus, the Fraud Claims fail and must be disallowed and expunged in their entirety.[12]

### E. Claimants Fail to State a Claim for Bad-Faith Promise.

38. Claimants fail to state a claim for fraud based on a bad-faith promise. The so-called "bad-faith" exception to the general rule that promises are not actionable as torts applies when "a promise [is] made in bad faith without the intention of performance." Hi-Way Motor Co., 247 N.W.2d at 816. For a claim to fall within this exception, the Claimant must allege facts sufficient to show fraudulent intent "'at the very time of making the representations, or almost immediately thereafter.'" Id. at 817 (citing Danto v. Charles C. Robbins, Inc., 230 N.W. 188, 190 (Mich. 1930). In their general allegations, Claimants identify three purported "bad-faith" promises. (Am. Cmplt. ¶¶ 29-31 (alleging, in connection with the Juarez Relationship, that DAS LLC promised that HES would be "given the exclusive contract to serve" DAS LLC's needs), ¶ 48 (alleging, in connection with the Flint Relationship, that DAS LLC promised future business to HES), ¶ 82 (alleging, in connection with the EX-CELL-O Relationship, that DAS LLC promised to purchase parts from HES).) However, Claimants articulate no facts showing a contemporaneous fraudulent intent on the part of DAS LLC. Accordingly, the claim for fraud based on a bad-faith promise fails and must be disallowed and expunged in its entirety.

---

[12] Moreover, Claimants' failure to comply with Fed. R. Civ. P. 9(b) provides an independent basis for disallowing and expunging these claims.

17

F.   Claimants Fail to State a Claim for Promissory Estoppel.

39.   The Claimants' promissory estoppel claim fails for multiple reasons. As an initial matter, the Claimants allege, and DAS LLC agrees, that contracts govern each of the Relationships. Michigan law provides that "[w]here the parties have an enforceable contract and merely dispute its terms, scope, or effect, one party cannot recover for promissory estoppel . . . ." Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 181 (6th Cir. 1996). Thus, an action for promissory estoppel cannot lie.

40.   Moreover, Claimants do not allege, and certainly cannot prove, reasonable reliance on the purported promises. First, Claimants' reliance on oral statements outside the four corners of the written contracts is unreasonable because DAS LLC's terms and conditions contained an integration clause. Second, Claimants reliance on DAS LLC's alleged and indefinite statements – rather than the actual promises embodied in the agreements – is inherently unreasonable. As a long-time and sophisticated DAS LLC supplier, HES's reliance on volume projections or notification of business opportunities – rather than purchase orders – was unreasonable.

G.   Claimants' Breach of Contract Claims Fail Under the Parole Evidence Rule.

41.   To support their breach of contract allegations, Claimants rely on evidence of apparently oral promises extrinsic to the written contracts between the parties. The evidence will show that each of the Relationships was governed by written purchase orders issued by DAS LLC and accepted by HES. Moreover, each purchase order expressly incorporates DAS LLC's General Terms & Conditions, which includes an integration clause and a written amendment requirement. (See e.g., Dawe Decl. Ex. A, Terms & Conditions ¶¶ 1, 29.) Thus, Claimants'

18

breach of contract claims, which are apparently based on either pre- or post-contract formation oral promises, must fail and be disallowed and expunged in their entirety.

### H. Claimants' Claims Also Fail On The Merits.

42. Each of Claimants' claims fail on the merits as well. To the extent that Claimants properly state claims for relief, DAS LLC denies Claimants' allegations in their entirety. The evidence will show that in connection with each Relationship, DAS LLC's conduct is not actionable; rather, Claimants essentially ask this Court to hold DAS LLC responsible for Claimants' poor business management and resulting financial losses. Because Claimants have not – and cannot – meet their burden of proving each of the essential elements of the eight causes of action, Claimants' Proofs of Claims should be disallowed and expunged in their entirety.

### Identification of Witnesses

43. The parties have mutually agreed that more than the two witnesses allotted under the claim hearing procedures order are needed to fairly adjudicate the claims. In addition to the witnesses whose declarations are attached as exhibits to the Supplemental Reply, the Debtors also may seek to depose or submit declarations from witnesses outside Debtors' control, including former Delphi employees Jerry Haller, Enrique Chavez, and Gregg Novac. Moreover, the Debtors are unaware of any fraud, misrepresentation, false promise, and the like made to HES, and HES has failed to identify specific individuals making such statements. HES also has failed to attach copies of agreements or purchase orders that form the basis of its claims. Accordingly, the Debtors reserve their right to name, as witnesses, additional individuals including those alleged to have made statements forming the basis of HES's claims or who were otherwise involved in the Relationships.

Conclusion

44.      For the reasons stated above, the Proof of Claims asserted by HES, Backie, and Janes should be disallowed and expunged in their entirety.

WHEREFORE the Debtors respectfully request the Court enter an order (i) sustaining the Third Omnibus Claims Objection as to the Proof of Claim, (ii) disallowing and expunging the Proof of Claim, and (iii) granting such further and other relief the Court deems just and proper.

Dated: New York, New York
         April 16, 2007

                    SKADDEN, ARPS, SLATE,
                      MEAGHER & FLOM LLP

                    By: /s/ Albert L. Hogan III
                        John Wm. Butler, Jr. (JB 4711)
                        Albert L. Hogan III (AH 8807)
                        John K. Lyons (JL 4951)
                        Ron E. Meisler (RM 3026)
                    333 West Wacker Drive, Suite 2100
                  Chicago, Illinois 60606
                  (312) 407-0700

                    – and –

                  SKADDEN, ARPS, SLATE,
                    MEAGHER & FLOM LLP

                  By: /s/ Kayalyn A. Marafioti
                        Kayalyn A. Marafioti (KM 9632)
                        Thomas J. Matz (TM 5986)
                  Four Times Square
                  New York, New York 10036
                  (212) 735-3000

                  Attorneys for Delphi Corporation, et al.,
                    Debtors and Debtors-in-Possession