# EXHIBIT 2

**Hearing Date:  June 22, 2007**
**Hearing Time:  10:00 a.m. (Prevailing Eastern Time)**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
333 West Wacker Drive, Suite 2100
Chicago, Illinois 60606
John Wm. Butler, Jr. (JB 4711)
John K. Lyons (JL 4951)
Albert L. Hogan III (AH 8807)
Ron E. Meisler (RM 3026)

      - and -

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Kayalyn A. Marafioti (KM 9632)
Thomas J. Matz (TM 5986)

Attorneys for Delphi Corporation, et al.,
    Debtors and Debtors-in-Possession

Delphi Legal Information Hotline:
Toll Free:  (800) 718-5305
International:  (248) 813-2698

Delphi Legal Information Website:
http://www.delphidocket.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -  -  x
                                                         :
      In re                                              :     Chapter 11
                                                         :
DELPHI CORPORATION, et al.,                              :     Case No. 05-44481 (RDD)
                                                         :
                                                         :     (Jointly Administered)
                    Debtors.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DECLARATION OF STEPHEN DAWE IN SUPPORT OF DEBTORS' SUPPLEMENTAL
REPLY WITH RESPECT TO PROOFS OF CLAIM NUMBERS 837, 838 & 14762
(H.E. SERVICES COMPANY, ROBERT BACKIE & RICHARD JANES)

("DAWE DECLARATION – H.E. SERVICES COMPANY, ET AL.")

Stephen Dawe declares as follows:

1.     Delphi Corporation and certain of its subsidiaries and affiliates are debtors and debtors-in-possession in these chapter 11 cases.  I submit this declaration in support of the Debtors' Supplemental Reply With Respect To Proofs Of Claim 837, 838 & 14762  (H.E. Services Company, Robert Backie and Richard Janes) (the "Supplemental Reply").  Capitalized terms not otherwise defined in this declaration have the meanings ascribed to them in the Supplemental Reply and the Statement of Disputed Issues.

2.     Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge, my review of relevant documents, my opinion, and my experience with and knowledge of Delphi Automotive Systems LLC's ("DAS LLC") relationship with H.E. Services Company  ("H.E. Services").  If I were called upon to testify, I could and would testify to the facts set forth herein.

3.     I have worked for DAS LLC, or its predecessor the GM Corporation ("GM"), in various capacities since 1973.  From 1997 to 2000, I served as the Metallic Purchasing Manager for the DAS LLC Saginaw Steering Systems division.  In that capacity I oversaw Buyers who purchased products from H.E. Services.  From 2000 through 2002, I served as the Purchasing Manager – Contract Manufacturing for the DAS LLC Saginaw Steering Systems division.  In that capacity I oversaw both Buyers who purchased products from H.E. Services and Supplier Quality Engineers who evaluated the quality of H.E. Services' products. From 2002 to the present, I have continued to serve as a Purchasing Manager for DAS LLC; in 2002 I was the Business Line Purchasing Manager for Halfshafts, from 2003 through 2005 I was the Purchasing Manager for Indirect & M&E, and since 2006 I have been the Purchasing Manager – Machinery & Equipment.

2

4.      I am unaware of DAS LLC ever asking H.E. Services or any employee of H.E. Services to establish a plant in the Flint Michigan area.

5.      In or around 2000, after H.E. Service's Flint plant was operational, I became involved with the Flint Relationship.  With respect to the Flint Relationship, when I became the Purchasing Manager – Contract Manufacturing I assumed responsibility for overseeing both the quality and cost of products purchased from various suppliers, including the products purchased from H.E. Services' Flint Manufacturing division ("Flint Manufacturing").  I was similarly responsible for overseeing both the quality and cost of products purchased from H.E. Services' Saginaw plant, which was known as the Universal Manufacturing division ("Universal Manufacturing").

6.      Prior to my involvement with the Flint Relationship, DAS LLC issued purchase orders to H.E. Services for the manufacture of machine shift tubes, press pins, and side covers at its Flint Facility.  Also prior to my involvement, in approximately 1999 and 2000, DAS LLC awarded business to Universal Manufacturing for the assembly of lower column brackets, pump housings tie rods, flanges and lock modules.

7.      Each of the purchase orders issued to H.E. Services' Flint Manufacturing and Universal Manufacturing divisions expressly incorporated DAS LLC's General Terms and Conditions.  (Ex. A (DAS LLC Terms & Conditions).)  Moreover, each purchase order was issued only after H.E. Services bid in response to a DAS LLC Request for Quotation ("RFQ").  DAS LLC's standard and well-established practice is to issue RFQs to multiple prospective suppliers who then have the opportunity to bid on the available work.  Both the value and the quality of suppliers' products are considered when awarding business to the most competitive

3

supplier. DAS LLC does not give prospective suppliers "high probability ratings"—or any probability ratings—related to their chance of securing future business.

8.  Indeed, over the course of the Flint Relationship, DAS LLC issued RFQs to H.E. Services for the production or assembly of many products. In cases where H.E. Services failed to win the bid it was due solely to H.E. Services' relative lack of competitiveness. (See, e.g., Ex. B (linear shift assemblies sourcing and recommendation summary demonstrating that H.E. Services bid was slightly higher than the current supplier's); Ex. C (shift bracket assembly sourcing and recommendation summary demonstrating that H.E. Services bid was $10.22 per part higher than the winning supplier); Ex. D ("tele motor and pot" assembly sourcing and recommendation summary demonstrating that H.E. Services bid was $5.34 per part higher than the winning supplier); Ex. E (motor bracket assembly sourcing and recommendation summary demonstrating that H.E. Services bid was $6.68 per part higher than the winning supplier); see also Ex. F (9/4/01 letter from Robert Backie indicating that H.E. Services was "advised that [it would] not be awarded a P.O. for the machining of shift bowls" and that H.E. Services received RFQs for trunnion, spacer and bearing holder and prototype operations)[1].) Decisions not to award business to H.E. Services were not premised on H.E. Services' minority status.

9.  Many quality problems arose with respect to products produced at both the Flint Manufacturing and Universal Manufacturing plants during the 2001-2003 timeframe.

10.  For example, beginning in the summer of 2001 and continuing through early 2002, DAS LLC's customers issued Problem Reports and Resolutions ("PRR") to Universal Manufacturing, complaining of quality issues related to Universal Manufacturing's products.

---

[1]   Although Mr. Backie's September 4, 2001 letter indicates that H.E. Services had "shown a loss for fifteen straight months" (Ex. F), a November 28, 2001 letter from H.E. Services' Joe Stearns states that H.E. Services recorded a profit in October 2001 after instituting improvements and cost-cutting measures (Ex. G).

11.    In response to these PRRs, I asked a Supplier Quality Engineer reporting to me, Sybil Chernek, to audit Universal Manufacturing's facility and report back to me on the results.  Ms. Chernek completed audits of Universal Manufacturing on March 22, 2002 and March 26, 2002.  (See Exs. H (audits).)  During these audits, Ms. Chernek reviewed Universal Manufacturing's production of lock modules and flanges, respectively.  (See id.)  As a result of the audits, DAS LLC placed Universal Manufacturing on "major nonconformity status" resulting from the "absence or total breakdown of [quality systems]" at Universal Manufacturing.  (See Ex. H at 23.)  Further, it was determined that Universal Manufacturing's systems were unable to meet DAS LLC's customer requirements.  (See id.)  All products produced at Universal Manufacturing were thereby placed in Level II Containment[2] until the end of May 2002, or later depending on subsequent findings.  (Id. at 8.)  Robert Backie was notified of this decision in a letter dated March 31, 2002.  (Ex. I.)

12.    Problems continued to surface at the Universal Manufacturing plant and, in August of 2002, I was notified that a sticky residue was found on the pump housings manufactured there.  (Ex. J.)  I also was informed that a visit to the plant revealed that "adequate maintenance of the washer was neither being performed nor documented."  (Id.)

13.    Similarly, in approximately the summer of 2002, I learned of quality issues with respect to side covers produced by Flint Manufacturing.  Specifically, H.E. Services consistently machined the side cover castings supplied to it by a third company, Madison-Kipp,

---

[2]    When products are placed in Level II Containment, the supplier bears the cost of hiring a third company to inspect and sort all products prior to their use.  This differs from Level I Containment where the supplier may inspect and sort their own products.

incorrectly.[3]  (Ex. K.)  As a result, the product was routinely returned to Madison-Kipp, at

substantial cost to Madison-Kipp, for reworking.  (Id.)  In August 2002, Madison-Kipp proposed

to DAS LLC that it machine the castings, rather than send the castings to H.E. Services.  (Id.)

Madison-Kipp offered Delphi a price of $2.1560 per side cover, resulting in a $0.371 savings per

side cover.  (See id.)   DAS LLC approached H.E. Services regarding both the quality and price

issues with respect to this product and gave H.E. Services several opportunities to make their

product more competitive and retain the business.  (See id.)

14.    Ultimately, on April 24, 2003, DAS LLC notified Robert Backie that H.E.

Services was on the "Delphi Saginaw Steering Systems Top Problem Supplier List" as a result of

H.E. Services' serious quality issues.  (Ex. L.)

15.    In approximately February 2002, as the quality of H.E. Services' products

began to deteriorate, H.E. Services proposed various price increases to DAS LLC for certain

parts produced at its Flint Manufacturing and Saginaw Manufacturing divisions.  H.E. Services

represented that these price increases were necessary to ensure their profitability where several

of DAS LLC's projected volumes had not been met.  However, DAS LLC never guaranteed

specific volumes for the products at issue.  The contractual relationships associated with these

products were requirements contracts whereby DAS LLC agreed to purchase its requirements

from H.E. Services.  That requirements will change and sometimes be less than anticipated is

well-known to sophisticated suppliers such as H.E. Services.  Because DAS LLC continued to

---

[3]    These problems were unrelated to the equipment DAS LLC supplied to Flint Manufacturing.  On occasions
where I learned of problems related to any equipment on consignment to H.E. Services, I immediately remedied
the problem.  For example, in approximately 2001, I became aware of problems at Flint Manufacturing related
to tooling equipment that DAS LLC had outsourced to H.E. Services.  Specifically, I learned that the pin presses
DAS LLC had supplied H.E. Services were in need of repair.  In response, I immediately hired a repairman to
fix the pin presses.  After the repairs, the DAS LLC Supplier Quality Engineer who reported to me informed me
that the problem was resolved.

6

purchase its requirements under these contracts, DAS LLC determined that the proposed price increases were not warranted. Therefore, DAS LLC rejected H.E. Services' unilateral attempt to alter the pricing terms of its contracts.  (See Ex. M (Price Increase Follow-Up indicating that the request was refused on 2/25/2002).)

16.    H.E. Services continued to pressure DAS LLC for price increases (and, conversely, the quality of its products continued to decrease, see supra ¶¶ 10-15).  On or around April 9, 2002, DAS LLC personnel, including myself and Sybil Chernek, among others, and H.E. Services personnel, including Mr. Backie, met.  Although the meeting was called to address the break down of quality systems at H.E. Services, Mr. Backie stated that he was uninterested in addressing the quality issues unless he was awarded price increases.  (Ex. N (4/9/02 meeting notes).)[4]  Mr. Backie further stated that "there would not be a quality system without a price increase."  (Id. at 2.)  Mr. Backie also indicated that he did not want DAS LLC's "piddley" assembly jobs; he wanted lucrative hi-tech jobs.  (Id.)  Moreover, Mr. Backie threatened to breach his contracts with DAS LLC unless he was awarded a price increase.  (Id.)

17.    On or around October 8, 2002, in response to H.E. Services' persistent requests for price increases, DAS LLC and H.E Services personnel met again.  (See Ex. O.)  During the meeting, H.E. Services stated that it refused to continue to produce the products at the agreed upon rates.  (See id.)  I again told H.E. Services that DAS LLC refused to accept the price increases.  (See id.)  As a result, I advised H.E. Services that DAS LLC intended to resource the

---

[4]    Sybil Chernek took notes during the meeting and they accurately reflect my memory of what occurred during the meeting.

H.E. Services business to more competitive suppliers, exercising DAS LLC's right under the purchase orders to terminate for convenience.[5]  (See id.)

18.    In a subsequent meeting that occurred on or about December 4, 2002, DAS LLC and H.E. Services mutually agreed that all of the H.E. Services business would be resourced to more competitive suppliers because DAS LLC was unwilling to accept the proposed price increases.  (See Ex. P (12/6/2002 Letter).)

19.    Due to H.E. Services' pervading quality issues and continual requests for price increases, on or about December 6, 2002, DAS LLC notified H.E. Services in writing that because H.E. Services refused to honor its contract prices, DAS LLC intended to terminate its contracts with H.E. Services and resource the business to more competitive suppliers.[6]  (Id.)   At that time, DAS LLC agreed to extend its current purchase orders with H.E. Services through and including March 31, 2003, giving DAS LLC several months to pursue resourcing the business. (Id.)  DAS LLC further extended certain of these purchase orders as it continued to pursue resourcing the business.  (See Ex. Q (6/3/2004 Letter).)

20.    Following the submission of RFQs to potential suppliers, DAS LLC eventually resourced the H.E. Services business to several new suppliers, including Prince Manufacturing ("Prince"), Contech Metal Forge ("Contech"), and Mariah Industries ("Mariah"). (See, e.g., Ex. R (April 2, 2003 memorandum indicating that Prince's pricing resulted in a 17%

---

[5]    Although H.E. Services expressed a willingness to continue to perform under the few contracts it viewed as lucrative, DAS LLC determined to terminate all of its contracts with H.E. Services pursuant to DAS LLC's general Terms & Conditions.  (See Exs. O, P.)  Given H.E. Services' on-going quality issues and refusal to honor certain of its contractual obligations to DAS LLC, DAS LLC decided that it was prudent to resource all business away from H.E. Services' Flint Manufacturing and Universal Manufacturing divisions.

[6]    DAS LLC's Terms & Conditions, applicable to all purchase ordered issued in connection with the Flint Relationship, enabled DAS LLC to terminate its contracts with H.E. Services as DAS LLC's convenience upon written notification.  (See Ex. A at § 11.)

savings to DAS LLC); Ex. S (recommendation summary indicating that DAS LLC would benefit from "significant logistics savings" by resourcing business away from H.E. Services to Contech, a division of SPX Corporation).)   Mariah is a minority-owed company.  (Ex. T (indicating that the majority of the Universal Manufacturing business was resourced to another minority business enterprise ("MBE") named Mariah Industries).)

21.    Due to the lack of quality records at H.E. Services' Flint Manufacturing and Universal Manufacturing divisions, we hired H.E. Services' Universal Inspection division ("Universal Inspection") to inspect and sort products produced by Prince and Mariah during the early production phase.  Despite problems with H.E. Services' Flint Manufacturing and Universal Manufacturing divisions, DAS LLC continued to have a good working relationship with Universal Inspection.  (See id. ("It is our understanding that the Universal Inspection and Ancon facilities were profitable and we are disappointed that they are being closed.  It was our intention to continue the business relationship with these divisions.").)

22.    After DAS LLC resourced its business away from H.E. Services Flint Manufacturing and Universal Manufacturing divisions, DAS LLC reclaimed possession of certain machinery and equipment that was on consignment to H.E. Services.  I was informed that when DAS LLC collected this equipment it had been intentionally damaged.  For instance, wires were severed inside the panel boxes of various pieces of equipment.  (Ex. U.)  DAS LLC bore the cost of repairing this damage.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing statements are true and correct.

Executed on April 16, 2007 in Saginaw, Michigan.


_____Stephen Dawe_____

Stephen Dawe

# EXHIBIT A

Revised June 24, 1999

# DELPHI AUTOMOTIVE SYSTEMS

## GENERAL TERMS AND CONDITIONS

> *Delphi Automotive Systems seeks to exceed its customers' expectations. Delphi's suppliers are integral to achieving this objective, and Delphi hopes that its suppliers will recognize Delphi as their preferred customer. Delphi will establish high performance expectations for itself and its suppliers, measure performance and reward superior performance.*

## 1. ACCEPTANCE

Seller acknowledges and agrees that these General Terms and Conditions are incorporated in, and a part of, this contract and each purchase order, release, requisition, work order, shipping instruction, specification and other document, whether expressed in written form or by electronic data interchange, relating to the goods and/or services to be provided by Seller pursuant to this contract (such documents are collectively referred to as this "Contract"). Seller acknowledges and agrees that it has read and understands these General Terms and Conditions. If Seller accepts this Contract in writing or commences any of the work or services which are the subject of this Contract, Seller will be deemed to have accepted this Contract and these General Terms and Conditions in their entirety without modification. Any additions to, changes in, modifications of, or revisions of this Contract (including these General Terms and Conditions) which Seller proposes will be deemed to be rejected by Buyer except to the extent that Buyer expressly agrees to accept any such proposals in writing.

## 2. SHIPPING AND BILLING

2.1 Shipping. Seller will (a) properly pack, mark and, ship goods as instructed by Buyer or any carriers and in accordance with any applicable laws or regulations, (b) route shipments as Buyer instructs, (c) not charge for costs relating to handling, packaging, storage or transportation (including duties, taxes, fees, etc.) unless otherwise expressly stated in this Contract, (d) provide packing slips with each shipment that identify Buyer's contract and/or release number and the date of the shipment, and (e) promptly forward the original bill of lading or other shipping receipt with respect to each shipment as Buyer instructs. Seller will include on bills of lading or other shipping receipts the correct classification identification of the goods shipped as Buyer or the carrier requires. The marks on each package and identification of the goods on packing slips, bills of lading and invoices must enable Buyer to easily identify the goods.

2.2 Billing. Seller will (a) accept payment based upon Buyer's Evaluated Receipt Record/Self-Billed Invoice unless Buyer requests that Seller issue and deliver an invoice and (b) accept payment by electronic funds transfer. If the payment due date is not otherwise specified in this Contract, the payment due date will be the due date established by the Multilateral Netting System (MNS-2) used by Buyer, which provides, on average, that payment will be due on the second day of the second month following the date Buyer receives the goods or services. Buyer may withhold payment for any goods or services until Buyer receives evidence, in such form and detail as Buyer requires, of the absence of any liens, encumbrances and claims on such goods or services.

2.3 Delivery Schedules. Deliveries will be made in the quantities, on the dates, and at the times specified by Buyer in this Contract or any subsequent releases or instructions Buyer issues under this Contract. Time is of

Revised June 24, 1999

the essence with respect to all delivery schedules Buyer establishes. Buyer will not be required to pay for any goods that exceed the quantities specified in Buyer's delivery schedules or to accept goods that are delivered in advance of the delivery date specified in Buyer's delivery schedules. Seller bears the risk of loss of all goods delivered in advance of the delivery date specified in Buyer's delivery schedules. If Buyer determines that the requirements of Buyer's customers or market, economic or other conditions require changes in delivery schedules, Buyer may change the rate of scheduled shipments or direct temporary suspension of scheduled shipments without entitling Seller to a price adjustment or other modification of this Contract.

2.4   Premium Shipments.   If Seller fails to have goods ready for shipment in time to meet Buyer's delivery schedules using the method of transportation originally specified by Buyer and, as a result, Buyer requires Seller to ship the goods using a premium (more expeditious) method of transportation, Seller will ship the goods as expeditiously as possible. Seller will pay, and be responsible for, the entire cost of such premium shipment, unless Buyer's actions caused Seller to fail to meet Buyer's delivery schedules, in which case Buyer will pay any costs for premium shipment.

## 3.  SPECIFICATION, DESIGN AND SCOPE CHANGES

Buyer may at any time require Seller to implement changes to the specifications or design of the goods or to the scope of any services or work covered by this Contract, including work related to inspection, testing or quality control. While Buyer will endeavor to discuss any such changes with Seller as early as practical, Seller will promptly implement such changes. Buyer will equitably determine any adjustment in price or delivery schedules resulting from such changes, including Buyer's payment of reasonable costs of modifications to Seller's Equipment and Facilities (as defined in Article 16) necessary to implement such changes. In order to assist in the determination of any equitable adjustment in price or delivery schedules, Seller will, as requested, provide information to Buyer, including documentation of changes in Seller's cost of production and the time to implement such changes. In the event of any disagreement arising out of such changes, Buyer and Seller will work to resolve the disagreement in good faith, provided, however, that Seller will continue performing under this Contract, including prompt implementation of changes required by Buyer, while Buyer and Seller resolve any disagreement arising out of such changes.

## 4.  QUALITY AND INSPECTION

Seller will participate in Buyer's supplier quality and development program(s) and comply with all quality requirements and procedures Buyer specifies from time to time. Seller will permit Buyer and its representatives and consultants to (i) inspect Seller's books and records in order to monitor Seller's compliance with this Contract and Seller's financial condition and (ii) enter Seller's facilities at reasonable times to inspect such facilities and any goods, materials and property that relate to this Contract. No such inspection by Buyer will constitute acceptance by Buyer of any work-in-process or finished goods.

## 5.  NON-CONFORMING GOODS

Buyer is not required to perform incoming inspections of any goods, and Seller waives any right to require Buyer to conduct any such inspections. Seller will not substitute any goods for the goods covered by this Contract unless Buyer consents in writing. If Buyer rejects any goods as non-conforming, Buyer may, at its option, (a) reduce the quantities of goods ordered under this Contract by the quantity of non-conforming goods, (b) require Seller to replace the non-conforming goods, and/or (c) exercise any other applicable rights or remedies. If Seller fails to inform Buyer in writing of the manner in which Seller desires that Buyer dispose of non-conforming goods within forty-eight (48) hours of notice of Buyer's rejection of non-conforming goods (or such shorter period as is reasonable under the circumstances), Buyer will be entitled to dispose of the non-conforming goods without liability to Seller, provided, however, that in any event Buyer may elect to

Revised June 24, 1999

arrange for the shipment of any non-conforming goods back to Seller at Seller's expense. Seller will bear all risk of loss with respect to all non-conforming goods and will promptly pay or reimburse all costs incurred by Buyer to return, store or dispose any non-conforming goods. Buyer's payment for any non-conforming goods will not constitute acceptance by Buyer, limit or impair Buyer's right to exercise any rights or remedies, or relieve Seller of responsibility for the non-conforming goods.

## 6. FORCE MAJEURE

If Seller is unable to produce, sell or deliver any goods or services covered by this Contract, or Buyer is unable to accept delivery, buy or use any goods or services covered by this Contract, as a result of an event or occurrence beyond the reasonable control of the affected party and without such party's fault or negligence, then any delay or failure to perform under this Contract that results from such event or occurrence will be excused for so long as such event or occurrence continues, provided, however, that the affected party gives written notice of such delay (including the anticipated duration of the delay) to the other party as soon as possible after the event or occurrence (but in no event more than three (3) days thereafter). Such events and occurrences may include, by way of example and not limitation, natural disasters, fires, floods, windstorms, severe weather, explosions, riots, wars, sabotage, labor problems (including lockouts, strikes and slowdowns), equipment breakdowns and power failures. During any delay or failure to perform by Seller, Buyer may (i) purchase substitute goods from other available sources, in which case the quantities under this Contract will be reduced by the quantities of such substitute goods and Seller will reimburse Buyer for any additional costs to Buyer of obtaining the substitute goods compared to the prices set forth in this Contract and/or (ii) have Seller provide substitute goods from other available sources in quantities and at times Buyer requests and at the prices set forth in this Contract. If Seller fails to provide adequate assurances that any delay will not exceed thirty (30) days or if any delay lasts more than thirty (30) days, Buyer may terminate this Contract without liability. Before any of Seller's labor contracts expire and as soon as Seller anticipates or learns of any impending strike, labor dispute, work stoppage or other disruption at Seller's facilities that might affect the delivery of goods to Buyer, Seller will produce (and locate in an area that will not be affected by any such disruption) a finished inventory of goods in quantities sufficient to ensure the supply of goods to Buyer for at least thirty (30) days after such disruption commences.

## 7. WARRANTY

7.1 <u>General</u>. Seller warrants and guarantees to Buyer, its successors, assigns and customers that the goods and services covered by this Contract will (a) conform to all applicable specifications, drawings, samples, descriptions, brochures and manuals furnished by Seller or Buyer, (b) will be merchantable, (c) of good material and workmanship, (d) free from defect, and (e) are fit and sufficient for the particular purposes intended by Buyer and any customer of Buyer. If requested by Buyer, Seller will enter into a separate agreement for the administration or processing of warranty chargebacks for nonconforming goods.

7.2 <u>Date and Time Processing</u>. Seller warrants and guarantees to Buyer and its customers that any products (including computer hardware, software, firmware, machinery and equipment) covered by this Contract must at all times accurately process, handle, calculate, compare and sequence date and time data from, into, within and between the 20th and 21st centuries, including leap year calculations.

7.3 <u>Warranty Period</u>. The period for each of the foregoing warranties will be that provided by applicable law, except that if Buyer ever provides a longer warranty to its customers, such longer warranty period will apply to the goods covered by this Contract.

Revised June 24, 1999

## 8. INGREDIENTS AND HAZARDOUS MATERIALS

If Buyer requests, Seller will promptly furnish to Buyer, in such form and detail as Buyer directs: (a) a list of all ingredients in the goods, (b) the amount of all ingredients, and (c) information concerning any changes in or additions to the ingredients. Prior to, and together with, the shipment of the goods, Seller will furnish to Buyer and all carriers sufficient written warning and notice (including appropriate labels on the goods, containers and packing) of any hazardous material that is an ingredient or a part of any of the goods, together with all special handling instructions, safety measures and precautions as may be necessary to comply with applicable law, to inform Buyer and all carriers of any applicable legal requirements and to best allow Buyer and all carriers to prevent bodily injury or property damage in the handling, transportation, processing, use or disposal of the goods, containers and packing.

## 9. INSOLVENCY OF SELLER

Buyer may immediately terminate this Contract without liability to Seller in any of the following or any similar events: (a) insolvency or financial difficulties of Seller, (b) filing of a voluntary petition in bankruptcy by Seller, (c) filing of any involuntary petition in bankruptcy against Seller, (d) appointment of a receiver or trustee for Seller, (e) execution of an assignment for the benefit of creditors by Seller, or (f) any accommodation by Buyer, financial or otherwise, not contemplated by this Contract, that are necessary for Seller to meet its obligations under this Contract. Seller will reimburse Buyer for all costs Buyer incurs in connection with any of the foregoing whether or not this Contract is terminated, including, but not limited to, all attorney or other professional fees.

## 10. TERMINATION FOR BREACH

Buyer may terminate all or any part of this Contract, without liability to Seller at any time after execution if Seller (a) repudiates, breaches, or threatens to breach any of the terms of this Contract, including Seller's warranties, (b) fails to perform or threatens not to perform services or deliver goods in accordance with this Contract; or (c) fails to assure timely and proper completion of services or delivery of goods.

## 11. TERMINATION FOR CONVENIENCE

In addition to any other rights of Buyer to terminate this Contract, Buyer may immediately terminate all or any part of this Contract, at any time and for any reason, by notifying Seller in writing. Upon such termination, Buyer may, at its option, purchase from Seller any or all raw materials, work-in-process and finished goods inventory related to the goods under this Contract which are useable and in a merchantable condition. The purchase price for such finished goods, raw materials and work-in-process, and Seller's sole and exclusive recovery from Buyer (without regard to the legal theory which is the basis for any claim by Seller) on account of such termination, will be (a) the contract price for all goods or services that have been completed in accordance with this Contract as of termination date and delivered and accepted by Buyer and not previously paid for, plus (b) the actual costs of work-in-process and raw materials incurred by Seller in furnishing the goods or services under this Contract to the extent such costs are reasonable in amount and are properly allocable or apportionable under generally accepted accounting principles to the terminated portion of this Contract less (c) the reasonable value or cost (whichever is higher) of any goods or materials used or sold by Seller with Buyer's written consent. In no event will Buyer be required to pay for finished goods, work-in-process or raw materials which Seller fabricates or procures in amounts that exceed those Buyer authorizes in delivery releases nor will Buyer be required to pay for any goods or materials that are in Seller's standard stock or that are readily marketable. Payments made under this Article will not exceed the aggregate price for finished goods that would be produced by Seller under delivery or release schedules outstanding at the date of termination. Within sixty (60) days after the effective date of termination, Seller will submit a comprehensive

Revised June 24, 1999

termination claim to Buyer, with sufficient supporting data to permit an audit by Buyer, and will thereafter promptly furnish any supplemental and supporting information Buyer requests.

## 12. TECHNICAL INFORMATION

12.1   Exchange of Information.   Buyer and Seller will cooperate to create, maintain, update, and share technical information about the goods, products, machinery, materials, formulations and their manufacture, use, application and control in compliance with Buyer's drafting and math data standards.  Such technical information will not be subject to any use or disclosure restrictions.  Accordingly, Seller agrees not to assert any claims against Buyer, its customers or their respective suppliers with respect to any technical information that Seller discloses in connection with this Contract.

12.2   Waiver of Claims.   Seller agrees not to assert any claim (other than a claim for patent infringement) against Buyer, Buyer's customers or their respective suppliers with respect to any technical information that Seller shall have disclosed or may hereafter disclose in connection with the goods or services covered by this Contract.

12.3   Repair and Rebuild.   Seller authorizes Buyer, its affiliates, agents and subcontractors, and Buyer's customers and their subcontractors to repair, reconstruct or rebuild the goods and products delivered under this Contract without payment of any royalty or other compensation to Seller.

12.4   Computer Programs and Written Works.   All works of authorship, including without limitation, software, computer programs, and databases (including object code, micro code, source code and data structures), and all enhancements, modifications and updates thereof and all other written work products or materials, which are created in the course of performing this Contract (separately or as part of any goods and components) are "works made for hire" and the sole property of Buyer.  To the extent that such works of authorship do not qualify under applicable law as works made for hire, Seller agrees to assign and assigns to Buyer all right, title and interest in any intellectual property rights in such works of authorship.

## 13. INDEMNIFICATION

13.1   Infringement. Seller will defend, hold harmless and indemnify Buyer and its customers, and their respective successors and assigns, against any claims of infringement (including patent, trademark, copyright, moral, industrial design or other proprietary rights, or misuse or misappropriation of trade secret) and resulting damages and expenses (including, without limitation, attorney and other professional fees and disbursements) relating to the goods or services covered by this Contract, including any claims in circumstances where Seller has provided only part of the goods or services.   Seller waives any claim against Buyer that any such infringement arose out of compliance with Buyer's specifications.

13.2 Activities on Buyer's Premises.  Seller will defend, hold harmless, and indemnify Buyer from and against any liability, claims, demands, damages, costs or expenses (including, without limitation, reasonable attorney and other professional fees and disbursements) arising from or in connection with the performance of any service or work by Seller or its employees, agents, representatives and subcontractors on Buyer's or Buyer's customer's premises or the use of the property of Buyer or any customer of Buyer, except to the extent such liability arises out of the negligence or willful misconduct of Buyer or Buyer's customer.

13.3   Product Liability .  Seller will defend, hold harmless, and indemnify Buyer from and against any liability and expenses (including, without limitation, attorney and other professional fees and disbursements) arising from or in connection with any third party claims or demands to recover for personal injury or death, property damage or economic loss caused by any of the goods or services supplied by Seller (regardless of whether

Revised June 24, 1999

such claim or demand arises under tort, negligence, contract, warranty, strict liability or other legal theories), except to the extent such injury, damage or loss results from Buyer's specifications as to design or materials or from alteration or improper repair, maintenance or installation by any party other than Seller.

## 14. COMPLIANCE WITH LAWS

Seller, and any goods or services supplied by Seller, will comply with all applicable laws, rules, regulations, orders, conventions, ordinances and standards of the country(ies) of origin and destination or that relate to the manufacture, labeling, transportation, importation, exportation, licensing, approval or certification of the goods or services, including, but not limited to, those relating to environmental matters, wages, hours and conditions of employment, subcontractor selection, discrimination, occupational health/safety and motor vehicle safety. Neither Seller nor any of its subcontractors will utilize slave, prisoner or any other form of forced or involuntary labor in the supply of goods or services under this Contract.  Upon Buyer's request, Seller will certify in writing its compliance with the foregoing. Seller will defend, hold harmless and indemnify Buyer from and against any liability, claims, demands, damages or expenses (including reasonable attorney or other professional fees and disbursements) arising from or relating to Seller's noncompliance with this Article.

## 15. INSURANCE

Seller will maintain insurance coverage as required by applicable law or as reasonably requested by Buyer with carriers reasonably acceptable to Buyer.  With respect to any such insurance coverage, Seller will furnish to Buyer either a certificate evidencing satisfaction of the above-mentioned insurance requirements under this Contract or certified copies of all insurance policies within ten (10) days after Buyer requests. The certificate must provide that Buyer will receive thirty (30) days prior written notice from the insurer of any termination or reduction in the amount or scope of coverage.  The furnishing of certificates of insurance and purchase of insurance will not limit or release Seller from Seller's obligations or liabilities under this Contract.

## 16. SELLER'S EQUIPMENT

Seller, at its expense, will furnish, keep in good condition, and replace when necessary all of its machinery and equipment, including related tooling, jigs, dies, gauges, fixtures, molds, patterns, fixtures and other accessories, required for the production of the products covered by this Contract ("Seller's Equipment"). Seller will insure Seller's Equipment with fire and extended coverage insurance for its full replacement value. Seller grants Buyer an irrevocable option to take possession of, and title to, all or part of Seller's Equipment that is specially designed or outfitted for the production of the goods covered by this Contract upon payment to Seller of the net book value of such Seller's Equipment less any amounts that Buyer has previously paid to Seller for the cost of such Seller's Equipment.  This option will not apply to the extent that Seller's Equipment is used to produce goods that are the standard stock of Seller or if a substantial quantity of like goods are being sold by Seller to others.  Buyer's right to exercise this option is not conditioned on Seller's breach or Buyer's termination of this Contract or upon payment of any other amounts due under this Contract.

## 17. BUYER'S PROPERTY

17.1  Bailment of Property.  All supplies, materials, tooling, jigs, dies, gauges, fixtures, molds, patterns, equipment and other items Buyer furnishes, either directly or indirectly, to Seller, or for which Buyer gives consideration to Seller in whole or in part ("Buyer's Property"), will be and remain the property of Buyer and be held by Seller on a bailment basis.  To the extent that this Contract provides that Buyer will reimburse Seller for any specific items of Buyer's Property (such as tooling), Seller will purchase and pay for such Buyer's Property as agent of Buyer.  To the extent that this Contract provides that Seller will obtain any specific items of Buyer's Property (such as tooling) without separate or additional payment or reimbursement by Seller,

Revised June 24, 1999

Seller acknowledges and agrees that Buyer's issuance of this Contract is good and sufficient consideration for such Buyer's Property and that title to such Buyer's Property shall vest immediately in Buyer and be held by Seller pursuant to this Article. Seller shall assign to Buyer any contract rights or claims in which Seller has an interest with respect to Buyer's Property. Seller shall also execute (i) any bills of sale or other documents of conveyance Buyer requests to evidence the transfer to Buyer of title to any Buyer's Property, related contract rights and claims and (ii) any financing statements or other documents Buyer requests to evidence Buyer's ownership of Buyer's Property. Title to all replacement parts, additions, improvements and accessories purchased by Seller will vest in Buyer immediately upon attachment to or incorporation into Buyer's Property. Seller will not sell, lend, rent, encumber, pledge, lease, transfer or otherwise dispose of Buyer's Property. Furthermore, Seller will not assert, or permit any person claiming an interest through Seller to assert any claims of ownership to or any other interest in Buyer's Property. When permitted by law, Seller waives any lien or other rights that Seller might otherwise have on or in any of Buyer's Property for work performed on such property or otherwise. Goods manufactured based on Buyer's drawings and/or specifications may not be used for Seller's own use or sold to third parties without Buyer's express written authorization.

17.2  Seller's Duties with Respect to Buyer's Property.  While Buyer's Property is in Seller's possession and until Seller delivers Buyer's Property back to Buyer, Seller bears the risk of loss and damage to Buyer's Property. Seller will be responsible for the cost of repairing or replacing Buyer's Property if it is damaged or destroyed regardless of cause or fault. Seller will at all times: (a) regularly inspect, maintain in good condition, and repair Buyer's Property at Seller's own expense, (b) use Buyer's Property only for the performance of this Contract, (c) deem Buyer's Property to be personal property, (d) conspicuously mark Buyer's Property as the property of Buyer and maintain such markings, (e) not commingle Buyer's Property with the property of Seller or with that of a third person, (f) not move Buyer's Property from Seller's premises without Buyer's written approval, and (g) use Buyer's Property in compliance with Buyer's or the manufacturer's instructions and in compliance with all federal, state and local laws, ordinances and regulations. Buyer will have the right to enter Seller's premises at all reasonable times to inspect Buyer's Property and Seller's records with respect thereto.

17.3  Return of Buyer's Property.  Seller agrees that Buyer has the right, at any time and from time to time, with or without reason and without payment of any kind, to retake possession of or request the return of Buyer's Property. Without further notice or court hearings, which rights, if any, are hereby waived, Buyer or its designee(s) will have the right to enter Seller's premises and take possession of any and all of Buyer's Property. Upon Buyer's request and in accordance with Buyer's instructions, Buyer's Property will be immediately released to Buyer or delivered to Buyer by Seller, either (i) Ex Works (Incoterms 1990) at Seller's plant properly packed and marked in accordance with the requirements of the carrier selected by Buyer to transport such Buyer's Property or (ii) to any location Buyer designates, in which event Buyer will pay Seller the reasonable costs of delivering Buyer's Property to the location Buyer designates. If Seller does not release and deliver any Buyer's Property in accordance with this Article, Buyer may obtain an immediate writ of possession without notice and without the posting of any bond and/or enter Seller's premises, with or without legal process, and take immediate possession of Buyer's Property.

17.4  Disclaimer of Warranties.  Seller acknowledges and agrees that (i) Buyer is not the manufacturer of Buyer's Property nor the manufacturer's agent nor a dealer therein, (ii) Buyer is bailing Buyer's Property to Seller for Seller's benefit, (iii) Seller is satisfied that Buyer's Property is suitable and fit for its purposes, and (iv) BUYER HAS NOT MADE AND DOES NOT MAKE ANY WARRANTY OR REPRESENTATION WHATSOEVER, EITHER EXPRESS OR IMPLIED, AS TO THE FITNESS, CONDITION, MERCHANTABILITY, DESIGN OR OPERATION OF BUYER'S PROPERTY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE. Buyer will not be liable to Seller for any loss, damage, injury or expense of any kind or nature caused, directly or indirectly, by Buyer's Property, including, without limitation, the use or maintenance thereof, or the repair, service or adjustment thereof, or by any interruption of service or for any

**Revised June 24, 1999**

loss of business whatsoever or howsoever caused, including, without limitation, any loss of anticipatory damages, profits or any other indirect, special or consequential damages.

17.5 <u>Development, Engineering And Consulting Services</u>.  Engineering, consulting or development services ("Development Services") funded under this Contract that result in any idea, invention, concept, discovery, work of authorship, patent, copyright, trademark, trade secret, know-how or other intellectual property ("IP") shall be the sole property of Buyer.  Seller agrees to assign all right, title and interest in and to IP that results from Development Services ("Developed IP") to Buyer.  Seller shall notify Buyer of the existence of Developed IP and assist Buyer in every reasonable way to perfect its right, title and interest in Developed IP, such as by executing and delivering all additional documents reasonably requested by Buyer in order to perfect, register, and/or enforce the same, and Buyer shall reimburse Seller for reasonable costs incurred by Seller in providing such assistance.

## 18. SERVICE AND REPLACEMENT PARTS

During the term of  this Contract, Seller will sell to Buyer goods necessary to fulfill Buyer's service and replacement parts requirements to Buyer's customers at the then current production price(s) under this Contract.  If the goods are systems or modules, Seller will sell the components or parts that comprise the system or module at price(s) that will not, in the aggregate, exceed the price of the system or module less assembly costs.  If this Contract is in effect at the end of the vehicle production program into which the goods covered by the Contract are incorporated, Seller will also sell goods to Buyer to fulfill Buyer's and its customers' service and replacement parts requirements during the fifteen (15) year period following the end of such vehicle production program (the "Post-Production Period"), and this Contract will automatically remain in effect during the entire Post-Production Period.  During the first three (3) years of the Post-Production Period, the price(s) for such goods will be the production price(s) which were in effect at the commencement of the Post-Production Period.  For the remainder of the Post-Production Period, the price(s) for such service goods will be as reasonably agreed to by the parties.  If requested by Buyer, Seller will also make service literature and other materials available at no additional charge to support Buyer's service activities.

## 19. REMEDIES

The rights and remedies reserved to Buyer in this Contract are cumulative with, and in addition to, all other or further remedies provided in law or equity.

## 20. CUSTOMS AND EXPORT CONTROLS

Credits or benefits resulting or arising from this Contract, including trade credits, export credits or the refund of duties, taxes or fees, belong to Buyer.  Seller will provide all information necessary (including written documentation and electronic transaction records) to permit Buyer to receive these benefits or credits, and to fulfill any customs related obligations, origin marking or labeling requirements and local content origin requirements.  Seller will obtain all export licenses or authorizations necessary for the export of the goods unless otherwise indicated in this Contract, in which event Seller will provide all information as may be necessary to enable Buyer to obtain such licensees or authorization(s).  Seller will make all arrangements that are necessary for the goods to be covered by any duty deferral or free trade zone program(s) of the country of import.

## 21. SETOFF AND RECOVERY

Revised June 24, 1999

With respect to any monetary obligations of Seller or Seller's affiliates to Buyer or Buyer's affiliates, Buyer may (i) setoff such obligations against any sums owing to Seller or Seller's affiliates and/or (ii) recoup such obligations from any amounts paid to Seller or Seller's affiliates by Buyer or Buyer's affiliates.

## 22. NO ADVERTISING

Seller will not, in any manner, advertise or publish that Seller has contracted to furnish Buyer the goods or services covered by this Contract or use any trademarks or trade names of Buyer in Seller's advertising or promotional materials unless Buyer consents in writing.

## 23. NO IMPLIED WAIVER

The failure of either party at any time to require performance by the other party of any provision of this Contract will not affect the right to require such performance at any later time, nor will the waiver by either party of a breach of any provision of this Contract constitute a waiver of any succeeding breach of the same or any other provision. No course of dealing or course of performance may be used to evidence a waiver or limitation of Seller's obligations under this Contract.

## 24. ASSIGNMENT

Buyer may assign its rights and obligations under this Contract without Seller's prior written consent. Seller may not assign or delegate its rights or obligations under this Contract without Buyer's prior written consent.

## 25. RELATIONSHIP OF PARTIES

Seller and Buyer are independent contracting parties. Nothing in this Contract makes either party the agent or legal representative of the other for any purpose whatsoever, nor grants either party any authority to assume or create any obligation on behalf of or in the name of the other party.

## 26. GOVERNING LAW AND JURISDICTION

This Contract is to be construed according to the laws of the country (and state or province, if applicable) from which this Contract is issued as shown by the address of Buyer, excluding the provisions of the United Nations Convention on Contracts for the International Sale of Goods and any choice of law provisions that require application of any other law. Any action or proceedings by Buyer against Seller may be brought by Buyer in any court(s) having jurisdiction over Seller or, at Buyer's option, in the court(s) having jurisdiction over Buyer's location, in which event Seller consents to jurisdiction and service of process in accordance with applicable procedures. Any actions or proceedings by Seller against Buyer may be brought by Seller only in the court(s) having jurisdiction over the location of Buyer from which this Contract is issued.

## 27. SEVERABILITY

If any provision of this Contract is invalid or unenforceable under any statute, regulation, ordinance, executive order or other rule of law, such provision will be deemed reformed or deleted, as the case may be, but only to the extent necessary to comply with such statute, regulation, ordinance, order or rule, and the remaining provisions of this Contract will remain in full force and effect.

## 28. RIGHT TO AUDIT AND INSPECT

**Revised June 24, 1999**

Buyer, at its expense, has the right to audit and review all relevant books, records, payroll data, receipts and other documents, including Seller's administrative and accounting policies, guidelines, practices and procedures, in order to substantiate any charges and other matters under this Contract. Seller will maintain and preserve all such documents for a period of four (4) years following final payment under this Contract. In addition, Buyer has the right to inspect all inventories, work-in-process, materials, machinery, equipment, tooling, fixtures, gauges, and other items related to Seller's performance of this Contract. Seller will provide Buyer with reasonable access to its facilities and otherwise cooperate and facilitate any such audits or inspections by Buyer.

## 29. ENTIRE AGREEMENT

This Contract, together with the attachments, exhibits, supplements or other terms of Buyer specifically referenced in this Contract, constitutes the entire agreement between Seller and Buyer with respect to the matters contained in this Contract and supersedes all prior oral or written representations and agreements. This Contract may only be modified by a written contract amendment issued by Buyer. Notwithstanding anything to the contrary contained herein, Buyer explicitly reserves, and this Contract will not constitute a waiver or release of, any rights and claims against Seller arising out of, or relating to, any fraud or duress in connection with the formation of this Contract or any breach or anticipatory breach of any previously existing contract between Buyer and Seller (whether or not such previously existing contract related to the same or similar goods or subject matter as this Contract). All payments by Buyer to Seller under this Contract are without prejudice to Buyer's claims, rights, or remedies.

# EXHIBIT B

# Buyer:  Jodi Wood (36)
# GS #11072

## P/N  Various Linear Shift Assemblies

### PROGRAM INFORMATION

Model Year/Car Body:  2002 GMT 800 & various other applications
Cost Book:  Current Prices    $0 (Tooling)
APV/TPV:  $4,824,724
PPAP:  NA
SOP:  01JA02

### PRODUCT BACKGROUND

Negotiations with current supplier did not result in initial savings, last
right of refusal was given and supplier answered the targets.

Business Team requires that the source be local.

Selected supplier would eventually purchase all components currently
consigned and Delphi will purchase final assembly only.

### STRATEGY

Keep business local and provide same quality and technical expertise.

Link and Leverage future business with Euclid for additional savings

### RECOMMENDATION

Supplier:  Euclid Industries @ 27.1 – 3 – 3 - 3

Current/primary supplier of Linear Shift assemblies to Delphi



# RECOMMENDATION SUMMARY

Reporting Date: 13-Mar-2002 12:26:44

Buyer Name: WOOD, JODI
Activity/RFQ Project ID: 11072
Activity Type: GLOBAL SOURCING
Total NPV: 10,117,453
Currency: USD

| Year | Comparison APV (first 12 months only) | Recommended APV (first 12 months only) | Quality (part-years only) | Tooling cost-2 of 4 Capital (parts only) | Savings % (parts only) |
|---|---|---|---|---|---|
| 2002 | REDACTED | REDACTED | REDACTED | REDACTED | |
| 2003 | | | REDACTED | | |
| 2004 | | | REDACTED | | |
| 2005 | | | REDACTED | | |
| Totals | REDACTED | REDACTED | REDACTED | | |

| Recommended Supplier Name | DUNS Number | PPV | Region | Quality Rating | Commodity Number |
|---|---|---|---|---|---|
| EUCLID INDUSTRIES INC 051506467 | 21 | N/A | DSSS | QS 9000 07-Jan-2003 | 12 | 26051958MA999, 26057528MA999, 26063900MA020, 26064241MA999, 26075696MA999, 26077203MA999, 26078761MA999, 26089071MA999, 26089928MA999, |

Recommended Contract-NPV

Buyer _(signature)_

Divisional Supplier Quality _(signature)_

Divisional Purchasing Director _(signature)_

Divisional/Production Control _(signature)_

Regional Purchasing Director _(signature)_

Divisional Engineer _Michael DeBranski (signature)_

DGP Commodity Director _Pat Murtagh (signature)_

Commodity Team Leader/Manager _Christine Ciardininni (signature)_

CONDITIONAL UPON TIMING PLAN TO HAVE EUCLID OBTAIN COMPONENTS THEMSELVES

— DELPHI CONFIDENTIAL —

Page 1 of 1

# SOURCE COMPARISON DETAIL

**Buyer Name:** WOOD, JODI

**Activity/RFQ Project ID:** 11072

**Reporting Date:** 13-Mar-2002 12:23:14

All prices are expressed in the Receiving Country Currency

| SUPPLIER NAME / DUNS Number | | | | | | | | | NPV | Period 1 Savings |
|---|---|---|---|---|---|---|---|---|---|---|
| SKILLED MANUFACTURING INC 12000912 / Round 3 | US | | | REDACTED | REDACTED | 0.00.0 | | | | |
| FE SERVICES CO 081546288 / Round 4 | US USD | | REDACTED | REDACTED | REDACTED | REDACTED | | | REDACTED | |
| EUCLID INDUSTRIES INC 051506467 / Round 4 | US USD | | REDACTED | REDACTED | REDACTED | REDACTED | | | REDACTED | REDACTED |
| MEANS INDUSTRIES INC 057693145 / Round 4 | US USD | | REDACTED | REDACTED | REDACTED | REDACTED | | | REDACTED | REDACTED |

——— **DELPHI CONFIDENTIAL** ———

Page 2 of 24

# SOURCE COMPARISON DETAIL

**Buyer Name:** WOOD, JODI

**Activity/RFQ Project ID:** 11072

**Reporting Date:** 13-Mar-2002 12:23:14

All prices are expressed in the Receiving Country Currency

## PART:

| Part Number/Description | | | | | | | | | | | Estimated SOP Date |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 26051958MA699 SHIFT ASM, LINEAR | | | | | | | | | | | Container Package Type - Comments |

| Supplier Name/ DUNS Number/Last Redline Quoting (suppliers only) | Sup Ctry | Sup Curncy | Red Line Trig | | | | REDACTED | | | | NPV | Period 1 Savings |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## CURRENT SUPPLIERS/COSTBOOK:

| EUCLID INDUSTRIES INC 05150647 | | | | | | REDACTED | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

## QUOTING SUPPLIERS:

| ANDROID INDUSTRIES- WHITMORE LK 196776627 / Round 1 | US | | | | | | 0.00.0 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| MADISON-KIPP CORP 006071716 / Round 2 | US | | | | | | 0.00.0 | | | | |
| PRINCE MANUFACTURING CORP OXFORD 879345916 / Round 1 | US | | | | | | 0.00.0 | | | | |
| REA INTERNATIONAL INC 256854258 / Round 1 | CA | | | | | | 0.00.0 | | | | |

------- DELPHI CONFIDENTIAL -------

EXHIBIT C

# GLOBAL SOURCING AND ADVANCED PURCHASING
## ROUNDS OF NEGOTIATION

REQUEST NUMBER: _____

BUYER NAME: DALE E. KOWALESKI

PART NUMBER: 26100244

PART NAME: Shift Bracket Assembly

DECISION DATE: _____

| SUPPLIER | 1ST ROUND PRICE/TOOLS | 2ND ROUND PRICE/TOOLS | 3RD ROUND PRICE/TOOLS | 4TH ROUND PRICE/TOOLS | 5TH ROUND PRICE/TOOLS | 6TH ROUND PRICE/TOOLS |
|---|---|---|---|---|---|---|
| H. E. SERVICES | REDACTED | REDACTED | | | | |
| MANCELONA MFG | | | | | | |
| TIERCON INDUSTRIES | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CURRENT PRICE: _____

FINAL TARGET PRICE: _____

9/4/2002

REV: 10/19/00

S:\PURCHGS\CFORMS\26100244

# RECOMMENDATION SUMMARY

Reporting Date:   04-Oct-2002  14:50:37

**Buyer Name:** KOWALESKI, DALE
**Activity/RFQ Project ID:** 59725
**Activity Type:** ADVANCE PURCHASING
**Total Cost (NPV):** 90,416
**Currency:** USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) |
|------|----------------|-----------------|-----------------------------------|------------------------------|------------------------|
| 2002 | | | | | |
| 2003 | REDACTED | REDACTED | REDACTED | REDACTED | |
| 2004 | | | | | |
| 2005 | | | | | |
| 2006 | | | | | |
| Totals | | | | | |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm-ended | Part Numbers |
|----------------------------------------|-----|----------------------|---------------------|----------------------|--------------|
| MANCELONA MANUFACTURING INC 937511681 | 122 | NO | QS9000 13-Nov-2003 | 1 | 26100244 |

| Recommended Contract Types | Regions | Divisions |
|----------------------------|---------|-----------|
| Long Term | N | DSSS |

Buyer

Divisional Supplier Quality

Divisional Purchasing Director

Divisional Production Control   11/7/02

Regional Purchasing Director

Divisional Engineer   3002

DGP Commodity Director

Commodity Team Leader/Manager

-------- DELPHI CONFIDENTIAL --------

Page 1 of 1

EXHIBIT D

9/4/2002

# GLOBAL SOURCING AND ADVANCED PURCHASING
## ROUNDS OF NEGOTIATION

REQUEST NUMBER: _____

BUYER NAME: DALE E. KOWALESKI

PART NUMBER: 26100242

PART NAME: Tele Motor & Pot Assembly

DECISION DATE: _____

| SUPPLIER | 1ST ROUND PRICE/TOOLS | 2ND ROUND PRICE/TOOLS | 3RD ROUND PRICE/TOOLS | 4TH ROUND PRICE/TOOLS | 5TH ROUND PRICE/TOOLS | 6TH ROUND PRICE/TOOLS |
|---|---|---|---|---|---|---|
| H. E. SERVICES | | | | | | |
| | | | | | | |
| MANCELONA MFG | REDACTED | | | | | |
| | | REDACTED | | | | |
| TIERCON INDUSTRIES | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CURRENT PRICE: _____

FINAL TARGET PRICE: _____

S:\PURCHGSO\FORMS\26100242

REV: 10/18/00

# RECOMMENDATION SUMMARY

**Reporting Date:** 03-Oct-2002  15:33:24

**Buyer Name:** KOWALESKI, DALE
**Activity/RFQ Project ID:** 59562
**Activity Type:** ADVANCE PURCHASING
**Total Cost (NPV):** 89,431
**Currency:** USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) |
|---|---|---|---|---|---|
| 2002 | | | | | |
| 2003 | REDACTED | REDACTED | REDACTED | | REDACTED |
| 2004 | | | | | |
| 2005 | | | | | |
| 2006 | | | | | |
| Totals | | | | | |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm- ended | Part Numbers |
|---|---|---|---|---|---|
| MANCELONA MANUFACTURING INC 937511681 | 122 | NO | QS9000 13-Nov-2003 | 1 | 26100242 |

| Recommended Contract Types | Regions | Divisions |
|---|---|---|
| | N | DSSS |

Buyer

Divisional Supplier Quality

Divisional Purchasing Director

Divisional Production Control   11/7/02

Regional Purchasing Director

Divisional Engineer   2.2002

DGP Commodity Director

Commodity Team Leader/Manager

-------- DELPHI CONFIDENTIAL --------

Page 1 of 1

# EXHIBIT E

# GLOBAL SOURCING AND ADVANCED PURCHASING
## ROUNDS OF NEGOTIATION

REQUEST NUMBER:

BUYER NAME: DALE E. KOWALESKI

PART NUMBER: 26100243

PART NAME: Motor Bracket Assembly

DECISION DATE:

| SUPPLIER | 1ST ROUND PRICE/TOOLS | 2ND ROUND PRICE/TOOLS | 3RD ROUND PRICE/TOOLS | 4TH ROUND PRICE/TOOLS | 5TH ROUND PRICE/TOOLS | 6TH ROUND PRICE/TOOLS |
|---|---|---|---|---|---|---|
| H. E. SERVICES | | | | | | |
| MANCELONA MFG | REDACTED | REDACTED | | | | |
| TIERCON INDUSTRIES | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

CURRENT PRICE:

FINAL TARGET PRICE:

9/4/2002

REV: 10/19/00

S:\PURCHGSC\FORMS\26100243

# RECOMMENDATION SUMMARY

Reporting Date:    04-Oct-2002  13:06:47

**Buyer Name:** KOWALESKI, DALE

**Activity/RFQ Project ID:** 59681

**Activity Type:** ADVANCE PURCHASING

**Total Cost (NPV):** 85,515

**Currency:** USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) |
|------|----------------|-----------------|------------------------------------|------------------------------|------------------------|
| 2002 | | | | | |
| 2003 | REDACTED | | | | |
| 2004 | | REDACTED | | | |
| 2005 | | | REDACTED | | |
| 2006 | | | | | REDACTED |
| Totals | | | | | |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm- ended | Part Numbers |
|----------------------------------------|-----|----------------------|---------------------|------------------------|--------------|
| MANCELONA MANUFACTURING INC 937511681 | 122 | NO | QS9000 13-Nov-2003 | 1 | 26102043 |

| Recommended Contract Types | Regions | Divisions |
|----------------------------|---------|-----------|
| Long Term | N | DSSS |

_____
Buyer

_____
Divisional Supplier Quality

_____
Divisional Purchasing Director

_____
Divisional Production Control
11/1/02

_____
Regional Purchasing Director

_____
Divisional Engineer
250002

_____
DGP Commodity Director

_____
Commodity Team Leader/Manager

——— DELPHI CONFIDENTIAL ———

Page 1 of 1

# EXHIBIT F

** HES**

ENGINEERING / TESTING

MANUFACTURING

H E. SERVICES • 5117 S. DORT HWY • FLINT, MI 48507 • (810) 743-4900 • FAX (810) 743-8400

September 4, 2001

Delphi Saginaw Steering Systems
3900 Holland Rd.
Saginaw, MI  48601
Attention:  Mr. Duane Bolinger
                     Director of Purchasing

Dear Duane,

As of the present date, H.E. Services continues to support Delphi in their technical support requirements to assist in their operational objectives.  As a supplier to Delphi for fifteen years and one of the largest minority owned business enterprises in the Delphi supplier base, we are thankful for the many opportunities we have been provided.

As you are well aware, we have gone through tremendous changes to address Delphi's need to improve profitability.  H.E. Services has been forced to close operations, sell off equipment, reduce staff and implement an extreme austerity plan that is in its eighth phase totaling annualized cost cutting to exceed $3,360,000.

In addition to the above, ownership has infused an additional amount exceeding $1,000,000 to help ensure near-term continuation of our operations.  Even with the above extreme changes, we have shown a loss for fifteen straight months totaling $1,681,901.

Our intent was, and still is, to execute a recovery action plan that provides you, our primary customer, with "Win-Win" opportunities.  This plan was presented and initiated with positive verbal conversation with you and your staff, but with little results to date.

The following is a brief status of these "Win-Win" opportunities:

#### Side Covers
We have quoted competitively (we are told) on the 670 Left Hand Side Covers to allow for a 'win-win' opportunity".  H.E. Services has machined, to date, an average of about 40% of the quoted volume of 1,400 parts per day and there is a need for approximately 1,800 per day.  Awarding the additional quantities to H.E. Services will help us recover our losses we have taken on this program.  Delphi wins because H.E. Services is the best supplier of Side Covers with a perfect record on both delivery and quality at a competitive price.

-2-

## Level II Containment and Sorting

We are an outstanding source for sorting and level II containment with superior qualifications to provide your organization with the level of quality assurance that Delphi should demand. We have recently provided Steve Dawe with an outline of our qualifications (copy attached) to compare to any other source and had suggested that the standards for qualification to engage in this business be comparable to ours. H.E. Services, as history suggests, has always reacted in record time to making available the necessary resources required to perform the job, including securing buildings for additional floor-space as required.

## Shift Bowls

We have recently been advised that we will not be awarded a P.O. for the machining of shift bowls.

## Trunnion, Spacer, and Bearing Holder

We have resubmitted a quote on the GMX270 Trunnion, Spacer, and Bearing Holder and have received a technical review package in preparation for a technical review meeting to be held on September 6, 2001.

## Prototype Operations

We have received an RFQ, which will allow us to submit our ideas for improving the effectiveness and efficiency of this important activity. We are looking forward to discussing this proposal with your people.

## Cost Bridging

Finally, the opportunity to allow us to cost bridge per the Delphi mentorship program for minority owned business enterprises would provide a win-win opportunity with respect to maintaining your low cost objectives. Our Ancon Prototype and Machine (Vendor no. 608814059) and Universal Tool and EDM (Vendor no. 00-703-4445) are fully QS9000 certified with the outstanding track record of delivery, quality and the highest technology in machine tool provisions. The 'Bridge Solution' is attached per the MBE mentorship program at Delphi.

It is my hope that all of these mutual beneficial opportunities can be initiated to allow us to maintain our excellent relationship and continued business viability. Please contact me upon your availability to further discuss the contents of this letter.

Sincerely yours,

Robert L. Backie – CEO

Cc: Mr. Ray Campbell

EXHIBIT G

**-HES** ENGINEERING / TESTING
MANUFACTURING

H.E. SERVICES • 225 E. MORLEY DR. • SAGINAW, MI 48601 • (989) 753-9015 • FAX (989) 753-7703

November 28, 2001

Mr. Steve Dawe, Purchasing Dept.
Delphi Automotive
3900 Holland Rd.
Saginaw, Michigan 48601

Dear Steve,

In the past few months, we have continued to institute cost reduction measures in the form of reduced direct and indirect labor, material cost reductions, and improvements in efficiency. The results of these efforts are starting to pay off and we recorded a profit in the month of October. We have additional improvement measures in the planning stages and we fully expect this cost reduction trend to continue.

During this past year we have increased our customer base and have taken on new business in various sectors of our company. This diversification has strengthened our company and will continue to pay off as we go forward.

Our outlook for the short and long term is positive. However, until the general economy picks up we will not realize the profit levels that we had previously projected. Our employee moral is high and we are all feeling positive that we will continue to maintain our business position in the automotive business community and continue our companies growth pattern of the past 15 years.

The linear shift program is a perfect fit for our Flint facility and will have a very positive impact in spreading the fixed cost thus allowing this facility to make a major contribution to the company's bottom line. We are requesting that you award this business to H.E. Services and allow us to utilize the manufacturing floor space that we had reserved for our manufacturing expansion plans with your company.

I have attached a copy of a letter dated Oct. 24th, which addresses the TechCenteral/ H.E. Services relationship. As you can see in the letter, these are two separate companies.

If you have need of additional information please feel free to contact me.

Regards,

Joseph A. Stearns
VP Engineering and Manufacturing

Attachment:

# EXHIBIT H

# DELPHI
Automotive Systems

**PRODUCTION PROCESS REVIEW**

Appendix 39

Supplier: _Universal Tool (HE)_    Part Number(s): _26056263, 26093782_
_26088811, 26075081 - Lock modules_
SQE: _Sibil Chernek_    Date: _March 22, 02_

## ** USE OPEN ISSUES LIST TO DOCUMENT ACTION ITEMS **

### Process Observations

Y _✓_ N ____  1. Is the product being manufactured at the production site using the production tooling, gaging, process, materials, operators, environment, and process settings?
Comments: _____
_____
_____

Y _✓_ N ____  2. Are good housekeeping practices being followed? Is the work place properly configured? (adequate lighting, space, etc.)? Comments: _Lighting not good on factory_
_floor_ _____

### Quality Documents

Y ____ N _✓_  3. Does the actual process flow agree with the process flow diagram? Comments: _____
_____
_____

Y ____ N _✓_  4. Are operator instructions/visual controls available and adhered to at each work station?
Comments: _Operator Instructions were pasted_ _but_ _however_
_WF need updated_ / _Parts list / B/P's and Visual aids are needed for operator_
_Reject Mat'l added_ / _in order for operator to be assured they are building correct_
_Clear Containers_ / _part No's_ _Π u_
_+ tagging added_ 5. Are work instructions available for the following:
        *(For additional detail, see optional 'Work Instruction' section)*
Y ____ N/A  • Start/Stop: (Explains how to start up run and shutdown equipment safely)
Y _✓_ N ____  • Run: (Standardized method of performing work)
Y ____ N/A  • Setup/Changeover: (Requirements for set-up, changeover and start/end of shift)
Y ____ N/A  • Control & Gaging: (Control checks for 'important' product and process characteristics)
Comments: _A) no gaging req'd - no machines, no_
_change over as in 0 machines_
_B) operators did not know how to tell if correct part_
_#'d were being built - met to post B/P's & Build sheets + visual_
_all operators were signed off on Job Instructions_ _a_

Y ✓ N ___    6. Is the production process control plan (or equivalent) easily accessible to operators?
Comments: _but operators don't know where_
_they are_

Y ✓ N ___    7. Does production process control plan relate to the process flow diagram and PFMEA? (i.e. Is the process control plan numerically sequenced to the process flow diagram and PFMEA?)
Comments: _Control Plan needs updating_
_on some of the verbage_

Y ✓ N ___    8. Does the production process control plan agree with the actual process? (i.e. Is the control plan being followed?) Comments: _in some cases the control_
_Plan is better than the work instruction_
_the work content than the work instruction_

Y ✓ N ___    9. Do production part checks and statistical monitoring take place and properly recorded as outlined on the process control plan? Comments: _There is no SPC_
_requirements in this process_

Y ___ N/A    10. Is process capability data maintained and regularly updated as required for KPC's?
Comments: _Not a requirement_

    • Is it readily available? _N/A / N/R_
    • How current is it? _N/A / N/R_
    • Is the process in control (Ppk ≥ 1.67 Short Term, Cpk ≥ 1.33 Long Term)? _N/A / N/R_

Y ___ N/A    11. Does the statistical data make sense (Reasonable control limits, normal variation, common cause vs. special cause)? Comments: _N/A / N/R_

Y ___ N/A    12. Are measurement devices properly calibrated? Comments: _N/A / N/R_

Y ✓ N ___    13. Is the process control plan sufficient to effectively meet the design record requirements? (KPC's, customer interface dimensions) Comments: _____

Y ___ N ___    14. Are High RPN potential failure modes, as identified in the PFMEA, addressed through error-proofing equipment or documented in the control plan? Comments: _not addressed_
_by error proofing - but addressed thru proven_
_double._

Y ✓ N ___    15. Is there proper lot traceability/identification of all material? (in-process and final labeling, packaging, shipping) Comments: _____

Y ✓ N ___    16. Can the parts run since the last good check be traced to the producing shift and operation to prevent reoccurrence? Comments: _____

_Needs to_
_switch to 7 step_

_CFO Mark → Joel called_
_to discuss the_
_(spreadsheet) problem @ 1:05 P.M._

## Gage Control/Error Proofing

Y ___ N _A_   17. Does a calibration control system for manual gages exist?  Comments: _____
_____

Y ___ N/A   18. For automatic inspection stations, does a verification / calibration plan exist?  Comments: __
_____

Y ___ N/A   19. Is there evidence of compliance?  Comments: _____
_____

Y ___ N/A   20. Are gages labeled with calibration status?  Comments: _____
_____

Y ___ N/A   21. Are the required gages available at the point of use?  Comments: _____
_____

Y ___ N/A   22. Are they easy to use repetitively?  Comments: _____
_____

Y ___ N/A   23. Do gages have adequate repeatability and discrimination (Gage R & R)?  Comments: _____
_____

Y ___ N/A   24. Are variable gages used where necessary (i.e. KPC's) for tracking common cause variation?
Are attribute gages used where appropriate (i.e. 100% containment of special cause variation)?
Comments: _____
_____

Y ✓ N ___   25. Is error-proofing employed and implemented according to the PFMEA and process control
plan?  Comments: _Error proofed fixture's_
_____

Y ✓ N ___   26. Does the machine logic prevent non-conforming parts from reaching subsequent operations (is
it effective)?  Comments: _no machines, however error
proofed fixtures are in placed_

Y ✓ N ✓   27. Are error proofing devices checked periodically for proper function?  Comments: _
_recommendation - fixture lay out should_

Y ___ N ___   28. Are Error Proof verification masters included?  Comments: _____
_be performed @ a frequency of E/6Mo_

Y ___ N ✓   29. Are the error proofing devices re-verified following P.M., etc. and is the frequency of error
proof verification identified in the work instruction?  Comments: _Needs to be write_
_P.M. W/Instruction and ensure_

## Handling of Reject/Suspect Material

Y ✓  N ___   30. Does the process control plan contain a reaction plan for nonconformances?  Comments:___
_See last section of C/P_

Y ✓  N ___   31. Does the reaction plan have containment and corrective actions?  Comments:___
_Corrective actions must be addressed thee_
_5 phase, PRR's, 7-step Corrective Action_

Y ✓  N ___   32. When a part out of spec/control limits is identified as a result of the Control Plan, Pre-Control or SPC, is this condition properly managed within the organization (Action Plans, Assigned Responsibility, Progress Monitoring, and Containment)?

_need QSP 127_   * Comments: _Ref. Procedure # [QSP 127]_

Y ✓  N ___   33. Do problems, including out of spec./control limits, quickly get communicated to people that can help? Comments: _Ref. 5 phase In Book_

Y ___  N/A   34. Does information, including out of spec./out of control conditions, get passed across shifts?
Comments: _Only runs (1) One shift_

Y ✓  N ___   35. Does the support system respond to the operator? Comment: ___
_Ref 5 phase_

Y ✓  N ___   36. Are controls in place to isolate incoming material until it has been approved?
Comments: ___

___ Y ✓ N ___   37. Are all non-conforming products (in-process and finished) properly quarantined and/or scrapped? Comments: _non- Conforming is promptly_
_Record retention problem_  _returned to Supplier- Not held over 24 hrs._
_Employee couldn't find the remaining records-  No Scrap d_

Y ___  N ___   38. Is the suspect / scrap data recorded?  Comments: ___
_Jan 5, 02 was last date Shown on Rejects Rec'd - Ref QF 224_

Y ___  N ✓   39. Is there evidence that the data is used?  Comments: _Purchased or SAG Make parts_
_returned._

Y ✓  N ___   40. Is it likely that a suspect / scrap part will be reintroduced into the normal process flow?
Comments: _No records found to incidicate_
_it couldn't   Documentation retention_
_Problem- Also Lack of records- No organization_

Y ✓  N ___   41. Are suspect / scrap containers available at each operation?  Comments: ___
_However parts were still Sorting Around but Sill_

Y ___  N ✓   42. Is the use of these containers defined in the operator work instructions? Comments: ___
_new work Instructions written in Jan of 02 defining_
_the Containers but the plant never reviewed/signed_
_or posted these instructions they were still_
_Sitting in the Book._

Y ___ N ✓    43. Are the containers properly sized and identified for visual control (color coded, etc.)?
Comments: _Only (1) one Color Red Container_

Y ___ N ✓    44. Does the supplier proactively revert to their Early Production Containment Plan should problems arise? Comments:
_No Documented Evedence_

*Docum . Contr_ _ _ (Page 48 of 99)  less than desire*
*has many issue's = Lack of Con*

---

## Work Instructions (Optional Detail)

### 45. Work Instruction - Start/Stop
**(Explains how to start-up, run, and shutdown equipment safely)**
- If Start/Stop procedure is not followed correctly, is there a negative impact on product quality?
- Do they exist?
- Do they have the correct content?
- Does it tell how to do a 'cold' start-up?
- Does it tell how to shut equipment down?

*N/A - No Machine*

### 46. Work Instruction - Run
**(Standardized method of performing work)**
- Do they exist?   *yes but not current*
- Are they posted in front of the operator?   *NO - Central Location*
- For automatic stations, are they posted appropriately?   *N/A*
- Do they have correct content?   *NO*
- Are they short, simple, and easily understandable?   *To Short/need up dated*

*Ref. Quality # 4 & 3*

### 47. Work Instruction - Setup/Changeover
**(Requirements for set-up, changeover, and start/end of shift)**
- Do they exist?
- Are they readily available?
- Does everyone who needs then know where to find them?
- Do they have the correct content?
- Are they short, simple, and easily understandable?
- Is it identified who is authorized to do what?
- Is setup inspection/verification method identified?
- Is proper disposal of set-up parts defined?
- Do instructions insure correct feeder parts are being assembled?

*N/A*

### 48. Work Instruction - Control & Gaging
**(Control checks for 'important' product and process characteristics)**
- Does it exist for both product and process?
- Is it posted in front of the operator?
- For automatic stations, is it posted appropriately?
- Are all required checks included?
- Are frequencies appropriate for process capability levels?
- Are they short, simple, and understandable?
- Are responsibilities for checks clearly defined?
- For automatic stations, do they tell operator/jobsetter what to do with part(s) in station when auto sequence is interrupted and how to restart?
- Is proper disposal of suspect/scrap parts defined for attended and unattended stations?

*N/A*

- Are Error Proof verification checks included?   *NO*

## Training (Optional)

49. Is a training plan written and training materials available?  Comments: _____
_training Materials Limited to Work Instructions_
_____

50. Are operators, jobsetters, etc. familiar with the training plan?  Comments: _____
_Ask the operators about HE's Training_
_Plan - he said there is pretty Much not One -_

51. Is the training formalized?  Comments: _____
_NO_
_____

52. Does the training have suitable content?  Comments: _____
_NO   Only short Work Instructions_
_+ a few Visual Aid._

53. Does the plan address transfers, absences, etc.?  Comments: _Yes Ref Procedure_
_# QSP-135 - 4.15 & 4.16_

54. Does the plan address the need for additional training due to product / process
changes or improvements?  Comments: _____ _NO_
_____

55. Does the plan recognize the need for retraining if a trained operator has not run a job
in a long time?  Comments: _____
_NO_

## Additional Comments/Recommendations

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Overall Subjective Ranking:    ☒ Red    ☐ Yellow    ☐ Green

Follow-Up Date: _____ _TBD_ _____    ☐ None Required

## PRODUCTION PROCESS REVIEW

# RESULTS SUMMARY

**SUPPLIER:** HE SERVICES SAL.

**DATE OF PROCESS REVIEW:** 22 MR 02

**S.Q.E.:** Sybil Chernek    **OTHERS:** _____

**STATUS (Circle one)*:**    (RED)    |YELLOW|    ▮▮▮▮▮

**PROCESS RESULTS:**
When checking Dock Audit records duplicate copies were
found when questioning person responsible for Dock Audit
she stated she was sick! Alot in Jan. and she admitted
to fudging the Doc. Audit records!

**ENGINEERING ISSUES:**
N/A

**SYSTEMIC CONCERNS:**
Ref. Attachment 1 and 2 Attached to
26056263

Note: All products produced @ HE
Saginaw - has been placed in
CS2 until End of May or later
depending on findings
Sybil
22 MR 02

# DELPHI
## Automotive Systems

### PRODUCTION PROCESS REVIEW

Appendix 39

**Supplier:** _HE SERVICES (SAG.)_   **Part Number(s):** _1818568 (FLANGE)_

**SQE:** _SYBIL CHERNEK_   **Date:** _3/26/02_

**\*\* USE OPEN ISSUES LIST TO DOCUMENT ACTION ITEMS \*\***

## Process Observations

Y ___ N _✓_  1. Is the product being manufactured at the production site using the production tooling, gaging, process, materials, operators, environment, and process settings?
Comments: _CAN Not ANSWER this - No Flow, PFMEA, Control Plan ON HAND_

Y ___ N _✓_  2. Are good housekeeping practices being followed? Is the work place properly configured? (adequate lighting, space, etc.)? Comments: _HS KEEPING OK CURRENTly! Lighting poor_

## Quality Documents

Y ___ N _✓_  3. Does the actual process flow agree with the process flow diagram? Comments: _____
_No Flow DEVELOPED_

Y ___ N _✓_  4. Are operator instructions/visual controls available and adhered to at each work station?
Comments: _No OPERATOR Instructions @ OPERATION Operator Stated She hAd Not SEEN ANy iN Months_

5. Are work instructions available for the following:
*(For additional detail, see optional 'Work Instruction' section)*
Y ___ N _✓_   • Start/Stop: (Explains how to start up run and shutdown equipment safely)
Y ___ N _✓_   • Run: (Standardized method of performing work)
Y ___ N _✓_   • Setup/Changeover:  (Requirements for set-up, changeover and start/end of shift)
Y ___ N _✓_   • Control & Gaging: (Control checks for 'important' product and process characteristics)
Comments: _Nothing ON HAND to Review_

Y ___ N ✓  6. Is the production process control plan (or equivalent) easily accessible to operators?
Comments: _Not Developed_____

Y ___ N ✓  7. Does production process control plan relate to the process flow diagram and PFMEA? (i.e. Is
the process control plan numerically sequenced to the process flow diagram and PFMEA?)
Comments: _Not Developed_____

Y ___ N ✓  8. Does the production process control plan agree with the actual process? (i.e. Is the control plan
being followed) Comments: _Not Developed_____

Y ___ N ✓  9. Do production part checks and statistical monitoring take place and properly recorded as
outlined on the process control plan? Comments: Operator using
Wrong Chart to Record on for 2-3 days &
Not Properly using Calipers - Never Zero's out!

Y ___ N/A  10. Is process capability data maintained and regularly updated as required for KPC's?
Comments: _No KPC'd._____

• Is it readily available? ____N/A_____
• How current is it? ___N/A_____
• Is the process in control (Ppk ≥ 1.67 Short Term, Cpk ≥ 1.33 Long Term)? _N/A_

Y ___ N/A  11. Does the statistical data make sense (Reasonable control limits, normal variation, common
cause vs. special cause)? Comments: ___N/A_____

Y ✓ N ___  12. Are measurement devices properly calibrated? Comments: _Caliper & 1 Gage
Used was Calibrated_____

Y ___ N ✓  13. Is the process control plan sufficient to effectively meet the design record requirements?
(KPC's, customer interface dimensions) Comments: _Control Plan
Not Developed - Could Not Be Found_

Y ___ N ✓  14. Are High RPN potential failure modes, as identified in the PFMEA, addressed through error-
proofing equipment or documented in the control plan? Comments: _No PFMEA
Found_

Y ✓ N ___  15. Is there proper lot traceability/identification of all material? (in-process and final labeling,
packaging, shipping) Comments: _Note: Parts Being Manu-
Actured to Ship (1150 Pcs) No! PPAP Approval!
they Are Now on Hold Ref Tag II'd. 1363163 & 136 3196_

Y ✓ N ___  16. Can the parts run since the last good check be traced to the producing shift and operation to
prevent reoccurrence? Comments: _____

## Gage Control/Error Proofing

Y __✓__ N ____    17. Does a calibration control system for manual gages exist?  Comments:_____
_____

Y ____ N /A    18. For automatic inspection stations, does a verification / calibration plan exist?  Comments: __
_____

Y ____ N /A    19. Is there evidence of compliance?  Comments: _____
_____

Y __✓__ N ____    20. Are gages labeled with calibration status?  Comments: _____
_____

Y __✓__ N ____    21. Are the required gages available at the point of use?  Comments: _____
_____

Y __✓__ N ____    22. Are they easy to use repetitively?  Comments: _____
_____

Y ____ N __✓__    23. Do gages have adequate repeatability and discrimination (Gage R & R)?  Comments: _____
NO GAGE R+R'D FOUND
_____

Y ____ N /A    24. Are variable gages used where necessary (i.e. KPC's) for tracking common cause variation?
Are attribute gages used where appropriate (i.e. 100% containment of special cause variation)?
Comments: _____
_____

Y ____ N __✓__    25. Is error-proofing employed and implemented according to the PFMEA and process control
plan?  Comments:    No PFMEA FOUND , No Control
PLAN FOUND
_____

Y ____ N /A    26. Does the machine logic prevent non-conforming parts from reaching subsequent operations (is
it effective)?  Comments: _____
_____

Y ____ N /A    27. Are error proofing devices checked periodically for proper function?  Comments: N/A
_____

Y ____ N /A    28. Are Error Proof verification masters included?  Comments: N/A
_____

Y ____ N /A    29. Are the error proofing devices re-verified following P.M., etc. and is the frequency of error
proof verification identified in the work instruction?  Comments: N/A
_____

## Handling of Reject/Suspect Material

Y ___ N ✓ 30. Does the process control plan contain a reaction plan for nonconformances?   Comments:___
*No Control PLAN Found*

Y ___ N ✓ 31. Does the reaction plan have containment and corrective actions?   Comments:_____
*NO Control PLAN Found*

Y ___ N ✓ 32. When a part out of spec/control limits is identified as a result of the Control Plan, Pre-Control or SPC, is this condition properly managed within the organization (Action Plans, Assigned Responsibility, Progress Monitoring, and Containment)?
Comments: *CAN't Comment No! Documents to Review*

Y ___ N ✓ 33. Do problems, including out of spec./control limits, quickly get communicated to people that can help? Comments: *No Documented Records to Review — CAN't Comment*

Y ___ N ✓ 34. Does information, including out of spec./out of control conditions, get passed across shifts?
Comments: *Can't Comment — No Records to Review!*

Y ___ N ✓ 35. Does the support system respond to the operator? Comment: *No Comment What Support System!??*

Y ✓ N 36. Are controls in place to isolate incoming material until it has been approved?
Comments: *Some what!! NEEDS improvement*

Y ___ N ✓ 37. Are all non-conforming products (in-process and finished) properly quarantined and/or scrapped? Comments: *Just put in place a Quarantine Area.*

Y ___ N ✓ 38. Is the suspect / scrap data recorded? Comments: *Not! Always — Scrap Data Could Not BE Found, Reject log for Incoming Mat'l only Recorded Some times — Last Date Recorded 5 Jan.*

Y ___ N ✓ 39. Is there evidence that the data is used? Comments: _____

Y ✓ N 40. Is it likely that a suspect / scrap part will be reintroduced into the normal process flow?
Comments: *Tagging & Record keeping Less than Desirable*

Y ___ N ✓ 41. Are suspect / scrap containers available at each operation? Comments: _____

Y ___ N ✓ 42. Is the use of these containers defined in the operator work instructions? Comments: _____
*No Operator Instruction on Job!*

Y ___ N ✓    43. Are the containers properly sized and identified for visual control (color coded, etc.)?
             Comments: _____

Y ___ N ✓    44. Does the supplier proactively revert to their Early Production Containment Plan should
             problems arise? Comments: _No Control Plan Found_
             _____

*Note: All these question recieve a "NO" answer since no work instruction was on job.*

## Work Instructions (Optional Detail)

### 45. Work Instruction - Start/Stop
**(Explains how to start-up, run, and shutdown equipment safely)**
- If Start/Stop procedure is not followed correctly, is there a negative impact on product quality?
- Do they exist?
- Do they have the correct content?
- Does it tell how to do a 'cold' start-up?
- Does it tell how to shut equipment down?

### 46. Work Instruction - Run
**(Standardized method of performing work)**
- Do they exist?
- Are they posted in front of the operator?
- For automatic stations, are they posted appropriately?
- Do they have correct content?
- Are they short, simple, and easily understandable?

### 47. Work Instruction - Setup/Changeover
**(Requirements for set-up, changeover, and start/end of shift)**
- Do they exist?
- Are they readily available?
- Does everyone who needs then know where to find them?
- Do they have the correct content?
- Are they short, simple, and easily understandable?
- Is it identified who is authorized to do what?
- Is setup inspection/verification method identified?
- Is proper disposal of set-up parts defined?
- Do instructions insure correct feeder parts are being assembled?

### 48. Work Instruction - Control & Gaging
**(Control checks for 'important' product and process characteristics)**
- Does it exist for both product and process?
- Is it posted in front of the operator?
- For automatic stations, is it posted appropriately?
- Are all required checks included?
- Are frequencies appropriate for process capability levels?
- Are they short, simple, and easily understandable?
- Are responsibilities for checks clearly defined?
- For automatic stations, do they tell operator/jobsetter what to do with part(s) in station when auto sequence is interrupted and how to restart?
- Is proper disposal of suspect/scrap parts defined for attended and unattended stations?

- Are Error Proof verification checks included?

## Training (Optional)

49. Is a training plan written and training materials available?  Comments: _____
TRAINING PLAN WRITTEN - NOT WELL USED PER
OPERATORS ON FLOOR + MY QUESTIONS TO OPERATORS

50. Are operators, jobsetters, etc. familiar with the training plan?  Comments: _____
MOST STATED NO OR NOT SURE

51. Is the training formalized?  Comments: _NO_____

52. Does the training have suitable content?  Comments: _NO_____

53. Does the plan address transfers, absences, etc.?  Comments: YES_____

54. Does the plan address the need for additional training due to product / process
changes or improvements?  Comments: NO_____

55. Does the plan recognize the need for retraining if a trained operator has not run a job
in a long time?  Comments: NO_____

---

## Additional Comments/Recommendations

---

**Overall Subjective Ranking:**   ☒ Red     ☐ Yellow     ☐ Green

**Follow-Up Date:** ___TBD-_____     ☐ None Required

## *PRODUCTION PROCESS REVIEW*

# RESULTS SUMMARY

**SUPPLIER:** _HE Services (SAG.)_

**DATE OF PROCESS REVIEW:** _3/26/02_

**S.Q.E. :** _Sybil Chernek_    **OTHERS:** _____

**STATUS (Circle one)\*:**    [RED]    [YELLOW]    [■■■■]

**PROCESS RESULTS:**

A)    NONE - ReJected - No Documents to use AS A Standard to Verify Process

**ENGINEERING ISSUES:**

B)    THE SAME AS Item "A"

**SYSTEMIC CONCERNS:**

C)    THERE IS NOT A System @ HE Service Washington Rd. "See Attachment", This HAS A ON Going Problem For Over 1½ Yrs. AND No Improvements to date! Please See Attachment #1 - For HE SAG. Status As of MR. 26, 02

This location Currently in CS2 As of failure On 3/22/02 Audit.

Sybil Chernek
Delphi AQE/SQE
26MR.02
989-284-1385

# PRODUCTION PROCESS REVIEW

## Suggested guidelines for Red, Yellow, & Green rankings

 **(Institute Controlled Shipping)**

- KPC's, CQC's, or other **not** being monitored for statistical control.
- Substantial number of nonconformances to the process review which are deterrents to an effective quality system.
- Any non-compliance to the following questions that would probably result in a non-conformance being shipped to Delphi or Delphi's customers. (Questions 1,8,10,18,19,26,31,36,40 are major quality process requirements)
- Any noncompliance subject to the judgement and experience of the S.Q.E., which would result in a major failure of the quality system and/or non-conforming product being shipped to Delphi or Delphi's customers.

 **(Corrective action plans required within 30 days)**

- KPC's, CQC's, or other monitored but no reaction to out of control conditions or, control limits not established for KPC characteristics.
- Work instructions are not linked to the control plan. Items on the control plan should have specific links to specific instructions of the controlling characteristics.
- A number of nonconformances to the process review that are not likely to result in Delphi or one of its' customers receiving nonconforming product, but improvements within the quality system are recognized.

**(Process in control, action plans as required)**

- KPC's are being effectively monitored and controlled.
- Minor noncompliance in part of the suppliers quality system.
- Confidence by the S.Q.E. that the supplier will not ship known nonconformances to Delphi or its' customer.

# PRODUCTION PROCESS REVIEW

## Suggested guidelines for Red, Yellow, & Green rankings

### ██████ (Institute Controlled Shipping)

- KPC's, CQC's, or other **not** being monitored for statistical control. *N/A*
- Substantial number of nonconformances to the process review which are deterrents to an effective quality system.
- Any non-compliance to the following questions that would probably result in a non-conformance being shipped to Delphi or Delphi's customers. (Questions 1,8,10,18,19,26,31,36,40 are major quality process requirements)
- Any noncompliance subject to the judgement and experience of the S.Q.E., which would result in a major failure of the quality system and/or non-conforming product being shipped to Delphi or Delphi's customers.

*Dock Audit Reject log*

### YELLOW (Corrective action plans required within 30 days)

- KPC's, CQC's, or other monitored but no reaction to out of control conditions or, control limits not established for KPC characteristics. *N/A*
- Work instructions are not linked to the control plan. Items on the control plan should have specific links to specific instructions of the controlling characteristics.
- A number of nonconformances to the process review that are not likely to result in Delphi or one of its' customers receiving nonconforming product, but improvements within the quality system are recognized.



### ██████ (Process in control, action plans as required)

- KPC's are being effectively monitored and controlled. *N/A*
- Minor noncompliance in part of the suppliers quality system.
- Confidence by the S.Q.E. that the supplier will not ship known nonconformances to Delphi or its' customer.

*Attachment #1*

**Phase III - Analysis and Report** A review of the findings of the first two phases is used to determine supplier conformance to *QS-9000*.

## Audit Summary Alternatives

The auditor/customer will determine which of two alternatives will be used to summarize audit findings:

- Recommended/not recommended
- Variable score

Each of the elements may be classified in one of two ways, depending on the customer's requirements:

- As a "conforms" or "minor/major nonconformance" status for that element.
- As a 0 to 10 point rating for the element, see Evaluation Process for Using a Variables Score Method.

## Definitions

**A MAJOR NONCONFORMITY** is either:

- "The absence" or total breakdown of a system to meet a *QS-9000* requirement. A number of minor nonconformities against one requirement which when combined can represent a total breakdown of the system and thus be considered a major nonconformity.

- Any noncompliance that would result in the probable shipment of a nonconforming product. A condition that may result in the failure or materially reduce the usability of the products or services for their intended purpose

- A noncompliance that judgment and experience indicate is likely either to result in the failure of the quality system or to materially reduce its ability to assure controlled processes and products.

**A MINOR NONCONFORMITY** is a QS-9000 noncompliance that judgment and experience indicate is not likely to :

- result in the failure of the quality system, or
- reduce its ability to assure controlled processes, or
- result in the probable shipment of nonconforming product.

2

Attach Meet #2
62 of 99

Audit Summary for                    3/26/02

3/26/02 - Flange Asm.

1) - no Work Instructions pasted @ job, operator stated she does not know where they are she hasn't had any since last summer.

2) Operator not trained and/or signed off on work instructions

3) no gage instructions - Operator did not use Calipers properly - she did not "Zero" Out before use, then when I explained She needed to Zero Out she did "Once" and then made 6 to 7 checks before I explained again you must "Zero" Out each time.

4) Operator using wrong inspection Chart for 7818568 Flange she was using Chart for 7815986 she had been using this Chart for 2 to 3 days, since she started the build.

5) Chart needs up dating if the added readings are to be recorded. (SEE ABOVE)

6) Could not find a Flow, PFMEA and Control Plan for this part Number

7) "NO" PPAP Approval was found for this part no. and it "Was not" Covered On any of the Warrents. The parts Have been Put on Hold until all documents are Complete & I approve them! SHIPPING WITHOUT PPAP.

8) Charts in use On Factory floor
not being Completed as req'd these
were falled Submitted for filing with
Only Part No, date and Signed.

9) Flanges & Lock Modules in CS1 the
required Paper work not submitted
to the SOE since day I I have
ask for this several times. (ALMOST 1 YEAR)

10) Flanges stored in a regular Card board
Box under ASM. table rejected tag On
them but Also displayed a "OK" certified
tag. (improper Container & tags Only 1 tag
to Container)

11) Work/ASM Carts are Very! Very! "dirty"
Bottom of Cart has unidentified parts
On it.

12) Procedures given to me On Friday
Mar. 22, 02. Audit did not and
does not Match the Master Book
in the Document Control Center.
the Procedures found in the Doc Center
are the Ones that has been cited by
Delphi as insufficent @ the begening
of 2001 the Ones that was given
to me On the 22 MR 02 was the
Current up dated Ones. that Was
Completed in the time frame of My
June, July by Paris Rogers these were
retained in a green folder On Top
of the file Cabinet Out Side Tom
Nienks office Also several Procedures
was falled in the Computer @ Tom's
Plant that don't Match Master Book.



13) The Master Procedure Book did not have a table of contents you could not tell what was suppose to be there, or what was or has been deleted and when.

14) Internal Audits for 2001 could not be found in the Doc. Center

15) QS9000 Audits for 2001 and 02 Could not be found in Doc Center

16) The INTERNAL Audit Schedule was not on hand for review the Corp. Quality Manager Stated it was on his Computer @ the Flint Office and was locked in his Computer by a code. The Audit Schedule Should/Shall be on hand and posted for Review On site @ ALL times.

15) Charts/forms that are to be Controlled are not there several Versions On the floor @ Anytime and these don't match the Master book.

16) 75% Of the Master forms/charts in the Book are not used @ least Can not be found filed in the Document Control Center - these Must be used to fuel fill QS9000 requirements since the Procedures in many Cases are Vague or non existent.

17) The records, Books ect. that are to be Contained in the Document Controll

Center needs Attention ASAP. The entire
DOC Center is in a State of ~~disarray~~
disarray.

18) no records Could be found stating
Who the Certified internal Auditors
were

19) Tom's Plant don't really know Where
Quality records/Procedures are kept
Or What status Quality items are in.

20) Please Read Attachment I After
reviewing this report and you will
understand why you are in a
"MAJOR NONCONFORMITY" STATUS AS
THE ABSENCE OF OR Total BreAKDOWN
OF A SYSTEM to MEET A QS9000/Customer
ReQuire MENt.

21) ON 8-24-01 HE WAS REQUESTED TO UPDATE PFMEA, Control Plans,
PROCESS FLOW & WORK INSTRUCTIONS AS A RESULT OF A QUALITY SPILL AT
FORD. AS OF TODAY THIS UPDATE                    Thank You,
IS FAR FROM BEING COMPLETED. No WORK
INSTRUCTIONS ARE ON THE JOB.         Sylvil Chernek
                                     Delph AQE/SQE

                                     phone 989-757 3325
                          OR    Cell  989-284-1935

# EXHIBIT I

**DELPHI**

Automotive Systems

Mr. Robert Backie                                                    31 MR 02
H E Services
5117 S. Dort Hwy.
Flint, MI 48507

Subject:                **CONTROLLED SHIPPING NOTIFICATION - LEVEL 2**

Dear Mr Backie:

      It has come to our attention that the quality of your products shipped to our facility are falling substantially short of our specifications. We have determined that you have lost control of your process and we believe you currently lack the capability to isolate our plants from further discrepancies. We have, therefore, decided to implement Level 2 Controlled Shipping which requires you to bear the expense of a third party inspection company for containment and reinspection of your products until you re-establish suitable process control and quality systems..

The following part number(s), produced by your facility (Mfg. DUNS # 007034445) are unacceptable for use at Delphi Saginaw Steering Systems Plants 3, 6 , 7 & 33 at their current quality level:

| Part Number | Part Name | Problem |
|---|---|---|
| All Part Numbers Manufactured at this facility | Assemblies | Total breakdown of quality systems |

      The third party's responsibilities will be to inspect your production parts and provide data for you to utilize in your root cause analysis. The inspection has two purposes:

- First, it will isolate our plants from nonconforming material.
- Second, it will provide your operating people with the actual discrepant parts and shorten the feedback loop to enhance corrective action efforts.

A meeting will be held at your Flint facility on 4/3/02 at 3 p.m. to outline containment requirements and documentation required. At that time exit criteria will be established.

You are instructed to notify your QS9000 registrar that you have been placed in Level 2 Controlled Shipping and provide evidence at the meeting on 4/3/02.

      Thank you for your immediate attention to this matter. If you have further questions about this procedure, please contact me at (989) 757-2959 or fax at (989) 757- 1048.

Sincerely,

Diane Fries
Director of Supplier Quality

| c.c. | Bill Vance | John Riester | Mark Johnston | Dale Kowaleski |
|---|---|---|---|---|
| | Steve Dawe | Bill Bringer | Mike Howerton | Brian Darling |

# CONTROLLED SHIPPING CONFIRMATION REPLY

**TO:**      Sybil Chernek
Delphi Saginaw Steering Systems
3900 Holland Rd.
Saginaw. MI 48601

**FROM:**   H E Services
SUPPLIER DUNS NUMBER  007034445
5117 S. Dort Hwy.
Flint. MI 48507

We acknowledge receipt of your letter dated. _____ advising us that our above facility has been placed in:  (check those that apply)

         ☒   Controlled Shipping Level 1
         ☒   Controlled Shipping Level 2

☐   We understand the containment process requirements.
☐   We do not fully understand the containment process requirements.   Please
     contact:_____ (Name of contact)
     _____ (Telephone number)


Following is a description of how conforming parts and shipments will be identified to indicate that they have been qualified as conforming to requirements.

_____
_____
_____
_____
_____
_____

The containment activity will be performed at the following location:

_____
_____

The person responsible for the containment activity:
Name   _____
Phone  _____


_____      Date: _____
(Signature of person responsible for containment)

heacknowltr                                                          12/1/99

# EXHIBIT J



**DELPHI**
Automotive Systems

**memo**

Date:     06AU02

To:       S. Chernek          D. Timma          T. Mienke
c.c.      D. C. Cook          S. Caird

From:     G. Gerrish   T. Maurer

Subject:  Residue on 26045841 Pump Housing - Visit to HE Services to Review Cleaning Process

A visit was made to HE Services to try to determine the cause of a "sticky" residue on pump housing that are sent to Prince for assembly. During review of the washer and conversation with Tom Mienk, the Plant Manager, the following observations were made:

1. <u>In general, adequate maintenance of this washer was neither being performed nor documented.</u> The maintenance procedure and data sheets need to be revised to reflect the corrective actions and to comply to basic quality record requirements per QS-9000.

2. The washer appeared to need cleaning, based on condition of the wash and rinse tanks, as well as the presence of a sticky residue on various components of the track and vent. Also, according to Tom Mienk, the last time the washer was drained, cleaned, and recharged was last September.

3. Records of wash and rinse tank concentrations were incomplete:
   - Checks were not recorded every day
   - No checks were recorded since 19JL02
   - All checks in the wash tank were recorded at 3% and all rinse tank concentrations were recorded at 2.5%, with no readings recorded of the concentration before additions (assuming the recorded readings were taken after additions)
   - There were no specifications identified on the data sheets.

4. There is no record of when additions were made, or how much cleaner was added.

5. There were no weekly temperature checks recorded.

Based on these observations and further discussion, the following action items will be taken by Tom Mienk:

1. The washer will be drained, cleaned, and refilled at a minimum of quarterly intervals, beginning with today.

2. Washer concentration checks will be recorded before and after additions (when necessary) daily. If the washer is not running, N/R will be noted on that date. Amount and date of additions will be noted on the sheets. Copies of these sheets will be obtained by S. Chernek for the next two weeks for review by the Delphi Metallurgy Department.

3. The weekly temperature checks will be performed and recorded.

In addition to the preceding corrective actions, samples of the wash and rinse tanks were taken to determine the concentration in the washer during this problem period. Delphi Metallurgy will evaluate these samples.

EXHIBIT K

Steve,

Just a quick summary supporting the move of the LH Side Cover (26063061) from H.E.
Services to Madison-Kipp.

As you can see from the letter addressed to me, from Sharon Mobry of Madison-Kipp
dated Aug. 13, 2002, quality was a huge issue. Madison-Kipp supplied the casting to
H.E. Services who was to machine it and press in a bushing and ship to Delphi. The
second paragraph of the letter explains that Madison-Kipp wanted to take on the
machining as well, due to H.E. Services lack of ability to machine the part correctly
resulting in product being returned to Madison-Kipp. This obviously was costly to
Madison-Kipp.

The second issue was price. Madison-Kipp produced the casting for a cost of  **REDACTED**
H.E. Services machined that casting and pressed the bushing in for $.827 ea. Making the
total cost of the Side Cover $2.527.

I had approached H.E. Services both on quality and the cost penalty. H.E. Services had
many opportunities to reduce cost and improve quality, to make the product more
competitive and retain the business. They were unable to accomplish this therefore, the
business was moved to Madison-Kipp.

                                                              Steve Burk

## Burk, Steve

| | |
|---|---|
| **From:** | Mobry Sharon [smobry@madison-kipp.com] |
| **Sent:** | Tuesday, August 13, 2002 3:30 PM |
| **To:** | Burk, Steve |
| **Cc:** | Johnson Robert; McNulty Craig; Jerry Lawicki; Sholl Gary; Wojdak Joe |
| **Subject:** | Cost Reduction for part 26063061 |

Steve,

Confirming your phone conversation with Jerry Lawicki on Monday, August 12, 2002, Madison-Kipp Corporation is prepared to offer Delphi Saginaw a price on part 26063061, LH Side Cover of          **REDACTED**          RH Side Cover to cover the cost of the tooling change to reverse threads on the LH Side Cover.

Madison-Kipp Corporation can no longer accept the exorbitant cost of taking product back that HE Services can't machine correctly.  Their CNC machining centers do not perform all the operations required to machine all features as is done by the MKC dedicated machining center.  The unwillingness of HE and Delphi to address this problem over the past year has been unsatisfactory, and MKC will no longer accept parts back and perform the remaining operations.  All this time MKC has absorbed transportation costs back to MKC and performed the rework at no cost to Delphi.  MKC management specifically requests you award this business to MKC effective September 1, 2002.

MKC offers the above price for 100% of the business, currently estimated at 183,000 pieces per year.  MKC has the capacity, prior operations instructions, prior quality instructions, and can take over the business upon approval. If you have any questions, please call me or contact Jerry upon his return from vacation on August 19th.

Regards.
Sharon Mobry
Madison-Kipp Corporation
Phone:  608-242-5272
Fax:     608-242-5284
Email: smobry@madison-kipp.com <mailto:smobry@madison-kipp.com>

1

# EXHIBIT L



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan 48601

April 24, 2003

Robert Backie
HE Services
5117 S. Dort Hwy.
Flint, MI 48507

Dear Mr. Backie:

Reference: Mfg. DUNS: 007034445

This letter is to notify you that HE Services appears on the Delphi Saginaw Steering Systems Top Problem Supplier List for the month of March. HE Services must focus immediate attention to containing and irreversibly correcting the source of the quality issues. The inclusion of HE Services on this list is the direct result of parts not banded properly for shipment, causing 3 trays to be scrapped out, also, mistagged part.

Information concerning the suppliers appearing on this list is communicated across Delphi Corporation and receives high-level visibility and reviews. Removal from this list will occur only as the result of sustained quality improvement. Failure to resolve the quality issues within a timely manner will affect future sourcing decisions and current Delphi Corporation business with HE Services.

If additional help is required from Delphi Saginaw Steering Systems, please contact your Delphi Saginaw Steering Systems Supplier Quality Engineer, Sybil Chernek at 989-757-3325. Please acknowledge in writing the receipt of this letter and the actions HE Services will be taking to address the quality issues described above. Your prompt attention to the quality issues is appreciated. If you have any questions, please call me at 989-757-4904.

Sincerely,

*Leisha McKay*

Leisha McKay
Supplier Quality Manager
Delphi Saginaw Steering Systems

cc: Diane Fries, Beverly Gaskin, JP Sexton, Sybil Chernek, Jeff Uhl

# EXHIBIT M



**DELPHI**
Automotive Systems

## Price Increase Follow-Up

| | Division | Old $ | New $ | $ Inc. | % Inc. |
|---|---|---|---|---|---|
| Supplier: H.E. Services | DE&C | | | $0 | 0.00% |
| Mfg. Location: Saginaw, MI | DDELCO | | | $0 | 0.00% |
| Parent Corporation: H.E. Services | DHTS | | | $0 | 0.00% |
| Contact: David Stearns | DILS | | | $0 | 0.00% |
| Title: Account Manager | DPES | | | $0 | 0.00% |
| Telephone: (989)753-9015 | DSSS | $509,172 | $664,693 | $155,521 | 30.54% |
| Fax: (989)753-7703 | | | | $0 | 0.00% |
| Contract Expiration: 12/31/2002 | | | | $0 | 0.00% |
| Notification Date: 2/25/2002 | | | | $0 | 0.00% |
| Buyer: Dale E. Kowaleski | | | | $0 | 0.00% |
| Commodity Manager: Steve Dawe | | | | $0 | 0.00% |
| Commodity Director: Pat Murtagh | *Total:* | $509,172 | $664,693 | $155,521 | 30.54% |
| Commodity Team: Assemblies | | | | | |

**Supplier Cost Savings History:**

| Year | % |
|---|---|
| | |
| | |

**Cost Breakdown**

| % Mat'l | % Labor |
|---|---|
| | |

Chemical ☐   Electrical ☐   Metallic ☑

Description: _____

| Action | Date | Comments |
|---|---|---|
| Refuse Request | 2/25/2002 | |
| Obtain Documentation | | |
| G/S | | |
| Move Business | | |
| A/P Leverage | | |
| Short Term Strategy | Lean | |
| | Resale | |
| | Mat'l Chg. | |
| Reviews | Pur. Dir. | |
| | Com. Dir. | |
| | VP | |
| DGP Staff | | |
| Final Disposition | | |

Notes:
1. Final documentation should be an approved action plan. (Supplier negotiation or Global sourcing)

EXHIBIT N

PREPARED BY 54Bil
DATE 4/9/02

HE Service Mtg -          10:30 AM.

Topic: Moving of all jobs From HE Services, Washington Rd Saginaw Mich due to total Break down of Quality System

- Mr. Backie Stated while in the Main Lobby awaiting for Some one to pick him and his other personnel that if the Scheluded mtg was about Quality he was not going to Attend, I told him I did not know what all the mtg was about.

Start of Mtg.
Mr. Backie Stated he was not interested in talking about Quality unless he was Awarded a pc. price increase

Mr. Backie Stated he Quoted 9/10 jobs this past year and Only got 3/4 out of those.

Mr. Backie Stated he just gave $279,000.00 rebates and his bank doesn't like what its Seeing.

PREPARED BY: SYBIL
DATE: 4/9/02

In regards to the Moving of the equipment from HE Washington. Jag ke (Mr. Backie) was not interested unless he get's a Pc price increase And Delphi would pay for all equip-ment moves.

Mr. Backie Stated Againg he had been kicking around the Quality Issue's and there would not be a Quality System w/out a price increase he stated he goes to the mtg's in Detroit & Troy and he knows whats going on and that Delphi's pricing is not Correct and that he really doesn't want our "Piddley" Asm jobs. He wants Hi-Tech jobs and that he just got 2 "Big" jobs from Chrysler that he Can make money on.

Mr. Backie Stated Again. he will decide when the Price increase is offered if he keeps the jobs are not.

Mr. Backie Stated he will go and talk to Bill Loyd and

PREPARED BY Sybil
DATE 4/9/62

J. T. Battenberg that he Sits On Boards With Our "Hi-up's" And Again he knows what is going On.

Mr. Backie expressed in detail Loud & Clear how unhappy he is And has been With Delphi and that Again his bank don't like What they See.

he departed Awaiting a Answer from Delphi.

Sybil Chernek
Delphi AOE/SOE

Sybil
4/9/02

Backie HE Mtg.

mtg - Troy - he know whats going
on.
9/10 Jobs = Only Have 3/4 Jobs. Out of those
$279 000.00 - rebates to Tech Central

① Move Equip - who pays?
② do all drop lines
Piddley ③ Kicking around Quality =
Got 2 New Jobs w/ Chrysler -
he goes to Mtg in Det. 4 listen

Say. is Your Pe. Price Correct - ??

Proper Pricing
What Price
will decide if they Keep it.
Dont Want to do ASM. per. Backie

$18,000°° Putting error proofing =
Bill Loyd - Battenberg will
go talk to them.
Hiel Rd. Fenton =

not suppose to go out on Bid

EXHIBIT O

# H.E. SERVICES COMPANY

**225 E. Morley Drive - Saginaw · MI · 48601 · (517) 753-9015 - fax (517) 753-7703**

October 9, 2002

Steve Dawe
Purchasing Department
Delphi – Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan 48601

Re:    **Purchase Orders Renewal/Cancellation Intent**

Mr. Dawe,

This letter is documentation and follow-up regarding a meeting held at your location on October 8, 2002. I presented you with information on H.E. Services historical actual volumes compared to quoted volumes supplied by Delphi Saginaw Steering Systems Purchasing. I had also discussed break-even analysis and how volume impacts profit and loss. H.E. Services is operating at a significant loss on programs where actual volumes are only 0% - 40% of quoted volumes.

| Program | Quoted Volume – YTD | 2002 Actual Volume – YTD | % of Quoted Volume |
|---|---|---|---|
| Outer Tie Rods | 18000 | 0 | 0% |
| Bearing Holder | 135,450 | 31,500 | 23.3% |
| Flange Coupling | 46,080 | 13,700 | 29.7% |
| Support Housing | 53,100 | 16,980 | 32.0% |
| Jack Screw | 45,900 | 19,308 | 32.7% |
| Dia Size Pumps | 315,000 | 117,629 | 37.3% |

H.E. Services had submitted price increases on these programs back on February 25, 2002 as a result of the non-materialized volumes. All of the programs where price increases were submitted have contracts that expire on 12/31/02. I stated in that meeting that our company would not renew these contracts under the given pricing structure. You stated that you would not grant the price increases due to budgetary concerns. It was decided by you to resource the business covering these programs. Furthermore, you decided that you would resource all of the business that you hold contracts with at the Universal Manufacturing Division of H.E. Services. Some of these programs have multi-year contracts. H.E. Services is not in agreement with cancellation on any program that has a multi-year, agreed upon, contract. H.E. Services does not want to be punished for making a sound business decision for cutting severe losses.

I am requesting that you identify which jobs and/or purchase orders you are considering or planning to cancel or not renew with H.E. Services. In addition, I need a detailed timeline and plan for each program. Please respond as soon as possible. H.E. Services has been a dedicated minority service supplier to your organization for over sixteen years and has provided top quality manufacturing services while never missing a delivery. H.E. Services understands Delphi's commitment to assist and foster minority supplier business development and growth.

Sincerely,


David Stearns
V.P. – Manufacturing

Cc: Robert Backie, Duane Bolinger


SteveDawe100902.doc

# EXHIBIT P



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan  48601
December 6, 2002


H.E. Services
Attn:  Mr. David Stearns
225 E. Morley Drive
Saginaw, MI  48601


Dave:

As a follow-up to the meeting that Steve Dawe and I had with you and Tom Mienk on Wednesday, December 4th, I wanted to reiterate Delphi's intent to extend our current purchase orders with H.E. Services up through and including March 31, 2003.  Based on a discussion that took place in a previous meeting, it was mutually agreed upon that the business be resourced since H.E. Services could no longer produce these parts at the current contract price and Delphi Saginaw could not accept the price increase that was being proposed.  Note that we are aggressively pursuing this resourcing in compliance with our conversation and, therefore, the contract extension will be submitted at the current contract price foregoing any additional premium costs that were proposed for this period of time.

Best Regards,


Dale E. Kowaleski
Senior Buyer-Assemblies
Delphi Saginaw Steering Systems

# EXHIBIT Q



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan  48601

June 4, 2003

H.E. Services Company
Attn:  Patrick Harmon
5117 S. Dort Highway
Flint, MI  48507

Pat:

As we continue to move forward in the process of resourcing the business that Delphi Saginaw currently has with H.E. Services (both in Saginaw and Flint), we need to insure that previous commitments made by Delphi Saginaw to our customers remain intact.  From a delivery standpoint, much emphasis has been placed on the bank build and availability of parts as we go through the validation process.  These efforts to build this bank cannot be compromised.  The bank-build quantities that we've established through the issuance of spot-buy P.O. #9FI4771 must be fulfilled by June 27, 2003.

With respect to quality, an obligation remains for H.E. Services to meet the standards outlined by Delphi Saginaw for all parts in the system for which they have had manufacturing responsibility.  This responsibility for quality and liability of all said parts will extend until all of these parts have been exhausted through the Delphi Saginaw system.  In order to distinguish between suppliers, these parts processed by the new supplier will be marked for identification.

Thank you for your continued cooperation and support as we work toward completion of this project.  If you have any questions pertaining to this correspondence, please contact me immediately.

Best Regards,

Dale E. Kowaleski
Senior Buyer-Assemblies and
Remanufactured Components
(989)757-6009ph
(989)757-5983fx

CC:  Garrett Backie
     Diane Fries
     Leisha McKay
     **Terry Wirsing**
     Steve Dawe
     Sybil Chernek

EXHIBIT R



Delphi Saginaw Steering Systems
3900 Holland Road
Saginaw, Michigan 48601

April 2, 2003

To:  J.P. Sexton, Terry Wirsing

From:  Dale E. Kowaleski

RE:  Lock Module Resourcing Summary/Overview of Prince Mfg (Delphi Saginaw Plant 33)


HE Services (HES) originally came to Delphi in March 2002 proposing a price increase that amounted to $155,000. This increase affected six of the eleven 'product families' that they assembled for Delphi. The price increase was fought off by Delphi until October 2002 when a meeting between both parties resulted in a mutual agreement whereby stating that neither party could continue on under the current business agreement. Delphi advised HES that they would begin to resource the business immediately. HES expressed their willingness to retain the 'families' that were viewed as financial winners. Delphi stated it was all or nothing and we continued on with our resourcing exercise.

 The Assembly Commodity Team (ACT) provided a bid list of four suppliers to Saginaw. All four of these suppliers held minority status. Prior to the initial technical review, one of the four suppliers dropped out. Of the remaining three, only Mariah demonstrated a legitimate effort in working toward meeting our targets throughout multiple rounds of negotiations and provided out year price reductions as well. Even though their efforts identified them as the best of the suppliers from the ACT bid list, Mariah's pricing was still in excess of 30% higher than the prices we are currently paying through HES. At this point no one from the original bid list was competitive.

Prince Mfg (Plant 33) is a dedicated Delphi Saginaw facility located in Oxford, MI. In the 1st Quarter of 2001, they were chosen to take over the assembly of all TC Pumps (both Service and Production) manufactured by Delphi Saginaw. This line was transferred from Delphi Plant 21 in Alabama to Prince Mfg beginning in May 2001. As a dedicated facility, they have access to all Delphi IS&S and PC&L systems and are responsible for their own quality to other Delphi plants and/or customers.

A group from Saginaw Purchasing visited Prince Mfg's plant on Wednesday, February 5th to review the process improvements they had made to their facility as well as to Delphi-owned equipment. In attendance were Steve Dawe, JP Sexton, Duane Bolinger and Dale Kowaleski. Due to the success that was demonstrated by Prince, along with the significant gains that were made in transforming a losing TC Pump program into a winner, a decision was made at this meeting to identify new business opportunities for Prince Mfg. It was agreed that we would benchmark them on all remaining assemblies being resourced from HE Services. From the standpoint of economics, we felt we could leverage any open payment issues with the prospect of potential new business on the horizon. Upon receiving their responses back after multiple rounds of activity, we were pleasantly surprised to find Prince Mfg to be most competitive coming in with prices that represented a savings to those which we were currently on contract with HES. Prince's pricing resulted in a savings of approximately 17%.

Prince Mfg's capabilities include column and pump assembly, painting operations, column sequencing as well as pump housing machining. The majority of the work that they currently perform for Saginaw relates to the machining and assembly of TC Pumps. Long-range considerations include the transfer of assembly for S4 and P&N Pumps from Delphi Saginaw Plant 3 .

Our timeline for moving entirely out of HES is May 1, 2003. While this date has moved several times, the supplier has been very clear that this timing is now firm. We have prioritized the order in which we're moving the families of parts to Mariah. In order to build an adequate bank of parts prior to the moves, HES has indicated that they would need to utilize the manpower currently associated with lock module assembly. Due to the tight timing we're faced with, we will need to free up this manpower by finalizing the lock module resourcing allowing the build-ahead of other assemblies to occur.

# EXHIBIT S

# RECOMMENDATION SUMMARY

**Reporting Date:**    15-May-2003    15:39:04

**Buyer Name:**    ROUECIL, KARRIE

**Activity/RFQ Project ID:**    70846

**Activity Type:**    GLOBAL SOURCING

**Total Cost (NPV):**    1,805,087

**Currency:**    USD

| Year | Comparison APV | Recommended APV | Calendar Year Savings (Parts only) | Tooling Cost < or = Costbook | Savings % (Parts only) | Part Numbers |
|------|----------------|-----------------|------------------------------------|------------------------------|------------------------|--------------|
| 2003 |  |  |  |  |  |  |
| 2004 | REDACTED |  |  |  | REDACTED |  |
| 2005 |  |  | REDACTED |  |  |  |
| 2006 |  |  |  |  |  |  |
| 2007 |  | REDACTED |  |  |  |  |
| Totals |  |  |  |  |  |  |

| Recommended Supplier Name/ DUNS Number | PPM | Top Problem Supplier | QS9000 Status/ Date | # Parts Recomm- ended | Part Numbers |
|----------------------------------------|-----|----------------------|---------------------|-----------------------|--------------|
| SPX CORP 053669594 | 79 | NO | QS9000 12-Sep-2005 | 2 | 26063655, 26103560 |

| Recommended Contract Types | Regions | Divisions |
|----------------------------|---------|-----------|
| Long Term | N | DSSS |

_KSlough_ 5/12/03
**Buyer**

_Sybil Cherwick_
**Divisional Supplier Quality**

_[signature]_ 6/2/03
**Divisional Purchasing Director**

_Clair Wintzel_ 5-20-03
**Divisional Production Control**

**Regional Purchasing Director**

_M. Domnutt_
**Divisional Engineer**
ECR Reward 5/20/03

**DGP Commodity Director**

**Commodity Team Leader/Manager**

---------  **DELPHI CONFIDENTIAL**  ---------

If a field is blank, the calculated value may be too large to display.  Contact your Divisional/Regional DGSS Primary Support for further information.

Page 1 of 1

# BACKGROUND SHEET

| **Buyer Name:** | ROUECH, KARRIE | **Planned Approval Date:** | May-2003 |
|---|---|---|---|
| **Activity/RFQ Project ID:** | 70846 | **Buyer Phone:** | 989-757-3180 |
| | | | |
| **Activity Type:** | GLOBAL SOURCING | | |
| **Activity Description:** | SUPPORT, STRG COL IISG | **Regions:** | N |
| **Savings Category:** | DGP | **Divisions:** | DSSS |
| **Commodity:** | METALLIC | | |
| **Commodity Team:** | CASTINGS | | |
| **Commodity Subgroup:** | HIGH PRESSURE ALUMINUM | | |
| **Material Group:** | HIGH PRESSURE ALUMINUM | **Total Activity APV (USD):** | $560,124 |

## SUMMARY

| | |
|---|---|
| **Current Situation:** | SUPPORT PINS ARE ASSEMBLED TO THE HOUSING AT IIE SERVICES.  DELPHI IS SEEKING TO EXIT ALL BUSINESS FROM IIE, AS THEY IIAVE REQUESTED A PRICE INCREASE. |
| **Customers:** | GM |
| **Product Lines:** | COLUMNS |
| **Activity Comments:** | CONTECII HAS OFFERED ADDITIONAL DAILY CAPACITY ON THE TWO-PIECE HOUSING OF 1,000 PARTS PER DAY IN EXCHANGE FOR THE AWARD OF THE PIN PRESS OPERATION. |
| **Activity Target %:** | 3 |
| **Quality & Engineering Functional Requirements:** | RISK ASSESSMENT & TECH REVIEWS |
| **Receiving Countries:** | US |
| **Estimated SOP Date:** | Jul-2003 |

## PURCHASING STRATEGY

SELECTED CONTECII FOR PRICE, SIIORTENED VALUE STREAM, AVOIDED $400,000 INVESTMENT WHILE GAINING NEEDED MACIIINING CAPACITY. SIGNIFICANT LOGISTICS SAVING VS. CURRENT SITUATION OR OTIIER BIDDERS.

---------   DELPHI CONFIDENTIAL   ---------

**Pin Press Savings**

**Piece Price Savings:**

|          | HE Price | Contech Price | Savings Per Piece | Volumes | Savings per year |
|----------|----------|---------------|-------------------|---------|------------------|
| 26063655 |          |               |                   |         |                  |
| 26103560 | **REDACTED** |           |                   |         |                  |

Total

**Logistics Savings:**

Logistics savings on 3,100,000 parts per year are approximately $.0952 per support and $.0034 per set of two pins. This figures out to be approximately **$305,600 savings per year**.

**Inventory Savings:**

According to Curt Dalton, the expediter at plant 6, Delphi held a two day inventory of supports at HE Services. The savings from eliminating this inventory is approximately **$96,000.**

# EXHIBIT T

The attached describes recent activity between HE Services and Delphi Saginaw Steering Systems. I will cover the points by HE locations in Saginaw, Mi.

**TechCentral:**
- Saginaw Steering spends approximately $20,000,000 with them annually
- Bob Backie sold this business in March 2004 to Troy Design

**Universal Inspection:**
- This location provides gage calibration services and sorting services
- Saginaw Steering Prototype operations purchased $528,000 in services from this location in the last year
- Universal was awarded a sorting contract on October 27, 2003 that is worth $400,000 on an annual basis
- We also do random sorting activities with an approximate value of $50,000
- Lee Lambert, who was the Manager of this facility under HE Services, has attempted to purchase the inspection services business.
- Our prototype operations will issue a purchase order to the new company for calibration after the sale is complete.

**HE Services – Morley St.:**
- Saginaw Steering has been doing validation testing at this site for 8 years
- The testing is done with Saginaw owned equipment and we pay monthly fees of approximately $150,000 which include facilities, technicians and utilities
- A decision was made in June, 2003 to insource this testing and HE Services was unofficially notified of this decision in September, 2003 (see attached engineering note on timing)
- The bundled service for personnel was to be maintained with HE Services until they announced closing of the business. This bundled service will go to Troy Design which purchased the contract employee business from HE

**Ancon:**
- Saginaw Steering Prototype operations purchased $1,268,000 in machined product from this location in the last year
- The prototype operations had an excellent relationship with Ancon. In many cases, Ancon approached us advising that they were short of work or could use additional opportunities. In every case, we have bent over backwards to accommodate them. Our Purchasing Manager directed, in some cases, that the buyer advise them of the market pricing so if they wished to match it, they would get the orders. Our buyers would also work with their management in reviewing their price performance "after the fact" so they could get a feel for where they had to be to get future work.

**It is our understanding that the Universal Inspection and Ancon facilities were profitable and we are disappointed that they are being closed. It was our intention to continue the business relationship with these divisions.**

Previously we also did business with another operation, Universal Manufacturing, which is now closed. We resourced the majority of this business to another MBE named Mariah Industries on July 1, 2003. The resourcing occurred due to quality issues and a requested price increase.

EXHIBIT U

# DELPHI

## Automotive Systems

Tuesday, July 15, 2003

| | | | |
|---|---|---|---|
| To: | PAT HARMON | From: | Dale E. Kowaleski, Senior Buyer - Misc Assemblies/Remanufactured Components |
| Company: | H E SERVICES | Email: | dale.e.kowaleski@delphi.com |
| Phone: | (810)743-4900 | Phone: | (989) 757-6009 |
| Fax: | (810)743-8400 and (989)755-0337 | Fax: | (989) 757-5983 |

Subject:   Resourcing Issues

☐ Urgent        ☐ Review        ☒ Reply

Number of Pages
(including Cover Sheet): 1

Pat:

As a follow-up to the discussion we had yesterday, here are the gage numbers (w/specifications) that are missing from the Inner Tie Rod line:

246976    203.0mm
246976    429.5mm (+/- 1.0mm)
246976    263.0mm (+/- 2.0mm)
246976    33.7mm (+/- 3.0mm)

809014    M18x1.5mm (6H thread) minor diameter of 16.89mm/16.38mm
809014    33.0mm/36.0mm

980527    3.5mm (+/- 0.5mm)

980529    30.5mm (+/- 5mm)

In addition to these missing gages, several other issues remain as a result of this business moving from Universal Mfg:

* Battery on bearing press in GMX Room became dislodged causing the program to be lost.
* Wires were cut IN panel boxes for equipment in GMX Room and Diamondsizer.
* Several wires in panel boxes for equipment in GMX Room were crossed.

Pat, we need you to look into these occurrences and respond back as soon as possible. As always, thanks for the support you've offered to us during this period of transition.

Best Regards.